# United States Court of Appeals
## For the First Circuit

———————————————

No.   24-1770

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

v.

ZHIYING YVONNE GASARCH,

Defendant - Appellant,

FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS; PAUL
SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ; AVTAR S. DHILLON;
GRAHAM R. TAYLOR,

Defendants.

———————————————

No.   24-1771

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

v.

MIKE K. VELDHUIS,

Defendant - Appellant,

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP; COURTNEY
KELLN; PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

Defendants.

No.    24-1772

—————————————————

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

v.

PAUL SEXTON,

Defendant - Appellant,

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP; COURTNEY
KELLN; MIKE K. VELDHUIS; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

Defendants.

—————————————————

No.    24-1773

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

v.

COURTNEY KELLN,

Defendant - Appellant,

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP; MIKE K.
VELDHUIS; PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

Defendants.

No.    24-1774

_____

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

v.

JACKSON T. FRIESEN,

Defendant - Appellant,

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS; PAUL SEXTON; WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

Defendants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

_____

BRIEF OF DEFENDANT - APPELLANT JACKSON T. FRIESEN

_____

Dated:  February 6, 2025

By: */s/ Timothy J. Fazio*
    Timothy J. Fazio, No. 120461
    MG+M The Law Firm
    125 High Street, 6th Floor
    Oliver Street Tower
    Boston, MA  02110
    TEL:  617-670-8635
    Email:  Tfazio@mgmlaw.com

*Counsel for Jackson T. Friesen*

By: */s/ Maranda E. Fritz*
    Maranda E. Fritz, No. 1213765
    Maranda E. Fritz, PC
    521 Fifth Avenue
    New York, NY  10017
    TEL:  646-584-8231
    Email:  Maranda@fritzpc.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................i

TABLE OF AUTHORITIES................................................................ iii

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED FOR REVIEW ......................................................1

STATEMENT OF THE CASE..............................................................2

    A.    The Evidence at Trial Regarding the Q Records...................................3

    B.    The Testimony Regarding the Alleged Scheme to Fail to Make Filings Required Under United States Law ................................6

        1.  William Kaitz .................................................................8

        2.  Avtar Dhillon................................................................10

        3.  Roger Knox and Kenneth Ciapala .................................15

        4.  Communications Involving Mr. Friesen ........................18

SUMMARY OF ARGUMENT..............................................................18

ARGUMENT ...............................................................................23

    A.    The District Court Erred in Holding That the Q Records Were Admissible as a Business Record.......................................................23

        1.  The Q Records Relating to Stock Allocation and to Purported "Profits" Were Not Authenticated or Reliable ..........................23

        2.  The District Court's Decision to Admit the Q Records as Business Records Was an Abuse of Discretion.......................................26

        3.  The Admission of the Q Records Was Not Harmless Because Plaintiff Relied on Guilt by Association and Failed to Present Evidence of Critical Elements of the Charged Offenses ..........28

    B.    The District Court Erred in its Holdings Concerning Both the Method and Calculation of the Disgorgement Award Against Mr. Friesen......35

CONCLUSION ...................................................................................47

CERTIFICATE OF COMPLIANCE ....................................................48

CERTIFICATE OF SERVICE .............................................................49

ADDENDUM… .................................................................................50

ADDENDUM TABLE OF CONTENTS …...........................................51

# TABLE OF AUTHORITIES

## Cases

*Belber v. Lipson*, 905 F.2d 549, 552 (1st Cir. 1990) .................................................25

*BioPoint, Inc. v. Dickhaut*, 110 F.4th 337 (1st Cir. 2024).........................................42

*Duval v. Dep't of Veterans Affs.*, 69 F.4th 37 (1st Cir. 2023) ...................................22

*FTC v. LoanPointe, LLC*, 525 F. App'x 696, 699 (10th Cir. 2013).........................23

*Lech v. Goeler*, 92 F.4th 56 (1st Cir. 2024).............................................................22

*Liu v. SEC*, 591 U.S. 71 (2020)................................................................. 35, 44-45

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77 (1st Cir. 1998) .........22

*SEC v. Camarco*, No. 19-1486, 2021 U.S. App. LEXIS 37191
    (10th Cir. Dec. 16, 2021) ......................................................................23, 43

*SEC v. Happ*, 392 F.3d 12 (1st Cir. 2004)...............................................................37

*SEC v. Jones*, 300 F. Supp. 3d 312 (D. Mass. 2018)...............................................30

*SEC v. Maxxon, Inc.*, 465 F.3d 1174 (10th Cir. 2006) .............................................23

*SEC v. Saxon*, 433 F.Supp.3d 496 (S.D.N.Y. 2020).................................................30

*Tax-Free Fixed Income Fund for P.R. Residents, Inc. v. Ocean Capital LLC*, 2023
    U.S. Dist. LEXIS 161741 (D.P.R. Aug. 9, 2023) ..........................................34

*Torres-Rivera v. O'Neill-Cancel*, 524 F.3d 331 (1st Cir. 2008) ..............................22

*United States v. Kilmartin,* 944 F.3d 315 (1st Cir. 2019)........................................22

*United States v. RaPower-3, LLC*, 960 F.3d 1240 (10th Cir. 2020) ........................23

*Wallace Motor Sales, Inc. v. Am. Motors Sales Corp.*, 780 F.2d 1049
    (1st Cir. 1985) ...............................................................................................25

iii

*Ziehm v. Radioshack Corp.*, 2010 WL 2079550 (D. Me. May 22, 2010), report and
    recommendation adopted, 2010 WL 2680024 (D. Me. July 1, 2010)...........25

**Statutes**

15 U.S.C. 77e ..........................................................................................30

17 C.F.R.240.13d-1 ................................................................................32

28 U.S.C. § 1291 .......................................................................................1

## JURISDICTIONAL STATEMENT

Jackson Friesen appeals from the judgment and orders entered in this action by the United States District Court for the District of Massachusetts dated June 17, 2024 and June 20, 2024 (Appendix ("A") A1756, A3741, A3823-3885) as well as all orders encompassed therein, and the following orders issued by the District Court (to the extent they are not merged into the June 20, 2024 judgment): the July 11, 2024 Orders (A3991); and the July 16, 2024 Order (A4019). A notice of appeal was timely filed on August 20, 2024. A4066.

This Court has jurisdiction pursuant to 28 U.S.C. §1291 which confers jurisdiction to review all final decisions of the District Courts.

## ISSUES PRESENTED FOR REVIEW

1.      Whether the finding of liability as to Mr. Friesen should be reversed because the District Court erred by admitting into evidence at trial the entirety of certain electronic records seized from the storage facility of a fugitive defendant, known as the "Q System," where those records ("Q Records") were not properly authenticated or demonstrated to be reliable and the error was not harmless?

2.      Whether, even assuming liability, the District Court erred in holding Mr. Friesen "jointly and severally liable with co-Defendants Frederick L. Sharp, Paul Sexton, and Mike K. Veldhuis for disgorgement of $42,503,547.00, with the amount to be disgorged from Defendant to not exceed $11,846,176.00" (A3913) (Judgment),

1

where the disgorgement figures were based on Q Records that were not authenticated or reliable and where, as even the District Court found, those records "[did] not show that ill-gotten gains have been obtained and retained by the individual Defendants, much less in the amounts requested by the SEC" and "it is entirely possible that at least a portion of the ill-gotten gains may never have reached the pockets of individual Defendants"? A3882-83 (Memorandum and Order).[1]

## STATEMENT OF THE CASE

There were two types of evidence presented by the Plaintiff at trial: first, the Plaintiff presented a series of witnesses and days of testimony regarding its acquisition of the Q Records including descriptions of its seizure by agents of the Federal Bureau of Investigation in Curacao and the Plaintiff's processing and analysis of the computer servers.

Second, the Plaintiff presented four witnesses who were involved in the securities transactions at issue: three were criminal defendants cooperating to obtain leniency and the fourth was one of the individuals involved in stock promotion, William Kaitz.

---

[1] All Defendants in the proceedings below argued that Plaintiff's claims are subject to a five-year statute of limitations. The District Court held, in its pretrial ruling, that the limitations period is governed by Section 6501 of the William M. Thornberry National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), which applies retroactively to extend the statute of limitations to ten years for claims commenced after its passage. *SEC v. Sharp*, 626 F. Supp. 3d 345 (D. Mass. 2022). Mr. Friesen joins in his fellow Appellants' arguments that the application of the NDAA was error.

### A.  The Evidence at Trial Regarding the Q Records

From the outset, it was evident that the Plaintiff's case against these Defendants was based primarily on the computerized "Q Records" seized from storage of lead Defendant and fugitive Fred Sharp, data that contained the only purported evidence of Sharp's allocation to Defendants of stock holdings, and the Defendants' supposed "profits."

The Q Records consisted of two very different kinds of data: one portion tracked purchases and sales of stock; the other was Sharp's own purported "allocations" of stock holdings and his listing of amounts held in "accounts" of various individuals including the Defendants.

The Plaintiff, plainly recognizing the critical need for authentication and verification of Sharp's personal journals, offered extensive and detailed testimony concerning its obtaining of contemporaneous records of the actual stock sales from across the globe and its painstaking cross check of those records against the Q Records to try to demonstrate its accuracy.  A2745-58 (Giankura); A2776-2806 (Beckstrom); A3128-3216; 3238, 3248-49 (Murphy).

The Plaintiff, however, eschewed any such process in relation to Sharp's journals of purported allocation of stock or tallies of Defendants' supposed proceeds. A3249-53 (Murphy).  There were multiple means by which the Plaintiff could have conducted the same kind of cross-check that it employed in relation to the records

3

of stock sales, but the Plaintiff failed to present any of those documents or analysis. Notwithstanding its massive seizure of documents from the Sharp organization, the Plaintiff offered no internal ledgers, balance sheets, accounting data or documentation of disbursements. It neither obtained nor offered any banking records of the Sharp entities that would evidence actual disbursements. In stark contrast to its treatment of records of stock sales, the Plaintiff did not gather or compare Sharp's personal tallies against any actual transactional records.

Nor did the Plaintiff obtain or offer any evidence that Mr. Friesen *received* the purported profits. Again, unlike the authentication process relating to stock sales, the Plaintiff failed to gather, review, analyze or present any banking records reflecting Mr. Friesen's supposed receipt of funds. Instead of obtaining and presenting evidence that funds were actually paid to Mr. Friesen or for his benefit, the Plaintiff relied solely on entries in the Q Records maintained by fugitive Fred Sharp.

In contrast to the records of sales of stock, the entries in those "account" records did not correspond to *any extrinsic data.* They constituted allocations by Sharp that were not supported by testimony or contract or agreement. The Plaintiff did not prove, and the Defendant had no way to challenge, Sharp's unexplained allocations, the basis or reasons for those entries, whether they were determined by Sharp or directed by someone else, and whether they were even known to Mr.

4

Friesen or the other Defendants.  Instead, this data that constituted the sole basis for the Plaintiff's claims that Mr. Friesen "owned" more than 5% of an issuer's stock or obtained any proceeds from the decade of transactions at issue was put before the jury as if it were somehow authenticated and reliable.

Nor did the Plaintiff offer testimony from any custodian of the Q Records. Certainly, there was evidence of individuals who input data into the system – primarily Sharp himself.  But in relation to the supposed individual accounts, the Plaintiff offered no witness who could explain the timing of the entry of that data, the source of the information, or the meaning of the voluminous and often inexplicable entries.   To "authenticate" the records, the Plaintiff offered deposition testimony of Fedir Nikolayev, a computer professional who designed the overall structure of the electronic folders and files found on the seized servers. A2740 (Transcript); A1174 (Nikolayev Deposition). Mr. Nikolayev, however, could not authenticate any of the entries in the Q Records.  He was not involved in Sharp's business or the entries of data.  He built a template for Sharp but had no knowledge of the method or basis for entries of data into that system.  He was not involved in receiving the information input into the system, nor could he testify as to when the information was entered or by whom, or whether the person entering the information did so with a duty to accurately record business information – let alone whether any of the information was accurate.  He was able to confirm, however, that it was Sharp

5

and he who had administrator access to the system and that Sharp could at any time enter or change data.  A1184-85, A1226-27 (Nikolayev).

The evidence was clear that, while the Q Records roughly corresponded to actual purchases and sales of stock, there was no basis or support for Sharp's own allocation of stock to certain Defendants or his entries concerning proceeds from stock sales, and that information did not correspond to any of the brokerage or other records gathered by Plaintiff from around the globe. Those entries in the Q Records remained unexplained and unauthenticated but were admitted as if they were reliable records of a decade of transactions.  Defendants sought the exclusion of the information and after initially acknowledging the issues associated with admission of that data, the District Court nonetheless allowed their use by the Plaintiff and ultimately issued a decision holding that the data was admissible as a business record.    A1154 (Friesen Motion in Limine); A1539-41 (Order); A3870-74 (Memorandum and Order).

### B. The Testimony Regarding the Alleged Scheme to Fail to Make Filings Required Under United States Law

The bulk of the testimony at trial from participants in the transactions came from the primary actors in these events, Roger Knox, Avtar Dhillon and Kenneth Ciapala, all of whom engaged in years of deliberate and sophisticated criminal activity and fraud, faced lengthy prison terms, and sought to obtain a reduction in their sentence by assisting the Plaintiff in prosecuting someone whom, they

acknowledged, they barely knew.[2] They provided excruciating detail regarding the transactions and the individuals who were actively involved in those deals and who are now facing decades of prison time.   Dhillon described his decades of involvement with Sexton while confirming that he had *never met or dealt with Mr. Friesen*. Knox explained about his years of dealing with Sexton and Veldhuis and Ciapala described substantial dealings with Veldhuis.  Knox and Ciapala were only able to describe meeting Mr. Friesen at dinner parties.

---

[2] A recurrent and troubling aspect of the Plaintiff's presentation of the cooperating witnesses involved the Plaintiff's seemingly deliberate effort to mislead the jury concerning the most basic aspect of cooperation with the government: the circumstance under which a 5K Letter will issue from the prosecutors.  The Plaintiff made every effort to create the misimpression that a cooperating witness need only "tell the truth" to gain cooperation credit under the Sentencing Guidelines (see e.g. A2445, A2553, 2558-62) (Dhillon) when in fact truth telling does not support the downward departure for cooperation *unless* the witness provides "substantial assistance to the government *in the investigation and prosecution of another person*." A2669-71 (Transcript). The witnesses were plainly carefully prepared on this issue to insist that their only obligation to obtain a 5K letter was to tell the truth. That insistence -- the erroneous contention that they would benefit from "telling the truth," as opposed to inculpating others, was stressed by the Plaintiff on the witnesses' direct and was consistently parroted by the witnesses during cross-examination.

Given the witnesses' testimony, and failure to acknowledge the critical need to inculpate others to receive a downward departure for cooperation, the District Court sought to explain the requirements (A2556-57) (Transcript) and the defense finally had the District Court read to the jury the language of 5K stating that the cooperating witness must have provided "substantial assistance in the investigation and prosecution of another person." A2669-71 (Transcript).

And while they had met Mr. Friesen either not at all or only at dinner parties, these cooperating witnesses all repeatedly injected seemingly rehearsed assertions that Mr. Friesen was part of a "control group." Those references to Mr. Friesen did not flow from the witnesses' involvement in any actual transactions; they were instead seeming afterthoughts elicited by the Plaintiff in a strained effort to try to present *some* testimony against Mr. Friesen. And that testimony provided no credible evidence that Mr. Friesen was involved in or aware of the machinations used by Fred Sharp regarding the impermissible aspect of the transactions. *i.e*., allocation of stock holdings and failures to make filings required under United States securities laws.

### 1. **William Kaitz**

William Kaitz was the only witness who was a participant in the transactions at issue who actually knew and dealt regularly with Mr. Friesen, *and* who had *not* plead guilty to criminal conduct and so was not seeking leniency by assisting the government in "the prosecution of others." He described continual dealings with Mr. Friesen and he made clear that neither he nor Mr. Friesen were engaged in any wrongdoing. A 2713-14 (Kaitz).

Kaitz testified that he operated a stock promotion business, confirming even on direct examination by the Plaintiff that stock promotion is permissible under applicable regulations and that he believed himself to be involved in a lawful and

good business.  A2621-25 (Kaitz).  Mr. Kaitz made clear that the merger transactions with which they were involved were not, to his knowledge, improper and that the operating entities appeared to be good opportunities for shareholders. He talked about the business being guided by and overrun with expensive big firm lawyers. He confirmed also that he and his team conducted proper research on the companies, consulted with counsel regarding their publications, and sought to ensure that they were providing proper information.  A2628-32, 2687-92 (Kaitz).  According to Mr. Kaitz, there was no way to know the transactions failed to comply with United States filing or disclosure requirements unless one knew both United States law and exactly what Sharp was doing behind the scenes.

Kaitz described his dealings with Mr. Friesen during the period 2011 through 2014.  He met Veldhuis and Mr. Friesen at a conference in 2011 at the suggestion of someone who went to high school with Mr. Friesen.  A 2628-32, 2685-86 (Kaitz). Veldhuis had a business that assisted in locating financing for start-up companies. He was a friend of Mr. Friesen's father, Bill, who was semi-retired.  Jackson Friesen was young and had no experience, as he was just starting out in the business, and Veldhuis "took him under his wing."  A2700-2701 (Kaitz).  It was Veldhuis who was Kaitz's primary contact and who provided the instructions. A2636-38; 2992-93 (Kaitz).  Mr. Friesen was involved in the marketing and promotional activity, but it was clear to Kaitz that Mr. Friesen was still trying to learn the business.  He dealt

regularly with Mr. Friesen from 2011 through 2013 or 2014 in relation to marketing issues but thereafter had less contact with him. A2713-14 (Kaitz). He considered Mr. Friesen to be a "partner" with Veldhuis but used that word only to mean that they "worked together." A2702-03 (Kaitz).

More importantly, Kaitz testified that he did not believe that he was involved in any wrongdoing nor did he believe that his dealings with Mr. Friesen involved any wrongdoing.

> 10 Q.       Look, Mr. Kaitz, were you trying to do a good
> 11 business?
> 12 A. Yes.
> 13 Q. Did you think you were doing an illegal business?
> 14 A. No.
> 15 Q. Did you think that anything that you spoke about
> 16 with Mr. Friesen was illegal?
> 17 A. No.
> 18 Q. Did you think he was trying to do an illegal
> 19 business?
> 20 A. No.
> 21 Q. Um, all right.  So once we get to 2014, your
> 22 business really drops off, correct?
> 23 A. Yes.
> 24 Q. You had very few conversations with Jackson
> 25    Friesen after 2014, is that correct?
> 1  A. Correct.

A2713-14 (Kaitz).

## 2.  Avtar Dhillon

In stark contrast to Kaitz' description of his actual dealings with Mr. Friesen was the testimony of the three cooperating witnesses who were directly involved

with Fred Sharp in the behind-the-scenes goings-on concerning allocation of stock holdings. Avtar Dhillon, the Plaintiff's opening witness, presented a textbook case of the development of a cooperating witness, with his testimony steadily transforming from his actual and limited recollections of events to an inculpatory narrative designed to tie Mr. Friesen, someone he had never met, into the illicit aspects of the transactions at issue.

Dhillon confirmed, first, that he had an extensive professional background, was a medical doctor, a corporate executive for more than twenty years, and then a venture capitalist, raising money for companies that were developing medical or cannabis-related products. A2440-43, 2450 (Dhillon).   He testified that he had plead guilty to securities fraud, faced substantial time in prison, and was testifying pursuant to a cooperation agreement.  A2444-46 (Dhillon).

Dhillon described in great detail three transactions that occurred from 2010 to 2013, each involving a company of which he was the chief executive.  A2455-85, 2469-70 (Dhillon). The companies, Dhillon explained, were engaged in research and development and needed financing.  Id. He made clear throughout his testimony that his principal contact was Paul Sexton and, when asked who Sexton worked with, readily identified Graham Taylor, Talal Usain, David Sidu and, as of 2013, Mike Veldhuis. A2460, 2489, 2516 (Dhillon).  Only when pressed by the Plaintiff as to whether he was "aware" or "learned" of other "partners" did Dhillon finally include

11

Mr. Friesen.  A2542-43 (Dhillon).[3]  Even then Dhillon said only that Mr. Friesen's "name had come up" after Veldhuis became involved and that he "assumed" that Mr. Friesen was part of their "group."  A2490, 2546 (Dhillon).

