# United States Court of Appeals
*for the*
# First Circuit

Case Nos. 24-1770,
24-1771, 24-1772,
24-1773, 24-1774

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

ZHIYING YVONNE GASARCH,

*Defendant-Appellant,*

FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS;
PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON IN CASE NO. 1:21-CV-11276-WGY,
HONORABLE WILLIAM G. YOUNG, U.S. DISTRICT JUDGE

## BRIEF FOR DEFENDANTS-APPELLANTS MIKE K. VELDHUIS,
## PAUL SEXTON AND COURTNEY KELLN

STEPHEN G. TOPETZES
NEIL T. SMITH
ROBERT S. SILVERBLATT
K&L GATES LLP
*Counsel for Defendant-Appellant*
 *Paul Sexton*
1601 K Street, NW
Washington, DC 20006
(202) 778-9000

MICHAEL TREMONTE
SHER TREMONTE
*Counsel for Defendant-Appellant*
 *Mike K. Veldhuis*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (336840)

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

MIKE K. VELDHUIS,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

---

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

PAUL SEXTON,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

---

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

COURTNEY KELLN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
MIKE K. VELDHUIS; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

---

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

JACKSON T. FRIESEN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; PAUL SEXTON;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

FRANK SCADUTO
KEVIN B. MUHLENDORF
WILEY REIN LLP
*Counsel for Defendant-Appellant*
   *Courtney Kelln*
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..........................1

JURISDICTIONAL STATEMENT ......................................................1

ISSUES PRESENTED..........................................................................2

STATEMENT OF THE CASE...............................................................2

    I.    The Pre-Remedies Phase .......................................................3

        A.    The Commission Files Suit and Obtains an Asset Freeze ...........................................................................3

        B.    Appellants Seek to Stay the Case ...............................5

        C.    Appellants Agree to Partial Judgments but Reserve Rights on Remedies While Other Defendants Proceed to Trial ...............................................................6

    II.    The Remedies Phase..............................................................8

        A.    The District Court Orders Briefing and Denies a Second Stay Motion.................................................8

        B.    The SEC Bases Its Remedies Request on an Unauthenticated Database...........................................9

        C.    The Commission Relies on Unverified Evidence of Purported Profits .....................................................10

        D.    The District Court Acknowledges the Evidentiary Gaps but Still Grants the SEC All Requested Relief ........................13

    III.    Additional Proceedings in the District Court ......................15

SUMMARY OF ARGUMENT .............................................................15

STANDARD OF REVIEW ..................................................................16

ARGUMENT .......................................................................................17

    I.    The District Court Committed Legal Errors and Abused Its Discretion in Making Its Disgorgement Award ................17

i

A.   The District Court Exceeded Its Equitable Authority by Imposing Joint-and-Several Disgorgement Liability................19

    i.   Joint-and-Several Liability Is Strongly Disfavored........................................................................19

    ii.   Two Recent Decisions from This Court Demonstrate the Errors .............................................22

    iii.   The Precedent Relied on by the District Court Is Inapposite...................................................26

    iv.   The District Court Should Not Have Acted *Sua Sponte* ............................................................27

B.   Disgorgement Is Time-Barred .................................29

    i.   The Proper Limitations Period Is Five Years ................30

    ii.   The Conduct Was Stale by the Time of the NDAA's Passage ..........................................35

    iii.   Tolling Is Unavailable ...................................35

C.   Disgorgement Without Identification of Victims Is Improper....................................................37

D.   Additional Errors Infect the Award Against Ms. Kelln............38

E.   The District Court Abused Its Discretion in Ordering Disgorgement ........................................................40

    i.   Q Data Regarding Alleged Profits Is Inadmissible Hearsay......................................40

        a.   The Data Does Not Constitute a Business Record ......................................................41

            1.   The District Court Properly Held Prior to Trial That Q Data Is Not a Business Record..........................41

            2.   Purported Profit Data Does Not Satisfy Any of the Business Records Requirements ...............................42

3.      There Are Several Affirmative
Indications That the Data Is Not
Trustworthy ................................................46

b.      The Data Does Not Constitute a Co-
Conspirator Statement .........................................48

ii.     Even If the Data Is Admissible, the District
Court's Reliance on Q Was an Abuse of
Discretion ........................................................50

F.     The District Court Abused Its Discretion by Ordering
Disgorgement Without Evidence That Alleged Gains
Were Ill-Gotten .........................................................53

G.     The District Court Abused Its Discretion by Failing to
Guard Against Double Counting .............................58

II.     The District Court Erred by Awarding Civil Monetary
Penalties................................................................................59

III.    The District Court Erred by Entering Obey-the-Law
Injunctions ...........................................................................61

CONCLUSION ...............................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alfaro De Quevedo v. De Jesus Schuck*,
556 F.2d 591 (1st Cir. 1977)..................................................53

*Aponte v. Calderon*,
284 F.3d 184 (1st Cir. 2002)..................................................17

*Belber v. Lipson*,
905 F.2d 549 (1st Cir. 1990)..................................................44

*Belknap v. Schild*,
161 U.S. 10 (1896)..................................................21

*BioPoint, Inc. v. Dickhaut*,
110 F.4th 337 (1st Cir. 2024)..................................................22, 25

*Brown v. Trustees of Bos. Univ.*,
891 F.2d 337 (1st Cir. 1989)..................................................65

*Chenault v. U.S. Postal Serv.*,
37 F.3d 535 (9th Cir. 1994) ..................................................35

*Cobell v. Babbitt*,
30 F. Supp. 2d 24 (D.D.C. 1998)..................................................36

*EEOC v. Aviation Port. Servs., LLC*,
2020 U.S. Dist. LEXIS 57073 (D. Mass. Apr. 1, 2020)..................................................64

*Enter. Mortg. Acceptance Co., LLC, Sec. Litig. v. Enter. Mortg. Acceptance Co.*,
391 F.3d 401 (2d Cir. 2004) ..................................................30, 31

*Estrada-Izquierdo v. Aponte-Roque*,
850 F.2d 10 (1st Cir. 1988)..................................................28

*Gabelli v. SEC*,
568 U.S. 442 (2013)..................................................29, 59

*Goncalves v. Reno*,
144 F.3d 110 (1st Cir. 1998)..................................................34

*Hughes Aircraft Co. v. United States ex rel. Schumer*,
520 U.S. 939 (1997)..................................................34, 35

iv

*In re Galectin Therapeutics, Inc. Sec. Litig.*,
    157 F. Supp. 3d 1230 (N.D. Ga. 2015), *aff'd*, 843 F.3d 1257
    (11th Cir. 2016).................................................................................56

*In re PHC, Inc. S'holder Litig.*,
    894 F.3d 419 (1st Cir. 2018)...........................................................16

*In re Worldcom, Inc. Securities Litigation*,
    No. 02-cv-3288 (DLC), 2002 WL 31729501 (S.D.N.Y. Dec. 5, 2002)..............5

*Ira Green, Inc. v. Mil. Sales & Serv. Co.*,
    775 F.3d 12 (1st Cir. 2014).............................................................44

*Jimenez v. Banco Santander De Puerto Rico*,
    No. 07-cv-1225 (JAG), 2011 WL 13209060 (D.P.R. Mar. 31, 2011) ..............44

*Kansas Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*,
    61 F.3d 608 (8th Cir. 1995) ............................................................33

*Landgraf v. USI Film Prod.*,
    511 U.S. 244 (1994).............................................................31, 33, 34

*Lattab v. Ashcroft*,
    384 F.3d 8 (1st Cir. 2004)...............................................................34

*Lieberman v. Cambridge Partners, L.L.C.*,
    432 F.3d 482 (3d Cir. 2005), *as amended* (Feb. 8, 2006) ............................30, 33

*Liu v. SEC*,
    591 U.S. 71 (2020)......................................................................*passim*

*McCoy v. Town of Pittsfield, NH*,
    59 F.4th 497 (1st Cir. 2023)............................................................28

*Petrocelli v. Gallison*,
    679 F.2d 286 (1st Cir. 1982)............................................................44

*Quaak v. Dexia S.A.*,
    357 F. Supp. 2d 330 (D. Mass. 2005)...............................................32

*S.E.C. v. TelexFree, Inc.*,
    52 F. Supp. 3d 349 (D. Mass. 2014).................................................5

*Sea Salt, LLC v. Bellerose*,
    No. 18-cv-00413, 2020 WL 2475874 (D. Me. May 13, 2020) ............................5

*SEC v. Camarco*,
   No. 19-cv-1486, 2021 WL 5985058 (10th Cir. Dec. 16, 2021) ........................58

*SEC v. Clark*,
   915 F.2d 439 (9th Cir. 1990) ...............................................................20

*SEC v. Cohen*,
   332 F. Supp. 3d 575 (E.D.N.Y. 2018) ...........................................35, 60

*SEC v. Contorinis*,
   743 F.3d 296 (2nd Cir. 2014) ...........................................................20

*SEC v. Goble*,
   682 F.3d 934 (11th Cir. 2012) ...........................................................63

*SEC v. Gomes*,
   No. 20-cv-11092 (FDS), 2022 WL 11804022 (D. Mass. Oct. 20, 2022)...........26

*SEC v. Govil*,
   86 F.4th 89 (2d Cir. 2023) ................................................................37

*SEC v. Jones*,
   300 F. Supp. 3d 312 (D. Mass. 2018)...................................35, 60, 64

*SEC v. Knox*,
   No. 18-cv-12058 (RGS),2022 WL 1912877 (D. Mass. June 3, 2022)...............26

*SEC v. MacDonald*,
   No. 78-ca-0073, 1981 WL 1635 (D.R.I. Apr. 23, 1981) ...................................64

*SEC v. Monterosso*,
   756 F.3d 1326 (11th Cir. 2014) .........................................................27

*SEC v. Navellier & Assocs., Inc.*,
   108 F.4th 19 (1st Cir. 2024)...............................................24, 25, 50

*SEC v. Platforms Wireless Int'l Corp.*,
   617 F.3d 1072 (9th Cir. 2010) ...........................................................26

*SEC v. Rajaratnam*,
   918 F.3d 36 (2d Cir. 2019) ................................................................17

*SEC v. Sanchez-Diaz*,
   88 F.4th 81 (1st Cir. 2023)................................................................17

*SEC v. Sky Way Glob., LLC*,
   710 F. Supp. 2d 1274 (M.D. Fla. 2010)...............................................62

*SEC v. Stack*,
   No. 23-50327, 2024 WL 4199017 (5th Cir. Sept. 16, 2024).......................22, 29

*SEC v. Straub*,
   No. 11-cv-9645, 2016 WL 5793398 (S.D.N.Y. Sept. 30, 2016).......................36

*SEC v. Whittemore*,
   659 F.3d 1 (DC Cir. 2011)..................................................................20, 28

*Swack v. Credit Suisse First Bos.*,
   383 F. Supp. 2d 223 (D. Mass. 2004).............................................................32

*United States v. $80,180.00 in U.S. Currency*,
   303 F.3d 1182 (9th Cir. 2002) ......................................................................32

*United States v. Ciresi*,
   697 F.3d 19 (1st Cir. 2012)...........................................................................49

*United States v. DaVita Inc.*,
   592 F. Supp. 3d 970 (D. Colo. 2022)..............................................................49

*United States v. Doe*,
   23 F.4th 146 (1st Cir. 2022)...........................................................................41

*United States v. Irizarry-Sisco*,
   87 F.4th 38 (1st Cir. 2023).............................................................................17

*United States v. Jackson*,
   636 F.3d 687 (5th Cir. 2011) ...................................................................45, 48

*United States v. Sepulveda*,
   15 F.3d 1161 (1st Cir. 1993)..........................................................................49

*United States v. Sharp*,
   No. 1:21-mj-782 (D. Mass. Aug. 4, 2021) ...................................................5, 37

*Wallace Motor Sales, Inc. v. Am. Motors Sales Corp.*,
   780 F.2d 1049 (1st Cir. 1985).........................................................................44

*Ziehm v. Radioshack Corp.*,
   No. 09-cv-69-P-S, 2010 WL 2079550 (D. Me. May 22, 2010) .......................44

## Statutes & Other Authorities:

U.S. Const. Amend. V...........................................................................7, 8, 12

15 U.S.C. § 78u(d)(8)(C) ...............................................................................35

15 U.S.C. § 78u(d)(8)(A)(ii) ......................................................................30

17 C.F.R. § 240.10b-5 ...............................................................................61

17 C.F.R. § 240.13d-101 ...........................................................................61

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1331 .........................................................................................1

28 U.S.C. § 1658(b) ..................................................................................31

28 U.S.C. § 2462 ................................................................29, 35, 36, 37

Exchange Act Rule 13d-1(I) .....................................................................62

Fed. R. Civ. Proc. 54(b) ..............................................................................6

Fed. R. Civ. Proc. 59(e) ............................................................................15

Fed. R. Civ. Proc. 60(a) ............................................................................15

Fed. R. Civ. Proc. 65 ................................................................................64

Fed. R. Civ. Proc. 65(d) .....................................................................16, 63

Fed. R. Evid. 801(d)(2)(E) ........................................................................49

Fed. R. Evid. 803(6) ....................................................................41, 44, 46

Pub. L. 116-283, § 6501 ............................................................................31

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellants Paul Sexton, Mike Veldhuis, and Courtney Kelln ("Appellants") request an oral argument.[1] This appeal presents complex factual and legal issues, including a matter of first impression for this Court regarding the statute of limitations for disgorgement. Appellants believe that an oral argument would be helpful in crystalizing the issues presented in this appeal.

## JURISDICTIONAL STATEMENT

This is an appeal from:

1.      Judgments entered in favor of the Securities and Exchange Commission ("SEC" or "Commission") and against Appellants on June 20, 2024, and all orders encompassed therein;

2.      The District Court's orders dated July 11, 2024 that directed transfers of funds held in certain of Appellants' financial accounts in Canada; and

3.      The District Court's order dated July 16, 2024 that denied a motion to amend the judgments entered on June 20, 2024.

---

[1] Appellants, as permitted by this Court's January 13, 2025 order, file this brief jointly as the three defendants below who are litigating appeals without having proceeded to trial in this matter.

The District Court exercised jurisdiction pursuant to, *inter alia*, 28 U.S.C. § 1331. This Court has jurisdiction to consider this appeal pursuant to 28 U.S.C. § 1291, as this is an appeal of a final judgment.

Appellants timely filed Notices of Appeal on August 19, 2024.

## ISSUES PRESENTED

1.      Whether the District Court erred by entering final judgments against Appellants that included "joint-and-several" disgorgement orders that were imposed *sua sponte*, were time-barred, and were not based on actual evidence showing either that any of the Appellants received such funds or that such funds constituted ill-gotten gains from a violation of the federal securities laws?

2.      Whether the District Court wrongfully granted the SEC's request for civil monetary penalties that were time-barred and excessive based upon the evidence before the District Court?

3.      Whether the District Court erred in entering an injunction containing impermissibly vague "obey the law"-type language?

## STATEMENT OF THE CASE

This appeal primarily presents a simple question: whether the District Court erred in imposing joint-and-several disgorgement liability, a time-barred remedy that no party requested, despite no evidence that Appellants received the funds and notwithstanding the Court's factual finding that the SEC's evidence "does not show

that ill-gotten gains have been obtained and retained by the individual Defendants, much less in the amounts requested by the SEC." Joint Appendix ("JA") 3882. Also at issue is the Court's imposition of untimely and unsupported penalties and impermissibly vague injunctive relief. Because Appellants consented to the entry of certain judgments prior to trial while reserving their rights to contest remedies, the Commission's theory of securities law violations has limited relevance, and Appellants pause only briefly to address the components of the Commission's liability evidence relevant to this appeal before discussing matters pertaining to remedies.

