UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

Case Nos. 24-1770, 24-1771, 24-1772, 24-1773, 24-1774


SECURITIES AND EXCHANGE COMMISSION,
*Plaintiff-Appellee,*
v.
ZHIYING YVONNE GASARCH,
*Defendant-Appellant,*

FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS; PAUL
SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ; AVTAR S.
DHILLON; GRAHAM R. TAYLOR,
*Defendants.*


ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON IN CASE NO. 1:21-CV-11276-
WGY, HONORABLE WILLIAM G. YOUNG, U.S. DISTRICT JUDGE


**BRIEF OF APPELLANT ZHIYING YVONNE GASARCH**


COUNSEL FOR DEFENDANT-APPELLANT
ZHIYING YVONNE GASARCH

Karen A. Pickett (First Circuit No. 89088)
Pickett Law Offices, P.C.
125 High Street, 26th Floor
Boston, MA  02110
617-423-0485
kpickettlaw@gmail.com


February 6, 2025

TABLE OF CONTENTS

TABLE OF AUTHORITIES                                                iii

I.      JURISDICTIONAL STATEMENT                            1

II.     ISSUES PRESENTED FOR REVIEW                       1

III.    STATEMENT OF THE CASE                               1

IV.     SUMMARY OF THE ARGUMENT                         9

V.      ARGUMENT                                                    10

        A. The Trial Court Erred In Admitting Evidence From
        The "Q System"                                              10

        B. The Trial Judge Erred In Instructing The Jury On
        Aiding/Abetting Liability                                  14

        C. The Trial Judge Erred In Denying Ms. Gasarch'
        Rule 50 Motions                                            16

        D. The Trial Judge Erred In Ordering Ms. Gasarch
        To Pay Disgorement/Civil Penalties                      19

VI.     CONCLUSION                                               32

Certificate of Compliance

Certificate of Service

TABLE OF AUTHORITIES

<u>CASES</u>

*Biopoint v. Dickhaut.* 110 F.3d 337 (1st Cir. 2024)                    29

*Deka Int'l S.A. v. Genzyme Corp.,* 754 F.3d 31 (1st Cir. 2014)     16-17

*SEC v. Apuzzo,* 689 F.2d 204 (2nd Cir. 2013)                    15

*SEC v. Bass*, 2013 U.S.Dist.LEXIS 153900 (N.D.N.Y. 2012)           24

*SEC v. Chapman*, 826 F. Supp. 2d 847 (D. Md. 2011)              27

*SEC v. Lemelson*, 596 F. Supp. 3d 227 (D. Mass. 2022)            26

*SEC v. Mapp*, 2018 U.S. Dist. LEXIS 125352 (E.D. Tx. 2018)       27

*SEC v. Monarch Funding Corp*., 193 F.3d 295 (2nd Cir. 1999)       16

*SEC v. Sharp,* 626 F. Supp. 3d 345 (D. Mass. 2022)            passim

*SEC v. E-Smart Techs, Inc.*, 139 F. Supp. 2d 170 (D.D.C. 2015)     26

*SEC v. Spongetech Delivery Sys., Inc*., 2015 U.S.Dist.LEXIS
        13148 (E.D.N.Y. 2015)                            24

*SEC v. Stubos*, 634 F. Supp. 3d 174 (S.D.N.Y. 2022)             28

*SEC v. Tripkgadget FZE,* 146 F.Supp.3d 270 (D. Mass 2015)        24

*United States v. Liu*, 140 S.Ct. 1936 (2020)                    23

<u>STATUTES AND RULES</u>

Securities Act of 1933                              passim

Securities Act of 1934                                    passim

15 U.S.C. Section 877(q)(a)(3)                              16

15 U.S.C. Section 78u                                       22

Fed.R.Evid. 803(b)                                         13

I.    <u>JURISDICTIONAL STATEMENT</u>

The United States Court of Appeals for the First Circuit has subject matter jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.  Zhiying Yvonne Gasarch ("Ms. Gasarch") was found liable for securities laws violations after a jury Final Judgment against her entered on June 20, 2024.  (A3917).  Ms. Gasarch filed a timely notice of appeal.

II.    <u>ISSUES PRESENTED</u>

Whether the judgment against must be vacated where:  (1) the trial judge admitted unauthenticated hearsay that served as almost the exclusive basis for the SEC's claims against Ms. Gasarch; (2) the trial judge erred in his instructions concerning "aiding and abetting; " (3) the trial judge erred in denying Ms. Gasarch's Rule 50 motions because no reasonable jury could find that she violated securities laws; and (4) the trial judge erred in awarding both civil monetary penalties and disgorgement.  the Government did not comply with the plea agreement; and (3) enforcing the appellate waiver of the plea agreement would result in a miscarriage of justice.

III.    <u>STATEMENT OF THE CASE</u>

A. <u>Procedural History</u>

On August 5, 2021, the Securities and Exchange Commission ("SEC") filed

1

a Complaint against Ms. Gasarch and several co-defendants.  (A55).  The

Complaint alleged that Ms. Gasarch had violated Section 17(a)(3) of the Securities

Act and aided and abetted in others' securities law violations.  The complaint in

essence asserted that the "mastermind" behind an alleged elaborate plan to

circumvent certain reporting requirements and to engage in a "pump and dump"

scheme as to certain securities was a Canadian money manager named Fred Sharp.

Ms. Gasarch filed a motion to dismiss on statute of limitations grounds that

was denied by the district court.  *See SEC v. Sharp*, 626 F.Supp.2d 345 (D. Mass.

2022).  The SEC later moved for summary judgment against defendants other than

Ms. Gasarch, which motion was denied.  Certain defendants settled before trial,

with Ms. Gasarch and her co-defendant Jackson Friesen ("Mr. Friesen")

proceeding to a jury trial.   Mr. Sharp never appeared in the action and a default

judgment entered against him.

