# United States Court of Appeals

*for the*

# First Circuit

Case Nos. 24-1770,
24-1771, 24-1772,
24-1773, 24-1774

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

ZHIYING YVONNE GASARCH,

*Defendant-Appellant,*

FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS;
PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON IN CASE NO. 1:21-CV-11276-WGY,
HONORABLE WILLIAM G. YOUNG, U.S. DISTRICT JUDGE

## JOINT APPENDIX
## Volume 1 of 8 (Pages A1 to A615)

STEPHEN G. TOPETZES
NEIL T. SMITH
ROBERT S. SILVERBLATT
K&L GATES LLP
*Counsel for Defendant-Appellant
  Paul Sexton*
1601 K Street, NW
Washington, DC 20006
(202) 778-9000

MICHAEL TREMONTE
SHER TREMONTE
*Counsel for Defendant-Appellant
  Mike K. Veldhuis*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS     (800) 4-APPEAL • (336840)

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

MIKE K. VELDHUIS,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

—————————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

PAUL SEXTON,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

—————————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

COURTNEY KELLN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
MIKE K. VELDHUIS; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

—————————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

JACKSON T. FRIESEN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; PAUL SEXTON;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

FRANK SCADUTO
KEVIN B. MUHLENDORF
WILEY REIN LLP
*Counsel for Defendant-Appellant*
   *Courtney Kelln*
2050 M Street, NW
Washington, DC 20036
(202) 719-7000


MARANDA FRITZ
MARANDA E. FRITZ PC
521 5th Avenue
17th Floor
New York, New York 10175
(646) 584-8231


TIMOTHY J. FAZIO
MANNING GROSS + MASSENBURG LLP
125 High Street
Oliver Street Tower, 6th Floor
Boston, Massachusetts 02110
(617) 670-8800


*Counsel for Defendant-Appellant*
   *Jackson T. Friesen*

DANIEL STAROSELSKY
ASSISTANT GENERAL COUNSEL
KERRY J. DINGLE
SENIOR APPELLATE COUNSEL
U.S. SECURITIES & EXCHANGE
   COMMISSION
*Counsel for Plaintiff-Appellee*
100 F Street, NE
Washington, DC 20549
(202) 551-6953

KAREN A. PICKETT
PICKETT LAW OFFICES, PC
*Counsel for Defendant-Appellant*
   *Zhiying Yvonne Gasarch*
125 High Street, 26th Floor
Boston, Massachusetts 02110
(617) 423-0485

# TABLE OF CONTENTS

**Page**

Docket Entries .................................................................................  A1

Complaint, filed August 5, 2021 (Dkt. 1) .........................................  A55

    Exhibit A: Hearing dated August 29, 2019 ...........................  A136

    Exhibit B: Foot Loose Charlie Smith's Offshore Chronicles ...............  A143

    Exhibit C: Invoice .................................................  A144

    Exhibit D: E-Mail Correspondence ........................................  A148

    Exhibit E: Q Account ...................................................  A184

    Exhibit F: Q Bank Broker: Work .........................................  A191

    Exhibit G: Peaceful Lion Holdings Limited ...............................  A194

    Exhibit H: Wire Transfer ...............................................  A211

    Exhibit I: Securities and Exchange Commission, Schedule 13D/A .......  A212

    Exhibit J: Chart ......................................................  A217

    Exhibit K: August 19, 2013, Treasury Order ...........................  A220

    Exhibit L: Portfolio Valuation 790-1 ....................................  A248

Declaration of Trevor T. Donelan, filed August 5, 2021 ......................  A275

Civil Cover Sheet ...........................................................  A310

Plaintiff's Emergency *Ex Parte* Motion for a Temporary Restraining Order,
Order Freezing Assets and Order for Other Equitable Relief, filed
August 5, 2021 (Dkt. 3) ....................................................  A311

[Proposed] Temporary Restraining Order, Order Freezing Assets, and Order
for Other Equitable Relief, filed August 5, 2021 ...........................  A313

Plaintiff's Memorandum of Law in Support of its Emergency *Ex Parte*
Motion for a Temporary Restraining Order, Order Freezing Assets,
and Other for Equitable Relief, filed August 5, 2021 (Dkt. 4) ..............  A323

Temporary Restraining Order, Order Freezing Assets, and Order for Other
Equitable Relief, filed August 6, 2021 (Dkt. 7) ...........................  A358

i

**Page**

[Proposed] Preliminary Injunction Order, order Freezing Assets, and Order for Other Equitable Relief, filed August 20, 2021 (Dkt. 39).................. A368

Transcript of Motion Hearing Held on January 20, 2022, filed January 25, 2022 (Dkt. 193)........................................................................ A380

Final Judgment as to Defendant Frederick L. Sharp, filed May 12, 2022 (Dkt. 211)....................................................................................... A407

Memorandum and Order, filed September 6, 2022 (Dkt. 228) ........................ A420

Amended Complaint, filed September 9, 2022 (Dkt. 230).............................. A524

Defendant Paul Sexton's Answer to Amended Complaint and Affirmative Defenses, filed September 23, 2022 (Dkt. 242) ..................................... A616

Defendant Mike K. Veldhuis Verified Answer to Verified Amended Complaint, filed September 23, 2022 (Dkt. 244) ................................... A652

Defendant Courtney Kelln's Answer to Amended Complaint, filed September 30, 2022 (Dkt. 245) ............................................................. A702

Defendant Zhiying Yvonne Gasarch's Anser to Amended Complaint and Affirmative Defenses, filed October 7, 2022 (Dkt. 246)...................... A738

Answer of Defendant Jackson T. Friesen to Amended Complaint, filed October 14, 2022 (Dkt. 247).................................................................. A848

Declaration of Roger Knox, filed April 17, 2023 (Dkt. 274) .......................... A950

Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 2, 2023 (Dkt. 280) ............................................ A959

Memorandum of Law in Support of Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 2, 2023 (Dkt. 281)................................................................................................ A962

Declaration of Robert Knuts, filed may 2, 2023 (Dkt. 282) ............................ A988

Exhibit A: Email correspondence dated February 8, 2022 ................... A990

Exhibit B: Email exchange involving AUSA Drabick and Kevin Muhlendorf, counsel for defendant Courtney Kelln, dated February 8, 2022 through February 11, 2022 .............................. A994

**Page**

Exhibit C: Email dated February 17, 2023, from AUSA Drabick to
counsel for Mr. Veldhuis, Michael Tremonte and Noam Biale... A997

Exhibit D: Email dated March 17, 2023, from SEC Attorney Kathleen
Shields ...................................................................................... A1014

Exhibit E: Notice of Civil Claim that the Securities and Exchange
Commission filed in the Supreme Court of British Columbia on
August 11, 2022 ........................................................................ A1020

Exhibit F: Reasons for Judgment issued by the Supreme Court
ofBritish Columbia on March 21, 2023 ................................... A1031

Exhibit G: SEC's Responses and Objections to Defendant Courtney
Kelln's First Requests for Admissions dated March 17, 2023 . A1061

Defendant Paul Sexton's Notice of Joinder, filed May 8, 2023 (Dkt. 286) . A1079

Plaintiff's Opposition to Defendants Mike K. Veldhuis and Courtney Kelln's
Motion to Stay the Proceedings, filed May 9, 2023 (Dkt. 289) ......... A1082

Exhibit A: Application Response ....................................................... A1096

Electronic Order, filed May 15, 2023 (Dkt. 292) ........................................ A1101

Defendants Courtney Kelln and Mike Veldhuis' Notice of Non-Opposition
to Entry of Judgment, filed June 13, 2023 (Dkt. 315)...................... A1102

[Proposed Order Entering] Judgment as to Defendant Courtney Kelln, filed
June 13, 2023 ................................................................................ A1106

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed
June 13, 2023 ................................................................................ A1112

Plaintiff's Response to Kelln's and Veldhuis's Notice of Non-Opposition to
Entry of Judgment, filed June 14, 2023 (Dkt. 316) ......................... A1118

Order Entering Judgment s to Defendant Courtney Kelln, filed June 14, 2023
(Dkt. 317)........................................................................................ A1121

Notice of Corrected Filing Regarding Defendant Mike Velhuis' Notice of
Non-Opposition of Entry of Judgment, filed June 14, 2023 (Dkt.
318) ................................................................................................ A1127

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed
June 14, 2023 ................................................................................ A1130

iii

**Page**

Notice of Corrected Filing Regarding Defendant Mike Veldhuis' Notice of
Non-Opposition to Entry of Judgment, filed June 15, 2023 (Dkt.
319) ................................................................................... A1137

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed
June 15, 2023 ................................................................... A1140

Judgment as to Defendant Mike Veldhuis, filed June 21, 2023 (Dkt. 325) ... A1147

Defendant Jackson T. Friesen's Motion in Limine to Exclude "Q" Records
and Purported Expert Testimony, filed August 10, 2023 (Dkt. 329) ... A1154

Order, filed August 10, 2023 ................................................... A1167

Yvonne Gasarch's Motion in Limine to Exclude "Q" Records and Purported
Expert Testimony, filed August 24, 2023 (Dkt.. 334) ...................... A1168

    Exhibit 1: Deposition of Fedir Nikolayev ........................... A1174

Plaintiff's Opposition to Defendant Jackson T. Friesen's Motion to Exclude
"Q" Records and Purported Expert Testimony, filed August 25, 2023
(Dkt. 336) ........................................................................ A1261

    Exhibit 1: Declaration of Ryan Murphy ............................. A1279

    Exhibit 2: Deposition of Written Questions of Zhiying Yvonne
    Gasarch ..................................................................... A1285

Defendant Paul Sexton's Motion in Limine to Exclude Q System and
Associated Data, fled August 31, 2023 (Dkt. 338) ........................ A1323

    Exhibit 1: Deposition of Fedir Nikolayev ........................... A1336

Transcript of Motion Hearing, filed September 1, 2023 (Dkt. 344) ............. A1356

Yvonne Gasarch's Motion to Supplement Her Motion in Limine filed on
August 24, 2023, filed September 1, 2023 (Dkt. 346) ...................... A1377

Plaintiff's Opposition to Defendants Sexton's and Gasarch's Motions to
Exclude Expert Testimony, filed September 4, 2023 (Dkt. 350) ......... A1379

    Exhibit A: Expert Witness Report of Philip A. Feigin ............. A1385

    Exhibit B: Government's Trial Memorandum, Response to
    Defendants' Motion in Limine, and Supplemental 404(b) Notice ....... A1395

**Page**

Plaintiff's Opposition to Defendant Yvonne Gasarch's Motion in Limine to
Exclude "Q" Records and Purported Expert Testimony, filed
September 5, 2023 (Dkt. 352) ............................................................ A1422

Plaintiff's Opposition to Defendant Paul Sexton's Motion in Limine to
Exclude "Q" System and Associated Data, filed September 5, 2023
(Dkt. 353).......................................................................................... A1426

    Exhibit A: Securities and Exchange Commission B03147 Analysis of
    MySQL Databases, Summary of Accounts ............................... A1439

    Exhibit B: Summary of Transfer Agent Records – Acquisitions of
    Stevia First, Vitality Stock ....................................................... A1454

    Exhibit C: Q Account Detail ................................................................ A1455

    Exhibit D: Revised Deposition on Written Questions of Paul Sexton . A1456

    Exhibit E: Wire Transfer ...................................................................... A1524

    Exhibit F: E-Mail Correspondence....................................................... A1527

    Exhibit G: E-Mail Correspondence ...................................................... A1528

    Exhibit H: E-Mail Correspondence ...................................................... A1529

Defendant Paul Sexton's Notice of Non-Opposition to Entry of Judgment,
filed September 11, 2023 (Dkt. 376) ................................................... A1530

[Proposed] Order Entering Judgment as to Defendant Paul Sexton, filed
September 11, 2023 ............................................................................. A1533

Order Entering Judgment as to Defendant Paul Sexton, filed September 12,
2023 (Dkt. 378)................................................................................... A1535

Order, filed September 19, 2023 (Dkt. 385) .................................................... A1537

Yvonne Gasarch's Motion in Limine to Preclude Admission of Exhibit QK,
filed September 21, 2023 (Dkt. 389) ................................................... A1542

    Exhibit 1: Summary of Gasarch Earnings ........................................... A1544

Yvonne Gasarch's Motion to Strike Evidence that the Court Admitted De
Bene Pursuant to Fed. R. Evid. 801(d)(2)(E), filed September 25,
2023 (Dkt. 394)................................................................................... A1545

Yvonne Gasarch's Motion Pursuant to Fed. R. Civ. P. 50 for Judgment as a
Matter of Law, filed September 25, 2023 (Dkt. 395)........................... A1548

**Page**

Verdict, filed September 27, 2023 (Dkt. 402) ................................. A1553

Yvonne Gasarch's Renewed Motion Pursuant to Fed. R. Civ. P. 50 for
    Judgment as a Matter of Law or, in the Alternative, for a New Trial,
    filed October 25, 2023 (Dkt. 413) ......................................... A1555

Electronic Order, filed October 26, 2023 (Dkt. 414)..................................... A1564

Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the
    Proceedings, filed December 5, 2023 (Dkt. 421) ................................. A1565

Memorandum of Law in Support of Defendants Mike K. Veldhuis and
    Courtney Kelln's Motion to Stay the Proceedings, filed December 5,
    2023 (Dkt. 422)..................................................................... A1569

Declaration of Robert Knuts, filed December 5, 2023 (Dkt. 423) ............... A1592

    Exhibit 1:Affidavit dated November 17, 2023 executed by Assistant
      United States Attorney James R. Drabick................................ A1594

    Exhibit 2: Email correspondence dated February 8, 2022 ................. A1726

    Exhibit 3: Email dated February 17, 2023 , from AUSA Drabick to
      counsel for Mr. Yeldhuis, Michael Tremonte and Noam Biale ...... A1730

    Exhibit 4: Email dated March 17, 2023, from SEC Attorney ............ A1747

Plaintiff's Motion for Remedies Against Defendants Mike Veldhuis, Paul
    Sexton, Jackson Friesen, Courtney Kelln and Zhiying Yvonne
    Gasarch, filed December 8, 2023 (Dkt. 425)...................................... A1753

Final Judgment as to Defendant Jackson T. Friesen, filed December 8,
    2023 ................................................................................. A1756

Final Judgment as to Defendant Yvonne Gasarch, filed December 8, 2023    A1769

Final Judgment as to Defendant Paul Sexton, filed December 8, 2023 ....... A1779

Final Judgment as to Defendant Mike K. Veldhuis, filed December 8,
    2023 ................................................................................. A1791

Final Judgment as to Defendant Courtney Kelln, filed December 8, 2023 .. A1804

Plaintiff's Memorandum in Support of Motion for Remedies Against
    Defendants Mike Veldhuis, Paul Sexton, Jackson Friesen, Courtney
    Kelln, and Zhiying Yvonne Gasarch, filed December 8, 2023 (Dkt.
    426) .................................................................................. A1813

**Page**

Exhibit A: Transcript of September 27, 2023 Jury Charge ............... A1845

Exhibit B: Government's Notice of Anticipated Restitution Request
and Motion for Continuance ..................................... A1890

Declaration of Ryan Murphy, filed December 8, 2023 (Dkt. 427) ............. A1902

Exhibit 1: ACCO / ACC1 Q Account Detail.................................... A1916

Exhibit 2: HEAR Q Account Detail ................................. A1941

Exhibit 3: GARD Q Account Detail.................................. A1956

Exhibit 4: Chart................................................... A1972

Exhibit 5: Wire Transfer........................................ A2141

Exhibit 6: Wire Transfer........................................ A2142

Exhibit 7: Wire Transfer........................................ A2143

Exhibit 8: Wire Transfer........................................ A2144

Exhibit 9: Wire Transfer........................................ A2145

Exhibit 10: Wire Transfer....................................... A2147

Exhibit 11: E-mail Correspondence ................................. A2149

Exhibit 12: E-mail Correspondence ................................. A2150

Exhibit 13: E-mail Correspondence ................................. A2151

Exhibit 14: Wire Transfer....................................... A2152

Exhibit 15: Wire Transfer....................................... A2153

Exhibit 16: E-mail Correspondence ................................. A2154

Exhibit 17: E-mail Correspondence ................................. A2155

Exhibit 18: Wire Transfer....................................... A2168

Exhibit 19: Wire Transfer....................................... A2169

Exhibit 20: DGM Bank and Trust Inc. Statement of Account Activity
.................................................. A2170

Exhibit 21: E-mail Correspondence ................................. A2171

Exhibit 22: E-mail Correspondence ................................. A2175

**Page**

Exhibit 23: Wire Transfer ............................................................... A2181

Exhibit 24: Text Messages ............................................................. A2182

Exhibit 25: Text Messages ............................................................. A2223

Exhibit 26: E-mail Correspondence ............................................... A2225

Exhibit 27: Invoice ........................................................................ A2226

Exhibit 28: Wire Transfer ............................................................... A2227

Exhibit 29: Wire Transfer ............................................................... A2228

Exhibit 30: E-mail Correspondence ............................................... A2229

Exhibit 31: Invoice ........................................................................ A2230

Exhibit 32: Bank Statement ........................................................... A2235

Exhibit 33: Veldhuis PJI Backup ................................................... A2237

Plaintiff's Opposition to Defendants Mike K. Veldhuis and Courtney Kelln's Second Motion to Stay the Proceedings, filed December 18, 2023 (Dkt. 429) ...................................................................................... A2284

Final Pretrial Conference Transcript, filed January 24, 2023 (Dkt. 434) ....... A2289

Jury Trial Transcript Day 1, filed January 24, 2024 (Dkt. 435) ..................... A2310

Jury Trial Transcript Day 2, filed January 24, 2024 (Dkt. 436) ..................... A2416

Jury Trial Transcript Day 3, filed January 24, 2024 (Dkt. 437) ..................... A2534

Jury Trial Transcript Day 4, filed January 24, 2024 (Dkt. 438) ..................... A2674

Jury Trial Transcript Day 5, filed January 24, 2024 (Dkt. 439) ..................... A2772

Jury Trial Transcript Day 6, filed January 24, 2024 (Dkt. 440) ..................... A2865

Jury Trial Transcript Day 7, filed January 24, 2024 (Dkt. 441) ..................... A2946

Jury Trial Transcript Day 8, filed January 24, 2024 (Dkt. 442) ..................... A3103

Motion and Charge Conference Transcript, filed January 24, 2024 (Dkt. 443) ...................................................................................... A3273

Jury Trial Transcript Day 9, filed January 24, 2024 (Dkt. 444) ..................... A3331

Jury Trial Transcript Day 10, filed January 24, 2024 (Dkt. 445) ................. A3458

**Page**

Electronic Order, filed February 7, 2024 (Dkt. 451) ...................................... A3469

Defendant Paul Sexton's Opposition to Motion for Remedies, filed February
14, 2024 (Dkt. 454) ................................................................................ A3470

Defendant Courtney Kelln's and Mike K. Veldhuis's Opposition to Plaintiff
SEC's Motion for Remedies Against Defendants Veldhuis, Sexton,
Friesen, Kelln, and Gasarch, filed February 14, 2024 (Dkt. 455) ........ A3491

Defendants Mike K. Veldhuis and Courtney Kelln's Motion for
Reconsideration, filed February 16, 2024 (Dkt. 456) ........................... A3495

Memorandum of Law in Support of Veldhuis and Kelln's Motion for
Reconsideration of the Second Motion to Stay, filed February 16, 224
(Dkt. 457) ............................................................................................... A3499

Declaration of Robert Knuts, filed February 16, 2024 (Dkt. 458) .............. A3505

     Exhibit 1: Indictment filed January 9, 2024 ...................................... A3506

Defendant Paul Sexton's Motion for Stay, filed February 20, 2024 (Dkt.
459) ......................................................................................................... A3544

Electronic Order Denying Motion for Reconsideration, filed February 20,
2024 (Dkt. 460) ...................................................................................... A3547

Defendant Yvonne Gasarch's Opposition to SEC's Remedies Motion, filed
February 21, 2024 (Dkt. 464) ................................................................ A3548

     Exhibit 1: Q System Data .................................................................. A3566

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against
Defendants Paul Sexton, Mike Veldhuis, and Courtney Kelln, filed
March 1, 2024 (Dkt. 470) ...................................................................... A3587

     Exhibit A: E-Mail Correspondence ................................................... A3602

     Exhibit B: Wire Transfer ................................................................... A3604

     Exhibit C: DGM Band and Trust Inc. Statement of Account
          Activity ..................................................................................... A3606

     Exhibit D: E-Mail Correspondence ................................................... A3610

     Exhibit E: E-Mail Correspondence.................................................... A3617

Defendant Jackson Friesen's Opposition to Plaintiff's Motion for Remedies,
filed March 1, 2024 (Dkt. 471) .............................................................. A3620

**Page**

Defendant Paul Sexton's Sur-Reply Regarding Motion for Remedies, filed
    March 6, 2024 (Dkt. 473) ................................................................ A3633

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against
    Defendant Yvonne Gasarch, filed March 7, 2024 (Dkt. 474) ............ A3641

    Exhibit A: Wire Transfer ..................................................... A3655

    Exhibit B: Wire Transfer ..................................................... A3656

    Exhibit C: Wire Transfer ..................................................... A3657

    Exhibit D: Information Return for Electronic Filing of An Individual's
        Income Tax and Benefit Return ................................ A3658

    Exhibit E: Officers and Directors Enquiry ......................... A3661

    Exhibit F: Wire Transfer ..................................................... A3666

    Exhibit G: Wire Transfer ..................................................... A3668

    Exhibit H: Letter dated April 21, 2018 ............................... A3671

    Exhibit I: Wire Transfer ...................................................... A3672

    Exhibit J: Bank Statement ................................................... A3673

    Exhibit K: Chart.................................................................. A3674

    Exhibit L: Assignment ........................................................ A3676

    Exhibit M: E-mail Correspondence .................................... A3681

Declaration of Christopher Beckstrom, filed March 7, 2024 (Dkt. 475)...... A3695

    Exhibit 1: E-Mail Correspondence ..................................... A3698

    Exhibit 2: E-Mail Correspondence ..................................... A3699

    Exhibit 3: E-Mail Correspondence ..................................... A3700

Declaration of Ryan Murphy, filed March 7, 2024 (Dkt. 476).................... A3701

    Exhibit 1: Summary of Cash Withdrawals ......................... A3704

    Exhibit 2: Summary of Cash Withdrawals ......................... A3706

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against
    Defendant Jackson Friesen, filed March 14, 2024 (Dkt. 480) ........... A3710

**Page**

Defendant Yvonne Casarch's Sur-Reply to SEC's Reply to her Opposition
    to SEC's Remedies Motion, filed March 15, 2024 (Dkt. 481)........... A3715

Plaintiff's Proposed Judgments Against Defendants Veldhuis, Sexton,
    Friesen, Kelln and Gasarch, filed May 10, 2024 (Dkt. 485) .............. A3723

Judgment as to Defendant Mike K. Veldhuis, filed May 10, 2024 ............ A3725

Judgment as to Defendant Paul Sexton, filed May 10, 2024...................... A3733

Judgment as to Defendant Jackson T. Friesen, filed May 10, 2024 ............. A3741

Judgment as to Defendant Courtney Kelln, filed May 10, 2024 ................. A3749

Judgment as to Defendant Yvonne Gasarch, filed May 10, 2024 ............... A3756

Yvonne Gasarch's Objections to SEC's Proposed (Partial) Judgment, filed
    May 20, 2024 (Dkt. 486) ....................................................... A3762

Plaintiff's Response to Defendant Zhiying Yvonne Gasarch's Objections to
    SEC's Proposed Judgment, filed may 20, 2024 (Dkt. 487) ................ A3766

Defendant Paul Sexton's Objections to Proposed Judgment, filed May 20,
    024 (Dkt. 488)...................................................................... A3769

Defendant Jackson Friesen's Objections to Plaintiff's Proposed Judgment,
    filed May 20, 2024 (Dkt. 489)................................................. A3773

Objections by Defendants Veldhuis and Kelln to Proposed Partial Judgments
    Against Veldhuis and Kelln Submitted by Plaintiff Securities and
    Exchange Commission, filed May 20, 2024 (Dkt. 490)..................... A3782

Transcript of Disgorgement, filed May 23, 2024 (Dkt. 491)...................... A3787

Memorandum and Order, filed June 17, 2024 (Dkt. 494) ............................ A3823

Judgment as to Defendant Paul Sexton, filed June 20, 2024 (Dkt. 495) ........ A3886

Judgment as to Defendant Mike K. Veldhuis, filed June 20, 2024 (Dkt.
    496) .................................................................................. A3896

Judgment as to Defendant Jackson T. Friesen, filed June 20, 2024 (Dkt.
    497) .................................................................................. A3907

Judgment as to Defendant Yvonne Gasarch, filed June 20, 2024 (Dkt. 498) .... A3917

Judgment as to Defendant Courtney Kelln, filed June 20, 2024 (Dkt. 499) .. A3925

**Page**

Motion for Orders Directing the Turnover of Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 (Dkt. 500)................... A3935

[Proposed] Order Directing Transfer of Jackson T. Friesen's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........ A3940

[Proposed] Order Directing Transfer of Yvonne Gasarch's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3947

[Proposed] Order Directing Transfer of Courtney Kelln's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3952

[Proposed] Order Directing Transfer of Paul Sexton's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ................. A3955

[Proposed] Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3961

Defendant Jackson Friesen's Objections to Judgment, Motion to Amend, Clarify or Correct Judgment and Opposition to Motion for Turnover Order, filed July 2, 2024 (Dkt. 501) .................................................... A3968

Defendant Paul Sexton's Opposition to Motion for Orders Directing the Turnover of Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 (Dkt. 502) ..................................... A3974

Defendant Courtney Kelln's Notice of Joinder, filed July 3, 2024 (Dkt. 503) ....................................................................................... A3977

Defendant Yvonne Gasarch's Notice of Joinder, filed July 3, 2024 (Dkt. 504) ....................................................................................... A3979

Defendant Paul Sexton's Notice of Joinder, filed July 3, 2024 (Dkt. 505) A3981

Defendant Mike K. Veldhuis's Notice of Joinder, filed July 3, 2024 (Dkt. 506) ....................................................................................... A3984

Plaintiff's Opposition to Defendants' Motions to Amend, Clarify or Correct Judgment, filed July 15, 2024 (Dkt. 507)......................................... A3986

Electronic Order Allowing Motion for Release of Funds, filed July 11, 2024 (Dkt. 508)........................................................................................ A3990

Order Directing Transfer of Jackson T. Friesen's Frozen Funds to the Securities and Exchange Commission, filed July 11, 2024 (Dkt. 509) ......................................................................................... A3991

**Page**

Order Directing Transfer of Yvonne Gasarch's Frozen Funds to the
  Securities and Exchange Commission, filed July 11, 2024 (Dkt.
  510) ................................................................. A3998

Order Directing Transfer of Courtney Kelln's Frozen Funds to the Securities
  and Exchange Commission, filed July 11, 2024 (Dkt. 511)............. A4003

Order Directing Transfer of Paul Sexton's Frozen Funds to the Securities
  and Exchange Commission, filed July 11, 2024 (Dkt. 512)............. A4006

Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to the
  Securities and Exchange Commission, filed July 11, 2024 (Dkt.
  513) ................................................................. A4012

Electronic Order re: Motion to Amend, filed July 16, 2024 (Dkt. 514)..... A4019

Defendant Paul Sexton's Motion to Stay Execution of Judgment, filed July
  18, 2024 (Dkt. 515)................................................. A4020

  Exhibit 1: E-mail Correspondence ................................... A4025

Motion of Defendants Mike Veldhuis and Courtney Kelln to Stay Execution
  of Judgment, filed July 19, 2024 (Dkt. 516)......................... A4029

Defendant Yvonne Gasarch's Motion to Stay Execution of Judgment, filed
  July 22, 2024 (Dkt. 517)............................................ A4035

  Exhibit 1: Order Made After Application ............................ A4045

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 518)    A4054

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 519).... A4055

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 520).... A4056

Notice of Appeal by Zhiying Yvonne Gasarch, filed August 19, 2024 (Dkt.
  521) ............................................................... A4057

Notice of Appeal by Mike Veldhuis, filed August 19, 2024 (Dkt. 522) ........ A4059

Notice of Appeal by Courtney Kelln, filed August 19, 2024 (Dkt. 523) ....... A4061

Notice of Appeal by Paul Sexton, filed August 19, 2024 (Dkt. 524)............ A4063

Notice of Appeal by Jackson T. Friesen, filed August 19, 2024 (Dkt. 525) .. A4066

Plaintiff's Motion in Support of Distribution for the Benefit of Harmed
  Investors and Seeking and Order Establishing a Fair Fund, Appointing

**Page**

a Tax Administrator, and Authorizing Payment of Tax Obligations and Related Fees and Expenses of Tax Administrator Without Further Court Order, filed September 4, 2024 (Dkt. 537) ................................ A4068

[Proposed] Order Establishing a Fair Fund, Appointing a Tax Administrator, and Authorizing Payment of Tax Obligations and Related Fees and Expenses of the Tax Administrator Without Further Court Order, filed September 4, 2024 ................................................................ A4071

Plaintiff's Memorandum of Law Describing Proposed Distribution Framework and in Support of Motion Seeking an Order Establishing a Fair Fund and Other Relief, filed September 4, 2024 (Dkt. 538) ........ A4074

Exhibit A: Order Approving Distribution Plan .................................... A4093

Exhibit B: Order Approving Plan of Distribution ................................ A4129

Exhibit C: Order Reclassifying Prejudgment Interest as Disgorgement, Appointing a Distribution Agent, and Approving a Distribution Plan for the Distribution Fund....................................................... A4160

Declaration of Dr. Thomas A. Dunn, filed September 4, 2024, filed September 4, 2024 (Dkt. 539) ........................................................ A4173

Appendix 1: Defendants' Monetary Remedies .................................... A4186

Appendix 2: Knox Restitution Fund, Losses by OTC Security Ticker  A4187

Appendix 3: Group 2 Tickers and Defendants .................................... A4188

Defendant Paul Sexton's Opposition to Motion for Fair Fund, filed September 16, 2024 (Dkt. 540) ............................................................ A4189

Defendant Jackson Friesen's Opposition to Motion for Fair Fund, filed September 16, 2024 (Dkt. 541) ............................................................ A4192

Defendant Yvonne Gasarch's Motion for Joinder, filed September 16, 2024 (Dkt. 542)....................................................................................... A4196

Defendant Courtney Kelln's Motion for Joinder, filed September 16, 2024 (Dkt. 543)....................................................................................... A4198

Defendant Mike K. Veldhuis's Notice of Joinder and Response to Motion, filed September 16, 2024 (Dkt. 544) ..................................................... A4200

Electronic Order, filed September 18, 2024 (Dkt. 545) ................................. A4203

**Page**

Trial Exhibits:

Exhibit 14: Xphone between 2, 4 and 66.................................................... A4204

Exhibit 16: Ian Cooper's Special Report re Arch Therapeutics................... A4205

Exhibit 17: Chuck Hughes Microcap Report (Conmar Capital) re Stevia First
$50 Billion Sugar....................................................................... A4250

Exhibit 18: Xphone chain between 2, 3, 4 and 66 re Send.......................... A4262

Exhibit 40: E-mail from Wires to Nikolayev (FEN) re Wire please........... A4264

Exhibit 45: Xphone chain between 2, 3, 4, 60 and Sexy re Summary........ A4265

Exhibit 79: Xphone chain between Elgi, Wires and 19............................... A4266

Exhibit 81: Xphone chain between Bond, 104 and Blgx re Hiya................ A4268

Exhibit 87: Xphone chain between 2, 3 and 4 re Meeting.......................... A4304

Exhibit 90: Xphone chain between Bond and Wires re Cash...................... A4305

Exhibit 99: Xphone chain between Gard, Celt and 2 re ARW ................... A4306

Exhibit 113: Xphone chain between 2, 3, and 4 re Copy ........................... A4307

Exhibit 126: Xphone between Gard and Kash re Yo ................................. A4308

Exhibit 134: Xphone chain between 2, 3, and 4 re Rights ......................... A4309

Exhibit 136: Xphone chain between 2, 3, and 4 re Today.......................... A4311

Exhibit 140: Xphone from 4 to 2 ................................................................ A4314

Exhibit 141: Xphone chain between 2, 3, and 4 ........................................ A4315

Exhibit 151: Xphone chain between Wires and 19 ELGI .......................... A4316

Exhibit 154: Xphone from GARD to KASH and ACCO re Yo.................. A4318

Exhibit 157: Xphone chain between Wires, Kash and Celt re Wire to
Business Venture Investments.............................................. A4319

Exhibit 168: Xphone chain between Peace, 77, Lion and Wires re Hi ....... A4320

Exhibit 170: Xphone chain between 2, 3 and 114 re There you have it...... A4321

Exhibit 180: Xphone chain between Wires, Bond, Luna and Alex 110 re
Remo.................................................................................... A4322

**Page**

Exhibit 183: Xphone between 2 and 98 re Test ..............................................  A4323

Exhibit 184: Xphone chain between Fen, Wires and 76 re Where r u ........  A4324

Exhibit 190: Xphone chain between 2 and 4 re Test ..................................  A4326

Exhibit 193: Xphone chain between 76, Fen and Wires re Xvoice .............  A4327

Exhibit 233: Beckstrom Xphone Header Spreadsheet ................................  A4329

Exhibit 237: Xmail message from Wires (xMeridian) to Friesen re 2 Wires
            to Go Out .......................................................................  A4384

Exhibit 239: Xmail message from Wires to Friesen re 2 Wires to go out...  A4385

Exhibit 261: Xmail messages between Friesen, "acco" and "hear" re NA .  A4387

Exhibit 273: Xmail message from Friesen to Acco and Hear re creative with
            attachments .....................................................................  A4391

Exhibit 284: Establishment of the beneficial owner's identity for Peregrine
            Capital ............................................................................  A4412

Exhibit 286: E-mail from Riverfall Group to Silverton Ops re wire 129k to
            Greenberg with attachments showing metadata ................................  A4413

Exhibit 287: E-mail from Hilton Capital to Wintercap Operations re wire
            CAD100016 to Sun Life with attachments .......................................  A4518

Exhibit 288: Text messages between Friesen, Knox, and Threema with
            photos of Cristal bottles and SUB Penny $ .....................................  A4523

Exhibit 289: Threema chats ...........................................................................  A4534

Exhibit 290: Friesen cash collection for 9k EUR ........................................  A4536

Exhibit 292: Murphy Summary charts summarizing transfers of Arch
            Therapeutics stock ...........................................................................  A4537

Exhibit 293: MDDD Q Account Details..........................................................  A4538

Exhibit 295: ARTH Q Account Details ...........................................................  A4546

Exhibit 296: STVFVBIO Q Account Details ...............................................  A4560

Exhibit 298: STEV Q Account Details............................................................  A4583

Exhibit 299: LBY and PBAV Q Account Details .........................................  A4594

Exhibit 306: RIHT & RIH1 Q Account Details .............................................  A4605

**Page**

Exhibit 307: Murphy Summary charts summarizing sales of the Fourteen
    Issuers' stock by year ......................................................................... A4619

Exhibit 308: Murphy Summary Charts showing sales of Fourteen Issuers'
    securities based on Q system and brokerage account........................ A4620

Exhibit 310: Murphy Summary charts summarizing market trading based on
    Blue Sheets in Stevia FirstVitality and Arch d................................. A4634

Exhibit 311: GARD Q reports ..................................................................... A4635

Exhibit 313: Murphy Summary charts showing profit allocations to the Q
    accounts of Veldhuis, Sexton and Friesen ....................................... A4651

Exhibit 314: Summary chart of allocations to PEAC PERE account.......... A4659

Query    Reports    Utilities    Help    Log Out

APPEAL

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:21-cv-11276-WGY

Securities and Exchange Commission v. Sharp et al          Date Filed: 08/05/2021
Assigned to: Judge William G. Young                        Date Terminated: 06/20/2024
Case in other court:  USCA - First Circuit, 24-01770       Jury Demand: Both
                      USCA - First Circuit, 24-01771       Nature of Suit: 850 Securities/Commodities
                      USCA - First Circuit, 24-01772       Jurisdiction: U.S. Government Plaintiff
                      USCA - First Circuit, 24-01773
                      USCA - First Circuit, 24-01774
Cause: 12:22 Securities Fraud

**Plaintiff**

**Securities and Exchange Commission**          represented by   **Eric A. Forni**
                                                                 DLA Piper LLP US
                                                                 33 Arch Street
                                                                 Ste 26th Floor
                                                                 Boston, MA 02110-1447
                                                                 617-406-6140
                                                                 Email: Eric.Forni@us.dlapiper.com
                                                                 *TERMINATED: 06/01/2022*
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Alfred A. Day**
                                                                 United States Securities and Exchange
                                                                 Commission
                                                                 33 Arch Street
                                                                 23rd Flr.
                                                                 Boston, MA 02110-1424
                                                                 617-573-4537
                                                                 Email: daya@sec.gov
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Amy Harman Burkart**
                                                                 U.S. Securities and Exchange Commission
                                                                 33 Arch Street
                                                                 Ste 24th Floor
                                                                 Boston, MA 02110
                                                                 617-573-5905
                                                                 Email: burkarta@sec.gov
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **David H. London**
                                                                 Securities and Exchange Commission - MA
                                                                 33 Arch Street

A1

23rd Floor
Boston, MA 02110-1424
617-573-8997
Fax: 617-424-5940
Email: londond@sec.gov
*ATTORNEY TO BE NOTICED*

**Kathleen Burdette Shields**
U.S. Securities and Exchange Commission
33 Arch Street, 24th Floor
Boston, MA 02110
617-573-8904
Email: shieldska@sec.gov
*ATTORNEY TO BE NOTICED*

**Nita Kumaraswami Klunder**
United States Securities and Exchange
Commission
33 Arch Street
23rd Flr.
Boston, MA 02110-1424
617-573-8822
Email: klunderni@sec.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Frederick L. Sharp**
*TERMINATED: 05/12/2022*

**Defendant**

**Zhiying Yvonne Gasarch**                represented by    **Karen A. Pickett**
*TERMINATED: 06/20/2024*                                   Pickett Law Offices, P.C.
                                                           26th Floor
                                                           125 High street
                                                           Boston, MA 02110
                                                           617-423-0485
                                                           Fax: 617-482-6677
                                                           Email: kpickettlaw@gmail.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Michelle R. Pascucci**
                                                           Donnelly, Conroy & Gelhaar, LLP
                                                           Suite 1600
                                                           260 Franklin Street
                                                           Boston, MA 02110
                                                           413-320-7029
                                                           Email: mrp@dcglaw.com
                                                           *TERMINATED: 02/25/2022*
                                                           *ATTORNEY TO BE NOTICED*

A2

**Defendant**

**Courtney Kelln**
*TERMINATED: 06/14/2023*

represented by **Holly J. Wilson**
DOJ-USAO
Robert C Byrd US Courthouse
300 Virginia Street East, Suite 4000
Charleston, WV 25301
304-340-7854
Fax: 304-347-5104
Email: hwilson@wiley.law
*TERMINATED: 02/08/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin B. Muhlendorf**
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
202-719-7052
Email: kmuhlendorf@wileyrein.com
*TERMINATED: 11/16/2023*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pamela L. Signorello**
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
202-719-3321
Email: psignorello@wiley.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mike K. Veldhuis**
*TERMINATED: 06/21/2023*

represented by **Michael Tremonte**
Sher Tremonte LLP
90 Broad Street
23r Floor
New York, NY 10004
212-202-2600
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert Knuts**
Sher Tremonte LLP
90 Broad Street
23rd Floor
New York, NY 10004
212-202-2638
Fax: 212-202-4156
Email: rknuts@shertremonte.com

A3

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Howard M. Cooper**
Todd & Weld
One Federal Street
27th Floor
Boston, MA 02110
617-720-2626
Fax: 617-227-5777
Email: hcooper@toddweld.com
*ATTORNEY TO BE NOTICED*

**Katie Elizabeth Renzler**
Sher Tremonte
90 Broad Street
23rd Fl.
New York, NY 10004
212-202-2600
Email: krenzler@shertremonte.com
*ATTORNEY TO BE NOTICED*

**Lorraine Belostock**
Todd & Weld LLP
One Federal Street
Boston, MA 02110
617-720-2626
*TERMINATED: 09/08/2023*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Paul Sexton**                         represented by   **Neil Thomas Smith**
*TERMINATED: 06/20/2024*                                 K & L Gates LLP - MA
                                                         1 Congress Street
                                                         Suite 2900
                                                         Boston, MA 02111
                                                         617-261-3180
                                                         Email: neil.smith@klgates.com
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Robert S. Silverblatt**
                                                         K&L Gates LLP
                                                         1601 K Street NW
                                                         Washington, DC 20006
                                                         202-778-9132
                                                         Fax: 202-778-9100
                                                         *LEAD ATTORNEY*
                                                         *PRO HAC VICE*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Stephen G. Topetzes**
                                                         K&L Gates LLP

A4

1601 K Street NW
Washington, DC 20006
202-778-9328
Fax: 202-778-9100
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jackson T. Friesen**
*TERMINATED: 06/20/2024*

represented by **Maranda Fritz**
Maranda E. Fritz PC
521 Fifth Avenue
Ste 17th Floor
New York, NY 10175
646-584-8231
Email: maranda@fritzpc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caitlyn M. Campbell**
McDermott Will & Emery
200 Clarendon Street
Ste ,Floor 58
Boston, MA 02116-5021
617-535-3930
Email: cmcampbell@mwe.com
*TERMINATED: 08/11/2022*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Rodd**
McDermott Will & Emery LLP
200 Clarendon Street
Boston, MA 02116-5021
617-535-4040
Email: erodd@mwe.com
*TERMINATED: 08/11/2022*
*ATTORNEY TO BE NOTICED*

**Sarah E. Walters**
Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199
617-235-4549
Email: sarah.walters@ropesgray.com
*TERMINATED: 07/28/2022*
*ATTORNEY TO BE NOTICED*

**Timothy J. Fazio**
Manning Gross Massenburg
125 High Street
Oliver Street Tower, 6th Floor
Boston, MA 02110
617-670-8800

A5

Email: tfazio@mgmlaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**William T. Kaitz**                    represented by    **Mian R. Wang**
*TERMINATED: 02/16/2023*                                 Greenberg Traurig, LLP
                                                         One International Place
                                                         20th Floor
                                                         Boston, MA 02110
                                                         617-310-6000
                                                         Email: wangm@gtlaw.com
                                                         *TERMINATED: 08/30/2021*
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Brian R. Blais**
                                                         Ropes & Gray LLP - MA
                                                         Prudential Tower
                                                         800 Boylston Street
                                                         Boston, MA 02199-3600
                                                         212-596-9000
                                                         Fax: 212-596-9090
                                                         Email: brian.blais@ropesgray.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Brooke Paula Cohen**
                                                         Ropes & Gray - MA
                                                         Prudential Tower
                                                         800 Boylston Street
                                                         Boston, MA 02199-3600
                                                         619-694-8228
                                                         Email: brooke.cohen@ropesgray.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Daniel A. Yanofsky**
                                                         Ropes & Gray - MA
                                                         Prudential Tower
                                                         800 Boylston Street
                                                         Boston, MA 02199-3600
                                                         617-951-7571
                                                         Email: daniel.yanofsky@ropesgray.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         **R. Daniel O'Connor**
                                                         Securities and Exchange Commission - MA
                                                         33 Arch Street
                                                         23rd Floor
                                                         Boston, MA 02110-1424
                                                         617-573-8979
                                                         Fax: 617-573-4590
                                                         Email: daniel.oconnor@ropesgray.com
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

A6

**Avtar S. Dhillon**
*TERMINATED: 10/10/2023*

represented by **Adrienne M Ward**
OLSHAN FROME WOLOSKY, LLP
1325 Avenue of the Americas
New York, NY 10019
212-451-2300
Email: award@olshanlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**George W. Vien**
Donnelly, Conroy & Gelhaar, LLP
Suite 1600
260 Franklin Street
Boston, MA 02110
617-720-2880
Fax: 617-720-3554
Email: gwv@dcglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John G. Moon**
Olshan Frome Wolosky LLP
1325 Avenue of the Americas
New York, NY 10019
212-451-2300
Fax: 212-451-2222
Email: jmoon@olshanlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel W. Sack**
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116
617-880-4690
Email: daniel.sack@lw.com
*TERMINATED: 07/12/2022*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Graham R. Taylor**
*TERMINATED: 02/16/2023*

represented by **Michael J. Quinn**
Vedder Price P.C.
1925 Century Park East
Suite 1900
Los Angeles, CA 90067
424-204-7734
Email: mquinn@vedderprice.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeffrey T. Collins**

A7

Morgan, Brown & Joy
200 State Street
11th Floor
Boston, MA 02109
617-788-5024
Fax: 617-367-3125
Email: jcollins@morganbrown.com
*ATTORNEY TO BE NOTICED*

**Maura D. McLaughlin**
Morgan, Brown & Joy LLP
200 State Street
11th Flr.
Boston, MA 02109
617-788-5015
Email: mmclaughlin@morganbrown.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mike K. Veldhuis**
*TERMINATED: 06/20/2024*

represented by **Robert Knuts**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Courtney Kelln**
*TERMINATED: 06/20/2024*

represented by **Frank Scaduto**
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
202-719-3479
Fax: 202-719-7049
Email: fscaduto@wiley.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Claire E. Kellen**
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
202-719-4437
Email: claire.kellen@kirkland.com
*TERMINATED: 02/26/2024*
*ATTORNEY TO BE NOTICED*

**Joel S. Nolette**
Wiley Rein LLP
2050 M St. NW
Washington, DC 20036
202-719-4741
Email: jnolette@wiley.law
*ATTORNEY TO BE NOTICED*

**Robert Knuts**
(See above for address)
*ATTORNEY TO BE NOTICED*

A8

**Defendant**

**Mike K. Veldhuis**                              represented by  **Robert Knuts**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/05/2021 | 1 | COMPLAINT against All Defendants, filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Donelan Declaration, # 14 Civil Cover Sheet, # 15 Category Form) (Pacho, Arnold) (Entered: 08/05/2021) |
| 08/05/2021 | 2 | Ex Parte MOTION to Seal Case and to File and Keep Pleadings Under Seal by the Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order) (Pacho, Arnold) (Entered: 08/05/2021) |
| 08/05/2021 | 3 | Emergency Ex Parte MOTION for a Temporary Restraining Order, Order Freezing Assets and Order for Other Equitable Relief by the Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order) (Pacho, Arnold) (Entered: 08/05/2021) |
| 08/05/2021 | 4 | MEMORANDUM in Support re 3 Emergency Ex Parte MOTION for a Temporary Restraining Order, Order Freezing Assets and Order for Other Equitable Relief filed by the Securities and Exchange Commission. (Pacho, Arnold) (Entered: 08/05/2021) |
| 08/05/2021 | 5 | ELECTRONIC NOTICE of Case Assignment. Judge William G. Young assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (Danieli, Chris) (Entered: 08/05/2021) |
| 08/06/2021 | 6 | Judge Nathaniel M. Gorton: ENDORSED ORDER entered granting 2 Motion to Seal Case (Lima, Christine) (Entered: 08/06/2021) |
| 08/06/2021 | 7 | Judge Nathaniel M. Gorton: ORDER entered granting 3 Motion for TRO (Lima, Christine) (Entered: 08/06/2021) |
| 08/06/2021 | 8 | MOTION to Unseal Case by Securities and Exchange Commission.(Lima, Christine) (Entered: 08/09/2021) |
| 08/09/2021 | 9 | Judge Nathaniel M. Gorton: ORDER entered. ALLOWING 8 MOTION to Unseal Case filed by Securities and Exchange Commission. (McDonagh, Christina) (Entered: 08/09/2021) |
| 08/10/2021 | 10 | NOTICE of Appearance by Kathleen Burdette Shields on behalf of Securities and Exchange Commission (Shields, Kathleen) (Entered: 08/10/2021) |
| 08/10/2021 | 11 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Lima, Christine) (Entered: 08/10/2021) |
| 08/12/2021 | 12 | SUMMONS Returned Executed Graham R. Taylor served on 8/10/2021, answer due 8/31/2021. (Paine, Matthew) (Entered: 08/12/2021) |

A9

| | | |
|---|---|---|
| 08/12/2021 | 13 | SUMMONS Returned Executed Frederick L. Sharp served on 8/10/2021, answer due 8/31/2021. (Paine, Matthew) (Entered: 08/12/2021) |
| 08/12/2021 | 14 | SUMMONS Returned Executed Paul Sexton served on 8/10/2021, answer due 8/31/2021. (Paine, Matthew) (Entered: 08/12/2021) |
| 08/12/2021 | 15 | SUMMONS Returned Executed Jackson T. Friesen served on 8/10/2021, answer due 8/31/2021. (Paine, Matthew) (Entered: 08/12/2021) |
| 08/12/2021 | 16 | SUMMONS Returned Executed Avtar S. Dhillon served on 8/10/2021, answer due 8/31/2021. (Paine, Matthew) (Entered: 08/12/2021) |
| 08/12/2021 | 17 | SUMMONS Returned Executed Mike K. Veldhuis served on 8/10/2021, answer due 8/31/2021. (Paine, Matthew) (Entered: 08/12/2021) |
| 08/12/2021 | 18 | SUMMONS Returned Executed Zhiying Yvonne Gasarch served on 8/11/2021, answer due 9/1/2021. (Paine, Matthew) (Entered: 08/12/2021) |
| 08/12/2021 | 19 | Notice of correction to docket made by Court staff. Correction: The Summons Returned Executed Filed By the Plaintiff - SEC - Were Re-Docketed as Counsel Failed to Follow the CM/ECF Prompts When Filing the Returns of Service as to the Defendants. The Summons Were Re-Docketed as to the Correct Parties With the Correct Dates of Service. (Paine, Matthew) (Entered: 08/12/2021) |
| 08/12/2021 | 20 | NOTICE of Appearance by Mian R. Wang on behalf of William T. Kaitz (Wang, Mian) (Entered: 08/12/2021) |
| 08/12/2021 | 21 | Assented to MOTION to Modify Temporary Restraining Order, Order Freezing Assets, and Order For Other Equitable Relief Dated August 6, 2021 by William T. Kaitz. (Attachments: # 1 Exhibit A Stipulated Modification to Temporary Restraining Order) (Wang, Mian) (Entered: 08/12/2021) |
| 08/13/2021 | 22 | Judge Nathaniel M. Gorton: ORDER entered ALLOWING 21 Assented to MOTION to Modify Temporary Restraining Order, Order Freezing Assets, and Order For Other Equitable Relief Dated August 6, 2021 (Warnock, Douglas) (Entered: 08/13/2021) |
| 08/13/2021 | 23 | SUMMONS Returned Executed Courtney Kelln served on 8/13/2021, answer due 9/3/2021. (Shields, Kathleen) (Entered: 08/13/2021) |
| 08/13/2021 | 24 | MOTION for Preliminary Injunction by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order)(Forni, Eric) (Entered: 08/13/2021) |
| 08/16/2021 | 25 | Set/Reset Deadlines as to 24 MOTION for Preliminary Injunction . Responses due by 12:00 PM on 8/19/2021 Motion Hearing set for 8/20/2021 10:30 AM in Remote Proceeding : Boston before Judge Nathaniel M. Gorton. (Lima, Christine) (Entered: 08/16/2021) |
| 08/16/2021 | 26 | WAIVER OF SERVICE Returned Executed by Securities and Exchange Commission. William T. Kaitz waiver sent on 8/9/2021, answer due 10/8/2021. (Shields, Kathleen) (Entered: 08/16/2021) |
| 08/18/2021 | 27 | Joint MOTION for Extension of Time to September 3, 2021 to Extend the TRO and the deadline for Kaitz to respond to the preliminary injunction motion by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Stipulated Extension of TRO as to William Kaitz)(Shields, Kathleen) Modified on 8/19/2021 the motion event type (Warnock, Douglas). (Entered: 08/18/2021) |

A10

| | | |
|---|---|---|
| 08/18/2021 | 28 | WAIVER OF SERVICE Returned Executed by Securities and Exchange Commission. Graham R. Taylor waiver sent on 8/18/2021, answer due 11/16/2021. (Shields, Kathleen) (Entered: 08/18/2021) |
| 08/19/2021 | 29 | MEMORANDUM in Support re 24 MOTION for Preliminary Injunction *with status report as to communications with defendants* filed by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Proposed Preliminary Injunction) (Shields, Kathleen) (Entered: 08/19/2021) |
| 08/19/2021 | 30 | Judge Nathaniel M. Gorton: ORDER entered ALLOWING 27 Joint MOTION for Extension of Time to September 3, 2021 to Extend the TRO and the deadline for Kaitz to respond to the 24 MOTION for Preliminary Injunction . Responses due by 9/3/2021 (Warnock, Douglas) (Entered: 08/19/2021) |
| 08/19/2021 | 31 | WAIVER OF SERVICE Returned Executed by Securities and Exchange Commission. Mike K. Veldhuis waiver sent on 8/19/2021, answer due 11/17/2021. (Shields, Kathleen) (Entered: 08/19/2021) |
| 08/19/2021 | 32 | WAIVER OF SERVICE Returned Executed by Securities and Exchange Commission. Paul Sexton waiver sent on 8/19/2021, answer due 11/17/2021. (Shields, Kathleen) (Entered: 08/19/2021) |
| 08/20/2021 | 33 | ADDENDUM re 24 MOTION for Preliminary Injunction *Revised Proposed Preliminary Injunction Order* filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 08/20/2021) |
| 08/20/2021 | 34 | MOTION for Extension of Time to September 3, 2021 to Extend the Existing Temporary Restraining Order *as to Defendants Gasarch, Kelln, Dhillon* by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Extending TRO as to Defendants Gasarch, Kelln, Dhillon)(Shields, Kathleen) (Entered: 08/20/2021) |
| 08/20/2021 | 35 | MOTION for Extension of Time to September 3, 2021 to to Extend the Existing TRO as to Defendants Gasarch, Kelln and Dhillon by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Extending TRO as to defendants Gasarch, Kelln and Dhillon)(Shields, Kathleen) (Entered: 08/20/2021) |
| 08/20/2021 | 36 | ADDENDUM re 24 MOTION for Preliminary Injunction *Revised Proposed Preliminary Injunction* filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 08/20/2021) |
| 08/20/2021 | 37 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered finding as moot 34 Motion for Extension of Time. Motion re-filed as Document No. 35. (Lima, Christine) (Entered: 08/20/2021) |
| 08/20/2021 | 38 | Electronic Clerk's Notes for proceedings held before Judge Nathaniel M. Gorton: Motion Hearing held by video on 8/20/2021 re 24 MOTION for Preliminary Injunction filed by Securities and Exchange Commission. Plaintiff informs the Court of updates on the matter since the filing of the status report. Plaintiff will submit a revised proposed preliminary injunction order with regards to certain defendants, as well as request for an extension of the TRO with regards to the other defendants. (Court Reporter: Kristin Kelley at kmob929@gmail.com.)(Attorneys present: Shields, Healey, Fritz) (Lima, Christine) (Entered: 08/20/2021) |
| 08/20/2021 | 39 | Judge Nathaniel M. Gorton: ORDER entered ALLOWING 24 Motion for Preliminary Injunction (Warnock, Douglas) (Entered: 08/20/2021) |
| 08/20/2021 | 40 | Judge Nathaniel M. Gorton: ORDER entered ALLOWING 35 MOTION for Extension of Time to September 3, 2021 to to Extend the Existing TRO as to Defendants Gasarch, |

A11

| | | |
|---|---|---|
| | | Kelln and Dhillon by Securities and Exchange Commission. (Warnock, Douglas) (Entered: 08/20/2021) |
| 08/20/2021 | 41 | Joint MOTION for Extension of Time to August 27, 2021 to Extend existing Temporary Restraining Order as to Defendant Friesen by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Extending Temporary Restraining Order as to Defendant Friesen)(Shields, Kathleen) (Entered: 08/20/2021) |
| 08/20/2021 | 42 | Judge Nathaniel M. Gorton: ORDER entered ALLOWING 41 Joint MOTION for Extension of Time to August 27, 2021 to Extend existing Temporary Restraining Order as to Defendant Friesen (Attachments: # 1 Endorsed Order) (Warnock, Douglas) (Entered: 08/20/2021) |
| 08/24/2021 | 43 | Assented to MOTION to Withdraw *Motion for Leave to Withdraw as Counsel for Defendant William Kaitz* by William T. Kaitz.(Wang, Mian) Modified on 8/30/2021 to correct relief event (Gaudet, Jennifer). (Entered: 08/24/2021) |
| 08/26/2021 | 44 | Assented to MOTION to Modify the Temporary Restraining Order , Joint MOTION for Extension of Time to September 10, 2021 to Extend the Temporary Restraining Order ( Responses due by 9/9/2021) by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order, # 2 Text of Proposed Order)(Forni, Eric) (Entered: 08/26/2021) |
| 08/27/2021 | 45 | District Judge Leo T. Sorokin. <br><br> ORDER entered ALLOWING 44 Assented to MOTION to Modify the Temporary Restraining Order. 44 Motion for Extension of Time to September 10, 2021 to Extend the Temporary Restraining Order. (Attachments: # 1 ORDER GRANTING JACKSON T. FRIESEN LIMITED RELIEF FROM ORDER TO FREEZE ASSETS) <br><br> (Simeone, Maria) (Entered: 08/27/2021) |
| 08/27/2021 | 46 | NOTICE of Appearance by R. Daniel O'Connor on behalf of William T. Kaitz (O'Connor, R.) (Entered: 08/27/2021) |
| 08/27/2021 | 47 | NOTICE of Appearance by Brian R. Blais on behalf of William T. Kaitz (Blais, Brian) (Entered: 08/27/2021) |
| 08/28/2021 | 48 | Joint MOTION for Preliminary Injunction by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order)(Forni, Eric) (Entered: 08/28/2021) |
| 08/30/2021 | 49 | Judge William G. Young: ELECTRONIC ORDER entered granting 43 Assented to Motion to Withdraw as Attorney. Attorney Mian R. Wang terminated. (Gaudet, Jennifer) (Entered: 08/30/2021) |
| 08/30/2021 | 50 | NOTICE of Appearance by Michelle R. Pascucci on behalf of Zhiying Yvonne Gasarch (Pascucci, Michelle) (Entered: 08/30/2021) |
| 08/30/2021 | 51 | Assented to MOTION for Extension of Time to Sept. 27, 2021 to File Answer re 1 Complaint, by Zhiying Yvonne Gasarch.(Pascucci, Michelle) (Entered: 08/30/2021) |
| 08/30/2021 | 52 | NOTICE of Appearance by Sarah E. Walters on behalf of Jackson T. Friesen (Walters, Sarah) (Entered: 08/30/2021) |
| 08/30/2021 | 53 | Assented to MOTION for Extension of Time to 09/30/2021 to File Answer or Response to Complaint by Jackson T. Friesen.(Walters, Sarah) **Modified on 9/29/2021 to Correct CM/ECF Filing Event (Paine, Matthew).** (Entered: 08/30/2021) |
| 08/30/2021 | 54 | District Judge Leo T. Sorokin: ORDER entered granting 48 Motion for Preliminary Injunction (Simeone, Maria) (Entered: 08/30/2021) |

A12

| 08/30/2021 | 55 | NOTICE of Appearance by Daniel W. Sack on behalf of Avtar S. Dhillon (Sack, Daniel) (Entered: 08/30/2021) |
| 08/30/2021 | 56 | NOTICE of Appearance by George W. Vien on behalf of Avtar S. Dhillon (Vien, George) (Entered: 08/30/2021) |
| 08/30/2021 | 57 | Assented to MOTION for Extension of Time to October 1, 2021 to File Answer by Avtar S. Dhillon.(Vien, George) (Entered: 08/30/2021) |
| 08/30/2021 | 58 | Joint MOTION for Extension of Time to September 24, 2021 to Extend Existing TRO as to Defendant Kaitz by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order)(Forni, Eric) (Entered: 08/30/2021) |
| 08/31/2021 | 59 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of John Moon Filing fee: $ 100, receipt number 0101-8926417 by Avtar S. Dhillon. (Attachments: # 1 Certification)(Vien, George) (Entered: 08/31/2021) |
| 08/31/2021 | 60 | District Judge Leo T. Sorokin: ORDER entered: re 58 Joint MOTION for Extension of Time to September 24, 2021 to Extend Existing TRO as to Defendant Kaitz by Securities and Exchange Commission. ALLOWED. (Dore, Samantha) (Entered: 08/31/2021) |
| 09/01/2021 | 61 | Judge William G. Young: ELECTRONIC ORDER entered granting 59 Motion for Leave to Appear Pro Hac Vice Added John Moon. **Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form.** (Paine, Matthew) (Entered: 09/01/2021) |
| 09/02/2021 | 62 | NOTICE of Appearance by Elizabeth A. Rodd on behalf of Jackson T. Friesen (Rodd, Elizabeth) (Entered: 09/02/2021) |
| 09/02/2021 | 63 | STIPULATION re 7 Order on Motion for TRO, 40 Order on Motion for Extension of Time *Extending TRO as to defendant Gasarch* by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 09/02/2021) |
| 09/02/2021 | 64 | Joint MOTION for Extension of Time to September 24, 2021 to Extend Existing Temporary Restraining Order as to Defendant Kelln and date to respond to Complaint by Securities and Exchange Commission.(Shields, Kathleen) (Entered: 09/02/2021) |
| 09/10/2021 | 65 | Joint MOTION to Modify Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief as to Jackson T. Friesen *to September 30, 2021* by Jackson T. Friesen. (Attachments: # 1 Text of Proposed Order)(Walters, Sarah) (Entered: 09/10/2021) |
| 09/16/2021 | 66 | Joint MOTION for Extension of Time to October 1, 2021 to Extend the TRO as to defendant Gasarch by Securities and Exchange Commission.(Shields, Kathleen) (Entered: 09/16/2021) |
| 09/16/2021 | 67 | Judge William G. Young: ORDER entered granting 64 Joint Motion for Extension of Time to September 24, 2021 to Extend Existing Temporary Restraining Order as to Defendant Kelln and date to respond to Complaint by Securities and Exchange Commission. (Gaudet, Jennifer) (Entered: 09/16/2021) |

A13

| 09/16/2021 | 68 | Judge William G. Young: ORDER entered granting 65 Joint Motion to Modify Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief as to Jackson T. Friesen to September 30, 2021 by Jackson T. Friesen. (Gaudet, Jennifer) (Entered: 09/16/2021) |
|---|---|---|
| 09/16/2021 | 69 | Judge William G. Young: ORDER entered granting 66 Joint Third Motion for Extension of Time to October 1, 2021 to Extend the TRO as to defendant Gasarch by Securities and Exchange Commission. (Gaudet, Jennifer) (Entered: 09/16/2021) |
| 09/16/2021 | 70 | NOTICE of Appearance by Daniel A. Yanofsky on behalf of William T. Kaitz (Yanofsky, Daniel) (Entered: 09/16/2021) |
| 09/21/2021 | 71 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Adrienne Ward Filing fee: $ 100, receipt number AMADC-8965812 by Avtar S. Dhillon. (Attachments: # 1 Certification)(Vien, George) (Entered: 09/21/2021) |
| 09/22/2021 | 72 | Judge William G. Young: ELECTRONIC ORDER entered granting 71 Motion for Leave to Appear Pro Hac Vice. Added Adrienne Ward.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(Paine, Matthew) (Entered: 09/22/2021) |
| 09/23/2021 | 73 | Joint MOTION for Extension of Time to October 8, 2021 to Temporary Restraining Order, Order Freezing Assets and Order for Other Equitable Relief by William T. Kaitz. (Attachments: # 1 Stipulated Extension of Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief as to William Kaitz (with Proposed Order)) (Yanofsky, Daniel) (Entered: 09/23/2021) |
| 09/24/2021 | 74 | Assented to MOTION for Extension of Time to File Answer re 1 Complaint, by Zhiying Yvonne Gasarch.(Pascucci, Michelle) (Entered: 09/24/2021) |
| 09/24/2021 | 75 | NOTICE of Appearance by Pamela L. Signorello on behalf of Courtney Kelln (Signorello, Pamela) (Entered: 09/24/2021) |
| 09/24/2021 | 76 | MOTION for Leave to Appear Pro Hac Vice for admission of Kevin B. Muhlendorf, Holly J. Wilson Filing fee: $ 200, receipt number AMADC-8974794 by Courtney Kelln. (Attachments: # 1 Certificate of Kevin B. Muhlendorf, # 2 Certificate of Holly J. Wilson) (Signorello, Pamela) (Entered: 09/24/2021) |
| 09/24/2021 | 77 | Joint MOTION for Preliminary Injunction *as to defendant Kelln* by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Proposed Preliminary Injunction as to defendant Kelln)(Shields, Kathleen) (Entered: 09/24/2021) |
| 09/26/2021 | 78 | Judge William G. Young: ELECTRONIC ORDER entered granting 76 Motion for Leave to Appear Pro Hac Vice. Added Kevin B. Muhlendorf and Holly J. Wilson.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.** |

A14

| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (Paine, Matthew) (Entered: 09/26/2021) |
|---|---|---|
| 09/28/2021 | 79 | Assented to MOTION for Extension of Time to October 29, 2021 to To Answer Complaint by Avtar S. Dhillon.(Vien, George) **Modified on 9/29/2021 to Correct CM/ECF Filing Event (Paine, Matthew).** (Entered: 09/28/2021) |
| 09/28/2021 | 80 | NOTICE of Appearance by Kevin B. Muhlendorf on behalf of Courtney Kelln (Muhlendorf, Kevin) (Entered: 09/28/2021) |
| 09/28/2021 | 81 | NOTICE of Appearance by Holly J. Wilson on behalf of Courtney Kelln (Wilson, Holly) (Entered: 09/28/2021) |
| 09/28/2021 | 82 | Assented to MOTION for Extension of Time to November 1, 2021 to File Answer *to Complaint* by Jackson T. Friesen.(Rodd, Elizabeth) (Entered: 09/28/2021) |
| 09/29/2021 | 83 | Judge William G. Young: ELECTRONIC ORDER entered granting 79 Assented-to Motion for Extension of Time to Answer or Otherwise Respond re 1 Complaint. Avtar S. Dhillon Answer/Response due 10/29/2021. (Paine, Matthew) (Entered: 09/29/2021) |
| 09/29/2021 | 84 | Judge William G. Young: ELECTRONIC ORDER entered granting 74 Assented-Motion for Extension of Time to Answer or Otherwise Respond re 1 Complaint. Zhiying Yvonne Gasarch answer/response due 10/27/2021. (Paine, Matthew) (Entered: 09/29/2021) |
| 09/29/2021 | 85 | Judge William G. Young: ELECTRONIC ORDER entered granting 53 Assented-to Motion for Extension of Time to Answer or Otherwise Respond re 1 Complaint. Jackson T. Friesen answer/response due 9/30/2021. (Paine, Matthew) (Entered: 09/29/2021) |
| 09/29/2021 | 86 | Judge William G. Young: ELECTRONIC ORDER entered granting 82 Assented-to Motion for Extension of Time to Answer or Otherwise Respond re 1 Complaint. Jackson T. Friesen answer/response due 11/1/2021. (Paine, Matthew) (Entered: 09/29/2021) |
| 09/30/2021 | 87 | Joint MOTION for Preliminary Injunction *as to Jackson T. Friesen* by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order)(Forni, Eric) (Entered: 09/30/2021) |
| 10/05/2021 | 88 | Assented to MOTION for Extension of Time to October 29, 2021 to Answer or Otherwise Respond to Complaint by William T. Kaitz.(O'Connor, R.) **Modified on 10/5/2021 to Correct Docket Text and CM/ECF Filing Event as Counsel Filed the Motion Under the Wrong Event (Paine, Matthew).** (Entered: 10/05/2021) |
| 10/05/2021 | 89 | Joint MOTION for Extension of Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief *(between Plaintiff, the Securities and Exchange Commission and Defendant William T. Kaitz)* by William T. Kaitz.(O'Connor, R.) (Additional attachment(s) added on 10/5/2021: # 1 Exhibit Proposed Order) (Paine, Matthew). (Entered: 10/05/2021) |
| 10/07/2021 | 90 | Judge William G. Young: ELECTRONIC ORDER entered granting 87 Joint Motion for Preliminary Injunction as to Jackson T. Friesen by Securities and Exchange Commission. (Gaudet, Jennifer) (Entered: 10/07/2021) |
| 10/07/2021 | 91 | Judge William G. Young: ORDER entered; Stipulation and Order for Entry of PRELIMINARY INJUNCTION, Order Freezing Assets, and Order for Other Equitable |

A15

| | | Relief as to Defendant Jackson T. Friesen.(Gaudet, Jennifer) (Entered: 10/07/2021) |
|---|---|---|
| 10/07/2021 | 92 | Judge William G. Young: ELECTRONIC ORDER entered granting 88 Assented to MOTION for Extension of Time to October 29, 2021 to Respond to Complaint , 1 Complaint, William T. Kaitz answer due 10/29/2021. (Gaudet, Jennifer) (Entered: 10/07/2021) |
| 10/07/2021 | 93 | Judge William G. Young: ELECTRONIC ORDER entered finding as moot 73 Joint Motion for Extension of Time to October 8, 2021 to Temporary Restraining Order, Order Freezing Assets and Order for Other Equitable Relief by William T. Kaitz. **Renewed motion filed 10/5/2021. See docket entry 89 .** (Gaudet, Jennifer) (Entered: 10/07/2021) |
| 10/07/2021 | 94 | Judge William G. Young: ELECTRONIC ORDER entered granting 77 Joint Motion for Preliminary Injunction as to defendant Kelln by Securities and Exchange Commission. (Gaudet, Jennifer) (Entered: 10/07/2021) |
| 10/07/2021 | 95 | Judge William G. Young: ORDER entered; Stipulation and Order for Entry of PRELIMINARY INJUNCTION, Order Freezing Assets, and Order for other Equitable Relief as to Defendant Courtney Kelln.(Gaudet, Jennifer) (Entered: 10/07/2021) |
| 10/07/2021 | 96 | Judge William G. Young: ELECTRONIC ORDER entered granting 89 Joint Motion for Extension of Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief (between Plaintiff, the Securities and Exchange Commission and Defendant William T. Kaitz) by William T. Kaitz. (Gaudet, Jennifer) (Entered: 10/07/2021) |
| 10/07/2021 | 97 | Judge William G. Young: ORDER entered; Stipulated Extension of Temporary Restraining Order, Order Freezing Assets, and Order for other Equitable Relief as to William Kaitz.(Gaudet, Jennifer) (Entered: 10/07/2021) |
| 10/08/2021 | 98 | Joint MOTION for Preliminary Injunction *as to defendant Zhiying Yvonne Gasarch* by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Stipulated Preliminary Injunction as to defendant Gasarch)(Shields, Kathleen) (Entered: 10/08/2021) |
| 10/12/2021 | 99 | Joint MOTION for Preliminary Injunction *as to defendant Kaitz* by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Proposed Preliminary Injunction as to defendant Kaitz)(Shields, Kathleen) (Entered: 10/12/2021) |
| 10/14/2021 | 100 | Judge William G. Young: ORDER entered re 99 Joint MOTION for Preliminary Injunction as to defendant Kaitz (Paine, Matthew) (Entered: 10/14/2021) |
| 10/15/2021 | 101 | Judge William G. Young: ORDER entered re 98 Joint MOTION for Preliminary Injunction as to defendant Zhiying Yvonne Gasarch (Paine, Matthew) (Entered: 10/15/2021) |
| 10/18/2021 | 102 | NOTICE of Appearance by Neil Thomas Smith on behalf of Paul Sexton (Smith, Neil) (Entered: 10/18/2021) |
| 10/18/2021 | 103 | MOTION for Leave to Appear Pro Hac Vice for admission of Stephen G. Topetzes Filing fee: $ 100, receipt number AMADC-9013929 by Paul Sexton. (Attachments: # 1 Exhibit Certification)(Smith, Neil) (Entered: 10/18/2021) |
| 10/18/2021 | 104 | MOTION for Leave to Appear Pro Hac Vice for admission of Robert S. Silverblatt Filing fee: $ 100, receipt number AMADC-9013986 by Paul Sexton. (Attachments: # 1 Certification)(Smith, Neil) (Entered: 10/18/2021) |
| 10/19/2021 | 105 | Judge William G. Young: ELECTRONIC ORDER entered granting 103 Motion for Leave to Appear Pro Hac Vice; granting 104 Motion for Leave to Appear Pro Hac Vice. Added |

A16

| | | Stephen G. Topetzes and Robert S. Silverblatt. |
|---|---|---|
| | | **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.** |
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. |
| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney. |
| | | (Paine, Matthew) (Entered: 10/19/2021) |
| 10/21/2021 | 106 | Assented to MOTION for Extension of Time to 11/30/2021 to File Answer re 1 Complaint, by Zhiying Yvonne Gasarch.(Pascucci, Michelle) (Entered: 10/21/2021) |
| 10/25/2021 | 107 | Assented to MOTION for Extension of Time to November 30, 2021 to File Answer re 1 Complaint, by Avtar S. Dhillon.(Vien, George) (Entered: 10/25/2021) |
| 10/25/2021 | 108 | Assented to MOTION for Extension of Time to December 3, 2021 to File Answer *or Otherwise Respond to the Complaint* by William T. Kaitz.(O'Connor, R.) (Entered: 10/25/2021) |
| 11/01/2021 | 109 | MOTION to Dismiss *Complaint* by Jackson T. Friesen.(Walters, Sarah) (Entered: 11/01/2021) |
| 11/01/2021 | 110 | MEMORANDUM in Support re 109 MOTION to Dismiss *Complaint* filed by Jackson T. Friesen. (Walters, Sarah) (Entered: 11/01/2021) |
| 11/02/2021 | 111 | Judge William G. Young: ELECTRONIC ORDER entered granting 106 Assented to MOTION for Extension of Time to 11/30/2021 to File Answer re 1 Complaint. Zhiying Yvonne Gasarch answer due 11/30/2021. **No further continuances.** (Gaudet, Jennifer) (Entered: 11/02/2021) |
| 11/02/2021 | 112 | Judge William G. Young: ELECTRONIC ORDER entered granting 107 Assented to MOTION for Extension of Time to November 30, 2021 to File Answer re 1 Complaint, Avtar S. Dhillon answer due 11/30/2021. **No further continuances.** (Gaudet, Jennifer) (Entered: 11/02/2021) |
| 11/02/2021 | 113 | Judge William G. Young: ELECTRONIC ORDER entered granting 108 Assented to MOTION for Extension of Time to December 3, 2021 to File Answer *or Otherwise Respond to the Complaint*, William T. Kaitz answer due 12/3/2021. **No further continuances.** (Gaudet, Jennifer) (Entered: 11/02/2021) |
| 11/02/2021 | 114 | ELECTRONIC NOTICE Setting Hearing on Motion 109 MOTION to Dismiss *Complaint* : Motion Hearing set for 1/18/2022 at 2:00 PM in Courtroom 18 before Judge William G. Young. (Gaudet, Jennifer) (Entered: 11/02/2021) |
| 11/10/2021 | 115 | Notice of Service of Process filed by Securities and Exchange Commission. Individual(s)/Entities served: Frederick Sharp. (Attachments: # 1 Exhibit A)(Shields, Kathleen) (Entered: 11/10/2021) |
| 11/10/2021 | 116 | MOTION for Entry of Default *as to defendant Frederick Sharp* by Securities and Exchange Commission.(Shields, Kathleen) (Entered: 11/10/2021) |
| 11/12/2021 | 117 | NOTICE of Appearance by Jeffrey T. Collins on behalf of Graham R. Taylor (Collins, Jeffrey) (Entered: 11/12/2021) |

A17

| | | |
|---|---|---|
| 11/12/2021 | 118 | NOTICE of Appearance by Maura D. McLaughlin on behalf of Graham R. Taylor (McLaughlin, Maura) (Entered: 11/12/2021) |
| 11/12/2021 | 119 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael J. Quinn Filing fee: $ 100, receipt number AMADC-9053289 by Graham R. Taylor. (Attachments: # 1 Certification in Support of Motion)(McLaughlin, Maura) (Entered: 11/12/2021) |
| 11/14/2021 | 120 | Judge William G. Young: ELECTRONIC ORDER entered granting 119 Motion for Leave to Appear Pro Hac Vice Added Micahel J. Quinn.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Paine, Matthew) (Entered: 11/14/2021) |
| 11/15/2021 | 121 | Judge William G. Young: ELECTRONIC ORDER entered granting 116 Motion for Entry of Default as to Frederick Sharp. (Paine, Matthew) (Entered: 11/15/2021) |
| 11/15/2021 | 122 | NOTICE: Clerk's ENTRY OF DEFAULT as to Frederick L. Sharp. (Paine, Matthew) (Entered: 11/15/2021) |
| 11/15/2021 | 123 | Judge William G. Young: ORDER entered. STANDING ORDER on motions for default judgment re 122 Notice: Clerk's Entry of Default as to Frederick L. Sharp. (Paine, Matthew) (Entered: 11/15/2021) |
| 11/15/2021 | 124 | Opposition re 109 MOTION to Dismiss *Complaint* filed by Securities and Exchange Commission. (Forni, Eric) (Entered: 11/15/2021) |
| 11/15/2021 | 125 | NOTICE of Appearance by Michael J. Quinn on behalf of Graham R. Taylor (Quinn, Michael) (Entered: 11/15/2021) |
| 11/16/2021 | 126 | MOTION to Dismiss *or, in the Alternative, to Strike Plaintiff's Complaint* by Graham R. Taylor.(Quinn, Michael) (Entered: 11/16/2021) |
| 11/16/2021 | 127 | MEMORANDUM OF LAW by Graham R. Taylor. (Quinn, Michael) (Entered: 11/16/2021) |
| 11/17/2021 | 128 | ELECTRONIC NOTICE Setting Hearing on Motion 126 MOTION to Dismiss *or, in the Alternative, to Strike Plaintiff's Complaint* : Motion Hearing set for 1/18/2022 at 2:00 PM in Courtroom 18 before Judge William G. Young. (Gaudet, Jennifer) (Entered: 11/17/2021) |
| 11/17/2021 | 129 | NOTICE of Appearance by Howard M. Cooper on behalf of Mike K. Veldhuis (Cooper, Howard) (Entered: 11/17/2021) |
| 11/17/2021 | 130 | NOTICE of Appearance by Lorraine Belostock on behalf of Mike K. Veldhuis (Belostock, Lorraine) (Entered: 11/17/2021) |
| 11/17/2021 | 131 | Assented to MOTION for Extension of Time to December 3, 2021 to File Answer re 1 Complaint, by Mike K. Veldhuis.(Belostock, Lorraine) (Entered: 11/17/2021) |

A18

| 11/17/2021 | 132 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Paul Sexton.(Smith, Neil) (Entered: 11/17/2021) |
| 11/17/2021 | 133 | MEMORANDUM in Support re 132 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Paul Sexton. (Smith, Neil) (Entered: 11/17/2021) |
| 11/18/2021 | 134 | Judge William G. Young: ELECTRONIC ORDER entered granting 131 Assented-to Motion for Extension of Time to Answer or Otherwise Respond re 1 Complaint. Mike K. Veldhuis answer/response due December 3, 2021. (Paine, Matthew) (Entered: 11/18/2021) |
| 11/18/2021 | 135 | ELECTRONIC NOTICE Setting Hearing on Motion 132 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM : Motion Hearing set for 1/18/2022 at 2:00 PM in Courtroom 18 before Judge William G. Young. (Gaudet, Jennifer) (Entered: 11/18/2021) |
| 11/19/2021 | 136 | Assented to MOTION for Leave to File *A Reply in Support of Motion to Dismiss* by Jackson T. Friesen.(Walters, Sarah) (Entered: 11/19/2021) |
| 11/19/2021 | 137 | Assented to MOTION for Extension of Time to File Response/Reply as to 126 MOTION to Dismiss *or, in the Alternative, to Strike Plaintiff's Complaint*, 132 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Securities and Exchange Commission.(Forni, Eric) (Entered: 11/19/2021) |
| 11/22/2021 | 138 | Judge William G. Young: ELECTRONIC ORDER entered granting 136 Assented to Motion for Leave to File Reply in Support of 109 Motion to Dismiss by Jackson T. Friesen; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Gaudet, Jennifer) (Entered: 11/22/2021) |
| 11/22/2021 | 139 | Judge William G. Young: ELECTRONIC ORDER entered granting 137 Assented to Motion for Extension of Time to File Response/Reply as to 126 MOTION to Dismiss *or, in the Alternative, to Strike Plaintiff's Complaint*, 132 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM . Responses due by 12/8/2021. (Gaudet, Jennifer) (Entered: 11/22/2021) |
| 11/30/2021 | 140 | Assented to MOTION for Extension of Time to JANUARY 31, 2022 to To Answer Complaint by Avtar S. Dhillon.(Vien, George) (Entered: 11/30/2021) |
| 11/30/2021 | 141 | NOTICE of Appearance by Caitlyn M. Campbell on behalf of Jackson T. Friesen (Campbell, Caitlyn) (Entered: 11/30/2021) |
| 11/30/2021 | 142 | Judge William G. Young: ELECTRONIC ORDER entered denying 140 Assented to Motion for Extension of Time to JANUARY 31, 2022 to To Answer Complaint by Avtar S. Dhillon. **Motion is denied. The defendant is defaulted unless on or before 12/20/2021 the case is reported settled or the defendant has filed a responsive pleading.** (Gaudet, Jennifer) (Entered: 11/30/2021) |
| 11/30/2021 | 143 | MOTION to Dismiss by Zhiying Yvonne Gasarch.(Pascucci, Michelle) (Entered: 11/30/2021) |
| 11/30/2021 | 144 | MEMORANDUM in Support re 143 MOTION to Dismiss filed by Zhiying Yvonne Gasarch. (Pascucci, Michelle) (Entered: 11/30/2021) |
| 12/01/2021 | 145 | ELECTRONIC NOTICE Setting Hearing on Motion 143 MOTION to Dismiss : Motion Hearing set for 1/18/2022 at 2:00 PM in Courtroom 18 before Judge William G. Young. (Gaudet, Jennifer) (Entered: 12/01/2021) |

A19

| 12/01/2021 | 146 | REPLY to Response to 109 MOTION to Dismiss *Complaint* filed by Jackson T. Friesen. (Walters, Sarah) (Entered: 12/01/2021) |
| 12/02/2021 | 147 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , MOTION to Dismiss for Lack of Jurisdiction *or, in the Alternative, Motion to Strike* ( Responses due by 12/16/2021) by Courtney Kelln.(Muhlendorf, Kevin) (Entered: 12/02/2021) |
| 12/02/2021 | 148 | MEMORANDUM in Support re 147 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction *or, in the Alternative, Motion to Strike* filed by Courtney Kelln. (Muhlendorf, Kevin) (Entered: 12/02/2021) |
| 12/03/2021 | 149 | ELECTRONIC NOTICE Setting Hearing on Motion 147 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction *or, in the Alternative, Motion to Strike* : Motion Hearing set for 1/18/2022 02:00 PM in Courtroom 18 before Judge William G. Young. (Gaudet, Jennifer) (Entered: 12/03/2021) |
| 12/03/2021 | 150 | ANSWER to 1 Complaint, with Jury Demand by William T. Kaitz.(O'Connor, R.) (Entered: 12/03/2021) |
| 12/03/2021 | 151 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Mike K. Veldhuis. (Belostock, Lorraine) (Entered: 12/03/2021) |
| 12/03/2021 | 152 | MEMORANDUM in Support re 151 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Mike K. Veldhuis. (Belostock, Lorraine) (Main Document 152 replaced on 12/6/2021) (Paine, Matthew) (Entered: 12/03/2021) |
| 12/06/2021 | 153 | ELECTRONIC NOTICE Setting Hearing on Motion 151 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM : Motion Hearing set for 1/18/2022 at 2:00 PM in Courtroom 18 before Judge William G. Young. (Gaudet, Jennifer) (Entered: 12/06/2021) |
| 12/07/2021 | 154 | Assented to MOTION for Leave to File Excess Pages by Securities and Exchange Commission.(Forni, Eric) (Entered: 12/07/2021) |
| 12/08/2021 | 155 | Assented to MOTION for Leave to File Excess Pages by Securities and Exchange Commission. (Attachments: # 1 Exhibit Opposition)(Forni, Eric) (Entered: 12/08/2021) |
| 12/09/2021 | 156 | Judge William G. Young: ELECTRONIC ORDER entered denying 154 Motion for Leave to File Excess Pages ; denying 155 Motion for Leave to File Excess Pages (Paine, Matthew) (Entered: 12/09/2021) |
| 12/09/2021 | 157 | Opposition re 132 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *filed by Defendant Sexton* filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 12/09/2021) |
| 12/09/2021 | 158 | Opposition re 126 MOTION to Dismiss *or, in the Alternative, to Strike Plaintiff's Complaint filed by Defendant Graham Taylor* filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 12/09/2021) |
| 12/09/2021 | 159 | Assented to MOTION for Leave to File *Reply Brief* by Paul Sexton.(Smith, Neil) (Entered: 12/09/2021) |
| 12/09/2021 | 160 | Assented to MOTION for Leave to File *a Reply Brief on or Before December 24, 2021* by Graham R. Taylor.(Quinn, Michael) (Entered: 12/09/2021) |

A20

| 12/10/2021 | 161 | Judge William G. Young: ELECTRONIC ORDER entered granting 159 Motion for Leave to File Reply; granting 160 Motion for Leave to File Reply ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Paine, Matthew) (Entered: 12/10/2021) |
| 12/14/2021 | 162 | Opposition re 143 MOTION to Dismiss filed by Securities and Exchange Commission. (Forni, Eric) (Entered: 12/14/2021) |
| 12/15/2021 | 163 | MOTION for Default Judgment as to Frederick Sharp by Securities and Exchange Commission. (Attachments: # 1 Affidavit of Trevor Donelan, # 2 Text of Proposed Order Proposed Final Judgment as to Frederick Sharp)(Shields, Kathleen) (Entered: 12/15/2021) |
| 12/15/2021 | 164 | MEMORANDUM in Support re 163 MOTION for Default Judgment as to Frederick Sharp filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 12/15/2021) |
| 12/16/2021 | 165 | Assented to MOTION to Amend *Preliminary Injunction* by Jackson T. Friesen. (Attachments: # 1 Text of Proposed Order Proposed Order)(Walters, Sarah) (Entered: 12/16/2021) |
| 12/16/2021 | 166 | Assented to MOTION for Leave to File *Reply in Support of Motion to Dismiss* by Zhiying Yvonne Gasarch.(Pascucci, Michelle) (Entered: 12/16/2021) |
| 12/16/2021 | 167 | Opposition re 147 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction *or, in the Alternative, Motion to Strike* filed by Securities and Exchange Commission. (Forni, Eric) (Entered: 12/16/2021) |
| 12/16/2021 | 168 | DECLARATION re 167 Opposition to Motion by Securities and Exchange Commission. (Attachments: # 1 Exhibit A, # 2 Exhibit Attachment to Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit Attachment to Exhibit C, # 6 Exhibit D, # 7 Exhibit E)(Forni, Eric) (Entered: 12/16/2021) |
| 12/16/2021 | 169 | Assented to MOTION for Leave to File *Reply in Support of Motion to Dismiss* by Courtney Kelln.(Wilson, Holly) (Entered: 12/16/2021) |
| 12/17/2021 | 170 | Judge William G. Young: ELECTRONIC ORDER entered granting 169 Motion for Leave to File Reply ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Paine, Matthew) (Entered: 12/17/2021) |
| 12/17/2021 | 171 | Opposition re 151 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *by defendant Veldhuis* filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 12/17/2021) |
| 12/20/2021 | 172 | Assented to MOTION for Leave to File *A Reply in Support of His Motion to Dismiss* by Mike K. Veldhuis.(Belostock, Lorraine) (Entered: 12/20/2021) |
| 12/20/2021 | 173 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael Tremonte Filing fee: $ 100, receipt number AMADC-9106999 by Mike K. Veldhuis. (Attachments: # 1 Affidavit Michael Tremonte)(Belostock, Lorraine) (Entered: 12/20/2021) |
| 12/20/2021 | 174 | MOTION for Leave to Appear Pro Hac Vice for admission of Robert Knuts Filing fee: $ 100, receipt number AMADC-9107035 by Mike K. Veldhuis. (Attachments: # 1 Affidavit Affidavit Robert Knuts)(Belostock, Lorraine) (Entered: 12/20/2021) |

A21

| | | |
|---|---|---|
| 12/21/2021 | 175 | Judge William G. Young: ELECTRONIC ORDER entered granting 172 Assented to Motion for Leave to File Reply in Support of His Motion to Dismiss by Mike K. Veldhuis; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Gaudet, Jennifer) (Entered: 12/21/2021) |
| 12/21/2021 | 176 | Judge William G. Young: ELECTRONIC ORDER entered granting 166 Motion for Leave to File Reply in Support of Motion to Dismiss by Zhiying Yvonne Gasarch; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Gaudet, Jennifer) (Entered: 12/21/2021) |
| 12/21/2021 | 177 | Judge William G. Young: ELECTRONIC ORDER entered granting 165 Assented to Motion to Amend Preliminary Injunction by Jackson T. Friesen. (Gaudet, Jennifer) (Entered: 12/21/2021) |
| 12/21/2021 | 178 | ANSWER to 1 Complaint, with Jury Demand by Avtar S. Dhillon.(Vien, George) (Entered: 12/21/2021) |
| 12/23/2021 | 179 | REPLY to Response to 126 MOTION to Dismiss *or, in the Alternative, to Strike Plaintiff's Complaint* filed by Graham R. Taylor. (Quinn, Michael) (Entered: 12/23/2021) |
| 12/24/2021 | 180 | Joint MOTION to Amend 39 Order on Motion for Preliminary Injunction *as to defendant Graham Taylor* by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order)(Shields, Kathleen) (Entered: 12/24/2021) |
| 12/24/2021 | 181 | REPLY to Response to 132 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Paul Sexton. (Smith, Neil) (Entered: 12/24/2021) |
| 01/03/2022 | 182 | Judge William G. Young: ELECTRONIC ORDER entered granting 173 Motion for Leave to Appear Pro Hac Vice; granting 174 Motion for Leave to Appear Pro Hac Vice. Added Michael Tremonte and Robert Knuts.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Paine, Matthew) (Entered: 01/03/2022) |
| 01/03/2022 | 183 | REPLY to Response to 147 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction *or, in the Alternative, Motion to Strike Complaint* filed by Courtney Kelln. (Muhlendorf, Kevin) (Entered: 01/03/2022) |
| 01/03/2022 | 184 | REPLY to Response to 143 MOTION to Dismiss filed by Zhiying Yvonne Gasarch. (Pascucci, Michelle) (Entered: 01/03/2022) |
| 01/03/2022 | 185 | REPLY to Response to 151 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Mike K. Veldhuis. (Belostock, Lorraine) (Entered: 01/03/2022) |

| 01/10/2022 | 186 | Judge William G. Young: ELECTRONIC ORDER entered granting 180 Joint Motion to Amend 39 Order on Motion for Preliminary Injunction as to defendant Graham Taylor by Securities and Exchange Commission. (Gaudet, Jennifer) (Entered: 01/10/2022) |
| --- | --- | --- |
| 01/10/2022 | 187 | Judge William G. Young: Stipulation and Order for Entry of Revised Preliminary Injunction, Order Freezing Assets, and Order for Other Equitable Relief as to Defendant Graham Taylor entered. (Gaudet, Jennifer) (Entered: 01/10/2022) |
| 01/10/2022 | 188 | ELECTRONIC NOTICE Resetting Hearing on Motion 126 MOTION to Dismiss *or, in the Alternative, to Strike Plaintiff's Complaint*, 151 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 132 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 147 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction *or, in the Alternative, Motion to Strike*, 143 MOTION to Dismiss , 109 MOTION to Dismiss *Complaint* : **Motion Hearing reset for 1/20/2022 at 11:00 AM in Remote Proceeding : Boston before Judge William G. Young.**<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the session's courtroom deputy as soon as possible.<br><br>Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.<br><br>(Gaudet, Jennifer) (Entered: 01/10/2022) |
| 01/20/2022 | 189 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 1/20/2022 by video re 109 MOTION to Dismiss *Complaint* filed by Jackson T. Friesen, 126 MOTION to Dismiss *or, in the Alternative, to Strike Plaintiff's Complaint* filed by Graham R. Taylor, 132 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Paul Sexton, 143 MOTION to Dismiss filed by Zhiying Yvonne Gasarch, 147 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction *or, in the Alternative, Motion to Strike* filed by Courtney Kelln, 151 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Mike K. Veldhuis. After hearing arguments of counsel, the Court tentatively denies all motions to dismiss pending further review. The plaintiff may within two weeks file a motion for leave to amend as to defendants Gasarch and Taylor. The defendants may file a written opposition. Scheduling conference held: The case is placed on the running trial list for January 2023; any dispositive motions are due on or before October 1, 2022. A joint final pretrial memorandum is due on or before December 1, 2022. Counsel are instructed to meet and confer to submit a joint proposed case management schedule within 30 days. (Dispositive Motions due by 10/1/2022; Ready for Trial on 1/3/2023 09:00 AM in Courtroom 18 before Judge William G. Young.) (Court Reporter: Alice Moran alice.moran@verizon.net.)(Attorneys present: Attorneys Forni, Shields and Bromberg for the plaintiff and Attorneys Quinn, Collins, McLaughlin, Muhlendorf, Wilson, Kane, Silverblatt, Walters, Campbell, Belostock, Ward, Vien, Topetzes and Smith for the defendants) (Gaudet, Jennifer) (Entered: 01/21/2022) |
| 01/24/2022 | 190 | Assented to MOTION to Amend 101 Order on Motion for Preliminary Injunction by Zhiying Yvonne Gasarch. (Attachments: # 1 Text of Proposed Order)(Pascucci, Michelle) |

A23

| | | (Entered: 01/24/2022) |
|---|---|---|
| 01/25/2022 | 191 | Judge William G. Young: ELECTRONIC ORDER entered granting 190 Assented to Motion to Amend 101 Order on Motion for Preliminary Injunction by Zhiying Yvonne Gasarch. (Gaudet, Jennifer) (Entered: 01/25/2022) |
| 01/25/2022 | 192 | Judge William G. Young: ORDER entered. (Gaudet, Jennifer) (Entered: 01/25/2022) |
| 01/25/2022 | 193 | Transcript of Motion Hearing held on January 20, 2022, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Alice Moran at alice.moran@verizon.net. Redaction Request due 2/15/2022. Redacted Transcript Deadline set for 2/25/2022. Release of Transcript Restriction set for 4/25/2022. (Coppola, Katelyn) (Entered: 01/31/2022) |
| 01/25/2022 | 194 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at http://www.mad.uscourts.gov/caseinfo/transcripts.htm (Coppola, Katelyn) (Entered: 01/31/2022) |
| 02/03/2022 | 195 | MOTION for Leave to File an Amended Complaint by Securities and Exchange Commission. (Attachments: # 1 Proposed Amended Complaint)(Shields, Kathleen)<br><br>**Modified on 2/3/2022 to Correct Docket Text and CM/ECF Filing Event As Counsel Filed the Motion Under the Wrong Event in CM/ECF (Paine, Matthew).**<br><br>(Entered: 02/03/2022) |
| 02/03/2022 | 196 | MEMORANDUM in Support re 195 MOTION to Amend *Complaint* filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 02/03/2022) |
| 02/15/2022 | 197 | Assented to MOTION for Extension of Time to File Response/Reply as to 195 MOTION for Leave to File an Amended Complaint by Zhiying Yvonne Gasarch.(Pascucci, Michelle) (Entered: 02/15/2022) |
| 02/16/2022 | 198 | Judge William G. Young: ELECTRONIC ORDER entered granting 197 Assented to MOTION for Extension of Time to File Response/Reply as to 195 MOTION for Leave to File an Amended Complaint , 195 MOTION for Leave to File an Amended Complaint Responses due by 3/3/2022 (Paine, Matthew) (Entered: 02/16/2022) |
| 02/17/2022 | 199 | Opposition re 195 MOTION for Leave to File an Amended Complaint filed by Graham R. Taylor. (Attachments: # 1 Declaration of Counsel in Support of Defendant Graham Taylor's Opposition to Plaintiff's Motion for Leave to File Amended Complaint, # 2 Exhibit A to Declaration, # 3 Exhibit B to Declaration)(Quinn, Michael) (Entered: 02/17/2022) |
| 02/18/2022 | 200 | Proposed Document(s) submitted by Securities and Exchange Commission. Document received: Proposed Scheduling Order. (Shields, Kathleen) (Entered: 02/18/2022) |
| 02/24/2022 | 201 | NOTICE of Appearance by Karen A. Pickett on behalf of Zhiying Yvonne Gasarch (Pickett, Karen) (Entered: 02/24/2022) |
| 02/24/2022 | 202 | Assented to MOTION to Withdraw as Attorney *as to Michelle Pascucci* by Zhiying Yvonne Gasarch.(Pascucci, Michelle) (Entered: 02/24/2022) |
| 02/25/2022 | 203 | Judge William G. Young: ELECTRONIC ORDER entered granting 202 Motion to Withdraw as Attorney. Attorney Michelle R. Pascucci terminated (Paine, Matthew) (Entered: 02/25/2022) |

| 03/02/2022 | 204 | NOTICE of Appearance by David H. London on behalf of Securities and Exchange Commission (London, David) (Entered: 03/02/2022) |
| 03/03/2022 | 205 | Opposition re 195 MOTION for Leave to File an Amended Complaint filed by Zhiying Yvonne Gasarch. (Pickett, Karen) (Entered: 03/03/2022) |
| 03/03/2022 | 206 | Notice of Supplemental Authorities re 147 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM MOTION to Dismiss for Lack of Jurisdiction *or, in the Alternative, Motion to Strike*, 109 MOTION to Dismiss *Complaint*, 126 MOTION to Dismiss *or, in the Alternative, to Strike Plaintiff's Complaint*, 143 MOTION to Dismiss , 151 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM , 132 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Attachments: # 1 Decision in SEC v. Gallison (S.D.N.Y.))(Shields, Kathleen) (Entered: 03/03/2022) |
| 03/18/2022 | 207 | JOINT SUBMISSION pursuant to Local Rule 16.1 by Securities and Exchange Commission.(Shields, Kathleen) (Entered: 03/18/2022) |
| 03/24/2022 | 208 | STIPULATION re 207 Joint submission *Stipulation and Proposed Protective Order Governing Confidentiality of Documents* by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 03/24/2022) |
| 03/25/2022 | 209 | Judge William G. Young: ORDER entered re 208 Stipulation and Proposed Protective Order Governing Confidentiality of Documents by Securities and Exchange Commission. **Allowed as modified: Nothing is to be filed under seal in Court pursuant to this order. It is not to be cited as a ground for sealing.** (Gaudet, Jennifer) (Entered: 03/25/2022) |
| 05/12/2022 | 210 | Judge William G. Young: ELECTRONIC ORDER entered granting 163 Motion for Default Judgment Against Defendant Frederick L. Sharp. (Gaudet, Jennifer) (Entered: 05/12/2022) |
| 05/12/2022 | 211 | Judge William G. Young: ORDER entered;DEFAULT JUDGMENT in favor of Securities and Exchange Commission as to Defendant Frederick L. Sharp. (Gaudet, Jennifer) (Entered: 05/12/2022) |
| 06/01/2022 | 212 | NOTICE of Withdrawal of Appearance by Eric A. Forni (Forni, Eric) (Entered: 06/01/2022) |
| 06/24/2022 | 213 | MOTION for Order to Enter Scheduling Order by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Proposed Scheduling Order)(Shields, Kathleen) (Entered: 06/24/2022) |
| 06/30/2022 | 214 | Judge William G. Young: ELECTRONIC ORDER entered granting 213 MOTION for Order to Enter Scheduling Order. (Paine, Matthew) (Entered: 06/30/2022) |
| 06/30/2022 | 215 | Judge William G. Young: ORDER entered. SCHEDULING ORDER: Discovery to be completed by 3/17/2023; Motions due by 3/23/2023; Ready for Trial on 7/17/2023 09:00 AM in Courtroom 18 - 5th Floor (In person only) before Judge William G. Young.(Paine, Matthew) (Entered: 06/30/2022) |
| 07/07/2022 | 216 | Assented to MOTION for Extension of Time to July 22, 2022 to Serve Initial Disclosures by Zhiying Yvonne Gasarch.(Pickett, Karen) (Entered: 07/07/2022) |
| 07/07/2022 | 217 | NOTICE of Appearance by Brooke Paula Cohen on behalf of William T. Kaitz (Cohen, Brooke) (Entered: 07/07/2022) |
| 07/11/2022 | 218 | NOTICE of Withdrawal of Appearance by Daniel W. Sack (Sack, Daniel) (Entered: 07/11/2022) |

A25

| 07/27/2022 | 219 | Assented to MOTION to Withdraw as Attorney *for Defendant Jackson Friesen* by Jackson T. Friesen.(Walters, Sarah) (Entered: 07/27/2022) |
| 07/28/2022 | 220 | Judge William G. Young: ELECTRONIC ORDER entered granting 219 Motion to Withdraw as Attorney. Attorney Sarah E. Walters terminated (Paine, Matthew) (Entered: 07/28/2022) |
| 08/11/2022 | 221 | Judge William G. Young: ELECTRONIC ORDER entered granting 216 Assented to Motion for Extension of Time to July 22, 2022 to Serve Initial Disclosures by Zhiying Yvonne Gasarch. (Gaudet, Jennifer) (Entered: 08/11/2022) |
| 08/19/2022 | 222 | MOTION for Protective Order *Seeking Stay of Discovery* by Zhiying Yvonne Gasarch. (Pickett, Karen) (Entered: 08/19/2022) |
| 08/19/2022 | 223 | MEMORANDUM in Support re 222 MOTION for Protective Order *Seeking Stay of Discovery* filed by Zhiying Yvonne Gasarch. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Pickett, Karen) (Entered: 08/19/2022) |
| 08/26/2022 | 224 | Opposition re 222 MOTION for Protective Order *Seeking Stay of Discovery* filed by Securities and Exchange Commission. (London, David) (Entered: 08/26/2022) |
| 08/31/2022 | 225 | REPLY to Response to 222 MOTION for Protective Order *Seeking Stay of Discovery* filed by Zhiying Yvonne Gasarch. (Pickett, Karen) (Entered: 08/31/2022) |
| 09/06/2022 | 226 | MOTION for Leave to Appear Pro Hac Vice for admission of Katie Renzler Filing fee: $ 100, receipt number AMADC-9482203 by Mike K. Veldhuis.(Belostock, Lorraine) (Additional attachment(s) added on 9/6/2022: # 1 Affidavit) (Paine, Matthew). (Main Document 226 replaced on 9/6/2022) (Paine, Matthew). (Entered: 09/06/2022) |
| 09/06/2022 | 227 | Judge William G. Young: ELECTRONIC ORDER entered granting 226 Motion for Leave to Appear Pro Hac Vice. Added Katie Renzler. <br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.** <br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. <br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney. <br><br>(Paine, Matthew) (Entered: 09/06/2022) |
| 09/06/2022 | 228 | Judge William G. Young: ORDER entered. MEMORANDUM AND ORDER(Sonnenberg, Elizabeth) (Entered: 09/06/2022) |
| 09/06/2022 | 229 | Judge William G. Young: ELECTRONIC ORDER entered denying 222 Defendant Zhiying Yvonne Gasarch's Motion for Protective Order. (Gaudet, Jennifer) (Entered: 09/06/2022) |
| 09/09/2022 | 230 | AMENDED COMPLAINT against Mike K. Veldhuis, Graham R. Taylor, Paul Sexton, William T. Kaitz, Jackson T. Friesen, Zhiying Yvonne Gasarch, Avtar S. Dhillon, Courtney Kelln, filed by Securities and Exchange Commission.(Shields, Kathleen) (Entered: 09/09/2022) |
| 09/13/2022 | 231 | NOTICE of Appearance by Timothy J. Fazio on behalf of Jackson T. Friesen (Fazio, Timothy) (Entered: 09/13/2022) |

| 09/13/2022 | 232 | First MOTION for Leave to Appear Pro Hac Vice for admission of Maranda E. Fritz Filing fee: $ 100, receipt number AMADC-9494294 by Jackson T. Friesen. (Attachments: # 1 Exhibit Certification for Maranda E. Fritz)(Fazio, Timothy) (Entered: 09/13/2022) |
|---|---|---|
| 09/14/2022 | 233 | NOTICE of Appearance by Amy Harman Burkart on behalf of Securities and Exchange Commission (Burkart, Amy) (Entered: 09/14/2022) |
| 09/19/2022 | 234 | Assented to MOTION for Extension of Time to File Answer re 230 Amended Complaint by Zhiying Yvonne Gasarch.(Pickett, Karen) (Entered: 09/19/2022) |
| 09/19/2022 | 235 | NOTICE of Appearance by Katie Elizabeth Renzler on behalf of Mike K. Veldhuis (Renzler, Katie) (Entered: 09/19/2022) |
| 09/20/2022 | 236 | Judge William G. Young: ELECTRONIC ORDER entered granting 232 Motion for Leave to Appear Pro Hac Vice. Added Maranda E. Fritz.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Paine, Matthew) (Entered: 09/20/2022) |
| 09/20/2022 | 237 | Judge William G. Young: ELECTRONIC ORDER entered granting 234 Assented-to Motion for Extension of Time to Answer or Otherwise Respond re 230 Amended Complaint. Zhiying Yvonne Gasarch answer/response due October 7, 2022. (Paine, Matthew) (Entered: 09/20/2022) |
| 09/20/2022 | 238 | MOTION for Extension of Time to 9/30/2022 to File Answer *to Amended Complaint* by Courtney Kelln.(Muhlendorf, Kevin) (Entered: 09/20/2022) |
| 09/21/2022 | 239 | Judge William G. Young: ELECTRONIC ORDER entered granting re 238 MOTION for Extension of Time to 9/30/2022 to Answer or Otherwise Respond *to Amended Complaint* Courtney Kelln. Answer/Response due September 30, 2022. (Paine, Matthew) (Entered: 09/21/2022) |
| 09/23/2022 | 240 | ANSWER to 230 Amended Complaint by Avtar S. Dhillon.(Vien, George) (Entered: 09/23/2022) |
| 09/23/2022 | 241 | ANSWER to 230 Amended Complaint by William T. Kaitz.(O'Connor, R.) (Entered: 09/23/2022) |
| 09/23/2022 | 242 | ANSWER to 230 Amended Complaint by Paul Sexton.(Smith, Neil) (Entered: 09/23/2022) |
| 09/23/2022 | 243 | ANSWER to 230 Amended Complaint by Graham R. Taylor.(Quinn, Michael) (Entered: 09/23/2022) |
| 09/23/2022 | 244 | ANSWER to 230 Amended Complaint by Mike K. Veldhuis.(Belostock, Lorraine) (Entered: 09/23/2022) |
| 09/30/2022 | 245 | ANSWER to 230 Amended Complaint by Courtney Kelln.(Muhlendorf, Kevin) (Entered: 09/30/2022) |

A27

| | | |
|---|---|---|
| 10/07/2022 | 246 | ANSWER to 230 Amended Complaint by Zhiying Yvonne Gasarch.(Pickett, Karen) (Entered: 10/07/2022) |
| 10/14/2022 | 247 | ANSWER to 230 Amended Complaint by Jackson T. Friesen.(Fazio, Timothy) (Entered: 10/14/2022) |
| 01/05/2023 | 248 | MOTION to Compel *Production of Documents and for Sanctions* by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order)(Shields, Kathleen) (Entered: 01/05/2023) |
| 01/05/2023 | 249 | MEMORANDUM in Support re 248 MOTION to Compel *Production of Documents and for Sanctions* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Shields, Kathleen) (Entered: 01/05/2023) |
| 01/19/2023 | 250 | Opposition re 248 MOTION to Compel Production of Documents and for Sanctions, by Jackson T. Friesen.(Fazio, Timothy)<br><br>**Modified on 1/20/2023 to Correct Docket Text, Add CM/ECF NextGen Document Link, and Correct Docket Text as Counsel Fazio Incorrectly Filed the Opposition as a Motion (Paine, Matthew).**<br><br>(Entered: 01/19/2023) |
| 01/19/2023 | 251 | Opposition re 248 MOTION to Compel *Production of Documents and for Sanctions* filed by Zhiying Yvonne Gasarch. (Pickett, Karen) (Entered: 01/19/2023) |
| 01/23/2023 | 252 | Judge William G. Young: ELECTRONIC ORDER entered re 248 MOTION to Compel Production of Documents and for Sanctions. (Paine, Matthew)<br><br>**The motion to compel is allowed as to each named defendant. The motion for sanctions is not yet ripe.**<br><br>(Entered: 01/23/2023) |
| 02/07/2023 | 253 | Assented to MOTION to Withdraw as Attorney *for Defendant Courtney Kelln* by Courtney Kelln.(Wilson, Holly) (Entered: 02/07/2023) |
| 02/08/2023 | 254 | Judge William G. Young: ELECTRONIC ORDER entered granting 253 Motion to Withdraw as Attorney. Attorney Holly J. Wilson terminated (Paine, Matthew) (Entered: 02/08/2023) |
| 02/10/2023 | 255 | MOTION for Extension of Time to May 4, 2023 to file dispositive motions *and for other extensions of the case schedule* by Securities and Exchange Commission.(Shields, Kathleen) (Entered: 02/10/2023) |
| 02/14/2023 | 256 | Judge William G. Young: ELECTRONIC ORDER entered re 255 Motion for Extension of Time (Paine, Matthew)<br><br>**The expert deposition deadline is extended by one week. Dispositive motions extended to April 15, 2023, Responses 21days thereafter. Joint pre-trial memorandum due June 15, 2023. Case continued to the September 2023 running trial list.**<br><br>(Entered: 02/14/2023) |
| 02/14/2023 | 257 | Set Deadlines/Hearings: Dispositive Motions due by April 15, 2023; Responses due by 5/6/2023; Ready for Trial on 9/11/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young. (Paine, Matthew) (Entered: 02/14/2023) |

A28

| 02/14/2023 | 258 | Joint MOTION to Approve Consent Judgment *as to Defendant Graham Taylor* by Securities and Exchange Commission. (Attachments: # 1 Exhibit Consent of Defendant Graham Taylor, # 2 Text of Proposed Order Proposed Final Judgment as to Defendant Graham Taylor)(London, David) (Entered: 02/14/2023) |
|---|---|---|
| 02/14/2023 | 259 | Joint MOTION to Approve Consent Judgment *as to Defendant William T. Kaitz* by Securities and Exchange Commission. (Attachments: # 1 Exhibit Consent of Defendant William T. Kaitz, # 2 Text of Proposed Order Proposed Final Judgment as to Defendant William T. Kaitz)(London, David) (Entered: 02/14/2023) |
| 02/16/2023 | 260 | Judge William G. Young: ELECTRONIC ORDER entered granting 258 Joint MOTION to Approve Consent Judgment as to Defendant Graham Taylor. (Paine, Matthew) (Entered: 02/16/2023) |
| 02/16/2023 | 261 | Judge William G. Young: ELECTRONIC ORDER entered granting 259 Joint MOTION to Approve Consent Judgment as to Defendant William T. Kaitz. (Paine, Matthew) (Entered: 02/16/2023) |
| 02/16/2023 | 262 | Judge William G. Young: ORDER entered. FINAL JUDGMENT as to Graham R. Taylor (Paine, Matthew) (Entered: 02/16/2023) |
| 02/16/2023 | 263 | Judge William G. Young: ORDER entered. FINAL JUDGMENT as to William T. Kaitz. (Paine, Matthew) (Entered: 02/16/2023) |
| 03/07/2023 | 264 | STIPULATION re 90 Order on Motion for Preliminary Injunction *Stipulated Joint Modification of Preliminary Injunction, Order Freezing Assets, and Order for Other Equitable Relief as to Jackson Friesen* by Jackson T. Friesen. (Attachments: # 1 Text of Proposed Order)(Fazio, Timothy) (Entered: 03/07/2023) |
| 03/09/2023 | 265 | Judge William G. Young: Modification of Preliminary Injunction, Order Freezing Assets, and Order for Other Equitable Relief as to Jackson T. Friesen. (Gaudet, Jennifer) (Entered: 03/09/2023) |
| 04/17/2023 | 266 | MOTION for Partial Summary Judgment by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 04/17/2023) |
| 04/17/2023 | 267 | MEMORANDUM in Support re 266 MOTION for Partial Summary Judgment filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 04/17/2023) |
| 04/17/2023 | 268 | Statement of Material Facts L.R. 56.1 re 266 MOTION for Partial Summary Judgment *(redacted as requested in pending motion)* filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 04/17/2023) |
| 04/17/2023 | 269 | ADDENDUM re 266 MOTION for Partial Summary Judgment *Appendix of Exhibits* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60 Exhibit 60, # 61 Exhibit 61, # 62 Exhibit 62, # 63 Exhibit 63, # 64 Exhibit 64, # 65 Exhibit 65, # 66 Exhibit 66, # 67 Exhibit 67, # 68 Exhibit 68, # 69 Exhibit 69, # 70 |

A29

| | | |
|---|---|---|
| | | Exhibit 70, # 71 Exhibit 71, # 72 Exhibit 72, # 73 Exhibit 73)(Shields, Kathleen) (Entered: 04/17/2023) |
| 04/17/2023 | 270 | AFFIDAVIT of Avtar Dhillon in Support re 266 MOTION for Partial Summary Judgment filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 04/17/2023) |
| 04/17/2023 | 271 | AFFIDAVIT of William Kaitz in Support re 266 MOTION for Partial Summary Judgment filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Shields, Kathleen) (Entered: 04/17/2023) |
| 04/17/2023 | 272 | AFFIDAVIT of W. Scott Lawler in Support re 266 MOTION for Partial Summary Judgment filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Shields, Kathleen) (Entered: 04/17/2023) |
| 04/17/2023 | 273 | AFFIDAVIT of Ryan Murphy in Support re 266 MOTION for Partial Summary Judgment filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17)(Shields, Kathleen) (Entered: 04/17/2023) |
| 04/17/2023 | 274 | AFFIDAVIT of Name withheld in Support re 266 MOTION for Partial Summary Judgment *(name withheld pending ruling on motion to file under seal)* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Shields, Kathleen) (Entered: 04/17/2023) |
| 04/17/2023 | 275 | ELECTRONIC NOTICE issued requesting SINGLE-SIDED PAPER courtesy copy for 270 Affidavit in Support of Motion, 266 MOTION for Partial Summary Judgment , 268 Statement of Material Facts L.R. 56.1, 269 Addendum to Motion/Memorandum, 272 Affidavit in Support of Motion, 273 Affidavit in Support of Motion, 271 Affidavit in Support of Motion, 267 Memorandum in Support of Motion, 274 Affidavit in Support of Motion,. Counsel who filed this document are requested to submit a courtesy copy of this document (or documents) to the Clerk's Office by Attention Matthew Paine - Docket Clerk - Judge Young. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (Paine, Matthew) (Entered: 04/17/2023) |
| 04/17/2023 | 276 | MOTION to Seal Declaration in Support of Plaintiff's Motion for Partial Summary Judgment by Securities and Exchange Commission. (Attachments: # 1 Proposed Order) (FILED UNDER SEAL)(Paine, Matthew) (Entered: 04/17/2023) |
| 04/18/2023 | 277 | ELECTRONIC NOTICE Setting Hearing on Motion 266 MOTION for Partial Summary Judgment : Motion Hearing set for 6/21/2023 02:00 PM in Courtroom 18 (In person only) before Judge William G. Young. (Gaudet, Jennifer) (Entered: 04/18/2023) |
| 04/19/2023 | 278 | NOTICE of Appearance by Nita Kumaraswami Klunder on behalf of Securities and Exchange Commission (Klunder, Nita) (Entered: 04/19/2023) |
| 04/26/2023 | 279 | NOTICE of Appearance by Alfred A. Day on behalf of Securities and Exchange Commission (Day, Alfred) (Entered: 04/26/2023) |
| 05/02/2023 | 280 | MOTION to Stay *the Proceedings* by Courtney Kelln, Mike K. Veldhuis.(Knuts, Robert) (Entered: 05/02/2023) |
| 05/02/2023 | 281 | MEMORANDUM in Support re 280 MOTION to Stay *the Proceedings* filed by Courtney Kelln, Mike K. Veldhuis. (Knuts, Robert) (Entered: 05/02/2023) |

A30

CM/ECF - USDC Massachusetts - Version 1.8.2 as of 12/23/2024

| 05/02/2023 | 282 | AFFIDAVIT in Support re 280 MOTION to Stay *the Proceedings* filed by Courtney Kelln, Mike K. Veldhuis. (Attachments: # 1 Exhibit A (Feb. 8-16, 2022 Email Exchange between AUSA Drabick and R. Knuts), # 2 Exhibit B (Feb. 8-11, 2022 Email Exchange between AUSA Drabick and K. Muhlendorf), # 3 Exhibit C (Feb. 17, 2023 Email from AUSA Drabick), # 4 Exhibit D (Mar. 17, 2023 Shields Email), # 5 Exhibit E (Notice of Civil Claim), # 6 Exhibit F (Reasons for Judgment), # 7 Exhibit G (SEC Responses & Objections to Kellns Request for Admissions))(Knuts, Robert) (Entered: 05/02/2023) |
|---|---|---|
| 05/04/2023 | 283 | MOTION for Leave to File *Motion to Reopen Discovery to Take Certain Depositions* by Jackson T. Friesen.(Fazio, Timothy) (Entered: 05/04/2023) |
| 05/04/2023 | 284 | MEMORANDUM in Support re 283 MOTION for Leave to File *Motion to Reopen Discovery to Take Certain Depositions* filed by Jackson T. Friesen. (Fazio, Timothy) (Entered: 05/04/2023) |
| 05/04/2023 | 285 | AFFIDAVIT in Support re 283 MOTION for Leave to File *Motion to Reopen Discovery to Take Certain Depositions* filed by Jackson T. Friesen. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Fazio, Timothy) (Entered: 05/04/2023) |
| 05/08/2023 | 286 | NOTICE of Joinder by Paul Sexton re 280 MOTION to Stay *the Proceedings*, 283 MOTION for Leave to File *Motion to Reopen Discovery to Take Certain Depositions* (Smith, Neil) **Modified on 5/30/2023 to Update Docket Text (Paine, Matthew).** (Entered: 05/08/2023) |
| 05/08/2023 | 287 | MEMORANDUM in Opposition re 266 MOTION for Partial Summary Judgment filed by Paul Sexton. (Attachments: # 1 Exhibit A: Statement of Material Facts in Genuine Dispute, # 2 Exhibit B: Dhillon Tr., # 3 Exhibit C: Nikolayev Tr.)(Smith, Neil) (Additional attachment(s) added on 5/8/2023: # 4 Paul Sexton's Redacted Summary Judgment Opposition) (Paine, Matthew). (Entered: 05/08/2023) |
| 05/09/2023 | 288 | MOTION to Seal (FILED UNDER SEAL) by Paul Sexton.(Paine, Matthew) (Entered: 05/09/2023) |
| 05/09/2023 | 289 | MEMORANDUM in Opposition re 280 MOTION to Stay *the Proceedings* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit A)(Shields, Kathleen) (Entered: 05/09/2023) |
| 05/11/2023 | 290 | MEMORANDUM in Opposition re 283 MOTION for Leave to File *Motion to Reopen Discovery to Take Certain Depositions* filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 05/11/2023) |
| 05/11/2023 | 291 | AFFIDAVIT of Kathleen Shields in Opposition re 283 MOTION for Leave to File *Motion to Reopen Discovery to Take Certain Depositions* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Shields, Kathleen) (Entered: 05/11/2023) |
| 05/15/2023 | 292 | Judge William G. Young: ELECTRONIC ORDER entered re 280 MOTION to Stay the Proceedings. (Paine, Matthew)<br><br>**The motion for stay is denied.**<br><br>(Entered: 05/15/2023) |
| 05/15/2023 | 293 | Judge William G. Young: ELECTRONIC ORDER entered re 283 MOTION for Leave to File Motion to Reopen Discovery to Take Certain Depositions. (Paine, Matthew)<br><br>**The motion to reopen discovery is denied.** |

A31

|  |  | (Entered: 05/15/2023) |
|---|---|---|
| 05/18/2023 | 294 | MOTION for Leave to File *Late* by Courtney Kelln, Mike K. Veldhuis. (Attachments: # 1 Exhibit A (Notice of Joinder))(Knuts, Robert) (Entered: 05/18/2023) |
| 05/19/2023 | 295 | MEMORANDUM in Opposition re 294 MOTION for Leave to File *Late* filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 05/19/2023) |
| 05/19/2023 | 296 | Judge William G. Young: ELECTRONIC ORDER entered granting 294 Motion for Leave to File Late by Courtney Kelln, Mike K. Veldhuis. (Gaudet, Jennifer) (Entered: 05/19/2023) |
| 05/19/2023 | 297 | NOTICE by Courtney Kelln, Mike K. Veldhuis re 287 Memorandum in Opposition to Motion, (Knuts, Robert) (Entered: 05/19/2023) |
| 05/22/2023 | 298 | REPLY to Response to 266 MOTION for Partial Summary Judgment filed by Securities and Exchange Commission. (Shields, Kathleen) (Additional attachment(s) added on 5/23/2023: # 1 Sealed Reply) (Paine, Matthew). (Entered: 05/22/2023) |
| 05/22/2023 | 299 | Supplemental Statement of Material Facts L.R. 56.1 re 266 MOTION for Partial Summary Judgment filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 05/22/2023) |
| 05/22/2023 | 300 | Supplemental DECLARATION in Support re 266 MOTION for Partial Summary Judgment *by Ryan Murphy* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit 18, # 2 Exhibit 19, # 3 Exhibit 20, # 4 Exhibit 21, # 5 Exhibit 22, # 6 Exhibit 23)(Shields, Kathleen) **Modified on 5/22/2023 to Correct Docket Text** (Paine, Matthew). (Entered: 05/22/2023) |
| 05/22/2023 | 301 | Supplemental ADDENDUM re 266 MOTION for Partial Summary Judgment *Table of Contents of Appendix of Exhibits* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit 74, # 2 Exhibit 75, # 3 Exhibit 76, # 4 Exhibit 77, # 5 Exhibit 78, # 6 Exhibit 79, # 7 Exhibit 80, # 8 Exhibit 81, # 9 Exhibit 82, # 10 Exhibit 83, # 11 Exhibit 84)(Shields, Kathleen) (Entered: 05/22/2023) |
| 05/22/2023 | 302 | MOTION for Leave to File *Late* by Jackson T. Friesen. (Attachments: # 1 Exhibit A, Opposition and Notice of Joinder, # 2 Affidavit In support of Exhibit A Opposition and Notice of Joinder)(Fazio, Timothy) (Entered: 05/22/2023) |
| 05/23/2023 | 303 | Judge William G. Young: ELECTRONIC ORDER entered granting 302 Motion for Leave to File Document Late; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Gaudet, Jennifer) (Entered: 05/23/2023) |
| 05/23/2023 | 304 | Opposition re 266 MOTION for Partial Summary Judgment *and Notice of Joinder* filed by Jackson T. Friesen. (Attachments: # 1 Affidavit in Support of Opposition)(Fazio, Timothy) (Entered: 05/23/2023) |
| 05/25/2023 | 305 | Assented to MOTION for Leave to File *reply brief* by Securities and Exchange Commission.(Shields, Kathleen) (Entered: 05/25/2023) |
| 05/25/2023 | 306 | Judge William G. Young: ELECTRONIC ORDER entered granting 305 Assented to MOTION for Leave to File Reply ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Paine, Matthew) (Entered: 05/25/2023) |

| | | |
|---|---|---|
| 05/30/2023 | 307 | MOTION to Strike 301 Addendum to Motion/Memorandum, 299 Statement of Material Facts L.R. 56.1, 300 Affidavit in Support of Motion, 298 Reply to Response to Motion by Paul Sexton.(Smith, Neil) (Entered: 05/30/2023) |
| 05/30/2023 | 308 | MEMORANDUM in Support re 307 MOTION to Strike 301 Addendum to Motion/Memorandum, 299 Statement of Material Facts L.R. 56.1, 300 Affidavit in Support of Motion, 298 Reply to Response to Motion filed by Paul Sexton. (Smith, Neil) (Entered: 05/30/2023) |
| 05/31/2023 | 309 | REPLY to Response to 266 MOTION for Partial Summary Judgment filed by Securities and Exchange Commission. (Shields, Kathleen) (Additional attachment(s) added on 6/15/2023: # 1 SEALED Reply) (Paine, Matthew). (Entered: 05/31/2023) |
| 05/31/2023 | 310 | Third Statement of Material Facts L.R. 56.1 re 266 MOTION for Partial Summary Judgment filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 05/31/2023) |
| 05/31/2023 | 311 | Third ADDENDUM re 266 MOTION for Partial Summary Judgment filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit 85, # 2 Exhibit 86, # 3 Exhibit 87, # 4 Exhibit 88, # 5 Exhibit 89, # 6 Exhibit 90, # 7 Exhibit 91, # 8 Exhibit 92, # 9 Exhibit 93, # 10 Exhibit 94, # 11 Exhibit 95, # 12 Exhibit 96, # 13 Exhibit 97, # 14 Exhibit 98, # 15 Exhibit 99, # 16 Exhibit 100, # 17 Exhibit 101)(Shields, Kathleen) (Entered: 05/31/2023) |
| 06/07/2023 | 312 | Opposition re 307 MOTION to Strike 301 Addendum to Motion/Memorandum, 299 Statement of Material Facts L.R. 56.1, 300 Affidavit in Support of Motion, 298 Reply to Response to Motion filed by Securities and Exchange Commission. (London, David) (Entered: 06/07/2023) |
| 06/08/2023 | 313 | Judge William G. Young: ELECTRONIC ORDER entered re 307 Motion to Strike 301 Addendum to Motion/Memorandum, 299 Statement of Material Facts L.R. 56.1, 300 Affidavit in Support of Motion, 298 Reply to Response to Motion. **In lieu of striking these materials, the defendants will be allowed to file a sur-reply.** (Gaudet, Jennifer) (Entered: 06/08/2023) |
| 06/12/2023 | 314 | SUR-REPLY to Motion re 266 MOTION for Partial Summary Judgment filed by Paul Sexton. (Smith, Neil) (Entered: 06/12/2023) |
| 06/13/2023 | 315 | NOTICE by Courtney Kelln, Mike K. Veldhuis *of Non-Opposition to Entry of Judgment* (Attachments: # 1 Text of Proposed Order as to Defendant Courtney Kelln, # 2 Text of Proposed Order as to Defendant Mike Veldhuis)(Muhlendorf, Kevin) (Entered: 06/13/2023) |
| 06/14/2023 | 316 | Response by Securities and Exchange Commission to 315 Notice (Other) *Response to Kelln's and Veldhuis's Notice of Non-Opposition to Entry of Judgment*. (London, David) (Entered: 06/14/2023) |
| 06/14/2023 | 317 | Judge William G. Young: ORDER entered. JUDGMENT as to Courtney Kelln (Paine, Matthew) (Entered: 06/14/2023) |
| 06/14/2023 | 318 | NOTICE by Mike K. Veldhuis *of Non-Opposition to Entry of Judgment* (Attachments: # 1 Text of Proposed Order)(Knuts, Robert) (Entered: 06/14/2023) |
| 06/15/2023 | 319 | Amended MOTION for Entry of Judgment (Non-Opposition) as to Mike Veldhuis, by Mike K. Veldhuis. (Attachments: # 1 Proposed Judgment - Mike Veldhuis)(Paine, Matthew) (Entered: 06/15/2023) |
| 06/15/2023 | 320 | PRETRIAL MEMORANDUM by Securities and Exchange Commission. (Attachments: # 1 Exhibit A - Plaintiff's Witness List, # 2 Exhibit B - Plaintiff's Exhibit List, # 3 Exhibit C |

A33

CM/ECF - USDC Massachusetts - Version 1.8.2 as of 12/23/2024

| | | |
|---|---|---|
| | | - Plaintiff's Expert Report)(Shields, Kathleen) (Additional attachment(s) added on 6/16/2023: # 4 SEALED - Final Pretrial Memorandum, # 5 SEALED - SEC Witness List) (Paine, Matthew). (Entered: 06/15/2023) |
| 06/15/2023 | 321 | First SUR-REPLY to Motion re 266 MOTION for Partial Summary Judgment filed by Jackson T. Friesen. (Attachments: # 1 Affidavit in Support of Sur-Reply)(Fazio, Timothy) (Entered: 06/15/2023) |
| 06/15/2023 | 322 | MOTION to Seal Portions of Parties' Joint Pre-Trial Memorandum and Plaintiff's List by Securities and Exchange Commission. (FILED UNDER SEAL)(Paine, Matthew) (Entered: 06/16/2023) |
| 06/21/2023 | 323 | Judge William G. Young: ELECTRONIC ORDER entered re 322 Motion to Seal Portions of Parties' Joint Pre-Trial Memorandum and Plaintiff's Witness List by Securities and Exchange Commission. **Motion allowed provided only the particular names shall be redacted.** (Gaudet, Jennifer) (Entered: 06/21/2023) |
| 06/21/2023 | 324 | Judge William G. Young: ELECTRONIC ORDER entered granting 319 Amended Motion for Entry of Judgment (non-opposition) as to Mike Veldhuis. (Gaudet, Jennifer) (Entered: 06/21/2023) |
| 06/21/2023 | 325 | Judge William G. Young: ORDER entered; JUDGMENT as to Defendant Mike Veldhuis. (Gaudet, Jennifer) (Entered: 06/21/2023) |
| 06/21/2023 | 327 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 6/21/2023 re 266 MOTION for Partial Summary Judgment filed by Securities and Exchange Commission. After hearing arguments of counsel, the Court takes the matter under advisement as to particular trades identified in the Q data; the motion is otherwise denied. (Court Reporter: Richard Romanow at bulldog@richromanow.com.)(Attorneys present: Attorneys Day, Shields, London and Klunder for the plaintiff; Attorneys Pickett, Silverblatt, Smith, Belostock for defendants) (Gaudet, Jennifer) (Entered: 07/12/2023) |
| 07/06/2023 | 326 | NOTICE by Securities and Exchange Commission *Unavailability of Counsel* (Day, Alfred) (Entered: 07/06/2023) |
| 08/10/2023 | 328 | Judge William G. Young: ORDER entered; PROCEDURAL ORDER re pretrial/trial. Final Pretrial Conference set for 9/5/2023 11:00 AM in Courtroom 18 (In person only) before Judge William G. Young. **A joint pretrial memorandum is due on or before Friday, September 1, 2023.**(Gaudet, Jennifer) (Entered: 08/10/2023) |
| 08/10/2023 | 329 | MOTION in Limine *to Exclude "Q" Records and Purported Expert Testimony* by Jackson T. Friesen. (Attachments: # 1 Text of Proposed Order Proposed Order)(Fazio, Timothy) (Entered: 08/10/2023) |
| 08/16/2023 | 330 | MOTION to Modify Preliminary Injunction to Pay Attorney's Fees and Request for Expedited Ruling by Paul Sexton.(Smith, Neil) (Entered: 08/16/2023) |
| 08/16/2023 | 331 | MEMORANDUM in Support re 330 MOTION to Modify Preliminary Injunction to Pay Attorney's Fees and Request for Expedited Ruling filed by Paul Sexton. (Attachments: # 1 Sexton Declaration)(Smith, Neil) (Additional attachment(s) added on 9/4/2023: # 2 Unredacted Memorandum, # 3 Unredacted Declaration) (Paine, Matthew). (Entered: 08/16/2023) |
| 08/16/2023 | 332 | MOTION to Seal by Paul Sexton.(Smith, Neil) (Entered: 08/16/2023) |
| 08/24/2023 | 333 | MEMORANDUM in Opposition re 330 MOTION to Modify Preliminary Injunction to Pay Attorney's Fees and Request for Expedited Ruling filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 08/24/2023) |

A34

| 08/24/2023 | 334 | MOTION in Limine *To Exclude "Q" System And Proposed Expert* by Zhiying Yvonne Gasarch. (Attachments: # 1 Exhibit Nikolayev Depo Transcript)(Pickett, Karen) (Entered: 08/24/2023) |
| 08/25/2023 | 335 | Judge William G. Young: ELECTRONIC ORDER entered re 330 Motion for Modify Preliminary Injunction. **The preliminary injunction is modified to release $250,000 for the sole purpose of providing legal representation. There will be no further modifications.** (Gaudet, Jennifer) (Entered: 08/25/2023) |
| 08/25/2023 | 336 | Opposition re 329 MOTION in Limine *to Exclude "Q" Records and Purported Expert Testimony* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit 1 - Murphy Declaration, # 2 Exhibit 2- Gasarch Deposition)(Day, Alfred) (Entered: 08/25/2023) |
| 08/28/2023 | 337 | ELECTRONIC NOTICE OF RESCHEDULING. Final Pretrial Conference reset for 9/7/2023 at 10:15 AM in Courtroom 18 (In person only) before Judge William G. Young. (Gaudet, Jennifer) (Entered: 08/28/2023) |
| 08/31/2023 | 338 | MOTION in Limine *to Exclude Q System and Associated Data* by Paul Sexton. (Attachments: # 1 Exhibit A: Nikolayev Tr.)(Smith, Neil) (Entered: 08/31/2023) |
| 08/31/2023 | 339 | MOTION in Limine *to Exclude Expert Testimony* by Paul Sexton.(Smith, Neil) (Entered: 08/31/2023) |
| 08/31/2023 | 340 | MOTION in Limine *to Compel Production of Documents* by Paul Sexton. (Attachments: # 1 Exhibit A: SEC's Discovery Responses, # 2 Exhibit B: SEC's Privilege Log)(Smith, Neil) (Entered: 08/31/2023) |
| 08/31/2023 | 341 | BRIEF in Support of Motion in Limine Regarding Admissibility of Third Party Records by Securities and Exchange Commission. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Klunder, Nita) Modified on 8/31/2023 to adjust docket text and event used (Currie, Haley). (Entered: 08/31/2023) |
| 09/01/2023 | 342 | NOTICE of Appearance by Maranda Fritz on behalf of Jackson T. Friesen (Fritz, Maranda) (Entered: 09/01/2023) |
| 09/01/2023 | 343 | DECLARATION *of Nita Klunder* by Securities and Exchange Commission. (Attachments: # 1 Exhibit A)(Klunder, Nita) (Entered: 09/01/2023) |
| 09/01/2023 | 344 | Transcript of Motion Hearing held on June 21, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at bulldog@richromanow.com. Redaction Request due 9/22/2023. Redacted Transcript Deadline set for 10/2/2023. Release of Transcript Restriction set for 11/30/2023. (McDonagh, Christina) (Entered: 09/01/2023) |
| 09/01/2023 | 345 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 09/01/2023) |
| 09/01/2023 | 346 | MOTION to Supplement Motion in Limine *To Adopt and Incorporate Defendant Sexton's Arguments re Q and Expert* by Zhiying Yvonne Gasarch.(Pickett, Karen) Modified on 9/6/2023 to adjust docket text (Currie, Haley). (Entered: 09/01/2023) |
| 09/01/2023 | 347 | MOTION in Limine *To Compel Production of Documents* by Zhiying Yvonne Gasarch. (Pickett, Karen) (Entered: 09/01/2023) |

A35

| | | |
|---|---|---|
| 09/01/2023 | [348](#) | MEMORANDUM in Opposition re [341](#) MOTION in Limine *Regarding Admissibility of Records* filed by Paul Sexton. (Smith, Neil) (Entered: 09/01/2023) |
| 09/01/2023 | [349](#) | PRETRIAL MEMORANDUM by Securities and Exchange Commission. (Attachments: # [1](#) Exhibit A SEC's Witness List, # [2](#) Exhibit B - Agreed To Exhibit List, # [3](#) Exhibit C - Objected To Exhibit List, # [4](#) Exhibit D - SEC's Proposed Verdict Form, # [5](#) Exhibit E - SEC's Proposed Voir Dire Questions, # [6](#) Exhibit F - SEC's Proposed Jury Instructions) (Shields, Kathleen) (Entered: 09/01/2023) |
| 09/04/2023 | [350](#) | Opposition re [346](#) Supplemental MOTION in Limine *To Adopt and Incorporate Defendant Sexton's Arguments re Q and Expert*, [339](#) MOTION in Limine *to Exclude Expert Testimony*, [334](#) MOTION in Limine *To Exclude "Q" System And Proposed Expert* filed by Securities and Exchange Commission. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B)(London, David) (Entered: 09/04/2023) |
| 09/05/2023 | [351](#) | MEMORANDUM in Opposition re [340](#) MOTION in Limine *to Compel Production of Documents* filed by Securities and Exchange Commission. (Klunder, Nita) (Entered: 09/05/2023) |
| 09/05/2023 | [352](#) | Opposition re [334](#) MOTION in Limine *To Exclude "Q" System And Proposed Expert* filed by Securities and Exchange Commission. (Day, Alfred) (Entered: 09/05/2023) |
| 09/05/2023 | [353](#) | Opposition re [338](#) MOTION in Limine *to Exclude Q System and Associated Data* filed by Securities and Exchange Commission. (Attachments: # [1](#) Exhibit A - Trial Ex. LI, # [2](#) Exhibit B - Trial Ex. MZ, # [3](#) Exhibit C - Trial Ex. NO (excerpt), # [4](#) Exhibit D - Trial Ex. NK (excerpt), # [5](#) Exhibit E - Sexton Dep. Ex. 22, # [6](#) Exhibit F - Sexton Dep. Ex. 24, # [7](#) Exhibit G - Sexton Dep. Ex. 25, # [8](#) Exhibit H - Sexton Dep. Ex. 26)(Day, Alfred) (Additional attachment(s) added on 9/5/2023: # [9](#) Unredacted Opposition) (Paine, Matthew). (Entered: 09/05/2023) |
| 09/05/2023 | [354](#) | MOTION to Seal *and redact names of certain witnesses* by Securities and Exchange Commission.(Day, Alfred) (Entered: 09/05/2023) |
| 09/06/2023 | 355 | ELECTRONIC NOTICE issued requesting a PAPER courtesy copy for [352](#) Opposition to Motion, [353](#) Opposition to Motion,, [351](#) Memorandum in Opposition to Motion, [348](#) Memorandum in Opposition to Motion, [346](#) Supplemental MOTION in Limine *To Adopt and Incorporate Defendant Sexton's Arguments re Q and Expert*, [339](#) MOTION in Limine *to Exclude Expert Testimony*, [338](#) MOTION in Limine *to Exclude Q System and Associated Data*, [354](#) MOTION to Seal *and redact names of certain witnesses*, [343](#) Declaration, [347](#) MOTION in Limine *To Compel Production of Documents*, [349](#) Pretrial Memorandum, [340](#) MOTION in Limine *to Compel Production of Documents*, [336](#) Opposition to Motion, [334](#) MOTION in Limine *To Exclude "Q" System And Proposed Expert*, [350](#) Opposition to Motion,. Counsel who filed this document are requested to submit a courtesy copy of this document (or documents) to the Clerk's Office by Attention Matthew Paine - Docket Clerk - Judge Young. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (Paine, Matthew) (Entered: 09/06/2023) |
| 09/06/2023 | [356](#) | Proposed Jury Questions by Jackson T. Friesen, Zhiying Yvonne Gasarch, Paul Sexton . (Attachments: # [1](#) Exhibit Exhibit 1 (Redlined Instructions))(Pickett, Karen) (Entered: 09/06/2023) |
| 09/06/2023 | [357](#) | Proposed Voir Dire by Jackson T. Friesen, Zhiying Yvonne Gasarch, Paul Sexton. (Pickett, Karen) (Entered: 09/06/2023) |
| 09/06/2023 | [358](#) | Proposed Jury Verdict by Jackson T. Friesen, Zhiying Yvonne Gasarch, Paul Sexton. (Pickett, Karen) (Entered: 09/06/2023) |

A36

| 09/06/2023 | 359 | NOTICE by Jackson T. Friesen, Zhiying Yvonne Gasarch, Paul Sexton *of filing of trial documents* (Pickett, Karen) (Entered: 09/06/2023) |
|---|---|---|
| 09/07/2023 | 360 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Final Pretrial Conference held on 9/7/2023. The Court makes rulings on outstand motions in open court (see transcript). After a brief recess, further hearing held in the jury room off the record. Jury trial to commence on Monday, September 11, 2023; 12 jurors to be empaneled with six (6) peremptory challenges per side. The Court reviews the trial schedule and explains empanelment procedures; time limits (45 minutes for opening statements per side and one and one half hour per side for closings); order for cross examination and order for closing arguments. (Oral order entered granting in part and denying in part 329 Motion in Limine; granting in part and denying in part 334 Motion in Limine; granting in part and denying in part 338 Motion in Limine; granting in part and denying in part 339 Motion in Limine; granting 354 Motion to Seal and redact names of certain witnesses by Securities and Exchange Commission.) (Jury Trial Day One set for 9/11/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young, Jury Trial Day Two set for 9/12/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young, Jury Trial Day Three set for 9/14/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young, Jury Trial Day Four set for 9/15/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young.). (Court Reporter: Richard Romanow at bulldog@richromanow.com.)(Attorneys present: Attorneys Shields, London and Day for the plaintiff; Attorneys Pickett, Smith, Silverblatt, Fritz and Fazio for the defendants) (Gaudet, Jennifer) (Entered: 09/08/2023) |
| 09/08/2023 | 361 | Emergency MOTION to Quash *Trial Subpoena Issued To Mrs. Gasarch by SEC* by Zhiying Yvonne Gasarch. (Attachments: # 1 Exhibit Exhibit A (email), # 2 Exhibit Exhibit B (trial subpoena))(Pickett, Karen) (Entered: 09/08/2023) |
| 09/08/2023 | 362 | NOTICE of Withdrawal of Appearance by Lorraine Belostock (Belostock, Lorraine) (Entered: 09/08/2023) |
| 09/08/2023 | 363 | Judge William G. Young: ELECTRONIC ORDER entered re 340 Motion in Limine to Compel Production of Documents by Paul Sexton; and 347 Motion in Limine To Compel Production of Documents by Zhiying Yvonne Gasarch. **The Commission shall produce forthwith to the defendants all prior statements of any witness it intends to call and any substantially verbatim characterization of such statements whether in an FBI 302 or otherwise. This order is to be liberally construed.** (Gaudet, Jennifer) (Entered: 09/08/2023) |
| 09/08/2023 | 364 | MOTION to Approve Consent Judgment *as to Defendant Avtar Dhillon* by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Proposed Final Judgment as to Avtar Dhillon, # 2 Consent of Avtar Dhillon)(Shields, Kathleen) (Entered: 09/08/2023) |
| 09/08/2023 | 365 | Emergency MOTION to Quash by Paul Sexton.(Smith, Neil) (Entered: 09/08/2023) |
| 09/08/2023 | 366 | Emergency MOTION to Quash *Trial Subpoena Issued to Mr. Friesen by SEC* by Jackson T. Friesen. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Fazio, Timothy) (Entered: 09/08/2023) |
| 09/08/2023 | 367 | Emergency MOTION to Quash *Trial Subpoena From Plaintiff SEC* by Courtney Kelln. (Muhlendorf, Kevin) (Entered: 09/08/2023) |
| 09/08/2023 | 368 | Emergency MOTION *to Quash Trial Subpoena* by Mike K. Veldhuis. (Attachments: # 1 Exhibit A - Trial Subpoena)(Knuts, Robert) (Entered: 09/08/2023) |
| 09/09/2023 | 369 | Opposition re 368 Emergency MOTION *to Quash Trial Subpoena*, 361 Emergency MOTION to Quash *Trial Subpoena Issued To Mrs. Gasarch by SEC*, 365 Emergency |

A37

|  |  | MOTION to Quash , 366 Emergency MOTION to Quash *Trial Subpoena Issued to Mr. Friesen by SEC*, 367 Emergency MOTION to Quash *Trial Subpoena From Plaintiff SEC* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit A)(Day, Alfred) (Entered: 09/09/2023) |
|---|---|---|
| 09/09/2023 | 370 | REPLY to Response to 367 Emergency MOTION to Quash *Trial Subpoena From Plaintiff SEC* filed by Courtney Kelln. (Attachments: # 1 Exhibit Email correspondence with SEC, # 2 Exhibit Trial Subpoena to Ms. Kelln)(Muhlendorf, Kevin) (Entered: 09/09/2023) |
| 09/09/2023 | 371 | Amended Opposition re 368 Emergency MOTION *to Quash Trial Subpoena*, 361 Emergency MOTION to Quash *Trial Subpoena Issued To Mrs. Gasarch by SEC*, 365 Emergency MOTION to Quash , 366 Emergency MOTION to Quash *Trial Subpoena Issued to Mr. Friesen by SEC*, 367 Emergency MOTION to Quash *Trial Subpoena From Plaintiff SEC* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit A (revised))(Day, Alfred) (Entered: 09/09/2023) |
| 09/09/2023 | 372 | RESPONSE to Motion re 367 Emergency MOTION to Quash *Trial Subpoena From Plaintiff SEC* filed by Securities and Exchange Commission. (Day, Alfred) (Entered: 09/09/2023) |
| 09/09/2023 | 373 | Emergency MOTION to Continue Trial to October 11, 2023 by Jackson T. Friesen. (Attachments: # 1 Exhibit 1 (trial subpoena), # 2 Exhibit 2 (SEC letter))(Fazio, Timothy) (Entered: 09/09/2023) |
| 09/10/2023 | 374 | MEMORANDUM in Opposition re 373 Emergency MOTION to Continue Trial to October 11, 2023 filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 09/10/2023) |
| 09/10/2023 | 375 | Supplemental Proposed Jury Instructions by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 09/10/2023) |
| 09/11/2023 | 376 | NOTICE by Paul Sexton *of Non-Opposition to Entry of Judgment* (Attachments: # 1 Text of Proposed Order)(Smith, Neil) (Entered: 09/11/2023) |
| 09/11/2023 | 377 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Jury Trial Day One held on 9/11/2023. Pretrial hearing held regarding outstanding pretrial matters. The Court enters an order re 373 Motion to Continue Trial: the motion is denied as to request for a continuance and granted as to the alternative request. The pending motion to allow witness to appear remotely is allowed over objection of the defendant(s). Attorney for defendant Sexton notified the Court that his client will be filing a motion to approve consent judgment. Defendant Sexton is excused. Jury venire brought to the courtroom at 10:30. Venire is sworn and questioned. Jury of 12 selected and sworn. The Court gives preliminary instructions. The plaintiff makes opening statement. Jury trial continued to Tuesday, September 12, 2023 at 9:00 AM. (Court Reporter: Richard Romanow at bulldog@richromanow.com.)(Attorneys present: Attorneys Shield, Day, Klunder and London for the plaintiff; Attorney Pickett for defendant Gasarch; Attorney Fritz and Fazio for defendant Friesen and Attorney Smith for defendant Sexton) (Gaudet, Jennifer) (Entered: 09/11/2023) |
| 09/12/2023 | 378 | Judge William G. Young: ORDER entered. JUDGMENT as to Paul Sexton. (Paine, Matthew) (Entered: 09/12/2023) |
| 09/12/2023 | 381 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Jury Trial Day Two held on 9/12/2023. Defendants opening statements. Plaintiff's evidence commences: P-1, Avtar Dhillon (sworn). (Court Reporter: Richard Romanow at bulldog@richromanow.com.)(Attorneys present: Attorneys Shield, Day, Klunder and |

A38

| | | |
|---|---|---|
| | | London for the plaintiff; Attorney Pickett for defendant Gasarch; Attorney Fritz and Fazio for defendant Friesen) (Gaudet, Jennifer) (Entered: 09/14/2023) |
| 09/13/2023 | 379 | MOTION to Modify Amended Preliminary Injunction *And Request For Expedited Ruling* by Zhiying Yvonne Gasarch. (Attachments: # 1 Exhibit A, # 2 Exhibit B (Affidavit)) (Pickett, Karen) (Entered: 09/13/2023) |
| 09/14/2023 | 380 | Judge William G. Young: ELECTRONIC ORDER entered re 379 MOTION to Modify Amended Preliminary Injunction And Request For Expedited Ruling. (Paine, Matthew) **Motion denied. This defendant's proper need for funds has already been fully considered and ruled upon.** (Entered: 09/14/2023) |
| 09/14/2023 | 382 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Jury Trial Three held on 9/14/2023. P-1, Dhillon resumes the stand; P-2, William Kaitz (sworn). (Court Reporter: Richard Romanow at bulldog@richromanow.com.)(Attorneys present: Attorneys Shield, Day, Klunder and London for the plaintiff; Attorney Pickett for defendant Gasarch; Attorney Fritz and Fazio for defendant Friesen) (Gaudet, Jennifer) (Entered: 09/14/2023) |
| 09/14/2023 | 383 | Supplemental Proposed Jury Instructions by Securities and Exchange Commission. (London, David) (Entered: 09/14/2023) |
| 09/15/2023 | 384 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Jury Trial Day Four held on 9/15/2023. Jury of 12 present. P-2, William Kaitz resumes the stand. Stipulations read into evidence. P-3, Fedir Nikolayev by video taped deposition; P-4, Chris Giankura (sworn). The parties agree to excuse juror. Jury trial continued to Tuesday, September 19, 2023 at 9:00 AM. ( Jury Trial set for 9/19/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young., Jury Trial set for 9/20/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young., Jury Trial set for 9/21/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young., Jury Trial set for 9/22/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young.). (Court Reporter: Richard Romanow at bulldog@richromanow.com.) (Attorneys present: Attorneys Shield, Day, Klunder and London for the plaintiff; Attorney Pickett for defendant Gasarch; Attorney Fritz and Fazio for defendant Friesen) (Gaudet, Jennifer) Modified on 9/19/2023 to correct typo (Gaudet, Jennifer). (Entered: 09/15/2023) |
| 09/19/2023 | 385 | Judge William G. Young: ORDER entered denying 266 Motion for Partial Summary Judgment (Sonnenberg, Elizabeth) (Entered: 09/19/2023) |
| 09/19/2023 | 387 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Jury Trial Day Five held on 9/19/2023. Jury of 11 present. Video taped Deposition of P-3, Fedir Nikolayev continued; P-5, Christopher Beckstrom (sworn); P-6, Roger Knox (sworn). (Court Reporter: Richard Romanow at bulldog@richromanow.com.)(Attorneys present: Attorneys Shield, Day, Klunder and London for the plaintiff; Attorney Pickett for defendant Gasarch; Attorney Fritz and Fazio for defendant Friesen) (Gaudet, Jennifer) (Entered: 09/20/2023) |
| 09/20/2023 | 386 | MOTION Admit Exhibits QK, QR and RL by Securities and Exchange Commission. (Klunder, Nita) (Entered: 09/20/2023) |
| 09/20/2023 | 388 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Jury Trial Day Six held on 9/20/2023. Jury of 11 present. P-6, Roger Knox resumes the stand. The Court enters an order at sidebar granting in part and denying in part 386 Motion to Admit Exhibits QK, QR and RL by Securities and Exchange Commission. (Court Reporter: Richard Romanow at rhrbulldog@aol.com.)(Attorneys present: Attorneys Shield, Day, |

| | | |
|---|---|---|
| | | Klunder and London for the plaintiff; Attorney Pickett for defendant Gasarch; Attorney Fritz and Fazio for defendant Friesen.) (Gaudet, Jennifer) Modified on 9/22/2023 to correct docket text to remove Attorney Smith (Gaudet, Jennifer). (Entered: 09/21/2023) |
| 09/21/2023 | [389](#) | MOTION in Limine *To Exclude Exhibit QK Summary Chart* by Zhiying Yvonne Gasarch. (Attachments: # 1 Exhibit Exhibit 1)(Pickett, Karen) (Entered: 09/21/2023) |
| 09/21/2023 | 390 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Jury Trial Day Seven held on 9/21/2023. Jury of 11 present. P-6, Roger Knox resumes the stand; P-7, Kenneth Ciapala (sworn) - by video. Court adjourned and continued to Friday, September 22, 2023 at 9:00 AM. (Court Reporter: Richard Romanow at rhrbulldog@aol.com.)(Attorneys present: Shield, Day, Klunder and London for the plaintiff; Attorney Pickett for defendant Gasarch; Attorney Fritz and Fazio for defendant Friesen) (Gaudet, Jennifer) (Entered: 09/22/2023) |
| 09/22/2023 | 391 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Jury Trial Eight held on 9/22/2023. Jury of 11 present. P-7, Ciapala resumes the stand (remotely); P-8, Ryan Murphy (sworn). Commission rests. Motions for directed verdict to be heard on Monday, September 25, 2023. Defendants rest. Jury excused until Tuesday, September 26, 2023 at 9:00 AM. The Court makes evidentiary rulings on the record. Motion hearing/Charge conference set for Monday, September 25, 2023 at 10:00 AM. (Jury Trial Day Eight set for 9/26/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young. Hearing set for 9/25/2023 10:00 AM in Courtroom 18 (In person only) before Judge William G. Young.)(Court Reporter: Richard Romanow at rhrbulldog@aol.com.)(Attorneys present: Shield, Day, Klunder and London for the plaintiff; Attorney Pickett for defendant Gasarch; Attorney Fritz and Fazio for defendant Friesen) (Gaudet, Jennifer) (Entered: 09/22/2023) |
| 09/24/2023 | [392](#) | Amended Proposed Jury Instructions by Securities and Exchange Commission. (Day, Alfred) (Entered: 09/24/2023) |
| 09/24/2023 | [393](#) | Amended Proposed Jury Verdict by Securities and Exchange Commission. (Day, Alfred) (Entered: 09/24/2023) |
| 09/25/2023 | [394](#) | MOTION to Strike *Hearsay (Alleged Coconspirator Evidence)* by Zhiying Yvonne Gasarch.(Pickett, Karen) (Entered: 09/25/2023) |
| 09/25/2023 | [395](#) | MOTION for Directed Verdict by Zhiying Yvonne Gasarch.(Pickett, Karen) (Entered: 09/25/2023) |
| 09/25/2023 | [396](#) | MOTION for Order to Effectuate Release of Funds by Paul Sexton. (Attachments: # 1 Text of Proposed Order)(Smith, Neil) (Entered: 09/25/2023) |
| 09/26/2023 | [397](#) | Judge William G. Young ORDER entered: re 396 MOTION for Order to Effectuate Release of Funds. (Paine, Matthew) (Entered: 09/26/2023) |
| 09/26/2023 | 398 | Judge William G. Young: ELECTRONIC ORDER entered denying 395 MOTION for Directed Verdict by Zhiying Yvonne. (Paine, Matthew) (Entered: 09/26/2023) |
| 09/26/2023 | 399 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 9/26/2023 re 395 MOTION for Directed Verdict filed by Zhiying Yvonne Gasarch. harge Conference held on 9/26/2023. The Court enters an order denying Motion for Directed Verdict. The Court reviews jury instructions, verdict form and time limits for closing arguments. Answers questions of counsel. (Court Reporter: Richard Romanow at rhrbulldog@aol.com.)(Attorneys present: Shield, Day, Klunder and London for the plaintiff; Attorney Pickett for defendant Gasarch; Attorney Fritz and Fazio for defendant Friesen)) (Gaudet, Jennifer) (Entered: 09/26/2023) |

A40

| 09/26/2023 | 400 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Jury Trial Day Nine held on 9/26/2023. Jury of 11 present. The Court charges the jury. Closing arguments made. Jury retires to deliberate at 1:00 PM. Jury of 11 brought into the courtroom at 2:55 to answer a question. Jurors request to leave at 4:00. Jury deliberations continued to 9:00 AM on Wednesday, September 27, 2023. (Jury Trial Ten set for 9/27/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young.). (Court Reporter: Richard Romanow at rhrbulldog@aol.com.)(Attorneys present: Shield, Day, Klunder and London for the plaintiff; Attorney Pickett for defendant Gasarch; Attorney Fritz and Fazio for defendant Friesen)) (Gaudet, Jennifer) (Entered: 09/26/2023) |
| 09/27/2023 | 401 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Jury Trial Day 10 held on 9/27/2023. Jury of 11 present and continue deliberations. Verdict returned at 10:35 AM. (Court Reporter: Richard Romanow at rhrbulldog@aol.com.)(Attorneys present: Shield, Day, Klunder and London for the plaintiff; Attorney Pickett for defendant Gasarch; Attorney Fritz and Fazio for defendant Friesen) (Gaudet, Jennifer) (Entered: 10/11/2023) |
| 09/27/2023 | 402 | JURY VERDICT in favor of the Plaintiff against the Defendants. (Gaudet, Jennifer) (Entered: 10/11/2023) |
| 10/10/2023 | 403 | Judge William G. Young: ELECTRONIC ORDER entered granting 364 MOTION to Approve Consent Judgment as to Defendant Avtar Dhillon. (Paine, Matthew) (Entered: 10/11/2023) |
| 10/10/2023 | 404 | Judge William G. Young ORDER entered: FINAL JUDGMENT as to Avtar S. Dhillon (Paine, Matthew) (Entered: 10/11/2023) |
| 10/13/2023 | 405 | MOTION to Modify Preliminary Injunction Order, Docket No. 91 *as to defendant Jackson Friesen* by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Proposed Order Modifying Preliminary Injunctioon as to Jackson Friesen)(Shields, Kathleen) (Entered: 10/13/2023) |
| 10/16/2023 | 406 | MOTION to Modify Preliminary Injunction (ECF No. 39) *to Pay Attorney's Fees and Request for Expedited Ruling* by Jackson T. Friesen. (Fazio, Timothy) Modified on 10/16/2023 to Correct Docket text and Remove Memorandum (Paine, Matthew). (Entered: 10/16/2023) |
| 10/16/2023 | 407 | MEMORANDUM in Support re 406 MOTION to Modify Preliminary Injunction (ECF No. 39) *to Pay Attorney's Fees and Request for Expedited Ruling* filed by Jackson T. Friesen. (Paine, Matthew) (Entered: 10/16/2023) |
| 10/16/2023 | 408 | Notice of correction to docket made by Court staff. Docket Entry 406 Motion to Modify Preliminary Injunction Correct Because Counsel Fazio Attached the Memorandum of Law in Support to the Motion in Violation of Court Rules and CM/ECF NextGen Administrative Procedures Section (G)(4). Please See ECF No. 407 for the Memorandum of Law in Support. (Paine, Matthew) (Entered: 10/16/2023) |
| 10/18/2023 | 409 | Judge William G. Young ELECTRONIC ORDER entered: re 406 MOTION to Modify Preliminary Injunction (ECF No. 39) to Pay Attorney's Fees and Request for Expedited Ruling. (Paine, Matthew)<br><br>**Motion denied without prejudice to its renewal when the Court engages in the remedy phase, which shall be promptly scheduled.**<br><br>(Entered: 10/18/2023) |
| 10/19/2023 | 410 | Judge William G. Young: ELECTRONIC ORDER entered granting 405 Motion to Modify Preliminary Injunction Order, Docket No. 91 as to defendant Jackson Friesen by |

| | | |
|---|---|---|
| | | Securities and Exchange Commission. (Gaudet, Jennifer) (Entered: 10/19/2023) |
| 10/19/2023 | 411 | Judge William G. Young ORDER entered: Second Modification of Preliminary Injunction, Order Freezing Assets, and Order for Other Equitable Relief as to Jackson T. Friesen. (Paine, Matthew) (Entered: 10/19/2023) |
| 10/25/2023 | 412 | Assented to MOTION for Leave to File Excess Pages by Securities and Exchange Commission.(Shields, Kathleen) (Entered: 10/25/2023) |
| 10/25/2023 | 413 | MOTION for Judgment NOV by Zhiying Yvonne Gasarch.(Pickett, Karen) (Entered: 10/25/2023) |
| 10/26/2023 | 414 | Judge William G. Young: ELECTRONIC ORDER entered denying 413 Renewed Motion Pursuant to Fed.R.Civ. P.50 for Judgment as a Matter of Law or, in the alternative, for a New Trial. (Gaudet, Jennifer) (Entered: 10/26/2023) |
| 10/26/2023 | 415 | Judge William G. Young: ELECTRONIC ORDER entered granting 412 Assented to Motion for Leave to File Excess Pages ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Gaudet, Jennifer) (Entered: 10/26/2023) |
| 11/09/2023 | 416 | MOTION for Leave to Appear Pro Hac Vice for admission of Claire E. Kellen Filing fee: $ 125, receipt number AMADC-10127314 by Courtney Kelln. (Attachments: # 1 Certificate of Attorney Claire E. Kellen)(Signorello, Pamela) **Modified on 11/12/2023 to Correct Name of Counsel** (Paine, Matthew). (Entered: 11/09/2023) |
| 11/12/2023 | 417 | Judge William G. Young: ELECTRONIC ORDER entered granting 416 Motion for Leave to Appear Pro Hac Vice Added Claire E. Kellen. <br><br> **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** <br><br> Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. <br><br> A Notice of Appearance must be entered on the docket by the newly admitted attorney. <br><br> (Paine, Matthew) (Entered: 11/12/2023) |
| 11/14/2023 | 418 | NOTICE of Appearance by Claire E. Kellen on behalf of Courtney Kelln (Kellen, Claire) (Entered: 11/14/2023) |
| 11/14/2023 | 419 | MOTION to Withdraw as Attorney *for Defendant Courtney Kelln* by Courtney Kelln. (Muhlendorf, Kevin) (Entered: 11/14/2023) |
| 11/16/2023 | 420 | Judge William G. Young: ELECTRONIC ORDER entered granting 419 Motion to Withdraw as Attorney. Attorney Kevin B. Muhlendorf terminated. (Gaudet, Jennifer) (Entered: 11/16/2023) |
| 12/05/2023 | 421 | Second MOTION to Stay *the Proceedings* by Courtney Kelln, Mike K. Veldhuis.(Knuts, Robert) (Entered: 12/05/2023) |
| 12/05/2023 | 422 | MEMORANDUM in Support re 421 Second MOTION to Stay *the Proceedings* filed by Courtney Kelln, Mike K. Veldhuis. (Knuts, Robert) (Entered: 12/05/2023) |

A42

| | | |
|---|---|---|
| 12/05/2023 | 423 | AFFIDAVIT in Support re 421 Second MOTION to Stay *the Proceedings* filed by Courtney Kelln, Mike K. Veldhuis. (Attachments: # 1 Exhibit 1 (Nov. 17, 2023 Affidavit of AUSA Drabick), # 2 Exhibit 2 (Feb. 8-16, 2022 Email Exchange between AUSA Drabick and R. Knuts), # 3 Exhibit 3 (Feb. 17, 2023 Email from AUSA Drabick), # 4 Exhibit 4 (Mar. 17, 2023 Shields Email))(Knuts, Robert) (Entered: 12/05/2023) |
| 12/06/2023 | 424 | ELECTRONIC NOTICE issued requesting PAPER courtesy copy for 421 Second MOTION to Stay *the Proceedings*, 423 Affidavit in Support of Motion, 422 Memorandum in Support of Motion. Counsel who filed this document are requested to submit a courtesy copy of this document (or documents) to the Clerk's Office by Attention Matthew Paine - Docket Clerk - Judge Young. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (Paine, Matthew) (Entered: 12/06/2023) |
| 12/08/2023 | 425 | MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhuis and Kelln* by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Proposed Final Judgment as to Friesen, # 2 Text of Proposed Order Proposed Final Judgment as to Gasarch, # 3 Text of Proposed Order Proposed Final Judgment as to Sexton, # 4 Text of Proposed Order Proposed Final Judgment as to Veldhuis, # 5 Text of Proposed Order Proposed Final Judgment as to Kelln)(Shields, Kathleen) (Entered: 12/08/2023) |
| 12/08/2023 | 426 | MEMORANDUM in Support re 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhuis and Kelln* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit A (Draft Jury Charge Transcript), # 2 Exhibit B)(Shields, Kathleen) (Entered: 12/08/2023) |
| 12/08/2023 | 427 | AFFIDAVIT of Ryan Murphy in Support re 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhuis and Kelln* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4 (part 1), # 5 Exhibit 4 (part 2), # 6 Exhibit 4 (part 3), # 7 Exhibit 4 (part 4), # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15, # 19 Exhibit 16, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21, # 25 Exhibit 22, # 26 Exhibit 23, # 27 Exhibit 24, # 28 Exhibit 25, # 29 Exhibit 26, # 30 Exhibit 27, # 31 Exhibit 28, # 32 Exhibit 29, # 33 Exhibit 30, # 34 Exhibit 31, # 35 Exhibit 32, # 36 Exhibit 33)(Shields, Kathleen) (Entered: 12/08/2023) |
| 12/15/2023 | 428 | MOTION for Extension of Time to File Response/Reply as to 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhuis and Kelln* by Paul Sexton.(Smith, Neil) (Entered: 12/15/2023) |
| 12/18/2023 | 429 | Opposition re 421 Second MOTION to Stay *the Proceedings* filed by Securities and Exchange Commission. (Day, Alfred) (Entered: 12/18/2023) |
| 12/18/2023 | 430 | Judge William G. Young: ELECTRONIC ORDER entered granting re 428 MOTION for Extension of Time to File Response/Reply as to 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhuis and Kelln. (Paine, Matthew) (Entered: 12/18/2023)* |
| 12/18/2023 | 431 | MOTION for Extension of Time to File Response To SEC Remedies Motion *Until 21 days after receipt of transcript* by Zhiying Yvonne Gasarch.(Pickett, Karen) **Modified on 12/18/2023 to Correct CM/ECF Filing Event** (Paine, Matthew). (Entered: 12/18/2023) |
| 12/19/2023 | 432 | MEMORANDUM in Opposition re 431 MOTION for Extension of Time to File Response To SEC Remedies Motion *Until 21 days after receipt of transcript* filed by |

| | | Securities and Exchange Commission. (Shields, Kathleen) (Entered: 12/19/2023) |
|---|---|---|
| 12/19/2023 | 433 | STIPULATION *and [Proposed] Order Regarding Defendants Veldhuis' and Kelln's Time to Respond* by Courtney Kelln, Mike K. Veldhuis. (Knuts, Robert) (Entered: 12/19/2023) |
| 01/24/2024 | 434 | Transcript of Final Pretrial Conference held on September 7, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due 2/14/2024. Redacted Transcript Deadline set for 2/26/2024. Release of Transcript Restriction set for 4/23/2024. (McDonagh, Christina) (Entered: 01/24/2024) |
| 01/24/2024 | 435 | Transcript of Jury Trial Day One held on September 11, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due 2/14/2024. Redacted Transcript Deadline set for 2/26/2024. Release of Transcript Restriction set for 4/23/2024. (McDonagh, Christina) (Entered: 01/24/2024) |
| 01/24/2024 | 436 | Transcript of Jury Trial Day Two held on September 12, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due 2/14/2024. Redacted Transcript Deadline set for 2/26/2024. Release of Transcript Restriction set for 4/23/2024. (McDonagh, Christina) (Entered: 01/24/2024) |
| 01/24/2024 | 437 | Transcript of Jury Trial Three held on September 14, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due 2/14/2024. Redacted Transcript Deadline set for 2/26/2024. Release of Transcript Restriction set for 4/23/2024. (McDonagh, Christina) (Entered: 01/24/2024) |
| 01/24/2024 | 438 | Transcript of Jury Trial Day Four held on September 15, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due 2/14/2024. Redacted Transcript Deadline set for 2/26/2024. Release of Transcript Restriction set for 4/23/2024. (McDonagh, Christina) (Entered: 01/24/2024) |
| 01/24/2024 | 439 | Transcript of Jury Trial Day Five held on September 19, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due 2/14/2024. Redacted Transcript Deadline set for 2/26/2024. Release of Transcript Restriction set for 4/23/2024. (McDonagh, Christina) (Entered: 01/24/2024) |
| 01/24/2024 | 440 | Transcript of Jury Trial Day Six held on September 20, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due 2/14/2024. Redacted Transcript Deadline set for 2/26/2024. Release of Transcript Restriction set for 4/23/2024. (McDonagh, Christina) (Entered: 01/24/2024) |
| 01/24/2024 | 441 | Transcript of Jury Trial Day Seven held on September 21, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due |

A44

| | | |
|---|---|---|
| | | 2/14/2024. Redacted Transcript Deadline set for 2/26/2024. Release of Transcript Restriction set for 4/23/2024. (McDonagh, Christina) (Entered: 01/24/2024) |
| 01/24/2024 | 442 | Transcript of Jury Trial Eight held on September 22, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Redaction Request due 2/14/2024. Redacted Transcript Deadline set for 2/26/2024. Release of Transcript Restriction set for 4/23/2024. (McDonagh, Christina) (Entered: 01/24/2024) |
| 01/24/2024 | 443 | Transcript of Motion and Charge Conference held on September 25, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due 2/14/2024. Redacted Transcript Deadline set for 2/26/2024. Release of Transcript Restriction set for 4/23/2024. (McDonagh, Christina) (Entered: 01/24/2024) |
| 01/24/2024 | 444 | Transcript of Jury Trial Day Nine held on September 26, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due 2/14/2024. Redacted Transcript Deadline set for 2/26/2024. Release of Transcript Restriction set for 4/23/2024. (McDonagh, Christina) (Entered: 01/24/2024) |
| 01/24/2024 | 445 | Transcript of Jury Trial Day Ten held on September 27, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due 2/14/2024. Redacted Transcript Deadline set for 2/26/2024. Release of Transcript Restriction set for 4/23/2024. (McDonagh, Christina) (Entered: 01/24/2024) |
| 01/24/2024 | 446 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 01/24/2024) |
| 02/01/2024 | 447 | Judge William G. Young: ELECTRONIC ORDER entered finding as moot 431 MOTION for Extension of Time to File Response To SEC Remedies Motion *Until 21 days after receipt of transcript. See stipulation filed on 12/19/2023 433* . (Gaudet, Jennifer) (Entered: 02/01/2024) |
| 02/01/2024 | 448 | Judge William G. Young: Stipulation and Order Regarding Defendants Veldhuis' and Kelln's Time to Respond entered. (Gaudet, Jennifer) (Entered: 02/01/2024) |
| 02/06/2024 | 449 | Assented to MOTION for Extension of Time to 2/21/2024 to File Response To SEC Remedies Motion by Zhiying Yvonne Gasarch.(Pickett, Karen) **Modified on 2/7/2024 to Correct CM/ECF NextGen Filing Event as Counsel Filed the Motion Under the Wrong Event in NextGen (Paine, Matthew).** (Entered: 02/06/2024) |

| 02/07/2024 | 450 | Judge William G. Young: ELECTRONIC ORDER entered granting 449 Assented to MOTION for Extension of Time to 2/21/2024 to File Response To SEC Remedies Motion re 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhuis and Kelln* Responses due by 2/21/2024 (Paine, Matthew) (Entered: 02/07/2024) |
|---|---|---|
| 02/07/2024 | 451 | Judge William G. Young: ELECTRONIC ORDER entered denying 421 Second MOTION to Stay the Proceedings. (Paine, Matthew) (Entered: 02/07/2024) |
| 02/09/2024 | 452 | Assented to MOTION for Extension of Time to File Response/Reply by Jackson T. Friesen.(Fritz, Maranda) (Entered: 02/09/2024) |
| 02/14/2024 | 453 | Judge William G. Young: ELECTRONIC ORDER entered granting re 452 Assented to MOTION for Extension of Time to File Response/Reply, 425 MOTION for Permanent Injunction and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhuis and Kelln. Responses due by 3/1/2024 (Paine, Matthew) (Entered: 02/14/2024) |
| 02/14/2024 | 454 | MEMORANDUM in Opposition re 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhuis and Kelln* filed by Paul Sexton. (Smith, Neil) (Entered: 02/14/2024) |
| 02/14/2024 | 455 | MEMORANDUM in Opposition re 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhuis and Kelln* filed by Courtney Kelln, Mike K. Veldhuis. (Kellen, Claire) (Entered: 02/14/2024) |
| 02/16/2024 | 456 | MOTION for Reconsideration by Courtney Kelln, Mike K. Veldhuis.(Knuts, Robert) (Entered: 02/16/2024) |
| 02/16/2024 | 457 | MEMORANDUM in Support re 456 MOTION for Reconsideration filed by Courtney Kelln, Mike K. Veldhuis. (Knuts, Robert) (Entered: 02/16/2024) |
| 02/16/2024 | 458 | AFFIDAVIT in Support re 456 MOTION for Reconsideration filed by Courtney Kelln, Mike K. Veldhuis. (Attachments: # 1 Exhibit 1 (US v. Sharp, et al., 24-cr-10002, Indictment))(Knuts, Robert) (Entered: 02/16/2024) |
| 02/20/2024 | 459 | MOTION to Stay *Proceedings* by Paul Sexton.(Smith, Neil) (Entered: 02/20/2024) |
| 02/20/2024 | 460 | Judge William G. Young: ELECTRONIC ORDER entered denying re 456 MOTION for Reconsideration filed by Mike K. Veldhuis, Courtney Kelln (Paine, Matthew) (Entered: 02/20/2024) |
| 02/20/2024 | 461 | MOTION for Leave to File *Reply Brief in support of its motion for remedies* by Securities and Exchange Commission.(Shields, Kathleen) (Entered: 02/20/2024) |
| 02/20/2024 | 462 | Opposition re 461 MOTION for Leave to File *Reply Brief in support of its motion for remedies* filed by Paul Sexton. (Smith, Neil) (Entered: 02/20/2024) |
| 02/21/2024 | 463 | NOTICE of Appearance by Joel S. Nolette on behalf of Courtney Kelln (Nolette, Joel) (Entered: 02/21/2024) |
| 02/21/2024 | 464 | Opposition re 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhuis and Kelln* filed by Zhiying Yvonne Gasarch. (Attachments: # 1 Exhibit Exhibit 1)(Pickett, Karen) (Entered: 02/21/2024) |
| 02/22/2024 | 465 | Assented to MOTION to Withdraw as Attorney *for Defendant Courtney Kelln* by Courtney Kelln.(Kellen, Claire) (Entered: 02/22/2024) |
| 02/22/2024 | 466 | Judge William G. Young: ELECTRONIC ORDER entered re 461 MOTION for Leave to File Reply Brief in support of its motion for remedies. (Paine, Matthew) |

A46

| | | |
|---|---|---|
| | | **Motion allowed. The defendants may file a sur-reply by March 7, 2024 should the reply contain anything new.**<br><br>(Entered: 02/22/2024) |
| 02/22/2024 | 467 | MOTION for Leave to File *Reply Brief to Opposition Brief filed by defendant Gasarch* by Securities and Exchange Commission.(Shields, Kathleen) (Entered: 02/22/2024) |
| 02/26/2024 | 468 | Judge William G. Young: ELECTRONIC ORDER entered granting 465 Motion to Withdraw as Attorney. Attorney Claire E. Kellen terminated. (Gaudet, Jennifer) (Entered: 02/26/2024) |
| 02/26/2024 | 469 | Judge William G. Young: ELECTRONIC ORDER entered granting 467 Motion for Leave to File Reply Brief to Opposition Brief filed by defendant Gasarch by Securities and Exchange Commission. **Reply brief due on or by 3//7/2024.** (Gaudet, Jennifer) (Entered: 02/26/2024) |
| 03/01/2024 | 470 | REPLY to Response to 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhduis and Kelln* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Shields, Kathleen) (Entered: 03/01/2024) |
| 03/01/2024 | 471 | Opposition re 425 MOTION for Permanent Injunction and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhduis and Kelln filed by Jackson T. Friesen. (Fazio, Timothy) Modified on 3/4/2024 (Paine, Matthew). (Entered: 03/01/2024) |
| 03/06/2024 | 472 | MOTION for Leave to File *Reply Brief In Response to Opposition by Defendant Friesen* by Securities and Exchange Commission.(London, David) (Entered: 03/06/2024) |
| 03/06/2024 | 473 | SUR-REPLY to Motion re 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhduis and Kelln* filed by Paul Sexton. (Smith, Neil) (Entered: 03/06/2024) |
| 03/07/2024 | 474 | REPLY to Response to 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhduis and Kelln* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M)(Shields, Kathleen) (Entered: 03/07/2024) |
| 03/07/2024 | 475 | AFFIDAVIT of Christopher Beckstrom in Support re 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhduis and Kelln* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Shields, Kathleen) (Entered: 03/07/2024) |
| 03/07/2024 | 476 | AFFIDAVIT in Support re 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhduis and Kelln* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Shields, Kathleen) (Entered: 03/07/2024) |
| 03/07/2024 | 477 | Assented to MOTION for Leave to File *Sur-Reply to SEC's Reply* by Zhiying Yvonne Gasarch.(Pickett, Karen) (Entered: 03/07/2024) |
| 03/11/2024 | 478 | Judge William G. Young: ELECTRONIC ORDER entered granting 477 Assented to MOTION for Leave to File Sur-Reply ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Paine, Matthew) (Entered: 03/11/2024) |

A47

| 03/12/2024 | 479 | Judge William G. Young: ELECTRONIC ORDER entered granting 472 Motion for Leave to File Reply Brief In Response to Opposition by Defendant Friesen by Securities and Exchange Commission; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Gaudet, Jennifer) (Entered: 03/12/2024) |
|---|---|---|
| 03/14/2024 | 480 | REPLY to Response to 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhuis and Kelln responding to arguments made by Defendant Friesen* filed by Securities and Exchange Commission. (Shields, Kathleen) (Entered: 03/14/2024) |
| 03/15/2024 | 481 | SUR-REPLY to Motion re 425 MOTION for Permanent Injunction *and Monetary Relief as to Defendants Friesen, Gasarch, Sexton, Veldhuis and Kelln* filed by Zhiying Yvonne Gasarch. (Pickett, Karen) (Entered: 03/15/2024) |
| 03/20/2024 | 482 | Judge William G. Young: ELECTRONIC ORDER entered finding as moot 276 Motion to Seal Document 276 MOTION to Seal Document, 288 MOTION to Seal, 332 MOTION to Seal ; finding as moot 288 Motion to Seal. ; finding as moot 332 Motion to Seal. (Gaudet, Jennifer) (Entered: 03/20/2024) |
| 04/02/2024 | 483 | NOTICE of Appearance by Frank Scaduto on behalf of Courtney Kelln (Scaduto, Frank) (Entered: 04/02/2024) |
| 04/12/2024 | 484 | ELECTRONIC NOTICE of Hearing.Hearing re remedies set for 5/8/2024 11:00 AM in Courtroom 18 (In person only) before Judge William G. Young. (Gaudet, Jennifer) (Entered: 04/12/2024) |
| 05/08/2024 | 493 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Hearing held on 5/8/2024. The matter of disgorgement is taken under advisement after hearing arguments of counsel. Judgment to enter as to defendants Sexton, Friesen, Gasarch, Kelln and Veldhuis. The Court announces civil penalties (see transcript). The SEC shall prepare a form of judgment. Defendants shall have 10 days to file a response to the proposed form of judgment. Permanent injunction enters as to Sexton, Friesen and Gasarch. A written opinion to follow which will include the decision on disgorgement. (Court Reporter: Richard Romanow at rhr3tubas@aol.com.)(Attorneys present: Attorneys Shields, Day, London and Klunder for the SEC; Attorneys Pickett, Smith, Silverblatt, Fritz, Knuts and Scaduto for the defendants) (Gaudet, Jennifer) (Entered: 05/31/2024) |
| 05/10/2024 | 485 | Proposed Document(s) submitted by Securities and Exchange Commission. Document received: proposed judgments. (Attachments: # 1 Proposed Judgment as to Veldhuis, # 2 Proposed Judgment as to Sexton, # 3 Proposed Judgment as to Friesen, # 4 Proposed Judgment as to Kelln, # 5 Proposed Judgment as to Gasarch)(Shields, Kathleen) (Entered: 05/10/2024) |
| 05/20/2024 | 486 | Objection to 485 Proposed Document(s) submitted, by Zhiying Yvonne Gasarch *(objection to proposed partial judgment)*. (Pickett, Karen) (Entered: 05/20/2024) |
| 05/20/2024 | 487 | Response by Securities and Exchange Commission to 485 Proposed Document(s) submitted, 486 Objection . (Shields, Kathleen) (Entered: 05/20/2024) |
| 05/20/2024 | 488 | Objection to 485 Proposed Document(s) submitted, by Paul Sexton . (Smith, Neil) (Entered: 05/20/2024) |
| 05/20/2024 | 489 | Objection to 485 Proposed Document(s) submitted, by Jackson T. Friesen . (Fazio, Timothy) (Entered: 05/20/2024) |

A48

| 05/20/2024 | 490 | Objection to 485 Proposed Document(s) submitted, by Courtney Kelln, Mike K. Veldhuis. (Knuts, Robert) (Entered: 05/20/2024) |
| 05/23/2024 | 491 | Transcript of Disgorgement held on May 8, 2024, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 6/13/2024. Redacted Transcript Deadline set for 6/24/2024. Release of Transcript Restriction set for 8/21/2024. (Cook, Savannah) (Entered: 05/23/2024) |
| 05/23/2024 | 492 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (Cook, Savannah) (Entered: 05/23/2024) |
| 06/17/2024 | 494 | Judge William G. Young: ORDER entered.<br><br>MEMORANDUM AND ORDER<br><br>(Sonnenberg, Elizabeth) (Entered: 06/17/2024) |
| 06/20/2024 | 495 | Judge William G. Young: ORDER entered. JUDGMENT as to Paul Sexton (Paine, Matthew) (Entered: 06/20/2024) |
| 06/20/2024 | 496 | Judge William G. Young: ORDER entered. JUDGMENT as to Mike K. Veldhuis. (Paine, Matthew) (Entered: 06/20/2024) |
| 06/20/2024 | 497 | Judge William G. Young: ORDER entered. JUDGMENT as to Jackson T. Friesen. (Paine, Matthew) (Entered: 06/20/2024) |
| 06/20/2024 | 498 | Judge William G. Young: ORDER entered. JUDGMENT as to Yvonne Gasarch. (Paine, Matthew) (Entered: 06/20/2024) |
| 06/20/2024 | 499 | Judge William G. Young: ORDER entered. JUDGMENT as to Courtney Kelln. (Paine, Matthew) (Entered: 06/20/2024) |
| 07/02/2024 | 500 | MOTION for Release of Funds *Motion for Order Directing the Turnover of Frozen Funds to the SEC* by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order Proposed Order Directing Transfer of Jackson T. Friesen's Frozen Funds to the SEC, # 2 Text of Proposed Order Proposed Order Directing Transfer of Yvonne Gasarch's Frozen Funds to the SEC, # 3 Text of Proposed Order Proposed Order Directing Transfer of Courtney Kelln's Frozen Funds to the SEC, # 4 Text of Proposed Order Proposed Order Directing Transfer of Paul Sexton's Frozen Funds to the SEC, # 5 Text of Proposed Order Proposed Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to the SEC) (London, David) (Entered: 07/02/2024) |
| 07/02/2024 | 501 | MOTION to Amend 497 Judgment, 500 MOTION for Release of Funds *Motion for Order Directing the Turnover of Frozen Funds to the SEC* by Jackson T. Friesen.(Fazio, Timothy) (Entered: 07/02/2024) |
| 07/02/2024 | 502 | Opposition re 500 MOTION for Release of Funds *Motion for Order Directing the Turnover of Frozen Funds to the SEC* filed by Paul Sexton. (Smith, Neil) (Entered: 07/02/2024) |
| 07/03/2024 | 503 | MOTION for Joinder by Courtney Kelln.(Scaduto, Frank) (Entered: 07/03/2024) |
| 07/03/2024 | 504 | MOTION for Joinder by Zhiying Yvonne Gasarch re 501 MOTION to Amend 497 Judgment, 500 MOTION for Release of Funds *Motion for Order Directing the Turnover* |

A49

| | | |
|---|---|---|
| | | *of Frozen Funds to the SEC* , [502](#) Opposition to Motion *(Joinder)* (Pickett, Karen) Modified on 7/8/2024 to Correct CM/ECF Filing Event (Paine, Matthew). (Entered: 07/03/2024) |
| 07/03/2024 | [505](#) | MOTION for Joinder by Paul Sexton.(Smith, Neil) (Entered: 07/03/2024) |
| 07/03/2024 | [506](#) | MOTION for Joinder by Mike K. Veldhuis re [501](#) MOTION to Amend [497](#) Judgment, [500](#) MOTION for Release of Funds *Motion for Order Directing the Turnover of Frozen Funds to the SEC* , [502](#) Opposition to Motion *(Joinder)* (Knuts, Robert) Modified on 7/8/2024 to Correct CM/ECF NextGen Filing Event (Paine, Matthew). (Entered: 07/03/2024) |
| 07/11/2024 | 508 | Judge William G. Young: ELECTRONIC ORDER entered [500](#) MOTION for Release of Funds Motion for Order Directing the Turnover of Frozen Funds to the SEC. (Paine, Matthew)<br><br>**Motion allowed. Funds held for disgorgement shall be held in an interest bearing account pursuant to the earlier orders of this Court.**<br><br>(Entered: 07/16/2024) |
| 07/11/2024 | [509](#) | Judge William G. Young: ORDER entered. ORDER Directing Transfer of Jackson T. Friesen's Frozen Funds to the Securities & Exchange Commission. (Paine, Matthew) (Entered: 07/16/2024) |
| 07/11/2024 | [510](#) | Judge William G. Young: ORDER entered. ORDER Directing Transfer of Yvonne Gasarch's Frozen Funds to the Securities & Exchange Commission.(Paine, Matthew) (Entered: 07/16/2024) |
| 07/11/2024 | [511](#) | Judge William G. Young: ORDER entered. ORDER Directing Transfer of Courtney Kelln's Frozen Funds to the Securities & Exchange Commission.(Paine, Matthew) (Entered: 07/16/2024) |
| 07/11/2024 | [512](#) | Judge William G. Young: ORDER entered. ORDER Directing Transfer of Paul Sexton's Frozen Funds to the Securities & Exchange Commission.(Paine, Matthew) (Entered: 07/16/2024) |
| 07/11/2024 | [513](#) | Judge William G. Young: ORDER entered. ORDER Directing Transfer of Mike K. Veldhuis's Frozen Funds to the Securities & Exchange Commission.(Paine, Matthew) (Entered: 07/16/2024) |
| 07/15/2024 | [507](#) | Opposition re [501](#) MOTION to Amend [497](#) Judgment, [500](#) MOTION for Release of Funds *Motion for Order Directing the Turnover of Frozen Funds to the SEC* filed by Securities and Exchange Commission. (Klunder, Nita) (Entered: 07/15/2024) |
| 07/16/2024 | 514 | Judge William G. Young: ELECTRONIC ORDER entered [501](#) Motion to Amend (Paine, Matthew)<br><br>**There is no occasion to clarify. The judgment stands.**<br><br>(Entered: 07/16/2024) |
| 07/18/2024 | [515](#) | MOTION to Stay re [495](#) Judgment by Paul Sexton. (Attachments: # [1](#) Exhibit)(Smith, Neil) (Entered: 07/18/2024) |
| 07/19/2024 | [516](#) | MOTION to Stay re [515](#) MOTION to Stay re [495](#) Judgment by Courtney Kelln, Mike K. Veldhuis.(Knuts, Robert) (Entered: 07/19/2024) |

A50

| 07/22/2024 | 517 | MOTION to Stay re 498 Judgment by Zhiying Yvonne Gasarch. (Attachments: # 1 Exhibit 1 (Canadian order))(Pickett, Karen) (Entered: 07/22/2024) |
| 07/24/2024 | 518 | Judge William G. Young: ELECTRONIC ORDER entered denying 515 Motion to Stay (Paine, Matthew) (Entered: 07/24/2024) |
| 07/24/2024 | 519 | Judge William G. Young: ELECTRONIC ORDER entered denying 516 Motion to Stay (Paine, Matthew) (Entered: 07/24/2024) |
| 07/24/2024 | 520 | Judge William G. Young: ELECTRONIC ORDER entered 517 Motion to Stay (Paine, Matthew)<br><br>**The motion for stay is denied but the Court in no way intrudes on or impugns the orders of the Canadian courts of British Columbia as to funds subject to its orders.**<br><br>(Entered: 07/24/2024) |
| 08/19/2024 | 521 | NOTICE OF APPEAL 498 JUDGMENT by Zhiying Yvonne Gasarch Filing fee: $ 605, receipt number AMADC-10560431 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 9/9/2024. (Pickett, Karen)**<br><br>**Modified on 8/19/2024 to Correct Docket Text and Add CM/ECF Document Link to Judgment Being Appealed as Counsel Pickett Failed to Follow the CM/ECF NextGen Prompts When Filing the Notice of Appeal in Violation of Court Rules and CM/ECF NextGen Administrative Procedures. (Paine, Matthew).**<br><br>**(Entered: 08/19/2024)** |
| 08/19/2024 | 522 | NOTICE OF APPEAL as to 519 Order on Motion to Stay, 514 Order on Motion to Amend, 496 Judgment, 513 Order by Mike K. Veldhuis Filing fee: $ 605, receipt number AMADC-10560669 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 9/9/2024. (Knuts, Robert) (Entered: 08/19/2024)** |
| 08/19/2024 | 523 | NOTICE OF APPEAL 499 JUDGMENT, 508 ELECTRONIC ORDER, 511 ORDER, 514 ELECTRONIC ORDER, 519 ELECTRONIC ORDER by Courtney Kelln Filing fee: $ 605, receipt number AMADC-10560737 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 9/9/2024. (Scaduto,** |

| | | |
|---|---|---|
| | | Frank) **Modified on 8/19/2024 to Correct Docket Text and Add CM/ECF Document Link to Orders Being Appealed as Counsel Scaduto Failed to Follow the CM/ECF NextGen Prompts When Filing the Notice of Appeal in Violation of Court Rules and CM/ECF NextGen Administrative Procedures. (Paine, Matthew).** **(Entered: 08/19/2024)** |
| 08/19/2024 | 524 | NOTICE OF APPEAL as to 495 Judgment by Paul Sexton Filing fee: $ 605, receipt number AMADC-10560781 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 9/9/2024. (Smith, Neil) (Entered: 08/19/2024) |
| 08/19/2024 | 525 | NOTICE OF APPEAL 514 ORDER, 497 JUDGMENT, 509 ORDER, 494 MEMOPRANDUM AND ORDER by Jackson T. Friesen Filing fee: $ 605, receipt number AMADC-10560810 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** US District Court Clerk to deliver official record to Court of Appeals by 9/9/2024. (Fritz, Maranda) (Main Document 525 replaced on 8/20/2024) (Paine, Matthew). **Modified on 8/20/2024 to Correct Docket Text and Add CM/ECF Document Link to Orders Being Appealed as Counsel Fritz Failed to Follow the CM/ECF NextGen Prompts When Filing the Notice of Appeal in Violation of Court Rules and CM/ECF NextGen Administrative Procedures. (Paine, Matthew).** **(Entered: 08/19/2024)** |
| 08/19/2024 | 526 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 521 Notice of Appeal. (Paine, Matthew) (Entered: 08/19/2024) |
| 08/19/2024 | 527 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 522 Notice of Appeal. (Paine, Matthew) (Entered: 08/19/2024) |
| 08/19/2024 | 528 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 524 Notice of Appeal. (Paine, Matthew) (Entered: 08/19/2024) |
| 08/19/2024 | 529 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 523 Notice of Appeal. (Paine, Matthew) (Entered: 08/19/2024) |
| 08/20/2024 | 530 | USCA Case Number 24-1770 for 521 Notice of Appeal, filed by Zhiying Yvonne Gasarch. (Paine, Matthew) (Entered: 08/20/2024) |
| 08/20/2024 | 531 | USCA Case Number 24-1771 for 522 Notice of Appeal, filed by Mike K. Veldhuis. (Paine, Matthew) (Entered: 08/20/2024) |
| 08/20/2024 | 532 | USCA Case Number 24-1772 for 524 Notice of Appeal, filed by Paul Sexton. (Paine, Matthew) (Entered: 08/20/2024) |

| 08/20/2024 | 533 | USCA Case Number 24-1773 for 523 Notice of Appeal, filed by Courtney Kelln. (Paine, Matthew) (Entered: 08/20/2024) |
| 08/20/2024 | 534 | Notice of correction to docket made by Court staff. Correction: Docket Entry 534 Deleted from the Docket as Duplicative of ECF No. 525 Notice of Appeal. (Paine, Matthew) (Entered: 08/20/2024) |
| 08/20/2024 | 535 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 525 Notice of Appeal. (Paine, Matthew) (Entered: 08/20/2024) |
| 08/20/2024 | 536 | USCA Case Number 24-1774 for 525 Notice of Appeal, filed by Jackson T. Friesen. (Paine, Matthew) (Entered: 08/20/2024) |
| 09/04/2024 | 537 | MOTION for Disbursement of Funds *to Create a Fair Fund and for other relief* by Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order) (Shields, Kathleen) (Entered: 09/04/2024) |
| 09/04/2024 | 538 | MEMORANDUM in Support re 537 MOTION for Disbursement of Funds *to Create a Fair Fund and for other relief* filed by Securities and Exchange Commission. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Shields, Kathleen) (Entered: 09/04/2024) |
| 09/04/2024 | 539 | AFFIDAVIT of Dr. Thomas Dunn in Support re 537 MOTION for Disbursement of Funds *to Create a Fair Fund and for other relief* filed by Securities and Exchange Commission. (Shields, Kathleen) (Additional attachment(s) added on 9/5/2024: # 1 Appendix 1, # 2 Appendix 2, # 3 Appendix 3) (Paine, Matthew). (Main Document 539 replaced on 9/5/2024) (Paine, Matthew). (Entered: 09/04/2024) |
| 09/16/2024 | 540 | Opposition re 537 MOTION for Disbursement of Funds *to Create a Fair Fund and for other relief* filed by Paul Sexton. (Smith, Neil) (Entered: 09/16/2024) |
| 09/16/2024 | 541 | Opposition re 537 MOTION for Disbursement of Funds *to Create a Fair Fund and for other relief* filed by Jackson T. Friesen. (Fritz, Maranda) (Entered: 09/16/2024) |
| 09/16/2024 | 542 | MOTION for Joinder *to Other Defendants' Oppositions to Motion For Fair Fund* by Zhiying Yvonne Gasarch.(Pickett, Karen) (Entered: 09/16/2024) |
| 09/16/2024 | 543 | MOTION for Joinder by Courtney Kelln.(Scaduto, Frank) (Entered: 09/16/2024) |
| 09/16/2024 | 544 | Opposition re 537 MOTION for Disbursement of Funds *to Create a Fair Fund and for other relief* filed by Mike K. Veldhuis. (Knuts, Robert) (Entered: 09/16/2024) |
| 09/18/2024 | 545 | Judge William G. Young ELECTRONIC ORDER entered: **Well aware that this case is on appeal, the Court makes the indicative ruling that, if the jury's verdict is affirmed, the Court intends to allow the Fair Plan motion in its entirely, save only that, if the funds presently ordered disgorged exceed the sum of the identified claimants claims, such funds shall be retained by the SEC subject to further order of the Court.** (Paine, Matthew) (Entered: 09/18/2024) |
| 09/18/2024 | 546 | Supplemental Record on Appeal transmitted to US Court of Appeals re 523 Notice of Appeal, 522 Notice of Appeal, 521 Notice of Appeal, 524 Notice of Appeal, 525 Notice of Appeal, Documents included: ECF No. 545 (Paine, Matthew) (Entered: 09/18/2024) |
| 01/08/2025 | 547 | Assented to MOTION for Leave to File *Consent Order*(United States Legal Fees) by Jackson T. Friesen. (Attachments: # 1 Proposed Consent Order)(Fazio, Timothy) (Entered: 01/08/2025) |

A53

| 01/17/2025 | 548 | Assented to MOTION for Leave to File *Consent Order*(Canadian Legal Fees) by Jackson T. Friesen. (Attachments: # 1 Proposed Consent Order)(Fazio, Timothy) . (Entered: 01/17/2025) |
| 01/21/2025 | 549 | Judge William G. Young ORDER entered: CONSENT ORDER (United States Legal Fees) as to Jackson T. Friesen. (Attachments: # 1 Exhibit A)(MAP) (Entered: 01/21/2025) |
| 01/27/2025 | 550 | Judge William G. Young ORDER entered: CONSENT ORDER (Canadian Legal Fees) as to Jackson T. Friesen. (Attachments: # 1 Exhibit A)(MAP) (Entered: 01/28/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/30/2025 09:37:40 | | |
| **PACER Login:** | cpnycpara17 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-11276-WGY |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

A54

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br> **Plaintiff,** <br><br> **v.** <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br> **Defendants.** | **Civil Action No. 21-CV-____ (___)** <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Frederick L. Sharp ("Sharp"), Zhiying Yvonne Gasarch ("Gasarch"), Courtney Kelln ("Kelln"), Mike K. Veldhuis ("Veldhuis"), Paul Sexton ("Sexton"), Jackson T. Friesen ("Friesen"), William T. Kaitz ("Kaitz"), Avtar S. Dhillon ("Dhillon"), and Graham R. Taylor ("Taylor") (collectively, the "Defendants").

## SUMMARY

1. This case concerns a sophisticated, multiyear, multi-national attack on the United States financial markets and retail United States investors by foreign and domestic actors. These actors schemed to sell fraudulently hundreds of millions of dollars in stocks in the United States markets.

2. In exchange for lucrative fees, a group headed by defendant Sharp provided services to various groups of public company control persons to help those control persons dump

A55

United States-quoted stocks—typically penny stocks—on retail investors. These services included providing networks of offshore shell companies to conceal stock ownership, arranging stock transfers and money transmittals, and providing encrypted accounting and communications systems.

3.      Other defendants named in this Complaint were control persons who dumped their shares, a complicit public company chairman, and a promoter who touted the stocks to retail investors.

4.      The Defendants' fraudulent conduct deprived investors of the full and fair disclosure mandated by the federal securities laws.

**Sharp's, Kelln's and Gasarch's Participation in the Fraudulent Scheme**

5.      Beginning in or before 2010 and continuing through the present, Sharp, Gasarch, and Kelln (the "Sharp Group") were in the business of facilitating illegal stock sales in the public securities markets. The Sharp Group provided a variety of services to help corporate control persons conceal their identities when selling the stock of penny stock companies they controlled. By disguising their identities and their controlling positions, the Sharp Group's clients fraudulently concealed the fact that public company control persons were selling large blocks of stock to investors.

6.      The Sharp Group deliberately concealed the identities of its clients through the array of services it offered, including forming and providing offshore nominee companies that could hold shares for undisclosed control persons; providing and administering an encrypted communication network; purchasing, configuring and delivering devices that the Sharp Group referred to as "xPhones," which were designed to be used only for communications on the Sharp Group's encrypted communications network; and arranging for clients to deposit stock in

2

offshore trading platforms, including Wintercap SA[1] and Blacklight SA,[2] both Swiss-based, to obfuscate the control persons' association with their public company stock. The Sharp Group also provided various additional services to its clients in furtherance of the fraudulent scheme such as: administering a proprietary accounting system that tracked clients' total stock holdings and sales across various nominee shareholders and trading platforms; paying out the proceeds of illegal stock sales at clients' direction to accounts around the world; arranging to route such payments by circuitous methods designed to conceal the source of funds; and fabricating documents, such as invoices, to conceal the nature and source of the payments.

**Veldhuis', Sexton's, and Friesen's Participation in the Fraudulent Scheme**

7.      Working together, Veldhuis, Sexton, and Friesen (hereinafter referred to as the "Veldhuis Control Group") were one group of control persons (hereinafter referred to as a "control group") that teamed with the Sharp Group to run lucrative, fraudulent schemes to sell stock surreptitiously in the public markets.

8.      At various times, the Veldhuis Control Group collaborated with defendants Dhillon, Taylor, and Kaitz. In particular, the Veldhuis Control Group sold illegally the stock of Stevia First Corp. ("Stevia First"), Stevia First's successor company Vitality Biopharma, Inc. ("Vitality"), Arch Therapeutics, Inc. ("Arch"), and OncoSec Medical Incorporated ("OncoSec") in concert with Dhillon. The Veldhuis Control Group and Dhillon also sold illegally the stock of Vitality and Arch in concert with Kaitz and Taylor.

---

[1] The Commission charged Wintercap SA and its principal, Roger Knox, on October 2, 2018, with violating the antifraud provisions of the Securities Act of 1933 ("Securities Act") and Securities Exchange Act of 1934 ("Exchange Act") as a result of engaging in a multiyear scheme that generated more than $165 million from the illegal sale of stock of at least 50 publicly traded companies.

[2] The Commission charged Blacklight SA and its principals, Anthony Killarney and Kenneth Ciapala, on January 2, 2020 with violating the Securities Act and Exchange Act antifraud provisions as a result of engaging in a multiyear scheme that generated more than $35 million from the illegal sale of stock of at least 45 publicly traded companies.

A57

**Dhillon's Role in the Scheme**

9.      Dhillon served as the chairman of the board of directors of Stevia First, Vitality, Arch, and OncoSec.  Dhillon's status as a high-level corporate insider enabled him to obtain and/or direct the issuance of millions of shares of each company's stock to his undisclosed associates.  Dhillon knew that, because he was a corporate insider, federal securities laws prohibited him from selling his stock into the securities markets without complying with various registration and disclosure rules designed to protect investors.

10.     At various times, Dhillon coordinated with the Veldhuis Control Group and Taylor to sell surreptitiously stock in the companies atop whose boards he sat.  These sales were conducted through various nominee shareholders and involved sales of stock that Dhillon was legally prohibited from selling without registering the sales with the Commission.  In certain instances, the nominee shareholders that effectuated the illegal sales of Dhillon's shares included entities administered by the Sharp Group.

11.     Dhillon abused his senior corporate role—a position of trust and confidence—in order to conceal his own and others' fraudulent conduct from investors, securities market intermediaries, securities regulators, and law enforcement.

**Kaitz's Role in the Scheme**

12.     Kaitz owned and operated Full Service Media LLC, a company that promoted the stock of public companies to retail investors.  Kaitz substantially assisted the Veldhuis Control Group by touting stocks that the Veldhuis Control Group sought to dump.  Kaitz promoted as urgent and bullish investment opportunities the stock of various publicly traded companies that the Veldhuis Control Group simultaneously planned to sell surreptitiously—including Vitality and Arch stock.  A key component of Kaitz's touting efforts was concealing the role of the

4

A58

Veldhuis Control Group, which paid Kaitz for his services. For example, Kaitz falsely claimed when touting the stock of public companies like Vitality that third parties (which appeared to be unaffiliated with the public companies) paid for his services. This concealment enabled the Veldhuis Control Group to anonymously sell its stock to the investors whom it simultaneously encouraged, through Kaitz's stock promotional efforts, to buy the stock and thus trade in the very opposite direction.

13.    During an SEC investigation into one of the promotional campaigns Kaitz had run for the Veldhuis Group, Kaitz appeared for testimony. During that testimony, Kaitz made false and misleading statements, including claims (i) that he had not received payment for the promotion in question from any entity other than that identified as the paying party in the promotion (despite having received such payments, arranged by Veldhuis, from other entities); and (ii) that he had no communications devices other than the two he identified to Commission staff (despite having had, and used in connection with the promotions in question, one of the Sharp Group-supplied "xPhones" that are described below).

**Taylor's Role in the Scheme**

14.    Taylor, among other things, arranged to merge a public company with one of Dhillon's private companies, ultimately resulting in the distribution and fraudulent sale of shares associated with the resulting public company, Stevia First. Taylor also controlled nominee shareholders who held and traded stock surreptitiously in concert with Dhillon and the Veldhuis Control Group. In exchange for these services, Taylor received a significant cut of the illegal stock sale proceeds.

5

**Dhillon's Additional Illegal Stock Sales through Person A's Companies**

15.     At various times between 2011 and 2017, an individual identified herein as

Person A operated at least two nominee companies that he created to hold and trade stock of two

public companies atop whose boards Dhillon sat: Arch and OncoSec.  Person A illegally sold

shares in both Arch and OncoSec on Dhillon's behalf.

**Dhillon's False Statements During the Commission's Investigation**

16.     In October 2018, the Commission charged Wintercap SA—one of the Veldhuis

Control Group's primary conduits for the illegal sale of stock—with engaging in securities fraud,

and Wintercap SA's illegal sale of Vitality stock was cited in the Commission's Complaint in

that action.  Early the following month, the Commission suspended trading in Vitality.  During

the Commission's investigation leading to the filing of the instant action, the Commission sought

information from Dhillon about his involvement in the Vitality scheme, and Dhillon twice

appeared for testimony (in August 2019 and July 2020).  During that testimony, Dhillon made

false statements that are illustrated below.

**The Defendants Violated Various Securities Laws**

17.     As a result of the conduct alleged herein, Sharp, Kelln, Veldhuis, Sexton, Friesen,

Dhillon, and Taylor violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities

Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules

10b-5(a) and (c) thereunder; Sharp, Kelln, Veldhuis, Sexton, Friesen, and Dhillon violated

Sections 5(a) and 5(c) of the Securities Act; Veldhuis, Sexton, and Friesen violated Section 13(d)

of the Exchange Act and Rule 13d-1 thereunder; Dhillon violated Sections 13(d) and 16(a) of the

Exchange Act and Rules 13d-2 and 16a-3 thereunder; Taylor violated Section 15(b) of the

Securities Act by aiding and abetting Dhillon's violations of Sections 5(a) and 5(c) of the

A60

Securities Act; Sharp and Kelln violated Section 15(b) of the Securities Act and Section 20(e) of

the Exchange Act by aiding and abetting others' violations of Sections 5(a), 5(c), 17(a)(1) and

17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and

10b-5(c) thereunder; Gasarch violated Section 17(a)(3) of the Securities Act, and also violated

Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act by aiding and abetting

others' violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the

Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder; and Kaitz violated Section 17(a)(3)

of the Securities Act, and also violated Section 15(b) of the Securities Act and Section 20(e) of

the Exchange Act by aiding and abetting others' violations of Sections 17(a)(1) and 17(a)(3) of

the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)

thereunder.

18.     The Commission seeks a temporary restraining order prohibiting the Defendants

from future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange

Act and Rule 10b-5 thereunder; prohibiting Veldhuis, Sexton, and Friesen from future violations

of Section 13(d) and Rule 13d-1 thereunder; prohibiting Dhillon from violations of Section 13(d)

of the Exchange Act and Rule 13d-2 thereunder; prohibiting Dhillon from future violations of

Exchange Act Section 16(a) and Rule 16a-3 thereunder; prohibiting Sharp, Kelln, Veldhuis,

Sexton, Friesen, Dhillon and Taylor from violations of Securities Act Sections 5(a) and 5(c), and

if entered, a preliminary injunction order for the same; and (ii) a repatriation order, and an order

freezing the assets of the Defendants held for their direct or indirect benefit, and/or subject to

their direct or indirect control.

19.     The Commission seeks permanent injunctions against the Defendants, enjoining

them from engaging in the transactions, acts, practices, and courses of business alleged in this

A61

Complaint; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this

Complaint, together with prejudgment interest pursuant to Section 21(d) of the Exchange Act;

civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the

Exchange Act; an order barring the Defendants from participating in any offering of a penny

stock, pursuant to Section 20(g) of the Securities Act and/or Section 21(d) of the Exchange Act;

conduct-based injunctions enjoining the Defendants from directly or indirectly, including, but

not limited to, through an entity owned or controlled by any of them, participating in the

issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall

not prevent defendants from purchasing or selling securities listed on a national securities

exchange for their own personal account; and such other relief as the Court may deem

appropriate.  Further, as to Dhillon, the Commission seeks an officer and director bar pursuant to

Section 20(e) of the Securities Act and Section 21(d) of the Exchange Act.

## **JURISDICTION AND VENUE**

20.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§78u(d), 78u(e), 78aa].

21.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C.

§77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Certain of the acts, practices,

transactions and courses of business alleged in this Complaint occurred within the District of

Massachusetts, and were affected, directly or indirectly, by making use of means or

instrumentalities of transportation or communication in interstate commerce, or the mails.  For

example, Dhillon sat atop the board of Arch, a Massachusetts-based issuer.

A62

## **DEFENDANTS**

22.    **Frederick L. Sharp**, age 69 and born in Los Angeles, California, resides in West Vancouver, British Columbia, Canada.

23.    **Zhiying Yvonne Gasarch a/k/a Zhiying Chen**, age 49 and born in China, is a dual citizen of Canada and China, and resides in Richmond, British Columbia, Canada.

24.    **Courtney Kelln**, age 41, resides in Surrey, British Columbia, Canada.

25.    **Mike K. Veldhuis**, age 41 and born in the Netherlands, resides in Vancouver, Canada.

26.    **Paul Sexton**, age 53 and born in the United Kingdom, resides in Anmore, British Columbia, Canada.

27.    **Jackson T. Friesen**, age 33, lives in Delta, British Columbia, Canada.

28.    **William T. Kaitz**, age 40, lives in Arnold, Maryland.

29.    **Graham R. Taylor**, age 51 and born in the United Kingdom, resides in Vancouver, British Columbia, Canada on information and belief.

30.    **Avtar Singh Dhillon, MD**, age 60 and born in India, is a Canadian citizen residing in Long Beach, California.  Dhillon is currently the chairman of the board of directors of Emerald Health Therapeutics, Inc., a Canadian company that publicly trades in the United States markets.  Further:

      a.    Between approximately April 2013 and July 2018, Dhillon was the chairman of the board of directors of Arch.

      b.    Between approximately March 2009 and January 2019, Dhillon was the chairman of the board of directors of Inovio Pharmaceuticals, Inc. ("Inovio").

      c.    Between approximately January 2012 and April 2019, Dhillon was the chairman

of the board of directors of Vitality, including its predecessor, Stevia First Corp.

    d.   Between approximately March 2011 and April 2020, Dhillon was the chairman of the board of directors of OncoSec.

## **RELATED PARTIES**

31.    **Vitality Biopharma, Inc.** ("**Vitality**"), formerly known as **Stevia First Corp.** ("**Stevia First**"), currently trades on the Over-the-Counter ("OTC") Markets Group, Inc. ("OTC Markets"), an interdealer quotation service that provides a platform to buy and sell securities. Vitality was incorporated in Nevada in 2007 and its principal place of business is in Los Angeles, California. Throughout its history, Vitality has undergone several changes to its business plan and now purports to be in the business of developing cannabinoid drugs for medical treatment. At all times relevant to this Complaint, Vitality's common stock was registered under Section 12(g) of the Exchange Act, and it files Exchange Act reports with the Commission pursuant to the reporting requirements of Section 13(a) of the Exchange Act.

32.    **Arch Therapeutics Inc. ("Arch")** currently trades on OTC Markets. It was incorporated in Nevada in September 2009, and its principal place of business is in Massachusetts. The company has had different purported business objectives over the years; it currently purports to be focused on "developing a novel approach to stop bleeding ("hemostasis"), control leaking ("sealant") and manage wounds during surgery, trauma and interventional care." Arch's common stock is, and has been since June 2013, registered with the Commission pursuant to Section 12 of the Exchange Act.

33.    **OncoSec Medical Incorporated ("OncoSec")** currently trades on NASDAQ (to which it was uplisted, from the OTC Markets, in May 2015). It is a Nevada corporation headquartered in Pennington, New Jersey and San Diego, California. The company purports to

A64

be a biotechnology company focused on designing, developing and commercializing innovative therapies and proprietary medical approaches to stimulate and to guide an anti-tumor immune response for the treatment of cancer. OncoSec's common stock is, and has been since March 2011, registered with the Commission pursuant to Section 12 of the Exchange Act.

34.     **Garmatex Holdings, Ltd. ("Garmatex")**, now known as Evolution Blockchain Group, Inc., currently trades in the grey market. It was incorporated in Nevada in 2014 and is located in Las Vegas, Nevada. In 2018, the company announced a change in its business plan, purportedly to pivot from textiles to holding intellectual property related to blockchain technology, and changed its name to Evolution Blockchain. The Commission suspended trading in the securities of Evolution Blockchain on June 25, 2018. During the time period of the trading described in this Complaint, the company voluntarily filed periodic reports with the Commission.

## BACKGROUND

35.     Before selling stock, control persons are required to: (a) register such sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. §240.144], including limitations on the amount of stock a control person can legally sell. In addition, investors in certain public companies are required publicly to disclose any ownership interest in excess of 5% of the company's publicly traded stock. Such registration requirements, sale restrictions, and disclosure obligations are safeguards designed to protect the market for purchases and sales of stock, and to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

36.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through

one or more intermediaries, controls, is controlled by, or is under common control with, such

issuer (i.e., a control person). "Control" means the power to direct management and policies of

the company in question. Affiliates include officers, directors and controlling shareholders, as

well as any person who is under "common control" with or has common control of an issuer. As

used herein, the term "control group" means a group that collectively is an "affiliate" of an

issuer.

37.    "Restricted stock" includes stock of a publicly traded company (also known as an

"issuer") that has been acquired from an issuer, or an affiliate of an issuer, in a private

transaction that is not registered with the Commission. All stock held by an issuer or affiliate of

an issuer is restricted stock. Absent an exemption under the federal securities laws and rules,

restricted stock cannot legally be offered or sold to the public unless a registration statement has

been filed with the Commission (for an offer) or is in effect (for a sale). A registration statement

contains important information about an issuer's business operations, financial condition, results

of operation, risk factors, and management. It also identifies any person or group who is the

beneficial owner of more than 5% of the company's securities.

38.    "Unrestricted stock" is stock that may legally be offered and sold in the public

securities marketplace by a non-affiliate, ordinarily after having previously been subject to a

registration statement. Registration statements are transaction specific, and apply to each

separate offer and sale as detailed in the registration statement. Registration, therefore, does not

attach to the security itself, and registration at one stage for one party does not necessarily suffice

to register subsequent offers and sales by the same or different parties. Thus, when a control

person buys publicly traded or otherwise unrestricted shares in a company that s/he controls,

those shares automatically become subject to the legal restrictions on sales by an affiliate. Such

A66

legal restrictions include strict limits on the quantity of shares that may be sold in the public markets absent registration. Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

39.     A "transfer agent" is a business that facilitates certain types of securities transactions. Among other things, transfer agents issue and cancel certificates of a company's stock to reflect changes in ownership. Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock. Transfer agents routinely keep track of whether particular shares are restricted from resale.

40.     "Penny Stock," as used herein, generally refers to a security issued by a very small company that trades at less than $5 per share.

41.     "S-1 Registration Statement(s)" refer(s) to SEC Form S-1, which is a registration statement filed publicly by an issuer in connection with the sale of stock to shareholders. "S-1 Shareholders," as used herein, means shareholders who acquired stock pursuant to an S-1 Registration Statement.

## OVERVIEW OF THE SHARP GROUP'S CONDUCT

### Obfuscating Beneficial Ownership and Control

42.     From approximately 2010 through at least 2019, the Sharp Group facilitated illegal sales of stock in hundreds of penny stock companies.

43.     As reflected in the table below, the Sharp Group's stock sales generated over one billion dollars in gross proceeds:

13

A67

| YEAR | STOCK SALES ($) | STOCK PURCHASES ($) | NET SALES ($) |
|------|----------------|---------------------|---------------|
| 2010 | $ 40,452,026 | $ (7,344,138) | $ 33,107,888 |
| 2011 | $ 198,245,334 | $ (67,424,315) | $ 130,821,019 |
| 2012 | $ 205,403,649 | $ (60,952,750) | $ 144,450,899 |
| 2013 | $ 290,452,161 | $ (62,460,290) | $ 227,991,871 |
| 2014 | $ 64,960,760 | $ (6,612,156) | $ 58,348,605 |
| 2015 | $ 22,057,413 | $ (2,631,013) | $ 19,426,400 |
| 2016 | $ 68,171,713 | $ (9,861,177) | $ 58,310,536 |
| 2017 | $ 86,158,566 | $ (15,867,701) | $ 70,290,865 |
| 2018 | $ 31,155,352 | $ (4,674,550) | $ 26,480,802 |
| 2019 | $ 1,702,074 | $ (889,639) | $ 812,435 |
| **TOTAL** | **$ 1,008,759,049** | **$ (238,717,730)** | **$ 770,041,319** |

44.     Sharp, who used the code name "Bond" (styling himself after the fictional character *James Bond*), was the mastermind and leader of the Sharp Group.  Among other things, Sharp cultivated relationships with the Sharp Group's clients—that is, individuals seeking fraudulently to sell stock in the markets to retail investors—and with various offshore trading platforms.  Sharp also routinely served as a liaison between dozens of clients (like the Veldhuis Control Group) and the trading platforms (like Wintercap SA).

45.     During the period of the scheme detailed herein, Sharp described in a communication to a client the following about the Sharp Group's services: "The service provided is comprehensive; it is not limited to trading.  It includes pyaments [sic], loans, private placements **and keeping clients out of jail.**" (Emphasis added).

46.     Sharp oversaw the creation and deployment of various front companies, which served as nominee shareholders used to disguise his clients' stock ownership and to sell stock surreptitiously.

47.     One of the services provided by the Sharp Group was making available offshore corporate nominee shareholders and individuals who would serve as the nominal owners of those entities.  Sharp installed these various nominal owners to pose as the beneficial owners of the

14

A68

various entities that served as nominee shareholders.  In actuality, these individuals did not own

or control the stock held by the nominee shareholders and generally had no role other than

offering their names, passports, and signatures, which the Sharp Group used to incorporate and

open accounts for the corporate nominees.  In dealing with banks, brokerages, and other financial

services providers, these individuals were held out as actual beneficial owners.  In this way, the

Sharp Group kept the identities of control groups hidden, while fraudulently appearing to satisfy

the compliance requirements of the banking and securities firms where the Sharp Group opened

these accounts.

48.    In 2002, Sharp wrote a fictionalized book about securities fraud and money

laundering in which he described illegal conduct that parallels the Sharp Group's business

model.  Sharp's book (*Footloose:  Charlie Smith's Offshore Chronicles*) includes the following

passage:

> Eventually [the client] took greater positions in the stocks, sharing the
> take with fewer partners.  This meant he had to disguise his
> shareholdings in order to avoid securities disclosure requirements and
> trading restrictions.
>
> Offshore companies were ideal for his purpose.  They came from
> around the world with nominee directors, but were still subject to his
> control.  The perfect situation for his masterly stock manipulations.

49.    Sharp hired and directed various individuals to operate the administrative services

offered by the Sharp Group.  For example, Sharp oversaw the creation of a network of encrypted

communications, including code-names for the users, encrypted electronic chat functions, and

encrypted email functions.[3]  The Sharp Group purchased, configured and delivered devices that

---

[3] Encrypted communications sent and received through the Sharp Group-administered server are hereinafter referred
to as "Encrypted Communication(s)."

A69

the Sharp Group referred to as "xPhones," which were designed to be used only for the Encrypted Communications.

50.     Sharp also hired and directed individuals who created and administered the Sharp Group's accounting system, which Sharp called "Q" (thereby expanding his *James Bond* affectations – "Q" being another fictional character in *James Bond*).  Given the extensive efforts by the Sharp Group and its clients to conceal and obscure the actual ownership and control of the stock they were surreptitiously selling, the Q system was essential in keeping track of the amounts of stock to be sold and the total proceeds being collected for each deal Sharp's clients ran.  Accordingly, the Sharp Group accounted for all of the nominee shareholders' assets in Q by tracking which of the nominee shareholders held which stocks (and which stocks' sales proceeds) for which particular client or client group, like the Veldhuis Control Group.  The Sharp Group also relied on the Q system to calculate the commissions and fees it collected for facilitating its clients' illegal stock sales.

51.     Sharp arranged for the Encrypted Communication services and the Q accounting system to be hosted on a server that was physically located on the island of Curaçao, in the belief that, there, it would be unreachable by U.S. securities regulators and law enforcement officials.

52.     Kelln is one of the individuals who worked for Sharp.  Kelln routinely performed a variety of complex administrative tasks associated with obtaining, allocating, and distributing blocks of shares across multiple nominee shareholders in a manner designed to conceal the Sharp Group's clients' common control of all the stock so distributed.

53.     In particular, Kelln—at the direction of Sharp and others—routinely split Sharp Group clients' shareholdings into blocks of stock, each comprising less than five percent of each public company's outstanding shares, to be held in the names of various nominee entities.  Kelln

sent an Encrypted Communication on or about February 8, 2013 to a client describing her work:

> The process is: I group certs [stock certificates] together that keep the total under 5%. Then I sen[d] them in for transfer to the TA [transfer agent]. Once processed the TA fedex's them to the broker. Then we wait for the shares to clear [i.e., become available for trading]. We only submit 1 transfer a day per broker until we have submitted all the shares.

54.    These acts enabled the Sharp Group's clients to further conceal their control by making it seem as if multiple different, unrelated offshore corporate entities each held less than five percent of the stock of a public company when, in actuality, those offshore corporate entities were all under common control by the Sharp Group, and their stock in the public company was all held in coordinated fashion for the benefit of the Sharp Group's clients. In this manner, the clients concealed the fact that they routinely held far greater than five percent of such public companies' stock through the various Sharp Group-supplied nominee entities.

55.    Breaking the shares into blocks of less than five percent avoided scrutiny by brokerage firms and other market participants. Brokerage firms routinely consider the 5% ownership threshold in determining whether particular stock sales may be part of a distribution that must be registered pursuant to Section 5 of the Securities Act. Further, the OTC Markets requires public companies to disclose its five percent (or greater) shareholders to meet certain listing requirements.

56.    Once blocks of shares were broken up and dispersed among multiple nominee shareholders, the Sharp Group coordinated with offshore trading platforms, such as Wintercap SA and Blacklight SA, which specialized in depositing and liquidating stock through various domestic and foreign brokerage firms. By so doing, the Sharp Group further obscured both the identities of the true beneficial owners and the fact that they were selling in concert.

57.    Gasarch is another one of the individuals who worked for Sharp. Her duties

17

A71

included arranging for transfers—typically in the form of wire transfers—of the proceeds of illegal stock sales, such as the sales referenced in the table appearing at ¶ 43 above.  In this role, Gasarch routinely arranged to transfer stock sale proceeds to accounts as directed by the Sharp Group's clients in a manner designed to conceal the fact that undisclosed control persons were, in fact, the actual beneficial owners of the stock being sold, and the ultimate recipients of the sales proceeds.  Because of her role, Gasarch was routinely referred to by others involved in the scheme by the nickname "Wires."

58.     Gasarch also implemented Sharp's plan to protect the identities of the Sharp Group's clients.  For example, (a) Gasarch helped to disguise the identities of actual shareholders by personally serving as the purported owner of a nominee shareholder—Peregrine Capital Corp. f/k/a Peaceful Lion Holdings—that the Sharp Group routinely used to facilitate the illegal stock sales on behalf of control group clients; and (b) in late 2015, around the time the Sharp Group distributed to clients a new set of xPhones for their use in Encrypted Communications, Gasarch drafted a memo with instructions about how to "delete all secure chats when xphone is shut down (e.g., to cross a border)."

59.     Kelln likewise made it a point to remind Wintercap SA principals of these security protocols, as in a November 2016 Encrypted Communication in which she noted, after traveling back to Canada from Switzerland, "I had to delete my phone going through customs." A Wintercap SA principal responded "[w]e approve of your security."

**The Sharp Group Benefited from Illegal Stock Sales**

60.     Sharp, Kelln, and Gasarch profited handsomely from their illicit services to the Sharp Group's clients.

61.     For example, between just August 2017 and July 2018, Wintercap SA transferred

18

A72

approximately $7 million to a Marshall Islands company called Cortona Equity, Inc. ("Cortona")

for Sharp's benefit. Sharp had installed his wife's tennis coach as the purported beneficial owner

of Cortona.

62.    On various dates between 2010 and 2019, Kelln and Gasarch were the

beneficiaries of more than $1 million each of funds derived from the Sharp Group's conduct.

### SHARP GROUP EXAMPLE ONE: ILLEGAL SALES OF STEVIA FIRST/VITALITY BY DHILLON, VELDHUIS CONTROL GROUP AND TAYLOR

63.    By August 2011, Dhillon had become the Interim Principal Executive and

Financial Officer of Stevia First and, by January 2012, had become its Chairman. As detailed

below, during and after his securing of these roles, Dhillon coordinated with the Veldhuis

Control Group and Taylor fraudulently to sell Stevia First/Vitality[4] stock to retail investors at

inflated prices on various occasions over several years. Further, Sharp, Kelln, Veldhuis, Friesen,

Sexton, Taylor and Dhillon failed to register their sales of Stevia First/Vitality stock described

herein pursuant to Section 5 of the Securities Act.

64.    Defendants' successive campaigns to sell Stevia First/Vitality stock fraudulently

were very successful. The following table reflects the proceeds that several of the Defendants'

illicit sales of Stevia First/Vitality stock generated during the scheme (the "quantity sold" in the

table below reflects the number of shares sold, and incorporates a 1-for-10 reverse stock split in

2016).

---

[4] Stevia First changed its name to Vitality in 2016, and the company still operates under that name. Stevia First and Vitality stock is referred to as "Stevia First/Vitality" in this Complaint.

19

| Year | Quantity Sold | Trading Proceeds |
|---|---|---|
| 2012 | 19,600,000 | $ 24,718,428 |
| 2013 | - | - |
| 2014 | 1,320,511 | 566,715 |
| 2015 | 2,424,661 | 770,492 |
| 2016 | 5,474,517 | 5,503,691 |
| 2017 | 4,904,846 | 10,570,537 |
| 2018 | 2,045,146 | 3,509,479 |
| **Grand Total** | **35,769,681** | **$ 45,639,343** |

**Background**

65.    By early 2011, Dhillon controlled a private company called Stevia First.  Around that time, Dhillon looked for an opportunity to convert that business to a publicly traded company in a process known as a "reverse merger."  In a reverse merger transaction, an existing public company having a ticker symbol cleared for quoting on OTC Markets, but with little, if any, operations (often referred to as a "shell company"), acquires a private operating company. After the private operating company is absorbed into the public shell company, the shell company typically undergoes a name, ticker-symbol, and business-plan change, to align with the name and purported business of the formerly private operating company.  In such transactions, shareholders of the formerly private company frequently receive shares in the newly merged public company.  In many instances, those shares comprise a controlling interest in the post-merger public company.

66.    In or about early 2011, Taylor introduced Dhillon and the then-Chief Executive Officer (the "CEO") of Dhillon's private company to certain of Taylor's contacts in China and to an attorney in Vancouver.  Dhillon and the CEO eventually merged the private company with a public shell company.  On paper, the bulk of the shares in the shell company were held by

20

A74

various Chinese nationals who were identified in an S-1 registration statement that had

previously been filed by the shell company (hereinafter the "Stevia S-1 Shareholders").

67.     According to public filings, on July 28, 2011, the purported president, chief

executive officer, treasurer and director of the public shell company agreed to sell all of his

4,500,000 shares to Dhillon pursuant to a stock purchase agreement.  The stock purchase

agreement contemplated that, immediately upon closing of the reverse merger, Dhillon would be

appointed as a director, and as the President, Chief Executive Officer, Secretary, and Treasurer,

of the surviving public company.

68.     On or about October 10, 2011, the reverse merger went effective and the

surviving public company was re-named Stevia First, thereby assuming the name of Dhillon's

private company.

69.     On or about October 12, 2011, Stevia First effected a 7-for-1 forward stock split,

which caused Dhillon's 4,500,000 shares (referenced in ¶ 67) to convert to 31,500,000 shares of

Stevia First/Vitality stock.

70.     Dhillon was the sole signer of Stevia First's filing with the Commission, which

reported the 7-for-1 forward stock split.  The stock split had the effect of increasing the number

of shares held by Dhillon considerably.

71.     In or about January 2012, Dhillon assumed the role of chairman of Stevia First's

board of directors.  Stevia First/Vitality's stock was registered pursuant to Section 12 of the

Exchange Act.

72.     Dhillon was an affiliate of Stevia First (and, subsequently, Vitality) because he

had the power to control the company through his role as chairman of its board.  As a public

company affiliate, Dhillon was legally required to register any sales of his Stevia First/Vitality

21

A75

stock unless Dhillon elected to comply with the safe harbor provisions set forth in Commission Rule 144. Dhillon testified, under oath, during the Commission's investigation leading to the filing of this action that he understood these legal requirements at all times relevant to this Complaint. As described in more detail in this Complaint, Dhillon repeatedly sold shares of Stevia First/Vitality without registering such sales.

73.     As a director of Stevia First (and, eventually, Vitality), Dhillon was required to file various "Form 4" statements (i.e., a "Statement of Changes of Beneficial Ownership of Securities"), which is a public form required by the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder. Dhillon was required to file an updated Form 4 to reflect any change in his beneficial ownership of Stevia First/Vitality stock, regardless of the amount of that change. Dhillon understood these legal requirements at all times relevant to this Complaint. Dhillon testified, under oath, during the Commission's investigation leading to the filing of this action that "[a]nytime there's sales by insiders, you have to file appropriate forms to disclose your purchases or sales."

74.     Dhillon was also legally required to file a public disclosure report—a "Schedule 13D"—with the Commission pursuant to Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder, to the extent he was the beneficial owner of greater than five percent of Stevia First/Vitality's common stock. Dhillon was likewise required to disclose, via a Schedule 13D filing, any agreements he entered into concerning disposition of Stevia First stock, as well as the combined holdings of all participants in any such agreements. Dhillon was further required to file a Schedule 13D Amendment whenever his position materially changed. Dhillon understood these legal requirements at all times relevant to this Complaint. For example, on or about August 17, 2011, Dhillon filed a Schedule 13D with the Commission disclosing that he

was the beneficial owner of 4,500,000 *restricted* shares of Stevia First/Vitality stock, which comprised more than five percent of the company's outstanding common shares at that time. As described in more detail in this Complaint, Dhillon intentionally failed to disclose his beneficial ownership interest in additional shares of Stevia First/Vitality stock, which were purportedly *unrestricted*; and he never made any disclosure concerning his agreements with the Veldhuis Group concerning Stevia First stock.

**Round One: 2012 Stevia First/Vitality Stock Sales**

75.     Beginning in January 2012, shortly after Dhillon took over Stevia First, Dhillon, Taylor, and the Veldhuis Control Group arranged to sell surreptitiously Stevia First/Vitality's purportedly unrestricted stock and share in the proceeds of those unregistered sales.

76.     First, Taylor, working in concert with others, facilitated the transfer of Stevia First/Vitality's purportedly unrestricted stock from the Stevia S-1 Shareholders (defined in ¶ 66) to, initially, fifteen Sharp Group-administered nominee companies that held the stock for the Veldhuis Control Group. Shortly thereafter, the Sharp Group consolidated or further transferred shares held by several of these Sharp Group-administered shareholders into other Sharp Group-administered shareholders, including Peaceful Lion Holdings, a nominee shareholder for which Gasarch personally served as purported owner, and thus as purported owner of any shares held by it. The flow chart below reflects these transfers:[5]

---

[5] The entities color coded in green in this chart and other charts within this Complaint were administered or otherwise utilized, directly or indirectly, by the Sharp Group.

A77



77.    Between January and March 2012, the Sharp Group-administered nominee

shareholders (including Gasarch's Peaceful Lion Holdings) received 19,600,000 shares of Stevia

First/Vitality stock, representing over 37% of the company's total outstanding stock and over

97% of its purportedly unrestricted stock.  These particular shares, which were all issued without

restrictive legend, are hereinafter referred to as the "'Unrestricted' Stevia First Merger Shares."

(Shares issued without restrictive legend are commonly treated by securities brokers and transfer

agents as immediately and freely tradeable.  In reality, however, these 'Unrestricted' Stevia First

Merger Shares were held by affiliates of the issuer who were acting in league with its Chairman.

24

A78

As such, these shares were, as a matter of law, restricted, and thus were subject to the federal securities laws' limitations and restrictions on unregistered sales of such shares.)

78.    In March 2012, Stevia First—with Dhillon serving as the chairman of its board of directors—began to issue press releases claiming various positive business developments for the company while, at or about the same time, the Veldhuis Control Group orchestrated a promotional campaign touting Stevia First's stock.

79.    For example, the Veldhuis Control Group paid for promotional materials touting Stevia First that were disseminated to investors during approximately March through May 2012. These Stevia First promotional materials urged investors to buy and buy quickly, saying things like, "*Get in now; this is huge!*" (emphasis in original) and "*Buy STVF right now!*" (emphasis in original; "STVF" was Stevia First's ticker symbol).  These promotional materials misleadingly claimed both that "Conmar Capital Inc." was the paying party, and that Conmar Capital "will not trade in the securities of Stevia First."  In fact (i) it was the Veldhuis Group, which controlled the overwhelming majority of Stevia First's free-trading shares, that paid for the promotions; (ii) the Veldhuis Control Group had paid the Sharp Group to incorporate Conmar Capital; and (iii) although no Stevia First trading took place (at the time of the campaign) through Conmar Capital, the Veldhuis Control Group was indeed "trad[ing] in the securities of Stevia First" by massively unloading them on the very retail investors who were buying in response to that campaign.

80.    The Veldhuis Control Group also engaged Kaitz to promote Stevia First, including through paying Kaitz's stock promotion company over $200,000 on or about April 3, 2012.

25

A79

81.    Overall, from approximately March 6, 2012 to May 23, 2012, the Veldhuis

Control Group, with Kaitz's substantial assistance, unloaded every share of the 'Unrestricted'

Stevia First Merger Shares into the market, generating illicit proceeds of over $24 million.

82.    Both Taylor and Dhillon contemporaneously shared in the illicit proceeds

stemming from the Veldhuis Control Group's March-May 2012 lucrative unloading of Stevia

First stock, described above.  In particular, between approximately April and June 2012, the

Veldhuis Control Group used the Sharp Group to remit eight wire payments, all funded by Stevia

First stock-sale proceeds, and totaling over $4.2 million, to the Swiss bank account of an

offshore front company that Taylor controlled; and Taylor, in turn, promptly transferred over

60% of that money to Dhillon as follows:

| Date | Veldhuis Control Group Transfers to Taylor's Company | Taylor Transfers to Dhillon's Companies |
|------|------|------|
| April 12, 2012 | $610,200 | |
| April 12, 2012 | $498,900 | |
| April 13, 2012 | $496,800 | |
| April 17, 2012 | | $498,000 |
| May 4, 2012 | | $400,000* |
| May 11, 2012 | | $496,000* |
| June 8, 2012 | $475,000 | |
| June 8, 2012 | $800,000 | |
| June 8, 2012 | $900,000 | |
| July 16, 2012 | | $1,300,000* |

*Each of these transfers went to the Swiss bank account of a front company incorporated in
Panama called Ortivo Enterprises Corp. ("Ortivo") that Dhillon controlled.

83.    To further conceal the identities of the people sharing in the illicit proceeds from

the unregistered sale of the 'Unrestricted' Stevia First Merger Shares, as well as the illicit source

of those proceeds, the Veldhuis Control Group distributed portions of those proceeds in cash

obtained from the Sharp Group on various dates.  These cash withdrawals were recorded in the Q

system and allocated to the Stevia First deal.

26

A80

**Round Two: 2014 Stevia First/Vitality Stock Sales**

84.    On or about March 30, 2012, May 25, 2012, and February 13, 2014, Stevia First

issued a total of 1,320,511 shares of Stevia First/Vitality stock to a Sharp Group-administered

nominee shareholder.  The Sharp Group, in turn, divided those shares between two additional

Sharp Group-administered nominee shareholders.  The table below reflects these transfers.



85.    Thereafter, the Veldhuis Control Group sold these shares through Sharp Group-

administered nominee shareholders for the benefit of Dhillon, the Veldhuis Control Group, and

Taylor.  Specifically, between approximately January 14, 2014 and July 14, 2014, the Veldhuis

Control Group sold all 1,320,511 of these Stevia First/Vitality shares through at least two

offshore brokerage firms, obscuring the shares' ownership and the disposition of their proceeds

by running the trades through two Sharp Group-administered nominee shareholders.

86.    Kelln facilitated the unregistered sale of the 1,320,511 Stevia First/Vitality shares.

For example, on or about October 9, 2013, Kelln provided Stevia First's transfer agent with the

required paperwork to transfer 625,000 of the 1,320,511 shares of Stevia First/Vitality shares to

Nautilus Growth Fund.  Kelln also provided a check to pay for the transfer.  The documents

provided by Kelln to Stevia First's transfer agent included an attorney opinion letter that falsely

represented that Nautilus Growth Fund was not an affiliate of Stevia First.  Kelln knew, or

recklessly disregarded, that Nautilus Growth Fund was merely a nominee shareholder holding stock for the Veldhuis Control Group, which was an affiliate of Stevia First.

87.     As the Veldhuis Control Group sold shares, Veldhuis, Sexton, and Friesen discussed distributing the proceeds from the sale of the 1,320,511 shares of Stevia First/Vitality stock in a furtive manner that was designed to conceal the funds' source as well as their ultimate recipients.

88.     For example, on or about February 25, 2014, Sexton and Veldhuis discussed in an Encrypted Communication their plan to distribute a pool of proceeds from the sale of the 1,320,511 shares of Stevia First/Vitality stock in "cash" and noted that "AV will be fine with [our so distributing] it." "AV" is a reference to Avtar Dhillon.

89.     On or about March 6, 2014, Veldhuis sent the following Encrypted Communication to Friesen: "u r getting 173k today.  A cut from MDDD [the ticker symbol of another public company stock the Veldhuis Control Group fraudulently sold through the Sharp Group] and STVF [the ticker symbol of Stevia First in 2014].  Buy a boat [expletive].  Rich mother [expletive]."  Of the "173k" (i.e. $173,000) referred to by Veldhuis in the Encrypted Communication to Friesen, $100,000 came from proceeds of selling the 1,320,511 shares of Stevia First/Vitality stock.

90.     On or about March 6, 2014—around the same time that Veldhuis was coordinating the distribution of Stevia First/Vitality stock sale proceeds to Friesen (and others)— the Veldhuis Control Group caused the Sharp Group to send $124,000 in Stevia First/Vitality stock-sale proceeds to the same Taylor Swiss bank account referenced in ¶ 82 above.

91.     On various dates later in 2014, the Veldhuis Control Group continued to sell Stevia First/Vitality stock.  For example:

     a.   On or about May 28, 2014, Friesen sent an Encrypted Communication, copying Veldhuis, directing a trader working for Sharp to sell 25,000 shares of Stevia First/Vitality stock that was held in an account in the name of a Sharp Group-administered nominee shareholder.

     b.   On or about July 7, 2014, Friesen sent an Encrypted Communication directing a trader working for Sharp to sell 25,000 shares of Stevia First/Vitality stock.

92.     On or about August 5, 2014, Veldhuis sent an Encrypted Communication asking Gasarch the following: "How much cash do you have in total.  We might cut the balance of STVF [Stevia First] that's left.  So we would need about $110K.  Do you have or be able to get?"

93.     On or about August 6, 2014, Veldhuis sent a follow up Encrypted Communication to Gasarch: "Can I please get $120K cash from STVF?"

94.     On or about August 6, 2014, Veldhuis picked up $120,000 in cash from Sharp's office.

95.     On or about August 6, 2014, Sexton and Veldhuis continued to discuss, via Encrypted Communications, the planned distribution of proceeds from selling the 1,320,511 shares of Stevia First/Vitality stock.  Veldhuis wrote: "so STVF with the two wires being added back is 126,693.74 . . . Avtar 50,000 (40%) . . . [there is] enough cash to do it might [sic] be easier to transfer."

96.     During the same August 6, 2014 Encrypted Communication, Sexton replied: "You should cut up the 120,000 [in] cash.  Which would allow for . . . Avtar/GT [Dhillon and Taylor] 42,000[.] So if you want to bring me 96k on Friday I can distribute?  GT [Taylor] will be up here shortly . . . ."

A83

97.     During the same August 6, 2014 Encrypted Communication, Veldhuis asked

Sexton how he should transmit the cash, writing, "U want me to put in the safety deposit box or

bring it to you."  Sexton replied: "You can do either.  I have a safe here.  I can distribute mind

[sic] and grahams [Taylor] from here.  I can hold . . . av's [Avtar Dhillon's] for next meeting."

98.     On or about August 7, 2014, Veldhuis reported to Sexton via an Encrypted

Communication that "I pick up [sic] that cash yesterday.  Its [sic] all 50's."

99.     Similarly, between approximately November 2013 and January 2015, Taylor

arranged to transfer approximately $1.7 million to third parties for Dhillon's benefit.

100.    Dhillon failed to file any Form 4 disclosing the sales of Stevia First stock directed

by the Veldhuis Control Group, despite having a pecuniary interest in Stevia First stock sales

effected through the Veldhuis Group, and despite knowing of his obligations, as Chairman of

Stevia First, to report any and all of his Stevia First stock sales on Forms 4 filed with the

Commission.

**Round Three:  2015 and 2016 Stevia First/Vitality Stock Sales**

101.    In connection with the 2011 merger of Dhillon's private company into the public

shell company, Dhillon received 4,500,000 restricted shares of Stevia First/Vitality stock

(hereinafter referred to as the "March 2012 Stevia First/Vitality Stock").  After Stevia First,

directed by Dhillon, issued a 7-for-1 forward split of Stevia First/Vitality stock, Dhillon held

31,500,000 shares of the March 2012 Stevia First/Vitality Stock, all of which was restricted.

102.    The scheme by the Veldhuis Control Group, Taylor and Dhillon to unload this

March 2012 Stevia First/Vitality Stock through another round of illicit stock sales began in

March 2012.

A84

103.    The first step in this facet of the scheme was to move Stevia First/Vitality stock into the hands of the Veldhuis Control Group, while concealing the common ownership and control of this large block of shares.

104.    As with prior illegal sales of Stevia First/Vitality stock, several of the Defendants used multiple Sharp Group-supplied entities as nominee shareholders, each purporting to hold less than 5% of the company's shares, in order to conceal the fact that affiliates of the issuer were, in concert, controlling, and would be illegally selling, unregistered shares of Stevia First/Vitality stock.

105.    To that end, in or about March 2012 (i) Sharp authorized, through a wire request he signed, a payment to Dhillon in the amount of $33,800, and (ii) Taylor also directed two payments totaling $9,450 to Dhillon.  These payments were all made to Dhillon's personal bank account.

106.    Sharp's March 2012 $33,800 payment to Dhillon—which was funded by proceeds from the Veldhuis Control Group's sale of the 'Unrestricted' Stevia First/Vitality Merger Shares earlier that month—was for the purchase of 15,750,000 shares of Dhillon's March 2012 Stevia First/Vitality Stock.  Meanwhile, Taylor's March 2012 payments (for a total of $9,450) were for the purported purchase of another 4,227,500 shares of Dhillon's March 2012 Stevia First/Vitality Stock.

107.    To conceal the common control and disposition of the roughly 20 million shares of March 2012 Stevia First/Vitality Stock shares that Dhillon had transferred based on the aforementioned Sharp- and Taylor-arranged payments, Dhillon disguised his transfers as a series of smaller sales to (i) various Sharp Group-administered shareholders—all of which would hold, and ultimately sell, the Stevia First/Vitality stock for the benefit of the Veldhuis Control Group

31

A85

and Dhillon—and (ii) two nominee shareholders that were controlled by Taylor, which would hold, and ultimately sell, the Stevia First/Vitality stock for Taylor's and Dhillon's benefit. The chart below illustrates Dhillon's sale of these shares, as well as Dhillon's division of the remaining shares that were derived from the March 2012 Stevia First/Vitality Stock. (In fact, however, as detailed below, Dhillon did not fully relinquish his interest in the March 2012 Stevia First/Vitality Stock.):[6]



---

[6] Heng Hong is another nominee shareholder controlled by Taylor.

108.    The roughly 20 million shares of the March 2012 Stevia First/Vitality Stock that Dhillon transferred to nominee shareholders administered by the Sharp Group or Taylor comprised approximately 39 percent of the company's outstanding shares.  But, by spreading these shares among various nominee shareholders, each shown as holding under five percent of the company's outstanding shares, Dhillon obscured the facts that (i) he had not, in truth, relinquished his interests in all of these shares; and (ii) these shares were, in truth, held by the Veldhuis Control Group, himself, and Taylor, all of whom were acting in concert.

109.    The Veldhuis Control Group and Taylor did not immediately sell the shares held by the nominee shareholders referenced in ¶ 107 above, at least partly because the stock was initially marked as restricted by Stevia First's transfer agent since it was acquired directly from Dhillon, an affiliate of the company.  SEC Rule 144 provides a safe harbor from registering the sale of restricted stock acquired directly from an affiliate if, among other things, the acquirer(s) hold those shares for at least six months.  In the meantime, the Veldhuis Control Group sold the other Stevia First/Vitality stock that they had obtained, as described in ¶¶ 76 through 77 ("Round 1") and ¶¶ 84 through 85 ("Round 2"), above.

110.    Beginning in the fall of 2014, the Veldhuis Control Group arranged for the unregistered sale of the March 2012 Stevia First/Vitality Stock in concert with Taylor and Dhillon.

111.    In an Encrypted Communication on or about October 24, 2014, Veldhuis, Sexton and Friesen discussed their plans to sell the March 2012 Stevia First/Vitality Stock into the public markets.  In particular, Sexton summarized the Veldhuis Control Group's plans to sell the 15,750,000 shares that Dhillon had transferred to the various Sharp Group-administered nominee shareholders, which included 1,000,000 shares to be sold for Dhillon's benefit, and raised the

33

A87

possibility of coordinating those sales with sales of the shares Dhillon had transferred to Taylor's nominee shareholders, writing: "There was 31,500,000 in total. We have 15,750,000 minus the 1mm to Avtar [Dhillon]. GTaylor is **outside the 15.75**. He would consider blending back if Av [Dhillon] agrees to the plan." (Emphasis added).

112.    Taylor, as illustrated in ¶ 106 above, held approximately 4.2 million additional shares via two nominee shareholders, which is consistent with Sexton's referring to Taylor's position, in the above-quoted Encrypted Communication, as "outside the 15.75" million shares held by various Sharp Group-administered nominee shareholders.

113.    On or about October 28, 2014, Sexton met with Dhillon in California, and summarized their meeting in an Encrypted Communication between Sexton and Veldhuis the following day in these words:

> a.    Dhillon "said that stv [Stevia First] is working 2 big food producers and they feel that one has a very good chance to come to table. He would like to be more aggressive and get the price and volume up. . . . He's also sharing in part of grahams [Taylor's] retained [sic] position."
>
> b.    "Also, av [Dhillon] said that he would prefer if we took the shares in gt [Taylor's] names and sold them all together. Lol."

114.    On various dates thereafter, Taylor, directly or indirectly, transferred the March 2012 Stevia First/Vitality Stock held by his two nominee shareholders to Sharp Group-administered nominee shareholders that were used by the Veldhuis Control Group. For its part, in or about December 2014, the Veldhuis Control Group arranged to sell March 2012 Stevia First/Vitality Stock through Wintercap SA and Blacklight SA using Sharp Group-administered

34

A88

nominee shareholders.  The chart below reflects the transfers to various Sharp Group-administered nominee shareholders:



115.    On or about December 2, 2014, Veldhuis sent an Encrypted Communication to Gasarch, copying Sharp, to determine if the nominee shareholders his team had been using to hold March 2012 Stevia First/Vitality Stock were administered by the Sharp Group, or some

A89

other offshore nominee shareholder provider. Veldhuis wrote: "[w]e are in the process of receiving approximately 20 million shares of [Vitality] that were held in ESCROW. At the time of ESCROW agreement we may have put some of the stock in NON BOND [i.e. non-Sharp] [nominee] entities. Can you please go through the list below and let me know which entities you guys administer." (Veldhuis's reference to "approximately 20 million" comports with the sum of (i) the 15,750,000 shares of March 2012 Stevia First/Vitality Stock that Dhillon transferred to the various Sharp Group-administered nominee shareholders in 2012, plus (ii) the approximately 4.2 million shares of March 2012 Stevia First/Vitality Stock that Dhillon transferred to two nominee shareholders controlled by Taylor.)

116.    Sharp, copying Kelln, replied to Veldhuis's December 2, 2014 Encrypted Communication by writing: "This [message] shld have gone to celtic." "Celtic" was Kelln's pseudonym. Kelln promptly replied: "I confirm they [nominee shareholders] are all ours [i.e, Sharp Group-administered nominee shareholders]."

117.    Kelln subsequently arranged for the Veldhuis Control Group's stock, which now included the approximately 4.2 million shares initially held by Taylor's two nominee shareholders, to be deposited into accounts controlled by Wintercap SA and Blacklight SA.

118.    Thereafter, during the course of 2015 and early 2016, the Veldhuis Control Group directed the unregistered sales of March 2012 Stevia First/Vitality Stock in coordination with another stock promotional campaign run by Kaitz.

119.    In or about January 2015, via an Encrypted Communication, Veldhuis asked Kaitz who Kaitz would identify as the "third party" payer on the Stevia First/Vitality stock promotional alerts. Kaitz replied, "Conmar Capital," which was the name of a Sharp Group-administered entity that the Veldhuis Control Group had paid to incorporate in 2012. Ultimately,

36

A90

the January 2015 promotions identified "Full Service Media" (Kaitz's own company), as well as

an unidentified "third party," as each having supplied funds to pay for those stock promotions.

Kaitz knew that the Veldhuis Control Group was paying for the stock promotions and concealed

this by listing "Conmar Capital" as the party paying for his promotional campaign.  Kaitz further

knew, or recklessly disregarded, that the Veldhuis Control Group intended to sell stock

surreptitiously and was paying for the promotional campaign in order to facilitate such sales.

120.    The members of the Veldhuis Control Group each knew or recklessly disregarded

that stock promoters, like Kaitz, falsely identified third party payers in order to conceal the fact

that control groups and other affiliates were sponsoring promotional campaigns in order to

surreptitiously dump stock in the markets.  Similarly, Dhillon and Taylor knew, or recklessly

disregarded, that the Veldhuis Control Group would retain a stock promoter to tout Stevia

First/Vitality stock and would conceal (i) their role in funding the stock promotional campaign,

(ii) the fact that they were part of a group that controlled the issuer, and (iii) the fact that they

intended to trade, and were trading, in the opposite direction to which the touts urged retail

investors to trade.

121.    On or about March 13, 2015, Sexton and Veldhuis exchanged Encrypted

Communications concerning Dhillon and continuing the Stevia First/Vitality stock promotion:

> Sexton to Veldhuis: "Avtar said they got additional things going for stvf [the ticker
> symbol for Stevia First at the time].  To keep going with [a stock promoter] and they only
> have another 1mm to chew thru and it should clean up real nice.
>
> Veldhuis to Sexton: "Nice."

122.    Veldhuis, on behalf of Dhillon, the Veldhuis Control Group, and Taylor,

continued to orchestrate stock promotions concerning Stevia First/Vitality stock later in 2015.

To that end, Veldhuis sought to identify a nominee entity that could be cited as the paying party

A91

for the promotional campaign in order to conceal the fact that the Veldhuis Control Group actually paid for the stock promotional campaign.

123.    For example, on or about March 31, 2015, Veldhuis sent an Encrypted Communication, subject line "promo," to Sharp asking if one of eight Sharp Group-administered nominees "can be used . . . as the payee [sic] for the promotion.  Or should we set up a new company?"  Sharp responded and instructed Veldhuis to use one of the preexisting nominee companies.

124.    On or about the same day, Veldhuis forwarded Sharp's Encrypted Communication to Kelln and asked: "[c]an u please send me on[e] of the 8 companies including the address?"  Kelln, in turn, copied Gasarch on the Encrypted Communications chain and wrote: "Wire [Gasarch]: pls provide [Veldhuis] a current 2015 holding co with address."  Later that day, Gasarch confirmed that she emailed the requested information to Veldhuis.

125.    On or about April 7, 2015, Veldhuis communicated with Kaitz by Encrypted Communications about issuing promotions concerning Stevia First/Vitality stock.

126.    On or about May 6, 2015, Veldhuis and Sexton discussed, via Encrypted Communications, arrangements for additional stock promotions to tout Stevia First/Vitality stock.  Veldhuis wrote: "I been [sic] back and forth with [Kaitz] on it today.  He had trouble getting ads approved on new network.  He has spent 2k this week so far and trying to get other stuff approved today.  Was supposed to be done by Tuesday afternoon."

127.    On various dates in 2015 and 2016, during the promotional campaign that Veldhuis coordinated through Kaitz, the Veldhuis Control Group sold, via Sharp Group-administered nominee shareholders, in total, millions of shares of the March 2012 Stevia First/Vitality Stock.

128.     Dhillon received a cut of these proceeds, just as he had received distributions from the proceeds of the defendants' Stevia First/Vitality stock sales in at least 2012 and 2014. On or about October 28, 2015, for example—consistent with Dhillon's instruction that his cut of the proceeds be transferred to third parties on his behalf to obscure the fact that they were redounding to his benefit—the Veldhuis Control Group arranged for Wintercap SA to pay a third party approximately $25,000 toward an expense incurred by Dhillon's family.

129.     Similarly, on or about June 21, 2016, Wintercap SA remitted $110,431.86 to a loan servicing company in Colorado.  This payment, sent from a Sharp Group-administered nominee entity, Morris Capital, was applied to pay a mortgage loan for Sexton's benefit on a property in California.

**Round Four: 2016 – 2018 Illegal Vitality Stock Sales**

130.     On or about July 10, 2016, Stevia First changed its name to Vitality and executed a 1-for-10 reverse split of its common stock.  The reverse split meant that shareholders were required to exchange 10 shares for one share, which had the effect of reducing the total number of outstanding shares of the company by a factor of 10.  This also had the effect of drastically reducing the holdings of retail investors whom Defendants had prompted to purchase shares in Stevia First through their previous promotional campaigns.

131.     On various dates in 2016, the Veldhuis Control Group sent numerous wire payments to Vitality, or to third parties on behalf of Vitality, totaling approximately $4.4 million. In exchange, Vitality—with Dhillon operating as the chairman of its board of directors—issued millions of shares (the "Vitality Stock") to nominee entities that the Sharp Group once again provided for use by the Veldhuis Control Group.

132.    The Vitality Stock shares acquired by the Veldhuis Control Group from the financing described in ¶ 131, above, were initially issued with restricted legends.  In order to facilitate the liquidation of these shares, Kelln retained an attorney on behalf of each of the nominee shareholder entities to prepare opinion letters that falsely represented that the nominee shareholders were not affiliates of Vitality.

133.    On various dates ranging between 2016 and 2018, the attorney retained by Kelln on behalf of the Veldhuis Control Group issued opinion letters to Vitality's transfer agent, representing that none of the Sharp Group-administered nominee shareholders were affiliates of Vitality.  Based on these false representations, Vitality's transfer agent removed the restricted legends from the Vitality Stock, thereby enabling the Veldhuis Control Group to sell the Vitality Stock to the public.  In actuality, the Vitality Stock was controlled by affiliates of the company and was legally restricted from resale.  Among other points of affiliation, the Veldhuis Control Group was acting in concert with Dhillon, who was the chairman of Vitality's board.

134.    After Vitality's transfer agent removed the restricted legend for one of the nominee shareholders, Kelln advised Wintercap SA of an incoming deposit of 750,000 shares of Vitality in the name of a Sharp Group-administered nominee shareholder called Hilton Capital.

135.    At that time, Kelln noticed from reviewing Q records that Wintercap SA was already holding Vitality shares (that had been previously deposited) in the name of Hilton Capital.  The 750,000 additional shares would have brought the total shares held by that nominee to more than 5% of Vitality's issued shares.  As Kelln knew or recklessly disregarded, any shareholder who was the beneficial owner of more than 5% of Vitality's outstanding stock was legally required to publicly disclose its holdings.  Such disclosures would have frustrated Dhillon's and the Veldhuis Control Group's efforts to conceal their stock holdings and sales.

40

A94

136.    On or about February 28, 2017, Kelln instructed Wintercap SA to allocate all Vitality Stock sales Wintercap was making that day to the Hilton account, thereby reducing the number of Vitality shares that Hilton Capital was shown as holding.  This ruse prevented Hilton Capital from showing share ownership in excess of 5%.  Specifically, Kelln wrote: "allocate all VBIO [ticker symbol of Vitality] to the [Hilton Capital] account today.  We need to make room for pending 750k.  Again 5% rule is biting me in the ass."

137.    The 750,000 shares were subsequently deposited with Wintercap SA.  Thereafter, Veldhuis provided trading instructions to Wintercap SA to sell the Vitality Stock.

138.    In or about December 2016, during the course of another Veldhuis Group-funded, Kaitz-managed stock promotion touting Vitality's stock, Wintercap SA's principal asked Veldhuis through an encrypted messaging application if the Vitality Control Group could "switch selling to another outlet to let us [Wintercap SA] breath[e]" and slow the pace of selling. Veldhuis responded that he could slow the pace "on the next batch, but that's a week out.  In the meantime, sell 15k VBIO @ 2.11."  Wintercap SA's principal suggested, in response, "[m]aybe 2 days on, 1 day off . . . ."  In response, Veldhuis suggested that he could move the stock held at Wintercap SA to a competitor, Blacklight SA ("BL").  This exchange followed:

| Veldhuis to Wintercap | I will figure out how to move some elsewhere.  It pains me to give BL business. |
| Wintercap to Veldhuis | Ok.  I don't wish you to do that ;) |
| Veldhuis to Wintercap | Lol |
| Wintercap to Veldhuis | We can stay on point |

139.    In connection with their efforts to sell Vitality Stock in 2016 and later, the Veldhuis Control Group again retained Kaitz to conduct a promotional campaign.  Between October 2016 and March 2017, Veldhuis directed Wintercap SA to wire $530,000, which was

derived from financial accounts associated with four Sharp Group-administered nominee

shareholders, to Kaitz's entity for the purpose of promoting Vitality.

***

140.    Overall, the Sharp Group allocated Stevia First/Vitality stock sale proceeds as

follows during the period of time subject to this Complaint:

| Defendant | Approximate Amount (Millions) |
|---|---|
| Sexton | $5.5 |
| Veldhuis | $3.1 |
| Friesen | $2.3 |
| Taylor | $4.3 (of which Taylor, in turn, promptly forwarded approximately $2.6 million to Dhillon, as noted in ¶ 82) |
| Kaitz | $1.4 |

141.    Dhillon benefited by receiving millions of dollars from the proceeds of these

illegal stock sales, including through payments made by the Veldhuis Control Group and Taylor

to various third parties on Dhillon's behalf.

**The Veldhuis Control Group's Omissions in Furtherance of the Scheme**

142.    Veldhuis, Sexton and Friesen acted as a group for purposes of acquiring, holding,

and ultimately disposing of Vitality shares, and consequently became subject to regulation as a

single person pursuant to Exchange Act Section 13(d)(3).  Veldhuis, Sexton and Friesen failed to

file any report on behalf of the group as required under Rule 13d-1(k)(2), even though they

collectively acquired, held, and were responsible for directing the disposition of, far more than

5% of Vitality's outstanding stock through nominee entities that were under their group's

control.

143.    In failing to make required Schedule 13D/G filings, Veldhuis, Sexton, and Friesen

violated Section 13(d) and Rule 13d-1 thereunder.

42

A96

**Dhillon's Failures to Disclose in Furtherance of the Scheme**

144.    On August 17, 2016, Dhillon filed an untimely and inaccurately amended Schedule 13D (specifically, a Schedule 13D/A) with the Commission.  Dhillon reported that he was the beneficial owner of 1,530,585 shares (post stock split) consisting of:

     a.   515,000 shares issued directly by Vitality in 2012.

     b.   50,000 in stock options issued by Vitality in 2012.

     c.   40,000 shares of common stock issued by Vitality in 2015.

     d.   925,585 shares of common stock issued by Vitality in 2016.

145.    In actuality, as of August 17, 2016, Dhillon was also a beneficial owner of a significant number of shares of the stock held by the Veldhuis Control Group.  Dhillon did not report, among other things, these shares in his Schedule 13D.

146.    Dhillon also failed to file any Forms 4 reflecting the sales of Vitality stock that had been sold on his behalf, directly or indirectly, by the Veldhuis Control Group.  For example, on or about January 13, 2017, the Veldhuis Control Group caused Wintercap SA to sell 44,661 shares of Vitality, which sales generated proceeds of $105,551.21.  On or about January 27, 2017, the Veldhuis Control Group caused Wintercap SA to transfer $100,000 to pay an expense incurred by Dhillon.  Dhillon failed to file a Form 4 reflecting either of these January 2017 Vitality stock sales, or any other sales by the Veldhuis Control Group in 2017 or 2018 from which he benefitted.

**Dhillon's False and Misleading Testimony in Furtherance of the Scheme**

147.    On or about August 29, 2019, during the investigation leading to the filing of this action, Dhillon provided sworn testimony to the Commission staff.  Seeking to conceal his illegal conduct, Dhillon falsely denied being the beneficiary of any undisclosed Stevia First/Vitality

43

A97

stock sales, and falsely denied knowing that the Veldhuis Control Group had sold Stevia First/Vitality stock.

148.   For example, during the August 2019 testimony, the Commission asked Dhillon if he ever received the proceeds of any sales of Stevia First/Vitality stock.  Dhillon falsely replied, "I have not."  In actuality, the Veldhuis Control Group and Taylor had distributed Stevia First/Vitality stock trading proceeds to Dhillon, directly and indirectly, through cash payments and through payments to third parties on Dhillon's behalf.

149.   Similarly, during the August 2019 testimony, the Commission asked Dhillon if he knew anyone who sold Stevia First/Vitality stock.  Dhillon falsely replied, "I'm not aware."  In actuality, Dhillon knew that the Veldhuis Control Group and Taylor had sold Stevia First/Vitality stock, and had shared the resulting proceeds with him.

**SHARP GROUP EXAMPLE TWO:**
**ILLEGAL ARCH STOCK SALES INVOLVING DHILLON, THE VELDHUIS**
**CONTROL GROUP, AND TAYLOR**

150.   Beginning in or about 2013, the Veldhuis Control Group schemed with Dhillon, Taylor and Kaitz to sell illegally the stock of Arch.

151.   In 2013, Dhillon arranged for a private company he controlled to merge (as a reverse merger) into a publicly traded shell company controlled by the Veldhuis Control Group. Following the reverse merger, which closed in or about June 2013, the surviving public company was called Arch.

152.   By April 2013, Dhillon had become an officer or director of Arch; and by June 2013, Dhillon had assumed the role of chairman of Arch's board of directors.

153.   Prior to the 2013 Arch reverse merger, Arch had issued shares to various S-1 Shareholders (hereinafter referred to as the "Arch S-1 Shareholders") in 2012.  By early 2013,

44

A98

following a stock split, the Arch S-1 Shareholders collectively held 20 million shares of Arch

stock (which traded under the ticker symbol "ARTH").

154.    Leading up to, and shortly after, the closing of the reverse merger, the Veldhuis

Control Group directed the transfer of 16,920,000 Arch shares, held in the names of several Arch

S-1 Shareholders, to eleven Sharp Group-administered nomine shareholders for the benefit of the

Veldhuis Control Group.

155.    Kelln arranged, on behalf of the Veldhuis Control Group, to transfer an additional

2,310,000 shares, held in the names of several additional Arch S-1 Shareholders, to an entity

controlled by Wintercap SA called "Victory Capital" on behalf of the Veldhuis Control Group.

156.    Combined, the Veldhuis Control Group held at least 19,230,000 purportedly

unrestricted shares of Arch, representing over 48% of Arch's total issued and outstanding stock,

which constituted close to 100% of Arch's unrestricted shares that were available for trading, at

or around the time of the reverse merger.

157.    Shortly before the reverse merger closed, the Veldhuis Control Group controlled,

through a Sharp Group-administered nominee, an additional 20,000,000 shares that were marked

as restricted.  In anticipation of the reverse merger, the Veldhuis Control Group transferred these

shares to Dhillon (10,000,000) and a company controlled by the CEO of Arch (10,000,000).

Dhillon, in turn, transferred 2,750,000 shares to a domestic corporate entity ("Company A"), an

entity that was controlled by Dhillon's associate, Person A.

158.    The chart below illustrates the transfers described in ¶¶ 153 through 157.

A99



159.    The Veldhuis Control Group provided financing to Arch around the time of the reverse merger.  Specifically, the Veldhuis Control Group funneled approximately $1.75 million through an attorney's escrow account, which was remitted to Arch in the form of equity subscription agreements.  Dhillon, through his same Swiss-banking Ortivo account referenced in ¶ 82, also contributed $250,000 as part of this financing, but concealed this involvement from Arch's principals.

160.    Following the reverse merger, the Veldhuis Control Group engaged Kaitz to

A100

promote Arch and paid Kaitz approximately $1.2 million from June 2013 to August 2013 for this promotion.

161.     As Kaitz knew or recklessly disregarded, these payments were derived from money held by Sharp Group-administered nominee shareholders on behalf of the Veldhuis Control Group.  For example, on or about July 24, 2013, Kaitz sent the following Encrypted Communication to Veldhuis: "Are you able to capture anything on arth?"  Kaitz was asking Veldhuis, in substance, how much money, if any, the Veldhuis Control Group made from the sale of Arch stock during the course of the stock promotion.

162.     Some of the promotions managed by Kaitz falsely identified the promotions' funding source.  For example, the landing page for an Arch promotion cited "Advantage Media Corp" as the "paying party" of a $790,000 "total production budget."  As Kaitz knew or recklessly disregarded, Advantage Media was a front company used to disguise the identity of the parties actually paying for the promotion, i.e. the Veldhuis Control Group.

163.     On September 27, 2013, Kaitz asked Veldhuis in an Encrypted Communication what to do if other stock promoters hired by Kaitz to distribute touts about Arch refused to identify Advantage Media as the supposed paying party.  Kaitz wrote to Veldhuis: "Am trying to have them put Advantage media, if they won't then what?"  Later that day, Kaitz explained that the other stock promoters said that "[t]hey will go if they get the invoice signed and sent back to them via email from advantage."  Veldhuis responded and directed Kaitz to send the invoice to an email address created for the purpose of making it appear as if Advantage Media Corp. was an actual third party: "send to marketing@advantagemedia.co."

164.     Sharp substantially assisted the Veldhuis Control Group's use of Advantage Media Corp. to disguise the Veldhuis Control Group's Arch-related conduct.  For example, on or

A101

about January 21, 2014, Sharp asked Veldhuis in an Encrypted Communication whether he should continue to pay incorporation fees associated with Advantage Media Corp., and, if so, whether he (Sharp) should use Arch stock sale proceeds to make such payments: "Do we pay the 2014 annual fees for advantage media corp (belize)?  Debit arth?"  Veldhuis responded: "Kill it." By that time, Advantage Media Corp. had served its purpose: the Veldhuis Control Group used it as a front company to fund a stock promotional campaign touting Arch stock.

165.     The chart below illustrates the success of the Veldhuis Control Group's paid promotion of Arch between June and September 2013:



166.     During the period of the promotional campaign, the Veldhuis Control Group surreptitiously sold millions of Arch shares into the market through nominee shareholders administered by the Sharp Group.  Specifically, between June 11, 2013 and September 30, 2013, the Veldhuis Control Group sold approximately 16.6 million shares of Arch stock through Sharp Group-administered nominee shareholders, generating proceeds of at least $11.5 million.  The

A102

Veldhuis Control Group sold another approximately 1.4 million shares generating proceeds of approximately $574,000 through a nominee shareholder administered by Wintercap SA.

167.    Throughout the period of these unregistered sales, the Veldhuis Control group was an affiliate of Arch, by virtue of its control over a significant percentage of Arch's stock and/or because it was acting in concert with Dhillon, the chairman of the company.  Sharp, Kelln, Veldhuis, Friesen, and Sexton failed to register their sales of Arch stock described herein pursuant to Section 5 of the Securities Act.  In selling these shares, the Veldhuis Control Group, through Sharp Group-administered nominee shareholders, surreptitiously sold unregistered shares of stock, and schemed to defraud investors by concealing the fact that public company affiliates were dumping stock into the markets.

168.    The Veldhuis Control Group coordinated with Dhillon on the stock promotions. For example, Sexton had one or more discussions with Dhillon where he discussed sharing the promotional materials with Dhillon before they were published, and Sexton reported to Dhillon the budget for promotions.  In addition, shortly before the merger closed, Friesen asked Sexton and Veldhuis whether Dhillon would "have a set of news releases to begin issuing next week?", to which Sexton responded, "I asked for that yesterday.  He said he would deliver."  Dhillon played this role in order to benefit from the Veldhuis Control Group's sale of stock, since, as the Veldhuis Control Group and Dhillon knew, promotional campaigns tend to be more effective when they coincide with news releases by the issuer whose stock is being promoted.

169.    Dhillon directly participated in the Veldhuis Control Group's sales of Arch, while failing to register those sales pursuant to Section 5 of the Securities Act.  For example, on or about August 13, 2013 in an Encrypted Communication, Sexton relayed a conversation he had with Dhillon to Veldhuis: Sexton reported that he told Dhillon that the Veldhuis Control Group

A103

"would be active in the market" until the first week of September and that they "wouldn't sell below $0.40 [per share]."  Sexton also relayed to Dhillon that the Veldhuis Control Group would first distribute the proceeds of such sales as a repayment for the private placements they had made (including Dhillon's anonymous $250,000 investment) into Arch, but that a broader distribution would take place in September.  Sexton noted Dhillon was "disappointed it wasn't bigger success as we all are but I explained sometimes things out of control and we were squeezing this out in short timeframe so it may have hurt us a bit in that we weren't able to stop once we started."  Sexton continued, "I said we worked well together and everyone did what they said they would and that we would continue to look at his projects in future."

170.    On or about September 6, 2013, Veldhuis instructed Gasarch to wire $250,000 from the Arch proceeds to the same Dhillon owned Swiss-banking Ortivo account referenced in ¶¶ 82 and 159, thereby reimbursing Dhillon for his undocumented private placement investment.  Consistent with Sexton's description above, the Veldhuis Control Group caused a further distribution to be made from the Group's illicit Arch stock sale proceeds for Dhillon's benefit in September 2013.

171.    In particular, on or about September 26, 2013, Wintercap SA wired $200,000 to a Canadian company controlled by Dhillon's tax accountant, who, in turn, wired the very same amount, on or about the same day, to a U.S.-based corporate account that Dhillon controlled.  This money was derived from the sale of Arch stock.

172.    Taylor also schemed with the Veldhuis Control Group on the Arch deal and received at least $600,000 of the proceeds generated by its Arch sales, while also failing to register those sales pursuant to Section 5 of the Securities Act.  On or about August 20, 2013, Sexton wrote to Veldhuis and instructed him to "send 600k from ARTH" to the same Taylor-

A104

controlled Swiss bank account as that referenced in ¶ 82.  Two days later, at Veldhuis's

direction, Gasarch wired the funds, to that same destination, from a Cayman Islands brokerage

account.  This $600,000 distribution derived from the illegal sales of Arch stock.

173.    The Sharp Group allocated Arch stock sale proceeds to the Veldhuis Control

Group as follows during the period of time subject to this Complaint:

| Veldhuis Control Group Member | Approximate Amount (Millions) |
|---|---|
| Sexton | $1.7 |
| Veldhuis | $1.5 |
| Friesen | $1.5 |

\*\*\*

174.    The table below reflects payments directed by the Veldhuis Control Group to

Dhillon and Taylor or entities with whom they were associated, sourced from the sale of Stevia

First/Vitality and Arch stock through Sharp Group-administered nominee shareholders from

2012 to 2018:[7]

| Year | Dhillon | Taylor | Total |
|---|---|---|---|
| 2012 | $ 33,890 | $ 4,225,531 | $ 4,259,421 |
| 2013 | 259,770 | 600,200 | 859,970 |
| 2014 | 10,000 | 124,200 | 134,200 |
| 2015 | 25,030 | | 25,030 |
| 2016 | 231,672 | | 231,672 |
| 2017 | 2,157,330 | | 2,157,330 |
| 2018 | 300,500 | | 300,500 |
| **Total** | **$  3,018,192** | **$  4,949,931** | **$  7,968,123** |

175.    As described in ¶ 171, Dhillon was also the beneficiary of another $200,000 in

Arch stock sale proceeds in 2013, at the Veldhuis Control Group's direction, but these funds

were sourced from a Wintercap SA-administered, rather than a Sharp Group-administered,

---

[7] The table does not include payments made in cash to Dhillon or Taylor's payments to Dhillon.

nominee shareholder.

\*\*\*

176.    During the period of April 2014 through March 2016, the table below reflects various distributions of money, some of which were derived from Stevia First/Vitality and Arch stock sale proceeds, directed by Taylor to third parties for the benefit of Dhillon or otherwise associated with Dhillon:

| DATE | PAID TO | AMOUNT |
|---|---|---|
| 4/17/2012 | SUTTER BUTTES LLC* | $ 498,000 |
| 5/4/2012 | ORTIVO (Defined at ¶ 82) | 400,000 |
| 5/11/2012 | ORTIVO | 496,000 |
| 7/16/2012 | ORTIVO | 1,300,000 |
| 11/20/2013 | DHILLON RELATIVE A | 90,000 |
| 11/26/2013 | DHILLON RELATIVE B | 40,000 |
| 11/26/2013 | DHILLON CONTRACTOR | 95,000 |
| 12/2/2013 | DHILLON CREDITOR A | 95,000 |
| 12/18/2013 | DHILLON CONTRACTOR | 65,000 |
| 1/15/2014 | DHILLON CREDITOR B | 65,000 |
| 1/21/2014 | DHILLON CREDITOR B | 35,000 |
| 4/25/2014 | DHILLON CREDITOR A | 94,980 |
| 6/19/2014 | CHALMERS GROUP LLC* | 60,000 |
| 6/24/2014 | CHALMERS GROUP LLC* | 210,000 |
| 7/7/2014 | CHALMERS GROUP LLC* | 120,000 |
| 7/24/2014 | DHILLON CREDITOR A | 294,475 |
| 9/17/2014 | DHILLON CREDITOR A | 247,000 |
| 2/26/2016 | DHILLON CREDITOR A | 99,965 |
| 3/28/2016 | DHILLON CREDITOR A | 99,965 |
| **TOTAL** | | **$ 4,405,385** |

*\* - Dhillon-controlled private company*

\*\*\*

177.    On or about July 30, 2020, Dhillon appeared for further testimony before the Commission in connection with the investigation leading to the filing of this action, and again made false and misleading statements, including claims that (i) prior to 2014, his interactions

52

A106

with Sexton had been limited to seeing him from a distance "in social circles … [like] hockey

games", "at charity events with his own tables [and] at restaurants entertaining people" and that

(ii) since 2014, his substantive interactions with Sexton have been limited to several discrete

topics that he characterized as innocent in nature.

***

178.    In addition to their schemes to sell Arch and Vitality stock illegally that are

described above, Taylor and Dhillon also schemed to sell the stock of at least two other Dhillon-

chaired issuers:  Inovio and OncoSec.  Taylor's and Dhillon's Inovio scheme is described in the

following paragraph; the pair's OncoSec scheme is described at ¶¶ 218 and 219.

179.    At the time of Taylor's and Dhillon's Inovio scheme, Dhillon was the chairman of

Inovio's Board of Directors.  Similarly to Taylor and Dhillon's other schemes, Dhillon facilitated

the transfer of Inovio shares to a nominee company controlled by Taylor, who then directed the

unregistered sale of those shares from at least approximately August 23, 2013 to September 13,

2013.  Taylor's sales generated at least $2.5 million in proceeds.  On various dates during

approximately November 2013 through January 2014, Taylor paid hundreds of thousands of

dollars to Dhillon or for Dhillon's benefit.  Also, similarly to Taylor and Dhillon's other

schemes, Dhillon failed to register the Inovio shares or report his beneficial ownership interest in

them or sale of them on either Schedule 13D or Form 4.

### DHILLON'S SCHEME TO SELL ARCH STOCK ILLEGALLY THROUGH PERSON A

180.    Dhillon illegally sold the stock of companies atop whose boards he sat through

different channels, apart from the Veldhuis Control Group and Taylor.  To that end, Dhillon

enlisted Person A to establish and manage a front company through which Dhillon

surreptitiously sold such stock, without Dhillon appearing associated with those stock sales in

53

A107

any public record or filing.  Dhillon's scheme to sell Arch stock illegally with Person A is described in detail below.

181.    Dhillon schemed to sell the stock of Arch fraudulently by, among other things, concealing from securities intermediaries such as brokers that he was selling, through a nominee shareholder, stock that was legally required to be registered, and concealing from Arch's shareholders that he—Arch's highest-level insider—was selling Arch stock into the market.

182.    In or about April 2013, Dhillon became a director of Arch, and, by June of that year, became chairman of its board.  Dhillon was an affiliate of Arch in that he had the power to control the company through his role as its chairman.  As a public company affiliate, Dhillon was legally required to register any sale of Arch stock unless Dhillon elected to comply with the safe harbor provisions set forth in Commission Rule 144, which strictly limit the quantity of securities an affiliate may sell to the public.  Dhillon testified, under oath, during the Commission's investigation that he understood these legal requirements at all times relevant to this Complaint.

183.    As a director of Arch, Dhillon was required to file public reports—including a Form 4—with the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder disclosing any change in his beneficial ownership of Arch stock, regardless of amount.  Dhillon understood these legal requirements at all times relevant to this Complaint. Dhillon failed to file any Forms 4 reflecting sales of Arch stock by the Veldhuis Control Group (described above) or Person A from which he benefitted.

184.    Dhillon was legally required to file a Schedule 13D with the Commission pursuant to Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the extent he was the beneficial owner of greater than five percent of Arch's common stock.  Dhillon understood

54

A108

these legal requirements at all times relevant to this Complaint.  Dhillon failed to file an accurate Schedule 13D reflecting his beneficial ownership of Arch's stock.

185.    Shortly after Dhillon became the chairman of Arch's board in April 2013, he arranged for at least one *alter ego* corporate shareholder to hold Arch stock on his behalf. Specifically, in or about June 2013, Dhillon arranged for the transfer of 2,750,000 Arch shares to Company A, a corporate nominee that Dhillon directed Person A to form.  In order to disguise Dhillon's association with Company A, Person A, as directed by Dhillon, identified only Person A as Company A's director in its incorporation papers.  Company A was, in actuality, holding Arch stock for Dhillon.

186.    On or about April 6, 2016, Person A caused Company A to open an account with a United States brokerage firm for the purpose of selling Arch stock.  Person A represented to the United States brokerage firm that he (as the sole director of Company A), was not an "officer, director, or more than a 10% shareholder of [Arch] or in any other way an 'affiliate' of [Arch]." Person A's representation was false and misleading in that Company A was actually holding, and was created in order to sell, Arch stock on behalf of Dhillon, who was a director and affiliate of Arch.  Dhillon knew, or recklessly disregarded, that Person A misled the United States brokerage firm as part of their scheme to sell Arch stock surreptitiously.

187.    The table below reflects Company A's sales of Arch stock, all of which occurred during a four-month period in 2016.  Dhillon failed to register these sales pursuant to Section 5 of the Securities Act:

| Month | Arch Shares Sold | Arch Sale Proceeds | |
|---|---|---|---|
| Apr-16 | 210,000 | $ | 79,711 |
| May-16 | 460,000 | | 181,925 |
| Jun-16 | 1,035,000 | | 444,567 |
| Jul-16 | 1,045,000 | | 631,133 |
| **Total** | **2,750,000** | **$** | **1,337,336** |

A109

188.    At or about the same time that Company A sold Arch stock, Person A caused Company A to transfer at least $850,000 of Arch stock sale proceeds to third parties identified by Dhillon, his assistant, or both, all to benefit Dhillon.  These transfers included paying various business and personal expenses Dhillon had incurred.

189.    Examples of Arch proceeds-funded payments routed by Company A through Dhillon's assistant to a bank account controlled by Dhillon in the name of One World Ranches LLC, as directed by Dhillon, are below.



190.    Dhillon did not disclose the stock that Company A held on Dhillon's behalf, or Dhillon's agreements with Person A concerning the holding and sale of those shares, on a Schedule 13D, as legally required.  Nor did Dhillon disclose any of Company A's Arch sales executed on Dhillon's behalf on any Form 4 filing with the Commission.

191.    On or about July 8, 2013, Dhillon filed a Schedule 13D with the Commission purportedly reflecting all of the Arch shares in which he held a beneficial interest.  This is the only Schedule 13D Dhillon filed concerning Arch.  Dhillon reported that he was the beneficial owner of 7,160,373 of Arch shares, consisting of:

        a.    7,000,000 shares that he received in a private transaction in or about June 2013.

A110

      b.  160,373 shares of common stock in exchange for the cancellation of debt

            Dhillon was owed by a private company that had merged with Arch.

192.    Dhillon's July 8, 2013 Schedule 13D was materially misleading in that it failed to reflect that Dhillon was also a beneficial owner of Arch stock held on Dhillon's behalf by Company A and additional Arch stock held on Dhillon's behalf by the Veldhuis Control Group. The Schedule 13D was also materially misleading in that it failed to disclose Dhillon's agreements with Person A and with the Veldhuis Control Group concerning the sale of Arch shares, or his and their respective combined holdings in Arch securities. Dhillon knowingly failed to make any of these disclosures in his Schedule 13D in order to conceal that information from investors and securities market intermediaries.

193.    Dhillon also knowingly failed to file any Forms 4 reflecting the sales of Arch stock that had been effected on his behalf, directly or indirectly, by Company A or the Veldhuis Control Group. For example, on various dates in April through June 2016, Company A sold Arch shares in the market on Dhillon's behalf. Dhillon intentionally failed to file a Form 4 reflecting any of these 2016 Arch stock sales in order to conceal his conduct form Arch investors.

194.    On or about August 29, 2019, during the investigation leading to the filing of this action, Dhillon provided sworn testimony to the Commission staff.

195.    During that August 2019 testimony, the Commission asked Dhillon if he knew of anyone who sold Arch stock prior to 2019. Dhillon, seeking to conceal his illegal conduct from the Commission, falsely replied, under oath: "I'm not aware." In actuality, and as Dhillon well knew, Person A caused Company A to sell Arch shares on Dhillon's behalf. As described above,

and as Dhillon likewise well knew, the Veldhuis Control Group also sold Arch shares on Dhillon's behalf.

**SHARP GROUP EXAMPLE THREE:**
**ILLEGAL ONCOSEC STOCK SALES INVOLVING DHILLON AND THE VELDHUIS CONTROL GROUP**

**The Veldhuis Control Group's Scheme to Sell OncoSec Stock Fraudulently**

196.    Prior to the Stevia First/Vitality and Arch fraudulent conduct described above, the Veldhuis Control Group schemed with the Sharp Group and Dhillon to sell fraudulently the stock of another issuer, OncoSec.  Further, Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon failed to register the sales of OncoSec stock described herein pursuant to Section 5 of the Securities Act.

197.    In or about February 2011, the Veldhuis Control Group directed the transfer to seven Sharp Group-administered nominee shareholders of 12,800,000 purportedly unrestricted OncoSec shares sourced from 20 original individual investors.  At the time, OncoSec had 52,656,000 shares outstanding.  The Veldhuis Control Group, therefore, held over 24% of the total common stock outstanding across the Sharp Group-provided nominee shareholders to which the Veldhuis Control Group directed OncoSec shares, and was an affiliate of the issuer. The Veldhuis Control Group knew that its 24% stake in OncoSec was legally restricted from resale absent an effective registration statement.  The table below reflects the transfers summarized in this paragraph.[8]

---

[8] Monterra Investments, Cliffside Partners, and Dartmore International are nominee shareholders utilized by the Veldhuis Control Group.

A112



198.    Between approximately March 2011 and November 2011, the Veldhuis Control Group sold, via various Sharp Group-administered nominee shareholders, approximately 2.2 million shares of OncoSec stock through offshore brokerage firms for proceeds of approximately $3 million.

199.    Later, the Veldhuis Control Group sold through the Sharp Group approximately 11 million more OncoSec shares between approximately February 2012 and August 2012 for approximately $2.4 million more in illicit proceeds.

**Dhillon's Scheme to Sell OncoSec Fraudulently through Person A**

200.    Around the same time that the Veldhuis Control Group sold OncoSec securities, Dhillon schemed to sell the stock of OncoSec fraudulently through Person A.  Dhillon concealed from securities intermediaries, such as brokers, that he was selling, through a nominee shareholder, stock that was legally required to be restricted, and concealed from OncoSec's investors that he was selling OncoSec stock into the market.

59

A113

201.    On or about March 10, 2011, Dhillon became the chairman of OncoSec's board of

directors.

202.    Dhillon was an affiliate of OncoSec because he was the chairman of its board.

Through that role, he had the power to control the company.  As a public company affiliate,

Dhillon was legally required to register any sale of OncoSec stock unless Dhillon elected to

comply with the safe harbor provisions set forth in Commission Rule 144.  Dhillon testified,

under oath, during the Commission's investigation that he understood these legal requirements at

all times relevant to this Complaint.

203.    As a director of OncoSec, Dhillon was required to file public reports—including a

Form 4—with the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3

thereunder disclosing any change in his beneficial ownership of OncoSec stock, regardless of

amount.  Dhillon understood these legal requirements at all times relevant to this Complaint.

204.    Dhillon was legally required to file a Schedule 13D with the Commission

pursuant to Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the extent he was

the beneficial owner of greater than five percent of OncoSec's common stock.  On or about

March 22, 2011, Dhillon received 9,910,496 restricted shares of OncoSec, which comprised

greater than 5% of the company's outstanding stock.

205.    Dhillon understood these legal requirements at all times relevant to this

Complaint.  Dhillon intentionally failed to file an accurate Schedule 13D reflecting his beneficial

ownership of OncoSec's stock, his agreement with Person A concerning the sale of OncoSec

stock, or his and Person A's combined holdings in OncoSec, despite being the beneficial owner

of greater than five percent of the company's outstanding common stock.

A114

206.    Around the time that Dhillon became the chairman of OncoSec's board in March 2011, he arranged for Person A to hold OncoSec stock on his behalf through a nominee shareholder.

207.    On or about March 2, 2011, Person A incorporated a corporate entity at Dhillon's direction, hereinafter referred to as Company B, to serve as Dhillon's nominee shareholder. Shortly thereafter, Dhillon facilitated Company B's nominal acquisition of 2,354,880 OncoSec shares. At Dhillon's direction, Person A identified himself as Company B's sole director, in order to conceal Dhillon's association with Company B.

208.    By December 2012, Person A opened a brokerage account in the name of Company B.

209.    On or about January 19, 2013, Person A represented to Company B's brokerage firm that Company B was never an "Officer, Director, Control Person, 10% owner or Affiliate of the issuer being presented for deposit [i.e., OncoSec]," which was a confirmation required by the brokerage firm when the OncoSec shares were deposited for resale.

210.    Person A's representations to the brokerage firm were false and misleading because Company B was, in actuality, holding shares for Dhillon, who was a Director, Control Person, and Affiliate of OncoSec. Dhillon knew, or was reckless in not knowing, that Person A would make these types of material misrepresentations to brokerage firms. Indeed, Dhillon directed Person A to establish Company B for precisely this purpose: to conceal the fact that Dhillon was actually the beneficial owner of Company B's OncoSec stock.

211.    In or about January 2013, Person A caused Company B to deposit 2,354,880 shares of OncoSec into its brokerage account. Person A, working in concert with Dhillon, subsequently caused Company B to sell these shares on Dhillon's behalf.

A115

212.   The table below reflects Company B's sales of all 2,354,880 of its shares of OncoSec stock, between 2013 and 2017.  Dhillon failed to register these stock sales pursuant to Section 5 of the Securities Act.

| Month | OncoSec Shares Sold | OncoSec Sale Proceeds |
|-------|--------------------:|----------------------:|
| Feb-13 | 50,000 | $ 9,979 |
| Mar-13 | 81,400 | 16,878 |
| Apr-13 | 193,600 | 43,728 |
| May-13 | 280,000 | 78,159 |
| Jul-13 | 50,000 | 14,127 |
| Aug-13 | 375,000 | 118,681 |
| Feb-14 | 50,000 | 37,800 |
| Mar-14 | 250,000 | 204,406 |
| Apr-14 | 60,000 | 43,820 |
| May-14 | 250,000 | 198,535 |
| Jun-14 | 80,000 | 69,434 |
| Feb-17 | 54,880 | 3,705 |
| Jul-17 | 370,000 | 21,185 |
| Sep-17 | 110,000 | 6,415 |
| Oct-17 | 100,000 | 5,650 |
| **Total** | **2,354,880** | **$ 872,502** |

213.   Person A, acting through Company B, distributed the majority of the OncoSec sale proceeds at Dhillon's direction to third parties identified by Dhillon.  Dhillon directed the transfers to third parties, instead of directly to his own bank accounts, to conceal that he was the actual beneficiary of the stock sales.

214.   The flow chart below reflects examples of Company B's OncoSec proceeds-funded transfers to Dhillon's assistant for the benefit of Dhillon, as directed by Dhillon:

A116



215. To conceal his conduct from investors, Dhillon never filed a Schedule 13D with the SEC disclosing his agreement with Person A concerning the sale of OncoSec stock through Company B, or his and Person A's combined holdings in OncoSec stock, or any of the many material changes to those combined holdings.

216. Dhillon knew that OncoSec's public filings concealed from OncoSec's shareholders and securities market intermediaries the true extent of Dhillon's beneficial ownership position. For example, OncoSec's Form 10-K for the year ended July 31, 2011 only reported Dhillon's ownership of 9,910,496 shares, and failed to disclose Dhillon's further beneficial ownership of, at a minimum, the Company B shares. As a further example, OncoSec's Form 10-K for the year ended July 31, 2017 failed to disclose the existence or extent of Dhillon's Form 4 filing delinquencies stemming from his failure to file any Forms 4 concerning his OncoSec share sales that year through Company B.

217. Indeed, to conceal his conduct from investors, Dhillon never filed any Forms 4 reporting Company B's sales of OncoSec stock on his behalf, as legally required.

**DHILLON'S SCHEME TO SELL ONCOSEC STOCK ILLEGALLY VIA TAYLOR**

218. During the course of his scheme with Person A to sell illegally OncoSec stock, described above, Dhillon also schemed with Taylor to sell illegally even more OncoSec stock. At the time of this Dhillon-Taylor OncoSec scheme, Dhillon was the chairman of OncoSec's

Board of Directors.  As part of this scheme, between at least April 2 and June 19, 2014, Taylor

sold at least 827,000 shares of OncoSec stock, through a Singapore-banking nominee

shareholder that he controlled, for proceeds totaling approximately $586,000.  Taylor failed to

register these stock sales pursuant to Section 5 of the Securities Act.

219.    During that same period, and from the same account in which he had realized the

aforementioned approximately $586,000 in sale proceeds, Taylor, in turn, sent out two wires

totaling $155,000 for Dhillon's benefit.  For examples, Taylor wired approximately $95,000 to

pay a creditor Dhillon owed, and $60,000 to a private company Dhillon owned.  And, as with his

other, similar schemes, Dhillon never disclosed—through any Form 4 or any other filing—his

OncoSec trading through Taylor.

***

**ADDITIONAL SHARP GROUP AND VELDHUIS CONTROL GROUP DEALS**

220.    The Veldhuis Control Group utilized the Sharp Group's services to disguise their

stock sales in deals beyond the Vitality, Arch, and OncoSec conduct detailed above.  In each

such case, the Sharp Group provided the infrastructure necessary to obfuscate the Veldhuis

Control Group's ownership of a significant percentage of the public companies' shares.  The

table below reflects a non-exhaustive list of stock sold by the Veldhuis Control Group using

Sharp Group-administered nominee shareholders to disguise their control.

64

A118

| Issuer | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Vitality / Stevia First | $ - | $ 24,718,428 | $ - | $ 566,715 | $ 770,492 | $ 5,503,691 | $ 10,570,537 | $ 3,509,479 | $ 45,639,343 |
| Echo Automotive, Inc. | - | 48,115 | 23,582,539 | 30,221 | - | - | - | - | 23,660,874 |
| Arch | - | 189 | 11,755,408 | 257,689 | 1,220,451 | 2,738,550 | 84,091 | - | 16,056,376 |
| Stevia Corp | 6,905,120 | 2,172,356 | 971,330 | 3,175,474 | - | - | - | - | 13,224,281 |
| Liberty One Lithium Corp | - | - | - | - | - | (54,767) | 8,576,091 | 222,194 | 8,743,519 |
| Oryon Technologies, Inc. | - | 7,668,439 | 898,616 | - | - | - | - | - | 8,567,054 |
| Makism 3D Corp | - | - | 6,070,042 | 2,423,056 | - | - | - | - | 8,493,098 |
| Graphite Corp | - | 4,457,264 | 1,796,167 | (1,590) | - | - | - | - | 6,251,841 |
| OncoSec | 2,925,270 | 2,356,056 | - | - | - | - | - | - | 5,281,325 |
| NewGen Biopharma Corp | - | - | - | - | - | 7,627 | 3,859,972 | - | 3,867,599 |
| StartMonday Technology Corp | - | - | - | - | - | 296,664 | 2,133,104 | 6,339 | 2,436,107 |
| Lexington Biosciences Holdings Corp | - | - | - | - | - | - | 422,552 | 947,039 | 1,369,592 |
| BreathTec Biomedical, Inc. | - | - | - | - | - | 421,745 | - | - | 421,745 |
| RightsCorp | - | - | 124,926 | 5,402 | - | - | - | - | 130,328 |
| **TOTAL** | **$9,830,390** | **$41,420,845** | **$45,199,028** | **$6,456,966** | **$1,990,943** | **$8,913,509** | **$25,646,347** | **$4,685,052** | **$144,143,081** |

221.     The Veldhuis Control Group paid Kaitz to promote several of the issuers listed in the table in ¶ 220, including (in addition to Stevia First/Vitality and Arch, both detailed above) the stock of Echo Automotive, Liberty One Lithium Corp., Oryon Technologies, Inc., NewGen Biopharma Corp., StartMonday Technology Corp., and BreathTec Biomedical, Inc.

222.     In each instance, Kaitz knowingly or recklessly substantially assisted the Veldhuis Control Group by materially omitting or materially misrepresenting the facts that the Veldhuis Control Group (i) actually paid for the stock promotional campaign, and (ii) was actively trading, and planned to trade, in the very opposite direction to which the promotions urged investors to trade.

### SHARP GROUP EXAMPLE: LUIS CARRILLO

223.     As described in ¶ 43, above, the control group clients of the Sharp Group generated over one billion dollars in stock sales through the Sharp Group between approximately 2010 and 2019.  One such client is a repeat offender, Luis Carrillo.[9]  Carrillo generated, in concert with others, at least $75 million in illegal stock sale proceeds using the Sharp Group's encrypted communications and nominee shareholders as cover.  One such example is described below.

---

[9] See SEC v. Carrillo et al., 13-cv-1735-GBD (S.D.N.Y. March 2013).

A119

224.    On August 4, 2021, the Commission filed a Complaint against Luis Carrillo in connection with his illegal sale of the stock of Garmatex Holdings, Ltd.  Carrillo, acting in concert with others, amassed approximately 88% of Garmatex's unrestricted shares that were available for trading, and they used the Sharp Group, Wintercap SA, Blacklight SA, and a separate broker to execute the scheme.

225.    In particular, Kelln, at Sharp's direction, deposited three blocks of Garmatex stock—each consisting of 1,750,000 Garmatex shares, or just under five percent of Garmatex's total outstanding stock—with Wintercap SA in the name of three Sharp Group nominee shareholders.  As Sharp and Kelln knew, or recklessly disregarded, brokerage firms typically inquire about whether a shareholder owns more than five percent of a public company's stock because holding more than five percent may trigger additional questions about whether the sales are part of a distribution that must be registered pursuant to Section 5 of the Securities Act.

226.    Sharp and Kelln arranged for these deposits in the names of separate Sharp Group nominee shareholders well knowing that Carrillo and his team were actually the beneficial owners of the shares. For example, on or about March 9, 2017, Kelln replied to an Encrypted Communication from Wintercap SA's principal about the status of selling Garmatex stock: "Changing the [transfer agent] first . . . [Carrillo is] up my butt to get grmx [the ticker of Garmatex] all in."

227.    The Sharp Group's provision of these nominee shareholders enabled Carrillo, acting in concert with others, to conceal from brokerage firms that they actually controlled greater than five percent of the company's outstanding shares.

228.    Overall, during approximately March and April 2017, Kelln coordinated with Carrillo, acting in concert with others, to transfer a total of 12,233,337 shares of Garmatex

A120

nominally held by six different Sharp Group-administered nominee shareholders to Wintercap SA, Blacklight SA, and a third party.  Collectively, these positions accounted for approximately 88% of Garmatex's purportedly unrestricted shares that were available for trading, and approximately 34% of Garmatex's total issued and outstanding stock.  Carrillo, therefore, was an affiliate of Garmatex.

229.    The chart below summarizes the Garmatex share transfers described above:



230.    Carrillo, acting in concert with others, coordinated the trading of Garmatex stock at Wintercap SA, Blacklight SA and a separate broker during a stock promotional campaign, generating proceeds as a result of these unregistered sales in excess of $7 million.

**TOLLING AGREEMENTS**

67

A121

231.     Between January and June 2020, Dhillon entered into two separate tolling

agreements with the Commission.  Each tolling agreement specifies a period of time (a "tolling

period") in which "the running of any statute of limitations applicable to any action or

proceeding against Dhillon authorized, instituted, or brought by … the Commission… arising out

of the [Commission's investigation of Dhillon's conduct], including any sanctions or relief that

may be imposed therein, is tolled and suspended . . . ."  Each tolling agreement further provides

that Dhillon "shall not include the tolling period in the calculation of the running of any statute

of limitations or for any other time-related defense applicable to any proceeding, including any

sanctions or relief that may be imposed therein, in asserting or relying upon any such time-

related defenses."  Collectively, these agreements tolled the running of any limitations period or

any other time-related defenses available to Dhillon for a period of approximately seven months

and three days.

## FIRST CLAIM FOR RELIEF
## <u>FRAUD IN THE OFFER OR SALE OF SECURITIES</u>
**(Violations of Sections 17(a)(1) and (3) of the Securities Act by Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor)**

232.     Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if

fully set forth herein.

233.     During the Relevant Period, the stock of Vitality, Arch, and OncoSec was each a

security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)], and a penny stock.

234.     By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis,

Sexton, Friesen, Dhillon, and Taylor, in connection with the offer or sale of securities, by the use

of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly,

acting intentionally, knowingly, recklessly or negligently (i) employed devices, schemes, or

artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which

A122

operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

235.    By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)] and will continue to violate those sections unless enjoined.

### SECOND CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor)**

236.    Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if fully set forth herein.

237.    During the Relevant Period, the stock of Vitality, Arch, and OncoSec was each a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)], and a penny stock.

238.    By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

239.    By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

69

A123

**THIRD CLAIM FOR RELIEF**
**UNREGISTERED OFFERINGS OF SECURITIES**
**(Violations of Sections 5(a) and 5(c) of the Securities Act by Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon)**

240.    Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if fully set forth herein.

241.    During the Relevant Period, the stock of Vitality, Arch, and OncoSec was each a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)], and a penny stock.

242.    By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

243.    As a result, Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

**FOURTH CLAIM FOR RELIEF**
**FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP**
**(Violations of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder by Veldhuis, Sexton, and Friesen)**

244.    Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if fully set forth herein.

70

A124

245.    During the Relevant Period, the stock of Vitality was a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

246.    During the Relevant Period, Vitality had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

247.    By reason of the conduct described above, defendants Veldhuis, Sexton, and Friesen, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a class of Vitality equity securities, failed to file a statement with the Commission containing the information required by Schedule 13D [17 C.F.R. §240.13d-101] within ten days after they acquired such shares, or at all.

248.    As a result, defendants Veldhuis, Sexton, and Friesen violated Section 13(d) of the Exchange Act and Rule 13d-1 thereunder [15 U.S.C. §78m(d); 17 C.F.R. §240.13d-1].

**FIFTH CLAIM FOR RELIEF**
**FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP**
**(Violation of Section 13(d) of the Exchange Act and Rule 13d-2 Thereunder by Dhillon)**

249.    Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if fully set forth herein.

250.    During the Relevant Period, the stock of Vitality was a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

251.    During the Relevant Period, Vitality had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

252.    By reason of the conduct described above, defendant Dhillon, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a class of Vitality equity securities and filing a Schedule 13D, acquired beneficial ownership of 1 percent or more of that

class of equity securities and failed to file with the Commission a timely and accurate amendment disclosing this material change.

253.    As a result, defendant Dhillon violated Section 13(d) of the Exchange Act and Rule 13d-2 thereunder [15 U.S.C. §78m(d); 17 C.F.R. §240.13d-2].

**SIXTH CLAIM FOR RELIEF**
**FAILURE TO FILE**
**(Violation of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder by Dhillon)**

254.    Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if fully set forth herein.

255.    During the Relevant Period, the stock of Arch and OncoSec was each a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

256.    During the Relevant Period, Arch and OncoSec had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

257.    Defendant Dhillon violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)], and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3], in that as a director of Arch and OncoSec and having acquired more than 10% of a registered class of Arch's and OncoSec's equity securities, Dhillon failed to file reports of ownership and changes of ownership with the Commission as required.

**SEVENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Taylor)**

258.    Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if fully set forth herein.

259.    By reason of the conduct described above, Dhillon, directly or indirectly:

(a) made use of the means or instruments of transportation or communication in interstate

72

A126

commerce or of the mails to sell, through the use or medium of a prospectus or otherwise,

securities as to which no registration statement has been in effect and for which no exemption

from registration has been available; and/or (b) made use of the means or instruments of

transportation or communication in interstate commerce or of the mails to offer to sell, through

the use or medium of a prospectus or otherwise, securities, including, but not limited to, the

securities of Vitality, as to which no registration statement has been filed and for which no

exemption from registration has been available.

260.    Taylor knowingly or recklessly provided substantial assistance to Dhillon in his

violation of Sections 5(a) and 5(c) of the Securities Act.

261.    As a result, Taylor violated Section 15(b) the Securities Act [15 U.S.C. §§

77o(b)].

**EIGHTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Sharp and Kelln)**

262.    Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if

fully set forth herein.

263.    By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo,

and other Sharp Group clients, directly or indirectly, in the offer or sale of securities, by the use

of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any

national securities exchange, intentionally, knowingly or recklessly, (i) employed devices,

schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business

which operated or would operate as a fraud or deceit upon any persons, including purchasers or

sellers of the securities.

73

A127

264.    By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the securities of Vitality, Arch, OncoSec, and Garmatex, as to which no registration statement has been filed and for which no exemption from registration has been available.

265.    Sharp and Kelln knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Sections 5(a), 5(c), and 17(a)(1) and (3) of the Securities Act.

266.    As a result, Sharp and Kelln each violated Section 15(b) of the Securities Act [15 U.S.C. §§ 77o(b)].

### NINTH CLAIM FOR RELIEF
### AIDING AND ABETTING
**(Violations of Section 20(e) of the Exchange Act by Sharp and Kelln)**

267.    Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if fully set forth herein.

268.    By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i)

74

A128

employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

269.    Sharp and Kelln knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

270.    As a result, Sharp and Kelln each violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

**TENTH CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a)(3) of the Securities Act by Gasarch)**

271.    Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if fully set forth herein.

272.    During the Relevant Period, the stock of Vitality, Arch, OncoSec, and Garmatex was each a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

273.    By reason of the conduct described above, defendant Gasarch, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

274.    By reason of the conduct described above, defendant Gasarch violated Securities Act Section 17(a)(3) [15 U.S.C. §77q(a)(3)].

A129

### ELEVENTH CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
**(Violations of Section 17(a)(3) of the Securities Act by Kaitz)**

275.     Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if fully set forth herein.

276.     During the Relevant Period, the stock of Vitality and Arch was each a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

277.     By reason of the conduct described above, defendant Kaitz, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

278.     By reason of the conduct described above, defendant Kaitz violated Securities Act Section 17(a)(3) [15 U.S.C. §77q(a)(3)].

### TWELFTH CLAIM FOR RELIEF
### AIDING AND ABETTING
**(Violations of Section 15(b) of the Securities Act by Gasarch)**

279.     Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if fully set forth herein.

280.     By reason of the conduct described above, Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices,

76

A130

or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

281.    Gasarch knowingly or recklessly provided substantial assistance to Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act.

282.    As a result, Gasarch violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

## THIRTEENTH CLAIM FOR RELIEF
## AIDING AND ABETTING
### (Violations of Section 15(b) of the Securities Act by Kaitz)

283.    Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if fully set forth herein.

284.    By reason of the conduct described above, Veldhuis, Sexton, and Friesen, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

285.    Kaitz knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, and Friesen in their violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act.

286.    As a result, Kaitz violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

A131

**FOURTEENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Gasarch)**

287.    Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if fully set forth herein.

288.    By reason of the conduct described above, Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

289.    Gasarch knowingly or recklessly provided substantial assistance to Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

290.    As a result, Gasarch violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

**FIFTEENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Kaitz)**

291.    Paragraphs 1 through 231 above are re-alleged and incorporated by reference as if fully set forth herein.

292.    By reason of the conduct described above Veldhuis, Sexton, and Friesen directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or

78

A132

artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

293.    Kaitz knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, and Friesen in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

294.    As a result, Kaitz violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.    Enter a permanent injunction restraining the defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, Gasarch, Kaitz and Taylor, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 17(a) of the Securities Act [15 U.S.C. §§77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

B.    Enter a permanent injunction restraining defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Taylor and Dhillon, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

C.    Enter a permanent injunction restraining defendants Veldhuis, Sexton, and Friesen, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or

otherwise, from violating Section 13(d) of the Exchange Act [15 U.S.C. §78m(d)] and Rule 13d-1 thereunder.

      D.     Enter a permanent injunction restraining defendant Dhillon, his agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Section 13(d) of the Exchange Act [15 U.S.C. §78m(d)] and Rule 13d-2 thereunder.

      E.     Enter a permanent injunction restraining defendant Dhillon, his agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Section 16(a) of the Exchange Act [15 U.S.C. §78p(a)] and Rule 16a-3 thereunder.

      F.     Order the defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)];

      G.     Order the defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

      H.     Enter an order barring the defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

      I.     Enter an order barring the defendants from directly or indirectly, including, but not limited to, through an entity owned or controlled by any of them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall

A134

not prevent defendants from purchasing or selling securities listed on a national securities

exchange for their own personal account;

       J.      Enter an order barring defendant Dhillon from serving as an officer or director of

a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

       K.      Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

       L.      Grant such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.

DATED this 4th day of August, 2021.

Respectfully submitted,

/s/ Eric A. Forni
Eric A. Forni (Mass Bar No. 669685)
Kathleen B. Shields (Mass Bar No. 637438)
Katherine Bromberg (New York Bar No. 4154555)
J. Lee Buck II (DC Bar No. 421878)
Edward B. Gerard (CA Bar No. 248053)
Amy Gwiazda (Mass Bar No. 663494)
Martin Healey (Mass Bar No. 227550)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8904 (Shields direct),
(617) 573-8827 (Forni direct)
Fax: (617) 573-4590 (fax)
ShieldsKa@sec.gov (Shields email)
ForniE@sec.gov (Forni email)

A135

Page 1

1 THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:          )

4                            ) File No. HO-13182-A

5 VITALITY BIOPHARMA, INC.   )

6

7 WITNESS:  Avtar Dhillon

8 PAGES:  1 through 223

9 PLACE:   Securities and Exchange Commission

10          100 F Street, NE, Suite 1590, Room 10

11          Washington, D.C. 20549

12 DATE:   Thursday, August 29, 2019

13

14      The above entitled matter came on for hearing,

15 pursuant to notice, at 9:47 a.m.

16

17

18                 **Donelan Declaration**
                        **Exhibit**

19

20                          **A**

21                      SEC v Sharp, et al

22

23

24          Diversified Reporting Services, Inc.

25              (202) 467-9200

---

Page 2

1 APPEARANCES:

2

3 On behalf of the Securities and Exchange Commission:

4      EDWARD B. GERARD, ESQ., COUNSEL

5      JAMES LEE BUCK, ASSISTANT DIRECTOR

6      Division of Enforcement

7      100 F Street, NE

8      Washington, DC 20549

9      (202) 551-8264

10      ERIC FORNI, ESQ., COUNSEL

11      TREVOR DONELAN, STAFF ACCOUNTANT

12      33 Arch Street

13      Boston, MA 02110

14      (617)573-4561

15

16      On behalf of the Witness:

17      MIRIAM G. BAHCALL

18      Greenberg Traurig, LLP

19      77 West Wacker Drive, Suite 3100

20      Chicago, IL 60601

21      (312) 476-5135

22

23 Also Present:

24      Charles Stiene, Intern

25

---

Page 3

1              C O N T E N T S

2 WITNESS                          EXAMINATION

3 Avtar Dhillon                        4

4

5 EXHIBITS:     DESCRIPTION          IDENTIFIED

6  46      Subpoena with attachments        8

7  47      Background questionnaire        17

8  48      DGM Bank and Trust cash ledger    61

9  49      Fax - wire instruction          63

10  50      Fax - wire instruction          64

11  51      DGM Bank and Trust cash ledger   65

12  52      Fax - wire instruction          67

13  53      DGM Bank and Trust Inc cash ledger  70

14  54      Fax - wire instruction          71

15  55      email with attachment           93

16  56      Form S-1                       137

17  57      email with attachment          162

18  58      Report of new wire transfer gift

19          with attachments              168

20  59      Autism Partnership Payment receipts

21          with attachments              175

22  60      Baltikum bank statement        175

23  61      WB21 Account statement         185

24  62      email with attachments         191

25  63      Spreadsheet, Sch A, Form 56-106F1  194

---

Page 4

1              P R O C E E D I N G S

2      MR. GERARD:  So, we're on the record at 9:47

3 a.m., on August 29th, 2019.  Will you raise your right

4 arm?

5      Do you swear or affirm that you will tell the

6 truth, the whole truth, and nothing but the truth?

7      MR. DHILLON:  I do.

8 Whereupon,

9              AVTAR DHILLON

10 was called as a witness, and having been first duly

11 sworn, was examined and testified as follows:

12              EXAMINATION

13 BY MR. GERARD:

14      Q   Please state and spell your full name for the

15 record.

16      A   My name is Avtar Singh Dhillon.  A-v-t-a-r.

17 S-i-n-g-h.  D-h-i-l-l-o-n.

18      Q   Are you known by other name -- any nicknames?

19      A   I am not.

20      Q   My name is Eddy Gerard, and with me is James

21 Lee Buck.  We are members of the Staff of the

22 Enforcement Division of the United States Securities and

23 Exchange Commission and are officers of the Commission

24 for purposes of this proceeding.

25      MR. BUCK:  We should also -- well, at what

---

A136

Page 29

1    A    Some of these are likely to be jointly held
2  with my wife, and that's it.
3    Q    Are there any offshore bank accounts in which
4  you have an indirect or direct beneficial interest in?
5    A    I do not.
6         MR. BUCK:  Have there been, at any time in the
7  last five or six years?
8         THE WITNESS:  No there hasn't.
9         MR. GERARD:  Are there any offshore bank
10 accounts in which you've ever exercised any control
11 over?
12        THE WITNESS:  I have not.
13        MR. GERARD:  Have you ever directed any
14 transaction at all from an offshore bank account?
15        THE WITNESS:  No.
16        MR. BUCK:  Are you aware of any offshore
17 accounts where anyone has directed any transactions on
18 your behalf?
19        THE WITNESS:  I am not.
20        MR. GERARD:  Let's go --
21        MR. BUCK:  One other question, because we've
22 seen this -- have there been -- have there ever been any
23 offshore bank issued prepaid debit cards that were
24 issued to you?
25        THE WITNESS:  No, sir.

Page 30

1         MR. BUCK:  Or that you've used?
2         THE WITNESS:  I have not.
3         BY MR. GERARD:
4    Q    If you could turn back a couple of pages --
5  we're still on Exhibit 47 -- Exhibit A -- I see you list
6  a number of a number of companies in response to
7  question 13.  Do you see that?
8    A    Correct.
9    Q    Actually, question 13 and 14.  Is this a
10 complete list of all -- was -- were the answers to
11 question 13/14 -- are they a complete list of all public
12 companies you've served as officer, director, or had a
13 beneficial interest of five-percent or more of the
14 company's shares, at any time -- or I should say since
15 2014?
16   A    Correct.
17   Q    And you see Vitality Biopharma, Inc.?
18   A    Yes.
19   Q    You see that?  Does that refer both to
20 Vitality and its predecessor companies?
21   A    It does.
22   Q    Okay.  So, for purpose of this testimony --
23 well, let me actually back up.  Vitality Biopharma was
24 originally incorporated as Legend Mining, Inc.  Correct?
25   A    Correct.

Page 31

1    Q    And then, later, its name was changed to
2  Stevia First Corporation.  Correct?
3    A    Yes.
4    Q    When I -- when we refer to Vitality in this
5  testimony, will you understand if I -- that I'm
6  referring both to Vitality Biopharma and its predecessor
7  companies?
8    A    Okay.
9    Q    Now, Vitality's the only public company in
10 which you've ever been a beneficial owner of five-
11 percent or more of the stock.  Is that right?
12   A    I believe so, yeah.
13   Q    Have you ever owned close to five-percent of
14 the shares of a public company, besides Vitality?
15   A    I don't recall.
16   Q    Do you own shares in all the companies -- do
17 you currently own shares in all the companies listed in
18 Exhibit A?
19   A    I do.
20   Q    Have you ever sold any shares of any of these
21 companies listed in Exhibit A?
22   A    I have sold some shares, yes.
23   Q    Which -- for which companies?
24   A    Since I retired as the chairman of Inovio, I
25 have sold some shares in Inovio.  I believe I'd sold

Page 32

1  some shares in OncoSec.  I have -- since leaving the
2  board position at Arch, I have sold some shares.
3  Emerald Biosciences -- that's a private company.  I have
4  sold some shares.
5         Emerald Health Therapeutics is the public
6  company.  I have not sold any shares.  Vitality -- I
7  have not sold any shares.
8    Q    Have you -- apart from what you just
9  mentioned, have you ever -- have you -- are you aware of
10 any shares that have been sold in any of these companies
11 through -- let me back up.
12   A    I'm sorry.  I'll -- slight correction.
13 Emerald Biosciences is a public company, and I have not
14 sold any shares in there.  And the private company's --
15 Emerald Health Sciences is what I was referring to.
16   Q    So, I want to focus on Vitality -- so, you've
17 never sold any shares in Vitality?
18   A    I have not.
19        MR. BUCK:  Did you ever participate directly,
20 or indirectly, in any profitable sales of Vitality
21 through any other account, anywhere in the world?
22        THE WITNESS:  I have not.
23        MR. GERARD:  Have you ever received the
24 proceeds related to any sales of Vitality shares?
25        THE WITNESS:  I have not.

A137

Page 33

1      MR. GERARD: Have you ever received any gift
2  or benefit, whether financial or non-financial, in
3  connection with the sale of Vitality stock?
4      THE WITNESS: I have not.
5      BY MR. FORNI:
6   Q   Do you know anyone who sold Vitality stock?
7   A   I'm not aware.
8   Q   Do you know anyone that sold Arch stock?
9   A   I have sold Arch.
10  Q   Anyone other than yourself?
11  A   I'm not aware.
12     BY MR. GERARD:
13  Q   How many shares do you currently own in
14 Vitality?
15  A   I don't know.
16  Q   Approximately. I'm not asking the specific
17 figure, but --
18  A   Actually, you know, it's been rolled back, and
19 things, so I -- the number -- I really don't know.
20  Q   Have you ever assigned or gifted or otherwise
21 transferred any of your shares to anyone?
22  A   I have not.
23     MR. FORNI: Other than yourself and other
24 officers and directors of Vitality, do you know anyone
25 who held shares of Vitality stock?

Page 34

1      MS. BAHCALL: Other than what he may have
2  learned through counsel?
3      BY MR. FORNI:
4   Q   Well, if your only source is through counsel,
5  then don't answer, but if counsel confirmed what you
6  already knew, you can answer.
7   A   In -- I'm only aware of any specifics through
8  counsel.
9   Q   Okay. Just -- I want to make sure we're clear
10 on the answer.
11     So, to the extent you're aware of anyone other
12 than yourself, or an officer or director of Vitality,
13 who held stock, you know that information only through
14 your counsel?
15  A   I'm -- yeah, I'm trying to be complete.
16 Certainly, as a board member, I'm communicating with the
17 CEO, you know, and from time to time, investors -- like,
18 we had -- there are investors that --
19  Q   Let's talk about those investors, then. What
20 investors, if any, were you aware of in Vitality,
21 besides the officers and directors -- the listed
22 officers and directors of the company -- assuming you
23 haven't learned this only through counsel.
24  A   I'm -- you know, when we did placements, you
25 know, through the banks, you know, I know that some of

Page 35

1  the funds that came in. You know, so that's my only
2  real verification that somebody actually bought equity
3  in the company.
4   Q   Who are you referring to right now?
5   A   So, I would dial in on banking deals with the
6  H.C. Wainwright, and we've done -- we've had investors
7  coming in to those investments, like, Intercoastal, I
8  believe, and Anson, and others, so -- you know, would be
9  the ones that I'm aware of that specific placements
10 subscribed for treasury stock. Outside of that, I don't
11 have further knowledge of who actually owns what shares
12 in Vitality.
13     BY MR. GERARD:
14  Q   Are you aware of any other shareholders that
15 have participated in any offering by Vitality, besides
16 what you just mentioned?
17  A   Off the top of my head, that's -- those are
18 the ones that come to mind.
19  Q   Are you aware of anyone who has acted behalf -
20 - on behalf of any investor who's participated in an
21 offering by Vitality?
22  A   I can't think of any.
23  Q   Okay. We'll come back to that. You can put
24 Exhibit 47 away.
25     MR. DONELAN: Actually --

Page 36

1      MR. GERARD: Go ahead.
2      MR. DONELAN: -- in -- just a couple of follow
3  up questions on Exhibit 47. In Exhibit A of Exhibit 47,
4  I don't see listed on here anything related to NewGen
5  BioPharma. Were you involved with NewGen BioPharma?
6      THE WITNESS: No, I wasn't.
7      MR. DONELAN: In any capacity?
8      THE WITNESS: Only to the extent that the CEO
9  of -- asked some questions related to the cannabis
10 space, and so forth. So --
11     MR. GERARD: Who is that person?
12     THE WITNESS: Navdeep Jaikaria.
13     MS. BAHCALL: And you're talking -- to be
14 clear, NewGen -- you're talking about the private
15 company?
16     THE WITNESS: Correct.
17     MS. BAHCALL: Not the public.
18     THE WITNESS: Correct.
19     MS. BAHCALL: Right.
20     BY MR. DONELAN:
21  Q   So, it was in a consulting capacity?
22  A   I was not a consultant, no.
23  Q   So, what was your relationship, then, with the
24 CEO of the NewGen Bio company?
25  A   Navdeep was an analyst at the previous company

A138

Page 1

1 UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3 In the Matter of:          )
4                           ) File No. B-03147-A
5 POSSIBLE MANIPULATIVE SCHEMES)
6 INVOLVING MICROCAP AND OTHER )
7 SECURITIES AND VITALITY    )
8 BIOPHARMA, INC.        )
9
10 WITNESS:  Avtar Dhillon
11 PAGES:   1 through 177
12 PLACE:    Securities and Exchange Commission
13          Boston Regional Office
14          33 Arch Street, 24th Floor
15          Boston, MA 02110
16 DATE:    Thursday, July 30, 2020
17
18      The above entitled matter came on for hearing,
19 pursuant to notice, at 1:07 p.m.
20
21
22
23
24          Diversified Reporting Services, Inc.
25              (202) 467-9200

Page 2

1 APPEARANCES:
2
3 On behalf of the Securities and Exchange Commission:
4      ERIC FORNI, ESQ.
5      KATHLEEN SHIELDS, ESQ.
6      TREVOR DONELAN, Senior Enforcement Accountant
7      Securities and Exchange Commission
8      Boston Regional Office
9      33 Arch Street, 24th Floor
10     Boston, MA 02110
11
12
13 On behalf of the Witness:
14     JOHN MOON ESQ.
15     ADRIENNE WARD, ESQ.
16     KYLE BISCEGLIE, ESQ.
17     Olshan, Frome, Wolosky, LLP
18     1325 Avenue of the Americas
19     New York, NY 10019
20
21 Also present:
22     JONATHAN BERGER, Intern
23
24
25

Page 3

C O N T E N T S

1
2
3 WITNESS:                          EXAMINATION
4 Avtar Dhillon                          8
5
6 EXHIBITS:     DESCRIPTION                IDENTIFIED
7 72    Subpoena                         8
8 73    Subpoena HO-13182                 8
9 74    Summary of Charges              36
10 75   Table with attachments          93
11 76   Transfer agent records          96
12 77   Action stock transfer doc.      99
13    with attachments
14 78   1/30/18 Instrument of transfer     101
15    with attachments
16 79   List of wire transfers          109
17    4/20/16-2/19/19
18 80   List of payments                117
19    7/27/16-10/12/18
20 81   Payments in & out of Zoran's account     155
21    11/26/13-6/8/15
22 82   Wire records                    157
23 83   3/19/11 Email & attachment         162
24 84   5/5/11 Email                    164
25 85   Record of wire to Ortivo Enterprises     166

Page 4

C O N T E N T S (CONT.)

1
2
3 EXHIBITS:     DESCRIPTION                IDENTIFIED
4 86    Cash ledger with attachment        169
5 87    Rabobank Statement              170
6    4/10/13-5/10/13
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

A139

Page 29

1  have the ability to delete their messages that were
2  already sent to other Signal users' mailboxes?
3      A   I don't recall that kind of feature.
4      BY MR. FORNI:
5      Q   On your particular device, Dr. Dhillon, wd
6  your Signal chats self-delete or were they preserved
7  for any period of time?
8      A   I just downloaded the app and used it.  I
9  didn't -- I wasn't aware of any special features like
10 that.
11     Q   Aside from using Signal, did anyone ever
12 give you a phone or any other device to communicate
13 with them with?
14     A   No.
15     Q   Is there any other information that you
16 think should be supplemented to make your background
17 questionnaire complete and accurate through today?
18     A   No.
19     Q   All right, let's move on from the background
20 questionnaire for now.
21     BY MR. DONELAN:
22     Q   Just -- Dr. Dhillon, did you ever have a
23 email account with xMeridian?
24     A   No.  I certainly don't recall Meridian or
25 xMeridian.

Page 30

1      Q   Okay.  Did you ever use Blackberry Messenger
2  as a mode of communication?
3      A   I'm Canadian, so we all had Blackberries
4  when it first came out, but I can't remember the last
5  time.  I miss my Blackberries.
6      Q   Okay, thank you.
7      BY MR. FORNI:
8      Q   Mr. Dhillon, it's fair to say that you've
9  been associated with public companies in the U.S. for
10 a number of years; is that right?
11     A   Yes.
12     Q   And you've had -- like chairman of the board
13 or other senior positions in public companies; is that
14 fair?
15     A   That's fair, yes.
16     Q   Do you have any understanding of how, if at
17 all, a chairman of a public company can sell stock in
18 their own companies in the U.S. markets?
19     A   Yeah, there's -- there's a procedure to be
20 able to do that, 10b.  Actually, I take that back.  I
21 don't remember the acronym, between there is a way to
22 be able to preplan your sales.
23     Q   All right.  I think you might be referring
24 to a 10b-51 plan, but let's move on to something else.
25         Do you know what restricted stock means in

Page 31

1  the context of stock trading in the U.S. markets?
2      A   Generally, yes.
3      Q   What is your understanding of what
4  restricted stock is?
5      A   Restricted stock needs to be unrestricted in
6  order to do a sale.
7      Q   Do you have an understanding of whether
8  chairmen of public companies declare holding
9  restricted stock or stock that has been unrestricted?
10     A   I think there's a range of practices.
11     Q   And what do you mean by that?
12     A   I think certainly board members can have
13 options, they have RSUs, restricted stock units, or
14 freely or unrestricted shares.  That's my
15 understanding.
16     A   All right.  And you may -- I don't want to
17 put words in your mouth, but it sounds like you were
18 about to say freely trading stock.  What is your
19 understanding of what freely trading stock is?
20     A   Unrestricted, meaning you still have a
21 disclosure requirement, but you don't have to go
22 through legend removal process that you would have for
23 restricted stock.
24     Q   When you said, "disclosure requirement,"
25 what did you mean?

Page 32

1      A   Anytime there's sales by insiders, you have
2  to file appropriate forms to disclose your purchases
3  or sales.
4      Q   When did you first come to understand that
5  rule that you just summarized?
6      A   I think ever since I've been a chairman or a
7  board member of public companies.
8      Q   So would you say it's fair to understand
9  that -- it's fair to say that you understood that
10 there were certain disclosure requirements
11 attributable to company insiders as early as 2013 in
12 the U.S.?
13     A   Yes.
14     Q   Do you -- have you heard the term
15 "affiliate" in the context of public companies?
16     A   Yes.
17     Q   Do you have an understanding of what the
18 term "affiliate" means in the context of public
19 companies?
20     A   Generally, yes
21     Q   What is your understanding?
22     A   Affiliate would be -- call it a related
23 party or ownership or an entity that would be
24 associated with an insider.
25     Q   And do you have an understanding of whether

A140

Page 61

1  still ongoing?
2      A   Yes, it is.
3      Q    Has he completed his options payments?
4      A   No.  We haven't completed the final phase of
5  the re-zoning.  That's the next milestone.
6      Q    How much more does he owe before he gets his
7  25 percent equity?
8      A   I believe there's about a million dollars
9  left.
10     Q    Okay, let's go back to Exhibit 74, Dr.
11  Dhillon, and you're going to see now the rest of the
12  spreadsheet.  There's payments from Silverton SA, and
13  I'm sure you recall we talked about Silverton when we
14  met last time.
15     A   I do.
16     Q    So I'm happy to take it kind of wholesale,
17  but why don't we start off taking it in part.  Let's
18  look at the very first one, October 30th, 2015, a
19  payment from Silverton to Autism Partnership, Inc. for
20  approximately $25,000.  Do you see that?
21     A   I do.
22     Q    What was the source of this payment?
23     A   This payment was part of a loan agreement.
24     Q    With whom?
25     A   With Paul Sexton.

Page 62

1      Q    Was Paul Sexton a lender?
2      A   I have not seen the final documentation on
3  who the lenders are going to be.
4      Q    All right.  So let's sort of break this
5  down.  This is from October of 2015, right?
6      A   Mm-hmm.
7      Q    And I'm sorry, Dr. Dhillon, if you could
8  just answer yes or no so Ms. Roots can make sure to
9  get it down.
10     A   Yes.
11     Q    What is the loan arrangement you're
12  referring to that led to this particular payment?
13     A   I had approached Paul regarding lending up
14  to a million dollars, and this was part of his -- the
15  loan agreement that -- part of that particular loan
16  agreement
17     Q    Okay.  So Paul is Paul Sexton; is that
18  right?
19     A   Yes, Paul Sexton.
20     Q    When did you first meet Mr. Sexton?
21     A   I met him -- I had seen him prior to 2014 in
22  social circles.  I had seen him at hockey games and
23  things.  And the first time I think I actually met
24  with him to speak of any substance was 2014.
25     Q    What precipitated that meeting?

Page 63

1      A   He was interested in investing in Emerald
2  Health Sciences, my private cannabis-focused company
3  in Canada.
4      Q    Did he in fat invest?
5      A   He did.
6      Q    How much did he invest?
7      A   I believe it was about $100,000.
8      Q    Who introduced you two in 2014 for purposes
9  of his potentially investing in Emerald Health
10  Sciences?
11     A   It was -- I -- it was me speaking to him
12  directly, and he was very much interested in the
13  cannabis base.  And when I told him what I was doing,
14  he chose to invest.
15     Q    What led you to reach out to him directly?
16     A   It was after he had made a contribution to a
17  charity that my wife had organized that year.
18     Q    What charity was that?
19     A   It was American Cancer Society fundraiser
20  that we had on our property in Yuba City.
21     Q    What was Mr. Sexton's donation?
22     A   It was a few thousand dollars. I don't
23  remember exactly how much it was.
24     Q    How many other people --
25         BY MR. BUCK:

Page 64

1      Q    I'm sorry, what year is this again that
2  we're speaking of?
3      A   2014.
4         BY MR. FORNI:
5      Q    How many other people donated?
6      A   I think we had about 300 people attending
7  the function, so everybody there plus people that
8  didn't attend ended up donating.
9      Q    Did you reach out to anyone else to see if
10  they'd be interested in investing in Emerald Health
11  Sciences besides Mr. Sexton after that fundraiser?
12     A   I didn't.
13     Q    Why did you select Mr. Sexton of the 300 or
14  so people to contact?
15     A   I didn't select him.  When I went to thank
16  him for his contribution, the dialogue went to what
17  else I was doing.  And when I told him about my
18  building Emerald Health Sciences in the Canadian
19  medicinal cannabis base, he was very much intrigued.
20  It was a very big topic in Canada as one of the
21  world's leading countries for cannabis legalization.
22     Q    What, if anything, did you know about Mr.
23  Sexton's professional endeavors when you had this
24  conversation with him in 2014?
25     A   I didn't know much, other than having seen

A141

Page 65

1　him socially at social functions.
2　　Q　What about your observations when you saw
3　him socially gave you some impression about his
4　professional endeavors, if anything?
5　　A　Well, you know, I'd seen him at hockey
6　seats, I'd seen him at charity events with his own
7　tables, I've seen him at restaurants entertaining
8　people, so he was kind of in the business circles of
9　Vancouver.
10　　Q　So is it fair to say you thought he had
11　money?
12　　A　Yes.
13　　Q　So 2014, is this a phone call you had with
14　him or an in-person meeting when you first talked with
15　him about Emerald Health Sciences?
16　　A　It was an in-person meeting.
17　　Q　What happened after that meeting with regard
18　to him?
19　　A　So after the -- after his investment in
20　2014, he subsequently made this particular donation
21　the following year.  I guess the date here is 10/30.
22　It's cutoff a little bit, but the 25,000.  So the
23　10/30, 2015, he made a donation to a charitable cause
24　that my wife was supporting for the Autism Partnership
25　Foundation.

Page 66

1　　Q　I want to make sure I understand, because
2　perhaps I misheard you earlier, but I thought that
3　payment on October 30th was part of a loan
4　arrangement.  But now I hear you to be saying it was a
5　donation for something your wife was organization.
6　　A　Yeah, I beg your pardon.  I confused that
7　because of you're asking what was the next
8　interaction.  So the next interaction there was a
9　combination of a donation and a contribution to the
10　Autism Partnership.  So there's Autism Partnership,
11　Inc., and there's an Autism Partnership Foundation.
12　　Q　So that I'm following, I'm probably being
13　dense, I'm just going to try and break it down a
14　little bit.  So after 2014, Mr. Taylor invests in
15　Emerald Health Sciences; is that correct?
16　　A　Yeah.
17　　Q　Or after your meeting in 2014.  When dd his
18　first investment in Emerald Health Sciences occur, was
19　it 2014 or 2015?
20　　A　His investment was in 2014.
21　　Q　When was your next interaction with him
22　approximately?
23　　A　Next interaction was in 2015 sometime.
24　　Q　What precipitated that next interaction?
25　　A　The next interaction was related to seeking

Page 67

1　a donation for Autism Partners.
2　　Q　Who was seeking a donation?
3　　A　I was.
4　　Q　And you and your wife; is that fair?
5　　A　Well, my wife was dealing with the
6　foundation; I was looking for potential people that
7　might want to support the charity.
8　　Q　Understood.  And so did you reach out to Mr.
9　Taylor to solicit a donation in the Autism Foundation?
10　　A　To Mr. Taylor?  Yes, yes, I did.
11　　Q　Sorry, I meant Mr. Sexton.  Did you reach
12　out to both Mr. Taylor and Mr. Sexton to solicit a
13　donation in the Autism Foundation?
14　　A　I did.  And I'm seeing -- so that in 2015
15　was for the charity, and 2016 was when we went into a
16　loan arrangement with Mr. Sexton.  So I did get that
17　confused a moment ago.
18　　Q　All right.  Let's put the loan arrangement
19　aside for a moment.  I want to keep focusing on 2015
20　because I'm still not sure I'm following.
21　　So is your testimony that the $25,035
22　payment on October 30th, 2015 was Mr. Sexton making a
23　donation to an Autism Foundation charity?
24　　A　That's my understanding, yes.
25　　Q　Why is it directed, though, to a bill that

Page 68

1　you owe for your daughter's care at Autism care at
2　Autism Partnership, Inc.?
3　　A　I believe the Autism Partnership may have
4　applied part of his donation to my daughter's care as
5　opposed to just keeping it into the foundation.  The
6　purpose of the foundation was to support families in
7　need of getting therapy, and that was the whole
8　purpose of raising the funds.  So based on this, it
9　looks like some of that money was applied to the care
10　associated with my daughter.
11　　Q　What is your understanding of the total
12　donation that Mr. Sexton made that -- (notification
13　chime) -- 2015?
14　　A　My understanding was that he made about a
15　$25,000 donation that stayed in the foundation.  So my
16　understanding, based on this calculus, would be around
17　$50,000.
18　　Q　All right, I want to repeat what I think I
19　heard you say to make sure I got it right.  Correct me
20　if I have it wrong.  So at some point in 2015, you
21　solicited donations from Mr. Sexton, and Mr. Taylor
22　for that matter, for you're the Autism Foundation; is
23　that right?
24　　A　Yes.
25　　Q　It's your understanding that Mr. Sexton made

exhibitsticker.com

**Donelan Declaration Exhibit**

**B**

SEC v. Sharp, et al

"We have reviewed the files at Provident Trust Company where Mr. Renard has his companies and trusts, including the trading records in the Soar Industries stock. We have them here for you.

"There is no doubt in our minds that, as a director of Soar, Mr. Renard acted in violation of securities laws," the Minister continued. "At the start, he held 32% of the stock through nine companies incorporated in this jurisdiction. They were all directed by him through the Renard Family Trust, which was administered by Provident. This evidence clearly shows he was in control and required to disclose his shareholdings."

started their free run ....com.

Today's stock, "Soar Industries", had just finished its "dead cat bounce" after plunging from $63 per share, then recovering to $2.75 before settling in at yesterday's close of $0.06.

"Even the dead cat bounces when he is dropped from high enough," Jean-Pierre mused to himself.

In the beginning, due to his conservative training in the bank, Renard's name did not appear anywhere. Not as an officer, director, shareholder – nothing. There was no trace of him in any company records or the public files for securities regulators to use against him.

As time went by, his stock empire grew and the fox became bolder.

Eventually, Renard took greater positions in the stocks, sharing the take with fewer partners. This meant he had to disguise his shareholdings in order to avoid securities disclosure requirements and trading restrictions.

Offshore companies were ideal for his purpose. They came from around the world complete with nominee directors, but were still subject to his control. The perfect situation for his master stock manipulations.

# FOOT LOOSE

Charlie Smith's
Offshore Chronicles

Fred Sharp

 

Invoice No.:    4265938
File No.      :    147866.010100
Bill Date     :    August 5, 2016

Morris Capital Inc.
21 Regent Street
Belize City,
Belize

## INVOICE

Re:   Corporate and Securities

Legal Services through July 31, 2016:

|  | | |
|---|---|---|
| Total Fees: | $ | 466.00 |
| **Current Invoice**: | **$** | **466.00** |
| | | |
| Previous Balance (see attached statement): | $ | 1,339.00 |
| **Total Amount Due:** | **$** | **4,833.50** |

MCL:TC
Tax ID: 13-3613083

Greenberg Traurig, LLP | Attorneys at Law | 1201 K Street | Suite 1100 | Sacramento, California 95814
Tel 916.442.1111 | Fax 916.448.1709 | www.gtlaw.com



Invoice No.: 4265938
File No.  :  147866.010100

> **FOR YOUR CONVENIENCE,**
> **PAYMENT INSTRUCTIONS FOR GT FIRM ACCOUNT**
> **FOR FEES & COSTS ARE AS FOLLOWS:**

**For Wire and ACH Instructions:**

| | |
|---|---|
| TO: | CITIBANK, N.A. |
| ABA #: | 266086554 |
| INTERNATIONAL SWIFT: | CITIUS33 |
| CREDIT TO: | GREENBERG TRAURIG ACCOUNT |
| ACCOUNT #: | ▇5071 |
| PLEASE REFERENCE: | **CLIENT NAME:** |
| | **FILE NUMBER:**      147866.010100 |
| | **INVOICE NUMBER:**   4265938* |
| | **BILLING PROFESSIONAL:**   Mark C Lee |

Wire fees may be assessed by your bank.
**\* If paying more than one invoice, please reference all invoice numbers in wiring instructions.**

MCL:TC
Tax ID: 13-3613083

Greenberg Traurig, LLP | Attorneys at Law | 1201 K Street | Suite 1100 | Sacramento, California 95814
Tel 916.442.1111 | Fax 916.448.1709 | www.gtlaw.com

A145



Invoice No.:  4265938
File No.    :  147866.010100

**Account Statement**

| Date | Invoice # | Fees Due | Expenses Due | Other Due | Total Due |
|------|-----------|---------:|-------------:|----------:|----------:|
| 12/03/15 | 4078030 | 211.00 | 0.00 | 0.00 | 211.00 |
| 01/15/16 | 4112799 | 1,128.00 | 0.00 | 0.00 | 1,128.00 |
| | Totals: $ | 1,339.00 | $       0.00 | $       0.00 | $   1,339.00 |

MCL:TC
Tax ID: 13-3613083

Greenberg Traurig, LLP | Attorneys at Law | 1201 K Street | Suite 1100 | Sacramento, California 95814
Tel 916.442.1111 | Fax 916.448.1709 | www.gtlaw.com

A146

Invoice No.:      4265938                                          Page  1
Re:               Corporate and Securities
Matter No.:       147866.010100

Description of Professional Services Rendered:

| DATE | TIMEKEEPER | DESCRIPTION | HOURS | AMOUNT |
|------|------------|-------------|-------|--------|
| 07/25/16 | Brooke Ehrman | Prepare Form 12b-25 10-K extension filing and communicate with Client regarding filing. | 0.90 | 315.00 |
| 07/25/16 | Mark C Lee | Attend to 10K extension. | 0.20 | 151.00 |

|  |  |  | Total Time: | 1.10 |  |
|  |  |  | Total Fees: |  | $ 466.00 |

Donelan Declaration
Exhibit

D

SEC v Sharp, et al

```
Ok. Understood.
------Original Message------
From: Bond
To: 104
Subject: Re: Hiya
Sent: 19 Jul 2013 12:35

I am not upset. The service provided is comprehensive; it is not limited to trading. It
includes pyaments, loans, private placements and keeping clients out of jail. This stock
trades lightly at a high price, and looks unsuited to the cost of this service (ie the
aspects beyond simply trading). We try to avoid trivial matters that bog down movement,
and rather focus on the bigger picture
------Original Message------
From: Blgx
To: bond
Subject: Re: Hiya
Sent: Jul 19, 2013 11:52 AM

My intention certainly wasn't to tick you off about such a small matter- chop asked the
simple question about the trade error (good to know for future) to kash and he told him
to contact you.  I did so on his behalf.

------Original Message------
To: Bond
Subject: Re: Hiya
Sent: 19 Jul 2013 11:47

I'll leave that to isaac - would you like him to call you?
------Original Message------
To: Bond
Subject: Re: Hiya
Sent: 19 Jul 2013 11:46

The whole account?
------Original Message------
From: Bond
To: 104
Subject: Re: Hiya
Sent: 19 Jul 2013 11:46

We need the request to come from the client, but have no objection. Its $100. We r
forming the opinion this account shld move elsewhere
------Original Message------
From: Blgx
To: bond
Subject: Re: Hiya
Sent: Jul 19, 2013 11:43 AM

So...ok not to charge commission from your side?
------Original Message------
To: Bond
Subject: Re: Hiya
Sent: 19 Jul 2013 10:51

Yes...but I would like to see the trade and offset charged no commission from your side
------Original Message------
From: Bond
To: 104
To: 91 Cho

------Original Message Truncated------
```

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

Great. Thanks.
------Original Message------
From: 3
To: 4
Subject: Re: Lom
Sent: Jan 30, 2014 11:45 AM

Sold from Avtar Dhillon on feb 14 2012
Ocean Park LLC - 2,200,000
Parma Institute SA - 2,450,000
Ashborough Holdings Ltd. - 2,250,000
Bayview Equities Ltd. - 2,100,000
Newmarket Traders Ltd. - 2,050,000
Conmar Capital Inc. - 2,400,000
Millwork Trading Inc. - 2,300,000

15,750,000 total. Just because you don't recognize some names doesn't mean those names aren't Bonds. He could have set up for Steve.
------Original Message------
From: 4
To: 3
Subject: Re: Lom
Sent: Jan 30, 2014 11:32 AM

Can u send the breakdown when u can?
------Original Message------
From: 3
To: 4
Subject: Re: Lom
Sent: Jan 30, 2014 11:17 AM

Set up singapore co's to hold the accounts. Maybe in the future.
------Original Message------
From: 4
To: 3
Subject: Re: Lom
Sent: Jan 30, 2014 11:15 AM

Unlikely they would open. They would tell you to open in canada.
------Original Message------
From: 3
To: 4
Subject: Re: Lom
Sent: Jan 30, 2014 11:00 AM

What about interactive in singapore or HK.
------Original Message------
To: 4
Subject: Lom
Sent: Jan 30, 2014 10:58 AM

They won't sell any otc right?  We can't go onshore at lom bahamas and deposit.

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0268822

I removed all unused keys from pgp but it's still not letting me to enroll 132. And daily error message changed before it was warning that we are overusing our license now it says we have reached maximum.

Guys we have been over license of pgp universal server for some time now. We only have 20 licenses.

I looked in emails we purchased those licenses from unilogik.com
It was purchased on the name richard smith kendo capital.

Do you have contact information for this company?

------Original Message------
From: 76
To: fen
Subject: Re: PGP Universal Server Daily Email For keys.xmeridian.com - Fri Aug 8, 2014
Sent: Aug 8, 2014 1:50 PM

Could u call Manny, we bought from him
604 833 9973
------Original Message------
From: FEN
To: WIRES
To: BOND
Subject: Re: PGP Universal Server Daily Email For keys.xmeridian.com - Fri Aug 8, 2014
Sent: Aug 8, 2014 10:48 AM

Yvonne when you going to check with company where we bought pgp universal server.. We looking for pgp universal server CALs only.
------Original Message------
From: 76
To: fen
Subject: Re: PGP Universal Server Daily Email For keys.xmeridian.com - Fri Aug 8, 2014
Sent: Aug 8, 2014 12:16 PM

#132 , I no problem when I set up.
I will contact PGP guy today
------Original Message------
From: FEN
To: BOND
To: WIRES
Subject: Fw: PGP Universal Server Daily Email For keys.xmeridian.com - Fri Aug 8, 2014
Sent: Aug 8, 2014 6:50 AM

I am having trouble enrolling 132.

Pgp server asking for more licenses see below.

Yvonne could you see where you guys. Were buying pgp universal server license we may need about 80 of them.

We been running on 20.

------Original Message------
From: PGP Universal Server
To: fen
Subject: PGP Universal Server Daily Email For keys.xmeridian.com - Fri Aug 8, 2014
Sent: Aug 8, 2014 12:05 AM

Fri Aug 8, 2014 keys.xmeridian.com Version 3.0.0 Build (2881) Running for 0 days, 7 hours, 6 minutes

Maximum Number of Users Exceeded You have exceeded the maximum number of users allowed by your license. Please upgrade your license.
WDE Login Failures There were no WDE login failures today.
Administration Login Failures There were no failed attempts to log into the Administration interface tod

------Original Message Truncated------

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

A150

We will dtc the shares out once they clear keeping the total under 5%.

There is also another 2 certs for 200k. I will break them up.
------Original Message------
From: ELGI
To: CELT
Subject: Re: U around all day wednesday?
Sent: Feb 7, 2013 8:34 AM

After deposits are done, sorry I sent you a message yesterday going over this.
------Original Message------
From: Celt
To: 19
Subject: Re: U around all day wednesday?
Sent: 8 Feb 2013 00:32

When is this happening?

------Original Message------
From: ELGI
To: CELT
Subject: Re: U around all day wednesday?
Sent: Feb 7, 2013 8:27 AM

My concern is the one for 200k especially after restructure (forward split) it will be
over 5 percent? They are doing a 50-1 forward then cancelling restricted to bring total
to 110 million out! 200k at 50 times is 10million?
------Original Message------
From: Celt
To: 19
Subject: Re: U around all day wednesday?
Sent: 8 Feb 2013 00:22

The process is: I group certs together that keep the total under 5%. Then I send them in
for transfer to the TA. Once processed the TA fedex's them to the broker. Then we wait
for the shares to clear.

We only submit 1 transfer a day per broker until we have submitted all the shares.

Correct, there was no cert totaling 250k but there was a cert for 200k and one for 50k.
They went together and 2 certs became 1 in the name of our company to be deposited at
our broker.

Does this make sense? Let me know if u need any further info. Thx!

------Original Message------
From: ELGI
To: CELT
Subject: Re: U around all day wednesday?
Sent: Feb 7, 2013 8:12 AM

When u say you sent in 250 k cert there were none that big were there?
------Original Message------
To: Celt
Subject: Re: U around all day wednesday?
Sent: 7 Feb 2013 23:27

Do you have a minute to explain the

------Original Message Truncated------

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

```
Who cares.
------Original Message------
From: 4
To: 3
Subject: Re:
Sent: Feb 25, 2014 12:45 PM

Right. Forgot about him.
------Original Message------
From: 3
To: 4
Subject: Re:
Sent: Feb 25, 2014 12:44 PM

I'm fine with it. AV will be fine with it.  T will be fine with it. GT will hate it.
------Original Message------
From: 4
To: 3
Subject: Re:
Sent: Feb 25, 2014 12:34 PM

Yeah. Dont need too. But we could probably do it all in cash if we did. It that way.
------Original Message------
From: 3
To: 4
Subject: Re:
Sent: Feb 25, 2014 12:32 PM

So he will always be ahead on this one. But we can deal with it when it happens. what
your asking is it ok to not distribute stvf until end of march?

------Original Message------
From: 4
To: 3
Subject: Re:
Sent: Feb 25, 2014 12:18 PM

STVF when all sold will be 500K.
------Original Message------
From: 3
To: 4
Subject: Re:
Sent: Feb 25, 2014 12:14 PM

Sure that's fine by me. But when the end of march comes will our portion be in line with
t's.

He has 150 but he's only really 1/5 of the value. So we would have to expect 600k in
account??

------Original Message------
From: 4
To: 3
Subject:
Sent: Feb 25, 2014 12:08 PM

Lets leave STVF out of the CRCL payment.  I will order cash for the full amount we
expect of STVF when its closer to when we are complete (probably end of March)
Thoughts?
```

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

```
Haha thank you sir!
------Original Message------
From: 4
To: 2
Subject:
Sent: Mar 6, 2014 11:30 AM
```

U r getting 173K today. A cut from MDDD and STVF. Buy a boat bitch. Rich mother fucker.

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

A153

Kk
------Original Message------
From: GARD
To: KASH
Cc: ACCO
Subject: Yo
Sent: May 28, 2014 9:49 AM

Sell 100K mddd @ 0.15 limit.
Sell 25K stvf @ 0.37 limit
Sell 100K hptg @ 0.12 limit.

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

Kkk
------Original Message------
From: GARD
To: KASH
Subject: Yo
Sent: Jul 7, 2014 11:13 AM

Sell 25K STVF @ 0.39
100K hptg @ 0.09
500K MDDD @ 0.08

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

Okay.
------Original Message------
From: Wires
To: 4
Subject: Re:
Sent: Aug 6, 2014 11:49 AM

Yes, I have for u
------Original Message------
From: ACCO
To: WIRES
Subject:
Sent: Aug 6, 2014 11:48 AM

How much cash do you have in total. We might cut the balance of STVF that's left.  So we would need about $110K. Do you have or be able to get?

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0545423

Ok
------Original Message------
From: ACCO
To: WIRES
Subject:
Sent: Aug 6, 2014 1:41 PM

Can I please get 120K cash from STVF?  It will be a small debit but I will make an internal transfer tomorrow to cover.

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

A157

Okay. Cool. U want me to put in the safety deposit box or bring It to you.
-----Original Message------
From: 3
To: 4
Subject: Re: Yo
Sent: Aug 6, 2014 1:30 PM

No. T is not around. I will hold for him and deliver. I have never given money to SB.
-----Original Message------
From: 4
To: 3
Subject: Re: Yo
Sent: Aug 6, 2014 1:28 PM

I can do that. What about pina. Leave at front desk?
-----Original Message------
From: 3
To: 4
Subject: Re: Yo
Sent: Aug 6, 2014 1:15 PM

You should cut up 120,000 cash. Which will allow for the 5%

It would be as follows:
- ACCO/GARD 24,000 (20%)
- HEAR 27,000 (22.5%)
- PINA 27,000 (22.5%)
- Avtar/GT 42,000  (35%)

So if you want to bring me 96k on friday I can distribute?  GT will be up here shortly his inlaws have a place at riccardos.


------Original Message------
From: 4
To: 3
Subject: Yo
Sent: Aug 6, 2014 12:47 PM

So STVF with the two wires being added back is 126,693.74.
So if we cut up 125K it would be:
- ACCO/GARD 25,000 (20%)
- HEAR 25,000 (22%)
- PINA 25,000 (22%)
- Avtar 50,000  (40%)
wires has enough cash to do but it might just be easier to transfer.

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

Okay. Cool. U want me to put in the safety deposit box or bring It to you.
-----Original Message------
From: 3
To: 4
Subject: Re: Yo
Sent: Aug 6, 2014 1:30 PM

No. T is not around. I will hold for him and deliver. I have never given money to SB.
-----Original Message------
From: 4
To: 3
Subject: Re: Yo
Sent: Aug 6, 2014 1:28 PM

I can do that. What about pina. Leave at front desk?
-----Original Message------
From: 3
To: 4
Subject: Re: Yo
Sent: Aug 6, 2014 1:15 PM

You should cut up 120,000 cash. Which will allow for the 5%

It would be as follows:
- ACCO/GARD 24,000 (20%)
- HEAR 27,000 (22.5%)
- PINA 27,000 (22.5%)
- Avtar/GT 42,000  (35%)

So if you want to bring me 96k on friday I can distribute?  GT will be up here shortly his inlaws have a place at riccardos.


------Original Message------
From: 4
To: 3
Subject: Yo
Sent: Aug 6, 2014 12:47 PM

So STVF with the two wires being added back is 126,693.74.
So if we cut up 125K it would be:
- ACCO/GARD 25,000 (20%)
- HEAR 25,000 (22%)
- PINA 25,000 (22%)
- Avtar 50,000  (40%)
wires has enough cash to do but it might just be easier to transfer.

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

You know that ghil got halted right?
-----Original Message-----
To: 4
Subject: Re: Yo
Sent: Aug 6, 2014 1:36 PM

You can do either. I have a safe here. I can distribute mine and grahams from here. I can hold t's and av's for next meeting.

-----Original Message-----
From: 4
To: 3
Subject: Re: Yo
Sent: Aug 6, 2014 1:34 PM

Okay. Cool. U want me to put in the safety deposit box or bring It to you.
-----Original Message-----
From: 3
To: 4
Subject: Re: Yo
Sent: Aug 6, 2014 1:30 PM

No. T is not around. I will hold for him and deliver. I have never given money to SB.
-----Original Message-----
From: 4
To: 3
Subject: Re: Yo
Sent: Aug 6, 2014 1:28 PM

I can do that. What about pina. Leave at front desk?
-----Original Message-----
From: 3
To: 4
Subject: Re: Yo
Sent: Aug 6, 2014 1:15 PM

You should cut up 120,000 cash. Which will allow for the 5%

It would be as follows:
- ACCO/GARD 24,000 (20%)
- HEAR 27,000 (22.5%)
- PINA 27,000 (22.5%)
- Avtar/GT 42,000  (35%)

So if you want to bring me 96k on friday I can distribute?  GT will be up here shortly his inlaws have a place at riccardos.


-----Original Message-----
From: 4
To: 3
Subject: Yo
Sent: Aug 6, 2014 12:47 PM

So STVF with the two wires being added back is 126,693.74.
So if we cut up 125k it would be:
- ACCO/GARD 25,000 (20%)
- HEAR 25,000 (22%)

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

```
- PINA 25,000 (22%)
- Avtar 50,000  (40%)
wires has enough cash to do but it might just be easier to transfer.
```

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0021079

A161

You know that ghil got halted right?

-----Original Message-----
To: 4
Subject: Re: Yo
Sent: Aug 6, 2014 1:36 PM

You can do either. I have a safe here. I can distribute mine and grahams from here. I can hold t's and av's for next meeting.

-----Original Message-----
From: 4
To: 3
Subject: Re: Yo
Sent: Aug 6, 2014 1:34 PM

Okay. Cool. U want me to put in the safety deposit box or bring It to you.
-----Original Message-----
From: 3
To: 4
Subject: Re: Yo
Sent: Aug 6, 2014 1:30 PM

No. T is not around. I will hold for him and deliver. I have never given money to SB.
-----Original Message-----
From: 4
To: 3
Subject: Re: Yo
Sent: Aug 6, 2014 1:28 PM

I can do that. What about pina. Leave at front desk?
-----Original Message-----
From: 3
To: 4
Subject: Re: Yo
Sent: Aug 6, 2014 1:15 PM

You should cut up 120,000 cash. Which will allow for the 5%

It would be as follows:
- ACCO/GARD 24,000 (20%)
- HEAR 27,000 (22.5%)
- PINA 27,000 (22.5%)
- Avtar/GT 42,000  (35%)

So if you want to bring me 96k on friday I can distribute?  GT will be up here shortly his inlaws have a place at riccardos.


-----Original Message-----
From: 4
To: 3
Subject: Yo
Sent: Aug 6, 2014 12:47 PM

So STVF with the two wires being added back is 126,693.74.
So if we cut up 125k it would be:
- ACCO/GARD 25,000 (20%)
- HEAR 25,000 (22%)

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

```
- PINA 25,000 (22%)
- Avtar 50,000  (40%)
wires has enough cash to do but it might just be easier to transfer.
```

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

We won't be able to meet at eldorado.  I think killer and his kids coming over.


------Original Message------
From: 4
To: 3
Subject: Re: Yo
Sent: Aug 7, 2014 2:27 PM

I pick up that cash yesterday. Its all 50's.  I was planning on surfing at dougs
tomorrow.  If you guys are free maybe head toward kelowna and we can all grab a drink at
the Eldorado and check out his boat.
------Original Message------
From: 3
To: 4
Subject: Re: Yo
Sent: Aug 7, 2014 2:22 PM

You know that ghil got halted right?

------Original Message------
To: 4
Subject: Re: Yo
Sent: Aug 6, 2014 1:36 PM

You can do either. I have a safe here. I can distribute mine and grahams from here. I
can hold t's and av's for next meeting.

------Original Message------
From: 4
To: 3
Subject: Re: Yo
Sent: Aug 6, 2014 1:34 PM

Okay. Cool. U want me to put in the safety deposit box or bring It to you.
------Original Message------
From: 3
To: 4
Subject: Re: Yo
Sent: Aug 6, 2014 1:30 PM

No. T is not around. I will hold for him and deliver. I have never given money to SB.
------Original Message------
From: 4
To: 3
Subject: Re: Yo
Sent: Aug 6, 2014 1:28 PM

I can do that. What about pina. Leave at front desk?
------Original Message------
From: 3
To: 4
Subject: Re: Yo
Sent: Aug 6, 2014 1:15 PM

You should cut up 120,000 cash. which will allow for the 5%

It would be as follows:
- ACCO/GARD 24,000 (20%)
- HEAR 27,000 (22.5%)
- PINA 27,000 (22.5%)
- Avtar/GT 42,000  (35%)

So if you want to bring me 96k on friday I can distribute?  GT will be up here shortly
his inlaws have a place at riccardos.


------Original Message------
From: 4
To: 3

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

Subject: Yo
Sent: Aug 6, 2014 12:47 PM

So STVF with the two wires being added back is 126,693.74.
So if we cut up 125K it would be:
– ACCO/GARD 25,000 (20%)
– HEAR 25,000 (22%)
– PINA 25,000 (22%)
– Avtar 50,000  (40%)
wires has enough cash to do but it might just be easier to transfer.

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0279049

A165

Yes. I know. That's the point I will try to make to AV.

------Original Message------
From: 114
To: 3
To: 2
Subject: Re: ST
Sent: Oct 24, 2014 8:47 AM

Not if everyone agrees.
------Original Message------
From: 3
To: 114
To: 2
Subject: ST
Sent: Oct 24, 2014 8:45 AM

We will still have the issue of the bleed on the stock.

There was 31,500,000 in total
We have 15,750,000 minus the 1mm to Avtar. Gtaylor is outside the 15.75. He would consider blending back if AV agrees to the plan.

But this stock was on a 36 month bleed as per agreement.

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0281397

A166

I think we all agree with that.
------Original Message------
From: 3
To: 114
Subject: Re: St
Sent: Oct 29, 2014 8:59 AM

8 would equate to about 4.4 but if that was able to be deposited, cleared, sold quickly and the market going right direction and everyone happy I would then then request the 12 mnths previous hold as well.

Also, av said that he would much prefer if we took the shares in gt names and sold them all together. Lol.

------Original Message------
From: 114
To: 3
Subject: Re: St
Sent: Oct 29, 2014 8:48 AM

It would be abour 8 months worth. Which is plenty.
------Original Message------
From: 3
To: 114
Subject: Re: St
Sent: Oct 29, 2014 8:47 AM

So, I said let's get caught up on the lock agreement because that would be like 18mnths or something? I didn't ask to release the entire 30mm. Figured we could get as much as possible, get started and see where it goes.

------Original Message------
From: 114
To: 3
Subject: Re: St
Sent: Oct 29, 2014 8:36 AM

Okay.  Great. Let's see where that goes
------Original Message------
From: 3
To: 114
Subject: St
Sent: Oct 29, 2014 8:29 AM

He also said that stv is working with 2 big food producers and they feel that one has a very good chance to come to table. He would like to be more aggressive and get the price and volume up.  He's on board with us doing things as long as not too crazy.... He's going to talk with bobby. He thinks if price and volume up he can raise another 5mm to execute on the chinese supply off take and then he thinks they will be the 3rd largest stevia company. He won't raise any money under .42 because he got all his buddies to exercise warrant at .42.

He's also sharing in part of grahams position.

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

Even better.
------Original Message------
From: Wires
To: 114
Cc: Bond
Subject: Re: Good morning
Sent: Dec 2, 2014 12:48 PM

All r ours.
------Original Message------
From: 114
To: WIRES
Cc: BOND
Subject: Good morning
Sent: Dec 2, 2014 12:33 PM

We are in the process of receiving approximately 20 million shares of STVF that were
held in ESCROW.  At the time of the ESCROW agreement we may have put some of the stock
in NON BOND entities.  Can you please go through the list below and let me know which
entities you guys administer:
(1) Ashborough Holdings
(2) Bayview Equities
(3) Conmar Capital
(4) Millwork Trading
(5) Newmarket traders
(6) Ocean Park LLC
(7) Parma Institute
You can just confirm the entities by listing the number (for example entities 2,4,6 and
7).

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

```
Opps. My bad.
------Original Message------
From: Bond
To: 114
To: Wires
To: Celt
Subject: Re: Good morning
Sent: Dec 2, 2014 12:49 PM

This shld have gone to celtic
------Original Message------
From: 114
To: Wires
Cc: bond
Subject: Good morning
Sent: Dec 2, 2014 12:33 PM

We are in the process of receiving approximately 20 million shares of STVF that were
held in ESCROW.  At the time of the ESCROW agreement we may have put some of the stock
in NON BOND entities.  Can you please go through the list below and let me know which
entities you guys administer:
(1) Ashborough Holdings
(2) Bayview Equities
(3) Conmar Capital
(4) Millwork Trading
(5) Newmarket traders
(6) Ocean Park LLC
(7) Parma Institute
You can just confirm the entities by listing the number (for example entities 2,4,6 and
7).
```

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

Sure but its still costing in the meantime.
------Original Message------
From: 4
To: 3
Subject: Re: ST
Sent: Mar 13, 2015 3:11 PM

Nice.
------Original Message------
From: 3
To: 4
Subject: ST
Sent: Mar 13, 2015 12:09 PM

Avtar said they got additional things going for stvf. To keep going with david and they
only have another 1mm to chew thru and it should clean up real nice.

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0219140

A170

Wire: pls provide acco a current 2015 holding co with address.

Thx!
-----Original Message------
From: Acco
To: CELT
Subject: Fw: Promo
Sent: Mar 31, 2015 12:00 PM

See below.  Can u please send me on of the 8 companies including the address?  Any chance I could get today.
------Original Message------
From: Bond
To: 4
Subject: Re: Promo
Sent: Mar 31, 2015 11:59 AM

Use one of the 8
------Original Message------
From: Acco
To: bond
Subject: Promo
Sent: Mar 31, 2015 11:49 AM

Can any of the 8 companies be used as the payee for promotion?  Or should we set up a new company?

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

```
Thanks Y!
-----Original Message-----
From: WIRES
To: CELT
To: Acco
Subject: Re: Promo
Sent: Mar 31, 2015 1:12 PM

Xmailed to ACCO
-----Original Message-----
From: CELT
To: ACCO
To: WIRES
Subject: Re: Promo
Sent: Mar 31, 2015 1:01 PM

Wire: pls provide acco a current 2015 holding co with address.

Thx!
-----Original Message-----
From: Acco
To: CELT
Subject: Fw: Promo
Sent: Mar 31, 2015 12:00 PM

See below.  Can u please send me on of the 8 companies including the address?  Any chance I could get today.
-----Original Message-----
From: Bond
To: 4
Subject: Re: Promo
Sent: Mar 31, 2015 11:59 AM

Use one of the 8
-----Original Message-----
From: Acco
To: bond
Subject: Promo
Sent: Mar 31, 2015 11:49 AM

Can any of the 8 companies be used as the payee for promotion?  Or should we set up a new company?
```

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

The issue with the cheap paper mailed flat is it doesn't deliver well. If flat needs to be heavier cover at least or heavier stock throughout.  Which increases weight and increases postage.  So if we mail flat we will have the same delay because will be 2 stage printing to get better cover.

------Original Message------
From: 66
To: 3
To: 4
To: 2
Subject: Re: Cover
Sent: Apr 7, 2015 8:43 AM

I was told the following:

20 pages is max for tabbing

24 mailed flat should be no different in postage, waiting on 100% confirm, but was pretty sure about it.

Bookalog will ad .015 cents per piece and about 1 day to production. This can be lowered if we print same stock throughout. It takes two machines for heavier cover, so time and cost is affected.

For flat mail this copy need better covers and 2-3 spread, I think it can also use with smaller font and better graphic/sidebar integration.

------Original Message------
From: 3
To: 4
To: 2
To: 66
Subject: Re: Cover
Sent: Apr 7, 2015 10:26 AM

We were talking about it based on the 24 pages. I think the copy we have now seems like it has too many pages with too large a font. I just thought it might serve itself very well as a booklet with only minimal design changes.  We can continue with the reportalog format but then we need to know if 24 pages can still be tabbed. Or is it now in another class of mail by weight. This is mostly for the cover. Because if we have to mail it flat as a reportalog with 24 pages it will start to be pricey.

------Original Message------
From: 4
To: 3
To: 2
To: 66
Subject: Re: Cover
Sent: Apr 7, 2015 7:19 AM

Added 66. Do we want to push for a booklet?
------Original Message------
From: 3
To: 4
To: 2
Subject: Cover
Sent: Apr 7, 2015 7:17 AM

The only thing I think I would change on cover 1 is instead of saying "get in now for the biggest profits." I would consider saying "find out how to win  the bitcoin craze inside" or "find out how

------Original Message Truncated------

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

AA be back on thursday night. So we can meet friday.
------Original Message------
From: 4
To: 3
Subject: Re:
Sent: May 6, 2015 9:58 AM

I might go meet kaitz in seattle on monday. He will be on the west coast and can't come
into canada as he still hasn't got his customs issue resolved
------Original Message------
From: 3
To: 4
Subject: Re:
Sent: May 6, 2015 9:52 AM

Actually I think the native guys going calgary friday so maybe we meet on native Monday.
------Original Message------
To: 4
Subject: Re:
Sent: May 6, 2015 9:49 AM

Will be in office as well. AA is going calgary tomorrow. So maybe we meet him friday on
native.
------Original Message------
To: 4
Subject: Re:
Sent: May 6, 2015 9:42 AM

I been back and forth with him on it today. He had trouble getting ads approved on new
network. He has spent 2k this week so far and trying to get other stuff approved today.
Was supposed to be done by tuesday afternoon.
------Original Message------
From: 4
To: 3
Subject:
Sent: May 6, 2015 9:28 AM

Has Zazoff mentioned when he will kick up STVF again.

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0501527

A174

About 50%
------Original Message------
From: 66
To: 4
Subject:
Sent: Jul 24, 2013 8:08 AM

Are you able to capture anything on arth?

At 20% even this is pretty shitty.

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

```
Sent
-----Original Message-----
From: 4
To: 66
Subject: Re:
Sent: Sep 27, 2013 2:41 PM

Send to:
marketing@advantagemarketing.co
-----Original Message-----
From: 66
To: 4
Subject: Re:
Sent: Sep 27, 2013 11:25 AM

They said they will go if they get the invoice signed and sent back to them via email from advantage.

They "requested" it be done by EOD
-----Original Message-----
From: 4
To: 66
Subject: Re:
Sent: Sep 27, 2013 2:19 PM

No. We go without them. Tards.
-----Original Message-----
From: 66
To: 4
Subject: Re:
Sent: Sep 27, 2013 11:17 AM

Of course, but then what, cancel the other spend?
-----Original Message-----
From: 4
To: 66
Subject: Re:
Sent: Sep 27, 2013 2:17 PM

Make sure it does not show as paragon
-----Original Message-----
From: 66
To: 4
Subject: Re:
Sent: Sep 27, 2013 11:11 AM

Am trying to have them put Advantage media, if they won't then what? Full service?
-----Original Message-----
From: 4
To: 66
Subject: Re:
Sent: Sep 27, 2013 1:44 PM

Cant do that.  We'll have to return the funds.
-----Original Message-----
From: 66
To: 4
```

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0186963

A176

Subject: Re:
Sent: Sep 27, 2013 9:27 AM

Wire to circle came from Paragon Web Media Solutions, so now they say they need to put that in the disclaimer, how to handle?
-----Original Message------
From: 4
To: 66
Subject:
Sent: Sep 27, 2013 11:36 AM

Call me.

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0186964

A177

```
Kill it.
------Original Message------
From: Bond
To: 4
Subject: Renewal
Sent: Jan 21, 2014 9:20 AM

Do we pay the 2014 annual fees for advantage media corp (belize)? Debit arth?
```

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

A178

I asked for that yesterday.  He said he would deliver. I will follow up with ian today.
------Original Message------
From: 2
To: 3
To: 4
Subject: News
Sent: Jun 19, 2013 9:46 AM

Does avtar have a set of news releases to begin issuing next week?

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-1122854

A179

Yeah going to head up after the 23rd.
------Original Message------
From: 3
To: 4
Subject: Re:
Sent: Aug 13, 2013 3:30 PM

Ok, next week is a week of guests. Are you in okanagan at all?

------Original Message------
From: 4
To: 3
Subject: Re:
Sent: Aug 12, 2013 11:56 PM

Cool. It is disappointing but still a win.
We can't send his 250K to mark lee and then transfer to a third party. But Fitzroy could
send direct back to Z. I suggest we move our 1.25 million to Rights Corp account at
bonds. I am back on monday.
------Original Message------
From: 3
To: 4
Subject: Re:
Sent: Aug 13, 2013 2:56 AM

He had questions about grph, tung, norx and wondered why those projects all grouped
together with ecau and arth on the boards and basher sites.

He said a lot of grief from inovio etc being attached to a p and d. Same shit that we
heard from echo guys. He had a 50mm funding for inovio blah blah. I said that we really
got hurt as all our guys in at higher price etc.

He's wanting to go on funding when we say so. I told him he could after first week of
september. Told him we would be active in the market until then I told him we wouldn't
sell below $0.40.

I told him we would take out the pp money and leave distribution until after september
if he wanted or we could do it now. He said he would support a distribution now. Lol.

I told him greenburg already has the 500k balance for pp. He was wondering if we could
add his 250 to greenburg and then return the original 250 back to Z since his entity did
not sign for the pp. That may be cleanest way.  Said we would pay back pp money, and
distribute 3.0 and leave balance as working cap while we sell rest of paper etc.

He was disappointed it wasn't bigger success as we all are but I explained some times
things out of control and we were aqueezing

------Original Message Truncated------

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

Cool. It is disappointing but still a win.
We can't send his 250K to mark lee and then transfer to a third party. But Fitzroy could
send direct back to Z. I suggest we move our 1.25 million to Rights Corp account at
bonds. I am back on monday.
------Original Message------
From: 3
To: 4
Subject: Re:
Sent: Aug 13, 2013 2:56 AM

He had questions about grph, tung, norx and wondered why those projects all grouped
together with ecau and arth on the boards and basher sites.

He said a lot of grief from inovio etc being attached to a p and d. Same shit that we
heard from echo guys. He had a 50mm funding for inovio blah blah. I said that we really
got hurt as all our guys in at higher price etc.

He's wanting to go on funding when we say so. I told him he could after first week of
september. Told him we would be active in the market until then I told him we wouldn't
sell below $0.40.

I told him we would take out the pp money and leave distribution until after september
if he wanted or we could do it now. He said he would support a distribution now. Lol.

I told him greenburg already has the 500k balance for pp. He was wondering if we could
add his 250 to greenburg and then return the original 250 back to Z since his entity did
not sign for the pp. That may be cleanest way.  Said we would pay back pp money, and
distribute 3.0 and leave balance as working cap while we sell rest of paper etc.

He was disappointed it wasn't bigger success as we all are but I explained some times
things out of control and we were aqueezing this out in short timeframe so it may have
hurt usa bit in that we weren't able to stop once we started.

All in all not a total failure. Might be that we see $4-5 mm once all said and done.

We also talked about opportiunity moving forward. if there still was one. I said we
worked well together and everyone did what they said they would and that we would
continue to look at his projects in future.
------Original Message------
From: 4
To: 3
Subject:
Sent: Aug 12, 2013 5:12 PM

How did it go with avtar?

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0189154

A181

From ARTH
------Original Message------
To: Wires
Subject:
Sent: Sep 6, 2013 2:34 PM

Please wire 250K to:

Correspondent bank:
Citibank NA, New York
Swift CITIU33

Beneficiary Bank:
Banque Heritage, Geneva,
Swift: HETCCHGG
Ac no: ████6296
Aba no: 021000089

Beneficiary name: Ortivo Enterprises Corp
Address: Salduba Building, East 53rd Street, Marbella, Panama, Republic of Panama
Beneficiary ac no: 0988930

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

That can go back to where came from  even if we do it?  He hasn't provided those instruction yet.
------Original Message------
From: 4
To: 3
Subject: Re: Wire
Sent: Aug 20, 2013 9:03 AM

What about his 250K?
------Original Message------
From: 3
To: 4
Subject: Wire
Sent: Aug 20, 2013 8:58 AM

Can you send 600k from ARTH to following:

Beneficiary: Banque Heritage Geneva
61 route de Chene
Geneve 6
CH-1211
Swift: HFTCCHGG
Attn: Eileen Tan
65-6590-0269

Further credit to: Heng Hong Investment Limited
Acc no: 0988630

Correspondent Bank:
Citibank NA
New York
Swift: CITIUS33
Beneficiary: banque heritage geneva
Acc no: 36966296
ABA: 021000089

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

**VBIO**

Settings ☑B ☑H ☑C  show filters  525 record(s)  Refresh

| Balances as of 2020-12-15 | | Account Holdings as of 2020-12-15 | |
|---|---|---|---|
| USD | 1,858,702.72 | Stock: VBIO | 2,370,603 |
| CAD | -643,085.61 | Restricted: VBIO-R | 400,000 |
| CHF | 0.00 | | |
| EUR | 0.00 | | |
| GBP | 0.00 | | |

**Donelan Declaration Exhibit**

**E**

SEC v Sharp, et al

showing 1-400 of 525 record(s)

NEXT> >>

| bID | Date | Ban/Brk | Smbl | Units | Descriptor | USD | CAD | CHF | EUR | GBP | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 123757 | 2019-04-12 | BSCT | | | Emphasism TT | -19,880.64 | | | | | 1,858,702.72 |
| 123339 | 2019-02-01 | BSCI | | | GT Law TT Roger | -36,487.04 | | | | | 1,878,583.36 |
| 123282 | 2019-01-22 | BSCI | | | GT Law TT Roger | -15,652.00 | | | | | 1,915,070.40 |
| 123338 | 2019-01-22 | BPIE | | | debit | | -9,966.06 | | | | -643,085.61 |
| 123233 | 2019-01-11 | BSCI | | | Full Service TT | -52,104.00 | | | | | 1,930,722.40 |
| 123337 | 2019-01-10 | BPIE | | | debit | | -17,425.00 | | | | -633,119.55 |
| 123113 | 2018-12-31 | BPIE | | | GT Law Vortex TT | -52,119.60 | | | | | 1,982,826.40 |
| 123333 | 2018-12-26 | BPIE | | | debit | | -10,832.45 | | | | -615,694.55 |
| 123335 | 2018-12-06 | BPIE | | | debit | | -11,274.86 | | | | -604,862.10 |
| 123332 | 2018-12-06 | BPIE | | | debit | | -4,100.14 | | | | -593,587.24 |
| 123065 | 2018-11-26 | BPIE | | | debit | | -69,176.35 | | | | -589,487.10 |
| 123063 | 2018-11-26 | BPIE | | | debit | | -10,250.00 | | | | -520,310.75 |
| 123062 | 2018-11-23 | BPIE | | | debit | | -17,429.97 | | | | -510,060.75 |
| 122921 | 2018-11-16 | LEEN | | | cancel TLS subscription | 203,347.00 | | | | | 2,034,946.00 |
| 123064 | 2018-11-08 | BPIE | | | debit | | -15,375.00 | | | | -492,630.78 |
| 122863 | 2018-11-05 | CANE | VBIO | -15,000 | sell stock | 23,945.04 | | | | | 1,831,599.00 |
| 122903 | 2018-11-05 | TENT | VBIO | -10,000 | sell stock | 15,482.88 | | | | | 1,807,653.96 |
| 122859 | 2018-11-03 | LEEN | | | TLS Genetics subscription USD203,347 | | -267,380.97 | | | | -477,255.78 |
| 122869 | 2018-10-30 | WORK | | | Directors fees | -1,000.00 | | | | | 1,792,171.08 |
| 122744 | 2018-10-23 | CANE | VBIO | -10,000 | sell stock | 16,608.00 | | | | | 1,793,171.08 |
| 122721 | 2018-10-15 | BPIE | | | outgoing wire USD100k | | -136,303.01 | | | | -209,874.81 |
| 122688 | 2018-10-11 | WORK | | | internal transfer loss provision VBIO | -893,365.00 | | | | | 1,776,563.08 |
| 122598 | 2018-10-01 | WORK | | | forex | -108,148.36 | | | 92,434.50 | | 0.00 |
| 122598 | 2018-10-01 | WORK | | | forex | | -108,148.36 | | | | 2,669,928.08 |
| 122393 | 2018-09-30 | WORK | | | custody fees | -11,228.07 | | | | | 2,778,076.44 |
| 122751 | 2018-09-27 | BPIE | | | forex | | -73,571.80 | | | | -73,571.80 |
| 122201 | 2018-09-24 | WILA | VBIO | -64,927 | sell stock | 120,085.60 | | | | | 2,789,304.51 |
| 122202 | 2018-09-21 | WILA | VBIO | -40,000 | sell stock | 78,692.78 | | | | | 2,669,218.91 |
| 122176 | 2018-09-20 | WILA | VBIO | -10,000 | sell stock | 18,530.92 | | | | | 2,590,526.13 |
| 122150 | 2018-09-18 | WILA | | | Quantum Solutions TT | | | | -92,434.50 | | -92,434.50 |
| 122159 | 2018-09-18 | WILA | VBIO | -4,174 | sell stock | 7,320.69 | | | | | 2,571,995.21 |
| 122106 | 2018-09-11 | WILA | VBIO | -21,520 | sell stock | 38,599.08 | | | | | 2,564,674.52 |
| 122080 | 2018-09-10 | WILA | VBIO | -16,430 | sell stock | 29,400.59 | | | | | 2,526,075.44 |
| 122074 | 2018-09-07 | WILA | VBIO | -29,220 | sell stock | 51,734.86 | | | | | 2,496,674.85 |
| 122051 | 2018-09-04 | WILA | VBIO | -128,547 | sell stock | 265,693.23 | | | | | 2,444,939.99 |
| 122044 | 2018-09-04 | WIHI | VBIO | -11,091 | sell stock | 22,525.79 | | | | | 2,179,246.76 |
| 121855 | 2018-08-30 | WILA | VBIO | -30,000 | sell stock | 54,791.99 | | | | | 2,156,720.97 |
| 121847 | 2018-08-28 | WILA | VBIO | -55,000 | sell stock | 94,573.52 | | | | | 2,101,928.98 |
| 121839 | 2018-08-27 | WILA | VBIO | -31,300 | sell stock | 52,038.61 | | | | | 2,007,355.46 |
| 121823 | 2018-08-23 | WILA | VBIO | -20,000 | sell stock | 32,728.01 | | | | | 1,955,316.85 |
| 121818 | 2018-08-22 | WIHI | VBIO | -66,766 | sell stock | 104,120.60 | | | | | 1,922,588.84 |
| 121815 | 2018-08-21 | WIHI | VBIO | -20,000 | sell stock | 30,845.31 | | | | | 1,818,468.24 |
| 121814 | 2018-08-21 | WILA | VBIO | -36,550 | sell stock | 55,912.97 | | | | | 1,787,622.93 |
| 121816 | 2018-08-20 | | | | forex 10 | | | | | | 0.00 |
| 122015 | 2018-08-20 | WIVA | | | forex 10 | | -6,092.65 | | | | 1,731,709.96 |
| 121747 | 2018-08-20 | WIVA | | | Emphasism Creative Media TT | | | | -5,135.25 | | -5,135.25 |
| 122031 | 2018-08-16 | REST | | | deliver stock: Fedex #773134380685 | | -1,000.00 | | | | 1,737,902.61 |
| 122031 | 2018-08-16 | BESQ | VBIO-R | -400,000 | deliver stock | | -1,000.00 | | | | 1,737,902.61 |
| 122032 | 2018-08-16 | BESQ | | | Island Stock Transer | | -237.00 | | | | 1,738,902.61 |
| 121788 | 2018-08-15 | WILA | VBIO | -16,500 | sell stock | 22,165.40 | | | | | 1,739,139.61 |
| 121730 | 2018-08-07 | WILA | VBIO | -20,000 | sell stock | 30,043.88 | | | | | 1,716,974.21 |
| 121571 | 2018-07-31 | WIHI | VBIO | -2,168 | sell stock | 3,215.25 | | | | | 1,686,930.33 |
| 121507 | 2018-07-20 | WILA | VBIO | -10,000 | sell stock | 16,645.57 | | | | | 1,683,715.08 |
| 121499 | 2018-07-18 | WIHI | VBIO | -61,401 | sell stock | 102,071.17 | | | | | 1,667,069.51 |
| 121498 | 2018-07-18 | WILA | VBIO | -35,000 | sell stock | 60,597.17 | | | | | 1,564,998.34 |
| 122978 | 2018-07-17 | BESQ | | | Greenberg Traurig | | -782.50 | | | | 1,504,401.17 |
| 121419 | 2018-07-06 | WIHI | VBIO | -5,050 | sell stock | 9,171.64 | | | | | 1,505,183.67 |
| 121418 | 2018-07-06 | WILA | VBIO | -49,650 | sell stock | 89,392.62 | | | | | 1,496,012.03 |
| 121408 | 2018-07-05 | WILA | VBIO | -52,000 | sell stock | 95,899.79 | | | | | 1,406,619.41 |
| 121405 | 2018-07-05 | WILA | VBIO | -25,000 | sell stock | 45,131.57 | | | | | 1,310,719.62 |
| 121407 | 2018-07-03 | WILA | VBIO | -55,000 | sell stock | 99,496.22 | | | | | 1,265,588.05 |
| 121404 | 2018-07-03 | WILA | VBIO | -30,000 | sell stock | 53,697.94 | | | | | 1,166,091.83 |
| 121305 | 2018-07-02 | WIHI | VBIO | -25,000 | sell stock | 42,066.44 | | | | | 1,112,393.89 |
| 121377 | 2018-06-30 | WORK | | | custody fees | | -12,449.80 | | | | 1,070,347.45 |
| 121304 | 2018-06-29 | WIHI | VBIO | -35,000 | sell stock | 55,563.05 | | | | | 1,082,797.25 |
| 121136 | 2018-06-27 | WILA | VBIO | -28,500 | sell stock | 40,930.13 | | | | | 1,027,234.20 |
| 121096 | 2018-06-25 | WILA | VBIO | -14,150 | sell stock | 21,554.67 | | | | | 986,304.07 |
| 121090 | 2018-06-22 | WIHI | VBIO | -65,000 | sell stock | 106,483.14 | | | | | 964,749.40 |
| 121089 | 2018-06-22 | WILA | VBIO | -1,000 | sell stock | 1,214.00 | | | | | 858,266.26 |
| 121084 | 2018-06-21 | WIHI | VBIO | -47,568 | sell stock | 71,908.82 | | | | | 857,052.26 |
| 121066 | 2018-06-20 | WILA | VBIO | -26,000 | sell stock | 36,250.46 | | | | | 785,143.44 |
| 121068 | 2018-06-20 | WIHI | VBIO | -32,889 | sell stock | 45,815.60 | | | | | 748,892.98 |
| 121041 | 2018-06-18 | WIVA | | | Quantum Solutions TT | | -82,164.00 | | | | 703,077.38 |
| 121042 | 2018-06-18 | WILA | VBIO | -30,000 | sell stock | 37,668.85 | | | | | 785,241.38 |
| 121044 | 2018-06-18 | WILA | VBIO | -7,100 | sell stock | 8,919.43 | | | | | 747,572.53 |
| 121039 | 2018-06-15 | WILA | VBIO | -4,450 | sell stock | 5,212.35 | | | | | 738,653.10 |
| 121021 | 2018-06-14 | WILA | VBIO | -24,000 | sell stock | 29,124.06 | | | | | 733,440.75 |
| 121003 | 2018-06-13 | WIHI | | | World Wide Holdings TT | | -35,946.75 | | | | 704,316.69 |
| 120972 | 2018-06-08 | WIHI | VBIO | -5,000 | sell stock | 6,153.60 | | | | | 740,263.44 |
| 121295 | 2018-06-07 | WILA | | | rebalance VBIO | | -300.00 | | | | 734,109.84 |
| 120926 | 2018-06-07 | CANE | VBIO | 25,000 | buy stock | | -35,482.20 | | | | 734,409.84 |
| 120925 | 2018-06-06 | WILA | VBIO | -72,000 | sell stock | 83,981.08 | | | | | 769,892.04 |
| 120924 | 2018-06-06 | WIRI | VBIO | -23,447 | sell stock | 27,187.62 | | | | | 685,910.96 |
| 120922 | 2018-06-06 | WILA | VBIO | -160,553 | sell stock | 185,901.30 | | | | | 658,723.34 |

| | | | | | |
|---|---|---|---|---|---|
| 120903 | 2018-06-05 | WIVA | | Quantum Solutions TT | -82,164.00 | 472,822.04 |
| 120560 | 2018-05-17 | WILA | | Core Lithium TT | -20,541.00 | 554,986.04 |
| 120498 | 2018-05-09 | WILA | | Quantum Solutions TT | -164,256.25 | 575,527.04 |
| 120489 | 2018-05-08 | WILA | | rebalance VBIO | -500.00 | 739,783.29 |
| 120464 | 2018-05-03 | WIRI | VBIO | sell stock | -40,000.00 | 54,645.35 | 740,283.29 |
| 120264 | 2018-04-24 | WILA | VBIO | sell stock | -7,804 | 11,437.64 | 685,637.94 |
| 120196 | 2018-04-18 | WILA | VBIO | sell stock | -19,200 | 27,473.88 | 674,200.30 |
| 120088 | 2018-04-07 | WIRI | | Dari International TT | -164,256.25 | 646,726.42 |
| 119963 | 2018-03-30 | WORK | | custody fees | -12,880.93 | 810,982.67 |
| 119812 | 2018-03-28 | WILA | VBIO | sell stock | -28,625 | 43,525.97 | 823,863.60 |
| 119760 | 2018-03-23 | WIVA | | Pyronix Media TT | -184,756.25 | 780,337.63 |
| 119566 | 2018-03-02 | WILA | VBIO | sell stock | -20,000 | 35,958.75 | 965,093.88 |
| 119555 | 2018-03-01 | WILA | VBIO | sell stock | -25,900 | 47,854.72 | 929,135.13 |
| 119531 | 2018-02-28 | WILA | VBIO | sell stock | -20,000 | 36,604.03 | 881,280.41 |
| 119530 | 2018-02-28 | WIRI | VBIO | sell stock | -20,000 | 36,438.96 | 844,676.38 |
| 119344 | 2018-02-27 | WILA | | West Coast Stock TT | -3,110.00 | 808,237.42 |
| 119360 | 2018-02-27 | WILA | VBIO | sell stock | -10,000 | 18,061.58 | 811,347.42 |
| 119359 | 2018-02-27 | WIHI | VBIO | sell stock | -9,915 | 18,117.38 | 793,285.84 |
| 119356 | 2018-02-27 | WIRI | VBIO | sell stock | -10,000 | 18,138.48 | 775,168.46 |
| 119572 | 2018-02-26 | WIHI | VBIO | sell stock | -10,000 | 18,273.10 | 757,029.98 |
| 119335 | 2018-02-26 | WIRI | VBIO | sell stock | -5,000 | 8,976.00 | 738,756.88 |
| 119336 | 2018-02-23 | WILA | VBIO | sell stock | -10,000 | 18,000.00 | 729,780.88 |
| 119242 | 2018-02-20 | WIIN | | The Ideal TT UAGZ Filings | -5,135.25 | 711,780.88 |
| 119211 | 2018-02-15 | WILA | VBIO | sell stock | -15,000 | 26,866.56 | 716,916.13 |
| 119212 | 2018-02-15 | WIHI | VBIO | sell stock | -25,000 | 44,615.39 | 690,049.57 |
| 119569 | 2018-02-14 | WILA | | rebalance VBIO | -300.00 | 645,434.18 |
| 119179 | 2018-02-14 | WIHI | VBIO | sell stock | -40,000 | 71,405.38 | 645,734.18 |
| 119175 | 2018-02-14 | WILA | VBIO | sell stock | -1,000 | 1,410.00 | 574,328.80 |
| 119159 | 2018-02-13 | WIRI | VBIO | sell stock | -30,000 | 53,146.10 | 572,918.80 |
| 119141 | 2018-02-12 | WILA | | rebalance VBIO | -300.00 | 519,772.70 |
| 119127 | 2018-02-08 | WORK | | internal transfer | -120,100.00 | 520,072.70 |
| 119126 | 2018-02-08 | WORK | | internal transfer | -340,100.00 | 640,172.70 |
| 119125 | 2018-02-08 | WORK | | internal transfer | -340,100.00 | 980,272.70 |
| 119131 | 2018-02-08 | WIHI | VBIO | sell stock | -5,000 | 9,022.56 | 1,320,372.70 |
| 119128 | 2018-02-08 | WORK | | internal transfer | -400,100.00 | 1,311,350.14 |
| 119116 | 2018-02-07 | WIHI | VBIO | sell stock | -37,650 | 69,724.38 | 1,711,450.14 |
| 119115 | 2018-02-07 | WIRI | VBIO | sell stock | -11,553 | 20,859.35 | 1,641,725.76 |
| 119073 | 2018-02-05 | WILA | | Dari International TT | -164,256.25 | 1,620,866.41 |
| 118757 | 2018-01-26 | WILA | VBIO | receive stock via DWAC | 1,100,000 | -1,100.00 | 1,785,122.66 |
| 118804 | 2018-01-24 | BESQ | | Booth Udall Fuller | -1,000.00 | 1,786,222.66 |
| 118756 | 2018-01-19 | BESQ | | Island Stock Transfer | -1,000.00 | 1,787,222.66 |
| 118755 | 2018-01-19 | REST | | deliver stock: Fedex #771253821424 | -50.00 | 1,787,491.66 |
| 118755 | 2018-01-19 | REST | VBIO-R | deliver stock | -1,100,000 | -1,000.00 | 1,787,541.66 |
| 118748 | 2018-01-18 | WIRI | VBIO | sell stock | -10,000 | 18,048.00 | 1,788,541.66 |
| 118746 | 2018-01-08 | REST | VBIO-R | receive stock | 400,000 | -100.00 | 1,770,493.66 |
| 118669 | 2018-01-08 | WIHI | | rebalance VBIO | -300.00 | 1,770,593.66 |
| 118410 | 2018-01-04 | WIRI | | Dari International TT | -164,256.25 | 1,770,893.66 |
| 118402 | 2018-01-04 | WIVA | | Midiam Ventures TT | -102,705.00 | 1,935,149.91 |
| 118503 | 2018-01-04 | TENT | VBIO | buy stock | 25,105 | -48,288.97 | 2,037,854.91 |
| 118500 | 2018-01-04 | PESC | VBIO | buy stock | 100,000 | -214,104.80 | 2,086,143.88 |
| 118509 | 2018-01-03 | BEAG | VBIO | sell stock | -50,000 | 103,081.80 | 2,300,248.68 |
| 118425 | 2018-01-02 | WISA | VBIO | sell stock | -7,075 | 2,197,166.88 |
| 118417 | 2018-01-02 | WILA | VBIO | sell stock | -117,578 | 223,389.50 | 2,184,283.93 |
| 118508 | 2018-01-02 | BEAG | VBIO | sell stock | -25,000 | 48,944.50 | 1,960,894.43 |
| 118292 | 2018-01-01 | WIRI | VBIO | receive stock via DWAC | 150,000 | -1,100.00 | 1,911,949.93 |
| 118483 | 2017-12-31 | WORK | | custody fees | -12,908.34 | 1,913,049.93 |
| 118416 | 2017-12-29 | WILA | VBIO | sell stock | -5,500 | 9,506.69 | 1,925,958.27 |
| 118415 | 2017-12-28 | WILA | VBIO | sell stock | -20,000 | 34,060.80 | 1,916,451.58 |
| 118413 | 2017-12-26 | WILA | VBIO | sell stock | -7,200 | 12,235.20 | 1,882,390.78 |
| 118423 | 2017-12-22 | WISA | VBIO | sell stock | -45,000 | 75,410.97 | 1,870,155.58 |
| 118292 | 2017-12-19 | REST | | deliver stock: Fedex #771040734253 | -50.00 | 1,794,744.61 |
| 118290 | 2017-12-19 | REST | VBIO-R | deliver stock | -150,000 | -500.00 | 1,794,794.61 |
| 118291 | 2017-12-19 | BESQ | | Island Stock Transfer | -256.42 | 1,795,294.61 |
| 118246 | 2017-12-16 | WIRI | | Greenberg Traurig TT | -41,082.00 | 1,795,551.03 |
| 118196 | 2017-12-13 | WIVA | | Vitality Biopharma TT | -256,506.25 | 1,836,633.03 |
| 118195 | 2017-12-13 | WIRI | | Vitality Biopharma TT | -359,006.25 | 2,093,139.28 |
| 118178 | 2017-12-12 | REST | | directors fee | -400.00 | 2,452,145.53 |
| 118201 | 2017-12-12 | WIHI | VBIO | sell stock | -15,000 | 25,982.49 | 2,452,545.53 |
| 118175 | 2017-12-11 | WILA | VBIO | sell stock | -20,000 | 34,609.82 | 2,426,563.04 |
| 118173 | 2017-12-11 | WIHI | VBIO | sell stock | -19,950 | 34,518.60 | 2,391,953.22 |
| 118086 | 2017-12-06 | WIRI | | Dari International TT | -10,270.50 | 2,357,434.62 |
| 118066 | 2017-12-04 | WIHI | VBIO | sell stock | -4,452 | 7,190.97 | 2,367,705.12 |
| 117798 | 2017-11-28 | WISA | VBIO | sell stock | -10,000 | 16,325.26 | 2,360,514.15 |
| 117670 | 2017-11-27 | WIHI | VBIO | receive stock via DWAC | 750,000 | -1,100.00 | 2,344,188.89 |
| 117646 | 2017-11-24 | PESC | VBIO | receive stock via DWAC | 100,000 | -1,100.00 | 2,345,288.89 |
| 117722 | 2017-11-24 | WIRI | | Dari International TT | -143,756.25 | 2,346,388.89 |
| 117734 | 2017-11-23 | WORK | | director fee | -100.00 | 2,490,145.14 |
| 117721 | 2017-11-22 | WIIN | | UCLA Foundation TT | -87,299.25 | 2,490,245.14 |
| 117718 | 2017-11-22 | WIRI | | NG Mobile Systems TT | -105,272.63 | 2,577,544.39 |
| 117717 | 2017-11-22 | WIVA | | NG Mobile Systems TT | -106,299.68 | 2,682,817.02 |
| 117668 | 2017-11-20 | REST | | deliver stock: Fedex #770791548707 | -50.00 | 2,789,116.70 |
| 117668 | 2017-11-20 | REST | VBIO-R | deliver stock | -750,000 | -500.00 | 2,789,166.70 |
| 117669 | 2017-11-20 | BESQ | | Island Stock Transfer | -256.42 | 2,789,666.70 |
| 117698 | 2017-11-20 | WISA | VBIO | sell stock | -71,954 | 130,400.84 | 2,789,923.12 |
| 117644 | 2017-11-17 | REST | VBIO-R | receive stock | -100,000 | -500.00 | 2,659,522.28 |
| 117644 | 2017-11-17 | REST | | deliver stock: Fedex #770782440764 | -500.00 | 2,660,022.28 |
| 117642 | 2017-11-17 | BESQ | | Booth Udall Fuller | -550.00 | 2,660,072.28 |
| 117645 | 2017-11-17 | BESQ | | Island Stock Transfer | -256.42 | 2,660,622.28 |
| 117635 | 2017-11-16 | WILA | VBIO | sell stock | -20,000 | 35,109.60 | 2,660,878.70 |
| 117648 | 2017-11-16 | WISA | VBIO | sell stock | -5,000 | 8,600.62 | 2,625,769.10 |
| 117584 | 2017-11-15 | WISA | VBIO | sell stock | -20,000 | 34,343.44 | 2,617,168.48 |
| 117564 | 2017-11-13 | WISA | VBIO | sell stock | -5,400 | 9,985.90 | 2,582,825.04 |
| 117533 | 2017-11-10 | WISA | VBIO | sell stock | -20,918 | 38,147.79 | 2,572,939.14 |
| 117464 | 2017-11-08 | WILA | VBIO | sell stock | -9,650 | 18,262.94 | 2,534,791.35 |
| 117455 | 2017-11-08 | WISA | VBIO | sell stock | -1,950 | 3,239.88 | 2,516,528.41 |
| 117439 | 2017-11-07 | WILA | VBIO | sell stock | -40,000 | 76,570.94 | 2,513,288.53 |
| 117435 | 2017-11-07 | WIRI | VBIO | sell stock | -13,199 | 25,432.88 | 2,436,717.59 |
| 117410 | 2017-11-06 | BESQ | | Booth Udall Fuller | -2,050.00 | 2,411,284.71 |

A185

| 117423 | 2017-11-06 | WILA | VBIO | | -28,477 sell stock | 58,399.79 | 2,413,334.71 |
|---|---|---|---|---|---|---|---|
| 117406 | 2017-11-03 | WISA | VBIO | | -104,993 sell stock | 210,438.34 | 2,354,934.92 |
| 117408 | 2017-11-03 | WILA | VBIO | | -10,300 sell stock | 20,899.73 | 2,144,496.58 |
| 117359 | 2017-11-02 | WISA | VBIO | | -91,535 sell stock | 184,998.66 | 2,123,596.85 |
| 117357 | 2017-11-02 | WILA | VBIO | | -40,000 sell stock | 82,630.27 | 1,938,598.19 |
| 117355 | 2017-11-02 | WIRI | VBIO | | -40,000 sell stock | 82,417.89 | 1,855,967.92 |
| 117337 | 2017-11-01 | WIRI | | Dari International TT | -143,756.25 | | 1,773,550.03 |
| 117346 | 2017-11-01 | WILA | VBIO | | -25,000 sell stock | 47,378.28 | 1,917,306.28 |
| 117343 | 2017-11-01 | WIRI | VBIO | | -35,000 sell stock | 69,135.73 | 1,869,928.00 |
| 117342 | 2017-11-01 | WISA | VBIO | | -56,276 sell stock | 110,073.49 | 1,800,792.27 |
| 117329 | 2017-10-31 | TENT | | 5,000 buy stock | -10,792.86 | | 1,690,718.78 |
| 117327 | 2017-10-31 | WILA | VBIO | | -11,298 sell stock | 21,385.92 | 1,701,511.64 |
| 117069 | 2017-10-30 | TENT | | 7,500 buy stock | -16,029.00 | | 1,680,125.72 |
| 117057 | 2017-10-30 | WIRI | VBIO | | -5,000 sell stock | 9,264.67 | 1,696,154.72 |
| 117028 | 2017-10-30 | WISA | VBIO | | -120,678 sell stock | 218,254.47 | 1,686,890.05 |
| 117055 | 2017-10-30 | WILA | VBIO | | -40,277 sell stock | 75,261.23 | 1,468,635.58 |
| 117030 | 2017-10-27 | WIRI | VBIO | | -122,475 sell stock | 226,700.89 | 1,393,374.35 |
| 117029 | 2017-10-27 | WILA | VBIO | | -70,000 sell stock | 127,992.52 | 1,166,673.46 |
| 116996 | 2017-10-26 | WIRI | VBIO | | -60,000 sell stock | 104,697.48 | 1,038,680.94 |
| 116998 | 2017-10-26 | WILA | VBIO | | -75,000 sell stock | 129,806.40 | 933,983.46 |
| 116982 | 2017-10-25 | WIRI | VBIO | | -80,000 sell stock | 128,787.39 | 804,177.06 |
| 116991 | 2017-10-25 | TENT | | 20,000 buy stock | -36,332.40 | | 675,389.67 |
| 116984 | 2017-10-25 | WISA | VBIO | | -20,000 sell stock | 31,620.00 | 711,722.07 |
| 116944 | 2017-10-24 | WIRI | VBIO | | -90,000 sell stock | 135,509.40 | 680,102.07 |
| 116913 | 2017-10-23 | WIRI | VBIO | | -7,288 sell stock | 10,186.94 | 544,592.67 |
| 116895 | 2017-10-20 | WISA | VBIO | | -9,232 sell stock | 13,316.98 | 534,405.73 |
| 116853 | 2017-10-19 | WISA | VBIO | | -15,000 sell stock | 21,456.98 | 521,088.75 |
| 116837 | 2017-10-18 | WIRI | VBIO | | -4,691 sell stock | 6,452.74 | 499,631.77 |
| 116616 | 2017-10-06 | WBHI | | Mdam Ventures TT | -102,705.00 | | 493,179.03 |
| 116629 | 2017-10-06 | WIRI | VBIO | | -7,014 sell stock | 9,920.25 | 595,884.03 |
| 116594 | 2017-10-05 | WBHI | | World Wide Holdings TT | -64,195.75 | | 585,963.78 |
| 116593 | 2017-10-05 | WBRI | | Full Service Media TT | -154,006.25 | | 650,159.53 |
| 116602 | 2017-10-05 | WIRI | VBIO | | -25,015 sell stock | 37,373.76 | 804,165.78 |
| 116550 | 2017-10-04 | PESP | | internal transfer | 24,601 | | 766,792.02 |
| 116650 | 2017-10-04 | BEAP | | internal transfer | -24,601 | -175.00 | 767,392.02 |
| 116582 | 2017-10-04 | WIRI | VBIO | | -63,245 sell stock | 93,392.70 | 767,567.02 |
| 116463 | 2017-09-30 | WORK | | custody fees | -7,651.19 | | 674,174.32 |
| 115937 | 2017-09-07 | WBRI | | Dari International TT | -143,756.25 | | 681,825.51 |
| 115929 | 2017-09-07 | REST | | directors fee | -200.00 | | 825,581.76 |
| 115689 | 2017-09-01 | WBRI | | Full Service Media TT | -236,006.25 | | 825,781.76 |
| 115882 | 2017-08-28 | REST | VBIO-R | receive stock | -100.00 | | 1,061,788.01 |
| 115334 | 2017-08-25 | TENT | VBIO | | 42,034 Dari TT | -74,113.93 | 1,061,888.01 |
| 115182 | 2017-08-22 | SIQU | VBIO | | -545,680 internal transfer | -100.00 | 1,136,001.94 |
| 115182 | 2017-08-22 | WILA | VBIO | | 545,680 internal transfer | 0.00 | 1,136,101.94 |
| 112795 | 2017-08-03 | WBSA | | Dari TT | -143,756.25 | | 1,136,101.94 |
| 112814 | 2017-08-02 | BEAG | VBIO | | 25,000 buy stock | -44,768.58 | 1,279,858.19 |
| 112813 | 2017-08-02 | BEAG | | 4,710 buy stock | -7,775.20 | | 1,324,626.77 |
| 112778 | 2017-08-01 | BEAT | VBIO | | 38,843 buy stock | -61,161.64 | 1,332,401.97 |
| 112457 | 2017-07-26 | WBRI | | Full Service Media TT | -154,006.25 | | 1,393,563.61 |
| 112435 | 2017-07-25 | WBVA | | Paragon Webmedia TT | -51,352.50 | | 1,547,569.86 |
| 112424 | 2017-07-25 | WORK | | internal transfer | -36,100.00 | | 1,598,922.36 |
| 112423 | 2017-07-25 | WORK | | internal transfer | -102,100.00 | | 1,635,022.36 |
| 112422 | 2017-07-25 | WORK | | internal transfer | -102,100.00 | | 1,737,122.36 |
| 112421 | 2017-07-25 | WORK | | internal transfer | -120,100.00 | | 1,839,222.36 |
| 112350 | 2017-07-20 | SIQU | VBIO | | -15,000 sell stock | 27,338.00 | 1,959,322.36 |
| 112349 | 2017-07-20 | WISA | VBIO | | -3,625 sell stock | 6,356.75 | 1,931,984.36 |
| 112348 | 2017-07-19 | SIQU | VBIO | | -25,000 sell stock | 45,214.56 | 1,925,627.61 |
| 112259 | 2017-07-17 | REST | | directors fee | -1,000.00 | | 1,880,413.05 |
| 112343 | 2017-07-17 | SIQU | VBIO | | -14,320 sell stock | 24,726.52 | 1,881,413.05 |
| 112246 | 2017-07-14 | REST | | directors fee | -1,000.00 | | 1,856,686.53 |
| 112223 | 2017-07-13 | WBRI | | Vitality BioPharma TT | -308,012.50 | | 1,857,686.53 |
| 112221 | 2017-07-13 | WORK | | directors fees | -1,000.00 | | 2,165,699.03 |
| 112202 | 2017-07-12 | BESQ | | Island Stock Transfer | -159.00 | | 2,166,699.03 |
| 112201 | 2017-07-12 | REST | | directors fee + fedex #779615398320 | -350.00 | | 2,166,858.03 |
| 112215 | 2017-07-12 | BEAP | VBIO | | 24,601 buy stock | -49,159.69 | 2,167,208.03 |
| 112176 | 2017-07-11 | REST | | directors fee | -1,000.00 | | 2,216,367.72 |
| 112197 | 2017-07-11 | WIRI | VBIO | | -10,000 sell stock | 18,288.00 | 2,216,567.72 |
| 112193 | 2017-07-10 | SIQU | | rebalance VBIO 600k | -300.00 | | 2,198,279.72 |
| 112160 | 2017-07-10 | WIRI | VBIO | | -6,573 sell stock | 12,657.49 | 2,198,579.72 |
| 111933 | 2017-07-07 | WISA | VBIO | | 588,236 receive stock via DWAC | -1,100.00 | 2,185,922.23 |
| 111930 | 2017-07-07 | PESC | VBIO | | 600,000 receive stock via DWAC | -1,100.00 | 2,187,022.23 |
| 111927 | 2017-07-07 | TENT | VBIO | | 700,000 receive stock via DWAC | -1,000.00 | 2,188,122.23 |
| 112150 | 2017-07-07 | WIRI | VBIO | | -13,600 sell stock | 26,215.30 | 2,189,122.23 |
| 112126 | 2017-07-05 | TENT | VBIO | | -4,983 sell stock | 10,005.80 | 2,162,906.93 |
| 112118 | 2017-07-05 | WIRI | VBIO | | -1,900 sell stock | 3,482.67 | 2,152,901.13 |
| 112008 | 2017-07-04 | WBVA | | Vitality Biopharma TT | -307,756.25 | | 2,149,418.46 |
| 112007 | 2017-07-03 | WORK | | director fees | -1,000.00 | | 2,457,174.71 |
| 111906 | 2017-06-30 | WBRI | | Dari International TT | -143,756.25 | | 2,458,174.71 |
| 111642 | 2017-06-30 | WIRI | VBIO | | 600,000 receive stock via DWAC | -1,100.00 | 2,601,930.96 |
| 111931 | 2017-06-30 | REST | VBIO-R | -588,236 deliver stock | -300.00 | | 2,603,030.96 |
| 111931 | 2017-06-30 | REST | | deliver stock: Fedex #779528304600 | -300.00 | | 2,603,330.96 |
| 111639 | 2017-06-30 | SIQU | VBIO | | 600,000 receive stock via DWAC | -1,100.00 | 2,603,630.96 |
| 111928 | 2017-06-30 | REST | | deliver stock: Fedex #779528023456 | -50.00 | | 2,604,480.96 |
| 111928 | 2017-06-30 | REST | VBIO-R | -600,000 deliver stock | -300.00 | | 2,604,530.96 |
| 111925 | 2017-06-30 | REST | VBIO-R | -700,000 deliver stock | -300.00 | | 2,604,830.96 |
| 111925 | 2017-06-30 | REST | | deliver stock: Fedex #779527743211 | -50.00 | | 2,605,130.96 |
| 111926 | 2017-06-30 | BESQ | | Island Stock Transfer | -256.42 | | 2,605,180.96 |
| 111929 | 2017-06-30 | BESQ | | Island Stock Transfer | -256.42 | | 2,605,437.38 |
| 111932 | 2017-06-30 | BESQ | | Island Stock Transfer | -256.42 | | 2,605,693.80 |
| 112010 | 2017-06-30 | TENT | VBIO | | -7,734 sell stock | 15,199.08 | 2,605,950.22 |
| 111900 | 2017-06-29 | WORK | | custody fees | -2,096.34 | | 2,590,751.14 |
| 111890 | 2017-06-29 | BESQ | | Booth Udall Fuller | -1,500.00 | | 2,592,847.48 |
| 111926 | 2017-06-28 | BESQ | | Booth Udall Fuller | -800.00 | | 2,594,347.48 |
| 112009 | 2017-06-28 | TENT | VBIO | | -400 sell stock | 735.00 | 2,595,147.48 |
| 111695 | 2017-06-27 | REST | | directors fee | -900.00 | | 2,594,412.48 |
| 111684 | 2017-06-26 | PESC | VBIO | | -2,075 sell stock | 4,258.82 | 2,595,312.48 |
| 111640 | 2017-06-26 | REST | | deliver stock: Fedex #779494381764 | -50.00 | | 2,591,053.66 |
| 111640 | 2017-06-26 | REST | VBIO-R | -600,000 deliver stock | -400.00 | | 2,591,103.66 |

12/15/2020, 11:19 AM

A186

| ID | Date | Code | Sub | Amount | Description | Value | Balance |
|---|---|---|---|---|---|---|---|
| 111637 | 2017-06-26 | REST | VBIO-R | -600,000 | deliver stock | -300.00 | 2,591,503.66 |
| 111637 | 2017-06-26 | REST | | | deliver stock: Fedex #779493925650 | -50.00 | 2,591,803.66 |
| 111641 | 2017-06-26 | BESQ | | | Island Stock Transfer | -256.42 | 2,591,853.66 |
| 111638 | 2017-06-26 | BESQ | | | Island Stock Transfer | -256.42 | 2,592,110.08 |
| 111646 | 2017-06-26 | TENT | VBIO | -18,528 | sell stock | 39,770.97 | 2,592,366.50 |
| 111625 | 2017-06-23 | TENT | VBIO | -49,000 | sell stock | 105,216.72 | 2,552,595.53 |
| 111645 | 2017-06-23 | PESC | VBIO | -5,000 | sell stock | 10,488.77 | 2,447,378.81 |
| 111624 | 2017-06-22 | PESC | VBIO | -57,625 | sell stock | 120,741.92 | 2,436,890.04 |
| 111612 | 2017-06-21 | PESC | VBIO | -40,800 | sell stock | 84,484.98 | 2,316,148.12 |
| 111601 | 2017-06-20 | PESC | VBIO | -30,000 | sell stock | 60,075.67 | 2,231,663.14 |
| 111593 | 2017-06-19 | PESC | VBIO | -22,500 | sell stock | 45,665.10 | 2,171,587.47 |
| 111576 | 2017-06-16 | PESC | VBIO | -19,489 | sell stock | 39,105.55 | 2,125,922.37 |
| 111533 | 2017-06-15 | WBRI | | | Merger TT | -205,256.25 | 2,086,816.82 |
| 111573 | 2017-06-15 | PESC | VBIO | -10,200 | sell stock | 19,977.97 | 2,292,073.07 |
| 111535 | 2017-06-14 | BEAG | VBIO | -14,088 | sell stock | 28,957.20 | 2,272,095.10 |
| 111520 | 2017-06-13 | BEAG | VBIO | -15,265 | sell stock | 30,807.97 | 2,243,137.90 |
| 111517 | 2017-06-13 | SIQU | VBIO | -10,476 | sell stock | 20,577.50 | 2,212,329.93 |
| 111515 | 2017-06-13 | WIHI | VBIO | -56,536 | sell stock | 109,589.88 | 2,191,752.43 |
| 111505 | 2017-06-12 | SIQU | VBIO | -7,760 | sell stock | 14,839.41 | 2,082,162.55 |
| 111504 | 2017-06-12 | WIHI | VBIO | -22,500 | sell stock | 42,716.02 | 2,067,323.14 |
| 111496 | 2017-06-09 | SIQU | VBIO | -2,886 | sell stock | 5,295.88 | 2,024,607.12 |
| 111478 | 2017-06-08 | SIQU | VBIO | -4,950 | sell stock | 9,448.60 | 2,019,311.24 |
| 111468 | 2017-06-07 | WBHI | | | World Wide TT | -30,811.50 | 2,009,862.64 |
| 111471 | 2017-06-07 | SIQU | VBIO | -24,087 | sell stock | 46,745.35 | 2,040,674.14 |
| 111435 | 2017-06-06 | SIQU | VBIO | -13,995 | sell stock | 27,065.01 | 1,993,928.79 |
| 111384 | 2017-06-02 | WBSA | | | World Wide TT | -30,811.50 | 1,966,863.78 |
| 111383 | 2017-06-02 | WBVA | | | Paragon Webmedia TT | -51,352.50 | 1,997,675.28 |
| 111357 | 2017-06-01 | WORK | | | internal transfer | -360,100.00 | 2,049,027.78 |
| 111359 | 2017-06-01 | WORK | | | internal transfer | -400,100.00 | 2,409,127.78 |
| 111358 | 2017-06-01 | WORK | | | internal transfer | -360,100.00 | 2,809,227.78 |
| 111356 | 2017-06-01 | WORK | | | internal transfer | -80,100.00 | 3,169,327.78 |
| 111120 | 2017-05-29 | WBSA | | | Paragon Webmedia TT | -205,256.25 | 3,249,427.78 |
| 111126 | 2017-05-26 | SIQU | VBIO | -10,000 | sell stock | 18,846.72 | 3,454,684.03 |
| 111096 | 2017-05-25 | SIQU | VBIO | -1,900 | sell stock | 3,321.79 | 3,435,837.31 |
| 111036 | 2017-05-19 | SIQU | VBIO | -5,000 | sell stock | 10,652.16 | 3,432,515.52 |
| 111012 | 2017-05-19 | WBHI | | | World Wide TT | -30,811.50 | 3,421,863.36 |
| 110981 | 2017-05-18 | WBVA | | | Merger TT | -154,006.25 | 3,452,674.86 |
| 110978 | 2017-05-17 | WORK | | | internal transfer | -360,100.00 | 3,606,681.11 |
| 110979 | 2017-05-17 | WORK | | | internal transfer | -360,100.00 | 3,966,781.11 |
| 110977 | 2017-05-17 | WORK | | | internal transfer | -80,100.00 | 4,326,881.11 |
| 110975 | 2017-05-17 | WORK | | | internal transfer | -400,100.00 | 4,406,981.11 |
| 110988 | 2017-05-16 | WIHI | VBIO | -50,000 | sell stock | 109,152.31 | 4,807,081.11 |
| 110990 | 2017-05-16 | PESC | VBIO | 1,304 | buy stock | -3,628.93 | 4,697,928.80 |
| 110967 | 2017-05-15 | PESC | VBIO | 29,549 | buy stock | -80,734.36 | 4,701,557.73 |
| 110944 | 2017-05-15 | SIQU | VBIO | -12,750 | sell stock | 29,659.18 | 4,782,292.09 |
| 110898 | 2017-05-12 | WBHI | | | World Wide TT returned | -230.00 | 4,752,632.91 |
| 110951 | 2017-05-12 | PESC | VBIO | 6,972 | buy stock | -19,128.50 | 4,752,862.91 |
| 110925 | 2017-05-12 | SIQU | VBIO | -14,500 | sell stock | 34,018.59 | 4,771,991.41 |
| 110922 | 2017-05-12 | WIHI | VBIO | -10,000 | sell stock | 23,028.02 | 4,737,972.82 |
| 110906 | 2017-05-11 | SIQU | VBIO | -30,000 | sell stock | 70,378.74 | 4,714,944.80 |
| 110902 | 2017-05-11 | WIHI | VBIO | -40,000 | sell stock | 93,566.23 | 4,644,566.06 |
| 110874 | 2017-05-10 | WIHI | VBIO | -35,000 | sell stock | 79,764.85 | 4,550,999.83 |
| 110930 | 2017-05-10 | PESC | VBIO | 21,175 | buy stock | -57,884.23 | 4,471,234.98 |
| 110929 | 2017-05-09 | PESC | VBIO | 1,000 | buy stock | -2,769.10 | 4,529,119.21 |
| 110823 | 2017-05-09 | SIQU | VBIO | -10,690 | sell stock | 23,741.76 | 4,531,888.31 |
| 110812 | 2017-05-08 | SIQU | VBIO | -50,000 | sell stock | 116,560.40 | 4,508,146.55 |
| 110809 | 2017-05-08 | WIHI | VBIO | -29,535 | sell stock | 66,917.84 | 4,391,586.15 |
| 110773 | 2017-05-05 | WBRI | | | Merger TT | -102,705.00 | 4,324,668.31 |
| 117591 | 2017-05-05 | SIQU | | | rebalance VBIO | -300.00 | 4,427,373.31 |
| 110783 | 2017-05-05 | WIHI | VBIO | -32,095 | sell stock | 71,592.59 | 4,427,673.31 |
| 110784 | 2017-05-05 | SIQU | VBIO | -43,689 | sell stock | 97,472.04 | 4,356,080.72 |
| 110782 | 2017-05-05 | PESC | VBIO | 51,455 | buy stock | -134,864.95 | 4,258,608.68 |
| 110724 | 2017-05-04 | BEAG | VBIO | -2,107 | sell stock | 5,030.62 | 4,393,473.63 |
| 110909 | 2017-05-04 | WIHI | VBIO | -66,000 | sell stock | 147,930.72 | 4,388,443.01 |
| 110908 | 2017-05-04 | SIQU | VBIO | -30,000 | sell stock | 65,105.74 | 4,240,512.29 |
| 110729 | 2017-05-03 | WIHI | VBIO | -83,078 | sell stock | 202,562.17 | 4,175,406.55 |
| 110765 | 2017-05-03 | BEAG | VBIO | -15,000 | sell stock | 36,854.41 | 3,972,844.38 |
| 110727 | 2017-05-03 | SIQU | VBIO | -71,587 | sell stock | 172,348.93 | 3,935,989.97 |
| 110680 | 2017-05-02 | WIHI | VBIO | -80,000 | sell stock | 187,334.94 | 3,763,641.04 |
| 110707 | 2017-05-02 | SIQU | VBIO | -49,000 | sell stock | 113,915.64 | 3,576,306.10 |
| 110675 | 2017-05-01 | WIHI | VBIO | -39,500 | sell stock | 84,991.28 | 3,462,390.46 |
| 110674 | 2017-05-01 | SIQU | VBIO | -24,000 | sell stock | 50,598.36 | 3,377,399.18 |
| 110605 | 2017-04-29 | WBVA | | | Dari International TT | -143,756.25 | 3,326,800.82 |
| 110613 | 2017-04-28 | WIHI | VBIO | -17,679 | sell stock | 36,686.80 | 3,470,557.07 |
| 110611 | 2017-04-28 | SIQU | VBIO | -40,000 | sell stock | 80,938.84 | 3,433,870.27 |
| 110417 | 2017-04-27 | SIQU | VBIO | -45,000 | sell stock | 88,944.97 | 3,352,931.43 |
| 110429 | 2017-04-26 | WIHI | VBIO | -60,000 | sell stock | 118,335.92 | 3,263,986.46 |
| 110426 | 2017-04-26 | SIQU | VBIO | -60,800 | sell stock | 117,963.41 | 3,145,650.54 |
| 110365 | 2017-04-25 | WIHI | VBIO | -47,300 | sell stock | 90,641.63 | 3,027,687.13 |
| 110339 | 2017-04-21 | WBHI | | | Dari International TT | -12,838.13 | 2,937,045.50 |
| 110346 | 2017-04-21 | WIHI | VBIO | -8,555 | sell stock | 15,132.79 | 2,949,883.63 |
| 110325 | 2017-04-20 | WBHI | | | World Wide TT | -35,946.75 | 2,934,750.84 |
| 110337 | 2017-04-20 | WIHI | VBIO | -30,000 | sell stock | 54,211.95 | 2,970,697.59 |
| 110326 | 2017-04-19 | WIHI | VBIO | -3,970 | sell stock | 6,735.69 | 2,916,485.64 |
| 110297 | 2017-04-17 | WBQU | | | Pyronix Media TT | -157,081.25 | 2,909,749.95 |
| 110277 | 2017-04-13 | WIHI | VBIO | -60,767 | sell stock | 118,576.91 | 3,066,831.20 |
| 110259 | 2017-04-12 | WIHI | VBIO | -42,902 | sell stock | 79,237.21 | 2,948,254.29 |
| 110258 | 2017-04-12 | WIRI | VBIO | -2,741 | sell stock | 4,835.06 | 2,869,017.08 |
| 110251 | 2017-04-11 | WIHI | VBIO | -5,000 | sell stock | 8,985.36 | 2,864,182.02 |
| 110218 | 2017-04-10 | REST | VBIO-R | 1,500,000 | receive stock | -100.00 | 2,855,196.66 |
| 110232 | 2017-04-10 | WIRI | VBIO | -25,000 | sell stock | 45,192.00 | 2,855,296.66 |
| 110205 | 2017-04-07 | WIHI | VBIO | -24,573 | sell stock | 43,739.36 | 2,810,104.66 |
| 110207 | 2017-04-06 | WIRI | VBIO | -3,269 | sell stock | 5,477.53 | 2,766,365.30 |
| 110177 | 2017-04-05 | WIHI | VBIO | -22,195 | sell stock | 38,510.68 | 2,760,887.77 |
| 110176 | 2017-04-05 | WIRI | VBIO | -30,100 | sell stock | 53,236.26 | 2,722,377.09 |
| 110136 | 2017-03-31 | WORK | | | custody fees | -5,882.94 | 2,669,140.83 |
| 110023 | 2017-03-31 | WBRI | | | Mobius TT | -61,623.00 | 2,675,023.77 |

A187

https://q.skyfall.app/trn.htm?aid=163

| 110046 | 2017-03-31 | WIHI | VBIO | -30,000 | sell stock | 55,121.81 | 2,736,646.77 |
| 110047 | 2017-03-31 | SIQU | | | rebalance VBIO | -300.00 | 2,681,524.96 |
| 110045 | 2017-03-31 | WIRI | VBIO | -12,300 | sell stock | 21,646.95 | 2,681,824.96 |
| 109777 | 2017-03-30 | WBMO | | | Dari International TT | -143,756.25 | 2,660,178.01 |
| 110020 | 2017-03-30 | WIHI | VBIO | -79,700 | sell stock | 140,945.71 | 2,803,934.26 |
| 110019 | 2017-03-30 | WIRI | VBIO | -34,649 | sell stock | 58,793.60 | 2,662,988.55 |
| 109789 | 2017-03-29 | BEAG | VBIO | 5,600 | buy stock | -8,700.31 | 2,604,194.95 |
| 109659 | 2017-03-20 | WBHI | | | World Wide TT | -30,811.50 | 2,612,895.26 |
| 109652 | 2017-03-16 | BEAG | VBIO | 13,860 | buy stock | -27,906.91 | 2,643,706.76 |
| 109600 | 2017-03-15 | WIRI | VBIO | -30,000 | sell stock | 50,825.28 | 2,671,613.67 |
| 109572 | 2017-03-13 | WIHI | VBIO | -4,023 | sell stock | 6,759.20 | 2,620,788.39 |
| 109569 | 2017-03-13 | WIRI | VBIO | -5,000 | sell stock | 8,646.72 | 2,614,029.19 |
| 109554 | 2017-03-10 | WIRI | VBIO | -50,000 | sell stock | 84,840.34 | 2,605,382.47 |
| 109499 | 2017-03-07 | WIHI | VBIO | -4,800 | sell stock | 8,147.33 | 2,520,542.13 |
| 109012 | 2017-03-06 | SIQU | VBIO | 350,081 | receive stock via DWAC | -1,100.00 | 2,512,394.80 |
| 109015 | 2017-03-06 | WIRI | VBIO | 231,309 | receive stock via DWAC | -1,100.00 | 2,513,494.80 |
| 109468 | 2017-03-06 | WIRI | VBIO | -38,250 | sell stock | 65,784.48 | 2,514,594.80 |
| 109348 | 2017-03-03 | WBHI | | | Vitality TT | -205,256.25 | 2,448,810.32 |
| 108963 | 2017-03-03 | WIHI | VBIO | 750,000 | receive stock via DWAC | -1,100.00 | 2,654,066.57 |
| 109448 | 2017-03-03 | WIHI | VBIO | -9,000 | sell stock | 15,182.48 | 2,655,166.57 |
| 109334 | 2017-03-02 | REST | | | directors fee | -200.00 | 2,639,984.09 |
| 109350 | 2017-03-02 | WIHI | VBIO | -96,410 | sell stock | 172,721.65 | 2,640,184.09 |
| 109366 | 2017-03-01 | BEAG | VBIO | 50,000 | buy stock | -90,176.84 | 2,467,462.44 |

page 1 of 2     NEXT>>>

12/15/2020, 11:19 AM

A188

**VBIO**                                                                  Settings ☑B☑H☑C  show filters  **525** record(s)  Refresh

| Balances as of 2020-12-15 | | Account Holdings as of 2020-12-15 | |
|---|---|---|---|
| USD | 1,858,702.72 | Stock: VBIO | 2,370,603 |
| CAD | -643,085.61 | Restricted: VBIO-R | 400,000 |
| CHF | 0.00 | | |
| EUR | 0.00 | | |
| GBP | 0.00 | | |

<< < PREVIOUS                              showing 401-525 of 525 record(s)

| bID | Date | Ban/Brk | Smbl | Units | Descriptor | USD | CAD | CHF | EUR | GBP | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 109329 | 2017-03-01 | WBMO | | | Pyronix Media TT | -256,506.25 | | | | | 1,858,702.72 |
| 109319 | 2017-03-01 | WIHI | VBIO | 47,000 | buy stock | -87,926.02 | | | | | 2,115,208.97 |
| 109197 | 2017-02-28 | BEAG | VBIO | 20,741 | buy stock | -41,885.04 | | | | | 2,203,134.99 |
| 109014 | 2017-02-27 | BESQ | | | Island Stock Transfer | -212.00 | | | | | 2,245,020.03 |
| 109013 | 2017-02-27 | REST | | | deliver stock: Fedex #778526297616 | -500.00 | | | | | 2,245,232.03 |
| 109013 | 2017-02-27 | REST | VBIO-R | -231,309 | deliver stock | -500.00 | | | | | 2,245,282.03 |
| 109011 | 2017-02-27 | BESQ | | | Island Stock Transfer | -212.00 | | | | | 2,245,782.03 |
| 109010 | 2017-02-27 | REST | | | deliver stock: Fedex #778526175115 | -50.00 | | | | | 2,245,994.03 |
| 109010 | 2017-02-27 | REST | VBIO-R | -350,081 | deliver stock | -400.00 | | | | | 2,246,044.03 |
| 109006 | 2017-02-24 | REST | VBIO-R | 581,390 | receive stock | -100.00 | | | | | 2,246,444.03 |
| 108969 | 2017-02-24 | BESQ | | | 1440pinion.com | -495.00 | | | | | 2,246,544.03 |
| 108968 | 2017-02-24 | BESQ | | | 1440pinion.com | -495.00 | | | | | 2,247,039.03 |
| 108880 | 2017-02-24 | SIQU | VBIO | 212,989 | receive stock via DWAC | -1,100.00 | | | | | 2,247,534.03 |
| 108881 | 2017-02-24 | WIHI | VBIO | 294,118 | receive stock via DWAC | -1,100.00 | | | | | 2,248,634.03 |
| 108962 | 2017-02-24 | BESQ | | | Island Stock Transfer | -212.00 | | | | | 2,249,734.03 |
| 108961 | 2017-02-24 | REST | | | deliver stock: Fedex #778506680792 | -50.00 | | | | | 2,249,946.03 |
| 108961 | 2017-02-24 | REST | VBIO-E | -750,000 | deliver stock | -300.00 | | | | | 2,249,996.03 |
| 109335 | 2017-02-23 | WBMO | | | Stevia First TT | -256,506.25 | | | | | 2,250,296.03 |
| 108957 | 2017-02-23 | BEAG | VBIO | -13,431 | sell stock | 28,908.38 | | | | | 2,506,802.28 |
| 108953 | 2017-02-23 | SIQU | VBIO | -4,412 | sell stock | 9,387.80 | | | | | 2,477,893.90 |
| 108906 | 2017-02-22 | REST | | | directors fee | -100.00 | | | | | 2,468,506.10 |
| 108994 | 2017-02-22 | BEAG | VBIO | -18,499 | sell stock | 40,401.33 | | | | | 2,468,606.10 |
| 108993 | 2017-02-22 | SIQU | VBIO | -58,546 | sell stock | 122,948.67 | | | | | 2,428,204.77 |
| 108903 | 2017-02-21 | SIQU | VBIO | -40,000 | sell stock | 78,781.80 | | | | | 2,305,256.10 |
| 108877 | 2017-02-20 | BESQ | | | Island Stock Transfer | -159.00 | | | | | 2,226,474.30 |
| 108876 | 2017-02-20 | BESQ | | | Island Stock Transfer | -212.00 | | | | | 2,226,633.30 |
| 108873 | 2017-02-20 | REST | VBIO-R | -294,118 | deliver stock | -400.00 | | | | | 2,226,845.30 |
| 108872 | 2017-02-20 | REST | | | deliver stock: Fedex #778471024280 | -50.00 | | | | | 2,227,245.30 |
| 108872 | 2017-02-20 | REST | VBIO-E | -212,989 | deliver stock | -400.00 | | | | | 2,227,295.30 |
| 108872 | 2017-02-20 | REST | | | deliver stock: Fedex #778471297112 | -50.00 | | | | | 2,227,695.30 |
| 108885 | 2017-02-17 | SIQU | VBIO | -15,000 | sell stock | 30,222.99 | | | | | 2,227,745.30 |
| 108843 | 2017-02-16 | SIQU | VBIO | -40,000 | sell stock | 80,435.77 | | | | | 2,197,522.31 |
| 108833 | 2017-02-15 | REST | VBIO-R | 1,300,000 | receive stock | -100.00 | | | | | 2,117,086.54 |
| 108846 | 2017-02-15 | SIQU | VBIO | -15,000 | sell stock | 29,810.40 | | | | | 2,117,186.54 |
| 108821 | 2017-02-14 | WISA | VBIO | -16,923 | sell stock | 35,131.19 | | | | | 2,087,376.14 |
| 108818 | 2017-02-14 | SIQU | VBIO | -5,254 | sell stock | 10,648.10 | | | | | 2,052,244.95 |
| 108798 | 2017-02-13 | WORK | | | director fee | -100.00 | | | | | 2,041,596.85 |
| 108796 | 2017-02-13 | REST | | | directors fee | -400.00 | | | | | 2,041,696.85 |
| 108774 | 2017-02-11 | WBHI | | | Stevia First TT | -256,506.25 | | | | | 2,042,096.85 |
| 108775 | 2017-02-11 | WBRI | | | VBIO TT | -154,006.25 | | | | | 2,298,603.10 |
| 108773 | 2017-02-10 | WORK | | | director fees | -100.00 | | | | | 2,452,609.35 |
| 108787 | 2017-02-10 | WISA | VBIO | -125,000 | sell stock | 261,902.97 | | | | | 2,452,809.35 |
| 108764 | 2017-02-10 | WORK | | | director fee | -100.00 | | | | | 2,190,906.38 |
| 108788 | 2017-02-09 | WISA | VBIO | -20,897 | sell stock | 41,789.77 | | | | | 2,191,006.38 |
| 107961 | 2017-02-07 | TENT | VBIO | 187,654 | receive stock via DWAC | -800.00 | | | | | 2,149,216.61 |
| 108744 | 2017-02-07 | SIQU | VBIO | -42,600 | sell stock | 86,823.54 | | | | | 2,150,016.61 |
| 108727 | 2017-02-06 | SIQU | VBIO | -27,500 | sell stock | 59,534.44 | | | | | 2,063,193.07 |
| 108722 | 2017-02-06 | WISA | VBIO | -50,000 | sell stock | 109,674.36 | | | | | 2,003,658.63 |
| 108172 | 2017-02-03 | WBMO | | | Mergerr TT | -1,893,984.27 | | | | | 1,893,984.27 |
| 108664 | 2017-02-03 | WISA | VBIO | -26,981 | sell stock | 58,234.99 | | | | | 2,150,490.52 |
| 108588 | 2017-02-02 | WBHI | | | Full Service Media TT | -51,352.50 | | | | | 2,092,255.53 |
| 108589 | 2017-02-02 | WBHI | | | World Wide Holdings TT | -41,082.00 | | | | | 2,143,608.03 |
| 108590 | 2017-02-02 | WBRI | | | Pyronix Media TT | -154,006.25 | | | | | 2,184,690.03 |
| 108608 | 2017-02-02 | REST | | | directors fee + fedex #778341908754 | -150.00 | | | | | 2,338,696.28 |
| 108637 | 2017-02-02 | WISA | VBIO | -30,000 | sell stock | 62,964.84 | | | | | 2,338,846.28 |
| 108634 | 2017-02-02 | SIMO | VBIO | -4,412 | sell stock | 9,082.22 | | | | | 2,275,881.44 |
| 108633 | 2017-02-02 | SIQU | VBIO | -10,588 | sell stock | 21,913.24 | | | | | 2,266,799.22 |
| 108603 | 2017-02-01 | BEAG | VBIO | -2,834 | sell stock | 5,931.25 | | | | | 2,244,885.98 |
| 108596 | 2017-02-01 | WISA | VBIO | -40,000 | sell stock | 82,782.11 | | | | | 2,238,954.73 |
| 108599 | 2017-01-31 | PESC | VBIO | 76,234 | buy stock | -176,146.92 | | | | | 2,156,172.62 |
| 108107 | 2017-01-31 | WISA | VBIO | 309,803 | receive stock via DWAC | -1,100.00 | | | | | 2,332,319.54 |
| 108190 | 2017-01-27 | REST | VBIO-E | 212,989 | receive stock | -100.00 | | | | | 2,333,419.54 |
| 108137 | 2017-01-26 | WBHI | | | VBIO TT | -308,115.00 | | | | | 2,333,519.54 |
| 108126 | 2017-01-26 | WORK | | | director fee | -100.00 | | | | | 2,641,634.54 |
| 108106 | 2017-01-25 | BESQ | | | Island Stock Transfer | -162.00 | | | | | 2,641,734.54 |
| 108105 | 2017-01-25 | REST | | | deliver stock: Fedex #778275572470 | -50.00 | | | | | 2,641,896.54 |
| 108105 | 2017-01-25 | REST | VBIO-E | -309,803 | deliver stock | -600.00 | | | | | 2,641,946.54 |
| 108100 | 2017-01-25 | BESQ | | | Booth Udall Fuller (morris) | -450.00 | | | | | 2,642,546.54 |
| 108099 | 2017-01-24 | REST | VBIO-R | 600,000 | receive stock | -100.00 | | | | | 2,642,996.54 |
| 108097 | 2017-01-24 | REST | VBIO-E | 1,053,557 | receive stock | -100.00 | | | | | 2,643,096.54 |
| 108077 | 2017-01-24 | SIQU | VBIO | -557 | sell stock | 798.27 | | | | | 2,643,196.54 |
| 108036 | 2017-01-23 | SIMO | VBIO | -10,000 | sell stock | 21,858.12 | | | | | 2,642,398.27 |
| 108035 | 2017-01-23 | SIQU | VBIO | -34,661 | sell stock | 75,880.78 | | | | | 2,620,540.15 |
| 107988 | 2017-01-20 | BESQ | | | 1440pinions.com (gotama #2) | -495.00 | | | | | 2,544,659.37 |
| 107966 | 2017-01-19 | BESQ | | | 1440pinions.com (quezon) | -695.00 | | | | | 2,545,154.37 |
| 107942 | 2017-01-19 | WBMO | | | Dari International TT | -143,756.25 | | | | | 2,545,849.37 |
| 107789 | 2017-01-18 | SIQU | VBIO | 294,118 | receive stock via DWAC | -1,100.00 | | | | | 2,689,605.62 |
| 107889 | 2017-01-17 | WORK | | | internal transfer | -159,100.00 | | | | | 2,690,705.62 |
| 107913 | 2017-01-17 | BEAG | VBIO | -10,000 | sell stock | 25,367.95 | | | | | 2,849,805.62 |
| 107909 | 2017-01-17 | SIMO | VBIO | -25,000 | sell stock | 62,781.31 | | | | | 2,824,437.67 |
| 107832 | 2017-01-13 | BESQ | | | 1440pinions.com (santos torres) | -695.00 | | | | | 2,761,656.36 |
| 107831 | 2017-01-13 | REST | VBIO-R | 600,000 | receive stock | -100.00 | | | | | 2,762,351.36 |
| 107862 | 2017-01-13 | BEAG | VBIO | -21,345 | sell stock | 59,174.10 | | | | | 2,762,451.36 |
| 107878 | 2017-01-13 | SIMO | VBIO | -76,940 | sell stock | 203,117.33 | | | | | 2,703,277.26 |
| 107809 | 2017-01-12 | WBMO | | | Stevia First TT | -256,506.25 | | | | | 2,500,159.93 |

A189

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 107827 | 2017-01-12 | BEAG | VBIO | -15,000 | sell stock | 40,165.42 | 2,756,666.18 |
| 107820 | 2017-01-12 | SIMO | VBIO | -81,033 | sell stock | 208,521.59 | 2,716,500.76 |
| 107791 | 2017-01-11 | WORK | | | director fee | -100.00 | 2,507,979.17 |
| 107788 | 2017-01-11 | BESQ | | | Island Stock Transfer | -212.00 | 2,508,079.17 |
| 107787 | 2017-01-11 | REST | VBIO-R | -294,118 | deliver stock | -400.00 | 2,508,291.17 |
| 107787 | 2017-01-11 | REST | | | deliver stock: Fedex #778153029377 | -50.00 | 2,508,691.17 |
| 107785 | 2017-01-11 | REST | | | directors fee | -500.00 | 2,508,741.17 |
| 107614 | 2017-01-11 | SIMO | VBIO | 294,118 | receive stock via DWAC | -1,100.00 | 2,509,241.17 |
| 107802 | 2017-01-11 | BEAG | VBIO | -65,000 | sell stock | 178,143.12 | 2,510,341.17 |
| 107794 | 2017-01-11 | SIMO | VBIO | -96,733 | sell stock | 256,064.78 | 2,332,198.05 |
| 107749 | 2017-01-10 | WORK | | | director fees | -500.00 | 2,076,133.27 |
| 107743 | 2017-01-10 | BESQ | | | 1440pinions.com (trius) | -695.00 | 2,076,633.27 |
| 107751 | 2017-01-10 | BOCO | | | VBIO TT | -102,787.92 | 2,077,328.27 |
| 107724 | 2017-01-09 | WBQU | | | Merger TT | -102,705.00 | 2,180,116.19 |
| 107712 | 2017-01-09 | REST | | | directors fee + fedex #778128095930 | -250.00 | 2,282,821.19 |
| 107733 | 2017-01-09 | WIRI | VBIO | -86,660 | sell stock | 232,637.43 | 2,283,071.19 |
| 107742 | 2017-01-06 | BESQ | | | Booth Udall Fuller | -450.00 | 2,050,433.76 |
| 107710 | 2017-01-06 | WIRI | VBIO | -91,000 | sell stock | 221,230.09 | 2,050,883.76 |
| 107662 | 2017-01-05 | WIRI | VBIO | -100,000 | sell stock | 212,306.44 | 1,829,653.67 |
| 107653 | 2017-01-05 | WBQU | | | Full Service Media TT | -123,246.00 | 1,617,347.23 |
| 107639 | 2017-01-05 | BEAG | VBIO | 758,169 | receive stock via DRS | -600.00 | 1,740,593.23 |
| 107646 | 2017-01-05 | BESQ | | | 1440pinions.com (hampton) | -695.00 | 1,741,193.23 |
| 107651 | 2017-01-05 | WBMO | | | Mobius Biotechology TT | -102,705.00 | 1,741,888.23 |
| 107652 | 2017-01-05 | WBMO | | | Dari International TT | -143,756.25 | 1,844,593.23 |
| 107612 | 2017-01-04 | BESQ | | | deliver stock: Fedex #778097801350 | -240.00 | 1,988,349.48 |
| 107612 | 2017-01-04 | REST | | | | -100.00 | 1,988,589.48 |
| 107612 | 2017-01-04 | REST | VBIO-R | -294,118 | deliver stock | -400.00 | 1,988,689.48 |
| 107633 | 2017-01-04 | WIRI | VBIO | -37,330 | sell stock | 95,953.80 | 1,989,089.48 |
| 107597 | 2017-01-03 | BESQ | | | Booth Udall Fuller | -450.00 | 1,893,135.68 |
| 107086 | 2017-01-03 | WIRI | VBIO | 500,000 | receive stock via DWAC | -1,100.00 | 1,893,585.68 |
| 107594 | 2017-01-03 | REST | | | directors fee | -200.00 | 1,894,685.68 |
| 107596 | 2017-01-03 | BESQ | | | 1440pinions.com (gotama) | -695.00 | 1,894,885.68 |
| 107601 | 2017-01-03 | WIRI | VBIO | -135,010 | sell stock | 373,003.05 | 1,895,580.68 |
| 113164 | 2016-12-31 | WORK | | | opening balance | 2,221,514.19 | 1,522,577.63 |
| 114239 | 2016-12-31 | STEL | VBIO | -52,000 | opening balance | 0.00 | -698,936.56 |
| 113810 | 2016-12-31 | REST | VBIO-R | 2,070,590 | opening balance | 0.00 | -698,936.56 |
| 114216 | 2016-12-31 | SGPE | VBIO | 22,000 | opening balance | 0.00 | -698,936.56 |
| 113809 | 2016-12-31 | REST | VBIO-E | 6,246 | opening balance | 0.00 | -698,936.56 |
| 114862 | 2016-12-31 | WIRI | VBIO | -50,000 | opening balance | 0.00 | -698,936.56 |
| 113978 | 2016-12-31 | VERL | VBIO | 30,000 | opening balance | 0.00 | -698,936.56 |

<<< PREVIOUS                                        page 2 of 2

A190

Q - Bank/Broker: WORK    https://q.skyfall.app/trn.htm

Donovan Declaration Exhibit

**F**

SEC v Sharp, et al

| ID | Date | Code | Description | | | | Amount |
|---|---|---|---|---|---|---|---|
| 119499 | 2018-02-27 | MEND | interest charge | | 0.00 | 0.00 | -92.40 |
| 119495 | 2018-02-27 | LOTU | interest charge | | | 0.00 | -4.39 |
| 119490 | 2018-02-27 | BOND | interest charge: DIGA | 0.00 | | 0.00 | 2.31 |
| 119486 | 2018-02-27 | BOND | interest charge: BENE | 0.00 | | 0.00 | 95.35 |
| 119521 | 2018-02-27 | BOND | interest charge: WIND | 0.00 | 0.00 | 0.00 | 10,603.04 |
| 119343 | 2018-02-27 | AHAD | internal transfer CRUMBLE HOUSE | 0.00 | | 0.00 | -12,100.00 |
| 119343 | 2018-02-27 | SUSS | internal transfer CRUMBLE HOUSE | 0.00 | | 0.00 | 12,000.00 |
| 119342 | 2018-02-27 | AHAD | internal transfer OFFICE EQUIP | 0.00 | | 0.00 | -54,600.00 |
| 119342 | 2018-02-27 | SUSS | internal transfer OFFICE EQUIP | 0.00 | | 0.00 | 54,500.00 |
| 119341 | 2018-02-27 | AHAD | internal transfer Headsets | 0.00 | | 0.00 | -3,100.00 |
| 119341 | 2018-02-27 | SUSS | internal transfer Headsets | 0.00 | | 0.00 | 3,000.00 |
| 119318 | 2018-02-26 | SUSS | internal transfer CASH / RM | 0.00 | | 0.00 | 60,000.00 |
| 119318 | 2018-02-26 | AHAD | internal transfer CASH / RM | 0.00 | | 0.00 | -60,100.00 |
| 119317 | 2018-02-26 | SUSS | internal transfer TIME | 0.00 | | 0.00 | 54,000.00 |
| 119317 | 2018-02-26 | AHAD | internal transfer TIME | 0.00 | | 0.00 | -54,100.00 |
| 119303 | 2018-02-25 | UMFG | internal transfer TIME | 0.00 | | 0.00 | -20,100.00 |
| 119303 | 2018-02-25 | SUSS | internal transfer TIME | 0.00 | | 0.00 | 20,000.00 |
| 119301 | 2018-02-25 | AHAD | internal transfer MORFF / FEE | 0.00 | | 0.00 | -10,400.00 |
| 119301 | 2018-02-25 | SUSS | internal transfer MORFF / FEE | 0.00 | | 0.00 | 10,300.00 |
| 119300 | 2018-02-25 | SUSS | internal transfer MORFF / MARCH COSTS | 0.00 | | 0.00 | 6,180.00 |
| 119300 | 2018-02-25 | AHAD | internal transfer MORFF / MARCH COSTS | 0.00 | | 0.00 | -6,280.00 |
| 119299 | 2018-02-25 | SUSS | internal transfer NEWS | 0.00 | | 0.00 | 10,300.00 |
| 119299 | 2018-02-25 | AHAD | internal transfer NEWS | 0.00 | | 0.00 | -10,400.00 |
| 119298 | 2018-02-25 | SUSS | internal transfer WOLF / MONTHLY | 0.00 | | 0.00 | 29,870.00 |
| 119298 | 2018-02-25 | OLMM | internal transfer WOLF / MONTHLY | 0.00 | | 0.00 | -29,970.00 |
| 119297 | 2018-02-25 | OLMM | internal transfer MORFF / FEB COSTS | 0.00 | | 0.00 | -6,280.00 |
| 119297 | 2018-02-25 | SUSS | internal transfer MORFF / FEB COSTS | 0.00 | | 0.00 | 6,180.00 |
| 119296 | 2018-02-25 | OLMM | internal transfer MORFF / MONTHLY | 0.00 | | 0.00 | -27,850.00 |
| 119296 | 2018-02-25 | SUSS | internal transfer MORFF / MONTHLY | 0.00 | | 0.00 | 27,750.00 |
| 119295 | 2018-02-25 | AHAD | internal transfer OFFICE | 0.00 | | 0.00 | -20,100.00 |
| 119295 | 2018-02-25 | SUSS | internal transfer OFFICE | 0.00 | | 0.00 | 20,000.00 |
| 119302 | 2018-02-25 | SUSS | internal transfer NEWS | 0.00 | | 0.00 | 10,300.00 |
| 119302 | 2018-02-25 | OLMM | internal transfer NEWS | 0.00 | | 0.00 | -10,400.00 |
| 119292 | 2018-02-23 | UMFG | internal transfer MAGIC | 0.00 | | 0.00 | 154,006.25 |
| 119292 | 2018-02-23 | AHAD | internal transfer MAGIC | 0.00 | | 0.00 | -154,106.25 |
| 119289 | 2018-02-22 | BOND | deliver stock: Fedex #771559796080 | 0.00 | | 0.00 | 0.00 |
| 119280 | 2018-02-22 | ROAD | USD1k cash close ROAD | 0.00 | | 0.00 | -986.22 |
| 119280 | 2018-02-22 | BOND | USD1k cash close ROAD | 0.00 | | 0.00 | 986.22 |
| 119279 | 2018-02-22 | LNB | director fee | 0.00 | | 0.00 | -100.00 |
| 119275 | 2018-02-22 | BOND | PV trip MXN13,150@18 | 0.00 | | 0.00 | 731.00 |
| 119275 | 2018-02-22 | ROAD | PV trip MXN13,150@18 | 0.00 | | 0.00 | -731.00 |
| 119274 | 2018-02-22 | DIGA | director fees | 0.00 | | 0.00 | -400.00 |
| 119255 | 2018-02-21 | VIST | Kevin Laird TT to PQ | 0.00 | | 0.00 | 1,050.00 |
| 119255 | 2018-02-21 | SUSS | Kevin Laird TT to PQ | 0.00 | | 0.00 | -1,050.00 |
| 119239 | 2018-02-20 | BOND | deliver stock per Fire: Fedex #771527096123 | 0.00 | | 0.00 | 0.00 |
| 119237 | 2018-02-20 | SUSS | Deposit to PQ | 0.00 | | 0.00 | -2,000.00 |
| 119237 | 2018-02-20 | VIST | Deposit to PQ | 0.00 | | 0.00 | 2,000.00 |
| 119222 | 2018-02-16 | MINE | director fees | 0.00 | 0.00 | 0.00 | -250.00 |
| 119205 | 2018-02-15 | SUSS | Deposit to PQ | 0.00 | | 0.00 | -650.00 |
| 119205 | 2018-02-15 | VIST | Deposit to PQ | 0.00 | | 0.00 | 650.00 |
| 119204 | 2018-02-15 | SUSS | internal transfer ELMAN | 0.00 | | 0.00 | 3,280.00 |
| 119204 | 2018-02-15 | AHAD | internal transfer ELMAN | 0.00 | | 0.00 | -3,380.00 |
| 119198 | 2018-02-15 | SUSS | internal transfer PR 1 | 0.00 | | 0.00 | 400.00 |
| 119198 | 2018-02-15 | AHAD | internal transfer PR 1 | 0.00 | | 0.00 | -500.00 |
| 119196 | 2018-02-15 | AHAD | internal transfer ZERO OUT | 0.00 | | 0.00 | -177,100.00 |
| 119196 | 2018-02-15 | SUSS | internal transfer ZERO OUT | 0.00 | | 0.00 | 177,000.00 |
| 119167 | 2018-02-15 | VXBT | director fee | 0.00 | | 0.00 | -100.00 |
| 119166 | 2018-02-15 | REME | internal transfer | 0.00 | | 0.00 | -15,100.00 |
| 119166 | 2018-02-15 | EVER | internal transfer | 0.00 | | 0.00 | 15,000.00 |
| 119158 | 2018-02-13 | SUSS | Geoff Teehan TT to PQ | 0.00 | | 0.00 | -3,700.00 |
| 119158 | 2018-02-13 | VIST | Geoff Teehan TT to PQ | 0.00 | | 0.00 | 3,700.00 |
| 119206 | 2018-02-13 | SUSS | Deposit to PQ | 0.00 | | 0.00 | -732.00 |
| 119206 | 2018-02-13 | VIST | Deposit to PQ | 0.00 | | 0.00 | 732.00 |
| 119157 | 2018-02-13 | OLMM | internal transfer | 0.00 | | 0.00 | -25,850.00 |
| 119157 | 2018-02-13 | ASHT | internal transfer | 0.00 | | 0.00 | 25,750.00 |
| 119139 | 2018-02-12 | AHAD | internal transfer MTUU | 0.00 | | 0.00 | -500,100.00 |
| 119139 | 2018-02-12 | PEGA | internal transfer MTUU | 0.00 | | 0.00 | 500,000.00 |
| 120523 | 2018-02-12 | AHAD | Directors fees | 0.00 | | 0.00 | 3,000.00 |
| 120523 | 2018-02-12 | SANT | Directors fees | 0.00 | | 0.00 | 5,000.00 |
| 119127 | 2018-02-08 | VBJO | internal transfer | 0.00 | | 0.00 | -120,100.00 |
| 119127 | 2018-02-08 | GARD | internal transfer | 0.00 | | 0.00 | 120,000.00 |
| 119126 | 2018-02-08 | VBJO | internal transfer | 0.00 | | 0.00 | -340,100.00 |
| 119126 | 2018-02-08 | ACCO | internal transfer | 0.00 | | 0.00 | 340,000.00 |
| 119125 | 2018-02-08 | HEAR | internal transfer | 0.00 | | 0.00 | 340,000.00 |
| 119125 | 2018-02-08 | VBJO | internal transfer | 0.00 | | 0.00 | -340,100.00 |
| 119059 | 2018-02-08 | ROAD | MXN12,600 cash@18 | 0.00 | | 0.00 | -700.00 |
| 119059 | 2018-02-08 | BOND | MXN12,600 cash@18 | 0.00 | | 0.00 | 700.00 |
| 119128 | 2018-02-08 | VBJO | internal transfer | 0.00 | | 0.00 | -400,100.00 |
| 119128 | 2018-02-08 | ARTH | internal transfer | 0.00 | | 0.00 | 400,000.00 |
| 119085 | 2018-02-05 | SUSS | David Cervantes TT to PQ | 0.00 | | 0.00 | -800.00 |
| 119085 | 2018-02-05 | VIST | David Cervantes TT to PQ | 0.00 | | 0.00 | 800.00 |
| 119084 | 2018-02-05 | SUSS | David Cervantes TT to PQ | 0.00 | | 0.00 | -100.00 |
| 119084 | 2018-02-05 | VIST | David Cervantes TT to PQ | 0.00 | | 0.00 | 100.00 |
| 119050 | 2018-02-01 | BOND | deliver stock: Fedex #772165994459 | 0.00 | 0.00 | 0.00 | 0.00 |
| 119042 | 2018-02-01 | SUSS | director fees | 0.00 | | 0.00 | -2,000.00 |
| 119033 | 2018-01-31 | UMFG | internal transfer Jan 2018 / Leads | 0.00 | | 0.00 | -500,100.00 |
| 119033 | 2018-01-31 | REME | internal transfer Jan 2018 / Leads | 0.00 | | 0.00 | 500,000.00 |
| 118994 | 2018-01-31 | FUND | forex adjust | 0.00 | | 0.00 | 20,725.19 |
| 118994 | 2018-01-31 | FUND | forex adjust | | 0.00 | 0.00 | -10,511.57 |
| 118993 | 2018-01-31 | EGRE | forex | 0.00 | | 0.00 | 314.31 |
| 118993 | 2018-01-31 | EGRE | forex | | 0.00 | 0.00 | -389.75 |
| 118992 | 2018-01-31 | ESQ | forex | | ESQ | 0.00 | 17,080.00 |
| 118992 | 2018-01-31 | ESQ | forex | 0.00 | | 0.00 | -14,000.00 |
| 118991 | 2018-01-31 | SANT | forex | 0.00 | | 0.00 | 3,322.88 |
| 118991 | 2018-01-31 | SANT | forex | | 0.00 | 0.00 | -4,120.37 |
| 118990 | 2018-01-31 | VARE | forex | | 0.00 | 0.00 | 2,203.23 |
| 118990 | 2018-01-31 | VARE | forex | 0.00 | | 0.00 | -1,803.47 |
| 118989 | 2018-01-31 | BOND | forex | | | 0.00 | 0.00 | -225.45 |
| 118989 | 2018-01-31 | BOND | forex | | 0.00 | 0.00 | 315.63 |
| 118988 | 2018-01-31 | WINT | forex | 0.00 | | 0.00 | 315.63 |
| 118988 | 2018-01-31 | WINT | forex | | | 0.00 | 0.00 | -225.45 |
| 118987 | 2018-01-31 | SANT | forex | | | 0.00 | 0.00 | -225.45 |
| 118987 | 2018-01-31 | SANT | forex | 0.00 | | 0.00 | 315.63 |
| 118986 | 2018-01-31 | FUND | forex | 0.00 | | 0.00 | 631.26 |
| 118986 | 2018-01-31 | FUND | forex | | | 0.00 | 0.00 | -450.90 |
| 118985 | 2018-01-31 | PERE | Commission | | 0.00 | 0.00 | 2,674.00 |

12/17/2020, 2:54 PM

A191

| ID | Date | Code | Sub | Qty | Description | Col1 | Col2 | Col3 | Col4 | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 112734 | 2017-07-31 | ORRP | | | interest charge | 0.00 | | | 0.00 | -2,575.44 |
| 112736 | 2017-07-31 | BOND | | | interest charge: PEGA | 0.00 | | | 0.00 | 2,605.00 |
| 112741 | 2017-07-31 | BOND | | | interest charge: SRUP | 0.00 | | | 0.00 | -6.54 |
| 112746 | 2017-07-31 | BOND | | | interest charge: WATE | | 0.00 | | 0.00 | 3,953.40 |
| 112718 | 2017-07-31 | BOND | | | interest charge: ENVV | 0.00 | | | 0.00 | 25.25 |
| 112723 | 2017-07-31 | BOND | | | interest charge: LION | 0.00 | | | 0.00 | 403.57 |
| 112728 | 2017-07-31 | BOND | | | interest charge: MMNT | 0.00 | | | 0.00 | 3.39 |
| 112732 | 2017-07-31 | BOND | | | interest payment: OME1 | 0.00 | | | 0.00 | -120.41 |
| 112740 | 2017-07-31 | SOLE | | | interest charge | 0.00 | | | 0.00 | -5,353.46 |
| 112717 | 2017-07-31 | WATE | | | interest charge | 0.00 | | | 0.00 | -261.31 |
| 112717 | 2017-07-31 | CMXC | | | interest charge | 0.00 | | | 0.00 | -3,420.96 |
| 112721 | 2017-07-31 | STVA | | | interest charge | 0.00 | | | 0.00 | -708.38 |
| 112727 | 2017-07-31 | MEND | | | interest charge | 0.00 | | | 0.00 | -741.31 |
| 112731 | 2017-07-31 | OLMM | | | interest charge | 0.00 | | | 0.00 | -207.63 |
| 112735 | 2017-07-31 | PLYN | | | interest charge | 0.00 | | | 0.00 | -87.33 |
| 112738 | 2017-07-31 | BOND | | | interest charge: REQU | 0.00 | | | 0.00 | 4.14 |
| 112743 | 2017-07-31 | BOND | | | interest charge: UNEQ | 0.00 | | | 0.00 | 78.20 |
| 112747 | 2017-07-31 | BOND | | | interest charge: WIND | | 0.00 | | 0.00 | 11,052.35 |
| 112719 | 2017-07-31 | BOND | | | interest charge: ARSN | 0.00 | | | 0.00 | 329.22 |
| 112519 | 2017-07-31 | BOND | | | interest payment: ESQ1 | 0.00 | | | 0.00 | -495.27 |
| 112725 | 2017-07-31 | BOND | | | interest charge: MARA | | 0.00 | | 0.00 | 394.25 |
| 112729 | 2017-07-31 | BOND | | | interest charge: MTUU | 0.00 | | | 0.00 | 88.14 |
| 112733 | 2017-07-31 | BOND | | | interest charge: OMGB | 0.00 | | | 0.00 | 116.66 |
| 112741 | 2017-07-31 | SRUP | | | interest charge | 0.00 | | | 0.00 | -6.54 |
| 112746 | 2017-07-31 | WATE | | | interest charge | 0.00 | | | 0.00 | -3,953.40 |
| 112718 | 2017-07-31 | BLGI | | | interest charge | 0.00 | | | 0.00 | -25.25 |
| 112723 | 2017-07-31 | LION | | | interest charge | 0.00 | | | 0.00 | -403.57 |
| 112728 | 2017-07-31 | MMNT | | | interest charge | 0.00 | | | 0.00 | -3.39 |
| 112732 | 2017-07-31 | OME1 | | | interest payment | 0.00 | | | 0.00 | 120.41 |
| 112736 | 2017-07-31 | PEGA | | | MT Maintenance | 0.00 | | | 0.00 | -2,605.00 |
| 112519 | 2017-07-31 | GOTA | | | MT Maintenance | 0.00 | | | 0.00 | 3,500.00 |
| 112519 | 2017-07-31 | BOND | | | MT Maintenance | 0.00 | | | 0.00 | -3,500.00 |
| 15167 | 2017-07-31 | ASHT | | | internal transfer | 0.00 | | | 0.00 | -15,000.00 |
| 15167 | 2017-07-31 | NSUB | | | internal transfer | | | | 0.00 | 15,000.00 |
| 112709 | 2017-07-31 | SANT | | | Santana loan $386 interest @ 12% | | | | 0.00 | 0.00 |
| 112791 | 2017-07-31 | BOND | | | forex | | 0.00 | | 0.00 | 680,307.90 |
| 112791 | 2017-07-31 | BOND | | | forex | 0.00 | | | 0.00 | -553,095.85 |
| 112710 | 2017-07-31 | BOND | | | Santana loan payment bal $18,219 | | | | 0.00 | 20,000.00 |
| 112710 | 2017-07-31 | SANT | | | Santana loan payment bal $18,219 | | | | 0.00 | -20,000.00 |
| 112708 | 2017-07-31 | SANT | | | forex | | 0.00 | | 0.00 | -473.87 |
| 112707 | 2017-07-31 | RIVE | | | forex | 0.00 | | | 0.00 | 379.10 |
| 112707 | 2017-07-31 | RIVE | | | forex | | 0.00 | | 0.00 | 318.08 |
| 112707 | 2017-07-31 | OME1 | | | forex | | 0.00 | | 0.00 | -397.60 |
| 112706 | 2017-07-31 | OME1 | | | forex | 0.00 | | | 0.00 | 750.00 |
| 112705 | 2017-07-31 | BLSA | | | internal transfer ORRP | 0.00 | | | 0.00 | -60,000.00 |
| 112705 | 2017-07-31 | ORRP | | | internal transfer ORRP | 0.00 | | | 0.00 | 60,000.00 |
| 112704 | 2017-07-31 | BOND | | | Commission | | 0.00 | | 0.00 | -3,645.00 |
| 112704 | 2017-07-31 | PERE | | | Commission | | | | 0.00 | 3,645.00 |
| 112703 | 2017-07-31 | PERE | | | Commission | 0.00 | | | 0.00 | 9,983.00 |
| 112703 | 2017-07-31 | BOND | | | Commission | 0.00 | | | 0.00 | -9,983.00 |
| 112698 | 2017-07-31 | RETC | | | director fee | 0.00 | | | 0.00 | -100.00 |
| 111990 | 2017-07-31 | EGRE | | | forex | 0.00 | | | 0.00 | 5,484.02 |
| 111990 | 2017-07-31 | EGRE | | | forex | | 0.00 | | 0.00 | -6,909.87 |
| 112696 | 2017-07-31 | BLSA | | | forex | 0.00 | | | 0.00 | 12,149.17 |
| 112696 | 2017-07-31 | BLSA | | | forex | | 0.00 | | 0.00 | -15,307.96 |
| 112695 | 2017-07-31 | TRJU | | | forex | 0.00 | | | 0.00 | 2,610.16 |
| 112695 | 2017-07-31 | TRJU | | | forex | | 0.00 | | 0.00 | -3,288.80 |
| 112694 | 2017-07-31 | VARE | | | forex | | 0.00 | | 0.00 | 37,489.95 |
| 112694 | 2017-07-31 | VARE | | | forex | 0.00 | | | 0.00 | -29,991.96 |
| 112693 | 2017-07-31 | FUND | | | forex | | | 0.00 | 0.00 | -200.00 |
| 112693 | 2017-07-31 | FUND | | | forex | 0.00 | | | 0.00 | 290.25 |
| 112692 | 2017-07-31 | SANT | | | forex | 0.00 | | | 0.00 | 290.25 |
| 112691 | 2017-07-31 | SANT | | | forex | | | | 0.00 | -225.00 |
| 112691 | 2017-07-31 | BOND | | | forex | 0.00 | | | 0.00 | 290.25 |
| 112691 | 2017-07-31 | BOND | | | forex | | | | 0.00 | -225.00 |
| 112874 | 2017-07-31 | SRGZ | | | internal transfer close SRGZ | 0.00 | | | 0.00 | -377.38 |
| 112874 | 2017-07-31 | FUND | | | internal transfer close SRGZ | 0.00 | | | 0.00 | 377.38 |
| 112690 | 2017-07-31 | WINT | | | forex | 0.00 | | | 0.00 | 290.25 |
| 112690 | 2017-07-31 | WINT | | | forex | | | | 0.00 | -225.00 |
| 112689 | 2017-07-31 | FUND | | | forex | | | | 0.00 | -450.00 |
| 112689 | 2017-07-31 | FUND | | | forex | 0.00 | | | 0.00 | 580.50 |
| 112759 | 2017-07-31 | BOND | | | VR4 maid 8 days MXN2,769@18 | 0.00 | | | 0.00 | 153.83 |
| 112759 | 2017-07-31 | VIST | | | VR4 maid 8 days MXN2,769@18 | | | | 0.00 | -153.83 |
| 112687 | 2017-07-31 | BOND | | | internal transfer | 0.00 | | | 0.00 | 200.00 |
| 112686 | 2017-07-31 | BOND | | | commission withdrawal | 0.00 | | | 0.00 | 8,700.00 |
| 112520 | 2017-07-28 | VIST | | | Amy Schofield TT to PQ | 0.00 | | | 0.00 | 1,524.00 |
| 112520 | 2017-07-28 | SUSS | | | Amy Schofield TT to PQ | 0.00 | | | 0.00 | -1,524.00 |
| 112490 | 2017-07-27 | STOC | | | internal transfer close STO1 | 0.00 | | | 0.00 | -108,371.24 |
| 112490 | 2017-07-27 | STO1 | | | internal transfer close STO1 | | 0.00 | | 0.00 | 108,371.24 |
| 112489 | 2017-07-27 | STOC | | | internal transfer close STO1 | 0.00 | | | 0.00 | 626,680.64 |
| 112489 | 2017-07-27 | STO1 | | | internal transfer close STO1 | 0.00 | | | 0.00 | -626,680.64 |
| 112500 | 2017-07-27 | VIST | | | VR4 maintenance Q3 MXN11,750@18 | 0.00 | | | 0.00 | -652.77 |
| 112500 | 2017-07-27 | BOND | | | VR4 maintenance Q3 MXN11,750@18 | 0.00 | | | 0.00 | 652.77 |
| 112492 | 2017-07-27 | STOC | L-OILC | 315,131 | internal transfer close STO1 | 0.00 | | | 0.00 | 0.00 |
| 112492 | 2017-07-27 | STO1 | L-OILC | -315,131 | internal transfer close STO1 | 0.00 | | | 0.00 | 0.00 |
| 112491 | 2017-07-27 | STOC | CBA | 137,500 | internal transfer close STO1 | 0.00 | | | 0.00 | 0.00 |
| 112491 | 2017-07-27 | STO1 | CBA | -137,500 | internal transfer close STO1 | 0.00 | | | 0.00 | 0.00 |
| 112484 | 2017-07-27 | SUSS | | | airfare YVR-GVA June 2017 | 0.00 | | | 0.00 | 4,393.66 |
| 112484 | 2017-07-27 | BOND | | | airfare YVR-GVA June 2017 | 0.00 | | | 0.00 | -4,393.66 |
| 112483 | 2017-07-27 | SUSS | | | internal transfer RING/COST | 0.00 | | | 0.00 | 7,300.00 |
| 112483 | 2017-07-27 | RETC | | | internal transfer RING/COST | 0.00 | | | 0.00 | -7,400.00 |
| 112448 | 2017-07-26 | PEBL | | | director fees | 0.00 | | | 0.00 | -1,000.00 |
| 112447 | 2017-07-26 | EVER | | | internal transfer | 0.00 | | | 0.00 | 45,000.00 |
| 112447 | 2017-07-26 | REME | | | internal transfer | 0.00 | | | 0.00 | -45,000.00 |
| 112497 | 2017-07-26 | PEBL | | | forex | 0.00 | | | 0.00 | 1,000.00 |
| 112497 | 2017-07-26 | PEBL | | | forex | | 0.00 | | 0.00 | -1,260.00 |
| 112495 | 2017-07-26 | INDE | | | forex | 0.00 | | | 0.00 | 5,235.25 |
| 112495 | 2017-07-26 | INDE | | | forex | 0.00 | | | 0.00 | -6,596.42 |
| 112317 | 2017-07-26 | INDE | | | director fee | 0.00 | | | 0.00 | -100.00 |
| 112496 | 2017-07-26 | ORCH | | | forex | 0.00 | | | 0.00 | 3,979.00 |
| 112496 | 2017-07-26 | ORCH | | | forex | | 0.00 | | 0.00 | -5,053.33 |
| 112428 | 2017-07-25 | PINA | | | director fee | 0.00 | | | 0.00 | -100.00 |
| 112427 | 2017-07-25 | OLMM | | | director fee | 0.00 | | | 0.00 | -100.00 |
| 112424 | 2017-07-25 | VB3O | | | internal transfer | 0.00 | | | 0.00 | -36,100.00 |
| 112424 | 2017-07-25 | GARD | | | internal transfer | 0.00 | | | 0.00 | 36,000.00 |

A192

| ID | Date | Code | Description | | | |
|---|---|---|---|---|---|---|
| 112423 | 2017-07-25 | ACCO | internal transfer | 0.00 | 0.00 | 102,000.00 |
| 112423 | 2017-07-25 | VBIO | internal transfer | 0.00 | 0.00 | -102,100.00 |
| 112422 | 2017-07-25 | HEAR | internal transfer | 0.00 | 0.00 | 102,000.00 |
| 112422 | 2017-07-25 | VBIO | internal transfer | 0.00 | 0.00 | -102,100.00 |
| 112421 | 2017-07-25 | VBIO | internal transfer | 0.00 | 0.00 | -120,100.00 |
| 112421 | 2017-07-25 | ARTH | internal transfer | 0.00 | 0.00 | 120,000.00 |
| 112419 | 2017-07-25 | LOTU | director fee | | 0.00 | -100.00 |
| 112305 | 2017-07-25 | LBY | forex | 0.00 | 0.00 | 343,085.84 |
| 112305 | 2017-07-25 | LBY | forex | | 0.00 | -435,719.01 |
| 112404 | 2017-07-25 | ASHT | internal transfer CORP | 0.00 | 0.00 | 250,000.00 |
| 112404 | 2017-07-25 | RETC | internal transfer CORP | 0.00 | 0.00 | -250,100.00 |
| 112403 | 2017-07-25 | RETC | internal transfer COMM | 0.00 | 0.00 | -300,100.00 |
| 112403 | 2017-07-25 | SUSS | internal transfer COMM | 0.00 | 0.00 | 300,000.00 |
| 112402 | 2017-07-25 | SUSS | internal transfer FIRE | 0.00 | 0.00 | 450,000.00 |
| 112402 | 2017-07-25 | RETC | internal transfer FIRE | 0.00 | 0.00 | -450,100.00 |
| 112401 | 2017-07-25 | REME | internal transfer ACE | 0.00 | 0.00 | 300,000.00 |
| 112401 | 2017-07-25 | RETC | internal transfer ACE | 0.00 | 0.00 | -300,100.00 |
| 112400 | 2017-07-25 | RETC | internal transfer SHREDS | 0.00 | 0.00 | -250,100.00 |
| 112400 | 2017-07-25 | SUSS | internal transfer SHREDS | 0.00 | 0.00 | 250,000.00 |
| 112399 | 2017-07-25 | RETC | internal transfer COL | 0.00 | 0.00 | -250,100.00 |
| 112399 | 2017-07-25 | SUSS | internal transfer COL | 0.00 | 0.00 | 250,000.00 |
| 112398 | 2017-07-25 | SUSS | internal transfer FIRE | 0.00 | 0.00 | 585,000.00 |
| 112398 | 2017-07-25 | SLDC | internal transfer FIRE | 0.00 | 0.00 | -585,100.00 |
| 112397 | 2017-07-25 | SUSS | internal transfer COL | 0.00 | 0.00 | 585,000.00 |
| 112397 | 2017-07-25 | SLDC | internal transfer COL | 0.00 | 0.00 | -585,100.00 |
| 112396 | 2017-07-25 | SLDC | internal transfer SHREDS | 0.00 | 0.00 | -585,100.00 |
| 112396 | 2017-07-25 | SUSS | internal transfer SHREDS | 0.00 | 0.00 | 585,000.00 |
| 112395 | 2017-07-25 | SLDC | internal transfer COMM | 0.00 | 0.00 | -300,100.00 |
| 112395 | 2017-07-25 | SUSS | internal transfer COMM | 0.00 | 0.00 | 300,000.00 |
| 112394 | 2017-07-25 | SUSS | internal transfer TR/Costs | 0.00 | 0.00 | 171,890.94 |
| 112394 | 2017-07-25 | SLDC | internal transfer TR/Costs | 0.00 | 0.00 | -171,990.94 |
| 112393 | 2017-07-25 | SUSS | internal transfer COSTS | 0.00 | 0.00 | 323,420.00 |
| 112393 | 2017-07-25 | SLDC | internal transfer COSTS | 0.00 | 0.00 | -323,520.00 |
| 112390 | 2017-07-24 | SUSS | VSR TT to PQ SUMM | 0.00 | 0.00 | -61,400.00 |
| 112390 | 2017-07-24 | SUMM | VSR TT to PQ SUMM | 0.00 | 0.00 | 61,400.00 |
| 112375 | 2017-07-24 | OLMM | director fee | | 0.00 | -100.00 |
| 112758 | 2017-07-22 | VIST | VR4 telephone MXN950@18 | 0.00 | 0.00 | -52.78 |
| 112758 | 2017-07-22 | BOND | VR4 telephone MXN950@18 | 0.00 | 0.00 | 52.78 |
| 112325 | 2017-07-21 | BOND | deliver stock: Fedex #779706367075 | 0.00 | 0.00 | 0.00 |
| 112322 | 2017-07-21 | BOND | deliver stock: Fedex #779706358986 | 0.00 | 0.00 | 0.00 |
| 112321 | 2017-07-21 | REME | internal transfer SPLIT/AD | 0.00 | 0.00 | 150,000.00 |
| 112321 | 2017-07-21 | RETC | internal transfer SPLIT/AD | 0.00 | 0.00 | -150,100.00 |
| 115157 | 2017-07-20 | GARD | forex | 0.00 | 0.00 | -16,800.00 |
| 115157 | 2017-07-20 | GARD | forex | | 0.00 | 21,000.00 |
| 112319 | 2017-07-20 | SUSS | deposit to PQ | 0.00 | 0.00 | -960.00 |
| 112319 | 2017-07-20 | VIST | deposit to PQ | 0.00 | 0.00 | 960.00 |
| 112295 | 2017-07-20 | OLMM | director fees | | 0.00 | -200.00 |
| 112282 | 2017-07-19 | SUSS | Ron Kilgarlin TT to PQ | 0.00 | 0.00 | -2,678.00 |
| 112282 | 2017-07-19 | VIST | Ron Kilgarlin TT to PQ | 0.00 | 0.00 | 2,678.00 |
| 112276 | 2017-07-18 | MONT | director fee | | 0.00 | -100.00 |
| 112268 | 2017-07-18 | RETC | internal transfer MUFF/COSTS | 0.00 | 0.00 | -5,600.00 |
| 112268 | 2017-07-18 | SUSS | internal transfer MUFF/COSTS | 0.00 | 0.00 | 5,500.00 |
| 112267 | 2017-07-18 | SUSS | internal transfer MUFF/COSTS | 0.00 | 0.00 | 5,500.00 |
| 112267 | 2017-07-18 | SLDC | internal transfer MUFF/COSTS | 0.00 | 0.00 | -5,600.00 |
| 112281 | 2017-07-18 | VIST | deposit to PQ | 0.00 | 0.00 | 481.00 |
| 112281 | 2017-07-18 | SUSS | deposit to PQ | 0.00 | 0.00 | -481.00 |
| 112260 | 2017-07-17 | VIST | Jay Gar TT to PQ | 0.00 | 0.00 | 1,300.00 |
| 112260 | 2017-07-17 | SUSS | Jay Gar TT to PQ | 0.00 | 0.00 | -1,300.00 |
| 112309 | 2017-07-14 | SPRN | forex | | 0.00 | -26,050.87 |
| 112309 | 2017-07-14 | SPRN | forex | | 0.00 | 32,352.08 |
| 112230 | 2017-07-13 | BOND | Buy Enrall units | 0.00 | 0.00 | -850,000.00 |
| 112230 | 2017-07-13 | STO1 | Buy Enrall units | 0.00 | 0.00 | 850,000.00 |
| 112310 | 2017-07-13 | STO1 | forex | 0.00 | 0.00 | -18,063.11 |
| 112310 | 2017-07-13 | STO1 | forex | | 0.00 | 22,432.24 |
| 112221 | 2017-07-13 | VBIO | director fees | 0.00 | 0.00 | -1,000.00 |
| 112220 | 2017-07-13 | ASHT | director fees | 0.00 | 0.00 | -1,000.00 |
| 112377 | 2017-07-13 | VIST | VR4 Pamela Yanes PayPal to Tomas - 20.06 fee | 0.00 | 0.00 | 361.94 |
| 112377 | 2017-07-13 | BOND | VR4 Pamela Yanes PayPal to Tomas - 20.06 fee | 0.00 | 0.00 | -361.94 |
| 112208 | 2017-07-12 | REME | director fee | | 0.00 | -100.00 |
| 112204 | 2017-07-12 | PEBL | director fees | | 0.00 | -200.00 |
| 112203 | 2017-07-12 | ASHT | internal transfer | 0.00 | 0.00 | 515,000.00 |
| 112203 | 2017-07-12 | RETC | internal transfer | 0.00 | 0.00 | -515,100.00 |
| 112216 | 2017-07-12 | SUSS | David Covenant TT to PQ | 0.00 | 0.00 | -200.00 |
| 112216 | 2017-07-12 | VIST | David Covenant TT to PQ | 0.00 | 0.00 | 200.00 |
| 112183 | 2017-07-12 | REME | internal transfer Aug costs | 0.00 | 0.00 | 350,000.00 |
| 112183 | 2017-07-12 | RETC | internal transfer Aug costs | 0.00 | 0.00 | -350,100.00 |
| 112186 | 2017-07-12 | RETC | internal transfer prior costs | 0.00 | 0.00 | -12,825.00 |
| 112186 | 2017-07-12 | SUSS | internal transfer prior costs | 0.00 | 0.00 | 12,725.00 |
| 112189 | 2017-07-12 | STVA | director fee | | 0.00 | -100.00 |
| 112188 | 2017-07-12 | TTSI | director fee | | 0.00 | -100.00 |
| 112185 | 2017-07-12 | RETC | internal transfer expenses | 0.00 | 0.00 | -159,100.00 |
| 112185 | 2017-07-12 | SUSS | internal transfer expenses | 0.00 | 0.00 | 159,000.00 |
| 112184 | 2017-07-12 | SUSS | internal transfer disclaimer corp | 0.00 | 0.00 | 7,591.10 |
| 112184 | 2017-07-12 | RETC | internal transfer disclaimer corp | 0.00 | 0.00 | -7,691.10 |
| 112181 | 2017-07-12 | BOND | deliver stock: Fedex #779607124287 | 0.00 | 0.00 | 0.00 |
| 112172 | 2017-07-11 | PART | director fee | | 0.00 | -100.00 |
| 112217 | 2017-07-11 | VIST | David Lakin TT to PQ | 0.00 | 0.00 | 100.00 |
| 112217 | 2017-07-11 | SUSS | David Lakin TT to PQ | 0.00 | 0.00 | -100.00 |
| 112307 | 2017-07-11 | PART | forex | 0.00 | 0.00 | 3,010.00 |
| 112307 | 2017-07-11 | PART | forex | | 0.00 | -3,822.70 |
| 112158 | 2017-07-10 | REME | internal transfer | 0.00 | 0.00 | 100,000.00 |
| 112158 | 2017-07-10 | RETC | internal transfer | 0.00 | 0.00 | -100,100.00 |
| 112177 | 2017-07-10 | BOND | deliver stock: Fedex #779607189641 | 0.00 | 0.00 | 0.00 |
| 112144 | 2017-07-07 | BOND | interest charge: MONT | 0.00 | 0.00 | 62.12 |
| 112144 | 2017-07-07 | MONT | interest charge | 0.00 | 0.00 | -62.12 |
| 112304 | 2017-07-07 | ARTH | forex | 0.00 | 0.00 | -39,037.55 |
| 112304 | 2017-07-07 | ARTH | forex | | 0.00 | 48,480.00 |
| 112141 | 2017-07-07 | VIST | deposit to PQ | 0.00 | 0.00 | 2,000.00 |
| 112145 | 2017-07-07 | SUSS | deposit to PQ | 0.00 | 0.00 | -2,000.00 |
| 112145 | 2017-07-07 | MONT | forex | | 0.00 | -36,860.11 |
| 112145 | 2017-07-07 | MONT | forex | 0.00 | 0.00 | 28,353.93 |
| 112132 | 2017-07-06 | RETC | internal transfer June costs #2 | 0.00 | 0.00 | -300,100.00 |
| 112132 | 2017-07-06 | SUSS | internal transfer June costs #2 | 0.00 | 0.00 | 300,000.00 |
| 112108 | 2017-07-05 | SUSS | internal transfer June costs | 0.00 | 0.00 | 262,600.00 |
| 112108 | 2017-07-05 | RETC | internal transfer June costs | 0.00 | 0.00 | -262,700.00 |
| 112106 | 2017-07-05 | RETC | internal transfer June costs | 0.00 | 0.00 | -87,600.00 |

A193



SAMOA

Company No.: **46633**



Donelan Declaration
Exhibit

**G**

SEC v Sharp, et al

## INTERNATIONAL COMPANIES ACT 1987
### (Section 23(4))

### CERTIFICATE OF INCORPORATION
### (CHANGE OF NAME)

PURSUANT to the provisions of Section 23(4) of the International Companies Act 1987, it is hereby certified that

## PEACEFUL LION HOLDINGS LIMITED

an international company incorporated at Apia on the 8th day of September 2010  having by resolution and with the approval of the Deputy Registrar of International and Foreign Companies changed its name, is now registered under the name of

## PEREGRINE CAPITAL LIMITED

Given under my hand and seal at Apia this 30th day of January 2014.



O. MALUA
DEPUTY REGISTRAR OF INTERNATIONAL
AND FOREIGN COMPANIES

*This Certificate of Incorporation shall remain valid until the company is struck off and dissolved, pursuant to the provisions of the International Companies Act 1987.*

*An annual renewal fee is due and payable by the company on the 30th day of November of every year following incorporation.*

A194



SAMOA

Company No.: **46633**

## INTERNATIONAL COMPANIES ACT 1987
### (Section 14(3))

### CERTIFICATE OF INCORPORATION

It is hereby certified that pursuant to the provisions of Section 14(3) of

the International Companies Act 1987

# PEREGRINE CAPITAL LIMITED
#### (Formerly known as PEACEFUL LION HOLDINGS LIMITED)

was incorporated as an international company on the 8th day of

September 2010.

Given under my hand and seal at Apia this 30th day of January

2014.

C. MALUA

DEPUTY REGISTRAR OF INTERNATIONAL
AND FOREIGN COMPANIES

*This Certificate of Incorporation shall remain valid until the company is struck off and dissolved, pursuant to the provisions of the International Companies Act 1987.*

*An annual renewal fee is due and payable by the company on the 30th day of November of every year following incorporation.*

A195



# SAMOA

## INTERNATIONAL COMPANIES ACT, 1987

### MEMORANDUM

### AND

### ARTICLES OF ASSOCIATION

### OF

## PEACEFUL LION HOLDINGS LIMITED

No. of Company:  46633



Incorporated the 8ᵗʰ day of September, 2010

## MOSSACK FONSECA & CO. (SAMOA) LIMITED
### Apia, Samoa

A196

SAMOA

THE INTERNATIONAL COMPANIES ACT, 1987
("the IC Act")

MEMORANDUM OF ASSOCIATION

OF

PEACEFUL LION HOLDINGS LIMITED

("the Company")
A Company Limited by Shares



1.  The Name of the Company is **PEACEFUL LION HOLDINGS LIMITED**

2.  The Company is limited by shares.

3.  The Subscriber of the Company is MOSSFON SUBSCRIBERS LTD. having its registered office at Level 5, Development Bank of Samoa Building, Beach Road, Apia, Samoa.

4.  The Registered Office of the Company is: Level 5, Development Bank of Samoa Building, Beach Road, Apia, Samoa.

5.  The Resident Agent of the Company is Mossack Fonseca & Co. (Samoa) Limited, Level 5, Development Bank of Samoa Building, Beach Road, Apia, Samoa; e-mail: samoa@mossfon.com; website: www.mossfon.com.

6.  The authorised capital of the Company is US$50,000.00 divided into 50,000 shares with a par value of US$1.00 each. The directors are duly empowered to issue shares as registered shares only.

7.  The Company shall have all the powers of a natural person including the following powers and objects:

    a)  To carry on any business, other than a business which it is prohibited by the IC Act or the regulations from carrying on, which may seem to the company capable of being conveniently carried on or calculated directly or indirectly to enhance the value of or render profitable any of the company's property or rights.

    b)  To enter into or be a party to any transaction or document.

    c)  To acquire, hold, dispose of or deal with any information or rights or property of any kind.

    d)  To acquire, hold, dispose of or deal with the whole or any part of the undertaking of any other company, association or business.

    e)  To dispose of or otherwise deal with the whole or any part of its undertaking or business.

    f)  To assume any duties, obligations or liabilities.

    g)  To acquire any rights or interests.

    h)  To provide or procure provision of any services.

    i)  To lend to and borrow.

    j)  To procure its registration or recognition in any place outside Samoa.

A197

2

k)   To create and extinguish liabilities and rights and interests.

l)   To issue shares, debentures and options, and to take shares, debentures and options and to redeem and forfeit the same.

m)  To employ or retain person in and about its business or the business of any other company or person.

n)   To give indemnities and guarantees and obtain indemnities and guarantees.

o)   To take out insurance of all kinds whether over the property or rights of the company or not.

p)   To promote any other company.

q)   To make gifts, donations and wagers which may lawfully be made whether the same may, or may not, be for the purpose of advancing its business.

r)   By way of settlement or other dealing or disposition to give the right to a person not a member of the company to share in the whole or any part of its gains or profits to the exclusion of its members provided that in exercising such power no distribution of gains or profits shall be made pursuant to such settlement disposition or other dealing which would exceed the amount properly distributable as a dividend or properly capable of being returned as capital surplus were such distribution a distribution to some or to all of the members of the company.

s)   To do any of the things which it may do in association with any other person or company and as principal or agent or as trustee or for its own benefit.

t)   To promote any other business.

u)   To distribute any of the property of the company among the members, in kind or otherwise.

v)   To give security by charging uncalled capital.

w)   To grant a floating charge on the undertaking or property of the company;

x)   To procure the company to be registered or recognised as a body corporate in any place out of Samoa.

y)   To make provision in connection with the cessation of the whole or part of the business of the company, or of any subsidiary of the company, for the benefit of any subsidiary of the company, for the benefit of employees or former employees of the company or of a subsidiary of the company or for the dependent of such employees or former employees.

z)   To do all such things as are incidental or conducive to the exercise of the other powers of the company.

aa)  To do all other things which are not prohibited by or under the IC Act or the regulations made there under or otherwise by the laws of Samoa.

And it is hereby declared that the intention is that each of the objects specified in each paragraph of this clause shall, except where otherwise expressed in such paragraph, be an independent main object and be in nowise limited or restricted by reference to or inference from the terms of any other paragraph or the name of the Company.

8.   The Company has no power to:

(a)   carry on business with, or acquire any assets from –

      (i)      any natural person ordinarily resident in Samoa; or

SAMOA-ARTS-E-APRIL-2009-MF

A198

    (ii)    any domestic company which is not a trustee company.

(b)    own an interest in land or real estate situated in Samoa other than a lease of property for use as an office which it has established from which to communicate with members or where books and records of the company are prepared or maintained, or from where it maintains and, being the holder or an off-shore banking licence, operates, its business with the approval and consent of the Minister.

(c)    make any disposition to or grant or settle any property (including shares or debentures) on –

    (i)    any natural person ordinarily resident in Samoa; or

    (ii)    any domestic company which is not a trustee company.

(d)    make any disposition or grant or settle any property outside Samoa in the currency of Samoa.

(e)    carry on banking or trust business, unless it is licensed under an enactment authorising it to carry on that business.

(f)    carry on business as an insurance or reinsurance company or insurance manager unless it is licensed under an enactment authorising it to carry on that business.

WE, MOSSFON SUBSCRIBERS LTD., the Subscriber to this Memorandum desire to form a company in pursuance of this Memorandum of Association and agree to take the number and class of shares in the capital of the company set opposite our name.

| NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER | Number and Class of Share(s) taken by the Subscriber |
|---|---|
| **MOSSFON SUBSCRIBERS LTD.**<br>Level 5, Development Bank of Samoa Building,<br>Beach Road,<br>P. O. Box 204<br>Apia, Samoa | One (1)<br>Ordinary |

_____
Authorised Signatory

DATED this 8th day of September, 2010



SAMOA

**THE INTERNATIONAL COMPANIES ACT, 1987**

———

**ARTICLES OF ASSOCIATION**

**OF**

**PEACEFUL LION HOLDINGS LIMITED**

("the Company")

1.  References in these Regulations to the Act shall mean The International Companies Act, 1987. The following Regulations shall constitute the Regulations of the Company. In these Articles, words and expressions defined in the Act shall have the same meaning and, unless otherwise required by the context, the singular shall include the plural and vice versa, the masculine shall include the feminine and neuter, and references to persons shall include corporations and all legal entities capable of having a legal existence.

### SHARES

2.  The authorised capital of the Company is US$50,000.00 divided into 50,000 shares with a par value of US$1.00 each. The directors are duly empowered to issue shares as registered shares only.

3.  The shares shall be divided into such number of classes and series as the directors shall by resolution from time to time determine and until so divided shall comprise one class and series.

4.  The directors shall by resolution have the power to issue any class or series of shares that the Company is authorised to issue in its capital, original or increased, with or subject to any designations, powers, preferences, rights, qualifications, limitations and restrictions.

5.  Every person whose name is entered as a member in the share register being the holder of registered shares shall be entitled to a certificate signed by the director(s) or officer(s) so authorised as the case may be.

6.  If a certificate is worn out or lost, it may be renewed on production of the worn-out certificate, or on satisfactory proof of its loss together with such indemnity as the directors may reasonably require. Any member receiving a share certificate shall indemnify and hold the Company and its officers harmless from any loss or liability which it or they may incur by reason of wrongful or fraudulent use or representation made by any person by virtue of the possession of such certificate.

### SHARE CAPITAL AND VARIATION OF RIGHTS

7.  Subject to the provisions of these Articles, the unissued shares of the Company (whether forming part of the original or any increased capital) shall be at the disposal of the directors who may offer, allot, grant options or otherwise dispose of them to such persons at such times and for such consideration, being not less than the par value of the shares being disposed of, and upon such terms and conditions as the directors may determine.

8.  Without prejudice to any special rights previously conferred on the holders of any existing shares or class of shares, any share in the Company may be issued with such preferred, deferred or other special rights, or such restrictions, whether in regard to dividend, voting, return of capital or otherwise, as the directors may from time to time determine.

A200

2

9. Subject to the provisions of the Act in this regard, shares may be issued on the terms that they are redeemable, or, at the option of the Company, liable to be redeemed on such terms and in such manner as the directors before or at the time of the issue of the shares may determine.

10. The directors may redeem any such share at a premium.

11. If at any time the share capital is divided into different classes of shares, the rights attached to any class (unless otherwise provided by the terms of issue of the shares of that class) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of not less than fifty-one percent of the issued shares of that class and of the holders of not less than fifty-one percent of the issued shares of any other class of shares which may be affected by such variation.

12. The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

### TRANSFER OF SHARES

13. Registered shares in the Company may be transferred by a written instrument signed by the transferor and containing the name and address of the transferee or in such other manner or form and subject to such evidence as the directors shall consider appropriate.

### ACQUISITION OF OWN SHARES

14. Subject to the provisions of the Act in this regard, the directors may, on behalf of the Company, purchase, redeem or otherwise acquire any of the Company's own shares but only out of surplus or in exchange for newly issued shares of equal value, or for such consideration as they consider fit, and either cancel or hold such shares as treasury shares. The directors may dispose of any shares held as treasury shares on such terms and conditions as they may from time to time determine. Shares may be purchased or otherwise acquired in exchange for newly issued shares in the Company.

### ALTERATION IN CAPITAL

15. Subject to the terms of any resolution passed by the directors for the purpose of increasing the authorised capital of the Company, such increased capital may be divided into shares of such respective amounts, and with such rights or privileges (if any) as the directors think expedient.

16. Any capital raised by the creation of new shares shall be considered as part of the original capital, and shall be subject to the same provisions as if it had been part of the original capital.

### MEETINGS OF MEMBERS

17. The directors may convene meetings of the members of the Company at such times and in such manner and places as the directors consider necessary or desirable, and they shall convene such a meeting upon the written request of members holding not less than 51 percent of the votes of the outstanding voting shares in the Company.

18. Seven days' notice at the least specifying the place, the day and the hour of the meeting and the general nature of the business to be conducted shall be given in the manner hereinafter mentioned to such persons whose names on the date the notice is given appear as members in the share register of the Company.

19. A meeting of the members shall be deemed to have been validly held, notwithstanding that it is held in contravention of the requirement to give notice in Regulation 18 if notice of the meeting is waived by ninety percent of the holders of the votes of all shares having a right to attend and vote at the meeting.

SAMOA-ARTS-E-APRIL-2009-MF

A201

20. The inadvertent failure of the directors to give notice of a meeting to a member or to the agent or attorney as the case may be, or the fact that a member or such agent or attorney has not received the notice, does not invalidate the meeting.

21. No business shall be transacted at any meeting unless a quorum of members is present at the time when the meeting proceeds to business. A quorum shall consist of the holder or holders present in person or by proxy of not less than one third of the shares of each class or series of shares entitled to vote as a class or series thereon and the same proportion of the votes of the remaining shares entitled to vote thereon.

22. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting shall be dissolved.

23. Votes may be given either personally or by proxy.

24. The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.

25. An instrument appointing a proxy shall be in such form as the Chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the proxy.

26. The instrument appointing a proxy shall be in writing under the hand of the appointer, unless the appointer is a corporation or other form of legal entity other than one or more individuals holding as joint owners, in which case the instrument appointing a proxy shall be in writing under the hand of an individual duly authorised by such corporation or legal entity to execute the same. The Chairman of any meeting at which a vote is cast by proxy so authorised may call for a notarially certified copy of such authority which shall be produced within 7 days of being so requested or the vote or votes cast by such proxy shall be disregarded.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

27. Any corporation or other form of corporate legal entity which is a member of the Company may by resolution of its directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the members or of any class of members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual member of the Company.

## DIRECTORS

28. Subject to any subsequent amendment to change the number of directors, the minimum number of directors of the Company shall be one and the maximum number shall be twenty.

29. The first director or directors shall be elected by the subscriber to the Memorandum. Thereafter, the director(s) shall be elected by the members or the director (if there is only one) or directors for such term as the members or the director (if there is only one) or directors may determine.

30. The director(s) shall hold office until his(their) successor(s) shall take office or until his(their) earlier death, resignation or removal.

31. Every vacancy in the board of directors may be filled by a resolution of the members or of the director (if there is only one) or of a majority of the remaining directors if applicable.

32. A director may be a company whether incorporated in Samoa or elsewhere and may act through a representative or delegate appointed from time to time by written notice lodged with the secretary. Any director with the approval of the directors may appoint any person, whether a member of the

A202

4

company or not, to be alternate or substitute director in his place during such period as he thinks fit. Any person while he so holds office as an alternate or substitute director shall be entitled to notice of meetings of the directors and to attend and vote thereat accordingly, and to exercise all the powers of the appointor in his place. An alternate or substitute director shall not be required to hold any share qualification, and shall ipso facto vacate office if the appointor vacates office as a director or removes the appointee from office. Any appointment or removal under this Article shall be effected by notice in writing under the hand of the director making the same.

33.   The directors shall not be required to hold any shares in the company unless the company resolves otherwise.

34.   The office of director shall be vacated if the director:

(a)   is removed from office by a resolution of members or by a resolution of directors, or

(b)   becomes bankrupt or makes any arrangement or composition with his creditors generally, or

(c)   becomes of unsound mind, or of such infirm health as to be incapable of managing his affairs, or

(d)   resigns his office by notice in writing to the Company.

35.

(a)   A director may hold any other office or position of profit under the Company (except that of auditor) in conjunction with his office of director, and may act in a professional capacity to the Company on such terms as to remuneration and otherwise as the directors shall arrange.

(b)   A director may be or become a director or other officer of, or otherwise interested in any company promoted by the Company, or in which the Company may be interested, as a member or otherwise, and no such director shall be accountable for any remuneration or other benefits received by him as director or officer or from his interest in such other company. The directors may also exercise the voting powers conferred by the shares in any other company held or owned by the Company in such manner in all respects as they think fit, including the exercise thereof in favour of any resolutions appointing them, or any of their number, directors or officers of such other company, or voting or providing for the payment of remuneration to the directors or officers of such other company. A director may vote in favour of the exercise of such voting rights in the manner aforesaid, notwithstanding that he may be, or be about to become, a director or officer of such other company, and as such in any other manner is, or may be, interested in the exercise of such voting rights in the manner aforesaid.

(c)   No director shall be disqualified by his office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any director shall be in any way interested be voided, nor shall any director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement, by reason of such director holding that office or of the fiduciary relationship thereby established. The nature of a director's interest must be declared by him at the meeting of the directors at which the question of entering into the contract or arrangement is first taken into consideration, and if the director was not at the date of that meeting interested in the proposed contract or arrangement, or shall become interested in a contract or arrangement after it is made, he shall forthwith after becoming so interested advise the Company in writing of the fact and nature of his interest. A general notice to the directors by a director that he is a member of a specified firm or company, and is to be regarded as interested in any contract or transaction which may, after the date of notice, be made with such firm or company shall (if such director shall give the same at a meeting of the directors, or shall take reasonable steps to secure that the same is brought up and read at the next meeting of directors after it is given) be a sufficient declaration of interest in relation to such contract or transaction with such firm or company. A director may be counted as one of a quorum upon a motion in

A203

respect of any contract or arrangement which he shall make with the Company, or in which he is so interested as aforesaid, and may vote upon such motion.

## OFFICERS

36. The Secretary shall be appointed by the director(s) for such term, and upon such conditions as the director(s) and the secretary shall agree. The directors may appoint other secretaries and, subject to the Act, fix their respective duties and functions. Any secretary may be removed by the director(s) subject to the provisions of the Act.

37. The directors of the Company may, by a resolution of directors, appoint other officer(s) of the Company at such times as shall be considered necessary or expedient, and such officers may consist of a President, one or more Vice-Presidents, other Secretaries in addition to the Secretary and a Treasurer and such other officers as may from time to time be deemed desirable.

38. The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed by the directors thereafter, but in the absence of any specific allocation of duties it shall be the responsibility of the President to manage the day-to-day affairs of the Company, the Vice-Presidents to act in order of seniority in the absence of the President but otherwise to perform such duties as may be delegated to them by the President, the Secretary to maintain the registers, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company.

39. Any person may hold more than one office and no officer need be a director or member of the Company. The officers shall remain in office until removed from office by the directors whether or not a successor is appointed.

40. Any officer who is a body corporate may appoint any person its duly authorised representative for the purpose of representing it and of transacting any of the business of the officers.

## POWERS OF DIRECTORS

41. The business of the Company shall be managed by the directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company, and may exercise all such powers of the Company as are not by the Act or by these Regulations required to be exercised by the members subject to any delegation of such powers as may be authorised by these Regulations and to such requirements as may be prescribed by resolution of the members; but no requirement made by resolution of the members shall prevail if it be inconsistent with these Regulations nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been made.

42. The directors may entrust to and confer upon any director or officer any of the powers exercisable by them upon such terms and conditions and with such restrictions as they think fit, and either collaterally with, or to the exclusion of, their own powers, and may from time to time revoke, withdraw, alter or vary all or any of such powers. The directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the directors.

43. The directors may from time to time and at any time by power of attorney appoint any company, firm or person or body of persons, whether nominated directly or indirectly by the directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the directors under these Regulations) and for such period and subject to such conditions as they may think fit, and any such powers of attorney may contain such provisions for the protection and convenience of persons dealing with any such

SAMOA-ARTS-E-APRIL-2009-MF

A204

attorney as the directors may think fit and may also authorise any such attorney to delegate all or any of the powers, authorities and discretions vested in him.

44. Any director may appoint any person as its duly authorised representative for the purpose of representing it at Directors Meetings and of transacting any of the business of the directors.

45. The directors are authorised to open and operate bank accounts with banks, brokerage houses, savings and/or loan associations, credit institutes or any similar institutions of their choice anywhere in the world. All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as the directors shall from time to time by resolution determine.

46. The directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertakings, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

47. The continuing directors may act notwithstanding any vacancy in their body, save that if the number of directors shall have been fixed at two or more persons and by reason of vacancies having occurred among the directors there shall be only one continuing director, he shall be authorised to act alone only for the purpose of appointing another director.

## PROCEEDINGS OF DIRECTORS

48. The meetings of the directors and any committee thereof shall be held at such place or places as the directors shall decide.

49. The directors may meet together for the dispatch of business, adjourn and otherwise regulate their meetings as they think fit. Questions arising at any meeting shall be decided by a majority of votes; in case of an equality of votes the chairman shall have a second or casting vote. A director may at any time summon a meeting of the directors. If the Company shall have only one director, the provisions hereinafter contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters and in lieu of minutes of a meeting shall record in writing and sign a note or memorandum of all matters requiring a resolution of the directors. Such note or memorandum shall constitute sufficient evidence of such resolution for all purposes.

50. A director shall be given not less than three days notice of a meeting of the directors.

51. Notwithstanding Regulation 50 above, a meeting of directors held in contravention of that regulation shall be valid if a majority of the directors entitled to vote at the meeting have waived the notice of the meeting.

52. The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

53. A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than the majority of the total number of directors with a minimum of two.

54. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting shall be dissolved.

55. Any one or more of the directors or any committee thereof may participate in a meeting of directors or of a committee of directors by means of a conference telephone or similar communications

equipment allowing all persons participating in the meeting to hear each other at the same time. Participation by such means shall constitute presence in person at a meeting.

56.    A resolution approved by a majority of the directors for the time being entitled to receive notice of a meeting of the directors or of a committee of the directors and taking the form of one or more documents in writing or by facsimile, telex, telegram, cable or other written electronic communication shall be as valid and effectual as if it had been passed at a meeting of the directors or of such committee duly convened and held, without the need for any notice.

**INDEMNITY**

57.    Subject to the provisions of the Act and of any other statute for the time being in force, every director or other officer of the Company shall be entitled to be indemnified out of the assets of the Company against all losses or liabilities which he may sustain or incur in or about the execution of the duties of his office or otherwise in relation thereto, and no director or other officer shall be liable for any loss, damage or misfortune which may happen to, or be incurred by the Company in the execution of the duties of his office, or in relation thereto.

**SEAL**

58.    If adopted, the directors shall provide for the safe custody of the common seal of the Company. The common seal when affixed to any instrument, shall be witnessed by a director or any other person so authorised from time to time by the directors.

**DIVIDENDS AND RESERVES**

59.    The directors may, by resolution, declare a dividend, but no dividend shall be declared and paid except out of surplus and unless the directors determine that immediately after the payment of the dividend

   (a)    the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business; and

   (b)    the realisable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in the books of account, and its capital.

60.    Dividends may be declared and paid in money, shares or other property.

61.    The directors may from time to time pay to the members such interim dividends as appear to the directors to be justified by the surplus of the Company.

62.    Notice of any dividend that may have been declared shall be given to each member in the manner hereinafter mentioned and all dividends unclaimed for three years after having been declared may be forfeited by the directors for the benefit of the Company.

63.    No dividend shall bear interest against the Company.

**BOOKS AND RECORDS**

64.    The Company shall keep such accounts and records as the directors consider necessary or desirable in order to reflect the financial position of the Company.

65.    The Company shall keep minutes of all meetings of directors, members, committees of directors, committees of officers and committees of members, and copies of all resolutions consented to by directors, members, committees of directors, committees of officers and committees of members.

SAMOA-ARTS-E-APRIL-2009-MF

A206

8

66. The books, records and minutes required by Regulations 64 and 65 shall be kept at the Registered Office of the Company or at such other place as the directors may determine, and shall be open to the inspection of the directors at all times.

67. The directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the books, records and minutes of the Company or any of them shall be open to the inspection of members not being directors, and no member (not being a director) shall have any right of inspecting any book, record, minute or document of the Company except as conferred by Law or authorised by resolution of the directors.

## AUDIT

68. The directors may by resolution call for the accounts of the Company to be examined by an auditor or auditors to be appointed by them at such remuneration as may from time to time be agreed.

69. The report of the auditor shall be annexed to the accounts upon which he reports, and the auditor shall be entitled to receive notice of, and to attend, any meeting at which the Company's audited Profit and Loss Account and Balance Sheet is to be presented.

## NOTICES

70. Any notice, information or written statement required to be given to members shall be served, by mail (air mail service if available) addressed to each member at the address shown in the share register.

71. All notices directed to be given to the members shall, with respect to any registered share to which persons are jointly entitled, be given to whichever of such persons is named first in the share register, and notice so given shall be sufficient notice to all the holders of such share.

72. Any notice, if served by post, shall be deemed to have been served within ten days of posting, and in proving such service it shall be sufficient to prove that the letter containing the notice was properly addressed and put into the Post Office.

## WINDING UP

73. If the Company shall be wound up, the Liquidator may, in accordance with a resolution of members, divide among the members in specie or in kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the members or different classes of members. The Liquidator may vest the whole or any part of such assets in trustees upon such trusts for the benefit of the contributories as the Liquidator shall think fit, but so that no member shall be compelled to accept any shares or other securities whereon there is any liability.

## AMENDMENT TO ARTICLES

74. The Company may alter or modify the conditions contained in the Memorandum of Association and these Regulations, as originally drafted or as amended from time to time, by a resolution of either the Company member(s) or of the director(s).

SAMOA-ARTS-E-APRIL-2009-MF

A207

9

---

## NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER

---

**MOSSFON SUBSCRIBERS LTD.**
Level 5, Development Bank of Samoa Building,
Beach Road,
P. O. Box 204
Apia, Samoa

_____
Authorised Signatory

DATED this 8th day of September, 2010

SAMOA-ARTS-E-APRIL.2009-MF

A208

## PEACEFUL LION HOLDINGS LIMITED
### Incorporated in Samoa

### REGISTER OF DIRECTORS AND OFFICERS

| DATE OF APPOINTMENT | FULL NAME | FULL ADDRESS | POSITION HELD | DATE CEASED TO ACT |
|---|---|---|---|---|
| 8 September 2010 | Charter Ltd. | 60 Market Square, Belize City, Belize | Director | 8 July 2013 |
| 8 September 2010 | Mandate Ltd. | 60 Market Square, Belize City, Belize | Director | 8 July 2013 |
| 13 September 2010 | Zhiying Chen | Flat 5, 37/F., Blk L, Yu Man Hse, Yu Chui Court PH3, Sha Tin, NT, Hong Kong | Secretary | |
| 8 July 2013 | Zhiying Chen | Flat 5, 37/F., Blk L, Yu Man Hse, Yu Chui Court PH3, Sha Tin, NT, Hong Kong | Director | |

A209

# PEACEFUL LION HOLDINGS LIMITED
### (Samoa)

## REGISTER OF MEMBERS

| MEMBERS Name & Address | Cert. Nº | Nº & Class/Series of Shares | Date of Issue | Ceased to be member on: | Transfer / Exchange | | |
|---|---|---|---|---|---|---|---|
| | | | | | Date of transference | Nº & Class/Series of Shares | New Cert. Nº |
| MOSSFON SUBSCRIBERS LTD. Level 5,Development Bank of Samoa Building, Beach Road, Apia, Samoa. | N/A | One (1) ordinary | 8 September 2010 | | 13 September 2010 | One (1) Ordinary | One (1) |
| SHA TIN FOUNDATION Mossfon Building Panama City, Panama | 1 | 50,000 Ordinary | 13 September 2010 | | 8 July 2013 | 50,000 Ordinary | 2 |
| ZHIYING CHEN Flat 5, 37/F, Blk L, Yu Man Hse, Yu Chui Court PH3, Sha Tin, NT, Hong Kong | 2 | 50,000 Ordinary | 8 July 2013 | | | | |

A210

Donelan Declaration
Exhibit

H

SEC v Sharp, et al

```
Timestamp: 2/26/2017 4:36:39 PM(UTC+0)
Source App: Threema
Body:
Yes
------------------------------
To: 3KD5Y6DN The Cuntessa
Timestamp: 2/27/2017 7:48:52 PM(UTC+0)
Source App: Threema
Body:
Hey! Sorry about the Riverfall SPRN cluster. I wanted to give you time to settle the
shares to sisa before I sent the shares for Siri.

So... the Siri dwac will arrive at Action on Weds. This should give 3 days to sort the
sisa dwac. I'm always paranoid about 5% rule.
------------------------------
From: SilverWags SilverWags
Timestamp: 2/27/2017 7:49:04 PM(UTC+0)
Source App: Threema
Body:
Ok
------------------------------
To: 3KD5Y6DN The Cuntessa
Timestamp: 2/27/2017 7:49:19 PM(UTC+0)
Source App: Threema
Body:
👍
------------------------------
To: 3KD5Y6DN The Cuntessa
Timestamp: 2/28/2017 6:56:33 AM(UTC+0)
Source App: Threema
Body:
Pls make sure to allocate all Vbio sales to the sihi account today. We need to make room
for the pending 750k.

Again 5% rule is biting me ass.
------------------------------
From: SilverWags SilverWags
Timestamp: 2/28/2017 1:15:47 PM(UTC+0)
Source App: Threema
Body:
Is Action stock going to receive certs for the 2 posns of 5m SPRN for SISA and SIRI?
Kim. Saying she hasn't got these yet. Any eta ?
------------------------------
To: 3KD5Y6DN The Cuntessa
Timestamp: 2/28/2017 2:14:07 PM(UTC+0)
Source App: Threema
Body:
She should have had sisa yesterday.
------------------------------
To: 3KD5Y6DN The Cuntessa
Timestamp: 2/28/2017 2:14:07 PM(UTC+0)
Source App: Threema
Body:
She will get Siri tmro
------------------------------
From: SilverWags SilverWags
Timestamp: 2/28/2017 2:14:13 PM(UTC+0)
Source App: Threema
Body:
Ok
------------------------------
To: 3KD5Y6DN The Cuntessa
Timestamp: 2/28/2017 2:14:19 PM(UTC+0)
Source App: Threema
Body:
She should have all the certs in her office.
------------------------------
To: 3KD5Y6DN The Cuntessa
Timestamp: 2/28/2017 2:14:50 PM(UTC+0)
Source App: Threema
Body:
```

SC 13D/A 1 v447243_sc13da.htm SC 13D/A



Donelan Declaration
Exhibit

SEC v Sharp, et al

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.  20549

## SCHEDULE 13D/A
Under the Securities Exchange Act of 1934
(Amendment No. 2)*

## VITALITY BIOPHARMA, INC.
(Name of Issuer)

## COMMON STOCK, PAR VALUE $0.001
(Title of Class of Securities)

## 92849B107
(CUSIP Number)

**Avtar S. Dhillon**
**Vitality Biopharma, Inc.**
**1901 Avenue of the Stars, 2nd Floor**
**Los Angeles, CA 90067**
**(530) 231-7800**
(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

## July 15, 2016
(Date of Event Which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§ 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box ☐.

*The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

(Continued on following pages)

(Page 1 of 5 Pages)



A212

524938107                          **13D**                          Page 2 of 5 Pages

| 1 | NAMES OF REPORTING PERSONS |
|---|---|
| | Avtar S. Dhillon |

| 2 | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP |
|---|---|
| | (see instructions) |
| | (a) ☐ |
| | (b) ☐ |

| 3 | SEC USE ONLY |
|---|---|
| | |

| 4 | SOURCE OF FUNDS (see instructions) |
|---|---|
| | PF |

| 5 | CHECK IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED |
|---|---|
| | PURSUANT TO ITEM 2(d) or 2(e) |
| | ☐ |

| 6 | CITIZENSHIP OR PLACE OF ORGANIZATION |
|---|---|
| | Canada |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | SOLE VOTING POWER |
|---|---|---|
| | | 1,530,585 |
| | 8 | SHARED VOTING POWER |
| | | 0 |
| | 9 | SOLE DISPOSITIVE POWER |
| | | 1,530,585[1] |
| | 10 | SHARED DISPOSITIVE POWER |
| | | 0[2] |

| 11 | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON |
|---|---|
| | 1,530,858[1] |

| 12 | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES |
|---|---|
| | CERTAIN SHARES (see instructions) |
| | ☐ |

| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW 11 |
|---|---|
| | 12.8 % |

| 14 | TYPE OF REPORTING PERSON (see instructions) |
|---|---|
| | IN |

2

A213

**Explanatory Note:**

This Amendment No. 2 to Schedule 13D (the "Amendment") amends and supplements the Schedule 13D initially filed on August 22, 2011, and the Amendment No. 1 to Schedule 13D filed on March 21, 2012 (as amended, the "Statement"), on behalf of Avtar S. Dhillon (the "Reporting Person") relating to the beneficial ownership of shares of common stock,  par value $0.001 value per share (the "Common Stock") of Vitality Biopharma, Inc., a Nevada corporation  (formerly known as Stevia First Corp., the "Issuer").  The Reporting Person is filing this Amendment to report changes in his beneficial ownership since the date of the Statement as previously filed.  Except as set forth below, this Amendment does not supplement, restate or amend any of the other information disclosed in the Statement as previously filed.  Capitalized terms not defined in this Amendment have the meanings ascribed to them in the Statement as previously filed.

Item 2.                     Identity and Background.

Items 2(a) through 2(c) are amended and restated in their entirety to read in full as follows:

(a) — (c)          This Statement is being filed by Avtar S. Dhillon. The business address for the Reporting Person is Vitality Biopharma, Inc., 1901 Avenue of the Stars, 2nd Floor, Los Angeles, CA 90067. The Reporting Person is currently a director of the Issuer and was formerly the Interim Chief Executive Officer and Interim Chief Financial Officer of the Issuer until January 2012. The Reporting Person is currently also (i) a director of BC Advantage Funds, a venture capital corporation in British Columbia, which is located at 885 West Georgia St., Suite 1500, Vancouver, BC, Canada V6C 3E8; (ii) the Chairman of the Board of Inovio Pharmaceuticals, Inc. (NASDAQ: INO), a vertically integrated DNA vaccine development company, which is located at 660 W. Germantown Pike, Suite 110, Plymouth Meeting, PA 19462; (iii) the Chairman of the Board of Oncosec Medical, Inc. (NASDAQ: ONCS), a developer of immunotherapeutic product candidates to treat a wide range of solid tumor types, which is located at 5820 Nancy Ridge Drive, San Diego, CA 92121; and (iv) the Chairman of the Board of Arch Therapeutics, Inc., (OTCQB: ARTH), a developer of surgical and interventional hemostasis products that stop bleeding, which is located at 235 Walnut Street, Suite 6, Framingham, MA 01702.

Item 4.                     Purpose of Transaction.

The last paragraph of Item 4 is deleted in its entirety and replaced with the following four paragraphs:

On July 20, 2016, the Issuer affected a one (1) for ten (10) reverse stock split of the outstanding Common Stock.  As a result and immediately after the reverse stock split, the Reporting Person owned 515,000 shares of Common Stock and a stock option to purchase 50,000 shares of Common Stock with an exercise price of $1.00 per share, as previously reported on a Form 4 filed March 21, 2012.

On May 21, 2015, the Reporting Person was issued a stock option award for 40,000 shares with an exercise price of $2.10, which is scheduled to vest in full on May 21, 2017.

On July 15, 2016, the Reporting Person was issued a restricted stock award for 925,585 shares, of which 50% is scheduled to vest on March 1, 2017, and to vest in full on March 1, 2018.

Dr. Dhillon is the current Chairman of the Issuer, and acquired the shares of Common Stock for investment purposes, as well as through equity grants provided to him. Depending on market conditions and other factors, the Reporting Person may acquire additional securities of the Issuer as he deems appropriate, whether in open market purchases, privately negotiated transactions, private placements with the Issuer or otherwise. The Reporting Person also reserves the right to dispose of some or all of his shares of Common Stock in the open market, in privately negotiated transactions to third parties or otherwise, provided such transactions are in compliance with applicable securities laws.

Item 5.                     Interest in Securities of the Issuer.

3

A214

Items 5(a) through 5(c) are amended and restated in their entirety to read as follows:

(a)        According to the Current Report on Form 10-Q filed on August 16, 2016 by the Issuer with the Securities and Exchange Commission (the "Commission"), as of August 16, 2016, there were 11,997,878 shares of Common Stock outstanding. After the 1-for-10 reverse stock split, the Reporting Person held 515,000 shares of Common Stock that were acquired in a private stock transaction, as well as an option to purchase 50,000 shares of Common Stock, an option to purchase 40,000 shares of Common Stock, and a restricted stock unit award, which upon vesting and conversion would provide 925,585 shares of Common Stock, with the options and restricted stock units being issued to the Reporting Person in connection with his service to the Issuer as a director. Assuming vesting and exercise of each option, and vesting and conversion of the restricted stock units, the Reporting Person would hold 12.8% of the issued and outstanding shares of Common Stock.

(b)        The Reporting Person has the sole power to vote and dispose of 1,530,585 shares of Common Stock (giving effect to the shares of Common Stock underlying the options and restricted stock units issued to the Reporting Person in connection with his service to the Issuer as a director, which are currently unvested but could become exercisable within 60 days of July 15, 2016).

(c)        Except as reported herein, the Reporting Person has not effected any transactions in the Issuer's securities within the past 60 days.

**Item 6.            Contracts, Arrangements, Understandings or Relationships With Respect to Securities of the Issuer.**

Item 6 is amended by adding the following paragraphs:

On July 20, 2016, the Issuer affected a one (1) for ten (10) reverse stock split of the outstanding Common Stock.

On May 21, 2015, the Reporting Person was granted an option to purchase 40,000 shares of Common Stock (now reflected on a post-split basis) of the Issuer pursuant to the Issuer's Stock Incentive Plan in connection with his service to the Issuer as a director. The option is exercisable at a price of $2.10 per share, expires on May 21, 2020, and is scheduled to vest in full on May 21, 2017.

On July 15, 2016, the Reporting Person was granted a restricted stock unit award for 925,585 shares of Common Stock, which is scheduled to vest in full on March 1, 2018. The restricted stock grant will vest immediately upon a corporate change of control, or if the individual is terminated for any reason other than a "For Cause" termination.

**Item 7.            Material to be Filed as Exhibits.**

Exhibit    Description
4.1        Restricted Stock Option Award Agreement dated July 15, 2016

4

A215

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.


Dated:  August 17, 2016          By: /s/ Avtar S. Dhillon
                                      Avtar S. Dhillon

A216

exhibitsticker.com

Exhibit

J

SEC v Sharp, et al

| Defendant | Country | Financial Institution | Account Name | Last 4 Digits of Account Number (If Known) |
|---|---|---|---|---|
| AVTAR DHILLON | CANADA | CANADIAN IMPERIAL BANK OF COMMERCE | AVTAR S. DHILLON M.D. INC | 3010 |
| AVTAR DHILLON | CANADA | TD CANADA TRUST | ONE WORLD FARMS INC | 1487 |
| AVTAR DHILLON | U.S. | FIRST CITIZENS BANK & TRUST COMPANY | CHALMERS GROUP LLC | 0993 |
| AVTAR DHILLON | U.S. | FIRST REPUBLIC BANK | ONE WORLD RANCHES LLC | 7123 |
| AVTAR DHILLON | U.S. | MECHANICS BANK | DILJIT KAUR BAINS / AVTAR DHILLON | 4326 |
| AVTAR DHILLON | U.S. | MECHANICS BANK | ONE WORLD RANCHES LLC | 2519 |
| AVTAR DHILLON | U.S. | MECHANICS BANK | ONE WORLD REAL ESTATE LLC | 4836 |
| AVTAR DHILLON | U.S. | MECHANICS BANK | ONE WORLD REAL ESTATE LLC | 7356 |
| AVTAR DHILLON | U.S. | MECHANICS BANK | ONE WORLD REAL ESTATE LLC | 4993 |
| AVTAR DHILLON | U.S. | MECHANICS BANK | SUTTER BUTTES LLC | 8841 |
| AVTAR DHILLON | U.S. | SUNCREST BANK | ONE WORLD RANCHES LLC | 6238 |
| AVTAR DHILLON | U.S. | SUNCREST BANK | ONE WORLD REAL ESTATE LLC | 6369 |
| AVTAR DHILLON | U.S. | UNIONBANK | AVTAR DHILLON | 9309 |
| AVTAR DHILLON | U.S. | UNIONBANK | AVTAR DHILLON | 0165 |
| AVTAR DHILLON | U.S. | UNIONBANK | AVTAR DHILLON / DILJIT BAINS | 6218 |
| COURTNEY KELLN | CANADA | PI FINANCIAL CORP | EVERVEST EQUITY INC | 4535 |
| FRED SHARP | CANADA | BANK OF MONTREAL | CHARTERHOUSE CAPITAL INC | |
| FRED SHARP | CANADA | CANACCORD GENUITY CORP | EGREIDOR HOLDINGS LTD | 58A1 |
| FRED SHARP | CANADA | CANACCORD GENUITY CORP | EGREIDOR HOLDINGS LTD | 58B1 |
| FRED SHARP | CANADA | CANACCORD GENUITY CORP | INLAND TRADING LTD | 51A1 |
| FRED SHARP | CANADA | CANACCORD GENUITY CORP | INLAND TRADING LTD | 51B1 |
| FRED SHARP | CANADA | COAST CAPITAL SAVINGS FEDERAL CREDIT UNION | QUARRY BAY EQUITY INC | 3321 |
| FRED SHARP | CANADA | COAST CAPITAL SAVINGS FEDERAL CREDIT UNION | QUARRY BAY EQUITY INC | 2685 |
| FRED SHARP | CANADA | LEEDE JONES GABLE INC | NORTON INVESTMENTS LLC | 283A |
| FRED SHARP | CANADA | TD CANADA TRUST | PHEON EQUITY INC | 1686 |
| FRED SHARP | DOMINICAN REPUBLIC | BANCO MULTIPLE SANTA CRUZ | ESQUIRE CORPORATE SERVICES SRL | 4578 |
| FRED SHARP | DOMINICAN REPUBLIC | BANCO MULTIPLE SANTA CRUZ | INLAND TRADING SRL | 2021 |
| FRED SHARP | DOMINICAN REPUBLIC | BANCO MULTIPLE SANTA CRUZ | LARAMEX HOLDINGS SRL | 2405 |
| FRED SHARP | DOMINICAN REPUBLIC | BANCO MULTIPLE SANTA CRUZ | TRIUS HOLDINGS LIMITED SRL | 2147 |
| FRED SHARP | MALTA | TENDALL CAPITAL MARKETS LTD | TRIUS HOLDING HOLDING LIMITED SRL | 5001 |
| FRED SHARP | MAURITIUS | PETER PESIC & CO SECURITIES INC | CORBY VENTURES INC | 57CV |
| FRED SHARP | MAURITIUS | PETER PESIC & CO SECURITIES INC | PEGASUS GLOBAL LTD | 57PG |
| FRED SHARP | ST LUCIA | VIA BANK LTD | CORTONA EQUITY INC | |
| FRED SHARP | U.S. | EURO PACIFIC INTERNATIONAL BANK INC | EGREIDOR HOLDINGS LTD | 8141 |
| FRED SHARP | U.S. | EURO PACIFIC INTERNATIONAL BANK INC | EGREIDOR HOLDINGS LTD | 7846 |
| FRED SHARP | U.S. | WELLS FARGO | L & L INVESTORS | |
| FRED SHARP | U.S. | WELLS FARGO | ROAD RUNNER | |
| GRAHAM TAYLOR | MAURITIUS | ABC BANKING CORPORATION LTD | HENG HONG INVESTMENT LIMITED | 1000 |
| JACKSON FRIESEN | CANADA | BANK OF MONTREAL | ARDENT STRATEGIES CORP | 0469 |
| JACKSON FRIESEN | CANADA | BANK OF MONTREAL | FERROUS CAPITAL CORPORATION | 0477 |
| JACKSON FRIESEN | CANADA | BANK OF MONTREAL | FERROUS CAPITAL CORPORATION | 7732 |
| JACKSON FRIESEN | CANADA | BANK OF MONTREAL | FIRST AVENUE CAPITAL CORP | 0202 |

A217

| Defendant | Country | Financial Institution | Account Name | Last 4 Digits of Account Number (If Known) |
|---|---|---|---|---|
| JACKSON FRIESEN | CANADA | BANK OF MONTREAL | MGF STRATEGIES CORP | 3623 |
| JACKSON FRIESEN | CANADA | BANK OF MONTREAL | PINE STRATEGIES CORP | 4339 |
| JACKSON FRIESEN | CANADA | BANK OF MONTREAL | VALLEY DRIVE ESTATES INC | 0655 |
| JACKSON FRIESEN | CANADA | CANADIAN IMPERIAL BANK OF COMMERCE | JACKSON FRIESEN | 2334 |
| JACKSON FRIESEN | CANADA | ENVISION FINANCIAL | JACKSON FRIESEN | 4112 |
| JACKSON FRIESEN | CANADA | LEEDE JONES GABLE INC | ARDENT STRATEGIES CORP | 873A |
| JACKSON FRIESEN | CANADA | LEEDE JONES GABLE INC | JACKSON FRIESEN | 901A |
| JACKSON FRIESEN | CANADA | LEEDE JONES GABLE INC | JACKSON FRIESEN | 850Q |
| JACKSON FRIESEN | CANADA | LEEDE JONES GABLE INC | PINE STRATEGIES CORP | 762A |
| MIKE VELDHUIS | CANADA | BANK OF MONTREAL | AVONHURST CAPITAL CORP | 1741 |
| MIKE VELDHUIS | CANADA | BANK OF MONTREAL | MIKE VELDHUIS | 7997 |
| MIKE VELDHUIS | CANADA | BANK OF MONTREAL | MIKE VELDHUIS | 1464B |
| MIKE VELDHUIS | CANADA | COAST CAPITAL SAVINGS FEDERAL CREDIT UNION | MIKE VELDHUIS | 8846 |
| MIKE VELDHUIS | CANADA | LEEDE JONES GABLE INC | BLACKSTONE CAPITAL PARTNERS INC | 321A |
| MIKE VELDHUIS | CANADA | LEEDE JONES GABLE INC | BLACKSTONE CAPITAL PARTNERS INC | 321E |
| MIKE VELDHUIS | CANADA | LEEDE JONES GABLE INC | BLACKSTONE CAPITAL PARTNERS INC | 321F |
| MIKE VELDHUIS | CANADA | LEEDE JONES GABLE INC | MIKE VELDHUIS | 953A |
| MIKE VELDHUIS | CANADA | LEEDE JONES GABLE INC | MIKE VELDHUIS | 955A |
| MIKE VELDHUIS | CANADA | LEEDE JONES GABLE INC | MIKE VELDHUIS | 953A |
| MIKE VELDHUIS | CANADA | MACKIE RESEARCH CAPITAL CORPORATION | MIKE VELDHUIS | 862Q |
| MIKE VELDHUIS | CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 9203 |
| MIKE VELDHUIS | CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 313A |
| PAUL SEXTON | CANADA | LEEDE JONES GABLE INC | NOVA TREK CAPITAL INC | 984A |
| PAUL SEXTON | CANADA | LEEDE JONES GABLE INC | PAUL SEXTON | 984Q |
| PAUL SEXTON | CANADA | LEEDE JONES GABLE INC | PAUL SEXTON | |
| PAUL SEXTON | CANADA | MACKIE RESEARCH CAPITAL CORPORATION | PAUL SEXTON | |
| PAUL SEXTON | CANADA | PI FINANCIAL CORP | PAUL SEXTON | 5109 |
| PAUL SEXTON | CANADA | TD CANADA TRUST | NOVA TREK CAPITAL INC | 2034 |
| PAUL SEXTON | CANADA | TD CANADA TRUST | NOVA TREK CAPITAL INC | 6857 |
| PAUL SEXTON | CANADA | TD CANADA TRUST | PAUL SEXTON | 0618 |
| PAUL SEXTON | U.S. | PACIFIC WESTERN BANK | PAUL SEXTON | 6814 |
| WILLIAM KAITZ | U.S. | JP MORGAN CHASE BANK NA | WILLIAM KAITZ | 5150 |
| | | | | 4131 |
| WILLIAM KAITZ | U.S. | PNC BANK NA | PROMETHEAN MARKETING, INC. | 9779 |
| WILLIAM KAITZ | U.S. | PNC BANK NA | WILLIAM KAITZ | 2768 |
| WILLIAM KAITZ | U.S. | TRUIST BANK | FULL SERVICE MEDIA LLC | 0828 |
| | | | | 3789 |
| | | | | 1111 |
| | | | | 1533 |
| WILLIAM KAITZ | U.S. | TRUIST BANK | WILLIAM KAITZ | 5280 |
| | | | | 2273 |
| YVONNE GASARCH | CANADA | SUN LIFE ASSURANCE COMPANY OF CANADA | ZHIYING YVONNE GASARCH | 2937 |

A218

Case 1:21-cv-11276-WGY    Document 1-10    Filed 08/05/21    Page 3 of 3

| Defendant | Country | Financial Institution | Account Name | Last 4 Digits of Account Number (If Known) |
|---|---|---|---|---|
| YVONNE GASARCH | CANADA | TD CANADA TRUST | HIGHPOINT DRIVE ESTATES INC | 2128 |
| YVONNE GASARCH | CANADA | TD CANADA TRUST | LAKEHOUSE CAPITAL INC | 2580 |
| YVONNE GASARCH | CANADA | TD CANADA TRUST | LAKEHOUSE CAPITAL INC | 9416 |
| YVONNE GASARCH | CANADA | WESTMINSTER SAVINGS CREDIT UNION | NORLAND ESTATES INC | 2505 |
| YVONNE GASARCH | U.S. | WELLS FARGO | W&B RIDING CLUB @ ASSUNPINK WNA LLC | 9413 |
| YVONNE GASARCH | U.S. | WELLS FARGO | W&B RIDING CLUB @ ASSUNPINK WNA LLC | 5351 |

A219





# TREASURY ORDER

August 19, 2013

**Computershare Trust Company of Canada**
510 Burrard Street, 4th Floor
Vancouver, BC
V6C  3B9

**Re:    Inovio Pharmaceuticals, Inc.  (the "Company")**

You are hereby authorized and directed to hold to the order of or to issue a certificate for the common securities of the company as set out below.

We certify that these securities have been allotted to the person(s) named, that the company has received full consideration therefore and that they are, therefore, fully paid and non-assessable.

And we also certify that the said allotment is not made consequent upon a direction given by an optionee or other party primarily entitled to ownership in said securities, but that it constitutes the first transaction having the effect of creating ownership, control, or the right to receive such securities.

The shares issued hereunder were approved for issuance by the Company's Board of Directors:

Confidential FOIA Treatment Requested by Inovio Pharmaceuticals, Inc.                    INOV_HO_ 0000558

A220



| NAME AND ADDRESS | NUMBER OF SHARES |
|---|---|
| Heng Hong Investment Ltd | 1,076,923 shares |

**Please deliver via DTC to:**
**Verdmont Capital**
**DTC # 0901**
**Account# ▮▮▮8307**
**Agent ID#80901**
**Institution ID#53372**
**ABA #021000018**

Contact: Mohammad Shaygan
Senior Vice President
Verdmont Capital, S.A.
Ecificio Verdmont
Ave. Aquilino De La Guardia No. 18
Apartado Postal 0823-03017
Ciudad de PanamÃ¡, RepÃºblica de PanamÃ¡
tel: +507 301 9030

**Inovio Pharmaceuticals Inc.**

_Maggie Campbell_
Maggie Campbell,
Director of Accounting & Finance

08/19/2013

Date

Confidential FOIA Treatment Requested by Inovio Pharmaceuticals, Inc.

INOV_HO_ 0000559

A221

EXHIBIT A

**EXERCISE NOTICE**

**TO BE EXECUTED BY THE REGISTERED HOLDER TO EXERCISE THIS
WARRANT TO PURCHASE COMMON STOCK**

**INOVIO PHARMACEUTICALS, INC.**

The undersigned holder hereby exercises the right to purchase _____ of the shares of Common Stock (**"Warrant Shares"**) of Inovio Pharmaceuticals, Inc., a Delaware corporation (the **"Company"**), evidenced by the attached Warrant to Purchase Common Stock (the **"Warrant"**). Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Warrant.

1. <u>Form of Exercise Price</u>. The Holder intends that payment of the Exercise Price shall be made as:

_____✓_____ a "Cash Exercise" with respect to _1,076,923_ Warrant Shares; and/or

_____ a "Cashless Exercise" with respect to _____ Warrant Shares.

2. <u>Payment of Exercise Price</u>. In the event that the holder has elected a Cash Exercise with respect to some or all of the Warrant Shares to be issued pursuant hereto, the holder shall pay the Aggregate Exercise Price in the sum of $ _700,000_ to the Company in accordance with the terms of the Warrant.

3. <u>Delivery of Warrant Shares</u>. The Company shall deliver to the holder _1,076,923_ Warrant Shares in accordance with the terms of the Warrant and, after delivery of such Warrant Shares, _211,773_ Warrant Shares remain subject to the Warrant.

Date: _Aug_ _19_, _13_

Heng Hong Investment Limited
Name of Registered Holder

By: _____
Name: Daniel MacMullin
Title: Director Heng Hong Investments Limited

A-1

---

Confidential FOIA Treatment Requested by Inovio Pharmaceuticals, Inc.    INOV_HO_ 0000560

A222

Treasury Information Report                                                                Page 1 of 2

| WELLS FARGO | 08/19/2013 12:08 PM ET<br>CUSTOMER ID: INOVIO1<br>OPERATOR ID: MCAMPBEL | INOVIO BIOMEDICAL CORPORATION<br>Wire Transfer Detail Report<br>As of 08/19/2013 |
|---|---|---|

**Commercial Electronic Office®**                                                    **Treasury Information Reporting**

*Note: Intraday information subject to change*

Currency: USD
Bank:     121000248                                                          **WELLS FARGO BANK, N.A.**
Account:     ████9694(CA)                                                              **Operating Acct**

| Credit<br>Wire Amount | Process<br>Date<br>Time | From | Corresponding Bank: | Status |
|---|---|---|---|---|
| 700,000.00 | 08/19/2013<br>05:19 AM CT | INTERNATIONAL<br>N/A<br>1/HENG HONG INVESTMENT LIMITED<br>N/A | N/A | COMPLETE |

Wire Service Reference Number:                          Instructed Currency/Amount:
**0819B1Q8021C003044**                                  **USD/700,000.00**
Wells Message Number:                                   Exchange Rate:
**130819001772**                                        **1.000000**
PC Reference/Confirmation Number:                       Fed/CHIPS/SWIFT Reference Number:
**N/A**                                                 **0819B1Q8021C003044**
Value Date:                                             Completed Timestamp:
**08/19/2013**                                          **08/19/2013 05:16 AM CT**
Wire Type:                                              Sender Reference Number:
**208**                                                 **S0632280DD1D01**
Wire Amount:                                            Originating Bank Code/ID:
**700,000.00**                                          **N/A**
Transaction Reference Number:                           Originating Bank Name and Address:
**130819001772**                                        **BANQUE HERITAGE**
USD Equivalent Amount:                                  **61, ROUTE DE CHENE**
**700,000.00**                                          **GENEVA, CH 1211**
Originator ID:                                          Receiving Party ID:
**CH2808788009886300003**                               ████9694
Originator Name and Address:                            Receiving Party Name and Address:
**1/HENG HONG INVESTMENT LIMITED**                      **GENETRONICS, INC.**
**6/CH/HFTCCHGG/8390**                                  **OPERATING ACCOUNT**
Instructing Bank Code/ID:                               **11494 SORRENTO VALLEY RD**
**N/A**                                                 **SAN DIEGO CA 92121-1318**
Instructing Bank Name and Address:                      Intermediary Bank Code/ID:
**N/A**                                                 **N/A**
Sending Party ID:                                       Intermediary Bank Name and Address:
████0089                                                **N/A**
Sending Party Name and Address:                         Beneficiary Code/ID:
**CITIBANK N.A. NEW YORK, NY**                          **N/A**
**NEW YORK, NY**                                        Beneficiary Reference ID:
**UNITED STATES**                                       ████9694
Bank to Bank Info:                                      Beneficiary Name and Address:
**N/A**                                                 **GENETRONICS, INC. (INOVIO)**
Beneficiary Bank Code/ID:
**N/A**
Beneficiary Bank Name and Address:
**N/A**
Originator to Beneficiary Info:
**FUNDS ARE FOR INOVIO WARRANTS**
**EXERCISE FOR HENG HONG LTD.**
Text:
**RATE=1.000000 FX AMT=70000000 CCY=USD 021000089 CITIBANK N.A. NEW YORK, NY NEW YORK, NY**
**UNITEDSTATES S0632280DD1D01 OGB=BANQUE HERITAGE 61, ROUTE DE CHENE GENEVA, CH 1211**
**ORG=1/HENG HONG INVESTMENT LIMITED 6/CH/HFTCCHGG/8390 OBI=FUNDS ARE FOR INOVIO WARRANTS**
**EXERCISE FOR HENG HONGLTD. OPI=CH2808788009886300003 /FTR/ BNF=████9694 GENETRONICS, INC.**
**(INOVIO) COMPLETED TIMESTAMP 08/19/2013 05:16 AM CT**

                                        Process

Confidential FOIA Treatment Requested by Inovio Pharmaceuticals, Inc.                    INOV_HO_0000561

A223

**Maggie Campbell**

| | |
|---|---|
| **From:** | Joann MacMullin <jmacmullin@ifgnevis.com> |
| **Sent:** | Friday, August 16, 2013 10:24 AM |
| **To:** | Maggie Campbell |
| **Subject:** | Re: Transfer Warrants |
| **Attachments:** | Verdmont equity instructions.pdf; ATT00001.htm |

Maggie,

Please note that you should be receiving a new wire for $700,000 on Monday 19 or Tuesday 20 August from Heritage Bank that is for exercise of 1,076,923 warrants for Heng Hong Ltd. These warrants will be sent to Verdmont this time, please see attached information.

1

Confidential FOIA Treatment Requested by Inovio Pharmaceuticals, Inc.

INOV_HO_ 0000562

A224

Verdmont Capital, S.A.
Edificio Verdmont
Ave. Aquilino De La Guardia No.18
Apartado Postel 0823-03017
Ciudad de Panamá, República de Panamá
Tel +507 301 9000
Fax +507 301 9001
www.verdmont.com.pa



## EQUITY DELIVERY INSTRUCTIONS

Please ensure that Verdmont Capital is informed in advance of any deliveries of securities or they will be rejected by our custodian. Please advise the name and quantity of shares, the delivery date and a contact name and phone number at the delivering broker.

| | |
|---|---|
| **USD**<br>**US FED**<br>RBC Dexia<br>DTC #0901<br>Agent ID #80901<br>Institution ID #53372<br>ABA #021000018<br>Account #: ███8307<br>Ref: Verdmont Capital<br>Ref #: 161932002<br>021000018 BK of NYC/Cust/ac 298307 | **CAD** RBC Dexia<br>CUID: RTRA<br>BIC: ROYCCAT2<br>Account: Verdmont Capital<br>Account #: ███2001 |
| **EUR**<br>**Euroclear (nonequities)**<br>Euroclear Code: 92282<br>Account: 92282<br>MGTCBEBE<br>Ref: Verdmont Capital<br>Account #: ███1500 | **EUR**<br>**Netherlands**<br>BIC: KASANL2A<br>Participant Code: NEGICEF 300<br>Account: 223603287<br>Ref: Verdmont Capital<br>Account #: ███1500 |
| **AUD** Equities: CHESS (PID# 20057)<br>Bonds: SFE Austraclear Ltd<br>HSBC Custody Nominees (Australia) Limited<br>BIC: HKBAAU2S<br>Account No. 011-280716-063<br>Ref: Verdmont Capital<br>Account #: ███1500 | **GBP**<br>BIC Code: RTBSGB2L<br>Crest code: 00XJN<br>Subcustodian: ROY Nominees Limited<br>Depository: ROY Nominees Limited<br>Ref: Verdmont Capital<br>Account #: ███1500 |
| **Peru**<br>Citibank del Peru, S.A.<br>Swift: CITIUS33LIM<br>Sec A/C: 0124841300<br>FFC: ███1500 Verdmont Capital, S.A. | **HKD**<br>Subcustodian: SCBLHKHH<br>Participant Code: CCASS C00039<br>Depository account: Horsford Nominees a/c RBC<br>RBC Dexia Investor Services Trust – Client Account<br>Account: ████████████397-8<br>Ref: Verdmont Capital<br>Account #: ███500 |

Confidential FOIA Treatment Requested by Inovio Pharmaceuticals, Inc.

INOV_HO_ 0000563

A225



# TREASURY ORDER

September 10, 2013

**Computershare Trust Company of Canada**
510 Burrard Street, 4th Floor
Vancouver, BC
V6C 3B9

**Re:    Inovio Pharmaceuticals, Inc.  (the "Company")**

You are hereby authorized and directed to hold to the order of or to issue a certificate for the common securities of the company as set out below.

We certify that these securities have been allotted to the person(s) named, that the company has received full consideration therefore and that they are, therefore, fully paid and non-assessable.

And we also certify that the said allotment is not made consequent upon a direction given by an optionee or other party primarily entitled to ownership in said securities, but that it constitutes the first transaction having the effect of creating ownership, control, or the right to receive such securities.

The shares issued hereunder were approved for issuance by the Company's Board of Directors:

A226



| NAME AND ADDRESS | NUMBER OF SHARES |
|---|---|
| Heng Hong Investment Ltd | 211,773 shares |

**Please deliver via DTC to:**
**Verdmont Capital**
**DTC # 0901**
**Account#** ████**3307**
**Agent ID#80901**
**Institution ID#53372**
**ABA #021000018**

Contact: Mohammad Shaygan
Senior Vice President
Verdmont Capital, S.A.
Edificio Verdmont
Ave. Aquilino De La Guardia No. 18
Apartado Postal 0823-03017
Ciudad de PanamÃ¡, RepÃºblica de PanamÃ¡
tel: +507 301 9030

**Inovio Pharmaceuticals Inc.**

*Maggie Campbell*

Maggie Campbell,
Director of Accounting & Finance

09/10/2013

Date

A227

**EXHIBIT A**

**EXERCISE NOTICE**

**TO BE EXECUTED BY THE REGISTERED HOLDER TO EXERCISE THIS WARRANT TO PURCHASE COMMON STOCK**

**INOVIO PHARMACEUTICALS, INC.**

The undersigned holder hereby exercises the right to purchase *211,773* of the shares of Common Stock (**"Warrant Shares"**) of Inovio Pharmaceuticals, Inc., a Delaware corporation (the **"Company"**), evidenced by the attached Warrant to Purchase Common Stock (the **"Warrant"**). Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Warrant.

1. <u>Form of Exercise Price</u>. The Holder intends that payment of the Exercise Price shall be made as:

       ✓      a "Cash Exercise" with respect to *211,773* Warrant Shares; and/or

              a "Cashless Exercise" with respect to _____ Warrant Shares.

2. <u>Payment of Exercise Price</u>. In the event that the holder has elected a Cash Exercise with respect to some or all of the Warrant Shares to be issued pursuant hereto, the holder shall pay the Aggregate Exercise Price in the sum of $ *137,652.45* to the Company in accordance with the terms of the Warrant.

3. <u>Delivery of Warrant Shares</u>. The Company shall deliver to the holder *211,773* Warrant Shares in accordance with the terms of the Warrant and, after delivery of such Warrant Shares, *Ø* Warrant Shares remain subject to the Warrant.

Date: *Sept 6 , 13*

<u>Heng Hong Investment Limited</u>
Name of Registered Holder

By: *[signature]*
    Name: *Daniel MacMullin*
    Title: *Director*
    *Heng Hong Investment Limited*

A-1



September 6, 2013

**Verdmont Capital, S.A.**
**Edificio Verdmont**
**Ave. Aquilino De La Guardia No. 18**
**Apartado Postal 0823-03017**
**Ciudad de Panamá, República de Panamá**
**tel: +507 301 9030**
**www.verdmont.com.pa**

Attention: Mohammad Shaygon

RE: Heng Hong Investmetn Limited.

Please note that we will be wiring out $ 137,652.45 USD (please ensure that bank fees and wiring fees are added) to Inovio Pharmaceuticals, Inc.

Thank you

Daniel MacMullin

IFG TRUST SERVICES INC.

Rams Complex, P.O. Box# 822, Stoney Grove, Nevis, W.I.
Tel: 1 869 469 7040/7041 - Fax: 1 869 469 7042 - Website: www.ifgnevis.com

A229

Treasury Information Report

| Credit Wire Amount | Process Date Time | From | Corresponding Bank: | Status |
|---|---|---|---|---|
| 137,652.45 | 09/10/2013 02:46 PM CT | FEDWIRE HSBC BANK PANAMA S A VERDMONT CAPITAL S.A. N/A | N/A | COMPLETE |

Wire Service Reference Number:
0910B1Q8982C003802

Wells Message Number:
130910105709

PC Reference/Confirmation Number:
48203V7023VM

Value Date:
09/10/2013

Wire Type:
195

Wire Amount:
137,652.45

Transaction Reference Number:
130910105709

USD Equivalent Amount:
137,652.45

Originator ID:
████████4590

Originator Name and Address:
VERDMONT CAPITAL S.A.
EDIF. HITECH PLAZA
CALLE 53 OBARRIO
PANAMA / PANAMA

Instructing Bank Code/ID:
N/A

Instructing Bank Name and Address:
HSBC BANK PANAMA S A
HSBC BLDG AQUILINO DE LA GUARDIA 47

Sending Party ID:
████1088

Sending Party Name and Address:
HSBC BANK USA
452 FIFTH AVENUE
NEW YORK, NEW YORK

Bank to Bank Info:
/REC/REF:48203V7023VM

Beneficiary Bank Code/ID:
N/A

Beneficiary Bank Name and Address:
N/A

Originator to Beneficiary Info:
N/A

Text:
021001088 HSBC BANK USA 452 FIFTH AVENUE NEW YORK, NEW YORK HSBC BANK PANAMA S A HSBC BLDG AQUILINO DE LA GUARDIA 47 253469615 OGB=HSBC BANK USA -HSBCNET PAYMENT ORG=VERDMONT CAPITAL S.A.EDIF. HITECH PLAZA CALLE 53 OBARRIO PANAMA / PANAMA RFB=48203V7023VM OPI=████████4590 /FTR/ BNF=████████9694 GENETRONICS INC 11494 SORRENTO VALLEY ROAD SUITE A SAN DIEGO CA 92121 USA BBI=/REC/REF:48203V7023VM COMPLETED TIMESTAMP 09/10/2013 02:46 PM CT

Instructed Currency/Amount:
USD/137,652.45

Exchange Rate:
1.000000

Fed/CHIPS/SWIFT Reference Number:
0910B1Q8982C003802

Completed Timestamp:
09/10/2013 02:46 PM CT

Sender Reference Number:
253469615

Originating Bank Code/ID:
N/A

Originating Bank Name and Address:
HSBC BANK USA -HSBCNET PAYMENT

Receiving Party ID:
████████9694

Receiving Party Name and Address:
GENETRONICS, INC.
OPERATING ACCOUNT
11494 SORRENTO VALLEY RD
SAN DIEGO CA 92121-1318

Intermediary Bank Code/ID:
N/A

Intermediary Bank Name and Address:
N/A

Beneficiary Code/ID:
N/A

Beneficiary Reference ID:
████████9694

Beneficiary Name and Address:
GENETRONICS INC
11494 SORRENTO VALLEY ROAD SUITE A
SAN DIEGO CA 92121
USA

2,268,468.45 Credit Subtotal for FEDWIRE

2,268,468.45 Credit Total For Account ████9694

2,268,468.45 Credit Total For Account ████9694

2,268,468.45 Account Net Total

2,268,468.45 Credit Total For Bank 121000248(USD)
2,268,468.45 Net Total For Bank 121000248(USD)

A230

Verdmont Capital, S.A.
Edificio Verdmont
Ave. Aquilino De La Guardia No.18
Apartado Postal 0823-03017
Ciudad de Panamá, República de Panamá
Tel. +507 301 9000
Fax +507 301 9001
www.verdmont.com.pa

**Verdmont Capital**

Panamá, 14 de Agosto de 2013

SUPERVAL 14AGO'13 AM 10:1

CONS: 87686

RECIBIDO POR:

Señores
Superintendencia del Mercado de Valores
Panamá

Estimados señores:

Adjunto encontrarán el Informe Globalizado de Transacciones (Formulario DS-01), correspondiente al mes de Julio del 2013.

A su vez hemos incluido el Reporte de Adecuación de Capital que incluye el Informe de Liquidez (Formulario DS-02).

Adicionalmente y en relación al Acuerdo 6-2001 queremos hacer constar que:

"*Este documento ha sido preparado con el conocimiento de que su contenido será puesto a disposición del público inversionista y del público en general*".

Si tiene alguna consulta en relación a los reportes adjuntos, no dude en contactarnos.

Atentamente,

**VERDMONT CAPITAL, S.A.**

Yessenia Batista
Yessenia Batista
Oficial de Cumplimiento

Entidad Regulada y Supervisada por la Superintendencia del Mercado de Valores.  Licencia para operar como Casa de Valores.

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used
for investigative uses consistent with the undertaking between the SMV and the SEC
dated January 28, 2016 The materials "may not" be used without prior notice to the
SMV. including use in a public proceeding or sharing with third parties

SEC-SMV-P-0001996



A231

**FORMULARIO DS-1**

**REPORTE MENSUAL DE CASAS DE VALORES**

| | |
|---|---|
| Casa de Valores: | Verdmont Capital, S.A. |
| Mes que Reporta: | Julio, 2013 |
| Fecha de entrega: | 14 de Agosto, 2013 |

| | |
|---|---|
| Persona de Contacto: | Yessenia Batista |
| Teléfono de Contacto: | 301-9051 |
| E-mail: | yessenia.batista@verdmont.com.pa |

**NOTA IMPORTANTE PARA COMPLETAR LA SECCION I, PARTES A, B Y C:**

Columna "Tipo de Valor": En esta columna se debe indicar el tipo de valor según la clasificación establecida en la parte II del presente formulario (bonos, acciones, futuros, opciones, etc).
Columna "Tipo de Operación": En esta columna se deberá indicar el Tipo de Operación, (ej. cédula de valores, mutuo de valores, etc.)
Columnas de "Compra" y de "Venta": En estas columnas se sabe indicar el monto resultante de multiplicar la cantidad por el precio. La celda debe contener un número, no son válidos los ganchos (√), ni 'x', ni cualquier otro símbolo.
Fila de "Total Transado": En dicha celda se debe colocar la sumatoria de las compras y ventas.
Puesto de Bolsa: En el caso que la Casa de Valores no tenga puesto de bolsa, se deberá indicar el Puesto de Bolsa a través del cual se realizó la transacción.
Moneda: Los montos reflejados en este formulario deben ser en balboas.
Otras anotaciones: Si la Casa de Valores no realizó transacciones ya sea por cuenta de clientes o por cuenta propia en determinado mercado deben indicar expresamente "no se realizaron transacciones".
El formulario debe ser completado a computadora.
El formulario deberá ser entregado de forma física y a través de algún medio de almacenamiento digital (ej. Disco Compacto, USB, etc.)

**I. Informe Globalizado de Transacciones**

**A. Transacciones negociadas a través de una Bolsa Autorizada**

| Fecha Transacción | Fecha Liquidación | Número de Transacción | Tipo de Valor(1) | Tipo de Operación(2) | Emisor | Cantidad | Precio | Compra(3) | Venta(3) | Tipo de Transacción | | Puesto de Bolsa(5) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Indicar con una "X" si fue producto de un Reporto: | Indicar con una "X" si fue financiado con Préstamo (Margen): | |
| **A.1 Por Cuenta de Clientes:** | | | | | | | | | | | | |
| No se realizaron transacciones | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | Sub Total | 0.00 | 0.00 | 0.00 | | | |
| **A.2 Carteras y Obligaciones Propias:** | | | | | | | | | | | | |
| No se realizaron transacciones | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | SubTotal | 0.00 | 0.00 | 0.00 | | | |
| | | | | Sub Total de transacciones negociadas a través de una Bolsa Autorizada | | | | B/.0.00 | B/.0.00 | | | |
| | | | | | | | Total Transado (En Balboas) (A) | B/.0.00 | B/.0.00 | | | |

SUPERVAL 14AGO13AM10:14

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used for investigative uses consistent with the undertaking between the SMV and the SEC dated January 28, 2016 The materials "may not" be used without prior notice to the SMV, including use in a public proceeding or sharing with third parties

SEC-SMV-P-0001997

A232

**FORMULARIO DS-1**
**REPORTE MENSUAL DE CASAS DE VALORES**

Casa de Valores: Verdmont Capital, S.A.

Mes que Reporta: Julio, 2013

Fecha de entrega: 14 de Agosto, 2013

Persona de Contacto: Yessenia Batista

Teléfono de Contacto: 301-9051

E-mail: yessenia.batista@verdmont.com.pa

I. Informe Globalizado de Transacciones.

B. Transacciones negociadas Fuera de Bolsa

Nota: Para las transacciones negociadas Fuera de Bolsa se debe aplicar el procedimiento descrito en el artículo 17 del presente Acuerdo. En esta sección se reportan las transacciones negociadas Fuera de Bolsa sobre valores registrados en la Comisión Nacional de Valores de Panamá.

B.1 Por Cuenta de Clientes:

| Fecha Transacción | Fecha Liquidación | Número de Transacción | Tipo de Valor(1) | Emisor | Cantidad | Precio | Compra(3) | Venta(3) | Indicar con una "X" si fue producto de un Reporto: | Indicar con una "X" si fue financiado con Préstamo (Margen): |
|---|---|---|---|---|---|---|---|---|---|---|
| No se realizaron transacciones | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | SubTotal 0.00 | 0.00 | | | |

B.2 Carteras y Obligaciones Propias:

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| No se realizaron transacciones | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | SubTotal 0.00 | 0.00 | | | |

| Sub Total de transacciones fuera de Bolsa | B/.0.00 | B/.0.00 |
|---|---|---|
| Total Transado (En Balboas) (4) | B/.0.00 | B/.0.00 |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used for investigative uses consistent with the undertaking between the SMV and the SEC dated January 28, 2016 The materials "may not" be used without prior notice to the SMV, including use in a public proceeding or sharing with third parties

SEC-SMV-P-0001998

A233

*1378*

**FORMULARIO DS-1**
**REPORTE MENSUAL DE CASAS DE VALORES**

Casa de Valores: Verdmont Capital, S.A.
Mes que Reporta: Julio, 2013
Fecha de entrega: 14 de Agosto, 2013

Persona de Contacto: Yesseria Batista
Teléfono de Contacto: 391-0651
E-mail: yesseria.batista@verdmont.com.pa

**C. Transacciones negociadas en Mercados Extranjeros**

**I. Informe Globalizado de Transacciones**

**C.1 Por Cuenta de Clientes:**
Renta Variable

| Fecha Transacción | Fecha Liquidación | Número de Transacción | Tipo de Valor(1) | Tipo de Operación(2) | Emisor | Cantidad | Precio | Compra(3) | Venta(3) | Indicar con una "X" si fue producto de un Reporto: | Indicar con una "X" si fue financiado con Préstamo (Margen): | Distribuidos por la Casa de Valores | Fondos de Sociedades de Inversión Constituidos y Administrados en el Extranjero. Indique con "X" si son: | Solicitados por el Cliente |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | AUD 0.8994 / CAD 0.9734 / EUR 1.3304 / GBP 1.5209 | |
| 01/07/2013 | 05/07/2013 | T193296 | Acciones Comunes | Compra/Venta | Pandora Media Inc | 100,000 | 19.15000 | 0.00 | 1,915,000.00 | | | | | |
| 01/07/2013 | 05/07/2013 | T193301 | Acciones Comunes | Compra/Venta | Newmont Mining Corp | 5,000 | 29.65561 | 0.00 | 148,278.04 | | | | | |
| 01/07/2013 | 05/07/2013 | T193303 | Acciones Comunes | Compra/Venta | 22nd Century Group Inc | 30,000 | 0.73250 | 0.00 | 21,975.00 | | | | | |
| 01/07/2013 | 05/07/2013 | T193305 | Acciones Comunes | Compra/Venta | Pershing Gold Corp | 10,000 | 0.37500 | 0.00 | 3,750.00 | | | | | |
| 01/07/2013 | 05/07/2013 | T193307 | Acciones Comunes | Compra/Venta | Tesla Motors Inc | 1,000 | 114.99000 | 114,990.00 | 0.00 | | | | | |
| 01/07/2013 | 05/07/2013 | T193312 | Acciones Comunes | Compra/Venta | Northumberland Resources Inc | 126,000 | 0.82952 | 0.00 | 104,519.39 | | | | | |
| 01/07/2013 | 05/07/2013 | T193314 | Acciones Comunes | Compra/Venta | Poly Shield Technologies | 11,000 | 0.31010 | 0.00 | 3,411.10 | | | | | |
| 01/07/2013 | 05/07/2013 | T193527 | Acciones Comunes | Compra/Venta | IPATH S&P 500 VIX Short-Term F | 100,000 | 20.00028 | 2,000,027.70 | 0.00 | | | | | |
| 01/07/2013 | 05/07/2013 | T193528 | Acciones Comunes | Compra/Venta | IPATH S&P 500 VIX Short-Term F | 50,000 | 20.04320 | 1,002,160.00 | 0.00 | | | | | |
| 01/07/2013 | 05/07/2013 | T193443 | Acciones Comunes | Compra/Venta | Bullfrog Gold Corp | 9,500 | 0.22500 | 0.00 | 2,137.50 | | | | | |
| 01/07/2013 | 05/07/2013 | T193400 | Acciones Comunes | Compra/Venta | B2Gold Corp | 25,000 | 2.65471 | 0.00 | 66,367.65 | | | | | |
| 01/07/2013 | 05/07/2013 | T193320 | Acciones Comunes | Compra/Venta | Biologix Hair Inc | 3,100 | 2.89774 | 0.00 | 8,983.00 | | | | | |
| 01/07/2013 | 05/07/2013 | T193331 | Acciones Comunes | Compra/Venta | Bullfrog Gold Corp | 45,100 | 0.22749 | 0.00 | 10,259.98 | | | | | |
| 01/07/2013 | 05/07/2013 | T193333 | Acciones Comunes | Compra/Venta | CIG Wireless Corp | 3,000 | 3.40800 | 0.00 | 10,224.00 | | | | | |
| 01/07/2013 | 05/07/2013 | T193335 | Acciones Comunes | Préstamos (margen) | Kinross Gold Corp | 10,000 | 5.13000 | 51,300.00 | 0.00 | | X | | | |
| 01/07/2013 | 05/07/2013 | T193336 | Acciones Comunes | Compra/Venta | Kinross Gold Corp | 10,000 | 5.06038 | 0.00 | 50,603.75 | | | | | |
| 01/07/2013 | 05/07/2013 | T193337 | Acciones Comunes | Compra/Venta | Silver Wheaton Corp | 5,000 | 19.99080 | 0.00 | 99,954.00 | | | | | |
| 01/07/2013 | 05/07/2013 | T193297 | Acciones Comunes | Compra/Venta | Panosonic Energy Inc | 69,835 | 0.79376 | 0.00 | 5,431.95 | | | | | |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used for investigative uses consistent with the undertaking between the SMV and the SEC dated January 28, 2016 The materials "may not" be used without prior notice to the SMV. including use in a public proceeding or sharing with third parties

SEC-SMV-P-0001999

A234

# FORMULARIO DS-1
## REPORTE MENSUAL DE CASAS DE VALORES

Casa de Valores: Verdmont Capital, S.A.

Mes de Reporte: Julio, 2013

Fecha de entrega: 14 de Agosto, 2013

Persona de Contacto: Yessenia Batista

Teléfono de Contacto: 301-0051

E-mail: yessenia.batista@verdmont.com.pa

| Fecha de entrega | Código | Compra/Venta | Tipo | Emisor | Cantidad | Precio | Col A | Col B |
|---|---|---|---|---|---|---|---|---|
| 08/07/2013 | T193929 | Compra/Venta | Acciones Comunes | Arch Therapeutics Inc | 50,000 | 1.24690 | 0.00 | 62,345.00 |
| 08/07/2013 | T193700 | Compra/Venta | Acciones Comunes | Confederation Minerals Ltd | 42,000 | 0.35500 | 0.00 | 14,308.98 |
| 11/07/2013 | T193717 | Compra/Venta | Acciones Comunes | CuOro Resources Corp | 245,000 | 0.11500 | 27,425.55 | 0.00 |
| 08/07/2013 | T193796 | Compra/Venta | Acciones Comunes | Surge Energy Inc | 7,000 | 5.80000 | 0.00 | 39,520.04 |
| 08/07/2013 | T193722 | Compra/Venta | Acciones Comunes | Graphite Corp | 5,000 | 0.17500 | 0.00 | 875.00 |
| 08/07/2013 | T193724 | Compra/Venta | Acciones Comunes | Beeptem US Corp | 75,050 | 0.25111 | 0.00 | 18,845.66 |
| 11/07/2013 | T193728 | Compra/Venta | Acciones Comunes | CIG Wireless Corp | 1,500 | 3.39667 | 0.00 | 5,095.00 |
| 11/07/2013 | T193794 | Compra/Venta | Prestamos (margen) | Petrosonic Energy Inc | 16,000 | 0.72500 | 11,600.00 | 0.00 |
| 08/07/2013 | T193848 | Compra/Venta | Acciones Comunes | Emo Capital Corp | 7,124 | 0.07500 | 0.00 | 534.30 |
| 08/07/2013 | T193708 | Compra/Venta | Acciones Comunes | Direxion Daily Gold Miners Bul | 10,000 | 5.05100 | 0.00 | 50,510.00 |
| 08/07/2013 | T193710 | Compra/Venta | Acciones Comunes | North American Oil & Gas Corp | 3,750 | 0.74400 | 0.00 | 2,790.00 |
| 08/07/2013 | T193713 | Compra/Venta | Acciones Comunes | Bio-Solutions Corp | 40,000 | 0.01280 | 0.00 | 512.00 |
| 08/07/2013 | T193714 | Compra/Venta | Acciones Comunes | Anavex Life Sciences Corp | 5,000 | 0.61000 | 3,050.00 | 0.00 |
| 11/07/2013 | T193715 | Compra/Venta | Acciones Comunes | Xumanii International Holdings | 100,000 | 0.34627 | 0.00 | 34,626.80 |
| 11/07/2013 | T193718 | Compra/Venta | Acciones Comunes | Neolydhn Technologies Corp | 75,000 | 0.02005 | 0.00 | 1,504.05 |
| 11/07/2013 | T193692 | Compra/Venta | Acciones Comunes | Xumanii International Holdings | 100,000 | 0.34658 | 0.00 | 34,657.80 |
| 11/07/2013 | T193696 | Compra/Venta | Acciones Comunes | Alternet Systems Inc | 47,000 | 0.09000 | 0.00 | 4,230.00 |
| 08/07/2013 | T193699 | Compra/Venta | Acciones Comunes | Petrosonic Energy Inc | 38,500 | 0.74422 | 0.00 | 28,652.43 |
| 08/07/2013 | T193701 | Compra/Venta | Acciones Comunes | Inovio Pharmaceuticals Inc | 20,000 | 1.00090 | 0.00 | 20,018.00 |
| 08/07/2013 | T193702 | Compra/Venta | Acciones Comunes | Holloman Energy Corp | 16,640 | 0.58901 | 0.00 | 9,801.19 |
| 08/07/2013 | T193707 | Compra/Venta | Acciones Comunes | Game Plan Holdings Inc | 10,000 | 0.71500 | 0.00 | 7,150.00 |
| 08/07/2013 | T193709 | Compra/Venta | Acciones Comunes | VelocityShares 3x Long Silver | 10,000 | 5.15011 | 0.00 | 51,501.10 |
| 08/07/2013 | T193853 | Compra/Venta | Acciones Comunes | Bio-Solutions Corp | 1,131,000 | 0.01344 | 0.00 | 15,200.64 |
| 08/07/2013 | T193704 | Compra/Venta | Acciones Comunes | 22nd Century Group Inc | 3,950 | 1.07000 | 0.00 | 4,226.50 |
| 08/07/2013 | T193716 | Compra/Venta | Acciones Comunes | Tianbao Holdings Ltd | 250 | 2.10000 | 698.46 | 0.00 |
| 11/07/2013 | T193991 | Compra/Venta | Acciones Comunes | Xumanii International Holdings | 50,000 | 0.34580 | 0.00 | 17,286.80 |
| 11/07/2013 | T193727 | Compra/Venta | Acciones Comunes | CIG Wireless Corp | 500 | 3.41000 | 0.00 | 1,705.00 |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used for investigative uses consistent with the undertaking between the SMV and the SEC dated January 28, 2016 The materials "may not" be used without prior notice to the SMV, including use in a public proceeding or sharing with third parties

1386

Case 1:21-cv-11276-WGY    Document 1-11    Filed 08/05/21    Page 17 of 28

FORMULARIO DS-1
REPORTE MENSUAL DE CASAS DE VALORES

Casa de Valores: Verdmont Capital, S.A.

Mes que Reporta: Julio, 2013

Fecha de entrega: 14 de Agosto, 2013

Persona de Contacto: Yessenia Batista
Teléfono de Contacto: 301-9651
E-mail: yessenia.batista@verdmont.com.pa

| Fecha | ID | Tipo | Operación | Valor | Cantidad | Precio | Valor 1 | Valor 2 | |
|---|---|---|---|---|---|---|---|---|---|
| 10/07/2013 | T193975 | Acciones Comunes | Compra/Venta | Direxion Daily Small Cap Bear | 2,000 | 27.82000 | 55,640.00 | 0.00 | |
| 10/07/2013 | T193993 | Acciones Comunes | Compra/Venta | Blue River Resources Ltd | 25,000 | 0.10840 | 2,637.91 | 0.00 | |
| 10/07/2013 | T193991 | Acciones Comunes | Compra/Venta | Alternet Systems Inc | 36,000 | 0.09000 | 0.00 | 3,240.00 | |
| 10/07/2013 | T193964 | Acciones Comunes | Compra/Venta | Calsco Pharma Corp | 399,008 | 0.00150 | 0.00 | 598.51 | |
| 10/07/2013 | T193967 | Acciones Comunes | Compra/Venta | Green Innovations Ltd | 34,970 | 0.33357 | 0.00 | 11,664.80 | |
| 10/07/2013 | T193962 | Acciones Comunes | Compra/Venta | DOT Resources Ltd | 10,000 | 0.07150 | 715.45 | 0.00 | |
| 10/07/2013 | T193983 | Acciones Comunes | Compra/Venta | Biostem US Corp | 165,299 | 0.18170 | 0.00 | 30,034.50 | |
| 10/07/2013 | T193984 | Acciones Comunes | Compra/Venta | Enterologics Inc | 250,000 | 0.02344 | 5,860.00 | 0.00 | |
| 10/07/2013 | T193888 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 40,000 | 0.39845 | 0.00 | 15,938.48 | |
| 10/07/2013 | T193969 | Acciones Comunes | Compra/Venta | Tungsten Corp | 30,000 | 0.37587 | 0.00 | 11,276.10 | |
| 10/07/2013 | T193971 | Acciones Comunes | Compra/Venta | Inovio Pharmaceuticals Inc | 10,000 | 1.35000 | 0.00 | 13,500.00 | |
| 10/07/2013 | T193972 | Acciones Comunes | Compra/Venta | Holloman Energy Corp | 43,500 | 0.54506 | 0.00 | 23,709.98 | |
| 10/07/2013 | T193976 | Acciones Comunes | Compra/Venta | EFLO Energy Inc | 500 | 1.80000 | 900.00 | 0.00 | |
| 10/07/2013 | T193979 | Acciones Comunes | Compra/Venta | Neolydis Technologies Corp | 100,000 | 0.03050 | 0.00 | 3,050.00 | |
| 10/07/2013 | T193981 | Acciones Comunes | Compra/Venta | Marine Drive Mobile Corp | 36,000 | 0.01000 | 0.00 | 360.00 | |
| 10/07/2013 | T193960 | Acciones Comunes | Compra/Venta | International Display Advertis | 25,000 | 0.25000 | 6,250.00 | 0.00 | |
| 10/07/2013 | T193978 | Acciones Comunes | Compra/Venta | Northumberland Resources Inc | 15,000 | 0.36000 | 0.00 | 5,400.00 | |
| 10/07/2013 | T193982 | Acciones Comunes | Préstamos (margen) | Duma Energy Corp | 1,100 | 2.00000 | 2,200.00 | 0.00 | |
| 10/07/2013 | T193986 | Acciones Comunes | Compra/Venta | Poly Shield Technologies | 10,000 | 0.28000 | 0.00 | 2,800.00 | |
| 10/07/2013 | T193987 | Acciones Comunes | Compra/Venta | SearchCore Inc | 9,400 | 0.18047 | 0.00 | 1,696.40 | |
| 10/07/2013 | T193990 | Acciones Comunes | Compra/Venta | Duma Energy Corp | 5,000 | 2.05609 | 0.00 | 10,280.45 | |
| 12/07/2013 | T193992 | Acciones Comunes | Compra/Venta | CIG Wireless Corp | 2,500 | 2.61600 | 0.00 | 8,700.82 | |
| 10/07/2013 | T194039 | Acciones Comunes | Préstamos (margen) | Petrosonic Energy Inc | 35,000 | 0.68571 | 23,999.99 | 0.00 | X |
| 10/07/2013 | T193973 | Acciones Comunes | Préstamos (margen) | Goldenrye Resources Corp | 5,000 | 0.23000 | 1,119.41 | 0.00 | X |
| 10/07/2013 | T193974 | Acciones Comunes | Compra/Venta | Pure Energy Minerals Ltd | 100,000 | 0.05185 | 5,047.08 | 0.00 | |
| 10/07/2013 | T193991 | Acciones Comunes | Préstamos (margen) | Rio Nova Gold Inc | 100,000 | 0.09500 | 9,247.30 | 0.00 | X |
| 10/07/2013 | T193993 | Acciones Comunes | Préstamos (margen) | B2Gold Corp | 10,000 | 2.35000 | 23,500.00 | 0.00 | X |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used for investigative uses consistent with the undertaking between the SMV and the SEC dated January 28, 2016 The materials "may not" be used without prior notice to the SMV, including use in a public proceeding or sharing with third parties

SEC-SMV-P-0002007

A236

*1435*

FORMULARIO DS-1
REPORTE MENSUAL DE CASAS DE VALORES

| Casa de Valores: | Verdmont Capital, S.A. |
|---|---|
| Mes que Reporta: | Agosto, 2013 |
| Fecha de entrega: | 13 de Septiembre, 2013 |

| Persona de Contacto: | Yessenia Batista |
|---|---|
| Teléfono de Contacto: | 301-9951 |
| E-mail: | yessenia.batista@verdmont.com.pa |

| Fecha | ID | Tipo | Operación | Emisor | Cantidad | Precio | Valor | X | Valor2 |
|---|---|---|---|---|---|---|---|---|---|
| 23/08/2013 | T197762 | Acciones Comunes | Compra/Venta | Game Plan Holdings Inc | 5,000 | 0.55000 | 2,750.00 | | 0.00 |
| 23/08/2013 | T197780 | Acciones Comunes | Compra/Venta | Novus Energy Inc | 15,000 | 0.86000 | 12,243.39 | | |
| 23/08/2013 | T197766 | Acciones Comunes | Préstamos (margen) | Rio Novo Gold Inc | 40,000 | 0.06000 | 2,277.84 | X | 0.00 |
| 23/08/2013 | T197728 | Acciones Comunes | Compra/Venta | PetroNova Inc | 42,500 | 0.27500 | 11,092.61 | | 0.00 |
| 23/08/2013 | T197770 | Acciones Comunes | Compra/Venta | Novus Energy Inc | 50,000 | 0.86000 | 40,811.30 | | 0.00 |
| 23/08/2013 | T197865 | Acciones Comunes | Préstamos (margen) | Stockpot Exploration Inc | 90,000 | 0.06000 | 5,125.14 | X | 0.00 |
| 23/08/2013 | T197732 | Acciones Comunes | Compra/Venta | Sphere 3D Corp | 6,500 | 2.20000 | 13,572.13 | | |
| 23/08/2013 | T197738 | Acciones Comunes | Compra/Venta | Coronet Metals Inc | 8,000 | 0.08000 | 607.42 | | |
| 23/08/2013 | T197748 | Acciones Comunes | Compra/Venta | ProShares Ultra VIX Short-Term | 3,000 | 36.42000 | 109,260.00 | | |
| 23/08/2013 | T197764 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 93,925 | 0.63520 | 59,661.16 | | |
| 23/08/2013 | T197708 | Acciones Comunes | Compra/Venta | PAE Thailand PLC | 13,139,600 | 0.02890 | 379,316.92 | | |
| 23/08/2013 | T197726 | Acciones Comunes | Compra/Venta | BlueFire Equipment Corp | 7,500 | 0.58000 | 4,350.00 | | |
| 23/08/2013 | T197938 | Acciones Comunes | Compra/Venta | Pershing Gold Corp | 71,500 | 0.34690 | 24,953.50 | | |
| 23/08/2013 | T197850 | Acciones Comunes | Compra/Venta | Zollar Resources Inc | 2,000 | 1.18000 | 3,657.06 | | |
| 23/08/2013 | T197867 | Acciones Comunes | Préstamos (margen) | Bullfrog Gold Corp | 8,000 | 0.28300 | 2,264.00 | X | 0.00 |
| 23/08/2013 | T197736 | Acciones Comunes | Préstamos (margen) | Bullfrog Gold Corp | 14,000 | 0.28000 | 3,920.00 | X | 0.00 |
| 23/08/2013 | T197739 | Acciones Comunes | Préstamos (margen) | Respect Your Universe Inc | 17,200 | 0.19419 | 3,340.00 | X | 0.00 |
| 23/08/2013 | T198366 | Acciones Comunes | Préstamos (margen) | Montise PLC | 100,000 | 0.47375 | 73,412.30 | X | 0.00 |
| 23/08/2013 | T197872 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 17,000 | 0.63022 | 0.00 | | 10,713.76 |
| 23/08/2013 | T197735 | Acciones Comunes | Compra/Venta | Soja Minerals Corp | 2,000 | 0.60000 | 1,200.00 | | 0.00 |
| 23/08/2013 | T197745 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 3,225 | 0.36155 | 1,166.00 | | 0.00 |
| 23/08/2013 | T197747 | Acciones Comunes | Compra/Venta | Inovio Pharmaceuticals Inc | 300,000 | 1.62100 | 486,300.00 | | |
| 23/08/2013 | T197753 | Acciones Comunes | Compra/Venta | Indo Global Exchanges Pte. Ltd | 2,700 | 0.70000 | 1,890.00 | | |
| 23/08/2013 | T197783 | Acciones Comunes | Compra/Venta | Horizon Minerals Corp | 4,000 | 0.50000 | 2,000.00 | | |
| 23/08/2013 | T197765 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 127,500 | 0.61400 | 78,530.60 | | 0.00 |
| 23/08/2013 | T197845 | Acciones Comunes | Compra/Venta | Alternet Systems Inc | 30,000 | 0.07067 | 2,120.01 | | 0.00 |
| 23/08/2013 | T197740 | Acciones Comunes | Préstamos (margen) | Mahdia Gold Corp | 100,000 | 0.07950 | 7,116.25 | X | 0.00 |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used for investigative uses consistent with the undertaking between the SMV and the SEC dated January 28, 2016 The materials "may not" be used without prior notice to the SMV, including use in a public proceeding or sharing with third parties

SEC-SMV-P-0002057

A237

**FORMULARIO DS-1**
**REPORTE MENSUAL CASAS DE VALORES**

Casa de Valores: Vertmont Capital, S.A.
Mes que Reporta: Agosto, 2013
Fecha de entrega: 13 de Septiembre, 2013

Persona de Contacto: Yessenia Batista
Teléfono de Contacto: 301-0051
E-mail: yessenia.batista@vertmont.com.pa

| Fecha | ID | Tipo | Operación | Valor | Cantidad | Precio | Monto | | X |
|---|---|---|---|---|---|---|---|---|---|
| 23/08/2013 | T197769 | Acciones Comunes | Préstamos (margen) | iShares MSCI Brazil Index Fund | 5,000 | 42.80560 | 214,028.00 | 0.00 | X |
| 23/08/2013 | T197743 | Acciones Comunes | Acciones Comunes | Direxion Daily Gold Miners Bea | 5,000 | 22.48500 | 112,425.00 | 0.00 | |
| 23/08/2013 | T197731 | Acciones Comunes | Compra/Venta | Brookemont Capital Inc | 60,500 | 0.04500 | 2,583.92 | | |
| 23/08/2013 | T197724 | Acciones Comunes | Compra/Venta | TAD Mineral Exploration Inc | 25,000 | 0.03000 | 711.83 | 0.00 | |
| 23/08/2013 | T197734 | Acciones Comunes | Compra/Venta | Bellhaven Copper & Gold Inc | 61,500 | 0.12299 | 7,178.77 | 0.00 | |
| 23/08/2013 | T197750 | Acciones Comunes | Préstamos (margen) | B2Gold Corp | 100,000 | 3.01532 | 286,184.02 | 0.00 | X |
| 23/08/2013 | T197751 | Acciones Comunes | Compra/Venta | B2Gold Corp | 100,000 | 3.01029 | 291,400.75 | | |
| 23/08/2013 | T197730 | Acciones Comunes | Compra/Venta | August Metal Corp | 100,000 | 0.01000 | 949.10 | | |
| 23/08/2013 | T197869 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 68,500 | 0.61400 | 42,059.00 | | |
| 23/08/2013 | T197859 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 22,142 | 0.34969 | 7,742.92 | | |
| 23/08/2013 | T197862 | Acciones Comunes | Compra/Venta | Rango Energy Inc | 75,000 | 0.23650 | 17,737.50 | | |
| 23/08/2013 | T197863 | Acciones Comunes | Compra/Venta | Indo Global Exchanges Pte. Ltd | 3,500 | 0.70000 | 2,450.00 | | |
| 26/08/2013 | T197864 | Acciones Comunes | Compra/Venta | Monarchy Resources Inc | 40,050 | 0.15384 | 6,161.25 | | |
| 26/08/2013 | T199060 | Acciones Comunes | Préstamos (margen) | Alexandria Capital Corp | 43,500 | 0.15000 | 6,192.88 | 0.00 | X |
| 26/08/2013 | T197846 | Acciones Comunes | Compra/Venta | Blue River Resources Ltd | 40,000 | 0.07063 | 2,681.21 | | |
| 26/08/2013 | T197855 | Acciones Comunes | Compra/Venta | Equinox Copper Corp | 10,000 | 0.07000 | 664.37 | | |
| 26/08/2013 | T197853 | Acciones Comunes | Compra/Venta | Direxion Daily Small Cap Bear | 3,000 | 25.56100 | 76,683.00 | | |
| 26/08/2013 | T197848 | Acciones Comunes | Compra/Venta | Suja Minerals Corp | 1,900 | 0.60000 | 1,140.00 | | |
| 26/08/2013 | T197849 | Acciones Comunes | Compra/Venta | Samwin Corp | 500 | 0.39000 | 195.00 | | |
| 26/08/2013 | T197852 | Acciones Comunes | Compra/Venta | LKA Gold Inc | 1,351 | 0.53701 | 725.50 | | |
| 26/08/2013 | T197860 | Acciones Comunes | Compra/Venta | Inovio Pharmaceuticals Inc | 100,000 | 1.72100 | 172,100.00 | | |
| 26/08/2013 | T197871 | Acciones Comunes | Compra/Venta | Eco-Tek Group Inc | 50,010 | 0.05060 | 2,540.51 | | |
| 26/08/2013 | T197873 | Acciones Comunes | Compra/Venta | Horizon Minerals Corp | 31,500 | 0.50000 | 15,750.00 | | |
| 26/08/2013 | T197875 | Acciones Comunes | Compra/Venta | CIG Wireless Corp | 2,500 | 1.80000 | 5,947.65 | | |
| 26/08/2013 | T197876 | Acciones Comunes | Compra/Venta | PAE Thailand PLC | 27,304,900 | 0.72890 | 619,128.26 | | |
| 26/08/2013 | T197877 | Acciones Comunes | Préstamos (margen) | Potash Corp of Sasakatchewan In | 5,000 | 30.72038 | 153,601.92 | 0.00 | X |
| 26/08/2013 | T197851 | Acciones Comunes | Préstamos (margen) | Respect Your Universe Inc | 40,000 | 0.19453 | 7,781.00 | 0.00 | X |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used for investigative uses consistent with the undertaking between the SMV and the SEC dated January 28, 2016 The materials "may not" be used without prior notice to the SMV, including use in a public proceeding or sharing with third parties

SEC-SMV-P-0002058

A238

1438

## FORMULARIO DS-1
## REPORTE MENSUAL DE CASAS DE VALORES

Casa de Valores: Vestment Capital, S.A.

Mes que Reporta: Agosto, 2013

Fecha de entrega: 13 de Septiembre, 2013

Persona de Contacto: Yessenia Batista

Teléfono de Contacto: 301-9051

E-mail: yessenia.batista@verdmont.com.pa

| Fecha entrega | Fecha | Número | Tipo | Operación | Emisor | Cantidad | Precio | Valor | | Valor |
|---|---|---|---|---|---|---|---|---|---|---|
| 27/08/2013 | 30/08/2013 | T197985 | Acciones Comunes | Compra/Venta | Soltera Mining Corp | 24,945 | 0.11600 | 0.00 | | 2,893.62 |
| 27/08/2013 | 30/08/2013 | T197986 | Acciones Comunes | Compra/Venta | Pulse Network Inc/The | 1,800 | 0.49000 | 0.00 | | 882.00 |
| 27/08/2013 | 30/08/2013 | T197991 | Acciones Comunes | Compra/Venta | Suja Minerals Corp | 3,700 | 0.60000 | 2,220.00 | | 0.00 |
| 27/08/2013 | 30/08/2013 | T197992 | Acciones Comunes | Compra/Venta | Suja Minerals Corp | 4,000 | 0.65000 | 0.00 | | 2,600.00 |
| 27/08/2013 | 30/08/2013 | T198006 | Acciones Comunes | Compra/Venta | Inovio Pharmaceuticals Inc | 50,000 | 1.65697 | 0.00 | | 82,948.65 |
| 27/08/2013 | 30/08/2013 | T198017 | Acciones Comunes | Compra/Venta | Horizon Minerals Corp | 11,000 | 0.50000 | 0.00 | | 5,500.00 |
| 27/08/2013 | 30/08/2013 | T198015 | Acciones Comunes | Compra/Venta | Santacruz Silver Mining Ltd | 5,000 | 1.48000 | 0.00 | | 7,023.34 |
| 27/08/2013 | 30/08/2013 | T197996 | Acciones Comunes | Compra/Venta | Kandi Technologies Corp | 20,000 | 4.70181 | 0.00 | | 94,036.20 |
| 27/08/2013 | 30/08/2013 | T197997 | Acciones Comunes | Compra/Venta | Direxion Daily Gold Miners Bea | 1,000 | 24.33800 | 24,338.00 | | 0.00 |
| 27/08/2013 | 30/08/2013 | T197998 | Acciones Comunes | Compra/Venta | Direxion Daily Gold Miners Bea | 6,000 | 21.07800 | 0.00 | | 126,468.00 |
| 27/08/2013 | 30/08/2013 | T197999 | Acciones Comunes | Compra/Venta | Direxion Daily Gold Miners Bul | 3,000 | 93.13913 | 275,417.38 | | 0.00 |
| 27/08/2013 | 30/08/2013 | T198000 | Acciones Comunes | Compra/Venta | Direxion Daily Gold Miners Buf | 1,000 | 92.81400 | 0.00 | | 92,814.00 |
| 27/08/2013 | 30/08/2013 | T198007 | Acciones Comunes | Compra/Venta | Direxion Daily Gold Miners Buf | 1,000 | 96.74500 | 96,745.00 | | 0.00 |
| 27/08/2013 | 30/08/2013 | T198002 | Acciones Comunes | Compra/Venta | Equinox Copper Corp | 1,000 | 0.07000 | 0.00 | | 66.44 |
| 27/08/2013 | 30/08/2013 | T197999 | Acciones Comunes | Prestamos (margen) | Bullfrog Gold Corp | 18,500 | 0.27270 | 5,045.01 | | 0.00 |
| 27/08/2013 | 30/08/2013 | T198001 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 12,500 | 0.35120 | 4,390.00 | X | 0.00 |
| 27/08/2013 | 30/08/2013 | T198004 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 129,250 | 0.61374 | 79,325.25 | | 0.00 |
| 27/08/2013 | 30/08/2013 | T198005 | Acciones Comunes | Compra/Venta | Vista Gold Corp | 20,000 | 0.96717 | 19,343.38 | | 0.00 |
| 27/08/2013 | 30/08/2013 | T198008 | Acciones Comunes | Compra/Venta | Rango Energy Inc | 15 | 0.20000 | 0.00 | | 3.00 |
| 27/08/2013 | 30/08/2013 | T198009 | Acciones Comunes | Compra/Venta | Indo Global Exchanges Pte. Ltd | 2,400 | 0.70000 | 0.00 | | 1,680.00 |
| 30/08/2013 | 30/08/2013 | T198010 | Acciones Comunes | Compra/Venta | Monarchy Resources Inc | 700 | 0.18500 | 0.00 | | 129.50 |
| 28/08/2013 | 03/09/2013 | T198008 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 3,500 | 0.33154 | 1,160.40 | | 0.00 |
| 28/08/2013 | 03/09/2013 | T198104 | Acciones Comunes | Compra/Venta | Rango Energy Inc | 20,000 | 0.17000 | 3,400.00 | | 0.00 |
| 28/08/2013 | 03/09/2013 | T198105 | Acciones Comunes | Compra/Venta | Indo Global Exchanges Pte. Ltd | 4,226 | 0.70000 | 0.00 | | 2,958.20 |
| 28/08/2013 | 03/09/2013 | T198106 | Acciones Comunes | Compra/Venta | Monarchy Resources Inc | 7,100 | 0.19500 | 0.00 | | 1,384.50 |
| 28/08/2013 | 03/09/2013 | T198110 | Acciones Comunes | Compra/Venta | Poly Shield Technologies | 2,500 | 0.55000 | 0.00 | | 1,375.00 |
| 28/08/2013 | 02/09/2013 | T198083 | Acciones Comunes | Compra/Venta | Blue River Resources Ltd | 30,000 | 0.07167 | 2,040.57 | | 0.00 |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may be used for investigative uses consistent with the undertaking between the SMV and the SEC dated January 28, 2016 The materials "may not" be used without prior notice to the SMV, including use in a public proceeding or sharing with third parties

SEC-SMV-P-0002060

A239

**FORMULARIO DS-1**
**REPORTE MENSUAL DE CASAS DE VALORES**

| | |
|---|---|
| Casa de Valores: | Verdmont Capital, S.A. |
| Mes que Reporta: | Agosto, 2013 |
| Fecha de entrega: | 13 de Septiembre, 2013 |
| Persona de Contacto: | Yassenia Batista |
| Teléfono de Contacto: | 301-9051 |
| E-mail: | yassenia.batista@verdmont.com.pa |

| Fecha 1 | Fecha 2 | Código | Tipo | Operación | Emisor | Cantidad | Precio | Valor 1 | Valor 2 | X |
|---|---|---|---|---|---|---|---|---|---|---|
| 28/08/2013 | 03/09/2013 | T198090 | Acciones Comunes | Compra/Venta | TAG Minerals Exploration Inc | 174,000 | 0.03000 | 4,654.30 | 0.00 | |
| 28/08/2013 | 03/09/2013 | T198100 | Acciones Comunes | Compra/Venta | Equinox Copper Corp | 119,000 | 0.05109 | 0.00 | 5,770.48 | |
| 28/08/2013 | 03/09/2013 | T198096 | Acciones Comunes | Compra/Venta | Division Daily Gold Miners Bul | 1,000 | 77,98250 | 77,982.50 | 0.00 | |
| 28/08/2013 | 03/09/2013 | T198095 | Acciones Comunes | Préstamos (margen) | Bellhaven Copper & Gold Inc | 5,000 | 0.12000 | 569.46 | 0.00 | X |
| 28/08/2013 | 03/09/2013 | T198094 | Acciones Comunes | Compra/Venta | Pulse Network Inc/The | 3,158 | 0.48032 | 0.00 | 1,516.84 | |
| 28/08/2013 | 03/09/2013 | T198091 | Acciones Comunes | Compra/Venta | Rostock Ventures Corp | 950,000 | 0.01200 | 11,400.00 | 0.00 | |
| 28/08/2013 | 03/09/2013 | T198190 | Acciones Comunes | Compra/Venta | Inovio Pharmaceuticals Inc | 50,000 | 1.67142 | 0.00 | 83,570.90 | |
| 28/08/2013 | 03/09/2013 | T198093 | Acciones Comunes | Compra/Venta | Suja Minerals Corp | 5,000 | 0.66000 | 3,300.00 | 0.00 | |
| 28/08/2013 | 03/09/2013 | T198099 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 2,500 | 0.33990 | 849.75 | 0.00 | |
| 28/08/2013 | 03/09/2013 | T198112 | Acciones Comunes | Compra/Venta | Horizon Minerals Corp | 9,000 | 0.50111 | 0.00 | 4,510.00 | |
| 28/08/2013 | 03/09/2013 | T198116 | Acciones Comunes | Compra/Venta | Pulse Beverage Corp/The | 10,000 | 0.86000 | 0.00 | 8,600.00 | |
| 28/08/2013 | 03/09/2013 | T198113 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 64,000 | 0.58943 | 37,723.26 | 0.00 | |
| 28/08/2013 | 03/09/2013 | T198114 | Acciones Comunes | Compra/Venta | Ireland Inc | 24,000 | 0.26052 | 6,252.50 | 0.00 | |
| 28/08/2013 | 03/09/2013 | T198094 | Acciones Comunes | Compra/Venta | Cepa Holdings SA | 120 | 125.00000 | 15,000.00 | 0.00 | |
| 28/08/2013 | 03/09/2013 | T198097 | Acciones Comunes | Compra/Venta | EFLO Energy Inc | 1,500 | 1.30000 | 0.00 | 1,950.00 | |
| 28/08/2013 | 03/09/2013 | T198102 | Acciones Comunes | Compra/Venta | Poly Shield Technologies | 10,000 | 0.55000 | 0.00 | 5,500.00 | |
| 28/08/2013 | 03/09/2013 | T198086 | Acciones Comunes | Compra/Venta | Pershing Gold Corp | 20,000 | 0.40000 | 0.00 | 8,000.00 | |
| 28/08/2013 | 03/09/2013 | T198092 | Acciones Comunes | Compra/Venta | Pershing Gold Corp | 40,000 | 0.39500 | 0.00 | 15,800.00 | |
| 28/08/2013 | 03/09/2013 | T198200 | Acciones Comunes | Compra/Venta | Pershing Gold Corp | 151,000 | 0.39580 | 0.00 | 59,765.05 | |
| 28/08/2013 | 03/09/2013 | T198197 | Acciones Comunes | Préstamos (margen) | Stockport Exploration Inc | 28,000 | 0.07268 | 1,931.43 | 0.00 | X |
| 28/08/2013 | 03/09/2013 | T198087 | Acciones Comunes | Compra/Venta | Colossus Minerals Inc | 135,000 | 0.78274 | 0.00 | 100,291.43 | |
| 28/08/2013 | 03/09/2013 | T198088 | Acciones Comunes | Compra/Venta | ProShares Ultra VIX Short-Term | 2,000 | 43.00000 | 86,000.00 | 0.00 | |
| 28/08/2013 | 03/09/2013 | T198103 | Acciones Comunes | Compra/Venta | Patient Home Monitoring Corp | 26,000 | 0.19000 | 0.00 | 4,688.55 | |
| 28/08/2013 | 03/09/2013 | T198116 | Acciones Comunes | Préstamos (margen) | Rio Novo Gold Inc | 125,000 | 0.06000 | 7,118.25 | 0.00 | X |
| 28/08/2013 | 03/09/2013 | T198118 | Acciones Comunes | Compra/Venta | Rosgold Inc | 40,000 | 0.66000 | 0.00 | 25,815.52 | |
| 28/08/2013 | 03/09/2013 | T198082 | Acciones Comunes | Compra/Venta | Sunoco Energy Inc | 65,500 | 0.32000 | 19,893.14 | 0.00 | |
| 28/08/2013 | 03/09/2013 | T198085 | Acciones Comunes | Compra/Venta | Cabo Drilling Corp | 4,000 | 0.04500 | 170.84 | 0.00 | |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used for investigative uses consistent with the undertaking between the SMV and the SEC dated January 28, 2016 The materials "may not" be used without prior notice to the SMV, including use in a public proceeding or sharing with third parties

SEC-SMV-P-0002061

A240

## FORMULARIO DS-1
## REPORTE MENSUAL DE CASAS DE VALORES

Casa de Valores: Verdmont Capital, S.A.

Mes que Reporta: Agosto, 2013

Fecha de entrega: 13 de Septiembre, 2013

Persona de Contacto: Yessenia Batista

Teléfono de Contacto: 301-9051

E-mail: yessenia.batista@verdmont.com.pa

| Fecha de entrega | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 29/08/2013 | T198178 | Acciones Comunes | Compra/Venta | Cabo Drilling Corp | 10,000 | 0.04500 | 427.10 | | 0.00 |
| 04/09/2013 | T198180 | Acciones Comunes | Compra/Venta | ProShares Ultra VIX Short-Term | 2,000 | 44.82400 | 0.00 | | 69,648.00 |
| 04/09/2013 | T198175 | Acciones Comunes | Compra/Venta | RED EAGLE MINING CORP | 10,000 | 0.26575 | 2,522.23 | | 0.00 |
| 04/09/2013 | T198198 | Acciones Comunes | Préstamos (margen) | Stockport Exploration Inc | 100,000 | 0.06370 | 6,045.77 | | 0.00 |
| 04/09/2013 | T198208 | Acciones Comunes | Préstamos (margen) | Rio Novo Gold Inc | 100,000 | 0.06000 | 5,694.60 | X | 0.00 |
| 04/09/2013 | T198211 | Acciones Comunes | Compra/Venta | iShares MSCI Brazil Index Fund | 5,000 | 42.28000 | 0.00 | X | 211,400.00 |
| 04/09/2013 | T198203 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 10,000 | 0.58750 | 0.00 | | 5,875.00 |
| 04/09/2013 | T198209 | Acciones Comunes | Préstamos (margen) | CIG Wireless Corp | 500 | 2.50000 | 1,250.00 | | 0.00 |
| 04/09/2013 | T198189 | Acciones Comunes | Compra/Venta | ProShares UltraShort S&P500 | 5,000 | 38.45000 | 0.00 | X | 192,250.00 |
| 04/09/2013 | T198357 | Acciones Comunes | Compra/Venta | Pershing Gold Corp | 172,000 | 0.36350 | 0.00 | | 62,521.66 |
| 04/09/2013 | T198182 | Acciones Comunes | Préstamos (margen) | Rostock Ventures Corp | 410,000 | 0.01298 | 5,320.16 | | 0.00 |
| 04/09/2013 | T198183 | Acciones Comunes | Compra/Venta | Bullfrog Gold Corp | 26,000 | 0.29423 | 7,650.01 | | 0.00 |
| 04/09/2013 | T198184 | Acciones Comunes | Préstamos (margen) | Bullfrog Gold Corp | 6,900 | 0.30000 | 0.00 | | 2,070.00 |
| 04/09/2013 | T198185 | Acciones Comunes | Compra/Venta | ProShares UltraShort S&P500 | 12,500 | 38.45504 | 0.00 | X | 480,688.00 |
| 04/09/2013 | T198193 | Acciones Comunes | Compra/Venta | Poly Shield Technologies | 10,000 | 0.48000 | 0.00 | | 4,800.00 |
| 04/09/2013 | T198177 | Acciones Comunes | Compra/Venta | Neohydro Technologies Corp | 75,755 | 0.04172 | 0.00 | | 3,160.35 |
| 04/09/2013 | T198179 | Acciones Comunes | Préstamos (margen) | Bullfrog Gold Corp | 25,000 | 0.30000 | 7,500.00 | | 0.00 |
| 04/09/2013 | T198192 | Acciones Comunes | Compra/Venta | Suja Materials Corp | 725 | 0.70000 | 0.00 | | 507.50 |
| 04/09/2013 | T198202 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 107,100 | 0.57924 | 0.00 | X | 62,036.82 |
| 04/09/2013 | T198187 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 50,000 | 0.31025 | 0.00 | | 15,512.50 |
| 04/09/2013 | T198188 | Acciones Comunes | Compra/Venta | Bullfrog Gold Corp | 40,000 | 0.29750 | 11,900.00 | | 0.00 |
| 04/09/2013 | T198206 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 9,000 | 0.31000 | 0.00 | | 2,790.00 |
| 04/09/2013 | T198207 | Acciones Comunes | Compra/Venta | Horizon Minerals Corp | 18,000 | 0.50000 | 0.00 | | 9,000.00 |
| 04/09/2013 | T198205 | Acciones Comunes | Compra/Venta | Pulse Beverage Corp/The | 10,000 | 0.84765 | 0.00 | | 8,476.50 |
| 04/09/2013 | T198260 | Acciones Comunes | Compra/Venta | Boldface Group Inc | 72,575 | 0.03041 | 2,207.22 | | 0.00 |
| 06/09/2013 | T198352 | Acciones Comunes | Compra/Venta | Inovio Pharmaceuticals Inc | 50,000 | 1.72200 | 0.00 | | 86,100.00 |
| 29/08/2013 | T198186 | Acciones Comunes | Compra/Venta | Direxion Daily Gold Miners Bul | 1,000 | 71.81400 | 71,814.00 | | 0.00 |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used
for investigative uses consistent with the undertaking between the SMV and the SEC
dated January 28, 2016 The materials "may not" be used without prior notice to the
SMV, including use in a public proceeding or sharing with third parties

SEC-SMV-P-0002062

A241

**FORMULARIO DS-1**
**REPORTE MENSUAL DE CASAS DE VALORES**

Casa de Valores: Verinvest Capital, S.A.

Mes que Reporta: Agosto, 2013

Fecha de entrega: 13 de Septiembre, 2013

Persona de Contacto: Yessenia Batista
Teléfono de Contacto: 391-9051
E-mail: yessenia.batista@verdmont.com.pa

| Fecha | Código | Tipo | Operación | Emisor | Cantidad | Precio | Valor 1 | Valor 2 | X |
|---|---|---|---|---|---|---|---|---|---|
| 29/08/2013 | T198176 | Acciones Comunes | Compra/Venta | DGT Resources Ltd | 56,000 | 0.06071 | 0.00 | 3,226.92 | |
| 29/08/2013 | T198181 | Acciones Comunes | Compra/Venta | TAD Mineral Exploration Inc | 4,000 | 0.03000 | 113.89 | 0.00 | |
| 04/09/2013 | T198365 | Acciones Comunes | Compra/Venta | Makena Resources Inc | 97,000 | 0.22433 | 0.00 | 20,852.43 | |
| 29/08/2013 | T198194 | Acciones Comunes | Compra/Venta | Indo Global Exchanges Pte. Ltd | 3,400 | 0.70588 | 0.00 | 2,400.00 | |
| 29/08/2013 | T198195 | Acciones Comunes | Compra/Venta | Monarchy Resources Inc | 100,000 | 0.18035 | 0.00 | 18,035.00 | |
| 29/08/2013 | T198204 | Acciones Comunes | Compra/Venta | Poly Shield Technologies | 4,500 | 0.55000 | 0.00 | 2,475.00 | |
| 29/08/2013 | T198205 | Acciones Comunes | Compra/Venta | Indo Global Exchanges Pte. Ltd | 10,960 | 0.69000 | 7,562.40 | 0.00 | |
| 29/08/2013 | T198259 | Acciones Comunes | Préstamos (margen) | Scout Exploration Inc | 20,000 | 0.05950 | 1,190.00 | 0.00 | X |
| 05/09/2013 | T198345 | Acciones Comunes | Préstamos (margen) | Bullfrog Gold Corp | 44,000 | 0.31000 | 13,640.00 | 0.00 | X |
| 05/09/2013 | T198356 | Acciones Comunes | Compra/Venta | Indo Global Exchanges Pte. Ltd | 5,000 | 0.71000 | 0.00 | 3,550.00 | |
| 05/09/2013 | T198402 | Acciones Comunes | Compra/Venta | Colonial Coal International Co | 15,000 | 0.47200 | 6,719.63 | 0.00 | |
| 05/09/2013 | T198343 | Acciones Comunes | Compra/Venta | Grande Portage Resources Ltd | 100,000 | 0.04050 | 0.00 | 4,270.95 | |
| 05/09/2013 | T198429 | Acciones Comunes | Compra/Venta | Habaners Resources Inc | 1,500,000 | 0.01517 | 0.00 | 21,592.50 | |
| 05/09/2013 | T198360 | Acciones Comunes | Compra/Venta | Drexion Daily 20 Year Plus Tr | 20 | 69.22000 | 0.00 | 1,384.40 | |
| 05/09/2013 | T198354 | Acciones Comunes | Compra/Venta | Suja Minerals Corp | 7,500 | 0.70000 | 0.00 | 5,250.00 | |
| 05/09/2013 | T198355 | Acciones Comunes | Compra/Venta | National Graphite Corp | 87,500 | 0.05000 | 0.00 | 4,375.00 | |
| 05/09/2013 | T198359 | Acciones Comunes | Préstamos (margen) | NanoViricides Inc | 30,000 | 1.20000 | 36,000.00 | 0.00 | X |
| 05/09/2013 | T198363 | Acciones Comunes | Compra/Venta | Pulse Beverage Corp/The | 1,150 | 0.87000 | 0.00 | 1,000.50 | |
| 05/09/2013 | T198443 | Acciones Comunes | Compra/Venta | Inovio Pharmaceuticals Inc | 15,624 | 1.77200 | 0.00 | 27,685.73 | |
| 05/09/2013 | T198341 | Acciones Comunes | Compra/Venta | Alternet Systems Inc | 112,000 | 0.04003 | 0.00 | 4,483.02 | |
| 05/09/2013 | T198342 | Acciones Comunes | Compra/Venta | Neohydro Technologies Corp | 31,600 | 0.03891 | 0.00 | 1,229.49 | |
| 05/09/2013 | T198349 | Acciones Comunes | Compra/Venta | Rostock Ventures Corp | 20,000 | 0.02000 | 400.00 | 0.00 | |
| 05/09/2013 | T198351 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 50,000 | 0.55600 | 0.00 | 27,900.00 | |
| 05/09/2013 | T198362 | Acciones Comunes | Compra/Venta | Bullfrog Gold Corp | 12,540 | 0.30000 | 0.00 | 3,762.00 | |
| 05/09/2013 | T198339 | Acciones Comunes | Compra/Venta | BlueFire Equipment Corp | 11,570 | 0.52000 | 0.00 | 6,016.40 | |
| 05/09/2013 | T198341 | Acciones Comunes | Compra/Venta | PacWest Equities Inc | 247,500 | 0.03310 | 8,191.26 | 0.00 | |
| 05/09/2013 | T198513 | Acciones Comunes | Compra/Venta | Pershing Gold Corp | 120,000 | 0.38303 | 0.00 | 45,963.24 | |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used
for investigative uses consistent with the undertaking between the SMV and the SEC
dated January 28, 2016 The materials "may not" be used without prior notice to the
SMV, including use in a public proceeding or sharing with third parties

SEC-SMV-P-0002063

A242

FORMULARIO DS-01
REPORTE MENSUAL DE CASAS DE VALORES

| Casa de Valores: | Vertmont Capital, S.A. |
| Mes que Reporta: | Septiembre, 2013 |
| Fecha de entrega: | Octubre 15, 2013 |

| Persona de Contacto: | Yessenia Batista |
| Teléfono de Contacto: | 301-9051 |
| E-mail: | yessenia.batista@verdmont.com.pa |

| Fecha | Fecha | ID | Instrumento | Operación | Descripción | Cantidad | Precio | Valor 1 | Valor 2 | |
|---|---|---|---|---|---|---|---|---|---|---|
| 03/09/2013 | 06/09/2013 | T198461 | Acciones Comunes | Compra/Venta | VelocityShares Daily 2x VIX Sh | 10,000 | 19.20315 | 0.00 | 192,031.51 | |
| 03/09/2013 | 06/09/2013 | T198422 | Acciones Comunes | Compra/Venta | Royal Mines & Minerals Corp | 90,000 | 0.01300 | 0.00 | 1,170.00 | |
| 03/09/2013 | 06/09/2013 | T198423 | Acciones Comunes | Compra/Venta | Alternet Systems Inc | 62,000 | 0.04774 | 0.00 | 2,960.00 | |
| 03/09/2013 | 06/09/2013 | T198424 | Acciones Comunes | Compra/Venta | Neohydro Technologies Corp | 150,000 | 0.04750 | 0.00 | 7,125.00 | |
| 03/09/2013 | 06/09/2013 | T198426 | Acciones Comunes | Compra/Venta | Petrosonic Energy Inc | 30,000 | 0.39917 | 11,975.01 | 0.00 | |
| 03/09/2013 | 06/09/2013 | T198432 | Acciones Comunes | Compra/Venta | Game Plan Holdings Inc | 3,800 | 0.65100 | 0.00 | 2,473.80 | |
| 03/09/2013 | 06/09/2013 | T198436 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 5,000 | 0.27500 | 1,375.00 | 0.00 | |
| 03/09/2013 | 06/09/2013 | T198585 | Acciones Comunes | Compra/Venta | Logan International Inc | 1,000 | 7.94400 | 7,710.45 | 0.00 | |
| 03/09/2013 | 06/09/2013 | T198461 | Préstamos (margin) | Compra/Venta | Concordia Resource Corp | 20,000 | 0.15000 | 2,911.80 | 0.00 | X |
| 03/09/2013 | 06/09/2013 | T198525 | Acciones Comunes | Compra/Venta | ProShares Ultra S&P500 | 10,000 | 80.50000 | 0.00 | 805,000.00 | |
| 03/09/2013 | 06/09/2013 | T198555 | Acciones Comunes | Compra/Venta | Tapjan Resources Inc | 12,000 | 0.30875 | 0.00 | 3,586.07 | |
| 03/09/2013 | 06/09/2013 | T198437 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 8,000 | 0.27629 | 2,210.30 | 0.00 | |
| 03/09/2013 | 06/09/2013 | T198439 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 7,500 | 0.27730 | 2,079.75 | 0.00 | |
| 03/09/2013 | 06/09/2013 | T198441 | Acciones Comunes | Compra/Venta | Portlogic Systems Inc | 900,000 | 0.03466 | 0.00 | 31,194.90 | |
| 03/09/2013 | 06/09/2013 | T198444 | Acciones Comunes | Compra/Venta | Inovio Pharmaceuticals Inc | 284,376 | 1.86981 | 0.00 | 531,728.24 | |
| 03/09/2013 | 06/09/2013 | T198456 | Acciones Comunes | Compra/Venta | Pulse Beverage Corp/The | 29,300 | 0.88000 | 0.00 | 25,784.00 | |
| 03/09/2013 | 06/09/2013 | T198442 | Acciones Comunes | Compra/Venta | Nokia OYJ | 2,560 | 5.30000 | 0.00 | 13,568.00 | |
| 03/09/2013 | 06/09/2013 | T198453 | Acciones Comunes | Compra/Venta | Poly Shield Technologies | 10,000 | 0.55000 | 0.00 | 5,500.00 | |
| 03/09/2013 | 06/09/2013 | T198430 | Acciones Comunes | Compra/Venta | Habanero Resources Inc | 26,000 | 0.01500 | 0.00 | 378.53 | |
| 03/09/2013 | 06/09/2013 | T198509 | Préstamos (margin) | Compra/Venta | Alexandria Capital Corp | 2,000 | 0.10000 | 194.12 | 0.00 | X |
| 03/09/2013 | 06/09/2013 | T198510 | Acciones Comunes | Compra/Venta | Colonial Coal International Co | 14,000 | 0.45000 | 6,114.78 | 0.00 | |
| 03/09/2013 | 06/09/2013 | T198425 | Acciones Comunes | Compra/Venta | Petrosonic Energy Inc | 25,000 | 0.42000 | 10,500.00 | 0.00 | |
| 03/09/2013 | 06/09/2013 | T198427 | Préstamos (margin) | Compra/Venta | Bullfrog Gold Corp | 5,000 | 0.30000 | 1,500.00 | 0.00 | X |
| 03/09/2013 | 06/09/2013 | T198438 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 10,000 | 0.27990 | 2,799.00 | 0.00 | |
| 03/09/2013 | 06/09/2013 | T198440 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 3,000 | 0.27990 | 839.70 | 0.00 | |
| 03/09/2013 | 06/09/2013 | T198447 | Acciones Comunes | Compra/Venta | Inca Global Exchanges Pte. Ltd | 30,000 | 0.71000 | 0.00 | 21,300.00 | |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used
for investigative uses consistent with the undertaking between the SMV and the SEC
dated January 28, 2016 The materials "may not" be used without prior notice to the
SMV, including use in a public proceeding or sharing with third parties

SEC-SMV-P-0002076

A243

**FORMULARIO DS-01**
**REPORTE M... AL DE CASAS DE VALORES**

| Casa de Valores: | Vestmont Capital, S.A. |
|---|---|
| Mes que Reporta: | Septiembre, 2013 |
| Fecha de entrega: | Octubre 15, 2013 |

| Persona de Contacto: | Yessenia Batista |
|---|---|
| Teléfono de Contacto: | 301-9051 |
| E-mail: | yessenia.batista@verdmont.com.pa |

| | | | | Company | Qty | Price | Val 1 | Val 2 | X |
|---|---|---|---|---|---|---|---|---|---|
| 06/09/2013 | 11/09/2013 | T198869 | Compra/Venta | Acciones Comunes | East West Petroleum Corp | 20,000 | 0.43188 | 0.00 | 8,383.56 | |
| 06/09/2013 | 11/09/2013 | T198872 | Compra/Venta | Acciones Comunes | Indo Global Exchanges Pte. Ltd | 8,108 | 0.73000 | 0.00 | 5,918.84 | |
| 06/09/2013 | 11/09/2013 | T198873 | Compra/Venta | Acciones Comunes | Ener-Core Inc | 11,500 | 1.33000 | 0.00 | 15,295.00 | |
| 06/09/2013 | 11/09/2013 | T198874 | Compra/Venta | Acciones Comunes | Monarchy Resources Inc | 1,750 | 0.07000 | 0.00 | 122.50 | |
| 06/09/2013 | 11/09/2013 | T198861 | Compra/Venta | Acciones Comunes | Divesion Daily Gold Miners Bul | 1,000 | 74.26550 | 0.00 | 74,265.50 | |
| 06/09/2013 | 11/09/2013 | T198858 | Compra/Venta | Acciones Comunes | CelLynx Group Inc | 6,000,000 | 0.00070 | 4,200.00 | 0.00 | |
| 06/09/2013 | 11/09/2013 | T198859 | Compra/Venta | Acciones Comunes | Emo Capital Corp | 667,030 | 0.00999 | 6,665.63 | 0.00 | |
| 06/09/2013 | 11/09/2013 | T198862 | Compra/Venta | Acciones Comunes | American Graphite Technologies | 5,000 | 0.25440 | 0.00 | 1,272.00 | |
| 06/09/2013 | 11/09/2013 | T198863 | Compra/Venta | Acciones Comunes | Alkaline Water Co Inc/The | 359,395 | 0.81122 | 0.00 | 291,475.40 | |
| 06/09/2013 | 11/09/2013 | T198864 | Compra/Venta | Acciones Comunes | American Graphite Technologies | 5,290 | 0.24500 | 1,296.05 | 0.00 | |
| 06/09/2013 | 11/09/2013 | T198866 | Compra/Venta | Acciones Comunes | Portlogic Systems Inc | 360,000 | 0.04120 | 0.00 | 14,832.00 | |
| 06/09/2013 | 11/09/2013 | T198867 | Compra/Venta | Acciones Comunes | Inovio Pharmaceuticals Inc | 25,000 | 2.22500 | 0.00 | 55,625.00 | |
| 06/09/2013 | 11/09/2013 | T198868 | Compra/Venta | Acciones Comunes | GEI Global Energy Corp | 6,200 | 0.60000 | 3,720.00 | 0.00 | |
| 06/09/2013 | 11/09/2013 | T198870 | Compra/Venta | Acciones Comunes | Rango Energy Inc | 20,000 | 0.16000 | 3,200.00 | 0.00 | |
| 06/09/2013 | 11/09/2013 | T198871 | Compra/Venta | Acciones Comunes | Stevia Corp | 11,900 | 0.14042 | 0.00 | 1,671.00 | |
| 06/09/2013 | 11/09/2013 | T198876 | Compra/Venta | Acciones Comunes | OncoSec Medical Inc | 100,000 | 0.33607 | 0.00 | 33,606.80 | |
| 06/09/2013 | 11/09/2013 | T198878 | Compra/Venta | Acciones Comunes | CelLynx Group Inc | 10,000,000 | 0.00070 | 7,000.00 | 0.00 | |
| 06/09/2013 | 11/09/2013 | T198883 | Compra/Venta | Acciones Comunes | B2Gold Corp | 20,000 | 2.73094 | 0.00 | 54,618.70 | |
| 06/09/2013 | 11/09/2013 | T198844 | Compra/Venta | Acciones Comunes | Brigus Gold Corp | 10,000 | 0.59000 | 0.00 | 5,726.54 | |
| 06/09/2013 | 11/09/2013 | T198845 | Compra/Venta | Acciones Comunes | Petrominerales Ltd | 10,000 | 6.66200 | 64,661.37 | 0.00 | |
| 06/09/2013 | 11/09/2013 | T198846 | Compra/Venta | Acciones Comunes | Cabo Drilling Corp | 9,000 | 0.04500 | 393.09 | 0.00 | |
| 06/09/2013 | 11/09/2013 | T198847 | Compra/Venta | Acciones Comunes | GPM Metals Inc | 150,000 | 0.08167 | 0.00 | 11,888.90 | |
| 06/09/2013 | 11/09/2013 | T198852 | Compra/Venta | Acciones Comunes | CounterPath Corp | 1,200 | 1.65000 | 0.00 | 1,921.79 | |
| 06/09/2013 | 11/09/2013 | T198857 | Compra/Venta | Acciones Comunes | US Oil Sands Inc | 83,000 | 0.10000 | 0.00 | 8,055.98 | |
| 06/09/2013 | 11/09/2013 | T198860 | Préstamos (margen) | Acciones Comunes | Aguia Resources Ltd | 250,000 | 0.09000 | 20,985.75 | 0.00 | X |
| 06/09/2013 | 11/09/2013 | T198866 | Préstamos (margen) | Acciones Comunes | VelocityShares Daily 2x VIX Sh | 10,000 | 18.04370 | 180,437.00 | 0.00 | X |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used
for investigative uses consistent with the undertaking between the SMV and the SEC
dated January 28, 2016 The materials "may not" be used without prior notice to the
SMV, including use in a public proceeding or sharing with third parties

SEC-SMV-P-0002080

A244

FORMULARIO DS-01
REPORTE MENSUAL DE CASAS DE VALORES

Casa de Valores: Verdmont Capital, S.A.
Mes que Reporta: Septiembre, 2013
Fecha de entrega: Octubre 15, 2013

Persona de Contacto: Yessenia Batista
Teléfono de Contacto: 301-9051
E-mail: yessenia.batista@verdmont.com.pa

| Fecha | Fecha | Código | Tipo | Transacción | Valor | Cantidad | Precio | Valor 1 | Valor 2 |
|---|---|---|---|---|---|---|---|---|---|
| 08/09/2013 | 12/09/2013 | T199858 | Acciones Comunes | Compra/Venta | Matawra Resources Inc | 5,500 | 0.12500 | 667.29 | 0.00 |
| 09/09/2013 | 12/09/2013 | T199859 | Acciones Comunes | Compra/Venta | TAD Mineral Exploration Inc | 1,282,000 | 0.03000 | 37,339.28 | 0.00 |
| 10/09/2013 | 13/09/2013 | T199124 | Acciones Comunes | Compra/Venta | TAD Mineral Exploration Inc | 23,000 | 0.03000 | 668.71 | 0.00 |
| 10/09/2013 | 13/09/2013 | T199287 | Acciones Comunes | Compra/Venta | VelocityShares Daily 2x VIX Sh | 58,047 | 16.50000 | 957,776.50 | 0.00 |
| 10/09/2013 | 13/09/2013 | T199120 | Acciones Comunes | Compra/Venta | Monarchy Resources Inc | 212,500 | 0.04109 | 0.00 | 8,732.48 |
| 10/09/2013 | 13/09/2013 | T199129 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 8,000 | 0.17500 | 1,400.00 | 0.00 |
| 10/09/2013 | 13/09/2013 | T199130 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 10,000 | 0.20000 | 2,000.00 | 0.00 |
| 10/09/2013 | 13/09/2013 | T199147 | Acciones Comunes | Compra/Venta | Range Energy Inc | 15,919 | 0.15000 | 0.00 | 2,387.85 |
| 10/09/2013 | 13/09/2013 | T199148 | Acciones Comunes | Compra/Venta | Indo Global Exchanges Pte, Ltd | 4,500 | 0.74000 | 0.00 | 3,330.00 |
| 10/09/2013 | 13/09/2013 | T199149 | Acciones Comunes | Compra/Venta | Ener-Core Inc | 12,650 | 1.45289 | 0.00 | 18,379.00 |
| 10/09/2013 | 13/09/2013 | T199159 | Acciones Comunes | Compra/Venta | Poly Shield Technologies | 8,000 | 0.57000 | 0.00 | 4,560.00 |
| 10/09/2013 | 13/09/2013 | T199173 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 140,000 | 0.90120 | 0.00 | 126,168.00 |
| 10/09/2013 | 13/09/2013 | T199177 | Acciones Comunes | Compra/Venta | Colossus Minerals Inc | 125,000 | 0.64824 | 0.00 | 81,074.22 |
| 10/09/2013 | 13/09/2013 | T199139 | Acciones Comunes | Compra/Venta | PIMCO 0-5 Year High Yield Corp | 240 | 104.55000 | 25,092.00 | 0.00 |
| 10/09/2013 | 13/09/2013 | T199151 | Acciones Comunes | Prestamos (margen) | Apple Inc | 6,000 | 500.20099 | 3,001,205.96 | 0.00 (X) |
| 10/09/2013 | 13/09/2013 | T199168 | Acciones Comunes | Compra/Venta | PIMCO 0-5 Year High Yield Corp | 120 | 104.55000 | 12,546.00 | 0.00 |
| 10/09/2013 | 13/09/2013 | T199171 | Acciones Comunes | Compra/Venta | Corsa Coal Corp | 150,000 | 0.12000 | 0.00 | 17,470.80 |
| 10/09/2013 | 13/09/2013 | T199119 | Acciones Comunes | Compra/Venta | Tungsten Corp | 100,000 | 0.21778 | 0.00 | 21,778.00 |
| 10/09/2013 | 13/09/2013 | T199131 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 357,500 | 0.86100 | 0.00 | 307,807.50 |
| 10/09/2013 | 13/09/2013 | T199141 | Acciones Comunes | Compra/Venta | Inovio Pharmaceuticals Inc | 100,000 | 2.71100 | 0.00 | 271,100.00 |
| 10/09/2013 | 13/09/2013 | T199142 | Acciones Comunes | Compra/Venta | Inovio Pharmaceuticals Inc | 100,000 | 2.47400 | 0.00 | 247,400.00 |
| 10/09/2013 | 13/09/2013 | T199143 | Acciones Comunes | Compra/Venta | Inovio Pharmaceuticals Inc | 1,923 | 2.45000 | 0.00 | 4,711.35 |
| 10/09/2013 | 13/09/2013 | T199144 | Acciones Comunes | Compra/Venta | GEI Global Energy Corp | 1,000 | 0.60000 | 600.00 | 0.00 |
| 10/09/2013 | 13/09/2013 | T199155 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 296,800 | 0.89120 | 0.00 | 264,508.16 |
| 10/09/2013 | 13/09/2013 | T199156 | Acciones Comunes | Compra/Venta | OncoSec Medical Inc | 100,000 | 0.33355 | 0.00 | 33,355.00 |
| 10/09/2013 | 13/09/2013 | T199170 | Acciones Comunes | Compra/Venta | Cellynx Group Inc | 5,000,000 | 0.00050 | 2,500.00 | 0.00 |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used for investigative uses consistent with the undertaking between the SMV and the SEC dated January 28, 2016 The materials "may not" be used without prior notice to the SMV, including use in a public proceeding or sharing with third parties

*1465*

**FORMULARIO DS-01**
**REPORTE MENSUAL DE CASAS DE VALORES**

| Casa de Valores: | Verdmont Capital, S.A. |
|---|---|
| Mes que Reporta: | Septiembre, 2013 |
| Fecha de entrega: | Octubre 15, 2013 |

| Persona de Contacto: | Yessenia Batista |
|---|---|
| Teléfono de Contacto: | 301-0051 |
| E-mail: | yessenia.batista@verdmont.com.pa |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/09/2013 | 17/09/2013 | T199463 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 47,000 | 0.15840 | 0.00 | 7,444.99 | |
| 12/09/2013 | 17/09/2013 | T199465 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 47,000 | 0.16196 | 0.00 | 7,611.98 | |
| 12/09/2013 | 17/09/2013 | T199620 | Acciones Comunes | Compra/Venta | Pandora Media Inc | 159,600 | 23.57103 | 0.00 | 3,761,936.07 | |
| 12/09/2013 | 17/09/2013 | T199461 | Acciones Comunes | Compra/Venta | Direxion Daily Gold Miners Bul | 2,000 | 56.05070 | 112,101.40 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199461 | Acciones Comunes | Prestamo (margen) | Apple Inc | 1,000 | 473.42390 | 473,423.90 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199506 | Acciones Comunes | Prestamo (margen) | Newmont Mining Corp | 5,000 | 28.71080 | 143,554.00 | 0.00 | X |
| 12/09/2013 | 17/09/2013 | T199665 | Acciones Comunes | Prestamo (margen) | B2Gold Corp | 50,000 | 2.44901 | 122,450.50 | 0.00 | X |
| 12/09/2013 | 17/09/2013 | T199485 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 339,345 | 1.18370 | 401,682.68 | 0.00 | X |
| 12/09/2013 | 17/09/2013 | T199488 | Acciones Comunes | Compra/Venta | NanoViricides Inc | 6,000 | 3.59450 | 21,567.00 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199464 | Acciones Comunes | Compra/Venta | PacWest Equities Inc | 897,228 | 0.08003 | 71,803.36 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199486 | Acciones Comunes | Compra/Venta | Press Ventures Inc | 277,551 | 0.11188 | 31,080.72 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199501 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 434,021 | 1.15120 | 499,644.98 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199505 | Acciones Comunes | Compra/Venta | PacWest Equities Inc | 385,000 | 0.08439 | 32,567.54 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199462 | Acciones Comunes | Compra/Venta | Bullfrog Gold Corp | 30,000 | 0.24667 | 7,400.01 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199468 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 11,900 | 0.16000 | 1,904.00 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199669 | Acciones Comunes | Compra/Venta | PacWest Equities Inc | 2,400,000 | 0.08356 | 200,532.00 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199470 | Acciones Comunes | Compra/Venta | Inivio Pharmaceuticals Inc | 100,000 | 2.23300 | 223,300.00 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199471 | Acciones Comunes | Compra/Venta | Green Envirotech Holdings Corp | 3,000 | 0.75100 | 2,253.00 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199478 | Acciones Comunes | Compra/Venta | Indo Global Exchanges Pte Ltd | 50,000 | 0.76000 | 38,000.00 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199438 | Acciones Comunes | Compra/Venta | PacWest Equities Inc | 875,000 | 0.08670 | 75,860.75 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199441 | Acciones Comunes | Compra/Venta | PacWest Equities Inc | 125,000 | 0.08510 | 10,637.50 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199445 | Acciones Comunes | Compra/Venta | Royal Mines & Minerals Corp | 30,000 | 0.02600 | 780.00 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199456 | Acciones Comunes | Compra/Venta | Monarchy Resources Inc | 90,000 | 0.05000 | 4,500.00 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199466 | Acciones Comunes | Compra/Venta | Kunekt Corp | 134,551 | 0.02140 | 2,879.26 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199458 | Acciones Comunes | Compra/Venta | PacWest Equities Inc | 132,668 | 0.08300 | 11,011.58 | 0.00 | |
| 12/09/2013 | 17/09/2013 | T199473 | Acciones Comunes | Compra/Venta | ProShares Ultra VIX Short-Term | 2,000 | 33.00000 | 66,000.00 | 0.00 | |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used for investigative uses consistent with the undertaking between the SMV and the SEC dated January 28, 2016 The materials "may not" be used without prior notice to the SMV, including use in a public proceeding or sharing with third parties

SEC-SMV-P-0002088

A246

## FORMULARIO DS-01
### REPORTE MENSUAL DE CASAS DE VALORES

Casa de Valores: Verdmont Capital, S.A.
Mas que Reporta: Septiembre, 2013
Fecha de entrega: Octubre 15, 2013

Persona de Contacto: Yessenia Batista
Teléfono de Contacto: 301-0051
E-mail: yessenia.batista@verdmont.com.pa

| Fecha | Fecha entrega | Código | Tipo | Operación | Emisor | Cantidad | Precio | Compra | Venta | Margen |
|---|---|---|---|---|---|---|---|---|---|---|
| 13/09/2013 | 18/09/2013 | T199657 | Acciones Comunes | Compra/Venta | PacWest Equities Inc | 100,000 | 0.08541 | 0.00 | 8,541.10 | |
| 13/09/2013 | 18/09/2013 | T199659 | Acciones Comunes | Compra/Venta | Press Ventures Inc | 542,071 | 0.14700 | 79,684.44 | 0.00 | |
| 13/09/2013 | 18/09/2013 | T199660 | Acciones Comunes | Compra/Venta | Horizon Minerals Corp | 125,000 | 0.49460 | 0.00 | 61,825.00 | |
| 13/09/2013 | 18/09/2013 | T199662 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 30,000 | 0.18166 | 0.00 | 5,449.74 | |
| 13/09/2013 | 18/09/2013 | T199663 | Acciones Comunes | Compra/Venta | PacWest Equities Inc | 2,020,000 | 0.08120 | 0.00 | 164,024.00 | |
| 13/09/2013 | 18/09/2013 | T199831 | Acciones Comunes | Compra/Venta | Inovio Pharmaceuticals Inc | 111,773 | 2.27200 | 0.00 | 253,948.26 | |
| 13/09/2013 | 18/09/2013 | T199851 | Acciones Comunes | Préstamos (margen) | Direxon Daily Gold Miners Bul | 10,000 | 55.00350 | 550,035.00 | 0.00 | X |
| 13/09/2013 | 18/09/2013 | T199852 | Acciones Comunes | Compra/Venta | Direxon Daily Gold Miners Bul | 10,000 | 56.36018 | 0.00 | 563,601.77 | |
| 13/09/2013 | 18/09/2013 | T199640 | Acciones Comunes | Compra/Venta | American Graphite Technologies | 181,600 | 0.18117 | 0.00 | 32,900.47 | |
| 13/09/2013 | 18/09/2013 | T199643 | Acciones Comunes | Compra/Venta | PacWest Equities Inc | 1,000,000 | 0.08110 | 0.00 | 81,100.00 | |
| 13/09/2013 | 18/09/2013 | T199645 | Acciones Comunes | Compra/Venta | Western Graphite Inc | 55,000 | 0.22000 | 0.00 | 12,100.00 | |
| 13/09/2013 | 18/09/2013 | T199646 | Acciones Comunes | Compra/Venta | Indo Global Exchanges Pte. Ltd | 25,800 | 0.78454 | 0.00 | 20,241.00 | |
| 13/09/2013 | 18/09/2013 | T199648 | Acciones Comunes | Compra/Venta | Ener-Core Inc | 100 | 1.50000 | 0.00 | 150.00 | |
| 13/09/2013 | 18/09/2013 | T199655 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 126,400 | 0.74949 | 0.00 | 94,734.90 | |
| 13/09/2013 | 18/09/2013 | T199616 | Acciones Comunes | Compra/Venta | Mount Knowledge Holdings Inc | 90,000 | 0.04161 | 0.00 | 3,744.63 | |
| 13/09/2013 | 18/09/2013 | T199624 | Acciones Comunes | Compra/Venta | Monarchy Resources Inc | 70,000 | 0.05000 | 0.00 | 3,500.00 | |
| 13/09/2013 | 18/09/2013 | T199831 | Acciones Comunes | Compra/Venta | Kunekt Corp | 9,100 | 0.02400 | 0.00 | 218.40 | |
| 13/09/2013 | 18/09/2013 | T199834 | Acciones Comunes | Compra/Venta | PacWest Equities Inc | 600,000 | 0.08526 | 0.00 | 51,154.20 | |
| 13/09/2013 | 18/09/2013 | T199836 | Acciones Comunes | Compra/Venta | Press Ventures Inc | 199,000 | 0.16119 | 32,077.41 | 0.00 | |
| 13/09/2013 | 18/09/2013 | T199839 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 262,223 | 1.18654 | 0.00 | 311,138.08 | |
| 13/09/2013 | 18/09/2013 | T199623 | Acciones Comunes | Compra/Venta | Aurgent Gold Corp | 6,000 | 0.05000 | 349.42 | 0.00 | |
| 13/09/2013 | 18/09/2013 | T199649 | Acciones Comunes | Compra/Venta | Ener-Core Inc | 13,800 | 1.48000 | 0.00 | 20,424.00 | |
| 13/09/2013 | 18/09/2013 | T199656 | Acciones Comunes | Compra/Venta | Press Ventures Inc | 389,198 | 0.08400 | 0.00 | 32,692.46 | |
| 13/09/2013 | 18/09/2013 | T199658 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 145,000 | 0.12800 | 18,560.00 | 0.00 | |
| 13/09/2013 | 18/09/2013 | T199661 | Acciones Comunes | Compra/Venta | Alkaline Water Co Inc/The | 20,000 | 0.84500 | 0.00 | 16,900.00 | |
| 13/09/2013 | 18/09/2013 | T199664 | Acciones Comunes | Compra/Venta | PacWest Equities Inc | 1,750,000 | 0.08320 | 0.00 | 145,600.00 | |

Confidential pursuant to Securities Exchange Act s.24(d). The materials "may" be used for investigative uses consistent with the undertaking between the SMV and the SEC dated January 28, 2016 The materials "may not" be used without prior notice to the SMV. including use in a public proceeding or sharing with third parties

SEC-SMV-P-0002090

A247

Donelan Declaration
Exhibit

**L**

SEC v Sharp, et al

Portfolio Valuation - ▇790-1 - Page 1/6

In USD as at 31 March 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF : H-16 V2013.1/099 CFD-01 April 2014 09:17:42

## Portfolio Valuation - ▇790-1

This report represents the market value of your portfolio ▇790-1 as at 31 March 2014 for USD 815,426.41. The prices mentioned in the present document are provided only as an indication of the portfolio value and the Bank takes no responsibility therefor.

**Summary of client portfolios ▇790**

Valuation of All your Portfolios

▇790-1   NON DISCRETIONARY                                          USD       815,426.41

### Portfolio Breakdown by Currency and by Assets

| Asset Classes | Total USD | Total | USD |
|---|---|---|---|
| Cash & Equiv. | 6,926.41 | 0.85% | 0.85% |
| Equities | 808,500.00 | 99.15% | 99.15% |
| **Total** | **815,426.41** | **100.00%** | **100.00%** |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000609

Portfolio Valuation - ███ 790-1 - Page 2/6

In USD as at 31 March 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF : H76 V005 1/098 OFD-01 April 2014 09:17:42



### Portfolio Breakdown by Assets (Excluding Loans)

### Portfolio Breakdown by Assets

| Asset Classes | Valuation Amount USD | |
|---|---|---|
| Cash and Cash Equivalents | 6,926.41 | 0.85% |
| Equities | 808,500.00 | 99.15% |
| **Total** | **815,426.41** | **100.00%** |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000610

A249



Portfolio Valuation - ▮▮790-1 - Page 3/6

In USD as at 31 March 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF : H16 VDD3,1/090 OFD-01 April 2014 09:17:42

**Portfolio Performance Analysis - Reference Currency: USD**

**Performance 2014: 450.73 %**

| | |
|---|---|
| Portfolio Valuation at 13 March 2014 | 0.00 |
| + Contributions | 279,970.00 |
| - Withdrawals | -273,045.00 |
| Adjusted Portfolio Valuation | 6,925.00 |
| Portfolio Valuation at 31 March 2014 | 815,426.41 |
| (Accrued Interests Included) | 0.00 |
| Net Result | 808,501.41 |
| Performance on 31 March 2014 | 450.73 % |
| Average Capital | 179,374.47 |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000611

A250



Portfolio Valuation - ████790-1 - Page 4/6

In USD as at 31 March 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY

| Ccy | Nominal | Description | Value Date / Maturity Date | Purchase Price | Valuation Price | Unrealized Gain Currency Effect | Purchase Cost USD | Valuation Amount USD | % of Port |
|-----|---------|-------------|---------------------------|----------------|-----------------|--------------------------------|-------------------|---------------------|-----------|
| **CASH AND CASH EQUIVALENTS** | | | | | | | | **6,926.41** | **0.85%** |
| | | Cash Accounts | | | | | | | |
| USD | 6,926.41 | CURRENT ACCOUNT 386790.122.8 | | | | | | 6,926.41 | 0.85% |
| **EQUITIES** | | | | | | | | **808,500.00** | **99.15%** |
| | | Equities | | | | | | | |
| USD | 1,050,000 | ONCOSEC MEDICAL INC -USD- US68234L1089 004117-151 Last acq. Holding Period 4 Days | | 0.26 | 0.77 (as at 31-03-14) | 196.15 % | 273,000.00 | 808,500.00 | 99.15% |
| | | | | | | **GRAND TOTAL** Accrued Interest Included | | **815,426.41 USD** | |

E. & O. E.  Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000612

A251

Portfolio Valuation - ███790-1 - Page 5/6

In USD as at 31 March 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF : H-16 USD-1 / 000-CFD-01 /p4-2014 01/17/42

| Transaction Reference | Description | Trade Date | Value Date Maturity Date | Sec. Ccy | Quantity / Notional Amt | Price | Ccy | Amount (including interest) |
|---|---|---|---|---|---|---|---|---|
| | **TRANSACTION MOVEMENTS FROM 01 MARCH 2014 TO 31 MARCH 2014** | | | | | | | |

**Equities**

| Transaction Reference | Description | Trade Date | Value Date Maturity Date | Sec. Ccy | Quantity / Notional Amt | Price | Ccy | Amount (including interest) |
|---|---|---|---|---|---|---|---|---|
| US68234L1089 | ONCOSEC MEDICAL INC -USD- | | | | | | | |
| | Balance as at 01 Mar 2014 | | | USD | 0 | | USD | 0.00 |
| SECTSC1409000039.3 | POSITION TRANSFER | 28 Mar 2014 | 28 Mar 2014 | USD | -1,050,000 | 0.26 | USD | -273,000.00 |
| SECTSC1409000039.1 | TRANSFER (ADJUSTMENT) | 28 Mar 2014 | 28 Mar 2014 | USD | 1,050,000 | 0.26 | USD | 273,000.00 |
| SECTSC1409000039.5 | POSITION TRANSFER | 28 Mar 2014 | 28 Mar 2014 | USD | 1,050,000 | 0.26 | USD | 273,000.00 |
| | Balance as at 31 Mar 2014 | | | USD | 1,050,000 | 0.77 | USD | 808,500.00 |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000613

A252

Portfolio Valuation - ████790-1 - Page 6/6

In USD as at 31 March 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF : H76100/2,1790.0F0.01 dyd.2014.01.17.tl

## Glossary

**Notes for Portfolio Valuation**

Disclaimer

The present portfolio valuation (hereafter: the "valuation") states the market prices (and the applicable foreign exchange rates) of the positions (assets and liabilities) in your account. In general, the stated prices correspond to the resale price in the market as of the date of the present valuation. The indicated market prices are provided by EFG Bank AG, Singapore Branch (hereafter: the "Bank") by standard banking information sources which the Bank considers to be reliable. Nevertheless, for certain securities, in particular for illiquid assets, the information sources of the Bank may not provide any valuation. The Bank values such securities at the value it deems to be the market price, without any commitment on the part of the Bank. Moreover, for certain investment products, e.g. hedge funds or private equity funds, the official net asset value can only be obtained at certain dates. In such cases, it is possible that your portfolio valuation refers to an internal estimated valuation and not to an official valuation.

The present valuation is provided solely for information purposes and does not obligate the Bank to buy or sell assets at the stated prices. The Bank cannot guarantee that the valuation or other information and calculations in relation with the assets in custody are exact and/or exhaustive and it reserves the right to rectify these. The Bank shall not be held liable for any damages which may result from the use of the present valuation.

This valuation is not a tax valuation and should not be used for tax purposes.

Any discrepancy should be submitted to the Bank to the attention of the Compliance Department in writing within ninety (90) days from the date of dispatch of the present valuation.

E. & O. E.    Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000614

A253

01 May 2014 09:17:31

Portfolio ▮790-1
HENG HONG INVESTMENT LIMITED

HENG HONG INVESTMENT LIMITED
IFG TRUST SERVICES INC.,
BOX 822 RAMS BUSINESS OFFICE,
STONEY GROVE, NEVIS,
WEST INDIES

REF. : 1436 YODE / 7000 OFS
AU1.SG1.SIN00
VALUATION AS AT 30 April 2014

CLIENT NOTIFICATION

With effect from 30 June 2014, an annual Account Maintenance Fee of USD1,000 will be imposed per group of accounts having relationship with the Bank whose aggregate Assets-Under-Management (AUM) is below USD250,000 on a preceding 12 month-end average basis upon the completion of the annual anniversary of account opening.

AUM refers to the aggregate balance of deposits, loans, overdrafts, investment securities and cash surrender value of insurance policies maintained with the Bank.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000621

A254

Portfolio Valuation - ███790-1 - Page 1/6

In USD as at 30 April 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF  1.N4 YORK / USD GFS 01 Mai 2014 09.17.01

## Portfolio Valuation - ███790-1

This report represents the market value of your portfolio ███790-1 as at 30 April 2014 for USD 284,327.49. The prices mentioned in the present document are provided only as an indication of the portfolio value and the Bank takes no responsibility therefor.

**Summary of client portfolios** ███790

Valuation of All your Portfolios

| | | | |
|---|---|---|---|
| ███790-1    NON DISCRETIONARY | | USD | 284,327.49 |

**Portfolio Breakdown by Currency and by Assets**

| Asset Classes | Total USD | Total | USD |
|---|---|---|---|
| Cash & Equiv. | 10,577.49 | 3.72% | 3.72% |
| Equities | 273,750.00 | 96.28% | 96.28% |
| **Total** | **284,327.49** | **100.00%** | **100.00%** |

E. & O. E.  Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000622

A255

Portfolio Valuation - ███790-1 - Page 2/6

In USD as at 30 April 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF : HUN YORK / USD GPS 01 May 2014 09:17:31



**Portfolio Breakdown by Assets (Excluding Loans)**

**Portfolio Breakdown by Assets**

| Asset Classes | Valuation Amount USD | |
|---|---|---|
| Cash and Cash Equivalents | 10,577.49 | 3.72% |
| Equities | 273,750.00 | 96.28% |
| Total | 284,327.49 | 100.00% |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000623

A256

Portfolio Valuation - ▊790-1 - Page 3/6

In USD as at 30 April 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF  11/NYORE1/USD GFS.01 Mai 2014 09:11:21

**Portfolio Performance Analysis - Reference Currency: USD**

| | |
|---|---|
| Portfolio Valuation at 13 March 2014 | 0.00 |
| + Contributions | 420,970.00 |
| - Withdrawals | -897,785.00 |
| Adjusted Portfolio Valuation | -476,815.00 |
| Portfolio Valuation at 30 April 2014 (Accrued Interests Included) | 284,327.49 0.00 |
| Net Result | 761,142.49 |
| Performance on 30 April 2014 | -3392.53 % |
| Average Capital | -22,435.82 |

**Performance 2014: -3,392.53 %**



E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000624

A257

Portfolio Valuation - ▮790-1 - Page 4/6

In USD as at 30 April 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF: HAN YORE / GID GP5.11 Mar 2014 IV11-11



| Ccy | Nominal | Description | Value Date Maturity Date | Purchase Price | Valuation Price | Unrealized Gain Currency Effect | Purchase Cost USD | Valuation Amount USD | % of Port |
|-----|---------|-------------|--------------------------|----------------|-----------------|--------------------------------|-------------------|----------------------|-----------|
| **CASH AND CASH EQUIVALENTS** | | | | | | | | 10,577.49 | 3.72% |
| | | **Cash Accounts** | | | | | | | |
| USD | 10,577.49 | CURRENT ACCOUNT 386790.122.8 | | | | | | 10,577.49 | 3.72% |
| **EQUITIES** | | | | | | | | 273,750.00 | 96.28% |
| | | **Equities** | | | | | | | |
| USD | 375,000 | ONCOSEC MEDICAL INC -USD- US68234L1089 004117-151 Last acq. Holding Period 10 Days | | 0.26 | 0.73 (as at 30-04-14) | 180.77 % | 97,500.00 | 273,750.00 | 96.28% |
| | | | | | | **GRAND TOTAL** Accrued Interest Included | | 284,327.49 | USD |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000625

A258

Portfolio Valuation - ████790-1 - Page 5/6

In USD as at 30 April 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF : HAN YORE / UBO GPS14 May 2014 09 12 21

| Transaction Reference | Description | Trade Date | Value Date Maturity Date | Sec. Ccy | Quantity / Notional Amt | Price | Ccy | Amount (including interest) |
|---|---|---|---|---|---|---|---|---|
| | **TRANSACTION MOVEMENTS FROM 01 April 2014 TO 30 April 2014** | | | | | | | |
| | | | | | | | | |
| **Equities** | | | | | | | | |
| | | | | | | | | |
| US68234L1089 | ONCOSEC MEDICAL INC -USD- | | | | | | | |
| | Balance as at 01 Apr 2014 | | | USD | 1,050,000 | 0.77 | USD | 808,500.00 |
| SCTRSC1409300033.3 | POSITION TRANSFER | 02 Apr 2014 | 07 Apr 2014 | USD | 100,000 | 0.785 | USD | 78,107.50 |
| SCTRSC1409300033.1 | SPOT SALE | 02 Apr 2014 | 07 Apr 2014 | USD | -100,000 | 0.785 | USD | -78,107.50 |
| SCTRSC1409300033.5 | POSITION TRANSFER | 02 Apr 2014 | 07 Apr 2014 | USD | -100,000 | 0.785 | USD | -78,107.50 |
| SCTRSC1410400028.3 | POSITION TRANSFER | 11 Apr 2014 | 16 Apr 2014 | USD | 100,000 | 0.7382 | USD | 73,450.90 |
| SCTRSC1410400028.1 | SPOT SALE | 11 Apr 2014 | 16 Apr 2014 | USD | -100,000 | 0.7382 | USD | -73,450.90 |
| SCTRSC1410400028.5 | POSITION TRANSFER | 11 Apr 2014 | 16 Apr 2014 | USD | -100,000 | 0.7382 | USD | -73,450.90 |
| SCTRSC1410600009.3 | POSITION TRANSFER | 15 Apr 2014 | 21 Apr 2014 | USD | 100,000 | 0.6098 | USD | 60,675.10 |
| SCTRSC1410600009.1 | SPOT SALE | 15 Apr 2014 | 21 Apr 2014 | USD | -100,000 | 0.6098 | USD | -60,675.10 |
| SCTRSC1410600009.5 | POSITION TRANSFER | 15 Apr 2014 | 21 Apr 2014 | USD | -100,000 | 0.6098 | USD | -60,675.10 |
| SCTRSC1411100024.3 | POSITION TRANSFER | 17 Apr 2014 | 23 Apr 2014 | USD | 50,000 | 0.70 | USD | 34,825.00 |
| SCTRSC1411100024.1 | SPOT SALE | 17 Apr 2014 | 23 Apr 2014 | USD | -50,000 | 0.70 | USD | -34,825.00 |
| SCTRSC1411100024.5 | POSITION TRANSFER | 17 Apr 2014 | 23 Apr 2014 | USD | -50,000 | 0.70 | USD | -34,825.00 |
| SCTRSC1411200012.3 | POSITION TRANSFER | 21 Apr 2014 | 24 Apr 2014 | USD | 325,000 | 0.7432 | USD | 240,332.30 |
| SCTRSC1411200012.1 | SPOT SALE | 21 Apr 2014 | 24 Apr 2014 | USD | -325,000 | 0.7432 | USD | -240,332.30 |
| SCTRSC1411200012.5 | POSITION TRANSFER | 21 Apr 2014 | 24 Apr 2014 | USD | -325,000 | 0.7432 | USD | -240,332.30 |
| | Balance as at 30 Apr 2014 | | | USD | 375,000 | 0.73 | USD | 273,750.00 |

E. & O. E.  Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000626

A259

Portfolio Valuation - ▇790-1 - Page 6/6

In USD as at 30 April 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF. HAN YORK / OAD GPS 01 Wai 2014 09:17:31

## Glossary

**Notes for Portfolio Valuation**

Disclaimer

The present portfolio valuation (hereafter: the "valuation") states the market prices (and the applicable foreign exchange rates) of the positions (assets and liabilities) in your account. In general, the stated prices correspond to the resale price in the market as of the date of the present valuation. The indicated market prices are provided to EFG Bank AG, Singapore Branch (hereafter: the "Bank") by standard banking information sources which the Bank considers to be reliable. Nevertheless, for certain securities, in particular for illiquid assets, the information sources of the Bank may not provide any valuation. The Bank values such securities at the value it deems to be the market price, without any commitment on the part of the Bank. Moreover, for certain investment products, e.g. hedge funds or private equity funds, the official net asset value can only be obtained at certain dates. In such cases, it is possible that your portfolio valuation refers to an internal estimated valuation and not to an official valuation.

The present valuation is provided solely for information purposes and does not obligate the Bank to buy or sell assets at the stated prices. The Bank cannot guarantee that the valuation or other information and calculations in relation with the assets in custody are exact and/or exhaustive and it reserves the right to rectify these. The Bank shall not be held liable for any damages which may result from the use of the present valuation.

This valuation is not a tax valuation and should not be used for tax purposes.

Any discrepancy should be submitted to the Bank to the attention of the Compliance Department in writing within ninety (90) days from the date of dispatch of the present valuation.

E. & O. E.    Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

31 May 2014 09:07:49

Portfolio ███ 790-1
HENG HONG INVESTMENT LIMITED

HENG HONG INVESTMENT LIMITED
IFG TRUST SERVICES INC.,
BOX 822 RAMS BUSINESS OFFICE,
STONEY GROVE, NEVIS,
WEST INDIES

REF. : 1436 YODE / 7000 OFS
AU1.SG1.SIN00
VALUATION AS AT 31 May 2014

CLIENT NOTIFICATION

Please be informed that the following investment fund(s) has/have been removed from EFG Mutual/Hedge Fund List.

Mutual Fund:
N/A

Hedge Fund:
Schroder GAIA CQS Credit Long Short Fund (Date: 5 May 2014)

Please disregard this notice if you do not have such investments or your investment(s) has/have been entered at your own initiation. For further information, please contact your Client Relationship Officer/Marketing Officer.

CHANGE ON SCALE OF CHARGES

With effect from 30 June 2014, an annual Account Maintenance Fee of USD1,000 will be imposed per annum per customer account on every annual anniversary of account opening if the average aggregate Assets-Under-Management (AUM) of the group of related accounts in the preceding 12 month-end is below USD250,000.

AUM refers to the aggregate balance of deposits, loans, overdrafts, investment securities and cash surrender value of insurance policies maintained with the Bank.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000726

A261

In USD as at 31 May 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF   H.N YORK / 0269 GRS 31 May 2014 09:07:49

## Portfolio Valuation - ⬛790-1

This report represents the market value of your portfolio ⬛790-1 as at 31 May 2014 for USD 269,257.07. The prices mentioned in the present document are provided only as an indication of the portfolio value and the Bank takes no responsibility therefor.

**Summary of client portfolios** ⬛790

Valuation of All your Portfolios

| | | |
|---|---|---|
| ⬛790-1  NON DISCRETIONARY | USD | 269,257.07 |

### Portfolio Breakdown by Currency and by Assets

| Asset Classes | Total USD | Total | USD |
|---|---|---|---|
| Cash & Equiv. | 2,757.07 | 1.02% | 1.02% |
| Equities | 266,500.00 | 98.98% | 98.98% |
| **Total** | **269,257.07** | **100.00%** | **100.00%** |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000727

Portfolio Valuation - ███790-1 - Page 2/6

In USD as at 31 May 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF. 11.IN YORE I ISIG GF5.51 May 2014 09 07 r8



**Portfolio Breakdown by Assets (Excluding Loans)**

**Portfolio Breakdown by Assets**

| Asset Classes | Valuation Amount USD | |
|---|---|---|
| Cash and Cash Equivalents | 2,757.07 | 1.02% |
| Equities | 266,500.00 | 98.98% |
| **Total** | **269,257.07** | **100.00%** |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000728

A263

Portfolio Valuation - ███790-1 - Page 3/6

In USD as at 31 May 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF  HAN YORE / (SID GF5 31 May 2014 09 07 16

**Portfolio Performance Analysis - Reference Currency: USD**

| | |
|---|---|
| Portfolio Valuation at 13 March 2014 | 0.00 |
| + Contributions | 420,970.00 |
| - Withdrawals | -943,873.04 |
| Adjusted Portfolio Valuation | -522,903.04 |
| Portfolio Valuation at 31 May 2014 (Accrued Interests Included) | 269,257.07 0.00 |
| Net Result | 792,160.11 |
| Performance on 31 May 2014 | -380.74 % |
| Average Capital | -208,056.06 |

**Performance 2014: -380.74 %**



E. & O. E.  Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000729

A264

Portfolio Valuation - ███790-1 - Page 4/6

In USD as at 31 May 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF. HAN YORK / OAD GPS 31 May 2014 NY-01-B



| Ccy | Nominal | Description | Value Date Maturity Date | Purchase Price | Valuation Price | Unrealized Gain Currency Effect | Purchase Cost USD | Valuation Amount USD | % of Port |
|------|---------|-------------|--------------------------|----------------|-----------------|--------------------------------|--------------------|----------------------|-----------|
| | | **CASH AND CASH EQUIVALENTS** | | | | | | 2,757.07 | 1.02% |
| | | Cash Accounts | | | | | | | |
| USD | 2,757.07 | CURRENT ACCOUNT 386790.122.8 | | | | | | 2,757.07 | 1.02% |
| | | **EQUITIES** | | | | | | 266,500.00 | 98.98% |
| | | Equities | | | | | | | |
| USD | 325,000 | ONCOSEC MEDICAL INC -USD- US68234L1089 004117-151 Last acq. Holding Period 27 Days | | 0.26 | 0.82 (as at 30-05-14) | 215.38 % | 84,500.00 | 266,500.00 | 98.98% |
| | | | | | | **GRAND TOTAL** Accrued Interest Included | | 269,257.07 USD | |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000730

A265

Portfolio Valuation - ■790-1 - Page 5/6

In USD as at 31 May 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF: HAN YORE / USD GPS 31 May 2014 09 07-8

| Transaction Reference | Description | Trade Date | Value Date Maturity Date | Sec. Ccy | Quantity / Notional Amt | Price | Ccy | Amount (including interest) |
|---|---|---|---|---|---|---|---|---|
| | **TRANSACTION MOVEMENTS FROM 01 May 2014 TO 31 May 2014** | | | | | | | |
| **Equities** | | | | | | | | |
| US68234L1089 | ONCOSEC MEDICAL INC -USD- | | | | | | | |
| | Balance as at 01 May 2014 | | | USD | 375,000 | 0.73 | USD | 273,750.00 |
| SCTRSC1412700012.3 | POSITION TRANSFER | 06 May 2014 | 09 May 2014 | USD | 50,000 | 0.77 | USD | 38,307.50 |
| SCTRSC1412700012.1 | SPOT SALE | 06 May 2014 | 09 May 2014 | USD | -50,000 | 0.77 | USD | -38,307.50 |
| SCTRSC1412700012.5 | POSITION TRANSFER | 06 May 2014 | 09 May 2014 | USD | -50,000 | 0.77 | USD | -38,307.50 |
| | Balance as at 31 May 2014 | | | USD | 325,000 | 0.82 | USD | 266,500.00 |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000731

A266

Portfolio Valuation - ███ 790-1 - Page 8/6

In USD as at 31 May 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF  HAN YORE-1000 GPR 51 May 2014 09 07+8

## Glossary

**Notes for Portfolio Valuation**

Disclaimer

The present portfolio valuation (hereafter: the "valuation") states the market prices (and the applicable foreign exchange rates) of the positions (assets and liabilities) in your account. In general, the stated prices correspond to the resale price in the market as of the date of the present valuation. The indicated market prices are provided to EFG Bank AG, Singapore Branch (hereafter: the "Bank") by standard banking information sources which the Bank considers to be reliable. Nevertheless, for certain securities, in particular for illiquid assets, the information sources of the Bank may not provide any valuation. The Bank values such securities at the value it deems to be the market price, without any commitment on the part of the Bank. Moreover, for certain investment products, e.g. hedge funds or private equity funds, the official net asset value can only be obtained at certain dates. In such cases, it is possible that your portfolio valuation refers to an internal estimated valuation and not to an official valuation.

The present valuation is provided solely for information purposes and does not obligate the Bank to buy or sell assets at the stated prices. The Bank cannot guarantee that the valuation or other information and calculations in relation with the assets in custody are exact and/or exhaustive and it reserves the right to rectify these. The Bank shall not be held liable for any damages which may result from the use of the present valuation.

This valuation is not a tax valuation and should not be used for tax purposes.

Any discrepancy should be submitted to the Bank to the attention of the Compliance Department in writing within ninety (90) days from the date of dispatch of the present valuation.

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000732

A267

01 July 2014 09:08:21

Portfolio ███790-1
HENG HONG INVESTMENT LIMITED

HENG HONG INVESTMENT LIMITED
IFG TRUST SERVICES INC.,
BOX 822 RAMS BUSINESS OFFICE,
STONEY GROVE, NEVIS,
WEST INDIES

REF. : 1436 YODE / 7000 OFS
AU1.SG1.SIN00
VALUATION AS AT 30 June 2014

CLIENT NOTIFICATION

Please be informed that the following investment fund(s) has/have been removed from EFG Mutual/Hedge Fund List.

Mutual Fund:
N/A

Hedge Fund:
BlueTrend Fund Limited (Date: 30 May 2014)
Waterstone Market Neutral Offshore Fund Ltd (Date: 30 May 2014)

Please disregard this notice if you do not have such investments.
For further information, please contact your Client Relationship Officer/Marketing Officer.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000633

A268

Portfolio Valuation - ███790-1 - Page 1/6

In USD as at 30 June 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF. : N/R •COD./ /●00.0●5/B1-JUL-2014 09:00.2●

## Portfolio Valuation - ███790-1

This report represents the market value of your portfolio ███790-1 as at 30 June 2014 for USD 133,298.83. The prices mentioned in the present document are provided only as an indication of the portfolio value and the Bank takes no responsibility therefor.

**Summary of client portfolios** ███790

Valuation of All your Portfolios

| | | |
|---|---|---|
| ███790-1   NON DISCRETIONARY | USD | 133,298.83 |

**Portfolio Breakdown by Currency and by Assets**

| Asset Classes | Total USD | Total | USD |
|---|---|---|---|
| Cash & Equiv. | 2,843.83 | 2.13% | 2.13% |
| Equities | 130,455.00 | 97.87% | 97.87% |
| **Total** | **133,298.83** | **100.00%** | **100.00%** |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000634

Portfolio Valuation - ▓790-1 - Page 2/6

In USD as at 30 June 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY



**Portfolio Breakdown by Assets (Excluding Loans)**

**Portfolio Breakdown by Assets**

| Asset Classes | Valuation Amount USD | |
|---|---|---|
| Cash and Cash Equivalents | 2,843.83 | 2.13% |
| Equities | 130,455.00 | 97.87% |
| **Total** | **133,298.83** | **100.00%** |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000635

A270

Portfolio Valuation - ███ 790-1 - Page 3/6

In USD as at 30 June 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF : N 70 •COE / 000 0P0 01 JUL 2014 09 00 2•

**Portfolio Performance Analysis - Reference Currency: USD**

**Performance 2014: -238.42 %**

| | |
|---|---|
| Portfolio Valuation at 13 March 2014 | 0.00 |
| + Contributions | 630,898.04 |
| - Withdrawals | -1,214,033.04 |
| Adjusted Portfolio Valuation | -583,135.00 |
| Portfolio Valuation at 30 June 2014 (Accrued Interests Included) | 133,298.83 0.00 |
| Net Result | 716,433.83 |
| Performance on 30 June 2014 | -238.42 % |
| Average Capital | -300,482.87 |



E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000636

A271



Portfolio Valuation - ███ ′90-1 - Page 4/6

In USD as at 30 June 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY

| Ccy | Nominal | Description | Value Date Maturity Date | Purchase Price | Valuation Price | Unrealized Gain Currency Effect | Purchase Cost USD | Valuation Amount USD | % of Port |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND CASH EQUIVALENTS** | | | | | | | | 2,843.83 | 2.13% |
| | | Cash Accounts | | | | | | | |
| USD | 2,843.83 | CURRENT ACCOUNT 386790.122.8 | | | | | | 2,843.83 | 2.13% |
| **EQUITIES** | | | | | | | | 130,455.00 | 97.87% |
| | | Equities | | | | | | | |
| USD | 223,000 | ONCOSEC MEDICAL INC -USD- US68234L1089 004117-151 Last acq. Holding Period 18 Days | | 0.26 | 0.585 (as at 30-06-14) | 125.00 % | 57,980.00 | 130,455.00 | 97.87% |
| | | | | | | **GRAND TOTAL** Accrued Interest Included | | **133,298.83 USD** | |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000637

A272



Portfolio Valuation - ███790-1 - Page 5/6

In USD as at 30 June 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF : NON-DISC / 000979810-AA-2014-06-30-I

| Transaction Reference | Description | Trade Date | Value Date Maturity Date | Sec. Ccy | Quantity / Notional Amt | Price | Ccy | Amount (including interest) |
|---|---|---|---|---|---|---|---|---|
| | **TRANSACTION MOVEMENTS FROM 01 June 2014 TO 30 June 2014** | | | | | | | |
| **Equities** | | | | | | | | |
| US68234L1089 | ONCOSEC MEDICAL INC -USD- | | | | | | | |
| | Balance as at 01 Jun 2014 | | | USD | 325,000 | 0.82 | USD | 266,500.00 |
| SCTRSC1416700054.3 | POSITION TRANSFER | 13 Jun 2014 | 18 Jun 2014 | USD | 102,000 | 0.5971 | USD | 60,599.68 |
| SCTRSC1416700054.1 | SPOT SALE | 13 Jun 2014 | 18 Jun 2014 | USD | -102,000 | 0.5971 | USD | -60,599.68 |
| SCTRSC1416700054.5 | POSITION TRANSFER | 13 Jun 2014 | 18 Jun 2014 | USD | -102,000 | 0.5971 | USD | -60,599.68 |
| | Balance as at 30 Jun 2014 | | | USD | 223,000 | 0.585 | USD | 130,455.00 |

E. & O. E.   Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000638

A273

**Donelan Declaration
Exhibit**

**K**

SEC v Sharp, et al

Portfolio Valuation - ▮790-1 - Page 6/6

In USD as at 30 June 2014
HENG HONG INVESTMENT LIMITED
Mandate: NON DISCRETIONARY
REF: NON-CODE / 0000 075 01 JUL 2014 09 00 21

## Glossary

**Notes for Portfolio Valuation**

Disclaimer

The present portfolio valuation (hereafter: the "valuation") states the market prices (and the applicable foreign exchange rates) of the positions (assets and liabilities) in your account. In general, the stated prices correspond to the resale price in the market as of the date of the present valuation. The indicated market prices are provided to EFG Bank AG, Singapore Branch (hereafter: the "Bank") by standard banking information sources which the Bank considers to be reliable. Nevertheless, for certain securities, in particular for illiquid assets, the information sources of the Bank may not provide any valuation. The Bank values such securities at the value it deems to be the market price, without any commitment on the part of the Bank. Moreover, for certain investment products, e.g. hedge funds or private equity funds, the official net asset value can only be obtained at certain dates. In such cases, it is possible that your portfolio valuation refers to an internal estimated valuation and not to an official valuation.

The present valuation is provided solely for information purposes and does not obligate the Bank to buy or sell assets at the stated prices. The Bank cannot guarantee that the valuation or other information and calculations in relation with the assets in custody are exact and/or exhaustive and it reserves the right to rectify these. The Bank shall not be held liable for any damages which may result from the use of the present valuation.

This valuation is not a tax valuation and should not be used for tax purposes.

Any discrepancy should be submitted to the Bank to the attention of the Compliance Department in writing within ninety (90) days from the date of dispatch of the present valuation.

E. & O. E.    Not valid for tax purposes.

Confidential pursuant to Securities Exchange Act s.24(d).
Contact forwarding regulator prior to onward sharing
Contact OIA for further information at x16691

SEC-MAS-E-0000639

A274

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

**SECURITIES AND EXCHANGE**
**COMMISSION,**
                                      **Plaintiff,**

            **v.**

**FREDERICK L. SHARP, ZHIYING**
**YVONNE GASARCH, COURTNEY**
**KELLN, MIKE K. VELDHUIS, PAUL**
**SEXTON, JACKSON T. FRIESEN,**
**WILLIAM T. KAITZ, AVTAR S.**
**DHILLON, and GRAHAM R. TAYLOR,**

                                      **Defendants.**

---

**Civil Action No. 21-CV-\_\_\_\_**
**(\_\_\_)**

---

## DECLARATION OF TREVOR T. DONELAN

I, Trevor T. Donelan, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1.      Since September 2014, I have been employed as an Enforcement Accountant with the U.S. Securities and Exchange Commission ("the Commission") in its Boston Regional Office.  My duties include conducting investigations relating to potential violations of the federal securities laws.

2.      I received a Bachelor of Science degree in business administration, with a concentration in accounting, from the University of Richmond in Virginia in 2000.  Before joining the Commission, I was most recently a managing director in the forensic accounting and complex business litigation unit at StoneTurn Group, LLP ("StoneTurn"), in Boston, where I worked for over seven years.  Before joining StoneTurn, I held forensic accounting and auditor positions for a total of approximately seven years with Deloitte Financial Advisory Services LLP, and Arthur Andersen LLP, both in Boston.

A275

3.      I am a Certified Public Accountant in the Commonwealth of Massachusetts, and a Certified Fraud Examiner by the Association of Certified Fraud Examiners.  I am also certified in Financial Forensics by the American Institute of Certified Public Accountants.

4.      I make this Declaration based upon my personal knowledge and upon information and belief as set forth below, and in support of the Commission's Motion for a Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief.

5.      In or about 2017, I became actively involved in the Commission's investigation into possible violations of the federal securities laws by the defendants subject to the Complaint in this matter (the "Defendants").

6.      In the course of that investigation, I reviewed documents and data produced to the Commission and attended witness interviews.  The purpose of this declaration is to relay certain information that the Commission has gathered about the Defendants through interviews and testimony of certain witnesses and the review and analysis of certain documents.

7.      The principal sources of documentation produced to the Commission that I have relied upon for this declaration include, but are not limited to:

a.   Transfer agent records for certain public company issuers under the control of and/or traded by the Defendants.

b.   Trading data collected by the Commission for certain public company issuers held by and/or traded by the Defendants (referred to as "Blue Sheet Data").

c.   Brokerage records for certain of the Defendants' accounts held at domestic and foreign broker-dealers.

d.   Banking records for certain of the Defendants' accounts.

2

A276

e.  Documents produced to the Commission during the course of its investigation by various third parties, including a significant amount of information collected from Curacao reflecting an accounting system (known as "Q") and communications maintained by Defendant Sharp.

f.  Publicly available information including filings made to the Commission and OTC Markets Group ("OTC Markets"), and public information regarding the market price and trading volume of certain securities.

g.  Investigative testimony provided by Avtar Dhillon, a compilation of excerpts of which are attached hereto as **Exhibit A**.

8.  I have been asked by counsel for the Commission to summarize certain transactions and communications involving the defendants in this case. To the extent I refer to my "understand[ing]" herein, that understanding is based on my review of the evidence collected in the investigation that led to the filing of this case.

## **<u>DEFENDANTS</u>**

9.  My understanding is that:

a.  **Frederick L. Sharp**, age 69, resides in West Vancouver, British Columbia, Canada. Sharp authored and published a book that, among other things, describes conduct similar to that alleged in the Complaint. The book's cover page and an excerpt is attached hereto as **Exhibit B** (highlighting added).

b.  **Zhiying Yvonne Gasarch a/k/a Zhiying Chen**, age 49, resides in Richmond, British Columbia, Canada.

c.  **Courtney Kelln**, age 41, resides in Surrey, British Columbia, Canada.

d.  **Mike K. Veldhuis**, age 41, resides in Vancouver, British Columbia, Canada.

A277

    e.  **Paul Sexton**, age 53, resides in Anmore, British Columbia, Canada.

    f.  **Jackson T. Friesen**, age 33, resides in Delta, British Columbia, Canada.

    g.  **William T. Kaitz**, age 40, resides in Arnold, Maryland.

    h.  **Graham R. Taylor**, age 51, resides in Vancouver, British Columbia, Canada.

    i.  **Avtar Singh Dhillon, MD**, 60, is a Canadian citizen and currently resides in Long Beach, California.  Dhillon is a member of the board of, and identified as the "Executive Chairman" by, Emerald Health Therapeutics, Inc., a Canadian company that publicly trades in the United States markets (*see* https://emeraldhealth.ca/).  Dhillon is also currently a Board Observer and advisor being paid $10,000 per month by Skye Bioscience, Inc. (formerly Emerald Bioscience, Inc.).[1]  Further:

        1.  Between approximately April 2013 and July 2018, Dhillon was the chairman of the board of directors of Arch Therapeutics Inc.

        2.  Between approximately March 2009 and January 2019, Dhillon was the chairman of the board of directors of Inovio Pharmaceuticals, Inc.

        3.  Between approximately January 2012 and April 2019, Dhillon was the chairman of the board of directors of Vitality, including its predecessor, Stevia First Corp.

        4.  Between approximately March 2011 and April 2020, Dhillon was the chairman of the board of directors of OncoSec.

---

[1] According to a supplemental prospectus filed by Skye with the Commission in May 2021, the company "has devoted substantially all of its efforts to securing product licenses, carrying out research and development, building infrastructure, and raising capital."

4

## RELATED PARTIES

10.    According to public records:

a.    **Vitality Biopharma, Inc. ("Vitality")**, formerly known as **Stevia First Corp.** ("**Stevia First**") currently trades on the Over-the-Counter ("OTC") Markets Group, Inc. ("OTC Markets"), an interdealer quotation service that provides a platform to buy and sell securities.  Vitality was incorporated in Nevada in 2007 and its principal place of business is in Los Angeles, California.  Throughout its history, Vitality has undergone several changes to its business plan and now purports to be in the business of developing cannabinoid drugs for medical treatment.  At all times relevant to the Complaint, Vitality's common stock was registered under Section 12(g) of the Exchange Act, and it files Exchange Act reports with the Commission pursuant to the reporting requirements of Section 13(a) of the Exchange Act.

b.    **Arch Therapeutics Inc. ("Arch")**, currently trades on OTC Markets.  It was incorporated in Nevada in September 2009, and its principal place of business is in Massachusetts.  The company has had different purported business objectives over the years; it currently purports to be focused on "developing a novel approach to stop bleeding ("hemostasis"), control leaking ("sealant") and manage wounds during surgery, trauma and interventional care."  Arch's common stock is, and has been since June 2013, registered with the Commission pursuant to Section 12 of the Exchange Act.

c.    **OncoSec Medical Incorporated ("OncoSec")**, currently trades on NASDAQ (to which it was uplisted, from the OTC Link, in May 2015).  It is a Nevada

5

A279

corporation headquartered in Pennington, New Jersey and San Diego, California. The company purports to be a biotechnology company focused on designing, developing and commercializing innovative therapies and proprietary medical approaches to stimulate and to guide an anti-tumor immune response for the treatment of cancer.  OncoSec's common stock is, and has been since March 2011, registered with the Commission pursuant to Section 12 of the Exchange Act.

d. **Garmatex Holdings, Ltd. ("Garmatex")**, currently known as Evolution Blockchain Group, Inc., currently trades in the grey market.  It was incorporated in Nevada in 2014 and is located in Las Vegas, Nevada.  In 2018, the company announced a change in its business plan, purportedly to pivot from textiles to holding intellectual property related to blockchain technology, and changed its name to Evolution Blockchain.  The Commission suspended trading in the securities of Evolution Blockchain on June 25, 2018.  During the time period of the trading described in the Complaint, the company voluntarily filed periodic reports with the Commission.

## <u>OVERVIEW OF THE SHARP GROUP'S CONDUCT</u>

11. Definitions to be used in this section:

a. The "Sharp Group" means Sharp, Gasarch, and Kelln.

b. The "Veldhuis Control Group" means Veldhuis, Friesen, and Sexton.

c. "Sharp Group-administered nominee shareholders" means the foreign-based entities that became shareholders of a number of public companies, including Stevia First, Vitality, and/or Arch.

A280

12.     My understanding is that:

    a.  Sharp, Gasarch and/or Kelln provided communication devices to their clients that they and others referred to as "xPhone."

    b.  Sharp maintained servers located in Curacao, through which, among other things, he maintained an accounting system referred to by Sharp and others as "Q," and encrypted communications (hereinafter referred to as "Encrypted Communications") between xPhone users.

    c.  Kelln, among other things, facilitated the transfer and deposit of shares of stock held by various companies administered by the Sharp Group.

    d.  Gasarch, among other things, prepared paperwork to send wires to clients of the Sharp Group and prepared fake invoices or other documentary support to justify payments to, or on behalf of, the Sharp Group clients.  An example of an invoice is attached hereto as **Exhibit C**.

13.     During the course of the investigation, I reviewed thousands of Encrypted Communications after they were decrypted.  I observed that the sender and recipient(s) of the Encrypted Communications are typically identified by a number or pseudonym, not a name (or email address).  I, and others with whom I work, analyzed the Encrypted Communications and related information to attribute the numerical or code-name identifiers to specific individuals (*e.g.*, at times, the Encrypted Communication user would self-identify within the communication, or would say that s/he did something—like have a meeting or send a wire transfer—that could be compared against other available evidence collected in this case).  The table below reflects a summary of some of that analysis:

7

A281

| To/From Number | User |
|---|---|
| 2 | Friesen |
| GARD | Friesen |
| 3 | Sexton |
| 4 | Veldhuis |
| 114 | Veldhuis |
| ACCO | Veldhuis |
| 66 | Kaitz |
| 76 | Gasarch |
| WIRES | Gasarch |
| CELT | Kelln |
| BOND | Sharp |

14.     Attached hereto as **Exhibit D** is a compilation of various Encrypted Communications.  The code names used by many of the Defendants in these Encrypted Communications is reflected in the table in Paragraph 13.

15.     I reviewed the "Q" accounting system.  The Q system tracked the total amounts of stock to be sold by, any stock purchased by, and the total proceeds being collected for, Sharp Group clients.  The Q system also tracked distributions of the proceeds to, and for the benefit of, Sharp Group clients.  The Q system had separate accounts for each deal on which Sharp's clients worked based on the stock symbol, and also account names for each of Sharp's clients based on code names for each client.  For example, the Vitality deal described in the complaint was given account name VBIO (which is the stock's symbol).  Another example is the Veldhuis's account in Q, which was named ACCO (a code name he also used in Encrypted Communications).  Attached hereto as **Exhibit E** (an excerpt from the VBIO Q account) and **Exhibit F** (excerpts of the work ledger from Q (highlighting added)) are examples of information from the Q system.

16.     As reflected in the table below, which I prepared after reviewing and summarizing records from the Q accounting system, the Sharp Group-administered nominee shareholders' stock sales generated over one billion dollars in gross proceeds:

8

A282

| YEAR | STOCK SALES ($) | STOCK PURCHASES ($) | NET SALES ($) |
|------|------|------|------|
| 2010 | $ 40,452,026 | $ (7,344,138) | $ 33,107,888 |
| 2011 | $ 198,245,334 | $ (67,424,315) | $ 130,821,019 |
| 2012 | $ 205,403,649 | $ (60,952,750) | $ 144,450,899 |
| 2013 | $ 290,452,161 | $ (62,460,290) | $ 227,991,871 |
| 2014 | $ 64,960,760 | $ (6,612,156) | $ 58,348,605 |
| 2015 | $ 22,057,413 | $ (2,631,013) | $ 19,426,400 |
| 2016 | $ 68,171,713 | $ (9,861,177) | $ 58,310,536 |
| 2017 | $ 86,158,566 | $ (15,867,701) | $ 70,290,865 |
| 2018 | $ 31,155,352 | $ (4,674,550) | $ 26,480,802 |
| 2019 | $ 1,702,074 | $ (889,639) | $ 812,435 |
| **TOTAL** | **$ 1,008,759,049** | **$ (238,717,730)** | **$ 770,041,319** |

### The Sharp Group

17.    The Q system also tracked the commissions and fees charged by the Sharp Group, and payments made to them.  For example:

    a. Between August 2017 and July 2018, Wintercap SA (a Swiss-based entity that the Commission has sued for fraudulently selling stock) transferred approximately $7 million to a Marshall Islands company called Cortona Equity, Inc. ("Cortona") for Sharp's benefit.  Based on records I reviewed, the individual identified on Cortona's corporate paperwork as its owner is a person whom I understand to be Sharp's wife's tennis coach.

    b. On various dates between 2010 and 2019, payments were made for the personal benefit of Kelln and Gasarch.  Kelln and Gasarch each received over $1 million over this time period.

### STEVIA FIRST/VITALITY

18.    By early 2011, Dhillon controlled a private company called Stevia First Corp. ("Stevia First").

A283

19.     On July 28, 2011, the purported president, chief executive officer, treasurer and director of a public shell company agreed to sell all of his 4,500,000 shares to Dhillon pursuant to a stock purchase agreement. The stock purchase agreement contemplated that, immediately upon closing of the reverse merger, Dhillon would be appointed as a director, the President, Chief Executive Officer, Secretary, and Treasurer of the surviving public company.

20.     According to public filings and transfer agent records, the bulk of the shares in the public shell company were held by various Chinese nationals identified in an S-1 registration statement filed by the shell company (hereinafter the "Stevia S-1 Shareholders").

21.     On or about October 10, 2011, the reverse merger went effective and the surviving public company was re-named Stevia First, thereby assuming the name of Dhillon's private company.

22.     On or about October 12, 2011, Stevia First effected a 7-for-1 forward stock split, which caused Dhillon's 4,500,000 shares to convert to 31,500,000 shares of Stevia First/Vitality stock (hereinafter referred to as the "March 2012 Stevia First/Vitality Stock"). Dhillon was the sole signor of Stevia First's filing with the Commission that reported the 7-for-1 forward stock split.

23.     In January 2012, Dhillon assumed the role of chairman of Stevia First's board of directors.

24.     Between January and March 2012, shares held in the names of the Stevia S-1 Shareholders were transferred as follows:[2]

---

[2] I coded in green the shareholders whom I understand were administered or otherwise utilized, directly or indirectly, by the Sharp Group.

10

A284



25.    Zhiying Chen is identified on corporate paperwork as the beneficial owner of Peaceful Lion Holdings.  Attached hereto as **Exhibit G** is a document showing the incorporation of Peaceful Lion Holdings and identifying Chen as its owner.  I understand Zhiying Chen to be Gasarch.

26.    As the flow chart above reflects, between January and March 2012, the Sharp Group-administered nominee shareholders (including Gasarch's Peaceful Lion Holdings) received 19,600,000 shares of Stevia First/Vitality stock.  These shares comprised over 37% of the company's total outstanding stock and over 97% of its purportedly unrestricted stock.

11

27.     These particular shares, which were all issued without restrictive legends, are hereinafter referred to as the "'Unrestricted' Stevia First Merger Shares."

28.     In March 2012, Stevia First began to issue press releases.  Also one or more members of the Veldhuis Control Group arranged to pay Kaitz's stock promotion company over $200,000 on or about April 3, 2012.

29.     Between approximately March 6, 2012 and May 23, 2012, Sharp Group-administered nominee shareholders sold every share of the "Unrestricted" Stevia First Merger Shares into the market, generating proceeds of over $24 million.

30.     In March 2012, Sharp authorized, through a wire request he signed, a payment to Dhillon in the amount of $33,800, and Taylor also directed two payments totaling $9,450 to Dhillon.  These amounts were paid to Dhillon's personal bank account.

    a.  Sharp's payment in March 2012, which was funded by proceeds from the Sharp Group-administered nominee shareholders' sale of the "Unrestricted" Stevia First Merger Shares earlier that month, was for the purchase of 15,750,000 shares of Dhillon's March 2012 Stevia First/Vitality Stock.

    b.  Taylor's March 2012 payments (for a total of $9,450) were used to acquire another 4,227,500 shares of Dhillon's March 2012 Stevia First/Vitality Stock.

31.     The chart below illustrates Dhillon's documented sale of these shares to various shareholders, as well as Dhillon's division of the remaining shares that were derived from the March 2012 Stevia First/Vitality Stock:[3]

---

[3] The "orange" reflects shareholders whom I understand to be controlled by or otherwise acting in concert with Taylor.

A286



32.    The following chart reflects subsequent transfers of many of the shares reflected in the table in the preceding Paragraph:

A287



33.     The roughly 20 million shares of the March 2012 Stevia First/Vitality Stock that Dhillon transferred to the Sharp Group-administered nominee shareholders, Heng Hong and Taylor Nominee A, comprised approximately 39 percent of the company's outstanding shares.

34.     Between approximately April and June 2012, one or more members of the Veldhuis Control Group used the Sharp Group to remit eight wire payments, totaling over $4.2

A288

million, to Heng Hong, a company with a Swiss-bank account that I understand that Taylor

controlled. Taylor subsequently transferred a portion of that money to Dhillon, as follows:

| Date | Veldhuis Control Group Transfers to Taylor's Company | Taylor Transfers to Dhillon's Companies |
|---|---|---|
| April 12, 2012 | $610,200 | |
| April 12, 2012 | $498,900 | |
| April 13, 2012 | $496,800 | |
| April 17, 2012 | | $498,000 |
| May 4, 2012 | | $400,000* |
| May 11, 2012 | | $496,000* |
| June 8, 2012 | $475,000 | |
| June 8, 2012 | $800,000 | |
| June 8, 2012 | $900,000 | |
| July 16, 2012 | | $1,300,000* |

*Each of these transfers went to the Swiss bank account of a company incorporated in Panama called Ortivo Enterprises Corp. ("Ortivo") that Dhillon controlled.*

35.     Based on my review of the Q accounting system, the Veldhuis Control Group

withdrew and distributed a portion of the "Unrestricted" Stevia First Merger Share sale proceeds

in cash from the Sharp Group on various dates. Further, bank records reflect that Heng Hong, a

company with a Swiss-bank account controlled by Taylor, received $124,000 in March 2014. Q

records show that the money was derived from the sale of Stevia First/Vitality stock.

36.     On or about March 30, 2012, May 25, 2012, and February 13, 2014, Stevia First

issued a total of 1,320,511 shares of Stevia First to a Sharp Group-administered nominee

shareholder. One or more members of the Sharp Group, in turn, divided those shares between

two additional Sharp Group-administered nominee shareholders. The chart below reflects these

transfers.

15

A289



37. On or about October 9, 2013, Kelln provided Stevia First's transfer agent with the required paperwork to transfer 625,000 of the 1,320,511 shares of Stevia First/Vitality shares to Nautilus Growth Fund. Kelln also provided a check to pay for the transfer. The documents provided by Kelln to Stevia First's transfer agent included an attorney opinion letter that claimed that Nautilus Growth Fund was not an affiliate of Stevia First.

38. Between approximately January 14, 2014 and July 14, 2014, Sharp Group-administered nominee shareholders sold all 1,320,511 of these Stevia First shares through at least two offshore brokerage firms.

39. On or about May 28, 2014, Friesen sent an Encrypted Communication, copying Veldhuis, directing a trader working for Sharp to sell 25,000 shares of Stevia First/Vitality stock that was held in an account in the name of a Sharp Group-administered nominee shareholder.

40. On or about July 7, 2014, Friesen sent an Encrypted Communication directing a trader working for Sharp to sell 25,000 shares of Stevia First/Vitality stock.

41. Between approximately November 2013 and March 2016, Taylor arranged to transfer approximately $1.7 million to third parties for Dhillon's benefit.

42. Between 2015 and 2016, Heng Hong and Taylor Nominee A transferred their March 2012 Stevia First/Vitality stock to Sharp Group-administered nominee shareholders.

A290

43.     Beginning in or about December 2014, one or more members of the Veldhuis Control Group arranged, through Kelln, to transfer March 2012 Stevia First/Vitality Stock (which was being held in the names of Sharp Group-administered nominee shareholders) to Wintercap SA and Blacklight SA (another Swiss-based entity that the Commission has sued for fraudulently selling stock).

44.     On various dates in 2015 and 2016, Sharp Group-administered nominee shareholders sold millions of shares of the March 2012 Stevia First/Vitality Stock through Wintercap SA and Blacklight SA.

45.     On or about October 28, 2015, one or more members of the Veldhuis Control Group arranged for Wintercap SA to pay a third party approximately $25,000 towards an expense incurred by Dhillon's family.

46.     On or about June 21, 2016, Wintercap SA remitted $110,431.86 to a loan servicing company in Colorado.  The payment, sent from Morris Capital—a Sharp Group-administered nominee shareholder—was applied to pay a mortgage loan for Sexton's benefit on a property in California.

47.     On or about July 10, 2016, Stevia First changed its name to Vitality and executed a 1-for-10 reverse split of its common stock.  The reverse split meant that shareholders were required to exchange 10 shares for one share, which had the effect of reducing the total number of outstanding shares of the company by a factor of 10.

48.     On various dates in 2016, one or more members of the Veldhuis Control Group sent numerous wire payments to Vitality, or to third parties on behalf of Vitality, totaling approximately $4.4 million.  In exchange, Vitality—with Dhillon operating as the chairman of

A291

the board of directors—issued millions of shares (the "Vitality Stock") to Sharp Group-administered nominee shareholders.

49.     The Vitality Stock shares acquired by the Sharp Group-administered nominee shareholders from the financing described in Paragraph 48, above, were initially issued with restricted legends.

50.     On various dates during 2016 through 2018, an attorney retained by Kelln issued opinion letters to Vitality's transfer agent representing that none of above-referenced Vitality stock Sharp Group-administered nominee shareholders were affiliates of Vitality. Based on these representations, Vitality's transfer agent removed the restricted legends from the Vitality Stock.

51.     After Vitality's transfer agent removed the restricted legend for one of the nominee shareholders, Kelln advised Wintercap SA of an incoming deposit of 750,000 shares of Vitality in the name of a Sharp Group-administered nominee shareholder called Hilton Capital.

52.     On or about February 28, 2017, Kelln instructed Wintercap SA to allocate all Vitality Stock sales Wintercap was making that day to the Hilton account, thereby reducing the number of Vitality shares that Hilton Capital was shown as holding. Specifically, Kelln wrote: "allocate all VBIO [ticker symbol of Vitality] sales to the [Hilton Capital] account today. We need to make room for the pending 750k. Again 5% rule is biting me ass." This communication is attached hereto as **Exhibit H**.

53.     The 750,000 shares were subsequently deposited with Wintercap SA. Thereafter, Veldhuis provided trading instructions to Wintercap SA to sell the Vitality Stock.

54.     In or about December 2016, Wintercap SA's principal asked Veldhuis if the Veldhuis Control Group could "switch selling to another outlet to let us [Wintercap SA]

18

breath[e]" and slow the pace of selling.  Veldhuis responded that he could slow the pace "on the next batch, but that's a week out.  In the meantime, sell 15k VBIO @ 2.11."  Wintercap SA's principal suggested, in response, "[m]aybe 2 days on, 1 day off . . . ."  In response, Veldhuis suggested that he could move the stock held at Wintercap SA to a competitor, Blacklight SA ("BL"):

| Veldhuis to Wintercap | I will figure out how to move some elsewhere.  It pains me to give BL business. |
| Wintercap to Veldhuis | Ok.  I don't wish you to do that ;) |
| Veldhuis to Wintercap | Lol |
| Wintercap to Veldhuis | We can stay on point |

55.     Between October 2016 and March 2017, Veldhuis directed Wintercap SA to wire $530,000, which was derived from financial accounts associated with four Sharp Group-administered nominee shareholders, to an entity controlled by Kaitz.

56.     The chart below illustrates the volume and price per share of Vitality stock generated during January 2016 through October 2018:

A293



57.    Dhillon benefited by receiving millions of dollars from the proceeds of Vitality stock sales, primarily through payments made by the Veldhuis Control Group and Taylor to various third parties on Dhillon's behalf.

58.    Between May 2, 2018 and June 27, 2018, Wintercap SA wired CAD $621,500 to a Canadian public company as a purported investment.  Among the investors credited with making this investment were a company controlled by Sexton and a company controlled by Friesen.

59.    Overall, the Q accounting system maintained by the Sharp Group reflected the allocation of net profit derived from Stevia First/Vitality stock sale proceeds during the period of time subject to the Complaint as follows:

20

A294

| Defendant | Approximate Amount (Millions) |
|---|---|
| Sexton | $5.5 |
| Veldhuis | $3.1 |
| Friesen | $2.3 |
| Taylor | $4.3 (of which Taylor, in turn, promptly forwarded approximately $2.6 million to Dhillon, as noted in ¶ 82) |
| Kaitz | $1.4 |

60.     The table below reflects my summary of Stevia First/Vitality stock sale proceeds, as reflected in the Q accounting system.

| Year | Quantity Sold | Trading Proceeds |
|---|---|---|
| 2012 | 19,600,000 | $ 24,718,428 |
| 2013 | - | - |
| 2014 | 1,320,511 | 566,715 |
| 2015 | 2,424,661 | 770,492 |
| 2016 | 5,474,517 | 5,503,691 |
| 2017 | 4,904,846 | 10,570,537 |
| 2018 | 2,045,146 | 3,509,479 |
| **Grand Total** | **35,769,681** | **$ 45,639,343** |

## **ARCH**

61.     By April 2013, Dhillon had become an officer or director of Arch; and by June 2013, Dhillon had assumed the role of chairman of Arch's board of directors.

62.     In 2012, Arch issued shares to various S-1 Shareholders (hereinafter referred to as the "Arch S-1 Shareholders").  By early 2013, following a stock split, the Arch S-1 Shareholders collectively held 20 million shares of Arch stock.

63.     Leading up to, and shortly after, the closing of the reverse merger, the S-1 Shareholders transferred 16,920,000 of the 20 million Arch shares to eleven shareholder entities that I understand to be administered and controlled by the Sharp Group.

64.     Kelln also arranged to transfer an additional 2,310,000 shares held by several additional Arch S-1 Shareholders to a shareholder entity named Victory Capital, that I

21

A295

understand to be controlled by Wintercap SA.

65.     Combined, the foregoing Arch transfers comprised over 48% of Arch's total issued and outstanding stock, or close to 100% of Arch's unrestricted shares that were deposited and available for trading at brokerage firms, at or around the time of the reverse merger.

66.     Shortly before the reverse merger closed, public filings and transfer agent records demonstrate that Dhillon received 10,000,000 restricted shares of Arch stock (as did Arch's CEO).  Dhillon subsequently transferred 2,750,000 shares to a domestic corporate entity ("Company A"), an entity that I understand to be controlled by Dhillon's associate, Person A.

67.     The chart below illustrates the transfers described in Paragraphs 63 through 66, above.

A296



68.    The Veldhuis Control Group provided financing to Arch around the time of the reverse merger. Specifically, the Veldhuis Control Group paid $1.75 million through an attorney's escrow account, which was remitted to Arch in the form of equity subscription agreements. Arch described its receipt of these funds in its annual report as the "Coldstream Financing."

69.    In an annual report filed by Arch, the company disclosed that "[o]n July 3, 2013, pursuant to the Coldstream Financing [sic] the Company issued and sold additional units

A297

consisting of 500,000 shares of common stock and warrants to purchase 500,000 shares of common stock to a foreign accredited investor identified by Coldstream for gross proceeds of $250,000." Dhillon actually provided this financing through Ortivo, a Panamanian company that he controlled, which had a Swiss bank account.

70.    Following the reverse merger, the Veldhuis Control Group engaged Kaitz to promote Arch and paid Kaitz approximately $1.2 million from June 2013 to August 2013 for this promotion.

71.    The landing page for an Arch promotion that I reviewed cited "Advantage Media Corp" as the "paying party" of a $790,000 "total production budget." The landing page did not disclose the Veldhuis Control Group as a paying party.

72.    The Sharp Group appeared to have a role in incorporating and maintaining Advantage Media Corp. on behalf of Veldhuis. For example, Sharp discussed with Veldhuis whether to pay the annual filing fees for Advantage Media Corp., which was a company incorporated in Belize.

73.    The chart below illustrates the impact of the Veldhuis Control Group's paid promotion of Arch between June and September 2013:

A298



74.    Between June 11, 2013 and September 30, 2013, Sharp Group-administered nominee shareholders sold approximately 16.6 million shares of Arch stock, generating proceeds of at least $11.5 million.

75.    Separately, an account in the name of Victory Capital, controlled by Wintercap SA, sold another approximately 1.4 million shares generating proceeds of approximately $574,000 around that same time on behalf of the Veldhuis Control Group.

76.    On or about September 6, 2013, Veldhuis instructed Gasarch to wire $250,000 from the Arch proceeds to an offshore company that Dhillon controlled.

77.    On or about September 26, 2013, Wintercap SA wired $200,000 to a Canadian company controlled by Dhillon's longtime tax accountant and business partner, who, in turn, wired the very same amount – $200,000 – on or about the same day, to a U.S.-based corporate account that Dhillon controlled.

25

78.    On August 20, 2013, Sexton wrote to Veldhuis and instructed him to "send 600k from ARTH" to a Swiss bank account in the name of Heng Hong, a company that Taylor controlled.  ARTH is the stock symbol for Arch.  Two days later, Veldhuis directed Gasarch to wire the funds.  This $600,000 distribution derived directly from Arch sales proceeds.

79.    Overall, the Q accounting system maintained by the Sharp Group reflected the allocation of net profit derived from Arch stock sale proceeds to the Veldhuis Control Group as follows during the period of time subject to this Complaint:

| Defendant | Approximate Amount (Millions) |
|---|---|
| Sexton | $1.7 |
| Veldhuis | $1.5 |
| Friesen | $1.5 |

80.    The table below reflects payments directed by the Veldhuis Control Group to Dhillon and Taylor or entities with whom they were associated, sourced from the sale of Stevia First/Vitality and Arch stock through Sharp Group-administered nominee shareholders from 2012 to 2018:

| Year | Dhillon | Taylor | Total |
|---|---|---|---|
| 2012 | $    33,890 | $    4,225,531 | $    4,259,421 |
| 2013 | 259,770 | 600,200 | 859,970 |
| 2014 | 10,000 | 124,200 | 134,200 |
| 2015 | 25,030 | | 25,030 |
| 2016 | 231,672 | | 231,672 |
| 2017 | 2,157,330 | | 2,157,330 |
| 2018 | 300,500 | | 300,500 |
| **Total** | **$    3,018,192** | **$    4,949,931** | **$    7,968,123** |

81.    The table below reflects various distributions of money directed by Taylor to third parties for the benefit of Dhillon or otherwise associated with Dhillon for the period from 2012

26

A300

to 2018:

| DATE | PAID TO | AMOUNT |
|---|---|---|
| 4/17/2012 | SUTTER BUTTES LLC* | $    498,000 |
| 5/4/2012 | ORTIVO (Defined at ¶ 82) | 400,000 |
| 5/11/2012 | ORTIVO | 496,000 |
| 7/16/2012 | ORTIVO | 1,300,000 |
| 11/20/2013 | DHILLON RELATIVE A | 90,000 |
| 11/26/2013 | DHILLON RELATIVE B | 40,000 |
| 11/26/2013 | DHILLON CONTRACTOR | 95,000 |
| 12/2/2013 | DHILLON CREDITOR A | 95,000 |
| 12/18/2013 | DHILLON CONTRACTOR | 65,000 |
| 1/15/2014 | DHILLON CREDITOR B | 65,000 |
| 1/21/2014 | DHILLON CREDITOR B | 35,000 |
| 4/25/2014 | DHILLON CREDITOR A | 94,980 |
| 6/19/2014 | CHALMERS GROUP LLC* | 60,000 |
| 6/24/2014 | CHALMERS GROUP LLC* | 210,000 |
| 7/7/2014 | CHALMERS GROUP LLC* | 120,000 |
| 7/24/2014 | DHILLON CREDITOR A | 294,475 |
| 9/17/2014 | DHILLON CREDITOR A | 247,000 |
| 2/26/2016 | DHILLON CREDITOR A | 99,965 |
| 3/28/2016 | DHILLON CREDITOR A | 99,965 |
| **TOTAL** | | **$ 4,405,385** |

*\* - Dhillon-controlled private company*

**PERSON A: ARCH**

82.    In or about June 2013, Dhillon arranged for the transfer of 2,750,000 Arch shares

to Company A, a corporate nominee that was formed by Dhillon's associate, Person A.  I have

reviewed an operating agreement dated May 17, 2013 for Company A, and Person A is identified

as the sole member and manager.

83.    On or about April 6, 2016, Person A caused Company A to open an account with

a United States brokerage firm for the purpose of selling Arch stock.  Person A represented to the

United States brokerage firm that he (as the sole director of Company A), was not an "officer,

director, or more than a 10% shareholder of [Arch] or in any other way an 'affiliate' of [Arch]."

27

A301

84.    The table below reflects Company A's sales of Arch stock, all of which occurred during a four-month period in 2016:

| Month | Arch Shares Sold | Arch Sale Proceeds |
|---|---|---|
| Apr-16 | 210,000 | $ 79,711 |
| May-16 | 460,000 | 181,925 |
| Jun-16 | 1,035,000 | 444,567 |
| Jul-16 | 1,045,000 | 631,133 |
| **Total** | **2,750,000** | **$ 1,337,336** |

85.    At or about the same time that Company A sold Arch stock, Person A caused Company A to transfer at least $850,000 of Arch stock sale proceeds to third parties identified by Dhillon, his longtime assistant, or both, to pay various business and personal expenses incurred by Dhillon.

86.    Examples of payments routed by Company A through Dhillon's longtime assistant to a bank account controlled by Dhillon in the name of One World Ranches LLC, as directed by Dhillon, are below.



**PERSON A: ONCOSEC**

87.    I understand that, on or about March 2, 2011, Person A incorporated a corporate entity at Dhillon's direction, hereinafter referred to as Company B, to serve as Dhillon's nominee

A302

shareholder.  Shortly thereafter, Company B acquired 2,354,880 shares of OncoSec stock.

Person A identified himself as Company B's sole director.

88.     By December 2012, Person A opened a brokerage account in the name of

Company B.

89.     On or about January 19, 2013, Person A represented to Company B's brokerage

firm that Company B was never an "Officer, Director, Control Person, 10% owner or Affiliate of

the issue [OncoSec] being presented for deposit," which was a confirmation required by the

brokerage firm when the OncoSec shares were deposited for resale.

90.     In or about January 2013, Person A caused Company B to deposit 2,354,880

shares of OncoSec into its brokerage account.  Person A subsequently caused Company B to sell

these shares on Dhillon's behalf.

91.     The table below reflects Company B's sales of all 2,354,880 of its shares of

OncoSec stock, which took place between 2013 and 2017.[4]

---

[4] The quantities in this table are adjusted to remove the effect of a stock split in 2015.

A303

| Month | OncoSec Shares Sold | OncoSec Sale Proceeds |
|---|---|---|
| Feb-13 | 50,000 | $ 9,979 |
| Mar-13 | 81,400 | 16,878 |
| Apr-13 | 193,600 | 43,728 |
| May-13 | 280,000 | 78,159 |
| Jul-13 | 50,000 | 14,127 |
| Aug-13 | 375,000 | 118,681 |
| Feb-14 | 50,000 | 37,800 |
| Mar-14 | 250,000 | 204,406 |
| Apr-14 | 60,000 | 43,820 |
| May-14 | 250,000 | 198,535 |
| Jun-14 | 80,000 | 69,434 |
| Feb-17 | 54,880 | 3,705 |
| Jul-17 | 370,000 | 21,185 |
| Sep-17 | 110,000 | 6,415 |
| Oct-17 | 100,000 | 5,650 |
| **Total** | **2,354,880** | **$ 872,502** |

92.    Person A, acting through Company B, distributed the majority of the OncoSec sale proceeds at Dhillon's direction to third parties identified by Dhillon.  Dhillon directed the transfers to third parties, instead of directly to his own bank accounts, to conceal that he was the actual beneficiary of the stock sales.

93.    The flow chart below reflects examples of Company B's transfers to Dhillon's assistant for the benefit of Dhillon, as directed by Dhillon:



A304

\*\*\*

### ADDITIONAL SHARP GROUP AND VELDHUIS CONTROL GROUP DEALS

94.     The table below reflects a non-exhaustive list of stock sold by the Veldhuis

Control Group using shareholders whom I understand to be controlled and administered by the

Sharp Group.

| Issuer | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Vitality / Stevia First | $ - | $ 24,718,428 | $ - | $ 566,715 | $ 770,492 | $ 5,503,691 | $ 10,570,537 | $ 3,509,479 | $ 45,639,343 |
| Echo Automotive, Inc. | - | 48,115 | 23,582,539 | 30,221 | - | - | - | - | 23,660,874 |
| Arch | - | 189 | 11,755,408 | 257,689 | 1,220,451 | 2,738,550 | 84,091 | - | 16,056,376 |
| Stevia Corp | 6,905,120 | 2,172,356 | 971,330 | 3,175,474 | - | - | - | - | 13,224,281 |
| Liberty One Lithium Corp | - | - | - | - | - | (54,767) | 8,576,091 | 222,194 | 8,743,519 |
| Oryon Technologies, Inc. | - | 7,668,439 | 898,616 | - | - | - | - | - | 8,567,054 |
| Makism 3D Corp | - | - | 6,070,042 | 2,423,056 | - | - | - | - | 8,493,098 |
| Graphite Corp | - | 4,457,264 | 1,796,167 | (1,590) | - | - | - | - | 6,251,841 |
| OncoSec | 2,925,270 | 2,356,056 | - | - | - | - | - | - | 5,281,325 |
| NewGen Biopharma Corp | - | - | - | - | - | 7,627 | 3,859,972 | - | 3,867,599 |
| StartMonday Technology Corp | - | - | - | - | - | 296,664 | 2,133,104 | 6,339 | 2,436,107 |
| Lexington Biosciences Holdings Corp | - | - | - | - | - | - | 422,552 | 947,039 | 1,369,592 |
| BreathTec Biomedical, Inc. | - | - | - | - | - | 421,745 | - | - | 421,745 |
| RightsCorp | - | - | 124,926 | 5,402 | - | - | - | - | 130,328 |
| **TOTAL** | **$9,830,390** | **$41,420,845** | **$45,199,028** | **$6,456,966** | **$1,990,943** | **$8,913,509** | **$25,646,347** | **$4,685,052** | **$144,143,081** |

95.     One issuer listed in Paragraph 94, above, is OncoSec.  The table below reflects

the transfer of OncoSec shares to shareholders whom I understand to be controlled and

administered by the Sharp Group:



A305

96.     The Veldhuis Control Group paid Kaitz to promote several of the issuers listed in the table in Paragraph 94, including (in addition to Stevia First/Vitality and Arch, both detailed above) the stock of Echo Automotive, Liberty One Lithium Corp., Oryon Technologies, Inc., NewGen Biopharma Corp., StartMonday Technology Corp., and BreathTech Biomedical, Inc.

### LUIS CARRILLO

97.     On August 4, 2021, the Commission filed a Complaint against Luis Carrillo in connection with his illegal sale of the stock of Garmatex Holdings, Ltd.

98.     As described in Paragraph 16, above, clients of the Sharp Group generated over one billion dollars in stock sales through the Sharp Group between approximately 2011 and 2019. One such client is Luis Carrillo. I understand, based on my review of the records, that Carrillo and those individuals with whom he coordinated generated at least $75 million in stock sale proceeds using the Sharp Group's Encrypted Communications and nominee shareholders.

99.     The chart below reflects various transfers of Garmatex securities to shareholders whom I understand to be controlled and administered by the Sharp Group, and subsequent transfers to Wintercap SA and Blacklight SA:

32

A306



**PUBLIC FILINGS**

100.  Based on my review of publicly available information, I did <u>not</u> observe:

a.  Dhillon disclosing any sales of stock in the companies atop whose board he sat by Person A or any Sharp Group-administered nominee shareholder at any point in time.

b.  Dhillon disclosing any beneficial ownership in the stock of companies atop whose board he sat that was held by the entities formed by Person A or held by Sharp Group-administered nominee shareholders.  Attached hereto as **Exhibit I** is a Schedule 13D/A that Dhillon filed in August 2016.

c.  The Veldhuis Control Group, individually or collectively, filing a Schedule 13D

A307

reflecting their beneficial ownership interest in Vitality stock at any point in time.

## ACCOUNTS

101.    The table attached hereto as **Exhibit J** reflects a list of financial accounts that, based on my review of various records, I understand to be owned, controlled by, used, or otherwise held for the benefit of at least one of the Defendants.

## UNITED STATES INVESTORS

102.    During the course of the investigation, I reviewed Blue Sheet Data that reflected individuals and entities that purchased shares of the securities subject to the Complaint, and during the same timeframe as the alleged misconduct.  Based on my review, many United States-based brokerage account holders purchased stock sold by, or on behalf of, one or more of the defendants in this case.

103.    For examples, brokerage account holders based in Massachusetts purchased the securities of Vitality and Arch during the periods of time subject to the Complaint.

## ONGOING CONDUCT

104.    Based on a Financial Industry Regulatory Authority referral that I have reviewed, dated January 29, 2021, Kelln and Kaitz may still be involved in promotional schemes.  The referral indicates that a media company controlled by Kaitz was paid to run a promotional campaign for a gold mining company whose stock price and volume increased in conjunction with the paid promotional campaign, which ran from August through December 2020.  The referral also indicates that an account held by an entity owned by Kelln received transfers of over a million shares of the company and sold them into the promotion, receiving proceeds of approximately $700,000 (CAD).

34

A308

## ADDITIONAL TRADING BY TAYLOR

105.    Attached hereto as **Exhibit K** is a compilation of documents showing (a) Inovio shares received pursuant to two "treasury orders" by Heng Hong, an entity I understand to be controlled by Taylor; and (b) Inovio stock sales through an account held at Verdmont Capital, a former brokerage firm, during August and September 2013, which reflects the same number of Inovio shares sold as the total amount of Inovio sales obtained by Heng Hong pursuant to the aforementioned "treasury orders."  Attached hereto as **Exhibit L** is a Heng Hong account statement showing sales of OncoSec stock.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 4, 2021, in Boston, Massachusetts.


_____
Trevor T. Donelan

A309

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | FREDERICK L. SHARP, et al |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant ___Foreign___
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Eric A. Forni, SEC, Boston Regional Office, 33 Arch St, 24th Floor, Boston MA 02110, Phone: 617-573-8827

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

[x] 1   U.S. Government
        Plaintiff

[ ] 2   U.S. Government
        Defendant

[ ] 3   Federal Question
        *(U.S. Government Not a Party)*

[ ] 4   Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - | of Property 21 USC 881 | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Product Liability | [ ] 690 Other | 28 USC 157 | 3729(a)) |
| [ ] 140 Negotiable Instrument | Liability | [ ] 367 Health Care/ | | | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted | Liability | [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| Student Loans | [ ] 340 Marine | Injury Product | | New Drug Application | [ ] 470 Racketeer Influenced and |
| (Excludes Veterans) | [ ] 345 Marine Product | Liability | | [ ] 840 Trademark | Corrupt Organizations |
| [ ] 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | [ ] 371 Truth in Lending | Act | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | Product Liability | [ ] 380 Other Personal | [ ] 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal | Property Damage | Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury | [ ] 385 Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [x] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury - | Product Liability | [ ] 751 Family and Medical | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate | | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ | Sentence | | or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - | [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | [ ] 462 Naturalization Application | | Agency Decision |
| | [ ] 446 Amer. w/Disabilities - | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| | Other | [ ] 550 Civil Rights | Actions | | State Statutes |
| | [ ] 448 Education | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

[x] 1  Original
       Proceeding

[ ] 2  Removed from
       State Court

[ ] 3  Remanded from
       Appellate Court

[ ] 4  Reinstated or
       Reopened

[ ] 5  Transferred from
       Another District
       *(specify)*

[ ] 6  Multidistrict
       Litigation -
       Transfer

[ ] 8  Multidistrict
       Litigation -
       Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §77v(a); 15 U.S.C. §§78u(d), 78u(e), 78aa; 15 U.S.C. §77v(a); 15 U.S.C. §78aa
Brief description of cause:
Securities Fraud

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION
    UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions:)*

JUDGE _____   DOCKET NUMBER _____

DATE  08/04/2021

SIGNATURE OF ATTORNEY OF RECORD  /s/ Eric A. Forni

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

A310

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br> **Plaintiff,** <br> **v.** <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR** <br><br> **Defendants.** | **Civil Action No. 21-CV-____ (___)** |

### PLAINTIFF'S EMERGENCY EX PARTE MOTION FOR A TEMPORARY RESTRAINING ORDER, ORDER FREEZING ASSETS AND ORDER FOR OTHER EQUITABLE RELIEF

Pursuant to Fed. R. Civ. P. 65(b), plaintiff United States Securities and Exchange Commission (the "Commission" or "SEC") hereby files this emergency motion for entry of an order freezing assets, and order for other equitable relief as to defendants Frederick Sharp, Zhiying Yvonne Gasarch, Courtney Kelln, Mike Veldhuis, Paul Sexton, Jackson Friesen, William Kaitz, Avtar Dhillon, and Graham Taylor (collectively, the "Defendants"). A proposed form of Order is attached hereto. In support of this motion, the Commission submits the accompanying memorandum of law, the declaration of Trevor Donelan and related Exhibits.

A311

WHEREFORE, the Commission respectfully requests that the Court enter the Temporary

Restraining Order, Order Freezing Assets and Order for Other Equitable Relief filed herewith.

Dated:  August 4, 2021

                              Respectfully submitted,

                              SECURITIES AND EXCHANGE COMMISSION
                              By its attorneys,

                              /s/ Eric A. Forni
                              Eric A. Forni (Mass Bar No. 669685)
                              Kathleen Burdette Shields (Mass Bar No. 637438)
                              SECURITIES AND EXCHANGE COMMISSION
                              33 Arch St., 24th Floor
                              Boston, MA 02110
                              Phone: (617) 573-8827 (Forni direct), (617) 573-
                              8904 (Shields direct)
                              Fax: (617) 573-4590 (fax)
                              Fornie@sec.gov; Shieldska@sec.gov

2

A312

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>                         **Plaintiff,** <br><br>     **v.** <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br>                    **Defendants.** | Civil Action No. 21-CV-____ (___) |

### [Proposed]
### TEMPORARY RESTRAINING ORDER, ORDER FREEZING ASSETS, AND ORDER FOR OTHER EQUITABLE RELIEF

Having considered the emergency motion for a temporary restraining order, order freezing assets, and for other equitable relief filed by plaintiff Securities and Exchange Commission ("the Commission"), as well as the Complaint, the Commission's memorandum of law, the Declaration of Trevor Donelan, and the accompanying evidentiary materials, the Court finds that the Commission has made the showing required by Fed. R. Civ. P. 65(b)(1) and, in addition, that the Commission has shown that: (1) it is reasonably likely to establish that Frederick Sharp ("Sharp"), Zhiying Yvonne Gasarch ("Gasarch"), Courtney Kelln ("Kelln"), Mike Veldhuis ("Veldhuis"), Paul Sexton ("Sexton"), Jackson Friesen ("Friesen"), William Kaitz ("Kaitz"), Avtar Dhillon ("Dhillon"), and Graham Taylor ("Taylor") (collectively, the "Defendants") have directly or indirectly engaged in the violations alleged in the Complaint; (2) there is a reasonable likelihood that these violations will be repeated; (3) there is a strong indication that unless restrained and enjoined by Order of this Court, Defendants may dissipate

A313

and conceal assets which could be subject to an order of disgorgement or an order to pay a civil

monetary penalty in this action; and (4) entry of a temporary restraining order and an order

freezing assets is in the public interest.  In consideration of the foregoing:

## I.

**IT IS HEREBY ORDERED** that the Defendants and each of their officers, agents,

servants, employees, attorneys, and other persons in active concert or participation with them

who receive actual notice of this Order by personal service or otherwise (including by fax, email,

or overnight delivery service) are restrained from violating Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17

C.F.R. §240.10b-5] by, directly or indirectly, through the use of the means or instrumentalities of

interstate commerce or of the mails or of any facility of any national securities exchange, in

connection with the purchase or sale of any security:

    (a)    employing any device, scheme or artifice to defraud;

    (b)    making any untrue statement of a material fact or omitting to state a material fact
necessary in order to make the statements made, in the light of the circumstances
under which they were made, not misleading; or

    (c)    engaging in any act, practice or course of business which operates or would
operate as a fraud or deceit upon any person.

## II.

**IT IS HEREBY FURTHER ORDERED** that the Defendants and each of their officers,

agents, servants, employees, attorneys, and other persons in active concert or participation with

them who receive actual notice of this Order by personal service or otherwise (including by fax,

email, or overnight delivery service) are restrained from violating Section 17(a) of the Securities

A314

Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)] by, directly or indirectly, through the use of any means or instrumentalities of interstate commerce or the mails or of any facility of any national securities exchange, in the offer or sale of any security:

(a)    employing any device, scheme or artifice to defraud;

(b)    obtaining any money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)    engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

### III.

**IT IS HEREBY FURTHER ORDERED** that Defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon and Taylor and each of their officers, agents, servants, employees, and attorneys, and other persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise (including by fax, email, or overnight delivery service) are restrained from violating Section 5(a) and (c) of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)    making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell any security through the use or medium of any prospectus or otherwise, unless a registration is in effect as to such security; or

(b)    making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use

A315

or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. §77h].

## IV.

**IT IS HEREBY FURTHER ORDERED** that Defendants Veldhuis, Friesen and Sexton and each of their agents, servants, employees, and attorneys, and other persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise (including by fax, email, or overnight delivery service) are restrained from violating Section 13(d) of the Exchange Act [15 U.S.C. §78m(d)] and Rule 13d-1 thereunder [17 C.F.R. §240.13d-1] by acting individually or as part of a group to acquire, directly or indirectly, beneficial ownership of more than 5 percent of a class of an issuer's equity securities that are registered pursuant to Section 12 of the Exchange Act, and then failing to file statements with the Commission containing the information required by Schedule 13D [17 C.F.R. §240.13d-101] within ten days after they acquire such shares.

## V.

**IT IS HEREBY FURTHER ORDERED** that Defendant Dhillon and each of his agents, servants, employees, and attorneys, and other persons in active concert or participation with him who receive actual notice of this Order by personal service or otherwise (including by fax, email, or overnight delivery service) are restrained from violating Section 13(d) of the Exchange Act [15 U.S.C. §78m(d)] and Rule 13d-2 thereunder [17 C.F.R. §240.13d-2] by failing to file timely and accurate amendments to any filings under Schedule 13D [17 C.F.R. §240.13d-101].

4

A316

## VI.

**IT IS HEREBY FURTHER ORDERED** that Defendant Dhillon and each of his agents, servants, employees, and attorneys, and other persons in active concert or participation with him who receive actual notice of this Order by personal service or otherwise (including by fax, email, or overnight delivery service) are restrained from violating Section 16(a) of the Exchange Act [15 U.S.C. §78p(a)] and Rule 16a-3 thereunder [17 C.F.R. §240.16a-3] by failing to file reports of ownership and changes of ownership with the Commission as required.

## VII.

**IT IS HEREBY ORDERED** that:

A.     Defendants, and each of their officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, including facsimile transmission, electronic mail, or overnight delivery service, shall hold and retain funds and other assets of Defendants presently held by them, for their direct or indirect benefit, under their direct or indirect control or over which they exercise actual or apparent investment or other authority (including assets held in the name of or for the benefit of Defendants, in whatever form such assets may presently exist and wherever located, and shall prevent any withdrawal, sale, payment (including, but not limited to, any charges on any credit card or draws on any other credit arrangement)), transfer, dissipation, assignment, pledge, alienation, encumbrance, disposal, or diminution in value of any such funds or other assets, which are hereby frozen, including, but not limited to, such funds held in the following accounts:

A317

| Location | Financial Institution | Possible Account Name(s) | Possible Account No(s). |
|---|---|---|---|
| CANADA | BANK OF MONTREAL | CHARTERHOUSE CAPTIAL INC | |
| | | PINE STRATEGIES CORP. | X4339 |
| | | ARDENT STRATEGIES CORP. | X0469 |
| | | MFG STRATEGIES CORP. | X3623 |
| | | FERROUS CAPITAL CORP. | X0477 |
| | | FERROUS CAPITAL CORP. | X7732 |
| | | VALLEY DRIVE ESTATES INC. | X0655 |
| | | FIRST AVENUE CAPITAL CORP | X0202 |
| | | MIKE VELDHUIS | X7997 |
| | | MIKE VELDHUIS | SAFE DEPOSIT X464B |
| | | AVONHURST CAPITAL CORP | X1741 |
| CANADA | CANACCORD GENUITY CORP | EGREDIOR HOLDINGS INC. | X58A-1 |
| | | EGREDIOR HOLDINGS INC. | X58B-1 |
| | | INLAND TRADING LTD, | X51A-1 |
| | | INLAND TRADING LTD. | X51B-1 |
| CANADA | CANADIAN IMPERIAL BANK OF COMMERCE | AVTAR S. DHILLON MD INC. | X3010 |
| | | JACKSON FRIESEN | X2334 |
| CANADA | COAST CAPITAL SAVINGS FEDERAL CREDIT UNION | QUARRY BAY EQUITY INC. | X3321 |
| | | QUARRY BAY EQUITY INC. | X2685 |
| | | MIKE VELDHUIS | X8846 |
| CANADA | ENVISION FINANCIAL | JACKSON FRIESEN | X4112 |
| CANADA | LEEDE JONES GABLE INC. | NORTON INVESTMENTS LLC | X283A |
| | | ARDENT STRATEGIES CORP. | X873A |
| | | JACKSON FRIESEN | X901A |
| | | JACKSON FRIESEN | X850Q |
| | | PINE STRATEGIES CORP. | X762A |
| | | BLACKSTONE CAPITAL PARTNERS INC. | X231A |
| | | BLACKSTONE CAPITAL PARTNERS INC. | X231E |
| | | BLACKSTONE CAPITAL PARTNERS INC. | X231F |
| | | MIKE VELDHUIS | X953A |
| | | MIKE VELDHUIS | X953S |
| | | MIKE VELDHUIS | X862Q |
| | | NOVA TREK CAPITAL INC. | X313A |
| | | PAUL SEXTON | X984A |
| | | PAUL SEXTON | X984Q |

A318

| Location | Financial Institution | Possible Account Name(s) | Possible Account No(s). |
|---|---|---|---|
| CANADA | MACKIE RESEARCH CAPITAL CORP. | BLACKSTONE CAPITAL PARTNERS INC | |
| | | PAUL SEXTON | |
| CANADA | PI FINANCIAL CORP | EVERVEST EQUITY INC. | X4535 |
| | | BLACKSTONE CAPITAL PARTNERS INC. | X9203 |
| | | PAUL SEXTON | |
| CANADA | SUN LIFE ASSURANCE COMPANY OF CANADA | ZHIYING YVONNE GASARCH | X2937 |
| CANADA | TD CANADA TRUST | ONE WORLD FARMS INC. | X1487 |
| | | PHEON EQUITY INC. | X1686 |
| | | PAUL SEXTON | X6857 |
| | | NOVA TREK CAPITAL INC. | X5109 |
| | | NOVA TREK CAPITAL INC. | X2034 |
| | | LAKEHOUSE CAPITAL INC. | X2580 |
| | | LAKEHOUSE CAPITAL INC. | X9416 |
| | | HIGHPOINT DRIVE ESTATES INC. | X2128 |
| CANADA | WESTMINSTER SAVINGS CREDIT UNION | NORLAND ESTATES INC. | X2505 |
| DOMINICAN REPULBLIC | BANCO MULTIPLE SANTA CRUZ SA | ESQUIRE CORPORATE SERVICES SRL | X4578 |
| | | INLAND TRADING SRL | X2021 |
| | | TRIUS HOLDINGS LIMITED SRL | X2147 |
| | | LARAMEX HOLDINGS SRL | X2405 |
| MALTA | TENDALL CAPITAL MARKETS INC. | TRIUS HOLDINGS LIMITED SRL | X5001 |
| MAURITIUS | PETER PESIC & CO SECURITIES INC. | CORBY VENTURES INC. | X57CV |
| | | PEGASUS GLOBAL LTD | X57PG |
| MAURITIUS | ABC BANKING CORPORATION LTD. | HENG HONG INVESTMENT LTD. | X1000 |
| PHILIPPINES | METROBANK BACOLOD | EMPHASISM CREATIVE MEDIA INC. | X0513 |
| ST. LUCIA | VIA BANK LTD. | CORTONA EQUITY INC. | |
| USA | EURO PACIFIC INTERNATIONAL BANK INC. | EGREDIOR HOLDINGS LTD. | X8141 |
| | | EGREDIOR HOLDINGS LTD. | X7846 |
| USA | FIRST CITIZENS BANK & TRUST CO. | CHALMERS GROUP LLC | X0993 |
| USA | FIRST REPUBLIC BANK | ONE WORLD RANCHES LLC | X7123 |

A319

| Location | Financial Institution | Possible Account Name(s) | Possible Account No(s). |
|----------|----------------------|--------------------------|-------------------------|
| USA | JP MORGAN CHASE BANK NA | WILLIAM KAITZ | X5150 |
| | | WILLIAM KAITZ | X4131 |
| USA | MECHANICS BANK | SUTTER BUTTES LLC | X8841 |
| | | ONE WORLD REAL ESTATE LLC | X4836 |
| | | ONE WORLD REAL ESTATE LLC | X7356 |
| | | ONE WORLD REAL ESTATE LLC | X4993 |
| | | ONE WORLD RANCHES LLC | X2519 |
| | | DILJIT KAUR BAINS/AVTAR DHILLON | X4326 |
| USA | PACIFIC WESTERN BANK | PAUL SEXTON | X0618 |
| | | PAUL SEXTON | X6814 |
| USA | PNC BANK NA | PROMETHEAN MARKETING INC | X9779 |
| | | WILLIAM KAITZ | X2768 |
| USA | SUNCREST BANK | ONE WORLD REAL ESTATE LLC | X6369 |
| | | ONE WORLD RANCHES LLC | X6238 |
| USA | TRUIST BANK | FULL SERVICE MEDIA LLC | X0828 |
| | | FULL SERVICE MEDIA LLC | X3798 |
| | | FULL SERVICE MEDIA LLC | X1111 |
| | | FULL SERVICE MEDIA LLC | X1533 |
| | | WILLIAM KAITZ | X5280 |
| | | WILLIAM KAITZ | X2273 |
| USA | UNIONBANK | AVTAR DHILLON | X9309 |
| | | AVTAR DHILLON | X0165 |
| | | AVTAR DHILLON/DILJIT BAINS | X6218 |
| USA | WELLS FARGO | ROAD RUNNER | |
| | | L & L INVESTORS | |
| | | W&B RIDING CLUB @ ASSUNPINK WNA LLC | X9413 |
| | | W&B RIDING CLUB @ ASSUNPINK WNA LLC | X5351 |

B.      All banks, brokerage, and other financial institutions (including but not limited to those listed in Paragraph VII.A) and other persons or entities (including but not limited to payment processors, investors and/or promoters) that receive actual notice of this Order by personal service or otherwise, including via facsimile or email transmission, or overnight

8

A320

delivery service, holding any funds or other assets in the name, for the direct or indirect benefit, or under the direct or indirect control of Defendants or over which Defendants exercise actual or apparent investment or other authority, in whatever form such assets may presently exist and wherever located, shall hold and retain within their control and prohibit the withdrawal, removal, sale, payment (including, but not limited to, any charges on any credit card or draws on any other credit arrangement), transfer, dissipation, assignment, pledge, alienation, encumbrance, diminution in value, or other disposal of any such funds or other assets; and that such funds and assets are hereby frozen.

   C. The above Paragraphs VII.A and VII.B shall immediately cease to apply to any assets located within the United States, including any bank, brokerage or other financial institution account, which becomes subject to any later order entered by any federal court as a result of proceedings which may be filed by the United States or any department or agency thereof under any federal civil or criminal forfeiture statute, to the extent such later order requires the transfer of any asset to the United States government.

## VIII.

   **IT IS HEREBY FURTHER ORDERED** that Defendants, and each of their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, including via facsimile or email transmission, or overnight delivery service, and each of them, shall, within five days of receiving actual notice of this Order, take such steps as are necessary to repatriate and deposit into the registry of the Court in an interest bearing account, any and all funds or assets that presently may be located outside of the United States that were obtained directly or indirectly from the trading described in the Complaint.

A321

**IX.**

**IT IS HEREBY FURTHER ORDERED** that service of this Order, and the Summons

and Complaint, may be made by facsimile, mail, e-mail, delivery by commercial courier, or

personally by any employee of the Commission who is not counsel of record in this matter, or

special process server, or any other person, or in any other manner authorized by Rule 5 of the

Federal Rules of Civil Procedure and may be made on any registered agent, officer, or director of

Defendants, or by publication.


_____
UNITED STATES DISTRICT JUDGE


Dated:  _____, 2021 at _____a.m./p.m.

A322

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
|                          **Plaintiff,** | **Civil Action No. 21-CV-____ (___)** |
|     **v.** | |
| **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** | |
|                        **Defendants.** | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY**
***EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER, ORDER**
**FREEZING ASSETS, AND ORDER FOR OTHER EQUITABLE RELIEF**

Plaintiff Securities and Exchange Commission (the "Commission") submits this

memorandum of law, as well as the Declaration of Trevor Donelan and related Exhibits, in

support of its emergency *ex parte* motion for a temporary restraining order, order freezing assets,

and order for other equitable relief as to defendants Frederick Sharp ("Sharp"), Zhiying Yvonne

Gasarch ("Gasarch"), Courtney Kelln ("Kelln"), Mike Veldhuis ("Veldhuis"), Paul Sexton

("Sexton"), Jackson Friesen ("Friesen"), William Kaitz ("Kaitz"), Avtar Dhillon ("Dhillon"), and

Graham Taylor ("Taylor") (collectively, the "Defendants").

**PRELIMINARY STATEMENT**

Defendants engaged in a sophisticated, multiyear, internationally-based attack on the U.S.

financial markets and U.S. retail investors who purchased the penny stocks Defendants schemed

to sell.  Defendants' combined conduct resulted in hundreds of millions of dollars in illegal stock

sales that enriched themselves and defrauded retail investors.  Defendants each played key roles

1

A323

in interlocking fraudulent schemes to sell stock belonging to public company control persons to unsuspecting investors in the public markets, often during promotional activity designed to inflate the stocks' price and volume. The public companies whose stock was sold in Defendants' schemes were mostly "penny stock" companies, which means they are small companies whose stock trades at less than $5 per share.

As detailed below, Defendants **Dhillon, Veldhuis, Friesen, Sexton,** and **Taylor** were control persons of various penny stock companies who schemed to sell fraudulently those companies' stock to retail investors through offshore trading platforms in order to conceal their conduct from investors, securities market intermediaries, regulators, and law enforcement. Defendant **Sharp** and his team—**Kelln** and **Gasarch** (together the **"Sharp Group"**)—provided one-stop-shopping to support the fraudulent conduct of their control person clients. The Sharp Group provided: an array of offshore front companies with banking and brokerage accounts scattered across over a dozen bank-secrecy jurisdictions, encrypted communications networks, and an accounting system to track illegal sales on multiple foreign trading platforms and organize disbursements of fraudulent proceeds around the world. The Sharp Group charged their control group clients, including Veldhuis, Sexton and Friesen, lucrative fees to facilitate their fraudulent dumps of shares of hundreds of public companies into the U.S. market for more than a decade. In addition to employing the Sharp Group, Defendants Veldhuis, Sexton and Friesen often employed and bankrolled stock promoters like Defendant **Kaitz**. Kaitz ran promotions to encourage retail investors to buy the shares his employers were fraudulently selling into the demand he created – all while concealing that he was being paid by those sellers and depriving investors of the full and fair information to which the federal securities laws entitle them.

2

A324

The conduct described herein has left a wake of harmed investors; many people who bought control persons' stock, often in the aftermath of promotional campaigns designed to increase the stocks' price, are now left with nearly worthless shares. *See* Declaration of Trevor Donelan ("Donelan"), ¶¶28, 96, 102-103.

In light of this conduct, the Commission has charged the Defendants with engaging in, or aiding and abetting, schemes to defraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5(a) and (c) thereunder, and Sections 17(a)(1) and (3) of the Securities Act of 1933 (the "Securities Act"). *See* Complaint, Counts 1-2, 7-14. The Commission has also charged all Defendants except Gasarch, Taylor, and Kaitz with selling unregistered stock in violation of Sections 5(a) and (c) of the Securities Act. *See id.*, Count 3. The Complaint pleads additionally that Veldhuis, Sexton, Friesen and Dhillon violated Section 13(d) of the Exchange Act and either Rules 13d-1 or 13d-2 thereunder by failing to report that they were beneficial owners of more than 5% of shares in a particular company (*see id.*, Counts 4-5), and that Dhillon also violated Section 16(a) of the Exchange Act and Rule 16a-3 thereunder by failing to file required reports of his ownership and changes in his ownership of two other companies (*see id.*, Count 6).

The Commission seeks a temporary restraining order that would prevent all Defendants from engaging in further violations of the securities laws, an asset freeze order restraining accounts belonging to all of the Defendants, an order requiring funds to be repatriated to the United States, and an order permitting alterative service of the pleadings in this case. The evidence establishes that the Commission is likely to succeed on the merits of its claims, warranting the issuance of the requested orders. Defendants' fraudulent schemes lasted for years and caused hundreds of millions of dollars in harm to retail investors. Each Defendant is a repeat

A325

player in fraudulent schemes involving the stock of numerous public companies. The evidence detailed below demonstrates a substantial risk of irreparable harm—that is, the dissipation and further concealment of assets that could be used to compensate investor-victims—that justifies the requested emergency relief.

## STATEMENT OF FACTS

**A.    Statutory Framework Concerning the Sale of Securities: Control Persons, Restrictions on Sales, and Issuer Disclosure Requirements**

Stock held by public company control persons cannot generally be offered or sold to the public without being first registered with the Commission or without complying with various public disclosure requirements and limits on the amount of stock that can be sold. These legal requirements create market transparency by giving investors access to material information, including information identifying: from whom the investors would be buying stock, the control persons of the company, and what those control persons are doing with their own stock.

Before stock can be sold to the public, the person issuing or selling the stock must either (a) register the stock sales with the Commission pursuant to Section 5 of the Securities Act; (b) rely on an exemption from registration; or (c) comply with the sale conditions outlined in Commission Rule 144, which provides a safe harbor for selling unregistered stock. *See* 15 U.S.C. §§77d, 77e; 17 C.F.R. §230.144. Importantly, even if a public company files a registration statement to offer and issue stock to its investors, those investors *must* comply with the registration, exemption, or safe harbor rules before distributing (selling) that stock to other investors. *See e.g.* §230.144 (preamble).

"Restricted stock" is stock of a publicly traded company (also known as an "issuer") acquired from an issuer, or an affiliate of the issuer, in a private transaction that is not registered with the Commission. Stock held by an issuer or affiliate of an issuer is restricted stock. Absent

4

A326

an exemption, restricted stock cannot legally be offered or sold to the public unless a securities

registration statement has been filed with the Commission (for an offer) or is in effect (for a

sale).  *See* 15 U.S.C. §77e.  A registration statement describes an issuer's business operations,

financial condition, risk factors, and management.  *See* 15 U.S.C. §77g; 17 C.F.R. §229.101-105.

It also discloses any person or group who beneficially owns more than 5% of the company's

securities.  *See* 15 U.S.C. §77g; 17 C.F.R. §229.403.

An "affiliate" of an issuer is a person or group that, "directly, or indirectly through one or

more intermediaries, controls, or is controlled by, or is under common control with, such issuer"

(*i.e.*, a control group).  17 C.F.R. §230.144(a)(1).  Typical affiliates are officers, directors and

controlling shareholders.  For purposes of this memorandum, an "affiliate" is synonymous with a

"control group."  *See id.*  Control groups, like Veldhuis, Sexton, and Friesen, are subject to strict

limitations on the amount of stock they can sell, and have specific disclosure obligations.  *See

generally* 17 C.F.R. §230.144.  In short, control persons cannot secretly dump vast quantities of

stock into the securities markets – as Defendants did.  *See id.*

"Unrestricted stock" may legally be offered and sold in the public securities market by a

non-affiliate, ordinarily after being registered via a registration statement.  Registration

statements are transaction specific, and apply to each separate offer and sale as detailed in the

registration statement.  Registration does not attach to the security itself, and registration at one

stage for one party does not necessarily suffice to register later offers and sales by the same or

other parties.  *See SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007).  If a

control person buys shares in the company s/he controls, those shares are restricted and

ordinarily must be registered before a bulk sale to public investors.

A327

In addition, certain investors must disclose their control of more than 5% of an issuer's outstanding shares. *See* 15 U.S.C. §78m. Public companies that are required to file periodic reports with the Commission must accurately disclose shareholders who own more than 5% of the company's outstanding shares. *See* 15 U.S.C. §78m(d)(1). The Sharp Group schemed with numerous control groups to conceal that the groups owned more than 5% of an issuer's stock by dividing the control groups' stock into tranches of less than 5% across a number of nominee entities that then traded in concert. *See* Donelan, ¶¶26, 52.

**B.     Defendants Schemed To Sell The Stock of Numerous Companies Illegally.**

**1.     Overview of the Sharp Group's Conduct**

From at least 2010 to 2019, the Sharp Group ran a business that facilitated illegal stock sales of hundreds of penny stock companies in the U.S. public securities markets. *See* Complaint ("Comp."), ¶¶5, 42; Donelan, ¶16. The Sharp Group thereby facilitated over $1 billion in gross stock sales. *See* Comp. ¶43; Donelan, ¶16. Two of the Sharp Group's larger clients were the Veldhuis Control Group (composed of Veldhuis, Sexton and Friesen) and Luis Carrillo, who, together were responsible for at least $250 million in illicit stock sales. *See* Comp. ¶¶220, 223; Donelan, ¶¶94, 98. Sharp, Kelln, and Gasarch personally made millions from providing their services to facilitate their clients' stock frauds. *See* Comp. ¶¶60-62; Donelan, ¶17.

The Sharp Group provided many services to help its corporate control group clients conceal their identities when selling the stock of penny stock companies they controlled. By disguising their clients' identities and their controlling positions, the Sharp Group hid the fact that public company control persons were selling large blocks of stock to investors. *See* Comp. ¶¶2, 5-6. The Sharp Group enabled its clients to hide their identities by: 1) forming and providing offshore nominee companies that held shares for undisclosed control groups; 2)

6

providing and administering an encrypted communication network; 3) arranging for clients to deposit and sell stock through illegal offshore trading platforms, including Swiss-based Wintercap SA and Blacklight SA;[1] 4) administering a proprietary accounting system that tracked the Sharp Group's clients' total stock holdings and sales across various nominee shareholders and trading platforms; 5) paying out the proceeds of illegal stock sales at clients' direction to accounts around the world; 6) arranging to route such payments by circuitous methods designed to conceal the source of funds; and 7) fabricating documents, such as invoices, to conceal the nature and source of those payments. *See* Comp. ¶¶5-6, 44-58; Donelan, ¶¶11-15, Exs. C - G. As Sharp himself described the Sharp Group's services to one of his clients, "The service provided is comprehensive; it is not limited to trading. It includes payments, loans, private placements and keeping clients out of jail." *See* Comp. ¶¶45; Donelan, ¶14, Ex. D at 1.

Sharp was the mastermind of the Sharp Group's activities. He wrote a book about securities fraud and money laundering in which he described illegal conduct that parallels the Sharp Group's business model and demonstrated his intention to evade securities disclosure requirements to engage in "masterly stock manipulations." *See* Comp. ¶¶48; Donelan, ¶9, Ex. B. As the head of his organization, Sharp hired and directed various individuals to operate the administrative services offered by the Sharp Group. For example, Sharp oversaw the creation of his encrypted communications network, his proprietary "Q" accounting system, and the installation of individuals around the world to serve as the purported owners of his network of

---

[1] The Commission charged Wintercap SA and its principal on October 2, 2018 with violating the antifraud provisions of the Securities Act and the Exchange Act by engaging in a multiyear scheme that generated more than $165 million from the illegal sale of stock of at least 50 publicly traded companies. *See SEC v. Knox, et al.,* No. 18-cv-12058 (D. Mass.). The Commission charged Blacklight SA and its principals on January 2, 2020 with violating the Securities Act and Exchange Act antifraud provisions by engaging in a multiyear scheme that generated more than $35 million from the illegal sale of stock of at least 45 publicly traded companies. *See SEC v. Bajic, et al.,* No. 20-cv-007 (S.D.N.Y.).

A329

nominee shareholding companies.  *See* Comp. ¶¶49-51.  Sharp's Q system kept track of the total amounts of stock deposited and sold, and the total proceeds collected, for each deal his clients ran, as well as the commissions and fees the Sharp Group was owed for enabling its clients to sell stock illegally.  *See* Comp. ¶¶50; Donelan, ¶15, Exs. E and F.

Kelln and Gasarch were instrumental in providing the Sharp Group's services.  Kelln's primary role was to obtain, allocate, and distribute blocks of shares across multiple nominee shareholders to conceal the Sharp Group's clients' common control of all the stock so distributed.  Kelln routinely split clients' stocks into blocks of less than 5% of a company's outstanding shares.  *See* Comp. ¶¶52-54; Donelan, ¶¶12, 52, Exs. D at 21-22, H.  She did this to avoid the rules of market intermediaries who applied greater scrutiny to transactions by shareholders owning more than 5% of a company's shares.  *See* Comp. ¶¶55.  Kelln also coordinated the deposit of Sharp Group clients' stock with Wintercap SA and Blacklight SA. *See* Comp. ¶¶56, 117, 134-136, 163, 230-33; Donelan, ¶¶51-54, Ex. H.

Gasarch's primary role was to arrange for wire transfers to distribute the Sharp Group's clients' illegal trading proceeds back to them, or as they directed.  Gasarch (nicknamed "Wires" for her role) routinely arranged to transfer stock sale proceeds to accounts as directed by the Sharp Group's clients in a manner designed to conceal the fact that they were the ultimate recipients of their sales proceeds; she often fabricated invoices to justify these payments.  *See* Comp. ¶¶5, 57, 92-93, 170, 172; Donelan, ¶12, Ex. C.  Gasarch also served as the purported owner of one of the corporate nominees (Peaceful Lion Holdings) that the Sharp Group loaned to its clients to obscure the clients' ownership of stock they were selling.  *See* Comp. ¶¶58, 76-77; Donelan, ¶25, Ex. G.

The Sharp Group's conduct relating to its clients' dumps of the stock of Stevia First Corp./Vitality Biopharma, Inc. ("Stevia/Vitality") and Arch Therapeutics, Inc. ("Arch") are detailed below.  The Complaint also details additional dumps of other securities by all of the Defendants.  Defendants' repeated conduct, involving many securities over the span of years, demonstrates the propriety of the relief sought in this motion.

### 2.     The Stevia/Vitality Scheme

Between 2012 and 2018, the Veldhuis Control Group, Dhillon and Taylor schemed with the Sharp Group to sell over 35 million shares of Stevia and Vitality for combined proceeds of over $45 million.   *See* Comp. ¶¶64; Donelan, ¶60

In 2011, Dhillon and Taylor arranged to merge Dhillon's private company into a public shell company which became Stevia.  Comp. ¶¶65-68; *see* Donelan ¶¶21, 22.  By early 2012, Dhillon was Stevia's CEO and Chairman of its Board, and owned over 31,500,000 shares of its stock.  Comp. ¶¶69-71; Donelan, ¶¶22, 23.  Dhillon controlled Stevia and was thus its "affiliate" and required to disclose any change in his ownership of Stevia stock.  Comp. ¶¶72- 74.

### a.     Round 1 – Stevia Sales in 2012

Beginning in January 2012, shortly after Dhillon took over Stevia, Dhillon, Taylor, and the Veldhuis Control Group arranged to sell secretly Stevia's purportedly unrestricted stock and share in the proceeds of those sales.  First, Taylor coordinated the transfer of 19,600,000 shares of purportedly unrestricted Stevia shares to numerous Sharp Group-administered nominees, including Peaceful Lion Holdings (for which Gasarch was the purported owner).  *See* Comp. ¶¶76-77; Donelan, ¶¶24-26.  These shares represented over 37% of Stevia's total outstanding stock and over 97% of its purportedly unrestricted stock.  Donelan, ¶26.  Dhillon then began issuing press releases touting Stevia's purportedly positive business developments while the

9

Veldhuis Control Group hired Kaitz and others to promote Stevia, and paid Kaitz over $200,000 for those promotions. *See* Comp. ¶¶78-80; Donelan, ¶28. Between about March 6, 2012 and May 23, 2012, the Veldhuis Control Group, with Kaitz's substantial assistance, sold all 19,600,000 Stevia shares they controlled into the market, generating proceeds of over $24 million. *See* Comp. ¶81; Donelan, ¶29.

Dhillon, Taylor and the Veldhuis Control Group shared in the proceeds from these Stevia sales. *See* Comp. ¶¶82-83; Donelan, ¶¶30, 34. For example, the Sharp Group directed wires of over $4.2 million in Stevia sales proceeds to a Swiss bank account of a foreign company controlled by Taylor, which then transferred 60% of those funds to the Swiss bank account of a foreign company controlled by Dhillon. Donelan, ¶34. The Veldhuis Control Group also asked the Sharp Group for some of its Stevia sales proceeds in cash, which the Sharp Group withdrew from the accounts of the corporate nominee shareholders they administered. *See* Comp. ¶83; Donelan, ¶¶14, 35, Ex. D at 5, 9-18.

### b.    Round 2 – Stevia Sales in 2014

Between 2012 and February 13, 2014, Stevia (under Dhillon's control) issued an additional 1,320,511 shares to a Sharp Group-administered nominee, which transferred those shares to two other Sharp Group-administered nominees. *See* Comp. ¶84; Donelan ¶36. The Veldhuis Control Group then sold these shares into the public markets between January and July 2014, with Kelln's help and in a manner that did not reveal the control group's affiliation with Dhillon and Stevia. *See id.* Comp. ¶85-86; Donelan ¶37-38. While the Veldhuis Control Group was reaping these illegal proceeds, they discussed splitting up their gains, noting that Dhillon was agreeable to distributing some of the proceeds in cash, which would further conceal the money trail. *See id.* ¶¶87-90, 92-98; Donelan, ¶¶14, Ex. D at 11-18. The Veldhuis Control

10

A332

Group also distributed proceeds from their Stevia sales to Friesen and to Taylor's Swiss bank account.  *See* Comp. ¶¶89-90; Donelan, ¶¶14, 35, Exhibit D at 6.

### c.    Round 3 – Stevia Sales in 2015 and 2016

As a consequence of the merger that created Stevia, Dhillon came to control 31,500,000 restricted shares of Stevia stock (the "March 2012 Stevia Stock").  *See* Comp. ¶101, Donelan, ¶22.  Through a complex series of transactions that were designed to conceal the connections between Dhillon and the Veldhuis Control Group, Dhillon transferred the nominal ownership of 20 million shares of the March 2012 Stevia Stock to multiple Sharp Group nominee shareholders and to several nominees controlled by Taylor, in blocks of less than 5% each.  *See* Comp. ¶¶102-107; Donelan ¶¶24, 26.  These 20 million shares were about 37% of Stevia's outstanding shares, but by spreading them in small blocks across various nominee corporate shareholders, Dhillon, Taylor and the Veldhuis Control Group were able to obscure the fact that the shares remained commonly owned and controlled and that they would act in concert to sell them.  *See* Comp. ¶108.

In 2014, Dhillon, Taylor and the Veldhuis Control Group began planning to sell the March 2012 Stevia Stock.  *See* Comp. ¶¶110-117.  With Dhillon's agreement, Taylor transferred the portion of the March 2012 Stevia Stock held in the names of his nominees to other Sharp Group-administered nominees, and the Veldhuis Control Group, working with Sharp and Kelln, arranged to transfer those shares to other Sharp Group-administered nominees who had accounts at Wintercap SA and Blacklight SA.  *See id.*; Donelan, ¶14, 43, Ex. D at 2, 19, 21, 22.

The Veldhuis Control Group then directed Wintercap SA and Blacklight SA to sell the March 2012 Stevia Stock in conjunction with another misleading promotional campaign run by Kaitz.  *See* Comp. ¶¶118-119; Donelan, ¶44.  Kaitz knew that the entity he was describing as the

paying party for the promotions would not be traceable to the Veldhuis Control Group and would not inform investors that the persons paying for the promotions were the same people selling the shares into the demand that the promotions would generate. *See id.* ¶¶119-126. Sharp, Kelln and Gasarch assisted the Veldhuis Control Group by supplying an additional nominee to disclose as the party purportedly paying for promotions, to further distance the real sellers (the Veldhuis Control Group, Dhillon and Taylor) from the promotions. *See id.* ¶¶123-24; Donelan, ¶14, Ex. D at 25.

During 2015 and 2016, the Veldhuis Control Group sold millions of shares of the March 2012 Stevia Stock, for proceeds of over $6 million during those years. *See* Comp. ¶¶64, 127; Donelan, ¶44, 60. The Veldhuis Control Group shared the proceeds of these sales with Dhillon, and paid third party obligations directly for Dhillon and Sexton so that proceeds were not routed directly to them. *See id.* ¶¶128-129; Donelan, ¶¶80, 81. The Sharp Group recorded all of these transactions in its Q system. *See* Donelan, ¶15.

### d.    Round 4 – Vitality Sales in 2016-2018

In July 2016, Stevia changed its name to Vitality and reduced its outstanding shares by a factor of 10. *See* Comp. ¶130; Donelan ¶47. This transaction had the effect of eliminating much of the Vitality stock that retail investors had purchased during the promotions in Rounds 1-3, and consolidated the Defendants' control over Vitality's outstanding stock. *See* Comp. ¶130. In 2016, Dhillon orchestrated the issuance of millions of shares of restricted Vitality stock to various Sharp Group-administered nominees in exchange for $4.4 million in financing for Vitality. *See id.,* ¶131; Donelan ¶48. Kelln hired a lawyer to opine that the restricted legend could be removed from those shares based on the false claim that the nominees were not affiliates of Vitality. *See* Comp., ¶¶132-133; Donelan ¶¶49-51. In reality, these shares were

12

legally restricted from resale because the Veldhuis Control Group was acting in concert with Dhillon, who was the chairman of Vitality's board. *See* Comp., ¶133.

Once the restricted legends were removed from these Vitality shares, Kelln and the Sharp Group coordinated their transfer to Wintercap SA in blocks of less than 5%, and their eventual sale through Wintercap brokerage accounts. *See id.*, ¶¶134-137; Donelan, ¶¶51-53, Ex. H. Veldhuis directed Wintercap's trading. *See* Comp. ¶¶137-38; Donelan, ¶54. Again, the Veldhuis Control Group paid Kaitz to run a promotion for Vitality that did not disclose that the group funding the promotion was selling into the demand it created. *See* Comp. ¶¶138-140; Donelan ¶55. As in the earlier rounds, the Veldhuis Control Group and Taylor shared their profits from selling Vitality stock with Dhillon, and caused sales proceeds to be sent to third parties on their behalf to assist in concealing the fact that they were the real beneficiaries of the sales. *See* Comp. ¶¶141, 146; Donelan, ¶¶57, 59, 80, 81. Overall, each of Sexton, Veldhuis, Friesen, Taylor, and Dhillon received over $2 million from their scheme to sell Stevia/Vitality stock, and Kaitz received about $1.4 million. *See* Comp. ¶140; Donelan, ¶59.

**3.      The Arch Scheme**

The Veldhuis Control Group, Dhillon and Taylor schemed with the Sharp Group and Kaitz to sell over 18 million shares of Arch for combined proceeds of over $12 million. *See* Comp. ¶¶150, 165-168; Donelan, ¶¶74, 75. Many aspects of the Arch scheme were similar to the Stevia/Vitality scheme. In 2013, Dhillon arranged for a private company he controlled to reverse merge into a publicly-traded shell company controlled by the Veldhuis Control Group; the surviving public company was Arch. Comp. ¶151; *see* Donelan, ¶¶61-63. By June 2013, Dhillon was an officer of Arch and chairman of its Board of Directors. *See* Comp. ¶152; Donelan, ¶61.

13

A335

In 2013, the Veldhuis Control Group controlled at least 19,230,000 purportedly unrestricted shares of Arch, representing over 48% of Arch's outstanding stock and 100% of its float (or shares available for trading).  Comp. ¶¶152-56, 158; Donelan, ¶¶63-67.  The Veldhuis Control Group arranged for the transfer of those shares into blocks of less than 5% to a number of Sharp Group-administered nominees.  Comp. ¶¶152-56; *see* Donelan, ¶67.  Shortly before the reverse merger closed, the Veldhuis Control Group controlled an additional 20,000,000 restricted Arch shares.  *See* Donelan, ¶¶66, 67.  In connection with the reverse merger, the Veldhuis Control Group transferred 10,000,000 of these shares to Dhillon and 10,000,000 of these shares to a company controlled by Arch's CEO.  *See* Comp. ¶¶157-58; Donelan, ¶¶66, 67.  Dhillon then transferred 2,750,000 of the shares he received to Company A, which was controlled by his associate.  *See* Comp. ¶157; Donelan, ¶66.

      **a.  Dhillon's Arch Scheme With the Veldhuis Control Group and Taylor**

The Veldhuis Control Group hired Kaitz to run a promotion on Arch stock, and paid him (through various Sharp Group-administered nominees) about $1.2 million from June to August 2013 for the promotion, which intentionally concealed that the paying party was the Veldhuis Control Group.  *See* Comp. ¶¶160-64; Donelan, ¶¶14, 70, Ex. D at 28, 33-34.  Kaitz's promotion was very successful.  *See* Donelan, ¶73.  Between June 11, 2013 and September 30, 2013, the Veldhuis Control Group sold about 16.6 million shares of Arch stock through Sharp Group-administered nominees, generating proceeds of at least $11.5 million.  *See id.*, ¶74.  The Veldhuis Control Group sold about 1.4 million additional shares through a nominee shareholder administered by Wintercap SA, generating proceeds of about $574,000.  *See* Comp. ¶¶165-66; Donelan, ¶75.  Each of Sexton, Friesen and Veldhuis personally profited by at least $1.5 million from these sales.  *See* Comp. ¶¶173; Donelan, ¶79.  During these sales, the Veldhuis Control

14

A336

Group was an affiliate of Arch because it controlled a significant percentage of Arch's stock and/or because it was acting in concert with Dhillon, the Arch chairman. Comp. ¶167. The Veldhuis Control Group thus illegally sold unregistered shares of Arch stock, and schemed to defraud investors by concealing the fact that Arch's affiliates were dumping stock into the markets.

Dhillon coordinated Arch's press releases with the Veldhuis Control Group's promotional activity, participated in discussions about the Veldhuis Control Group's sales of Arch, and also shared in the proceeds of those sales. *See id.* ¶¶168-171, 174-76; Donelan, ¶¶14, 78, 80, Ex. D at 32-36. Taylor also schemed with the Veldhuis Control Group on the Arch deal and received about $600,000 of the proceeds from the Veldhuis Control Group' sales. *See* Comp. ¶¶172, 174, 176; Donelan, ¶14, 78, Exhibit D at 36.

### b. Dhillon's Arch Scheme Using Company A

Apart from his schemes with Taylor and the Veldhuis Control Group, Dhillon engaged in additional illegal sales of the stock of several companies atop whose boards he sat, including Arch. *See* Comp. ¶¶178-79; 218-19. Dhillon did this, in part, by using an associate, Person A, who set up Company A to hold and sell Dhillon's Arch stock. *See* Comp. ¶¶180-81. Dhillon knew that, as a high-level Arch insider, his Arch stock sales were subject to restrictions and disclosure requirements. *See* Donelan, ¶7.g, Exhibit A at 5. By using Company A as a nominee shareholder, Dhillon knowingly schemed to avoid those limits and requirements and defraud the market and securities intermediaries like brokers. *See* Comp, ¶¶182-84.

In June 2013, Dhillon arranged to transfer 2,750,000 Arch shares to Company A, which was a nominee entity set up by Person A to disguise Dhillon's stock holdings. *See* Donelan, ¶¶82, 83. As Dhillon directed Person A, Dhillon's name does not appear on Company's A's

A337

incorporation papers. *See* Comp., ¶185, Donelan, ¶82. When Company A set up a brokerage account in April 2016, Person A misleadingly informed the brokerage firm that he, as Company A's sole director, was not an affiliate of Arch (and omitted that Dhillon, whose stock Company A would hold and sell, was an Arch affiliate). *See* Comp., ¶186; Donelan, ¶83. Dhillon then caused Company A to sell all 2,750,000 shares of Arch stock for proceeds of over $1.3 million. *See* Comp., ¶187; Donelan, ¶84. Person A then transferred at least $850,000 of those Arch sales proceeds to or for the benefit of Dhillon. *See* Comp. ¶¶188-89; Donelan, ¶¶85, 86.

During the Commission's investigation into Dhillon's conduct, he testified under oath and was asked whether he knew anyone who sold Arch before 2019. Dhillon falsely replied that he was not aware of Company A's sales and also failed to disclose his knowledge of the Veldhuis Control Group's sales. *See* Comp. ¶¶194-95; Donelan, ¶7.g; Ex. A at 3.

### 4. Defendants' Ongoing Activities Pose Future Risks of Securities Fraud.

Dhillon remains in positions of authority in several related publicly-traded companies. He is currently the Executive Chairman of Emerald Health Therapeutics, Inc., a publicly traded cannabis company that is currently raising money. *See* Donelan, ¶9.i. Dhillon is also currently a Board Observer and advisor being paid $10,000 per month by Skye Bioscience, Inc. (formerly Emerald Bioscience, Inc.), another company currently raising money, after having turned over the CEO and Chairman of the Board roles to his nephew. *See id.* Dhillon's influence over these companies that are currently selling securities to the public poses the threat that he will misuse his authority to commit securities fraud, as he did when he was the Chairman of Arch, Stevia/Vitality, Oncosec Medical Incorporated ("Oncosec") and Inovio Pharmaceuticals, Inc. ("Inovio")

A338

There is also evidence that at least Kelln and Kaitz are still involved in recent fraudulent promotional schemes. Donelan, ¶104. A media company controlled by Kaitz was paid to run a suspicious promotional campaign for a gold mining company whose stock price and volume increased in conjunction with the paid promotional campaign from August through December 2020. *See id.* An account held by an entity owned by Kelln received transfers of over a million shares of the company and sold them into the promotion, receiving proceeds of approximately $700,000 (Canadian $). *See id.*

## ARGUMENT

## I.    THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS.

Section 27 of the Exchange Act gives the district courts jurisdiction over suits claiming violations of the Exchange Act and has been construed to extend to foreign defendants, bounded only by the due process clause of the Fifth Amendment. *See Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir. 1972); *SEC v. Carrillo*, 115 F.3d 1540, 1543 (11th Cir. 1997); *see also Bluetarp Fin., Inc. v. Matrix Construction Co.*, 709 F.3d 72, 82 (1st Cir. 2013) (finding personal jurisdiction over foreign defendants); *Nowak v. Tak How Invs, Ltd.*, 94 F.3d 708, 713, 717 (1st Cir. 1996) (same). The standard applied is the traditional minimum contacts analysis. *Id.* Under this analysis, courts look to whether a defendant has purposefully availed himself of the United States by conducting activities here. *Id.* This standard is clearly met in this case. Defendants availed themselves of the United States financial markets by selling the stock of dozens of U.S. companies including Stevia/Vitality and Arch through their transactions on OTC Markets, a U.S.-based financial marketplace. *See* Comp. ¶¶8, 31, 32, 64. Defendants' conduct also often targeted U.S. investors transacting in U.S. markets. *See* Donelan, ¶¶102-103. Their conduct was purposefully directed towards U.S. market participants to

17

A339

accomplish the goals of their scheme: to dump the stocks of publicly-traded U.S. companies while concealing those stocks' true ownership.

Similarly, venues lies in this district. The "proper question . . . is not just where defendants acted, but whether defendants knew or had reason to know that the misleading manipulation would be communicated to and relied upon by market participants within the forum." *SEC v. AutoChina Int'l. Ltd.*, No. 12–10643, 2013 WL 265974, *1-2 (D. Mass. Jan. 24, 2013) (finding that venue was proper because Massachusetts-based investors purchased the illegally sold stock). Here, Massachusetts investors purchased stock sold illegally by Defendants. *See* Donelan, ¶103.

## II. A TEMPORARY RESTRAINING ORDER IS BOTH NECESSARY TO PROTECT INVESTORS AND IN THE PUBLIC INTEREST

### A. Legal Framework

In the First Circuit, a temporary restraining order and a preliminary injunction "may be granted if the movant shows a likelihood of success on the merits, a risk of irreparable harm, a favorable balance of equities, and that the injunction would be in the public interest." *SEC v. Fife*, 311 F.3d 1, 8 (1st Cir 2002). "The '*sine qua non*' of a preliminary injunction analysis is whether the plaintiff is likely to succeed on the merits of its claim." *Id.*

### B. The Commission is Likely to Succeed on the Merits of its Claims

The strength of the evidence detailed above demonstrates that the Commission is likely to succeed in showing that Defendants engaged in multiple fraudulent schemes over many years, in violation of Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) and Rules 10b-5(a) and (c) under the Exchange Act. The Commission is also likely to succeed on its claims that all Defendants except Gasarch and Kaitz violated Section 5 by selling unregistered stock. Further, Defendants' sale of unregistered stock in violation of Section 5—for which scienter is not an

18

A340

element—is a sufficient basis for freezing their assets. *See SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 748, 756 (S.D.N.Y. 2018) (granting preliminary injunction freezing assets for alleged violations of Section 5 of the Securities Act).

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit any person, in connection with the purchase or sale of any security, from, directly or indirectly: (a) employing any device, scheme or artifice to defraud; or (c) engaging in any act, practice, or course of business that operates as a fraud or deceit upon any person, in connection with the purchase or sale of a security. *See* 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5(a), (c). Section 17(a) of the Securities Act contains similar prohibitions in the offer or sale of any security. *See* 15 U.S.C. §77q(a). The language of these provisions is "expansive" and they "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019). *Lorenzo* defined the term "device," simply as something "devised, or formed by design," defined a scheme as a "project, plan or program of something to be done," and defined an artifice as "an artful stratagem or trick." *Id.* (internal quotations and citations omitted). The Court similarly defined "act" and "practice" broadly to include things done, actions and deeds. *See id.*

To establish violations of Section 10(b) and Section 17(a)(1), the Commission must show that Defendants acted with scienter, but negligence is sufficient to establish liability under Section 17(a)(3). *See Aaron v. SEC*, 446 U.S. 680, 687 n.5, 695-97 (1980); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002) (scienter may be established by a showing of recklessness). Direct evidence of scienter is unnecessary; rather, "proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983).

    **1.**     **Sharp and Kelln Engaged in, and Aided and Abetted, Fraud.**

The Commission has produced evidence to show that it is likely to succeed on its claims that Sharp and Kelln violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder and Sections 17(a)(1) and (3) of the Securities Act and aided and abetted their control group clients' violations of those provisions.

The evidence shows that Sharp and Kelln violated Sections 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder. Their business – for at least a decade – was facilitating their clients' securities fraud by concealing their clients' ownership of hundreds of stocks that their clients were selling into the U.S. markets. *See* Comp. ¶¶5-6, 42-43, 49-50, 59; Donelan, ¶¶14, 16, Exhibit D at 1 (Sharp describing his services). They employed multiple devices, schemes and artifices to defraud – the primary one being the network of nominee corporations that they rented to their clients to hide their clients' controlling ownership of numerous public companies' stock. *See* Comp. ¶¶46-48, 52-56, 76, 84, 86, 107, 114, 158; Donelan, ¶¶12-15, Exs. C, D, E, F, and G. Sharp also created, used and maintained the Q accounting system that allowed him to track his clients' stock positions that had been deposited in various illegal trading platforms, keep track of the proceeds when his clients sold those shares, and distribute those proceeds to, or for the benefit of, those clients in ways that would obscure the origin of the funds and their receipt of those proceeds. *See* Comp. ¶¶6, 50, 57, 82-83, 90, 92-94, 140, 170 172-73; Donelan, ¶¶12, 15, Exs. E and F. Sharp also made sure that he, Kelln and Gasarch were well-compensated when his clients used the nominees they administered and any of the services they provided. *See* Comp. ¶¶60-62; Donelan, ¶17.b.

A342

The evidence is clear that Sharp knew he was engaged in securities fraud and that his role was to facilitate illegal trading by his clients. Sharp's "fictional" book that describes securities fraud schemes following the Sharp Group's business model is evidence that he intentionally engaged in misconduct, and that he knew that his schemes were designed to avoid the rules of the U.S. securities markets. *See* Comp. ¶48; Donelan, ¶9.b., Ex. B. Sharp also told his clients that his services included "keeping his clients out of jail" – an implicit admission that he knew his clients were engaging in criminal conduct and that he was facilitating it. *See* Comp. ¶45; Donelan, ¶14, Ex. D at 1. Kelln's words and actions also demonstrate her knowledge and intention to engage in securities fraud. She wrote to clients or illegal trading platform representatives to explain that she was taking actions to keep each nominee's ownership of a company's stock below 5% - to avoid the scrutiny of market gatekeepers. *See* Comp. ¶¶53, 86, 117, 135-36, 225-26, 228; Donelan, ¶52, Ex. H.

Sharp's and Kelln's entire business model was designed to allow their clients to conceal the fact that persons controlling public companies' stock were dumping restricted shares into the market. *See* Comp., ¶¶2, 5-6, 37, 46-47. This conduct in splitting up the ownership of their clients' stock into tranches of less than 5% concealed the fact that all of the nominees they administered were acting as a group. *See id.*, ¶¶53-54. Sharp and Kelln thereby defrauded investors who thought they were purchasing legitimately unrestricted shares and were unaware of the massive dumps by those controlling the company. *See id.*, ¶¶2, 4, 35, 44, 55-56; *see also SEC v. Esposito*, 260 F. Supp. 3d 79, 91 (D. Mass. 2017) (defendants liable for securities fraud scheme who "fabricated corporate documents and regulatory filings, and submitted them to the transfer agent, along with false attorney opinion letters, as part of the scheme to induce the

A343

transfer agent to issue hundreds of millions of purportedly unrestricted [] shares that were ultimately sold to the investing public despite the trading prohibitions on their sale").

Further, Sharp and Kelln also aided and abetted their clients' violations of Section 17(a)(1) and (3), Section 10(b) and Rules 10b-5(a) and (c) because they were aware that their clients' sales in the public markets were made in conjunction with misleading promotional activities funded by their clients, and they provided substantial assistance to their clients by sometimes providing the nominee whose name was publicly listed as the party paying for the promotions. *See id.*, ¶¶79, 164; 15 U.S.C. §§77o(b); 78t(e); *SEC v. Tambone*, 550 F.3d 106, 144 (1st Cir. 2008) (aiding and abetting liability has 3 elements: a primary violation, defendant's awareness that his conduct was part of improper activity, and defendant knowingly or recklessly substantially assisted the primary violation). Their repeated coordination of sales with these fraudulent promotional activities evidences their intent to profit at the expense of the truth and to the detriment of the retail investors who purchased the stocks being dumped by their clients. *See* Comp., ¶¶77-81, 110-118, 158-166. Sharp and Kelln thus knew that their business was a course of conduct that operated as a fraud on the purchasers of numerous securities – and caused fraudulent securities sales. *See e.g.* Comp. ¶¶1, 43.

### 2.    Veldhuis, Sexton and Friesen Engaged in Fraud

Veldhuis, Sexton and Friesen (the "Veldhuis Control Group") each also engaged in deceptive acts in violation of Sections 17(a)(1) and (3) of the Securities Act, and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder. The three of them functioned as a group to control the stock of over a dozen public penny stock companies (including Stevia/Vitality, Arch, and others), whose securities they sold into U.S. markets in conjunction with misleading promotions. *See* Comp. ¶¶7-8, 76-81, 118-27, 139; 160-64, 220; Donelan, ¶94.

22

They did not disclose their control over these companies, as the securities laws required, and thereby misled the securities market intermediaries through whom their sales took place, and the unsuspecting retail investors who purchased the shares they sold. *See* Comp., ¶¶79, 87, 123-24, 132-33, 156, 159, 163-67; 221-22; Donelan, ¶100. The Veldhuis Control Group's use of Sharp Group-administered nominees to hold their stock and prevent the market from discovering that stock -- nominally spread between multiple companies -- was all controlled by them is a deceptive act and course of business whose use violates Section 10(b), Rules 10b-5(a) and (c) and Sections 17(a)(1) and (3). *See* Comp., ¶¶77, 85, 103-107, 114-18, 131, 154-55, 166; Donelan, ¶67; *SEC v. Fiore*, 416 F. Supp. 3d 306, 320-21 (S.D.N.Y. 2019) (SEC pled sufficient deceptive conduct by entities who acquired and sold penny stocks into misleading promotions for which they paid).

The Veldhuis Control Group's scienter is demonstrated by their efforts to obscure the fact that they were controlling the companies whose stock they sold by paying for promotions that did not disclose their involvement, by using Sharp Group-administered nominees to hold their shares, by using Sharp's encrypted communications network to communicate (the "Encrypted Communications"), and by dividing the proceeds of their illicit sales in cash. For example, Veldhuis engaged in Encrypted Communications with Sharp, Kelln and Kaitz about using Sharp nominees that could not be connected to him as paying parties in promotions, and about distributing Stevia sales proceeds in cash. *See* Comp. ¶¶92-94, 123-24, 162-63; Donelan, ¶14, Ex. D at 5, 11-18, 29-31. Similarly, Sexton engaged in Encrypted Communications about dividing Stevia proceeds in cash and about conspiring to sell Stevia stock held by multiple nominees. *See* Comp. ¶¶96-98, 111-113; Donelan, ¶ 14, Ex. D at 5, 11-18. Friesen's scienter is also shown by similar Encrypted Communications: he instructed Sharp employees to sell Stevia

shares through nominees and asked about news releases to support the group's promotional activity. *See* Comp. ¶¶91, 111, 168; Donelan, ¶40.

As a result of their illegal trades of Stevia/Vitality and Arch stock alone, each of Veldhuis, Sexton and Friesen personally made millions. *See* Comp. ¶¶140, 173; Donelan, ¶¶59, 79. At the same time, their illegal stock sales generated over $144 million in proceeds – largely from investors who were kept in the dark about their control over the companies' stock they were selling. *See* Comp. ¶¶220-22; Donelan, ¶94.

### 3. Dhillon and Taylor Engaged in Fraud

Dhillon and Taylor also violated Sections 17(a)(1) and (3) of the Securities Act, Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder as a result of their participation in fraudulent schemes with the Veldhuis Control Group to sell Stevia/Vitality, Arch, and other stocks. Dhillon was the "inside man" in these deals. As the chair of the Board of Directors of Stevia/Vitality, Arch, and other companies, he controlled the companies, facilitated the issuance of shares to the other Defendants, and abused his positions of trust and influence to conceal illegal trading by himself and his associates. *See* Comp. ¶¶9-11, 30, 71, 88, 103-07, 111, 121, 131, 152, 159, 168; Donelan, ¶¶9.a., 14, 30, 31, 33, 34, 41, 45, 48, 57, 59, 76, 77, 80, 81, Exhibit D at 2, 11-18, 20, 31, 33. Dhillon knew he was required to, but failed, to disclose his ownership interest in the stock his associates were selling. *See* Comp. ¶¶72-74, 100, 144-46, 169, 181-87, 190-93; Donelan, ¶7.g., Ex. A at 5. Dhillon's deceptive conduct enabled stock to be sold by a coordinated network of nominee shareholders to enrich himself and the other Defendants. Dhillon's scienter is demonstrated by the fact that he misrepresented his connections to the other Defendants and his involvement in selling shares of the companies atop whose boards he sat, as well as by his admitted knowledge of the securities laws he was violating when he concealed his

24

A346

involvement in these sales. *See* Comp. ¶¶72-74, 100, 144-149, 169, 177, 181-87, 194-95;

Donelan, ¶7.g., Ex. A at 2-3 (under oath testimony falsely denying any involvement with, or

knowledge of anyone, who sold Vitality stock; and falsely denying knowing of anyone who sold

Arch stock (other than his own Arch sales, which he testified he sold after leaving the board of

Arch)), 5 (Dhillon admitting that he understands relevant securities laws), 6-7 (Dhillon

minimizing his relationship with Sexton).

Taylor participated in these fraudulent schemes along with Dhillon and the Veldhuis

Control Group and is similarly liable. Taylor facilitated Dhillon's company's merger with the

shell company that enabled the creation of Stevia, and transferred its shares to Sharp Group-

administered nominees for sale by the Veldhuis Control Group. *See* Comp. ¶¶14, 66-68, 76.

Taylor also controlled other nominee shareholders who held and traded stock in concert with

Dhillon and the Veldhuis Control Group. *See* Comp. ¶¶14, 105-07, 110-14, 179, 218-19;

Donelan, ¶¶14, 42, 78, Exhibit D at 19, 22, 36. As a participant in the fraudulent schemes

relating to Stevia, Arch and other issuers, Taylor received a significant cut of the illegal sales

proceeds, and shared some of those funds with Dhillon, thus helping Dhillon further to obscure

the source of the funds Dhillon received. *See* Comp. ¶¶82, 90, 96, 99, 140, 172, 174, 176, 179;

Donelan, ¶¶34, 41, 57, 59, 80, 81. Taylor's coordination with the other Defendants and his

sharing in the proceeds demonstrate his knowing participation in the scheme and thus his

scienter.

### 4.     Gasarch Engaged in, and Aided and Abetted, Fraud

The evidence shows that Gasarch, a Sharp Group employee, both violated Section

17(a)(3) of the Securities Act and aided and abetted securities fraud violations by the Sharp

Group and its control group clients. First, Gasarch engaged in transactions, practices and courses

A347

of business that operated as a fraud. She lent her name to one of the Sharp Group-administered nominees that was used by the Veldhuis Control Group to conceal its ownership of Stevia shares that were sold illegally. *See* Comp. ¶¶58, 76-77. Gasarch also instructed the Sharp Group's clients on how to conceal their Encrypted Communications using the Sharp Group's exclusive network. *See id.* ¶58. She also provided information to Veldhuis and clients about Sharp Group nominees that the clients could use to conceal their roles in stock sales and promotions. *See id.* ¶¶123-24. She was at least negligent in these actions because the circumstances of these communications, including her long-term employment at the Sharp Group, raised sufficient red flags that she knew or should have known she was engaged in unlawful activity. *See SEC v. Sason*, 433 F. Supp. 3d 496, 509-10 (S.D.N.Y. 2020) (SEC sufficiently pled scheme liability for defendants who had notice of false documents supporting sale of unregistered securities).

Second, Gasarch (a/k/a "Wires") aided and abetted the Sharp Group and its control group clients by routinely arranging for wire or cash transfers to distribute the proceeds of illegal stock sales to, or at the direction of, the Sharp Group's clients. *See* Comp. ¶¶57, 170, 172. Gasarch's wire transfers were often accompanied by false documentation, or were otherwise designed to conceal the fact that control groups were the real beneficiaries of the stock being sold and the ultimate recipients of the sale proceeds. *See id.* ¶¶57, 92-94; Donelan, ¶12.d, Ex. C. Her actions provided substantial assistance to the other Defendants because their motive in conducting these illegal stock transactions was to make money, and she facilitated their acquisition of those funds. *See SEC v. Durgarian*, 477 F. Supp. 2d 342, 353-54, 357 (D. Mass. 2007) (defendants who acted to conceal errors and were aware actions would further the scheme were liable as aiders and abettors).

A348

### 5.     Kaitz Engaged in, and Aided and Abetted, Fraud

Kaitz was a stock promoter who ran misleading promotional campaigns targeting retail investors for many of the stocks illegally sold by the Veldhuis Control Group.  *See* Comp. ¶¶12, 221.  By engaging in these misleading campaigns, Kaitz violated Section 17(a)(3) of the Securities Act and aided and abetted securities fraud schemes by the Veldhuis Control Group. Kaitz routinely received money from the Veldhuis Control Group and used that money to pay for promotions whose objective was to increase the price and volume of the stocks the Veldhuis Control Group wished to sell, all without revealing the facts that the insiders were dumping their shares and were paying for the promotions.  *See id.* ¶¶12, 80, 138-40, 160, 162, 222; Donelan ¶¶70-71.  This practice and course of business operated as a fraud on purchasers of the securities by concealing important information about who was behind the promotions and the sales.  *See SEC v. Thompson*, 238 F. Supp. 3d 575, 597-600 (S.D.N.Y. 2017) (rejecting penny stock promoter's motion to dismiss antifraud claims based on misleading promotions).  Kaitz's communications with Veldhuis demonstrate that he acted at least recklessly or negligently when he gave false names of the parties paying for promotions when he knew the funds were coming from Veldhuis and his associates.  *See id.* ¶¶119-20, 125-26, 161, 163; Donelan, ¶14, Ex. D at 29-30.  Kaitz's culpable state of mind is also demonstrated by his lies under oath about who paid for promotions on a stock dumped by the Veldhuis Control Group.  *See* Comp. ¶13.  Kaitz's actions also provided substantial assistance to the fraudulent scheme because his promotional activities created the liquidity into which the Veldhuis Control Group was able to sell millions of shares of these otherwise thinly-traded stocks.

27

A349

**6.    Sharp, Kelln, Veldhuis, Sexton, Friesen, and Dhillon Sold Unregistered Stock, and Taylor Aided and Abetted Dhillon's Sales**

Section 5(a) of the Securities Act prohibits the direct or indirect sale of securities through interstate commerce unless a registration statement has been filed and is in effect. Section 5(c) of the Securities Act prohibits the offer to sell securities through the mail or interstate commerce unless a registration statement has been filed. A *prima facie* showing of a Section 5(a) or 5(c) violation requires that: (1) no registration statement was filed or is in effect; (2) the defendant directly or indirectly offered to sell the securities; and (3) the offer or sale was made in connection with the use of interstate communications. *See SEC v. Esposito*, 260 F. Supp. 3d 79, 88 (D. Mass. 2017); *SEC v. Tropikgadget FZE*, 146 F. Supp. 3d 270, 280 (D. Mass. 2015) (citing *SEC v. Spence & Green Chemical Co.*, 612 F. 2d 896, 901-02 (5th Cir. 1980)). Section 5 violations are strict liability offenses and do not require proof of scienter. *See Esposito*, 260 F. Supp. 3d at 88-89; *SEC v. Current Fin. Servs., Inc.*, 100 F. Supp. 2d 1, 5-6 (D.D.C. 2000).

Regarding the first element, the requirement for a registration statement applies to each separate offer and sale of a security, not to the security itself; thus, "proper registration of a security at one stage does not necessarily suffice to register subsequent offers or sales of that security." *SEC v. Universal Exp., Inc.,* 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007). No registration statement existed to govern Defendants' sales of Stevia, Arch or OncoSec stock. *See* Complaint, ¶63, 75, 77, 86, 110, 118, 167, 169, 172, 179, 187, 196, 212, 218. For the third element, Defendants' stock sales were in connection with the use of interstate communications because they used interstate methods to communicate with the foreign and domestic bank and brokerage accounts through which they sold via OTC Markets. *See e.g.* Donelan, ¶7 (the Defendants used various foreign brokerage accounts).

28

A350

Courts interpreting the second, "sale," element have concluded that it may be satisfied by a showing that a defendant was a "necessary participant" or a "substantial factor" in the unregistered sale or offer of sale. *See Zacharias v. SEC,* 569 F.3d 458, 464-66 (D.D.C. 2009) (applying "substantial factor" test); *see also SEC v. Friendly Power Co. LLC,* 49 F. Supp. 2d 1363, 1371 (S.D. Fla. 1999); *SEC v. Murphy,* 626 F.2d 633, 649-52 (9th Cir. 1980); *SEC v. Holschuh,* 694 F.2d 130, 139-40 (7th Cir. 1982) ("[T]he relevant inquiry in an enforcement action is whether the evidence shows that the defendant was a substantial and necessary participant in the sales transactions."); *cf. SEC v. Saxena,* 26 Fed. Appx. 22, 23 (1st Cir. 2001) (per curiam) (noting that defendant violated Sections 5(a) and 5(c) by "participating in the offer or sale of unregistered securities in interstate commerce or through the mails").

As set forth above, the Defendants whom the Commission has charged with Sections 5(a) and (c) violations were all "necessary participants" and "substantial factors" in the sale of the relevant securities. Sharp and Kelln coordinated the deposit of their control group clients' stock with the Wintercap SA and Blacklight SA trading platforms, and employed their own traders, so that their clients' stock could be sold without revealing their clients' control over that stock. Comp., ¶¶6, 16, 44, 54, 56, 114, 117, 135-36; Donelan, ¶¶43-46, 51-55, 64, 99. Veldhuis, Sexton, Friesen, and Dhillon all directed, or shared in the proceeds of, sales of Stevia/Vitality, Arch and OncoSec stock through the Sharp Group, and Dhillon also coordinated sales of stock he controlled through outlets other than the Sharp Group, including Person A and a corporation controlled by Taylor, who provided substantial assistance. Comp., ¶¶118, 137-38, 146, 166, 173-75, 180-89, 212-13, 218-19; Donelan, ¶¶34, 59, 60, 77-80. Defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, and Dhillon were, therefore, both necessary participants and substantial factors in these sales because they ensured the shares were distributed for purposes of

29

A351

sale and gave the instructions to brokers to sell them, and, as set forth herein, Taylor provided

substantial assistance to Dhillon (and shared in the proceeds). Accordingly, the Commission has

established a likelihood of proving that Defendants Sharp, Kelln, Veldhuis, Friesen, Sexton, and

Dhillon violated Sections 5(a) and (c) of the Securities Act, and that Taylor aided and abetted

Dhillon's violations.

### 7. Veldhuis, Sexton, Friesen, and Dhillon Failed to Make Required Disclosures

The evidence demonstrates that the Commission is likely to prove that Veldhuis, Sexton,

and Friesen violated Section 13(d) of the Exchange Act and Rule 13d-1 thereunder when they

failed to file required disclosures revealing that they directly or indirectly owned more than 5%

of Stevia/Vitality stock. Donelan, ¶100.c. Section 13(d)(1) of the Exchange Act and Rule 13d-1

together require any person who has acquired, directly or indirectly, beneficial ownership of

more than 5% of a voting class of equity securities registered under Section 12 of the Exchange

Act to file a statement with the Commission disclosing the identity of the beneficial owners and

the purpose of the acquisition. *See* 17 C.F.R. §240.13d-1. This statement, which is called a

Schedule 13D, must be filed with the Commission within ten business days after the acquisition,

and is available to investors. A "beneficial owner of a security" is "any person who, directly or

indirectly, through any contract, arrangement, understanding, relationship or otherwise has or

shares… investment power which includes the power to dispose, or to direct the disposition, of

such security." Rule 13d-3 [17 C.F.R. §240.13d-3]. Scienter is not required to establish a

violation of Section 13(d). *See SEC v. Levy*, 706 F. Supp. 61, 69 (D.D.C. 1989).

Stevia/Vitality had a voting class of equity securities registered under Section 12 of the

Exchange Act. *See* Donelan Dec., ¶10.a. Between January and March 2012, the Sharp Group-

administered nominee shareholders (including Gasarch's Peaceful Lion Holdings) received

A352

19,600,000 shares of Stevia First/Vitality stock, which they held on behalf of the Veldhuis

Control Group.  Donelan, ¶26.  At the time, those shares represented over 37% of the outstanding

common stock of Vitality.  *See id*.  Given that the Veldhuis Control Group was empowered to

dispose of those Stevia/Vitality shares (*see, e.g.*, Donelan, ¶14, Exhibit D (various emails

involving Veldhuis, Sexton, and/or Friesen discussing the transfer and disposition of these

shares), they therefore "acquired" beneficial ownership within the meaning of Rule 13d-5(a).

Accordingly, the Veldhuis Control Group was required, but failed, to file a statement of

beneficial ownership on Schedule 13D within ten days of acquiring that beneficial ownership in

Stevia/Vitality shares.  They therefore violated Section 13(d) and Rule 13d-1.

Similarly, the evidence demonstrates that the Commission is likely to prove that Dhillon

violated Section 13(d) of the Exchange Act and Rule 13d-2 thereunder.  Dhillon made a false

filing in the August 17, 2016 amendment he made to his Schedule 13D regarding Vitality.  *See*

Comp. ¶¶144-145; Donelan, ¶100.b. Exhibit I.  Dhillon's August 2016 amendment was made

after the timing specified in Rule 13d-2(a), and understated his share ownership by failing to

disclose additional shares held by the Veldhuis Control Group in which Dhillon had a beneficial

ownership interest.  *See id.*  In failing to make this required disclosure, Dhillon violated Section

13(d) of the Exchange Act and Rule 13d-2 thereunder.

Dhillon also violated Section 16(a) of the Exchange Act and Rule 16a-3 thereunder.  As

an officer of Arch and OncoSec, Dhillon was required to file statements, including "[s]tatements

of changes in beneficial ownership on Form 4."  15 U.S.C. §78p(a)(1); 17 C.F.R. §240.16a-3.

Here, Dhillon was required to file Forms 4 reporting changes in the number of shares held for his

benefit in the Company A and B accounts.  *See* Comp. ¶¶183, 203; Donelan, ¶¶82-93.  Yet,

Dhillon failed to file the required Forms 4 for any of these sales.  *See* Comp. ¶¶193, 217,

A353

Donelan, ¶100.a.

### C.    An Asset Freeze Is Necessary and in the Public Interest

An asset freeze is appropriate in cases, such as this one, where there is a likelihood of remaining assets being dissipated. *See SEC v. Dubovoy*, No. 15-cv-6076, 2015 WL 6122261, at *3 (D.N.J. Oct. 16, 2015). The purpose of an asset freeze is "to preserve funds that a defendant may be ordered to pay if he is held liable," *SEC v. One or More Unknown Traders in Securities of Onyx Pharmaceuticals, Inc.*, 296 F.R.D. 241, 254 (2d Cir. 2013), and "to ensure that any funds that may become due can be collected." *Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011) (internal quotation marks and citation omitted).

The Sharp Group's schemes generated over $770 million in net illegal stock sales for their control group clients, over at least a ten-year period. *See* Comp. ¶43; Donelan, ¶16. This money is the ill-gotten gains that the Sharp Group Defendants made from investors. Similarly, the Veldhuis Control Group's proceeds from their illegal sales of multiple issuers' stocks were over $144 million. *See* Comp. ¶220; Donelan, ¶94. During the period of time subject to the Complaint, Dhillon was the beneficiary of approximately $6.7 million, and a private entity of which he is the Chief Executive Officer received approximately $2 million, paid by a combination of the Veldhuis Control Group, Taylor, and Person A. *See* Comp. 174-76, 179, 188-89. 213-14, 219; Donelan, ¶¶34, 59, 80, 81, 84, 91, 105, Exhibits K and L. Taylor's proceeds from his participation in the various schemes were at least $3.7 million; and Kaitz received at least $2.5 million for his participation in these fraudulent schemes. *See* Comp. ¶174, 179, 219 (Taylor), 140, 160 (Kaitz); Donelan, ¶¶34, 35, 59, 70. 105, Exhibits K and L. The Commission is also entitled to seek civil penalties from defendants in set statutory amounts, or in the amount of their pecuniary gain. *See* 15 U.S.C. §77t(d); §78u(d)(3). As a result, the

A354

Commission could seek millions in monetary remedies from each of the Defendants.  Because it is unlikely that Defendants will hold sufficient sums to compensate harmed investors throughout the duration of this action, it is important to preserve the funds that still exist today to fund an eventual disgorgement and civil penalty remedy.  *See SEC v. Unifund SAL*, 910 F.2d 1028, 1041-42 (2d Cir. 1990) (a freeze order on a brokerage account in an amount equal to the potential disgorgement and civil monetary penalty was appropriate relief).

In this case, an asset freeze is particularly warranted because Defendants are mostly foreign citizens who frequently funnel their money out of the United States and between numerous foreign jurisdictions—leading to the dissipation of funds—and have demonstrated efforts to conceal their conduct.  *See e.g.,* Comp., ¶¶6, 46-47, 49, 82, 83, 159.  The evidence clearly shows that Defendants will continue to take steps to dissipate their illegally obtained money.  *See Micro Signal Research, Inc. v. Otus*, 417 F.3d 28, 31 (1st Cir. 2005) ("[t]he possibility that a defendant may not have assets on the day of judgment may not automatically make out a showing of irreparable injury, . . . the story is quite different where there is a strong indication that the defendant may dissipate or conceal assets") (citations omitted).

## III.  THE COURT SHOULD GRANT ADDITIONAL RELIEF TO FACILITATE THE PRESERVATION OF INVESTOR ASSETS AND LITIGATION OF THIS CASE.

### A.    The Court Should Order Repatriation of Defendants' Assets.

Courts may impose an order to repatriate funds transferred to foreign jurisdictions.  *See SEC v. Thibeault*, 80 F. Supp. 3d 288, 293 (D. Mass. 2015) (ordering repatriation and noting that "once equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy"); *SEC v. Illarramendi*, 2011 WL 2457734, at * 6 (D. Conn. June 16, 2011) (same).

A355

Such relief will further protect the funds from dissipation, and is appropriate when, as here, foreign nationals have transferred funds outside of the jurisdiction of the United States.

**B.      An Order Authorizing Alternative Means of Service is Appropriate.**

In addition to the means of service provided by the Federal Rules of Civil Procedure, the Commission asks the Court to authorize service of any Order issued by the Court in connection with this motion, as well as the papers on which the Order was granted, and the Complaint and Summonses, upon Defendants and their agents (or banks and brokerage firms holding Defendants' assets) by email or overnight delivery service.  This alternative means is calculated to provide notice of the Court's Order and the underlying documents and has been approved by courts in similar circumstances in other cases.  *See AngioDynamics, Inc. v. Biolitec, AG*, 780 F.3d 420, 429 (1st Cir. 2015) ("[b]y its plain terms, Rule 4(f)(3) does not require exhaustion of all possible methods of service before a court may authorize service by 'other means,' such as service through counsel and by email"); *SEC v. Gomes*, No. 20-cv-11092-FDS, Dkt. No 8, ¶VII (D. Mass. June 9, 2020) (permitting service of complaint, summons and temporary restraining order freezing assets by alternative means).

34

A356

## **CONCLUSION**

For the reasons set forth above, the Commission respectfully requests that the Court

enter, *ex parte*, a temporary restraining order, order freezing assets and ordering other equitable

relief in the form attached hereto and set a hearing date before the temporary restraining order

expires to determine whether to enter a preliminary injunction.

Dated:  August 4, 2021                    Respectfully submitted,

                                                  SECURITIES AND EXCHANGE COMMISSION
                                                  By its attorneys,

                                                  /s/ Kathleen Burdette Shields
                                                  Eric A. Forni (Mass Bar No. 669685)
                                                  Kathleen Burdette Shields (Mass Bar No. 637438)
                                                  SECURITIES AND EXCHANGE COMMISSION
                                                  33 Arch St., 24th Floor
                                                  Boston, MA 02110
                                                  Phone: (617) 573-8827 (Forni direct), (617) 573-
                                                  8904 (Shields direct)
                                                  Fax: (617) 573-4590 (fax)
                                                  Fornie@sec.gov; Shieldska@sec.gov

A357

Case: 24-1770    Document: 00118249065    Page: 378    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY *SEALED*  Document 3-1  Filed 08/05/21  Page 1 of 10
Case 1:21-cv-11276-WGY  Document 7  Filed 08/06/21  Page 1 of 10

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

> Plaintiff,

v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R. TAYLOR,

> Defendants.

Civil Action No. 21-CV-____
(___)

[Proposed]

**TEMPORARY RESTRAINING ORDER, ORDER FREEZING ASSETS,
AND ORDER FOR OTHER EQUITABLE RELIEF**

Having considered the emergency motion for a temporary restraining order, order

freezing assets, and for other equitable relief filed by plaintiff Securities and Exchange

Commission ("the Commission"), as well as the Complaint, the Commission's memorandum of

law, the Declaration of Trevor Donelan, and the accompanying evidentiary materials, the Court

finds that the Commission has made the showing required by Fed. R. Civ. P. 65(b)(1) and, in

addition, that the Commission has shown that: (1) it is reasonably likely to establish that

Frederick Sharp ("Sharp"), Zhiying Yvonne Gasarch ("Gasarch"), Courtney Kelln ("Kelln"),

Mike Veldhuis ("Veldhuis"), Paul Sexton ("Sexton"), Jackson Friesen ("Friesen"), William

Kaitz ("Kaitz"), Avtar Dhillon ("Dhillon"), and Graham Taylor ("Taylor") (collectively, the

"Defendants") have directly or indirectly engaged in the violations alleged in the Complaint; (2)

there is a reasonable likelihood that these violations will be repeated; (3) there is a strong

indication that unless restrained and enjoined by Order of this Court, Defendants may dissipate

A358

Case 1:21-cv-11276-WGY  Document 7  Filed 08/06/21  Page 2 of 10

and conceal assets which could be subject to an order of disgorgement or an order to pay a civil monetary penalty in this action; and (4) entry of a temporary restraining order and an order freezing assets is in the public interest.  In consideration of the foregoing:

## I.

**IT IS HEREBY ORDERED** that the Defendants and each of their officers, agents, servants, employees, attorneys, and other persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise (including by fax, email, or overnight delivery service) are restrained from violating Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5] by, directly or indirectly, through the use of the means or instrumentalities of interstate commerce or of the mails or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)    employing any device, scheme or artifice to defraud;

    (b)    making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

## II.

**IT IS HEREBY FURTHER ORDERED** that the Defendants and each of their officers, agents, servants, employees, attorneys, and other persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise (including by fax, email, or overnight delivery service) are restrained from violating Section 17(a) of the Securities

A359

Case 1:21-cv-11276-WGY   Document 7   Filed 08/06/21   Page 3 of 10

Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)] by, directly or indirectly, through the use of any means or instrumentalities of interstate commerce or the mails or of any facility of any national securities exchange, in the offer or sale of any security:

    (a)    employing any device, scheme or artifice to defraud;

    (b)    obtaining any money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

### III.

**IT IS HEREBY FURTHER ORDERED** that Defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon and Taylor and each of their officers, agents, servants, employees, and attorneys, and other persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise (including by fax, email, or overnight delivery service) are restrained from violating Section 5(a) and (c) of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

    (a)    making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell any security through the use or medium of any prospectus or otherwise, unless a registration is in effect as to such security; or

    (b)    making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use

A360

or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. §77h].

## IV.

**IT IS HEREBY FURTHER ORDERED** that Defendants Veldhuis, Friesen and Sexton and each of their agents, servants, employees, and attorneys, and other persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise (including by fax, email, or overnight delivery service) are restrained from violating Section 13(d) of the Exchange Act [15 U.S.C. §78m(d)] and Rule 13d-1 thereunder [17 C.F.R. §240.13d-1] by acting individually or as part of a group to acquire, directly or indirectly, beneficial ownership of more than 5 percent of a class of an issuer's equity securities that are registered pursuant to Section 12 of the Exchange Act, and then failing to file statements with the Commission containing the information required by Schedule 13D [17 C.F.R. §240.13d-101] within ten days after they acquire such shares.

## V.

**IT IS HEREBY FURTHER ORDERED** that Defendant Dhillon and each of his agents, servants, employees, and attorneys, and other persons in active concert or participation with him who receive actual notice of this Order by personal service or otherwise (including by fax, email, or overnight delivery service) are restrained from violating Section 13(d) of the Exchange Act [15 U.S.C. §78m(d)] and Rule 13d-2 thereunder [17 C.F.R. §240.13d-2] by failing to file timely and accurate amendments to any filings under Schedule 13D [17 C.F.R. §240.13d-101].

4

A361

## VI.

**IT IS HEREBY FURTHER ORDERED** that Defendant Dhillon and each of his agents, servants, employees, and attorneys, and other persons in active concert or participation with him who receive actual notice of this Order by personal service or otherwise (including by fax, email, or overnight delivery service) are restrained from violating Section 16(a) of the Exchange Act [15 U.S.C. §78p(a)] and Rule 16a-3 thereunder [17 C.F.R. §240.16a-3] by failing to file reports of ownership and changes of ownership with the Commission as required.

## VII.

**IT IS HEREBY ORDERED** that:

A.      Defendants, and each of their officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, including facsimile transmission, electronic mail, or overnight delivery service, shall hold and retain funds and other assets of Defendants presently held by them, for their direct or indirect benefit, under their direct or indirect control or over which they exercise actual or apparent investment or other authority (including assets held in the name of or for the benefit of Defendants, in whatever form such assets may presently exist and wherever located, and shall prevent any withdrawal, sale, payment (including, but not limited to, any charges on any credit card or draws on any other credit arrangement)), transfer, dissipation, assignment, pledge, alienation, encumbrance, disposal, or diminution in value of any such funds or other assets, which are hereby frozen, including, but not limited to, such funds held in the following accounts:

A362

Case 1:21-cv-11276-WGY    Document 7    Filed 08/06/21    Page 6 of 10

| Location | Financial Institution | Possible Account Name(s) | Possible Account No(s). |
|---|---|---|---|
| CANADA | BANK OF MONTREAL | CHARTERHOUSE CAPTIAL INC | |
| | | PINE STRATEGIES CORP. | X4339 |
| | | ARDENT STRATEGIES CORP. | X0469 |
| | | MFG STRATEGIES CORP. | X3623 |
| | | FERROUS CAPITAL CORP. | X0477 |
| | | FERROUS CAPITAL CORP. | X7732 |
| | | VALLEY DRIVE ESTATES INC. | X0655 |
| | | FIRST AVENUE CAPITAL CORP | X0202 |
| | | MIKE VELDHUIS | X7997 |
| | | MIKE VELDHUIS | SAFE DEPOSIT X464B |
| | | AVONHURST CAPITAL CORP | X1741 |
| CANADA | CANACCORD GENUITY CORP | EGREDIOR HOLDINGS INC. | X58A-1 |
| | | EGREDIOR HOLDINGS INC. | X58B-1 |
| | | INLAND TRADING LTD, | X51A-1 |
| | | INLAND TRADING LTD. | X51B-1 |
| CANADA | CANADIAN IMPERIAL BANK OF COMMERCE | AVTAR S. DHILLON MD INC. | X3010 |
| | | JACKSON FRIESEN | X2334 |
| CANADA | COAST CAPITAL SAVINGS FEDERAL CREDIT UNION | QUARRY BAY EQUITY INC. | X3321 |
| | | QUARRY BAY EQUITY INC. | X2685 |
| | | MIKE VELDHUIS | X8846 |
| CANADA | ENVISION FINANCIAL | JACKSON FRIESEN | X4112 |
| CANADA | LEEDE JONES GABLE INC. | NORTON INVESTMENTS LLC | X283A |
| | | ARDENT STRATEGIES CORP. | X873A |
| | | JACKSON FRIESEN | X901A |
| | | JACKSON FRIESEN | X850Q |
| | | PINE STRATEGIES CORP. | X762A |
| | | BLACKSTONE CAPITAL PARTNERS INC. | X231A |
| | | BLACKSTONE CAPITAL PARTNERS INC. | X231E |
| | | BLACKSTONE CAPITAL PARTNERS INC. | X231F |
| | | MIKE VELDHUIS | X953A |
| | | MIKE VELDHUIS | X953S |
| | | MIKE VELDHUIS | X862Q |
| | | NOVA TREK CAPITAL INC. | X313A |
| | | PAUL SEXTON | X984A |
| | | PAUL SEXTON | X984Q |

A363

Case: 24-1770    Document: 00118249065    Page: 384    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY *SEALED*   Document 3-1   Filed 08/05/21   Page 7 of 10
Case 1:21-cv-11276-WGY   Document 7   Filed 08/06/21   Page 7 of 10

| Location | Financial Institution | Possible Account Name(s) | Possible Account No(s). |
|---|---|---|---|
| CANADA | MACKIE RESEARCH CAPITAL CORP. | BLACKSTONE CAPITAL PARTNERS INC | |
| | | PAUL SEXTON | |
| CANADA | PI FINANCIAL CORP | EVERVEST EQUITY INC. | X4535 |
| | | BLACKSTONE CAPITAL PARTNERS INC. | X9203 |
| | | PAUL SEXTON | |
| CANADA | SUN LIFE ASSURANCE COMPANY OF CANADA | ZHIYING YVONNE GASARCH | X2937 |
| CANADA | TD CANADA TRUST | ONE WORLD FARMS INC. | X1487 |
| | | PHEON EQUITY INC. | X1686 |
| | | PAUL SEXTON | X6857 |
| | | NOVA TREK CAPITAL INC. | X5109 |
| | | NOVA TREK CAPITAL INC. | X2034 |
| | | LAKEHOUSE CAPITAL INC. | X2580 |
| | | LAKEHOUSE CAPITAL INC. | X9416 |
| | | HIGHPOINT DRIVE ESTATES INC. | X2128 |
| CANADA | WESTMINSTER SAVINGS CREDIT UNION | NORLAND ESTATES INC. | X2505 |
| DOMINICAN REPULBLIC | BANCO MULTIPLE SANTA CRUZ SA | ESQUIRE CORPORATE SERVICES SRL | X4578 |
| | | INLAND TRADING SRL | X2021 |
| | | TRIUS HOLDINGS LIMITED SRL | X2147 |
| | | LARAMEX HOLDINGS SRL | X2405 |
| MALTA | TENDALL CAPITAL MARKETS INC. | TRIUS HOLDINGS LIMITED SRL | X5001 |
| MAURITIUS | PETER PESIC & CO SECURITIES INC. | CORBY VENTURES INC. | X57CV |
| | | PEGASUS GLOBAL LTD | X57PG |
| MAURITIUS | ABC BANKING CORPORATION LTD. | HENG HONG INVESTMENT LTD. | X1000 |
| PHILIPPINES | METROBANK BACOLOD | EMPHASISM CREATIVE MEDIA INC. | X0513 |
| ST. LUCIA | VIA BANK LTD. | CORTONA EQUITY INC. | |
| USA | EURO PACIFIC INTERNATIONAL BANK INC. | EGREDIOR HOLDINGS LTD. | X8141 |
| | | EGREDIOR HOLDINGS LTD. | X7846 |
| USA | FIRST CITIZENS BANK & TRUST CO. | CHALMERS GROUP LLC | X0993 |
| USA | FIRST REPUBLIC BANK | ONE WORLD RANCHES LLC | X7123 |

7

A364

Case 1:21-cv-11276-WGY *SEALED*    Document 3-1    Filed 08/05/21    Page 8 of 10

| Location | Financial Institution | Possible Account Name(s) | Possible Account No(s). |
|---|---|---|---|
| USA | JP MORGAN CHASE BANK NA | WILLIAM KAITZ | X5150 |
| | | WILLIAM KAITZ | X4131 |
| USA | MECHANICS BANK | SUTTER BUTTES LLC | X8841 |
| | | ONE WORLD REAL ESTATE LLC | X4836 |
| | | ONE WORLD REAL ESTATE LLC | X7356 |
| | | ONE WORLD REAL ESTATE LLC | X4993 |
| | | ONE WORLD RANCHES LLC | X2519 |
| | | DILJIT KAUR BAINS/AVTAR DHILLON | X4326 |
| USA | PACIFIC WESTERN BANK | PAUL SEXTON | X0618 |
| | | PAUL SEXTON | X6814 |
| USA | PNC BANK NA | PROMETHEAN MARKETING INC | X9779 |
| | | WILLIAM KAITZ | X2768 |
| USA | SUNCREST BANK | ONE WORLD REAL ESTATE LLC | X6369 |
| | | ONE WORLD RANCHES LLC | X6238 |
| USA | TRUIST BANK | FULL SERVICE MEDIA LLC | X0828 |
| | | FULL SERVICE MEDIA LLC | X3798 |
| | | FULL SERVICE MEDIA LLC | X1111 |
| | | FULL SERVICE MEDIA LLC | X1533 |
| | | WILLIAM KAITZ | X5280 |
| | | WILLIAM KAITZ | X2273 |
| USA | UNIONBANK | AVTAR DHILLON | X9309 |
| | | AVTAR DHILLON | X0165 |
| | | AVTAR DHILLON/DILJIT BAINS | X6218 |
| USA | WELLS FARGO | ROAD RUNNER | |
| | | L & L INVESTORS | |
| | | W&B RIDING CLUB @ ASSUNPINK WNA LLC | X9413 |
| | | W&B RIDING CLUB @ ASSUNPINK WNA LLC | X5351 |

B.    All banks, brokerage, and other financial institutions (including but not limited to those listed in Paragraph VII.A) and other persons or entities (including but not limited to payment processors, investors and/or promoters) that receive actual notice of this Order by personal service or otherwise, including via facsimile or email transmission, or overnight

A365

delivery service, holding any funds or other assets in the name, for the direct or indirect benefit, or under the direct or indirect control of Defendants or over which Defendants exercise actual or apparent investment or other authority, in whatever form such assets may presently exist and wherever located, shall hold and retain within their control and prohibit the withdrawal, removal, sale, payment (including, but not limited to, any charges on any credit card or draws on any other credit arrangement), transfer, dissipation, assignment, pledge, alienation, encumbrance, diminution in value, or other disposal of any such funds or other assets; and that such funds and assets are hereby frozen.

    C.    The above Paragraphs VII.A and VII.B shall immediately cease to apply to any assets located within the United States, including any bank, brokerage or other financial institution account, which becomes subject to any later order entered by any federal court as a result of proceedings which may be filed by the United States or any department or agency thereof under any federal civil or criminal forfeiture statute, to the extent such later order requires the transfer of any asset to the United States government.

### VIII.

    **IT IS HEREBY FURTHER ORDERED** that Defendants, and each of their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, including via facsimile or email transmission, or overnight delivery service, and each of them, shall, within five days of receiving actual notice of this Order, take such steps as are necessary to repatriate and deposit into the registry of the Court in an interest bearing account, any and all funds or assets that presently may be located outside of the United States that were obtained directly or indirectly from the trading described in the Complaint.

A366

## IX.

**IT IS HEREBY FURTHER ORDERED** that service of this Order, and the Summons

and Complaint, may be made by facsimile, mail, e-mail, delivery by commercial courier, or

personally by any employee of the Commission who is not counsel of record in this matter, or

special process server, or any other person, or in any other manner authorized by Rule 5 of the

Federal Rules of Civil Procedure and may be made on any registered agent, officer, or director of

Defendants, or by publication.


_____
UNITED STATES DISTRICT JUDGE

Dated: _Aug 6_____, 2021 at _1:10___ a.m./p.m.

10

A367

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** Plaintiff, v. **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** **Defendants.** | **Civil Action No. 21-CV-11276-WGY** |

[Proposed]
### PRELIMINARY INJUNCTION ORDER, ORDER FREEZING ASSETS, AND ORDER FOR OTHER EQUITABLE RELIEF

Having considered the motion for a preliminary injunction, order freezing assets, and order for other equitable relief filed by plaintiff Securities and Exchange Commission ("the Commission"), as well as the Complaint (Dkt. No. 1), the Commission's memoranda of law (Dkt. Nos. 4 and 24), the Declaration of Trevor Donelan and the accompanying evidentiary materials (Dkt. Nos. 1-1 – 1-13), the Court finds that the Commission has made the showing required by Fed. R. Civ. P. 65(a) and, in addition, that the Commission has shown that: (1) it is reasonably likely to establish that Frederick Sharp ("Sharp"), Mike Veldhuis ("Veldhuis"), Paul Sexton ("Sexton"), and Graham Taylor ("Taylor") (collectively, the "Defendants")[1] have directly or indirectly engaged in the violations alleged in the Complaint; (2) there is a reasonable likelihood that these violations will be repeated; (3) there is a strong indication that unless

---

[1] Defendants Courtney Kelln, Zhiying Yvonne Gasarch, Jackson Friesen, Avtar Dhillon, and William T. Kaitz will be addressed in a separate order or orders.

A368

restrained and enjoined by Order of this Court, Defendants may dissipate and conceal assets

which could be subject to an order of disgorgement or an order to pay a civil monetary penalty in

this action; and (4) entry of a preliminary injunction order and an order freezing assets is in the

public interest. In consideration of the foregoing:

## I.

**IT IS HEREBY ORDERED** that the Defendants and each of their officers, agents,

servants, employees, attorneys, and other persons in active concert or participation with them

who receive actual notice of this Order by personal service or otherwise (including by fax, email,

or overnight delivery service) are restrained from violating Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17

C.F.R. §240.10b-5] by, directly or indirectly, through the use of the means or instrumentalities of

interstate commerce or of the mails or of any facility of any national securities exchange, in

connection with the purchase or sale of any security:

    (a)    employing any device, scheme or artifice to defraud;

    (b)    making any untrue statement of a material fact or omitting to state a material fact
necessary in order to make the statements made, in the light of the circumstances
under which they were made, not misleading; or

    (c)    engaging in any act, practice or course of business which operates or would
operate as a fraud or deceit upon any person.

## II.

**IT IS HEREBY FURTHER ORDERED** that the Defendants and each of their officers,

agents, servants, employees, attorneys, and other persons in active concert or participation with

them who receive actual notice of this Order by personal service or otherwise (including by fax,

A369

Case 1:21-cv-11276-WGY   Document 36   Filed 08/20/21   Page 3 of 12

email, or overnight delivery service) are restrained from violating Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)] by, directly or indirectly, through the use of any means or instrumentalities of interstate commerce or the mails or of any facility of any national securities exchange, in the offer or sale of any security:

    (a)    employing any device, scheme or artifice to defraud;

    (b)    obtaining any money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

### III.

**IT IS HEREBY FURTHER ORDERED** that Defendants Sharp, Veldhuis, Sexton, and Taylor and each of their officers, agents, servants, employees, and attorneys, and other persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise (including by fax, email, or overnight delivery service) are restrained from violating Section 5(a) and (c) of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

    (a)    making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell any security through the use or medium of any prospectus or otherwise, unless a registration is in effect as to such security; or

3

A370

Case 1:21-cv-11276-WGY    Document 36    Filed 08/20/21    Page 4 of 12

(b)    making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. §77h].

## IV.

**IT IS HEREBY FURTHER ORDERED** that Defendants Veldhuis and Sexton and each of their agents, servants, employees, and attorneys, and other persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise (including by fax, email, or overnight delivery service) are restrained from violating Section 13(d) of the Exchange Act [15 U.S.C. §78m(d)] and Rule 13d-1 thereunder [17 C.F.R. §240.13d-1] by acting individually or as part of a group to acquire, directly or indirectly, beneficial ownership of more than 5 percent of a class of an issuer's equity securities that are registered pursuant to Section 12 of the Exchange Act, and then failing to file statements with the Commission containing the information required by Schedule 13D [17 C.F.R. §240.13d-101] within ten days after they acquire such shares.

## V.

**IT IS HEREBY ORDERED** that:

A.    Defendants, and each of their officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, including facsimile transmission, electronic mail, or

A371

overnight delivery service, shall hold and retain funds and other assets of Defendants presently

held by them, for their direct or indirect benefit, under their direct or indirect control or over

which they exercise actual or apparent investment or other authority (including assets held in the

name of or for the benefit of Defendants, in whatever form such assets may presently exist and

wherever located, and shall prevent any withdrawal, sale, payment (including, but not limited to,

any charges on any credit card or draws on any other credit arrangement)), transfer, dissipation,

assignment, pledge, alienation, encumbrance, disposal, or diminution in value of any such funds

or other assets, which are hereby frozen, including, but not limited to, such funds held in the

following accounts:

| Country | Financial Institution | Account Name | Last 4 Digits of Account Number (If Known) |
|---------|----------------------|--------------|---------------------------------------------|
| CANADA | BANK OF MONTREAL | AVONHURST CAPITAL CORP | 1741 |
| CANADA | BANK OF MONTREAL | CHARTERHOUSE CAPITAL INC | 8904 |
| CANADA | BANK OF MONTREAL | MIKE VELDHUIS | 7997 |
| CANADA | BANK OF MONTREAL | MIKE VELDHUIS | 1464B |
| CANADA | CANACCORD GENUITY CORP | BLACKSTONE CAPITAL PARTNERS INC | 65A1 |
| CANADA | CANACCORD GENUITY CORP | EGREDIOR HOLDINGS LTD | 58A1 |
| CANADA | CANACCORD GENUITY CORP | EGREDIOR HOLDINGS LTD | 58B1 |
| CANADA | CANACCORD GENUITY CORP | NORTON INVESTMENTS LLC | 36A1 |
| CANADA | CANACCORD GENUITY CORP | NORTON INVESTMENTS LLC | 36B1 |
| CANADA | CANACCORD GENUITY CORP | NOVA TREK CAPITAL INC | 08A1 |
| CANADA | CANACCORD GENUITY CORP | NOVA TREK CAPITAL INC | 08B1 |
| CANADA | CANACCORD GENUITY CORP | PAUL SEXTON | 91E1 |

A372

| Country | Financial Institution | Account Name | Last 4 Digits of Account Number (If Known) |
|---------|----------------------|--------------|--------------------------------------------|
| CANADA | CANACCORD GENUITY CORP | PAUL SEXTON | 91F1 |
| CANADA | CANACCORD GENUITY CORP | PAUL SEXTON | 31A7 |
| CANADA | CANACCORD GENUITY CORP | PAUL SEXTON | 31B6 |
| CANADA | COAST CAPITAL SAVINGS FEDERAL CREDIT UNION | MIKE VELDHUIS | 8846 |
| CANADA | COAST CAPITAL SAVINGS FEDERAL CREDIT UNION | RPC STRATEGIES INC | 9188 |
| CANADA | COAST CAPITAL SAVINGS FEDERAL CREDIT UNION | RPC STRATEGIES INC | 0503 |
| CANADA | COAST CAPITAL SAVINGS FEDERAL CREDIT UNION | RPC STRATEGIES INC | 9188 |
| CANADA | HAYWOOD SECURITIES, INC | CHRISTINE VINCENTI | 041C |
| CANADA | HAYWOOD SECURITIES, INC | CHRISTINE VINCENTI | 041U |
| CANADA | HAYWOOD SECURITIES, INC | GRAHAM TAYLOR | 543C |
| CANADA | HAYWOOD SECURITIES, INC | GRAHAM TAYLOR | 543C |
| CANADA | HAYWOOD SECURITIES, INC | GRAHAM TAYLOR | 543C |
| CANADA | HAYWOOD SECURITIES, INC | KEVIN VINCENTI | 042U |
| CANADA | HAYWOOD SECURITIES, INC | LARA DAWN HOLTE | 475C |
| CANADA | HAYWOOD SECURITIES, INC | LARA DAWN HOLTE | 475C |
| CANADA | HAYWOOD SECURITIES, INC | LARA DAWN HOLTE | 475C |
| CANADA | LEEDE JONES GABLE INC | BLACKSTONE CAPITAL PARTNERS INC | 321A |
| CANADA | LEEDE JONES GABLE INC | BLACKSTONE CAPITAL PARTNERS INC | 321E |

6

A373

| Country | Financial Institution | Account Name | Last 4 Digits of Account Number (If Known) |
|---|---|---|---|
| CANADA | LEEDE JONES GABLE INC | BLACKSTONE CAPITAL PARTNERS INC | 321F |
| CANADA | LEEDE JONES GABLE INC | MIKE VELDHUIS | 953A |
| CANADA | LEEDE JONES GABLE INC | MIKE VELDHUIS | 953A |
| CANADA | LEEDE JONES GABLE INC | MIKE VELDHUIS | 862Q |
| CANADA | LEEDE JONES GABLE INC | NOVA TREK CAPITAL INC | 313A |
| CANADA | LEEDE JONES GABLE INC | PAUL SEXTON | 984A |
| CANADA | LEEDE JONES GABLE INC | PAUL SEXTON | 984Q |
| CANADA | PI FINANCIAL CORP | 0792438 BC LTD | 5860 |
| CANADA | PI FINANCIAL CORP | 0792438 BC LTD | 2452 |
| CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 4273 |
| CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 4281 |
| CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 4299 |
| CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 3608 |
| CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 3616 |
| CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 3624 |
| CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 9203 |

A374

| Country | Financial Institution | Account Name | Last 4 Digits of Account Number (If Known) |
|---------|----------------------|--------------|--------------------------------------------|
| CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 9211 |
| CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 9229 |
| CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 9237 |
| CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 9245 |
| CANADA | PI FINANCIAL CORP | BLACKSTONE CAPITAL PARTNERS INC | 9252 |
| CANADA | PI FINANCIAL CORP | FDS CAPITAL INC | 6628 |
| CANADA | PI FINANCIAL CORP | FDS CAPITAL INC | 7179 |
| CANADA | PI FINANCIAL CORP | GRAHAM TAYLOR | 5258 |
| CANADA | PI FINANCIAL CORP | GRAHAM TAYLOR | 8908 |
| CANADA | PI FINANCIAL CORP | GRAHAM TAYLOR | 6999 |
| CANADA | PI FINANCIAL CORP | GRAHAM TAYLOR | 7005 |
| CANADA | PI FINANCIAL CORP | GRAHAM TAYLOR | 3755 |
| CANADA | PI FINANCIAL CORP | GRAHAM TAYLOR | 8336 |
| CANADA | PI FINANCIAL CORP | GRAHAM TAYLOR | 3184 |
| CANADA | PI FINANCIAL CORP | GRAHAM TAYLOR | 3192 |
| CANADA | PI FINANCIAL CORP | GRAHAM TAYLOR | 9412 |
| CANADA | PI FINANCIAL CORP | GRAHAM TAYLOR | 9644 |
| CANADA | PI FINANCIAL CORP | GRAHAM TAYLOR | 3922 |

A375

| Country | Financial Institution | Account Name | Last 4 Digits of Account Number (If Known) |
|---------|----------------------|--------------|--------------------------------------------|
| CANADA | PI FINANCIAL CORP | MIKE VELDHUIS | 7396 |
| CANADA | PI FINANCIAL CORP | MIKE VELDHUIS | 1710 |
| CANADA | PI FINANCIAL CORP | MIKE VELDHUIS | 1728 |
| CANADA | PI FINANCIAL CORP | NOVA TREK CAPITAL INC | 6518 |
| CANADA | PI FINANCIAL CORP | NOVA TREK CAPITAL INC | 6526 |
| CANADA | PI FINANCIAL CORP | NOVA TREK CAPITAL INC | 4234 |
| CANADA | PI FINANCIAL CORP | PAUL SEXTON | 1414 |
| CANADA | PI FINANCIAL CORP | PAUL SEXTON | 1675 |
| CANADA | PI FINANCIAL CORP | PAUL SEXTON | 3953 |
| CANADA | PI FINANCIAL CORP | SOLITO CAPITAL CORP | 6951 |
| CANADA | PI FINANCIAL CORP | SOLITO CAPITAL CORP | 6969 |
| CANADA | PI FINANCIAL CORP | SOLITO CAPITAL CORP | 6977 |
| CANADA | PI FINANCIAL CORP | SOLITO CAPITAL CORP | 1700 |
| CANADA | PI FINANCIAL CORP | SOLITO CAPITAL CORP | 7401 |
| CANADA | PI FINANCIAL CORP | SOLITO CAPITAL CORP | 7419 |
| CANADA | PI FINANCIAL CORP | SOLITO CAPITAL CORP | 7427 |
| CANADA | RESEARCH CAPITAL CORPORATION | BLACKSTONE CAPITAL PARTNERS INC | KLA4 |
| CANADA | RESEARCH CAPITAL CORPORATION | BLACKSTONE CAPITAL PARTNERS INC | KKH4 |
| CANADA | RESEARCH CAPITAL CORPORATION | MIKE VELDHUIS | KJV9 |

9

A376

Case 1:21-cv-11276-WGY    Document 39    Filed 08/20/21    Page 10 of 12

| Country | Financial Institution | Account Name | Last 4 Digits of Account Number (If Known) |
|---|---|---|---|
| CANADA | RESEARCH CAPITAL CORPORATION | MIKE VELDHUIS | KK66 |
| CANADA | RESEARCH CAPITAL CORPORATION | NOVA TREK CAPITAL INC | AAZ8 |
| CANADA | RESEARCH CAPITAL CORPORATION | PAUL SEXTON | KK82 |
| CANADA | TD CANADA TRUST | NOVA TREK CAPITAL INC | 5109 |
| CANADA | TD CANADA TRUST | NOVA TREK CAPITAL INC | 2034 |
| CANADA | TD CANADA TRUST | PAUL SEXTON | 6857 |
| CANADA | TD CANADA TRUST | PAUL SEXTON | 8504 |
| CANADA | TD CANADA TRUST | PAUL SEXTON | 5768 |
| CANADA | TD CANADA TRUST | PAUL SEXTON | 9202 |
| CANADA | TD CANADA TRUST | PAUL SEXTON | 3768 |
| CANADA | TD CANADA TRUST | PAUL SEXTON | 5696 |
| CANADA | TD CANADA TRUST | PAUL SEXTON | 4209 |
| CANADA | TD CANADA TRUST | PAUL SEXTON | 4527 |
| DOMINICAN REPUBLIC | BANCO MULTIPLE SANTA CRUZ | LARAMEX HOLDINGS SRL | 2405 |
| MALTA | TENDALL CAPITAL MARKETS LTD | TRIUS HOLDINGS LIMITED SRL | 5001 |
| MAURITIUS | ABC BANKING CORPORATION LTD | HENG HONG INVESTMENT LIMITED | 1000 |
| MAURITIUS | PETER PESIC & CO SECURITIES INC | CORBY VENTURES INC | 57CV |
| MAURITIUS | PETER PESIC & CO SECURITIES INC | PEGASUS GLOBAL LTD | 57PG |
| ST. LUCIA | VIA BANK LTD | CORTONA EQUITY INC | |

A377

| Country | Financial Institution | Account Name | Last 4 Digits of Account Number (If Known) |
|---------|----------------------|--------------|-------------------------------------------|
| U.S. | PACIFIC WESTERN BANK | PAUL SEXTON | 0618 |
| U.S. | PACIFIC WESTERN BANK | PAUL SEXTON | 6814 |
| U.S. | WELLS FARGO | L & L INVESTORS | 3969 |
| U.S. | WELLS FARGO | ROAD RUNNER | 3977 |

B.      All banks, brokerage, and other financial institutions (including but not limited to those listed in Paragraph V.A) and other persons or entities (including but not limited to payment processors, investors and/or promoters) that receive actual notice of this Order by personal service or otherwise, including via facsimile or email transmission, or overnight delivery service, holding any funds or other assets in the name, for the direct or indirect benefit, or under the direct or indirect control of Defendants or over which Defendants exercise actual or apparent investment or other authority, in whatever form such assets may presently exist and wherever located, shall hold and retain within their control and prohibit the withdrawal, removal, sale, payment (including, but not limited to, any charges on any credit card or draws on any other credit arrangement), transfer, dissipation, assignment, pledge, alienation, encumbrance, diminution in value, or other disposal of any such funds or other assets; and that such funds and assets are hereby frozen.

C.      The above Paragraphs V.A and V.B shall immediately cease to apply to any assets located within the United States, including any bank, brokerage or other financial institution account, which becomes subject to any later order entered by any federal court as a result of proceedings which may be filed by the United States or any department or agency

11

A378

thereof under any federal civil or criminal forfeiture statute, to the extent such later order

requires the transfer of any asset to the United States government.

## VI.

**IT IS HEREBY FURTHER ORDERED** that Defendants, and each of their officers,

agents, servants, employees and attorneys, and those persons in active concert or participation

with them who receive actual notice of this Order by personal service or otherwise, including via

facsimile or email transmission, or overnight delivery service, and each of them, shall, within

five days of receiving actual notice of this Order, take such steps as are necessary to repatriate

and deposit into the registry of the Court in an interest bearing account, any and all funds or

assets that presently may be located outside of the United States that were obtained directly or

indirectly from the trading described in the Complaint.

## VII.

**IT IS HEREBY FURTHER ORDERED** that service of this Order may be made by

facsimile, mail, e-mail, delivery by commercial courier, or personally by any employee of the

Commission who is not counsel of record in this matter, or special process server, or any other

person, or in any other manner authorized by Rule 5 of the Federal Rules of Civil Procedure and

may be made on any registered agent, officer, or director of Defendants, or by publication.

_____
UNITED STATES DISTRICT JUDGE

Dated: _Aug. 20_ , 2021

12

A379

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2                    WESTERN SECTION

 3

 4
      Securities and Exhange Commission)
 5                                     )      21cv11276-WGY
           vs                          )
 6                                     )      January 20, 2022
      Frederick L. Sharp, et al.       )
 7    _____)

 8

 9              VIDEO HEARING HELD BEFORE THE

10            HONORABLE JUDGE WILLIAM G. YOUNG.

11

12    APPEARANCES:

13
      On behalf of the plaintiff:  Eric A. Forni, Securities and
14    Exchange Commission, 33 Arch Street, 23rd Floor, Boston,
      MA 02110-1424.
15
      Kathleen Burdette Shields, Securities and Exchange
16    Commission, 33 Arch Street, 24th Floor, Boston, MA 02110.

17    Catherine Bromberk, Securities and Exchange Commission, 33
      Arch Street, 24th Floor, Boston, MA 02110.
18

19    On behalf of the defendants:  Michelle R. Pascucci,
      Donnelly, Conroy & Gelhaar, LLP, Suite 1600, 260 Franklin
20    Street, Boston, MA 02110.

21    Matthew Kane, 260 Franklin Street, Suite 1600, Boston, MA
      02110.
22
      Michael J. Quinn, Vedder Price P.C., 1925 Century Park
23    East, Suite 1900, Los Angeles, CA 90067.

24    Jeffrey T. Collins, Morgan, Brown & Joy, 200 State Street
      11th Floor, Boston, MA 02109.
25
```

**APPEARANCES:**

Maura D. McLaughlin, Morgan, Brown & Joy LLP, 200 State Street, 11th Floor, Boston, MA 02109.

Sarah E. Walters, McDermott Will & Emery LLP, 200 Clarendon Street, Boston, MA 02116-5021.

Caitlyn M. Campbell, McDermott Will & Emery LLP, 200 Clarendon Street, Floor 58, Boston, MA 02116-5021.

Kevin B. Muhlendorf, Wiley Rein LLP, 1776 K Street, NW, Washington, DC 20006.

Holly J. Wilson, Wiley Rein LLP, 2050 M Street NW, Washington, DC 20036.

Stephen G. Topetzes, K&L Gates LLP, 1601 K Street NW, Washington, DC 20006.

Robert S. Silverblatt, K&L Gates LLP, 1601 K Street NW, Washington, DC 20006.

Neil Thomas Smith, K & L Gates LLP, One Lincoln Street, State Street Financial Center, Boston, MA 02111.

George W. Vien, Donnelly, Conroy & Gelhaar, LLP, Suite 1600, 260 Franklin Street, Boston, MA 02110.

Lorraine Belostock, Todd & Weld LLP, One Federal Street Boston, MA 02110.

Adrienne M Ward, Olshan Frome Wolosky, LLP, 1325 Avenue of the Americas, New York, NY 10019.

George W. Vien, Donnelly, Conroy & Gelhaar, LLP, Suite 1600, 260 Franklin Street, Boston, MA 02110.

Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
United States Courthouse
300 State Street, Room 303D
Springfield, MA 01105
(413)731-0086
alice.moran@verizon.net

A381

 1   **(Video hearing commenced at 11:00.)**

 2              THE CLERK:  Now hearing civil matter 21-11276,

 3   SEC versus Sharp, et al.

 4              THE COURT:  Good morning, counsel.  This is a

 5   hearing on various motions to dismiss held on our Zoom

 6   platform.  Our host for the hearing is courtroom deputy

 7   clerk Jennifer Gaudet.  The proceedings are taken down by

 8   our official court reporter Rich Romano (sic).  I have law

 9   clerks on the line.

10       These proceedings are open to the public.  If any

11   members of the public are present, I welcome you.  I do

12   remind you to keep your microphone muted and that the

13   rules of court remain in full force and effect.  That is

14   to say, that there is no taping, streaming, rebroadcast,

15   screenshots, or other transcriptions of these proceedings.

16       Now, with that stated, I'll ask counsel to introduce

17   themselves and who they represent and we'll start with the

18   SEC.

19              ATTORNEY SHIELDS:  Good morning, Your Honor.

20   This is Kathleen Shields on behalf of the SEC.

21              THE COURT:  Good morning to you.

22              ATTORNEY FORNI:  Good morning, Your Honor.  Eric

23   Forni on behalf of the SEC.

24              THE COURT:  Good morning to you, sir.

25              ATTORNEY BROMBERK:  Good morning, Your Honor.

A382

1    Catherine Bromberk on behalf of the SEC.

2            THE COURT:  Good morning to you.

3        And that's it for the SEC?

4        All right.  Now will defense counsel introduce

5    themselves?

6            ATTORNEY QUINN:  I'll go ahead and start.  This

7    is Michael Quinn on behalf of defendant Graham Taylor.

8            THE COURT:  Mr. Quinn, good morning, sir.

9            ATTORNEY QUINN:  Good morning.

10           ATTORNEY COLLINS:  Good morning, Your Honor.

11   Jeffrey Collins on behalf -- local counsel with Mr. Quinn

12   on behalf of Mr. Taylor.

13           THE COURT:  Good morning to you.

14           ATTORNEY McLAUGHLIN:  Good morning, Your Honor.

15   Maura McLaughlin also local counsel with Mr. Quinn and Mr.

16   Collins on behalf of Graham Taylor.

17           THE COURT:  Good morning.

18           ATTORNEY MUHLENDORF:  Good morning, Your Honor.

19   This is Kevin Muhlendorf for Ms. Kelln from Wiley Rein.

20   I'm here with Holly Wilson as well.

21           THE COURT:  Good morning to you.

22           ATTORNEY MUHLENDORF:  Thank you.

23           ATTORNEY KANE:  Good morning, Your Honor.  This

24   is Matthew Kane.  We represent the defendant Yvonne

25   Gasarch.  I'm with my colleague Michelle Pascucci who will

```
 1    be arguing the motion today.

 2            THE COURT:  Good morning to you, sir.

 3            ATTORNEY KANE:  Good morning.

 4            ATTORNEY WALTERS:  Good morning, Your Honor.

 5    Sarah Walters appearing on behalf of Jackson Friesen, and

 6    with me is Caitlyn Campbell also on behalf of Mr. Friesen.

 7            THE COURT:  Good morning to you.

 8            ATTORNEY BELOSTOCK:  Good morning, Your Honor.

 9    Lorraine Belostock on behalf of defendant Mike Veldhuis.

10            THE COURT:  Good morning.  It that everybody?

11            ATTORNEY WARD:  Good morning, Your Honor.

12    Adrienne Ward, Olshan Frome Wolosky, on behalf of

13    defendant Avtar Dhillon.

14            THE COURT:  Good morning to you.

15            ATTORNEY VIEN:  Good morning, Your Honor.

16    George Vien also on behalf of Mr. Dhillon.

17            THE COURT:  Mr. Vien, good to see you, sir.

18            ATTORNEY VIEN:  Thank you, Your Honor.

19            ATTORNEY TOPETZES:  Good morning.  This is Steve

20    Topetzes of behalf of defendant Paul Sexton, and I'm

21    joined by my colleagues Neil Smith and Rob Silverblatt.

22            THE COURT:  Good morning to you folks.  All

23    right.  Now is that everybody?

24        Now we're not going to hear these motions separately

25    and not everyone is going to argue.  Argument in total is
```

A384

```
 1    not going to take more than a half an hour, 15 minutes a
 2    side.  And really the only issue, the issue that is worth
 3    developing and which I really do want to hear your
 4    arguments, is this issue of the statute of limitations.
 5    And while that has other implications, that's the issue
 6    that I'll want to hear argument.
 7         I'm going to start with the SEC because it seems to
 8    me the defendants have the better of it, at least with
 9    respect to which statute applies.  But as you SEC folks
10    have argued, it doesn't make much difference because you
11    say that conduct within the statute of limitations would
12    -- you can proceed against each one of these defendants.
13         I have some real doubts whether that's so as to
14    defendant Taylor and defendant Gasarch, but that seems to
15    be correct.  And if I allowed you, gave you a couple of
16    weeks to amend as to Taylor and Gasarch and, of course,
17    gave the defense -- those defendants a chance to oppose
18    that when we had some more detailed pleadings, this is a
19    relatively prolix complaint to begin with, you're fine
20    with that, aren't you?
21              ATTORNEY FORNI:  Good morning, Your Honor.
22    Again, Eric Forni on behalf of the Commission.
23         If I can answer that in pieces, if you would permit
24    me?  I think as an initial matter I'd like to just make
25    sure that the proper issues are before the court.  And
```

1    even as to defendants Gasarch and Taylor the Commission

2    seeks equitable relief, injunctions, two forms of

3    injunctions, and a penny stock bar.

4         For those forms of relief prior to the NDAA's

5    enactment in January of 2021, there was no statute of

6    limitations that applied.  Even Section 2462, which is the

7    statute of limitations that *Kokesh* held applied to

8    disgorgement, does not apply to equitable relief like

9    injunctions, the two forms we're seeking here, and penny

10   stock bars.

11        So even if Your Honor decided that the NDAA is

12   unconstitutional and, therefore, cannot be applied

13   retroactively in Ms. Gasarch's and/or Mr. Taylor's

14   conduct, or anyone's conduct for that matter, there is no

15   motion to dismiss on a basis that there's no relief for

16   which the claims stand because, in fact, the Commission

17   has sought injunctions and bars.

18        Now that being said, as to all of the parties the

19   Commission strongly believes that the NDAA properly

20   applies for all the reasons we set forth in the briefs.

21        The NDAA is not improperly retroactive.  The language

22   of it precisely matches language that the Supreme Court

23   has held on two separate occasions is sufficient and

24   unambiguous, and that is language we cite in the briefs

25   and there's a table in several of the briefs where that

A386

1    language is compared between *Martin* and *Landgraf* and the

2    language of the NDAA.

3        Presumably Congress was aware of what the Supreme

4    Court had said in those other cases as to what would be an

5    unambiguous application of the statute, which is why it

6    landed on language that is indisputably verbatim.  So for

7    that reason the NDAA does in fact apply to conduct from

8    August, in this case August, at least August 5, 2011 --

9    and if you'll permit me, I'll explain why I say at least

10   in a moment -- but at least August 5, 2011 to the date we

11   filed this case, which was August 5, 2021.

12       Now, even as to defendants Gasarch and Taylor, even

13   if Your Honor was to apply just 2462 and to determine that

14   the NDAA is unconstitutional or unconstitutionally vague,

15   there is a tolling provision in Section 2462 that is also

16   ripe in this case.

17       The Commission alleges that both of these defendants

18   -- all of the defendants, with the exception of the

19   defendants who are not subject to the motion to dismiss,

20   reside out of the country.  The tolling provision says

21   that unless a defendant is found in the United States --

22   this is again under Section 2462 -- the statute does not

23   begin to accrue, and whether the Commission is able to

24   serve a party in a different country is irrelevant and the

25   *Straub* case says as much.

1      So even for Gasarch and Taylor, the Commission is

2    entitled to discovery.  It is well settled that on

3    affirmative defenses the Commission is entitled to

4    discovery on these issues and the motion to dismiss would

5    be inappropriate, particularly where the complaint is not

6    clear on its face as fatally flawed and, therefore,

7    warranting an affirmative defense.  It is not in this case

8    because there is an outstanding question as to where Mr.

9    Taylor and Ms. Gasarch resided at all times during the

10   relevant period of the complaint.

11      There's more I can say on that, but I also want to

12   just agree with one thing you said, of course, which is

13   that for the other defendants the Commission has pled with

14   particularity that conduct after August 5, 2016 and I pick

15   that date because that is precisely five years before the

16   date that case was filed.

17      So even if Your Honor decides that the NDA is

18   unconstitutional -- which I reiterate we disagree with for

19   the reasons I said -- the question before the court as to

20   these other defendants is really the extent to which the

21   Commission can seek disgorgement, not whether the

22   Commission can seek disgorgement or a penalty for that

23   matter.

24      So really at this point what the parties are

25   litigating it appears is how much disgorgement ought to be

1   awarded, which is premature.  That's something for the

2   remedy phase in this case after liability has been

3   established.

4           THE COURT:  All right.  Thank you.  I'll hear

5   the defense.

6       You people would be wise to use your time

7   appropriately.  That was a direct and powerful argument.

8   We're not going to hear all of you.  Who shall I hear?

9           ATTORNEY QUINN:  Good morning, Your Honor.  This

10  is Michael Quinn on behalf of Mr. Taylor.

11          THE COURT:  Go ahead, Mr. Quinn.

12          ATTORNEY QUINN:  Your Honor, if I can start with

13  the last comment that counsel made with respect to a

14  purported tolling provision in Section 2462, that is

15  simply a false statement.  There is no such tolling

16  provision in 2462.  2462 says that there's a five-year

17  statute of limitation and it applies if the defendant may

18  be found in the United States at any time during that five

19  years.

20      The SEC cited the _SEC v. Straub_ case, and in the _SEC_

21  _v. Straub_ case the court specifically assessed this

22  particular provision and says the five-year statute of

23  limitation accrues when it accrues and it lapses five

24  years thereafter and it applies if the defendant is ever,

25  even for a moment, in the United States within that five

A389

 1    years.

 2        That is not a tolling provision.  That didn't toll

 3    the accrual of the statute of limitations.  It's a binary

 4    decision.  It applies or it doesn't apply if the defendant

 5    was in the United States and so there is no such tolling

 6    provision.

 7        With respect to the applicability of the NDAA, the

 8    SEC in its opposition, after defendants went through great

 9    length in their briefs to explain why the NDAA was not

10    intended to and cannot be used to revive time-barred

11    claims, in its opposition the SEC effectively concedes

12    that the NDA cannot be used to revive time-barred claims.

13        The SEC wrote at page 12, "The NDAA merely broadens

14    the period of time in which the SEC can seek disgorgement

15    in the cases it is otherwise entitled to bring."

16        The SEC conflates the issue of retroactivity with the

17    ability of a court to -- with the ability of the statute

18    to revive claims that were already time-barred.  The

19    language that the SEC points to says it applies to pending

20    cases.

21            THE COURT:  Let me interrupt though in this

22    wise.  I'm following your argument, but as the SEC has

23    argued here, I have before me various motions to dismiss.

24        Now I've indicated that but for the motion of your

25    client and one other, I'm inclined to deny those motions

1    and indeed with respect to your client to allow the SEC to

2    further plead to make clear that they state a cause of

3    action against your client.  So I don't have to ultimately

4    decide these matters at this stage, do I?

5            ATTORNEY QUINN:  Unless the SEC is going to tell

6    you they are going to come up with new conduct that is not

7    alleged in the complaint, because the SEC in their

8    opposition with respect to Mr. Taylor comes up with two

9    sets of conduct that it think brings his conduct within a

10   five-year statute of limitations.

11       Number one, they refer to conduct by other defendants

12   a year and a half later claiming that stock sales by other

13   defendants in 2015 and 2016 somehow reset the statute of

14   limitation with respect to Mr. Taylor whose last conduct

15   was in October 2014.

16       There is absolutely no basis in the law to infer his

17   conduct, to place the statute of limitations for Mr.

18   Taylor in 2015 or 2016 based on conduct of other

19   defendants that he was not alleged to have been involved

20   in.  That he is not alleged to have had any knowledge of.

21   So if they can't allege anything other than that, that one

22   is not going to get it within five years.

23       The second is they allude to a table that appears in

24   paragraph 176 of the complaint that says Mr. Taylor made

25   payments to some third parties for the benefit of

1     defendant Dhillon.

2         A court in this district has already ruled that even

3     the defendants' passive receipt of money cannot be

4     sufficient to reset the statute of limitation.  Certainly

5     Mr. Taylor's payments to other people is not sufficient to

6     reset the statute of limitations and, as counsel said, the

7     SEC's claim for disgorgement is for the net profits.

8         Any payments by Mr. Dhillon to some third party would

9     only serve to decrease -- excuse me -- Mr. Taylor, would

10    only serve to decrease any amount of disgorgement because

11    it would decrease his net payments.

12        And, third, those two payments that are in that chart

13    in 2016 are a year and a half removed from the next most

14    recent payments and any alleged conduct by Mr. Taylor.

15    There is no way to tie those two payments to any conduct a

16    year and a half earlier.

17        So if those are the two things that the SEC has

18    pointed to so far to even try to pull it within six years,

19    let alone five years, if that's all they can do, amending

20    the complaint is just going to get us right back to where

21    we are.

22            THE COURT:  Thank you.

23        All right.  Anyone else?

24            ATTORNEY PASCUCCI:  Your Honor, I would just

25    speak to Ms. Gasarch very briefly.  Good morning, Your

A392

1    Honor.

2                  THE COURT:  Good morning.

3                  ATTORNEY PASCUCCI:  Thank you.

4        Just very briefly, to the SEC's point and reiterating

5    what my colleague Mr. Quinn indicated the only conduct

6    that we have regarding Ms. Gasarch is from late 2015 and

7    earlier.

8        So inasmuch as amending the complaint could remedy

9    the statute of limitations issue, the key issue we have

10   that all is alleged against Ms. Gasarch within the last

11   five years is her receipt of funds.

12       I'd direct Your Honor to a case cited in our brief

13   *SEC v Cohen* out of E.D.N.Y in 2018.  There the court does

14   a really good job of saying disgorgement itself is not a

15   claim, and as the SEC says in its opposition to our motion

16   to dismiss receipt of funds is not an element of the

17   crime.  So her core receipt of funds cannot serve to

18   tether along the statute of limitations.

19       So unless the SEC has something more than her receipt

20   of funds which is untethered to conduct from 2016 going

21   forward, I do not believe that amending the complaint

22   would remedy the issues so far as timeliness against Ms.

23   Gasarch in the complaint.

24                  THE COURT:  Thank you.

25       Anyone else?

A393

1          ATTORNEY WALTERS:  If I may, Your Honor, Sarah

2     Walters on behalf of Jackson Friesen.

3          I would like to respond to your suggestion that there

4     is sufficient conduct pled within the last five years of

5     the complaint to keep Mr. Friesen in the case and also

6     particularly respond to Mr. Forni's comment that their

7     allegations pled with particularity as to Mr. Friesen in

8     particular up through I believe what the SEC suggested in

9     their opposition was 2018.  The lack of particularity as a

10    general matter as to Mr. Friesen is really stark, and he

11    stands in stark contrast to many of the other defendants

12    and the specific factual allegations here.

13         With regard to the conduct between 2016 and '18 the

14    SEC cited to ten paragraphs in the complaint, some of

15    which, but not all of which, refer to the Veldhuis Control

16    Group just in a group pleading way.

17         Including Mr. Friesen in the Veldhuis Control Group

18    is not sufficient and certainly is not particularized

19    allegations with regard to him in those last few years

20    which are critical years if you're applying 2462.

21         Specifically there are literally within those ten

22    paragraphs two paragraphs that mention -- or one paragraph

23    that mentions Mr. Friesen's name.  In that paragraph,

24    which is paragraph 140, he's alleged to have been

25    allocated shares sometime during the subject -- I'm sorry,

A394

 1    allocated proceeds of certain stock sales sometime during

 2    the time period subject to the complaint which, as we

 3    know, goes back to 2010.

 4        So in addition to the fact that it doesn't -- the

 5    mere allocution of proceeds to him without his involvement

 6    and more is insufficient to plead anything with

 7    particularity.  That doesn't even give you a time frame in

 8    which he was allegedly allocated these proceeds, and then

 9    the only other paragraph --

10        THE COURT:  Let me ask you something and this

11    may be unfair, but you're the one who's arguing and it

12    sticks from what the SEC argued to set the stage here.

13        I've heard argument and it's been very helpful on the

14    issue of the applicability of this new statute with a

15    ten-year statute of limitations, and I think I understand

16    that.  But he points out or he says that as to all the

17    defendants some equitable relief, injunctive relief, and

18    the like is sought.  Now that's your defendant.

19        So at least as to that, let's say I go with you as to

20    the other things.  It's five years and then -- because I'm

21    going to have to go back over this in detail, and there's

22    not enough as to your particular defendant, so he's out.

23    But he's out, if you will, with respect to only the

24    disgorgement remedy.  He's not out with respect to

25    anything else.  Isn't that true?

```
 1              ATTORNEY WALTERS:  No, Your Honor, and this was
 2     laid out in at least some of the briefs and we
 3     incorporated Mr. Quinn's in particular with Mr. Taylor.
 4              THE COURT:  Sure.
 5              ATTORNEY WALTERS:  On injunctive relief that is
 6     inherently penal as well, and so our position is that that
 7     also is out with the five-year statute of limitations
 8     within 2462.
 9         I would direct you to Judge Wooklock's opinion in the
10     Bio Defense case where he specifically found that the
11     injunctive relief was also penal.  That would apply
12     directly here, you know, applying 2462.  It's one of the
13     remedies that is limited by that five-year statute of
14     limitations as well.
15              THE COURT:  I see.  So that's your answer as to
16     that.
17              ATTORNEY WALTERS:  That is my answer.  My
18     colleagues might have others.
19              THE COURT:  No.  No.  I have to deal with all of
20     you, and I have to go back and review these briefs but I
21     thank you.  All right.  Anything else?
22              ATTORNEY WALTERS:  Just one last point and I do
23     want to let everybody else speak, but I do --
24              THE COURT:  Everybody else is not going to have
25     a chance.
```

A396

```
 1              ATTORNEY WALTERS:  I know.

 2              THE COURT:  There's five minutes left.

 3              ATTORNEY WALTERS:  Well, I will then shut up.

 4              THE COURT:  All right.

 5              ATTORNEY MUHLENDORF:  Your Honor, it's Kevin

 6    Muhlendorf for Ms. Kelln.  I understand Your Honor's

 7    focused on the statute of limitation issues.  I just want

 8    to make sure I understand that you're going back to look

 9    at the briefs.  Are there other issues you don't want to

10    hear argument on them because you've reached a conclusion

11    or you just wanted to hear argument on the statute of

12    limitations issue?

13              THE COURT:  It's the latter.

14              ATTORNEY MUHLENDORF:  Okay.  Thank you, Your

15    Honor, because obviously we disagree with the SEC on a lot

16    of what they wrote, but you've got oodles of briefing on

17    that.

18              THE COURT:  I do indeed and I appreciate it.

19              ATTORNEY MUHLENDORF:  Thank you.

20              THE COURT:  All right.  Anyone else want to

21    argue?

22              ATTORNEY TOPETZES:  Your Honor, this is Steve

23    Topetzes on behalf of defendant Paul Sexton.

24          I just wanted to build on some of the questions

25    related to the statute of limitations, but before doing
```

1     that I'll just glance against a point Ms. Walters made in

2     response to counsel for the plaintiff's assertions related

3     to these post-2015 allegations in the complaint.

4          Our client, Mr. Sexton, is also painted with this

5     very broad brush regarding the Veldhuis Control Group

6     allegations.  It's typically the case, as counsel for

7     defendant where you've got a fraud claim, that you assert

8     that this is ranked group pleading by the plaintiff.

9          In this case the Commission, more or less,

10    acknowledges it certainly in their opposition and on the

11    face of the complaint, and so we know the court will look

12    at those issues.

13         As to our client, there's an absence of

14    particularity.  He's lumped in with others as to alleged

15    conduct that occurred subsequent to 2015.  The

16    particularized references to Mr. Sexton all are 2015 or

17    2014 or earlier, and so we make that point for the court.

18         Very briefly, judge, with respect to the statute of

19    limitations and counsel for the SEC's assertion relative

20    to the distinction between claims and remedies and

21    plaintiff's purported ability to seek an injunction

22    irrespective of the passage of time, we submit to you,

23    judge, and we know you've reviewed the papers, there's a

24    lot of briefing here.

25         This is not a case that would have been brought by

A398

1    the SEC a year before it was filed, 15 months.  If I'm

2    being very conservative, I'll say nine months before it

3    was filed.  And significantly, judge, as set forth in our

4    papers, we think this is a case that could not have been

5    brought by the SEC a year before it was filed.

6         There are a number of permutations and alternative

7    scenarios that might, and no doubt will, give rise to

8    questions regarding the application of the NDAA to claims

9    brought by the SEC in other settings.  But in this case at

10   least as it relates to Mr. Sexton, and I know my

11   colleagues have addressed these issues in their papers on

12   behalf of their respective clients, this case presents a

13   stark circumstance as framed by the allegations on the

14   face of plaintiff's complaint.

15        The claims asserted against Mr. Sexton were not

16   viable a year before the complaint was filed.  They had

17   expired.  So stated differently, when the NDAA was passed

18   -- again to touch on some of the language in the relevant

19   provisions -- there was no claim pending against Mr.

20   Sexton, and the claims that were later asserted as part of

21   the complaint filed in this action had expired.  They were

22   time-barred.

23        So we submit, and I know the court acknowledges this,

24   that the issue before Your Honor is whether the NDAA

25   operated to revive or resurrect those expired claims.

1           The SEC appears to concede, Mr. Quinn touched on

2      this, that the statute does not revive expired claims.

3      That's significant, judge, we submit.  Instead, the SEC

4      contends that "The NDAA" -- again this is a quote Mr.

5      Quinn read and I'll be very quick -- "merely broadens the

6      period of time in which the SEC can seek disgorgement in

7      the cases it is otherwise entitled to bring."

8           Judge, the SEC was not otherwise entitled to bring

9      the claims asserted against Mr. Sexton.  They were stale,

10     and I'd like to talk about a couple of --

11                THE COURT:  About another minute.

12                ATTORNEY TOPETZES:  Okay.  Just very quickly,

13     the argument that Mr. Forni made on behalf of the

14     plaintiff with respect to injunctive relief and the fact

15     if injunctive relief was timely and that means that the

16     rest of the remedies can be pursued in this case.  Your

17     Honor, we submit to you that's a manufactured argument.

18     The SEC cites no authority whatsoever.

19          The idea that as long as it's a timely claim for

20     injunctive relief it can employ the NDAA to go back ten

21     years to disgorgement we submit has no support.  The

22     distinction between claims and remedies that they're

23     making, judge, we submit is not meaningful.  Both sides

24     have cited extensively the Supreme Court's decision in

25     Landgraf.  We'd note that the Supreme Court makes two

A400

1    distinctions in *Landgraf* that we think --

2              THE COURT:  Really, I set time limits for a

3    reason.  I have prepared myself for this argument, and I

4    do read your materials.  So we'll call it a halt now.

5              ATTORNEY TOPETZES:  Understood, judge.

6              THE COURT:  Now here's what we're going to do.

7    For the purpose of managing this case, this court

8    tentatively denies each of these motions to dismiss

9    subject to its further review.

10       The court provides the SEC with two weeks from

11   today's date further to allege -- well, to file a motion

12   within two weeks with further specific allegations against

13   the defendants Taylor and Gasarch.  I do not require it.

14   I simply give the SEC two weeks to file such a motion.

15   Those defendants may oppose the motion.

16       The court though -- I want now to turn to scheduling

17   the case in order to get things moving -- necessarily I

18   think should write on the important issues raised and I

19   will.  My written opinion may revise, in whole or in part,

20   the tentative denial of these motions to dismiss.  But for

21   our purposes this morning, really to save you time and

22   money, we're going to discuss the management of this case

23   in the future.

24       Let me ask a question of the SEC.  This is not for

25   argument now, but a question.  Your complaint seeks a jury

```
 1      trial on these issues.  So there are certain relief that

 2      you think only a jury or a jury can afford.  What's that

 3      relief?

 4              ATTORNEY FORNI:  Well, Your Honor, we think that

 5      the request for the jury trial is as to the liability.  We

 6      don't believe that there's any right to a jury trial as to

 7      any of the remedies --

 8              THE COURT:  I see.

 9              ATTORNEY FORNI:  -- because of a filing I made

10      in another case last week.

11              THE COURT:  Well, all right, and that's not

12      insignificant because I'm not at all sure I agree with

13      that.

14          But, in any event, as to the factual underpinning of

15      any of the relief, any of the relief, disgorgement,

16      penalty, those facts it seems to the court must be found

17      under the Seventh Amendment by a jury, and if I were to

18      adhere to my expressed -- but I haven't made this ruling

19      -- my expressed instinct that the statute of limitations

20      here is five years, not ten years, then it's a jury who's

21      going to have to decide whether there are -- even if it's

22      adequately pled, whether there's adequate facts within

23      those five years.

24          Now, I welcome you to take issue with that

25      expression, but that is the current, the court's current
```

A402

```
 1    view.
 2         With that said, let's move to scheduling the case
 3    with some specificity.  Turning to you as plaintiff, when
 4    do you want to go to trial in this case?  The latest you
 5    can have is February 2023.
 6              ATTORNEY FORNI:  Your Honor, we have not had an
 7    opportunity to meet and confer with counsel, but the
 8    Commission is prepared to go to trial whenever Your Honor
 9    schedules us to go to trial.
10              THE COURT:  Well, you know, I'm always delighted
11    with those statements because, you know, April, you want
12    to try it in April?
13              ATTORNEY FORNI:  Actually I think we would be
14    happy to.  But in all seriousness if February of 2023 is a
15    date on Your Honor's calendar, we'll be prepared for
16    trial.
17              THE COURT:  It isn't a date.  It's the outside
18    date, but I accept everything you said in good faith.
19         Let's turn to the defense.  When do you want to go to
20    trial in this matter, anybody?  I don't hear anything.
21              ATTORNEY MUHLENDORF:  Your Honor, this is Kevin
22    Muhlendorf for Ms. Kelln.  Again, we obviously haven't
23    talked about it but we will be ready when Your Honor tells
24    us to.  I would note that the Commission has been
25    investigating this since 2017 and none of us in this case
```

A403

1   have any discovery yet, and so it will take us some time

2   to digest and it's a complicated case.

3           THE COURT:  I respect that.  Shall we say

4   January of next year?

5       All right.  It's on the running trial list for

6   January, 2023.  Summary judgment motions must be filed no

7   later than October 1, 2022.

8       You will meet -- really I'm trying to save you time

9   here and money, but you will meet within 30 days of

10  today's date and you will propose a case management

11  schedule consistent with the court's practice which lead

12  to those dates.

13      That is, we'll plan on a January, 2023 trial; a final

14  pretrial memorandum therefore will be due December 1,

15  2022; motions for summary judgment the last date for that

16  is October 1, 2022.

17      You can give me your proposals and give them to me

18  jointly on a single document.  You don't have to agree,

19  but if you disagree as to the scope of discovery or you

20  disagree as to anything, set forth the SEC position, set

21  forth the defense position, and I will choose like a

22  baseball arbitrator one or the other as to each disputed

23  element.

24      I will not micromanage the case.  This is your

25  incentive to be reasonable and proportionate as the rules

1    require.  My instincts or my experience has been when you

2    give lawyers an incentive to be reasonable and tell them

3    to be reasonable, they are, and I can simply endorse the

4    proposed case management schedule.

5         With those tentative rulings made, let me ask if

6    there are any questions before we recess?  Starting with

7    the SEC, any questions?

8              ATTORNEY FORNI:  Just one, Your Honor.  On the

9    date for the day by which we must or you're at least

10   enabling us to file a motion to amend, just to be clear is

11   that February 3rd?

12             THE COURT:  If it's two weeks from today, yes,

13   sir.

14             ATTORNEY FORNI:  Thank you, Your Honor.

15             THE COURT:  Okay.  Defense, any questions, not

16   argument now?

17        All right.  I hear none.  I look forward to working

18   with you, which doesn't mean some of you may make a

19   gracious exit when I come to write this.  If it does not

20   write, we'll see.  I thank you for all the work you have

21   put in.  We'll stand in recess.

22   **(Hearing recessed at 11:38.)**

23   --------------

24

25

```
 1                      C E R T I F I C A T E

 2

 3      UNITED STATES DISTRICT COURT )
        DISTRICT OF MASSACHUSETTS    )
 4

 5

 6               I certify that the foregoing is a correct

 7      transcript from the record of proceedings in the

 8      above-entitled matter.  This transcript was prepared to

 9      the best of my ability via a Zoom videoconference held by

10      the Court.

11

12      (The certification of this transcript does not apply to
        any reproduction of this transcript, unless under the
13      direct control and/or supervision of the certifying
        reporter.  I assume no responsibility for the accuracy of
14      any reproduced copies not made under my control or
        direction.)

15

16

17      /s/ Alice Moran                     January 24, 2022
        Alice Moran, RMR, RPR
18      Federal Official Court Reporter

19

20

21

22

23

24

25
```

A406

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>　　　　　　　**Plaintiff,** <br> <br>　**v.** <br> <br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br> <br>　　　　　　　**Defendants.** | **21-cv-11276-WGY** |

## FINAL JUDGMENT AS TO DEFENDANT FREDERICK L. SHARP

WHEREAS, on October 2, 2018, the plaintiff Securities and Exchange Commission ("Commission") commenced this action by filing a Complaint against defendant Frederick L. Sharp ("Sharp" or "Defendant") and others;

WHEREAS, a summons was issued to Sharp on August 10, 2021 (*see* Dkt. No. 11), a return of service was filed as to Sharp on August 11, 2021, and a supplemental proof of service was filed on November 10, 2021.  *See* Dkt. Nos. 13, 115;

WHEREAS, the Commission filed a motion for entry of default against Sharp on November 10, 2021 for failure to answer or otherwise appear.  *See* Dkt. No. 116;

WHEREAS, in accordance with Fed. R. Civ. P. 55(a), a clerk's Notice of Default was entered against Sharp on November 15, 2021.  *See* Dkt. No. 122;

WHEREAS, the court accepts as true the factual allegations of the Complaint against defendant Sharp, who has defaulted, and finds that the court has jurisdiction over this action

1

A407

pursuant to Sections 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77t(d), 77v(a)], and Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(d), 78u(e), 78aa].

WHEREAS, the Commission has applied, pursuant to Fed. R. Civ. P. 55(b)(2), for the entry of this Final Judgment based on defendant Sharp's failure to answer or otherwise respond to the Commission's Complaint, and the court having considered the prima facie case for relief shown by the Commission's Complaint, the memorandum of law in support of the Commission's motion for default judgment, and the supporting declaration of Trevor Donelan, which showing has not been rebutted by defendant Sharp, the Court finds that Sharp has violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securites Act and Sections 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder and has aided and abetted others' violations of those provisions;

NOW THEREFORE, BASED ON THE FOREGOING:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)    to employ any device, scheme, or artifice to defraud;

A408

(b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)    to employ any device, scheme, or artifice to defraud;

(b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

A409

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)    Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)    Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)    Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination

4

A410

under Section 8 of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by any of him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for his own personal account.

V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. 240.3a51-1].

A411

VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

is liable for disgorgement of $21,760,936, representing net profits gained as a result of the

conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of

$7,173,497, and a civil penalty in the amount of $23,990,781 pursuant to Section 20(d) of the

Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C.

§78u(d)(3)].  Defendant shall satisfy this obligation by paying $52,925,214 to the Securities and

Exchange Commission within 30 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank

cashier's check, or United States postal money order payable to the Securities and Exchange

Commission, which shall be delivered or mailed to

      Enterprise Services Center
      Accounts Receivable Branch
      6500 South MacArthur Boulevard
      Oklahoma City, OK 73169

 and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; Sharp as a defendant in this action; and specifying that payment is made pursuant to

this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case

identifying information to the Commission's counsel in this action.  By making this payment,

Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part

of the funds shall be returned to Defendant.

A412

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by using all collection procedures authorized by law, including, but not limited to, moving for civil contempt at any time after 30 days following entry of this Final Judgment.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. §3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action. Defendant shall pay post judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 U.S.C. §1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such

7

A413

a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty

Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset

to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall

not be deemed an additional civil penalty and shall not be deemed to change the amount of the

civil penalty imposed in this Judgment.  For purposes of this paragraph, a "Related Investor

Action" means a private damages action brought against Defendant by or on behalf of one or

more investors based on substantially the same facts as alleged in the Complaint in this action.

VII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, Wells Fargo Bank, N.A. ("Wells Fargo") shall

transfer the entire balance of the following Wells Fargo account(s) which are controlled by

defendant Sharp and were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| **L & L Investors** | *3969 |
| **Road Runner Estates** | *3977 |

Wells Fargo may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Wells Fargo also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

8

A414

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Final Judgment.

VIII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, Bank of Montreal shall transfer the entire balance of the following Bank of Montreal account(s) which are controlled by defendant Sharp and were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| **Charterhouse Capital Inc.** | *8904 |

Bank of Montreal may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Bank of Montreal also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Final Judgment.

IX.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, Canaccord Genuity Corp. ("Canaccord") shall transfer the entire balance of the following Canaccord account(s) which are controlled by

9

A415

defendant Sharp and were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| **Egredior Holdings Ltd.** | *58A1 |
| **Egredior Holdings Ltd.** | *58B1 |
| **Norton Investments LLC** | *36A1 |
| **Norton Investments LLC** | *36B1 |

Canaccord may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Canaccord also may transfer these funds by certified

check, bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

X.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, Tendall Capital Markets Ltd. ("Tendall") shall

transfer the entire balance of the following Tendall account(s) which are controlled by defendant

Sharp and were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| **Trius Holdings Limited SRL** | *5001 |

A416

Tendall may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Tendall also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

      Enterprise Services Center
      Accounts Receivable Branch
      6500 South MacArthur Boulevard
      Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Final Judgment.

XI.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, Peter Pesic & Co. Securities Inc. ("Peter Pesic") shall transfer the entire balance of the following Peter Pesic account(s) which are controlled by defendant Sharp and were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| Corby Ventures Inc. | *57CV |
| Pegasus Global Ltd. | *57PG |

Peter Pesic may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Peter Pesic also may transfer these funds by certified

11

A417

check, bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

## XII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, solely for purposes of

exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the

allegations in the complaint are true and admitted by Defendant, and further, any debt for

disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this

Final Judgment or any other judgment, order, consent order, decree or settlement agreement

entered in connection with this proceeding, is a debt for the violation by Defendant of the federal

securities laws or any regulation or order issued under such laws, as set forth in Section

523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

## XIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## XIV.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

A418

Dated:   <u>May 12, 2022</u> , <u>      </u>

<u>  /s/ William G. Young                    </u>
UNITED STATES DISTRICT JUDGE

A419

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
SECURITIES AND EXCHANGE COMMISSION,)
                              )
              Plaintiff,      )
                              )
         v.                   )        CIVIL ACTION
                              )        NO. 21-11276-WGY
FREDERICK L. SHARP, ZHIYING YVONNE )
GASARCH, COURTNEY KELLN, MIKE K.   )
VELDHUIS, PAUL SEXTON, JACKSON T.  )
FRIESEN, WILLIAM T. KAITZ, AVTAR S.)
DHILLON, and GRAHAM R. TAYLOR,     )
                              )
              Defendants.     )
_____)
```

YOUNG, D.J.                                September 6, 2022

**MEMORANDUM & ORDER**

**I.    INTRODUCTION**

In this case, the Securities and Exchange Commission (the "SEC") brings an enforcement action against nine defendants for their alleged violation of several securities laws and regulations.  Six of these nine defendants move to dismiss the case against them based on two main arguments: (1) the claims against them are untimely because the SEC (a) is applying the incorrect statute of limitations and (b) does not allege sufficient facts within the applicable time-period to impose liability; and (2) the SEC does not state facts with sufficient particularity plausibly to allege violations of the aforementioned statutes and regulations.

[1]

A420

First, the SEC applies the correct statute of limitations to scienter-based disgorgement claims.  The limitations period is governed by Section 6501 of the William M. Thornberry National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), which applies retroactively to extend the statute of limitations to ten years for claims commenced after its passage. This conclusion is necessitated by the clear mandate provided by Congress in the text of the statute.

Furthermore, as to timely pleading on the face of the complaint, the defendants are incorrect on two bases: (1) the SEC alleges sufficient facts within both the ten- and five-year time periods -- the latter being still applicable to other types of claims relevant to this action; and (2) the five-year statute of limitations may not even apply to, or have start to run for, several of the defendants, as exceptions to the statute of limitations apply for those who have been absent from the United States.

Second, the SEC has alleged sufficient facts with particularity as to all defendants to buttress the violations claimed.  This Court therefore DENIES all six of the defendants' motions to dismiss in their entirety.

II.    **PROCEDURAL HISTORY**

On August 5, 2021, the SEC brought this enforcement action for violation of securities and exchange laws against nine

[2]

A421

defendants: Frederick L. Sharp ("Sharp"), Zhiying Yvonne Gasarch

("Gasarch"), Courtney Kelln ("Kelln"), Mike K. Veldhuis

("Veldhuis"), Paul Sexton ("Sexton"), Jackson T. Friesen

("Friesen"), William T. Kaitz ("Kaitz"), Avtar S. Dhillon

("Dhillon"), and Graham R. Taylor ("Taylor") (collectively, the

"Defendants").  See Compl., ECF No. 1.  On the same day the SEC

filed an emergency ex parte motion for a temporary restraining

order ("TRO") freezing assets and requesting equitable relief

against all the Defendants.  See Pl.'s Emergency Ex Parte Mot.

TRO, Order Freezing Assets, & Order Other Equitable Relief, ECF

No. 3.  Judge Gorton entered an order granting the TRO on August

6, 2021.  See TRO Order, Order Freezing Assets, & Order Other

Equitable Relief, ECF No. 7.  Subsequently, a series of

preliminary injunctive orders were sought and granted.[1]

_____

    [1] On August 13, 2021, the SEC filed a motion for a
preliminary injunction against four of the Defendants: Sharp,
Veldhuis, Sexton, and Taylor.  See Pl.'s Mot. Prelim. Inj.,
Asset Freeze, & Order Other Equitable Relief, ECF No. 24; Pl.'s
Status Report Prelim. Inj. Hearing 6, ECF No. 29; Revised
Proposed Prelim. Inj. Order 1, ECF No. 36.  Judge Gorton entered
an order allowing the motion for a preliminary injunction.  See
Sharp, Veldhuis, Sexton, & Taylor Prelim. Inj. Order, ECF No.
39.
    Judge Gorton also allowed motions for extension of the TRO
as to Kaitz, Gasarch, Kelln, Dhillon, and Friesen.  See
Extension TRO Kaitz, ECF No. 30; Extension TRO Gasarch, Kelln, &
Dhillon, ECF No. 40; Extension TRO Friesen, ECF No. 42.
Subsequently, Judge Sorokin allowed another motion to extend the
TRO as to Friesen.  See Second Extension TRO Friesen, ECF No.
45.
    The SEC moved for a preliminary injunction against Dhillon
on August 28, 2021.  See Joint Mot. Entry Prelim. Inj., Order

[3]

A422

After these preliminary injunctions were issued, six of the defendants -- Friesen, Taylor, Sexton, Gasarch, Kelln, and Veldhuis -- moved to dismiss the case. See Def. Jackson T. Friesen's Mot. Dismiss Compl., ECF No. 109; Def. Graham R. Taylor's Mot. Dismiss Strike Pl.'s Compl., ECF No. 126; Def. Paul Sexton's Mot. Dismiss Compl., ECF No. 132; Def. Yvonne Gasarch's Mot. Dismiss Compl., ECF No. 143; Def. Courtney Kelln's Mot. Dismiss SEC's Compl., ECF No. 147; Def. Mike K. Veldhuis's Mot. Dismiss Compl., ECF No. 151.

The Defendants have fully briefed these motions. See Mem. Supp. Def. Jackson T. Friesen's Mot. Dismiss Compl. ("Friesen Mem."), ECF No. 110; Mem. Supp. Def. Graham R. Taylor's Mot. Dismiss Strike Pl.'s Compl. ("Taylor Mem."), ECF No. 127; Def. Paul Sexton's Mem. Supp. Mot. Dismiss Compl. ("Sexton Mem."), ECF No. 133; Mem. Supp. Def. Yvonne Gasarch's Mot. Dismiss Compl. ("Gasarch Mem."), ECF No. 144; Mem. Law Supp. Def. Courtney Kelln's Mot. Dismiss SEC's Compl. ("Kelln Mem."), ECF

---

Freezing Assets, & Order Other Equitable Relief Def. Dhillon, ECF No. 48.  Judge Sorokin also granted this preliminary injunction on August 30, 2021.  See Dhillon Prelim. Inj. Order, ECF No. 54.  Kaitz's TRO was further extended two more times. See Second Extension TRO Kaitz, ECF No. 60; Third Extension TRO Kaitz, ECF No. 97.  This Court also granted preliminary injunctions against Friesen, Gasarch, and Kaitz.  See Order Entry Prelim. Inj. Friesen, ECF No. 91; Order Entry Prelim. Inj. Kaitz, ECF No. 100; Order Entry Prelim. Inj. Gasarch, ECF No. 101.

[4]

A423

No. 148; Mem. Supp. Mot. Dismiss Mike K. Veldhuis ("Veldhuis Mem."), ECF No. 152.  The SEC opposed these motions.  See Pl.'s Opp'n Friesen's Mot. Dismiss Compl. ("SEC's Opp'n Friesen"), ECF No. 124; Pl.'s Opp'n Sexton's Mot. Dismiss Compl. ("SEC's Opp'n Sexton"), ECF No. 157; Pl.'s Opp'n Def. Taylor's Mot. Dismiss Compl. ("SEC's Opp'n Taylor"), ECF No. 158; Pl.'s Opp'n Def. Gasarch's Mot. Dismiss Compl. ("SEC's Opp'n Gasarch"), ECF No. 162; Pl.'s Opp'n Def. Kelln's Mot. Dismiss Compl. ("SEC's Opp'n Kelln"), ECF No. 167; Pl.'s Opp'n Def. Veldhuis's Mot. Dismiss Compl. ("SEC's Opp'n Veldhuis"), ECF No. 171.

At the same time, the SEC moved for entry of default as to Frederick Sharp, see Pl.'s Mot. Entry Default Def. Frederick L. Sharp, ECF No. 116, which this Court granted, see Electronic Order Granting Mot. Entry Default Sharp, ECF No. 122.  This Court later entered final judgment against Sharp.  See Final J. Def. Frederick L. Sharp, ECF No. 211.

At a hearing held on January 20, 2022, this Court heard argument on the Defendants' six motions to dismiss and tentatively denied all of them pending further review.[2]  See Electronic Clerk's Notes ("Clerk's Notes"), ECF No. 189; see

---

[2] This Court has federal question subject matter jurisdiction pursuant to section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), 78aa.

[5]

A424

<u>also</u> Hearing Tr. 22:6-9, ECF No. 193.  The Court also allowed
the SEC to file a motion for leave to file an amended complaint
as to Gasarch and Taylor.  <u>See</u> Clerk's Notes; Hearing Tr. 22:10-
13.  The SEC so moved, submitting a proposed Amended Complaint
containing more specific allegations as to Taylor and Gasarch.
<u>See</u> Pl. Mot. Leave File Am. Compl., ECF No. 195; <u>id.</u> Ex. 1,
Proposed Am. Compl. ("Am. Compl."), ECF No. 195-1.  Taylor and
Gasarch both oppose the Amended Complaint on the ground that it
is futile, as it would not redress the insufficiency of the
Complaint's factual allegations.  <u>See</u> Def. Taylor's Opp'n Pl.'s
Mot Leave File Am. Compl. ("Taylor's Opp'n Am. Compl.") 4-11,
ECF No. 199; Gasarch's Opp'n SEC's Mot. Leave Am. Compl.
("Gasarch's Opp'n Am. Comp.") 1-6, ECF No. 205.  Taylor also
suggests that these new allegations are "manufactured."  <u>See</u>
Taylor's Opp'n Am. Compl. 1.

This Court hereby **GRANTS** the SEC's motion to amend the
complaint.  The issues of futility will be dealt with on the
merits by determining whether the allegations raised in the
Amended Complaint are sufficient to pass muster under Federal
Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").  As to the
allegation that these claims are manufactured, this is an issue
of fact to be dealt with at the fact-finding stage.  All of the
motions to dismiss, <u>see</u> Def. Jackson T. Friesen's Mot. Dismiss
Compl.; Def. Graham R. Taylor's Mot. Dismiss Strike Pl.'s

[6]

A425

Compl.; Def. Paul Sexton's Mot. Dismiss Compl.; Def. Yvonne
Gasarch's Mot. Dismiss Compl.; Def. Courtney Kelln's Mot.
Dismiss SEC's Compl.; Def. Mike K. Veldhuis's Mot. Dismiss
Compl., filed as to the prior complaint, Compl., will be treated
as applying to the Amended Complaint with equal force, as it is
identical in nearly all material respects to the original
complaint, with the exception of allegations against Taylor and
Gasarch, see generally Am. Compl. As to any additional
objections raised by Taylor and Gasarch in their oppositions to
the SEC's motion for leave to amend, these objections shall be
construed as additional possible grounds for dismissal pursuant
to Rule 12(b)(6).

**III.    FACTS ALLEGED**

    **A.    Background**

This SEC-enforcement action targets a specific type of
securities violation pertaining to stock registration and sale
requirements. See Am. Compl. ¶ 35. Securities must be
registered pursuant to Section 5 of the Securities Act of 1933
("Securities Act"), 15 U.S.C. § 77e, unless (1) they fall under
an applicable exemption or (2) the stock is sold in accordance
with the conditions of SEC Rule 144, 17 C.F.R. § 240.144.

One registration exemption is that securities need not be
registered if the individual selling the stocks is **not** an
"issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1).

[7]

A426

Section 2(a) of the Securities Act defines an issuer as any "person who issues or proposes to issue a security" and an underwriter as "any person who has purchased from an issuer with a view to . . . the distribution of any security." 15 U.S.C. § 77b(a)(4), (11). Rule 144 dictates that an individual is not an underwriter if he is not an affiliate of the issuer at the time of sale and has not been an affiliate for the last three months -- as long as one year has elapsed from when the securities were obtained from the issuer or an affiliate. See 17 C.F.R. § 230.144(b)(1)(i). An "affiliate" is "a person that directly, or indirectly . . . controls, or is controlled by, or is under common control with, such issuer." Id. § 230.144(a)(1).

When referring to a "control group" this Court describes individuals who are affiliates or controlled by the issuer. This Court utilizes the term "restricted stock" as shorthand for stock that has been acquired from an issuer or affiliate, absent one of the above exemptions, or is held by an issuer or affiliate that has not been registered; this stock cannot be sold to the public without violating securities laws. When referring to "unrestricted stock" this Court describes stock that can be sold in the public market. "Unrestricted stock" can become restricted if it is purchased by an affiliate. This Court also refers to stock as "registered" or "unregistered"

[8]

A427

depending on whether a registration statement has been filed with respect to that stock's sale transaction.

Another securities requirement, relevant to this suit, mandates that an individual must file a disclosure statement if she becomes the beneficial owner of more than five percent equity stock of a company. See 17 C.F.R. 240.13d-1(a).

### B.   The Scheme

This SEC-enforcement action centers around a "scheme[] to sell fraudulently hundreds of millions of dollars in stocks in the United States markets" over a period that spanned 2010 to 2019. Am. Compl. ¶¶ 1, 42. The scheme generated more than one billion dollars in gross proceeds. Id. ¶ 43. "In exchange for lucrative fees," a sophisticated enterprise, the Sharp Group, provided a series of services to public company control persons -- shell companies to conceal stock ownership, nominal beneficial shareholders, offshore accounts, stock transfers, money transfers, encrypted accounting and communication systems, and fabricated documents -- in order to facilitate the dumping of penny stocks[3] to the detriment of unsuspecting investors, without full and fair disclosure. See id. ¶¶ 2, 4-6. This enforcement action targets both the sophisticated enterprise and

---

[3] "[P]enny stocks" refers to stocks traded at less than $5 per share. See Am. Compl. ¶ 40.

[9]

A428

the public company control persons who were complicit. <u>See id.</u>
¶¶ 2-3.

In brief, the scheme allegedly worked as follows. Sharp,
Gasarch, and Kelln (the "Sharp Group") helped facilitate illicit
stock sales of large, unregistered blocks of restricted penny
stocks by helping conceal their clients' identities as control
persons. <u>See id.</u> ¶¶ 5-6. Veldhuis, Sexton, and Friesen (the
"Veldhuis Control Group") were affiliates who collaborated with
the Sharp Group to sell restricted unregistered stocks on the
public market in collaboration with Dhillon, Taylor, and Kaitz.
<u>See id.</u> ¶¶ 7-8.

For example, blocks of stock actually controlled by Sharp
and other control groups were grouped into small blocks and
"sold" to offshore dummy entities (all in actuality controlled
by Sharp Group and other control groups) which would then sell
the shares to the public. <u>Id.</u> ¶¶ 54-55. Engaging in this shell
game allowed the stocks to go unregistered and prevented the
need for disclosure by individuals who held more than five
percent of the companies' stock. <u>See id.</u> Sharp further
utilized offshore trading platforms to obscure the identities of
the true beneficial owners. <u>Id.</u> ¶ 56.

C.   **The Players**

**Sharp** was the "mastermind" of this operation. <u>Id.</u> ¶ 44.
Sharp cultivated relationships with clients -- individuals

[10]

A429

seeking to sell stock while skirting securities laws --
connected them with offshore trading platforms, created "front
companies" to serve as nominee shareholders, and facilitated the
surreptitious fraudulent sales of unregistered restricted
stocks.  See id. ¶¶ 44-47.  Sharp also hired individuals to
operate administrative services and created encrypted
communication and accounting systems which he housed physically
outside the United States, hoping they would be unreachable by
SEC investigators.  Id. ¶¶ 49-51.

    **Kelln**, one of Sharp's employees, helped obtain, allocate,
and distribute shares to conceal their common control.  Id. ¶¶
52.  Much of Kelln's work was grouping stocks for transmission
to transfer agents[4] such that the totals appeared under five
percent to avoid disclosure and registration requirements.  Id.
¶¶ 53-55.

    **Gasarch**, another employee of Sharp's, organized wire
transfers of the proceeds from the illegal stock sales while
concealing the beneficiaries, maintained records in the
encrypted accounting system, and routinely created false
invoices to support the payments.  Id. ¶¶ 57-58.

-------------------

[4] "[T]ransfer agents" are individuals or businesses that
facilitate the transfer of securities -- and who keep track of
whether a stock is restricted or unrestricted.  See Am. Compl. ¶
39.

[11]

A430

"**Veldhuis, Sexton, and Friesen** acted as a group for purposes of acquiring, holding, and ultimately disposing of [] shares . . . ." <u>Id.</u> ¶ 153.  They teamed up with Sharp and his employees surreptitiously to sell the stock of several corporations sometimes in concert with Dhillon, Taylor, and Kaitz.  <u>See id.</u> ¶¶ 7-8.  In short, the Veldhuis Control Group was a Sharp Group client, which used its services to sell restricted stock to the public.  <u>See id.</u> ¶ 50.

**Dhillon** assisted by chairing the board of four of the companies whose stocks were subject to these illegal sales; he utilized his insider corporate status to issue shares to his associates and direct their sale to the public, while leaving them unregistered, in violation of several federal securities laws.  <u>Id.</u> ¶¶ 9-11.  When questioned about his involvement in these sales by the SEC, Dhillon allegedly made false statements.  <u>Id.</u> ¶ 16.

**Taylor** participated by "arrang[ing] to merge a public company with one of Dhillon's private companies, ultimately resulting in the distribution and fraudulent sale of shares," for which he received a portion of the proceeds.  <u>Id.</u> ¶ 14.  Additionally, Taylor "controlled nominee shareholders who held and traded stock surreptitiously in concert with Dhillon and the Veldhuis Control Group."  <u>Id.</u>

[12]

A431

**Kaitz** participated by using a media company he owned and operated, Full Services Media LLC, to promote stock that the Veldhuis Control Group was looking to dump.  Id. ¶ 12.  In promoting sale of this stock, Kaitz concealed the Veldhuis Control Group's control over the stock as well as their involvement in paying for the advertisements; when questioned by the SEC he denied his involvement.  Id. ¶¶ 12-13.

Sharp, Gasarch, Kelln, Veldhuis, Sexton, Friesen, and Taylor all currently reside in Canada, whereas Kaitz and Dhillon reside in the United States -- Maryland and California, respectively.  Id. ¶¶ 22-30.

**D.   Iterations of the Scheme**

**1.   OncoSec**

In 2011 Dhillon became the chairman of OncoSec Medical Incorporated's ("OncoSec") board of directors and therefore an affiliate of the company.  Id. ¶¶ 218-19.

Dhillon used an individual to conceal his control of the stock ("Person A") and organized the sale of OncoSec stock through a front company -- illegally skirting registration restrictions.  See id. ¶¶ 217-24.  Person A misrepresented Dhillon's connection to the shares held by the front company and sold shares on Dhillon's behalf from 2013 to 2017 to the public.  Id. ¶¶ 225-29.  Between April and June 2014 Taylor also sold hundreds of thousands of OncoSec shares through a nominee entity

[13]

A432

he controlled without registering them and paid Dhillon the profits.  Id. ¶¶ 235-36.

During the same period the Veldhuis Control Group was executing similar trades.  In 2011, "the Veldhuis Control Group directed the transfer" of OncoSec shares "to seven Sharp Group-administered" nominee entities -- at the time the Veldhuis Control Group was an affiliate of OncoSec due to the proportion of shares it held.  Id. ¶ 214.  Between 2011 and 2012 the Veldhuis Control Group sold millions of dollars in restricted OncoSec shares on the United States markets, without ever registering the shares.  See id. ¶¶ 215-16.

### 2.  **Stevia First/Vitality**

In 2012 Dhillon became the Chairman of a Company called Stevia First Corp. ("Stevia First"), which was later renamed Vitality Biopharma, Inc. ("Vitality") (collectively, "Stevia First/Vitality").  Id. ¶¶ 8, 70.  Through a reverse merger,[5] Dhillon combined Stevia First/Vitality with a public shell company, became a director of the new company, purchased the former CEO's shares, and engaged in a seven-for-one forward stock split which considerably increased the number of shares he

---

[5] A "reverse merger" is shorthand for a public shell company acquiring a private company -- generally awarding the private company's shareholders shares in the process -- in order to make the private company public (the merger often comes with a name change aligning with the private company).  Am. Compl. ¶ 72.

[14]

A433

held of the company; he later also became the chairman of the company's board of directors. Id. ¶¶ 72-78. Dhillon, although an affiliate of Stevia First/Vitality due to his control position on the board, repeatedly failed to register the company's stock before selling it, a violation of securities laws. See id. ¶¶ 79-80. Dhillon also failed to file Schedule 13D Disclosure statements -- required due to his greater than five percent share of stock in the company. Id. ¶ 81.

In 2012, Dhillon distributed his shares to the nominee entities controlled by the Sharp Group (including individually by Gasarch), the Veldhuis Control Group, and Taylor to obscure his interest in the shares and skirt the registration and disclosure requirements; these individuals worked in concert to sell the stocks on the public market. See id. ¶¶ 83-84, 110-15. This was all part of the plan to make these stocks appear unrestricted when they were, in reality, still restricted. See id. ¶ 84. At the same time, the Veldhuis Control Group promoted the sale of Stevia First/Vitality by issuing misleading materials about the stock. Id. ¶¶ 85-86. Kaitz was involved in this effort and received payments from the Veldhuis Control Group to publicize the stock. Id. ¶ 87. From March to May 2012 the Veldhuis Control Group with Kaitz's assistance unloaded thousands of shares generating $24,000,000 in profits; meanwhile, Taylor and Dhillon "shared in these illicit proceeds"

[15]

A434

which were funneled by the Veldhuis Control Group through the
Sharp Group. Id. ¶¶ 88-89.

Later in 2012 and in 2014 Stevia First/Vitality issued more
shares to a Sharp-nominee shareholder. Id. ¶ 91. The Sharp
Group had those stocks divided among two other nominee
shareholders, who then sold those stocks to the public "for the
benefit of Dhillon, the Veldhuis Control Group, and Taylor."
Id. ¶¶ 91-92. Throughout 2013 and 2014 Kelln facilitated the
sale of these shares, helped make transfers, and provided false
documentation to legitimize the sales. Id. ¶ 93. In 2014, the
Veldhuis Control Group discussed via encrypted communications
the distribution of these illegitimate funds with each other as
well as with Gasarch and continued to sell Stevia First/Vitality
Stock while utilizing the Sharp Group's services. Id. ¶¶ 94-
106, 117-18. Beginning in 2014 and continuing into 2016, Taylor
held additional shares via nominee shareholders, which would
then be transmitted to Sharp Group nominee shareholders and
eventually transfer agents for sale to the public -- a process
facilitated by Kelln. See id. ¶¶ 119-25.

Between 2015 and 2016 the Veldhuis Control Group directed
millions in unregistered sales of restricted Stevia
First/Vitality stock in coordination with another stock
promotional campaign run by Kaitz, which the Veldhuis Control
Group funded. Id. ¶¶ 125-27, 132-34. The Veldhuis Control

[16]

A435

Group coordinated with Sharp, Gasarch, and Kelln, as shown by encrypted communications in 2015. See id. ¶¶ 130-31.

In 2016 "Stevia First changed its name to Vitality and executed a 1-for-10 reverse split of its common stock." Id. ¶ 141. The Veldhuis Control Group sent several payments to Stevia First/Vitality and in exchange Dhillon issued millions of shares to nominee entities controlled by the Sharp Group. Id. ¶ 142. During this time the Veldhuis Control Group sold the Stevia First/Vitality stock to the public, even though it was restricted. Id. ¶ 144. Between 2016 and 2018 Kelln retained an attorney to create opinion letters that falsely reported these nominee entities were not affiliates of Stevia First/Vitality, thereby enabling these restricted sales. Id. ¶¶ 143-44. In 2017, Kelln also strategically transmitted sets of shares from nominal shareholders to transfer agents to ensure that the shareholders always appeared to be in possession of less than five percent of the company's shares, effectively skirting the disclosure requirements. Id. ¶¶ 145-48. Around December 2016 the Veldhuis Control Group again funded a stock promotion touting Stevia First/Vitality's stock and once again utilized Kaitz's services. Id. ¶ 149.

Sexton, Veldhuis, Friesen, Taylor (who forwarded proceeds to Dhillon), and Kaitz each received the proceeds from these illicit sales. Id. ¶¶ 136, 151-52.

[17]

A436

### 3.    Arch

Dhillon, alongside the Veldhuis Control Group, and with the assistance of Taylor and Kaitz, replicated his efforts on Stevia First/Vitality with a company named Arch Therapeutics, Inc. ("Arch") in 2013.  Id. ¶¶ 8, 161.  In 2013 Dhillon organized a reverse merger between one of his private companies and a public shell company, controlled by the Veldhuis Control Group, creating Arch.  Id. ¶ 162.  Dhillon became Arch's chairman, and Arch began issuing shares and underwent a stock split.  Id. ¶¶ 163-64.  Prior to the merger, the Veldhuis Control Group with Kelln's assistance directed the transfer of Arch shares to several Sharp-controlled nominee-entities for their benefit. Id. ¶¶ 164-69.

After the merger, "the Veldhuis Control Group engaged Kaitz to promote" the stock.  Id. ¶ 171.  Kaitz's promotion included false statements that misrepresented who was paying for the promotion and that disguised the Veldhuis Control Group's involvement in the stock sales -- these promotions were coordinated with the Sharp Group and Dhillon's assistance.  See id. ¶¶ 173-75, 179.

The Veldhuis Control Group sold millions of Arch shares to the public without registration although they were Arch affiliates -- either because of their majority shareholder status or because of their concerted actions with Dhillon, the

[18]

A437

company's chairman.  Id. ¶¶ 177-78.  Dhillon and Taylor
participated actively in these sales and received the proceeds.
Id. ¶¶ 180-83.  "The Veldhuis Control Group and Taylor continued
to engage in fraudulent sales of Arch stock into 2017" in
coordination with the Sharp Group and Dhillon.  Id. ¶ 184, 188.
The Veldhuis Control Group reaped the proceeds and issued
payments to Dhillon and Taylor from 2012 to 2018.  See id. ¶¶
189-90.  Dhillon also received direct proceeds of sales
orchestrated by Taylor.  See id. ¶ 193.

Furthermore, Dhillon schemed to sell Arch stock through
another individual, Person A, who established a front company
used to sell stock surreptitiously, while concealing from
intermediaries and purchasers the provenance of these shares and
the fact they were restricted due to Dhillon's affiliate status.
Id. ¶¶ 197-99, 202.  Sale of stock through this front company
occurred from April to July 2016.  See id. ¶¶ 203-04.

### 4.  Other Events

The Sharp Group provided services to disguise stock sales
apart from those involving Stevia First/Vitality, Arch, and
OncoSec.  Id. ¶ 237.  Specifically, the Sharp Group provided
nominee-entities to disguise Veldhuis, Sexton, and Friesen's
control of other issuing companies from 2011 to 2018.  See id.
Kaitz was involved in promoting these companies while materially
omitting or misrepresenting the reality of Veldhuis, Sexton, and

[19]

A438

Friesen's control of these nominee-entities.  See id. ¶¶ 238-39.
Kelln helped deposit stock via brokerage firms in small blocks
in order to skirt the five percent limit -- in particular the
SEC cites instances of Kelln doing so in 2017.  Id. ¶¶ 242-45.

## IV.  PLEADING STANDARD

To withstand a motion to dismiss, a complaint must "state a
claim upon which relief can be granted . . . ."  Fed. R. Civ. P.
12(b)(6).  The complaint must include sufficient factual
allegations that, accepted as true, "state a claim to relief
that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550
U.S. 544, 570 (2007).  Courts "draw every reasonable inference"
in favor of the plaintiff, Berezin v. Regency Sav. Bank, 234
F.3d 68, 70 (1st Cir. 2000), but they disregard statements that
"merely offer legal conclusions couched as fact or threadbare
recitals of the elements of a cause of action," Ocasio-Hernández
v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (brackets,
ellipsis, and quotations omitted).

## V.  ANALYSIS

The Defendants seek to dismiss the SEC enforcement action
against them on two key bases: (1) the SEC applies the wrong
statute of limitations to certain claims, and thus the SEC does
not plead timely facts on the face of the complaint; and (2) the
SEC does not plead sufficient facts with particularity to
establish violations.  This Memorandum addresses each issue in

[20]

A439

turn and concludes that neither is meritorious.  Therefore, this Court denies each defendant's motion to dismiss.

  **A. Timeliness**

  The Court addresses two key issues with regard to timeliness: (1) whether the SEC utilizes the proper statute of limitations for scienter-based disgorgement claims; and (2) whether the allegations in the SEC's complaint are timely on their face as to each defendant for each violation.

  This Court concludes, first, that the SEC applies the correct statute of limitations, as the NDAA **applies retroactively** to cases commenced after its passage, given the express mandate by Congress.  Second, while some claims at issue are subject to a five-year statute of limitations, and others are subject to a ten-year statute of limitations, all are timely pled.

  **1. The Applicable Statute of Limitations for Scienter-Based Disgorgement Claims**

  Six of the Defendants[6] move to dismiss the SEC's scienter-based securities claims for disgorgement on the basis that they are time-barred.  <u>See</u> Friesen Mem. 7-10; Taylor Mem. 8-20; Sexton Mem. 7-18; Gasarch Mem. 5-8; Kelln Mem. 20 & n.7;

---

  [6] Dhillon entered into a tolling agreement with the SEC that "tolled the running of any limitations period or any other time-related defenses available to [him] for a period of approximately seven months and three days."  Am. Compl. ¶ 249.

[21]

A440

Veldhuis Mem. 11.[7]  The Defendants argue that in seeking
disgorgement for securities violations that took place between
five and ten years ago, the SEC is applying the NDAA
retroactively.  See Taylor Mem. 1-2.  In essence, the Defendants
assert that claims based on conduct that occurred between 2011
and January 1, 2016, are untimely because the NDAA's new statute
of limitations cannot apply retroactively to revive stale
claims.  See Friesen Mem. 7-10; Taylor Mem. 10-20; Sexton Mem.
7-18; Gasarch Mem. 7-8; Kelln Mem. 20 n.7; Veldhuis Mem. 11.
The Defendants support this argument by comparing the NDAA's
language to that of the Public Company Accounting Reform and
Investor Protection Act of 2002 ("Sarbanes-Oxley"), "which
courts have consistently held is not sufficient to revive time-
barred claims," and by arguing that applying the NDAA
retroactively in this way would violate the Ex Post Facto Clause
because disgorgement is penal in nature.  See Taylor Mem. 2.
The SEC rebuts that Sarbanes-Oxley ought not bear on the Court's
analysis, as it is distinguishable from the NDAA; and that
disgorgement is not akin to criminal punishment and thus that

---

[7] Taylor and Sexton brief this issue at the greatest length
and level of specificity.  See Taylor Mem. 1-20; Sexton Mem. 7-
18.  To the extent the other defendants challenge the timeliness
of the SEC's action, their arguments are similar to or
duplicative of Taylor's, see Friesen Mem. 7-10; Gasarch Mem. 5-8;
Kelln Mem. 20 & n.7; Veldhuis Mem. 11; thus, Taylor's brief,
arguably the most complete of the motions on this issue, will be
used as a reference point throughout this Memorandum.

[22]

A441

the Ex Post Facto Clause does not apply.  See SEC's Opp'n Taylor 9.

This Court holds that the NDAA's ten-year statute of limitations on disgorgement for scienter-based claims applies retroactively to both cases pending on and cases commenced after its passage, because the statute contains an express retroactivity command from Congress.  In arriving at this conclusion this Court: (a) provides a brief overview of the status of the law before and after the passage of the NDAA; (b) explains why an analysis of the NDAA's language demands retroactive application; and (c) determines that retroactive application of the new statute of limitations is not violative of the Ex Post Facto Clause.

      **a.  The Background of the NDAA**

The Supreme Court has twice restricted the SEC's disgorgement power in recent years.  The first time in Kokesh v. SEC, 137 S. Ct. 1635 (2017), and the second in Liu v. SEC, 140 S. Ct. 1936 (2020).  In Kokesh the Supreme Court decided whether "[d]isgorgement in the securities-enforcement context is a 'penalty' within the meaning of [28 U.S.C.] § 2462 [("Section 2462")]."  137 S. Ct. at 1639.  It answered the question in the affirmative; thus, it concluded that "disgorgement actions must be commenced within five years of the date the claim accrues," because a "[five]-year statute of limitations applies to any

[23]

A442

'action, suit or proceeding for the enforcement of any civil fine, **penalty**, or forfeiture, pecuniary or otherwise.'" Id. (quoting 28 U.S.C. § 2462) (emphasis added).  The Supreme Court in Liu addressed an "antecedent question," that is, "whether, and to what extent, the SEC may seek 'disgorgement' in the first instance through its power to award 'equitable relief' under 15 U.S.C. § 78u(d)(5), a power that historically excludes punitive sanctions."  140 S. Ct. at 1940.  The Supreme Court held that if the disgorgement "does not exceed a wrongdoer's net profits and is awarded for victims," then it is equitable relief.  Id.  In short, Kokesh, 137 S. Ct. at 1639, and Liu, 140 S. Ct. at 1940, limited the SEC's disgorgement power such that the SEC could not seek disgorgement for wrongful acts committed more than five years before filing of the SEC's enforcement action, could not receive disgorgement as equitable relief in amounts that exceeded the wrongdoer's profits, and was required to award such equitable relief to the victims.

    This state of affairs changed when Congress renewed the NDAA on January 1, 2021, over the President's Veto.  See All Information for H.R. 6395 – William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Congress.gov, https://www.congress.gov/bill/116th-congress/house-bill/6395/all-info (last visited Aug. 11, 2021).  The NDAA provides that:

[24]

> The Commission may bring a claim for disgorgement under
> paragraph (7) . . . not later than **10 years** after the
> latest date of the violation that gives rise to the action
> or proceeding in which the Commission seeks the claim if
> the violation involves conduct that violates --
>
> (I)   section 10(b);
> (II) section 17(a)(1) of the Securities Act of 1933
> (15 U.S.C. 77q(a)(1));
> (III) section 206(1) of the Investment Advisers Act of
> 1940 (15 U.S.C. 80b-6(1))
> (IV) any other provision of the securities laws for
> which scienter must be established.

William M. (Mac) Thornberry National Defense Authorization Act

for Fiscal Year 2021, Pub. L. No. 116-283, § 6501, 134 Stat.

3388, 4626 (2021) (codified in part at 15 U.S.C. § 78u(d)(8)(A))

("NDAA § 6501").  Section 6501 of the NDAA ("Section 6501")

departed from the status quo by extending the <u>Kokesh</u> five-year

statute of limitations to ten years.[8]  This change left an

unanswered question: can the SEC disgorge profits from

---

[8] Observers have raised several other questions regarding
Section 6501.  For example, another portion of Section 6501
states: "In any action or proceeding brought by the Commission
under any provision of the securities laws, the Commission may
seek, and any Federal court may order, disgorgement."  NDAA §
6501.  This has created confusion as to whether the SEC can now
seek disgorgement for any unjust enrichment, or whether it is
still cabined by the wrongdoer's profits.  It has also opened
questions as to whether the SEC must return funds to the
defendant's victims or whether it can place those disgorged
funds into the Treasury.  <u>See, e.g.,</u> Ike Adams, Chris Mills, &
David Petron, <u>SEC Disgorgement Authority May Be Limited Even
After Recent Amendments to the Exchange Act</u>, ABA: Business Law
Today (Jan. 27, 2021),
https://www.americanbar.org/groups/business_law/publications/blt
/2021/02/sec-disgorgement-authority/.

[25]

A444

individuals who committed conduct between five and ten years

before the NDAA's passage against whom actions are now being

filed?

 This appears to be an issue which the First Circuit has yet

to consider.[9]  Furthermore, the precise matter of concern in this

_____

 [9] The SEC has previously attempted to litigate the NDAA's
retroactive applicability to a case pending on appeal in the
First Circuit.  See Brief of the SEC, Appellee at 23, SEC v.
Morrone, 997 F.3d 52 (1st Cir. 2021) (Nos. 19-2006, 19-2007)
("The 2021 NDAA makes clear that, to the extent the Court finds
it necessary to do so, it would be appropriate to consider those
acts [now covered by the ten-year statute of limitations].").
The SEC argued such an assessment would be necessary in a
decision adverse to the SEC, because the District Court had only
considered conduct within the five-year statute of limitations.
See id. ("[A] decision in this appeal that is adverse to the
Commission may warrant a remand to the district court for
reconsideration of [the defendants'] misconduct within the
expanded limitations period.").

 The defendants in that case countered that consideration of
the new ten-year statute of limitations was unnecessary given
that the conduct that occurred before the five-year statute of
limitations -- by the SEC's own admission -- impacted none of
the claims on appeal and was only directly relevant to claims
for which the appeals period had expired.  See Reply Brief for
Defendants-Appellants Jonathan Morrone and Z. Paul Jurberg at
19-20, Morrone, 997 F.3d 52 (Nos. 19-2006, 19-2007).

 Ultimately, the First Circuit affirmed the District Court's
decision in favor of the SEC and declined to rule on the matter
of retroactivity given the fact that the larger limitations
period did "not impact [the] case" at bar.  See Morrone, 997
F.3d at 55 n.3, 62.  In short, as noted by the District of
Connecticut, "the First Circuit declined to analyze the
application of the NDAA beyond" noting its inapplicability to
the case at hand, because the issue on appeal did "not appear to
reach disgorgement."  SEC v. Ahmed, No. 3:15-675 (JBA), 2021 WL
2471526, at *4 n.4 (D. Conn. June 16, 2021).  At least one other
Circuit has similarly declined to consider the expanded statute
of limitations when unnecessary for resolving the matters at

[26]

A445

case -- whether the NDAA applies retroactively to actions **commenced after** its passage -- is an issue of first impression for this Court.[10]

This action was commenced after the passage of the NDAA -- the SEC filed the Complaint on August 5, 2021, see Compl. 1 -- and seeks to reach conduct between five and ten years before the NDAA's passage, see generally Am. Compl.  Therefore, this Court must consider the NDAA's retroactivity.

**b.  Retroactivity Analysis for the NDAA**

The relevant provision of the NDAA details that the amendments, including the Act's alteration of the statute of limitations, "apply with respect to any action or proceeding that is **pending on, or commenced on or after**" January 1, 2021. NDAA § 6501 (emphasis added); see also SEC v. Ahmed, No. 3:15-675 (JBA), 2021 WL 2471526, at *3 (D. Conn. June 16, 2021).

---

issue in the case.  See SEC v. Camarco, No. 19-1486, 2021 WL 5985058, at *2 n.3 (10th Cir. Dec. 16, 2021) (declining to consider the issue in a pending action, as "the SEC did not contend that the amendments permitted recovery of monies [the defendant] embezzled outside the five-year statute-of-limitations period that controlled the proceedings in the district court").

[10] Another session of this Court has, however, applied the ten-year statute of limitations retroactively to a case **pending** at the NDAA's passage.  See SEC v. Navellier & Assocs., Inc., No. 17-CV-11633-DJC, 2021 WL 5072975, at *4 (D. Mass. Sept. 21, 2021) (Casper, J.).

[27]

"Retroactive application of a new statute . . . occurs whenever the statute is applied to causes of action already accrued prior to its enactment date." Lieberman v. Cambridge Partners, L.L.C., 432 F.3d 482, 487-88 (3d Cir. 2005), as amended (Feb. 8, 2006). Without a provision to the contrary, "statutes operate only prospectively" to conduct occurring after their passage. United States v. Sec. Indus. Bank, 459 U.S. 70, 79 (1982). Consequently, there is a presumption against reading statutes retroactively to burden private rights. See United States v. Heth, 3 Cranch 399, 413 (1806); Landgraf v. USI Film Prod., 511 U.S. 244, 270 (1994) ("The presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact.").

"There is no doubt," however, "that Congress has the raw power to enact statutes that operate retroactively." Lattab v. Ashcroft, 384 F.3d 8, 14 (1st Cir. 2004). To determine whether Congress has exercised this power, courts engage in a two-step inquiry set out in Landgraf v. USI Film Production, 511 U.S. at 272-273. First, this Court must assess whether Congress "expressly prescribed the statute's proper reach" or clearly "command[ed]" retroactive application. Id. at 280. Second, if the Court concludes Congress has not done so, it must consider

[28]

A447

"whether the application [of the statute] in question would have

an impermissibly retroactive effect." Lattab, 384 F.3d at 15.

Beginning at the first step of the Landgraf test, this

Court assesses whether Congress "clearly stated an intention to

have the [NDAA] apply retrospectively." Id. at 14.

This requires scrutinizing the NDAA's text, starting with

the word "pending" in the phrase "pending on, or commenced on or

after" and applying the normal rules of construction. See Lindh

v. Murphy, 521 U.S. 320, 326 (1997). This Court utilizes the

"fundamental canon of statutory construction that words

generally should be interpreted as taking their ordinary,

contemporary, common meaning . . . at the time Congress enacted

the statute." Wisconsin Cent. Ltd. v. United States, 138 S. Ct.

2067, 2074 (2018) (quotations omitted and alterations in

original). A case is pending until the "last court in the

hierarchy [of Article III courts] [] rules on the" matter.

Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 227 (1995); see

also Griffith v. Kentucky, 479 U.S. 314, 321-22 (1987); see also

Georgia Ass'n of Retarded Citizens v. McDaniel, 855 F.2d 805,

813 (11th Cir. 1988) ("When it so intends, [Congress'] ability

to affect the content of a nonfinal judgment in a civil case,

through retroactive legislation ceases only when a case's

journey through the courts comes to an end."). Any claim

pending at the NDAA's enactment would have been filed under the

[29]

A448

Kokesh five-year statute of limitations -- therefore, under a
plain reading, the application of the NDAA's new ten-year
statute of limitations to "pending" actions would necessarily
require retroactive application of the statute.

There appears no doubt then that the language "pending on,
or commenced on or after" suggests an express mandate of
retroactivity for **pending cases**.  In fact, the parties both
imply as much.  See Taylor Mem. 1, 12 n.6; SEC's Opp'n Taylor
10.  Furthermore, several courts in a variety of circuits agree
that the NDAA applies retroactively to pending claims.  See SEC
v. Gallison, No. 15-cv-5456, 2022 U.S. Dist. LEXIS 35810, at
*13-17 (S.D.N.Y. Feb. 28, 2022) (taking for granted that the
NDAA's new statute of limitations is "applicable to any action
pending at the date of the NDAA's enactment" and applying it to
the case at bar which was filed in 2015 and thus was pending at
the Act's passage in 2021); SEC v. Fowler, 6 F.4th 255, 260 n.5
(2d Cir. 2021) (identifying the retroactivity of the NDAA's ten-
year statute of limitations for disgorgement claims in the
context of a pending case); SEC v. Navellier & Assocs., No. 17-
cv-11633, 2021 U.S. Dist. LEXIS 212209, at *10 (D. Mass. Sep.
21, 2021) (Casper, J.) (applying the ten-year statute of
limitations in a pending case); SEC v. Sneed, No. 3:20-cv-2988,
2021 U.S. Dist. LEXIS 179239, at *30 n.6 (N.D. Tex. Sept. 10,
2021) (same); Ahmed, 2021 WL 2471526, at *11 n.4 (same); SEC v.

[30]

A449

<u>Liberty</u>, No. 2:18-cv-00139, 2021 U.S. Dist. LEXIS 31296, at *21
(D. Me. Feb. 19, 2021) (same); <u>SEC</u> v. <u>Sidoti</u>, EDCV 20-2178, 2021
U.S. Dist. LEXIS 80055, at *17-18 (C.D. Cal. Mar. 19, 2021)
(acknowledging the longer statute of limitations as applicable
to pending claims, although the defendants had conceded this
point).  For example, the Central District of California
explicitly addressed this issue by holding -- in the context of
a case pending at the NDAA's passage, filed on April 28, 2020 --
that "[b]ecause [the] Action was pending on January 1, the SEC
[could] revive previously time-barred claims and" thus that it
could reach the "Defendant's alleged violations dating back to
2011."  <u>SEC</u> v. <u>Kellen</u>, No. CV 20-3861-RSWL-AGR, 2021 U.S. Dist.
LEXIS 204153, at *10 (C.D. Cal. Sep. 14, 2021).

     Where the parties diverge, and what they argue has yet to
be determined by any court, is whether the language "pending on,
or commenced on or after" creates the same explicit mandate of
retroactivity for cases **"commenced . . . after"** the statute's
passage.  This Court holds that it does.

     First, "pending on, or commenced on or after" indicates an
express mandate of retroactivity, given the explicit temporal
scope suggested by the word "pending"; the words "commenced . .
. after" cannot be divorced from the context of their placement
adjacent to the word "pending".  <u>See</u> <u>Yates</u> v. <u>United States</u>, 574
U.S. 528, 543 (2015) (discussing the well-known statutory canon

[31]

A450

"of _noscitur a sociis_ -- a word is known by the company it keeps").

Second, the Supreme Court has identified nearly the precise language used in the NDAA -- "pending on or commenced on or after" the date of the statute's enactment -- as explicitly suggesting an express mandate of retroactivity from Congress. See _Landgraf_, 511 U.S. at 259-60 (holding that Section 402(a) of Title VII did not apply to pending cases, because Congress would have included language such as the following if that had been its intent: "shall apply to all proceedings pending on or commenced after the date of enactment of this Act"); _see also id._ at 255-56 & n.8 (citing to the 1990 draft of the Civil Rights Act's language, which stated that its amendments would apply to "all proceedings pending on or commenced after," as an example of a statute mandating retroactive application); _Martin_ v. _Hadix_, 527 U.S. 343, 354-55 (1999) (holding the Prison Litigation Reform Act's fee limitation did not apply to cases pending on its enactment, because it lacked language as specific as "pending on or commenced after"); _Rivers_ v. _Roadway Exp., Inc._, 511 U.S. 298, 303, 307-08 (1994) (citing the absence of language such as "pending on or commenced after" as an indicator that a statutory mandate of retroactivity did not apply to cases pending at its passage).  This Supreme Court precedent alone is sufficient to support this Court's conclusion.

[32]

A451

Third, simple logic demands this reading.  If this Court read only "pending on" to apply retroactively, and not "commenced on or after," it would lead to an irrational outcome: (1) a case filed before or on December 31, 2020 seeking disgorgement for pre-January 1, 2016 conduct would receive the extended statute of limitations and be timely, and (2) a case filed January 2, 2021 seeking to reach the very same conduct would be untimely.  SEC-enforcement actions would be able to reach more -- or less -- allegedly violative conduct, simply by virtue of their filing date under the exact same statutory scheme.  Furthermore, reading the statute in this way would reward the SEC for filing what the Defendants argue are stale claims before the statute's enactment and penalize it for doing so once it arguably possessed such authority.  The Supreme Court has previously rejected such nonsensical readings of retroactive mandates.  See Int'l Union of Elec., Radio & Mach. Workers, Loc. 790 v. Robbins & Myers, Inc., 429 U.S. 229, 242-43 (1976) (rejecting the argument that a case was not "pending" if it included claims that would have been "untimely" at the time of filing and noting that courts "should not presume Congress created [an] odd hiatus in retroactivity. . .  unless congressional intent to do so was conveyed by" precise language).  Therefore, this Court's conclusion is demanded by the maxim that courts must "construe statutes so as to avoid

[33]

results [that are] glaringly absurd." Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 586 n.16 (1982).

Furthermore, in the context of similar statutory mandates, courts have held that statutory retroactivity must be applied to cases "commenced after" an Act's passage in a way that is congruous to how it is applied in pending cases. See, e.g., Heaven v. Gonzales, 473 F.3d 167, 174-75 (5th Cir. 2006) (holding in the context of the Illegal Immigration Reform and Immigrant Responsibility Act's pronouncement that the section would "apply to notices issued before, on, or after the date of the enactment of [the] Act" that it would be "incongruous" to treat pending cases differently from those commenced after); United States v. Wall, 794 F. Supp. 350, 352 (D. Or. 1992) (reading an amendment to the Higher Education Act of 1965 eliminating the statute of limitations for student loan collections as applying retroactively "to any action, whether currently pending or not," because an alternative "interpretation would create an irrational distinction between types of claims which were already time barred under the prior law, based only on the happenstance of whether an action had been filed or not").

Fourth, the legislative history of the NDAA supports this conclusion. "Where the text of a statute is clear, as it is here, we need not go on to consider the act's legislative

[34]

A453

history to divine Congress's intent." Telecommunications Regul.
Bd. of P.R. v. CTIA-Wireless Ass'n, 752 F.3d 60, 66 (1st Cir.
2014).  In conducting a retroactivity analysis, however, courts
often also look to legislative history to ascertain intent.  See
Lattab, 384 F.3d at 14.  Here, there is an indication that
Congress' intent was to reverse the effects of the Supreme
Court's decision in Kokesh.  First, the clear consequence of the
Act's extension of the ten-year statute of limitations was to
undo the Supreme Court's Kokesh decision, which severely cabined
the formerly unlimited statute of limitations for SEC
disgorgement actions to five years.  137 S. Ct. 1635.[11]  Second,
the amendment came on the heels of multiple pleas from the SEC
to Congress to overturn Kokesh and Liu.[12]  Finally, some Members

---

[11] Some observers have argued that Congress was motivated
directly by Kokesh.  See Adams, Mills, & Petron, supra note 8.

[12] The Director of the SEC's Division of Enforcement
complained of the challenges in the agency's enforcement efforts
in a post-Kokesh world.  See Stephanie Avakian, Remarks at the
Institute for Law and Economics, University of
Pennsylvania Carey Law School Virtual Program, SEC (Sept. 17,
2020), https://www.sec.gov/news/speech/avakian-protecting-
everyday-investors-091720.  Furthermore, a former SEC Chairman
has several times pleaded with Congress to establish lengthier
limitations periods for SEC disgorgements.  See Letter from SEC
Chairman Jay Clayton, Nov. 17, 2019, reprinted in 165 Cong. Rec.
H8931-32 (daily ed. Nov. 18, 2019),
https://www.congress.gov/116/crec/2019/11/18/CREC-2019-11-18-
pt1-PgH8929.pdf; Testimony on "Oversight of the Securities and
Exchange Commission: Hearing Before the S. Comm. on Banking,
Housing, & Urban Affs., 116th Cong. 24 (Nov. 17, 2020)
(statement of Jay Clayton, Chairman, SEC),

A454

of Congress previously sought to amend the Securities and
Exchange Act ("Exchange Act") to extend the statute of
limitations on disgorgement actions.  <u>See, e.g.,</u> Investor
Protection and Capital Markets Fairness Act, H.R. 4344, 116th
Cong. (2019); Securities Fraud Enforcement and Investor
Compensation Act, S. 799, 116th Cong. (2019).[13]  Retroactivity
adequately fulfills Congress' intent to undo the effects of
<u>Kokesh</u>.

　　　Therefore, the text, context, and legislative history of
the NDAA all suggest an explicit mandate for retroactive
application of the ten-year statute of limitations.

---

https://www.banking.senate.gov/imo/media/doc/Clayton%20Testimony
%2011-17-202.pdf.

　　　[13] Before the NDAA's passage Congressmen decried <u>Kokesh</u> as a
"boon to white collar criminals" and described expanding the
statute of limitations for disgorgement as a solution that
"would ensure the SEC [had] the tools it [needed] to hold bad
actors accountable."  165 Cong. Rec. H8930 (daily ed. Nov. 18,
2019) (statement of Rep. Green).  After its passage, some
members of Congress touted Section 6501 as an effort to
strengthen the SEC.  <u>See</u> Press Release, House Committee on
Financial Services, Waters Statement on Inclusion of Key
Democratic Financial Services Bills in FY 2021 NDAA (Dec. 3,
2020),
https://financialservices.house.gov/news/documentsingle.aspx?Doc
umentID=407049 (citing the NDAA as one of the "measures that
will help law enforcement prevent these criminals from using
shell companies to hide their activities and will close
loopholes and increase penalties on those bad actors who are
using our system for activities that threaten the U.S. and our
allies").

A455

The Defendants raise two main counterarguments to the conclusion that Congress' language indicates an express mandate of retroactivity; this Court finds both unpersuasive.

First, the Defendants argue that the language **"commenced on or after"** has already been considered insufficient to allow retroactive application in the context of Sarbanes-Oxley, Pub. L. No. 107-204, § 804, 116 Stat. 745, 801 (codified in part at 28 U.S.C. § 1658(b)) (emphasis added). Taylor Mem. 12-13. The Defendants are correct that several circuit and district courts have held that the language "commenced on or after" **alone** is not an "express retroactivity command." Aetna Life Ins. Co. v. Enter. Mortg. Acceptance Co., 391 F.3d 401, 406-07 (2d Cir. 2004), as amended (Jan. 7, 2005); Lieberman, 432 F.3d at 487-91; Foss v. Bear, Stearns and Co., Inc., 394 F.3d 540, 542 (7th Cir. 2005); In re ADC Telecommunications, Inc. Sec. Litig., 409 F.3d 974, 977-78 (8th Cir. 2005); Quaak v. Dexia S.A., 357 F. Supp. 2d 330, 336-37 (D. Mass. 2005) (Saris, J.) (listing cases).

These cases, however, are distinguishable from the case at bar. Notably absent from the language of Sarbanes-Oxley are the words "pending on," which provide a key indication of Congress' intent to address temporal scope. See Landgraf, 511 U.S. at 259-60. In this vein, courts have specifically distinguished the language "pending on, or commenced on or after" from that of Sarbanes-Oxley, while describing why Sarbanes-Oxley lacks an

[37]

A456

express mandate of retroactivity. <u>See</u> <u>Enter. Mortg. Acceptance</u>
<u>Co.</u>, 391 F.3d at 406-07. The text of Sarbanes-Oxley is also
distinct from that of the NDAA because it contains specific
language indicating that nothing in the statute ought be read as
creating a new cause of action; courts have held that this
language weighs against finding a clear Congressional
retroactivity mandate. <u>See, e.g.</u>, <u>id.</u> at 407 ("Plaintiff's
argument that Sarbanes-Oxley unambiguously revived previously
expired securities fraud claims is also not assisted by Section
804(c), which states: 'Nothing in this section shall create a
new, private right of action.'" (quoting Sarbanes-Oxley, Pub. L.
No. 107-204, § 804, 116 Stat. 745, 801 (codified in part at 28
U.S.C. § 1658(b)))).

Second, the Defendants claim that the SEC-enforcement
action at issue here is unique because it seeks to revive
moribund or stale claims. <u>See, e.g.</u>, Taylor Mem. 1, 13. This
argument falls short. For one, it is unclear whether the NDAA
can in actuality be classified as reviving a lost right. Cases
that discuss the revival of stale claims distinguish between
statutes of limitations and statutes of repose, highlighting the
latter as "unequivocally creat[ing] a new cause of action." <u>See</u>
<u>Lieberman</u> 432 F.3d at 490 (describing how the claims at issue in
that case "had been extinguished by a statute of repose, not
merely by a statute of limitations" (emphasis omitted)). In

[38]

A457

general, statutes of limitations "bear on the availability of remedies," whereas statutes of repose affect the "underlying right." See P. Stolz Fam. P'ship L.P. v. Daum, 355 F.3d 92, 102 (2d Cir. 2004) (citing Calvin W. Corman, Limitation of Actions, § 1.1, at 4-5 (1991)).  The statute at hand expands a statute of limitations, not a statute of repose, as it affects the availability of a remedy.  See NDAA § 6501 (defining when the SEC may bring a claim for "disgorgement"); Kokesh, 137 S. Ct. at 1639 (defining the NDAA's predecessor statute as a "statute of limitations").  Liability in a SEC enforcement action can exist without disgorgement -- they are separate elements of a SEC action.  See John D. Ellsworth, Disgorgement in Securities Fraud Actions Brought by the SEC, 1977 Duke L. J. 641, 641 & n.1, 647 (1977) (discussing SEC v. Texas Gulf Sulphur Co., 258 F. Supp. 262 (S.D.N.Y. 1966), the case in which the SEC first argued for the "right to seek restitution of the ill-gotten profits of securities law violators").  In fact, before the district courts began issuing disgorgement as a remedy, the SEC had to resort to other forms of recourse such as injunctive relief and voluntary restitution.  See id. at 642-43.  Therefore, the NDAA's expansion of the statute of limitations for **disgorgement** addressed the limitations on a remedy -- not a right.

Furthermore, even if this case were construed as reviving a stale claim via the NDAA, Congress has the power to revive stale

[39]

A458

claims as long as it does so clearly.  See Resol. Tr. Corp. v. Seale, 13 F.3d 850, 853 (5th Cir. 1994) ("Congress can revive stale claims but must do so clearly."); see also Robbins & Myers, Inc., 429 U.S. at 243 (holding that amendment to limitations period for filing complaints with Equal Employment Opportunity Commission ("EEOC") applied to previously expired but currently pending claim because of clear language); Bank Markazi v. Peterson, 578 U.S. 212, 229 (2016) ("Congress may indeed direct courts to apply newly enacted, outcome-altering legislation in pending civil cases.").  This is precisely what Congress has done here through its express language.[14]

Given this Court's holding that the language of the NDAA constitutes an express mandate of retroactivity as to both pending claims and claims commenced after the statute's passage, this Court need not and does not proceed to the second step of the Landgraf test.

### a. Ex Post Facto Concerns

The Defendants also object to the applicability of the ten-year statute of limitations by claiming that it violates the Ex

_____

[14] The Defendants also raise the argument that the NDAA's attempted revival of stale claims "[u]ndercuts the [v]ery [p]urpose of [s]tatutes of [l]imitations.  Taylor Mem. 17.  This argument fails for similar reasons as their other objections.  Given Congress' clear power retroactively to alter statutes of limitations, see Seale, 13 F.3d at 853, it is simply unpersuasive.

Post Facto Clause of the Constitution.  See, e.g., Taylor Mem. 14-17.[15]  The first step of the Ex Post Facto analysis is to determine whether a statute is civil or criminal.  Smith v. Doe, 538 U.S. 84, 92 (2003).  In making this determination courts ask "whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other" -- criminal or civil.  Hudson v. United States, 522 U.S. 93, 100 (1997) (quotations omitted). "If the intention of the legislature was to impose punishment, that ends the inquiry."  Smith, 538 U.S. at 92.

Here, disgorgement is denominated as a civil remedy by the Exchange Act.  See 15 U.S.C. § 78u(d).  The "ordinary meaning,"

_____

[15] While the Defendants do not raise this objection, a common objection to applying statutes retroactively is that they may cause a due process violation.  The retroactive application of a statute that restores a lost remedy via expanding the statute of limitations does not violate due process.  See Chase Securities Corp. v. Donaldson, 325 U.S. 304, 315-316 (1945) (ruling that extension of a state law's statute of limitations did not offend 14th Amendment due process); see also Robbins & Myers, Inc., 429 U.S. at 241-44 (ruling that "Congress might constitutionally provide for retroactive application of the extended limitations period" for filing charges with the EEOC, provided by the 1972 amendments to Title VII, which professed to "be applicable with respect to charges pending with the [EEOC] on the date of enactment of [the amendments] and all charges filed thereafter").  Importantly, "[t]his is not a case where [the Defendants'] conduct would have been different if the present rule had been known and the change foreseen." Donaldson, 325 U.S. at 316 (1945) ("It does not say, and could hardly say, that it sold unregistered stock depending on a statute of limitation for shelter from liability.").  Therefore, applying retroactively the NDAA's extended limitations period does not violate due process.

[41]

A460

Mohamad v. Palestinian Auth., 566 U.S. 449, 454 (2012), of the
text demands this conclusion.  The Exchange Act allows
disgorgement "of any unjust enrichment by the person who
received such unjust enrichment as a result of such violation."
15 U.S.C. § 78u(d)(3)(ii).  Unjust enrichment claims lie in
equity, not law, Fed. Deposit Ins. Corp. v. Bank of Am., N.A.,
308 F. Supp. 3d 197, 202 (D.D.C. 2018), making them civil and
non-punitive in nature.  Furthermore, "[i]t is a fundamental
canon of statutory construction that the words of a statute must
be read in their context and with a view to their place in the
overall statutory scheme."  Davis v. Mich. Dep't of Treasury,
489 U.S. 803, 809 (1989).  The Exchange Act empowers district
courts with the authority to order disgorgement, and the SEC to
pursue disgorgement, **alongside** other civil remedies.  See id. §
78u(d)(3)(A); see also Kellen, 2021 U.S. Dist. LEXIS 204153, at
*9-10 (arguing that both of these pieces of evidence support
that the NDAA does not violate the Ex Post Facto Clause).

     The Court's inquiry does not stop here, however.  Even if
"the intention was to enact a regulatory scheme that is civil
and nonpunitive, we must further examine whether the statutory
scheme is 'so punitive either in purpose or effect as to negate
[the State's] intention to deem it civil.'"  Smith, 538 U.S. at
92 (quoting Kansas v. Hendricks, 521 U.S. 346, 361 (1997)).  The

[42]

A461

Supreme Court has determined that this analysis turns on whether the regulatory scheme:

> has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.

Id. at 97.  The Court "ordinarily defer[s] to the legislature's stated intent," Hendricks, 521 U.S. at 361, and "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty," Hudson, 522 U.S. at 100 (quotations omitted); see also United States v. Ward, 448 U.S. 242, 249 (1980).

First, disgorgement has not been historically regarded as punishment.  As discussed earlier, disgorgement that seeks to remedy unjust enrichment is equitable in nature and equity "historically excludes punitive sanctions."  Liu, 140 S. Ct. at 1940.  The Supreme Court's decision in Liu further anchored this historical notion by cabining disgorgement to a wrongdoer's net profits and requiring that such awards be returned to the victims.  See id.  Well before the cabining of SEC enforcement power by Liu, however, courts "repeatedly stressed that [] disgorgement is an equitable, not a punitive, remedy" and applied this concept in limiting the boundaries of the disgorgement remedy.  See Elaine Buckberg & Frederick C. Dunbar, Disgorgement: Punitive Demands and Remedial Offers, 63 Bus. Law

[43]

A462

347, 357 (2007-2008).  In fact, several sister circuits agree that disgorgement has not "historically been viewed as punishment."  See SEC v. Palmisano, 135 F.3d 860, 866 (2d Cir. 1998); see also United States v. Bank, 965 F.3d 287, 299 (4th Cir. 2020) (concluding so based on an analysis of double jeopardy); United States v. Dyer, 908 F.3d 995, 1002-03 (6th Cir. 2018) (adopting SEC v. Palmisano's rationale as persuasive in concluding disgorgement is civil).

Second, the law does not impose an affirmative disability or restraint.  The paradigmatic test for whether a statute burdens defendants in this way is whether it "restrain[s] [the] activities" in which defendant may engage.  See Smith, 538 U.S. at 100.  There is no doubt that disgorgement simply imposes duties of monetary repayment and, unlike bars, does not limit what types of behaviors or work in which defendants may engage. See Rizek v. SEC, 215 F.3d 157, 161 (1st Cir. 2000) (discussing the conditions upon which the SEC may impose a bar).

Third, disgorgement has a rational connection to a non-punitive purpose.  It seeks to make violations less profitable by "depriving violators of the fruits of their illegal conduct." SEC v. Contorinis, 743 F.3d 296, 301 (2d Cir. 2014).  The Supreme Court has entrenched disgorgement's non-punitive character in the context of securities violations, by requiring that it be used to make victims whole.  See Liu, 140 S. Ct. at

[44]

A463

1947-49.  Other courts are in accord that disgorgement does not
have a punitive purpose or result.  See SEC v. Happ, 295 F.
Supp. 2d 189, 198 (D. Mass. 2003) (Keeton, S.J.) (acknowledging
disgorgement as not punitive), aff'd, 392 F.3d 12 (1st Cir.
2004); SEC v. Gordon, 822 F. Supp. 2d 1144, 1159-61 (N.D. Okla.
2011) (holding disgorgement to be non-punitive in nature and
rejecting the argument that it triggered application of the
Double Jeopardy clause when levelled in tandem with a criminal
conviction for insider trading violations), aff'd, 522 F. App'x
448 (10th Cir. 2013).

   Disgorgement does not necessarily promote the aims of
traditional punishment -- such as "incapacitation [or]
retribution," Doe v. Snyder, 834 F.3d 696, 704 (6th Cir. 2016) -
- and is not excessive here in light of the violation in
question.  That a statute might deter crime is not determinative
of whether it serves the functions of traditional punishment.
Smith, 538 U.S. at 102.  In ordering disgorgement "the court may
exercise its equitable power only over property causally related
to the wrongdoing."  SEC v. First City Fin. Corp., 890 F.2d
1215, 1231 (D.C. Cir. 1989).  Such a measured imposition of
liability is neither retributive, nor does it seek to
incapacitate defendants.  Furthermore, it does not exceed the
bounds of the violative conduct.

[45]

A464

Finally, for reasons similar to those outlined by this Court, two other district courts have ruled that retroactive application of the NDAA's ten-year statute of limitations does not violate the Ex Post Facto Clause.  See Gallison, 2022 U.S. Dist. LEXIS 35810, at *16 ("Accordingly, the NDAA's extension of the statute of limitations applicable to disgorgement does not violate the Ex Post Facto Clause."); Kellen, 2021 U.S. Dist. LEXIS 204153, at *10 (concluding the same).

The Defendants have, therefore, in no way met their burden of providing the "clearest proof" that disgorgement is "punitive in either purpose or effect."  Ward, 448 U.S. at 251.  The Defendants' primary counterargument is that, because Kokesh held disgorgement to be a penalty within the meaning of 28 U.S.C. § 2462, it must be punitive in nature.  See Taylor Mem. 15.  This is unpersuasive for at least two reasons: (1) Kokesh "is limited to its interpretation of Section 2462 and does not inform whether disgorgement is a criminal penalty for purposes of the Ex Post Facto Clause," Gallison, 2022 U.S. Dist. LEXIS 35810, at *13-14; and (2) Kokesh provides no insight into Congressional intent as to the 2021 amendments to the Exchange Act -- which is the center of this Court's Ex Post Facto inquiry, see Hudson, 522 U.S. at 99-100 (delineating that the analysis for determining whether a statute is violative of the Ex Post Facto Clause begins not with the Supreme Court's reasoning, but with

[46]

A465

the **legislature's** intent and whether it meant to impose a
punitive sanction).

      2.    **Whether the Allegations Are Timely Pled**

    Having now determined the appropriate statute of
limitations for scienter-based disgorgement claims, this Court
next moves to determining: (a) what is the relevant statute of
limitations for each claim alleged by the SEC; and (b) whether
each claim contains sufficient allegations within the applicable
limitations period.

      a.    **What Statute of Limitations Applies to Each Claim**

    The SEC seeks injunctive relief, civil monetary penalties,
disgorgement, and orders barring the defendants from engaging in
future trades.  See Am. Compl. ¶ 307(A)-(L).

    First, this Court holds that Section 6501 applies
retroactively to expand the statute of limitations to **ten-years**
as to **scienter-based** claims for **disgorgement,** which include
violations of:

> (I) section 10(b);
> (II) section 17(a)(1) of the Securities Act of
> 1933 (15 U.S.C. 77q(a)(1));
> (III) section 206(1) of the Investment Advisers
> Act of 1940 (15 U.S.C. 80b-6(1)); or
> (IV) any other provision of the securities laws
> for which scienter must be established.

15 U.S.C. 78u(d)(8)(A)(ii).  **Non-scienter-based** claims for
**disgorgement** continue to require a **five-year** statute of
limitations under the NDAA, see id. § 78u(d)(8)(A)(i), as they

[47]

A466

did under Kokesh, see 28 U.S.C. § 2462; Kokesh, 137 S. Ct. at 1639.[16]

Second, the statute of limitations for **civil penalties** has always been set at five-years under 28 U.S.C. § 2462. See Gabelli v. SEC, 568 U.S. 442, 445 (2013). As the SEC concedes, this statute of limitations remains unchanged by the NDAA. See SEC's Opp'n Veldhuis 15; see also Gallison, 2022 U.S. Dist. LEXIS 35810, at *13 n.14 (noting the same).

Third, it was previously unclear what statute of limitations applied to claims for **injunctive relief**, for both scienter and non-scienter-based violations. Compare SEC v. Graham, 823 F.3d 1357, 1362 (11th Cir. 2016) (applying no statute of limitations "[b]ecause injunctions are equitable, forward-looking remedies and not penalties within the meaning of § 2462" and therefore "the five-year statute of limitations is inapplicable") with SEC v. Cohen, 332 F. Supp. 3d 575, 594 (E.D.N.Y. 2018) (applying a five-year statute of limitations depending on the nature of the injunction). The SEC argues that there was previously no statute of limitations for these claims. See SEC Opp'n Gasarch 6-7. Under the NDAA, these remedies are

_____

[16] Although it does not make a practical difference, the NDAA also applies retroactively to govern the statute of limitations of non-scienter-based disgorgement claims, see NDAA § 6501, for the same reasons described above, see supra Section V.A.1.

[48]

A467

currently subject to the ten-year statute of limitations.  See

15 U.S.C. § 78u(d)(8)(B).  Sexton argues that the injunctions at

issue in this case are subject to a five-year statute of

limitations because they operate as penalties under Kokesh and

pursuant to Section 2462.  See Sexton Mem. 19; see also Cohen,

332 F. Supp. 3d at 594-95.  The NDAA applies retroactively as to

equitable remedies including injunctions and does not violate

the Ex Post Facto Clause for the same reasons as those stated

for disgorgement, see supra Section V.A.1.  Therefore, the ten-

year statute of limitations applies, and this Court need not

assess whether the injunctions in the case at bar would be

deemed penalties under the Kokesh standard.

     The SEC filed the original Complaint on August 5, 2021.

See Compl. 1.  The applicable limitations period thus runs **from

August 5, 2016 to August 5, 2021** for **civil penalties and non-

scienter-based disgorgement claims**.  The applicable limitations

period for **scienter-based disgorgement claims and injunctions**

spans from **August 5, 2011** to **August 5, 2021**.  No briefing or

objections have been raised as to the bars; thus, this Court

reserves any concomitant questions on those particular remedies

for a later stage.

     The SEC raises claims under Sections 17(a)(1) and (3), 5(a)

& (c), 15(b) of the Securities Act and Sections 10(b), 13(d),

and 20(e) of the Exchange Act.  Am. Compl. 250-307.  Claims

[49]

A468

brought pursuant to sections 10(b) of the Exchange Act and Rule 10b-5 thereunder, and 17(a)(1) of the Securities Act are explicitly defined as claims to which the ten-year statute of limitations applies for disgorgement under the NDAA, see NDAA § 6501, although the five-year statute of limitations continues to apply to civil penalties sought pursuant to these acts, see 28 U.S.C. § 2462.

The NDAA's ten-year statute of limitations also applies to "any other provision of the securities laws for which scienter must be established." NDAA § 6501. "Scienter is a mental state embracing intent to deceive, manipulate, or defraud. [The First Circuit] has held that a plaintiff can demonstrate scienter by showing that defendants either consciously intended to defraud, or that they acted with a high degree of recklessness." Mississippi Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp., 523 F.3d 75, 85 (1st Cir. 2008) (citations and quotations omitted).

Sections 17(a)(3) and 5(a) & (c) of the Securities Act, and Section 13(d) of the Exchange Act are not scienter-based because neither their governing statutes nor the caselaw interpreting them require scienter. See 15 U.S.C. § 77q(a)(3) (governing Section 17(a)(3) of the Securities Act and not requiring scienter); SEC v. Ficken, 546 F.3d 45, 47 (1st Cir. 2008) (requiring only a showing of negligence for 17(a)(3) claims); 15 U.S.C. § 77e(a),(c) (governing Sections 5(a) and (c) of the

[50]

A469

Securities Act and not requiring scienter); SEC v. CMKM Diamonds, Inc., 729 F.3d 1248, 1256 (9th Cir. 2013) (noting that a majority of circuit courts have concluded that "scienter is not an element of Section 5 liability"); 15 U.S.C. § 78m(d) (governing Section 13(d) of the Exchange Act and requiring no scienter); SEC v. Levy, 706 F. Supp. 61, 69 (D.D.C. 1989) ("[S]cienter is not an element that plaintiff must prove under section 13(d)."). These are therefore subject to the five-year statute of limitations regardless whether disgorgement or civil penalties are sought. See NDAA § 6501; 28 U.S.C. § 2462.

The only remaining claims are those brought under Section 20(e) of the Exchange Act and 15(b) of the Securities Act. These types of claims require knowing or reckless behavior. 15 U.S.C. § 78t(e) (governing Section 20(e) of the Exchange Act and requiring knowledge or recklessness); 15 U.S.C. § 77o(b) (governing Section 15(b) of the Securities Act and requiring knowledge or recklessness). Claims that require knowledge or recklessness constitute scienter-based claims, see Bos. Sci. Corp., 523 F.3d at 85, therefore these claims are governed by the ten-year statute of limitations for disgorgement. They nevertheless remain subject to the five-year statute of limitations for civil penalties. See 28 U.S.C. § 2462.

> **b.    Sufficient Allegations Exist Under Either Statute of Limitations.**

[51]

Several of the Defendants argue that at least some claims against them ought be dismissed because, even if the ten-year statute of limitations applies for scienter-based disgorgement claims, the SEC has not alleged sufficient facts in the complaint to establish that violations occurred within the five-year statute of limitations for purposes of the civil penalty- and non-scienter-based disgorgement claims. <u>See</u> Sexton Mem. 20; Taylor Mem. 6-10; Gasarch Mem. 5-6; Friesen Mem. 7; Kelln Mem. 20; Veldhuis Mem. 11 (incorporating arguments from other memoranda by reference).

The SEC rebuts that, where applicable, the five-year statute of limitations should be tolled for time spent outside the United States and that it has alleged sufficient facts within the five-year period sustain its claims. <u>See</u> SEC's Opp'n Taylor 16-18; SEC's Opp'n Sexton 1, 18-19; SEC's Opp'n Gasarch 4-5, 9-10; SEC's Opp'n Kelln 17-18; SEC's Opp'n Veldhuis 15-16.

This Court concludes that the allegations are timely under both the ten-year and the five-year statute of limitations, for each respective type of claim, for the following reasons: (i) the SEC has timely pled facts on the face of the Amended Complaint for each Defendant; and (ii) the five-year statute of limitations for non-scienter-based disgorgement and civil penalties is not applicable for individuals who have not been present within the United States for the last five years --

[52]

therefore it is unclear whether the SEC even needed to plead

facts within the five-year period for all Defendants.

> **i.    Allegations are Timely on the Face of the Complaint.**

Generally, seeking dismissal based on a statute of

limitations having run is an affirmative defense.  <u>See</u> Fed. R.

Civ. P. 8(c); <u>Martínez-Rivera</u> v. <u>Puerto Rico</u>, 812 F.3d 69, 73

(1st Cir. 2016) (citing <u>Bowles</u> v. <u>Russell</u>, 551 U.S. 205, 218-19

(2007)) ("As a general matter, statutes of limitations are

affirmative defenses rather than jurisdictional bars.").  A

Court can consider affirmative defenses at the motion to dismiss

stage and may dismiss a complaint if the allegations taken as

true show the action is time barred.  <u>Jones</u> v. <u>Bock</u>, 549 U.S.

199, 215 (2007).  More specifically, if the face of the

complaint "**conclusively establish[es]** the affirmative defense"

then the Court may grant dismissal on that basis.  <u>In re</u>

<u>Colonial Mortg. Bankers Corp.</u>, 324 F.3d 12, 16 (1st Cir. 2003)

(emphasis added); <u>Poirier v. Massachusetts Dep't of Corr.</u>, 160

F. Supp. 3d 399, 404 (D. Mass. 2016) (Hillman, J.) (citing <u>In re</u>

<u>Colonial</u>, 324 F.3d at 16) (describing it as a two-step process:

determining whether (1) facts that buttress the affirmative

defense are ascertainable from the complaint, incorporated

documents, matters of public record, and facts of which the

Court may take judicial notice; and (2) these facts conclusively

[53]

A472

establish the affirmative defense), <u>on reconsideration</u>, 186 F.
Supp. 3d 66 (D. Mass. 2016), <u>aff'd</u>, No. 16-1587, 2018 WL
11337451 (1st Cir. Feb. 22, 2018).  "Where the dates included in
the complaint show that the limitations period has been exceeded
and the complaint fails to sketch a factual predicate that would
warrant the application of either a different statute of
limitations period or equitable estoppel, dismissal is
appropriate."  <u>Trans-Spec Truck Serv., Inc.</u> v. <u>Caterpillar Inc.</u>,
524 F.3d 315, 320 (1st Cir. 2008) (quotations omitted).

   In securities cases, however, "[t]he [SEC] has the burden
of pleading and proving facts demonstrating the timeliness of
its action . . . ."  <u>SEC</u> v. <u>Tambone</u>, 802 F. Supp. 2d 299, 304
(D. Mass. 2011) (Gorton, J.) (citing <u>Young</u> v. <u>Lepone</u>, 305 F.3d
1, 8 (1st Cir. 2002)) ("When the defendant in a securities fraud
case pleads the statute of limitations as an affirmative
defense, the plaintiff normally has the burden of pleading and
proving facts demonstrating the timeliness of her action.")).
Furthermore,

> This general rule applies with particular force to §
> 2462, which prohibits the court from "entertain[ing]"
> actions that accrued more than five years earlier and
> seeking certain forms of relief.  Allowing discovery
> to proceed with respect to claims that appear to be
> time-barred on the face of a plaintiff's complaint
> would constitute "entertain[ing]" those claims, which
> § 2462 clearly prohibits.

[54]

A473

Cohen, 332 F. Supp. 3d at 587 (alterations in original).  The
SEC, then, must meet a high bar when objections as to timeliness
are raised.  The SEC has, however, met this burden; in other
words, "based on timely-pled allegations alone" the SEC alleges
sufficient facts to support its claims.  SEC v. Fiore, 416 F.
Supp. 3d 306, 331 (S.D.N.Y. 2019).

There appears to be little argument that the allegations
are timely under the ten-year statute of limitations.  See
generally Taylor Mem.; SEC Opp'n Taylor.  Therefore, this Court
focuses its inquiry on whether there are sufficient allegations
within the five-year statute of limitations for the SEC to raise
civil penalties and disgorgement for non-scienter-based claims.

The SEC states several times in its complaint that all of
the Defendants committed an assortment of violations from 2010
to 2019 -- which contains the relevant five-year time period
starting in August 2016.  See Am. Compl. ¶¶ 1, 5, 42-43, 68.
Furthermore, the complaint contains specific allegations as to
every defendant within the relevant time period.  For example,
at the end of 2016 **Veldhuis**, **Sexton** and **Friesen** conducted
unregistered sales of millions of Stevia First/Vitality shares.
Id. ¶¶ 125, 134.  At the same time, the Veldhuis Control Group
also surreptitiously funded a promotional campaign by Kaitz,
which encouraged these stock sales by disseminating allegedly
false information.  Id. ¶ 125, 149.  At various times in 2016

[55]

A474

Veldhuis, Sexton, and Friesen sent numerous wire transfers to Stevia First/Vitality, which in exchange issued shares to Sharp-controlled nominee entities; this and other services provided by Sharp enabled the Veldhuis Control Group to sell restricted Stevia First/Vitality stock to the public, without registering it, even though the nominees were Stevia First/Vitality affiliates.  Id. ¶¶ 142-43.

At least until December 2016 **Taylor** sold millions in Stevia First/Vitality stocks via Sharp-Group administered nominee entities.  Id. ¶ 134.  He also received funds, and redistributed part of them to Dhillon, during this period.  Id. ¶ 152.  Taylor engaged in fraudulent sales of another company, Arch's, stock into 2017 directing sales through nominee entities to skirt registration requirements.  Id. ¶ 184.  He also signed and backdated fraudulent Option Agreements to justify his payments to Dhillon and provided these documents to Canadian regulators in 2021.  Id. ¶ 191.

**Kelln** helped recruit attorneys for the Sharp Group in 2016 and 2018 to create fraudulent opinion letters to legitimize the unregistered sale of restricted Stevia First/Vitality stock.  Id. ¶ 144.  In 2017, Kelln directed the redistribution of funds among nominee entities to help clients skirt the five percent disclosure required of Section 13(d) of the Exchange Act.  Id. ¶ 147.

[56]

A475

Throughout 2016 and 2017, **Gasarch** created fictitious invoices, loan and subscription agreements, and other documents for Sharp Group nominee entities that were used to cover up the fraudulent payments to clients from the Sharp-Group. Id. ¶ 58. Specifically, the SEC cites four documents that Gasarch made and sent from August 2016 to October 2017. Id. Gasarch also communicated with transfer agents pretending to be the nominal owner of Sharp-Group administered entities in furtherance of the scheme and helped move clients' shares to the transfer agents in 2016, 2017, and 2018. Id. ¶¶ 61-62. It ought be noted that Gasarch claims she gave birth in 2016 and took leave from the Sharp Group, see Gasarch Mem. 1 n.1; this court must, however, accept the SEC's well pled allegations as true at the motion to dismiss stage.

Gasarch and Kelln received $1,000,000 each of funds from the Sharp Group's conduct and some of these payments continued on from 2016 to 2019. Id. ¶ 68.

This is by no means an exhaustive list of the SEC's post-2016 allegations, yet these facts alone establish a sufficient basis for the timeliness of the SEC's complaint -- even in the absence of application of tolling provisions. To the extent that there is doubt regarding whether these claims are sufficient to allege "violations" within the relevant time period, this memorandum later addresses the sufficiency of the

[57]

allegations with respect to each claim.  See infra Section
V.B.2.

    The Defendants argue that certain factual allegations are
insufficient to establish timeliness, because they are only
indicative of residual benefits from a much earlier violation;
for example, funds received in 2016 are simply benefits from
violations which occurred mainly in 2012.  See, e.g., Sexton
Mem. 3.  This is unpersuasive for two reasons: (1) first, as
discussed in more detail below, the SEC makes sufficient
allegations of **violations** not just receipt of funds within the
five-year statute of limitations for each Defendant, see infra
Section V.B.2; (2) second, to the extent the Defendants
challenge the accuracy of the SEC's timeline, determination of
this issue would be premature.  It is well-established in this
Circuit that "[w]here questions of fact are presented, statute
of limitations defenses are ordinarily submitted to the jury."
Melendez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F.3d 30, 38
(1st Cir. 2001).  In particular, "when accrual actually occurred
in a particular case is a question of fact to be resolved by the
fact finder."  Duke v. Cmty. Health Connections, Inc., 355 F.
Supp. 3d 49, 56 (D. Mass. 2019) (Hillman, J.) (quotations
omitted).

       **ii.  The Five-Year Statute of Limitations Does Not
Apply to Individuals Who Have Been Absent from
the United States.**

[58]

A477

For several of the Defendants the five-year statute of limitations may not apply to civil penalties and may not have begun to run for non-scienter-based disgorgement claims. Both civil penalties and non-scienter-based claims for disgorgement continue to be subject to a five-year statute of limitations, notwithstanding Section 6501. See 28 U.S.C. § 2462 (imposing a five-year statute of limitations on civil penalties); 15 U.S.C. § 78u(d)(8)(A)(i) (imposing a five-year statute of limitations on non-scienter-based disgorgement claims). Each statute, however, includes modifications to the limitations provisions for time spent outside the United States.

**Civil penalties** are governed by 28 U.S.C. § 2462, which dictates that an action "shall not be entertained **unless** commenced within five years from the date when the claim first accrued **if, within the same period, the offender or the property is found within the United States** in order that proper service may be made thereon." 28 U.S.C. § 2462 (emphasis added). How this requirement ought be applied is matter of first impression within the Circuit.

The Southern District of New York, however, has read this requirement to mean that if a Defendant has not been found in the United States at any time during the limitations period, or within five years of when the claim first accrued, then a claim

[59]

A478

is actionable -- even if more than five years have elapsed since the SEC's claims first accrued.  <u>SEC</u> v. <u>Straub</u>, 921 F. Supp. 2d 244, 259-61 (S.D.N.Y. 2013); <u>see also</u> <u>SEC</u> v. <u>Wey</u>, 246 F. Supp. 3d 894, 935 (S.D.N.Y. 2017) ("For the reasons cited in Judge Sullivan's opinions [<u>Straub</u>, 921 F.Supp.2d at 260], the Court finds that the limitations period has not run as to claims for civil penalties against [the defendant] as he has not been present in the United States during the five-year period."). The Southern District of New York also clarified that the statute does not operate like a tolling provision:

> For the foregoing reasons, the Court finds that actions covered by Section 2462 are subject to a five-year statute of limitations that applies if the defendant is present in the United States at any time during that five-year period, which begins to run on the date the subject claim accrues and does not toll while the defendant is absent from the United States. The Court also finds that the limitations period does not apply at all if the defendant is not present in the United States at any point during the five-year period.

<u>SEC</u> v. <u>Straub</u>, No. 11 CIV. 9645 (RJS), 2016 WL 5793398, at *19 (S.D.N.Y. Sept. 30, 2016).

**Non-scienter-based disgorgement** claims are governed by Section 6501, which provides that, for purposes of calculating the limitations period, "any time in which the person against which the action or claim, as applicable, is brought is outside of the United States shall not count towards the accrual of that

[60]

A479

period." See NDAA § 6501; 15 U.S.C. § 78u(d)(8)(C).[17]  A date of

accrual is when a statute of limitations begins to run.  See

Carreras-Rosa v. Alves-Cruz, 127 F.3d 172, 174 (1st Cir. 1997).

Taking the "ordinary" meaning of the statute's text, Wisconsin

Cent. Ltd., 138 S. Ct. at 2074, this Court reads this provision

to entail that the statute of limitations does not **begin to run**

until the defendant sets foot in the United States.

    The Amended Complaint makes several allegations that are

relevant to whether the five-year statute of limitations does

not apply to (as to civil penalties), or has not yet begun to

run for (as to non-scienter-based disgorgement), the Defendants:

(1) the Complaint alleges that Taylor, Friesen, Veldhuis,

Sexton, Kelln, and Gasarch all reside in Canada and spend most

of their time there, Am. Compl. ¶¶ 23-29; (2) Sexton visited

Dhillon in the United States once in 2014 and claims to have

made several other trips to the United States since, id. ¶ 120;

Sexton Mem. 6 n.5; (3) while the face of complaint makes no

mention of Taylor or Gasarch's presence in the United States,

_____

[17] The five-year statute of limitations for non-scienter-
based disgorgement claims remained constant, at five years, pre-
and post-adoption the NDAA, although it was previously governed
by 28 U.S.C. § 2462 and later became governed by 15 U.S.C. §
78u(d)(8)(C).  See supra Section V.A.2.a.  Because the statutes
of limitations for disgorgement claims (and the manner in which
they are to be calculated) are governed by Section 6501 and it
applies retroactively, see supra Section V.A., it controls the
standard for time spent outside the United States.

[61]

A480

see SEC Opp'n Gasarch 5; see generally Am. Compl., Taylor claims
he visited the United States on numerous occasions, Taylor's
Opp'n Am. Compl. 7, and Gasarch's counsel represents that she
"traveled to the United States for personal reasons during the
limitations period," see Gasarch's Opp'n Am. Compl. 7 n.2; and
(5) as to the remaining Defendants -- Friesen, Veldhuis, and
Kelln -- neither the Defendants nor the SEC ever allege that
Plaintiffs visited the United States between 2011 and 2019, see
generally Am. Compl.; Kelln Mem. 17 ("There is no allegation
that Kelln ever . . . traveled to the United States during the
relevant time."); SEC Opp'n Kelln 17 (noting Kelln's
concession); SEC's Opp'n Veldhuis 16; Friesen Mem. 2 (noting the
general absence of allegations against Friesen).

As already discussed, see supra Section V.A.2.b.i.,
although the SEC has an affirmative duty to make timely
pleadings on the face of the complaint, Tambone, 802 F. Supp. 2d
at 304, untimeliness is an affirmative defense, see Fed. R. Civ.
P. 8(c)(1); Martínez-Rivera, 812 F.3d at 73, which must be
established conclusively on the face of the complaint, see In re
Colonial, 324 F.3d at 16.  This Court has previously identified
other defenses, such as allegations that the SEC neglected its
duty to investigate fraud, as the defendant's burden.  See
Tambone, 804 F. Supp. 2d at 304.  With the exception of Sexton,
who the SEC admits on the face of the complaint visited the

[62]

A481

United States in 2014, see Am. Compl. ¶ 120, the SEC alleges all
other Defendants were residents of Canada, who spent most of
their time in Canada, see id. ¶¶ 23-29. The SEC then meets its
affirmative burden for timeliness, by raising the plausible
applicability of these limitations-modifying provisions.

Although Taylor and Gasarch claim they have visited the
United States multiple times, both fail to provide any evidence
to support their claims, see Taylor's Opp'n Am. Compl. 7;
Gasarch's Opp'n Am. Compl. 7 n.2, and none of the remaining
Defendants even argue they were present in the United States
during the period. Therefore, Taylor, Gasarch, Kelln, Veldhuis,
and Friesen have failed to meet their burden for levelling this
affirmative defense at the motion to dismiss stage; this entails
that the five-year statute of limitations may either not apply
to, or not have start to run for, these Defendants.
Accordingly, dismissal on this basis would be premature.

**B.  Sufficiency of the Allegations on the Merits**

Almost all of the Defendants move to dismiss the SEC's
claims based on the factual sufficiency of the allegations.
Friesen, Veldhuis, Gasarch, and Kelln challenge the SEC's claims
on the basis that they do not sufficiently plead the elements of
the alleged violations. See Friesen Mem. 10-20; Veldhuis Mem.
8-10; Gasarch Mem. 9-15; Kelln Mem. 7-16. Sexton raises the
Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") pleading

[63]

A482

standard in his motion to dismiss but does not brief the issue, and Taylor does not make claims steeped in factual sufficiency in his motion to dismiss or memorandum in support but does so in his opposition to the SEC's motion for leave to amend the complaint.  *See* Sexton Mot. Dismiss 1; Taylor Opp'n Am. Compl. 4-11; *see generally* Sexton Mem.; Taylor Mem.

This Court concludes that the SEC has sufficiently pled each claim against each Defendant in accordance with the requisite standards.  In so ruling, the Court first, addresses the appropriate pleading standard under Rule 9(b); and second, considers each of the claims raised against the Defendants.  In conducting the latter analysis this Court focuses on the five-year statute of limitations, as the sufficiency of the allegations within this time-period was most contested by the Defendants.

### 1. Standard to be Applied Pursuant to Federal Rule of Civil Procedure 9(b)

This Court applies the Rule 9(b) pleading standard for SEC enforcement actions.  *See* SEC v. Durgarian, 477 F. Supp. 2d 342, 347 (D. Mass. 2007) (Gorton, J.), *aff'd sub nom.* SEC v. Papa, 555 F.3d 31 (1st Cir. 2009).  "In the securities context, this [C]ircuit has strictly applied Rule 9(b)."  Driscoll v. Landmark Bank for Sav., 758 F. Supp. 48, 51 (D. Mass. 1991) (Caffrey, J.).  Rule 9(b) requires that cases sounding in fraud "state

[64]

A483

with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Under Rule 9(b) "[m]alice, intent, knowledge and other conditions of the mind of a person may be averred generally." Id. To satisfy Rule 9(b) a pleading must specify the "time, place and content of an alleged false representation, but not the circumstances or evidence from which the fraudulent intent could be inferred." Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985). "In regards to claims alleging a scheme involving deceptive or manipulative acts, plaintiffs must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and what effect the scheme had on investors in the securities at issue." SEC v. Lee, 720 F. Supp. 2d 305, 338 (S.D.N.Y. 2010). This pleading standard applies to all of the claims brought by the SEC here as they all sound in fraud. See SEC v. Thompson, 238 F. Supp.3d 575, 591 (S.D.N.Y. 2017) (requiring claims brought under Section 10(b) and 17(a) to be pled with particularity); SEC v. Alternative Green Techs., Inc., No. 11 CIV. 9056 SAS, 2012 WL 4763094, at *3 (S.D.N.Y. Sept. 24, 2012) (applying the 9(b) pleading standard to Section 5(a) & (c) claims).

It is important to note that Congress has "impose[d] heightened pleading requirements" even more severe than those laid out in Rule 9(b) "in actions brought pursuant to § 10(b)

[65]

A484

and Rule 10b-5," if the case is a **private enforcement action**.

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 81 (2006).  In these cases, the pleaded facts must give rise to a "strong inference" of scienter -- meaning the plaintiff must plead with particularity the facts that give rise to that inference.  Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322-24 (2007); see also In re Boston Sci. Corp. Secs. Litig., 686 F.3d 21, 30 (1st Cir.2012) (emphasizing the statute's requirement that complaints must "state with particularity facts giving rise to a **strong inference** that the defendant acted with the required state of mind" (emphasis in original) (quoting 15 U.S.C. 78u-4(b)(2)).  A "plaintiff alleging fraud in a § 10(b) action . . . must plead facts rendering an inference of scienter **at least as likely as** any plausible opposing inference."  Tellabs, Inc., 551 U.S. at 328 (emphasis in original).  The Defendants argue that the SEC must meet this heightened pleading standard in this action.  See Veldhuis Mem. 10 ("[T]he SEC's fraud claims fail to plead facts that could support a 'strong inference' of scienter against Veldhuis individually."); Kelln Mem. 11 (seeking application of 'strong inference' standard); Friesen Mem. 17 (same).  As the SEC appropriately argues, this heightened pleading standard does not apply to enforcement actions.  See SEC Opp'n Veldhuis 15 ("Veldhuis is incorrect when he argues that the Commission needs

[66]

A485

to plead a 'strong inference of scienter.'" (quoting Veldhuis
Mem. 9)).

    The First Circuit has **outright rejected** that the "strong
inference" requirement is applicable to SEC enforcement actions.
Papa, 555 F.3d at 35 n.1 (citing SEC v. Tambone, 550 F.3d 106,
119-20 (1st Cir. 2008), reh'g en banc granted, opinion
withdrawn, 573 F.3d 54 (1st Cir. 2009), and opinion reinstated
in part on reh'g, 597 F.3d 436 (1st Cir. 2010)).  This comports
with common practice by other Courts.  See, e.g., SEC v. Dunn,
587 F. Supp. 2d 486, 501-02 (S.D.N.Y. 2008) (declining to apply
the heightened standard in the SEC enforcement context); SEC v.
Landberg, 836 F. Supp. 2d 148, 154 n.4 (S.D.N.Y. 2011)
("Although the Second Circuit has not directly addressed the
issue, courts in this Circuit have declined to extend the
Supreme Court's interpretation of the PSLRA's 'strong inference'
standard."); SEC v. Steffes, 805 F. Supp. 2d 601, 617 (N.D. Ill.
2011) (listing cases that "stand for the proposition that the
strong inference standard applies only to private securities
action" (quotations omitted)).  But see Wey, 246 F. Supp. 3d at
922 ("In order to adequately plead scienter in the context of
securities fraud, the SEC must allege facts that give rise to a
strong inference of fraudulent intent." (quotations omitted)).
Thus, this Court applies, the Rule 9(b) standard.

        2.   **Analysis for Each Claim**

        [67]

A486

### a. Claims Brought Under 10(b) of the Exchange Act and 17(a)(1) of the Securities Act

Kelln, Veldhuis, Sexton, Friesen, and Taylor face counts brought under both sections 10(b) of the Exchange Act and 17(a)(1) of the Securities Act. See Am. Compl. ¶¶ 250-55.

Section 10(b) of the Exchange Act establishes that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). The SEC's interpretive Rule 10b-5(a), issued under its rulemaking authority states "[i]t shall be unlawful for any person, directly or indirectly, . . . [t]o employ any device, scheme or artifice to defraud" and subsection (c) makes it unlawful "[t]o engage in any act, practice, course of business which operates or would operate as a fraud or deceit upon any person. 17 C.F.R. § 240.10b-5(a)-(c). Section 17(a)(1) of the Securities Act makes it "unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly" to "employ any device, scheme, or artifice to defraud." 15 U.S.C. § 77q(a)(1).

"The elements of an action for securities fraud under Section 10(b) of the Exchange Act (and Rule 10b-5 thereunder)

[68]

A487

and Section 17(a)(1) of the Securities Act are substantially the same under the Supreme Court's precedents." SEC v. Tambone, 417 F. Supp. 2d 127, 131 (D. Mass. 2006) (Gorton, J.); see also SEC v. Patel, No. CIV. 07-CV-39-SM, 2008 WL 781914, at *7 (D.N.H. Mar. 24, 2008) (collapsing the analysis). "[I]f a complaint is sufficient to state a claim under section 10(b) and Rule 10b-5, it is also sufficient to state a claim under section 17(a)(1)"; therefore, this Memorandum proceeds to analyze only the requirements under Section 10(b). SEC v. Collins & Aikman Corp., 524 F. Supp. 2d 477, 490 (S.D.N.Y. 2007); see also Aaron v. SEC, 446 U.S. 680, 695-96 (1980) (specifying both Section 10(b) and Section 17(a)(1) require pleading scienter).

In order to commit a Section 10(b) violation a plaintiff must have: "(1) made a material misrepresentation or a material omission . . . or used a fraudulent device [scheme or artifice]; (2) with scienter; (3) in connection with the purchase or sale of securities." SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999); see also Deka Int'l S.A. v. Genzyme Corp. (In re Genzyme Corp. Sec. Litig.), 754 F.3d 31, 40 (1st Cir. 2014).

As to the first requirement of this test, the SEC alleges a fraudulent scheme, rather than a misrepresentation or omission. Am. Compl. ¶¶ 251, 254. "Conduct itself can be deceptive" under Rule 10b-5; statements are not required for liability. Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc., 552 U.S.

[69]

A488

148, 158 (2008); In re DVI, Inc. Sec. Litig., 639 F.3d 623, 643 n.29 (3d Cir. 2011) ("We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements."). Section 10(b) and Rule 10(b)-5 impose "primary liability[18] on any person who **substantially participates** in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market." In re Lernout & Hauspie Sec. Litig., 236 F. Supp. 2d 161, 173 (D. Mass. 2003) (Saris, J.). "Participation in a scheme can [however, only] be sufficient for liability under section 10(b) . . . if that participation took the form of actions or statements that were independently deceptive or fraudulent." Collins & Aikman Corp., 524 F. Supp. 2d at 486 (explaining how mere participation in a scheme via performance of purely administrative duties is insufficient). It is also true, however, that actions which are not deceptive in a vacuum -- for

---

[18] Private plaintiffs can only bring suit under Rule 10b-5 against primary violators, whereas the SEC has the right to bring aiding and abetting claims pursuant to Section 20(e) of the Exchange Act. See Tambone, 597 F.3d at 445. Regardless, because Section 20(e) liability is addressed in a later section, this sub-section addresses primary violators.

[70]

A489

example transmitting a prospectus -- may be deceptive in concert

with other actions -- for example transmitting a prospectus to

investors that an individual knows was created fraudulently.

See id. 486-87.  In short:

> [i]n order to state a claim that a defendant is a
> "primary violator", the complaint must allege not only
> a fraudulent scheme but also facts to demonstrate that
> the defendant under consideration "substantially
> participated" in the alleged scheme . . . .  In other
> words, the SEC must allege how each of the defendants'
> actions had a principal purpose and effect upon
> creating a false appearance in fact in furtherance of
> the scheme to defraud.

Durgarian, 477 F. Supp. 2d at 352-53 (internal citations

omitted).

As to the second requirement of this test, "[s]cienter is a

mental state embracing intent to deceive, manipulate, or

defraud.  This Circuit has held that a plaintiff can demonstrate

scienter by showing that defendants either consciously intended

to defraud, or that they acted with a high degree of

recklessness." Bos. Sci. Corp., 523 F.3d at 85 (internal

citations and quotations omitted).  Recklessness encompasses

"highly unreasonable" conduct, "involving not merely simple, or

even inexcusable[ ] negligence, but an extreme departure from

the standards of ordinary care, and which presents a danger of

misleading buyers or sellers that is either known to the

defendant or is so obvious the actor must have been aware of

it." SEC v. Fife, 311 F.3d 1, 9-10 (1st Cir. 2002) (alterations

[71]

A490

in original) (quoting Greebel v. FTP Software, 194 F.3d 185, 198 (1st Cir.1999)).

The third requirement simply demands that the "deceptive devices and contrivances" be used in connection with "the purchase of sale or securities"; this reaches sales regardless "whether conducted in the organized markets or face to face." Superintendent of Ins. of State of N. Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 12 (1971). This requirement is easily met in the case at bar, as the Amended Complaint discusses schemes to defraud relevant to the stock sales of several companies: Stevia First/Vitality, OncoSec, Arch, and others. See generally Am. Compl. Therefore, of interest to this Court, is whether the first and second requirements are met.

The SEC successfully alleges facts for these remaining requirements as to all of the Defendants. What follows is an analysis of whether the SEC pleads the following from 2016 to 2021, for each Defendant: (1) involvement in a scheme to defraud and **substantial participation** via actions that were independently deceptive or fraudulent (alleged with particularity), and (2) the requisite scienter -- intentional or reckless (alleged generally).

As to **Kelln** first, the SEC alleges she was a member of the Sharp Group. See Am. Compl. ¶ 5. Kelln allegedly "routinely performed a variety of complex administrative tasks associated

[72]

A491

with obtaining, allocating, and distributing blocks of shares across multiple nominee shareholders in a manner designed to conceal the Sharp Group's clients' common control of all the stock so distributed." Id. ¶ 52. These acts, if alleged with particularity, would constitute "substantial participation" in a scheme to defraud as they involve active efforts to create and conceal entities such that SEC regulations can be skirted. See SEC v. Frohling, 851 F.3d 132, 138 (2d Cir. 2016) (concluding skirting of Rule 144 registration requirements can form the basis of Section 10(b) liability); see also Lorenzo v. SEC, 139 S. Ct. 1094, 1101 (2019) (defining a "scheme" as a "project, plan, or program of something to be done" (quotations omitted)).

The next question is whether the SEC alleges these fraudulent acts with particularity during the relevant time period (August 2016-2021). The complaint alleges the following relevant facts: (1) on various dates in 2016 and 2018 Kelln retained an attorney to prepare false opinion letters, which attempted to hide that nominee entities were affiliates of one of the companies that was selling stocks, Am. Compl. ¶ 144; (2) in 2017 Kelln aided in the transfer of Stevia First/Vitality shares from a Sharp Group administered nominee entity to an offshore trading platform (Wintercap SA), id. ¶ 145; (3) in 2017, Kelln instructed Wintercap SA to assign all the sales of shares made to a specific account in order to reduce the number

[73]

A492

of shares one of Sharp's nominee entities was shown as holding -
- "[t]his ruse prevented Hilton Capital from showing share
ownership in excess of 5%. Specifically, Kelln wrote: 'allocate
all VBIO [ticker symbol of Stevia First/Vitality] to the [Hilton
Capital] account today. We need to make room for pending 750k.
Again 5% rule is biting me in the ass,'" id. ¶ 147. These
allegations are just a sample of the allegations that are
sufficient to establish the particularity needed here.

Second, the question is whether the SEC alleges Kelln
possessed the requisite scienter. The SEC alleges "Kelln knew
or recklessly disregarded" that transferring funds from the
nominee entities controlled by the Sharp Group to Wintercap SA
would have brought the total shares held by the nominee entity
to more than five percent in violation of SEC regulations. Id.
¶ 146. This was demonstrated via her communications with Sharp,
indicating the difficulty of skirting this regulation. Id. ¶
147. This is sufficient to establish the requisite scienter.

As to **Veldhuis**, **Sexton**, and **Friesen**, the members of the
Veldhuis Control Group, allegedly illegally sold Stevia
First/Vitality, Arch, OncoSec and other Company's stock. See
id. ¶¶ 7-8. These individuals "teamed up with the Sharp Group
to run lucrative, fraudulent schemes to sell stock
surreptitiously in the public markets." Id. ¶ 7. This conduct
spans beyond "substantial participation" by providing the

[74]

A493

necessary infrastructure for the entire scheme; without these individuals' surreptitious sales the shell game would not have been possible. Therefore, if alleged with particularity, the claims against Veldhuis, Sexton, and Friesen are sufficient for Section 10(b) liability.

First, the SEC successfully alleges this participation with particularity. At various points in 2016 the Veldhuis Control Group sent wire payments to Stevia First/Vitality, amounting to $ 4.4 million in exchange for the issuance of millions of shares to nominee entities. Id. ¶ 142. From 2016 to 2018 the Veldhuis Control Group acted in concert with Dhillon to sell Stevia First/Vitality's stock to the public even though it was unregistered and restricted. Id. ¶ 144. Still in 2017 Veldhuis provided trading instructions to Wintercap SA to sell Stevia First/Vitality shares to the public. Id. ¶ 147-48. In an effort to pump up the value of Stevia First/Vitality stock between October 2016 and March 2017 the Veldhuis Control Group retained Kaitz to run promotional campaigns; Veldhuis wired money from Sharp Group nominee shareholders to foot the bill. Id. ¶ 150. Again, although these allegations are only in reference to one part of the scheme, they sufficiently provide the when, where, and how needed for particularity.

Second, by alleging that Veldhuis, Sexton, and Friesen (1) acted in concert with Dhillon, while representing to the public

[75]

they were not affiliates of Dhillon's company Stevia First/Vitality, id. 144, and (2) hired Kaitz to promote the stock sales as legitimate, while selling from affiliates of Stevia First/Vitality, the SEC sufficiently alleges the scienter necessary for this type of violation, id. ¶ 150.

As to **Taylor**, the SEC first alleges "Taylor [] controlled nominee shareholders who held and traded stock surreptitiously in concert with Dhillon and the Veldhuis Control Group." Id. ¶ 14. This constitutes "substantial participation," as controlling a "dummy entity" and transferring funds to skirt SEC regulations is precisely the type of participation that other sessions of this Court have contemplated as being substantial. See In re Lernout, 236 F. Supp. 2d at 173 (listing creation of a "sham entity" as an example of utilizing a deceptive device under Section 10(b)).

Furthermore, the SEC alleges Taylor's participation with particularity. Taylor participated in the fraudulent sales of Stevia First/Vitality in December 2016 in conjunction with the stock promotion directed by the Veldhuis Control Group; in fact, he received a portion of the $1.7 million in profits obtained. Id. ¶ 137. In December 2016, Taylor used "the obfuscation provided by the Sharp Group" to orchestrate payments garnered from the fraudulent Stevia First/Vitality sales, for the benefit of his company. Id. ¶ 140. Taylor was also associated with

[76]

A495

nominee entities who received payments from the sale of Stevia First/Vitality shares well into 2018.  Id. ¶ 190.  From 2015 to June 2016 Taylor sold Arch shares via an intermediary (Blacklight SA) generating $775,000 in proceeds -- these profits were funneled through Taylor's nominee entities in May through October 2016 for Taylor and Dhillon's benefit.  Id. ¶ 186.  On several dates in 2016 (June 28, July 5, August 8, September 27, November 2016) Arch issued millions of shares to a nominee entity controlled by Taylor (Heng Hong) which then transferred the shares to a Sharp Group nominee -- these shares were then utilized by the Veldhuis Control Group, which sold to unsuspecting investors in the public market.  Id. ¶¶ 187-88.

Second, the SEC alleges that Taylor participated in the scheme with scienter.  Taylor's provision of Heng Hong to allow for the obfuscation of Dhillon and other's control, alongside his use of fraudulent invoices to receive payments for sales made through nominee entities associated with Heng Hong is sufficient to establish knowing or reckless scienter.  See id. ¶¶ 138, 189.  Furthermore, the SEC alleges that once Taylor became aware of its investigation, he signed false documents to obfuscate his involvement and provide legitimate explanations for his payments to Dhillon; he provided these documents to Canadian regulators.  Id. ¶ 191.

[77]

A496

### i.   Counterarguments

Veldhuis and Friesen raise two main counterarguments to the sufficiency of the SEC's allegations: (1) the SEC fails to allege sufficient deceptive acts, see Friesen Mem. 15; Veldhuis Mem. 9-10; and (2) allegations that "lump multiple defendants together" as the "Veldhuis Control Group" are not sufficient to establish violations, see Friesen Mem. 1, 18; Veldhuis Mem. 5 (decrying the improper "group[ing]" of defendants).

As to the first counterargument, manipulation of securities markets constitutes a section 10(b) and 17(a) violation and "fictitious transactions" that "do not result in any change in beneficial ownership" or that artificially alter stock price constitute market manipulation.  SEC v. Masri, 523 F. Supp. 2d 361, 366 (S.D.N.Y. 2007).  The Defendants' intentional efforts to conceal their and others' identities as affiliates of companies in order to sell more shares falls within this type of market manipulation.

As to the second, the Defendants correctly highlight that complaints may not "clump[] [defendants] together in vague allegations," as such pleadings fail to meet Rule 9(b) particularity.  Three Crown Ltd. P'ship v. Caxton Corp., 817 F. Supp. 1033, 1040 (S.D.N.Y. 1993) (concluding references to "some or all of the defendants" were insufficient).  This is not, however, what the SEC has done here.  The SEC initially listed

[78]

the constituent members of the Veldhuis Control Group, Am.
Compl. ¶ 7, it then went on to define each individual's role in
the scheme, id. ("Working together, Veldhuis, Sexton, and
Friesen . . . were one group of control persons . . . that
teamed up with the Sharp Group to run lucrative, fraudulent
schemes to sell stock surreptitiously in the public markets."),
and finally it mentioned with particularity when the Group took
part in the larger exchange of securities, see, e.g., id. ¶¶ 58,
237 (describing how in 2016 and 2017 "[t]he Veldhuis Control
Group utilized the Sharp Group's services to disguise their . .
. ownership of a significant percentage of [certain] public
companies' shares," in other words "disguise[d] their control,"
while selling those shares in the public market without
registration).  These allegations suggest that each of the
Defendants bought and sold shares illegally by hiding their
identities as control persons of various companies.  Their
concerted efforts to do so is of key importance to the
functioning of the larger scheme -- which relied on buying and
selling large blocks of shares strategically.

    Several courts have determined that using shorthand
abbreviations for multiple defendants, as was done here, is
acceptable, where the complaint explains the role of each member
of a group or when it is referring to collective conduct.  See
Monterey Bay Military Hous., LLC v. AMBAC Assurance Corp., 531

[79]

A498

F. Supp. 3d 673, 729 (S.D.N.Y. 2021) (outlining how reference to
"Jefferies" to summarize multiple "Jefferies Entities" was
acceptable under Rule 9(b) because the basis of each entity's
liability was "readily inferable" from other parts of the
complaint); SEC v. Sugarman, No. 19cv5998, 2020 U.S. Dist. LEXIS
181034, at **14-15 (S.D.N.Y. Sep. 30, 2020) (concluding that the
SEC's references to "Sugarman and Galanis," two defendants, in
unison "throughout the Complaint" was acceptable in part because
"many of these references . . . explain their collective
scheme").  References to the Veldhuis Control Group properly
describe "conduct in tandem," by Veldhuis, Sexton, and Friesen;
"[t]his Court can hardy fault the SEC for the fact that [the
defendants] acted in concert."  Sugarman, 2020 U.S. Dist. LEXIS
181034, at *16.

Furthermore, the Defendants cite to SEC v. Durgarian, for
the notion that "the SEC cannot simply group defendants together
and make undifferentiated allegations against that group without
providing facts specific to each defendants' alleged
wrongdoing."  Friesen Mem. 12 (citing Durgarian, 477 F. Supp.
2d at 355).  In Durgarian another session of this Court held
that the SEC's "general assertion[s] that the defendants
attended [a] meeting" were "too attenuated to link them to the
fraudulent scheme."  477 F. Supp. 2d at 355.  This is a far cry
from the case at bar, where allegations refer to specific

[80]

A499

actions taken in unison by members of the Veldhuis Control Group. To conclude otherwise would yield the absurd result that the SEC's complaint would only be acceptable had it listed out Veldhuis, Sexton, and Friesen's names individually for each of hundreds of allegations. See Friesen Mem. 15.

> **b.    Claims Brought Under Section 17(a)(3) of the Securities Act**

Gasarch, Kelln, Veldhuis, Sexton, Friesen, and Taylor are accused of violating Section 17(a)(3) of the Securities Act. Am. Compl. ¶¶ 250-52 (count II), 286-88 (count X). Section 17(a)(3) of the Securities Act makes it unlawful in "the offer or sale of any securities . . . by the use of any means of communication in interstate commerce or by use of the mails directly or indirectly" to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a), (a)(3). "[N]egligence," as opposed to proof of scienter, "is sufficient to establish liability under . . . § 17(a)(3)." Ficken, 546 F.3d at 47.

"A defendant may be liable under § 17(a)(3) if he undertook a deceptive scheme or course of conduct that went beyond . . . misrepresentations." SEC v. Bio Def. Corp., Civ. No. 12-11669-DPW, 2019 WL 7578525, at *25 (D. Mass. Sept. 6, 2019) (Woodlock, J.) (internal quotation omitted), aff'd sub nom. SEC v. Morrone,

[81]

A500

997 F.3d 52 (1st Cir. 2021).  Engagement in the deceptive scheme is met by participation alone -- "the participation need not have been substantial to satisfy the requirement." Id.  For example, preparation and distribution of materials that were deceptive to investors is sufficient to meet this requirement. Id.  Furthermore, another session of this Court has previously held that where the pleading requirements for 17(a)(1) and 10(b) are met, they are also met for 17(a)(3).  SEC v. Esposito, 260 F. Supp. 3d 79, 92 (D. Mass. 2017) (Burroughs, J.).

For the same reasons described above the SEC has alleged sufficient facts to establish a Section 17(a)(3) violation by the following defendants, for several reasons: (1) **Kelln** managed nominee entities, transfers, and the production of false documentation to legitimize the scheme; (2) **Veldhuis**, **Sexton**, and **Friesen** artificed several fraudulent transfers of shares; and (3) **Taylor** managed nominee entities and transferred unregistered stock to trading platforms for illegal sale to the public.  See supra Section V.B.2.a.

As to **Gasarch**, the SEC sufficiently alleges all of the requirements for a Section 17(a)(3) violation.  First, the SEC alleges generally that Gasarch participated in the scheme -- substantial participation is not necessary.  Gasarch was allegedly a key member of the Sharp group which facilitated illegal stock sales from 2010 to the present.  Am. Compl. ¶ 5.

[82]

A501

> Gasarch routinely arranged to transfer stock sale
> proceeds to accounts as directed by the Sharp Group's
> clients in a manner designed to conceal the fact that
> undisclosed control persons were, in fact, the actual
> beneficial owners of the stock being sold, and the
> ultimate recipients of the sales proceeds.  When she
> sent these wires, Gasarch also recorded them in [the
> Sharp Group's encrypted] accounting system.  She thus
> observed and maintained the records showing how the
> Sharp Group's clients were generating, receiving, and
> disbursing their revenue from securities trading.

Id. ¶ 57.  The SEC also alleges with particularity Gasarch's

participation.  For example, Gasarch created false invoices,

loan subscription agreements, and other documents that could

back the illegitimate payments that emerged from the scheme: she

did so at least on (1) August 23, 2016, (2) May 16, 2017, and

(3) October 11, 2017.  Id. ¶ 58.  Gasarch also sent several

emails pretending to be an owner of Sharp Group-administered

nominee entities to further the Sharp Group's scheme and

legitimize the fraudulent transactions.  Id. ¶ 61.  For example,

she did so on July 7, 2017, and July 12, 2018.  Id.  Gasarch was

also a go-between for the movement of shares from clients to

Wintercap SA from June and September 2016.  Id. ¶ 62.

Finally, the SEC alleges that "Gasarch understood that her

job was to obfuscate the source and destination of

distributions" and cites to specific conversations Gasarch had

with Sharp that buttress this conclusion.  Id. ¶¶ 59-60.

Gasarch's understanding is further supported by the fact that

she also helped keep the Sharp Group's clients' identities

[83]

A502

secret by personally serving as a nominee shareholder.  Id. ¶ 64.  For example, Gasarch administered Peregrine Capital Corp. f/k/a Peaceful Lion Holdings, a nominee shareholder.  Id.  The SEC therefore alleges generally knowing, reckless, or negligent scienter by Gasarch, going above and beyond the requirements for Section 17(a)(3) violations, which only require negligence.  Id. ¶ 61.

### c.   Claims Brought Under Sections 5(a) and (c) of the Securities Act

Kelln, Veldhuis, Sexton, and Friesen are all accused of violating Section 5(a) and (c).  Am. Compl. ¶¶ 256-58 (count III).  Sections 5(a) and (c) of the Securities Act makes it unlawful to sell unregistered securities through, or utilize in connection with such sale, interstate commerce or the mails. See 15 U.S.C. § 77e(a), (c); see also SEC v. N. Am. Rsch. & Dev. Corp., 424 F.2d 63, 71 (2d Cir. 1970).[19]  "A prima facie case for

---

[19] Specifically, the text of Sections 5(a) & (c) provides:

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly --
    (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any propsectus or otherwise; or
    (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.
                    * * *

[84]

A503

violation of Sections 5(a) and 5(c) requires a showing that: (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly offered to sell the securities; and (3) the offer or sales were made in connection with the use of interstate transportation, communication, or the mails." SEC v. Tropikgadget FZE, 146 F. Supp. 3d 270, 280 (D. Mass. 2015) (Burroughs, J.). "Courts interpreting the 'sale' element have concluded that it may be satisfied by a showing that a defendant was a 'necessary participant' or a 'substantial factor' in the unregistered sale or offer of sale. SEC v. Jones, 300 F. Supp. 3d 312, 315-16 (D. Mass. 2018) (Stearns, J.).

First, the SEC has sufficiently alleged that hundreds of securities that were sold as part of this scheme were not registered. See, e.g., Am. Compl. ¶¶ 125, 144 (describing how the Veldhuis Control Group sold restricted Stevia First/Vitality shares), 144-45 (describing Kelln's involvement with these

---

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

15 U.S.C. § 77e (a),(c).

A504

restricted shares) 245-47 (describing how Kelln coordinated the trading of "purportedly unrestricted" but unregistered share of Garmatex stocks in the excess of $7 million).

Second, **Kelln** as a member of the Sharp Group was in 2016 and 2017 helping administer the transfer of shares from nominee entities to Wintercap SA, which would then sell unregistered stocks to the public. Id. ¶¶ 145, 147. Furthermore, in 2016 and 2018 Kelln helped in the distribution of the unregistered shares by hiring attorneys to prepare opinion letters to falsely represent that nominee entities were not affiliates of Stevia First/Vitality. Id. ¶ 144.

The SEC also alleges with particularity the offer and sale of unregistered securities by **Veldhuis, Sexton, and Friesen**. The SEC's allegations that these individuals engaged in the sale of Stevia First/Vitality's unregistered stock in 2016 and 2018 alone is sufficient to sustain this claim. Id. ¶¶ 134, 144 (mentioning Veldhuis, Sexton and Friesen's efforts to sell restricted shares), 111 (designating these stocks as unregistered). As just one example of the Sharp Group and Veldhuis Control Group's participation in the sale of unregistered stock the SEC alleges that: "On various dates in 2016, the Veldhuis Control Group sent numerous wire payments to [Stevia First/]Vitality, or to third parties on behalf of [Stevia First/]Vitality, totaling approximately $4.4 million.

[86]

A505

In exchange, [Stevia First/]Vitality -- with Dhillon operating as the chairman of its board of directors -- issued millions of shares . . . to nominee entities that the Sharp Group once again provided for use by the Veldhuis Control Group." Id. ¶ 142. Both these sets of allegations are more than enough to establish Kelln, Veldhuis, Sexton, and Friesen were 'substantial factors' in the sale of unregistered securities.

"Finally, the [Amended] Complaint adequately alleges that these sales and offerings were made in connection with the use of interstate transportation, communication, or the mails." Esposito, 260 F. Supp. 3d at 89. The Amended Complaint alleges that several of these individuals communicated via encrypted messaging platforms. Am. Compl. ¶¶ 149 (discussing Veldhuis' communications), 123 (listing a communication by Kelln). The sale of Veldhuis, Sexton, and Friesen's stocks were also facilitated by use of interstate communication by Kaitz who misleadingly publicized the stock. Id. ¶ 150. Finally, the transfers of stocks and money occurred to offshore brokerage firms. Id. ¶¶ 6 (describing Wintercap SA and Blacklight SA as Swiss-based offshore trading platforms), 145-47 (discussing Kelln's use of Wintercap SA in 2017), 245 (describing Kelln's use of Wintercap SA and Blacklight SA in connection with Garmatex stock).

[87]

A506

### c.  Claims Brought Under Section 13(d) and Rule 13d-1 of the Exchange Act

Veldhuis, Sexton, and Friesen are accused of violating Section 13(d).  Am. Compl. ¶¶ 259-63 (count IV).  Section 13(d) and Rule 13d-1[20] of the Exchange Act requires anyone who obtains beneficial ownership of more than five percent of any class of shares to file ownership reports with the SEC.  15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-1.  It states in relevant part:

> Any person who, after acquiring directly or indirectly the beneficial ownership of any equity . . . which would have been required to be so registered . . . . and is directly or indirectly the beneficial owner of more than 5 per centum of such class shall . . . file with the Commission, a statement . . . .

15 U.S.C. § 78m(d)(1).  Furthermore, "[w]hen two or more persons act as a . . . group for purposes of acquiring, holding, or disposing of securities" they are a "person" under the Exchange Act.  Id. § 78(d)(3).

The SEC alleges with particularity that the Sharp Group assisted the Veldhuis Control Group in skirting the "five percent" beneficial ownership rule.  Am. Compl. ¶¶ 146-48.  It states that at one-point Kelln even wrote in messages how

---

[20] "Rule 13d-1 of the Securities and Exchange Commission provides that the disclosure required by Section 13(d)(1) be set forth in a Schedule 13D." Gen. Aircraft Corp. v. Lampert, 556 F.2d 90, 92 n.1 (1st Cir. 1977); see also 17 C.F.R. §§ 240.13d-1, 240.13d-101.

[88]

A507

difficult the rule was to navigate around, while assisting the Veldhuis Control Group.  Id. ¶ 147.  The SEC also explicitly states the following: "Veldhuis, Sexton and Friesen failed to file any report on behalf of the group as required under Rule 13d-1(k)(2), even though they collectively acquired, held, and were responsible for directing the disposition of, far more than 5% of [Stevia First/]Vitality's outstanding stock through nominee entities that were under their group's control."  Id. ¶ 153.

Although Veldhuis and Friesen argue that the Veldhuis control group is not sufficiently alleged as acting as a group for purposes of Section 13(d) liability, see Friesen Mem. 20; Veldhuis Mem. 10, "the existence of a section 13(d)(3) group may be demonstrated circumstantially" and "any arrangements [to act as a group] may be formal or informal."  SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1162-63 (D.C. Cir. 1978).  The Veldhuis Control Group's concerted efforts to sell unregistered stock is sufficient to meet this requirement.

> **d.    Section 20(e) of the Exchange Act and Section 15(b) of the Securities Act**

Kelln and Gasarch are accused of violating Section 20(e) of the Exchange Act.  Am. Compl. ¶¶ 282-85 (count IX), 300-03 (count XIV).  Section 20(e) makes it unlawful to assist anyone in the violation of the Exchange Act:

[89]

A508

> any person that knowingly or recklessly provides
> substantial assistance to another person in violation
> of a provision of this chapter, or of any rule or
> regulation issued under this chapter, shall be deemed
> to be in violation of such provision to the same
> extent as the person to whom such assistance is
> provided.

15 U.S.C. § 78t(e).  To survive a motion to dismiss the SEC must

allege: "(1) the existence of a securities law violation by the

primary (as opposed to the aiding and abetting) party; (2)

'knowledge' of this violation on the part of the aider and

abettor; and (3) 'substantial assistance' by the aider and

abettor in the achievement of the primary violation."  SEC v.

Apuzzo, 689 F.3d 204, 206 (2d Cir. 2012) (quotations omitted).

"Substantial assistance" requires the defendant to have

"associated himself with the venture, that he participated in it

as in something that he wished to bring about, and that he

sought by his action to make it succeed."  Id. (quotations and

alterations omitted).

     Gasarch, Taylor, and Kelln are accused of violating Section

15(b) of the Securities Act.  Am. Compl. ¶¶ 273-76 (count VII),

277-81 (count VIII), 292-95 (count XII).  Section 15(b) makes it

unlawful to assist another in the violation of Securities Act:

> any person that knowingly or recklessly provides
> substantial assistance to another person in violation
> of a provision of this subchapter, or of any rule or
> regulation issued under this subchapter, shall be
> deemed to be in violation of such provision to the
> same extent as the person to whom such assistance is
> provided.

[90]

A509

15 U.S.C. § 77o(b).  "Because the operative language in § 15(b) is nearly identical to that in § 20(e), the standard for aiding and abetting liability is the same under both statutes."  SEC v. Lek Sec. Corp., 276 F. Supp. 3d 49, 61 (S.D.N.Y. 2017).

For the same reasons that the SEC plausibly alleges violations of 17(a)(1) and 10(b)(5) for Kelln and Taylor and 17(a)(3) for Gasarch, see supra Sections V.B.2.a.-b., it also alleges substantial assistance. Gasarch, Taylor, and Kelln all assisted the Sharp Group and the Veldhuis Control Group in the unregistered sale of Stevia First/Vitality Stock from 2016 to 2018.

### C.    Other Arguments Raised by Defendants

The Defendants raise several other arguments in support of their motions to dismiss.  The Court addresses them briefly here.

### 1.    The Appropriateness of Injunctions

More than one defendant -- Sexton and Kelln -- challenge the injunctions sought on the basis that they do not serve to enjoin any existing conduct and would simply compel the Defendants to obey the law.  See Sexton Mem. 19; Kelln Mem. 19. More specifically, Kelln posits that "there is nothing remaining to be enjoined" because she no longer "works for Mr. Sharp,

[91]

A510

services his clients, or works in the securities industry in any way."  Kelln Mem. 19 (quotations and citations omitted).

The SEC rebuts that "there is no requirement" that "conduct must be ongoing to warrant an injunction" and that the "likelihood of recurrence" and other factors weigh in favor of an injunction.  See SEC Opp'n Kelln 15-17.  Furthermore, it states that it plausibly alleges conduct to the present and that the proper time to evaluate injunctive relief is after the liability stage.  Id.

"The Securities and Exchange Act permits the SEC to seek an injunction in federal district court to prevent violations of securities laws."  SEC v. Sargent, 329 F.3d 34, 39 (1st Cir. 2003); see also 15 U.S.C. § 78u(d).  "[T]he appropriate standard for issuance of an injunction in such cases is the reasonable likelihood of future violations of the statutory provisions."  SEC v. John Adams Tr. Corp., 697 F. Supp. 573, 577 (D. Mass. 1988) (Woodlock, J.).  "When predicting the reasonable likelihood of future violations in order to determine the appropriateness of injunctive relief, this court must assess the totality of the circumstances surrounding the defendant and his violation of the securities laws."  SEC v. Ingoldsby, CIV. A. No. 88-1001-MA, 1990 WL 120731, at *2 (D. Mass. May 15, 1990) (Mazzone, J.).  The following factors are all relevant to the inquiry: (1) "degree of scienter involved," (2) "the defendant's

[92]

A511

recognition of wrongful conduct, [and] the sincerity of his assurances against future violations," (3) "the isolated or recurrent nature of the infraction," id. (quoting John Adams, 697 F. Supp. at 578) (quotations omitted), (4) the egregiousness of the conduct, (5) the likelihood of future violations, id. (citing SEC v. Blatt, 583 F.2d 1325, 1334 n. 29 (5th Cir. 1978)) and (6) the possible adverse impact and hardship on defendant counterbalanced by the public interest which is "paramount," id.

Given the alleged scienter and the recurrent nature of the infractions discussed above with reference to Kelln and Sexton, see supra Section V.B.2.a., there are sufficient allegations for the SEC's requests for injunctive relief to pass motion to dismiss muster. Further consideration of the appropriateness of injunctive relief would be premature.

### 2. The Appropriateness of Disgorgement

Kelln also challenges disgorgement as a remedy by arguing she was not unjustly enriched by the scheme, because she only received compensation in the form of an annual salary -- which cannot be attributed to the scheme. Kelln Mem. 18-19.

The SEC rebuts that Kelln "was the beneficiary of more than 1 million in funds **derived** from the Sharp Group's conduct," that her argument disgorgement can be obtained only from those directly enriched by the scheme is incorrect, and that her

[93]

A512

"causal assertion[s]" are premature and ignore allegations in the complaint. SEC Opp'n Kelln 15 (quotations omitted).

"[C]ourts commonly order defendants to disgorge not only the proceeds of a fraud but also salary and bonuses earned during the period of a fraud and amounts equivalent to losses avoided as a result of the securities violation." SEC v. Johnston, 368 F. Supp. 3d 247, 254 (D. Mass. 2019) (Gorton, J.), aff'd, 986 F.3d 63 (1st Cir. 2021).

Kelln's arguments here are inapposite. As discussed earlier, see supra Section V.B.2.a., the SEC has sufficiently alleged Kelln's contribution to the scheme and the amount of ill-gotten gains she received, see Am. Compl. ¶ 68 (alleging she received $1 million). Limitation of the disgorgement remedy at this stage would be premature.

### 3. Issues of Personal Jurisdiction

Kelln and Gasarch, both citizens and residents of Canada, see Am. Compl. ¶¶ 23-24; Kelln Mem. 17, argue this Court lacks personal jurisdiction over them, Kelln Mem. 16-18 (moving to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2)); Gasarch's Opp'n Am. Compl. 6-9 (opposing SEC's Amended Complaint on this ground). For her part, Gasarch did not raise her objection to personal jurisdiction in her first responsive

[94]

A513

pleading and has therefore waived the defense.[21]  Kelln, on the

other hand, who properly raised the defense, see Kelln Mem. 16-

18, asserts the SEC has failed to establish minimum contacts

because Kelln communicated with and facilitated trades only

between foreign entities and "is not alleged to have ever sold

stock in the United States markets as part of the scheme or to

---

[21] Gasarch raised this objection for the first time in a
footnote in her reply to the SEC's opposition to her motion to
dismiss and discusses it at greatest length in her opposition to
the SEC's amended complaint.  See generally Gasarch's Mot.
Dismiss Compl.; Gasarch Mem.; see also Reply Supp. Gasarch's
Mot. Dismiss Compl. 8 n.4, ECF No. 184; Gasarch's Opp'n Am.
Compl. 6-9.  Rule 12, which governs the personal jurisdiction
defense, is subject to strict waiver, see Pilgrim Badge & Label
Corp. v. Barrios, 857 F.2d 1, 3 (1st Cir. 1988), which entails
that failure to raise the defense in one's answer or motion to
dismiss waives it, see Fed. R. Civ. P. 12(g),(h).  Therefore,
Gasarch has waived her personal jurisdiction defense.  Filing of
an amended complaint does nothing to revive this waived defense.
See Pruco Life Ins. Co. v. Wilmington Tr. Co., 616 F. Supp. 2d
210, 216 (D.R.I. 2009) ("[W]hile the amended complaints in both
cases supercede the original complaints for all intents and
purposes in the litigation, they do not revive Wilmington's
personal jurisdiction defense."); Credle-Brown v. Connecticut,
246 F.R.D. 408, 409 (D. Conn. 2007) ("A response to an amended
complaint is not sufficient to override a party's earlier
waiver.").  While Gasarch argues this defense was not available
at the time of her first responsive pleading, because the SEC's
original complaint was largely silent on the location of the
defendants and because, at the time, the SEC did not seek to
toll based on extraterritoriality, see Gasarch's Opp'n Am.
Compl. 7-8, this argument is unavailing.  Gasarch had knowledge
of her own whereabouts and her contacts with the United States,
and the purported dearth of sufficient allegations about her
contacts with the United States should have prompted her to
argue these issues of personal jurisdiction in her first
responsive pleading.  Even were this not the case, this Court
has sufficient basis to assert personal jurisdiction over
Gasarch regardless, as discussed later in this section of the
Memorandum.

[95]

A514

have ever held bank accounts in the United States." Kelln Mem. 17.

"It is the plaintiff's burden to establish that personal jurisdiction exists over the defendants in this forum." LTX Corp. v. Daewoo Corp., 979 F. Supp. 51, 54 (D. Mass. 1997) (O'Toole, J.). Without an evidentiary hearing, the Court must base its personal jurisdiction ruling on the prima facie standard. See United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001). To meet this standard the plaintiff must "go beyond the pleadings and make affirmative proof." Id. at 619 (quoting United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 987 F.2d 39, 44 (1st Cir. 1993)). Furthermore, the Court acts not "as a factfinder; rather, it accepts properly supported proffers of evidence by a plaintiff as true and makes its ruling as a matter of law." Id. (quoting 163 Pleasant St. Corp., 987 F.2d at 44).

For personal jurisdiction inquiries under federal question cases, like the one at bar, the First Circuit has held that "the constitutional limits of the [C]ourt's personal jurisdiction are fixed . . . not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment," United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1085 (1st Cir. 1992), meaning the "plaintiff need only show that the defendant has adequate contacts with the United States as a

[96]

A515

whole, rather than with a particular state," <u>Swiss Am. Bank</u>,
274 F.3d at 618.  The plaintiff must satisfy "both the forum's
long-arm statute and the Due Process Clause of the
Constitution."  <u>Id.</u> (quoting <u>Pleasant St.</u>, 987 F.2d at 44).

First, then, this Court assesses whether the SEC's claims
"arise from a statute that provides for worldwide service." <u>SEC</u>
v. <u>Spencer Pharm. Inc.,</u> 57 F. Supp. 3d 127, 133 (D. Mass. 2014)
(Talwani, J.).  "The Securities Act and the Exchange Act include
identical language providing in pertinent part that 'process . .
. may be served in any other district of which the defendant is
an inhabitant or **wherever the defendant may be found**.'" <u>Id.</u>
(emphasis and alterations in original)(quoting 15 U.S.C. §§
77v(a); <u>id.</u> 78aa(a)).

Second, "[a] district court may exercise authority over a
defendant by virtue of either general or specific jurisdiction."
<u>Massachusetts Sch. of Law at Andover, Inc.</u> v. <u>Am. Bar Ass'n</u>, 142
F.3d 26, 34 (1st Cir.1998).  Specific jurisdiction exists where
there is a "nexus" between the claims in question and
"defendant's forum-based activities." <u>Id.</u>  The SEC here bases
its arguments on specific jurisdiction.  <u>See</u> SEC Kelln Opp'n 19.

Specific jurisdiction requires "minimum contacts" with the
forum, "such that the maintenance of the suit does not offend
traditional notions of fair play and substantial justice."
<u>Int'l Shoe Co.</u> v. <u>Washington</u>, 326 U.S. 310, 316 (1945)

[97]

A516

(quotation marks omitted).  Establishing whether specific

jurisdiction exists involves a three-part analysis:

> First, an inquiring court must ask whether the claim
> that undergirds the litigation directly relates to or
> **arises out of** the defendant's contacts with the forum.
> Second, the court must ask whether those contacts
> **constitute purposeful availment** of the benefits and
> protections afforded by the forum's laws.  Third, if
> the proponent's case clears the first two hurdles, the
> court then must analyze the overall **reasonableness** of
> an exercise of jurisdiction in light of a variety of
> pertinent factors that touch upon the fundamental
> fairness of an exercise of jurisdiction.

Phillips Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 288

(1st Cir. 1999) (emphasis added).  This sub-section will

consider whether the SEC meets each requirement.

### a.    Relatedness

"The evidence produced to support specific jurisdiction

must show that the cause of action either arises directly out

of, or is related to, the defendant's forum-based contacts."

Harlow v. Children's Hosp., 432 F.3d 50, 60-61 (1st Cir. 2005).

The "connection between the cause of action and the defendant's

forum-state contacts [cannot be] attenuated and indirect."

Pleasant Street, 960 F.2d at 1089.  "Instead, the defendant's

in-state conduct must form an 'important, or [at least]

material, element of proof' in the plaintiff's case." Id.

(alteration in original) (quoting Marino v. Hyatt Corp., 793

F.2d 427, 430 (1st Cir. 1986)).

[98]

A517

Another session of this Court held that false representations to investors in the United States via email or in person were sufficient to establish such a nexus and that even representations made by a defendant's agents to United States individuals were sufficient to establish the Court's jurisdiction. SEC v. Elliott, Civil No. 20-10860-LTS, 2020 WL 7185854, at *4 (D. Mass. Dec. 7, 2020) (Sorokin, J.). Other cases involving securities violations found specific jurisdiction even with only a few contacts. See, e.g., SEC v. Gilbert, 82 F.R.D. 723, 725 (S.D.N.Y. 1979) (finding personal jurisdiction over a Swiss Bank based on the existence of four accounts maintained with three broker dealers in the United States for the bank's customers).

In general, alleging "conduct that was designed to violate United States securities regulations and was thus necessarily directed toward the United States" allows the SEC to meet its burden for a prima facie case of jurisdiction. Straub, 921 F. Supp. 2d at 255-56 (holding trading on the NYSE along with fraudulent SEC registration statements constituted sufficient minimum contacts). For example, in In re Parmalat Securities Litigation, the Southern District of New York held that allegations that "Parmalat securities traded actively in the United States, that Parmalat made note offerings here, and that company documents including Statutory Board reports were posted

[99]

A518

on company web sites in English" were sufficient to satisfy minimum contacts.  376 F. Supp. 2d 449, 456 (S.D.N.Y. 2005). Furthermore, in In re CINAR Corporation Securities Litigation the Eastern District held the exercise of jurisdiction based solely on a Canadian General Counsel's signing an unlawful registration statement was sufficient because she "must have known that the Statement was made to comply with the laws governing securities offerings in American markets, and as such, it would be used and relied upon by American investors."  186 F. Supp. 2d 279, 305-06 (E.D.N.Y. 2002).

Kelln and Gasarch's actions were specifically directed at skirting SEC regulations in order to deceive American investors trading in United States markets.  For example, Kelln "routinely split Sharp Group clients' shareholdings into blocks of stock, each comprising less than five percent of each public company's outstanding shares to be held in the names of various nominee entities," Am. Compl. ¶¶ 53-55, in order to skirt Schedule 13D and Section 5 filing requirements and deceive United States markets by concealing the true control over these stocks, id. ¶¶ 31-33 (describing how the companies involved in these schemes are traded on OTC Markets).  Gasarch arranged for the transfer of stock sale proceeds from illegal sales, faked invoices and emails to help conceal the true identities of the owners of stock that would eventually be sold on United States markets,

[100]

A519

and managed nominee entities to facilitate these stock sales.

Id. ¶¶ 57-58, 61-62.  These intentional schemes to skirt United

States laws and regulations in order to sell stocks on United

States markets are sufficient alone to establish minimum

contacts.  The SEC, however, provides more specific allegations

of contacts with the United States for each Defendant.

For **Kelln**, the SEC provides evidence that Kelln routinely

contacted United States-based transfer agents regarding the

stock that Sharp Group clients sold in violation of SEC

regulations and contacted a United-States based attorney several

times between 2016 and 2018.  Decl. Trevor T. Donelan ¶¶ 9-10,

ECF No. 168; see also Am. Compl. ¶¶ 53, 93, 143-44.  As to

**Gasarch**, the SEC alleged that she owned a United States-based

corporate entity through which she received the profits from

fraudulent trades.  Am. Compl. ¶ 68.

### b.  Purposeful Availment

"The purposeful availment prong examines whether the

defendant's contacts with the forum 'represent a purposeful

availment of the privilege of conducting activities in the forum

. . . .'"  New Life Brokerage Servs., Inc. v. Cal-Surance

Assocs., Inc., 222 F. Supp. 2d 94, 105-06 (D. Me. 2002) (quoting

Pleasant St., 960 F.2d at 1089).  "This prong is only satisfied

when the defendant purposefully and voluntarily directs his

activities toward the forum so that he should expect, by virtue

[101]

A520

of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." Swiss Am. Bank, 274 F.3d at 624. Another session of this Court has held that "[t]he defendant need not reside in or even spend substantial time in the forum -- in cases where the defendant has not physically entered the forum, First Circuit courts may 'look for some other indication that the defendant reached into the forum, such as mail or telephone contacts.'" Elliott, 2020 WL 7185854, at *4 (quoting Swiss Am. Bank, 274 F.3d at 622).

Where defendants are aware that their misrepresentations or deceptions would be "relied upon by American investors" there is "no clearer example of purposeful availment." See CINAR, 186 F. Supp. 2d at 306; see also Straub, 921 F. Supp. 2d at 255 (holding "[d]efendants knew or had reason to know that any false or misleading financial reports would be given to prospective American purchasers of those securities"); SEC v. Sharef, 924 F. Supp. 2d 539, 547 (S.D.N.Y. 2013) ("It is by now well-established that signing or directly manipulating financial statements to cover up illegal foreign action, with knowledge that those statements will be relied upon by United States investors satisfies [the personal jurisdiction] test."). The case at bar presents precisely the same type of purposeful availment -- Kelln and Gasarch allegedly actively worked to skirt SEC regulations and to deceive American investors.

[102]

A521

### c.    Reasonableness

In assessing reasonableness, the Court looks to: "five gestalt factors: (1) the defendant's burden in appearing in the court; (2) the forum state's interest in hearing the suit; (3) the plaintiff's convenience and interest in effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all interested states in promoting substantive social policies." Hasbro, Inc. v. Clue Computing, Inc., 994 F. Supp. 34, 45 (D. Mass. 1997) (Woodlock, J.) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)). As to the first factor, the First Circuit has held that "staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly . . . [therefore] this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir.1994). Neither Kelln, nor Gasarch make any specific arguments with regard to reasonableness beyond stressing their residence and citizenship outside of the United States, failing to demonstrate such a "special or unusual" circumstance. See id.; Kelln Mem. 17-18; Gasarch Opp'n Am. Compl. 8-9. The second and third factor clearly weigh in favor of a ruling of personal jurisdiction. As to the fourth, and fifth prongs of the test, while this Court "recognizes that Canada has a strong interest in the enforcement

[103]

A522

of its laws and the adjudication of disputes regarding its

citizens, [it holds] that this interest does not outweigh the

United States' interest in resolving cases related to a

violation of U.S. securities law and giving rise to injury

within this forum's borders." Spencer Pharm. Inc., 57 F. Supp.

3d at 137.

**VI.  CONCLUSION**

Therefore, this Court DENIES all six of the Defendants'

motions to dismiss in their entirety.

**SO ORDERED.**


<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[22]

_____

[22] This is how my predecessor, Peleg Sprague (D. Mass. 1841-
1865), would sign official documents. Now that I'm a Senior
District Judge I adopt this format in honor of all the judicial
colleagues, state and federal, with whom I have had the
privilege to serve over the past 44 years.

[104]

A523

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br><br> **Plaintiff,** <br><br> v. <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br> **Defendants.** | Civil Action No. 21-CV-11276-WGY <br><br> **JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Frederick L. Sharp ("Sharp"), Zhiying Yvonne Gasarch ("Gasarch"), Courtney Kelln ("Kelln"), Mike K. Veldhuis ("Veldhuis"), Paul Sexton ("Sexton"), Jackson T. Friesen ("Friesen"), William T. Kaitz ("Kaitz"), Avtar S. Dhillon ("Dhillon"), and Graham R. Taylor ("Taylor") (collectively, the "Defendants").

### SUMMARY

1.　　This case concerns a sophisticated, multiyear, multi-national attack on the United States financial markets and retail United States investors by foreign and domestic actors. These actors schemed to sell fraudulently hundreds of millions of dollars in stocks in the United States markets.

2.　　In exchange for lucrative fees, a group headed by defendant Sharp provided services to various groups of public company control persons to help those control persons dump United States-quoted stocks—typically penny stocks—on retail investors. These services

included providing networks of offshore shell companies to conceal stock ownership, arranging stock transfers and money transmittals, and providing encrypted accounting and communications systems.

3.       Other defendants named in this Complaint were control persons who dumped their shares, a complicit public company chairman, and a promoter who touted the stocks to retail investors.

4.       The Defendants' fraudulent conduct deprived investors of the full and fair disclosure mandated by the federal securities laws.

**Sharp's, Kelln's and Gasarch's Participation in the Fraudulent Scheme**

5.       Beginning in or before 2010 and continuing through the present, Sharp, Gasarch, and Kelln (the "Sharp Group") were in the business of facilitating illegal stock sales in the public securities markets.  The Sharp Group provided a variety of services to help corporate control persons conceal their identities when selling the stock of penny stock companies they controlled. By disguising their identities and their controlling positions, the Sharp Group's clients fraudulently concealed the fact that public company control persons were selling large blocks of stock to investors.

6.       The Sharp Group deliberately concealed the identities of its clients through the array of services it offered, including forming and providing offshore nominee companies that could hold shares for undisclosed control persons; providing and administering an encrypted communication network; purchasing, configuring and delivering devices that the Sharp Group referred to as "xPhones," which were designed to be used only for communications on the Sharp Group's encrypted communications network; and arranging for clients to deposit stock in

A525

offshore trading platforms, including Wintercap SA[1] and Blacklight SA,[2] both Swiss-based, to obfuscate the control persons' association with their public company stock. The Sharp Group also provided various additional services to its clients in furtherance of the fraudulent scheme such as: administering a proprietary accounting system that tracked clients' total stock holdings and sales across various nominee shareholders and trading platforms; paying out the proceeds of illegal stock sales at clients' direction to accounts around the world; arranging to route such payments by circuitous methods designed to conceal the source of funds; and fabricating documents, such as invoices, to conceal the nature and source of the payments.

**Veldhuis', Sexton's, and Friesen's Participation in the Fraudulent Scheme**

7.       Working together, Veldhuis, Sexton, and Friesen (hereinafter referred to as the "Veldhuis Control Group") were one group of control persons (hereinafter referred to as a "control group") that teamed with the Sharp Group to run lucrative, fraudulent schemes to sell stock surreptitiously in the public markets.

8.       At various times, the Veldhuis Control Group collaborated with defendants Dhillon, Taylor, and Kaitz. In particular, the Veldhuis Control Group sold illegally the stock of Stevia First Corp. ("Stevia First"), Stevia First's successor company Vitality Biopharma, Inc. ("Vitality"), Arch Therapeutics, Inc. ("Arch"), and OncoSec Medical Incorporated ("OncoSec") in concert with Dhillon. The Veldhuis Control Group and Dhillon also sold illegally the stock of Vitality and Arch in concert with Kaitz and Taylor.

---

[1] The Commission charged Wintercap SA and its principal, Roger Knox, on October 2, 2018, with violating the antifraud provisions of the Securities Act of 1933 ("Securities Act") and Securities Exchange Act of 1934 ("Exchange Act") as a result of engaging in a multiyear scheme that generated more than $165 million from the illegal sale of stock of at least 50 publicly traded companies.

[2] The Commission charged Blacklight SA and its principals, Anthony Killarney and Kenneth Ciapala, on January 2, 2020 with violating the Securities Act and Exchange Act antifraud provisions as a result of engaging in a multiyear scheme that generated more than $35 million from the illegal sale of stock of at least 45 publicly traded companies.

A526

**Dhillon's Role in the Scheme**

9.      Dhillon served as the chairman of the board of directors of Stevia First, Vitality, Arch, and OncoSec.  Dhillon's status as a high-level corporate insider enabled him to obtain and/or direct the issuance of millions of shares of each company's stock to his undisclosed associates.  Dhillon knew that, because he was a corporate insider, federal securities laws prohibited him from selling his stock into the securities markets without complying with various registration and disclosure rules designed to protect investors.

10.      At various times, Dhillon coordinated with the Veldhuis Control Group and Taylor to sell surreptitiously stock in the companies atop whose boards he sat.  These sales were conducted through various nominee shareholders and involved sales of stock that Dhillon was legally prohibited from selling without registering the sales with the Commission.  In certain instances, the nominee shareholders that effectuated the illegal sales of Dhillon's shares included entities administered by the Sharp Group.

11.      Dhillon abused his senior corporate role—a position of trust and confidence—in order to conceal his own and others' fraudulent conduct from investors, securities market intermediaries, securities regulators, and law enforcement.

**Kaitz's Role in the Scheme**

12.      Kaitz owned and operated Full Service Media LLC, a company that promoted the stock of public companies to retail investors.  Kaitz substantially assisted the Veldhuis Control Group by touting stocks that the Veldhuis Control Group sought to dump.  Kaitz promoted as urgent and bullish investment opportunities the stock of various publicly traded companies that the Veldhuis Control Group simultaneously planned to sell surreptitiously—including Vitality and Arch stock.  A key component of Kaitz's touting efforts was concealing the role of the

A527

Veldhuis Control Group, which paid Kaitz for his services. For example, Kaitz falsely claimed when touting the stock of public companies like Vitality that third parties (which appeared to be unaffiliated with the public companies) paid for his services. This concealment enabled the Veldhuis Control Group to anonymously sell its stock to the investors whom it simultaneously encouraged, through Kaitz's stock promotional efforts, to buy the stock and thus trade in the very opposite direction.

13.    During an SEC investigation into one of the promotional campaigns Kaitz had run for the Veldhuis Group, Kaitz appeared for testimony. During that testimony, Kaitz made false and misleading statements, including claims (i) that he had not received payment for the promotion in question from any entity other than that identified as the paying party in the promotion (despite having received such payments, arranged by Veldhuis, from other entities); and (ii) that he had no communications devices other than the two he identified to Commission staff (despite having had, and used in connection with the promotions in question, one of the Sharp Group-supplied "xPhones" that are described below).

**Taylor's Role in the Scheme**

14.    Taylor, among other things, arranged to merge a public company with one of Dhillon's private companies, ultimately resulting in the distribution and fraudulent sale of shares associated with the resulting public company, Stevia First. Taylor also controlled nominee shareholders who held and traded stock surreptitiously in concert with Dhillon and the Veldhuis Control Group. In exchange for these services, Taylor received a significant cut of the illegal stock sale proceeds.

A528

**Dhillon's Additional Illegal Stock Sales through Person A's Companies**

15.     At various times between 2011 and 2017, an individual identified herein as Person A operated at least two nominee companies that he created to hold and trade stock of two public companies atop whose boards Dhillon sat: Arch and OncoSec.  Person A illegally sold shares in both Arch and OncoSec on Dhillon's behalf.

**Dhillon's False Statements During the Commission's Investigation**

16.     In October 2018, the Commission charged Wintercap SA—one of the Veldhuis Control Group's primary conduits for the illegal sale of stock—with engaging in securities fraud, and Wintercap SA's illegal sale of Vitality stock was cited in the Commission's Complaint in that action.  Early the following month, the Commission suspended trading in Vitality.  During the Commission's investigation leading to the filing of the instant action, the Commission sought information from Dhillon about his involvement in the Vitality scheme, and Dhillon twice appeared for testimony (in August 2019 and July 2020).  During that testimony, Dhillon made false statements that are illustrated below.

**The Defendants Violated Various Securities Laws**

17.     As a result of the conduct alleged herein, Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder; Sharp, Kelln, Veldhuis, Sexton, Friesen, and Dhillon violated Sections 5(a) and 5(c) of the Securities Act; Veldhuis, Sexton, and Friesen violated Section 13(d) of the Exchange Act and Rule 13d-1 thereunder; Dhillon violated Sections 13(d) and 16(a) of the Exchange Act and Rules 13d-2 and 16a-3 thereunder; Taylor violated Section 15(b) of the Securities Act by aiding and abetting Dhillon's violations of Sections 5(a) and 5(c) of the

6

A529

Securities Act; Sharp and Kelln violated Section 15(b) of the Securities Act and Section 20(e) of

the Exchange Act by aiding and abetting others' violations of Sections 5(a), 5(c), 17(a)(1) and

17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and

10b-5(c) thereunder; Gasarch violated Section 17(a)(3) of the Securities Act, and also violated

Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act by aiding and abetting

others' violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the

Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder; and Kaitz violated Section 17(a)(3)

of the Securities Act, and also violated Section 15(b) of the Securities Act and Section 20(e) of

the Exchange Act by aiding and abetting others' violations of Sections 17(a)(1) and 17(a)(3) of

the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)

thereunder.

18.     The Commission seeks a temporary restraining order prohibiting the Defendants

from future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange

Act and Rule 10b-5 thereunder; prohibiting Veldhuis, Sexton, and Friesen from future violations

of Section 13(d) and Rule 13d-1 thereunder; prohibiting Dhillon from violations of Section 13(d)

of the Exchange Act and Rule 13d-2 thereunder; prohibiting Dhillon from future violations of

Exchange Act Section 16(a) and Rule 16a-3 thereunder; prohibiting Sharp, Kelln, Veldhuis,

Sexton, Friesen, Dhillon and Taylor from violations of Securities Act Sections 5(a) and 5(c), and

if entered, a preliminary injunction order for the same; and (ii) a repatriation order, and an order

freezing the assets of the Defendants held for their direct or indirect benefit, and/or subject to

their direct or indirect control.

19.     The Commission seeks permanent injunctions against the Defendants, enjoining

them from engaging in the transactions, acts, practices, and courses of business alleged in this

A530

Complaint; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this

Complaint, together with prejudgment interest pursuant to Section 21(d) of the Exchange Act;

civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the

Exchange Act; an order barring the Defendants from participating in any offering of a penny

stock, pursuant to Section 20(g) of the Securities Act and/or Section 21(d) of the Exchange Act;

conduct-based injunctions enjoining the Defendants from directly or indirectly, including, but

not limited to, through an entity owned or controlled by any of them, participating in the

issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall

not prevent defendants from purchasing or selling securities listed on a national securities

exchange for their own personal account; and such other relief as the Court may deem

appropriate.  Further, as to Dhillon, the Commission seeks an officer and director bar pursuant to

Section 20(e) of the Securities Act and Section 21(d) of the Exchange Act.

## **JURISDICTION AND VENUE**

20.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§78u(d), 78u(e), 78aa].

21.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C.

§77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Certain of the acts, practices,

transactions and courses of business alleged in this Complaint occurred within the District of

Massachusetts, and were affected, directly or indirectly, by making use of means or

instrumentalities of transportation or communication in interstate commerce, or the mails.  For

example, Dhillon sat atop the board of Arch, a Massachusetts-based issuer.

A531

**DEFENDANTS**

22.     **Frederick L. Sharp**, age 69 and born in Los Angeles, California, resides in West Vancouver, British Columbia, Canada.

23.     **Zhiying Yvonne Gasarch a/k/a Zhiying Chen**, age 49 and born in China, is a dual citizen of Canada and China, and resides in Richmond, British Columbia, Canada.  On information and belief, at all times relevant to this Complaint, Gasarch spent most of her time in Canada.

24.     **Courtney Kelln**, age 41, resides in Surrey, British Columbia, Canada.

25.     **Mike K. Veldhuis**, age 41 and born in the Netherlands, resides in Vancouver, Canada.

26.     **Paul Sexton**, age 53 and born in the United Kingdom, resides in Anmore, British Columbia, Canada.

27.     **Jackson T. Friesen**, age 33, lives in Delta, British Columbia, Canada.

28.     **William T. Kaitz**, age 40, lives in Arnold, Maryland.

29.     **Graham R. Taylor**, age 51 and born in the United Kingdom, resides in Vancouver, British Columbia, Canada on information and belief.  On information and belief, at all times relevant to this Complaint, Taylor spent most of his time in Canada.

30.     **Avtar Singh Dhillon, MD**, age 60 and born in India, is a Canadian citizen residing in Long Beach, California.  Dhillon is currently the chairman of the board of directors of Emerald Health Therapeutics, Inc., a Canadian company that publicly trades in the United States markets.  Further:

   a.   Between approximately April 2013 and July 2018, Dhillon was the chairman of the board of directors of Arch.

9

A532

b. Between approximately March 2009 and January 2019, Dhillon was the chairman of the board of directors of Inovio Pharmaceuticals, Inc. ("Inovio").

c. Between approximately January 2012 and April 2019, Dhillon was the chairman of the board of directors of Vitality, including its predecessor, Stevia First Corp.

d. Between approximately March 2011 and April 2020, Dhillon was the chairman of the board of directors of OncoSec.

## **RELATED PARTIES**

31. **Vitality Biopharma, Inc. ("Vitality")**, formerly known as **Stevia First Corp.** ("**Stevia First**"), currently trades on the Over-the-Counter ("OTC") Markets Group, Inc. ("OTC Markets"), an interdealer quotation service that provides a platform to buy and sell securities. Vitality was incorporated in Nevada in 2007 and its principal place of business is in Los Angeles, California. Throughout its history, Vitality has undergone several changes to its business plan and now purports to be in the business of developing cannabinoid drugs for medical treatment. At all times relevant to this Complaint, Vitality's common stock was registered under Section 12(g) of the Exchange Act, and it files Exchange Act reports with the Commission pursuant to the reporting requirements of Section 13(a) of the Exchange Act.

32. **Arch Therapeutics Inc. ("Arch")** currently trades on OTC Markets. It was incorporated in Nevada in September 2009, and its principal place of business is in Massachusetts. The company has had different purported business objectives over the years; it currently purports to be focused on "developing a novel approach to stop bleeding ("hemostasis"), control leaking ("sealant") and manage wounds during surgery, trauma and interventional care." Arch's common stock is, and has been since June 2013, registered with the Commission pursuant to Section 12 of the Exchange Act.

10

A533

33.     **OncoSec Medical Incorporated ("OncoSec")** currently trades on NASDAQ (to which it was uplisted, from the OTC Markets, in May 2015).  It is a Nevada corporation headquartered in Pennington, New Jersey and San Diego, California.  The company purports to be a biotechnology company focused on designing, developing and commercializing innovative therapies and proprietary medical approaches to stimulate and to guide an anti-tumor immune response for the treatment of cancer.  OncoSec's common stock is, and has been since March 2011, registered with the Commission pursuant to Section 12 of the Exchange Act.

34.     **Garmatex Holdings, Ltd. ("Garmatex")**, now known as Evolution Blockchain Group, Inc., currently trades in the grey market.  It was incorporated in Nevada in 2014 and is located in Las Vegas, Nevada.  In 2018, the company announced a change in its business plan, purportedly to pivot from textiles to holding intellectual property related to blockchain technology, and changed its name to Evolution Blockchain.  The Commission suspended trading in the securities of Evolution Blockchain on June 25, 2018.  During the time period of the trading described in this Complaint, the company voluntarily filed periodic reports with the Commission.

## **BACKGROUND**

35.     Before selling stock, control persons are required to: (a) register such sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. §240.144], including limitations on the amount of stock a control person can legally sell.  In addition, investors in certain public companies are required publicly to disclose any ownership interest in excess of 5% of the company's publicly traded stock.  Such registration requirements, sale restrictions, and disclosure obligations are safeguards designed to protect the market for purchases and sales of stock, and to inform investors about the

A534

nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

36.    An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person).  "Control" means the power to direct management and policies of the company in question.  Affiliates include officers, directors and controlling shareholders, as well as any person who is under "common control" with or has common control of an issuer.  As used herein, the term "control group" means a group that collectively is an "affiliate" of an issuer.

37.    "Restricted stock" includes stock of a publicly traded company (also known as an "issuer") that has been acquired from an issuer, or an affiliate of an issuer, in a private transaction that is not registered with the Commission.  All stock held by an issuer or affiliate of an issuer is restricted stock.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.  It also identifies any person or group who is the beneficial owner of more than 5% of the company's securities.

38.    "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily after having previously been subject to a registration statement.  Registration statements are transaction specific, and apply to each separate offer and sale as detailed in the registration statement.  Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice

A535

to register subsequent offers and sales by the same or different parties. Thus, when a control person buys publicly traded or otherwise unrestricted shares in a company that s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate. Such legal restrictions include strict limits on the quantity of shares that may be sold in the public markets absent registration.  Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

39.    A "transfer agent" is a business that facilitates certain types of securities transactions.  Among other things, transfer agents issue and cancel certificates of a company's stock to reflect changes in ownership.  Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock.  Transfer agents routinely keep track of whether particular shares are restricted from resale.

40.     "Penny Stock," as used herein, generally refers to a security issued by a very small company that trades at less than $5 per share.

41.    "S-1 Registration Statement(s)" refer(s) to SEC Form S-1, which is a registration statement filed publicly by an issuer in connection with the sale of stock to shareholders. "S-1 Shareholders," as used herein, means shareholders who acquired stock pursuant to an S-1 Registration Statement.

## OVERVIEW OF THE SHARP GROUP'S CONDUCT

### Obfuscating Beneficial Ownership and Control

42.    From approximately 2010 through at least 2019, the Sharp Group facilitated illegal sales of stock in hundreds of penny stock companies.

43.    As reflected in the table below, the Sharp Group's stock sales generated over one billion dollars in gross proceeds:

13

A536

| YEAR | STOCK SALES ($) | STOCK PURCHASES ($) | NET SALES ($) |
|------|------|------|------|
| 2010 | $ 40,452,026 | $ (7,344,138) | $ 33,107,888 |
| 2011 | $ 198,245,334 | $ (67,424,315) | $ 130,821,019 |
| 2012 | $ 205,403,649 | $ (60,952,750) | $ 144,450,899 |
| 2013 | $ 290,452,161 | $ (62,460,290) | $ 227,991,871 |
| 2014 | $ 64,960,760 | $ (6,612,156) | $ 58,348,605 |
| 2015 | $ 22,057,413 | $ (2,631,013) | $ 19,426,400 |
| 2016 | $ 68,171,713 | $ (9,861,177) | $ 58,310,536 |
| 2017 | $ 86,158,566 | $ (15,867,701) | $ 70,290,865 |
| 2018 | $ 31,155,352 | $ (4,674,550) | $ 26,480,802 |
| 2019 | $ 1,702,074 | $ (889,639) | $ 812,435 |
| **TOTAL** | $ 1,008,759,049 | $ (238,717,730) | $ 770,041,319 |

44.     Sharp, who used the code name "Bond" (styling himself after the fictional character *James Bond*), was the mastermind and leader of the Sharp Group. Among other things, Sharp cultivated relationships with the Sharp Group's clients—that is, individuals seeking fraudulently to sell stock in the markets to retail investors—and with various offshore trading platforms. Sharp also routinely served as a liaison between dozens of clients (like the Veldhuis Control Group) and the trading platforms (like Wintercap SA).

45.     During the period of the scheme detailed herein, Sharp described in a communication to a client the following about the Sharp Group's services: "The service provided is comprehensive; it is not limited to trading. It includes pyaments [sic], loans, private placements **and keeping clients out of jail.**" (Emphasis added).

46.     Sharp oversaw the creation and deployment of various front companies, which served as nominee shareholders used to disguise his clients' stock ownership and to sell stock surreptitiously.

47.     One of the services provided by the Sharp Group was making available offshore corporate nominee shareholders and individuals who would serve as the nominal owners of those entities. Sharp installed these various nominal owners to pose as the beneficial owners of the

14

A537

various entities that served as nominee shareholders.  In actuality, these individuals did not own

or control the stock held by the nominee shareholders and generally had no role other than

offering their names, passports, and signatures, which the Sharp Group used to incorporate and

open accounts for the corporate nominees.  In dealing with banks, brokerages, and other financial

services providers, these individuals were held out as actual beneficial owners.  In this way, the

Sharp Group kept the identities of control groups hidden, while fraudulently appearing to satisfy

the compliance requirements of the banking and securities firms where the Sharp Group opened

these accounts.

48.    In 2002, Sharp wrote a fictionalized book about securities fraud and money

laundering in which he described illegal conduct that parallels the Sharp Group's business

model.  Sharp's book (*Footloose:  Charlie Smith's Offshore Chronicles*) includes the following

passage:

> Eventually [the client] took greater positions in the stocks, sharing the
> take with fewer partners.  This meant he had to disguise his
> shareholdings in order to avoid securities disclosure requirements and
> trading restrictions.
>
> Offshore companies were ideal for his purpose.  They came from
> around the world with nominee directors, but were still subject to his
> control.  The perfect situation for his masterly stock manipulations.

49.    Sharp hired and directed various individuals to operate the administrative services

offered by the Sharp Group.  For example, Sharp oversaw the creation of a network of encrypted

communications, including code-names for the users, encrypted electronic chat functions, and

encrypted email functions.[3]  The Sharp Group purchased, configured and delivered devices that

---

[3] Encrypted communications sent and received through the Sharp Group-administered server are hereinafter referred
to as "Encrypted Communication(s)."

the Sharp Group referred to as "xPhones," which were designed to be used only for the Encrypted Communications.

50.     Sharp also hired and directed individuals who created and administered the Sharp Group's accounting system, which Sharp called "Q" (thereby expanding his *James Bond* affectations – "Q" being another fictional character in *James Bond*).  Given the extensive efforts by the Sharp Group and its clients to conceal and obscure the actual ownership and control of the stock they were surreptitiously selling, the Q system was essential in keeping track of the amounts of stock to be sold and the total proceeds being collected for each deal Sharp's clients ran.  Accordingly, the Sharp Group accounted for all of the nominee shareholders' assets in Q by tracking which of the nominee shareholders held which stocks (and which stocks' sales proceeds) for which particular client or client group, like the Veldhuis Control Group.  The Sharp Group also relied on the Q system to calculate the commissions and fees it collected for facilitating its clients' illegal stock sales.

51.     Sharp arranged for the Encrypted Communication services and the Q accounting system to be hosted on a server that was physically located on the island of Curaçao, in the belief that, there, it would be unreachable by U.S. securities regulators and law enforcement officials.

52.     Kelln is one of the individuals who worked for Sharp.  Kelln routinely performed a variety of complex administrative tasks associated with obtaining, allocating, and distributing blocks of shares across multiple nominee shareholders in a manner designed to conceal the Sharp Group's clients' common control of all the stock so distributed.

53.     In particular, Kelln—at the direction of Sharp and others—routinely split Sharp Group clients' shareholdings into blocks of stock, each comprising less than five percent of each public company's outstanding shares, to be held in the names of various nominee entities.  Kelln

16

A539

sent an Encrypted Communication on or about February 8, 2013 to a client describing her work:

> The process is: I group certs [stock certificates] together that keep the total under 5%. Then I sen[d] them in for transfer to the TA [transfer agent]. Once processed the TA fedex's them to the broker. Then we wait for the shares to clear [i.e., become available for trading]. We only submit 1 transfer a day per broker until we have submitted all the shares.

54.    These acts enabled the Sharp Group's clients to further conceal their control by making it seem as if multiple different, unrelated offshore corporate entities each held less than five percent of the stock of a public company when, in actuality, those offshore corporate entities were all under common control by the Sharp Group, and their stock in the public company was all held in coordinated fashion for the benefit of the Sharp Group's clients. In this manner, the clients concealed the fact that they routinely held far greater than five percent of such public companies' stock through the various Sharp Group-supplied nominee entities.

55.    Breaking the shares into blocks of less than five percent avoided scrutiny by brokerage firms and other market participants. Brokerage firms routinely consider the 5% ownership threshold in determining whether particular stock sales may be part of a distribution that must be registered pursuant to Section 5 of the Securities Act. Further, the OTC Markets requires public companies to disclose its five percent (or greater) shareholders to meet certain listing requirements.

56.    Once blocks of shares were broken up and dispersed among multiple nominee shareholders, the Sharp Group coordinated with offshore trading platforms, such as Wintercap SA and Blacklight SA, which specialized in depositing and liquidating stock through various domestic and foreign brokerage firms. By so doing, the Sharp Group further obscured both the identities of the true beneficial owners and the fact that they were selling in concert.

57.    Gasarch is another one of the individuals who worked for Sharp and managed the

complex administrative tasks that were necessary to the fraudulent scheme. Her duties included arranging for transfers—typically in the form of wire transfers—of the proceeds of illegal stock sales, such as the sales referenced in the table appearing at ¶43 above. In this role, Gasarch routinely arranged to transfer stock sale proceeds to accounts as directed by the Sharp Group's clients in a manner designed to conceal the fact that undisclosed control persons were, in fact, the actual beneficial owners of the stock being sold, and the ultimate recipients of the sales proceeds. When she sent these wires, Gasarch also recorded them in the Q accounting system. She thus observed and maintained the records showing how the Sharp Group's clients were generating, receiving and disbursing their revenue from securities trading. Because of her role, Gasarch was routinely referred to by others involved in the scheme by the nickname "Wires."

58.    One of the ways that Gasarch accomplished the distribution of fraudulent trading proceeds to, and for the benefit of, the Sharp Group's clients was by routinely creating false invoices, loan and subscription agreements, and other documents that purported to originate from Sharp Group-administered nominees, and that could serve as the "back up" to support these payments if they were questioned by the banks and brokerage firms from which the proceeds were being sent. Some examples include:

a) On August 23, 2016, Gasarch created an invoice (on which she left "Company Name" at the top) purportedly to Sharp Group-administered nominee Quezon Group LLC, in the amount of CAD $125,000 from a builder in Canada that was renovating a property for one of the Sharp Group's clients. About a minute after Gasarch last modified the invoice, she sent it, using an email address for Quezon Group administered by the Sharp Group, to Wintercap SA and requested payment from a Wintercap SA account. Gasarch informed Wintercap SA that the reference on the

18

A541

wire to the builder should read "Subscription Agreement 500,000 shares." Wintercap SA paid the invoice as directed by Gasarch.

b) On May 16, 2017, Gasarch modified an invoice from a law firm so that the invoice appeared to have been issued to Sharp Group-administered nominee Riverfall Group Ltd. The invoice requested payment for work done in connection with NewGen Biopharma Corp. and its predecessor company. As discussed in paragraph 237 below, the Veldhuis Control Group engaged in fraudulent sales of the securities of NewGen Biopharma Corp in 2016 and 2017. The Sharp Group debited the amount of this payment in its Q accounting system from the NewGen account. Gasarch also was the last person who edited the cover memo to Wintercap SA (which purported to be written by the beneficial owner of Riverfall Group) asking that Wintercap SA make a partial payment of $129,000 on this invoice. Several hours later, using an email address for Riverfall Group administered by the Sharp Group, Gasarch sent the invoice and the cover memo to Wintercap SA and requested payment from a Wintercap SA controlled-account. Wintercap SA paid the invoice as directed by Gasarch.

c) On or about October 11, 2017, Gasarch created an invoice purportedly to Sharp Group-administered nominee Hilton Capital Inc., in the amount of $28,000 from an entity named SkyLeap Industries, Inc. in Canada. The invoice states that it is for "data encryption tool for internal use." About 5 minutes later, Gasarch was the last person to modify a cover memo, purportedly from the beneficial owner of Hilton Capital, to Wintercap SA, asking Wintercap SA to pay the invoice. The cover memo stated that the purpose of the invoice was "payment of consulting services." The next

19

A542

day, using an email address for Hilton Capital administered by the Sharp Group,

Gasarch sent the invoice and cover memo to Wintercap SA and requested payment

from a Wintercap SA account.  Wintercap SA paid the invoice as directed by

Gasarch.  In the Q accounting system, this payment was charged to the account for

Liberty One Lithium, another issuer whose stock was sold fraudulently by the

Veldhuis Control Group (see paragraph 237).

59.    Gasarch understood that her job was to obfuscate the source and destination of

distributions that the Sharp Group's clients were taking from their fraudulent trading proceeds

and that they were laundering through the Sharp Group.  Her communications with Sharp

demonstrate Gasarch's understanding.  For example, in August of 2013, Gasarch engaged in the

following Encrypted Communication with Sharp:

| Sharp to Gasarch | On aug 12 u wrote a draft for grand yachts against cash.  C[ou]ld u pls explain to me how this is a legitimate payment?  My concern is money laundering: hells angels gives us cash, we give them a draft to buy a boat. Later, boat is seized, polic[e] investigate, find out charterhouse [a Sharp Group-administered nominee] paid for it; visit us and ask why.  What will u say? |
| --- | --- |
| Gasarch to Sharp | Can we lend money to them?  Thomas asks them sign loan agreement for us. Thomas will call me back. |
| Sharp to Gasarch | Who r they? |
| Gasarch to Sharp | Thomas s client |
| Sharp to Gasarch | Yes but who?  A person, a company, what business? |
| Gasarch to Sharp | Waiting Thomas reply |

60.    Gasarch's communications demonstrate her understanding that the Sharp Group

was controlling the Sharp Group-administered nominees for the benefit of the Sharp Group

clients.  For example, on February 18 and 19, 2015, Gasarch engaged in a series of Encrypted

Communications with Sharp and others about the urgency of responding to an attorney's request

for documents to be signed by the purported control persons of a Sharp Group-administered

nominee.  Gasarch informed Sharp that "we" signed the documents for all of the directors, but

A543

she didn't know who should sign the documents for the notary. Sharp chided Gasarch: "Of course u do; his name is on the stamp!," thus telling Gasarch to sign for the notary.

61.    Similarly, communications between Sharp Group clients and Wintercap SA report instances demonstrating that Gasarch knowingly, recklessly, or negligently sent emails pretending to be from the nominal owners of Sharp Group-administered nominees in furtherance of the Sharp Group's clients' fraudulent schemes.

    a.    On July 7, 2017, Sharp Group client Benjamin Kirk[4] and a Wintercap SA employee communicated about an email message seeking to transfer CAD $60,000 that Gasarch had sent to Wintercap SA a week earlier at Kirk's request. Gasarch's email purported to be written by the beneficial owner of a Sharp-administered nominee and came from an email address for that nominee that was administered by the Sharp Group.

    b.    On July 12, 2018, Sharp Group client Luis Carrillo and a Wintercap SA employee communicated about what to do about a rejected wire that Gasarch had requested on June 22, 2018 for a Sharp Group-administered nominee named Santos Torres LLC. The Wintercap SA employee told Carrillo to get Gasarch to email Wintercap SA from the Santos Torres account to inform Wintercap SA that the wire was rejected and why.

62.    Gasarch was also involved in the movement of Sharp Group clients' shares to Wintercap SA. For example:

    a.    On June 16, 2016, Veldhuis wrote to Gasarch to ask for her help in getting Wintercap SA to sign documents that would make it appear as if Wintercap

---

[4] *SEC v. Lee, et al.*, No. 21-cv-11997 (D. Mass. filed Dec. 9, 2021).

A544

SA was purchasing for itself 5 million shares of Stevia First/Vitality, when Veldhuis was just using Wintercap SA to conceal the Veldhuis' Control Group's ownership of those shares.  The same day, Gasarch forwarded Veldhuis' request to Wintercap SA's operations employees and asked them to sign the documents and return them to her.

   b.  On September 23, 2016, Veldhuis wrote to Gasarch that he was sending 2,375,000 warrants of StartMonday Technology Corp. to Wintercap SA (StartMonday was an issuer whose securities the Veldhuis Control Group sold fraudulently in 2016 through 2018 – see paragraph 237).  Veldhuis also informed Gasarch that "[b]ecause they are still in the 4 month hold period we will need Silverton SA [the former name of Wintercap SA] to sign the attached document.  Please arrange."  Gasarch forwarded Veldhuis' message to Wintercap SA, which then asked Gasarch for some supporting documentation.

63.     Gasarch knew, or recklessly or negligently disregarded, that the Sharp Group's clients were paying for promotions for the stocks they were involved in selling, and that it was important to separate the Sharp Group-administered nominees that paid for stock promotions from the Sharp Group-administered nominees that held and traded stock for the Sharp Group's clients.  Gasarch's knowledge is demonstrated in at least the following two Encrypted Communications:

   a.  On or about April 29, 2014, Gasarch communicated with Sharp Group client Benjamin Kirk regarding an outgoing wire he was requesting in the amount of $281,233.  Kirk informed Gasarch that he had "very good paper work" but

A545

needed the name and address for the account from which the Sharp Group

would send the wire (showing that the source of the payment was arbitrary).

Gasarch asked Kirk if the payment was for a stock promotion because if it

was, "I need to find a safe account for wire."

b.  Similarly, on or about September 5, 2014, Gasarch communicated with Sharp

Group client Steve Bajic[5] regarding what account would be used to send an

outgoing wire he was requesting in the amount of $100,000.  Gasarch asked

Bajic if the payment was for a stock promotion, and if so, she needed to know

which stock.  Bajic responded that it was not for a stock promotion so Gasarch

told him that he could use Peregrine Capital (the entity for which she was the

listed as the owner).  Bajic asked again:  "Does peregrine trade stocks?  I want

$ to come from bank that has no links to trading, if that's even possible?"

Gasarch reassured him: "I asked u what stock for, U answer not promote.  So I

can use any account."

64.     Gasarch also implemented Sharp's plan to protect the identities of the Sharp

Group's clients.  For example, (a) Gasarch helped to disguise the identities of actual shareholders

by personally serving as the purported owner of a nominee shareholder—Peregrine Capital Corp.

f/k/a Peaceful Lion Holdings—that the Sharp Group routinely used to facilitate the illegal stock

sales on behalf of control group clients; and (b) in late 2015, around the time the Sharp Group

distributed to clients a new set of xPhones for their use in Encrypted Communications, Gasarch

drafted a memo with instructions about how to "delete all secure chats when xphone is shut

down (e.g., to cross a border)."

---

[5] *SEC v. Bajic, et al.*, No. 20-cv-007 (S.D.N.Y. filed Jan. 2, 2020).

A546

65.     Kelln likewise made it a point to remind Wintercap SA principals of these security protocols, as in a November 2016 Encrypted Communication in which she noted, after traveling back to Canada from Switzerland, "I had to delete my phone going through customs." A Wintercap SA principal responded "[w]e approve of your security."

**The Sharp Group Benefited from Illegal Stock Sales**

66.     Sharp, Kelln, and Gasarch profited handsomely from their illicit services to the Sharp Group's clients.

67.     For example, between just August 2017 and July 2018, Wintercap SA transferred approximately $7 million to a Marshall Islands company called Cortona Equity, Inc. ("Cortona") for Sharp's benefit.  Sharp had installed his wife's tennis coach as the purported beneficial owner of Cortona.

68.     On various dates between 2010 and 2019, Kelln and Gasarch were the beneficiaries of more than $1 million each of funds derived from the Sharp Group's conduct.  By way of example:

    a.   On or about January 2, 2019, a Sharp Group-administered nominee named Inland Trading wired $49,861.10 to a United States-based corporate entity owned jointly by Gasarch and her husband.  The primary source of Inland Trading's income was fraudulent trading on behalf of Sharp Group clients. The wire payment to the company owned by Gasarch and her husband listed Gasarch's home address in Canada as the "Beneficiary address."

    b.   On or about May 2, 2018, Gasarch, using the email account for Sharp Group-administered nominee Hilton Capital Inc., asked Wintercap SA to send $100,016 from Hilton Capital's account to Gasarch's account at Sun Life

A547

Assurance Co.  Gasarch attached copies of her passport and driver's license to the request as backup for the transaction.

69.    Further, between at least September 2011 and April 2019, the Sharp Group would perform a month-end sweep, using its Q accounting system, of commissions and fees that it earned from the securities transactions, securities deposits, and other securities-related services it performed for its clients in that month.  The sweep allocated a portion of the commissions and fees that were paid into the Bond account (the account associated with Sharp) to accounts in the names of Kelln and Gasarch, from which Kelln and Gasarch could then withdraw funds.  Between August 2016 and April 2019, Gasarch's portion of these monthly commissions and fees totaled over $300,000.  In addition, Gasarch received Christmas bonuses of CAD $100,000 in 2016 and 2017 and a Christmas bonus of CAD $70,000 in 2018.

### SHARP GROUP EXAMPLE ONE: ILLEGAL SALES OF STEVIA FIRST/VITALITY BY DHILLON, VELDHUIS CONTROL GROUP AND TAYLOR

70.    By August 2011, Dhillon had become the Interim Principal Executive and Financial Officer of Stevia First and, by January 2012, had become its Chairman.  As detailed below, during and after his securing of these roles, Dhillon coordinated with the Veldhuis Control Group and Taylor fraudulently to sell Stevia First/Vitality[6] stock to retail investors at inflated prices on various occasions over several years.  Further, Sharp, Kelln, Veldhuis, Friesen, Sexton, Taylor and Dhillon failed to register their sales of Stevia First/Vitality stock described herein pursuant to Section 5 of the Securities Act.

---

[6] Stevia First changed its name to Vitality in 2016, and the company still operates under that name.  Stevia First and Vitality stock is referred to as "Stevia First/Vitality" in this Complaint.

25

A548

71.    Defendants' successive campaigns to sell Stevia First/Vitality stock fraudulently were very successful.  The following table reflects the proceeds that several of the Defendants' illicit sales of Stevia First/Vitality stock generated during the scheme (the "quantity sold" in the table below reflects the number of shares sold, and incorporates a 1-for-10 reverse stock split in 2016).

| Year | Quantity Sold | Trading Proceeds |
|---|---|---|
| 2012 | 19,600,000 | $    24,718,428 |
| 2013 | - | - |
| 2014 | 1,320,511 | 566,715 |
| 2015 | 2,424,661 | 770,492 |
| 2016 | 5,474,517 | 5,503,691 |
| 2017 | 4,904,846 | 10,570,537 |
| 2018 | 2,045,146 | 3,509,479 |
| Grand Total | 35,769,681 | $    45,639,343 |

**Background**

72.    By early 2011, Dhillon controlled a private company called Stevia First.  Around that time, Dhillon looked for an opportunity to convert that business to a publicly traded company in a process known as a "reverse merger."  In a reverse merger transaction, an existing public company having a ticker symbol cleared for quoting on OTC Markets, but with little, if any, operations (often referred to as a "shell company"), acquires a private operating company. After the private operating company is absorbed into the public shell company, the shell company typically undergoes a name, ticker-symbol, and business-plan change, to align with the name and purported business of the formerly private operating company.  In such transactions, shareholders of the formerly private company frequently receive shares in the newly merged

26

A549

public company.  In many instances, those shares comprise a controlling interest in the post-merger public company.

73.    In or about early 2011, Taylor introduced Dhillon and the then-Chief Executive Officer (the "CEO") of Dhillon's private company to certain of Taylor's contacts in China and to an attorney in Vancouver.  Dhillon and the CEO eventually merged the private company with a public shell company.  On paper, the bulk of the shares in the shell company were held by various Chinese nationals who were identified in an S-1 registration statement that had previously been filed by the shell company (hereinafter the "Stevia S-1 Shareholders").

74.    According to public filings, on July 28, 2011, the purported president, chief executive officer, treasurer and director of the public shell company agreed to sell all of his 4,500,000 shares to Dhillon pursuant to a stock purchase agreement.  The stock purchase agreement contemplated that, immediately upon closing of the reverse merger, Dhillon would be appointed as a director, and as the President, Chief Executive Officer, Secretary, and Treasurer, of the surviving public company.

75.    On or about October 10, 2011, the reverse merger went effective and the surviving public company was re-named Stevia First, thereby assuming the name of Dhillon's private company.

76.    On or about October 12, 2011, Stevia First effected a 7-for-1 forward stock split, which caused Dhillon's 4,500,000 shares (referenced in ¶74) to convert to 31,500,000 shares of Stevia First/Vitality stock.

77.    Dhillon was the sole signer of Stevia First's filing with the Commission, which reported the 7-for-1 forward stock split.  The stock split had the effect of increasing the number of shares held by Dhillon considerably.

78.     In or about January 2012, Dhillon assumed the role of chairman of Stevia First's board of directors.  Stevia First/Vitality's stock was registered pursuant to Section 12 of the Exchange Act.

79.     Dhillon was an affiliate of Stevia First (and, subsequently, Vitality) because he had the power to control the company through his role as chairman of its board.  As a public company affiliate, Dhillon was legally required to register any sales of his Stevia First/Vitality stock unless Dhillon elected to comply with the safe harbor provisions set forth in Commission Rule 144.  Dhillon testified, under oath, during the Commission's investigation leading to the filing of this action that he understood these legal requirements at all times relevant to this Complaint.  As described in more detail in this Complaint, Dhillon repeatedly sold shares of Stevia First/Vitality without registering such sales.

80.     As a director of Stevia First (and, eventually, Vitality), Dhillon was required to file various "Form 4" statements (i.e., a "Statement of Changes of Beneficial Ownership of Securities"), which is a public form required by the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder.  Dhillon was required to file an updated Form 4 to reflect any change in his beneficial ownership of Stevia First/Vitality stock, regardless of the amount of that change.  Dhillon understood these legal requirements at all times relevant to this Complaint.  Dhillon testified, under oath, during the Commission's investigation leading to the filing of this action that "[a]nytime there's sales by insiders, you have to file appropriate forms to disclose your purchases or sales."

81.     Dhillon was also legally required to file a public disclosure report—a "Schedule 13D"—with the Commission pursuant to Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder, to the extent he was the beneficial owner of greater than five percent of

Stevia First/Vitality's common stock. Dhillon was likewise required to disclose, via a Schedule 13D filing, any agreements he entered into concerning disposition of Stevia First stock, as well as the combined holdings of all participants in any such agreements. Dhillon was further required to file a Schedule 13D Amendment whenever his position materially changed. Dhillon understood these legal requirements at all times relevant to this Complaint. For example, on or about August 17, 2011, Dhillon filed a Schedule 13D with the Commission disclosing that he was the beneficial owner of 4,500,000 *restricted* shares of Stevia First/Vitality stock, which comprised more than five percent of the company's outstanding common shares at that time. As described in more detail in this Complaint, Dhillon intentionally failed to disclose his beneficial ownership interest in additional shares of Stevia First/Vitality stock, which were purportedly *unrestricted*; and he never made any disclosure concerning his agreements with the Veldhuis Group concerning Stevia First stock.

### Round One: 2012 Stevia First/Vitality Stock Sales

82.    Beginning in January 2012, shortly after Dhillon took over Stevia First, Dhillon, Taylor, and the Veldhuis Control Group arranged to sell surreptitiously Stevia First/Vitality's purportedly unrestricted stock and share in the proceeds of those unregistered sales.

83.    First, Taylor, working in concert with others, facilitated the transfer of Stevia First/Vitality's purportedly unrestricted stock from the Stevia S-1 Shareholders (defined in ¶73) to, initially, fifteen Sharp Group-administered nominee companies that held the stock for the Veldhuis Control Group. Shortly thereafter, the Sharp Group consolidated or further transferred shares held by several of these Sharp Group-administered shareholders into other Sharp Group-administered shareholders, including Peaceful Lion Holdings, a nominee shareholder for which

A552

Gasarch personally served as purported owner, and thus as purported owner of any shares held by it. The flow chart below reflects these transfers:[7]



84. Between January and March 2012, the Sharp Group-administered nominee shareholders (including Gasarch's Peaceful Lion Holdings) received 19,600,000 shares of Stevia First/Vitality stock, representing over 37% of the company's total outstanding stock and over 97% of its purportedly unrestricted stock. These particular shares, which were all issued without restrictive legend, are hereinafter referred to as the "'Unrestricted' Stevia First Merger Shares."

---

[7] The entities color coded in green in this chart and other charts within this Complaint were administered or otherwise utilized, directly or indirectly, by the Sharp Group.

(Shares issued without restrictive legend are commonly treated by securities brokers and transfer agents as immediately and freely tradeable.  In reality, however, these 'Unrestricted' Stevia First Merger Shares were held by affiliates of the issuer who were acting in league with its Chairman.  As such, these shares were, as a matter of law, restricted, and thus were subject to the federal securities laws' limitations and restrictions on unregistered sales of such shares.)

85.    In March 2012, Stevia First—with Dhillon serving as the chairman of its board of directors—began to issue press releases claiming various positive business developments for the company while, at or about the same time, the Veldhuis Control Group orchestrated a promotional campaign touting Stevia First's stock.

86.    For example, the Veldhuis Control Group paid for promotional materials touting Stevia First that were disseminated to investors during approximately March through May 2012.  These Stevia First promotional materials urged investors to buy and buy quickly, saying things like, "***Get in now; this is huge!***" (emphasis in original) and "***Buy STVF right now!***" (emphasis in original; "STVF" was Stevia First's ticker symbol).  These promotional materials misleadingly claimed both that "Conmar Capital Inc." was the paying party, and that Conmar Capital "will not trade in the securities of Stevia First."  In fact (i) it was the Veldhuis Group, which controlled the overwhelming majority of Stevia First's free-trading shares, that paid for the promotions; (ii) the Veldhuis Control Group had paid the Sharp Group to incorporate Conmar Capital; and (iii) although no Stevia First trading took place (at the time of the campaign) through Conmar Capital, the Veldhuis Control Group was indeed "trad[ing] in the securities of Stevia First" by massively unloading them on the very retail investors who were buying in response to that campaign.

31

A554

87.     The Veldhuis Control Group also engaged Kaitz to promote Stevia First,

including through paying Kaitz's stock promotion company over $200,000 on or about April 3,

2012.

88.     Overall, from approximately March 6, 2012 to May 23, 2012, the Veldhuis

Control Group, with Kaitz's substantial assistance, unloaded every share of the 'Unrestricted'

Stevia First Merger Shares into the market, generating illicit proceeds of over $24 million.

89.     Both Taylor and Dhillon contemporaneously shared in the illicit proceeds

stemming from the Veldhuis Control Group's March-May 2012 lucrative unloading of Stevia

First stock, described above.  In particular, between approximately April and June 2012, the

Veldhuis Control Group used the Sharp Group to remit eight wire payments, all funded by Stevia

First stock-sale proceeds, and totaling over $4.2 million, to the Swiss bank account of an

offshore front company that Taylor controlled; and Taylor, in turn, promptly transferred over

60% of that money to Dhillon as follows:

| Date | Veldhuis Control Group Transfers to Taylor's Company | Taylor Transfers to Dhillon's Companies |
|---|---|---|
| April 12, 2012 | $610,200 | |
| April 12, 2012 | $498,900 | |
| April 13, 2012 | $496,800 | |
| April 17, 2012 | | $498,000 |
| May 4, 2012 | | $400,000* |
| May 11, 2012 | | $496,000* |
| June 8, 2012 | $475,000 | |
| June 8, 2012 | $800,000 | |
| June 8, 2012 | $900,000 | |
| July 16, 2012 | | $1,300,000* |

*Each of these transfers went to the Swiss bank account of a front company incorporated in
Panama called Ortivo Enterprises Corp. ("Ortivo") that Dhillon controlled.*

90.     To further conceal the identities of the people sharing in the illicit proceeds from

the unregistered sale of the 'Unrestricted' Stevia First Merger Shares, as well as the illicit source

of those proceeds, the Veldhuis Control Group distributed portions of those proceeds in cash obtained from the Sharp Group on various dates. These cash withdrawals were recorded in the Q system and allocated to the Stevia First deal.

**Round Two: 2014 Stevia First/Vitality Stock Sales**

91.     On or about March 30, 2012, May 25, 2012, and February 13, 2014, Stevia First issued a total of 1,320,511 shares of Stevia First/Vitality stock to a Sharp Group-administered nominee shareholder. The Sharp Group, in turn, divided those shares between two additional Sharp Group-administered nominee shareholders. The table below reflects these transfers.



92.     Thereafter, the Veldhuis Control Group sold these shares through Sharp Group-administered nominee shareholders for the benefit of Dhillon, the Veldhuis Control Group, and Taylor. Specifically, between approximately January 14, 2014 and July 14, 2014, the Veldhuis Control Group sold all 1,320,511 of these Stevia First/Vitality shares through at least two offshore brokerage firms, obscuring the shares' ownership and the disposition of their proceeds by running the trades through two Sharp Group-administered nominee shareholders.

93.     Kelln facilitated the unregistered sale of the 1,320,511 Stevia First/Vitality shares. For example, on or about October 9, 2013, Kelln provided Stevia First's transfer agent with the required paperwork to transfer 625,000 of the 1,320,511 shares of Stevia First/Vitality shares to Nautilus Growth Fund. Kelln also provided a check to pay for the transfer. The documents

33

provided by Kelln to Stevia First's transfer agent included an attorney opinion letter that falsely represented that Nautilus Growth Fund was not an affiliate of Stevia First. Kelln knew, or recklessly disregarded, that Nautilus Growth Fund was merely a nominee shareholder holding stock for the Veldhuis Control Group, which was an affiliate of Stevia First.

94.     As the Veldhuis Control Group sold shares, Veldhuis, Sexton, and Friesen discussed distributing the proceeds from the sale of the 1,320,511 shares of Stevia First/Vitality stock in a furtive manner that was designed to conceal the funds' source as well as their ultimate recipients.

95.     For example, on or about February 25, 2014, Sexton and Veldhuis discussed in an Encrypted Communication their plan to distribute a pool of proceeds from the sale of the 1,320,511 shares of Stevia First/Vitality stock in "cash" and noted that "AV will be fine with [our so distributing] it." "AV" is a reference to Avtar Dhillon.

96.     On or about March 6, 2014, Veldhuis sent the following Encrypted Communication to Friesen: "u r getting 173k today. A cut from MDDD [the ticker symbol of another public company stock the Veldhuis Control Group fraudulently sold through the Sharp Group] and STVF [the ticker symbol of Stevia First in 2014]. Buy a boat [expletive]. Rich mother [expletive]." Of the "173k" (i.e. $173,000) referred to by Veldhuis in the Encrypted Communication to Friesen, $100,000 came from proceeds of selling the 1,320,511 shares of Stevia First/Vitality stock.

97.     On or about March 6, 2014—around the same time that Veldhuis was coordinating the distribution of Stevia First/Vitality stock sale proceeds to Friesen (and others)— the Veldhuis Control Group caused the Sharp Group to send $124,000 in Stevia First/Vitality stock-sale proceeds to the same Taylor Swiss bank account referenced in ¶89 above.

98.     On various dates later in 2014, the Veldhuis Control Group continued to sell Stevia First/Vitality stock.  For example:

    a.  On or about May 28, 2014, Friesen sent an Encrypted Communication, copying Veldhuis, directing a trader working for Sharp to sell 25,000 shares of Stevia First/Vitality stock that was held in an account in the name of a Sharp Group-administered nominee shareholder.

    b.  On or about July 7, 2014, Friesen sent an Encrypted Communication directing a trader working for Sharp to sell 25,000 shares of Stevia First/Vitality stock.

99.     On or about August 5, 2014, Veldhuis sent an Encrypted Communication asking Gasarch the following: "How much cash do you have in total.  We might cut the balance of STVF [Stevia First] that's left.  So we would need about $110K.  Do you have or be able to get?"

100.     On or about August 6, 2014, Veldhuis sent a follow up Encrypted Communication to Gasarch: "Can I please get $120K cash from STVF?"

101.     On or about August 6, 2014, Veldhuis picked up $120,000 in cash from Sharp's office.

102.     On or about August 6, 2014, Sexton and Veldhuis continued to discuss, via Encrypted Communications, the planned distribution of proceeds from selling the 1,320,511 shares of Stevia First/Vitality stock.  Veldhuis wrote: "so STVF with the two wires being added back is 126,693.74 . . . Avtar 50,000 (40%) . . . [there is] enough cash to do it might [sic] be easier to transfer."

103.     During the same August 6, 2014 Encrypted Communication, Sexton replied: "You should cut up the 120,000 [in] cash.  Which would allow for . . . Avtar/GT [Dhillon and

A558

Taylor] 42,000[.] So if you want to bring me 96k on Friday I can distribute?  GT [Taylor] will be up here shortly . . . ."

104.    During the same August 6, 2014 Encrypted Communication, Veldhuis asked Sexton how he should transmit the cash, writing, "U want me to put in the safety deposit box or bring it to you."  Sexton replied: "You can do either.  I have a safe here.  I can distribute mind [sic] and grahams [Taylor] from here.  I can hold . . . av's [Avtar Dhillon's] for next meeting."

105.    On or about August 7, 2014, Veldhuis reported to Sexton via an Encrypted Communication that "I pick up [sic] that cash yesterday.  Its [sic] all 50's."

106.    Similarly, between approximately November 2013 and January 2015, Taylor arranged to transfer approximately $1.7 million to third parties for Dhillon's benefit.

107.    Dhillon failed to file any Form 4 disclosing the sales of Stevia First stock directed by the Veldhuis Control Group, despite having a pecuniary interest in Stevia First stock sales effected through the Veldhuis Group, and despite knowing of his obligations, as Chairman of Stevia First, to report any and all of his Stevia First stock sales on Forms 4 filed with the Commission.

**Round Three:  2015 and 2016 Stevia First/Vitality Stock Sales**

108.    In connection with the 2011 merger of Dhillon's private company into the public shell company, Dhillon received 4,500,000 restricted shares of Stevia First/Vitality stock (hereinafter referred to as the "March 2012 Stevia First/Vitality Stock").  After Stevia First, directed by Dhillon, issued a 7-for-1 forward split of Stevia First/Vitality stock, Dhillon held 31,500,000 shares of the March 2012 Stevia First/Vitality Stock, all of which was restricted.

36

A559

109.    The scheme by the Veldhuis Control Group, Taylor and Dhillon to unload this March 2012 Stevia First/Vitality Stock through another round of illicit stock sales began in March 2012.

110.    The first step in this facet of the scheme was to move Stevia First/Vitality stock into the hands of the Veldhuis Control Group, while concealing the common ownership and control of this large block of shares.

111.    As with prior illegal sales of Stevia First/Vitality stock, several of the Defendants used multiple Sharp Group-supplied entities as nominee shareholders, each purporting to hold less than 5% of the company's shares, in order to conceal the fact that affiliates of the issuer were, in concert, controlling, and would be illegally selling, unregistered shares of Stevia First/Vitality stock.

112.    To that end, in or about March 2012 (i) Sharp authorized, through a wire request he signed, a payment to Dhillon in the amount of $33,800, and (ii) Taylor also directed two payments totaling $9,450 to Dhillon.  These payments were all made to Dhillon's personal bank account.

113.    Sharp's March 2012 $33,800 payment to Dhillon—which was funded by proceeds from the Veldhuis Control Group's sale of the 'Unrestricted' Stevia First/Vitality Merger Shares earlier that month—was for the purchase of 15,750,000 shares of Dhillon's March 2012 Stevia First/Vitality Stock.  Meanwhile, Taylor's March 2012 payments (for a total of $9,450) were for the purported purchase of another 4,227,500 shares of Dhillon's March 2012 Stevia First/Vitality Stock.  Taylor purchased 2,227,500 of these shares in the name of Heng Hong Investments, a nominee entity he controlled.

A560

114.    To conceal the common control and disposition of the roughly 20 million shares of March 2012 Stevia First/Vitality Stock shares that Dhillon had transferred based on the aforementioned Sharp- and Taylor-arranged payments, Dhillon disguised his transfers as a series of smaller sales to (i) various Sharp Group-administered shareholders—all of which would hold, and ultimately sell, the Stevia First/Vitality stock for the benefit of the Veldhuis Control Group and Dhillon—and (ii) two nominee shareholders that were controlled by Taylor, which would hold, and ultimately sell, the Stevia First/Vitality stock for Taylor's and Dhillon's benefit.  The chart below illustrates Dhillon's sale of these shares, as well as Dhillon's division of the remaining shares that were derived from the March 2012 Stevia First/Vitality Stock.  (In fact, however, as detailed below, Dhillon did not fully relinquish his interest in the March 2012 Stevia First/Vitality Stock.):

A561



115.    The roughly 20 million shares of the March 2012 Stevia First/Vitality Stock that

Dhillon transferred to nominee shareholders administered by the Sharp Group or Taylor

comprised approximately 39 percent of the company's outstanding shares.  But, by spreading

these shares among various nominee shareholders, each shown as holding under five percent of

the company's outstanding shares, Dhillon obscured the facts that (i) he had not, in truth,

relinquished his interests in all of these shares; and (ii) these shares were, in truth, held by the

Veldhuis Control Group, himself, and Taylor, all of whom were acting in concert.

39

A562

116.    The Veldhuis Control Group and Taylor did not immediately sell the shares held

by the nominee shareholders referenced in ¶114 and 115 above, at least partly because the stock

was initially marked as restricted by Stevia First's transfer agent since it was acquired directly

from Dhillon, an affiliate of the company.  SEC Rule 144 provides a safe harbor from registering

the sale of restricted stock acquired directly from an affiliate if, among other things, the

acquirer(s) hold those shares for at least six months.  In the meantime, the Veldhuis Control

Group sold the other Stevia First/Vitality stock that they had obtained, as described in ¶¶83 to 84

("Round 1") and ¶¶91 to 92 ("Round 2"), above.

117.    Beginning in the fall of 2014, the Veldhuis Control Group arranged for the

unregistered sale of the March 2012 Stevia First/Vitality Stock in concert with Taylor and

Dhillon.

118.    In an Encrypted Communication on or about October 24, 2014, Veldhuis, Sexton

and Friesen discussed their plans to sell the March 2012 Stevia First/Vitality Stock into the

public markets.  In particular, Sexton summarized the Veldhuis Control Group's plans to sell the

15,750,000 shares that Dhillon had transferred to the various Sharp Group-administered nominee

shareholders, which included 1,000,000 shares to be sold for Dhillon's benefit, and raised the

possibility of coordinating those sales with sales of the shares Dhillon had transferred to Taylor's

nominee shareholders, writing: "There was 31,500,000 in total. We have 15,750,000 minus the

1mm to Avtar [Dhillon].  GTaylor is **outside the 15.75**.  He would consider blending back if Av

[Dhillon] agrees to the plan."  (Emphasis added).

119.    Taylor, as illustrated in ¶113 above, held approximately 4.2 million additional

shares via two nominee shareholders, which is consistent with Sexton's referring to Taylor's

40

position, in the above-quoted Encrypted Communication, as "outside the 15.75" million shares held by various Sharp Group-administered nominee shareholders.

120.    On or about October 28, 2014, Sexton met with Dhillon in California, and summarized their meeting in an Encrypted Communication between Sexton and Veldhuis the following day in these words:

    a.  Dhillon "said that stv [Stevia First] is working 2 big food producers and they feel that one has a very good chance to come to table. He would like to be more aggressive and get the price and volume up. . . . He's also sharing in part of grahams [Taylor's] retained [sic] position."

    b.  "Also, av [Dhillon] said that he would prefer if we took the shares in gt [Taylor's] names and sold them all together. Lol."

121.    On various dates thereafter, Taylor, directly or indirectly, transferred the March 2012 Stevia First/Vitality Stock held by his two nominee shareholders to Sharp Group-administered nominee shareholders that were used by the Veldhuis Control Group. Though Taylor allowed the Veldhuis Control Group to trade these shares on his behalf, he retained a beneficial ownership interest in the proceeds of those trades. For its part, in or about December 2014, the Veldhuis Control Group arranged to sell March 2012 Stevia First/Vitality Stock through Wintercap SA and Blacklight SA using Sharp Group-administered nominee shareholders. The chart below reflects the transfers to various Sharp Group-administered nominee shareholders:

A564



122.    On or about December 2, 2014, Veldhuis sent an Encrypted Communication to

Gasarch, copying Sharp, to determine if the nominee shareholders his team had been using to

hold March 2012 Stevia First/Vitality Stock were administered by the Sharp Group, or some

other offshore nominee shareholder provider.  Veldhuis wrote: "[w]e are in the process of

receiving approximately 20 million shares of [Vitality] that were held in ESCROW.  At the time

42

of ESCROW agreement we may have put some of the stock in NON BOND [i.e. non-Sharp] [nominee] entities.  Can you please go through the list below and let me know which entities you guys administer."  (Veldhuis's reference to "approximately 20 million" comports with the sum of (i) the 15,750,000 shares of March 2012 Stevia First/Vitality Stock that Dhillon transferred to the various Sharp Group-administered nominee shareholders in 2012, plus (ii) the approximately 4.2 million shares of March 2012 Stevia First/Vitality Stock that Dhillon transferred to two nominee shareholders controlled by Taylor.)

123.    Sharp, copying Kelln, replied to Veldhuis's December 2, 2014 Encrypted Communication by writing: "This [message] shld have gone to celtic."  "Celtic" was Kelln's pseudonym.  Kelln promptly replied: "I confirm they [nominee shareholders] are all ours [i.e, Sharp Group-administered nominee shareholders]."

124.     Kelln subsequently arranged for the Veldhuis Control Group's stock, which now included the approximately 4.2 million shares initially held by Taylor's two nominee shareholders, to be deposited into accounts controlled by Wintercap SA and Blacklight SA.

125.    Thereafter, during the course of 2015 and through the end of 2016, the Veldhuis Control Group directed the unregistered sales of their and Taylor's March 2012 Stevia First/Vitality Stock in coordination with another stock promotional campaign run by Kaitz.

126.    In or about January 2015, via an Encrypted Communication, Veldhuis asked Kaitz who Kaitz would identify as the "third party" payer on the Stevia First/Vitality stock promotional alerts.  Kaitz replied, "Conmar Capital," which was the name of a Sharp Group-administered entity that the Veldhuis Control Group had paid to incorporate in 2012.  Ultimately, the January 2015 promotions identified "Full Service Media" (Kaitz's own company), as well as an unidentified "third party," as each having supplied funds to pay for those stock promotions.

43

A566

Kaitz knew that the Veldhuis Control Group was paying for the stock promotions and concealed this by listing "Conmar Capital" as the party paying for his promotional campaign. Kaitz further knew, or recklessly disregarded, that the Veldhuis Control Group intended to sell stock surreptitiously and was paying for the promotional campaign in order to facilitate such sales.

127.    The members of the Veldhuis Control Group each knew or recklessly disregarded that stock promoters, like Kaitz, falsely identified third party payers in order to conceal the fact that control groups and other affiliates were sponsoring promotional campaigns in order to surreptitiously dump stock in the markets. Similarly, Dhillon and Taylor knew, or recklessly disregarded, that the Veldhuis Control Group would retain a stock promoter to tout Stevia First/Vitality stock and would conceal (i) their role in funding the stock promotional campaign, (ii) the fact that they were part of a group that controlled the issuer, and (iii) the fact that they intended to trade, and were trading, in the opposite direction to which the touts urged retail investors to trade.

128.    On or about March 13, 2015, Sexton and Veldhuis exchanged Encrypted Communications concerning Dhillon and continuing the Stevia First/Vitality stock promotion:

> Sexton to Veldhuis: "Avtar said they got additional things going for stvf [the ticker symbol for Stevia First at the time]. To keep going with [a stock promoter] and they only have another 1mm to chew thru and it should clean up real nice.
>
> Veldhuis to Sexton: "Nice."

129.    Veldhuis, on behalf of Dhillon, the Veldhuis Control Group, and Taylor, continued to orchestrate stock promotions concerning Stevia First/Vitality stock later in 2015. To that end, Veldhuis sought to identify a nominee entity that could be cited as the paying party for the promotional campaign in order to conceal the fact that the Veldhuis Control Group actually paid for the stock promotional campaign.

A567

130.     For example, on or about March 31, 2015, Veldhuis sent an Encrypted

Communication, subject line "promo," to Sharp asking if one of eight Sharp Group-administered

nominees "can be used . . . as the payee [sic] for the promotion.  Or should we set up a new

company?"  Sharp responded and instructed Veldhuis to use one of the preexisting nominee

companies.

131.     On or about the same day, Veldhuis forwarded Sharp's Encrypted

Communication to Kelln and asked: "[c]an u please send me on[e] of the 8 companies including

the address?"  Kelln, in turn, copied Gasarch on the Encrypted Communications chain and wrote:

"Wire [Gasarch]: pls provide [Veldhuis] a current 2015 holding co with address."  Later that day,

Gasarch confirmed that she emailed the requested information to Veldhuis.

132.     On or about April 7, 2015, Veldhuis communicated with Kaitz by Encrypted

Communications about issuing promotions concerning Stevia First/Vitality stock.

133.     On or about May 6, 2015, Veldhuis and Sexton discussed, via Encrypted

Communications, arrangements for additional stock promotions to tout Stevia First/Vitality

stock.  Veldhuis wrote: "I been [sic] back and forth with [Kaitz] on it today.  He had trouble

getting ads approved on new network.  He has spent 2k this week so far and trying to get other

stuff approved today.  Was supposed to be done by Tuesday afternoon."

134.     On various dates in 2015 and 2016, including through at least December 2016,

during the promotional campaign that Veldhuis coordinated through Kaitz, the Veldhuis Control

Group and Taylor sold, via Sharp Group-administered nominee shareholders, in total, millions of

shares of the March 2012 Stevia First/Vitality Stock.

135.     Dhillon received a cut of these proceeds, just as he had received distributions

from the proceeds of the defendants' Stevia First/Vitality stock sales in at least 2012 and 2014.

On or about October 28, 2015, for example—consistent with Dhillon's instruction that his cut of the proceeds be transferred to third parties on his behalf to obscure the fact that they were redounding to his benefit—the Veldhuis Control Group arranged for Wintercap SA to pay a third party approximately $25,000 toward an expense incurred by Dhillon's family.

136.    Similarly, on or about June 21, 2016, Wintercap SA remitted $110,431.86 to a loan servicing company in Colorado. This payment, sent from a Sharp Group-administered nominee entity, Morris Capital, was applied to pay a mortgage loan for Sexton's benefit on a property in California.

137.    Taylor also participated in the Veldhuis Control Group's sales of Stevia First/Vitality stock in at least December 2016. In conjunction with their promotional activities, the Veldhuis Control Group sold shares of Stevia First/Vitality through Sharp-administered nominees between December 1 and 22, 2016 for proceeds of more than $1.7 million. Taylor received some of the proceeds of these sales.

138.    Specifically, on or about December 22, 2016, Taylor created an invoice seeking payment of $10,000 for "consulting services for introduction of marketing" and for "Intro VBIO." VBIO was Stevia First/Vitality's ticker symbol at that time. The invoice was directed to one of the Sharp-administered nominee entities that was selling Stevia First/Vitality shares. The invoice asked that payment be made to an individual in Singapore ("Taylor Nominee B") who served as a nominee owner for some of Taylor's Heng Hong accounts (*see* ¶113).

139.    The metadata for the invoice shows that about 1.5 hours after Taylor created the invoice, Gasarch modified it. In her role as the coordinator of clients' wire requests, two minutes after she last modified the invoice, Gasarch sent Taylor's invoice to Wintercap SA using an email address for the Sharp Group-administered nominee named on the invoice. Wintercap SA

46

A569

paid the invoice out of the proceeds that the Veldhuis Control Group earned by selling Vitality stock in December 2016.  Gasarch recorded the wire request in the Q accounting system and debited the amount of the wire from the Stevia First/Vitality account.

140.    Taylor Nominee B received the $10,000 Wintercap SA wire on or about December 27, 2016.  Contemporaneously, Taylor Nominee B paid CAD $10,000 to a Canadian law firm.  The wire to the law firm stated, in the remittance information section, that the payment related to a company of which Taylor was the CEO, CFO and founder.  The processing date of this wire was January 4, 2017.  Using the obfuscation provided by the Sharp Group, Taylor thus orchestrated a payment recorded for the benefit of his company with his portion of fraudulent Stevia First/Vitality stock sales.

**Round Four: 2016 – 2018 Illegal Vitality Stock Sales**

141.    On or about July 10, 2016, Stevia First changed its name to Vitality and executed a 1-for-10 reverse split of its common stock.  The reverse split meant that shareholders were required to exchange 10 shares for one share, which had the effect of reducing the total number of outstanding shares of the company by a factor of 10.  This also had the effect of drastically reducing the holdings of retail investors whom Defendants had prompted to purchase shares in Stevia First through their previous promotional campaigns.

142.    On various dates in 2016, the Veldhuis Control Group sent numerous wire payments to Vitality, or to third parties on behalf of Vitality, totaling approximately $4.4 million. In exchange, Vitality—with Dhillon operating as the chairman of its board of directors—issued millions of shares (the "Vitality Stock") to nominee entities that the Sharp Group once again provided for use by the Veldhuis Control Group.

47

143. The Vitality Stock shares acquired by the Veldhuis Control Group from the financing described in ¶142, above, were initially issued with restricted legends. In order to facilitate the liquidation of these shares, Kelln retained an attorney on behalf of each of the nominee shareholder entities to prepare opinion letters that falsely represented that the nominee shareholders were not affiliates of Vitality.

144. On various dates ranging between 2016 and 2018, the attorney retained by Kelln on behalf of the Veldhuis Control Group issued opinion letters to Vitality's transfer agent, representing that none of the Sharp Group-administered nominee shareholders were affiliates of Vitality. Based on these false representations, Vitality's transfer agent removed the restricted legends from the Vitality Stock, thereby enabling the Veldhuis Control Group to sell the Vitality Stock to the public. In actuality, the Vitality Stock was controlled by affiliates of the company and was legally restricted from resale. Among other points of affiliation, the Veldhuis Control Group was acting in concert with Dhillon, who was the chairman of Vitality's board.

145. After Vitality's transfer agent removed the restricted legend for one of the nominee shareholders, Kelln advised Wintercap SA of an incoming deposit of 750,000 shares of Vitality in the name of a Sharp Group-administered nominee shareholder called Hilton Capital.

146. At that time, Kelln noticed from reviewing Q records that Wintercap SA was already holding Vitality shares (that had been previously deposited) in the name of Hilton Capital. The 750,000 additional shares would have brought the total shares held by that nominee to more than 5% of Vitality's issued shares. As Kelln knew or recklessly disregarded, any shareholder who was the beneficial owner of more than 5% of Vitality's outstanding stock was legally required to publicly disclose its holdings. Such disclosures would have frustrated Dhillon's and the Veldhuis Control Group's efforts to conceal their stock holdings and sales.

147.    On or about February 28, 2017, Kelln instructed Wintercap SA to allocate all Vitality Stock sales Wintercap was making that day to the Hilton account, thereby reducing the number of Vitality shares that Hilton Capital was shown as holding.  This ruse prevented Hilton Capital from showing share ownership in excess of 5%.  Specifically, Kelln wrote: "allocate all VBIO [ticker symbol of Vitality] to the [Hilton Capital] account today.  We need to make room for pending 750k.  Again 5% rule is biting me in the ass."

148.    The 750,000 shares were subsequently deposited with Wintercap SA.  Thereafter, Veldhuis provided trading instructions to Wintercap SA to sell the Vitality Stock.

149.    In or about December 2016, during the course of another Veldhuis Group-funded, Kaitz-managed stock promotion touting Vitality's stock, Wintercap SA's principal asked Veldhuis through an encrypted messaging application if the Vitality Control Group could "switch selling to another outlet to let us [Wintercap SA] breath[e]" and slow the pace of selling. Veldhuis responded that he could slow the pace "on the next batch, but that's a week out.  In the meantime, sell 15k VBIO @ 2.11."  Wintercap SA's principal suggested, in response, "[m]aybe 2 days on, 1 day off . . . ."  In response, Veldhuis suggested that he could move the stock held at Wintercap SA to a competitor, Blacklight SA ("BL").  This exchange followed:

| Veldhuis to Wintercap | I will figure out how to move some elsewhere.  It pains me to give BL business. |
| Wintercap to Veldhuis | Ok.  I don't wish you to do that ;) |
| Veldhuis to Wintercap | Lol |
| Wintercap to Veldhuis | We can stay on point |

150.    In connection with their efforts to sell Vitality Stock in 2016 and later, the Veldhuis Control Group again retained Kaitz to conduct a promotional campaign.  Between October 2016 and March 2017, Veldhuis directed Wintercap SA to wire $530,000, which was

derived from financial accounts associated with four Sharp Group-administered nominee

shareholders, to Kaitz's entity for the purpose of promoting Vitality.

\*\*\*

151.    Overall, the Sharp Group allocated Stevia First/Vitality stock sale proceeds as

follows during the period of time subject to this Complaint:

| Defendant | Approximate Amount (Millions) |
|---|---|
| Sexton | $5.5 |
| Veldhuis | $3.1 |
| Friesen | $2.3 |
| Taylor | $4.3 (of which Taylor, in turn, promptly forwarded approximately $2.6 million to Dhillon, as noted in ¶89) |
| Kaitz | $1.4 |

152.    Dhillon benefited by receiving millions of dollars from the proceeds of these

illegal stock sales, including through payments made by the Veldhuis Control Group and Taylor

to various third parties on Dhillon's behalf.

**The Veldhuis Control Group's Omissions in Furtherance of the Scheme**

153.    Veldhuis, Sexton and Friesen acted as a group for purposes of acquiring, holding,

and ultimately disposing of Vitality shares, and consequently became subject to regulation as a

single person pursuant to Exchange Act Section 13(d)(3).  Veldhuis, Sexton and Friesen failed to

file any report on behalf of the group as required under Rule 13d-1(k)(2), even though they

collectively acquired, held, and were responsible for directing the disposition of, far more than

5% of Vitality's outstanding stock through nominee entities that were under their group's

control.

154.    In failing to make required Schedule 13D/G filings, Veldhuis, Sexton, and Friesen

violated Section 13(d) and Rule 13d-1 thereunder.

50

A573

**Dhillon's Failures to Disclose in Furtherance of the Scheme**

155.    On August 17, 2016, Dhillon filed an untimely and inaccurately amended Schedule 13D (specifically, a Schedule 13D/A) with the Commission.  Dhillon reported that he was the beneficial owner of 1,530,585 shares (post stock split) consisting of:

      a.   515,000 shares issued directly by Vitality in 2012.

      b.   50,000 in stock options issued by Vitality in 2012.

      c.   40,000 shares of common stock issued by Vitality in 2015.

      d.   925,585 shares of common stock issued by Vitality in 2016.

156.    In actuality, as of August 17, 2016, Dhillon was also a beneficial owner of a significant number of shares of the stock held by the Veldhuis Control Group.  Dhillon did not report, among other things, these shares in his Schedule 13D.

157.    Dhillon also failed to file any Forms 4 reflecting the sales of Vitality stock that had been sold on his behalf, directly or indirectly, by the Veldhuis Control Group.  For example, on or about January 13, 2017, the Veldhuis Control Group caused Wintercap SA to sell 44,661 shares of Vitality, which sales generated proceeds of $105,551.21.  On or about January 27, 2017, the Veldhuis Control Group caused Wintercap SA to transfer $100,000 to pay an expense incurred by Dhillon.  Dhillon failed to file a Form 4 reflecting either of these January 2017 Vitality stock sales, or any other sales by the Veldhuis Control Group in 2017 or 2018 from which he benefitted.

**Dhillon's False and Misleading Testimony in Furtherance of the Scheme**

158.    On or about August 29, 2019, during the investigation leading to the filing of this action, Dhillon provided sworn testimony to the Commission staff.  Seeking to conceal his illegal conduct, Dhillon falsely denied being the beneficiary of any undisclosed Stevia First/Vitality

A574

stock sales, and falsely denied knowing that the Veldhuis Control Group had sold Stevia First/Vitality stock.

159.    For example, during the August 2019 testimony, the Commission asked Dhillon if he ever received the proceeds of any sales of Stevia First/Vitality stock. Dhillon falsely replied, "I have not." In actuality, the Veldhuis Control Group and Taylor had distributed Stevia First/Vitality stock trading proceeds to Dhillon, directly and indirectly, through cash payments and through payments to third parties on Dhillon's behalf.

160.    Similarly, during the August 2019 testimony, the Commission asked Dhillon if he knew anyone who sold Stevia First/Vitality stock. Dhillon falsely replied, "I'm not aware." In actuality, Dhillon knew that the Veldhuis Control Group and Taylor had sold Stevia First/Vitality stock, and had shared the resulting proceeds with him.

### SHARP GROUP EXAMPLE TWO:
### ILLEGAL ARCH STOCK SALES INVOLVING DHILLON, THE VELDHUIS CONTROL GROUP, AND TAYLOR

161.    Beginning in or about 2013, the Veldhuis Control Group schemed with Dhillon, Taylor and Kaitz to sell illegally the stock of Arch.

162.    In 2013, Dhillon arranged for a private company he controlled to merge (as a reverse merger) into a publicly traded shell company controlled by the Veldhuis Control Group. Following the reverse merger, which closed in or about June 2013, the surviving public company was called Arch.

163.    By April 2013, Dhillon had become an officer or director of Arch; and by June 2013, Dhillon had assumed the role of chairman of Arch's board of directors.

164.    Prior to the 2013 Arch reverse merger, Arch had issued shares to various S-1 Shareholders (hereinafter referred to as the "Arch S-1 Shareholders") in 2012. By early 2013,

52

A575

following a stock split, the Arch S-1 Shareholders collectively held 20 million shares of Arch

stock (which traded under the ticker symbol "ARTH").

165.    Leading up to, and shortly after, the closing of the reverse merger, the Veldhuis

Control Group directed the transfer of 16,920,000 Arch shares, held in the names of several Arch

S-1 Shareholders, to eleven Sharp Group-administered nomine shareholders for the benefit of the

Veldhuis Control Group.

166.    Kelln arranged, on behalf of the Veldhuis Control Group, to transfer an additional

2,310,000 shares, held in the names of several additional Arch S-1 Shareholders, to an entity

controlled by Wintercap SA called "Victory Capital" on behalf of the Veldhuis Control Group.

167.    Combined, the Veldhuis Control Group held at least 19,230,000 purportedly

unrestricted shares of Arch, representing over 48% of Arch's total issued and outstanding stock,

which constituted close to 100% of Arch's unrestricted shares that were available for trading, at

or around the time of the reverse merger.

168.    Shortly before the reverse merger closed, the Veldhuis Control Group controlled,

through a Sharp Group-administered nominee, an additional 20,000,000 shares that were marked

as restricted.  In anticipation of the reverse merger, the Veldhuis Control Group transferred these

shares to Dhillon (10,000,000) and a company controlled by the CEO of Arch (10,000,000).

Dhillon, in turn, transferred 2,750,000 shares to a domestic corporate entity ("Company A"), an

entity that was controlled by Dhillon's associate, Person A.

169.    The chart below illustrates the transfers described in ¶¶165 through 168.

A576



170.    The Veldhuis Control Group provided financing to Arch around the time of the reverse merger.  Specifically, the Veldhuis Control Group funneled approximately $1.75 million through an attorney's escrow account, which was remitted to Arch in the form of equity subscription agreements.  Dhillon, through his same Swiss-banking Ortivo account referenced in ¶89, also contributed $250,000 as part of this financing, but concealed this involvement from Arch's principals.

171.    Following the reverse merger, the Veldhuis Control Group engaged Kaitz to

promote Arch and paid Kaitz approximately $1.2 million from June 2013 to August 2013 for this promotion.

172.    As Kaitz knew or recklessly disregarded, these payments were derived from money held by Sharp Group-administered nominee shareholders on behalf of the Veldhuis Control Group.  For example, on or about July 24, 2013, Kaitz sent the following Encrypted Communication to Veldhuis: "Are you able to capture anything on arth?"  Kaitz was asking Veldhuis, in substance, how much money, if any, the Veldhuis Control Group made from the sale of Arch stock during the course of the stock promotion.

173.    Some of the promotions managed by Kaitz falsely identified the promotions' funding source.  For example, the landing page for an Arch promotion cited "Advantage Media Corp" as the "paying party" of a $790,000 "total production budget."  As Kaitz knew or recklessly disregarded, Advantage Media was a front company used to disguise the identity of the parties actually paying for the promotion, i.e. the Veldhuis Control Group.

174.    On September 27, 2013, Kaitz asked Veldhuis in an Encrypted Communication what to do if other stock promoters hired by Kaitz to distribute touts about Arch refused to identify Advantage Media as the supposed paying party.  Kaitz wrote to Veldhuis: "Am trying to have them put Advantage media, if they won't then what?"  Later that day, Kaitz explained that the other stock promoters said that "[t]hey will go if they get the invoice signed and sent back to them via email from advantage."  Veldhuis responded and directed Kaitz to send the invoice to an email address created for the purpose of making it appear as if Advantage Media Corp. was an actual third party: "send to marketing@advantagemedia.co."

175.    Sharp substantially assisted the Veldhuis Control Group's use of Advantage Media Corp. to disguise the Veldhuis Control Group's Arch-related conduct.  For example, on or

A578

about January 21, 2014, Sharp asked Veldhuis in an Encrypted Communication whether he should continue to pay incorporation fees associated with Advantage Media Corp., and, if so, whether he (Sharp) should use Arch stock sale proceeds to make such payments: "Do we pay the 2014 annual fees for advantage media corp (belize)?  Debit arth?"  Veldhuis responded: "Kill it." By that time, Advantage Media Corp. had served its purpose: the Veldhuis Control Group used it as a front company to fund a stock promotional campaign touting Arch stock.

176.     The chart below illustrates the success of the Veldhuis Control Group's paid promotion of Arch between June and September 2013:



177.     During the period of the promotional campaign, the Veldhuis Control Group surreptitiously sold millions of Arch shares into the market through nominee shareholders administered by the Sharp Group.  Specifically, between June 11, 2013 and September 30, 2013, the Veldhuis Control Group sold approximately 16.6 million shares of Arch stock through Sharp Group-administered nominee shareholders, generating proceeds of at least $11.5 million.  The

56

A579

Veldhuis Control Group sold another approximately 1.4 million shares generating proceeds of approximately $574,000 through a nominee shareholder administered by Wintercap SA.

178.    Throughout the period of these unregistered sales, the Veldhuis Control group was an affiliate of Arch, by virtue of its control over a significant percentage of Arch's stock and/or because it was acting in concert with Dhillon, the chairman of the company.  Sharp, Kelln, Veldhuis, Friesen, and Sexton failed to register their sales of Arch stock described herein pursuant to Section 5 of the Securities Act.  In selling these shares, the Veldhuis Control Group, through Sharp Group-administered nominee shareholders, surreptitiously sold unregistered shares of stock, and schemed to defraud investors by concealing the fact that public company affiliates were dumping stock into the markets.

179.    The Veldhuis Control Group coordinated with Dhillon on the stock promotions. For example, Sexton had one or more discussions with Dhillon where he discussed sharing the promotional materials with Dhillon before they were published, and Sexton reported to Dhillon the budget for promotions.  In addition, shortly before the merger closed, Friesen asked Sexton and Veldhuis whether Dhillon would "have a set of news releases to begin issuing next week?", to which Sexton responded, "I asked for that yesterday.  He said he would deliver."  Dhillon played this role in order to benefit from the Veldhuis Control Group's sale of stock, since, as the Veldhuis Control Group and Dhillon knew, promotional campaigns tend to be more effective when they coincide with news releases by the issuer whose stock is being promoted.

180.    Dhillon directly participated in the Veldhuis Control Group's sales of Arch, while failing to register those sales pursuant to Section 5 of the Securities Act.  For example, on or about August 13, 2013 in an Encrypted Communication, Sexton relayed a conversation he had with Dhillon to Veldhuis: Sexton reported that he told Dhillon that the Veldhuis Control Group

57

A580

"would be active in the market" until the first week of September and that they "wouldn't sell below $0.40 [per share]."  Sexton also relayed to Dhillon that the Veldhuis Control Group would first distribute the proceeds of such sales as a repayment for the private placements they had made (including Dhillon's anonymous $250,000 investment) into Arch, but that a broader distribution would take place in September.  Sexton noted Dhillon was "disappointed it wasn't bigger success as we all are but I explained sometimes things out of control and we were squeezing this out in short timeframe so it may have hurt us a bit in that we weren't able to stop once we started."  Sexton continued, "I said we worked well together and everyone did what they said they would and that we would continue to look at his projects in future."

181.    On or about September 6, 2013, Veldhuis instructed Gasarch to wire $250,000 from the Arch proceeds to the same Dhillon owned Swiss-banking Ortivo account referenced in ¶¶89 and 170, thereby reimbursing Dhillon for his undocumented private placement investment. Consistent with Sexton's description above, the Veldhuis Control Group caused a further distribution to be made from the Group's illicit Arch stock sale proceeds for Dhillon's benefit in September 2013.

182.    In particular, on or about September 26, 2013, Wintercap SA wired $200,000 to a Canadian company controlled by Dhillon's tax accountant, who, in turn, wired the very same amount, on or about the same day, to a U.S.-based corporate account that Dhillon controlled. This money was derived from the sale of Arch stock.

183.    Taylor also schemed with the Veldhuis Control Group on the Arch deal and received at least $600,000 of the proceeds generated by its Arch sales, while also failing to register those sales pursuant to Section 5 of the Securities Act.  On or about August 20, 2013, Sexton wrote to Veldhuis and instructed him to "send 600k from ARTH" to the same Taylor-

58

A581

controlled Swiss bank account as that referenced in ¶89.  Two days later, at Veldhuis's direction, Gasarch wired the funds, to that same destination, from a Cayman Islands brokerage account. This $600,000 distribution derived from the illegal sales of Arch stock.

184.    The Veldhuis Control Group and Taylor continued to engage in fraudulent sales of Arch stock into 2017.

185.    For example, Taylor, through Heng Hong, received Arch shares in 2014, 2015 and 2016.  The shares and warrant rights that Heng Hong purchased from Arch in 2014 were funded by the Veldhuis Control Group.  In August 2013, the Veldhuis Control Group directed the Sharp Group to send $600,000 derived from its previous fraudulent trading in Arch securities to Heng Hong.  Heng Hong used these funds to pay for the Arch shares and warrants it acquired from the issuer in the January 2014 round of financing.

186.    Taylor arranged for many of these Arch shares to be deposited into Heng Hong accounts managed by Blacklight SA, and he sold those shares over time, including between December 24, 2015 and June 6, 2016, generating proceeds of approximately $616,000.  Taylor shared a portion of these proceeds with Dhillon, by arranging for two payments of approximately $100,000 each to a creditor of Dhillon's (Dhillon Creditor A) in February and March 2016. Blacklight SA sent another approximately $159,000 of these proceeds to Taylor Nominee B (*see* ¶138).  Those transfers occurred in May through October 2016.  Taylor Nominee B, in turn, paid at least some of those proceeds to Taylor, including: $5,000 wired on or about November 2, 2016 to an account controlled by Taylor, and CAD $65,000 wired on or about December 8, 2016 to a Canadian law firm trust account stating that it was "in favour of Graham Taylor".

187.    In addition, Arch issued a total of 4,458,608 new shares to Taylor's Heng Hong entity on or about June 28, July 5, August 8, September 27, and November 8, 2016.  Within

A582

several weeks of each new issuance to Heng Hong, Heng Hong transferred those shares to Trius

Holdings Ltd., a Sharp Group-administered nominee that was being used by the Veldhuis

Control Group.  The share issuance to Taylor's Heng Hong entity on or about November 8, 2016

was funded by the Veldhuis Control Group.  In particular, the $220,000 owed to Arch for the

shares issued to Heng Hong on that date was charged to the Arch account in the Q accounting

system, was funded out of the Veldhuis Control Group's fraudulent proceeds from sales of

Vitality stock, and was sent by wire to Arch from an account managed by Wintercap SA.

188.    The Veldhuis Control Group, through Trius Holdings, deposited the Arch shares

it received from Heng Hong into an account controlled by Blacklight SA and sold those shares to

unsuspecting investors in the market between about June 9, 2016 and May 17, 2017, for total

proceeds of at least $2.5 million.  These sales were recorded in the Sharp Group's Q accounting

system into the Arch account, from which distributions were directed by the Veldhuis Control

Group including payments for the benefit of Dhillon.  By furnishing his Heng Hong entity to

facilitate the Veldhuis Control Group's concealment of their ownership and sales of these shares,

Taylor knew, or recklessly disregarded that he was substantially assisting the scheme to defraud

the market about the control of Arch shares then being sold.

189.    The Sharp Group allocated Arch stock sale proceeds to the Veldhuis Control

Group as follows during the period of time subject to this Complaint:

| Veldhuis Control Group Member | Approximate Amount (Millions) |
| --- | --- |
| Sexton | $1.7 |
| Veldhuis | $1.5 |
| Friesen | $1.5 |

***

190.    The table below reflects payments directed by the Veldhuis Control Group to

Dhillon and Taylor or entities with whom they were associated, sourced from the sale of Stevia First/Vitality and Arch stock through Sharp Group-administered nominee shareholders from 2012 to 2018:[8]

| Year | Dhillon | Taylor | Total |
|------|---------|--------|-------|
| 2012 | $        33,890 | $     4,225,531 | $     4,259,421 |
| 2013 | 259,770 | 600,200 | 859,970 |
| 2014 | 10,000 | 124,200 | 134,200 |
| 2015 | 25,030 | - | 25,030 |
| 2016 | 231,672 | 10,000 | 241,672 |
| 2017 | 2,157,330 | - | 2,157,330 |
| 2018 | 300,500 | - | 300,500 |
| **Total** | $     3,018,192 | $     4,959,931 | $     7,978,123 |

191.    Once Taylor became aware of the Commission's investigation into the schemes described in this complaint, he signed false documents that were intended to provide false explanations for his payments to Dhillon of the proceeds from the sales of Stevia First/Vitality and Arch securities.  Specifically, Taylor signed a fraudulent and backdated Option Agreement that purported to justify his payments to Dhillon as purchases of interests in a parcel of land owned by Dhillon.  In April 2021, Taylor then provided that false document to Canadian regulators who had requested documents from him on behalf of the Commission.  Taylor's provision of this false document was designed to obfuscate his role in the scheme and shows his consciousness of guilt.

192.    As described in ¶182, Dhillon was also the beneficiary of another $200,000 in Arch stock sale proceeds in 2013, at the Veldhuis Control Group's direction, but these funds were sourced from a Wintercap SA-administered, rather than a Sharp Group-administered, nominee shareholder.

---

[8] The table does not include payments made in cash to Dhillon or Taylor's payments to Dhillon.

A584

***

193.    During the period of April 2014 through March 2016, the table below reflects

various distributions of money, some of which were derived from Stevia First/Vitality and Arch

stock sale proceeds, directed by Taylor to third parties for the benefit of Dhillon or otherwise

associated with Dhillon:

| DATE | PAID TO | AMOUNT |
|---|---|---|
| 3/1/2012 | AVTAR DHILLON | $    4,450 |
| 3/2/2012 | AVTAR DHILLON | 5,000 |
| 4/17/2012 | SUTTER BUTTES LLC* | 498,000 |
| 5/4/2012 | ORTIVO (Defined at ¶ 82) | 400,000 |
| 5/11/2012 | ORTIVO | 496,000 |
| 7/16/2012 | ORTIVO | 1,300,000 |
| 11/20/2013 | DHILLON RELATIVE A | 90,000 |
| 11/26/2013 | DHILLON RELATIVE B | 40,000 |
| 11/26/2013 | DHILLON CONTRACTOR | 95,000 |
| 12/2/2013 | DHILLON CREDITOR A | 95,000 |
| 12/18/2013 | DHILLON CONTRACTOR | 65,000 |
| 1/15/2014 | DHILLON CREDITOR B | 65,000 |
| 1/21/2014 | DHILLON CREDITOR B | 35,000 |
| 4/25/2014 | DHILLON CREDITOR A | 94,980 |
| 6/19/2014 | CHALMERS GROUP LLC* | 60,000 |
| 6/24/2014 | CHALMERS GROUP LLC* | 210,000 |
| 7/7/2014 | CHALMERS GROUP LLC* | 120,000 |
| 7/24/2014 | DHILLON CREDITOR A | 294,475 |
| 9/17/2014 | DHILLON CREDITOR A | 247,000 |
| 9/17/2014 | DHILLON CREDITOR A | 96,500 |
| 2/26/2016 | DHILLON CREDITOR A | 99,965 |
| 3/28/2016 | DHILLON CREDITOR A | 99,965 |
| **TOTAL** | | **$ 4,511,335** |

***

194.    On or about July 30, 2020, Dhillon appeared for further testimony before the

Commission in connection with the investigation leading to the filing of this action, and again

made false and misleading statements, including claims that (i) prior to 2014, his interactions

A585

with Sexton had been limited to seeing him from a distance "in social circles … [like] hockey games", "at charity events with his own tables [and] at restaurants entertaining people" and that (ii) since 2014, his substantive interactions with Sexton have been limited to several discrete topics that he characterized as innocent in nature.

\*\*\*

195.    In addition to their schemes to sell Arch and Vitality stock illegally that are described above, Taylor and Dhillon also schemed to sell the stock of at least two other Dhillon-chaired issuers:  Inovio and OncoSec.  Taylor's and Dhillon's Inovio scheme is described in the following paragraph; the pair's OncoSec scheme is described at ¶¶235 and 236.

196.    At the time of Taylor's and Dhillon's Inovio scheme, Dhillon was the chairman of Inovio's Board of Directors.  Similarly to Taylor and Dhillon's other schemes, Dhillon facilitated the transfer of Inovio shares to a nominee company controlled by Taylor, who then directed the unregistered sale of those shares from at least approximately August 23, 2013 to September 13, 2013.  Taylor's sales generated at least $2.5 million in proceeds.  On various dates during approximately November 2013 through January 2014, Taylor paid hundreds of thousands of dollars to Dhillon or for Dhillon's benefit.  Also, similarly to Taylor and Dhillon's other schemes, Dhillon failed to register the Inovio shares or report his beneficial ownership interest in them or sale of them on either Schedule 13D or Form 4.

**DHILLON'S SCHEME TO SELL ARCH STOCK ILLEGALLY THROUGH PERSON A**

197.    Dhillon illegally sold the stock of companies atop whose boards he sat through different channels, apart from the Veldhuis Control Group and Taylor.  To that end, Dhillon enlisted Person A to establish and manage a front company through which Dhillon surreptitiously sold such stock, without Dhillon appearing associated with those stock sales in

63

any public record or filing.  Dhillon's scheme to sell Arch stock illegally with Person A is described in detail below.

198.    Dhillon schemed to sell the stock of Arch fraudulently by, among other things, concealing from securities intermediaries such as brokers that he was selling, through a nominee shareholder, stock that was legally required to be registered, and concealing from Arch's shareholders that he—Arch's highest-level insider—was selling Arch stock into the market.

199.    In or about April 2013, Dhillon became a director of Arch, and, by June of that year, became chairman of its board.  Dhillon was an affiliate of Arch in that he had the power to control the company through his role as its chairman.  As a public company affiliate, Dhillon was legally required to register any sale of Arch stock unless Dhillon elected to comply with the safe harbor provisions set forth in Commission Rule 144, which strictly limit the quantity of securities an affiliate may sell to the public.  Dhillon testified, under oath, during the Commission's investigation that he understood these legal requirements at all times relevant to this Complaint.

200.    As a director of Arch, Dhillon was required to file public reports—including a Form 4—with the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder disclosing any change in his beneficial ownership of Arch stock, regardless of amount.  Dhillon understood these legal requirements at all times relevant to this Complaint. Dhillon failed to file any Forms 4 reflecting sales of Arch stock by the Veldhuis Control Group (described above) or Person A from which he benefitted.

201.    Dhillon was legally required to file a Schedule 13D with the Commission pursuant to Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the extent he was the beneficial owner of greater than five percent of Arch's common stock.  Dhillon understood

A587

these legal requirements at all times relevant to this Complaint. Dhillon failed to file an accurate Schedule 13D reflecting his beneficial ownership of Arch's stock.

202.    Shortly after Dhillon became the chairman of Arch's board in April 2013, he arranged for at least one *alter ego* corporate shareholder to hold Arch stock on his behalf. Specifically, in or about June 2013, Dhillon arranged for the transfer of 2,750,000 Arch shares to Company A, a corporate nominee that Dhillon directed Person A to form. In order to disguise Dhillon's association with Company A, Person A, as directed by Dhillon, identified only Person A as Company A's director in its incorporation papers. Company A was, in actuality, holding Arch stock for Dhillon.

203.    On or about April 6, 2016, Person A caused Company A to open an account with a United States brokerage firm for the purpose of selling Arch stock. Person A represented to the United States brokerage firm that he (as the sole director of Company A), was not an "officer, director, or more than a 10% shareholder of [Arch] or in any other way an 'affiliate' of [Arch]." Person A's representation was false and misleading in that Company A was actually holding, and was created in order to sell, Arch stock on behalf of Dhillon, who was a director and affiliate of Arch. Dhillon knew, or recklessly disregarded, that Person A misled the United States brokerage firm as part of their scheme to sell Arch stock surreptitiously.

204.    The table below reflects Company A's sales of Arch stock, all of which occurred during a four-month period in 2016. Dhillon failed to register these sales pursuant to Section 5 of the Securities Act:

| Month | Arch Shares Sold | Arch Sale Proceeds |
|---|---|---|
| Apr-16 | 210,000 | $ 79,711 |
| May-16 | 460,000 | 181,925 |
| Jun-16 | 1,035,000 | 444,567 |
| Jul-16 | 1,045,000 | 631,133 |
| **Total** | **2,750,000** | **$ 1,337,336** |

65

A588

205.    At or about the same time that Company A sold Arch stock, Person A caused

Company A to transfer at least $850,000 of Arch stock sale proceeds to third parties identified by

Dhillon, his assistant, or both, all to benefit Dhillon.  These transfers included paying various

business and personal expenses Dhillon had incurred.

206.    Examples of Arch proceeds-funded payments routed by Company A through

Dhillon's assistant to a bank account controlled by Dhillon in the name of One World Ranches

LLC, as directed by Dhillon, are below.



207.    Dhillon did not disclose the stock that Company A held on Dhillon's behalf, or

Dhillon's agreements with Person A concerning the holding and sale of those shares, on a

Schedule 13D, as legally required.  Nor did Dhillon disclose any of Company A's Arch sales

executed on Dhillon's behalf on any Form 4 filing with the Commission.

208.    On or about July 8, 2013, Dhillon filed a Schedule 13D with the Commission

purportedly reflecting all of the Arch shares in which he held a beneficial interest.  This is the

only Schedule 13D Dhillon filed concerning Arch.  Dhillon reported that he was the beneficial

owner of 7,160,373 of Arch shares, consisting of:

      a.    7,000,000 shares that he received in a private transaction in or about June

         2013.

A589

   b.   160,373 shares of common stock in exchange for the cancellation of debt

        Dhillon was owed by a private company that had merged with Arch.

209.   Dhillon's July 8, 2013 Schedule 13D was materially misleading in that it failed to

reflect that Dhillon was also a beneficial owner of Arch stock held on Dhillon's behalf by

Company A and additional Arch stock held on Dhillon's behalf by the Veldhuis Control Group.

The Schedule 13D was also materially misleading in that it failed to disclose Dhillon's

agreements with Person A and with the Veldhuis Control Group concerning the sale of Arch

shares, or his and their respective combined holdings in Arch securities.  Dhillon knowingly

failed to make any of these disclosures in his Schedule 13D in order to conceal that information

from investors and securities market intermediaries.

210.   Dhillon also knowingly failed to file any Forms 4 reflecting the sales of Arch

stock that had been effected on his behalf, directly or indirectly, by Company A or the Veldhuis

Control Group.  For example, on various dates in April through June 2016, Company A sold

Arch shares in the market on Dhillon's behalf.  Dhillon intentionally failed to file a Form 4

reflecting any of these 2016 Arch stock sales in order to conceal his conduct form Arch

investors.

211.   On or about August 29, 2019, during the investigation leading to the filing of this

action, Dhillon provided sworn testimony to the Commission staff.

212.   During that August 2019 testimony, the Commission asked Dhillon if he knew of

anyone who sold Arch stock prior to 2019.  Dhillon, seeking to conceal his illegal conduct from

the Commission, falsely replied, under oath: "I'm not aware."  In actuality, and as Dhillon well

knew, Person A caused Company A to sell Arch shares on Dhillon's behalf.  As described above,

and as Dhillon likewise well knew, the Veldhuis Control Group also sold Arch shares on Dhillon's behalf.

## SHARP GROUP EXAMPLE THREE:
## ILLEGAL ONCOSEC STOCK SALES INVOLVING DHILLON AND THE VELDHUIS CONTROL GROUP

### The Veldhuis Control Group's Scheme to Sell OncoSec Stock Fraudulently

213.    Prior to the Stevia First/Vitality and Arch fraudulent conduct described above, the Veldhuis Control Group schemed with the Sharp Group and Dhillon to sell fraudulently the stock of another issuer, OncoSec.  Further, Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon failed to register the sales of OncoSec stock described herein pursuant to Section 5 of the Securities Act.

214.    In or about February 2011, the Veldhuis Control Group directed the transfer to seven Sharp Group-administered nominee shareholders of 12,800,000 purportedly unrestricted OncoSec shares sourced from 20 original individual investors.  At the time, OncoSec had 52,656,000 shares outstanding.  The Veldhuis Control Group, therefore, held over 24% of the total common stock outstanding across the Sharp Group-provided nominee shareholders to which the Veldhuis Control Group directed OncoSec shares, and was an affiliate of the issuer. The Veldhuis Control Group knew that its 24% stake in OncoSec was legally restricted from resale absent an effective registration statement.  The table below reflects the transfers summarized in this paragraph.[9]

---

[9] Monterra Investments, Cliffside Partners, and Dartmore International are nominee shareholders utilized by the Veldhuis Control Group.



215.    Between approximately March 2011 and November 2011, the Veldhuis Control Group sold, via various Sharp Group-administered nominee shareholders, approximately 2.2 million shares of OncoSec stock through offshore brokerage firms for proceeds of approximately $3 million.

216.    Later, the Veldhuis Control Group sold through the Sharp Group approximately 11 million more OncoSec shares between approximately February 2012 and August 2012 for approximately $2.4 million more in illicit proceeds.

**Dhillon's Scheme to Sell OncoSec Fraudulently through Person A**

217.    Around the same time that the Veldhuis Control Group sold OncoSec securities, Dhillon schemed to sell the stock of OncoSec fraudulently through Person A.  Dhillon concealed from securities intermediaries, such as brokers, that he was selling, through a nominee shareholder, stock that was legally required to be restricted, and concealed from OncoSec's investors that he was selling OncoSec stock into the market.

69

A592

218.    On or about March 10, 2011, Dhillon became the chairman of OncoSec's board of directors.

219.    Dhillon was an affiliate of OncoSec because he was the chairman of its board. Through that role, he had the power to control the company.  As a public company affiliate, Dhillon was legally required to register any sale of OncoSec stock unless Dhillon elected to comply with the safe harbor provisions set forth in Commission Rule 144.  Dhillon testified, under oath, during the Commission's investigation that he understood these legal requirements at all times relevant to this Complaint.

220.    As a director of OncoSec, Dhillon was required to file public reports—including a Form 4—with the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder disclosing any change in his beneficial ownership of OncoSec stock, regardless of amount.  Dhillon understood these legal requirements at all times relevant to this Complaint.

221.    Dhillon was legally required to file a Schedule 13D with the Commission pursuant to Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the extent he was the beneficial owner of greater than five percent of OncoSec's common stock.  On or about March 22, 2011, Dhillon received 9,910,496 restricted shares of OncoSec, which comprised greater than 5% of the company's outstanding stock.

222.    Dhillon understood these legal requirements at all times relevant to this Complaint.  Dhillon intentionally failed to file an accurate Schedule 13D reflecting his beneficial ownership of OncoSec's stock, his agreement with Person A concerning the sale of OncoSec stock, or his and Person A's combined holdings in OncoSec, despite being the beneficial owner of greater than five percent of the company's outstanding common stock.

A593

223.    Around the time that Dhillon became the chairman of OncoSec's board in March 2011, he arranged for Person A to hold OncoSec stock on his behalf through a nominee shareholder.

224.    On or about March 2, 2011, Person A incorporated a corporate entity at Dhillon's direction, hereinafter referred to as Company B, to serve as Dhillon's nominee shareholder. Shortly thereafter, Dhillon facilitated Company B's nominal acquisition of 2,354,880 OncoSec shares. At Dhillon's direction, Person A identified himself as Company B's sole director, in order to conceal Dhillon's association with Company B.

225.    By December 2012, Person A opened a brokerage account in the name of Company B.

226.    On or about January 19, 2013, Person A represented to Company B's brokerage firm that Company B was never an "Officer, Director, Control Person, 10% owner or Affiliate of the issuer being presented for deposit [i.e., OncoSec]," which was a confirmation required by the brokerage firm when the OncoSec shares were deposited for resale.

227.    Person A's representations to the brokerage firm were false and misleading because Company B was, in actuality, holding shares for Dhillon, who was a Director, Control Person, and Affiliate of OncoSec. Dhillon knew, or was reckless in not knowing, that Person A would make these types of material misrepresentations to brokerage firms. Indeed, Dhillon directed Person A to establish Company B for precisely this purpose: to conceal the fact that Dhillon was actually the beneficial owner of Company B's OncoSec stock.

228.    In or about January 2013, Person A caused Company B to deposit 2,354,880 shares of OncoSec into its brokerage account. Person A, working in concert with Dhillon, subsequently caused Company B to sell these shares on Dhillon's behalf.

A594

229.    The table below reflects Company B's sales of all 2,354,880 of its shares of

OncoSec stock, between 2013 and 2017.  Dhillon failed to register these stock sales pursuant to

Section 5 of the Securities Act.

| Month | OncoSec Shares Sold | OncoSec Sale Proceeds |
|-------|--------------------:|----------------------:|
| Feb-13 | 50,000 | $  9,979 |
| Mar-13 | 81,400 | 16,878 |
| Apr-13 | 193,600 | 43,728 |
| May-13 | 280,000 | 78,159 |
| Jul-13 | 50,000 | 14,127 |
| Aug-13 | 375,000 | 118,681 |
| Feb-14 | 50,000 | 37,800 |
| Mar-14 | 250,000 | 204,406 |
| Apr-14 | 60,000 | 43,820 |
| May-14 | 250,000 | 198,535 |
| Jun-14 | 80,000 | 69,434 |
| Feb-17 | 54,880 | 3,705 |
| Jul-17 | 370,000 | 21,185 |
| Sep-17 | 110,000 | 6,415 |
| Oct-17 | 100,000 | 5,650 |
| **Total** | **2,354,880** | **$  872,502** |

230.    Person A, acting through Company B, distributed the majority of the OncoSec

sale proceeds at Dhillon's direction to third parties identified by Dhillon.  Dhillon directed the

transfers to third parties, instead of directly to his own bank accounts, to conceal that he was the

actual beneficiary of the stock sales.

231.    The flow chart below reflects examples of Company B's OncoSec proceeds-

funded transfers to Dhillon's assistant for the benefit of Dhillon, as directed by Dhillon:



232.    To conceal his conduct from investors, Dhillon never filed a Schedule 13D with the SEC disclosing his agreement with Person A concerning the sale of OncoSec stock through Company B, or his and Person A's combined holdings in OncoSec stock, or any of the many material changes to those combined holdings.

233.    Dhillon knew that OncoSec's public filings concealed from OncoSec's shareholders and securities market intermediaries the true extent of Dhillon's beneficial ownership position.  For example, OncoSec's Form 10-K for the year ended July 31, 2011 only reported Dhillon's ownership of 9,910,496 shares, and failed to disclose Dhillon's further beneficial ownership of, at a minimum, the Company B shares.  As a further example, OncoSec's Form 10-K for the year ended July 31, 2017 failed to disclose the existence or extent of Dhillon's Form 4 filing delinquencies stemming from his failure to file any Forms 4 concerning his OncoSec share sales that year through Company B.

234.    Indeed, to conceal his conduct from investors, Dhillon never filed any Forms 4 reporting Company B's sales of OncoSec stock on his behalf, as legally required.

**DHILLON'S SCHEME TO SELL ONCOSEC STOCK ILLEGALLY VIA TAYLOR**

235.    During the course of his scheme with Person A to sell illegally OncoSec stock, described above, Dhillon also schemed with Taylor to sell illegally even more OncoSec stock. At the time of this Dhillon-Taylor OncoSec scheme, Dhillon was the chairman of OncoSec's

A596

Board of Directors.  As part of this scheme, between at least April 2 and June 19, 2014, Taylor

sold at least 827,000 shares of OncoSec stock, through a Singapore-banking nominee

shareholder that he controlled, for proceeds totaling approximately $586,000.  Taylor failed to

register these stock sales pursuant to Section 5 of the Securities Act.

236.    During that same period, and from the same account in which he had realized the

aforementioned approximately $586,000 in sale proceeds, Taylor, in turn, sent out two wires

totaling $155,000 for Dhillon's benefit.  For examples, Taylor wired approximately $95,000 to

pay a creditor Dhillon owed, and $60,000 to a private company Dhillon owned.  And, as with his

other, similar schemes, Dhillon never disclosed—through any Form 4 or any other filing—his

OncoSec trading through Taylor.

***

### ADDITIONAL SHARP GROUP AND VELDHUIS CONTROL GROUP DEALS

237.    The Veldhuis Control Group utilized the Sharp Group's services to disguise their

stock sales in deals beyond the Vitality, Arch, and OncoSec conduct detailed above.  In each

such case, the Sharp Group provided the infrastructure necessary to obfuscate the Veldhuis

Control Group's ownership of a significant percentage of the public companies' shares.  The

table below reflects a non-exhaustive list of stock sold by the Veldhuis Control Group using

Sharp Group-administered nominee shareholders to disguise their control.

74

A597

| Issuer | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Vitality / Stevia First | $        - | $  24,718,428 | $        - | $   566,715 | $   770,492 | $  5,503,691 | $  10,570,537 | $  3,509,479 | $  45,639,343 |
| Echo Automotive, Inc. | - | 48,115 | 23,582,539 | 30,221 | - | - | - | - | 23,660,874 |
| Arch | - | 189 | 11,755,408 | 257,689 | 1,220,451 | 2,738,550 | 84,091 | - | 16,056,376 |
| Stevia Corp | 6,905,120 | 2,172,356 | 971,330 | 3,175,474 | - | - | - | - | 13,224,281 |
| Liberty One Lithium Corp | - | - | - | - | - | (54,767) | 8,576,091 | 222,194 | 8,743,519 |
| Oryon Technologies, Inc. | - | 7,668,439 | 898,616 | - | - | - | - | - | 8,567,054 |
| Makism 3D Corp | - | - | 6,070,042 | 2,423,056 | - | - | - | - | 8,493,098 |
| Graphite Corp | - | 4,457,264 | 1,796,167 | (1,590) | - | - | - | - | 6,251,841 |
| OncoSec | 2,925,270 | 2,356,056 | - | - | - | - | - | - | 5,281,325 |
| NewGen Biopharma Corp | - | - | - | - | - | 7,627 | 3,859,972 | - | 3,867,599 |
| StartMonday Technology Corp | - | - | - | - | - | 296,664 | 2,133,104 | 6,339 | 2,436,107 |
| Lexington Biosciences Holdings Corp | - | - | - | - | - | - | 422,552 | 947,039 | 1,369,592 |
| BreathTec Biomedical, Inc. | - | - | - | - | - | 421,745 | - | - | 421,745 |
| RightsCorp | - | - | 124,926 | 5,402 | - | - | - | - | 130,328 |
| **TOTAL** | **$9,830,390** | **$41,420,845** | **$45,199,028** | **$6,456,966** | **$1,990,943** | **$8,913,509** | **$25,646,347** | **$4,685,052** | **$144,143,081** |

238.    The Veldhuis Control Group paid Kaitz to promote several of the issuers listed in the table in ¶237, including (in addition to Stevia First/Vitality and Arch, both detailed above) the stock of Echo Automotive, Liberty One Lithium Corp., Oryon Technologies, Inc., NewGen Biopharma Corp., StartMonday Technology Corp., and BreathTec Biomedical, Inc.

239.    In each instance, Kaitz knowingly or recklessly substantially assisted the Veldhuis Control Group by materially omitting or materially misrepresenting the facts that the Veldhuis Control Group (i) actually paid for the stock promotional campaign, and (ii) was actively trading, and planned to trade, in the very opposite direction to which the promotions urged investors to trade.

### SHARP GROUP EXAMPLE: LUIS CARRILLO

240.    As described in ¶43, above, the control group clients of the Sharp Group generated over one billion dollars in stock sales through the Sharp Group between approximately 2010 and 2019.  One such client is a repeat offender, Luis Carrillo.[10]  Carrillo generated, in concert with others, at least $75 million in illegal stock sale proceeds using the Sharp Group's encrypted communications and nominee shareholders as cover.  One such example is described

---

[10] See SEC v. Carrillo et al., No. 13-cv-1735-GBD (S.D.N.Y. March 2013); SEC v. Carrillo et al., No. 21-cv-11272 (D. Mass. Aug. 2021).

A598

below.

241.    On August 4, 2021, the Commission filed a Complaint against Luis Carrillo in connection with his illegal sale of the stock of Garmatex Holdings, Ltd.  Carrillo, acting in concert with others, amassed approximately 88% of Garmatex's unrestricted shares that were available for trading, and they used the Sharp Group, Wintercap SA, Blacklight SA, and a separate broker to execute the scheme.

242.    In particular, Kelln, at Sharp's direction, deposited three blocks of Garmatex stock—each consisting of 1,750,000 Garmatex shares, or just under five percent of Garmatex's total outstanding stock—with Wintercap SA in the name of three Sharp Group nominee shareholders.  As Sharp and Kelln knew, or recklessly disregarded, brokerage firms typically inquire about whether a shareholder owns more than five percent of a public company's stock because holding more than five percent may trigger additional questions about whether the sales are part of a distribution that must be registered pursuant to Section 5 of the Securities Act.

243.    Sharp and Kelln arranged for these deposits in the names of separate Sharp Group nominee shareholders well knowing that Carrillo and his team were actually the beneficial owners of the shares. For example, on or about March 9, 2017, Kelln replied to an Encrypted Communication from Wintercap SA's principal about the status of selling Garmatex stock: "Changing the [transfer agent] first . . . [Carrillo is] up my butt to get grmx [the ticker of Garmatex] all in."

244.    The Sharp Group's provision of these nominee shareholders enabled Carrillo, acting in concert with others, to conceal from brokerage firms that they actually controlled greater than five percent of the company's outstanding shares.

245.    Overall, during approximately March and April 2017, Kelln coordinated with

A599

Carrillo, acting in concert with others, to transfer a total of 12,233,337 shares of Garmatex nominally held by six different Sharp Group-administered nominee shareholders to Wintercap SA, Blacklight SA, and a third party. Collectively, these positions accounted for approximately 88% of Garmatex's purportedly unrestricted shares that were available for trading, and approximately 34% of Garmatex's total issued and outstanding stock. Carrillo, therefore, was an affiliate of Garmatex.

246.    The chart below summarizes the Garmatex share transfers described above:



247.    Carrillo, acting in concert with others, coordinated the trading of Garmatex stock at Wintercap SA, Blacklight SA and a separate broker during a stock promotional campaign, generating proceeds as a result of these unregistered sales in excess of $7 million.

A600

248.    In addition to Carrillo's conduct relating to Garmatex, he used the Sharp Group

and its network of nominees to facilitate fraudulent trading in the stock of many other issuers he

controlled.  He also used the Sharp Group to coordinate the payment of expenses associated with

his fraudulent sales, and other payments to or for his benefit.  Carrillo frequently corresponded

with Gasarch about payments he was seeking the Sharp Group's assistance in effecting, and

payments that had been charged to his account in the Q accounting system.  Carrillo sometimes

communicated with Gasarch using bespoke email addresses created and administered by the

Sharp Group called the "xmeridian" or "xmail" system.  Gasarch's address on this system was

"wires@secure.xmeridian.com."  Carrillo and Gasarch engaged in email correspondence about

invoices he had asked her to pay, invoices that had been improperly charged to his Q account,

incorrect amounts of invoices he had asked her to send, and related subjects, on at least the

following dates:  August 8, 9, and 12, 2016, September 28 and 29, 2016 and multiple dates in

October 2016.

## TOLLING AGREEMENTS

249.    Between January and June 2020, Dhillon entered into two separate tolling

agreements with the Commission.  Each tolling agreement specifies a period of time (a "tolling

period") in which "the running of any statute of limitations applicable to any action or

proceeding against Dhillon authorized, instituted, or brought by … the Commission… arising out

of the [Commission's investigation of Dhillon's conduct], including any sanctions or relief that

may be imposed therein, is tolled and suspended . . . ."  Each tolling agreement further provides

that Dhillon "shall not include the tolling period in the calculation of the running of any statute

of limitations or for any other time-related defense applicable to any proceeding, including any

sanctions or relief that may be imposed therein, in asserting or relying upon any such time-

A601

related defenses." Collectively, these agreements tolled the running of any limitations period or any other time-related defenses available to Dhillon for a period of approximately seven months and three days.

### FIRST CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
**(Violations of Sections 17(a)(1) and (3) of the Securities Act by Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor)**

250.    Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

251.    By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

252.    By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)] and will continue to violate those sections unless enjoined.

### SECOND CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor)**

253.    Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

A602

254.     By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

255.     By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

### THIRD CLAIM FOR RELIEF
### <u>UNREGISTERED OFFERINGS OF SECURITIES</u>
**(Violations of Sections 5(a) and 5(c) of the Securities Act by Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon)**

256.     Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

257.     By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

A603

258.    As a result, Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon violated

Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

**FOURTH CLAIM FOR RELIEF**
**<u>FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP</u>**
**(Violations of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder by Veldhuis,**
**Sexton, and Friesen)**

259.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if

fully set forth herein.

260.    During the Relevant Period, the stock of Vitality was a security under Section

3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

261.    During the Relevant Period, Vitality had equity securities that were registered

pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

262.    By reason of the conduct described above, defendants Veldhuis, Sexton, and

Friesen, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a

class of Vitality equity securities, failed to file a statement with the Commission containing the

information required by Schedule 13D [17 C.F.R. §240.13d-101] within ten days after they

acquired such shares, or at all.

263.    As a result, defendants Veldhuis, Sexton, and Friesen violated Section 13(d) of

the Exchange Act and Rule 13d-1 thereunder [15 U.S.C. §78m(d); 17 C.F.R. §240.13d-1].

**FIFTH CLAIM FOR RELIEF**
**<u>FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP</u>**
**(Violation of Section 13(d) of the Exchange Act and Rule 13d-2 Thereunder by Dhillon)**

264.    Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if

fully set forth herein.

265.    During the Relevant Period, the stock of Vitality was a security under Section

3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

A604

266.    During the Relevant Period, Vitality had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

267.    By reason of the conduct described above, defendant Dhillon, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a class of Vitality equity securities and filing a Schedule 13D, acquired beneficial ownership of 1 percent or more of that class of equity securities and failed to file with the Commission a timely and accurate amendment disclosing this material change.

268.    As a result, defendant Dhillon violated Section 13(d) of the Exchange Act and Rule 13d-2 thereunder [15 U.S.C. §78m(d); 17 C.F.R. §240.13d-2].

**SIXTH CLAIM FOR RELIEF**
**FAILURE TO FILE**
**(Violation of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder by Dhillon)**

269.    Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

270.    During the Relevant Period, the stock of Arch and OncoSec was each a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

271.    During the Relevant Period, Arch and OncoSec had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

272.    Defendant Dhillon violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)], and Rule 16a-3 thereunder [17 C.F.R. § 240.16a(a)], in that as a director of Arch and OncoSec and having acquired more than 10% of a registered class of Arch's and OncoSec's equity securities, Dhillon failed to file reports of ownership and changes of ownership with the Commission as required.

A605

**SEVENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Taylor)**

273.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

274.    By reason of the conduct described above, Dhillon, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the securities of Vitality, as to which no registration statement has been filed and for which no exemption from registration has been available.

275.    Taylor knowingly or recklessly provided substantial assistance to Dhillon in his violation of Sections 5(a) and 5(c) of the Securities Act.

276.    As a result, Taylor violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

**EIGHTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Sharp and Kelln)**

277.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

278.    By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly, in the offer or sale of securities, by the use

83

A606

of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

279.    By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the securities of Vitality, Arch, OncoSec, and Garmatex, as to which no registration statement has been filed and for which no exemption from registration has been available.

280.    Sharp and Kelln knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Sections 5(a), 5(c), and 17(a)(1) and (3) of the Securities Act.

281.    As a result, Sharp and Kelln each violated Section 15(b) of the Securities Act [15 U.S.C. §§ 77o(b)].

A607

**NINTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Sharp and Kelln)**

282.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

283.    By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

284.    Sharp and Kelln knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

285.    As a result, Sharp and Kelln each violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

**TENTH CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a)(3) of the Securities Act by Gasarch)**

286.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

287.    By reason of the conduct described above, defendant Gasarch, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently

85

A608

engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

288.    By reason of the conduct described above, defendant Gasarch violated Securities Act Section 17(a)(3) [15 U.S.C. §77q(a)(3)].

## ELEVENTH CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### (Violations of Section 17(a)(3) of the Securities Act by Kaitz)

289.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

290.    By reason of the conduct described above, defendant Kaitz, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

291.    By reason of the conduct described above, defendant Kaitz violated Securities Act Section 17(a)(3) [15 U.S.C. §77q(a)(3)].

## TWELFTH CLAIM FOR RELIEF
## AIDING AND ABETTING
### (Violations of Section 15(b) of the Securities Act by Gasarch)

292.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

293.    By reason of the conduct described above, Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly,

A609

(i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

294.    Gasarch knowingly or recklessly provided substantial assistance to Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act.

295.    As a result, Gasarch violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

### THIRTEENTH CLAIM FOR RELIEF
### AIDING AND ABETTING
#### (Violations of Section 15(b) of the Securities Act by Kaitz)

296.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

297.    By reason of the conduct described above, Veldhuis, Sexton, and Friesen, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

298.    Kaitz knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, and Friesen in their violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act.

299.    As a result, Kaitz violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

A610

## FOURTEENTH CLAIM FOR RELIEF
### AIDING AND ABETTING
### (Violations of Section 20(e) of the Exchange Act by Gasarch)

300.     Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

301.     By reason of the conduct described above, Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

302.     Gasarch knowingly or recklessly provided substantial assistance to Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

303.     As a result, Gasarch violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

## FIFTEENTH CLAIM FOR RELIEF
### AIDING AND ABETTING
### (Violations of Section 20(e) of the Exchange Act by Kaitz)

304.     Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

305.     By reason of the conduct described above Veldhuis, Sexton, and Friesen directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or

88

A611

artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

306.    Kaitz knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, and Friesen in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

307.    As a result, Kaitz violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.    Enter a permanent injunction restraining the defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, Gasarch, Kaitz and Taylor, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 17(a) of the Securities Act [15 U.S.C. §§77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

B.    Enter a permanent injunction restraining defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Taylor and Dhillon, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

C.    Enter a permanent injunction restraining defendants Veldhuis, Sexton, and Friesen, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or

A612

otherwise, from violating Section 13(d) of the Exchange Act [15 U.S.C. §78m(d)] and Rule 13d-1 thereunder.

      D.     Enter a permanent injunction restraining defendant Dhillon, his agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Section 13(d) of the Exchange Act [15 U.S.C. §78m(d)] and Rule 13d-2 thereunder.

      E.     Enter a permanent injunction restraining defendant Dhillon, his agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Section 16(a) of the Exchange Act [15 U.S.C. §78p(a)] and Rule 16a-3 thereunder.

      F.     Order the defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)];

      G.     Order the defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

      H.     Enter an order barring the defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

      I.     Enter an order barring the defendants from directly or indirectly, including, but not limited to, through an entity owned or controlled by any of them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall

A613

not prevent defendants from purchasing or selling securities listed on a national securities

exchange for their own personal account;

      J.      Enter an order barring defendant Dhillon from serving as an officer or director of

a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

      K.      Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

      L.      Grant such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.


DATED: September 9, 2022            Respectfully submitted,

                                /s/ Kathleen B. Shields
                                Kathleen B. Shields (Mass Bar No. 637438)
                                David H. London (Mass Bar No. 638289)
                                Amy Harman Burkart (Mass Bar No. 651828)
                                Katherine Bromberg (New York Bar No. 4154555)
                                J. Lee Buck II (DC Bar No. 421878)
                                Edward B. Gerard (CA Bar No. 248053)
                                Amy Gwiazda (Mass Bar No. 663494)
                                SECURITIES AND EXCHANGE COMMISSION
                                Boston Regional Office
                                33 Arch St., 24th Floor
                                Boston, MA 02110
                                Phone: (617) 573-8904 (Shields direct),
                                (617) 573-8997 (London direct)
                                (617) 573-5905 (Burkart direct)
                                Fax: (617) 573-4590 (fax)
                                ShieldsKa@sec.gov (Shields email)
                                LondonD@sec.gov (London email)
                                BurkartA@sec.gov (Burkart email)

A614

**CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2022, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case. A copy will also be sent via first class mail and/or email to those parties who have not yet registered for notice via the Court's CM/ECF system.

<u>/s/ Kathleen B. Shields</u>
Kathleen B. Shields

A615