# United States Court of Appeals
*for the*
# First Circuit

Case Nos. 24-1770,
24-1771, 24-1772,
24-1773, 24-1774

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

ZHIYING YVONNE GASARCH,

*Defendant-Appellant,*

FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS;
PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON IN CASE NO. 1:21-CV-11276-WGY,
HONORABLE WILLIAM G. YOUNG, U.S. DISTRICT JUDGE

## JOINT APPENDIX
## Volume 2 of 8 (Pages A616 to A1260)

STEPHEN G. TOPETZES
NEIL T. SMITH
ROBERT S. SILVERBLATT
K&L GATES LLP
*Counsel for Defendant-Appellant*
  *Paul Sexton*
1601 K Street, NW
Washington, DC 20006
(202) 778-9000

MICHAEL TREMONTE
SHER TREMONTE
*Counsel for Defendant-Appellant*
  *Mike K. Veldhuis*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*(For Continuation of Appearances See Inside Cover)*

COUNSEL PRESS    (800) 4-APPEAL • (336840)

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

MIKE K. VELDHUIS,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

———————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

PAUL SEXTON,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

———————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

COURTNEY KELLN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
MIKE K. VELDHUIS; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

———————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

JACKSON T. FRIESEN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; PAUL SEXTON;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

FRANK SCADUTO
KEVIN B. MUHLENDORF
WILEY REIN LLP
*Counsel for Defendant-Appellant*
   *Courtney Kelln*
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

MARANDA FRITZ
MARANDA E. FRITZ PC
521 5th Avenue
17th Floor
New York, New York 10175
(646) 584-8231

TIMOTHY J. FAZIO
MANNING GROSS + MASSENBURG LLP
125 High Street
Oliver Street Tower, 6th Floor
Boston, Massachusetts 02110
(617) 670-8800

*Counsel for Defendant-Appellant*
   *Jackson T. Friesen*

DANIEL STAROSELSKY
ASSISTANT GENERAL COUNSEL
KERRY J. DINGLE
SENIOR APPELLATE COUNSEL
U.S. SECURITIES & EXCHANGE
   COMMISSION
*Counsel for Plaintiff-Appellee*
100 F Street, NE
Washington, DC 20549
(202) 551-6953

KAREN A. PICKETT
PICKETT LAW OFFICES, PC
*Counsel for Defendant-Appellant*
   *Zhiying Yvonne Gasarch*
125 High Street, 26th Floor
Boston, Massachusetts 02110
(617) 423-0485

# TABLE OF CONTENTS

**Page**

Docket Entries ................................................................................. A1

Complaint, filed August 5, 2021 (Dkt. 1) ......................................... A55

    Exhibit A: Hearing dated August 29, 2019 ........................... A136

    Exhibit B: Foot Loose Charlie Smith's Offshore Chronicles ............... A143

    Exhibit C: Invoice ................................................................ A144

    Exhibit D: E-Mail Correspondence ........................................ A148

    Exhibit E: Q Account ........................................................... A184

    Exhibit F: Q Bank Broker: Work ........................................... A191

    Exhibit G: Peaceful Lion Holdings Limited ........................... A194

    Exhibit H: Wire Transfer ...................................................... A211

    Exhibit I: Securities and Exchange Commission, Schedule 13D/A ....... A212

    Exhibit J: Chart ................................................................... A217

    Exhibit K: August 19, 2013, Treasury Order ......................... A220

    Exhibit L: Portfolio Valuation 790-1 ..................................... A248

Declaration of Trevor T. Donelan, filed August 5, 2021 ................... A275

Civil Cover Sheet ............................................................................. A310

Plaintiff's Emergency *Ex Parte* Motion for a Temporary Restraining Order, Order Freezing Assets and Order for Other Equitable Relief, filed August 5, 2021 (Dkt. 3) ........................................................ A311

[Proposed] Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief, filed August 5, 2021 ................... A313

Plaintiff's Memorandum of Law in Support of its Emergency *Ex Parte* Motion for a Temporary Restraining Order, Order Freezing Assets, and Other for Equitable Relief, filed August 5, 2021 (Dkt. 4) .............. A323

Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief, filed August 6, 2021 (Dkt. 7) ................... A358

i

**Page**

[Proposed] Preliminary Injunction Order, order Freezing Assets, and Order for Other Equitable Relief, filed August 20, 2021 (Dkt. 39).................. A368

Transcript of Motion Hearing Held on January 20, 2022, filed January 25, 2022 (Dkt. 193)....................................................................... A380

Final Judgment as to Defendant Frederick L. Sharp, filed May 12, 2022 (Dkt. 211)............................................................................... A407

Memorandum and Order, filed September 6, 2022 (Dkt. 228) ........................ A420

Amended Complaint, filed September 9, 2022 (Dkt. 230)............................... A524

Defendant Paul Sexton's Answer to Amended Complaint and Affirmative Defenses, filed September 23, 2022 (Dkt. 242) ..................................... A616

Defendant Mike K. Veldhuis Verified Answer to Verified Amended Complaint, filed September 23, 2022 (Dkt. 244) ................................... A652

Defendant Courtney Kelln's Answer to Amended Complaint, filed September 30, 2022 (Dkt. 245) .............................................................. A702

Defendant Zhiying Yvonne Gasarch's Anser to Amended Complaint and Affirmative Defenses, filed October 7, 2022 (Dkt. 246)...................... A738

Answer of Defendant Jackson T. Friesen to Amended Complaint, filed October 14, 2022 (Dkt. 247).................................................... A848

Declaration of Roger Knox, filed April 17, 2023 (Dkt. 274) .......................... A950

Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 2, 2023 (Dkt. 280) ............................................ A959

Memorandum of Law in Support of Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 2, 2023 (Dkt. 281)............................................................................... A962

Declaration of Robert Knuts, filed may 2, 2023 (Dkt. 282) ............................ A988

Exhibit A: Email correspondence dated February 8, 2022 ................... A990

Exhibit B: Email exchange involving AUSA Drabick and Kevin Muhlendorf, counsel for defendant Courtney Kelln, dated February 8, 2022 through February 11, 2022 .............................. A994

**Page**

Exhibit C: Email dated February 17, 2023, from AUSA Drabick to counsel for Mr. Veldhuis, Michael Tremonte and Noam Biale ... A997

Exhibit D: Email dated March 17, 2023, from SEC Attorney Kathleen Shields ...................................................................... A1014

Exhibit E: Notice of Civil Claim that the Securities and Exchange Commission filed in the Supreme Court of British Columbia on August 11, 2022 ........................................................ A1020

Exhibit F: Reasons for Judgment issued by the Supreme Court ofBritish Columbia on March 21, 2023 ................................. A1031

Exhibit G: SEC's Responses and Objections to Defendant Courtney Kelln's First Requests for Admissions dated March 17, 2023 . A1061

Defendant Paul Sexton's Notice of Joinder, filed May 8, 2023 (Dkt. 286) . A1079

Plaintiff's Opposition to Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 9, 2023 (Dkt. 289) ......... A1082

Exhibit A: Application Response ....................................... A1096

Electronic Order, filed May 15, 2023 (Dkt. 292) ........................................ A1101

Defendants Courtney Kelln and Mike Veldhuis' Notice of Non-Opposition to Entry of Judgment, filed June 13, 2023 (Dkt. 315)...................... A1102

[Proposed Order Entering] Judgment as to Defendant Courtney Kelln, filed June 13, 2023 .................................................................... A1106

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 13, 2023 .................................................................... A1112

Plaintiff's Response to Kelln's and Veldhuis's Notice of Non-Opposition to Entry of Judgment, filed June 14, 2023 (Dkt. 316) .......................... A1118

Order Entering Judgment s to Defendant Courtney Kelln, filed June 14, 2023 (Dkt. 317)......................................................................... A1121

Notice of Corrected Filing Regarding Defendant Mike Velhuis' Notice of Non-Opposition of Entry of Judgment, filed June 14, 2023 (Dkt. 318) .................................................................... A1127

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 14, 2023 .................................................................... A1130

**Page**

Notice of Corrected Filing Regarding Defendant Mike Veldhuis' Notice of
Non-Opposition to Entry of Judgment, filed June 15, 2023 (Dkt.
319) ................................................................................................ A1137

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed
June 15, 2023 ................................................................................ A1140

Judgment as to Defendant Mike Veldhuis, filed June 21, 2023 (Dkt. 325) ... A1147

Defendant Jackson T. Friesen's Motion in Limine to Exclude "Q" Records
and Purported Expert Testimony, filed August 10, 2023 (Dkt. 329) ... A1154

Order, filed August 10, 2023 ................................................................ A1167

Yvonne Gasarch's Motion in Limine to Exclude "Q" Records and Purported
Expert Testimony, filed August 24, 2023 (Dkt.. 334) ........................ A1168

Exhibit 1: Deposition of Fedir Nikolayev ........................................ A1174

Plaintiff's Opposition to Defendant Jackson T. Friesen's Motion to Exclude
"Q" Records and Purported Expert Testimony, filed August 25, 2023
(Dkt. 336) ...................................................................................... A1261

Exhibit 1: Declaration of Ryan Murphy ............................................ A1279

Exhibit 2: Deposition of Written Questions of Zhiying Yvonne
Gasarch ........................................................................................ A1285

Defendant Paul Sexton's Motion in Limine to Exclude Q System and
Associated Data, fled August 31, 2023 (Dkt. 338) ............................ A1323

Exhibit 1: Deposition of Fedir Nikolayev ........................................ A1336

Transcript of Motion Hearing, filed September 1, 2023 (Dkt. 344) .............. A1356

Yvonne Gasarch's Motion to Supplement Her Motion in Limine filed on
August 24, 2023, filed September 1, 2023 (Dkt. 346) ........................ A1377

Plaintiff's Opposition to Defendants Sexton's and Gasarch's Motions to
Exclude Expert Testimony, filed September 4, 2023 (Dkt. 350) ......... A1379

Exhibit A: Expert Witness Report of Philip A. Feigin ........................ A1385

Exhibit B: Government's Trial Memorandum, Response to
Defendants' Motion in Limine, and Supplemental 404(b) Notice ....... A1395

**Page**

Plaintiff's Opposition to Defendant Yvonne Gasarch's Motion in Limine to Exclude "Q" Records and Purported Expert Testimony, filed September 5, 2023 (Dkt. 352) .............................................................. A1422

Plaintiff's Opposition to Defendant Paul Sexton's Motion in Limine to Exclude "Q" System and Associated Data, filed September 5, 2023 (Dkt. 353).................................................................................. A1426

    Exhibit A: Securities and Exchange Commission B03147 Analysis of MySQL Databases, Summary of Accounts ............................... A1439

    Exhibit B: Summary of Transfer Agent Records – Acquisitions of Stevia First, Vitality Stock ........................................................ A1454

    Exhibit C: Q Account Detail ................................................................ A1455

    Exhibit D: Revised Deposition on Written Questions of Paul Sexton . A1456

    Exhibit E: Wire Transfer ...................................................................... A1524

    Exhibit F: E-Mail Correspondence ...................................................... A1527

    Exhibit G: E-Mail Correspondence ...................................................... A1528

    Exhibit H: E-Mail Correspondence ...................................................... A1529

Defendant Paul Sexton's Notice of Non-Opposition to Entry of Judgment, filed September 11, 2023 (Dkt. 376) .................................................... A1530

[Proposed] Order Entering Judgment as to Defendant Paul Sexton, filed September 11, 2023 ................................................................................ A1533

Order Entering Judgment as to Defendant Paul Sexton, filed September 12, 2023 (Dkt. 378).................................................................................... A1535

Order, filed September 19, 2023 (Dkt. 385) ..................................................... A1537

Yvonne Gasarch's Motion in Limine to Preclude Admission of Exhibit QK, filed September 21, 2023 (Dkt. 389) .................................................... A1542

    Exhibit 1: Summary of Gasarch Earnings ........................................... A1544

Yvonne Gasarch's Motion to Strike Evidence that the Court Admitted De Bene Pursuant to Fed. R. Evid. 801(d)(2)(E), filed September 25, 2023 (Dkt. 394).................................................................................... A1545

Yvonne Gasarch's Motion Pursuant to Fed. R. Civ. P. 50 for Judgment as a Matter of Law, filed September 25, 2023 (Dkt. 395).......................... A1548

**Page**

Verdict, filed September 27, 2023 (Dkt. 402) ................................. A1553

Yvonne Gasarch's Renewed Motion Pursuant to Fed. R. Civ. P. 50 for
     Judgment as a Matter of Law or, in the Alternative, for a New Trial,
     filed October 25, 2023 (Dkt. 413) ........................................... A1555

Electronic Order, filed October 26, 2023 (Dkt. 414)..................................... A1564

Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the
     Proceedings, filed December 5, 2023 (Dkt. 421) ................................. A1565

Memorandum of Law in Support of Defendants Mike K. Veldhuis and
     Courtney Kelln's Motion to Stay the Proceedings, filed December 5,
     2023 (Dkt. 422).................................................................... A1569

Declaration of Robert Knuts, filed December 5, 2023 (Dkt. 423) .............. A1592

     Exhibit 1:Affidavit dated November 17, 2023 executed by Assistant
         United States Attorney James R. Drabick................................ A1594

     Exhibit 2: Email correspondence dated February 8, 2022 ................. A1726

     Exhibit 3: Email dated February 17, 2023 , from AUSA Drabick to
         counsel for Mr. Yeldhuis, Michael Tremonte and Noam Biale A1730

     Exhibit 4: Email dated March 17, 2023, from SEC Attorney ............ A1747

Plaintiff's Motion for Remedies Against Defendants Mike Veldhuis, Paul
     Sexton, Jackson Friesen, Courtney Kelln and Zhiying Yvonne
     Gasarch, filed December 8, 2023 (Dkt. 425)..................................... A1753

Final Judgment as to Defendant Jackson T. Friesen, filed December 8,
     2023 ................................................................................. A1756

Final Judgment as to Defendant Yvonne Gasarch, filed December 8, 2023 A1769

Final Judgment as to Defendant Paul Sexton, filed December 8, 2023 ....... A1779

Final Judgment as to Defendant Mike K. Veldhuis, filed December 8,
     2023 ................................................................................. A1791

Final Judgment as to Defendant Courtney Kelln, filed December 8, 2023 .. A1804

Plaintiff's Memorandum in Support of Motion for Remedies Against
     Defendants Mike Veldhuis, Paul Sexton, Jackson Friesen, Courtney
     Kelln, and Zhiying Yvonne Gasarch, filed December 8, 2023 (Dkt.
     426) .................................................................................. A1813

**Page**

Exhibit A: Transcript of September 27, 2023 Jury Charge ................ A1845

Exhibit B: Government's Notice of Anticipated Restitution Request
    and Motion for Continuance ...................................... A1890

Declaration of Ryan Murphy, filed December 8, 2023 (Dkt. 427) ............. A1902

Exhibit 1: ACCO / ACC1 Q Account Detail.................................. A1916

Exhibit 2: HEAR Q Account Detail ...................................... A1941

Exhibit 3: GARD Q Account Detail...................................... A1956

Exhibit 4: Chart.................................................... A1972

Exhibit 5: Wire Transfer............................................. A2141

Exhibit 6: Wire Transfer............................................. A2142

Exhibit 7: Wire Transfer............................................. A2143

Exhibit 8: Wire Transfer............................................. A2144

Exhibit 9: Wire Transfer............................................. A2145

Exhibit 10: Wire Transfer............................................ A2147

Exhibit 11: E-mail Correspondence .................................. A2149

Exhibit 12: E-mail Correspondence .................................. A2150

Exhibit 13: E-mail Correspondence .................................. A2151

Exhibit 14: Wire Transfer............................................ A2152

Exhibit 15: Wire Transfer............................................ A2153

Exhibit 16: E-mail Correspondence .................................. A2154

Exhibit 17: E-mail Correspondence .................................. A2155

Exhibit 18: Wire Transfer............................................ A2168

Exhibit 19: Wire Transfer............................................ A2169

Exhibit 20: DGM Bank and Trust Inc. Statement of Account Activity
    .............................................................. A2170

Exhibit 21: E-mail Correspondence .................................. A2171

Exhibit 22: E-mail Correspondence .................................. A2175

**Page**

Exhibit 23: Wire Transfer ................................................................ A2181

Exhibit 24: Text Messages .............................................................. A2182

Exhibit 25: Text Messages .............................................................. A2223

Exhibit 26: E-mail Correspondence ................................................ A2225

Exhibit 27: Invoice .......................................................................... A2226

Exhibit 28: Wire Transfer ................................................................ A2227

Exhibit 29: Wire Transfer ................................................................ A2228

Exhibit 30: E-mail Correspondence ................................................ A2229

Exhibit 31: Invoice .......................................................................... A2230

Exhibit 32: Bank Statement ............................................................ A2235

Exhibit 33: Veldhuis PJI Backup .................................................... A2237

Plaintiff's Opposition to Defendants Mike K. Veldhuis and Courtney Kelln's
Second Motion to Stay the Proceedings, filed December 18, 2023
(Dkt. 429) ..................................................................................... A2284

Final Pretrial Conference Transcript, filed January 24, 2023 (Dkt. 434) ....... A2289

Jury Trial Transcript Day 1, filed January 24, 2024 (Dkt. 435) ..................... A2310

Jury Trial Transcript Day 2, filed January 24, 2024 (Dkt. 436) ..................... A2416

Jury Trial Transcript Day 3, filed January 24, 2024 (Dkt. 437) ..................... A2534

Jury Trial Transcript Day 4, filed January 24, 2024 (Dkt. 438) ..................... A2674

Jury Trial Transcript Day 5, filed January 24, 2024 (Dkt. 439) ..................... A2772

Jury Trial Transcript Day 6, filed January 24, 2024 (Dkt. 440) ..................... A2865

Jury Trial Transcript Day 7, filed January 24, 2024 (Dkt. 441) ..................... A2946

Jury Trial Transcript Day 8, filed January 24, 2024 (Dkt. 442) ..................... A3103

Motion and Charge Conference Transcript, filed January 24, 2024 (Dkt.
443) ............................................................................................... A3273

Jury Trial Transcript Day 9, filed January 24, 2024 (Dkt. 444) ..................... A3331

Jury Trial Transcript Day 10, filed January 24, 2024 (Dkt. 445) ................. A3458

**Page**

Electronic Order, filed February 7, 2024 (Dkt. 451) ..................................... A3469

Defendant Paul Sexton's Opposition to Motion for Remedies, filed February 14, 2024 (Dkt. 454).............................................................................. A3470

Defendant Courtney Kelln's and Mike K. Veldhuis's Opposition to Plaintiff SEC's Motion for Remedies Against Defendants Veldhuis, Sexton, Friesen, Kelln, and Gasarch, filed February 14, 2024 (Dkt. 455)........ A3491

Defendants Mike K. Veldhuis and Courtney Kelln's Motion for Reconsideration, filed February 16, 2024 (Dkt. 456)............................ A3495

Memorandum of Law in Support of Veldhuis and Kelln's Motion for Reconsideration of the Second Motion to Stay, filed February 16, 224 (Dkt. 457)....................................................................................... A3499

Declaration of Robert Knuts, filed February 16, 2024 (Dkt. 458) ............... A3505

Exhibit 1: Indictment filed January 9, 2024 ..................................... A3506

Defendant Paul Sexton's Motion for Stay, filed February 20, 2024 (Dkt. 459) ....................................................................................... A3544

Electronic Order Denying Motion for Reconsideration, filed February 20, 2024 (Dkt. 460)....................................................................... A3547

Defendant Yvonne Gasarch's Opposition to SEC's Remedies Motion, filed February 21, 2024 (Dkt. 464) ............................................................ A3548

Exhibit 1: Q System Data .................................................................. A3566

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against Defendants Paul Sexton, Mike Veldhuis, and Courtney Kelln, filed March 1, 2024 (Dkt. 470) ..................................................... A3587

Exhibit A: E-Mail Correspondence ..................................................... A3602

Exhibit B: Wire Transfer .................................................................... A3604

Exhibit C: DGM Band and Trust Inc. Statement of Account Activity ................................................................................. A3606

Exhibit D: E-Mail Correspondence ..................................................... A3610

Exhibit E: E-Mail Correspondence..................................................... A3617

Defendant Jackson Friesen's Opposition to Plaintiff's Motion for Remedies, filed March 1, 2024 (Dkt. 471)......................................................... A3620

**Page**

Defendant Paul Sexton's Sur-Reply Regarding Motion for Remedies, filed
March 6, 2024 (Dkt. 473) .................................................................... A3633

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against
Defendant Yvonne Gasarch, filed March 7, 2024 (Dkt. 474) ............ A3641

    Exhibit A: Wire Transfer ..................................................................... A3655

    Exhibit B: Wire Transfer ..................................................................... A3656

    Exhibit C: Wire Transfer ..................................................................... A3657

    Exhibit D: Information Return for Electronic Filing of An Individual's
Income Tax and Benefit Return ................................................. A3658

    Exhibit E: Officers and Directors Enquiry ......................................... A3661

    Exhibit F: Wire Transfer ..................................................................... A3666

    Exhibit G: Wire Transfer ..................................................................... A3668

    Exhibit H: Letter dated April 21, 2018 ............................................... A3671

    Exhibit I: Wire Transfer ...................................................................... A3672

    Exhibit J: Bank Statement ................................................................... A3673

    Exhibit K: Chart .................................................................................. A3674

    Exhibit L: Assignment ........................................................................ A3676

    Exhibit M: E-mail Correspondence .................................................... A3681

Declaration of Christopher Beckstrom, filed March 7, 2024 (Dkt. 475)...... A3695

    Exhibit 1: E-Mail Correspondence ..................................................... A3698

    Exhibit 2: E-Mail Correspondence ..................................................... A3699

    Exhibit 3: E-Mail Correspondence ..................................................... A3700

Declaration of Ryan Murphy, filed March 7, 2024 (Dkt. 476).................... A3701

    Exhibit 1: Summary of Cash Withdrawals ......................................... A3704

    Exhibit 2: Summary of Cash Withdrawals ......................................... A3706

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against
Defendant Jackson Friesen, filed March 14, 2024 (Dkt. 480) ........... A3710

**Page**

Defendant Yvonne Casarch's Sur-Reply to SEC's Reply to her Opposition
to SEC's Remedies Motion, filed March 15, 2024 (Dkt. 481)........... A3715

Plaintiff's Proposed Judgments Against Defendants Veldhuis, Sexton,
Friesen, Kelln and Gasarch, filed May 10, 2024 (Dkt. 485) .............. A3723

Judgment as to Defendant Mike K. Veldhuis, filed May 10, 2024 ............ A3725

Judgment as to Defendant Paul Sexton, filed May 10, 2024...................... A3733

Judgment as to Defendant Jackson T. Friesen, filed May 10, 2024 ............. A3741

Judgment as to Defendant Courtney Kelln, filed May 10, 2024 ................. A3749

Judgment as to Defendant Yvonne Gasarch, filed May 10, 2024 ............... A3756

Yvonne Gasarch's Objections to SEC's Proposed (Partial) Judgment, filed
May 20, 2024 (Dkt. 486) ........................................................ A3762

Plaintiff's Response to Defendant Zhiying Yvonne Gasarch's Objections to
SEC's Proposed Judgment, filed may 20, 2024 (Dkt. 487) ................ A3766

Defendant Paul Sexton's Objections to Proposed Judgment, filed May 20,
024 (Dkt. 488)........................................................................ A3769

Defendant Jackson Friesen's Objections to Plaintiff's Proposed Judgment,
filed May 20, 2024 (Dkt. 489)................................................... A3773

Objections by Defendants Veldhuis and Kelln to Proposed Partial Judgments
Against Veldhuis and Kelln Submitted by Plaintiff Securities and
Exchange Commission, filed May 20, 2024 (Dkt. 490)...................... A3782

Transcript of Disgorgement, filed May 23, 2024 (Dkt. 491)........................ A3787

Memorandum and Order, filed June 17, 2024 (Dkt. 494) .............................. A3823

Judgment as to Defendant Paul Sexton, filed June 20, 2024 (Dkt. 495) ........ A3886

Judgment as to Defendant Mike K. Veldhuis, filed June 20, 2024 (Dkt.
496) ..................................................................................... A3896

Judgment as to Defendant Jackson T. Friesen, filed June 20, 2024 (Dkt.
497) ..................................................................................... A3907

Judgment as to Defendant Yvonne Gasarch, filed June 20, 2024 (Dkt. 498) A3917

Judgment as to Defendant Courtney Kelln, filed June 20, 2024 (Dkt. 499) .. A3925

**Page**

Motion for Orders Directing the Turnover of Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 (Dkt. 500) ................... A3935

[Proposed] Order Directing Transfer of Jackson T. Friesen's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........ A3940

[Proposed] Order Directing Transfer of Yvonne Gasarch's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3947

[Proposed] Order Directing Transfer of Courtney Kelln's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3952

[Proposed] Order Directing Transfer of Paul Sexton's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ................. A3955

[Proposed] Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3961

Defendant Jackson Friesen's Objections to Judgment, Motion to Amend, Clarify or Correct Judgment and Opposition to Motion for Turnover Order, filed July 2, 2024 (Dkt. 501) ..................................................... A3968

Defendant Paul Sexton's Opposition to Motion for Orders Directing the Turnover of Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 (Dkt. 502) ...................................... A3974

Defendant Courtney Kelln's Notice of Joinder, filed July 3, 2024 (Dkt. 503) ................................................................................................... A3977

Defendant Yvonne Gasarch's Notice of Joinder, filed July 3, 2024 (Dkt. 504) ................................................................................................... A3979

Defendant Paul Sexton's Notice of Joinder, filed July 3, 2024 (Dkt. 505) A3981

Defendant Mike K. Veldhuis's Notice of Joinder, filed July 3, 2024 (Dkt. 506) ................................................................................................... A3984

Plaintiff's Opposition to Defendants' Motions to Amend, Clarify or Correct Judgment, filed July 15, 2024 (Dkt. 507) ........................................ A3986

Electronic Order Allowing Motion for Release of Funds, filed July 11, 2024 (Dkt. 508) ........................................................................................ A3990

Order Directing Transfer of Jackson T. Friesen's Frozen Funds to the Securities and Exchange Commission, filed July 11, 2024 (Dkt. 509) ................................................................................................... A3991

**Page**

Order Directing Transfer of Yvonne Gasarch's Frozen Funds to the
    Securities and Exchange Commission, filed July 11, 2024 (Dkt.
    510) ................................................... A3998

Order Directing Transfer of Courtney Kelln's Frozen Funds to the Securities
    and Exchange Commission, filed July 11, 2024 (Dkt. 511)............. A4003

Order Directing Transfer of Paul Sexton's Frozen Funds to the Securities
    and Exchange Commission, filed July 11, 2024 (Dkt. 512)............. A4006

Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to the
    Securities and Exchange Commission, filed July 11, 2024 (Dkt.
    513) ................................................... A4012

Electronic Order re: Motion to Amend, filed July 16, 2024 (Dkt. 514)..... A4019

Defendant Paul Sexton's Motion to Stay Execution of Judgment, filed July
    18, 2024 (Dkt. 515).................................. A4020

    Exhibit 1: E-mail Correspondence ................................ A4025

Motion of Defendants Mike Veldhuis and Courtney Kelln to Stay Execution
    of Judgment, filed July 19, 2024 (Dkt. 516).................... A4029

Defendant Yvonne Gasarch's Motion to Stay Execution of Judgment, filed
    July 22, 2024 (Dkt. 517).................................. A4035

    Exhibit 1: Order Made After Application ...................... A4045

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 518)    A4054

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 519).... A4055

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 520).... A4056

Notice of Appeal by Zhiying Yvonne Gasarch, filed August 19, 2024 (Dkt.
    521) ................................................... A4057

Notice of Appeal by Mike Veldhuis, filed August 19, 2024 (Dkt. 522) ........ A4059

Notice of Appeal by Courtney Kelln, filed August 19, 2024 (Dkt. 523) ....... A4061

Notice of Appeal by Paul Sexton, filed August 19, 2024 (Dkt. 524)............ A4063

Notice of Appeal by Jackson T. Friesen, filed August 19, 2024 (Dkt. 525) .. A4066

Plaintiff's Motion in Support of Distribution for the Benefit of Harmed
    Investors and Seeking and Order Establishing a Fair Fund, Appointing

a Tax Administrator, and Authorizing Payment of Tax Obligations and Related Fees and Expenses of Tax Administrator Without Further Court Order, filed September 4, 2024 (Dkt. 537) ................................ A4068

[Proposed] Order Establishing a Fair Fund, Appointing a Tax Administrator, and Authorizing Payment of Tax Obligations and Related Fees and Expenses of the Tax Administrator Without Further Court Order, filed September 4, 2024 ................................................................................ A4071

Plaintiff's Memorandum of Law Describing Proposed Distribution Framework and in Support of Motion Seeking an Order Establishing a Fair Fund and Other Relief, filed September 4, 2024 (Dkt. 538) ........ A4074

Exhibit A: Order Approving Distribution Plan .................................... A4093

Exhibit B: Order Approving Plan of Distribution ................................ A4129

Exhibit C: Order Reclassifying Prejudgment Interest as Disgorgement, Appointing a Distribution Agent, and Approving a Distribution Plan for the Distribution Fund...................................................... A4160

Declaration of Dr. Thomas A. Dunn, filed September 4, 2024, filed September 4, 2024 (Dkt. 539) ...................................................... A4173

Appendix 1: Defendants' Monetary Remedies .................................... A4186

Appendix 2: Knox Restitution Fund, Losses by OTC Security Ticker  A4187

Appendix 3: Group 2 Tickers and Defendants .................................... A4188

Defendant Paul Sexton's Opposition to Motion for Fair Fund, filed September 16, 2024 (Dkt. 540) ............................................................ A4189

Defendant Jackson Friesen's Opposition to Motion for Fair Fund, filed September 16, 2024 (Dkt. 541) ............................................................ A4192

Defendant Yvonne Gasarch's Motion for Joinder, filed September 16, 2024 (Dkt. 542)............................................................................................ A4196

Defendant Courtney Kelln's Motion for Joinder, filed September 16, 2024 (Dkt. 543)............................................................................................ A4198

Defendant Mike K. Veldhuis's Notice of Joinder and Response to Motion, filed September 16, 2024 (Dkt. 544) .................................................... A4200

Electronic Order, filed September 18, 2024 (Dkt. 545) .................................. A4203

**Page**

Trial Exhibits:

Exhibit 14: Xphone between 2, 4 and 66.....................................................A4204

Exhibit 16: Ian Cooper's Special Report re Arch Therapeutics...................A4205

Exhibit 17: Chuck Hughes Microcap Report (Conmar Capital) re Stevia First
    $50 Billion Sugar.....................................................................................A4250

Exhibit 18: Xphone chain between 2, 3, 4 and 66 re Send...........................A4262

Exhibit 40: E-mail from Wires to Nikolayev (FEN) re Wire please...........A4264

Exhibit 45: Xphone chain between 2, 3, 4, 60 and Sexy re Summary........A4265

Exhibit 79: Xphone chain between Elgi, Wires and 19...............................A4266

Exhibit 81: Xphone chain between Bond, 104 and Blgx re Hiya...............A4268

Exhibit 87: Xphone chain between 2, 3 and 4 re Meeting...........................A4304

Exhibit 90: Xphone chain between Bond and Wires re Cash......................A4305

Exhibit 99: Xphone chain between Gard, Celt and 2 re ARW....................A4306

Exhibit 113: Xphone chain between 2, 3, and 4 re Copy ...........................A4307

Exhibit 126: Xphone between Gard and Kash re Yo ..................................A4308

Exhibit 134: Xphone chain between 2, 3, and 4 re Rights .........................A4309

Exhibit 136: Xphone chain between 2, 3, and 4 re Today...........................A4311

Exhibit 140: Xphone from 4 to 2 ................................................................A4314

Exhibit 141: Xphone chain between 2, 3, and 4 .........................................A4315

Exhibit 151: Xphone chain between Wires and 19 ELGI ..........................A4316

Exhibit 154: Xphone from GARD to KASH and ACCO re Yo.................A4318

Exhibit 157: Xphone chain between Wires, Kash and Celt re Wire to
    Business Venture Investments...............................................................A4319

Exhibit 168: Xphone chain between Peace, 77, Lion and Wires re Hi .......A4320

Exhibit 170: Xphone chain between 2, 3 and 114 re There you have it......A4321

Exhibit 180: Xphone chain between Wires, Bond, Luna and Alex 110 re
    Remo......................................................................................................A4322

**Page**

Exhibit 183: Xphone between 2 and 98 re Test .......................................... A4323

Exhibit 184: Xphone chain between Fen, Wires and 76 re Where r u ........ A4324

Exhibit 190: Xphone chain between 2 and 4 re Test ................................... A4326

Exhibit 193: Xphone chain between 76, Fen and Wires re Xvoice............. A4327

Exhibit 233: Beckstrom Xphone Header Spreadsheet................................. A4329

Exhibit 237: Xmail message from Wires (xMeridian) to Friesen re 2 Wires
    to Go Out ........................................................................... A4384

Exhibit 239: Xmail message from Wires to Friesen re 2 Wires to go out... A4385

Exhibit 261: Xmail messages between Friesen, "acco" and "hear" re NA . A4387

Exhibit 273: Xmail message from Friesen to Acco and Hear re creative with
    attachments ........................................................................ A4391

Exhibit 284: Establishment of the beneficial owner's identity for Peregrine
    Capital................................................................................. A4412

Exhibit 286: E-mail from Riverfall Group to Silverton Ops re wire 129k to
    Greenberg with attachments showing metadata ................................ A4413

Exhibit 287: E-mail from Hilton Capital to Wintercap Operations re wire
    CAD100016 to Sun Life with attachments ........................................ A4518

Exhibit 288: Text messages between Friesen, Knox, and Threema with
    photos of Cristal bottles and SUB Penny $ ...................................... A4523

Exhibit 289: Threema chats ......................................................................... A4534

Exhibit 290: Friesen cash collection for 9k EUR ....................................... A4536

Exhibit 292: Murphy Summary charts summarizing transfers of Arch
    Therapeutics stock ............................................................................. A4537

Exhibit 293: MDDD Q Account Details....................................................... A4538

Exhibit 295: ARTH Q Account Details ....................................................... A4546

Exhibit 296: STVFVBIO Q Account Details .............................................. A4560

Exhibit 298: STEV Q Account Details......................................................... A4583

Exhibit 299: LBY and PBAV Q Account Details ....................................... A4594

Exhibit 306: RIHT & RIH1 Q Account Details .......................................... A4605

**Page**

Exhibit 307: Murphy Summary charts summarizing sales of the Fourteen
Issuers' stock by year ......................................................... A4619

Exhibit 308: Murphy Summary Charts showing sales of Fourteen Issuers'
securities based on Q system and brokerage account........................ A4620

Exhibit 310: Murphy Summary charts summarizing market trading based on
Blue Sheets in Stevia FirstVitality and Arch d................................. A4634

Exhibit 311: GARD Q reports .................................................... A4635

Exhibit 313: Murphy Summary charts showing profit allocations to the Q
accounts of Veldhuis, Sexton and Friesen ........................................ A4651

Exhibit 314: Summary chart of allocations to PEAC PERE account.......... A4659

<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

</div>

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:21-cv-11276-WGY |
| v. | **DEMAND FOR JURY TRIAL** |
| Frederick L. Sharp, *et al.*, | |
| Defendants. | |

<div align="center">

**DEFENDANT PAUL SEXTON'S ANSWER TO AMENDED COMPLAINT AND**
<u>**AFFIRMATIVE DEFENSES**</u>

</div>

Defendant Paul Sexton ("Mr. Sexton"), through his attorneys, hereby answers the

Amended Complaint (ECF No. 230) in the above-captioned matter filed by the Securities and

Exchange Commission (the "Commission" or "Plaintiff") and presents his affirmative defenses.

Mr. Sexton incorporates the headings of the Amended Complaint solely for organizational and

reference purposes. Mr. Sexton denies any allegations contained in the headings, tables, and

unnumbered paragraphs of the Amended Complaint, as well as any characterizations of the

documents referred to in the Amended Complaint. Every allegation that is not specifically

admitted is hereby denied.

<div align="center">

<u>**SUMMARY**</u>

</div>

1.      Mr. Sexton lacks knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 1.

2.      Mr. Sexton lacks knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 2.

3.      Mr. Sexton lacks knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 3.

313471130.1

<div align="center">

A616

</div>

4.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 4.

**Sharp's, Kelln's and Gasarch's Participation in the Fraudulent Scheme**

5.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 5.

6.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 6.

**Veldhuis', Sexton's, and Friesen's Participation in the Fraudulent Scheme**

7.     Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 7 on that basis.

8.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 8.

**Dhillon's Role in the Scheme**

9.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 9.

10.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 10.

11.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 11.

**Kaitz's Role in the Scheme**

12.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 12.

13.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the

313471130.1

A617

truth of the allegations in paragraph 13.

### Taylor's Role in the Scheme

14.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14.

### Dhillon's Additional Illegal Stock Sales through Person A's Companies

15.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 15.

### Dhillon's False Statements During the Commission's Investigation

16.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 16.

### The Defendants Violated Various Securities Laws

17.    Mr. Sexton avers that paragraph 17 states a legal conclusion for which no answer is required.

18.    Mr. Sexton avers that paragraph 18 states a legal conclusion for which no answer is required.

19.    Mr. Sexton avers that paragraph 19 states a legal conclusion for which no answer is required.

### JURISDICTION AND VENUE

20.    Mr. Sexton avers that paragraph 20 states a legal conclusion for which no answer is required. Mr. Sexton does not dispute jurisdiction.

21.    Mr. Sexton avers that paragraph 21 states a legal conclusion for which no answer is required. Mr. Sexton does not dispute venue.

### DEFENDANTS

22.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the

313471130.1

truth of the allegations in paragraph 22.

23.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23.

24.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 24.

25.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 25.

26.    Mr. Sexton admits he was born in the United Kingdom and otherwise denies the allegations in paragraph 26.

27.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 27.

28.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 28.

29.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 29.

30.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 30.

## RELATED PARTIES

31.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31.

32.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 32.

33.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the

4

313471130.1

truth of the allegations in paragraph 33.

34.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 34.

## BACKGROUND

35.     Mr. Sexton avers that paragraph 35 states a legal conclusion for which no answer is required.

36.     Mr. Sexton avers that paragraph 36 states a legal conclusion for which no answer is required.

37.      Mr. Sexton avers that paragraph 37 states a legal conclusion for which no answer is required.

38.     Mr. Sexton avers that paragraph 38 states a legal conclusion for which no answer is required.

39.     Mr. Sexton avers that paragraph 39 states a legal conclusion for which no answer is required.

40.      Mr. Sexton avers that paragraph 40 states a legal conclusion for which no answer is required.

41.     Mr. Sexton avers that paragraph 41 states a legal conclusion for which no answer is required.

## OVERVIEW OF THE SHARP GROUP'S CONDUCT

### Obfuscating Beneficial Ownership and Control

42.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 42.

43.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the

5

313471130.1

A620

truth of the allegations in paragraph 43.

44.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 44.

45.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 45.

46.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 46.

47.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 47.

48.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 48.

49.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 49.

50.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 50.

51.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 51.

52.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 52.

53.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 53.

54.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 54.

313471130.1

A621

55.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 55.

56.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 56.

57.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 57.

58.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 58.

59.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 59.

60.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 60.

61.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 61.

62.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 62.

63.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 63.

64.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 64.

65.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 65.

313471130.1

A622

**The Sharp Group Benefited from Illegal Stock Sales**

66.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 66.

67.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 67.

68.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 68.

69.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 69.

**<u>SHARP GROUP EXAMPLE ONE:</u>**
**<u>ILLEGAL SALES OF STEVIA FIRST/VITALITY BY DHILLON,</u>**
**<u>VELDHUIS CONTROL GROUP AND TAYLOR</u>**

70.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 70 on that basis.

71.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 71.

**Background**

72.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 72.

73.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 73.

74.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 74.

75.    Mr. Sexton lacks knowledge or information sufficient to form a belief about

313471130.1

A623

the truth of the allegations in paragraph 75.

76.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 76.

77.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 77.

78.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 78.

79.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 79. Mr. Sexton avers that paragraph 79 states a legal conclusion for which no answer is required.

80.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 80. Mr. Sexton avers that paragraph 80 states a legal conclusion for which no answer is required.

81.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 81. Mr. Sexton avers that paragraph 81 states a legal conclusion for which no answer is required.

**Round One: 2012 Stevia First/Vitality Stock Sales**

82.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 82.

83.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 83.

84.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 84.

313471130.1

A624

85.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 85.

86.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 86.

87.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 87.

88.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 88.

89.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 89.

90.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 90.

**Round Two: 2014 Stevia First/Vitality Stock Sales**

91.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 91.

92.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 92.

93.     Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 93.

94.     Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 94 on that basis.

95.     Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 95 on that basis.

313471130.1

A625

96.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 96.

97.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 97.

98.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in the subparts to paragraph 98.

99.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 99.

100.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 100.

101.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 101.

102.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 102 on that basis.

103.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 103 on that basis.

104.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 104 on that basis.

105.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 105 on that basis.

106.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 106.

107.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the

313471130.1

A626

truth of the allegations in paragraph 107.

**Round Three: 2015 and 2016 Stevia First/Vitality Stock Sales**

108.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 108

109.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 109.

110.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 110.

111.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 111.

112.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 112.

113.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 113.

114.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 114.

115.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 115.

116.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 116.

117.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 117.

118.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and

313471130.1

A627

refuses to answer the allegations in paragraph 118 on that basis.

119. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 119.

120. Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 120 and its subparts on that basis.

121. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 121.

122. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 122.

123. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 123.

124. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 124.

125. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 125.

126. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 126.

127. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 127.

128. Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 128 on that basis

129. Mr. Sexton lacks knowledge or information sufficient to form a belief about the

313471130.1

A628

truth of the allegations in paragraph 129.

130.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 130.

131.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 131.

132.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 132.

133.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 133 on that basis.

134.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 134.

135.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 135.

136.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 136 on that basis.

137.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 137.

138.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 138.

139.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 139.

140.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 140.

313471130.1

A629

**Round Four: 2016 – 2018 Illegal Vitality Stock Sales**

141.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 141.

142.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 142.

143.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 143.

144.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 144.

145.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 145.

146.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 146.

147.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 147.

148.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 148.

149.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 149.

150.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 150.

151.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 151 on that basis.

313471130.1

A630

152.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 152.

**The Veldhuis Control Group's Omissions in Furtherance of the Scheme**

153.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 153 on that basis.

154.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 154 on that basis.

**Dhillon's Failures to Disclose in Furtherance of the Scheme**

155.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 155.

156.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 156.

157.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 157.

**Dhillon's False and Misleading Testimony in Furtherance of the Scheme**

158.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 158.

159.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 159.

160.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 160.

313471130.1

A631

### SHARP GROUP EXAMPLE TWO:
### ILLEGAL ARCH STOCK SALES INVOLVING DHILLON, THE VELDHUIS
### CONTROL GROUP, AND TAYLOR

161.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 161.

162.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 162.

163.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 163.

164.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 164.

165.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 165.

166.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 166.

167.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 167.

168.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 168.

169.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 169.

170.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 170.

171.    Mr. Sexton lacks knowledge or information sufficient to form a belief about

313471130.1

A632

the truth of the allegations in paragraph 171.

172. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 172.

173. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 173.

174. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 174.

175. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 175.

176. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 176.

177. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 177.

178. Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 178 on that basis.

179. Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 179 on that basis.

180. Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 180 on that basis.

181. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 181.

182. Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 182.

313471130.1

A633

183.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 183 on that basis

184.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 184.

185.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 185.

186.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 186.

187.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 187.

188.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 188.

189.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 189 on that basis.

190.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 190.

191.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 191.

192.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 192.

193.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 193.

194.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the

313471130.1

A634

truth of the allegations in paragraph 194.

195.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 195.

196.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 196.

## DHILLON'S SCHEME TO SELL ARCH STOCK ILLEGALLY THROUGH PERSON A

197.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 197.

198.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 198.

199.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 199.

200.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 200.

201.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 201.

202.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 202.

203.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 203.

204.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 204.

205.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the

313471130.1

truth of the allegations in paragraph 205.

206.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 206.

207.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 207.

208.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 208.

209.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 209.

210.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 210.

211.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 211.

212.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 212.

### SHARP GROUP EXAMPLE THREE:
### ILLEGAL ONCOSEC STOCK SALES INVOLVING DHILLON AND THE VELDHUIS CONTROL GROUP

**The Veldhuis Control Group's Scheme to Sell OncoSec Stock Fraudulently**

213.    Mr. Sexton asserts his Fifth Amendment right against self-incrimination and refuses to answer the allegations in paragraph 213 on that basis.

214.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 214.

215.    Mr. Sexton lacks knowledge or information sufficient to form a belief about

313471130.1

A636

the truth of the allegations in paragraph 215.

216.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 216.

**Dhillon's Scheme to Sell OncoSec Fraudulently through Person A**

217.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 217.

218.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 218.

219.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 219

220.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 220.

221.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 221.

222.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 222.

223.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 223.

224.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 224.

225.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 225.

226.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the

313471130.1

A637

truth of the allegations in paragraph 226.

227.   Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 227.

228.   Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 228.

229.   Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 229.

230.   Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 230.

231.   Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 231:

232.   Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 232.

233.   Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 233.

234.   Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 234.

## **DHILLON'S SCHEME TO SELL ONCOSEC STOCK ILLEGALLY VIA TAYLOR**

235.   Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 235.

236.   Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 236.

313471130.1

A638

**ADDITIONAL SHARP GROUP AND VELDHUIS CONTROL GROUP DEALS**

237.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 237.

238.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 238.

239.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 239.

**SHARP GROUP EXAMPLE: LUIS CARRILLO**

240.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 240.

241.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 241.

242.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 242.

243.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 243.

244.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 244.

245.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 245.

246.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 246.

247.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the

313471130.1

A639

truth of the allegations in paragraph 247.

248.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 248.

## **TOLLING AGREEMENTS**

249.    Mr. Sexton lacks knowledge or information sufficient to form a belief about the

truth of the allegations in paragraph 249.

## **FIRST CLAIM FOR RELIEF**
## **FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Sections 17(a)(1) and (3) of the Securities Act by Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor)**

250.    Paragraphs 1 through 249 above are incorporated by reference as if fully set forth

herein.

251.    Mr. Sexton avers that paragraph 251 states a legal conclusion for which no

answer is required.

252.    Mr. Sexton avers that paragraph 252 states a legal conclusion for which no

answer is required.

## **SECOND CLAIM FOR RELIEF**
## **FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor)**

253.    Paragraphs 1 through 249 above are incorporated by reference as if fully set forth

herein.

254.    Mr. Sexton avers that paragraph 254 states a legal conclusion for which no

answer is required.

255.    Mr. Sexton avers that paragraph 255 states a legal conclusion for which no

answer is required.

313471130.1

A640

**THIRD CLAIM FOR RELIEF**
**UNREGISTERED OFFERINGS OF SECURITIES**
**(Violations of Sections 5(a) and 5(c) of the Securities Act by Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon)**

256.    Paragraphs 1 through 249 above are incorporated by reference as if fully set forth herein.

257.    Mr. Sexton avers that paragraph 257 states a legal conclusion for which no answer is required.

258.    Mr. Sexton avers that paragraph 258 states a legal conclusion for which no answer is required.

**FOURTH CLAIM FOR RELIEF**
**FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP**
**(Violations of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder by Veldhuis, Sexton, and Friesen)**

259.    Paragraphs 1 through 248 above are incorporated by reference as if fully set forth herein.

260.    Mr. Sexton avers that paragraph 260 states a legal conclusion for which no answer is required.

261.    Mr. Sexton avers that paragraph 261 states a legal conclusion for which no answer is required.

262.    Mr. Sexton avers that paragraph 262 states a legal conclusion for which no answer is required.

263.    Mr. Sexton avers that paragraph 263 states a legal conclusion for which no answer is required.

313471130.1

A641

**FIFTH CLAIM FOR RELIEF**
**FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP**
**(Violation of Section 13(d) of the Exchange Act and Rule 13d-2 Thereunder by Dhillon)**

264.     Paragraphs 1 through 249 above are incorporated by reference as if fully set forth herein.

265.     The Fifth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 265 states a legal conclusion for which no answer is required.

266.     The Fifth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 266 states a legal conclusion for which no answer is required.

267.     The Fifth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 267 states a legal conclusion for which no answer is required.

268.     The Fifth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 268 states a legal conclusion for which no answer is required.

**SIXTH CLAIM FOR RELIEF**
**FAILURE TO FILE**
**(Violation of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder by Dhillon)**

269.     Paragraphs 1 through 249 above are incorporated by reference as if fully set forth herein.

270.     The Sixth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 270 states a legal conclusion for which no answer is required.

313471130.1

A642

271.    The Sixth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 271 states a legal conclusion for which no answer is required.

272.    The Sixth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 272 states a legal conclusion for which no answer is required.

<div align="center">

**SEVENTH CLAIM FOR RELIEF**
**<u>AIDING AND ABETTING</u>**
**(Violations of Section 15(b) of the Securities Act by Taylor)**

</div>

273.    Paragraphs 1 through 248 above are incorporated by reference as if fully set forth herein.

274.    The Seventh Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 274 states a legal conclusion for which no answer is required.

275.    The Seventh Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 275 states a legal conclusion for which no answer is required.

276.    The Seventh Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 276 states a legal conclusion for which no answer is required.

<div align="center">

**EIGHTH CLAIM FOR RELIEF**
**<u>AIDING AND ABETTING</u>**
**(Violations of Section 15(b) of the Securities Act by Sharp and Kelln)**

</div>

277.    Paragraphs 1 through 248 above are incorporated by reference as if fully set forth herein.

313471130.1

<div align="center">

A643

</div>

278.     The Eighth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 278 states a legal conclusion for which no answer is required.

279.     The Eighth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 279 states a legal conclusion for which no answer is required.

280.     The Eighth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 280 states a legal conclusion for which no answer is required.

281.     The Eighth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 281 states a legal conclusion for which no answer is required.

**NINTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Sharp and Kelln)**

282.     Paragraphs 1 through 248 above are incorporated by reference as if fully set forth herein.

283.     The Ninth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 283 states a legal conclusion for which no answer is required.

284.     The Ninth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 284 states a legal conclusion for which no answer is required.

285.     The Ninth Claim for Relief is not asserted against Mr. Sexton and

313471130.1

therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 285 states a legal conclusion for which no answer is required.

## TENTH CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
#### (Violations of Section 17(a)(3) of the Securities Act by Gasarch)

286.    Paragraphs 1 through 248 above are incorporated by reference as if fully set forth herein.

287.    The Tenth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 287 states a legal conclusion for which no answer is required.

288.    The Tenth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 288 states a legal conclusion for which no answer is required.

## ELEVENTH CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
#### (Violations of Section 17(a)(3) of the Securities Act by Kaitz)

289.    Paragraphs 1 through 248 above are incorporated by reference as if fully set forth herein.

290.    The Eleventh Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 290 states a legal conclusion for which no answer is required.

291.    The Eleventh Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 291 states a legal conclusion for which no answer is required.

313471130.1

A645

## TWELFTH CLAIM FOR RELIEF
## AIDING AND ABETTING
### (Violations of Section 15(b) of the Securities Act by Gasarch)

292.     Paragraphs 1 through 248 above are incorporated by reference as if fully set forth herein.

293.     The Twelfth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 293 states a legal conclusion for which no answer is required.

294.     The Twelfth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 294 states a legal conclusion for which no answer is required.

295.     The Twelfth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 295 states a legal conclusion for which no answer is required.

## THIRTEENTH CLAIM FOR RELIEF
## AIDING AND ABETTING
### (Violations of Section 15(b) of the Securities Act by Kaitz)

296.     Paragraphs 1 through 248 above are incorporated by reference as if fully set forth herein.

297.     The Thirteenth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 297 states a legal conclusion for which no answer is required.

298.     The Thirteenth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 298 states a legal conclusion for which no answer is required.

313471130.1

299.    The Thirteenth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 299 states a legal conclusion for which no answer is required.

### FOURTEENTH CLAIM FOR RELIEF
### AIDING AND ABETTING
### (Violations of Section 20(e) of the Exchange Act by Gasarch)

300.    Paragraphs 1 through 248 above are incorporated by reference as if fully set forth herein.

301.    The Fourteenth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 301 states a legal conclusion for which no answer is required.

302.    The Fourteenth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 302 states a legal conclusion for which no answer is required.

303.    The Fourteenth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 303 states a legal conclusion for which no answer is required.

### FIFTEENTH CLAIM FOR RELIEF
### AIDING AND ABETTING
### (Violations of Section 20(e) of the Exchange Act by Kaitz)

304.    Paragraphs 1 through 248 above are incorporated by reference as if fully set forth herein.

305.    The Fifteenth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 305 states a legal conclusion for which no answer is required.

313471130.1

A647

306.    The Fifteenth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 306 states a legal conclusion for which no answer is required.

307.    The Fifteenth Claim for Relief is not asserted against Mr. Sexton and therefore no answer from Mr. Sexton is required. Mr. Sexton also avers that paragraph 307 states a legal conclusion for which no answer is required.

## AFFIRMATIVE DEFENSES

Mr. Sexton asserts the following affirmative defenses as separate and distinct defenses to the Amended Complaint. Without assuming the burden of proof for such defenses that he would not otherwise have, Mr. Sexton asserts the following:

### First Affirmative Defense

The Commission's Amended Complaint, and each claim alleged therein, fails to state a claim against Mr. Sexton upon which relief can be granted.

### Second Affirmative Defense

The Commission's claims as well as its ability to obtain the requested relief are barred in whole or part by the applicable statutes of limitations. To the extent that any limitations periods currently in existence would make the Commission's claims timely, Mr. Sexton asserts that such periods do not apply retroactively to revive time-barred claims or remedies.

### Third Affirmative Defense

The Commission's claim for injunctive relief is barred because the Commission has failed to adequately plead a reasonable likelihood of future violations.

313471130.1

A648

**Fourth Affirmative Defense**

The Commission's claim for disgorgement is barred to the extent it is based on alleged gross as opposed to net proceeds and to the extent that the Commission will not be able to return any purported profits to investors who were allegedly harmed.

**Fifth Affirmative Defense**

The Amended Complaint does not sufficiently plead that Mr. Sexton's alleged violations of the securities laws and/or the regulations promulgated thereunder caused any purported investors to suffer any losses.

**Sixth Affirmative Defense**

The Commission fails to allege fraud with particularity under Federal Rule of Civil Procedure 9(b) and engages in improper "group" pleading.

**Reservation of Defenses**

Mr. Sexton expressly reserves the right to amend his affirmative defenses and/or add additional affirmative defenses as facts are developed through discovery. Mr. Sexton also reserves the right to withdraw any of these defenses.

**JURY DEMAND**

Mr. Sexton demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Neil T. Smith*

Neil T. Smith (BBO# 651157)
    Neil.Smith@klgates.com
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Tel:  (617) 261-3100
Fax:  (617) 261-3175

34

313471130.1

A649

/s/ Stephen G. Topetzes

Stephen G. Topetzes*
    Stephen.Topetzes@klgates.com
Robert S. Silverblatt*
    Rob.Silverblatt@klgates.com
K&L Gates LLP
1601 K St. NW
Washington, DC 20006
Tel:  (202) 778-9328
Fax:  (202) 778-9100
*Admitted pro hac vice
Counsel for Paul Sexton

Dated:  September 23, 2022

313471130.1

A650

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on September 23, 2022, and a copy thereof will be sent electronically to the registered recipients and counsel of record as identified on the Notice of Electronic Filing.

*<u>/s/ Neil T. Smith</u>*

Neil T. Smith

313471130.1

A651

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

    v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COUTRNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                    Defendants.

Case No. 1:21-cv-11276-WGY

## DEFENDANT MIKE K. VELDHUIS VERIFIED ANSWER
## TO VERIFIED AMENDED COMPLAINT

For the Verified Answer to the Verified Amended Complaint filed by Plaintiff Securities

Exchange Commission on September 9, 2022 (the "Complaint"), Defendant Mike K. Veldhuis in

response to each of the corresponding paragraphs of the Complaint, states as follows:

### <u>SUMMARY</u>

1.      On the advice of counsel, Defendant invokes his rights and privileges under the

United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 1

of the Amended Complaint.

2.      On the advice of counsel, Defendant invokes his rights and privileges under the

United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 2

of the Amended Complaint.

A652

3.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 3 of the Amended Complaint.

4.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 4 of the Amended Complaint.

**Sharp's, Kelln's and Gasarch's Participation in the Fraudulent Scheme**

5.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 5 of the Amended Complaint.

6.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 6 of the Amended Complaint.

**Veldhuis', Sexton's, and Friesen's Participation in the Fraudulent Scheme**

7.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 7 of the Amended Complaint.

8.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 8 of the Amended Complaint.

**Dhillon's Role in the Scheme**

9.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 9 of the Amended Complaint.

10.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 10 of the Amended Complaint.

11.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 11 of the Amended Complaint.

**Kaitz's Role in the Scheme**

12.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 12 of the Amended Complaint.

13.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 13 of the Amended Complaint.

**Taylor's Role in the Scheme**

14.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 14 of the Amended Complaint.

**Dhillon's Additional Illegal Stock Sales through Person A's Companies**

15.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 15 of the Amended Complaint.

**Dhillon's False Statements During the Commission's Investigation**

16.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 16 of the Amended Complaint.

**The Defendants Violated Various Securities Laws**

17.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 17 of the Amended Complaint.

18.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 18 of the Amended Complaint.

19.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 19 of the Amended Complaint.

**<u>JURISDICTION AND VENUE</u>**

20.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 20 of the Amended Complaint.

21.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 21 of the Amended Complaint.

## **DEFENDANTS**

22.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 22 of the Amended Complaint.

23.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 23 of the Amended Complaint.

24.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 24 of the Amended Complaint.

25.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 25 of the Amended Complaint.

26.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 26 of the Amended Complaint.

27.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 27 of the Amended Complaint.

28.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 28 of the Amended Complaint.

29.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 29 of the Amended Complaint.

30.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 29 of the Amended Complaint.

## RELATED PARTIES

31.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 31 of the Amended Complaint.

32.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 32 of the Amended Complaint.

33.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 33 of the Amended Complaint.

34.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 34 of the Amended Complaint.

## BACKGROUND

35.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 35 of the Amended Complaint.

36.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 36 of the Amended Complaint.

37.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 37 of the Amended Complaint.

38.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 38 of the Amended Complaint.

39.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 39 of the Amended Complaint.

40.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 40 of the Amended Complaint.

41.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 41 of the Amended Complaint.

## OVERVIEW OF THE SHARP GROUP'S CONDUCT

### Obfuscating Beneficial Ownership and Control

42.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 42 of the Amended Complaint.

43.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 43 of the Amended Complaint.

44.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 44 of the Amended Complaint.

45.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 45 of the Amended Complaint.

46.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 46 of the Amended Complaint.

47.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 47 of the Amended Complaint.

48.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 48 of the Amended Complaint.

49.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 49 of the Amended Complaint.

50.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 50 of the Amended Complaint.

51.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 51 of the Amended Complaint.

52.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 52 of the Amended Complaint.

53.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 53 of the Amended Complaint.

54.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 54 of the Amended Complaint.

55.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 55 of the Amended Complaint.

56.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 56 of the Amended Complaint.

57.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 57 of the Amended Complaint.

58.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 58 of the Amended Complaint.

59.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 70 of the Amended Complaint.

60.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 60 of the Amended Complaint.

61.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 61 of the Amended Complaint.

62.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 62 of the Amended Complaint.

63.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 63 of the Amended Complaint.

64.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 64 of the Amended Complaint.

65.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 65 of the Amended Complaint.

**The Sharp Group Benefitted from Illegal Stock Sales**

66.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 66 of the Amended Complaint.

67.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 67 of the Amended Complaint.

68.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 68 of the Amended Complaint.

69.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 69 of the Amended Complaint.

**SHARP GROUP EXAMPLE ONE:**
**ILLEGAL SALES OF STEVIA FIRST/VITALITY BY DHILLON,**

## VELDHUIS CONTROL GROUP AND TAYLOR

70.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 70 of the Amended Complaint.

71.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 71 of the Amended Complaint.

### Background

72.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 72 of the Amended Complaint.

73.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 73 of the Amended Complaint.

74.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 74 of the Amended Complaint.

75.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 75 of the Amended Complaint.

76.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 76 of the Amended Complaint.

77.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 77 of the Amended Complaint.

78.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 78 of the Amended Complaint.

79.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 79 of the Amended Complaint.

80.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 80 of the Amended Complaint.

81.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 81 of the Amended Complaint.

**Round One: 2012 Stevia First/Vitality Stock Sales**

82.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 82 of the Amended Complaint.

83.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 83 of the Amended Complaint.

84.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 84 of the Amended Complaint.

85.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 85 of the Amended Complaint.

86.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 86 of the Amended Complaint.

87.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 87 of the Amended Complaint.

88.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 88 of the Amended Complaint.

89.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 89 of the Amended Complaint.

90.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 90 of the Amended Complaint.

**Round Two: 2014 Stevia First/Vitality Stock Sales**

91.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 91 of the Amended Complaint.

92.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 92 of the Amended Complaint.

93.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 93 of the Amended Complaint.

94.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 94 of the Amended Complaint.

95.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 95 of the Amended Complaint.

96.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 96 of the Amended Complaint.

97.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 97 of the Amended Complaint.

98.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 98 of the Amended Complaint.

99.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 99 of the Amended Complaint.

100.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 100 of the Amended Complaint.

101.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 101 of the Amended Complaint.

102.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 102 of the Amended Complaint.

103.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 103 of the Amended Complaint.

104.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 104 of the Amended Complaint.

105.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 105 of the Amended Complaint.

106.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 106 of the Amended Complaint.

107.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 107 of the Amended Complaint.

**Round Three: 2015 and 2016 Stevia First/Vitality Stock Sales**

108.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 108 of the Amended Complaint.

109.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 109 of the Amended Complaint.

110.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 110 of the Amended Complaint.

111.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 111 of the Amended Complaint.

112.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 112 of the Amended Complaint.

113.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 113 of the Amended Complaint.

114.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 114 of the Amended Complaint.

115.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 115 of the Amended Complaint.

116.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 116 of the Amended Complaint.

117.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 117 of the Amended Complaint.

118.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 118 of the Amended Complaint.

119.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 119 of the Amended Complaint.

120.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 120 of the Amended Complaint.

121.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 121 of the Amended Complaint.

122.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 122 of the Amended Complaint.

123.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 123 of the Amended Complaint.

124.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 124 of the Amended Complaint.

125.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 125 of the Amended Complaint.

126.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 126 of the Amended Complaint.

127.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 127 of the Amended Complaint.

128.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 128 of the Amended Complaint.

129.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 129 of the Amended Complaint.

130.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 130 of the Amended Complaint.

131.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 131 of the Amended Complaint.

132.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 132 of the Amended Complaint.

133.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 133 of the Amended Complaint.

134.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 134 of the Amended Complaint.

135.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 135 of the Amended Complaint.

136.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 136 of the Amended Complaint.

137.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 137 of the Amended Complaint.

138.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 138 of the Amended Complaint.

139.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 139 of the Amended Complaint.

140.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 140 of the Amended Complaint.

**Round Four: 2016 – 2018 Illegal Vitality Stock Sales**

141.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 141 of the Amended Complaint.

142.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 142 of the Amended Complaint.

143.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 143 of the Amended Complaint.

144.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 144 of the Amended Complaint.

145.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 145 of the Amended Complaint.

146.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 146 of the Amended Complaint.

147.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 147 of the Amended Complaint.

148.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 148 of the Amended Complaint.

149.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 149 of the Amended Complaint.

150.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 150 of the Amended Complaint.

***

151.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 151 of the Amended Complaint.

152.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 152 of the Amended Complaint.

153.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 153 of the Amended Complaint.

154.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 154 of the Amended Complaint.

155.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 155 of the Amended Complaint.

156.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 156 of the Amended Complaint.

157.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 157 of the Amended Complaint.

158.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 158 of the Amended Complaint.

159.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 159 of the Amended Complaint.

160.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 160 of the Amended Complaint.

161.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 161 of the Amended Complaint.

162.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 162 of the Amended Complaint.

163.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 163 of the Amended Complaint.

164.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 164 of the Amended Complaint.

165.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 165 of the Amended Complaint.

166.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 166 of the Amended Complaint.

167.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 167 of the Amended Complaint.

168.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 168 of the Amended Complaint.

169.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 169 of the Amended Complaint.

170.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 170 of the Amended Complaint.

171.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 171 of the Amended Complaint.

172.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 172 of the Amended Complaint.

173.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 173 of the Amended Complaint.

174.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 174 of the Amended Complaint.

175.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 175 of the Amended Complaint.

176.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 176 of the Amended Complaint.

177.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 177 of the Amended Complaint.

178.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 178 of the Amended Complaint.

179.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 179 of the Amended Complaint.

180.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 180 of the Amended Complaint.

181.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 181 of the Amended Complaint.

182.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 182 of the Amended Complaint.

183.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 183 of the Amended Complaint.

184.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 184 of the Amended Complaint.

185.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 185 of the Amended Complaint.

186.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 186 of the Amended Complaint.

187.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 187 of the Amended Complaint.

188.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 188 of the Amended Complaint.

189.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 189 of the Amended Complaint.

\*\*\*

190.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 190 of the Amended Complaint.

191.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 191 of the Amended Complaint.

192.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 192 of the Amended Complaint.

193.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 193 of the Amended Complaint.

194.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 194 of the Amended Complaint.

\*\*\*

195.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 196 of the Amended Complaint.

196.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 196 of the Amended Complaint.

**<u>DHILLON'S SCHEME TO SELL ARCH STOCK ILLEGALLY THROUGH PERSON A</u>**

197.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 197 of the Amended Complaint.

198.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 198 of the Amended Complaint.

199.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 199 of the Amended Complaint.

200.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 200 of the Amended Complaint.

201.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 201 of the Amended Complaint.

202.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 202 of the Amended Complaint.

203.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 203 of the Amended Complaint.

204.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 204 of the Amended Complaint.

205.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 205 of the Amended Complaint.

206.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 206 of the Amended Complaint.

207.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 207 of the Amended Complaint.

208.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 208 of the Amended Complaint.

209.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 209 of the Amended Complaint.

210.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 210 of the Amended Complaint.

211.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 211 of the Amended Complaint.

212.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 212 of the Amended Complaint.

### SHARP GROUP EXAMPLE THREE:
### ILLEGAL ONCOSEC STOCK SALES INVOLVING DHILLON AND THE VELDHUIS CONTOL GROUP

#### The Veldhuis Control Group's Scheme to Sell OncoSec Stock Fraudulently

213.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 213 of the Amended Complaint.

214.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 214 of the Amended Complaint.

215.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 215 of the Amended Complaint.

216.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 216 of the Amended Complaint.

**Dhillon's Scheme to Sell OncoSec Fraudulently through Person A**

217.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 217 of the Amended Complaint.

218.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 218 of the Amended Complaint.

218.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 219 of the Amended Complaint.

219.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 220 of the Amended Complaint.

220.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 221 of the Amended Complaint.

221.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 222 of the Amended Complaint.

223.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 223 of the Amended Complaint.

224.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 224 of the Amended Complaint.

225.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 225 of the Amended Complaint.

226.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 226 of the Amended Complaint.

227.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 227 of the Amended Complaint.

228.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 228 of the Amended Complaint.

229.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 229 of the Amended Complaint.

230.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 230 of the Amended Complaint.

231.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 231 of the Amended Complaint.

232.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 232 of the Amended Complaint.

233.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 233 of the Amended Complaint.

234.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 234 of the Amended Complaint.

### DHILLON'S SCHEME TO SELL ONCOSEC STOCK ILLEGALLY VIA TAYLOR

235.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 235 of the Amended Complaint.

236.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 236 of the Amended Complaint.

*** 

### ADDITIONAL SHARP GROUP AND VELDHUIS CONTROL GROUP DEALS

237.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 237 of the Amended Complaint.

238.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 238 of the Amended Complaint.

239.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 239 of the Amended Complaint.

**SHARP GROUP EXAMPLE: LUIS CARRILLO**

240.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 240 of the Amended Complaint.

241.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 241 of the Amended Complaint.

242.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 242 of the Amended Complaint.

243.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 243 of the Amended Complaint.

244.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 244 of the Amended Complaint.

245.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 245 of the Amended Complaint.

246.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 246 of the Amended Complaint.

247.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 247 of the Amended Complaint.]

248.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 248 of the Amended Complaint.

## TOLLING AGREEMENTS

249.     On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 249 of the Amended Complaint.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Sections 17(a)(1) and (3) of the Securities Act by Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor**

250. On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 250 of the Amended Complaint.

251. On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 251 of the Amended Complaint.

252. On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 252 of the Amended Complaint.

## SECOND CLAIM FOR RELIEF
## <u>FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES</u>
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor)**

253. On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 253 of the Amended Complaint.

254. On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 254 of the Amended Complaint.

255. On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 255 of the Amended Complaint.

## THIRD CLAIM FOR RELIEF
## <u>UNREGISTERED OFFERINGS OF SECURITIES</u>
**(Violations of Sections 5(a) and 5(c) of the Securities Act by Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon)**

256.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 256 of the Amended Complaint.

257.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 257 of the Amended Complaint.

258.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 258 of the Amended Complaint.

**FOURTH CLAIM FOR RELIEF**
**FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP**
**(Violations of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder by Veldhuis, Sexton, and Friesen)**

259.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 259 of the Amended Complaint.

260.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 260 of the Amended Complaint.

261.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 261 of the Amended Complaint.

262.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 262 of the Amended Complaint.

263.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 263 of the Amended Complaint.

**FIFTH CLAIM FOR RELIEF**
**<u>FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP</u>**
**(Violation of Section 13(d) of the Exchange Act and Rule 13d-2 Thereunder by Dhillon)**

264.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 264 of the Amended Complaint.

265.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 265 of the Amended Complaint.

266.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 266 of the Amended Complaint.

267.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 267 of the Amended Complaint.

268.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 268 of the Amended Complaint.

**SIXTH CLAIM FOR RELIEF**
**<u>FAILURE TO FILE</u>**
**(Violation of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder by Dhillon)**

269.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 269 of the Amended Complaint.

270.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 270 of the Amended Complaint.

271.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 271 of the Amended Complaint.

272.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 272 of the Amended Complaint.

## SEVENTH CLAIM FOR RELIEF
## AIDING AND ABETTING
### (Violations of Section 15(b) of the Securities Act by Taylor)

273.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 273 of the Amended Complaint.

274.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 274 of the Amended Complaint.

275.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 275 of the Amended Complaint.

276.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 276 of the Amended Complaint.

### EIGHTH CLAIM FOR RELIEF
### AIDING AND ABETTING
**(Violations of Section 15(b) of the Securities Act by Sharp and Kelln)**

277.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 277 of the Amended Complaint.

278.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 278 of the Amended Complaint.

279.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 279 of the Amended Complaint.

280.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 280 of the Amended Complaint.

281.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 281 of the Amended Complaint.

### NINTH CLAIM FOR RELIEF
### AIDING AND ABETTING
**(Violations of Section 20(e) of the Exchange Act by Sharp and Kelln)**

282.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 282 of the Amended Complaint.

283.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 283 of the Amended Complaint.

284.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 284 of the Amended Complaint.

285.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 285 of the Amended Complaint.

**TENTH CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a)(3) of the Securities Act by Gasarch)**

286.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 286 of the Amended Complaint.

287.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 287 of the Amended Complaint.

288.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 288 of the Amended Complaint.

**ELEVENTH CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a)(3) of the Securities Act by Kaitz)**

289.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 289 of the Amended Complaint.

290.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 290 of the Amended Complaint.

291.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 291 of the Amended Complaint.

**TWELFTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Gasarch)**

292.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 292 of the Amended Complaint.

293.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 293 of the Amended Complaint.

294.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 294 of the Amended Complaint.

295.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 295 of the Amended Complaint.

## THIRTEENTH CLAIM FOR RELIEF
## AIDING AND ABETTING]
**(Violations of Section 15(b) of the Securities Act by Kaitz)**

296.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 296 of the Amended Complaint.

297.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 297 of the Amended Complaint.

298.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 298 of the Amended Complaint.

299.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 229 of the Amended Complaint.

## FOURTEENTH CLAIM FOR RELIEF
## AIDING AND ABETTING
**(Violations of Section 20(e) of the Exchange Act by Gasarch)**

300.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 300 of the Amended Complaint.

301.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 301 of the Amended Complaint.

302.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 302 of the Amended Complaint.

303.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 303 of the Amended Complaint.

**FIFTEENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Kaitz)**

304.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 304 of the Amended Complaint.

305.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 305 of the Amended Complaint.

306.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 306 of the Amended Complaint.

307.    On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph 307 of the Amended Complaint.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph A of the Amended Complaint.

B.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph B of the Amended Complaint.

C.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph C of the Amended Complaint.

D.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph D of the Amended Complaint.

E.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph E of the Amended Complaint.

F.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph F of the Amended Complaint.

G.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph G of the Amended Complaint.

H.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph H of the Amended Complaint.

I.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph I of the Amended Complaint.

J.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph J of the Amended Complaint.

K.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph K of the Amended Complaint.

L.      On the advice of counsel, Defendant invokes his rights and privileges under the United States Constitution, including the Fifth Amendment, and declines to answer Paragraph L of the Amended Complaint.

DATED: September 23, 2022
New York, New York

SHER TREMONTE LLP

By: ___*/s/ Michael Tremonte*___
     Michael Tremonte
     Robert Knuts
     Katie Renzler
     90 Broad Street, 23rd Floor
     New York, New York 10004
     Tel: 212.202.2600
     Email: MTremonte@shertremonte.com

TODD & WELD LLP

By: ___*/s/ Lorraine Belostock*___
     Lorraine Belostock (BBO # 692183)
     Howard M. Cooper (BBO # 543842)
     One Federal Street, 27th Floor
     Boston, Massachusetts 02110
     Tel: 617.720.2626
     Email: lbelostock@toddweld.com

*Attorneys for Defendant Mike K. Veldhuis*

A700

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2022, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF system and that all counsel of record and registered recipients will be served via the Notice of Electronic Filing generated by CM/ECF.

*/s/ Lorraine Belostock*
Lorraine Belostock

A701

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>                  Plaintiff, <br><br> v. <br><br> FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR, <br><br>                  Defendants. | Case No. 21-cv-11276-WGY |

### DEFENDANT COURTNEY KELLN'S ANSWER TO AMENDED COMPLAINT

Defendant Courtney Kelln, through undersigned counsel, answers the allegations in the Amended Complaint filed by the Securities and Exchange Commission (the "Commission" or "Plaintiff"). Kelln incorporates the headings of the Amended Complaint solely for organizational purposes.

### SUMMARY

1. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

2. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

3. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

4. Paragraph 4 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

**Sharp's, Kelln's and Gasarch's Participation in the Fraudulent Scheme**

5. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

6. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**Veldhuis', Sexton's, and Friesen's Participation in the Fraudulent Scheme**

7. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

8. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**Dhillon's Role in the Scheme**

9. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

10. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

11. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**Kaitz's Role in the Scheme**

12. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

13. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A703

**Taylor's Role in the Scheme**

14. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**Dhillon's Additional Illegal Stock Sales through Person A's Companies**

15. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**Dhillon's False Statements During the Commission's Investigation**

16. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**The Defendants Violated Various Securities Laws**

17. Paragraph 17 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

18. Paragraph 18 states the relief sought by the Commission and requires no response. To the extent a response is required, Kelln invokes the Fifth Amendment.

19. Paragraph 19 states the relief sought by the Commission and requires no response. To the extent a response is required, Kelln invokes the Fifth Amendment.

## JURISDICTION AND VENUE

20. Paragraph 20 consists of legal conclusions to which no response is required.

21. Paragraph 21 consists of legal conclusions to which no response is required.

## DEFENDANTS

22. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A704

23. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

24. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

25. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

26. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

27. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

28. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

29. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

30. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

## **RELATED PARTIES**

31. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

32. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

33. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A705

34. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

## BACKGROUND

35. Paragraph 35 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

36. Paragraph 36 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

37. Paragraph 37 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

38. Paragraph 38 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

39. Paragraph 39 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

40. Paragraph 40 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

41. Paragraph 41 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

## OVERVIEW OF THE SHARP GROUP'S CONDUCT

### Obfuscating Beneficial Ownership and Control

42. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

43. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A706

44. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

45. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

46. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

47. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

48. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

49. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

50. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

51. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

52. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

53. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

54. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A707

55. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

56. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

57. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

58. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

59. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

60. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

61. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

62. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

63. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

64. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

65. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**The Sharp Group Benefited from Illegal Stock Sales**

A708

66. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

67. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

68. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

69. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**SHARP GROUP EXAMPLE ONE:**
**ILLEGAL SALES OF STEVIA FIRST/VITALITY BY DHILLON,**
**VELDHUIS CONTROL GROUP AND TAYLOR**

70. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

71. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

72. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

73. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

74. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

75. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A709

76. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

77. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

78. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

79. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

80. Paragraph 80 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

81. Paragraph 81 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

**Round One: 2012 Stevia First/Vitality Stock Sales**

82. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

83. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

84. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

85. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

86. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

87. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

88. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

89. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

90. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**Round Two: 2014 Stevia First/Vitality Stock Sales**

91. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

92. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

93. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

94. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

95. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

96. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

97. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A711

98. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

99. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

100. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

101. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

102. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

103. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

104. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

105. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

106. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

107. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**Round Three: 2015 and 2016 Stevia First/Vitality Stock Sales**

108. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A712

109. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

110. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

111. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

112. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

113. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

114. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

115. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

116. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

117. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

118. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

119. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

120. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

121. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

122. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

123. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

124. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

125. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

126. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

127. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

128. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

129. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

130. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

131. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

132. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

133. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

134. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

135. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

136. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

137. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

138. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

139. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

140. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**Round Four: 2016 – 2018 Illegal Vitality Stock Sales**

141. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

14

A715

142. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

143. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

144. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

145. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

146. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

147. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

148. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

149. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

150. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

151. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

152. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A716

153. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

154. Paragraph 154 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

**Dhillon's Failures to Disclose in Furtherance of the Scheme**

155. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

156. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

157. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

158. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

159. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

160. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**SHARP GROUP EXAMPLE TWO:**
**ILLEGAL ARCH STOCK SALES INVOLVING DHILLON, THE VELDHUIS**
**CONTROL GROUP, AND TAYLOR**

161. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

162. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A717

163. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

164. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

165. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

166. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

167. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

168. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

169. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

170. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

171. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

172. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

173. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A718

174. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

175. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

176. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

177. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

178. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

179. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

180. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

181. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

182. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

183. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

184. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

185. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

186. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

187. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

188. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

189. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

190. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

191. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

192. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

193. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

194. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

195. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A720

196. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**DHILLON'S SCHEME TO SELL ARCH STOCK ILLEGALLY THROUGH PERSON A**

197. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

198. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

199. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

200. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

201. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

202. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

203. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

204. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

205. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

206. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A721

207. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

208. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

209. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

210. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

211. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

212. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

### SHARP GROUP EXAMPLE THREE:
### ILLEGAL ONCOSEC STOCK SALES INVOLVING DHILLON AND THE VELDHUIS CONTROL GROUP

**The Veldhuis Control Group's Scheme to Sell OncoSec Stock Fraudulently**

213. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

214. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

215. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

216. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A722

**Dhillon's Scheme to Sell OncoSec Fraudulently through Person A**

217. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

218. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

219. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

220. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

221. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

222. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

223. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

224. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

225. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

226. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

227. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A723

228. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

229. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

230. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

231. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

232. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

233. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

234. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

### **DHILLON'S SCHEME TO SELL ONCOSEC STOCK ILLEGALLY VIA TAYLOR**

235. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

236. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

### **ADDITIONAL SHARP GROUP AND VELDHUIS CONTROL GROUP DEALS**

237. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

238. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

239. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**SHARP GROUP EXAMPLE: LUIS CARRILLO**

240. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

241. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

242. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

243. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

244. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

245. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

246. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

247. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

248. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

**TOLLING AGREEMENTS**

249. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer

on that basis.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Sections 17(a)(1) and (3) of the Securities Act by Sharp, Kelln, Veldhuis,**
**Sexton, Friesen, Dhillon, and Taylor)**

250. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if

fully set forth herein.

251. Paragraph 251 consists of legal conclusions to which no response is required.  To the

extent a response is required, Kelln invokes the Fifth Amendment.

252. Paragraph 252 consists of legal conclusions to which no response is required.  To the

extent a response is required, Kelln invokes the Fifth Amendment.

**SECOND CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by Sharp,**
**Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor)**

253. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if

fully set forth herein.

254. Paragraph 254 consists of legal conclusions to which no response is required.  To the

extent a response is required, Kelln invokes the Fifth Amendment.

255. Paragraph 255 consists of legal conclusions to which no response is required.  To the

extent a response is required, Kelln invokes the Fifth Amendment.

A726

**THIRD CLAIM FOR RELIEF**
**UNREGISTERED OFFERINGS OF SECURITIES**
**(Violations of Sections 5(a) and 5(c) of the Securities Act by Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon)**

256. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if fully set forth herein.

257. Paragraph 257 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

258. Paragraph 258 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

**FOURTH CLAIM FOR RELIEF**
**FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP**
**(Violations of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder by Veldhuis, Sexton, and Friesen)**

259. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if fully set forth herein.

260. Paragraph 260 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

261. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

262. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

263. Paragraph 262 consists of legal conclusions to which no response is required. Further, the Fourth Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

A727

**FIFTH CLAIM FOR RELIEF**
**FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP**
**(Violation of Section 13(d) of the Exchange Act and Rule 13d-2 Thereunder by Dhillon**)

264. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if fully set forth herein.

265. Paragraph 265 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

266. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

267. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

268. Paragraph 268 consists of legal conclusions to which no response is required. Further, the Fifth Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

**SIXTH CLAIM FOR RELIEF**
**FAILURE TO FILE**
**(Violation of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder by Dhillon)**

269. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if fully set forth herein.

270. Paragraph 270 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

271. Kelln respectfully invokes her rights under the Fifth Amendment and declines to answer on that basis.

A728

272. Paragraph 272 consists of legal conclusions to which no response is required. Further, the Sixth Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

**SEVENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Taylor)**

273. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if fully set forth herein.

274. Paragraph 274 consists of legal conclusions to which no response is required. Further, the Seventh Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

275. Paragraph 275 consists of legal conclusions to which no response is required. Further, the Seventh Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

276. Paragraph 276 consists of legal conclusions to which no response is required. Further, the Seventh Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

A729

**EIGHTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Sharp and Kelln)**

277. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if fully set forth herein.

278. Paragraph 278 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

279. Paragraph 279 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

280. Paragraph 280 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

281. Paragraph 281 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

**NINTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Sharp and Kelln)**

282. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if fully set forth herein.

283. Paragraph 283 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

284. Paragraph 284 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

285. Paragraph 285 consists of legal conclusions to which no response is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

A730

**TENTH CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a)(3) of the Securities Act by Gasarch)**

286. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if fully set forth herein.

287. Paragraph 287 consists of legal conclusions to which no response is required. Further, the Tenth Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

288. Paragraph 288 consists of legal conclusions to which no response is required. Further, the Tenth Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

**ELEVENTH CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a)(3) of the Securities Act by Kaitz)**

289. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if fully set forth herein.

290. Paragraph 290 consists of legal conclusions to which no response is required. Further, the Eleventh Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

291. Paragraph 291 consists of legal conclusions to which no response is required. Further, the Eleventh Claim for Relief is not asserted against Kelln and therefore no response

30

A731

from Kelln is required.  To the extent a response is required, Kelln invokes the Fifth

Amendment.

**TWELFTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Gasarch)**

292. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if

fully set forth herein.

293. Paragraph 293 consists of legal conclusions to which no response is required.  Further,

the Twelfth Claim for Relief is not asserted against Kelln and therefore no response from

Kelln is required.  To the extent a response is required, Kelln invokes the Fifth

Amendment.

294. Paragraph 294 consists of legal conclusions to which no response is required.  Further,

the Twelfth Claim for Relief is not asserted against Kelln and therefore no response from

Kelln is required.  To the extent a response is required, Kelln invokes the Fifth

Amendment.

295. Paragraph 295 consists of legal conclusions to which no response is required.  Further,

the Twelfth Claim for Relief is not asserted against Kelln and therefore no response from

Kelln is required.  To the extent a response is required, Kelln invokes the Fifth

Amendment.

**THIRTEENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Kaitz)**

296. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if

fully set forth herein.

A732

297. Paragraph 297 consists of legal conclusions to which no response is required. Further, the Thirteenth Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

298. Paragraph 298 consists of legal conclusions to which no response is required. Further, the Thirteenth Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

299. Paragraph 299 consists of legal conclusions to which no response is required. Further, the Thirteenth Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

**FOURTEENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Gasarch)**

300. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if fully set forth herein.

301. Paragraph 301 consists of legal conclusions to which no response is required. Further, the Fourteenth Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

302. Paragraph 302 consists of legal conclusions to which no response is required. Further, the Fourteenth Claim for Relief is not asserted against Kelln and therefore no response

A733

from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

303. Paragraph 303 consists of legal conclusions to which no response is required. Further, the Fourteenth Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

<div align="center">

**FIFTEENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Kaitz)**

</div>

304. Kelln incorporates by reference her answers to paragraphs 1 through 249 above as if fully set forth herein.

305. Paragraph 305 consists of legal conclusions to which no response is required. Further, the Fifteenth Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

306. Paragraph 306 consists of legal conclusions to which no response is required. Further, the Fifteenth Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

307. Paragraph 307 consists of legal conclusions to which no response is required. Further, the Fifteenth Claim for Relief is not asserted against Kelln and therefore no response from Kelln is required. To the extent a response is required, Kelln invokes the Fifth Amendment.

<div align="center">

A734

</div>

**PRAYER FOR RELIEF**

Plaintiff's Prayer for Relief, Sections A-L, requires no response as it calls for legal conclusions and seeks relief from the Court.  To the extent a response is required, Kelln invokes the Fifth Amendment.

**AFFIRMATIVE DEFENSES**

The pleading of defenses by Kelln should in no way be deemed to be a waiver, in whole or in part, of her rights under the Fifth Amendment of the United States Constitution against self-incrimination.  The pleading of defenses is merely to provide the Commission with notice of affirmative defenses in accordance with Rule 8 of the Federal Rules of Civil Procedure. Kelln expressly reserves the right to amend and/or add additional affirmative defenses as the case continues and facts are developed through discovery.

**FIRST AFFIRMATIVE DEFENSE**

Plaintiff fails to state a claim upon which relief may be granted.

**SECOND AFFIRMATIVE DEFENSE**

Plaintiff's claims and its ability to obtain the requested relief are barred, in whole or in part, by the applicable statute of limitations.

**THIRD AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred because this Court lacks personal jurisdiction over Kelln.

**PRAYER FOR RELIEF**

Wherefore, Kelln respectfully requests that this Court:

1. Dismiss the claims in the Amended Complaint with prejudice;

2. Award costs and reasonable attorneys' fees; and

3. Award such other and further relief as the Court deems just and proper.

A735

Respectfully submitted,

Dated: September 30, 2022

/s/ *Kevin B. Muhlendorf*

Kevin B. Muhlendorf (*pro hac vice*)
Pamela L. Signorello (BBO# 651483)
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Tel.: 202.719.7000
Fax: 202.719.7049
KMuhlendorf@wiley.law
PSignorello@wiley.law

*Counsel for Defendant Courtney Kelln*

A736

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2022, I filed the foregoing via the Court's ECF system, which electronically serves a copy on all counsel of record.

/s/ *Kevin B. Muhlendorf*
Kevin B. Muhlendorf

A737

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>                               **Plaintiff,** <br>     **v.** <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br>                               **Defendants.** | Civil Action No. 21-CV-11276-WGY <br><br> **JURY TRIAL DEMANDED** |

**DEFENDANT ZHIYING YVONNE GASARCH'S ANWER TO AMENDED COMPLAINT AND AFFIRMATIVE DEENSES**

Defendant Zhiying Yvonne Gasarch ("Ms. Gasarch") hereby answers the Amended Complaint and asserts affirmative defenses as follow:

**SUMMARY**

1.     This case concerns a sophisticated, multiyear, multi-national attack on the United States financial markets and retail United States investors by foreign and domestic actors. These actors schemed to sell fraudulently hundreds of millions of dollars in stocks in the United States markets.

     ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

2.     In exchange for lucrative fees, a group headed by defendant Sharp provided services to various groups of public company control persons to help those control persons dump United States-quoted stocks—typically penny stocks—on retail investors. These services

A738

included providing networks of offshore shell companies to conceal stock ownership, arranging

stock transfers and money transmittals, and providing encrypted accounting and communications

systems.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

3.      Other defendants named in this Complaint were control persons who dumped

their shares, a complicit public company chairman, and a promoter who touted the stocks to retail

investors.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

4.      The Defendants' fraudulent conduct deprived investors of the full and fair

disclosure mandated by the federal securities laws.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

**Sharp's, Kelln's and Gasarch's Participation in the Fraudulent Scheme**

5.      Beginning in or before 2010 and continuing through the present, Sharp, Gasarch,

and Kelln (the "Sharp Group") were in the business of facilitating illegal stock sales in the public

securities markets.  The Sharp Group provided a variety of services to help corporate control

persons conceal their identities when selling the stock of penny stock companies they controlled.

By disguising their identities and their controlling positions, the Sharp Group's clients

fraudulently concealed the fact that public company control persons were selling large blocks of

stock to investors.

> ANSWER:  DENIED as to Ms. Gasarch.

6.      The Sharp Group deliberately concealed the identities of its clients through the array of services it offered, including forming and providing offshore nominee companies that could hold shares for undisclosed control persons; providing and administering an encrypted communication network; purchasing, configuring and delivering devices that the Sharp Group referred to as "xPhones," which were designed to be used only for communications on the Sharp Group's encrypted communications network; and arranging for clients to deposit stock in offshore trading platforms, including Wintercap SA[1] and Blacklight SA,[2] both Swiss-based, to obfuscate the control persons' association with their public company stock.  The Sharp Group also provided various additional services to its clients in furtherance of the fraudulent scheme such as: administering a proprietary accounting system that tracked clients' total stock holdings and sales across various nominee shareholders and trading platforms; paying out the proceeds of illegal stock sales at clients' direction to accounts around the world; arranging to route such payments by circuitous methods designed to conceal the source of funds; and fabricating documents, such as invoices, to conceal the nature and source of the payments.

ANSWER:    Denied as to Ms. Gasarch.

**Veldhuis', Sexton's, and Friesen's Participation in the Fraudulent Scheme**

7.      Working together, Veldhuis, Sexton, and Friesen (hereinafter referred to as the "Veldhuis Control Group") were one group of control persons (hereinafter referred to as a

---

[1] The Commission charged Wintercap SA and its principal, Roger Knox, on October 2, 2018, with violating the antifraud provisions of the Securities Act of 1933 ("Securities Act") and Securities Exchange Act of 1934 ("Exchange Act") as a result of engaging in a multiyear scheme that generated more than $165 million from the illegal sale of stock of at least 50 publicly traded companies.

[2] The Commission charged Blacklight SA and its principals, Anthony Killarney and Kenneth Ciapala, on January 2, 2020 with violating the Securities Act and Exchange Act antifraud provisions as a result of engaging in a multiyear scheme that generated more than $35 million from the illegal sale of stock of at least 45 publicly traded companies.

3

A740

"control group") that teamed with the Sharp Group to run lucrative, fraudulent schemes to sell stock surreptitiously in the public markets.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
> the truth of the allegations in this paragraph, and therefore denies them.

8.    At various times, the Veldhuis Control Group collaborated with defendants Dhillon, Taylor, and Kaitz.  In particular, the Veldhuis Control Group sold illegally the stock of Stevia First Corp. ("Stevia First"), Stevia First's successor company Vitality Biopharma, Inc. ("Vitality"), Arch Therapeutics, Inc. ("Arch"), and OncoSec Medical Incorporated ("OncoSec") in concert with Dhillon.  The Veldhuis Control Group and Dhillon also sold illegally the stock of Vitality and Arch in concert with Kaitz and Taylor.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
> the truth of the allegations in this paragraph, and therefore denies them.

**Dhillon's Role in the Scheme**

9.    Dhillon served as the chairman of the board of directors of Stevia First, Vitality, Arch, and OncoSec.  Dhillon's status as a high-level corporate insider enabled him to obtain and/or direct the issuance of millions of shares of each company's stock to his undisclosed associates.  Dhillon knew that, because he was a corporate insider, federal securities laws prohibited him from selling his stock into the securities markets without complying with various registration and disclosure rules designed to protect investors.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
> the truth of the allegations in this paragraph, and therefore denies them.

10.    At various times, Dhillon coordinated with the Veldhuis Control Group and Taylor to sell surreptitiously stock in the companies atop whose boards he sat.  These sales were

A741

conducted through various nominee shareholders and involved sales of stock that Dhillon was

legally prohibited from selling without registering the sales with the Commission. In certain

instances, the nominee shareholders that effectuated the illegal sales of Dhillon's shares included

entities administered by the Sharp Group.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

11.     Dhillon abused his senior corporate role—a position of trust and confidence—in

order to conceal his own and others' fraudulent conduct from investors, securities market

intermediaries, securities regulators, and law enforcement.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

### Kaitz's Role in the Scheme

12.     Kaitz owned and operated Full Service Media LLC, a company that promoted the

stock of public companies to retail investors. Kaitz substantially assisted the Veldhuis Control

Group by touting stocks that the Veldhuis Control Group sought to dump. Kaitz promoted as

urgent and bullish investment opportunities the stock of various publicly traded companies that

the Veldhuis Control Group simultaneously planned to sell surreptitiously—including Vitality

and Arch stock. A key component of Kaitz's touting efforts was concealing the role of the

Veldhuis Control Group, which paid Kaitz for his services. For example, Kaitz falsely claimed

when touting the stock of public companies like Vitality that third parties (which appeared to be

unaffiliated with the public companies) paid for his services. This concealment enabled the

Veldhuis Control Group to anonymously sell its stock to the investors whom it simultaneously

A742

encouraged, through Kaitz's stock promotional efforts, to buy the stock and thus trade in the very opposite direction.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

13.     During an SEC investigation into one of the promotional campaigns Kaitz had run for the Veldhuis Group, Kaitz appeared for testimony.  During that testimony, Kaitz made false and misleading statements, including claims (i) that he had not received payment for the promotion in question from any entity other than that identified as the paying party in the promotion (despite having received such payments, arranged by Veldhuis, from other entities); and (ii) that he had no communications devices other than the two he identified to Commission staff (despite having had, and used in connection with the promotions in question, one of the Sharp Group-supplied "xPhones" that are described below).

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

### Taylor's Role in the Scheme

14.     Taylor, among other things, arranged to merge a public company with one of Dhillon's private companies, ultimately resulting in the distribution and fraudulent sale of shares associated with the resulting public company, Stevia First.  Taylor also controlled nominee shareholders who held and traded stock surreptitiously in concert with Dhillon and the Veldhuis Control Group.  In exchange for these services, Taylor received a significant cut of the illegal stock sale proceeds.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

6

A743

**Dhillon's Additional Illegal Stock Sales through Person A's Companies**

15.     At various times between 2011 and 2017, an individual identified herein as Person A operated at least two nominee companies that he created to hold and trade stock of two public companies atop whose boards Dhillon sat: Arch and OncoSec.  Person A illegally sold shares in both Arch and OncoSec on Dhillon's behalf.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

**Dhillon's False Statements During the Commission's Investigation**

16.     In October 2018, the Commission charged Wintercap SA—one of the Veldhuis Control Group's primary conduits for the illegal sale of stock—with engaging in securities fraud, and Wintercap SA's illegal sale of Vitality stock was cited in the Commission's Complaint in that action.  Early the following month, the Commission suspended trading in Vitality.  During the Commission's investigation leading to the filing of the instant action, the Commission sought information from Dhillon about his involvement in the Vitality scheme, and Dhillon twice appeared for testimony (in August 2019 and July 2020).  During that testimony, Dhillon made false statements that are illustrated below.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

**The Defendants Violated Various Securities Laws**

17.     As a result of the conduct alleged herein, Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities

7

A744

Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder; Sharp, Kelln, Veldhuis, Sexton, Friesen, and Dhillon violated Sections 5(a) and 5(c) of the Securities Act; Veldhuis, Sexton, and Friesen violated Section 13(d) of the Exchange Act and Rule 13d-1 thereunder; Dhillon violated Sections 13(d) and 16(a) of the Exchange Act and Rules 13d-2 and 16a-3 thereunder; Taylor violated Section 15(b) of the Securities Act by aiding and abetting Dhillon's violations of Sections 5(a) and 5(c) of the Securities Act; Sharp and Kelln violated Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act by aiding and abetting others' violations of Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder; Gasarch violated Section 17(a)(3) of the Securities Act, and also violated Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act by aiding and abetting others' violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder; and Kaitz violated Section 17(a)(3) of the Securities Act, and also violated Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act by aiding and abetting others' violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder.

ANSWER; Paragraph 17 states a legal conclusion for which no answer is required.

18.     The Commission seeks a temporary restraining order prohibiting the Defendants from future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; prohibiting Veldhuis, Sexton, and Friesen from future violations of Section 13(d) and Rule 13d-1 thereunder; prohibiting Dhillon from violations of Section 13(d) of the Exchange Act and Rule 13d-2 thereunder; prohibiting Dhillon from future violations of

A745

Exchange Act Section 16(a) and Rule 16a-3 thereunder; prohibiting Sharp, Kelln, Veldhuis,

Sexton, Friesen, Dhillon and Taylor from violations of Securities Act Sections 5(a) and 5(c), and

if entered, a preliminary injunction order for the same; and (ii) a repatriation order, and an order

freezing the assets of the Defendants held for their direct or indirect benefit, and/or subject to their

direct or indirect control.

      ANSWER:    Paragraph 18 states a legal conclusion for which no answer is required.

      19.    The Commission seeks permanent injunctions against the Defendants, enjoining

them from engaging in the transactions, acts, practices, and courses of business alleged in this

Complaint; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this

Complaint, together with prejudgment interest pursuant to Section 21(d) of the Exchange Act;

civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the

Exchange Act; an order barring the Defendants from participating in any offering of a penny

stock, pursuant to Section 20(g) of the Securities Act and/or Section 21(d) of the Exchange Act;

conduct-based injunctions enjoining the Defendants from directly or indirectly, including, but not

limited to, through an entity owned or controlled by any of them, participating in the issuance,

purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent

defendants from purchasing or selling securities listed on a national securities exchange for their

own personal account; and such other relief as the Court may deem appropriate.  Further, as to

Dhillon, the Commission seeks an officer and director bar pursuant to Section 20(e) of the

Securities Act and Section 21(d) of the Exchange Act.

      ANSWER:    Paragraph 19 states a legal conclusion for which no answer is required.

## JURISDICTION AND VENUE

      20.    This Court has jurisdiction over this action pursuant to Section 22(a) of the

A746

Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§78u(d), 78u(e), 78aa].

     ANSWER:    Paragraph 20 states a legal conclusion for which no answer is required.

    21.      Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C.

§77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Certain of the acts, practices,

transactions and courses of business alleged in this Complaint occurred within the District of

Massachusetts, and were affected, directly or indirectly, by making use of means or

instrumentalities of transportation or communication in interstate commerce, or the mails.  For

example, Dhillon sat atop the board of Arch, a Massachusetts-based issuer.

     ANSWER:    Paragraph 21 states a legal conclusion for which no answer is required.


## **DEFENDANTS**

    22.      **Frederick L. Sharp**, age 69 and born in Los Angeles, California, resides in West

Vancouver, British Columbia, Canada.

     ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about

     the truth of the allegations in this paragraph, and therefore denies them.

    23.      **Zhiying Yvonne Gasarch a/k/a Zhiying Chen**, age 49 and born in China, is a

dual citizen of Canada and China, and resides in Richmond, British Columbia, Canada.  On

information and belief, at all times relevant to this Complaint, Gasarch spent most of her time in

Canada.

     ANSWER:    Admitted.

    24.      **Courtney Kelln**, age 41, resides in Surrey, British Columbia, Canada.

A747

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

25. **Mike K. Veldhuis**, age 41 and born in the Netherlands, resides in Vancouver, Canada.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

26. **Paul Sexton**, age 53 and born in the United Kingdom, resides in Anmore, British Columbia, Canada.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

27. **Jackson T. Friesen**, age 33, lives in Delta, British Columbia, Canada.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

28. **William T. Kaitz**, age 40, lives in Arnold, Maryland.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

29. **Graham R. Taylor**, age 51 and born in the United Kingdom, resides in Vancouver, British Columbia, Canada on information and belief.  On information and belief, at all times relevant to this Complaint, Taylor spent most of his time in Canada.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

30. **Avtar Singh Dhillon, MD**, age 60 and born in India, is a Canadian citizen residing in Long Beach, California.  Dhillon is currently the chairman of the board of directors of

11

A748

Emerald Health Therapeutics, Inc., a Canadian company that publicly trades in the United States markets.  Further:

  a.  Between approximately April 2013 and July 2018, Dhillon was the chairman of the board of directors of Arch.

  b.  Between approximately March 2009 and January 2019, Dhillon was the chairman of the board of directors of Inovio Pharmaceuticals, Inc. ("Inovio").

  c.  Between approximately January 2012 and April 2019, Dhillon was the chairman of the board of directors of Vitality, including its predecessor, Stevia First Corp.

  d.  Between approximately March 2011 and April 2020, Dhillon was the chairman of the board of directors of OncoSec.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.


**RELATED PARTIES**

31.    **Vitality Biopharma, Inc.** ("**Vitality**"), formerly known as **Stevia First Corp.** ("**Stevia First**"), currently trades on the Over-the-Counter ("OTC") Markets Group, Inc. ("OTC Markets"), an interdealer quotation service that provides a platform to buy and sell securities. Vitality was incorporated in Nevada in 2007 and its principal place of business is in Los Angeles, California.  Throughout its history, Vitality has undergone several changes to its business plan and now purports to be in the business of developing cannabinoid drugs for medical treatment.  At all times relevant to this Complaint, Vitality's common stock was registered under Section 12(g) of the Exchange Act, and it files Exchange Act reports with the Commission pursuant to the reporting requirements of Section 13(a) of the Exchange Act.

12

A749

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

32.    **Arch Therapeutics Inc. ("Arch")** currently trades on OTC Markets.  It was incorporated in Nevada in September 2009, and its principal place of business is in Massachusetts.  The company has had different purported business objectives over the years; it currently purports to be focused on "developing a novel approach to stop bleeding ("hemostasis"), control leaking ("sealant") and manage wounds during surgery, trauma and interventional care."  Arch's common stock is, and has been since June 2013, registered with the Commission pursuant to Section 12 of the Exchange Act.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

33.    **OncoSec Medical Incorporated ("OncoSec")** currently trades on NASDAQ (to which it was uplisted, from the OTC Markets, in May 2015).  It is a Nevada corporation headquartered in Pennington, New Jersey and San Diego, California.  The company purports to be a biotechnology company focused on designing, developing and commercializing innovative therapies and proprietary medical approaches to stimulate and to guide an anti-tumor immune response for the treatment of cancer.  OncoSec's common stock is, and has been since March 2011, registered with the Commission pursuant to Section 12 of the Exchange Act.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

34.    **Garmatex Holdings, Ltd. ("Garmatex")**, now known as Evolution Blockchain Group, Inc., currently trades in the grey market.  It was incorporated in Nevada in 2014 and is

13

A750

located in Las Vegas, Nevada.  In 2018, the company announced a change in its business plan,

purportedly to pivot from textiles to holding intellectual property related to blockchain

technology, and changed its name to Evolution Blockchain.  The Commission suspended trading

in the securities of Evolution Blockchain on June 25, 2018.  During the time period of the trading

described in this Complaint, the company voluntarily filed periodic reports with the Commission.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
> the truth of the allegations in this paragraph, and therefore denies them.

## BACKGROUND

35.     Before selling stock, control persons are required to: (a) register such sales with

the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (b) sell the stock

pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions

set forth in SEC Rule 144 [17 C.F.R. §240.144], including limitations on the amount of stock a

control person can legally sell.  In addition, investors in certain public companies are required

publicly to disclose any ownership interest in excess of 5% of the company's publicly traded

stock.  Such registration requirements, sale restrictions, and disclosure obligations are safeguards

designed to protect the market for purchases and sales of stock, and to inform investors about the

nature of the stock they are holding or considering buying, and from whom they would be buying

that stock.

> ANSWER:     This paragraph states a legal conclusion for which no answer is required.

36.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through

one or more intermediaries, controls, is controlled by, or is under common control with, such

issuer (i.e., a control person).  "Control" means the power to direct management and policies of

the company in question.  Affiliates include officers, directors and controlling shareholders, as

14

A751

well as any person who is under "common control" with or has common control of an issuer. As used herein, the term "control group" means a group that collectively is an "affiliate" of an issuer.

     ANSWER:     This paragraph states a legal conclusion for which no answer is required.

     37.     "Restricted stock" includes stock of a publicly traded company (also known as an "issuer") that has been acquired from an issuer, or an affiliate of an issuer, in a private transaction that is not registered with the Commission. All stock held by an issuer or affiliate of an issuer is restricted stock. Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a registration statement has been filed with the Commission (for an offer) or is in effect (for a sale). A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management. It also identifies any person or group who is the beneficial owner of more than 5% of the company's securities.

     ANSWER:     This paragraph states a legal conclusion for which no answer is required.

     38.     "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily after having previously been subject to a registration statement. Registration statements are transaction specific, and apply to each separate offer and sale as detailed in the registration statement. Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties. Thus, when a control person buys publicly traded or otherwise unrestricted shares in a company that s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate. Such legal restrictions include strict limits on the quantity of shares that may be sold in the public markets absent registration. Without registration, affiliates are prohibited from selling large quantities of

A752

an issuer's shares, regardless of how the affiliates obtained those shares.

ANSWER:    This paragraph states a legal conclusion for which no answer is required.

39.    A "transfer agent" is a business that facilitates certain types of securities transactions. Among other things, transfer agents issue and cancel certificates of a company's stock to reflect changes in ownership. Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock. Transfer agents routinely keep track of whether particular shares are restricted from resale.

ANSWER:    This paragraph states a legal conclusion for which no answer is required.

40.    "Penny Stock," as used herein, generally refers to a security issued by a very small company that trades at less than $5 per share.

ANSWER:    This paragraph states a legal conclusion for which no answer is required.

41.    "S-1 Registration Statement(s)" refer(s) to SEC Form S-1, which is a registration statement filed publicly by an issuer in connection with the sale of stock to shareholders. "S-1 Shareholders," as used herein, means shareholders who acquired stock pursuant to an S-1 Registration Statement.

ANSWER:    This paragraph states a legal conclusion for which no answer is required.

## OVERVIEW OF THE SHARP GROUP'S CONDUCT

### Obfuscating Beneficial Ownership and Control

42.    From approximately 2010 through at least 2019, the Sharp Group facilitated illegal sales of stock in hundreds of penny stock companies.

ANSWER:    Denied as to Mrs. Gasarch.

43.    As reflected in the table below, the Sharp Group's stock sales generated over one billion dollars in gross proceeds:

16

A753

| YEAR | STOCK SALES ($) | STOCK PURCHASES ($) | NET SALES ($) |
|------|-----------------|---------------------|---------------|
| 2010 | $ 40,452,026 | $ (7,344,138) | $ 33,107,888 |
| 2011 | $ 198,245,334 | $ (67,424,315) | $ 130,821,019 |
| 2012 | $ 205,403,649 | $ (60,952,750) | $ 144,450,899 |
| 2013 | $ 290,452,161 | $ (62,460,290) | $ 227,991,871 |
| 2014 | $ 64,960,760 | $ (6,612,156) | $ 58,348,605 |
| 2015 | $ 22,057,413 | $ (2,631,013) | $ 19,426,400 |
| 2016 | $ 68,171,713 | $ (9,861,177) | $ 58,310,536 |
| 2017 | $ 86,158,566 | $ (15,867,701) | $ 70,290,865 |
| 2018 | $ 31,155,352 | $ (4,674,550) | $ 26,480,802 |
| 2019 | $ 1,702,074 | $ (889,639) | $ 812,435 |
| **TOTAL** | $ 1,008,759,049 | $ (238,717,730) | $ 770,041,319 |

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

44.    Sharp, who used the code name "Bond" (styling himself after the fictional character *James Bond*), was the mastermind and leader of the Sharp Group.  Among other things, Sharp cultivated relationships with the Sharp Group's clients—that is, individuals seeking fraudulently to sell stock in the markets to retail investors—and with various offshore trading platforms.  Sharp also routinely served as a liaison between dozens of clients (like the Veldhuis Control Group) and the trading platforms (like Wintercap SA).

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

45.    During the period of the scheme detailed herein, Sharp described in a communication to a client the following about the Sharp Group's services: "The service provided is comprehensive; it is not limited to trading.  It includes pyaments [sic], loans, private placements **and keeping clients out of jail.**" (Emphasis added).

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

17

A754

46.     Sharp oversaw the creation and deployment of various front companies, which served as nominee shareholders used to disguise his clients' stock ownership and to sell stock surreptitiously.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

47.     One of the services provided by the Sharp Group was making available offshore corporate nominee shareholders and individuals who would serve as the nominal owners of those entities. Sharp installed these various nominal owners to pose as the beneficial owners of the various entities that served as nominee shareholders. In actuality, these individuals did not own or control the stock held by the nominee shareholders and generally had no role other than offering their names, passports, and signatures, which the Sharp Group used to incorporate and open accounts for the corporate nominees. In dealing with banks, brokerages, and other financial services providers, these individuals were held out as actual beneficial owners. In this way, the Sharp Group kept the identities of control groups hidden, while fraudulently appearing to satisfy the compliance requirements of the banking and securities firms where the Sharp Group opened these accounts.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

48.     In 2002, Sharp wrote a fictionalized book about securities fraud and money laundering in which he described illegal conduct that parallels the Sharp Group's business model. Sharp's book (*Footloose: Charlie Smith's Offshore Chronicles*) includes the following passage:

> Eventually [the client] took greater positions in the stocks, sharing the take with fewer partners. This meant he had to disguise his shareholdings in order to avoid securities disclosure requirements and trading restrictions.

A755

> Offshore companies were ideal for his purpose. They came from
> around the world with nominee directors, but were still subject to his
> control. The perfect situation for his masterly stock manipulations.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about

the truth of the allegations in this paragraph, and therefore denies them.

49.    Sharp hired and directed various individuals to operate the administrative services

offered by the Sharp Group. For example, Sharp oversaw the creation of a network of encrypted

communications, including code-names for the users, encrypted electronic chat functions, and

encrypted email functions.[3] The Sharp Group purchased, configured and delivered devices that

the Sharp Group referred to as "xPhones," which were designed to be used only for the Encrypted

Communications.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about

the truth of the allegations in this paragraph, and therefore denies them.

50.    Sharp also hired and directed individuals who created and administered the Sharp

Group's accounting system, which Sharp called "Q" (thereby expanding his *James Bond*

affectations – "Q" being another fictional character in *James Bond*). Given the extensive efforts

by the Sharp Group and its clients to conceal and obscure the actual ownership and control of the

stock they were surreptitiously selling, the Q system was essential in keeping track of the amounts

of stock to be sold and the total proceeds being collected for each deal Sharp's clients ran.

Accordingly, the Sharp Group accounted for all of the nominee shareholders' assets in Q by

tracking which of the nominee shareholders held which stocks (and which stocks' sales proceeds)

for which particular client or client group, like the Veldhuis Control Group. The Sharp Group

---

[3] Encrypted communications sent and received through the Sharp Group-administered server are hereinafter referred to as "Encrypted Communication(s)."

A756

also relied on the Q system to calculate the commissions and fees it collected for facilitating its clients' illegal stock sales.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

51.     Sharp arranged for the Encrypted Communication services and the Q accounting system to be hosted on a server that was physically located on the island of Curaçao, in the belief that, there, it would be unreachable by U.S. securities regulators and law enforcement officials.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

52.     Kelln is one of the individuals who worked for Sharp.  Kelln routinely performed a variety of complex administrative tasks associated with obtaining, allocating, and distributing blocks of shares across multiple nominee shareholders in a manner designed to conceal the Sharp Group's clients' common control of all the stock so distributed.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

53.     In particular, Kelln—at the direction of Sharp and others—routinely split Sharp Group clients' shareholdings into blocks of stock, each comprising less than five percent of each public company's outstanding shares, to be held in the names of various nominee entities.  Kelln sent an Encrypted Communication on or about February 8, 2013 to a client describing her work:

> The process is: I group certs [stock certificates] together that keep the total under 5%. Then I sen[d] them in for transfer to the TA [transfer agent].  Once processed the TA fedex's them to the broker.  Then we wait for the shares to clear [i.e., become available for trading].  We only submit 1 transfer a day per broker until we have submitted all the shares.

A757

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

54.    These acts enabled the Sharp Group's clients to further conceal their control by making it seem as if multiple different, unrelated offshore corporate entities each held less than five percent of the stock of a public company when, in actuality, those offshore corporate entities were all under common control by the Sharp Group, and their stock in the public company was all held in coordinated fashion for the benefit of the Sharp Group's clients. In this manner, the clients concealed the fact that they routinely held far greater than five percent of such public companies' stock through the various Sharp Group-supplied nominee entities.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

55.    Breaking the shares into blocks of less than five percent avoided scrutiny by brokerage firms and other market participants.  Brokerage firms routinely consider the 5% ownership threshold in determining whether particular stock sales may be part of a distribution that must be registered pursuant to Section 5 of the Securities Act.  Further, the OTC Markets requires public companies to disclose its five percent (or greater) shareholders to meet certain listing requirements.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

56.    Once blocks of shares were broken up and dispersed among multiple nominee shareholders, the Sharp Group coordinated with offshore trading platforms, such as Wintercap SA and Blacklight SA, which specialized in depositing and liquidating stock through various

21

A758

domestic and foreign brokerage firms.  By so doing, the Sharp Group further obscured both the

identities of the true beneficial owners and the fact that they were selling in concert.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

57.    Gasarch is another one of the individuals who worked for Sharp and managed the

complex administrative tasks that were necessary to the fraudulent scheme.  Her duties included

arranging for transfers—typically in the form of wire transfers—of the proceeds of illegal stock

sales, such as the sales referenced in the table appearing at ¶43 above.  In this role, Gasarch

routinely arranged to transfer stock sale proceeds to accounts as directed by the Sharp Group's

clients in a manner designed to conceal the fact that undisclosed control persons were, in fact, the

actual beneficial owners of the stock being sold, and the ultimate recipients of the sales proceeds.

When she sent these wires, Gasarch also recorded them in the Q accounting system.  She thus

observed and maintained the records showing how the Sharp Group's clients were generating,

receiving and disbursing their revenue from securities trading.  Because of her role, Gasarch was

routinely referred to by others involved in the scheme by the nickname "Wires."

> ANSWER: Admitted that Ms. Gasarch worked for the entire office as an office manager.
>
> Denied as to the remainder.

58.    One of the ways that Gasarch accomplished the distribution of fraudulent trading

proceeds to, and for the benefit of, the Sharp Group's clients was by routinely creating false

invoices, loan and subscription agreements, and other documents that purported to originate from

Sharp Group-administered nominees, and that could serve as the "back up" to support these

payments if they were questioned by the banks and brokerage firms from which the proceeds

were being sent.  Some examples include:

A759

a) On August 23, 2016, Gasarch created an invoice (on which she left "Company Name" at the top) purportedly to Sharp Group-administered nominee Quezon Group LLC, in the amount of CAD $125,000 from a builder in Canada that was renovating a property for one of the Sharp Group's clients. About a minute after Gasarch last modified the invoice, she sent it, using an email address for Quezon Group administered by the Sharp Group, to Wintercap SA and requested payment from a Wintercap SA account. Gasarch informed Wintercap SA that the reference on the wire to the builder should read "Subscription Agreement 500,000 shares." Wintercap SA paid the invoice as directed by Gasarch.

b) On May 16, 2017, Gasarch modified an invoice from a law firm so that the invoice appeared to have been issued to Sharp Group-administered nominee Riverfall Group Ltd. The invoice requested payment for work done in connection with NewGen Biopharma Corp. and its predecessor company. As discussed in paragraph 237 below, the Veldhuis Control Group engaged in fraudulent sales of the securities of NewGen Biopharma Corp in 2016 and 2017. The Sharp Group debited the amount of this payment in its Q accounting system from the NewGen account. Gasarch also was the last person who edited the cover memo to Wintercap SA (which purported to be written by the beneficial owner of Riverfall Group) asking that Wintercap SA make a partial payment of $129,000 on this invoice. Several hours later, using an email address for Riverfall Group administered by the Sharp Group, Gasarch sent the invoice and the cover memo to Wintercap SA and requested payment from a Wintercap SA controlled-account. Wintercap SA paid the invoice as directed by Gasarch.

A760

c)  On or about October 11, 2017, Gasarch created an invoice purportedly to Sharp

Group-administered nominee Hilton Capital Inc., in the amount of $28,000 from an

entity named SkyLeap Industries, Inc. in Canada.  The invoice states that it is for

"data encryption tool for internal use."  About 5 minutes later, Gasarch was the last

person to modify a cover memo, purportedly from the beneficial owner of Hilton

Capital, to Wintercap SA, asking Wintercap SA to pay the invoice.  The cover memo

stated that the purpose of the invoice was "payment of consulting services."  The next

day, using an email address for Hilton Capital administered by the Sharp Group,

Gasarch sent the invoice and cover memo to Wintercap SA and requested payment

from a Wintercap SA account.  Wintercap SA paid the invoice as directed by

Gasarch.  In the Q accounting system, this payment was charged to the account for

Liberty One Lithium, another issuer whose stock was sold fraudulently by the

Veldhuis Control Group (see paragraph 237).

ANSWER:        Ms. Gasarch admits that her tasks included creating invoices but

denies that she sent these externally.

59.     Gasarch understood that her job was to obfuscate the source and destination of

distributions that the Sharp Group's clients were taking from their fraudulent trading proceeds and

that they were laundering through the Sharp Group.  Her communications with Sharp demonstrate

Gasarch's understanding.  For example, in August of 2013, Gasarch engaged in the following

Encrypted Communication with Sharp:

| Sharp to Gasarch | On aug 12 u wrote a draft for grand yachts against cash.  C[ou]ld u pls explain to me how this is a legitimate payment?  My concern is money laundering: hells angels gives us cash, we give them a draft to buy a boat.  Later, boat is seized, polic[e] investigate, find out charterhouse [a Sharp Group-administered nominee] paid for it; visit us and ask why.  What will u say? |
| --- | --- |
| Gasarch to Sharp | Can we lend money to them?  Thomas asks them sign loan agreement for us.  Thomas will call me back. |

24

| Sharp to Gasarch | Who r they? |
| Gasarch to Sharp | Thomas s client |
| Sharp to Gasarch | Yes but who?  A person, a company, what business? |
| Gasarch to Sharp | Waiting Thomas reply |
| | |
| | |

ANSWER:  Gasarch admits that the document speaks for itself but denies the remaining allegations.

60.     Gasarch's communications demonstrate her understanding that the Sharp Group was controlling the Sharp Group-administered nominees for the benefit of the Sharp Group clients.  For example, on February 18 and 19, 2015, Gasarch engaged in a series of Encrypted Communications with Sharp and others about the urgency of responding to an attorney's request for documents to be signed by the purported control persons of a Sharp Group-administered nominee.  Gasarch informed Sharp that "we" signed the documents for all of the directors, but she didn't know who should sign the documents for the notary.  Sharp chided Gasarch:  "Of course u do; his name is on the stamp!," thus telling Gasarch to sign for the notary.

ANSWER:  Ms. Gasarch admits that the document speaks but denies the remaining allegations.

61.     Similarly, communications between Sharp Group clients and Wintercap SA report instances demonstrating that Gasarch knowingly, recklessly, or negligently sent emails pretending to be from the nominal owners of Sharp Group-administered nominees in furtherance of the Sharp Group's clients' fraudulent schemes.

a.     On July 7, 2017, Sharp Group client Benjamin Kirk[4] and a Wintercap SA employee communicated about an email message seeking to transfer CAD

---

[4] *SEC v. Lee, et al.*, No. 21-cv-11997 (D. Mass. filed Dec. 9, 2021).

25

A762

$60,000 that Gasarch had sent to Wintercap SA a week earlier at Kirk's request. Gasarch's email purported to be written by the beneficial owner of a Sharp-administered nominee and came from an email address for that nominee that was administered by the Sharp Group.

b. On July 12, 2018, Sharp Group client Luis Carrillo and a Wintercap SA employee communicated about what to do about a rejected wire that Gasarch had requested on June 22, 2018 for a Sharp Group-administered nominee named Santos Torres LLC. The Wintercap SA employee told Carrillo to get Gasarch to email Wintercap SA from the Santos Torres account to inform Wintercap SA that the wire was rejected and why.

ANSWER:    Ms. Gasarch is without sufficient information as to the truthfulness of the allegations in this paragraph and therefore denies them.

62.    Gasarch was also involved in the movement of Sharp Group clients' shares to Wintercap SA. For example:

a. On June 16, 2016, Veldhuis wrote to Gasarch to ask for her help in getting Wintercap SA to sign documents that would make it appear as if Wintercap SA was purchasing for itself 5 million shares of Stevia First/Vitality, when Veldhuis was just using Wintercap SA to conceal the Veldhuis' Control Group's ownership of those shares. The same day, Gasarch forwarded Veldhuis' request to Wintercap SA's operations employees and asked them to sign the documents and return them to her.

b. On September 23, 2016, Veldhuis wrote to Gasarch that he was sending 2,375,000 warrants of StartMonday Technology Corp. to Wintercap SA

26

A763

(StartMonday was an issuer whose securities the Veldhuis Control Group sold

fraudulently in 2016 through 2018 – see paragraph 237).  Veldhuis also

informed Gasarch that "[b]ecause they are still in the 4 month hold period we

will need Silverton SA [the former name of Wintercap SA] to sign the

attached document.  Please arrange."  Gasarch forwarded Veldhuis' message

to Wintercap SA, which then asked Gasarch for some supporting

documentation.

> ANSWER    Ms. Gasarch admits that the documents speak for themselves.

63.    Gasarch knew, or recklessly or negligently disregarded, that the Sharp Group's

clients were paying for promotions for the stocks they were involved in selling, and that it was

important to separate the Sharp Group-administered nominees that paid for stock promotions

from the Sharp Group-administered nominees that held and traded stock for the Sharp Group's

clients.  Gasarch's knowledge is demonstrated in at least the following two Encrypted

Communications:

> a. On or about April 29, 2014, Gasarch communicated with Sharp Group client
> Benjamin Kirk regarding an outgoing wire he was requesting in the amount of
> $281,233.  Kirk informed Gasarch that he had "very good paper work" but
> needed the name and address for the account from which the Sharp Group
> would send the wire (showing that the source of the payment was arbitrary).
> Gasarch asked Kirk if the payment was for a stock promotion because if it
> was, "I need to find a safe account for wire."
>
> b. Similarly, on or about September 5, 2014, Gasarch communicated with Sharp

27

A764

Group client Steve Bajic[5] regarding what account would be used to send an outgoing wire he was requesting in the amount of $100,000.  Gasarch asked Bajic if the payment was for a stock promotion, and if so, she needed to know which stock.  Bajic responded that it was not for a stock promotion so Gasarch told him that he could use Peregrine Capital (the entity for which she was the listed as the owner).  Bajic asked again:  "Does peregrine trade stocks?  I want $ to come from bank that has no links to trading, if that's even possible?"  Gasarch reassured him:  "I asked u what stock for, U answer not promote.  So I can use any account."

ANSWER:  Ms. Gasarch admits that the documents speak for themselves but denies the SEC's conclusions.

64.     Gasarch also implemented Sharp's plan to protect the identities of the Sharp Group's clients.  For example, (a) Gasarch helped to disguise the identities of actual shareholders by personally serving as the purported owner of a nominee shareholder—Peregrine Capital Corp. f/k/a Peaceful Lion Holdings—that the Sharp Group routinely used to facilitate the illegal stock sales on behalf of control group clients; and (b) in late 2015, around the time the Sharp Group distributed to clients a new set of xPhones for their use in Encrypted Communications, Gasarch drafted a memo with instructions about how to "delete all secure chats when xphone is shut down (e.g., to cross a border)."

ANSWER:  Denied as to characterization and denied as to (a).  Admitted as to (b) but further stating the memo was simply the instructions contained in the Xphones box and Ms. Gasarch had been directed to disseminate them.

---

[5] *SEC v. Bajic, et al.*, No. 20-cv-007 (S.D.N.Y. filed Jan. 2, 2020).

65.     Kelln likewise made it a point to remind Wintercap SA principals of these security protocols, as in a November 2016 Encrypted Communication in which she noted, after traveling back to Canada from Switzerland, "I had to delete my phone going through customs." A Wintercap SA principal responded "[w]e approve of your security."

> ANSWER:    Ms. Gasarch is without sufficient information as to the truthfulness of the allegations in this paragraph and therefore denies them.

**The Sharp Group Benefited from Illegal Stock Sales**

66.     Sharp, Kelln, and Gasarch profited handsomely from their illicit services to the Sharp Group's clients.

> ANSWER:  Denied as to Ms. Gasarch.

67.     For example, between just August 2017 and July 2018, Wintercap SA transferred approximately $7 million to a Marshall Islands company called Cortona Equity, Inc. ("Cortona") for Sharp's benefit.  Sharp had installed his wife's tennis coach as the purported beneficial owner of Cortona.

> ANSWER:    Ms. Gasarch is without sufficient information as to the truthfulness of the allegations in this paragraph and therefore denies them.

68.     On various dates between 2010 and 2019, Kelln and Gasarch were the beneficiaries of more than $1 million each of funds derived from the Sharp Group's conduct.  By way of example:

> a.   On or about January 2, 2019, a Sharp Group-administered nominee named Inland Trading wired $49,861.10 to a United States-based corporate entity owned jointly by Gasarch and her husband.  The primary source of Inland Trading's income was fraudulent trading on behalf of Sharp Group clients.

29

A766

The wire payment to the company owned by Gasarch and her husband listed

Gasarch's home address in Canada as the "Beneficiary address."

    b.   On or about May 2, 2018, Gasarch, using the email account for Sharp Group-

administered nominee Hilton Capital Inc., asked Wintercap SA to send

$100,016 from Hilton Capital's account to Gasarch's account at Sun Life

Assurance Co.  Gasarch attached copies of her passport and driver's license to

the request as backup for the transaction.

ANSWER:     Ms. Gasarch admits that the documents speak for themselves but

denies that the amounts and characterization set forth by the SEC.

69.     Further, between at least September 2011 and April 2019, the Sharp Group would

perform a month-end sweep, using its Q accounting system, of commissions and fees that it

earned from the securities transactions, securities deposits, and other securities-related services it

performed for its clients in that month.  The sweep allocated a portion of the commissions and

fees that were paid into the Bond account (the account associated with Sharp) to accounts in the

names of Kelln and Gasarch, from which Kelln and Gasarch could then withdraw funds.  Between

August 2016 and April 2019, Gasarch's portion of these monthly commissions and fees totaled

over $300,000.  In addition, Gasarch received Christmas bonuses of CAD $100,000 in 2016 and

2017 and a Christmas bonus of CAD $70,000 in 2018.

ANSWER:     Ms. Gasarch admits to receiving payments from her work, and says the

documents speak for themselves.  She denies ever receiving any payment as a

"commission."

**SHARP GROUP EXAMPLE ONE:**
**ILLEGAL SALES OF STEVIA FIRST/VITALITY BY DHILLON,**

## VELDHUIS CONTROL GROUP AND TAYLOR

70.     By August 2011, Dhillon had become the Interim Principal Executive and Financial Officer of Stevia First and, by January 2012, had become its Chairman.  As detailed below, during and after his securing of these roles, Dhillon coordinated with the Veldhuis Control Group and Taylor fraudulently to sell Stevia First/Vitality[6] stock to retail investors at inflated prices on various occasions over several years.  Further, Sharp, Kelln, Veldhuis, Friesen, Sexton, Taylor and Dhillon failed to register their sales of Stevia First/Vitality stock described herein pursuant to Section 5 of the Securities Act.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

71.     Defendants' successive campaigns to sell Stevia First/Vitality stock fraudulently were very successful.  The following table reflects the proceeds that several of the Defendants' illicit sales of Stevia First/Vitality stock generated during the scheme (the "quantity sold" in the table below reflects the number of shares sold, and incorporates a 1-for-10 reverse stock split in 2016).

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

---

[6] Stevia First changed its name to Vitality in 2016, and the company still operates under that name.  Stevia First and Vitality stock is referred to as "Stevia First/Vitality" in this Complaint.

A768

| Year | Quantity Sold | Trading Proceeds |
|---|---|---|
| 2012 | 19,600,000 | $    24,718,428 |
| 2013 | - | - |
| 2014 | 1,320,511 | 566,715 |
| 2015 | 2,424,661 | 770,492 |
| 2016 | 5,474,517 | 5,503,691 |
| 2017 | 4,904,846 | 10,570,537 |
| 2018 | 2,045,146 | 3,509,479 |
| Grand Total | 35,769,681 | $    45,639,343 |

**Background**

72.     By early 2011, Dhillon controlled a private company called Stevia First.  Around that time, Dhillon looked for an opportunity to convert that business to a publicly traded company in a process known as a "reverse merger."  In a reverse merger transaction, an existing public company having a ticker symbol cleared for quoting on OTC Markets, but with little, if any, operations (often referred to as a "shell company"), acquires a private operating company.  After the private operating company is absorbed into the public shell company, the shell company typically undergoes a name, ticker-symbol, and business-plan change, to align with the name and purported business of the formerly private operating company.  In such transactions, shareholders of the formerly private company frequently receive shares in the newly merged public company. In many instances, those shares comprise a controlling interest in the post-merger public company.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

73.     In or about early 2011, Taylor introduced Dhillon and the then-Chief Executive Officer (the "CEO") of Dhillon's private company to certain of Taylor's contacts in China and to an attorney in Vancouver.  Dhillon and the CEO eventually merged the private company with a public shell company.  On paper, the bulk of the shares in the shell company were held by various Chinese nationals who were identified in an S-1 registration statement that had previously been filed by the shell company (hereinafter the "Stevia S-1 Shareholders").

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

74.     According to public filings, on July 28, 2011, the purported president, chief executive officer, treasurer and director of the public shell company agreed to sell all of his 4,500,000 shares to Dhillon pursuant to a stock purchase agreement.  The stock purchase agreement contemplated that, immediately upon closing of the reverse merger, Dhillon would be appointed as a director, and as the President, Chief Executive Officer, Secretary, and Treasurer, of the surviving public company.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

75.     On or about October 10, 2011, the reverse merger went effective and the surviving public company was re-named Stevia First, thereby assuming the name of Dhillon's private company.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

76.     On or about October 12, 2011, Stevia First effected a 7-for-1 forward stock split, which caused Dhillon's 4,500,000 shares (referenced in ¶74) to convert to 31,500,000 shares of Stevia First/Vitality stock.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

77.     Dhillon was the sole signer of Stevia First's filing with the Commission, which reported the 7-for-1 forward stock split.  The stock split had the effect of increasing the number of shares held by Dhillon considerably.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

78.     In or about January 2012, Dhillon assumed the role of chairman of Stevia First's board of directors.  Stevia First/Vitality's stock was registered pursuant to Section 12 of the Exchange Act.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

79.     Dhillon was an affiliate of Stevia First (and, subsequently, Vitality) because he had the power to control the company through his role as chairman of its board.  As a public company affiliate, Dhillon was legally required to register any sales of his Stevia First/Vitality stock unless Dhillon elected to comply with the safe harbor provisions set forth in Commission Rule 144.  Dhillon testified, under oath, during the Commission's investigation leading to the filing of this action that he understood these legal requirements at all times relevant to this Complaint.  As described in more detail in this Complaint, Dhillon repeatedly sold shares of Stevia First/Vitality without registering such sales.

34

A771

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

80.     As a director of Stevia First (and, eventually, Vitality), Dhillon was required to file various "Form 4" statements (i.e., a "Statement of Changes of Beneficial Ownership of Securities"), which is a public form required by the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder.  Dhillon was required to file an updated Form 4 to reflect any change in his beneficial ownership of Stevia First/Vitality stock, regardless of the amount of that change.  Dhillon understood these legal requirements at all times relevant to this Complaint.  Dhillon testified, under oath, during the Commission's investigation leading to the filing of this action that "[a]nytime there's sales by insiders, you have to file appropriate forms to disclose your purchases or sales."

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

81.     Dhillon was also legally required to file a public disclosure report—a "Schedule 13D"—with the Commission pursuant to Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder, to the extent he was the beneficial owner of greater than five percent of Stevia First/Vitality's common stock.  Dhillon was likewise required to disclose, via a Schedule 13D filing, any agreements he entered into concerning disposition of Stevia First stock, as well as the combined holdings of all participants in any such agreements.  Dhillon was further required to file a Schedule 13D Amendment whenever his position materially changed.  Dhillon understood these legal requirements at all times relevant to this Complaint.  For example, on or about August 17, 2011, Dhillon filed a Schedule 13D with the Commission disclosing that he was the beneficial owner of 4,500,000 *restricted* shares of Stevia First/Vitality stock, which comprised more than

35

five percent of the company's outstanding common shares at that time. As described in more detail in this Complaint, Dhillon intentionally failed to disclose his beneficial ownership interest in additional shares of Stevia First/Vitality stock, which were purportedly *unrestricted*; and he never made any disclosure concerning his agreements with the Veldhuis Group concerning Stevia First stock.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

### Round One: 2012 Stevia First/Vitality Stock Sales

82.     Beginning in January 2012, shortly after Dhillon took over Stevia First, Dhillon, Taylor, and the Veldhuis Control Group arranged to sell surreptitiously Stevia First/Vitality's purportedly unrestricted stock and share in the proceeds of those unregistered sales.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

83.     First, Taylor, working in concert with others, facilitated the transfer of Stevia First/Vitality's purportedly unrestricted stock from the Stevia S-1 Shareholders (defined in ¶73) to, initially, fifteen Sharp Group-administered nominee companies that held the stock for the Veldhuis Control Group. Shortly thereafter, the Sharp Group consolidated or further transferred shares held by several of these Sharp Group-administered shareholders into other Sharp Group-administered shareholders, including Peaceful Lion Holdings, a nominee shareholder for which Gasarch personally served as purported owner, and thus as purported owner of any shares held by it. The flow chart below reflects these transfers:[7]

---

[7] The entities color coded in green in this chart and other charts within this Complaint were administered or otherwise utilized, directly or indirectly, by the Sharp Group.

A773



ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

84.    Between January and March 2012, the Sharp Group-administered nominee shareholders (including Gasarch's Peaceful Lion Holdings) received 19,600,000 shares of Stevia First/Vitality stock, representing over 37% of the company's total outstanding stock and over 97% of its purportedly unrestricted stock.  These particular shares, which were all issued without restrictive legend, are hereinafter referred to as the "'Unrestricted' Stevia First Merger Shares."  (Shares issued without restrictive legend are commonly treated by securities brokers and transfer agents as immediately and freely tradeable.  In reality, however, these 'Unrestricted' Stevia First

A774

Merger Shares were held by affiliates of the issuer who were acting in league with its Chairman.

As such, these shares were, as a matter of law, restricted, and thus were subject to the federal

securities laws' limitations and restrictions on unregistered sales of such shares.)

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
> the truth of the allegations in this paragraph, and therefore denies them.

85.    In March 2012, Stevia First—with Dhillon serving as the chairman of its board of

directors—began to issue press releases claiming various positive business developments for the

company while, at or about the same time, the Veldhuis Control Group orchestrated a

promotional campaign touting Stevia First's stock.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
> the truth of the allegations in this paragraph, and therefore denies them.

86.    For example, the Veldhuis Control Group paid for promotional materials touting

Stevia First that were disseminated to investors during approximately March through May 2012.

These Stevia First promotional materials urged investors to buy and buy quickly, saying things

like, "***Get in now; this is huge!***" (emphasis in original) and "***Buy STVF right now!***" (emphasis in

original; "STVF" was Stevia First's ticker symbol).  These promotional materials misleadingly

claimed both that "Conmar Capital Inc." was the paying party, and that Conmar Capital "will not

trade in the securities of Stevia First."  In fact (i) it was the Veldhuis Group, which controlled the

overwhelming majority of Stevia First's free-trading shares, that paid for the promotions; (ii) the

Veldhuis Control Group had paid the Sharp Group to incorporate Conmar Capital; and (iii)

although no Stevia First trading took place (at the time of the campaign) through Conmar Capital,

the Veldhuis Control Group was indeed "trad[ing] in the securities of Stevia First" by massively

unloading them on the very retail investors who were buying in response to that campaign.

A775

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

87.    The Veldhuis Control Group also engaged Kaitz to promote Stevia First, including through paying Kaitz's stock promotion company over $200,000 on or about April 3, 2012.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

88.    Overall, from approximately March 6, 2012 to May 23, 2012, the Veldhuis Control Group, with Kaitz's substantial assistance, unloaded every share of the 'Unrestricted' Stevia First Merger Shares into the market, generating illicit proceeds of over $24 million.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

89.    Both Taylor and Dhillon contemporaneously shared in the illicit proceeds stemming from the Veldhuis Control Group's March-May 2012 lucrative unloading of Stevia First stock, described above.  In particular, between approximately April and June 2012, the Veldhuis Control Group used the Sharp Group to remit eight wire payments, all funded by Stevia First stock-sale proceeds, and totaling over $4.2 million, to the Swiss bank account of an offshore front company that Taylor controlled; and Taylor, in turn, promptly transferred over 60% of that money to Dhillon as follows:

| Date | Veldhuis Control Group Transfers to Taylor's Company | Taylor Transfers to Dhillon's Companies |
|---|---|---|
| April 12, 2012 | $610,200 | |
| April 12, 2012 | $498,900 | |
| April 13, 2012 | $496,800 | |
| April 17, 2012 | | $498,000 |
| May 4, 2012 | | $400,000* |

39

A776

| May 11, 2012 | | $496,000* |
| June 8, 2012 | $475,000 | |
| June 8, 2012 | $800,000 | |
| June 8, 2012 | $900,000 | |
| July 16, 2012 | | $1,300,000* |

*Each of these transfers went to the Swiss bank account of a front company incorporated in Panama called Ortivo Enterprises Corp. ("Ortivo") that Dhillon controlled.*

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

90.     To further conceal the identities of the people sharing in the illicit proceeds from the unregistered sale of the 'Unrestricted' Stevia First Merger Shares, as well as the illicit source of those proceeds, the Veldhuis Control Group distributed portions of those proceeds in cash obtained from the Sharp Group on various dates. These cash withdrawals were recorded in the Q system and allocated to the Stevia First deal.

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

**Round Two: 2014 Stevia First/Vitality Stock Sales**

91.     On or about March 30, 2012, May 25, 2012, and February 13, 2014, Stevia First issued a total of 1,320,511 shares of Stevia First/Vitality stock to a Sharp Group-administered nominee shareholder. The Sharp Group, in turn, divided those shares between two additional Sharp Group-administered nominee shareholders. The table below reflects these transfers.



A777

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

92.      Thereafter, the Veldhuis Control Group sold these shares through Sharp Group-administered nominee shareholders for the benefit of Dhillon, the Veldhuis Control Group, and Taylor.  Specifically, between approximately January 14, 2014 and July 14, 2014, the Veldhuis Control Group sold all 1,320,511 of these Stevia First/Vitality shares through at least two offshore brokerage firms, obscuring the shares' ownership and the disposition of their proceeds by running the trades through two Sharp Group-administered nominee shareholders.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

93.      Kelln facilitated the unregistered sale of the 1,320,511 Stevia First/Vitality shares.  For example, on or about October 9, 2013, Kelln provided Stevia First's transfer agent with the required paperwork to transfer 625,000 of the 1,320,511 shares of Stevia First/Vitality shares to Nautilus Growth Fund.  Kelln also provided a check to pay for the transfer.  The documents provided by Kelln to Stevia First's transfer agent included an attorney opinion letter that falsely represented that Nautilus Growth Fund was not an affiliate of Stevia First.  Kelln knew, or recklessly disregarded, that Nautilus Growth Fund was merely a nominee shareholder holding stock for the Veldhuis Control Group, which was an affiliate of Stevia First.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

94.      As the Veldhuis Control Group sold shares, Veldhuis, Sexton, and Friesen discussed distributing the proceeds from the sale of the 1,320,511 shares of Stevia First/Vitality

41

A778

stock in a furtive manner that was designed to conceal the funds' source as well as their ultimate recipients.

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

95. For example, on or about February 25, 2014, Sexton and Veldhuis discussed in an Encrypted Communication their plan to distribute a pool of proceeds from the sale of the 1,320,511 shares of Stevia First/Vitality stock in "cash" and noted that "AV will be fine with [our so distributing] it." "AV" is a reference to Avtar Dhillon.

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

96. On or about March 6, 2014, Veldhuis sent the following Encrypted Communication to Friesen: "u r getting 173k today. A cut from MDDD [the ticker symbol of another public company stock the Veldhuis Control Group fraudulently sold through the Sharp Group] and STVF [the ticker symbol of Stevia First in 2014]. Buy a boat [expletive]. Rich mother [expletive]." Of the "173k" (i.e. $173,000) referred to by Veldhuis in the Encrypted Communication to Friesen, $100,000 came from proceeds of selling the 1,320,511 shares of Stevia First/Vitality stock.

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

97. On or about March 6, 2014—around the same time that Veldhuis was coordinating the distribution of Stevia First/Vitality stock sale proceeds to Friesen (and others)— the Veldhuis Control Group caused the Sharp Group to send $124,000 in Stevia First/Vitality stock-sale proceeds to the same Taylor Swiss bank account referenced in ¶89 above.

A779

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

98.    On various dates later in 2014, the Veldhuis Control Group continued to sell Stevia First/Vitality stock.  For example:

    a.    On or about May 28, 2014, Friesen sent an Encrypted Communication, copying Veldhuis, directing a trader working for Sharp to sell 25,000 shares of Stevia First/Vitality stock that was held in an account in the name of a Sharp Group-administered nominee shareholder.

    b.    On or about July 7, 2014, Friesen sent an Encrypted Communication directing a trader working for Sharp to sell 25,000 shares of Stevia First/Vitality stock.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

99.    On or about August 5, 2014, Veldhuis sent an Encrypted Communication asking Gasarch the following: "How much cash do you have in total.  We might cut the balance of STVF [Stevia First] that's left.  So we would need about $110K.  Do you have or be able to get?"

ANSWER:    Ms. Gasarch admits that the document speaks for itself.

100.    On or about August 6, 2014, Veldhuis sent a follow up Encrypted Communication to Gasarch: "Can I please get $120K cash from STVF?"

ANSWER:    Ms. Gasarch admits that the document speaks for itself.

101.    On or about August 6, 2014, Veldhuis picked up $120,000 in cash from Sharp's office.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

102.    On or about August 6, 2014, Sexton and Veldhuis continued to discuss, via Encrypted Communications, the planned distribution of proceeds from selling the 1,320,511 shares of Stevia First/Vitality stock.  Veldhuis wrote: "so STVF with the two wires being added back is 126,693.74 . . . Avtar 50,000 (40%) . . . [there is] enough cash to do it might [sic] be easier to transfer."

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

103.    During the same August 6, 2014 Encrypted Communication, Sexton replied: "You should cut up the 120,000 [in] cash.  Which would allow for . . . Avtar/GT [Dhillon and Taylor] 42,000[.] So if you want to bring me 96k on Friday I can distribute?  GT [Taylor] will be up here shortly . . . ."

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

104.    During the same August 6, 2014 Encrypted Communication, Veldhuis asked Sexton how he should transmit the cash, writing, "U want me to put in the safety deposit box or bring it to you."  Sexton replied: "You can do either.  I have a safe here.  I can distribute mind [sic] and grahams [Taylor] from here.  I can hold . . . av's [Avtar Dhillon's] for next meeting."

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

105.    On or about August 7, 2014, Veldhuis reported to Sexton via an Encrypted Communication that "I pick up [sic] that cash yesterday.  Its [sic] all 50's."

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

106.    Similarly, between approximately November 2013 and January 2015, Taylor arranged to transfer approximately $1.7 million to third parties for Dhillon's benefit.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

107.    Dhillon failed to file any Form 4 disclosing the sales of Stevia First stock directed by the Veldhuis Control Group, despite having a pecuniary interest in Stevia First stock sales effected through the Veldhuis Group, and despite knowing of his obligations, as Chairman of Stevia First, to report any and all of his Stevia First stock sales on Forms 4 filed with the Commission.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

**Round Three:  2015 and 2016 Stevia First/Vitality Stock Sales**

108.    In connection with the 2011 merger of Dhillon's private company into the public shell company, Dhillon received 4,500,000 restricted shares of Stevia First/Vitality stock (hereinafter referred to as the "March 2012 Stevia First/Vitality Stock").  After Stevia First, directed by Dhillon, issued a 7-for-1 forward split of Stevia First/Vitality stock, Dhillon held 31,500,000 shares of the March 2012 Stevia First/Vitality Stock, all of which was restricted.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

109.    The scheme by the Veldhuis Control Group, Taylor and Dhillon to unload this March 2012 Stevia First/Vitality Stock through another round of illicit stock sales began in March 2012.

A782

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

110.     The first step in this facet of the scheme was to move Stevia First/Vitality stock into the hands of the Veldhuis Control Group, while concealing the common ownership and control of this large block of shares.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

111.     As with prior illegal sales of Stevia First/Vitality stock, several of the Defendants used multiple Sharp Group-supplied entities as nominee shareholders, each purporting to hold less than 5% of the company's shares, in order to conceal the fact that affiliates of the issuer were, in concert, controlling, and would be illegally selling, unregistered shares of Stevia First/Vitality stock.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

112.     To that end, in or about March 2012 (i) Sharp authorized, through a wire request he signed, a payment to Dhillon in the amount of $33,800, and (ii) Taylor also directed two payments totaling $9,450 to Dhillon.  These payments were all made to Dhillon's personal bank account.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

113.     Sharp's March 2012 $33,800 payment to Dhillon—which was funded by proceeds from the Veldhuis Control Group's sale of the 'Unrestricted' Stevia First/Vitality Merger Shares earlier that month—was for the purchase of 15,750,000 shares of Dhillon's March

46

A783

2012 Stevia First/Vitality Stock.  Meanwhile, Taylor's March 2012 payments (for a total of

$9,450) were for the purported purchase of another 4,227,500 shares of Dhillon's March 2012

Stevia First/Vitality Stock.  Taylor purchased 2,227,500 of these shares in the name of Heng

Hong Investments, a nominee entity he controlled.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about

the truth of the allegations in this paragraph, and therefore denies them.

114.    To conceal the common control and disposition of the roughly 20 million shares

of March 2012 Stevia First/Vitality Stock shares that Dhillon had transferred based on the

aforementioned Sharp- and Taylor-arranged payments, Dhillon disguised his transfers as a series

of smaller sales to (i) various Sharp Group-administered shareholders—all of which would hold,

and ultimately sell, the Stevia First/Vitality stock for the benefit of the Veldhuis Control Group

and Dhillon—and (ii) two nominee shareholders that were controlled by Taylor, which would

hold, and ultimately sell, the Stevia First/Vitality stock for Taylor's and Dhillon's benefit.  The

chart below illustrates Dhillon's sale of these shares, as well as Dhillon's division of the

remaining shares that were derived from the March 2012 Stevia First/Vitality Stock.  (In fact,

however, as detailed below, Dhillon did not fully relinquish his interest in the March 2012 Stevia

First/Vitality Stock.):

A784



ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

115.    The roughly 20 million shares of the March 2012 Stevia First/Vitality Stock that Dhillon transferred to nominee shareholders administered by the Sharp Group or Taylor comprised approximately 39 percent of the company's outstanding shares.  But, by spreading these shares among various nominee shareholders, each shown as holding under five percent of the company's outstanding shares, Dhillon obscured the facts that (i) he had not, in truth,

48

A785

relinquished his interests in all of these shares; and (ii) these shares were, in truth, held by the

Veldhuis Control Group, himself, and Taylor, all of whom were acting in concert.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

116.    The Veldhuis Control Group and Taylor did not immediately sell the shares held

by the nominee shareholders referenced in ¶114 and 115 above, at least partly because the stock

was initially marked as restricted by Stevia First's transfer agent since it was acquired directly

from Dhillon, an affiliate of the company.  SEC Rule 144 provides a safe harbor from registering

the sale of restricted stock acquired directly from an affiliate if, among other things, the

acquirer(s) hold those shares for at least six months.  In the meantime, the Veldhuis Control

Group sold the other Stevia First/Vitality stock that they had obtained, as described in ¶¶83 to 84

("Round 1") and ¶¶91 to 92 ("Round 2"), above.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

117.    Beginning in the fall of 2014, the Veldhuis Control Group arranged for the

unregistered sale of the March 2012 Stevia First/Vitality Stock in concert with Taylor and

Dhillon.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

118.    In an Encrypted Communication on or about October 24, 2014, Veldhuis, Sexton

and Friesen discussed their plans to sell the March 2012 Stevia First/Vitality Stock into the public

markets.  In particular, Sexton summarized the Veldhuis Control Group's plans to sell the

15,750,000 shares that Dhillon had transferred to the various Sharp Group-administered nominee

shareholders, which included 1,000,000 shares to be sold for Dhillon's benefit, and raised the possibility of coordinating those sales with sales of the shares Dhillon had transferred to Taylor's nominee shareholders, writing: "There was 31,500,000 in total. We have 15,750,000 minus the 1mm to Avtar [Dhillon].  GTaylor is **outside the 15.75**.  He would consider blending back if Av [Dhillon] agrees to the plan."  (Emphasis added).

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

119.    Taylor, as illustrated in ¶113 above, held approximately 4.2 million additional shares via two nominee shareholders, which is consistent with Sexton's referring to Taylor's position, in the above-quoted Encrypted Communication, as "outside the 15.75" million shares held by various Sharp Group-administered nominee shareholders.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

120.    On or about October 28, 2014, Sexton met with Dhillon in California, and summarized their meeting in an Encrypted Communication between Sexton and Veldhuis the following day in these words:

> a.  Dhillon "said that stv [Stevia First] is working 2 big food producers and they feel that one has a very good chance to come to table.  He would like to be more aggressive and get the price and volume up. . . . He's also sharing in part of grahams [Taylor's] retained [sic] position."
>
> b.  "Also, av [Dhillon] said that he would prefer if we took the shares in gt [Taylor's] names and sold them all together.  Lol."

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about

the truth of the allegations in this paragraph, and therefore denies them.

121.    On various dates thereafter, Taylor, directly or indirectly, transferred the March

2012 Stevia First/Vitality Stock held by his two nominee shareholders to Sharp Group-

administered nominee shareholders that were used by the Veldhuis Control Group.  Though

Taylor allowed the Veldhuis Control Group to trade these shares on his behalf, he retained a

beneficial ownership interest in the proceeds of those trades.  For its part, in or about December

2014, the Veldhuis Control Group arranged to sell March 2012 Stevia First/Vitality Stock through

Wintercap SA and Blacklight SA using Sharp Group-administered nominee shareholders.  The

chart below reflects the transfers to various Sharp Group-administered nominee shareholders:

. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the

allegations in this paragraph, and therefore denies them..

122.    On or about December 2, 2014, Veldhuis sent an Encrypted Communication to

Gasarch, copying Sharp, to determine if the nominee shareholders his team had been using to hold

March 2012 Stevia First/Vitality Stock were administered by the Sharp Group, or some other

offshore nominee shareholder provider.  Veldhuis wrote: "[w]e are in the process of receiving

approximately 20 million shares of [Vitality] that were held in ESCROW.  At the time of

ESCROW agreement we may have put some of the stock in NON BOND [i.e. non-Sharp]

[nominee] entities.  Can you please go through the list below and let me know which entities you

guys administer."  (Veldhuis's reference to "approximately 20 million" comports with the sum of

(i) the 15,750,000 shares of March 2012 Stevia First/Vitality Stock that Dhillon transferred to the

various Sharp Group-administered nominee shareholders in 2012, plus (ii) the approximately 4.2

51

A788

million shares of March 2012 Stevia First/Vitality Stock that Dhillon transferred to two nominee shareholders controlled by Taylor.)

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

123.    Sharp, copying Kelln, replied to Veldhuis's December 2, 2014 Encrypted Communication by writing: "This [message] shld have gone to celtic."  "Celtic" was Kelln's pseudonym.  Kelln promptly replied: "I confirm they [nominee shareholders] are all ours [i.e, Sharp Group-administered nominee shareholders]."

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

124.    Kelln subsequently arranged for the Veldhuis Control Group's stock, which now included the approximately 4.2 million shares initially held by Taylor's two nominee shareholders, to be deposited into accounts controlled by Wintercap SA and Blacklight SA.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

125.    Thereafter, during the course of 2015 and through the end of 2016, the Veldhuis Control Group directed the unregistered sales of their and Taylor's March 2012 Stevia First/Vitality Stock in coordination with another stock promotional campaign run by Kaitz.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

126.    In or about January 2015, via an Encrypted Communication, Veldhuis asked Kaitz who Kaitz would identify as the "third party" payer on the Stevia First/Vitality stock promotional alerts.  Kaitz replied, "Conmar Capital," which was the name of a Sharp Group-

52

A789

administered entity that the Veldhuis Control Group had paid to incorporate in 2012. Ultimately, the January 2015 promotions identified "Full Service Media" (Kaitz's own company), as well as an unidentified "third party," as each having supplied funds to pay for those stock promotions. Kaitz knew that the Veldhuis Control Group was paying for the stock promotions and concealed this by listing "Conmar Capital" as the party paying for his promotional campaign. Kaitz further knew, or recklessly disregarded, that the Veldhuis Control Group intended to sell stock surreptitiously and was paying for the promotional campaign in order to facilitate such sales.

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

127.    The members of the Veldhuis Control Group each knew or recklessly disregarded that stock promoters, like Kaitz, falsely identified third party payers in order to conceal the fact that control groups and other affiliates were sponsoring promotional campaigns in order to surreptitiously dump stock in the markets. Similarly, Dhillon and Taylor knew, or recklessly disregarded, that the Veldhuis Control Group would retain a stock promoter to tout Stevia First/Vitality stock and would conceal (i) their role in funding the stock promotional campaign, (ii) the fact that they were part of a group that controlled the issuer, and (iii) the fact that they intended to trade, and were trading, in the opposite direction to which the touts urged retail investors to trade.

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

128.    On or about March 13, 2015, Sexton and Veldhuis exchanged Encrypted Communications concerning Dhillon and continuing the Stevia First/Vitality stock promotion:

Sexton to Veldhuis: "Avtar said they got additional things going for stvf [the ticker symbol for Stevia First at the time].  To keep going with [a stock promoter] and they only have another 1mm to chew thru and it should clean up real nice.

Veldhuis to Sexton: "Nice."

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

129.    Veldhuis, on behalf of Dhillon, the Veldhuis Control Group, and Taylor, continued to orchestrate stock promotions concerning Stevia First/Vitality stock later in 2015.  To that end, Veldhuis sought to identify a nominee entity that could be cited as the paying party for the promotional campaign in order to conceal the fact that the Veldhuis Control Group actually paid for the stock promotional campaign.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

130.    For example, on or about March 31, 2015, Veldhuis sent an Encrypted Communication, subject line "promo," to Sharp asking if one of eight Sharp Group-administered nominees "can be used . . . as the payee [sic] for the promotion.  Or should we set up a new company?"  Sharp responded and instructed Veldhuis to use one of the preexisting nominee companies.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

131.    On or about the same day, Veldhuis forwarded Sharp's Encrypted Communication to Kelln and asked: "[c]an u please send me on[e] of the 8 companies including the address?"  Kelln, in turn, copied Gasarch on the Encrypted Communications chain and wrote:

54

A791

"Wire [Gasarch]: pls provide [Veldhuis] a current 2015 holding co with address." Later that day, Gasarch confirmed that she emailed the requested information to Veldhuis.

>ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

132.    On or about April 7, 2015, Veldhuis communicated with Kaitz by Encrypted Communications about issuing promotions concerning Stevia First/Vitality stock.

>ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

133.    On or about May 6, 2015, Veldhuis and Sexton discussed, via Encrypted Communications, arrangements for additional stock promotions to tout Stevia First/Vitality stock. Veldhuis wrote: "I been [sic] back and forth with [Kaitz] on it today.  He had trouble getting ads approved on new network.  He has spent 2k this week so far and trying to get other stuff approved today.  Was supposed to be done by Tuesday afternoon."

>ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

134.    On various dates in 2015 and 2016, including through at least December 2016, during the promotional campaign that Veldhuis coordinated through Kaitz, the Veldhuis Control Group and Taylor sold, via Sharp Group-administered nominee shareholders, in total, millions of shares of the March 2012 Stevia First/Vitality Stock.

>ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

135.    Dhillon received a cut of these proceeds, just as he had received distributions from the proceeds of the defendants' Stevia First/Vitality stock sales in at least 2012 and 2014.

A792

On or about October 28, 2015, for example—consistent with Dhillon's instruction that his cut of the proceeds be transferred to third parties on his behalf to obscure the fact that they were redounding to his benefit—the Veldhuis Control Group arranged for Wintercap SA to pay a third party approximately $25,000 toward an expense incurred by Dhillon's family.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

136.    Similarly, on or about June 21, 2016, Wintercap SA remitted $110,431.86 to a loan servicing company in Colorado.  This payment, sent from a Sharp Group-administered nominee entity, Morris Capital, was applied to pay a mortgage loan for Sexton's benefit on a property in California.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

137.    Taylor also participated in the Veldhuis Control Group's sales of Stevia First/Vitality stock in at least December 2016.  In conjunction with their promotional activities, the Veldhuis Control Group sold shares of Stevia First/Vitality through Sharp-administered nominees between December 1 and 22, 2016 for proceeds of more than $1.7 million.  Taylor received some of the proceeds of these sales.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

138.    Specifically, on or about December 22, 2016, Taylor created an invoice seeking payment of $10,000 for "consulting services for introduction of marketing" and for "Intro VBIO." VBIO was Stevia First/Vitality's ticker symbol at that time.  The invoice was directed to one of the Sharp-administered nominee entities that was selling Stevia First/Vitality shares.  The invoice

56

asked that payment be made to an individual in Singapore ("Taylor Nominee B") who served as a nominee owner for some of Taylor's Heng Hong accounts (*see* ¶113).

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

139.     The metadata for the invoice shows that about 1.5 hours after Taylor created the invoice, Gasarch modified it.  In her role as the coordinator of clients' wire requests, two minutes after she last modified the invoice, Gasarch sent Taylor's invoice to Wintercap SA using an email address for the Sharp Group-administered nominee named on the invoice.  Wintercap SA paid the invoice out of the proceeds that the Veldhuis Control Group earned by selling Vitality stock in December 2016.  Gasarch recorded the wire request in the Q accounting system and debited the amount of the wire from the Stevia First/Vitality account.

> ANSWER:  Denied.

140.     Taylor Nominee B received the $10,000 Wintercap SA wire on or about December 27, 2016.  Contemporaneously, Taylor Nominee B paid CAD $10,000 to a Canadian law firm.  The wire to the law firm stated, in the remittance information section, that the payment related to a company of which Taylor was the CEO, CFO and founder.  The processing date of this wire was January 4, 2017.  Using the obfuscation provided by the Sharp Group, Taylor thus orchestrated a payment recorded for the benefit of his company with his portion of fraudulent Stevia First/Vitality stock sales.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

**Round Four: 2016 – 2018 Illegal Vitality Stock Sales**

A794

141.    On or about July 10, 2016, Stevia First changed its name to Vitality and executed a 1-for-10 reverse split of its common stock.  The reverse split meant that shareholders were required to exchange 10 shares for one share, which had the effect of reducing the total number of outstanding shares of the company by a factor of 10.  This also had the effect of drastically reducing the holdings of retail investors whom Defendants had prompted to purchase shares in Stevia First through their previous promotional campaigns.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

142.    On various dates in 2016, the Veldhuis Control Group sent numerous wire payments to Vitality, or to third parties on behalf of Vitality, totaling approximately $4.4 million.  In exchange, Vitality—with Dhillon operating as the chairman of its board of directors—issued millions of shares (the "Vitality Stock") to nominee entities that the Sharp Group once again provided for use by the Veldhuis Control Group.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

143.    The Vitality Stock shares acquired by the Veldhuis Control Group from the financing described in ¶142, above, were initially issued with restricted legends.  In order to facilitate the liquidation of these shares, Kelln retained an attorney on behalf of each of the nominee shareholder entities to prepare opinion letters that falsely represented that the nominee shareholders were not affiliates of Vitality.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

144.    On various dates ranging between 2016 and 2018, the attorney retained by Kelln on behalf of the Veldhuis Control Group issued opinion letters to Vitality's transfer agent, representing that none of the Sharp Group-administered nominee shareholders were affiliates of Vitality.  Based on these false representations, Vitality's transfer agent removed the restricted legends from the Vitality Stock, thereby enabling the Veldhuis Control Group to sell the Vitality Stock to the public.  In actuality, the Vitality Stock was controlled by affiliates of the company and was legally restricted from resale.  Among other points of affiliation, the Veldhuis Control Group was acting in concert with Dhillon, who was the chairman of Vitality's board.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

145.    After Vitality's transfer agent removed the restricted legend for one of the nominee shareholders, Kelln advised Wintercap SA of an incoming deposit of 750,000 shares of Vitality in the name of a Sharp Group-administered nominee shareholder called Hilton Capital.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

146.    At that time, Kelln noticed from reviewing Q records that Wintercap SA was already holding Vitality shares (that had been previously deposited) in the name of Hilton Capital. The 750,000 additional shares would have brought the total shares held by that nominee to more than 5% of Vitality's issued shares.  As Kelln knew or recklessly disregarded, any shareholder who was the beneficial owner of more than 5% of Vitality's outstanding stock was legally required to publicly disclose its holdings.  Such disclosures would have frustrated Dhillon's and the Veldhuis Control Group's efforts to conceal their stock holdings and sales.

A796

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

147.    On or about February 28, 2017, Kelln instructed Wintercap SA to allocate all Vitality Stock sales Wintercap was making that day to the Hilton account, thereby reducing the number of Vitality shares that Hilton Capital was shown as holding.  This ruse prevented Hilton Capital from showing share ownership in excess of 5%.  Specifically, Kelln wrote: "allocate all VBIO [ticker symbol of Vitality] to the [Hilton Capital] account today.  We need to make room for pending 750k.  Again 5% rule is biting me in the ass."

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

148.    The 750,000 shares were subsequently deposited with Wintercap SA.  Thereafter, Veldhuis provided trading instructions to Wintercap SA to sell the Vitality Stock.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

149.    In or about December 2016, during the course of another Veldhuis Group-funded, Kaitz-managed stock promotion touting Vitality's stock, Wintercap SA's principal asked Veldhuis through an encrypted messaging application if the Vitality Control Group could "switch selling to another outlet to let us [Wintercap SA] breath[e]" and slow the pace of selling.  Veldhuis responded that he could slow the pace "on the next batch, but that's a week out.  In the meantime, sell 15k VBIO @ 2.11."  Wintercap SA's principal suggested, in response, "[m]aybe 2 days on, 1 day off . . . ."  In response, Veldhuis suggested that he could move the stock held at Wintercap SA to a competitor, Blacklight SA ("BL").  This exchange followed:

| Veldhuis to Wintercap | I will figure out how to move some elsewhere.  It pains me to give BL business. |
|---|---|
| Wintercap to Veldhuis | Ok.  I don't wish you to do that ;) |

A797

| Veldhuis to Wintercap | Lol |
|---|---|
| Wintercap to Veldhuis | We can stay on point |
| | |

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

150.    In connection with their efforts to sell Vitality Stock in 2016 and later, the Veldhuis Control Group again retained Kaitz to conduct a promotional campaign.  Between October 2016 and March 2017, Veldhuis directed Wintercap SA to wire $530,000, which was derived from financial accounts associated with four Sharp Group-administered nominee shareholders, to Kaitz's entity for the purpose of promoting Vitality.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

***

151.    Overall, the Sharp Group allocated Stevia First/Vitality stock sale proceeds as follows during the period of time subject to this Complaint:

| Defendant | Approximate Amount (Millions) |
|---|---|
| Sexton | $5.5 |
| Veldhuis | $3.1 |
| Friesen | $2.3 |
| Taylor | $4.3 (of which Taylor, in turn, promptly forwarded approximately $2.6 million to Dhillon, as noted in ¶89) |
| Kaitz | $1.4 |
| | |

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

61

A798

152.    Dhillon benefited by receiving millions of dollars from the proceeds of these illegal stock sales, including through payments made by the Veldhuis Control Group and Taylor to various third parties on Dhillon's behalf.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

**The Veldhuis Control Group's Omissions in Furtherance of the Scheme**

153.    Veldhuis, Sexton and Friesen acted as a group for purposes of acquiring, holding, and ultimately disposing of Vitality shares, and consequently became subject to regulation as a single person pursuant to Exchange Act Section 13(d)(3).  Veldhuis, Sexton and Friesen failed to file any report on behalf of the group as required under Rule 13d-1(k)(2), even though they collectively acquired, held, and were responsible for directing the disposition of, far more than 5% of Vitality's outstanding stock through nominee entities that were under their group's control.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

154.    In failing to make required Schedule 13D/G filings, Veldhuis, Sexton, and Friesen violated Section 13(d) and Rule 13d-1 thereunder.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

**Dhillon's Failures to Disclose in Furtherance of the Scheme**

155.    On August 17, 2016, Dhillon filed an untimely and inaccurately amended Schedule 13D (specifically, a Schedule 13D/A) with the Commission.  Dhillon reported that he was the beneficial owner of 1,530,585 shares (post stock split) consisting of:

a.   515,000 shares issued directly by Vitality in 2012.

A799

    b.  50,000 in stock options issued by Vitality in 2012.

    c.  40,000 shares of common stock issued by Vitality in 2015.

    d.  925,585 shares of common stock issued by Vitality in 2016.

    ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

156.    In actuality, as of August 17, 2016, Dhillon was also a beneficial owner of a significant number of shares of the stock held by the Veldhuis Control Group. Dhillon did not report, among other things, these shares in his Schedule 13D.

    ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

157.    Dhillon also failed to file any Forms 4 reflecting the sales of Vitality stock that had been sold on his behalf, directly or indirectly, by the Veldhuis Control Group. For example, on or about January 13, 2017, the Veldhuis Control Group caused Wintercap SA to sell 44,661 shares of Vitality, which sales generated proceeds of $105,551.21. On or about January 27, 2017, the Veldhuis Control Group caused Wintercap SA to transfer $100,000 to pay an expense incurred by Dhillon. Dhillon failed to file a Form 4 reflecting either of these January 2017 Vitality stock sales, or any other sales by the Veldhuis Control Group in 2017 or 2018 from which he benefitted.

    ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

**Dhillon's False and Misleading Testimony in Furtherance of the Scheme**

A800

158.     On or about August 29, 2019, during the investigation leading to the filing of this action, Dhillon provided sworn testimony to the Commission staff.  Seeking to conceal his illegal conduct, Dhillon falsely denied being the beneficiary of any undisclosed Stevia First/Vitality stock sales, and falsely denied knowing that the Veldhuis Control Group had sold Stevia First/Vitality stock.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

159.     For example, during the August 2019 testimony, the Commission asked Dhillon if he ever received the proceeds of any sales of Stevia First/Vitality stock.  Dhillon falsely replied, "I have not."  In actuality, the Veldhuis Control Group and Taylor had distributed Stevia First/Vitality stock trading proceeds to Dhillon, directly and indirectly, through cash payments and through payments to third parties on Dhillon's behalf.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

160.     Similarly, during the August 2019 testimony, the Commission asked Dhillon if he knew anyone who sold Stevia First/Vitality stock.  Dhillon falsely replied, "I'm not aware."  In actuality, Dhillon knew that the Veldhuis Control Group and Taylor had sold Stevia First/Vitality stock, and had shared the resulting proceeds with him.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

### SHARP GROUP EXAMPLE TWO: ILLEGAL ARCH STOCK SALES INVOLVING DHILLON, THE VELDHUIS CONTROL GROUP, AND TAYLOR

161.     Beginning in or about 2013, the Veldhuis Control Group schemed with Dhillon,

64

A801

Taylor and Kaitz to sell illegally the stock of Arch.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

162.    In 2013, Dhillon arranged for a private company he controlled to merge (as a reverse merger) into a publicly traded shell company controlled by the Veldhuis Control Group. Following the reverse merger, which closed in or about June 2013, the surviving public company was called Arch.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

163.    By April 2013, Dhillon had become an officer or director of Arch; and by June 2013, Dhillon had assumed the role of chairman of Arch's board of directors.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

164.    Prior to the 2013 Arch reverse merger, Arch had issued shares to various S-1 Shareholders (hereinafter referred to as the "Arch S-1 Shareholders") in 2012.  By early 2013, following a stock split, the Arch S-1 Shareholders collectively held 20 million shares of Arch stock (which traded under the ticker symbol "ARTH").

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

165.    Leading up to, and shortly after, the closing of the reverse merger, the Veldhuis Control Group directed the transfer of 16,920,000 Arch shares, held in the names of several Arch S-1 Shareholders, to eleven Sharp Group-administered nomine shareholders for the benefit of the Veldhuis Control Group.

A802

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

166.    Kelln arranged, on behalf of the Veldhuis Control Group, to transfer an additional 2,310,000 shares, held in the names of several additional Arch S-1 Shareholders, to an entity controlled by Wintercap SA called "Victory Capital" on behalf of the Veldhuis Control Group.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

167.    Combined, the Veldhuis Control Group held at least 19,230,000 purportedly unrestricted shares of Arch, representing over 48% of Arch's total issued and outstanding stock, which constituted close to 100% of Arch's unrestricted shares that were available for trading, at or around the time of the reverse merger.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

168.    Shortly before the reverse merger closed, the Veldhuis Control Group controlled, through a Sharp Group-administered nominee, an additional 20,000,000 shares that were marked as restricted.  In anticipation of the reverse merger, the Veldhuis Control Group transferred these shares to Dhillon (10,000,000) and a company controlled by the CEO of Arch (10,000,000). Dhillon, in turn, transferred 2,750,000 shares to a domestic corporate entity ("Company A"), an entity that was controlled by Dhillon's associate, Person A.

169.    The chart below illustrates the transfers described in ¶¶165 through 168.

66

A803



ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

170.    The Veldhuis Control Group provided financing to Arch around the time of the reverse merger.  Specifically, the Veldhuis Control Group funneled approximately $1.75 million through an attorney's escrow account, which was remitted to Arch in the form of equity subscription agreements.  Dhillon, through his same Swiss-banking Ortivo account referenced in ¶89, also contributed $250,000 as part of this financing, but concealed this involvement from

67

A804

Arch's principals.

>ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

171.    Following the reverse merger, the Veldhuis Control Group engaged Kaitz to promote Arch and paid Kaitz approximately $1.2 million from June 2013 to August 2013 for this promotion.

>ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

172.    As Kaitz knew or recklessly disregarded, these payments were derived from money held by Sharp Group-administered nominee shareholders on behalf of the Veldhuis Control Group.  For example, on or about July 24, 2013, Kaitz sent the following Encrypted Communication to Veldhuis: "Are you able to capture anything on arth?"  Kaitz was asking Veldhuis, in substance, how much money, if any, the Veldhuis Control Group made from the sale of Arch stock during the course of the stock promotion.

>ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

173.    Some of the promotions managed by Kaitz falsely identified the promotions' funding source.  For example, the landing page for an Arch promotion cited "Advantage Media Corp" as the "paying party" of a $790,000 "total production budget."  As Kaitz knew or recklessly disregarded, Advantage Media was a front company used to disguise the identity of the parties actually paying for the promotion, i.e. the Veldhuis Control Group.

>ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

174.    On September 27, 2013, Kaitz asked Veldhuis in an Encrypted Communication what to do if other stock promoters hired by Kaitz to distribute touts about Arch refused to identify Advantage Media as the supposed paying party.  Kaitz wrote to Veldhuis: "Am trying to have them put Advantage media, if they won't then what?"  Later that day, Kaitz explained that the other stock promoters said that "[t]hey will go if they get the invoice signed and sent back to them via email from advantage."  Veldhuis responded and directed Kaitz to send the invoice to an email address created for the purpose of making it appear as if Advantage Media Corp. was an actual third party: "send to marketing@advantagemedia.co."

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

175.    Sharp substantially assisted the Veldhuis Control Group's use of Advantage Media Corp. to disguise the Veldhuis Control Group's Arch-related conduct.  For example, on or about January 21, 2014, Sharp asked Veldhuis in an Encrypted Communication whether he should continue to pay incorporation fees associated with Advantage Media Corp., and, if so, whether he (Sharp) should use Arch stock sale proceeds to make such payments: "Do we pay the 2014 annual fees for advantage media corp (belize)?  Debit arth?"  Veldhuis responded: "Kill it." By that time, Advantage Media Corp. had served its purpose: the Veldhuis Control Group used it as a front company to fund a stock promotional campaign touting Arch stock.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

176.    The chart below illustrates the success of the Veldhuis Control Group's paid promotion of Arch between June and September 2013:

A806



ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

177.    During the period of the promotional campaign, the Veldhuis Control Group surreptitiously sold millions of Arch shares into the market through nominee shareholders administered by the Sharp Group.  Specifically, between June 11, 2013 and September 30, 2013, the Veldhuis Control Group sold approximately 16.6 million shares of Arch stock through Sharp Group-administered nominee shareholders, generating proceeds of at least $11.5 million.  The Veldhuis Control Group sold another approximately 1.4 million shares generating proceeds of approximately $574,000 through a nominee shareholder administered by Wintercap SA.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

178.    Throughout the period of these unregistered sales, the Veldhuis Control group was an affiliate of Arch, by virtue of its control over a significant percentage of Arch's stock

70

and/or because it was acting in concert with Dhillon, the chairman of the company.  Sharp, Kelln,

Veldhuis, Friesen, and Sexton failed to register their sales of Arch stock described herein pursuant

to Section 5 of the Securities Act.  In selling these shares, the Veldhuis Control Group, through

Sharp Group-administered nominee shareholders, surreptitiously sold unregistered shares of

stock, and schemed to defraud investors by concealing the fact that public company affiliates

were dumping stock into the markets.

>ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>the truth of the allegations in this paragraph, and therefore denies them.

179.    The Veldhuis Control Group coordinated with Dhillon on the stock promotions.

For example, Sexton had one or more discussions with Dhillon where he discussed sharing the

promotional materials with Dhillon before they were published, and Sexton reported to Dhillon

the budget for promotions.  In addition, shortly before the merger closed, Friesen asked Sexton

and Veldhuis whether Dhillon would "have a set of news releases to begin issuing next week?", to

which Sexton responded, "I asked for that yesterday.  He said he would deliver."  Dhillon played

this role in order to benefit from the Veldhuis Control Group's sale of stock, since, as the

Veldhuis Control Group and Dhillon knew, promotional campaigns tend to be more effective

when they coincide with news releases by the issuer whose stock is being promoted.

>ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>the truth of the allegations in this paragraph, and therefore denies them.

180.    Dhillon directly participated in the Veldhuis Control Group's sales of Arch, while

failing to register those sales pursuant to Section 5 of the Securities Act.  For example, on or

about August 13, 2013 in an Encrypted Communication, Sexton relayed a conversation he had

with Dhillon to Veldhuis: Sexton reported that he told Dhillon that the Veldhuis Control Group

A808

"would be active in the market" until the first week of September and that they "wouldn't sell below $0.40 [per share]." Sexton also relayed to Dhillon that the Veldhuis Control Group would first distribute the proceeds of such sales as a repayment for the private placements they had made (including Dhillon's anonymous $250,000 investment) into Arch, but that a broader distribution would take place in September. Sexton noted Dhillon was "disappointed it wasn't bigger success as we all are but I explained sometimes things out of control and we were squeezing this out in short timeframe so it may have hurt us a bit in that we weren't able to stop once we started." Sexton continued, "I said we worked well together and everyone did what they said they would and that we would continue to look at his projects in future."

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

181.    On or about September 6, 2013, Veldhuis instructed Gasarch to wire $250,000 from the Arch proceeds to the same Dhillon owned Swiss-banking Ortivo account referenced in ¶¶89 and 170, thereby reimbursing Dhillon for his undocumented private placement investment. Consistent with Sexton's description above, the Veldhuis Control Group caused a further distribution to be made from the Group's illicit Arch stock sale proceeds for Dhillon's benefit in September 2013.

ANSWER: Ms. Gasarch admits the document speaks for itself.

182.    In particular, on or about September 26, 2013, Wintercap SA wired $200,000 to a Canadian company controlled by Dhillon's tax accountant, who, in turn, wired the very same amount, on or about the same day, to a U.S.-based corporate account that Dhillon controlled. This money was derived from the sale of Arch stock.

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about

A809

the truth of the allegations in this paragraph, and therefore denies them.

183.     Taylor also schemed with the Veldhuis Control Group on the Arch deal and
received at least $600,000 of the proceeds generated by its Arch sales, while also failing to
register those sales pursuant to Section 5 of the Securities Act.  On or about August 20, 2013,
Sexton wrote to Veldhuis and instructed him to "send 600k from ARTH" to the same Taylor-
controlled Swiss bank account as that referenced in ¶89.  Two days later, at Veldhuis's direction,
Gasarch wired the funds, to that same destination, from a Cayman Islands brokerage account.
This $600,000 distribution derived from the illegal sales of Arch stock.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
> the truth of the allegations in this paragraph, and therefore denies them.

184.     The Veldhuis Control Group and Taylor continued to engage in fraudulent sales
of Arch stock into 2017.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
> the truth of the allegations in this paragraph, and therefore denies them.

185.     For example, Taylor, through Heng Hong, received Arch shares in 2014, 2015
and 2016.  The shares and warrant rights that Heng Hong purchased from Arch in 2014 were
funded by the Veldhuis Control Group.  In August 2013, the Veldhuis Control Group directed the
Sharp Group to send $600,000 derived from its previous fraudulent trading in Arch securities to
Heng Hong.  Heng Hong used these funds to pay for the Arch shares and warrants it acquired
from the issuer in the January 2014 round of financing.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
> the truth of the allegations in this paragraph, and therefore denies them.

186.     Taylor arranged for many of these Arch shares to be deposited into Heng Hong

A810

accounts managed by Blacklight SA, and he sold those shares over time, including between December 24, 2015 and June 6, 2016, generating proceeds of approximately $616,000. Taylor shared a portion of these proceeds with Dhillon, by arranging for two payments of approximately $100,000 each to a creditor of Dhillon's (Dhillon Creditor A) in February and March 2016. Blacklight SA sent another approximately $159,000 of these proceeds to Taylor Nominee B (*see* ¶138). Those transfers occurred in May through October 2016. Taylor Nominee B, in turn, paid at least some of those proceeds to Taylor, including: $5,000 wired on or about November 2, 2016 to an account controlled by Taylor, and CAD $65,000 wired on or about December 8, 2016 to a Canadian law firm trust account stating that it was "in favour of Graham Taylor".

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

187.    In addition, Arch issued a total of 4,458,608 new shares to Taylor's Heng Hong entity on or about June 28, July 5, August 8, September 27, and November 8, 2016. Within several weeks of each new issuance to Heng Hong, Heng Hong transferred those shares to Trius Holdings Ltd., a Sharp Group-administered nominee that was being used by the Veldhuis Control Group. The share issuance to Taylor's Heng Hong entity on or about November 8, 2016 was funded by the Veldhuis Control Group. In particular, the $220,000 owed to Arch for the shares issued to Heng Hong on that date was charged to the Arch account in the Q accounting system, was funded out of the Veldhuis Control Group's fraudulent proceeds from sales of Vitality stock, and was sent by wire to Arch from an account managed by Wintercap SA.

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

188.    The Veldhuis Control Group, through Trius Holdings, deposited the Arch shares

A811

it received from Heng Hong into an account controlled by Blacklight SA and sold those shares to

unsuspecting investors in the market between about June 9, 2016 and May 17, 2017, for total

proceeds of at least $2.5 million.  These sales were recorded in the Sharp Group's Q accounting

system into the Arch account, from which distributions were directed by the Veldhuis Control

Group including payments for the benefit of Dhillon.  By furnishing his Heng Hong entity to

facilitate the Veldhuis Control Group's concealment of their ownership and sales of these shares,

Taylor knew, or recklessly disregarded that he was substantially assisting the scheme to defraud

the market about the control of Arch shares then being sold.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

189.    The Sharp Group allocated Arch stock sale proceeds to the Veldhuis Control

Group as follows during the period of time subject to this Complaint:

| Veldhuis Control Group Member | Approximate Amount (Millions) |
|---|---|
| Sexton | $1.7 |
| Veldhuis | $1.5 |
| Friesen | $1.5 |
|  |  |
|  |  |

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

***

190.    The table below reflects payments directed by the Veldhuis Control Group to

Dhillon and Taylor or entities with whom they were associated, sourced from the sale of Stevia

First/Vitality and Arch stock through Sharp Group-administered nominee shareholders from 2012

A812

to 2018:[8]

| Year | Dhillon | Taylor | Total |
|------|---------|--------|-------|
| 2012 | $      33,890 | $  4,225,531 | $  4,259,421 |
| 2013 | 259,770 | 600,200 | 859,970 |
| 2014 | 10,000 | 124,200 | 134,200 |
| 2015 | 25,030 | - | 25,030 |
| 2016 | 231,672 | 10,000 | 241,672 |
| 2017 | 2,157,330 | - | 2,157,330 |
| 2018 | 300,500 | - | 300,500 |
| Total | $   3,018,192 | $  4,959,931 | $  7,978,123 |

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

191.    Once Taylor became aware of the Commission's investigation into the schemes described in this complaint, he signed false documents that were intended to provide false explanations for his payments to Dhillon of the proceeds from the sales of Stevia First/Vitality and Arch securities.  Specifically, Taylor signed a fraudulent and backdated Option Agreement that purported to justify his payments to Dhillon as purchases of interests in a parcel of land owned by Dhillon.  In April 2021, Taylor then provided that false document to Canadian regulators who had requested documents from him on behalf of the Commission.  Taylor's provision of this false document was designed to obfuscate his role in the scheme and shows his consciousness of guilt.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

192.    As described in ¶182, Dhillon was also the beneficiary of another $200,000 in Arch stock sale proceeds in 2013, at the Veldhuis Control Group's direction, but these funds were

---

[8] The table does not include payments made in cash to Dhillon or Taylor's payments to Dhillon.

sourced from a Wintercap SA-administered, rather than a Sharp Group-administered, nominee shareholder.

    ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

<div align="center">***</div>

193.    During the period of April 2014 through March 2016, the table below reflects various distributions of money, some of which were derived from Stevia First/Vitality and Arch stock sale proceeds, directed by Taylor to third parties for the benefit of Dhillon or otherwise associated with Dhillon:

| DATE | PAID TO | AMOUNT |
|---|---|---|
| 3/1/2012 | AVTAR DHILLON | $ 4,450 |
| 3/2/2012 | AVTAR DHILLON | 5,000 |
| 4/17/2012 | SUTTER BUTTES LLC* | 498,000 |
| 5/4/2012 | ORTIVO (Defined at ¶ 82) | 400,000 |
| 5/11/2012 | ORTIVO | 496,000 |
| 7/16/2012 | ORTIVO | 1,300,000 |
| 11/20/2013 | DHILLON RELATIVE A | 90,000 |
| 11/26/2013 | DHILLON RELATIVE B | 40,000 |
| 11/26/2013 | DHILLON CONTRACTOR | 95,000 |
| 12/2/2013 | DHILLON CREDITOR A | 95,000 |
| 12/18/2013 | DHILLON CONTRACTOR | 65,000 |
| 1/15/2014 | DHILLON CREDITOR B | 65,000 |
| 1/21/2014 | DHILLON CREDITOR B | 35,000 |
| 4/25/2014 | DHILLON CREDITOR A | 94,980 |
| 6/19/2014 | CHALMERS GROUP LLC* | 60,000 |
| 6/24/2014 | CHALMERS GROUP LLC* | 210,000 |
| 7/7/2014 | CHALMERS GROUP LLC* | 120,000 |
| 7/24/2014 | DHILLON CREDITOR A | 294,475 |
| 9/17/2014 | DHILLON CREDITOR A | 247,000 |
| 9/17/2014 | DHILLON CREDITOR A | 96,500 |
| 2/26/2016 | DHILLON CREDITOR A | 99,965 |
| 3/28/2016 | DHILLON CREDITOR A | 99,965 |

| TOTAL | | $ 4,511,335 |
|---|---|---|

<div align="center">A814</div>

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

\*\*\*

194.     On or about July 30, 2020, Dhillon appeared for further testimony before the Commission in connection with the investigation leading to the filing of this action, and again made false and misleading statements, including claims that (i) prior to 2014, his interactions with Sexton had been limited to seeing him from a distance "in social circles … [like] hockey games", "at charity events with his own tables [and] at restaurants entertaining people" and that (ii) since 2014, his substantive interactions with Sexton have been limited to several discrete topics that he characterized as innocent in nature.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

\*\*\*

195.     In addition to their schemes to sell Arch and Vitality stock illegally that are described above, Taylor and Dhillon also schemed to sell the stock of at least two other Dhillon-chaired issuers:  Inovio and OncoSec.  Taylor's and Dhillon's Inovio scheme is described in the following paragraph; the pair's OncoSec scheme is described at ¶¶235 and 236.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

196.     At the time of Taylor's and Dhillon's Inovio scheme, Dhillon was the chairman of Inovio's Board of Directors.  Similarly to Taylor and Dhillon's other schemes, Dhillon facilitated the transfer of Inovio shares to a nominee company controlled by Taylor, who then directed the unregistered sale of those shares from at least approximately August 23, 2013 to September 13,

A815

2013.  Taylor's sales generated at least $2.5 million in proceeds.  On various dates during

approximately November 2013 through January 2014, Taylor paid hundreds of thousands of

dollars to Dhillon or for Dhillon's benefit.  Also, similarly to Taylor and Dhillon's other schemes,

Dhillon failed to register the Inovio shares or report his beneficial ownership interest in them or

sale of them on either Schedule 13D or Form 4.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

### DHILLON'S SCHEME TO SELL ARCH STOCK ILLEGALLY THROUGH PERSON A

197.    Dhillon illegally sold the stock of companies atop whose boards he sat through

different channels, apart from the Veldhuis Control Group and Taylor.  To that end, Dhillon

enlisted Person A to establish and manage a front company through which Dhillon  surreptitiously

sold such stock, without Dhillon appearing associated with those stock sales in any public record

or filing.  Dhillon's scheme to sell Arch stock illegally with Person A is described in detail below.

198.    Dhillon schemed to sell the stock of Arch fraudulently by, among other things,

concealing from securities intermediaries such as brokers that he was selling, through a nominee

shareholder, stock that was legally required to be registered, and concealing from Arch's

shareholders that he—Arch's highest-level insider—was selling Arch stock into the market.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

199.     In or about April 2013, Dhillon became a director of Arch, and, by June of that

year, became chairman of its board.  Dhillon was an affiliate of Arch in that he had the power to

control the company through his role as its chairman.  As a public company affiliate, Dhillon was

legally required to register any sale of Arch stock unless Dhillon elected to comply with the safe

A816

harbor provisions set forth in Commission Rule 144, which strictly limit the quantity of securities an affiliate may sell to the public. Dhillon testified, under oath, during the Commission's investigation that he understood these legal requirements at all times relevant to this Complaint.

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

200. As a director of Arch, Dhillon was required to file public reports—including a Form 4—with the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder disclosing any change in his beneficial ownership of Arch stock, regardless of amount. Dhillon understood these legal requirements at all times relevant to this Complaint. Dhillon failed to file any Forms 4 reflecting sales of Arch stock by the Veldhuis Control Group (described above) or Person A from which he benefitted.

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

201. Dhillon was legally required to file a Schedule 13D with the Commission pursuant to Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the extent he was the beneficial owner of greater than five percent of Arch's common stock. Dhillon understood these legal requirements at all times relevant to this Complaint. Dhillon failed to file an accurate Schedule 13D reflecting his beneficial ownership of Arch's stock.

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

202. Shortly after Dhillon became the chairman of Arch's board in April 2013, he arranged for at least one *alter ego* corporate shareholder to hold Arch stock on his behalf. Specifically, in or about June 2013, Dhillon arranged for the transfer of 2,750,000 Arch shares to

80

A817

Company A, a corporate nominee that Dhillon directed Person A to form.  In order to disguise Dhillon's association with Company A, Person A, as directed by Dhillon, identified only Person A as Company A's director in its incorporation papers.  Company A was, in actuality, holding Arch stock for Dhillon.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

203.    On or about April 6, 2016, Person A caused Company A to open an account with a United States brokerage firm for the purpose of selling Arch stock.  Person A represented to the United States brokerage firm that he (as the sole director of Company A), was not an "officer, director, or more than a 10% shareholder of [Arch] or in any other way an 'affiliate' of [Arch]."  Person A's representation was false and misleading in that Company A was actually holding, and was created in order to sell, Arch stock on behalf of Dhillon, who was a director and affiliate of Arch.  Dhillon knew, or recklessly disregarded, that Person A misled the United States brokerage firm as part of their scheme to sell Arch stock surreptitiously.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

204.    The table below reflects Company A's sales of Arch stock, all of which occurred during a four-month period in 2016.  Dhillon failed to register these sales pursuant to Section 5 of the Securities Act:

| Month | Arch Shares Sold | Arch Sale Proceeds |
|-------|-----------------|--------------------|
| Apr-16 | 210,000 | $    79,711 |
| May-16 | 460,000 | 181,925 |
| Jun-16 | 1,035,000 | 444,567 |
| Jul-16 | 1,045,000 | 631,133 |
| **Total** | **2,750,000** | **$    1,337,336** |

A818

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

205.    At or about the same time that Company A sold Arch stock, Person A caused Company A to transfer at least $850,000 of Arch stock sale proceeds to third parties identified by Dhillon, his assistant, or both, all to benefit Dhillon.  These transfers included paying various business and personal expenses Dhillon had incurred.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

206.    Examples of Arch proceeds-funded payments routed by Company A through Dhillon's assistant to a bank account controlled by Dhillon in the name of One World Ranches LLC, as directed by Dhillon, are below.



ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

207.    Dhillon did not disclose the stock that Company A held on Dhillon's behalf, or Dhillon's agreements with Person A concerning the holding and sale of those shares, on a Schedule 13D, as legally required.  Nor did Dhillon disclose any of Company A's Arch sales executed on Dhillon's behalf on any Form 4 filing with the Commission.

A819

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

208.    On or about July 8, 2013, Dhillon filed a Schedule 13D with the Commission purportedly reflecting all of the Arch shares in which he held a beneficial interest.  This is the only Schedule 13D Dhillon filed concerning Arch.  Dhillon reported that he was the beneficial owner of 7,160,373 of Arch shares, consisting of:

    a.  7,000,000 shares that he received in a private transaction in or about June 2013.

    b.  160,373 shares of common stock in exchange for the cancellation of debt Dhillon was owed by a private company that had merged with Arch.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

209.    Dhillon's July 8, 2013 Schedule 13D was materially misleading in that it failed to reflect that Dhillon was also a beneficial owner of Arch stock held on Dhillon's behalf by Company A and additional Arch stock held on Dhillon's behalf by the Veldhuis Control Group. The Schedule 13D was also materially misleading in that it failed to disclose Dhillon's agreements with Person A and with the Veldhuis Control Group concerning the sale of Arch shares, or his and their respective combined holdings in Arch securities.  Dhillon knowingly failed to make any of these disclosures in his Schedule 13D in order to conceal that information from investors and securities market intermediaries

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

A820

210.    Dhillon also knowingly failed to file any Forms 4 reflecting the sales of Arch stock that had been effected on his behalf, directly or indirectly, by Company A or the Veldhuis Control Group.  For example, on various dates in April through June 2016, Company A sold Arch shares in the market on Dhillon's behalf.  Dhillon intentionally failed to file a Form 4 reflecting any of these 2016 Arch stock sales in order to conceal his conduct form Arch investors.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

211.    On or about August 29, 2019, during the investigation leading to the filing of this action, Dhillon provided sworn testimony to the Commission staff.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

212.    During that August 2019 testimony, the Commission asked Dhillon if he knew of anyone who sold Arch stock prior to 2019.  Dhillon, seeking to conceal his illegal conduct from the Commission, falsely replied, under oath: "I'm not aware."  In actuality, and as Dhillon well knew, Person A caused Company A to sell Arch shares on Dhillon's behalf.  As described above, and as Dhillon likewise well knew, the Veldhuis Control Group also sold Arch shares on Dhillon's behalf.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

### SHARP GROUP EXAMPLE THREE:
### ILLEGAL ONCOSEC STOCK SALES INVOLVING DHILLON AND THE VELDHUIS CONTROL GROUP

**The Veldhuis Control Group's Scheme to Sell OncoSec Stock Fraudulently**

84

A821

213.    Prior to the Stevia First/Vitality and Arch fraudulent conduct described above, the Veldhuis Control Group schemed with the Sharp Group and Dhillon to sell fraudulently the stock of another issuer, OncoSec.  Further, Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon failed to register the sales of OncoSec stock described herein pursuant to Section 5 of the Securities Act.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

214.    In or about February 2011, the Veldhuis Control Group directed the transfer to seven Sharp Group-administered nominee shareholders of 12,800,000 purportedly unrestricted OncoSec shares sourced from 20 original individual investors.  At the time, OncoSec had 52,656,000 shares outstanding.  The Veldhuis Control Group, therefore, held over 24% of the total common stock outstanding across the Sharp Group-provided nominee shareholders to which the Veldhuis Control Group directed OncoSec shares, and was an affiliate of the issuer.  The Veldhuis Control Group knew that its 24% stake in OncoSec was legally restricted from resale absent an effective registration statement.  The table below reflects the transfers summarized in this paragraph.[9]

---

[9] Monterra Investments, Cliffside Partners, and Dartmore International are nominee shareholders utilized by the Veldhuis Control Group.

A822



ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

215.    Between approximately March 2011 and November 2011, the Veldhuis Control Group sold, via various Sharp Group-administered nominee shareholders, approximately 2.2 million shares of OncoSec stock through offshore brokerage firms for proceeds of approximately $3 million.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

216.    Later, the Veldhuis Control Group sold through the Sharp Group approximately 11 million more OncoSec shares between approximately February 2012 and August 2012 for approximately $2.4 million more in illicit proceeds.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

**Dhillon's Scheme to Sell OncoSec Fraudulently through Person A**

86

217.    Around the same time that the Veldhuis Control Group sold OncoSec securities, Dhillon schemed to sell the stock of OncoSec fraudulently through Person A.  Dhillon concealed from securities intermediaries, such as brokers, that he was selling, through a nominee shareholder, stock that was legally required to be restricted, and concealed from OncoSec's investors that he was selling OncoSec stock into the market.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

218.    On or about March 10, 2011, Dhillon became the chairman of OncoSec's board of directors.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

219.    Dhillon was an affiliate of OncoSec because he was the chairman of its board. Through that role, he had the power to control the company.  As a public company affiliate, Dhillon was legally required to register any sale of OncoSec stock unless Dhillon elected to comply with the safe harbor provisions set forth in Commission Rule 144.  Dhillon testified, under oath, during the Commission's investigation that he understood these legal requirements at all times relevant to this Complaint.

> ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

220.    As a director of OncoSec, Dhillon was required to file public reports—including a Form 4—with the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder disclosing any change in his beneficial ownership of OncoSec stock, regardless of amount.  Dhillon understood these legal requirements at all times relevant to this Complaint.

A824

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

221.    Dhillon was legally required to file a Schedule 13D with the Commission pursuant to Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the extent he was the beneficial owner of greater than five percent of OncoSec's common stock.  On or about March 22, 2011, Dhillon received 9,910,496 restricted shares of OncoSec, which comprised greater than 5% of the company's outstanding stock.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

222.    Dhillon understood these legal requirements at all times relevant to this Complaint.  Dhillon intentionally failed to file an accurate Schedule 13D reflecting his beneficial ownership of OncoSec's stock, his agreement with Person A concerning the sale of OncoSec stock, or his and Person A's combined holdings in OncoSec, despite being the beneficial owner of greater than five percent of the company's outstanding common stock.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

223.    Around the time that Dhillon became the chairman of OncoSec's board in March 2011, he arranged for Person A to hold OncoSec stock on his behalf through a nominee shareholder.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

224.    On or about March 2, 2011, Person A incorporated a corporate entity at Dhillon's direction, hereinafter referred to as Company B, to serve as Dhillon's nominee shareholder.

Shortly thereafter, Dhillon facilitated Company B's nominal acquisition of 2,354,880 OncoSec

shares. At Dhillon's direction, Person A identified himself as Company B's sole director, in order

to conceal Dhillon's association with Company B.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

225.    By December 2012, Person A opened a brokerage account in the name of

Company B.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

226.    On or about January 19, 2013, Person A represented to Company B's brokerage

firm that Company B was never an "Officer, Director, Control Person, 10% owner or Affiliate of

the issuer being presented for deposit [i.e., OncoSec]," which was a confirmation required by the

brokerage firm when the OncoSec shares were deposited for resale.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

227.    Person A's representations to the brokerage firm were false and misleading

because Company B was, in actuality, holding shares for Dhillon, who was a Director, Control

Person, and Affiliate of OncoSec. Dhillon knew, or was reckless in not knowing, that Person A

would make these types of material misrepresentations to brokerage firms. Indeed, Dhillon

directed Person A to establish Company B for precisely this purpose: to conceal the fact that

Dhillon was actually the beneficial owner of Company B's OncoSec stock.

> ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about
>
> the truth of the allegations in this paragraph, and therefore denies them.

228.    In or about January 2013, Person A caused Company B to deposit 2,354,880 shares of OncoSec into its brokerage account.  Person A, working in concert with Dhillon, subsequently caused Company B to sell these shares on Dhillon's behalf.

229.    The table below reflects Company B's sales of all 2,354,880 of its shares of OncoSec stock, between 2013 and 2017.  Dhillon failed to register these stock sales pursuant to Section 5 of the Securities Act.

| Month | OncoSec Shares Sold | OncoSec Sale Proceeds |
|-------|--------------------:|----------------------:|
| Feb-13 | 50,000 | $            9,979 |
| Mar-13 | 81,400 | 16,878 |
| Apr-13 | 193,600 | 43,728 |
| May-13 | 280,000 | 78,159 |
| Jul-13 | 50,000 | 14,127 |
| Aug-13 | 375,000 | 118,681 |
| Feb-14 | 50,000 | 37,800 |
| Mar-14 | 250,000 | 204,406 |
| Apr-14 | 60,000 | 43,820 |
| May-14 | 250,000 | 198,535 |
| Jun-14 | 80,000 | 69,434 |
| Feb-17 | 54,880 | 3,705 |
| Jul-17 | 370,000 | 21,185 |
| Sep-17 | 110,000 | 6,415 |
| Oct-17 | 100,000 | 5,650 |
| **Total** | **2,354,880** | **$            872,502** |

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about

t     he truth of the allegations in this paragraph, and therefore denies them.

230.    Person A, acting through Company B, distributed the majority of the OncoSec sale proceeds at Dhillon's direction to third parties identified by Dhillon.  Dhillon directed the transfers to third parties, instead of directly to his own bank accounts, to conceal that he was the actual beneficiary of the stock sales.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

A827

231.    The flow chart below reflects examples of Company B's OncoSec proceeds-funded transfers to Dhillon's assistant for the benefit of Dhillon, as directed by Dhillon:



ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

232.    To conceal his conduct from investors, Dhillon never filed a Schedule 13D with the SEC disclosing his agreement with Person A concerning the sale of OncoSec stock through Company B, or his and Person A's combined holdings in OncoSec stock, or any of the many material changes to those combined holdings.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

233.    Dhillon knew that OncoSec's public filings concealed from OncoSec's shareholders and securities market intermediaries the true extent of Dhillon's beneficial ownership position.  For example, OncoSec's Form 10-K for the year ended July 31, 2011 only reported Dhillon's ownership of 9,910,496 shares, and failed to disclose Dhillon's further beneficial ownership of, at a minimum, the Company B shares.  As a further example, OncoSec's Form 10-K for the year ended July 31, 2017 failed to disclose the existence or extent of Dhillon's Form 4 filing delinquencies stemming from his failure to file any Forms 4 concerning his OncoSec share sales that year through Company B.

91

A828

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

234.    Indeed, to conceal his conduct from investors, Dhillon never filed any Forms 4 reporting Company B's sales of OncoSec stock on his behalf, as legally required.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

## DHILLON'S SCHEME TO SELL ONCOSEC STOCK ILLEGALLY VIA TAYLOR

235.    During the course of his scheme with Person A to sell illegally OncoSec stock, described above, Dhillon also schemed with Taylor to sell illegally even more OncoSec stock.  At the time of this Dhillon-Taylor OncoSec scheme, Dhillon was the chairman of OncoSec's Board of Directors.  As part of this scheme, between at least April 2 and June 19, 2014, Taylor sold at least 827,000 shares of OncoSec stock, through a Singapore-banking nominee shareholder that he controlled, for proceeds totaling approximately $586,000.  Taylor failed to register these stock sales pursuant to Section 5 of the Securities Act.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

236.    During that same period, and from the same account in which he had realized the aforementioned approximately $586,000 in sale proceeds, Taylor, in turn, sent out two wires totaling $155,000 for Dhillon's benefit.  For examples, Taylor wired approximately $95,000 to pay a creditor Dhillon owed, and $60,000 to a private company Dhillon owned.  And, as with his other, similar schemes, Dhillon never disclosed—through any Form 4 or any other filing—his OncoSec trading through Taylor.

A829

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

***

### ADDITIONAL SHARP GROUP AND VELDHUIS CONTROL GROUP DEALS

237.　The Veldhuis Control Group utilized the Sharp Group's services to disguise their stock sales in deals beyond the Vitality, Arch, and OncoSec conduct detailed above.  In each such case, the Sharp Group provided the infrastructure necessary to obfuscate the Veldhuis Control Group's ownership of a significant percentage of the public companies' shares.  The table below reflects a non-exhaustive list of stock sold by the Veldhuis Control Group using Sharp Group-administered nominee shareholders to disguise their control.

| Issuer | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Vitality / Stevia First | $ - | $ 24,718,428 | $ - | $ 566,715 | $ 770,492 | $ 5,503,691 | $ 10,570,537 | $ 3,509,479 | $ 45,639,343 |
| Echo Automotive, Inc. | - | 48,115 | 23,582,539 | 30,221 | - | - | - | - | 23,660,874 |
| Arch | - | 189 | 11,755,408 | 257,689 | 1,220,451 | 2,738,550 | 84,091 | - | 16,056,376 |
| Stevia Corp | 6,905,120 | 2,172,356 | 971,330 | 3,175,474 | - | - | - | - | 13,224,281 |
| Liberty One Lithium Corp | - | - | - | - | - | (54,767) | 8,576,091 | 222,194 | 8,743,519 |
| Oryon Technologies, Inc. | - | 7,668,439 | 898,616 | - | - | - | - | - | 8,567,054 |
| Makism 3D Corp | - | - | 6,070,042 | 2,423,056 | - | - | - | - | 8,493,098 |
| Graphite Corp | - | 4,457,264 | 1,796,167 | (1,590) | - | - | - | - | 6,251,841 |
| OncoSec | 2,925,270 | 2,356,056 | - | - | - | - | - | - | 5,281,325 |
| NewGen Biopharma Corp | - | - | - | - | - | 7,627 | 3,859,972 | - | 3,867,599 |
| StartMonday Technology Corp | - | - | - | - | - | 296,664 | 2,133,104 | 6,339 | 2,436,107 |
| Lexington Biosciences Holdings Corp | - | - | - | - | - | - | 422,552 | 947,039 | 1,369,592 |
| BreathTec Biomedical, Inc. | - | - | - | - | - | 421,745 | - | - | 421,745 |
| RightsCorp | - | - | 124,926 | 5,402 | - | - | - | - | 130,328 |
| **TOTAL** | $9,830,390 | $41,420,845 | $45,199,028 | $6,456,996 | $1,990,943 | $8,913,509 | $25,646,347 | $4,685,052 | $144,143,081 |

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

238.　The Veldhuis Control Group paid Kaitz to promote several of the issuers listed in the table in ¶237, including (in addition to Stevia First/Vitality and Arch, both detailed above) the stock of Echo Automotive, Liberty One Lithium Corp., Oryon Technologies, Inc., NewGen Biopharma Corp., StartMonday Technology Corp., and BreathTec Biomedical, Inc.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about

93

A830

the truth of the allegations in this paragraph, and therefore denies them.

239.     In each instance, Kaitz knowingly or recklessly substantially assisted the Veldhuis Control Group by materially omitting or materially misrepresenting the facts that the Veldhuis Control Group (i) actually paid for the stock promotional campaign, and (ii) was actively trading, and planned to trade, in the very opposite direction to which the promotions urged investors to trade.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

### SHARP GROUP EXAMPLE: LUIS CARRILLO

240.     As described in ¶43, above, the control group clients of the Sharp Group generated over one billion dollars in stock sales through the Sharp Group between approximately 2010 and 2019.  One such client is a repeat offender, Luis Carrillo.[10]  Carrillo generated, in concert with others, at least $75 million in illegal stock sale proceeds using the Sharp Group's encrypted communications and nominee shareholders as cover.  One such example is described below.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

241.     On August 4, 2021, the Commission filed a Complaint against Luis Carrillo in connection with his illegal sale of the stock of Garmatex Holdings, Ltd.  Carrillo, acting in concert with others, amassed approximately 88% of Garmatex's unrestricted shares that were available for trading, and they used the Sharp Group, Wintercap SA, Blacklight SA, and a

---

[10] *See SEC v. Carrillo et al.*, No. 13-cv-1735-GBD (S.D.N.Y. March 2013); *SEC v. Carrillo et al.*, No. 21-cv-11272 (D. Mass. Aug. 2021).

A831

separate broker to execute the scheme.

     ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

242.     In particular, Kelln, at Sharp's direction, deposited three blocks of Garmatex stock—each consisting of 1,750,000 Garmatex shares, or just under five percent of Garmatex's total outstanding stock—with Wintercap SA in the name of three Sharp Group nominee shareholders.  As Sharp and Kelln knew, or recklessly disregarded, brokerage firms typically inquire about whether a shareholder owns more than five percent of a public company's stock because holding more than five percent may trigger additional questions about whether the sales are part of a distribution that must be registered pursuant to Section 5 of the Securities Act.

     ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

243.     Sharp and Kelln arranged for these deposits in the names of separate Sharp Group nominee shareholders well knowing that Carrillo and his team were actually the beneficial owners of the shares. For example, on or about March 9, 2017, Kelln replied to an Encrypted Communication from Wintercap SA's principal about the status of selling Garmatex stock: "Changing the [transfer agent] first . . . [Carrillo is] up my butt to get grmx [the ticker of Garmatex] all in."

     ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

244.     The Sharp Group's provision of these nominee shareholders enabled Carrillo, acting in concert with others, to conceal from brokerage firms that they actually controlled greater than five percent of the company's outstanding shares.

A832

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about

the truth of the allegations in this paragraph, and therefore denies them.

245.    Overall, during approximately March and April 2017, Kelln coordinated with

Carrillo, acting in concert with others, to transfer a total of 12,233,337 shares of Garmatex

nominally held by six different Sharp Group-administered nominee shareholders to Wintercap

SA, Blacklight SA, and a third party.  Collectively, these positions accounted for approximately

88% of Garmatex's purportedly unrestricted shares that were available for trading, and

approximately 34% of Garmatex's total issued and outstanding stock.  Carrillo, therefore, was an

affiliate of Garmatex.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about

the truth of the allegations in this paragraph, and therefore denies them.

246.    The chart below summarizes the Garmatex share transfers described above:



ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

247.    Carrillo, acting in concert with others, coordinated the trading of Garmatex stock at Wintercap SA, Blacklight SA and a separate broker during a stock promotional campaign, generating proceeds as a result of these unregistered sales in excess of $7 million.

ANSWER:  Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

248.    In addition to Carrillo's conduct relating to Garmatex, he used the Sharp Group and its network of nominees to facilitate fraudulent trading in the stock of many other issuers he controlled.  He also used the Sharp Group to coordinate the payment of expenses associated with

A834

his fraudulent sales, and other payments to or for his benefit. Carrillo frequently corresponded with Gasarch about payments he was seeking the Sharp Group's assistance in effecting, and payments that had been charged to his account in the Q accounting system. Carrillo sometimes communicated with Gasarch using bespoke email addresses created and administered by the Sharp Group called the "xmeridian" or "xmail" system. Gasarch's address on this system was "wires@secure.xmeridian.com." Carrillo and Gasarch engaged in email correspondence about invoices he had asked her to pay, invoices that had been improperly charged to his Q account, incorrect amounts of invoices he had asked her to send, and related subjects, on at least the following dates: August 8, 9, and 12, 2016, September 28 and 29, 2016 and multiple dates in October 2016.

> ANSWER: Gasarch admits that the documents speak for themselves. "Wires" was an internal email address and these emails would be forwarded to Sharp who addressed them substantively.

## TOLLING AGREEMENTS

249.    Between January and June 2020, Dhillon entered into two separate tolling agreements with the Commission. Each tolling agreement specifies a period of time (a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against Dhillon authorized, instituted, or brought by … the Commission… arising out of the [Commission's investigation of Dhillon's conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended . . . ." Each tolling agreement further provides that Dhillon "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related

A835

defenses." Collectively, these agreements tolled the running of any limitations period or any other time-related defenses available to Dhillon for a period of approximately seven months and three days.

ANSWER: Ms. Gasarch lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, and therefore denies them.

## ANSWERS TO CLAIMS FOR RELIEF AGAINST MS. GASARCH

Ms. Gasarch answers the claims for relief (Claims 10, 12 and 14) against her below. Answers to claims against other defendants are not required. To the extent they are required, Ms. Gasarch asserts that she lacks knowledge or information sufficient to form a belief about the claims and therefore denies them.

## FIRST CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
**(Violations of Sections 17(a)(1) and (3) of the Securities Act by Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor)**

250.    Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

251.

252.    By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)] and will continue to violate those sections unless enjoined.

## SECOND CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor)**

253.    Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

99

A836

254.    By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

255.    By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

### THIRD CLAIM FOR RELIEF
### <u>UNREGISTERED OFFERINGS OF SECURITIES</u>
**(Violations of Sections 5(a) and 5(c) of the Securities Act by Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon)**

256.    Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

257.    By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

A837

258.    As a result, Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon violated

Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

### FOURTH CLAIM FOR RELIEF
### FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP
**(Violations of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder by Veldhuis, Sexton, and Friesen)**

259.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if

fully set forth herein.

260.    During the Relevant Period, the stock of Vitality was a security under Section

3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

261.    During the Relevant Period, Vitality had equity securities that were registered

pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

262.    By reason of the conduct described above, defendants Veldhuis, Sexton, and

Friesen, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a

class of Vitality equity securities, failed to file a statement with the Commission containing the

information required by Schedule 13D [17 C.F.R. §240.13d-101] within ten days after they

acquired such shares, or at all.

263.    As a result, defendants Veldhuis, Sexton, and Friesen violated Section 13(d) of

the Exchange Act and Rule 13d-1 thereunder [15 U.S.C. §78m(d); 17 C.F.R. §240.13d-1].

### FIFTH CLAIM FOR RELIEF
### FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP
**(Violation of Section 13(d) of the Exchange Act and Rule 13d-2 Thereunder by Dhillon)**

264.    Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if

fully set forth herein.

265.    During the Relevant Period, the stock of Vitality was a security under Section

3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

A838

266.    During the Relevant Period, Vitality had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

267.    By reason of the conduct described above, defendant Dhillon, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a class of Vitality equity securities and filing a Schedule 13D, acquired beneficial ownership of 1 percent or more of that class of equity securities and failed to file with the Commission a timely and accurate amendment disclosing this material change.

268.    As a result, defendant Dhillon violated Section 13(d) of the Exchange Act and Rule 13d-2 thereunder [15 U.S.C. §78m(d); 17 C.F.R. §240.13d-2].

<div align="center">

**SIXTH CLAIM FOR RELIEF**
**<u>FAILURE TO FILE</u>**
**(Violation of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder by Dhillon)**

</div>

269.    Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

270.    During the Relevant Period, the stock of Arch and OncoSec was each a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

271.    During the Relevant Period, Arch and OncoSec had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

272.    Defendant Dhillon violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)], and Rule 16a-3 thereunder [17 C.F.R. § 240.16(a)], in that as a director of Arch and OncoSec and having acquired more than 10% of a registered class of Arch's and OncoSec's equity securities, Dhillon failed to file reports of ownership and changes of ownership with the Commission as required.

**SEVENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Taylor)**

273.     Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

274.     By reason of the conduct described above, Dhillon, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the securities of Vitality, as to which no registration statement has been filed and for which no exemption from registration has been available.

275.     Taylor knowingly or recklessly provided substantial assistance to Dhillon in his violation of Sections 5(a) and 5(c) of the Securities Act.

276.     As a result, Taylor violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

**EIGHTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Sharp and Kelln)**

277.     Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

278.     By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly, in the offer or sale of securities, by the use of

A840

the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

279.     By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the securities of Vitality, Arch, OncoSec, and Garmatex, as to which no registration statement has been filed and for which no exemption from registration has been available.

280.     Sharp and Kelln knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Sections 5(a), 5(c), and 17(a)(1) and (3) of the Securities Act.

281.     As a result, Sharp and Kelln each violated Section 15(b) of the Securities Act [15 U.S.C. §§ 77o(b)].

A841

**NINTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Sharp and Kelln)**

282.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

283.    By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

284.    Sharp and Kelln knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

285.    As a result, Sharp and Kelln each violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

**TENTH CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a)(3) of the Securities Act by Gasarch)**

286.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

287.    Denied.

288.    Denied.

A842

**ELEVENTH CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a)(3) of the Securities Act by Kaitz)**

289.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

290.    By reason of the conduct described above, defendant Kaitz, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

291.    By reason of the conduct described above, defendant Kaitz violated Securities Act Section 17(a)(3) [15 U.S.C. §77q(a)(3)].

**TWELFTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Gasarch)**

292.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

293.    Denied.

294.    Denied.

295.    Denied.

**THIRTEENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Kaitz)**

296.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

106

A843

297.    By reason of the conduct described above, Veldhuis, Sexton, and Friesen, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

298.    Kaitz knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, and Friesen in their violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act.

299.    As a result, Kaitz violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

**FOURTEENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Gasarch)**

300.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

301.    Denied.

302.    Denied.

303.    Denied.

**FIFTEENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Kaitz)**

304.    Paragraphs 1 through 248 above are re-alleged and incorporated by reference as if fully set forth herein.

305.    By reason of the conduct described above Veldhuis, Sexton, and Friesen directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national

A844

securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

306.    Kaitz knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, and Friesen in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

307.    As a result, Kaitz violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

### AFFIRMATIVE DEFENSES

#### FIRST AFFIRMATIVE DEFENSE

The Amended Complaint fails to state a claim against Ms. Gasarch upon which relief can be granted.

#### SECOND AFFIRMATIVE DEFENSE

This Court lacks personal jurisdiction over Ms. Gasarch.

#### THIRD AFFIRMATIVE DEFENSE

The claims against Ms. Gasarch are barred by the relevant statute of limitations.

#### FOURTH AFFIRMATIVE DEFENSE

Ms. Gasarch at all times acted in good faith.

#### FIFTH AFFIRMATIVE DEFENSE

Ms. Gasarch was acting at the direction of her superiors and had no reason to believe there was any violations of United States securities laws (if there were, in fact, any).

#### SIXTH AFFIRMATIVE DEFENSE

The Commission is not entitled to injunctive relief because it has not shown the

A845

likelihood of future violations.

<div align="center">SEVENTH AFFIRMATIVE DEFENSE</div>

The Commission's disgorgement claim is barred to the extent that it is based on alleged gross as opposed to net proceeds and to the extent that the Commission will not be able to return any purported profits to investors who were allegedly harmed.

<div align="center">EIGHTH AFFIRMATIVE DEFENSE</div>

The Commission does not sufficiently allege that Ms. Gasarch's alleged violations of securities laws caused any loss to purported investors.

<div align="center">NINTH AFFIRMATIVE DEFENSE</div>

The Commission fails to allege fraud with particularity against Ms. Gasarch as required under Fed.R.Civ.P. 9(b).

<div align="center">RESERVATION OF DEFENSES</div>

Ms. Gasarch hereby reserves his right to amend his affirmative defenses or add additional defenses as facts are developed through discovery.

L.    Grant such other and further relief as this Court may deem just and proper.

<div align="center">**JURY DEMAND**</div>

Ms. Gasarch demands a jury in this matter for all claims so triable.

DATED: October 7, 2022

Respectfully submitted,

ZHIYING YVONNE GASARCH

BY HER COUNSEL

/s/ Karen A. Pickett
BBO No. 633801
Pickett Law Offices, P.C.
125 High St., 26th Floor
Boston, MA  02110
617.423.0485
kpickettlaw@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2022, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.  A copy will also be sent via first class mail and/or email to those parties who have not yet registered for notice via the Court's CM/ECF system.

/s/ Karen A. Pickett
Karen A. Pickett

110

A847

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

          v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY KELLN,
MIKE K. VELDHUIS, PAUL SEXTON,
JACKSON T. FRIESEN, WILLIAM T.
KAITZ, AVTAR S. DHILLON, and
GRAHAM R. TAYLOR,

                    Defendants.

Civil Action No. 21-CV-11276-WGY

DEMAND FOR JURY TRIAL

## ANSWER OF DEFENDANT JACKSON T. FRIESEN TO AMENDED COMPLAINT

Defendant Jackson T. Friesen hereby answers the Amended Complaint filed by Plaintiff

United States Securities and Exchange Commission ("Plaintiff" or the "SEC") and alleges his

Affirmative Defenses as follows:

### SUMMARY

**ALLEGATION NO. 1:**

This case concerns a sophisticated, multiyear, multi-national attack on the United States financial markets and retail United States investors by foreign and domestic actors. These actors schemed to sell fraudulently hundreds of millions of dollars in stocks in the United States markets.

**ANSWER:**

Defendant denies the allegations in Paragraph 1.

**ALLEGATION NO. 2:**

In exchange for lucrative fees, a group headed by defendant Sharp provided services to various groups of public company control persons to help those control persons dump United States-quoted stocks—typically penny stocks—on retail investors. These services included providing networks of offshore shell companies to conceal stock ownership, arranging stock

1

A848

transfers and money transmittals, and providing encrypted accounting and communications systems.

**ANSWER:**

Defendant denies the allegations in Paragraph 2.

**ALLEGATION NO. 3:**

Other defendants named in this Complaint were control persons who dumped their shares, a complicit public company chairman, and a promoter who touted the stocks to retail investors.

**ANSWER:**

Defendant denies the allegations in Paragraph 3.

**ALLEGATION NO. 4:**

The Defendants' fraudulent conduct deprived investors of the full and fair disclosure mandated by the federal securities laws.

**ANSWER:**

Defendant denies the allegations in Paragraph 4.

**Sharp's, Kelln's and Gasarch's Participation in the Fraudulent Scheme**

**ALLEGATION NO. 5:**

Beginning in or before 2010 and continuing through the present, Sharp, Gasarch, and Kelln (the "Sharp Group") were in the business of facilitating illegal stock sales in the public securities markets. The Sharp Group provided a variety of services to help corporate control persons conceal their identities when selling the stock of penny stock companies they controlled. By disguising their identities and their controlling positions, the Sharp Group's clients fraudulently concealed the fact that public company control persons were selling large blocks of stock to investors.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 5, and therefore denies the same.

**ALLEGATION NO. 6:**

The Sharp Group deliberately concealed the identities of its clients through the array of services it offered, including forming and providing offshore nominee companies that could hold shares for undisclosed control persons; providing and administering an encrypted communication

2

A849

network; purchasing, configuring and delivering devices that the Sharp Group referred to as "xPhones," which were designed to be used only for communications on the Sharp Group's encrypted communications network; and arranging for clients to deposit stock in offshore trading platforms, including Wintercap SA[1] and Blacklight SA,[2] both Swiss-based, to obfuscate the control persons' association with their public company stock. The Sharp Group also provided various additional services to its clients in furtherance of the fraudulent scheme such as: administering a proprietary accounting system that tracked clients' total stock holdings and sales across various nominee shareholders and trading platforms; paying out the proceeds of illegal stock sales at clients' direction to accounts around the world; arranging to route such payments by circuitous methods designed to conceal the source of funds; and fabricating documents, such as invoices, to conceal the nature and source of the payments.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 6, and therefore denies the same.

**Veldhuis', Sexton's, and Friesen's Participation in the Fraudulent Scheme**

**ALLEGATION NO. 7:**

Working together, Veldhuis, Sexton, and Friesen (hereinafter referred to as the "Veldhuis Control Group") were one group of control persons (hereinafter referred to as a "control group") that teamed with the Sharp Group to run lucrative, fraudulent schemes to sell stock surreptitiously in the public markets.

**ANSWER:**

Defendant denies the allegations in Paragraph 7.

---

[1] The Commission charged Wintercap SA and its principal, Roger Knox, on October 2, 2018, with violating the antifraud provisions of the Securities Act of 1933 ("Securities Act") and Securities Exchange Act of 1934 ("Exchange Act") as a result of engaging in a multiyear scheme that generated more than $165 million from the illegal sale of stock of at least 50 publicly traded companies.

[2] The Commission charged Blacklight SA and its principals, Anthony Killarney and Kenneth Ciapala, on January 2, 2020 with violating the Securities Act and Exchange Act antifraud provisions as a result of engaging in a multiyear scheme that generated more than $35 million from the illegal sale of stock of at least 45 publicly traded companies.

A850

**ALLEGATION NO. 8:**

At various times, the Veldhuis Control Group collaborated with defendants Dhillon, Taylor, and Kaitz. In particular, the Veldhuis Control Group sold illegally the stock of Stevia First Corp. ("Stevia First"), Stevia First's successor company Vitality Biopharma, Inc. ("Vitality"), Arch Therapeutics, Inc. ("Arch"), and OncoSec Medical Incorporated ("OncoSec") in concert with Dhillon. The Veldhuis Control Group and Dhillon also sold illegally the stock of Vitality and Arch in concert with Kaitz and Taylor.

**ANSWER:**

Defendant denies the allegations in Paragraph 8.

**Dhillon's Role in the Scheme**

**ALLEGATION NO. 9:**

Dhillon served as the chairman of the board of directors of Stevia First, Vitality, Arch, and OncoSec. Dhillon's status as a high-level corporate insider enabled him to obtain and/or direct the issuance of millions of shares of each company's stock to his undisclosed associates. Dhillon knew that, because he was a corporate insider, federal securities laws prohibited him from selling his stock into the securities markets without complying with various registration and disclosure rules designed to protect investors.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 9, and therefore denies the same.

**ALLEGATION NO. 10:**

At various times, <u>Dhillon</u> coordinated with the Veldhuis Control Group and Taylor to sell surreptitiously stock in the companies atop whose boards he sat. These sales were conducted through various nominee shareholders and involved sales of stock that Dhillon was legally prohibited from selling without registering the sales with the Commission. In certain instances, the nominee shareholders that effectuated the illegal sales of Dhillon's shares included entities administered by the Sharp Group.

**ANSWER:**

Defendant denies the allegations in Paragraph 10.

4

A851

**ALLEGATION NO. 11:**

Dhillon abused his senior corporate role—a position of trust and confidence—in order to conceal his own and others' fraudulent conduct from investors, securities market intermediaries, securities regulators, and law enforcement.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 11, and therefore denies the same.

**Kaitz's Role in the Scheme**

**ALLEGATION NO. 12:**

Kaitz owned and operated Full Service Media LLC, a company that promoted the stock of public companies to retail investors. Kaitz substantially assisted the Veldhuis Control Group by touting stocks that the Veldhuis Control Group sought to dump. Kaitz promoted as urgent and bullish investment opportunities the stock of various publicly traded companies that the Veldhuis Control Group simultaneously planned to sell surreptitiously—including Vitality and Arch stock. A key component of Kaitz's touting efforts was concealing the role of the Veldhuis Control Group, which paid Kaitz for his services. For example, Kaitz falsely claimed when touting the stock of public companies like Vitality that third parties (which appeared to be unaffiliated with the public companies) paid for his services. This concealment enabled the Veldhuis Control Group to anonymously sell its stock to the investors whom it simultaneously encouraged, through Kaitz's stock promotional efforts, to buy the stock and thus trade in the very opposite direction.

**ANSWER:**

Defendant denies the allegations in Paragraph 12.

**ALLEGATION NO. 13:**

During an SEC investigation into one of the promotional campaigns Kaitz had run for the Veldhuis Group, Kaitz appeared for testimony. During that testimony, Kaitz made false and misleading statements, including claims (i) that he had not received payment for the promotion in question from any entity other than that identified as the paying party in the promotion (despite having received such payments, arranged by Veldhuis, from other entities); and (ii) that he had no communications devices other than the two he identified to Commission staff (despite having had, and used in connection with the promotions in question, one of the Sharp Group-supplied "xPhones" that are described below).

A852

**ANSWER:**

Defendant denies the allegations in Paragraph 13.

<div align="center">

**Taylor's Role in the Scheme**

</div>

**ALLEGATION NO. 14:**

Taylor, among other things, arranged to merge a public company with one of Dhillon's private companies, ultimately resulting in the distribution and fraudulent sale of shares associated with the resulting public company, Stevia First. Taylor also controlled nominee shareholders who held and traded stock surreptitiously in concert with Dhillon and the Veldhuis Control Group. In exchange for these services, Taylor received a significant cut of the illegal stock sale proceeds.

**ANSWER:**

Defendant denies the allegations in Paragraph 14.

<div align="center">

**Dhillon's Additional Illegal Stock Sales through Person A's Companies**

</div>

**ALLEGATION NO. 15:**

At various times between 2011 and 2017, an individual identified herein as Person A operated at least two nominee companies that he created to hold and trade stock of two public companies atop whose boards Dhillon sat: Arch and OncoSec. Person A illegally sold shares in both Arch and OncoSec on Dhillon's behalf.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 15, and therefore denies the same.

<div align="center">

**Dhillon's False Statements During the Commission's Investigation**

</div>

**ALLEGATION NO. 16:**

In October 2018, the Commission charged Wintercap SA—one of the Veldhuis Control Group's primary conduits for the illegal sale of stock—with engaging in securities fraud, and Wintercap SA's illegal sale of Vitality stock was cited in the Commission's Complaint in that action. Early the following month, the Commission suspended trading in Vitality. During the Commission's investigation leading to the filing of the instant action, the Commission sought information from Dhillon about his involvement in the Vitality scheme, and Dhillon twice appeared for testimony (in August 2019 and July 2020). During that testimony, Dhillon made false statements that are illustrated below.

<div align="center">

6

</div>

<div align="center">

A853

</div>

**ANSWER:**

Defendant denies the allegations in Paragraph 16.

**The Defendants Violated Various Securities Laws**

**ALLEGATION NO. 17:**

As a result of the conduct alleged herein, Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder; Sharp, Kelln, Veldhuis, Sexton, Friesen, and Dhillon violated Sections 5(a) and 5(c) of the Securities Act; Veldhuis, Sexton, and Friesen violated Section 13(d) of the Exchange Act and Rule 13d-1 thereunder; Dhillon violated Sections 13(d) and 16(a) of the Exchange Act and Rules 13d-2 and 16a-3 thereunder; Taylor violated Section 15(b) of the Securities Act by aiding and abetting Dhillon's violations of Sections 5(a) and 5(c) of the Securities Act; Sharp and Kelln violated Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act by aiding and abetting others' violations of Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder; Gasarch violated Section 17(a)(3) of the Securities Act, and also violated Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act by aiding and abetting others' violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b5(a) and 10b-5(c) thereunder; and Kaitz violated Section 17(a)(3) of the Securities Act, and also violated Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act by aiding and abetting others' violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder.

**ANSWER:**

Defendant denies the allegations in Paragraph 17.

**ALLEGATION NO. 18:**

The Commission seeks a temporary restraining order prohibiting the Defendants from future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; prohibiting Veldhuis, Sexton, and Friesen from future violations of Section 13(d) and Rule 13d-1 thereunder; prohibiting Dhillon from violations of Section 13(d) of the Exchange Act and Rule 13d-2 thereunder; prohibiting Dhillon from future violations of Exchange Act Section 16(a) and Rule 16a-3 thereunder; prohibiting Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon and Taylor from violations of Securities Act Sections 5(a) and 5(c), and if entered, a preliminary injunction order for the same; and (ii) a repatriation order, and an order freezing the assets of the Defendants held for their direct or indirect benefit, and/or subject to their direct or indirect control.

7

A854

**ANSWER:**

Defendant avers that no response is necessary to the allegations in Paragraph 18.

**ALLEGATION NO. 19:**

The Commission seeks permanent injunctions against the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest pursuant to Section 21(d) of the Exchange Act; civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act; an order barring the Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act and/or Section 21(d) of the Exchange Act; conduct-based injunctions enjoining the Defendants from directly or indirectly, including, but not limited to, through an entity owned or controlled by any of them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent defendants from purchasing or selling securities listed on a national securities exchange for their own personal account; and such other relief as the Court may deem appropriate. Further, as to Dhillon, the Commission seeks an officer and director bar pursuant to Section 20(e) of the Securities Act and Section 21(d) of the Exchange Act.

**ANSWER:**

Defendant avers that no response is necessary to the allegations in Paragraph 19.

**JURISDICTION AND VENUE**

**ALLEGATION NO. 20:**

This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].

**ANSWER:**

The allegations in Paragraph 20 state legal conclusions to which no response is required.

**ALLEGATION NO. 21:**

Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa]. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts, and were affected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. For example, Dhillon sat atop the board of Arch, a Massachusetts-based issuer.

**ANSWER:**

The allegations in Paragraph 21 state legal conclusions to which no response is required.

### DEFENDANTS

**ALLEGATION NO. 22:**

**Frederick L. Sharp**, age 69 and born in Los Angeles, California, resides in West Vancouver, British Columbia, Canada.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 22, and therefore denies the same.

**ALLEGATION NO. 23:**

**Zhiying Yvonne Gasarch a/k/a Zhiying Chen**, age 49 and born in China, is a dual citizen of Canada and China, and resides in Richmond, British Columbia, Canada. On information and belief, at all times relevant to this Complaint, Gasarch spent most of her time in Canada.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 23, and therefore denies the same.

**ALLEGATION NO. 24:**

**Courtney Kelln**, age 41, resides in Surrey, British Columbia, Canada.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 24, and therefore denies the same.

**ALLEGATION NO. 25:**

**Mike K. Veldhuis**, age 41 and born in the Netherlands, resides in Vancouver, Canada.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 25, and therefore denies the same.

A856

**ALLEGATION NO. 26:**

    **Paul Sexton**, age 53 and born in the United Kingdom, resides in Anmore, British Columbia, Canada.

**ANSWER:**

    Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 26, and therefore denies the same.

**ALLEGATION NO. 27:**

    **Jackson T. Friesen**, age 33, lives in Delta, British Columbia, Canada.

**ANSWER:**

    Defendant admits the allegations in Paragraph 27.

**ALLEGATION NO. 28:**

    **William T. Kaitz**, age 40, lives in Arnold, Maryland.

**ANSWER:**

    Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 28, and therefore denies the same.

**ALLEGATION NO. 29:**

    **Graham R. Taylor**, age 51 and born in the United Kingdom, resides in Vancouver, British Columbia, Canada on information and belief. On information and belief, at all times relevant to this Complaint, Taylor spent most of his time in Canada.

**ANSWER:**

    Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 29, and therefore denies the same.

A857

**ALLEGATION NO. 30:**

**Avtar Singh Dhillon, MD**, age 60 and born in India, is a Canadian citizen residing in Long Beach, California. Dhillon is currently the chairman of the board of directors of Emerald Health Therapeutics, Inc., a Canadian company that publicly trades in the United States markets. Further:

    (a)    Between approximately April 2013 and July 2018, Dhillon was the chairman of the board of directors of Arch.

    (b)    Between approximately March 2009 and January 2019, Dhillon was the chairman of the board of directors of Inovio Pharmaceuticals, Inc. ("Inovio").

    (c)    Between approximately January 2012 and April 2019, Dhillon was the chairman of the board of directors of Vitality, including its predecessor, Stevia First Corp.

    (d)    Between approximately March 2011 and April 2020, Dhillon was the chairman of the board of directors of OncoSec.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 30, and therefore denies the same.

## RELATED PARTIES

**ALLEGATION NO. 31:**

**Vitality Biopharma, Inc.** ("**Vitality**"), formerly known as **Stevia First Corp.** ("**Stevia First**"), currently trades on the Over-the-Counter ("OTC") Markets Group, Inc. ("OTC Markets"), an interdealer quotation service that provides a platform to buy and sell securities. Vitality was incorporated in Nevada in 2007 and its principal place of business is in Los Angeles, California. Throughout its history, Vitality has undergone several changes to its business plan and now purports to be in the business of developing cannabinoid drugs for medical treatment. At all times relevant to this Complaint, Vitality's common stock was registered under Section 12(g) of the Exchange Act, and it files Exchange Act reports with the Commission pursuant to the reporting requirements of Section 13(a) of the Exchange Act.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 31, and therefore denies the same.

A858

**ALLEGATION NO. 32:**

Arch Therapeutics Inc. ("**Arch**") currently trades on OTC Markets. It was incorporated in Nevada in September 2009, and its principal place of business is in Massachusetts. The company has had different purported business objectives over the years; it currently purports to be focused on "developing a novel approach to stop bleeding ("hemostasis"), control leaking ("sealant") and manage wounds during surgery, trauma and interventional care." Arch's common stock is, and has been since June 2013, registered with the Commission pursuant to Section 12 of the Exchange Act.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 32, and therefore denies the same.

**ALLEGATION NO. 33:**

OncoSec Medical Incorporated ("**OncoSec**") currently trades on NASDAQ (to which it was uplisted, from the OTC Markets, in May 2015). It is a Nevada corporation headquartered in Pennington, New Jersey and San Diego, California. The company purports to be a biotechnology company focused on designing, developing and commercializing innovative therapies and proprietary medical approaches to stimulate and to guide an anti-tumor immune response for the treatment of cancer. OncoSec's common stock is, and has been since March 2011, registered with the Commission pursuant to Section 12 of the Exchange Act.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 33, and therefore denies the same.

**ALLEGATION NO. 34:**

Garmatex Holdings, Ltd. ("**Garmatex**"), now known as Evolution Blockchain Group, Inc., currently trades in the grey market. It was incorporated in Nevada in 2014 and is located in Las Vegas, Nevada. In 2018, the company announced a change in its business plan, purportedly to pivot from textiles to holding intellectual property related to blockchain technology, and changed its name to Evolution Blockchain. The Commission suspended trading in the securities of Evolution Blockchain on June 25, 2018. During the time period of the trading described in this Complaint, the company voluntarily filed periodic reports with the Commission.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 34, and therefore denies the same.

## BACKGROUND

### ALLEGATION NO. 35:

Before selling stock, control persons are required to: (a) register such sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. §240.144], including limitations on the amount of stock a control person can legally sell. In addition, investors in certain public companies are required publicly to disclose any ownership interest in excess of 5% of the company's publicly traded stock. Such registration requirements, sale restrictions, and disclosure obligations are safeguards designed to protect the market for purchases and sales of stock, and to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

### ANSWER:

The allegations in Paragraph 35 state legal conclusions to which no response is required.

### ALLEGATION NO. 36:

An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person). "Control" means the power to direct management and policies of the company in question. Affiliates include officers, directors and controlling shareholders, as well as any person who is under "common control" with or has common control of an issuer. As used herein, the term "control group" means a group that collectively is an "affiliate" of an issuer.

### ANSWER:

The allegations in Paragraph 36 state legal conclusions to which no response is required.

### ALLEGATION NO. 37:

"Restricted stock" includes stock of a publicly traded company (also known as an "issuer") that has been acquired from an issuer, or an affiliate of an issuer, in a private transaction that is not registered with the Commission. All stock held by an issuer or affiliate of an issuer is restricted stock. Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a registration statement has been filed with the Commission (for an offer) or is in effect (for a sale). A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management. It also identifies any person or group who is the beneficial owner of more than 5% of the company's securities.

13

A860

**ANSWER:**

The allegations in Paragraph 37 state legal conclusions to which no response is required.

**ALLEGATION NO. 38:**

"Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily after having previously been subject to a registration statement. Registration statements are transaction specific, and apply to each separate offer and sale as detailed in the registration statement. Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties. Thus, when a control person buys publicly traded or otherwise unrestricted shares in a company that s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate. Such legal restrictions include strict limits on the quantity of shares that may be sold in the public markets absent registration. Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

**ANSWER:**

The allegations in Paragraph 38 state legal conclusions to which no response is required.

**ALLEGATION NO. 39:**

A "transfer agent" is a business that facilitates certain types of securities transactions. Among other things, transfer agents issue and cancel certificates of a company's stock to reflect changes in ownership. Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock. Transfer agents routinely keep track of whether particular shares are restricted from resale.

**ANSWER:**

The allegations in Paragraph 39 state conclusions to which no response is required.

**ALLEGATION NO. 40:**

"Penny Stock," as used herein, generally refers to a security issued by a very small company that trades at less than $5 per share.

**ANSWER:**

The allegations in Paragraph 40 state legal conclusions to which no response is required.

A861

**ALLEGATION NO. 41:**

"S-1 Registration Statement(s)" refer(s) to SEC Form S-1, which is a registration statement filed publicly by an issuer in connection with the sale of stock to shareholders. "S-1 Shareholders," as used herein, means shareholders who acquired stock pursuant to an S-1 Registration Statement.

**ANSWER:**

The allegations in Paragraph 41 state legal conclusions to which no response is required.

### OVERVIEW OF THE SHARP GROUP'S CONDUCT

**Obfuscating Beneficial Ownership and Control**

**ALLEGATION NO. 42:**

From approximately 2010 through at least 2019, the Sharp Group facilitated illegal sales of stock in hundreds of penny stock companies.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 42, and therefore denies the same.

**ALLEGATION NO. 43:**

As reflected in the table below, the Sharp Group's stock sales generated over one billion dollars in gross proceeds:

[CHART OMITTED]

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 43, and therefore denies the same.

**ALLEGATION NO. 44:**

Sharp, who used the code name "Bond" (styling himself after the fictional character *James Bond*), was the mastermind and leader of the Sharp Group. Among other things, Sharp cultivated relationships with the Sharp Group's clients—that is, individuals seeking fraudulently to sell stock in the markets to retail investors—and with various offshore trading platforms. Sharp also routinely served as a liaison between dozens of clients (like the Veldhuis Control Group) and the trading platforms (like Wintercap SA).

**ANSWER:**

Defendant denies the allegations contained in Paragraph 44.

**ALLEGATION NO. 45:**

During the period of the scheme detailed herein, Sharp described in a communication to a client the following about the Sharp Group's services: "The service provided is comprehensive; it is not limited to trading. It includes pyaments [sic], loans, private placements **and keeping clients out of jail**." (Emphasis added).

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 45, and therefore denies the same.

**ALLEGATION NO. 46:**

Sharp oversaw the creation and deployment of various front companies, which served as nominee shareholders used to disguise his clients' stock ownership and to sell stock surreptitiously.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 46, and therefore denies the same.

**ALLEGATION NO. 47:**

One of the services provided by the Sharp Group was making available offshore corporate nominee shareholders and individuals who would serve as the nominal owners of those entities. Sharp installed these various nominal owners to pose as the beneficial owners of the various entities that served as nominee shareholders. In actuality, these individuals did not own or control the stock held by the nominee shareholders and generally had no role other than offering their names, passports, and signatures, which the Sharp Group used to incorporate and open accounts for the corporate nominees. In dealing with banks, brokerages, and other financial services providers, these individuals were held out as actual beneficial owners. In this way, the Sharp Group kept the identities of control groups hidden, while fraudulently appearing to satisfy the compliance requirements of the banking and securities firms where the Sharp Group opened these accounts.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 47, and therefore denies the same.

16

A863

**ALLEGATION NO. 48:**

In 2002, Sharp wrote a fictionalized book about securities fraud and money laundering in which he described illegal conduct that parallels the Sharp Group's business model. Sharp's book (*Footloose: Charlie Smith's Offshore Chronicles*) includes the following passage:

> Eventually [the client] took greater positions in the stocks, sharing the take with fewer partners. This meant he had to disguise his shareholdings in order to avoid securities disclosure requirements and trading restrictions.

> Offshore companies were ideal for his purpose. They came from around the world with nominee directors, but were still subject to his control. The perfect situation for his masterly stock manipulations.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 48, and therefore denies the same.

**ALLEGATION NO. 49:**

Sharp hired and directed various individuals to operate the administrative services offered by the Sharp Group. For example, Sharp oversaw the creation of a network of encrypted communications, including code-names for the users, encrypted electronic chat functions, and encrypted email functions.[3] The Sharp Group purchased, configured and delivered devices that the Sharp Group referred to as "xPhones," which were designed to be used only for the Encrypted Communications.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 49, and therefore denies the same.

---

[3] Encrypted communications sent and received through the Sharp Group-administered server are hereinafter referred to as "Encrypted Communication(s)."

A864

**ALLEGATION NO. 50:**

Sharp also hired and directed individuals who created and administered the Sharp Group's accounting system, which Sharp called "Q" (thereby expanding his James Bond affectations – "Q" being another fictional character in James Bond). Given the extensive efforts by the Sharp Group and its clients to conceal and obscure the actual ownership and control of the stock they were surreptitiously selling, the Q system was essential in keeping track of the amounts of stock to be sold and the total proceeds being collected for each deal Sharp's clients ran. Accordingly, the Sharp Group accounted for all of the nominee shareholders' assets in Q by tracking which of the nominee shareholders held which stocks (and which stocks' sales proceeds) for which particular client or client group, like the Veldhuis Control Group. The Sharp Group also relied on the Q system to calculate the commissions and fees it collected for facilitating its clients' illegal stock sales.

**ANSWER:**

Defendant denies the allegations contained in Paragraph 50.

**ALLEGATION NO. 51:**

Sharp arranged for the Encrypted Communication services and the Q accounting system to be hosted on a server that was physically located on the island of Curaçao, in the belief that, there, it would be unreachable by U.S. securities regulators and law enforcement officials.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 51, and therefore denies the same.

**ALLEGATION NO. 52:**

Kelln is one of the individuals who worked for Sharp. Kelln routinely performed a variety of complex administrative tasks associated with obtaining, allocating, and distributing blocks of shares across multiple nominee shareholders in a manner designed to conceal the Sharp Group's clients' common control of all the stock so distributed.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 52, and therefore denies the same.

18

A865

**ALLEGATION NO. 53:**

In particular, Kelln—at the direction of Sharp and others—routinely split Sharp Group clients' shareholdings into blocks of stock, each comprising less than five percent of each public company's outstanding shares, to be held in the names of various nominee entities. Kelln sent an Encrypted Communication on or about February 8, 2013 to a client describing her work:

> The process is: I group certs [stock certificates] together that keep the total under 5%. Then I sen[d] them in for transfer to the TA [transfer agent]. Once processed the TA fedex's them to the broker. Then we wait for the shares to clear [i.e., become available for trading]. We only submit 1 transfer a day per broker until we have submitted all the shares.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 53, and therefore denies the same.

**ALLEGATION NO. 54:**

These acts enabled the Sharp Group's clients to further conceal their control by making it seem as if multiple different, unrelated offshore corporate entities each held less than five percent of the stock of a public company when, in actuality, those offshore corporate entities were all under common control by the Sharp Group, and their stock in the public company was all held in coordinated fashion for the benefit of the Sharp Group's clients. In this manner, the clients concealed the fact that they routinely held far greater than five percent of such public companies' stock through the various Sharp Group-supplied nominee entities.

**ANSWER:**

Defendant denies the allegations contained in Paragraph 54.

**ALLEGATION NO. 55:**

Breaking the shares into blocks of less than five percent avoided scrutiny by brokerage firms and other market participants. Brokerage firms routinely consider the 5% ownership threshold in determining whether particular stock sales may be part of a distribution that must be registered pursuant to Section 5 of the Securities Act. Further, the OTC Markets requires public companies to disclose its five percent (or greater) shareholders to meet certain listing requirements.

19

A866

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 55, and therefore denies the same.

**ALLEGATION NO. 56:**

Once blocks of shares were broken up and dispersed among multiple nominee shareholders, the Sharp Group coordinated with offshore trading platforms, such as Wintercap SA and Blacklight SA, which specialized in depositing and liquidating stock through various domestic and foreign brokerage firms. By so doing, the Sharp Group further obscured both the identities of the true beneficial owners and the fact that they were selling in concert.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 56, and therefore denies the same.

**ALLEGATION NO. 57:**

Gasarch is another one of the individuals who worked for Sharp and managed the complex administrative tasks that were necessary to the fraudulent scheme. Her duties included arranging for transfers—typically in the form of wire transfers—of the proceeds of illegal stock sales, such as the sales referenced in the table appearing at ¶43 above. In this role, Gasarch routinely arranged to transfer stock sale proceeds to accounts as directed by the Sharp Group's clients in a manner designed to conceal the fact that undisclosed control persons were, in fact, the actual beneficial owners of the stock being sold, and the ultimate recipients of the sales proceeds. When she sent these wires, Gasarch also recorded them in the Q accounting system. She thus observed and maintained the records showing how the Sharp Group's clients were generating, receiving and disbursing their revenue from securities trading. Because of her role, Gasarch was routinely referred to by others involved in the scheme by the nickname "Wires."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 57, and therefore denies the same.

A867

**ALLEGATION NO. 58:**

One of the ways that Gasarch accomplished the distribution of fraudulent trading proceeds to, and for the benefit of, the Sharp Group's clients was by routinely creating false invoices, loan and subscription agreements, and other documents that purported to originate from Sharp Group administered nominees, and that could serve as the "back up" to support these payments if they were questioned by the banks and brokerage firms from which the proceeds were being sent. Some examples include:

(a)     On August 23, 2016, Gasarch created an invoice (on which she left "Company Name" at the top) purportedly to Sharp Group-administered nominee Quezon Group LLC, in the amount of CAD $125,000 from a builder in Canada that was renovating a property for one of the Sharp Group's clients. About a minute after Gasarch last modified the invoice, she sent it, using an email address for Quezon Group administered by the Sharp Group, to Wintercap SA and requested payment from a Wintercap SA account. Gasarch informed Wintercap SA that the reference on the wire to the builder should read "Subscription Agreement 500,000 shares." Wintercap SA paid the invoice as directed by Gasarch.

(b)     On May 16, 2017, Gasarch modified an invoice from a law firm so that the invoice appeared to have been issued to Sharp Group-administered nominee Riverfall Group Ltd. The invoice requested payment for work done in connection with NewGen Biopharma Corp. and its predecessor company. As discussed in paragraph 237 below, the Veldhuis Control Group engaged in fraudulent sales of the securities of NewGen Biopharma Corp in 2016 and 2017. The Sharp Group debited the amount of this payment in its Q accounting system from the NewGen account. Gasarch also was the last person who edited the cover memo to Wintercap SA (which purported to be written by the beneficial owner of Riverfall Group) asking that Wintercap SA make a partial payment of $129,000 on this invoice. Several hours later, using an email address for Riverfall Group administered by the Sharp Group, Gasarch sent the invoice and the cover memo to Wintercap SA and requested payment from a Wintercap SA controlled-account. Wintercap SA paid the invoice as directed by Gasarch.

(c)     On or about October 11, 2017, Gasarch created an invoice purportedly to Sharp Group-administered nominee Hilton Capital Inc., in the amount of $28,000 from an entity named SkyLeap Industries, Inc. in Canada. The invoice states that it is for "data encryption tool for internal use." About 5 minutes later, Gasarch was the last person to modify a cover memo, purportedly from the beneficial owner of Hilton Capital, to Wintercap SA, asking Wintercap SA to pay the invoice. The cover memo stated that the purpose of the invoice was "payment of consulting services." The next day, using an email address for Hilton Capital administered by the Sharp Group, Gasarch sent the invoice and cover memo to Wintercap SA and requested payment from a Wintercap SA account. Wintercap SA paid the invoice as directed

21

A868

by Gasarch. In the Q accounting system, this payment was charged to the account for Liberty One Lithium, another issuer whose stock was sold fraudulently by the Veldhuis Control Group (see paragraph 237).

**ANSWER:**

Defendant is without sufficient knowledge admit or deny the allegations in Paragraph 58, and therefore denies the same.

**ALLEGATION NO. 59:**

Gasarch understood that her job was to obfuscate the source and destination of distributions that the Sharp Group's clients were taking from their fraudulent trading proceeds and that they were laundering through the Sharp Group. Her communications with Sharp demonstrate Gasarch's understanding. For example, in August of 2013, Gasarch engaged in the following Encrypted Communication with Sharp:

[CHART OMITTED]

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 59, and therefore denies the same.

**ALLEGATION NO. 60:**

Gasarch's communications demonstrate her understanding that the Sharp Group was controlling the Sharp Group-administered nominees for the benefit of the Sharp Group clients. For example, on February 18 and 19, 2015, Gasarch engaged in a series of Encrypted Communications with Sharp and others about the urgency of responding to an attorney's request for documents to be signed by the purported control persons of a Sharp Group-administered nominee. Gasarch informed Sharp that "we" signed the documents for all of the directors, but she didn't know who should sign the documents for the notary. Sharp chided Gasarch: "Of course u do; his name is on the stamp!," thus telling Gasarch to sign for the notary.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 60, and therefore denies the same.

A869

**ALLEGATION NO. 61:**

Similarly, communications between Sharp Group clients and Wintercap SA report instances demonstrating that Gasarch knowingly, recklessly, or negligently sent emails pretending to be from the nominal owners of Sharp Group-administered nominees in furtherance of the Sharp Group's clients' fraudulent schemes.

(a)     On July 7, 2017, Sharp Group client Benjamin Kirk[4] and a Wintercap SA employee communicated about an email message seeking to transfer CAD $60,000 that Gasarch had sent to Wintercap SA a week earlier at Kirk's request. Gasarch's email purported to be written by the beneficial owner of a Sharp-administered nominee and came from an email address for that nominee that was administered by the Sharp Group.

(b)     On July 12, 2018, Sharp Group client Luis Carrillo and a Wintercap SA employee communicated about what to do about a rejected wire that Gasarch had requested on June 22, 2018 for a Sharp Group-administered nominee named Santos Torres LLC. The Wintercap SA employee told Carrillo to get Gasarch to email Wintercap SA from the Santos Torres account to inform Wintercap SA that the wire was rejected and why.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 61, and therefore denies the same.

**ALLEGATION NO. 62:**

Gasarch was also involved in the movement of Sharp Group clients' shares to Wintercap SA. For example:

(a)     On June 16, 2016, Veldhuis wrote to Gasarch to ask for her help in getting Wintercap SA to sign documents that would make it appear as if Wintercap SA was purchasing for itself 5 million shares of Stevia First/Vitality, when Veldhuis was just using Wintercap SA to conceal the Veldhuis' Control Group's ownership of those shares. The same day, Gasarch forwarded Veldhuis' request to Wintercap SA's operations employees and asked them to sign the documents and return them to her.

(b)     On September 23, 2016, Veldhuis wrote to Gasarch that he was sending 2,375,000 warrants of StartMonday Technology Corp. to Wintercap SA (StartMonday was an issuer whose securities the Veldhuis Control Group sold fraudulently in 2016

---

[4] *SEC v. Lee, et al.*, No. 21-cv-11997 (D. Mass. filed Dec. 9, 2021).

23

through 2018 – see paragraph 237). Veldhuis also informed Gasarch that "[b]ecause they are still in the 4 month hold period we will need Silverton SA [the former name of Wintercap SA] to sign the attached document. Please arrange." Gasarch forwarded Veldhuis' message to Wintercap SA, which then asked Gasarch for some supporting documentation.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 62, and therefore denies the same.

**ALLEGATION NO. 63:**

Gasarch knew, or recklessly or negligently disregarded, that the Sharp Group's clients were paying for promotions for the stocks they were involved in selling, and that it was important to separate the Sharp Group-administered nominees that paid for stock promotions from the Sharp Group-administered nominees that held and traded stock for the Sharp Group's clients. Gasarch's knowledge is demonstrated in at least the following two Encrypted Communications:

(a)    On or about April 29, 2014, Gasarch communicated with Sharp Group client Benjamin Kirk regarding an outgoing wire he was requesting in the amount of $281,233. Kirk informed Gasarch that he had "very good paper work" but needed the name and address for the account from which the Sharp Group would send the wire (showing that the source of the payment was arbitrary). Gasarch asked Kirk if the payment was for a stock promotion because if it was, "I need to find a safe account for wire."

(b)    Similarly, on or about September 5, 2014, Gasarch communicated with Sharp Group client Steve Bajic[5] regarding what account would be used to send an outgoing wire he was requesting in the amount of $100,000. Gasarch asked Bajic if the payment was for a stock promotion, and if so, she needed to know which stock. Bajic responded that it was not for a stock promotion so Gasarch told him that he could use Peregrine Capital (the entity for which she was the listed as the owner). Bajic asked again: "Does peregrine trade stocks? I want $ to come from bank that has no links to trading, if that's even possible?" Gasarch reassured him: "I asked u what stock for, U answer not promote. So I can use any account."

---

[5] *SEC v. Bajic, et al.*, No. 20-cv-007 (S.D.N.Y. filed Jan. 2, 2020).

A871

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 63, and therefore denies the same.

**ALLEGATION NO. 64:**

Gasarch also implemented Sharp's plan to protect the identities of the Sharp Group's clients. For example, (a) Gasarch helped to disguise the identities of actual shareholders by personally serving as the purported owner of a nominee shareholder—Peregrine Capital Corp. f/k/a Peaceful Lion Holdings—that the Sharp Group routinely used to facilitate the illegal stock sales on behalf of control group clients; and (b) in late 2015, around the time the Sharp Group distributed to clients a new set of xPhones for their use in Encrypted Communications, Gasarch drafted a memo with instructions about how to "delete all secure chats when xphone is shut down (e.g., to cross a border)."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 64, and therefore denies the same.

**ALLEGATION NO. 65:**

Kelln likewise made it a point to remind Wintercap SA principals of these security protocols, as in a November 2016 Encrypted Communication in which she noted, after traveling back to Canada from Switzerland, "I had to delete my phone going through customs." A Wintercap SA principal responded "[w]e approve of your security."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 65, and therefore denies the same.

**The Sharp Group Benefited from Illegal Stock Sales**

**ALLEGATION NO. 66:**

Sharp, Kelln, and Gasarch profited handsomely from their illicit services to the Sharp Group's clients.

25

A872

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 66, and therefore denies the same.

**ALLEGATION NO. 67:**

For example, between just August 2017 and July 2018, Wintercap SA transferred approximately $7 million to a Marshall Islands company called Cortona Equity, Inc. ("Cortona") for Sharp's benefit. Sharp had installed his wife's tennis coach as the purported beneficial owner of Cortona.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 67, and therefore denies the same.

**ALLEGATION NO. 68:**

On various dates between 2010 and 2019, Kelln and Gasarch were the beneficiaries of more than $1 million each of funds derived from the Sharp Group's conduct. By way of example:

    (a)    On or about January 2, 2019, a Sharp Group-administered nominee named Inland Trading wired $49,861.10 to a United States-based corporate entity owned jointly by Gasarch and her husband. The primary source of Inland Trading's income was fraudulent trading on behalf of Sharp Group clients. The wire payment to the company owned by Gasarch and her husband listed Gasarch's home address in Canada as the "Beneficiary address."

    (b)    On or about May 2, 2018, Gasarch, using the email account for Sharp Group-administered nominee Hilton Capital Inc., asked Wintercap SA to send $100,016 from Hilton Capital's account to Gasarch's account at Sun Life Assurance Co. Gasarch attached copies of her passport and driver's license to the request as backup for the transaction.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 68, and therefore denies the same.

A873

**ALLEGATION NO. 69:**

Further, between at least September 2011 and April 2019, the Sharp Group would perform a month-end sweep, using its Q accounting system, of commissions and fees that it earned from the securities transactions, securities deposits, and other securities-related services it performed for its clients in that month. The sweep allocated a portion of the commissions and fees that were paid into the Bond account (the account associated with Sharp) to accounts in the names of Kelln and Gasarch, from which Kelln and Gasarch could then withdraw funds. Between August 2016 and April 2019, Gasarch's portion of these monthly commissions and fees totaled over $300,000. In addition, Gasarch received Christmas bonuses of CAD $100,000 in 2016 and 2017 and a Christmas bonus of CAD $70,000 in 2018.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 69, and therefore denies the same.

<div align="center">

**SHARP GROUP EXAMPLE ONE:**

**ILLEGAL SALES OF STEVIA FIRST/VITALITY BY DHILLON, VELDHUIS CONTROL GROUP AND TAYLOR**

</div>

**ALLEGATION NO. 70:**

By August 2011, Dhillon had become the Interim Principal Executive and Financial Officer of Stevia First and, by January 2012, had become its Chairman. As detailed below, during and after his securing of these roles, Dhillon coordinated with the Veldhuis Control Group and Taylor fraudulently to sell Stevia First/Vitality[6] stock to retail investors at inflated prices on various occasions over several years. Further, Sharp, Kelln, Veldhuis, Friesen, Sexton, Taylor and Dhillon failed to register their sales of Stevia First/Vitality stock described herein pursuant to Section 5 of the Securities Act.

**ANSWER:**

Defendant denies the allegations in Paragraph 70.

---

[6] Stevia First changed its name to Vitality in 2016, and the company still operates under that name. Stevia First and Vitality stock is referred to as "Stevia First/Vitality" in this Complaint.

A874

**ALLEGATION NO. 71:**

Defendants' successive campaigns to sell Stevia First/Vitality stock fraudulently were very successful. The following table reflects the proceeds that several of the Defendants' illicit sales of Stevia First/Vitality stock generated during the scheme (the "quantity sold" in the table below reflects the number of shares sold, and incorporates a 1-for-10 reverse stock split in 2016).

[CHART OMITTED]

**ANSWER:**

Defendant denies the allegations in Paragraph 71.

**Background**

**ALLEGATION NO. 72:**

By early 2011, Dhillon controlled a private company called Stevia First. Around that time, Dhillon looked for an opportunity to convert that business to a publicly traded company in a process known as a "reverse merger." In a reverse merger transaction, an existing public company having a ticker symbol cleared for quoting on OTC Markets, but with little, if any, operations (often referred to as a "shell company"), acquires a private operating company. After the private operating company is absorbed into the public shell company, the shell company typically undergoes a name, ticker-symbol, and business-plan change, to align with the name and purported business of the formerly private operating company. In such transactions, shareholders of the formerly private company frequently receive shares in the newly merged public company. In many instances, those shares comprise a controlling interest in the post- merger public company.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 72, and therefore denies the same.

**ALLEGATION NO. 73:**

In or about early 2011, Taylor introduced Dhillon and the then-Chief Executive Officer (the "CEO") of Dhillon's private company to certain of Taylor's contacts in China and to an attorney in Vancouver. Dhillon and the CEO eventually merged the private company with a public shell company. On paper, the bulk of the shares in the shell company were held by various Chinese nationals who were identified in an S-1 registration statement that had previously been filed by the shell company (hereinafter the "Stevia S-1 Shareholders").

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 74, and therefore denies the same.

A875

**ALLEGATION NO. 74:**

According to public filings, on July 28, 2011, the purported president, chief executive officer, treasurer and director of the public shell company agreed to sell all of his 4,500,000 shares to Dhillon pursuant to a stock purchase agreement. The stock purchase agreement contemplated that, immediately upon closing of the reverse merger, Dhillon would be appointed as a director, and as the President, Chief Executive Officer, Secretary, and Treasurer, of the surviving public company.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 74, and therefore denies the same.

**ALLEGATION NO. 75:**

On or about October 10, 2011, the reverse merger went effective and the surviving public company was re-named Stevia First, thereby assuming the name of Dhillon's private company.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 75, and therefore denies the same.

**ALLEGATION NO. 76:**

On or about October 12, 2011, Stevia First effected a 7-for-1 forward stock split, which caused Dhillon's 4,500,000 shares (referenced in ¶74) to convert to 31,500,000 shares of Stevia First/Vitality stock.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 76, and therefore denies the same.

**ALLEGATION NO. 77:**

Dhillon was the sole signer of Stevia First's filing with the Commission, which reported the 7-for-1 forward stock split. The stock split had the effect of increasing the number of shares held by Dhillon considerably.

A876

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 77, and therefore denies the same.

**ALLEGATION NO. 78:**

In or about January 2012, Dhillon assumed the role of chairman of Stevia First's board of directors. Stevia First/Vitality's stock was registered pursuant to Section 12 of the Exchange Act.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 78, and therefore denies the same.

**ALLEGATION NO. 79:**

Dhillon was an affiliate of Stevia First (and, subsequently, Vitality) because he had the power to control the company through his role as chairman of its board. As a public company affiliate, Dhillon was legally required to register any sales of his Stevia First/Vitality stock unless Dhillon elected to comply with the safe harbor provisions set forth in Commission Rule 144. Dhillon testified, under oath, during the Commission's investigation leading to the filing of this action that he understood these legal requirements at all times relevant to this Complaint. As described in more detail in this Complaint, Dhillon repeatedly sold shares of Stevia First/Vitality without registering such sales.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 79, and therefore denies the same.

**ALLEGATION NO. 80:**

As a director of Stevia First (and, eventually, Vitality), Dhillon was required to file various "Form 4" statements (i.e., a "Statement of Changes of Beneficial Ownership of Securities"), which is a public form required by the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder. Dhillon was required to file an updated Form 4 to reflect any change in his beneficial ownership of Stevia First/Vitality stock, regardless of the amount of that change. Dhillon understood these legal requirements at all times relevant to this Complaint. Dhillon testified, under oath, during the Commission's investigation leading to the filing of this action that "[a]nytime there's sales by insiders, you have to file appropriate forms to disclose your purchases or sales."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 80, and therefore denies the same.

**ALLEGATION NO. 81:**

Dhillon was also legally required to file a public disclosure report—a "Schedule 13D"— with the Commission pursuant to Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder, to the extent he was the beneficial owner of greater than five percent of Stevia First/Vitality's common stock. Dhillon was likewise required to disclose, via a Schedule 13D filing, any agreements he entered into concerning disposition of Stevia First stock, as well as the combined holdings of all participants in any such agreements. Dhillon was further required to file a Schedule 13D Amendment whenever his position materially changed. Dhillon understood these legal requirements at all times relevant to this Complaint. For example, on or about August 17, 2011, Dhillon filed a Schedule 13D with the Commission disclosing that he was the beneficial owner of 4,500,000 *restricted* shares of Stevia First/Vitality stock, which comprised more than five percent of the company's outstanding common shares at that time. As described in more detail in this Complaint, Dhillon intentionally failed to disclose his beneficial ownership interest in additional shares of Stevia First/Vitality stock, which were purportedly *unrestricted*; and he never made any disclosure concerning his agreements with the Veldhuis Group concerning Stevia First stock.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 81, and therefore denies the same.

**Round One: 2012 Stevia First/Vitality Stock Sales**

**ALLEGATION NO. 82:**

Beginning in January 2012, shortly after Dhillon took over Stevia First, Dhillon, Taylor, and the Veldhuis Control Group arranged to sell surreptitiously Stevia First/Vitality's purportedly unrestricted stock and share in the proceeds of those unregistered sales.

**ANSWER:**

Defendant denies the allegations in Paragraph 82.

**ALLEGATION NO. 83:**

First, Taylor, working in concert with others, facilitated the transfer of Stevia First/Vitality's purportedly unrestricted stock from the Stevia S-1 Shareholders (defined in ¶73)

31

A878

to, initially, fifteen Sharp Group-administered nominee companies that held the stock for the Veldhuis Control Group. Shortly thereafter, the Sharp Group consolidated or further transferred shares held by several of these Sharp Group-administered shareholders into other Sharp Group-administered shareholders, including Peaceful Lion Holdings, a nominee shareholder for which Gasarch personally served as purported owner, and thus as purported owner of any shares held by it. The flow chart below reflects these transfers:[7]

[CHART OMITTED]

**ANSWER:**

Defendant denies the allegations in Paragraph 83.

**ALLEGATION NO. 84:**

Between January and March 2012, the Sharp Group-administered nominee shareholders (including Gasarch's Peaceful Lion Holdings) received 19,600,000 shares of Stevia First/Vitality stock, representing over 37% of the company's total outstanding stock and over 97% of its purportedly unrestricted stock. These particular shares, which were all issued without restrictive legend, are hereinafter referred to as the "'Unrestricted' Stevia First Merger Shares." (Shares issued without restrictive legend are commonly treated by securities brokers and transfer agents as immediately and freely tradeable. In reality, however, these 'Unrestricted' Stevia First Merger Shares were held by affiliates of the issuer who were acting in league with its Chairman. As such, these shares were, as a matter of law, restricted, and thus were subject to the federal securities laws' limitations and restrictions on unregistered sales of such shares.)

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 84, and therefore denies the same.

**ALLEGATION NO. 85:**

In March 2012, Stevia First—with Dhillon serving as the chairman of its board of directors—began to issue press releases claiming various positive business developments for the company while, at or about the same time, the Veldhuis Control Group orchestrated a promotional campaign touting Stevia First's stock.

---

[7] The entities color coded in green in this chart and other charts within this Complaint were administered or otherwise utilized, directly or indirectly, by the Sharp Group.

**ANSWER:**

Defendant denies the allegations in Paragraph 85.

**ALLEGATION NO. 86:**

For example, the Veldhuis Control Group paid for promotional materials touting Stevia First that were disseminated to investors during approximately March through May 2012. These Stevia First promotional materials urged investors to buy and buy quickly, saying things like, "***Get in now; this is huge***!" (emphasis in original) and "***Buy STVF right now***!" (emphasis in original; "STVF" was Stevia First's ticker symbol). These promotional materials misleadingly claimed both that "Conmar Capital Inc." was the paying party, and that Conmar Capital "will not trade in the securities of Stevia First." In fact (i) it was the Veldhuis Group, which controlled the overwhelming majority of Stevia First's free-trading shares, that paid for the promotions; (ii) the Veldhuis Control Group had paid the Sharp Group to incorporate Conmar Capital; and (iii) although no Stevia First trading took place (at the time of the campaign) through Conmar Capital, the Veldhuis Control Group was indeed "trad[ing] in the securities of Stevia First" by massively unloading them on the very retail investors who were buying in response to that campaign.

**ANSWER:**

Defendant denies the allegations contained in Paragraph 86.

**ALLEGATION NO. 87:**

The Veldhuis Control Group also engaged Kaitz to promote Stevia First, including through paying Kaitz's stock promotion company over $200,000 on or about April 3, 2012.

**ANSWER:**

Defendant denies the allegations in Paragraph 87.

**ALLEGATION NO. 88:**

Overall, from approximately March 6, 2012 to May 23, 2012, the Veldhuis Control Group, with Kaitz's substantial assistance, unloaded every share of the 'Unrestricted' Stevia First Merger Shares into the market, generating illicit proceeds of over $24 million.

**ANSWER:**

Defendant denies the allegations in Paragraph 88.

**ALLEGATION NO. 89:**

Both Taylor and Dhillon contemporaneously shared in the illicit proceeds stemming from the Veldhuis Control Group's March-May 2012 lucrative unloading of Stevia First stock, described above. In particular, between approximately April and June 2012, the Veldhuis Control

A880

Group used the Sharp Group to remit eight wire payments, all funded by Stevia First stock-sale proceeds, and totaling over $4.2 million, to the Swiss bank account of an offshore front company that Taylor controlled; and Taylor, in turn, promptly transferred over 60% of that money to Dhillon as follows:

[CHART OMITTED]

**ANSWER:**

Defendant denies the allegations in Paragraph 89.

**ALLEGATION NO. 90:**

To further conceal the identities of the people sharing in the illicit proceeds from the unregistered sale of the 'Unrestricted' Stevia First Merger Shares, as well as the illicit source of those proceeds, the Veldhuis Control Group distributed portions of those proceeds in cash obtained from the Sharp Group on various dates. These cash withdrawals were recorded in the Q system and allocated to the Stevia First deal.

**ANSWER:**

Defendant denies the allegations in Paragraph 90.

**Round Two: 2014 Stevia First/Vitality Stock Sales**

**ALLEGATION NO. 91:**

On or about March 30, 2012, May 25, 2012, and February 13, 2014, Stevia First issued a total of 1,320,511 shares of Stevia First/Vitality stock to a Sharp Group-administered nominee shareholder. The Sharp Group, in turn, divided those shares between two additional Sharp Groupadministered nominee shareholders. The table below reflects these transfers.

[CHART OMITTED]

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 91, and therefore denies the same.

**ALLEGATION NO. 92:**

Thereafter, the Veldhuis Control Group sold these shares through Sharp Group-administered nominee shareholders for the benefit of Dhillon, the Veldhuis Control Group, and Taylor. Specifically, between approximately January 14, 2014 and July 14, 2014, the Veldhuis Control Group sold all 1,320,511 of these Stevia First/Vitality shares through at least two offshore brokerage firms, obscuring the shares' ownership and the disposition of their proceeds by running the trades through two Sharp Group-administered nominee shareholders.

34

A881

**ANSWER:**

Defendant denies the allegations in Paragraph 92.

**ALLEGATION NO. 93:**

Kelln facilitated the unregistered sale of the 1,320,511 Stevia First/Vitality shares. For example, on or about October 9, 2013, Kelln provided Stevia First's transfer agent with the required paperwork to transfer 625,000 of the 1,320,511 shares of Stevia First/Vitality shares to Nautilus Growth Fund. Kelln also provided a check to pay for the transfer. The documents provided by Kelln to Stevia First's transfer agent included an attorney opinion letter that falsely represented that Nautilus Growth Fund was not an affiliate of Stevia First. Kelln knew, or recklessly disregarded, that Nautilus Growth Fund was merely a nominee shareholder holding stock for the Veldhuis Control Group, which was an affiliate of Stevia First.

**ANSWER:**

Defendant denies the allegations in Paragraph 93.

**ALLEGATION NO. 94:**

As the Veldhuis Control Group sold shares, Veldhuis, Sexton, and Friesen discussed distributing the proceeds from the sale of the 1,320,511 shares of Stevia First/Vitality stock in a furtive manner that was designed to conceal the funds' source as well as their ultimate recipients.

**ANSWER:**

Defendant denies the allegations in Paragraph 94.

**ALLEGATION NO. 95:**

For example, on or about February 25, 2014, Sexton and Veldhuis discussed in an Encrypted Communication their plan to distribute a pool of proceeds from the sale of the 1,320,511 shares of Stevia First/Vitality stock in "cash" and noted that "AV will be fine with [our so distributing] it." "AV" is a reference to Avtar Dhillon.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 95, and therefore denies the same.

**ALLEGATION NO. 96:**

On or about March 6, 2014, Veldhuis sent the following Encrypted Communication to Friesen: "u r getting 173k today. A cut from MDDD [the ticker symbol of another public company

35

A882

stock the Veldhuis Control Group fraudulently sold through the Sharp Group] and STVF [the ticker symbol of Stevia First in 2014]. Buy a boat [expletive]. Rich mother [expletive]." Of the "173k" (i.e. $173,000) referred to by Veldhuis in the Encrypted Communication to Friesen, $100,000 came from proceeds of selling the 1,320,511 shares of Stevia First/Vitality stock.

**ANSWER:**

Defendant denies the allegations in Paragraph 96 and refers to the cited document for its contents.

**ALLEGATION NO. 97:**

On or about March 6, 2014—around the same time that Veldhuis was coordinating the distribution of Stevia First/Vitality stock sale proceeds to Friesen (and others)— the Veldhuis Control Group caused the Sharp Group to send $124,000 in Stevia First/Vitality stock-sale proceeds to the same Taylor Swiss bank account referenced in ¶89 above.

**ANSWER:**

Defendant denies the allegations in Paragraph 97.

**ALLEGATION NO. 98:**

On various dates later in 2014, the Veldhuis Control Group continued to sell Stevia First/Vitality stock. For example:

(a)     On or about May 28, 2014, Friesen sent an Encrypted Communication, copying Veldhuis, directing a trader working for Sharp to sell 25,000 shares of Stevia First/Vitality stock that was held in an account in the name of a Sharp Group administered nominee shareholder.

(b)     On or about July 7, 2014, Friesen sent an Encrypted Communication directing a trader working for Sharp to sell 25,000 shares of Stevia First/Vitality stock.

**ANSWER:**

Defendant denies the allegations in Paragraph 98 and refers to the cited documents for their contents.

**ALLEGATION NO. 99:**

On or about August 5, 2014, Veldhuis sent an Encrypted Communication asking Gasarch the following: "How much cash do you have in total. We might cut the balance of STVF [Stevia First] that's left. So we would need about $110K. Do you have or be able to get?"

36

A883

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 99, and therefore denies the same.

**ALLEGATION NO. 100:**

On or about August 6, 2014, Veldhuis sent a follow up Encrypted Communication to Gasarch: "Can I please get $120K cash from STVF?"

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 100, and therefore denies the same.

**ALLEGATION NO. 101:**

On or about August 6, 2014, Veldhuis picked up $120,000 in cash from Sharp's office.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 101, and therefore denies the same.

**ALLEGATION NO. 102:**

On or about August 6, 2014, Sexton and Veldhuis continued to discuss, via Encrypted Communications, the planned distribution of proceeds from selling the 1,320,511 shares of Stevia First/Vitality stock. Veldhuis wrote: "so STVF with the two wires being added back is 126,693.74 . . . Avtar 50,000 (40%) . . . [there is] enough cash to do it might [sic] be easier to transfer."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 102, and therefore denies the same.

**ALLEGATION NO. 103:**

During the same August 6, 2014 Encrypted Communication, Sexton replied: "You should cut up the 120,000 [in] cash. Which would allow for . . . Avtar/GT [Dhillon and Taylor] 42,000[.] So if you want to bring me 96k on Friday I can distribute? GT [Taylor] will be up here shortly"

37

A884

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 103, and therefore denies the same.

**ALLEGATION NO. 104:**

During the same August 6, 2014 Encrypted Communication, Veldhuis asked Sexton how he should transmit the cash, writing, "U want me to put in the safety deposit box or bring it to you." Sexton replied: "You can do either. I have a safe here. I can distribute mind [sic] and grahams [Taylor] from here. I can holdav's [Avtar Dhillon's] for next meeting."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 104, and therefore denies the same.

**ALLEGATION NO. 105:**

On or about August 7, 2014, Veldhuis reported to Sexton via an Encrypted Communication that "I pick up [sic] that cash yesterday. Its [sic] all 50's."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 105, and therefore denies the same.

**ALLEGATION NO. 106:**

Similarly, between approximately November 2013 and January 2015, Taylor arranged to transfer approximately $1.7 million to third parties for Dhillon's benefit.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 106, and therefore denies the same.

**ALLEGATION NO. 107:**

Dhillon failed to file any Form 4 disclosing the sales of Stevia First stock directed by the Veldhuis Control Group, despite having a pecuniary interest in Stevia First stock sales effected through the Veldhuis Group, and despite knowing of his obligations, as Chairman of Stevia First, to report any and all of his Stevia First stock sales on Forms 4 filed with the Commission.

A885

**ANSWER:**

Defendant denies the allegations in Paragraph 107.

**Round Three: 2015 and 2016 Stevia First/Vitality Stock Sales**

**ALLEGATION NO. 108:**

In connection with the 2011 merger of Dhillon's private company into the public shell company, Dhillon received 4,500,000 restricted shares of Stevia First/Vitality stock (hereinafter referred to as the "March 2012 Stevia First/Vitality Stock"). After Stevia First, directed by Dhillon, issued a 7-for-1 forward split of Stevia First/Vitality stock, Dhillon held 31,500,000 shares of the March 2012 Stevia First/Vitality Stock, all of which was restricted.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 108, and therefore denies the same.

**ALLEGATION NO. 109:**

The scheme by the Veldhuis Control Group, Taylor and Dhillon to unload this March 2012 Stevia First/Vitality Stock through another round of illicit stock sales began in March 2012.

**ANSWER:**

Defendant denies the allegations in Paragraph 109.

**ALLEGATION NO. 110:**

The first step in this facet of the scheme was to move Stevia First/Vitality stock into the hands of the Veldhuis Control Group, while concealing the common ownership and control of this large block of shares.

**ANSWER:**

Defendant denies the allegations in Paragraph 110.

**ALLEGATION NO. 111:**

As with prior illegal sales of Stevia First/Vitality stock, several of the Defendants used multiple Sharp Group-supplied entities as nominee shareholders, each purporting to hold less than 5% of the company's shares, in order to conceal the fact that affiliates of the issuer were, in concert, controlling, and would be illegally selling, unregistered shares of Stevia First/Vitality stock.

**ANSWER:**

A886

Defendant denies the allegations in Paragraph 111.

**ALLEGATION NO. 112:**

To that end, in or about March 2012 (i) Sharp authorized, through a wire request he signed, a payment to Dhillon in the amount of $33,800, and (ii) Taylor also directed two payments totaling $9,450 to Dhillon. These payments were all made to Dhillon's personal bank account.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 112, and therefore denies the same.

**ALLEGATION NO. 113:**

Sharp's March 2012 $33,800 payment to Dhillon—which was funded by proceeds from the Veldhuis Control Group's sale of the 'Unrestricted' Stevia First/Vitality Merger Shares earlier that month—was for the purchase of 15,750,000 shares of Dhillon's March 2012 Stevia First/Vitality Stock. Meanwhile, Taylor's March 2012 payments (for a total of $9,450) were for the purported purchase of another 4,227,500 shares of Dhillon's March 2012 Stevia First/Vitality Stock. Taylor purchased 2,227,500 of these shares in the name of Heng Hong Investments, a nominee entity he controlled.

**ANSWER:**

Defendant denies the allegations in Paragraph 113.

**ALLEGATION NO. 114:**

To conceal the common control and disposition of the roughly 20 million shares of March 2012 Stevia First/Vitality Stock shares that Dhillon had transferred based on the aforementioned Sharp- and Taylor-arranged payments, Dhillon disguised his transfers as a series of smaller sales to (i) various Sharp Group-administered shareholders—all of which would hold, and ultimately sell, the Stevia First/Vitality stock for the benefit of the Veldhuis Control Group and Dhillon—and (ii) two nominee shareholders that were controlled by Taylor, which would hold, and ultimately sell, the Stevia First/Vitality stock for Taylor's and Dhillon's benefit. The chart below illustrates Dhillon's sale of these shares, as well as Dhillon's division of the remaining shares that were derived from the March 2012 Stevia First/Vitality Stock. (In fact, however, as detailed below, Dhillon did not fully relinquish his interest in the March 2012 Stevia First/Vitality Stock.):

**ANSWER:**

Defendant denies the allegations in Paragraph 114.

A887

**ALLEGATION NO. 115:**

The roughly 20 million shares of the March 2012 Stevia First/Vitality Stock that Dhillon transferred to nominee shareholders administered by the Sharp Group or Taylor comprised approximately 39 percent of the company's outstanding shares. But, by spreading these shares among various nominee shareholders, each shown as holding under five percent of the company's outstanding shares, Dhillon obscured the facts that (i) he had not, in truth, relinquished his interests in all of these shares; and (ii) these shares were, in truth, held by the Veldhuis Control Group, himself, and Taylor, all of whom were acting in concert.

**ANSWER:**

Defendant denies the allegations in Paragraph 115.

**ALLEGATION NO. 116:**

The Veldhuis Control Group and Taylor did not immediately sell the shares held by the nominee shareholders referenced in ¶114 and 115 above, at least partly because the stock was initially marked as restricted by Stevia First's transfer agent since it was acquired directly from Dhillon, an affiliate of the company. SEC Rule 144 provides a safe harbor from registering the sale of restricted stock acquired directly from an affiliate if, among other things, the acquirer(s) hold those shares for at least six months. In the meantime, the Veldhuis Control Group sold the other Stevia First/Vitality stock that they had obtained, as described in ¶¶83 to 84 ("Round 1") and ¶¶91 to 92 ("Round 2"), above.

**ANSWER:**

Defendant denies the allegations in Paragraph 116.

**ALLEGATION NO. 117:**

Beginning in the fall of 2014, the Veldhuis Control Group arranged for the unregistered sale of the March 2012 Stevia First/Vitality Stock in concert with Taylor and Dhillon.

**ANSWER:**

Defendant denies the allegations in Paragraph 117.

**ALLEGATION NO. 118:**

In an Encrypted Communication on or about October 24, 2014, Veldhuis, Sexton and Friesen discussed their plans to sell the March 2012 Stevia First/Vitality Stock into the public markets. In particular, Sexton summarized the Veldhuis Control Group's plans to sell the 15,750,000 shares that Dhillon had transferred to the various Sharp Group-administered nominee shareholders, which included 1,000,000 shares to be sold for Dhillon's benefit, and raised the possibility of coordinating those sales with sales of the shares Dhillon had transferred to Taylor's

A888

nominee shareholders, writing: "There was 31,500,000 in total. We have 15,750,000 minus the 1mm to Avtar [Dhillon]. GTaylor is outside the 15.75. He would consider blending back if Av [Dhillon] agrees to the plan." (Emphasis added).

**ANSWER:**

Defendant denies the allegations in Paragraph 118 and refers to the cited document for its

contents.

**ALLEGATION NO. 119:**

Taylor, as illustrated in ¶113 above, held approximately 4.2 million additional shares via two nominee shareholders, which is consistent with Sexton's referring to Taylor's position, in the above-quoted Encrypted Communication, as "outside the 15.75" million shares held by various Sharp Group-administered nominee shareholders.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 119, and therefore denies the same.

**ALLEGATION NO. 120:**

On or about October 28, 2014, Sexton met with Dhillon in California, and summarized their meeting in an Encrypted Communication between Sexton and Veldhuis the following day in these words:

(a)     Dhillon "said that stv [Stevia First] is working 2 big food producers and they feel that one has a very good chance to come to table. He would like to be more aggressive and get the price and volume up. He's also sharing in part of grahams [Taylor's] retained [sic] position."

(b)     "Also, av [Dhillon] said that he would prefer if we took the shares in gt [Taylor's] names and sold them all together. Lol."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 120, and therefore denies the same.

**ALLEGATION NO. 121:**

On various dates thereafter, Taylor, directly or indirectly, transferred the March 2012 Stevia First/Vitality Stock held by his two nominee shareholders to Sharp Group- administered

A889

nominee shareholders that were used by the Veldhuis Control Group. Though Taylor allowed the Veldhuis Control Group to trade these shares on his behalf, he retained a beneficial ownership interest in the proceeds of those trades. For its part, in or about December 2014, the Veldhuis Control Group arranged to sell March 2012 Stevia First/Vitality Stock through Wintercap SA and Blacklight SA using Sharp Group-administered nominee shareholders. The chart below reflects the transfers to various Sharp Group-administered nominee shareholders:

**ANSWER:**

Defendant denies the allegations in Paragraph 121.

**ALLEGATION NO. 122:**

On or about December 2, 2014, Veldhuis sent an Encrypted Communication to Gasarch, copying Sharp, to determine if the nominee shareholders his team had been using to hold March 2012 Stevia First/Vitality Stock were administered by the Sharp Group, or some other offshore nominee shareholder provider. Veldhuis wrote: "[w]e are in the process of receiving approximately 20 million shares of [Vitality] that were held in ESCROW. At the time of ESCROW agreement we may have put some of the stock in NON BOND [i.e. non-Sharp] [nominee] entities. Can you please go through the list below and let me know which entities you guys administer." (Veldhuis's reference to "approximately 20 million" comports with the sum of (i) the 15,750,000 shares of March 2012 Stevia First/Vitality Stock that Dhillon transferred to the various Sharp Group administered nominee shareholders in 2012, plus (ii) the approximately 4.2 million shares of March 2012 Stevia First/Vitality Stock that Dhillon transferred to two nominee shareholders controlled by Taylor.)

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 122, and therefore denies the same.

**ALLEGATION NO. 123:**

Sharp, copying Kelln, replied to Veldhuis's December 2, 2014 Encrypted Communication by writing: "This [message] shld have gone to celtic." "Celtic" was Kelln's pseudonym. Kelln promptly replied: "I confirm they [nominee shareholders] are all ours [i.e, Sharp Group administered nominee shareholders]."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 123, and therefore denies the same.

43

A890

**ALLEGATION NO. 124:**

Kelln subsequently arranged for the Veldhuis Control Group's stock, which now included the approximately 4.2 million shares initially held by Taylor's two nominee shareholders, to be deposited into accounts controlled by Wintercap SA and Blacklight SA.

**ANSWER:**

Defendant denies the allegations in Paragraph 124.

**ALLEGATION NO. 125:**

Thereafter, during the course of 2015 and through the end of 2016, the Veldhuis Control Group directed the unregistered sales of their and Taylor's March 2012 Stevia First/Vitality Stock in coordination with another stock promotional campaign run by Kaitz.

**ANSWER:**

Defendant denies the allegations in Paragraph 125.

**ALLEGATION NO. 126:**

In or about January 2015, via an Encrypted Communication, Veldhuis asked Kaitz who Kaitz would identify as the "third party" payer on the Stevia First/Vitality stock promotional alerts. Kaitz replied, "Conmar Capital," which was the name of a Sharp Group- administered entity that the Veldhuis Control Group had paid to incorporate in 2012. Ultimately, the January 2015 promotions identified "Full Service Media" (Kaitz's own company), as well as an unidentified "third party," as each having supplied funds to pay for those stock promotions. Kaitz knew that the Veldhuis Control Group was paying for the stock promotions and concealed this by listing "Conmar Capital" as the party paying for his promotional campaign. Kaitz further knew, or recklessly disregarded, that the Veldhuis Control Group intended to sell stock surreptitiously and was paying for the promotional campaign in order to facilitate such sales.

**ANSWER:**

Defendant denies the allegations in Paragraph 126.

**ALLEGATION NO. 127:**

The members of the Veldhuis Control Group each knew or recklessly disregarded that stock promoters, like Kaitz, falsely identified third party payers in order to conceal the fact that control groups and other affiliates were sponsoring promotional campaigns in order to surreptitiously dump stock in the markets. Similarly, Dhillon and Taylor knew, or recklessly disregarded, that the Veldhuis Control Group would retain a stock promoter to tout Stevia First/Vitality stock and would conceal (i) their role in funding the stock promotional campaign, (ii) the fact that they were part of a group that controlled the issuer, and (iii) the fact that they intended to trade, and were trading, in the opposite direction to which the touts urged retail investors to trade.

44

A891

**ANSWER:**

Defendant denies the allegations in Paragraph 127.

**ALLEGATION NO. 128:**

On or about March 13, 2015, Sexton and Veldhuis exchanged Encrypted Communications concerning Dhillon and continuing the Stevia First/Vitality stock promotion:

> Sexton to Veldhuis: "Avtar said they got additional things going for stvf [the ticker symbol for Stevia First at the time]. To keep going with [a stock promoter] and they only have another 1mm to chew thru and it should clean up real nice.
>
> Veldhuis to Sexton: "Nice."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 128, and therefore denies the same.

**ALLEGATION NO. 129:**

Veldhuis, on behalf of Dhillon, the Veldhuis Control Group, and Taylor, continued to orchestrate stock promotions concerning Stevia First/Vitality stock later in 2015. To that end, Veldhuis sought to identify a nominee entity that could be cited as the paying party for the promotional campaign in order to conceal the fact that the Veldhuis Control Group actually paid for the stock promotional campaign.

**ANSWER:**

Defendant denies the allegations in Paragraph 129.

**ALLEGATION NO. 130:**

For example, on or about March 31, 2015, Veldhuis sent an Encrypted Communication, subject line "promo," to Sharp asking if one of eight Sharp Group-administered nominees "can be used . . . as the payee [sic] for the promotion. Or should we set up a new company?" Sharp responded and instructed Veldhuis to use one of the preexisting nominee companies.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 130, and therefore denies the same.

A892

**ALLEGATION NO. 131:**

On or about the same day, Veldhuis forwarded Sharp's Encrypted Communication to Kelln and asked: "[c]an u please send me on[e] of the 8 companies including the address?" Kelln, in turn, copied Gasarch on the Encrypted Communications chain and wrote: "Wire [Gasarch]: pls provide [Veldhuis] a current 2015 holding co with address." Later that day, Gasarch confirmed that she emailed the requested information to Veldhuis.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 131, and therefore denies the same.

**ALLEGATION NO. 132:**

On or about April 7, 2015, Veldhuis communicated with Kaitz by Encrypted Communications about issuing promotions concerning Stevia First/Vitality stock.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 132, and therefore denies the same.

**ALLEGATION NO. 133:**

On or about May 6, 2015, Veldhuis and Sexton discussed, via Encrypted Communications, arrangements for additional stock promotions to tout Stevia First/Vitality stock. Veldhuis wrote: "I been [sic] back and forth with [Kaitz] on it today. He had trouble getting ads approved on new network. He has spent 2k this week so far and trying to get other stuff approved today. Was supposed to be done by Tuesday afternoon."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 133, and therefore denies the same.

**ALLEGATION NO. 134:**

On various dates in 2015 and 2016, including through at least December 2016, during the promotional campaign that Veldhuis coordinated through Kaitz, the Veldhuis Control Group and Taylor sold, via Sharp Group-administered nominee shareholders, in total, millions of shares of the March 2012 Stevia First/Vitality Stock.

A893

**ANSWER:**

Defendant denies the allegations in Paragraph 134.

**ALLEGATION NO. 135:**

Dhillon received a cut of these proceeds, just as he had received distributions from the proceeds of the defendants' Stevia First/Vitality stock sales in at least 2012 and 2014. On or about October 28, 2015, for example—consistent with Dhillon's instruction that his cut of the proceeds be transferred to third parties on his behalf to obscure the fact that they were redounding to his benefit—the Veldhuis Control Group arranged for Wintercap SA to pay a third party approximately $25,000 toward an expense incurred by Dhillon's family.

**ANSWER:**

Defendant denies the allegations in Paragraph 135.

**ALLEGATION NO. 136:**

Similarly, on or about June 21, 2016, Wintercap SA remitted $110,431.86 to a loan servicing company in Colorado. This payment, sent from a Sharp Group-administered nominee entity, Morris Capital, was applied to pay a mortgage loan for Sexton's benefit on a property in California.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 136, and therefore denies the same.

**ALLEGATION NO. 137:**

Taylor also participated in the Veldhuis Control Group's sales of Stevia First/Vitality stock in at least December 2016. In conjunction with their promotional activities, the Veldhuis Control Group sold shares of Stevia First/Vitality through Sharp-administered nominees between December 1 and 22, 2016 for proceeds of more than $1.7 million. Taylor received some of the proceeds of these sales.

**ANSWER:**

Defendant denies the allegations in Paragraph 137.

A894

**ALLEGATION NO. 138:**

Specifically, on or about December 22, 2016, Taylor created an invoice seeking payment of $10,000 for "consulting services for introduction of marketing" and for "Intro VBIO." VBIO was Stevia First/Vitality's ticker symbol at that time. The invoice was directed to one of the Sharp administered nominee entities that was selling Stevia First/Vitality shares. The invoice asked that payment be made to an individual in Singapore ("Taylor Nominee B") who served as a nominee owner for some of Taylor's Heng Hong accounts (see ¶113).

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 138, and therefore denies the same.

**ALLEGATION NO. 139:**

The metadata for the invoice shows that about 1.5 hours after Taylor created the invoice, Gasarch modified it. In her role as the coordinator of clients' wire requests, two minutes after she last modified the invoice, Gasarch sent Taylor's invoice to Wintercap SA using an email address for the Sharp Group-administered nominee named on the invoice. Wintercap SA paid the invoice out of the proceeds that the Veldhuis Control Group earned by selling Vitality stock in December 2016. Gasarch recorded the wire request in the Q accounting system and debited the amount of the wire from the Stevia First/Vitality account.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 139, and therefore denies the same.

**ALLEGATION NO. 140:**

Taylor Nominee B received the $10,000 Wintercap SA wire on or about December 27, 2016. Contemporaneously, Taylor Nominee B paid CAD $10,000 to a Canadian law firm. The wire to the law firm stated, in the remittance information section, that the payment related to a company of which Taylor was the CEO, CFO and founder. The processing date of this wire was January 4, 2017. Using the obfuscation provided by the Sharp Group, Taylor thus orchestrated a payment recorded for the benefit of his company with his portion of fraudulent Stevia First/Vitality stock sales.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 140, and therefore denies the same.

A895

**Round Four: 2016 – 2018 Illegal Vitality Stock Sales**

**ALLEGATION NO. 141:**

On or about July 10, 2016, Stevia First changed its name to Vitality and executed a 1-for10 reverse split of its common stock. The reverse split meant that shareholders were required to exchange 10 shares for one share, which had the effect of reducing the total number of outstanding shares of the company by a factor of 10. This also had the effect of drastically reducing the holdings of retail investors whom Defendants had prompted to purchase shares in Stevia First through their previous promotional campaigns.

**ANSWER:**

Defendant denies the allegations in Paragraph 141 as phrased.

**ALLEGATION NO. 142:**

On various dates in 2016, the Veldhuis Control Group sent numerous wire payments to Vitality, or to third parties on behalf of Vitality, totaling approximately $4.4 million. In exchange, Vitality—with Dhillon operating as the chairman of its board of directors—issued millions of shares (the "Vitality Stock") to nominee entities that the Sharp Group once again provided for use by the Veldhuis Control Group.

**ANSWER:**

Defendant denies the allegations in Paragraph 142.

**ALLEGATION NO. 143:**

The Vitality Stock shares acquired by the Veldhuis Control Group from the financing described in ¶142, above, were initially issued with restricted legends. In order to facilitate the liquidation of these shares, Kelln retained an attorney on behalf of each of the nominee shareholder entities to prepare opinion letters that falsely represented that the nominee shareholders were not affiliates of Vitality.

**ANSWER:**

Defendant denies the allegations in Paragraph 143.

**ALLEGATION NO. 144:**

On various dates ranging between 2016 and 2018, the attorney retained by Kelln on behalf of the Veldhuis Control Group issued opinion letters to Vitality's transfer agent, representing that none of the Sharp Group-administered nominee shareholders were affiliates of Vitality. Based on these false representations, Vitality's transfer agent removed the restricted legends from the Vitality Stock, thereby enabling the Veldhuis Control Group to sell the Vitality Stock to the public. In actuality, the Vitality Stock was controlled by affiliates of the company and was legally

49

A896

restricted from resale. Among other points of affiliation, the Veldhuis Control Group was acting in concert with Dhillon, who was the chairman of Vitality's board.

**ANSWER:**

Defendant denies the allegations in Paragraph 144.

**ALLEGATION NO. 145:**

After Vitality's transfer agent removed the restricted legend for one of the nominee shareholders, Kelln advised Wintercap SA of an incoming deposit of 750,000 shares of Vitality in the name of a Sharp Group-administered nominee shareholder called Hilton Capital.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 145, and therefore denies the same.

**ALLEGATION NO. 146:**

At that time, Kelln noticed from reviewing Q records that Wintercap SA was already holding Vitality shares (that had been previously deposited) in the name of Hilton Capital. The 750,000 additional shares would have brought the total shares held by that nominee to more than 5% of Vitality's issued shares. As Kelln knew or recklessly disregarded, any shareholder who was the beneficial owner of more than 5% of Vitality's outstanding stock was legally required to publicly disclose its holdings. Such disclosures would have frustrated Dhillon's and the Veldhuis Control Group's efforts to conceal their stock holdings and sales.

**ANSWER:**

Defendant denies the allegations in Paragraph 146.

**ALLEGATION NO. 147:**

On or about February 28, 2017, Kelln instructed Wintercap SA to allocate all Vitality Stock sales Wintercap was making that day to the Hilton account, thereby reducing the number of Vitality shares that Hilton Capital was shown as holding. This ruse prevented Hilton Capital from showing share ownership in excess of 5%. Specifically, Kelln wrote: "allocate all VBIO [ticker symbol of Vitality] to the [Hilton Capital] account today. We need to make room for pending 750k. Again 5% rule is biting me in the ass."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 147, and therefore denies the same.

50

A897

**ALLEGATION NO. 148:**

The 750,000 shares were subsequently deposited with Wintercap SA. Thereafter, Veldhuis provided trading instructions to Wintercap SA to sell the Vitality Stock.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 148, and therefore denies the same.

**ALLEGATION NO. 149:**

In or about December 2016, during the course of another Veldhuis Group-funded, Kaitz managed stock promotion touting Vitality's stock, Wintercap SA's principal asked Veldhuis through an encrypted messaging application if the Vitality Control Group could "switch selling to another outlet to let us [Wintercap SA] breath[e]" and slow the pace of selling. Veldhuis responded that he could slow the pace "on the next batch, but that's a week out. In the meantime, sell 15k VBIO @ 2.11." Wintercap SA's principal suggested, in response, "[m]aybe 2 days on, 1 day off . . . ." In response, Veldhuis suggested that he could move the stock held at Wintercap SA to a competitor, Blacklight SA ("BL").

**ANSWER:**

Defendant denies the allegations of Paragraph 149.

**ALLEGATION NO. 150:**

In connection with their efforts to sell Vitality Stock in 2016 and later, the Veldhuis Control Group again retained Kaitz to conduct a promotional campaign. Between October 2016 and March 2017, Veldhuis directed Wintercap SA to wire $530,000, which was derived from financial accounts associated with four Sharp Group-administered nominee shareholders, to Kaitz's entity for the purpose of promoting Vitality.

**ANSWER:**

Defendant denies the allegations in Paragraph 150.

**ALLEGATION NO. 151:**

Overall, the Sharp Group allocated Stevia First/Vitality stock sale proceeds as follows during the period of time subject to this Complaint:

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 151, and therefore denies the same.

**ALLEGATION NO. 152:**

Dhillon benefited by receiving millions of dollars from the proceeds of these illegal stock sales, including through payments made by the Veldhuis Control Group and Taylor to various third parties on Dhillon's behalf.

**ANSWER:**

Defendant denies the allegations in Paragraph 152.

**The Veldhuis Control Group's Omissions in Furtherance of the Scheme**

**ALLEGATION NO. 153:**

Veldhuis, Sexton and Friesen acted as a group for purposes of acquiring, holding, and ultimately disposing of Vitality shares, and consequently became subject to regulation as a single person pursuant to Exchange Act Section 13(d)(3). Veldhuis, Sexton and Friesen failed to file any report on behalf of the group as required under Rule 13d-1(k)(2), even though they collectively acquired, held, and were responsible for directing the disposition of, far more than 5% of Vitality's outstanding stock through nominee entities that were under their group's control.

**ANSWER:**

Defendant denies the allegations in Paragraph 153.

**ALLEGATION NO. 154:**

In failing to make required Schedule 13D/G filings, Veldhuis, Sexton, and Friesen violated Section 13(d) and Rule 13d-1 thereunder.

**ANSWER:**

Defendant denies the allegations in Paragraph 154.

**Dhillon's Failures to Disclose in Furtherance of the Scheme**

**ALLEGATION NO. 155:**

On August 17, 2016, Dhillon filed an untimely and inaccurately amended Schedule 13D (specifically, a Schedule 13D/A) with the Commission. Dhillon reported that he was the beneficial owner of 1,530,585 shares (post stock split) consisting of:

52

(a)    515,000 shares issued directly by Vitality in 2012.

(b)    50,000 in stock options issued by Vitality in 2012.

(c)    40,000 shares of common stock issued by Vitality in 2015.

(d)    925,585 shares of common stock issued by Vitality in 2016.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 155, and therefore denies the same.

**ALLEGATION NO. 156:**

In actuality, as of August 17, 2016, Dhillon was also a beneficial owner of a significant number of shares of the stock held by the Veldhuis Control Group. Dhillon did not report, among other things, these shares in his Schedule 13D.

**ANSWER:**

Defendant denies the allegations in Paragraph 156.

**ALLEGATION NO. 157:**

Dhillon also failed to file any Forms 4 reflecting the sales of Vitality stock that had been sold on his behalf, directly or indirectly, by the Veldhuis Control Group. For example, on or about January 13, 2017, the Veldhuis Control Group caused Wintercap SA to sell 44,661 shares of Vitality, which sales generated proceeds of $105,551.21. On or about January 27, 2017, the Veldhuis Control Group caused Wintercap SA to transfer $100,000 to pay an expense incurred by Dhillon. Dhillon failed to file a Form 4 reflecting either of these January 2017 Vitality stock sales, or any other sales by the Veldhuis Control Group in 2017 or 2018 from which he benefitted.

**ANSWER:**

Defendant denies the allegations in Paragraph 157.

**Dhillon's False and Misleading Testimony in Furtherance of the Scheme**

**ALLEGATION NO. 158:**

On or about August 29, 2019, during the investigation leading to the filing of this action, Dhillon provided sworn testimony to the Commission staff. Seeking to conceal his illegal conduct, Dhillon falsely denied being the beneficiary of any undisclosed Stevia First/Vitality stock sales, and falsely denied knowing that the Veldhuis Control Group had sold Stevia First/Vitality stock.

A900

**ANSWER:**

Defendant denies the allegations in Paragraph 158.

**ALLEGATION NO. 159:**

For example, during the August 2019 testimony, the Commission asked Dhillon if he ever received the proceeds of any sales of Stevia First/Vitality stock. Dhillon falsely replied, "I have not." In actuality, the Veldhuis Control Group and Taylor had distributed Stevia First/Vitality stock trading proceeds to Dhillon, directly and indirectly, through cash payments and through payments to third parties on Dhillon's behalf.

**ANSWER:**

Defendant denies the allegations in Paragraph 159.

**ALLEGATION NO. 160:**

Similarly, during the August 2019 testimony, the Commission asked Dhillon if he knew anyone who sold Stevia First/Vitality stock. Dhillon falsely replied, "I'm not aware." In actuality, Dhillon knew that the Veldhuis Control Group and Taylor had sold Stevia First/Vitality stock, and had shared the resulting proceeds with him.

**ANSWER:**

Defendant denies the allegations in Paragraph 160.

**SHARP GROUP EXAMPLE TWO:**
**ILLEGAL ARCH STOCK SALES INVOLVING DHILLON, THE VELDHUIS**
**CONTROL GROUP, AND TAYLOR**

**ALLEGATION NO. 161:**

Beginning in or about 2013, the Veldhuis Control Group schemed with Dhillon, Taylor and Kaitz to sell illegally the stock of Arch.

**ANSWER:**

Defendant denies the allegations in Paragraph 161.

**ALLEGATION NO. 162:**

In 2013, Dhillon arranged for a private company he controlled to merge (as a reverse merger) into a publicly traded shell company controlled by the Veldhuis Control Group. Following the reverse merger, which closed in or about June 2013, the surviving public company was called Arch.

54

A901

**ANSWER:**

Defendant denies the allegations in Paragraph 162.

**ALLEGATION NO. 163:**

By April 2013, Dhillon had become an officer or director of Arch; and by June 2013, Dhillon had assumed the role of chairman of Arch's board of directors.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 163, and therefore denies the same.

**ALLEGATION NO. 164:**

Prior to the 2013 Arch reverse merger, Arch had issued shares to various S-1 Shareholders (hereinafter referred to as the "Arch S-1 Shareholders") in 2012. By early 2013, following a stock split, the Arch S-1 Shareholders collectively held 20 million shares of Arch stock (which traded under the ticker symbol "ARTH").

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 164, and therefore denies the same.

**ALLEGATION NO. 165:**

Leading up to, and shortly after, the closing of the reverse merger, the Veldhuis Control Group directed the transfer of 16,920,000 Arch shares, held in the names of several Arch S-1 Shareholders, to eleven Sharp Group-administered nominee shareholders for the benefit of the Veldhuis Control Group.

**ANSWER:**

Defendant denies the allegations in Paragraph 165.

**ALLEGATION NO. 166:**

Kelln arranged, on behalf of the Veldhuis Control Group, to transfer an additional 2,310,000 shares, held in the names of several additional Arch S-1 Shareholders, to an entity controlled by Wintercap SA called "Victory Capital" on behalf of the Veldhuis Control Group.

A902

**ANSWER:**

Defendant denies the allegations in Paragraph 166.

**ALLEGATION NO. 167:**

Combined, the Veldhuis Control Group held at least 19,230,000 purportedly unrestricted shares of Arch, representing over 48% of Arch's total issued and outstanding stock, which constituted close to 100% of Arch's unrestricted shares that were available for trading, at or around the time of the reverse merger.

**ANSWER:**

Defendant denies the allegations in Paragraph 167.

**ALLEGATION NO. 168:**

Shortly before the reverse merger closed, the Veldhuis Control Group controlled, through a Sharp Group-administered nominee, an additional 20,000,000 shares that were marked as restricted. In anticipation of the reverse merger, the Veldhuis Control Group transferred these shares to Dhillon (10,000,000) and a company controlled by the CEO of Arch (10,000,000). Dhillon, in turn, transferred 2,750,000 shares to a domestic corporate entity ("Company A"), an entity that was controlled by Dhillon's associate, Person A.

**ANSWER:**

Defendant denies the allegations in Paragraph 168.

**ALLEGATION NO. 169:**

The chart below illustrates the transfers described in ¶¶165 through 168.

[CHART OMITTED]

**ANSWER:**

Defendant denies the allegations in Paragraph 169.

**ALLEGATION NO. 170:**

The Veldhuis Control Group provided financing to Arch around the time of the reverse merger. Specifically, the Veldhuis Control Group funneled approximately $1.75 million through an attorney's escrow account, which was remitted to Arch in the form of equity subscription agreements. Dhillon, through his same Swiss-banking Ortivo account referenced in ¶89, also contributed $250,000 as part of this financing, but concealed this involvement from Arch's principals.

A903

**ANSWER:**

Defendant denies the allegations in Paragraph 170.

**ALLEGATION NO. 171:**

Following the reverse merger, the Veldhuis Control Group engaged Kaitz to promote Arch and paid Kaitz approximately $1.2 million from June 2013 to August 2013 for this promotion.

**ANSWER:**

Defendant denies the allegations in Paragraph 171.

**ALLEGATION NO. 172:**

As Kaitz knew or recklessly disregarded, these payments were derived from money held by Sharp Group-administered nominee shareholders on behalf of the Veldhuis Control Group. For example, on or about July 24, 2013, Kaitz sent the following Encrypted Communication to Veldhuis: "Are you able to capture anything on arth?" Kaitz was asking Veldhuis, in substance, how much money, if any, the Veldhuis Control Group made from the sale of Arch stock during the course of the stock promotion.

**ANSWER:**

Defendant denies the allegations in Paragraph 172.

**ALLEGATION NO. 173:**

Some of the promotions managed by Kaitz falsely identified the promotions' funding source. For example, the landing page for an Arch promotion cited "Advantage Media Corp" as the "paying party" of a $790,000 "total production budget." As Kaitz knew or recklessly disregarded, Advantage Media was a front company used to disguise the identity of the parties actually paying for the promotion, i.e. the Veldhuis Control Group.

**ANSWER:**

Defendant denies the allegations in Paragraph 173.

**ALLEGATION NO. 174:**

On September 27, 2013, Kaitz asked Veldhuis in an Encrypted Communication what to do if other stock promoters hired by Kaitz to distribute touts about Arch refused to identify Advantage Media as the supposed paying party. Kaitz wrote to Veldhuis: "Am trying to have them put Advantage media, if they won't then what?" Later that day, Kaitz explained that the other stock promoters said that "[t]hey will go if they get the invoice signed and sent back to them via email from advantage." Veldhuis responded and directed Kaitz to send the invoice to an email address

A904

created for the purpose of making it appear as if Advantage Media Corp. was an actual third party: "send to marketing@advantagemedia.co."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 174, and therefore denies the same.

**ALLEGATION NO. 175:**

Sharp substantially assisted the Veldhuis Control Group's use of Advantage Media Corp. to disguise the Veldhuis Control Group's Arch-related conduct. For example, on or about January 21, 2014, Sharp asked Veldhuis in an Encrypted Communication whether he should continue to pay incorporation fees associated with Advantage Media Corp., and, if so, whether he (Sharp) should use Arch stock sale proceeds to make such payments: "Do we pay the 2014 annual fees for advantage media corp (belize)? Debit arth?" Veldhuis responded: "Kill it." By that time, Advantage Media Corp. had served its purpose: the Veldhuis Control Group used it as a front company to fund a stock promotional campaign touting Arch stock.

**ANSWER:**

Defendant denies the allegations in Paragraph 175.

**ALLEGATION NO. 176:**

The chart below illustrates the success of the Veldhuis Control Group's paid promotion of Arch between June and September 2013:

[CHART OMITTED]

**ANSWER:**

Defendant denies the allegations in Paragraph 176.

**ALLEGATION NO. 177:**

During the period of the promotional campaign, the Veldhuis Control Group surreptitiously sold millions of Arch shares into the market through nominee shareholders administered by the Sharp Group. Specifically, between June 11, 2013 and September 30, 2013, the Veldhuis Control Group sold approximately 16.6 million shares of Arch stock through Sharp Group-administered nominee shareholders, generating proceeds of at least $11.5 million. The Veldhuis Control Group sold another approximately 1.4 million shares generating proceeds of approximately $574,000 through a nominee shareholder administered by Wintercap SA.

A905

**ANSWER:**

Defendant denies the allegations in Paragraph 177.

**ALLEGATION NO. 178:**

Throughout the period of these unregistered sales, the Veldhuis Control group was an affiliate of Arch, by virtue of its control over a significant percentage of Arch's stock and/or because it was acting in concert with Dhillon, the chairman of the company. Sharp, Kelln, Veldhuis, Friesen, and Sexton failed to register their sales of Arch stock described herein pursuant to Section 5 of the Securities Act. In selling these shares, the Veldhuis Control Group, through Sharp Group-administered nominee shareholders, surreptitiously sold unregistered shares of stock, and schemed to defraud investors by concealing the fact that public company affiliates were dumping stock into the markets.

**ANSWER:**

Defendant denies the allegations in Paragraph 178.

**ALLEGATION NO. 179:**

The Veldhuis Control Group coordinated with Dhillon on the stock promotions. For example, Sexton had one or more discussions with Dhillon where he discussed sharing the promotional materials with Dhillon before they were published, and Sexton reported to Dhillon the budget for promotions. In addition, shortly before the merger closed, Friesen asked Sexton and Veldhuis whether Dhillon would "have a set of news releases to begin issuing next week?", to which Sexton responded, "I asked for that yesterday. He said he would deliver." Dhillon played this role in order to benefit from the Veldhuis Control Group's sale of stock, since, as the Veldhuis Control Group and Dhillon knew, promotional campaigns tend to be more effective when they coincide with news releases by the issuer whose stock is being promoted.

**ANSWER:**

Defendant denies the allegations in Paragraph 179.

**ALLEGATION NO. 180:**

Dhillon directly participated in the Veldhuis Control Group's sales of Arch, while failing to register those sales pursuant to Section 5 of the Securities Act. For example, on or about August 13, 2013 in an Encrypted Communication, Sexton relayed a conversation he had with Dhillon to Veldhuis: Sexton reported that he told Dhillon that the Veldhuis Control Group "would be active in the market" until the first week of September and that they "wouldn't sell below $0.40 [per share]." Sexton also relayed to Dhillon that the Veldhuis Control Group would first distribute the proceeds of such sales as a repayment for the private placements they had made (including Dhillon's anonymous $250,000 investment) into Arch, but that a broader distribution would take place in September. Sexton noted Dhillon was "disappointed it wasn't bigger success as we all are but I explained sometimes things out of control and we were squeezing this out in short timeframe

59

A906

so it may have hurt us a bit in that we weren't able to stop once we started." Sexton continued, "I said we worked well together and everyone did what they said they would and that we would continue to look at his projects in future."

**ANSWER:**

Defendant denies the allegations in Paragraph 180.

**ALLEGATION NO. 181:**

On or about September 6, 2013, Veldhuis instructed Gasarch to wire $250,000 from the Arch proceeds to the same Dhillon owned Swiss-banking Ortivo account referenced in ¶¶89 and 170, thereby reimbursing Dhillon for his undocumented private placement investment. Consistent with Sexton's description above, the Veldhuis Control Group caused a further distribution to be made from the Group's illicit Arch stock sale proceeds for Dhillon's benefit in September 2013.

**ANSWER:**

Defendant denies the allegations in Paragraph 181.

**ALLEGATION NO. 182:**

In particular, on or about September 26, 2013, Wintercap SA wired $200,000 to a Canadian company controlled by Dhillon's tax accountant, who, in turn, wired the very same amount, on or about the same day, to a U.S.-based corporate account that Dhillon controlled. This money was derived from the sale of Arch stock.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 182, and therefore denies the same.

**ALLEGATION NO. 183:**

Taylor also schemed with the Veldhuis Control Group on the Arch deal and received at least $600,000 of the proceeds generated by its Arch sales, while also failing to register those sales pursuant to Section 5 of the Securities Act. On or about August 20, 2013, Sexton wrote to Veldhuis and instructed him to "send 600k from ARTH" to the same Taylor-controlled Swiss bank account as that referenced in ¶9. Two days later, at Veldhuis's direction, Gasarch wired the funds, to that same destination, from a Cayman Islands brokerage account. This $600,000 distribution derived from the illegal sales of Arch stock.

60

A907

**ANSWER:**

Defendant denies the allegations in Paragraph 183.

**ALLEGATION NO. 184:**

The Veldhuis Control Group and Taylor continued to engage in fraudulent sales of Arch stock into 2017.

**ANSWER:**

Defendant denies the allegations in Paragraph 184.

**ALLEGATION NO. 185:**

For example, Taylor, through Heng Hong, received Arch shares in 2014, 2015 and 2016. The shares and warrant rights that Heng Hong purchased from Arch in 2014 were funded by the Veldhuis Control Group. In August 2013, the Veldhuis Control Group directed the Sharp Group to send $600,000 derived from its previous fraudulent trading in Arch securities to Heng Hong. Heng Hong used these funds to pay for the Arch shares and warrants it acquired from the issuer in the January 2014 round of financing.

**ANSWER:**

Defendant denies the allegations in Paragraph 185.

**ALLEGATION NO. 186:**

Taylor arranged for many of these Arch shares to be deposited into Heng Hong accounts managed by Blacklight SA, and he sold those shares over time, including between December 24, 2015 and June 6, 2016, generating proceeds of approximately $616,000. Taylor shared a portion of these proceeds with Dhillon, by arranging for two payments of approximately $100,000 each to a creditor of Dhillon's (Dhillon Creditor A) in February and March 2016. Blacklight SA sent another approximately $159,000 of these proceeds to Taylor Nominee B (see ¶138). Those transfers occurred in May through October 2016. Taylor Nominee B, in turn, paid at least some of those proceeds to Taylor, including: $5,000 wired on or about November 2, 2016 to an account controlled by Taylor, and CAD $65,000 wired on or about December 8, 2016 to a Canadian law firm trust account stating that it was "in favour of Graham Taylor".

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 186, and therefore denies the same.

A908

**ALLEGATION NO. 187:**

In addition, Arch issued a total of 4,458,608 new shares to Taylor's Heng Hong entity on or about June 28, July 5, August 8, September 27, and November 8, 2016. Within several weeks of each new issuance to Heng Hong, Heng Hong transferred those shares to Trius Holdings Ltd., a Sharp Group-administered nominee that was being used by the Veldhuis Control Group. The share issuance to Taylor's Heng Hong entity on or about November 8, 2016 was funded by the Veldhuis Control Group. In particular, the $220,000 owed to Arch for the shares issued to Heng Hong on that date was charged to the Arch account in the Q accounting system, was funded out of the Veldhuis Control Group's fraudulent proceeds from sales of Vitality stock, and was sent by wire to Arch from an account managed by Wintercap SA.

**ANSWER:**

Defendant denies the allegations in Paragraph 187.

**ALLEGATION NO. 188:**

The Veldhuis Control Group, through Trius Holdings, deposited the Arch shares it received from Heng Hong into an account controlled by Blacklight SA and sold those shares to unsuspecting investors in the market between about June 9, 2016 and May 17, 2017, for total proceeds of at least $2.5 million. These sales were recorded in the Sharp Group's Q accounting system into the Arch account, from which distributions were directed by the Veldhuis Control Group including payments for the benefit of Dhillon. By furnishing his Heng Hong entity to facilitate the Veldhuis Control Group's concealment of their ownership and sales of these shares, Taylor knew, or recklessly disregarded that he was substantially assisting the scheme to defraud the market about the control of Arch shares then being sold.

**ANSWER:**

Defendant denies the allegations in Paragraph 188.

**ALLEGATION NO. 189:**

The Sharp Group allocated Arch stock sale proceeds to the Veldhuis Control Group as follows during the period of time subject to this Complaint:

**ANSWER:**

Defendant denies the allegations in Paragraph 189.

A909

**ALLEGATION NO. 190:**

The table below reflects payments directed by the Veldhuis Control Group to Dhillon and Taylor or entities with whom they were associated, sourced from the sale of Stevia First/Vitality and Arch stock through Sharp Group-administered nominee shareholders from 2012 to 2018:[8]

[CHART OMITTED]

**ANSWER:**

Defendant denies the allegations in Paragraph 190.

**ALLEGATION NO. 191:**

Once Taylor became aware of the Commission's investigation into the schemes described in this complaint, he signed false documents that were intended to provide false explanations for his payments to Dhillon of the proceeds from the sales of Stevia First/Vitality and Arch securities. Specifically, Taylor signed a fraudulent and backdated Option Agreement that purported to justify his payments to Dhillon as purchases of interests in a parcel of land owned by Dhillon. In April 2021, Taylor then provided that false document to Canadian regulators who had requested documents from him on behalf of the Commission. Taylor's provision of this false document was designed to obfuscate his role in the scheme and shows his consciousness of guilt.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 191, and therefore denies the same.

**ALLEGATION NO. 192:**

As described in ¶182, Dhillon was also the beneficiary of another $200,000 in Arch stock sale proceeds in 2013, at the Veldhuis Control Group's direction, but these funds were sourced from a Wintercap SA-administered, rather than a Sharp Group-administered, nominee shareholder.

**ANSWER:**

Defendant denies the allegations in Paragraph 192.

---

[8] The table does not include payments made in cash to Dhillon or Taylor's payments to Dhillon.

A910

**ALLEGATION NO. 193:**

During the period of April 2014 through March 2016, the table below reflects various distributions of money, some of which were derived from Stevia First/Vitality and Arch stock sale proceeds, directed by Taylor to third parties for the benefit of Dhillon or otherwise associated with Dhillon:

[CHART OMITTED]

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 193, and therefore denies the same.

**ALLEGATION NO. 194:**

On or about July 30, 2020, Dhillon appeared for further testimony before the Commission in connection with the investigation leading to the filing of this action, and again made false and misleading statements, including claims that (i) prior to 2014, his interactions with Sexton had been limited to seeing him from a distance "in social circles … [like] hockey games", "at charity events with his own tables [and] at restaurants entertaining people" and that (ii) since 2014, his substantive interactions with Sexton have been limited to several discrete topics that he characterized as innocent in nature.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 194, and therefore denies the same.

**ALLEGATION NO. 195:**

In addition to their schemes to sell Arch and Vitality stock illegally that are described above, Taylor and Dhillon also schemed to sell the stock of at least two other Dhillon- chaired issuers: Inovio and OncoSec. Taylor's and Dhillon's Inovio scheme is described in the following paragraph; the pair's OncoSec scheme is described at ¶¶235 and 236.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 195, and therefore denies the same.

A911

**ALLEGATION NO. 196:**

At the time of Taylor's and Dhillon's Inovio scheme, Dhillon was the chairman of Inovio's Board of Directors. Similarly to Taylor and Dhillon's other schemes, Dhillon facilitated the transfer of Inovio shares to a nominee company controlled by Taylor, who then directed the unregistered sale of those shares from at least approximately August 23, 2013 to September 13, 2013. Taylor's sales generated at least $2.5 million in proceeds. On various dates during approximately November 2013 through January 2014, Taylor paid hundreds of thousands of dollars to Dhillon or for Dhillon's benefit. Also, similarly to Taylor and Dhillon's other schemes, Dhillon failed to register the Inovio shares or report his beneficial ownership interest in them or sale of them on either Schedule 13D or Form 4.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 196, and therefore denies the same.

**DHILLON'S SCHEME TO SELL ARCH STOCK ILLEGALLY THROUGH PERSON A**

**ALLEGATION NO. 197:**

Dhillon illegally sold the stock of companies atop whose boards he sat through different channels, apart from the Veldhuis Control Group and Taylor. To that end, Dhillon enlisted Person A to establish and manage a front company through which Dhillon surreptitiously sold such stock, without Dhillon appearing associated with those stock sales in any public record or filing. Dhillon's scheme to sell Arch stock illegally with Person A is described in detail below.

**ANSWER:**

Defendant denies the allegations in Paragraph 197.

**ALLEGATION NO. 198:**

Dhillon schemed to sell the stock of Arch fraudulently by, among other things, concealing from securities intermediaries such as brokers that he was selling, through a nominee shareholder, stock that was legally required to be registered, and concealing from Arch's shareholders that he—Arch's highest-level insider—was selling Arch stock into the market.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 198, and therefore denies the same.

65

A912

**ALLEGATION NO. 199:**

In or about April 2013, Dhillon became a director of Arch, and, by June of that year, became chairman of its board. Dhillon was an affiliate of Arch in that he had the power to control the company through his role as its chairman. As a public company affiliate, Dhillon was legally required to register any sale of Arch stock unless Dhillon elected to comply with the safe harbor provisions set forth in Commission Rule 144, which strictly limit the quantity of securities an affiliate may sell to the public. Dhillon testified, under oath, during the Commission's investigation that he understood these legal requirements at all times relevant to this Complaint.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 199, and therefore denies the same.

**ALLEGATION NO. 200:**

As a director of Arch, Dhillon was required to file public reports—including a Form 4—with the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder disclosing any change in his beneficial ownership of Arch stock. Dhillon understood these legal requirements at all times relevant to this Complaint. Dhillon failed to file any Forms 4 reflecting sales of Arch stock by the Veldhuis Control Group (described above) or Person A from which he benefitted.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 200, and therefore denies the same.

**ALLEGATION NO. 201:**

Dhillon was legally required to file a Schedule 13D with the Commission pursuant to Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the extent he was the beneficial owner of greater than five percent of Arch's common stock. Dhillon understood these legal requirements at all times relevant to this Complaint. Dhillon failed to file an accurate Schedule 13D reflecting his beneficial ownership of Arch's stock.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 201, and therefore denies the same.

A913

**ALLEGATION NO. 202:**

Shortly after Dhillon became the chairman of Arch's board in April 2013, he arranged for at least one alter ego corporate shareholder to hold Arch stock on his behalf. Specifically, in or about June 2013, Dhillon arranged for the transfer of 2,750,000 Arch shares to Company A, a corporate nominee that Dhillon directed Person A to form. In order to disguise Dhillon's association with Company A, Person A, as directed by Dhillon, identified only Person A as Company A's director in its incorporation papers. Company A was, in actuality, holding Arch stock for Dhillon.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 202, and therefore denies the same.

**ALLEGATION NO. 203:**

On or about April 6, 2016, Person A caused Company A to open an account with a United States brokerage firm for the purpose of selling Arch stock. Person A represented to the United States brokerage firm that he (as the sole director of Company A), was not an "officer, director, or more than a 10% shareholder of [Arch] or in any other way an 'affiliate' of [Arch]." Person A's representation was false and misleading in that Company A was actually holding, and was created in order to sell, Arch stock on behalf of Dhillon, who was a director and affiliate of Arch. Dhillon knew, or recklessly disregarded, that Person A misled the United States brokerage firm as part of their scheme to sell Arch stock surreptitiously.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 203, and therefore denies the same.

**ALLEGATION NO. 204:**

The table below reflects Company A's sales of Arch stock, all of which occurred during a four-month period in 2016. Dhillon failed to register these sales pursuant to Section 5 of the Securities Act:

[CHART OMITTED]

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 204, and therefore denies the same.

67

A914

**ALLEGATION NO. 205:**

At or about the same time that Company A sold Arch stock, Person A caused Company A to transfer at least $850,000 of Arch stock sale proceeds to third parties identified by Dhillon, his assistant, or both, all to benefit Dhillon. These transfers included paying various business and personal expenses Dhillon had incurred.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 205, and therefore denies the same.

**ALLEGATION NO. 206:**

Examples of Arch proceeds-funded payments routed by Company A through Dhillon's assistant to a bank account controlled by Dhillon in the name of One World Ranches LLC, as directed by Dhillon, are below.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 206, and therefore denies the same.

**ALLEGATION NO. 207:**

Dhillon did not disclose the stock that Company A held on Dhillon's behalf, or Dhillon's agreements with Person A concerning the holding and sale of those shares, on a Schedule 13D, as legally required. Nor did Dhillon disclose any of Company A's Arch sales executed on Dhillon's behalf on any Form 4 filing with the Commission.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 207, and therefore denies the same.

A915

**ALLEGATION NO. 208:**

On or about July 8, 2013, Dhillon filed a Schedule 13D with the Commission purportedly reflecting all of the Arch shares in which he held a beneficial interest. This is the only Schedule 13D Dhillon filed concerning Arch. Dhillon reported that he was the beneficial owner of 7,160,373 of Arch shares, consisting of:

(a)    7,000,000 shares that he received in a private transaction in or about June 2013.

(b)    160,373 shares of common stock in exchange for the cancellation of debt Dhillon was owed by a private company that had merged with Arch.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 208, and therefore denies the same.

**ALLEGATION NO. 209:**

Dhillon's July 8, 2013 Schedule 13D was materially misleading in that it failed to reflect that Dhillon was also a beneficial owner of Arch stock held on Dhillon's behalf by Company A and additional Arch stock held on Dhillon's behalf by the Veldhuis Control Group. The Schedule 13D was also materially misleading in that it failed to disclose Dhillon's agreements with Person A and with the Veldhuis Control Group concerning the sale of Arch shares, or his and their respective combined holdings in Arch securities. Dhillon knowingly failed to make any of these disclosures in his Schedule 13D in order to conceal that information from investors and securities market intermediaries.

**ANSWER:**

Defendant denies the allegations in Paragraph 209.

**ALLEGATION NO. 210:**

Dhillon also knowingly failed to file any Forms 4 reflecting the sales of Arch stock that had been effected on his behalf, directly or indirectly, by Company A or the Veldhuis Control Group. For example, on various dates in April through June 2016, Company A sold Arch shares in the market on Dhillon's behalf. Dhillon intentionally failed to file a Form 4 reflecting any of these 2016 Arch stock sales in order to conceal his conduct form Arch investors.

**ANSWER:**

Defendant denies the allegations in Paragraph 210.

A916

**ALLEGATION NO. 211:**

On or about August 29, 2019, during the investigation leading to the filing of this action, Dhillon provided sworn testimony to the Commission staff.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 211, and therefore denies the same.

**ALLEGATION NO. 212:**

During that August 2019 testimony, the Commission asked Dhillon if he knew of anyone who sold Arch stock prior to 2019. Dhillon, seeking to conceal his illegal conduct from the Commission, falsely replied, under oath: "I'm not aware." In actuality, and as Dhillon well knew, Person A caused Company A to sell Arch shares on Dhillon's behalf. As described above, and as Dhillon likewise well knew, the Veldhuis Control Group also sold Arch shares on Dhillon's behalf.

**ANSWER:**

Defendant denies the allegations in Paragraph 212.

### SHARP GROUP EXAMPLE THREE:
### ILLEGAL ONCOSEC STOCK SALES INVOLVING DHILLON AND THE VELDHUIS CONTROL GROUP

**The Veldhuis Control Group's Scheme to Sell OncoSec Stock Fraudulently**

**ALLEGATION NO. 213:**

Prior to the Stevia First/Vitality and Arch fraudulent conduct described above, the Veldhuis Control Group schemed with the Sharp Group and Dhillon to sell fraudulently the stock of another issuer, OncoSec. Further, Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon failed to register the sales of OncoSec stock described herein pursuant to Section 5 of the Securities Act.

**ANSWER:**

Defendant denies the allegations in Paragraph 213.

**ALLEGATION NO. 214:**

In or about February 2011, the Veldhuis Control Group directed the transfer to seven Sharp Group-administered nominee shareholders of 12,800,000 purportedly unrestricted OncoSec shares sourced from 20 original individual investors. At the time, OncoSec had 52,656,000 shares outstanding. The Veldhuis Control Group, therefore, held over 24% of the total common stock outstanding across the Sharp Group-provided nominee shareholders to which the Veldhuis Control

70

A917

Group directed OncoSec shares, and was an affiliate of the issuer. The Veldhuis Control Group knew that its 24% stake in OncoSec was legally restricted from resale absent an effective registration statement. The table below reflects the transfers summarized in this paragraph.[9]

**ANSWER:**

Defendant denies the allegations in Paragraph 214.

**ALLEGATION NO. 215:**

Between approximately March 2011 and November 2011, the Veldhuis Control Group sold, via various Sharp Group-administered nominee shareholders, approximately 2.2 million shares of OncoSec stock through offshore brokerage firms for proceeds of approximately $3 million.

**ANSWER:**

Defendant denies the allegations in Paragraph 215.

**ALLEGATION NO. 216:**

Later, the Veldhuis Control Group sold through the Sharp Group approximately 11 million more OncoSec shares between approximately February 2012 and August 2012 for approximately $2.4 million more in illicit proceeds.

**ANSWER:**

Defendant denies the allegations in Paragraph 216.

**Dhillon's Scheme to Sell OncoSec Fraudulently through Person A**

**ALLEGATION NO. 217:**

Around the same time that the Veldhuis Control Group sold OncoSec securities, Dhillon schemed to sell the stock of OncoSec fraudulently through Person A. Dhillon concealed from securities intermediaries, such as brokers, that he was selling, through a nominee shareholder, stock that was legally required to be restricted, and concealed from OncoSec's investors that he was selling OncoSec stock into the market.

---

[9] Monterra Investments, Cliffside Partners, and Dartmore International are nominee shareholders utilized by the Veldhuis Control Group.

A918

**ANSWER:**

Defendant denies the allegations in Paragraph 217.

**ALLEGATION NO. 218:**

On or about March 10, 2011, Dhillon became the chairman of OncoSec's board of directors.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 218, and therefore denies the same.

**ALLEGATION NO. 219:**

Dhillon was an affiliate of OncoSec because he was the chairman of its board. Through that role, he had the power to control the company. As a public company affiliate, Dhillon was legally required to register any sale of OncoSec stock unless Dhillon elected to comply with the safe harbor provisions set forth in Commission Rule 144. Dhillon testified, under oath, during the Commission's investigation that he understood these legal requirements at all times relevant to this Complaint.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 219, and therefore denies the same.

**ALLEGATION NO. 220:**

As a director of OncoSec, Dhillon was required to file public reports—including a Form 4—with the Commission pursuant to Section 16(a) of the Exchange Act and Rule 16a-3 thereunder disclosing any change in his beneficial ownership of OncoSec stock, regardless of amount. Dhillon understood these legal requirements at all times relevant to this Complaint.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 220, and therefore denies the same.

**ALLEGATION NO. 221:**

Dhillon was legally required to file a Schedule 13D with the Commission pursuant to Section 13(d) of the Exchange Act and Rule 13d-1 thereunder to the extent he was the beneficial owner of greater than five percent of OncoSec's common stock. On or about March 22, 2011,

A919

Dhillon received 9,910,496 restricted shares of OncoSec, which comprised greater than 5% of the company's outstanding stock.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 221, and therefore denies the same.

**ALLEGATION NO. 222:**

Dhillon understood these legal requirements at all times relevant to this Complaint. Dhillon intentionally failed to file an accurate Schedule 13D reflecting his beneficial ownership of OncoSec's stock, his agreement with Person A concerning the sale of OncoSec stock, or his and Person A's combined holdings in OncoSec, despite being the beneficial owner of greater than five percent of the company's outstanding common stock.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 222, and therefore denies the same.

**ALLEGATION NO. 223:**

Around the time that Dhillon became the chairman of OncoSec's board in March 2011, he arranged for Person A to hold OncoSec stock on his behalf through a nominee shareholder.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 223, and therefore denies the same.

**ALLEGATION NO. 224:**

On or about March 2, 2011, Person A incorporated a corporate entity at Dhillon's direction, hereinafter referred to as Company B, to serve as Dhillon's nominee shareholder. Shortly thereafter, Dhillon facilitated Company B's nominal acquisition of 2,354,880 OncoSec shares. At Dhillon's direction, Person A identified himself as Company B's sole director, in order to conceal Dhillon's association with Company B.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 224, and therefore denies the same.

**ALLEGATION NO. 225:**

By December 2012, Person A opened a brokerage account in the name of Company B.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 225, and therefore denies the same.

**ALLEGATION NO. 226:**

On or about January 19, 2013, Person A represented to Company B's brokerage firm that Company B was never an "Officer, Director, Control Person, 10% owner or Affiliate of the issuer being presented for deposit [i.e., OncoSec]," which was a confirmation required by the brokerage firm when the OncoSec shares were deposited for resale.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 226, and therefore denies the same.

**ALLEGATION NO. 227:**

Person A's representations to the brokerage firm were false and misleading because Company B was, in actuality, holding shares for Dhillon, who was a Director, Control Person, and Affiliate of OncoSec. Dhillon knew, or was reckless in not knowing, that Person A would make these types of material misrepresentations to brokerage firms. Indeed, Dhillon directed Person A to establish Company B for precisely this purpose: to conceal the fact that Dhillon was actually the beneficial owner of Company B's OncoSec stock.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 227, and therefore denies the same.

**ALLEGATION NO. 228:**

In or about January 2013, Person A caused Company B to deposit 2,354,880 shares of OncoSec into its brokerage account. Person A, working in concert with Dhillon, subsequently caused Company B to sell these shares on Dhillon's behalf.

A921

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 228, and therefore denies the same.

**ALLEGATION NO. 229:**

The table below reflects Company B's sales of all 2,354,880 of its shares of OncoSec stock, between 2013 and 2017. Dhillon failed to register these stock sales pursuant to Section 5 of the Securities Act.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 229, and therefore denies the same.

**ALLEGATION NO. 230:**

Person A, acting through Company B, distributed the majority of the OncoSec sale proceeds at Dhillon's direction to third parties identified by Dhillon. Dhillon directed the transfers to third parties, instead of directly to his own bank accounts, to conceal that he was the actual beneficiary of the stock sales.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 230, and therefore denies the same.

**ALLEGATION NO. 231:**

The flow chart below reflects examples of Company B's OncoSec proceeds- funded transfers to Dhillon's assistant for the benefit of Dhillon, as directed by Dhillon:

[CHART OMITTED]

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 231, and therefore denies the same.

A922

**ALLEGATION NO. 232:**

To conceal his conduct from investors, Dhillon never filed a Schedule 13D with the SEC disclosing his agreement with Person A concerning the sale of OncoSec stock through Company B, or his and Person A's combined holdings in OncoSec stock, or any of the many material changes to those combined holdings.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 232, and therefore denies the same.

**ALLEGATION NO. 233:**

Dhillon knew that OncoSec's public filings concealed from OncoSec's shareholders and securities market intermediaries the true extent of Dhillon's beneficial ownership position. For example, OncoSec's Form 10-K for the year ended July 31, 2011 only reported Dhillon's ownership of 9,910,496 shares, and failed to disclose Dhillon's further beneficial ownership of, at a minimum, the Company B shares. As a further example, OncoSec's Form 10-K for the year ended July 31, 2017 failed to disclose the existence or extent of Dhillon's Form 4 filing delinquencies stemming from his failure to file any Forms 4 concerning his OncoSec share sales that year through Company B.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 233, and therefore denies the same.

**ALLEGATION NO. 234:**

Indeed, to conceal his conduct from investors, Dhillon never filed any Forms 4 reporting Company B's sales of OncoSec stock on his behalf, as legally required.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 234, and therefore denies the same.

**DHILLON'S SCHEME TO SELL ONCOSEC STOCK ILLEGALLY VIA TAYLOR**

**ALLEGATION NO. 235:**

A923

During the course of his scheme with Person A to sell illegally OncoSec stock, described above, Dhillon also schemed with Taylor to sell illegally even more OncoSec stock. At the time of this Dhillon-Taylor OncoSec scheme, Dhillon was the chairman of OncoSec's Board of Directors. As part of this scheme, between at least April 2 and June 19, 2014, Taylor sold at least 827,000 shares of OncoSec stock, through a Singapore-banking nominee shareholder that he controlled, for proceeds totaling approximately $586,000. Taylor failed to register these stock sales pursuant to Section 5 of the Securities Act.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 235, and therefore denies the same.

**ALLEGATION NO. 236:**

During that same period, and from the same account in which he had realized the aforementioned approximately $586,000 in sale proceeds, Taylor, in turn, sent out two wires totaling $155,000 for Dhillon's benefit. For examples, Taylor wired approximately $95,000 to pay a creditor Dhillon owed, and $60,000 to a private company Dhillon owned. And, as with his other, similar schemes, Dhillon never disclosed—through any Form 4 or any other filing—his OncoSec trading through Taylor.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 236, and therefore denies the same.

### ADDITIONAL SHARP GROUP AND VELDHUIS CONTROL GROUP DEALS

**ALLEGATION NO. 237:**

The Veldhuis Control Group utilized the Sharp Group's services to disguise their stock sales in deals beyond the Vitality, Arch, and OncoSec conduct detailed above. In each such case, the Sharp Group provided the infrastructure necessary to obfuscate the Veldhuis Control Group's ownership of a significant percentage of the public companies' shares. The table below reflects a non-exhaustive list of stock sold by the Veldhuis Control Group using Sharp Group-administered nominee shareholders to disguise their control.

**ANSWER:**

Defendant denies the allegations in Paragraph 237.

A924

**ALLEGATION NO. 238:**

The Veldhuis Control Group paid Kaitz to promote several of the issuers listed in the table in ¶237, including (in addition to Stevia First/Vitality and Arch, both detailed above) the stock of Echo Automotive, Liberty One Lithium Corp., Oryon Technologies, Inc., NewGen Biopharma Corp., StartMonday Technology Corp., and BreathTech Biomedical, Inc.

**ANSWER:**

Defendant denies the allegations in Paragraph 238.

**ALLEGATION NO. 239:**

In each instance, Kaitz knowingly or recklessly substantially assisted the Veldhuis Control Group by materially omitting or materially misrepresenting the facts that the Veldhuis Control Group (i) actually paid for the stock promotional campaign, and (ii) was actively trading, and planned to trade, in the very opposite direction to which the promotions urged investors to trade.

**ANSWER:**

Defendant denies the allegations in Paragraph 239.

**SHARP GROUP EXAMPLE: LUIS CARRILLO**

**ALLEGATION NO. 240:**

As described in ¶43, above, the control group clients of the Sharp Group generated over one billion dollars in stock sales through the Sharp Group between approximately 2010 and 2019. One such client is a repeat offender, Luis Carrillo.[10] Carrillo generated, in concert with others, at least $75 million in illegal stock sale proceeds using the Sharp Group's encrypted communications and nominee shareholders as cover. One such example is described below.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 240, and therefore denies the same.

---

[10] *See SEC v. Carrillo et al.*, No. 13-cv-1735-GBD (S.D.N.Y. March 2013); SEC v. Carrillo et al., No. 21-cv-11272 (D. Mass. Aug. 2021).

A925

**ALLEGATION NO. 241:**

On August 4, 2021, the Commission filed a Complaint against Luis Carrillo in connection with his illegal sale of the stock of Garmatex Holdings, Ltd. Carrillo, acting in concert with others, amassed approximately 88% of Garmatex's unrestricted shares that were available for trading, and they used the Sharp Group, Wintercap SA, Blacklight SA, and a separate broker to execute the scheme.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 241, and therefore denies the same.

**ALLEGATION NO. 242:**

In particular, Kelln, at Sharp's direction, deposited three blocks of Garmatex stock—each consisting of 1,750,000 Garmatex shares, or just under five percent of Garmatex's total outstanding stock—with Wintercap SA in the name of three Sharp Group nominee shareholders. As Sharp and Kelln knew, or recklessly disregarded, brokerage firms typically inquire about whether a shareholder owns more than five percent of a public company's stock because holding more than five percent may trigger additional questions about whether the sales are part of a distribution that must be registered pursuant to Section 5 of the Securities Act.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 242, and therefore denies the same.

**ALLEGATION NO. 243:**

Sharp and Kelln arranged for these deposits in the names of separate Sharp Group nominee shareholders well knowing that Carrillo and his team were actually the beneficial owners of the shares. For example, on or about March 9, 2017, Kelln replied to an Encrypted Communication from Wintercap SA's principal about the status of selling Garmatex stock: "Changing the [transfer agent] first . . . [Carrillo is] up my butt to get grmx [the ticker of Garmatex] all in."

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 243, and therefore denies the same.

A926

**ALLEGATION NO. 244:**

The Sharp Group's provision of these nominee shareholders enabled Carrillo, acting in concert with others, to conceal from brokerage firms that they actually controlled greater than five percent of the company's outstanding shares.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 244, and therefore denies the same.

**ALLEGATION NO. 245:**

Overall, during approximately March and April 2017, Kelln coordinated with Carrillo, acting in concert with others, to transfer a total of 12,233,337 shares of Garmatex nominally held by six different Sharp Group-administered nominee shareholders to Wintercap SA, Blacklight SA, and a third party. Collectively, these positions accounted for approximately 88% of Garmatex's purportedly unrestricted shares that were available for trading, and approximately 34% of Garmatex's total issued and outstanding stock. Carrillo, therefore, was an affiliate of Garmatex.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 245, and therefore denies the same.

**ALLEGATION NO. 246:**

The chart below summarizes the Garmatex share transfers described above:

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 246, and therefore denies the same.

**ALLEGATION NO. 247:**

Carrillo, acting in concert with others, coordinated the trading of Garmatex stock at Wintercap SA, Blacklight SA and a separate broker during a stock promotional campaign, generating proceeds as a result of these unregistered sales in excess of $7 million.

A927

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 247, and therefore denies the same.

**ALLEGATION NO. 248:**

In addition to Carrillo's conduct relating to Garmatex, he used the Sharp Group and its network of nominees to facilitate fraudulent trading in the stock of many other issuers he controlled. He also used the Sharp Group to coordinate the payment of expenses associated with his fraudulent sales, and other payments to or for his benefit. Carrillo frequently corresponded with Gasarch about payments he was seeking the Sharp Group's assistance in effecting, and payments that had been charged to his account in the Q accounting system. Carrillo sometimes communicated with Gasarch using bespoke email addresses created and administered by the Sharp Group called the "xmeridian" or "xmail" system. Gasarch's address on this system was "wires@secure.xmeridian.com." Carrillo and Gasarch engaged in email correspondence about invoices he had asked her to pay, invoices that had been improperly charged to his Q account, incorrect amounts of invoices he had asked her to send, and related subjects, on at least the following dates: August 8, 9, and 12, 2016, September 28 and 29, 2016 and multiple dates in October 2016.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 248, and therefore denies the same.

**TOLLING AGREEMENTS**

**ALLEGATION NO. 249:**

Between January and June 2020, Dhillon entered into two separate tolling agreements with the Commission. Each tolling agreement specifies a period of time (a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against Dhillon authorized, instituted, or brought by … the Commission… arising out of the [Commission's investigation of Dhillon's conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended . . . ." Each tolling agreement further provides that Dhillon "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defenses." Collectively, these agreements tolled the running of any limitations period or any other time-related defenses available to Dhillon for a period of approximately seven months and three days.

A928

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 249, and therefore denies the same.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Sections 17(a)(1) and (3) of the Securities Act by Sharp, Kelln, Veldhuis,
Sexton, Friesen, Dhillon, and Taylor)**

**ALLEGATION NO. 250:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set
forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the

Amended Complaint.

**ALLEGATION NO. 251:**

By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton,
Friesen, Dhillon, and Taylor, in connection with the offer or sale of securities, by the use of the
means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting
intentionally, knowingly, recklessly or negligently (i) employed devices, schemes, or artifices to
defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would
operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

**ANSWER:**

Defendant denies the allegations in Paragraph 251.

**ALLEGATION NO. 252:**

By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton,
Friesen, Dhillon, and Taylor violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C.
§77q(a)(1) and (3)] and will continue to violate those sections unless enjoined.

**ANSWER:**

Defendant denies the allegations in Paragraph 252.

A929

**SECOND CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by Sharp,**
**Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor)**

**ALLEGATION NO. 253:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the

Amended Complaint.

**ALLEGATION NO. 254:**

By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

**ANSWER:**

Defendant denies the allegations in Paragraph 254.

**ALLEGATION NO. 255:**

By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Sexton, Friesen, Dhillon, and Taylor violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

**ANSWER:**

Defendant denies the allegations in Paragraph 255.

**THIRD CLAIM FOR RELIEF**
**UNREGISTERED OFFERINGS OF SECURITIES**
**(Violations of Sections 5(a) and 5(c) of the Securities Act by Sharp, Kelln, Veldhuis,**
**Friesen, Sexton, and Dhillon)**

A930

**ALLEGATION NO. 256:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the Amended Complaint.

**ALLEGATION NO. 257:**

By reason of the conduct described above, defendants Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

**ANSWER:**

Defendant denies the allegations in Paragraph 257.

**ALLEGATION NO. 258:**

As a result, Sharp, Kelln, Veldhuis, Friesen, Sexton, and Dhillon violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

**ANSWER:**

Defendant denies the allegations in Paragraph 258.

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP**
**(Violations of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder by Veldhuis, Sexton, and Friesen)**

</div>

**ALLEGATION NO. 259:**

Paragraphs 1 through 29 above are re-alleged and incorporated by reference as if fully set forth herein.

A931

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the Amended Complaint.

**ALLEGATION NO. 260:**

During the Relevant Period, the stock of Vitality was a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 260, and therefore denies the same.

**ALLEGATION NO. 261:**

During the Relevant Period, Vitality had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 261, and therefore denies the same.

**ALLEGATION NO. 262:**

By reason of the conduct described above, defendants Veldhuis, Sexton, and Friesen, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a class of Vitality equity securities, failed to file a statement with the Commission containing the information required by Schedule 13D [17 C.F.R. §240.13d-101] within ten days after they acquired such shares, or at all.

**ANSWER:**

Defendant denies the allegations in Paragraph 262.

**ALLEGATION NO. 263:**

As a result, defendants Veldhuis, Sexton, and Friesen violated Section 13(d) of the Exchange Act and Rule 13d-1 thereunder [15 U.S.C. §78m(d); 17 C.F.R. §240.13d-1].

**ANSWER:**

Defendant denies the allegations in Paragraph 263.

<div align="center">

**FIFTH CLAIM FOR RELIEF**
**FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP**
**(Violation of Section 13(d) of the Exchange Act and Rule 13d-2 Thereunder by Dhillon)**

</div>

**ALLEGATION NO. 264:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the Amended Complaint.

**ALLEGATION NO. 265:**

During the Relevant Period, the stock of Vitality was a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 265, and therefore denies the same.

**ALLEGATION NO. 266:**

During the Relevant Period, Vitality had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 266, and therefore denies the same.

A933

**ALLEGATION NO. 267:**

By reason of the conduct described above, defendant Dhillon, after acquiring directly or indirectly beneficial ownership of more than 5 percent of a class of Vitality equity securities and filing a Schedule 13D, acquired beneficial ownership of 1 percent or more of that class of equity securities and failed to file with the Commission a timely and accurate amendment disclosing this material change.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 267, and therefore denies the same.

**ALLEGATION NO. 268:**

As a result, defendant Dhillon violated Section 13(d) of the Exchange Act and Rule 13d-2 thereunder [15 U.S.C. §78m(d); 17 C.F.R. §240.13d-2].

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 268, and therefore denies the same.

<div align="center">

**SIXTH CLAIM FOR RELIEF**
**FAILURE TO FILE**
**(Violation of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder by Dhillon)**

</div>

**ALLEGATION NO. 269:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the Amended Complaint.

**ALLEGATION NO. 270:**

During the Relevant Period, the stock of Arch and OncoSec was each a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)], and a penny stock.

A934

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 270, and therefore denies the same.

**ALLEGATION NO. 271:**

During the Relevant Period, Arch and OncoSec had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 271, and therefore denies the same.

**ALLEGATION NO. 272:**

Defendant Dhillon violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)], and Rule 16a-3 thereunder [17 C.F.R. § 240.16(a)], in that as a director of Arch and OncoSec and having acquired more than 10% of a registered class of Arch's and OncoSec's equity securities, Dhillon failed to file reports of ownership and changes of ownership with the Commission as required.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 272, and therefore denies the same.

**SEVENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Taylor)**

**ALLEGATION NO. 273:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the Amended Complaint.

A935

**ALLEGATION NO. 274:**

By reason of the conduct described above, Dhillon, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the securities of Vitality, as to which no registration statement has been filed and for which no exemption from registration has been available.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 274, and therefore denies the same.

**ALLEGATION NO. 275:**

Taylor knowingly or recklessly provided substantial assistance to Dhillon in his violation of Sections 5(a) and 5(c) of the Securities Act.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 275, and therefore denies the same.

**ALLEGATION NO. 276:**

As a result, Taylor violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 276, and therefore denies the same.

A936

**EIGHTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Sharp and Kelln)**

**ALLEGATION NO. 277:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the

Amended Complaint.

**ALLEGATION NO. 278:**

By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

**ANSWER:**

Defendant denies the allegations in Paragraph 278.

**ALLEGATION NO. 279:**

By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the securities of Vitality, Arch, OncoSec, and Garmatex, as to which no registration statement has been filed and for which no exemption from registration has been available.

**ANSWER:**

Defendant denies the allegations in Paragraph 279.

A937

**ALLEGATION NO. 280:**

Sharp and Kelln knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Sections 5(a), 5(c), and 17(a)(1) and (3) of the Securities Act.

**ANSWER:**

Defendant denies the allegations in Paragraph 280.

**ALLEGATION NO. 281:**

As a result, Sharp and Kelln each violated Section 15(b) of the Securities Act [15 U.S.C. §§ 77o(b)].

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 281, and therefore denies the same.

<div align="center">

**NINTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Sharp and Kelln)**

</div>

**ALLEGATION NO. 282:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the Amended Complaint.

**ALLEGATION NO. 283:**

By reason of the conduct described above, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

<div align="center">91</div>

<div align="center">

A938

</div>

**ANSWER:**

Defendant denies the allegations in Paragraph 283.

**ALLEGATION NO. 284:**

Sharp and Kelln knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

**ANSWER:**

Defendant denies the allegations in Paragraph 284.

**ALLEGATION NO. 285:**

As a result, Sharp and Kelln each violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in

Paragraph 285, and therefore denies the same.

**TENTH CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a)(3) of the Securities Act by Gasarch)**

**ALLEGATION NO. 286:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the

Amended Complaint.

A939

**ALLEGATION NO. 287:**

By reason of the conduct described above, defendant Gasarch, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 287, and therefore denies the same.

**ALLEGATION NO. 288:**

By reason of the conduct described above, defendant Gasarch violated Securities Act Section 17(a)(3) [15 U.S.C. §77q(a)(3)].

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 288, and therefore denies the same.

<div align="center">

**ELEVENTH CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a)(3) of the Securities Act by Kaitz)**

</div>

**ALLEGATION NO. 289:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the Amended Complaint.

**ALLEGATION NO. 290:**

By reason of the conduct described above, defendant Kaitz, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

<div align="center">93</div>

<div align="center">A940</div>

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 290, and therefore denies the same.

**ALLEGATION NO. 291:**

By reason of the conduct described above, defendant Kaitz violated Securities Act Section 17(a)(3) [15 U.S.C. §77q(a)(3)].

**ANSWER:**

Defendant is without sufficient knowledge to either admit or deny the allegations in Paragraph 291, and therefore denies the same.

**TWELFTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Gasarch)**

**ALLEGATION NO. 292:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the Amended Complaint.

**ALLEGATION NO. 293:**

By reason of the conduct described above, Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

**ANSWER:**

Defendant denies the allegations in Paragraph 293.

94

A941

**ALLEGATION NO. 294:**

Gasarch knowingly or recklessly provided substantial assistance to Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act.

**ANSWER:**

Defendant denies the allegations in Paragraph 294.

**ALLEGATION NO. 295:**

As a result, Gasarch violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

**ANSWER:**

Defendant denies the allegations in Paragraph 295.

**THIRTEENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act by Kaitz)**

**ALLEGATION NO. 296:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the

Amended Complaint.

**ALLEGATION NO. 297:**

By reason of the conduct described above, Veldhuis, Sexton, and Friesen, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

**ANSWER:**

Defendant denies the allegations in Paragraph 297.

A942

**ALLEGATION NO. 298:**

Kaitz knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, and Friesen in their violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act.

**ANSWER:**

Defendant denies the allegations in Paragraph 298.

**ALLEGATION NO. 299:**

As a result, Kaitz violated Section 15(b) the Securities Act [15 U.S.C. §§ 77o(b)].

**ANSWER:**

Defendant denies the allegations in Paragraph 299.

**FOURTEENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Gasarch)**

**ALLEGATION NO. 300:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the

Amended Complaint.

**ALLEGATION NO. 301:**

By reason of the conduct described above, Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

**ANSWER:**

Defendant denies the allegations in Paragraph 301.

A943

**ALLEGATION NO. 302:**

Gasarch knowingly or recklessly provided substantial assistance to Sharp, Kelln, Veldhuis, Sexton, Friesen, Carrillo, and other Sharp Group clients in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

**ANSWER:**

Defendant denies the allegations in Paragraph 302.

**ALLEGATION NO. 303:**

As a result, Gasarch violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

**ANSWER:**

Defendant denies the allegations in Paragraph 303.

<div align="center">

**FIFTEENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 20(e) of the Exchange Act by Kaitz)**

</div>

**ALLEGATION NO. 304:**

Paragraphs 1 through 249 above are re-alleged and incorporated by reference as if fully set forth herein.

**ANSWER:**

Defendant incorporates by reference and restates his responses to the allegations of the

Amended Complaint.

**ALLEGATION NO. 305:**

By reason of the conduct described above Veldhuis, Sexton, and Friesen directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

**ANSWER:**

Defendant denies the allegations in Paragraph 305.

<div align="center">

A944

</div>

**ALLEGATION NO. 306:**

Kaitz knowingly or recklessly provided substantial assistance to Veldhuis, Sexton, and Friesen in their violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

**ANSWER:**

Defendant denies the allegations in Paragraph 306.

**ALLEGATION NO. 307:**

As a result, Kaitz violated Section 20(e) the Exchange Act [15 U.S.C. § 78t(e)].

**ANSWER:**

Defendant denies the allegations in Paragraph 307.

A945

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE (Failure to State a Claim)

The Amended Complaint, and each count thereof, fails to state a claim or claims upon which relief can be granted against Defendant.

### SECOND AFFIRMATIVE DEFENSE (Failure to Plead with Particularity)

The Amended Complaint fails to plead fraud with particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure.

### THIRD AFFIRMATIVE DEFENSE (No Misstatements or Omissions)

The Amended Complaint fails to identify the existence of any false or misleading statements or omissions made by Defendant.

### FOURTH AFFIRMATIVE DEFENSE (Statute of Limitations)

Plaintiff's claims as well as its ability to obtain the requested relief are barred in whole or in part by the applicable statutes of limitations. To the extent that any limitations periods currently in existence would make Plaintiff's claims untimely, Defendant asserts that such periods do not apply retroactively to revive time-barred claims.

### FIFTH AFFIRMATIVE DEFENSE (Good Faith)

The Amended Complaint, and each cause of action, are barred, in whole or in part, because Defendant acted in good faith at all times.

### SIXTH AFFIRMATIVE DEFENSE (No Causation)

The Amended Complaint, and each cause of action, is barred, in whole or in part, because Defendant did not directly or indirectly induce the act or acts constituting the alleged violations and causes of action outlined in the Complaint.

A946

**SEVENTH AFFIRMATIVE DEFENSE (No Scienter)**

The Amended Complaint is barred, in whole or in part, because Defendant did not act with

scienter.

**EIGHTH AFFIRMATIVE DEFENSE
(No Liability for Statements or Omissions)**

Defendant is not liable under Section 10(b) of the Securities Exchange Act of

1934, Rule 10b-5 promulgated thereunder, or otherwise for any statements or omissions.

**RESERVATION OF RIGHTS**

Defendant reserves the right to assert other and further defenses as may later become

known to counsel in a manner consistent with the Federal Rules of Civil Procedure and the Local

Rules of this Court.

**PRAYER FOR RELIEF**

**WHEREFORE**, Defendant prays for judgment as follows:

1.  That Plaintiff take nothing by its Amended Complaint;

2.  That Plaintiff's Amended Complaint be dismissed in its entirety with prejudice;

3.  That Defendant be awarded costs of suit, including, but not limited to, expenses and

    attorneys' fees to the extent permitted by law; and

4.  That the Court award such other and further relief as it deems just and proper.

**DEMAND FOR JURY TRIAL**

Defendant demands a jury trial on all counts.

A947

Dated: October 14, 2022

Respectfully submitted,

Jackson T. Friesen
By his attorneys,

*/s/ Timothy J. Fazio*
Timothy J. Fazio, BBO # 654157
MANNING GROSS + MASSENBURG LLP
125 High Street
6th Floor, Oliver Street Tower
Boston, MA 02110
Telephone: (617) 670-8800
Email: tfazio@mgmlaw.com

*and*

Maranda E. Fritz (*Admitted Pro Hac*)
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: (646) 584-8231
Email: maranda@fritzpc.com

A948

## **CERTIFICATE OF SERVICE**

  I, Timothy J. Fazio, counsel for Defendant, Jackson T. Friesen, hereby certify that a true and accurate copy of the above document was filed electronically on the Court's CM/ECF system on October 14, 2022.  Notice of this filing will be sent to all counsel of record via the Court's ECF system.

           */s/ Timothy J. Fazio*     
           Timothy J. Fazio

A949

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>                              **Plaintiff,** <br><br>    **v.** <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br>                              **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

<u>**DECLARATION OF ROGER KNOX**</u>

I, Roger Knox, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1.      I make this Declaration based upon my personal knowledge and on my review of certain documents as set forth below.

2.      From May 2013 until October 2018, I owned and operated an entity based in Switzerland named Silverton SA.  In 2015, Silverton changed its name to Wintercap SA.  In this declaration, I will refer to both Silverton and Wintercap as "Silverton" regardless of which name it was using at the relevant time.

3.      On January 13, 2020, I pled guilty to an indictment that charged me with one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. §371, and one count of securities fraud in violation of 15 U.S.C. §§78j(b) and 78ff, and 17 C.F.R.  §240.10b-5.  When I pled guilty, I acknowledged that, through Silverton, I engaged in a scheme to fraudulently sell stock of numerous publicly traded United States companies.

4.      Silverton provided a route to market for people who wished to sell large quantities of microcap stocks into the United States securities markets while concealing that they owned, controlled, and were directing sales of, those shares.

5.      I am familiar with defendants Frederick Sharp ("Sharp"), Courtney Kelln ("Kelln") and Zhiying Yvonne Chen Gasarch ("Gasarch"). Kelln and Gasarch were employees of Sharp, and Sharp and his business were one of Silverton's major clients. The scheme to which I pled guilty involved Silverton's sales of stock for the clients of Sharp and his business, including Veldhuis, Sexton and Friesen. Sharp's business was based in and around Vancouver, British Columbia, Canada.

6.      Sharp's business provided a range of services to people who controlled the stock of numerous microcap stock issuers. One of Sharp's primary services was to maintain and administer a group of nominee companies, incorporated in many foreign countries, that he allowed his clients to use to hold shares of stock on their behalf. Sharp charged his clients fees for using his nominee companies to hold shares. Sharp allowed his clients to direct the nominee companies' purchases and sales of stock without revealing that the clients were the people actually directing those purchases and sales. I am aware that Sharp's clients often paid to promote the stock at the same time that they were directing purchases and sales of that stock.

7.      I often worked with Kelln on the stock transfer aspects of Sharp's business. Kelln was the person with whom I interacted to organize the transfer of shares that Sharp's clients wanted to sell into accounts managed by Silverton. In particular, I understood from numerous interactions with her that Kelln broke shares controlled by Sharp clients into blocks of less than 5% of each issuer's outstanding shares. Kelln would then collect or create all of the supporting documents needed to transfer each block of shares into the name of a nominee company

2

A951

controlled by Sharp's business.  Sometimes that nominee company had an account with Silverton.  Sometimes Kelln would organize the transfer of shares from a first nominee company to a second nominee company that had an account with Silverton.  Examples of supporting documents that Kelln would provide or create included powers of attorney and share purchase agreements.  As far as I know, these share purchase agreements transferred shares from the name of one nominee company to another; there were no actual payments for the shares between nominee companies.

8.      It was important to me, to Kelln, and to Sharp's clients to keep an issuer's shares held by a nominee company under 5% of the issuer's outstanding shares.  If a nominee company held more than 5% of an issuer's shares, there were regulatory disclosure requirements that would apply.  Also, brokerage firms would apply greater scrutiny to the shares and would have imposed additional requirements before allowing those shares to be traded.

9.      I often worked with Gasarch on the financial side of Sharp's business.  She sent wire requests and supporting invoices to Silverton when Sharp's clients were seeking payments out of the proceeds of the trading that Silverton did for them.  Gasarch would often send these requests by using email addresses that appeared to come from the nominee companies that Sharp's business controlled.  My Silverton colleagues and I often corresponded with Gasarch when there were questions about payments to Sharp's clients.

10.     I got to know some of Sharp's clients well.  For example, I met Mike Veldhuis ("Veldhuis") and Jackson Friesen ("Friesen") a number of times.  We communicated about business and were also social.  I also met Paul Sexton ("Sexton") two or three times when I was also meeting with Veldhuis and Friesen.

11.    I understood that Veldhuis, Friesen and Sexton were clients of the Sharp Group, who often together worked as partners to own and sell various issuers' stocks.  They owned shares that Silverton traded, through nominee companies, on their behalf.

12.    Sharp's business provided its clients and service providers with Blackberry devices called xphones.  I got my first xphone in approximately 2010.  In approximately 2016, Sharp replaced the Blackberry xphones with new Samsung xphones.  My use of the xphones declined and stopped after about 2017 because other encrypted communications tools became more available.  Xphones were described to me as part of a secure, encrypted communications network.  Xphones could only communicate with other xphones.  In the earlier years, I could only use my xphone to communicate with other xphone users that Sharp specifically gave me approval to communicate with.

13.    Each xphone user used code names and numbers to communicate.  I used these code names and numbers to conceal my identity and I understand that Sharp's employees and clients used the xphones for the same purpose.  I sometimes communicated with Sharp clients where I knew the person's code number or name, but not the person's real name.

14.    I knew the code names and numbers for some xphone users.  When I communicated with xphone user WIRES or 76, I was communicating with Gasarch.  When I communicated with xphone user CELT, I was communicating with Kelln.  When I communicated with xphone user 2 or GARD, I was communicating with Friesen.  When I communicated with xphone user 4 or ACCO, I was communicating with Veldhuis.  When I communicated with xphone user BOND, I was communicating with Sharp.  When I communicated with xphone users KASH or TRAD, I was communicating with traders employed by Sharp.

4

A953

15.     Attached to this Declaration as Exhibits 1 through 3 are accurate examples of xphone communications I had with Veldhuis.  In these messages, I am xphone user SILV or BLAG and Veldhuis is xphone user 4.  In Exhibit 1, Veldhuis is directing me to trade shares of Arch Therapeutics (ticker symbol ARTH) and I am reporting sales to him.  In Exhibit 3, we are discussing an accounting for trades of Arch Therapeutics and RightsCorp (ticker symbol RIHT) that Silverton had done on his behalf through nominees administered by Sharp's business.

16.     Attached to this Declaration as Exhibits 4 and 5 are accurate examples of xphone communications I had with Kelln and others.  In these messages, I am xphone user SILV, SILR, BLAG or Silverton, and Kelln is xphone user CELT.  Other participants in some of these messages are Veldhuis (xphone user ACCO or 4) and Sharp (xphone user BOND).  In Exhibit 4, we are discussing that Blacklight will keep shares of Stevia First (ticker symbol STVF) rather than transferring those shares to Silverton to be traded and our meetings during Kelln's visit to Geneva.  In Exhibit 5, we are discussing the transfer of stocks to Silverton in the names of nominee companies administered by Sharp's business and the deposit of those shares into brokerage accounts where they can be traded.

17.     Beginning in about 2016, I began using an encrypted communications application named Threema to communicate with some of Silverton's clients.  I communicated via Threema with at least Kelln, Veldhuis and Friesen.  When we communicated via Threema, we used code names.  Kelln's code names included The Cuntessa, Esquire and Celtic.  Friesen's code names included Stockman00.  Veldhuis' code names included Stockman 007, Usual Suspects, and Kobayashi.  My code names included Arrow777.  Richard Targett-Adams ("Targett-Adams"), who worked with me at Silverton, often used code name SilverWags or Silvereagle.

5

18.     Attached are accurate copies of Threema messages I exchanged with Kelln and Targett-Adams.  When I was shown these messages, they had been previously marked as Exhibits Kelln 17, Kelln 30 and Kelln 34.

19.     Attached is an accurate copy of Threema messages I exchanged with Friesen. When I was shown these messages, they had been previously marked as Exhibit Friesen 5.  An accurate copy of another set of Threema messages that I exchanged with Friesen and Targett-Adams is attached as Exhibit 6.

20.     Attached as Exhibits 7 and 8 are accurate copies of Threema messages I exchanged with Veldhuis.

21.     Sharp ran his business using an accounting system that was called MT, and later Q.  The Q system kept track of his clients' stock holdings in the names of the various nominee companies Sharp and his employees administered.  Q also kept track of purchases and sales of his clients' stock through those nominees.  Q also kept track of all of the financial transactions for Sharp's business, including all payments sent at client's direction out of the proceeds of their trading and all fees and commissions they were charged for using Sharp's services.

22.     When I was at Silverton, I had access to, and used, parts of the Q system.  When I was at Silverton, I relied on the Q system to see when stock was going to be transferred to Silverton.  When Silverton bought or sold shares on behalf of Sharp's clients, I reported those transactions into the Q system.  Silverton was also paid fees and commissions based on the transactions it reported into the Q system.  Silverton also sent payments from the proceeds of the trading it did that Sharp, his employees and his clients requested.  All of those payments were also reported in the Q system.  I reconciled my own accounting for the stock that Silverton held on behalf of Sharp's clients to the transactions shown in Q so that I was certain that both of our

6

record-keeping systems were accurate and consistent.  When I observed that there was an error in the Q system, I asked Sharp to correct it and made sure that it was fixed.

23.     I am aware that Sharp and his employees entered information into the Q system at the time of, or very close in time to, the transactions recorded in the Q system.  I often communicated with Sharp, Kelln and Gasarch about the transactions reflected in Q.  Our discussions made it clear that the accuracy of Q was important because we all relied on it.

24.     Silverton had a number of accounts for nominee companies that were administered by Sharp, Kelln and Gasarch.  Silverton held shares for, and traded shares for, those nominee companies in its own omnibus brokerage accounts, but it kept records showing which nominee company was the underlying account holder for those transactions.  I understood that the stock in the accounts of those nominee companies was not owned by the person who, on paper, was the beneficial owner of those nominee companies.  Rather, I understood that Sharp and his employees allowed the nominee companies to hold shares for the benefit of their clients, like Veldhuis, Sexton and Friesen.

25.     For example, the first Sharp nominee company that had an account at Silverton was Peaceful Lion Holdings.  The beneficial owner of Peaceful Lion Holdings was Gasarch.  I knew that when I traded stock for Peaceful Lion Holdings, that stock was not controlled by Gasarch.  Instead, it was controlled by Sharp's clients.

26.     Over time, Silverton had accounts for many different nominee companies administered by Sharp, Kelln and Gasarch, including:  Peaceful Lion, Morris Capital, City Group Alliance, Quezon Group, Hampton Partners, Riverfall Group, Santos Torres, Varese Capital, Hilton Capital and Cortona Equity.

27.     Silverton sold many different issuers' stocks on behalf of Sharp and his clients, including Veldhuis, Sexton and Friesen.  Silverton recorded those sales as being made by its clients, which were nominee companies administered by Sharp, Kelln and Gasarch.  In reality, those sales were made at the direction of, and for the benefit of, Veldhuis, Sexton and Friesen. Some of the stocks that Silverton sold on behalf of Veldhuis, Sexton and Friesen included: Stevia First (name later changed to Vitality BioPharma) (ticker STVF/VBIO), Arch Therapeutics (ticker ARTH), Stevia Corp (ticker STEV), RightsCorp (ticker RIHT), Lexington Biosciences (ticker LNB), BreathTec BioMedical (BHT), StartMonday Technology Corp (ticker JOB), Liberty One Lithium Corp (ticker LBY), Makism 3D Corp (MDDD), and NewGen Biopharma (NEWG).

28.     When Silverton traded in the shares listed in paragraph 27 above, my staff or I took trading directions either from Veldhuis, Friesen, or one of the traders employed by Sharp.  I communicated with Sharp's traders using xphone messages, and later by Threema or other encrypted applications.

29.     When Silverton sold the stocks listed in paragraph 27 above, for Veldhuis, Sexton and Friesen, Silverton was selling through its own omnibus brokerage accounts.  Several of Silverton's brokerage accounts were held at United States broker dealers such as Wedbush Securities.  When Silverton sent sale orders to Wedbush Securities, it used phone and email to communicate with Wedbush, which was located in California.  Most of Silverton's brokerage accounts were held by broker-dealers outside of the United States (for example, in the United Arab Emirates, in the United Kingdom and in Malta).  My understanding is that those foreign broker-dealers transmitted Silverton's sale orders to their correspondent broker-dealers in the United States using a variety of interstate and international communications methods so that the sale transactions could be executed in the United States.

8

A957

30.     Silverton often received shares of stock to sell for Sharp and his clients through DWAC (Deposit/Withdrawal at Custodian) transfers. DWAC transfers are an electronic method of transferring shares from one custodian to another, that was used instead of transferring paper stock certificates. Transfer agents could send shares to Silverton's brokerage accounts via the DWAC system. In order to use this system, the issuer's securities had to be eligible for deposit with the Depository Trust Corporation (DTC) in the United States.

31.     When Silverton sold the stocks listed in paragraph 27 above, it was my understanding that no registration statements were being filed with the Securities and Exchange Commission for those sales and that Veldhuis, Sexton and Friesen were not filing any other public disclosures that they owned or controlled those sales. I believe it would have been contrary to the entire purpose of using my services and Sharp's services for Veldhuis, Sexton and Friesen to disclose in a public filing that they were directing those sales.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on APRIL 14 , 2023, in Boston, Massachusetts.

_____
Roger Knox

ACTIVE 686712045v1

9

A958

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

         v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                              Defendants.

Case No. 1:21-cv-11276-WGY

**DEFENDANTS MIKE K. VELDHUIS AND COURTNEY KELLN'S**
**MOTION TO STAY THE PROCEEDINGS**

Defendants Mike K. Veldhuis and Courtney Kelln (the "Defendants") request that the

Court stay the proceedings in the above-captioned matter until the resolution of criminal

proceeding against them, 1:21-MJ-07182 (JB) (D. Mass.).  In support of this motion, the

Defendants submit the accompanying memorandum of law, declaration, and exhibits.

Defendants also request that the Court extend Defendants' time to respond to the pending

motion for partial summary judgment (ECF No. 267) filed by plaintiff Securities and Exchange

Commission ("SEC") until after the Court resolves the instant motion.

With the consent of counsel for plaintiff SEC, pursuant to FRCP 16(c)(2)(K), Defendants

request that the Court schedule a pretrial conference for the purpose of disposing of this now

pending motion for a stay of proceedings and other relief.

A959

DATED: May 2, 2023
            New York, New York

| SHER TREMONTE LLP | WILEY REIN LLP |
|---|---|
| By: /s/ Robert Knuts | By: /s/ Kevin Muhlendorf |
| Michael Tremonte (*pro hac vice*) | Kevin B. Mulendorf (*pro hac vice*) |
| Robert Knuts (*pro hac vice*) | Pamela L. Signorello (BBO# 651483) |
| Katie Renzler (*pro hac vice*) | 2050 M Street NW |
| 90 Broad Street, 23rd Floor | Washington, DC 20036 |
| New York, New York 10004 | Tel: 202.719.7000 |
| Tel: 212.202.2600 | Fax: 202.719.7049 |
| Email: mtremonte@shertremonte.com | Email: KMuhlendorf@wiley.law |
| | PSignorello@wiley.law |
| *Attorneys for Defendant Mike K. Veldhuis* | *Attorneys for Defendant Courtney Kelln* |

2

A960

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by ECF on May 2, 2023.

_____/s/ Robert Knuts_____
Robert Knuts

A961

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

                          Plaintiff,

        v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                          Defendants.

Case No. 1:21-cv-11276-WGY

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MIKE K. VELDHUIS AND COURTNEY KELLN'S MOTION TO STAY THE PROCEEDINGS

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600

WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Tel: 202.719.7000

*Attorneys for Defendant Mike K. Veldhuis*

*Attorneys for Defendant Courtney Kelln*

A962

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .................................................................................................................. 2

    I.     The Criminal Action ................................................................................................. 2

    II.    The SEC Action ....................................................................................................... 4

    III.   The Interplay Between the Criminal and SEC Actions ........................................... 8

    IV.   The Canadian Action .............................................................................................. 10

LEGAL STANDARD ........................................................................................................ 11

ARGUMENT ..................................................................................................................... 12

CONCLUSION .................................................................................................................. 20

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Magnusson,*
No. 19-cv-00547, 2020 WL 2770682 (D. Me. May 28, 2020)................................. 17

*Brock v. Tolkow,*
109 F.R.D. 116 (E.D.N.Y. 1985)..................................................................... 14

*Carnahan v. McClure,*
No. 12CV775, 2012 WL 13170238 (N.D. Ohio Dec. 10, 2012)............................ 15

*Chao v. Fleming,*
498 F. Supp. 2d 1034 (W.D. Mich. 2007) ...................................................... 14, 15

*Commodity Futures Trading Comm'n v. Watson,*
No. 11-10949, 2011 WL 2174904 (E.D. Mich. June 3, 2011) ................................ 15

*Cruz v. Cty. of DuPage,*
No. 96 C 7170, 1997 WL 370194 (N.D. Ill. June 27, 1997) ................................. 14

*D.R. v. Bigda,*
No. 20-cv-30085, 2021 WL 1080244 (D. Mass. Mar. 18, 2021) ............................ 12

*Eastwood v. United States,*
No. 06-cv-164, 2008 WL 656074 (E.D. Tenn. Mar. 6, 2008)........................... 15, 19

*Green v. Cosby,*
177 F. Supp. 3d 673 (D. Mass. 2016) ...................................................... 13, 14, 16, 17

*Heck v. Humphrey,*
512 U.S. 477 (1994).................................................................................... 19

*Ismail v. Robinson,*
No. 22-cv-00150, 2022 WL 4121930 (D. Me. Aug. 1, 2022) ................................ 19

*Louis Vuitton Malletier S.A. v. LY USA, Inc.,*
676 F.3d 83 (2d Cir. 2012) ......................................................................... 15

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.,*
385 F.3d 72 (1st Cir. 2004)..................................................................... 11, 12, 14

*Nat'l Ass'n of Gov't Emps. v. Mulligan,*
849 F. Supp. 2d 167 (D. Mass. 2012) ........................................................... 18

ii

A964

*New England Sports Network, L.P. v. Alley Interactive, LLC (CT)*,
   No. 22-cv-10024, 2023 WL 2140474 (D. Mass. Feb. 21, 2023).............................................. 12

*Sea Salt, LLC v. Bellerose*,
   No. 18-cv-00413, 2020 WL 2475874 (D. Me. May 13, 2020)........................................... 13, 18

*SEC v. Constantin*,
   No. 11 Civ. 4642, 2012 WL 1195700 (S.D.N.Y. Apr. 9, 2012)............................................... 13

*SEC v. Dresser Indus., Inc.*,
   628 F.2d 1368 (D.C. Cir. 1980) ............................................................................................... 15

*SEC v. Liberty*,
   No. 18-cv-00139, 2019 WL 3752907 (D. Me. Aug. 8, 2019) ........................................... 15, 18

*SEC v. TelexFree, Inc.*,
   52 F. Supp. 3d 349 (D. Mass. 2014) ..................................................................... 12, 13, 17, 18

*Sparkman v. Thompson*,
   No. 08-01-KKC, 2009 WL 1941907 (E.D. Ky. July 6, 2009)................................................. 15

*Taylor, Bean & Whitaker Mortg. Corp. v. Tridaunum Financial, Inc.*,
   No. 09-cv-0954, 2009 WL 2136986 (EC.D. Cal. July 15, 2009)............................................ 15

*Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*,
   886 F. Supp. 1134 (S.D.N.Y. 1995) ........................................................................................ 15

*United Techs. Corp., Hamilton Standard Div. v. Dean*,
   906 F. Supp. 27 (D. Mass. 1995) ............................................................................................ 14

**Other Authorities**

J. Milton Pollack, *Parallel Civil & Criminal Proceedings*, 129 F.R.D. 201 (1989) ................... 15

A965

## PRELIMINARY STATEMENT

Defendants Mike K. Veldhuis and Courtney Kelln (the "Defendants") face an impossible decision between defending themselves in this enforcement action and defending their liberty in parallel criminal proceedings pending in this Court. Worse, based on the same allegations in the instant action, plaintiff Securities and Exchange Commission (the "Commission" or the "SEC") has instituted ancillary proceedings in Canada that directly attack the Defendants' Fifth Amendment rights. A stay of this action is now necessary to preserve these rights and serve the ends of justice.

In apparent coordination, in August 2021, the SEC and the United States Attorney's Office for the District of Massachusetts (the "USAO") commenced legal proceedings against Mr. Veldhuis and Ms. Kelln, among others. The Commission and the USAO lodge nearly identical accusations against Mr. Veldhuis and Ms. Kelln—both allege that the Defendants participated in a scheme involving the promotion, purchase, and sale of "penny stocks" in violation of criminal and civil securities laws. A criminal complaint and arrest warrants have been issued as to Mr. Veldhuis and Ms. Kelln, and the USAO has made abundantly clear that its criminal investigation is ongoing, including through coordination with the Commission. To preserve their abilities to defend themselves in the looming criminal proceedings, Mr. Veldhuis and Ms. Kelln have only nominally participated in the instant action, invoking their rights and privileges under the Fifth Amendment instead of responding substantively to the Commission's pleadings and discovery requests.

Recent developments now warrant a stay of this action. First, the SEC incorporated into its motion for partial summary judgment three affidavits that, absent a stay, forces the Defendants to choose between allowing this testimony to go unchallenged and previewing to the

A966

USAO their defenses and legal theories well in advance of any criminal trial.  Individuals facing criminal prosecution should not be forced to forfeit their ability—and right—to properly defend themselves in criminal actions.  Second, in the Canadian proceedings, the SEC is invoking Canadian procedural rules that effectively create an end-run around the Defendants' Fifth Amendment rights by requiring them to provide sworn declarations concerning, among other things, ownership over certain assets and sources of funds.

Given these changes, Mr. Veldhuis and Ms. Kelln cannot simply assert the Fifth Amendment in lieu of putting forth an active defense; however, they cannot do more without jeopardizing their defense in the criminal proceedings.  The Court has the power to protect Mr. Veldhuis and Ms. Kelln from making this impossible decision by staying these proceedings as to them until the resolution of the criminal proceedings against them.

## BACKGROUND

### I.    The Criminal Action

On August 4, 2021, the USAO filed under seal a criminal complaint in this Court charging four individuals—Frederick Sharp, Luis Carrillo, Mike Veldhuis, and Courtney Kelln—with two offenses: (i) conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and (ii) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 (the "Criminal Complaint").  *See* Compl., ECF No. 3, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021); Brown Aff., ECF No. 3-1, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021).  In support of the Criminal Complaint, the government submitted an affidavit sworn to by FBI Special Agent Keith Brown (the "Brown Affidavit").  *See* Brown Aff., ECF No. 3-1, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021).

A967

Arrest warrants were issued for the named defendants the same day. *See* ECF Nos. 5-8, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021).

The Brown Affidavit alleged "that, from no later than 2014 through no earlier than September 2018," the defendants in the Criminal Complaint, "together with multiple co-conspirators[] directed and/or participated in sophisticated pump-and-dump schemes involving concealed-control of large portions of stock in several microcap [or 'penny' stock] companies that netted, at a minimum, tens of millions of dollars in illicit proceeds." Brown Aff. ¶ 23, ECF No. 3-1, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021); *see also id.* ¶ 3. Further, it alleged that "[t]he scheme generally involved a similar series of steps for each microcap stock," which "would often begin with an individual or group of individuals acquiring control of a significant portion of a microcap company's free-trading shares . . . through various nominee entities." *Id.* ¶ 24. Veldhuis, allegedly, "acted as [a] point person[] for such control groups," and on his behalf "deposit[s] of shares of microcap companies" would be made "into brokerage accounts" at an asset management firm, at which Kelln managed "client relations" and "prepared" documents "to facilitate the breakdown, transfer, and deposit of the control shares into blocks of less than five percent." *Id.* ¶¶ 24-25, 35. According to the Brown Affidavit, "[e]ach of the nominee entities generally held less than five percent of the given company's shares in order to avoid disclosure obligations under the federal securities laws and to circumvent brokers' compliance protocols." *Id.* ¶ 24. Sharp allegedly owned the asset management firm, which offered "a variety of services to control persons seeking to conceal their identity when selling large quantities of shares of penny stock companies." *Id.* ¶ 26. The Brown Affidavit further alleged that Mr. Veldhuis and others would direct, through a series of entities and individuals, the sale of shares, which occurred in tandem with promotional campaigns for those

A968

stocks, and the asset management firm would hold the proceeds until directed otherwise by co-conspirators. *See id.* ¶¶ 40-42, 47. It identifies Mr. Veldhuis as allegedly involved in illicit sales of Vitality Biopharma, Inc. stock and Ms. Kelln as allegedly involved in illicit sales of Garmatex Holdings, Ltd., OneLife Technologies Corp., and Vitality Biopharma, Inc. stock. *See id.* ¶¶ 66-106.

Magistrate Judge Boal unsealed the Criminal Complaint on August 6, 2021. *See* Order Granting Mot. to Unseal, ECF No. 10, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 6, 2021). No further activity has since been recorded on the criminal case docket, but, as explained below, the investigation is ongoing.

## II.     The SEC Action

The day after the Criminal Complaint was filed, on August 5, 2021, the SEC commenced the instant action against defendants Frederick L. Sharp, Zhiying Yvonne Gasarch, Courtney Kelln, Mike K. Veldhuis, Paul Sexton, Jackson T. Friesen, William T. Kaitz, Avtar S. Dhillon, and Graham R. Taylor (the "SEC Action"). On August 6, the SEC obtained a temporary restraining order that froze assets controlled by the defendants. *See* Order Granting Mot. for TRO, ECF No. 7. Two weeks later, the Court issued a preliminary injunction freezing the assets of several defendants, including Mr. Veldhuis. *See* Order Allowing Mot. for Preliminary Injunction, ECF No. 39. With respect to Ms. Kelln, the Court extended the temporary restraining order multiple times, and, on October 7, 2021, issued a preliminary injunction freezing her assets. *See* Order Entering Preliminary Injunction, ECF No. 95.

In its pleadings, the SEC makes practically identical allegations to those outlined in the Brown Affidavit. The SEC alleges that "[i]n exchange for lucrative fees, a group headed by defendant Sharp provided services to various groups of public company control persons to help

4

A969

those control persons dump United States-quoted stocks—typically penny stocks—on retail investors.  These services included providing networks of offshore shell companies to conceal stock ownership, arranging stock transfers and money transmittals, and providing encrypted accounting and communications systems."  Am. Compl. ¶ 2, ECF No. 230.  With respect to Mr. Veldhuis, the pleadings allege that he belonged to a "group of control persons" including him, Sexton, and Friesen.  *Id.* ¶ 7.  The SEC alleges that the group "collaborated" with Dhillon to sell "illegally the stock of Stevia First Corp. ('Stevia First'), Stevia First's successor company Vitality Bioparma, Inc. ('Vitality'), Arch Therapeutics, Inc. ('Arch'), and OncoSec Medical Incorporated ('OncoSec')," and collaborated with Kaitz and Taylor to sell illegally Vitality and Arch.  *Id.* ¶ 8.  With respect to Ms. Kelln, the pleadings allege that, with Gasarch and Sharp, she was a part of the "Sharp Group" which "help[ed] corporate control persons conceal their identities when selling the stock of penny stock companies they controlled.  By disguising their identities and their controlling positions, the Sharp Group's clients fraudulently concealed the fact that public company control persons were selling large blocks of stock to investors."  *Id.* ¶ 5.  The SEC further alleges that Ms. Kelln carried out administrative tasks in furtherance of Sharp's method of "obtaining, allocating, and distributing blocks of shares across multiple nominee shareholders in a manner designed to conceal the Sharp Group's clients' common control of all the stock so distributed."  *Id.* ¶ 52.

The SEC asserts four claims against Mr. Veldhuis and five claims against Ms. Kelln.  The SEC asserts with respect to both:  Fraud in the Offer or Sale of Securities – Violations of Sections 17(a)(1) and (3) of the Securities Act (Claim 1); Fraud in Connection with the Purchase or Sale of Securities – Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) (Claim 2); and Unregistered Offerings of Securities – Violations of Sections 5(a) and 5(c) of

A970

the Securities Act (Claim 3). *Id.* ¶¶ 250-258. The SEC additionally charges Mr. Veldhuis with

Failure to Report over 5% Beneficial Ownership – Violations of Section 13(d) of the Exchange

Act and Rule 13d-1 Thereunder (Claim 4)*, id.* ¶¶ 259-263, and Ms. Kelln with Aiding and

Abetting – Violations of Section 15(b) of the Securities Act (Claim 8) and Aiding and Abetting –

Violations of Section 20(e) of the Exchange Act (Claim 9), *id.* ¶¶ 277-285.

   Along with four other defendants, Mr. Veldhuis and Ms. Kelln moved to dismiss this

action. *See* Friesen Mot. to Dismiss, ECF No. 109; Taylor Mot. to Dismiss or Strike, ECF No.

126; Sexton Mot. to Dismiss, ECF No. 132; Gasarch Mot. to Dismiss, ECF No. 143; Kelln Mot.

to Dismiss or Strike, ECF No. 147; Veldhuis Mot. to Dismiss, ECF No. 151. Following oral

argument, the Court denied the motions to dismiss on September 6, 2022, and granted the SEC

permission to file an amended complaint. *See* Mem. and Order, ECF No. 228. Three days later,

the SEC filed an amended complaint (the "Amended Complaint"). *See* Am. Compl., ECF No.

230. In recognition of his ongoing criminal exposure, discussed further *infra*, Mr. Veldhuis'

Answer to the Amended Complaint, filed on September 23, 2022, responded to the allegations

only by invoking his rights and privileges under the Fifth Amendment and by declining to

otherwise answer. *See* Veldhuis Answer to Am. Compl., ECF No. 244. Likewise, in her answer

filed on September 30, 2022, Ms. Kelln asserted the Fifth Amendment in response to the SEC's

allegations, in addition to other objections to the claims for relief. *See* Kelln Answer to Am.

Compl., ECF No. 245.

   Pursuant to the Court's scheduling orders, fact discovery concluded on March 17, 2022,

and expert discovery concluded on March 24, 2023. *See* Scheduling Order, ECF No. 215; Order

re Mot. for Extension of Time to File, ECF No. 256. During discovery, the SEC propounded

requests for production of documents, requests for admissions, and interrogatories. The SEC

also conducted depositions, including written and limited live depositions of Mr. Veldhuis and Ms. Kelln. As explained in more detail below, the ongoing criminal proceedings greatly impaired Mr. Veldhuis' and Ms. Kelln's ability to meaningfully participate in discovery. Recognizing their continued criminal exposure, Mr. Veldhuis and Ms. Kelln sought discovery only in the form of written requests and very limited participation in depositions of the SEC's witnesses.

Following the close of discovery, on April 17, 2023, the SEC filed its motion for partial summary judgment on the Third and Fourth Claims of the Amended Complaint, which charge, respectively, (i) defendants Veldhuis, Sexton, Friesen, and Kelln with unregistered distributions of securities in violation of Sections 5(a) and 5(c) of the Securities Act and (ii) Veldhuis, Sexton, and Friesen with failure to report their greater than 5% ownership in Vitality Biopharma Inc. in violation of Section 13(d) of the Exchange Act and Rule 13d-1 thereunder. *See* SEC's Mem. in Support of Mot. for Summ. J., ECF No. 267. In support of its motion for summary judgment, the SEC submitted affidavits from defendants Dhillon and Kaitz and from a non-party whose identity the SEC seeks to keep under seal. All three affidavits purport to corroborate the SEC's allegations, including specifically with respect to Mr. Veldhuis and Ms. Kelln. *See e.g.*, Dhillon Aff., ECF No. 270; Kaitz Aff., ECF No. 271.[1] Dhillon's affidavit admits that he has pleaded guilty to criminal charges relating to failure to disclose stock sales, sale of unregistered securities, and touting compensation nondisclosure conspiracy. *See* Dhillon Aff. ¶ 6, ECF No. 270.

---

[1]     Pending the resolution of the SEC's motion to seal a portion of its motion for summary judgment, this memorandum will not cite to the affidavit submitted by the non-party who counsel for Defendants Veldhuis and Kelln independently believe to be a cooperating witness for the USAO and who has pled guilty to certain criminal charges but not yet been sentenced on those charges.

A972

### III.    The Interplay Between the Criminal and SEC Actions

Although no indictment has followed the filing of the Criminal Complaint, the USAO has, in no uncertain terms, made clear that the criminal investigations into Mr. Veldhuis and Ms. Kelln remain active and the Criminal Complaint remains pending.  On the eve of finalizing the case schedule in the SEC Action, on February 8, 2022, the USAO emailed counsel for the defendants and counsel for the SEC in the SEC Action, reminding defense counsel of their clients' continued criminal exposure, stating "each of you represents a defendant in the [SEC Action], and that later this week you will be discussing a case schedule with counsel for the SEC. As many (if not all) of you know, *I am conducting a parallel criminal investigation* on behalf of the U.S. Attorney's Office for the District of Massachusetts into *the same matters* alleged in the SEC's Amended Complaint."  Ex. A (Feb. 8-16, 2022 Email Exchange between AUSA Drabick and R. Knuts) (emphasis added).  The email further stated, "[s]ome" of the defendants in the SEC Action "have already been charged by criminal complaint and I anticipate the investigation will continue to mature.  Given these circumstances, I anticipate soon moving to intervene in [the SEC Action] to seek a stay of deposition discovery and perhaps other forms of discovery."  Ex. A (Feb. 8-16, 2022 Email Exchange between AUSA Drabick and R. Knuts).  Counsel for Mr. Veldhuis followed up with clarifying questions regarding the anticipated motion to stay, and the USAO confirmed that it "would indeed seek to stay substantially all, if not all, depositions in the SEC case, given the *extensive overlap* between the criminal matter and the SEC matter.  . . . With regard to the length of the requested stay, it would be until a resolution of the criminal matter(s) as to the overlapping charged defendants."  Ex. A (Feb. 8-16, 2022 Email Exchange between AUSA Drabick and R. Knuts) (emphasis added).  The USAO similarly wrote to counsel for Ms. Kelln that "the thrust of my proposed stay will be depositions," to which counsel for Ms.

A973

Kelln responded, "We are certainly open to discussions *once we see the motion*, but we generally oppose a stay in the SEC action." Ex. B (Feb. 8-11, 2022 Email Exchange between AUSA Drabick and K. Muhlendorf) (emphasis added).

For reasons unknown to Mr. Veldhuis and Ms. Kelln, some fourteen months later, the USAO has not yet moved to stay the SEC Action. Whatever the reason, however, it clearly was not because the criminal investigation terminated. For example, in the fall of 2022, the USAO contacted Mr. Veldhuis' counsel proposing a call to discuss potential resolution of the case, thereby confirming the criminal matter was active. Further demonstration of the ongoing nature of the investigation came in an email from the USAO early this year. On February 17, 2023, the USAO emailed counsel for Mr. Veldhuis to request, in connection with "the investigation of [Mr. Veldhuis]," information relating to Mr. Veldhuis' attorneys for an AUSA to apply to a privilege screen of communications alleged to belong to Mr. Veldhuis. *See* Ex. C (Feb. 17, 2023 Email from AUSA Drabick). One month later, on March 17, 2023, SEC Attorney Kathleen Shields ("Attorney Shields") sent an email to counsel for Mr. Veldhuis, Ms. Kelln, and others highlighting the intimate relationship between the Criminal and SEC Actions. *See* Ex. D (Mar. 17, 2023 Shields Email). Attaching an email sent by the USAO from earlier that day, Attorney Shields explained that the USAO had "inadvertently produced to the SEC, and the SEC then produced to [defendants' counsel], certain" documents containing "search terms that the USAO used in its privilege filter review" of communications alleged to belong to the defendants in the SEC Action. *See* Ex. D (Mar. 17, 2023 Shields Email).

Understanding that they continued to face criminal exposure, Mr. Veldhuis and Ms. Kelln refrained from substantively engaging in discovery in the SEC Action. On the advice of counsel, the Defendants invoked their rights under the Fifth Amendment of the U.S. Constitution across

A974

the board in response to the SEC's written discovery requests, including requests for production of documents, interrogatories, and requests for admission. Instead of conducting a traditional deposition, the SEC provided over 400 written questions, to which Mr. Veldhuis and Ms. Kelln each responded in writing by invoking their Fifth Amendment rights (along with other objections) and conducting short virtual depositions in which they did the same.

The SEC's recent motion for summary judgment provides further evidence that the criminal proceedings are alive and ongoing. As noted above, in support of its motion, the SEC included affidavits from persons believed to be cooperating witnesses in that criminal action.

## IV.    The Canadian Action

Approximately one year after the USAO and SEC commenced proceedings in the United States, in August 2022, the SEC commenced legal proceedings in the Supreme Court of British Columbia against seven of the defendants named in this action—Frederick L. Sharp, Zhiying Yvonne Gasarch, Courtney Kelln, Mike K. Veldhuis, Paul Sexton, Jackson T. Friesen, and Graham R. Taylor (the "Canadian Action"). In a Notice of Civil Claim dated August 11, 2022, the SEC commenced a proceeding seeking two orders from that court: (1) an order freezing the defendants' assets, and (2) an order that each defendant provide the SEC with a sworn statement disclosing, *inter alia*, information concerning any and all assets held, wherever situated, and sources of funds in accounts held directly or indirectly by defendants. *See* Ex. E (Notice of Civil Claim) at 8.

Consistent with their conduct in the SEC Action, Mr. Veldhuis and Ms. Kelln (as well as Gasarch and Sexton) opposed the SEC's application on grounds that, among other things, it would violate their Fifth Amendment rights. They advised the court that they had asserted their Fifth Amendment rights in response to the SEC's discovery demands in the United States, and

A975

that compelling the Defendants to provide the requested sworn statements disclosing their assets would undermine their Fifth Amendment rights.  Moreover, they argued that if the court were to compel the Defendants to provide that information in the face of a U.S. criminal investigation, doing so would violate Canadian constitutional protections.  On March 21, 2023, the Supreme Court of British Columbia ruled against the Defendants.  In so doing, it stated—incorrectly— "[t]here is no criminal proceeding in the U.S. . . . .  The Fifth Amendment protects a party from self-incrimination; it does not protect against civil liability."  Ex. F (Reasons for Judgment, *United States Securities and Exchange Commission v. Sharp*, 2023 BCSC 425) at 13.  No order has yet been entered by the Canadian court and the SEC's end-run around Defendants' Fifth Amendment rights can be brought to a halt by this Court by granting Defendants' motion for a stay.

## LEGAL STANDARD

A court can exercise its discretion to grant a stay of civil proceedings when the interests of justice so require.  *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004).  "The pendency of a parallel or related criminal proceeding can constitute such a" circumstance.  *Id.*  The "determination is highly nuanced," and requires the court to balance "competing interests" and "take a careful look at the idiosyncratic circumstances of the case before it."  *Id.* at 78.  Under First Circuit law, when deciding whether to grant a stay of a civil proceeding in the face of a criminal proceeding, courts consider:

> (i) the interests of the civil plaintiff in proceeding expeditiously with the civil litigation, including the avoidance of any prejudice to the plaintiff should a delay transpire; (ii) the hardship to the defendant, including the burden placed upon him should the cases go forward in tandem; (iii) the convenience of both the civil and criminal courts; (iv) the interests of third parties; . . . (v) the public interest[;] . . . (vi) the good faith of litigants (or the absence of it)[;] and (vii) the status of the cases.

11

A976

*Id.* "Another factor that . . . courts consider is the extent to which the issues in the criminal case overlap with those presented in the civil case." *New England Sports Network, L.P. v. Alley Interactive, LLC (CT)*, No. 22-cv-10024, 2023 WL 2140474, at *3 (D. Mass. Feb. 21, 2023) (ellipsis in original) (quoting *SEC v. TelexFree, Inc.*, 52 F. Supp. 3d 349, 352 (D. Mass. 2014)). Courts have described this last factor "as the threshold or most important factor that a trial court should consider." *D.R. v. Bigda*, No. 20-cv-30085, 2021 WL 1080244, at *2 (D. Mass. Mar. 18, 2021) (collecting cases); *see also* J. Milton Pollack, *Parallel Civil & Criminal Proceedings*, 129 F.R.D. 201, 203 (1989). The movant carries the burden of demonstrating the need for a stay. *Microfinancial, Inc.*, 385 F.3d at 77.

## ARGUMENT

The interests of justice require that the SEC Action against defendants Veldhuis and Kelln be stayed. "Courts have repeatedly issued stays in securities cases involving SEC civil enforcement actions and corresponding criminal proceedings." *TelexFree, Inc.*, 52 F. Supp. 3d at 352. Given the indisputable threat to Mr. Veldhuis' and Ms. Kelln's Fifth Amendment rights should the instant case proceed, the Court should stay the SEC Action as to Mr. Veldhuis and Ms. Kelln pending resolution of the Criminal Action as to them.

Of the eight factors relevant to the Court's analysis, four weigh heavily in favor of staying the SEC Action pending the resolution of the Criminal Action as to Mr. Veldhuis and Ms. Kelln. As for the remaining factors, one weighs in favor or is neutral, and three are neutral or weigh only slightly against a stay.

First, the "most important factor" for the Court to consider—the degree of overlap between the civil and criminal proceedings—unwaveringly supports staying the instant action. "Where there is substantial overlap between the subject matter of the two proceedings, a stay of

12

A977

the civil proceeding is favored." *Sea Salt, LLC v. Bellerose*, No. 18-cv-00413, 2020 WL 2475874, at *2 (D. Me. May 13, 2020) (citation and internal quotation marks omitted). This is "[b]ecause there is more danger of self-incrimination when the issues in both cases overlap." *SEC v. Constantin*, No. 11 Civ. 4642, 2012 WL 1195700, at *2 (S.D.N.Y. Apr. 9, 2012). Here, according to the USAO, the overlap is nearly complete. *See* Ex. A (Feb. 8-16, 2022 Email Exchange between AUSA Drabick and R. Knuts) (describing the overlap as "extensive" and the cases as arising from "the same matters"). The continuity of allegations describing the alleged illicit scheme across the Amended Complaint and the Criminal Complaint confirms as much. *Compare* Brown Aff. ¶¶ 3, 18, 23-26, 29, 34-39, 40-42, 46-47, 52-56, 66-106, ECF No. 3-1, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021)*, with* Am. Compl. ¶¶ 2, 5, 7-8, 17-18, 52-56, 65-69, 93, 123-160, 242-263, 277-285, ECF No. 230. Further illustration of the overlap is found in the explicit coordination between the USAO and the SEC, evidenced by the SEC's reliance on the affidavits of cooperating witnesses in its motion for summary judgment and the USAO's transmission to the SEC of evidence for use in in the instant prosecution. *See* Ex. D (Mar. 17, 2023 Shields Email); *see also* Ex. G (SEC Responses & Objections to Kelln's Request for Admissions) at 6-7 (describing coordination between the SEC and USAO in joint witness proffers and sharing of documents and information). This conduct demonstrates that not only is "the substance of the two parallel actions [] nearly identical," but also that "[t]he cases will almost certainly rely on identical witnesses, evidence, and financial data." *TelexFree, Inc.*, 52 F. Supp. 3d at 352. Considering this court has granted stays where the civil and criminal proceedings share substantially less overlap, the high degree of overlap here weighs heavily in favor of a stay of the SEC Action. *See, e.g.*, *Green v. Cosby*, 177 F. Supp. 3d 673, 681 (D. Mass. 2016) (granting a stay of discovery as to the defendant even though "the

A978

specific events directly at issue in [the civil] case and in the criminal case do not necessarily overlap"). Accordingly, a stay as to the entire SEC Action is both appropriate and necessary here.

Related to the overlap factor, courts have reasoned that "[t]he fear of prejudice to a defendant is more pressing" in cases where, as here, "the government is both civil and criminal litigant." *United Techs. Corp., Hamilton Standard Div. v. Dean*, 906 F. Supp. 27, 29 (D. Mass. 1995). This is because "[w]hen both actions are brought by the government, there is a danger that the government may use civil discovery to obtain evidence and information for use in its criminal prosecution, and by doing so, circumvent the Fifth Amendment rights against self-incrimination." *Cruz v. Cty. of DuPage*, No. 96 C 7170, 1997 WL 370194, at *3 (N.D. Ill. June 27, 1997). Accordingly, a stay of civil proceedings "is even more appropriate when both actions are brought by the government." *Brock v. Tolkow*, 109 F.R.D. 116, at 119 (E.D.N.Y. 1985); *Chao v. Fleming*, 498 F. Supp. 2d 1034, 1039 (W.D. Mich. 2007). Mr. Veldhuis and Ms. Kelln face twin government-led prosecutions—one by the USAO and one by the SEC. The coordination described above, particularly the shared use of discovery and a cooperating witness, underscore the genuine threat that the parallel proceedings pose to Mr. Veldhuis' and Ms. Kelln's Fifth Amendment rights and which can be ameliorated only with the requested stay of the SEC Action.

Second, "the hardship to the defendant[s], including the burden placed upon [them] should the cases go forward in tandem," necessitates a stay. *See Microfinancial*, 385 F.3d at 78. Typically, parallel proceedings prejudice a defendant by placing before him the "precarious dilemma" of deciding "whether to assert [the] Fifth Amendment privilege against self-incrimination . . . or waive that privilege." *Green*, 177 F. Supp. 3d at 676. "In such a situation, a

A979

stay can protect a civil defendant from facing the difficult choice between being prejudiced in the civil litigation, if the defendant asserts his or her Fifth Amendment privilege, or from being prejudiced in the criminal litigation if he or she waives that privilege in the civil litigation." *SEC v. Liberty*, No. 18-cv-00139, 2019 WL 3752907, at *2 (D. Me. Aug. 8, 2019) (alterations and internal quotation marks omitted) (quoting *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97 (2d Cir. 2012)).  Courts in other circuits have found that the hardship to a party who is simultaneously a litigant in a civil proceeding and a defendant in a criminal prosecution extends beyond the dilemma of choosing whether or not to invoke the Fifth Amendment.  They have explained that justice may also require a stay where, to participate meaningfully in the civil proceeding, the criminal defendant would have to "expose the defense's theory to the prosecution in advance of trial, or otherwise prejudice the criminal case."  *See Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1138 (S.D.N.Y. 1995); *Chao*, 498 F. Supp. 2d at 1037; *Sparkman v. Thompson*, No. 08-01-KKC, 2009 WL 1941907, at *1 (E.D. Ky. July 6, 2009); *Carnahan v. McClure*, No. 12CV775, 2012 WL 13170238, at *1 (N.D. Ohio Dec. 10, 2012); *Commodity Futures Trading Comm'n v. Watson*, No. 11-10949, 2011 WL 2174904, at *1 (E.D. Mich. June 3, 2011); *Eastwood v. United States*, No. 06-cv-164, 2008 WL 656074, at *1 (E.D. Tenn. Mar. 6, 2008); *see also SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1376 (D.C. Cir. 1980) (explaining a stay of noncriminal proceedings may be necessary where, without it, a criminal defendant might be required to "expose the basis of the defense to the prosecution in advance of the criminal trial, or otherwise prejudice the case"); *Taylor, Bean & Whitaker Mortg. Corp. v. Tridaunum Financial, Inc.*, No. 09-cv-0954, 2009 WL 2136986, at *2 (E.D. Cal. July 15, 2009) (granting six-month stay in part because

A980

pending litigation could "expose defendants' strategy or theories with respect to the criminal case").

Although Mr. Veldhuis and Ms. Kelln have already made the difficult choice to assert their Fifth Amendment rights to refrain from responding to the SEC's discovery demands, they continue to face the "precarious dilemma," *Green*, 177 F. Supp. 3d at 676, of choosing between defending themselves in the SEC Action or in the Criminal Action. By incorporating into its motion for summary judgment affidavits from three individuals almost certain to be called as witnesses against Mr. Veldhuis and Ms. Kelln at a criminal trial, the SEC is forcing Mr. Veldhuis and Ms. Kelln to choose between remaining silent and previewing in detail to the USAO the defenses and legal theories they would pursue in the Criminal Action. No criminal defendant should be forced to make this decision. Accordingly, a stay of the SEC Action is necessary. This is a substantial shift in the character of the case that was not present when the USAO initially raised the issue of a stay fourteen months ago.

The Canadian Action only further compounds the issue. There, the SEC—despite knowing that the Defendants were intent on asserting their Fifth Amendment rights—has sought to compel Mr. Veldhuis and Ms. Kelln to testify using the Canadian courts to accomplish what is forbidden here. *See, e.g.*, Ex. G (SEC Responses & Objections to Kelln's Request for Admissions) at 8-9 ("In the British Columbia case, the Commission is seeking relief commonly available under British Columbia law, including a *declaration* of assets that would affect the enforcement of the asset freeze." (emphasis added)). While the SEC explains that it will not argue that any compelled disclosure in Canada waives the Defendants' rights in the United States, the SEC is nonetheless now utilizing the Canadian courts to compel Defendants to provide information to the SEC that would otherwise be unavailable to it, or the USAO, if

Defendants continue to assert their Fifth Amendment rights, as they have unequivocally signaled they intend to do.  Here again, absent a stay of the SEC Action, the Defendants will be compelled to provide information to the SEC and ultimately the USAO that no defendant should be compelled to do.

Third, the good faith factor weighs in favor of a stay.  Mr. Veldhuis and Ms. Kelln have acted in good faith throughout the lifespan of this litigation.  The SEC's decision to rely in support of its motion for summary judgment on affidavits from cooperating witnesses and to seek discovery in Canada it cannot otherwise obtain here, have fundamentally altered the playing field for Mr. Veldhuis and Ms. Kelln.  As described above, the compromise they made previously to invoke the Fifth Amendment is no longer sufficient to protect their interests in both the SEC and Criminal Actions.  "[F]rom a practical standpoint," therefore, "it is reasonable that [Mr. Veldhuis and Ms. Kelln] waited until" now to move for a stay.  *Green*, 177 F. Supp. 3d at 682 (finding defendant acted in good faith by waiting to file the motion to stay until motion to dismiss criminal case was denied).

Fourth, the public interest factor supports granting a stay.  Mr. Veldhuis and Ms. Kelln recognize the public's interest in the resolution of the SEC Action.  "Nevertheless, the public interest in unimpeded criminal law enforcement outweighs the civil interests here." *TelexFree, Inc.*, 52 F. Supp. 3d at 353; *see also Adams v. Magnusson*, No. 19-cv-00547, 2020 WL 2770682, at *2 (D. Me. May 28, 2020) ("The public interest in assuring that the criminal matter, which involves serious charges, proceeds to a conclusion without any delay . . . weighs in favor of a stay.").

Next, convenience to the courts weighs in favor of a stay or is at least neutral.  Even where a defendant in a civil action has not been criminally indicted, courts have stayed civil

17

A982

proceedings if there is nonetheless an active criminal matter. *See Nat'l Ass'n of Gov't Emps. v. Mulligan*, 849 F. Supp. 2d 167, 174 (D. Mass. 2012) (granting stay of civil action where certain defendants were the subject of a grand jury investigation and not yet indicted); *Sea Salt, LLC*, 2020 WL 2475874, at *1-3 (granting partial stay where there was no "formal criminal charge" but there was an "ongoing criminal investigation"); *Liberty*, 2019 WL 3752907, at *1 (noting court previously granted and extended a stay of the civil action pending ongoing grand jury investigation into conduct related to SEC allegations); *cf. Russell v. Chenevert*, 573 F. Supp. 3d 391, 402 (D. Me. 2021) (finding "[c]onvenience to the [c]ourt" factor cautioned against staying civil proceedings because there was "no clear evidence that the" prosecutor's office was "actively pursuing a case against" the defendant). Mr. Veldhuis and Ms. Kelln are defendants in a criminal complaint and warrants for their arrest have been issued. *See* Compl, ECF No. 3, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021); Arrest Warrant for Veldhuis, ECF No. 7, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021); Arrest Warrant for Kelln, ECF No. 8, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021). The USAO has repeatedly made clear—both with words and actions—that the criminal proceedings are ongoing as to Mr. Veldhuis and Ms. Kelln, and possibly other defendants in the SEC Action. *See* Exs. A (Feb. 8-16, 2022 Email Exchange between AUSA Drabick and R. Knuts); C (Feb. 17, 2023 Email from AUSA Drabick); D (Mar. 17, 2023 Shields Email). Moreover, "[a] stay would also conserve judicial resources and narrow the issues to be resolved in the event that criminal convictions are obtained;" for example, "defendants would be estopped from re-litigating issues decided against them," which would "undoubtedly expedite resolution of the civil action . . . , even with respect to the individual defendants in the civil case who are not criminal defendants." *TelexFree, Inc.*, 52 F. Supp. 3d at 353; *see also Nat'l Ass'n of*

18

A983

*Gov't Emps.*, 849 F. Supp. 2d at 174.  Similarly, a stay of the SEC Action would obviate "the risk of conflicting results" "arising from the same circumstances," an outcome which the "Supreme Court has expressed a desire to avoid."  *Ismail v. Robinson*, No. 22-cv-00150, 2022 WL 4121930, at *2 (D. Me. Aug. 1, 2022) (citing *Heck v. Humphrey*, 512 U.S. 477 (1994)) (granting defendants' motion to stay civil proceeding in light of ongoing related criminal proceeding).

Finally, although the remaining three factors either are neutral or weigh slightly against granting a stay, they are greatly outweighed by the factors outlined above.  First, with respect to the status of the cases, Mr. Veldhuis and Ms. Kelln recognize that the mature stage of this litigation generally counts against their request to stay the action.  As explained above, however, the timing of this motion is a prompt reaction to a change in circumstances.  For these reasons, the Court should not put too much weight on the stage of the litigation in resolving Mr. Veldhuis and Ms. Kelln's motion to stay the SEC Action.  Second, the SEC clearly has an interest in the resolution of this case.  That said, "as [a] representative[] of the Government," the SEC "embod[ies] a public interest in prompt and effective criminal prosecution."  *Eastwood*, 2008 WL 656074, at *3.  The SEC's interest in resolution thus does not weigh heavily against a stay of this action.  Third, given the overlap between the SEC and Criminal Actions, outlined above, any third-party interest in the resolution of this matter would likely apply to the Criminal Action as well.  Yielding to the Criminal Action, therefore, will not leave those interests unattended.

The most important factors pertinent to the Court's analysis weigh heavily in favor of granting Mr. Veldhuis and Ms. Kelln's motion to stay the SEC Action until the resolution of the criminal proceedings against them.  It is evident that the Criminal and SEC Actions not only overlap substantively but also that the government—meaning the USAO and the SEC—is

19

A984

developing and prosecuting the cases in tandem.  Further proceedings in the SEC Action,

therefore, hold the dangerous potential to impede Mr. Veldhuis' and Ms. Kelln's Fifth

Amendment rights.

**CONCLUSION**

For the foregoing reasons, Mr. Veldhuis and Ms. Kelln respectfully request that this

Court issue a stay of proceedings as to them until the related criminal proceedings against them

are resolved.

A985

DATED: May 2, 2023
  New York, New York

SHER TREMONTE LLP     WILEY REIN LLP

By: */s/ Robert Knuts*     By: */s/ Kevin B. Muhlendorf*
  Michael Tremonte (*pro hac vice*)   Kevin B. Muhlendorf (*pro hac vice*)
  Robert Knuts (*pro hac vice*)    Pamela L. Signorello (BBO# 651483)
  Katie Renzler (*pro hac vice*)    2050 M Street NW
  90 Broad Street, 23rd Floor    Washington, DC 20036
  New York, New York 10004    Tel: 202.719.7000
  Tel: 212.202.2600     Fax: 202.719.7049
  Email: mtremonte@shertremonte.com  Email: KMuhlendorf@wiley.law
               PSignorello@wiley.law

*Attorneys for Defendant Mike K. Veldhuis*  *Attorneys for Defendant Courtney Kelln*

21

A986

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by ECF on May 2, 2023.

_____/s/ Robert Knuts_____
Robert Knuts

22

A987

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

Defendants.

Case No. 1:21-cv-11276-WGY

## DECLARATION OF ROBERT KNUTS

I, ROBERT KNUTS, pursuant to 28 U.S.C. § 1746 declare as follows:

1.    I represent Mike K. Veldhuis, a defendant in the above-captioned matter. I make this declaration in support Mr. Veldhuis' Motion to Stay the Proceedings.

2.    Attached hereto as Exhibit A is a true and accurate copy of email correspondence dated February 8, 2022, involving myself, prior and current counsel for other defendants in the above-captioned matter, and James R. Drabick, Assistant United States Attorney for the United States Attorney's Office for the District of Massachusetts ("AUSA Drabick").

3.    Attached hereto as Exhibit B is a true and accurate copy of an email exchange involving AUSA Drabick and Kevin Muhlendorf, counsel for defendant Courtney Kelln, dated February 8, 2022 through February 11, 2022.

4.      Attached hereto as Exhibit C is a true and accurate copy of an email dated February 17, 2023, from AUSA Drabick to counsel for Mr. Veldhuis, Michael Tremonte and Noam Biale, both of whom are attorneys at my law firm.

5.      Attached hereto as Exhibit D is a true and accurate copy of an email dated March 17, 2023, from SEC Attorney Kathleen Shields to counsel for the defendants in the above-captioned matter, including myself.

6.      Attached hereto as Exhibit E is a true and accurate copy of the Notice of Civil Claim that the Securities and Exchange Commission filed in the Supreme Court of British Columbia on August 11, 2022, in the action captioned *United States Securities and Exchange Commission v. Sharp*, Docket No. S226494.

7.      Attached hereto as Exhibit F is a true and accurate copy of the Reasons for Judgment issued by the Supreme Court of British Columbia on March 21, 2023 in the action captioned *United States Securities and Exchange Commission v. Sharp*, Docket No. S226494. The citation for this decision is *United States Securities and Exchange Commission v. Sharp*, 2023 BCSC 425.

8.      Attached hereto as Exhibit G is a true and accurate copy of the SEC's Responses and Objections to Defendant Courtney Kelln's First Requests for Admissions dated March 17, 2023.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 2, 2023, in New York, New York.

Robert Knuts

2

A989

# Exhibit A

## Robert Knuts

| | |
|---|---|
| **From:** | Drabick, James (USAMA) <James.Drabick@usdoj.gov> |
| **Sent:** | Wednesday, February 16, 2022 9:58 PM |
| **To:** | Robert Knuts |
| **Cc:** | Michael Tremonte |
| **Subject:** | RE: SEC v. Sharp et al. - Anticipated Motion to Intervene & Stay |

Mr. Knuts –

To your questions below, I anticipate that I would indeed seek to stay substantially all, if not all, depositions in the SEC case, given the extensive overlap between the criminal matter and the SEC matter. That said, if there are particular exceptions you propose, I am happy to discuss. With regard to the length of the requested stay, it would be until a resolution of the criminal matter(s) as to the overlapping charged defendants. And finally, I don't have particular other forms of discovery in mind at this juncture, but included it in my email simply out of an abundance of caution.

I would be happy to discuss any of the above, including potential resolution of the criminal matter as to your client, at your convenience.

Best,
JR

James R. (JR) Drabick
Assistant U.S. Attorney
(617) 748-3498 (o)
(617) 710-6105 (c)

---

**From:** Robert Knuts <RKnuts@shertremonte.com>
**Sent:** Tuesday, February 15, 2022 11:56 AM
**To:** Drabick, James (USAMA) <jdrabick@usa.doj.gov>
**Subject:** [EXTERNAL] RE: SEC v. Sharp et al. - Anticipated Motion to Intervene & Stay

Mr. Drabick,

Please see the below email – typo in your email address.

Bob

---

**From:** Robert Knuts
**Sent:** Tuesday, February 15, 2022 11:53 AM
**To:** james.drabik@usdoj.gov
**Cc:** mrp@dcglaw.com; Muhlendorf, Kevin <KMuhlendorf@wiley.law>; Wilson, Holly <HWilson@wiley.law>; Belostock, Lorraine <lbelostock@toddweld.com>; Michael Tremonte <MTremonte@shertremonte.com>; Smith, Neil T. <Neil.Smith@klgates.com>; Topetzes, Stephen G. <Stephen.Topetzes@klgates.com>; Walters, Sarah E. <sewalters@mwe.com>; Cmcampbell@mwe.Com; R. Daniel O'Connor <daniel.oconnor@ropesgray.com>; Brian R. Blais <brian.blais@ropesgray.com>; Yanofsky, Daniel <Daniel.Yanofsky@ropesgray.com>; George W. Vien <gwv@dcglaw.com>; Mquinn@vedderprice.Com; Jcollins@morganbrown.Com; Mmclaughlin@morganbrown.Com; 'Ward, Adrienne M.' <AWard@olshanlaw.com>; John Moon <jmoon@olshanlaw.com>; Shields, Kathleen (BRO)

1

A991

(ShieldsKa@SEC.gov) <ShieldsKa@SEC.gov>; Forni, Eric <ForniE@sec.gov>
**Subject:** RE: SEC v. Sharp et al. - Anticipated Motion to Intervene & Stay

Mr. Drabick,

I work with Michael Tremonte and I'm primarily responsible for representing Mr. Veldhuis in the SEC civil action.

To clarify the scope of your anticipated motion: (a) do you intend to seek a stay of *all* depositions that might be taken in the SEC case; (b) for how long would such a stay be sought; and (c) what "other forms" of discovery would be stayed pursuant to your motion?

Happy to discuss by phone if that is easier but I thought the group might benefit from answers to these questions.

Bob

Robert Knuts | Sher Tremonte LLP | 90 Broad Street, 23rd Floor | New York, New York 10004 |
tel: 212.202.2600 | direct: 212.202.2638 | fax: 212.202.4156 | rknuts@shertremonte.com | www.shertremonte.com

Confidentiality Notice:  This e-mail is for the sole use of the intended recipient(s) and may contain confidential and/or privileged information.  Any unauthorized use or dissemination of this communication or any of its contents or attachments is strictly prohibited.  If you received this communication in error, please notify Sher Tremonte LLP immediately and destroy the original message and all paper and electronic copies.

---

**From:** Drabick, James (USAMA) <James.Drabick@usdoj.gov>
**Sent:** Tuesday, February 8, 2022 9:55 AM
**To:** Michelle Rita Pascucci <mrp@dcglaw.com>; Muhlendorf, Kevin <KMuhlendorf@wiley.law>; Wilson, Holly <HWilson@wiley.law>; Lbelostock@toddweld.Com; Michael Tremonte <MTremonte@shertremonte.com>; Smith, Neil T. <Neil.Smith@klgates.com>; Topetzes, Stephen G. <Stephen.Topetzes@klgates.com>; Walters, Sarah E. <sewalters@mwe.com>; Cmcampbell@mwe.Com; R. Daniel O'Connor <daniel.oconnor@ropesgray.com>; Brian R. Blais <brian.blais@ropesgray.com>; Yanofsky, Daniel <Daniel.Yanofsky@ropesgray.com>; George W. Vien <gwv@dcglaw.com>; Ward, Adrienne M. <AWard@olshanlaw.com>; John Moon <jmoon@olshanlaw.com>; Mquinn@vedderprice.Com; Jcollins@morganbrown.Com; Mmclaughlin@morganbrown.Com
**Cc:** Shields, Kathleen (BRO) (ShieldsKa@SEC.gov) <ShieldsKa@SEC.gov>; Forni, Eric <ForniE@sec.gov>
**Subject:** SEC v. Sharp et al. - Anticipated Motion to Intervene & Stay

Good morning –

I understand each of you represents a defendant in the matter SEC v. Sharp et al., 21-cv-11276-WGY, and that later this week you will be discussing a case schedule with counsel for the SEC.  As many (if not all) of you know, I am conducting a parallel criminal investigation on behalf of the U.S. Attorney's Office for the District of Massachusetts into the same matters alleged in the SEC's Amended Complaint.  Some your respective clients have already been charged by criminal complaint and I anticipate the investigation will continue to mature.

Given these circumstances, I anticipate soon moving to intervene in SEC v. Sharp to seek a stay of deposition discovery and perhaps other forms of discovery.  I'm writing to solicit your respective position(s) on such a motion.  I am available and happy to discuss with each of you individually at your convenience.

Thank you.

Best,
JR

James R. (JR) Drabick

2

A992

Assistant U.S. Attorney
(617) 748-3498 (o)
(617) 710-6105 (c)

A993

# Exhibit B

**Muhlendorf, Kevin**

| | |
|---|---|
| **From:** | Muhlendorf, Kevin |
| **Sent:** | Friday, February 11, 2022 4:40 PM |
| **To:** | Drabick, James (USAMA) |
| **Cc:** | Wilson, Holly |
| **Subject:** | RE: SEC v. Sharp et al. - Anticipated Motion to Intervene & Stay |

JR,

Thanks for the clarification. We are certainly open to discussions once we see the motion, but we generally oppose a stay in the SEC action.

Have a great weekend.

Kevin.

**From:** Drabick, James (USAMA) <James.Drabick@usdoj.gov>
**Sent:** Friday, February 11, 2022 3:59 PM
**To:** Muhlendorf, Kevin <KMuhlendorf@wiley.law>
**Cc:** Wilson, Holly <HWilson@wiley.law>
**Subject:** RE: SEC v. Sharp et al. - Anticipated Motion to Intervene & Stay

Kevin –

That was more of a placeholder for caution's sake. The thrust of my proposed stay motion will be depositions.

Best,
JR

James R. (JR) Drabick
Assistant U.S. Attorney
(617) 748-3498 (o)
(617) 710-6105 (c)

**From:** Muhlendorf, Kevin <KMuhlendorf@wiley.law>
**Sent:** Friday, February 11, 2022 3:21 PM
**To:** Drabick, James (USAMA) <jdrabick@usa.doj.gov>
**Cc:** Wilson, Holly <HWilson@wiley.law>
**Subject:** [EXTERNAL] Re: SEC v. Sharp et al. - Anticipated Motion to Intervene & Stay

JR,

Hope all is well. On your proposed stay motion, can you be more specific about the "other forms of discovery?"

Thanks.

Kevin

Kevin B. Muhlendorf

A995

Wiley Rein LLP • 1776 K Street NW • Washington, DC 20006
o:  202.719.7052
Download V-Card | wiley.law | Bio

Note: The firm's domain has changed to wiley.law. To update my contact information, please download my vCard

> On Feb 8, 2022, at 9:56 AM, Drabick, James (USAMA) <James.Drabick@usdoj.gov> wrote:
>
> Good morning –
>
> I understand each of you represents a defendant in the matter SEC v. Sharp et al., 21-cv-11276-WGY, and that later this week you will be discussing a case schedule with counsel for the SEC.  As many (if not all) of you know, I am conducting a parallel criminal investigation on behalf of the U.S. Attorney's Office for the District of Massachusetts into the same matters alleged in the SEC's Amended Complaint.  Some your respective clients have already been charged by criminal complaint and I anticipate the investigation will continue to mature.
>
> Given these circumstances, I anticipate soon moving to intervene in SEC v. Sharp to seek a stay of deposition discovery and perhaps other forms of discovery.  I'm writing to solicit your respective position(s) on such a motion.  I am available and happy to discuss with each of you individually at your convenience.
>
> Thank you.
>
> Best,
> JR
>
> James R. (JR) Drabick
> Assistant U.S. Attorney
> (617) 748-3498 (o)
> (617) 710-6105 (c)

NOTICE: This message (including any attachments) from Wiley Rein LLP may constitute an attorney-client communication and may contain information that is PRIVILEGED and CONFIDENTIAL and/or ATTORNEY WORK PRODUCT. If you are not an intended recipient, you are hereby notified that any dissemination of this message is strictly prohibited. If you have received this message in error, please do not read, copy or forward this message. Please permanently delete all copies and any attachments and notify the sender immediately by sending an e-mail to Information@wiley.law

A996

# Exhibit C

**From:** Drabick, James (USAMA)
**Sent:** Friday, February 17, 2023 4:51 PM
**To:** Michael Tremonte; Noam Biale
**Subject:** Michael Veldhuis / xmail Filter Terms
**Attachments:** 2021_10_26 Drabick to Tremonte re xmail.pdf

Hi Michael, Noam –

As you will recall, I previously reached out to you to solicit any names, email addresses, and/or domains for attorneys with whom Mr. Veldhuis might have had privileged communications on the xmail system. During our subsequent discussions, without admitting any facts, you declined to provide information to me based on your client's Fifth Amendment rights, but also shared that your client "may be willing as an accommodation to consider providing certain information to a walled-off government 'taint team,' to enable the 'taint team' to identify potentially privileged communications without disclosing information that could be used by the prosecution team to establish a link in the chain of evidence against our client."

I'm reaching out today because I asked my office to assign a filter AUSA who has no involvement in the investigation of your client to serve as a conduit for receipt of any such attorney names, email addresses, and/or domains. If you have any attorney names/addresses/domains that you believe should be filtered out of the xmail messages for mike[@]secure.xmeridian.com, acco[@]securecuracao.xmeridian.com, and/or acco[@]sc.xmail.guru because the communications could potentially be privileged, **please send them to AUSA Laura Kaplan (cc'd) by close of business Tuesday, February 21st**. AUSA Kaplan will transmit them to the FBI forensic staff who will filter communications with those names/addresses/domains from the messages to/from those addresses. The information you provide, if any, will not be shared with me or the case agents. As noted in my earlier communication, we anticipate undertaking an independent filter review of the excluded emails at a later date.

If you have any questions about the above, please call me at your convenience. Please note, we are taking appropriate steps to filter out any suspected attorney communications regardless of your response.

Best,
JR

James R. (JR) Drabick
Assistant U.S. Attorney
U.S. Attorney's Office for the District of Massachusetts
(617) 748-3498 (o) | (617) 710-6105 (c)
james.drabick@usdoj.gov
Pronouns: he/him/his



**U.S. Department of Justice**

***Nathaniel R. Mendell***
*Acting United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

October 26, 2021

Michael Tremonte, Esq.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004

   Re:  <u>Potential Privilege & "xmail"</u>

Dear Attorney Tremonte:

   I write today in connection with your representation of Mr. Mike Veldhuis.  Specifically, I write to provide your client an opportunity to identify any potentially privileged communications sent to or from your client using any email account(s) that were maintained on servers in Curacao.

   As noted in Footnote 7 in the recent criminal complaint in <u>United States v. Sharp et al.</u>, 21-mj-07182-JCB (D. Mass.), my office received forensic copies of four servers from Curacao in March 2020 pursuant to a Mutual Legal Assistance Treaty ("MLAT") request.  Decryption of the servers has resulted in the identification of emails to/from email accounts using the domains "secure.xmeridian.com" and "securecuracao.xmeridian.com," among others.  Our investigation leads us to believe that these email accounts were informally referred to as "xmail" accounts, and based on our review of the header information, we believe your client likely used one or more such email accounts.  Those accounts appear to include:

- mike@secure.xmeridian.com
- acco@securecuracao.xmeridian.com
- acco@sc.xmail.guru

   Our review of the header information further leads to us to believe that there might be privileged communications among the full population of xmail emails.  In an abundance of caution, we anticipate implementing a filter screen to exclude any potentially privileged communications from the case team.  (We further anticipate undertaking an independent filter review of the excluded emails by individuals not associated with the case team at an appropriate juncture.)

   In order to ensure that we have identified the appropriate list of names and domains for the privilege filter screen, I am reaching out to provide you an opportunity to identify any attorney names and corresponding email addresses for potentially privileged communications involving

A999

your client.  To assist you, please find attached to this letter a list of email account domains identified among the xmail emails.

Please respond with your identification of attorney names (if any) and corresponding email addresses, along with a general statement of the nature of the privilege, by close of business on Tuesday, November 2, 2021.  If you have any questions, please do not hesitate to call.

Sincerely,

James R. (JR) Drabick
Assistant United States Attorney
james.drabick@usdoj.gov
(617) 748-3498

Enclosure:    Unique Domain List

2

A1000

**Unique Domain List**

a1movingandstorage.ca
abbottcresswell.com
accountantsinbc.com
acdinsurance.com
acm-services.ch
actinver.com.mx
actionstocktransfer.com
adrenalin.la
advantecglobal.com
aeroplan.com
aetna.com
afrasiabank.com
alexandracapitalcorp.com
allianz.com
allianzworldwidecare.com
allstream.com
allwestins.com
alphayomega.mx
amadeosbistro.com
amazon.com
americancorpenterprises.com
amstock.com
ancsecservices.com
anulfoarias.info
aol.com
aol.com
aphelion.com
applegaterealtors.com
aquinas.org
argus.com.cy
argussoftware.com
arlingtoncorporation.com
armlaw.com
armoursecure.com
arnulfoarias.info
arowayenergy.com
arvayfinlay.ca
ascotmining.com
associatedtrustees.com
associated-trustees.com
atlasblockchaingroup.com
atlascloud.ca
att.com
att.net
audiencemarketing.com

3

ayogdl.com
bakerst.com
bankgutenberg.ch
banking.bz
banquehavilland.ch
basaltwhistler.com
bathway.ca
bb.com.mx
bcsc01a.gov.bc.ca
bcshipping.ca
bdconsultants.com
bdo.ca
bdo.ca
beaufortacs.com
beaufortsecurities.com
bed-rock.com
bell.blackberry.net
bellalliance.ca
bellnet.ca
bennettjones.com
Bentallkennedy.com
berrylogic.net
bfbcpa.us
bgreiglaw.com
biancardilaw.com
bigskymanagement.net
bitreturn.com
blacklightsa.ch
bmasecurities.com
bmo.com
bodcaplaw.com
bondmerc.com
boothudall.com
bordier.com
boslil.com
boslil.com
breder-suasso.com
bristol.ch
broadridge.com
bruyneelandco.ca
bsibank.com
bsibank.com
btinternet.com
bty.com
buckleyhogan.com
buzzmail.ltd

A1002

cameony.com
canaccord.com
canadahelps.org
cannabiscomplianceinc.com
cannonpowergroup.com
capilanovw.com
carpa.ca
casadelosarcos.com
casselsbrock.com
cbhbank.com
ccltd.ca
cdw.ca
cellalange.net
centralbank.org.bz
cgf.com
chemesis.com
choicebankld.com
choicebankltd.com
chzllp.com
cigna.com
citifund.com
claruscap.com
claruscap.com
claruscapital-hk.com
cleartrusttransfer.com
clsolutions.com.hk
coastcapitalsavings.com
colcorsa.com
columbiastock.com
com.cast.net
comcast.net
consultant.com
continentalsock.com
continentalstock.com
contrerasabogados.mx
coralwave.com
coralwave.com.bs
corphouse.net
corporatehouse.com
corporatestock.com
corptrax.com
corptrax.coom
crebermusic.com
credicorpbank.com
creel.mx
creelconcepts.com

5

A1003

csair.com
csl.ap.blackberry.net
curadon.com
cwilson.com
cwpanama.net
dacostacorp.com
dantelabs.com
dccnet.com
deanlawcorp.com
dekora.com
delanocapital.ca
deloitte.com
desjardins.com
dgmgroup.com
diamondresorts.com
diocese-geraldton.org
dlubinassociates.com
dmcl.ca
dominionlending.ca
dorchestercollection.com
dubo.com
e.fanaticsretailgroup.com
earls.ca
earlston.ca
earthlink.net
easyapplianceparts.ca
edr.com
egmfirm.com
ehtrustco.ch
elcondorminerals.com
email.hpconnected.com
emerald.life
empirestock.com
empoweredcbd.ch
engelvoelkers.com
ennova.net
enrailpartners.com
equivest.ch
equuscapital.ch
esquirecs.com
eucapitalcorp.com
europacbank.com
Fairmont.com
fasken.com
fayo.biz
fedex.com

6

A1004

fensolutions.com
filersupport.com
financialfootprint.ca
firstcanada.ca
firstlandmark.ca
firstlineholdings.com
firstmg.com
foglioabogados.com
formacompany.com
fortesecurities.com
francesmahonlaw.com
FraserLitigation.com
frederksharp.com
fredericksharp.com
fretwell.ca
frugalware.org
fultonco.com
fyklaw.com
GBHCPAS.COM
ggsibahamas.com
gki.com.bz
glennandglenn.com
globextransfer.com
gmail.com
gmx.com
gov.bc.ca
granvilleislandcatering.com
greenhilladmin.com
greenworkscarpetcare.com
gtlaw.com
gtlaw.con
harpergrey.com
haywood.com
hbvanlaw.com
hdas.com
hecapital.com
helenaabstract.com
heliograph.ca
hellenicbank.com
hillcrestpetroleum.com
hol.gr
holladay1.com
homereworks.com
hotelmoskva.rs
hotmail.com
hotmail.fr

7

A1005

hours.bz
hsbc.com
hsbc.com.mc
hsbc.com.mx
htln.com
hushmail.com
icloud.com
incnow.com
infinity-group.sc
insurebc.ca
interiortesting.com
interwestta.com
investfortuna.com
investingpacific.com
isgsecurities.com
islandstocktranfer.com
islandstocktransfer.com
isodiol.com
itpa.org
iydaco.com
jacksoncompany.ca
jaffa.ca
jamcocapital.com
jamesstafford.ca
jamesstafford.com
jandm.com
jmgm.com
jofinancial.com
johnpunzo.com
joyroadcatering.com
jrsholdingsinc.com
jt-lex.com
juscollege.com
katanassociates.com
kearneyff,com
kearneyfs.com
KornFerry.com
korveconsulting.com
l1lithium.com
lakehg.com
la-law.ca
lancetracey.com
landquest.com
langlois.ca
larlee.com
lawlerfirm.com

8

A1006

lawrosen.com
lcpa.ca
lcrhealth.com
leedefinancial.com
leedejonesgable.com
lexingtonbiosciences.com
lgt.com
lideresadvisors.com
live.com
live.com.mx
livingspace.com
livingspacehomes.com
lklaw.ca
lloyds.com
lmu.edu
localhost
lombardforte.com
lrmm.co
lrmm.com
lsauto.ca
ltic.com
lundandguttry.com
mac.com
macdonald.com
macrealty.com
mad.uscourts.gov
madala.ch
mail.com
malone-bailey.com
manulife.com
mapleviewfamilydentistry.com
mariacondesa.com
marinedrive.com
marketplace.amazon.ca
marshbuildinginspections.ca
martinandassociates.ca
mbaerbank.com
mbtaxlaw.com
mcewanpartners.com
mclmotorcars.com
mcmillan.ca
me.com
meshdesignstudio.com
messaging.microsoft.com
mexlend.com
mhklaw.com

9

A1007

michaeldowling.ca
michaelnesbit.com
midas-offshore.com
milio.com
millersassociates.com
mininghouse.com
mixbook.com
moisolicitors.com
mollymaid.ca
monex.com.mx
monsas.co.uk
montrose.net
morandmatsushi.onmicrosoft.de
morse.biz
mossfon.com
mossfon-bvi.com
motiva.ca
msn.com
mtech.edu
mulberryproperty.ca
myflightsavers.com
namprd20.prod.outlook.com
natco.org
naturogroup.com
newsfilecorp.com
nike.ins.cwru.edu
nmu.edu
nortonrosefulbright.com
notariapublicados.com
ocsecurities.com
okanagancrushpad.com
olipv.com
onelifetc.com
openroadautogroup.com
orbislegalservices.com
origua.com
outlook.com
outlook.com
pacificangler.ca
pacificproperty.ca
pacificstocktransfer.com
palkowski.com
parttimecfo.ca
patentable.com
peckandcompany.ca
pgp.com

10

phx2-ss-5-lb.cnet.com
pilotelectric.ca
pintoconstruction.com
plhlaw.ca
porschedrivingexperience.de
porscheexperience.de
premierfinservices.com
presidentstocktransfer.com
primorigroup.com
prival.com
privateequitysecurities.com
prodigy.net.mx
prontomail.com
protaxbook.com
protegesoluciones.com
protonmail.ch
protonmail.com
ptmtalent.com
pubcoreporting.com
puremobile.com
qstransfer.com
quijano.com
rambler.ru
randb.co.uk
rbc.com
rci.rogers.com
rdos.bc.ca
rdscapital.com
RedwoodEG.com
regeniva.com
rentaclassiccar.com
rhbgroup.com
riedesser.com.mx
rightsignature.com
rim.com
rogers.com
ronerickson.com
routhtransfer.com
rowlandlaw.ca
royalscotsclub.com
rubinrudman.com
runbox.com
ryanwilson.com
sadlergibb.com
safe-mail.net
samcoprinters.com

A1009

santacruzsilver.com
santander.com.mx
saturnagroup.com
sauerenergy.com
sc.mail.guru
sc.xmail.guru
scadmissions.com
scheduleonce.com
scholefield.ca
sckservices.com
scm.ca
scottsdalecapital.com
scure.xmeridian.com
sdkcpa.com
sdlergibb.com
secrue.xmeridian.com
secure.meridian.com
secure.xmail.guru
secure.xmeridan.com
secure.xmeridian.com
secure.xmeridian.comp
secureciracao.xmeridian.com
securecucacao.xmeridian.com
securitieslaw.bc.ca
semper.ch
sepepsa.mx
sercure.xmeridian.com
sharedata.co.uk
shareregistrars.uk.com
shaw.ca
shawbiz.ca
sherani.com.fj
sierraresgroup.com
signaturestocktransfer.com
silverton.ch
sir-inc.com
sizinos.com
smallcapadmin.com
smorg.ca
smythecpa.com
sonic.net
spartansecurities.com
stanford.edu
stctransfer.com
steinerfinance.net
steinmedical.com

A1010

sterlinggloballtd.com
stevia-first.com
stockslaw.com
stonecroftmgt.ca
strongholdmetals.com
Sun.COM
superiortoursvallarta.com
supernaturallandscapes.com
support.ucla.edu
surfjack.com
surgetech.com
sweetome.com
sympatico.ca
tampabay.rr.com
td.com
telus.com
telus.net
tendallcapital.com
thearcaneorder.com
thebmwstore.ca
thor.ca
tinglemerrett.com
tippetrichardson.com
tmx.com
trademarkindustriesltd.com
transcendcapital.com
transferonline.com
transhare.com
trars.com
tutanota.com
unilogik.com
unitedbdc.com
valor.ky
vancity.com
vandopgallery.com
vch.ca
vencapfirst.com
verdmont.com.pa
vger.kernel.org
viabank.com
vip.net
visionquestsociety.org
visualant.net
vitality.bio
vitality.bio
volansgroup.ch

A1011

vontobel.ch
vpbank.com
vsmcapital.com
vstocktransfer.com
vtcusa.com
vumee.com
wb21.com
wcsti.com
wdco.com
weintraub.com
weiser.com.bs
wengervieli.ch
westcoastpool.com
westernwater.us
westnet.com.au
whidbey.net
windsorplywood.com
wintercap.ch
winvestments.ca
wiupdate.com
wlmlaw.ca
wm.com
wood.bz
worldmoto.com
worthington.bz
wow.bz
wrm.ca
wscu.com
wwg.bz
wws24.ch
xado.bz
xmail.com
xmail.guru
xmeridian.com
xn.bz
xnw.bz
xnxx.bz
xtc.bz
xtg.bz
xxx.bz
yah.bz
yahoo.ca
yahoo.com
yahoo.com.mx
yahoo.gr
yaletownlaser.com

14

yaletownnaturopathic.com
yamaki.bz
yarfm.co.zm
yes.et
yetmanslaw.com
yin.bz
ym.bz
ymc.bz
ymn.bz
yogen.bz
yokohama.bz
yoon.bz
yosa.com.et
youhavemail.bz
youporn.com.bz
yourbiz.com
yourbz.com
yourfuture.bz
yourmail.bz
yourmail.com
yourmailbiz.com
zamilparealtors.com
zbscpas.com
zflawfirm.com

A1013

# Exhibit D

**From:** Shields, Kathleen (BRO)
**Sent:** Friday, March 17, 2023 4:09 PM
**To:** DiPaolo, Alyssa; Robert Knuts; stephen.topetzes@klgates.com; award@olshanlaw.com;
neil.smith@klgates.com; Michael Tremonte; jmoon@olshanlaw.com; kmuhlendorf@wiley.law;
maranda@fritzpc.com; hwilson@wiley.law; psignorello@wiley.law; kpickettlaw@gmail.com;
rob.silverblatt@klgates.com; hcooper@toddweld.com; mmclaughlin@morganbrown.com;
jcollins@morganbrown.com; gwv@dcglaw.com; lbelostock@toddweld.com; tfazio@mgmlaw.com; Katie
Renzler; ckellen@wiley.law
**CC:** London, David H.; Day, Alfred
**Subject:** SEC v. Sharp, et al. - xmail inadvertent production issue
**Attachments:** xmail Materials & Inadvertent Production


Dear Counsel –

An issue with the production of xmail has come to my attention.  As described in the attached letter from JR Drabick, the USAO inadvertently produced to the SEC, and the SEC then produced to you, certain xmail messages and/or attachments that hit on one or more of the search terms that the USAO used in its privilege filter review.

I was first notified of a potential problem by JR late on Tuesday afternoon.  At his request, SEC staff working on this case suspended our review of the xmail production at that time.  We have not reviewed any of the xmail since then.  When SEC staff reviewed the xmail production before Tuesday afternoon, none of the documents we reviewed appeared to us to be privileged.  This morning, JR informed me of the scope of the inadvertent production, as described in the attached letter.

I have begun the process of assembling an SEC filter team to conduct its own filter review of the potentially privileged xmail files.  That filter team will review the xmail production for privilege, and I will inform you as soon as that review is complete.  To the extent that the filter team identifies any documents it believes to be privileged, we will remove those documents from the SEC's database and ask that you do the same.

If you choose not to conduct your own filter reviews of the xmail production, I ask that you await the conclusion of the SEC's filter review before looking further at the xmail production.  I will endeavor to get the SEC's filter review completed promptly.

Please let me know if you have any questions.

-        Kathy

A1015

**From:** Drabick, James (USAMA)
**Sent:** Friday, March 17, 2023 3:59 PM
**To:** Shields, Kathleen (BRO)
**CC:** London, David H.
**Subject:** xmail Materials & Inadvertent Production
**Attachments:** 2023_03_17 Letter to Shields re xmail Materials.pdf; Veldhuis - Inadvertently Produced .eml Files.xlsx; Carrillo - Inadvertently Produced .eml Files.xlsx; Friesen - Inadvertently Produced .eml Files.xlsx; Gasarch - Inadvertently Produced .eml Files.xlsx; Kelln - Inadvertently Produced .eml Files.xlsx; Sexton - Inadvertently Produced .eml Files.xlsx; Sharp - Inadvertently Produced .eml Files.xlsx; Nikolayev - Inadvertently Produced .eml Files.xlsx

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Kathy –

Please see the attached letter and enclosed materials.  Please do not hesitate to call with any questions.

Best,
JR

James R. (JR) Drabick
Assistant U.S. Attorney
U.S. Attorney's Office for the District of Massachusetts
(617) 748-3498 (o) | (617) 710-6105 (c)
James.drabick@usdoj.gov
Pronouns: he/him/his

A1016



**U.S. Department of Justice**

***Rachael S. Rollins***
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

March 17, 2023

<u>VIA EMAIL</u>

Kathleen Shields
Senior Trial Counsel
U.S. Securities and Exchange Commission
33 Arch Street, 24th Floor
Boston, MA  02110
shieldska@sec.gov

  Re: "xmail" Filter Screen & Inadvertent Production

Dear Attorney Shields:

  I write to follow-up on the potential issue I alerted you about on Tuesday afternoon this week regarding the xmail materials produced to you to date.

  As you know, the FBI and I have shared with you a selection of emails known as "xmail" messages that were recovered from servers we obtained from Curacao pursuant to a mutual legal assistance request.  We have shared these materials with you for purposes of your parallel investigations and civil enforcement actions.  Specifically, we have shared with you xmail messages believed to be associated with the following individuals:  Fedir Nikolayev, Yvonne Gasarch, Frederick Sharp, Courtney Kelln, Mike Veldhuis, Paul Sexton, Jackson Friesen, and Luis Carrillo.

  Before sharing the materials with you, we ran a filter screen against the emails believed to be associated with each of these individuals to remove any emails that might potentially contain privileged information.  To do so, we generated a list of domains, names, and generic filter terms (the "Filter Terms") based on (i) a review of the header information for the entire xmail set of emails and (ii) input we solicited from counsel to Gasarch, Sharp, Kelln, Veldhuis, Sexton, and Friesen, as well as from Carrillo directly.  Some counsel provided names and/or domains for us to include, while others declined, even after we afforded them an opportunity to provide such information to a walled-off filter AUSA.  We incorporated into the Filter Terms the information provided by the counsel who elected to respond, and an FBI forensic staff member then ran a filter screen on the xmail materials using the Filter Terms.[1]  The forensics staff

---

  [1] The Filter Terms that the FBI forensics staff member ran are attached hereto.

member then marked for exclusion the emails and/or attachments that hit on one or more of the Filter Terms and endeavored to export sets of xmail messages that did *not* hit on any such terms (the "Result Sets."). At the time the Results Sets were generated, I had no reason to believe there were any potentially privileged materials in the Results Sets and I authorized them to be shared with you for purposes of your parallel matters. I nevertheless requested that if you came across any messages or other materials you believe might be privileged, to please let me know immediately and cease review of those materials.

On Tuesday afternoon this week I learned that there was a theoretical possibility that certain materials that were intended to be excluded from the Results Sets were nevertheless inadvertently included and produced to you. Specifically, I learned that there was a theoretical possibility that one or more .eml files produced to you as part of the xmail materials might have included attachments that hit on one or more Filter Terms and the FBI forensic staff member accordingly intended to be excluded from the Results Sets. This possibility was discovered when my office's litigation technology staff prepared to load the xmail materials in my office's document review tool, during which process my litigation technology staff consulted with the FBI forensics staff member about the scope of documents in the Results Sets. Immediately upon learning of this possibility, I asked that you please stop any additional review of the xmail materials produced to you until I had a chance to learn more. I understand you agreed to do so.

I have since directly spoken with the FBI forensics staff member about this possibility and can now report as follows. The FBI forensics staff member inadvertently included in the Results Sets certain .eml files that included one or more attachment(s) embedded within them that were intended to be excluded because those attachment(s) hit on one or more Filter Terms. This inadvertent production applies only to a subset of the .eml files that were produced and does not apply to the duplicate .htm versions of emails (which do not have the attachments embedded within them) nor the native files (which generally are the attachments to the .htm versions of emails, but which do not include any attachments that hit on one or more Filter Terms). At this juncture, I do not know whether any of the inadvertently produced attachments are in fact privileged; I simply know that the FBI forensics staff member intended that those attachments (and, in turn, the .eml files in which they were embedded) be excluded based on the Filter Terms that were applied.

Enclosed please find Excel files by individual containing a list of the attachments and associated .eml files that were inadvertently produced.[2] We will not be loading these .eml files or attachments into our review tool or otherwise reviewing them until an independent filter review of them can be completed. We ask that the SEC likewise take appropriate steps to segregate and avoid review by any investigation and/or litigation teams of any potentially privileged materials included in the materials produced to you. To that end, I understand the SEC is considering undertaking its own independent filter review of such materials. To the extent we determine that any documents in the inadvertently produced materials are in fact privileged, we will let you know, and we ask that you likewise do the same.

---

[2] Note, there are duplicate .eml entries in the lists when multiple attachments in the same email hit on a Filter Term. There are also duplicate .eml entries across the lists, presumably because the message at issue was sent to/from two or more of the individuals.

A1018

I understand you have produced the xmail materials for certain of these individuals to certain defense counsel in your parallel civil enforcement action against Frederick Sharp et al.  I ask that you please share this letter and the relevant Excel files with those counsel so that they can take the appropriate precautions while ultimate privilege determinations are made.  They are welcome to reach out to me with questions if they so choose.

Thank you for your prompt attention to this matter.

Sincerely,

James R. Drabick
Assistant U.S. Attorney

Enclosures & Attachment

3

A1019

# Exhibit E

Form 1 (Rule 3-1(1))                    S=226494

No. _____
Vancouver Registry

**SUPREME COURT**
**OF BRITISH COLUMBIA**
**VANCOUVER REGISTRY**
**IN THE SUPREME COURT OF BRITISH COLUMBIA**
AUG 1 1 2022

BETWEEN:          

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION

PLAINTIFF

AND:

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN, and
GRAHAM R. TAYLOR

DEFENDANTS

## NOTICE OF CIVIL CLAIM

**This action has been started by the plaintiffs for the relief set out in Part 2 below.**

If you intend to respond to this action, you or your lawyer must

(a)     file a response to civil claim in Form 2 in the above-named registry of this
court within the time for response to civil claim described below, and

(b)     serve a copy of the filed response to civil claim on the plaintiffs.

If you intend to make a counterclaim, you or your lawyer must

(a)     file a response to civil claim in Form 2 and a counterclaim in Form 3 in the
above-named registry of this court within the time for response to civil
claim described below, and

(b)     serve a copy of the filed response to civil claim and counterclaim on the
plaintiffs and on any new parties named in the counterclaim.

JUDGMENT MAY BE PRONOUNCED AGAINST YOU IF YOU FAIL to file the response to
civil claim within the time for response to civil claim described below.

11AUG22  2209957  RISS     200.00
21422  S226494

A1021

**Time for response to civil claim**

A response to civil claim must be filed and served on the plaintiff,

> (a)    if you were served with the notice of civil claim anywhere in Canada, within 21 days after that service,
>
> (b)    if you were served with the notice of civil claim anywhere in the United States of America, within 35 days after that service,
>
> (c)    if you were served with the notice of civil claim anywhere else, within 49 days after that service, or
>
> (d)    if the time for response to civil claim has been set by order of the court, within that time.

<u>**CLAIM OF THE PLAINTIFF**</u>

**PART 1:  STATEMENT OF FACTS**

**The Parties**

1.      The Plaintiff, the United States Securities and Exchange Commission ("**SEC**"), is a federal agency of the United States of America. The SEC enforces the federal securities laws of the United States and is authorized to bring civil claims for violations of those laws. The SEC regulates the securities industry in the United States, including securities exchanges, brokers, dealers, investment advisors, mutual funds, and parties that offer and sell securities

2.      The Defendants Frederick L. Sharp ("**Sharp**"), Zhiying Yvonne Gasarch ("**Gasarch**"), Courtney Kelln ("**Kelln**"), Mike K. Veldhuis ("**Veldhuis**"), Paul Sexton ("**Sexton**"), Jackson T. Friesen ("**Friesen**"), and Graham R. Taylor ("**Taylor**") are each subjects of a complaint filed in the United States District Court, District of Massachusetts ("**District Court**") by the SEC on August 5, 2021. This complaint alleges their involvement in a sophisticated and long-running fraud (the "**US Complaint**"). All of the Defendants are British Columbia residents.

3.      The US Complaint seeks, among other things, disgorgement (with prejudgment interest) of all the Defendants' ill-gotten gains arising from the unlawful conduct alleged in the US Complaint, and civil monetary penalties pursuant to the United States *Securities Act of 1933* and *Securities Exchange Act of 1934*.

4.     The Defendants Sharp, Gasarch, and Kelln (together, the **"Sharp Group"**) are individuals residing in West Vancouver, Richmond, and Surrey, British Columbia, respectively. Together, they operated an illicit enterprise of facilitating securities fraud: in exchange for lucrative fees, the Sharp Group provided its 'clients' with various means of concealing their identities. This enabled these clients to fraudulently manipulate the price of certain US-listed stocks, concealing their role in promoting and later selling these stocks. This allowed them to avoid disclosure requirements applicable to sales of large stock positions like theirs, which in turn allowed them to profit from their scheme at the expense of unsuspecting retail investors.

5.     The Defendants Veldhuis, Sexton, and Friesen (together, the **"Veldhuis Control Group"**) are individuals residing in Vancouver, Anmore, and Delta, British Columbia, respectively. Acting in concert, these individuals were some of the Sharp Group's most significant clients. Using the Sharp Group's services, the Veldhuis Control Group orchestrated at least six schemes to inflate (i.e. "pump") the share price of a public company in which they – through Sharp Group-provided nominee shareholders – held substantial positions, and then rapidly sell (i.e. "dump") these shares to members of the public under the illusion that these sales came from numerous unrelated entities.

6.     The Defendant Taylor is an individual residing in Vancouver, British Columbia. Together with the Veldhuis Control Group and Avtar Dhillon (**"Dhillon"** who is not a Defendant in this proceeding, but is a subject of the US Complaint), Taylor facilitated transactions by which private companies controlled by his co-conspirator Dhillon became public and thus able to sell shares to the public. He also, like the Veldhuis Control Group, held and sold shares in Dhillon's companies through nominee entities and earned substantial profit therefrom.

**The Defendants' Fraud**

7.     Over the course of at least nine years, the Defendants carried out an elaborate fraud on public market participants. Under Sharp's leadership, the Sharp Group provided its clients (including the Veldhuis Control Group and Taylor), who were persons in control of "penny stock" public companies (i.e. companies with stock that is publicly trade for less than $5/share), with such services as:

(a)     Networks of offshore shell companies to conceal stock ownership;

    (b)      Arranging stock transfers and money transmittals; and

    (c)      Providing encrypted accounting and communications systems. Over the course of the fraud, the Sharp Group processed over $1 billion in gross stock sales (and over $770 million in net sales).

8.      Each of the Sharp Group's members had a distinct set of responsibilities in the enterprise. Sharp was the operation's mastermind, and was the primary liaison between clients and various offshore trading platforms (including two based in Switzerland, Blacklight SA and Wintercap SA, that the SEC has previously charged with fraud in connection with illegal stock sales). He also cultivated and maintained client relationships.

9.      Gasarch's role was to move, typically through wire transfers, the proceeds of illegal stock sales as directed by clients in a manner designed to conceal the stocks' true beneficial owners. She also forged documentation to support these payments, instructed clients on how to use the Sharp Group's clandestine communications network, and personally served as the purported owner of certain nominee entities.

10.      Kelln's role was to help clients avoid disclosure requirements when "dumping" their share positions on public markets. She did so by splitting Sharp Group Clients' shareholdings, held by Sharp Group-provided nominee entities, into small blocks of less than 5% of outstanding stock. She would then distribute these blocks across multiple nominee entities, which would then be sold to unsuspecting buyers. She also engaged lawyers to provide deceptive opinion letters to transfer agents stating that the public company and the nominee entities holding its shares were not affiliates. This caused these agents to remove trading restrictions on the shares and allowed them to be sold to the public.

11.      The Veldhuis Control Group and Taylor, often acting in concert, made extensive use of the Sharp Group's services and accounted for over $140 million in illegal stock sales. Typically, their fraudulent schemes followed a regular pattern. First, Dhillon (sometimes in concert with Taylor) would arrange a reverse-take-over ("**RTO**") by which a private company he controlled (as chair of the board of directors) would purchase a public company with little, if any, operations. He would then exchange his shares in the private company for those of the public company, changing the

public company's name, ticker, and business plan to align with those of his private company. Effectively, this allowed for the sale of shares in Dhillon's company to the public without the disclosure requirements that come with the usual initial public offering process.

12.     Next, Dhillon would use his position at the company to issue a large number of shares to his associates (i.e. the Veldhuis Control Group and Taylor), which would be held through nominee entities provided by the Sharp Group. Once his associates effectively held a large share position, he would use his position to issue press releases touting favorable business developments.

13.     In a further effort to increase the company's share price, the Veldhuis Control Group would hire a promoter, William Kaitz ("**Kaitz**", who is not a Defendant in this proceeding but is a subject of the US Complaint), to promote urgent and bullish investment opportunities in the company's stock to retail investors. On at least one occasion, it did so through Sharp Group-provided nominee entities to conceal its involvement. Kaitz would (falsely) assure prospective investors that independent third parties paid for his promotional services.

14.     Once the company's share price increased, the Veldhuis Control Group and Taylor would cause the nominee entities they controlled to sell their share positions to the public. They did so with the assistance of Sharp, Gasarch and Kelln. This assistance was necessary in order for the Veldhuis Control Group and Taylor to sell the shares to the public at all, and to avoid the reporting requirements for sales of share positions as large as theirs.

15.     The Defendants repeated this pattern on at least six occasions, all involving entities whose boards Dhillon chaired: four times in respect of Vitality Biopharma, Inc. (f.k.a. Stevia First Corp), once in respect of Arch Therapeutics Inc., and once in respect of OncoSec Medical Incorporated. Further, Taylor and Dhillon also engaged in a similar scheme with another of Dhillon's companies, Inovio Pharmaceuticals, Inc.

**The United States Enforcement Proceedings and Orders**

16.     On the same day the SEC filed the US Complaint, August 5, 2021, it also moved before the District Court for a Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief. Judge Nathaniel Gorton of the District Court granted this injunctive relief the next day, on August 6, 2021. This order (the "**TRO**") included an order freezing the assets held by

or for the benefit of the Defendants and entities they control, wherever such assets may be located. Among these assets, as mentioned in the TRO, are dozens of bank accounts held by the Defendants and their nominee entities in British Columbia.

17.    On August 20, 2021, Judge Gorton entered a preliminary injunction order against Sharp, Veldhuis, Sexton, and Taylor.

18.    On August 30, 2021, Judge Leo T. Sorokin of the District Court entered a stipulated preliminary injunction against Dhillon.

19.    On October 7, 2021, Judge William G. Young of the District Court entered a preliminary injunction order against Kelln.

20.    Also on October 7, 2021, Judge Young entered a preliminary injunction order against Friesen.

21.    On October 15, 2021, Judge Young entered a preliminary injunction order against Gasarch.

22.    On May 12, 2022, Judge Young entered default judgment against the Defendant Sharp; accepting as true the factual allegations in the US Complaint in respect of Sharp and finding several violations of United States securities law (the "**Default Judgment**").

23.    The Default Judgment set out permanent restrictions on Sharp's ability to participate in United States capital markets, along with a civil penalty of $23,990,781 and liability for disgorgement in the amount of $21,760,936 (and $7,173,497 in prejudgment interest thereon). The Default Judgment also ordered various financial institutions at which Sharp-controlled entities maintained accounts, where these accounts had previously frozen by the District Court, to transfer the accounts' entire balances to the SEC. This payment was due within 30 days of May 12, 2022.

**The British Columbia Properties**

24.    The Defendants' each residing in Canada prompted the SEC to conduct property searches in Canada. Through those searches, the SEC has discovered properties legally owned by the Defendants (the "**BC Properties**") that the SEC is aware of, including:

    (a)    16750 Maki Road, Lake Country, BC V4V 1C2, owned by Sexton; and

    (b)    2769 1ˢᵗ Ave W Vancouver, BC V6K 1H2, owned by Friesen.

25.    Vehicles in which the Defendants are registered as the debtor that the SEC is aware of include:

    (a)    a 2018 Volkswagen Golf Comfortli with the serial number 3VWG17AU7JM277083, owned by Sharp;

    (b)    a 2021 Chevrolet Suburban with the serial number 1GNSKEKT9MR467224, owned by Kelln;

    (c)    a 2020 Yamaha YZ250FLG with the serial number JYACG40C4LA015931, owned by Taylor;

    (d)    a GMC Sierra 3500 with the serial number 1GT42YEY0JF173394, owned by Sexton;

    (e)    a 2009 Toyota Tacoma with the serial number 5TEUU42N99Z659648, owned by Veldhuis;

    (f)    a 2008 Forest River Rockwood ULT with the serial number 4X4TRLY298D096087, owned by Veldhuis.

26.    Results of a publically available Personal Property Registry ("**PPR**") search identified Gasarch registered as the debtor in one instance, listing shares in Creery Estates Inc. as collateral.

27.    The SEC does not have full insight into the Defendants' financial affairs and the whereabouts of their assets in Canada, other than the bank and investment accounts subject to the TRO and the District Court's various preliminary injunction orders.

**PART 2: RELIEF SOUGHT**

28.    The Plaintiff claims against the Defendants for:

(a)    An Order for the Preservation of Assets freezing the assets of the Defendants, including the BC Properties;

(b)    Order that each Defendant provide the Plaintiff with a sworn statement disclosing any and all assets held, wherever situated, including:

    (i)    The nature of each asset;

    (ii)    The value of each asset;

    (iii)    Any identifying information in regard to the asset;

    (iv)    The exact location of each asset; and

    (v)    Whether the asset is held in the Defendant's name, the name of another, or jointly with another person.

(c)    Costs of this proceeding; and

(d)    Such further and other relief as this Court deems just and appropriate.

## PART 3:  LEGAL BASIS

29.    The Plaintiff relies on Section 39 of the *Law and Equity Act,* RSBC 1996, c. 253; rule 10-4 of the *Supreme Court rules*; and the inherent jurisdiction of this Court.

30.    There is a strong *prima facie* case, and by extension a good arguable case, on the merits that the Defendants perpetrated, participated in, and/or benefitted from the fraud. The balance of convenience favours granting the freezing (also known as Mareva) injunction. The Defendants each have assets within British Columbia and there is a real risk that any or all of them will dissipate those assets so as to render nugatory and judgment obtained against them (or, in the case of Sharp, the Default Judgment already in place against him) in the SEC's enforcement proceedings in the United States.

31.    The granting of the injunctive relief sought is just and equitable in all the circumstances of this case.

32.    The Plaintiff ought to be relieved from granting an undertaking as to damages.

Plaintiffs' address for service:

Bennett Jones LLP
Barristers and Solicitors
2500 – 666 Burrard Street
Vancouver, B.C. V6C 2X8
Attention: David Gruber

E-mail address for service:

gruberd@bennettjones.com

Place of trial:

Vancouver, British Columbia

The address of the registry is:

800 Smithe Street
Vancouver, British Columbia

Dated:    Aug 11/2022

Signature of Bennett Jones LLP
(David Gruber)
☐ Plaintiff  ☒ Lawyer for Plaintiff

Rule 7-1(1) of the Supreme Court Civil Rules states:
    (1) Unless all parties of record consent or the court otherwise orders, each party of record
to an action must, within 35 days after the end of the pleading period,
        (a) prepare a list of documents in Form 22 that lists
            (i) all documents that are or have been in the party's possession or control
            and that could, if available, be used by any party at trial to prove or disprove
            a material fact, and
            (ii) all other documents to which the party intends to refer at trial, and
        (b) serve the list on all parties of record.

Form 1 (Rule 3-1(1))

### Appendix

[The following information is provided for data
collection purposes only and is of no legal effect.]

**Part 1:  CONCISE SUMMARY OF NATURE OF CLAIM:**

The plaintiffs claim against the defendant for fraud.

**Part 2:  THIS CLAIM ARISES FROM THE FOLLOWING:**

*[Check one box below for the case type that best describes this case.]*

A personal injury arising out of:

        ☐ a motor vehicle accident
        ☐ medical malpractice
        ☐ another cause

A dispute concerning:

        ☐ contaminated sites
        ☐ construction defects
        ☒ real property (real estate)
        ☐ personal property
        ☐ the provision of goods or services or other general commercial matters
        ☐ investment losses
        ☐ the lending of money
        ☐ an employment relationship
        ☐ a will or other issues concerning the probate of an estate
        ☐ a matter not listed here

**Part 3:  THIS CLAIM INVOLVES:**

*[Check all boxes below that apply to this case]*

        ☐ a class action
        ☐ maritime law
        ☐ aboriginal law
        ☐ constitutional law
        ☐ conflict of laws
        ☒ none of the above
        ☐ do not know

**Part 4:**

*[If an enactment is being relied on, specify. Do not list more than 3 enactments.]*

n/a

A1030

# Exhibit F

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Citation:    *United States Securities and Exchange Commission v. Sharp,*
2023 BCSC 425

Date: 20230321
Docket: S226494
Registry: Vancouver

Between:

## United States Securities and Exchange Commission

Plaintiff

And

## Frederick L. Sharp, Zhiying Yvonne Gasarch, Courtney Kelln, Mike K. Veldhuis, Paul Sexton, Jackson T. Friesen, and Graham R. Taylor

Defendants

Before: The Honourable Justice Francis

## Reasons for Judgment

| | |
|---|---|
| Counsel for the Plaintiff: | D.E. Gruber |
| Counsel for the Defendant, Jackson T. Friesen: | O. Ahmad<br>T. Milne |
| The Defendant, Graham Taylor: | E. Thorpe, appearing as Agent<br>(February 6, 2023) |
| Counsel for the Defendants Mike K. Veldhuis, Paul Sexton, Yvonne Gasarch, and Courtney Kelln: | G. DelBigio, K.C. |
| Place and Date of Trial/Hearing: | Vancouver, B.C.<br>February 6-8, 2023 |
| Place and Date of Judgment: | Vancouver, B.C.<br>March 21, 2023 |

A1032

*United States Securities and Exchange Commission v. Sharp*                    **Page 2**

# Table of Contents

I.     INTRODUCTION ......................................................................... 3

II.    RELEVANT FACTS ................................................................... 4

    A.   Note on Hearsay and Quality of Evidence.................................... 4

    B.   The SEC Investigation................................................................. 5

III.   ISSUES.................................................................................... 7

IV.   DOES THIS COURT HAVE JURISDICTION TO MAKE THE ORDER SOUGHT? ................................................................................... 8

V.    CONSTITUTIONAL ISSUES ................................................... 12

    A.   Fifth Amendment of the United States Constitution...................... 13

    B.   *Canadian Charter of Rights and Freedoms*................................. 13

        1.   Right Against Self-Incrimination............................................ 14

        2.   Excision Argument................................................................. 15

        3.   Section 24(2) of the *Charter* ................................................ 17

VI.   APPLICATION OF LEGAL TEST FOR A *MAREVA* INJUNCTION................. 17

    A.   Strong *Prima Facie* Case .......................................................... 18

        1.   Expert Evidence of U.S. Securities Law ................................ 19

        2.   Evidentiary Value of the TRO ................................................ 21

        3.   Has a Strong *Prima Facie* Case Been Made Out on the Evidence?.......... 22

    B.   Does the Balance of Convenience Favour the Granting of an Injunction? .... 22

        1.   B.C. Assets of the Application Defendants .............................. 23

        2.   Is the Plaintiff Under-Secured?............................................. 24

        3.   Risk of Dissipation of Assets ................................................ 26

        4.   Delay .................................................................................. 27

        5.   Concern re: Overlapping or Duplicative Orders ....................... 28

VII.  CONCLUSION....................................................................... 28

## I.    INTRODUCTION

[1]      In this application, the United States Securities and Exchange Commission (the "SEC") seeks a *Mareva* injunction in aid of civil proceedings presently pending in the United States.

[2]      This action is related to a proceeding (the "U.S. Proceeding") before the United States District Court, District of Massachusetts (the "U.S. Court") in which the SEC filed a complaint against the defendants (the "Complaint") alleging that the defendants were involved in a fraudulent scheme to circumvent a number of provisions of U.S. securities legislation. In the Complaint, the SEC alleges that the defendants were involved in a "pump and dump" scheme, in which the defendants acted in concert to raise the share prices of public companies that were controlled by their affiliates and then to sell their shares at an artificially inflated price. The defendants are all residents of British Columbia.

[3]      In the Complaint, the SEC seeks disgorgement remedies from the defendants as well as civil monetary penalties. The SEC has obtained a temporary restraining order in the U.S. Proceeding, freezing the assets of the defendants (the "TRO") and preliminary injunction orders against certain defendants (the "Injunctions"). Additionally, the British Columbia Securities Commission has issued preservation orders against the defendants (the "Preservation Orders").

[4]      Notwithstanding the security that the SEC has successfully obtained from the U.S. Court and from the B.C. Securities Commission, the SEC submits that it is under-secured with respect to its claim for disgorgement against the defendants. The SEC points out that the existing orders in place do not cover all of the assets presently held by the defendants.

[5]      Due to scheduling challenges, the plaintiff's application as it pertains to an order freezing the assets of Frederick Sharp and Graham Taylor was not heard at the same time as the application with respect to the other defendants; the applications for injunctive relief pertaining to Mr. Sharp and Mr. Taylor have been scheduled for dates later this year. Therefore, these reasons for judgment only

*United States Securities and Exchange Commission v. Sharp*                    **Page 4**

pertain to the *Mareva* injunction that the plaintiff seeks with respect to the defendants Zhiying Yvonne Gasarch, Courtney Kelln, Mike Veldhuis, Paul Sexton, and Jackson Friesen (the "Application Defendants").

## II.    RELEVANT FACTS

### A.    Note on Hearsay and Quality of Evidence

[6]    The Application Defendants raise a number of admissibility issues with respect to the plaintiff's evidence. Hearsay is a significant concern. The defendants submit that the affidavits of the plaintiff's primary witness, Trevor Donelan, are problematic because Mr. Donelan deposes to facts that are based on his review of documents and communications that are not before the Court.

[7]    An application for a *Mareva* injunction is an interlocutory application. Hearsay is not *per se* inadmissible. Further, I find that many of the concerns the defendants have about the quality of Mr. Donelan's evidence are not well founded. While it is true that Mr. Donelan does not consistently state the source of his information and belief, a reading of the whole of his affidavit makes it clear that his evidence comes from his lengthy review and investigation of the relevant documents.

[8]    This application must be considered in the context of the test that must be met by the plaintiff. On a *Mareva* application, the Court is not being asked to find facts on the civil standard of balance of probabilities. Rather, the Court is tasked with reviewing a body of evidence and determining whether it is satisfied that the plaintiff has a good arguable case, such that it is appropriate to tie up the assets of the defendant pending judgment. The authorities are clear that this calls for a flexible approach that is not unduly rigid or compartmentalized.

[9]    In *Silver Standard Resources Inc. v. Joint Stock Co.* (1998), 59 B.C.L.R. (3d) 196, 168 D.L.R. (4th) 309 (C.A.), the Court of Appeal endorsed the flexible approach to *Mareva* injunctions set out by Justice Huddart in *Mooney v. Orr* (1994), 100 B.C.L.R. (2d) 335, 33 C.P.C. (3d) 31 (S.C.):

*United States Securities and Exchange Commission v. Sharp*          **Page 5**

[19]     … By taking a flexible approach, the court may take account of a wide variety of circumstances, including "the relative strengths of the parties' cases, evidence of irreparable harm one way or the other, potential effects on third parties, and factors affecting the public interest." (at 349) Further, Huddart J. said, such an approach:

. . . prevents the judge from becoming a prisoner of a fixed formula and places the emphasis where it belongs, on the justice and fairness of the order inter partes. It is fair to both sides, because, while maintaining the burden on the plaintiff to establish grounds for the application, it justifies calling upon the defendant to meet the case brought by the plaintiff, by putting forth evidence to support his position.

[10]     Applying the flexible approach, and being mindful that it would not be practical or proportional for the record to include all of the documents Mr. Donelan reviewed in his multi-year investigation, I find that the evidence tendered by the plaintiff is of a sufficient quality for me to fairly consider and determine the question of whether the plaintiff has established a strong *prima facie* case against the defendants.

**B.     The SEC Investigation**

[11]     The first affidavit of Mr. Donelan attaches, among other things, the Complaint filed in the U.S. Court as well as the declaration that Mr. Donelan swore in support of that proceeding.

[12]     Mr. Donelan is an enforcement accountant with the SEC in Boston. His duties include conducting investigations relating to potential violations of U.S. securities law. In 2017, he became involved in the SEC's investigation into possible violations of U.S. securities law by the defendants.

[13]     Mr. Donelan's evidence focusses primarily on the defendants' activities surrounding two companies, a company called "Stevia First", which later changed its name to "Vitality," and a company called "Arch". Mr. Donelan's affidavit and declaration provide a fairly detailed description of the defendants' actions relating to Stevia First/Vitality and Arch, and how those actions are alleged to be fraudulent and in violation of U.S. securities legislation.

*United States Securities and Exchange Commission v. Sharp*                    **Page 6**

[14]    According to Mr. Donelan, Mr. Sharp and his employees offered a suite of services to their clients that served to conceal the clients' identities. This allowed clients to avoid reporting and disclosure requirements applicable to large share sales and allowed them to anonymously hire stock promotors. Some of the services offered by Mr. Sharp and his associates, Ms. Gasarch and Ms. Kelln, included encrypted communication devices called xPhones, and servers located in Curacao through which Mr. Sharp maintained the encrypted communications, as well as an accounting system referred to as "Q". Mr. Sharp also offered clients the use of offshore nominee companies that could be used to hold shares.

[15]    Mr. Donelan has provided evidence with respect to the role that each of Mr. Sharp, Ms. Gasarch, and Ms. Kelln (the "Sharp Defendants") are alleged to have played in the illegal activity described in the Complaint. This evidence supports the inference that the Sharp Defendants helped clients hide their identities for the purposes of circumventing securities law. According to Mr. Donelan, Mr. Sharp was primarily responsible for client relationships, Ms. Gasarch facilitated wire transfers and prepared counterfeit invoices, and Ms. Kelln facilitated the transfer and deposit of shares held by various companies administered by the Sharp Defendants.

[16]    According to Mr. Donelan's evidence, Mr. Veldhuis, Mr. Sexton, and Mr. Friesen (the "Veldhuis Defendants") were clients of Mr. Sharp, who, acting in concert, orchestrated the Stevia First/Vitality and Arch transactions.

[17]    With respect to both Stevia First/Vitality and Arch, Mr. Donelan has attached documentary evidence to support the plaintiff's allegation that the Veldhuis Defendants, using the services of the Sharp Defendants, successfully inflated the share price of these two public companies in which they held substantial positions, and then rapidly sold those shares at an inflated value. This activity forms the basis for the allegations of wrongdoing against the Sharp Defendants and the Veldhuis Defendants that are set out in the Complaint. The pattern of alleged fraudulent activity is similar in the cases of Stevia First/Vitality and Arch and is described in some detail by Mr. Donelan in his affidavit and declaration.

[18]     Copies of messages, taken from the Sharp Defendants' encrypted communication network, form a significant part of the supporting documentary evidence appended to Mr. Donelan's declaration. These messages support an inference that the individuals on the network were engaged in fraudulent activity intended to circumvent securities legislation, and that they openly discussed fraudulent activity on the encrypted communication network.

[19]     Mr. Donelan deposed that he reviewed thousands of encrypted communications and has discerned which code name and code number is associated with each of the defendants. He has attached to his declaration copies of encrypted messages that either specifically identify a particular defendant with a code name or number, or which provide some other evidence that connects an individual defendant to a code name or number.

### III.     ISSUES

[20]     Counsel for Mr. Friesen, on the one hand, and counsel for Ms. Gasarch, Ms. Kelln, Mr. Veldhuis, and Mr. Sexton, on the other, have advanced a number of arguments as to why they say a *Mareva* injunction should not be granted. Some of the matters raised—such as the question of jurisdiction raised by Mr. Friesen, and the constitutional issues raised by Ms. Gasarch, Ms. Kelln, Mr. Veldhuis, and Mr. Sexton—are threshold issues. Therefore, I have departed in these reasons from the order in which submissions were made by counsel. For clarity, I have re-ordered and re-framed the material issues raised for determination as follows:

a)     Does the Court have jurisdiction to grant injunctive relief where no substantive relief is being sought in British Columbia, and the injunction sought is ancillary to a foreign proceeding asserting foreign law?

b)     Should the application be denied on the basis that a *Mareva* injunction would violate the defendants' U.S. constitutional protections under the Fifth Amendment?

c)  Has there been a warrantless search that invokes the defendants' rights under the *Canadian Charter of Rights and Freedoms* and if so, should portions of the evidence be excised*?*

d)  Are the defendants' rights against self-incrimination, protected under ss. 7 and 13 of the *Charter,* engaged and if so, should the application be denied because the relief sought would violate those rights?

e)  If the Court has jurisdiction to hear the application, and the relief sought does not violate the Application Defendant's constitutionally protected rights, can the plaintiff meet the first requirement for a *Mareva* injunction, namely a strong *prima facie* case on the evidence, in the absence of expert evidence tendered to prove U.S. securities law? If so, is the evidence tendered sufficient to establish a strong *prima facie* case?

f)  With respect to the balance of convenience:

  i.  Is the plaintiff under-secured with respect to the Application Defendants?

  ii.  Is there a risk of dissipation of assets?

  iii.  Should the delay in the plaintiff bringing this application disentitle it from the relief sought?

  iv.  Is there a risk of inconsistent orders from different courts?

g)  Weighing all the relevant factors, should a *Mareva* injunction be ordered, and if so, what terms should it contain?

## IV.    DOES THIS COURT HAVE JURISDICTION TO MAKE THE ORDER SOUGHT?

[21]    The only relief sought by the plaintiff in this action is the *Mareva* injunction itself. This British Columbia lawsuit is ancillary to the Complaint before the U.S.

*United States Securities and Exchange Commission v. Sharp*          **Page 9**

Court, and its sole purpose is to provide additional security for the SEC in the pending claims that will be adjudicated by the U.S. Court.

[22]     While the parties agree that this Court has jurisdiction in some circumstances to grant a free-standing *Mareva* injunction in support of a foreign proceeding, they disagree as to whether this is a case in which the Court may assert jurisdiction. The defendant Mr. Friesen argues that this Court may only grant a free-standing *Mareva* injunction in circumstances where the dispute between the parties in the foreign proceeding is justiciable in this Court. Because the U.S. Proceeding is grounded in alleged breaches of U.S. statutes (specifically, the *Securities Act of 1933* and *Securities Exchange Act of 1934*), he argues that the substantive dispute between the parties is not justiciable before this Court. As such, Mr. Friesen submits that this Court lacks jurisdiction to issue a *Mareva* injunction. He argues that the Supreme Court of Canada's decision in *Brotherhood of Maintenance of Way Employees Canadian Pacific System Federation v. Canadian Pacific Ltd.*, [1996] 2 S.C.R. 495, 136 D.L.R. (4th) 289 (S.C.C.) [*BMWE*] supports this conclusion.

[23]     The plaintiff submits that Mr. Friesen takes an overly narrow view of *BMWE*, and submits that it need not establish that it has asserted rights in the U.S. Proceeding that are justiciable in this Court in order to be entitled to a *Mareva* injunction.

[24]     In considering these competing readings of *BMWE*, it is helpful to review the jurisprudential development of stand-alone *Mareva* injunctions in the U.K. and Canadian courts. Historically, our common law did not allow a party to a foreign proceeding to seek a *Mareva* injunction for the purpose of securing a future judgment in the foreign case. In *Siskina (Cargo Owners) v. Distos Compania Naviera S.A.*, [1977] 3 All E.R. 803 at 825 (H.L.), the House of Lords refused to grant an injunction that was ancillary to a foreign proceeding and held that in order for an injunction to be granted, it must be ancillary to a cause of action before the issuing court.

[25]    In *Channel Tunnel Group Ltd. v. Balfour Beatty Construction Ltd.*, [1993] 1 All E.R. 664 (H.L.), the House of Lords revisited its approach to stand-alone injunctions. *Channel Tunnel* involved a claim for a *Mareva* injunction in aid of a foreign arbitration. The House of Lords held that, so long as a substantive right was "justiciable" in England, an injunction could be granted by the English court, even if that right was not asserted in the proceeding in which the injunction was sought. In determining whether or not a court has jurisdiction to grant an injunction ancillary to a foreign proceeding, the relevant question was whether the issuing court "has power to grant the substantive relief, not whether it will in fact do so": *Channel Tunnel* at 669.

[26]    The Supreme Court of Canada considered the application of the principles in *Channel Tunnel* to Canadian law in *BMWE*. That case considered whether the Supreme Court of British Columbia could issue an injunction in a labour dispute governed by the *Canada Labour Code*. On the question of whether this Court could grant an injunction ancillary to a matter within the exclusive jurisdiction of a labour arbitrator, the Court cited *Channel Tunnel* as "categorically rejecting the submission that to grant interim relief, the courts must have jurisdiction over the cause of action": at para. 15.

[27]    Justice McLachlin (as she then was) went on to summarize the Canadian authorities which have permitted the granting of stand-alone injunctions:

> 16    Canadian courts since *Channel Tunnel* have applied it for the proposition that the courts have jurisdiction to grant an injunction where there is a justiciable right, wherever that right may fall to be determined. . .

[28]    The Court ultimately concluded at para. 17 that "the absence of a cause of action claiming final relief in the Supreme Court of British Columbia did not deprive the court of jurisdiction to grant an interim injunction."

[29]    There are two British Columbia cases, relied on by the plaintiff, that consider *BMWE* in the context of applications analogous to the one before me. In *United States of America v. Friedland*, [1996] B.C.J. No. 2845 (S.C.), Justice Spencer

*United States Securities and Exchange Commission v. Sharp*               **Page 11**

considered an *ex parte* injunction application in B.C. that was ancillary to a U.S. proceeding in which the U.S. government had sued the defendant for costs associated with environmental cleanup. The Court noted, at para. 18, that

> there is strong authority for the proposition that this [C]ourt has jurisdiction to grant a *Mareva* style of injunction to protect the plaintiff from the removal of assets from British Columbia so that they may be available for a judgment to be obtained in the state of Colorado.

[30]   In *Mishkin (Trustee of) v. Roddy DiPrima Ltd.*, [1996] B.C.J. No. 2660 (S.C.), the plaintiff obtained an *ex parte Mareva* injunction, and the defendant applied to set it aside. The underlying proceeding in that case was a New York action in which Mr. DiPrimo was found liable for violating federal securities law and for common law fraud and deception. At the time the *Mareva* injunction was sought, the defendant had already been found liable in the foreign proceeding. Mr. Justice Harvey relied on *Friedland* and *BMWE* for the proposition that "an interim injunction may be granted to prevent removal of assets so that they are available for execution in a foreign judgment": at para. 7.

[31]   In his textbook, *Injunctions and Specific Performance* (Toronto: Thomson Reuters, 2022), Justice Sharpe considers the academic commentary and notes, at § 2:35.50, that "it has been forcefully argued that Canadian law should favour injunctive relief in aid of a foreign proceeding." The rationale for this was in part expressed by Spencer J. in *Friedland* when he noted, at para. 16, that "[i]n the modern age of easily transportable assets and international commerce entailing liability in foreign states…the court should be empowered to protect serious claims." *Friedland* was decided in 1996. The policy imperative to protect claims in the face of an increasingly borderless electronic world of commerce has only become more pressing since that time.

[32]   *Channel Tunnel* is not the most recent appellate authority from the U.K. on this issue. In *Broad Idea International Ltd. v. Convoy Collateral Ltd.*, [2021] UKPC 24, the Privy Council was asked to expressly depart from the decision of the House of Lords in *Siskina*. Lord Leggatt noted that "fundamental changes in commercial

*United States Securities and Exchange Commission v. Sharp*          **Page 12**

and financial practices, driven in large part by the revolution in information technology" necessitated the expansion of freezing injunctions beyond their prior confines: *Broad Idea* at para. 59.

[33]    In *Broad Idea,* the Privy Council discussed the "enforcement principle", which acknowledges that the essential purpose of a freezing injunction is to facilitate the enforcement of a judgment or other order to pay a sum of money by preventing dissipation of assets against which such a judgment could be enforced. The Court held:

> 92.    In applying for a freezing injunction, the relevance of a cause of action, where there is one, is evidential: in showing that there is a sufficient basis for anticipating that a judgment will be obtained to justify the exercise of the court's power to freeze assets against which such a judgment, when obtained, can be enforced. That is the rationale for requiring the applicant to show a good arguable case; but there is no reason why the good arguable case need be that the applicant is entitled to substantive relief from the court which is asked to grant a freezing injunction. What in principle matters is that the applicant has a good arguable case for being granted substantive relief in the form of a judgment that will be enforceable by the court from which a freezing injunction is sought. . .

[34]    Ultimately, the Privy Council held that where a court has personal jurisdiction over a party, it has the power to grant a freezing injunction.

[35]    In accordance with the reasoning of the Privy Council in *Broad Idea*, and this Court in *Friedland* and *Roddy DiPrima,* it appears to me that this Court has jurisdiction to grant a *Mareva* injunction in aid of a foreign proceeding, even where the issue between the parties in the foreign proceeding is not justiciable before this Court.

[36]    I therefore find that this Court has jurisdiction to issue the injunction sought by the plaintiff, irrespective of whether the causes of action pursued by the SEC in the Complaint could be adjudicated in British Columbia.

## V.    CONSTITUTIONAL ISSUES

[37]    Counsel for Mr. Veldhuis, Ms. Gasarch, Mr. Sexton, and Ms. Kelln has made a number of submissions on constitutional law which, if accepted, could lead the

Court to deny the relief sought by the plaintiff irrespective of whether the common law test for a *Mareva* injunction is met.

### A.    Fifth Amendment of the United States Constitution

[38]    Counsel for Mr. Veldhuis, Ms. Gasarch, Mr. Sexton, and Ms. Kelln submits that a *Mareva* injunction would result in an "end-run" around their Fifth Amendment Constitutional protections. This is because these defendants have invoked the Fifth Amendment in the U.S. Proceeding in refusing to answer interrogatories issued in that proceeding that called for them to make financial disclosure. Counsel argues that requiring these parties to produce an asset list, a standard component of a *Mareva* injunction, could be used against his clients in the U.S. Proceeding, which would result in their constitutional rights being violated.

[39]    I agree with the plaintiff that this submission is misconceived. There is no criminal proceeding in the U.S. The sole concern expressed by these defendants is that they could be found civilly liable in the U.S. Proceeding as a result of information obtained ancillary to the *Mareva* injunction in British Columbia. The Fifth Amendment protects a party from self-incrimination; it does not protect against civil liability. Therefore, there is no risk of violation of the rights of the defendants under the Fifth Amendment of the U.S. Constitution as a consequence of evidence being disclosed in a civil proceeding in Canada that might be used in a civil proceeding in the U.S.

### B.    *Canadian Charter of Rights and Freedoms*

[40]    Counsel for Mr. Veldhuis, Ms. Gasarch, Mr. Sexton, and Ms. Kelln submits that evidence shared by the B.C. Securities Commission with the SEC was the product of warrantless searches. As I understand the argument made by counsel, it is that the B.C. Securities Commission's gathering of information and sharing it with the SEC amounted to a warrantless search. This, according to these defendants, gives rise to a "matrix that engages the defendants' section 7, 8 and 13 *Charter* rights."

[41]    There appear to be two distinct submissions made by these defendants with respect to their *Charter* rights. One relates to an alleged violation of these defendants' protection from self-incrimination under the *Charter*. The other relates to the s. 8 rights of these defendants with respect to an alleged warrantless search and seizure.

### 1.    Right Against Self-Incrimination

[42]    In oral submissions, Mr. Veldhuis, Ms. Gasarch, Mr. Sexton, and Ms. Kelln invoked their rights against self-incrimination protected by ss. 7 and 13 of the *Charter*. Their argument in this regard is similar to their argument that the injunction sought by the plaintiff would undermine their right against self-incrimination protected by the Fifth Amendment of the U.S. Constitution, discussed above. This argument was not well-developed.

[43]    It is important to note that this action was brought only to obtain a *Mareva* injunction in support of the U.S. Proceeding. There is no prospect that the defendants will be compelled to give *viva voce* or documentary evidence in this proceeding, either through discovery or at a trial, that could be used against them in a future Canadian or U.S. proceeding. The only evidence that will be compellable, if the plaintiff is successful in this action, is a list of the defendants' assets which is a customary element of a *Mareva* injunction.

[44]    Under Canadian law, the right against self-incrimination, protected under ss. 7 and 13 of the *Charter*, does not give rise to a general right to refuse to give evidence in the course of a civil proceeding. A witness is not permitted to be excused from answering questions on the ground that the answer may tend to incriminate them: *Canada Evidence Act*, R.S.C. 1985, c. C-5, s. 5(1). However, where witnesses are compelled to testify, they have protections regarding the use and derivative use of their testimony under ss. 7 and 13 of the *Charter: Tak v. British Columbia (Securities Commission)*, 2023 BCCA 76 at para. 15 [*Tak (CA)*].

[45]    These defendants invoked, and sought to distinguish, my decision in *British Columbia (Securities Commission) v. Tak*, 2021 BCSC 2283 [*Tak (SC)*], the appeal

of which was dismissed by the Court of Appeal in *Tak (CA)* subsequent to the hearing of this application. While I agree with these defendants that *Tak (SC)* is factually distinguishable from this case, those factual distinctions do not assist the defendants in advancing their position that the *Mareva* application should be dismissed on the basis of a risk to their ss. 7 and 13 *Charter* rights.

[46]    In this case, in which the plaintiff has sued for a civil injunction in aid of a U.S. civil proceeding, the derivative use immunity provided under ss. 7 and 13 is not engaged. To the extent that these defendants are concerned about a possible future U.S. criminal proceeding against them, the draft orders contemplate the SEC undertaking that the information disclosed will only be used for the purposes of this action in British Columbia and the civil U.S. Proceeding. In my view, this resolves any concerns that may arise about derivative use immunity with respect to evidence compelled as a result of the injunction. There is therefore no basis for denying the injunction in order to protect the ss. 7 and 13 *Charter* rights of these defendants.

### 2.    Excision Argument

[47]    Mr. Veldhuis, Ms. Gasarch, Mr. Sexton and Ms. Kelln submit in their written argument that "the information, documents or data obtained from the warrantless seizures should be excised" from the affidavits before me.

[48]    Relying on *Hunter et. al. v. Southam Inc.*, [1984] 2 S.C.R. 145, 11 D.L.R. (4th) 641 (S.C.C.), these defendants submit that the plaintiff has the burden of demonstrating that the process by which the B.C. Securities Commission obtained and shared documents and information with the SEC was lawful, because a warrantless search is *prima facie* unreasonable. Since the plaintiff has not provided evidence of the lawfulness of this information sharing, these defendants submit that all the evidence relied on by the plaintiff is constitutionally tainted and must be excised from the record.

[49]    In their written and oral submissions, these defendants invoke the doctrine of excision which has been developed in the criminal law context, particularly in applications based on *R. v. Garofoli*, [1990] 2 S.C.R. 1421, 60 C.C.C. (3d) 161

(S.C.C.), in which investigative information obtained in breach of an accused's *Charter* rights may be excised from the evidence the Court considers in reviewing a search warrant. The doctrine was recently described by Justice Ker in *R. v. Kang*, 2020 BCSC 1151 (a case relied on by these defendants):

> [82]    The noun "excision" used in its ordinary, grammatical sense describes the act of cutting out or erasing a passage from a book, a clause from a bill, etc. In the jurisprudential sense, employed in the context of reviewing judicial authorizations such as production orders, search warrants and Part VI wiretap authorizations, excision refers to the process of editing or removing "tainted" or questionable information contained in the ITO from the reviewing judge's consideration of the sufficiency of the application materials. Once those passages are removed, the question becomes whether there remains in the affidavit at least some reasonably believable evidence that <u>could have</u> formed a basis for issuing the authorization. To this end then, excision is more akin to a mechanism or instrument than a remedy. It is but one procedural step in the *Garofoli* review of the materials placed before an authorizing judge or justice in the prior authorization process.
>
> [Citations removed; emphasis in original.]

[50]    I am doubtful that the doctrine of excision has any bearing on a civil case of this nature. However, I am in no position to analyze this novel argument in circumstances in which these defendants have failed to establish that a warrantless search and seizure ever took place. Nor have these defendants specified which evidence they say ought to be excised on the basis that it is alleged to be tainted by a *Charter* violation.

[51]    While these defendants did not articulate precisely which actions they say amounted to a warrantless search and seizure, to the extent their position is that the B.C. Securities Commission acted unconstitutionally in compelling evidence from them in the course of its investigation, I note that the commission has the authority to compel documents and information in the course of an investigation pursuant to s. 144 of the *Securities Act*, R.S.B.C. 1996, c. 418. I was provided with no authority for the proposition that statutorily authorized steps taken in an investigation by a Canadian securities regulator amount to state action infringing on a reasonably held expectation of privacy, which would be a threshold requirement in order for s. 8 of the *Charter* to be invoked.

[52]    In my view, these defendants' excision argument is misconceived. To the extent that they seek to have a portion of the evidentiary record before me excised as a result of a violation of their *Charter* rights, I decline to do so.

### 3.    Section 24(2) of the *Charter*

[53]    In the amended response to application, these defendants sought to have evidence excluded pursuant to s. 24(2) of the *Charter* on the basis that evidence was obtained in violation of their *Charter* rights. This argument was not made in oral submissions nor was it mentioned in these defendants' written argument.

[54]    Upon reviewing the amended response to application, and the written submissions of these defendants, it is not clear to me whether the defendant's submission regarding exclusion of evidence under s. 24(2) is a separate argument from the excision argument, or whether these defendants have erroneously used the terms "exclusion" and "excision" interchangeably. If it is the case that these defendants wish to have certain evidence excluded pursuant to s. 24(2) of the *Charter*, I decline to do so on the basis that no *Charter* violation has been particularized, nor evidence identified that would allow me to evaluate such a submission.

## VI.    APPLICATION OF LEGAL TEST FOR A *MAREVA* INJUNCTION

[55]    The objective of a *Mareva* injunction is to mitigate the risk of harm to a plaintiff in collecting on a judgment debt by preventing dissipation or removal of assets, pending judgment*: Tracy v. Instaloans Financial Solutions Centres (B.C.) Ltd.*, 2007 BCCA 481 at para. 45.

[56]    The two-part test for granting a *Mareva* injunction was succinctly described by our Court of Appeal in *Kepis & Pobe Financial Group Inc. v. Timis Corporation*, 2018 BCCA 420 at para. 18:

> The legal test requires an applicant to establish: (1) the threshold issue of a strong *prima facie* or good arguable case; and (2) in balancing the interests of the parties, to consider all the relevant factors, including (i) the existence of exigible assets by the defendant both inside and outside the jurisdiction, and (ii) whether there is evidence of a real risk of disposal or dissipation of those

assets that would impede the enforcement of any favourable judgment to the plaintiff.

[57]    The test is to be applied flexibly. There is no strict list of factors that enter into the two-part analysis. Rather, each case is decided on its own factual matrix: *Fernandes v. Legacy Financial Systems, Inc.*, 2020 BCSC 885 at para. 11.

### A.    Strong *Prima Facie* Case

[58]    In *Shakeri-Saleh v. Estate of Ahmadi-Niri*, 2022 BCSC 700, Justice Matthews described the flexible approach to determining whether the plaintiff has established a strong *prima facie* case:

> [16]    The applicant defendants have not cited any case for the proposition that the threshold must be met for each element of a cause of action. The jurisprudence does not fairly admit to such a finely parsed analysis. It is true that in most cases, it will not be just or convenient to tie up a defendant's assets or funds simply to give the plaintiff security for a judgment he or she may never obtain. Courts will be reluctant to interfere with a party's normal business arrangements and affect the rights of its other creditors, merely on the speculation that the plaintiff will ultimately succeed on its claim and have difficulty collecting this judgment if the injunction is not granted: *Fernandes* at para. 9, citing *Kepis* and *Silver Standard Resources Inc.*
>
> [17]    However, that does not translate to an inviolable rule that the plaintiff must establish a good arguable case / strong *prima facie* case for each element of the cause of action. In British Columbia, the Court of Appeal has stipulated that the test is to be applied flexibly, with a focus on what is just and convenient, considering the balance of convenience and justice between the parties, so long as the applicant has established a good arguable / strong *prima facie* case: *Kepis* at paras. 10, 12, 18. Rather, if the threshold is met pertaining to the claim overall, relative weakness in an element of a cause of action should be taken into account when considering the balance of convenience.

[59]    In *Tracy*, our Court of Appeal considered what is meant by the terms "strong *prima facie* case" and "good arguable case":

> [54]    The chambers judge used the test of "good arguable case". I do not consider that a strict formula should be applied. Whereas, the Supreme Court of Canada in *Aetna* appeared to favour "strong *prima facie* case", that Court also appeared to leave considerable room for courts to frame the test as fits the nature of the case before them. *Mooney No. 2* recognized both standards, "strong *prima facie* case" and "good arguable case," as formulations that have been used. I expect that the difference in words is a difference without practical consequence. In either case, it is more than an

arguable case, and may be met by an assessment that does not reach the "bound to succeed" threshold.

[60]    In this case, the plaintiff points to the evidence in the record that establishes a strong *prima facie* case that the defendants engaged in fraudulent activities. The evidence particularly relied on by the plaintiff in this regard includes:

a)  The TRO and Injunctions which were granted on the basis of the same evidence that is before this Court. These orders were predicated on a determination that the defendants had each violated U.S. securities law and were reasonably likely to repeat their violations; and

b)  The exhibits to the first affidavit of Trevor Donelan, which include evidence of at least one detailed fraudulent transaction involving each defendant.

[61]    The Application Defendants argue that the plaintiff has failed to meet the threshold of establishing a strong *prima facie* or good arguable case, because the plaintiff has failed to tender expert evidence with respect to U.S. securities law. They further argue that, when analyzing the strength of the plaintiff's case in the U.S. Proceeding, it is improper for the Court to consider the fact that the TRO, an *ex parte* order, was issued. The defendant Mr. Friesen also argues that there is a dearth of evidence linking him personally to any alleged wrongful acts.

### 1.    Expert Evidence of U.S. Securities Law

[62]    The plaintiff frames its submission on the basis that a good arguable case has been established that each of the defendants engaged in fraud. However, fraud is not the cause of action pleaded in the U.S. Proceeding. Rather, the plaintiff has pursued the defendants in the U.S. for violations of specific sections of U.S. securities legislation. The Application Defendants argue that, in order for this Court to adjudicate whether there is a strong *prima facie* case against them in the U.S. Proceeding, the Court needs to know the law the defendants are alleged to have broken, which must be proven by expert evidence.

*United States Securities and Exchange Commission v. Sharp*    **Page 20**

[63]     In order to meet its burden on this application, the plaintiff must show that it has a good arguable case in the U.S. Proceeding. It is a potential future judgment in the U.S. Proceeding that will be secured in the event that this Court issues the *Mareva* injunction sought by the plaintiff. The likelihood of the plaintiff obtaining that judgment ought to be the focus of the first branch of the test for issuing a *Mareva* injunction.

[64]     The U.S. Proceeding will stand to be determined on the basis of U.S. law. It is a well accepted principle that, for the purposes of applying foreign law, a B.C. court must rely on the evidence of an expert competent to explain and interpret the foreign law, and the judge's conclusion on the foreign law is a finding of fact: *Friedl v. Friedl,* 2009 BCCA 314 at para. 20.

[65]     In my view, it would have assisted the Court greatly, in considering whether a strong *prima facie* case was made out by the plaintiff, if the plaintiff had submitted evidence of the U.S. securities law that will apply in the U.S. Proceeding.

[66]     Nevertheless, I am not satisfied that the defendants are correct that expert evidence of foreign law is always required in an application for a *Mareva* injunction in aid of a foreign proceeding.

[67]     There is a distinction between applying foreign law, which this Court is sometimes called upon to do, and evaluating a plaintiff's prospects of success in a foreign jurisdiction. In this case, I am not being asked to apply U.S. securities law, as I am not adjudicating the U.S. Proceeding. Rather, I am asked to consider the plaintiff's case in the U.S. Proceeding as one element of the test in determining whether to exercise my discretion in favour of injunctive relief. In my view, this distinction is important. In a case such as this one, in which the alleged behaviour is clearly and manifestly fraudulent, to require expert evidence that such behavior violates U.S. law would be to create a technical impediment to injunctive relief that is inconsistent with the flexible and discretionary nature of the *Mareva* injunction.

[68]    I am mindful of the facial similarities between the U.S. securities legislation at play in the Complaint and the B.C. *Securities Act* with respect to fraudulent schemes of the kind alleged against the defendants. These provisions, in both jurisdictions, are neither ambiguous nor complex. I have also considered the seriousness of the fraudulent activity alleged to have occurred. In my view, it is simply not necessary for me to have the assistance of an expert in U.S. securities law to know that, if proven, the alleged activities of the defendants were unlawful.

[69]    I am therefore prepared to consider whether the plaintiff has a good arguable case in the absence of expert evidence of U.S. securities law.

### 2.    Evidentiary Value of the TRO

[70]    The defendants submit that the TRO cannot be relied on by the plaintiff in establishing a strong *prima facie* case. They point out that the TRO was issued on an *ex parte*, emergency basis and does not represent a considered opinion on the likelihood of the plaintiff's success in the U.S. Proceeding.

[71]    I agree with this submission. The nature of the application for the TRO was such that the judge did not have the benefit of full submissions from all parties. While the TRO was the product of an emergency *ex parte* application, the application before me was on notice to the defendants, with three days of argument from the plaintiff and the Application Defendants. I have no doubt that the evidence has been canvassed and argued more fully before me than it could have been in front of Judge Gorton of the U.S. Court, given the exigencies of the application before him. Therefore, I do not find the fact that the TRO was issued of particular assistance in evaluating whether the plaintiff has met the first branch of the test for a *Mareva* injunction and demonstrated a strong *prima facie* case. Rather, I have looked at the evidence filed in this Court and the U.S. Court in assessing the merits of the plaintiff's case.

*United States Securities and Exchange Commission v. Sharp*          **Page 22**

### 3.    Has a Strong *Prima Facie* Case Been Made Out on the Evidence?

[72]    Many of the arguments made by the Application Defendants with respect to this branch of the test are arguments about the sufficiency of the evidence. For example, the defendants argue that the evidence linking particular defendants to particular code names on the Q system is tenuous. The difficulty with many of the defendants' submissions in this regard is that the alleged weaknesses in the plaintiff's evidence would only be determinative if the Court were undertaking a fact-finding exercise on a balance of probabilities. This is not the exercise that the Court undertakes in considering whether the plaintiff has established a strong *prima facie* case for the purposes of a *Mareva* injunction.

[73]    Injunction applicants are not required to demonstrate that they are bound to succeed: *Tracy* at para. 54. As Matthews J. noted in *Shakeri-Saleh*, the test is satisfied if either side might win. If it were not so, the word "arguable" in the descriptor of the test would be oxymoronic: *Shakeri-Saleh* at para. 227.

[74]    The exhibits attached to the first affidavit of Trevor Donelan include evidence of at least one detailed fraudulent transaction involving each defendant, including Mr. Friesen. There are records in the evidence that arguably establish that Mr. Friesen used the encrypted communication system to communicate with other Veldhuis Defendants about the pump and dump scheme, and that he benefitted from the sale of the inflated shares into the public market.

[75]    This is not to say that Mr. Donelan's affidavit proves on a balance of probabilities that each defendant engaged in a fraudulent transaction. However, there is a good arguable case of this, and either side might win. I therefore find that the first part of the test for a *Mareva* injunction has been met.

### B.    Does the Balance of Convenience Favour the Granting of an Injunction?

[76]    In *Shakeri-Saleh* at para. 321, Matthews J. enumerated a number of relevant factors that may be considered on the balance of convenience analysis:

*United States Securities and Exchange Commission v. Sharp*    **Page 23**

a)    the residency of the defendant;

b)    enforcement rights of judgment creditors in the jurisdiction where the defendant's assets are located;

c)    evidence showing the existence of assets within British Columbia or outside;

d)    evidence showing a real risk of the disposal or dissipation of assets to render a judgment nugatory;

e)    evidence of irreparable harm;

f)    the strength of the plaintiff's case;

g)    the nature of the transaction giving rise to the action;

h)    the risks inherent in the transaction;

i)    the amount of the claim;

j)    the defendant's assets;

k)    evidence that the injunction would have a material adverse effect on an innocent third party; and

l)    the history of the defendant's conduct.

[77]    Not all of these factors will apply in every case, and there is some overlap amongst the factors.

[78]    In this case, I find that the following factors are of particular importance in weighing the balance of convenience: the presence of assets in British Columbia, the fact that the current freezing orders in place leave the plaintiff under-secured with respect to its disgorgement claim, and the risk of dissipation of assets.

### 1.    B.C. Assets of the Application Defendants

[79]    The plaintiff submits that the Application Defendants own moveable and immoveable assets located in B.C. beyond the personal banking and investment accounts covered by the TRO and Preservation Orders. These primarily consist of real property and vehicles. However, the SEC also notes that it does not have full insight into the defendants' financial affairs and the whereabouts of their assets in Canada.

[80]    The defendants do not deny that they own assets in British Columbia.

*United States Securities and Exchange Commission v. Sharp*                    **Page 24**

### 2.    Is the Plaintiff Under-Secured?

[81]    There is some dispute amongst the parties about the amount that the plaintiff is claiming in the U.S. Proceeding, and the consequent amount of assets for each defendant that ought to be secured pending determination of that claim. For each defendant in the U.S. Proceeding, the plaintiff seeks a disgorgement remedy, prejudgment interest, and a penalty. The plaintiff concedes that the penalty sought under U.S. securities law could not be the subject of a freezing order in B.C., so it seeks only to secure assets for each defendant equivalent to the amount of the disgorgement, plus prejudgment interest, it seeks in the U.S. Proceeding.

[82]    The disgorgement amounts sought by the SEC in the U.S. Proceeding are set out by Mr. Donelan in his second affidavit. There, he deposes that the plaintiff seeks the following amounts from each of the Application Defendants:

| Defendant | Disgorgement (USD) | Prejudgment Interest (USD) |
|-----------|--------------------|-----------------------------|
| Ms. Gasarch | $2,136,385 | $498,081 |
| Ms. Kelln | $1,582,785 | $460,688 |
| Mr. Veldhuis | $12,327,562 | $3,989,130 |
| Mr. Sexton | $15,425,549 | $5,139,332 |
| Mr. Friesen | $9,787,574 | $3,604,255 |

[83]    Mr. Donelan deposes that he calculated the disgorgement amounts set out above by using data contained in the Q accounting system. Each of the defendants had an account in the Q system into which they received proceeds generated by the alleged fraudulent trading. With respect to all the Application Defendants other than Ms. Gasarch, Mr. Donelan calculated the net amount received by each defendant in their personal Q accounts as the disgorgement amount. With respect to

*United States Securities and Exchange Commission v. Sharp*          **Page 25**

Ms. Gasarch, Mr. Donelan calculated her disgorgement amount as the sum of identifiable payments and cash withdrawals made for her benefit from her personal Q accounts.

[84]    With respect to prejudgment interest, Mr. Donelan calculated this on an annual basis, assuming that each year's net proceeds were received on the last day of the year in which each defendant received it. He used the standard calculation tool established by the SEC.

[85]    The Preservation Orders presently in place have frozen some accounts of the Application Defendants in the following amounts:

| Defendant | Number of Accounts | Balance (CAD) |
|-----------|--------------------|--------------| 
| Ms. Gasarch | 15 | $365,294 |
| Ms. Kelln | 3 | $584,417 |
| Mr. Veldhuis | 31 | $5,473,946 |
| Mr. Sexton | 34 | $18,711,119 |
| Mr. Friesen | 31 | $3,799,106 |

[86]    On the basis of Mr. Donelan's calculations, it appears that the Preservation Orders are insufficient to secure the plaintiff's claim.

[87]    Counsel for Mr. Friesen submits that, at least with respect to his client, the disgorgement amount sought by the SEC is untethered to any evidence before this Court about amounts alleged to have been improperly received by Mr. Friesen with respect to the two transactions about which detailed evidence is provided, namely the Stevia First/Vitality and Arch transactions. He notes that, even on Mr. Donelan's calculation (with which he disagrees), Mr. Friesen received net profits of $2,300,000 USD from the Stevia First/Vitality transaction and $1,500,000 USD from the Arch

*United States Securities and Exchange Commission v. Sharp*          **Page 26**

transaction, far less than the $9,787,574 USD disgorgement amount sought in the Complaint.

[88]     In reply, the plaintiff submits that the Stevia First/Vitality and Arch transactions were illustrations of the mechanics of how the defendants' "pump and dump" scheme worked. However, in the Complaint, the SEC seeks disgorgement of all the profits made by the defendants on transactions that were run through the Sharp Defendants' Q system because the SEC intends to prove that they were all illicit activities.

[89]     As Matthews J. noted in *Shakeri-Saleh* at para. 16, a "finely parsed analysis" of the evidence is not called for in this type of application. The plaintiff has satisfied me that it has a good arguable case in the U.S. Proceeding for establishing liability on the part of the Application Defendants for disgorgement and prejudgment interest in the amounts calculated by Mr. Donelan. As such, I find that the current Preservation Orders do not secure the entirety of the potential judgment that could be awarded in the SEC's favour if it is successful in the U.S. Proceeding.

### 3.     Risk of Dissipation of Assets

[90]     In cases alleging serious fraud, the risk that assets will be dissipated may be inferred from the evidence relating to the plaintiff's strong *prima facie* case. However, the inference is permissive and evidence of a strong *prima facie* case does not lead inevitably to a finding that there is a real risk of dissipation of assets: *ICBC v. Patko*, 2008 BCCA 65 [*Patko (CA)*] at paras. 28 and 29.

[91]     In *Patko*, the chambers judge refused to grant a *Mareva* injunction in the face of a strong *prima facie* case in part because there was no risk of dissipation of assets. She found that, while Mr. Patko's conduct demonstrated a propensity for dishonesty, this was insufficient to support the inference of a real risk that the asset would be dissipated: *ICBC v. Patko et. al.*, 2007 BCSC 743 at para. 42 [*Patko (BCSC)*]. The Court of Appeal refused to interfere with the chambers judge's fact finding on this point: *Patko (CA)* at para. 32.

[92]     As I have noted, the plaintiff has established a strong *prima facie* case that the defendants engaged in fraudulent activity. From this, it is open to me to infer that there is a risk that assets in British Columbia will be removed or dissipated. This conclusion is not mandatory, and I still must consider all of the factors in order to determine whether such an inference is appropriate. As Fisher J. (as she then was) noted in *Patko (BCSC)* at para. 38*:*

> [T]o determine whether there is a real risk, it is necessary to look at all the circumstances, including the nature of the conduct alleged, the type of assets involved and the general circumstances. The court must assess whether in all of those circumstances the defendant will deal with the assets in a manner that will interfere with or defeat the plaintiff's attempts to realize on any judgment it might obtain.

[93]     In *Patko (BCSC)*, Fisher J. did not find that there was a real risk of the defendant dissipating assets to frustrate a judgment. There were two primary reasons for this, both unique to the *Patko* case: the nature of the fraudulent conduct, which involved dishonesty but not a fraudulent scheme, and the nature of the asset sought to be enjoined, being settlement funds that the plaintiff insurer had previously agreed to pay.

[94]     Considering the conduct alleged, the type of assets involved, and the general circumstances, I find this case to be an appropriate one to draw the permissible inference that the alleged fraudulent activities of the defendants give rise to a risk of dissipation. The plaintiff has alleged, with some evidence in support, that the defendants were engaged in a complex securities fraud scheme that involved shell companies, secret encrypted communications, and a clear pattern of deceptive behaviour. In my view, this is precisely the kind of case in which it is appropriate for the Court to infer, on the basis of the fraudulent conduct alleged in the proceeding, that there is a real risk of asset dissipation in advance of judgment.

### 4.    Delay

[95]     The plaintiff waited approximately one year between the filing of the Complaint in the U.S. in August 2021, and the filing of the proceeding herein, seeking a *Mareva* injunction in British Columbia, in August 2022. The defendant

*United States Securities and Exchange Commission v. Sharp*          **Page 28**

Mr. Friesen submits that the plaintiff's delay in bringing this application undermines any claim it could make with respect to irreparable harm. In a case where a plaintiff has languished in seeking to freeze the assets of the defendant, an inference can often be drawn that assets that are the subject matter of the application are not at serious risk. However, each case must be decided on its own facts and the issue of delay must be considered in the context of the case as a whole. In the circumstances of this case, given the seriousness of the fraud alleged, I cannot find that the delay undermines the real risk that assets will be depleted such as to impair the ability of the plaintiff to collect on a future judgment in the U.S. Proceeding.

### 5.      Concern re: Overlapping or Duplicative Orders

[96]    The Application Defendants submit that this proceeding is an abuse of process because it is duplicative of the Complaint in the U.S. Proceeding. They also submit that it is not possible for them to comply with the TRO, the Injunctions, the Preservation Orders, and the proposed *Mareva* injunction at the same time, due to differences in the wording of the orders.

[97]    I agree with the plaintiff that the proposed *Mareva* injunction has been drafted to be complimentary, not in conflict, with the existing TRO, Injunctions, and Preservations Orders. The terms comply with the model order, but are drafted on the basis that they are deemed to be satisfied in respect of all assets covered by the TRO, Injunctions, and Preservation Orders, so long as those orders are in place. In this way, the plaintiff avoids any overlap between the freezing orders already in place and the order it seeks from this Court in this application.

### VII.    CONCLUSION

[98]    I am satisfied on the basis of all the evidence before me that the plaintiff has demonstrated that it has a strong *prima facie* case and that the balance of convenience favours the plaintiff. As such, I am prepared to grant the injunction sought by the plaintiff on the terms set out in the draft order with respect to each of the Application Defendants, with the exception of Schedule "A", which is the provision in the draft order that sets out the plaintiff's undertaking.

*United States Securities and Exchange Commission v. Sharp*          **Page 29**

[99]    Pursuant to Rule 10-4(5) of the *Supreme Court Civil Rules*, an undertaking as to damages must flow for an interim injunction, unless the Court otherwise orders.

[100]   The plaintiff submits that, because of its status as a U.S. government agency, it should not be required to give an undertaking as to damages. The plaintiff relies on U.K. case authority in which the SEC has been excused from providing an undertaking as to damages on this basis. I am unaware of any Canadian authority in which a successful *Mareva* applicant has been excused from an undertaking as to damages on the basis that it is a public entity.

[101]   No evidence has been provided to suggest that the SEC is incapable of giving an undertaking as to damages, although the plaintiff states in argument that the SEC is legally prevented from giving an unlimited undertaking because of its status as an independent agency of the U.S. federal government. No evidence or submissions were made about the precise contours of this legal prohibition and, more importantly, what form of undertaking the SEC is legally capable of making.

[102]   In my view, there is no basis to depart from the usual rule. If the SEC is indeed legally incapable of providing an unlimited undertaking, then the plaintiff has leave to appear before me, on notice to the defendants, to make submissions on the scope of a limited undertaking as to damages, in the event that the parties cannot agree on undertaking terms.


"Francis J."

# Exhibit G

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____    )
                                              )
SECURITIES AND EXCHANGE COMMISSION,           )
                                              )
            Plaintiff,                        )
                                              )
        v.                                    )    Case No. 21-cv-11276-WGY
                                              )
FREDERICK L. SHARP, ZHIYING YVONNE            )
GASARCH, COURTNEY KELLN, MIKE K.              )
VELDHUIS, PAUL SEXTON, JACKSON T.             )
FRIESEN, WILLIAM T. KAITZ, AVTAR S.           )
DHILLON, and GRAHAM R. TAYLOR,                )
                                              )
            Defendants.                       )
_____    )

## PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANT COURTNEY KELLN'S FIRST REQUESTS FOR ADMISSIONS

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, and Local Rule 36.1 of the District of Massachusetts, plaintiff Securities and Exchange Commission (the "Commission") hereby responds, subject to the objections noted below, to defendant Courtney Kelln's ("Kelln") First Requests for Admissions to Plaintiff Securities and Exchange Commission ("Requests") dated February 15, 2023.

## GENERAL RESPONSES AND OBJECTIONS

1.    The Commission objects to the Requests, Definitions and Instructions contained therein to the extent that they purport to impose obligations on the Commission beyond the requirements of the Federal Rules of Civil Procedure and the local rules of the United States District Court for the District of Massachusetts.

2.    The Commission objects to the Requests, Definitions and Instructions contained therein to the extent that they call for information protected by the attorney-client privilege,

1

A1062

work-product immunity, deliberative process privilege, law enforcement privilege or any other privilege or immunity. By answering the Requests, the Commission does not waive, intentionally or otherwise, its attorney-client privilege, work-product protection, deliberative process privilege, law enforcement privilege or any other privilege, doctrine or immunity protecting its communications, transactions, records or deliberations from disclosure. Accordingly, any responses inconsistent with the foregoing are wholly inadvertent and shall not constitute a waiver of any such privilege or immunity. To its knowledge, the Commission has not withheld any non-privileged information based on this objection.

3.      The Commission objects to the Requests to the extent that the discovery sought by these Requests is unreasonably cumulative or burdensome, or is obtainable from some other source that is more convenient, less burdensome, or less expensive and to the extent compliance with any such request would be unduly burdensome, expensive, annoying or oppressive, as prohibited by Fed. R. Civ. P. 26(b).

4.      The Commission objects to definitions and instructions contained in the Requests to the extent they are vague, ambiguous and unintelligible and insofar as they purport to impose discovery obligations broader than those required under the Federal Rules of Civil Procedure, the local rules of the District of Massachusetts or any other applicable laws.

5.      The Commission objects to the definition of "Interview" contained in Definition ¶19 of the Definitions from Kelln's First Set of Interrogatories which are incorporated by reference, to the extent that it is overly broad and seeks to impose upon the Commission an undue burden, and seeks documents and communications that constitute the Commission attorneys' work product in litigating this action after the filing of the Complaint.

6.      The Commission objects to the definition of "Investigation" contained in

2

A1063

Definition ¶20 of the Definitions from Kelln's First Set of Interrogatories which are incorporated by reference, to the extent that it is overly broad and seeks to impose upon the Commission an undue burden, and seeks documents and communications that constitute the Commission attorneys' work product in litigating this action after the filing of the Complaint. The Commission also objects to this definition to the extent that it encompasses any and all investigative efforts taken by DOJ in its investigation into the defendants in the Sharp action. The SEC has no obligation to produce documents or information that may be maintained in the files of DOJ.

Responding further to the definition's statement that it covers "the matter of *SEC v. Sharp et al.*, 21-cv-11276-WGY or any other matter related to or coordinated with the Sharp matter," the Commission informed the defendants in its initial disclosures that the *SEC v. Sharp* case was part of a large Commission investigation numbered B-3147 that has produced a number of cases including but not limited to: in D. Mass.*: SEC v. Carrillo, SEC v. Ciccarelli, SEC v. DiChiara, SEC v. Gomes, SEC v. Knox, SEC v. Landis, SEC v. Tobin*, SEC v. Trends Investments* and *SEC v. Zinkwich*; in S.D.N.Y. and E.D.N.Y: *SEC v. Bajic, SEC v. Biller, SEC v. Cattlin, SEC v. O'Rourke, SEC v. Page*; in other courts: *SEC v. Bauman, SEC v. Sidoti*; in administrative proceedings: *In re Bercowy, In re Killarney*, Apotheca Biosciences Inc. trading suspension, Bioscience Neutraceuticals trading suspension, *In re Ciapala, In re Bauman, In re Ledvina, In re Patel, In re DiChiara, In re Taneja*, Sandy Steele trading suspension, *In re Targett-Adams, In re Wedbush*, WOD Retail Solutions trading suspension. Much of the information collected in the B-3147 investigation is not relevant to the *SEC v. Sharp* litigation as it relates to the actions of individuals not involved in the conduct described in the Complaint or Amended Complaint or the sales of securities not described in the Complaint or Amended Complaint. The Commission has

A1064

nonetheless disclosed to defendants the existence of all information and third party documents it

collected as part of the B-3147 investigation. The Commission also informed defendants in its

initial disclosures that it conducted investigations numbered HO-13182 (Vitality Biopharma, Inc.

and Other Issuers) and B-3475 (Microcap Trading Using Offshore Services) in which

information and documents relevant to the *SEC v. Sharp* litigation were collected. The

Commission has provided disclosures concerning the information and documents produced in

those HO-13182 and B-3475 investigations to the defendants in *SEC v. Sharp*.

      7.     The Commission objects to paragraph 5 of the Definitions and Instructions

because it seeks to impose upon the Commission a duty to file supplemental responses that is

beyond the duties imposed by Fed. R. Civ. P. 26(e). The Commission will supplement its

responses only if required to do so by Fed. R. Civ. P. 26(e).

      8.     The Commission reserves all objections and reserves the right to supplement

these responses at any time.

      9.     The following responses are submitted subject to, and without in any way waiving

or intending to waive, the above objections, as well as the right to object to other discovery

procedures involving or related to the same subject matter as the Interrogatories herein

responded to.

### SPECIFIC RESPONSES AND OBJECTIONS

**Request No. 1:**

**Admit that the SEC has no witness who will testify based on personal knowledge that Ms. Kelln utilized or was known by, the name "ESQ," "Esquire," "Celt," "Celtic," or "Cuntessa" in relation to the "Sharp Group."**

**Response:**

     Denied.

**Request No. 2:**

A1065

**Admit that the SEC invented the term "the Sharp Group" for purposes of this litigation and consequently the SEC has identified no witness who will testify based on personal knowledge that Ms. Kelln was aware of her inclusion in something called "the Sharp Group" prior to the filing of the Complaint.**

**Response:**

      Denied as stated. The Commission defined the term "the Sharp Group" in its Complaint and Amended Complaint to refer collectively to defendants Sharp, Gasarch and Kelln. *See* Amended Complaint, ¶5. The Commission does not expect that the defined term "the Sharp Group" was used either by defendants Sharp, Gasarch or Kelln, or by others, before the filing of the Complaint. However, regardless of the use or nonuse of that defined term, the Commission maintains that Kelln was aware of her work for Sharp and his businesses, and participation in a larger group of people working with a common aim to serve clients of Sharp and his businesses, for more than a decade before the filing of the Complaint.

**Request No. 3:**

**Admit that there was no document produced in discovery and created before the SEC's investigation into the allegations of the Amended Complaint which contains both the term "the Sharp Group" as defined in Paragraph 5 of the Amended Complaint and Ms. Kelln's name.**

**Response:**

      Admitted with the qualifications explained in the response to Request No. 2.

**Request No. 4:**

**Admit that Ms. Kelln never owned shares in, or sold shares of, Stevia First/Vitality, Arch, OncoSec, or Garmatex.**

**Response:**

      The Commission objects to Request No. 4 because it is compound and improperly combines 4 requests for admission into one. Notwithstanding that objection, admitted in part, denied in part. The Commission admits that Kelln never owned shares in her own name in Stevia First/Vitality, Arch, OncoSec or Garmatex. However, Kelln exercised control over shares

A1066

in each of those entities by directing the transfer of those shares to and from various nominee

entities she administered in connection with her work for Sharp's businesses and the clients of

those businesses, often without any consideration for the transfers, and sometimes by fabricating

documents to facilitate those transfers. Kelln thus assumed at least some of the indicia of

ownership of those shares by exercising the authority to direct their transfer from one nominee

entity to another. Similarly, Kelln also acted as an indirect seller of shares of Stevia

First/Vitality, Arch, OncoSec and Garmatex by acting as a "necessary participant" or a

"substantial factor" in the sales of those shares. Those sales depended on Kelln's actions in

breaking the ownership of those shares into blocks of less than 5% to be held in the names of

numerous nominee corporate entities, providing the paperwork to transfer those shares into the

names of the nominee entities, and coordinating the deposit of those shares with trading

platforms (including Wintercap SA and Blacklight SA) or into brokerage accounts where the

shares could be traded.

**Request No. 5:**

**Admit that none of the Encrypted Communications described throughout the Amended
Complaint include or show Ms. Kelln's full name.**

**Response:**

Denied. The Amended Complaint describes the system of Encrypted Communications

maintained by the Sharp Group for the benefit of its clients. A search of all of those Encrypted

Communications for the phrase "Courtney Kelln" yields 54 results. As three examples, *see* SEC

MLATCKLP-E 908687, SEC MLATCKLP-E 296398, and SEC MLATCKLP-E 583227.

**Request No. 6:**

**Admit that the SEC coordinated its Investigation and the commencement of this civil
enforcement action with the United States Attorney's Office for the District of
Massachusetts.**

A1067

**Response:**

Denied as stated.  This response incorporates specifically the Commission's objections to the term "Investigation" as that term is defined by Kelln.  The Commission did not "coordinate" with the United States Attorney's Office for the District of Massachusetts ("USAO DMass").  The Commission participated in certain joint proffers of witnesses with USAO DMass as part of its investigation into the facts ultimately alleged in the Complaint.  The Commission also shared some of the documents it obtained as part of its investigation with USAO DMass, and USAO DMass also shared some documents it obtained as part of its own investigation with the Commission.  Staff of the Commission and USAO DMass corresponded concerning each agency's investigation.  The Commission unilaterally decided on its filing date for this action and informed USAO DMass about when it was planning to file this action in advance of the filing date.

Parallel civil and criminal investigations are constitutional and appropriate.  *See United States v. Kordel*, 397 U.S. 1, 11 (1970); *United States v. Stringer*, 535 F.3d 929, 933 (9th Cir. 2008) ("There is nothing improper about the government undertaking simultaneous criminal and civil investigations.").  Moreover, the federal securities laws expressly permit the Commission to share information with other government agencies and to provide information to the Department of Justice.  *See* Section 24(f) of the Securities Exchange Act of 1934 ("Sharing privileged information with other authorities"); 17 C.F.R. §240.24c-1 ("access to nonpublic information").

**Request No. 7:**

**Admit that the SEC did not conduct a "filter review" of the materials obtained from the server referenced in Paragraph 51 of the Amended Complaint.**

**Response:**

A1068

The Commission objects to Request No. 7 to the extent that it does not define the term "filter review" and there are many different ways to understand the scope of what a "filter review" may entail. Notwithstanding that objection, denied as stated. The server referenced in paragraph 51 of the Amended Complaint contained three categories of data: the Encrypted Communications (as that term is used in the Amended Complaint), the Q accounting system, and xmail communications. With respect to the Encrypted Communications, staff of the Commission undertook an internal review to determine whether there were likely to be any issues of attorney-client privilege within the Encrypted Communications. With respect to the Q accounting system, the nature of the files provided no reason to believe that they contained privileged information. With respect to the xmail communications, the Commission understands that a filter review was conducted by USAO DMass before the Commission received that category of data from the server. Notwithstanding that review by the USAO, the Commission understands that some documents may have been inadvertently produced. As described in my email to you on March 17, 2023, the Commission will conduct its own filter review of the xmail documents and notify all counsel if any privileged materials were inadvertently produced.

**Request No. 8:**

**Admit that the SEC continues to seek information under oath from Ms. Kelln in Canada related to this case even after becoming aware that she asserted her Fifth Amendment rights against self-incrimination in the above captioned matter.**

**Response:**

Denied as stated. The Commission is seeking, in a separate court proceeding in the courts of British Columbia, to secure an injunction freezing Kelln's assets in Canada as a method to enforce the asset freeze order issued by the Court in this case. In the British Columbia case, the Commission is seeking relief commonly available under British Columbia law, including a

A1069

declaration of assets that would affect the enforcement of the asset freeze.  It is the

Commission's position that Kelln's invocation of her Fifth Amendment right in this proceeding

has no direct effect in the Canadian court proceeding, and that Kelln's protections against self-

incrimination in the British Columbia proceeding, if any, are to be determined in accordance

with Canadian laws on the subject.  Specifically, the Commission will not argue that any

compelled asset disclosure by the Canadian courts waives Kelln's ability to assert her Fifth

Amendment rights in this proceeding.

**Request No. 9:**

**Admit that because there is no prohibition under United States law against holding less
than a 5% ownership interest in a security, investors can legally (under U.S. Securities
Laws) seek to hold less than 5% of a security in order to avoid being required to report
their ownership in that security.**

**Response:**

Admitted with qualification.  The Commission admits that if certain investors actually

decided to hold less than a 5% ownership interest in a security and did so independently and not

as part of a group, certain investors would have no obligation under the U.S. Securities Laws to

report their ownership in that security; but certain investors, regardless of their ownership

percentages, may have reporting obligations.  However, the allegations of the Amended

Complaint are that multiple nominee shareholders administered by the Sharp Group held shares

for a common group of investors, who collectively held far more than 5% of an issuer's shares.

In that circumstance, the common group of investors cannot avoid its obligation to report its

ownership of 5% or more of an issuer's securities by using the nominee shareholders to try to

conceal their beneficial ownership.

**Request No. 10:**

**Admit that the SEC has no witness who will testify based on personal knowledge that Ms.**

A1070

**Kelln was aware that the attorney described in Paragraphs 143-144 of the Amended Complaint prepared opinion letters that "falsely represented that the nominee shareholders were not affiliates of Vitality."**

**Response:**

Denied.  In response to a document subpoena served on him by the Commission, attorney Scott Lawler (the attorney discussed in paragraphs 143-144 of the Amended Complaint) stated that Kelln retained him to prepare the opinion letters that lifted the restricted legends on shares of Vitality.  The Commission further expects that Lawler will confirm that Kelln provided him with the factual information on which he relied to prepare those opinion letters and that Kelln did not provide him with any documents revealing either: (i) that she administered all of these entities, or (ii) that these entities were nominees controlled by Sharp and his employees which held shares for the benefit of the clients of Sharp's business, including Veldhuis, Sexton and Friesen.  As a result of Kelln's failure to provide Lawler with this information she knew, the letters written by Lawler falsely represented that the nominee shareholders were not affiliates of Vitality.

**Request No. 11:**

**Admit that Ms. Kelln has never been an attorney and that the SEC has no document showing, nor witness who will testify based on personal knowledge that Ms. Kelln has received any formal training regarding United States Securities Laws.**

**Response:**

The Commission objects to Request No. 11 because it is compound and improperly combines 2 requests for admission into one.  Notwithstanding that objection, admitted with qualifications.  The Commission admits that it has no evidence that Kelln has ever been an attorney.  The Commission similarly has no evidence that Kelln has received formal training regarding the U.S. Securities Laws.  However, Kelln's expected assertion of her Fifth Amendment rights has hampered the Commission's ability to take discovery into her

A1071

understanding of the U.S. Securities Laws. She should not be permitted to invoke that right as a shield against discovery and then use it as a sword to complain that the Commission lacks evidence about her understanding of, and training on, the U.S. Securities Laws. Further, whether she received "formal" as opposed to "on-the-job" training, Kelln's communications reveal her familiarity with, and understanding of, those aspects of the U.S. Securities Laws that are relevant to the allegations of the Amended Complaint.

**Request No. 12:**

**Admit that Ms. Kelln has never been a transfer agent nor possessed a U.S. securities license, such as a Series 7.**

**Response:**

The Commission objects to Request No. 12 because it is compound and improperly combines 2 requests for admission into one. Notwithstanding that objection, admitted.

**Request No. 13:**

**Admit that the SEC has no witness who will testify, based on personal knowledge that Kelln was aware of the book described in Paragraph 48 of the Amended Complaint.**

**Response:**

Denied. *See* Written Deposition Questions to Kelln, Exhibit Kelln 2.

**Request No. 14:**

**Admit that the SEC has no witness who will testify, based on personal knowledge that Ms. Kelln knew "any shareholder who was the beneficial owner of more than 5% of Vitality's outstanding stock was legally required to publicly disclose its holdings."**

**Response:**

Denied. Silverton personnel may testify concerning their understanding of their communications with Kelln on this topic. *See* Written Deposition Questions to Kelln, Exhibit Kelln 17 at pages 117-119 and 134. *See also* Exhibit Kelln 27 and other exhibits in which Kelln

11

A1072

explained her understanding of what she called the "5% rule."

**Request No. 15:**

**Admit that the SEC has no document showing, nor witness who will testify based on personal knowledge that Ms. Kelln wrote the quoted language in Paragraph 147 of the Amended Complaint.**

**Response:**

    Denied.

**Request No. 16:**

**Admit that the SEC has no witness who will testify based on personal knowledge that Ms. Kelln was aware that "[b]rokerage firms routinely consider the 5% ownership threshold in determining whether particular stock sales may be part of a distribution that must be registered pursuant to Section 5 of the Securities Act" as alleged in Paragraph 55 of the Amended Complaint.**

**Response:**

    The Commission is unable to answer Request No. 16 at this time. The Commission has

not completed its preparation for trial, nor asked every potential trial witness what he or she

knows about Ms. Kelln's knowledge of specific topics, including the language quoted in Request

No. 16. At this time, the Commission cannot identify such a witness. However, Kelln herself

communicated on numerous occasions her understanding of the 5% rule, which likely

encompasses brokerage firms' considerations of ownership of 5% or more of an issuer's

securities.

**Request No. 17:**

**Admit that the SEC has no witness who will testify based on personal knowledge that Ms. Kelln was aware that "the OTC Markets requires public companies to disclose its five percent (or greater) shareholders to meet certain listing requirements" as alleged in Paragraph 55 of the Amended Complaint.**

**Response:**

    The Commission is unable to answer Request No. 17 at this time. The Commission has

not completed its preparation for trial, nor asked every potential trial witness what he or she

knows about Ms. Kelln's knowledge of specific topics, including the language quoted in Request

No. 17. At this time, the Commission cannot identify such a witness. However, Kelln herself

communicated on numerous occasions her understanding of the 5% rule, which likely

encompasses OTC's listing requirements relating to disclosure of ownership of 5% or more of an

issuer's securities.

**Request No. 18:**

**Admit that the SEC has no witness who will testify based on personal knowledge that Ms. Kelln knew any of the securities described in the Amended Complaint were the subject of a manipulation scheme.**

**Response:**

The Commission objects to Request No. 18 to the extent that it does not define the term

"manipulation scheme" and there are many different ways to understand the scope of what a

"manipulation scheme" may entail. The Commission considers a "manipulation scheme" to

encompass the scheme described in the Amended Complaint, whereby Sharp, Kelln and Gasarch

enabled their clients to use nominee shareholders to hold multiple blocks of issuers' shares and

to sell those shares while promoting the issuers' stock, all while concealing their ownership and

control of those shares. With that understanding of the term "manipulation scheme," denied.

**Request No. 19:**

**Admit that the SEC has no witness who will testify based on personal knowledge that Ms. Kelln was aware of the stock "promotions" described throughout the Amended Complaint.**

**Response:**

Denied.

**Request No. 20:**

**Admit that Ms. Kelln worked at the direction of Mr. Sharp and others, as described in**

13

A1074

**Paragraph 53 of the Amended Complaint, and consequently the SEC has no witness who will testify that Ms. Kelln made an independent judgment about any of the actions attributed to her in the Amended Complaint.**

**Response:**

Admitted in part and denied in part.  The Commission admits that Kelln often took direction from Sharp and others about certain aspects of her work.  The language following "consequently" in Request No. 20 does not logically follow.  Individuals who take direction from others still exercise their independent judgment about portions of the actions they take and the ways in which they choose to implement an overall directive.  The Commission denies that it has no witness who will testify that Kelln exercised her independent judgment about her actions that are described in the Amended Complaint.

**Request No. 21:**

**Admit that the communications quoted about the phone deletion alleged in Paragraph 65 of the Amended Complaint nowhere utilize the term "remind" as alleged in the Amended Complaint, and that the term "remind" is a characterization created by the SEC.**

**Response:**

Admitted.

**Request No. 22:**

**Admit that the SEC has no witness who will testify that Ms. Kelln knew that the attorney opinion letter referenced in Paragraph 93 of the Amended Complaint "falsely represented that Nautilus Growth Fund was not an affiliate of Stevia First."**

**Response:**

Denied.  In response to a document subpoena served on him by the Commission, attorney Scott Lawler (the attorney whose opinion letter is discussed in paragraph 93 of the Amended Complaint) stated that Kelln retained him to prepare the opinion letter at issue.  The Commission further expects that Lawler will confirm that Kelln provided him with the factual information on

14

A1075

which he relied to prepare that opinion letter and that Kelln did not provide him with any documents revealing either that she administered Hartford Equity or Nautilus Growth Fund or that these entities were nominees controlled by Sharp and his employees which held shares for the benefit of the clients of Sharp's business, including Veldhuis, Sexton and Friesen. As a result of Kelln's failure to provide Lawler with this information she knew, the letters written by Lawler falsely represented that Nautilus Growth Fund was not an affiliate of Stevia First.

**Request No. 23:**

**Admit that the SEC has no witness who will testify that Ms. Kelln knew that Nautilus Growth Fund was "merely a nominee shareholder holding stock for the Veldhuis Control Group which is an affiliate of Stevia First" as alleged in Paragraph 94 of the Amended Complaint.**

**Response:**

The Commission is unable to answer Request No. 23 at this time. The Commission has not completed its preparation for trial, nor asked every potential trial witness what he or she knows about Ms. Kelln's knowledge of specific topics, including the language quoted in Request No. 23. At this time, the Commission cannot identify such a witness. However, Kelln herself communicated on dozens of occasions her understanding that Nautilus Growth Fund was a nominee holding stock for Veldhuis, Sexton, Friesen and others. For example, there are dozens of Encrypted Communications in which Kelln discusses with others, including Sharp, Veldhuis, brokers at Verdmont, and personnel at Blacklight, the transfer and deposits of shares into and out of accounts in the name of Nautilus Growth Fund, for the stock of numerous issuers including Stevia First. In one of these communications, Kelln even asks Sharp if he has input into how she should answer potential questions from the Commission about how she got paid for her work for Nautilus and another nominee entity she helped to administer. *See* SEC MLATCKLP E 721308. In another communication, Kelln discusses holding shares in the name of Nautilus on behalf of

15

A1076

Friesen.  *See* SEC MLATCKLP E 601510, 628499.  In a third, Kelln discusses with Veldhuis

getting attorney Scott Lawler to write opinion letters to allow the deposit of shares held in the

name of Nautilus into a brokerage account.  *See* SEC MLATCKLP E 69898, 511898.

**Request No. 24:**

**Admit that the Encrypted Communication referenced in Paragraph 123 of the Amended
Complaint did not have Ms. Kelln's name on it.**

**Response:**

Denied.  The messages in that Encrypted Communication are sent to "CELT," which

functions as Kelln's name in Encrypted Communications.

**Request No. 25:**

**Admit that Ms. Kelln had no obligation under U.S. Securities Laws to register the sales of
shares of Stevia First/Vitality, Arch and OncoSec shares as alleged in Paragraphs 70, 178,
213, and 242-247, respectively, of the Amended Complaint.**

**Response:**

The Commission objects to Request No. 25 because it is compound and improperly

combines at least three, and perhaps more, requests for admission into one.  Notwithstanding that

objection, denied.

**AS TO OBJECTIONS**:

Dated: March 17, 2023                    SECURITIES AND EXCHANGE COMMISSION

                                         By its attorneys,

                                         /s/ Kathleen B. Shields
                                         Kathleen B. Shields (Mass. Bar No. 637438)
                                         Alfred A. Day (Mass. Bar No. 654436)
                                         David H. London (Mass. Bar No. 638289)
                                         Katherine Bromberg (New York Bar No. 4154555)
                                         SECURITIES AND EXCHANGE COMMISSION
                                         Boston Regional Office
                                         33 Arch St., 24th Floor
                                         Boston, MA 02110
                                         Phone: (617) 573-8904 (Shields direct); (617) 573-

A1077

8997 (London direct); (617) 573-4537 (Day direct)
Fax: (617) 573-4590 (fax)
Shieldska@sec.gov; LondonD@sec.gov;
DayA@sec.gov

**AS TO ANSWERS**:

I, Amy Gwiazda, declare under penalty of perjury under the laws of the United State of America that the foregoing factual answers are true and correct to the best of my knowledge, information and belief.

/s/ Amy Gwiazda
Amy Gwiazda
Assistant Director, Division of Enforcement
Securities and Exchange Commission

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 17, 2023, a true and correct copy of the foregoing document was sent by email to all counsel for all parties.

/s/ Kathleen B. Shields
Kathleen B. Shields

17

A1078

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:21-cv-11276-WGY |
| v. | |
| Frederick L. Sharp, *et al.*, | |
| Defendants. | |

<u>**DEFENDANT PAUL SEXTON'S NOTICE OF JOINDER**</u>

Mr. Sexton hereby provides notice that he joins in seeking the relief requested in the recently filed Motion to Stay the Proceedings (ECF No. 280) and Motion for Leave to Reopen Discovery to Take Certain Depositions (ECF No. 283).

Respectfully submitted,

*/s/ Neil T. Smith*

Neil T. Smith (BBO# 651157)
    Neil.Smith@klgates.com
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Tel: (617) 261-3100
Fax: (617) 261-3175

*/s/ Stephen G. Topetzes*

Stephen G. Topetzes*
    Stephen.Topetzes@klgates.com
Robert S. Silverblatt*
    Rob.Silverblatt@klgates.com
K&L Gates LLP
1601 K St. NW
Washington, DC 20006
Tel: (202) 778-9328
Fax: (202) 778-9100

A1079

*Admitted pro hac vice*
*Counsel for Paul Sexton*

Dated:  May 8, 2023

2

A1080

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on May 8, 2023, and a copy thereof will be sent electronically to the registered recipients and counsel of record as identified on the Notice of Electronic Filing.

*/s/ Neil T. Smith*

Neil T. Smith

3

A1081

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <div align="right">**Plaintiff,**</div>     v.<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <div align="right">**Defendants.**</div> | **Civil Action No. 21-CV-11276 (WGY)** |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS MIKE K. VELDHUIS AND COURTNEY KELLN'S MOTION TO STAY THE PROCEEDINGS

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission") submits this opposition to defendants Mike K. Veldhuis ("Veldhuis") and Courtney Kelln's ("Kelln") (together "Defendants") motion to stay the proceedings (the "Motion"), which has also been joined by defendant Paul Sexton ("Sexton"). Dkt. Nos. 280, 286. After litigating this action for almost two years, Defendants waited until faced with opposing the Commission's motion for partial summary judgment to seek a stay. *See* Dkt. No. 266. The advanced stage of this litigation, coupled with the uncertainty regarding the timeline and scope of the related criminal matter suggest that the balance of all relevant interests is better served by denying the Motion.

## RELEVANT FACTUAL AND PROCEDURAL HISTORY

Defendants' account of the relationship between the criminal matter and this action draws unwarranted conclusions. *See* Dkt. No. 281 ("Brief"), at 8-10. First, the record is clear that while the U.S. Attorney's Office once believed it would seek to stay this case, it changed its

mind after defendant Kelln objected to a stay and before filing such a motion,.  Brief at 9.

Whatever the U.S. Attorney's Office may once have thought about seeking a stay, what matters

now is that it has not sought a stay of this action.  Second, defendants mischaracterize

communications about the production of documents that the Commission obtained from the U.S.

Attorney's Office as demonstrating an "intimate relationship" between this case and the criminal

matter.  All those communications show is that the Commission obtained evidence from the U.S.

Attorney's Office, which it promptly turned over to Defendants in discovery.  Nothing more.

Third, it is immaterial whether the witnesses from whom the Commission filed declarations in

support of its summary judgment motion are cooperating in a criminal action or not.  All that is

relevant for this case is that those witnesses provided sworn declarations on issues that are

relevant to the Defendants' liability.

Next, Defendants mischaracterize the Commission's civil action filed in British

Columbia to enforce this Court's asset freeze order.  As reflected in this Court's asset freeze

orders (at both the Temporary Restraining Order and Preliminary Injunction stages), most of the

Defendants' assets are in Canada and other foreign countries.  *See* Dkt. Nos. 7, 39, 95.  To

enforce this Court's asset freeze in Canada, the Commission sought a Canadian court order,

called a Mareva injunction, freezing the defendants' assets there.  Part of the Canadian courts'

standard Mareva injunction order also requires defendants to disclose their assets in order to

effectuate the freeze on all available assets.  *See* Dkt. No. 282-6 at 14, ¶43.  In seeking the

standard Mareva order, the Commission clarified for the Canadian court that it would not argue

that the compelled disclosure to effect an asset freeze would waive the defendants' Fifth

Amendment rights.  The Canadian court ruled that the Commission was entitled to a Mareva

injunction and that the standard order did not violate the Defendants' rights because the

A1083

Commission's proceeding in the United States is not a criminal proceeding. The import of the Court's reasoning is that the defendant's Fifth Amendment rights are not violated by a disclosure of the existence of assets in a civil case like this one. *See* Dkt. No. 282-6 at 13, 15. Contrary to the Defendants' assertion, the Canadian court was aware of the criminal investigation, as Defendants' responsive pleading filed in that court stated that "[t]here is an active United States Department of Justice criminal investigation ongoing against all or some of the defendants." Exhibit A (Application Response, filed by Defendants Gasarch, Kelln, Veldhuis and Sexton on Nov. 10, 2022), attached hereto.

## **LEGAL STANDARD**

"The decision whether or not to stay civil litigation in deference to parallel criminal proceedings is discretionary." *SEC v. K2 Unlimited, Inc.*, 15 F. Supp. 3d 158, 160 (D. Mass. 2014) (quoting *Microfinancial, Inc. v. Premier Holidays Int'l*, 385 F.3d 72, 77 (1st Cir. 2004)). The First Circuit has identified seven factors that bear on the decision of whether to stay civil proceedings in light of parallel criminal proceedings. *Microfinancial*, 385 F.3d at 78. Those factors are:

> (i) the interests of the civil plaintiff in proceeding expeditiously with the civil litigation, including the avoidance of any prejudice to the plaintiff should a delay transpire; (ii) the hardship to the defendant, including the burden placed upon him should the cases go forward in tandem; (iii) the convenience of both the civil and criminal courts; (iv) the interests of third parties; and (v) the public interest…. (vi) the good faith of the litigants (or the absence of it) and (vii) the status of the cases.

*Id.* "[A] defendant in a criminal case has no constitutional right to a stay simply because he or she is also the subject of a parallel civil case and such a defendant bears the heavy burden of showing that a stay is warranted." *D.R. v. Bigda*, No. 3:20-cv-30085-MGM, 2021 WL 1080244 at *2 (D. Mass. Mar. 18, 2021) (citing *Microfinancial*, 385 F.3d at 77–78). In fact, granting a stay is "extraordinary relief." *Microfinancial*, 385 F.3d at 79.

3

A1084

**ARGUMENT**

**THE COURT SHOULD EXERCISE ITS DISCRETION AND DENY A STAY**

Veldhuis and Kelln fail to point to a single case, in this circuit or elsewhere, that supports staying a civil proceeding after the close of discovery, after summary judgment has been filed, and four months ahead of trial. Accordingly, in their twenty page brief, Defendants spend all of three sentences on the "mature stage of this litigation." Brief at 19. But the fact that this civil proceeding is on the "brink of trial" weighs against granting a stay and impacts nearly every other relevant factor as is discussed below. *See, e.g., Microfinancial*, 385 F.3d at 79 (upholding denial of stay where civil proceeding "was on the brink of trial").

Throughout their Brief, Defendants reference a change in circumstances that purportedly justifies their eleventh hour (or "thirteenth hour" as measured against the already-complete discovery schedule) filing of a motion to stay. Brief at 16, 17, 19. On closer inspection, this "substantial shift" is nothing more than the eminently foreseeable fact that the Commission filed a motion for partial summary judgment (which Commission's counsel discussed with defense counsel on numerous occasions), based on evidence, including witness statements from three witnesses who may also testify in any future criminal trial. Defendants have been aware of these witnesses and the likely nature of their testimony for more than a year because they were disclosed in the Commission's Initial Disclosures served on April 1, 2022. Two of these witnesses are also defendants in this action. Defendants can hardly be surprised that individuals charged in the same scheme would have evidence relevant to their culpability.

In short, there has simply been no change in circumstances that justifies the current belated request for a stay. All that has happened is that the Commission has complied with the deadlines set forth in this Court's several Scheduling Orders. Defendants are essentially seeking

4

A1085

to relitigate this Court's Scheduling Orders to avoid the consequences of civil litigation. Further, balanced together, all of the *Microfinancial* factors weigh against a stay in this case.

### 1. The Commission Would be Prejudiced by a Stay.

The SEC clearly has an interest in "proceeding expeditiously with the civil litigation." *Microfinancial*, 385 F.3d at 78. This case was filed nearly two years ago and a "decision in it will serve the public interest that the SEC is constituted to represent." *K2*, 15 F. Supp. 3d at 160. Moreover, given the age and length of the Defendants' scheme, the events at issue in this action are already old, and any further delay is likely to contribute to fading memories, which will prejudice the Commission (as the party with the burden of proof) more than it will prejudice the defendants. A stay in this case "would entail the risk of losing evidence through the death of witnesses or fading memories." *K2*, 15 F. Supp. 3d at 160 (denying stay of Commission action). "These concerns are compounded by the fact that the Court has no way of knowing the timeline of the criminal proceedings." *Nat'l Coal. On Black Civic Participation v. Wohl*, No. 20 Civ. 8668, 2021 WL 694557, at *3 (S.D.N.Y. Feb. 22, 2021), *appeal dismissed*, No. 21-232, 2021 WL 3852252 (2d Cir. June 22, 2021) (denying renewed motion for stay).

Fundamentally, Defendants are asking this Court to stay this civil proceeding indefinitely, in favor of a criminal proceeding in which no indictments have yet been returned. Further, Defendants are asking this Court for an indefinite stay when the criminal complaint that has been filed to date implicates only 2 of the 5 remaining defendants who are actively litigating this action (Veldhuis and Kelln).[1] Even if an indictment against those two, or more than those

---

[1] Although there are still six defendants remaining in this civil action, the Commission is not actively litigating with defendant Avtar Dhillon ("Dhillon"), and expects that it will reach a resolution with Dhillon and will propose to this Court a Consent and Final Judgment. Dhillon has already entered a guilty plea to related criminal conduct. *See U.S. v. Dhillon*, No. 22-cr-10265-DPW (D. Mass.) (guilty plea entered on Dec. 7, 2022).

A1086

two defendants, were to be returned soon, that would only be the start of a lengthy extradition process, which would likely take years. The remaining five defendants, Veldhuis, Kelln, Sexton, Jackson Friesen and Yvonne Gasarch, are all Canadian citizens residing in Canada. It is the Commission's counsel's understanding, based on its familiarity with other cases, that Canadian processes for extraditing Canadian citizens to the United States routinely take 4 or more years. None of these defendants have offered any representations or assurances that – even if they are indicted – they would take any steps to waive extradition or take other steps to expedite any criminal cases that may be filed against them. Defendants' ask of this Court is thus extreme – they seek an indefinite delay on the basis of an indictment that has not yet been issued – and when this case is on the trial list in four months.

**2. Any Hardship to Defendants Results from the Fact that They are Defendants in this Action, Not From the Denial of a Stay.**

The next factor is the hardship to the Defendants that would result from the civil and criminal cases going forward in tandem. Here, however, having litigated this civil action through the discovery period, Defendants' arguments ring hollow. There is no current deadline, or schedule in the criminal case and there are no actions Defendants are being required to take in the criminal case. There is thus no burden that would otherwise arise were two cases actively being litigating at the same time.

What Defendants are really complaining about is the fact that they are defendants in a civil case at all – a fact that does not change whether or not a stay is granted. While there may be significant overlap between the instant case and the scope of a potential criminal indictment, the scope of the Commission's case when compared to the existing criminal complaint is far more comprehensive. The Commission's action includes more defendants, covers a greater period of time, and involves the manipulation of more securities. Defendants have incorrectly

6

A1087

characterized likely overlap between civil and criminal proceedings as the "most important" in the sense that it should be given more weight as to whether a stay is granted. Brief at 12-14. The extent of overlap is properly considered a "preliminary or threshold factor" – a necessary but not sufficient factor in granting a stay. *See Green v. Crosby*, 177 F. Supp. 673, 678 (D. Mass. 2016). Treating potential overlap in that way is logical because if the two parallel proceedings were not in fact "parallel," a defendant would not be faced with the "precarious dilemma" of deciding whether to assert or waive their privilege against self-incrimination. *Id.* at 676; *see also Chao v. Fleming*, 498 F. Supp. 2d 1034, 1037 (W.D. Mich. 2007) ("if there is no overlap, then there would be no danger of self-incrimination and no need for a stay").

Defendant's argument that they would be harmed absent a stay might have been more compelling before the commencement of discovery, rather than days before their summary judgment response was due. Here, because the Defendants have already participated in discovery, which has now closed, by asserting their Fifth Amendment rights against self-incrimination in response to requests for the production of documents, interrogatories, requests for admission, and in response to deposition questions covering all relevant facts, they have already made the relevant strategic decisions. Much of Defendants' argument on the harm they might face from having to participate in civil discovery is now moot; for example, their contention that "there is a danger that the government may use civil discovery to obtain evidence and information for use in its criminal prosecution." Brief at 14 (quoting *Cruz v. Cty. Of DuPage*, No. 96 C 7170, 1997 WL 370194, at *3 (N.D. Ill. June 27, 1992)). The Commission has taken the discovery it wished to take during the discovery period, solely for the purpose of this action, and the no Defendant has claimed that the Commission's discovery requests were made to obtain evidence for the U.S. Attorney's Office's prosecution rather than for this civil

A1088

action.  Such arguments by Defendants thus no longer carry any weight.

Defendants make a single novel argument, that having to "expose the defense's theory to the prosecution in advance of trial" may require a stay.  Brief at 15.  In support of their argument, they cite seven out-of-circuit cases.  *Id.* (citing cases).  The majority of those cases did not grant stays, nor did *any* of them *discuss* exposure of a defenses' legal theory as a basis to grant a stay.  *E.g. CFTC v. Watson*, No 11-10949, 2011 WL 2174904, at *1 (E.D. Mich. June 3, 2011) (quoting *Transworld* and denying stay based in part on "the uncertainty surrounding when, if ever, an indictment will be issued").  Rather, four district court cases cited boiler plate language about exposing the defense's theory from a single district court case - *Transworld*.  *See Chao*, 498 F. Supp. 2d at 1037 (quoting *Trs. Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1138 (S.D.N.Y. 1995) and granting 90-day stay); *Sparkman v. Thompson*, No. 08-01-KKC, 2009 WL 1941907, at *1 (E.D. Ky. July 6, 2009) (quoting *Transworld* and denying stay); *Carnahan v. McClure*, No. 12CV775, 2012 WL 13170238, at *1 (N.D. Ohio Dec. 10, 2012) (quoting *Sparkman*, which is quoting *Transworld*, and granting plaintiff's motion for a stay ahead of discovery due to the "fundamental unfairness of letting defendants take unilat[e]ral discovery"); *Watson*, 2011 WL 2174904, at *1 (quoting *Transworld*); *Eastwood v. U.S.*, No. 06-cv-164, 2008 WL 656074, at *1 (E.D. Tenn. Mar 6, 2008) (quoting *Transworld* and reserving ruling on stay).  Defendants also cite to a single out-of-circuit case which uses similar language concerning exposing the basis of the defense to the prosecution, but there, the court affirmed the lower court's decision to deny a motion to quash an SEC subpoena.  *See SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1376–77 (D.C. Cir. 1980) ("The SEC cannot always wait for Justice to complete the criminal proceedings if it is to obtain the necessary prompt civil remedy").  The final case cited by Defendants for this proposition granted

a six-month stay where the civil "case is in the early stages of litigation. No answer has been

filed, no scheduling order has been issued, and no dispositive motions have been filed." *Taylor,*

*Bean & Whitaker Mortg. Corp. v. Tidaunum Fin. Inc.,* No. 09-cv-0954, 2009 WL 2136986, at *2

(E.D. Cal. July 15, 2009). That case is inapposite given its procedural posture.

Moreover, Defendants' argument that litigating this case to its conclusion would

somehow violate their rights by requiring them to put on a defense stretches well beyond its

limits the Defendants' Fifth Amendment rights. The Fifth Amendment protects their right not to

testify against themselves. Throughout discovery, they have not done so, asserting their right to

refuse to produce documents and answer questions relevant to the merits of this case. The Fifth

Amendment "applies only to testimonial communications" and does not absolve them from

having to put on a defense in a civil case entirely. *United States v. Chen,* 952 F. Supp. 2d 321,

328 (D. Mass. 2013) (Young, J.) (Fifth Amendment privilege against self-incrimination does not

prevent enforcement of IRS subpoena); *Kirane v. City of Lowell*, 622 F. Supp. 262, 266 (D.

Mass. 1985) (Young, J.) (denying continuance and setting case for trial to force plaintiff to

choose between asserting Fifth Amendment privilege and need to produce evidence to prosecute

case).

   **3. The Convenience of the Civil and Criminal Courts Weighs Against a Stay.**

A stay in this action does not benefit either the courts handling the civil case or the

criminal case because the civil case will likely need to be tried regardless of the outcome of any

eventual criminal case that may, at some uncertain future date, proceed to trial. Of the five

remaining defendants who are actively litigating this action, three of them have not been named

in any criminal action, and a stay as to those defendants is not appropriate. *See, e.g., Sea Salt,*

*LLC v. Bellerose*, No. 2:18-cv-00413, 2020 WL 2485874, at *3 (D. Me. May 13, 2020) (granting

A1090

stay as to sole defendant with criminal exposure while the civil matter proceeds as to remaining

defendants).  Trying two civil cases with the same witnesses regarding the same facts would not

conserve judicial resources.

Further, this Court handing the civil case, "has an interest in not permitting this case to

remain on the docket indefinitely" pending the resolution of the criminal matter which could take

years.  *Russell v. Chenevert*, 573 F. Supp. 3d 391, 402 (D. Me. 2021) (denying stay when

defendant had not been indicted); *see also Sumpter v. Albany Cnty.*, No. 920 cv 0619, 2020 WL

4816181, at *7 (N.D.N.Y. Aug. 19, 2020) ("[T]he Court has an interest in the orderly and

efficient management of its docket that would be ill-served by the stay… [which] would entail

putting this case on hold for an indeterminate period of time."); *Eastwood*, 2008 WL 656074, at

*1 ("The Court… cannot permit itself to be held hostage by the timeline of the government's

criminal investigation."); *cf. Horwitt v. Sarroff*, No. 3:17-cv-1902, 2019 WL 13124298, at *2 (D.

Conn. Aug. 13, 2019) (granting stay and noting, "[i]mportantly, a trial date on the Criminal Case

has been set for… approximately six months from now, making the requested stay relatively

short in nature."); *SEC v. Blaszczak*, No 17-cv-3919, 2018 WL 301091, at *3 (S.D.N.Y. Jan 3,

2018) (granting stay where criminal trial was scheduled to begin "less than six months from the

date of this Order").  Granting a stay in favor of an indefinite delay serves the interests of neither

the civil nor the criminal courts.

### 4.  And 5.  The Interests of Third Parties and The Public Weigh Against a Stay.

The interests of third parties and the public are all better served by denying the Motion.

Third parties, such as investors who lost money in the Defendants' scheme, would also be

harmed by a stay of this case.  Delaying a determination of the Defendants' liability also delays

the Commission's ability to collect against the Defendants' frozen assets, and to pursue the

A1091

identification and collection of other assets belonging to the Defendants. The longer those collection efforts are delayed, the greater the likelihood that the Defendants' assets decrease in value or the Defendants are able to hide their assets from discovery. Further, it does not serve the interests of either the direct victims of the Defendants' schemes, or the public interest generally, if victims are forced to wait indefinitely so that all funds collected from the Defendants can be returned to them though a distribution process. There is significant public interest in holding Defendants accountable publicly for their actions in this civil case. While the public undeniably has an interest in the resolution of any eventual criminal prosecution, that is a distinct interest and there is no reason to delay the current civil case in favor of uncertain future actions in a separate criminal case.

**6.    The Litigants' Good Faith Weighs Against a Stay.**

At all stages of this action, the Commission's counsel has acted in good faith to pursue expeditiously the claims it has asserted against the Defendants. Despite Defendants' suggestions to the contrary in its brief, the Commission's interests are distinct from, and its counsel litigates separately from, the U.S. Attorney's Office. While there is certainly overlap in the evidence that is relevant to both the civil and the criminal matters, Defendants' suggestions that the Commission is somehow jointly managing its case with that of the U.S. Attorney's Office are unfounded. *See* Brief, at 8-10, 13, 14.

Defendants had ample opportunity to move for a stay before they were faced with a dispositive motion after the conclusion of discovery. They concede, as they must, that by this point, they have "already made the difficult choice to assert their Fifth Amendment rights to refrain from responding to the SEC's discovery demands[.]" Brief at 16. When the notion of a stay was first raised, by the Assistant U.S. Attorney handling the criminal matter, over a year ago

and before finalizing the case schedule in this civil matter, Kelln's counsel indicated, "we generally oppose a stay in the SEC action." Dkt. Nos. 282-2. This stay would have preserved the same interests Defendants knowingly waived throughout discovery, but faced with a summary judgment motion, now feel compelled to protect. This transparent gamesmanship suggests that the "good faith" factor weighs against granting the stay which Defendants now seek. *See, e.g., SEC v. Boucher*, No 320 cv 1650, 2021 WL 5178519, at *3 (S.D. Cal. Nov. 8, 2021) (denying motion for stay where, *inter alia*, "defendants were aware for months of likely pending criminal indictment and yet affirmatively opposed the stay that was sought by the USAO"). It is also relevant that, faced with Defendant Kelln's opposition to a stay, the US Attorney's Office chose not to seek a stay of this case at all. Moreover, having asserted their Fifth Amendment rights during discovery, they "likely will be barred from offering testimony at trial… because that would be unfair to Plaintiff." *Bigda*, 2021 WL 1080244, *3 (citing *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 577 (1st Cir. 1989) ("A defendant may not use the fifth amendment to shield herself from the oppositions inquiries during discovery only to impale her accusers with surprise testimony at trial.").

**7. The Advanced Status of this Action Suggests it Should Proceed Forward.**

In stark contrast to the criminal case, in which an indictment has not yet been filed, this case is ready for the resolution of dispositive motions, the exchange and submission to the Court of the parties' Joint Pretrial Memorandum, and a trial that is scheduled to begin in about four months. Defendants claim that the stay would "undoubtedly expedite resolution of the civil action" but offer no explanation as to how a stay would produce that result. Brief at 18 (quoting *SEC v. TelexFree, Inc.*, 52 F. Supp. 3d 349, 353 (D. Mass. 2014)). This case is currently scheduled to be trial ready in September 2023. Dkt. No. 257. It is simply not possible that an

A1093

indefinite stay would "expedite" the resolution of this matter.

### DEFENDANTS' POSITIONS HAVE NECESSITATED A BRIEF DELAY IN THE COURT'S SCHEDULED PRETRIAL MEMORANDUM FIILING DATE

The Court's most recent Scheduling Order requires the parties' Joint Pretrial Memorandum to be filed June 15, 2023.  *See* Dkt. No. 256.  Typically, the parties exchange their portions of that joint memorandum about 30 days before the date it is due to the Court.  *See* Dkt. No. 215 (prior Scheduling Order).  On April 19, 2023, counsel for the Commission asked counsel for all five remaining defendants to confirm that the parties would exchange their sections of the parties' Joint Pretrial Memorandum on May 19 to facilitate the filing with the Court by June 15.  None of the defense counsel has agreed to a date for exchanging sections of the Joint Pretrial Memorandum and some of them contend that their filing of this motion holds their obligation to exchange sections of that memorandum in abeyance.  Because the parties have been unable to reach agreement as to whether they are obligated to exchange their portions of the Joint Pretrial Memorandum, the Commission seeks a brief extension of the filing date of the Joint Pretrial Memorandum until 45 days after the Court rules on this motion to stay, with an additional requirement that the parties exchange their respective sections of the Joint Pretrial Memorandum 20 days after the Court rules on this motion to stay.  The Commission's counsel does not expect that this modest delay would necessitate any delay in the trial date.

### CONCLUSION

For the reasons set forth above, Defendants Veldhuis and Kelln have not met their "heavy burden" of establishing that the "extraordinary relief" of a stay in this matter is justified. The Commission respectfully requests that the Court deny Veldhuis and Kelln's Motion to Stay the Proceedings.  The Commission further requests that the Court grant a brief delay in the due

A1094

date for the parties' Joint Pretrial Memorandum, which will not affect the scheduled September 11, 2023 trial ready date.

**Oral Argument Is Requested on this Motion.**

Dated:  May 9, 2023                                 Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its Attorneys,
/s/ Kathleen Burdette Shields
Kathleen B. Shields (Mass. Bar No. 637438)
Alfred Day (Mass. Bar No. 654436)
David H. London (Mass. Bar No. 638289)
Nita K. Klunder (Mass. Bar No. 689304)
33 Arch Street, 24th Floor
Boston, MA  02110
Telephone: (617) 573-8904 (Shields); (617) 573-4537 (Day); (617) 573-8997 (London)
Fax: (617) 573-4590
Email: shieldska@sec.gov; daya@sec.gov; londond@sec.gov; klunderni@sec.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2023, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.  A copy will also be sent via first class mail and/or email to those parties who have not yet registered for notice via the Court's CM/ECF system.

/s/ Kathleen Burdette Shields
Kathleen Burdette Shields

A1095

*Form 33 (Rule 8-1(10))*

No. S-226494
Vancouver Registry

**IN THE SUPREME COURT OF BRITISH COLUMBIA**

BETWEEN:

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION

PLAINTIFF

AND:

FREDERICK L. SHARP, ZHIYING YVONNE GASARCH,
COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON,
JACKSON T. FRIESEN, and GRAHAM P. TAYLOR

DEFENDANTS

## APPLICATION RESPONSE

**Application response of:** Zhiying Yvonne Gasarch, Courtney Kelln, Mike K. Veldhuis, and Paul Sexton (the "application respondents").

THIS IS A RESPONSE TO the notice of application of the plaintiff filed August 11, 2022.

**Part 1: ORDERS CONSENTED TO**

1. The application respondents consent to the granting of the orders set out in the following NONE paragraphs of Part 1 of the notice of application.

**Part 2: ORDERS OPPOSED**

1. The application respondents oppose the granting of the orders set out in paragraphs 1(a) and 1(b) of Part 1 of the notice of application.

**Part 3: ORDERS ON WHICH NO POSITION IS TAKEN**

1. The application respondents take no position on the granting of the orders set out in NONE paragraphs of Part 1 of the notice of application.

A1096

**Part 4:  FACTUAL BASIS**

1.  The plaintiff commenced legal proceedings against the defendants in the United States District Court, District of Massachusetts (the "**US SEC Proceedings**").

2.  The US SEC Proceedings are ongoing. No final determinations have been made in the US SEC Proceedings.

3.  The defendants are defending against the allegations made in the US SEC Proceedings.

4.  The present proceeding, commenced by the SEC in this Court (the "**BC SEC Proceeding**") is essentially a duplicate of the US SEC Proceedings.

5.  The allegations in the US SEC Proceedings and the BC SEC Proceedings are unproven and there is no conclusive evidence whatsoever upon which this Court can assess the strength of the plaintiff's case.

6.  There is an active United States Department of Justice criminal investigation ongoing against all or some of the defendants.

7.  The United States Department of Justice and the US SEC have acted with cooperation and coordination in their respective investigations against the defendants.

**Part 5:  LEGAL BASIS**

1.  The defendants oppose the orders sought in paragraphs 1(a) and 1(b) of Part 1 of the notice of application.

2.  In the alternative, if the Court grants the orders sought by the applicant, the defendants seek an order:

   a.  that the order in respect of each defendant be no more than the amount that might be received by the plaintiff, should the plaintiff successfully prove its allegations against the defendants; and

   b.  that the information sought in paragraph 1(b) of Part 1 of the notice of application be provided to plaintiff's counsel on an undertaking to this Court that the information be held by plaintiff's counsel and not provided to the plaintiff or to any other person or entity.

   ***The Applicant has Not Established that a Freezing Injunction should be Imposed***

3.  To obtain a Mareva injunction, the applicant must establish that:

    a.  it has a strong *prima facie* case, on the merits; and

    b.  the balance of convenience leans in favour of granting the injunction, considering all the circumstances of the case.

    *Kepis & Pobe Financial Group Inc v Timis Corporation*, 2018 BCCA 420 at 10.

4.  In determining whether the balance of convenience leans in favour of granting the injunction, the court should consider all relevant factors.

    *Kepis & Pobe Financial Group Inc v Timis Corporation*, 2018 BCCA 420 at 13.

5.  A Mareva injunction should only be granted in the clearest of cases. The applicant has not established either of the necessary requirements. This case is therefore far from a clear case and the Court should not grant the application for a Mareva injunction.

    *Access Human Resources Inc v Earl*, 2018 BCSC 2347 at 13.

### It is Impossible to Assess the Strength of the Applicant's Case

6.  The applicant has not established that it has a strong *prima facie* case, on the merits.

7.  There is no conclusive evidence whatsoever upon which to assess the strength of the applicant's case. The facts underlying the allegations of fraud and unlawful conduct as set out in the affidavit of Trevor T. Donelan are unproven. The defendants are actively defending the allegations in the US SEC Proceedings.

8.  The applicant has pled vague and sweeping allegations of fraud and unlawful conduct allegedly committed by the defendants. The applicant has not set out the laws it alleges the defendants have violated, nor has it specified how the defendants have allegedly violated such laws. It is therefore impossible for this Court to determine the strength of the applicant's case against any or all of the defendants.

### The Balance of Convenience Militates in Favour of Not Granting the Injunction

9.  The balance of convenience dictates that the injunction should not be granted because the BC SEC Proceeding is an abuse of the process of this Court. The ongoing adjudication of this claim in the BC SEC Proceeding presents a risk of inconsistent results with the US SEC Proceedings. This BC SEC Proceeding is essentially a duplication of the US SEC Proceeding. The defendants are actively defending the US SEC Proceedings and no determination has been made in that case.

A1098

10. Furthermore, freeze orders have been issued in connection with the US SEC Proceedings over the defendants' worldwide assets. To bring duplicated proceedings in this Court with a view to obtaining a duplicated order over the same assets is a misuse of this Court's process.

11. There is a risk that the applicant will misuse the Court's process to obtain information that it and the United States Department of Justice could not otherwise have obtained in the US SEC Proceedings. The defendants have the right to refrain from answering questions posed in the US SEC Proceedings. The defendants do not have this right in respect of the BC SEC Proceeding and may consequently be compelled to provide incriminating information in the adjudication of this Proceeding. Given that the applicant has coordinated and cooperated with the United States Department of Justice in its investigation and prosecution efforts, there is a risk that any information obtained by the applicant in the BC SEC Proceeding will be communicated and passed on to the United States Department of Justice. There is a significant risk that any such information would be used to advance an investigation and prosecution of the defendants in the United States.

12. The applicant has erroneously asked this Court to issue a freezing order in an indeterminate amount. The applicant has not set out any precise amounts in issue in this proceeding, nor the amount it seeks to obtain in judgment in respect of any of the defendants. The British Columbia Court of Appeal in *First Majestic Silver Corp v Davila* clearly stated that a "Mareva injunction should not tie up assets beyond the value necessary to satisfy any likely judgment". The applicant's request is improper and amounts to a misuse of the Court's process.

*First Majestic Silver Corp v Davila*, 2009 BCCA 71 at 28.

**If the Injunction is Granted, the Applicant Should Provide an Undertaking as to Damages**

13. The general rule under Rule 10-4(5) is that an order for an interim injunction must contain the applicant's undertaking to abide by any order the Court may make as to damages.

Rule 10-4(5)

14. The Court should not exercise its discretion to relieve the applicant of the requirement to provide an undertaking as to damages in the circumstances of this case.

**Part 6:  MATERIAL TO BE RELIED ON**

1. Such further and other evidence as counsel may advise and this Court may permit.

The application respondents estimate that the application will take two days.

[X]    The application respondents have filed in this proceeding a document that contains the application respondents' addresses for service.

[ ]    The application respondents have not filed in this proceeding a document that contains an address for service. The application respondents' ADDRESS FOR SERVICE is:

Date: November 10, 2022

Gregory DelBigio, K.C.
Morgan Watchorn
**Counsel for the defendants/application respondents,** Zhiying Yvonne Gasarch, Courtney Kelln, Mike K. Veldhuis, and Paul Sexton

Thorsteinssons LLP
PO Box 49123
27th Floor, Three Bentall Centre
595 Burrard Street
Vancouver, BC V7X 1J2

Tel:    (604) 689-1261
Fax:    (604) 688-4711
E-mail: gdelbigio@thor.ca

4854-6857-2724, v. 1

A1100

| 05/15/2023 | 292 | Judge William G. Young: ELECTRONIC ORDER entered re 280 MOTION to Stay the Proceedings. (Paine, Matthew) <br><br> **The motion for stay is denied.** <br><br> (Entered: 05/15/2023) |
| --- | --- | --- |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiff,

  v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

               Defendants.

Case No. 1:21-cv-11276-WGY

**DEFENDANTS COURTNEY KELLN AND MIKE VELDHUIS'**
**NOTICE OF NON-OPPOSITION TO ENTRY OF JUDGMENT**

1. Defendants Courtney Kelln and Mike Veldhuis (together, "Defendants") hereby
notify the Court and the parties that, while continuing to invoke their Fifth
Amendment Right to not be witnesses against themselves and to preserve all of their
rights under the Federal Rules of Criminal Procedure to defend themselves against
criminal charges brought by the U.S. Attorney's Office for the District of
Massachusetts (the "Pending Criminal Charges"), neither defendant Kelln nor
defendant Veldhuis any longer oppose the entry of a Judgment against each of them
in the above captioned action in the forms attached hereto (the "Judgments" or
"Draft Orders") and Defendants ask the Court to enter the Draft Orders incorporated
by reference herein, which, among other things:

1

A1102

(a) permanently restrain and enjoin Defendants from violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5], and Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77e(a), (c), 77a(a)];

(b) order that Defendants are permanently restrained and enjoined from directly or indirectly, including but not limited to, through an entity owned or controlled by defendant Kelln or defendant Veldhuis, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent defendant Kelln or defendant Veldhuis from purchasing or selling securities listed on a national securities exchange for her own personal account; and

(c) bar Defendants from participating in an offering of penny stock.

2. If the Draft Orders are entered by the Court, then the only remaining proceedings concerning Defendants Kelln and Veldhuis will be the determination of monetary sanctions in the forms of disgorgement, pre-judgment interest, and civil penalties, if any. That determination will be made by the Court and, in connection with that determination, Defendants Kelln and Veldhuis will not contest liability under the claims filed by Plaintiff. The Court's determination of monetary sanctions should occur after the conclusion of the Pending Criminal Charges so that: (a) the Court may take into account the resolution of the Pending Criminal Charges in assessing what monetary sanctions, if any, in this case are in the public interest; and (b)

A1103

Defendants Kelln and Veldhuis will be able to fully participate in the determination of monetary sanctions without waiving their Fifth Amendment privilege.

Respectfully submitted,

Dated: June 13, 2023

/s/ *Kevin B. Muhlendorf*
Kevin B. Muhlendorf (*pro hac vice*)
Pamela L. Signorello (BBO# 651483)
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Tel.: 202.719.7000
Fax: 202.719.7049
KMuhlendorf@wiley.law
PSignorello@wiley.law

*Counsel for Defendant Courtney Kelln*

/s/ Robert Knuts
Robert Knuts

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, NY 10004
Tel.: 212.202.2638
Fax: 212.202.4156
rknuts@shertremonte.com

*Counsel for Defendant Mike Veldhuis*

A1104

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2023, I filed the foregoing via the Court's ECF system, which electronically serves a copy on all counsel of record.

/s/ *Kevin B. Muhlendorf*

Kevin B. Muhlendorf

4

A1105

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

                   Plaintiff,

    v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                   Defendants.

Case No. 1:21-cv-11276-WGY

**[PROPOSED ORDER ENTERING] JUDGMENT AS TO**
**DEFENDANT COURTNEY KELLN**

The Securities and Exchange Commission having filed a Complaint and Defendant

Courtney Kelln ("Kelln") having entered a general appearance; consented to the Court's

jurisdiction over Defendant and the subject matter of this action; and declined to oppose entry

of this Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the

Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5

promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of

interstate commerce, or of the mails, or of any facility of any national securities exchange, in

1

A1106

connection with the purchase or sale of any security:

  (a)    to employ any device, scheme, or artifice to defraud;

  (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

  (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

  (a)    to employ any device, scheme, or artifice to defraud;

  (b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or to engage in any transaction, practice, or course of business

2

A1107

which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)     Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)     Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)     Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order

A1108

or (prior to the effective date of the registration statement) any public

proceeding or examination under Section 8 of the Securities Act [15 U.S.C.

§77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following

who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert

or participation with Defendant or with anyone described in (a).

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED, pursuant to

Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], that Defendant is permanently

restrained and enjoined from directly or indirectly, including but not limited to, through an

entity owned or controlled by Kelln, participating in the issuance, purchase, offer, or sale of

any security; provided, however, that such injunction shall not prevent Kelln from purchasing

or selling securities listed on a national securities exchange for her own personal account.

V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that

Defendant is barred from participating in an offering of penny stock, including engaging in

activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or

attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity

security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the

Exchange Act [17 C.F.R. §240.3a51-1].

4

A1109

VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant may be ordered to pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. In connection with any such determination of disgorgement and/or civil penalties, the Court may determine the amounts of the disgorgement and civil penalty after briefing by Defendant and the Securities and Exchange Commission and, if necessary, a hearing to resolve any material factual disputes before the Court. For purposes of that determination, Defendant will not contest liability under the claims filed by the Plaintiff, but will be permitted to challenge the remedies and sanctions sought by the Commission as a result of that liability.

VII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that nothing in this Judgment or in connection with Defendant's decision to decline opposing entry of Judgment shall constitute a waiver of Defendant's previously asserted invocation of her Fifth Amendment Right not to be a witness against herself or any other rights Defendant may have under the U.S. Constitution or the Federal Rules of Criminal Procedure concerning the pending criminal charges brought against her by the U.S. Attorney's Office for the District of Massachusetts.

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.

A1110

IX.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

Dated: _____, 2023

_____

UNITED STATES DISTRICT JUDGE

A1111

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

                  Plaintiff,

    v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                  Defendants.

Case No. 1:21-cv-11276-WGY

<u>**[PROPOSED ORDER ENTERING] JUDGMENT AS TO**
**DEFENDANT MIKE VELDHUIS**</u>

The Securities and Exchange Commission having filed a Complaint and Defendant

Mike Veldhuis ("Veldhuis") having entered a general appearance; consented to the Court's

jurisdiction over Defendant and the subject matter of this action; and declined to oppose entry

of this Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the

Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5

promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of

interstate commerce, or of the mails, or of any facility of any national securities exchange, in

1

A1112

connection with the purchase or sale of any security:

    (a)     to employ any device, scheme, or artifice to defraud;

    (b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    (a)     to employ any device, scheme, or artifice to defraud;

    (b)     to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or to engage in any transaction, practice, or course of business

2

A1113

which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)     Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)     Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)     Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order

3

A1114

or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. §77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], that Defendant is permanently restrained and enjoined from directly or indirectly, including but not limited to, through an entity owned or controlled by Veldhuis, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Veldhuis from purchasing or selling securities listed on a national securities exchange for his own personal account.

V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. §240.3a51-1].

4

A1115

VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant may

be ordered to pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil

penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3)

of the Exchange Act [15 U.S.C. § 78u(d)(3)]. In connection with any such determination of

disgorgement and/or civil penalties, the Court may determine the amounts of the disgorgement

and civil penalty after briefing by Defendant and the Securities and Exchange Commission and,

if necessary, a hearing to resolve any material factual disputes before the Court. For purposes of

that determination, Defendant will not contest liability under the claims filed by the Plaintiff, but

will be permitted to challenge the remedies and sanctions sought by the Commission as a result

of that liability.

VII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that nothing

in this Judgment or in connection with Defendant's decision to decline opposing entry of

Judgment shall constitute a waiver of Defendant's previously asserted invocation of his Fifth

Amendment Right not to be a witness against himself or any other rights Defendant may have

under the U.S. Constitution or the Federal Rules of Criminal Procedure concerning the pending

criminal charges brought against him by the U.S. Attorney's Office for the District of

Massachusetts.

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall

retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.

A1116

IX.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

Dated: _____, 2023

_____

UNITED STATES DISTRICT JUDGE

A1117

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>    **Plaintiff,** <br> **v.** <br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br>    **Defendants.** | **Civil Action No. 21-CV-11276-WGY** |

**PLAINTIFF'S RESPONSE TO KELLN'S AND VELDHUIS'S
NOTICE OF NON-OPPOSITION TO ENTRY OF JUDGMENT**

Defendants Kelln and Veldhuis request that the Court enter judgments against them as to liability, but put off consideration of appropriate monetary sanctions (disgorgement and penalty) until after the conclusion of any related criminal proceedings against them. Dkt. No. 315. Plaintiff Securities and Exchange Commission (the "Commission") does not oppose entry of judgment against defendants establishing liability. The Commission, however, respectfully requests that the Court enter defendants' proposed judgments and consider appropriate monetary sanctions upon motion of the Commission.

First, while defendants, both of whom are Canadian citizens residing in Canada, have been charged by criminal complaint, they have not yet been indicted. The Commission understands that, if indicted, extradition proceedings will likely take several years. Defendants are thus essentially seeking an indefinite postponement of this Court's consideration of appropriate monetary sanctions. This Court has already denied a stay of these proceedings pending resolution of any potential criminal proceeding and the same result should obtain here. *See* Dkt. No. 292.

Second, delaying resolution of appropriate monetary remedies for an indefinite term harms victims of defendants' fraud. The Commission plans to distribute disgorged funds to innocent investors after proposing a plan of distribution to be overseen by the Court.[1] Justice delayed is justice denied as to the victims of defendants' fraud.

Third, any sanctions eventually imposed in any criminal proceeding do not displace the remedies sought by the Commission. *See* Dkt. No. 315 at 2 (suggesting that the Court may take into account remedies eventually imposed in any potential criminal proceeding when assessing monetary sanctions in this civil case). The Department of Justice may eventually seek monetary sanctions if ultimately successful at trial or in the context of a plea agreement. But there is no reason that any potential future criminal sanctions must come first, such that defendants can use any such sanctions to argue against further monetary sanctions in this case. They offer no reason why the order of events cannot be flipped, such that defendants can use any monetary sanctions imposed in this case to argue against further monetary sanctions in any potential criminal proceeding.

For these reasons, the Commission respectfully requests that the Court enter defendants' proposed judgments and then consider and impose appropriate monetary sanctions upon motion of the Commission.

---

[1] *See* Dkt. Nos. 262 (Final Judgment as to former defendant Taylor) and 263 (Final Judgment as to former defendant Kaitz) at ¶V ("[t]he Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court").

A1119

Dated:  June 14, 2023

Respectfully submitted,

**SECURITIES AND EXCHANGE
COMMISSION**

By its Attorneys,

/s/ David H. London
Kathleen B. Shields (Mass. Bar No. 637438)
Alfred Day (Mass. Bar No. 654436)
David London (Mass. Bar No. 638289)
Nita K. Klunder (Mass. Bar No. 689304)
33 Arch Street, 24th Floor
Boston, MA  02110
Telephone: (617) 573-8904 (Shields); (617)
573-4537 (Day); (617) 573-8997 (London)
Fax: (617) 573-4590
Email: shieldska@sec.gov; daya@sec.gov;
londond@sec.gov

### CERTIFICATE OF SERVICE

I certify that on June 14, 2023, this motion was filed electronically with the Court. The filing will be sent to the registered participants as identified on the Notice of Electronic Filing and may also be accessed through the Court's ECF system.

/s/ David London
David London

A1120

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

                      Plaintiff,

    v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                      Defendants.

Case No. 1:21-cv-11276-WGY

## [~~PROPOSED~~ ORDER ENTERING] JUDGMENT AS TO DEFENDANT COURTNEY KELLN

The Securities and Exchange Commission having filed a Complaint and Defendant Courtney Kelln ("Kelln") having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; and declined to oppose entry of this Judgment:

### I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in

1

A1121

connection with the purchase or sale of any security:

 (a) to employ any device, scheme, or artifice to defraud;

 (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

 (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

 IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

<div align="center">II.</div>

 IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

 (a) to employ any device, scheme, or artifice to defraud;

 (b) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or to engage in any transaction, practice, or course of business

<div align="center">2</div>

<div align="center">A1122</div>

which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

    (a)    Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

    (b)    Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

    (c)    Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order

A1123

or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. §77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], that Defendant is permanently restrained and enjoined from directly or indirectly, including but not limited to, through an entity owned or controlled by Kelln, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Kelln from purchasing or selling securities listed on a national securities exchange for her own personal account.

V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. §240.3a51-1].

4

A1124

VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

may be ordered to pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil

penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3)

of the Exchange Act [15 U.S.C. § 78u(d)(3)]. In connection with any such determination of

disgorgement and/or civil penalties, the Court may determine the amounts of the disgorgement

and civil penalty after briefing by Defendant and the Securities and Exchange Commission and,

if necessary, a hearing to resolve any material factual disputes before the Court. For purposes of

that determination, Defendant will not contest liability under the claims filed by the Plaintiff, but

will be permitted to challenge the remedies and sanctions sought by the Commission as a result

of that liability.

VII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that nothing

in this Judgment or in connection with Defendant's decision to decline opposing entry of

Judgment shall constitute a waiver of Defendant's previously asserted invocation of her Fifth

Amendment Right not to be a witness against herself or any other rights Defendant may have

under the U.S. Constitution or the Federal Rules of Criminal Procedure concerning the pending

criminal charges brought against her by the U.S. Attorney's Office for the District of

Massachusetts.

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall

retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.

A1125

IX.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

Dated: _June 14_, 2023

_William G. Young_

UNITED STATES DISTRICT JUDGE

6

A1126

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

    v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                Defendants.

Case No. 1:21-cv-11276-WGY

### NOTICE OF CORRECTED FILING REGARDING DEFENDANT MIKE VELDHUIS' NOTICE OF NON-OPPOSITION TO ENTRY OF JUDGMENT

Defendant Mike Veldhuis ("Defendant") respectfully notifies this Court that in filing yesterday's Joint Notice of Non-Opposition to Entry of Judgment and his related [Proposed Order Entering] Judgement, Defendant inadvertently omitted reference to injunctive relief sought by plaintiff Securities and Exchange Commission concerning Section 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") in the [Proposed Order Entering] Judgement as to Defendant Mike Veldhuis. Defendant therefore respectfully asks this Court to accept this Notice of Corrected Filing and the attached [Proposed Order Entering] Judgement as to Defendant Mike Veldhuis.

1

A1127

Dated: June 14, 2023                Respectfully submitted,


                                      /s/ Robert Knuts
                                      Robert Knuts

                                      SHER TREMONTE LLP
                                      90 Broad Street, 23rd Floor
                                      New York, NY 10004
                                      Tel.: 212.202.2638
                                      Fax: 212.202.4156
                                      rknuts@shertremonte.com

                                      *Attorneys for Defendant Mike Veldhuis*

A1128

**CERTIFICATE OF SERVICE**

     I hereby certify that on June 14, 2023, I filed the foregoing via the Court's ECF system, which electronically serves a copy on all counsel of record.

                 /s/ Robert Knuts
                 Robert Knuts

A1129

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:21-cv-11276-WGY |
| v. | |
| FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R TAYLOR, | |
| Defendants. | |

## [PROPOSED ORDER ENTERING] JUDGMENT AS TO DEFENDANT MIKE VELDHUIS

The Securities and Exchange Commission having filed a Complaint and Defendant Mike Veldhuis ("Veldhuis") having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; and declined to oppose entry of this Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in

1

A1130

connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or to engage in any transaction, practice, or course of business

2

A1131

which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)    Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)    Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)    Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order

3

A1132

or (prior to the effective date of the registration statement) any public

proceeding or examination under Section 8 of the Securities Act [15 U.S.C.

§77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following

who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert

or participation with Defendant or with anyone described in (a).

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED, pursuant to

Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], that Defendant is permanently

restrained and enjoined from directly or indirectly, including but not limited to, through an

entity owned or controlled by Veldhuis, participating in the issuance, purchase, offer, or sale of

any security; provided, however, that such injunction shall not prevent Veldhuis from

purchasing or selling securities listed on a national securities exchange for his own personal

account.

V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that

Defendant is permanently restrained and enjoined from violating Section 13(d) of the

Exchange Act [15 U.S.C. §78m(d)] by, directly or indirectly, failing to file statements with

the Commission contained the information required by Schedule 13D [17 C.F.R. §240.13d-

101] within 10 days after acquiring directly or indirectly a beneficial ownership interest of

more than five percent of any equity security of a class of securities which is specific in

4

Exchange Act Rule 13d-1(i) [17 C.F.R. §240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. §240.3a51-1].

VII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant may be ordered to pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. In connection with any such determination of disgorgement and/or civil penalties, the Court may determine the amounts of the disgorgement and civil penalty after briefing by Defendant and the Securities and Exchange Commission and, if necessary, a hearing to resolve any material factual disputes before the Court. For purposes of that determination, Defendant will not contest liability under the claims filed by the Plaintiff, but will be permitted to challenge the remedies and sanctions sought by the Commission as a result of that liability.

A1134

VIII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that nothing in this Judgment or in connection with Defendant's decision to decline opposing entry of Judgment shall constitute a waiver of Defendant's previously asserted invocation of his Fifth Amendment Right not to be a witness against himself or any other rights Defendant may have under the U.S. Constitution or the Federal Rules of Criminal Procedure concerning the pending criminal charges brought against him by the U.S. Attorney's Office for the District of Massachusetts.

IX.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.

A1135

X.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

Dated: _____, 2023

_____

UNITED STATES DISTRICT JUDGE

7

A1136

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                Defendants.

Case No. 1:21-cv-11276-WGY

**NOTICE OF CORRECTED FILING REGARDING DEFENDANT MIKE**
**VELDHUIS' NOTICE OF NON-OPPOSITION TO ENTRY OF JUDGMENT**

    Defendant Mike Veldhuis ("Defendant") respectfully notifies this Court that in filing

yesterday's Joint Notice of Non-Opposition to Entry of Judgment and his related [Proposed Order

Entering] Judgement, Defendant inadvertently omitted reference to injunctive relief sought by

plaintiff Securities and Exchange Commission concerning Section 13(d) of the Securities

Exchange Act of 1934 ("Exchange Act") in the [Proposed Order Entering] Judgement as to

Defendant Mike Veldhuis. Defendant therefore respectfully asks this Court to accept this Notice

of Corrected Filing and the attached [Proposed Order Entering] Judgement as to Defendant Mike

Veldhuis.

1

A1137

Dated: June 14, 2023                    Respectfully submitted,


                                        /s/ Robert Knuts
                                        Robert Knuts

                                        SHER TREMONTE LLP
                                        90 Broad Street, 23rd Floor
                                        New York, NY 10004
                                        Tel.: 212.202.2638
                                        Fax: 212.202.4156
                                        rknuts@shertremonte.com

                                        *Attorneys for Defendant Mike Veldhuis*

A1138

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 14, 2023, I filed the foregoing via the Court's ECF system, which electronically serves a copy on all counsel of record.

/s/ Robert Knuts
Robert Knuts

A1139

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

    v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                Defendants.

Case No. 1:21-cv-11276-WGY

**[PROPOSED ORDER ENTERING] JUDGMENT AS TO**
**DEFENDANT MIKE VELDHUIS**

The Securities and Exchange Commission having filed a Complaint and Defendant

Mike Veldhuis ("Veldhuis") having entered a general appearance; consented to the Court's

jurisdiction over Defendant and the subject matter of this action; and declined to oppose entry

of this Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the

Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5

promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of

interstate commerce, or of the mails, or of any facility of any national securities exchange, in

1

A1140

connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or to engage in any transaction, practice, or course of business

2

A1141

which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)   Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)   Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)   Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order

3

A1142

or (prior to the effective date of the registration statement) any public

proceeding or examination under Section 8 of the Securities Act [15 U.S.C.

§77h].

     IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following

who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert

or participation with Defendant or with anyone described in (a).

<div align="center">IV.</div>

     IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED, pursuant to

Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], that Defendant is permanently

restrained and enjoined from directly or indirectly, including but not limited to, through an

entity owned or controlled by Veldhuis, participating in the issuance, purchase, offer, or sale of

any security; provided, however, that such injunction shall not prevent Veldhuis from

purchasing or selling securities listed on a national securities exchange for his own personal

account.

<div align="center">V.</div>

     IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that

Defendant is permanently restrained and enjoined from violating Section 13(d) of the

Exchange Act [15 U.S.C. §78m(d)] by, directly or indirectly, failing to file statements with

the Commission contained the information required by Schedule 13D [17 C.F.R. §240.13d-

101] within 10 days after acquiring directly or indirectly a beneficial ownership interest of

more than five percent of any equity security of a class of securities which is specific in

<div align="center">4</div>

<div align="center">A1143</div>

Exchange Act Rule 13d-1(i) [17 C.F.R. §240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. §240.3a51-1].

VII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant may be ordered to pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. In connection with any such determination of disgorgement and/or civil penalties, the Court may determine the amounts of the disgorgement and civil penalty after briefing by Defendant and the Securities and Exchange Commission and, if necessary, a hearing to resolve any material factual disputes before the Court. For purposes of that determination, Defendant will not contest liability under the claims filed by the Plaintiff, but will be permitted to challenge the remedies and sanctions sought by the Commission as a result of that liability.

A1144

VIII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that nothing in this Judgment or in connection with Defendant's decision to decline opposing entry of Judgment shall constitute a waiver of Defendant's previously asserted invocation of his Fifth Amendment Right not to be a witness against himself or any other rights Defendant may have under the U.S. Constitution or the Federal Rules of Criminal Procedure concerning the pending criminal charges brought against him by the U.S. Attorney's Office for the District of Massachusetts.

IX.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.

A1145

X.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.


Dated: _____, 2023

_____

UNITED STATES DISTRICT JUDGE

A1146

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                               Plaintiff,<br><br>    v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R TAYLOR,<br><br>                               Defendants. | Case No. 1:21-cv-11276-WGY |

**JUDGMENT AS TO**
**DEFENDANT MIKE VELDHUIS**

The Securities and Exchange Commission having filed a Complaint and Defendant Mike Veldhuis ("Veldhuis") having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; and declined to oppose entry of this Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in

1

A1147

connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or to engage in any transaction, practice, or course of business

2

A1148

which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)     Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)     Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)     Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order

3

A1149

or (prior to the effective date of the registration statement) any public

proceeding or examination under Section 8 of the Securities Act [15 U.S.C.

§77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following

who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert

or participation with Defendant or with anyone described in (a).

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED, pursuant to

Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], that Defendant is permanently

restrained and enjoined from directly or indirectly, including but not limited to, through an

entity owned or controlled by Veldhuis, participating in the issuance, purchase, offer, or sale of

any security; provided, however, that such injunction shall not prevent Veldhuis from

purchasing or selling securities listed on a national securities exchange for his own personal

account.

V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that

Defendant is permanently restrained and enjoined from violating Section 13(d) of the

Exchange Act [15 U.S.C. §78m(d)] by, directly or indirectly, failing to file statements with

the Commission contained the information required by Schedule 13D [17 C.F.R. §240.13d-

101] within 10 days after acquiring directly or indirectly a beneficial ownership interest of

more than five percent of any equity security of a class of securities which is specific in

A1150

Exchange Act Rule 13d-1(i) [17 C.F.R. §240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. §240.3a51-1].

VII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant may be ordered to pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. In connection with any such determination of disgorgement and/or civil penalties, the Court may determine the amounts of the disgorgement and civil penalty after briefing by Defendant and the Securities and Exchange Commission and, if necessary, a hearing to resolve any material factual disputes before the Court. For purposes of that determination, Defendant will not contest liability under the claims filed by the Plaintiff, but will be permitted to challenge the remedies and sanctions sought by the Commission as a result of that liability.

5

A1151

VIII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that nothing in this Judgment or in connection with Defendant's decision to decline opposing entry of Judgment shall constitute a waiver of Defendant's previously asserted invocation of his Fifth Amendment Right not to be a witness against himself or any other rights Defendant may have under the U.S. Constitution or the Federal Rules of Criminal Procedure concerning the pending criminal charges brought against him by the U.S. Attorney's Office for the District of Massachusetts.

IX.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.

A1152

X.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

Dated: ___June 21_____, 2023

_____
/s/ William G. Young

UNITED STATES DISTRICT JUDGE

7

A1153

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>      **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>                              **Defendants.** | **Civil Action No. 21-CV-11276-WGY** |

### DEFENDANT JACKSON T. FRIESEN'S MOTION IN LIMINE TO EXCLUDE "Q" RECORDS AND PURPORTED EXPERT TESTIMONY

Pursuant to Rule 104(a) of the Federal Rules of Civil Procedure and Rules 16.5(c) and (d)(12) of this Court's Local Rules, Defendant Jackson T. Friesen ("Mr. Friesen"), through his attorneys, respectfully moves *in limine* to exclude the use of material from the "Sharp Group Servers" seized by FBI agents in Curacao (the "Q Records") as evidence and of the testimony of Plaintiff's expert. Mr. Friesen hereby objects to the use of the Q Records as evidence and testimony of Plaintiff's expert in accordance with Rules 16.5(c) and (d)(12) of this Court's Local Rules. The Q Records and the testimony of Plaintiff's expert should be excluded because (i) Plaintiff has no reasonable expectation of authenticating the Q Records as required by Rules 803(6) and 901(a) of the Federal Rules of Evidence; (ii) the probative value of the Q Records is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury; and (iii) Plaintiff's expert report improperly and solely concerns legal conclusions. In support, Mr. Friesen submits his Memorandum of Law, which is incorporated below. Mr. Friesen requests that this Court hear

1

A1154

the issues raised in this Motion at oral argument on a date in advance of September 11, 2023, to be determined by the Court.

**Introduction**

As this Court aptly addressed during argument on the motions for summary judgment, the cornerstone of Plaintiff's case is the material derived from computer servers maintained by alleged co-conspirator, criminal mastermind, and current fugitive Fred Sharp.  As reflected in the Pretrial Memorandum, the critical evidentiary issue is the admissibility of material from the "Sharp Group Servers" seized by FBI agents in Curacao (the "Q Records").  ECF 320, at 14, 28.  Those servers are the source of Plaintiff's ONLY purported evidence of *both* communications, and tallies of stock transactions. Further, Plaintiff expressly intends to use these Q Records to support not only its claims of liability, but also the true driving force behind this case: Plaintiff's demand for massive disgorgement.  Plaintiff bases its claims of disgorgement on Fred Sharp's unauthenticated and unexplained parsing and divvying up of proceeds of sales of stock among various individuals. Those entries, Plaintiff insists, are sufficient evidence of Mr. Friesen's share of profits to support a claim of disgorgement (along with other Defendants), and would shift the burden to Mr. Friesen to show he did *not* receive those proceeds.  Instead of obtaining and presenting evidence that funds were actually paid to Mr. Friesen or for his benefit, and that Mr. Friesen should therefore have to repay or disgorge them, Plaintiff insists that the fictional accounts contained in the Q Records and maintained exclusively by fugitive Fred Sharp, are sufficient to support a claim for, in Mr. Friesen's case, a disgorgement award of $9 million.

The only way to address fairly the admissibility of the Q Records is to do so well in advance of trial.  This Court has already expressed its view that Plaintiff's evidence is insufficient to satisfy the requirements for admissibility as a business record. If this Court adheres to that view and rules

2

A1155

accordingly, Plaintiff may well conclude that the trial should not proceed or the Parties may be able to reach a settlement. Even if we must proceed to a trial, the evidence to be elicited would be narrowed, and the length of the trial properly and substantially reduced. Given these circumstances, Mr. Friesen requests that this Court adjust the current schedule to set *an evidentiary hearing* to begin on or after September 11, 2023, instead of the trial. Once this critical evidentiary issue concerning the Q Records is resolved, the Parties can attempt to resolve the case entirely, or work with this Court to promptly reschedule the trial.

Defendant further requests that, to facilitate the orderly progress of this case and allow proper preparation by all Parties, the Court conduct a conference by telephone or virtually on this application on or before August 15, 2023.

**1. The Q Records are the only evidence of an alleged unlawful stock acquisition and sales by Mr. Friesen, and their probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury.**

Plaintiff acknowledges that the accumulation and sales of stock at issue were conducted "through nominee entities" "administered by" fugitive Fred Sharp (the "Sharp Entities"). *See e.g.*, Pretrial Brief, ECF No. 320, at 3. According to Plaintiff, fugitive Fred Sharp offered and provided such services to various clients and used his own raft of entities and employees to conduct those transactions. *See* Plaintiff's Memorandum of Law ("Pl.Mem.") ECF No. 267, at 11. Through evidence concerning the Sharp Entities and their dealings (*i.e.*, records from brokerage firms and transfer agents) Plaintiff believes it will be able to demonstrate that *the Sharp Entities* acquired and sold stock in transactions that allegedly violated the federal securities laws.

Critically, **none** of those business records provide evidence of a connection between the transactions and Mr. Friesen. As illustrated by the contents of the Murphy Declaration (ECF No. 300), the corporate records, brokerage records and documentation from the transfer agents do not

A1156

include Mr. Friesen's name; they reflect the activities of fugitive Fred Sharp's entities and employees. Neither Mr. Friesen, nor any entity that he allegedly controlled, entered into any of those purchases or sales of stock.

Given the fact that fugitive Fred Sharp engaged in and/or directed the transactions, the critical and plainly disputed issue in the case is whether Plaintiff can prove that Mr. Friesen is responsible and liable for any of those transactions. Plaintiff's entire case against Mr. Friesen, therefore, requires that it present sufficient evidence that Mr. Friesen knew of and was involved in those transactions to such an extent that he (as opposed to fugitive Fred Sharp) is liable for them and liable for the alleged failures to disclose them. Plaintiff then, in relation to claims of violations of Section 13(d), has to go the additional step of proving that Mr. Friesen is liable not only for transactions that allegedly relate to him, but also for the transactions made by other Defendants with whom he supposedly formed a "group."

Plaintiff's witness and exhibit lists make abundantly clear that it intends to rely on those Q Records, both accounting documents and supposed communications, to prove that Mr. Friesen is responsible and liable for fugitive Fred Sharp's purchases and sales of stock. In fact, Plaintiff's pretrial submissions reflect that its entire *factual* presentation, other than the Q Records, only consists of its three cooperating witnesses combined with Mr. Friesen's Fifth Amendment assertions. That evidence, without the unreliable Q Records, proves nothing other than Mr. Friesen worked at times with Mr. Veldhuis and Mr. Sexton, beginning when he was about 19 years old. The declarations of Plaintiff's cooperating witnesses contain only vague and conclusory assertions concerning Mr. Friesen, stating that they somehow "knew" or "understood" that Mr. Friesen was a "partner" with Mr. Veldhuis and Mr. Sexton at some vague point in relation to some unnamed transactions (ECF 309 at 3). Even if those statements, which are likely inadmissible hearsay or

A1157

pure speculation, were admissible, they suggest only that Mr. Friesen was someone who worked with or for other Defendants, as opposed to someone who was aware of and a participant in the alleged machinations engaged in by fugitive Fred Sharp.

"Although relevant evidence is admissible, the Court may still exclude it 'if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Teva Pharm. Int'l GmbH v. Eli Lilly & Co.*, 2022 WL 10489059, at *6 (D. Mass. Oct. 17, 2022) (quoting Fed. R. Evid. 403). Rule 403 "gives the district judge ample discretion to exclude testimony [or evidence] where its probity is substantially outweighed by prejudice, confusion, or the like." *Sailor Inc. F/V v. City of Rockland*, 428 F.3d 348, 355 (1st Cir. 2005) (exclusion of evidence that vessel captain was involved with prior sinkings of two other vessels was warranted on grounds that the probative value was substantially outweighed by unfair prejudice because the party seeking admission lacked evidence showing any wrongdoing in connection with the prior sinkings). "Courts have broad discretion to weigh the probative value and any factors counseling against admissibility in making evidentiary rulings." *Doe v. Sanderson*, 2021 WL 2593776, at *1 (D. Mass. June 24, 2021) (citing *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008)); *United States v. Brissette*, 2020 WL 718294, at 36 (D. Mass. Feb. 12, 2020) ("Had the Court known that the government would not ultimately offer evidence connecting [Defendant] Sullivan to the [subject] events, or had the government not represented it had such evidence, the Court at a minimum would not have permitted the jury to consider the [subject events] evidence against Sullivan.").

Aside from the above-mentioned dearth of direct testimony and evidence, and its purported expert witness, Plaintiff intends to present no less than *six witnesses* to testify just about the Q

5

A1158

Records. Doc. 320, at 14-15. Those witnesses will supposedly testify concerning the seizure of the servers in Curacao, how the servers were then "processed," "decrypted" and "exported" by the FBI, and how Plaintiff's own employee "summarizes" the materials found within the servers. Plaintiff plainly intends to inundate and regale the jury with tales of the international intrigue and technical machinations involved in obtaining and "decrypting" the Q Records. Through likely days of such testimony, which would constitute the bulk of its presentation to the jury, Plaintiff intends to force Mr. Friesen (and all Defendants) to battle in the courtroom to prevent those unauthenticated and fictional records created and maintained by the alleged mastermind of this scheme and current fugitive, from being admitted as a business record. Plaintiff well knows that, through that process, it will be able to get before the jury a substantial quantity of irrelevant evidence and prejudicial inferences regarding tenuous connections to the "bad guy" Fred Sharp. Regardless of this Court's eventual ruling, the damage will be done with the jury, irreparably prejudicing Mr. Friesen and all Defendants. *See Teva Pharm.*, 2022 WL 10489059, at *6 ("Although relevant evidence is admissible, the Court may still exclude it if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.") (internal citations omitted).

**2. Plaintiff has not and cannot present evidence sufficient to satisfy the business record exception to the prohibition against hearsay.**

Federal Rule of Evidence 803(6) provides that records of "a regularly conducted activity" may be admissible if (1) "the record was made at or near the time by—or from information transmitted by—someone with knowledge"; (2) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;" (3) "making the record was a regular practice of that activity;" (4) the testimony of a custodian,

6

A1159

another qualified witness, or where applicable a certification shows the above conditions are
satisfied; and (5) "neither the source of information nor the method or circumstances of preparation
indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(A)-(E). Where business records cannot
be produced with testimony from the actual custodian of those records—the "third party
exception" to Rule 803(6)(A)-(E)—to be admissible "[t]he records must have been incorporated
into the records of the offering party; the business must rely on the accuracy of the contents of the
documents; and there must be circumstances which indicate that the records are trustworthy."
*United States v. Hughes*, 44 F. Supp. 3d 169, 173 (D. Mass. 2014) (citing *United States v. Doe*,
960 F.2d 221, 223 (1st Cir. 1992)). In short, whether a compilation of records from third parties
satisfies the business records exception under Rule 803(6)(A)-(E) turns on the question "whether
the records in question are reliable enough to be admissible." *U.S. Bank Tr., N.A. as Tr. for LSF9
Master Participation Tr. v. Jones*, 925 F.3d 534, 538 (1st Cir. 2019) (internal citations omitted).
"In answering that question [of reliability], we are mindful that the 'reliability of business records
is said variously to be supplied by systematic checking, by regularity and continuity which produce
habits of precision, by actual experience of business in relying upon them, or by a duty to make an
accurate record as part of a continuing job or occupation.'" *Id.* (quoting Fed. R. Evid. 803 advisory
committee's note to 1972 proposed rule); *see e.g.*, *United States v. Jackson*, 208 F.3d 633, 638
(7th Cir. 2000) ("[C]omputer data compilations are admissible as business records under Fed. R.
Evid. 803(6) if a proper foundation as to *the reliability of the records* is established.").

    With respect to the admissibility of the Q Records, Plaintiff intends to offer chain of
custody evidence stemming from the seizure, but has no evidence regarding the reliability of the
entries in those vast records that would satisfy the requisites for admission as a business record.
*US. Bank Tr.*, 925 F.3d at 538 (The "reliability of business records is said variously to be supplied

7

A1160

by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation."). Plaintiff insists that testimony from Fedir Nikolayev, who designed the overall structure of the electronic folders and files found on the seized servers, is sufficient to authenticate the Q Records. However, Mr. Nikolayev admittedly has no knowledge of data entry into the Q Records by fugitive Fred Sharp or anyone else. *See* Fed. R. Evid. 803(6)(D) (Business records must be accompanied by the testimony of the custodian or another qualified witness.); *see e.g. Hughes*, 44 F. Supp. 3d at 173 (Where no such testimony is present, "[t]he records must have been incorporated into the records of the offering party; the business must rely on the accuracy of the contents of the documents; and there must be circumstances which indicate that the records are trustworthy."). Mr. Nickolayev can literally only testify to the fact that he built the house, but never saw a single piece of furniture moved into it, let alone who moved the furniture. *See id*. He was not involved in receiving the information input into the system, nor can he testify as to when the information was entered or by whom, or whether the person entering the information did so with a duty to accurately record business information – let alone whether any of the information is actually accurate. To the contrary, Mr. Nikolayev's testimony will actually prove the opposite: the entries were made by fugitive Fred Sharp, or those acting at his direction, and the entries were *not an accurate recordation* of any actual transaction. *See* ECF No. 287-4 at 8-11.

Plaintiff is not able to present any witness that can explain the basis for fugitive Fred Sharp's entries, whether the entries were made contemporaneously with the events in question, or whether the person making the entries possessed a duty to record the information accurately. The evidence will confirm that the data is *not* an accurate reflection of stock ownership or stock sales;

it does not correspond to the Plaintiff's own evidence, whether brokerage or transfer agent records, concerning the ownership and sales of stock.  The Q Records are unquestionably a fiction, bearing no relationship to the Plaintiff's own evidence of actual transactions.  Fugitive Fred Sharp's entries lack any credible foundation, and they result from and embody unknown and inadmissible hearsay that is not subject to cross examination. Viewed from any perspective, the Q Records will remain nothing but the unexplained personal journals of fugitive and alleged criminal mastermind Fred Sharp.

### 3. Plaintiff's purported expert testimony should be precluded.

The report of Plaintiff's expert contains no information that could properly be the subject of expert testimony. The bulk of the expert's report is devoted to iteration of securities laws, an area about which the witness would not be permitted to testify. *See e.g.*, *S.E.C. v. Goldsworthy*, 2008 WL 2943398, at *2 (D. Mass. Jan. 3, 2008) ("[A]n expert opinion must be helpful to the trier of fact and should not be admitted where it would merely tell the jury what result to reach.") (internal citations omitted).

That prohibition would also apply to the proffered conclusion that the "Veldhuis Control Group was required to submit a Schedule 13D to the Commission (on becoming at least a 5% holder of Stevia First shares)."  Whether a Schedule 13D must be filed is a legal issue and whether individuals constitute a "group" is a matter of fact for the jury to determine.  The Plaintiff's witness is not permitted simply to accept and repeat the Plaintiff's allegations and then on that basis opine to the jury that a "group" existed for purposes of Section 13(d).  The proposed testimony does not comport with Federal Rule of Evidence 702 because it does not contain any "specialized knowledge" that will "help the trier of fact to understand the evidence or to determine a fact in issue."

A1162

**REQUEST FOR ORAL ARGUMENT**

Mr. Friesen believes that oral argument may assist the court and wishes to be heard at oral argument concerning the issues raised in this Motion. Therefore, pursuant to Local Rule 7.1(d) of this Court's Local Rules and Rule 104(a) of the Federal rules of Evidence, Mr. Friesen hereby requests that this Court schedule a date and time in advance of September 11, 2023, to be determined by the Court, in order that Mr. Friesen be heard.

**Conclusion**

The Q Records are nothing more than unauthenticated information, not kept in the ordinary course of any legitimate business, and compiled by someone the Government has charged with various crimes and who is currently a fugitive from justice. The Q Records are extremely prejudicial to Mr. Friesen, not because they actually show any evidence of wrongdoing, but because they are so tainted by fugitive Fred Sharp and the perception that the Plaintiff's apprehension of these materials somehow unlocked a sprawling international criminal scheme, that anyone caught in the cross-fire will inevitably be dragged down as a co-conspirator. Given the extremely tenuous connections as noted above, the risk of such a perception is plainly unfair to Mr. Friesen, and all Defendants – and clearly more so if the matter is not decided long before trial. Accordingly, for the reasons stated above, Mr. Friesen respectfully requests that the Q Records be precluded, that Plaintiff's expert be precluded, that this Court schedule a telephonic or virtual conference on or before August 15, 2023 to help the parties plan to address this issue, and that if this Court finds a hearing necessary to decide this motion, it be set for the week of September 11, 2023 and the trial date continued.

WHEREFORE, Defendant Jackson T. Friesen hereby requests that this Court ORDER:

1. Defendant Jackson T. Friesen's Motion *in Limine* GRANTED.

2. Any Material from the "Sharp Group Servers" seized by FBI agents in Curacao (the "Q Records") excluded from admission at trial; and

10

A1163

3.  The testimony of Plaintiff Securities and Exchange Commission's expert precluded from trial.

Dated: August 10, 2023

Respectfully submitted,

Jackson T. Friesen
By his attorneys,

*/s/ Maranda E. Fritz*
Maranda E. Fritz (*Pro Hac Vice*)
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: (646) 584-8231
Email: Maranda@fritzpc.com

*and*

Timothy J. Fazio, BBO # 654157
MANNING GROSS + MASSENBURG LLP
125 High Street
6th Floor, Oliver Street Tower
Boston, MA 02110
Telephone: (617) 670-8800
Email: TFazio@mgmlaw.com

Counsel for Jackson T. Friesen

A1164

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule 7.1(a)(2), I hereby certify that I, counsel for the moving party, conferred with counsel in a good faith effort to resolve or narrow the issues raised by this motion.

_/s/ Timothy J. Fazio_
Timothy J. Fazio

A1165

**CERTIFICATE OF SERVICE**

     I hereby certify that a true copy of the above document was served upon the attorney of record for each party by ECF on August 10, 2023.

                               _/s/ Timothy J. Fazio_____
                                 Timothy J. Fazio

A1166

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**SECURITIES AND EXCHANGE**
**COMMISSION,**
                                **Plaintiff,**

    **v.**

**FREDERICK L. SHARP, ZHIYING**
**YVONNE GASARCH, COURTNEY**
**KELLN, MIKE K. VELDHUIS, PAUL**
**SEXTON, JACKSON T. FRIESEN,**
**WILLIAM T. KAITZ, AVTAR S.**
**DHILLON, and GRAHAM R. TAYLOR,**


                    **Defendants.**

**Civil Action No. 21-CV-11276-WGY**

## <u>ORDER</u>

Having considered Defendant Jackson T. Friesen's Motion *in limine* to Exclude "Q"

Records and Purported Expert Testimony and the hearing on the Motion, it is HEREBY

ORDERED:

1. Defendant Jackson T. Friesen's Motion *in limine* is GRANTED.

2. Any Material from the "Sharp Group Servers" seized by FBI agents in Curacao (the "Q Records") is excluded from admission at trial; and

3. The testimony of Plaintiff Securities and Exchange Commission's expert is excluded from trial.


Dated: This ___ day of _____, 2023    _____
                                                                Honorable

1

A1167

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE         ¶:
COMMISSION,                     ¶
                                ¶:
        Plaintiff,              ¶        No. 1:21-cv-11276-WGY
                                ¶
        v.                      ¶:
                                ¶:
YVONNE GASARCH, *et al.*        ¶:
                                ¶:
        Defendants.             ¶:

## YVONNE GASARCH'S MOTION IN LIMINE TO EXCLUDE "Q" RECORDS AND PURPORTED EXPERT TESTIMONY

Defendant Yvonne Gasarch moves in limine to exclude "Q" records and purported expert testimony proffered by the SEC. Mrs. Gasarch specifically adopts and incorporates by reference the arguments made by defendant Jackson Friesen (D.E. 329).

I.      FACTS FROM "AUTHENTICATING" WITNESS

In order to further factually show that the "Q" records cannot be authenticated and do not meet the "business records" exception to the rule against hearsay, Mrs. Gasarch attaches the deposition transcript of Fedir Nikolayev, the only witness the SEC claims can authenticate the proposed "Q" records. The testimony of Mr. Nikolayev (who will not be testifying in court, but rather through his deposition) specifically establishes that the Q system is unauthenticated, not maintained in the "ordinary" course of business and as far from reliable as can be. \

Specifically, Mrs. Gasarch calls the Court's attention to this specific testimony of Mr. Nikolayev, the IT person who worked for Fred Sharp for some twenty years:

- Mr. Nikolayev set up a server for Mr. Sharp in Curacao (Tr., p. 45);

1

A1168

- Mr. Nikolayev set up an accounting and communications system for Mr. Sharp called the "Q" system (Tr., pp. 41-44);

- "The system was a multiuser system. And it had three types of users; Administrators; Employees; staff; and customers." (Tr., p. 45).

- "So administrators would be Mr. Sharp and myself, because I needed to like – I don't know – check things for him. *The administrator would have full access to any information, any – do any kind of work*." (Tr., pp. 45-56).

- "The staff would be limited; *Mr. Sharp could select what bank and what clients staff could see*. So like not every staff member could see all the banks and all of the clients." (Tr., p. 46).

- As administrators, he and Mr. Sharp had "full access." (Tr., p. 46).

- A difference between staff and administrator is that the staff "*does not have the control of like how the commissions are calculated*." (Tr., p. 48).

- The administrator "can see the calculation and details how everything is calculated. And *they can manually adjust all of the numbers between them*." (Tr., p. 50).

- At a certain point, Mr. Sharp asked to remove information from the server. "I would take balances of everything and then just clear it as of the first of January. Basically just going to keep the balance and the holdings, *but did jot contain any record of what happened before – before that date*."

- Mr. Sharp (only) had remote access to the server from his laptop. (Tr., pp. 54-55).

- Mr. Sharp asked Mr. Nikolayev to work on an encrypted communications network that Mr. Nikolayev believed was run on the same server as the accounting system. (Tr., p. 62).

A1169

- All the decisions on the encrypted network came from Mr. Sharp.  (Tr., p. 64).

- There was a code name "Wires" on the encrypted network but Mr. Nikolayev did not know who it was connected to.  (Tr., p. 76).

- "Administrator access has access to all – all accounts and all banks.  And administrator access gives us ability to control who has access to what."  (Tr., p. 212).

- Emails to or from "Wires" (which the SEC contends always was Mrs. Gasarch) could have been written by anyone with access to the Wires account and possibly Mr. Sharp. (Tr., p. 221).

## II.    LEGAL ARGUMENT

As asserted by Mr. Friesen, the records cannot be authenticated by Mr. Nikolayev.  He was not located in Canada and made none of the entries the SEC seeks to introduce.

As further asserted by Mr. Friesen, the "Q" records do not meet the standards of admission under the business records exception to the hearsay rule.

Rule 803(6), known as the business records  exception, authorizes the admission of certain documents under an exceptionto the usual prohibition against the admission of hearsay statements…"Rule 803(6)  provides that "[a] record of an act, event, condition, opinion, or diagnosis" is "not excluded by the rule against hearsay" if:

'(A) the record was made at or near the time by-or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

A1170

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."

Nothing in Mr. Nikolayev's testimony establishes that he knows when and under what circumstances the records in the Q system were made, who made them, and even whether Mr. Sharp's allegedly criminal activities were a "regular practice" of his business. On the other hand, his testimony establishes that the source of the information and the circumstances indicate an utter lack of trustworthiness. It is quintessential "garbage in, garbage out" and the jury should not be subjected to such evidence. Moreover, Mrs. Gasarch should not face the harsh consequences of securities fraud liability based on this evidence.

Finally, Mrs. Gasarch specifically adopts and incorporates the argument of Mr. Friesen why the testimony of the purported "expert' should be precluded. This Court will instruct the jury on the relevant claims and definitions and it is their province, not an "expert's", to determine liability.

da. *SEC v. Lee et al.*, No. 1:21-cv-11997 (D. Mass. Dec. 9, 2021); *SEC Charges Three Canadians with Securities Fraud*, Press Release, *available at* https://www.sec.gov/litigation/litreleases/2021/lr25287.htm (Dec. 10, 2021). Likewise, Luis Carillo, another individual alleged to have possibly had communications with Mrs. Gasarch (D.E. 195-1 ¶ 61.b), was similarly charged by the SEC and a resident of Mexico. *SEC v. Carillo*, No. 1:21-cv-11272 (D. Mass. filed August 4, 2021); *SEC Charges Four in International Microcap Scheme*, Press Release, *available at* https://www.sec.gov/litigation/litreleases/2021/lr25161.htm (Aug. 9, 2021). These alleged details are important because they reveal that, not only was Ms. Gasarch outside the United States for purposes of her involvement in the alleged scheme, but that her colleagues and professional contacts were outside the United States as well. Moreover, the Amended Complaint does not allege that Ms. Gasarch ever met with clients one-on-one, traveled for her position, or

prepared financial statements or regulatory filings.  The allegations largely place her in an

administrative role, conducting wire transfers and sending emails.  The reasonableness inquiry

further supports that a finding of personal jurisdiction is unwarranted here given Ms. Gasarch's

continued residence outside the United States.  *See Sharef*, 924 F. Supp. 2d ay 548 ("Steffen's

lack of geographic ties to the United States, his age, his poor proficiency in English, and the

forum's diminished interest in adjudicating the matter, all weigh against personal jurisdiction.").

<u>**CONCLUSION**</u>

For the reasons set forth, Mrs. Gasarch respectfully requests that this Court exclude the

SEC from introduction evidence from the "Q" system and also exclude the proposed expert's

testimony

Respectfully submitted,

YVONNE GASARCH

 By her Attorney,

/s/Karen A. Pickett

_____
Karen A. Pickett (BBO # 633801)
PICKETT LAW OFFICES, PC
125 High St., 26th Floor
Boston, MA  02110
617 423 0485
kpickettlaw@gmail.com

August 24, 2023

A1172

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 24, 2023.

*/s/ Karen A. Pickett*

A1173

Fedir Nikolayev
2/2/2023

**Page 1**

```
1          UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
2
             Case No. 21-cv-11276-WGY
3
   SECURITIES AND EXCHANGE COMMISSION,
4
                  Plaintiff,
5
       vs.
6
   FREDERICK L. SHARP, ZHIYING YVONNE
7  GASARCH, COURTNEY KELLN, MIKE K.
   VELDHUIS, PAUL SEXTON, JACKSON T.
8  FRIESEN, WILLIAM T. KAITZ, AVTAR S.
   DHILLON, and GRAHAM R. TAYLOR,
9
                  Defendants.
10
             UNITED STATES DISTRICT COURT
11         THE EASTERN DISTRICT OF NEW YORK
12           Case No. 22-cv-4674 (E.D. N.Y.)
13 SECURITIES AND EXCHANGE COMMISSION,
                  Plaintiff,
14
       vs.
15 GEORGE STUBOS, et al.,
16                Defendants.
17
18         The videotaped in-person and remote
19 deposition of FEDIR NIKOLAYEV, called as a witness
20 by the Plaintiff, before Juan Carlos Ortíz, Esquire,
21 Notary Public, Dominican Republic, on Thursday,
22 February 2, 2023, at the law offices of Ortiz &
23 Compres, Santiago, Dominican Republic, commencing at
24 9:53 a.m.
25 Reported by:  Dennis Zambataro, RPR
```

**Page 2**

```
1  APPEARANCES:
2  On behalf of the Plaintiff:
3  DAVID H. LONDON, ESQUIRE (in person)
   KATHLEEN B. SHIELDS, ESQUIRE (in person)
4  Securities and Exchange Commission
   Boston Regional Office
5  33 Arch Street, 24th Floor
   Boston, MA 02110
6  617.573.8997 Phone (London)
   617.573.8904 Phone (Shields)
7  LondonD@sec.gov
   ShieldsKa@sec.gov
8
   On behalf of Defendant Yvonne Gasarch:
9
   KAREN PICKETT, ESQUIRE (remote)
10 Pickett Law Offices
   125 High Street
11 Floor 26
   Boston, MA 02110
12 Main Phone: 617.423.0485
   125 High St
13 Floor 26
   Boston, MA 02110
14 617.423.0485 Phone
   kpickettlaw@gmail.com
15
   On behalf of Defendant Courtney Kelln:
16
   KEVIN D. MUHLENDORF, ESQUIRE (remote)
17 Wiley Rein LLP
   2050 M Street NW
18 Washington, DC 20036
   202.719.7000 Phone
19 kmuhlendorf@wiley.law
   On behalf of Defendant Mike Veldhuis:
20
21 ROBERT KNUTS, ESQUIRE (remote)
   Sher Tremonte
22 90 Broad Street
   23rd Floor
23 New York, New York 10004
   212.202.2638 Phone
24 rknuts@shertremonte.com
25
```

**Page 3**

```
1  APPEARANCES: (Continued)
2  On behalf of Defendant George Stubos:
3  ZACHARIA (ZACK) CHIBANE, ESQUIRE (remote)
   Spears Imes
4  767 Third Avenue
   New York, NY 10017
5  212.213.6996 Phone
   zchibane@spearsimes.com
6
7
8  Also present:  Juan Carlos Ortíz, Esquire, Notary
                  Public, Dominican Republic
9
             Andrea García, Esquire
10           Jiménez Peña
             (Interpreted the oath)
11
             Videographer, Franklin Bencosme
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                  I N D E X
2  Witness:  FEDIR NIKOLAYEV           Page
3  Examination by Mr. London            11, 242
4  Examination by Ms. Shields           191
5  Examination by Ms. Pickett           212
6  Examination by Mr. Muhlendorf        227
7  Examination by Mr. Knuts             239
8
9          EXHIBIT INDEX           Page
10 Exhibit 17 Previously marked Amended Complaint  151
11 Exhibit 18 Gotama Capital Bylaws       94
12 Exhibit 19 Gotama Capital Business Plan   108
13 Exhibit 20 Beaufort Account Application form    112
14 Exhibit 21 Beaufort Power of Attorney     115
15 Exhibit 22 2016-04-28__Gotama__Breder     118
16         Suasso__application
17 Exhibit 23 Bates SEC-NZFMA-E-0000201 - -204   121
18 Exhibit 24 Bates SEC-NZFMA-E-0000118 - -126   124
19 Exhibit 25 Bates SEC-FINMA-E-0027107 - -259   125
20 Exhibit 26 Bates SEC-FINMA-E-0029150      136
21         Document produced in Native format
22 Exhibit 27 Bates JB-000140 - -158        141
23 Exhibit 28 Bates JB-000080             147
24 Exhibit 29 email Cory O'Haggarty to fen    154
25 Exhibit 30 email string, Celtic to Nikolayev  157
```

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1174

Fedir Nikolayev
2/2/2023

1  Exhibit Index (Continued)              Page
2  Exhibit 31 email from fen to Wires, Xphone 76   163
3  Exhibit 32 Bates SEC-MLATCKLP-E-0467346       165
4  Exhibit 33 Bates SEC-MLATCKLP-E-0675826       169
5  Exhibit 34 SEC-MLATCKLP-E-0682889            172
6  Exhibit 35 SEC-MLATCKLP-E-0687417            172
7  Exhibit 36 12/15/15 email from Wires to fen   175
8  Exhibit 37 7/4/17 email from Wires to fen     181
9  Exhibit 38 4/3/18 email from fen to Wires     185
10 Exhibit 39 7/25/18 email from fen to Wires    189
11 Exhibit 40 12/21/12 email from fen to Lion    191
12 Exhibit 41 Bates SEC-MLATCKLP-E-0253308       194
13 Exhibit 42 Bates SEC-MLATCKLP-E-0543148       197
14 Exhibit 43 Bates SEC-MLATCKLP-E-0567849       200
15 Exhibit 44 Bates SEC-MLATCKLP-E-0562148       202
16 Exhibit 45 Bates SEC-MLATCKLP-E-0498217       204
17 Exhibit 46 Bates SEC-MLATCKLP-E-0648586       208
18
19
20
21
22
23
24
25

5

1  one by one please identify themselves and their
2  client?
3         MR. MUHLENDORF:  This is Kevin
4  Muhlendorf [indeciperable speech.]
5         [Court reporter requests
6  clarification.]
7         MR. LONDON:  Kevin, we just need you
8  to say your name again and your client.
9         MR. MUHLENDORF:  Sure.  This is Kevin
10 Muhlendorf for the Defendant Courtney Kelln.
11        MR. LONDON:  Karen, do you want to go
12 next?
13        MS. PICKETT:  Can you guys see me or
14 no?
15        MS. SHIELDS:  No.
16        MS. PICKETT:  No, okay.  I am trying
17 to figure out -- oh, here I am.
18        It is Karen Pickett for the Defendant
19 Yvonne Gasarch; it' P-I-C-K-E-T-T, and Gasarch is
20 G-A-S-A-R-C-H.
21        MR. LONDON:  Bob, do you want to go
22 next?
23        MR. KNUTS:  So it is Robert Knuts
24 spelled K-N-U-T-S, for defendant Mike Veldhuis
25 spelled V-E-L-D-H-U-I-S.

7

1         Santo Domingo, Dominican Republic
2         Thursday, February 2, 2023
3         Time Noted:  9:53 a.m.
4         THE VIDEOGRAPHER:  Good morning.
5  This is the videotaped deposition of
6  Fedir Nikolayev, in the matter of Securities and
7  Exchange Commission versus Frederick Sharp, et al.,
8  Case Number 21-cv-11276 WGY.
9         This deposition is being held at
10 Ortíz & Comprés, Santiago, Dominican Republic.
11        Today is February 2, 2023.  The time
12 on the video monitor is 9:53.
13        My name is Franklin Bencosme,
14 certified legal video specialist with Gradillas
15 Court Reporters, located at 400 Brand Boulevard,
16 Glendale, California.
17        Would counsel and all present please
18 identify themselves?
19        MR. LONDON:  I am David London.  I
20 represent the Plaintiff, Securities and Exchange
21 Commission.
22        MR. MUHLENDORF:  And I'm Kathleen
23 Shields.  I represent the Securities and Exchange
24 Commission.
25        MR. LONDON:  Would defense counsel

6

1         MR. CHIBANE:  Zack Chibane, last
2  named is spelled C-H-I-B-A-N-E, on behalf of
3  Defendant George Stubos, that's S-T-U-B-O-S.
4         THE VIDEOGRAPHER:  Will the notary
5  please swear in the deponent.
6               FEDIR NIKOLAYEV
7  was called as a witness by the Plaintiff, having
8  been first duly sworn in Spanish by Juan Carlos
9  Ortíz, Esquire, Notary Public for the Dominican
10 Republic, testified as follows:
11        MR. LONDON:  And, counsel on the
12 line, the witness was just sworn in Spanish.
13        Would counsel one by one stipulate
14 that swearing in the witness by Spanish and having a
15 translation to English, after you stipulate that you
16 ascent to that, will be sufficient for purposes of
17 proceeding forward with the deposition today?
18        And just to make it easy, Karen,
19 would you stipulate to that?
20        Sorry, we didn't catch that.
21        MS. PICKETT:  Karen Pickett, we'll
22 stipulate to that, yes.
23        MR. LONDON:  Thank you.
24        Kevin, would you stipulate?
25        MR. MUHLENDORF:  Yes.

8

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1175

Fedir Nikolayev
2/2/2023

| | |
|---|---|
| 1    MR. LONDON:  Thank you. | 1    MR. LONDON:  Because I didn't catch |
| 2    Bob, would you stipulate? | 2    your question. |
| 3    MR. KNUTS:  Yes. | 3    [Discussion off the record.] |
| 4    MR. LONDON:  Thank you. | 4    EXAMINATION |
| 5    Zack, would you stipulate? | 5    BY MR. LONDON: |
| 6    MR. CHIBANE:  Yes. | 6    Q.  Good morning, Mr. Nikolayev. |
| 7    MR. LONDON:  Thank you all. | 7    One of the things we'll need to do today |
| 8    For the record, Zack is here | 8    is make sure we both speak up, speak relatively |
| 9    representing a defendant by the name of George | 9    slow, and speak clearly for the court reporter and |
| 10    Stubos in a separate SEC case.  That case is SEC | 10    for the people participating. |
| 11    versus George Stubos, et al., Case Number 22-cv-4674 | 11    So by way of background, can you just tell |
| 12    in the Eastern District of New York. | 12    me your name and your address for the record? |
| 13    For efficiency purposes, we have | 13    A.  My name is Fedir Nikolayev.  I live in |
| 14    noticed Mr. Nikolayev's deposition for both SEC | 14    Calle Doctor Alejo Martinez, that is Infiniti Blue, |
| 15    cases.  In order to avoid having to call him | 15    Apartment B3B, Sosua, Puerto Plata, Dominican |
| 16    separately in both cases, we are calling him once. | 16    Republic. |
| 17    My colleague, Kathleen Shields and I, | 17    [Reporter requests clarification.] |
| 18    who are representing the SEC, will question | 18    THE WITNESS:  Okay.  I live in Calle |
| 19    Mr. Nikolayev. | 19    Doctor Alejo Martínez.  That is Infiniti Blue, |
| 20    I will question Mr. Nikolayev for | 20    Apartment B3B. |
| 21    purposes of the SEC versus Sharp case and we can | 21    That's Sosua, Puerto Plata, Dominican |
| 22    make a decision as we proceed, depending on if | 22    Republic. |
| 23    there's additional questions that my colleague Kathy | 23    Q.  Mr. Nikolayev, thank you for appearing |
| 24    Shields would want to ask solely for purposes of the | 24    here today.  A few questions by way of background. |
| 25    Stubos case. | 25    You understand that you were sworn in |
| 9 | 11 |
| 1    But we can take a break and discuss | 1    under oath today? |
| 2    that. | 2    A.  Yes. |
| 3    I'm going to have the translation of | 3    Q.  And just a little housekeeping matters. |
| 4    the witness swearing in just read into the record | 4    It's a little unnatural, but I have to ask a |
| 5    now. | 5    question and then you just have to wait until the |
| 6    MS. GARCÍA:  "I, Juan Carlos Ortíz, | 6    question is done before you answer, just to make it |
| 7    Notary Public of Santiago, the Dominican Republic, | 7    easier. |
| 8    would ask you to raise your right hand and do you | 8    Have you taken any medication that would |
| 9    swear under penalty of perjury to tell the truth?" | 9    prevent you from responding to questions fully and |
| 10    THE WITNESS:  I swear. | 10    completely today? |
| 11    MR. LONDON:  Thank you all.  Thank | 11    A.  No. |
| 12    you everyone for stipulating to that. | 12    Q.  Is there any other reason that you can |
| 13    What I would ask defense counsel just to | 13    think of that would prevent you from answering |
| 14    go on mute to avoid the background interference. | 14    questions fully and completely today? |
| 15    MR. MUHLENDORF:  Just to clarify | 15    A.  No. |
| 16    before we start [indeciperable]. | 16    Q.  As I said, the reporter is taking down our |
| 17    THE COURT REPORTER:  Who is talking? | 17    questions and answers, so we just need to do our |
| 18    MR. MUHLENDORF:  Kevin Muhlendorf. | 18    best to speak slowly and clearly.  If I ask a |
| 19    THE COURT REPORTER:  I cannot | 19    question that you don't understand, or if you need a |
| 20    understand him. | 20    translation from a word I ask in English, let me |
| 21    MR. LONDON:  Kevin, is this a | 21    know, and we can use a translation app, for example, |
| 22    question you want to ask on the record or do you | 22    to help you. |
| 23    want to go off the record and ask the question? | 23    If you need a break at any point during |
| 24    MR. MUHLENDORF:  It's on the record | 24    the proceedings, let me know, and I'll accommodate |
| 25    now, but we can go off the record, yeah. | 25    you. |
| 10 | 12 |

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

Fedir Nikolayev
2/2/2023

13

1    One thing that -- these proceedings result
2  in a written transcript.  The court reporter creates
3  a document of questions and answers.  We offer the
4  witness the opportunity, if they want, to read that,
5  and if there's any corrections that need to be made
6  there's a correction sheet.
7    If that's something that you would want to
8  do, I can send you a copy.  Would like a copy?
9    A.  Please.
10   Q.  I will send you a copy by email.  What we
11 typically do is we ask if there's any -- we call
12 them errata -- changes that you would want to write
13 in, you do that within 30 days; do you agree with --
14   A.  Yes.
15   Q.  Okay, thank you.
16   So to prepare for today's deposition,
17 other than me asking you to come here today, did you
18 do -- did you do any preparation?
19   A.  No, I did not.
20   Q.  So, for example, did you jump online and
21 look up any information?
22   A.  No, I haven't.
23   Q.  Are you aware that the reason you're
24 sitting here is there's a federal lawsuit in the
25 United States brought by the Securities and Exchange

15

1  video screen attempted to contact you before today?
2    A.  No.  I've never seen them before.
3    Q.  Has any lawyer, other than the ones
4  appearing on the screen, attempted to contact you
5  today about this case?
6    A.  No, nobody contacted me.
7    Q.  So other than myself, you haven't spoken
8  to anyone about this case?
9    A.  Correct.  Correct.
10   Q.  Some high-level background questions.
11   A.  Okay.
12   Q.  How old are you, sir?
13   A.  I'm 43.
14   Q.  And where were you born?
15   A.  I was born in Feodosia, Crimea; it was
16 Ukraine, now occupied by Russia.
17   Q.  And so you currently live in the Dominican
18 Republic.
19   A.  Yes, I have been living here since '96.
20   Q.  Generally speaking, can you just give us
21 your educational history?
22   A.  Basically I finished my high school in
23 Ukraine, and I was hired to work here in '96, right
24 after leaving high school.
25   I was interested in IT, since I was like

14

1  Commission?
2    A.  I have heard about it.
3    Q.  And are you -- at any time point in time
4  did you look up any information about the lawsuit?
5    A.  I would say yes, but I did not really care
6  much about details.
7    Q.  So just generally speaking what --
8    A.  I know that there's something, but I did
9  not really read into it.
10   Q.  So you haven't read any documents about
11 the lawsuit?
12   A.  No, I haven't.
13   Q.  Other than me, did you speak to anybody
14 else about today's deposition before coming today?
15   A.  I mentioned it to a couple of people, like
16 people that I'm working with that I will be not
17 available, and that is the reason.
18   I mentioned to a couple of people that I
19 will do this and that's why I will not be available
20 this morning, because I have a lot of things going
21 on right now at work.
22   Q.  Understood.  So that as you can see,
23 there's people appearing on video screen and those
24 lawyers representing various defendants.
25   Have any of the lawyers that are on the

16

1  eight.  And I guess I had enough reputation that I
2  was hired that early.
3    Q.  And --
4    A.  And you can be legal age 16, I was able to
5  get permission from my parents and basically since I
6  was 16 I live in the Dominican Republic.
7    Q.  Who asked you to come to the Dominican
8  Republic back then?
9    A.  Just some people that are not related to
10 this case.  Basically it was software engineering.
11   Q.  And so if you can -- and maybe the easiest
12 way to do it is just chronologically, when you moved
13 to the Dominican Republic, what were the jobs that
14 you have held from that point until today?
15   A.  It was always software design and support.
16 And I was working -- I didn't have the company --
17 the people that brought me here.
18   And then I worked for a translation
19 company.
20   Then I worked for Internet service
21 provider.
22   And then I worked -- and then I worked
23 for, I would say, some sort of corporate services
24 office.
25   And then I kind of went -- did not work

A1177

Fedir Nikolayev
2/2/2023

1    like per se a job.  I was more like a free
2    contractor.
3          And then I just remotely worked for a
4    number of businesses, it's like mostly it's Internet
5    service providers, or some sort of web development
6    companies.
7          Q.   Okay.  When you said you worked for a
8    translation --
9          A.   Company, yeah.
10         Q.   What did you translate?
11         A.   I did not translate.  That was IT.  I was
12   working as -- basically designing their system for
13   that, iLanguage.com.
14         Q.   Is it fair to say that since you've been
15   in the Dominican Republic the substance of your work
16   has been IT?
17         A.   IT, yeah.  Exclusive IT.  Nothing else.
18         Q.   Did you ever work in any manner, since
19   you've been in the Dominican Republic, as a
20   stockbroker?
21         A.   No.
22         Q.   Have you ever worked in any way since
23   you've been in the Dominican Republic in the
24   financial services industry other than potentially
25   IT work?

17

1    operations of equipment.
2          Q.   When you performed work for the various
3    companies that you have identified, do you do so
4    through some sort of corporate entity?
5          A.   Not directly.  Indirectly.
6          Q.   Just as an independent contractor?
7          A.   Yeah.
8          Q.   Is there a company called Ocean
9    Communications?
10         A.   Yes.
11         Q.   What is that?
12         A.   It's -- it was converted from what I
13   worked in 2000.  And it moved to Curacao.  And
14   basically what they do, we rent -- we rent space in
15   the server farm and we sublet it to online gaming
16   entities.
17         Q.   And when you say a server farm, just so I
18   can picture that, what does that mean, a server
19   farm?
20         A.   It's just a room that provides electricity
21   and, you know, a controlled temperature and the
22   server is provided with remote access and internet
23   service provider.  And then we -- basically what we
24   do is we let them operate.
25         Q.   And for purposes of your work, do you work

19

1          A.   No.  No.
2          Q.   Has any of your IT work involved Internet
3    gaming?
4          A.   Yes.
5          Q.   What is that about?
6          A.   Well, that internet service provider and
7    what was happening is I was working in the companies
8    that were giving support or providing hosting
9    services to the gaming industry.
10         And my first work related to that was in
11   2000.  And then basically it was a server farm and
12   that was -- I was the day shift of just giving
13   general technical support on that.
14         Q.   And just sort of going a little deeper
15   into the IT work you've done.  Substantively what is
16   it that you have done for IT work?  If you could
17   give me examples of the type of things --
18         A.   My day-to-day operations are basically
19   support of the networks and the systems.  And
20   sometimes I have to develop some sort of
21   applications to help with like support, provide like
22   reporting.  And the couple of times I just did like
23   a basic kind of accounting systems that is
24   web-based -- web-based accounting systems.
25         But mostly it's like support and

18

1    solely from the Dominican Republic or do you have to
2    go somewhere else to do the work?
3          A.   Most of the work I do remotely.  But I do
4    visit Curacao like, I don't know, maybe once every
5    two, three years, something like that.  But mostly
6    just to make sure that because I'm not present
7    there, I just need to make sure that all of the
8    cable and how they connect.  Because remotely
9    sometimes it's very difficult to -- all the things
10   that I have to tell them to do, I have to like
11   imagine them, without seeing them.  So I just do
12   kind of a review.
13         Q.   In connection with the various employment
14   that you discussed, have any of those jobs involved
15   you trading stock in any United States companies?
16         A.   Me?  No.
17         Q.   Personally outside of work do you ever
18   trade stock?
19         A.   No, I haven't.
20         Q.   And I apologize for asking this again, we
21   just need to make sure I finish my questions and you
22   answer.  I know it's hard --
23         A.   I have not traded any stock on my own.
24         MR. LONDON:  He's not traded any
25   stock on his own.

20

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1178

Fedir Nikolayev
2/2/2023

**21**

1          I'll be your translator every once in
2  a while.
3  BY MR. LONDON:
4       **Q.**  Are you familiar with a person by name of
5  Fred Sharp?
6       **A.**  Yes, I am.
7       **Q.**  How do you know Fred Sharp?
8       **A.**  I have been helping him with his IT needs
9  for some time now.
10      **Q.**  When did you first meet Fred Sharp?
11      **A.**  I can't tell you the exact year.  But I
12  think it is mainly like sometime 2004, 2005,
13  something like that.
14      **Q.**  So in the neighborhood of 20 years ago?
15      **A.**  Yeah.  Yeah.
16      **Q.**  How did it come about?  How did you meet
17  him?
18      **A.**  Just like a reference from some other
19  customer.  And I think it all came to be like maybe
20  he asked me to help him with something as simple
21  like maybe email or something.  And I helped him
22  out.  And then I think he just liked the way that I
23  was attending the cases and he just continued
24  contact with me.
25      **Q.**  For the record, when you say "he," do you

**22**

1  mean Mr. Sharp?
2       **A.**  Mr. Sharp himself.
3       **Q.**  So you helped him with some sort email and
4  then you continued --
5       **A.**  Yeah.  Yeah.
6       **Q.**  When was your last communication with
7  Mr. Sharp?
8       **A.**  I would say maybe six months ago.
9       **Q.**  What was the reason that you stopped
10  communicating?
11      **A.**  Well, it was the day when -- when the
12  servers were picked up in Curacao, basically that
13  evening he called me and said that he will never
14  work with me again.
15      **Q.**  And we are going to get into some more
16  questions about this.  So roughly six months ago
17  Mr. Sharp cut you off?
18      **A.**  No, it wasn't six months ago.  I don't
19  remember the exact date.  But it was -- I don't
20  know, like is it 2018 or something like that, or
21  '19?  Something like that.
22          And he called me just about six months ago
23  just -- just -- I don't know -- just to call to find
24  out how I am.
25      **Q.**  I understand.  So let me just go back.

**23**

1          At some point in roughly in 2018 or
2  thereabouts you had a conversation with Mr. Sharp
3  where he informed you that he would no longer use
4  your services?
5       **A.**  Yes.  And basically since then there was
6  no, I would say -- I couldn't say that I gave him
7  any services that I got paid for.
8       **Q.**  And I'll go back to some of that.  But
9  when you said that he contacted you about six months
10  ago --
11      **A.**  Right.
12      **Q.**  How did he contact you?
13      **A.**  He called me.
14      **Q.**  By phone.
15      **A.**  Yes.
16      **Q.**  What did Mr. Sharp say to you at that
17  time?
18      **A.**  It was just like, How are you doing kind
19  of conversation.  It was just -- didn't have details.  It was just
20  like that.  Nothing -- all of a sudden like
21  friendly, he was very friendly.
22      **Q.**  Do you know where he was calling you from?
23      **A.**  No.  No.  I think it was one of those
24  signal calls.
25      **Q.**  Other than that call six months ago, have

**24**

1  you had any other contact with Mr. Sharp since then?
2       **A.**  No.
3       **Q.**  And as far as when you stopped doing
4  substantive work for Mr. Sharp, when you recall the
5  servers were seized, you're not sure exactly what
6  year that was, right?
7       **A.**  Yeah, I thought you would have this on
8  record.  I think it was like 2018, like June.
9          I think it was June, it was June.
10      **Q.**  It's possible it was in late 2019 or 2020.
11      **A.**  It's possible.  Yeah, yeah, it is
12  possible.
13      **Q.**  And --
14      **A.**  It was like during COVID -- I think it was
15  before COVID, no?  I think '19.
16      **Q.**  I'm just getting your best recollection of
17  answers, so don't read anything into what I ask you
18  as a question.  Just answer to the best of your
19  memory.
20          So going back to the period of time that
21  you performed work for Mr. Sharp, so starting with
22  roughly 20 years ago --
23      **A.**  Right.
24      **Q.**  -- up until you stopped doing work, can
25  you explain as best as you can the nature of the

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1179

**Fedir Nikolayev**
**2/2/2023**

<table>
<tr><td>

1  work that you did for Mr. Sharp?
2      **A.**  It was just general support, mostly it's
3  email, computer problems -- well, at some point he
4  asked me to manage a network of Blackberries.  And
5  basically it was just that -- and -- yeah, that's
6  it.
7      **Q.**  And this work that you have just
8  described, you did that for a little less than
9  20 years, give or take?
10     **A.**  Yeah.
11     **Q.**  At the time that you did the work for
12 Mr. Sharp -- actually let me start over.
13         Did Mr. Sharp hire you to work for him?
14 Were you employed by Mr. Sharp directly?
15     **A.**  No.  No.  It was like I said, like I'm a
16 freelance IT specialist.  And basically he would
17 just call me sometimes to help him with certain
18 things.
19         And -- yeah, until one point.  And then at
20 some point he was giving me more like a salary, but
21 it did not last that long.
22     **Q.**  So when you received compensation from
23 Mr. Sharp, how did you get paid?
24     **A.**  Wire transfers.
25     **Q.**  And did you get the wire transfers from --

25

</td><td>

1      **A.**  I remember Courtney.  The last name I
2  don't know.
3      **Q.**  What was your understanding of who
4  Courtney was?
5      **A.**  I would say assistant, assistant maybe.
6      **Q.**  An assistant to Mr. Sharp?
7      **A.**  Yeah.  Yeah.
8      **Q.**  Did you have an understanding of what
9  Courtney's role was working with Mr. Sharp, what she
10 did?
11     **A.**  No.  No.
12     **Q.**  Did you have an understanding that she did
13 some sort of administrative tasks?
14         MR. MUHLENDORF:  Objection, leading.
15 BY MR. LONDON:
16     **Q.**  You can answer the question.
17     **A.**  Being assistant I thought it could be an
18 administration tasks.
19     **Q.**  Have you ever been asked to do anything on
20 behalf of Mr. Sharp by somebody by the name of
21 Yvonne Gasarch?
22     **A.**  Yes, I also felt like she was some sort of
23 assistant to Mr. Sharp, kind of the same as
24 Courtney, I think.
25     **Q.**  I'm going to give you some other names now

27

</td></tr>
<tr><td>

1  was the source of the wire transfer a company or a
2  person?
3      **A.**  Honestly, I don't know.  I did not look
4  into it.
5      **Q.**  Are you familiar with the name of a
6  company Corporate House?
7      **A.**  Yes.
8      **Q.**  And what is Corporate House?
9      **A.**  That's what were his emails.  And it's
10 some office in Vancouver, Canada I think.
11     **Q.**  So you understood that Corporate House was
12 an entity that Mr. Sharp was affiliated with?
13     **A.**  Yes.
14     **Q.**  Did you ever work for Corporate House?
15     **A.**  No.  It was always Mr. Sharp.  It wasn't
16 really -- like all requests were coming from him.
17     **Q.**  Did you ever take requests from anyone
18 else on behalf of Mr. Sharp?
19     **A.**  There was like assistants.  But if you can
20 mention names I can maybe -- there was a lot of
21 people.
22     **Q.**  Sure, I can help you out.
23         So did you -- did you ever take any
24 direction on behalf of Mr. Sharp from somebody by
25 the name of Courtney Kelln, K-E-L-L-N?

26

</td><td>

1  and ask if any of these people, do you recognize
2  them as having provided direction to you on behalf
3  of Mr. Sharp?  Do you recognize the name of Mike
4  Veldhuis, V-E-L-D-H-U-I-S?
5      **A.**  No.  No.  No.
6      **Q.**  Paul Sexton, S-E-X-T-O-N?
7      **A.**  No.
8      **Q.**  And the question is, Do you recognize
9  them?
10     **A.**  Right.  Right.  No, I definitely don't
11 recognize them.
12     **Q.**  Jackson Friesen, F-R-I-E-S-E-N?
13     **A.**  No.
14     **Q.**  Avtar Dhillon, D-H-I-L-L-O-N?
15     **A.**  No.
16     **Q.**  Graham Taylor, T-A-Y-L-O-R?
17     **A.**  No.
18     **Q.**  William Kaitz, K-A-I-T-Z?
19     **A.**  No.
20     **Q.**  At the time that you were doing work for
21 Mr. Sharp, that approximately 20-year period, did
22 you have an understanding of what Mr. Sharp's
23 business was?
24     **A.**  I'm not really in business to look what
25 people do.  I just making sure that their IT needs

28

</td></tr>
</table>

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1180

Fedir Nikolayev
2/2/2023

---

1  were met.  I do not really like look into it.
2      Q.  And I understand that your function was to
3  for IT work.  But just so that you can understand my
4  question:  In connection with performing your IT
5  work, did you develop an understanding of what the
6  business was that you were doing work for?
7      A.  Being called Corporate House I thought it
8  was some sort of corporate services operation.  And
9  I did not dig much more than that into it.
10     Q.  Did you ever, as part of your working for
11  Mr. Sharp, come to learn that his business involved
12  forming offshore nominee companies to hold shares of
13  stock in US companies?
14     A.  I'm sorry, could you repeat?
15     Q.  Sure.  Sure.  As part of working for
16  Mr. Sharp --
17     A.  Right.
18     Q.  -- did you ever come to learn through your
19  work for Mr. Sharp that part of his business
20  involved forming offshore nominee companies to hold
21  stock in United States companies?
22     A.  I would say I only understood the forming
23  offshore companies.  For what, I did not -- did
24  not -- did not look into it.
25     Q.  Okay.  I understand.

29

1      So you've developed an understanding that
2  part of Mr. Sharp's business was forming offshore
3  companies?
4      A.  Right.  Right.
5      Q.  Did you know where those offshore
6  companies were formed?
7      A.  No, I haven't?
8      Q.  Do you recall any names of the offshore
9  companies?
10     A.  No.  Not really, no.
11     Q.  And how did you develop that
12  understanding, meaning how did you figure out that
13  one of Mr. Sharp's business functions was forming
14  offshore companies?
15     A.  I don't know, just seeing screen shots
16  sometimes or something like that.
17     Again I'm trying not to dig into what a
18  client is doing.  I'm just making sure that what is
19  going on -- that my responsibilities are to make
20  sure that everything is operating how it should be.
21     Q.  And I understand that.  And I'm only
22  asking what you experienced as part of your work.
23     So I have a few more questions on this
24  topic, so if you would bear with me.
25     So as part of your work for Mr. Sharp, did

30

1  you ever develop an understanding that one of
2  Mr. Sharp's business functions was to help clients
3  of his conceal their identities?
4      A.  I did not have that understanding.  I
5  understood that there was offshore entities that
6  were created, but I did not have any understanding
7  why.
8      Q.  Did you -- so did you have any basis of
9  understanding any reason why these offshore
10  companies were created?
11     A.  Based on just general understanding of
12  offshore, I was thinking it's some point sort of --
13  some -- some sort of entities in the jurisdictions
14  to protect some assets or something like that.  But
15  that's just -- that comes from general understanding
16  why offshore companies are existing.
17     Q.  Did you ever have any discussions with
18  Mr. Sharp about the creation of the offshore
19  companies?
20     A.  Like the process or something?  No.
21     Q.  What conversations did you have with
22  Mr. Sharp connected to offshore companies?
23     A.  I think we have created one in my name.
24  And that's what -- what was -- that's where it came
25  to be, I guess.

31

1      Q.  Do you know the name of that company that
2  you are remembering?
3      A.  Gotama Capital.
4      Q.  G-O-T-A-M-A.  And it's pronounced Gotama?
5      A.  Yeah, I always been mentioned G-O-T in the
6  conversation.
7      Q.  I am going to come back to that.  But let
8  me ask you this, as part of your work for Mr. Sharp,
9  did you ever come to learn that one of Mr. Sharp's
10  purposes of his business was to give his clients
11  access to email accounts to send messages on behalf
12  of the offshore companies?
13     A.  I did not -- they were giving access just
14  to communicate with Mr. Sharp.  But I did not know
15  that -- I didn't have that impression.  I didn't
16  have that impression.
17     Q.  What was your impression?
18     A.  I think emails were created just to
19  communicate with Mr. Sharp or between them.
20     Q.  Did you ever communicate with any of
21  Mr. Sharp's clients?
22     A.  If I did it was just general technical
23  support, a question about Blackberries or something
24  like that.
25     Q.  Do you know what services Mr. Sharp

32

---

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1181

Fedir Nikolayev
2/2/2023

---

33

1  offered to his clients?
2      A.  No.  No.
3      Q.  Do you know where his clients were
4  located?
5      A.  No, I don't.
6      Q.  Did you ever come to learn that Mr. Sharp
7  arranged for his clients to deposit stock in
8  Switzerland?
9      A.  No.  No.
10     Q.  Does the name Winter Cap mean anything to
11  you?
12     A.  No.  No.
13     Q.  Did you recognize the name Winter Cap as
14  an offshore trading platform in Switzerland?
15     A.  No.
16     Q.  Does the name Silverton mean anything to
17  you?
18     A.  There was sometimes mentioned S-I-L-V,
19  that's like code in the accounting system.  I saw
20  that one.
21     Q.  So you recognize the name --
22     A.  Maybe it is this.  It sounds like it,
23  yeah.
24     Q.  So you recognize S-I-L-V as a code that
25  was used by Mr. Sharp?

---

34

1      A.  Yeah, but I just say it's similar to what
2  you're saying, the name, so maybe it's that.
3      Q.  I understand.  And you just -- don't worry
4  so much about if I take notes.
5      A.  Okay.
6      Q.  Just answer the questions.
7          Does name Blacklight mean anything to you?
8      A.  Yes, it was -- again, I remember the name
9  but I don't remember why.
10     Q.  Do you remember Blacklight as an offshore
11  entity?
12     A.  I -- honestly I just remember the name,
13  but I do not know why -- what exactly.
14     Q.  And do you remember the name Blacklight as
15  somehow connected to work that Mr. Sharp was doing?
16     A.  Just mentioned something.  I'm not sure.
17  Maybe an email or something.  I don't remember
18  exactly why, honestly.
19     Q.  I asked you the name Courtney Kelln
20  earlier.  When was last time you had any
21  communication with Courtney Kelln?
22     A.  I honestly can't tell you the date, I
23  don't -- a long time ago.  I cannot even like -- I
24  don't -- exact date, I have no idea.  But it was a
25  long time ago.

---

35

1      Q.  What about Yvonne Gasarch?  When was the
2  last time you had any communication with Yvonne
3  Gasarch?
4      A.  Maybe a year before the servers were
5  seized.
6      Q.  When you say the servers were seized, what
7  is it that you understand happened?
8      A.  I understand that the FBI came to
9  Curacao's server farm and collected the servers.
10     Q.  Is that the same server farm that I asked
11  you about earlier?
12     A.  Yeah.  Yeah.
13     Q.  How did you learn that the FBI seized the
14  server farm?
15     A.  I am director of Ocean Communications, so
16  the hosting facility -- the server farm, actual
17  server farm, e-Commerce Park notified me that there
18  was people at the door, the ones who collect.
19         And they kind of asked me permission if
20  they can do it.  I did not have any legal authority
21  to say no to them because they came with the Curacao
22  government.
23     Q.  Going back for a moment to your work for
24  Mr. Sharp.  Did you ever develop an understanding
25  when working for Mr. Sharp that Mr. Sharp was

---

36

1  routing payments to various accounts around the
2  world?
3      A.  Based on -- you'll probably get to the
4  accounting system, I could just see something like
5  that.  But, again, I didn't question it.
6      Q.  But you had some sort of understanding
7  based on your work for Mr. Sharp that he was routing
8  payments for accounts around the world?
9          MR. MUHLENDORF:  Objection.  Leading.
10         It's Muhlendorf again.
11         THE WITNESS:  Yeah, I did not look
12  into it.
13  BY MR. LONDON:
14     Q.  Did you ever develop an understanding that
15  part of Mr. Sharp's business involved fabricating
16  documents, for example, invoices to conceal
17  information about payments?
18     A.  I did not come to see that.
19     Q.  In connection with your work for
20  Mr. Sharp, did you have anyone else that helped with
21  the IT function?
22     A.  No.  I mean I had a system, but he was not
23  involved in any of that.
24     Q.  So you were solely responsible for the IT
25  work for Mr. Sharp?

---

A1182

Fedir Nikolayev
2/2/2023

37

1      A.   Yeah.  Yeah.
2      Q.   When you were doing the work for
3  Mr. Sharp, approximately how much time did you spend
4  on work for him?
5      A.   It could be an hour every two weeks or
6  something like that.  The only time -- the only
7  period of time that took more of my time is when I
8  developed the accounting system and whenever I had
9  to set up new servers.
10          But it was like completely incidental,
11  like if there is a problem with email or something
12  he would contact me.
13      Q.   How did you work out an arrangement for
14  your compensation?  How did you decide how much to
15  charge him?
16      A.   Well, originally it was just per hour.
17  And then once the accounting system was set up and
18  it required like adjustments, I suggested him to
19  have some sort of compensation like he was paying me
20  quarterly.
21      Q.   So when you were charging for hourly did
22  you have a set rate you --
23      A.   Yeah, I would charge $150 an hour.
24      Q.   And then when you asked to be paid
25  quarterly, what was the rate?

38

1      A.   I think it was around 3,000 every three
2  months.
3      Q.   And what country currency do you mean?
4      A.   The US dollars.
5      Q.   During the time that you were performing
6  work for Mr. Sharp, what was your understanding of
7  where he was based out of?
8      A.   I was always under the impression that he
9  was in Vancouver.
10      Q.   What about Courtney Kelln, did you
11  understand where she was based?
12      A.   I felt like she was Vancouver.
13      Q.   What about Yvonne Gasarch?
14      A.   As well as, yeah.  I think they all were
15  in Vancouver.
16      Q.   Did you ever go to Vancouver?
17      A.   No.  I got once a Canadian visa, but I
18  never used it.
19          I didn't want to go to the cold.  And then
20  just -- too much work, I did not manage to get
21  there.
22      Q.   Did Mr. Sharp ever come visit you in the
23  Dominican Republic?
24      A.   Me, per se, no.  He was visiting the
25  Dominican Republic.  And we would have like lunch or

39

1  something.  But he did not come just for me.
2      Q.   But there were occasions where you met
3  with members.
4      A.   Yeah.  Yeah.  Yeah.  Yeah.
5      Q.   What about Ms. Kelln, did you ever meet
6  her in person?
7      A.   I don't think so.  I don't think so.
8      Q.   How about Ms. Gasarch?
9      A.   No.
10      Q.   I'm going to go back to some of the
11  information that you provided earlier, and you
12  referred to the accounting system that took up some
13  time.
14      A.   Yeah.
15      Q.   Can you explain to me what that accounting
16  system was?
17      A.   Well, at some point Mr. Sharp was
18  complaining, Mr. Sharp was asking for help with --
19  he seemed to have his accounts running in Excel.
20          And because there was the several people
21  who were accessing that file it was a difficulty to
22  do records at the same time.  Several people cannot
23  access it at the same.
24          So I suggested to basically convert that
25  Excel file into a web platform where they could

40

1  connect -- a number of people could connect at the
2  same time and post at the same time.  And maybe have more
3  complex formulas and stuff like that.
4      Q.   How did you develop the understanding that
5  various people were trying to use the Excel?
6      A.   Well, Mr. Sharp told me.
7      Q.   That's what I'm asking.  What did
8  Mr. Sharp tell you, to the best of your
9  recollection?
10      A.   I think there were several times files got
11  corrupted or something like that and they needed me
12  to fix it.
13          And then before I developed software, the
14  web software, I -- I helped him to add formulas into
15  that Excel.  And so that was my relationship between
16  that Excel file and myself.
17      Q.   So if I understand you -- and I'm not a
18  tech guy, but it sounds to me like you recognized
19  that the Excel spreadsheet platform was insufficient
20  and you recommended a better way to do it?
21      A.   Yeah.  Yeah.  Yeah.  That's what I did.
22      Q.   And so did you actually design some system
23  for him?
24      A.   Yeah.  It was -- but basically I just took
25  the Excel as the -- because they were comfortable

Fedir Nikolayev
2/2/2023

41

1  how they were filling out all of the information, so
2  I basically created something similar under that.
3      Q.  And the people that were having trouble,
4  the people that you understand were having issues
5  with inputting information in Excel, who were those
6  people?
7      A.  Well, Mr. Sharp reported it to me.  But
8  again it is only a guess, but maybe Courtney.  But I
9  cannot just tell you that they complained it.
10      Mr. Sharp would be the person who would
11  report problems to me.
12      Q.  Did you have an understanding at the time
13  that you were developing the web-based system as to
14  the purpose of Mr. Sharp needing an accounting
15  system?
16      A.  Functionality.  I did not question what it
17  was for.  I did it to make sure that multiple people
18  can post information and it has to calculate the
19  balances.
20      Q.  The balance of what?
21      A.  In transactions.
22      Q.  So is it fair to say that you understood
23  that Mr. Sharp needed an accounting system to keep
24  track of financial information?
25      A.  Financial transactions.  And it did have a

42

1  component of stocks to it and the holdings.
2      Q.  So as part of your work in setting up the
3  accounting system, you understood that the
4  functionality needed to account for financial
5  transactions including stock holdings.
6      A.  Yeah.
7      Q.  Was part of the setup of the accounting
8  system to keep track of any proceeds of stock
9  transactions for Mr. Sharp's clients?
10      A.  Proceeds -- I guess, yes.
11      Q.  Just so I know that you are understanding
12  my question, when I say "proceeds," I mean when you
13  sell stock, the proceeds of selling stock.
14      A.  Yeah, there were balances for the clients
15  and the transactions related to them.
16      Q.  So did your accounting system keep track
17  of stock purchases and sales?
18      A.  Yeah.
19      Q.  Did your accounting system keep track of
20  who the shareholders were of those stock purchases
21  and sales?
22      A.  Basically each transaction has a bank
23  related to it and the client related to it.  That's
24  how I see it.  And the balances are calculated from
25  the point of view of the bank and from the point of

43

1  view of the client.
2      Q.  Did your accounting system keep track
3  of -- or I guess I should ask it this way:
4      Did your accounting system calculate any
5  commissions?
6      A.  Yes.  It was one of the functions of Excel
7  spreadsheet as well.
8      Q.  Other than what I've asked you, were there
9  any other functions in the accounting system?
10      A.  I think at some point he asked me to
11  create some kind of a loan functionality, which was
12  created by like -- it was -- functionality was a
13  loan, but it was presented as an asset similar to
14  stock holdings.
15      Like loan would be some sort of created
16  stock, not real stock, but just some symbol.  That
17  would be a loan.
18      Q.  A loan, like loaning money?
19      A.  Yeah.  Something like that.
20      Q.  Do you know who was loaning money?
21      A.  No, I don't know.
22      Q.  Do you know who was borrowing money?
23      A.  No, I don't -- my responsibility was
24  functionality.  And I don't ask questions.
25      Q.  And we have been referring to the system.

44

1      Did the system have a name?
2      A.  Well, I think he's very -- he was very
3  creative.  In the beginning he called it Q.
4      Q.  The letter Q?
5      A.  Q, yeah.
6      Q.  Do you know where the letter Q name came
7  from?
8      A.  It was maybe related to James Bond and
9  stuff, maybe a little bit like this.
10      Q.  So as in the character Q from the Bond
11  movies?
12      A.  Yeah.
13      Q.  So we'll call this the Q accounting
14  system?
15      A.  Okay.
16      Q.  I mean I'm asking, is that okay?
17      A.  Yeah.  Yeah.
18      Q.  So when I say the Q accounting system, we
19  understand that we're talking about the web-based
20  platform that you developed?
21      A.  Yeah.
22      Q.  When did you develop the Q system?
23      A.  I mean I don't have the exact timeline.
24  But maybe some time like 2015, maybe something like
25  that.

A1184

Fedir Nikolayev
2/2/2023

---

**45**

1    **Q.**   And not being a tech guy, I'm not sure I
2   asked the question, so I want to be sure that I ask
3   it right.  But how was it hosted?
4       **A.**   It was hosted in a server in Curacao.
5       **Q.**   So you developed the platform, but the
6   platform itself was hosted by the farm in Curacao?
7       **A.**   Yeah.  Yeah -- well, the server on the
8   farm -- the server was hosted on the farm.
9       **Q.**   So the server was hosted on the farm in
10   Curacao.  You can access the server from the
11   Dominican Republic.
12       **A.**   Yeah.  Yeah.
13       **Q.**   So you go online and you input user name
14   and password?
15       **A.**   Yeah.
16       **Q.**   Okay.  So who else had access to the
17   server?
18       **A.**   The system was a multiuser system.  And it
19   had three types of users:
20           Administrators;
21           Employees, staff;
22           And customers.
23           So administrators would be Mr. Sharp and
24   myself, because I needed to like -- I don't know --
25   check things for him.  The administrator would have

---

**47**

1   list?
2       **A.**   I -- I -- I guess Yvonne, but I
3   couldn't --
4       **Q.**   Let me ask it this way:  Who had to assign
5   somebody to have either employee access or client
6   access?
7       **A.**   Well, generally it would be like
8   Mr. Sharp.  But sometimes he would not understand
9   100 percent how this works.  And he would just say,
10   "Okay, change this for this employee."
11           And he would ask me to do that.
12           But all of the transactions in the system,
13   they are marked by which user did them.
14       **Q.**   So let me ask you that.  So order to input
15   data into the system, who was able to do that?
16       **A.**   The staff -- if Mr. Sharp allowed them --
17   and me or Mr. Sharp.
18       **Q.**   Okay.  So I just want to make sure that I
19   understand.  So yourself and Mr. Sharp having full
20   access could input data.
21       **A.**   Yeah.  Yeah.
22       **Q.**   Somebody who was listed on the
23   employee/staff group would have to be allowed to
24   input data in order to do so.
25       **A.**   Yeah.  It can be controlled per bank or

---

**46**

1   full access to any information, any -- do any kind
2   of work.
3           The staff would be limited; Mr. Sharp
4   could select what bank and what clients the staff
5   can see.
6           So like not every staff member could see
7   all of the banks and all of the clients.  And
8   clients could see only their own account.
9           But it was not available -- he asked me to
10   close access to clients sometime -- again I don't
11   know the date -- but at some point he asked me not
12   to -- not to have it available to them.
13       **Q.**   So it sounds like there were only two
14   administrators:  Yourself and Mr. Sharp.
15       **A.**   Yeah.  Yeah.
16       **Q.**   And as administrators you and Mr. Sharp
17   had full access.
18       **A.**   Yes.
19       **Q.**   The employees/staff, that was a more
20   limited access?
21       **A.**   Limited access.  I mean they could have
22   similar access to administrator, but they wouldn't
23   be able, for example, to change access to other
24   people, to change level of access to other people.
25       **Q.**   Do you know who was on the employees/staff

---

**48**

1   per clients, yes.
2       **Q.**   Do you know whether Yvonne Gasarch was
3   authorized to put information into the Q system?
4       **A.**   I don't recall that -- I can't tell you
5   for sure.
6       **Q.**   Do you know if Courtney Kelln was
7   authorized to put information into the Q system?
8       **A.**   I -- I don't have that -- I did not -- I
9   do not -- I don't have it like noted.  I have too
10   much information going on.
11           I didn't have it recorded.  I don't know.
12       **Q.**   Let me ask you this:  When somebody put
13   information into the Q system, whether it was
14   yourself or Mr. Sharp or an employee, when
15   information was input, what happened to that
16   information?
17           In other words, how did you arrange it so
18   that that information was kept?
19       **A.**   Well, it's on the same server.  There is a
20   database that it just creates records.
21           And another difference between staff and
22   administrator is that the staff does not have the
23   control of like how commissions are calculated.
24           So they would just enter amount where they
25   would say like -- there was two amounts, one is the

---

A1185

**Fedir Nikolayev**
**2/2/2023**

1  amount for the bank and the amount for client.  And
2  then they either enter, for example, bank amount and
3  then the system calculates with client what
4  commissions will be distributed.  Or it could be
5  like they put it from the point of view of a client
6  and then all of that information being calculated.
7       When the administrator is doing that they
8  can see the calculation and details how everything
9  is calculated.  And they can actually manually
10  adjust all of the numbers between them.
11      **Q.**  I just want to make sure that I understand
12  correctly.  Who had the ability to manually adjust?
13      **A.**  The administrator.
14      **Q.**  Just the administrator.
15      **A.**  Just the administrator, yeah.
16      **Q.**  When the information was input -- and this
17  is more of a process question I'm asking -- was it
18  your regular practice to keep that information on
19  the server?
20      **A.**  Yes.
21      **Q.**  Was it fair to say that it was Mr. Sharp's
22  regular practice to keep the information on the
23  server?
24      **A.**  Until a certain point, yes.
25      **Q.**  What point?

49

1      **A.**  Again I don't know the date, but he asked
2  me to summarize it every first of January after a
3  certain year -- after some year, I don't know -- I
4  don't remember which year.
5       And summarize -- I mean I would make a
6  backup.  And then I would just take balances of
7  everything and then just clear it as of the first of
8  January.  Basically just going to keep balance and
9  the holdings, but did not contain any record of what
10  happened before -- before that date.
11      **Q.**  In order to make sure that I understand
12  this I am just sort of going to repeat that to you.
13       So at a certain point in time all of the
14  underlying data that was in the Q system you were
15  asked to summarize --
16      **A.**  Um-hmm.
17      **Q.**  And --
18      **A.**  You could still use the system, you can
19  still see the balances, but you could not see what
20  happened -- how did it arrive to that balance.
21      **Q.**  So what remained?  What specific data?
22      **A.**  Just balance.
23      **Q.**  Just balance?
24      **A.**  And it would be balanced as of that date,
25  as of the first of January of some year.

50

1      **Q.**  And when you were say you made a backup;
2  what did that mean?
3      **A.**  I just made a backup of -- a snapshot of
4  what data looked like at that moment and delivered
5  it to Mr. Sharp.
6      **Q.**  So from that point in time forward, after
7  you took the snapshot and delivered the snapshot to
8  Mr. Sharp, going forward then, was it as if you were
9  starting a new database?
10      **A.**  Well, it had the same list of clients,
11  stocks and everything, but it did not have a
12  record -- it had the balances but it did not have a
13  record, previous record of what happened.
14      **Q.**  So going forward after this snapshot
15  process, is it fair to say that moving forward new
16  data would be entered at that point in time?
17      **A.**  Yeah.  Yeah.  Throughout the year and then
18  on the first of January of next year it would be
19  reset -- the copy would be made and it would be
20  reset.
21      **Q.**  In between resets, as data was entered
22  over course of the year --
23      **A.**  Yeah.
24      **Q.**  -- was it your regular practice to keep
25  that data on the server?

51

1      **A.**  Yeah, it was always on the server.
2          MR. LONDON:  We are going to go off
3  the record to change the tape.
4          THE WITNESS:  Okay.
5          THE VIDEOGRAPHER:  The time is 10:55.
6  We are off the record:
7          (Recess taken from 10:56 until.
8          11:04 a.m.)
9          THE VIDEOGRAPHER:  We are on the
10  record.  The time is 11:03 in this media.
11  BY MR. LONDON:
12      **Q.**  Mr. Nikolayev, we were talking about the Q
13  accounting system.  And then was the Q accounting
14  system how Mr. Sharp regularly operated his
15  business, he used the Q system?
16      **A.**  That was my understanding.  I wasn't in
17  day-to-day operations but just that's what it seems
18  like.
19      **Q.**  But based on you being an administrative
20  assistant, was it your understanding that Mr. Sharp
21  used the Q system as a regular function of his
22  business?
23      **A.**  Yeah.  Yeah.  That was my impression.
24      **Q.**  And you explained a little bit earlier
25  about the yearly backup and then the saving of the

52

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1186

Fedir Nikolayev
2/2/2023

1  backup.  Did you save the backups themselves on a
2  server?
3      A.   In the beginning.  Then he asked me to put
4  them offsite, but I give it to him.
5      Q.   So the backups were saved somewhere else
6  eventually?
7      A.   Yeah.
8      Q.   Do you know where?
9      A.   His laptop.
10     Q.   Mr. Sharp's laptop?
11     A.   Yeah.
12     Q.   When you backed up the system on a
13 periodic basis and saved the backup, did you assign
14 some sort of name to the backup so you knew what
15 version it was?
16     A.   No, just the date.  I usually put the
17 date; it would be like the year, month, 31st of
18 December.
19     Q.   So, for example, you explained how there
20 was the James Bond naming --
21     A.   Yeah.
22     Q.   Was there any James Bond naming to backup?
23     A.   I don't remember why, but I called myself
24 the system MT -- I don't remember why.
25         I think that was the name of the file,

53

1  Excel file, initially was MT.  And in myself so that
2  would be like SQL_MT_ and then the date and maybe
3  the time.  Probably it is going to have extensions
4  GZ -- it was compressed.
5      Q.   Did you ever use the James Bond name
6  Skyfall in connection with this?
7      A.   I don't remember now -- Skyfall?
8          Oh, I think it was the name of a server,
9  maybe it was a name of a server.  I think that was
10 my idea, actually.
11     Q.   Okay.  Did any other names apply to any
12 other servers?
13     A.   I don't remember.  But the Skyfall was my
14 idea, yes, to call it like that.  I just used it --
15 based on Q, I just thought maybe it would be fine to
16 code something James Bond as well.
17     Q.   Did the other servers have any kind
18 nomenclature, names?
19     A.   I don't remember particularly.  I mean
20 that one was -- I think that one was where
21 Mr. Sharp's remote desktop was located.
22     Q.   So Skyfall was connected to Mr. Sharp's
23 remote access?
24     A.   Yeah.  Yeah.  I think so.
25     Q.   So was there something differentiating

54

1  Skyfall from other information?
2      A.   It contained his files, his files.
3      Q.   I'm just trying to understand, what was
4  the difference?  What did you mean by "his files"?
5      A.   Well, he used this server -- why it was in
6  Curacao is that at some point I understand that the
7  US passed some sort of policy where when you cross
8  the border that the government can seize your
9  devices and make a copy of the data.
10         So what he was doing is that he basically
11 did not have any data on his laptop that can be
12 seized.  And he would have it all in Curacao.
13         And he would just run remote desk like he
14 would run his computer from there.  So his laptop
15 would be like -- have a minimum amount of data on
16 it.
17     Q.   And Skyfall was connected to his --
18     A.   I think that was the Skyfall.
19     Q.   Does the name XM, the letters XM Live --
20     A.   Okay, yeah -- that's -- well, that's the
21 new name of Q, XM Live is the new name of Q.
22     Q.   So do you know the reason why the name was
23 changed from Q to XM Live?
24     A.   I think at that time when he told me not
25 to give access to clients, he asked me to rename it.

55

1      Q.   Other than renaming the accounting system
2  from Q to XM Live, was there any other changes?
3      A.   Just basically closed access to all the
4  clients.
5      Q.   In connection with your work for Mr.
6  Sharp, separate from the Q account system, did you
7  work on some sort form of encrypted communication
8  network?
9      A.   Yes.  At some point the servers of
10 Mr. Sharp's were located at Mossack Fonseca in
11 Panama.  It's a company in Panama.
12         And the technical support -- we used them
13 as a farm, like a server farm.  But the service was
14 like -- the technical support was just horrible,
15 horrible.  Like seriously like really bad.  Like any
16 attention to the server just takes hours or days, or
17 just the way it was sold was just horrible.
18         And at some point we moved -- we moved
19 from there, because -- and I suggested Curacao
20 because in Curacao was the company that I support
21 and operate for longer than I know Mr. Sharp.  And
22 that's why I suggested Curacao, that that would have
23 more like faster access to everything.
24     Q.   Just to make sure that I got the record
25 clear.

56

Fedir Nikolayev
2/2/2023

---

**Page 57**

1    There was I think there was a law firm in
2 Panama called Mossack Fonseca; is that right?
3    **A.** Yeah.
4    **Q.** And Mr. Sharp's servers were originally
5 serviced through the law firm?
6    **A.** There. There. So when they were there
7 somebody else, I don't know who, started the
8 service, the Blackberries -- the Blackberries
9 service. So it started as he would give Blackberry
10 to a customer. And that Blackberry would have
11 additional encryption software installed on it. And
12 they would communicate through that Blackberry
13 system.
14    **Q.** Let me just make sure that I have got this
15 correct.
16    So at some point in time, which hopefully
17 you can narrow down for me -- so at some point in
18 time there was a setup of servers hosted in Panama
19 at the law firm of Mossack Fonseca.
20    **A.** Yeah.
21    **Q.** And based on what you just explained, did
22 you mean that Mr. Sharp had arranged to provide
23 Blackberry phones to people?
24    **A.** Yes.
25    **Q.** Were you involved in that?

---

**Page 58**

1    **A.** I was not involved in the initial setup.
2 But I was involved in operations. And I was
3 involved in, to the extent that I even set up the
4 SIM cards for those phones was done in the Dominican
5 Republic, in Claro.
6    **Q.** Roughly time frame-wise, what's the time
7 frame initially that you are talking about where the
8 servers were at the law firm in Panama before you
9 got more involved in the [inaudible].
10    **A.** Like how long before me? I don't know.
11 But like I would say in Panama it lasted maybe a
12 year or something with me. And then it moved to --
13 I don't know, early 2010, something like this.
14    Again I don't know exact date.
15    **Q.** I understand. I'm just trying to figure
16 out general ballpark figure of that.
17    So at that time, when the system was in
18 Panama, what was your understanding of purpose of
19 these Blackberry phones?
20    **A.** You have to understand that people trust
21 me because I do not dig into what they are doing.
22    My responsibility was to make sure they
23 operate, that they are secure. And basically that's
24 what I was doing. I was just providing the
25 technical side of it.

---

**Page 59**

1    **Q.** And I understand. You were --
2    **A.** There was a group of Blackberries and they
3 communicated between each other. That's all I know.
4    **Q.** Was it your understanding that Mr. Sharp
5 provided a group of Blackberries to communicate?
6    **A.** Yes. Yes. Yes.
7    **Q.** Do you know who Mr. Sharp provided those
8 Blackberries to?
9    **A.** It was -- initially I would get the
10 Blackberries -- or like accounts for them here -- or
11 they would be purchased in Canada.
12    I set up everything. And then they would
13 be distributed from office in Vancouver.
14    I did not have a direct like -- I did not
15 ship or anything to anybody, nothing. It was all --
16 the only thing I shipped way SIM cards.
17    **Q.** So the physical phones, did you ever have
18 them?
19    **A.** For myself, one, yeah.
20    **Q.** But the other phones, did you ever have
21 them?
22    **A.** No.
23    **Q.** So where were the other phones other than
24 yours?
25    **A.** They were distributed from the Vancouver

---

**Page 60**

1 office.
2    **Q.** Do you know who distributed them from
3 Vancouver?
4    **A.** I think that's what -- I think Yvonne was
5 involved at some point.
6    **Q.** And for purposes of these questions I'm
7 going to break this up between before moving to
8 Curacao and then after moving to Curacao.
9    So right now I'm talking about when you
10 first became involved with the phones when the
11 server was located in Panama.
12    At that point in time was it your
13 understanding that the phones were encrypted?
14    **A.** Yeah. Yeah. Those were like standard
15 encryption. Like in the Blackberry at that point
16 there was another App that would -- Blackberries
17 themselves were encrypted, but there was another App
18 that would add an addition. But it was standard
19 form, the Blackberry system.
20    **Q.** And again non-tech questions, so help me
21 out here.
22    So when you talk about there was this
23 additional level of encryption, what does that mean?
24    **A.** It's just that if anybody sees the
25 servers, you would be able to see the -- who wrote

---

A1188

1  to whom, but you wouldn't be able to see the content
2  without the password of the person for whom this
3  message is intended.
4      **Q.** So is it fair to say that the encryption
5  was designed to protect the information from being
6  seen?
7      **A.** Yeah.
8      **Q.** By whom?
9      **A.** Whoever gets access to the server.
10     **Q.** And in your understanding, who made the
11 decision to add this extra level of encryption?
12     **A.** It was done before me. I just was -- the
13 Blackberry operation, it was set up before me. But
14 in very early stages it was kind of passed to me to
15 operate.
16         At that moment I was not even familiar
17 with Blackberry systems. I kind of learned as I go.
18     **Q.** Now, at some point -- now I'm going to go
19 to the portion where it was moved to Curacao -- just
20 explain to me your involvement at that point and
21 what happened.
22     **A.** Okay. Well, again the technical support
23 for this phone was like really difficult. And I
24 don't remember what exactly happened. But for some
25 reason that Mr. Sharp got really upset about this.

61

1  phones?
2      **Q.** Good question. Can you explain to me the
3  difference?
4      **A.** Okay, the servers had the hard drives
5  encrypted. And that password -- if you removed the
6  server, the password has to be entered in order for
7  the server to boot up. And this process also
8  encrypts all the data on the server.
9      **Q.** So there was one aspect of encryption to
10 the server.
11     **A.** Right.
12     **Q.** There was a different type of encryption
13 to the phone?
14     **A.** Yes.
15     **Q.** What is the phone encryption? Explain
16 that to me.
17     **A.** The phone encryption is a symmetric
18 encryption where the user can share a public key
19 with the person who wants to communicate. And that
20 person using that public key can encrypt the message
21 for that user.
22         So like, for example, if I want you to
23 write me something, I send you a public key. And
24 you, when you are creating the message you use that
25 public key to send it to me.

63

1  And then he told me he would like to find another
2  place.
3         And I think that I was suggesting to him
4  that this is not how the operations should be run.
5         So I suggested Curacao. And then at
6  some -- I got him in touch with sales. And then
7  Mr. Sharp transferred me funds so that I can
8  purchase the servers. And I purchased it somewhere
9  in the US, and then shipped it to Curacao. And I
10 set them up there.
11        I didn't have to go physically there
12 because that's the purpose of server farm, that you
13 can actually do a lot of things remotely.
14     **Q.** When you set up the servers on the server
15 farm for the phones, were those phone servers
16 different from the Q accounting servers?
17     **A.** Just different operating system. But I
18 think it was just one server.
19     **Q.** One server in Curacao that dealt with...
20     **A.** With the phones, phones and
21 communications.
22     **Q.** Did you have any involvement from that
23 point forward when the server was at Curacao as far
24 as the encryption aspect?
25     **A.** The encryption of the server or the

62

1         And because I have the private key, I
2  would be able to read that message.
3         And the Blackberries -- I must say, the
4  users were not very sophisticated, so the
5  Blackberries did it easy enough for them to do that.
6         That was until the Blackberries -- like at
7  some point, if you remember, there was a big outage
8  of Blackberries. And a couple of months after that
9  they decided to stop using the Blackberries.
10     **Q.** Who made the decision to stop using the
11 Blackberries?
12     **A.** Everything -- all decisions came from
13 Mr. Sharp for me.
14         And then he asked me to do alternative
15 method. And basically what I suggested is like --
16 they wanted also to have a voice communication. So
17 I created -- again I did not write any software,
18 just created the -- used open-source tools. And
19 they created voice select [inaudible] system, the
20 VPN.
21         And chat that is not hosted on many cloud
22 services. So it was hosted in Curacao.
23     **Q.** So you created a system for the phone
24 users to --
25     **A.** To communicate. Basically do exactly the

64

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1189

Fedir Nikolayev
2/2/2023

**Page 65**

1  same as Blackberries, except it was additional, the
2  voice communication.
3       And I guess they still used the SIM cards
4  from here, from the Dominican Republic.
5       Q.  And just to make sure I understand, at a
6  more basic level for non-tech people, is it fair to
7  say that you created a system, or you helped create
8  the system so that the users of the phones could
9  communicate either through text messaging or phone
10  calls?
11       A.  Yeah.
12       Q.  That's sort of a more generic way.
13       A.  Yes.  Right.  The phone part of the voice
14  was not -- because they were like roving all the
15  time -- it was not stable enough.  So they did
16  not -- I think at some point they just stopped using
17  that.
18       And at some point it basically converted
19  to just email service.
20       Q.  Just to make sure I've sort of captured
21  all of the methods of communication on the phones.
22       At various points in time there was text
23  messaging?
24       A.  Um-hmm.
25       Q.  There was email?

**Page 66**

1       A.  Um-hmm.
2       Q.  You have to say yes.
3       A.  Yes.  Yes.
4       Q.  And there was voice?
5       A.  Voice.  Yes.
6       Q.  Did the physical phone change from a
7  Blackberry to another phone company phone?
8       A.  Yeah, it was just androids, some Samsung
9  something.
10       Q.  Do you know who made the decision to
11  switch to whatever it was, to android or Samsung?
12       A.  It was my suggestion.  I mean Mr. Sharp
13  really liked his Blackberry, but it was not usable
14  for that purpose.
15       But I suggested, it was requested like to
16  have as cheap as possible and as reliable as
17  possible, so I chose like some sort of like --
18  something like Samsung Galaxy or something.
19       Q.  So the new phones that were being used
20  for -- whether it was voice or text or email -- was
21  the data hosted on the Curacao server?
22       A.  On the Curacao server, yeah.  Basically
23  Curacao server was like a cloud.
24       Q.  And when a user communicated via text
25  message to another user, was that information, that

**Page 67**

1  text message contained on the server?
2       A.  Yeah, but it was expiring like I think in
3  about seven days.
4       Q.  So what remained on the server then?
5       A.  Not really anything.  These communications
6  did not remain on the server.
7       Q.  So the text communications were
8  temporarily?
9       A.  Temporarily, yeah.
10       Q.  After they left the server, were they gone
11  completely?
12       A.  Yeah.
13       Q.  How about email messages; were those
14  retained on the server?
15       A.  Yes.  And they were like -- there was no
16  expiration to them.  It just sometimes Mr. Sharp
17  would ask me to just clear everybody's mailboxes.
18  But I think it was maybe once or twice.
19       Q.  And I kind of asked you this line of
20  questioning with respect to the Q accounting system,
21  just so that I understand if there's a difference
22  with the phones.
23       Were there different levels of access to
24  be able to --
25       A.  No.  No.  Nothing like that.  Basically

**Page 68**

1  all the phones -- if you know -- like the phones
2  were identified by number 1, 2, 3, 4, 5, 6, 7.  Only
3  Mr. Sharp's was called Bond, and everyone else is
4  just number.  I was F-E-N.
5       Q.  And I think I know what you're talking
6  about.  I'll get to that a moment.  I think my
7  question is just a little more basic.
8       It's just the data itself --
9       A.  Yeah, there was no --
10       Q.  -- on the server?
11       Who had access to the data on the server?
12       A.  I guess I did.  But like I don't know what
13  data you would be looking for.
14       Messages would be encrypted.  And I
15  don't -- again my responsibility was just to make
16  sure that everything is operating how it should be.
17       Q.  Okay.
18       A.  I think -- I guess I would have more
19  access than Mr. Sharp.  I probably have more access
20  than Mr. Sharp, but it was just for technical
21  reasons.  Nothing else.
22       Q.  Was it your understanding that Mr. Sharp
23  provided the phones to other people as a regular
24  part of his business?
25       A.  I wouldn't -- I cannot like answer this

A1190

Fedir Nikolayev
2/2/2023

**Page 69**

1 exactly. I guess. I guess.
2 **Q.** Was it your understanding that Mr. Sharp
3 and the people who worked with him regularly
4 communicated using the encryption technology on the
5 phones?
6 **A.** Yes. Yes.
7 **Q.** Is it your understanding that Mr. Sharp
8 and the people who worked with Mr. Sharp did so,
9 communicated using the encryption technology as a
10 regular part of Mr. Sharp's business?
11 **A.** Yes.
12 **Q.** Do you ever recall the domains that were
13 used for email?
14 **A.** Well, XMeridian maybe.
15     MS. SHIELDS: M-E-R-I-D-I-A-N.
16 **A.** And Corporate House. And I don't seem
17 to -- do you have anything --
18 **Q.** I can offer a couple of names.
19     Does Corptrax, C-O-R-P-T-R-A-X dot com --
20 **A.** Yeah. Yeah, I think so.
21 **Q.** That was a domain; was Buzzmail.com a
22 domain name?
23 **A.** It seems like I am recognizing that, yeah,
24 maybe.
25 **Q.** How about Yourbiz, Y-O-U-R-B-I-Z dot com?

69

**Page 70**

1 **A.** I don't remember that one. I don't
2 remember.
3     If it was, it was for a short period of
4 time. I don't remember at all.
5     Yeah, I think they are all registered in
6 Mr. Sharp's account, in a registry.
7 **Q.** Okay. You had referred a couple minutes
8 ago about numbers and names.
9 **A.** Yes.
10 **Q.** Let's talk about that a little bit.
11     What exactly were you -- what were you
12 recalling?
13 **A.** I think there was sequential numbers,
14 maybe like going to 60 maybe, from one to 60, maybe
15 something like that.
16 **Q.** Do you mean each of the phones had a
17 specific number assigned to the phone?
18 **A.** Yeah. Yeah.
19 **Q.** From one going up?
20 **A.** Yeah. Maybe 60.
21 **Q.** Do you know who assigned the numbers to
22 the phones?
23 **A.** I'm just like -- when I creating a new
24 account I just create a number. It's later in the
25 office was assigned to the particular customer.

70

**Page 71**

1 **Q.** And we'll just sort of break this up.
2     So you would create a new account on the
3 phone, you would assign that account a number.
4 **A.** Yeah.
5 **Q.** An integer?
6 **A.** Yeah. And you just work --
7 **Q.** After one you went to two --
8 **A.** Yes.
9 **Q.** -- and to three?
10 **A.** Yeah.
11 **Q.** And so on.
12     And if I understand you, you provided
13 those phones to Mr. Sharp?
14 **A.** SIM card. And the phones were purchased I
15 guess there in Canada.
16 **Q.** And the SIM cards, somebody had to
17 physically put them into the phone?
18 **A.** Yeah.
19 **Q.** Do you know who did that?
20 **A.** It was done in the office.
21 **Q.** When you say "The office," do you mean
22 Mr. Sharp's Vancouver?
23 **A.** Vancouver, yeah.
24 **Q.** And then you had mentioned names. You had
25 mentioned the word Bond -- we're talking about James

71

**Page 72**

1 Bond.
2 **A.** Yeah. Yeah.
3 **Q.** So was it your understanding that
4 Mr. Sharp used a code name Bond?
5 **A.** Bond, yeah. Everywhere, it's like
6 everywhere.
7 **Q.** And what was your understanding of what
8 Mr. Sharp used the code name Bond for when he used
9 that name.
10 **A.** It was his e-mail. It was everything. It
11 was his computer name. Everything. Everything.
12 Just Bond.
13 **Q.** Were there any other code names assigned
14 to Mr. Sharp that you know of?
15 **A.** No.
16 **Q.** Was the code name Bond for Mr. Sharp, was
17 that something that he used for his phones?
18 **A.** Yes. Yes.
19 **Q.** It does the term XPhone come into play?
20 **A.** Yeah, I mean basically they called them --
21 I guess when they sold the idea to customers they
22 called them XPhones.
23 **Q.** Meaning Mr. Sharp referred to the phone
24 system as XPhones?
25 **A.** XPhones, yeah.

72

A1191

**Fedir Nikolayev**
**2/2/2023**

---

**Page 73**

1   **Q.** Was the code name Bond something that
2   Mr. Sharp used for the Q accounting system?
3   **A.** Yeah, that was his -- I think in
4   accounting system that would be like -- how do you
5   call that -- like basically it would be base
6   account.
7      Like it would through that account all of
8   the commissions were paid from that account.
9   **Q.** So you said that you had a phone yourself.
10   **A.** Yeah.
11   **Q.** Did you have a code name?
12   **A.** F-E-N, it is my initials.
13   **Q.** So Fedir Nikolayev?
14   **A.** Yeah.
15   **Q.** Did you have any other phone names?
16   **A.** No, not that I know of. No.
17      Just the administrator on the servers.
18   **Q.** Did you have an account on the Q system?
19   **A.** Well, I had FEN on my account.
20   **Q.** SO with respect to, when you communicated
21   with Mr. Sharp and others who worked with Mr. Sharp,
22   you would sometimes use the name FEN?
23   **A.** FEN, FEN -- they called me Albert. They
24   called me Albert.
25   **Q.** What's Albert?

---

**Page 74**

1   **A.** It's just -- it was apparently
2   unpronounceable to say Fedir, so people started to
3   call me -- decided to call me Albert Einstein. But
4   I told them I'm no way near that person, that man.
5      So I said just stay at Albert.
6   **Q.** So you were just Albert because it was
7   easier to say Albert?
8   **A.** Yeah. That's it.
9   **Q.** Did people refer to you as Tech, T-E-C-H?
10   **A.** Oh, there emails of Tech, yeah, t could
11   be.
12   **Q.** Was that you?
13   **A.** Yeah, I think so.
14   **Q.** How about Techster? T-E-C-H-S-T-E-R?
15   **A.** No. No. But the Tech would be like an
16   email address. But if there's an account like that
17   in the Q system that's not me.
18   **Q.** So just to wrap it up, when people
19   communicated with you or you communicated with
20   people, you used a handle either FEN or Albert or
21   Tech.
22   **A.** Or Tech, yeah.
23   **Q.** I'm going to ask you about some of the
24   other individuals whose names have come up.
25      My question is, with respect to the

---

**Page 75**

1   XPhone, if you know the code names of any other
2   individuals.
3   **A.** I guarantee you that I don't.
4   **Q.** Let me try.
5      So do you know what Yvonne Gasarch's name
6   was on the XPhone.
7   **A.** I think the staff were named, like they
8   were not numbers, they were like letters. So like
9   something maybe -- I don't remember.
10      But like I would say if it's a letters
11   then it's the staff.
12   **Q.** So just to make sure that I understand,
13   each phone had a number assigned to it, correct?
14   **A.** Yeah.
15   **Q.** That number was coded to a specific phone?
16   **A.** Yeah.
17   **Q.** And an individual might have also a code
18   name that involved letters, correct?
19   **A.** Yes.
20   **Q.** Would those code names also be assigned to
21   the same specific phone that that individual used?
22   **A.** They could -- it could be, yes.
23      One more thing that XPhones were is when
24   the access was granted to clients to Q system, which
25   at some point in time I was asked to introduce

---

**Page 76**

1   two-step authentication. And you actually had to
2   receive the code on your XPhone in order to be able
3   to gain access to the system.
4   **Q.** So was it your understanding that
5   Mrs. Gasarch had an XPhone?
6   **A.** Gasarch is Yvonne?
7   **Q.** Yvonne.
8   **A.** Yes, I think she did.
9   **Q.** Do you know what number phone that she
10   had?
11   **A.** No.
12   **Q.** Do you know whether the number 76 was
13   connected to Yvonne's phone?
14   **A.** I don't have -- if I knew that I don't
15   recall it right now.
16   **Q.** Do you know whether the code name Wires
17   was connected to Yvonne?
18   **A.** There is a Wires, but I don't know who it
19   was connected to.
20   **Q.** And we talked about Ms. Courtney Kelln; do
21   you know what code name Ms. Kelln was assigned?
22   **A.** No. Something with K something.
23   **Q.** Does the word Celt, C-E-L-T, ring a bell?
24      MR. MUHLENDORF: Objection. Leading.
25

---

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1192

Fedir Nikolayev
2/2/2023

BY MR. LONDON:

1  BY MR. LONDON:
2      **Q.**  Do you know whether Courtney Kelln used
3  the code name Celt?
4      **A.**  And my answer is like I do not have the
5  association.
6      **Q.**  Is it fair to say that the user of an
7  XPhone could identify a certain number as a code
8  name?  In other words, did it have to be letters or
9  could somebody use numbers as a code name?
10      **A.**  Well, there was Blackberries, the
11  Blackberries had this functionality where you could
12  see directory or all the users in a group.
13          But they would be just numbers.  So they
14  would have to know each other in order to be -- to
15  know who it is.
16          But I think everybody was just basically
17  communicating with Wires and Bond.
18      **Q.**  Could an XPhone user on their XPhone
19  rename somebody on their contact list?
20      **A.**  Yes.  Yes, they could.
21      **Q.**  So, for example, if there was user
22  number 4 could rename user number 2 as some
23  identity.
24      **A.**  Like you do that on your phone, yes.
25      **Q.**  And I know I asked you these names earlier

77

1      We set up a credit card, it was a secured
2  credit card where we put the deposits in the bank.
3  And it was, I don't know, maybe like -- I think
4  maybe like six or $10,000 something limit.  And we
5  set up a FedEx account.  And then that's it.
6      **Q.**  So the company name was Esquire Corporate
7  Services?
8      **A.**  -- Corporate Services, SRL.
9      **Q.**  And that company, the function of the
10  company Mr. Sharp asked you to set up to host a
11  credit card on a FedEx account?
12      **A.**  Yeah.
13      **Q.**  Do you know why Mr. Sharp asked you to do
14  that?
15      **A.**  I don't know.  I don't know.  It did not
16  see much traffic.  It was not like -- I don't think
17  it was used that much.
18      **Q.**  But my question is a little different:  So
19  you were the tech guy for Mr. Sharp.
20      **A.**  Yeah.  Yeah.
21      **Q.**  You provided technical services?
22      **A.**  Yeah.
23      **Q.**  You serviced the phones?
24      **A.**  Yeah.
25      **Q.**  You serviced the accounting system.

79

1  and you had not recognized them.  But just to make
2  sure, I ask you specifically with respect to
3  codes --
4      **A.**  Okay.
5      **Q.**  Did you have an understanding as to any
6  code or number assigned to Paul Sexton?
7      **A.**  No.  I actually never heard that name.
8      **Q.**  Do you have an understanding of any code
9  or number assigned to Jackson Friesen?
10      **A.**  No.
11      **Q.**  Did you have an understanding of any code
12  or number assigned to Mike Veldhuis?
13      **A.**  No, no.  Again I never heard that name
14  before.
15      **Q.**  Did Mr. Sharp ever ask you to set up a
16  company in the Dominican Republic to be a credit
17  card holder for him?
18      **A.**  Yes, he did.
19      **Q.**  What were the circumstances of that?
20      **A.**  Just we setup Esquire Corporate Services,
21  SRL.
22          And he said that he needs credit cards to
23  pay like things -- we set up the credit card and the
24  FedEx account number.
25          [Reporter requests clarification.]

78

1      **A.**  I think the phones been sent -- I remember
2  the phones should be used that account on the FedEx.
3      **Q.**  And we may be sort of talking about
4  slightly different things, so I want to reorient
5  both of us.
6          But given your testimony today you've
7  explained that your function was as the tech person.
8      **A.**  Tech, yeah, yeah.
9      **Q.**  At some point in time Mr. Sharp asked you
10  to open up a company.
11      **A.**  Right.
12      **Q.**  What I am trying to understand is your
13  understanding of why Mr. Sharp wanted you, the tech
14  person, to open this company.
15      **A.**  Yeah.  I have no idea of why.  I was
16  trying to be serviceful (sic), I guess.  Not more
17  thoughts were added to that.
18      **Q.**  So let me ask you this:  So Mr. Sharp was
19  a client of yours?
20      **A.**  Yeah.
21      **Q.**  And he asked you to do something that he
22  would compensate you for.
23      **A.**  Yeah.  Exactly, that's it.
24      **Q.**  So it was a way to earn more money by
25  doing something that Mr. Sharp asked you to do.

80

A1193

Fedir Nikolayev
2/2/2023

**81**

1    A.   Yes.
2    Q.   And you set up a company.
3    A.   Yes.
4    Q.   Do you know why the name Esquire Corporate
5   Services was used?
6    A.   I was -- it was chosen by Mr. Sharp.
7    Q.   When you set up the company did you have a
8   role in the company?  For example, a role as owner?
9    A.   Probably director, I think.  I think me
10   and my assistants were directors.
11    Q.   What was your responsibility as a director
12   of the company?
13    A.   There was no responsibility.  It went as
14   far as just setting up the company.  I did not do --
15   well, I paid the FedEx bills and were making sure
16   credit card is paid.
17    Q.   So your understanding of your role was
18   just to set up the company for Mr. Sharp.
19    A.   Yes.
20    Q.   And your understanding was Mr. Sharp did
21   the business that he needed to do through the
22   company?
23    A.   Yeah.  I do not recall any -- any
24   paperwork that this company used or anything else,
25   other than this FedEx account and the credit card.

**82**

1    Q.   Did this company, Esquire Corporate
2   Services, use the credit card to pay for services
3   for Mr. Sharp's clients?
4    A.   I don't -- I definitely used that credit
5   card to pay for FedEx.  And then they did have
6   access to the credit card numbers.  But I don't -- I
7   don't know what they were paying.
8    Q.   When you say "they had access to the
9   credit card number," who is "they"?
10    A.   Well, Mr. Sharp and his assistants.
11    Q.   Did Courtney Kelln have access to the
12   credit card number?
13    A.   I provided it to Mr. Sharp and it was up
14   to him to --
15    Q.   So I guess, so let me take a step back.
16    Who was authored to use the credit card?
17    A.   I don't have that information.  I just
18   provided the card information to Mr. Sharp.  And
19   then he was the one who would do further -- to
20   distribute it further.
21    Q.   Who got the credit card bill every month?
22    A.   I did.
23    Q.   Who paid the credit card bill?
24    A.   I did.
25    Q.   Where did you get the money to pay the

**83**

1   credit card?
2    A.   I would receive a wire transfer to the
3   account for that.
4    Q.   Who sent the wire transfer?
5    A.   Well, somebody from -- from Mr. Sharp's
6   office.
7    Q.   So either Mr. Sharp or somebody working
8   for him?
9    A.   Yeah.
10    Q.   So you didn't have to use your own
11   personal money?
12    A.   No, no, no, I didn't.
13    Q.   Do you know if the credit card was
14   sometimes used to pay expenses that transfer agents
15   charged for transferring shares of companies?
16    A.   I've seen something like that, yeah, I
17   did.  I did see that.
18    Q.   Was there a significance to having the
19   company in the Dominican Republic?
20    A.   I never thought that the Dominican
21   Republic would be that interest of the jurisdiction
22   -- I didn't understand why it was --
23    (Reporter requests clarification.)
24    I did not have any reason -- myself, I
25   didn't understand why the Dominican Republic.

**84**

1    Q.   So there was a credit card associated with
2   the company?
3    A.   Yes.
4    Q.   And the FedEx bill.
5    A.   Yes.
6    Q.   Who paid the FedEx bill?
7    A.   The same company.  I did.
8    Q.   And did you use the money that was wired?
9    A.   Yeah.
10    Q.   What purposes did you have to use FedEx
11   for?
12    A.   Myself, I used it to send SIM cards.  And
13   right now I still have that account, but we changed
14   the account number.  I'm using it for my, I don't
15   know, like online shopping and stuff, or something
16   that I buy in China.
17    Q.   And who else had access to the FedEx
18   account number at Esquire Corporate Services?
19    A.   I brought it -- same as credit card, I
20   brought it to Mr. Sharp and after that it was up to
21   him to distribute it.
22    But as soon as that date that Mr. Sharp
23   told me that he's not going to work with me, I
24   basically changed -- I requested FedEx to change
25   the account number.

A1194

Fedir Nikolayev
2/2/2023

85

1    Q.  But during the period where you were
2  working and doing services for Mr. Sharp, it was
3  your understanding that Mr. Sharp had a FedEx
4  account number to use?
5    A.  Yes.
6    Q.  And it was your understanding that
7  Mr. Sharp provided the FedEx number to others to
8  use?
9    A.  Yeah, I think so.
10   Q.  We had talked earlier about a company -- I
11 think it was it's pronounced Gotama?
12   A.  Something be like that.
13   Q.  G-O-T-A-M-A?
14      So what was Gotama?
15   A.  I have no idea.  I think -- I think it's
16 something that he offered me to make extra money and
17 that he would use my name to set up that company.
18 And I'm being a little bit stupid, I just went for
19 it.
20   Q.  Just to make sure that we understand for
21 the record, when you say "he," you mean Mr. Sharp?
22   A.  Mr. Sharp, yeah.
23   Q.  He asked you to set up this company
24 Gotama?
25   A.  No, no, no.  I was not involved in setting

87

1    A.  Possibly.  Possibly.
2    Q.  Is it fair to say your understanding was
3  that Mr. Sharp would compensate you through some
4  sort of means of where he would put money in your
5  account?
6    A.  Yeah.
7    Q.  But you didn't have a specific amount?
8    A.  No, there is no specific amount.
9    Q.  You left it up to Mr. Sharp to decide how
10 much he gave you?
11   A.  Yes.
12   Q.  Were you happy with what he gave you?
13   A.  There was a flow money for some time and
14 then it just kind of slowed down.
15   Q.  Overall, generally speaking, were you
16 happy with the compensation that you received from
17 Mr. Sharp?
18   A.  Yes.  Yes.
19   Q.  So you said that you provided certain
20 information to Mr. Sharp so he could form Gotama.
21   A.  Right.
22   Q.  Your passport?
23   A.  My passport and my phone bill -- actually
24 I looked this up before coming here, I think it was
25 like 2017.

86

1  up the company.  All I provided was my ID and KYC.
2    Q.  Know your customer?
3    A.  Yeah.
4    Q.  So it's fair to say that Mr. Sharp asked
5  you to provide personal information in connection
6  with setting up the Gotama company?
7    A.  Yes.
8    Q.  And is it fair to say that the reason you
9  did so was in part because Mr. Sharp was a client of
10 yours?
11   A.  Yes.
12   Q.  And also in part because Mr. Sharp said
13 that he would compensate you?
14   A.  Yeah.
15   Q.  How would he compensate you for Gotama?
16   A.  Well, he -- in this situation he was
17 saying that he would give me some commission on
18 transactions that were going through this account.
19 But like we did not agree on, like, any particular
20 amount.
21      It would just show up on my account on the
22 Q system.
23   Q.  So is it fair to say that you had an
24 understanding that Mr. Sharp used Gotama to trade
25 stock?

88

1    Q.  Just your personal phone bill.
2    A.  Yeah, personal phone bill.
3    Q.  And potentially some other documents?
4    A.  I think in 2017 it was just that.
5    Q.  Were you considered the beneficial owner
6  of Gotama?
7    A.  I did not -- I was not involved in like
8  how it was operating.  The only thing I was provided
9  was the passport.
10   Q.  So let me ask you this way -- or let me
11 ask you this question, Mr. Nikolayev:
12      Other than providing the passport and
13 phone bill to Mr. Sharp, did you have any other role
14 with respect to Gotama?
15   A.  No.
16   Q.  At any point in time?
17   A.  Not at all.
18   Q.  Was it your understanding that all
19 activities of Gotama were conducted by either Mr.
20 Sharp or people working with Mr. Sharp?
21   A.  Yes, yes, that's correct.
22      It was April 23, 2016, that I provided my
23 bank reference, my phone bill and my passport.
24   Q.  Bank reference, phone bill and passport.
25   A.  Yes.

Fedir Nikolayev
2/2/2023

1    **Q.**  Just for the record we are just going to
2  reflect that you just looked up the information on
3  your phone to --
4    **A.**  Yeah, yeah.  I have a copy of those
5  records.
6    **Q.**  Totally fine.  What we're doing is we are
7  informing everybody that's where you're getting it.
8      I'm not putting a document in front of
9  you.
10    **A.**  Oh, okay.  Okay.  Okay.
11    **Q.**  Just so people know where we are getting
12  this from.
13      Sometimes we lawyers have to do that as
14  part of these proceedings.
15      Were you ever aware that you were
16  identified as an officer of Gotama?
17    **A.**  Google search, something in the Marshall
18  Islands or something, my name showed.
19    **Q.**  You did a Google search?
20    **A.**  Like a couple of years ago.
21    **Q.**  You found out that you were an officer?
22    **A.**  No.  I found out my name is in some
23  document in the Marshall Islands.
24    **Q.**  But you didn't know that until a couple of
25  years ago?

89

1    **A.**  No.
2    **Q.**  So at the time that you provided
3  information to Mr. Sharp, you didn't have any
4  awareness one way or the other whether Mr. Sharp was
5  going to use your name as an officer of Gotama?
6    **A.**  Well, you know, if he said that in the
7  company, I guess I would be the officer.  So I
8  assumed that much.
9      But there was no explanation of what
10  exactly was going to happen.
11    **Q.**  But again you did not consider yourself a
12  substantive officer?
13    **A.**  Correct.  Correct.
14    **Q.**  You didn't anticipate taking any action?
15    **A.**  Exactly.
16    **Q.**  You didn't anticipate doing any work for
17  Gotama?
18    **A.**  Exactly.
19    **Q.**  You didn't anticipate making any decisions
20  for Gotama?
21    **A.**  Correct.
22    **Q.**  Other than the providing information to
23  set up the company, did Mr. Sharp ever ask you to do
24  anything with respect to Gotama?
25    **A.**  There was periodically where he asked

90

1  me to -- asked me to send the KYC.  So I got one on
2  the 23rd of January, 2018; 20th of February of 2018;
3  24th of April 2018; 17th of January, 2019; 25th of
4  February, 2019; and 20th of April of 2019.
5    **Q.**  All those dates that you just identified,
6  those were all times when Mr. Sharp -- what was it
7  Mr. Sharp was asking you specifically to do?
8    **A.**  He was asking me for my bank -- again my
9  bank reference letter, phone bill and the latest
10  copy of my passport.
11    **Q.**  So again Mr. Sharp was asking you to
12  provide documentation?
13    **A.**  Yeah.
14    **Q.**  Do you know whether Gotama had accounts at
15  any particular financial institutions?
16    **A.**  I personally don't.
17    **Q.**  Did you have a role other than providing
18  the documents to Mr. Sharp to open any accounts with
19  financial institutions?
20    **A.**  I think maybe I had to fill out the form.
21      One of those things I heard there was a
22  very long form that they had to fill out.
23    **Q.**  I'm going to give you names of some
24  financial institutions to see if you recognize these
25  names as affiliated with Gotama.

91

1      There's a company Breder Suasso -- I will
2  spell that:  B-R-E-D-E-R; second word, S-U-A-S-S-O
3    **A.**  I don't know that one.
4    **Q.**  There is a company by the name of WB21PTE
5  Limited; do you recognize that name?
6    **A.**  Well, I think I recognize it just from --
7  is it some sort of offshore bank like online bank?
8    **Q.**  Sir, let me ask you --
9    **A.**  I'm not sure if it's related to Gotama --
10  I think it was just general --
11    **Q.**  You have a general awareness of WB21.
12    **A.**  Yes.
13    **Q.**  But not necessarily in connection with
14  Gotama.
15    **A.**  No.
16    **Q.**  Do you recognize the entity named Beaufort
17  B-E-A-U-F-O-R-T, in connection with Gotama?
18    **A.**  I just remember the name, but I don't
19  remember why. I don't remember why.
20    **Q.**  Do you recognize he name Beaufort as a
21  brokerage account in the United Kingdom?
22    **A.**  No, I don't.
23    **Q.**  Do you know whether Beaufort had an entry
24  in the Q accounting system in the bank code column?
25    **A.**  I do not know.

92

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1196

Fedir Nikolayev
2/2/2023

1    **Q.**  Do you recognize the name St. Galler
2  Kantonal Bank -- and I will spell that -- Saint is
3  St. Galler is G-A-L-L-E-R; Kantonal Bank is
4  K-A-N-T-O-N-A-L  B-A-N-K?
5    **A.**  No, I do not.
6    **Q.**  Do you recognize the name Hyposwiss,
7  H-Y-P-O-S-W-I-S-S?
8    **A.**  I do not.
9    **Q.**  Do you recognize the name Banque
10 Havilland, B-A-N-Q-U-E and Havilland is
11 H-A-V-I-L-L-A-N-D?
12   **A.**  No, I don't recognize it.
13   **Q.**  Do you recognize an individual -- the name
14 of an individual Anthony Killarney,
15 K-I-L-L-A-R-N-E-Y?
16   **A.**  No.
17   **Q.**  Do you recognize the name of a person by
18 the name Kenneth Ciapala, C-I-A-P-A-L-A?
19   **A.**  No.  I don't remember that at all.
20   **Q.**  Do you recognize the name Roger Knox,
21 K-N-O-X?
22   **A.**  It seems like I heard it, but I don't
23 remember why.
24      I cannot place it, no.
25   **Q.**  Do you recognize the company by the name

93

1  welcome to look through it.  I just need you to
2  familiarize yourself with it.  But there are
3  particular areas I'll point you to.
4      But if you feel like right now flipping
5  through this, go ahead.  Just look up when you are
6  ready.
7    **A.**  So that's Gotama Capital.
8    **Q.**  I haven't asked you a question yet.  Just
9  flip this up the document to familiarize yourself.
10 I will point you to specific information when you
11 are ready.
12      MR. KNUTS:  If you could just repeat
13 the exhibit number when you start asking questions.
14      THE COURT REPORTER:  Who is speaking?
15      MR. LONDON:  Kevin, that was you,
16 right?
17      MR. KNUTS:  Actually, this time it's
18 Bob.
19      MR. LONDON:  Bob.
20      And, yes, just for counsel on the
21 call, I will identify exhibit number -- and some of
22 the exhibits just regrettably don't have Bates
23 numbers on them.  I'll do my best, but some do have
24 Bates numbers.  So I will identify as best as
25 possible what we're looking at.

95

1  or an entity by the name Edenbridge,
2  E-D-E-N-B-R-I-G-E?
3    **A.**  No.
4      MR. LONDON:  How much time do we have
5  left on the videotape?  Do we need to break?
6      THE VIDEOGRAPHER:  Fourteen minutes.
7      MR. LONDON:  Fourteen?
8      (Deposition Exhibit 18 was marked for
9  identification.)
10 BY MR. LONDON:
11   **Q.**  Mr. Nikolayev, I'm handing you a document
12 that we've marked as Deposition Exhibit 18.
13     I'm going to identify it for people
14 participating on the video call so they know the
15 document I'm referring to.
16     So for counsel on the call we provided you
17 potential exhibits for use today.  And so in the PDF
18 name the document I'm looking at -- there's no Bates
19 number on this particular one, but it was named as a
20 PDF 2012-01-19__Gotama__Capital__formation.
21     I'm just doing that so they know what
22 we're looking at.
23     When I hand you a document, Mr. Nikolayev,
24 there may be multiple pages of a document.  I'm not
25 going to ask you to read every single page.  You're

94

1      THE WITNESS:  It's funny, the
2  document says 2012, but I provided this information
3  for 2016.
4  BY MR. LONDON:
5    **Q.**  Maybe if we question to the questions we
6  can talk a little bit about that.  But again I don't
7  want to take away from you looking at them.  But to
8  make it sort of more efficient I'll point you to
9  certain areas.
10     On the first page of Exhibit 18 it states:
11 "Gotama Capital SA bylaws as adopted January 19,
12 2012."
13     Mr. Nikolayev, did you have any role in
14 drafting these files?
15   **A.**  No, I have not.
16   **Q.**  And on the twelfth page -- so basically if
17 everybody in Exhibit 18 goes to the twelfth page,
18 there's a page called "Certificate of Incumbency."
19     Mr. Nikolayev, we're now looking at the
20 page in Exhibit 18, the top of the page says
21 "Certificate of Incumbency."
22     Other than me showing you this document
23 today sitting here, have you ever seen this page
24 before?
25   **A.**  No, no, I haven't.

96

GRADILLAS COURT REPORTERS
(424) 239-2800

A1197

Fedir Nikolayev
2/2/2023

1    **Q.**  And you'll see in the page we are looking
2  at there's numbered paragraphs and letters.  And
3  under Paragraph 2-A, if you look down, do you see
4  there's a statement the company's operating address
5  is c/o Blacklight SA; do you see that?
6    **A.**  Yes, I see that.
7    **Q.**  Do you have an understanding of what
8  Blacklight is?
9    **A.**  I don't know exactly what Blacklight, but
10 based on what I see it seems to be its operating
11 address of -- the company operating address of
12 Gotama Capital.
13   **Q.**  I probably should have asked the question
14 a little better, that was probably my fault.  But do
15 you know the function of Blacklight as an entity?
16   **A.**  No, no, I don't.
17   **Q.**  And you'll see the date on this particular
18 page is August 11, 2014, that's towards the bottom;
19 do you see that?
20   **A.**  Yeah.
21   **Q.**  A little bit above that there's two boxes;
22 one box states, "The current director is: Edenbridge
23 Directors Limited"; do you see that?
24   **A.**  Um-hmm.
25   **Q.**  I had asked you the name Edenbridge

97

1  before but looking at it here --
2    **A.**  I honestly never came up to me with that
3  name.
4    **Q.**  So you have no understanding of what
5  Edenbridge Directors Limited is?
6    **A.**  Right.  Right.
7    **Q.**  So now we are going to go two or three
8  pages down.  There's a page called "Consent of
9  Incorporator of Gotama Capital SA.
10   **A.**  Right.
11   **Q.**  And there's a date towards the bottom of
12 January 19, 2012 on this page; do you see that?
13   **A.**  Um-hmm.
14   **Q.**  There are three names on this page.  I'm
15 going to direct you to that; the names that I asked
16 you earlier but they are now written on this page;
17 do you see name Anthony Killarney?
18   **A.**  Yes.
19   **Q.**  Seeing it on this page, do you have an
20 understanding of who Anthony Killarney is?
21   **A.**  It is a shareholder, right?
22   **Q.**  He's identified on this page as a director
23 --
24   **A.**  Okay.
25   **Q.**  -- on this paper.  But did you have any

98

1  understanding of any role that Anthony Killarney
2  played with respect to Gotama?
3    **A.**  No.
4    **Q.**  Did you have an understanding of any role
5  Kenneth Ciapala played with respect to Gotama?
6    **A.**  No.
7    **Q.**  Other than seeing the name Roger Knox
8  identified as an officer on this page, did you ever
9  have an understanding of any role Roger Knox played
10 with respect to Gotama?
11   **A.**  No, no, I don't.
12   **Q.**  We are now going to flip forward in this
13 and there's a bank statement called Banco BHD León.
14   **A.**  BHD León, yes.
15   **Q.**  And so have you ever seen this page
16 before?
17   **A.**  Yes, that's one that I told you I provided
18 in 2016.
19   **Q.**  So this is a document that you provided to
20 Mr. Sharp?
21   **A.**  Yeah.
22   **Q.**  And did you have an understanding at the
23 time that you provided this to Mr. Sharp as to why
24 he needed this document?
25   **A.**  He wanted to incorporate the company.

99

1    **Q.**  And this was in connection with Gotama?
2    **A.**  Yeah.
3    **Q.**  Where did you get this document?
4    **A.**  At the bank branch in Sosua.  I used that
5  bank.
6    **Q.**  That was your bank?
7    **A.**  Yeah.
8    **Q.**  You used that bank for -- do you mean for
9  personal --
10   **A.**  Yes.  Yeah, it is my personal.
11   **Q.**  So on this document that we're looking at,
12 on the left-hand side it says Blacklight SA; do you
13 see that?
14   **A.**  Oh, that's where I know this name from.
15       Okay, yes.
16   **Q.**  You're anticipating where I'm going with
17 this.
18       What is the connection between Blacklight
19 SA with respect to Gotama?
20   **A.**  I guess there's no connection with my
21 bank?  I guess when Mr. Sharp asked me to create or
22 asked for a bank reference, he asked me to address
23 it to that name.
24   **Q.**  So the reason the word Blacklight SA
25 appears on your bank account statement is because

100

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1198

Fedir Nikolayev
2/2/2023

---

1  Mr. Sharp directed you to put that in?
2      A.  Yeah, he asked me to because generally --
3  like this letter is "To Whom it may Concern," and
4  apparently in this case the actual destination was
5  required.
6      Q.  So you had no independent reason for
7  identifying Blacklight.
8      A.  Yeah, it was -- I was asked to put that on
9  there.
10     Q.  Two pages from where we are looking at
11 there's a --
12     A.  Phone.
13     Q.  This is your phone bill?
14     A.  Um-hmm.
15     Q.  And this was the phone bill that you
16 provided to Mr. Sharp?
17     A.  Yeah.  Yeah.
18     Q.  And again you did so because Mr. Sharp
19 directed you to do so?
20     A.  Right.
21     Q.  Not because you had an independent basis.
22     A.  Correct.
23     Q.  If you flip a few page down, you're ahead
24 of the game here, there is a page with what appears
25 to be your passport.

101

1      A.  Yes, I did.  I did.
2      Q.  And you did this at the direction of
3  Mr. Sharp?
4      A.  Yes.  He told me that my actual CV was too
5  long.
6      Q.  I would like to ask you:  In the summary
7  of employment section of the CV, if you look down it
8  states "1999 to present time stockbroker plus
9  financial services."
10     Do you see that?
11     A.  Yes.
12     Q.  Is that an accurate reflection of your
13 job?
14     A.  But not my position; the company that I
15 worked at.
16     Q.  So which company did you work at?
17     A.  What I meant there I'm not an English
18 speaker so I was working at HE Capital SA.
19     Q.  HE Capital?
20     A.  -- SA, which I previously sold, but it's a
21 corporate services company.
22     Q.  Is that name on résumé at all, on the CV?
23     A.  No.
24     Q.  So you just have under Summary of
25 Employment --

103

---

1      A.  Yes.
2      Q.  And that is your passport.
3      A.  Yes, that is my passport.
4      Q.  You provided your passport or last least a
5  copy of your passport to Mr. Sharp.
6      A.  Yeah.  That document.
7      Q.  And you provided this document with your
8  passport on it because Mr. Sharp directed you to do
9  that.
10     A.  Yes.
11     Q.  You had no independent basis for doing
12 this.
13     A.  Correct.
14     Oh, found my CV.  He asked me to --
15     Q.  And that's your CV, right?
16     A.  He asked me to -- my CV is like maybe six
17 pages long.  And he asked me to create one that is
18 short.
19     Q.  So the page we're looking at right now is
20 the Fedir Nikolayev CV page?
21     A.  Yeah.
22     Q.  It's a single-page document.
23     A.  Yeah.
24     Q.  And did you actually prepare this
25 particular document?

102

1      A.  Yeah.  I think -- I don't recall exactly
2  how I created it.  But like maybe Mr. Sharp asked me
3  to put it like that.
4      Q.  I have a very specific question.
5      So under summary of employment from 1999
6  until the present time, this document states that
7  you are a stockbroker; is that true?
8      A.  This doc -- it's written like that but I
9  did not meant to be that, yes, it is my position as
10 a stockbroker.
11     (Court reporter requests clarification.)
12     Q.  For the court reporter's benefit can you
13 repeat your answer?
14     A.  Yes, on this document it does say that.
15     Q.  And in separate --
16     MR. LONDON:  We need to -- let's go
17 off the record and change the tape.
18     THE VIDEOGRAPHER:  The time is 12:08.
19 We're off the record.
20     (Recess taken at 12:08 p.m. until
21 12:17 p.m.)
22     THE VIDEOGRAPHER:  Back on the
23 record.  The time is 12:16, tape number 3.
24     THE WITNESS:  Okay.
25

104

---

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1199

Fedir Nikolayev
2/2/2023

BY MR. LONDON:
Q. So, yeah, so let me just pose a question to you.
So we're looking at your CV page. And the CV page reflects that you from 1999 to the present time, as reflected on the CV, are identified as a stockbroker.
Did you perform the function of a stockbroker?
A. Never. I have never performed that function.
Q. Do you know how the identity of you being a stockbroker ended up on your CV?
A. Because that's the word template for the standard résumé. So I just looked on my computer for all résumés that I have created and I found one that looks like this one. And in that résumé I indicated that from May 2001 until now I work as -- the exact words that I used in that résumé, "Offshore worker, financial and corporate services and asset management."
And my -- my -- I did not indicate that I did use any trading. It was all IT related.
That was my original résumé that I have created. And as I recall, Mr. Sharp said that it

105

was too long and he wanted to shorten it.
Q. So the reason that you're identified as a stockbroker on your CV is that you had that on a template at one point?
A. Yes. But not -- again, it was not as my position. It's for whom I was giving -- providing IT services to.
Q. I understand. Thank you.
The next page after the CV is a page that purports to be a stock share certificate in Gotama Capital SA; do you see this page?
A. Yes.
Q. Do you recognize this page?
A. I'm not really like -- I see my name, but I don't recall seeing that.
Q. This page reflects that Fedir Nikolayev -- that's you, correct -- is the owner of one share of common stock in Gotama Capital; do you see that?
A. Yeah.
Q. Do you have an understanding that you were a shareholder in Gotama Capital? Other than looking at this page, do you have an understanding that you --
A. No, I did not. I did not have that understanding.

106

Q. The very last page of Exhibit 18 is titled "Resolution of Director in Writing, Gotama Capital SA"; have you ever seen this particular page before?
A. No, I have not.
Q. You see the name at the bottom is Anthony Killarney; do you see that?
A. Yes.
Q. That's a name I asked you about. You don't recognize that name, correct?
A. No.
Q. In this document there's a statement -- it is the fourth bullet point down -- and it refers to Fedir Nikolayev, one registered share without a par value; do you see that?
A. Yeah.
Q. Right above that it states "beneficial owner"; do you see that?
A. Yeah.
Q. And actually I'm going to read a little bit more. I'll read the whole sentence.
It says: "It is resolved that the share of the company be and it is hereby issued as registered share to the following shareholder and beneficial owner," and then it identifies you; do you see that?

107

A. Yeah.
Q. Did you have an understanding that you were a shareholder and beneficial owner of Gotama Capital?
A. I did not. I do not.
Q. So I'm going to give you another document next so we can move that to the side.
A. Do I get to keep it?
Q. You don't get to keep it. These are official records of the deposition.
If for some reason you have a question, we can talk after we're done.
(Deposition Exhibit 19 was marked for identification.)
BY MR. LONDON:
Q. Mr. Nikolayev, I am handing you a document that we have marked as Deposition Exhibit 19. For the benefit of the counsel participating remotely, this also doesn't have the Bates number. We've identified this in the photo we sent you as the PDF with name 2016-04-11__Gotama-business plan.
And so, Mr. Nikolayev, your role now is to flip through and I'll ask you a question when you look up so that I know that you are ready.
A. Okay.

108

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1200

Fedir Nikolayev
2/2/2023

---

**109**

1    **Q.** Having reviewed this document now, have
2    you ever seen this before?
3    **A.** No, I haven't.
4    **Q.** The first page of the document, which is
5    the page titled, "Business Plan Gotama Capital" has
6    a -- what appears to be an org chart, an
7    organizational chart. And at the bottom right
8    you're identified as "Clients unique shareholder";
9    do you see that?
10    **A.** Right. My name is misspelled.
11    **Q.** Yeah, your name is misspelled, so it's
12    spelled on here as N-I-C-O-L-A-Y-E-V, but the
13    correct spelling is with a K, correct?
14    **A.** Yeah.
15    **Q.** So you did not fill this out, correct?
16    **A.** No.
17    **Q.** You never saw this before, correct?
18    **A.** No, I have not.
19    **Q.** The second page of the document that we're
20    looking at that is Exhibit 19 is also titled
21    "Business Plan" and it purports to be some form of
22    financial statement.
23    **A.** Right.
24    **Q.** Have you ever seen that page before?
25    **A.** No, I have not.

---

**110**

1    **Q.** The third and final page of Exhibit 19,
2    also titled "Business Plan Gotama Capital SA" has
3    nine paragraphs in it.
4    **A.** Um-hmm.
5    **Q.** I'm going to direct your attention to
6    paragraph number 5, which is entitled "Business
7    Activities"; do you see that?
8    **A.** Yes.
9    **Q.** So I'm just going to ask you to read
10    Paragraph 5 in its entirety and look up when you are
11    ready.
12    **A.** "The core of business --"
13    **Q.** No, no, no, no. Just read it to yourself.
14    **A.** (Witness complies.)
15        Okay.
16    **Q.** Ready? So paragraph Number 5 entitled
17    "Business Activities" has a portion that says, "The
18    client (unique shareholder of the company) is
19    sophisticated investor. He has extensive knowledge
20    in capital and equity markets from his former career
21    as investor in global equities markets and private
22    companies.
23        "Since then, he concentrated his efforts
24    in participating investments into small/mid cap
25    companies, which is a natural course of progression

---

**111**

1    after generating significant wealth to do so.
2        "He uses Blacklight's SA services for the
3    purpose of setting up a corporate to open
4    brokerage/banking accounts to facilitate formation,
5    administration and consolidate his stock portfolio
6    trading.
7        "This affords her more time to source,
8    research, analyze other public companies to
9    potentially invest in."
10        So I've just read into the record that
11    paragraph. Aside from the sort of format, there are
12    grammatical inconsistencies --
13    **A.** Right, the "her," I think it was taken
14    from somewhere else.
15    **Q.** Aside from the grammatical
16    inconsistencies, my question to you is this:
17        Is any information in that paragraph that
18    I just read into the record an accurate reflection
19    of you?
20    **A.** No. I do not know anything about
21    financial services or the stock market or anything
22    like that.
23    **Q.** Do you have an understanding of anyway at
24    all of how that information about you was put into
25    this business plan?

---

**112**

1    **A.** No, not at all.
2    **Q.** And you had nothing to do with that,
3    correct?
4    **A.** I had nothing to do with that?
5        You can see it says "her."
6    **Q.** I will let the record reflect that there
7    are certain grammatical inconsistencies, yes.
8        And you did not write that?
9    **A.** I did not write that. That's not my
10    English at all. I wouldn't write that.
11    **Q.** Okay. Thank you.
12        You can put that to the side. We are
13    going to give you another exhibit.
14        (Deposition Exhibit 20 was marked for
15    identification.)
16    BY MR. LONDON:
17    **Q.** Mr. Nikolayev, we are giving you now a
18    document that we've marked as Deposition Exhibit 20.
19        Take a moment to flip through it. I'm
20    going to identify it for the record. For counsel,
21    Deposition Exhibit 20 does have a Bates number. And
22    so we've identified it in the folder we gave you by
23    the Bates number SEC-UKFCA-E-0105406.
24    **A.** It has a different number.
25    **Q.** Just for Mr. Nikolayev's benefit, what

---

**Fedir Nikolayev**
**2/2/2023**

1 those numbers are, this is just something that
2 lawyers do to code a document to make it easy to
3 find a page. That's why those numbers are on this
4 one.
5        But just to yourself, just flip through it
6 and then I will ask you a question.
7    **A.** Okay.
8    **Q.** So, Mr. Nikolayev, the document we've
9 marked as Deposition Exhibit 20 is a multiple-page
10 document. And I'm just reading this into the record
11 so just bear with me here.
12        Bates range SEC-UKFCA-E-0105406 through
13 5415. It's a multiple-page document. The first
14 page of the document is entitled "Beaufort
15 Securities Limited Company Account Application
16 Form."
17    **A.** Um-hmm.
18    **Q.** Now I'm going to pose the question to you:
19 Do you recognize this document?
20    **A.** I do not. I do not recognize -- what date
21 is this?
22    **Q.** Well, to the extent that there's a date --
23 I'm not sure, if you flip through it, if there's a
24 particular date on it.
25        On the page that is 5413, if that helps

113

1 Muhlendorf.
2        MR. LONDON: Sure, Kevin. Let the
3 record reflect that Mr. Nikolayev is searching on
4 his personal cell phone in connection with answering
5 the question I posed to him.
6        THE WITNESS: Okay. On that date
7 that is written over here I have -- I have a KYC
8 form general. And then there's my signature which I
9 do not see a signature on this one.
10        And nothing else.
11        But I do not see this particular form
12 over here that I sent to -- to Fred.
13 BY MR. LONDON:
14    **Q.** So based on information available to you,
15 including information that you retained in your
16 personal cell phone, is it fair to say that you did
17 not fill out any information in the Beaufort Company
18 Account Information Form as reflected by Exhibit 20?
19    **A.** Correct.
20        (Deposition Exhibit 21 was marked for
21 identification.)
22 BY MR. LONDON:
23    **Q.** Mr. Nikolayev, I've handed you a document
24 we've just marked as Deposition Exhibit 21.
25        For the benefit of counsel participating,

115

1 you, so those numbers at the bottom that end in 5413
2 appear to have a date of 04.01.17; do you see that?
3    **A.** Right.
4    **Q.** To the extent that that helps you.
5        It's not a question, but to the extent
6 that helps you.
7        My question is: Have you seen this?
8    **A.** I do not recall this. I don't recall it.
9    **Q.** So I'm going to point out for you that on
10 the second page of the document, which is the Bates
11 page ending in 5407 --
12    **A.** Yep.
13    **Q.** -- you're identified as the Ultimate
14 Beneficial Holder; do you see that?
15    **A.** Yep.
16    **Q.** Did you fill out that information?
17    **A.** Let me just confirm. Let me just confirm.
18        I do not recall that. But let me confirm
19 if it was one of the things that -- it says --
20        So January 2017 --
21        MR. MUHLENDORF: Do you mind just
22 putting on the record that he is searching through
23 his phone while he answers the questions?
24        THE COURT REPORTER: Who is talking?
25        MR. MUHLENDORF: That is Kevin

114

1 this also does not have a Bates number attached to
2 it. We've identified this in the folder we provided
3 to you with a PDF label "Beaufort Power of Attorney
4 Form."
5        This is a two-page document. The first
6 page states on it that it's a Beaufort Power of
7 Attorney Form.
8    **A.** Yes. I confirmed that I have sent this
9 one on the 28th of November 2016.
10    **Q.** So you sort of jumped ahead. I'm going to
11 give you the question and you can give the answer,
12 just so we do this correctly. But do you recognize
13 this document?
14    **A.** Yes. Yes.
15    **Q.** Is this a document that you provided to
16 Mr. Sharp?
17    **A.** Yes, on his request.
18    **Q.** And is the signature on the first page of
19 the document your signature?
20    **A.** Yeah.
21    **Q.** And what's the actual date of that? Is
22 that November 28, 2016?
23    **A.** Yeah. And I scanned this in my computer
24 on that date.
25

116

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1202

Fedir Nikolayev
2/2/2023

---

1    **Q.** And what is the reason you provided this
2    document to Mr. Sharp?
3        **A.** I understand that it was a part of that
4    services that he requested me to provide him as part
5    of my bank reference, phone bill and my passport, he
6    requested that -- this to be signed.
7        **Q.** And you had no independent reason for
8    providing this to him?
9        **A.** Correct.
10       **Q.** In this document that you signed, if you
11   would take a look in the middle of the first page,
12   it states that -- and I'll read this:
13       "I appoint the above-named individual to
14   buy and sell on my behalf and give instructions
15   relating to investments in securities."
16       **A.** Right.
17       **Q.** It goes on. I'm not going to read the
18   whole thing. But the name referenced above --
19   there's actually two names -- do you see the names
20   Anthony Killarney and Kenneth Ciapala?
21       **A.** Yeah.
22       **Q.** Did you intentionally appoint Anthony
23   Killarney and Kenneth Ciapala to buy and sell on
24   your behalf and give instructions relating to
25   investments and securities?

117

---

1        **A.** No. I just signed the document that was
2    asked me to sign at that time.
3        **Q.** So the only reason you signed this
4    document was because Mr. Sharp directed you to do
5    so?
6        **A.** Yes. Yes.
7        (Deposition Exhibit 22 was marked for
8    identification.)
9        MR. LONDON: Mr. Nikolayev, I'm now
10   handing you a document we marked as Deposition
11   Exhibit 22.
12       Counsel on the call, this is also a
13   document without a Bates numbers. We've identified
14   this as a PDF with the name 2016-04-28_Gotama_Breder
15   Suasso__application.
16       Mr. Nikolayev, take a moment to look
17   through this document and just look up when you are
18   ready.
19       THE WITNESS: There is no
20   signature -- my signature on this one.
21   BY MR. LONDON:
22       **Q.** I'll pose the question to make it easy.
23   Do you recognize this document?
24       **A.** No, I do not.
25       **Q.** You've never seen this before?

118

---

1        **A.** No.
2        **Q.** Having looked through this document now,
3    sitting at the table, are any of the signatures on
4    this document yours?
5        **A.** I do not see my signature. Let me look.
6        **Q.** Sure. Take your time.
7        **A.** No.
8        **Q.** And one last question on this document, on
9    the fifth page there's a page called "Application
10   for Opening and Maintaining a Legal Entities Current
11   Account."
12       **A.** Okay.
13       **Q.** Do you see that page?
14       **A.** Um-hmm.
15       **Q.** Do you see that your name is on that page,
16   Fedir Nikolayev?
17       **A.** Right.
18       **Q.** Did you provide this information for
19   purposes of filling out --
20       **A.** This form?
21       **Q.** -- this form?
22       **A.** That's general information that Mr. Sharp
23   had on file.
24       **Q.** There's an email address on this page -- I
25   don't think that I can pronounce it. I think that I

119

---

1    have to read it into the record.
2        But for purposes of the record, the email
3    address listed under your name is
4    ekuczynska@totalpro.EU; do you see that?
5        **A.** Yes.
6        **Q.** Is that your email?
7        **A.** No. My emails always include F-E-N in
8    them.
9        **Q.** So you don't recognize that email?
10       **A.** No. And I think that's the Swiss phone
11   number, that's not mine. A phone number from
12   Switzerland. It's not mine.
13       **Q.** You're anticipating me again. I was going
14   to ask you: There's a telephone number identified,
15   for the record I'm going to read the phone
16   Number 004-122-761-4488; do you see that?
17       **A.** Yeah, I do not recognize this number.
18       **Q.** That's not your number?
19       **A.** No, not my number.
20       **Q.** You have never had that number.
21       **A.** Yeah, and I've never been in Switzerland.
22       **Q.** Pardon me?
23       **A.** I have never been to Switzerland.
24       **Q.** I hear it's a very nice country.
25       **A.** Yes. From the plane it looked beautiful.

120

---

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1203

Fedir Nikolayev
2/2/2023

1    **Q.** Did you know that Gotama had an account at
2    Breder Suasso?
3        **A.** No, I did not.
4        (Deposition Exhibit 23 was marked for
5    identification.
6    BY MR. LONDON:
7        **Q.** Mr. Nikolayev, I'm now handing you a
8    document we've identified as Deposition Exhibit 23.
9        For the benefit of the individuals on the
10    Webex, this is a Bates-numbered document. We've
11    identified this in our PDF list of documents we gave
12    you have as SEC-NZFMA-E-0000201.
13        The document is a four-page document that
14    runs from that Bates number through 204.
15        Just take a moment and look at it and look
16    up when you are ready.
17        **A.** Okay.
18        **Q.** Have you ever seen the document that we've
19    marked as Exhibit 23?
20        **A.** No, I have not.
21        **Q.** I'm going to direct your attention to the
22    top right of the first page. There's a reference to
23    CO Blacklight SA Gotama Capital SA Stockbroking
24    Account; do you see that?
25        **A.** Right.

121

1    column, August 3rd, August 2nd, June 14th and
2    June 13th; those four lines reflect buys and sells
3    in Vitality Biopharma; do you see those?
4        **A.** Yeah.
5        **Q.** Did you make those transactions in
6    Vitality Biopharma?
7        **A.** No, I did not.
8        **Q.** Have you ever heard of the company name
9    Vitality Biopharma?
10        **A.** No, no, I have not.
11        **Q.** Did you ever receive any money in
12    connection with stock trading in Vitality Biopharma
13    stock?
14        **A.** I don't know. I don't know.
15        **Q.** Were you ever aware of receiving any funds
16    in connection with trading in Vitality Biopharma
17    stock?
18        **A.** No. I don't know.
19        **Q.** Do you know who executed the transactions
20    reflected on the first page of Exhibit 23 in
21    Vitality Biopharma stock?
22        **A.** I do not know.
23        **Q.** There's other transactions reflected
24    besides Vitality Biopharma. Do you have an
25    understanding or knowledge of who transacted any of

123

1    **Q.** Are you aware of a Gotama Capital account
2    at Blacklight?
3        **A.** Now that we're -- I'm aware as of now, but
4    not before.
5        **Q.** Let me make it a better question.
6        So other than looking at this document
7    that I've put in front of you, had you ever been
8    aware of a Gotama Capital account at Beaufort?
9        **A.** No, I had not.
10        **Q.** I misspoke earlier, so I just want to make
11    sure that the record reflects that this is a
12    Beaufort account.
13        So you're not aware, other than looking at
14    this document in front of you, you were never aware
15    of a Gotama Capital account at Beaufort; is that
16    correct?
17        **A.** Correct.
18        **Q.** Taking a look at the document --
19    understanding that you have not seen it before --
20    I'm going to point out a couple of references in
21    this document.
22        If you look on the first page, I'm going
23    to point this out, there are four transactions in an
24    entity called Vitality Biopharma, Inc.
25        Just to help you see them, under the date

122

1    those other buys and sells?
2        **A.** No, I do not.
3        **Q.** Do you have anything you think is --
4        **A.** Do you have the dates when servers were
5    seized? Do you have that date?
6        **Q.** Let me state this. To the extent that I
7    can't testify for you, I can probably help you, but
8    do you recall servers being seized in either late
9    2019 or early 2020?
10        **A.** Okay. Yes, something like that.
11    Something like that. I don't remember the exact
12    date. Because I thought it was in June, June
13    something. At some point in June.
14        **Q.** So I can now reflect for you the exhibit
15    we're looking at, Exhibit 23, appears to reflect
16    transactions in 2017.
17        **A.** Right. Right. So it is not related to
18    me.
19        (Deposition Exhibit 24 was marked for
20    identification.)
21    BY MR. LONDON:
22        **Q.** I'm handing you now a document we've just
23    marked as Deposition Exhibit 24.
24        **A.** Um-hmm.
25        **Q.** While you're looking through that I'm

124

A1204

Fedir Nikolayev
2/2/2023

1    going to identify it for the people on Webex.
2        This is a document we have identified by
3    its Bates number.  The name of the document, PDF, is
4    SEC-NZFMA-E-0000118.
5        The actual document is a multiple-page
6    document that runs through page 126.
7        The first page is titled "Statement of
8    Account Breder Suasso."
9        When you are ready, just look up.
10       Have you ever seen this document that
11   we've marked as Exhibit 24?
12       **A.**  No, I have not seen it before.
13       **Q.**  Do you have an understanding of who
14   executed the transactions reflected on this
15   document?
16       **A.**  I do not have this inform--- I do not
17   know who did this.
18       **Q.**  But you did not?
19       **A.**  I did not.
20       **Q.**  Going to another document, so we can put
21   that the side.  But you're free to look at it.  I
22   don't want to take it away from you.
23       **A.**  Beautiful.
24       (Deposition Exhibit 25 was marked for
25   identification.)

125

1        **A.**  Um-hmm.
2        **Q.**  -- to the cover page I'm going to just ask
3    you.
4        Did you have an understanding that Gotama
5    had a brokerage account at Hyposwiss Private Bank?
6        **A.**  No, I did not.
7        **Q.**  Do you have any understanding of whose
8    idea it was to open this account?
9        **A.**  No.
10       **Q.**  If you want turn to the pages starting at
11   27203.
12       **A.**  Okay.
13       **Q.**  And if you look from that through 27204,
14   27205 and the next one which is --
15       **A.**  -- 208.
16       **Q.**  -- 208, yes, just take a look at those.
17       **A.**  Well, what I can say about this is it has
18   my address from my driving license.  Not my actual
19   address.
20       **Q.**  Where are you looking at?  You're looking
21   at page 27205?
22       **A.**  Yeah.
23       **Q.**  So let me ask you this question:  As
24   reflected on these pages, it identifies you as the
25   beneficial owner of the Gotama account at Hyposwiss.

127

1    BY MR. LONDON:
2        **Q.**  Mr. Nikolayev, I am handing you a document
3    that we have marked as Deposition Exhibit 25.  This
4    is a multiple-page document.  For the benefit of the
5    people on the call, as you look through it, the
6    Bates number of this document that we've identified
7    by name is SEC-FINMA-E-0027107.
8        It's a multiple-page document that runs
9    through Bates number 27259.  And in the folder we
10   sent you, it may actually be labeled as "Excerpts
11   from Hyposwiss account."
12       If anyone has trouble locating it,
13   just let us know.
14       MS. PICKETT:  David, I'm sorry.  I'm
15   not seeing this in the documents that I have.
16       MR. MUHLENDORF:  It's got the main
17   pages.
18       MS. PICKETT:  Oh, pages?  Okay.  Oh,
19   I've got it.  Okay, thanks.
20   BY MR. LONDON:
21       **Q.**  Whenever you're ready to look up --
22       **A.**  I'm ready.
23       **Q.**  So the first page of this document that
24   we've marked as Exhibit 25, which is the Bates
25   number 27107.  So if you just flip --

126

1        Did you have an understanding other than
2    seeing this in front of you today, did you have an
3    understanding at any point in time that you were
4    identified as the beneficial owner of the Gotama
5    account held at Hyposwiss?
6        **A.**  I did not know about it.
7        **Q.**  And with respect to your passport -- I
8    know that you testified earlier today that you
9    provided your passport to Mr. Sharp.
10       Did you know at any point in time that you
11   were providing your passport to Mr. Sharp in
12   connection with opening a Hyposwiss account?
13       **A.**  No, I just -- there were no details of
14   where or what.
15       **Q.**  You just did what Mr. Sharp told you to
16   do.
17       **A.**  Yes.
18       **Q.**  On the page that is 27216, it is a
19   Hyposwiss Private Bank statement page; are you there
20   with me?
21       **A.**  Um-hmm.
22       **Q.**  Do you see there are transactions
23   reflected on that page?
24       **A.**  Right.
25       **Q.**  Did you execute any of those transactions?

128

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1205

Fedir Nikolayev
2/2/2023

1    A.  No, I did not.
2    Q.  Do you see how --
3    A.  Notice how the dates are 2013 but I
4  provided my passport in 2016.
5    Q.  So the document, you're correct that it
6  reflects the dates in the year 2013.
7        So just looking at that particular page --
8  let me -- hold on to that page and then if you flip
9  back to page 27204 with your passport --
10    A.  Yeah.
11    Q.  -- page?
12    A.  My passport is actually dated 2013 I
13  think.
14    Q.  Yeah, so you'll notice, let the record
15  reflect, go ahead and direct your attention, your
16  passport is dated 2013; do you see that?
17    A.  Yeah.
18    Q.  Do you see there's a stamp on bottom left
19  of your passport, a Blacklight stamp, 21 May 2013?
20    A.  Yes, I do.
21    Q.  So does that refresh your recollection as
22  to when you provided your passport?
23    A.  I brought it in 2016.
24    Q.  Is it --
25    A.  Is this something that I provided earlier?

129

1    Q.  -- as reflected on this page?
2    A.  No.  I did not.
3    Q.  Do you know where this money came from?
4    A.  No.  I do not know.
5    Q.  I'm going to direct your attention to a
6  specific transaction on this page.
7        Do you see on the account statement page,
8  on -- it says 09.07; it says "Stock Exchange
9  Purchase."
10    A.  Right.
11    Q.  Petrosonic Energy"; do you see that?
12    A.  Um-hmm.
13    Q.  Did you make a transaction with Petrosonic
14  Energy on that date?
15    A.  No, I did not do any stock transactions.
16    Q.  And I think that reflects July 9, correct?
17    A.  Yes, I think so.
18    Q.  So you didn't on July 9, 2013, transact in
19  Petrosonic Energy?
20    A.  Right.
21    Q.  Is that accurate?
22    A.  Yes.
23    Q.  Do you know what this company is,
24  Petrosonic Energy?
25    A.  I do not.

131

1    Q.  Let me ask you this:  Is it possible that
2  you provided your passport on more than one occasion
3  to Mr. Sharp?
4    A.  Yes, it is possible, yes.
5    Q.  Is it possible that as reflected by this
6  particular document we're looking at, document --
7    A.  Like --
8    Q.  25 -- just let me -- if you don't mind,
9  I'm just going to read a question into the record.
10        Is it possible that as reflected by
11  Exhibit 25 you provided a copy of your passport in
12  or around May of 2013 to Mr. Sharp?
13    A.  Yes, possible.  I do not have a record of
14  that.  I did not take a note of that.
15    Q.  Taking a look at Exhibit 25 --
16    A.  It is my passport.  It is my passport.
17    Q.  And just to focus back again on the
18  account statement page, which is page 27216; if you
19  would turn to that for a moment.
20        Do you see that there's reflections of
21  incoming payments reflected on this page?
22    A.  Right.
23    Q.  There are several of them.  Did you ever
24  receive money --
25    A.  No.

130

1    Q.  A few rows down on July 15, if you see
2  July 15 there's a reference to a purchased of Arch
3  Therapeutics; do you see that?
4    A.  Right.
5    Q.  Did you make that transaction?
6    A.  No.
7    Q.  Do you know who did?
8    A.  I do not know.
9    Q.  So with respect to either the Petrosonic
10  or Arch Therapeutics transaction purchases, do you
11  know whether those shares were purchased on behalf
12  of Fred Sharp's clients?
13    A.  I do not know.
14    Q.  The next page, page 27217, if you turn to
15  that.  There are three references on this page to
16  transactions in Arch Therapeutics.  I'll focus you
17  on them.  On July 22, July 29 and July 30, there's a
18  purchase and then two sales; do you see those?
19    A.  Um-hmm.  Um-hmm.
20    Q.  Did you execute those transactions?
21    A.  No, I didn't.
22    Q.  Do you know who did?
23    A.  I do not know.
24    Q.  Do you know whether those transactions
25  were made on behalf of Fred Sharp's clients?

132

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1206

Fedir Nikolayev
2/2/2023

133

```
 1    A.  I do not know.
 2    Q.  I am going to direct your attention to the
 3  page that is Bates numbered 27257.
 4    A.  Right.
 5    Q.  It is also an account statement page from
 6  2013, this one in November.
 7        Do you see that?
 8    A.  Um-hmm.  Um-hmm.
 9    Q.  Are you familiar with this page -- other
10  than sitting here?
11    A.  I've never seen it before.
12    Q.  I'm going to direct your attention to
13  transactions on this page.  I'm going to direct your
14  attention to three specific ones.
15        On November 7 there's a reflection for the
16  purchase of Rightscorp; do you see that?  The second
17  row down.
18    A.  Okay.
19    Q.  Do you see that?
20    A.  27257?
21    Q.  Yes, 27257.  So that page and then on
22  November 7 --
23    A.  Oh, the seventh.  Okay.  Right.
24    Q.  Do you see that there's a purchase of
25  Rightscorp?
```

134

```
 1    A.  Yes.
 2    Q.  Did you execute that?
 3    A.  I did not.
 4    Q.  Do you know what Rightscorp is?
 5    A.  No.
 6    Q.  Below that on November 7 there's a sale of
 7  Makism 3D Corp; do you see that?
 8    A.  Right.
 9    Q.  Did you execute that transaction?
10    A.  I did not.
11    Q.  Do you know who did?
12    A.  No.
13    Q.  Do you know whether the transactions in
14  Rightscorp and Makism were made on behalf of Fred
15  Sharp's clients?
16    A.  I do not know.
17    Q.  On the row, a couple of rows down from
18  where we're looking there's a November 11 row.  If
19  you can direct your attention to that.
20        Do you see there's a debit to Tandem
21  Growth LLC?
22    A.  Um-hmm.
23    Q.  Do you know what Tandem Growth LLC is?
24    A.  No.
25    Q.  Do you have any connection to Tandem
```

135

```
 1  Growth LLC?
 2    A.  I do not recognize this name.
 3    Q.  Do you see as reflected by this page,
 4  there's a debit of a little more than 1.2 million --
 5    A.  Yeah.
 6    Q.  -- to Tandem Growth; do you see that?
 7    A.  Yes.  But I did not request this
 8  transaction and I don't know what Tandem Growth is.
 9    Q.  So you didn't authorize that payment?
10    A.  No.
11    Q.  And you don't know who did authorize that.
12    A.  Correct.
13    Q.  And you don't know who is behind Tandem
14  Growth.
15    A.  No, I do not know.  I do not know.
16    Q.  And then if you look at the last two pages
17  of the exhibit, with page 27258 and 27259, there are
18  several transactions in Makism 3D and Petrosonic.
19        It is probably almost too many to direct
20  your attention.  If you look you'll see numerous
21  transactions in those two companies.
22        Just familiarize yourself with the
23  references to that.  My question to you is, Did you
24  execute any of those transactions?
25    A.  I did not execute any of those
```

136

```
 1  transactions or requested anybody to execute them.
 2    Q.  I'm going to give you another document.  I
 3  don't want to pull that away from you.
 4    A.  No, (mumbling).
 5    Q.  I have another document I am going to give
 6  you.
 7        If you're ready make sure you have a clean
 8  area in front of you to give you the ability to look
 9  at this.  It is a document we've marked as Exhibit
10  26.
11        (Deposition Exhibit 26 was marked for
12  identification.)
13  BY MR. LONDON:
14    Q.  So this is a -- it's a multiple-page
15  document.  It's a document -- this is for benefit of
16  the individuals on the Webex.
17        It is a document produced in native
18  format.  The slip sheet referencing the native
19  format is Bates SEC-FINMA-E-0029150.
20        The actual native format is printed out.
21  There's no Bates numbers on the printout, but they
22  are part of this document.
23        And it's in the folder we produced to you,
24  the name of it is St. Galler Kantonalbank.
25        Galler is G-A-L-L-E-R.
```

GRADILLAS COURT REPORTERS
(424) 239-2800

A1207

**Fedir Nikolayev**
**2/2/2023**

---

1          Kantonalbank is K-A-N-T-O-N-A-L-B-A-N-K.
2     I will have specific questions for you.
3  You're free to look through it, but whenever you're
4  ready, look up and I'll know to ask you question.
5     **A.** It's in German.
6     **Q.** I don't speak German, but I can ask you
7  some questions.
8     **A.** Okay.
9     **Q.** So having looked at this document, this
10  spreadsheet document, do you recognize this as
11  having seen it before today?
12     **A.** No, I did not see it -- ever.
13     **Q.** Are you aware -- other than me putting
14  this in front of you today -- had you ever been
15  aware that Gotama Capital had a brokerage account at
16  St. Galler Kantonalbank?
17     **A.** No, I did not.
18     **Q.** Are you aware -- other than sitting here
19  today -- had you ever been aware that you were
20  listed as being the beneficial owner of the Gotama
21  Capital account at St. Galler Kantonalbank?
22     **A.** I did not know that.
23     **Q.** Did you ever put any money into the Gotama
24  Capital account at St. Galler Kantonalbank?
25     **A.** No, I have not.

137

---

1     **Q.** So the particular document that you were
2  looking at purports to be a trade blotter of all of
3  the transactions in the Gotama account.  And for the
4  benefit of the individuals on the call, this
5  document was produced by St. Galler.
6     Mr. Nikolayev, taking a look at this
7  document, do you have an understanding of the column
8  headings, what they mean?
9     **A.** Sure.
10     **Q.** So do you see there's a column called
11  "Order Type"?
12     **A.** Um-hmm.
13     **Q.** Do you know that reflects?
14     **A.** Well, "Type," if it's a purchase or a
15  sale, what it says here.  I don't know the other --
16  words mean.
17     **Q.** Do you speak German?
18     **A.** Living in Sosua, it has a very large
19  German community, so I have some knowledge of
20  German.
21     **Q.** Oh, so that's helpful today; isn't it?
22     The word "Kauf," do you know what that
23  means?
24     **A.** That means "purchase" and "Verkauf" is
25  "sell."

138

---

1     **Q.** So "Kauf" is "purchase" and "Verkauf" is
2  "sell."
3     **A.** Yeah.
4     **Q.** Okay.  Did you make any of these
5  transactions?
6     **A.** No.  No, I have not.
7     **Q.** There is a column called "Asset"; do you
8  see that about halfway through?
9     **A.** Um-hmm.
10     **Q.** So the column in "Asset" has several
11  transactions in an entity called Ener-Core; do you
12  see that?
13     **A.** Yeah, I see that.
14     **Q.** Did you make any transactions in
15  Ener-Core?
16     **A.** No, I don't know what Ener-Core is.
17     **Q.** There's a specific line that I want to
18  point you to.  So if you go to the -- it's maybe
19  about a third of the way down there's a line with
20  Stevia Corp. and the date reflected on it in the
21  Date column is --
22     **A.** June.
23     **Q.** Yeah, it's 1/6/2014.
24     **A.** First of June 2014.
25     **Q.** So the 1/6/2014 row shows a "Verkauf"

139

---

1  which you understand is a sale.
2     **A.** Yeah, but it says something "Stormo."  I
3  don't know what that means.  It says some sort
4  of sale but something additional than that.
5     In the column "Order Type" it says "Stormo
6  Verkauf"; so there's some --
7     **Q.** Not that row.  Go up four up from that.
8     **A.** Okay.
9     **Q.** 1/6.
10     **A.** Yes.
11     **Q.** Do you see that?
12     **A.** Yes.
13     **Q.** Stevia Corp. is the company identified so
14  you're looking at the row I'm looking at?
15     **A.** Yes, yes.
16     **Q.** Did you make that transaction in Stevia
17  Corp.?
18     **A.** No, I did not.
19     **Q.** Do you know what Stevia Corp. is?
20     **A.** Just know a brand, in general, some sort
21  of like a sugar replacement.
22     **Q.** So other than just sort of a general
23  understanding of what Stevia is; are you aware of a
24  specific company Stevia First?
25     **A.** No, I do not.

140

---

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1208

Fedir Nikolayev
2/2/2023

1    **Q.** And you did not execute the transactions
2  as reflected here in Stevia Corp.?
3    **A.** Correct.
4      (Court reporter requests clarification.)
5      MR. LONDON: There's no page number
6  on this, but it's the first page of the spreadsheet
7  as reflected by --
8      THE WITNESS: Maybe you can look up a
9  reference...
10 BY MR. LONDON:
11   **Q.** To the extent that it helps, the first
12 column --
13   **A.** The third column --
14   **Q.** Yeah, I'm sorry, the third reference
15 number that I'm looking at is 476232905.
16     (Deposition Exhibit 27 was marked for
17 identification.)
18 BY MR. LONDON:
19   **Q.** I'm going to give you another document
20 when you are ready. Again I don't want to pull that
21 away from you. But if you think you are ready we
22 will continue.
23     So I'm handing you a document that we've
24 just marked as Deposition Exhibit 27. And this is a
25 document that for the benefit of the people on the

141

1  to you.
2      Ready? So do you see that this purports
3  to be a memo to Action Stock Transfer from Fedir
4  Nikolayev?
5      (Court reporter requests clarification.)
6  BY MR. LONDON:
7    **Q.** Do you see that this purports to be a memo
8  to Action Stock Transfer from Fedir Nikolayev?
9    **A.** Right.
10   **Q.** And you see your name?
11   **A.** Yes.
12   **Q.** Is that your signature?
13   **A.** It is my signature, yes.
14   **Q.** And you see the top of the page where the
15 memo is from Gotama Capital to Action Stock
16 Transfer. There's a reference line. And the
17 reference is 1,750,000 shares of Garma Tex Holdings
18 Ltd.; do you see that?
19   **A.** Yep.
20   **Q.** Do you recall providing this memo to
21 Mr. Sharp?
22   **A.** No, I do not.
23   **Q.** Do you know what Garma Tex Holdings Ltd.
24 is?
25   **A.** No, I do not.

143

1  call it is identified by its Bates number in the
2  file, it is JB-000140. It's a multiple-page
3  document.
4      The first page says "Action Stock Transfer
5  Corp." on the top and it runs through Bates page
6  159.
7      There's a few pages here. I don't want to
8  necessarily make you read every single page. You
9  can familiarize yourself to it. But when you are
10 ready I will direct you to the page that I want to
11 ask you about.
12     So are you familiar with an entity called
13 Action Stock Transfer?
14   **A.** No. Myself, no.
15   **Q.** Did you ever conduct any business on
16 behalf of Fred Sharp with Action Stock Transfer?
17   **A.** No.
18   **Q.** So I'm going to have you to turn to the
19 second page in Exhibit 27 and it's Bates page
20 JB-000141.
21   **A.** Okay.
22   **Q.** So it's a page, at the top of is "Memo
23 from Gotama Capital SA."
24     So just take a look at this particular
25 page. That's where I'm going to direct my question

142

1    **Q.** Under the Instructions portion of this
2  page it states: "Please issue one free trading
3  certificate for 1,750,000 shares to Gotama Capital,
4  SA."
5      And it goes on from there.
6    **A.** Yeah.
7    **Q.** Do you see that reference?
8      Prior to me showing you this document do
9  you have an understanding that at some point in time
10 Mr. Sharp directed you to tell Action Stock Transfer
11 to issue a free trading certificate to Gotama
12 Capital of 1.75 million shares of Garma Tex?
13   **A.** No, I do not request anybody nor did I
14 ever issue that memo.
15   **Q.** So looking at this document today, is it
16 your understanding that the only reason for your
17 signature on this document to Action Stock Transfer
18 would be instructions because Fred Sharp directed
19 you to do so?
20   **A.** I did not -- he may actually have my
21 signature as a digital scan of my signature, so it's
22 possible that this is one of those.
23     I do not recall signing this.
24   **Q.** So you provided at some point in time a
25 digital version of your signature to go Fred Sharp?

144

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1209

**Fedir Nikolayev**
**2/2/2023**

1   **A.** Yes, yes, I did.
2   **Q.** Did Mr. Sharp ask you to provide your
3   digital signature to him?
4   **A.** Yeah, I do not recall exact date when this
5   happened, but, yes.
6   **Q.** Date aside, just the actual -- the
7   directive, did Mr. Sharp direct you --
8   **A.** Yes.
9   **Q.** -- to give you an electronic signature?
10  **A.** Yeah. Yeah.
11  **Q.** Did he explain why he needed your
12  electronic signature?
13  **A.** It was as part of this service when
14  originally Gotama was set up.
15  **Q.** So in connection with you providing
16  documents to Mr. Sharp to set up Gotama, you also
17  provided an electronic signature --
18  **A.** Right.
19  **Q.** -- for Mr. Sharp to use in connection with
20  Gotama.
21  **A.** Yes. But, for example, this signature I
22  don't think that I signed that. It is just too
23  clean and it is not exactly the way I sign it on
24  this page.
25  **Q.** Which page are you on?

145

1   **A.** 156, JB-000156.
2   **Q.** Let me just turn to that page so I am with
3   you.
4       So on page 156 is a document titled
5   "Resolution to Transfer Securities."
6       That's what we're looking at?
7   **A.** Right.
8   **Q.** And there's a signature on there which is
9   above the name Fedir Nikolayev; is that where you
10  looking?
11  **A.** Yeah. Yeah.
12  **Q.** And it's your testimony today that you
13  don't believe that's your signature?
14  **A.** Yeah, you can actually see the difference
15  from -- the one that's on the JB-000141, that's how
16  I sign it.
17      And over here it just looks too clean.
18  **Q.** So what you are doing -- I am just reading
19  for the record -- so the signature on page 141
20  compared to the signature on page 156, you don't
21  believe that the signature on page 156 is your
22  signature.
23  **A.** Yes.
24  **Q.** Correct?
25  **A.** Yeah.

146

1   **Q.** And that signature on page 156 identifies
2   you as secretary; do you see that?
3   **A.** Yeah.
4   **Q.** Do you have an understanding that
5   Mr. Sharp named you as secretary of Gotama?
6   **A.** I did not know that.
7   **Q.** You can put that to the side. Thank you.
8       (Deposition Exhibit 28 was marked for
9   identification.)
10  BY MR. LONDON:
11  **Q.** Mr. Nikolayev, I've now handed you a
12  document we have marked as Deposition Exhibit 28.
13      This is a single-page document, the Bates
14  number, which is the name we've identified when we
15  saved the PDF is JB-00080.
16      This one is a memo from Gotama
17  Capital to Action Stock Transfer. Take a moment.
18  I'll direct your attention to a couple of areas.
19  When you are ready, just look up.
20  **A.** Let me check it out, the FedEx account
21  number.
22  **Q.** Let the record reflect that Mr. Nikolayev
23  is taking a look on the information in his personal
24  iPhone for the FedEx account number reflected on
25  Exhibit 28. Just look up when you are ready.

147

1   **A.** Yeah, that's the FedEx account number that
2   we set up in the Dominican Republic.
3   **Q.** I'll pose a question to help keep the
4   record clean on that, so let me start with this.
5       Other than me putting this document in
6   front of you today, have you ever seen Deposition
7   Exhibit 28 before?
8   **A.** I do not recall this.
9   **Q.** The signature that appears on Exhibit 28,
10  do you recognize that as your signature?
11  **A.** Yes, that is my signature.
12  **Q.** Substantively, this particular memo that
13  is sent to Action Stock Transfer, the instruction is
14  to issue one free trading certificate of 37,500
15  shares of Trust Company Complex at Ajeltake Road; do
16  you see that?
17  **A.** Yes.
18  **Q.** And then the reference line above that is,
19  "UA Granite Corp."
20      Do you see that.
21  **A.** Um-hmm.
22  **Q.** Do you know what UA Granite Corp. is?
23  **A.** No.
24  **Q.** At any point in time were you aware that
25  you were instructing Action Stock Transfer to issue

148

A1210

Fedir Nikolayev
2/2/2023

| | |
|---|---|
| 1 37,500 shares of UA Granite Corp. to Gotama? | 1 thing. |
| 2    **A.** No, I did not know that. | 2    **A.** Okay. |
| 3    **Q.** The Instructions section, the second | 3    (Deposition Exhibit 17 was previously |
| 4 paragraph instructs Action Stock Transfer to send | 4 marked for identification.) |
| 5 the certificate to Scott Lawler at Booth Udall | 5 BY MR. LONDON: |
| 6 Fuller; do you see that? | 6    **Q.** I'm going to start out -- I'm going to -- |
| 7    **A.** Yeah. | 7 I'm going to provide you information first. I'm |
| 8    **Q.** Do you know the name Scott Lawler? | 8 going to tell you that this is a charging document |
| 9    **A.** No. | 9 that the SEC filed in this case. This is the |
| 10    **Q.** Do you know who Booth Udall Fuller is? | 10 lawsuit that we asked you to come and testify about. |
| 11    **A.** No, I do not. | 11    **A.** Okay. |
| 12    **Q.** As part of your work for Mr. Sharp, were | 12    **Q.** Have you ever seen this document? |
| 13 you ever involved in sending materials to an | 13    **A.** No, I did not. |
| 14 attorney by the name of Scott Lawler? | 14    **Q.** So in your potential of looking about the |
| 15    **A.** I do not recall. | 15 case you never came across this document. |
| 16    **Q.** There's another name in that paragraph, | 16    **A.** No. |
| 17 Becky Hermosillo; do you see that? | 17    **Q.** Okay. To make this easy, I'm going to |
| 18    **A.** Hermosillo, no. | 18 point you to a paragraph on a specific page. So the |
| 19    **Q.** Do you know who Becky Hermosillo Is? | 19 first paragraph I want to point you to is |
| 20    **A.** No. | 20 Paragraph 83 on Page 29. |
| 21    **Q.** Have you ever sent information to Becky | 21    When you get to Page 29 you'll see at the |
| 22 Hermosillo? | 22 bottom there's a numbered paragraph. |
| 23    **A.** I do not recall. | 23    **A.** Okay. |
| 24    **Q.** Do you have an understanding of why you | 24    **Q.** If you read Paragraph 83, and it actually |
| 25 were asked to provide this information on the memo, | 25 goes to page 30, there's a chart. I just want you |
| 149 | 151 |
| 1 the information to send the certificate to Scott | 1 to yourself read Paragraph 83 and look at the chart |
| 2 Lawler at Booth Udall, attention Becky Hermosillo? | 2 and look up when you are done. |
| 3    **A.** I do not compose those instructions. I | 3    **A.** Okay. |
| 4 don't know. | 4    **Q.** So are you ready? |
| 5    **Q.** Now the FedEx account reference is on the | 5    **A.** Yes. |
| 6 third paragraph. I know you've referenced that | 6    **Q.** So in this chart I'm going to direct your |
| 7 earlier, but just to pose the question to you: Do | 7 attention to a very specific reference. In the |
| 8 you recognize that FedEx account number? | 8 chart you'll see about three-quarters of the way |
| 9    **A.** Yes, I confirmed that's the original FedEx | 9 down there's a reference to a transfer of 900,000 |
| 10 account number that we set up. | 10 shares from an entity called Sharma Investments to |
| 11    **Q.** So that's the account that you set up for | 11 Gotama Capital; do you see that? |
| 12 Mr. Sharp to use. | 12    **A.** Yes. |
| 13    **A.** Yeah. Yeah. | 13    **Q.** Other than looking at this document, but |
| 14    **Q.** Through the entity that Mr. Sharp asked | 14 in your dealings with Mr. Sharp, did you ever have |
| 15 you to set up. | 15 any understanding of transferring 900,000 shares of |
| 16    **A.** Correct. | 16 stock in the company either known as Stevia First or |
| 17    **Q.** Mr. Nikolayev, I'm going to hand you now a | 17 Vitality Biopharma? |
| 18 rather thick document. This is a document that had | 18    **A.** No. |
| 19 previously been marked in these proceedings before | 19    **Q.** From Sharma to Gotama? |
| 20 today. | 20    **A.** No, I do not have any additional -- |
| 21    We've marked this as Deposition Exhibit | 21 (inaudible). |
| 22 17. For the benefit of those on phone call, | 22    **Q.** I'm going to direct your attention to |
| 23 Deposition Exhibit 17 is the amended complaint in | 23 another paragraph of the chart that's on page 33. |
| 24 this action. | 24 And it's Paragraph 91. |
| 25    I'm not going to ask you to the read whole | 25    **A.** Okay. |
| 150 | 152 |

Fedir Nikolayev
2/2/2023

| | |
|---|---|
| 1    **Q.**  A short paragraph.  Just take a look at | 1      There are no Bates numbers on this |

1     **Q.**  A short paragraph.  Just take a look at
2   that paragraph and chart and look up when you are
3   ready.
4     **A.**  Okay.
5     **Q.**  And do you see this paragraph of the chart
6   reflects a transfer of 695,511 shares of a company
7   known as Stevia First/Vitality Biopharma from
8   Hartford Equity to Gotama Capital; do you see that?
9     **A.**  Right.  Yeah.
10    **Q.**  Other than looking at this document today,
11  having worked with Fred Sharp, did you ever have an
12  understanding of Hartford Equity transferring
13  695,511 shares of Stevia First/Vitality Biopharma to
14  Gotama?
15    **A.**  I don't recognize any of it.
16    **Q.**  Those are all of my only questions on this
17  document.  You're obviously free to look at it.  But
18  I don't have any other questions on that document.
19        Let's just go off the record.  We are
20  going to change the tape.
21        THE VIDEOGRAPHER:  The time is 1:17.
22  We're on of off the record.
23        MR. LONDON:  Let's take a quick
24  five-minute break, folks.
25        (Recess taken at 1:18 p.m. until 1:28

<div align="center">153</div>

1     There are no Bates numbers on this
2   particular one, but it's -- I'm sorry, this is an
3   Xmail -- this is Xmail, not XPhone.
4         So it's a Xmail with the subject
5   XPhones.  It's from Cory O'Haggarty to
6   fen@securexmeridian.com on March 18, 2011.
7         Mr. Nikolayev, was there something
8   that you wanted to correct on the record?
9     **A.**  Yeah, at some point you asked me about the
10  domain that you mailed BZ or something like that.
11  That I didn't recognize that was used as an alias to
12  exmeridian.com.
13        So I just did not catch how you pronounce
14  it.  I did not catch it.
15  BY MR. LONDON:
16    **Q.**  So when I asked you about your mail
17  earlier --
18    **A.**  Yes, I recognized it was like an alias to
19  exmeridian.com.
20    **Q.**  Thank you.
21        So the document that I put in front of
22  you, do you recognize this as a chat on the secure
23  Xmail system?
24    **A.**  Yeah, it is just an email.
25    **Q.**  So and this email from Cory O'Haggarty to

<div align="center">155</div>

1   p.m.)
2         THE VIDEOGRAPHER:  Time --
3         MR. LONDON:  We'll make sure.  Is all
4   defense counsel back?  We don't see everybody on
5   screen yet.
6         THE VIDEOGRAPHER:  The time is 1:29.
7   We are back on tape number 4.
8   BY MR. LONDON:
9     **Q.**  Mr. Nikolayev, right before we went back
10  on the record Mr. Nikolayev asked if he could make a
11  correction to his earlier testimony.  So I'm happy
12  to do that.  But I did give you a document we are
13  ready to move on to.
14        If it's about this document --
15    **A.**  It's related.
16    **Q.**  So why don't I introduce the document
17  first.
18    **A.**  Okay.
19    **Q.**  I've handed you a document we've marked as
20  Deposition Exhibit 29.
21        (Deposition Exhibit 29 was marked for
22  identification.)
23        MR. LONDON:  For the benefit of
24  counsel on the call, this is from the XPhone chat
25  folder that we provided to you.

<div align="center">154</div>

1   you, correct?
2     **A.**  Right.
3     **Q.**  Do you know who Cory O'Haggarty is?
4     **A.**  The person who -- some assistant.
5     **Q.**  Somebody connected to Mr. Sharp?
6     **A.**  Yeah.  Yeah.
7     **Q.**  In this message from Cory O'Haggarty to
8   you, there is a forwarding of a message from Mike
9   Veldhuis to Cory O'Haggarty; do you do so that?
10    **A.**  Yes.  Yes.
11    **Q.**  Does this help refresh your recollection
12  as to who Mike Veldhuis is?
13    **A.**  No.  For me any request it was more about
14  like the numbers.  Nothing about the names.  I did
15  not care about who it was.
16    **Q.**  And understanding that, I'm just going to
17  ask you one other question about the area from the
18  Mike Veldhuis to Cory O'Haggarty email contained in
19  Exhibit 29.
20        Mr. Veldhuis appears at the request of
21  Mr. O'Haggarty to "Please make sure 4, 2, 54 and 55
22  can all communicate with each other; do you see
23  that?
24    **A.**  Yeah.  I think what -- I'm not sure if
25  that was the time when it was still Blackberries.

<div align="center">156</div>

<div align="center">**GRADILLAS COURT REPORTERS**
**(424) 239-2800**</div>

<div align="center">A1212</div>

Fedir Nikolayev
2/2/2023

1  But possibility it was a possibility to control
2  which accountants can talk to each other. But I
3  don't recall exactly that functionality.
4      Q.  Okay. So if I understand you, you have a
5  general recollection that at some point in time
6  there was a concern to having certain XPhones
7  communicate with other Xphones?
8      A.  Yeah, but like I do not -- I do not recall
9  exactly like -- there was not a general like rule of
10  who can communicate as well.
11      So like it must -- this request it sounds
12  legit, but I don't remember details about it. I
13  don't remember how I executed it. Possibly that it
14  was some sort of policy in the Blackberries, or
15  something like that.
16      Q.  And sitting here today, are you able to
17  identify who was affiliated with either number 4 or
18  number 2 phone?
19      A.  No. No.
20      Q.  So, for example, you wouldn't be able to
21  identify whether or not Mike Veldhuis was identified
22  with number 4, correct?
23      A.  Right. I do not.
24      (Deposition Exhibit 30 was marked for
25  identification.)

157

1  can't the find the document he's looking at, is the
2  problem.
3      MS. SHIELDS:  We'll just give you a
4  minute to find it. I don't think we have the time
5  to redo all of them.
6      MR. KNUTS:  If you can read the
7  subject Line, that should do it.
8      MR. LONDON:  The subject line is "Re:
9  Xphones."
10      MR. MUHLENDORF:  Okay. There are
11  three of them like that. I will find them. Hold
12  on.
13      Okay, I've got it. Thank you.
14      MR. LONDON:  We didn't intentionally
15  do that to cause difficulty. We had very late
16  production.
17      MS. PICKETT:  Kevin or somebody, can
18  you tell me where it is? I'm still not finding it
19  in mine. What folder is it under?
20      MR. MUHLENDORF:  It's under the one
21  that's -- hold on. It is Xmailed to Nikolayev. It
22  is the second-to-last document, the way mine are
23  organized.
24      MS. PICKETT:  Okay. Thanks. Oh,
25  I've got it. Thanks.

159

1      Q.  I have now handed you a document we've
2  marked as Deposition Exhibit 30.
3      This is an Xmail chat from Celtic
4  Consultants to Fedir Nikolayev on February 21, 2012.
5      A.  Right.
6      Q.  So taking a look at this, you recognize
7  this as an email, correct?
8      MR. MUHLENDORF:  Hold on for a second
9  so we can identify it.
10      MR. LONDON:  Sure. Sure.
11      MR. MUHLENDORF:  What's the PDF on
12  this one?
13      MR. LONDON:  These are all -- I'm not
14  sure what you are seeing it as.
15      We gave you a folder of Xmail emails
16  and XPhone chats. And this is an Xmail dated
17  February 21, 2012.
18      MR. MUHLENDORF:  The way the folder
19  is set up, PDFs have names, but there is nothing
20  that says 2012, unless I'm missing it.
21      MR. LONDON:  You're probably not
22  missing it. It's just may be the way -- the way
23  they were produced to us, we just saved on there.
24      MS. SHIELDS:  Yeah.
25      MR. MUHLENDORF:  Yeah, but I just

158

1  BY MR. LONDON:
2      Q.  So, Mr. Nikolayev, Deposition Exhibit 30
3  reflects an Xmail email transmission; is that
4  correct?
5      A.  Yes.
6      Q.  And the top of the chain is from Celtic
7  Consultants to you; is that correct?
8      A.  Right.
9      Q.  Taking a look at this, do you know what or
10  who Celtic Consultants is?
11      A.  As I've said before, it was not about who;
12  it was just the request came from the authorized
13  email and I just executed the support -- I gave the
14  support.
15      Q.  Okay. And understanding that, if you look
16  in the email chain, at the bottom of the page,
17  there's an email from Celtic Consultants LLC to
18  fen@fensolutions.com on Tuesday, February 21, 2012,
19  at 11:20 a.m.; do you see that?
20      A.  Yep.
21      Q.  That's your email; is that correct?
22      A.  Yeah, that's mine.
23      Q.  The email -- the substance of it is from
24  Courtney; do you see that?
25      A.  Right. Yes.

160

Fedir Nikolayev
2/2/2023

1    **Q.**   Do you know who Courtney is?
2    **A.**   Yeah, the assistant.
3    **Q.**   Courtney Kelln; is that correct?
4    **A.**   Yes.  Yes.
5    **Q.**   And that's Courtney Kelln who worked for
6    Fred Sharp?
7    **A.**   Yes, I think so.
8    **Q.**   And seeing Courtney sign a message from
9    Celtic Consultants; does that help?
10        MR. MUHLENDORF:  Objection.  She
11   didn't sign it.
12   BY MR. LONDON:
13   **Q.**   Fair.  Fair.
14       Seeing an email transmission with the name
15   Courtney from Celtic Consultants, does that help you
16   identify if Courtney Kelln was Celtic Consultants?
17   **A.**   In this message, but you have to
18   understand that I did not look at it as company
19   names or anything like that.  I was looking at it
20   from a technical point of view.  They were asking me
21   to fix the problem.
22       So I didn't give a thought to (inaudible).
23       MR. LONDON:  Did you have something,
24   counsel?
25       MS. PICKETT:  (Inaudible).

161

1    some form of action related to IT business?
2    **A.**   IT business.  Strictly IT business, yes.
3    **Q.**   You can move that document out of the way.
4    I am now introducing what we're marking as
5    Deposition Exhibit 31.  This is an Xmail chat from
6    FEN to Wires.  The subject line is "XPhone
7    number 76."  And the date is July 17, 2012.  And
8    I'll give everyone a moment to locate it.
9        Just let me know when you have it.
10       MR. LONDON:  Were you guys still
11   searching for it?
12       MR. MUHLENDORF:  Okay.  I've got it.
13       MS. PICKETT:  I've got it.
14       (Deposition Exhibit 31 was marked for
15   identification.)
16   BY MR. LONDON:
17   **Q.**   Okay.  Mr. Nikolayev, Deposition Exhibit
18   31 purports to be an Xmail message from FEN to Wires
19   on July 17, 2012.
20       Do you recognize this document as a Xmail
21   that you sent?
22   **A.**   Yeah, yeah, I do.
23   **Q.**   And you're FEN.
24   **A.**   Yes, I am.
25   **Q.**   And did you specifically direct it to

163

1    BY MR. LONDON:
2    **Q.**   Yes, sir.
3    **A.**   Well, basically it looks like it was at
4    the time of the Blackberries, when they were like
5    about to go out of business.  And it looks like this
6    SIM cards were not giving the data service to the
7    phone.  And that's why this person complained about
8    whatever they complained about.
9        That's what this message involved.
10   **Q.**   Well, let me ask you this:  Do you recall
11   on occasions Courtney, who worked with Mr. Sharp,
12   contacting you for business-related purposes?
13       (Court reporter requests clarification.)
14       THE WITNESS:  For what related
15   purposes?
16   BY MR. LONDON:
17   **Q.**   Do you recall Courtney, who worked with
18   Mr. Sharp, contacting you for business-related
19   purposes?
20   **A.**   Regarding -- most of the time it was IT
21   questions.
22   **Q.**   And I'm not directing it specifically to
23   the exhibit.  I'm directing it generally, while you
24   worked for Mr. Sharp, is it fair to say that on
25   occasion Courtney Kelln reached out to you to take

162

1    Wires?
2    **A.**   I'm replying on the original message.  And
3    the original message signed as Yvonne, so I'm just
4    answering, "Hi, Yvonne."
5    **Q.**   So the message to you is from Yvonne; is
6    that correct?
7    **A.**   Yes, well, it was signed by Yvonne, yes,
8    and it looks like it's Wires.
9    **Q.**   So did you understand Yvonne to be Yvonne
10   Gasarch?
11   **A.**   Yes.  Yes.
12   **Q.**   And did you have an understanding when you
13   received this message that Yvonne Gasarch had the
14   code name Wires?
15   **A.**   I cannot -- code name Wires.
16       I guess it was kind of a flow of emails.
17   So I was just replying to the messages.  I did not
18   have it like on my mind that she's Wires.  I just
19   replied to the messages.
20   **Q.**   So is it fair to say that when you replied
21   to Yvonne, in your mind you were just answering
22   Yvonne's question.  You were not focused so much on
23   the code name?
24   **A.**   On code name, yeah.  It's -- all those
25   messages, it is about like executing -- like give

164

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1214

1 the support with it.  I was not -- I saw that the
2 message was from authorized.  And I was giving
3 service.
4        Q.  I understand.  So let me ask you just one
5 final question on this document.
6            Does this document accurately reflect an
7 Xmail transmission between you Yvonne in July of
8 2012?
9        A.  I don't recall this message, but I do not
10 see anything unusual about it, so (inaudible).  And
11 I signed it as Albert.
12            As I mentioned to you before, that's how
13 everybody seemed to be more comfortable calling me.
14        Q.  So you have no reason to doubt that this
15 was an Xmail correspondence between you and Yvonne?
16        A.  Yes.  Correct.
17        Q.  The next document I'm introducing is
18 Deposition Exhibit 32.  This one actually does have
19 a Bates number, so this will be in the folder we
20 gave you for an XPhone chat --
21            MS. SHIELDS:  The same date?
22            (Deposition Exhibit 32 was marked for
23 identification.)
24 BY MR. LONDON:
25        Q.  So I'll give you the Bates number and the

165

1 date.  I'm not sure exactly whether --
2            MS. SHIELDS:  It's not Bates
3 numbered.
4 BY MR. LONDON:
5        Q.  So the folder -- July 24, 2013 is the
6 date.
7            For the record, the Bates number of the
8 exhibit I'm introducing is SEC-MLATCKLP-E-0467346.
9            This one may actually -- I may actually
10 have a Bates number.
11            MS. PICKETT:  Okay.  I've got it.
12 BY MR. LONDON:
13        Q.  Mr. Nikolayev, do you recognize this
14 document as a chat between you and the code name
15 Bond?
16        A.  Yeah.  But, okay.  Possibly, yeah.
17        Q.  And there's another code in here, 102; do
18 you see that?
19        A.  Yes.
20        Q.  So this is a correspondence between
21 yourself, Bond and 102?
22        A.  102.
23        Q.  And Bond is Mr. Sharp, correct?
24        A.  Yes.
25        Q.  You will see in substance there's a

166

1 message from Advest; do you see that?
2        A.  Yes.
3        Q.  And 102 is emailing you and copying Bond;
4 is that correct?
5        A.  Um-hmm.  Um-hmm.
6        Q.  Based on reviewing this message, do you
7 see where on July 24, 2013, 102 states, "We here at
8 Advest have been testing your back office program
9 for some time, we are very much -- we are very
10 impressed by it and very much looking forward to
11 using it as the platform for the business."
12            Do you see that?
13        A.  Yeah, I don't remember -- yeah.
14        Q.  Then do you see above that it appears to
15 be your reply.  So do you see from FEN to 102 on
16 July 24, 2013?
17        A.  Yeah.
18        Q.  Is that your reply?  Yes?
19        A.  Possible, possible.  But I do not recall this
20 conversation.  But maybe at some point somebody --
21 Fred suggested somebody to use my software.
22            But I honestly don't recall this
23 conversation.  But possible.  It's possible.
24        Q.  And actually I have a very specific
25 question for you to help.  In your reply to 102, the

167

1 message states:
2            "Client details are limited because that
3 was requirement from Bond"; do you see that?
4        A.  Right.  Yeah.
5        Q.  Do you know what you meant by that?
6        A.  Well, he basically didn't want to have any
7 client information on the Q system.
8            So all clients are identified by four
9 letter symbols.  And that's -- I guess they are
10 asking if it's possible to have a KYC inside on the
11 system.
12            So I'm responding to them that because
13 Bond did not want to have that information that's
14 why it is like that.
15        Q.  And so if I understand you, is it fair to
16 say that Sharp's requirement was to have his
17 clients' names somehow hidden in the Q system?
18        A.  Yeah.  Yeah.  Basically it was just
19 four-letter code and (inaudible).
20        Q.  And that was because Fred Sharp wanted to
21 have the clients' names hidden; is that correct?
22        A.  I guess, yes.
23            It did have like a typo.  He didn't have
24 to put anything in it.
25        Q.  You didn't question Fred Sharp; you just

168

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1215

Fedir Nikolayev
2/2/2023

1  did what he said.
2      **A.**  Yeah.  And this final message was from
3  what date?
4      **Q.**  Mr. Nikolayev, I was looking at the top of
5  Exhibit 32.  It appears to be a cutoff.
6      **A.**  Okay.
7      **Q.**  So the document itself is only -- the
8  corners of the document are where it's contained in
9  that message.
10     **A.**  Okay.
11         (Deposition Exhibit 33 was marked for
12  identification.)
13  BY MR. LONDON:
14     **Q.**  Mr. Nikolayev, I'm handing now a document
15  we're marking as Deposition Exhibit 33; this is a
16  Xmail message that has a Bates identification
17  SEC-MLATICKLP-E-0675826.
18         The subject is "Wire"; the date is
19  March 10, 2014.
20     **A.**  Okay.
21     **Q.**  Counsel, are you ready for me to proceed
22  or do you need time to find it?
23         MR. MUHLENDORF:  I found it.
24  BY MR. LONDON:
25     **Q.**  Mr. Nikolayev, do you understand that

169

1      **Q.**  So let me pose the question first.  You're
2  jumping ahead of me to where I want to go.  But the
3  message that you sent to Yvonne is:  "Could you
4  please wire to my BOFA account 1,800 USD.  Fred
5  okayed it."  Period.
6      **A.**  Yeah, so there was some sort of
7  conversation.  I don't remember why it was 1,800 but
8  like there was conversation and that Fred would okay
9  it by saying "Request Wires to send -- to wire the
10  money."
11     **Q.**  So just to sum it up, to make sure that I
12  understand you, is it fair to say that you needed
13  $1,800 to conduct some business on behalf of Fred
14  Sharp?
15     **A.**  I do not know what is this amount was for.
16  I don't know.  I don't remember what it is for.
17     **Q.**  Okay.  But is it fair to say that there
18  was a that reason you needed $1,800 sent to you?
19     **A.**  Yeah.  Yeah.
20     **Q.**  And according to your message here, is it
21  fair to say that Fred Sharp approved sending money
22  to you?
23     **A.**  Yeah.  Yeah.
24     **Q.**  And that's the reason you reached out to
25  Yvonne to effect that transmission.

171

1  this is an XPhone chat?
2      **A.**  I think it's an Xmail email.
3      **Q.**  An Xmail email?
4      **A.**  Um-hmm.
5      **Q.**  So it's from FEN to Wires, and you're FEN,
6  correct?
7      **A.**  Correct.
8      **Q.**  Is it possible this is a XPhone chat?
9      **A.**  Yeah.  Possible.
10     **Q.**  And do you see the message, the substance
11  of it is from Albert; that's you, correct?
12     **A.**  Yeah.
13     **Q.**  And it's to Yvonne; is that correct?
14     **A.**  Yeah.
15     **Q.**  And do you see how the message
16  transmission is directed to Wires?
17     **A.**  Right.  Right.
18     **Q.**  But your understanding is you were
19  directing a message to Yvonne specifically --
20     **A.**  Right.  I guess at some point, at this
21  point it was Yvonne who I dealt with.  And I was --
22  you know, like where it says, "Fred okayed it"?
23         So when he okayed it, he actually said,
24  "Send Wires this request."
25         That's what he would tell him.

170

1      **A.**  Yeah.
2      **Q.**  The next document we're marking as
3  Deposition Exhibit 34.  It's a single-page document.
4         For purposes of the folks on the call,
5  this is a -- purports to be an XPhone chat with
6  Bates number SEC-MLATCKLP-E-0682889.  And this
7  purports to be an Xmail chat from March 2015.
8         I'll give Mr. Nikolayev a moment to take a
9  look at it.
10     **A.**  That was not Blackberries.  These were
11  already the Samsung phone.
12         (Deposition Exhibit 34 was marked for
13  identification.)
14  BY MR. LONDON:
15     **Q.**  So, Mr. Nikolayev, do you recognize
16  Deposition Exhibit 34 as an XPhone chat on the
17  Samsung phones?
18     **A.**  Yeah.
19     **Q.**  And it appears to be a chat between three
20  individuals.  At the bottom of the chat, on
21  March 26, 2015, at 10:28 a.m., it's from "2" to
22  "FEN," and also to the number "76."
23     **Q.**  Do you know who "2" is?
24     **A.**  Again, it's all about the support.  I was
25  not minding who it is.  I just -- they called it

172

Fedir Nikolayev
2/2/2023

1 numbers and stuff like that and I guess I am just
2 executing.
3          I don't -- I don't remember who "2" is.
4 No, I can't really place a name to it.
5          (Deposition Exhibit 35 was marked for
6 identification.)
7 BY MR. LONDON:
8      Q.  Mr. Nikolayev, I've handed you a document
9 we've just marked as Deposition Exhibit 35. It's a
10 single-page document.
11          The Bates number on this is
12 SEC-MLATCKLP-E-0687417.
13          It appears to be a XPhone chat in the
14 November 2015 time frame.
15          Take a moment to look at it and let me
16 know when you are ready.
17      A.  Yes, that's when we sent out the card.
18      Q.  So your understanding is this chat is
19 referring to what specifically?
20      A.  To the credit card that we set up in the
21 Dominican Republic.
22          (Court reporter requests clarification.)
23      A.  To the credit card that we set up in the
24 Dominican Republic.
25      Q.  So the company that you organized for

173

1 purposes of owning a credit card.
2      A.  Yeah. Yeah.
3      Q.  That we referred to earlier?
4      A.  Yeah.
5      Q.  In the chat -- there's a chat from Bond to
6 Celt and also to FEN on November 12, 2015 at 11:19
7 a.m.
8          Do you see that?
9      A.  Um-hmm.
10      Q.  And your understanding is Bond is
11 Mr. Sharp, correct?
12      A.  Yeah. Yeah.
13      Q.  Even though you may not know who others
14 are, you do know that Bond is Sharp.
15      A.  Yeah, basically all of the requests and
16 other things, even if it comes from somebody else,
17 it usually comes from Mr. Sharp.
18      Q.  In this request Mr. Sharp says, "Celt.
19 See below. FEN, each time the card is used it is
20 posted to besq in Q."
21          So just taking a look at that portion
22 I read, do you know what besq in Q means?
23      A.  The besq it must be a bank set up in the
24 system -- in the billing system -- not billing, in
25 the accounting system it is set up as a bank.

174

1      Q.  So besq you think refers to a bank or the
2 company that you set up?
3      A.  No, no, no. In the Q system there's --
4 the information is stored as a bank or as a client.
5 And each transaction is actually associated with
6 some bank and some client.
7          So it sounds like besq it must be the
8 bank -- it is set up as a bank.
9          But it doesn't mean that the -- according
10 to this email, it was related to that credit card.
11          But all of the records in that besq will
12 be related to that credit card.
13          I think what is happening over here is
14 just because I told them in the Dominican Republic,
15 usually when you get a lot of phone calls, incurring
16 international charges. And I was saying if they are
17 going to use it they need to let me know if the bank
18 calls to contend a charge.
19          MR. LONDON: Counsel, somebody is
20 unmuted. We're just getting some feedback back
21 here. Just double-check to make sure that you're on
22 mute.
23          Thanks.
24          (Deposition Exhibit 36 was marked for
25 identification.)

175

1 BY MR. LONDON:
2      Q.  I've now handed Mr. Nikolayev a document
3 we've marked as Deposition Exhibit 36. This will
4 come from the Xmail folder. It doesn't have a Bates
5 number.
6          The subject is XPhone. The date is
7 December 15, 2015, at 9:03:35 a.m. and it's from
8 Wires to fen@secure.Xmeridian.com.
9      A.  Okay.
10      Q.  There is an attachment called
11 "Untitled.PDF" which appears on the back of the
12 page. So it's a two-page document, the message and
13 the attachment.
14          I'll give the people on phone a moment to
15 locate it.
16          So, Mr. Nikolayev, do you recognize
17 Exhibit 36 as an Xmail message from Wires to you?
18      A.  Yep.
19      Q.  Let's take a look at the chart on the
20 back, it would appear to be a spreadsheet called
21 Xphones; do you see that?
22      A.  Yes. Yes.
23      Q.  Do you know who created this chart?
24      A.  Because the number is not a Dominican one,
25 so I would say it was originally created in Canada.

176

A1217

Fedir Nikolayev
2/2/2023

---

**Page 177**

1  But I'm sure I'm the one who filled the information
2  like the passwords and stuff.
3      **Q.**  Let me help you there.  So the chart has
4  various columns, there's a column called "Code."
5      **A.**  Right.
6      **Q.**  Those are what we refer to as various
7  codes assigned to individuals?
8      **A.**  Yeah.
9      **Q.**  And then there's a column called "Email,"
10  do you know what that is?
11      **A.**  That's the identity -- it either was an
12  email address or just in the context (inaudible)
13  that would be identified by that.
14      **Q.**  In the email column there's some words
15  such as "Bond" and "Celt" and "FEN" but there is
16  also a bunch of numbers.
17      **A.**  Right.
18      **Q.**  What's the distinction?
19      **A.**  I think in this format it means with whom
20  that particular line can communicate.
21      **Q.**  Well, there's a third column called
22  "Communication;" so I just want to make sure we
23  understand the distinction.
24          So there's the email column and then
25  there's the communication column.  So I'm looking at

---

**Page 179**

1      **A.**  Right.
2      **Q.**  And then after that there's a various
3  sequence of information.  Do you understand what
4  that means?
5      **A.**  Yeah.  Yeah.
6      **Q.**  Can you explain that?
7      **A.**  Yeah.  It means to whom they
8  can communicate -- to whom they can communicate --
9  to whom they can send messages to.
10      **Q.**  So if the entry in the Communication
11  column says "All," what does that mean?
12      **A.**  Can write to any of the ones.
13      **Q.**  So anyone who can communicate "All" can
14  send or receive a message to any other Xphone
15  holder.
16      **A.**  Yeah.  Yeah.  Yeah.
17      **Q.**  And if anybody is more limited then that
18  would it be a limitation on who they can send and
19  receive messages from?
20      **A.**  Yeah.  I would say I guess there's "B,"
21  Bond and "W" is Wires.
22      I guess "K" is Cash; "T" is Trade and "C"
23  I don't know -- oh, I guess Celt.
24      I executed it like blindly, like whatever
25  was requested I added it to the system.

---

**Page 178**

1  just the email column.
2          In the e-mail column, some of the entries
3  in the email column are words such as Bond, Celt and
4  FEN.  And then below that there's a series of
5  numbers, two, three, four and so forth.
6          So I'm just asking you, do you understand
7  why some of the entries are numbered?
8      **A.**  Yeah, I told you earlier, my understanding
9  is that staff would be named and clients would be
10  numbered.
11      **Q.**  And this just refers back to what your
12  understanding was about staff having names and
13  clients having numbers.
14      **A.**  Yeah.
15      **Q.**  Okay.
16      **A.**  But like, you have to look -- not -- in
17  this particular document you can see that there's a
18  reference between that code of the client and the
19  number.  I did not -- like I did not -- like pay
20  attention to that part.
21      **Q.**  I understand.  There's the Communication
22  column.  I think you might have been referring to
23  that earlier.  In the Communication column the first
24  four or five or six rows actually all have the word
25  "All" in it.

---

**Page 180**

1      **Q.**  Let the record reflect you will notice at
2  the bottom of chart it says, "Updated 11/5/2015."
3      **A.**  Yes.
4      **Q.**  Which I suppose can either be November or
5  May; do you know which one it is?
6      **A.**  I think it was November.
7      **Q.**  November?
8      **A.**  And it's written by hand.  This is very
9  strange.
10      **Q.**  My final question:  Do you recognize the
11  handwriting?
12      **A.**  No.
13          But it is just kind of very strange that
14  it's by hand.  Usually it's like an Excel file and
15  stuff.
16          MR. MUHLENDORF:  Before we read that
17  document, could you reread the subject line of
18  the -- because I still haven't found it.
19          MR. LONDON:  Sure.  So the subject
20  line is "XPhone."
21          MR. MUHLENDORF:  Yeah, under the
22  Xmail messages I have no subject line XPhone.
23          MR. LONDON:  But is there more than
24  one folder that you have with Xmail messages?
25          MR. MUHLENDORF:  No.

---

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1218

Fedir Nikolayev
2/2/2023

| | |
|---|---|
| 1       MR. LONDON: Does anyone else see it? | 1    **Q.** And -- |
| 2       MR. KNUTS: Yeah. It is the last one | 2    **A.** And, you know, I guess because I had to |
| 3   in my folder under the "Xmail Nikolayev" folder. | 3   write to Wires, that is how I addressed it. |
| 4       MR. MUHLENDORF: Yeah, the last | 4       I haven't done much communications in a |
| 5   message in mine is that XPhone number 76 that we | 5   number of years with them that's why I couldn't like |
| 6   previously marked. | 6   clearly identify that Wires is Yvonne, when you |
| 7       MR. KNUTS: I've got two under that | 7   asked me -- |
| 8   one. | 8    **Q.** But according to this it appears that |
| 9       MR. LONDON: Bob, everybody got the | 9   Wires is Yvonne, correct? |
| 10   exact same transmission of documents. So it would | 10   **A.** Yes. |
| 11   have to be in there. Just because we didn't send | 11   **Q.** And you're requesting from Yvonne to send |
| 12   them separately. We sent them all to everyone's | 12   the balance of something to your BOFA account. |
| 13   group. | 13   **A.** Yes. |
| 14       THE WITNESS: I was the one who set | 14   **Q.** That was a G-O-T-A to your BOFA account? |
| 15   up the password, for sure. | 15   **A.** Yeah. |
| 16       MR. MUHLENDORF: I'll go back to | 16   **Q.** Can you interpret that for me and tell me |
| 17   Xcelion (phonetic) and try again. | 17   what it means? |
| 18       MR. LONDON: All right. It would be | 18   **A.** Okay. G-O-T-A was the email account in the |
| 19   after we're done here, unfortunately, but I can | 19   accounting system, that's how was declared the |
| 20   direct the email to you, if for some reason you | 20   account which were receiving commissions from the |
| 21   can't find it later on, happy to give you a copy. | 21   Gotama Capital. |
| 22       But why don't we just continue | 22   **Q.** So G-O-T-A is a code in the Q accounting |
| 23   forward. | 23   system for commissions that you received from work |
| 24       (Deposition Exhibit 37 was marked | 24   done by Gotama? |
| 25   for identification.) | 25   **A.** Yeah. |
| 181 | 183 |
| 1   BY MR. LONDON: | 1   **Q.** And is it fair to say that your request to |
| 2   **Q.** Okay, Mr. Nikolayev, I am giving you a | 2   Yvonne was to send the commission money to your BOFA |
| 3   document we've marked as Deposition Exhibit 37. | 3   account? |
| 4       This is -- it purports to be an Xmail | 4   **A.** Yes. |
| 5   message with the subject "Re: Wire please," dated | 5   **Q.** So your Bank of America account? |
| 6   July 4, 2017 from Wires to FEN. | 6   **A.** Yeah. |
| 7       Taking a look at this, do you recognize | 7   **Q.** At any point, did you ever ask Yvonne to |
| 8   this document as an Xmail transmission? | 8   take action when you found out that she no longer |
| 9   **A.** Yeah. | 9   worked for Sharp? |
| 10   **Q.** And again you're FEN, correct? | 10   **A.** You know, all of those kinds of |
| 11   **A.** Yeah. | 11   communications all were eventually authorized by |
| 12   **Q.** So this was a message that you were | 12   Mr. Sharp. |
| 13   sending to Yvonne, correct? | 13       So I would generally contact him first |
| 14   **A.** Um-hmm. | 14   before I do anything. |
| 15   **Q.** So the date of this transmission is | 15       So like maybe at some point he just did |
| 16   July 4, 2017; you see that, correct? | 16   not ask me to write anything to her on that. |
| 17   **A.** Yeah. | 17   **Q.** So it was your practice of seeking |
| 18   **Q.** Was it your understanding that as of | 18   Mr. Sharp's authorization initially for money to be |
| 19   July 4, 2017, Yvonne was working for Fred Sharp? | 19   transmitted to you? |
| 20   **A.** I don't know. I don't know. I don't | 20   **A.** Yes. |
| 21   know. | 21   **Q.** And if Mr. Sharp then told you to contact |
| 22   **Q.** Did you know whether or not Yvonne ever | 22   Yvonne, you would contact Yvonne. |
| 23   stopped working for Sharp? | 23   **A.** Yeah. |
| 24   **A.** I think there was a point where she | 24   **Q.** So your pattern and practice was to only |
| 25   stopped working, but I don't know exact dates. | 25   contact Yvonne if Mr. Sharp informed you that that's |
| 182 | 184 |

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1219

Fedir Nikolayev
2/2/2023

---

**Page 185**

1  the step that you needed to do to get your money.
2      **A.**  Right.  Right.
3          There was a point where I stopped hearing
4  like her name.  But I don't know exact date -- I
5  cannot -- I really cannot tell you exact date when
6  this happened.
7      **Q.**  At least based on Exhibit 37 it appears
8  that you reached out to Yvonne to request a transfer
9  of money and she then replied to you by saying,
10  "Will do today," correct?
11      **A.**  Yeah, yeah.
12          MS. PICKETT:  Objection as to form.
13          Just to put on the record, the email
14  was not signed by Yvonne or in the response it
15  doesn't even say Yvonne so --
16          THE WITNESS:  Yeah, I agree on that.
17  There's no signature from her over here.
18  BY MR. LONDON:
19      **Q.**  Was there ever an occasion where you
20  reached out to Yvonne to take some sort of action
21  and somebody wrote back to you to tell you that
22  Yvonne didn't work there anymore?
23          MS. PICKETT:  Objection as to form.
24          THE WITNESS:  I don't recall that.
25          (Deposition Exhibit 38 was marked for

---

**Page 186**

1  identification.)
2  BY MR. LONDON:
3      **Q.**  I've handed Mr. Nikolayev the document we
4  have marked as Deposition Exhibit 38.
5          It's a two-page document from the Xmail
6  folder.  So the subject is "Re: Returned mail:  See
7  transcript for details."
8          It's from "fen at ch to Wires" and the
9  date is April 3rd, 2018.  I'll give everyone a
10  moment to locate it.
11          Mr. Nikolayev, I'm focused on the first of
12  the two pages in Exhibit 38.  So looking
13  sequentially at the bottom first, there appears to
14  be some sort of return mail message on April 3,
15  2018; do you see that?
16      **A.**  Yes.
17      **Q.**  Do you have an understanding of what the
18  problem there was?
19      **A.**  Yeah.  I think at this point we used Xmail
20  and the client were able to configure forward.  And
21  basically it looks like when they replied -- or sent
22  an email to secure email, it was forwarded to
23  another address, this Jordan@dracus.com and it
24  bounced back.
25          And basically the conversation is like

---

**Page 187**

1  that they -- they're asking me to remove that
2  forward -- configuration for this forwarding.
3      **Q.**  So there's a portion of this message where
4  on April 3, 2018, you write a message where you say
5  "Hi Yvonne, I think he set up forward.  That's why
6  his mail is rejected.  Would you like me to remove
7  his forwarding configuration?  Thanks, Albert."
8          Do you see that?
9      **A.**  Yeah.  If you're asking me if I identify
10  Yvonne as being Wires, I think I'm just doing to
11  automatically at this point of time.  I don't know.
12      **Q.**  So your purpose is to send a message to
13  Yvonne with respect to whether or not you need to
14  remove a forwarding configuration for a client.
15      **A.**  Yeah.  Yeah.  At that email address,
16  phantom@securecuracao.xmeridian.com
17      **Q.**  Just focusing on your communication with
18  Yvonne, your intent was to ask Yvonne to direct you
19  whether or not to do something, correct?
20          You originally wrote to Yvonne
21  specifically.
22      **A.**  I'm guessing -- I wrote Yvonne because I
23  guess that's who was usually replying to me at
24  Wires.
25          I don't think I give it much thought when

---

**Page 188**

1  I wrote Yvonne over here.
2      **Q.**  And then Wires replies and says, "Yes
3  please."
4      **A.**  Again and did not sign it.
5      **Q.**  I understand.  And you then reply to that
6  message -- and this is the top message on April 3rd,
7  2018 at 3:29 p.m. -- this is your reply; is that
8  correct?
9      **A.**  Yeah.  Yeah.
10      **Q.**  And you say:
11          "Done.  Just you need to let him know that
12  he should check his email and not forward it because
13  it defeats the purpose of the closed system."
14      **A.**  Correct.
15      **Q.**  Now, you wrote that.
16      **A.**  Yeah, I wrote that.
17      **Q.**  Just with respect to that, what did you
18  mean by "It defeats the purpose of the closed
19  system"?
20      **A.**  I'm saying that the reason why I was asked
21  to set this system up is that if they would be
22  traveling borders and stuff like that they would be
23  able to communicate securely between each other.
24          The moment when it's leaving the system
25  it's not secure anymore.  And that's what I was

---

A1220

189

```
 1   telling them why is this person doing that?  Why are
 2   they --
 3       Q.  And is it fair to say that the closed
 4   system, the reason to have a closed system is
 5   because Fred Sharp directed you to have a closed
 6   system?
 7       A.  Yes.  Yes.  Yes.  Yes.
 8       (Deposition Exhibit 39 was marked for
 9   identification.)
10   BY MR. LONDON:
11       Q.  I'm handing you a document that we marked
12   as Deposition Exhibit 39.  For the benefit of the
13   individuals on the call, this is an Xmail document
14   where the subject is "Re: BESQ refill."  And it
15   purports to be a message from FEN to Wires on
16   July 25 2018.
17       Just take a moment to read that.
18           MS. SHIELDS:  I apologize, where are
19   we right now?  I'm sorry.
20           MR. LONDON:  So the subject which I
21   think it may be the name it is saved as is "Re: BESQ
22   refill."
23           MS. SHIELDS:  BESQ refill, oh, got
24   it.  Thank you.
25
```

190

```
 1   BY MR. LONDON:
 2       Q.  On or around July 17, 2018, you were
 3   sending a message to Yvonne, correct?
 4       A.  Yes.
 5       Q.  Can you explain to me what it is that you
 6   wanted to ask her?
 7       A.  The email was to Wires.  So again like the
 8   name Yvonne is just like -- I guess because Wires
 9   was signing it as Yvonne or something.
10       So I requesting to wire to be sent on the
11   account related to the credit card so that I can
12   create a credit card.
13       Q.  So the purpose -- just to sum it up, if
14   I'm correct -- the purpose of you reaching out to
15   the Wires account is because you needed money from
16   Fred Sharp to pay the credit card account of the
17   company.
18       A.  Yes.  Yeah.  I don't know what this
19   reference is.
20           MR. LONDON:  For logistics reasons,
21   I'm going to turn over the questioning now to Kathy
22   Shields.  She has some documents that she has
23   prepared to ask Mr. Nikolayev.  As we indicated
24   earlier, we dual-noticed this deposition for
25   purposes of two cases.
```

191

```
 1       So with respect to the SEC versus
 2   Stubos case, I'm going to have Kathy turn over the
 3   questioning.
 4       Is that fine with everybody or is
 5   there any objection to me switching with Kathy now?
 6       Does anyone have an objection?
 7           MS. PICKETT:  No objection.
 8           MR. MUHLENDORF:  No objection.
 9           MR. LONDON:  Thank you.
10           MS. SHIELDS:  How are we on the
11   length of time on the videotape?
12       Ten minutes?  Okay, let's see if we
13   can do it in ten minutes.
14           EXAMINATION
15   BY MS. SHIELDS:
16       Q.  Good afternoon, Mr. Nikolayev.
17       I'm going to ask you a couple of
18   questions.  So the first document, counsel, is in
19   the Xmail folder.  The subject line is "Master of My
20   Domain."
21       Give everyone a moment to pull that one
22   up.
23       A.  Okay.
24       (Deposition Exhibit 40 was marked for
25   identification.)
```

192

```
 1   BY MS. SHIELDS:
 2       Q.  So, Mr. Nikolayev, do you recognize this
 3   document that we've marked as Exhibit 40 as a
 4   message from the Xmail system?
 5       A.  Yes.
 6       Q.  At the top of the page is a message from
 7   you to someone named Lion with the subject "master
 8   of my domain"; do you see that?
 9       A.  Yeah.  That is initiated.  I don't know
10   who initiated it.
11       Q.  If you look to the bottom message, do you
12   see it says, "On Tuesday 11 December 2012, Lion
13   wrote"; do you see that?
14       A.  Yeah.  Yeah.  Yeah.
15       Q.  So my first question is, do you know --
16       A.  I guess I got a message from Fred over
17   here.  There's a message from Fred to me:
18       "Albert, see below and advise please."
19       Q.  Yes.
20       A.  That's when I got into this.
21       Q.  Right.  So is it fair to say you read
22   these email chains from the bottom up?
23       A.  Yeah.  Yeah.
24       Q.  So the bottom message is from Lion and
25   then the message above that it looks like Fred Sharp
```

Fedir Nikolayev
2/2/2023

1  is forwarding that message along to you.
2      **A.**  Yeah.
3      **Q.**  Is that right?
4      **A.**  Yeah.
5      **Q.**  Because you are Albert.
6      **A.**  Yeah.
7      **Q.**  That is referred to there?
8      **A.**  Yeah.
9      **Q.**  So my first question is:  Do you know who
10 Lion is?
11     **A.**  No.
12     **Q.**  Is it fair to say that from the context of
13 this message, you understand that Lion is a client
14 of Fred Sharp's?
15     **A.**  Yes.  Yes.
16     **Q.**  And he's writing to you about opening a
17 GoDaddy account for Action Publishing LLC; do you
18 see that request?
19     **A.**  Yeah.  Yeah.
20     **Q.**  And then in the message in the middle of
21 the page Lion writes:  "Time is of the essence on
22 this"; do you see that?
23     **A.**  Yes.
24     **Q.**  Do you have any idea why time is of the
25 essence?

193

1      **A.**  Basically I think when they say that to me
2  it basically means they want it to be executed as
3  soon as possible.
4      **Q.**  Okay.  And then you respond to that
5  message and ask Lion what address you should put on
6  the account; is that right?
7      **A.**  Yes.
8      **Q.**  And above that you're asking Lion if you
9  can go ahead with the transfer, you're saying:  "You
10 have a GoDaddy account with your billing
11 information."
12     **A.**  Um-hmm.
13     **Q.**  And then you can give him a separate
14 log-in to manage his domain; do you remember that?
15     **A.**  Yes.  Yes.
16     **Q.**  So did you actually set up this website
17 registration for Lion?
18     **A.**  I guess -- I don't recall specifics, but
19 a lot of times to not complicate things I would do
20 it in my name.  And then if they want to transfer it
21 to there home, I will transfer it from my home.  It
22 was just to move things much faster.
23     **Q.**  Okay.  Did you have any communications
24 with Lion about what he was going to use this Action
25 Publishing --

194

1      **A.**  I don't recall.  I don't recall.  I don't
2  recall.
3          (Deposition Exhibit 41 was marked for
4  identification.)
5  BY MS. SHIELDS:
6      **Q.**  Okay.  I'm going to hand you a document
7  we've marked as Exhibit 41.
8          Counsel, this is in the folder that I
9  think we've labeled "Stubos chats."  This is an
10 XPhone communication dated October 21, 2013.
11     **A.**  Okay.
12     **Q.**  Just give everybody a minute to pull that
13 up.
14     **A.**  Um-hmm.
15     **Q.**  So, Mr. Nikolayev, do you recognize the
16 document we've marked as Exhibit 13 as a set of
17 XPhone chats between you and Bond and Number 77?
18     **A.**  Yes.
19     **Q.**  Okay.  And so is it fair to say that Fred
20 Sharp starts this conversation off by asking you to
21 create a new Xmail account for
22 alliance@corptrax.com?
23     **A.**  He is asking me to create corptrax email
24 address --
25     **Q.**  Okay.

195

1      **A.**  And to forward it to Lion.
2      **Q.**  And so can you explain to me how that
3  works?  So is alliance@corptrax.com, was that part
4  of your Xmail system?
5      **A.**  Yeah, yeah.  It basically it was several
6  of the domain names.
7      **Q.**  Okay.  And then when you are saying -- or
8  when he said:  "Forward copies to
9  Lion@secure.xmeridian.com," is that Lion's Xmail
10 account?
11     **A.**  Yeah.
12     **Q.**  Okay.  And does that mean he's giving
13 control or Mr. Bond or Mr. Sharp is asking you to
14 give control over that alliance@corptrax account to
15 Lion?
16     **A.**  I think what was happening here is that
17 the e-mail address was created with its own
18 password.
19          But all of the emails that would come to
20 Alliance would be forwarded to Lion because he would
21 get notified on his iPhone of that message.
22     **Q.**  And do you see how the number -- the
23 XPhone user 77 is also copied?
24     **A.**  77, yeah.  Yeah.
25     **Q.**  Do you know whether 77 is also Lion?

196

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1222

Fedir Nikolayev
2/2/2023

1    **A.** As I responded earlier, I did not pay
2  attention to that.
3    **Q.** Have you ever heard the name George
4  Stubos?
5    **A.** No.
6    **Q.** That name doesn't mean anything?
7    **A.** Does nothing.
8    **Q.** Is that typical for when you had
9  interactions -- or to the extent that you had any
10  interactions with Mr. Sharp's clients, did you know
11  their names typically?
12    **A.** I typically didn't know anybody's name.
13    I just was giving support to what was
14  requested mostly from email addresses that I give
15  support to.
16    **Q.** If you go maybe halfway up that chain, do
17  you see there's a message at 3:05 p.m. from 77
18  asking: "And this will be able to send external
19  emails?"
20    **A.** Yes.
21    **Q.** And you say yes.
22    Do you have an understanding of why there
23  was a desire to be able to send external emails from
24  that account?
25    MR. MUHLENDORF: Objection.

197

1    THE WITNESS: I don't know.
2    (Deposition Exhibit 42 was marked for
3  identification.)
4  BY MS. SHIELDS:
5    **Q.** I'm going to hand you another document
6  that's we have marked as Exhibit 42. And, counsel,
7  this is in that Stubos messages folder. It's an
8  XPhone chat dated February 13, 2014. And the Bates
9  number ends 543148.
10    So, Mr. Nikolayev, do you recognize this
11  as an XPhone message between Bond and Lion or 77
12  that you got added into?
13    **A.** Yeah.
14    **Q.** Okay. So is it fair to say in the second
15  message up you got this message when Bond or
16  Mr. Sharp forwarded a message from Lion to you?
17    **A.** Right.
18    **Q.** Is that right?
19    **A.** But that's the event that I was saying
20  earlier in the time of this deposition that the
21  servers were at the Mossack Fonseca. And I was
22  suggesting to move them -- to set up new ones to
23  Ocean Communications.
24    **Q.** So let's go through the message.
25    So it starts with Lion saying to

198

1  Mr. Sharp:
2    "I want to register some domain names and
3  set up a website and email server from 'over
4  there,'" in quotes; do you see that?
5    **A.** "Over there" means -- he's setting up the
6  website.
7    Okay. Yeah, I guess he means Curacao.
8    **Q.** Okay. And then Bond forwards that message
9  to you and asks, "Can you help Lion?"
10    Do you see that?
11    **A.** Okay. Yeah.
12    **Q.** And then you ask, "as a separate setup
13  from Bond?"
14    **A.** Right.
15    **Q.** And then the response from Bond is "Sí,"
16  is that yes?
17    **A.** Yes.
18    **Q.** And then you respond with "Ocean
19  Communications," and say, "Please contact Curacao."
20    **A.** Yes.
21    **Q.** Do you recall a scenario where one of
22  Bond's clients reached out to you or Ocean
23  Communications to set up websites separate from
24  Mr. Sharp's platform?
25    **A.** I do not recall that being done. I think

199

1  maybe it just stayed at this stage. I don't
2  remember doing that.
3    **Q.** Okay. The top message says, "Okay. They
4  will here from Katie"; does that mean anything to
5  you?
6    **A.** No. I do not recall them -- anybody else
7  setting up with Ocean Communications.
8    (Deposition Exhibit 43 was marked for
9  identification.)
10  BY MS. SHIELDS:
11    **Q.** Okay. I'm handing you a document we've
12  marked as Exhibit 43.
13    Counsel, this is in that Stubos chats
14  folder. This is an Xphone communication with the
15  date of February 18, 2014, and the Bates number is
16  567849.
17    So, Mr. Nikolayev, do you recognize this
18  document as another XPhone chat between you and 77
19  and then Bond is added to that later?
20    **A.** Right.
21    **Q.** And Lion or I'm sorry 77 starts a chain by
22  asking if you registered a website hotstockpick.com
23  for him?
24    **A.** Um-hmm.
25    **Q.** And then you send that to Mr. Sharp

200

Fedir Nikolayev
2/2/2023

| | |
|---|---|
| 1 asking: "What do you do with this," right? | 1 do with these websites? |
| 2    **A.** Yes. | 2    **A.** I did not have those details, but I think |
| 3    **Q.** Why did you send this to Mr. Sharp asking | 3 what he was -- he wanted me to register the name. |
| 4 him what to do with it? | 4     I mean you see like over here I am asking |
| 5    **A.** Because I'm getting paid by Mr. Sharp and | 5 him what address information the payment he got? |
| 6 this is kind of request that is not under general | 6     And I do not -- even like that answer, |
| 7 support of the system? | 7 "Please use Alliance financial media," I wouldn't |
| 8     So I asked him why -- like what are we | 8 know that. I must have requested Bond to later give |
| 9 doing here? What's going on, basically. | 9 me that information. |
| 10    **Q.** Okay. And then in the next message up | 10    **Q.** Okay. That's the question that I was |
| 11 Mr. Bond responds -- Mr. Sharp responds to you, | 11 going to ask you: Did you understand from this |
| 12 "That Lion." | 12 message that Sharp, Mr. Sharp, had a company called |
| 13     Does that mean to you that 77 is Lion? | 13 Alliance Financial Media LLC that was going -- whose |
| 14    **A.** Yeah, well, I guess that's what he's | 14 name and address you were going to be able to use to |
| 15 saying. But like again, I'm not paying attention | 15 register these things? |
| 16 who it is. | 16    **A.** I did not know that. I just used that |
| 17    **Q.** Okay. | 17 which was provided to me to request this information |
| 18    **A.** It just -- | 18 from Mr. Sharp. |
| 19    **Q.** And then so Mr. Sharp asks you, "Are you | 19    **Q.** And did Mr. Sharp allow user 77 to use |
| 20 working for him or not?" | 20 that Alliance Financial Media? |
| 21    **A.** Right. | 21    **A.** I do not remember. I don't remember. |
| 22    **Q.** Is that a reference to the prior email | 22     Do you have any further emails? I don't |
| 23 where we saw Lion asking for a setup outside of | 23 remember. |
| 24 Bond? | 24    **Q.** So if -- let me just ask you this. |
| 25    **A.** Right. | 25     If that payment was made, I assume it |
| 201 | 203 |
| 1    **Q.** So do you remember -- does this help you | 1 would be recorded in the Q accounting system; is |
| 2 to recall whether you were doing work for 77 or | 2 that your understanding? |
| 3 Lion? | 3    **A.** Yes. |
| 4    **A.** It did not go anywhere. It did not go | 4    **Q.** Okay. |
| 5 anywhere. Just basically you can see over here | 5     MS. SHIELDS: Why don't we take -- we |
| 6 there's no further communication. | 6 need to change the videotape. Is there something |
| 7    **Q.** Okay. Let's go to the next document; this | 7 that you wanted add -- |
| 8 is Exhibit 44. | 8     THE WITNESS: It's a forward |
| 9    (Deposition Exhibit 44 was marked for | 9 payment which is -- I'm not asking for the payment |
| 10 identification.) | 10 for the service. I'm asking for payment that I |
| 11     MS. SHIELDS: Counsel, this is in | 11 would be using in GoDaddy or something, to register |
| 12 that Stubos chats file; it is an Xphone | 12 that. |
| 13 communication dated February 18, 2014. And the | 13     So it would be some sort of credit |
| 14 Bates number is 562148. | 14 card or something. That's what I'm asking for here. |
| 15 BY MS. SHIELDS: | 15     MS. SHIELDS: Understood. We need to |
| 16    **Q.** Mr. Nikolayev, do you recognize this as a | 16 take a five-minute break to change the tape. I've |
| 17 set of XPhone communications? | 17 only got two more documents, but let's go off the |
| 18    **A.** Yes. | 18 record. |
| 19    **Q.** And this is between you and 77? | 19     THE VIDEOGRAPHER: Time is 2:31. |
| 20    **A.** Right. | 20 We're off the record. |
| 21    **Q.** And it starts by 77 asking you if you | 21    (Deposition Exhibit 45 was marked for |
| 22 registered hot -- | 22 identification.) |
| 23    **A.** Yeah, stockpicks and then superstarstocks. | 23 BY MS. SHIELDS: |
| 24    **Q.** And then superstarstocks. | 24    **Q.** Handing you what we've marked as Exhibit |
| 25     Did you understand what user 77 wanted to | 25 45. |
| 202 | 204 |

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1224

Fedir Nikolayev
2/2/2023

1         THE VIDEOGRAPHER:  Wait.
2         MS. SHIELDS:  We weren't on the
3  record.
4         THE WITNESS:  Sorry.  We need to
5  start.
6         THE VIDEOGRAPHER:  We're back on the
7  record.  The time is 2:34.  Tape number five.
8  BY MS. SHIELDS:
9    **Q.**  Mr. Nikolayev, I'm handing you a document
10  we've marked as Exhibit 45.
11         Counsel, this is in that Stubos chats
12  file.  It's an XPhone message from April 10, 2014,
13  the Bates number is 498217.
14         Mr. Nikolayev, just take a minute to look
15  through this and let me know when you are ready.
16    **A.**  Okay.
17    **Q.**  Do you recognize this as a series of
18  Xphone messages that you exchanged with Number 77
19  between April 8 and April 10, 2014?
20    **A.**  It appears to be -- I don't have a
21  recollection of this.  But I think it's because it
22  didn't go anywhere.
23    **Q.**  Okay.  So it starts at the bottom message
24  on the second page of the exhibit.  Fair to say that
25  it starts with user Lion having a problem logging

205

1  onto the alliance Xmail; do you see that?
2    **A.**  Yeah.
3    **Q.**  And then that message gets forwarded on to
4  you by Mr. Sharp.
5    **A.**  Right.
6    **Q.**  So does that suggest to you that the user,
7  Lion, or 77, had access to the Alliance Xmail
8  account?
9    **A.**  Yes.
10    **Q.**  And was the user of that.
11    **A.**  Yes.
12    **Q.**  And so as the messages continue up, fair
13  to say that you provide him the password to that
14  Xmail account?
15    **A.**  Yes.
16    **Q.**  And then on the message on the first page,
17  about two-thirds of the way down, he tells you --
18  he's asking to talk to you so that you -- because he
19  wants to set up a couple of things.  And then he
20  identifies that as a daily e-letter and build an
21  email database; do you see that?
22    **A.**  Yeah.
23    **Q.**  And then you ask him what kept him from
24  using existing service providers; do you see that?
25    **A.**  Yeah.

206

1    **Q.**  And then he responds:  "Nothing other than
2  desire for anonymity"; do you see that?
3    **A.**  Yeah.
4    **Q.**  Did you have any further communications
5  with Lion or 77 about setting up these services?
6    **A.**  I do not recall anything going on with
7  that.  I don't think we ever end up sending an
8  email, letters like that.
9    **Q.**  Do you understand why Lion, or 77, wanted
10  anonymity for these services?
11    **A.**  I did not question it.  I didn't question
12  it.
13    **Q.**  Did you understand or have an
14  understanding about whether he wanted to use these
15  services for stock promotions?
16    **A.**  I don't know.
17    **Q.**  So up in the top, towards the top, fair to
18  say that you told Lion that you would investigate
19  options and then offer him a tech person?
20    **A.**  Right.  I was not comfortable about doing
21  like email marketing and stuff.  So I really did not
22  want to --
23    **Q.**  Okay.  So did you discourage --
24    **A.**  I think I was trying to answer it slower
25  and slower so I did not have to deal with that.

207

1    **Q.**  And why is it that you didn't want to be
2  involved in marketing?
3    **A.**  I just find it very fishy, and did not
4  want to deal with this.
5         (Deposition Exhibit 46 was marked for
6  identification.)
7  BY MS. SHIELDS:
8    **Q.**  I'm going to hand you another document
9  that's Exhibit 46.
10         Counsel, this is in that Stubos chats
11  folder.  It's an XPhone communication dated April 10
12  to April 14, 2014.  And the Bates number on the
13  first page is 648586.
14    **A.**  Right.
15    **Q.**  So let me ask you, Mr. Nikolayev, just
16  take a moment and look at this and then I'll have a
17  question for you.
18    **A.**  Okay.  You can also see that I was
19  concerned about -- that his servers would be
20  blacklisted.
21    **Q.**  Let me ask you a question.  So do you
22  recognize this as a series of XPhone communications
23  between April 10 and April 14?
24    **A.**  Yes.  Yes.
25    **Q.**  And is it fair to say that part of this

208

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1225

**Fedir Nikolayev**
**2/2/2023**

---

**Page 209**

1  chain is part of the communications string we saw in
2  Exhibit 45?
3     **A.**  Yeah.
4     **Q.**  And then the new material picks up sort of
5  halfway down first page; is that right?
6     **A.**  Yeah.
7     **Q.**  So this is a communication you were having
8  with XPhone user 77; is that right?
9     **A.**  Yeah.
10     **Q.**  And is it fair to say that you offer 77
11  hosting services from Ocean Communications in
12  Curacao?
13     **A.**  Yeah.
14     **Q.**  That was your company where you have the
15  server farm; is that right?
16     **A.**  Yeah.
17     **Q.**  And then in response to 77's request for
18  somebody to register domain names for him, you then
19  write to Mr. Sharp; is that right?
20     **A.**  Yes.  Basically I'm just saying I don't
21  want my name on it, because if it's more IT stuff.
22  I did not want my reputation ruined from the IT
23  point of view.
24     **Q.**  And is that why you're saying you didn't
25  want to put your name on it?

*209*

---

**Page 210**

1     **A.**  Exactly.  Exactly.
2     **Q.**  Do you remember how this request by user
3  77 was resolved?
4     **A.**  I think that basically that was -- I do
5  not remember -- I don't remember if anything
6  happened.
7     I don't think -- there's no -- I mean
8  there's no clients -- there were no new clients like
9  this that do mailings like that from Curacao, from
10  Ocean Communications.
11     **Q.**  So Ocean Communications didn't take on
12  user 77 as its own client?
13     **A.**  Did not take it, no.
14     **Q.**  And is that because you had discomfort
15  with the business that 77 wanted to do?
16     **A.**  No.  I think this email basically
17  discouraged him.  Like when I told this to Fred it
18  discouraged him I think.
19     Basically I don't think -- I don't
20  remember hearing much more than that from Fred.
21     **Q.**  So, Mr. Nikolayev, at this time we've
22  asked the questions that we wanted to ask of you.
23     We are going to turn it over to defense
24  counsel for the questions they want to ask.
25     It's possible that after they finish we'll

*210*

---

**Page 211**

1  have a few what we call rebuttal questions for.  But
2  we are going to turn it over now to defense counsel
3  to ask you questions they might have.
4     MR. MUHLENDORF:  Can we go off the
5  record for a second?  It might help organize us.
6     MR. LONDON:  Sure.  Off the record.
7     (Discussion off the record.)
8     MR. LONDON:  We're on the record now.
9     So, Karen, why don't you just
10  identify yourself and your client and start your
11  questions?
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*211*

---

**Page 212**

1            EXAMINATION
2  BY MS. PICKETT:
3     **Q.**  Good afternoon, Mr. Nikolayev, I hope I'm
4  pronouncing that correctly.  I'm Karen Pickett.  I
5  represent Yvonne Gasarch.
6     I just have after few follow-up questions
7  for you. I would like to start with the Q system.
8     I would like for you to explain to me if
9  you could the different levels of access in the Q
10  system.
11     **A.**  So the customers had the read-only access.
12  And staff would have access to selected number of
13  banks and clients related -- and the clients.
14     And it could be read-only or
15  read-and-write.  And some people might have access
16  to modify the transactions.
17     **Q.**  What in the administrator access?
18     **A.**  Administrator access has access to all --
19  all accounts and all banks.  And administrator
20  access gives us ability to control who has access to
21  what.
22     **Q.**  As we sit here today, do you have any
23  understanding as to the access that Yvonne Gasarch
24  would have in the system when she was employed
25  there?

*212*

---

A1226

Fedir Nikolayev
2/2/2023

1    **A.** I do not recall. I don't recall.
2    **Q.** And is it fair to say that as an
3    administrator Mr. Sharp could change entries in the
4    Q system?
5    **A.** He could, yes. But it would be recorded.
6    There's a record saying who created the record and
7    who modified it.
8    **Q.** And how would one figure out who recorded
9    it and if it was changed or not?
10    **A.** If you click on the transaction number it
11    will have a detail that says "Created By" and then
12    "Modified By" and then it will say "Date."
13    **Q.** Okay. Were you ever -- do you recall ever
14    making changes in the Q system, to entries in the Q
15    system?
16    **A.** Entries? Not particularly, no.
17         I sometimes would have to like modify like
18    let's say a formula for commission calculations, so
19    it would be like a general change. Not a particular
20    transaction.
21    **Q.** Okay. I'm sorry because I don't think
22    this was introduced as an exhibit.
23         Are you familiar with sort of what the Q
24    system entries look like in the categories?
25    **A.** Right.

213

1    **Q.** Okay. So, for example -- and this is --
2    I'm just using a page that I received, a printout
3    from the SEC. But if a database source says XMY
4    that was the predecessor to the Q system?
5    **A.** Predecessor? No, that's the last name I
6    think on the Q system.
7    **Q.** Oh, the last name used, okay.
8         And if something said account code bind
9    (phonetic), what was your understanding about what
10    the Bond account code was?
11    **A.** That's like a base account. That's where
12    all the transactions, like let's say commissions
13    were initially created to two. And then were
14    debited later on.
15    **Q.** Okay. And when it says "Batch ID Number,"
16    do you have any understanding what that means?
17    **A.** Yeah, batch ID is because the transactions
18    are between, for example, between accounts, so they
19    would be one transaction, let's say, from certain
20    banks, certain client; and then another transaction,
21    certain bank, certain client. And then they will be
22    connected with the batch number.
23    **Q.** Okay. And when there's a bank code called
24    "Work," what do you understand that to mean?
25    **A.** My understanding that was not actually a

214

1    bank. It was like some sort of like -- I don't
2    know, maybe -- maybe an office petty cash or
3    something like this. I don't know, something
4    that -- I don't know, payments for FedEx or phones,
5    something like that, I think they were posted there.
6    **Q.** Okay. When there's something called batch
7    description --
8    **A.** Right.
9    **Q.** -- who was responsible for putting in the
10    batch descriptions or were they auto-filled? How
11    did that work?
12    **A.** There's something called this category,
13    which is like templates for a transaction. And the
14    batch description comes from a template. And then
15    the person who is entering the transaction, they
16    have a choice to modify it.
17    **Q.** Who set up sort of the stock batch
18    description?
19    **A.** For the batch description? I'm sorry.
20    **Q.** You said they could pick from like a list;
21    who decided that list?
22    **A.** It was given by Mr. Sharp. And I set this
23    up, but like Mr. Sharp told me what kind of
24    transactions and how they are going to be -- like
25    how the calculations are going to be.

215

1    **Q.** And did you have any discussions with
2    Yvonne Gasarch about that process?
3    **A.** No. No.
4    **Q.** Why don't we move on to the XPhone
5    information.
6         First of all -- actually can we just take
7    a look at -- I think it was marked as Exhibit 36.
8         You guys can correct me if I'm wrong.
9    I'm sorry, I'm trying to keep track of these. It's
10    the exhibit that had the handwritten notes on the
11    XPhones list.
12         MR. LONDON: Okay.
13         MS. PICKETT: Sorry, is that Exhibit
14    36?
15         MR. LONDON: Yeah.
16    BY MS. PICKETT:
17    **Q.** Okay. So on Exhibit 36, which was from
18    Wires to you, and then attached is this
19    handwritten -- well, it's a printout, but there
20    is handwritten notes on it.
21         Do you know who created this XPhones list?
22    **A.** I do not know actual person who did that.
23    **Q.** I believe that you said you didn't
24    recognize the handwriting on the list; is that
25    correct?

216

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1227

**Fedir Nikolayev**
**2/2/2023**

217

```
 1      A.  Yeah.  I just find it strange that it's
 2  handwriting.
 3      Q.  Okay.  I just want to go through some of
 4  the codes at the top.  Do you see first code listed
 5  as "Bond"?
 6      A.  Um-hmm.
 7      Q.  And your understanding is that that is
 8  Mr. Sharp?
 9      A.  Yeah.
10      Q.  And the next code listed is C-E-L-T?
11      A.  Um-hmm.
12      Q.  And do you have an understanding of who
13  C-E-L-T is?
14      A.  Not off the top of my head.  I think it
15  was mentioned earlier in one of the exhibits.
16      Q.  Okay.  But independently sitting here
17  today, you don't know who C-E-L-T is?
18      A.  No.  No.
19      Q.  You are guessing based on the exhibits you
20  saw earlier?
21      A.  Reference in the emails and stuff and
22  messages and Xphone.
23      Q.  FEN, I think we established, was you; is
24  that correct?
25      A.  Yes.
```

218

```
 1      Q.  Who is K-A-S-H?
 2      A.  I don't recall the name of this person.
 3      Q.  How about T-R-A-D?
 4      A.  I don't know.
 5      Q.  You don't know who that is?
 6      A.  No.
 7      Q.  How about Tester?
 8      A.  It must be an account that's used on
 9  Blackberries to try them out.  It wasn't used by any
10  particular person.
11      Q.  It wasn't assigned to anyone as you
12  understand it?
13      A.  No.  No.  No.
14      Q.  How about G-R-A-D?
15      A.  I don't know.
16      Q.  You don't know?
17      A.  No.
18      Q.  As you look down -- let's go down to
19  Wires; do you see that sort of two-thirds down the
20  page?
21      A.  Right.
22      Q.  Right.  And the email code assigned to
23  that is 76?
24      A.  Right.
25      Q.  Okay.  And I believe that you testified
```

219

```
 1  earlier in your deposition that you would get emails
 2  from Wires.
 3      And did you know that Wires could be used
 4  by anyone at the office or was it your understanding
 5  that it could only be used by Yvonne Gasarch?
 6      A.  I did not -- I didn't identify it with
 7  people.  It was just their email address that I was
 8  supposed to reply to.
 9      Q.  Okay.  I believe -- let's move on to
10  Exhibit 37.  This was the email shown to you from
11  Wires to you dated July 4, 2017; do you have that in
12  front of you?
13      A.  Yeah.  Yeah.
14      Q.  And you see that you write, "Hi Yvonne,"
15  and then you sent a message --
16      A.  Yeah.
17      Q.  And the response is, "Will do today"; is
18  that correct?
19      A.  Yes.
20      Q.  And as we sit here today, you don't know
21  that Yvonne Gasarch sent that email back to you, do
22  you?
23      A.  Right.  I think I just -- just maybe at
24  that point get used that maybe Yvonne was apprising
25  me -- send Yvonne the messages and this was -- this
```

220

```
 1  was just completely like automatic that I just wrote
 2  that.
 3      Q.  So you had emails of Yvonne in the past
 4  and you received emails from Wires that you
 5  identified coming from Yvonne.
 6      A.  Yeah.
 7      Q.  Is that correct?
 8      A.  Yes.
 9      Q.  But you don't know on July 4, 2017, that
10  Yvonne was emailing this to you; is that correct?
11      A.  Right.  Right.
12      Q.  Okay.  I want to go on to Exhibit 38.
13  That was the email dated April 3, 2018, from you to
14  Wires; is that correct?
15      A.  Yes.
16      Q.  Okay.  And I'm going to ask you the same
17  question.  As we sit here today, you don't know that
18  any of the -- the messaging from Wires came from
19  Yvonne Gasarch; is that correct?
20      A.  Right.
21      Q.  Finally I'm going to point you to Exhibit
22  39, which is an email dated July 25, 2018, from you
23  to Wires and Wires on the 18th of July wrote:
24  "Please confirm receipt within ten working days, via
25  email."
```

Fedir Nikolayev
2/2/2023

221

1    Again you don't know if that was written
2  by Yvonne Gasarch; is that right?
3     A.  Right.
4     Q.  It could have been written by anyone in
5  the office who had access to the Wires account?
6     A.  Yes.
7     Q.  You were never asked to cancel the Wires
8  account, I take it, as the IT person?
9     A.  No.  No.  I mean if anybody would ask me
10 to like gain access to it, it would be Fred who
11 would ask me to give him the password.
12    Q.  Okay.
13    A.  I wouldn't give passwords to anybody else
14 other than him.
15    Q.  Okay.  Do you know if Fred had access to
16 the Wires email?
17    A.  Possibly.
18    Q.  Would you say that Fred was running the
19 show essentially?
20    A.  From my point of view, yes.  All the
21 orders basically like requests to do anything was
22 pretty much coming from him.
23    Q.  Okay.  I would like to direct you to what
24 had previously been marked as Exhibit 17, which I
25 think the SEC show you.

222

1     A.  The really thick one?
2        MR. LONDON:  Yes (indicating).
3  BY MS. PICKETT:
4     Q.  Can I direct you to Paragraph 64 of the
5  amended complaint?
6     A.  Okay.
7     Q.  Are you there?
8     A.  Yes, I'm just reading.
9     Q.  I'm sorry.  You see in Paragraph 64,
10 subparagraph (b) or parenthesis (b) it says:
11       "In late 2015, around the time the Sharp
12 Group distributed to clients a new set of XPhones
13 for their encrypted communications, Gasarch drafted
14 a memo with instructions about how to,
15 quote/unquote, 'delete all secure chats when XPhone
16 is shut down (e.g., to cross a border).'"
17       Do you see that?
18    A.  Yes.
19    Q.  Do you know whether -- were you
20 responsible for giving instructions on how to use
21 the XPhones?
22    A.  I would not have like direct contact with
23 Fred's customer.
24    Q.  But would you have direct contact with
25 Fred or people in his office?

223

1     A.  To provide them with instructions.
2     Q.  To give instructions; is that correct?
3     A.  Yeah.  Yeah.
4     Q.  Okay.  And do you recall giving these
5  instructions back in 2015?
6     A.  I remember at some point -- I don't know
7  exactly the date -- but at some point Mr. Sharp
8  asked me to introduce policy of deleting the mess-
9  -- I think Blackberry is supposed to delete the
10 messages after like seven days.
11    Q.  Okay.  And that direction came from
12 Mr. Sharp and not Ms. Gasarch; is that correct?
13    A.  Yes.  Yes.
14    Q.  I just want to go a little bit to -- I'm
15 sorry, I am blanking on the name -- is it Gotama --
16 the company that we talked about?
17    A.  Gotama Capital.
18    Q.  Gotama Capital.  I believe the SEC showed
19 you a series of documents that purported to have
20 your signatures on them; is that correct?
21    A.  Yeah.
22    Q.  And I believe that you testified at least
23 at one point that you don't believe that you signed
24 the document yourself; is that correct?
25    A.  Correct.

224

1     Q.  Okay.  And in other cases where you
2  believe that you did sign, it was at the direction
3  of Mr. Sharp; is that correct?
4     A.  Yes.  Yes.
5     Q.  And I believe the SEC showed you a number
6  of financial transactions related to the company; is
7  that correct?
8     A.  Right.
9     Q.  Okay.  And I believe that you testified
10 that you really didn't direct any of those
11 transactions.
12    A.  Yes.  Yes.
13    Q.  If I could just have a minute.
14       There was something else that I wanted to
15 ask about Gotama.
16       Did you ever receive any kind of tax
17 return or anything related to Gotama?
18    A.  No, I don't recall that.
19    Q.  Okay.  And as we sit here today, has
20 anyone ever tried to collect money from you based on
21 your business dealings at Gotama?
22    A.  No, I've not heard from anybody.
23    Q.  And I believe that you said that you
24 created another smaller company at Mr. Sharp's
25 request called -- I believe it was called Esquire?

A1229

Fedir Nikolayev
2/2/2023

| | |
|---|---|
| 1   **A.** Yeah, Esquire Corporate Services. | 1   **A.** Let's say I did not bother to even think |
| 2   **Q.** Okay. Did you understand that -- you've | 2 about it. |
| 3 known Mr. Sharp for a long time; is that correct? | 3   **Q.** Okay. When he asked you to help set up |
| 4   **A.** Right. | 4 that corporation, you weren't afraid to work with |
| 5   **Q.** And did you have an understanding that he | 5 him because you thought he was a fraudulent or a -- |
| 6 had a law degree? | 6 person? |
| 7   **A.** Yes. | 7   **A.** Yes, exactly. I did not feel -- I did not |
| 8   **Q.** Okay. And is that where the name Esquire | 8 feel like I was in danger. |
| 9 came from? | 9   **Q.** Okay. |
| 10   **A.** I did not question it. I just -- | 10     MS. PICKETT: That's all the |
| 11   **Q.** Okay. | 11 questions that I have. Thank you so much. |
| 12   **A.** I think it was another name originally but | 12     EXAMINATION |
| 13 -- (In Spanish). | 13 BY MR. MUHLENDORF: |
| 14     No, basically there was another name that | 14   **Q.** Mr. Nikolayev, my name is Kevin |
| 15 he wanted to put and the register did not accept it. | 15 Muhlendorf. Thank you for your patience today. I |
| 16     But I don't remember what name it is. So | 16 hope that I don't go too long so we can get you out |
| 17 he came up with Esquire Corporate Services. | 17 of here. |
| 18   **Q.** How was it that you learned that Mr. Sharp | 18     I represent one of the defendants named |
| 19 was an attorney; did he tell you? | 19 Courtney Kelln. |
| 20   **A.** I think -- he's not hiding it. | 20     I want to follow up on a question that |
| 21   **Q.** Right. Okay. That's one of the benefits | 21 Ms. Pickett asked to start with. |
| 22 I guess for clients working with him is that he was | 22     She asked you if anyone had asked you for |
| 23 an attorney? | 23 any of the money related to your work for Mr. Sharp. |
| 24   **A.** Probably, yeah. | 24     And I particularly wonder, has the SEC |
| 25   **Q.** Okay. In the course of -- I'm sorry -- | 25 asked you to give back any of the money that you |
| 225 | 227 |
| 1   **A.** Yeah, I don't know -- | 1 made from Gotama Capital? |
| 2   **Q.** In the course of your dealings -- which | 2   **A.** No, they haven't. Are you going to ask me |
| 3 sounds like, you know, covered many, many years with | 3 for money? |
| 4 Mr. Sharp, had you ever heard that he had been in | 4   **Q.** Well, you understand that I believe as we |
| 5 trouble with the law? | 5 talked about it -- and it was in Exhibit 17 -- that |
| 6   **A.** No. | 6 the SEC has claimed that Gotama Capital was a |
| 7   **Q.** Had you ever heard that he was committing | 7 nominee account used as part of a securities fraud |
| 8 securities violations? | 8 scheme, right? |
| 9   **A.** No. He's just a small customer for me | 9   **A.** Right. According to -- |
| 10 that does not bother me that much. So I do not | 10   **Q.** And how much compensation did you receive |
| 11 deal -- this is just like tech support mostly, very | 11 from Gotama Capital over the years? |
| 12 small tech support. I am like, sometimes I don't | 12   **A.** I don't know. |
| 13 have enough time to sleep. | 13   **Q.** $50,000? |
| 14   **Q.** I understand. But I'm just wondering if | 14   **A.** Maybe all over all years maybe, maybe yes. |
| 15 you heard anything bad about his -- prior to the | 15   **Q.** Our government hasn't asked you to give |
| 16 servers being confiscated had you heard anything | 16 that back yet. |
| 17 about illegal or fraudulent activities of Mr. Sharp? | 17   **A.** No. |
| 18   **A.** At the moment that his servers were | 18   **Q.** So one question that I had, sir, was are |
| 19 confiscated I just typed my name in Google around | 19 you under subpoena today for this deposition? |
| 20 that time. And then I found out about the Marshall | 20   **A.** No. |
| 21 Islands. | 21   **Q.** How was this deposition arranged? How did |
| 22   **Q.** Right. But in the course of your dealings | 22 you end up in this room? |
| 23 before that happened, you had no reason to believe | 23   **A.** By email, Mr. London. |
| 24 that he was engaging in securities violations or | 24   **Q.** Okay. So he just asked if you would spend |
| 25 fraud. | 25 the day and sit for a deposition? |
| 226 | 228 |

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1230

Fedir Nikolayev
2/2/2023

229

```
 1      A.  Something like that, yeah.
 2      Q.  Tell me how -- exactly how it went.
 3      A.  I guess maybe two -- no, three or four
 4  months ago I got the email from Mr. London.  And he
 5  introduced himself.  And he wanted to -- to see if
 6  we can meet.
 7          Then we -- I basically looked at the -- I
 8  personally do not see that I was doing much wrong.
 9  And I did not find that that I am like in danger or
10  anything like that.  And I agreed to that.
11          And then we spent some time arranging
12  where the deposition is going to be done.
13      Q.  Did they interview you before the
14  deposition?
15      A.  The SEC?  No.
16      Q.  So is this the first time that you talked
17  to Mr. London?
18      A.  Yes.
19      Q.  In arranging the deposition, did the SEC
20  make any promises to you about whether they would
21  charge you?
22      A.  No.  I was told that I am presenting as a
23  witness, represented as a witness.
24      Q.  Did they tell you that if you sat for a
25  deposition that you would not have to come to the
```

231

```
 1  FBI seized the servers?
 2      A.  Yeah.
 3      Q.  So aside from the SEC, have you talked to
 4  anyone from the FBI?
 5      A.  The FBI contacted me maybe a year ago.
 6  That's why I was comfortable talking to Mr. London,
 7  because there was a previous contact with them.
 8      Q.  And so it is a year ago.  Do you know who
 9  contacted you from the FBI?
10      A.  I don't recall the name right now.
11      Q.  Do you remember how long you talked to
12  them?
13      A.  No.  But they presented me with subpoena.
14      Q.  They gave you a subpoena?
15      A.  Yeah.
16      Q.  Was it for documents or to testify?
17      A.  No.  To testify.  To testify.
18      Q.  Have you testified pursuant to that
19  subpoena?
20      A.  Yes, over the phone.  It wasn't long.  It
21  was maybe -- I don't know -- 20 minutes or something
22  like that.
23      Q.  What questions were you asked in that
24  testimony?
25      A.  Just how the servers are set up, and stuff
```

230

```
 1  United States?
 2      A.  I wasn't against it.  But I offered to do
 3  this over Zoom, but they preferred personal.
 4      Q.  No.  My question was -- maybe I wasn't
 5  clear, I'm sorry.
 6          Did the SEC tell you that if you sat for a
 7  deposition voluntarily today that if there's a trial
 8  that you wouldn't have to come to the United States?
 9      A.  Yes, I was mentioned that today.
10      Q.  Do you have a current passport?
11      A.  Yeah.
12      Q.  And do you travel?
13      A.  Yeah.
14      Q.  Have you been to the United States
15  recently?
16      A.  Sure -- well, last year.
17      Q.  Okay.
18      A.  Last year -- 2000 -- I think maybe 2021.
19      Q.  So you don't have any objection to coming
20  to the United States for the trial, do you?
21      A.  Yes, no problem.  I hope I don't have to
22  live with it again.  I did not think it was going to
23  be that long.
24      Q.  Okay.  So we've talked a little bit about
25  the servers in Curacao.  And you mentioned that the
```

232

```
 1  like that.
 2      Q.  Did you hire an attorney when you got the
 3  subpoena?
 4      A.  No.
 5      Q.  Do you have an attorney today?
 6      A.  No, I do not.
 7      Q.  When you testified did anyone give you any
 8  warnings about whether you should testify, whether
 9  you had a Fifth Amendment right not to testify?
10      A.  I was told that I have a choice not to.
11  And I just -- again I do not feel like I personally
12  did much wrong -- or anything wrong -- and I do not
13  want to have anything hanging over me.  And that's
14  why I'm here.
15      Q.  Fair enough.
16          Do you have a transcript of that
17  testimony?
18      A.  No, I don't.
19      Q.  When you were arranging that testimony, as
20  called it, do you have emails about that?
21      A.  I could probably find them, yeah.
22      Q.  Excuse my next question.
23          Has the SEC asked -- you've referenced
24  your phone a lot during the testimony today -- has
25  the SEC asked you to turn over your emails to them?
```

A1231

Fedir Nikolayev
2/2/2023

| | |
|---|---|
| 1    **A.** What emails? They are all in the servers<br>2 that they confiscated.<br>3    **Q.** Right. But they are also on your phone,<br>4 correct?<br>5    **A.** This is just PDF files that I sent to<br>6 Mr. Sharp.<br>7    **Q.** I see. So you were able to search PDF<br>8 files during deposition?<br>9    **A.** Right.<br>10    **Q.** Okay.<br>11    **A.** I mean if anybody asks I can provide them,<br>12 all of the files that I have in the Gotama Capital<br>13 folder.<br>14    **Q.** That's what you were looking at was the<br>15 Gotama Capital folder?<br>16    **A.** Yeah. Yeah.<br>17    **Q.** And this 20 minutes with the FBI, is that<br>18 the only other time that you've talked to someone<br>19 from the United States government about this?<br>20    **A.** Yes.<br>21    **Q.** Who was on the phone? Was it an agent or<br>22 an attorney; do you remember?<br>23    **A.** He presented himself as an agent.<br>24    **Q.** Was it only one agent or was it more than<br>25 one? | 1    **A.** Right.<br>2    **Q.** Do you know if the agents knew that<br>3 Mr. Sharp was an attorney?<br>4    **A.** I didn't have contact with an agents --<br>5 oh, the agent from the FBI?<br>6    **Q.** Yes.<br>7    **A.** They did not talk about that, no.<br>8    **Q.** No, I was referring to the agents from the<br>9 FBI when they seized the server.<br>10    **A.** I had no contact with them.<br>11    **Q.** There's no one raised with you the<br>12 question of whether there was privileged material on<br>13 the server before they seized it; is that right?<br>14    **A.** Mr. Sharp, let's say, did not notify me or<br>15 anything that he wanted to have some sort of<br>16 privileged status for the servers, or anything like<br>17 that. And I did not -- we did not have any special<br>18 handling set up for that.<br>19    **Q.** Do you understand what attorney-client<br>20 privilege is?<br>21    **A.** Yes.<br>22    **Q.** Do you know if there was any<br>23 attorney-client privileged material on the server?<br>24    **A.** I don't know.<br>25    **Q.** So I think Ms. Pickett you asked this. I |
| <div align="center">233</div> | <div align="center">235</div> |
| 1    **A.** I think I recall just one.<br>2    **Q.** And the questions were about the server?<br>3    **A.** Yes, the servers related; how they set up,<br>4 how they connected.<br>5    **Q.** And when the FBI showed up in Curacao to<br>6 seize the server --<br>7    **A.** Right.<br>8    **Q.** -- how did you learn about it?<br>9    **A.** I got a message from e-Commerce park, the<br>10 server farm, that they have a government agents,<br>11 Curacao government agents with the FBI and they are<br>12 looking for and they wanted me to identify the<br>13 servers.<br>14    **Q.** Did you -- did they ask if there was any<br>15 privileged information on the servers?<br>16    **A.** No, they didn't. But they had a court<br>17 reporter from Curacao which had to be executed.<br>18    **Q.** I understand. But the server was in your<br>19 company's name, right?<br>20    **A.** Yes.<br>21    **Q.** Did you have any concerns about what was<br>22 on the server?<br>23    **A.** No.<br>24    **Q.** And I think Ms. Pickett mentioned and you<br>25 knew that Mr. Sharp was an attorney, correct? | 1 don't want to retread old ground.<br>2    It's fair to say in your dealings with<br>3 Mr. Sharp, Mr. Sharp was the individual calling the<br>4 shots, I think is what she said; is that correct?<br>5    **A.** Individual calling the shots?<br>6    **Q.** Mr. Sharp gave the orders?<br>7    **A.** Yes.<br>8    **Q.** Now, you mentioned that you met Mr. Sharp<br>9 in the Dominican Republic?<br>10    **A.** Yeah.<br>11    **Q.** Have you ever met my client, Ms. Kelln?<br>12    **A.** I don't recall.<br>13    **Q.** Do you know what she looks like?<br>14    **A.** No.<br>15    **Q.** And you said that you have not talked to<br>16 her in several years, right?<br>17    **A.** Yeah. I mean if I see her maybe in some<br>18 video call or something. But I don't recall what<br>19 she looks like, no.<br>20    **Q.** Is it fair to say that you don't even know<br>21 if the person that you were speaking with was<br>22 Courtney Kelln?<br>23    **A.** Well, it's emails. So I don't even know.<br>24 Mostly it's emails, so it could be anybody.<br>25    **Q.** Right. And I think that you testified |
| <div align="center">234</div> | <div align="center">236</div> |

<div align="center">

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

</div>

Fedir Nikolayev
2/2/2023

1  that Mr. Sharp had access to the passwords for
2  systems; is that right?
3      **A.** Yes.
4      **Q.** And that specifically I was talking
5  about when you were -- the few times you spoke to
6  Ms. Kelln that could have been anyone --
7      **A.** Right.
8      **Q.** -- saying they were Ms. Kelln, right?
9      **A.** Right. I mean if I had the phone
10 conversation with her it was like very limited, like
11 maybe five times total throughout all the years.
12     **Q.** Over twenty years maybe five times?
13     **A.** Yeah, maybe less.
14     **Q.** Let see --
15     **A.** I mean I would get a phone call from
16 Mr. Sharp and he would be talking to me for two
17 hours, just about life in general. And just about
18 some ideas about -- I don't know -- how the system
19 has to run or something like that.
20     **Q.** Okay.
21     **A.** But nobody else talked to me that much. I
22 had to charge per hour.
23     **Q.** I'm sorry?
24     **A.** I have to charge per hour, phone calls.
25     **Q.** Okay. I see.

237

1      So the government, the SEC showed you
2  Exhibit 35. If you could pull that one up.
3      And I believe that that was -- do you have
4  that one in front of you?
5      **A.** Yes.
6      **Q.** It has Bates number 7417.
7      **A.** Yeah.
8      **Q.** And as represented that's a text between
9  FEN, Bond and C-E-L-T; do you see that?
10     **A.** Yes.
11     **Q.** Does C-E-L-T ever respond to any of those
12 or is it just communications between you and Bond?
13     **A.** I wouldn't -- I wouldn't -- I don't
14 remember. I don't remember.
15     **Q.** Just reading the document, there's
16 "From" --
17     **A.** In this document it does not appear to be
18 that C-E-L-T replied.
19     **Q.** She's uninvolved in the conversation; do
20 you remember that?
21     **A.** She's copied in it, but not involved.
22     **Q.** If in fact it is a she; we don't even no
23 who Celt is, right?
24     **A.** Right.
25         MR. MUHLENDORF: Okay, Mr. Nikolayev,

238

1  thank you for your time. That's all the questions
2  that I have.
3         EXAMINATION
4  BY MR. KNUTS:
5      **Q.** Mr. Nikolayev, my name is Bob Knuts. I
6  represent defendant Mike Veldhuis in the case. I
7  will have just a couple of follow-up questions.
8      You said that you learned about the
9  seizure of the servers through a phone call?
10     **A.** Well, email.
11     **Q.** Email. And did you learn anything about
12 the Curacao court reporter at the time those servers
13 were seized?
14     **A.** No. But I'm not in Curacao. I do not
15 have -- I was not in Curacao at the time -- at the
16 moment of the seizure. And I trusted that the
17 e-Commerce Park validated the court orders.
18     **Q.** But these were -- this was equipment that
19 belonged to you, correct?
20     **A.** It's equipment that I did not -- okay,
21 Mr. Sharp sent me the money to purchase this
22 equipment. And it was located in the -- in the
23 cabinets related to Ocean Communications. But I
24 assume it was his.
25     **Q.** Did you have an agreement with -- did

239

1  Ocean Communications have an agreement with the
2  e-Commerce Park for storing servers there, correct?
3      **A.** Yes. Yes.
4      **Q.** And did you ever consent to seizures of
5  those servers?
6      **A.** I was notified after they were -- well, I
7  was notified while -- I was told that they wanted me
8  to identify them and I identified -- they told me
9  that the order is for the servers related to Bond,
10 and so -- and I identified the servers.
11     **Q.** Were those the only servers that were --
12     **A.** Seized?
13     **Q.** -- held by Ocean Communications at that
14 park?
15     **A.** No. But they took the servers, but they
16 did not take the firewall that was also in Bond's
17 name.
18     I told them that basically everything that
19 has the Bond as a prefix is from Mr. Sharp.
20     **Q.** Okay. One last time, could you take a
21 look at Exhibit 36 which has a chart with the
22 handwriting on it?
23     **A.** Okay.
24     **Q.** And am I correct that sitting here today
25 you do not have any personal knowledge about whether

240

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1233

Fedir Nikolayev
2/2/2023

1  the information on that chart is accurate or not?
2      **A.**  Yes, I do not have that -- it was not my
3  responsibility to identify or associate the clients
4  with Bond or email accounts they wanted.
5      **Q.**  You have personal knowledge that FEN
6  refers to you, correct?
7      **A.**  Fred would request a creation of an
8  account, but he would never tell me like who is
9  this.
10     **Q.**  I guess my point is, you do know on that
11  chart you do know who FEN refers to.
12     **A.**  Fred, yeah, Bond.  It's Bond.
13     **Q.**  And you, you're FEN.
14     **A.**  FEN, yeah, it's me.  Those are my
15  initials.  And as you see, I do not hide them.
16     **Q.**  But other than that personal knowledge,
17  you don't know whether the rest of the chart is
18  accurate or not?
19     **A.**  Right.
20         MR. KNUTS:  No more questions from
21  me.
22         MR. LONDON:  I think that's everyone
23  on defense side.
24         Does anyone have any -- everyone done
25  right?  Speak up if anyone else is there who wants

241

1  to ask questions.
2         Okay.
3         MR. LONDON:  Just a couple of
4  follow-up questions.
5             EXAMINATION
6  BY MR. LONDON:
7      **Q.**  During the questioning at one point you
8  were asked about the code Work, W-O-R-K, in your
9  accounting system.
10     Is it possible that the Work account was
11  used to make transfers between other Q accounts?
12     **A.**  Well, you know, like -- you know, it's
13  like a bookkeeping, you have to come -- you have to
14  balances it to zero.
15     So there would be like -- it would be a
16  transaction that would come from, let's say, a
17  client to do the work.  And then it would be debited
18  from the client and then it would be credited, let's
19  say, to somebody's account that is being paid for
20  that -- for whatever is the work to be done.
21     **Q.**  And just with respect to the various
22  accounts, is it possible that the Work account was
23  used in part to effect transfers to balance accounts
24  out?
25     **A.**  Possibly.  But I never was like -- I never

242

1  like really looked at it.  I know because I just
2  like accidentally I would see like a description or
3  something.  It sounded like it's the balancing --
4  balancing account kind of thing.
5      **Q.**  Okay.
6      **A.**  I would call it petty cash maybe, I don't
7  know, maybe --
8      **Q.**  At one point during one of the questions
9  posed to you, in your answer you talked about how
10  you have to charge Mr. Sharp by the hour for phone
11  calls because he kept up on the calls for a while.
12     **A.**  Yeah.  Yeah.
13     **Q.**  During the periods of time when you were
14  having phone calls with Mr. Sharp, did he discuss
15  with you at any point in time any work that he ever
16  did as a lawyer?
17     **A.**  No, it was like Dominican Republic; also
18  like his artwork, he's a painter; and how -- I don't
19  know, like how his kids finishing college or
20  something like that.  Nothing -- nothing about
21  actual work.
22     And then we would come to -- the
23  conversation would come to maybe like, let's say,
24  what can be done -- what has to be done in the Q
25  system or some sort of enhancement to communications

243

1  or something like that.
2         So if there was a conversation it was just
3  life in general, and then slowly moving towards some
4  IT questions.
5      **Q.**  And then in response to a question posed
6  during the deposition today, on one or more
7  occasions you talked about at a certain point in
8  time you had jumped online and found your name
9  associated with certain Gotama documents.
10     **A.**  Right.  Right.
11     **Q.**  So when did that occur, when did you jump
12  online?
13     **A.**  I think like around when the servers were
14  seized.  And then when I called Mr. Sharp to notify
15  him about that, he reacted very like violently, like
16  he was very upset.  And -- and -- but then he's
17  like, "I will never work with you again," something
18  like that.
19     And then I was thinking, like what -- what
20  is -- what am I -- like how what affects -- how is
21  it affecting me?
22     And I typed -- because I didn't expect the
23  FBI to come to seize his servers.  So I wanted to
24  see what -- how much trouble I'm in, I would say.
25     **Q.**  So when you jumped online, did you type in

244

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1234

Fedir Nikolayev
2/2/2023

1  your name?
2      **A.**  My name, yeah, I was interested -- in my
3  name.
4      **Q.**  What type of information did you locate?
5      **A.**  I just saw like some paper that something
6  like from Marshall Islands where I was removed from
7  being some officer of Gotama Capital, something like
8  that.  I just saw that.
9          And then when -- that was pretty much.
10  And I was thinking that maybe that means that I'm
11  not associated with this anymore.  And I kind of
12  stopped looking.
13      **Q.**  What was your reaction when you jumped
14  online to find out any information with your name on
15  it?
16      **A.**  I guess that I was -- well, being that the
17  FBI seized the servers, I was kind of trying to keep
18  it cool, I don't know.  But I didn't know what I
19  actually could do because, again I'm not -- I do not
20  hold the servers to myself.  Like I didn't keep the
21  servers myself.  I couldn't do anything.
22      **Q.**  You had looked at your phone during
23  periods of time during the deposition.  In
24  connection with any information that you have
25  available to you now, are there any e-mails that you

245

1  still retained between you and Mr. Sharp?
2      **A.**  I checked it actually this morning and I
3  don't have any -- it actually -- I kept it on the
4  servers there.
5      **Q.**  So your understanding right now is you
6  have no access to any e-mails between you and Sharp;
7  is that correct?
8      **A.**  Correct.
9      **Q.**  What about anyone affiliated with Sharp
10  that we've talked about, for example, Ms. Kelln --
11      **A.**  No.  It was all like in the same system.
12      **Q.**  So the PDFs you retained, you've
13  identified them as being in a folder that you called
14  Gotama; is that right?
15      **A.**  Yeah.  Yeah.
16      **Q.**  Is that the only folder of information
17  that you have connected to your work with Sharp?
18      **A.**  I have another one that's Esquire
19  Corporate Services.
20      **Q.**  So the Gotama folder and the Esquire
21  Corporate Services folder?
22      **A.**  Yeah.
23      **Q.**  What type of information is contained in
24  these folders?  PDFs?
25      **A.**  PDFs, the documents that I had provided to

246

1  him, or I had to fill out some forms.  Any forms
2  that he asked me to fill, I kept it.
3      **Q.**  Would you be willing to provide that
4  information to the SEC?
5      **A.**  Sure.  No problem.
6      **Q.**  Would you be willing to email me the
7  universe of documents in those two folders?
8      **A.**  Yeah, no problem.
9          MR. LONDON:  I don't have any more
10  questions for you.  Again I thank you for your time.
11  I know it's been a long day for you, so we
12  appreciate your sitting here and answering our
13  questions.
14          THE WITNESS:  That is all right.
15          MR. LONDON:  Anyone else on the video
16  have anything?
17          MR. MUHLENDORF:  Not from me.
18          THE COURT REPORTER:  This is the
19  court reporter.  Would you stay on the record after
20  we close the video record so we can discuss
21  transcript?
22          MR. LONDON:  We can close the record
23  out.
24          THE VIDEOGRAPHER:  The time is 3:29.
25  We're off the record.

247

1          (Whereupon at 3:29 p.m. the video
2  record was closed.)
3          MR. KNUTS:  I would like a copy of
4  the transcript, the slowest and cheapest way if
5  possible.
6          MR. MUHLENDORF:  Same for Muhlendorf,
7  unless the SEC is paying for everyone.
8          MR. LONDON:  We are not.
9          MS. PICKETT:  I would like the same.
10  I saw from the previous deposition that the SEC
11  posted the transcript in the Excel, I don't know.
12  Is the SEC willing to do that?
13          MR. LONDON:  I'm sorry.  I missed
14  your question, Karen.
15          MS. PICKETT:  For like the prior
16  deposition, I think transcript was posted.
17          MR. LONDON:  That was not a
18  deposition transcript.  That was an investigative
19  testimony transcript that was identified in our
20  disclosures.
21          MS. PICKETT:  Okay.  Then I'm with
22  the other guys, I'll take the cheapest way to get
23  the transcript as well.
24          THE COURT REPORTER:  So we have Mr.
25  Knuts, Ms. Pickett, Mr. Muhlendorf.

248

A1235

Fedir Nikolayev
2/2/2023

```
 1          MR. MUHLENDORF:  Whatever your
 2  cheapest, slowest way.
 3          THE COURT REPORTER:  How about Zack?
 4          MR. CHIBANE:  Same as rest of the
 5  group for Zack.
 6          (The deposition was concluded at 3:33
 7  p.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                          249
```

```
 1          E R R A T A  S H E E T
 2      Pursuant to the Federal Rules of Civil
 3  Procedure, any changes in form or substance which
 4  you desire to make to your deposition testimony
 5  shall be entered upon the deposition with a
 6  statement of the reasons given for making them.
 7      To assist you in making any such corrections,
 8  please use the form below.  If supplemental or
 9  additional pages are necessary, please furnish same
10  and attach them to this errata sheet.
11      I, the undersigned, FEDIR NIKOLAYEV, do hereby
12  certify that I have read the foregoing deposition
13  and that to the best of my knowledge said deposition
14  is true and accurate (with the exception of the
15  following corrections listed below).
16  Page ___ Line ___ Should read:_____
17  Reason for change:_____
18  Page ___ Line ___ Should read:_____
19  Reason for change:_____
20  Page ___ Line ___ Should read:_____
21  Reason for change:_____
22  Page ___ Line ___ Should read:_____
23  Reason for change:_____
24  Page ___ Line ___ Should read:_____
25  Reason for change:_____
                          251
```

```
 1          NOTARIAL CERTIFICATION
 2  Notary JUAN CARLOS ORTIZ ABREU, Dominican, adult, married,
    public notary No. 4799 fo rthe municipality of Santiago,
 3  matriculated in the Colegio Dominicano de Notarios, domiciled and
    resident in this city of Santiago, Dominican Identity Number 050-
 4  00121213-3, with professional studies located in Profesor
    Hernandez Street, No. 17 (seventeen), Los Jardines Metropolitanos
 5  sector, in this city, in the present document I declare the following:
    FIRST:  That today February second (2nd) of twenty twenty-three
 6  (2023) I have taken the oath with the caveat of perjury to Mr. FEDIR
    NICOLAYEV, domiciled and resident in the city of Sosua and
 7  accidentally in this city of Santiago.  SECOND:  what is declared here
    is according to the truth, conserving its value for any type of
 8  operation, being criminal law, civil law or labor law.
 9  In this city of Santiago de los Caballeros, Municipality and providence
    of Santiago, Dominical Republic, February Second (2nd) twenty
10  twenty-three (2023).------------------------------------------
11
12
13
    _____
14      JUAN CARLOS ORTIZ ABREU
15          Notario Publico
16
17
18
19
20
21
22
23
24
25
                          250
```

```
 1  Page ___ Line ___ Should read:_____
 2  Reason for change:_____
 3  Page ___ Line ___ Should read:_____
 4  Reason for change:_____
 5  Page ___ Line ___ Should read:_____
 6  Reason for change:_____
 7  Page ___ Line ___ Should read:_____
 8  Page ___ Line ___ Should read:_____
 9  Reason for change:_____
10  Page ___ Line ___ Should read:_____
11  Reason for change:_____
12  Page ___ Line ___ Should read:_____
13  Reason for change:_____
14
15
16
17  _____   _____
    FEDIR NIKOLAYEV          DATE
18
19  Sworn to and Subscribed before me_____
20  Notary Public. This ____day of_____, 2023.
21  _____
    Notary Public
22
23  My Commission Expires:_____
24
25
                          252
```

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1236

Fedir Nikolayev
2/2/2023

```
 1          COURT REPORTER'S CERTIFICATE
 2   City of San Juan       )
 3                          ) ss.:
 4   Commonwealth of Puerto Rico   )
 5
 6        I, DENNIS ZAMBATARO, Certified Court Reporter
 7   in the United States, do hereby certify that the
 8   foregoing is a true and correct transcript of the
 9   proceedings had in the within entitled and numbered
10   cause on February 2, 2023; and I do further certify
11   that the foregoing transcript has been prepared
12   under my direction.
13
14
15
16
17   _____
     DENNIS ZAMBATARO, RPR and
18   N.M. and GA CSR
19   February 15, 2023
20
21
22
23
24
25
                         253
```

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1237

Fedir Nikolayev
2/2/2023

1

**A**

**a.m** 1:24 6:3 52:8 160:19
172:21 174:7 176:7
**ability** 49:12 136:8 212:20
**able** 16:4 46:23 47:15 60:25
61:1 64:2 67:24 76:2
157:16,20 186:20 188:23
197:18,23 203:14 233:7
**above-named** 117:13
**ABREU** 250:2,13
**accept** 225:15
**access** 19:22 32:11,13
39:23 45:10,16 46:1,10,17
46:20,21,22,23,24 47:5,6
47:20 54:23 55:25 56:3,23
61:9 67:23 68:11,19,19
75:24 76:3 82:6,8,11 84:17
206:7 212:9,11,12,15,17
212:18,18,20,20,23 221:5
221:10,15 237:1 246:6
**accessing** 39:21
**accidentally** 243:2 250:7
**accommodate** 12:24
**account** 4:13 42:4 46:8 56:6
70:6,24 71:2,3 73:6,7,8,18
73:19 74:16 78:24 79:5,11
80:2 81:25 83:3 84:13,14
84:18,25 85:4 86:18,21
87:5 92:21 100:25 113:15
115:18 119:11 121:1,24
122:1,8,12,15 125:8
126:11 127:5,8,25 128:5
128:12 130:18 131:7 133:5
137:15,21,24 138:3 147:20
147:24 148:1 150:5,8,10
150:11 171:4 183:12,14,18
183:20 184:3,5 190:11,15
190:16 193:17 194:6,10
195:21 196:10,14 197:24
206:8,14 214:8,10,11
218:8 221:5,8 228:7 241:8
242:10,19,22 243:4
**accountants** 157:2
**accounting** 18:23,24 33:19
36:4 37:8,17 39:12,15
41:14,23 42:3,7,16,19 43:2
43:4,9 44:13,18 52:13,13
56:1 62:16 67:20 73:2,4
79:25 92:24 174:25 183:19
183:22 204:1 242:9
**accounts** 32:11 36:1,8
39:19 59:10 91:14,18
111:4 212:19 214:18 241:4
242:11,22,23
**accurate** 103:12 111:18

**accurately** 165:6
**action** 90:14 142:4,13,16
143:3,8,15 144:10,17
147:17 148:13,25 149:4
150:24 163:1 184:8 185:20
193:17 194:24
**activities** 88:19 110:7,17
226:17
**actual** 35:16 101:4 103:4
116:21 125:5 127:18
136:20 145:6 216:22
243:21
**add** 40:14 60:18 61:11 204:7
**added** 80:17 179:25 198:12
200:19
**addition** 60:18
**additional** 9:23 57:11 60:23
65:1 140:4 152:20 251:9
**address** 11:12 74:16 97:4
97:11,11 100:22 119:24
120:3 127:18,19 177:12
186:23 187:15 194:5
195:24 196:17 203:5,14
219:7
**addressed** 183:3
**addresses** 197:14
**adjust** 49:10,12
**adjustments** 37:18
**administration** 27:18 111:5
**administrative** 27:13 52:19
**administrator** 45:25 46:22
48:22 49:7,13,14,15 73:17
212:17,18,19 213:3
**administrators** 45:20,23
46:14,16
**adopted** 96:11
**adult** 250:2
**Advest** 167:1,8
**advise** 192:18
**affiliated** 26:12 91:25
157:17 246:9
**affords** 111:7
**afraid** 227:4
**afternoon** 191:16 212:3
**age** 16:4
**agent** 233:21,23,24 235:5
**agents** 83:14 234:10,11
235:2,4,8
**ago** 21:14 22:8,16,18,22
23:10,25 24:22 34:23,25
70:8 89:20,25 229:4 231:5
231:8
**agree** 13:13 86:19 185:16
**agreed** 229:10

**agreement** 239:25 240:1
**ahead** 95:5 101:23 116:10
129:15 171:2 194:9
**Ajeltake** 148:15
**al** 1:15 6:7 9:11
**Albert** 73:23,24,25 74:3,5,6
74:7,20 165:11 170:11
187:7 192:18 193:5
**Alejo** 11:14,19
**alias** 155:11,18
**alliance** 196:20 203:7,13,20
206:1,7
**alliance@corptrax** 196:14
**alliance@corptrax.com**
195:22 196:3
**allow** 203:19
**allowed** 47:16,23
**alternative** 64:14
**amended** 4:10 150:23 222:5
**Amendment** 221:4
**America** 184:5
**amount** 48:24 49:1,1,2
55:15 86:20 87:7,8 171:15
**amounts** 48:25
**analyze** 111:8
**Andrea** 3:9
**android** 66:11
**androids** 66:8
**anonymity** 207:2,10
**answer** 12:6 20:22 24:18
27:16 34:6 68:25 77:4
104:13 116:11 203:6
207:24 243:9
**answering** 12:13 115:4
164:4,21 247:12
**answers** 12:17 13:3 24:17
114:23
**Anthony** 93:14 98:17,20
99:1 107:5 117:20,22
**anticipate** 90:14,16,19
**anticipating** 100:16 120:13
**anybody** 14:13 59:15 60:24
136:1 144:13 179:17 200:6
221:9,13 224:22 233:11
236:24
**anybody's** 197:12
**anymore** 185:22 188:25
245:11
**anyway** 111:23
**Apartment** 11:15,20
**apologize** 20:20 189:18
**app** 12:21 60:16,17
**apparently** 74:1 101:4
**appear** 114:2 176:20 238:17
**APPEARANCES** 2:1 3:1

**appearing** 11:23 14:23 15:4
**appears** 100:25 101:24
109:6 124:15 148:9 156:20
167:14 169:5 172:19
173:13 176:11 183:8 185:7
186:13 205:20
**application** 4:13,16 113:15
118:15 119:9
**applications** 18:21
**apply** 54:11
**appoint** 117:13,22
**appreciate** 247:12
**apprising** 219:24
**approved** 171:21
**approximately** 28:21 37:3
**April** 88:22 91:3,4 186:9,14
187:4 188:6 205:12,19,19
208:11,12,23,23 220:13
**Arch** 2:5 132:2,10,16
**area** 136:8 156:17
**areas** 95:3 96:9 147:18
**arrange** 48:17
**arranged** 33:7 57:22 228:21
**arrangement** 37:13
**arranging** 229:11,19 232:19
**arrive** 50:20
**artwork** 243:18
**ascent** 8:16
**aside** 111:11,15 145:6 231:3
**asked** 16:7 21:20 25:4 27:19
34:19 35:10,19 37:24 43:8
43:10 45:2 46:9,11 50:1,15
53:3 55:25 64:14 67:19
75:25 77:25 79:10,13 80:9
80:21,25 85:23 86:4 90:25
91:1 95:8 97:13,25 98:15
100:21,22,22 101:2,8
102:14,16,17 104:2 107:8
118:2 149:25 150:14
151:10 154:10 155:9,16
183:7 188:20 201:8 210:22
221:7 223:8 227:3,21,22
227:22,25 228:15,24
231:23 232:23,25 235:25
242:8 247:2
**asking** 13:17 20:20 30:22
39:18 40:7 44:16 49:17
91:7,8,11 95:13 161:20
168:10 178:6 187:1,9
194:8 195:20,23 196:13
197:18 200:22 201:1,3,23
202:21 203:4 204:9,10,14
206:18
**asks** 199:9 201:19 233:11
**aspect** 62:24 63:9

Fedir Nikolayev
2/2/2023

2

**asset** 43:13 105:21 139:7,10
**assets** 31:14
**assign** 47:4 53:13 71:3
**assigned** 70:17,21,25 72:13 75:13,20 76:21 78:6,9,12 177:7 218:11,22
**assist** 251:7
**assistant** 27:5,5,6,17,23 52:20 156:4 161:2
**assistants** 26:19 81:10 82:10
**associate** 241:3
**associated** 84:1 175:5 244:9 245:11
**association** 77:5
**assume** 203:25 239:24
**assumed** 90:8
**attach** 251:10
**attached** 116:1 216:18
**attachment** 176:10,13
**attempted** 15:1,4
**attending** 21:23
**attention** 56:16 110:5 121:21 129:15 131:5 133:2 133:12,14 134:19 135:20 147:18 150:2 152:7,22 178:20 197:2 201:15
**attorney** 4:14 116:3,7 149:14 225:19,23 232:2,5 233:22 234:25 235:3
**attorney-client** 235:19,23
**August** 97:18 123:1,1
**authentication** 76:1
**authored** 82:16
**authority** 35:20
**authorization** 184:18
**authorize** 135:9,11
**authorized** 48:3,7 160:12 165:2 184:11
**auto-filled** 215:10
**automatic** 220:1
**automatically** 187:11
**available** 14:17,19 46:9,12 115:14 245:25
**Avenue** 3:4
**avoid** 9:15 10:14
**Avtar** 1:8 28:14
**aware** 13:23 89:15 122:1,3,8 122:13,14 123:15 137:13 137:15,18,19 140:23 148:24
**awareness** 90:4 92:11

_____
**B**
_____

**b** 2:3,16 179:20 222:10,10

**B-A-N-K** 93:4
**B-A-N-Q-U-E** 93:10
**B-E-A-U-F-O-R-T** 92:17
**B-R-E-D-E-R** 92:2
**B3B** 11:15,20
**back** 16:8 22:25 23:8 24:20 32:7 35:23 39:10 82:15 104:22 129:9 130:17 154:4 154:7,9 167:8 175:20 176:11,20 178:11 181:16 185:21 186:24 205:6 219:21 223:5 227:25 228:16
**backed** 53:12
**background** 10:14 11:11,24 15:10
**backup** 50:6 51:1,3 52:25 53:1,13,14,22
**backups** 53:1,5
**bad** 56:15 226:15
**balance** 41:20 50:8,20,22,23 183:12 242:23
**balanced** 50:24
**balances** 41:19 42:14,24 50:6,19 51:12 242:14
**balancing** 243:3,4
**ballpark** 58:16
**Banco** 99:13
**bank** 42:22,25 46:4 47:25 49:1,2 79:2 88:23,24 91:8 91:9 92:7,7,24 93:2,3 99:13 100:4,5,6,8,19,21,22 100:25 117:5 127:5 128:19 174:23,25 175:1,4,6,8,8,17 184:5 214:21,23 215:1
**banks** 46:7 212:13,19 214:20
**Banque** 93:9
**base** 73:5 214:11
**based** 31:11 36:3,7 38:7,11 52:19 54:15 57:21 97:10 115:14 167:6 185:7 217:19 224:20
**basic** 18:23 65:6 68:7
**basically** 15:22 16:5,10 17:12 18:11,18 19:14,23 22:12 23:5 25:5,16 39:24 40:24 41:2 42:22 50:8 55:10 56:3 58:23 64:15,25 65:18 66:22 67:25 72:20 73:5 77:16 84:24 96:16 162:3 168:6,18 174:15 186:21,25 194:1,2 196:5 201:9 202:5 209:20 210:4 210:16,19 221:21 225:14

229:7 240:18
**basis** 31:8 53:13 101:21 102:11
**batch** 214:15,17,22 215:6,10 215:14,17,19
**Bates** 4:17,18,19,20,22,23 5:3,4,12,13,14,15,16,17 94:18 95:22,24 108:19 112:21,23 113:12 114:10 116:1 118:13 121:14 125:3 126:6,9,24 133:3 136:19 136:21 142:1,5,19 147:13 155:1 165:19,25 166:2,7 166:10 169:16 172:6 173:11 176:4 198:8 200:15 202:14 205:13 208:12 238:6
**Bates-numbered** 121:10
**bear** 30:24 113:11
**Beaufort** 4:13,14 92:16,20 92:23 113:14 115:17 116:3 116:6 122:8,12,15
**beautiful** 120:25 125:23
**Becky** 149:17,19,21 150:2
**beginning** 44:3 53:3
**behalf** 2:2,8,15,20 3:2 8:2 26:18,24 27:20 28:2 32:11 117:14,24 132:11,25 134:14 142:16 171:13
**believe** 146:13,21 216:23 218:25 219:9 223:18,22,23 224:2,5,9,23,25 226:23 228:4 238:3
**bell** 76:23
**belonged** 239:19
**Bencosme** 3:11 6:13
**beneficial** 88:5 107:16,24 108:3 114:14 127:25 128:4 137:20
**benefit** 104:12 108:18 112:25 115:25 121:9 126:4 136:15 138:4 141:25 150:22 154:23 189:12
**benefits** 225:21
**besq** 174:20,22,23 175:1,7 175:11 189:14,21,23
**best** 12:18 24:16,18,25 40:8 95:23,24 251:13
**better** 40:20 97:14 122:5
**BHD** 99:13,14
**big** 64:7
**bill** 82:21,23 84:4,6 87:23 88:1,2,13,23,24 91:9 101:13,15 117:5
**billing** 174:24,24 194:10

**bills** 81:15
**bind** 214:8
**Biopharma** 122:24 123:3,6 123:9,12,16,21,24 152:17 153:7,13
**bit** 44:9 52:24 70:10 85:18 96:6 97:21 107:20 223:14 230:24
**Blackberries** 25:4 32:23 57:8,8 59:2,5,8,10 60:16 64:3,5,6,8,9,11 65:1 77:10 77:11 156:25 157:14 162:4 172:10 218:9
**Blackberry** 57:9,10,12,23 58:19 60:15,19 61:13,17 66:7,13 223:9
**Blacklight** 34:7,10,14 97:5,8 97:9,15 100:12,18,24 101:7 121:23 122:2 129:19
**Blacklight's** 111:2
**blacklisted** 208:20
**blanking** 223:15
**blindly** 179:24
**blotter** 138:2
**Blue** 11:14,19
**Bob** 7:21 9:2 95:18,19 181:9 239:5
**BOFA** 171:4 183:12,14 184:2
**Bond** 44:8,10 53:20,22 54:5 54:16 68:3 71:25 72:1,4,5 72:8,12,16 73:1 77:17 166:15,21,23 167:3 168:3 168:13 174:5,10,14 177:15 178:3 179:21 195:17 196:13 198:11,15 199:8,13 199:15 200:19 201:11,24 203:8 214:10 217:5 238:9 238:12 240:9,19 241:4,12 241:12
**Bond's** 199:22 240:16
**bookkeeping** 242:13
**boot** 63:7
**Booth** 149:5,10 150:2
**border** 55:8 222:16
**borders** 188:22
**born** 15:14,15
**borrowing** 43:22
**Boston** 2:4,5,11,13
**bother** 226:10 227:1
**bottom** 97:18 98:11 107:5 109:7 114:1 129:18 151:22 160:16 172:20 180:2 186:13 192:11,22,24 205:23

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1239

Boulevard 6:15
bounced 186:24
box 97:22
boxes 97:21
branch 100:4
brand 6:15 140:20
break 10:1 12:23 60:7 71:1
    94:5 153:24 204:16
Breder 4:15 92:1 121:2
    125:8
Broad 2:22
brokerage 92:21 127:5
    137:15
brokerage/banking 111:4
brought 13:25 16:17 84:19
    84:20 129:23
build 206:20
bullet 107:12
bunch 177:16
business 4:12 28:23,24 29:6
    29:11,19 30:2,13 31:2
    32:10 36:15 52:15,22
    68:24 69:10 81:21 109:5
    109:21 110:2,6,12,17
    111:25 142:15 162:5 163:1
    163:2,2 167:11 171:13
    210:15 224:21
business-related 162:12,18
businesses 17:4
buy 84:16 117:14,23
buys 123:2 124:1
Buzzmail.com 69:21
bylaws 4:11 96:11
BZ 155:10

_____

C

C 179:22
C-E-L-T 76:23 217:10,13,17
    238:9,11,18
C-H-I-B-A-N-E 8:2
C-I-A-P-A-L-A 93:18
C-O-R-P-T-R-A-X 69:19
c/o 97:5
Caballeros 250:9
cabinets 239:23
cable 20:8
calculate 41:18 43:4
calculated 42:24 48:23 49:6
    49:9
calculates 49:3
calculation 49:8
calculations 213:18 215:25
California 6:16
call 9:15 13:11 22:23 23:25
    25:17 44:13 54:14 73:5

74:3,3 94:14,16 95:21
    118:12 126:5 138:4 142:1
    150:22 154:24 172:4
    189:13 211:1 236:18
    237:15 239:9 243:6
Calle 11:14,18
called 1:19 8:7 19:8 22:13
    22:22 23:13 29:7 44:3
    53:23 57:2 68:3 72:20,22
    73:23,24 96:18 98:8 99:13
    119:9 122:24 138:10 139:7
    139:11 142:12 152:10
    172:25 176:10,20 177:4,9
    177:21 203:12 214:23
    215:6,12 224:25,25 232:20
    244:14 246:13
calling 9:16 23:22 165:13
    236:3,5
calls 23:24 65:10 175:15,18
    237:24 243:11,11,14
Canada 26:10 59:11 71:15
    176:25
Canadian 38:17
cancel 221:7
cap 33:10,13 110:24
capital 4:11,12 32:3 94:20
    95:7 96:11 97:12 98:9
    103:18,19 106:11,18,21
    107:2 108:4 109:5 110:2
    110:20 121:23 122:1,8,15
    137:15,21,24 142:23
    143:15 144:3,12 147:17
    152:11 153:8 183:21
    223:17,18 228:1,6,11
    233:12,15 245:7
captured 65:20
card 71:14 78:17,23 79:1,2
    79:11 81:16,25 82:2,5,6,9
    82:12,16,18,21,23 83:1,13
    84:1,19 173:17,20,23
    174:1,19 175:10,12 190:11
    190:12,16 204:14
cards 58:4 59:16 65:3 71:16
    78:22 84:12 162:6
care 14:5 156:15
career 110:20
Carlos 1:20 3:8 8:8 10:6
    250:2,13
case 1:2,12 6:8 9:10,10,11
    9:21,25 15:5,8 16:10 101:4
    151:9,15 191:2 239:6
cases 9:15,16 21:23 190:25
    224:1
cash 179:22 215:2 243:6
catch 8:20 11:1 155:13,14

categories 213:24
category 215:12
cause 159:15 253:10
caveat 250:6
cell 115:4,16
Celt 76:23 77:3 174:6,18
    177:15 178:3 179:23
    238:23
Celtic 4:25 158:3 160:6,10
    160:17 161:9,15,16
certain 25:17 49:24 50:3,13
    77:7 87:19 96:9 112:7
    157:6 214:19,20,21,21
    244:7,9
certificate 96:18,21 106:10
    144:3,11 148:14 149:5
    150:1 253:1
CERTIFICATION 250:1
certified 6:14 253:6
certify 251:12 253:7,10
ch 186:8
chain 160:6,16 197:16
    200:21 209:1
chains 192:22
change 46:23,24 47:10 52:3
    66:6 84:24 104:17 153:20
    204:6,16 213:3,19 251:17
    251:19,21,23,25 252:2,4,6
    252:9,11,13
changed 55:23 84:13,24
    213:9
changes 13:12 56:2 213:14
    251:3
character 44:10
charge 37:15,23 175:18
    229:21 237:22,24 243:10
charged 83:15
charges 175:16
charging 37:21 151:8
chart 109:6,7 151:25 152:1
    152:6,8,23 153:2,5 176:19
    176:23 177:3 180:2 240:21
    241:1,11,17
chat 64:21 154:24 155:22
    158:3 163:5 165:20 166:14
    170:1,8 172:5,7,16,19,20
    173:13,18 174:5,5 198:8
    200:18
chats 158:16 195:9,17
    200:13 202:12 205:11
    208:10 222:15
cheap 66:16
cheapest 248:4,22 249:2
check 45:25 147:20 188:12
checked 246:2

Chibane 3:3 8:1,1 9:6 249:4
China 84:16
choice 215:16 232:10
chose 66:17
chosen 81:6
chronologically 16:12
Ciapala 93:18 99:5 117:20
    117:23
circumstances 78:19
city 250:3,5,6,7,9 253:2
civil 250:8 251:2
claimed 228:6
clarification 7:6 11:17 78:25
    83:23 104:11 141:4 143:5
    162:13 173:22
clarify 10:15
Claro 58:5
clean 136:7 145:23 146:17
    148:4
clear 50:7 56:25 67:17 230:5
clearly 11:9 12:18 183:6
click 213:10
client 7:2,8 30:18 42:23 43:1
    47:5 49:1,3,5 80:19 86:9
    110:18 168:2,7 175:4,6
    178:18 186:20 187:14
    193:13 210:12 211:10
    214:20,21 236:11 242:17
    242:18
clients 31:2 32:10,21 33:1,3
    33:7 42:9,14 46:4,7,8,10
    48:1 51:10 55:25 56:4
    75:24 82:3 109:8 132:12
    132:25 134:15 168:8 178:9
    178:13 197:10 199:22
    210:8,8 212:13,13 222:12
    225:22 241:3
clients' 168:17,21
close 46:10 247:20,22
closed 56:3 188:13,18 189:3
    189:4,5 248:2
cloud 64:21 66:23
code 33:19,24 54:16 72:4,8
    72:13,16 73:1,11 75:1,17
    75:20 76:2,16,21 77:3,7,9
    78:6,8,11 92:24 113:2
    164:14,15,23,24 166:14,17
    168:19 177:4 178:18
    183:22 214:8,10,23 217:4
    217:10 218:22 242:8
coded 75:15
codes 78:3 177:7 217:4
cold 38:19
Colegio 250:3
colleague 9:17,23

Fedir Nikolayev
2/2/2023

4

**collect** 35:18 224:20
**collected** 35:9
**college** 243:19
**column** 92:24 123:1 138:7
138:10 139:7,10,21 140:5
141:12,13 177:4,9,14,21
177:24,25 178:1,2,3,22,23
179:11
**columns** 177:4
**com** 69:19,25
**come** 13:17 16:7 21:16
29:11,18 32:7,9 33:6 36:18
38:22 39:1 72:19 74:24
151:10 176:4 196:19
229:25 230:8 242:13,16
243:22,23 244:23
**comes** 31:15 174:16,17
215:14
**comfortable** 40:25 165:13
207:20 231:6
**coming** 14:14 26:16 87:24
220:5 221:22 230:19
**commencing** 1:23
**commission** 1:3,13 2:4 6:7
6:21,24 14:1 86:17 184:2
213:18 252:23
**commissions** 43:5 48:23
49:4 73:8 183:20,23
214:12
**committing** 226:7
**common** 106:18
**Commonwealth** 253:4
**communicate** 32:14,19,20
57:12 59:5 63:19 64:25
65:9 156:22 157:7,10
177:20 179:8,8,13 188:23
**communicated** 59:3 66:24
69:4,9 73:20 74:19,19
**communicating** 22:10 77:17
**communication** 22:6 34:21
35:2 56:7 64:16 65:2,21
177:22,25 178:21,23
179:10 187:17 195:10
200:14 202:6,13 208:11
209:7
**communications** 19:9 35:15
62:21 67:5,7 183:4 184:11
194:23 198:23 199:19,23
200:7 202:17 207:4 208:22
209:1,11 210:10,11 222:13
238:12 239:23 240:1,13
243:25
**community** 138:19
**companies** 17:6 18:7 19:3
20:15 29:12,13,20,21,23

30:3,6,9,14 31:10,16,19,22
32:12 83:15 110:22,25
111:8 135:21
**company** 16:16,19 17:9
19:8 26:1,6 32:1 56:11,20
66:7 78:16 79:6,9,10 80:10
80:14 81:2,7,8,12,14,18,22
81:24 82:1 83:19 84:2,7
85:10,17,23 86:1,6 90:7,23
92:1,4 93:25 97:11 99:25
103:14,16,21 107:22
110:18 113:15 115:17
123:8 131:23 140:13,24
148:15 152:16 153:6
161:18 173:25 175:2
190:17 203:12 209:14
223:16 224:6,24
**company's** 97:4 234:19
**compared** 146:20
**compensate** 80:22 86:13,15
87:3
**compensation** 25:22 37:14
37:19 87:16 228:10
**complained** 41:9 162:7,8
**complaining** 39:18
**complaint** 4:10 150:23
222:5
**completely** 12:10,14 37:10
67:11 220:1
**complex** 40:3 148:15
**complicate** 194:19
**complies** 110:14
**component** 42:1
**compose** 150:3
**Compres** 1:23
**Comprés** 6:10
**compressed** 54:4
**computer** 25:3 55:14 72:11
105:15 116:23
**conceal** 31:3 36:16
**concentrated** 110:23
**concern** 101:3 157:6
**concerned** 208:19
**concerns** 234:21
**concluded** 249:6
**conduct** 142:15 171:13
**conducted** 88:19
**configuration** 187:2,7,14
**configure** 186:20
**confirm** 114:17,17,18
220:24
**confirmed** 116:8 150:9
**confiscated** 226:16,19
233:2
**connect** 20:8 40:1,1

**connected** 31:22 34:15
54:22 55:17 76:13,17,19
156:5 214:22 234:4 246:17
**connection** 20:13 29:4
36:19 54:6 56:5 86:5 92:13
92:17 100:1,18,20 115:4
123:12,16 128:12 134:25
145:15,19 245:24
**consent** 98:8 240:4
**conserving** 250:7
**consider** 90:11
**considered** 88:5
**consolidate** 111:5
**Consultants** 158:4 160:7,10
160:17 161:9,15,16
**contact** 15:1,4 21:24 23:12
24:1 37:12 77:19 184:13
184:21,22,25 199:19
222:22,24 231:7 235:4,10
**contacted** 15:6 23:9 231:5,9
**contacting** 162:12,18
**contain** 50:9
**contained** 55:2 67:1 156:18
169:8 246:23
**contend** 175:18
**content** 61:1
**context** 177:12 193:12
**continue** 141:22 181:22
206:12
**continued** 3:1 5:1 21:23
22:4
**contractor** 17:2 19:6
**control** 48:23 157:1 196:13
196:14 212:20
**controlled** 19:21 47:25
**conversation** 23:2,19 32:6
167:20,23 171:7,8 186:25
195:20 237:10 238:19
243:23 244:2
**conversations** 31:21
**convert** 39:24
**converted** 19:12 65:18
**cool** 245:18
**copied** 196:23 238:21
**copies** 196:8
**copy** 13:8,8,10 51:19 55:9
89:4 91:10 102:5 130:11
181:21 248:3
**copying** 167:3
**core** 110:11
**corners** 169:8
**Corp** 134:7 139:20 140:13
140:17,19 141:2 142:5
148:19,22 149:1
**corporate** 16:23 19:4 26:6,8

26:11,14 29:7,8 69:16
78:20 79:6,8 81:4 82:1
84:18 103:21 105:20 111:3
225:1,17 246:19,21
**corporation** 227:4
**corptrax** 69:19 195:23
**correct** 15:9,9 57:15 75:13
75:18 88:21 90:13,13,21
101:22 102:13 106:17
107:9 109:13,13,15,17
112:3 115:19 117:9 122:16
122:17 129:5 131:16
135:12 141:3 146:24
150:16 155:8 156:1 157:22
158:7 160:4,7,21 161:3
164:6 165:16 166:23 167:4
168:21 170:6,7,11,13
174:11 182:10,13,16 183:9
185:10 187:19 188:8,14
190:3,14 216:8,25 217:24
219:18 220:7,10,14,19
223:2,12,20,24,25 224:3,7
225:3 233:4 234:25 236:4
239:19 240:2,24 241:6
246:7,8 253:8
**correction** 13:6 154:11
**corrections** 13:5 251:7,15
**correctly** 49:12 116:12
212:4
**correspondence** 165:15
166:20
**corrupted** 40:11
**Cory** 4:24 155:5,25 156:3,7
156:9,18
**counsel** 6:17,25 8:11,13
10:13 94:16 95:20 108:18
112:20 115:25 118:12
154:4,24 161:24 169:21
175:19 191:18 195:8 198:6
200:13 202:11 205:11
208:10 210:24 211:2
**country** 38:3 120:24
**couple** 14:15,18 18:22 64:8
69:18 70:7 89:20,24
122:20 134:17 147:18
191:17 206:19 239:7 242:3
**course** 51:22 110:25 225:25
226:2,22
**court** 1:1,10 6:15 7:5 10:17
10:19 11:9 13:2 95:14
104:11,12 114:24 141:4
143:5 162:13 173:22
234:16 239:12,17 247:18
247:19 248:24 249:3 253:1
253:6

**Fedir Nikolayev**
**2/2/2023**

5

**Courtney** 1:7 2:15 7:10
26:25 27:1,4,24 34:19,21
38:10 41:8 48:6 76:20 77:2
82:11 160:24 161:1,3,5,8
161:15,16 162:11,17,25
227:19 236:22
**Courtney's** 27:9
**cover** 127:2
**covered** 226:3
**COVID** 24:14,15
**create** 43:11 65:7 70:24 71:2
100:21 102:17 190:12
195:21,23
**created** 31:6,10,23 32:18
41:2 43:12,15 64:17,18,19
64:23 65:7 104:2 105:16
105:25 176:23,25 196:17
213:6,11 214:13 216:21
224:24
**creates** 13:2 48:20
**creating** 63:24 70:23
**creation** 31:18 241:7
**creative** 44:3
**credit** 78:16,22,23 79:1,2,11
81:16,25 82:2,4,6,9,12,16
82:21,23 83:1,13 84:1,19
173:20,23 174:1 175:10,12
190:11,12,16 204:13
**credited** 242:18
**Crimea** 15:15
**criminal** 250:8
**cross** 55:7 222:16
**CSR** 253:18
**Curacao** 19:13 20:4 22:12
35:21 45:4,6,10 55:6,12
56:19,20,22 60:8,8 61:19
62:5,9,19,23 64:22 66:21
66:22,23 199:7,19 209:12
210:9 230:25 234:5,11,17
239:12,14,15
**Curacao's** 35:9
**currency** 38:3
**current** 97:22 119:10 230:10
**currently** 15:17
**customer** 21:19 57:10 70:25
86:2 222:23 226:9
**customers** 45:22 72:21
212:11
**cut** 22:17
**cutoff** 169:5
**CV** 102:14,15,16,20 103:4,7
103:22 105:4,5,6,13 106:3
106:9

---

**D**

---

**D** 4:1
**D-H-I-L-L-O-N** 28:14
**daily** 206:20
**danger** 227:8 229:9
**data** 47:15,20,24 50:14,21
51:4,16,21,25 55:9,11,15
63:8 66:21 68:8,11,13
162:6
**database** 48:20 51:9 206:21
214:3
**date** 22:19 34:22,24 46:11
50:1,10,24 53:16,17 54:2
58:14 84:22 97:17 98:11
113:20,22,24 114:2 115:6
116:21,24 122:25 124:5,12
131:14 139:20,21 145:4,6
163:7 165:21 166:1,6
169:3,18 176:6 182:15
185:4,5 186:9 200:15
213:12 223:7 252:17
**dated** 129:12,16 158:16
182:5 195:10 198:8 202:13
208:11 219:11 220:13,22
**dates** 91:5 124:4 129:3,6
182:25
**David** 2:3 6:19 126:14
**day** 18:12 22:11 228:25
247:11 252:20
**day-to-day** 18:18 52:17
**days** 13:13 56:16 67:3
220:24 223:10
**DC** 2:18
**de** 250:3,9
**deal** 207:25 208:4 226:11
**dealings** 152:14 224:21
226:2,22 236:2
**dealt** 62:19 170:21
**debit** 134:20 135:4
**debited** 214:14 242:17
**December** 53:18 176:7
192:12
**decide** 37:14 87:9
**decided** 64:9 74:3 215:21
**decision** 9:22 61:11 64:10
66:10
**decisions** 64:12 90:19
**declare** 250:5
**declared** 183:19 250:7
**deeper** 18:14
**defeats** 188:13,18
**defendant** 2:8,15,20 3:2
7:10,18,24 8:3 9:9 239:6
**defendants** 1:9,16 14:24
227:18
**defense** 6:25 10:13 154:4

---

210:23 211:2 241:23
**definitely** 28:10 82:4
**degree** 225:6
**delete** 222:15 223:9
**deleting** 223:8
**delivered** 51:4,7
**Dennis** 1:25 253:6,17
**depending** 9:22
**deponent** 8:5
**deposit** 33:7
**deposition** 1:19 6:5,9 8:17
9:14 13:16 14:14 94:8,12
108:10,13,17 112:14,18,21
113:9 115:20,24 118:7,10
121:4,8 124:19,23 125:24
126:3 136:11 141:16,24
147:8,12 148:6 150:21,23
151:3 154:20,21 157:24
158:2 160:2 163:5,14,17
165:18,22 169:11,15 172:3
172:12,16 173:5,9 175:24
176:3 181:24 182:3 185:25
186:4 189:8,12 190:24
191:24 195:3 198:2,20
200:8 202:9 204:21 208:5
219:1 228:19,21,25 229:12
229:14,19,25 230:7 233:8
244:6 245:23 248:10,16,18
249:6 251:4,5,12,13
**deposits** 79:2
**described** 25:8
**description** 215:7,14,18,19
243:2
**descriptions** 215:10
**design** 16:15 40:22
**designed** 61:5
**designing** 17:12
**desire** 197:23 207:2 251:4
**desk** 55:13
**desktop** 54:21
**destination** 101:4
**detail** 213:11
**details** 14:6 23:19 49:8
128:13 157:12 168:2 186:7
203:2
**develop** 18:20 29:5 30:11
31:1 35:24 36:14 40:4
44:22
**developed** 30:1 37:8 40:13
44:20 45:5
**developing** 41:13
**development** 17:5
**devices** 55:9
**Dhillon** 1:8 28:14
**difference** 48:21 55:4 63:3

---

67:21 146:14
**different** 62:16,17 63:12
67:23 79:18 80:4 112:24
212:9
**differentiating** 54:25
**difficult** 20:9 61:23
**difficulty** 39:21 159:15
**dig** 29:9 30:17 58:21
**digital** 144:21,25 145:3
**direct** 59:14 98:15 110:5
121:21 129:15 131:5 133:2
133:12,13 134:19 135:19
142:10,25 145:7 147:18
152:6,22 163:25 181:20
187:18 221:23 222:4,22,24
224:10
**directed** 101:1,19 102:8
118:4 144:10,18 170:16
189:5
**directing** 162:22,23 170:19
**direction** 26:24 28:2 103:2
223:11 224:2 253:12
**directive** 145:7
**directly** 19:5 25:14
**director** 35:15 81:9,11 97:22
98:22 107:2
**directors** 81:10 97:23 98:5
**directory** 77:12
**disclosures** 248:20
**discomfort** 210:14
**discourage** 207:23
**discouraged** 210:17,18
**discuss** 10:1 243:14 247:20
**discussed** 20:14
**Discussion** 11:3 211:7
**discussions** 31:17 216:1
**distinction** 177:18,23
**distribute** 82:20 84:21
**distributed** 49:4 59:13,25
60:2 222:12
**District** 1:1,1,10,11 9:12
**doc** 104:8
**Doctor** 11:14,19
**document** 4:21 13:3 89:8,23
94:11,15,18,23,24 95:9
96:2,22 99:19,24 100:3,11
102:6,7,22,25 104:6,14
107:11 108:6,16 109:1,4
109:19 112:18 113:2,8,10
113:13,14,19 114:10
115:23 116:5,13,15,19
117:2,10 118:1,4,10,13,17
118:23 119:2,4,8 121:8,10
121:13,13,18 122:6,14,18
122:21 124:22 125:2,3,5,6

---

125:10,15,20 126:2,4,6,8
126:23 129:5 130:6,6
136:2,5,9,15,15,17,22
137:9,10 138:1,5,7 141:19
141:23,25 142:3 144:8,15
144:17 146:4 147:12,13
148:5 150:18,18 151:8,12
151:15 152:13 153:10,17
153:18 154:12,14,16,19
155:21 158:1 159:1,22
163:3,20 165:5,6,17
166:14 169:7,8,14 172:2,3
173:8,10 176:2,12 178:17
180:17 182:3,8 186:3,5
189:11,13 191:18 192:3
195:6,16 198:5 200:11,18
202:7 205:9 208:8 223:24
238:15,17 250:5
**documentation** 91:12
**documents** 14:10 36:16
88:3 91:18 121:11 126:15
145:16 181:10 190:22
204:17 223:19 231:16
244:9 246:25 247:7
**doing** 23:18 24:3,24 28:20
29:6 30:18 34:15 37:2 49:7
55:10 58:21,24 80:25 85:2
89:6 90:16 94:21 102:11
146:18 187:10 189:1 200:2
201:9 202:2 207:20 229:8
**dollars** 38:4
**domain** 69:21,22 155:10
191:20 192:8 194:14 196:6
199:2 209:18
**domains** 69:12
**domiciled** 250:3,6
**Domingo** 6:1
**Dominical** 250:9
**Dominican** 1:21,23 3:8 6:1
6:10 8:9 10:7 11:15,21
15:17 16:6,7,13 17:15,19
17:23 20:1 38:23,25 45:11
58:4 65:4 78:16 83:19,20
83:25 148:2 173:21,24
175:14 176:24 236:9
243:17 250:2,3
**Dominicano** 250:3
**door** 35:18
**dot** 69:19,25
**double-check** 175:21
**doubt** 165:14
**drafted** 222:13
**drafting** 96:14
**drives** 63:4
**driving** 127:18

**dual-noticed** 190:24
**duly** 8:8

---

**E**

**E** 4:1 251:1,1,1
**e-Commerce** 35:17 234:9
239:17 240:2
**E-D-E-N-B-R-I-G-E** 94:2
**e-letter** 206:20
**e-mail** 72:10 178:2 196:17
**e-mails** 245:25 246:6
**E.D** 1:12
**e.g** 222:16
**earlier** 34:20 35:11 39:11
52:24 77:25 85:10 98:16
122:10 128:8 129:25 150:7
154:11 155:17 174:3 178:8
178:23 190:24 197:1
198:20 217:15,20 219:1
**early** 16:2 58:13 61:14 124:9
**earn** 80:24
**easier** 12:7 74:7
**easiest** 16:11
**Eastern** 1:11 9:12
**easy** 8:18 64:5 113:2 118:22
151:17
**Edenbridge** 94:1 97:22,25
98:5
**educational** 15:21
**effect** 171:25 242:23
**efficiency** 9:13
**efficient** 96:8
**efforts** 110:23
**eight** 16:1
**Einstein** 74:3
**either** 47:5 49:2 65:9 74:20
83:7 88:19 124:8 132:9
152:16 157:17 177:11
180:4
**ekuczynska@totalpro.EU**
120:4
**electricity** 19:20
**electronic** 145:9,12,17
**email** 4:24,25 5:2,7,8,9,10
5:11 13:10 21:21 22:3 25:3
32:11 34:17 37:11 65:19
65:25 66:20 67:13 69:13
74:16 119:24 120:2,6,9
155:24,25 156:18 158:7
160:3,13,16,17,21,23
161:14 170:2,3 175:10
177:9,12,14,24 178:1,3
181:20 183:18 185:13
186:22,22 187:15 188:12
190:7 192:22 195:23

197:14 199:3 201:22
206:21 207:8,21 210:16
218:22 219:7,10,21 220:13
220:22,25 221:16 228:23
229:4 239:10,11 241:4
247:6
**emailing** 167:3 220:10
**emails** 26:9 32:18 74:10
120:7 158:15 164:16
196:19 197:19,23 203:22
217:21 219:1 220:3,4
232:20,25 233:1 236:23,24
**employed** 25:14 212:24
**employee** 47:5,10 48:14
**employee/staff** 47:23
**Employees** 45:21
**employees/staff** 46:19,25
**employment** 20:13 103:7,25
104:5
**encrypt** 63:20
**encrypted** 56:7 60:13,17
63:5 68:14 222:13
**encryption** 57:11 60:15,23
61:4,11 62:24,25 63:9,12
63:15,17,18 69:4,9
**encrypts** 63:8
**ended** 165:11
**ends** 198:9
**Ener-Core** 139:11,15,16
**Energy** 131:11,14,19,24
**engaging** 226:24
**engineering** 16:10
**English** 8:15 12:20 103:17
112:10
**enhancement** 243:25
**enter** 48:24 49:2
**entered** 51:16,21 63:6 251:5
**entering** 215:15
**entirety** 110:10
**entities** 19:16 31:5,13
119:10
**entitled** 110:6,16 113:14
253:9
**entity** 19:4 26:12 34:11
92:16 94:1 97:15 122:24
139:11 142:12 150:14
152:10
**entries** 178:2,7 213:3,14,16
213:24
**entry** 92:23 179:10
**equipment** 19:1 239:18,20
239:22
**equities** 110:21
**equity** 110:20 153:8,12
**errata** 13:12 251:10

**Esquire** 1:20 2:3,3,9,16,21
3:3,8,9 8:9 78:20 79:6 81:4
82:1 84:18 224:25 225:1,8
225:17 246:18,20
**essence** 193:21,25
**essentially** 221:19
**established** 217:23
**et** 1:15 6:7 9:11
**evening** 22:13
**event** 198:19
**eventually** 53:6 184:11
**everybody** 77:16 89:7 96:17
154:4 165:13 181:9 191:4
195:12
**everybody's** 67:17
**everyone's** 181:12
**exact** 21:11 22:19 34:24
44:23 58:14 105:19 124:11
145:4 181:10 182:25 185:4
185:5
**exactly** 24:5 34:13,18 61:24
64:25 69:1 70:11 80:23
90:10,15,18 97:9 104:1
145:23 157:3,9 166:1
210:1,1 223:7 227:7 229:2
**Examination** 4:3,4,5,6,7
11:4 191:14 212:1 227:12
239:3 242:5
**example** 12:21 13:20 36:16
46:23 49:2 53:19 63:22
77:21 81:8 145:21 157:20
214:1,18 246:10
**examples** 18:17
**Excel** 39:19,25 40:5,15,16
40:19,25 41:5 43:6 54:1
180:14 248:11
**exception** 251:14
**Excerpts** 126:10
**Exchange** 1:3,13 2:4 6:7,20
6:23 13:25 131:8
**exchanged** 205:18
**Exclusive** 17:17
**Excuse** 232:22
**execute** 128:25 132:20
134:2,9 135:24,25 136:1
141:1
**executed** 123:19 125:14
157:13 160:13 179:24
194:2 234:17
**executing** 164:25 173:2
**exhibit** 4:9,10,11,12,13,14
4:15,17,18,19,20,22,23,24
4:25 5:1,2,3,4,5,6,7,8,9,10
5:11,12,13,14,15,16,17
94:8,11,16 95:13,21 96:10,17

96:20 107:1 108:13,17
109:20 110:1 112:13,14,18
112:21 113:9 115:18,20,24
118:7,11 121:4,8,19
123:20 124:14,15,19,23
125:11,24 126:3,24 130:11
130:15 135:17 136:9,11
141:16,24 142:19 147:8,12
147:25 148:7,9 150:21,23
151:3 154:20,21 156:19
157:24 158:2 160:2 162:23
163:5,14,17 165:18,22
166:8 169:5,11,15 172:3
172:12,16 173:5,9 175:24
176:3,17 181:24 182:3
185:7,25 186:4,12 189:8
189:12 191:24 192:3 195:3
195:7,16 198:2,6 200:8,12
202:8,9 204:21,24 205:10
205:24 208:5,9 209:2
213:22 216:7,10,13,17
219:10 220:12,21 221:24
228:5 238:2 240:21
**exhibits** 94:17 95:22 217:15
217:19
**existing** 31:16 206:24
**exmeridian.com** 155:12,19
**expect** 244:22
**expenses** 83:14
**experienced** 30:22
**expiration** 67:16
**Expires** 252:23
**expiring** 67:2
**explain** 24:25 39:15 61:20
63:2,15 145:11 179:6
190:5 196:2 212:8
**explained** 52:24 53:19 57:21
80:7
**explanation** 90:9
**extensions** 54:3
**extensive** 110:19
**extent** 58:3 113:22 114:4,5
124:6 141:11 197:9
**external** 197:18,23
**extra** 61:11 85:16

_____
**F**

**F-E-N** 68:4 73:12 120:7
**F-R-I-E-S-E-N** 28:12
**fabricating** 36:15
**facilitate** 111:4
**facility** 35:16
**fact** 238:22
**fair** 17:14 41:22 49:21 51:15
61:4 65:6 77:6 86:4,8,23

87:2 115:16 161:13,13
162:24 164:20 168:15
171:12,17,21 184:1 189:3
192:21 193:12 195:19
198:14 205:24 206:12
207:17 208:25 209:10
213:2 232:15 236:2,20
**familiar** 21:4 26:5 61:16
133:9 142:12 213:23
**familiarize** 95:2,9 135:22
142:9
**far** 24:3 62:23 81:14
**farm** 18:11 19:15,17,19 35:9
35:10,14,16,17 45:6,8,8,9
56:13,13 62:12,15 209:15
234:10
**faster** 56:23 194:22
**fault** 97:14
**FBI** 35:8,13 231:1,4,5,9
233:17 234:5,11 235:5,9
244:23 245:17
**February** 1:22 6:2,11 91:2,4
158:4,17 160:18 198:8
200:15 202:13 250:5,9
253:10,19
**federal** 13:24 251:2
**FedEx** 78:24 79:5,11 80:2
81:15,25 82:5 84:4,6,10,17
84:24 85:3,7 147:20,24
148:1 150:5,8,9 215:4
**Fedir** 1:19 4:2 6:6 8:6 11:13
73:13 74:2 102:20 106:16
107:13 119:16 143:3,8
146:9 158:4 250:6 251:11
252:17
**feedback** 175:20
**feel** 95:4 227:7,8 232:11
**felt** 27:22 38:12
**fen** 4:24 5:2,7,8,9,10,11
73:19,22,23,23 74:20
163:6,18,23 167:15 170:5
170:5 172:22 174:6,19
177:15 178:4 182:6,10
186:8 189:15 217:23 238:9
241:5,11,13,14
**fen@fensolutions.com**
160:18
**fen@secure.Xmeridian.c...**
176:8
**fen@securexmeridian.com**
155:6
**Feodosia** 15:15
**fifth** 119:9 232:9
**figure** 7:17 30:12 58:15,16
213:8

**file** 39:21,25 40:16 53:25
54:1 119:23 142:2 180:14
202:12 205:12
**filed** 151:9
**files** 40:10 55:2,2,4 96:14
233:5,8,12
**fill** 91:20,22 109:15 114:16
115:17 247:1,2
**filled** 177:1
**filling** 41:1 119:19
**final** 110:1 165:5 169:2
180:10
**Finally** 220:21
**financial** 17:24 41:24,25
42:4 91:15,19,24 103:9
105:20 109:22 111:21
203:7,13,20 224:6
**find** 22:23 62:1 113:3 159:1
159:4,11 169:22 181:21
208:3 217:1 229:9 232:21
245:14
**finding** 159:18
**fine** 54:15 89:6 191:4
**finish** 20:21 210:25
**finished** 15:22
**finishing** 243:19
**firewall** 240:16
**firm** 57:1,5,19 58:8
**first** 8:8 18:10 21:10 50:2,7
50:25 51:18 60:10 96:10
109:4 113:13 116:5,18
117:11 121:22 122:22
123:20 125:7 126:23
139:24 140:24 141:6,11
142:4 151:7,19 152:16
154:17 171:1 178:23
184:13 186:11,13 191:18
192:15 193:9 206:16
208:13 209:5 216:6 217:4
229:16 250:5
**First/Vitality** 153:7,13
**fishy** 208:3
**five** 178:24 205:7 237:11,12
**five-minute** 153:24 204:16
**fix** 40:12 161:21
**flip** 95:9 99:12 101:23
108:23 112:19 113:5,23
126:25 129:8
**flipping** 95:4
**Floor** 2:5,11,13,22
**flow** 87:13 164:16
**fo** 250:2
**focus** 130:17 132:16
**focused** 164:22 186:11
**focusing** 187:17

**folder** 112:22 116:2 126:9
136:23 154:25 158:15,18
159:19 165:19 166:5 176:4
180:24 181:3,3 186:6
191:19 195:8 198:7 200:14
208:11 233:13,15 246:13
246:16,20,21
**folders** 246:24 247:7
**folks** 153:24 172:4
**follow** 227:20
**follow-up** 212:6 239:7 242:4
**following** 107:23 250:5
251:15
**follows** 8:10
**Fonseca** 56:10 57:2,19
198:21
**foregoing** 251:12 253:8,11
**form** 4:13 56:7 60:19 87:20
91:20,22 109:21 113:16
115:8,11,18 116:4,7
119:20,21 163:1 185:12,23
251:3,8
**format** 4:21 111:11 136:18
136:19,20 177:19
**formation** 94:20 111:4
**formed** 30:6
**former** 110:20
**forming** 29:12,20,22 30:2,13
**forms** 247:1,1
**formula** 213:18
**formulas** 40:3,14
**forth** 178:5
**forward** 8:17 51:6,8,14,15
62:23 99:12 167:10 181:23
186:20 187:2,5 188:12
196:1,8 204:8
**forwarded** 186:22 196:20
198:16 206:3
**forwarding** 156:8 187:2,7,14
193:1
**forwards** 199:8
**found** 89:21,22 102:14
105:16 169:23 180:18
184:8 226:20 244:8
**four** 122:23 123:2 140:7
168:8 178:5,24 229:3
**four-letter** 168:19
**four-page** 121:13
**Fourteen** 94:6,7
**fourth** 107:12
**frame** 58:7 173:14
**frame-wise** 58:6
**Franklin** 3:11 6:13
**fraud** 226:25 228:7
**fraudulent** 226:17 227:5

Fedir Nikolaev
2/2/2023

8

**Fred** 21:5,7,10 115:12
132:12,25 134:14 142:16
144:18,25 153:11 161:6
167:21 168:20,25 170:22
171:4,8,13,21 182:19
189:5 190:16 192:16,17,25
193:14 195:19 210:17,20
221:10,15,18 222:25 241:7
241:12
**Fred's** 222:23
**Frederick** 1:6 6:7
**free** 17:1 125:21 137:3 144:2
144:11 148:14 153:17
**freelance** 25:16
**friendly** 23:21,21
**Friesen** 1:8 28:12 78:9
**front** 89:8 122:7,14 128:2
136:8 137:14 148:6 155:21
219:12 238:4
**full** 46:1,17 47:19
**Fuller** 149:6,10
**fully** 12:9,14
**function** 29:2 36:21 52:21
79:9 80:7 97:15 105:8,11
**functionality** 41:16 42:4
43:11,12,24 77:11 157:3
**functions** 30:13 31:2 43:6,9
**funds** 62:7 123:15
**funny** 96:1
**furnish** 251:9
**further** 82:19,20 202:6
203:22 207:4 253:10

**G**

**G-A-L-L-E-R** 93:3 136:25
**G-A-S-A-R-C-H** 7:20
**G-O-T** 32:5
**G-O-T-A** 183:14,18,22
**G-O-T-A-M-A** 32:4 85:13
**G-R-A-D** 218:14
**GA** 253:18
**gain** 76:3 221:10
**Galaxy** 66:18
**Galler** 93:1,3 136:24,25
137:16,21,24 138:5
**game** 101:24
**gaming** 18:3,9 19:15
**García** 3:9 10:6
**Garma** 143:17,23 144:12
**Gasarch** 1:7 2:8 7:19,19
27:21 35:1,3 38:13 39:8
48:2 76:5,6 164:10,13
212:5,23 216:2 219:5,21
220:19 221:2 222:13
223:12

**Gasarch's** 75:5
**general** 18:13 25:2 31:11,15
32:22 58:16 92:10,11
115:8 119:22 140:20,22
157:5,9 201:6 213:19
237:17 244:3
**generally** 14:7 15:20 47:7
87:15 101:2 162:23 184:13
**generating** 111:1
**generic** 65:12
**George** 1:15 3:2 8:3 9:9,11
197:3
**German** 137:5,6 138:17,19
138:20
**getting** 24:16 89:7,11
175:20 201:5
**give** 15:20 18:17 25:9 27:25
32:10 53:4 55:25 57:9
86:17 91:23 108:6 112:13
116:11,11 117:14,24 136:2
136:5,8 141:19 145:9
154:12 159:3 161:22 163:8
164:25 165:25 172:8
176:14 181:21 186:9
187:25 191:21 194:13
195:12 196:14 197:14
203:8 221:11,13 223:2
227:25 228:15 232:7
**given** 80:6 215:22 251:6
**gives** 212:20
**giving** 18:8,12 25:20 32:13
106:6 112:17 162:6 165:2
182:2 196:12 197:13
222:20 223:4
**Glendale** 6:16
**global** 110:21
**go** 7:11,21 10:14,23,25 20:2
22:25 23:8 38:16,19 39:10
45:13 52:2 61:17,18 62:11
95:5 98:7 104:16 129:15
139:18 140:7 144:25
153:19 162:5 171:2 181:16
194:9 197:16 198:24 202:4
202:4,7 204:17 205:22
211:4 217:3 218:18 220:12
223:14 227:16
**GoDaddy** 193:17 194:10
204:11
**goes** 96:17 117:17 144:5
151:25
**going** 10:3 14:20 18:14
22:15 24:20 27:25 30:19
32:7 35:23 39:10 48:10
50:8,12 51:8,14 52:2 54:3
60:7 61:18 70:14,19 74:23

84:23 86:18 89:1 90:5,10
91:23 94:13,25 98:7,15
99:12 100:16 107:19 108:6
110:5,9 112:13,20 113:18
114:9 116:10 117:17
120:13,15 121:21 122:20
122:22 125:1,20 127:2
130:9 131:5 133:2,12,13
136:2,5 141:19 142:18,25
150:17,25 151:6,6,7,8,17
152:6,22 153:20 156:16
175:17 190:21 191:2,17
194:24 195:6 198:5 201:9
203:11,13,14 207:6 208:8
210:23 211:2 215:24,25
220:16,21 228:2 229:12
230:22
**Good** 6:4 11:6 63:2 191:16
212:3
**Google** 89:17,19 226:19
**Gotama** 4:11,12,15 32:3,4
85:11,14,24 86:6,15,24
87:20 88:6,14,19 89:16
90:5,17,20,24 91:14,25
92:9,14,17 94:20 95:7
96:11 97:12 98:9 99:2,5,10
100:1 106:10,18,21 107:2
108:3 109:5 110:2 121:1
121:23 122:1,8,15 127:4
127:25 128:4 137:15,20,23
138:3 142:23 143:15 144:3
144:11 145:14,16,20 147:5
147:16 149:1 152:11,19
153:8,14 183:21,24 223:15
223:17,18 224:15,17,21
228:1,6,11 233:12,15
244:9 245:7 246:14,20
**Gotama-business** 108:21
**government** 35:22 55:8
228:15 233:19 234:10,11
238:1
**Gradillas** 6:14
**Graham** 1:8 28:16
**grammatical** 111:12,15
112:7
**Granite** 148:19,22 149:1
**granted** 75:24
**ground** 236:1
**group** 47:23 59:2,5 77:12
181:13 222:12 249:5
**Growth** 134:21,23 135:1,6,8
135:14
**guarantee** 75:3
**guess** 16:1 31:25 41:8 42:10
43:3 47:2 65:3 68:12,18

69:1,1 71:15 72:21 80:16
82:15 90:7 100:20,21
164:16 168:9,22 170:20
173:1 179:20,22,23 183:2
187:23 190:8 192:16
194:18 199:7 201:14
225:22 229:3 241:10
245:16
**guessing** 187:22 217:19
**guy** 40:18 45:1 79:19
**guys** 7:13 163:10 216:8
248:22
**GZ** 54:4

**H**

**H** 2:3 251:1
**H-A-V-I-L-L-A-N-D** 93:11
**H-Y-P-O-S-W-I-S-S** 93:7
**halfway** 139:8 197:16 209:5
**hand** 10:8 94:23 150:17
180:8,14 195:6 198:5
208:8
**handed** 115:23 147:11
154:19 158:1 173:8 176:2
186:3
**handing** 94:11 108:16
118:10 121:7 124:22 126:2
141:23 169:14 189:11
200:11 204:24 205:9
**handle** 74:20
**handling** 235:18
**handwriting** 180:11 216:24
217:2 240:22
**handwritten** 216:10,19,20
**hanging** 232:13
**happen** 90:10
**happened** 35:7 48:15 50:10
50:20 51:13 61:21,24
145:5 185:6 210:6 226:23
**happening** 18:7 175:13
196:16
**happy** 87:12,16 154:11
181:21
**hard** 20:22 63:4
**Hartford** 153:8,12
**Havilland** 93:10,10
**head** 217:14
**headings** 138:8
**hear** 120:24
**heard** 14:2 78:7,13 91:21
93:22 123:8 197:3 224:22
226:4,7,15,16
**hearing** 185:3 210:20
**held** 6:9 16:14 128:5 240:13
**help** 12:22 18:21 21:20

**Fedir Nikolayev**
**2/2/2023**

9

25:17 26:22 31:2 39:18
60:20 122:25 124:7 148:3
156:11 161:9,15 167:25
177:3 199:9 202:1 211:5
227:3
**helped** 21:21 22:3 36:20
40:14 65:7
**helpful** 138:21
**helping** 21:8
**helps** 113:25 114:4,6 141:11
**Hermosillo** 149:17,18,19,22
150:2
**Hernandez** 250:4
**Hi** 164:4 187:5 219:14
**hidden** 168:17,21
**hide** 241:15
**hiding** 225:20
**high** 2:10,12 15:22,24
**high-level** 15:10
**hire** 25:13 232:2
**hired** 15:23 16:2
**history** 15:21
**hold** 29:12,20 129:8 158:8
159:11,21 245:20
**holder** 78:17 114:14 179:15
**holdings** 42:1,5 43:14 50:9
143:17,23
**home** 194:21,21
**honestly** 26:3 34:12,18,22
98:2 167:22
**hope** 212:3 227:16 230:21
**hopefully** 57:16
**horrible** 56:14,15,17
**host** 79:10
**hosted** 45:3,4,6,8,9 57:18
64:21,22 66:21
**hosting** 18:8 35:16 209:11
**hot** 202:22
**hotstockpick.com** 200:22
**hour** 37:5,16,23 237:22,24
243:10
**hourly** 37:21
**hours** 56:16 237:17
**House** 26:6,8,11,14 29:7
69:16
**housekeeping** 12:3
**Hyposwiss** 93:6 126:11
127:5,25 128:5,12,19

I

**ID** 86:1 214:15,17
**idea** 34:24 54:10,14 72:21
80:15 85:15 127:8 193:24
**ideas** 237:18
**identification** 94:9 108:14

112:15 115:21 118:8 121:5
124:20 125:25 136:12
141:17 147:9 151:4 154:22
157:25 163:15 165:23
169:12,16 172:13 173:6
175:25 181:25 186:1 189:9
191:25 195:4 198:3 200:9
202:10 204:22 208:6
**identified** 19:3 68:2 89:16
91:5 98:22 99:8 105:6
106:2 108:20 109:8 112:22
114:13 116:2 118:13
120:14 121:8,11 125:2
126:6 128:4 140:13 142:1
147:14 157:21 168:8
177:13 220:5 240:8,10
246:13 248:19
**identifies** 107:24 127:24
147:1 206:20
**identify** 6:18 7:1 77:7 94:13
95:21,24 112:20 125:1
157:17,21 158:9 161:16
183:6 187:9 211:10 219:6
234:12 240:8 241:3
**identifying** 101:7
**identities** 31:3
**identity** 77:23 105:12
177:11 250:3
**iLanguage.com** 17:13
**illegal** 226:17
**imagine** 20:11
**Imes** 3:3
**impressed** 167:10
**impression** 32:15,16,17
38:8 52:23
**in-person** 1:18
**inaudible** 58:9 64:19 152:21
161:22,25 165:10 168:19
177:12
**incidental** 37:10
**include** 120:7
**including** 42:5 115:15
**incoming** 130:21
**inconsistencies** 111:12,16
112:7
**incorporate** 99:25
**Incorporator** 98:9
**Incumbency** 96:18,21
**incurring** 175:15
**indeciperable** 7:4 10:16
**independent** 19:6 101:6,21
102:11 117:7
**independently** 217:16
**Index** 4:9 5:1
**indicate** 105:22

**indicated** 105:18 190:23
**indicating** 222:2
**Indirectly** 19:5
**individual** 75:17,21 93:13
93:14 117:13 236:3,5
**individuals** 74:24 75:2
121:9 136:16 138:4 172:20
177:7 189:13
**industry** 17:24 18:9
**Infiniti** 11:14,19
**inform-** 125:16
**information** 13:21 14:4
36:17 39:11 41:1,5,18,24
46:1 48:3,7,10,13,15,16,18
49:6,16,18,22 55:1 61:5
66:25 82:17,18 86:5 87:20
89:2 90:3,22 95:10 96:2
111:17,24 114:16 115:14
115:15,17,18 119:18,22
147:23 149:21,25 150:1
151:7 168:7,13 175:4
177:1 179:3 194:11 203:5
203:9,17 216:5 234:15
241:1 245:4,14,24 246:16
246:23 247:4
**informed** 23:3 184:25
**informing** 89:7
**initial** 58:1
**initially** 54:1 58:7 59:9
184:18 214:13
**initials** 73:12 241:15
**initiated** 192:9,10
**input** 45:13 47:14,20,24
48:15 49:16
**inputting** 41:5
**inside** 168:10
**installed** 57:11
**institutions** 91:15,19,24
**instructing** 148:25
**instruction** 148:13
**instructions** 117:14,24
144:1,18 149:3 150:3
222:14,20 223:1,2,5
**instructs** 149:4
**insufficient** 40:19
**integer** 71:5
**intended** 61:3
**intent** 187:18
**intentionally** 117:22 159:14
**interactions** 197:9,10
**interest** 83:21
**interested** 15:25 245:2
**interference** 10:14
**international** 175:16
**internet** 16:20 17:4 18:2,6

19:22
**interpret** 183:16
**Interpreted** 3:10
**interview** 229:13
**introduce** 75:25 154:16
223:8
**introduced** 213:22 229:5
**introducing** 163:4 165:17
166:8
**invest** 111:9
**investigate** 207:18
**investigative** 248:18
**investments** 110:24 117:15
117:25 152:10
**investor** 110:19,21
**invoices** 36:16
**involved** 18:2 20:14 29:11
29:20 36:15,23 57:25 58:1
58:2,3,9 60:5,10 75:18
85:25 88:7 149:13 162:9
208:2 238:21
**involvement** 61:20 62:22
**iPhone** 147:24 196:21
**Islands** 89:18,23 226:21
245:6
**issue** 144:2,11,14 148:14,25
**issued** 107:22
**issues** 41:4
**it'** 7:19

J

**Jackson** 1:7 28:12 78:9
**James** 44:8 53:20,22 54:5
54:16 71:25
**January** 50:2,8,25 51:18
91:2,3 96:11 98:12 114:20
**Jardines** 250:4
**JB-000080** 4:23
**JB-000140** 4:22 142:2
**JB-000141** 142:20 146:15
**JB-000156** 146:1
**JB-00080** 147:15
**Jiménez** 3:10
**job** 17:1 103:13
**jobs** 16:13 20:14
**Jordan@dracus.com**
186:23
**Juan** 1:20 3:8 8:8 10:6 250:2
250:13 253:2
**July** 131:16,18 132:1,2,17
132:17,17 163:7,19 165:7
166:5 167:7,16 182:6,16
182:19 189:16 190:2
219:11 220:9,22,23
**jump** 13:20 244:11

**Fedir Nikolayev**
**2/2/2023**

10

**jumped** 116:10 244:8,25
  245:13
**jumping** 171:2
**June** 24:8,9,9 123:1,2
  124:12,12,13 139:22,24
**jurisdiction** 83:21
**jurisdictions** 31:13

---

**K**

**K** 1:7 76:2 109:13 179:22
**K-A-I-T-Z** 28:18
**K-A-N-T-O-N-A-L** 93:4
**K-A-N-T-O-N-A-L-B-A-N-K**
  137:1
**K-A-S-H** 218:1
**K-E-L-L-N** 26:25
**K-I-L-L-A-R-N-E-Y** 93:15
**K-N-O-X** 93:21
**K-N-U-T-S** 7:24
**Kaitz** 1:8 28:18
**Kantonal** 93:2,3
**Kantonalbank** 136:24 137:1
  137:16,21,24
**Karen** 2:9 7:11,18 8:18,21
  211:9 212:4 248:14
**Kathleen** 2:3 6:22 9:17
**Kathy** 9:23 190:21 191:2,5
**Katie** 200:4
**Kauf** 138:22 139:1
**keep** 41:23 42:8,16,19 43:2
  49:18,22 50:8 51:24 108:8
  108:9 148:3 216:9 245:17
  245:20
**Kelln** 1:7 2:15 7:10 26:25
  34:19,21 38:10 39:5 48:6
  76:20,21 77:2 82:11 161:3
  161:5,16 162:25 227:19
  236:11,22 237:6,8 246:10
**Kenneth** 93:18 99:5 117:20
  117:23
**kept** 48:18 206:23 243:11
  246:3 247:2
**Kevin** 2:16 7:3,7,9 8:24
  10:18,21 95:15 114:25
  115:2 159:17 227:14
**key** 63:18,20,23,25 64:1
**kids** 243:19
**Killarney** 93:14 98:17,20
  99:1 107:6 117:20,23
**kind** 16:25 18:23 20:12
  23:18 27:23 35:19 43:11
  46:1 54:17 61:14,17 67:19
  87:14 164:16 180:13 201:6
  215:23 224:16 243:4
  245:11,17

**kinds** 184:10
**Kingdom** 92:21
**kmuhlendorf@wiley.law**
  2:19
**knew** 53:14 76:14 234:25
  235:2
**know** 12:21,24 14:8 19:21
  20:4,22 21:7 22:20,23
  23:22 26:3 27:2 30:5,15
  32:1,14,25 33:3 34:13
  42:11 43:20,21,22 44:6
  45:24 46:11,25 48:2,6,11
  50:1,3 53:8 55:22 56:21
  57:7 58:10,13,14 59:3,7
  60:2 66:10 68:1,5,12 70:21
  71:19 72:14 73:16 75:1,5
  76:9,12,16,18,21 77:2,14
  77:15,25 79:3,13,15,15
  81:4 82:7 83:13 84:15 86:2
  89:11,24 90:6 91:14 92:3
  92:23,25 94:14,21 97:9,15
  100:14 105:12 108:24
  111:20 121:1 123:14,14,18
  123:19,22 125:17 126:13
  128:6,8,10 131:3,4,23
  132:7,8,11,13,22,23,24
  133:1 134:4,11,13,16,23
  135:8,11,13,15,15 137:4
  137:22 138:13,15,19
  139:16 140:3,19,20 143:23
  147:6 148:22 149:2,8,10
  149:19 150:4,6 156:3
  160:9 161:1 163:9 168:5
  170:22 171:15,16 172:23
  173:16 174:13,14,22
  175:17 176:23 177:10
  179:23 180:5 182:20,20,21
  182:22,25 183:2 184:10
  185:4 187:11 188:11
  190:18 192:9,15 193:9
  196:25 197:10,12 198:1
  203:8,16 205:15 207:16
  215:2,3,4 216:21,22
  217:17 218:4,5,15,16
  219:3,20 220:9,17 221:1
  221:15 222:19 223:6 226:1
  226:3 228:12 231:8,21
  235:2,22,24 236:13,20,23
  237:18 241:10,11,17
  242:12,12 243:1,7,19
  245:18,18 247:11 248:11
**knowledge** 110:19 123:25
  138:19 240:25 241:5,16
  251:13
**known** 152:16 153:7 225:3

**Knox** 93:20 99:7,9
**Knuts** 2:21 4:7 7:23,23 9:3
  95:12,17 159:6 181:2,7
  239:4,5 241:20 248:3,25
**kpickettlaw@gmail.com**
  2:14
**KYC** 86:1 91:1 115:7 168:10

---

**L**

**L** 1:6
**label** 116:3
**labeled** 126:10 195:9
**labor** 250:8
**laptop** 53:9,10 55:11,14
**large** 138:18
**lasted** 58:11
**late** 24:10 124:8 159:15
  222:11
**latest** 91:9
**law** 1:22 2:10 57:1,5,19 58:8
  225:6 226:5 250:8,8,8
**Lawler** 149:5,8,14 150:2
**lawsuit** 13:24 14:4,11
  151:10
**lawyer** 15:3 243:16
**lawyers** 14:24,25 89:13
  113:2
**leading** 27:14 36:9 76:24
**learn** 29:11,18 32:9 33:6
  35:13 234:8 239:11
**learned** 61:17 225:18 239:8
**leaving** 15:24 188:24
**left** 67:10 87:9 94:5 129:18
**left-hand** 100:12
**legal** 6:14 16:4 35:20 119:10
**legit** 157:12
**length** 191:11
**León** 99:13,14
**let's** 70:10 104:16 153:19,23
  176:19 191:12 198:24
  202:7 204:17 213:18
  214:12,19 218:18 219:9
  227:1 235:14 242:16,18
  243:23
**letter** 44:4,6 91:9 101:3
  168:9
**letters** 55:19 75:8,10,18
  77:8 97:2 207:8
**level** 46:24 60:23 61:11 65:6
**levels** 67:23 212:9
**license** 127:18
**life** 237:17 244:3
**liked** 21:22 66:13
**limit** 79:4
**limitation** 179:18

**limited** 46:3,20,21 92:5
  97:23 98:5 113:15 168:2
  179:17 237:10
**line** 8:12 67:19 139:17,19
  143:16 148:18 159:7,8
  163:6 177:20 180:17,20,22
  191:19 251:16,18,20,22,24
  252:1,3,5,7,8,10,12
**lines** 123:2
**Lion** 5:11 192:7,12,24
  193:10,13,21 194:5,8,17
  194:24 196:1,15,20,25
  198:11,16,25 199:9 200:21
  201:12,13,23 202:3 205:25
  206:7 207:5,9,18
**Lion's** 196:9
**Lion@secure.xmeridian....**
  196:9
**list** 47:1 51:10 77:19 121:11
  215:20,21 216:21,24
**listed** 47:22 120:3 137:20
  217:4,10 251:15
**little** 12:3,4 18:14 25:8 44:9
  52:24 68:7 70:10 79:18
  85:18 96:6 97:14,21
  107:19 135:4 223:14
  230:24
**live** 11:13,18 15:17 16:6
  55:19,21,23 56:2 230:22
**living** 15:19 138:18
**LLC** 134:21,23 135:1 160:17
  193:17 203:13
**LLP** 2:17
**loan** 43:11,13,15,17,18
**loaning** 43:18,20
**locate** 163:8 176:15 186:10
  245:4
**located** 6:15 33:4 54:21
  56:10 60:11 239:22 250:4
**locating** 126:12
**log-in** 194:14
**logging** 205:25
**logistics** 190:20
**London** 2:3,6 4:3 6:19,19,25
  7:7,11,21 8:11,23 9:1,4,7
  10:11,21 11:1,5 20:24 21:3
  27:15 36:13 52:2,11 77:1
  94:4,7,10 95:15,19 96:4
  104:16 105:1 108:15
  112:16 115:2,13,22 118:9
  118:21 121:6 124:21 126:1
  126:20 136:13 141:5,10,18
  143:6 147:10 151:5 153:23
  154:3,8,23 155:15 158:10
  158:13,21 159:8,14 160:1

---

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1247

Fedir Nikolayev
2/2/2023

11

161:12,23 162:1,16 163:10
163:16 165:24 166:4,12
169:13,24 172:14 173:7
175:19 176:1 180:19,23
181:1,9,18 182:1 185:18
186:2 189:10,20 190:1,20
191:9 211:6,8 216:12,15
222:2 228:23 229:4,17
231:6 241:22 242:3,6
247:9,15,22 248:8,13,17
LondonD@sec.gov 2:7
long 25:21 34:23,25 58:10
91:22 102:17 103:5 106:1
225:3 227:16 230:23
231:11,20 247:11
longer 23:3 56:21 184:8
look 13:21 14:4 26:3 28:24
29:1,24 36:11 95:1,5 97:3
103:7 108:24 110:10
117:11 118:16,17 119:5
121:15,15 122:18,22 125:9
125:21 126:5,21 127:13,16
130:15 135:16,20 136:8
137:3,4 138:6 141:8
142:24 147:19,23,25 152:1
152:2 153:1,2,17 158:6
160:9,15 161:18 172:9
173:15 174:21 176:19
178:16 182:7 192:11
205:14 208:16 213:24
216:7 218:18 240:21
looked 51:4 87:24 89:2
105:15 119:2 120:25 137:9
229:7 243:1 245:22
looking 68:13 94:18,22
95:25 96:7,19 97:1 98:1
100:11 101:10 102:19
105:4 106:21 109:20 122:6
122:13 124:15,25 127:20
127:20 129:7 130:6 134:18
138:2 140:14,14 141:15
144:15 146:6,10 151:14
152:13 153:10 159:1
161:19 167:10 169:4
177:25 186:12 233:14
234:12 245:12
looks 105:17 146:17 162:3,5
164:8 186:21 192:25
236:13,19
los 250:4,9
lot 14:20 26:20 62:13 175:15
194:19 232:24
lunch 38:25

**M**

**M** 2:17
**M-E-R-I-D-I-A-N** 69:15
**MA** 2:5,11,13
**mail** 155:16 186:6,14 187:6
**mailboxes** 67:17
**mailed** 155:10
**mailings** 210:9
**main** 2:12 126:16
**Maintaining** 119:10
**making** 28:25 30:18 81:15
90:19 213:14 251:6,7
**Makism** 134:7,14 135:18
**man** 74:4
**manage** 25:4 38:20 194:14
**management** 105:21
**manner** 17:18
**manually** 49:9,12
**March** 155:6 169:19 172:7
172:21
**marked** 4:10 47:13 94:8,12
108:13,17 112:14,18 113:9
115:20,24 118:7,10 121:4
121:19 124:19,23 125:11
125:24 126:3,24 136:9,11
141:16,24 147:8,12 150:19
150:21 151:4 154:19,21
157:24 158:2 163:14
165:22 169:11 172:12
173:5,9 175:24 176:3
181:6,24 182:3 185:25
186:4 189:8,11 191:24
192:3 195:3,7,16 198:2,6
200:8,12 202:9 204:21,24
205:10 208:5 216:7 221:24
**market** 111:21
**marketing** 207:21 208:2
**markets** 110:20,21
**marking** 163:4 169:15 172:2
**married** 250:2
**Marshall** 89:17,23 226:20
245:6
**Martinez** 11:14
**Martinez** 11:19
**MASSACHUSETTS** 1:1
**master** 191:19 192:7
**material** 209:4 235:12,23
**materials** 149:13
**matriculated** 250:3
**matter** 6:6
**matters** 12:3
**mean** 19:18 22:1 33:10,16
34:7 36:22 38:3 42:12
44:16,23 46:21 50:5 51:2
54:19 55:4 57:22 60:23
66:12 70:16 71:21 72:20

85:21 100:8 138:8,16
175:9 179:11 188:18
196:12 197:6 200:4 201:13
203:4 210:7 214:24 221:9
233:11 236:17 237:9,15
**meaning** 30:12 72:23
**means** 87:4 138:23,24 140:3
174:22 177:19 179:4,7
183:17 194:2 199:5,7
214:16 245:10
**meant** 103:17 104:9 168:5
**media** 52:10 203:7,13,20
**medication** 12:8
**meet** 21:10,16 39:5 229:6
**member** 46:6
**members** 39:3
**memo** 142:22 143:3,7,15,20
144:14 147:16 148:12
149:25 222:14
**memory** 24:19
**mention** 26:20
**mentioned** 14:15,18 32:5
33:18 34:16 71:24,25
165:12 217:15 230:9,25
234:24 236:8
**mess-** 223:8
**message** 61:3 63:20,24 64:2
66:25 67:1 156:7,8 161:8
161:17 162:9 163:18 164:2
164:3,5,13 165:2,9 167:1,6
168:1 169:2,9,16 170:10
170:15,19 171:3,20 176:12
176:17 179:14 181:5 182:5
182:12 186:14 187:3,4,12
188:6,6 189:15 190:3
192:4,6,11,16,17,24,25
193:1,13,20 194:5 196:21
197:17 198:11,15,15,16,24
199:8 200:3 201:10 203:12
205:12,23 206:3,16 219:15
234:9
**messages** 32:11 67:13
68:14 164:17,19,25 179:9
179:19 180:22,24 198:7
205:18 206:12 217:22
219:25 223:10
**messaging** 65:9,23 220:18
**met** 29:1 39:2 236:8,11
**method** 64:15
**methods** 65:21
**Metropolitanos** 250:4
**middle** 117:11 193:20
**Mike** 1:7 2:20 7:24 28:3
78:12 156:8,12,18 157:21
239:6

**million** 135:4 144:12
**mind** 114:21 130:8 164:18
164:21
**minding** 172:25
**mine** 120:11,12 159:19,22
160:22 181:5
**minimum** 55:15
**minute** 159:4 195:12 205:14
224:13
**minutes** 70:7 94:6 191:12
191:13 231:21 233:17
**missed** 248:13
**missing** 158:20,22
**misspelled** 109:10,11
**misspoke** 122:10
**modified** 213:7,12
**modify** 212:16 213:17
215:16
**moment** 35:23 51:4 61:16
68:6 112:19 118:16 121:15
130:19 147:17 163:8 172:8
173:15 176:14 186:10
188:24 189:17 191:21
208:16 226:18 239:16
**money** 43:18,20,22 80:24
82:25 83:11 84:8 85:16
87:4,13 123:11 130:24
131:3 137:23 171:10,21
184:2,18 185:1,9 190:15
224:20 227:23,25 228:3
239:21
**monitor** 6:12
**month** 53:17 82:21
**months** 22:8,16,18,22 23:9
23:25 38:2 64:8 229:4
**morning** 6:4 11:6 14:20
246:2
**Mossack** 56:10 57:2,19
198:21
**move** 108:7 154:13 163:3
194:22 198:22 216:4 219:9
**moved** 16:12 19:13 56:18,18
58:12 61:19
**movies** 44:11
**moving** 51:15 60:7,8 244:3
**MT** 53:24 54:1
**Muhlendorf** 2:16 4:6 6:22
7:3,4,9,10 8:25 10:15,18
10:18,24 27:14 36:9,10
76:24 114:21,25 115:1
126:16 158:8,11,18,25
159:10,20 161:10 163:12
169:23 180:16,21,25 181:4
181:16 191:8 197:25 211:4
227:13,15 238:25 247:17

248:6,6,25 249:1
**multiple** 41:17 94:24
**multiple-page** 113:9,13
  125:5 126:4,8 136:14
  142:2
**multiuser** 45:18
**mumbling** 136:4
**municipality** 250:2,9
**mute** 10:14 175:22

---

**N**

**N** 4:1
**N-I-C-O-L-A-Y-E-V** 109:12
**N.M** 253:18
**N.Y** 1:12
**name** 6:13 7:8 9:9 11:12,13
  21:4 26:5,25 27:1,20 28:3
  31:23 32:1 33:10,13,16,21
  34:2,7,8,12,14,19 44:1,6
  45:13 53:14,25 54:5,8,9
  55:19,21,21,22 69:22 72:4
  72:8,9,11,16 73:1,11,22
  75:5,18 76:16,21 77:3,8,9
  78:7,13 79:6 81:4 85:17
  89:18,22 90:5 92:4,5,18,20
  93:1,6,9,13,17,18,20,25
  94:1,18 97:25 98:3,17 99:7
  100:14,23 103:22 106:14
  107:5,8,9 108:21 109:10
  109:11 117:18 118:14
  119:15 120:3 123:8 125:3
  126:7 135:2 136:24 143:10
  146:9 147:14 149:8,14,16
  161:14 164:14,15,23,24
  166:14 173:4 185:4 189:21
  190:8 194:20 197:3,6,12
  203:3,14 209:21,25 214:5
  214:7 218:2 223:15 225:8
  225:12,14,16 226:19
  227:14 231:10 234:19
  239:5 240:17 244:8 245:1
  245:2,3,14
**named** 8:2 75:7 92:16 94:19
  147:5 178:9 192:7 227:18
**names** 26:20 27:25 30:8
  54:11,18 69:18 70:8 71:24
  72:13 73:15 74:24 75:1,20
  77:25 91:23,25 98:14,15
  117:19,19 156:14 158:19
  161:19 168:17,21 178:12
  196:6 197:11 199:2 209:18
**naming** 53:20,22
**narrow** 57:17
**native** 4:21 136:17,18,20
**natural** 110:25

**nature** 24:25
**near** 74:4
**necessarily** 92:13 142:8
**necessary** 251:9
**need** 7:7 11:7 12:17,19,23
  13:5 20:7,21 94:5 95:1
  104:16 169:22 175:17
  187:13 188:11 204:6,15
  205:4
**needed** 40:11 41:23 42:4
  45:24 81:21 99:24 145:11
  171:12,18 185:1 190:15
**needing** 41:14
**needs** 21:8 28:25 78:22
**neighborhood** 21:14
**network** 25:4 56:8
**networks** 18:19
**never** 15:2 22:13 38:18 78:7
  78:13 83:20 98:2 105:10
  105:10 109:17 118:25
  120:20,21,23 122:14
  133:11 151:15 221:7 241:8
  242:25,25 244:17
**new** 1:1 2:23,23 3:4 9:12
  37:9 51:9,15 55:21,21
  66:19 70:23 71:2 195:21
  198:22 209:4 210:8 222:12
**nice** 120:24
**NICOLAYEV** 250:6
**Nikolayev** 1:19 4:2,25 6:6
  8:6 9:19,20 11:6,13,23
  52:12 73:13 88:11 94:11
  94:23 96:13,19 102:20
  106:16 107:13 108:16,22
  112:17 113:8 115:3,23
  118:9,16 119:16 121:7
  126:2 138:6 143:4,8 146:9
  147:11,22 150:17 154:9,10
  155:7 158:4 159:21 160:2
  163:17 166:13 169:4,14,25
  172:8,15 173:8 176:2,16
  181:3 182:2 186:3,11
  190:23 191:16 192:2
  195:15 198:10 200:17
  202:16 205:9,14 208:15
  210:21 212:3 227:14
  238:25 239:5 251:11
  252:17
**Nikolayev's** 9:14 112:25
**nine** 110:3
**nomenclature** 54:18
**nominee** 29:12,20 228:7
**non-tech** 60:20 65:6
**NOTARIAL** 250:1
**Notario** 250:14

**Notarios** 250:3
**notary** 1:21 3:8 8:4,9 10:7
  250:2,2 252:20,21
**note** 244:11
**noted** 6:3 48:9
**notes** 34:4 216:10,20
**notice** 129:3,14 180:1
**noticed** 9:14
**notified** 35:17 196:21 240:6
  240:7
**notify** 235:14 244:14
**November** 116:9,22 133:6
  133:15,22 134:6,18 173:14
  174:6 180:4,6,7
**number** 6:8 9:11 17:4 40:1
  68:2,4 70:17,24 71:3 75:13
  75:15 76:9,12 77:7,22,22
  78:6,9,12,24 82:9,12 84:14
  84:18,25 85:4,7 94:19
  95:13,21 104:23 108:19
  110:6,16 112:21,23,24
  116:1 120:11,11,14,16,17
  120:18,19,20 121:14 125:3
  126:6,9,25 141:5,15 142:1
  147:14,21,24 148:1 150:8
  150:10 154:7 157:17,18,22
  163:7 165:19,25 166:7,10
  172:6,22 173:11 176:5,24
  178:19 181:5 183:5 195:17
  196:22 198:9 200:15
  202:14 205:7,13,18 208:12
  212:12 213:10 214:15,22
  224:5 238:6 250:3
**numbered** 97:2 133:3
  151:22 166:3 178:7,10
  253:9
**numbers** 49:10 70:8,13,21
  75:8 77:9,13 82:6 95:23,24
  113:1,3 114:1 118:13
  136:21 155:1 156:14 173:1
  177:16 178:5,13
**numerous** 135:20
**NW** 2:17
**NY** 3:4

---

**O**

**O'Haggarty** 4:24 155:5,25
  156:3,7,9,18,21
**oath** 3:10 12:1 250:6
**objection** 27:14 36:9 76:24
  161:10 185:12,23 191:5,6
  191:7,8 197:25 230:19
**obviously** 153:17
**occasion** 130:2 162:25
  185:19

**occasions** 39:2 162:11
  244:7
**occupied** 15:16
**occur** 244:11
**Ocean** 19:8 35:15 198:23
  199:18,22 200:7 209:11
  210:10,11 239:23 240:1,13
**October** 195:10
**offer** 13:3 69:18 207:19
  209:10
**offered** 33:1 85:16 230:2
**office** 2:4 16:24 26:10 59:13
  60:1 70:25 71:20,21 83:6
  167:8 215:2 219:4 221:5
  222:25
**officer** 89:16,21 90:5,7,12
  99:8 245:7
**offices** 1:22 2:10
**official** 108:10
**offshore** 29:12,20,23 30:2,5
  30:8,14 31:5,9,12,16,18,22
  32:12 33:14 34:10 92:7
  105:20
**offsite** 53:4
**oh** 7:17 54:8 74:10 89:10
  100:14 102:14 126:18,18
  133:23 138:21 159:24
  179:23 189:23 214:7 235:5
**okay** 7:16 11:18 13:15 15:11
  17:7 29:25 34:5 44:15,16
  45:16 47:10,18 52:4 54:11
  55:20 61:22 63:4 68:17
  70:7 78:4 89:10,10,10
  98:24 100:15 104:24
  108:25 110:15 112:11
  113:7 115:6 119:12 121:17
  124:10 126:18,19 127:12
  133:18,23 137:8 139:4
  140:8 142:21 151:2,11,17
  151:23 152:3,25 153:4
  154:18 157:4 159:10,13,24
  160:15 163:12,17 166:11
  166:16 169:6,10,20 171:8
  171:17 176:9 178:15 182:2
  183:18 191:12,23 194:4,23
  195:6,11,19,25 196:7,12
  198:14 199:7,8,11 200:3,3
  200:11 201:10,17 202:7
  203:10 204:4 205:16,23
  207:23 208:18 213:13,21
  214:1,7,15,23 215:6
  216:12,17 217:3,16 218:25
  219:9 220:12,16 221:12,15
  221:23 222:6 223:4,11
  224:1,9,19 225:2,8,11,21

Fedir Nikolayev
2/2/2023

13

225:25 227:3,9 228:24
230:17,24 233:10 237:20
237:25 238:25 239:20
240:20,23 242:2 243:5
248:21
**okayed** 170:22,23 171:5
**old** 15:12 236:1
**once** 9:16 20:4 21:1 37:17
38:17 67:18
**ones** 15:3 35:18 133:14
179:12 198:22
**online** 13:20 19:15 45:13
84:15 92:7 244:8,12,25
245:14
**open** 80:10,14 91:18 111:3
127:8
**open-source** 64:18
**opening** 119:10 128:12
193:16
**operate** 19:24 56:21 58:23
61:15
**operated** 52:14
**operating** 30:20 62:17 68:16
88:8 97:4,10,11
**operation** 29:8 61:13 250:8
**operations** 18:18 19:1 52:17
58:2 62:4
**opportunity** 13:4
**options** 207:19
**order** 9:15 47:14,24 50:11
63:6 76:2 77:14 138:11
140:5 240:9
**orders** 221:21 236:6 239:17
**org** 109:6
**organizational** 109:7
**organize** 211:5
**organized** 159:23 173:25
**original** 105:24 150:9 164:2
164:3
**originally** 37:16 57:4 145:14
176:25 187:20 225:12
**Ortiz** 1:22 250:2,13
**Ortiz** 1:20 3:8 6:10 8:9 10:6
**outage** 64:7
**outside** 20:17 201:23
**Overall** 87:15
**owner** 81:8 88:5 106:17
107:17,24 108:3 127:25
128:4 137:20
**owning** 174:1

———————
**P**
———————
**P-I-C-K-E-T-T** 7:19
**p.m** 104:20,21 153:25 154:1
188:7 197:17 248:1 249:7

**page** 4:2,9 5:1 94:25 96:10
96:16,17,18,20,20,23 97:1
97:18 98:8,12,14,16,19,22
99:8,15 101:23,24 102:19
102:20 105:4,5 106:9,9,11
106:13,16,22 107:1,3
109:4,5,19,24 110:1 113:3
113:14,25 114:10,11 116:6
116:18 117:11 119:9,9,13
119:15,24 121:22 122:22
123:20 125:6,7 126:23
127:2,21 128:18,19,23
129:7,8,9,11 130:18,18,21
131:1,6,7 132:14,14,15
133:3,5,9,13,21 135:3,17
141:5,6 142:4,5,8,10,19,19
142:22,25 143:14 144:2
145:24,25 146:2,4,19,20
146:21 147:1 151:18,20,21
151:25 152:23 160:16
176:12 192:6 193:21
205:24 206:16 208:13
209:5 214:2 216:11 218:20
251:16,18,20,22,24 252:1
252:3,5,7,8,10,12
**pages** 94:24 98:8 101:10
102:17 126:17,18 127:10
127:24 135:16 142:7
186:12 251:9
**paid** 23:7 25:23 37:24 73:8
81:15,16 82:23 84:6 201:5
242:19
**painter** 243:18
**Panama** 56:11,11 57:2,18
58:8,11,18 60:11
**paper** 98:25 245:5
**paperwork** 81:24
**par** 107:13
**paragraph** 97:3 110:6,10,16
111:11,17 149:4,16 150:6
151:18,19,20,22,24 152:1
152:23,24 153:1,2,5 222:4
222:9
**paragraphs** 97:2 110:3
**Pardon** 120:22
**parenthesis** 222:10
**parents** 16:5
**park** 35:17 234:9 239:17
240:2,14
**part** 29:10,15,19 30:2,22,25
32:8 36:15 42:2,7 65:13
68:24 69:10 86:9,12 89:14
117:3,4 136:22 145:13
149:12 178:20 196:3
208:25 209:1 228:7 242:23

**participating** 11:10 94:14
108:18 110:24 115:25
**particular** 70:25 86:19 91:15
94:19 95:3 97:17 102:25
107:3 113:24 115:11 129:7
130:6 138:1 142:24 148:12
155:2 177:20 178:17
213:19 218:10
**particularly** 54:19 213:16
227:24
**passed** 55:7 61:14
**passport** 87:22,23 88:9,12
88:23,24 91:10 101:25
102:2,3,4,5,8 117:5 128:7
128:9,11 129:4,9,12,16,19
129:22 130:2,11,16,16
230:10
**password** 45:14 61:2 63:5,6
181:15 196:18 206:13
221:11
**passwords** 177:2 221:13
237:1
**patience** 227:15
**pattern** 184:24
**Paul** 1:7 28:6 78:6
**pay** 78:23 82:2,5,25 83:14
178:19 190:16 197:1
**paying** 37:19 82:7 201:15
248:7
**payment** 135:9 203:5,25
204:9,9,10
**payments** 36:1,8,17 130:21
215:4
**PDF** 94:17,20 108:20 116:3
118:14 121:11 125:3
147:15 158:11 233:5,7
**PDFs** 158:19 246:12,24,25
**Peña** 3:10
**penalty** 10:9
**people** 11:10 14:15,16,18,23
16:9,17 26:21 28:1,25
35:18 39:20,22 40:1,5 41:3
41:4,6,17 46:24,24 57:23
58:20 65:6 68:23 69:3,8
74:2,9,18,20 88:20 89:11
94:13 125:1 126:5 141:25
176:14 212:15 219:7
222:25
**percent** 47:9
**perform** 105:8
**performed** 19:2 24:21
105:10
**performing** 29:4 38:5
**period** 24:20 28:21 37:7
70:3 85:1 171:5

**periodic** 53:13
**periodically** 90:25
**periods** 243:13 245:23
**perjury** 10:9 250:6
**permission** 16:5 35:19
**person** 2:3,3 21:4 26:2 39:6
41:10 61:2 63:19,20 74:4
80:7,14 93:17 156:4 162:7
189:1 207:19 215:15
216:22 218:2,10 221:8
227:6 236:21
**personal** 83:11 86:5 88:1,2
100:9,10 115:4,16 147:23
230:3 240:25 241:5,16
**personally** 20:17 91:16
229:8 232:11
**Petrosonic** 131:11,13,19,24
132:9 135:18
**petty** 215:2 243:6
**phantom@securecuraca...**
187:16
**phone** 2:6,6,12,14,18,23 3:5
23:14 61:23 62:15 63:13
63:15,17 64:23 65:9,13
66:6,7,7 70:17 71:3,17
72:23 73:9,15 75:13,15,21
76:9,13 77:24 87:23 88:1,2
88:13,23,24 89:3 91:9
101:12,13,15 114:23 115:4
115:16 117:5 120:10,11,15
150:22 157:18 162:7
172:11 175:15 176:14
231:20 232:24 233:3,21
237:9,15,24 239:9 243:10
243:14 245:22
**phones** 57:23 58:4,19 59:17
59:20,23 60:10,13 62:15
62:20,20 63:1 66:9,12
66:19 67:22 68:1,1,23 69:5
70:16,22 71:13,14 72:17
79:23 80:1,2 172:17 215:4
**phonetic** 181:17 214:9
**photo** 108:20
**physical** 59:17 66:6
**physically** 62:11 71:17
**pick** 215:20
**picked** 22:12
**Pickett** 2:9,10 4:5 7:13,16
7:18 8:21,21 126:14,18
159:17,24 161:25 163:13
166:11 185:12,23 191:7
212:2,4 216:13,16 222:3
227:10,21 234:24 235:25
248:9,15,21,25
**picks** 209:4

Fedir Nikolayev
2/2/2023

14

picture 19:18
place 62:2 93:24 173:4
Plaintiff 1:4,14,20 2:2 6:20
8:7
plan 4:12 108:21 109:5,21
110:2 111:25
plane 120:25
Plata 11:15,21
platform 33:14 39:25 40:19
44:20 45:5,6 167:11
199:24
play 72:19
played 99:2,5,9
please 6:17 7:1 8:5 13:9
144:2 156:21 171:4 182:5
188:3 192:18 199:19 203:7
220:24 251:8,9
plus 103:8
point 12:23 14:3 16:14 23:1
25:3,19,20 31:12 39:17
42:25,25 43:10 46:11 49:5
49:24,25 50:13 51:6,16
55:6 56:9,18 57:16,17 60:5
60:12,15 61:18,20 62:23
64:7 65:16,18 75:25 80:9
88:16 95:3,10 96:8 106:4
107:12 114:9 122:20,23
124:13 128:3,10 139:18
144:9,24 148:24 151:18,19
155:9 157:5 161:20 167:20
170:20,21 182:24 184:7,15
185:3 186:19 187:11
209:23 219:24 220:21
221:20 223:6,7,23 241:10
242:7 243:8,15 244:7
points 65:22
policy 55:7 157:14 223:8
portfolio 111:5
portion 61:19 110:17 144:1
174:21 187:3
pose 105:2 113:18 118:22
148:3 150:7 171:1
posed 115:5 243:9 244:5
position 103:14 104:9 106:6
possibility 157:1,1
possible 24:10,11,12 66:16
66:17 95:25 130:1,4,5,10
130:13 144:22 167:19,19
167:23,23 168:10 170:8,9
194:3 210:25 242:10,22
248:5
Possibly 87:1,1 157:13
166:16 221:17 242:25
post 40:2 41:18
posted 174:20 215:5 248:11

248:16
potential 94:17 151:14
potentially 17:24 88:3 111:9
Power 4:14 116:3,6
practice 49:18,22 51:24
184:17,24
predecessor 214:4,5
preferred 230:3
prefix 240:19
preparation 13:18
prepare 13:16 102:24
prepared 190:23 253:11
present 3:8 6:17 20:6 103:8
104:6 105:5 250:5
presented 43:13 231:11
233:23
presenting 229:22
pretty 221:22 245:9
prevent 12:9,13
previous 51:13 231:7
248:10
previously 4:10 103:20
150:19 151:3 181:6 221:24
printed 136:20
printout 136:21 214:2
216:19
prior 144:8 201:22 226:15
248:15
private 64:1 110:21 127:5
128:19
privilege 235:20
privileged 234:15 235:12,16
235:23
probably 36:3 54:3 68:19
81:9 97:13,14 124:7
135:19 158:21 225:24
232:21
problem 37:11 159:2 161:21
186:18 205:25 230:21
247:5,8
problems 25:3 41:11
Procedure 251:3
proceed 9:22 169:21
proceeding 8:17
proceedings 12:24 13:1
89:14 150:19 253:9
proceeds 42:8,10,12,13
process 31:20 49:17 51:15
63:7 216:2
produced 4:21 136:17,23
138:5 158:23
production 159:16
Profesor 250:4
professional 250:4
program 167:8

progression 110:25
promises 229:20
promotions 207:15
pronounce 119:25 155:13
pronounced 32:4 85:11
pronouncing 212:4
protect 31:14 61:5
provide 18:21 57:22 86:5
91:12 117:4 119:18 145:2
149:25 151:7 206:13 223:1
233:11 247:3
provided 19:22 28:2 39:11
59:5,7 68:23 71:12 79:21
82:13,18 85:7 86:1 87:19
88:8,22 90:2 94:16 96:2
99:17,19,23 101:16 102:4
102:7 116:2,15 117:1
128:9 129:4,22,25 130:2
130:11 144:24 145:17
154:25 203:17 246:25
providence 250:9
provider 16:21 18:16 19:20
providers 17:5 206:24
provides 19:20
providing 18:8 58:24 88:12
90:22 91:17 106:6 117:8
128:11 143:20 145:15
public 1:21 3:8 8:9 10:7
63:18,20,23,25 111:8
250:2 252:20,21
Publico 250:14
Publishing 193:17 194:25
Puerto 11:15,21 253:4
pull 136:3 141:20 191:21
195:12 238:2
purchase 62:8 131:9 132:18
133:16,24 138:14,24 139:1
239:21
purchased 59:11 62:8 71:14
132:2,11
purchases 42:17,20 132:10
purported 223:19
purports 106:10 109:21
138:2 143:2,7 163:18
172:5,7 182:4 189:15
purpose 41:14 58:18 62:12
66:14 111:3 187:12 188:13
188:18 190:13,14
purposes 8:16 9:13,21,24
19:25 32:10 60:6 84:10
119:19 120:2 162:12,15,19
172:4 174:1 190:25
pursuant 231:18 251:2
put 48:3,7,12 49:5 53:3,16
71:17 79:2 87:4 101:1,8

104:3 111:24 112:12 122:7
125:20 137:23 147:7
155:21 168:24 185:13
194:5 209:25 225:15
putting 89:8 114:22 137:13
148:5 215:9

_____

Q

quarterly 37:20,25
question 9:18,20 10:22,23
11:2 12:5,6,19 24:18 27:16
28:8 29:4 32:23 36:5 41:16
42:12 45:2 49:17 63:2 68:7
74:25 79:18 88:11 95:8
96:5 97:13 104:4 105:2
108:11,23 111:16 113:6,18
114:5,7 115:5 116:11
118:22 119:8 122:5 127:23
130:9 135:23 137:4 142:25
148:3 150:7 156:17 164:22
165:5 167:25 168:25 171:1
180:10 192:15 193:9
203:10 207:11,11 208:17
208:21 220:17 225:10
227:20 228:18 230:4
232:22 235:12 244:5
248:14
questioning 67:20 190:21
191:3 242:7
questions 9:23 11:24 12:9
12:14,17 13:3 15:10 20:21
22:16 30:23 34:6 43:24
60:6,20 95:13 96:5 114:23
137:2,7 153:16,18 162:21
191:18 210:22,24 211:1,3
211:11 212:6 227:11
231:23 234:2 239:1,7
241:20 242:1,4 243:8
244:4 247:10,13
quick 153:23
quote/unquote 222:15
quotes 199:4

_____

R

R 1:8 251:1,1
raise 10:8
raised 235:11
range 113:12
rate 37:22,25
reached 162:25 171:24
185:8,20 199:22
reaching 190:14
reacted 244:15
reaction 245:13
read 10:4 13:4 14:9,10 24:17

Fedir Nikolayev
2/2/2023

15

64:2 94:25 107:19,20
110:9,13 111:10,18 117:12
117:17 120:1,15 130:9
142:8 150:25 151:24 152:1
159:6 174:22 180:16
189:17 192:21 251:12,16
251:18,20,22,24 252:1,3,5
252:7,8,10,12
**read-and-write** 212:15
**read-only** 212:11,14
**reading** 113:10 146:18
222:8 238:15
**ready** 95:6,11 108:24 110:11
110:16 118:18 121:16
125:9 126:21,22 136:7
137:4 141:20,21 142:10
143:2 147:19,25 152:4
153:3 154:13 169:21
173:16 205:15
**real** 43:16
**really** 14:5,9 26:16 28:24
29:1 30:10 56:15 61:23,25
66:13 67:5 106:14 173:4
185:5 207:21 222:1 224:10
243:1
**reason** 12:12 13:23 14:17
22:9 31:9 55:22 61:25
83:24 86:8 100:24 101:6
106:2 108:11 117:1,7
118:3 144:16 165:14
171:18,24 181:20 188:20
189:4 226:23 251:17,19,21
251:23,25 252:2,4,6,9,11
252:13
**reasons** 68:21 190:20 251:6
**rebuttal** 211:1
**recall** 24:4 30:8 48:4 69:12
76:15 81:23 104:1 105:25
106:15 114:8,8,18 124:8
143:20 144:23 145:4 148:8
149:15,23 157:3,8 162:10
162:17 165:9 167:19,22
185:24 194:18 195:1,1,2
199:21,25 200:6 202:2
207:6 213:1,1,13 218:2
223:4 224:18 231:10 234:1
236:12,18
**recalling** 70:12
**receipt** 220:24
**receive** 76:2 83:2 123:11
130:24 179:14,19 224:16
228:10
**received** 25:22 87:16 164:13
183:23 214:2 220:4
**receiving** 123:15 183:20

**Recess** 52:7 104:20 153:25
**recognize** 28:1,3,8,11 33:13
33:21,24 91:24 92:5,6,16
92:20 93:1,6,9,12,13,17,20
93:25 106:13 107:9 113:19
113:20 116:12 118:23
120:9,17 135:2 137:10
148:10 150:8 153:15
155:11,22 158:6 163:20
166:13 172:15 176:16
180:10 182:7 192:2 195:15
198:10 200:17 202:16
205:17 208:22 216:24
**recognized** 40:18 78:1
155:18
**recognizing** 69:23
**recollection** 24:16 40:9
129:21 156:11 157:5
205:21
**recommended** 40:20
**record** 9:8 10:4,22,23,24,25
11:3,12 21:25 24:8 50:9
51:12,13,13 52:3,6,10
56:24 85:21 89:1 104:17
104:19,23 111:10,18 112:6
112:20 113:10 114:22
115:3 120:1,2,15 122:11
129:14 130:9,13 146:19
147:22 148:4 153:9,12
154:10 155:8 166:7 180:1
185:13 204:18,20 205:3,7
211:5,6,7,8 213:6,6 247:19
247:20,22,25 248:2
**recorded** 48:11 204:1 213:5
213:8
**records** 39:22 48:20 89:5
108:10 175:11
**redo** 159:5
**refer** 74:9 177:6
**reference** 21:18 88:23,24
91:9 100:22 117:5 121:22
132:2 141:9,14 143:16,17
144:7 148:18 150:5 152:7
152:9 178:18 190:19
201:22 217:21
**referenced** 117:18 150:6
232:23
**references** 122:20 132:15
135:23
**referencing** 136:18
**referred** 39:12 70:7 72:23
174:3 193:7
**referring** 43:25 94:15
173:19 178:22 235:8
**refers** 107:12 175:1 178:11

241:6,11
**refill** 189:14,22,23
**reflect** 89:2 112:6 115:3
123:2 124:14,15 129:15
147:22 165:6 180:1
**reflected** 105:6 115:18
123:20,23 125:14 127:24
128:23 130:5,10,21 131:1
135:3 139:20 141:2,7
147:24
**reflection** 103:12 111:18
133:15
**reflections** 130:20
**reflects** 105:5 106:16
122:11 129:6 131:16
138:13 153:6 160:3
**refresh** 129:21 156:11
**Regarding** 162:20
**Regional** 2:4
**register** 199:2 203:3,15
204:11 209:18 225:15
**registered** 70:5 107:13,23
200:22 202:22
**registration** 194:17
**registry** 70:6
**regrettably** 95:22
**regular** 49:18,22 51:24
52:21 68:23 69:10
**regularly** 52:14 69:3
**Rein** 2:17
**rejected** 187:6
**related** 16:9 18:10 42:15,23
42:23 44:8 92:9 105:23
124:17 154:15 162:14
163:1 175:10,12 190:11
212:13 224:6,17 227:23
234:3 239:23 240:9
**relating** 117:15,24
**relationship** 40:15
**relatively** 11:8
**reliable** 66:16
**remain** 67:6
**remained** 50:21 67:4
**remember** 22:19 27:1 34:8,9
34:10,12,14,17 50:4 53:23
53:24 54:7,13,19 61:24
64:7 70:1,2,4 75:9 80:1
92:18,19,19 93:19,23
124:11 157:12,13 167:13
171:7,16 173:3 194:14
200:2 202:1 203:21,21,23
210:2,5,5,20 223:6 225:16
231:11 233:22 238:14,14
238:20
**remembering** 32:2

**remote** 1:18 2:9,16,21 3:3
19:22 54:21,23 55:13
**remotely** 17:3 20:3,8 62:13
108:18
**remove** 187:1,6,14
**removed** 63:5 245:6
**rename** 55:25 77:19,22
**renaming** 56:1
**rent** 19:14,14
**reorient** 80:4
**repeat** 29:14 50:12 95:12
104:13
**replacement** 140:21
**replied** 164:19,20 185:9
186:21 238:18
**replies** 188:2
**reply** 167:15,18,25 188:5,7
219:8
**replying** 164:2,17 187:23
**report** 41:11
**reported** 1:25 41:7
**reporter** 7:5 10:17,19 11:9
11:17 12:16 13:2 78:25
83:23 95:14 104:11 114:24
141:4 143:5 162:13 173:22
234:17 239:12 247:18,19
248:24 249:3 253:6
**reporter's** 104:12 253:1
**Reporters** 6:15
**reporting** 18:22
**represent** 6:20,23 212:5
227:18 239:6
**represented** 229:23 238:8
**representing** 9:9,18 14:24
**Republic** 1:21,23 3:8 6:1,10
8:10 10:7 11:16,22 15:18
16:6,8,13 17:15,19,23 20:1
38:23,25 45:11 58:5 65:4
78:16 83:19,21,25 148:2
173:21,24 175:14 236:9
243:17 250:9
**reputation** 16:1 209:22
**request** 116:17 135:7
144:13 156:13,20 157:11
160:12 170:24 171:9
174:18 184:1 185:8 193:18
201:6 203:17 209:17 210:2
224:25 241:7
**requested** 66:15 84:24
117:4,6 136:1 179:25
197:14 203:8
**requesting** 183:11 190:10
**requests** 7:5 11:17 26:16,17
78:25 83:23 104:11 141:4
143:5 162:13 173:22

A1252

174:15 221:21
**required** 37:18 101:5
**requirement** 168:3,16
**reread** 180:17
**research** 111:8
**reset** 51:19,20
**resets** 51:21
**resident** 250:3,6
**Resolution** 107:2 146:5
**resolved** 107:21 210:3
**respect** 67:20 73:20 74:25
    78:2 88:14 90:24 99:2,5,10
    100:19 128:7 132:9 187:13
    188:17 191:1 242:21
**respond** 194:4 199:18
    238:11
**responded** 197:1
**responding** 12:9 168:12
**responds** 201:11,11 207:1
**response** 185:14 199:15
    209:17 219:17 244:5
**responsibilities** 30:19
**responsibility** 43:23 58:22
    68:15 81:11,13 241:3
**responsible** 36:24 215:9
    222:20
**rest** 241:17 249:4
**result** 13:1
**résum** 103:22 105:15,17,19
    105:24
**résumés** 105:16
**retained** 67:14 115:15 246:1
    246:12
**retread** 236:1
**return** 186:14 224:17
**Returned** 186:6
**review** 20:12
**reviewed** 109:1
**reviewing** 167:6
**Rico** 253:4
**right** 10:8 14:21 15:23 23:11
    24:6,23 28:10,10 29:17
    30:4,4 45:3 57:2 60:9
    63:11 65:13 76:15 80:11
    84:13 87:21 95:4,16 98:6,6
    98:10,21 101:20 102:15,19
    107:16 109:7,10,23 111:13
    114:3 117:16 119:17
    121:22,25 124:17,17
    128:24 130:22 131:10,20
    132:4 133:4,23 134:8
    143:9 145:18 146:7 153:9
    154:9 156:2 157:23 158:5
    160:8,25 168:4 170:17,17
    170:20 177:5,17 179:1

181:18 185:2,2 189:19
    192:21 193:3 194:6 198:17
    198:18 199:14 200:20
    201:1,21,25 202:20 206:5
    207:20 208:14 209:5,8,15
    209:19 213:25 215:8
    218:21,22,24 219:23
    220:11,11,20 221:2,3
    224:8 225:4,21 226:22
    228:8,9 231:10 232:9
    233:3,9 234:7,19 235:1,13
    236:16,25 237:2,7,8,9
    238:23,24 241:19,25
    244:10,10 246:5,14 247:14
**Rightscorp** 133:16,25 134:4
    134:14
**ring** 76:23
**rknuts@shertremonte.com**
    2:24
**Road** 148:15
**Robert** 2:21 7:23
**Roger** 93:20 99:7,9
**role** 27:9 81:8,8,17 88:13
    91:17 96:13 99:1,4,9
    108:22
**room** 19:20 228:22
**roughly** 22:16 23:1 24:22
    58:6
**routing** 36:1,7
**roving** 65:14
**row** 133:17 134:17,18
    139:25 140:7,14
**rows** 132:1 134:17 178:24
**RPR** 1:25 253:17
**rthe** 250:2
**ruined** 209:22
**rule** 157:9
**Rules** 251:2
**run** 55:13,14 62:4 237:19
**running** 39:19 221:18
**runs** 121:14 125:6 126:8
    142:5
**Russia** 15:16

---

**S**

**S** 1:8 199:15 251:1
**S-E-X-T-O-N** 28:6
**S-I-L-V** 33:18,24
**S-T-U-B-O-S** 8:3
**S-U-A-S-S-O** 92:2
**SA** 96:11 97:5 98:9 100:12
    100:19,24 103:18,20
    106:11 107:3 110:2 111:2
    121:23,23 142:23 144:4
**Saint** 93:2

**salary** 25:20
**sale** 134:6 138:15 140:1,4
**sales** 42:17,21 62:6 132:18
**Samsung** 66:8,11,18 172:11
    172:17
**San** 253:2
**Santiago** 1:23 6:10 10:7
    250:2,3,7,9,9
**Santo** 6:1
**sat** 229:24 230:6
**save** 53:1
**saved** 53:5,13 147:15
    158:23 189:21
**saving** 52:25
**saw** 33:19 109:17 165:1
    201:23 209:1 217:20 245:5
    245:8 248:10
**saying** 34:2 86:17 171:9
    175:16 185:9 188:20 194:9
    196:7 198:19,25 201:15
    209:20,24 213:6 237:8
**says** 96:2,20 100:12 107:21
    110:17 112:5 114:19 131:8
    131:8 138:15 140:2,3,5
    142:4 158:20 170:22
    174:18 179:11 180:2 188:2
    192:12 200:3 213:11 214:3
    214:15 222:10
**scan** 144:21
**scanned** 116:23
**scenario** 199:21
**scheme** 228:8
**school** 15:22,24
**Scott** 149:5,8,14 150:1
**screen** 14:23 15:1,4 30:15
    154:5
**se** 17:1 38:24
**search** 89:17,19 233:7
**searching** 114:22 115:3
    163:11
**SEC** 9:10,10,14,18,21 151:9
    191:1 214:3 221:25 223:18
    224:5 227:24 228:6 229:15
    229:19 230:6 231:3 232:23
    232:25 238:1 247:4 248:7
    248:10,12
**SEC-FINMA-E-0027107**
    4:19 126:7
**SEC-FINMA-E-0029150**
    4:20 136:19
**SEC-MLATCKLP-E-02533...**
    5:12
**SEC-MLATCKLP-E-04673...**
    5:3 166:8
**SEC-MLATCKLP-E-04982...**

5:16
**SEC-MLATCKLP-E-05431...**
    5:13
**SEC-MLATCKLP-E-05621...**
    5:15
**SEC-MLATCKLP-E-05678...**
    5:14
**SEC-MLATCKLP-E-06485...**
    5:17
**SEC-MLATCKLP-E-06758...**
    5:4
**SEC-MLATCKLP-E-06828...**
    5:5 172:6
**SEC-MLATCKLP-E-06874...**
    5:6 173:12
**SEC-MLATICKLP-E-0675...**
    169:17
**SEC-NZFMA-E-0000118**
    4:18 125:4
**SEC-NZFMA-E-0000201**
    4:17 121:12
**SEC-UKFCA-E-0105406**
    112:23 113:12
**second** 92:2 109:19 114:10
    133:16 142:19 149:3 158:8
    198:14 205:24 211:5 250:5
    250:7,9
**second-to-last** 159:22
**secretary** 147:2,5
**section** 103:7 149:3
**sector** 250:5
**secure** 58:23 155:22 186:22
    188:25 222:15
**secured** 79:1
**securely** 188:23
**securities** 1:3,13 2:4 6:6,20
    6:23 13:25 113:15 117:15
    117:25 146:5 226:8,24
    228:7
**see** 7:13 14:22 36:4,18
    42:24 46:5,6,8 49:8 50:19
    50:19 60:25 61:1 77:12
    79:16 83:17 91:24 97:1,3,5
    97:6,10,17,19,23 98:12,17
    100:13 103:10 106:11,14
    106:18 107:5,6,14,17,25
    109:9 110:7 112:5 114:2
    114:14 115:9,11 117:19
    119:5,13,15 120:4,16
    121:24 122:25 123:3
    128:22 129:2,16,18 130:20
    131:7,11 132:1,3,18 133:7
    133:16,19,24 134:7,20
    135:3,6,20 137:12 138:10
    139:8,12,13 140:11 143:2

Fedir Nikolayev
2/2/2023

17

143:7,10,14,18 144:7
146:14 147:2 148:16,20
149:6,17 151:21 152:8,11
153:5,8 154:4 156:22
160:19,24 165:10 166:18
166:25 167:1,7,12,14,15
168:3 170:10,15 174:8,19
176:21 178:17 181:1
182:16 186:6,15 187:8
191:12 192:8,12,13,18
193:18,22 196:22 197:17
199:4,10 202:5 203:4
206:1,21,24 207:2 208:18
217:4 218:19 219:14 222:9
222:17 229:5,8 233:7
236:17 237:14,25 238:9
241:15 243:2 244:24
**seeing** 20:11 30:15 98:19
99:7 106:15 126:15 128:2
158:14 161:8,14
**seeking** 184:17
**seen** 15:2 61:6 83:16 96:23
99:15 107:3 109:2,24
114:7 118:25 121:18
122:19 125:10,12 133:11
137:11 148:6 151:12
**sees** 60:24
**seize** 55:8 234:6 244:23
**seized** 24:5 35:5,6,13 55:12
124:5,8 231:1 235:9,13
239:13 240:12 244:14
245:17
**seizure** 239:9,16
**seizures** 240:4
**select** 46:4 64:19
**selected** 212:12
**sell** 42:13 117:14,23 138:25
139:2
**selling** 42:13
**sells** 123:2 124:1
**send** 13:8,10 32:11 63:23,25
84:12 91:1 149:4 150:1
170:24 171:9 179:9,14,18
181:11 183:11 184:2
187:12 197:18,23 200:25
201:3 219:25
**sending** 149:13 171:21
182:13 190:3 207:7
**sent** 80:1 83:4 108:20
115:12 116:8 126:10
148:13 149:21 163:21
171:3,18 173:17 181:12
186:21 190:10 219:15,21
233:5 239:21
**sentence** 107:20

**separate** 9:10 56:6 104:15
194:13 199:12,23
**separately** 9:16 181:12
**sequence** 179:3
**sequential** 70:13
**sequentially** 186:13
**series** 178:4 205:17 208:22
223:19
**seriously** 56:15
**server** 18:11 19:15,17,18,22
35:9,10,14,16,17 45:4,7,8
45:9,10,17 48:19 49:19,23
51:25 52:1 53:2 54:8,9
55:5 56:13,16 60:11 61:9
62:12,14,18,19,23,25 63:6
63:7,8,10 66:21,22,23 67:1
67:4,6,10,14 68:10,11
199:3 209:15 234:2,6,10
234:18,22 235:9,13,23
**servers** 22:12 24:5 35:4,6,9
37:9 54:12,17 56:9 57:4,18
58:8 60:25 62:8,14,15,16
63:4 73:17 124:4,8 198:21
208:19 226:16,18 230:25
231:1,25 233:1 234:3,13
234:15 235:16 239:9,12
240:2,5,9,10,11,15 244:13
244:23 245:17,20,21 246:4
**service** 16:20 17:5 18:6
19:23 56:13 57:8,9 65:19
145:13 162:6 165:3 204:10
206:24
**serviced** 57:5 79:23,25
**serviceful** 80:16
**services** 16:23 17:24 18:9
23:4,7 29:8 32:25 64:22
78:20 79:7,8,21 81:5 82:2
82:2 84:18 85:2 103:9,21
105:20 106:7 111:2,21
117:4 207:5,10,15 209:11
225:1,17 246:19,21
**set** 37:9,17,22 58:3 59:12
61:13 62:10,14 78:15,23
79:1,5,10 81:2,7,18 85:17
85:23 90:23 145:14,16
148:2 150:10,11,15 158:19
173:20,23 174:23,25 175:2
175:8 181:14 187:5 188:21
194:16 195:16 198:22
199:3,23 202:17 206:19
215:17,22 222:12 227:3
231:25 234:3 235:18
**setting** 42:2 81:14 85:25
86:6 111:3 199:5 200:7
207:5

**setup** 42:7 57:18 58:1 78:20
199:12 201:23
**seven** 67:3 223:10
**seventeen** 250:4
**seventh** 133:23
**Sexton** 1:7 28:6 78:6
**share** 63:18 106:10,17
107:13,21,23
**shareholder** 98:21 106:21
107:23 108:3 109:8 110:18
**shareholders** 42:20
**shares** 29:12 83:15 132:11
143:17 144:3,12 148:15
149:1 152:10,15 153:6,13
**Sharma** 152:10,19
**Sharp** 1:6 6:7 9:21 21:5,7,10
22:1,2,7,17 23:2,16 24:1,4
24:21 25:1,12,13,14,23
26:12,15,18,24 27:6,9,20
27:23 28:3,21 29:1,16,19
30:25 31:18,22 32:8,14,19
32:25 33:6,25 34:15 35:24
35:25,25 36:7,20,25 37:3
38:6,22 39:17,18 40:6,8
41:7,10,14,23 45:23 46:3
46:14,16 47:8,16,17,19
48:14 51:5,8 52:14,20 56:6
56:21 57:22 59:4,7 61:25
62:7 64:13 66:12 67:16
68:19,20,22 69:2,7,8 71:13
72:4,8,14,16,23 73:2,21,21
78:15 79:10,13,19 80:9,13
80:18,25 81:6,18,20 82:10
82:13,18 83:7 84:20,22
85:2,3,7,21,22 86:4,9,12
86:24 87:3,9,17,20 88:13
88:20,20 90:3,4,23 91:6,7
91:11,18 99:20,23 100:21
101:1,16,18 102:5,8 103:3
104:2 105:25 116:16 117:2
118:4 119:22 128:9,11,15
130:3,12 142:16 143:21
144:10,18,25 145:2,7,16
145:19 147:5 149:12
150:12,14 152:14 153:11
156:5 161:6 162:11,18,24
166:23 168:20,25 171:14
171:21 174:11,14,17,18
182:19,23 184:9,12,21,25
189:5 190:16 192:25
195:20 196:13 198:16
199:1 200:25 201:3,5,11
201:19 203:12,12,18,19
206:4 209:19 213:3 215:22
215:23 217:8 222:11 223:7

223:12 224:3 225:3,18
226:4,17 227:23 233:6
234:25 235:3,14 236:3,3,6
236:8 237:1,16 239:21
240:19 243:10,14 244:14
246:1,6,9,17
**Sharp's** 28:22 30:2,13 31:2
32:9,21 36:15 42:9 49:21
53:10 54:21,22 56:10 57:4
68:3 69:10 70:6 71:22 82:3
83:5 132:12,25 134:15
168:16 184:18 193:14
197:10 199:24 224:24
**sheet** 13:6 136:18 251:10
**Sher** 2:21
**Shields** 2:3,6 4:4 6:23 7:15
9:17,24 69:15 158:24
159:3 165:21 166:2 189:18
189:23 190:22 191:10,15
192:1 195:5 198:4 200:10
202:11,15 204:5,15,23
205:2,8 208:7
**ShieldsKa@sec.gov** 2:7
**shift** 18:12
**ship** 59:15
**shipped** 59:16 62:9
**shopping** 84:15
**short** 70:3 102:18 153:1
**shorten** 106:1
**shots** 30:15 236:4,5
**show** 86:21 221:19,25
**showed** 89:18 223:18 224:5
234:5 238:1
**showing** 96:22 144:8
**shown** 219:10
**shows** 139:25
**shut** 222:16
**sic** 80:16
**side** 58:25 100:12 108:7
112:12 125:21 147:7
241:23
**sign** 118:2 145:23 146:16
161:8,11 188:4 224:2
**signal** 23:24
**signature** 115:8,9 116:18,19
118:20,20 119:5 143:12,13
144:17,21,21,25 145:3,9
145:12,17,21 146:8,13,19
146:20,21,22 147:1 148:9
148:10,11 185:17
**signatures** 119:3 223:20
**signed** 117:6,10 118:1,3
145:22 164:3,7 165:11
185:14 223:23
**significance** 83:18

**Fedir Nikolaev**
**2/2/2023**

18

**significant** 111:1
**signing** 144:23 190:9
**Silverton** 33:16
**SIM** 58:4 59:16 65:3 71:14
  71:16 84:12 162:6
**similar** 34:1 41:2 43:13
  46:22
**simple** 21:20
**single** 94:25 142:8
**single-page** 102:22 147:13
  172:3 173:10
**sir** 15:12 92:8 162:2 228:18
**sit** 212:22 219:20 220:17
  224:19 228:25
**sitting** 13:24 96:23 119:3
  133:10 137:18 157:16
  217:16 240:24 247:12
**situation** 86:16
**six** 22:8,16,18,22 23:9,25
  79:4 102:16 178:24
**Skyfall** 54:6,7,13,22 55:1,17
  55:18
**sleep** 226:13
**slightly** 80:4
**slip** 136:18
**slow** 11:9
**slowed** 87:14
**slower** 207:24,25
**slowest** 248:4 249:2
**slowly** 12:18 244:3
**small** 226:9,12
**small/mid** 110:24
**smaller** 224:24
**snapshot** 51:3,7,7,14
**software** 16:10,15 40:13,14
  57:11 64:17 167:21
**sold** 56:17 72:21 103:20
**solely** 9:24 20:1 36:24
**somebody** 26:24 27:20 47:5
  47:22 48:12 57:7 71:16
  77:9,19 83:5,7 156:5
  159:17 167:20,21 174:16
  175:19 185:21 209:18
**somebody's** 242:19
**soon** 84:22 194:3
**sophisticated** 64:4 110:19
**sorry** 8:20 29:14 126:14
  141:14 155:2 189:19
  200:21 205:4 213:21
  215:19 216:9,13 222:9
  223:15 225:25 230:5
  237:23 248:13
**sort** 16:23 17:5 18:14,20
  19:4 22:3 27:13,22 29:8
  31:12,13 36:6 37:19 43:15

50:12 53:14 55:7 56:7
  65:12,20 66:17 71:1 80:3
  87:4 92:7 96:8 111:11
  116:10 140:3,20,22 157:14
  171:6 185:20 186:14
  204:13 209:4 213:23 215:1
  215:17 218:19 235:15
  243:25
**Sosua** 11:15,21 100:4
  138:18 250:6
**sounded** 243:3
**sounds** 33:22 40:18 46:13
  157:11 175:7 226:3
**source** 26:1 111:7 214:3
**space** 19:14
**Spanish** 8:8,12,14 225:13
**speak** 11:8,8,9 12:18 14:13
  137:6 138:17 241:25
**speaker** 103:18
**speaking** 14:7 15:20 87:15
  95:14 236:21
**Spears** 3:3
**special** 235:17
**specialist** 6:14 25:16
**specific** 50:21 70:17 75:15
  75:21 87:7,8 95:10 104:4
  131:6 133:14 137:2 139:17
  140:24 151:18 152:7
  167:24
**specifically** 78:2 91:7
  162:22 163:25 170:19
  173:19 187:21 237:4
**specifics** 194:18
**speech** 7:4
**spell** 92:2 93:2
**spelled** 7:24,25 8:2 109:12
**spelling** 109:13
**spend** 37:3 228:24
**spent** 229:11
**spoke** 237:5
**spoken** 15:7
**spreadsheet** 40:19 43:7
  137:10 141:6 176:20
**SQL_MT** 54:2
**SRL** 78:21 79:8
**ss** 253:3
**St** 2:12 93:1,3 136:24 137:16
  137:21,24 138:5
**stable** 65:15
**staff** 45:21 46:3,4,6 47:16
  48:21,22 75:7,11 178:9,12
  212:12
**stage** 200:1
**stages** 61:14
**stamp** 129:18,19

**standard** 60:14,18 105:15
**start** 10:16 25:12 95:13
  148:4 151:6 205:5 211:10
  212:7 227:21
**started** 57:7,9 74:2
**starting** 24:21 51:9 127:10
**starts** 195:20 198:25 200:21
  202:21 205:23,25
**state** 124:6
**statement** 97:4 99:13
  100:25 107:11 109:22
  125:7 128:19 130:18 131:7
  133:5 251:6
**states** 1:1,10 13:25 20:15
  29:21 96:10 97:22 103:8
  104:6 107:16 116:6 117:12
  144:2 167:7 168:1 230:1,8
  230:14,20 233:19 253:7
**status** 235:16
**stay** 74:5 247:19
**stayed** 200:1
**step** 82:15 185:1
**Stevia** 139:20 140:13,16,19
  140:23,24 141:2 152:16
  153:7,13
**stipulate** 8:13,15,19,22,24
  9:2,5
**stipulating** 10:12
**stock** 20:15,18,23,25 29:13
  29:21 33:7 42:5,8,13,13,17
  42:20 43:14,16,16 86:25
  106:10,18 111:5,21 123:12
  123:13,17,21 131:8,15
  142:4,13,16 143:3,8,15
  144:10,17 147:17 148:13
  148:25 149:4 152:16
  207:15 215:17
**stockbroker** 17:20 103:8
  104:7,10 105:7,9,13 106:3
**Stockbroking** 121:23
**stockpicks** 202:23
**stocks** 42:1 51:11
**stop** 64:9,10
**stopped** 22:9 24:3,24 65:16
  182:23,25 185:3 245:12
**stored** 175:4
**storing** 240:2
**Stormo** 140:2,5
**strange** 180:9,13 217:1
**Street** 2:5,10,17,22 250:4
**Strictly** 163:2
**string** 4:25 209:1
**Stubos** 1:15 3:2 8:3 9:10,11
  9:25 191:2 195:9 197:4
  198:7 200:13 202:12

205:11 208:10
**studies** 250:4
**stuff** 40:3 44:9 84:15 173:1
  177:2 180:15 188:22
  207:21 209:21 217:21
  231:25
**stupid** 85:18
**Suasso** 4:16 92:1 118:15
  121:2 125:8
**subject** 155:4 159:7,8 163:6
  169:18 176:6 180:17,19,22
  182:5 186:6 189:14,20
  191:19 192:7
**sublet** 19:15
**subparagraph** 222:10
**subpoena** 228:19 231:13,14
  231:19 232:3
**Subscribed** 252:19
**substance** 17:15 160:23
  166:25 170:10 251:3
**substantive** 24:4 90:12
**Substantively** 18:15 148:12
**sudden** 23:20
**sufficient** 8:16
**sugar** 140:21
**suggest** 206:6
**suggested** 37:18 39:24
  56:19,22 62:5 64:15 66:15
  167:21
**suggesting** 62:3 198:22
**suggestion** 66:12
**sum** 171:11 190:13
**summarize** 50:2,5,15
**summary** 103:6,24 104:5
**superstarstocks** 202:23,24
**supplemental** 251:8
**support** 16:15 18:8,13,19,21
  18:25 25:2 32:23 56:12,14
  56:20 61:22 160:13,14
  165:1 172:24 197:13,15
  201:7 226:11,12
**suppose** 180:4
**supposed** 219:8 223:9
**sure** 7:9 11:8 20:6,7,21 24:5
  26:22 28:25 29:15,15
  30:18,20 34:16 41:17 45:1
  45:2 47:18 48:5 49:11
  50:11 56:24 57:14 58:22
  65:5,20 68:16 75:12 78:2
  81:15 85:20 92:9 113:23
  115:2 119:6 122:11 136:7
  138:9 154:3 156:21,24
  158:10,10,14 166:1 171:11
  175:21 177:1,22 180:19
  181:15 211:6 230:16 247:5

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1255

**Fedir Nikolayev**
**2/2/2023**

19

swear 8:5 10:9,10
swearing 8:14 10:4
**Swiss** 120:10
switch 66:11
switching 191:5
**Switzerland** 33:8,14 120:12
  120:21,23
sworn 8:8,12 11:25 252:19
symbol 43:16
symbols 168:9
symmetric 63:17
system 17:12 33:19 36:4,22
  37:8,17 39:12,16 40:22
  41:13,15,23 42:3,8,16,19
  43:2,4,9,25 44:1,14,18,22
  45:18,18 47:12,15 48:3,7
  48:13 49:3 50:14,18 52:13
  52:14,15,21 53:12,24 56:1
  56:6 57:13 58:17 60:19
  62:17 64:19,23 65:7,8
  67:20 72:24 73:2,4,18
  74:17 75:24 76:3 79:25
  86:22 92:24 155:23 168:7
  168:11,17 174:24,24,25
  175:3 179:25 183:19,23
  188:13,19,21,24 189:4,4,6
  192:4 196:4 201:7 204:1
  212:7,10,24 213:4,14,15
  213:24 214:4,6 237:18
  242:9 243:25 246:11
systems 18:19,23,24 61:17
  237:2

---
**T**
t 1:7,8 74:10 179:22 251:1,1
**T-A-Y-L-O-R** 28:16
**T-E-C-H** 74:9
**T-E-C-H-S-T-E-R** 74:14
**T-R-A-D** 218:3
table 119:3
take 10:1 25:9 26:17,23 34:4
  50:6 82:15 96:7 112:19
  117:11 118:16 119:6
  121:15 125:22 127:16
  130:14 142:24 147:17
  153:1,23 162:25 172:8
  173:15 176:19 184:8
  185:20 189:17 204:5,16
  205:14 208:16 210:11,13
  216:6 221:8 240:16,20
  248:22
taken 12:8 52:7 104:20
  111:13 153:25 250:6
takes 56:16
talk 60:22 70:10 96:6 108:12

157:2 206:18 235:7
talked 76:20 85:10 223:16
  228:5 229:16 230:24 231:3
  231:11 233:18 236:15
  237:21 243:9 244:7 246:10
talking 10:17 44:19 52:12
  58:7 60:9 68:5 71:25 80:3
  114:24 231:6 237:4,16
Tandem 134:20,23,25 135:6
  135:8,13
tape 52:3 104:17,23 153:20
  154:7 204:16 205:7
tasks 27:13,18
tax 224:16
Taylor 1:8 28:16
tech 40:18 45:1 74:9,10,15
  74:21,22 79:19 80:7,8,13
  207:19 226:11,12
technical 18:13 32:22 56:12
  56:14 58:25 61:22 68:20
  79:21 161:20
technology 69:4,9
Techster 74:14
telephone 120:14
tell 10:9 11:11 20:10 21:11
  34:22 40:8 41:9 48:4
  144:10 151:8 159:18
  170:25 183:16 185:5,21
  225:19 229:2,24 230:6
  241:8
telling 189:1
tells 206:17
temperature 19:21
template 105:14 106:4
  215:14
templates 215:13
temporarily 67:8,9
ten 191:12,13 220:24
term 72:19
Tester 218:7
testified 8:10 128:8 218:25
  223:22 224:9 231:18 232:7
  236:25
testify 124:7 151:10 231:16
  231:17,17 232:8,9
testimony 80:6 146:12
  154:11 231:24 232:17,19
  232:24 248:19 251:4
testing 167:8
Tex 143:17,23 144:12
text 65:9,22 66:20,24 67:1,7
  238:8
thank 8:23 9:1,4,7 10:11,11
  11:23 13:15 106:8 112:11
  147:7 155:20 159:13

189:24 191:9 227:11,15
  239:1 247:10
thanks 126:19 159:24,25
  175:23 187:7
Therapeutics 132:3,10,16
there,' 199:4
thereabouts 23:2
thick 150:18 222:1
thing 13:1 59:16 75:23 88:8
  117:18 151:1 243:4
things 11:7 14:20 18:17
  20:9 25:18 45:25 62:13
  78:23 80:4 91:21 114:19
  174:16 194:19,22 203:15
  206:19
think 12:13 21:12,19,22
  23:23 24:8,9,14,15 26:10
  27:24 31:23 32:18 38:1,14
  39:7,7 40:10 43:10 44:2
  53:25 54:8,9,20,24 55:18
  55:24 57:1 60:4,4 62:3,18
  65:16 67:2,18 68:5,6,18
  69:20 70:5,13 73:3 74:13
  75:7 76:8 77:16 79:3,16
  80:1 81:9,9 85:9,11,15,15
  87:24 88:4 91:20 92:6,10
  104:1 111:13 119:25,25
  120:10 124:3 129:13
  131:16,17 141:21 145:22
  156:24 159:4 161:7 170:2
  175:1,13 177:19 178:22
  180:6 182:24 186:19 187:5
  187:10,25 189:21 194:1
  195:9 196:16 199:25 203:2
  205:21 207:7,24 210:4,7
  210:16,18,19 213:21 214:6
  215:5 216:7 217:14,23
  219:23 221:25 223:9
  225:12,20 227:1 230:18,22
  231:17 234:1,24 235:25
  236:4,25 241:22 244:13
  248:16
thinking 31:12 244:19
  245:10
third 3:4 110:1 139:19
  141:13,14 150:6 177:21
thought 24:7 27:17 29:7
  54:15 83:20 124:12 161:22
  187:25 227:5
thoughts 80:17
three 20:5 38:1 45:19 71:9
  98:7,14 132:15 133:14
  159:11 172:19 178:5 229:3
three-quarters 152:8
Thursday 1:21 6:2

time 6:3,11 14:3,3 21:9
  23:17 24:20 25:11 28:20
  34:20,23,25 35:2 37:3,6,7
  37:7 38:5 39:13,22 40:2
  41:12 44:24 50:13 51:6,16
  52:5,10 54:3 55:24 57:16
  57:18 58:6,6,17 60:12
  65:15,22 70:4 75:25 80:9
  87:13 88:16 90:2 94:4
  95:17 99:23 103:8 104:6
  104:18,23 105:6 111:7
  118:2 119:6 128:3,10
  144:9,24 148:24 153:21
  154:2,6 156:25 157:5
  159:4 162:4,20 167:9
  169:22 173:14 174:19
  187:11 191:11 193:21,24
  198:20 204:19 205:7
  210:21 222:11 225:3
  226:13,20 229:11,16
  233:18 239:1,12,15 240:20
  243:13,15 244:8 245:23
  247:10,24
timeline 44:23
times 18:22 40:10 91:6
  194:19 237:5,11,12
titled 107:1 109:5,20 110:2
  125:7 146:4
today 6:11 8:17 11:7,24 12:1
  12:10,14 13:17 14:14 15:1
  15:5 16:14 80:6 94:17
  96:23 128:2,8 137:11,14
  137:19 138:21 144:15
  146:12 148:6 150:20
  153:10 157:16 185:10
  212:22 217:17 219:17,20
  220:17 224:19 227:15
  228:19 230:7,9 232:5,24
  240:24 244:6 250:5
today's 13:16 14:14
told 40:6 55:24 62:1 74:4
  84:23 99:17 103:4 128:15
  175:14 178:8 184:21
  207:18 210:17 215:23
  229:22 232:10 240:7,8,18
tools 64:18
top 96:20 121:22 142:5,22
  143:14 160:6 169:4 188:6
  192:6 200:3 207:17,17
  217:4,14
topic 30:24
total 237:11
Totally 89:6
touch 62:6
track 41:24 42:8,16,19 43:2

**Fedir Nikolayev**
**2/2/2023**

20

216:9
**trade** 20:18 86:24 138:2
  179:22
**traded** 20:23,24
**trading** 20:15 33:14 105:23
  111:6 123:12,16 144:2,11
  148:14
**traffic** 79:16
**transact** 131:18
**transacted** 123:25
**transaction** 42:22 131:6,13
  132:5,10 134:9 135:8
  140:16 175:5 213:10,20
  214:19,20 215:13,15
  242:16
**transactions** 41:21,25 42:5
  42:9,15 47:12 86:18
  122:23 123:5,19,23 124:16
  125:14 128:22,25 131:15
  132:16,20,24 133:13
  134:13 135:18,21,24 136:1
  138:3 139:5,11,14 141:1
  212:16 214:12,17 215:24
  224:6,11
**transcript** 13:2 186:7 232:16
  247:21 248:4,11,16,18,19
  248:23 253:8,11
**transfer** 26:1 83:2,4,14
  142:4,13,16 143:3,8,16
  144:10,17 146:5 147:17
  148:13,25 149:4 152:9
  153:6 185:8 194:9,20,21
**transferred** 62:7
**transferring** 83:15 152:15
  153:12
**transfers** 25:24,25 242:11
  242:23
**translate** 17:10,11
**translation** 8:15 10:3 12:20
  12:21 16:18 17:8
**translator** 21:1
**transmission** 160:3 161:14
  165:7 170:16 171:25
  181:10 182:8,15
**transmitted** 184:19
**travel** 230:12
**traveling** 188:22
**Tremonte** 2:21
**trial** 230:7,20
**tried** 224:20
**trouble** 41:3 126:12 226:5
  244:24
**true** 104:7 251:14 253:8
**trust** 58:20 148:15
**trusted** 239:16

**truth** 10:9 250:7
**try** 75:4 181:17 218:9
**trying** 7:16 30:17 40:5 55:3
  58:15 80:12,16 207:24
  216:9 245:17
**Tuesday** 160:18 192:12
**turn** 127:10 130:19 132:14
  142:18 146:2 190:21 191:2
  210:23 211:2 232:25
**twelfth** 96:16,17
**twenty** 237:12 250:5,9
**twenty-three** 250:5,10
**twice** 67:18
**two** 20:5 37:5 46:13 48:25
  71:7 97:21 98:7 101:10
  117:19 132:18 135:16,21
  178:5 181:7 186:12 190:25
  204:17 214:13 229:3
  237:16 247:7
**two-page** 116:5 176:12
  186:5
**two-step** 76:1
**two-thirds** 206:17 218:19
**type** 18:17 63:12 138:11,14
  140:5 244:25 245:4 246:23
  250:7
**typed** 226:19 244:22
**types** 45:19
**typical** 197:8
**typically** 13:11 197:11,12
**typo** 168:23

**U**

**UA** 148:19,22 149:1
**Udall** 149:5,10 150:2
**Ukraine** 15:16,23
**Ultimate** 114:13
**Um-hmm** 50:16 65:24 66:1
  97:24 98:13 101:14 110:4
  113:17 119:14 124:24
  127:1 128:21 131:12
  132:19,19 133:8,8 134:22
  138:12 139:9 148:21 167:5
  167:5 170:4 174:9 182:14
  194:12 195:14 200:24
  217:6,11
**underlying** 50:14
**undersigned** 251:11
**understand** 10:20 11:25
  12:19 22:25 29:2,3,25
  30:21 34:3 35:7,8 38:11
  40:17 41:4 44:19 47:8,19
  49:11 50:11 55:3,6 58:15
  58:20 59:1 65:5 67:21
  71:12 75:12 80:12 83:22

83:25 85:20 106:8 117:3
  140:1 157:4 161:18 164:9
  165:4 168:15 169:25
  171:12 177:23 178:6,21
  179:3 188:5 193:13 202:25
  203:11 207:9,13 214:24
  218:12 225:2 226:14 228:4
  234:18 235:19
**understanding** 27:3,8,12
  28:22 29:5 30:1,12 31:1,4
  31:6,9,11,15 35:24 36:6,14
  38:6 40:4 41:12 42:11
  52:16,20 58:18 59:4 60:13
  61:10 68:22 69:2,7 72:3,7
  76:4 78:5,8,11 80:13 81:17
  81:20 85:3,6 86:24 87:2
  88:18 97:7 98:4,20 99:1,4
  99:9,22 106:20,22,25
  108:2 111:23 122:19
  123:25 125:13 127:4,7
  128:1,3 138:7 140:23
  144:9,16 147:4 149:24
  152:15 153:12 156:16
  160:15 164:12 170:18
  173:18 174:10 178:8,12
  182:18 186:17 197:22
  204:2 207:14 212:23 214:9
  214:16,25 217:7,12 219:4
  225:5 246:5
**understood** 14:22 26:11
  29:22 31:5 41:22 42:3
  204:15
**unfortunately** 181:19
**uninvolved** 238:19
**unique** 108:9 110:18
**United** 1:1,10 13:25 20:15
  29:21 92:21 230:1,8,14,20
  233:19 253:7
**universe** 247:7
**unmuted** 175:20
**unnatural** 12:4
**unpronounceable** 74:2
**Untitled.PDF** 176:11
**unusual** 165:10
**Updated** 180:2
**upset** 61:25 244:16
**usable** 66:13
**USD** 171:4
**use** 12:21 23:3 40:5 50:18
  54:5 63:24 73:22 77:9 82:2
  82:16 83:10 84:8,10 85:4,8
  85:17 90:5 94:17 105:23
  145:19 150:12 167:21
  175:17 194:24 203:7,14,19
  207:14 222:20 251:8

**user** 45:13 47:13 63:18,21
  66:24,25 77:6,18,21,22
  196:23 202:25 203:19
  205:25 206:6,10 209:8
  210:2,12
**users** 45:19 64:4,24 65:8
  77:12
**uses** 111:2
**usually** 53:16 174:17 175:15
  180:14 187:23

**V**

**V-E-L-D-H-U-I-S** 7:25 28:4
**validated** 239:17
**value** 107:14 250:7
**Vancouver** 26:10 38:9,12,15
  38:16 59:13,25 60:3 71:22
  71:23
**various** 14:24 19:2 20:13
  36:1 40:5 65:22 177:4,6
  179:2 242:21
**Veldhuis** 1:7 2:20 7:24 28:4
  78:12 156:9,12,18,20
  157:21 239:6
**Verkauf** 138:24 139:1,25
  140:6
**version** 53:15 144:25
**versus** 6:7 9:11,21 191:1
**video** 6:12,14 14:23 15:1
  94:14 236:18 247:15,20
  248:1
**Videographer** 3:11 6:4 8:4
  52:5,9 94:6 104:18,22
  153:21 154:2,6 204:19
  205:1,6 247:24
**videotape** 94:5 191:11
  204:6
**videotaped** 1:18 6:5
**view** 42:25 43:1 49:5 161:20
  209:23 221:20
**violations** 226:8,24
**violently** 244:15
**visa** 38:17
**visit** 20:4 38:22
**visiting** 38:24
**Vitality** 122:24 123:3,6,9,12
  123:16,21,24 152:17
**voice** 64:16,19 65:2,13 66:4
  66:5,20
**voluntarily** 230:7
**VPN** 64:20
**vs** 1:5,14

**W**

**W** 179:21

**W-O-R-K** 242:8
**wait** 12:5 205:1
**want** 7:11,21 9:24 10:22,23
13:4,7,12 38:19 45:2 47:18
49:11 63:22 80:4 96:7
122:10 125:22 127:10
136:3 139:17 141:20 142:7
142:10 151:19,25 168:6,13
171:2 177:22 194:2,20
199:2 207:22 208:1,4
209:21,22,25 210:24 217:3
220:12 223:14 227:20
232:13 236:1
**wanted** 64:16 80:13 99:25
106:1 155:8 168:20 190:6
202:25 203:3 204:7 207:9
207:14 210:15,22 224:14
225:15 229:5 234:12
235:15 240:7 241:4 244:23
**wants** 63:19 206:19 241:25
**warnings** 232:8
**Washington** 2:18
**wasn't** 22:18 26:15 52:16
218:9,11 230:2,4 231:20
**way** 11:11,24 16:12 17:22
21:22 40:20 43:3 47:4
56:17 59:16 65:12 74:4
80:24 88:10 90:4 139:19
145:23 152:8 158:18,22,22
159:22 163:3 206:17 248:4
248:22 249:2
**WB21** 92:11
**WB21PTE** 92:4
**we'll** 8:21 11:7 44:13 71:1
154:3 159:3 210:25
**we're** 44:19 71:25 89:6
94:22 95:25 96:19 100:11
102:19 104:19 105:4
108:12 109:19 122:3
124:15 130:6 134:18 146:6
153:22 163:4 169:15 172:2
175:20 181:19 204:20
205:6 211:8 247:25
**we've** 94:12 108:19 112:18
112:22 113:8 115:24 116:2
118:13 121:8,10,18 124:22
125:11 126:6,24 136:9
141:23 147:14 150:21
154:19 158:1 173:9 176:3
182:3 192:3 195:7,9,16
200:11 204:24 205:10
210:21 230:24 246:10
**wealth** 111:1
**web** 17:5 39:25 40:14
**web-based** 18:24,24 41:13

44:19
**Webex** 121:10 125:1 136:16
**website** 194:16 199:3,6
200:22
**websites** 199:23 203:1
**weeks** 37:5
**welcome** 95:1
**went** 16:25 71:7 81:13 85:18
154:9 229:2
**weren't** 205:2 227:4
**WGY** 6:8
**Wiley** 2:17
**William** 1:8 28:18
**willing** 247:3,6 248:12
**Winter** 33:10,13
**wire** 25:24,25 26:1 83:2,4
169:18 171:4,9 182:5
190:10
**wired** 84:8
**Wires** 5:2,7,8,9,10 76:16,18
77:17 163:6,18 164:1,8,14
164:15,18 170:5,16,24
171:9 176:8,17 179:21
182:6 183:3,6,9 186:8
187:10,24 188:2 189:15
190:7,8,15 216:18 218:19
219:2,3,11 220:4,14,18,23
220:23 221:5,7,16
**witness** 1:19 4:2 8:7,12,14
10:4,10 11:18 13:4 36:11
52:4 96:1 104:24 110:14
115:6 118:19 141:8 162:14
181:14 185:16,24 198:1
204:8 205:4 229:23,23
247:14
**wonder** 227:24
**wondering** 226:14
**word** 12:20 71:25 76:23 92:2
100:24 105:14 138:22
178:24
**words** 48:17 77:8 105:19
138:16 177:14 178:3
**work** 14:21 15:23 16:25
17:15,18,25 18:2,10,15,16
19:2,25,25 20:2,3,17 22:14
24:4,21,24 25:1,7,11,13
26:14 28:20 29:3,5,6,19
30:22,25 32:8 34:15 35:23
36:7,19,25 37:2,4,13 38:6
38:20 42:2 46:2 56:5,7
71:6 84:23 90:16 103:16
105:18 149:12 183:23
185:22 202:2 214:24
215:11 227:4,23 242:8,10
242:17,20,22 243:15,21

244:17 246:17
**worked** 16:18,20,22,22 17:3
17:7,22 19:13 69:3,8 73:21
103:15 153:11 161:5
162:11,17,24 184:9
**worker** 105:20
**working** 14:16 16:16 17:12
18:7 27:9 29:10,15 35:25
83:7 85:2 88:20 103:18
182:19,23,25 201:20
220:24 225:22
**works** 47:9 196:3
**world** 36:2,8
**worry** 34:3
**wouldn't** 46:22 61:1 68:25
112:10 157:20 203:7
221:13 230:8 238:13,13
**wrap** 74:18
**write** 13:12 63:23 64:17
112:8,9,10 179:12 183:3
184:16 187:4 209:19
219:14
**writes** 193:21
**writing** 107:2 193:16
**written** 13:2 98:16 104:8
115:7 180:8 221:1,4
**wrong** 216:8 229:8 232:12
232:12
**wrote** 60:25 185:21 187:20
187:22 188:1,15,16 192:13
220:1,23

**X**

**X** 4:1
**Xcelion** 181:17
**XM** 55:19,19,21,23 56:2
**Xmail** 155:3,3,4,23 158:3,15
158:16 160:3 163:5,18,20
165:7,15 169:16 170:2,3
172:7 176:4,17 180:22,24
181:3 182:4,8 186:5,19
189:13 191:19 192:4
195:21 196:4,9 206:1,7,14
**Xmailed** 159:21
**XMeridian** 69:14
**XMY** 214:3
**Xphone** 5:2 72:19 75:1,6
76:2,5 77:7,18,18 154:24
155:3 158:16 163:6 165:20
170:1,8 172:5,16 173:13
176:6 179:14 180:20,22
181:5 195:10,17 196:23
198:8,11 200:14,18 202:12
202:17 205:12,18 208:11
208:22 209:8 216:4 217:22

222:15
**XPhones** 72:22,24,25 75:23
155:5 157:6,7 159:9
176:21 216:11,21 222:12
222:21

**Y**

**Y-O-U-R-B-I-Z** 69:25
**yeah** 10:25 17:9,17 19:7
21:15,15 22:5,5 24:7,11,11
25:5,10,19 27:7,7 32:5
33:23 34:1 35:12,12 36:11
37:1,1,23 38:14 39:4,4,4,4
39:14 40:21,21,21,24 42:6
42:14,18 43:19 44:5,12,17
44:17,21 45:7,7,12,12,15
46:15,15 47:21,21,25
49:15 51:17,17,23 52:1,23
52:23 53:7,11,21 54:24,24
55:20 57:3,20 59:19 60:14
60:14 61:7 65:11 66:8,22
67:2,9,12 68:9 69:20,20,23
70:5,18,18,20 71:4,6,10,18
71:23 72:2,2,5,20,25 73:3
73:10,14 74:8,10,13,22
75:14,16 79:12,20,20,22
79:24 80:8,8,15,20,23
81:23 83:9,16 84:9 85:9,22
86:3,14 87:6 88:2 89:4,4
91:13 97:20 99:21 100:2,7
100:10 101:2,8,17,17
102:6,21,23 104:1 105:2
106:19 107:15,18 108:1
109:11,14 116:20,23
117:21 120:17,21 123:4
127:22 129:10,14,17 135:5
139:3,13,23 140:2 141:14
144:6 145:4,10,10 146:11
146:11,14,25 147:3 148:1
149:7 150:13,13 153:9
155:9,24 156:6,6,24 157:8
158:24,25 160:22 161:2
163:22,22 164:24 166:16
166:16 167:13,13,17 168:4
168:18,18 169:2 170:9,12
170:14 171:6,19,19,23,23
172:1,18 174:2,2,4,12,12
174:15 177:8 178:8,14
179:5,5,7,16,16,16,20
180:21 181:2,4 182:9,11
182:17 183:15,25 184:6,23
185:11,11,16 186:19 187:9
187:15,15 188:9,9,16
190:18 192:9,14,14,14,23
192:23 193:2,4,6,8,19,19

Fedir Nikolayev
2/2/2023

22

196:5,5,11,24,24 198:13
199:7,11 201:14 202:23
206:2,22,25 207:3 209:3,6
209:9,13,16 214:17 216:15
217:1,9 219:13,13,16
220:6 223:3,3,21 225:1,24
226:1 229:1 230:11,13
231:2,15 232:21 233:16,16
236:10,17 237:13 238:7
241:12,14 243:12,12 245:2
246:15,15,22 247:8
**year** 21:11 24:6 35:4 50:3,3
50:4,25 51:17,18,22 53:17
58:12 129:6 230:16,18
231:5,8
**yearly** 52:25
**years** 20:5 21:14 24:22 25:9
89:20,25 183:5 226:3
228:11,14 236:16 237:11
237:12
**Yep** 114:12,15 143:19
160:20 176:18
**York** 1:11 2:23,23 3:4 9:12
**Yourbiz** 69:25
**Yvonne** 1:6 2:8 7:19 27:21
35:1,2 38:13 47:2 48:2
60:4 75:5 76:6,7,17 164:3
164:4,5,7,9,9,13,21 165:7
165:15 170:13,19,21 171:3
171:25 182:13,19,22 183:6
183:9,11 184:2,7,22,22,25
185:8,14,15,20,22 187:5
187:10,13,18,18,20,22
188:1 190:3,8,9 212:5,23
216:2 219:5,14,21,24,25
220:3,5,10,19 221:2
**Yvonne's** 76:13 164:22

**Z**

**ZACHARIA** 3:3
**Zack** 3:3 8:1 9:5,8 249:3,5
**Zambataro** 1:25 253:6,17
**zchibane@spearsimes.c...**
3:5
**zero** 242:14
**ZHIYING** 1:6
**Zoom** 230:3

**0**

**00121213-3** 250:4
**004-122-761-4488** 120:16
**02110** 2:5,11,13
**04.01.17** 114:2
**050-** 250:3
**09.07** 131:8

**1**

**1** 68:2
**1,750,000** 143:17 144:3
**1,800** 171:4,7,13,18
**1.2** 135:4
**1.75** 144:12
**1/6** 140:9
**1/6/2014** 139:23,25
**1:17** 153:21
**1:18** 153:25
**1:28** 153:25
**1:29** 154:6
**10** 169:19 205:12,19 208:11
208:23
**10,000** 79:4
**10:28** 172:21
**10:55** 52:5
**10:56** 52:7
**100** 47:9
**10004** 2:23
**10017** 3:4
**102** 166:17,21,22 167:3,7,15
167:25
**108** 4:12
**11** 4:3 97:18 134:18 192:12
**11/5/2015** 180:2
**11:03** 52:10
**11:04** 52:8
**11:19** 174:6
**11:20** 160:19
**112** 4:13
**115** 4:14
**118** 4:15
**12** 174:6
**12/15/15** 5:7
**12/21/12** 5:11
**12:08** 104:18,20
**12:16** 104:23
**12:17** 104:21
**121** 4:17
**124** 4:18
**125** 2:10,12 4:19
**126** 4:18 125:6
**13** 195:16 198:8
**136** 4:20
**13th** 123:2
**14** 208:12,23
**141** 4:22 146:19
**147** 4:23
**14th** 123:1
**15** 132:1,2 176:7 253:19
**150** 37:23
**151** 4:10
**154** 4:24
**156** 146:1,4,20,21 147:1

**157** 4:25
**158** 4:22
**159** 142:6
**16** 14:4,6
**163** 5:2
**165** 5:3
**169** 5:4
**17** 4:10 150:22,23 151:3
163:7,19 190:2 221:24
228:5 250:4
**172** 5:5,6
**175** 5:7
**17th** 91:3
**18** 4:11 94:8,12 96:10,17,20
107:1 155:6 200:15 202:13
**181** 5:8
**185** 5:9
**189** 5:10
**18th** 220:23
**19** 4:12 22:21 24:15 96:11
98:12 108:13,17 109:20
110:1
**191** 4:4 5:11
**194** 5:12
**197** 5:13
**1999** 103:8 104:5 105:5

**2**

**2** 1:22 6:2,11 68:2 77:22
156:21 157:18 172:21,23
173:3 253:10
**2-A** 97:3
**2:31** 204:19
**2:34** 205:7
**20** 4:13 21:14 24:22 25:9
112:14,18,21 113:9 115:18
231:21 233:17
**20-year** 28:21
**200** 5:14
**2000** 18:11 19:13 230:18
**2001** 105:18
**20036** 2:18
**2004** 21:12
**2005** 21:12
**2010** 58:13
**2011** 155:6
**2012** 96:2,12 98:12 158:4,17
158:20 160:18 163:7,19
165:8 192:12
**2012-01-19** 94:20
**2013** 129:3,6,12,16,19
130:12 131:18 133:6 166:5
167:7,16 195:10
**2014** 97:18 139:24 169:19
198:8 200:15 202:13

**205:12,19 208:12**
**2015** 44:24 172:7,21 173:14
174:6 176:7 222:11 223:5
**2016** 88:22 96:3 99:18 116:9
116:22 129:4,23
**2016-04-11** 108:21
**2016-04-28** 4:15
**2016-04-28_Gotama_Bre...**
118:14
**2017** 87:25 88:4 114:20
124:16 182:6,16,19 219:11
220:9
**2018** 22:20 23:1 24:8 91:2,2
91:3 186:9,15 187:4 188:7
189:16 190:2 220:13,22
**2019** 24:10 91:3,4,4 124:9
**202** 5:15
**202.719.7000** 2:18
**2020** 24:10 124:9
**2021** 230:18
**2023** 1:22 6:2,11 250:6,10
252:20 253:10,19
**204** 4:17 5:16 121:14
**2050** 2:17
**208** 5:17 127:15,16
**20th** 91:2,4
**21** 4:14 115:20,24 129:19
158:4,17 160:18 195:10
**21-cv-11276** 6:8
**21-cv-11276-WGY** 1:2
**212** 4:5
**212.202.2638** 2:23
**212.213.6996** 3:5
**22** 4:15 118:7,11 132:17
**22-cv-4674** 1:12 9:11
**227** 4:6
**23** 4:17 88:22 121:4,8,19
123:20 124:15
**239** 4:7
**23rd** 2:22 91:2
**24** 4:18 124:19,23 125:11
166:5 167:7,16
**242** 4:3
**24th** 2:5 91:3
**25** 4:19 125:24 126:3,24
130:8,11,15 189:16 220:22
**259** 4:19
**25th** 91:3
**26** 2:11,13 4:20 136:10,11
172:21
**27** 4:22 141:16,24 142:19
**27107** 126:25
**27203** 127:11
**27204** 127:13 129:9
**27205** 127:14,21

Fedir Nikolayev
2/2/2023

23

**27216** 128:18 130:18
**27217** 132:14
**27257** 133:3,20,21
**27258** 135:17
**27259** 126:9 135:17
**28** 4:23 116:22 147:8,12,25
  148:7,9
**28th** 116:9
**29** 4:24 132:17 151:20,21
  154:20,21 156:19
**2nd** 123:1 250:5,9

---
**3**
---
**3** 68:2 104:23 186:14 187:4
  220:13
**3,000** 38:1
**3:05** 197:17
**3:29** 188:7 247:24 248:1
**3:33** 249:6
**30** 4:25 13:13 132:17 151:25
  157:24 158:2 160:2
**31** 5:2 163:5,14,18
**31st** 53:17
**32** 5:3 165:18,22 169:5
**33** 2:5 5:4 152:23 169:11,15
**34** 5:5 172:3,12,16
**35** 5:6 173:5,9 238:2
**36** 5:7 175:24 176:3,17
  216:7,14,17 240:21
**37** 5:8 181:24 182:3 185:7
  219:10
**37,500** 148:14 149:1
**38** 5:9 185:25 186:4,12
  220:12
**39** 5:10 189:8,12 220:22
**3D** 134:7 135:18
**3rd** 123:1 186:9 188:6

---
**4**
---
**4** 68:2 77:22 154:7 156:21
  157:17,22 182:6,16,19
  219:11 220:9
**4/3/18** 5:9
**40** 5:11 191:24 192:3
**400** 6:15
**41** 5:12 195:3,7
**42** 5:13 198:2,6
**43** 5:14 15:13 200:8,12
**44** 5:15 202:8,9
**45** 5:16 204:21,25 205:10
  209:2
**46** 5:17 208:5,9
**476232905** 141:15
**4799** 250:2
**498217** 205:13

---
**5**
---
**5** 68:2 110:6,10,16
**50,000** 228:13
**54** 156:21
**5407** 114:11
**5413** 113:25 114:1
**5415** 113:13
**543148** 198:9
**55** 156:21
**562148** 202:14
**567849** 200:16

---
**6**
---
**6** 68:2
**60** 70:14,14,20
**617.423.0485** 2:12,14
**617.573.8904** 2:6
**617.573.8997** 2:6
**64** 222:4,9
**648586** 208:13
**695,511** 153:6,13

---
**7**
---
**7** 68:2 133:15,22 134:6
**7/25/18** 5:10
**7/4/17** 5:8
**7417** 238:6
**76** 5:2 76:12 163:7 172:22
  181:5 218:23
**767** 3:4
**77** 195:17 196:23,24,25
  197:17 198:11 200:18,21
  201:13 202:2,19,21,25
  203:19 205:18 206:7 207:5
  207:9 209:8,10 210:3,12
  210:15
**77's** 209:17

---
**8**
---
**8** 205:19
**83** 151:20,24 152:1

---
**9**
---
**9** 131:16,18
**9:03:35** 176:7
**9:53** 1:24 6:3,12
**90** 2:22
**900,000** 152:9,15
**91** 152:24
**94** 4:11
**96** 15:19,23

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1260