After the Plaintiff trained Dhillon to repeatedly add Mr. Friesen to the purported "group" with Sexton and Veldhuis, and only on cross-examination, did the jury learn that Dhillon had no recollection of ever meeting or speaking with Mr. Friesen.

> 1 A. I don't recall meeting Mr. Jackson Friesen.
> 2 Q. Have you ever spoken with Mr. Friesen?
> 3 A. I don't recall that either.
> 4 Q. In all those years you've described a number of
> 5 meetings with Mr. Sexton and then with Mr. Veldhuis.
> 6 Mr. Friesen, to your recollection, was never present,
> 7 correct?
> 8 A. He could have been in the room, but I don't recall

---

[3] Plaintiff's counsel repeatedly resorted to leading the witness to get any mention of Mr. Friesen. For example:

> 20 And at this point in time who are Mr. Sexton's
> 21 associates?
> 22 A. At this particular point, um, and again I
> 23 understand there are several partners, um, but the ones
> 24 that I'm interacting with are Mr. Sexton, um,
> 25 Mr. Veldhuis, um, and Mr. Taylor.
> 1 Q. Is Mr. Friesen one of the associates that's
> 2 involved in this transaction?
> 3 MS. FRITZ:  Objection.
> 4 THE COURT:  Sustained, you're leading the witness.

A2496-97 (Dhillon).  *See also* A2486, A2489, A2515-16, 2542-43, A2869-70 (Dhillon).

9 him.

A2458 (Dhillon).

Dhillon eventually acknowledged that, during interviews with the government, he was repeatedly pressed to provide information about Mr. Friesen and his testimony slowly but surely evolved. At trial, Dhillon was asked on cross-examination about the information that he had provided to the government during prior sworn testimony.

> 4 So you were asked during that deposition,
> 5 "Do you know someone with the last name 'Friesen,'
> 6 F-R-I-E-S-E-N?" Do you recall that?
> 7 A. I -- I don't remember the testimony, but I do
> 8 remember being asked about Mr. Friesen, yes.
> 9 Q. Do you recall that your response was "I don't know
> 10 that name"?
> 11 A. Yes, at that time I lied.
> 12 Q. What you said under oath in 2019, before you
> 13 entered into cooperation agreements, was "I don't know
> 14 that name," correct?
> 15 A. Yes, when I was confronted by my conduct, I chose
> 16 to lie rather than take ownership at that time. ..... .
>
> Q. So the question was, were you asked whether you
> 12 knew the name "Friesen"? And did you say "I don't know
> 13 that name"?
> 14 A. Yes.
> 15 Q. And were you then asked a follow-up, "Jackson
> 16 Friesen?" And did you again say "I don't know that
> 17 name"?
> 18 A. (Silence.)
> 19 Q. Answer, please.
> 20 A. Yes.
> 21 Q. Okay. Now much later in the deposition, the issue
> 22 came up again and again you were asked about whether you

13

23 knew a person named "Jackson Friesen," much later in the
24 deposition.  Again your response was, "I don't know that
25 name."  Correct?

A2564-65 (Dhillon).[4]  After being pressed by the government for information

concerning Mr. Friesen, and desirous of receiving a cooperation agreement,

Dhillon went from not recalling Mr. Friesen to saying that he was mentioned by

others and was "probably" part of the "group."

6 Q. So at this point during the discussion
7 with the FBI agents and with the prosecutor and with the
8 SEC, you're being asked questions about who else was
9 involved, correct?
10 A. Yes.
11 Q. And the name "Jackson Friesen" is being presented.

---

[4] Ironically, even Dhillon's claim that he would have lied about knowing Mr.
Friesen appeared to be a lie.

6 To this jury what you said is "I lied during the
7 deposition because I didn't want to admit the wrongful
8 conduct that I had engaged in," correct?
9 A. More or less, yes. …

14 Q. All right.  So you didn't lie about knowing Mike
15 Veldhuis, correct?
16 A. Correct.
17 Q. And there would have been no reason to lie about
18 knowing the name "Jackson Friesen," would there?
19 A. (Silence.)
20 Q. Just like you said, "Sure I know Mike Veldhuis,"
21 there would have been no reason to lie about that,
22 correct?
23 A. No particular reason, no.

A2568 (Dhillon).

14

12 "Was Jackson Friesen mentioned?"  "Was Jackson Friesen
13 involved?"  Correct?
14 A. Yes, his name came up.
15 Q. Okay.  And so you finally tell them, "Sexton and
16 Taylor said they had another partner, the other partner
17 was probably Jackson Friesen," correct, that's what you
18 told them?
19 A. In the context of which company?
20 Q. This -- we've been talking about the Stevia
21 transaction, toward the end, correct?
22 A. Correct.

A2577 (Dhillon).  By the time of trial, the Plaintiff was able to obtain from Dhillon

trial testimony that he "learned" that Mr. Friesen was "partners" with Sexton and

Veldhuis.

### 3.  Roger Knox and Kenneth Ciapala

Knox and Ciapala were initially partners in a business similar to the one

operated by Fred Sharp and thereafter operated separate firms, assisting clients with

the acquisition, distribution and sale of stock.  Knox had spent literally years

traveling down the path of becoming a government cooperator.  He confirmed that

he was arrested, plead guilty, spent 18 months in jail trying all the while to get

released, then decided to cooperate with the government and, after providing

information to the government, was finally released from jail.  He had more than

twenty meetings with the government prior to his appearance at trial. A3016-21

(Knox).

And after those more than twenty meetings, Knox at trial dutifully recited the Plaintiff's assertion that Mr. Friesen was part of Sexton's and Veldhuis' "control group." In fact, he used prosecutorial language and phrasing as much if not more than the Plaintiff did, repeatedly offering assertions that were certainly not part of the vernacular that he likely would have used prior to his intensive preparation, volunteering at every opportunity that Mr. Friesen was part of a "control group" with Sexton and Veldhuis.  See e.g. A2859-60, A2861, A2885, A2887, A2890, A2899, A2905 (Knox).

Again, however, he confirmed that he did not have substantive dealings with Mr. Friesen.  He met Mr. Friesen only at dinner parties once or twice a year.  A2847, A2854, A2905-07, A2995-96 (Knox).

Knox also acknowledged that his testimony had transformed over time, that he had actually told the Plaintiff during interviews that he had dealt with *Veldhuis* in relation to trading (A3047-48) (Knox); that he met Mr. Friesen at group  business dinners and "assumed" that he was part of the referenced "control group," (A3001) (Knox) that he *did not recall* any "business discussions" with Mr. Friesen at those dinners because they were, as Knox confirmed, "more guarded."  A3049 (Knox).  He also testified that he was told by Veldhuis at some point that Friesen was no longer involved in deals.  A2871-72, 3002-03, 3120-22 (Knox).

Knox also confirmed that, of amounts that were received at his firm, Silverton, from sale of stock of individuals associated with Sharp, millions of dollars never left Silverton and that he eventually turned over more than $7 million of that money to the government. A3022-34 (Knox).

Finally, Kenneth Ciapala appeared remotely over the objections of defense. A3057 (Transcript).  He too had pleaded guilty and was facing 25 years.  A3061 (Ciapala).  And he too sought to persuade the jury that his cooperation required only that he "tell the truth." A3061 (Ciapala).  Like Knox, his contribution to the case against Mr. Friesen consisted of him recounting that he met Mr. Friesen once or twice at a get-together in Geneva.  A3067, A3089-91 (Ciapala).[5]

Ciapala also confirmed that Fred Sharp stole money from his clients and so funds "allocated" by Sharp to a client and still under Sharp's control would not have necessarily ever been disbursed to the client.  A3123-24 (Ciapala).

---

[5] Striking also about Ciapala's testimony was that the Plaintiff had "educated" him during preparation to get him to provide information against Mr. Friesen.  The witness had clearly told the Plaintiff that he did not know who was associated with the number "2" X phone.  He even explained that the only "code" he knew relating to Mr. Friesen was "JAX."  A3119-23 (Ciapala).

Not satisfied with that testimony, the Plaintiff during preparation walked Ciapala through documents that enabled him to "figure out" that "2" was Mr. Friesen. A3062-63, 3086-87 (Ciapala).

### 4. Communications Involving Mr. Friesen

In its attempt to tie Mr. Friesen to the actual wrongdoing – the stock transactions that were occurring behind the scenes -- the Plaintiff also sought to cobble together some evidence that Mr. Friesen was involved in directing certain stock trades. Those communications, however, failed to offer any persuasive evidence that Mr. Friesen was knowledgeable concerning the existence or extent of his own stock holdings or any failures to comply with United States reporting requirements. A4308 (Xphone), A4314 (Xphone), A4318 (Xphone). First, the communications were simply too few; had Mr. Friesen actually had meaningful involvement in the trading of stock, there would have certainly been an abundance of evidence. And even the communications relied on by the Plaintiff actually support the testimony that it was Veldhuis, otherwise known as ACCO or "4," who dealt with trading: Exhibit 141 appears to be from Veldhuis and Exhibit 154 is copied to him. A4315 (Xphone), A4318 (Xphone); A3239-44. Again, those claims were contradicted by the witnesses' prior statements that it was not Mr. Friesen but Veldhuis who directed the trading and by the abundance of emails regarding trading that *did not* involve Mr. Friesen.

### SUMMARY OF ARGUMENT

The Plaintiff's presentation at trial consisted of substantial evidence concerning transactions engaged in by certain Defendants but a striking scarcity of

evidence as to Defendant Jackson Friesen's role in those events.  The Plaintiff established that Defendant Fred Sharp operated a firm in Canada that enabled its clients to obtain and sell stock of U.S. and Canadian companies without the filing of a Schedule 13D, a document which must be filed when ownership rises above a 5% threshold.  Also clear was that Defendants Sexton and Veldhuis were engaged in business with Sharp and they reached settlements with the Plaintiff regarding their failure to file those forms and sales of unregistered securities.

As for the claims against Mr. Friesen, two critical aspects of the underlying events were clear:  First, the transactions themselves were *permissible* mergers between shell corporations and active businesses, with the stock then being promoted and sold to raise money for the developing business. The alleged wrongdoing occurred only in connection with the actions taken behind the scenes by Fred Sharp relating to stock holdings that *he acquired* directly or through "nominees" operated by his firm and Defendants' alleged failure to disclose *Sharp's* activities.  Because the evidence of conduct by Mr. Friesen was relatively scant,  the Plaintiff throughout the case  described Mr. Friesen *not by reference to his own actions* but as part of a "group," and attribute to him the actions, knowledge and intent of not just one but *two layers of other individuals*: according to the Plaintiff, Mr. Friesen was liable for the conduct of members of his purported "group" and *also* liable for *their* arrangements with Fred Sharp and the acts taken by Sharp.

In support of its claim that Mr. Friesen was part of the "group" that engaged in wrongdoing, the Plaintiff presented testimony of three criminal defendants, primary actors in the scheme, who had decidedly limited interaction with Mr. Friesen but nonetheless blithely insisted, as part of their effort to obtain leniency at sentencing, that Mr. Friesen was part of a "control group" with Sexton and Veldhuis and that he was privy to the improper actions taken by Defendant Sharp. But that testimony, while rife with inculpatory and legalistic catch phrases asserting Mr. Friesen's participation in a "group" or knowledge of "fraud," was sorely lacking in substance.

Given the problems associated with the Plaintiff's use of criminal defendants testifying pursuant to cooperation agreements, the Plaintiff's case ultimately hinged on the unauthenticated and unexplained records that had been maintained by the fugitive defendant Fred Sharp and eventually seized by the plaintiff, the so-called "Q Records." Those records were employed by the Plaintiff early and often to support its claims of the existence of a scheme, the breadth of all of the Defendants' alleged conduct and the requested disgorgement and penalty amounts. They provided the *only* evidence that Defendants "owned" more than 5% of issuer stock or that Defendants obtained significant "profit[] from their schemes" – even though the data did not even purport to show that the amounts were actually received by Defendants.

Yet the Plaintiff could offer no witness that could authenticate or explain the maintenance of Sharp's purported records or the way in which *he*, in those questionable tallies, divvied up stock holdings or sale proceeds. And so, central to the jury's assessment of liability at trial and the massive disgorgement ordered by the District Court, was the issue of whether that data maintained by Defendant Fred Sharp was admissible as a business record. Absent that evidence, the Plaintiff's case boiled down to the criminal conspirators who offered uncorroborated, unpersuasive, vague and self-serving bits of testimony about Mr. Friesen to obtain leniency.

As set forth below, the judgment against Mr. Friesen should be reversed because the District Court erred in two critical respects, both involving the improper admission and use of the Q Records. First, the District Court improperly admitted into evidence the entirety of the Q Records of Fred Sharp, failing to distinguish between those portions that were arguably authenticated, *i.e,* properly compared against reliable contemporaneous records, from those that were unauthenticated and constituted nothing other than hearsay statements of Fred Sharp. The District Court's stated basis for admission was error and, given the lack of other evidence

pertaining to Mr. Friesen, that error infected every aspect of the trial and the judgment against him.[6]

Second, in relation to imposition of penalties, the District Court acknowledged the correct principles relating to disgorgement but then failed properly to apply those principles. The District Court made the critical finding that the evidence presented by the Plaintiff "does not show that ill-gotten gains have been obtained and retained by the individual Defendants, much less in the amounts requested by the SEC." A3823 (Memorandum and Order) at 60-61 ("actual accrual to each of the Defendants cannot be shown and [] it is entirely possible that at least a portion of the ill-gotten gains may never have reached the pockets of individual

---

[6] This Court reviews preserved objections to the District Court's evidentiary rulings for abuse of discretion. *United States v. Kilmartin*, 944 F.3d 315, 335 (1st Cir. 2019).

An abuse of discretion occurs "when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co*., 161 F.3d 77, 83 (1st Cir. 1998) (quoting *Foster v. Mydas Assoc., Inc.,* 943 F.2d 139, 143 (1st Cir. 1991)). An error of law qualifies as an abuse of discretion. *Torres-Rivera v. O'Neill-Cancel*, 524 F.3d 331, 336 (1st Cir. 2008).

If we determine that the district court erroneously admitted or excluded evidence, we then review that ruling for harmless error. *Duval v. Dep't of Veterans Affs.,* 69 F.4th 37, 42 (1st Cir. 2023) (quoting *Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 62 (1st Cir. 2011)).

*Lech v. Von Goeler*, 92 F.4th 56 (1st Cir. 2024).

Defendants"). Yet the District Court acceded to the Plaintiff's claim that its unsupported and inapt Q Records formed the basis for a "reasonable approximation" of Defendants' profit.   Clear and relevant authority demonstrates that the disgorgement award must be reversed.[7]

## ARGUMENT

### A. The District Court Erred in Holding That the Q Records Were Admissible as a Business Record

#### 1. The Q Records Relating to Stock Allocation and to Purported "Profits" Were Not Authenticated or Reliable

Given the sparse evidence of Mr. Friesen's involvement in either the allocation of stock or receipt of "profits," the Plaintiff from the outset relied heavily on the Q Records as the support for its claims.  At trial, through days of testimony constituting the bulk of its presentation, the Plaintiff regaled the jury with descriptions of the seizure of Sharp records from Curacao and its own processing

---

[7] This Court applies a mixed standard of review to a district court order requiring disgorgement in a proceeding initiated by the SEC.

> An overarching abuse of discretion standard applies, and also governs the district court's calculation of the disgorgement award. *See FTC v. LoanPointe, LLC,* 525 F. App'x 696, 699 (10th Cir. 2013) (unpublished); see *also SEC v. Maxxon, Inc.,* 465 F.3d 1174, 1179 (10th Cir. 2006) (holding no abuse of discretion in district court's calculation of disgorgement award). However, we apply de novo review to a district court's "method" of determining a disgorgement award. *United States v. RaPower-3, LLC*, 960 F.3d 1240, 1251 (10th Cir. 2020).

*SEC v. Camarco*, 2021 U.S. App. LEXIS 37191 (10th Cir. Dec. 16, 2021).

and review of the data.  It did *not* present a witness who made the entries in the Q

Records relating to allocation of stock or purported profits, nor did it present

evidence of the method, timing, basis for or reliability of those entries. To the

contrary, the evidence established that those portions of the Q Records are

completely at odds with all reliable and contemporaneous records; *the entries by*

*Sharp in which he attributed shareholdings to certain individuals, and the entries*

*regarding allocation of supposed proceeds*, were not explained or authenticated by

any witness.  Those were nothing more than records maintained by a co-conspirator

who could not be cross-examined regarding the reason for or the timing or meaning

of the entries that he made.  As discussed below, those portions of the Q Records

were certainly not authenticated, accurate and reliable business records and the

District Court erred in admitting them as business records.

Instead of offering a proper custodian of the purported business records, the

Plaintiff offered testimony of a consultant who provided technical support, Mr.

Nikolayev.  Plainly that witness did not make and could not authenticate the entries

that were made into the template that he constructed.  He did not even understand or

have knowledge concerning the nature of the firm's business.    Instead of

authenticating or even explaining the data entries, he indicated that the system could

be accessed by its administrators, employees, and clients. A1185 (Nikolayev

Deposition). The administrators were Mr. Nikolayev and Fred Sharp.  Mr. Nikolayev

never made entries of his own initiative. A1180-89, A1227 (Nikolayev Deposition).

Sharp, as an administrator, had the ability to "manually adjust all of the numbers."

A1186-1227 (Nikolayev Deposition).   In terms of when entries were made, what

they were based on and what they consist of – none of that was established by any

witness.   The Plaintiff failed even to offer a credible argument regarding the

additional requirements for a business record.  Most critically, there was no witness

able to attest to the fact that he or she had a duty accurately to maintain the records

and that he or she recorded that data at or near the time of the recorded events.  It is

axiomatic that to authenticate business records the witness must be able to "explain

and be cross examined concerning the manner in which the records are made and

kept." *Wallace Motor Sales, Inc. v. Am. Motors Sales Corp.*, 780 F.2d 1049, 1061

(1st Cir. 1985); *see also Belber v. Lipson*, 905 F.2d 549, 552 (1st Cir. 1990) ("This

testimony [from a qualified witness] is essential. Without such a witness the writing

must be excluded.") (internal citation omitted). *Cf. Ziehm v. Radioshack Corp.*, No.

CIV. 09-69-PS, 2010 WL 2079550, at *10 (D. Me. May 22, 2010) ("The plaintiff,

who has not been shown to have knowledge of the manner in which records were

kept at the facility in question, is not a 'qualified witness' for this purpose."), report

and recommendation adopted, 2010 WL 2680024 (D. Me. July 1, 2010).

## 2. The District Court's Decision to Admit the Q Records as Business Records Was an Abuse of Discretion

Against this background, the District Court in its ruling on remedies described its initial skepticism regarding the Q Records and then set forth its basis for finding them to be admissible business records.

> The Court, having initially expressed significant concerns regarding the Q records, ultimately held that it was admissible. The court explained its ruling after the trial, stating that "While the Court did not make a final finding during the course of the trial, it intimated that it was prepared to admit the Q system into evidence under the business records exception to the rule against hearsay. See generally Tr. Jury Trial Day Four 69-72, ECF No. 438 (the Court, upon hearing from witness testimony, holding that the Q data "would seem to satisfy the business records exception." Tr. At 48-49. See also Tr. Hr'g Disgorgement 24:8-11, ECF No. 491 (the Court holding during the hearing on remedies that "[t]his Court is satisfied that the Q system records qualify as business records under the federal rules of evidence"). The district court therefore stated that the Q system constituted admissible evidence. Decision at 47.