### I.     The Pre-Remedies Phase

### A. The Commission Files Suit and Obtains an Asset Freeze

The Commission filed suit on August 5, 2021, alleging that Appellants and other defendants participated in a pump-and-dump scheme that involved 14 securities and was orchestrated by Fred Sharp. JA 55. As discussed below, although a database purportedly created and controlled by Mr. Sharp forms the basis for the SEC's disgorgement request, Mr. Sharp never appeared in the case or provided testimony or other authentication and instead had a default judgment entered against him. JA 407. At the beginning of the case, the Commission obtained a temporary restraining order, followed by a preliminary injunction, freezing Appellants' worldwide assets. JA 358–79. Subject to certain modifications, the freeze remained

3

in effect throughout the District Court proceedings and continues to be in place today.

The complaint broadly alleges that Mr. Sharp controlled the so-called Sharp Group, which purportedly provided services for customers engaged in trading or marketing activities related to the 14 issuers. The Commission believes that Messrs. Sexton and Veldhuis were, along with defendant Jackson Friesen, part of the so-called "Veldhuis Control Group," a term invented by the SEC that appears nowhere in the underlying pre-complaint factual record. *See* JA 57. The SEC contends that members of the Veldhuis Control Group were Mr. Sharp's customers. *Id.* The Commission also alleges that Ms. Kelln was a back-office employee of the Sharp Group. JA 70–71.

Appellants moved to dismiss the complaint on statute of limitations and other grounds. The motions to dismiss presented a novel question, which remains at issue in this appeal, regarding the Commission's ability to rely on a new limitations period, created by Congress after the relevant events, to revive stale claims that had become time-barred prior to that law's passage. The District Court denied the motions on September 6, 2022. JA 420. The SEC then amended its complaint on September 9, 2022. JA 524.

## B. Appellants Seek to Stay the Case

At the same time the civil case was proceeding, Appellants also faced criminal charges relating to the same underlying allegations. Mr. Veldhuis and Ms. Kelln were charged via criminal complaint on August 4, 2021, the day before the civil case was filed. *See United States v. Sharp*, No. 1:21-mj-782, ECF No. 3 (D. Mass. Aug. 4, 2021). The criminal case then lingered until an indictment was docketed on January 9, 2024, with Mr. Sexton then added as a defendant. *See United States v. Sharp*, No. 1:24-cr-10002, ECF No. 11 (D. Mass. Jan. 9, 2024). On May 2, 2023, which was in between the filing of the criminal complaint and the indictment, Mr. Veldhuis and Ms. Kelln moved to stay the civil proceedings in light of the parallel criminal case. JA 959. Mr. Sexton filed a notice of joinder on May 8, 2023. JA 1079.

As the motion explained, "[c]ourts have repeatedly issued stays in securities cases involving SEC civil enforcement actions and corresponding criminal proceedings." JA 977 (quoting *S.E.C. v. TelexFree, Inc.*, 52 F. Supp. 3d 349, 352 (D. Mass. 2014)). Indeed, "[w]here there is substantial overlap between the subject matter of the two proceedings, a stay of the civil proceeding is favored." *Sea Salt, LLC v. Bellerose*, No. 18-cv-00413, 2020 WL 2475874, at *2 (D. Me. May 13, 2020) (citation and internal quotation marks omitted). This is because "self-incrimination is more likely if there is significant overlap" between the cases. *In re Worldcom, Inc. Securities Litigation*, No. 02-cv-3288 (DLC), 2002 WL 31729501, at *3 (S.D.N.Y.

5

Dec. 5, 2002) (granting a stay where there was overlap of issues in the civil and criminal cases and explaining that overlap of issues is a particularly significant factor). The motion emphasized that there was no dispute that the criminal and civil proceedings completely overlapped, which heightened the need for a stay to protect the defendants' rights. JA 978. Nevertheless, on May 15, 2023, the District Court denied the motion to stay in a text order that did not contain any reasoning. JA 1101.

### C. Appellants Agree to Partial Judgments but Reserve Rights on Remedies While Other Defendants Proceed to Trial

Faced with limited resources due to the asset freeze and the prospect of having to divulge, through a civil trial, contemplated criminal defenses, Appellants elected not to proceed to trial. On June 13, 2023, Mr. Veldhuis and Ms. Kelln filed a notice of non-opposition to entry of injunctive relief and reserved their right to challenge the imposition of disgorgement and penalties. JA 1102–05. The District Court thereafter entered the injunctions pursuant to Federal Rule of Civil Procedure 54(b). The orders reflect the agreement by Mr. Veldhuis and Ms. Kelln that they "will not contest liability under the claims filed by the Plaintiff, but will be permitted to challenge the remedies and sanctions sought by the Commission as a result of that liability." JA 1110, 1116. On September 11, 2023, Mr. Sexton filed a notice of non-opposition to entry of judgment. JA 1530. The judgment found Mr. Sexton "liable

under Counts I-IV of the Amended Complaint" but reserved his right to challenge the imposition of disgorgement, penalties, and injunctive relief. JA 1533.

The limited effect of the judgments for purposes of this appeal is that Appellants, without waiving any of their Fifth Amendment rights in the pending criminal matter, may not dispute the existence of evidence that they engaged in violative conduct with respect to at least one of the 14 issuers that form the basis of the Commission's case. However, the burden remains on the Commission to establish that violations occurred within the relevant limitations period and that they resulted in ill-gotten gains.

Defendants Friesen and Yvonne Gasarch proceeded to trial and were ultimately found liable, but the jury's verdict has substantial limitations. Although the Commission has requested remedies with respect to trades in 14 different issuers, the District Court instructed the jury regarding liability: "The Commission only has to win on one [issuer] in order to have your answer to the questions that we put to you, if they win as to each element, [be] 'yes' as to that answer, and even if you're not persuaded as to other stocks. If you're persuaded as to one stock, that is sufficient." JA 1851. When the jury found Mr. Friesen and Ms. Gasarch liable, they were required to have agreed among themselves as to which security or securities were at issue, but they were not obligated to, and they did not, include that determination in their verdict. JA 1553–54. As a result, at the conclusion of trial,

7

there were no findings in the record, either in Appellants' pretrial judgments or in the jury verdict, that particular transactions constituted violations of the securities laws, and hence no basis to calculate disgorgement or other monetary relief based on those transactions.

## II.    The Remedies Phase

### A. The District Court Orders Briefing and Denies a Second Stay Motion

Following the jury verdict, the District Court set a schedule for the parties to brief whether the Commission is entitled to its requested remedies. On December 5, 2023, Mr. Veldhuis and Ms. Kelln filed a second motion to stay, requesting that the Court defer consideration of remedies until after the criminal case is resolved to enable them to mount a defense without waiving their Fifth Amendment rights. JA 1565. On December 8, 2023, the SEC filed a motion requesting the imposition of injunctive relief, disgorgement, and penalties. JA 1753.[2] On February 7, 2024, the Court denied the second stay motion, again in a text order without any reasoning. JA 3469. On February 14, 2024, Appellants opposed the Commission's remedies motion. JA 3470–3494. Then, on February 16, 2024, Mr. Veldhuis and Ms. Kelln moved for reconsideration of the denial of the second stay motion, followed four

---

[2] As noted, Mr. Veldhuis and Ms. Kelln had already consented to the imposition of injunctive relief. All other forms of relief against Appellants were opposed.

days later by a motion to stay filed by Mr. Sexton. JA 3495–3546. The Court denied

the motion for reconsideration on February 20, 2024 in a text order without any

reasoning. JA 3547. The Court never formally addressed Mr. Sexton's motion.

## B. The SEC Bases Its Remedies Request on an Unauthenticated Database

Throughout this litigation, the Commission has based its request for remedies

almost exclusively on purported evidence from the so-called Q system (the "Q

system" or "Q"), a third-party database that the Commission alleges demonstrates

Appellants' illegal network of trading. The system purports to serve two different

purposes: (1) logging trades and (2) allocating profits. Only this second function is

at issue in the appeal, and as discussed below, the Commission's reliance on the Q

system for this purpose is entirely unsupported by the record. By way of analogy,

the first part of the Q system purports to be like a brokerage firm. When people place

trades in their accounts, a brokerage firm might log the security traded, the number

of shares, the price, and the time of the transaction. The second part of the Q system

purports to be similar to a bank with an ATM.[3] Thus, the two parts of Q allegedly

serve completely distinct purposes.

---

[3] Although this analogy helps to understand the SEC's argument, it is important to note that there is no such thing as the "Bank of Sharp." As described below, key components of a bank, such as any demonstrated ability to even access funds, are lacking here.

9

The Q system has never been properly authenticated by any person with knowledge of how it operated or the accuracy of its "records." The SEC's principal source of purported confirmation is the testimony of Fedir Nikolayev, who allegedly assisted Mr. Sharp with the creation and maintenance of the Q system as a blank database to be used for purposes unknown to Mr. Nikolayev. But, as discussed below, Mr. Nikolayev, a part-time, remote IT consultant for Mr. Sharp, was not able to provide any testimony about the profits allegedly allocated to Appellants and lacked even basic familiarity with the alleged use of the Q system.

To overcome these issues, the Commission attempted to legitimize Q by testing its first function, which is to log purported trades. For instance, the SEC's summary witness testified that he was able, over the course of hundreds of hours, to match many of the stock transactions involving the 14 issuers to corresponding brokerage records. JA 3228. These records did not tie together in every instance, but the Commission argued, based on its analysis, that it had a high degree of confidence that the Q system accurately logged stock trades. *See, e.g.*, JA 3249.

### C. The Commission Relies on Unverified Evidence of Purported Profits

However, even assuming particular transactions were made, in order to secure financial remedies, the Commission must demonstrate that Appellants profited from those transactions. For such evidence, the SEC looked exclusively to the second part of the Q system, which purportedly allocates profits. Q, however, is not a bank; it is

a database. JA 3811–12. Nobody can walk into a Q branch and withdraw funds, as no such thing exists. *Id.* Nor does a Q bank account exist. Rather, Q purports to be a digital record of funds available for distribution, possibly from a completely different location in the name of an unknown party. *Id.* Under the Commission's theory, one such method of withdrawal would be a transfer from a Sharp Group account to an account in the name of a defendant. The Commission, however, offered no evidence of any such transfer from any account, nor did it demonstrate that enough money to fulfill withdrawal requests for the at-issue amounts even existed. The Q system lacks any record of actual transfers of funds to actual bank accounts controlled by Appellants or anyone else.

Moreover, in contrast to the methodical approach the SEC undertook with brokerage records to test the first part of the Q system, the Commission made virtually no effort to corroborate whether any of the funds purportedly allocated to any of the Appellants in the Q system were actually received. To the contrary, the SEC's remedies motion hinged on testimony from a summary witness who stated that he reviewed records of purported allocations in the Q system without any effort to match the receipt of those funds at a bank or other account controlled by Appellants—or anyone else. Crucially, the Commission has not offered a single bank record purportedly belonging to Appellants, and its summary witness admitted that he "did not look at any bank records" in arriving at the SEC's disgorgement

11

calculations. JA 3252. The Commission has the ability to request bank records, including from foreign banks, but did not do so in this case.[4] Relatedly, for any transactions that allegedly did not involve bank transfers, the Commission's summary witness conceded, "I do not know who got the cash." JA 3259.

Although the Commission, as reflected in the motion for a temporary restraining order, has known about bank accounts it believes belong to Appellants from the outset of the case, it never attempted to request records from those institutions. *See, e.g.*, JA 318–20. Instead, the SEC made a strategic—and, we submit, legally fatal—decision to not attempt to prove whether the funds were ever actually received by Appellants. In doing so, the SEC decided to rely on the staggering—albeit unsubstantiated—sums reflected in the Q system, likely because it knew that there were no bank records that supported the theoretical profits, losses, and transfers recorded in the Q system.

The trial record does not fill in any of the gaps. The closest the testimony came to this subject was when cooperating witness Roger Knox addressed the Q system. However, Mr. Knox conceded that he did not make entries of purported wire instructions in the Q system. JA 2913. Additionally, for proceeds attributed to the

---

[4] The SEC served discovery requests on Appellants seeking bank records but took no steps to obtain them from the banks after Appellants invoked their Fifth Amendment rights.

so-called Veldhuis Control Group, of which Messrs. Sexton and Veldhuis were allegedly members, Mr. Knox testified that he was involved in allocating funds to the group, but he did not claim that he had any role in further allocation of those amounts to individuals within the alleged group. JA 2914, 2976, 2981. And with the exception of one-off situations, like when Mr. Knox allegedly provided 4,000 Euros to a group of people (without evidence that any Appellant retained the funds), Mr. Knox has no knowledge of actual receipt of funds by Appellants or anyone else. JA 2917–18.

### D. The District Court Acknowledges the Evidentiary Gaps but Still Grants the SEC All Requested Relief

In ruling on the SEC's remedies motion, the District Court expressly found that the SEC's evidence "does not show that ill-gotten gains have been obtained and retained by the individual Defendants, much less in the amounts requested by the SEC." JA 3882. Although the Commission requested individual liability and never mentioned joint-and-several liability, the Court nonetheless decided *sua sponte* to impose joint-and-several liability "irrespective of to whom among the co-conspirators the proceeds accrued." *Id.* On June 20, 2024, the Court entered the judgments at issue in this appeal. JA 3886–934. In addition to injunctions, the Court imposed the following remedies that are relevant to Appellants:

13

- A joint-and-several disgorgement award against Messrs. Sexton, Veldhuis, Sharp, and Friesen in the amount of $42,503,547, with the amount to be collected from Mr. Sexton capped at $17,367,474 and the amount to be collected from Mr. Veldhuis capped at $13,289,897.

- A joint-and-several disgorgement award against Ms. Kelln and Mr. Sharp in the amount of $1,582,785.

- A civil penalty of $1,562,603 each against Mr. Sexton and Mr. Veldhuis.

- A civil penalty of $904,078.00 against Ms. Kelln.

JA 3857–58, 3879.

Notwithstanding its finding about the severe limitations of the Q system, the District Court based the disgorgement caps for Messrs. Sexton and Veldhuis and the disgorgement amount for Ms. Kelln exclusively on the profits purportedly allocated to each in the Q system. JA 3878–79. Meanwhile, the Court calculated penalties for Messrs. Sexton and Veldhuis by multiplying the maximum penalty amount permitted under the law by the number of issuers out of the 14 that the SEC alleged, based on Q, that they transacted in during the five years leading up to the filing of the complaint. JA 3857. For Ms. Kelln, the District Court calculated the penalty based on the number of violations that the SEC pled. For four of those violations,

14

the Court imposed a penalty of $223,229 each, and for the final one, the Court imposed a penalty of $11,162. JA 3857–58.

### III.    Additional Proceedings in the District Court

On July 2, 2024, Mr. Friesen filed a timely motion pursuant to Federal Rules of Civil Procedure 59(e) and 60(a) to alter or amend the judgment. JA 3968. Appellants subsequently filed notices of joinder. JA 3977–85. On July 16, 2024, the Court denied the motion. JA 4019. On August 19, 2024, Appellants filed timely notices of appeal. JA 4057–67. On September 4, 2024, after the District Court was divested of jurisdiction due to the appeal, the Commission filed a motion to create a Fair Fund. JA 4068. The Commission proposed in this filing to put any funds collected from Ms. Kelln into the restitution fund established in a separate criminal matter, *United States v. Knox*, No. 18-cr-10385-1-NMG (D. Mass.). JA 4085. On September 18, 2024, the District Court issued an indicative ruling expressing an intention to grant the SEC's motion if jurisdiction is returned. JA 4203.

### SUMMARY OF ARGUMENT

The District Court erred in three areas: disgorgement, penalties, and injunctive relief.

**First**, the District Court erroneously ordered joint-and-several disgorgement against Appellants despite its express finding that the evidence did not demonstrate their receipt of funds. Joint-and-several liability is highly disfavored, and clear

15

Supreme Court and First Circuit precedent prevents its application here. Numerous other issues also permeated the disgorgement order. The relief was time-barred, and the legislation that extended the limitations period did not operate to revive stale claims. Separately, the District Court improperly relied on inadmissible and unsubstantiated evidence, failed to require proof of victims, did not connect the award to violations of the securities laws, and overlooked double counting issues.