The jury entered a verdict on September 17, 2023.  (A1553).  Specifically,

pursuant to the jury verdict form, the jury found that:  (1)  Ms. Gasarch violated

Section 17(a)(3) (which requires only negligence, not scienter) and (2) that she

"did aid and abet violations of Sections 17(a)(10, Sections 17(a)(3) of the

Securities Act of 1933, **or** Section 10(b) of the Securities Exchange Act of 1934

and Rule 10-b-5(a) and (c) thereunder by others."  (Id.) (emphasis added).

After much briefing on the SEC's request for remedies (opposed by Ms. Gasarch and others), the  judgment against Mrs. Gasarch orders injunctive relief and further orders:

> (i)  Defendant is jointly and severally liable with co-Defendant Frederick L. Sharp for disgorgement of $2,522,367.00, representing profits gained as a result of the conduct on which she was found liable, and (ii) Defendant is liable for a civil penalty in the amount of $269,651.001 pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u]. The Court does not award prejudgment interest. Defendant shall satisfy this obligation by paying $2,792,018.00 to the Securities and Exchange Commission within 30 days after entry of this Judgment.

(A 3917 et seq.)

Ms. Gasarch had filed a Rule 50 motion for judgment as a matter of law before the jury's verdict (A1548) and renewed it after the jury's verdict.  (A1555). These motions were denied, without opinion, by the trial judge.  (A1564).

The trial judge denied Ms. Gasarch's and other defendants' motions to stay and to amend the judgment.  Currently, certain funds of Ms. Gasarch are "frozen" in Canada pursuant to injunctive relief sought by the SEC.

B. <u>Trial Evidence</u>

1. <u>Witness Testimony</u>

Ms. Gasarch will not attempt to summarize all the evidence presented at trial except so far as it relates specifically to her alleged involvement in securities violations.  As the Court shall see in the recitation of facts, there was an absolute

3

dearth of evidence against Ms. Gasarch who worked as a "receptionist/office manager" for Mr. Sharp's business (and other businesses housed in the same location in Vancouver, Washington).

There was no witness testimony that Ms. Gasarch was involved at all in trading securities or making any statements used by the investing public. She made no representations at all. The SEC claims that her nominal 'ownership" of Peaceful Lion/Peregrine could operate as a fraud, but every witness who testified said that Fred Sharp controlled these (and all the other) nominees that purchased stocks in question. Moreover, and perhaps most importantly, in order for her to be a primary violator or aider/abettor, it was the SEC's burden to show that she knew should have known of the five percent disclosure rule and the ban against "pump and dump" and ignored it. There is not a scintilla of evidence to this effect.

Instead, all of the witness testimony actually established that Mrs. Gasarch was not engaged in securities violations, but acting simply at the direction of Mr. Sharp, whom she would have no reason to know was violating United States securities laws.

First, the testimony of William Kaitz - - who had settled with the SEC - - was that, *although he was a stock promoter in the United States*, he did not believe he had engaged in any illegal business dealings with the other defendants. (A2713). He further testified that he had engaged the law firm of Greenberg

Traurig to ensure that he was complying with the necessary securities laws. (A2691).

Second, the testimony of Fedir Nikolayev established that an electronic ledger system, the "Q" System, designed for Mr. Sharp by Mr. Nikolayev was "administered" by both him and Mr. Sharp. Mr. Sharp, as an administrator, had complete access and could change entries in the system. (RA 1127). Nikolayev testified concerning emails that the code name "WIRES" could be used by anyone having access to the "WIRES" account, and that Fred Sharp "possibly" had access to the passwords. Importantly for purposes of Ms. Gasarch's (lack of knowledge), Mr. Nikolayev testified that he was the "signatory" on several documents that purported to show his ownership in Gotoma Capital - - which like Peaceful Lion - - was a company created and controlled by Fred Sharp. Significantly, Mr. Nikolayev testified that he had worked for Mr. Sharp for a long time and understood that he had a law degree. Mr. Nikolayev testified that in helping set up Gotoma, he did not understand that Mr. Sharp planned to use it to run afoul of securities laws. (A1230). Moreover, he believes that certain Gotoma-related documents that purportedly were signed by him were not in fact signed by him.

Not one of the testifying witnesses was able to say that Ms. Gasarch knew of the requirements (in the United States) that beneficial ownership of more than five percent of securities must be disclosed to the SEC. Nor could they say that Ms.

Gasarch was aware of any alleged "pump and dump scheme" or the impropriety of alleged stock transfers and sales. The witnesses who were business clients/cohorts of Mr. Sharp would contact Ms. Gasarch in order to receive payments (typically through wire transfers) on stock trading.

The only other witness who could remember meeting Ms. Gasarch was Roger Knox. At the time of his testimony, Mr. Knox had pleaded guilty to securities fraud and was cooperating with the Government. Significantly, Knox testified that he did conduct legitimate business at his company, Silverton, and the fraud was concealing a control group's five percent ownership of certain stock.

Q:     Okay, what was legitimate about Silverton then?

A:     The -- the fraud, the part of the fraud was concealing, um, when control groups approached Wintercap with more than 5 percent of a United States public company, the securities of a United States public company. So the fraud was concealing ownership of more han 5 percent. If a client or -- a client or a -- or a group of several clients held less than 5 percent of a 19 public company, there was no requirement to file, and therefore any trading on that company was **not a fraud**.

(A2931).

Mr. Knox testified that when he traveled to Vancouver, BC, to meet with Mr. Sharp at his offices, Ms. Gasarch was in the receptionist area of the office - - she did not have her own office. She did not attend the meeting with Mr. Knox. Moreover, when Sharp, Knox and other named defendants in the Complaint met in Europe to discuss business and celebrate, Ms. Gasarch was not present at those meetings. (A2935).