> As the affidavit of Ryan Murphy indicates, the comparison between Q data for each of the 14 issuers and independent brokerage records has confirmed the reliability of Q data with considerable accuracy: (1) 95% for Stevia First/Vitality, id. ¶ 17; (2) 94% for Echo Automotive, id. ¶ 20; (3) 97% for Arch Therapeutics, id. ¶ 23; (4) 100% for Stevia Corp., id. ¶ 26; (5) 95% for Liberty One Lithium Corp., id. ¶ 29; (6) 96% for Oryon Technologies, id. ¶ 31; (7) 100% for Makism 3D Corp., id. ¶ 33; (8) 98% for Graphite Corp., id. ¶ 35; (9) 97% OncoSec Medical Inc., id. ¶ 37; (10) 97% for NewGen Biopharma Corp., id. ¶ 39; (11) 91% for StartMonday Technology Corp., id. ¶ 41; (12) 100% for Lexington Biosciences Holdings Corp., id. ¶ 43; (13) 100% for BreathTec Biomedical Inc., id. ¶ 45; and (14) 75% for RightsCorp., id. ¶ 47.

A3870-73 (Memorandum and Order). That data provided in Murphy's affidavit has nothing to do with the critical portions of the Q Records at issue: Sharp's completely

unexplained allocations of stock holdings and purported profits. The only data that was verified by the Plaintiff was that which related to sales of stock by Sharp and his entities – a matter that was not disputed by Defendants. Sharp's entries as to allocations of stock or purported proceeds lacked any credible foundation, and they resulted from and embody unknown and inadmissible hearsay that was not subject to cross-examination. Those Q Records remain the veritable opposite of a business record because they unquestionably fail to record transactions that actually occurred, i.e., sales of stock by Sharp entities. Instead, they record only the fictions devised by Sharp which are based either on nothing or on hearsay information that exists nowhere in the record.

That the District Court heavily relied on the independent confirmation of the reliability of the *stock sale data* only underscores that such analysis was critical to the admission of Sharp's Q Records. But the district court was referencing completely unrelated and irrelevant data. The District Court was correct in focusing on whether the data in the Q Records was verified and reliable but failed properly to acknowledge that the Q Records relating to stock holdings and purported profits were totally – and inexplicably – *not* cross-checked or verified by the Plaintiff.

The District Court stated also that its decision was supported by Defendants' failure to challenge the import of the plaintiff's analysis, asserting that "[w]hile the Defendants are correct to argue that only a sample, and not all, of the brokerage

27

records and Q transactions were compared, they do not meaningfully challenge, much less demonstrate, how the sample is not representative." That assertion not only disregards but appears to try to negate the extensive arguments made by the Defendants that the Plaintiff's verification of *one portion* of the data did not have any bearing on the reliability of the other; in fact, it only served to underscore the need for – and lack of – any verification of the records on which the Plaintiff relied.

The District Court relied on the same limited and flawed justification in relation to the purported evidence of when entries were made into the Q Records. According to the Court, "evidence presented at trial demonstrated that Q system entries were made very close in time to the illegal trading that occurred. See, e.g., Tr. Jury Trial Day Six 49:9 (witness testimony that Q entries were made within "less than 24 hours" following trade)." Not only was that statement an isolated and generally insupportable claim but also it related only to trading activity and – again – had nothing to do with the records of purported *stock holdings and allocation of proceeds* that formed the basis for Plaintiff's claim regarding the involvement of particular Defendants.

### 3. The Admission of the Q Records Was Not Harmless Because Plaintiff Relied on Guilt by Association and Failed to Present Evidence of Critical Elements of the Charged Offenses

The crux of the Plaintiff's allegations of wrongdoing in this case are very specific reporting requirements that exist under United States securities laws. While

28

the Plaintiff sought to characterize the reverse merger process itself as part of a scheme, it is not. Those transactions themselves are entirely permissible *except for* the machinations of Sharp that resulted in failures to file Schedule 13Ds or registration statements.

More importantly, the Plaintiff's claims that it was Jackson Friesen who held more than 5% of an issuer's stock and failed to file a Schedule 13D, or who sold stock that was not the subject of a registration statement, require analytical and evidentiary leaps across legal fictions and factual hurdles. It is a given that Mr. Friesen never acquired or controlled the stock at issue; as Plaintiff has readily acknowledged, the accumulation and sales of stock at issue were conducted through nominee entities administered by Fred Sharp. And while the Plaintiff often insisted that Sharps' records were of accounts similar to bank accounts, the evidence established that Sharp did not send any periodic statements or other information concerning stock holdings to the supposed stockholders. A3254-56. It was all devised and inscribed by Sharp and known not to Mr. Friesen but to Sharp and those with whom he worked closely.

How then would Mr. Friesen, who worked in marketing in Vancouver and is not even alleged to have purchased stock, commit a violation of the disclosure or registration provisions of the United States securities laws? That contention required that the Plaintiff prove that Mr. Friesen was aware of and somehow indirectly liable

for the conduct, knowledge and intent of others *in not just one but two respects*:  the plaintiff alleged that Mr. Friesen was part of a "group" with Veldhuis and Sexton and so was liable for *their* conduct, knowledge and intent, and that they in turn were in league with Sharp and aware of and liable for the specific filing requirements and the failure to comply with those.  It is a bridge too far.

With respect to the registration requirements under Section 5 of the Securities Act of 1933, 15 U.S.C. 77e, for example, Mr. Friesen would have to know that stock was being sold *and* that the sales were supposed to be registered in the United States *and* that in fact the stock was neither registered nor subject to any number of complex potential exemptions from registration that were touched on during the trial.  Even then, the law is clear that Mr. Friesen would be liable under Section 5 only if he was a *"necessary participant"* in the sale of stock.  A defendant is a necessary participant if, "but for the defendant's participation, the sale transaction would not have taken place—in other words . . . the defendant's acts were a substantial factor in the sale transactions."  *SEC v. Saxon*, 433 F.Supp.3d 496, 513 (S.D.N.Y. 2020).   As emphasized in *SEC v. Jones*, 300 F. Supp. 3d 312 (D. Mass. 2018), "[b]ecause Section 5 imposes strict liability for violations of its registration requirement, we recognize that *it is particularly important that the necessary participant and substantial factor test be carefully applied* to each case so as not to subject defendants with a de minimis or insubstantial role in a securities scheme to strict

30

liability." (Emphasis added) (citing *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013)).  The Plaintiff failed to demonstrate that Mr. Friesen was a necessary participant.

Even more strained is the argument that Mr. Friesen committed a violation of the obligation to file a Schedule 13D.  To engage in that offense, Mr. Friesen would have had to know that Sharp was acquiring stock, the *amount* of stock that he was acquiring, that the stock was owned *not by Sharp or one of the other Defendants* but allegedly *by him* through the concept of "beneficial ownership" of that stock, that the total as to which he would be considered a "beneficial owner" was greater than 5%, and that for some reason the attorneys or others involved in the transactions had decided not to simply file a Schedule 13D. Evidence of every one of those elements was lacking in relation to Mr. Friesen.  While he was certainly aware that issuers were engaging in reverse merger transactions and selling stock, there was no evidence that he understood that *he* was the one who, through the mechanism of legal concepts of a "group" and "beneficial ownership," somehow owned that stock. There was no evidence at the trial that Mr. Friesen had any knowledge of or discussions regarding Schedule 13D or registration statement requirements.   There was no evidence that he would have known or assumed that, if *other* Defendants were acquiring stock, it was being allocated to or was "beneficially owned" by him. There exists not one shred of evidence that he ever directed the acquisition of stock

or received any communication indicating that he owned stock, much less stating the amount owned. It necessarily follows that the Plaintiff failed to prove that Mr. Friesen had knowledge of how much stock he was supposedly acquiring or that it exceeded 5% of the outstanding stock of the company.

Nor did the Plaintiff demonstrate that Mr. Friesen was part of a "control group" or that the supposed allocation of stock by Sharp constituted "beneficial ownership" of the stock. The legal notion of a "group" certainly means more than individuals who work with or for others. It requires that the individuals or entities, enter into an "agreement to act in concert." As stated in Rule 13d-5, a "group" exists where individuals "agree to act together for the purpose of acquiring, holding, voting or disposing of stock equity securities of an issuer." The Plaintiff proved that Mr. Friesen worked and travelled with Veldhuis and Sexton for some period of time but offered no evidence of any agreement in relation to acquisition, sale or voting of the stock. The Plaintiff offered no evidence that would distinguish Mr. Friesen from a marketer like William Kaitz. Plaintiff's cooperating witnesses offered only vague and conclusory assertions concerning Mr. Friesen, stating that they somehow "assumed" or "understood" that Mr. Friesen was a "partner" with Mr. Veldhuis and Mr. Sexton at some vague point in relation to some unnamed transactions. Those statements reflect only that Mr. Friesen was someone who worked with or for other

Defendants, as opposed to someone who had an agreement with other relating to the acquisition or ownership of stock.

The second requisite legal fiction, that by virtue of working Veldhuis and Sexton, Mr. Friesen "beneficially owned" all stock acquired by Sharp and allocated by Sharp to them, was equally unsupported by any evidence. A person is a "beneficial owner" of stock if that person directly or indirectly has, or shares, *voting power or investment power* for that security. "Investment power" includes the power to sell, or direct the sale, of a stock. A person "directly or indirectly has or shares" investment power when he has the sole power to sell a share, or when he shares the power to sell a share with someone else." Group beneficial ownership therefore exists "[w]hen two or more persons agree to act together *for the purpose of acquiring, holding, voting or disposing of stock equity securities of an issuer*, the group formed by that agreement shall be considered to be beneficial owners of that stock." (Emphasis added). Beneficial ownership can be obtained "through any contract, arrangement, understanding, relationship, or otherwise." This can include informal oral agreements so long as those agreements give a person voting or investment power.

> Even though Rule 13d-5 allows for the grouping of shares to attribute beneficial ownership to all members of a group, only persons who are beneficial owners of an issuer can be deemed to be part of the group. *Rosenberg v. XM Ventures*, 274 F.3d at 144-145 ("[O]ne who does not have beneficial ownership of the equity securities of an issuer cannot be a member of a group of individuals that do have beneficial ownership.") (citation

omitted); *see also Calvary Holdings, Inc. v. Chandler*, 948 F.2d at 63-64 (only individuals who can direct voting are required to file a Schedule 13D; individual with no control over the decision on how the stock is to be voted is not required to file Schedule 13D). Each member of the group must have something to "pool" (whether it be voting or other interests in the securities of an issuer) for that member to be deemed part of the group with Section 13(d) obligations. *Id.* at 146; *Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.*, 553 F.3d 1351, 1363-1366 (11th Cir. 2008) (noting that otherwise "groups" would be expanded beyond reason; arguably including attorneys, bankers, financial advisors, and accountants who assist persons to acquire beneficial ownership).

*Tax-Free Fixed Income Fund for P.R. Residents, Inc. v. Ocean Capital LLC*, 2023

U.S. Dist. LEXIS 161741 (D.P.R. Aug. 9, 2023)

Here, the evidence failed to address – much less prove – any agreement that included Mr. Friesen relating to voting or investment power with others; to the contrary, the Q data listed Veldhuis in the field designated "Account Title." A3240. And the evidence was devoid of any evidence that Mr. Friesen had any agreement, contract or other mechanism of control over those stock holdings. A3244 (Murphy). Taken as a whole, the evidence suggests only that Mr. Friesen worked with or assisted Mr. Veldhuis but not that he shared or exercised any power. To find "beneficial ownership" of stock by Mr. Friesen on this evidence would distort the concept and "expand[] [it] beyond reason" to include those who do no more than assist those who did in fact acquire beneficial ownership.

**B. The District Court Erred in its Holdings Concerning Both the Method and Calculation of the Disgorgement Award Against Mr. Friesen**

The District Court correctly articulated both the proper basis for a disgorgement award and *the evidence that would be essential to support such an award* but then, notwithstanding the clear absence of that essential evidence, granted the Plaintiff's massive disgorgement requests. The Court repeatedly through the proceedings identified the applicable principles concerning disgorgement. It clarified that disgorgement is non-punitive and intended to make victims whole and must therefore be limited to a wrongdoer's "net profits," (citing *Liu*, 591 U.S. at 74-75) (defining courts' power to award equitable relief as "a power that historically excludes punitive sanctions" and "a disgorgement award "is awarded for victims"); *see also SEC v. Sharp*, 626 F. Supp. 3d 345 at 380 ("The Supreme Court has entrenched disgorgement's non-punitive character in the context of securities violations, by requiring that it be used to make victims whole.").

The court also held that, under the holding in *Liu*, wrongdoers should be held *individually* liable for their personal ill-gotten gains. *Liu*, 591 U.S. at 82-83 ("Equity courts also generally awarded profits-based remedies against individuals or partners engaged in concerted wrongdoing, not against multiple wrongdoers under a joint-and-several liability theory."). As the District Court noted, the Supreme Court

35

observed that a "rule against joint-and-several liability for profits that have accrued

to another appears throughout equity cases awarding profits." *Id.*

> In sum, then, "[t]he [C]ourt's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." *Securities and Exchange Commission v. MacDonald*, 699 F.2d 47, 54 (1st Cir. 1983) (en banc) (quoting *Securities and Exchange Commission v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1987)).

A3865.

The District Court also correctly concluded that the evidence presented by the

Plaintiff "does not show that ill-gotten gains have been obtained and retained by the

individual Defendants, much less in the amounts requested by the SEC." A3883

(Memorandum and Order) (emphasis added). That conclusion was based on the fact

that the Q Records, while they contain credits that purport to reflect proceeds of sales

*allocated by Fred Sharp* to individual accounts, those entries did not even purport to

record actual *disbursements* made to the individual Defendants. The Plaintiff, while

it spent untold hours gathering and analyzing records of stock sales by Sharp, failed

to present any evidence of any aspect of disbursements to the Defendants. It did not

present banking or accounting records of disbursements from Sharp entities to or for

the Defendants nor did it gather or present evidence of Defendants' receipt of any

"ill gotten gains." As the District Court acknowledged, "the SEC has not submitted

any bank records to this Court that show actual receipt of funds by the Defendants."

That the Plaintiff failed to prove or even allege that amounts contained in individual accounts in the Q Records were disbursed to or received by the Defendants was confirmed by the District Court in its seemingly contradictory ruling regarding prejudgment interest. As the Court explained, the Q Records supported the conclusion that proceeds of sales existed, but not that those funds were transferred from Fred Sharp and his entities to Mr. Friesen.

> While the Q data evidence, verified by external brokerage records, persuades this Court that ill-gotten gains have been generated by the pump-and-dump scheme perpetrated by the Defendants -- irrespective of to whom among the co-conspirators the proceeds accrued -- thereby necessitating disgorgement, the same data does not show that ill-gotten gains have been obtained and retained by the individual Defendants, much less in the amounts requested by the SEC. Where ***actual accrual to each of the Defendants cannot be shown and where it is entirely possible that at least a portion of the ill-gotten gains may never have reached the pockets of individual Defendants***, it is not possible to speak with any reasonable degree of certainty that the Defendants benefited from what resembled an "interest-free loan."

A3882 (Memorandum and Order) (emphasis added).

Notwithstanding its conclusion that profits "may never have reached the pockets of individual Defendants" or "benefited" those Defendants, the District Court entered massive disgorgement awards based on the Plaintiff's claim that the Q Records provided "a reasonable approximation of profits causally connected to the violation.'" *Securities and Exchange Commission v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004) (quoting *Securities and Exchange Commission v. First City Fin. Corp*., 890 F.2d 1215, 1231 (D.C. Cir. 1981)). Holding that "once the SEC shows that the

disgorgement is a reasonable approximation, the burden shifts to the defendant to demonstrate that the amount of disgorgement is not a reasonable approximation," the District Court proceeded to accept the SEC's calculations of "sums that each of them received into their personal Q accounts of the Fourteen Issuers whose illegal trading was at issue" for a ten-year period. A3865 (Memorandum and Order).

The Court entered that disgorgement award based on its conclusion that, regardless of the "lack of bank records showing actual receipt of funds by the Defendants, "the balance of equities favors the awarding of the disgorgement amounts requested by the SEC." It explained that it did so based on three considerations, none of which address the lack of authenticity or reliability of the supposed "allocation" of proceeds. First, the District Court returned again to the supposed verification done by Plaintiffs establishing the "reliability" of the Q Records – a process that, as discussed above, confirmed *only* the totals of stock sales and not the entitlement to or distribution of any proceeds. A3872-75 (Memorandum and Order) (burden of proof shifting to defendants once SEC makes a reasonable approximation).

But the Q Records relating to supposed profits were not verified, reliable or even comprehensible. The Plaintiff relied principally, of course, on its own interpretation of the entries in the Q Records relating to "GARD." A1956 (GARD Account). As supposed extrinsic support for the claim that Mr. Friesen received

profits, the Plaintiff pointed to a series of communications. A1902 (Murphy Declaration) and A2152-2175 (Exhibits 14-21).  But those documents belie the Plaintiff's massive disgorgement demands.   Those communications are notable for the fact that, with the exception of seeking tuition for a friend of his (A2155) (Exhibit 17), they all relate to the period 2013 and 2014.  They total approximately $1.2 million.  And in only one instance are they accompanied by the kind of extrinsic financial records that would actually support the unauthenticated and unexplained tallies of Fred Sharp.  A2170 (Exhibit 20).

Further, the Plaintiff's disgorgement figures are derived from a cherry-picking of certain entries in the Q Record relating to GARD without regard for the voluminous offsetting and unexplained debits. A4635-50 (Murphy).  As confirmed by Ryan Murphy, the Plaintiff's analysis consisted of credits to the accounts; they did not consider or total the entries of transfers by Sharp *out* of those accounts. A3757-59 (Murphy).  And that actual document consists primarily of cryptic and unexplained entries made by or at the direction of Sharp.  The ledger begins, for example, with dozens of unexplained entries labelled "imported balance" and dated 2010, before Mr. Friesen even began working with Mr. Veldhuis.  A4635-50 (GARD Q Records); A1956-57 (GARD Account Summary).  The document shows a column labeled "Balance" but the figures in that column in no way correspond to the individual entries. The bulk of the entries consist of "forex credit" or "forex debit"

39

amounts but certainly no one suggested that those were done at the direction of or for Mr. Friesen. There are innumerable and enormous deductions from the supposed account listed as "buy stock," "internal transfers" "loan advance" or just "debit" with no other explanation and without a shred of evidence suggesting that Mr. Friesen controlled or directed those activities and in one month alone, June 2018, there are more than $2 million in "internal transfers Summy" and "loan payment Ferrous." A1971 (Gard Account Summary). But no effort was made by the Plaintiff to offset the supposed credits to the account against the debits. In the end, the entries are inexplicable, there is no evidence of any substantial "balance" in the midst of the constant stream of debits and, without an explanation, the plaintiff's aggregation of specific credits is meaningless.

The absence of reliability or credibility of those Q Records regarding "profits" was underscored by the evidence that Sharp stole from his clients. A3123-24 (Ciapala). Even where Sharp allocated amounts to a particular individual, absent extrinsic evidence of transfer there would be no reason to believe that those amounts were paid to or for the benefit of any defendant.

The District Court in its decision also addressed the Plaintiff's failure to present any "bank records confirming actual receipt of funds," noting that no court had ever "declared [such records] a sine qua non before finding the SEC's disgorgement calculation reasonable." But that is not an accurate iteration of the

40

issue; rather, the Defendants argued that the Plaintiff failed to produce any credible or contemporaneous record of amounts received by the Defendants, i.e., accounting or bank records of disbursements by Sharp *or* records of receipts by Defendants, and *instead* put forth an unreliable and inexplicable supposed accounting that, conveniently, included fictional and inflated entries.

Finally, the District Court considered the issue of "whether joint and several liability is permissible in the context of disgorgement."