**Second**, the penalties were untimely and unsubstantiated. The District Court improperly relied on the dates that Appellants allegedly received funds as opposed to the dates that the underlying conduct purportedly occurred. Because the SEC failed to produce evidence of violations of the securities laws within the five years leading up to the filing of the complaint, no penalties should be imposed.

**Third**, the injunctive relief entered against Mr. Sexton is impermissibly vague. So-called "obey the law" injunctions violate Federal Rule of Civil Procedure 65(d) and create impermissible risks of contempt based on ill-defined prohibitions. They are also unnecessary, as they simply command compliance with laws to which individuals are already subject. These unenforceable and improper provisions should be excised from the injunctive portion of the judgment.

## STANDARD OF REVIEW

Disgorgement awards are reviewed "under a bifurcated standard." *See In re PHC, Inc. S'holder Litig.*, 894 F.3d 419, 435 (1st Cir. 2018) (citation and internal

quotation marks omitted). Under this standard, the "availability of an equitable remedy presents a question of law engendering de novo review, while the decision either to award or to refrain from awarding an available equitable remedy is reviewed for abuse of discretion." *Id.* Factual determinations relevant to the exercise of discretion receive clear error review. *See SEC v. Sanchez-Diaz*, 88 F.4th 81, 87 n.2 (1st Cir. 2023). And preserved evidentiary challenges related to awards are reviewed for abuse of discretion. *See United States v. Irizarry-Sisco*, 87 F.4th 38, 44 (1st Cir. 2023).

The same mixed standard applies to penalty determinations and injunctions. *See, e.g.*, *Aponte v. Calderon*, 284 F.3d 184, 191 (1st Cir. 2002) (reviewing grant of an injunction for abuse of discretion, questions of law *de novo*, and factual findings for clear error); *SEC v. Rajaratnam*, 918 F.3d 36, 41 (2d Cir. 2019) (reviewing district court's selection of civil penalty for abuse of discretion and interpretation of statute *de novo*).

## **ARGUMENT**

## I. **The District Court Committed Legal Errors and Abused Its Discretion in Making Its Disgorgement Award**

The District Court erred by ordering disgorgement after making the express factual finding that the SEC's evidence "does not show that ill-gotten gains have been obtained and retained by the individual Defendants, much less in the amounts

requested by the SEC." JA 3882. The District Court's decision to nonetheless order joint-and-several disgorgement "irrespective of to whom among the co-conspirators the proceeds accrued," *id.*, represents a drastic and unwarranted expansion of this equitable remedy and contravenes binding precedent. Because the District Court recognized that it could not order disgorgement in the absence of joint-and-several liability, and given that joint-and-several liability was impermissible, the decision constitutes a legal error that should be reversed under *de novo* review. The District Court also made additional legal errors when it wrongly concluded that the SEC's disgorgement request was timely and when it entered its order without determining whether there were any victims.

Even if this Court determines that the District Court did not misinterpret the law, it at a minimum abused its discretion in ordering disgorgement. In particular, the District Court based its reasonable approximation on inadmissible and inherently unreliable records from the Q system without demanding any proof that Appellants actually received the at-issue funds. The Commission's evidence was so unreliable that the District Court conceded that it did not allow for a determination that each individual Appellant even received any funds. There was no basis to order disgorgement under these circumstances. The District Court also abused its discretion by not requiring the Commission to establish that the gains were ill-gotten and non-duplicative.

## A. The District Court Exceeded Its Equitable Authority by Imposing Joint-and-Several Disgorgement Liability

Having concluded that it was impossible to determine whether each Appellant received ill-gotten gains and, if so, in what amount, the District Court's analysis should have ended. Instead, the District Court wrongly determined, as a matter of law, that "the ill-gotten gains subject to disgorgement need not accrue to each defendant individually." JA 3875–76. On that legally erroneous basis, the District Court ordered joint-and-several liability. This should be reversed under *de novo* review. And based on the District Court's finding that disgorgement amounts could not be calculated in the absence of joint-and-several liability, this Court should remand with instructions to deny the Commission's request for disgorgement.

### i.     *Joint-and-Several Liability Is Strongly Disfavored*

The Supreme Court has made clear that joint-and-several liability is rarely, if ever, appropriate in disgorgement cases. In *Liu v. SEC*, the Court, canvassing the historical record, noted that "[e]quity courts also generally awarded profits-based remedies against individuals or partners engaged in concerted wrongdoing, not against multiple wrongdoers under a joint-and-several liability theory." 591 U.S. 71, 82–83 (2020); *see also id.* at 83 ("The rule against joint-and-several liability for profits that have accrued to another appears throughout equity cases awarding profits."). The Supreme Court went on to describe the more recent practice of

19

"occasionally" ordering "joint-and-several disgorgement" as one of the ways in which lower courts have "test[ed] the bounds of equity practice," and it described that outcome as being "in considerable tension with equity practices." *Id.* at 85.

The Supreme Court specifically criticized the rulings in three prior cases as "seemingly at odds with the common-law rule requiring individual liability for wrongful profits." *Id.* at 90. In the first, the court held that "a defendant could be forced to disgorge not only what he personally enjoyed from his exploitation of inside information, but also the profits of such exploitation that he channeled to friends, family, or clients." *Id.* (quoting *SEC v. Contorinis*, 743 F.3d 296, 302 (2nd Cir. 2014)) (internal quotation marks omitted). In the second, the court concluded that a "tipper can be required to disgorge his tippee's profits." *Id.* (quoting *SEC v. Clark*, 915 F.2d 439, 454 (9th Cir. 1990)) (internal quotation marks omitted). And in the third, the court approved "joint-and-several disgorgement liability where there is a close relationship between the defendants and collaboration in executing the wrongdoing." *Id.* (citing *SEC v. Whittemore*, 659 F.3d 1, 10 (DC Cir. 2011)). The Supreme Court noted that these types of decisions "could transform any equitable profits-focused remedy into a penalty" and that they "run[] against the rule to not impose joint liability in favor of holding defendants 'liable to account for such profits only as have accrued to themselves and not for those which have accrued to

another, and in which they have no participation.'" *Id.* (quoting *Belknap v. Schild*, 161 U.S. 10, 25–26 (1896)).

With that heavy thumb on the scale against disgorgement, the Supreme Court left open, without deciding, the possibility that circumstances could arise where joint-and-several liability would be appropriate. Among the potentially relevant factors identified were whether the individuals were married, whether their "finances were . . . commingled," whether they each "enjoy[ed] the fruits of the scheme," whether someone was a "mere passive recipient of profits," and whether "other circumstances would render a joint-and-several disgorgement order unjust." *Id.* at 91. Although the Supreme Court identified these factors, it declined to "wade into all the circumstances where an equitable profits remedy might be punitive when applied to multiple individuals." *Id.*

With the exception of the District Court's decision below, undersigned counsel has not identified a single post-*Liu* case where a court has imposed joint-and-several liability on multiple individuals without any showing that they received, or even had access to, the funds. There have been sporadic instances of joint-and-several liability against an individual and a corporate entity, but the District Court's decision breaks entirely new ground. And it runs afoul not only of *Liu*, but also of post-*Liu* case law, including in the First Circuit.

21

ii.    *Two Recent Decisions from This Court Demonstrate the Errors*

Shortly after the District Court's order, this Court decided two cases that reflect the proper interpretation of *Liu* and shine light on the legal errors in this case. In the first, this Court acknowledged the "general rule against joint-and-several liability for profits that have accrued to another" and overturned the lower court's disgorgement order that had imposed joint-and-several liability against an individual and the entity that employed him. *See BioPoint, Inc. v. Dickhaut*, 110 F.4th 337, 351 (1st Cir. 2024). Like the Supreme Court in *Liu*, this Court declined to "define all the facts and relationships that would render defendants 'partners engaged in concerted wrongdoing' such that joint-and-several liability would be appropriate." *Id.* at 353. Nonetheless, in guidance that should resolve this appeal, this Court wrote: "It is sufficient, for today, to decide that the district court exceeded its equitable powers when it imposed joint-and-several liability on an individual, non-owner, non-director employee, without concluding whether or how much the employee benefited from the scheme, merely because the employee 'collaborated with and ranks high' in the entity that profited from the wrongdoing." *Id.*

In reaching that conclusion, this Court highlighted the presence of "[m]ultiple red flags identified in *Liu*," including that there was no reason to believe that the individual and entity that were subject to the joint-and-several liability award "commingled finances" and that, other than the individual's salary and commissions,

22

he "did not receive any profits or otherwise enjoy the fruits of the scheme." *Id.*; *see also SEC v. Stack*, No. 23-50327, 2024 WL 4199017, at *3 (5th Cir. Sept. 16, 2024) (internal quotation marks omitted) (noting that it is "significant that, unlike the spouses' finances at issue in *Liu*, Stack's and Marshall's finances were not commingled" and finding that "[h]olding Stack liable for funds he did not keep or benefit from does not constitute a reasonable approximation of a defendant's unjust enrichment, as required by *Liu* and our precedent").

These same red flags abound here. The Commission has argued that each Appellant maintained separate Q accounts, and there is no evidence that any of their finances were commingled in the Q system. *See, e.g.*, JA 1905–09. And because there is no evidence that the funds were ever even disbursed from the Q accounts, there is no suggestion that funds were actually received by Appellants and subsequently commingled. Indeed, the SEC never even attempted to argue that Appellants share bank accounts or combine their finances in any way whatsoever. Nor is there any evidence that Appellants "receive[d] any profits or otherwise enjoy[ed] the fruits of the scheme." To the contrary, the District Court expressly found that the evidence "does not show that ill-gotten gains have been obtained and retained by the individual Defendants, much less in the amounts requested by the SEC." JA 3882.

Contrast this with *SEC v. Navellier & Assocs., Inc.*, in which the First Circuit concluded that joint-and-several liability was appropriate against an individual and a related entity. 108 F.4th 19, 43 (1st Cir. 2024). This Court relied upon, among other considerations, the individual's fiduciary duty to the entity's clients; his "authoritative role" in the entity; the fact that, as the entity's majority owner, he "shared in profits received by [the entity]"; and the finding that the individual also engaged in violations. *Id.* Save for the last factor, which is typically a prerequisite to any type of liability, whether or not joint and several, none of the others are present here. Appellants are not alleged to have had any "authorit[y]" over other defendants. There is no allegation, let alone evidence, that the individuals shared any profits. And because the relief is against individuals only, the ownership factor is irrelevant.

Indeed, the record underscores the lack of any ownership or authoritative role in the Sharp Group by Appellants. Messrs. Sexton and Veldhuis "were not part of the business, they were clients of Fred Sharp." JA 2852, 2858–59. Ms. Kelln was "Sharp's employee." JA 3828. As the SEC itself admitted, Ms. Kelln worked as an administrative assistant to Mr. Sharp, an attorney almost thirty years her senior. *See* JA 532, 539–40. She operated entirely "at the direction" of Mr. Sharp in performing basic "administrative tasks," which included arranging transfers on behalf of Mr. Sharp's clients, with whom Mr. Sharp was responsible for liaising. JA 537, 539–40.

24

These facts put this case firmly within the default rule against joint-and-several liability set forth in *Liu*, *BioPoint*, and *Navellier*.

Beyond these dispositive issues, there is also a fundamental logical flaw in the District Court's order. The District Court concluded that Mr. Sharp's alleged relationship with Appellants and involvement in the misconduct eliminated any need to make particularized findings. JA 3877 ("Given that Sharp was a co-conspirator in each of the conspiracies, the ill-gotten gains need not have accrued personally to each of the Defendants—that they may have partially or entirely accrued to Sharp suffices to award disgorgement.").[5] This is wrong.

In particular, the District Court found "Sexton, Veldhuis, and Friesen are jointly and severally liable with Sharp for disgorgement in the amount of $42,503,547." JA 3879. Similarly, the District Court found "Kelln is jointly and severally liable with Sharp for disgorgement in the amount of $1,582,785." *Id.* Although this was apparently based on the theory that Mr. Sharp could be liable for the full amount if he received all the profits, that is untenable because Mr. Sharp was no longer a party to the case at the time of the order. To the contrary, the District Court had already imposed a default disgorgement judgment against him in the

---

[5] The fact that the District Court conceded that the profits may have "entirely accrued" to someone other than Appellants is by itself a reason why disgorgement cannot be ordered against Appellants.

amount of $21,760,936. *See* JA 412. The District Court, of course, cannot expand the judgment with no request from the SEC and no notice to Mr. Sharp. So the District Court's fail-safe is nothing more than an illusion. Additionally, even if that were not the case, there is no basis to allow the Commission to seize funds from Appellants rather than Mr. Sharp when the District Court seems to believe that much or all of the amounts went instead to Mr. Sharp.

### iii. The Precedent Relied on by the District Court Is Inapposite

None of the cases cited by the District Court support its order. In *SEC v. Knox*, No. 18-cv-12058 (RGS), 2022 WL 1912877, at *4 (D. Mass. June 3, 2022), the court granted the Commission's unopposed request for joint-and-several liability against multiple entities based on their "interchangeable role." The Commission, by contrast, goes to great lengths to allege that Appellants played different roles, making them anything but interchangeable. Additionally, the *Knox* court granted the SEC's request for an exception to joint-and-several liability because certain entities "received lesser proceeds of the fraud and should only disgorge the amounts that passed through their accounts." *Id.* No such allowance exists here, and it cannot exist because the District Court determined that it was impossible to ascertain whether Appellants received any particular amount. Meanwhile, *SEC v. Gomes*, No. 20-cv-11092 (FDS), 2022 WL 11804022, at *2 (D. Mass. Oct. 20, 2022), involved a consent judgment of joint-and-several liability against an individual and an entity;

the court neither analyzed the appropriateness of such liability nor even laid out the facts supporting it.

The same holds true for the cases from other circuits. In *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010), the court upheld a judgment of joint-and-several liability against an entity and its former chairman and CEO. The court held that the defendant benefitted directly from the entity's fraud because the proceeds kept his business operational and protected the more than $2 million investment he would have lost had the entity failed. *See id.* ("Martin therefore benefitted from the Section 5 violations by keeping Platforms afloat, defraying further investment of his own money, and protecting his substantial personal financial interest in the company."). *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014), unlike the other cases, involves two individuals, but their companies had a "joint agreement," with payments flowing between the entities. There is no similar payment-flow allegation here. Additionally, both of these out-of-circuit cases substantially predate *Liu*, and their holdings are therefore no longer good law to the extent they are inconsistent with *Liu*.

### iv.     *The District Court Should Not Have Acted Sua Sponte*

Even assuming there could be a circumstance in which joint-and-several liability would be appropriate on these facts, the District Court committed legal error in ordering it *sua sponte*. The Commission did not seek joint-and-several liability at

any stage throughout the litigation. It was not included in the complaint or the amended complaint. Nor did the SEC request it in its motion for remedies, at the hearing on remedies, or in its proposed judgments. To the contrary, the SEC repeatedly sought separate, individual judgments against each defendant. The District Court likewise gave no notice of any intention to order joint-and-several liability. The concept never arose during the remedies hearing or in any other context until the District Court issued the order.

*Sua sponte* remedies are generally disfavored. *See, e.g.*, *McCoy v. Town of Pittsfield, NH*, 59 F.4th 497, 504–05 (1st Cir. 2023) (noting, in the context of *sua sponte* summary judgment, that the "power should be exercised sparingly and with great circumspection," and only after providing notice of the "grounds that the district court will consider") (internal quotation marks omitted); *see also Estrada-Izquierdo v. Aponte-Roque*, 850 F.2d 10, 19 (1st Cir. 1988) ("Because the hearing was on injunctive relief only, it was error for the district court sua sponte to reach the separate question of damages, without giving the parties notice or opportunity to be heard on that issue.").