Mr. Knox further testified that there was nothing nefarious about sending wires in business transactions, and that wires were used in conducting his own legitimate business. (A2967). Although Mr. Knox had testified that Ms. Gasarch was an "integral" part of the scheme, he could only testify that he was aware of her sending wires through the Q system, and not whether that was at the instruction of Mr. Sharp. Finally, concerning Ms. Gasarch's role in the nominee Peaceful Lion, Mr. Knox testified:

Q. So you were selling shares out of the Peaceful 15 Lion account?

A. Yes.

Q. Okay. Did Ms. Gasarch ever direct you to sell shares out of the Peaceful Lion?

 A. I do not recall her ever directing share sales.

Q. Okay. And would you say that Fred Sharp controls Peaceful Lion?

 A. Well ultimately Fred Sharp was my client for all of the -- for his accounts.

Q. Okay, he was your client for all of the nominee accounts including Peaceful Lion?

A. That is correct.

(Id. p.. 70-71).

7

Finally, Mr. Knox acknowledged that he did not know what Ms. Gasarch knew or didn't know as it related to what he dubbed the "criminal enterprise." (A3016).

### 2. Trial Exhibits.

The SEC and FBI had been involved in a years-long investigation of Mr. Sharp and other co-defendants. At one point, the FBI seized data from a "server farm" in Curacao related to Mr. Sharp's business activities. Significantly, a reviewing agent from the FBI, Agent Christopher Beckstrom, testified that the seized communications covered an **eight-year span** and numbered approximately **one million**. (A2812). Yet there was not one exhibit where Mrs. Gasarch was enlightened that there was a "five percent rule" Sharp and his clients were violating or that show any knowledge of any "pump and dump" scheme.

Instead, the exhibits show that Mrs. Gasarch would be contacted by Mr. Sharp's clients for certain tasks - - e.g., to distribute wires from amounts that they had earned in their accounts or to provide backup documentation. *See, e.g.*, A2141-2147. Yet nothing in these requests would alert someone in Ms. Gasarch's position that there was a "scheme" to hide five percent beneficial control or that a "pump and dump" scheme was afoot. Of course, it was important to clients that they receive payment but as Roger Knox testified, there were also legitimate

transactions.  Nothing in the exhibits suggests that Ms. Gasarch knew or should have known of any securities violation.

### 3. Summary Chart of Allocations to PEC PERE Account

Over objection, an SEC "summary witness," accountant Ryan Murphy was allowed to introduce a chart of Q system entries related to PEAC and PERE accounts and a "summary chart of allocations."  A4659.  This account was based on Mr. Murphy's review of "Q system" entries that were identified as "PEAC" or "PERE."  As set forth below, it was error to admit these Q system entries as business records or otherwise and the "summary" chart - - which the SEC asserted reflected illicit payments to Ms. Gasarch, a long-time employee - - similarly should not have come in.  In fact, the SEC needed this document because it asserted that the sheer amount of money allegedly reflected in the charts meant that Ms. Gasarch must have been "in on" the alleged scheme.

### SUMMARY OF ARGUMENT

Ms. Gasarch makes four arguments in support of her claim that the judgment should be vacated.

First, she argues that the judge erred in admitting, over objection, evidence from the "Q system."  Entries in this system were not authenticated.  Moreover, the entries did not qualify as exceptions as "business records."  (Pages 10-14).

Second, Ms. Gasarch argues that the trial judge erred in his instructions on "aiding and abetting" liability. (Pages 14-15)

Third, Ms. Gasarch asserts that the judge erred in not granting her Rule 50 motions. The SEC did not meet its burden to establish that Ms. Gasarch either was a primary violator or an "aider and abettor." (Pages 16-19).

Fourth, the trial judge erred in awarding disgorgement and civil penalties. Such relief was time-barred. Further he erred in finding "joint and several liability" when Ms. Gasarch did not control the business that allegedly benefited from securities violations. (Pages 19-31).

IV.    ARGUMENT

Ms. Gasarch makes several arguments in support of her appeal; (1) the trial judge erred in admitting the "Q system" and charts "drawn" from its data into evidence as because such documents were hearsay and not subject to any "business records" exception; (2) the trial judge erred in his instructions to the jury on "aiding and abetting"; (3) the trial judge should have allowed Ms. Gasarch's Rule 50 motions because no reasonable jury could find her in violation of United States securities laws and (4) the trial judge erred his award of civil penalties and disgorgement.

A.    The Trial Judge Erred In Admitting Evidence From The "Q System"

As an initial matter and as asserted below, there was not a proper foundation

for the admission of the Q records.  The only purported witness for authentication

was Mr. Nikolayev.  As set forth in Mr. Nikolayev's deposition:

- Mr. Nikolayev set up a server for Mr. Sharp in Curacao;

1

- Mr. Nikolayev set up an accounting and communications system for Mr. Sharp called the "Q" system;

- "The system was a multiuser system.  And it had three types of users; Administrators; Employees; staff; and customers.".

- "So administrators would be Mr. Sharp and myself, because I needed to like – I don't know – check things for him.  *The administrator would have full access to any information, any – do any kind of work*."

- "The staff would be limited; *Mr. Sharp could select what bank and what clients staff could see*.  So like not every staff member could see all the banks and all of the clients."

- As administrators, he and Mr. Sharp had "full access."

- A difference between staff and administrator is that the staff "*does not have the control* of like how the commissions are calculated."

- The administrator "can see the calculation and details how everything is calculated.  And *they can manually adjust all of the numbers between them*."

- At a certain point, Mr. Sharp asked to remove information from the server.  "I would take balances of everything and then just clear it as of

11

the first of January. Basically just going to keep the balance and the holdings, *but did jot contain any record of what happened before – before that date*."

- Mr. Sharp (only) had remote access to the server from his laptop.

- Mr. Sharp asked Mr. Nikolayev to work on an encrypted communications network that Mr. Nikolayev believed was run on the same server as the accounting system.

- All the decisions on the encrypted network came from Mr. Sharp.

- There was a code name "Wires" on the encrypted network but Mr. Nikolayev did not know who it was connected to.

- "Administrator access has access to all – all accounts and all banks. And administrator access gives us ability to control who has access to what.

- Emails to or from "Wires" (which the SEC contends always was Mrs. Gasarch) could have been written by anyone with access to the Wires account and possibly Mr. Sharp.

A1127 et seq.

Significantly, Mr. Nikolayev could not and did not testify as to when and how Mr. Sharp made entries into the Q system and whether they actually reflected real events. Because Mr. Nikolayev was located in the Dominican Republic (not Canada), he had no basis to authenticate the Q records.