> As noted above, *Liu*, while articulating the default rule of individual liability in the disgorgement context, still carved out an exception applicable to instances of "concerted wrongdoing." *Liu*, 591 U.S. at 90. Further, the Liu Court eschewed "wad[ing] into all the circumstances where an equitable profits remedy might be punitive when applied to multiple individuals[,]" id. at 91, remanding the case to the lower court instead so that it could determine whether joint and several liability would be appropriate, "[g]iven the wide spectrum of relationships between participants and beneficiaries of unlawful schemes—from equally culpable codefendants to more remote, unrelated tipper-tippee arrangements." Id. As such, the *Liu* Court recognized the permissibility of assigning joint and several liability to defendants engaged in concerted wrongdoing.

A3875-76 (Memorandum and Order).

Notwithstanding the "default rule" of individual liability, the absence of any evidence of shared control or intermixing of proceeds among the Defendants, and the distinctly different role occupied by Mr. Friesen compared to the other Defendants, the District Court decided to impose joint and several liability, holding that because "Sharp was a coconspirator in each of the conspiracies, *the ill-gotten gains need not have accrued personally to each of the Defendants –-that they may*

have partially or entirely accrued to Sharp suffices to award disgorgement." .
A3876.    Based on that view – that it did not matter whether the ill-gotten gains
"entirely accrued to Sharp," the District Court then held that "Sexton, Veldhuis, and
Friesen are jointly and severally liable with Sharp for disgorgement in the amount
of \$42,503,547; provided, however, that the amount to be disgorged from Sexton,
Veldhuis, and Friesen will be capped at, and shall not exceed, \$17,367,474,
\$13,289,897, and \$11,846,176, respectively. A3880-82 (Memorandum and Order)
("it suffices in the context of disgorgement for ill-gotten gains to have accrued to
one or more of the co-conspirators.")

The decision of the First Circuit in *BioPoint, Inc. v. Dickhaut*, 110 F.4th 337
(1st Cir. 2024), demonstrates that the District Court erred in the ruling that Mr.
Friesen was subject to joint and several liability with Fred Sharp and the other
Defendants.  The First Circuit emphasized that the court in *Lui* "pointed to several
factors that might render joint-and-several liability inappropriate. *Id.* at 91. These
circumstances included where the Defendants' "finances were not commingled,"
where "one [defendant] did not enjoy the fruits of the scheme," where "one
[defendant] was a mere passive recipient of profits," and where "other circumstances
would render a joint-and-several disgorgement order unjust."

The First Circuit then focused on the fact that the "profits attributable to trade-
secret misappropriation accrued to one defendant but not defendant Dickhaut."

42

Thus, the district court should have analyzed whether -- given factors like Dickhaut's relationship to Catapult, his role in the scheme, his enjoyment (or lack thereof) of the profits, and his status as an individual -- joint-and-several liability would be consistent with traditional equitable principles at common law. The district court did not conduct this inquiry.

Based on its consideration of the evidence, the First Circuit found that "[m]ultiple red flags identified in Liu are present here." There was not evidence that the defendants commingled finances. And other than through his salary and commissions, evidence of which the district court excluded from trial, Dickhaut did not receive any profits or otherwise enjoy the fruits of the scheme."

The court looked also to decisions from other circuits in concluding that the district court erred in imposing "joint-and-several liability on an individual, non-owner, non-director employee, without concluding whether or how much the employee benefited from the scheme."

No other circuit has applied Liu's concerted-wrongdoing exception to a non-owner employee as minor as Dickhaut. In *SEC v. Johnson*, the Fourth Circuit allowed the imposition of joint-and-several liability on an entity and an individual who was the entity's control person and owner. 43 F.4th 382, 389-93 (4th Cir. 2022). In *SEC v. World Tree Financial, LLC*, the Fifth Circuit allowed joint-and-several liability on an entity and an individual who was the entity's 60% owner and CEO. 43 F.4th 448, 448, 467 n.15 (5th Cir. 2022). In *Integrity Advance, LLC v. CFPB*, the Tenth Circuit allowed joint-and-several liability on an entity and an individual who was the entity's sole employee, founder, president, CEO, and majority shareholder. 48 F.4th 1161, 1165, 1177 n.21 (10th Cir. 2022); see Petitioner's Reply Brief at 13-14, *Integrity Advance*, 48 F.4th 1161 (No. 21-9521); see also SEC v. Camarco, No. 19-1486, 2021 U.S. App. LEXIS 37191, 2021 WL 5985058, at *18 (10th Cir. Dec. 16, 2021) (rejecting joint-and-several liability where non-profiting defendant merely "indirectly benefited" from profiting defendant's wrongdoing). Each of these

43

defendants was more closely related to and exerted more control over the profiting entity than did Dickhaut.

The District Court's error in relation to disgorgement was compounded when it appeared to confirm the appropriate predicate for a disgorgement award. i.e., identification of losses of victims, but then reversed itself. Initially, the District Court ruled on the predicate and process for a judgment of disgorgement in this case. The District Court focused on the Supreme Court's decision in *Liu v. Securities and Exchange Commission,* 591 U.S. 71 (2020), and, in numerous and consistent statements and rulings – held that disgorgement is a remedy that would be ordered *to the extent that* it reflected net profits to a defendant, and it served to reimburse harmed investors. In its pretrial decision, *SEC v. Sharp*, 626 F. Supp. 3d 354, 380, the district court confirmed that the "Supreme Court's decision in Liu further anchored this historical notion by cabining disgorgement to a wrongdoer's net profits and requiring that such awards be returned to the victims." The District Court reiterated that ruling at the oral argument as to penalties, stating that it intended to set a disgorgement figure that would then be subject to revision based on the Plaintiff's evidence concerning amounts due to harmed investors. A3787, A3792 (Transcript of Hearing) ("I may order funds to be returned or the like depending on the Court's satisfaction that the money is actually going back to identified victims, *not just some pseudo-penalty to be held by the SEC*.")

44

Those principles and authorities were then incorporated into the Court's Memorandum & Order of June 17, 2024, regarding penalties. A3823 (Memorandum and Order). The District Court again described the holding of the Supreme Court in *Liu v. SEC*, 591 U.S. 71, 75 (2020) that disgorgement is "permissible" so long as the amount "does not exceed a wrongdoer's net profits and is awarded for victims." The District Court then discussed the procedures that would be employed in this case to address the issue of disgorgement. As to the Defendant's arguments that the SEC had failed to demonstrate a basis for disgorgement because it failed to identify any harmed investors, the court described that contention as "premature." The reason, the Court explained, was that "the SEC has agreed in writing and verbally represented to the court during the hearing on remedies, see ECF No. 482, that a plan can and will be submitted to the Court, to its satisfaction, detailing plans to return the disgorged funds *to the harmed investors*." The Court then twice reiterated in that Order that its discussion of disgorgement amounts was "subject to" the SEC's compliance with that process and the court's approval of the plan for paying funds to "the harmed investors." Again, at the conclusion of its decision, the Court confirmed that the disgorgement awards were "subject to" the SEC's submission and the court's approval of a plan" "to make victims whole." A3968-73. The Court directed the SEC to "submit said plan in due course and without any unreasonable delay" so that the Court could review it and decide whether it met with its approval."

45

The parties at that point fully anticipated that the Plaintiff would adhere to the Court's direction and submit a "detailed plan" identifying harmed investors, and that Defendants would have an opportunity to review and respond. Instead, three days later, the Court issued judgments that failed to incorporate those prior rulings. A3907 (Judgment as to Friesen). The judgment instead set a disgorgement amount and directed the Defendant to pay a total of more than $13 million "within 30 days after entry of the judgment." A3915 (Judgment). That document provided for immediate enforcement of the judgment, without any reference to submission or approval of a plan identifying harmed investors and it allows for civil contempt for violation of the court orders. A3908 (Judgment).

While that language may have been appropriate in other securities matters, it was not consistent with the process that was ordered by the district court. The Court directed that the process of identification of harmed investors should occur without delay and that, through that process, the Court would determine if the disgorgement figures should be adjusted or reduced. It anticipated the possibility, for example, that these particular violations would have resulted in harm to investors that fell below the disgorgement figure that is based only on allocations contained in Defendant Sharp's Q Records. It did not endorse the notion that those disgorgement figures could, in the absence of identification of harmed investors, end up being nothing more than a massive and further penalty, delivered over to the U.S. Treasury.

Rather than address those critical issues, the Court granted the SEC's applications for immediate turnover of funds. A3991 (Order Directing Transfer).

## CONCLUSION

For the reasons set forth above, the judgment of liability as to Jackson Friesen should be reversed. In the alternative, the District Court's decision awarding disgorgement (A3823) (Memorandum and Order), the Judgment (A3907) and the Order Directing Transfer (A3991) as to Mr. Friesen should be reversed.

Dated: February 6, 2025

MG+M The Law Firm                         Maranda E. Fritz, PC


By: */s/ Timothy J. Fazio*                      By: */s/ Maranda E. Fritz*
   Timothy J. Fazio, No. 120461               Maranda E. Fritz, No. 1213765
   125 High Street, 6th Floor                 521 Fifth Avenue
   Oliver Street Tower                        New York, NY 10017
   Boston, MA 02110                           TEL: 646-584-8231
   TEL: 617-670-8635                          Email: Maranda@fritzpc.com
   Email: Tfazio@mgmlaw.com

   *Counsel for Jackson T. Friesen*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Fed. R. App. P.

32(a)(7)(B) because (1) this brief contains 11,712 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(f); and (2) this brief complies with the

typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of

Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14 point

proportionally spaced Times New Roman font.

By: */s/ Timothy J. Fazio*      
         Timothy J. Fazio
         Counsel for Jackson T. Friesen

Dated: February 6, 2025

**CERTIFICATE OF SERVICE**

I certify that on February 6, 2025, I served a copy of the foregoing document

on all counsel of record in the ECF system.

By: */s/ Timothy J. Fazio*
Timothy J. Fazio
Counsel for Jackson T. Friesen

Dated: February 6, 2025

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

Judge Young Memorandum & Order (June 17, 2024, Docket No. 494)………1-63

Judge Young Judgment as to Defendant Jackson T. Friesen (June 20, 2024, Docket No. 497) …………………………………………………………………….64-73

Order Directing Transfer of Jackson T. Friesen's Frozen Funds to the Securities & Exchange Commission (July 11, 2024, Docket No. 509) … …………………..74-80