Although at least one court has allowed the imposition of joint-and-several liability when the Commission did not include it in its complaint but did expressly request it in its remedies motion, *Whittemore*, 659 F.3d at 10, we are aware of no instance in which a court has been permitted to *sua sponte* order joint-and-several

liability that the plaintiff has not asked for.[6] By contrast, the Fifth Circuit recently held that the Commission can waive the ability to obtain joint-and-several liability. *See Stack*, 2024 WL 4199017, at *4 ("In sum, counsel affirmatively waived SEC's reliance on the theory of joint and several liability, so we need not discuss that theory, and the record and precedent contradict the district court's assessment of disgorgement far exceeding the amount by which Stack himself was unjustly enriched."). Particularly in the context of a waivable issue, it was legal error for the District Court to grant a remedy that had not been requested, especially without providing any notice to the parties.

## B. Disgorgement Is Time-Barred

At the time of all of the conduct alleged in this case, the SEC had five years "from the date when the claim first accrued" to file actions seeking disgorgement. *See* 28 U.S.C. § 2462. The clock starts running when the "allegedly fraudulent conduct occurs," not when it is discovered. *See Gabelli v. SEC*, 568 U.S. 442, 448–54 (2013). Under this prior limitations period, the Commission would not be entitled to any disgorgement. Although Congress subsequently enacted a new 10-year limitations period for scienter-based offenses, it is plainly inapplicable here. In

---

[6] As noted, *Whittemore* was one of the decisions the Supreme Court *Liu* highlighted as being "seemingly at odds" with traditional equitable principles. *See Liu*, 591 U.S. at 90.

concluding otherwise, the District Court relied on two words in the statutory text that have no application to this case and conflated two distinct types of retroactivity. This decision should be reversed under *de novo* review.

i.    *The Proper Limitations Period Is Five Years*

In 2021, long after all of the alleged conduct, Congress established a new limitations period for scienter-based disgorgement claims. In particular, a provision now codified as 15 U.S.C. §78u(d)(8)(A)(ii) was inserted on page 1,239 of the 1,480-page National Defense Authorization Act ("NDAA"), and it extends the limitations period for certain scienter-based offenses to "not later than 10 years after the latest date of the violation that gives rise to the action or proceeding in which the Commission seeks the claim." However, the provision does not apply retroactively to reach conduct that had occurred more than five years prior to its enactment.

Although Congress can, in certain contexts, apply new civil statutes retroactively to reach conduct that had become stale, in this case Congress did not use any of the language required to reach this result. *See Lieberman v. Cambridge Partners, L.L.C.*, 432 F.3d 482, 490–91 (3d Cir. 2005), *as amended* (Feb. 8, 2006); *Enter. Mortg. Acceptance Co., LLC, Sec. Litig. v. Enter. Mortg. Acceptance Co.*, 391 F.3d 401, 406 (2d Cir. 2004), *as amended* (Jan. 7, 2005).

To conclude that the NDAA does not restore expired claims, this Court need look no further than *Enterprise Mortgage*, *Lieberman*, and other decisions

interpreting the effect of virtually identical language from the Sarbanes-Oxley Act. That statute contains the following language: "EFFECTIVE DATE.—The limitations period provided by section 1658(b) of title 28, United States Code, as added by this section, shall apply to all proceedings addressed by this section that are commenced on or after the [July 30, 2002,] date of enactment of this Act." *Enterprise Mortgage*, 491 F.3d at 406. Similarly, the NDAA provides: "APPLICABILITY.—The amendments made by subsection (a) shall apply with respect to any action or proceeding that is pending on, or commenced on or after, the date of enactment of this Act." *See* Pub. L. 116-283, § 6501.

In rejecting the use of Sarbanes-Oxley to revive stale claims, courts have found dispositive the fact that the statute "contains none of the unambiguous language" necessary to have such an effect. *Enterprise Mortgage*, 391 F.3d at 406–07. When Congress wants to resurrect expired claims, it uses much clearer language, such as "the Corporation may bring an action on such claim without regard to the expiration of the statute of limitation applicable under State law," or "no limitation shall terminate the period within which suit may be filed." *Id.* at 407 (internal quotation marks omitted); *see also Landgraf v. USI Film Prod.*, 511 U.S. 244, 257 (1994) ("A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.").

31

Although the First Circuit has not addressed the retroactive effect of Sarbanes-Oxley, courts in this Circuit have agreed with the Second and Third Circuits. *See, e.g.*, *Quaak v. Dexia* S.A., 357 F. Supp. 2d 330, 337 (D. Mass. 2005) ("This Court agrees with the overwhelming majority of courts, which have found that Sarbanes–Oxley did not revive time-barred claims."); *Swack v. Credit Suisse First Bos.*, 383 F. Supp. 2d 223, 233 n.10 (D. Mass. 2004) ("If the question were simply whether the statute and legislative history supported a colorable argument that Congress intended to revive moribund actions, this would present a close case. Since the standard is far stricter, however, I cannot find that Congress intended § 804 of the Sarbanes-Oxley Act to apply to actions that were time-barred on July 29, 2002.").[7]

The District Court departed from the Sarbanes-Oxley rulings based on a red herring. JA 456 ("These cases, however, are distinguishable from the case at bar. Notably absent from the language of Sarbanes-Oxley are the words 'pending on,' which provide a key indication of Congress' intent to address temporal scope."). The words "pending on" are irrelevant to this matter, as the SEC's case against Appellants was not "pending" at the time the NDAA was passed. Instead, it was filed more than seven months later. *Cf. United States v. $80,180.00 in U.S. Currency*,

---

[7] After expressing agreement with the consensus view, the court in *Swack* noted that it did not have to expressly reach the question to resolve the case. *Swack*, 383 F. Supp. 2d at 233 n.10.

32

303 F.3d 1182, 1185 (9th Cir. 2002) ("A case is pending on a statute's effective date if the case was filed *before* the effective date."). The only language in the NDAA that could conceivably reach Appellants is the application to cases filed "on or after" the date of enactment—the same language from Sarbanes-Oxley that courts have consistently concluded is not sufficient to revive stale claims.

The District Court's observation that "pending on" can imply retroactivity is accurate but irrelevant because it conflates the different types of retroactivity. JA 456–57 (citing *Landgraf*, 511 U.S. at 259–60). There are two distinct ways in which limitations periods can apply retroactively. First, they can extend the relief window for cases where the clock had not yet expired. For instance, applying the 10-year limitations period from the NDAA to cases that were pending at the time of its enactment, clearly a proper result given the statutory language, would be a retroactive application of the law. That is the type of retroactivity at issue in *Landgraf*. It is a different matter entirely to apply a new limitations period to matters that were not pending, and where the clock had already run, at the time of enactment. *Cf. Lieberman*, 432 F.3d at 489 ("Even assuming, without deciding, that Section 804(b) clearly provides for retroactive application, it does not necessarily follow that Section 804(b) thereby clearly provides for the resurrection of moribund claims."); *see also Kansas Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 61 F.3d 608, 615 (8th Cir. 1995) ("Providing that a statute of limitations should be 'applied

33

retroactively' is a broad brush approach to what is actually a more specific inquiry. Retroactive application can reach two categories of cases: first, a group on which the statute has not run at the time the statute is amended; and second, cases on which the existing statute has run at the time of amendment. The second group is affected not only by questions of the retroactive application of the statute, but also by the need to consider the question of revival of barred claims."). It was error to apply the standards from the first type of retroactivity to a dispute about the second kind.

Given the lack of a clear command, the only remaining inquiry under *Landgraf* is whether applying the NDAA to Appellants' "circumstances would have an impermissibly retroactive effect." *Lattab v. Ashcroft*, 384 F.3d 8, 15 (1st Cir. 2004). Because the SEC's disgorgement claim against Appellants had expired prior to passage of the NDAA, this prong is satisfied. Indeed, the Supreme Court has stated that "extending a statute of limitations after the pre-existing period of limitations has expired impermissibly revives a moribund cause of action." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 950 (1997). It does not matter that securities fraud was "already unlawful" prior to passage of the NDAA; instead, it is the revival of stale claims that offends traditional notions of fair play. *See Goncalves v. Reno*, 144 F.3d 110, 130 (1st Cir. 1998). That is so because "reviv[ing] a plaintiff's claim that was otherwise barred under the old statutory scheme . . . would alter the

substantive rights of a party and increase a party's liability." *Hughes Aircraft*, 520

U.S. at 950 (quoting *Chenault v. U.S. Postal Serv.*, 37 F.3d 535, 539 (9th Cir. 1994)).

### ii.    The Conduct Was Stale by the Time of the NDAA's Passage

The Commission did not present evidence that Appellants engaged in

violations of the securities laws within the five-year window preceding the filing of

the complaint. To the contrary, the Commission's evidence of purported violations

consisted of alleged payments that Appellants received within the five-year window.

*See, e.g.*, JA 1905–06. But this is insufficient without proof, which is entirely

missing, of actual violative conduct within that window. *See SEC v. Jones*, 300 F.

Supp. 3d 312, 316 & n.7 (D. Mass. 2018) (rejecting as "pretty thin gruel" the SEC's

argument that the "passive receipt of commission payments" from allegedly

fraudulent conduct could restart the five-year clock); *SEC v. Cohen*, 332 F. Supp. 3d

575, 591 (E.D.N.Y. 2018) ("[T]he statute of limitations runs from when Defendants

allegedly engaged in misconduct, not when they received compensation in

connection with that misconduct."). Given the absence of required proof, the

disgorgement order improperly served to revive time-barred claims and should be

set aside in its entirety.

### iii.    Tolling Is Unavailable

In front of the District Court, the Commission argued that the limitations

period did not matter due to alleged tolling. This is wrong. The SEC relied on 15

U.S.C. § 78u(d)(8)(C), a provision that has no application to this case. The tolling rule cited by the SEC, which was added in the NDAA along with the increased limitations period for disgorgement, drastically altered existing law by providing that, "[f]or the purposes of calculating any limitations period under this paragraph with respect to an action or claim, any time in which the person against which the action or claim, as applicable, is brought is outside of the United States shall not count towards the accrual of that period." 15 U.S.C. § 78u(d)(8)(C). For the same reasons that using the new disgorgement period is improper under basic retroactivity principles, so too is the reliance on the new tolling rule. *Cf. Cobell v. Babbitt*, 30 F. Supp. 2d 24, 44 (D.D.C. 1998) ("In other words, the provision only tolls a clock that has not commenced running. It cannot revive claims for which the clock stopped running long ago.").

To the extent any rule applies to this case, it is 28 U.S.C. § 2462, which provides that a lawsuit must be "commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon." Put differently, "actions covered by Section 2462 are subject to a five-year statute of limitations that applies if the defendant is present in the United States at any time during that five-year period, which begins to run on the date the subject claim accrues and does not toll while the defendant is absent from the United States." *SEC*

36

*v. Straub*, No. 11-cv-9645, 2016 WL 5793398, at *19 (S.D.N.Y. Sept. 30, 2016) (emphasis added). Unlike the NDAA, which pauses the clock while individuals are abroad, § 2462's rule fails to apply if the defendant was within the United States even for a day during after the clock started running. And that is sufficient to defeat its application here. The complaint, for instance, alleged that Mr. Sexton was in the United States in October 2014, which is after the claims against him purportedly accrued. JA 88. Likewise, the criminal complaint indicated that Mr. Veldhuis visited Los Angeles in June 2015. *See United States v. Sharp*, No. 21-mj-782, ECF No. 3-1 (D. Mass. Aug. 4, 2021).

### C. Disgorgement Without Identification of Victims Is Improper

Another fatal deficiency is that the Commission has not established that there are any victims to whom disgorgement should be allocated. The Commission is entitled to disgorgement only if it is "awarded for victims." *SEC v. Govil*, 86 F.4th 89, 106 (2d Cir. 2023) (quoting *Liu*, 591 U.S. at 74) (internal quotation marks omitted). As a result, a court must "determine that the investors [who were] defrauded suffered . . . pecuniary harm before awarding disgorgement." *Id.* at 94. The mere existence of fraud, or the fact that investors were told a "lie," is insufficient, because "pecuniary harm" is an indispensable prerequisite. *Id.* at 104. The Commission has not even attempted at this stage to prove the existence, let alone

the identities, of victims. The Court's disgorgement award was therefore premature and legally erroneous.

Although the District Court did order the SEC to submit a disgorgement plan identifying victims "without any unreasonable delay," JA 3885, the SEC has not done so in the ensuing seven months. Instead, the Commission submitted a plan that did not purport to identify victims, and the Court issued an indicative ruling that it would approve the plan, notwithstanding its clear lack of compliance with the Court's prior ruling. JA 4203. This sequence of events only underscores the error.

### D. Additional Errors Infect the Award Against Ms. Kelln

Recognizing its fatal failure to identify victims to whom Appellants owe disgorgement, the SEC proposed to redirect collections from Ms. Kelln to victims of different securities violations in a different case to which Ms. Kelln was never a party. JA 1840–41, 4085 (seeking to contribute collections here to the so-called Knox Restitution Fund established in *United States v. Knox*, No. 18-cr-10385-NMG (D. Mass.)). The Court's indicative approval of this plan is clear error. The SEC admitted that this civil case and the restitution fund established in the *Knox* criminal case involved "different issuers' securities," save for one instance of overlap (Vitality Biopharma). *See* JA 1841; *compare also* JA 4619 (the 14 issuers in this civil case), *with* JA 4187 (the 17 securities "covered by the Knox Restitution Fund").

There is simply no legal or factual basis to conclude that Ms. Kelln received any ill-gotten gains from victims covered by the Knox Restitution Fund.

The SEC premised its plan on the unsubstantiated assertion that Ms. Kelln "participated in fraudulent schemes involving 16 of the 17 tickers for which restitution has been ordered [in *Knox*]." JA 4179 (citing no actual evidence). That claim lacks any support in the record. The SEC points to no testimony by Mr. Knox or any other witness to that effect. Indeed, Mr. Knox pled guilty in his criminal case, and so there was no actual substantiation of fraud as to the 17 securities there—let alone anything linking Ms. Kelln to them. Moreover, to the extent any documentary evidence connects Ms. Kelln to trades in any of those 17 securities (which were overwhelmingly not at issue here), that very same evidence shows only *one* such issuer for which Ms. Kelln's involvement was within the "inflation period for each stock—*i.e.*, the period(s) during which investor purchases would qualify for potential victim losses." JA 4178 & n.9; *see also* JA 2181–225 (referencing activity in tickers DIGAF, GRMX, OLMM, ORRP, PSCR, and SPRN that falls outside the relevant inflation period). But even as to that one issuer, Vitality Biopharma (VBIO), the evidence fails to establish what, if any, illegal profits Ms. Kelln received from victims of the Knox Restitution Fund that would satisfy the Supreme Court's standards for disgorgement.

Simply put, there is no proof that Mr. Knox's victims are Ms. Kelln's victims. The District Court's indicative order permitting disgorgement based on a different case involving different securities, different parties, and different alleged violations is reversible error.[8]

### E. The District Court Abused Its Discretion in Ordering Disgorgement

#### i. *Q Data Regarding Alleged Profits Is Inadmissible Hearsay*

The District Court erred by basing its disgorgement award on purported Q data, which was inadmissible. The alleged profit allocation from the Q system is classic hearsay in that the database is laden with unreliable out-of-court statements from unknown declarants. The District Court's two bases for admitting the evidence—as a business record and a co-conspirator statement—were erroneous. Because Appellants challenged the admission of Q data at every opportunity, the evidentiary rulings are reviewed for abuse of discretion.

---

[8] Ordering Ms. Kelln to pay disgorgement to the Knox Restitution Fund also raises due process concerns. The SEC brought this case focused on 14 specific issuers—not the 17 other issuers at issue in the *Knox* criminal case. Ms. Kelln had no notice that she faced any culpability with respect to those 17 issuers. Not only that, it is unclear when the SEC and the Department of Justice ("DOJ") first developed the idea of having defendants here contribute to the Knox Restitution Fund, despite a continuing request for admission that called for the SEC to acknowledge coordination with DOJ. If the idea was hatched before Mr. Knox testified in this case, his testimony suffers from serious undisclosed bias, as he had every reason to shift the blame to Ms. Kelln and thereby reduce his own disgorgement obligation.