12

Second, even if these records were properly "authenticated" by Mr.

Nikolayev, the entries themselves do not fit within the business records

exception to hearsay.  Rule 803(6), known as the business records  exception,

authorizes the admission of certain documents under an exception to the usual

prohibition against the admission of hearsay statements…"Rule 803(6)  provides

that "[a] record of an act, event, condition, opinion, or diagnosis" is "not

excluded by the rule against hearsay" if:

'(A) the record was made at or near the time by-or from information transmitted
by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity
of a business, organization, occupation, or calling, whether or not for
profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another
qualified witness, or by a certification that complies with Rule 902(11) or (12) or
with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or
circumstances of preparation indicate a lack of trustworthiness."

Nothing in Mr. Nikolayev's testimony establishes that he knows when and

under what circumstances the records in the Q system were made, who made

them, and even whether Mr. Sharp's allegedly criminal activities were a "regular

practice" of his business.  On the other hand, his testimony establishes that the

source of the information and the circumstances indicate an utter lack of

trustworthiness.  It is quintessential "garbage in, garbage out" and the jury should

not have been subjected to such evidence. Moreover, Mrs. Gasarch should not face the harsh consequences of securities fraud liability based on this utterly unreliable evidence.

For Mrs. Gasarch, the error in admitting the Q system records is especially problematic because there is no extrinsic evidence that she was receiving any funds from any alleged securities fraud scheme. Despite its years-long investigation, the SEC did not introduce any bank/financial records of either Mr. Sharp, Mr. Sharp's business or Ms. Gasarch herself. Nor was there an email or some other document over the course of eight years where Mrs. Gasarch acknowledges receipt of funds from any scheme or demands the same.

Ms. Gasarch also specifically incorporates and adopts by reference the arguments made in the briefs submitted by her co-defendants to this Court as to why the Q system records never should have been admitted or relied upon to fashion a remedy.

B.    The Trial Judge Erred In Instructing The Jury On Aiding/Abetting Liability

In order to prove aiding and abetting liability under either the Exchange Act or the Securities Act, the SEC was required to prove: (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting party); (2) knowledge of this violation on the part of the aider and abettor; and (3)

'substantial assistance' by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.2d 204, 206 (2nd Cir. 2012)." *SEC v. Sharp*, 626 F. Supp. 3d 345, 397 (D. Mass. 2022). Despite the trial judge adopting the *Apuzzo* standard in his opinion on the motions to dismiss, the judge charged the jury on the second element as follows: "Second, they have to prove that Ms. Gasarch understood that her role or conduct was part of an overall activity that was improper. (A3364). Ms. Gasarch objected to this formulation of the standard. (A3373).

The judge's instruction to the jury lessened the SEC's burden of proof. It was not enough that Ms. Gasarch had knowledge that the "overall activity" was improper but instead had to have knowledge of the specific securities violation by the primary violator. *See Apuzzo*, 689 F.2d at 204. The SEC made much of a few exhibits in which it claimed that Ms. Gasarch created false "backup" documents (invoices and the like) for Mr. Sharp's clients. But the jury could have viewed that as "improper activity" (perhaps, e.g., with a desire to aid in hiding things for tax purposes, etc.), but did not require the jurors to find the specific violations here - - failure to report a five percent beneficial ownership of certain stocks and then engaging in a "pump and dump" scheme.

C.     The Trial Judge Erred In Denying Ms. Gasarch's Rule 50
<u>Motions</u>

Ms. Gasarch filed Rule 50 motions at the close of the SEC's case as

well as after the jury's verdict.  The judge denied both of these motions

without a written decision.  This Court should find that no reasonable jury

could find, based on the evidence presented, that Ms. Gasarch either was

a primary violator of securities laws or an aider/abettor of violations of

same.

1. There Was Insufficient Evidence That Ms. Gasarch Was A
<u>"Primary Violator"</u>
"
The claim against Ms. Gasarch is under 15U.S.C. Section 77(q)(a)(3):

It shall be unlawful for any person in the offer or sale of any securities (including
security-based swaps) or any security-based swap agreement (as defined in section
3(a)(78) of the Securities Exchange Act [<u>15 USCS § 78c(a)(78)</u>]) by the use of any
means or instruments of transportation or communication in interstate commerce
or by use of the mails, directly or indirectly—……

(**3**) to engage in any transaction, practice, or course of business which operates or
would operate as a fraud or deceit upon the purchaser.

In the district court's opinion on the defendants' motion to dismiss, the

Court defined the elements of a 17a violation as such:  To be liable, the defendant

must have: "(1) made a material misrepresentation or a material omission . . . or

used a fraudulent device [scheme or artifice]; (2) with scienter; (3)  in connection

with the purchase or sale of securities."  *SEC v. Monarch Funding Corp*., 192 F.3d

295, 308 (2d Cir. 1999); see *also Deka Int'l S.A. v. Genzyme Corp. (In re Genzyme*

*Corp. Sec. Litig.*), 754 F.3d 31, 40 (1st Cir. 2014)." *SEC v. Sharp*, 626 F.Supp.3d 345, 389 (D. Mass. 202

In this case, the SEC has failed to establish that Ms. Gasarch was a primary violator of the 17(a)(3).  First, there is no evidence that Ms. Gasarch was involved at all in trading securities or making any statements used by the investing public.  She made no representations at all.  The SEC claimed that her nominal 'ownership" of Peaceful Lion/Peregrine could operate as a fraud, but every witness who testified said that Fred Sharp controlled these (and all the other) nominees.  Moreover, and perhaps most importantly, in order to have the requisite scienter the SEC would have to establish that Ms. Gasarch should have known of the five percent rule and the ban against "pump and dump" and ignored it.  There is not a scintilla of evidence to this effect.