Electric Order re Motion to Amend (July 16, 2024)………………………………..81

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
SECURITIES AND EXCHANGE        )
COMMISSION,                    )
                               )
            Plaintiff,         )
                               )
v.                             )          CIVIL ACTION
                               )          NO. 21-11276-WGY
FREDERICK L. SHARP,            )
ZHIYING YVONNE GASARCH,        )
COURTNEY KELLN,                )
MIKE K. VELDHUIS,              )
PAUL SEXTON,                   )
JACKSON T. FRIESEN,            )
WILLIAM T. KAITZ,              )
AVTAR S. DHILLON, and          )
GRAHAM R. TAYLOR,              )
                               )
            Defendants.        )
                               )
_____)
```

YOUNG, D.J.                                June 17, 2024

**MEMORANDUM & ORDER**

## I.    INTRODUCTION

Following a ten day civil securities fraud jury trial
resulting in a verdict for the plaintiff Securities and Exchange
Commission ("SEC"), the SEC now moves for remedies against the
defendants Zhiying Yvonne Gasarch ("Gasarch"), Courtney Kelln
("Kelln"), Mike K. Veldhuis ("Veldhuis"), Paul Sexton
("Sexton"), and Jackson T. Friesen ("Friesen") (collectively,
the "Defendants").  See generally Pl.'s Mot. for Remedies
against Defs. ("Mot. Remedies"), ECF No. 425.  The Defendants

oppose the SEC's proposed remedies.  See Def. Sexton's Opp'n
Mot. Remedies ("Sexton's Opp'n"), ECF No. 454; Defs. Kelln &
Veldhuis' Opp'n Mot. Remedies ("Kelln & Veldhuis' Opp'n"), ECF
No. 455; Def. Gasarch's Opp'n Mot. Remedies ("Gasarch's Opp'n"),
ECF No. 464; Def. Friesen's Opp'n Mot. Remedies ("Friesen's
Opp'n"), ECF No. 471.

   The SEC filed replies to all of the above-mentioned
opposition memoranda.  See Pl.'s Reply Mem. Supp. Mot. Remedies
against Defs. Sexton, Veldhuis, and Kelln ("Pl.'s Reply to
Sexton, Veldhuis & Kelln"), ECF No. 470; Pl.'s Reply Mem. Supp.
Mot. Remedies against Def. Gasarch ("Pl.'s Reply to Gasarch"),
ECF No. 474; Pl.'s Reply Mem. Supp. Mot. Remedies against Def.
Friesen ("Pl.'s Reply to Friesen"), ECF No. 480.  Sexton and
Gasarch filed sur-replies to the SEC's replies.  See Sexton's
Sur-Reply Mot. Remedies ("Sexton's Sur-Reply"), ECF No. 473;
Gasarch's Sur-Reply Mot. Remedies ("Gasarch's Sur-Reply"), ECF
No. 481.

   On September 27, 2023, a unanimous jury found Friesen and
Gasarch to have committed various securities violations alleged
by the SEC.  See Jury Verdict, ECF No. 402.[1]  As to the other
defendants presently before the Court, Kelln, Veldhuis, and

---

[1] These were various violations of both the Securities Act of
1933 ("Securities Act") and the Securities Exchange Act of 1934
("Exchange Act").

Sexton, the Court entered partial judgments against them before the trial.  <u>See</u> J. as to Kelln ("Kelln J."), ECF No. 317; J. as to Veldhuis ("Veldhuis J."), ECF No. 325; J. as to Sexton ("Sexton J."), ECF No. 378.  Pursuant to those judgments, the Court ordered Kelln, Veldhuis, and Sexton, and they each agreed, not to "contest liability under the claims filed by the [SEC]" at the remedies stage.  Kelln J. 5; Veldhuis J. 5; Sexton J. 1-2.  In the same partial judgments, however, the Court ordered that these three defendants, while accepting liability, would "be permitted to challenge the remedies and sanctions sought by the [SEC]," Kelln J. 5; Veldhuis J. 5, and that they would "be permitted to oppose the [SEC's] requested relief, including any calculations thereof."  Sexton J. 2.

The remedies now sought by the SEC are three-fold.  <u>See generally</u> Pl.'s Mem. Supp. Mot. Remedies ("Mem. Supp."), ECF No. 426.  <u>First</u>, the SEC requests injunctive relief against Sexton, Friesen, and Gasarch, asking this Court to (1) permanently restrain and enjoin them from violating securities laws; (2) issue specific conduct-based injunctions permanently barring them from professionally -- but not personally -- participating in a national securities exchange; and (3) issue penny stock

bars permanently barring them from trading in penny stocks.[2] <u>See</u> <u>id.</u> at 2–11.

    <u>Second</u>, the SEC requests this Court impose civil penalties against the Defendants in the following amounts: (1) $1,562,603 against Sexton; (2) $1,562,603 against Friesen; (3) $1,562,603 against Veldhuis; (4) $904,078 against Kelln; and (5) $558,072 against Gasarch. <u>Id.</u> at 1.

    <u>Third</u>, the SEC seeks disgorgement awards and prejudgment interest as to the Defendants in the following amounts: (1) $17,367,474 in disgorgement and $5,872,145 in prejudgment interest against Sexton; (2) $11,846,176 in disgorgement and $4,057,737 in prejudgment interest against Friesen; (3) $13,289,897 in disgorgement and $4,314,031 in prejudgment interest against Veldhuis; (4) $1,582,785 in disgorgement and $460,687 in prejudgment interest against Kelln; and (5) $2,522,367 in disgorgement and $646,366 in prejudgment interest against Gasarch. <u>Id.</u>

    Having reviewed the parties' briefs and having held a hearing on the question of remedies, <u>see</u> ECF No. 484, this Court (1) granted the SEC's request for injunctive relief against

---

    [2] Penny stock "generally refers to a security issued by a very small company that trades at less than $5 per share." Am. Compl. ¶ 40, ECF No. 230; <u>see also</u> <u>Securities and Exchange Commission</u> v. <u>Sharp</u>, 626 F. Supp. 3d 345, 366 n.3 (D. Mass. 2022).

Sexton, Friesen, and Gasarch in its entirety; (2) imposed civil
penalties against Sexton, Friesen, Veldhuis, and Kelln in the
amounts requested by the SEC, and as to Gasarch, having
considered a downward variance from the SEC's requested amount
of $558,072 equitable and appropriate, imposed a civil penalty
of $269,651; and (3) took the issue of disgorgement and
prejudgment interest as to all of the Defendants under
advisement. See id.

With this memorandum and order, the Court now provides its
written disposition of the SEC's motion for remedies. In
addition to providing its explanation for imposing the above-
mentioned injunctions and civil penalties against the
Defendants, for the reasons elucidated below, the Court now
**GRANTS** the SEC's motion for disgorgement in its entirety, but
modifying it to hold the Defendants jointly and severally liable
in the following manner, and **DENIES** the SEC's motion for
prejudgment interest.

## II.  FACTUAL BACKGROUND

At its core, the present enforcement action centers around
an elaborate securities fraud scheme involving a sequence of
separate pump and dump endeavors. Each proceeded in three
steps. Certain defendants (1) accumulated penny stocks in
national markets in micro-cap companies; (2) promoted the penny
stocks in these companies by using paid promotions to garner the

attention and interest of unwitting investors; and (3) sold
their stocks to investors, not in their own names but through
so-called shell or nominee companies they formed in order to
skirt securities laws that otherwise prohibit the unregulated
sale of restricted and control securities.  See Sharp, 626 F.
Supp. 3d at 366 (detailing the scheme based on allegations in
SEC's complaint).  In essence, the Defendants "engaged in a
decade-long scheme to profit at the expense of unwitting
investors by concealing their, or their clients', ownership and
control of many microcap companies."  Mem. Supp. 1.

Each of the Defendants played a different role in the
interconnected pump-and-dump schemes.  Sexton, Veldhuis, and
Friesen acted as a group that teamed with Sharp to "sell stock
surreptitiously in the public market."  Am. Compl. ¶ 7.  They
acquired, held, and then disposed of shares.  Id. ¶ 153.  Kelln,
Sharp's employee, helped conceal common control of shares by
distributing them accordingly to Sharp's directions.  Id. ¶¶ 52-
53.  "Much of Kelln's work was grouping stocks for transmission
to transfer agents such that the totals appeared five percent to
avoid disclosure and registration requirements."  Sharp, 626 F.
Supp. 3d at 366 (footnote omitted).  Gasarch, another Sharp
employee, "organized wire transfers of the proceeds from the
illegal stock sales while concealing the beneficiaries,
maintained records in the encrypted accounting system, and

routinely created false invoices to support the payments." Id. at 366-67; see also Am. Compl. ¶¶ 57-59.

Importantly, Kelln, Veldhuis, and Sexton have admitted their liability, and this Court has entered partial judgments against them in which they were instructed not to contest liability but were given the opportunity to challenge any and all remedies the SEC now seeks against them. See Kelln J. 5; Veldhuis J. 5; Sexton J. 1-2. As for the remaining defendants, Friesen and Gasarch, a ten-day trial ensued in which a unanimous jury found both liable for the various securities laws violations alleged in the SEC's complaint. See Jury Verdict; see also generally Tr. Jury Trial Day Ten 7-9, ECF No. 445.

## III. ANALYSIS

The SEC seeks three remedies: (1) injunctive relief against Sexton, Friesen, and Gasarch; (2) civil penalties against the Defendants, in varying amounts; and (3) disgorgement and prejudgment interest against the Defendants, in varying amounts. See generally Mem. Supp. 1.

### A. Injunctive Relief Against Sexton, Friesen, and Gasarch

Section 21(d) of the Exchange Act permits the SEC to seek temporary or permanent injunctions against persons "engaged or [] about to engage" in Exchange Act violations. 15 U.S.C. § 78(u)(d)(1); see also Securities and Exchange Commission v.

Sargent, 329 F.3d 34, 39 (1st Cir. 2003).  "Such an injunction
is appropriate where there is, 'at a minimum, proof that a
person is engaged in or is about to engage in a substantive
violation of either one of the Acts or of the regulations
promulgated thereunder.'"  Sargent, 329 F.3d at 39 (quoting
Aaron v. SEC, 446 U.S. 680, 700-01 (1980)).  "The legal standard
for issuing an injunction is 'reasonable likelihood of
recidivism, not an imminent threat of it.'"  Securities and
Exchange Commission v. Lemelson, 596 F. Supp. 3d 227, 231 (D.
Mass. 2022) (Saris, J.) (quoting Sargent, 329 F.3d at 39).  In
assessing the likelihood of recidivism, courts look at several,
non-dispositive factors, including "the nature of the violation,
including its egregiousness and its isolated or repeated
nature"; "whether the defendants will, owing to their
occupation, be in a position to violate again"; and "whether the
defendants have recognized the wrongfulness of their conduct."
Id.  In analyzing whether injunctive relief is appropriate,
courts consider the relevant factors to be established based on
"a preponderance of the evidence."  Steadman v. SEC, 450 U.S.
91, 95 (1981) (affirming a lower court "holding that in a
disciplinary proceeding before the [SEC] violations of the
antifraud provisions of the securities laws may be established
by a preponderance of the evidence").

Here, the SEC seeks three types of injunctive relief: (1) permanent injunctions; (2) specific, conduct-based injunctions; and (3) penny stock bars. <u>See</u> Mem. Supp. 2-11.

### 1. Permanent Injunctions

The SEC seeks permanent injunctions against Sexton, Friesen, and Gasarch that would prevent them from violating securities laws. <u>Id.</u> at 2.

Specifically, the SEC makes three arguments. First, it argues that the three Defendants' conduct was "egregious, recurrent, and sustained." <u>Id.</u> at 3. The SEC notes in support of this contention that the scheme in which these three Defendants were involved "resulted[ed] in the fraudulent sale of more than $144 million worth of penny stocks," <u>id.</u>; that Gasarch enabled the scheme by, among other things, concealing beneficial ownership and fabricating invoices and other documents, <u>id.</u> at 3-4; and that Sexton and Friesen exercised control over the stock of 14 issuers but concealed their control in their pump-and-dump schemes, <u>id.</u> at 4. Second, the SEC argues that these three Defendants "have the opportunity to violate again." <u>Id.</u> at 5. The SEC notes that they engaged in illegal conduct spanning a decade; that they are located in "metropolitan Vancouver where they apparently have not found gainful employment"; and that they have refused to testify before the SEC to answer questions about their activity. <u>Id.</u> at 5-6.

Third, the SEC argues that these three Defendants "have not yet recognized the wrongful nature of their conduct." Id. at 6. The SEC also notes that this Court has issued similar injunctions against certain other defendants in this case. Id. at 3; see, e.g., Final J. as to Sharp 2 ("Sharp J."), ECF No. 211 (ordering that Sharp "is permanently restrained and enjoined" from violating securities laws); Kelln J. 2-4 (same language); Veldhuis J. 2-4 (same language).

The three Defendants oppose. Sexton argues that the SEC "has not established a reasonable likelihood of recurrence," Sexton's Opp'n 16, emphasizing that the last purported profit attributed to him is dated 2018, and that "nearly 93 percent of the alleged profits are from in or before 2015," id. Friesen contends that the SEC has failed to provide the Court with "evidence of any conduct in the last six years" to establish a likelihood of recurrence. Friesen's Opp'n 11 (emphasis in original). Gasarch also opposes a permanent injunction, arguing that she was never involved in the actual issuance, purchase, offer or sale of security, which the permanent injunction seeks to enjoin. Gasarch's Opp'n 15. She also notes that the SEC has failed to establish the likelihood of recurrence. Id. at 16.

While "an injunction is a drastic remedy," Aaron, 446 U.S. at 703 (Burger, C.J., concurring), for the following reasons,

this Court concludes that a permanent injunction against Sexton, Friesen, and Gasarch is an appropriate remedy.

First, the Court finds that these three Defendants' securities laws violations were egregious and of a repeated nature. As the First Circuit has observed, a securities law "violation [may be considered] not an egregious one, particularly where [the defendant] neither traded on the information himself nor derived any direct personal profit." Sargent, 329 F.3d at 39. Conversely, here, each of the three Defendants directly and personally profited from the scheme. Pursuant to the partial judgment as to Sexton, he "is liable under Counts I-IV of the Amended Complaint[.]" Sexton J. 1. Those counts attribute liability to Sexton for engaging in fraud in connection with the offer and sale of unregistered securities, Am. Compl. ¶¶ 250-63, which has resulted in "the fraudulent sale of more than $144 million worth of penny stocks," Mem. Supp. 3, from which Sexton personally profited. See, e.g., Decl. of Ryan Murphy ("Decl. of Ryan Murphy I") ¶¶ 48-49, ECF No. 273; Mem. Supp. 4. Friesen and Gasarch have similarly profited from the schemes. See Decl. of Ryan Murphy I ¶¶ 48-49 (Friesen); Mem. Supp. 3-4 (Gasarch).

In addition to the egregiousness of the deceit undergirding it, the pump-and-dump schemes, far from being isolated or short in duration, lasted for a decade. See Mem. Supp. 1. Courts in

this district and others have not hesitated to impose permanent
injunctive relief against securities law violations much shorter
in duration.  See, e.g., Securities and Exchange Commission v.
Chan, 465 F. Supp. 3d 18, 38 (D. Mass. 2020) (Burroughs, J.)
(finding an "egregious" violation where "an [] insider trading
scheme [] lasted for nearly two years and involved multiple
trades"); Securities and Exchange Commission v. Wall, 2020 U.S.
Dist. LEXIS 56152, at *25 (D. Me. Mar. 31, 2020) (ordering
permanent injunction where "the defendants' violations were part
of a pattern lasting more than four years").

Additionally, in view of the fact that the pump-and-dump
scheme involved fourteen separate issuers, thus rendering these
Defendants' securities violations repetitive and schematic in
nature, the Court does not hesitate to conclude that said
violations were egregious.  Cf. Securities and Exchange
Commission v. Cody, 2019 U.S. Dist. LEXIS 210452, at *11 (D.
Mass. Dec. 5, 2019) (Saylor, J.) (finding egregious conduct in
view of "the fact that [defendant] made multiple representations
over a prolonged period of time and created falsified documents
to hide his deceptions"); Securities and Exchange Commission v.
Weed, 315 F. Supp. 3d 667, 676 (D. Mass. 2018) (Gorton, J.)
(finding egregiousness where "[t]he violations [] were repeated
in nature"); Securities and Exchange Commission v. Spencer
Pharm. Inc., 2015 U.S. Dist. LEXIS 132909, at *17 (D. Mass.

Sept. 30, 2015) (Talwani, J.) (finding that "the scope and complexity of the scheme supports the need for a permanent injunction").

Second, the Court finds that these three Defendants have the opportunity to violate securities laws again. As the First Circuit has clarified, under this prong of the analysis, courts must find a reasonable likelihood -- not mere possibility -- of recidivism. See Securities and Exchange Commission v. Lemelson, 57 F.4th 17, 31 (1st Cir. 2023). Here, the Court so finds. Although Sexton points out that his "proceeds have been frozen," Sexton's Opp'n 17, the SEC notes that "all three defendants recently sought a release of frozen funds," and none presented the Court with evidence that there are now gainfully employed outside of the microcap industry in which their fraudulent scheme operated. See Mem. Supp. 5. Remaining in the same sector or industry in which one's offensive conduct took place is a factor that courts have weighed in favor of finding a likelihood of recidivism. Cf. Lemelson, 57 F.4th at 31 ("Lemelson's continued position as a hedge fund manager and investment adviser would readily allow him to benefit from future material misstatements concerning investments."). Further, Sexton's argument that the "so-called Sharp network is no more," Sexton's Opp'n 16-17, is unavailing. The "Sharp network" is no more not because the Defendants ceased to operate

it on their own accord, which could have been an indication to
the Court that the Defendants do not intend to engage in future
violations.  That counterfactual is of no moment: the Sharp
network is no more simply because of law enforcement and the
present action brought by the SEC, not because the Defendants do
not intend to engage in future violations.

Moreover, that considerable time has elapsed since these
three Defendants last violated securities laws, see, e.g.,
Sexton's Opp'n 16; Friesen's Opp'n 11, does not persuade the
Court that they will not offend in the future.  Courts have
found a likelihood of recurrence where Defendants were seemingly
similarly, if not more, unlikely to offend again.  See, e.g.,
Cody, 2019 U.S. Dist. LEXIS 210452, at *10-11 (finding
likelihood of recurrence "[a]lthough it is true that he is
currently imprisoned, and thus not immediately in a position to
commit further violations"); Securities and Exchange Commission
v. Present, 2018 U.S. Dist. LEXIS 45056, at *5 n.1 (D. Mass.
Mar. 20, 2018) (Sorokin, J.) (finding likelihood of recidivism
in 2018 even though defendant "has not worked in the securities
industry since 2014").[3]

---

[3] The Court also observes that the duration of the schemes,
spanning nearly a decade, in addition to weighing in favor of
issuing a permanent injunction in and of itself, persuades the
Court, in combination with the reasons provided under this
paragraph, that the three defendants have significant experience
in the securities industry, rendering a future violation more

14

Third, the Court finds that these three Defendants have not acknowledged their wrongdoing.  Sexton still contends that the SEC, at most, can establish discrete securities laws violations but not that there was a fraudulent scheme where "all transactions involving 14 issuers were fraudulent," Sexton's Opp'n 8, thereby attempting to minimize his offensive conduct.  Sexton also contends that "[t]here is nothing unlawful about stock promotion," id. at 9, denying the impropriety and illegality of his conduct.  Sexton further avers that the SEC has not been able to show that there "are any victims" of the scheme, id. at 10, a contention reiterated by Friesen, see Friesen's Opp'n 8, that, once again, endeavors to deny or at least minimize the large-scale harm perpetrated by their schemes.  In similar fashion, Gasarch, despite a unanimous jury verdict finding her liable of independent and aiding-and-abetting violations of securities laws, see Jury Verdict, continues to argue that her involvement in the scheme was legitimate.  See, e.g., Gasarch's Opp'n 10 ("Clearly, given the length of time and the number of accounts and activities, Mrs. Gasarch was compensated for supporting Mr. Sharp in his

---

likely than not.  Cf. Securities and Exchange Commission v. Baccam, 2017 U.S. Dist. LEXIS 88450, at *26 (C.D. Cal. June 8, 2017) (granting SEC's request for a permanent injunction in view of the fact, among others, that "[defendant] has more than a decade of experience in the securities industry").

legitimate business activities."); see also id. at 16
(contending that her conduct was not "grave" and her involvement
in the scheme not "prominent"). The Court accordingly finds
that these three Defendants have failed to show proper remorse
and acknowledge the wrongful nature of their conduct.

Finally, Gasarch unpersuasively argues that a permanent
injunction restraining and enjoining her from the issuance,
purchase, offer or sale of securities is inappropriate because
she did not independently and directly engage in any violations
involving such actions but, at most, aided and abetted others
who directly engaged in those actions. See Gasarch's Opp'n 15.
Other sessions of this Court have not hesitated to permanently
restrain and enjoin defendants from engaging in violations whose
perpetration they aided and abetted. See, e.g., Spencer Pharm.
Inc., 2015 U.S. Dist. LEXIS 132909, at *15, *18 (issuing
permanent injunction against aider and abettor of securities law
violation).[4]

---

[4] Accepting Gasarch's contention that the Court ought not
issue a permanent injunction against her because she merely
aided and abetted others in their fraudulent participation in
the securities market is unmeritorious for two additional
reasons. First, the jury, in addition to finding her to have
aided and abetted others, found Gasarch independently liable of
violating Section 17(a)(3). See Jury Verdict 2. While that
independent violation does not directly pertain to the issuance
of securities, it supports this Court's finding - - made during
the trial - - that Gasarch was "at the hub" of the scheme. Tr.
Jury Trial Day Eight 41, 164, ECF No. 442. Her role at the hub
of the scheme supports this Court's finding that she was an

Accordingly, this Court finds that Sexton, Friesen, and Gasarch engaged in egregious and repeated violations of securities laws for many years; are in a position to violate again; and have failed to recognize the wrongfulness of their conduct.  In view of these findings, a permanent injunction against each of the three is appropriate.[5]

---

important part of the scheme even though she may not have been as culpable as the other defendants.  Second and more generally, permanent injunctions are equitable remedies over which courts enjoy a great degree of latitude.  See, e.g., Securities and Exchange Commission v. Tropikgadget FZE, 2017 U.S. Dist. LEXIS 25495, at *12 (D. Mass. Feb. 23, 2017) (Burroughs, J.) ("The Court has broad authority to grant such an injunction."). Gasarch's contention that she ought not be enjoined from activity she herself did not commit but only aided and abetted would run afoul of that latitude and also of the relevant statutory text that grants this Court broad equitable powers: "In any action or proceeding brought or instituted by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78(u)(d)(5) (emphasis added).

[5] At least one of the three defendants has averred that permanent injunctions enjoining future securities laws violations, so-called "obey-the-law injunctions," do not make sense because everyone, regardless of an injunction, is bound to not violate laws, including the securities laws in question. See, e.g., Sexton's Opp'n 17; see also Securities and Exchange Commission v. Goble, 682 F.3d 934, 949 (11th Cir. 2012) ("As the name implies, an obey-the-law injunction does little more than order the defendant to obey the law.  We have repeatedly questioned the enforceability of obey-the-law injunctions not only in the context of securities cases but other cases as well.").

While the First Circuit has struck general and vaguely worded "obey-the-law" injunctions in other contexts, see Equal Employment Opportunity Commission v. Aviation Port Servs., LLC, 2020 U.S. Dist. LEXIS 57073, at *34-35 (D. Mass. Apr. 1, 2020) (Saylor, C.J.) (collecting and analyzing cases), courts in this