### a. The Data Does Not Constitute a Business Record

For Q data related to purported profits to be admissible as business records, the SEC was required to prove that:

> (1) the record was made at or near the time by — or from information transmitted by — someone with knowledge; (2) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling; (3) making the record was a regular practice of that activity; (4) all these conditions are shown by the testimony of the custodian or another qualified witness, or by . . . certification; and (5) neither the source of the information [n]or the method or circumstance of preparation indicate a lack of trustworthiness.

*United States v. Doe*, 23 F.4th 146, 149 (1st Cir. 2022) (quoting Fed. R. Evid. 803(6)) (internal quotation marks omitted) (alterations in original).

### 1. The District Court Properly Held Prior to Trial That Q Data Is Not a Business Record

As the Court correctly held ahead of trial, the Commission fell far short of its burden for admission as a business record. Indeed, in the final pretrial hearing, the Court granted the defense group's motions *in limine* on this point, ruling that "I don't see any way that these Q records can be admitted under [Rule 803(6)] as business records, perhaps for the most simple reason that we have not got a custodian of records who can properly—is competent to testify sufficient under [Rule 803(6) . . . .]"[9] JA 2293. Then, at trial, the District Court inexplicably, on the basis of

---

[9] At the hearing, the Court reserved judgment on whether the data could be admitted as a co-conspirator statement.

the exact same evidence that had been proffered pretrial, made a preliminary ruling that the Q system's basic architecture met the standards of a business record but expressly reserved a conclusion on the data entered into it. The Court noted that it was "premature" to reach issues about entries into the Q system and that the Court's mind was "completely open" as to the "other stuff in there." JA 2743–45. Finally, after trial, and without analysis, the Court concluded when ordering disgorgement that "the Q system is admissible evidence [as a business record] and not hearsay." JA 3871.

### 2. Purported Profit Data Does Not Satisfy Any of the Business Records Requirements

The District Court erred because it did not—and could not—find that the specific requirements of the business records exception were satisfied. Recall that for purposes of disgorgement, the only part of the Q system that is relevant is the section of the database that purports to allocate profits to individuals. And there was no testimony at all about who entered such data or whether it was done contemporaneously. The only witness who even brushed up against the subject was Mr. Knox, who testified that he was sometimes involved in allocating profits to groups of individuals—a step that was necessarily antecedent to and distinct from the subsequent allocation from the groups to the individuals purportedly constituting the groups. JA 2914. He did not testify to entering any individualized information

about Appellants into the Q system or having knowledge of what was entered into the Q system about Appellants. Moreover, Mr. Knox repeatedly testified that he had no idea what happened to the funds after his involvement ended, stating that he did not remember "instances where we would have actually done a wire transfer to an account in one of [the defendants'] names" and that he had "no visibility on personal accounts" other than the one associated with his own business. JA 2976, 2981. And prior to trial, Mr. Knox submitted a declaration conceding that he only had access to "parts of the Q system." JA 955. In sum, the SEC's only Q-user witness supporting disgorgement amounts could not verify either the amounts entered into the Q system by someone else or the actual transfer of funds to any person, including Appellants.

Even assuming the SEC offered some evidence regarding the nature of data entry for separate, entirely independent parts of the Q system, there was no basis to wholesale admit the database when there was not a shred of evidence about the manner in which the key records were handled. Indeed, the records containing the purported profits were entirely separate documents—housed in distinct exhibits— for which an individualized hearsay analysis was required. Such analysis never occurred. There is, for instance, no testimony as to when the profits were purportedly allocated (and whether such data entry occurred days, months, or even years after the alleged transactions), who entered them into the system, or what indicia (if any) of regularity existed.

The lack of even basic information about the provenance of the information is fatal. Where there is a "complete absence of any indication as to where this information . . . came from," admission is improper. *Petrocelli v. Gallison*, 679 F.2d 286, 289 (1st Cir. 1982). Like the record in *Petrocelli*, the Q system is "so cryptic that pure guesswork and speculation is required to divine the source of the cited information," making it precisely the opposite of a business record. *Id.* at 291. This issue, coupled with the lack of information about contemporaneousness and regularity, requires exclusion. *See, e.g.*, *Ira Green, Inc. v. Mil. Sales & Serv. Co.*, 775 F.3d 12, 20 (1st Cir. 2014) (concluding that, due to a "lack of contemporaneity," emails from 2012 that "described what supposedly occurred in 2011" fell "outside the compass of the business records exception"); *Belber v. Lipson*, 905 F.2d 549, 552 (1st Cir. 1990) ("This testimony [from a qualified witness] is essential. Without such a witness the writing must be excluded.") (citation omitted); *Wallace Motor Sales, Inc. v. Am. Motors Sales Corp.*, 780 F.2d 1049, 1061 (1st Cir. 1985) (witness must be able to "explain and be cross-examined concerning the manner in which the records are made and kept"); *Jimenez v. Banco Santander De Puerto Rico*, No. 07-cv-1225 (JAG), 2011 WL 13209060, at *11 (D.P.R. Mar. 31, 2011) ("[T]hat document is inadmissible under Fed. R. Evid. 803(6) because there is no indication as to when the document was made, among other things."); *Ziehm v. Radioshack Corp.*, No. 09-cv-69-P-S, 2010 WL 2079550, at *10 (D. Me. May 22, 2010) ("The

plaintiff, who has not been shown to have knowledge of the manner in which records were kept at the facility in question, is not a 'qualified witness' for this purpose."), *report and recommendation adopted*, 2010 WL 2680024 (D. Me. July 1, 2010).

This case closely resembles *United States v. Jackson*, 636 F.3d 687, 693–94 (5th Cir. 2011), in which the court concluded that alleged narcotics ledgers did not constitute a business record. Among the various issues, there was no evidence "whether the ledgers were prepared by someone with knowledge of the transactions they supposedly record, or whether they record transactions at all." *Id.* at 693. Likewise, no "handwriting analysis was performed on the notebooks, and no member of the drug-trafficking organization testified relating to their trustworthiness." *Id.* at 694. The same evidentiary holes exist here. There is no evidence about who made the purported profit entries, no indication that the transactions (the transfer of money to Appellants) ever occurred, no metadata to reflect the timing or circumstances of the records' creation, and no testimony from anyone with knowledge about those records. And here, as in *Jackson*, the District Court provided "no reasons for its decision to admit the [materials as business records]; it simply admitted [them] without comment." *Id.* To the extent the District Court made any comments about the Q system, that analysis related to entirely separate documents coming from other parts of the Q database, making the decision

an abuse of discretion, particularly given that the Court had already ruled that the materials do not constitute business records.

### 3. There Are Several Affirmative Indications That the Data Is Not Trustworthy

Finally, there are numerous indications of a lack of trustworthiness. The only testimony about how the Q system was created and maintained on the back end came from Mr. Nikolayev, a part-time IT consultant who allegedly assisted Mr. Sharp with the creation of a blank database for Mr. Sharp's use and with its subsequent maintenance.[10] Mr. Nikolayev, however, is certainly not "someone with knowledge" of the transactions within the meaning of Rule 803(6), and he expressly disclaimed knowledge of the activities of what the SEC calls the "Sharp Group" and the operations that occurred at the supposed group's "Corporate House" headquarters. This is not surprising, since he did not work there or even in the same country. Take, for instance, the following exchange from Mr. Nikolayev's deposition:

> Q: And I understand that your function was to for [sic] IT work. But just so that you can understand my question: In connection with performing your IT work, did you develop an understanding of what the business was that you were doing work for?

---

[10] Mr. Nikolayev testified via video deposition. There is, however, no indication in the trial record which portions of his deposition were played at trial. The Court could conclude on this basis that there was no testimony about the database's creation and maintenance, as it is the Commission's burden to ensure that its deposition designations are adequately reflected in the trial record. But even if the Court considers the various portions of the transcript that were before the District Court in pretrial motions, it is evident that red flags abound.

> A: Being called Corporate House I thought it was some sort of
> corporate services operation. I did not dig much deeper than that
> into it.

JA 1181. So limited was Mr. Nikolayev's role that he described Mr. Sharp as a "small customer" for whom he did "very small tech support." JA 1230. Put differently, the SEC relied on testimony from a remote consultant, who allegedly created a blank database for Mr. Sharp to operate, in order to verify and admit evidence of alleged securities fraud in federal court. This is akin to asking the engineer who designed a car to verify that it was used as the getaway vehicle in a bank robbery. Such an attempt strains credulity.

Mr. Nikolayev testified that he and Mr. Sharp were the only two administrators with full access to the system. JA 1185. But he also explained that he only acted at the direction of Mr. Sharp and that he did not have any knowledge about the transactions; thus, he was not a proper custodian of records or a co-conspirator able to substantiate the admission of Q data under either theory. *See* JA 1180–81, 1185, 1189, 1227. Additionally, even if taken at face value, the evidence provided by Mr. Nikolayev leads to the unmistakable conclusion that the data presented from the Q system is false and unreliable. Mr. Nikolayev acknowledged that Mr. Sharp, as an administrator, had the ability to "manually adjust all of the numbers." JA 1345. Mr. Nikolayev also conceded that Mr. Sharp directed him to

47

"clear" the Q system on a yearly basis and erase "any record of what happened before—before that date." JA 1186. Although Mr. Nikolayev claims to have made backups, there is no description of the specific process used or assurance that the data remained intact through the backup process. Mr. Nikolayev also testified that at a certain point, Mr. Sharp directed him to "close[] access to all the clients" whose accounts were purportedly kept in Q—certainly not an indication of reliability or trustworthiness. *See* JA 1186–87. And the SEC itself alleges that Mr. Sharp has a track record of forging records, including by placing Mr. Nikolayev's signature on documents without his knowledge. JA 1352–53.

In sum, the Q system is the brainchild of Mr. Sharp, an alleged forger whose location is unknown and who never provided any testimony in this matter. There is no information that could lend credence to the supposed profit information in the database. And, as described above, the Commission undertook no efforts to verify this portion of the database. Under these circumstances, this Court should conclude that the alleged profit data is untrustworthy and therefore inadmissible.

### b. The Data Does Not Constitute a Co-Conspirator Statement

The District Court also abused its discretion in admitting the Q records as co-conspirator statements. As an initial matter, the same deficiencies that doom the materials under the business records rule also prevent admission as co-conspirator statements. *Cf. Jackson*, 636 F.3d at 694 ("Whether the notebooks represent

coconspirator statements made during and in furtherance of a conspiracy depends, in significant part, on whether Valdez made those records in the course of his drug-trafficking enterprise. We have already found the evidence insufficient for authentication on these grounds."). Indeed, without even basic information about who made the purported entries, the Commission could not conceivably have established that the statements were made by a co-conspirator. *Cf. United States v. DaVita Inc.*, 592 F. Supp. 3d 970, 986 (D. Colo. 2022) (rejecting application of co-conspirator rule where there was "no indication of who drafted the document and whether he or she was a member of the conspiracy"); *see also United States v. Sepulveda*, 15 F.3d 1161, 1181 (1st Cir. 1993) ("Our review of the record has [found] no extrinsic evidence tending to show that these out-of-court declarants . . . were involved in the conspiracy, and the government has directed us to no such proof.").

Additionally, the Commission did not establish that Q entries purporting to allocate profits were in furtherance of a conspiracy. At a minimum, a co-conspirator statement needs to "advance the goals of the conspiracy in some way." *United States v. Ciresi*, 697 F.3d 19, 28 (1st Cir. 2012) (internal quotation marks omitted). The First Circuit has also favorably cited the proposition that narratives about "past events . . . do not satisfy the 'in furtherance' requirement of Rule 801(d)(2)(E)." *Id.* (internal quotation marks omitted). The Q system is at most a backward-looking

49

accounting of past events, which by its very nature cannot be in furtherance of a conspiracy. As a result, admission under the co-conspirator rule was improper.

> ii.     *Even If the Data Is Admissible, the District Court's Reliance on Q Was an Abuse of Discretion*

At a bare minimum, disgorgement must constitute a "reasonable approximation of profits causally connected to the violation." *Navellier*, 108 F.4th at 42 (citation omitted). Even if the evidence from the Q system is admissible, the Commission offered no evidence that Appellants received the funds that the District Court included in its disgorgement order. Indeed, the District Court found that the SEC "did not look at any bank records" that would reflect actual receipt of funds. JA 3873 (internal quotation marks omitted). Instead, the SEC based its calculations entirely on purported evidence from the Q system. The District Court abused its discretion by relying on these records.

The Q system purports to serve two separate functions: (1) recording stock transactions and (2) reflecting the division of proceeds stemming from those transactions. The distinction between these functions is critical because, although the Commission introduced evidence that purportedly validated the stock transactions from the Q system, it did no such thing for the records that allegedly show profits. This is the equivalent of asking the Court to accept a financial

50

institution's unauthenticated ATM records merely because its separate brokerage records had been authenticated.

The District Court acknowledged this, but it nonetheless concluded that the "high degree of internal accuracy" of the brokerage side of Q "counsels a similar finding of accuracy as to its figures regarding the money going into the Defendants' personal Q accounts." JA 3874. But there was zero evidentiary basis for this conclusion, and not a shred of evidence showing any defendant held an account at any financial institution controlled by Q (or even that such an institution existed). There was, for instance, no testimony about whether the brokerage and payment sides of Q were maintained under the same circumstances, whether they were tied to distinct accounts, whether they accounted for actual as opposed to speculative profits, *etc.* The District Court provided no substantiation for the bare assertion that the validation of a separate set of alleged co-conspirator (not bank) records could serve to authenticate and prove purported payments to Appellants.

Additionally, as the District Court also acknowledged, even if the Q records are accurate, they at most reflect that money was allocated in a database to Appellants, not that Appellants ever withdrew—or even had the authority or capacity to withdraw—those funds. At the remedies hearing, the District Court observed that this constituted a gaping hole in the SEC's case, particularly given the lack of any bank records substantiating withdrawal from the Q accounts. In drawing the

distinction between money held in a bank versus funds allocated in the Q system, the District Court stated:

> Even if I say these are business records, the allocation, the credits upon which the disgorgement is based are like bank records, that, um—but with a bank you know that the person could go and withdraw it. That commends itself to the Court. What's the matter with that? It's a business record, but what does it show? It shows that, as against this co-conspirator, they, um, could argue you ought—you ought credit me with this amount. For disgorgement you've got to get the money in the hands of the wrongdoer.

JA 3811–12; *see also* JA 3814 ("Now I'm having trouble with the idea that because there is evidence which I credit out of the Q-System, that they disbursed this and that and so, that the total amount of the credits are somehow available to them.").

Tellingly, the evidence presented by the SEC supposedly showing that Ms. Kelln withdrew funds from her Q account adds up to a miniscule fraction of the roughly $1.5 million ordered to be disgorged from Ms. Kelln. That evidence shows about $100,000 in putative withdrawals, all of which fall far outside the five-year statute of limitations. JA 2226–29 (reflecting various requests from 2014 and 2015). That leaves Ms. Kelln's alleged receipt of over 93 percent of her purported Q funds unaccounted for. Her bank records would be the best evidence of any such receipt, and yet the Commission curiously opted not to get them. Likewise, the Commission presented evidence of messages purportedly involving Mr. Sexton, but they relate to only 4 percent of the amount of disgorgement requested against him, and there is no

indication that any of them relate to any of the 14 issuers that the Commission has identified as its basis for disgorgement. JA 2145–51. Finally, the messages that the Commission alleged to involve Mr. Veldhuis concerned purported transfers of approximately $65,000 and additional monies referring to a line of credit, a miniscule fraction of the $13,289,897 disgorgement cap determined by the District Court. JA 2141–44.