### 2.  No Reasonable Jury Could Find That Ms. Gasarch Was An Aider Or Abettor

This Court, in the opinion on defendants' motions to dismiss, also set out the elements of aiding and abetting liability.  Here, the SEC must prove by a preponderance of the evidence:

(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor

in the achievement of the primary violation." <u>SEC v. Apuzzo, 689 F.3d 204,</u> <u>206 (2d Cir. 2012)</u> (quotations omitted). "Substantial assistance" requires the defendant to have "associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed." <u>Id.</u> (quotations and alterations omitted).

*Sharp*, 626 F.3d at 398.

The SEC has presented no evidence that Ms. Gasarch knew of the five percent rule or of a "pump and dump" scheme. As the FBI examiner Beckstrom testified, the SEC reviewed approximately one million documents that spanned approximately ten years, and we have seen not one acknowledgement by Ms. Gasarch of awareness of either of these two things. Clearly, with the encrypted communications, she would have no reason to "hide" any knowledge. The only witness who even claimed to "know" Ms. Gasarch testified that he did not know what she knew. He also testified that Ms. Gasarch beginning in 2016/2017 was not included in the third party communications system they were using.

Ms. Gasarch cannot be said to have "substantially assisted" in the scheme, much less did so knowingly or recklessly. Ms. Gasarch was a functionary who sat in the reception area of an office suite that included other businesses. She did not make trades, direct trades, divvy up stocks to nominees in less than five percent

increments, engage in stock promotion or any of the other things the SEC claimed led to securities fraud. She responded to clients' requests for wire payments and documents. She responded to direction from Fred Sharp, her boss who was a lawyer (or at least claimed to be). Even Roger Knox testified that, living in Switzerland, he was not really aware of the SEC disclosure rule. He also testified that his business and Fred Sharp's business did legitimate deals. There was no showing at all that Ms. Gasarch knowingly or recklessly assisted in the alleged securities violations.

### D. The Trial Court Erred In Ordering Ms. Gasarch To Pay Disgorgement/Civil Penalties

As set forth above, the jury's verdict was not supported by the evidence the SEC presented and the SEC did not meet its burden of proof. It also was based on the improper admission of unauthenticated hearsay in the form of the "Q system" and should not stand. But even assuming that this Court finds that the jury's verdict should stand (which it should not), the judgment entered by the trial court in this case cannot insofar as it awards civil penalties and disgorgement.

First, it is important to understand the jury's verdict in this case. The jury verdict specifically found Mrs. Gasarch liable under Section 17(a)(3) and aiding and abetting "Sections 17(a)(1), 17(a)(3) of the Securities Act of 1933, **or** Section 10(b) of the Securities Exchange Act of 1934 and Rule  or Section 10b—5(a) and (c)…" (D.E. 402) (emphasis added). Thus, the jury verdict can be read as finding

19

Mrs. Gasarch liable only under Section 17(a)(3) - - as a primary violator and aider/abettor to others' violations.   Section 17(a)(3) is **not** a scienter-based violation and can be based on negligence, an important factor in the time in which the SEC is required to bring a claim, as discussed below.

Here, the SEC's request for disgorgement from Mrs. Gasarch was based almost entirely on a "summary chart" pulled from Q system data that captures transactions in accounts (labeled presumably by Sharp) as "PEAC" or "PERE." (Trial Exhibit 312).  Curiously, not one witness testified that Mrs. Gasarch ever went by the code name "PEAC" or "PERE," only that her signature appeared on documents establishing her alleged nominal ownership in these entities.   Instead, every witness testified that Mrs. Gasarch was referred to as "WIRES."  Nowhere in the SEC accountant's summary charts does "WIRES" appear.  This is in contrast to the other defendants - - referred to consistently as "ACCO" (Veldhuis); HEAR (Sexton); GARD (Friesen) and CELT/CEL1 (later ESQ/ESQ1).  (Ryan Murphy Aff., para. 8).

Nowhere did the SEC establish the Q data is independently reliable (as would be necessary if the Court admitted the records under the "business records" exception).  There was not a single witness at trial who could testify to Sharp keeping accurate and contemporaneous records.   In fact, Roger Knox testified that

Sharp often kept false records in the Q system in order to benefit himself. And there is a complete lack of verification of the Q data as it relates to Mrs. Gasarch. The SEC has presented literally **no** bank records of Mr. Sharp's business or Sharp that show the amounts reflected in the Q system going to Ms. Gasarch. Nor has the SEC - - despite investigating this case for many, many years and having an agent review over a million documents – presented any evidence of Mrs. Gasarch's bank records. Unlike with the other defendants where the SEC found at least some brokerage and transfer records to verify some entries in the Q system, as it relates to Mrs. Gasarch, there are **none**. (See Murphy trial testimony, pp. 126-127). As Mr. Murphy admitted in his trial testimony, he never reviewed bank records for PEAC or PERE, and he reviewed no records that showed money flowing out of Mr. Sharp's business to Mrs. Gasarch. (*Id*, pp. 123-124).

Most tellingly, the SEC never sets forth the allegedly fraudulent stock sales to which the alleged payments from the PEAC/PERE accounts relate. Mr. Knox testified that Mr. Sharp (like Knox himself) was involved in legitimate business transactions. There was no evidence that PEAC/PERE served as a nominee company in only allegedly fraudulent stock sales. Moreover, Mr. Knox testified that Mr. Sharp paid Mrs. Gasarch's salary out of various accounts and there is no way in which to attribute which or how much of the salary payments and/or bonuses made to Mrs. Gasarch relate to an allegedly fraudulent stock sale. The

SEC acknowledges that unlike Mrs. Kellen whom the Q records show received portions of commissions (split between herself and Mr. Sharp), there was no such allocation for Mrs. Gasarch. Instead, the decision of when and what amount to pay Mrs. Gasarch appears to be entirely in the discretion of Mr. Sharp.

To the extent that the SEC could establish payments to Mrs. Gasarch (which, as set forth above, it cannot), it does not even attempt to factor out the work on "legitimate" deals done over the course of Mrs. Gasarch's lengthy employment. Indeed, given the paucity of evidence against Mrs. Gasarch presented at trial - - including the facts that all witnesses did not even know who she was and/or what she knew and that she was "excluded" from the group's elaborate "parties" where the details were discussed and from the encrypted discussions on Threema- - it should be assumed that the vast majority of Mrs. Gasarch's services were performed on legitimate business dealings.