## 2. Specific, Conduct-Based Injunctions

The SEC requests this Court specifically enjoin Sexton, Friesen, and Gasarch from "participating in the issuance, purchase, offer, or sale of any security; provided, however, that such an injunction shall not prevent [defendants] from purchasing or selling securities listed on a national securities exchange for [their] own personal account." See, e.g., Mot. Remedies, Text of Proposed Order Proposed Final J. as to Gasarch, ECF No. 425-2. In essence, the requested conduct-based injunction would prevent the three Defendants from professionally -- but not personally -- engaging in the national securities market.

This Court is authorized to issue the requested conduct-based injunction. See 15 U.S.C. § 78(u)(d)(1); 15 U.S.C. § 78(u)(d)(5). "The Court has wide discretion to impose a conduct-based injunction in SEC actions." Securities and Exchange Commission v. CKB168 Holdings, Ltd., 2022 U.S. Dist. LEXIS 144893, at *9 (E.D.N.Y. Aug. 12, 2022). The analysis for the SEC's request for permanent injunctions, see supra Section

---

Circuit as well as other sessions of this Court have issued injunctions in the securities context that are similar to the injunctions requested in the present case. See, e.g., Chan, 465 F. Supp. 3d at 38; Present, 2018 U.S. Dist. LEXIS 45056, at *2-3.

III.A.1 ("Permanent Injunctions"), is equally applicable here.
See CKB168 Holdings, Ltd., 2022 U.S. Dist. LEXIS 144893, at *9
(applying its permanent injunction analysis in its entirety --
"[f]or the same reasons laid out [above]" -- to its conduct-
based injunction analysis).

For the same reasons elucidated above, the Court issues the
specific, conduct-based injunctions requested by the SEC.  The
Court additionally notes three points in support of its
conclusion.  First, as the SEC correctly brings to this Court's
attention, "[t]his Court has issued this same requested
injunction against Sharp, Kelln, and Veldhuis already."  Mem.
Supp. 7.  Sexton, Friesen, and Gasarch have not raised any
convincing argument as to why their cases ought be treated any
differently.  Second, other courts, including those in this
Circuit, have issued similar specific, conduct-based
injunctions.  See, e.g., Wall, 2020 U.S. Dist. LEXIS 56152, at
*26-27.  Third, the injunction still allows the three Defendants
to "purchas[e] or sell[] securities listed on a national
securities exchange for [their] own personal account."  See,
e.g., Mot. Remedies, Text of Proposed Order Proposed Final J. as
to Sexton 5, ECF No. 425-3.  As such, this conduct-based
injunction "does not deprive [the three defendants] of [their]
living or the opportunity to purchase and sell securities for

[their] own personal account." <u>Wall</u>, 2020 U.S. Dist. LEXIS 56152, at *27.

### 3. Penny Stock Bars

The SEC requests that Sexton, Friesen, and Gasarch be barred from participating in future offerings of penny stocks. <u>See</u> Mem. Supp. 8-11; <u>see also</u> Mot. Remedies, Text of Proposed Order Proposed Final J. as to Sexton 5 (requesting the Court decree the three Defendants "permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock").

"The standard for imposing a penny stock bar essentially 'mirrors that for imposing an officer-or-director bar.'" <u>Weed</u>, 315 F. Supp. 3d at 677 (quoting <u>Securities and Exchange Commission</u> v. <u>Universal Exp., Inc.</u>, 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007)). The criteria to determine whether an officer-or-director bar is appropriate, in turn, are: "(1) the egregiousness of the underlying securities law violation, (2) whether defendant was a repeat offender, (3) defendant[']s[] role in the fraud[,] (4) defendant's degree of scienter, (5) defendant's economic stake in the fraud and (6) the likelihood that misconduct will recur." <u>Id.</u> (citing <u>Securities and Exchange Commission</u> v. <u>Patel</u>, 61 F.3d 137, 142 (2d Cir. 1995)).

These criteria, also known as the Patel factors, are "neither mandatory nor exclusive." Securities and Exchange Commission v. Bankosky, 716 F.3d 45, 46 (2d Cir. 2013); see also Securities and Exchange Commission v. Johnston, 368 F. Supp. 3d 247, 251 (D. Mass. Mar. 21, 2019) (Gorton, J.) ("While the Patel factors are instructive . . . they are not exhaustive and it is not necessary to apply all of the factors in every case.").

Here, the analysis in the foregoing sections has already established that Sexton, Friesen, and Gasarch meet many of the Patel factors,[6] which obviates the need for repetition. Accordingly, the Court grants the SEC's request for penny stock bars against each of the three Defendants.

The Court finds it appropriate to dispose of Gasarch's argument concerning her scienter -- or rather, in her formulation, the lack thereof -- here, as a "defendant's degree of scienter" is among the relevant Patel factors quoted above. Weed, 315 F. Supp. 3d at 677.

In her opposition, Gasarch correctly points to a misquotation by the SEC. See Gasarch's Opp'n 1. Indeed, in its motion for remedies, the SEC submitted that the jury found

---

[6] For example, Sexton, Friesen, and Gasarch's conduct was egregious, see supra pp. 11-12; repeated over the course of many years, see supra pp. 12-13; and resulted in economic benefit to the three defendants, see supra pp. 11-12. Further, there is a likelihood that their misconduct, in the absence of an appropriate injunction, will recur. See supra pp. 13-14.

"Gasarch liable for violating Section 17(a)(3) of the Securities Act and aiding and abetting violations of Sections 17(a)(1) <u>and</u> (3) of the Securities Act <u>and</u> Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act. . . ." Mot. Remedies (emphasis added). Yet, as Gasarch points out and as the jury verdict form clearly indicates, the jury found Gasarch liable for independently violating Section 17(a)(3) of the Securities Act and aiding and abetting violations of Section 17(a)(1) <u>or</u> Section 17(a)(3) of the Securities Act <u>or</u> Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act. See Jury Verdict 2; <u>see also</u> Gasarch's Opp'n 1. While the jury may have found multiple aiding and abetting violations, the use of the disjunctive "or" indeed makes it also entirely possible, as Gasarch contends, that the jury may have found her liable for her independent violation of Section 17(a)(3) of the Securities Act and for aiding and abetting violations of, again, Section 17(a)(3). See Gasarch's Opp'n 1.

Since a Section 17(a)(3) violation does not require scienter, as this Court previously held, <u>see</u> <u>Sharp</u>, 626 F. Supp. 3d at 382, Gasarch argues that it is possible that she is liable for her independent non-scienter-based conduct violating Section 17(a)(3) and for aiding and abetting others' non-scienter-based conduct violating the same. See Gasarch's Opp'n 2. Gasarch goes on to argue that, assuming those are her only two

securities law violations, "an aider and abettor may be liable only to the same extent as the person to whom such assistance is provided." Gasarch's Sur-Reply 5 (quotation omitted). Her contention seems to be that her aiding and abetting violation may be without scienter since the conduct she aided and abetted itself is non-scienter-based if it is just the aiding and abetting of others' non-scienter-based Section 17(a)(3) violations.

This Court rejects this contention for two reasons and instead finds that Gasarch acted with a degree of scienter in aiding and abetting securities violations by other defendants. First, even assuming, arguendo, that they jury found Gasarch liable only for her independent and non-scienter-based violation of Section 17(a)(3) and for aiding and abetting other defendants' violation of the same, this Court is still permitted to make findings of fact as to the appropriate remedy that do not conflict with the jury's findings as to liability. Such findings as to remedy may –- and here they do –- include the finding that Gasarch acted with scienter. Based on ample evidence presented at trial, and as the Court made clear during the hearing on remedies, the Court finds that there is sufficient evidence to establish that Gasarch acted intentionally. Second, and relatedly, the Court rejects Gasarch's contention as erroneous that an aiding and abetting

violation ought have, at most, the same degree of scienter as
the underlying violation. That is because here, the very act of
aiding and abetting a securities violation, regardless of
whether the aided conduct itself requires scienter for its
commission, requires its own culpable mental state. See, e.g.,
Malouf v. SEC, 933 F.3d 1248, 1268 (10th Cir. 2019) (holding
that "scienter is an essential element of aiding and abetting a
violation of the securities law"); Securities and Exchange
Commission v. Blackburn, 2015 U.S. Dist. LEXIS 120747, at *21
(E.D. La. Sept. 10, 2015) ("[A] prima facie claim for aiding and
abetting a violation of securities laws involves an underlying
requirement of scienter."). In the case at bar, this Court
instructed the jury during Gasarch's trial that an aiding and
abetting violation requires knowing or reckless conduct. See
Tr. Jury Trial Day Nine 34:24-25, 35:1, ECF No. 444 (instructing
the jury on the aiding and abetting allegation against Gasarch,
explaining that it must find, among other things, that "Gasarch
knowingly or recklessly provided substantial assistance to the
violation"). Thus, regardless of the conduct Gasarch aided and
abetted, that she aided and abetted others' conduct in violation
of the securities laws suffices for this Court to find that she
acted with scienter.[7]

---

[7] In any event, in view of the fact that scienter is but one

Accordingly, a permanent penny stock bar will issue against Sexton, Friesen, and Gasarch.

### B. Civil Penalties Against All of the Defendants

#### 1. Legal Standard

Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the SEC to seek, and this Court to impose, civil penalties to be determined "in light of the facts and circumstances." See Lemelson, 596 F. Supp. 3d at 233. In assessing civil penalties, courts may choose from three tiers, Tier I, Tier II, and Tier III, in increasing order of severity. Tier II requires "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77(t)(d)(2)(B). Tier III requires all of the elements of Tier II and the additional requirement that "such violation directly or indirectly result[] in substantial losses or create[] a significant risk of substantial losses to other persons." 15 U.S.C. § 77(t)(d)(2)(C). Tier I is available for all other violations. See also Mem. Supp. 12 (outlining the tier system). "The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court."

---

of the many Patel factors discussed above, the egregiousness of Gasarch's conduct, her economic stake in the fraud, and the likelihood that her misconduct will recur, still weigh in favor of issuing a penny stock bar against her.

Securities and Exchange Commission v. Kern, 425 F.3d 143, 153
(2d Cir. 2005) (citing 15 U.S.C. § 77(t)(d)).

In fashioning an appropriate civil penalty, courts look to
a variety of factors, including: "the egregiousness of the
violation, the defendant's willingness or failure to admit
wrongdoing, the isolated or repeated nature of the violations,
the degree of scienter involved, the defendant's cooperation
with authorities or lack thereof, and the defendant's current
financial condition." Securities and Exchange Commission v.
Esposito, No. 16-cv-10960-ADB, 2018 U.S. Dist. LEXIS 72728, at
*9 (D. Mass. Apr. 30, 2018) (Burroughs, J.).

Importantly, civil penalty claims may be time-barred. As
this Court previously held in disposing of a prior motion to
dismiss in this case, see Sharp, 626 F. Supp. 3d at 385-86, the
applicable statute subjects civil penalty claims like those
requested here to a five-year statute of limitations. Thus,
this Court may impose civil penalties only in relation to
securities law violations that may have occurred between August
5, 2016, and August 5, 2021, id. at 382. By contrast, as this
Court previously stated, it cannot impose a monetary penalty in
relation to violations prior to August 2016. See Tr. Motion and
Charge Conference 55:15-18, ECF No. 443 ("So let me be clear.
If we get to remedies, and I'm coming to think about remedies,
and I think that violation was pre-August 2016, then I cannot

26

impose a monetary penalty."); see also Sexton's Opp'n 14 (same); Gasarch's Opp'n 13 (same).

### 2. Parties' Arguments

With the foregoing legal standard in mind, the SEC requests this Court condemn the Defendants' conduct as repeated and egregious violations "evinc[ing] a high degree of scienter." Mem. Supp. 13. The SEC also argues that none of the Defendants have acknowledged the wrongfulness of their conduct and that they are in possession of "substantial assets to satisfy a judgment." Id. at 14; see also id. at 3-5 (describing how the Defendants' conduct caused substantial loss to investors).

As for each of Sexton, Veldhuis, and Friesen, the SEC requests the Court impose "individual civil penalties in the amount of $1,562,603." Id. at 14. The SEC's proposed methodology is as follows: multiply a one-time Tier III penalty amount of $223,229 by seven since each of these three Defendants traded in seven issuers' stock -- out of the 14 -- during the five-year statute of limitations period between August 2016 and August 2021, that is, $223,229 x 7 = $1,562,603. See id.

Sexton opposes, arguing that the SEC's position that he was involved in issuing stock from seven companies between August 2016 and August 2021 is based on "a summary witness['] alleg[ations.]" Sexton's Opp'n 14. Sexton also argues that the evidence, at most, demonstrates that he profited from three

27

issuers, not seven, and even then, that the passive receipt of pay checks is not, in and of itself, sufficient to restart the five-year clock for what were payments relating to conduct predating August 2016. See id. at 15. Finally, Sexton argues that in alleging that he has sufficient funds to pay a civil penalty -- $13,808,338 in frozen assets according to the SEC, see Mem. Supp. 14 -- the SEC has failed to take into account the fact that it is also asking this Court to impose disgorgement and prejudgment interest against him in the amount of $17,367,474. Sexton's Opp'n 15. Veldhuis concurs with Sexton's objections. See Kelln & Veldhuis' Opp'n 2. Friesen similarly argues that the evidence proffered by the SEC shows that he "ceased his involvement with the other defendants in or about 2015," thus before the applicable five-year window beginning in August 2016. Friesen's Opp'n 10.

As for Kelln and Gasarch, the SEC requests this Court impose civil penalties in the amount of $904,078 and $558,072, respectively. Mem. Supp. 15. For Kelln, the SEC's proposed methodology is as follows: the sum of (1) one Tier III penalty for violating Section 17(a); (2) one Tier III penalty for violating Section 10(b); (3) one Tier III penalty for aiding and abetting violations of the Securities Act by the Sharp network clients; (4) one Tier III penalty for aiding and abetting violations of the Exchange Act by the Sharp network clients; and

(5) one Tier I penalty for her primary violation of Section 5 of the Securities Act. See id. In general, Kelln concurs with Sexton's objections to the civil penalties sought by the SEC. See Kelln & Veldhuis' Opp'n 2.

For Gasarch, the SEC's proposed methodology is as follows: the sum of (1) one Tier III penalty for aiding and abetting violations of the Securities Act by the Sharp network clients; (2) one Tier III penalty for aiding and abetting violations of the Exchange Act by the Sharp network clients; and (3) one Tier II penalty for her primary violation of Section 17(a)(3) of the Securities Act. Mem. Supp. 15. Gasarch opposes, arguing that the SEC has failed to proffer evidence that convincingly imputes any post-August 2016 liability to Gasarch. See Gasarch's Opp'n 13. She further objects to the amount as excessive, contending that the jury finding regarding her aiding and abetting "could have been based on one underlying violation," not two or three, id. at 14; that her distribution of proceeds happened after the purported fraud, id.; and that she does not have the requisite financial condition to pay the requested sum, id. at 15.

### 3. Analysis

The Court agrees with the SEC's proposed methodology for calculating civil penalties against Sexton, Veldhuis, and Friesen, determining that they each ought be liable for seven Tier III violations, as their fraudulent schemes concerned seven

out of the 14 issuers during the applicable five-year period.
Another session of this Court recently adopted a similar
methodology where a civil penalty was imposed against each of
the so-called entity defendants, that is, corporations who
engaged in penny stock fraud.  See Securities and Exchange
Commission v. Knox, 2022 U.S. Dist. LEXIS 99321, *9-10 (D. Mass.
June 3, 2022) (Stearns, J.).  Similarly, this Court finds it
appropriate to impose a civil penalty against each of Sexton,
Veldhuis, and Friesen per the number of entities they utilized
to defraud unwitting investors during the five years preceding
August 2021.  The SEC asserts, and this Court agrees, that that
number is seven.

Further, that the SEC is not seeking civil penalties in
relation to stock sold through all 14 of the issuers is
congruent with this Court's statement during trial that if it is
persuaded that a violation "was pre-August 2016, then [it]
cannot impose a monetary penalty."  Tr. Motion and Charge
Conference 55:17-18.

Indeed, evidence offered by the SEC supports its contention
that seven out of the 14 issuers were involved in the fraudulent
scheme between August 2016 and August 2021.  An affidavit by
Ryan Murphy, an enforcement accountant at the SEC, submits to
this Court "[his] determin[ation] that during that time period,
Veldhuis, Sexton and Friesen traded the securities of seven of

the Fourteen Issuers: Stevia First/Vitality, Arch Therapeutics,
Liberty One Lithium, NewGen Biopharma, StartMonday Technology
Corp., Lexington Biosciences, and BreathTec Biomedical." Decl.
of Ryan Murphy ("Decl. of Ryan Murphy II") ¶ 30, ECF No. 427.
While Sexton attempts to have the Court dismiss this as an
unsupported allegation of "a summary witness," Sexton's Opp'n
14, the SEC responds by drawing the Court's attention to
numerous pieces of evidence from trial exhibits as well as other
witness statements that show that Sexton sold stock of the seven
aforementioned issuers between August 5, 2016, and August 5,
2021. See Pl.'s Reply to Sexton 11 (collecting evidence). In
his sur-reply, Sexton argues that certain pieces of evidence put
forward by the SEC do not meaningfully identify that it was
Sexton who traded the stock of these seven issuers. Sexton's
Sur-Reply 5-6. Even assuming, arguendo, that Sexton's
objections have any merit, he fails to respond to witness
testimony as well as other evidence relating to his involvement
in these issuers. See, e.g., Tr. Jury Trial Day Two 108:19-20,
ECF No. 436 (Dhillon's testimony that Seton participated in the
sale of Vitality stock "in 2017 and maybe even '18"); Tr. Jury
Trial Day Five 91:9-18, ECF No. 439 (Knox's testimony regarding
Sexton's involvement in Vitality and Arch throughout 2018); Tr.
Jury Trial Day Six 34:24-25, 35:1-2, ECF No. 440 (Knox's
testimony regarding NewGen trading in 2017).

Sexton's remaining objections that he, at most, profited
from three out of the seven issuers during the five-year period
and that the penalty amount is excessive, see Sexton's Opp'n 14-
15, are unavailing.  As for profits, Sexton misconstrues the
law: the relevant inquiry for purposes of determining the
applicable period in relation to which civil penalties are to be
imposed is not whether he profited from his misconduct during
the relevant period but rather whether his misconduct, that is,
the illegal stock trading, occurred during that same period.
See, e.g., Securities and Exchange Commission v. Cohen, 332 F.
Supp. 3d 575, 591 (E.D.N.Y. 2018) ("[T]he statute of limitations
runs from when Defendants allegedly engaged in misconduct, not
when they received compensation in connection with that
misconduct.").  Regarding the alleged excessiveness of the
penalty, the SEC convincingly raises two points: (1) that the
Sexton, Veldhuis, and Friesen control group generated a total
amount of $31,000,000 in profits during the five-year window;
and (2) that Sexton "entirely ignores the value of his
significant real estate holdings and other assets not held in
frozen financial institutional accounts."  Pl.'s Reply to Sexton
12.  Sexton's frozen assets already total $13,808,338 as of
December 2022, according to the SEC.  Mem. Supp. 14.
Accordingly, this Court overrules Sexton's objection based on

his purported financial inability to pay the requested civil
penalty.

Much of the above analysis applies with equal force to
Veldhuis and Friesen against whom the SEC requests identical
civil penalties. Veldhuis and Friesen, too, illegally traded in
the stock of seven out of the 14 issuers during the relevant
five-year period.[8] Friesen, like Sexton, argues that the SEC has
failed to establish that he engaged in illegal conduct during
the five-year window, averring instead that he simply profited
from some deals that transpired prior to those five years. See
Friesen's Opp'n 10-11. The voluminous evidence provided during
trial contradicts that contention. See Pl.'s Reply to Friesen 3
(referring to numerous trial exhibits). Indeed, evidence was
put before the jury during trial that indicated Friesen's -- and
Veldhuis' -- involvement in the scheme post-dating August 5,
2016. See Pl.'s Reply to Sexton 11; see also Decl. of Ryan
Murphy II ¶ 30 (documenting Friesen and Veldhuis' engagement in
the trade of stocks of seven out of the 14 issuers during the
applicable window). In view of the foregoing as well as
voluminous evidence from trial demonstrating that Sexton,
Veldhuis, and Friesen acted in concert, the Court is persuaded

---

[8] Since Veldhuis concurs with Sexton's objections to the
civil penalty sought by the SEC, see Kelln & Veldhuis' Opp'n 2,
and since those objections have been overruled above, the
remainder of this paragraph deals with Friesen's objections.

that these three Defendants illegally traded in the stock of seven issuers between August 2016 and August 2021.  See, e.g., Tr. Jury Trial Day Five 78, 87-88, 90; Tr. Jury Trial Day Three 13-16, 24, 41, 96-97, ECF No. 437.

The Court also agrees with the SEC that the maximum Tier III penalty is warranted for each of the seven violations.  The scheme in which Sexton, Veldhuis, and Friesen were involved, this Court finds, operated through fraud and deceit, thereby fulfilling the statutory requirement that this Court impose Tier III penalties against violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  15 U.S.C. § 77(t)(d)(2)(B).  It is also clear that their violations "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," 15 U.S.C. § 77(t)(d)(2)(C), as it is inconceivable for the scheme these three Defendants participated in during the five-year period to not have caused actual loss, let alone a significant risk thereof.[9]

---

[9] While courts have split over the issue of whether a demonstration of actual loss is required to impose a Tier III penalty, see Lemelson, 596 F. Supp. 3d at 235 (collecting cases), this Court need not adopt a position as to that split since here it is clear that investors were defrauded through the pump-and-dump schemes.

Accordingly, the SEC's request of one Tier III penalty multiplied by seven against each of the three Defendants Sexton, Veldhuis, and Friesen is appropriate and hereby granted. The Court imposes a civil penalty of $223,229 x 7 = $1,562,603 against each of them.

The Court also grants the SEC's proposed civil penalty against Kelln. Pursuant to the partial judgment as to her, Kelln was ordered to "not contest liability under the claims filed by the [SEC]." J. as to Kelln 5. Those claims allege five different violations: (1) an independent violation of Section 17(a) of the Securities Act; (2) an independent violation of Section 10(b) of the Exchange Act; (3) aiding and abetting others in their violation of the Securities Act; (4) aiding and abetting in their violation of the Exchange Act; and (5) an independent violation of Section 5 of the Securities Act. See Mem. Supp 15; see also Am. Compl. ¶¶ 259-58, 277-85. "Liability under Section 17(a)(1) [and] Section 10(b) . . . requires materiality and scienter." Flannery v. SEC, 810 F.3d 1, 9 (1st Cir. 2015). Aiding and abetting securities violations, as the above discussion regarding Gasarch's aiding and abetting violation reveals, see supra pp. 21-24, requires, at a minimum, knowledge or recklessness. As such, the first four of the five violations by Kelln, this Court finds, qualify as Tier III violations.

As for Kelln's independent violation of Section 5 of the
Securities Act, because liability under thereof need not require
a showing of scienter, a less severe civil penalty is
appropriate.  See Securities and Exchange Commission v.
Esposito, 2017 U.S. Dist. LEXIS 192120, at *5-6 (D. Mass. Nov.
21, 2017) (Burroughs, J.) (collecting cases that have held that
a Section 5 violation does not require scienter); Securities and