Given the complete lack of evidence and the District Court's articulated concerns, which the Commission failed to address, about the Q evidence, it was an abuse of discretion to use that information as the basis for a disgorgement award. Additionally, the District Court's decision to credit Q as a basis for imposing disgorgement is flatly at odds with its later acknowledgement that the SEC's evidence "does not show that ill-gotten gains have been obtained and retained by the individual Defendants, much less in the amounts requested by the SEC." JA 3882. The District Court's remedies order is therefore "clearly erroneous" because it is "inconsistent with the district court's own specific factfindings." *See Alfaro De Quevedo v. De Jesus Schuck*, 556 F.2d 591, 593 (1st Cir. 1977).

### F. The District Court Abused Its Discretion by Ordering Disgorgement Without Evidence That Alleged Gains Were Ill-Gotten

Even if the Commission could establish that Appellants received funds, it has not demonstrated that they are ill-gotten gains, which is a fundamental prerequisite

to ordering disgorgement. *See Liu*, 591 U.S. at 79. Multiple cooperating witnesses testified that they were involved in legitimate transactions in addition to ones that they now say were violative. *See, e.g.*, JA 2931–32 (testimony of Mr. Knox) (Q: So there were cases in which Silverton was engaged in legitimate stock transactions, is that correct? A: That is correct. Q: And to your knowledge . . . were there any occasions where Fred Sharp was engaged in legitimate stock transactions? A: To my knowledge, yes, there were occasions."). And, as Mr. Knox explained, "[w]e did not have a . . . separate account for a stock that wasn't tainted, all of the money was in the same account." JA 2978.

This is particularly problematic given that the Commission asked the District Court to conclude that all transactions involving 14 issuers were fraudulent even though the evidence was scant to nonexistent regarding some of them. For instance, the Commission sought to disgorge from Mr. Sexton $5,275,000 allegedly related to Echo Automotive. JA 1906. Apart from the SEC's summary witness, there were only two references to this issuer during the entirety of the trial. In one, William Kaitz testified that he talked to Mr. Friesen about Echo, and in the other, Kenneth Ciapala indicated that he traded Echo. JA 2678, 3082. There were no witnesses who testified from personal knowledge as to any involvement by Appellants in the trading of Echo, and there was no testimony that the supposed Echo transactions were in any way unlawful. Likewise, the SEC requested to disgorge from Mr. Sexton $1.1

million supposedly attributable to Graphite even though the only time it came up outside the testimony of the summary witness was when Mr. Ciapala said it was one of the securities he traded. JA 1906, 3082. The District Court abused its discretion by accepting the Commission's request without requiring proof.

The evidence concerning the alleged violations underlying the District Court's disgorgement order against Mr. Veldhuis is a similar hodgepodge of conclusory statements regarding 14 different issuers over a seven-year time period. JA 1905. Like Mr. Sexton, the District Court has ordered Mr. Veldhuis to disgorge $5,275,000 concerning Echo Automotive (allegedly received in 2013) without any evidence that those funds (even if received) arose from any violation of the federal securities laws by Mr. Veldhuis. *Id.*

The proof as to Ms. Kelln is similarly lacking. The SEC's basis for disgorgement was her alleged role "transferring Sharp Group clients' shares into the names of nominee entities administered by the Sharp Group in tranches where each nominee would hold less than 5% of an issuer's stock, collecting and fabricating the paperwork needed to facilitate those transactions, and then coordinating the deposit of those shares into brokerage accounts with Knox's Silverton platform, Ciapala's Blacklight platform, or accounts at other broker-dealers through which the Sharp Group facilitated trading." JA 1837–38. But the SEC failed to meet its evidentiary burden, at trial or otherwise, showing that she actually did any of those things as to

55

the 14 issuers. Beyond evidence that certain securities were traded by the Sharp Group, there was no detailed testimony or documentary evidence substantiating Ms. Kelln's allegedly illegal activity.

Indeed, for the bulk of the funds at issue, it is unclear what the purported violation of the securities laws even was. The Commission's main theory at trial was that the defendants violated Section 13(d) of the Exchange Act by not disclosing beneficial ownership interests in excess of 5 percent. However, the SEC only presented evidence of combined ownership in excess of 5 percent for Stevia First/Vitality, and even then, only for the time periods of January 18, 2012–April 27, 2012 and April 18, 2016–November 5, 2018. JA 3216. There is no evidence that any of the proceeds attributed to Appellants arose from conduct during those limited timeframes. Although the Commission also introduced evidence that certain transactions were unregistered, the District Court properly concluded that those claims, which arise under Section 5 of the Securities Act, have a five-year limitations period. JA 469–70.

That means that, for the overwhelming majority of the Commission's requested disgorgement, which is heavily concentrated in years 6–10 prior to the filing of the complaint, the Commission needed to demonstrate fraud even though there is no evidence of concealment of ownership in excess of 5 percent. There is nothing unlawful about stock promotion. *See, e.g.*, *In re Galectin Therapeutics, Inc.*

*Sec. Litig.*, 157 F. Supp. 3d 1230, 1238 (N.D. Ga. 2015) ("The purpose of stock promoters is to promote a company and its stock, thereby increasing the value or price of the stock. Because it is permissible to use stock promoters, Defendants did not impermissibly manipulate the company's stock price."), *aff'd*, 843 F.3d 1257 (11th Cir. 2016). Nor is there anything inherently wrong with communicating about stock promotion via encrypted channels. The Commission offered no evidence that any of the stock promotions contained any false or misleading information about the performance or attractiveness of the securities. Nor did the SEC point, outside the context of Sections 5 and 13(d), to any affirmative obligation to register transactions or provide disclosures. On this record, there was therefore no basis to order disgorgement for those transactions.

Faced with this evidence, the District Court offered a one-sentence response: "As evidence submitted to this Court as well as presented during trial indicates, the proceeds reflected in the Q system are, absent any showing to the contrary proffered by the Defendants, generated by illegal pump-and-dump schemes that involved 14 different issuers." JA 3878. But that reverses the burden of proof. The Commission must prove that gains are ill-gotten; it is not Appellants' burden to disprove that. And it is not clear how the evidence presented could possibly justify the District Court's conclusion, particularly given testimony that certain transactions were legitimate and the absence of evidence regarding certain of the issuers. This finding

was therefore clearly erroneous, and reliance on it to order disgorgement was an abuse of discretion.

### G. The District Court Abused Its Discretion by Failing to Guard Against Double Counting

Appellants, in opposing the imposition of remedies, raised substantial concerns that the Commission was attempting to collect the same amount twice, not only from co-defendants in this matter, but also from Mr. Knox, who was charged in separate matters and testified that he had agreed to return millions of dollars of funds that he believed belonged to "Sharp Group" clients. JA 3033. The Commission did not deny that at least a portion of those funds might be attributable to Appellants and therefore duplicative of the remedy sought here, such that the Commission would receive a windfall. The District Court acknowledged in its order that Appellants had made this argument, but it failed to address it. *See* JA 3870. Because the SEC is not entitled to collect the same amounts twice, and because not even joint-and-several liability provides any protection against duplicative collection involving an entirely separate matter, it was an abuse of discretion not to resolve this objection. *Cf. SEC v. Camarco*, No. 19-cv-1486, 2021 WL 5985058, at *18 (10th Cir. Dec. 16, 2021) (noting that "errors such as double-counting . . . make several of [the] figures unsuitable bases for equitable disgorgement").

## II.     The District Court Erred by Awarding Civil Monetary Penalties

The Commission cannot obtain civil monetary penalties because it has failed to demonstrate any violations of the securities laws within the five-year window preceding the filing of the complaint. That the SEC is subject to a five-year lookback period for civil monetary penalties is beyond dispute. *See Gabelli*, 568 U.S. at 444 ("Under the general statute of limitations for civil penalty actions, the SEC has five years to seek such penalties."). On that basis, the District Court correctly concluded that conduct prior to August 5, 2016 cannot give rise to penalties. *See* JA 468 The District Court emphasized this at the charging conference, stating: "So let me be clear. If we get to remedies . . . and I think that [a] violation was pre-August 2016, then I cannot impose a monetary penalty." JA 3327. After the Commission noted its agreement with this principle, the Court remarked: "If we get to the remedies stage . . . you make sure you get a transcript of [the SEC's] statement right there." *Id.*

Notwithstanding the clear case law and the Commission's concession at the charging conference, the District Court did not apply this guardrail. The lone support for the penalty claim is a statement from a summary witness alleging that, based on unknown criteria, he determined that Mr. Sexton, along with others, "traded the securities of seven [issuers]" between August 5, 2016 and August 5, 2021. JA 1914.

But, as reflected above, there was no effort to connect that bare allegation to specific violations of the law.

Even assuming the SEC can meet that burden, its own evidence suggests that Mr. Sexton only received profits related to three issuers—not seven—during the relevant timeframe. JA 1906.[11] And not even evidence of receipt of funds during the applicable timeframe is relevant without proof, which is entirely missing, of actual conduct within that window. *See Jones*, 300 F. Supp. 3d at 316 & n.7; *Cohen*, 332 F. Supp. 3d at 591.

The District Court acknowledged this standard but then misapplied it, concluding: "As for profits, Sexton misconstrues the law: the relevant inquiry for purposes of determining the applicable period in relation to which civil penalties are to be imposed is not whether he profited from his misconduct during the relevant period but rather whether his misconduct, that is, the illegal stock trading, occurred during that same period." JA 3854. But that is precisely what Mr. Sexton argued. Logically, profits arise *after* the relevant trading. If the supposed profits were outside the five-year window, that definitionally means that the underlying conduct occurred even further outside that window. That in turn means that the penalties issued against

---

[11] For the reasons discussed above, this evidence, which comes from the Q system, does not actually establish that Appellants received any profits.

Mr. Sexton for at least four of the issuers were indisputable error. The remaining penalties were likewise improper because the Commission and the District Court relied on the timing of the alleged payments without evidence of when the underlying conduct occurred.

### III.    The District Court Erred by Entering Obey-the-Law Injunctions

Mr. Sexton maintains that the District Court erred by entering obey-the-law injunctions.[12] Specifically, the Court enjoined him from extremely broad, ill-defined areas of conduct, including "employ[ing] any device, scheme, or artifice to defraud," "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." JA 3887–92. This language and other provisions like it in the injunction merely parrot statutory prohibitions. *Compare id.*, *with* 17 CFR § 240.10b-5. Elsewhere, the injunction simply lists provisions and requires the enjoined party to look outside the scope of the injunction to ascertain the required behavior. *See, e.g.*, JA 3890–91 (prohibiting "failing to file with the Commission a statement containing the information required by Schedule 13D (as provided in 17 C.F.R. § 240.13d-101),

---

[12] As previously noted, Mr. Veldhuis and Ms. Kelln did not oppose the entry of injunctive relief.

within ten days after acquiring directly or indirectly beneficial ownership of more than five percent of any equity security of a class which is specified in Exchange Act Rule 13d-1(I)").

These provisions are wholly unnecessary, as Mr. Sexton, like everyone else, is already prohibited from engaging in conduct that violates the U.S. securities laws. An injunction requiring a party to comply with preexisting obligations wrongfully duplicates those obligations, and it risks expanding civil violations into jailable offenses if a court later determines that a defendant engaged in contempt of the injunction. If the government believes that a party has engaged in fresh violations of the securities laws, the remedy is to pursue those new violations using existing statutes and tools, not to turn injunctions into perpetual vehicles for enforcing existing obligations to obey the law. *See, e.g.*, *SEC v. Sky Way Glob., LLC*, 710 F. Supp. 2d 1274, 1280 (M.D. Fla. 2010) ("After entry of such an injunction, the Commission could return to the court at any time and seek through a basic contempt proceeding to enforce the law based on an alleged violation by the defendant—no matter how distinct the alleged violation (in nature, time, or location) from the violation underlying the injunction. Thus, an obey-the-law injunction permits the Commission to achieve through the mere filing of a motion a result that, absent the injunction, the Commission could achieve only through a full-scale prosecution."). These obey-the-law provisions are entirely different from other parts of the

injunction—such as the bars on participating in penny stock offerings, or participating in the issuance, purchase, offer, or sale of securities other than those in personal accounts—that arguably serve a purpose by prohibiting otherwise-lawful conduct.

Apart from being unnecessary, broad edicts—like a ban on "employ[ing] any device, scheme, or artifice to defraud"—are fraught with peril because they are sufficiently malleable as to not give any defendant reading them proper notice of what the Commission might later determine to be a violation. This contravenes the requirement in Federal Rule of Civil Procedure 65(d) to "describe in reasonable detail . . . the act or acts restrained or required." This approach to SEC injunctions has therefore been rejected or criticized by many courts, including district courts within the First Circuit.

An injunction like what the SEC requests here, which simply parrots the "language of § 10(b) of the Exchange Act or Rule 10b-5," gives a "defendant reading the injunction . . . little guidance on how to conform his conduct to the terms of the injunction"; such a defendant "would need to review hundreds of pages of the Federal Reporters, law reviews, and treatises before he could begin to grasp the conduct proscribed by § 10(b) and in turn the injunction." *SEC v. Goble*, 682 F.3d 934, 951 (11th Cir. 2012); *see also id.* at 952 ("What is troubling about the district court's injunction in this case is that its restrictions merely cross-reference the

relevant statutes and regulations. . . . We have said that a person enjoined by court order should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing.") (internal quotation marks and alteration omitted); *Jones*, 300 F. Supp. 3d at 318 (rejecting, under Rule 65, an injunction that would "simply admonish Jones to obey the federal securities laws in any future venturing on her part into what for her will likely prove perilous territory"); *SEC v. MacDonald*, No. 78-ca-0073, 1981 WL 1635, at *6 (D.R.I. Apr. 23, 1981) ("Insofar as an injunction is concerned, this Court does not intend to issue a hollow edict which simply says to somebody obey the law.").

The District Court, addressing this argument only in a footnote, concluded that obey-the-law injunctions are proper on the sole basis that "courts in this Circuit as well as other sessions of this Court have issued injunctions in the securities context that are similar to the injunctions requested in the present case." JA 3839–40 & n.5. But that something has been done before does not make it appropriate, and the inability to marshal any principled defense for how such provisions comply with Rule 65 effectively demonstrates their impermissibility.

Indeed, in its footnote, the District Court acknowledged that the "First Circuit has struck general and vaguely worked 'obey-the-law' injunctions in other contexts . . . ." JA 3839 & n.5 (citing *EEOC v. Aviation Port. Servs., LLC*, 2020 U.S. Dist. LEXIS 57073, at *34–35 (D. Mass. Apr. 1, 2020)). *Aviation Port Services*, in

64

turn, cites to First Circuit precedent rejecting such broad injunctions. *See Brown v. Trustees of Bos. Univ.*, 891 F.2d 337, 361 (1st Cir. 1989) ("The University argues that the injunction is overbroad insofar as it enjoins the University from sex discrimination against faculty other than Professor Brown, because it is tantamount to an injunction to 'obey the statute,' which the Supreme Court rejected as too broad . . . . The hazard of such an injunction, warns the University, is that the order has the potential to further embroil the courts in the University's internal affairs, allowing faculty members to circumvent administrative procedures by simply invoking the contempt jurisdiction of the district court whenever a dispute arises. We agree."). Effectively, the District Court's order amounts to an SEC carve-out from Rule 65, predicated only on the Commission having gotten away with such broad language in the past. This is not a basis to allow for continued violations of Rule 65, and this Court should squarely reject the impermissibly broad and vague injunctive relief.

## CONCLUSION

The disgorgement and penalty judgments against Appellants should be vacated with instructions for the District Court to deny those forms of relief. Additionally, the injunction against Mr. Sexton should be vacated with instructions to excise improper obey-the-law provisions.