1. The General Legal Framework

The general statutory framework governing the SEC's entitlement to monetary and injunctive relief it seeks against Mrs. Gasarch is set out in 15 U.S.C. §78u ("Investigations and actions"). Pursuant to Section 78u(d)(5), the Commission "may seek…any equitable relief that may be appropriate or necessary for the benefit of investors." Pursuant to Section 78u(d)(3)(A)(i), the Commission may seek "upon a proper showing, a civil penalty to be paid by the person who

committed such violation…."   The amount of penalty to be assessed is set out in various "tiers" under Section 78u(d)(3)(B).  Moreover, the Commission may seek disgorgement under Section 78u(d)(7) from "the person who received such unjust enrichment as a result of the violation."  Section 78u(d)(3)(A)(ii).   As the SEC acknowledged below, it has the burden to show by a "preponderance of the evidence" that the remedies it seeks are appropriate.  (D.E. 426, p. 2).  *See Steadman v. SEC*, 450 U.S. 91, 103 (1981).

## 2.  The SEC Has Not Met Its Burden To Establish Disgorgement

Pursuant to *United States v. Liu*, 140 S.Ct. 1936, 1940 (2020):  "[A] disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)."  The SEC has failed in presenting evidence to establish Mrs. Gasarch's "net profits."  Further, it points to no "victims" to which any disgorgement award could be directed because it cannot even, at a minimum, relate any alleged payments to Mrs. Gasarch to any of the alleged fraudulent stock transactions in the fourteen companies.

### a.  The SEC Has No Documentary Evidence To Corroborate Its Disgorgement Claim

The SEC investigation lasted several years during which Agent Beckstrom testified that he reviewed approximately one million documents.  Yet, unlike the case with other defendants where deals and profits and commissions were

discussed, there was <u>not one</u> document presented to show that Mrs. Gasarch sought

(or received) proceeds from any alleged illegal stock transaction.    Moreover,

despite claiming that any Q entries listing "PEAC" and "PERE" were Mrs.

Gasarch's "personal accounts" in Q, the SEC accountant candidly admitted that he

"did not look at any bank records" in arriving at the disgorgement calculations.

(D.E. 442, p. 150).  Moreover, he admitted:  "I do not know who got the cash."

(Id., pp. 156-157).

In other cases where the SEC has obtained disgorgement against an alleged

wrongdoer, it has presented bank records to show at least a "reasonable

approximation" of net profit.  For example, in *SEC v. Tropikgadget FZE*, 146

F.Supp.3d 270, 281 (D. Mass. 2015), the court awarded the SEC disgorgement

based on its accountant's review and analysis of the wrongdoer's bank records.

*See also SEC v. Spongetech Delivery Sys., Inc.*, 2015 U.S. Dist. LEXIS 134138,

*7-8 (E.D.N.Y. 2015) (finding disgorgement appropriate based on bank deposit

records); *SEC v. Bass*, 2012 U.S. Dist. LEXIS 153900, * 7 (N.D.N.Y. 2012)

(ordering disgorgement based on SEC's presentation of comprehensive listing of

Defendants' bank account activity involving investor funds").  Here, the SEC is

asking the Court to order over $2.5 million in disgorgement against Mrs. Gasarch

without any showing - - let alone by a preponderance of the evidence - - that she

received any money as a result of allegedly fraudulent stock transactions.  The

Court must deny the disgorgement request.

      b.  The SEC Did Not Tie Any Alleged "Payments" To Ms. Gasarch To
           Any Alleged Securities Violation

The SEC never tied any of the payments it alleged went to Mrs. Gasarch to

any particular security violation.  The SEC has a major problem in attempting to do

so.  First, as Roger Knox testified:

Q:     So there were cases in which Silverton engaged in legitimate stock

transactions, is that correct?

A.     That is correct.

Q:     And to your knowledge…were there any occasions where Fred Sharp

was engaged in legitimate stock transactions?

A:     To my knowledge, there were occasions.

(D.E. 440; pp. 67-68).

Second, as Mr. Knox testified that he did not know what Mrs. Gasarch knew

regarding the alleged securities violations.  (D.E. 441, p. 40).

Third, as the SEC itself must admit, unlike Courtney Kellen who split

commissions with Mr. Sharp, there was no "standard" for the payments to Mrs.

Gasarch.  And though there are entries in the Q labeled "commissions" (without

evidence as to whom the commissions were paid), Mr. Knox testified that Mrs. Gasarch, unlike the other defendants, never directed the buying and selling of securities. Moreover, PEAC and PERE were accounts controlled solely by Mr. Sharp. (*Id.*, pp. 30-31).

The SEC has not attempted to tie any alleged payments to Mrs. Gasarch to underlying securities violations. Obviously, Mrs. Gasarch was a long-term employee and would be entitled to salary and whatever bonuses determined by Mr. Sharp. Clearly, given the length of time and the number of accounts and activities, Mrs. Gasarch was compensated for supporting Mr. Sharp in his legitimate business activities. Because the SEC has not tied any specific fraud to any specific payment to Mrs. Gasarch, the SEC is not entitled to disgorge any payments made to her. See *SEC v. Lemelson*, 596 F. Supp. 3d 227(D. Mass. 2022). In *Lemelson*, Judge Saris refused to order disgorgement after finding that the SEC did not meet its burden: "In order to establish a proper disgorgement amount, the party seeking disgorgement must distinguish between the legally and illegally derived profits." Id. at 237-38.

The cases discussing disgorgement of salary and bonuses are clear: any salary or bonus payments must be causally connected to securities fraud. See, e.g., *SEC v. E-Smart Techs, Inc*., 139 F.Supp.3d 170, 189 (D.D.C. 2015) ("A defendant may certainly be ordered to disgorge salary payments when such

payments are tied to unlawful act." ).  In *E-Smart*, the court denied the SEC's

attempt to disgorge an employee's salary.  The court noted that it is the SEC's

burden to "reasonably approximate profits and tie those profits to benefits received

by [the employee*]." See also SEC v. Chapman*, 826 F.Supp.2d 847, 859 (D. Md.