Exchange Commission v. Smith, 2015 U.S. Dist. LEXIS 86625, at
*25 (D.N.H. July 2, 2015) ("Section 5 imposes no scienter
requirement."); see also Mem. Supp. 15 (contending that
"liability under [Section 5] does not require a showing of
scienter").  Accordingly, a Tier I civil penalty for Kelln's
independent and non-scienter-based violation of Section 5 is
appropriate.  In sum, a Tier III civil penalty of $223,229 for
each of her first four violations and a Tier I civil penalty of
$11,162 for her Section 5 violation is appropriate.  This Court
therefore imposes a civil penalty against Kelln in the amount of
($223,229 x 4) + $11,162 = $904,078.

As for Gasarch, the Court agrees with the SEC's proposed
methodology for calculating a monetary penalty but is persuaded
that a downward variance from the SEC's requested amount is
appropriate.  At the outset, the Court dismisses Gasarch's
contention that she merely rendered legitimate secretarial
services to Sharp and, at most, just arranged the distribution

of proceeds after the fraud by other occurred.  See Gasarch's

Opp'n 14.  That is precisely the unwitting secretary contention

and defense mounted by Gasarch during trial that the jury

necessarily rejected in finding her liable for various

securities law violations.  Relying on the disjunctive "or"

appearing on the jury verdict, see Jury Verdict 2, that found

her liable for alternative aiding and abetting violations,

Gasarch contends that she is liable for, at most, two

violations: (1) an independent violation of Section 17(a)(3) of

the Securities Act and (2) one aiding and abetting violation of

securities laws.  See Gasarch's Opp'n 14.

Gasarch is not wrong, per se, to argue that the jury, in

addition to finding her independently liable for a violation of

Section 17(a)(3) of the Securities Act, may have found that she

aided and abetted just one of the two violations separated by

the disjunctive "or" on the jury slip.  Conversely, the jury may

have found Gasarch liable for aiding and abetting both

Securities Act and Exchange Act violations in addition to her

independent violation of the Securities Act.

Moreover, and more importantly, for purposes of fashioning

appropriate remedies in the context of a securities enforcement

adjudication, "[a]t the remedies stage, trial judges may make

factual findings and rely on such findings in assessing the

amount of civil penalties so long as the court's findings do not

conflict with the jury's findings as to liability." Securities and Exchange Commission v. Life Partners Holdings, Inc., 854 F.3d 765, 781-82 (5th Cir. 2017). At trial, this Court found that Gasarch worked "at the hub" of the fraudulent Sharp enterprise. See Tr. Jury Trial Day Eight 41:10, 164:21, ECF No. 442. In her role as Sharp's aide working "at the hub," id., she aided and abetted the Sharp scheme clients in their violation of both the Securities Act and the Exchange Act. This finding does not conflict but rather comports with and honors the jury verdict against Gasarch.

Accordingly, this Court agrees with the SEC that she is liable for three violations: (1) her independent violation of Section 17(a)(3) of the Securities Act; (2) aiding and abetting others in their violation of the Securities Act; and (3) aiding and abetting others in their violation of the Exchange Act. See Mem. Supp. 15. Further, in view of the earlier discussion that Gasarch's aiding and abetting required scienter, see supra pp. 21-24, a Tier III monetary penalty for her two aiding and abetting violations is appropriate. As for her independent violation of Section 17(a)(3) of the Securities Act, a Tier II penalty is appropriate, as an independent violation of Section 17(a)(3) does not require a showing of scienter. See Sharp, 626 F. Supp. 3d at 382; see also supra p. 22.

While the Court agrees with the SEC's proposed methodology for imposing a monetary penalty against Gasarch, the Court will not impose the exact amount proposed by the SEC of ($223,229 x 2)[10] + $111,614[11] = $558,072. At least three reasons persuade this Court that a downward variance is appropriate. First, while this Court indeed found Gasarch to be an operative of the Sharp scheme and one at its hub, see Tr. Jury Trial Day Eight 41:10, 164:21, her role at the hub was necessarily under the command of Sharp and also meant that she did not operate at the spoke end of the hub-and-spoke scheme, where investors were directly harmed. Second, evidence presented at trial points to the fact that Gasarch was involved in the fraudulent enterprise not at the outset but later in time.[12] As such, the Court finds that, at least as an initial matter, prior to joining the scheme as co-conspirator, Gasarch performed legitimate secretarial

---

[10] A total of two Tier III penalties for Gasarch's two aiding and abetting violations: one for aiding and abetting Securities Act violations and the other for aiding and abetting Exchange Act violations.

[11] One Tier II penalty for Gasarch's independent and non scienter-based violation of Section 17(a)(3) of the Securities Act.

[12] At trial, the Court stated as much: "[Gasarch] joined the conspiracy later in time than her initial employment, which candidly I think is the fact, I'm not persuaded she was a co-conspirator at that time, whenever it was, that she became employed by Sharp. I'm not clear when she joined the conspiracy." Tr. Jury Trial Day Eight 165:8-13.

services to Sharp.  Third, the two Tier III civil penalties
against her are in relation to Gasarch's aiding and abetting,
not independent and primary, violations.  While her aiding and
abetting required its own mental culpability and scienter,
equitable considerations demand that a lesser civil penalty be
imposed against her than other Defendants whom she aided and
abetted in their primary and scienter-based violations of the
various securities laws.  Cf. Securities and Exchange Commission
v. Zwick, 2007 U.S. Dist. LEXIS 19045, at *83-84 (S.D.N.Y. Mar.
16, 2007) (imposing a Tier III penalty against an aider and
abettor but with a downward variance because of aider and
abettor status, as opposed to being the primary violator, among
other reasons).

In view of the fact that the SEC submits to this Court that
as of December 2022 Gasarch has $296,651 in frozen assets, the
Court imposes a civil penalty of $296,651 against her.[13]

---

[13] The Court observes that the civil penalty amounts
requested by the SEC are all based on inflation-adjusted figures
from 2023.  See Mem. Supp. 12.  Since the SEC moved for remedies
in December 2023, the SEC has updated its civil penalty amounts,
announcing in January 2024 its inflation adjustment figures for
2024.  See Inflation Adjustments to the Civil Monetary Penalties
Administered by the Securities and Exchange Commission (as of
January 15, 2024), SEC.gov (Jan. 16, 2024),
https://www.sec.gov/enforce/civil-penalties-inflation-
adjustments.  The question arises whether the Court ought
consider the most recent inflation-adjusted figures for 2024 or
instead ought consider the inflation-adjusted figures for 2023
used by the SEC in its calculation.

### C. Disgorgement and Prejudgment Interest Against All of the Defendants

#### 1. Legal Standard

Disgorgement is an equitable remedy that is intended to deprive a wrongdoer of his ill-gotten gains at the expense of victims.  See <u>Liu</u> v. <u>SEC</u>, 591 U.S. 71, 75 (2020) (clarifying "that a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78(u)(d)(5)").  <u>Liu</u> provided three clarifications to disgorgement law.

<u>First</u>, it clarified that disgorgement is non-punitive and intended to make victims whole.  See <u>id.</u> at 74 (defining courts' power to award equitable relief as "a power that historically excludes punitive sanctions"); <u>id.</u> at 75 (holding that a disgorgement award "is awarded for victims"); <u>see also</u> <u>Sharp</u>, 626 F. Supp. 3d at 380 ("The Supreme Court has entrenched disgorgement's non-punitive character in the context of securities violations, by requiring that it be used to make victims whole.").

The parties have not raised the issue of inflation adjustment in their briefs nor during oral argument.  In the interest of fairness, the Court will not adjust figures to reflect inflation for 2024, although it is highly likely that the Court has the equitable power to do so <u>sua sponte</u>.  <u>Cf.</u> <u>Weed</u>, 315 F. Supp. 3d at 677 (taking notice of the SEC's "increasing the maximum Tier-III penalty from the statutory limit of $100,000 to account for inflation adjustments").

Second and relatedly, a disgorgement award ought be limited to a wrongdoer's "net profits," Liu, 591 U.S. at 75, calculated by "deducting legitimate expenses" from a wrongdoer's gross ill-gotten gains, id. at 1946.  The Court noted one historical exception to the rule that legitimate expenses ought be diminished from the show of profits, defining that exception as "when the entire profit of a business or undertaking results from [a] wrongful activity."  Id. at 84 (quotation omitted).

Third, Liu clarified that the general rule in awarding disgorgement is to hold wrongdoers individually liable for their personal ill-gotten gains.  See id. at 82-83 ("Equity courts also generally awarded profits-based remedies against individuals or partners engaged in concerted wrongdoing, not against multiple wrongdoers under a joint-and-several liability theory.").  Reviewing a corpus of precedents, the Supreme Court observed that a "rule against joint-and-several liability for profits that have accrued to another appears throughout equity cases awarding profits."  Id.  Still, the Supreme Court also observed that "[t]he common law did . . . permit liability for partners engaged in concerted wrongdoing."  Id. at 90.

In sum, then, "[t]he [C]ourt's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing."  Securities and Exchange Commission v. MacDonald, 699 F.2d 47, 54 (1st Cir. 1983) (en

banc) (quoting <u>Securities and Exchange Commission</u> v. <u>Blatt</u>, 583 F.2d 1325, 1335 (5th Cir. 1987)). "[C]ourts consistently restrict[] awards to net profits from wrongdoing after deducting legitimate expenses[,]" <u>Liu</u>, 591 U.S. at 84, though it is also possible -- under exceptional circumstances -- to dispense with that requirement, especially if the entire business, undertaking, or enterprise involves wrongful activity, <u>id.</u> at 83.

In any case, "[t]he amount of disgorgement 'need only be a reasonable approximation of profits causally connected to the violation.'" <u>Securities and Exchange Commission</u> v. <u>Happ</u>, 392 F.3d 12, 31 (1st Cir. 2004) (quoting <u>Securities and Exchange Commission</u> v. <u>First City Fin. Corp.</u>, 890 F.2d 1215, 1231 (D.C. Cir. 1981)). "The risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." <u>Id.</u> "Once the SEC shows that the disgorgement is a reasonable approximation, the burden shifts to the defendant to demonstrate that the amount of disgorgement is not a reasonable approximation." <u>Id.</u>

Finally, the Court takes notice of its previous holding regarding the applicable statute of limitations in issuing disgorgement awards: scienter-based claims for disgorgement require a ten-year statute of limitations whereas non-scienter-

43

based claims for disgorgement "continue to require a five-year statute of limitations." Sharp, 626 F. Supp. 3d at 381.

### 2. Parties' Arguments

The SEC requests this Court issue disgorgement awards in the following amounts: (1) $17,367,474 against Sexton; (2) $13,289,897 against Veldhuis; (3) $11,846,176 against Friesen; (4) $1,582,785 against Kelln; and (5) $2,522,367 against Gasarch. Mem. Supp. 1.

The SEC bases its calculation "on the sums that each of them received into their personal Q accounts of the Fourteen Issuers whose illegal trading was at issue."[14] Id. at 17-18. The SEC further asserts that the applicable statute of limitations is ten, not five, years, rendering the Defendants' profits from 2011 –- not from 2016 –- onward susceptible to disgorgement. Id. at 17 ("[I]t is appropriate to award disgorgement for a ten-year time period, given that each of the

_____

[14] As the following discussion on the Q data will make clear, in proposing respective amounts for its proposed disgorgement awards, the SEC focuses on a specific piece of evidence presented at trial: the so-called "Q records" or "Q data" that is a compilation of internal records kept by Sharp that the SEC contends shows stock proceeds allocated to each of the Defendants that they gained throughout the course of the pump-and-dump scheme, as well as commissions received by some of them. See, e.g., Mem. Supp. 17-18, 19, 21.

Separately, because some of the transfers reflected on the Q system were made in Canadian Dollars, the SEC informs the Court that its estimate "converts all of those transfers into US Dollars, using the applicable exchange rate on the date of the transfer in the Q system." Id. at 18.

Defendants was found liable, or is being held liable, for violating a statute requiring the proof of scienter as an element."). As such, the SEC requests the Court award disgorgement based on the time period from August 5, 2011, that is, ten years before the SEC filed this present action.  Id.

The Defendants object to the SEC's position as well as the specific award amounts proposed by the SEC on numerous grounds. After having carefully reviewed their briefs and the arguments made during the hearing held on the question of remedies, the Court distills these various objections to seven separate contentions.

First, the Defendants impeach the credibility of the Q data evidence by variously characterizing it as hearsay or as a document susceptible to manipulation.  See, e.g., Sexton's Opp'n 6 (arguing that "the Court has already ruled, the database is not a business record, because, among other issues, there are not sufficient indications that the records were entered contemporaneously"); Kelln & Veldhuis' Opp'n 2 (concurring with Sexton's objections); Friesen's Opp'n 5 (characterizing Q records as inadmissible hearsay); Gasarch's Opp'n 2, 7-8 (arguing that the Q data is unreliable and unverified).  As a corollary to the objection regarding its reliability, Gasarch also contends that there is no evidence that the designations

45

"PEAC" or "PERE" in the Q data indicate her Q account. Gasarch's Opp'n 4.

Second, even assuming that the Q data is reliable, the Defendants argue, it shows, at most, the proceeds generated over the course of a decade but, crucially, not the actual disbursements made from the generated proceeds to the individual Defendants. Sexton argues that the Q system may be considered indicative of the stock transactions that transpired, but that there is no evidence that this data is reflective of "the division of proceeds stemming from those transactions." Sexton's Opp'n 7. In furtherance of his objection, Sexton also points out that the SEC has not presented this Court with any "documentary evidence to corroborate the purported gains" shown on the Q system, specifically, bank records that would verify that the Q system transfers actually happened and were received by the Defendants. See id. at 4-5; see also Kelln & Veldhuis' Opp'n 2 (concurring with Sexton's objections). Friesen, too, argues that the Q records, at most, indicate stock entries but not actual transfers to each of the Defendants. See Friesen's Opp'n 7.

Third, the Defendants argue that the SEC has not shown that any transfers that they may have received from trading in all 14 of the issuers are ill-gotten, and not legitimate, gains. See Sexton's Opp'n 8 (arguing that the SEC "has not tied funds to

violations of the securities laws"); Kelln & Veldhuis' Opp'n 2 (same); Friesen's Opp'n 3 (same); Gasarch's Opp'n 12 (rejecting the SEC's position that she received ill-gotten funds).

Fourth, the Defendants argue that the SEC has failed to show that disgorgement would make victims whole, as the SEC has failed to specifically point to any victims who have suffered pecuniary harm as a result of the Defendants' alleged misconduct. Sexton avers, for example, that the SEC "has not established that there are any victims to whom disgorgement should be allocated." Sexton's Opp'n 10; see also Friesen's Opp'n 8-9 (same); Gasarch's Opp'n 10-11 (same).

Fifth, the Defendants argue that the SEC, in relying on the sums reflected in the Q system to calculate proposed disgorgement award amounts, failed to factor out legitimate expenses and payments received by the Defendants. Friesen agues, for example, that the Q records also show repayments, debt payments, and offsets, which the SEC has not but should have considered in its calculation. Friesen's Opp'n 6. Gasarch similarly contends that the SEC does not attempt to factor out "legitimate" payments to her for her secretarial services. Gasarch's Opp'n 4-5, 10.

Sixth, the Defendants contend that disgorgement is time-barred as the SEC has failed to establish that disgorgement is

tied to scienter-based conduct.  Sexton's Opp'n 11; Gasarch's
Opp'n 12 (similar).

Seventh, the Defendants argue that the SEC should have but
has not avoided double counting in its calculations, failing to
offset funds frozen or funds collected from others –- such as
Sharp, Knox, or Dhillon –- involved in the Sharp enterprise.
See ECF No. 484.

### 3. Analysis

After reading the briefs and hearing the above-mentioned
objections from Defendants during a hearing held on the question
of remedies, the Court took the issue of disgorgement and
prejudgment interest under advisement.  See id.  The Court is
now prepared to rule on the issue and for the following reasons
**GRANTS** the SEC's motion for disgorgement in its entirety,
subject to certain caps as described below, see infra pp. 56-57,
and **DENIES** its motion for prejudgment interest in its entirety.

First, the Court has previously rejected, and once again
rejects, characterizations of the Q data that seek to describe
it as hearsay.  While the Court did not make a final finding
during the course of the trial, it intimated that it was
prepared to admit the Q system into evidence under the business
records exception to the rule against hearsay.  See generally
Tr. Jury Trial Day Four 69-72, ECF No. 438 (the Court, upon
hearing from witness testimony, holding that the Q data "would

seem to satisfy the business records exception"; noting that not "anyone could write in the book"; holding that the Q data "satisfies the requirements of a business record"); see also Tr. Hr'g Disgorgement 24:8-11, ECF No. 491 (the Court holding during the hearing on remedies that "[t]his Court is satisfied that the Q system records qualify as business records under the federal rules of evidence"). Thus, the Q system is admissible evidence and not hearsay.

Further, the Defendants' efforts to describe the Q data as easily manipulable are unavailing. See, e.g., Tr. Jury Trial Day Two 10:15-16 (Gasarch contending that Sharp "had the power as the administrator to change all the Q data"); id. at 21:11-12 (Friesen describing the Q system data as Sharp "sort of inputting data apparently in any way that he sees fit"); see also id. at 21:18-19 (Friesen arguing that the Q system data "is not a believable, authentic, reliable recitation of anything"); Tr. Jury Trial Day Nine 61:2 (Gasarch calling the Q data "garbage"). That Sharp may have been the main administrator of the Q system, see, e.g., Tr. Jury Trial Day Seven 129:3, ECF No. 441 (witness testimony characterizing the Q system as "[Sharp]'s own accounting system"), does not by itself demonstrate that the data has been unreliably manipulated.

The SEC has compared the Q data to independent brokerage records, Decl. of Ryan Murphy I ¶ 15, and the comparison has

returned a very high rate of accuracy.  As the affidavit of Ryan
Murphy indicates, the comparison between Q data for each of the
14 issuers and independent brokerage records has confirmed the
reliability of Q data with considerable accuracy: (1) 95% for
Stevia First/Vitality, id. ¶ 17; (2) 94% for Echo Automotive,
id. ¶ 20; (3) 97% for Arch Therapeutics, id. ¶ 23; (4) 100% for
Stevia Corp., id. ¶ 26; (5) 95% for Liberty One Lithium Corp.,
id. ¶ 29; (6) 96% for Oryon Technologies, id. ¶ 31; (7) 100% for
Makism 3D Corp., id. ¶ 33; (8) 98% for Graphite Corp., id. ¶ 35;
(9) 97% OncoSec Medical Inc., id. ¶ 37; (10) 97% for NewGen
Biopharma Corp., id. ¶ 39; (11) 91% for StartMonday Technology
Corp., id. ¶ 41; (12) 100% for Lexington Biosciences Holdings
Corp., id. ¶ 43; (13) 100% for BreathTec Biomedical Inc., id. ¶
45; and (14) 75% for RightsCorp., id. ¶ 47.  While the
Defendants are correct to argue that only a sample, and not all,
of the brokerage records and Q transactions were compared, they
do not meaningfully challenge, much less demonstrate, how the
sample is not representative.  Securities and Exchange
Commission v. Commonwealth Equity Servs., LLC, 2024 U.S. Dist.
LEXIS 59361, at *28 (D. Mass. Mar. 29, 2024) (Talwani, J.)
(rejecting the argument that the SEC's sample was "cherry-
picked").  Accordingly, the Q record, as a comparison with
independent brokerage records confirms, is a detailed and highly

accurate representation of the funds generated by the Sharp
pump-and-dump schemes.

The Court is further persuaded that the Q data is highly
accurate since evidence presented at trial demonstrated that Q
system entries were made very close in time to the illegal
trading that occurred.  See, e.g., Tr. Jury Trial Day Six 49:9
(witness testimony that Q entries were made within "less than 24
hours" following trade).  The Court therefore finds the Q data
reliable and credible evidence of the proceeds generated through
the illegal trading that occurred with respect to the 14
issuers.

Second, the Court rejects the Defendants' contention that
there is no evidence that the proceeds recorded in the Q system
were actually disbursed and distributed to and received by the
Defendants.  To be sure, the Defendants are correct to point out
that the SEC compared the Q data to independent brokerage
records but did not "look at any bank records."  Tr. Jury Trial
Day Eight 150:22 (SEC analyst testifying that he did not look at
bank records to confirm receipt of the proceeds by the
Defendants).  The Defendants repeatedly emphasized this point
during the hearing on remedies.  See Tr. Hr'g Disgorgement
16:12, 17:1, 20:21-22, (mentioning the lack of evidence that the
Defendants "actually received money"; that there are no "funds
received were by us"; and asking the Court to focus on "what the

51

51

individual actually received"). Moreover, witness testimony at trial seemed to indicate that not all of the proceeds generated by the pump-and-dump scheme actually went to the Defendants. See, e.g., Tr. Jury Trial Day Seven 89.

The SEC notes that the Q system shows the transfers of illegal stock sale proceeds from the issuer accounts into each of the Defendants' personal accounts, and that the system shows, just like a bank account would, the Defendants paying their mortgages, paying the expenses of their family members, and making other transfers. See Tr. Hr'g Disgorgement 26:9-17. This, while true, does not change the fact that the SEC has not submitted any bank records to this Court that show actual receipt of funds by the Defendants.

Having carefully reviewed the record and considered the question of the lack of bank records showing actual receipt of funds by the Defendants, this Court is persuaded, for the following reasons, that the balance of equities favors the awarding of the disgorgement amounts requested by the SEC. First, the Q data's high degree of internal accuracy as to the proceeds generated counsels a similar finding of accuracy as to its figures regarding the money going into the Defendants' personal Q accounts, especially because the Defendants failed to argue, much less show, that there is money in their accounts in the Q system that still remains there. See Happ, 392 F.3d at 31

(burden of proof shifting to defendants once SEC makes a reasonable approximation).

Second, the production of bank records confirming actual receipt of funds, to this Court's knowledge, has never been declared a sine qua non before finding the SEC's disgorgement calculation reasonable. Rather, courts in this district and in others have looked at bank records in combination with other evidence and sometimes have not looked at bank records at all. See, e.g., Securities and Exchange Commission v. Lazare Indus., 294 Fed. Appx. 711, 715 (3d Cir. 2008) (holding that the defendants' argument that the district court "abused its discretion in fixing the amount of disgorgement because the SEC did not offer bank records showing that defendants actually received the amounts memorialized on the subscription agreements" "lacks merit"); Securities and Exchange Commission v. Eiten, 2014 U.S. Dist. LEXIS 139428, at *3 (D. Mass. Sept. 30, 2014) (O'Toole, J.) (finding the SEC's disgorgement calculation based on "bank records, other financial information, and documents" reasonable).