Dated: February 6, 2025                    Respectfully submitted,

    */s/ Michael Tremonte*
Michael Tremonte
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
Mtremonte@shertremonte.com

*Counsel for Defendant-Appellant Mike
K. Veldhuis Rechnitz*

    */s/ Stephen G. Topetzes*
Stephen G. Topetzes
Neil T. Smith
Robert S. Silverblatt
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006
Tel: 202.778.9000
Stephen.topetzes@klgates.com
Neil.smith@klgates.com
Rob.silverblatt@klgates.com

*Counsel for Defendant-Appellant Paul
Sexton*

    */s/ Frank Scaduto*
Frank Scaduto
Kevin B. Muhlendorf
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036
Tel: 202.719.7000
Fscaduto@wiley.law
Kmuhlendorf@wiley.law

*Counsel for Defendant-Appellant
Courtney Kelln*

66

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) as modified by the Court's January 13, 2025 order, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 15,820 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Times New Roman font.

Dated:  February 6, 2025

<u>/s/ Stephen G. Topetzes</u>
Stephen G. Topetzes
Neil T. Smith
Robert S. Silverblatt
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006

*Counsel for Defendant-Appellant*
*Paul Sexton*

<u>/s/ Michael Tremonte</u>
Michael Tremonte
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004

*Counsel for Defendant-Appellant*
*Mike K. Veldhuis Rechnitz*

<u>/s/ Frank Scaduto</u>
Frank Scaduto
Kevin B. Muhlendorf
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036

*Counsel for Defendant-Appellant*
*Courtney Kelln*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this same date, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which electronically served a copy on all counsel of record.

Dated:  February 6, 2025

<u>/s/ Stephen G. Topetzes</u>
Stephen G. Topetzes
Neil T. Smith
Robert S. Silverblatt
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006

*Counsel for Defendant-Appellant*
*Paul Sexton*

<u>/s/ Michael Tremonte</u>
Michael Tremonte
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004

*Counsel for Defendant-Appellant*
*Mike K. Veldhuis Rechnitz*

<u>/s/ Frank Scaduto</u>
Frank Scaduto
Kevin B. Muhlendorf
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036

*Counsel for Defendant-Appellant*
*Courtney Kelln*

ADDENDUM

# ADDENDUM TABLE OF CONTENTS

Page

Judgment as to Defendant Paul Sexton, filed June 20, 2024 (Dkt. 495) ........ ADD1

Judgment as to Defendant Mike K. Veldhuis, filed June 20, 2024 (Dkt. 496) .................................................................................................. ADD11

Judgment as to Defendant Courtney Kelln, filed June 20, 2024 (Dkt. 499) .. ADD22

Electronic Order Allowing Motion for Release of Funds, filed July 11, 2024 (Dkt. 508) .......................................................................................... ADD32

Order Directing Transfer of Courtney Kelln's Frozen Funds to the Securities and Exchange Commission, filed July 11, 2024 (Dkt. 511) ............. ADD33

Order Directing Transfer of Paul Sexton's Frozen Funds to the Securities and Exchange Commission, filed July 11, 2024 (Dkt. 512) ............. ADD36

Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to the Securities and Exchange Commission, filed July 11, 2024 (Dkt. 513) ................................................................................................ ADD42

Electronic Order re: Motion to Amend, filed July 16, 2024 (Dkt. 514) ..... ADD49

Electronic Order, filed September 18, 2024 (Dkt. 545) ........................... ADD50

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
SECURITIES AND EXCHANGE       )
COMMISSION,                   )
                              )
              Plaintiff,      )
                              )
v.                            )        CIVIL ACTION
                              )        NO. 21-11276-WGY
FREDERICK L. SHARP,           )
ZHIYING YVONNE GASARCH,       )
COURTNEY KELLN,               )
MIKE K. VELDHUIS,             )
PAUL SEXTON,                  )
JACKSON T. FRIESEN,           )
WILLIAM T. KAITZ,             )
AVTAR S. DHILLON, and         )
GRAHAM R. TAYLOR,             )
                              )
              Defendants.     )
                              )
_____)
```

YOUNG, D.J.                                        June 20, 2024

**JUDGMENT AS TO DEFENDANT PAUL SEXTON**

On September 11, 2023, Defendant Paul Sexton ("Defendant"
or "Sexton") agreed not to contest his liability for violating
Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act
of 1933 and Sections 10(b) and 13(d) of the Securities Exchange
Act of 1934 and Rules 10b-5(a) and (c) and 13d-1 thereunder.
Dkt. No. 376.  The following day, the Court entered judgment
against Sexton finding him liable for violating Sections 5(a),
5(c), 17(a)(1) and 17(a)(3) of the Securities Act of 1933 and
Sections 10(b) and 13(d) of the Securities Exchange Act of 1934

1

ADD1

and Rules 10b-5(a) and (c) and 13d-1 thereunder.   Dkt No. 378.
On May 8, 2024, the Court, at a hearing, imposed injunctive
relief and a civil penalty on Sexton that is incorporated into
this judgment.   The Court held the issues of disgorgement and
prejudgment interest under advisement.   Accordingly, the Court
enters partial Judgment as follows:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is
permanently restrained and enjoined from violating, directly or
indirectly, Section 10(b) of the Securities Exchange Act of 1934
(the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5
promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means
or instrumentality of interstate commerce, or of the mails, or of
any facility of any national securities exchange, in connection
with the purchase or sale of any security:

(a)   to employ any device, scheme, or artifice to defraud;

(b)   to make any untrue statement of a material fact or to
      omit to state a material fact necessary in order to
      make the statements made, in the light of the
      circumstances under which they were made, not
      misleading; or

(c)   to engage in any act, practice, or course of
      business which operates or would operate as a fraud
      or deceit upon any person.

2

ADD2

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)   to employ any device, scheme, or artifice to defraud;

(b)   to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

ADD3

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)    Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)    Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)    Making use of any means or instruments of

4

ADD4

transportation or communication in interstate commerce
or of the mails to offer to sell or offer to buy
through the use or medium of any prospectus or
otherwise any security, unless a registration
statement has been filed with the Commission as to
such security, or while the registration statement is
the subject of a refusal order or stop order or (prior
to the effective date of the registration statement)
any public proceeding or examination under Section 8
of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as
provided in Federal Rule of Civil Procedure 65(d)(2), the
foregoing paragraph also binds the following who receive actual
notice of this Judgment by personal service or otherwise: (a)
Defendant's officers, agents, servants, employees, and attorneys;
and (b) other persons in active concert or participation with
Defendant or with anyone described in (a).

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant
is permanently restrained and enjoined from violating, directly or
indirectly, Section 13(d) of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 13d-1 promulgated thereunder [17 C.F.R. § 240.13d- 1], by
failing to file with the Commission a statement containing the
information required by Schedule 13D (as provided in 17 C.F.R. §

5

ADD5

240.13d-101), within ten days after acquiring directly or indirectly beneficial ownership of more than five percent of any equity security of a class which is specified in Exchange Act Rule 13d-1(I) [17 C.F.R. § 240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1].

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], Defendant is permanently restrained and enjoined from directly or

6

ADD6

indirectly, including, but not limited to, through an entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for his own personal account.

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that (i) Defendant is jointly and severally liable with co-Defendants Frederick L. Sharp, Jackson T. Friesen, and Mike K. Veldhuis for disgorgement of $42,503,547.00, with the amount to be disgorged from Defendant to not exceed $17,367,474.00, representing profits gained as a result of the conduct on which he was found liable, and (ii) is liable for a civil penalty in the amount of $1,562,603.00 pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u]. The Court does not award prejudgment interest. Defendant shall satisfy this obligation by paying $18,930,077.00 to the Securities and Exchange Commission within 30 days after entry of this Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also

ADD7

pay by certified check, bank cashier's check, or United States
postal money order payable to the Securities and Exchange
Commission, which shall be delivered or mailed to

    Enterprise Services
    Center Accounts
    Receivable Branch 6500
    South MacArthur
    Boulevard Oklahoma
    City, OK 73169

and shall be accompanied by a letter identifying the case title,
civil action number, and name of this Court; Paul Sexton as a
defendant in this action; and specifying that payment is made
pursuant to this Judgment.

    Defendant shall simultaneously transmit photocopies of
evidence of payment and case identifying information to the
Commission's counsel in this action.  By making this payment,
Defendant relinquishes all legal and equitable right, title, and
interest in such funds and no part of the funds shall be
returned to Defendant.

    The Commission may enforce the Court's judgment for
penalties by the use of all collection procedures authorized by
law, including the Federal Debt Collection Procedures Act, 28
U.S.C. § 3001 et seq., and moving for civil contempt for the
violation of any Court orders issued in this action.  Defendant
shall pay post judgment interest on any amounts due after 30
days of the entry of this Judgment pursuant to 28 U.S.C. § 1961.
The Commission shall hold the funds, together with any interest

ADD8

and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval.  Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay

ADD9

the amount of the Penalty Offset to the United States Treasury
or to a Fair Fund, as the Commission directs.  Such a payment
shall not be deemed an additional civil penalty and shall not be
deemed to change the amount of the civil penalty imposed in this
Judgment.  For purposes of this paragraph, a "Related Investor
Action" means a private damages action brought against Defendant
by or on behalf of one or more investors based on substantially
the same facts as alleged in the Complaint in this action.

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court
shall retain jurisdiction of this matter for the purposes of
enforcing the terms of this Judgment.  Further, the asset freeze
order imposed by Paragraph V of this Court's Order dated August
20, 2021, shall continue in full force and effect until the
monetary obligation imposed by this Judgment is paid in full.

IX.

There being no just reason for delay, pursuant to Rule 54(b)
of the Federal Rules of Civil Procedure, the Clerk is ordered to
enter this Judgment forthwith and without further notice.

**SO ORDERED.**

                              /s/ William G. Young
                              WILLIAM G. YOUNG
                              DISTRICT JUDGE

10

ADD10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                 )
SECURITIES AND EXCHANGE          )
COMMISSION,                      )
                                 )
             Plaintiff,          )
                                 )
v.                               )       CIVIL ACTION
                                 )       NO. 21-11276-WGY
FREDERICK L. SHARP,              )
ZHIYING YVONNE GASARCH,          )
COURTNEY KELLN,                  )
MIKE K. VELDHUIS,                )
PAUL SEXTON,                     )
JACKSON T. FRIESEN,              )
WILLIAM T. KAITZ,                )
AVTAR S. DHILLON, and            )
GRAHAM R. TAYLOR,                )
                                 )
             Defendants.         )
                                 )
_____)
```

YOUNG, D.J.                                      June 20, 2024

### JUDGMENT AS TO DEFENDANT MIKE K. VELDHUIS

On June 13, 2023, Defendant Mike K. Veldhuis ("Defendant"

or "Veldhuis") agreed not to contest his liability for violating

Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act

of 1933 and Sections 10(b) and 13(d) of the Securities Exchange

Act of 1934 and Rules 10b-5(a) and (c) and 13d-1 thereunder.

Dkt. No. 315.  On June 21, 2023, the Court entered judgment

against Veldhuis which included permanent injunctions and a

penny stock bar.  Dkt. No. 325.

The permanent injunctions and penny stock bar remain in full

1

ADD11

force and effect and are incorporated herein. That judgment
also contemplated additional monetary remedies that would be
determined by the Court at a later date, and that Veldhuis would
not contest liability for purposes of that determination. Id.
On May 8, 2024, the Court, at a hearing, imposed a civil penalty
on Veldhuis that is incorporated into this judgment. The Court
held the issues of disgorgement and prejudgment interest under
advisement. Accordingly, the Court enters partial Judgment as
follows:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is
permanently restrained and enjoined from violating, directly or
indirectly, Section 10(b) of the Securities Exchange Act of 1934
(the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5
promulgated thereunder [17 C.F.R. § 240.10b-5], by using any
means or instrumentality of interstate commerce, or of the
mails, or of any facility of any national securities exchange,
in connection with the purchase or sale of any security:

    (a)  to employ any device, scheme, or artifice to defraud;

    (b)  to make any untrue statement of a material fact or to
omit to state a material fact necessary in order to
make the statements made, in the light of the
circumstances under which they were made, not
misleading; or

ADD12

(c)    to engage in any act, practice, or course of
       business which operates or would operate as a fraud
       or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as
provided in Federal Rule of Civil Procedure 65(d)(2), the
foregoing paragraph also binds the following who receive actual
notice of this Judgment by personal service or otherwise: (a)
Defendant's officers, agents, servants, employees, and attorneys;
and (b) other persons in active concert or participation with
Defendant or with anyone described in (a).


                              II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant
is permanently restrained and enjoined from violating Section
17(a) of the Securities Act of 1933 (the "Securities Act") [15
U.S.C. § 77q(a)] in the offer or sale of any security by the use
of any means or instruments of transportation or communication in
interstate commerce or by use of the mails, directly or
indirectly:

(a)    to employ any device, scheme, or artifice to defraud;

(b)    to obtain money or property by means of any untrue
       statement of a material fact or any omission of a
       material fact necessary in order to make the
       statements made, in light of the circumstances under
       which they were made, not misleading; or

                              3

ADD13

(c) to engage in any transaction, practice, or course of
business which operates or would operate as a fraud
or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as
provided in Federal Rule of Civil Procedure 65(d)(2), the
foregoing paragraph also binds the following who receive actual
notice of this Judgment by personal service or otherwise: (a)
Defendant's officers, agents, servants, employees, and attorneys;
and (b) other persons in active concert or participation with
Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant
is permanently restrained and enjoined from violating Section 5 of
the Securities Act [15 U.S.C. § 77e] by, directly or indirectly,
in the absence of any applicable exemption:

(a) Unless a registration statement is in effect as to a
security, making use of any means or instruments of
transportation or communication in interstate commerce
or of the mails to sell such security through the use
or medium of any prospectus or otherwise;

(b) Unless a registration statement is in effect as to a
security, carrying or causing to be carried through
the mails or in interstate commerce, by any means or

4

ADD14

instruments of transportation, any such security for

the purpose of sale or for delivery after sale; or

(c)  Making use of any means or instruments of

transportation or communication in interstate commerce

or of the mails to offer to sell or offer to buy

through the use or medium of any prospectus or

otherwise any security, unless a registration

statement has been filed with the Commission as to

such security, or while the registration statement is

the subject of a refusal order or stop order or (prior

to the effective date of the registration statement)

any public proceeding or examination under Section 8

of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as

provided in Federal Rule of Civil Procedure 65(d)(2), the

foregoing paragraph also binds the following who receive actual

notice of this Judgment by personal service or otherwise: (a)

Defendant's officers, agents, servants, employees, and attorneys;

and (b) other persons in active concert or participation with

Defendant or with anyone described in (a).

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

is permanently restrained and enjoined from violating, directly or

indirectly, Section 13(d) of the Exchange Act [15 U.S.C. § 78j(b)]

ADD15

and Rule 13d-1 promulgated thereunder [17 C.F.R. § 240.13d- 1], by
failing to file with the Commission a statement containing the
information required by Schedule 13D (as provided in 17 C.F.R. §
240.13d-101), within ten days after acquiring directly or
indirectly beneficial ownership of more than five percent of any
equity security of a class which is specified in Exchange Act Rule
13d-1(I) [17 C.F.R. § 240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as
provided in Federal Rule of Civil Procedure 65(d)(2), the
foregoing paragraph also binds the following who receive actual
notice of this Judgment by personal service or otherwise: (a)
Defendant's officers, agents, servants, employees, and attorneys;
and (b) other persons in active concert or participation with
Defendant or with anyone described in (a).

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant
is permanently barred from participating in an offering of penny
stock, including engaging in activities with a broker, dealer, or
issuer for purposes of issuing, trading, or inducing or attempting
to induce the purchase or sale of any penny stock.  A penny stock
is any equity security that has a price of less than five dollars,
except as provided in Rule 3a51-1 under the Exchange Act [17
C.F.R. § 240.3a51-1].

VI.

6

ADD16

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for his own personal account.