2011) (denying SEC's request for disgorgement where "[t]he SEC has not shown a

causal relationship between [defendant's] salary and bonuses and the fraud.").

Moreover, the case law is clear that disgorgement cannot be based on speculation.

*See SEC v. Mapp*, 2018 U.S. Dist. 125352, *21 (E.D. Tx. 2018).

> c.  Disgorgement Is Time-Barred

The trial court  held in its opinion on the Motions to Dismiss that the NDAA

extended the relevant statute of limitations to ten years for "scienter-based claims

for disgorgement…"  *SEC v. Sharp*, 628 F.3d 345, 381 (D. Mass. 2022).  The court

then held that violations of Section 17(a)(30 were "not scienter based because

neither their governing statutes nor the caselaw interpreting them require scienter."

*Id.*

Here, the jury found Mrs. Gasarch liable for violating Section 17(a)(3) of the

Securities Act and for aiding and abetting others in violation of Section 17(a)(1),

Section 17(a)(3) **or** Section 10(b) and Rule 10-b-5.  B.  Section 17(a)(3) is a non-

scienter based claim, as it can be found on a showing of mere negligence.  And, as

this Court instructed the jury, any person who aids and abets a violation "shall be

deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." D.E. 426-1.   In a related case, the SEC has admitted - - and the district court so found  - - that Section 17(a)(3) provides for a five-year period for disgorgement. *See SEC v. Stubos*, 634 F.Supp.3d 174, 194 (S.D.N.Y. 2022).[1]

Here, the jury was not instructed to find that the claims against Mrs. Gasarch were within a five-year statute of limitations.  Because the five years is relevant for remedies purposes, this Court can order disgorgement only based on alleged securities violations committed by Mrs. Gasarch on or after August 5, 2016 (five years prior to filing of Complaint).

The SEC points to no specific disbursements linked to securities violations after August 6, 2016.  Nor does it identify any "victims" harmed on or after August 6, 2016.  As such, the SEC did make out a case for disgorgement and the judgment awarding disgorgement is in error.

### d. The Judge Erred In Ordering Joint And Several Liability

In *Liu v. Securities & Exchange Comm'n*, 591 U.S. at 80, the Supreme Court noted: "Decisions from this Court confirm that a remedy tethered to a wrongdoer's

---

[1]     Mr. Stubos was on the SEC's witness list but the SEC declined to call him at trial.

net unlawful profits, whatever the name, has been a mainstay of equity courts."  In examining "joint and several liability" for disgorgement, the Court found that: "[t]he SEC has sought to impose disgorgement liability on a wrongdoer for benefits that accrue to his affiliates, sometimes through joint-and-several liability, in a manner seemingly at odds with the common-law rule requiring individual liability for wrongful profits*." Id.* at 90.  The Court found that this practice "*runs against the rule not to impose joint liability in favor of holding defendants liable for such profits that accrue to themselves…and not for those which have accrued to another, and in which they do not participate*."  Id. (internal quotations and citation omitted) (emphasis added).  The Court found that the common law did permit liability for "partners engaged in concerted wrongdoing," but the court went on to suggest that a joint-and-several liability imposition may be "unjust" if finances were not comingled, or one defendant did not enjoy the fruits or other circumstances would render joint and several liability unjust.  *Id.* at 91

This Court very recently examined *Liu*'s joint-and-several liability analysis in *Biopoint v. Dickhaut*, 110 F.3d 337 (2024).  The Court disallowed imposing joint-and-several liability on a collaborator who did not enjoy profits from a scheme.  *Id.* at 352.  The court further noted that the collaborator did not "commingle" finances with the main defendant.  In examining the imposition of joint-and-several liability in cases after *Liu,* the court noted that they involved

entities and individuals that owned/controlled those entities. *Id.* The Court also noted that the Tenth Circuit had rejected joint and several liability for an individual who "indirectly benefited" from a scheme. *Id.*

Under both *Liu* and *Bipoint*, it is clear that the trial judge should not have imposed joint and several liability. There was no evidence that Ms. Gasarch "controlled" Mr. Sharp's business. There was zero evidence that she was responsible for allocating shares, obfuscating who controlled shares, selling shares, etc. Any "benefit" to Ms. Gasarch in the form of alleged distributions (which, as set forth above, were not established or verified) can only be said to be an "indirect" one given at the whim of Mr. Sharp.

 e. <u>The Trial Court Erred In Assessing Penalties Against Ms. Gasarch</u>

As with the case of non-scienter-based claims, civil penalties are subject to a five-year statute of limitations. *See Sharp*, 626 F,Supp.3d at 382 ("The applicable limitations period thus runs from August 5, 2016 to August 5, 2021 for civil penalties and non-scienter-based disgorgement claims."). The only specific transaction cited by the SEC falling within that time period is that there were four "rounds" of fraudulent stock sales relating to Stevia First/Vitality from 2012-2018. (SEC Memorandum, D.E. 426, p. 10). Here, the Court would need to find that any Section 17(a)(3) violation of Mrs. Gasarch's (either primarily or as an aider/abettor) occurred on or after August 5, 2016. It is unclear from the SEC's

papers which company's stock and which transactions post-dating August 5, 2016, are violations on Mrs. Gasarch's part.  As the trial court stated during the charging conference:  "So let me be clear.  If we get to remedies…and I think that [a] violation was pre-August 2016, then I cannot impose a monetary penalty."  (D.E. 443, p. 55).  Without proof of a violation post-dating August 5, 2016, the SEC's request for penalties should have been denied.

      E.    <u>Adoption Of Other Arguments</u>

Ms. Gasarch specifically adopts and incorporates by reference all arguments made by the other Defendants/Appellants in this appeal.

## V.  **CONCLUSION**

For the reasons set forth above, Mrs. Gasarch respectfully requests that this Court vacate the Judgment against Ms. Gasarch and further order that judgment against the SEC enter as a matter of law.