Third and most importantly, in cases involving concerted wrongdoing, joint and several liability may be appropriate, in which case the ill-gotten gains subject to disgorgement need not

accrue to each defendant individually.[15]  Cf. Securities and

Exchange Commission v. San Francisco Reg'l Ctr. LLC, 2019 U.S.

Dist. LEXIS 4983, at *9-10 (N.D. Cal. Jan. 10, 2019) (rejecting

the SEC's contention that the court can disgorge profits

accruing to a defendant that "it never had" because SEC failed

to articulate a conspiracy claim and that the defendant was "a

participant in the wrongdoing").  Here, the Defendants were co-

conspirators within a hub-and-spoke model: Gasarch conspired

with Sharp; Kelln conspired with Sharp; and Sexton, Veldhuis,

and Friesen conspired with each other and with Sharp as part of

---

[15] Here, the Court notes that the antecedent question may
arise as to whether joint and several liability is permissible
in the context of disgorgement.  As noted above, Liu, while
articulating the default rule of individual liability in the
disgorgement context, still carved out an exception applicable
to instances of "concerted wrongdoing."  Liu, 591 U.S. at 90.
Further, the Liu Court eschewed "wad[ing] into all the
circumstances where an equitable profits remedy might be
punitive when applied to multiple individuals[,]" id. at 91,
remanding the case to the lower court instead so that it could
determine whether joint and several liability would be
appropriate, "[g]iven the wide spectrum of relationships between
participants and beneficiaries of unlawful schemes—from equally
culpable codefendants to more remote, unrelated tipper-tippee
arrangements."  Id.  As such, the Liu Court recognized the
permissibility of assigning joint and several liability to
defendants engaged in concerted wrongdoing.
     Post-Liu, at least two sessions of this Court have held
securities law offenders jointly and severally liable for
disgorgement.  See Knox, 2022 U.S. Dist. LEXIS 99321, at *11
("The interchangeable role the Entity Defendants played within
the scheme makes joint and several liability appropriate."); see
also Securities and Exchange Commission v. Gomes, 2022 U.S.
Dist. LEXIS 191457, at *19-20 (D. Mass. Oct. 20, 2022) (Saylor,
C.J.).

specific pump-and-dump schemes.  As such, joint and several liability is appropriate: Gasarch is jointly and severally liable with Sharp; Kelln is jointly and severally liable with Sharp; and Sexton, Veldhuis, and Friesen are jointly and severally liable with Sharp.  Given that Sharp was a co-conspirator in each of the conspiracies, the ill-gotten gains need not have accrued personally to each of the Defendants -- that they may have partially or entirely accrued to Sharp suffices to award disgorgement.  See Securities and Exchange Commission v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1098 (9th Cir. 2010) ("We hold that the district court did not abuse its discretion in holding Martin jointly and severally liable with Platforms.  We have never held that a personal financial benefit is a prerequisite for joint and several liability."); see also Securities and Exchange Commission v. Monterosso, 756 F.3d 1326, 1337-38 (11th Cir. 2014) ("[Defendant] argues it would be inequitable to hold him liable for disgorgement when he did not receive proceeds.  The Ninth Circuit, however, has stated, and we agree, a personal financial benefit is not a prerequisite for joint and several liability." (quotations omitted)).

The Court, in exercising its "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged[,]" Securities and

55

Exchange Commission v. Druffner, 802 F. Supp 2d 293, 297 (D. Mass. 2011) (Gorton, J.) (quotation omitted), will, however, cap the individual amount that may be disgorged from each of the Defendants, notwithstanding their joint and several liability, at the following amounts requested by the SEC based on the Q system data: (1) $17,367,474 against Sexton; (2) $11,846,176 against Friesen; (3) $13,289,897 against Veldhuis; (4) $1,582,785 against Kelln; and (5) $2,522,367 against Gasarch.

Third, the Court finds the remaining objections raised by the Defendants unavailing. As evidence submitted to this Court as well as presented during trial indicates, the proceeds reflected in the Q system are, absent any showing to the contrary proffered by the Defendants, generated by illegal pump-and-dump schemes that involved 14 different issuers.

Additionally, the argument the SEC has failed to show any victims is premature: the SEC has agreed in writing, see, e.g., Mem. Supp. 22-24, and verbally represented to this Court during the hearing on remedies, see ECF No. 482, that a plan can and will be submitted to the Court, to its satisfaction, detailing plans to return the disgorged funds to the harmed investors.

The objection that disgorgement is time-barred is also without merit, as all of the Defendants acted with varying degrees of scienter, rendering the applicable statute of limitations ten, not five, years. Finally, as to offsetting

legitimate expenses, the Defendants' objections are, again, unpersuasive for two reasons. First, the Defendants do not meaningfully counter the SEC's calculation by any showing how certain payments were indeed legitimate, bearing in mind the SEC's obligation is to formulate a "reasonable approximation." Happ, 392 F.3d at 31. Second, even though there may have been incidental expenses that could be offset, the exception articulated in Liu that offsetting or diminishing legitimate business expenses is not necessary where the enterprise itself is fraudulent, see Liu, 591 U.S. at 83-84, is applicable here.

For the foregoing reasons, the Court holds the Defendants jointly and severally liable as follows:

- Gasarch is jointly and severally liable with Sharp for disgorgement in the amount of $2,522,367;

- Kelln is jointly and severally liable with Sharp for disgorgement in the amount of $1,582,785; and

- Sexton, Veldhuis, and Friesen are jointly and severally liable with Sharp for disgorgement in the amount of $42,503,547; provided, however, that the amount to be disgorged from Sexton, Veldhuis, and Friesen will be capped at, and shall not exceed, $17,367,474, $13,289,897, and $11,846,176, respectively.

The disgorgement awards are, of course, subject to the SEC's submission, and this Court's approval, of a plan detailing

how the disgorged funds will be returned to the harmed investors.

### 4. Prejudgment Interest

"Prejudgment interest, like disgorgement, prevents a defendant from profiting from his securities violations." Sargent, 329 F.3d at 40 (internal quotations omitted). "An award of prejudgment interest is based on consideration of a variety of factors, including the remedial purpose of the statute [involved], the goal of depriving culpable defendants of their unlawful gains, and . . . unfairness to defendants." Id. (citing Securities and Exchange Commission v. First Jersey Securities, 101 F.3d 1450, 1477 (2d Cir. 1996)). The award of prejudgment interest in securities violations prevents a defendant from "receiving the benefit of what would otherwise be an interest-free loan." Druffner, 802 F. Supp. 2d at 298.

Here, the SEC seeks prejudgment interest against all five Defendants. See Mem. Supp. 24. The SEC "computed prejudgment interest using the IRS underpayment rate, compounded quarterly on defendants' net proceeds for each calendar year separately, assuming (favorably to the defendants) that each year's net profit was received on the last day of the year in which it was received into each defendant's personal Q account." Id. at 25. The end date for the SEC's calculation is August 5, 2021, when the SEC obtained the asset freeze against the Defendants. See

id. The IRS methodology for calculating prejudgment interest is one which other sessions of this Court have previously determined to be appropriate. See, e.g., Commonwealth Equity Servs., LLC, 2024 U.S. Dist. LEXIS 59361, at *34; Securities and Exchange Commission v. Esposito, 260 F. Supp. 3d 79, 83 (2017) (Burroughs, J.).

Accordingly, the SEC asks that the Defendants pay the following amounts in prejudgment interest: (1) $5,872,145 against Sexton; (2) $4,314,031 against Veldhuis; (3) $4,057,737 against Friesen; (4) $460,687 against Kelln; and (5) $646,366 against Gasarch. Mem. Supp. 25.

The Defendants do not meaningfully oppose, having instead focused their objections on the SEC's request for disgorgement. Sexton argues, however, that the SEC "has not presented any evidence that [he] invested any funds or even placed them in an interest-bearing account." Sexton's Opp'n 13. Sexton misconstrues the law here: a showing of the defendant gaining interest on the ill-gotten funds is not necessary for the Court to award prejudgment interest. The very act of obtaining and retaining ill-gotten funds is enough for defendants to benefit from what resembles an interest-free loan: a showing that the Defendants used ill-gotten funds to make more money out of it is not necessary. Cf. Druffner, 802 F. Supp. 2d at 298 ("The

defendants derived direct monetary benefit from their misrepresentations and retained those profits unjustly.").

Because this Court holds the Defendants jointly and severally liable as described above, see supra pp. 54, 56, however, the imposition of prejudgment interest is not equitable. In holding the Defendants jointly and severally liable, the Court noted above that the ill-gotten gains need not have accrued to each of the individual offenders, see supra p. 54, and noted further that it suffices in the context of disgorgement for ill-gotten gains to have accrued to one or more of the co-conspirators.

The institution of prejudgment interest is premised, on the other hand, on the notion that a wrongdoer derives direct monetary benefit by unjustly "retain[ing]" profits. Druffner, 802 F. Supp. 2d at 298. While the Q data evidence, verified by external brokerage records, persuades this Court that ill-gotten gains have been generated by the pump-and-dump scheme perpetrated by the Defendants -- irrespective of to whom among the co-conspirators the proceeds accrued -- thereby necessitating disgorgement, the same data does not show that ill-gotten gains have been obtained and retained by the individual Defendants, much less in the amounts requested by the SEC. Where actual accrual to each of the Defendants cannot be shown and where it is entirely possible that at least a portion

of the ill-gotten gains may never have reached the pockets of individual Defendants, it is not possible to speak with any reasonable degree of certainty that the Defendants benefited from what resembled an "interest-free loan." <u>Sargent</u>, 329 F.3d at 41.

Additionally, and equally importantly, as "[t]he decision whether to grant prejudgment interest [is] confided to the district court's broad discretion," <u>Sargent</u>, 329 F.3d at 40 (quotation omitted), this Court, in view of having issued injunctive relief, imposed monetary penalties, and awarded disgorgement, is satisfied that the foregoing relief will serve a significant remedial purpose. Going any further and awarding prejudgment interest, in the absence of a precise determination as to the amount of ill-gotten gains actually obtained by the individual co-conspirators in the various conspiracies, may occasion unfairness to defendants. Having weighed these factors, the Court will not award prejudgment interest. <u>Cf.</u> <u>id.</u> at 40-41 (upholding a district court's finding of joint and several liability in the context of disgorgement, its disgorgement award, and its refusal to award prejudgment interest).

For the foregoing reasons, this Court **DENIES** the SEC's motion for prejudgment interest.

**IV. CONCLUSION**

Pursuant to the proposed judgments by the SEC, see ECF No. 485, which this Court hereby incorporates into this memorandum and order, injunctive relief will issue forthwith.

Civil penalties imposed against the Defendants in these amounts:

- Sexton: $1,562,603

- Friesen: $1,562,603

- Veldhuis: $1,562,603

- Kelln: $904,078

- Gasarch: $296,651

Such sums will be payable to the SEC within 30 days after entry of this memorandum and order, and together with it, entry of the incorporated judgments as to the Defendants.

Disgorgement, is ordered as follows:

- Gasarch is jointly and severally liable with Frederick L. Sharp ("Sharp") for disgorgement in the amount of $2,522,367;

- Kelln is jointly and severally liable with Sharp for disgorgement in the amount of $1,582,785; and

- Sexton, Veldhuis, and Friesen are jointly and severally liable with Sharp for disgorgement in the amount of $42,503,547; provided, however, that the amount to be disgorged from Sexton, Veldhuis, and Friesen will be capped at, and shall not exceed, $17,367,474, $13,289,897, and $11,846,176, respectively.

The disgorgement awards shall be subject to the SEC's submission, and this Court's approval, of a plan detailing how the funds disgorged will be used to make victims whole.  The SEC shall submit said plan in due course and without any unreasonable delay.

No prejudgment interest will be awarded.

For the reasons elucidated above, the Court **GRANTS** the SEC's motion for remedies in part, ECF No. 425.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[16]

---

[16] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                      )
SECURITIES AND EXCHANGE               )
COMMISSION,                           )
                                      )
            Plaintiff,                )
                                      )
v.                                    )          CIVIL ACTION
                                      )          NO. 21-11276-WGY
FREDERICK L. SHARP,                   )
ZHIYING YVONNE GASARCH,               )
COURTNEY KELLN,                       )
MIKE K. VELDHUIS,                     )
PAUL SEXTON,                          )
JACKSON T. FRIESEN,                   )
WILLIAM T. KAITZ,                     )
AVTAR S. DHILLON, and                 )
GRAHAM R. TAYLOR,                     )
                                      )
            Defendants.               )
                                      )
_____)

YOUNG, D.J.                                      June 20, 2024


**JUDGMENT AS TO DEFENDANT JACKSON T. FRIESEN**

On September 27, 2023, the jury in this matter found

Defendant Jackson T. Friesen ("Defendant" or "Friesen") liable

for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the

Securities Act of 1933 and Sections 10(b) and 13(d) of the

Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) and

13d-1 thereunder.  On May 8, 2024, the Court, at a hearing,

imposed injunctive relief and a civil penalty on Friesen that is

incorporated into this judgment.  The Court held the issues of

disgorgement and prejudgment interest under advisement.

1

Accordingly, the Court enters partial Judgment as follows:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)  to employ any device, scheme, or artifice to defraud;

    (b)  to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)  to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a)

Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)  to employ any device, scheme, or artifice to defraud;

(b)  to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)  to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a)

3

Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

### III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)   Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)   Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)   Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to

4

such security, or while the registration statement is

the subject of a refusal order or stop order or (prior

to the effective date of the registration statement)

any public proceeding or examination under Section 8

of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as

provided in Federal Rule of Civil Procedure 65(d)(2), the

foregoing paragraph also binds the following who receive actual

notice of this Judgment by personal service or otherwise: (a)

Defendant's officers, agents, servants, employees, and attorneys;

and (b) other persons in active concert or participation with

Defendant or with anyone described in (a).

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

is permanently restrained and enjoined from violating, directly or

indirectly, Section 13(d) of the Exchange Act [15 U.S.C. § 78j(b)]

and Rule 13d-1 promulgated thereunder [17 C.F.R. § 240.13d- 1], by

failing to file with the Commission a statement containing the

information required by Schedule 13D (as provided in 17 C.F.R.

§240.13d-101), within ten days after acquiring directly or

indirectly beneficial ownership of more than five percent of any

equity security of a class which is specified in Exchange Act Rule

13d-1(I) [17 C.F.R. § 240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as

provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1].

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for

his own personal account.

                                    VII.

     IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that (i)
Defendant is jointly and severally liable with co-Defendants
Frederick L. Sharp, Paul Sexton, and Mike K. Veldhuis for
disgorgement of $42,503,547.00, with the amount to be disgorged
from Defendant to not exceed $11,846,176.00, representing
profits gained as a result of the conduct on which he was found
liable, and (ii) Defendant is liable for a civil penalty in the
amount of $1,562,603.00 pursuant to Section 21(d) of the
Exchange Act [15 U.S.C. § 78u].   The Court does not award
prejudgment interest.   Defendant shall satisfy this obligation
by paying $13,408,779.00 to the Securities and Exchange
Commission within 30 days after entry of this Judgment.

     Defendant may transmit payment electronically to the
Commission, which will provide detailed ACH transfer/Fedwire
instructions upon request.   Payment may also be made directly
from a bank account via Pay.gov through the SEC website at
http://www.sec.gov/about/offices/ofm.htm.   Defendant may also
pay by certified check, bank cashier's check, or United States
postal money order payable to the Securities and Exchange
Commission, which shall be delivered or mailed to

          Enterprise Services
          Center Accounts
          Receivable Branch 6500
          South MacArthur

                                      7

                                     70

Boulevard Oklahoma
City, OK 73169

and shall be accompanied by a letter identifying the case title,
civil action number, and name of this Court; Jackson Friesen as a
defendant in this action; and specifying that payment is made
pursuant to this Judgment.

Defendant shall simultaneously transmit photocopies of
evidence of payment and case identifying information to the
Commission's counsel in this action. By making this payment,
Defendant relinquishes all legal and equitable right, title, and
interest in such funds and no part of the funds shall be
returned to Defendant.

The Commission may enforce the Court's judgment for
penalties by the use of all collection procedures authorized by
law, including the Federal Debt Collection Procedures Act, 28
U.S.C. § 3001 et seq., and moving for civil contempt for the
violation of any Court orders issued in this action. Defendant
shall pay post judgment interest on any amounts due after 30
days of the entry of this Judgment pursuant to 28 U.S.C. § 1961.
The Commission shall hold the funds, together with any interest
and income earned thereon (collectively, the "Fund"), pending
further order of the Court.

The Commission may propose a plan to distribute the Fund
subject to the Court's approval. Such a plan may provide that
the Fund shall be distributed pursuant to the Fair Fund

8

provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment.  For purposes of this paragraph, a "Related Investor

9

Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

                                VIII.

        IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.  Further, the asset freeze order imposed by Paragraph I of this Court's Order dated October 7, 2021 shall continue in full force and effect until the monetary obligation imposed by this Judgment is paid in full.

                                IX.

        There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.


**SO ORDERED.**


                                /s/ William G. Young
                                WILLIAM G. YOUNG
                                DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>        **Plaintiff,**<br>    v.<br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,<br><br>        **Defendants.** | Civil Action No. 21-CV-11276 (WGY) |

[PROPOSED] ORDER DIRECTING TRANSFER OF JACKSON T. FRIESEN'S
FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION

This Court, having reviewed the Motion for an Order Directing Turnover of Frozen

Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown,

it is hereby

    **ORDERED** that the Motion is **GRANTED**; and

I.

    IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Bank of Montreal shall transfer the entire balance of the

following Bank of Montreal account(s) which were frozen pursuant to an Order of this Court to

the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 0469 |
| FERROUS CAPITAL CORPORATION | 0477 |

1

| FERROUS CAPITAL CORPORATION | 7732 |
|---|---|
| FIRST AVENUE CAPITAL CORP | 0202 |
| MGF STRATEGIES CORP | 3623 |
| VALLEY DRIVE ESTATES INC | 0655 |
| BOUNDARY BAY STRATEGIES CORP. | 512 |
| JACKSON FRIESEN | 2540 |
| JACKSON FRIESEN | 5120 |
| JACKSON FRIESEN | 0170 |
| WESTSIDE CAPITAL PARTNERS INC | 964 |

Bank of Montreal may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Bank of Montreal also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

    Enterprise Services Center
    Accounts Receivable Branch
    6500 South MacArthur Boulevard
    Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

## II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, PI Financial Corp. ("PI Financial") shall transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 2276 |

2

| ARDENT STRATEGIES CORP | 3167 |
|---|---|
| ARDENT STRATEGIES CORP | 0153 |
| ARDENT STRATEGIES CORP | 0161 |
| FERROUS CAPITAL CORPORATION | 2958 |
| FERROUS CAPITAL CORPORATION | 2966 |
| FERROUS CAPITAL CORPORATION | 2974 |
| JACKSON FRIESEN | 0254 |

PI Financial may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. PI Financial also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

III.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Canadian Imperial Bank of Commerce ("Canadian

Imperial") shall transfer the entire balance of the following Canadian Imperial account(s) which

were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| JACKSON FRIESEN | 2334 |

3

76

Canadian Imperial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Canadian Imperial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

IV.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Envision Financial ("Envision") shall transfer the entire balance of the following Envision account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| JACKSON FRIESEN | 4112 |

Envision may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Envision also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

4

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

V.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Research Capital Corporation ("Research Capital") shall transfer the entire balance of the following Research Capital account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | KK15 |

Research Capital may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Research Capital also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

5

VI.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Leede Jones Gable Inc. ("Leede Jones") shall transfer the

entire balance of the following Leede Jones account(s) which were frozen pursuant to an Order

of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 873A |
| JACKSON FRIESEN | 6901 |
| WESTSIDE CAPITAL PARTNERS INC. | 8121 |

Leede Jones may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Leede Jones also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

VII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Haywood Securities Inc. ("Haywood") shall transfer the

entire balance of the following Haywood account(s) which were frozen pursuant to an Order of

6

79

this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 6164 |

Haywood may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Haywood also may transfer these funds by certified

check, bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

SO ORDERED.

Dated: July 11, 2024

William G. Young
WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

7

| 07/16/2024 | 514 | Judge William G. Young: ELECTRONIC ORDER entered 501 Motion to Amend (Paine, Matthew) |
| | | **There is no occasion to clarify. The judgment stands.** |
| | | (Entered: 07/16/2024) |