VII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that (i) Defendant is jointly and severally liable with co-Defendants Frederick L. Sharp, Jackson T. Friesen, and Paul Sexton for disgorgement of $42,503,547.00, with the amount to be disgorged from Defendant to not exceed $13,289,897.00, representing profits gained as a result of the conduct on which he was found liable, and (ii) Defendant is liable for a civil penalty in the amount of $1,562,603.00 pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u].  The Court does not award prejudgment interest. Defendant shall satisfy this obligation by paying $14,852,500.00 to the Securities and Exchange Commission within 30 days after entry of this Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire

ADD17

instructions upon request.   Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.   Defendant may also

pay by certified check, bank cashier's check, or United States

postal money order payable to the Securities and Exchange

Commission, which shall be delivered or mailed to

      Enterprise Services
      Center Accounts
      Receivable Branch 6500
      South MacArthur
      Boulevard Oklahoma
      City, OK 73169

and shall be accompanied by a letter identifying the case title,

civil action number, and name of this Court; Mike Veldhuis as a

defendant in this action; and specifying that payment is made

pursuant to this Judgment.

      Defendant shall simultaneously transmit photocopies of

evidence of payment and case identifying information to the

Commission's counsel in this action.   By making this payment,

Defendant relinquishes all legal and equitable right, title, and

interest in such funds and no part of the funds shall be

returned to Defendant.

      The Commission may enforce the Court's judgment for

penalties by the use of all collection procedures authorized by

law, including the Federal Debt Collection Procedures Act, 28

U.S.C. § 3001 et seq., and moving for civil contempt for the

violation of any Court orders issued in this action.   Defendant

ADD18

shall pay post judgment interest on any amounts due after 30 days of the entry of this Judgment pursuant to 28 U.S.C. § 1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval.  Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related

9

Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.  Further, the asset freeze order imposed by Paragraph V of this Court's Order dated August 20, 2021, shall continue in full force and effect until the monetary obligation imposed by this Judgment is paid in full.

IX.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

**SO ORDERED.**

10

ADD20

_/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE

11

ADD21

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                 )
SECURITIES AND EXCHANGE          )
COMMISSION,                      )
                                 )
            Plaintiff,           )
                                 )
v.                               )        CIVIL ACTION
                                 )        NO. 21-11276-WGY
FREDERICK L. SHARP,              )
ZHIYING YVONNE GASARCH,          )
COURTNEY KELLN,                  )
MIKE K. VELDHUIS,                )
PAUL SEXTON,                     )
JACKSON T. FRIESEN,              )
WILLIAM T. KAITZ,                )
AVTAR S. DHILLON, and            )
GRAHAM R. TAYLOR,                )
                                 )
            Defendants.          )
                                 )
_____)

YOUNG, D.J.                                    June 20, 2024

**JUDGMENT AS TO DEFENDANT COURTNEY KELLN**

On June 13, 2023, Defendant Courtney Kelln ("Defendant" or

"Kelln") agreed not to contest her liability for violating

Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act

of 1933 and Section 10(b) of the Securities Exchange Act of 1934

and Rules 10b-5(a) and (c) thereunder, and for aiding and

abetting others' violations of those provisions.  Dkt. No. 315.

The following day, the Court entered judgment against Kelln

which included permanent injunctions and a penny stock bar.

Dkt. No. 317.  The permanent injunctions and penny stock bar

1

ADD22

remain in full force and effect and are incorporated herein. That judgment also contemplated additional monetary remedies that would be determined by the Court at a later date, and that Kelln would not contest liability for purposes of that determination.  Id.  On May 8, 2024, the Court, at a hearing, imposed a civil penalty on Kelln that is incorporated into this judgment.  The Court held the issues of disgorgement and prejudgment interest under advisement.  Accordingly, the Court enters partial Judgment as follows:

                                    I.

     IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

     (a)  to employ any device, scheme, or artifice to defraud;

     (b)  to make any untrue statement of a material fact or to
          omit to state a material fact necessary in order to
          make the statements made, in the light of the
          circumstances under which they were made, not
          misleading; or

                                    2

(c)  to engage in any act, practice, or course of
     business which operates or would operate as a fraud
     or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as
provided in Federal Rule of Civil Procedure 65(d)(2), the
foregoing paragraph also binds the following who receive actual
notice of this Judgment by personal service or otherwise: (a)
Defendant's officers, agents, servants, employees, and attorneys;
and (b) other persons in active concert or participation with
Defendant or with anyone described in (a).

                              II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant
is permanently restrained and enjoined from violating Section
17(a) of the Securities Act of 1933 (the "Securities Act") [15
U.S.C. § 77q(a)] in the offer or sale of any security by the use
of any means or instruments of transportation or communication in
interstate commerce or by use of the mails, directly or indirectly:

(a)  to employ any device, scheme, or artifice to defraud;
(b)  to obtain money or property by means of any untrue
     statement of a material fact or any omission of a
     material fact necessary in order to make the
     statements made, in light of the circumstances under
     which they were made, not misleading; or

                              3

ADD24

(c)   to engage in any transaction, practice, or course of

business which operates or would operate as a fraud

or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as

provided in Federal Rule of Civil Procedure 65(d)(2), the

foregoing paragraph also binds the following who receive actual

notice of this Judgment by personal service or otherwise: (a)

Defendant's officers, agents, servants, employees, and attorneys;

and (b) other persons in active concert or participation with

Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

is permanently restrained and enjoined from violating Section 5 of

the Securities Act [15 U.S.C. § 77e] by, directly or indirectly,

in the absence of any applicable exemption:

(a)   Unless a registration statement is in effect as to a

security, making use of any means or instruments of

transportation or communication in interstate commerce

or of the mails to sell such security through the use

or medium of any prospectus or otherwise;

(b)   Unless a registration statement is in effect as to a

security, carrying or causing to be carried through

the mails or in interstate commerce, by any means or

4

ADD25

instruments of transportation, any such security for

the purpose of sale or for delivery after sale; or

(c)   Making use of any means or instruments of

transportation or communication in interstate commerce

or of the mails to offer to sell or offer to buy

through the use or medium of any prospectus or

otherwise any security, unless a registration

statement has been filed with the Commission as to

such security, or while the registration statement is

the subject of a refusal order or stop order or (prior

to the effective date of the registration statement)

any public proceeding or examination under Section 8

of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as

provided in Federal Rule of Civil Procedure 65(d)(2), the

foregoing paragraph also binds the following who receive actual

notice of this Judgment by personal service or otherwise: (a)

Defendant's officers, agents, servants, employees, and attorneys;

and (b) other persons in active concert or participation with

Defendant or with anyone described in (a).

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

is permanently barred from participating in an offering of penny

stock, including engaging in activities with a broker, dealer, or

5

ADD26

issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1].

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by her, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for her own personal account.

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that (i) Defendant is jointly and severally liable with co-Defendant Frederick L. Sharp for disgorgement of $1,582,785.00, representing profits gained as a result of the conduct on which she was found liable, and (ii) Defendant is liable for a civil penalty in the amount of $904,078.00 pursuant to Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15

6

ADD27

U.S.C. § 78u].  The Court does not award prejudgment interest.
Defendant shall satisfy this obligation by paying $2,486,863.00
to the Securities and Exchange Commission within 30 days after
entry of this Judgment.

Defendant may transmit payment electronically to the
Commission, which will provide detailed ACH transfer/Fedwire
instructions upon request.  Payment may also be made directly
from a bank account via Pay.gov through the SEC website at
http://www.sec.gov/about/offices/ofm.htm.  Defendant may also
pay by certified check, bank cashier's check, or United States
postal money order payable to the Securities and Exchange
Commission, which shall be delivered or mailed to

        Enterprise Services
        Center Accounts
        Receivable Branch 6500
        South MacArthur
        Boulevard Oklahoma
        City, OK 73169

and shall be accompanied by a letter identifying the case title,
civil action number, and name of this Court; Courtney Kelln as a
defendant in this action; and specifying that payment is made
pursuant to this Judgment.

Defendant shall simultaneously transmit photocopies of
evidence of payment and case identifying information to the
Commission's counsel in this action.  By making this payment,
Defendant relinquishes all legal and equitable right, title, and
interest in such funds and no part of the funds shall be

7

ADD28

returned to Defendant.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 et seq., and moving for civil contempt for the violation of any Court orders issued in this action.    Defendant shall pay post judgment interest on any amounts due after 30 days of the entry of this Judgment pursuant to 28 U.S.C. § 1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval.    Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes.    To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of

ADD29

compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that she is entitled to, nor shall she further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment. Further, the asset freeze order imposed by Paragraph I of this Court's Order dated October 7, 2021, shall continue in full force and effect until the monetary obligation imposed by this Judgment is paid in full.

ADD30

VIII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

**SO ORDERED.**

                                    /s/ William G. Young
                                    WILLIAM G. YOUNG
                                    DISTRICT JUDGE

ADD31

| 07/11/2024 | 508 | Judge William G. Young: ELECTRONIC ORDER entered 500 MOTION for Release of Funds Motion for Order Directing the Turnover of Frozen Funds to the SEC. (Paine, Matthew)<br><br>**Motion allowed. Funds held for disgorgement shall be held in an interest bearing account pursuant to the earlier orders of this Court.**<br><br>(Entered: 07/16/2024) |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>       **Plaintiff,**<br><br>v.<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>       **Defendants.** | Civil Action No. 21-CV-11276 (WGY) |

## ~~[PROPOSED]~~ ORDER DIRECTING TRANSFER OF COURTNEY KELLN'S FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION

This Court, having reviewed the Motion for an Order Directing Turnover of Frozen Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown, it is hereby

**ORDERED** that the Motion is **GRANTED**; and

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, PI Financial Corp. ("PI Financial") shall transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| EVERVEST EQUITY INC | 4535 |

1

ADD33

PI Financial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. PI Financial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, TD Canada Trust ("TD Canada") shall transfer the entire balance of the following TD Canada account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| EVERVEST EQUITY INC | 9909 |
| COURTNEY KELLN | 9889 |

TD Canada may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. TD Canada also may transfer these funds by

2

ADD34

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.


**SO ORDERED.**

Dated: _July 11, 2024_

_William M. Young_
WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

ADD35

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>    v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,<br><br>               Defendants. | Civil Action No. 21-CV-11276 (WGY) |

[PROPOSED] ORDER DIRECTING TRANSFER OF PAUL SEXTON'S
FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION

This Court, having reviewed the Motion for an Order Directing Turnover of Frozen Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown, it is hereby

**ORDERED** that the Motion is **GRANTED**; and

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Canaccord Genuity Corp ("Canaccord") shall transfer the entire balance of the following Canaccord account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | 08A1 |

1

ADD36

| NOVA TREK CAPITAL INC | 08B1 |
|---|---|
| PAUL SEXTON | 91E1 |
| PAUL SEXTON | 91F1 |
| PAUL SEXTON | 31A7 |
| PAUL SEXTON | 31B6 |

Canaccord may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Canaccord also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, PI Financial Corp. ("PI Financial") shall transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| PAUL SEXTON | 1414 |
| PAUL SEXTON | 3953 |
| NOVA TREK CAPITAL INC. | 6518 |
| NOVA TREK CAPITAL INC. | 6952 |

2

ADD37

| SOLITO CAPITAL CORP. | 7401 |
|---|---|
| SOLITO CAPITAL CORP. | 6951 |
| SOLITO CAPITAL CORP. | 6977 |

PI Financial may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  PI Financial also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

III.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, TD Canada Trust ("TD Canada") shall transfer the entire

balance of the following TD Canada account(s) which were frozen pursuant to an Order of this

Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | 5109 |
| NOVA TREK CAPITAL INC | 2034 |
| PAUL SEXTON | 6857 |
| PAUL SEXTON | 8504 |
| PAUL SEXTON | 6857 |
| PAUL SEXTON | 5768 |

3

ADD38

| PAUL SEXTON | 9202 |
|---|---|

TD Canada may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  TD Canada also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

IV.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Research Capital Corporation ("Research Capital") shall

transfer the entire balance of the following Research Capital account(s) which were frozen

pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | AAZ8 |
| PAUL SEXTON | KK82 |

Research Capital may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Research Capital also may transfer these funds by

4

ADD39

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

V.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Leede Jones Gable Inc. ("Leede Jones")shall transfer the

entire balance of the following Leede Jones account(s) which were frozen pursuant to an Order

of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | 8313 |
| PAUL SEXTON | 6984 |
| WESTWOOD VENTURES INC. | 227A |
| SOLITO CAPITAL CORP. | 7743 |

Leede Jones may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Leede Jones also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard

5

ADD40

Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

Dated: *July 11, 2024*

*William B. Young*
WILLIAM G YOUNG
UNITED STATES DISTRICT JUDGE

6

ADD41

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>          **Plaintiff,** <br><br>    v. <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br>          **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

## [PROPOSED] ORDER DIRECTING TRANSFER OF MIKE K. VELDHUIS'S FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION

This Court, having reviewed the Motion for an Order Directing Turnover of Frozen Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown, it is hereby

**ORDERED** that the Motion is **GRANTED**; and

### I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Bank of Montreal shall transfer the entire balance of the following Bank of Montreal account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| | |

1

| AVONHURST CAPITAL CORP | 1741 |
| MIKE VELDHUIS | 7997 |
| MIKE VELDHUIS | 1464B |

Bank of Montreal may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Bank of Montreal also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, PI Financial Corp. ("PI Financial") shall transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | 9203 |
| BLACKSTONE CAPITAL PARTNERS INC | 9237 |
| BLACKSTONE CAPITAL PARTNERS INC | 4273 |
| BLACKSTONE CAPITAL PARTNERS INC | 7396 |
| MIKE VELDHUIS | 1710 |

2

ADD43

PI Financial may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  PI Financial also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

    Enterprise Services Center
    Accounts Receivable Branch
    6500 South MacArthur Boulevard
    Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

III.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Canaccord Genuity Corp. ("Canaccord") shall transfer

the entire balance of the following Canaccord account(s) which were frozen pursuant to an Order

of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | 65A1 |

Canaccord may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Canaccord also may transfer these funds by certified

check, bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to

3

ADD44

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

IV.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Coast Capital Savings Federal Credit Union ("Coast

Capital") shall transfer the entire balance of the following Coast Capital account(s) which were

frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| MIKE VELDHUIS | 8846 |

Coast Capital may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Coast Capital also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

4

ADD45

V.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Research Capital Corporation ("Research Capital")shall

transfer the entire balance of the following Research Capital account(s) which were frozen

pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | KLA4 |
| BLACKSTONE CAPITAL PARTNERS INC | KKH4 |
| MIKE VELDHUIS | KJV9 |
| MIKE VELDHUIS | KK66 |

Research Capital may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Research Capital also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

5

ADD46

## VI.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Leede Jones Gable Inc. ("Leede Jones") shall transfer the entire balance of the following Leede Jones account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | 231A |
| BLACKSTONE CAPITAL PARTNERS INC | 231E |
| BLACKSTONE CAPITAL PARTNERS INC | 231F |
| MIKE VELDHUIS | 953A |
| MIKE VELDHUIS | 953S |
| MIKE VELDHUIS | 862Q |
| FDS CAPITAL INC. | 726A |

Leede Jones may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Leede Jones also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

        Enterprise Services Center
        Accounts Receivable Branch
        6500 South MacArthur Boulevard
        Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

ADD47

**SO ORDERED.**

Dated: July 11, 2024

WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

7

ADD48

| 07/16/2024 | 514 | Judge William G. Young: ELECTRONIC ORDER entered 501 Motion to Amend (Paine, Matthew) |
| | | **There is no occasion to clarify. The judgment stands.** |
| | | (Entered: 07/16/2024) |

ADD49

| | | | |
|---|---|---|---|
| 545 | 09/18/2024 | Judge William G. Young ELECTRONIC ORDER entered: Well aware that this case is on appeal, the Court makes the indicative ruling that, if the jury's verdict is affirmed, the Court intends to allow the Fair Plan motion in its entirely, save only that, if the funds presently ordered disgorged exceed the sum of the identified claimants claims, such funds shall be retained by the SEC subject to further order of the Court. (Paine, Matthew) (Entered: 09/18/2024) |  |