Respectfully submitted,

ZHIYING YVONNE GASARCH

BY HER COUNSEL

/s/Karen A. Pickett

_____
Karen A. Pickett (1st Cir. No. 88088)
Pickett Law Offices, PC
125 High Street, 26th Floor
Boston, MA  02110
617.423.0485
kpickettlaw@gmail.com

Dated:        February 6, 2025

ADDENDUM

Judgment of the United States District Court

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
SECURITIES AND EXCHANGE        )
COMMISSION,                    )
                               )
         Plaintiff,            )
                               )
v.                             )        CIVIL ACTION
                               )        NO. 21-11276-WGY
FREDERICK L. SHARP,            )
ZHIYING YVONNE GASARCH,        )
COURTNEY KELLN,                )
MIKE K. VELDHUIS,              )
PAUL SEXTON,                   )
JACKSON T. FRIESEN,            )
WILLIAM T. KAITZ,              )
AVTAR S. DHILLON, and          )
GRAHAM R. TAYLOR,              )
                               )
         Defendants.           )
                               )
_____)
```

YOUNG, D.J.                                      June 20, 2024

**JUDGMENT AS TO DEFENDANT YVONNE GASARCH**

On September 27, 2023, the jury in this matter found
Defendant Zhiying Yvonne Gasarch ("Defendant" or "Gasarch")
liable for violating Section 17(a)(3) of the Securities Act of
1933 and for aiding and abetting others' violations of Sections
17(a)(1) and 17(a)(3) of the Securities Act of 1933 and Section
10(b) of the Securities Exchange Act of 1934 and Rules 10b-5(a)
and (c) thereunder.  On May 8, 2024, the Court, at a hearing,
imposed injunctive relief and a civil penalty on Gasarch that is
incorporated into this judgment.  The Court held the issues of

disgorgement and prejudgment interest under advisement.

Accordingly, the Court enters partial Judgment as follows:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a) to employ any device, scheme, or artifice to defraud;

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a)

Defendant's officers, agents, servants, employees, and attorneys;
and (b) other persons in active concert or participation with
Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant
is permanently restrained and enjoined from violating Section
17(a) of the Securities Act of 1933 (the "Securities Act") [15
U.S.C. § 77q(a)] in the offer or sale of any security by the use
of any means or instruments of transportation or communication in
interstate commerce or by use of the mails, directly or
indirectly:

    (a)   to employ any device, scheme, or artifice to defraud;

    (b)   to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)   to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as
provided in Federal Rule of Civil Procedure 65(d)(2), the
foregoing paragraph also binds the following who receive actual
notice of this Judgment by personal service or otherwise: (a)

3

Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

### III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1].

### IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by her, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for her own personal account.

### V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that (i) Defendant is jointly and severally liable with co-Defendant Frederick L. Sharp for disgorgement of $2,522,367.00, representing profits gained as a result of the conduct on which she was found liable, and (ii) Defendant is liable for a civil penalty in the amount of $269,651.00[1] pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u].   The Court does not award prejudgment interest.   Defendant shall satisfy this obligation by paying $2,792,018.00 to the Securities and Exchange Commission within 30 days after entry of this Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.   Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

---

[1] In its Memorandum & Order on the Securities and Exchange Commission's Motion for Remedies, the Court made an error with respect to its civil penalty award imposed upon Gasarch.  Mem. & Order 5, 40, 62, ECF No. 494.  As this judgment confirms, this Court imposes a civil penalty of $269,651.00 against Gasarch, which reflects Gasarch's frozen assets as of December 2022, as reported by the Securities and Exchange Commission.  Pl.'s Mem. Supp. Mot. Remedies Against Defs. Veldhuis, Sexton, Friesen, Kelln, and Gasarch 14, ECF No. 426; Mem. & Order 40, ECF No. 494 (explaining that it calculated Gasarch's civil penalties by looking at her frozen assets as of December 2022).

            Enterprise Services
            Center Accounts
            Receivable Branch 6500
            South MacArthur
            Boulevard Oklahoma
            City, OK 73169

and shall be accompanied by a letter identifying the case title,

civil action number, and name of this Court; Zhiying Yvonne

Gasarch as a defendant in this action; and specifying that payment

is made pursuant to this Judgment.

        Defendant shall simultaneously transmit photocopies of

evidence of payment and case identifying information to the

Commission's counsel in this action.  By making this payment,

Defendant relinquishes all legal and equitable right, title, and

interest in such funds and no part of the funds shall be

returned to Defendant.

        The Commission may enforce the Court's judgment for

penalties by the use of all collection procedures authorized by

law, including the Federal Debt Collection Procedures Act, 28

U.S.C. § 3001 et seq., and moving for civil contempt for the

violation of any Court orders issued in this action.  Defendant

shall pay post judgment interest on any amounts due after 30

days of the entry of this Judgment pursuant to 28 U.S.C. § 1961.

The Commission shall hold the funds, together with any interest

and income earned thereon (collectively, the "Fund"), pending

further order of the Court.

        The Commission may propose a plan to distribute the Fund

subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that she is entitled to, nor shall she further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be

7

deemed to change the amount of the civil penalty imposed in this Judgment.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.  Further, the asset freeze order imposed by Paragraph I of this Court's Order dated October 15, 2021, shall continue in full force and effect until the monetary obligation imposed by this Judgment is paid in full.

VII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE

8

<u>CERTIFICATE OF COMPLIANCE UNDER FED.R.APP.P. 32(a)(7)</u>

I hereby certify that this brief complies with the type-volume limitation of

Fed. R. App. P. 32(a)(7)(B) because:  (1) this brief contains 7,066 words and (2)

this brief complies with the typeface requirements of Fed.R.App.P. 32(a)(6)

because this brief has been prepared in 14 point proportionality spaced using

Times New Roman font.

<u>/Karen A. Pickett</u>

Dated:        February 6, 2025

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

<u>/s/Karen A. Pickett</u>
Karen A. Pickett

Dated:        February 6, 2025