# United States Court of Appeals
*for the*
# First Circuit

---

Case Nos. 24-1770,
24-1771, 24-1772,
24-1773, 24-1774

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

ZHIYING YVONNE GASARCH,

*Defendant-Appellant,*

FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS;
PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

---

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON IN CASE NO. 1:21-CV-11276-WGY,
HONORABLE WILLIAM G. YOUNG, U.S. DISTRICT JUDGE

## JOINT APPENDIX
## Volume 3 of 8 (Pages A1261 to A1812)

STEPHEN G. TOPETZES
NEIL T. SMITH
ROBERT S. SILVERBLATT
K&L GATES LLP
*Counsel for Defendant-Appellant*
*  Paul Sexton*
1601 K Street, NW
Washington, DC 20006
(202) 778-9000

MICHAEL TREMONTE
SHER TREMONTE
*Counsel for Defendant-Appellant*
*  Mike K. Veldhuis*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

---

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (336840)

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

MIKE K. VELDHUIS,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

---

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

PAUL SEXTON,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

---

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

COURTNEY KELLN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
MIKE K. VELDHUIS; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

---

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

JACKSON T. FRIESEN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; PAUL SEXTON;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

FRANK SCADUTO
KEVIN B. MUHLENDORF
WILEY REIN LLP
*Counsel for Defendant-Appellant*
*Courtney Kelln*
2050 M Street, NW
Washington, DC 20036
(202) 719-7000


MARANDA FRITZ
MARANDA E. FRITZ PC
521 5th Avenue
17th Floor
New York, New York 10175
(646) 584-8231


TIMOTHY J. FAZIO
MANNING GROSS + MASSENBURG LLP
125 High Street
Oliver Street Tower, 6th Floor
Boston, Massachusetts 02110
(617) 670-8800


*Counsel for Defendant-Appellant*
*Jackson T. Friesen*

DANIEL STAROSELSKY
ASSISTANT GENERAL COUNSEL
KERRY J. DINGLE
SENIOR APPELLATE COUNSEL
U.S. SECURITIES & EXCHANGE
    COMMISSION
*Counsel for Plaintiff-Appellee*
100 F Street, NE
Washington, DC 20549
(202) 551-6953

KAREN A. PICKETT
PICKETT LAW OFFICES, PC
*Counsel for Defendant-Appellant*
*Zhiying Yvonne Gasarch*
125 High Street, 26th Floor
Boston, Massachusetts 02110
(617) 423-0485

# TABLE OF CONTENTS

**Page**

Docket Entries ......................................................................................... A1

Complaint, filed August 5, 2021 (Dkt. 1) ......................................... A55

    Exhibit A: Hearing dated August 29, 2019 ........................... A136

    Exhibit B: Foot Loose Charlie Smith's Offshore Chronicles ............... A143

    Exhibit C: Invoice ................................................................... A144

    Exhibit D: E-Mail Correspondence ....................................... A148

    Exhibit E: Q Account .............................................................. A184

    Exhibit F: Q Bank Broker: Work ........................................... A191

    Exhibit G: Peaceful Lion Holdings Limited.......................... A194

    Exhibit H: Wire Transfer ........................................................ A211

    Exhibit I: Securities and Exchange Commission, Schedule 13D/A....... A212

    Exhibit J: Chart ...................................................................... A217

    Exhibit K: August 19, 2013, Treasury Order ....................... A220

    Exhibit L: Portfolio Valuation 790-1 .................................... A248

Declaration of Trevor T. Donelan, filed August 5, 2021................... A275

Civil Cover Sheet ................................................................................. A310

Plaintiff's Emergency *Ex Parte* Motion for a Temporary Restraining Order, Order Freezing Assets and Order for Other Equitable Relief, filed August 5, 2021 (Dkt. 3) ........................................................... A311

[Proposed] Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief, filed August 5, 2021 ................... A313

Plaintiff's Memorandum of Law in Support of its Emergency *Ex Parte* Motion for a Temporary Restraining Order, Order Freezing Assets, and Other for Equitable Relief, filed August 5, 2021 (Dkt. 4).............. A323

Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief, filed August 6, 2021 (Dkt. 7) ...................... A358

**Page**

[Proposed] Preliminary Injunction Order, order Freezing Assets, and Order
for Other Equitable Relief, filed August 20, 2021 (Dkt. 39).................. A368

Transcript of Motion Hearing Held on January 20, 2022, filed January 25,
2022 (Dkt. 193)........................................................................ A380

Final Judgment as to Defendant Frederick L. Sharp, filed May 12, 2022
(Dkt. 211)............................................................................... A407

Memorandum and Order, filed September 6, 2022 (Dkt. 228) ........................ A420

Amended Complaint, filed September 9, 2022 (Dkt. 230)............................... A524

Defendant Paul Sexton's Answer to Amended Complaint and Affirmative
Defenses, filed September 23, 2022 (Dkt. 242) ..................................... A616

Defendant Mike K. Veldhuis Verified Answer to Verified Amended
Complaint, filed September 23, 2022 (Dkt. 244) ................................... A652

Defendant Courtney Kelln's Answer to Amended Complaint, filed
September 30, 2022 (Dkt. 245) ............................................................ A702

Defendant Zhiying Yvonne Gasarch's Anser to Amended Complaint and
Affirmative Defenses, filed October 7, 2022 (Dkt. 246)....................... A738

Answer of Defendant Jackson T. Friesen to Amended Complaint, filed
October 14, 2022 (Dkt. 247).................................................................... A848

Declaration of Roger Knox, filed April 17, 2023 (Dkt. 274) .......................... A950

Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the
Proceedings, filed May 2, 2023 (Dkt. 280) ............................................. A959

Memorandum of Law in Support of Defendants Mike K. Veldhuis and
Courtney Kelln's Motion to Stay the Proceedings, filed May 2, 2023
(Dkt. 281)................................................................................. A962

Declaration of Robert Knuts, filed may 2, 2023 (Dkt. 282) ............................ A988

Exhibit A: Email correspondence dated February 8, 2022 ................... A990

Exhibit B: Email exchange involving AUSA Drabick and Kevin
Muhlendorf, counsel for defendant Courtney Kelln, dated
February 8, 2022 through February 11, 2022 .............................. A994

**Page**

Exhibit C: Email dated February 17, 2023, from AUSA Drabick to counsel for Mr. Veldhuis, Michael Tremonte and Noam Biale... A997

Exhibit D: Email dated March 17, 2023, from SEC Attorney Kathleen Shields ...................................................................... A1014

Exhibit E: Notice of Civil Claim that the Securities and Exchange Commission filed in the Supreme Court of British Columbia on August 11, 2022 ........................................................ A1020

Exhibit F: Reasons for Judgment issued by the Supreme Court ofBritish Columbia on March 21, 2023 ................................. A1031

Exhibit G: SEC's Responses and Objections to Defendant Courtney Kelln's First Requests for Admissions dated March 17, 2023 . A1061

Defendant Paul Sexton's Notice of Joinder, filed May 8, 2023 (Dkt. 286) . A1079

Plaintiff's Opposition to Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 9, 2023 (Dkt. 289) ......... A1082

Exhibit A: Application Response ....................................................... A1096

Electronic Order, filed May 15, 2023 (Dkt. 292) ........................................ A1101

Defendants Courtney Kelln and Mike Veldhuis' Notice of Non-Opposition to Entry of Judgment, filed June 13, 2023 (Dkt. 315)...................... A1102

[Proposed Order Entering] Judgment as to Defendant Courtney Kelln, filed June 13, 2023 ................................................................... A1106

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 13, 2023 ................................................................... A1112

Plaintiff's Response to Kelln's and Veldhuis's Notice of Non-Opposition to Entry of Judgment, filed June 14, 2023 (Dkt. 316) .......................... A1118

Order Entering Judgment s to Defendant Courtney Kelln, filed June 14, 2023 (Dkt. 317)........................................................................ A1121

Notice of Corrected Filing Regarding Defendant Mike Velhuis' Notice of Non-Opposition of Entry of Judgment, filed June 14, 2023 (Dkt. 318) ................................................................... A1127

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 14, 2023 ................................................................... A1130

**Page**

Notice of Corrected Filing Regarding Defendant Mike Veldhuis' Notice of Non-Opposition to Entry of Judgment, filed June 15, 2023 (Dkt. 319) .................................................................................... A1137

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 15, 2023 ................................................................ A1140

Judgment as to Defendant Mike Veldhuis, filed June 21, 2023 (Dkt. 325) ... A1147

Defendant Jackson T. Friesen's Motion in Limine to Exclude "Q" Records and Purported Expert Testimony, filed August 10, 2023 (Dkt. 329)... A1154

Order, filed August 10, 2023 .................................................... A1167

Yvonne Gasarch's Motion in Limine to Exclude "Q" Records and Purported Expert Testimony, filed August 24, 2023 (Dkt.. 334)......................... A1168

    Exhibit 1: Deposition of Fedir Nikolayev ........................... A1174

Plaintiff's Opposition to Defendant Jackson T. Friesen's Motion to Exclude "Q" Records and Purported Expert Testimony, filed August 25, 2023 (Dkt. 336).................................................................... A1261

    Exhibit 1: Declaration of Ryan Murphy ............................. A1279

    Exhibit 2: Deposition of Written Questions of Zhiying Yvonne Gasarch .............................................................. A1285

Defendant Paul Sexton's Motion in Limine to Exclude Q System and Associated Data, fled August 31, 2023 (Dkt. 338) ..................... A1323

    Exhibit 1: Deposition of Fedir Nikolayev ........................... A1336

Transcript of Motion Hearing, filed September 1, 2023 (Dkt. 344).............. A1356

Yvonne Gasarch's Motion to Supplement Her Motion in Limine filed on August 24, 2023, filed September 1, 2023 (Dkt. 346) ..................... A1377

Plaintiff's Opposition to Defendants Sexton's and Gasarch's Motions to Exclude Expert Testimony, filed September 4, 2023 (Dkt. 350)......... A1379

    Exhibit A: Expert Witness Report of Philip A. Feigin .................. A1385

    Exhibit B: Government's Trial Memorandum, Response to Defendants' Motion in Limine, and Supplemental 404(b) Notice ....... A1395

**Page**

Plaintiff's Opposition to Defendant Yvonne Gasarch's Motion in Limine to
Exclude "Q" Records and Purported Expert Testimony, filed
September 5, 2023 (Dkt. 352) ............................................................ A1422

Plaintiff's Opposition to Defendant Paul Sexton's Motion in Limine to
Exclude "Q" System and Associated Data, filed September 5, 2023
(Dkt. 353)........................................................................................... A1426

    Exhibit A: Securities and Exchange Commission B03147 Analysis of
    MySQL Databases, Summary of Accounts ............................... A1439

    Exhibit B: Summary of Transfer Agent Records – Acquisitions of
    Stevia First, Vitality Stock ....................................................... A1454

    Exhibit C: Q Account Detail ................................................................ A1455

    Exhibit D: Revised Deposition on Written Questions of Paul Sexton . A1456

    Exhibit E: Wire Transfer ..................................................................... A1524

    Exhibit F: E-Mail Correspondence...................................................... A1527

    Exhibit G: E-Mail Correspondence..................................................... A1528

    Exhibit H: E-Mail Correspondence..................................................... A1529

Defendant Paul Sexton's Notice of Non-Opposition to Entry of Judgment,
filed September 11, 2023 (Dkt. 376) .................................................. A1530

[Proposed] Order Entering Judgment as to Defendant Paul Sexton, filed
September 11, 2023 ............................................................................. A1533

Order Entering Judgment as to Defendant Paul Sexton, filed September 12,
2023 (Dkt. 378).................................................................................. A1535

Order, filed September 19, 2023 (Dkt. 385) ..................................................... A1537

Yvonne Gasarch's Motion in Limine to Preclude Admission of Exhibit QK,
filed September 21, 2023 (Dkt. 389) .................................................. A1542

    Exhibit 1: Summary of Gasarch Earnings ........................................... A1544

Yvonne Gasarch's Motion to Strike Evidence that the Court Admitted De
Bene Pursuant to Fed. R. Evid. 801(d)(2)(E), filed September 25,
2023 (Dkt. 394)................................................................................. A1545

Yvonne Gasarch's Motion Pursuant to Fed. R. Civ. P. 50 for Judgment as a
Matter of Law, filed September 25, 2023 (Dkt. 395).......................... A1548

**Page**

Verdict, filed September 27, 2023 (Dkt. 402) .................................................. A1553

Yvonne Gasarch's Renewed Motion Pursuant to Fed. R. Civ. P. 50 for
    Judgment as a Matter of Law or, in the Alternative, for a New Trial,
    filed October 25, 2023 (Dkt. 413) .......................................................... A1555

Electronic Order, filed October 26, 2023 (Dkt. 414)...................................... A1564

Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the
    Proceedings, filed December 5, 2023 (Dkt. 421) ................................. A1565

Memorandum of Law in Support of Defendants Mike K. Veldhuis and
    Courtney Kelln's Motion to Stay the Proceedings, filed December 5,
    2023 (Dkt. 422).................................................................................... A1569

Declaration of Robert Knuts, filed December 5, 2023 (Dkt. 423) ............... A1592

    Exhibit 1:Affidavit dated November 17, 2023 executed by Assistant
        United States Attorney James R. Drabick................................ A1594

    Exhibit 2: Email correspondence dated February 8, 2022 ................. A1726

    Exhibit 3: Email dated February 17, 2023 , from AUSA Drabick to
        counsel for Mr. Yeldhuis, Michael Tremonte and Noam Biale A1730

    Exhibit 4: Email dated March 17, 2023, from SEC Attorney ............ A1747

Plaintiff's Motion for Remedies Against Defendants Mike Veldhuis, Paul
    Sexton, Jackson Friesen, Courtney Kelln and Zhiying Yvonne
    Gasarch, filed December 8, 2023 (Dkt. 425)...................................... A1753

Final Judgment as to Defendant Jackson T. Friesen, filed December 8,
    2023 ..................................................................................................... A1756

Final Judgment as to Defendant Yvonne Gasarch, filed December 8, 2023 A1769

Final Judgment as to Defendant Paul Sexton, filed December 8, 2023 ....... A1779

Final Judgment as to Defendant Mike K. Veldhuis, filed December 8,
    2023 ..................................................................................................... A1791

Final Judgment as to Defendant Courtney Kelln, filed December 8, 2023.. A1804

Plaintiff's Memorandum in Support of Motion for Remedies Against
    Defendants Mike Veldhuis, Paul Sexton, Jackson Friesen, Courtney
    Kelln, and Zhiying Yvonne Gasarch, filed December 8, 2023 (Dkt.
    426) ..................................................................................................... A1813

**Page**

Exhibit A: Transcript of September 27, 2023 Jury Charge ................ A1845

Exhibit B: Government's Notice of Anticipated Restitution Request
and Motion for Continuance ....................................... A1890

Declaration of Ryan Murphy, filed December 8, 2023 (Dkt. 427) ............. A1902

Exhibit 1: ACCO / ACC1 Q Account Detail.................................... A1916

Exhibit 2: HEAR Q Account Detail .................................. A1941

Exhibit 3: GARD Q Account Detail.................................... A1956

Exhibit 4: Chart.................................................... A1972

Exhibit 5: Wire Transfer.................................... A2141

Exhibit 6: Wire Transfer.................................... A2142

Exhibit 7: Wire Transfer.................................... A2143

Exhibit 8: Wire Transfer.................................... A2144

Exhibit 9: Wire Transfer.................................... A2145

Exhibit 10: Wire Transfer.................................... A2147

Exhibit 11: E-mail Correspondence .................................. A2149

Exhibit 12: E-mail Correspondence .................................. A2150

Exhibit 13: E-mail Correspondence .................................. A2151

Exhibit 14: Wire Transfer.................................... A2152

Exhibit 15: Wire Transfer.................................... A2153

Exhibit 16: E-mail Correspondence .................................. A2154

Exhibit 17: E-mail Correspondence .................................. A2155

Exhibit 18: Wire Transfer.................................... A2168

Exhibit 19: Wire Transfer.................................... A2169

Exhibit 20: DGM Bank and Trust Inc. Statement of Account Activity
.................................................................. A2170

Exhibit 21: E-mail Correspondence .................................. A2171

Exhibit 22: E-mail Correspondence .................................. A2175

**Page**

Exhibit 23: Wire Transfer.......................................................... A2181

Exhibit 24: Text Messages ...................................................... A2182

Exhibit 25: Text Messages ...................................................... A2223

Exhibit 26: E-mail Correspondence ....................................... A2225

Exhibit 27: Invoice .................................................................. A2226

Exhibit 28: Wire Transfer......................................................... A2227

Exhibit 29: Wire Transfer......................................................... A2228

Exhibit 30: E-mail Correspondence ....................................... A2229

Exhibit 31: Invoice .................................................................. A2230

Exhibit 32: Bank Statement..................................................... A2235

Exhibit 33: Veldhuis PJI Backup............................................. A2237

Plaintiff's Opposition to Defendants Mike K. Veldhuis and Courtney Kelln's
     Second Motion to Stay the Proceedings, filed December 18, 2023
     (Dkt. 429).......................................................................... A2284

Final Pretrial Conference Transcript, filed January 24, 2023 (Dkt. 434)....... A2289

Jury Trial Transcript Day 1, filed January 24, 2024 (Dkt. 435) ..................... A2310

Jury Trial Transcript Day 2, filed January 24, 2024 (Dkt. 436) ..................... A2416

Jury Trial Transcript Day 3, filed January 24, 2024 (Dkt. 437) ..................... A2534

Jury Trial Transcript Day 4, filed January 24, 2024 (Dkt. 438) ..................... A2674

Jury Trial Transcript Day 5, filed January 24, 2024 (Dkt. 439) ..................... A2772

Jury Trial Transcript Day 6, filed January 24, 2024 (Dkt. 440) ..................... A2865

Jury Trial Transcript Day 7, filed January 24, 2024 (Dkt. 441) ..................... A2946

Jury Trial Transcript Day 8, filed January 24, 2024 (Dkt. 442) ..................... A3103

Motion and Charge Conference Transcript, filed January 24, 2024 (Dkt.
     443) .................................................................................. A3273

Jury Trial Transcript Day 9, filed January 24, 2024 (Dkt. 444)..................... A3331

Jury Trial Transcript Day 10, filed January 24, 2024 (Dkt. 445).................. A3458

**Page**

Electronic Order, filed February 7, 2024 (Dkt. 451) ...................................... A3469

Defendant Paul Sexton's Opposition to Motion for Remedies, filed February 14, 2024 (Dkt. 454).............................................................................. A3470

Defendant Courtney Kelln's and Mike K. Veldhuis's Opposition to Plaintiff SEC's Motion for Remedies Against Defendants Veldhuis, Sexton, Friesen, Kelln, and Gasarch, filed February 14, 2024 (Dkt. 455)........ A3491

Defendants Mike K. Veldhuis and Courtney Kelln's Motion for Reconsideration, filed February 16, 2024 (Dkt. 456)............................ A3495

Memorandum of Law in Support of Veldhuis and Kelln's Motion for Reconsideration of the Second Motion to Stay, filed February 16, 224 (Dkt. 457)............................................................................................ A3499

Declaration of Robert Knuts, filed February 16, 2024 (Dkt. 458) ............... A3505

   Exhibit 1: Indictment filed January 9, 2024 ...................................... A3506

Defendant Paul Sexton's Motion for Stay, filed February 20, 2024 (Dkt. 459) ................................................................................................ A3544

Electronic Order Denying Motion for Reconsideration, filed February 20, 2024 (Dkt. 460)................................................................................... A3547

Defendant Yvonne Gasarch's Opposition to SEC's Remedies Motion, filed February 21, 2024 (Dkt. 464) ............................................................. A3548

   Exhibit 1: Q System Data .................................................................. A3566

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against Defendants Paul Sexton, Mike Veldhuis, and Courtney Kelln, filed March 1, 2024 (Dkt. 470) .................................................................... A3587

   Exhibit A: E-Mail Correspondence .................................................... A3602

   Exhibit B: Wire Transfer .................................................................... A3604

   Exhibit C: DGM Band and Trust Inc. Statement of Account Activity ..................................................................................... A3606

   Exhibit D: E-Mail Correspondence .................................................... A3610

   Exhibit E: E-Mail Correspondence.................................................... A3617

Defendant Jackson Friesen's Opposition to Plaintiff's Motion for Remedies, filed March 1, 2024 (Dkt. 471).......................................................... A3620

ix

**Page**

Defendant Paul Sexton's Sur-Reply Regarding Motion for Remedies, filed March 6, 2024 (Dkt. 473) .................................................................. A3633

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against Defendant Yvonne Gasarch, filed March 7, 2024 (Dkt. 474) ............ A3641

    Exhibit A: Wire Transfer ..................................................... A3655

    Exhibit B: Wire Transfer ..................................................... A3656

    Exhibit C: Wire Transfer ..................................................... A3657

    Exhibit D: Information Return for Electronic Filing of An Individual's Income Tax and Benefit Return ................................ A3658

    Exhibit E: Officers and Directors Enquiry ........................... A3661

    Exhibit F: Wire Transfer ..................................................... A3666

    Exhibit G: Wire Transfer ..................................................... A3668

    Exhibit H: Letter dated April 21, 2018................................. A3671

    Exhibit I: Wire Transfer ...................................................... A3672

    Exhibit J: Bank Statement ................................................... A3673

    Exhibit K: Chart.................................................................. A3674

    Exhibit L: Assignment........................................................ A3676

    Exhibit M: E-mail Correspondence ..................................... A3681

Declaration of Christopher Beckstrom, filed March 7, 2024 (Dkt. 475)...... A3695

    Exhibit 1: E-Mail Correspondence ..................................... A3698

    Exhibit 2: E-Mail Correspondence ..................................... A3699

    Exhibit 3: E-Mail Correspondence ..................................... A3700

Declaration of Ryan Murphy, filed March 7, 2024 (Dkt. 476).................... A3701

    Exhibit 1: Summary of Cash Withdrawals .......................... A3704

    Exhibit 2: Summary of Cash Withdrawals .......................... A3706

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against Defendant Jackson Friesen, filed March 14, 2024 (Dkt. 480) ........... A3710

**Page**

Defendant Yvonne Casarch's Sur-Reply to SEC's Reply to her Opposition to SEC's Remedies Motion, filed March 15, 2024 (Dkt. 481)........... A3715

Plaintiff's Proposed Judgments Against Defendants Veldhuis, Sexton, Friesen, Kelln and Gasarch, filed May 10, 2024 (Dkt. 485) .............. A3723

Judgment as to Defendant Mike K. Veldhuis, filed May 10, 2024 ............ A3725

Judgment as to Defendant Paul Sexton, filed May 10, 2024...................... A3733

Judgment as to Defendant Jackson T. Friesen, filed May 10, 2024 ............. A3741

Judgment as to Defendant Courtney Kelln, filed May 10, 2024 ................. A3749

Judgment as to Defendant Yvonne Gasarch, filed May 10, 2024 ............... A3756

Yvonne Gasarch's Objections to SEC's Proposed (Partial) Judgment, filed May 20, 2024 (Dkt. 486) ....................................................... A3762

Plaintiff's Response to Defendant Zhiying Yvonne Gasarch's Objections to SEC's Proposed Judgment, filed may 20, 2024 (Dkt. 487) ................ A3766

Defendant Paul Sexton's Objections to Proposed Judgment, filed May 20, 024 (Dkt. 488)........................................................................ A3769

Defendant Jackson Friesen's Objections to Plaintiff's Proposed Judgment, filed May 20, 2024 (Dkt. 489)................................................. A3773

Objections by Defendants Veldhuis and Kelln to Proposed Partial Judgments Against Veldhuis and Kelln Submitted by Plaintiff Securities and Exchange Commission, filed May 20, 2024 (Dkt. 490)...................... A3782

Transcript of Disgorgement, filed May 23, 2024 (Dkt. 491)........................ A3787

Memorandum and Order, filed June 17, 2024 (Dkt. 494) .............................. A3823

Judgment as to Defendant Paul Sexton, filed June 20, 2024 (Dkt. 495) ........ A3886

Judgment as to Defendant Mike K. Veldhuis, filed June 20, 2024 (Dkt. 496)............................................................................ A3896

Judgment as to Defendant Jackson T. Friesen, filed June 20, 2024 (Dkt. 497) ........................................................................... A3907

Judgment as to Defendant Yvonne Gasarch, filed June 20, 2024 (Dkt. 498) A3917

Judgment as to Defendant Courtney Kelln, filed June 20, 2024 (Dkt. 499) .. A3925

**Page**

Motion for Orders Directing the Turnover of Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 (Dkt. 500)................... A3935

[Proposed] Order Directing Transfer of Jackson T. Friesen's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........ A3940

[Proposed] Order Directing Transfer of Yvonne Gasarch's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3947

[Proposed] Order Directing Transfer of Courtney Kelln's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3952

[Proposed] Order Directing Transfer of Paul Sexton's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ................. A3955

[Proposed] Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3961

Defendant Jackson Friesen's Objections to Judgment, Motion to Amend, Clarify or Correct Judgment and Opposition to Motion for Turnover Order, filed July 2, 2024 (Dkt. 501) .................................................... A3968

Defendant Paul Sexton's Opposition to Motion for Orders Directing the Turnover of Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 (Dkt. 502) ..................................... A3974

Defendant Courtney Kelln's Notice of Joinder, filed July 3, 2024 (Dkt. 503) ................................................................................... A3977

Defendant Yvonne Gasarch's Notice of Joinder, filed July 3, 2024 (Dkt. 504) ................................................................................... A3979

Defendant Paul Sexton's Notice of Joinder, filed July 3, 2024 (Dkt. 505) .... A3981

Defendant Mike K. Veldhuis's Notice of Joinder, filed July 3, 2024 (Dkt. 506) ................................................................................... A3984

Plaintiff's Opposition to Defendants' Motions to Amend, Clarify or Correct Judgment, filed July 15, 2024 (Dkt. 507)........................................ A3986

Electronic Order Allowing Motion for Release of Funds, filed July 11, 2024 (Dkt. 508)........................................................................ A3990

Order Directing Transfer of Jackson T. Friesen's Frozen Funds to the Securities and Exchange Commission, filed July 11, 2024 (Dkt. 509) ................................................................................... A3991

336840_tst_ind

xii

**Page**

Order Directing Transfer of Yvonne Gasarch's Frozen Funds to the
    Securities and Exchange Commission, filed July 11, 2024 (Dkt.
    510) ................................................................... A3998

Order Directing Transfer of Courtney Kelln's Frozen Funds to the Securities
    and Exchange Commission, filed July 11, 2024 (Dkt. 511)............. A4003

Order Directing Transfer of Paul Sexton's Frozen Funds to the Securities
    and Exchange Commission, filed July 11, 2024 (Dkt. 512)............. A4006

Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to the
    Securities and Exchange Commission, filed July 11, 2024 (Dkt.
    513) ................................................................... A4012

Electronic Order re: Motion to Amend, filed July 16, 2024 (Dkt. 514)..... A4019

Defendant Paul Sexton's Motion to Stay Execution of Judgment, filed July
    18, 2024 (Dkt. 515).................................................... A4020

        Exhibit 1: E-mail Correspondence ................................. A4025

Motion of Defendants Mike Veldhuis and Courtney Kelln to Stay Execution
    of Judgment, filed July 19, 2024 (Dkt. 516)........................... A4029

Defendant Yvonne Gasarch's Motion to Stay Execution of Judgment, filed
    July 22, 2024 (Dkt. 517).............................................. A4035

        Exhibit 1: Order Made After Application ......................... A4045

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 518) A4054

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 519).... A4055

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 520).... A4056

Notice of Appeal by Zhiying Yvonne Gasarch, filed August 19, 2024 (Dkt.
    521) ................................................................. A4057

Notice of Appeal by Mike Veldhuis, filed August 19, 2024 (Dkt. 522) ........ A4059

Notice of Appeal by Courtney Kelln, filed August 19, 2024 (Dkt. 523) ....... A4061

Notice of Appeal by Paul Sexton, filed August 19, 2024 (Dkt. 524)............ A4063

Notice of Appeal by Jackson T. Friesen, filed August 19, 2024 (Dkt. 525) .. A4066

Plaintiff's Motion in Support of Distribution for the Benefit of Harmed
    Investors and Seeking and Order Establishing a Fair Fund, Appointing

**Page**

a Tax Administrator, and Authorizing Payment of Tax Obligations and Related Fees and Expenses of Tax Administrator Without Further Court Order, filed September 4, 2024 (Dkt. 537) ................................ A4068

[Proposed] Order Establishing a Fair Fund, Appointing a Tax Administrator, and Authorizing Payment of Tax Obligations and Related Fees and Expenses of the Tax Administrator Without Further Court Order, filed September 4, 2024 ................................................................................ A4071

Plaintiff's Memorandum of Law Describing Proposed Distribution Framework and in Support of Motion Seeking an Order Establishing a Fair Fund and Other Relief, filed September 4, 2024 (Dkt. 538) ........ A4074

Exhibit A: Order Approving Distribution Plan .................................... A4093

Exhibit B: Order Approving Plan of Distribution ................................ A4129

Exhibit C: Order Reclassifying Prejudgment Interest as Disgorgement, Appointing a Distribution Agent, and Approving a Distribution Plan for the Distribution Fund.................................................... A4160

Declaration of Dr. Thomas A. Dunn, filed September 4, 2024, filed September 4, 2024 (Dkt. 539) ........................................................ A4173

Appendix 1: Defendants' Monetary Remedies .................................... A4186

Appendix 2: Knox Restitution Fund, Losses by OTC Security Ticker  A4187

Appendix 3: Group 2 Tickers and Defendants .................................... A4188

Defendant Paul Sexton's Opposition to Motion for Fair Fund, filed September 16, 2024 (Dkt. 540) ............................................................ A4189

Defendant Jackson Friesen's Opposition to Motion for Fair Fund, filed September 16, 2024 (Dkt. 541) ............................................................ A4192

Defendant Yvonne Gasarch's Motion for Joinder, filed September 16, 2024 (Dkt. 542)............................................................................................ A4196

Defendant Courtney Kelln's Motion for Joinder, filed September 16, 2024 (Dkt. 543)............................................................................................ A4198

Defendant Mike K. Veldhuis's Notice of Joinder and Response to Motion, filed September 16, 2024 (Dkt. 544) .................................................... A4200

Electronic Order, filed September 18, 2024 (Dkt. 545) .................................. A4203

xiv

**Page**

Trial Exhibits:

Exhibit 14: Xphone between 2, 4 and 66......................................................... A4204

Exhibit 16: Ian Cooper's Special Report re Arch Therapeutics.................... A4205

Exhibit 17: Chuck Hughes Microcap Report (Conmar Capital) re Stevia First
$50 Billion Sugar ...................................................................... A4250

Exhibit 18: Xphone chain between 2, 3, 4 and 66 re Send ........................... A4262

Exhibit 40: E-mail from Wires to Nikolayev (FEN) re Wire please ........... A4264

Exhibit 45: Xphone chain between 2, 3, 4, 60 and Sexy re Summary ........ A4265

Exhibit 79: Xphone chain between Elgi, Wires and 19 ............................... A4266

Exhibit 81: Xphone chain between Bond, 104 and Blgx re Hiya................ A4268

Exhibit 87: Xphone chain between 2, 3 and 4 re Meeting........................... A4304

Exhibit 90: Xphone chain between Bond and Wires re Cash...................... A4305

Exhibit 99: Xphone chain between Gard, Celt and 2 re ARW .................... A4306

Exhibit 113: Xphone chain between 2, 3, and 4 re Copy ............................ A4307

Exhibit 126: Xphone between Gard and Kash re Yo ................................... A4308

Exhibit 134: Xphone chain between 2, 3, and 4 re Rights .......................... A4309

Exhibit 136: Xphone chain between 2, 3, and 4 re Today........................... A4311

Exhibit 140: Xphone from 4 to 2 ................................................................. A4314

Exhibit 141: Xphone chain between 2, 3, and 4 ......................................... A4315

Exhibit 151: Xphone chain between Wires and 19 ELGI .......................... A4316

Exhibit 154: Xphone from GARD to KASH and ACCO re Yo.................. A4318

Exhibit 157: Xphone chain between Wires, Kash and Celt re Wire to
Business Venture Investments.............................................. A4319

Exhibit 168: Xphone chain between Peace, 77, Lion and Wires re Hi ....... A4320

Exhibit 170: Xphone chain between 2, 3 and 114 re There you have it...... A4321

Exhibit 180: Xphone chain between Wires, Bond, Luna and Alex 110 re
Remo.................................................................................. A4322

**Page**

Exhibit 183: Xphone between 2 and 98 re Test ............................................ A4323

Exhibit 184: Xphone chain between Fen, Wires and 76 re Where r u ........ A4324

Exhibit 190: Xphone chain between 2 and 4 re Test ................................... A4326

Exhibit 193: Xphone chain between 76, Fen and Wires re Xvoice ............. A4327

Exhibit 233: Beckstrom Xphone Header Spreadsheet ................................. A4329

Exhibit 237: Xmail message from Wires (xMeridian) to Friesen re 2 Wires
    to Go Out ........................................................................ A4384

Exhibit 239: Xmail message from Wires to Friesen re 2 Wires to go out ... A4385

Exhibit 261: Xmail messages between Friesen, "acco" and "hear" re NA . A4387

Exhibit 273: Xmail message from Friesen to Acco and Hear re creative with
    attachments ......................................................................... A4391

Exhibit 284: Establishment of the beneficial owner's identity for Peregrine
    Capital .................................................................................. A4412

Exhibit 286: E-mail from Riverfall Group to Silverton Ops re wire 129k to
    Greenberg with attachments showing metadata ............................... A4413

Exhibit 287: E-mail from Hilton Capital to Wintercap Operations re wire
    CAD100016 to Sun Life with attachments ....................................... A4518

Exhibit 288: Text messages between Friesen, Knox, and Threema with
    photos of Cristal bottles and SUB Penny $ ..................................... A4523

Exhibit 289: Threema chats ......................................................................... A4534

Exhibit 290: Friesen cash collection for 9k EUR ....................................... A4536

Exhibit 292: Murphy Summary charts summarizing transfers of Arch
    Therapeutics stock ............................................................... A4537

Exhibit 293: MDDD Q Account Details ...................................................... A4538

Exhibit 295: ARTH Q Account Details ....................................................... A4546

Exhibit 296: STVFVBIO Q Account Details .............................................. A4560

Exhibit 298: STEV Q Account Details ........................................................ A4583

Exhibit 299: LBY and PBAV Q Account Details ....................................... A4594

Exhibit 306: RIHT & RIH1 Q Account Details .......................................... A4605

**Page**

Exhibit 307: Murphy Summary charts summarizing sales of the Fourteen
Issuers' stock by year ........................................................................ A4619

Exhibit 308: Murphy Summary Charts showing sales of Fourteen Issuers'
securities based on Q system and brokerage account........................ A4620

Exhibit 310: Murphy Summary charts summarizing market trading based on
Blue Sheets in Stevia FirstVitality and Arch d................................. A4634

Exhibit 311: GARD Q reports .................................................................... A4635

Exhibit 313: Murphy Summary charts showing profit allocations to the Q
accounts of Veldhuis, Sexton and Friesen ........................................ A4651

Exhibit 314: Summary chart of allocations to PEAC PERE account.......... A4659

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>                                    **Plaintiff,**<br>     **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>                                    **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT JACKSON T. FRIESEN'S MOTION
TO EXCLUDE "Q" RECORDS AND PURPORTED EXPERT TESTIMONY**

Defendant Friesen moves *in limine* (ECF No. 329[1]) to exclude evidence contained in an electronic database maintained by Frederick Sharp[2] (the "Q system") which recorded purchases and sales of stock on Friesen's behalf and distributions of trading proceeds to Friesen and others at Friesen's direction. While Friesen makes passing reference to the xPhone and xMail messages retrieved from the Curacao servers, he makes no related arguments about why he thinks those communications should be excluded. To the extent the issue is properly before the Court, Friesen's motion should be denied as to the xPhone and xMail messages for want of any argument or evidence on the subject. Friesen also seeks to exclude testimony from the

---

[1] "Br. at ___" refers to specific pages in Friesen's motion *in limine*, ECF No. 329.

[2] Friesen repeatedly refers to Sharp as a "fugitive." He is not. While Sharp chose to default in this action, he is actively litigating two related cases in Canada brought by the Commission to enforce this Court's judgment against his Canadian assets. *See SEC v. Sharp, et al.,* No. S226494 (British Columbia Supreme Court) and *SEC v. Sharp,* No. S225495 (British Columbia Supreme Court). The Commission agrees, however, with Friesen's characterization of Sharp as a "co-conspirator [and] criminal mastermind." Br. at 2.

A1261

Commission's expert witness, Philip A. Feigin, J.D. For the following reasons, Friesen's motion should be denied.

## A. Evidence Contained in Sharp's "Q" Database Is Reliable and Admissible.

There is no dispute that the FBI, working with authorities in Curacao, seized computer servers that housed three types of data—The Q accounting system, "xMail" electronic mail messages, and "xPhone" text messages. Br. at 2. All three categories of data were disclosed and made available to defendants in discovery. Neither Friesen nor any other defendant claims that the data seized in Curacao is not what the Commission says it is: Electronic records maintained by Sharp in the course of a conspiracy to profit from illegally buying and selling stock. FRE 901(a). Friesen instead maintains that (i) the Q system is unreliable, citing FRE 803(6), and (ii) if evidence contained in the Q system is admitted, he says its probative value is outweighed by a risk of unfair prejudice under FRE 403.

### 1. *Evidence contained in the Q system is authentic, reliable, and admissible as a business record.*

Friesen argues that evidence contained in the Q system is inadmissible hearsay and that the hearsay exception for business records does not apply. Rule 803(6) provides:

A record of an act, event, condition, opinion, or diagnosis [is admissible] if:

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness … ; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

2

A1262

Each of these elements is met with respect to the Q system.

The Q system was Sharp's means of recording transactions undertaken on behalf of his clients, including records of stock sales and purchases, and records of cash credits and debits in client accounts. Fedir Nikolayev, an IT professional working for Sharp, testified under oath that he created and administered the Q system for Sharp. ECF No. 268 (Commission Statement of Undisputed Facts ("56.1 SOF")) at ¶9. Nikolayev's deposition testimony established the following:

- That the Q system was the means by which Sharp kept track of financial transactions, stock holdings, purchases and sales of stock, proceeds from stock sales, client and bank account information, and commissions distributed to Sharp's clients. 56.1 SOF at ¶28.

- Administrators (Nikolayev and Sharp) had full access to the system, Sharp's staff (such as Gasarch and Kelln) had more limited access to input data, and Sharp clients (such as Friesen) could view their individual accounts. 56.1 SOF at ¶27; ECF No. 299 (Commission's Supplemental Statement of Undisputed Facts) at ¶138.

- It was Sharp's regular practice in conducting his business to keep all of this information in the Q system. 56.1 SOF at ¶28.

Nikolayev's testimony thus establishes that the Q system was Sharp's means of business recordkeeping.

Friesen claims that Nikolayev is not a qualified witness because he didn't personally enter information into the Q system. Br. at 8. But "a 'qualified witness' 'need not be the person who actually prepared the record." *U.S. Bank Trust, N.A. as Trustee for LSF9 Master Participation Trust v. Jones*, 925 F.3d 534, 538 (1st Cir. 2019) (citing *Wallace Motor Sales, Inc. v. Am. Motors Sales Corp.*, 780 F.2d 1049, 1061 (1st Cir. 1985)). A "qualified witness" is simply one who can explain and be cross-examined[3] concerning the manner in which the records

---

[3] Nikolayev was deposed in the Dominican Republic where he resides. All defendants were invited to participate either in person or by video. Several defendants' counsel attended and cross-examined Nikolayev. His deposition

3

A1263

are made and kept.  *Id.*  Nikolayev fits the bill:  He created the system at Sharp's direction, and

he knew how it would be used.  *United States v. Lauersen*, 348 F.3d 329, 342 (2d Cir. 2003)

(witness qualified to lay a foundation regarding record-keeping procedures for purposes of

admitting documents under business record hearsay exception when witness personally designed

record-keeping procedures and observed them being implemented), *judgment vacated on other

grounds*, *Lauersen v U.S.*, 543 U.S. 1097 (2005).  That Nikolayev did not personally enter data

into the system is irrelevant.

     Friesen next suggests that Nikolayev's deposition testimony shows that "the [Q system]

entries were *not an accurate recordation of any actual transactions*."  Br. at 8 (emphasis in

original).  Nikolayev said nothing of the sort.  Friesen instead cites to a portion of defendant

Sexton's opposition to the Commission's motion for summary judgment in which Sexton sought

to cast doubt on Nikolayev's credibility.  Br. at 8 (citing ECF No. 287-4 at 8-11).  But credibility

determinations are for the jury and Friesen's protestations are, at most, fodder for cross-

examination and closing arguments.  *United States v. Guevara*, 2015 WL 4776885, at *10 (D.

Mass. March 26, 2015) (arguments about chain of custody, credibility, and reliability were jury

questions that went to weight, not admissibility, of recorded conversations) (citations omitted).

     Friesen's focus on Nikolayev also ignores additional evidence that the Q system was how

Sharp and his co-conspirators kept track of the scheme.  Another individual,[4] a principal of

Silverton SA ("Silverton Principal"), is expected to testify at trial that he conspired with Sharp

and Sharp's clients by providing brokerage services to illicitly sell stock.  Silverton Principal has

---

testimony is admissible at trial because he is beyond the court's subpoena power and he has declined to travel to the
United States voluntarily.  *See* FRE 804(b)(1), 804(a)(5).

[4] This individual's name has not yet been publicly disclosed for the reasons set forth in the Commission's motion to
seal.  The Court has previously been provided with an unredacted version of this witness's declaration in support of
the Commission's motion for partial summary judgment.  *See* ECF No. 276 (filed under seal).

A1264

personal knowledge of how the Q system worked and submitted a declaration under penalty of

perjury establishing that:

- Sharp's business kept an accounting system that was called MT and later Q.

- The Q system kept track of Sharp's clients' stock holdings in the names of the various nominee companies Sharp and his employees administered.

- The Q system kept track of purchases and sales of Sharp's clients' stock through those nominees.

- The Q system also kept track of all of the financial transactions for Sharp's business, including all payments sent at clients' direction out of the proceeds of their trading and all fees and commissions they were charged for using Sharp's services.

- Silverton personnel used and reported data into the Q system.

- Silverton Principal reconciled his own accounting for stock it sold on behalf of Sharp's clients with the data in the Q system, to confirm that both systems were accurate and consistent.

- Silverton Principal was aware that Sharp and his employees entered information into the Q system at the time of, or very close in time to, the transactions recorded in the Q system and they all relied on the accuracy of the Q system.

56.1 SOF ¶27.  This evidence corroborates and expands on Nikolayev's deposition testimony,

demonstrating that the Q system is indeed a business record.

> Friesen further argues the Q system data is not reliable, stating in a conclusory fashion

that:

> The evidence will confirm that the [Q system] data is *not* an accurate reflection of stock ownership or stock sales; it does not correspond to the Plaintiff's own evidence, whether brokerage or transfer agent records, concerning the ownership and sales of stock.  The Q records are unquestionably a fiction, bearing no relationship to the Plaintiff's own evidence of actual transactions.

Br. at 8-9 (emphasis in original).  What evidence?  Friesen offers no explanation, much less

actual evidence, in support of his bald assertion that the Commission's evidence somehow

supports his position (which it does not).  FRE 803(6)(E) therefore does not apply to preclude the

Q system's admissibility as a business record because Friesen offers nothing more that unsubstantiated assertions that "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." *Id.*

Indeed, the evidence shows the opposite because the Q system data is corroborated by brokerage records maintained by independent third parties. In support of the Commission's motion for summary judgment, Commission accountant Ryan Murphy explained how he matched up certain Q system data with corresponding brokerage records. *See* ECF No. 273 (Declaration of Ryan Murphy dated Apr. 14, 2023) at ¶¶17-18, 20-21, 23-24, 26-27, 29, 31, 33, 35, 37, 39, 41, 43, 45, 47. Murphy subsequently expanded and refined his comparison of the Q system data to additional brokerage records and determined that:

- There are 2,115 unique sales of stock of the 14 issuers at issue in this case recorded in the Q system. *See* Murphy Declaration dated August 24, 2023 (filed herewith as Exhibit 1) at ¶9.

- The Commission has brokerage records that cover the trading accounts and the time period of 1,185 of the 2,115 sales transactions (*i.e.*, 56%). *Id.* at ¶¶12-13.

- Murphy was able to determine that the quantity of shares sold reported in the Q system for 1,154 of the 1,185 trades (*i.e.*, 97.4%) match the quantities reflected in the brokerage records. *Id.* at ¶14.

- For the remaining 2.6% of trades where there is not an exact match, the discrepancy is attributable to the number of shares not matching or a sale reported in the Q system not appearing in a corresponding brokerage records. *Id.* at ¶15.

In short, Friesen's contention that the Q system data is a "fiction" is belied by the facts.

### 2. Evidence contained in the Q system is admissible as the statements of a coconspirator.

Evidence contained in the Q system is also admissible as statements of a coconspirator. FRE 801(d)(2)(E) ("[s]tatements made by a coconspirator during and in furtherance of a conspiracy are not hearsay"). To admit a coconspirator's statement, the proponent must establish by a preponderance of the evidence that: (i) there was a conspiracy involving the declarant and

6

A1266

the non-offering party and (ii) that the statement was made during the course of and in
furtherance of the conspiracy. *Global Med. Solutions, Ltd v. Simon*, 2013 WL 12065418, at *9
(C.D. Cal. March 18, 2013) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)). "It is
not necessary to charge a conspiracy in the complaint in order to invoke the coconspirator
exclusion from the hearsay rule." *SEC v. Tome*, 638 F. Supp. 629, 634 (S.D.N.Y. 1986) (in civil
cases, coconspirators are sometimes called "joint venturers" or described as "acting in concert")
(citations omitted). In *Tome*, for example, the court found evidence that the declarant and the
defendants worked together to trade illegally on insider information sufficient to invoke Rule
801(d)(2)(E). *Id.* at 634–37. "The threshold evidence offered by the [proponent] need not be
overwhelming." *United States v. Ammar*, 714 F.2d 238, 250 (3d Cir. 1983) (quotation omitted).

The coconspirator hearsay exclusion applies not only to oral or written utterances, but
also to compilations of data maintained in furtherance of an unlawful scheme. For example,
*United States v. Musaibli* involved records kept by ISIS in the course of and in furtherance of a
terrorist conspiracy. The court held that various rosters of fighters, payroll records, and budget
databases recording payments to fighters and administrators were properly admitted under the
coconspirator hearsay exception. 42 F.4th 603, 609, 614–19 (6th Cir. 2022). The court noted
that "statements generated by ISIS's bureaucratic apparatus to support the mission of providing
the terrorist group with personnel . . . fit comfortably within the alleged conspiracy's scope." *Id.*
at 618. Here, too, the Q system supported defendants' overall scheme to effectuate illicit stock
sales by recording, among other things, stock acquisitions and sales, along with fees paid to
Sharp and profit distributions to defendants.

***Existence of a conspiracy***. There is ample evidence that defendants engaged in a multi-
year, multi-person, international scheme to profit from illegal stock sales. The Q system

7

A1267

includes transaction details from 2011 through 2018 (which, as noted above, are extensively corroborated by brokerage records). Though additional evidence will be presented at trial, even a small sampling demonstrates that Gasarch, Friesen, and Sexton were all engaged in a conspiracy involving Sharp and his employees throughout that time period. For example, Silverton Principal identifies Gasarch as an employee of Sharp who was responsible for sending wire requests and supporting invoices on behalf of Sharp's clients. ECF 274 at ¶¶5, 9.

Gasarch asserted her Fifth Amendment right against self-incrimination and declined to answer questions regarding her employment with Sharp and her role in the scheme. *See* Deposition on Written Questions to Gasarch and objections/responses (filed herewith as Exhibit 2) at ¶¶32, 36-37, 60, 73, 79, 195-197, 200-208. It is settled law that, in civil litigation, when, as here, a party asserts their Fifth Amendment privilege to refuse to answer a question, the "court is warranted in drawing a negative inference against that party." *Brookridge Funding Corp. v. Aquamarine, Inc.*, 675 F. Supp. 2d 227, 233 (D. Mass. 2009) (Young, J.). The jury is therefore entitled to draw an adverse inference against Gasarch under these circumstances.

Silverton Principal also identified Gasarch as xPhone user Wires or 76 and Gasarch again declined to answer questions about her code name based on her Fifth Amendment privilege. There are numerous communications with Wires or 76 throughout 2011 to 2018, in several of which she is either addressed as Yvonne, or signs her name as Yvonne. ECF 274 at ¶14; Ex. 2 at ¶¶211, 217, 219, 225, 238; ECF No. 269-16 (July 10, 2013 xPhone message where Wires identifies herself as "Yvonne Gasarch"). Finally, Gasarch asserted her Fifth Amendment privilege and declined to answer whether she assisted "a group of the Sharp business' clients, composed of Veldhuis, Sexton, Friesen and others, to keep accurate records relating to their sales of Stevia First/Vitality stock between 2012 and 2018." Ex. 2 at ¶¶275-286. An adverse

A1268

inference drawn against Friesen's coconspirators can be applied to him. *Brookridge,* 675 F.

Supp. 2d at 234 (citing *Federal Deposit Ins. Corp. v. Fidelity & Deposit Co., 45 F.3d 969, 978*

(5th Cir. 1995) (collecting cases). As shown below, Friesen and Sexton were coconspirators, and

the jury is therefore entitled to draw adverse inferences against Friesen, Sexton, and Gasarch

based on the silence of any of their other coconspirators.

      The evidence as to Friesen and Sexton is similar. Silverton Principal, Avtar Dhillon, and

William Kaitz have all provided evidence of Friesen and Sexton's longstanding role in the

conspiracy facilitated by Sharp and his employees, via, among other things, the Q system.

Silverton Principal knew Friesen, Sexton, and Mike Veldhuis as clients of Sharp who often

worked together and "owned shares that Silverton traded, through nominees, on their behalf."

ECF 274 at ¶¶ 10-11. Silverton Principal communicated by xPhone with Friesen and identified

his code names as "2" or "GARD." *Id.* at ¶14. Kaitz communicated by xPhone with Sexton and

identified him as xPhone user "3." ECF No. 271 at ¶16. Further, with regard to 13 of 14 issuers

whose sales are at issue as to Friesen and Sexton, Kaitz testified that he did promotional work on

behalf of Sexton, Friesen, and Veldhuis. *Id.* ¶¶ 10-13. Finally Dhillon describes his schemes

with Sexton, Friesen, and Veldhuis to profit from illegal sales of OncoSec, Stevia First/Vitality

and Arch stock. ECF No. 270 (Declaration of Avtar Dhillon) at ¶¶ 7-47. That conduct covered

at least 2011 through 2016. *Id.* ¶¶ 11, 38-42. Continuing into 2018, Silverton Principal has

identified communications with both Friesen and Veldhuis in which they continue to direct the

sale of stock that is the subject of the complaint. ECF 274 at ¶¶17, 19-20; ECF No. 274-6 & 7.

      ***The Q system was maintained in furtherance of the scheme.*** As discussed above, the Q

system was the means by which Sharp kept track of all aspects of the unlawful stock sale

scheme. Like the databases in *Musaibli*, the Q system was plainly part of the overall scheme as

A1269

it tracked the defendants' unlawful activities to the penny.  Importantly, a coconspirator

statement need not actually advance the conspiracy.  It is enough that the statements—here, the

Q system data—generally promote the purposes of the fraudulent scheme.  *Musaibli*, 42 F.4th at

619.  The Q system plainly promoted the purpose of the fraud because it provided an accounting

of profits that could be paid out to Sexton and Friesen—the very purpose of their conspiracy was

to reap that profit.

> ### *3.    Evidence contained in the Q system is not unfairly prejudicial.*

Friesen says that the Q system data is unfairly prejudicial.  Br. at 3-6 (citing FRE 403).

To be sure, the evidence is prejudicial in that it shows that Friesen made millions of dollars in ill-

gotten proceeds of his fraud.  But, as set forth below, it is not unfairly so.

The thrust of Friesen's argument seems to be that evidence contained in the Q system is

unfairly prejudicial because he says the Commission's evidence of his participation in the

charged scheme is lacking.  First, he claims, incorrectly, that "**none** of these business records

provide evidence of a connection between the transactions [recorded in the Q system] and Mr.

Friesen."  Br. at 3 (emphasis in original).  To the contrary, the Commission has extensive

evidence of Friesen's participation in the unlawful stock sale scheme, including transactions in

the Q system showing his GARD account being credited proceeds of the stock sales at issue.

The Commission will not repeat its voluminous compilation of evidence here, but rather refers

the Court to its memorandum in support its motion for summary judgment and supporting

papers.  ECF No. 267 at 2-5 (summary of evidence of illegal stock sale scheme, including

evidence of Friesen's participation).  *See also* ECF No. 273 at ¶¶11, 48-51, 54 and ECF No. 273-

9 (showing credits to Friesen' GARD account).

Second, Friesen says there's no evidence connecting him to the unlawful stock sales. Br. at 4. Not true. Friesen used encrypted communications services provided by Sharp—xPhone and xMail—to communicate with his coconspirators. 56.1 SOF at ¶17. In a criminal plea, Silverton Principal admitted that he engaged in a fraudulent scheme to illegally sell stock for the benefit of and at the direction of Sharp clients, including Friesen. *Id.* ¶¶21-22, 25. Friesen personally directed Sharp's traders to sell stock for his benefit and participated in promoting some of those same stocks. *Id.* at ¶50 and Ex. 38, ¶51, ¶¶87-88. Friesen also directed transfers of money between accounts in the Q system. *Id.* at ¶55 and Ex. 73 at 1-2. These are but a few examples of Friesen's ties to the fraudulent stock sale scheme.

Friesen and his coconspirators, including Kelln, Gasarch, Veldhuis, and Sexton all asserted their Fifth Amendment privilege against self-incrimination in response to numerous questions about their fraudulent scheme, trading activity, and distribution of proceeds of their fraud. As noted above, when a party asserts their Fifth Amendment privilege to refuse to answer a question, the jury may draw an adverse inference both as to the declarant and their coconspirators. *Brookridge*, 675 F. Supp. 2d at 233–34.

Here, Friesen himself asserted his Fifth Amendment privilege with respect to the following questions, which are but a small sampling of questions he declined to answer on Fifth Amendment grounds:

79.    You were a client of Sharp, correct?

83.    During the time that you were a client of Sharp, you understood that Sharp and his employees facilitated illegal stock sales, correct?

84.    During the time that you were a client of Sharp, you understood that Sharp and his employees helped their clients conceal their identities and their control of various penny stock companies' shares?

11

A1271

91.    During the time that you were a client of Sharp, you understood that Sharp's accounting system kept track of when stock was bought or sold on behalf of his clients?

93.    During the time that you were a client of Sharp, you understood that Sharp's accounting system also kept track of when and how clients asked for distributions of the proceeds from their securities sales?

95.    You referred to Sharp's accounting system as Q or MT, correct?

96.    You had a personal account in the Q system, correct?

97.    Your personal account in the Q system was the GARD account, correct?

103.    Periodically, you received copies of your GARD account statements from the Q system, didn't you?

144.    You understood that the activity in which you, Veldhuis, and Sexton was engaging on these penny stock deals was illegal, correct?

241.    During the time period from March to May 2012, you understood that the 19.6 million shares of Stevia First stock that you controlled along with Veldhuis, Sexton, Dhillon and Taylor, were sold into the public markets, correct?

242.    You understood that the proceeds from selling that 19.6 million shares of Stevia First stock was over $24 million, right?

243.    You knew that because you communicated regularly with Veldhuis and Sexton about the number of sales you were selling and the prices of those shares, correct?

244.    You received a share of that $24 million in proceeds, correct?

ECF No. 269-7 (Friesen written deposition questions and responses). Because the Commission will present independent corroborating evidence of Friesen's conduct, it is entitled to an adverse inference as to each of these questions which unequivocally demonstrate that Friesen knowingly participated in, and benefitted from, the illegal stock sale scheme.

In sum, there is ample evidence that the Q system is authentic and reliable. There is also ample evidence that Friesen participated in, and obtained millions of dollars from, the charged unlawful stock sale scheme. Under these circumstances, Friesen cannot complain that evidence

12

authenticating the Q system data[5] and related summaries and testimony will paint him in a bad

light.  Br. at 5-6.  Of course it will; but that is no reason to exclude evidence that doesn't unfairly

prey upon the jury's emotions:

> Evidence, however, is not unfairly prejudicial merely because it is harmful to the
> defendant.  Indeed, if the evidence did not prejudice [defendant] in some way, it
> would not be relevant to the case.  For purposes of Rule 403, "unfair prejudice"
> occurs where there is "an undue tendency to suggest decision on an improper
> basis, commonly, though not necessarily, an emotional one.

*United States v. Symonevich*, 688 F.3d 12, 22–23 (1st Cir. 2012) (charts summarizing and

comparing defendant's drug purchases against purchases by others not unfairly prejudicial)

(citation omitted).

### B. The Court Should Reject Friesen's Effort to Exclude the Commission's Expert Witness.

Friesen seeks to exclude the Commission's expert with a perfunctory argument that the

expert should not be allowed to explain (by way of background) the standard methods of trading

stocks, or render opinions about Friesen's conduct.  Friesen does not dispute the expert's

qualifications; he does, however, mischaracterize the law and the expert's anticipated testimony.

This case involves complex issues of securities registration and disclosure provisions.

The jury will hear about concepts such as "restricted stock," "holding period," "beneficial

ownership," and "affiliate status."  To help explain both those concepts and how adherence to the

regulatory disclosure regime impacts the investing public, especially in the over-the-counter

securities markets ("OTC Markets," where many of the defendants' stock trades at issue

occurred), the Commission intends to offer the expert testimony of Mr. Philip Feigin.  Feigin is a

---

[5] Evidence concerning the chain of custody of the Curacao servers and the process of decrypting and producing the evidence on those servers would not be necessary if defendants would stipulate to its authenticity.  To the extent Friesen believes such evidence is prejudicial, it is a problem of his own making.

well-recognized expert who has previously provided testimony on the operations of the securities industry in multiple other federal court cases.

### 1. *Mr. Feigin's anticipated testimony.*

The Commission intends to call Feigin at trial for two purposes. First, the Commission intends to call Feigin to explain to the jury the complex background of securities registration requirements, disclosure filings, and related concepts. ECF No. 320-3 (Expert Witness Report of Philip A. Feigin) at 9-13. These are concepts that are likely unfamiliar to many potential jurors. Second, the Commission intends to call Feigin to opine on how adherence to those rules impacts the investing public. *Id.* at 30-33. The full scope of Mr. Feigin's anticipated testimony is all the matters in his report. By summarizing those matters here, the SEC does not intend to limit Mr. Feigin's testimony to something other than the full scope of his report.

### 2. *The Commission needs, and is entitled to, an expert to explain complicated securities concepts to the jury.*

The first part of Feigin's proposed testimony—a background explanation of securities registration and related concepts—is critical for the jury in this case to be able to understand complex concepts, terms, and courses of events with which a typical layperson is not familiar. Friesen fails to provide a legitimate basis to strike this portion of Feigin's expected testimony. Friesen cites *SEC v. Goldsworthy*, 2008 WL 2943398 (D. Mass. Jan. 3, 2008), for the general proposition that "expert opinion must be helpful to the trier of fact." Br. at 9. This general rule is satisfied by Feigin's anticipated testimony.

Feigin's anticipated trial testimony is an essential part of evidence presentation in trials involving complicated concepts, and its use has been recognized in the advisory notes to Rule 702:

> The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles. For this kind of generalized

14

A1274

testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

Notes to Fed. R. Evid. 702; *see also In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 184 (S.D.N.Y. 2018) ("expert testimony is viewed as helpful in cases, like this one, involving complex statutes or issues outside of the general knowledge of the jury") (internal citations omitted).

Consequently, this proposed testimony should be allowed, given the complexity of the securities markets in general. *See, e.g., Ross v. Rothstein*, 92 F. Supp. 3d 1041, 1051 (D. Kan. 2015) (allowing expert to provide background testimony because of his specialized knowledge about OTC Markets); *United States. v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) (expert "testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice").

### 3. Feigin will offer opinions about how adherence to disclosure rules impacts the investing public.

Feigin's testimony will describe the rules the various defendants were subject to at points in time, and how adherence to those rules would impact the investing public. ECF No. 320-3 at 32 ("Had the Veldhuis Control Group reported this acquisition, public investors would have learned two important facts. …"), 33 ("Had the true identities of the owners of the shares been reported to the Commission on Schedule 13D and the facts been known to public investors, they would have been aware that the price of the shares they were being asked to pay was not being set by the open outcry of the public market but by the Veldhuis Control Group, the only source of the shares").

A1275

The ultimate issue in this case is whether Sexton and Friesen violated the specified provisions of the federal securities laws.  So, for example, one important factual issue that the jury will have to decide in this case is whether Friesen and Sexton (colluding with Veldhuis) owned more than 5% of the shares of the companies whose stock he acquired and then sold. Feigin's expected testimony will assist the jury in determining whether Friesen's conduct violated the securities laws.

Of note, courts permit expert testimony even where that testimony implicates mixed issues of fact and law.  For example:

> The three experts in this case intend to opine, based on their economic analyses, that the Defendants' behavior is "consistent with collusion and inconsistent with competition." This testimony is admissible under Rule 704(a), because it does not state a legal standard or draw a legal conclusion. Nor does it use terms with distinct and specialized meaning in the law. Instead, these experts intend to explain whether economic indicia of collusion were present during the class period. These opinions are not determinations of purely legal issues; rather, they are admissible testimony concerning mixed questions of fact and law.

*In re Titanium Dioxide Antitrust Litig*., No. RDB-10-0318, 2013 U.S. Dist. LEXIS 62394, at *14–15 (D. Md. May 1, 2013) (cleaned up).

Moreover, Feigin could discuss the ultimate issue in this case.  FRE 704(a) provides that "an opinion is not objectionable just because it embraces an ultimate issue."  Courts have permitted experts to offer legal conclusions in cases involving complex statutory or regulatory schemes, such as the federal securities laws.  *See United States v. Offill,* 666 F.3d 168 (4th Cir. 2011).  In *Offill*, the court upheld expert testimony that reached legal conclusions in relation to the requirements to register securities, including permitting hypotheticals that mirrored the defendant's conduct in a case alleging a scheme to "evade securities registration requirements." *Id.* at 171; *see also id*. at 175 ("we conclude that the specialized nature of the legal regimes involved in this case and the complex concepts involving securities registration, registration

16

A1276

exemptions, and specific regulatory practices make it a typical case for allowing expert testimony that arguably states a legal conclusion in order to assist the jury").

Simply put, Feigin's opinions are proper and should be admitted.

**C. There Is No Reason to Delay Trial to Consider the Issues Friesen Raises.**

Friesen asks the Court to delay the currently scheduled September 11 trial date to "set an evidentiary hearing" to resolve his motion. Br. at 1-2. He offers no explanation of what evidence he thinks needs to be presented to the Court or why the Court cannot issue a ruling on the papers. Like any motion *in limine*, the Court will have the motion fully briefed in advance of the September 5 pretrial conference and may issue a ruling (or reserve) at that time.

Dated:  August 25, 2023                    Respectfully submitted,

                                           **SECURITIES AND EXCHANGE
                                           COMMISSION**

                                           By its Attorneys,

                                           /s/ Alfred A. Day
                                           Alfred Day (Mass. BBO No. 654436)
                                           Kathleen B. Shields (Mass. BBO No. 637438)
                                           David H. London (Mass. BBO No. 638289)
                                           Nita K. Klunder (Mass. BBO No. 689304)
                                           33 Arch Street, 24th Floor
                                           Boston, MA  02110
                                           Telephone: (617) 573-8904 (Shields); (617) 573-
                                           4537 (Day); (617) 573-8997 (London)
                                           Fax: (617) 573-4590
                                           Email: shieldska@sec.gov; daya@sec.gov;
                                           londond@sec.gov; klunderni@sec.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on August 25, 2023, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

A1277

/s/ Alfred A. Day

A1278

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

**SECURITIES AND EXCHANGE COMMISSION,**

$\qquad\qquad\qquad\qquad$ **Plaintiff,**

$\quad$ **v.**

**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**

$\qquad\qquad\qquad\qquad$ **Defendants.**

---

**Civil Action No. 21-CV-11276 (WGY)**

---

### <u>DECLARATION OF RYAN MURPHY</u>

I, Ryan Murphy, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1.　　Since January 2020, I have been employed as an Enforcement Accountant with the U.S. Securities and Exchange Commission ("the Commission") in its Boston Regional Office.  My duties include conducting investigations relating to potential violations of the federal securities laws.

2.　　I received a Bachelor of Science degree in accounting and business administration, with a concentration in finance, from the University of Richmond in Virginia in 2009.  Before joining the Commission, I was most recently a managing director in the forensic accounting and complex business litigation practice at StoneTurn, in Boston, where I worked for over ten years.

A1279

3.      I am a Certified Public Accountant in the Commonwealth of Massachusetts and the State of New York.  I am also Certified in Financial Forensics by the American Institute of Certified Public Accountants.

4.      I make this Declaration based upon my personal knowledge and upon information and belief as set forth below, and in support of the Commission's Opposition to Defendant Jackson Friesen's Motion In Limine to Exclude "Q" Records and Purported Expert Testimony (Docket No. 329).  I have previously provided declarations in support of the Commission's motion for partial summary judgment.  *See* Docket Nos. 273, 300.

5.      In 2022, I became actively involved in the Commission's litigation into possible violations of the federal securities laws by the defendants in this case.

6.      In the course of that litigation, I reviewed documents and data produced to the Commission, including records that were maintained by Frederick Sharp on servers located in Curacao.  A portion of the files that were on the servers in Curacao were produced to the Commission by the Department of Justice, which obtained those files via a Mutual Legal Assistance Treaty request to Curacao.  These records included an accounting system referred to by Sharp and his employees as "MT" or "Q," and which I will refer to as the "Q system."

7.      I have examined the Q system, and it functions similarly to many brokerage accounts at financial institutions and "general ledger" accounting systems with which I am familiar.  The Q system tracked the amounts of stock sold by, stock purchased by, and the total proceeds resulting for, Sharp Group clients including Veldhuis, Sexton and Friesen.  The Q system also tracked distributions of the proceeds to, and for the benefit of, Sharp Group clients including Veldhuis, Sexton and Friesen.

A1280

8.      I understand that the Commission's claims against defendants Sexton and Friesen are based on their alleged sales of the securities of fourteen companies:  Stevia First Corp./Vitality BioPharma Inc., Echo Automotive Inc., Arch Therapeutics Inc., Stevia Corp., Liberty One Lithium Corp., Oryon Technologies, Inc., Makism 3D Corp., Graphite Corp., OncoSec Medical Inc., NewGen Biopharma Corp., StartMonday Technology Corp., Lexington Biosciences Holdings Corp., BreathTec Biomedical Inc., and RightsCorp. (collectively, the "Fourteen Issuers").

9.      I reviewed the Q system to count the number of unique stock sales of all Fourteen Issuers securities.  Combined, there are 2,115 stock sales of the Fourteen Issuers' shares that are recorded in the Q system.

| Batch Description | Quantity of Unique Stock Sales |
|---|---|
| Sell Stock | 2,115 |

10.      As part of my declaration in support of the Commission's summary judgment motion, I compared data in the Q system to the data in third party brokerage account records produced to the Commission during its investigation that led to the filing of this case.  *See* Docket No. 273, ¶¶17-18, 20-21, 23-24, 26-27, 29, 31, 33, 35, 37, 39, 41, 43, 45, 47 (declaration dated Apr. 14, 2023).

11.      Since the filing of my last declaration, I have updated my comparison of data from the Q system to data from third party brokerage records.  In particular, I examined additional brokerage records that I had not reviewed before the summary judgment filing.

12.      The Commission has brokerage records produced by the following brokerage firms that cover the trading accounts and time period of 1,185 of the 2,115 sales transactions recorded in Q (or about 56% of those sales transactions):

3

A1281

| Bank/Broker | Total |
|---|---|
| BSI SA | 197 |
| Beaufort Securities Ltd | 185 |
| Wedbush Securities Inc. | 125 |
| Prometheus Capital Finance | 108 |
| Verdmont Capital | 77 |
| Tendall Capital Markets | 64 |
| Haywood Securities Inc. | 64 |
| VP Bank Ltd | 54 |
| LGT Bank Ltd | 52 |
| Valbury Capital Ltd | 48 |
| Hyposwiss | 43 |
| St. Galler Kantonalbank AG | 43 |
| Canaccord Genuity | 40 |
| CBH Compagnie Bancaire Helvetique | 32 |
| Apex Clearing Corp. | 26 |
| Peter Pesic & Co Securities | 23 |
| Forte Securities LLC | 3 |
| Linear | 1 |
| **Total** | **1,185** |

13.     With respect to these third party brokerage records, the Commission has, or

expects promptly to obtain, business records certifications that cover all of these records with the

exception of the records produced on behalf of Verdmont Capital, S.A., which was based in

Panama.  Many of these business records certifications were filed as support for the

Commission's motion for partial summary judgment.  *See* Docket No. 300-1.  I understand that

Verdmont is defunct and thus is unable to obtain a certification that the documents on which it

relies are the firm's business records.  However, these Verdmont records were produced to the

Commission by the Panamanian Superintendencia del Mercado de Valores in conjunction with

Canadian securities regulators, and thus appear to come from a reliable source for Verdmont's

business records.

4

14.    I reviewed all of the brokerage account records in the Commission's possession, which cover 1,185 of the sales in the Fourteen Issuers' securities in the Q system. I was able to corroborate that the quantity of shares sold reported for 1,154 of those 1,185 trades are matches between the Q system and the third party brokerage records. That means that 97.4% of the sales reported in Q match the third party brokerage records.

15.    In the 2.6% of instances where there is not an exact match, most often there is a discrepancy between the number of shares reported sold between the Q system and the third-party brokerage account records. In the remaining instances, a sale reported in the Q system is missing from the available third-party brokerage records. Below is a table summarizing the quantity of shares corroborated between the Q system and the available third-party brokerage records for each of the Fourteen Issuers' securities:

| Issuer | Total Q Sales Transactions | Total Transactions Covered by Brokerage Records | Total Q Sales Transactions Tied Out | Number of Variances | Tie Out Percentage |
|---|---|---|---|---|---|
| Stevia Corp | 246 | 71 | 71 | - | 100.0% |
| Makism 3D Corp | 119 | 52 | 52 | - | 100.0% |
| Newgen Biopharma Corp | 66 | 64 | 64 | - | 100.0% |
| BreathTec Biomedical | 43 | 29 | 29 | - | 100.0% |
| Arch | 264 | 123 | 121 | 2 | 98.4% |
| StartMonday | 58 | 55 | 54 | 1 | 98.2% |
| Liberty One Lithium Corp | 121 | 101 | 99 | 2 | 98.0% |
| Graphite Corp | 131 | 50 | 49 | 1 | 98.0% |
| Stevia First / Vitality | 553 | 363 | 354 | 9 | 97.5% |
| OncoSec Medical | 153 | 34 | 33 | 1 | 97.1% |
| Oryon Technologies | 139 | 77 | 74 | 3 | 96.1% |
| Lexington Biosciences | 85 | 73 | 70 | 3 | 95.9% |
| Echo Automotive | 112 | 77 | 72 | 5 | 93.5% |
| RightsCorp | 25 | 16 | 12 | 4 | 75.0% |
| **Total** | **2,115** | **1,185** | **1,154** | **31** | **97.4%** |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 24, 2023, in Boston, Massachusetts.

5

A1283

Ryan Murphy

A1284



**EXHIBIT 90**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

**Plaintiff,**

v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R. TAYLOR,

**Defendants.**

Civil Action No. 21-CV-11276-WGY

<u>**DEPOSITION ON WRITTEN QUESTIONS OF ZHIYING YVONNE GASARCH**</u>

Pursuant to Fed. R. Civ. P. 31 and the agreement between the parties, plaintiff Securities and Exchange Commission requests that defendant Zhiying Yvonne Gasarch ("Gasarch") respond to each of the following questions under oath and under the pains and penalties of perjury. Please provide written responses to each question by March 20, 2023 and sign and date the certification at the conclusion of the deposition.

1.      What is your full name?
2.      What is your current address?  How long have you lived there?
3.      What was your address before your current home?
4.      When were you born?
5.      How long have you lived in Canada?
6.      Are you on any medication, or do you have any medical conditions, that affect your ability to understand or recall information?
7.      Are you on any medication, or do you have any medical conditions, that affect your ability to understand these written deposition questions or to provide accurate and truthful answers to them?

<u>Background</u>

8.      Are you married to Bruce Gasarch?

1

A1285

9.      How long have you been married to Bruce Gasarch?
10.     Do you have any children?
11.     If so, in what month/year was your child or children born?
12.     Did you graduate from high school?
13.     In what year did you graduate from high school?
14.     Did you attend college?
15.     Did you graduate from college?
16.     If so, when did you graduate and what in what field did you obtain a degree?
17.     Did you attend graduate school or any professional school after college?
18.     If so, did you obtain a degree?
19.     What type of graduate or professional degree did you obtain, and when?
20.     Have you ever held any securities licenses?
21.     Do you have any professional licenses or registrations?
22.     If so, describe which licenses you held and the time periods during which you held them?
23.     Describe your work history after high school, including the names of the places you were employed, the dates of your employment and brief description of your job duties.
24.     How are you currently employed?
25.     What are your current sources of income?
26.     From what sources did you earn income over the last 5 years?
27.     Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your background?

<div align="center">Sharp's Business and its Employees</div>

28.     You know Frederick Sharp ("Sharp"), right?
29.     When and how did you first meet him?
30.     When did you first begin to do any business with Sharp?
31.     You knew that Sharp and his employees did business under the name Corporate House, correct?
32.     You were an employee of Sharp, correct?
33.     When you reported income on your tax filings, who did you say was your employer?
34.     During what period of time were you an employee of Sharp?
35.     What did you understand Sharp's business to be?
36.     During the time that you were an employee of Sharp, you understood that the business you worked for (referred to herein as "Sharp's business") facilitated illegal stock sales, correct?
37.     During the time that you were an employee of Sharp, you understood that Sharp's business helped its clients conceal their identities and their control of various penny stock companies' shares so that the clients could sell that stock?
38.     When you worked for Sharp, you knew that he wrote a book styled as fiction that described the stock manipulation schemes in which Sharp's business actually engaged, correct?
        a.  That book was called *Footloose, Charlie Smith's Offshore Chronicles*?
        b.  You also knew that Sharp's son sought donations to make the book into a movie from you and other Sharp employees and clients, right?
        c.  Is the bottom-most email message in Exhibit **Gasarch 1** an accurate copy of an email message that Sharp's son sent to you (at the email address yg@lakehg.com) and others?

<div align="center">2</div>

<div align="center">A1286</div>

    d.  This email message was also sent to your husband at bg@lakehg.com, which was an email address he used, correct?

    e.  And in this message, Sharp's son states that his film is an adaptation of his father's *Footloose* book, which will satirize "the toils and troubles of offshore finance and investment banking" and "make fun of my Dad and all of his friends"?

39.    During the time that you were an employee of Sharp, you understood that the clients who hired Sharp's business to sell stock for them typically controlled the majority of shares of the companies whose stock they were asking Sharp's business to sell, correct?

40.    During the time that you were an employee of Sharp, you understood that Sharp's business did this by administering nominee companies that were incorporated in a variety of foreign countries to act as shareholders on behalf of its clients?

41.    During the time that you were an employee of Sharp, you understood that Sharp's business provided an encrypted communications network to its clients that could only be used to communicate with Sharp, his employees and service providers, and other Sharp clients?

42.    Did you refer to these devices that could utilize Sharp's encrypted communications network as xphones?

43.    You had and used an xphone, correct?

44.    During the time that you were an employee of Sharp, you understood that Sharp's business provided an accounting system that kept track of the shares of stock its clients owned through the nominee companies it administered?

45.    During the time that you were an employee of Sharp, you understood that Sharp's business' accounting system kept track of the deposits of its clients' stock in brokerage accounts around the world?

46.    During the time that you were an employee of Sharp, you understood that Sharp's business' accounting system kept track of when stock was bought or sold on behalf of its clients?

47.    During the time that you were an employee of Sharp, you understood that Sharp's business' accounting system kept track of the proceeds of those sales on behalf of its clients?

48.    We have previously marked as Exhibit 17 the Amended Complaint in this case. The table in Exhibit 17, ¶43, shows a tabulation of the total stock sales and purchases made by Sharp's business on behalf of its clients between 2010 and 2019. Do you have any reason to doubt the accuracy of the figures in this table?

49.    During the time that you were an employee of Sharp, you understood that Sharp's business' accounting system also kept track of when and how its clients asked for distributions of the proceeds from their securities sales?

50.    During the time that you were an employee of Sharp, you understood that Sharp's business' accounting system also kept track of the various fees and commissions that it charged its clients for its services?

51.    You referred to the business' accounting system as Q or MT, correct?

52.    You had a personal account in the Q system, correct?

53.    Your personal accounts in the Q system was the account named PEAC, which between January 9 and January 22, 2014, changed its name to PERE, correct?

54.    When did you first establish your personal account with in the Q system?

55.    Why did you choose the names PEAC and PERE for your personal Q accounts?

3

56.     Was your use of the names PEAC and PERE associated with your use of Peaceful Lion Holdings and Peregrine Capital Corp. to perform tasks that benefitted Sharp and his overall business?

57.     You had the authority to request any disbursements from the PEAC/PERE account in Q, correct?

58.     Other than fees that might be charged to your personal Q account by Sharp's business, no one other than you had the authority to request any disbursements from the PEAC/PERE account in Q, correct?

59.     Periodically, you reviewed transactions in your PEAC/PERE account in the Q system, didn't you?

60.     Did any employees of Sharp's business other than you regularly input information about withdrawals from Q accounts into the Q system?

61.     Please look at the attached Exhibit **Gasarch 2**.  This is a true and accurate copy of a list of the transactions in your PEAC/PERE account in the Q accounting system, correct?

    a.  Exhibit Gasarch 2 lists the dates and descriptions of the various transactions in your personal Q account, right?

    b.  It also separates the value of those transactions into the currency in which the transaction occurred, right?

62.     You know Courtney Kelln ("Kelln"), correct?

63.     How do you know her?

64.     You interacted with Kelln as an employee of Sharp's business?

65.     During what period of time did you interact with Kelln as an employee of Sharp's business?

66.     For what purposes did you interact with Kelln?

67.     During the time that you were an employee of Sharp, you understood that Kelln was responsible for dividing stock owned by Sharp's clients into blocks that would be held by the nominee companies Sharp and his employees administered?

68.     During the time that you were an employee of Sharp, you understood that Kelln also managed communications with transfer agents to get shares issued in the names of those nominee companies?

69.     During the time that you were an employee of Sharp, you understood that Kelln communicated with lawyers when it was necessary to get restricted legends removed from shares owned or controlled by Sharp's clients?

70.     During the time that you were an employee of Sharp, you understood that Kelln also communicated with personnel from various trading platforms and brokerage firms to get shares deposited into brokerage accounts and ready for sale on behalf of Sharp's clients?

71.     During what period of time did you interact with Kelln as an employee of Sharp's business?

72.     During the time that you were an employee of Sharp, generally for what purposes did you interact with Sharp?

73.     You continued working for Sharp into 2019, correct?

74.     Is Exhibit **Gasarch 49** an accurate copy of a chain of email messages you sent and received in September 2018 at your yg@corphouse.net address in which you were ordering gold coins for Sharp's business?

75.     Is Exhibit **Gasarch 50** an accurate copy of email messages between you (using email address wires@secure.xmeridian.com) and Sharp (using email address fsharp@corphouse.net)

4

A1288

on January 24, 2019 in which he asked you to sign documents in your capacity as the secretary of an entity he managed and to which you replied that you would mail out the documents the following day?

76.     Is Exhibit **Gasarch 51** an accurate copy of an email message you sent (using email address yg@corphouse.net) to an accountant on March 15, 2019 about paying taxes for a nominee in which you and your husband were involved with Sharp?

77.     Is Exhibit **Gasarch 52** an accurate copy of an email message that you (using email address wires@secure.xmeridian.com) and Sharp (using email address fsharp@secure.xmeridian.com) received from Courtney Kelln on April 15, 2019?
        a. Kelln attached to those emails invoices for her services, correct?
        b. And Kelln asked to meet you to pick up the checks for her payments, correct?

78.     Is Exhibit **Gasarch 53** an accurate copy of email messages you sent and received (using email address wires@secure.xmeridian.com) with Rick Hethey on May 26, 2019?
        a. Hethey was a client of Sharp's business?
        b. Hethey calls you by name in his message to you, correct?
        c. You had previously met Hethey to deliver cash to him from Sharp's business, correct?
        d. And you respond that your children, who are two, go to daycare every weekday, correct?

79.     Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your interactions with Sharp, Kelln, and other employees of Sharp's business?

## Your and Bruce Gasarch's Companies

80.     Did you incorporate or use any companies to perform work for or with Sharp?
81.     Did you incorporate Great Wall Management Inc. ("Great Wall") in or before 2011?
82.     Have you been the sole director of Great Wall since 2011?
83.     Who are the officers of Great Wall?
84.     What is the business of Great Wall?
85.     How long has that business been operating?
86.     What is your role on a day to day basis in that business?
87.     Did you direct payments to Great Wall from funds you obtained through your work for or with Frederick Sharp ("Sharp")?
88.     Were you the President and the 100% owner of a company called Lakehouse Capital Inc.?
89.     Exhibit **Gasarch 3** is a set of documents produced to the Commission by TD Bank concerning Lakehouse Capital. Do these documents accurately reflect that you owned Lakehouse Capital and that the company's address was the same as your home address, 7971 Gabriola Gate in Richmond, BC?
        a. Page 4 of this Exhibit lists your employer as Great Wall Management, at the same office address in which Sharp's businesses were located, correct?
        b. Was that information accurate?
        c. And this same page reports that you started working for Great Wall Management in June 2009. Was that the date on which you began working for Sharp's businesses?

5

A1289

      d.   You signed the safety deposit box rental agreement that is page 7 of this exhibit, correct?

      e.   And you also signed the business banking and services agreement that is pages 11-16 of this exhibit, correct?

      f.   And in the letter of Direction that is page 18 of this exhibit, you signed and represented that the Lakehouse Capital account will not be used by or on behalf of a third party, correct?

      g.   Was that representation false?

      h.   On page 48 of this Exhibit, on or about February 5, 2018, you signed a Lakehouse Capital Inc. check in the amount of $160,000 to Mulberry Property Group and the memo line says For Creery Estates, correct?

      i.   What was the purpose of this payment?

      j.   And on page 52 of this Exhibit, on or about February 27, 2018, you signed a Lakehouse Capital Inc. check in the amount of $200,000 to Mulberry Property Group and the memo line says Creery, correct?

      k.   What was the purpose of this payment?

90.     Was an entity named Peaceful Lion Holdings Ltd. ("Peaceful Lion") incorporated in Samoa in September 2010?

91.     At some point in time, did Peaceful Lion change its name to Peregrine Capital Corp. ("Peregrine")?

92.     When did that name change take place?

93.     For these questions, I will call Peaceful Lion and Peregrine collectively "Peaceful Lion."

94.     Have you been the sole director of Peaceful Lion since 2010?

95.     Who are the officers of Peaceful Lion?

96.     Are you the 100% shareholder of Peaceful Lion?

97.     Have you been the 100% shareholder of Peaceful Lion since its incorporation?

98.     Is Exhibit **Gasarch 4** an accurate copy of a form you signed that attests to the fact that you are the beneficial owner of Peaceful Lion?

99.     What is the business of Peaceful Lion?

100.    How long has that business been operating?

101.    What is your role on a day to day basis in that business?

102.    Did you allow Peaceful Lion to be used as a nominee shareholder by Sharp's businesses?

103.    In other words, you allowed Peaceful Lion to become the shareholder of record for shares that were actually controlled by clients of Sharp's businesses?

104.    For example, in early 2012, did Peaceful Lion acquire 1,034,000 shares of Stevia First from individual S-1 shareholders of Stevia First?

105.    You understood that those Stevia First shares did not actually belong to you as the beneficial owner of Peaceful Lion, right?

106.    Rather you knew that the clients of Sharp's business had the right to direct the transfer, disposition or sale of those Stevia First shares held by Peaceful Lion, correct?

107.    As another example, in September 2012, did Peaceful Lion acquire 140,000 shares of Arch stock from individual S-1 shareholders of Arch?

108.    Is Exhibit **Gasarch 5** an accurate copy of documents that Peaceful Lion provided to Arch's transfer agent as backup for this requested transfer of shares?

6

A1290

     a.  If you look at page 4 of this exhibit, there is a memo to Arch's transfer agent about this transfer of shares, and it represents, in the third bullet point, that "[t]he cost basis for this transfer is $.05 per share." Did you write this memo or authorize someone else to write it for you?

     b.  Peaceful Lion did not actually pay someone 5 cents per share for these 140,000 shares of Arch it obtained, right?

     c.  You had no right to direct the transfer, disposition or sale of these Arch shares held by Peaceful Lion, correct?

     d.  Rather, you understood that clients of Sharp's business had the right to direct the transfer, disposition or sale of those shares, right?

109.    Peaceful Lion had a bank account at Hyposwiss, a bank in Switzerland, correct?

110.    In the Q accounting system, the bank/brokerage code for that account was HYPP, correct?

111.    Peaceful Lion also had a brokerage account at DMS Bank & Trust Ltd. (Legacy Global Markets), right?

112.    In the Q accounting system, the bank/brokerage code for that account was LEPE, right?

113.    Peaceful Lion also had a bank account at St. Galler Kantonalbank, a bank in Switzerland, correct?

114.    In the Q accounting system, the bank/brokerage code for that account was SGPE, correct?

115.    You knew about these Peaceful Lion bank and brokerage accounts, correct?

116.    In part, you knew about them because you used the bank/brokerage account codes for those accounts to make entries into the Q accounting system?

117.    Any you knew about them because you personally directed transfers to be made out of those accounts for the benefit of the clients of Sharp's business, correct?

118.    You did not have the authority to control the millions of dollars that flowed through Peaceful Lion's bank and brokerage accounts for your own use and purpose, did you?

119.    Rather, you understood that clients of Sharp's business, with the approval of Sharp, had the authority to direct the payment of funds out of those accounts?

120.    Did you ask your husband, Bruce Gasarch, to serve as an officer or director of corporate entities that were controlled or administered by Sharp's business?

121.    I will represent to you that the attached Exhibit **Gasarch 6** is a printout obtained from searching for the name of Bruce Gasarch in the British Columbia corporate registry database. Do you have any reason to believe the information in Exhibit Gasarch 6 is inaccurate?

122.    Bruce Gasarch became a director of Norland Estates Inc. on or about June 23, 2014, correct?

123.    The email address for Norland Estates Inc. at the time was yg@corporatehouse.net, correct?

124.    Norland Estates was a company that was controlled and administered by Sharp's business, correct?

125.    How did it come to be that your husband was a director of this entity administered by Sharp's business?

126.    Did you ever have a role as an officer or director or shareholder of Norland Estates?

127.    Did you or your husband receive anything of value in exchange for Bruce Gasarch becoming a director of Norland Estates?

128.    Did you or your husband participate in, control, review or direct any business decisions made by Norland Estates?

129.    Bruce Gasarch also became a director of Coleman Strategies Inc. on or about October 23, 2015, correct?

130.    The email address for Coleman Strategies Inc. at the time was yg@corporatehouse.net, correct?

131.    Coleman Strategies was a company that was controlled and administered by Sharp's business, correct?

132.    How did it come to be that your husband was a director of this entity administered by Sharp's business?

133.    Did you or your husband receive anything of value in exchange for Bruce Gasarch becoming a director of Coleman Strategies?

134.    Did you or your husband participate in, control, review or direct any business decisions made by Coleman Strategies?

135.    Bruce Gasarch also became a director of Highpoint Drive Estates Inc. on or about July 24, 2015, correct?

136.    Highpoint Drive Estates was a company that was controlled and administered by Sharp's business, correct?

137.    How did it come to be that your husband was a director of this entity?

138.    Did you ever have a role as an officer or director or shareholder of Highpoint Drive Estates, either directly in your name or through another entity you owned (like Lakehouse Capital)?

139.    Did you or your husband receive anything of value in exchange for Bruce Gasarch becoming a director of Highpoint Drive Estates?

140.    Did you or your husband participate in, control, review or direct any business decisions made by Highpoint Drive Estates?

141.    Bruce Gasarch also became a director of Creery Estates Inc. on or about May 1, 2015, correct?

142.    Creery Estates was a company that was controlled and administered by Sharp's business, correct?

143.    How did it come to be that your husband was a director of this entity?

144.    Did you ever have a role as an officer or director or shareholder of Creery Estates?

145.    Did you or your husband receive anything of value in exchange for Bruce Gasarch becoming a director of Creery Estates?

146.    Did you or your husband participate in, control, review or direct any business decisions made by Creery Estates?

147.    Is Exhibit **Gasarch 7** an accurate copy of xphone communications between you (as xphone user WIRES) and Sharp (as xphone user BOND) on May 1, 2015 concerning your participation in forming Creery Estates?

    a.    When Sharp told you to set up Creery Estates the "same as the burnaby office company," what did you understand him to mean?

    b.    Did that mean to use the same officers and directors and shareholders?

    c.    What was the name of the "burnaby office company"?

148.    Is Exhibit **Gasarch 8** an accurate copy of xphone communications between you (as xphone user WIRES) and Sharp (as xphone user BOND) on May 7, 2015 concerning your participation in providing funding for assets to be held by Creery Estates?

8

      a.  In this exhibit, Sharp is explaining to you which bank or brokerage accounts belonging to nominee entities his business controls will be used to fund the assets that will be held by Creery Estates, correct?

      b.  In this exhibit, the terms sggo and sgpe refer to bank or brokerage accounts Sharp's business administers in the names of nominee entities, correct?

      c.  In particular, SGGO referred to a Gotama Capital bank account at St. Galler Kantonalbank in Switzerland and SGPE referred to a Peregrine Capital bank account at the same bank, correct?

      d.  When you told Sharp, "I knew I keep SGGO for u," what did you mean?

149.    Bruce Gasarch also became a director of Cross Pacific Ventures Inc. on or about September 17, 2015, correct?

150.    Cross Pacific Ventures was a company that was controlled and administered by Sharp's business, correct?

151.    How did it come to be that your husband was a director of this entity?

152.    Did you ever have a role as an officer or director or shareholder of Cross Pacific Ventures?

153.    Did you or your husband receive anything of value in exchange for Bruce Gasarch becoming a director of Cross Pacific Ventures?

154.    Did you or your husband participate in, control, review or direct any business decisions made by Cross Pacific Ventures?

155.    Is Exhibit **Gasarch 9** an accurate copy of xphone communications between you (as xphone user WIRES), Sharp (as xphone user BOND) and Alexandra Guinness (as xphone user 110 or Alex 110) on September 16 and 17, 2015 concerning your and your husband's participation in forming Cross Pacific Ventures and Cross Pacific Holdings?

      a.  In this exhibit, the address of 7971 Gabriola Gate that is to be provided for these companies is your home address, correct?

      b.  In the bottom most message, Sharp tells Alexandra (as code name LUNA) to "Copy creery format." You understood that this was a reference to the format of Creery Estates Inc., correct?

      c.  You were the president and secretary and shareholder of both Cross Pacific Holdings Inc. and Cross Pacific Ventures Inc., correct?

      d.  You were also the president and secretary and shareholder of Creery Estates, Inc.?

      e.  Why did you and your husband agree to let your names be used on these two companies?

156.    Bruce Gasarch also became a director of Bevendale Holdings Inc. on or about January 7, 2016, correct?

157.    Was Bevendale Holdings a company that was controlled and administered by Sharp's business?

158.    How did it come to be that your husband was a director of this entity?

159.    Did you or your husband receive anything of value in exchange for Bruce Gasarch becoming a director of Bevendale Holdings?

160.    Did you or your husband participate in, control, review or direct any business decisions made by Bevendale Holdings?

161.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your role as an officer, director, or shareholder of any corporate entities?

A1293

162.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning the business operations and accounts of entities in which you have an ownership interest or that you otherwise control?

163.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning Bruce Gasarch's role as an officer, director, or shareholder of any corporate entities?

### Relationship with Mike Veldhuis, Paul Sexton and Jackson Friesen

164.    When did you first meet Mike Veldhuis ("Veldhuis")?

165.    Describe your relationship with Veldhuis?

166.    What was your understanding of Veldhuis's job?

167.    When did Veldhuis first become a client of Sharp and his business?

168.    What services did Sharp's business provide to Veldhuis?

169.    For what business purposes did you interact with Veldhuis?

170.    Did Veldhuis use the services provided by Sharp's business and you to own, and pay the expenses of trading in, microcap stocks without disclosing his ownership and trading?

171.    When did you first meet Paul Sexton ("Sexton")?

172.    Describe your relationship with Sexton?

173.    What was your understanding of Sexton's job?

174.    When did Sexton first become a client of Sharp and his business?

175.    What services did Sharp's business provide to Sexton?

176.    For what business purposes did you interact with Sexton?

177.    Did Sexton use the services provided by Sharp's business and you to own, and pay the expenses of trading in, microcap stocks without disclosing his ownership and trading

178.    When did you first meet Jackson Friesen ("Friesen")?

179.    Describe your relationship with Friesen?

180.    What was your understanding of Friesen's job?

181.    When did Friesen first become a client of Sharp and his business?

182.    What services did Sharp's business provide to Friesen?

183.    For what business purposes did you interact with Friesen?

184.    Did Friesen use the services provided by Sharp's business and you to own, and pay the expenses of trading in, microcap stocks without disclosing his ownership and trading?

185.    Veldhuis, Sexton and Friesen were partners in a number of deals by which the three of them, working together, gained control of, and then directed sales of, large blocks of penny stock using methods that did not reveal that their ownership of those shares, right?

186.    When did Veldhuis, Sexton and Friesen begin working together on those types of penny stock deals?

187.    Veldhuis, Sexton and Friesen, working together and with others, controlled blocks of shares of Stevia First Corp. ("Stevia First") and its successor Vitality Biopharma Inc. ("Vitality") totaling more than 10% of the company's outstanding shares, correct?

188.    Veldhuis, Sexton and Friesen, working together and with others, controlled blocks of shares of Arch Therapeutics Inc. ("Arch") totaling more than 10% of the company's outstanding shares, correct?

189.    Veldhuis, Sexton and Friesen, working together and with others, controlled blocks of shares of OncoSec Medical Inc. ("OncoSec") totaling more than 10% of the company's outstanding shares, correct?

10

A1294

190.    You understood that Veldhuis and Sexton worked with Avtar Dhillon ("Dhillon") on these three deals (Stevia First, Arch and OncoSec) to get stock that the three of them would then control, correct?

191.    At the time Veldhuis and Sexton were working with Dhillon to get stock in Stevia First, Arch and OncoSec, you understood that Dhillon had a management role in each of those companies?

192.    At the time that Veldhuis, Sexton and Friesen, working together, controlled and were selling large blocks of Stevia First/Vitality, Arch, and OncoSec stock, you were aware that they were paying for promotions that attempted to convince investors to buy the stock they were selling, correct?

193.    You understood that when Veldhuis, Sexton and Friesen, working together, paid for promotions for the stock they were selling, that the promotions would not reveal that they were being funded by the same people who would be selling stock into the demand the promotions were working to create, correct?

194.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your interactions with Veldhuis, Sexton and Friesen?

Role in Sharp's Business

195.    During the time that you were an employee of Sharp, you were responsible for arranging for transfers of the proceeds of stock trading back to, or for the benefit of, Sharp's clients, right?

196.    You often communicated with clients of Sharp's business who wanted you to provide them with updates on the proceeds of their securities trading as shown in the Q accounting system, correct?

197.    For example, is Exhibit **Gasarch 10** an accurate copy of an xphone communication between you (as xphone user Wires) and Bradley Moynes (as xphone user 126 or 126 FRMC) concerning Moynes' request for the cash position in the Q account for FRMC?

    a.    Moynes was a client of Sharp's business, correct?

    b.    The FRMC account in Q was the account for Formcap, the issuer whose stock Moynes was selling, correct?

    c.    Moynes asked you whether the cash position in his account included trades on certain days, and you provided a response about which trading is reflected in the cash balance, correct?

198.    As another example, is Exhibit **Gasarch 11** an accurate copy of an xphone communication between you (as xphone user Wires) and Giovanni Punzo (as xphone user 105 or CATV 105) concerning Punzo's request for the wire transfer of $10,000?

    a.    In the message sent at 11:07, you asked Punzo, "do u sell some stocks?"

    b.    Your question indicated that you understood that the source of the $10,000 Punzo was seeking to be paid was his sale of stock using Sharp's business' services, correct?

199.    As another example, is Exhibit **Gasarch 12** an accurate copy of an xphone communication between you (as xphone user Wires), Sharp (a xphone user Bond), Dashiel Solomons (as xphone user Kash), Kelln (as xphone user Celt) and Bradley Moynes (as xphone user Frmc) on June 3, 2015, concerning Moynes' request for a Q account statement and for daily updates on his trading activity?

    a.    Dashiel Solomons was a trader who worked for Sharp's business, correct?

    b. Sharp told Moynes that Solomons could send him daily trading recaps by xphone, but that "Statements can be xmailed monthly, but only xmail; not to a public email." Did you understand that the statements to which Sharp referred were statements from the Q system?

    c. Did you send Q statement to Moynes and other clients of Sharp's business on a monthly basis?

    d. Why was it acceptable to send those Q statements by xmail but not to a public email?

200.   During the time that you were an employee of Sharp, you were responsible for sending the proceeds from the accounts of various nominee companies administered by Sharp's business as its clients directed those proceeds to be sent?

201.   During the time that you were an employee of Sharp, you were responsible for keeping track of such transfers in the Q accounting system?

202.   During the time that you were an employee of Sharp, you were responsible for getting approvals for such transfers from Sharp?

203.   And then you were responsible for deducting those transfers from the clients' account in the Q accounting system?

204.   Your nickname, and code name, in Sharp's business was Wires, because of the wire services you provided to Sharp and his clients, correct?

205.   Is Exhibit **Gasarch 13** an accurate copy of xphone communications between you (as xphone user Wires), Kelln (as xphone user Celt) and Dashiel Solomons (as xphone user KASH) on August 1, 2014 in which Solomons is seeking information about which nominee entity administered by Sharp sent a wire transfer to an entity called Business Venture Investments?

    a. In the message sent at 2:49 pm, Kelln writes that she cannot help Solomons with his request because "All wires are sent by Yvonne. She is the master of finance," and then forwards Solomons' request to you, correct?

    b. Was Kelln's statement that you sent all wires for Sharp's business accurate?

    c. Was Kelln's characterization of you as the "master of finance" for Sharp's business accurate?

    d. Later in this message chain, you provided Solomons with the information he was seeking, correct?

206.   You understood that part of your job for Sharp's businesses was to make it hard to connect the clients of Sharp's business to the source of the funds they were receiving and the destination of the funds they asked you to send, correct?

207.   Is Exhibit **Gasarch 14** an accurate copy of xphone communications between you (as xphone user Wires) and Sharp (as xphone user Bond) on August 23, 2013 in which Sharp asks you how you would defend a draft that you wrote for grand yachts against cash?

    a. Sharp asked you how this was "a legitimate payment" and told you that his "concern is money laundering: hells angels gives us cash; we give them a draft to buy a boat. Later, boat is seized, polic[e] investigate, find out charterhouse paid for it; visit us and ask why. What will u say?"

    b. You respond that you would see if "Thomas" would sign a loan agreement so that it would look like Sharp's business was loaning money to the Hells Angels, correct?

    c. Was the Thomas to whom you referred a member of the Hells Angels?

    d. How was this issue resolved?

A1296

e.  Were you concerned that your activities were money laundering?

208.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your role and responsibilities in Sharp's business?

<u>Xphones and Xmail</u>

209.    When did you get your first xphone from Sharp's business?

210.    When you communicated via xphone, you used code names and numbers to identify yourself, correct?

211.    Specifically, you used the code names WIRES, 76, GREAT and PEACE to communicate by xphone, correct?

212.    You used code names and a code number because you were trying to conceal your identity, correct?

213.    You also used a code name/number because you were trying to conceal your communications from law enforcement personnel or securities regulators, correct?

214.    And you wanted to conceal your identity because you were worried that law enforcement personnel or securities regulators would try to intercept your communications, correct?

215.    You were concerned that law enforcement personnel and securities regulators would try to bring legal actions against you for the activity in which you were engaging with Sharp's business, correct?

216.    When you communicated via xphone, you used the code names/numbers in column 1 of the chart below to communicate with the individuals listed in column 2, correct?

| Code Name/Number | Individual |
|---|---|
| BOND, BONDED | Frederick Sharp |
| 3, HEAR, SEXY | Paul Sexton |
| 4, 114, ACCO | Mike Veldhuis |
| 2, GARD | Jackson Friesen |
| CELT, CERTS, ESQ, CELTIC | Courtney Kelln |

217.    You were the only person using code names and numbers WIRES and 76 to communicate by xphone correct?

218.    Is Exhibit **Gasarch 15** an accurate copy of an xphone communication between you (as xphone user WIRES and Great) and Tyler Hachey (as xphone user Tayler or Wolf) in which he asks you "For wires is it just to u at this address?" and you respond yes?

219.    No one other than you ever sent xphone messages using the code names Wires or 76, correct?

220.    In addition to xphones, Sharp's business also provided you with a secure email address that the business administered, correct?

221.    You referred to that secure email as xmail, or xmeridian mail, correct?

222.    You understood that xmail was encrypted, correct?

223.    And you believed that it would therefore be more difficult for law enforcement personnel or securities regulators to intercept xmail, correct?

224.    You used the following email addresses that were part of xmail: wires@secure.xmeridian.com, wires@securecuracao.xmeridian.com, yg@secure.xmeridian.com and ychen@secure.xmeridian.com, correct?

A1297

225.    Is Exhibit **Gasarch 47** an accurate copy of an xmail communication between you (using email address wires@secure.xmeridian.com) and Veldhuis (using email address mike@secure.xmeridian.com) to which you signed your name, Yvonne?

226.    Is Exhibit **Gasarch 48** an accurate copy of an xmail communication between you (using email address wires@secure.xmeridian.com) and Veldhuis (using email address mike@secure.xmeridian.com) to which you signed your name, Yvonne?

227.    One of the things you used xmail to do was to send and receive transactional documents to and from clients of Sharp's business, correct?

228.    You also sent statements from the Q accounting system to clients using xmail, correct?

229.    Sharp's business also provided email addresses for the nominee companies it administered, and those email addresses used bespoke domain names that Sharp created, right?

230.    Over time, those Sharp domain names included corptrax.com, yourmail.bz and buzzmail.ltd, correct?

231.    You would also use email addresses for the nominee companies administered by Sharp's businesses that were part of these domain names, correct?

232.    For example, you sometimes sent emails pretending to be from the nominal owners of the nominee companies administered by Sharp's businesses, correct?

233.    One such address you used was hilton@buzzmail.ltd, which was the email for Sharp-administered nominee Hilton Capital, correct?

234.    You used the email address yg@corptrax.com for communications relating to Sharp's business, correct?

235.    In addition to the secure email discussed above, did you also use the email addresses yg@corphouse.net and yvonne@corporatehouse.com in connection with your work for Sharp's business?

236.    In addition to the xmail provided to you by Sharp's business, did you also use the email addresses yg@lakehg.com and yvonnech@telus.net at any time between 2011 and 2019?

237.    What other email addresses did you use between 2011 and 2019?

238.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your use of the xphone and xmail systems provided by Sharp's business?

<u>Understanding of the securities laws</u>

239.    During the time period from 2011 to 2019, you understood that you could not sell stock publicly in the United States without registering that sale transaction or falling into one of the exemptions to registration, correct?

240.    During the time period from 2011 to 2019, you understood that people who, on their own or as part of a group, owned 10% or more of a company's stock were considered to be affiliates of that company, correct?

241.    You also understood that officers and directors of a company are considered affiliates of that company?

242.    During the time period from 2011 to 2019, you understood that all of a company's stock held by an affiliate of that company is restricted and cannot be sold unless that sale is registered or an exemption from registration applies, correct?

243.    During the time period from 2011 to 2019, you were familiar with SEC Rule 144, which places restrictions on sales of a company's stock by affiliates of that company, correct?

A1298

244.    During the time period from 2011 to 2019, you understood that brokerage firms gave additional scrutiny to transactions in which a shareholder acquired 5% or more of a company's shares, correct?

245.    During the time period from 2011 to 2019, you understood that OTC Markets required public companies for whom they provided quotation services to disclose shareholders holding 5% or more of the company's stock in order to meet certain listing requirements, correct?

246.    During the time period from 2011 to 2019, you understood that shareholders had make disclosures in public filings with the SEC about their ownership, either individually or as part of a group, of 5% or more of certain companies' shares, correct?

247.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your understanding of the United States securities laws?

<u>Interactions with Silverton SA and Blacklight SA</u>

248.    You know Roger Knox ("Knox"), correct?

249.    When and how did you first interact with Knox?

250.    You understood that Knox ran a business called Silverton SA and later Wintercap SA (collectively "Silverton"), correct?

251.    You understood that Knox's business was to sell shares for groups of clients who wanted to conceal the fact that they controlled the shares they were selling into the public markets?

252.    You knew that Silverton sold shares for the clients of Sharp's business?

253.    You knew that Silverton sold shares for the clients of Sharp's business in multiple brokerage accounts that it controlled, right?

254.    On several occasions, you helped clients of Sharp's business facilitate the movement of shares to Silverton, correct?

255.    For example, is Exhibit **Gasarch 16** an accurate copy of xmail messages you received from Veldhuis and then forwarded to personnel at Silverton on June 16, 2016?

     a.  In this exhibit, Veldhuis asked you to help him get Silverton to sign documents that would make it appear that Silverton was purchasing for itself 5 million shares of Stevia First shares, when in reality, Veldhuis was just using Silverton to hold those shares on his behalf, correct?

     b.  You forwarded Veldhuis' request along to Silverton and asked them to sign the documents and return them to you, correct?

256.    As another example, is Exhibit **Gasarch 17** an accurate copy of xmail messages you received from Veldhuis and then forwarded to personnel at Silverton on September 23, 2016?

     a.  In this exhibit, Veldhuis told you that he was transferring 2,375,000 warrants of StartMonday Technology Corp. to Silverton and that "[b]ecause they are still in the 4 month hold period we will need Silverton SA to sign the attached document. Please arrange."  You then forwarded the documents to Silverton, correct?

257.    You further understood that Silverton would report its sales on behalf of Sharp clients back to you and your coworkers, or enter information about those sales directly into the Q accounting system?

258.    You communicated with Knox and with Richard Targett-Adams ("Targett-Adams") about the trading that Silverton was doing on behalf of the clients of Sharp's business, correct?

259.    You understand that both Knox and Targett-Adams have pled guilty to securities fraud in connection with the sales of securities about which you communicated with them, correct?

15

260.    You worked with Silverton to distribute the proceeds of stock sales that were made by, or for the benefit of, clients of Sharp's business, correct?

261.    And you also worked with Silverton to provide the documentation necessary to support the wire requests that you were sending to Silverton on behalf of clients of Sharp's business, correct?

262.    You understood that one of the reasons that the clients of Sharp's business used Silverton to sell stock was that it would make it harder to track the ownership of that stock back to those clients, correct?

263.    You know Kenneth Ciapala ("Ciapala"), correct?

264.    When and how did you first interact with Ciapala?

265.    You know Anthony Killarney ("Killarney")?

266.    When and how did you first interact with Killarney?

267.    You understand that Ciapala and Killarney together ran a business called Blacklight SA ("Blacklight") in Switzerland, correct?

268.    You understood that Blacklight's business was to sell shares for groups of clients who wanted to conceal the fact that they controlled the shares they were selling into the public markets?

269.    You knew that Blacklight sold shares for the clients of Sharp's business?

270.    You knew that Blacklight sold shares for the clients of Sharp's business in multiple brokerage accounts that it controlled, right?

271.    And you further understood that Blacklight would report those sales back to you and your coworkers, or enter information about those sales directly into the Q accounting system?

272.    You worked with Blacklight to distribute the proceeds of stock sales that were made by, or for the benefit of, clients of Sharp's business, correct?

273.    And you also worked with Blacklight to provide the documentation necessary to support the wire requests that you were sending to Blacklight on behalf of clients of Sharp's business, correct?

274.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your interactions and business dealings with Silverton and Blacklight?

Stevia First/Vitality Transactions

275.    Did you assist a group of the Sharp business' clients, composed of Veldhuis, Sexton, Friesen and others, to keep accurate records relating to their sales Stevia First/Vitality stock between 2012 and 2018?

276.    You assisted Veldhuis, Sexton and Friesen, in part, by sometimes updating the Q accounting system to make sure that all of the trades of their Stevia First/Vitality shares were recorded in Q?

277.    You also assisted them by paying the costs associated with their trading out of the Stevia First/Vitality account, correct?

278.    For example, on behalf of Veldhuis, Sexton and Friesen, you paid bills from stock promoters, for legal fees, and for other expenses they incurred?

279.    When you paid bills out of the Stevia First/Vitality account, you were able to observe that the proceeds flowing into that account originated from the sale of stock, correct?

280.    You also assisted Veldhuis, Sexton and Friesen by transferring portions of proceeds from the Q account for Stevia First/Vitality into their own personal Q accounts, correct?'

A1300

281.    And then you assisted Veldhuis, Sexton and Friesen by transferring funds out of their personal Q accounts to pay their own obligations or to make investments, right?

282.    When you made all of these transfers at the request of clients of Sharp's business, you also had to enter information into the Q system to document that these transfers took place, correct?

283.    Often, you had to create documents to substantiate why payments were being made out of the accounts of various nominee companies administered by Sharp's business to the people that Sharp's clients were directing to be paid, correct?

284.    You were also responsible for preparing the wire transfer request forms for these transactions, and for following up when there was a problem with wires that were erroneous or missing, correct?

285.    The Q account for the Stevia First/Vitality deal was named STVF and the name later changed to VBIO, correct?

286.    Is Exhibit **Gasarch 18** an accurate copy of a portion of the account records for the STVF/VBIO account in the Q accounting system?

      a.    You were responsible for entering the information into this Q account when you made transfers of money out of the account, correct?

      b.    So, for example, if you start at the bottom of page 1 and read up the page, you will see that the first 6 transactions were deposits into the STVF account that resulted from selling stock, correct?

      c.    And then you made a number of debits from the STVF account that were funded by the proceeds of that stock trading, correct?  Including by making internal transfers to other accounts in the Q system on 5/30/2012 and 6/4/2012, making a distribution of cash on 5/31/2012, sending wire transfers to an entity named Heng Hong on 6/7/2012 and 6/8/2012, paying for an audit confirmation on 6/12/2012, paying director fees on 10/22/2012, and paying attorney Scott Lawler on 1/28/2013?

      d.    When you made these, and other, transfers out of the STVF account, you did so at the request of Veldhuis, Sexton or Friesen, correct?

      e.    And you had to obtain Sharp's approval to make some of those transfers out of the STVF account, right?

      f.    In this and other Q account statements, the indication "TT" in a transaction description means that it is a wire transfer, correct?

      g.    When you recorded wire transfers out of the STVF account, you needed to decide which real-world bank or brokerage account to use to send those transfers, correct?

      h.    And you recorded the name of the actual bank or brokerage account from which you sent wire transfers in the third column of this exhibit (labeled Ban/Brk), correct?

      i.    For example, when you sent the wire transfer to Heng Hong on June 8, 2012, you did it from the account with code DGMI, which is shorthand for an account at DGM Bank and Trust Inc. in the name of Sharp-administered nominee Island Trust LLC?

287.    Is Exhibit **Gasarch 19** an accurate copy of an xphone communication between you (as xphone user WIRES), Sharp (as xphone user BOND), Kelln (as xphone user CELT) and

17

A1301

Veldhuis (as xphone user ACCO) on January 3, 2014 requesting that you send a wire from the Q account for Stevia First to pay a retainer to a lawyer?

    a. You understood the sentence "Acco approved," to mean that Veldhuis approved the wire?

    b. You sent the wire as requested, correct?

288.   Are Exhibits **Gasarch 20** and **Gasarch 21** accurate copies of xphone communications between you (as xphone user WIRES) and Veldhuis (as xphone user ACCO or 4) on August 5 and 6, 2014 asking you to provide him with cash to "cut the balance" of the Stevia First account in Q, correct?

    a. At first he asked for $110,000 and then increased his request to $120,000, correct?

    b. Veldhuis noted that giving him $120,000 in cash would cause a "small debit" in the Stevia First account but that he would make an internal transfer to cover the debit, and you say that is ok, correct?

289.   Is Exhibit **Gasarch 22** an accurate copy of an xphone communication between you (as xphone user WIRES or 76) and Sexton (as xphone user HEAR or 3) and Veldhuis (as xphone user ACCO or 4) on March 6, 2014 about Sexton's request that you get cash for him and charge it to the Stevia First account and also send a wire transfer to Heng Hong charged to the Stevia First account?

    a. You tell Sexton that you will send the wire but do not have cash available on that day, correct?

290.   You understood at the time that Sharp was allowing nominee companies administered by his business to hold and sell shares on behalf of Veldhuis, Sexton, Friesen and others in exchange for fees?

291.   You also understood at the time that was allowing nominee companies administered by his business to distribute the proceeds from selling shares on behalf of Veldhuis, Sexton, Friesen and others in exchange for fees?

292.   Did Veldhuis, Sexton, or Friesen sometimes ask you for statements of the Q accounts for the various companies whose stock they were selling?

293.   For example is Exhibit **Gasarch 23** an accurate copy of an xphone communication between you (as xphone user WIRES or 76) and Sexton (as xphone user HEAR or 3) on April 3, 2013 about Sexton's request that you print out Q account statements for multiple deals in which he was involved, including Stevia First?

    a. You responded to him that the statements he wanted were ready for him to pick up, right?

294.   And sometimes, Veldhuis, Sexton or Friesen asked you for the cash balances in the Q accounts for the deals in which they were involved, correct?

295.   For example, is Exhibit **Gasarch 24** an accurate copy of an xphone communication between you (as xphone user WIRES or 76) and Sexton (as xphone user HEAR or 3) on March 28, 2014 about Sexton's request to get the current balance in the Q accounts of multiple deals in which he was involved, including Stevia First?

296.   Sometimes, clients of Sharp's business also asked you for information about the identities of the nominee companies that were holding the shares they controlled, or the nominee companies that you were using to make the wire transfers they requested, correct?

297.   For example, is Exhibit **Gasarch 25** an accurate copy of an xphone communication between you (as xphone user WIRES), Sharp (as xphone user BOND), Veldhuis (as xphone user RIHT) and Kelln (as xphone user CELT) on December 2, 2014?

A1302

     a.  In the bottom-most message in this exhibit, Veldhuis tells Sharp and you that "we are in the process of receiving approximately 20 million shares of STVF that were held in ESCROW.  At the time of the ESCROW agreement, we may have put some of the stock in NON BOND entities" and then asks you to go through the list of seven shareholding companies to let them know "which entities you guys administer," correct?

     b.  Sharp tells Veldhuis that his message should have "gone to Celtic" and includes Kelln on the message chain, right?

     c.  Then Kelln responded, "I confirm they are all ours," meaning that the seven companies holding Stevia First shares that are listed in Veldhuis' message are all administered by Sharp's business, correct?

298.    You knew that Veldhuis, working on his own behalf and on behalf of others, was engaged in promotions for the Stevia First stock that he was simultaneously selling, right?

299.    Is Exhibit **Gasarch 26** an accurate copy of an xphone communication between you (as xphone user WIRES), Veldhuis (as xphone user ACCO) and Kelln (as xphone user CELT) on March 31, 2015?

     a.  In this exhibit, in the message sent at 12 pm, Veldhuis forwards an exchange he had with Sharp about which companies administered by Sharp's business can be used to pay for stock promotions, right?

     b.  And Veldhuis then asks for the name and address of one of the companies he could use as the entity to pay for his stock promotions?

     c.  And in the message at 1:01 pm, Kelln asked you to send Veldhuis the name and address of one of the holding companies that was then being administered by Sharp's business, right?

     d.  And then you responded that she had sent the requested information to Veldhuis' xmail account?

     e.  The top message "Thanks Y!" means "Thanks Yvonne," right?

300.    In July 2016, Stevia First changed its name to Vitality Biopharma ("Vitality"), correct?

301.    You were aware that Sharp allowed Veldhuis, Sexton, Friesen and others to use nominee companies administered by the Sharp business to hold and trade millions of shares Vitality stock in exchange for fees, right?

302.    As they did with Stevia First proceeds, Veldhuis, Sexton and Friesen asked you to make wire transfers and cash withdrawals to pay the expenses of their Vitality trading, and to distribute the proceeds of that trading to them and to their partners, correct?

303.    You made the payments that Veldhuis, Sexton or Friesen requested out of the proceeds of Vitality trading, correct?

304.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your involvement in transactions relating to Stevia First and Vitality?

<u>Arch Therapeutics</u>

305.    Did you assist a group of the Sharp business' clients, composed of Veldhuis, Sexton, Friesen and others, to keep accurate records relating to their sales of Arch stock between 2013 and 2017?

306.    You assisted Veldhuis, Sexton and Friesen, in part, by sometimes updating the Q accounting system to make sure that all of the trades of their Arch shares were recorded in Q?

A1303

307.    You also assisted them by paying the costs associated with their trading out of the Arch account, correct?

308.    For example, on behalf of Veldhuis, Sexton and Friesen, you paid bills from stock promoters, for legal fees, and for other expenses they incurred?

309.    When you paid bills out of the Arch account, you were able to observe that the proceeds flowing into that account originated from the sale of stock, correct?

310.    You also assisted Veldhuis, Sexton and Friesen by transferring portions of proceeds from the Q account for Arch into their own personal Q accounts, correct?'

311.    And then you assisted Veldhuis, Sexton and Friesen by transferring funds out of their personal Q accounts to pay their own obligations or to make investments, right?

312.    Arch's stock traded under the ticker symbol ARTH, right?

313.    The Q account for the Arch deal was named ARTH, correct?

314.    Is Exhibit **Gasarch 27** an accurate copy of a portion of the account records for the ARTH account in the Q accounting system?

    a.   You were responsible for entering the information into this Q account when you made transfers of money out of the account, correct?

    b.   So, for example, if you start at the bottom of page 3 and read up the page, you will see that the first about 20 transactions were deposits into the ARTH account that resulted from selling stock, correct?

    c.   And then you made a number of debits from the ARTH account that were funded by the proceeds of that stock trading, correct?  Including by making internal transfers to other accounts in the Q system on 12/9/2015, making distributions of cash on 10/23/2015 and 11/17/2015, paying Arch's transfer agent on 11/3/2015 and 11/26/2015, paying director fees on 4/6/2016, paying for new xphones and xphone service for Veldhuis, Sexton and Friesen on 11/12/2015 and 1/1/2016, and paying stock promoters on 10/6/2015?

    d.   When you made these, and other, transfers out of the ARTH account, you did so at the request of Veldhuis, Sexton or Friesen, correct?

    e.   And you had to obtain Sharp's approval to make some of those transfers out of the ARTH account, right?

    f.   When you recorded wire transfers out of the ARTH account, you needed to decide which real-world bank or brokerage account to use to send those transfers, correct?

    g.   For example, when you sent the wire transfer to Beneficial Designs on 2/5/2016, you did it from the account with code VPQU, which is shorthand for an account at VP Bank. in the name of Sharp-administered nominee Quezon Group LLC?

315.    Arch's former name was Almah, Inc. and its Q account code was AAHC, correct?

316.    Is Exhibit **Gasarch 28** an accurate copy of an xphone communication between you (as xphone user WIRES or 76) and Sexton (as xphone user HEAR or 3) on April 29, 2013 about Sexton's request that you send money from the Almah Inc. account in the Q system to Diljit Bains?

    a.   Were you aware that Diljit Bains was the wife of Avtar Dhillon who later became the chairman of Arch's board of directors?

317.    Is Exhibit **Gasarch 29** an accurate copy of an xphone communication between you (as xphone user WIRES) and Veldhuis (as xphone user ACCO) on August 21, 2013 about

Veldhuis' request that you distribute $2.4 million in Arch trading proceeds evenly between himself, Sexton, Friesen and another Sharp client?

    a.   Veldhuis also requested that you transfer $1.25 million from the ARTH Q account to the Q account for another company named RightsCorp with Q account RIHT, correct?

    b.   You made the transfers that Veldhuis requested, right?

318.    Is Exhibit **Gasarch 30** an accurate copy of an xphone communication between you (as xphone user WIRES) and Veldhuis (as xphone user ACCO) on August 22, 2013 about Veldhuis' request that you send a wire transfer of $600,000 of proceeds from Arch trading for the benefit of an entity named Hong Hing Investments Ltd.? You made the transfer that Veldhuis requested, right?

319.    Is Exhibit **Gasarch 31** an accurate copy of an xphone communication between you (as xphone user WIRES) and Veldhuis (as xphone user ACCO) on September 6, 2013 about Veldhuis' request that you send a wire transfer of $250,000 of proceeds from Arch trading for the benefit of an entity named Ortivo Enterprises Corp.? You made the transfer that Veldhuis requested, right?

320.    You understood at the time of these transfers that Sharp was allowing his nominee companies to hold and sell millions of Arch shares on behalf of Veldhuis, Sexton, Friesen and others in exchange for fees, correct?

321.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your involvement in transactions relating to Arch?

<u>Garmatex Holdings, Ltd.</u>

322.    Did you assist a client of Sharp business' clients, Luis Carrillo ("Carrillo"), to keep accurate records relating to his sales of shares of Garmatex Holdings Ltd. ("Garmatex") in 2017?

323.    You assisted Carrillo, in part, by sometimes updating the Q accounting system to make sure that all of the trades of his Garmatex shares were recorded in Q?

324.    You also assisted him by paying the costs associated with his trading out of the Garmatex account, correct?

325.    For example, on behalf of Carrillo, you paid bills from stock promoters, for legal fees, and for other expenses he incurred?

326.    When you paid bills out of the Garmatex account in Q, you were able to observe that the proceeds flowing into that account originated from the sale of stock, correct?

327.    You also assisted Carrillo by transferring portions of proceeds from the Q account for Garmatex into his own personal Q account, correct?'

328.    And then you assisted Carrillo by transferring funds out of his personal Q account to pay his own obligations or to make investments, right?

329.    Garmatex's stock traded under the ticker symbol GRMX, right?

330.    And the name of the Garmatex account in Q was also GRMX, correct?

331.    Is Exhibit **Gasarch 32** an accurate copy of a portion of the account records for the GRMX account in the Q accounting system?

    a.   You were responsible for entering the information into this Q account when you made transfers of money out of the account, correct?

A1305

b.  So, for example, if you start in the middle of page 2 and read up the page, you will see numerous transactions that were deposits into the GRMX account that resulted from selling stock, correct?

c.  And then you made a number of debits from the GRMX account that were funded by the proceeds of that stock trading, correct? Including by making internal transfers to other accounts in the Q system on 3/19/2017, sending a wire transfer to a lawyer on 4/3/2017, making a wire transfer to a watch company on 4/3/2017, and paying custody fees on 3/31/2017?

d.  When you made these, and other, transfers out of the GRMX account, you did so at Carrillo's request, correct?

e.  And you had to obtain Sharp's approval to make some of those transfers out of the GRMX account, right?

f.  When you recorded wire transfers out of the GRMX account, you needed to decide which real-world bank or brokerage account to use to send those transfers, correct?

g.  For example, when you sent the wire transfer to the watch company on 4/3/2017, you did it from the account with code WBHI, which is shorthand for an account at WB21 Pte. Ltd. in the name of Sharp-administered nominee Hilton Capital Inc.?

332.    You understand at the time that Sharp was allowing his nominee companies to hold and sell shares on behalf of Carrillo in exchange for fees?

333.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your involvement in transactions relating to Garmatex?

334.    In addition to assisting Carrillo with transfers arising from the proceeds of Garmatex stock, you provided similar services to him in connection with many other issuers' securities, correct?

335.    Several of the other issuers whose stock sale proceeds you helped Carrillo to distribute included: Proto Script Pharmaceutical Corp. (ticker PSCR), Oroplata Resources Inc. (ORRP), OneLife Technologies Corp. (ticker OLMM), (ticker ALKM), PureSnax International Inc. (ticker PSNX), and Digatrade Financial Corp (ticker DIGAF), correct?

336.    You frequently corresponded with Carrillo about payments he was seeking your assistance in effecting, and payments that had been charged to his account in the Q accounting system, correct?

337.    When you communicated with Carrillo, you often used your xmail address of wires@secure.xmeridian.com, didn't you?

338.    The documents labeled as Exhibits **Gasarch 33, 34, and 35** are all accurate copies of xmail communications between you and Carrillo between August and October 2016 concerning either invoices he asked you to pay, invoices he thought had been improperly charged to his Q account, incorrect amounts of invoices he had asked you to pay, and related topics, correct?

339.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your involvement in transactions relating to other issuers' stock for the benefit of Carrillo?

<u>Other Deals On Which You Assisted Veldhuis, Sexton and Friesen</u>

340.    In addition to assisting Veldhuis, Sexton and Friesen with transactions relating to Stevia First/Vitality and Arch stock, you provided similar services to them in connection with many other issuers' securities, correct?

A1306

341. When you performed those services, you understood that Veldhuis, Sexton and Friesen were being permitted to use the nominee companies provided by Sharp's business to hold shares for their benefit in exchange for paying fees to Sharp's business, correct?

342. Specifically, you assisted Veldhuis, Sexton and Friesen with transactions relating to the stock of Echo Automotive Inc. (ticker symbol ECAU) in 2012 through 2014, but primarily in 2013?

343. You knew that Veldhuis, Sexton and Friesen sold their Echo Automotive stock held in the names of Sharp-administered nominee companies into the public markets, right?

344. The total proceeds of those Echo Automotive sales through Sharp-administered nominees were approximately $23.6 million, correct?

345. You also assisted Veldhuis, Sexton and Friesen with transactions relating to the stock of OncoSec Medical Inc. (ticker symbol ONCS) in 2011 and 2012?

346. You knew that Veldhuis, Sexton and Friesen sold their OncoSec stock held in the names of Sharp-administered nominee companies into the public markets, right?

347. The total proceeds of those OncoSec sales through Sharp-administered nominees were approximately $5.28 million, correct?

348. You also assisted Veldhuis, Sexton and Friesen with transactions relating to the stock of Stevia Corp. (ticker symbol STEV) in 2011 through 2014?

349. You knew that Veldhuis, Sexton and Friesen sold their Stevia Corp. stock held in the names of Sharp-administered nominee companies into the public markets, right?

350. The total proceeds of those Stevia Corp. sales through Sharp-administered nominees were approximately $13.2 million, correct?

351. You also assisted Veldhuis, Sexton and Friesen with transactions relating to the stock of Liberty One Lithium Corp. (ticker symbol LBY) in 2017 through 2018?

352. You knew that Veldhuis, Sexton and Friesen sold their Liberty One Lithium stock held in the names of Sharp-administered nominee companies into the public markets, right?

353. The total proceeds of those Liberty One Lithium sales through Sharp-administered nominees were approximately $8.7 million, correct?

354. You also assisted Veldhuis, Sexton and Friesen with transactions relating to the stock of Oryon Technologies Inc. (ticker symbol ORYN) in 2012 through 2013?

355. You knew that Veldhuis, Sexton and Friesen sold their Oryon Technologies stock held in the names of Sharp-administered nominee companies into the public markets, right?

356. The total proceeds of those Oryon Technologies sales through Sharp-administered nominees were approximately $8.5 million, correct?

357. You also assisted Veldhuis, Sexton and Friesen with transactions relating to the stock of Makism 3D Corp. (ticker symbol MDDD) in 2013 and 2014?

358. You knew that Veldhuis, Sexton and Friesen sold their Makism 3D stock held in the names of Sharp-administered nominee companies into the public markets, right?

359. The total proceeds of those Makism 3D sales through Sharp-administered nominees approximately $8.5 million, correct?

360. You also assisted Veldhuis, Sexton and Friesen with transactions relating to the stock of Graphite Corp. (ticker symbol GRPH) in 2012 through 2014?

361. You knew that Veldhuis, Sexton and Friesen sold their Graphite Corp. stock held in the names of Sharp-administered nominee companies into the public markets, right?

362. The total proceeds of those Graphite Corp. sales through Sharp-administered nominees were approximately $6.2 million, correct?

A1307

363.    You also assisted Veldhuis, Sexton and Friesen with transactions relating to the stock of NewGen Biopharma Corp. (ticker symbol NEWG) in 2016 and 2017?

364.    You knew that Veldhuis, Sexton and Friesen sold their NewGen Biopharma stock held in the names of Sharp-administered nominee companies into the public markets, right?

365.    The total proceeds of those NewGen Biopharma sales through Sharp-administered nominees were approximately $3.8 million, correct?

366.    You also assisted Veldhuis, Sexton and Friesen with transactions relating to the stock of StartMonday Technology Corp. (ticker symbol STMDF) in 2016 to 2018?

367.    You knew that Veldhuis, Sexton and Friesen sold their StartMonday stock held in the names of Sharp-administered nominee companies into the public markets, right?

368.    The total proceeds of those StartMonday sales through Sharp-administered nominees were approximately $2.4 million, correct?

369.    You also assisted Veldhuis, Sexton and Friesen with transactions relating to the stock of Lexington Biosciences Holdings Corp. (ticker symbol LNB) in 2017 to 2018?

370.    You knew that Veldhuis, Sexton and Friesen sold their Lexington Biosciences stock held in the names of Sharp-administered nominee companies into the public markets, right?

371.    The total proceeds of those Lexington Biosciences sales through Sharp-administered nominees were approximately $1.37 million, correct?

372.    You also assisted Veldhuis, Sexton and Friesen with transactions relating to the stock of BreathTec Biomedical Inc. (ticker symbol BTH) in 2016?

373.    You knew that Veldhuis, Sexton and Friesen sold their BreathTec Biomedical stock held in the names of Sharp-administered nominee companies into the public markets, right?

374.    The total proceeds of those BreathTec Biomedical sales through Sharp-administered nominees were approximately $421,745, correct?

375.    You also assisted Veldhuis, Sexton and Friesen with transactions relating to the stock of RightsCorp (ticker symbol RIHT) in 2013 to 2014?

376.    You knew that Veldhuis, Sexton and Friesen sold their RightsCorp. stock held in the names of Sharp-administered nominee companies into the public markets, right?

377.    The total proceeds of those RightsCorp. sales through Sharp-administered nominees were approximately $130,328, correct?

378.    Do you have any reason to doubt the accuracy of the table contained in paragraph 237 of the Amended Complaint that summarizes stock sales made by Veldhuis, Sexton and Friesen, working together, through nominee companies administered by Sharp's business?

379.    You understood that Veldhuis, Sexton and Friesen used the nominee companies administered by Sharp's business to conceal the fact that they, working together, controlled large blocks of the issuers stocks, and were selling them to the public, correct?

380.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your involvement in transactions relating to other issuers' stock sold for the benefit of Veldhuis, Sexton and Friesen and others with whom they were sometimes working?

<u>Creation of Transfer Documents</u>

381.    As part of your job, you completed and compiled a number of different kinds of documents required to facilitate transfers to nominee companies administered by Sharp's business for the benefit of its clients, right?

A1308

382.    In the course of doing your job, you fabricated and backdated letters of direction, wire transfer requests, invoices, loan and subscription agreements and other documents to serve as the back-up documentation for the payments Sharp's clients were directing you to make, right?

383.    Those documents you fabricated and backdated make it appear that the nominee entities administered by Sharp's business were engaged in legitimate, arm's-length transactions, to support the payment requests you were making, correct?

384.    These back-up documents were often required by Silverton, by brokerage firms or by banks before they would send the wire transfers you were requesting, correct?

385.    You also often used xmail addresses administered by Sharp's business to send email that purported to come from the beneficial owners of the nominee entities administered by Sharp's business, when those email messages were really written by you, correct?

386.    For example, on or about August 23, 2016, you created on invoice that says it is being sent to Silverton by Burrard Green City Builders in British Columbia in the amount of CAD $125,000, correct?

      a.  Is Exhibit **Gasarch 36-A** an accurate copy of the invoice you created (and left the header "Company Name" at the top of the page)?

      b.  The metadata on the invoice shows that you created and last modified the invoice on 8/23/2016 at 8:50 pm, correct?

      c.  Pasted below is an accurate copy of the metadata on the invoice, correct?



      d.  At the time, Burrard Green City Builders was renovating a property for relatives of one of the clients of Sharp's business named Jay Lee, correct? (See Exhibit **Gasarch 36**, pages 3-4)

      e.  About one minute after you last modified this invoice, you sent it to Silverton personnel, using the email address of Quezon Group LLC, quezon@yourmail.bz, with the subject line BAQU wire CAD125K, correct? (see Exhibit Gasarch 36, page 1)

      f.  BAQU is a reference to an account Baltikums Bank in the name of Silverton and associated with Quezon Group, correct?

      g.  Quezon Group is one of the nominee entities administered by Sharp's business, correct?

    h.  One of the other documents you created and sent to Silverton was a wire transfer request purportedly signed by the owner of Quezon Group, directing the transfer to Burrard Green City Builders out of Silverton's Baltihums Bank account, correct? (see Exhibit Gasarch 36, page 2)

    i.  That wire transfer request says that the reference on the wire should be "Subscription Agreement 500,000 shares," correct?

    j.  You knew that the wire transfer was to pay for renovation expenses, and not a purchase of shares, right?

    k.  The wire request form was not actually signed by the owner of the Quezon Group, was it?

    l.  Rather, you used a copy of his signature that you kept in a file associated with Quezon Group, correct?

    m.  Silverton paid this invoice as you requested, correct?

387.    As another example, on or about May 16, 2017, you modified an invoice from the law firm of Greenberg Traurig so that the invoice appeared to have been issued to Riverfall Group Ltd., correct?

    a.  Is Exhibit **Gasarch 37-A** an accurate copy of the invoice you modified?

    b.  The invoice was for legal work done by Greenberg in connection with NewGen Biopharma Corp. and its predecessor company, correct?

    c.  You created and last modified the invoice on 8/23/2016 at 8:50 pm, correct?

    d.  Pasted below is an accurate copy of the metadata on the invoice, correct?



    e.  At the time, Veldhuis, Sexton and Friesen, working together, had been engaged in sales of NewGen Biopharma stock through nominee entities administered by Sharp's business, correct?

    f.  About two minutes before you last modified the invoice, you also last modified a wire transfer request directed to Silverton, purportedly signed by the owner of Riverfall Group Ltd., directing the transfer to Greenberg Traurig out of Silverton's WB21 Ltd. account for Riverfall Group, correct? (see Exhibit **Gasarch 37-B**), correct?

    g.  Pasted below is an accurate copy of the metadata on the wire transfer request, right?

26

A1310



h. The wire request form was not actually signed by the owner of Riverfall Group, was it?

i. Rather, you used a copy of his signature that you kept in a file associated with Riverfall Group, correct?

j. Riverfall Group is one of the nominee entities administered by Sharp's business, correct?

k. Several hours after you last modified the invoice and the wire transfer request, you emailed these documents to Silverton personnel using the email address for Riverfall Group Ltd., riverfall@buzzmail.ltd, with the subject line "wire 129k to Greenberg," correct? (see Exhibit **Gasarch 37**)

l. The email was not actually sent by any officer, director or employee of Riverfall Group, was it?

m. Silverton paid this invoice as you requested, correct?

n. You debited this payment to Greenberg Traurig from the Q account for NewGen Biopharma, correct?

388.    As a third example, on or about December 22, 2016, you modified on invoice that is addressed to Quezon Group, and seeks payment of $10,000 by Purwanto Handoko for "consulting services for introduction of marketing" and "For Intro VBIO," correct?

a. Is Exhibit **Gasarch 38-A** an accurate copy of the invoice you modified (at about 10:17 pm on December 22, 2016?

b. The metadata on the invoice shows that you last modified the invoice and that it was created by Graham Taylor, correct?

c. Pasted below is an accurate copy of the metadata on the invoice, correct?

27

A1311



d.  In December 2016, nominee entities administered by Sharp's business were selling shares of Vitality, or VBIO, correct?

e.  About two minutes after you last modified the invoice, you also last modified a wire transfer request directed to Silverton, purportedly signed by the owner of Quezon Group, directing the transfer to Handoko out of Silverton's WB21 Ltd. account for Quezon Group, and stating that this was a payment for an "international consulting invoice," correct? (see Exhibit **Gasarch 38-B**)

f.  Pasted below is an accurate copy of the metadata on the wire transfer request, right?



g.  Then, moments later, you emailed the invoice and wire transfer request documents to Silverton personnel using the email address for Quezon Group Ltd., quezon@yourmail.bz, with the subject line "wire 10K to Purwanto," correct? (See Exhibit **Gasarch 38**)

h.  The email was not actually sent by any officer, director or employee of Quezon Group, was it?

i.  Silverton paid this invoice as you requested, correct?

j.  You debited this payment to Purwanto Handoko from the Q account for Vitality, correct?

389.   You understood that Sharp's business controlled the nominee companies it administered for the benefit of its clients, right?

A1312

390.   For example, is Exhibit **Gasarch 39** an accurate copy of xphone communications between you (as xphone user WIRES), Alexandra Guinness (as xphone user 110 or Alex 110) and Sharp (as xphone user BOND) on February 19, 2015 about the urgency of responding to an attorney's request for documents to be signed by the directors who, on paper, controlled a nominee entity administered by Sharp's business?

    a.   In this exhibit, you told Bond, that "we" signed the documents for all of the directors, but you didn't know who should sign the documents for the notary, right?

    b.   By "we," you were referring to you and Ms. Guinness, correct?

    c.   Then Sharp responded to you "Of course u do: his name is on the stamp!"  Sharp is referring to the notary stamp that he noted you had already stamped on the documents, right?

    d.   You understood Sharp's message to you to mean that you should also sign the documents using the notary's name, correct?

391.   Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your creation of documents to support wire transfer requests or other documentation requests made by clients of Sharp's businesses?

<center>Knowledge of Clients' Stock Promotions</center>

392.   You frequently communicated with clients of Sharp's business about their need to pay for promotional activities for the stock they were selling, correct?

393.   You also understood that it was important to separate the nominee companies administered by Sharp's business that would be used to pay for stock promotions from the nominee companies that held and traded stock for Sharp clients, correct?

394.   For example, is Exhibit **Gasarch 40** an accurate copy of an xphone communication between you (as xphone user WIRES) and Benjamin Kirk (as xphone user 19 ELGI or 19) on April 29, 2014 about an outgoing wire Kirk was requesting in the amount of $281,233?

    a.   Kirk told you that he has "very good paper work" but needed the name and address for the account from which you would be sending the wire.  The fact that he needed to know the account from which you were sending the wire demonstrates that your decision of which account to use was arbitrary, correct?

    b.   You then asked Kirk if the payment was for a stock promotion because if it was, "I need to find a safe account for wire," correct?

    c.   Your response indicates that you could not send payments for promotions from some nominee entities' accounts, correct?

395.    As another example, is Exhibit **Gasarch 41** an accurate copy of an xphone communication between you (as xphone user WIRES) and Steve Bajic (as xphone user 92 or PINA) on September 5, 2014 about an outgoing wire Bajic was requesting in the amount of $100,000?

    a.   Bajic asked you what bank you would use to send the wire and you asked if the payment was for a stock promotion and if so, she needed to know which stock, correct?

    b.   Bajic said it was not for a stock promotion so you told him you would use Peregrine Capital.  Bajic then asked "Does peregrine trade stocks? I want $ to come from bank that has no links to trading, if that's even possible?"  And you

<center>29</center>

<center>A1313</center>

responded that you could use any account because the payment was not for a
promotion, correct?

396.    As a third example, is Exhibit **Gasarch 42** an accurate copy of an xphone communication
between you (as xphone user WIRES or PEACE) and George Stubos (as xphone user 77 or
LION) on October 3, 2014 about an outgoing wire Stubos was requesting to pay for a stock
promotion?

      a.  Stubos was pushing you to send out the wire sooner, but you stated "We have a a
           lot promotion wires need from that account.  We could not send too much every
           day. PSON wire is promotion, we have to use BSI bank," correct?

      b.  You then told him you will "play safe" but try to get the wire out sooner?

      c.  You understood that there were certain banks from which it was safer than others
           to send payments for promotions, right?

<u>Communications about Secrecy</u>

397.    You understood that it was important to protect the identity of the clients of Sharp's
business, correct?

398.    That is why you avoided using their real names when you communicated with them,
correct?

399.    Also, when you allowed the nominee company you controlled, Peregrine Capital Corp.,
to be used to hold shares for, or make payments for, clients of Sharp's business, you understood
that you were helping those clients to conceal their ownership of shares and connections to
payments, right?

400.    When you crossed national borders and went through customs, you deleted all
communications off of your xphone, correct?

401.    The reason you deleted your xphone communications at borders and at customs was
because you were concerned about them being captured by law enforcement personnel or
securities regulators, correct?

402.    In late 2015, around the time that Sharp's business was distributing a new set of xphones
to its clients to use, you drafted a memo with instructions about how to "delete all secure chats
when xphone is shut down (e.g. to cross a border), correct?

403.    An accurate copy of that memo you drafted is attached as Exhibit **Gasarch 43**, correct?

<u>Personal Benefit from Trading Activities</u>

404.    Between at least September 2011 and April 2019, Sharp would perform a month-end
sweep in the Q accounting system, of fees and commissions that Sharp's business earned that
month from all of the securities transactions, securities deposits, and other securities-related
services it had performed for its clients that month, correct?

405.    As part of that sweep, a portion of the fees and commissions that clients had paid directly
to the BOND account (which was associated with Sharp), were reallocated to your personal Q
accounts and to the personal Q accounts belonging to Kelln, correct?

406.    For example, as shown on page 15 of Exhibit Gasarch 2, on the following dates you
received the following amounts of month end "commissions", into your personal Q account,
correct?

| Date | Amount of Commissions |
|------|----------------------|
| 2/28/2017 | $3,063 USD and $3,707 CAD |

A1314

| 3/30/2017 | $13,909 USD and $3,310 CAD |
| 4/28/2017 | $5,678 USD and $2,041 CAD |
| 5/31/2017 | $6,039 USD and $538 CAD |
| 6/30/2017 | $10,079 USD and $3,871 CAD |
| 7/31/2017 | $9,983 USD and $3,645 CAD |

407.    Between August 2016 and April 2019, your personal Q accounts received more than $300,000 in commissions and fees for the work you performed on behalf of the clients of Sharp's business, right?

408.    In addition to the fees and commissions you received for each transaction or service you performed for the clients of Sharp's business, Sharp also paid you Christmas bonuses, right?

409.    You received those Christmas bonuses as deposits into your personal Q accounts in Canadian dollars, right?

410.    For the years 2013 through 2018, you received the following Christmas bonuses, correct?

| Date | Amount in CAD | Shown on page of Exhibit Gasarch 2 |
| --- | --- | --- |
| 12/13/2013 | $100,000 | 8 |
| 12/22/2014 | $120,000 | 10 |
| 12/18/2015 | $150,000 | 13 |
| 12/16/2016 | $100,000 | 15 |
| 12/16/2017 | $100,000 | 16 |
| 12/18/2018 | $70,000 | 17 |

411.    You received the benefit of the funds distributed from the PEAC/PERE account in the Q system, correct?

412.    In addition to paying your expenses with those funds, you also took withdrawals in the form of checks made payable to yourself, to an entity owned by you and your spouse, and to others to whom you owed money, correct?

413.    For example, did you direct a payment to an entity named W&B Riding Club at Assunpink WNA LLC ("W&B Riding Club") through one of the nominee entities administered by Sharp's business?

   a.   W&B Riding Club is an entity owned jointly by you and your husband, Bruce Gasarch, correct

   b.   Is Exhibit **Gasarch 44** an accurate copy of the bank documents showing that W&B Riding Club was paid USD $49,861.10 from an Inland Trading SRL account at Banco Santa Cruz on February 1, 2019?

   c.   Inland Trading SRL is a nominee company administered by Sharp's businesses, correct?

   d.   You provided an invoice from W&B Riding Club to Inland Trading claiming that W&B Riding Club provided services to Inland by paying city, engineering and legal fees for a property in New Jersey?

   e.   These were not actually services or benefits provided to Inland Trading were they?

   f.   Why did you arrange for W&B Riding Club to be paid through a Sharp-administered nominee entity?

31

414.     Please refer to page 17 of Exhibit Gasarch 2. In the middle of that page, there is a transaction dated 2/1/2109 with "Batch ID" of 123379 that shows a debit of USD $49,911.10 to your PERE account, and the transaction description is "W&B TT" and the bank is "Banco Santa"? That debit reflects the fact that you withdrew USD $49,861.10 plus $50 in fees from your PERE account to send money to an entity you and your husband control, right?

415.     As another example, is Exhibit **Gasarch 45** an accurate copy of an xmail message you sent to Silverton, using the email address belonging to Sharp-administered nominee Hilton Capital, on May 1, 2018, in which you asked Silverton to send $100,016 from Hilton Capital's account to your account at Sun Life Assurance Co.?

      a.  You attached copies of your passport and driver's license to this request as backup for the transaction, correct?

416.     Please refer to page 16 of Exhibit Gasarch 2. In the middle of that page, there is a transaction dated May 1, 2018 with "Batch ID" of 120410 that shows a debit of CAD $100,216.03 to your PERE account, and the transaction description is "Sun Life TT" and the bank code is "Wintercap." That debit reflects the fact that you withdrew CAD $100,016 plus a fee of $200 from your PERE account to pay for your insurance, right?

417.     You also withdrew cash from your PEAC/PERE account on numerous occasions, correct?

418.     Please refer to page 16 of Exhibit Gasarch 2. You made the following cash withdrawals on the following dates from your PERE account, correct?

| Date | Amount of Cash Withdrawal |
| --- | --- |
| 10/24/2017 | $5,990 CAD |
| 11/20/2017 | $20,000 CAD |
| 12/18/2017 | $30,000 CAD |
| 1/19/2018 | $18,160 CAD |
| 2/19/2018 | $8,010 CAD |
| 3/14/2018 | $17,620 CAD |
| 5/23/2018 | $16,700 CAD |
| 6/27/2018 | $50,000 CAD |
| 8/13/2018 | $20,000 CAD |
| 9/12/2018 | $690 CAD |
| 9/17/2018 | $10,000 CAD |
| 9/28/2018 | $1,720 CAD |

419.     In early 2018, you were audited by Canadian tax authorities as a result of your interactions with nominee entities administered by Sharp's business, correct?

420.     Is Exhibit **Gasarch 46** an accurate copy of an xmail message you sent (using the xmail address wires@secure.xmeridian.com) to Sharp (using the xmail address fsharp@secure.xmeridian.com) to which you attached a letter you received from tax authorities?

      a.  On page 2 of the exhibit, the tax authority informed you that it believed you had over $2.8 million in total unreported income, much of it tied to your ownership of Peaceful Lion and your transactions with other nominee entities administered by Sharp's business, correct?

      b.  Do the appendices in pages 6-27 of this exhibit accurately list payments that you received, or from which you benefitted, during calendar years 2009 to 2016?

      c.  Are the facts contained in the "statement of facts" on page 29 of this exhibit true?

    d.  What was the outcome of this audit?

421.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your use of, and benefit from, the funds in the PEAC/PERE Q account?

422.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your use of, and benefit from, funds originating from any Sharp business or nominee entity administered by Sharp's business?

I, Zhiying Yvonne Gasarch, declare under penalty of perjury under the laws of the United States of America that my foregoing answers to the questions posed in this deposition are true and correct according to the best of my knowledge, information and belief, and on the basis of the information supplied to me.

_____
Date

_____
Zhiying Yvonne Gasarch

A1318



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,
                    Plaintiff,

        v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R. TAYLOR,

                    Defendants.

Civil Action No. 21-CV-11276-WGY

## DEFENDANT ZHIYING YVONNE GASARCH'S OBJECTIONS AND RESPONSES TO DEPOSITION ON WRITTEN QUESTIONS

### GENERAL OBJECTIONS

Defendant Yvonne Gasarch ("Mrs. Gasarch") objects to the form of the questions that either directly reference or are made in reliance of documents and data that have not been authenticated and/or are not reliable and/or are not admissible. This general objection applies to any question relying on such, but specifically, Gasarch identifies the following questions which have a basis in either the Q system data, xphones, xmail or email.

Questions

44-55 (Q system)
57-61 (Q system)
74-78 (emails)
110; 112; 114; 116; 118-119 (Q system)
147-148; 155 (xphone)
195-199 ;207; 210; 210; 216-219; 224-226 (xphone and xmail)
228 (xphone and Q system)
229-234 (email)
258-259 (xmail)
257; 271-272 (Q system)
273 (xmail, email)

1

A1319

275-286 (Q system)
287-289; 294; 287; 297; 290 (xphone)
294-295; 297-311(Q system)
316-319 (xphone)
314-320; 323; 326-328 (Q system)
329-330 (xmail)
340; 342-353; 351; 346-355; 357=359; 350; 363; 366; 369; 372; 375 (Q system)
394-396; 390 (xphone)
395 (Q system)
404-418; (Q system)
420 (xmail)

## RESPONSES TO WRITTEN DEPOSITION QUESTIONS

Question 1:  Zhying Yvonne Gasarch.

Questions 2 – 422:  I invoke my rights under the Fifth Amendment to the United States
Constitution and decline to answer these questions.


AS TO OBJECTIONS:
YVONNE GASARCH
By her attorney

/s/ Karen A. Pickett
Karen A. Pickett (Mass Bar No. 633801)
Pickett Law Offices, PC
125 High St., 26th Floor
Boston, MA 02110
617.423.0485
kpickettlaw@gmail.com

March 20, 2023

2

A1320

I, Zhiying Yvonne Gasarch, declare under penalty of perjury under the laws of the United

States of America that my foregoing answers to the questions posed in this deposition are true and

correct according to the best of my knowledge, information and belief, and on the basis of the

information supplied to me.

March 20, 2023

Date

Zhiying Yvonne Gasarch

3

A1321

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2023, a true and correct copy of the foregoing document was emailed to counsel for the parties in the case.

/s/ Karen A. Pickett

A1322

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:21-cv-11276-WGY |
| v. | |
| Frederick L. Sharp, *et al.*, | |
| Defendants. | |

**DEFENDANT PAUL SEXTON'S MOTION *IN LIMINE* TO EXCLUDE Q SYSTEM AND ASSOCIATED DATA**

The lynchpin of the anticipated evidence from the Securities and Exchange Commission ("SEC" or "Commission") is an unauthenticated, anonymous third-party database purportedly established at the direction of a fugitive[1] criminal mastermind. Notwithstanding its confident assertions of admissibility, the Commission fails to offer evidence as to *who* made entries into the database and *when* those entries purportedly occurred. Instead of a custodian of records, the SEC offers only the deposition testimony of a part-time IT consultant located in a different country from the purported database who cannot corroborate the accuracy or purpose of any these data entries upon which the SEC relies. Although these defects alone are fatal, it also naturally flows from them that the SEC has no evidence as to whether the unknown author(s) of the entries had knowledge of the underlying transactions or were part of any alleged conspiracy. There is therefore

---

[1] The Commission objects to the labeling of Frederick Sharp as a "fugitive." *See, e.g.*, ECF No. 336 at 1 n.1. It is unclear what other term the SEC would have defendants use to describe an individual who remains at large following the issuance of an arrest warrant and who could not be located for purposes of service of process in this matter. *See United Sates v. Sharp*, No. 1:21-mj-7182, ECF No. 5 (D. Mass. Aug. 4, 2021).

1

A1323

no basis to admit the Q database as a business record or as a statement by a co-conspirator, or for that matter under any theory or Federal Rule of Evidence. Defendant Paul Sexton joins the motions to exclude this data filed by Defendants Friesen and Gasarch (ECF Nos. 329 and 334) and separately submits this motion seeking the same result.

**I.    Q Entries Are Not Business Records**

There are five requirements to satisfy the business records exception:

(1) the record was made at or near the time by — or from information transmitted by — someone with knowledge; (2) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling; (3) making the record was a regular practice of that activity; (4) all these conditions are shown by the testimony of the custodian or another qualified witness, or by . . . certification; and (5) neither the source of the information [n]or the method or circumstance of preparation indicate a lack of trustworthiness.

*United States v. Doe*, 23 F.4th 146, 149 (1st Cir. 2022) (quoting Fed. R. Evid. 803(6)) (internal quotation marks omitted) (alternations in original). None of these factors are present here.

*A.   The Records Were Not Made Contemporaneously By a Knowledgeable Person*

The SEC cannot establish that the entries in the Q system were made by (or from information transmitted by) someone with knowledge, or that they were made at or near the time of the alleged transactions. To the contrary, the SEC has offered no evidence whatsoever about who made entries in the Q system. To try to fill the void, the SEC presents testimony from Fedir Nikolayev, an IT consultant—not an employee or even a supposed member of the "conspiracy" that the SEC now tries to allege—who purportedly built the underlying architecture for the Q system. Mr. Nikolayev, however, is certainly not "someone with knowledge" of the transactions, and he expressly disclaimed knowledge of the activities of what the SEC calls the "Sharp Group" and the operations that occurred at the supposed group's "Corporate House." This is not surprising,

2

A1324

since he did not work there or even in the same country. Take, for instance, the following exchange

from Mr. Nikolayev's deposition:

> Q: And I understand that your function was to for [sic] IT work. But just so that
> you can understand my question: In connection with performing your IT work, did
> you develop an understanding of what the business was that you were doing work
> for?
>
> A: Being called Corporate House I thought it was some sort of corporate services
> operation. I did not dig much deeper than that into it.

Exhibit A at 29:2-9. So limited was Mr. Nikolayev's role that he described Mr. Sharp as a "small

customer" for whom he did "very small tech support." *Id.* at 226:9-13.[2] Again, the SEC is asking

this Court to rely on the services of a part-time, remote IT consultant, who allegedly created a

blank database, to verify and admit evidence of alleged securities fraud in federal court. This is

akin to asking the engineer who designed a car to verify that it was used as the getaway vehicle in

a bank robbery. Such an attempt strains credulity.

Nor did Mr. Nikolayev identify any other person with knowledge who made the entries

upon which the SEC relies. Instead, he indicated that administrators, employees, and clients had

access to the Q system. *Id.* at 45:18-22. The administrators were Mr. Nikolayev and Mr. Sharp,

although Mr. Nikolayev never made entries of his own initiative. *Id.* at 28:20-29:1, 45:23-24,

64:10-13, 213:13-20. Mr. Sharp, as an administrator, had the ability to "manually adjust all of the

numbers." *Id.* at 49:7-10. There is no indication that Mr. Sharp, in making those adjustments, had

knowledge of the alleged transactions he was manipulating. Nor can the SEC ever establish such

knowledge, as Mr. Sharp, a fugitive, will not be testifying at trial. Meanwhile, Mr. Nikolayev could

not identify which individuals had staff access, instead conceding: "I don't have it like noted. I

---

[2] Mr. Nikolayev will be appearing by deposition at trial, so the Commission will have no further
opportunity to address the many defects in his testimony.

A1325

have too much information going on. I didn't have it recorded. I don't know." *Id.* at 48:8-10. There is therefore no way to know whether the entries were made by someone with knowledge or, even assuming they were, whether they were subsequently altered by someone who lacked knowledge.

The Commission also relies on anticipated testimony from certain users of the Q system, including the so-called "Silverton Principal" whose name is redacted from the public record. But users do not know who was entering data into the Q system or whether it was accurate as to Mr. Sexton or other defendants, and the Silverton Principal's declaration nowhere purports to offer that level of information. Indeed, the Silverton Principal has no basis to testify about, let alone provide support for the admissibility of, records allegedly relating to Mr. Sexton for which he has no first-hand knowledge. He concedes as much. At the outset, the Silverton Principal, by his own admission, only had access to "parts of the Q system." Sealed Decl. (ECF No. 276) ¶22. He claims to have "reported [certain] transactions into the Q system," *id.*, but he does not identify which transactions those were. Additionally, Silverton was not involved in all the transactions at issue, and Mr. Nikolayev testified that all customers, which would include Silverton, had their Q access cut off at a certain point in time. Exhibit A at 55:22-56:4. The SEC has made no distinctions in its efforts to admit the Q system as a whole, as if it were dealing with an ongoing corporate entity with official recordkeeping rules and requirements.

The SEC's inability to identify a suitable declarant means that the evidence cannot be a business record. Where there is a "complete absence of any indication as to where this information . . . came from," the proponent of the evidence cannot establish that the declarant is a "person with knowledge" within the meaning of the rule. *Petrocelli v. Gallison*, 679 F.2d 286, 289 (1st Cir. 1982) (internal quotation marks omitted). Like the record in *Petrocelli*, the Q system is "so cryptic that pure guesswork and speculation is required to divine the source of the cited

A1326

information," making it precisely the opposite of a business record. *Id.* at 291.

Mr. Nikolayev also failed to identify *when* the entries were made. There is therefore no basis to believe that the entries occurred "at or near" the time of the alleged transactions. The Silverton Principal's declaration states that "I am aware that Sharp and his employees entered information into the Q system at the time of, or very close in time to, the transactions recorded in the Q system," Sealed Decl. (ECF No. 276) ¶ 23, but that does not come close to the level of verification required for records purportedly relating to Mr. Sexton. Silverton Principal was merely a user of a system allegedly created and maintained by others. His testimony is akin to a customer of a bank saying that his own transactions appeared in a timely manner in his online statements so therefore all other customers of the bank must also have had accurate records. Someone like Silverton Principal, who did not even have access to the entirety of the Q system and only took part in an unknown amount of the transactions, is wholly unqualified to lay a foundation for the admission of records allegedly related to Mr. Sexton.

There is simply no way from the SEC's proffered evidence to determine whether the alleged Q transactions were recorded days, months, or even years after they purportedly occurred. In *Ira Green, Inc. v. Mil. Sales & Serv. Co.*, 775 F.3d 12 (1st Cir. 2014), the First Circuit concluded that, due to a "lack of contemporaneity," emails from 2012 that "described what supposedly occurred in 2011" fell "outside the compass of the business records exception." *Id.* at 20. Unlike that case, here the SEC has not even provided a date when the transactions were allegedly recorded, which makes the business records argument even more untenable. *Cf. Jimenez v. Banco Santander De Puerto Rico*, No. CV 07-1225 (JAG), 2011 WL 13209060, at *11 (D.P.R. Mar. 31, 2011) ("[T]hat document is inadmissible under Fed. R. Evid. 803(6) because there is no indication as to when the document was made, among other things.").

A1327

*B.   There Are No Indications of Regularity*

The next two requirements—that the record must be kept in the course of a regularly conducted activity and that maintaining the record is a regular practice of the activity—are likewise absent. Even when presented with leading questions, Mr. Nikolayev could not attest to these factors:

> Q: Mr. Nikolayev, we were talking about the Q accounting system. And then was the Q accounting system how Mr. Sharp regularly operated his business, he used the Q system?
>
> A: That was my understanding. I wasn't in day-to-day operations **but just that's what it seems like**.
>
> Q: But based on you being an administrative assistant, was it your understanding that Mr. Sharp used the Q system as a regular function of his business?
>
> A: Yeah. Yeah. That was **my impression**.

Exhibit A at 52:12-23 (emphasis added).

Mr. Nikolayev's mere impressions and rank speculation are not evidence. *See, e.g.*, *Bucci v. Essex Ins. Co.*, 393 F.3d 285, 298 (1st Cir. 2005) (favorably citing, in context of related hearsay rule, Fed. R. Evid. 803(4), ruling that the word "apparently" was fatal to admission because it "may represent conjecture" on the part of the declarant). Nor can Silverton Principal make up for these deficits, as a customer is not in a position to attest to the practices of the alleged "Sharp Group" writ large, and certainly not as to any transaction purportedly relating to Mr. Sexton. Thus, the Commission is left with no witness to support this key factor for admissibility.

*C.   The Commission Lacks Testimony from a Competent Witness*

The Commission has not put forth a competent witness to lay a business records foundation for the Q system. To meet this criterion, the witness must be able to "explain and be cross-examined concerning the manner in which the records are made and kept." *Wallace Motor Sales,*

6

A1328

*Inc. v. Am. Motors Sales Corp.*, 780 F.2d 1049, 1061 (1st Cir. 1985); *see also Belber v. Lipson*, 905 F.2d 549, 552 (1st Cir. 1990) ("This testimony [from a qualified witness] is essential. Without such a witness the writing must be excluded.") (internal citation omitted).

Nikolayev, a part-time, remote contract IT worker with no knowledge of the alleged transactions, and Silverton Principal, an alleged customer with insight into only a subset of the transactions and operations, do not fit this bill. *Cf. Ziehm v. Radioshack Corp.*, No. CIV. 09-69-P-S, 2010 WL 2079550, at *10 (D. Me. May 22, 2010) ("The plaintiff, who has not been shown to have knowledge of the manner in which records were kept at the facility in question, is not a 'qualified witness' for this purpose."), *report and recommendation adopted*, 2010 WL 2680024 (D. Me. July 1, 2010).

### D.  There Are Multiple Indications of Untrustworthiness

There are numerous reasons to doubt the trustworthiness of this unauthenticated system. As noted, Mr. Sharp, as an administrator, had the ability to "manually adjust all of the numbers." Exhibit A at 49:7-10. The SEC itself alleges that Mr. Sharp has a track record of forging records, including by placing Mr. Nikolayev's signature on documents without his knowledge. *Id.* at 144:15-145:24. Mr. Nikolayev also conceded that Mr. Sharp directed him to "clear" the Q system on a yearly basis and erase "any record of what happened before—before that date." *Id.* at 49:21-50:10. Although Mr. Nikolayev claims to have made backups, there is no description of the specific process used or assurance that the data remained intact through the backup process. *Id.* at 50:11-51:22. And Mr. Nikolayev testified that at a certain point, Mr. Sharp directed him to "close[] access to all the clients" whose accounts were purportedly kept in Q. *Id.* at 55:22-56:4.

Despite this evidence from its only witness with purported knowledge of the Q system's architecture, the SEC nonetheless seeks admission of the entirety of the Q system as a reliable

7

A1329

business record. How the SEC can make such claims when the system was a) wiped on a yearly basis, b) in the sole control of one man who is a fugitive, and c) was rewritten, edited, and forged at the whim of that same fugitive, is ripe for discussion prior to trial.

These are hardly indicators of a system bearing the trappings of regularity or reliability. The Commission is asking the Court to take the testimony of uninformed third parties as the basis for admitting an alleged accounting system created by an absent witness who the SEC itself believes is a forger of business records. There is no basis on this record for the Court to do so.

E. The Commission's Remaining Arguments Are Unpersuasive

The Commission's other arguments likewise fail. For instance, the SEC cites *United States v. Lauersen*, 348 F.3d 329, 342 (2d Cir. 2003), for the proposition that testimony from Mr. Nikolayev is sufficient to authenticate the Q system. That case says nothing of the sort. *Lauersen* involved testimony from someone who "personally designed" a system and saw it being "properly implemented" under circumstances that allowed evidence to be "reliably admitted." *Id.* That is a far cry from Mr. Nikolayev, who designed a system as a third-party contractor for a business for which he has no insight that was subject to unilateral manipulation by an alleged criminal—a man who Mr. Nikolayev himself alleges forged records.

The SEC's other contention—that its efforts to verify the information in the Q system by comparing it to brokerage records support admission—also misses the mark. First, to the extent that the Q system does not meet the business records requirements, including entry at or near the time of occurrence by (or from information transmitted by) someone with knowledge, the accuracy of the records is immaterial. To the contrary, the business records exception does not allow for corroboration by third-party sources when the stated requirements for admissibility are not met. Even assuming that it did, the SEC acknowledges that the Q data does not match up to the

8

A1330

brokerage records in all instances. Instead, the Commission essentially argues that its sampling exercise, for which it offers no statistically sound methodology or justification, shows that the Q system is "good enough" because it mostly matches what is in the brokerage records for the limited set of records reviewed. This is not a proper foundation for admission of any type of evidence, let alone evidence of such a central nature to the litigation against Mr. Sexton.

## II.    Q Entries Are Not Co-Conspirator Statements

The Commission's fallback argument, that the Q system is admissible as a co-conspirator statement, suffers from the same fundamental flaws. At the outset, the Commission has not charged a conspiracy, and it lacks the legal authority to do so. But more fundamentally, the SEC has not established who entered the data into the Q system. Without this basic information, the Commission cannot conceivably establish that the statements were made by a co-conspirator. *Cf. United States v. DaVita Inc.*, 592 F. Supp. 3d 970, 986 (D. Colo. 2022) (rejecting application of co-conspirator rule where there was "no indication of who drafted the document and whether he or she was a member of the conspiracy"); *see also United States v. Sepulveda*, 15 F.3d 1161, 1181 (1st Cir. 1993) ("Our review of the record has [found] no extrinsic evidence tending to show that these out-of-court declarants (the unidentified caller to the Johnson residence and the unidentified passengers in Baranski's vehicle) were involved in the conspiracy, and the government has directed us to no such proof.").

Even if the SEC could clear this hurdle, it would still need to prove the elements of the exception under Fed. R. Evid. 801(d)(2)(E). Specifically, the Court would need to make a preliminary finding that Q records were created "(1) during the course and (2) in furtherance (3) of a conspiracy (4) of which declarant is a member." *Earle v. Benoit*, 850 F.2d 836, 841 (1st Cir. 1988). The Commission must prove this by a preponderance of the evidence, and the proof "must

9

A1331

rest at least in part on corroborating evidence beyond that contained in the statements at issue." *United States v. Portela*, 167 F.3d 687, 703 (1st Cir. 1999). Additionally, a "coconspirator's statement, standing alone, is insufficient to meet the preponderance standard of Rule 801(d)(2)(E)." *Sepulveda*, 15 F. 3d at 1182. The Commission cannot meet this high standard, and certainly not based on arguments raised for the first time in opposition to a motion *in limine*.

The Commission's case is built entirely on statements by alleged co-conspirators. Everything from the Q system to the xPhone data to the testimony of the Silverton Principal and other witnesses falls into that category. And even if accepted, those statements do not create a path to admission. At most, the SEC has alleged (but certainly has not established) that Mr. Sexton worked together with members of the so-called "Veldhuis Control Group," a term invented out of whole cloth to refer to Mr. Sexton and co-defendants Mike Veldhuis and Jackson Friesen. But there is no evidence that any of these three individuals was a declarant for the Q data, nor a single entry referring to this supposed Control Group—or Mr. Sexton—in the Q records.

Additionally, the Commission has not established that Q entries were in furtherance of a conspiracy. The SEC's argument on this point starts and ends with a misstatement of the law. Specifically, the SEC contends that "a coconspirator statement need not actually advance the conspiracy." ECF No. 336 at 10. However, the law is clear in the First Circuit that a statement needs to "advance the goals of the conspiracy in some way." *United States v. Ciresi*, 697 F.3d 19, 28 (1st Cir. 2012) (internal quotation marks omitted). The First Circuit has also favorably cited the proposition that narratives about "past events . . . do not satisfy the 'in furtherance' requirement of Rule 801(d)(2)(E)." *Id.* (internal quotation marks omitted). The Q system is at most a backward-looking accounting of past events, which by its very nature cannot be in furtherance of a conspiracy.

A1332

In sum, the Commission, which lacks the authority to charge a conspiracy, is trying to introduce evidence from anonymous individuals, without any proof that they were part of a conspiracy and without any demarcation of the contours of the alleged conspiracy. The Court should prevent the SEC from presenting this baseless theory to the jury and causing substantial and unwarranted prejudice to the defendants.

Not only is it important to exclude this theory, it is essential to do so ahead of trial consistent with the Court's gatekeeping function. "Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule." *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). This is a matter for the "judge, not the jury." *Earle*, 850 F.2d at 840. If the Commission is allowed to attempt to introduce this evidence at trial, it will be impossible to un-ring the bill, even if the Court ultimately determines that the Commission has failed to meet its burden and the evidence is inadmissible. The failed attempts to authenticate the data would cause extreme prejudice to Mr. Sexton in such a scenario. It is therefore essential to address the matter through a motion *in limine* as opposed to at trial.

### Conclusion

The SEC's central piece of evidence, the Q system, is unauthenticated, untrustworthy, and inadmissible. The Commission should not be permitted to taint the jury with this rank hearsay. As a result, Mr. Sexton moves *in limine* for its exclusion and asks the Court to address this matter in advance of the trial.

A1333

Respectfully submitted,


*/s/ Neil T. Smith*

Neil T. Smith (BBO# 651157)
    Neil.Smith@klgates.com
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Tel:  (617) 261-3100
Fax:  (617) 261-3175

*/s/ Stephen G. Topetzes*

Stephen G. Topetzes*
    Stephen.Topetzes@klgates.com
Robert S. Silverblatt*
    Rob.Silverblatt@klgates.com
K&L Gates LLP
1601 K St. NW
Washington, DC 20006
Tel:  (202) 778-9328
Fax:  (202) 778-9100

*Admitted pro hac vice*

*Counsel for Paul Sexton*

Dated: August 31, 2023

12

A1334

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on August 31, 2023, and a copy thereof will be sent electronically to the registered recipients and counsel of record as identified on the Notice of Electronic Filing.

*/s/ Neil T. Smith*

Neil T. Smith

A1335

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2
                  Case No. 21-cv-11276-WGY
 3    _____
      SECURITIES AND EXCHANGE COMMISSION,
 4
                       Plaintiff,
 5
       vs.
 6
      FREDERICK L. SHARP, ZHIYING YVONNE
 7    GASARCH, COURTNEY KELLN, MIKE K.
      VELDHUIS, PAUL SEXTON, JACKSON T.
 8    FRIESEN, WILLIAM T. KAITZ, AVTAR S.
      DHILLON, and GRAHAM R. TAYLOR,
 9
                       Defendants.
10    _____
                 UNITED STATES DISTRICT COURT
11            THE EASTERN DISTRICT OF NEW YORK

12             Case No. 22-cv-4674 (E.D. N.Y.)

13    SECURITIES AND EXCHANGE COMMISSION,

14                     Plaintiff,
      vs.
15    GEORGE STUBOS, et al.,

16                     Defendants.
      _____
17

18         The videotaped in-person and remote

19    deposition of FEDIR NIKOLAYEV, called as a witness

20    by the Plaintiff, before Juan Carlos Ortíz, Esquire,

21    Notary Public, Dominican Republic, on Thursday,

22    February 2, 2023, at the law offices of Ortiz &

23    Compres, Santiago, Dominican Republic, commencing at

24    9:53 a.m.

25    Reported by:  Dennis Zambataro, RPR
```

```
 1  APPEARANCES:
 2  On behalf of the Plaintiff:
 3  DAVID H. LONDON, ESQUIRE (in person)
    KATHLEEN B. SHIELDS, ESQUIRE (in person)
 4  Securities and Exchange Commission
    Boston Regional Office
 5  33 Arch Street, 24th Floor
    Boston, MA 02110
 6  617.573.8997 Phone (London)
    617.573.8904 Phone (Shields)
 7  LondonD@sec.gov
    ShieldsKa@sec.gov
 8
    On behalf of Defendant Yvonne Gasarch:
 9
    KAREN PICKETT, ESQUIRE (remote)
10  Pickett Law Offices
    125 High Street
11  Floor 26
    Boston, MA 02110
12  Main Phone: 617.423.0485
    125 High St
13  Floor 26
    Boston, MA 02110
14  617.423.0485 Phone
    kpickettlaw@gmail.com
15
    On behalf of Defendant Courtney Kelln:
16
    KEVIN B. MUHLENDORF, ESQUIRE (remote)
17  Wiley Rein LLP
    2050 M Street NW
18  Washington, DC 20036
    202.719.7000 Phone
19  kmuhlendorf@wiley.law
20  On behalf of Defendant Mike Veldhuis:
21  ROBERT KNUTS, ESQUIRE (remote)
    Sher Tremonte
22  90 Broad Street
    23rd Floor
23  New York, New York 10004
    212.202.2638 Phone
24  rknuts@shertremonte.com
25
```

<div align="right">2</div>

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
 1   APPEARANCES: (Continued)

 2   On behalf of Defendant George Stubos:

 3   ZACHARIA (ZACK) CHIBANE, ESQUIRE (remote)
     Spears Imes
 4   767 Third Avenue
     New York, NY 10017
 5   212.213.6996 Phone
     zchibane@spearsimes.com
 6


 7


 8   Also present: Juan Carlos Ortíz, Esquire, Notary
                   Public, Dominican Republic
 9
                   Andrea García, Esquire
10                 Jiménez Peña
                   (Interpreted the oath)
11
                   Videographer, Franklin Bencosme
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                                        3

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1338

```
 1                    I N D E X

 2   Witness:  FEDIR NIKOLAYEV                    Page

 3   Examination by Mr. London                 11, 242

 4   Examination by Ms. Shields                    191

 5   Examination by Ms. Pickett                    212

 6   Examination by Mr. Muhlendorf                 227

 7   Examination by Mr. Knuts                      239

 8

 9              EXHIBIT INDEX                      Page

10   Exhibit 17 Previously marked Amended Complaint  151

11   Exhibit 18 Gotama Capital Bylaws               94

12   Exhibit 19 Gotama Capital Business Plan       108

13   Exhibit 20 Beaufort Account Application form  112

14   Exhibit 21 Beaufort Power of Attorney         115

15   Exhibit 22 2016-04-28__Gotama__Breder         118

16            Suasso__application

17   Exhibit 23 Bates SEC-NZFMA-E-0000201 - -204   121

18   Exhibit 24 Bates SEC-NZFMA-E-0000118 - -126   124

19   Exhibit 25 Bates SEC-FINMA-E-0027107 - -259   125

20   Exhibit 26 Bates SEC-FINMA-E-0029150          136

21            Document produced in Native format

22   Exhibit 27 Bates JB-000140 - -158            141

23   Exhibit 28 Bates JB-000080                   147

24   Exhibit 29 email Cory O'Haggarty to fen      154

25   Exhibit 30 email string, Celtic to Nikolayev 157
```

4

A1339

| | Exhibit Index (Continued) | Page |
|---|---|---|
| 1 | | |
| 2 | Exhibit 31 email from fen to Wires, Xphone 76 | 163 |
| 3 | Exhibit 32 Bates SEC-MLATCKLP-E-0467346 | 165 |
| 4 | Exhibit 33 Bates SEC-MLATCKLP-E-0675826 | 169 |
| 5 | Exhibit 34 SEC-MLATCKLP-E-0682889 | 172 |
| 6 | Exhibit 35 SEC-MLATCKLP-E-0687417 | 172 |
| 7 | Exhibit 36 12/15/15 email from Wires to fen | 175 |
| 8 | Exhibit 37 7/4/17 email from Wires to fen | 181 |
| 9 | Exhibit 38 4/3/18 email from fen to Wires | 185 |
| 10 | Exhibit 39 7/25/18 email from fen to Wires | 189 |
| 11 | Exhibit 40 12/21/12 email from fen to Lion | 191 |
| 12 | Exhibit 41 Bates SEC-MLATCKLP-E-0253308 | 194 |
| 13 | Exhibit 42 Bates SEC-MLATCKLP-E-0543148 | 197 |
| 14 | Exhibit 43 Bates SEC-MLATCKLP-E-0567849 | 200 |
| 15 | Exhibit 44 Bates SEC-MLATCKLP-E-0562148 | 202 |
| 16 | Exhibit 45 Bates SEC-MLATCKLP-E-0498217 | 204 |
| 17 | Exhibit 46 Bates SEC-MLATCKLP-E-0648586 | 208 |

18

19

20

21

22

23

24

25

5

A1340

```
 1   and ask if any of these people, do you recognize
 2   them as having provided direction to you on behalf
 3   of Mr. Sharp?  Do you recognize the name of Mike
 4   Veldhuis, V-E-L-D-H-U-I-S?
 5       A.   No.  No.  No.
 6       Q.   Paul Sexton, S-E-X-T-O-N?
 7       A.   No.
 8       Q.   And the question is, Do you recognize
 9   them?
10       A.   Right.  Right.  No, I definitely don't
11   recognize them.
12       Q.   Jackson Friesen, F-R-I-E-S-E-N?
13       A.   No.
14       Q.   Avtar Dhillon, D-H-I-L-L-O-N?
15       A.   No.
16       Q.   Graham Taylor, T-A-Y-L-O-R?
17       A.   No.
18       Q.   William Kaitz, K-A-I-T-Z?
19       A.   No.
20       Q.   At the time that you were doing work for
21   Mr. Sharp, that approximately 20-year period, did
22   you have an understanding of what Mr. Sharp's
23   business was?
24       A.   I'm not really in business to look what
25   people do.  I just making sure that their IT needs
```

28

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1341

 1   were met.  I do not really like look into it.

 2        Q.   And I understand that your function was to

 3   for IT work.  But just so that you can understand my

 4   question:  In connection with performing your IT

 5   work, did you develop an understanding of what the

 6   business was that you were doing work for?

 7        A.   Being called Corporate House I thought it

 8   was some sort of corporate services operation.  And

 9   I did not dig much more than that into it.

10        Q.   Did you ever, as part of your working for

11   Mr. Sharp, come to learn that his business involved

12   forming offshore nominee companies to hold shares of

13   stock in US companies?

14        A.   I'm sorry, could you repeat?

15        Q.   Sure.  Sure.  As part of working for

16   Mr. Sharp --

17        A.   Right.

18        Q.   -- did you ever come to learn through your

19   work for Mr. Sharp that part of his business

20   involved forming offshore nominee companies to hold

21   stock in United States companies?

22        A.   I would say I only understood the forming

23   offshore companies.  For what, I did not -- did

24   not -- did not look into it.

25        Q.   Okay.  I understand.

                                                        29

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1342

```
 1        Q.   And not being a tech guy, I'm not sure I
 2   asked the question, so I want to be sure that I ask
 3   it right.  But how was it hosted?
 4        A.   It was hosted in a server in Curacao.
 5        Q.   So you developed the platform, but the
 6   platform itself was hosted by the farm in Curacao?
 7        A.   Yeah.  Yeah -- well, the server on the
 8   farm -- the server was hosted on the farm.
 9        Q.   So the server was hosted on the farm in
10   Curacao.  You can access the server from the
11   Dominican Republic.
12        A.   Yeah.  Yeah.
13        Q.   So you go online and you input user name
14   and password?
15        A.   Yeah.
16        Q.   Okay.  So who else had access to the
17   server?
18        A.   The system was a multiuser system.  And it
19   had three types of users:
20             Administrators;
21             Employees, staff;
22             And customers.
23             So administrators would be Mr. Sharp and
24   myself, because I needed to like -- I don't know --
25   check things for him.  The administrator would have
```

45

A1343

1    per clients, yes.

2        Q.    Do you know whether Yvonne Gasarch was

3    authorized to put information into the Q system?

4        A.    I don't recall that -- I can't tell you

5    for sure.

6        Q.    Do you know if Courtney Kelln was

7    authorized to put information into the Q system?

8        A.    I -- I don't have that -- I did not -- I

9    do not -- I don't have it like noted.  I have too

10   much information going on.

11            I didn't have it recorded. I don't know.

12       Q.    Let me ask you this:  When somebody put

13   information into the Q system, whether it was

14   yourself or Mr. Sharp or an employee, when

15   information was input, what happened to that

16   information?

17            In other words, how did you arrange it so

18   that that information was kept?

19       A.    Well, it's on the same server.  There is a

20   database that it just creates records.

21            And another difference between staff and

22   administrator is that the staff does not have the

23   control of like how commissions are calculated.

24            So they would just enter amount where they

25   would say like -- there was two amounts, one is the

                                                        48

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1344

 1    amount for the bank and the amount for client.  And

 2    then they either enter, for example, bank amount and

 3    then the system calculates with client what

 4    commissions will be distributed.  Or it could be

 5    like they put it from the point of view of a client

 6    and then all of that information being calculated.

 7           When the administrator is doing that they

 8    can see the calculation and details how everything

 9    is calculated.  And they can actually manually

10    adjust all of the numbers between them.

11       Q.   I just want to make sure that I understand

12    correctly.  Who had the ability to manually adjust?

13       A.   The administrator.

14       Q.   Just the administrator.

15       A.   Just the administrator, yeah.

16       Q.   When the information was input -- and this

17    is more of a process question I'm asking -- was it

18    your regular practice to keep that information on

19    the server?

20       A.   Yes.

21       Q.   Was it fair to say that it was Mr. Sharp's

22    regular practice to keep the information on the

23    server?

24       A.   Until a certain point, yes.

25       Q.   What point?

                                                        49

A1345

```
 1      A.   Again I don't know the date, but he asked
 2   me to summarize it every first of January after a
 3   certain year -- after some year, I don't know -- I
 4   don't remember which year.
 5           And summarize -- I mean I would make a
 6   backup.  And then I would just take balances of
 7   everything and then just clear it as of the first of
 8   January.  Basically just going to keep balance and
 9   the holdings, but did not contain any record of what
10   happened before -- before that date.
11      Q.   In order to make sure that I understand
12   this I am just sort of going to repeat that to you.
13           So at a certain point in time all of the
14   underlying data that was in the Q system you were
15   asked to summarize --
16      A.   Um-hmm.
17      Q.   And --
18      A.   You could still use the system, you can
19   still see the balances, but you could not see what
20   happened -- how did it arrive to that balance.
21      Q.   So what remained?  What specific data?
22      A.   Just balance.
23      Q.   Just balance?
24      A.   And it would be balanced as of that date,
25   as of the first of January of some year.
```

50

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1346

```
 1        Q.    And when you were say you made a backup;
 2   what did that mean?
 3        A.    I just made a backup of -- a snapshot of
 4   what data looked like at that moment and delivered
 5   it to Mr. Sharp.
 6        Q.    So from that point in time forward, after
 7   you took the snapshot and delivered the snapshot to
 8   Mr. Sharp, going forward then, was it as if you were
 9   starting a new database?
10        A.    Well, it had the same list of clients,
11   stocks and everything, but it did not have a
12   record -- it had the balances but it did not have a
13   record, previous record of what happened.
14        Q.    So going forward after this snapshot
15   process, is it fair to say that moving forward new
16   data would be entered at that point in time?
17        A.    Yeah.  Yeah.  Throughout the year and then
18   on the first of January of next year it would be
19   reset -- the copy would be made and it would be
20   reset.
21        Q.    In between resets, as data was entered
22   over course of the year --
23        A.    Yeah.
24        Q.    -- was it your regular practice to keep
25   that data on the server?
```

<div align="right">51</div>

```
 1        A.   Yeah, it was always on the server.
 2              MR. LONDON:  We are going to go off
 3   the record to change the tape.
 4              THE WITNESS:  Okay.
 5              THE VIDEOGRAPHER:  The time is 10:55.
 6   We are off the record:
 7              (Recess taken from 10:56 until.
 8              11:04 a.m.)
 9              THE VIDEOGRAPHER:  We are on the
10   record.  The time is 11:03 in this media.
11   BY MR. LONDON:
12        Q.   Mr. Nikolayev, we were talking about the Q
13   accounting system.  And then was the Q accounting
14   system how Mr. Sharp regularly operated his
15   business, he used the Q system?
16        A.   That was my understanding.  I wasn't in
17   day-to-day operations but just that's what it seems
18   like.
19        Q.   But based on you being an administrative
20   assistant, was it your understanding that Mr. Sharp
21   used the Q system as a regular function of his
22   business?
23        A.   Yeah.  Yeah.  That was my impression.
24        Q.   And you explained a little bit earlier
25   about the yearly backup and then the saving of the
```

                                                        52

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1348

```
 1   Skyfall from other information?
 2        A.   It contained his files, his files.
 3        Q.   I'm just trying to understand, what was
 4   the difference?  What did you mean by "his files"?
 5        A.   Well, he used this server -- why it was in
 6   Curacao is that at some point I understand that the
 7   US passed some sort of policy where when you cross
 8   the border that the government can seize your
 9   devices and make a copy of the data.
10            So what he was doing is that he basically
11   did not have any data on his laptop that can be
12   seized.  And he would have it all in Curacao.
13            And he would just run remote desk like he
14   would run his computer from there.  So his laptop
15   would be like -- have a minimum amount of data on
16   it.
17        Q.   And Skyfall was connected to his --
18        A.   I think that was the Skyfall.
19        Q.   Does the name XM, the letters XM Live --
20        A.   Okay, yeah -- that's -- well, that's the
21   new name of Q, XM Live is the new name of Q.
22        Q.   So do you know the reason why the name was
23   changed from Q to XM Live?
24        A.   I think at that time when he told me not
25   to give access to clients, he asked me to rename it.
```
                                                         55

A1349

1   Q.   Other than renaming the accounting system

2   from Q to XM Live, was there any other changes?

3   A.   Just basically closed access to all the

4   clients.

5   Q.   In connection with your work for Mr.

6   Sharp, separate from the Q account system, did you

7   work on some sort form of encrypted communication

8   network?

9   A.   Yes.  At some point the servers of

10   Mr. Sharp's were located at Mossack Fonseca in

11   Panama.  It's a company in Panama.

12        And the technical support -- we used them

13   as a farm, like a server farm.  But the service was

14   like -- the technical support was just horrible,

15   horrible.  Like seriously like really bad.  Like any

16   attention to the server just takes hours or days, or

17   just the way it was sold was just horrible.

18        And at some point we moved -- we moved

19   from there, because -- and I suggested Curacao

20   because in Curacao was the company that I support

21   and operate for longer than I know Mr. Sharp.  And

22   that's why I suggested Curacao, that that would have

23   more like faster access to everything.

24   Q.   Just to make sure that I got the record

25   clear.

56

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1350

1          And because I have the private key, I
2    would be able to read that message.
3          And the Blackberries -- I must say, the
4    users were not very sophisticated, so the
5    Blackberries did it easy enough for them to do that.
6          That was until the Blackberries -- like at
7    some point, if you remember, there was a big outage
8    of Blackberries.  And a couple of months after that
9    they decided to stop using the Blackberries.
10     Q.   Who made the decision to stop using the
11    Blackberries?
12     A.   Everything -- all decisions came from
13    Mr. Sharp for me.
14          And then he asked me to do alternative
15    method.  And basically what I suggested is like --
16    they wanted also to have a voice communication.  So
17    I created -- again I did not write any software,
18    just created the -- used open-source tools.  And
19    they created voice select [inaudible] system, the
20    VPN.
21          And chat that is not hosted on many cloud
22    services.  So it was hosted in Curacao.
23     Q.   So you created a system for the phone
24    users to --
25     A.   To communicate.  Basically do exactly the

                                                        64

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1351

1      Q.    Under the Instructions portion of this

2   page it states:  "Please issue one free trading

3   certificate for 1,750,000 shares to Gotama Capital,

4   SA."

5           And it goes on from there.

6      A.    Yeah.

7      Q.    Do you see that reference?

8           Prior to me showing you this document do

9   you have an understanding that at some point in time

10  Mr. Sharp directed you to tell Action Stock Transfer

11  to issue a free trading certificate to Gotama

12  Capital of 1.75 million shares of Garma Tex?

13     A.    No, I do not request anybody nor did I

14  ever issue that memo.

15     Q.    So looking at this document today, is it

16  your understanding that the only reason for your

17  signature on this document to Action Stock Transfer

18  would be instructions is because Fred Sharp directed

19  you to do so?

20     A.    I did not -- he may actually have my

21  signature as a digital scan of my signature, so it's

22  possible that this is one of those.

23          I do not recall signing this.

24     Q.    So you provided at some point in time a

25  digital version of your signature to go Fred Sharp?

                                                     144

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1352

```
1          A.   Yes, yes, I did.
2          Q.   Did Mr. Sharp ask you to provide your
3     digital signature to him?
4          A.   Yeah, I do not recall exact date when this
5     happened, but, yes.
6          Q.   Date aside, just the actual -- the
7     directive, did Mr. Sharp direct you --
8          A.   Yes.
9          Q.   -- to give you an electronic signature?
10         A.   Yeah.  Yeah.
11         Q.   Did he explain why he needed your
12    electronic signature?
13         A.   It was as part of this service when
14    originally Gotama was set up.
15         Q.   So in connection with you providing
16    documents to Mr. Sharp to set up Gotama, you also
17    provided an electronic signature --
18         A.   Right.
19         Q.   -- for Mr. Sharp to use in connection with
20    Gotama.
21         A.   Yes.  But, for example, this signature I
22    don't think that I signed that.  It is just too
23    clean and it is not exactly the way I sign it on
24    this page.
25         Q.   Which page are you on?
```

145

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

A1353

1      A.    I do not recall.  I don't recall.

2      Q.    And is it fair to say that as an

3  administrator Mr. Sharp could change entries in the

4  Q system?

5      A.    He could, yes.  But it would be recorded.

6  There's a record saying who created the record and

7  who modified it.

8      Q.    And how would one figure out who recorded

9  it and if it was changed or not?

10      A.    If you click on the transaction number it

11  will have a detail that says "Created By" and then

12  "Modified By" and then it will say "Date."

13      Q.    Okay.  Were you ever -- do you recall ever

14  making changes in the Q system, to entries in the Q

15  system?

16      A.    Entries?  Not particularly, no.

17           I sometimes would have to like modify like

18  let's say a formula for commission calculations, so

19  it would be like a general change.  Not a particular

20  transaction.

21      Q.    Okay.  I'm sorry because I don't think

22  this was introduced as an exhibit.

23           Are you familiar with sort of what the Q

24  system entries look like in the categories?

25      A.    Right.

                                                  213

A1354

```
 1        A.    Yeah, I don't know --
 2        Q.    In the course of your dealings -- which
 3   sounds like, you know, covered many, many years with
 4   Mr. Sharp, had you ever heard that he had been in
 5   trouble with the law?
 6        A.    No.
 7        Q.    Had you ever heard that he was committing
 8   securities violations?
 9        A.    No.  He's just a small customer for me
10   that does not bother me that much.  So I do not
11   deal -- this is just like tech support mostly, very
12   small tech support.  I am like, sometimes I don't
13   have enough time to sleep.
14        Q.    I understand.  But I'm just wondering if
15   you heard anything bad about his -- prior to the
16   servers being confiscated had you heard anything
17   about illegal or fraudulent activities of Mr. Sharp?
18        A.    At the moment that his servers were
19   confiscated I just typed my name in Google around
20   that time.  And then I found out about the Marshall
21   Islands.
22        Q.    Right.  But in the course of your dealings
23   before that happened, you had no reason to believe
24   that he was engaging in securities violations or
25   fraud.
```

<div align="right">226</div>

<div align="center">A1355</div>

1                    UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS (Boston)

3                              No. 1:21-cv-11276-WGY

4

5     SECURITIES and EXCHANGE COMMISSION,
                Plaintiff

6

7     vs.

8

9     FREDERICK L. SHARP, et al,
                Defendants

10

11                              * * * * * * * * *

12

13

                            For Hearing Before:
14                          Judge William G. Young

15

                              Summary Judgment
16

17                          United States District Court
                            District of Massachusetts (Boston)
18                          One Courthouse Way
                            Boston, Massachusetts 02210
19                          Wednesday, June 21, 2023

20

21                              * * * * * * * *

22

                        REPORTER: RICHARD H. ROMANOW, RPR
23                          Official Court Reporter
                          United States District Court
24          One Courthouse Way, Room 5510, Boston, MA 02210
                            bulldog@richromanow.com

25

A1356

```
 1                    A P P E A R A N C E S

 2
     KATHLEEN BURDETTE SHIELDS, ESQ.
 3   ALFRED A. DAY, ESQ.
     DAVID H. LONDON, ESQ.
 4   NITA KUMARASWAMI KLUNDER, ESQ.
        Securities and Exchange Commission - MA
 5      33 Arch Street, 24th Floor
        Boston, MA 02110
 6      (617) 573-8904
        Email: Shieldska@sec.gov
 7      For Plaintiff

 8   KAREN A. PICKETT, ESQ.
        Pickett Law Offices, P.C.
 9      125 High Street, 26th Floor
        Boston, MA 02110
10      (617) 423-0485
        Email: Kpickettlaw@gmail.com
11      For Defendant Zhiying Yvonne Gasarch

12   LORRAINE BELOSTOCK, ESQ.
        Todd & Weld, LLP
13      One Federal Street
        Boston, MA 02110
14      (617) 720-2626
        Email: Lbelostock@toddweld.com
15      For Defendant Mike K. Veldhuis

16   NEIL THOMAS SMITH, ESQ.
     ROBERT S. SILVERBLATT, ESQ.
17      K & L Gates LLP - MA
        One Lincoln Street
18      State Street Financial Center
        Boston, MA 02111
19      (617) 261-3180
        Email: Neil.smith@klgates.com
20      For Defendant Paul Sexton

21   MIRANDA E. FRITZ, ESQ.
     TIMOTHY J. FAZIO, ESQ.
22      Manning Gross Massenburg
        125 High Street
23      Oliver Street Tower, 6th Floor
        Boston, MA 02110
24      (617) 670-8800
        Email: Tfazio@mgmlaw.com
25      For Defendant Jackson T. Friesen
```

A1357

```
 1          P R O C E E D I N G S
 2          (Begins, 2:20 p.m.)
 3          THE CLERK:  Now hearing Civil Matter 21-11276,
 4     Securities and Exchange Commission versus Sharp, et al.
 5          THE COURT:  Would counsel identify themselves.
 6          MS. SHIELDS:  Good afternoon, your Honor, Kathleen
 7     Shields for the Securities and Exchange Commission, and
 8     with me are my colleagues David London, Al Day, and Nita
 9     Klunder.
10          THE COURT:  Good afternoon.
11          MR. SMITH:  Good afternoon, your Honor, Neil
12     Smith, Robert Silverblatt, K & L Gates, on behalf of
13     Defendant Paul Sexton.
14          THE COURT:  Good afternoon.
15          MS. PICKETT:  Good afternoon, your Honor, Karen
16     Pickett on behalf of defendant Yvonne Gasarch, I'm here
17     today but there's no summary judgment motion pending.
18          THE COURT:  But you're certainly welcome.
19          MS. FRITZ:  Good afternoon, your Honor, Miranda
20     Fritz on behalf of Jackson Friesen, and with me is Tim
21     Fazio.
22          THE COURT:  And good afternoon to you all.
23          My first question, before we get into the
24     substance --
25          I'm sorry.  I didn't recognize you and I
```

1    apologize.

2        MS. BELOSTOCK:  That's fine, your Honor.  Lorraine

3    Belostock, Todd & Weld, on behalf of the defendant Mike

4    Veldhuis.

5        THE COURT:  All right.  And good afternoon.  I

6    need to ask a few questions to tee this up so that I

7    understand it.

8        The defendants make various arguments and say

9    various things are incomplete and certainly in dispute,

10   but it's correct, isn't it, that the brokerage records

11   that I have before the Court, those are both authentic,

12   and it is undisputed that, so far as they go and they

13   appear only to be samples, that they are accurate,

14   accurate in the sense that they accurately reflect the

15   trade, who sold, who bought, and at what price, isn't

16   that so?  To the defense.  It is?

17       MR. SILVERBLATT:  Your Honor, that is not --

18       (Interruption by Court Reporter.)

19       MR. SILVERBLATT:  Oh, Rob Silverblatt on behalf of

20   Paul Sexton.

21       THE COURT:  Yes.

22       MR. SILVERBLATT:  Your Honor, we do have some

23   objections that we have made in our exhibit list, they

24   do not feature prominently in our summary judgment

25   briefing.  I will say that, you know, the thrust of our

```
 1    argument is that the brokerage records do not implicate

 2    our client in any way.

 3          THE COURT:  Well that wasn't my question.  But --

 4    we're going to go at this like this.  I'm accepting

 5    those as authentic and accurate as far as they go.  All

 6    right.

 7          Now to the SEC.  Let's start with the easy, the

 8    affidavits.  I can't -- you bear the burden of proof

 9    here.  I can't grant summary judgment based upon

10    affidavits, can I?

11          MS. SHIELDS:  Yes, you can, your Honor.

12          THE COURT:  No, I can't.  *Reeves vs. Sanderson*

13    *Plumbing.*  The jury -- this is a jury case, the jury

14    would be free to reject them.  So I simply can't base

15    summary judgment on them.

16          MS. SHIELDS:  Your Honor, I don't believe that's

17    an accurate reading of the *Reeves* case.  The First

18    Circuit in the *Murray, LaFreniere*, and the *Sears Robuck*

19    case, um, take a contrary view, and those cases from the

20    First Circuit say that arguing that witnesses should not

21    be believed is not adequate ground on which to deny

22    summary judgment.

23          THE COURT:  Well respectfully I think it is.  Let

24    me ask you about, um, this Q business.  That's hearsay?

25          MS. SHIELDS:  Your Honor, I would submit that the
```

```
 1    Q system is a business record of the Sharp organization.

 2          THE COURT:  Oh?

 3          MS. SHIELDS:  Yes.

 4          THE COURT:  And how -- what authenticates that?

 5          MS. SHIELDS:  The testimony both of users of the Q

 6    system and the individual who designed and created the Q

 7    system.

 8          THE COURT:  So affidavits?

 9          MS. SHIELDS:  Yes.

10          THE COURT:  All right.  All right.  So let's say I

11    accept that, that's a picture at one time.  But your

12    evidence extends over a much longer time than that.

13          MS. SHIELDS:  The Q system actually captures

14    transactions over the span of the time period that is

15    alleged in the complaint.

16          THE COURT:  Well the system may --

17          MS. SHIELDS:  Yes.

18          THE COURT:  -- but all I have is a picture of it

19    at the time the FBI seized those servers and examined

20    them.

21          MS. SHIELDS:  But the picture at the time that the

22    server was captured contains data stretching back in

23    time to 2011, which is when the allegations in this

24    complaint begin.  So it covers the entire timeframe from

25    2011 to 2019.
```

A1361

```
1          THE COURT:  All right.
2          Now, um, assume that, um, this Court will not --
3     not that they're not accurate, I simply don't know.  As
4     I read Reeves, I don't have to accept these affidavits,
5     a factfinder wouldn't have to believe these things.
6     These are, as they say, "flip witnesses," their
7     credibility is at issue.  And that being so, can you get
8     summary judgment on the sampling that you have taken,
9     which I will credit as accurate and undisputed, and, um,
10    this Q system picture so far as it is.  Can I?
11         MS. SHIELDS:  I would say yes, your Honor.
12         THE COURT:  I'll hear you.
13         MS. SHIELDS:  For a variety of reasons.  So
14    starting with, um, there are a number of forms of
15    evidence that the Commission has provided to your Honor
16    that are all corroborating of each other.  And so you
17    begin with the Q system, which is a business record of
18    the Sharp group's business and on which the defendants
19    relied over time, that database contains information on
20    a trade-by-trade basis about all of the trades, um, that
21    are summarized in the declaration of the SEC's
22    accountant, Mr. Murphy.  Those trades are corroborated
23    by the brokerage and bank records that the Commission
24    has.  And we admittedly do not have records for all of
25    the accounts in which the defendants traded.
```

A1362

```
 1        THE COURT:  But I asked you to assume I was not
 2   going to accept the affidavits.
 3        MS. SHIELDS:  I haven't spoken about the
 4   affidavits, I'm talking now about the Q system, which is
 5   corroborated by the brokerage records, your Honor.
 6        THE COURT:  All right.
 7        MS. SHIELDS:  And the Q system --
 8        THE COURT:  You said we're talking about the SEC's
 9   expert?
10        MS. SHIELDS:  The SEC's accountant, who is a
11   summary witness, your Honor.  His role in providing a
12   declaration to your Honor was to summarize the data
13   that's in the Q system.
14        THE COURT:  Very well.  Go ahead.
15        MS. SHIELDS:  That data shows all of the trading,
16   that's summarized for your Honor in the summary judgment
17   papers.  The data and the Q system is further
18   corroborated by the records of the transfer agents who
19   recorded the transfers of shares into the names of the
20   Sharp nominee companies.
21        THE COURT:  Well your sampling was only of a
22   portion of these records, not all of them.
23        MS. SHIELDS:  You are right because the Commission
24   does not have brokerage account records for all of the
25   brokerage accounts in which the trading occurred.  But
```

```
 1    --
 2         THE COURT:  So don't you have to -- aren't you
 3    asking me to draw inferences in your favor, inferences
 4    which a jury could well draw if we had a trial, but
 5    which I'm expressly instructed not to draw and instead
 6    to draw all inferences against you?
 7         MS. SHIELDS:  Your Honor, that is the summary
 8    judgment standard.  And if your Honor were only to grant
 9    summary judgment where there is a corroborating
10    brokerage record, your Honor could nonetheless grant
11    summary judgment on those transactions where the
12    transactions shown in the Q system are corroborated
13    either by a third-party brokerage record --
14         THE COURT:  I could grant summary judgment of
15    what?
16         MS. SHIELDS:  Of violations of the registration
17    requirement that is contained in Section 5 of the
18    Securities Act and of the reporting disclosure, the
19    ownership reporting requirements that are in Section
20    13(d) of the Exchange Act.
21         THE COURT:  All right.
22         MS. SHIELDS:  So with respect to Section 5, there
23    are three elements that your Honor must find in order to
24    grant summary judgment.  Your Honor must find that no
25    registration statements were filed, that the defendants
```

A1364

```
 1   transacted in the securities of the 14 issuers that are
 2   the subject of that claim, and that interstate commerce
 3   was used.  The brokerage -- if all your Honor is
 4   inclined to accept are the brokerage records, your Honor
 5   can find that the defendants transacted in those
 6   securities as a result of the transactions in the
 7   brokerage record.  Your Honor can find that there is no
 8   dispute that registration statements for those sales
 9   were not filed.  And your Honor can further find that
10   the means and methods of interstate commerce were used
11   because those transactions occurred through foreign
12   brokerage accounts and often occurred through the use of
13   the clearing house system called "DTC," or the
14   "Depository Trust Corporation."
15       THE COURT:  Now suppose I were inclined to do
16   that, you get partial summary judgment.
17       MS. SHIELDS:  That's correct, your Honor.
18       THE COURT:  And then what?
19       MS. SHIELDS:  Then we try the rest of it.
20       THE COURT:  All right.
21       MS. SHIELDS:  With respect to 13(d), your Honor,
22   you can also grant summary judgment on 13(d) on the
23   basis of the transfer agent records that are before your
24   Honor.  There are three elements of the Commission's
25   13(d) claim and those are, first, that the defendants
```

A1365

```
 1    owned 5 percent or more of Stevia First/Vitality shares,

 2    and in 13(d) Stevia First/Vitality is the only issuer

 3    that is the subject of that claim.  So the three

 4    elements are that that stock is registered under Section

 5    12, which you have undisputed evidence about from the

 6    public filings of Stevia First/Vitality, that the

 7    defendants acquired 5 percent or more of that company's

 8    shares, and that they did not file Section -- or

 9    Schedule 13(d) filings with the Commission within 10

10    days of those acquisitions, that's also undisputed,

11    there are no such filings in the public databases where

12    those filings are made.

13          With respect to the defendants acquisition of --

14          THE COURT:  And first tell me how I know that?

15          MS. SHIELDS:  Your Honor has the declaration of

16    our -- the SEC's accountant who searched those databases

17    and has said that when he searched those databases, no

18    such 13(d) filings appear.

19          THE COURT:  He's pretty central, isn't he?

20          MS. SHIELDS:  Yes, your Honor.

21          THE COURT:  All right.

22          All right.  What does the defense say?

23          MS. SHIELDS:  And may I, um, before your Honor

24    turns to the defense --

25          THE COURT:  Yes.
```

```
1          MS. SHIELDS:  -- I'd like to just point out, um,
2     that for purposes of summary judgment the defendants
3     failed to comply with Local Rule 56.1, which requires
4     them to provide in a paragraph-by-paragraph statement a
5     description of each of the Commission's statements of
6     undisputed material facts to which -- and cite evidence
7     to demonstrate that those assertions are inaccurate.
8     They failed to do so.  And under this Court's law and
9     First Circuit law, those assertions of undisputed facts
10    should be deemed true.
11         THE COURT:  Do you think that that squares with
12    *Reeves*?
13         MS. SHIELDS:  I do, your Honor, because I believe
14    that the First Circuit does not read *Reeves* the way you
15    read *Reeves*.  And in fact if you look at the First
16    Circuit's *Murray* decision, which we've quoted, um, in
17    our brief, Docket Number 298 at Pages 9 and 10, the
18    *LaFreniere*, the *Murray*, and the *Sears Robuck* cases, the
19    First Circuit has articulated a different understanding
20    of *Reeves*.
21         THE COURT:  Thank you.
22         MR. SILVERBLATT:  Good afternoon, your Honor.  I
23    want to start where Ms. Shields left off with the *Murray*
24    and *Sears* cases --
25         THE COURT:  Just so we're clear, this is not a 10
```

A1367

```
 1    minutes per person/defendant, this is 10 minutes.  I'll
 2    hear you.
 3         MR. SILVERBLATT:  Understood, your Honor.
 4         So starting where Ms. Shields left off, *Murray* and
 5    *Sears* are not intentioned with your Honor's
 6    understanding of the *Reeves* case, in both of those cases
 7    the nonmoving party bore the burden on the essential
 8    element and that's why the Court held the nonmoving
 9    party to a different standard.  Here the SEC bears the
10    burden with respect to the entirety of the case.
11         Turning to the SEC's central argument, it amounts
12    to "somebody violated the securities laws," they don't
13    have any evidence that that person is Mr. Sexton or any
14    of the other defendants, um, in this case.  The
15    brokerage records that the Court has accepted as
16    authentic for purposes of this decision do not mention
17    Mr. Sexton's name anywhere, all the transactions took
18    place in the names of entities other than Mr. Sexton,
19    his name is not anywhere in those records.  The only way
20    that the SEC attempts to get to Mr. Sexton is through
21    layers and layers of inferences, each of which need to
22    be resolved in the Commission's favor.
23         The Commission starts with the Q system, which is
24    problematic even in sampled form for any number of
25    reasons, um, including the fact that it is alleged to
```

A1368

```
 1    have been maintained and under the control of an
 2    individual who the SEC alleges to be a criminal
 3    mastermind, who is a fugitive in Canada or elsewhere,
 4    who had the sole ability to enter things into the system
 5    or to change things that were entered by others.  We
 6    don't know who made these initial records.  We don't
 7    know who might have edited them after the fact except
 8    for the fact that Fred Sharp allegedly, according to the
 9    SEC's own theory of the case, had the unilateral ability
10    to control what those records say, and this is an
11    individual who the SEC alleges has forged business
12    records under other circumstances.  So that is a factual
13    issue that needs to be decided by the jury.
14        The witness the SEC uses to authenticate these
15    records, even the samples, um, Fedir Nikolayev, is not
16    going to enter anything into this system.  He knows
17    nothing about the underlying transactions.  He doesn't
18    know whether they were made in the ordinary course of
19    business.  He doesn't even know what the business was.
20    The evidence that we do have tends to suggest that even
21    the sampled records are not accurate.
22        The SEC engaged in some sampling of some of the
23    transactions, they've admitted that they don't have even
24    records for all of them, but even the ones that they've
25    looked at didn't match up in all cases to what was in
```

```
 1    the Q system.  The SEC's affiant, whose name remains

 2    under seal, testified that he noticed errors in the Q

 3    system and had to correct them.  These are all factors

 4    that make this fundamentally a jury question.

 5         When you have a system in which my client's name

 6    does not appear once, that has not been properly

 7    authenticated, that is under the control of somebody who

 8    is not there to authenticate it, who's not on the SEC's

 9    witness list, it was seized in Curacao allegedly under

10    circumstances that have not been included in the SEC's

11    moving papers, there are just all kinds of problems with

12    trying to call this "undisputed evidence" that must be

13    accepted as accurate by the jury.

14         But even if you get that far, even if you assume

15    that what's in the Q system is accurate, it still

16    doesn't connect to Mr. Sexton because his name doesn't

17    appear in that system, his name doesn't appear in the

18    brokerage records that are allegedly -- that allegedly

19    correspond to some but not all of what's in the Q

20    system.  The only way they get to Mr. Sexton is through

21    the affidavit of Avtar Dhillon, who is an individual who

22    earned an entire portion in the SEC's amended complaint

23    due to the SEC's allegation that he's an unmitigated

24    perjurer, and now he's saying things that are

25    diametrically opposed to what he had said in his
```

A1370

 1    investigative testimony, and the SEC is asking this

 2    Court to accept these new diametrically-opposed

 3    contentions as undisputed facts for purposes of summary

 4    judgment.

 5         So every single link in this chain, going from Q

 6    to the brokerage records, to the declarations, is broken

 7    because the Court needs to make an inference, and that

 8    inference in every single step needs to be in favor of

 9    the SEC, which contravenes *Reeves*, it contravenes this

10    Court's decision in *EagleEye Asset Management* where the

11    Court indicated that the question is "Can a jury

12    reasonably disbelieve the evidence?"  And given that

13    there is no evidence that is competent, admissible, and

14    uncontroverted that ties Mr. Sexton to these

15    transactions, the answer is obviously, yes, a jury can

16    disbelieve this.

17         THE COURT:  Thank you.

18         Anyone else for the defense?

19         MS. FRITZ:  Yes.  Miranda Fritz on behalf of

20    Jackson Friesen.

21         Judge, I would just try to make the basic point

22    that this is not a case for summary judgment, this is a

23    case where the SEC is asking your Honor to take a series

24    of problematic items of supposed evidence, cobble them

25    together in order to get to a conclusion that is far

A1371

1    from clear in this record.

2         The only thing that is clear and undisputed in

3    this case is that someone, defendant Fred Sharp and his

4    employees, acquired and sold stock through entities that

5    they controlled in names that have nothing to do with

6    either Mr. Sexton or Mr. Friesen.  And that's why the

7    case is so problematic.  What you have are sales of

8    stock that do not relate to the individuals unless you

9    layer on top of it this mythical beast called the "Q

10   system."

11        This case depends entirely on the Q system.  And

12   when Ms. Shields said a moment ago that they have

13   otherwise proved that through brokerage records or

14   transfer-agent records, that's not the case.  If Company

15   A acquired and sold stock, how then do you say that has

16   anything to do with Jackson Friesen?  The Q system.  And

17   the Q system, your Honor, is hearsay.  The Q system is

18   fiction.

19        THE COURT:  Well it's hearsay, no one denies it's

20   hearsay.  She says she's established it's a business

21   record.

22        MS. FRITZ:  But it's clearly not an authentic

23   business record.  It is, I've argued, the opposite of a

24   business record.

25        In other words, the Q system does not accurately

A1372

```
 1    record any of the actual transactions that occurred.  So
 2    the brokerage records that your Honor talked about or
 3    the transfer-agent records, those are not being recorded
 4    in the Q system.  The Q system is somebody else's
 5    version of events that is based on nothing in the
 6    record.  So it's only the Q system that would enable the
 7    SEC to argue that Mr. Friesen had anything at all to do
 8    with purchases or sales of securities, much less that he
 9    acquired more than 5 percent.
10         And the idea of trying to cross-examine that
11    document is infuriating because we have no idea and the
12    record does not reflect why certain entries appear, the
13    entries are unexplained.  For some reason someone put an
14    entry in those records that the SEC says relates to
15    Jackson Friesen.  But why?
16         THE COURT:  About 3 more minutes, so you're clear.
17    Go ahead.
18         MS. FRITZ:  Okay.  But why is that entry there?
19    Who made it?  They cannot even present to the Court a
20    witness who can say the most basic component of a
21    business record, that "Yes, I made entries, they're
22    accurate, I was under a business duty to do so."  So we
23    have no way to challenge or understand --
24         THE COURT:  They don't argue this but it occurred
25    to me that they may argue that it's the record of a
```

A1373

```
1    co-conspirator made during and in furtherance of the
2    conspiracy.  What if they took that line?
3          MS. FRITZ:  They're trying to offer this for
4    truth, right?
5          THE COURT:  Well that would be another exception
6    to the rule against hearsay.
7          MS. FRITZ:  But at this point they are not
8    claiming anything like that.  What we are confronted
9    with is this idea that it's a business record, and
10   they're doing that for a reason, because then it has
11   some indicia of some kind of reliability.  Business
12   records -- if they are business records, they really do
13   have testimony that they are made by people who have a
14   duty accurately to report it.  So they are trying to add
15   in that reliability component.  If it's just a statement
16   of Fred Sharp, then it clearly doesn't have any
17   reliability and can't serve as the basis for summary
18   judgment.
19          THE COURT:  Okay, I understand the argument.
20          I have one question of the SEC.  An affiant's name
21   is under seal.  Is this summary witness's name under
22   seal?
23          MS. SHIELDS:  No, your Honor, we filed --
24          THE COURT:  What affiant's name is under seal?
25          MS. SHIELDS:  When we filed our summary judgment
```

A1374

 1   papers, we filed a motion to seal the declaration of one

 2   of the witnesses.

 3        THE COURT:  But not the summary witness?

 4        MS. SHIELDS:  No, your Honor.

 5        THE COURT:  Thank you.  All right.

 6        MS. SHIELDS:  May I?

 7        THE COURT:  You may not.

 8        The, um, the motion, um, as broadly framed for

 9   summary judgment is denied.  The fallback position for

10   the specific offenses allegedly supported by the

11   specific documents, I'll take under advisement.

12        All right.  This case is on for October for trial?

13        MS. SHIELDS:  I believe, your Honor, we're on your

14   September trial list.

15        THE COURT:  Yes, very well.  Good.

16        We'll stand in recess.

17        (Ends, 2:45 p.m.)

18

19

20

21

22

23

24

25

A1375

```
1                  C E R T I F I C A T E

2

3        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

4    do hereby certify that the foregoing record is a true

5    and accurate transcription of my stenographic notes

6    before Judge William G. Young, on Wednesday, June 21,

7    2023, to the best of my skill and ability.

8

9

10

11   /s/ Richard H. Romanow 09-01-23
     _____
12   RICHARD H. ROMANOW    Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | ¶:340 | |
| COMMISSION, | ¶ | |
| | ¶: | |
| Plaintiff, | ¶ | No. 1:21-cv-11276-WGY |
| | ¶ | |
| v. | ¶: | |
| | ¶: | |
| YVONNE GASARCH, *et al.* | ¶: | |
| | ¶: | |
| Defendants. | ¶: | |

## <u>YVONNE GASARCH'S MOTION TO SUPPLEMENT HER MOTION IN LIMINE</u> <u>FILED ON AUGUST 24, 2023</u>

Defendant Yvonne Gasarch moves to supplement the motion in limine she filed on

August 24, 2023 (DE 334), seeking to preclude the SEC from introducing "Q" system records

and expert testimony.  In that motion, Mrs. Gasarch adopted and incorporated by reference the

arguments in Defendant Jackson Friesen's motion in limine in this regard.  (DE 329).  Mrs.

Gasarch now seeks to supplement this motion to adopt and incorporate by reference the

arguments made by Defendant Paul Sexton in motions in limine he filed on August 31, 2023.

(D.E. 338; D.E. 339).                              Respectfully submitted,

                                                   YVONNE GASARCH

                                                    By her Attorney,

                                                   /s/Karen A. Pickett
                                                   _____
                                                   Karen A. Pickett (BBO # 633801)
                                                   PICKETT LAW OFFICES, PC
                                                   125 High St., 26th Floor
                                                   Boston, MA  02110
                                                   617 423 0485
                                                   kpickettlaw@gmail.com

September 1, 2023

1

A1377

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 1, 2023.

<u>*/s/ Karen A. Pickett*</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>                              **Plaintiff,**<br><br>      **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>                              **Defendants.** | **Civil Action No.  21-CV-11276 (WGY)** |

### PLAINTIFF'S OPPOSITION TO DEFENDANTS SEXTON'S AND GASARCH'S MOTIONS TO EXCLUDE EXPERT TESTIMONY

Defendants Sexton and Gasarch moved *in limine* ("Motion," Dkt. Nos. 334, 339, 346)[1] to exclude testimony from the Commission's expert witness, Philip A. Feigin, J.D.  For the following reasons, their motions should be denied.

**A.      Rule 702 Permits Expert Testimony on the Background of Complex Subjects.**

Federal Rule of Evidence 702 provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's … other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  "[I]n securities cases, expert testimony commonly is admitted to assist the trier of fact in understanding . . . securities industry practice, securities industry regulations, and complicated terms and concepts."  *SEC v. Johnson,* 525 F.

---

[1] "Motion at ___" refers to specific pages in Sexton's motion *in limine* (Dkt. No. 339).  Gasarch's motions merely adopt Freisen's and Sexton's motions to exclude the Commission's expert, she offers no additional argument of her own (*see* Dkt. No. 334 at 4; Dkt. No. 346).

A1379

Supp. 2d 70, 77 (D.D.C. 2007).  "Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."  *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir. 1991).

Sexton argues, however, that Feigin should not be allowed to help the jury understand the complexities of the securities laws—a matter that is plainly beyond the ken of the average juror. Motion at 1-2.  The Commission's Opposition to Defendant Friesen's previously filed motion *in limine* to exclude the Commission's expert (Dkt. No. 329) addressed in detail why it is permissible for Feigin to explain to the jury, among other things, the purpose and mechanisms of securities registration, the role of disclosure filings, and related concepts.  *See* Dkt. No. 336, at 13-15.  Rather than repeat those arguments here, the Commission will focus on new matters raised in Sexton's motion.

In the one case that Sexton cites where an expert was precluded from testifying as to background, *SEC v. Mudd*, Sexton omits to mention that "the parties acknowledged that they might agree to stipulated background facts."  No. 11 CIV. 9292 (PAC), 2016 WL 2593980, at *5 (S.D.N.Y May 4, 2016) (mortgage markets and financial crisis).  That is not the case here, as there are no such stipulations.[2]  *Ross v. Rothstein*, 92 F. Supp. 3d 1041, 1051 (D. Kan. 2015) (expert can testify about the operation, function, and trading of stocks in the over-the counter securities markets generally); *U.S. v. Russo*, 74 F.3d 1383, 1394–95 (2d Cir. 2007) (expert testimony admissible to help jury understand terms and concepts used in securities industry); *Remington v. Newbridge Sec. Corp.,* No. 13-60384-CIV, 2014 WL 505153, at *3 (S.D. Fla. Feb. 7, 2014) (expert can testify about regulation of the securities industry).

---

[2] The Commission proposed to the defendants stipulations about the absence of relevant registration statements and ownership disclosure filings, but defendants were not willing to stipulate on those subjects.

A1380

*Remington* is instructive, as the expert in that case worked for 35 years in the securities industry, including over 20 years as an attorney for regulatory bodies. *See Remington*, 2014 WL 505153, at *3. The *Remington* court noted that "the realm of securities regulation is arcane and inaccessible even to many legal professionals not versed in the subject [thus the expert's] proposed testimony would doubtless assist the jury in understanding the concepts and issues of this case." *Id*. Similarly, Mr. Feigin's experience encompasses 20 years in securities regulation, including 10 years as the Colorado Securities Commissioner. *See* Ex. A (Feigin Expert Disclosures), at 1-2.

Sexton (and the other defendants) will have the opportunity to cross-examine Feigin and they are free to argue about the weight the jury should give his testimony. Courts have held that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attack . . . rather than wholesale exclusions" of otherwise admissible testimony. *In re: Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2003 WL 1610775, at *25 (S.D.N.Y. Mar. 26, 2003) (*quoting Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 596 (1993)). There is no reason to deviate from this approach. Feigin should be permitted to assist the jury by providing helpful testimony about the operations of the securities markets and restricted stock; registration and exemptions; and common uses of terms such as "control," "affiliate," and "beneficial ownership," which he is eminently qualified to render.

**B.     Feigin's Opinions Are Based on Evidence in the Record.**

Sexton also argues that certain of Feigin's opinions are improperly based on allegations in the Amended Complaint. Motion at 2-3. In so doing, Sexton does not dispute Feigin's qualifications; he criticizes only the nature of the purported evidence relied on. What Sexton

A1381

elides, however, is that Feigin actually relied upon numerous emails, text messages, transfer agent documents, record ledgers, transcript testimony, public filings, corporate documents, Q data, and more.  *See* Expert Witness Report of Philip A. Feigin (Dkt. No. 320-3), at 2-3, 28-31, 33

Moreover, Feigin could discuss the ultimate issue in this case.  FRE 704(a) provides that "an opinion is not objectionable just because it embraces an ultimate issue."  Courts have permitted experts to offer legal conclusions in cases involving complex statutory or regulatory schemes, such as the federal securities laws.  *See United States v. Offill,* 666 F.3d 168 (4th Cir. 2011) (allowing expert testimony that reached legal conclusions in relation to the requirements to register securities, including permitting hypotheticals that mirrored the defendant's conduct in a case alleging a scheme to "evade securities registration requirements"); *see also* Dkt. No. 336, at 15-17.

C.    **Other Courts Have Permitted Mr. Feigin to Offer Testimony Similar to What is Proffered Here.**

The remainder of Sexton's motion essentially boils down to the following statement: "[a]lthough the SEC routinely brings cases involving complicated statutory schemes, it has cited no opinions allowing it to present testimony like Mr. Feigin's."  Motion at 5.  Not so.  The cases cited above (*Ross, Russo, and Remington*) are but a few examples.

Further, other federal courts have qualified Mr. Feigin himself as an expert on securities regulation and allowed him to give testimony about the securities industry similar in scope and nature to the proposed testimony in this case.  For example, in *United States v. Bank*, No. 2:17cr126 (E.D. Va.), Mr. Feigin provided trial testimony on the securities markets in general, registration and exemptions, and "fundamental terms and concepts that are likely unfamiliar to lay jurors not involved in the securities industry."  *See* Ex. A (Feigin Expert Disclosures), at 4;

4

A1382

Ex. B (Government's Trial Memorandum, 3/30/2021), at 9.  Similarly, in *United States v. Spanier*, No. 2:17cr126 (S.D. Ca.), Mr. Feigin provided trial (and retrial) testimony on the operation of the U.S. securities markets.  *See* Ex. A (Feigin Expert Disclosures), at 4.

Mr. Feigin has also testified on securities law in several state courts.  *See id.,* at 5-7.  Of note, in *CMKM Diamonds, Inc. v. Casavant*, a Nevada case, Mr.  Feigin provided trial testimony on federal securities law and penny stock fraud.  *See id.,* at 6.

For the foregoing reasons, the Commission respectfully requests that the Court deny Sexton and Gasarch's motions.

Dated:  September 4, 2023                    Respectfully submitted,

                                             **SECURITIES AND EXCHANGE
                                             COMMISSION**

                                             By its Attorneys,

                                             /s/ David H. London
                                             David H.  London (Mass. BBO No. 638289)
                                             Kathleen B. Shields (Mass. BBO No. 637438)
                                             Alfred Day (Mass. BBO No. 654436)
                                             Nita K. Klunder (Mass. BBO No. 689304)
                                             33 Arch Street, 24th Floor
                                             Boston, MA 02110
                                             Telephone: (617) 573-8904 (Shields); (617) 573-
                                             4537 (Day); (617) 573-8997 (London)
                                             Fax: (617) 573-4590
                                             Email: shieldska@sec.gov; daya@sec.gov;
                                             londond@sec.gov; klunderni@sec.gov

5

A1383

<u>**CERTIFICATE OF SERVICE**</u>

  I hereby certify that on September 4, 2023, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

         /s/ David H.  London

A1384

## PHILIP A. FEIGIN
PFeiginLaw LLC
Morrison, Colorado
(303) 885-0556
pfeiginlaw@outlook.com

### September 2022

I have practiced law since December 1977. Beginning in April 1979, I have focused my practice on securities law, with experience as both a regulator and an attorney in the private sector. My practice is focused on federal and state securities law, regulation, compliance and enforcement actions, involving investment advisers, private hedge funds, real estate syndicators, broker-dealers and other issuers as well as investors in dealing with securities-related matters. I have also served as counsel to U.S. and non-U.S. precious metals dealers on federal and state compliance and enforcement issues.

**Expert Witness Experience**

During my 20-year career in securities regulation and while representing clients in private practice for over 22 years now, I have served as an expert witness in a multitude of matters. While a state securities regulator, I served as an expert for prosecutors in Colorado, New Mexico and Nevada in dozens of criminal cases brought under state securities and commodities law. From 2000 to the present, I have served as an expert in dozens of criminal, civil enforcement, private civil and arbitration cases, dealing with a wide variety of issues involving state and federal securities and commodities laws and regulations. Included among the matters on which I have consulted and testified are:

- all aspects of federal and state law securities fraud, commodities-related fraud, so-called "Ponzi" schemes and a wide range of other investment frauds;
- the identification of securities (particularly "investment contracts" and "notes");
- the materiality of facts;
- broker-dealer and investment adviser regulation, responsibilities and abuses;
- a securities lawyer's standard of care and fiduciary duty;
- securities markets in general;
- customer and client suitability;
- day trading;
- insider trading;
- the unenforceability of unregistered broker agreements; and
- private placement offerings, federal Regulation D and other federal and state securities registration exemptions generally.

I have consulted with and testified on behalf of state securities administrators, state attorneys general, the Securities and Exchange Commission, U.S. Attorneys, counsel for brokerage firms, investment advisers and agents, plaintiff's and claimant's counsel, federal and state prosecutors, and civil and criminal defense counsel. I have appeared in criminal, civil, and administrative cases, in trials, arbitrations, depositions and mediations. I have been retained for

A1385

cases in many jurisdictions, including Alabama, Arizona, California, Colorado, Florida, Georgia, Nevada, New Jersey, North Carolina, Oklahoma and Washington State. I have consulted as an expert on many more cases than those that proceeded as far as providing testimony (matters resolved before they got that far), but, since 2000, I have provided testimony, declarations and affidavits in criminal trials, private civil and regulatory enforcement court proceedings and trials, administrative enforcement proceedings, before FINRA (NASD) arbitrations and in mediations. In my regulatory and private practice career, I have also testified before numerous committees and subcommittees of the U.S. Senate and House of Representatives, as well as the legislatures of Colorado, Nevada, Washington State and Massachusetts on investor protection and regulatory issues.

**Practice Experience**

I established my own part-time law practice, PFeiginLaw LLC, in early 2018, after retiring as a senior partner at Lewis Roca Rothgerber Christie LLP, practicing in the firm's Denver, Colorado and Tucson, Arizona offices for 18 years.

Before turning to private practice in 2000, I had a long career as a state securities regulator in Wisconsin, Colorado and Washington, D.C. I served in Washington, D.C. as Executive Director of the North American Securities Administrators Association ("NASAA")* from 1998 to 1999. During my 14 months as NASAA's Executive Director, I participated in the association's successful efforts to preserve state functional regulation of bank securities activities in the Gramm-Leach-Bliley Act. I was also a central figure in drawing national attention to abuses and concerns relating to day trading, on-line brokerage activities, overly aggressive advertising by brokerage firms and Internet-based investment fraud.

Prior to becoming NASAA's Executive Director, I served as Colorado's Securities Commissioner for 10 years, where I championed the reshaping of Colorado securities and investment regulation. I spearheaded the drafting and enactment of the Colorado Securities Act (1990), the Colorado Commodity Code, the Colorado Municipal Bond Supervision Act, Colorado local government investment pool trust fund regulation, and provisions under which Colorado's investment advisers and investment adviser representatives are regulated. I was also actively involved in the drafting of the Uniform Securities Act (2002).

While Commissioner in Colorado, I had the honor of serving as NASAA President in 1994-1995, and otherwise as a member of the NASAA Board of Directors for seven years. I testified on behalf of NASAA on numerous occasions before committees of both the U.S. House of Representatives and the Senate as well as various committees of the Colorado General Assembly and other state legislatures on securities, banking, commodities regulation and investor protection issues. I chaired the multi-state "Lloyd's of London" task force leading to a settlement of more than $60 million for American investors. I also served on NASAA's Task Force on the Future of Shared State and Federal Securities Regulation. I was appointed a member of two advisory committees to the federal Commodity Futures Trading Commission. Until assuming my duties in Washington in 1998, I also served as a founding trustee on the Board of the Investor Protection Trust. I was a principal authority in the creation and adoption of the Model State Commodity Code designed to prohibit off-exchange commodities fraud. In

October 1995, I was awarded NASAA's highest award, the "Blue Sky Cube," in recognition of my successful presidency, years of service and work in the cause of investor protection.

Before being named Colorado Securities Commissioner in 1988, I served as the Assistant Colorado Securities Commissioner from 1982 to 1988, and before that, as the Chief Attorney of the Enforcement Division of the Office of the Wisconsin Commissioner of Securities. I began my legal career in Madison, Wisconsin in private practice from 1977 to 1979. I received a Juris Doctor degree from Pepperdine University School of Law in 1977 and a Bachelor of Arts degree in American History from the University of Wisconsin-Madison in 1971. I am admitted to practice in California, Wisconsin, Colorado and Arizona (inactive in California and Wisconsin).

During my career, I have been quoted and cited as an expert in securities and commodities law and investor and consumer protection issues, in both national and local television, radio and print media. Before my retirement, I appeared frequently as a speaker, panelist and lecturer. I also served as an adjunct professor teaching real estate securities, syndication and entrepreneurship at the Burns School of Real Estate Management and Construction, Daniels College of Business, University of Denver. I have served since 2015 as a Professor of the Practice (adjunct professor) of securities law at the James E. Rogers College of Law, University of Arizona in Tucson, contributed material to the West treatise **Blue Sky Law** and co-authored **Real Estate Securities** with Prof. Mark Levine.

I am a member of the American Bar Association's State and Federal Regulation of Securities Committees. I have authored numerous articles, including "The Model State Commodity Code in 2012 and New CFTC Jurisdiction—Whither the States? Can "new dogs" learn "old tricks?" Banking & Financial Services Policy Report (Feb. 2012 edition); "The Model State Commodity Code in 2011, Whither the States? Can "new dogs" learn "old tricks?" and "Dodd-Frank, Suitability and Fiduciary Duty," and "The Uniform Securities Act of 2002," for the Blue Sky Bugle (American Bar Association Committee on State Regulation of Securities, Section of Business Law): and for RJ&L publications co-authored two Colorado Adviser Advisories with Nina G. Ward: "Do We Really Have to Do This? Some Observations on Dealing with the Sarbanes-Oxley Act," and "Truth or Consequences: The Sarbanes-Oxley Act of 2002". Most recently, I served as an independent hearing officer for the New Jersey Bureau of Securities considering promulgation of a rule to impose a fiduciary duty on broker-dealers and agents, and my report was submitted in August 2019.

*NASAA, the voice of the 67 state and provincial securities agencies of the 50 states, the District of Columbia, Puerto Rico, the provinces and territories of Canada, and the Republic of Mexico, is the oldest international organization devoted to investor protection.

**EXPERT TESTIMONY,
DECLARATIONS, AFFIDAVITS
AND OTHER STATEMENTS OF RECORD**

(January 2003—present)

**FEDERAL COURTS**

***Burton Wiand as Receiver for EquiAlt LLC, et al. v. Family Tree Estate Planning, LLC, et al.,***
United States District Court, Middle District of Florida, Tampa Division, Case No. 8:21-cv-
00361, August 2, 2021 (deposed by counsel for Defendant Bobby Armijo regarding Declaration
filed in the matter, September 9, 2022)

***Burton Wiand as Receiver for EquiAlt LLC, et al. v. Family Tree Estate Planning, LLC, et al.,***
United States District Court, Middle District of Florida, Tampa Division, Case No. 8:21-cv-
00361, August 2, 2021 (declaration by expert witness filed for Plaintiff receiver—federal
securities law—identification of securities, securities registration and exemptions, broker
registration and exemptions, lawful conduct for investment advisers, finders, anti-fraud
provisions, requisite state of mind for violations, duties of brokers)

***U.S. v. Bank, et al.,*** United States District Court for the Eastern District of Virginia, Norfolk
Division, Criminal No. 2:17cr126 (trial testimony anticipated in November 2020—expert
witness for the U.S. Attorney—securities markets in general, identification of membership
interests in limited liability companies as "investment contract" securities and "notes" as
securities, securities and transactional securities registration exemptions, securities fraud and
"materiality" under the Securities Act of 1933, as amended)

***U.S. v. Spanier,*** United States District Court for the Southern District of California, Case No.
12CR918-BEN (expert witness for the U.S. Attorney—retrial testimony on November 16, 2016)
(operation of U.S. securities markets and loans secured by shares of stock)

***U.S. v. Spanier,*** United States District Court for the Southern District of California, Case No.
12CR918-BEN (expert witness for the U.S. Attorney—trial testimony on December 13, 2013)
(operation of U.S. securities markets and loans secured by shares of stock)

***U.S. v. Forehand,*** United States District Court for the Middle District of Alabama, Southern
Division, Case No. 1:12cr181 MHT (expert witness for U.S. Attorney and Alabama Securities
Commission—trial testimony, week of April 8, 2013) (notes as securities under federal securities
laws, Ponzi schemes)

***Gross and Pepper v. Silverberg,*** United States District Court for the Southern District of Florida,
Case No. 11-80210-CIV-DMM (expert witness for Plaintiffs—trial testimony, November 10,
2011) (state securities law—promissory notes as securities and materiality of facts)—(change of
venue from United States District Court for the District of Colorado, Case No. 1:10-cv-00687-
REB-BNB)

***Sun River Energy, Inc. v. Nelson,*** United States District Court for the District of Colorado, Civil
Action No. 11-CV-00198-MSK-MEH (expert witness for Plaintiff—Declaration pursuant to 28

U.S.C. § 1746 in Support of Plaintiff's Motion for Preliminary Injunction, May 20, 2011) (state and federal securities law—unregistered, unlicensed broker-dealer, illegal contract and insider trading)

*CFTC v. 20/20 Trading Company, Inc., United States District Court for the Central District of California, Southern Division, Case No.* SACV11-00643 (FMOx) 0643 (expert witness for Defendants—Declaration pursuant to 28 U.S.C. § 1746 in Opposition to Plaintiff's Motion for Preliminary Injunction, May 13, 2011) (Commodity Exchange Act—regulation of sale of precious metals, leverage contract fraud)

*Gross and Pepper v. Silverberg,* United States District Court for the District of Colorado, Case No. 1:10-cv-00687-REB-BNB (expert witness for Plaintiffs—deposition December 9, 2010) (state securities law—notes as securities)

*U.S. v. Schmidt,* United States District Court for the District of Colorado, Criminal Case No. 04-CR-103-RB (expert witness for U.S. Attorney—trial testimony April 2007) (federal securities law—"prime bank" securities fraud)

*Tong v. Direct Trading Corp.,* U.S. District Court, Northern District of Texas, Fort Worth Division, Case No. 4:03-CV-1234-CV (expert witness for Plaintiff—deposition March 2005) (federal and state securities law—broker-dealer and agent regulation)

## STATE COURTS

*People v. Thacker,* District Court, County of Eagle, Colorado, Case No. 19CR78, Division 3, testimony scheduled for June 2021 (expert witness for Defendant—"prime bank" fraud)

*Rome v. Weiss,* District Court for the City and County of Denver, Colorado, Case No. 2014CV30773, July 29, 2015 (expert witness for Plaintiff Securities Commissioner—civil injunctive trial testimony) (securities registration exemptions, fraud)

*Bonsall v. Fahrendorf,* Superior Court of the State of Arizona in and for the County of Maricopa, Case No. CV2010-053879, May 13, 2014 (expert witness for Defendant Ryley Carlock & Applewhite—deposition testimony) (liability of law firm for private placement disclosures by bank holding company)

*Joseph v. HEI Resources, Inc.,* District Court of the City and County of Denver, Colorado, Case No. 2009CV7181, July 23, 2013 (expert witness for Plaintiff—trial testimony) (identification of securities, broker-dealers, sale representatives)

*Joseph v. HEI Resources, Inc.,* District Court of the City and County of Denver, Colorado, Case No. 2009CV7181, June 13, 2013 (expert witness for Plaintiff—deposition testimony) (identification of securities, broker-dealers, sale representatives)

*Woolbert v. McNamara,* District Court of the City and County of Denver, Colorado, Case No. 2011CV346, May 2, 2012 (expert witness for Plaintiffs—trial testimony) (identification of securities, sellers, broker-dealers, sales representatives, control persons and materiality)

*CapitalValue M&A, LLC v. K2D, Inc.*, Case Number. 2011 CV 609 (expert witness of Plaintiffs) (Affidavit in Opposition to Defendants' Motion for Summary Judgment, March 2012) (federal and state securities law—unlicensed broker-dealer, illegal contract)

*Woolbert v. McNamara*, District Court of the City and County of Denver, Colorado, Case No. 2011CV346, December 9, 2011 (expert witness for Plaintiffs—Affidavit in Support of Motion for Summary Judgment) (identification of securities, sellers, broker-dealers, sales representatives, control persons and materiality)

*CMKM Diamonds, Inc. v. Casavant,* Eighth Judicial District Court for the State of Nevada, Clark County, Case No. A540161, Dept. No. XIII (expert witness for Defendants D. Roger Glenn and Edwards Angell Palmer Dodge—trial testimony, August 2011) (federal and state securities law, attorney malpractice—attorney negligence in connection with penny stock fraud and Rule 144 letters)

*Alabama v. Harris*, Jefferson County Case No. CC-04-2050 (expert witness for State of Alabama—trial testimony February 2011) (state securities law—investment contract securities, definition of investment advisers and investment adviser fraud)

*Joseph v. Polocz*, In the District Court for the City and County of Denver, Case No. 2010CV1583 (expert witness for Plaintiff—deposed December 17, 2010) (state securities law—investment contract securities and exempt securities transactions)

*Joseph v. Financial Services Investors #4, LLC*, In the District Court for the City and County of Denver, Case No. 09CV0939 (expert witness for Plaintiff—trial testimony October 27, 2010) (state securities law—broker-dealer regulation and civil liability)

*MMH54 LLC v. Revenue Cycle Partners LLC,* Montana Thirteenth Judicial District Court, Yellowstone County, Cause No. DV-09-0334 (expert witness for Defendant—expert disclosures May 7, 2010) (state securities law—unlicensed broker-dealer, illegal contract)

*Joseph v. Financial Services Investors #4, LLC,* In the District Court for the City and County of Denver, Case No. 09CV0939 (expert witness for Plaintiff—deposed December 21, 2009) (state securities law—broker-dealer regulation and civil liability)

*Joseph v. Life Partners*, In the District Court for the City and County of Denver, Case No. 2007 CV 5218 (expert witness for Plaintiff—deposed November 2008) (state securities law—life settlement/viatical contracts as investment contract securities)

*Cohen v. Merrill Lynch*, In the Superior Court of Arizona, Maricopa County, No. CV2003-011120 (expert witness for Defendants—deposition December 2005) (state securities law—broker-dealer regulation and civil liability)

*Alabama v. Harris,* Montgomery County Case No. CC-04-501, Jefferson County Case No. CC-04-2050 (expert witness for State of Alabama—trial testimony January 2005) (state securities law—investment contract securities)

*People v. Chipperfield,* In the District Court for Douglas County, Colorado (rebuttal expert witness for the State of Colorado—trial testimony June 2004) (state securities law—materiality, securities fraud)

*Bendahan v. Wade Cook,* Washington Superior Court, King County Case No. 01-2-09754-7SEA (expert witness for Plaintiff—trial testimony 2003) (state securities law—securities fraud)

## ADMINISTRATIVE PROCEEDINGS

*Report of Philip A. Feigin, Hearing Officer, Public Hearing On Proposed N.J.A.C. 13:47a-6.4,* August 12, 2019 (hearing officer in New Jersey Securities Bureau rule proceeding)

*In the Matter of Fidelity Brokerage Services LLC,* Commonwealth of Massachusetts, Office of the Secretary of State of the Commonwealth, Securities Division, Docket No. E-2015-0078 (expert witness for Respondent broker-dealer charged with allowing unregistered investment advisers to manage client accounts constituting dishonest and unethical conduct—affidavit in support of Respondent's motion to dismiss)

*In the Matter of Intervest International Inc.,* State of Colorado, Department of Labor and Employment, Division of Employment and Training, Case No. 5460-2012 (expert testimony for Respondent Intervest, an SEC registered investment adviser at hearing to appeal Liability Determination that the firm's investment adviser representatives were employees and not independent contractors under Colorado law—October 1, 2012) (federal and state investment adviser law and FINRA regulations—supervisory requirements imposed by law on investment advisers)

*In the Matter of Mieka Corporation, et al.,* Before the Securities Commissioner, State of Colorado, Case No. XY 11-CD-11 (expert testimony for Staff of Colorado Securities Division at hearing before Panel of Colorado Securities Board on Order to Show Cause—March 17, 2011) (state securities law—joint venture interests as investment contract securities, materiality, securities fraud)

## ARBITRATIONS

*One additional FINRA arbitration involving Allegis Investment Advisors, LLC in Utah* (claim against broker-dealer affiliate for conduct of affiliated SEC registered investment adviser)

*Anderson v. Allegis Investment Advisors, LLC,* Case No. 01-16-0005-0320, Salt Lake City, UT (expert witness for respondent in 2017 AAA arbitration wherein claimants asserted claims against federal covered investment adviser under Utah securities statute and common law)

*Hansen v. Allegis Investment Services, LLC,* Case No. 17-00135, Boise, ID and Salt Lake City, UT (expert witness for respondents in 2017 FINRA arbitration wherein claimants asserted claims against broker-dealer and representative liability under federal and Idaho securities statutes,

FINRA rules and common law for acts of affiliated federal covered investment adviser in options trading)

*Petersen v. Allianz,* Minneapolis, MN (expert witness for claimant in 2015 FINRA arbitration on claimant registered representative's claim respondent broker-dealer wrongfully harmed claimant with wrongful termination and improper reporting of her termination on Form U5)

*Anderson v. Fintegra,* Case No. 13-01265, Phoenix, AZ (expert witness for respondents Fintegra and Galinsky in 2016 FINRA arbitration in which claimants alleged sale of unregistered securities, sales by unlicensed agent, securities fraud and common law claims in private equity acquisition of founders shares in anticipation of liquidity event that never materialized)

*Schott v. Shareholders Services Group, Inc.,* Case No. 13-02525, Denver, CO (expert witness for claimant in FINRA arbitration in 2016 in which claimant alleged defendant introducing broker improperly honored two forged requests for transfers of cash from her account)

*PH Pharmaceuticals, Inc. v. Dunn,* Case No. 02CV110, Arapahoe County, CO (expert witness in arbitration in March 2012 on coverage to pay award won by minority shareholders with insurance carrier of company against whom judgment obtained—question was whether company was a "subsidiary" under securities law, and whether there had been a "sale" of securities)

*Comet Enterprises, LLC v. Merrill Lynch,* Case No. 04-04080, Denver CO (expert witness for Respondents—hearing testimony December 2005-January 2006) (federal and state securities law—broker-dealer regulation and civil liability "prime bank" securities fraud)

*Cornett v. Pensco Pension Services, Inc.,* Charlotte, NC (expert witness for Claimant—hearing testimony May 6-8, 2003) (state securities law—broker-dealer regulation and civil liability)

*Moedes v. Merrill Lynch,* Denver CO (expert witness for Claimants—hearing testimony March 2003) (state securities law—broker-dealer regulation and civil liability)

## PUBLICATIONS

(January 2000—through present)

*Report of the Independent Hearing Officer in Public Hearing on Proposed N.J.A.C. 13:47A-6.4*, proposed amendments and new rule under which broker-dealers and agents licensed in New Jersey would owe a fiduciary duty to their customers, August 12, 2019

*Suitability" and "Failure to Supervise" Have No Place in FINRA Arbitrations*, **The Blue Sky Bugle**, a publication of the American Bar Association Committee on State Regulation of Securities, Section of Business Law, March 2018

*Real Estate Securities*, with Bar Association Committee on State Regulation of Securities, Section of Business Law, September Prof. Mark Levine, Denver University, available on Amazon, September 2014

*State Regulation of Broker-Dealers, Agents, Investment Advisers and Investment Adviser Representatives*, Contributing Author, **Blue Sky Law**, Joseph C. Long, West Publishing, Spring 2014

*wallstreetmainstreetlaw.com*, a blog sponsored by Rothgerber Johnson & Lyons LLP, Denver, Colorado:

*THE "ACCREDITED INVESTOR" QUESTION*, August 2014

*ABOUT "NEITHER ADMITTING NOR DENYING"* July 11, 2013

*WHY ALL THE ANGST ABOUT PUBLIC SOLICITATION?* June 18, 2013

*HAPPY BIRTHDAY, CHARLIE!* January 2013

*SOMETIMES THE REGULATED OBEY MORE WHILE THE REGULATORS COULD CARE LESS*, November 2012

*LOOKING BACK (in three parts)*, August 2012

*BACHUS BUNKUM*, August 7, 2012

*"SO WHAT WAS I SUPPOSED TO DO?"* July 2012

*INVESTMENT ADVISER SRO (in four parts)* June 2012

*THE JOBS ACT, Is it Really Securities Regulation that Hurts Small Business? (in five parts)*, May 2012

*Prime Bank Fraud, The Scam that Will Not Die*, Rothgerber Johnson & Lyons LLP, Denver, Colorado, April 2012

*The Model State Commodity Code in 2011 and New CFTC Jurisdiction—Whither the States? Can "new dogs" learn "old tricks"?* **Banking and Financial Services Policy Report**, February 2012

*The Model State Commodity Code in 2011*, *Whither the States? Can "new dogs" learn "old tricks"?* **The Blue Sky Bugle**, a publication of the American Bar Association Committee on State Regulation of Securities, Section of Business Law, September 2011

*"Dodd-Frank, Suitability and Fiduciary Duty,"* **The Blue Sky Bugle**, a publication of the American Bar Association Committee on State Regulation of Securities, Section of Business Law, August 2010

*"Investment Adviser Advisories,"* Rothgerber Johnson & Lyons LLP, August 2010, All Rights Reserved

*"Real Estate and Securities Law:  A Trap for the Unwary,"* Rothgerber Johnson & Lyons LLP, April 2009, All Rights Reserved

*"Do We Really Have to Do This," Some Observations on Dealing with the Sarbanes-Oxley Act,"* Rothgerber Johnson & Lyons LLP, 2006, All Rights Reserved

*"The Uniform Securities Act of 2002,"* Rothgerber Johnson & Lyons LLP, 2003, All Rights reserved. Originally published in **The Blue Sky Bugle**, a publication of the American Bar Association Committee on State Regulation of Securities, Section of Business Law, July 2003.

**"Truth or Consequences:  The Sarbanes-Oxley Act of 2002,"** 2002, Rothgerber Johnson & Lyons LLP, All Rights Reserved.

### Prior to 2000

I served as the Executive Director of the North American Securities Administrators Association, Inc. ("NASAA"). Washington, D.C. from October 1998 through December 1999. As Executive Director, I authored many documents that became public on behalf of NASAA. These documents represented the views and perspectives of NASAA and not necessarily my personal views. I served as Colorado's Securities Commissioner from March 1988 through November 1998, as Colorado's Assistant Securities Commissioner from November 1982-March 1988, and as Chief Attorney of the Enforcement Division of the Wisconsin Commissioner of Securities from April 1979 to October 1982. In those official capacities, I was either the principal draftsman or participated in the drafting of much legislation and many rules, authored dozens, if not hundreds, of other documents that became matters of public record, including pleadings, press releases, a multitude of interpretive letters, state legislative and Congressional testimony, guest commentaries, educational materials, blue ribbon papers and more.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

UNITED STATES OF AMERICA

v.                                                         Case No. 2:17cr126

DARYL G. BANK & BILLY J. SEABOLT,

Defendants.

## GOVERNMENT'S TRIAL MEMORANDUM,
## RESPONSE TO DEFENDANTS' MOTION IN LIMINE,
## AND SUPPLEMENTAL 404(b) NOTICE

The United States, by its undersigned counsel, hereby submits its trial brief in the above-captioned case.   Because the evidentiary issues discussed below overlap with defendant Bank's motion in limine to exclude certain evidence, ECF No. 344, the government responds to that motion here.   Additionally, it provides additional notice of its intent to introduce evidence related to the misappropriation of privileged attorney-client material from defendant Raeann Gibson by defendant Daryl Bank or someone working on his behalf.

**I.    The Second Superseding Indictment**

On May 5, 2018, the grand jury returned a twenty-eight (28) count second superseding indictment against defendants Daryl G. Bank (Bank) and Billy J. Seabolt (Seabolt) (collectively, "the defendants").[1]   ECF No. 105 (indictment).   The counts allege violations of various fraud, securities, and money laundering statutes.   Count 1 charges the defendants with Conspiracy to

---

[1]  The indictment also named defendant Raeann Gibson (Gibson).   However, pursuant to a plea agreement, Gibson subsequently pleaded guilty to a criminal information, and the relevant counts of the indictment against her were dismissed after she was sentenced to 10 years' imprisonment. ECF Nos. 194, 199, 288, 292.

A1395

Commit Mail and Wire Fraud, in violation of 18 U.S.C. § 1349.   Counts 2 through 6 charge the

defendants with Mail Fraud, in violation of 18 U.S.C. § 1341.   Counts 7 and 9 through 12

charge the defendants with Wire Fraud, in violation of 18 U.S.C. § 1343.[2]   Count 13 charges the

defendants with Conspiracy to Sell Unregistered Securities and to Commit Securities Fraud, in

violation of 18 U.S.C. § 371.   Counts 14 through 18 charge the defendants with Sale of

Unregistered Securities, in violation of 15 U.S.C. §§ 77e and 77x.   Counts 19 through 22 charge

the defendants with Securities Fraud, in violation of 15 U.S.C. §§ 77q and 77x.   Count 23

charges Bank with Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. §

1956(h).   Counts 24 through 27 charge Bank and Count 28 charges both defendants with

Unlawful Monetary Transactions, in violation of 18 U.S.C. § 1957.   The parties have entered

into factual stipulations regarding certain elements of these statutes.   *See* Attachment A (factual

stipulations) at 4-6.

These charges arise from a five-year scheme to defraud investors—almost all of whom

were at or near retirement age—of millions of dollars.   The fifty-six page indictment provides

substantial details of this scheme through which the defendants successfully defrauded over 300

investors across the country of over $20 million.

Specifically, the indictment alleges that defendants engaged in a conspiracy to personally

profit by misleading investors in material ways about their use of and control over, and the

ultimate status of, funds invested by clients.   The defendants, operating through numerous

limited liability companies (LLCs), intentionally misled investors, obtained investment funds,

and stole large portions of such funds for their own personal use.   Importantly, the evidence

---

[2] At the time of this filing, the government's motion to dismiss Count 8 is pending.   ECF
No. 352.

A1396

presented at trial will demonstrate that the defendants targeted unsophisticated victims who were at or near retirement age by, among other things, hosting social security maximization seminars. They targeted retirees with retirement funds to invest.

Throughout the scheme, the defendants and their army of sales agents obtained personal information from each victim, including the victim's age, employment or retirement status, and the amount of money saved in individual retirement accounts.   Armed with this information, the defendants and their agents, using materially misleading statements, encouraged retirees to invest in Bank's highly speculative, illiquid, fraudulent "private equity" investments.   Bank, with Seabolt's assistance, directed the investors to open self-directed IRA accounts at trust companies. Immediately upon receipt of the funds into companies he controlled, Bank stole between 20%-70% of the investment funds for his own purposes.

As will be shown at trial, the defendants used various labels to sell the investments, none of which were ever registered as securities with the Securities and Exchange Commission (SEC) or fell into an exemption from such registration.   Initially, the defendants sold Dental Support Plus "Franchises" (DSPF) to unsophisticated investors who believed, as they were told, they were investing in a hands-off, passive investment that would generate income for them.   Then, the defendants sold investments as memberships in LLCs.   Later on, the defendants sold the investments as secured promissory notes, and then as "member loans" to the LLCs.   Regardless of the meaningless label the defendants used for the different investments, they were in fact fraudulent and unregistered securities.

To conceal their fraudulent activities, the defendants knowingly and intentionally deceived investors as to the status of their invested funds by, in part, causing trust companies to send fraudulent quarterly statements to investors.   In at least one instance, after an investment

A1397

failed, the conspirators unilaterally moved funds to another illiquid, speculative investment without providing notice to the investors that the original investment had failed.   The defendants also concealed from the investors the existence of numerous investigations into their fraudulent activities, in part by sending lulling letters to the investors aimed at convincing them that nothing was amiss with their investment.

Throughout the scheme, numerous victims (and family members of victims) confronted Bank about the status of their investment funds.   These victims often demanded that Bank repay their invested funds and, when doing so, often described to Bank the impact that the loss of such funds would have on their lives.   Bank's responses to these conversations constitute highly relevant evidence of knowledge and intent, particularly given the perpetual nature of the scheme. As one example, the defendants created a whole separate investment vehicle—which they called DSPF Group—and used it to fraudulently obtain funds from new investors to repay original investors who voiced such complaints after the Dental Support business failed to produce income.   Evidence that victims confronted Bank about the impact of the loss of these funds is highly relevant, intrinsic to the scheme, and should be admissible at trial.

As a result of defendant's fraudulent scheme, victims have suffered losses exceeding $20 million.   In many circumstances, the victims lost almost the entirety of the funds they had set aside for retirement.   After years of deceit and concealment, in late 2017, many victims received notice from an independent, outside trust company that the actual value of their investments with Daryl Bank was zero.

## II.    Anticipated Testimony and Evidence

Trial is scheduled to begin on March 30, 2021.   The government intends to present the majority of its case-in-chief through the testimony of the following categories of witnesses:

The Investors: The government will call various investors in the defendants' fraudulent schemes as witnesses.   These will include victims from each of the various fraudulent investments; namely DSPF, DSPF Group, the spectrum investments (Janus Spectrum, Prime Spectrum, Spectrum 100 and Excel Bandwidth), WeMonitor, Venture Capital I, and PLI Group.   The investor witnesses are those specifically named in the indictment as well as a limited number of investors who provide support for the conspiracy charges and fall within the relevant time of the charged scheme.

Former Employees/Sales Agents: The government plans to call former partners, employees, and sales agents of Bank's investment companies.   These witnesses worked in various roles, including as officers, administrative staff, salespersons, and in marketing and media.   The category also includes two cooperating witnesses; Raeann Gibson,[3] who served as Chief Operations Officer of Bank's companies, and Roger Hudspeth, one of Bank's salesmen.

Investment Witnesses: The government will call representatives of some of the investments at issue to discuss the development and validity of the investment, the funding agreements, and funds they received from Bank.

---

[3] Gibson's testimony will be, by far, the longest of any of the government's witnesses, perhaps lasting almost two trial days.  She served as Bank's right-hand woman, and through her the government will be admitting a substantial amount of the documentary evidence and explaining each of the various schemes.  While her testimony will be lengthy, the government anticipates it will save multiple trial days due to the efficiency of admitting most of the Dominion corporate records through a witness familiar with them, and explaining the scheme from the inside through one primary Dominion witness with access to all of the relevant information, rather than piecing it together through multiple witnesses.  The government is familiar with the Court's preference for efficiency in trial presentation, and submits that the longer testimony of Gibson will allow it to shorten the overall length of its case-in-chief.

A1399

Bank and Trust Company Witnesses: The government plans to call witnesses from two of the banks the defendants used as part of their investment scheme, and from the trust companies the defendants used as pass-through investment custodians.

Money Laundering Witnesses:   While some of the other witnesses in other categories may provide testimony about how the investors' funds were used, the government will present witnesses to discuss certain purchases made by Bank that relate to the money laundering and unlawful monetary transactions charges.

Expert and Specialized Knowledge Witnesses: The government will call several expert witnesses and those with specialized knowledge from fields including forensic accounting, securities regulation, wireless regulation and wireless spectrum licenses, and the Financial Industry Regulatory Authority (FINRA).

Law Enforcement: Finally, the government will present witness testimony from a forensic accountant from the FBI and other FBI agents who participated in various aspects of the investigation.

## III.    Bases for the Admissibility of the Government's Anticipated Evidence

Given the volume of evidence likely to be introduced during the upcoming trial, the government believes it may be helpful to the Court to summarize the bases for admissibility of the government's key evidence.

### A.  Stipulations

The parties have already stipulated to the admission of a great deal of evidence, including business records of various regulatory agencies, trust accounts, bank records, and corporate entities controlled by defendants.   *See* Attachment A (evidentiary stipulations).   The parties have also stipulated to several facts that go to the elements of various charges offenses, for example, interstate commerce, the use of the mails or wires, and the fact that no registration

A1400

statements were filed for any of the investments at issue.  *Id.*   The government has marked the stipulations as government exhibit 2000, and the parties have agreed that the stipulations may be marked, admitted as evidence in the case, and submitted to the jury.   *Cf. United States v. Aragon*, 983 F.2d 1306, 1309 (4th Cir. 1993) (allowing stipulations as to testimony to be sent to the jury).   Because the stipulations here contain agreements as to certain facts that relate to the elements of the charged crimes, and because the parties have affirmatively agreed that they may go to the jury, the government asks that the Court permit them to do so.

In addition, pursuant to the Court's order, the parties have stipulated to the admission into evidence of videotaped deposition testimony from several witnesses.   The Court previously granted the government's unopposed motion to take these depositions, *see* ECF Nos. 177, 325, and these stipulations will permit the jury to hear from several witnesses who otherwise would not be available to testify at trial due to their age and/or health conditions.   Seabolt declined the government's offer to pay for him to travel to New Jersey, California, and Utah to be present for the depositions.   Seabolt completed waivers of appearance and his Sixth Amendment right of confrontation related to these depositions.   *See* Attachment B.   Bank traveled to California and Utah to attend two of the depositions but declined the government's offer to pay for him to travel to the deposition in New Jersey.   Bank likewise completed waivers of appearance and his Sixth Amendment right of confrontation related to the deposition in New Jersey.   *Id.*   Defense counsel moved on March 18, 2021, to take several depositions, and the government responded on March 28, 2021, objecting to one proposed deposition but consenting to the remainder so long as they take place on a single day during the defense's case.   ECF Nos. 331, 346.   That motion is pending.

A1401

### B. Expert Testimony

At trial, the government intends to introduce opinion testimony from two expert

witnesses: Phil Feigin on securities law and Coleman Bazelon on wireless spectrum.

Rule 702 of the Federal Rules of Evidence allows for testimony of experts with

specialized knowledge when it "will assist the trier of fact to understand the evidence or to

determine a fact in issue."   Fed. R. Evid. 702.   Although "opinion testimony that merely states a

legal conclusion is less likely to assist the jury in its determination," the Fourth Circuit has

explained that testimony that arguably states a legal conclusion is admissible in cases involving

specialized industries.   *United States v. Barile*, 286 F.3d 749, 760 n.7 (4th Cir. 2002) (citations

omitted).   In other words, expert opinion testimony does not present an improper legal

conclusion merely because the testimony involves legal subject matter.

The securities field is one such specialized industry.   *United States v. Offill*, 666 F.3d

168, 175 (4th Cir. 2011) ("the specialized nature of the legal regimes involved in this case and

the complex concepts involving securities registration, registration exemptions, and specific

regulatory practices make it a typical case for allowing expert testimony that arguably states a

legal conclusion in order to assist the jury.")   In *Offill*, the Fourth Circuit upheld the admission

of testimony by a professor of securities law and also from the Commissioner of the Texas State

Securities Board, who testified as to the general operation of securities law, "even though the

areas of testimony were directly relevant to the conduct with which Offill was charged, allowing

the jury to determine the law's applicability to Offill."   *Id.* at 176.   Similarly, in *Bilzerian*, the

court approved the expert testimony of a professor because he "did not give his opinion as to

whether Bilzerian's actions violated the securities laws," but rather provided "general

background on federal securities regulation" and answered questions based on hypothetical facts.

A1402

As the court noted, "the mere use of hypotheticals does not usurp the jury's function of applying the law to the facts of the case." *Id.*

At trial, the government's expert will discuss practices in the securities industry, define fundamental terms and concepts that are likely unfamiliar to lay jurors not involved in the securities industry, outline general procedures for conducting registered offerings or offerings pursuant to certain exemptions from registration, explain how stock obtained through such exemptions can or cannot be resold, and describe the operation of various markets.   Neither of the government's experts will opine or provide legal conclusions that the defendants committed his acts willfully or knowingly, that he had the intent to defraud, or that he manipulated the market, or state other conclusions that merely tell the jury the defendants are guilty.

Mr. Feigin's testimony is crucial to explaining an industry with which most jurors likely are entirely unfamiliar. Without it, the jury would be lost.   This case presents an almost identical situation to that confronted by the Fourth Circuit in *Offill*, in which a key issue was whether certain investments could be issued without the need of filing a registration statement under various exceptions contained in the Securities Act of 1933 and analogous state law.   *Id.* at 172. Offill, who was an attorney, provided advice and had even issued legal opinion letters addressing these purported registration exemptions.   *Id.*   Similarly, in this case, the government anticipates that defendants may argue that they relied upon advice from "legal and compliance" that the investments they offered were similarly exempt from registration.   As the Fourth Circuit noted, given the specialized knowledge necessary for the jury to fairly evaluate such an argument, it would be "difficult to imagine how the government could have presented its case against Offill without the assistance of expert testimony to explain the intricate regulatory landscape and how securities practitioners function within it."   *Id.* at 175.

9

A1403

Similarly, the government's expert in wireless spectrum, Mr. Coleman, is necessary to explain the complex field of wireless spectrum, spectrum licenses, and spectrum valuation. Mr. Coleman will explain how wireless spectrum is used to facilitate wireless communication and the methods the FCC has used to license particular bandwidths in particular geographical areas. He will also explain that certain ranges of bandwidth, including the "expansion" and "guard" portions of the 800 MHz range that was the basis of some of the investments at issue in this case, were not able to be used by major wireless carriers, as defendants claimed in their offering documents. As with Mr. Feigin, Mr. Coleman will not offer testimony on ultimate legal conclusions, defendants' intent, or any other ultimate issue.

The government provided notice that it would seek to introduce expert testimony from Mr. Feigin and Mr. Coleman on March 16, 2021, in a letter to the defense that also attached the expert reports and curriculum vitae for both witnesses. In the same letter, and in one follow-up letter, the government also notified the defendants that it intended to introduce testimony from several witnesses who have specialized knowledge and training, disclosed the subject matter of that testimony, and included copies of the witnesses' resumes.

**C. Charts and Summaries under Rules 1006 and 611**

Pursuant to Federal Rules of Evidence 1006 and 611, the government intends to present certain summary charts illustrating the flow of assets received from investors through accounts tied to defendants' various investment offerings.

Rule 1006 provides that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006. It is well-established that "[s]ummary charts are admissible if they aid the jury in ascertaining the truth." *United States v. Loayza,* 107 F.3d 257, 264 (4th Cir. 1997) (citing *United States v. Johnson*, 54 F.3d 1150, 1156 (4th Cir. 1995). This rule authorizes the

A1404

admission of charts into evidence that serve "as a surrogate for underlying voluminous records that would otherwise be admissible into evidence," thereby "reduc[ing] the volume of written documents that are introduced into evidence." *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004).   Rule 1006 further requires the proponent to "make the originals or duplicates available for examination . . . at a reasonable time and place."   Fed. R. Evid.1006.

The use of summary evidence is particularly appropriate in a case of this complexity. "The complexity and length of the case as well as the number[ ] of witnesses and exhibits [is also] considered" in determining whether summary evidence is appropriate.   *United States v. Loayza*, 107 F.3d 257, 264 (4th Cir. 1997).   Bank records often are the subject of proffered summary charts, as they typically are voluminous and do not lend themselves to easy examination in the courtroom.   *See Loayza*, 107 F.3d at 264 (affirming the admission of summary charts of bank records); *United States v. Dukes*, No. 05-5266, 2007 WL 1962954,*49-51 (4th Cir. July 3, 2007) (affirming admission of summary charts of bank records).   The government intends to introduce into evidence numerous charts that summarize the deposits into and withdrawals from defendant Bank's numerous bank accounts related to his investments and multitude of limited liability companies, and the deposits into his personal bank accounts. These charts qualify as summary charts under Rule 1006 because they summarize the full contents of these bank accounts and will aid the jury in understanding how the defendant moved investor funds through numerous limited liability companies.   The government produced the vast majority of these summary charts to defense counsel nearly two years ago, on April 15, 2019 and several additional charts with expert disclosures last week.   Defense counsel have had the underlying bank accounts on which these summary charts are based for approximately three years.

A1405

Under Federal Rule of Evidence 611(a), summaries and charts of evidence already in the record may also be presented. *Janati*, 374 F.3d at 273. "Rule 611(a) charts are not evidence themselves; they are used 'merely to aid the jury in its understanding of the evidence that has already been admitted,' by, for example, 'reveal[ing] inferences drawn in a way that would assist the jury.'" *United States v. Oloyede*, 933 F.3d 302, 311 (4th Cir. 2019) (*quoting Janati*, 374 F.3d at 273). For example, the Fourth Circuit recently allowed the presentation of charts of banking transactions that were presented at a criminal trial to "help the jury understand how various related records demonstrated a pattern of suspicious activity engaged in by the defendants." *Id.*

Here, the government intends to present Fed. R. Evid. 611 summary charts that summarize the flow of funds from investors/victims through accounts controlled by defendants. This evidence will show that in many cases this money was not used for the purported investment but, instead, was routed or siphoned off through various other companies used by the defendants. Again, the government produced the vast majority of these charts to the defense on April 15, 2019, and the underlying documents were themselves produced years ago during discovery. The government intends to call Alain Martell, an FBI Financial Analyst, to testify at the trial about these charts, and will seek to admit the Rule 1006 summary charts as evidence. Another witness, Jason Chorlins, will also testify about the defendants' relationship and transactions with Oculina Bank, and a report Mr. Chorlins created about his examination was also previously provided to the defense.

### D. Admission Under the Hearsay Rules

The parties have stipulated that much of the documentary evidence constitutes business records. Fed. R. Evid. 803(6). However, the government previews several evidentiary issues that may arise during trial involving application of other hearsay rules.

12

A1406

1.  **Statements of Defendants and their Employees and Agents (Rule 801(d)(2))**

The government will introduce many statements made by defendants themselves, such as those made to investors, employees, and public statements made during defendant's radio show. Such statements are admissions of a party opponent and are therefore excluded from the definition of hearsay under Federal Rule of Evidence 801(d)(2)(A) (excluding from the hearsay definition statements "offered against an opposing party" and "made by the party in an individual or representative capacity"). Further, when testimony relates to conversations with the defendant, the government may seek to introduce statements of the person with whom the defendant was speaking in order "to place [the defendant's] responses into context," *United States v. Wills*, 346 F.3d 476, 490 (4th Cir. 2003), and to make the defendant's statements "intelligible to the jury and recognizable as admissions," *id.* (quoting *United States v. Lemonakis*, 485 F.2d 941, 948 (D.C. Cir. 1973)).

Additionally, the defendant employed numerous staff and salespeople over the years of the charged fraud scheme. The government will seek to introduce various statements made by the defendant's employees during their employment. Whether made to other defendants, investors, or staff, these statements are admissible under Federal Rule of Evidence 801(d)(2)(D), which excludes from the definition of hearsay statements "made by [an opposing] party's agent or employee on a matter within the scope of that relationship and while it existed."

Although the government will lay a foundation that Bank authorized the sales agents to pitch his investments, this exception would apply even if the agent were "not authorized to speak on the matter," as long as the statement is "about a matter within the scope of [] employment." *United States v. Poulin*, 461 Fed. Appx. 272, 282 (4th Cir. 2012) (*quoting United States v. Portsmouth Paving Corp*, 694 F.2d 312, 321 (4th Cir. 1982)). Consistent with this principle,

even "a statement of illegal activity can still be within the scope of employment and can be

admissible under 801(d)(2)(D)." *United States v. Riley*, 621 F.3d 312, 338 (3d Cir. 2010), as

amended (Oct. 21, 2010) (citing *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 488 (4th Cir.

1982)).   Given that the Federal Rules of Evidence do not define the scope of an agency

relationship, courts in this Circuit have occasionally looked to the relevant treatises. *See, e.g.*,

*Quesenberry v. Volvo Grp. N. Am., Inc.*, 267 F.R.D. 475, 483 (W.D. Va. 2010) (stating that "[a]n

agent is 'a person authorized by another to act on his account and under his control'" (quoting

Restatement (Second) of Agency § 1 cmt. e (1958))). In any event, whether an agency

relationship exists in any given case is a fact-bound determination that depends on the

circumstances.   The key factor is whether the purported principal exercised control over the

declarant.   In this case, the government will offer statements from various sales agents and other

employees who acted as either employees or agents of defendants.

### 2.  Co-Conspirator Statements (Rule 801(d)(2)(E))

The government also intends to introduce statements made by defendant's co-

conspirators during and in furtherance of the conspiracy.   Under Federal Rules of Evidence

801(d)(2)(E), such statements are excluded from the definition of hearsay.

In order to admit co-conspirator statements under Rule 801(d)(2)(E), the government

"must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were

members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance,

of the conspiracy." *United States v. Graham*, 711 F.3d 445, 453 (4th Cir. 2013) (quoting *United

States v. Pratt*, 239 F.3d 640, 643 (4th Cir. 2001)). Each of these three factors "must be

supported by a preponderance of the evidence." *Id.* (citing *United States v. Blevins*, 960 F.2d

1252, 1255 (4th Cir. 1992)). The Fourth Circuit has explained, however, that district courts are

14

A1408

not required "to hold a hearing to determine whether a conspiracy exists before admitting statements under the rule." *Id.*   Instead, a reviewing court will affirm a district court's judgment "where the record reveals that the co-conspirator's statements were plainly admissible, whether or not a detailed rationale for admitting the statements had been stated by the trial court." *Id.* (quoting *Blevins*, 960 F.2d at 1256).

In support of the admission of coconspirator statements, the government will introduce evidence sufficient to support a finding as to each of the three necessary factors.   Importantly, the Fourth Circuit has stated that "[a] statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect."   *United States v. Smith*, 441 F.3d 254, 262 (4th Cir. 2006) (quoting *United States v. Shores*, 33 F.3d 438, 443 (4th Cir. 1994)).   In addition, the Fourth Circuit has construed the requirement that the proffered statements be made in support of the conspiracy "so broadly that even casual relationships to the conspiracy suffice to satisfy the exception."   *Id.*   (quoting 5 Weinstein's Federal Evidence §§ 801.34[5], 801–89).

Here, the government intends to introduce numerous co-conspirator statements made in support of the defendants' ongoing scheme to enrich themselves by making false statements to induce investments in failed, and unregistered, securities.   There were many conspirators who played a role in this scheme, including but not limited to Gibson, Kent Maerki, David Alcorn, Roger Hudspeth, and others.

### 3.  Business Records (Rule 803(6))

The government will seek to admit many documents as business records.   As detailed above, the parties have stipulated to the admission of a great deal of these records, including records detailing the operation of several entities controlled by defendants as well as bank

A1409

records reciting the flow of money through defendants' fraudulent schemes.   *See* Attachment A.

To satisfy the relevant hearsay exception—Federal Rule of Evidence 803(6)—a document "must be '(1) made by a regularly conducted business activity, (2) kept in the regular course of that business, (3) the regular practice of that business to make the memorandum, (4) and made by a person with knowledge or from information transmitted by a person with knowledge.'" *United States v. Cone*, 714 F.3d 197, 219 (4th Cir. 2013) (quoting *Clark v. City of L.A.*, 650 F.2d 1033, 1036–37 (9th Cir. 1981) (second set of internal quotation marks omitted)).

## IV. Response to Defendant Bank's Motion in Limine, ECF No. 344

On March 23, 2021, the government provided notice to the defendants of its intent to introduce certain evidence, most of which the government believed was intrinsic but some of which could be found to implicate Federal Rule of Evidence 404(b).   That rule provides for the admissibility of evidence of other crimes, wrongs or bad acts for purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity and absence of mistake or accident.   *See, e.g.*, *United States v. Queen*, 132 F.3d 991, 994 (4th Cir. 1997); *United States v. Bailey*, 990 F.2d 119, 122 (4th Cir. 1993); *United States v. Mark*, 943 F.2d 444, 447 (4th Cir. 1991); *United States v. Rawle*, 845 F.2d 1244, 1247 (4th Cir. 1988).

Defendant Bank moved in limine to exclude multiple categories of evidence: (1) the findings and conclusions Bank agreed would be entered against him to resolve a FINRA investigation; (2) evidence of Bank's retaliatory actions, including the filing of retaliatory civil lawsuits, against former employees he believed had been disloyal; (3) the sale of other fraudulent investments by Bank and Seabolt during the scheme, including through entity names they used after stopping use of the "Dominion" name; (4) the sale of investments into a trailer park without disclosing known environmental damage issues at the park; (5) that Bank and Gibson engaged in

16

a long-term, extramarital affair; (6) that Bank entered into a settlement agreement with the SEC in January 2017 regarding several of the same entities at issue in this case, including the judgment entered against him, by his consent, in April 2017; (7) that Bank and his wife attempted to get out of paying their mortgage with Southern Bank by claiming that Bank had forged his wife's name on the deed and mortgage papers; and (8) that Bank stole a hard drive belonging to Raeann Gibson.

**A. Governing Law**

The rule does not extend to evidence of acts which are "intrinsic" to the charged offense. *United States v. Kennedy*, 32 F.3d 876, 886 (4th Cir. 1994) (approving evidence of criminal conduct involving uncharged individuals that took place a year before the charged conspiracy period, without recourse to Rule 404(b)); *accord United States v. Lipford*, 203 F.3d 259, 268-69 (4th Cir. 2000) (shooting at police officers executing search warrant, hitting one, was intrinsic to the crime charged, not governed by Rule 404(b)); *United States v. Chin*, 83 F.3d 83 (4th Cir. 1996) (approving evidence of uncharged murder and threats to murder in prosecution of heroin distribution and other drug-related crimes as acts intrinsic to the alleged crime); *Mark*, 943 F.2d at 448 (evidence of uncharged criminal activity admissible "where it furnishes part of the context of the crime"); *United States v. Masters*, 622 F.2d 83, 87 (4th Cir. 1980) (evidence of uncharged criminal conduct admissible if it "served to complete the story of the crime on trial").

The Fourth Circuit, "after a full examination of our Rule 404(b) jurisprudence" in *Queen*, 132 F.3d at 993, restated a combined test for admissibility under Rules 404(b) and 403. The refined four-part test under *Queen* holds that evidence of prior acts is admissible if: (1) the evidence is relevant to an issue, such as an element of the offense, and is not offered to establish the defendant's bad character; (2) the act is necessary in that it is probative of an essential claim or an element of the offense; (3) the evidence is reliable; and (4) its probative value is not substantially

17

A1411

outweighed by confusion or unfair prejudice "in the sense that it tends to subordinate reason to emotion in the fact finding process." *Id*. at 997.

For evidence to have probative value under Rule 404(b), prior acts must be sufficiently similar in nature to the acts charged. The more similar the prior acts are, either in terms of physical similarity or state of mind, the more relevant the prior-act evidence becomes. *Queen*, 132 F.3d at 997; *Mark*, 943 F.2d at 448. It is not necessary, however, that the prior acts and the acts charged "be identical in every detail"; it is sufficient if they either share certain unique features or "a number of common features of lesser uniqueness . . . of significant probative value when considered together." *United States v. Myers*, 550 F.2d 1036, 1045 (5th Cir. 1977) (internal citations omitted). In *Queen*, prior-act evidence tending to make it less probable that the defendant's current actions were undertaken with an innocent purpose was deemed to be relevant under the restated test. *Queen*, 132 F.3d at 997.

Evidence of prior acts is "necessary" when it is an "essential part of the crimes on trial, or where it furnishes part of the context of the crime." *Id*. at 998 (citing *Mark*, 943 F.2d at 448). For the prior-act evidence to be "reliable," there must be proof such that a reasonable juror could find that the defendant committed the prior act. *Huddleson v. United States*, 485 U.S. 681, 689 (1988). For the reasons stated below, the government's proposed evidence is almost all intrinsic to the scheme and so does not fall under the auspices of Rule 404(b)—and to the extent it is not intrinsic, it is both necessary and reliable, and probative of the defendant's motive, intent, plan, knowledge, and absence of mistake.

In the Rule 404(b) context, undue prejudice requires exclusion of prior-act evidence only in those instances where the trial judge believes that "there is a genuine risk that the emotions of the jury will be excited to irrational behavior . . . disproportionate to the probative value of the

18

A1412

offered evidence." *United States v. Hernandez*, 975 F.2d 1035, 1041 (4th Cir. 1992) (citing *Masters*, 622 F.2d at 87); *see also Mark*, 943 F.2d at 449.   Prior-act evidence that is prejudicial only because it is "so highly probative," but does not "invoke emotion in place of reason," thereby causing a jury to act irrationally, satisfies the Rule 403 balancing test.   *Queen*, 132 F.3d at 998; *see also United States v. Powers*, 59 F.3d 1460, 1467 (4th Cir. 1995).

### B.  Categories of Evidence at Issue Here

#### 1.  FINRA Findings and Forgery

Most of the evidence to which Bank objects is intrinsic to the charged crimes.   Bank appears to concede the FINRA ban, which he did not disclose to victims who bought his investment products, is admissible—as he must—and limits his objection to the specific findings and conclusions he agreed would be entered against him by FINRA.   The government will agree to limit, during its case-in-chief, its evidence regarding Bank's prior kickback scheme to the fact that an investigation into alleged wrongdoing was initiated by FINRA, that Bank agreed to resolve it by having findings entered against him, and that as a result he was subject to a permanent ban from selling securities.   If Bank testifies in his defense and thereby puts his credibility at issue, or if defendant opens the door and puts his credibility at issue through cross-examination or otherwise during the government's case-in-chief, the fact that he agreed to the entry of a factual finding that he had lied under oath will become both relevant and material.   The government does not intend to introduce, in its case-in-chief, allegations related to forgery.   Those allegations, which relate directly to Bank's veracity as a witness, will also be explored during the government's cross-examination of Bank if he elects to testify.

#### 2.  SEC and Virginia SCC Complaints; SEC Consent Settlement and Judgment

The government intends to offer self-authenticating public documents and court documents related to the regulatory actions brought by the SEC and Virginia SCC against Bank

and his spectrum companies. These records also were the subject of a stipulation with defense counsel. *See* Attachment A. These documents are intrinsic to the scheme because Bank continued to sell spectrum investments, and then created and sold a new type of spectrum investment, without disclosing to potential investors that the SEC and Virginia SCC had filed suit and alleged that the spectrum investments were fraudulent. Incredibly, with respect to one of his businesses, Spectrum 100, LLC, Bank continued to sell the investment after the SEC sued both him and Spectrum 100, LLC, for securities fraud—without disclosing that fact to potential investors. To be clear, these records are not offered to prove that defendants did, in fact, commit securities fraud or any other crime. They are offered because defendants' failure to disclose the investigations and lawsuits against their spectrum businesses, *while pitching those spectrum businesses*, is clear evidence of securities fraud and the larger bank and wire fraud schemes alleged.

For example, the Virginia State Corporation Commission's motion for a temporary injunction against Bank, Gibson, and all of Bank's limited liability companies is highly relevant evidence because it put the defendants on notice that they were alleged by the relevant state regulator to be engaging in securities fraud—and yet they did not stop selling these unregistered securities nor bothering to inform their clients. Moreover, as outlined in the Second Superseding Indictment, in response to this filing, Bank, Seabolt, and Gibson shut down all of the limited liability companies in Virginia (thereby extinguishing victims' membership interests in the unregistered securities) and then lied to the victims by sending letters claiming that they were moving the companies to Florida for tax purposes and "efficiency." Moreover, in response to this regulatory filing, Bank and Seabolt altered the method through which they offered illegal securities, switching from limited liability companies to promissory notes.

<div align="center">20</div>

<div align="center">A1414</div>

Likewise, the filings related to the SEC's complaint, consent order, and judgment against Bank and his spectrum companies are highly relevant evidence of notice and intent in this case. (Bank objects, in his motion in limine, only to the admission of the consent order and judgment). Bank and Seabolt were aware in 2013 that the SEC was investigating his spectrum investments, but they did not stop selling these investments.   On April 6, 2015, the SEC filed a civil complaint against Bank and all of his spectrum investments.   Again, this complaint provided notice to Bank that: (1) he was engaging in securities fraud; (2) that he was actively selling unregistered securities; and (3) that the assertions he was making about the value and uses of the 800 MHz spectrum were untrue.   Bank, however, doubled down even after the complaint was filed and continued to sell Spectrum 100, LLC, and Venture Capital, LLC—another investment associated with spectrum. Indeed, Bank knowingly used investor funds from these investments to pay for attorneys to represent him.   Bank then spent the next two years selling yet another spectrum investment— "Xcel Bandwidth"—to investors, all the while continuing to steal large portions of their investments directly off the top, without disclosing to those new investors that he had just consented to an SEC judgment for securities fraud related to his prior spectrum investments.

This evidence is intrinsic to this scheme and not 404(b) evidence—it goes directly to the charged spectrum scheme and is direct evidence of core material facts Bank failed to disclose to investors, which goes to the heart of this case.   *See, e.g.*, *United States v. Warren*, No. 7:04-cr-21, 2005 WL 1164195, at *3-4 (W.D. Va. May 17, 2005) (holding that a prior consent order that prevented defendant from selling securities was admissible to "show the defendant's prior knowledge of securities laws and of what was permissible under those laws").   Even if it were considered 404(b) evidence, it would be admissible to show defendants' knowledge, motive, and absence of mistake.   *See United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981) (permitting an

earlier consent decree between defendant and the SEC to be introduced to show defendant's awareness of SEC requirements).   The Fourth Circuit has explicitly held that, despite Rule 403, a consent order is admissible to prove defendant's motive and intent as long as the Court properly cautions the jury as to the limited use of the evidence.   *See Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1413 (4th Cir. 1992); *see also United States v. Heyward*, 729 F.2d 297, 301 n.2 (4th Cir. 1984) ("The trial court has wide discretion [in applying Rule 403] and its determination will not be overturned except under the most 'extraordinary' of circumstances.").   As the documents the government seeks to introduce are certified copies of original documents field in a public office, they require no additional authentication, and should be admitted because they are intrinsic to the crimes—they are evidence of a core material omission alleged in the case—and also to show notice, knowledge, motive, and intent.   *See* FRE 902(4).

### 3.   The Trailer Park and "Venture Capital I"

The same reasoning applies to the evidence about the trailer park investment, which was part of the "Venture Capital I" scheme charged in the indictment.   Because the trailer park is part of a scheme charged in the indictment, which specifically references the trailer park at page 15, ¶ 50, allegations regarding misrepresentations and material omissions about the trailer park investment are by definition intrinsic, this being a securities fraud case.   That Bank and Seabolt knew of environmental damage issues at the trailer park, which was part of the "Venture Capital I" investment they pitched—and that they did not tell potential investors about those environmental damage issues—is on its face a material omission intrinsic to the charged scheme.

### 4.   Allegations of Retaliation

Likewise, the allegations that Bank retaliated against employees he believed had been disloyal to him are part and parcel of the years-long scheme charged in this case, not freestanding

"other bad acts" that would implicate Rule 404(b).   In several instances, he retaliated against former employees after learning that they intended to settle allegations made by state regulators or raised concerns about his business practices.   Bank controlled the Dominion companies and he controlled the people who worked for him.   His willingness to retaliate against them if they crossed him furthered this control—his actions illustrate the pattern of intimidation he used to keep employees in line and working to further his illegal fraud scheme.   Thus, the evidence is intrinsic; it "furnishes part of the context of the crime," *Mark*, 943 F.2d at 448, and "serve[s] to complete the story of the crime on trial," *United States v. Masters*, 622 F.2d 83, 87 (4th Cir. 1980).   To the extent the retaliatory acts do implicate Rule 404(b), they go directly to his intent, knowledge, and plan, and they are not unfairly prejudicial; the lawsuits and harassment Bank engaged in pale next to the massive fraud he was undertaking.

Bank's theft of Raeann Gibson's hard-drive after she elected to accept responsibility and plead guilty, which generated an earlier round of litigation that ended with Bank's agreement to turn the hard drive over to the government, is another species of the same retaliation against anyone Bank perceives as having crossed him.   It goes directly to consciousness of guilt, to motive, and to Bank's attempt to prevent Gibson from cooperating fully with the government.   Just this week, the Court has been made aware of yet another apparent impropriety: the potential misappropriation of attorney-client privileged documents taken from a computer used by Gibson, to which Bank also had the password, and apparently from her hard copy personal notes as well.   The government may inquire into the circumstances of how Bank came to possess his co-defendant's privileged materials, including hand-written notes made by Gibson, during any cross-examination of him.

### 5. Romantic Relationship

To be clear, the government does not intend to elicit detailed testimony about the

relationship between Bank and Gibson while he was her boss during this scheme.  But the fact that they were engaged in a romantic as well as a business relationship is relevant to the control Bank exercised over Gibson, to her continued willingness to go along with his scheme, and to her actions after this case was initiated—for example, working with him in a joint defense agreement, working out of the offices of Bank's counsel, and living with one of Bank's defense team, as the Court heard this week during its inquiry into the appropriation of her privileged communications by Bank.  Much like the retaliatory acts described above, the evidence is intrinsic in that it "furnishes part of the context of the crime," *Mark*, 943 F.2d at 448, and "serve[s] to complete the story of the crime on trial," *United States v. Masters*, 622 F.2d 83, 87 (4th Cir. 1980).

To the extent it can be considered a "prior bad act" of the type considered under the rubric of 404(b), it should still be admitted.  Defense counsel apparently plans a detailed cross-examination of Gibson, with hundreds of pages of documents taken from her own computer, including privileged communications between her and her attorney, to be used as "impeachment" material.  Even assuming he had proper impeachment material to use on cross, his attempt to keep the nature of his relationship with Gibson out of evidence raises the sword/shield problem: the defense will attempt to show her doing and saying things—which they believe will be helpful to the defense—that she said and did in part because of her relationship with Daryl Bank, while preventing the introduction of evidence about the nature of that relationship.

Bank's attempt to prevent the government from introducing an important fact that explains much of Gibson's pre-plea behavior will prevent the jury from learning the whole truth about *why* Gibson did the things she did for Bank.  The evidence is admissible under Rule 404(b).  Pursuant to *Queen*, it is relevant to the charged offenses and probative of them—given that Gibson helped Bank carry out the entire scheme, her reasons for doing so are relevant to explaining how the

24

A1418

scheme worked and why she took part in it.   The evidence is reliable; it will be introduced through the direct testimony of one of the parties involved.   Last, its probative value is not substantially outweighed by unfair prejudice.   The government does not intend to delve deeply into the nature of the romantic relationship, will not emphasize the fact that both Bank and Gibson were married at the time, and will not elicit intimate details about the relationship.   Put simply, it matters that Bank used both money and his personal relationship with Gibson to keep her under his control. Hiding that important fact from the jury will distort the testimony and open Gibson up to unfounded attacks on her veracity.   If the Court does not allow the government to briefly inquire into the nature of the relationship between Bank and Gibson during its direct examination, it should revisit that ruling after the defense cross-examination, which will surely attempt to call into question Gibson's credibility and intentionally leave unexplained an important motive explaining actions that would otherwise appear inexplicable.

### 6. Collins Asset Group

During the same scheme alleged in the indictment, Bank and Seabolt were also involved in selling another fraudulent investment: Collins Asset Group (CAG), which recently settled a class action lawsuit by agreeing to repay investors $16 million of the money it received from Daryl Bank-derived investors, among others.   The CAG sales were part of the same overarching scheme, involved many of the same personnel, and involved many of the same types of material misrepresentations and omissions at issue in the investment schemes named in the indictment.   To the extent evidence about the CAG sales is governed by Rule 404(b), it should be admissible: it is relevant to the same fraud elements at issue in the indictment, is probative of the material misstatements and omissions the defendants used to sell all of their fraudulent investments, and is not offered to establish anyone's bad character; it is more of the same conduct already at issue.

A1419

The more similar the prior acts are, either in terms of physical similarity or state of mind—and here they are functionally identical as to state of mind—the more relevant the prior-act evidence becomes. *Queen*, 132 F.3d at 997; *Mark*, 943 F.2d at 448. There is also no danger of unfair prejudice—the jury is not likely to be excited to irrational behavior by another instance of the same pattern of fraud. Last, the defendant's claim that the government's earlier objection to its improperly issued subpoena duces tecum to CAG somehow bars it from introducing relevant evidence about the CAG scheme is misplaced. Nothing prevented the defense from issuing trial subpoenas to anyone affiliated with CAG, including trial subpoenas requiring the production of documents at trial. And it is the defendant who possesses the documents relevant to his own interactions with the CAG investments, which he is free to use to attempt to explain away his involvement in yet another fraudulent investment.

Respectfully submitted,

Raj Parekh
Acting United States Attorney

By:    /s/
Melissa O'Boyle (Va. Bar No. 83180)
Elizabeth Yusi (Va. Bar No. 91982)
Andrew Bosse
Assistant United States Attorneys
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number: 757-441-6331
Facsimile Number: 757-441-6689
Email: melissa.oboyle@usdoj.gov

26

A1420

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of March, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

_____/s/_____
Melissa E. O'Boyle
Assistant United States Attorney
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Tel. – 757-441-6331
Fax – 757-441-6689
Email: melissa.oboyle@usdoj.gov

27

A1421

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <div style="text-align:right">**Plaintiff,**</div>     **v.** <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <div style="text-align:center">**Defendants.**</div> | **Civil Action No. 21-CV-11276 (WGY)** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT YVONNE GASARCH'S MOTION IN LIMINE TO EXCLUDE "Q" RECORDS AND PURPORTED EXPERT TESTIMONY**

Defendant Gasarch moves *in limine* (ECF No. 355) to exclude evidence contained in an electronic database maintained by Frederick Sharp (the "Q system") which recorded purchases and sales of stock on behalf of Sharp's clients and distributions of trading proceeds to Sharp's client. Gasarch's motion, like the related motions by Friesen and Sexton,[1] is built on the faulty premise that Fedir Nikolayev is the "only" witness the SEC relies upon to authenticate and admit the Q system. This is not true. As set forth in the Commission's opposition to Friesen's motion to exclude the Q system, there are multiple witnesses (Nikolayev, Silverton Principal, Murphy) and multiple indicia that demonstrate reliability and admissibility of the Q system. And the Commission will present even more evidence at trial, such as the testimony of Steve Bajic, another Sharp coconspirator who will testify that he relied upon the accuracy of the Q system,

---

[1] Gasarch's motion largely repeats Friesen's arguments about the Q system. ECF No. 329. The Commission therefore incorporates by reference its opposition to Friesen's motion *in limine* to exclude the Q system (ECF No. 336) and will endeavor not to repeat its arguments here.

1

A1422

that trading data was accurately entered into the Q system within a day or two of the trades, and that he asked Gasarch to input information into it, which she did. There's even more evidence, in the form of electronic communications showing that Gasarch, among other things, sent Q system reports to Sexton, Friesen, and others.

**Nikolayev Deposition**. The testimony of Fedir Nikolayev, the IT professional who built the Q system, is but one piece of the evidence demonstrating that the Q system is reliable and admissible. In a nutshell, and as set forth more fully in the Commission's opposition to Friesen's motion (ECF No. 336 at 3), Nikolayev testified that he built the Q system for Sharp to record stock and money transactions, that Sharp and his employees had access to the Q system to enter information, and that Sharp's practice was to record transactions in the Q system.

Gasarch points to various passages from Nikolayev's deposition that she says undermine the authenticity of the Q system. Ironically, much of the testimony she cites is the same evidence the Commission relies upon. For example, she recites testimony that Nikolayev "set up an accounting and communications system for Mr. Sharp called the 'Q' system." Br. at 2.[2] Other bits she cites are also unavailing. For example, she points out that Sharp and his employees, including Gasarch, could "manually adjust all of the numbers." *Id.* That innocuous observation is surely true of every database; one would hope and expect that database users could, for example, fix a mistake. Gasarch nevertheless insinuates that Sharp made everything up despite ample evidence that the Q system was accurate. Indeed, Commission witness Ryan Murphy compared over a thousand Q system stock sale entries to third party brokerage records and found that 97.4% of the Q system entries exactly matched the brokerage records. ECF No. 336 at 6.

---

[2] "Br. at ___" refers to specific pages in Gasarch's motion *in limine*, ECF No. 355.

There's another problem with Gasarch's motion. In places, she makes certain implicit factual assertions as to matters on which Gasarch refused to answer questions and invoked her Fifth Amendment privilege. For example, she says that emails sent to and from someone with the codename Wires "could have been written by anyone." Br. at 3. Implicit in that statement is the factual assertion that Gasarch is not Wires. But this is flatly inconsistent with Wires emails in which Gasarch identifies herself, and with the Silverton Principal's declaration identifying her as Wires. ECF No. 268 (Commission 56.1 statement in support of its motion for summary judgment) at ¶¶14 (communications in which Wires is identified as Gasarch) and 271 at ¶14 (sealed Silverton Principal's declaration identifying Wires as Gasarch). Having invoked her Fifth Amendment privilege, Gasarch should not now be permitted to make factual assertions that are inconsistent with the record and the adverse inference arising from her decision not to testify substantively. To the contrary, the Commission is entitled to the adverse inference that Gasarch is Wires—a fact for which there is ample evidence.

In the end, Gasarch's observations about Nikolayev's testimony go to the weight of the evidence, not its admissibility. Gasarch is free to argue to the jury that Sharp made everything up because entries in the Q system could be adjusted manually.

**Expert Testimony.** Gasarch incorporates by reference and joins in Freisen's motion to exclude the Commission's expert. The Commission therefore incorporates by reference its opposition to Friesen's motion. ECF No. 336 at 13-17.

Gasarch's motion should be denied.[3]

---

[3] There is a fragment of a paragraph at the end of Gasarch's motion that appears to be an argument about personal jurisdiction. Br. at 4-5. This appears to be an error and there is no corresponding request for relief. The Commission is not addressing this portion of Gasarch's motion but respectfully requests leave to do so if necessary.

A1424

Dated:  September 5, 2023

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its Attorneys,

/s/ Alfred A. Day

Alfred Day (Mass. BBO No. 654436)
Kathleen B. Shields (Mass. BBO No. 637438)
David H. London (Mass. BBO No. 638289)
Nita K. Klunder (Mass. BBO No. 689304)
33 Arch Street, 24th Floor
Boston, MA  02110
Telephone: (617) 573-8904 (Shields); (617) 573-4537 (Day); (617) 573-8997 (London)
Fax: (617) 573-4590
Email: shieldska@sec.gov; daya@sec.gov; londond@sec.gov; klunderni@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 5, 2023, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

/s/ Alfred A. Day

A1425

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                   Plaintiff,<br><br>      v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,<br><br>                                   Defendants. | Civil Action No. 21-CV-11276 (WGY) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT PAUL SEXTON'S MOTION
IN LIMINE TO EXCLUDE "Q" SYSTEM AND ASSOCIATED DATA**

Defendant Sexton moves *in limine* (ECF No. 338) to exclude evidence contained in an

electronic database maintained by Frederick Sharp (the "Q system") which recorded purchases

and sales of stock on Sexton's behalf and distributions of trading proceeds to Sexton and others.

Sexton's motion distorts the record and is built on implicit factual assertions that are at odds with

the evidence and Sexton's invocation of his Fifth Amendment privilege.  His motion should be

denied.[1]

      **A.**      **Sexton Mischaracterizes the Record.**

Sexton's motion opens with the accusation that the Q system is "an unauthenticated

anonymous third-party database purportedly established at the direction of a fugitive criminal

mastermind."  Br. at 1.  Sexton says this despite there being extensive evidence that the Q system

---

[1] Sexton joins in Friesen's and Gasarch's motions to exclude the Q data (ECF Nos. 329 and 334) and the Commission therefore incorporates by reference its oppositions to those motions.

A1426

was an electronic database maintained by Fred Sharp, which recorded purchases and sales of stock on behalf of Sharp's clients and distributions of trading proceeds to Sexton and others. Sexton's motion, like the related motions by Friesen and Gasarch, is built on the faulty premise that Fedir Nikolayev is the "only" witness the SEC relies upon to authenticate and admit the Q system. This is not true. As set forth in the Commission's opposition to Friesen's motion to exclude the Q system (ECF No. 336), there are multiple witnesses (*e.g.*, Nikolayev and Murphy) and multiple indicia that demonstrate the reliability and admissibility of the Q system, such as evidence that over a thousand stock sale entries in the Q system exactly match third party brokerage records—97.4% of the time. *Id.* at 6 (summarizing Commission witness Ryan Murphy's analysis). The Commission will not repeat all of that evidence here. Suffice it to say that the evidence before the Court goes far beyond the Nikolayev deposition.

Further, as Sexton is well aware, the Commission will present even more evidence at trial, such as:

- The testimony of FBI agents that they identified the Q system servers in Curacao as part of a criminal investigation, that the Curacao servers, which were labeled with variants of Sharp's codename BOND (as in, James Bond), were seized by authorities in Curacao, decrypted, and eventually produced to the Commission and, in turn, defendants.

- The testimony of ██████, ██████████, and George Stubos, more Sharp coconspirators, who will testify that they relied upon the accuracy of the Q system.

- ████ will additionally testify that trading data was accurately entered into the Q system within a day or two of the trades and that he asked Gasarch to input information into it, as reflected in contemporaneous communications, which she did.

- Stubos will additionally testify about Sharp's scheme, generally, and details about receiving trading profit distributions, sometimes in the form of untraceable cash and gold coins, that were reflected in the Q system.

2

A1427

- And there's even more evidence in the form of electronic communications showing that Sexton, Friesen, and others requested and received Q account statements from Gasarch.

**B.     The Q System Is a Business Record.**

Before getting into the details, the Commission submits that the Q system is, on its face, a

business record:

> [The Q system] functions similarly to many brokerage accounts at financial institutions and "general ledger" accounting systems with which I am familiar. The Q system tracked the amounts of stock sold by, stock purchased by, and the total proceeds resulting for, Sharp Group clients including Veldhuis, Sexton and Friesen. The Q system also tracked distributions of the proceeds to, and for the benefit of, Sharp Group clients including Veldhuis, Sexton and Friesen.

ECF. No. 273 (Murphy Decl.) at ¶7.  Sexton does not address this observation and instead

quibbles with the extensive evidence that the Q system is a business record.

Sexton first claims that the Commission can't show that the entries in the Q system were

made by someone with knowledge near the time of the transaction.  This is yet another distortion

of the record.  One of Sharp's coconspirators, ███████, a principal of Silverton SA , an entity

that, among other things, helped Sharp trade stock through nominee companies, declared as

follows:

> 21.  Sharp ran his business using an accounting system that was called MT, and later Q.  The Q system kept track of his clients' stock holdings in the names of the various nominee companies Sharp and his employees administered.  Q also kept track of purchases and sales of his clients' stock through those nominees.  Q also kept track of all of the financial transactions for Sharp's business, including all payments sent at client's direction out of the proceeds of their trading and all fees and commissions they were charged for using Sharp's services.

> 22.  *Both when I was at Blacklight and when I was at Silverton, I had access to, and used, parts of the Q system.  When I was at Silverton, I relied on the Q system to see when stock was going to be transferred to Silverton.  When Silverton bought or sold shares on behalf of Sharp's clients, I reported those transactions into the Q system.*  Silverton was also paid fees and commissions based on the transactions it reported into the Q system.  Silverton also sent payments from the proceeds of the trading it did and Sharp, his employees and his clients requested.  All of those payments were also reported in the Q system.  *I reconciled my own*

3

*accounting for the stock that Silverton held on behalf of Sharp's clients to the transactions shown in Q so that I was certain that both of our record-keeping systems were accurate and consistent.*  When I observed that there was an error in the Q system, I asked Sharp to correct it and made sure that it was fixed.

23.  *I am aware that Sharp and his employees entered information into the Q system at the time of, or very close in time to, the transactions recorded in the Q system.  I often communicated with Sharp, Kelln and Gasarch about the transactions reflected in Q.  Our discussions made it clear that the accuracy of Q was important because we all relied on it.*

ECF No. 274 (sealed) at ¶¶21-23 (emphasis added).

Sexton selectively quotes from these paragraphs to argue there is insufficient detail about the Q system in ████ declaration.  Br. at 5.  For example, he quotes the first sentence of Paragraph 23 above, but leaves out that ████ "often communicated with Sharp, Kelln and Gasarch about the transactions reflected in Q.  Our discussions made it clear that the accuracy of Q was important because we all relied on it."  Viewed in context, there is plenty of detail and, in any event, ████ is but one piece of the mosaic of evidence establishing that the Q system is a business record.

Sexton goes on to nitpick Nikolayev's testimony.  Like Gasarch, Sexton insinuates that because Sharp could change entries in the Q system the whole thing was made up.  Br. at 3-4.  The more likely reason—and one the jury is free to credit—is that Sharp could change entries because, like any database user, he should be able to fix mistakes.  *See* ECF No. 274 (sealed) at ¶22 ("When I observed that there was an error in the Q system, I asked Sharp to correct it and made sure that it was fixed.").  Another equally possible reason for the need to edit entries is that sometimes securities transactions do not settle and thus require adjustment once they have settled, and sometimes banks are not able to make requested wire transfers and those transfers need to be redone.  The need for a business to adjust entries in its accounting database is hardly reason to preclude that database from evidence.

4

A1429

Sexton goes on to point out various alleged deficiencies in ███ declaration. For example, Sexton says that "Silverton was not involved in *all* of the transactions at issue[.]"  Br. at 4 (emphasis added).  This is of no consequence.  It's doubtful any one person was involved in every transaction in any database maintained by any business.  Putting on endless evidence covering each and every transaction in a database would create an impossibly high bar for admissibility.  Sexton's attacks are at best glancing blows, not mortal wounds, and as such are just fodder for cross examination and argument to the jury.

This case bears no resemblance to the *Petrocelli* case, cited by Sexton, in which the provenance of something that appeared to be a medical record was completely unknown.  679 F.2d 286, 289 (1st Cir. 1982).  Sexton then says, quoting *Petrocelli*, that the Q system is "'so cryptic that pure guesswork and speculation is required to divine the source[.]'"  Br. at 4.  But in what way is the Q system supposedly "cryptic"?  Sexton doesn't explain this against the backdrop of perfectly understandable account statements and the fact that Commission summary witness Ryan Murphy was able to extract extensive, coherent transaction-level data from the Q system.  *See generally* ECF No. 273 (Murphy Decl.) (summarizing detailed transaction-level data derived from the Q system and cross-checked against third-party records).

Sexton lastly argues that one can't tell whether transactions in the Q system were "recorded days, months, or even years after they purportedly occurred."  Br. at 5.  Of course, there's no indication anywhere in the record that there was some lag in entering transactional data into the Q system.  Quite the contrary:  The Q system data itself contains a "batch date posted" field for each transaction, which appears to be the date the transaction data was entered into the system.  Ex. A (trial exhibit LI -Q data example).  There are also transfer agent records that show stock being transferred to Sharp entities and matching Q data showing receipt of the

A1430

same stock close in time.  *Compare* Ex. B (Trial Exhibit MZ) *with* Ex. C (excerpt of Trial

Exhibit NO) (showing, for example, transfer of 2,520,000 shares to Sharp on 1/23/2012 and

2,520,000 shares recorded in Q as received on 1/26/2012).  This data shows that most

transactions were entered into the Q system within several days after they happened.  Further, as

noted above, ███ will testify that trading data was accurately entered into the Q system within a

day or two of the trades.  Further, numerous witnesses will testify that they relied on the

accuracy of the Q system to keep track of trading, Sharp's fees, and disbursements of ill-gotten

trading proceeds.  It makes no sense that one could rely on a system that doesn't reflect

transactions until "weeks, months, or years" after-the-fact.

    **C.**    **Sexton's Remaining Arguments About the Business Records Exception Are Unavailing**.

Sexton asserts a few more arguments that are easily dispatched.  He says that there are

"no indications of regularity" of the transactions reflected in the Q system.  Br. at 6.  It is hard to

see how Sexton can say this with a straight face.  As set forth in the declarations of Commission

summary witness Ryan Murphy, the Q system data covers many years and contains thousands of

records of transactions per year, which, again, are extensively corroborated by third party

brokerage records.  ECF Nos. 336 at 6 (summary of brokerage record comparison) and 273

(summary of Q system data spanning years).  The idea that records covering thousands of

transactions spanning multiple years does *not* reflect a regular activity defies reason.  FRE

803(6) (requiring a showing that the record was a "regular practice").  The very volume of

trading and transactional data contained in Q demonstrates that the system was regularly used to

keep track of those transactions.

Sexton also says there are no indicia that the Q system was part of a regularly conducted

activity.  Br. at 6.  The testimony of numerous witnesses discussed in Part A above establishes

that they relied upon the Q system's accuracy in accounting for stock sales, proceeds, and distributions.  Further, as discussed in Part D below, Sexton invoked his Fifth Amendment right with respect to questions about all aspects of the Q system.  He should not now be permitted to contradict the adverse inference arising from his refusal to answer deposition questions substantively.

Sexton next says that the Commission has no "competent witness" to establish that the Q system is a business record.  Br. at 6-7.  Again, this is belied by the record.  As set forth above, there is ample evidence provided by persons with firsthand knowledge, including Nikolayev and ▮▮▮.  These are plainly percipient witnesses who can testify about how the Q system was used and its reliability.  There's also the expected testimony of FBI agents, ▮▮▮, ▮▮▮, and Stubos, all of whom have additional personal knowledge of the Q system and how and when it was populated.  And, as all the defendants gloss over, there are the adverse inferences, corroborated by extensive other evidence, that arise as a consequence of defendants' decision to assert their Fifth Amendment privilege on all questions relating to their use of and interactions with the Q system.

Sexton also trots out the arguments that Sharp could change entries in the Q system and may have fabricated certain documents (unrelated to the Q system).  He also points to Nikolayev's testimony that the Q system was backed up and cleared periodically, and that it was eventually shut down.  Br. at 7-8.  At best, these debatable observations go to the weight of the evidence.

More fairly, Sexton misses the point that Sharp fabricated documents to further the scheme in which Sexton was a knowing participant.  Pretending that nominee companies did certain actions, when Sexton and his associates were really calling the shots was a critical part of

7

A1432

the overall scheme – and a service for which Sexton and his associates paid Sharp dearly. Sexton cannot complain that Sharp made things up when that was the crux of what Sexton was paying him to do. Sexton also misses the point that, despite Nikolayev's statement that the Q system was backed up and cleared periodically is precisely consistent with how the Q system data was recovered from the servers from Curacao. There were 4 instances of the database from different time periods. But, contrary to Sexton's view, the older versions were not deleted, but were right there on the server to be recovered. Sexton still uses his arguments as the jumping off point for the extraordinary claim, *presented as a matter of fact*, that "the [Q] system was a) wiped on a yearly basis, b) in the sole control of one man who is a fugitive, and c) was rewritten, edited, and forged at the whim of that same fugitive[.]" Br. at 7-8. This is inconsistent with any fair reading of the record: There is simply no evidence, or any reasonable inference to be drawn from the record, that the Q system was "forged" or "rewritten" on a "whim."

Lastly, Sexton claims the fact that over 1000 entries in the Q system exactly match brokerage records somehow doesn't matter after maintaining all along that the Q system is unreliable. Br. at 8-9. He concedes, as he must, that the Q system "mostly matches" third party brokerage records. "Mostly" in fact means 97.4% of the time with respect to a sample of over 1000 records representing 56% of the total transactions, as discussed above. This is powerful evidence of reliability and Sexton's spin should be rejected.

**D.    Sexton's Arguments Improperly Contradict His Fifth Amendment Assertion.**

There's another serious problem with Sexton's motion. Sexton repeatedly makes implicit factual assertions about matters as to which he invoked his Fifth Amendment privilege. For example, he contends throughout his motion that the Q system is, as a factual matter, a fabrication. Another example: Sexton's claim noted above that the Q system was "rewritten,

8

A1433

edited, and forged" has no support and is contradicted by extensive evidence. Sexton should not

be permitted to assert such fanciful factual claims when he chose not to testify substantively.

The Commission is entitled to an adverse inference, supported by extensive evidence recited

above, that the Q system accurately reflected stock sales and payouts to Sexton. *Brookridge*

*Funding Corp. v. Aquamarine, Inc.*, 675 F. Supp. 2d 227, 233 (D. Mass. 2009) (Young, J.) (when

a party asserts their Fifth Amendment privilege to refuse to answer a question, the "court is

warranted in drawing a negative inference against that party").

       With respect to deposition questions, Sexton refused to answer the following about the Q

system:

> 41. During the time that you were a client of Sharp, you understood that Sharp's accounting system kept track of the deposits of his clients' stock in brokerage accounts around the world?

> 42. During the time that you were a client of Sharp, you understood that Sharp's accounting system kept track of when stock was bought and sold on behalf of his clients?

> 43. During the time that you were a client of Sharp, you understood that Sharp's accounting system kept track of the proceeds of those sales on behalf of his clients?

> 44. During the time that you were a client of Sharp, you understood that Sharp's accounting system also kept track of when and how clients asked for distributions of the proceeds from their securities sales?

> 46. You referred to Sharp's accounting system as Q, correct

> 132. Please refer back to Exhibit Sexton 22. You also received HEAR account statements via xmail, right?

> 133. You also requested transfers of funds via xmail, right?

> 132. Exhibits Sexton 24 and 25 are examples of such communications, right?

> 133. Exhibit Sexton 26 is a true and correct copy of an xmail message dated May 2, 2012 in which you (paul@secure.xmeridian.com) request that Gasarch (wires@secure.xmeridian.com) transfer funds from the STVF and ONCS accounts to several financial institutions, right?

Ex. D (Trial Ex. NK – Sexton Dep. Excerpts) and Exs. 22, 24-26. It makes no sense that Sexton

would request Q account statements and request disbursement of funds from a "forged"

accounting system. Sexton's factual assertions should be rejected and the Court should instead

draw an adverse inference against him based on his refusal to answer questions under the Fifth

Amendment.

####        E.        The Q System Is Admissible as a Coconspirator Statement.

Evidence contained in the Q system is also admissible as statements of a coconspirator.

FRE 801(d)(2)(E) ("[s]tatements made by a coconspirator during and in furtherance of a

conspiracy are not hearsay"). To admit a coconspirator's statement, the proponent must establish

by a preponderance of the evidence that: (i) there was a conspiracy involving the declarant and

the non-offering party and (ii) that the statement was made during the course of and in

furtherance of the conspiracy. *Global Med. Solutions, Ltd v. Simon*, 2013 WL 12065418, at *9

(C.D. Cal. March 18, 2013) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).

The coconspirator hearsay exclusion applies not only to oral or written utterances, but

also to compilations of data maintained in furtherance of an unlawful scheme. For example,

*United States v. Musaibli* involved records kept by ISIS in the course of and in furtherance of a

terrorist conspiracy. The court held that various rosters of fighters, payroll records, and budget

databases recording payments to fighters and administrators were properly admitted under the

coconspirator hearsay exception. 42 F.4th 603, 609, 614–19 (6th Cir. 2022). The court noted

that "statements generated by ISIS's bureaucratic apparatus to support the mission of providing

the terrorist group with personnel . . . fit comfortably within the alleged conspiracy's scope." *Id.*

at 618. Here, too, the Q system supported defendants' overall scheme to effectuate illicit stock

A1435

sales by recording, among other things, stock acquisitions and sales, along with fees paid to Sharp and profit distributions to defendants.

Sexton first argues that the Commission can't charge a *criminal* conspiracy and that the exception is therefore unavailable. Br. at 9 ("Commission has not charged a conspiracy, and it lacks the legal authority to do so."). Not so. "It is not necessary to charge a conspiracy in the complaint in order to invoke the coconspirator exclusion from the hearsay rule." *SEC v. Tome*, 638 F. Supp. 629, 634 (S.D.N.Y. 1986) (in civil cases, coconspirators are sometimes called "joint venturers" or described as "acting in concert") (citations omitted). In *Tome*, for example, the court found evidence that the declarant and the defendants worked together to trade illegally on insider information sufficient to invoke Rule 801(d)(2)(E). *Id.* at 634–37.

Sexton next claims that the Commission cannot meet the "high standard" of proving the existence of a conspiracy. Br. at 10. But "[t]he threshold evidence offered by the [proponent] need not be overwhelming." *United States v. Ammar*, 714 F.2d 238, 250 (3d Cir. 1983) (quotation omitted). Here, as discussed above, there is overwhelming evidence that Sharp and his employees, Kelln and Gasarch, worked in tandem with Veldhuis, Friesen, Sexton, ███, Stubos, ███, Kaitz, and others to effectuate illicit stock sales for a massive profit. Though additional evidence will be presented at trial, even a small sampling of evidence already in the record demonstrates that Sexton was engaged in a conspiracy involving Sharp and his employees.

███, Avtar Dhillon, and William Kaitz have all provided evidence of Sexton's longstanding role in the conspiracy facilitated by Sharp and his employees, via, among other things, the Q system. ███ knew Friesen, Sexton, and Mike Veldhuis as clients of Sharp who often worked together and "owned shares that Silverton traded, through nominees, on their

11

A1436

behalf." ECF 274 at ¶¶ 10-11. ▮▮▮ communicated by xPhone with Friesen and identified his code names as "2" or "GARD." *Id.* at ¶14. Kaitz communicated by xPhone with Sexton and identified him as xPhone user "3." ECF No. 271 at ¶16. Further, with regard to 13 of 14 issuers whose sales are at issue as to Friesen and Sexton, Kaitz testified that he did promotional work on behalf of Sexton, Friesen, and Veldhuis. *Id.* ¶¶ 10-13. Finally, Dhillon describes his schemes with Sexton, Friesen, and Veldhuis to profit from illegal sales of OncoSec, Stevia First/Vitality, and Arch stock. ECF No. 270 (Declaration of Avtar Dhillon) at ¶¶ 7-47.

What is more, Kelln, Gasarch, Veldhuis, Friesen, and Sexton all invoked their Fifth Amendment privilege with respect to extensive written deposition questions concerning their roles in the illegal stock sale scheme. The jury may therefore hold the ensuing adverse inferences against them and their coconspirators, especially when, as here, there is extensive independent evidence. *Brookridge*, 675 F. Supp. 2d at 234 (discussing adverse inference based on employment relationships) They cannot have their cake (not testifying substantively) and eat it, too (ignoring the adverse inference).

Sexton lastly argues that the Q system was not deployed in furtherance of the illegal stock sale scheme. But, as discussed above, the Q system was the means by which Sharp kept track of all aspects of the unlawful scheme. Like the databases in *Musaibli*, the Q system was plainly part of the overall scheme as it tracked the defendants' unlawful activities to the penny. Importantly, a coconspirator statement need not actually advance the conspiracy. It is enough that the statements—here, the Q system data—generally promote the purposes of the fraudulent scheme. *Musaibli*, 42 F.4th at 619. The Q system plainly promoted the purpose of the fraud because it provided an accounting of profits that could be paid out to Sexton and Friesen—the very purpose of their conspiracy was to reap that profit.

12

A1437

* * *

For all the reasons set forth above, Sexton's motion should be denied.

Dated:  September 5, 2023                    Respectfully submitted,

                                            **SECURITIES AND EXCHANGE**
                                            **COMMISSION**

                                            By its Attorneys,

                                            /s/ Alfred A. Day
                                            Alfred Day (Mass. BBO No. 654436)
                                            Kathleen B. Shields (Mass. BBO No. 637438)
                                            David H. London (Mass. BBO No. 638289)
                                            Nita K. Klunder (Mass. BBO No. 689304)
                                            33 Arch Street, 24th Floor
                                            Boston, MA  02110
                                            Telephone: (617) 573-8904 (Shields); (617) 573-
                                            4537 (Day); (617) 573-8997 (London)
                                            Fax: (617) 573-4590
                                            Email: shieldska@sec.gov; daya@sec.gov;
                                            londond@sec.gov; klunderni@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 5, 2023, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

                                            /s/ Alfred A. Day

13

A1438



EXHIBIT
LI
21-cv-11276-WGY

Case 1:21-cv-11276-WGY   Document 353-1   Filed 09/05/23   Page 1 of 15

U.S. SECURITIES AND EXCHANGE COMMISSION
B-03147
Analysis of MySQL Databases
Summary of Accounts

| Account ID | Account Code(s) | First Batch Date | Last Batch Date | Symbols Traded | Trans. Count | TOTAL CASH ACCOUNT BALANCE | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | USD | CAD | CHF | EUR | GBP |
| 49 | GARD | 9/3/2010 | 7/18/2018 | 19 | 983 | (3,693) | (15,246) | - | - | - |
| 121 | HEAR | 11/15/2009 | 10/10/2018 | 24 | 1,037 | 1,131,370 | (151,068) | - | - | - |
| 135 | ONCS | 3/11/2011 | 9/30/2012 | 3 | 338 | - | - | - | - | - |
| | | | | | 312,226 | 5,681,721 | 4,518,428 | (0) | 3,657 | (35) |

A1439

**U.S. SECURITIES AND EXCHANGE COMMISSION**
**B-03147**
**Analysis of MySQL Databases**
**Transaction Details**

Open Search Application

| | Cash Bank (in Curr) | Cash Acct (USD) | Cash Acct (CAD) | Cash Acct (CHF) | Cash Acct (EUR) | Cash Acct (GBP) | |
|---|---|---|---|---|---|---|---|
| TOTAL | | (214,213.74) | 436,910.48 | - | (0.00) | - | *1,618* |

| Database Source | Account ID | Account Code | Account Title | Internal Comments | Batch ID | Batch Date | Batch Date Posted | Bank ID | Bank Code | Bank Title | Symbol | Symbol Description | Stock | Batch Description | Transaction Description (1) | Transaction "mode" | Transaction Description (2) | Transaction Flags | Transactions Comments | Currency Code | Cash Bank (in Curr) | Cash Acct (USD) | Cash Acct (CAD) | Cash Acct (CHF) | Cash Acct (EUR) | Cash Acct (GBP) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| XM LIVE | 15 | ACCO | ACCO | | 105 | 9/3/2010 | 9/3/2010 | 27 | BCOA | BCOA | | | | Imported Balance | debit | keepcurrency | debit | | | CAD | - | - | (20,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 199 | 9/3/2010 | 9/3/2010 | 3 | WORK | WORK | | | | Imported Balance | debit | keepcurrency | debit | | | USD | - | (34,608.67) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 300 | 9/3/2010 | 9/3/2010 | 3 | WORK | WORK | | | | Imported Balance | debit | keepcurrency | debit | | | CAD | - | - | (452.09) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 332 | 9/3/2010 | 9/3/2010 | 3 | WORK | WORK | | | | Imported Balance | credit | keepcurrency | credit | | | EUR | - | - | - | - | 10,134.86 | - |
| XM LIVE | 15 | ACCO | ACCO | | 373 | 9/3/2010 | 9/3/2010 | 30 | BQUA | BQUA | | | | Imported Balance | credit | keepcurrency | credit | | | CAD | - | - | 21,900.12 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 576 | 9/3/2010 | 9/3/2010 | 4 | BSIT | BSIT | | | | Imported Balance | debit | keepcurrency | debit | | | USD | - | (35,394.83) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 577 | 9/3/2010 | 9/3/2010 | 4 | BSIT | BSIT | | | | Imported Balance | credit | keepcurrency | credit | | | CAD | - | - | 36,071.79 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 630 | 9/3/2010 | 9/3/2010 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | 67,000 | Imported Holdings | corporate action in | keepstock | corporate action in | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 719 | 9/3/2010 | 9/3/2010 | 4 | BSIT | BSIT | FEWP | Far East Wind Power | 28,000 | Imported Holdings | corporate action in | keepstock | corporate action in | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 744 | 9/3/2010 | 9/3/2010 | 5 | CASH | CASH | | | | Imported Balance | debit | keepcurrency | debit | | | CAD | - | - | (57,924.99) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 751 | 9/3/2010 | 9/3/2010 | 5 | CASH | CASH | | | | Imported Balance | debit | keepcurrency | debit | | | USD | - | (32,025.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 903 | 9/3/2010 | 9/3/2010 | 8 | DGMN | DGMN | | | | Imported Balance | credit | keepcurrency | credit | | | CAD | - | - | 3,956.55 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 941 | 9/3/2010 | 9/3/2010 | 8 | DGMN | DGMN | | | | Imported Balance | credit | keepcurrency | credit | | | USD | - | 2,546.29 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 954 | 9/3/2010 | 9/3/2010 | 8 | DGMN | DGMN | AAPH | American Petro-Hunter | 369,000 | Imported Holdings | corporate action in | keepstock | corporate action in | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 967 | 9/3/2010 | 9/3/2010 | 8 | DGMN | DGMN | EDE | Edge Resources | 32,300 | Imported Holdings | corporate action in | keepstock | corporate action in | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1016 | 9/3/2010 | 9/3/2010 | 8 | DGMN | DGMN | UVFT | UV Flu | 250,000 | Imported Holdings | corporate action in | keepstock | corporate action in | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1042 | 9/3/2010 | 9/3/2010 | 9 | DGMI | DGMI | | | | Imported Balance | credit | keepcurrency | credit | | | USD | - | 11,468.75 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1095 | 9/3/2010 | 9/3/2010 | 33 | DGPR | DGPR | | | | Imported Balance | credit | keepcurrency | credit | | | USD | - | 4,600.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1106 | 9/3/2010 | 9/3/2010 | 33 | DGPR | DGPR | AAPH | American Petro-Hunter | (7,000) | Imported Holdings | corporate action out | keepstock | corporate action out | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1145 | 9/3/2010 | 9/3/2010 | 10 | FCCN | FCCN | | | | Imported Balance | credit | keepcurrency | credit | | | USD | - | 64,072.59 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1183 | 9/3/2010 | 9/3/2010 | 10 | FCCN | FCCN | AAPH | American Petro-Hunter | (96,000) | Imported Holdings | corporate action out | keepstock | corporate action out | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1201 | 9/3/2010 | 9/3/2010 | 10 | FCCN | FCCN | UVFT | UV Flu | (40,000) | Imported Holdings | corporate action out | keepstock | corporate action out | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1215 | 9/3/2010 | 9/3/2010 | 11 | FINC | FINC | | | | Imported Balance | credit | keepcurrency | credit | | | USD | - | 18,795.36 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1251 | 9/3/2010 | 9/3/2010 | 11 | FINC | FINC | UVFT | UV Flu | (25,000) | Imported Holdings | corporate action out | keepstock | corporate action out | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1255 | 9/3/2010 | 9/3/2010 | 11 | FINC | FINC | AAPH | American Petro-Hunter | (40,000) | Imported Holdings | corporate action out | keepstock | corporate action out | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1328 | 9/3/2010 | 9/3/2010 | 12 | GGSB | GGSB | | | | Imported Balance | credit | keepcurrency | credit | | | USD | - | 3,326.41 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1354 | 9/3/2010 | 9/3/2010 | 12 | GGSB | GGSB | UVFT | UV Flu | (10,000) | Imported Holdings | corporate action out | keepstock | corporate action out | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1390 | 9/3/2010 | 9/3/2010 | 35 | JCIT | JCIT | | | | Imported Balance | credit | keepcurrency | credit | | | USD | - | 50,963.38 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1414 | 9/3/2010 | 9/3/2010 | 35 | JCIT | JCIT | AAPH | American Petro-Hunter | (40,500) | Imported Holdings | corporate action out | keepstock | corporate action out | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1422 | 9/3/2010 | 9/3/2010 | 35 | JCIT | JCIT | UVFT | UV Flu | (25,000) | Imported Holdings | corporate action out | keepstock | corporate action out | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1445 | 9/3/2010 | 9/3/2010 | 14 | LGTC | LGTC | | | | Imported Balance | debit | keepcurrency | debit | | | USD | - | (12,143.46) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1510 | 9/3/2010 | 9/3/2010 | 36 | PATH | PATH | | | | Imported Balance | credit | keepcurrency | credit | | | USD | - | 6,202.26 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1540 | 9/3/2010 | 9/3/2010 | 36 | PATH | PATH | EDE | Edge Resources | (32,300) | Imported Holdings | corporate action out | keepstock | corporate action out | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1586 | 9/3/2010 | 9/3/2010 | 15 | RANQ | RANQ | | | | Imported Balance | debit | keepcurrency | debit | | | EUR | - | - | - | - | (10,134.86) | - |
| XM LIVE | 15 | ACCO | ACCO | | 1589 | 9/3/2010 | 9/3/2010 | 15 | RANQ | RANQ | | | | Imported Balance | debit | keepcurrency | debit | | | USD | - | (85,905.51) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1642 | 9/3/2010 | 9/3/2010 | 15 | RANQ | RANQ | | | | Imported Balance | credit | keepcurrency | credit | | | CAD | - | - | 45,019.39 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1723 | 9/3/2010 | 9/3/2010 | 15 | RANQ | RANQ | AEE | Anatolia Energy | 178,533 | Imported Holdings | corporate action in | keepstock | corporate action in | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1725 | 9/3/2010 | 9/3/2010 | 15 | RANQ | RANQ | EDE | Edge Resources | 40,000 | Imported Holdings | corporate action in | keepstock | corporate action in | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1726 | 9/3/2010 | 9/3/2010 | 15 | RANQ | RANQ | CPAH | Counterpath | 62,500 | Imported Holdings | corporate action in | keepstock | corporate action in | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1925 | 9/3/2010 | 9/3/2010 | 17 | LESH | LESH | | | | Imported Balance | credit | keepcurrency | credit | | | USD | - | 52,316.70 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1948 | 9/3/2010 | 9/3/2010 | 17 | LESH | LESH | AAPH | American Petro-Hunter | (148,294) | Imported Holdings | corporate action out | keepstock | corporate action out | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 1969 | 9/3/2010 | 9/3/2010 | 17 | LESH | LESH | UVFT | UV Flu | (10,000) | Imported Holdings | corporate action out | keepstock | corporate action out | a=custom;cashbank=0;cashaccount=0 | | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2014 | 9/3/2010 | 9/3/2010 | 19 | TDQB | TDQB | | | | Imported Balance | debit | keepcurrency | debit | | | CAD | - | - | (36,722.39) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2019 | 9/3/2010 | 9/3/2010 | 19 | TDQB | TDQB | | | | Imported Balance | debit | keepcurrency | debit | | | USD | - | (9,982.88) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2118 | 9/3/2010 | 9/3/2010 | 24 | VERL | VERL | | | | Imported Balance | credit | keepcurrency | credit | | | CAD | - | - | 9,101.63 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2149 | 9/3/2010 | 9/3/2010 | 26 | XPHO | XPHO | | | | Imported Balance | debit | keepcurrency | debit | | | CAD | - | - | (700.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2245 | 9/3/2010 | 9/7/2010 | 17 | LESH | LESH | UVFT | UV Flu | (10,000) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 3,201.19 | 3,101.19 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2345 | 9/8/2010 | 9/9/2010 | 12 | GGSB | GGSB | UVFT | UV Flu | (10,000) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 3,133.08 | 3,033.08 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2337 | 9/8/2010 | 9/8/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | | USD | (2,000.00) | (2,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2392 | 9/9/2010 | 9/10/2010 | 12 | GGSB | GGSB | UVFT | UV Flu | (10,000) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 3,141.06 | 3,041.06 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2434 | 9/10/2010 | 9/10/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | | CAD | (7,500.00) | - | (7,875.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2560 | 9/14/2010 | 9/14/2010 | 15 | RANQ | RANQ | | | | forex | forex debit | nothing | forex debit | a=custom | | USD | (7,710.01) | (7,787.11) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2560 | 9/14/2010 | 9/14/2010 | 15 | RANQ | RANQ | | | | forex | forex credit | nothing | forex credit | | | CAD | 7,875.00 | - | 7,875.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2647 | 9/15/2010 | 9/16/2010 | 12 | GGSB | GGSB | UVFT | UV Flu | (10,000) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 2,816.19 | 2,716.19 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2554 | 9/16/2010 | 9/16/2010 | 4 | BSIT | BSIT | UVFT | UV Flu | (15,500) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 4,977.14 | 4,852.71 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2675 | 9/16/2010 | 9/16/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | | CAD | (2,500.00) | - | (2,625.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2680 | 9/16/2010 | 9/16/2010 | 20 | TDCO | TDCO | | | | forex | forex debit | nothing | forex debit | a=bank | | USD | (2,593.98) | (2,619.92) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2680 | 9/16/2010 | 9/16/2010 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | | CAD | 2,625.00 | - | 2,625.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2778 | 9/17/2010 | 9/20/2010 | 10 | FCCN | FCCN | FEWP | Far East Wind Power | (24,100) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 6,067.19 | 5,885.17 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2779 | 9/17/2010 | 9/20/2010 | 10 | FCCN | FCCN | AAPH | American Petro-Hunter | (5,000) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 1,668.10 | 1,568.10 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2697 | 9/17/2010 | 9/17/2010 | 12 | GGSB | GGSB | UVFT | UV Flu | (10,000) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 2,816.19 | 2,716.19 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2831 | 9/17/2010 | 9/21/2010 | 12 | GGSB | GGSB | UVFT | UV Flu | (10,000) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 3,022.85 | 2,922.85 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2731 | 9/17/2010 | 9/17/2010 | 10 | FCCN | FCCN | AAPH | American Petro-Hunter | (5,000) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 1,499.97 | 1,399.97 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 2912 | 9/22/2010 | 9/22/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | | USD | (500.00) | (600.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3133 | 9/24/2010 | 9/28/2010 | 12 | GGSB | GGSB | UVFT | UV Flu | (15,000) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 4,406.05 | 4,295.90 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3033 | 9/24/2010 | 9/24/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3162 | 9/27/2010 | 8/31/2011 | 12 | GGSB | GGSB | UVFT | UV Flu | (20,245) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 6,606.28 | 6,441.12 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3326 | 9/29/2010 | 10/1/2010 | 22 | TSLC | TSLC | UVFT | UV Flu | (18,618) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 5,352.33 | 5,218.52 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3179 | 9/29/2010 | 9/29/2010 | 19 | TDQB | TDQB | | | | Draft Leede Financial Markets ck #194 | debit | keepcurrency | debit | a=bank | | CAD | (5,007.50) | - | (5,107.50) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3238 | 9/29/2010 | 10/4/2010 | 10 | FCCN | FCCN | ABHD | Abtech | 40,000 | transfer stock | transfer stock in | keepstock | transfer stock in | sid=seq0;cid=seq0;cashbank=0;cashaccount=0;stock=seq0 | | USD | - | (20,000.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3216 | 9/29/2010 | 9/29/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | | CAD | (3,000.00) | - | (3,150.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3234 | 9/29/2010 | 9/29/2010 | 20 | TDCO | TDCO | | | | forex | forex debit | nothing | forex debit | a=bank | | USD | (13,298.71) | (13,431.70) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3234 | 9/29/2010 | 9/29/2010 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | | CAD | 13,507.50 | - | 13,507.50 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3488 | 9/30/2010 | 10/4/2010 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | | USD | - | 35.76 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3489 | 9/30/2010 | 10/4/2010 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | | CAD | - | - | (0.01) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3680 | 9/30/2010 | 10/5/2010 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | | USD | - | (377.38) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3681 | 9/30/2010 | 10/5/2010 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | | CAD | - | - | (52.71) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3353 | 10/3/2010 | 1/5/2011 | 9 | DGMI | DGMI | | | | Beneficial TT | debit | keepcurrency | debit | a=bank | | USD | (7,820.00) | (7,920.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3653 | 10/4/2010 | 10/5/2010 | 17 | LESH | LESH | ABHD | Abtech | (5,000) | sell stock | sell stock | keepstock | sell stock | a=bank | | USD | 4,218.11 | 4,112.66 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3642 | 10/4/2010 | 10/4/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | | CAD | (1,500.00) | - | (1,600.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3818 | 10/5/2010 | 10/7/2010 | 22 | TSLC | TSLC | UVFT | UV Flu | (10,882) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | | USD | 3,000.99 | 2,900.99 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3771 | 10/5/2010 | 10/6/2010 | 17 | LESH | LESH | ABHD | Abtech | (5,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | | USD | 4,214.54 | 4,109.18 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3827 | 10/6/2010 | 10/7/2010 | 17 | LESH | LESH | ABHD | Abtech | (2,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | | USD | 2,025.77 | 1,925.77 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3850 | 10/7/2010 | 10/7/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3987 | 10/7/2010 | 10/12/2010 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | | USD | (6,834.38) | (6,902.72) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 3987 | 10/7/2010 | 10/12/2010 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | | CAD | 6,902.72 | - | 6,902.72 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4076 | 10/13/2010 | 10/14/2010 | 17 | LESH | LESH | ABHD | Abtech | (5,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | | USD | 3,136.63 | 3,036.63 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4086 | 10/13/2010 | 10/14/2010 | 10 | FCCN | FCCN | AAPH | American Petro-Hunter | (5,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | | USD | 1,699.97 | 1,599.97 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4120 | 10/14/2010 | 10/15/2010 | 17 | LESH | LESH | ABHD | Abtech | (5,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | | USD | 2,941.36 | 2,841.36 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4102 | 10/14/2010 | 10/14/2010 | 19 | TDQB | TDQB | | | | RBC VISA ck #222 | debit | keepcurrency | debit | a=bank | | CAD | (6,961.41) | - | (7,061.41) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4111 | 10/14/2010 | 10/14/2010 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | | USD | - | (7,205.52) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4111 | 10/14/2010 | 10/14/2010 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | | CAD | - | - | 7,061.41 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4511 | 10/18/2010 | 10/25/2010 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | | USD | - | (14,610.50) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4511 | 10/18/2010 | 10/25/2010 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | | CAD | - | - | 14,610.50 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4238 | 10/18/2010 | 10/18/2010 | 19 | TDQB | TDQB | | | | 0837310 BC Ltd ck #230 | debit | keepcurrency | debit | a=bank | | CAD | (10,000.00) | - | (10,100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4239 | 10/18/2010 | 10/18/2010 | 18 | TDCH | TDCH | | | | BMO Draft #107805 | credit | keepcurrency | credit | a=bank | | CAD | 5,989.50 | - | 5,989.50 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4536 | 10/20/2010 | 10/26/2010 | 19 | TDQB | TDQB | | | | airfares ck #231 | debit | keepcurrency | debit | a=bank | | CAD | (1,761.28) | - | (1,861.28) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4337 | 10/20/2010 | 10/20/2010 | 4 | BSIT | BSIT | ABHD | Abtech | 7,000 | internal transfer | transfer stock in | keepstock | transfer stock in | sid=seq0;cid=seq0;cashbank=0;cashaccount=0;stock=seq0 | | USD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4601 | 10/20/2010 | 10/26/2010 | 20 | TDCO | TDCO | | | | forex | forex debit | nothing | forex debit | a=bank | | USD | (1,852.06) | (1,870.58) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4601 | 10/20/2010 | 10/26/2010 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | | CAD | 1,861.28 | - | 1,861.28 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4457 | 10/22/2010 | 10/22/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4488 | 10/25/2010 | 10/28/2010 | 17 | LESH | LESH | ABHD | Abtech | (24,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | | USD | 13,649.61 | 13,376.62 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4580 | 10/26/2010 | 1/19/2011 | 15 | RANQ | RANQ | AEE | Anatolia Energy | (178,533) | internal transfer | stock delivery | keepcurrency | stock delivery | a=custom;cashbank=0;cashaccount=0 | | CAD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4673 | 10/27/2010 | 10/27/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4799 | 10/29/2010 | 10/29/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4800 | 10/29/2010 | 10/29/2010 | 19 | TDQB | TDQB | | | | 0837310 BC Ltd ck | credit | keepcurrency | credit | a=bank | | CAD | 25,000.00 | - | 25,000.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4839 | 10/29/2010 | 10/30/2010 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | | USD | - | (59.49) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 4840 | 10/29/2010 | 10/30/2010 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | | CAD | - | - | (8.86) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 5171 | 11/2/2010 | 11/3/2010 | 10 | FCCN | FCCN | AAPH | American Petro-Hunter | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | | USD | 3,449.84 | 3,346.34 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 5339 | 11/4/2010 | 12/9/2010 | 15 | RANQ | RANQ | CPAH | Counterpath | (5,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | | USD | 7,789.55 | 7,672.71 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | | 5384 | 11/5/2010 | 11/9/2010 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | | CAD | - | - | (9,241.15) | - | - | - |







| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| XM LIVE | 15 | ACCO | ACCO | 5384 | 11/5/2010 | 11/9/2010 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | USD | - | 9,034.70 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 5284 | 11/5/2010 | 11/5/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (10,000.00) | (10,500.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 5504 | 11/10/2010 | 11/10/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (10,000.00) | (10,500.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 5561 | 11/12/2010 | 11/12/2010 | 19 | TDQB | TDQB | | | | RBC VISA ck #303 | debit | keepcurrency | debit | a=bank | CAD | (2,036.33) | - | (2,136.33) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 5658 | 11/12/2010 | 11/15/2010 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (2,197.12) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 5658 | 11/12/2010 | 11/15/2010 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 2,136.34 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 5764 | 11/17/2010 | 11/17/2010 | 5 | CASH | CASH | | | | credit | credit | keepcurrency | credit | a=bank | USD | 7,000.00 | 7,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 5766 | 11/17/2010 | 11/19/2010 | 15 | RANQ | RANQ | | | | Velduis TT | debit | keepcurrency | debit | a=bank | EUR | (5,018.64) | - | - | - | (5,118.64) | - |
| XM LIVE | 15 | ACCO | ACCO | 5852 | 11/17/2010 | 11/19/2010 | 15 | RANQ | RANQ | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (6,942.79) | (7,125.15) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 5852 | 11/17/2010 | 11/19/2010 | 15 | RANQ | RANQ | | | | forex | forex credit | nothing | forex credit | | EUR | 5,018.64 | - | - | - | 5,118.64 | - |
| XM LIVE | 15 | ACCO | ACCO | 5791 | 11/17/2010 | 11/17/2010 | 3 | WORK | WORK | | | | Accord incorp | debit | keepcurrency | debit | a=custom | USD | - | (2,900.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 5947 | 11/19/2010 | 11/23/2010 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (2,423.04) | (2,447.27) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 5947 | 11/19/2010 | 11/23/2010 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 2,450.90 | - | 2,450.90 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 5874 | 11/19/2010 | 11/19/2010 | 19 | TDQB | TDQB | | | | airfares ck #321 | debit | keepcurrency | debit | a=bank | CAD | (2,350.90) | - | (2,450.90) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 5999 | 11/23/2010 | 11/23/2010 | 33 | DGPR | DGPR | UVFT | UV Flu | 750,000 | internal transfer | transfer stock in | keepstock | transfer stock in | sid=seq0;cid=seq0;cashbank=0;cashaccount=0;stock=seq0 | USD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 6176 | 11/29/2010 | 11/30/2010 | 17 | LESH | LESH | UVFT | UV Flu | (25,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 5,377.14 | 5,269.60 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 6200 | 11/29/2010 | 11/30/2010 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (77.56) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 6201 | 11/29/2010 | 11/30/2010 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | CAD | - | - | 1.52 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 6637 | 11/30/2010 | 12/3/2010 | 15 | RANQ | RANQ | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (10,414.13) | (10,518.27) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 6637 | 11/30/2010 | 12/3/2010 | 15 | RANQ | RANQ | | | | forex | forex credit | nothing | forex credit | | CAD | 10,498.48 | - | 10,498.48 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 6336 | 11/30/2010 | 11/30/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 6979 | 12/8/2010 | 12/9/2010 | 4 | BSIT | BSIT | UVFT | UV Flu | (40,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 7,510.47 | 7,322.71 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 6986 | 12/9/2010 | 12/9/2010 | 4 | BSIT | BSIT | EDE | Edge Resources | (40,000) | internal transfer | stock delivery | keepcurrency | stock delivery | a=custom;cashbank=0;cashaccount=0 | CAD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 6987 | 12/9/2010 | 12/9/2010 | 15 | RANQ | RANQ | CPAH | Counterpath | (57,500) | internal transfer | stock delivery | keepcurrency | stock delivery | a=custom;cashbank=0;cashaccount=0 | USD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 7656 | 12/17/2010 | 12/23/2010 | 10 | FCCN | FCCN | AAPH | American Petro-Hunter | (79,206) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 25,415.00 | 24,652.55 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 7615 | 12/20/2010 | 12/23/2010 | 8 | DGMN | DGMN | ARW | Aroway Minerals | 60,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (31,211.00) | - | (31,991.28) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 7657 | 12/21/2010 | 12/23/2010 | 3 | WORK | WORK | | | | internal transfer [FEWP trade] | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 5,562.72 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 7604 | 12/22/2010 | 12/22/2010 | 19 | TDQB | TDQB | | | | airfares ck #440 | debit | keepcurrency | debit | a=custom | CAD | (112.00) | - | (112.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 7654 | 12/22/2010 | 12/23/2010 | 19 | TDQB | TDQB | | | | credit ck | credit | keepcurrency | credit | a=bank | CAD | 35,000.00 | - | 35,000.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 7491 | 12/23/2010 | 12/28/2010 | 20 | TDCO | TDCO | | | | forex ck #74 | forex debit | nothing | forex debit | a=bank | USD | (12,577.91) | (12,703.69) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 7491 | 12/23/2010 | 12/28/2010 | 5 | CASH | CASH | | | | forex ck #74 | forex credit | nothing | forex credit | | CAD | 12,614.47 | - | 12,614.47 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 7743 | 12/23/2010 | 12/28/2010 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (244.53) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 7743 | 12/23/2010 | 12/28/2010 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 238.81 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 7659 | 12/23/2010 | 12/23/2010 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (15,000.00) | - | (15,750.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 7983 | 12/30/2010 | 12/31/2010 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (107.52) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 8140 | 12/31/2010 | 1/1/2011 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (139.63) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 8141 | 12/31/2010 | 1/1/2011 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (78.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 8325 | 1/4/2011 | 1/4/2011 | 18 | TDCH | TDCH | | | | ARW finders fee | credit | keepcurrency | credit | a=bank | CAD | 9,930.00 | - | 9,930.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 8328 | 1/4/2011 | 1/4/2011 | 19 | TDQB | TDQB | | | | 0837310 BC Ltd ck #454 | debit | keepcurrency | debit | a=bank | CAD | (20,000.00) | - | (20,200.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 8385 | 1/4/2011 | 1/5/2011 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (10,348.03) | (10,451.51) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 8385 | 1/4/2011 | 1/5/2011 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 10,299.39 | - | 10,299.39 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 8505 | 1/7/2011 | 1/7/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 8643 | 1/10/2011 | 1/12/2011 | 15 | RANQ | RANQ | | | | Hendrikus Veldhuis TT | debit | keepcurrency | debit | a=bank | EUR | (10,040.02) | - | - | - | (10,140.42) | - |
| XM LIVE | 15 | ACCO | ACCO | 8611 | 1/10/2011 | 1/11/2011 | 19 | TDQB | TDQB | | | | credit | credit | keepcurrency | credit | a=bank | CAD | 35,000.00 | - | 35,000.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 8659 | 1/12/2011 | 1/12/2011 | 19 | TDQB | TDQB | | | | RBC VISA ck #483 | debit | keepcurrency | debit | a=bank | CAD | (7,505.49) | - | (7,605.49) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 8756 | 1/14/2011 | 2/1/2011 | 15 | RANQ | RANQ | | | | forex | forex debit | nothing | forex debit | a=custom | CAD | (13,565.07) | - | (13,837.73) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 8756 | 1/14/2011 | 2/1/2011 | 15 | RANQ | RANQ | | | | forex | forex credit | nothing | forex credit | | EUR | 10,040.02 | - | - | - | 10,140.43 | - |
| XM LIVE | 15 | ACCO | ACCO | 8779 | 1/14/2011 | 1/14/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (5,000.00) | (5,250.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 9085 | 1/21/2011 | 1/21/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (3,500.00) | - | (3,675.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 9509 | 1/30/2011 | 2/1/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | EUR | - | - | - | - | (0.01) | - |
| XM LIVE | 15 | ACCO | ACCO | 9507 | 1/30/2011 | 2/1/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (60.64) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 9508 | 1/30/2011 | 2/1/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (22.65) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 11545 | 2/28/2011 | 3/9/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (104.57) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 11546 | 2/28/2011 | 3/9/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (13.15) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 11361 | 3/1/2011 | 3/4/2011 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (7,220.85) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 11361 | 3/1/2011 | 3/4/2011 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | EUR | - | - | - | - | 5,250.00 | - |
| XM LIVE | 15 | ACCO | ACCO | 11127 | 3/1/2011 | 3/1/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | EUR | (5,000.00) | - | - | - | (5,250.00) | - |
| XM LIVE | 15 | ACCO | ACCO | 11258 | 3/1/2011 | 3/1/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 12346 | 3/22/2011 | 3/22/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 12354 | 3/22/2011 | 3/22/2011 | 20 | TDCO | TDCO | | | | forex ck #150 | forex debit | nothing | forex debit | a=bank | USD | (11,619.78) | (11,735.98) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 12354 | 3/22/2011 | 3/22/2011 | 5 | CASH | CASH | | | | forex ck #150 | forex credit | nothing | forex credit | | CAD | 11,202.63 | - | 11,202.63 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 12594 | 3/25/2011 | 4/1/2011 | 9 | DGMI | DGMI | | | | transfer from Red Rock 33655 | credit | keepcurrency | credit | a=bank | USD | 10,000.00 | 10,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 12780 | 3/30/2011 | 3/31/2011 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (86.82) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 12781 | 3/30/2011 | 3/31/2011 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (55.50) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 12864 | 3/30/2011 | 3/31/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (322.19) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 12865 | 3/30/2011 | 3/31/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (82.23) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 13234 | 3/31/2011 | 4/6/2011 | 8 | DGMN | DGMN | ARW | Aroway Minerals | (60,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 22,178.75 | - | 21,624.28 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 13492 | 3/31/2011 | 4/7/2011 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | CAD | - | - | (21,486.56) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 13492 | 3/31/2011 | 4/7/2011 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | USD | - | 22,531.96 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 13340 | 4/5/2011 | 4/5/2011 | 3 | WORK | WORK | | | | Red Rock 11 fees | debit | keepcurrency | debit | a=custom | USD | - | (2,400.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 13653 | 4/11/2011 | 4/11/2011 | 19 | TDQB | TDQB | | | | fare ck #748 | debit | keepcurrency | debit | a=bank | CAD | (7,538.85) | - | (7,638.85) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 13662 | 4/11/2011 | 4/11/2011 | 19 | TDQB | TDQB | | | | VC Management ck | credit | keepcurrency | credit | a=bank | CAD | 11,250.00 | - | 11,250.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 13864 | 4/15/2011 | 4/15/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 13891 | 4/15/2011 | 4/15/2011 | 20 | TDCO | TDCO | | | | forex ck #167 | forex debit | nothing | forex debit | a=bank | USD | (1,734.09) | (1,751.43) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 13891 | 4/15/2011 | 4/15/2011 | 5 | CASH | CASH | | | | forex ck #167 | forex credit | nothing | forex credit | | CAD | 1,638.86 | - | 1,638.86 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 14051 | 4/19/2011 | 4/19/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (3,000.00) | (3,150.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 14243 | 4/20/2011 | 4/26/2011 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (273.27) | (276.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 14243 | 4/20/2011 | 4/26/2011 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 259.03 | - | 259.03 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 14115 | 4/20/2011 | 4/20/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 14548 | 4/27/2011 | 4/29/2011 | 20 | TDCO | TDCO | | | | forex ck #181 | forex debit | nothing | forex debit | a=bank | USD | (7,425.74) | (7,500.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 14548 | 4/27/2011 | 4/29/2011 | 5 | CASH | CASH | | | | forex ck #181 | forex credit | nothing | forex credit | | CAD | 6,943.78 | - | 6,943.78 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 14402 | 4/27/2011 | 4/28/2011 | 9 | DGMI | DGMI | | | | Red Rock transfer | credit | keepcurrency | credit | a=bank | USD | 7,500.00 | 7,500.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 14564 | 4/28/2011 | 4/29/2011 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 3.25 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 14565 | 4/28/2011 | 4/29/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (29.14) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40391 | 4/29/2011 | 10/31/2012 | 19 | TDQB | TDQB | L-RPCC | Quarry:RPC:6%:Demand | 70,000 | RPC Strategies | buy stock | keepstock | buy stock | a=bank | CAD | - | - | (100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 15057 | 4/29/2011 | 5/6/2011 | 20 | TDCO | TDCO | | | | forex ck #185 | forex debit | nothing | forex debit | a=bank | USD | (3,490.16) | (3,525.06) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 15057 | 4/29/2011 | 5/6/2011 | 5 | CASH | CASH | | | | forex ck #185 | forex credit | nothing | forex credit | | CAD | 3,326.33 | - | 3,326.33 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 14714 | 4/29/2011 | 4/29/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 14915 | 5/4/2011 | 5/4/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (2,000.00) | (2,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16024 | 5/6/2011 | 5/30/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | 165,682 | receive stock | buy stock | keepstock | buy stock | a=bank | USD | - | (100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 15064 | 5/6/2011 | 5/6/2011 | 19 | TDQB | TDQB | | | | airtickets ck #816 | debit | keepcurrency | debit | a=bank | CAD | (1,773.31) | - | (1,873.31) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 15788 | 5/6/2011 | 5/24/2011 | 20 | TDCO | TDCO | | | | forex ck #196 | forex debit | nothing | forex debit | a=bank | USD | (1,945.23) | (1,964.68) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 15788 | 5/6/2011 | 5/24/2011 | 5 | CASH | CASH | | | | forex ck #196 | forex credit | nothing | forex credit | | CAD | 1,873.31 | - | 1,873.31 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 15720 | 5/23/2011 | 8/31/2011 | 4 | BSIT | BSIT | UVFT | UV Flu | (684,755) | internal transfer | stock delivery | keepcurrency | stock delivery | a=custom;cashbank=0;cashaccount=0 | USD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 15722 | 5/23/2011 | 5/23/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | 233,487 | internal transfer | transfer stock in | keepstock | transfer stock in | sid=seq0;cid=seq0;cashbank=0;cashaccount=0;stock=seq0 | USD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 15770 | 5/24/2011 | 5/26/2011 | 15 | RANQ | RANQ | | | | Hendrikus Veldhuis TT | debit | keepcurrency | debit | a=bank | EUR | (5,520.13) | - | - | - | (5,620.13) | - |
| XM LIVE | 15 | ACCO | ACCO | 15898 | 5/24/2011 | 6/2/2011 | 15 | RANQ | RANQ | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (7,856.80) | (8,078.95) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 15898 | 5/24/2011 | 6/2/2011 | 15 | RANQ | RANQ | | | | forex | forex credit | nothing | forex credit | | EUR | 5,520.13 | - | - | - | 5,620.14 | - |
| XM LIVE | 15 | ACCO | ACCO | 15801 | 5/24/2011 | 5/24/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (18,006) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 10,739.21 | 10,578.12 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 15836 | 5/25/2011 | 5/25/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (63,440) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 38,009.23 | 37,439.09 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 15962 | 5/27/2011 | 5/27/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 15997 | 5/27/2011 | 5/27/2011 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (5,506.06) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 15997 | 5/27/2011 | 5/27/2011 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 5,250.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16545 | 5/31/2011 | 6/3/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (1,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 471.88 | 371.88 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40392 | 5/31/2011 | 10/31/2012 | 19 | TDQB | TDQB | L-RPCC | Quarry:RPC:6%:Demand | 20,000 | RPC Strategies ck #887 | buy stock | keepstock | buy stock | a=bank | CAD | (20,000.00) | - | (20,200.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16588 | 5/31/2011 | 6/3/2011 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (36,672.81) | (37,039.54) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16588 | 5/31/2011 | 6/3/2011 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 35,800.00 | - | 35,800.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16310 | 5/31/2011 | 6/2/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (107.80) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16311 | 5/31/2011 | 6/2/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (0.01) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16312 | 5/31/2011 | 6/2/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | EUR | - | - | - | - | (0.01) | - |
| XM LIVE | 15 | ACCO | ACCO | 16548 | 6/2/2011 | 6/3/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (9,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 4,570.36 | 4,470.36 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16520 | 6/2/2011 | 10/31/2012 | 19 | TDQB | TDQB | | | | | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40393 | 6/2/2011 | 10/31/2012 | 19 | TDQB | TDQB | L-RPCC | Quarry:RPC:6%:Demand | 5,000 | RPC Strategies ck #893 | buy stock | keepstock | buy stock | a=bank | CAD | (5,000.00) | - | (5,100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16517 | 6/2/2011 | 6/2/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16551 | 6/3/2011 | 6/3/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (14,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 7,179.46 | 7,071.77 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16558 | 6/3/2011 | 6/3/2011 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 30,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16559 | 6/3/2011 | 6/3/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16666 | 6/3/2011 | 6/6/2011 | 20 | TDCO | TDCO | | | | forex ck #203 204 | forex debit | nothing | forex debit | a=bank | USD | (5,451.66) | (5,506.18) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16666 | 6/3/2011 | 6/6/2011 | 5 | CASH | CASH | | | | forex ck #203 204 | forex credit | nothing | forex credit | | CAD | 5,250.00 | - | 5,250.00 | - | - | - |

| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| XM LIVE | 15 | ACCO | ACCO | 16783 | 6/7/2011 | 6/8/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (2,180) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 1,051.18 | 951.18 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16790 | 6/8/2011 | 6/8/2011 | 19 | TDQB | TDQB | | | | Hudson Composites ck #907 | debit | keepcurrency | debit | a=bank | CAD | (9,632.00) | - | (9,732.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16824 | 6/8/2011 | 6/8/2011 | 20 | TDCO | TDCO | | | | forex ck #205 | forex debit | nothing | forex debit | a=bank | USD | (10,095.10) | (10,196.05) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16824 | 6/8/2011 | 6/8/2011 | 5 | CASH | CASH | | | | forex ck #205 | forex credit | nothing | forex credit | | CAD | 9,732.00 | - | 9,732.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16865 | 6/9/2011 | 6/9/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16874 | 6/9/2011 | 6/9/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (6,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 3,041.06 | 2,941.06 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17025 | 6/12/2011 | 6/13/2011 | 20 | TDCO | TDCO | | | | forex ck #216 | forex debit | nothing | forex debit | a=bank | USD | (10,903.10) | (11,012.13) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17025 | 6/12/2011 | 6/13/2011 | 5 | CASH | CASH | | | | forex ck #216 | forex credit | nothing | forex credit | | CAD | 10,500.00 | - | 10,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16949 | 6/12/2011 | 6/12/2011 | 3 | WORK | WORK | | | | Accord 11 fees | debit | keepcurrency | debit | a=custom | USD | - | (2,450.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 16988 | 6/12/2011 | 6/12/2011 | 3 | WORK | WORK | | | | Accord Fdn 11 fees | debit | keepcurrency | debit | a=custom | USD | - | (3,500.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17077 | 6/14/2011 | 6/14/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (6,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 2,878.19 | 2,778.19 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17300 | 6/20/2011 | 6/20/2011 | 4 | BSIT | BSIT | | | | Hendrikus Veldhuis TT | debit | keepcurrency | debit | a=bank | EUR | (8,500.00) | - | - | - | (8,600.00) | - |
| XM LIVE | 15 | ACCO | ACCO | 17332 | 6/21/2011 | 6/21/2011 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (12,429.55) | (12,701.54) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17332 | 6/21/2011 | 6/21/2011 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | EUR | 8,500.00 | - | - | - | 8,600.00 | - |
| XM LIVE | 15 | ACCO | ACCO | 17521 | 6/24/2011 | 6/27/2011 | 20 | TDCO | TDCO | | | | forex ck #228 | forex debit | nothing | forex debit | a=bank | USD | (5,406.77) | (5,460.84) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17521 | 6/24/2011 | 6/27/2011 | 5 | CASH | CASH | | | | forex ck #228 | forex credit | nothing | forex credit | | CAD | 5,250.00 | - | 5,250.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17484 | 6/24/2011 | 6/24/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17604 | 6/29/2011 | 6/29/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (7,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 2,883.88 | 2,783.88 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17686 | 6/29/2011 | 6/30/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (9,060) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 3,691.40 | 3,591.40 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18179 | 6/30/2011 | 7/5/2011 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (8.25) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18179 | 6/30/2011 | 7/5/2011 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | EUR | - | - | - | - | 5.65 | - |
| XM LIVE | 15 | ACCO | ACCO | 17683 | 6/30/2011 | 6/30/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (2,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 901.10 | 801.10 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17688 | 6/30/2011 | 6/30/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (9,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 4,523.89 | 4,423.89 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17819 | 6/30/2011 | 7/2/2011 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (300.18) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17912 | 6/30/2011 | 7/2/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (64.12) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17913 | 6/30/2011 | 7/2/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (20.28) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 17914 | 6/30/2011 | 7/2/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | EUR | - | - | - | - | (5.65) | - |
| XM LIVE | 15 | ACCO | ACCO | 18212 | 7/5/2011 | 7/5/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (6,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 3,030.35 | 2,930.35 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18279 | 7/6/2011 | 7/6/2011 | 19 | TDQB | TDQB | | | | RPC Strategies ck #985 | debit | keepcurrency | debit | a=bank | CAD | (60,000.00) | - | (60,600.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18344 | 7/6/2011 | 7/7/2011 | 20 | TDCO | TDCO | | | | forex ck #247 | forex debit | nothing | forex debit | a=bank | USD | (1,499.15) | (1,514.14) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18344 | 7/6/2011 | 7/7/2011 | 5 | CASH | CASH | | | | forex ck #247 | forex credit | nothing | forex credit | | CAD | 1,413.84 | - | 1,413.84 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18534 | 7/7/2011 | 7/14/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (1,600) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 819.82 | 719.82 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18395 | 7/11/2011 | 7/11/2011 | 9 | DGMI | DGMI | | | | credit | credit | keepcurrency | credit | a=bank | USD | 45,750.00 | 45,750.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18494 | 7/11/2011 | 7/13/2011 | 20 | TDCO | TDCO | | | | forex ck #250 | forex debit | nothing | forex debit | a=bank | USD | (21,751.63) | (21,969.15) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18494 | 7/11/2011 | 7/13/2011 | 5 | CASH | CASH | | | | forex ck #250 | forex credit | nothing | forex credit | | CAD | 20,513.76 | - | 20,513.76 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18460 | 7/12/2011 | 7/12/2011 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (40,689.77) | (41,096.67) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18460 | 7/12/2011 | 7/12/2011 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 38,692.68 | - | 38,692.68 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18537 | 7/12/2011 | 7/14/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (1,100) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 545.14 | 445.14 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18541 | 7/14/2011 | 7/14/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (15,231) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 8,195.26 | 8,072.33 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18590 | 7/15/2011 | 7/18/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (10,400) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 5,891.28 | 5,714.54 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18580 | 7/15/2011 | 7/15/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18609 | 7/15/2011 | 7/15/2011 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (5,646.34) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18609 | 7/15/2011 | 7/15/2011 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 5,250.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18630 | 7/18/2011 | 7/19/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (8,040) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 4,471.70 | 4,337.55 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18671 | 7/19/2011 | 7/19/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (30,820) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 17,478.92 | 17,216.74 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18727 | 7/20/2011 | 7/20/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (20,400) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 11,176.00 | 11,008.36 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18772 | 7/21/2011 | 7/21/2011 | 25 | VPQU | VPQU | AAPH | American Petro-Hunter | (12,060) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 6,561.01 | 6,461.01 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18827 | 7/22/2011 | 7/22/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18828 | 7/22/2011 | 7/22/2011 | 19 | TDQB | TDQB | | | | RPC Strategies ck #1014 | debit | keepcurrency | debit | a=bank | CAD | (22,400.00) | - | (22,624.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18836 | 7/22/2011 | 7/22/2011 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (10,414.04) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18836 | 7/22/2011 | 7/22/2011 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 9,589.78 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18938 | 7/22/2011 | 7/26/2011 | 20 | TDCO | TDCO | | | | forex ck #259 | forex debit | nothing | forex debit | a=bank | USD | (20,395.34) | (20,599.29) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18938 | 7/22/2011 | 7/26/2011 | 5 | CASH | CASH | | | | forex ck #259 | forex credit | nothing | forex credit | | CAD | 18,929.66 | - | 18,929.66 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 18977 | 7/27/2011 | 7/27/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (3,760) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 1,850.68 | 1,750.68 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19018 | 7/28/2011 | 7/28/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (4,807) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 2,657.17 | 2,557.17 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19086 | 7/28/2011 | 7/30/2011 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (6,707.02) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19086 | 7/28/2011 | 7/30/2011 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 6,268.24 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19061 | 7/29/2011 | 7/29/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (5,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 2,544.63 | 2,444.63 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40394 | 7/29/2011 | 10/31/2012 | 19 | TDQB | TDQB | L-RPCC | Quarry:RPC:6%:Demand | 25,000 | RPC Strategies ck #1036 | buy stock | keepstock | buy stock | a=bank | CAD | (25,000.00) | - | (25,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19651 | 7/29/2011 | 8/10/2011 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | CAD | - | - | (1,419.30) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19651 | 7/29/2011 | 8/10/2011 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | USD | - | 1,438.35 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19097 | 7/29/2011 | 7/30/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (45.46) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19098 | 7/29/2011 | 7/30/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (244.38) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19465 | 8/3/2011 | 8/4/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (4,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 2,053.37 | 1,953.37 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19526 | 8/5/2011 | 8/5/2011 | 20 | TDCO | TDCO | | | | Cash ck #265 | debit | keepcurrency | debit | a=custom | USD | (5,000.00) | (5,250.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19574 | 8/8/2011 | 8/8/2011 | 20 | TDCO | TDCO | | | | Cash ck #267 | debit | keepcurrency | debit | a=custom | USD | (5,000.00) | (5,250.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19810 | 8/16/2011 | 8/16/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (3,285) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 1,431.86 | 1,331.86 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19851 | 8/17/2011 | 8/18/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (4,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 1,659.97 | 1,559.97 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 20006 | 8/23/2011 | 8/24/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | 3,285 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | USD | (1,431.86) | (1,531.86) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 19988 | 8/23/2011 | 8/23/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (3,285) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 1,405.86 | 1,305.86 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 20112 | 8/29/2011 | 8/30/2011 | 4 | BSIT | BSIT | | | | Hendrikus Veldhuis TT | debit | keepcurrency | debit | a=bank | EUR | (10,019.00) | - | - | - | (10,119.19) | - |
| XM LIVE | 15 | ACCO | ACCO | 20120 | 8/30/2011 | 8/30/2011 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (14,867.71) | (15,045.42) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 20120 | 8/30/2011 | 8/30/2011 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | EUR | 10,100.00 | - | - | - | 10,119.19 | - |
| XM LIVE | 15 | ACCO | ACCO | 20570 | 8/31/2011 | 9/6/2011 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (9.47) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 20570 | 8/31/2011 | 9/6/2011 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | EUR | - | - | - | - | 6.65 | - |
| XM LIVE | 15 | ACCO | ACCO | 20218 | 8/31/2011 | 9/1/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (107.22) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 20219 | 8/31/2011 | 9/1/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | EUR | - | - | - | - | (6.65) | - |
| XM LIVE | 15 | ACCO | ACCO | 20830 | 9/14/2011 | 9/14/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (5,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 1,545.11 | 1,445.11 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 20877 | 9/15/2011 | 9/15/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (4,259) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 1,277.84 | 1,177.84 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 20920 | 9/16/2011 | 9/16/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (5,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 1,457.24 | 1,357.24 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 20995 | 9/20/2011 | 9/20/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (13,672) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 4,106.86 | 3,983.65 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 21083 | 9/21/2011 | 9/21/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (7,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 2,049.74 | 1,949.74 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 21141 | 9/22/2011 | 9/22/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (6,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 1,751.79 | 1,651.79 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 21204 | 9/23/2011 | 9/23/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (3,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 856.16 | 756.16 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 21345 | 9/27/2011 | 9/27/2011 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (4,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 1,184.70 | 1,084.70 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 21401 | 9/27/2011 | 9/27/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 21619 | 9/29/2011 | 9/30/2011 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (54.86) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 21716 | 9/29/2011 | 9/30/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (282.47) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 21717 | 9/29/2011 | 9/30/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (20.71) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 22692 | 10/1/2011 | 10/21/2011 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (81,371.71) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 22692 | 10/1/2011 | 10/21/2011 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 81,494.19 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 22542 | 10/17/2011 | 10/17/2011 | 9 | DGMI | DGMI | | | | Chamberlain Capital TT | debit | keepcurrency | debit | a=bank | USD | (2,570.00) | (2,670.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 22682 | 10/21/2011 | 10/21/2011 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 400,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 22688 | 10/21/2011 | 10/21/2011 | 19 | TDQB | TDQB | L-RPCC | Quarry:RPC:6%:Demand | 400,000 | RPC Strategies ck #1218 | buy stock | keepstock | buy stock | a=bank | CAD | (400,007.50) | - | (404,007.58) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 22774 | 10/25/2011 | 10/25/2011 | 20 | TDCO | TDCO | | | | forex ck #329 | forex debit | nothing | forex debit | a=bank | USD | (99,900.10) | (100,899.10) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 22774 | 10/25/2011 | 10/25/2011 | 5 | CASH | CASH | | | | forex ck #329 | forex credit | nothing | forex credit | | CAD | 99,700.00 | - | 99,700.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 22802 | 10/25/2011 | 10/25/2011 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (86.25) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 22802 | 10/25/2011 | 10/25/2011 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 85.23 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 22810 | 10/25/2011 | 10/25/2011 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (208,437.28) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 22810 | 10/25/2011 | 10/25/2011 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 206,786.49 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 23180 | 10/31/2011 | 11/1/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (1,133.45) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 23181 | 10/31/2011 | 11/1/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (965.75) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 23166 | 11/1/2011 | 11/1/2011 | 19 | TDQB | TDQB | | | | Airfare ck #1244 | debit | keepcurrency | debit | a=bank | CAD | (2,002.42) | - | (2,102.42) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 23693 | 11/10/2011 | 5/14/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=custom | CAD | (12,044.85) | - | (12,374.44) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 23693 | 11/10/2011 | 5/14/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | EUR | 8,609.00 | - | - | - | 8,756.99 | - |
| XM LIVE | 15 | ACCO | ACCO | 23648 | 11/10/2011 | 11/14/2011 | 4 | BSIT | BSIT | | | | Hendrikus Veldhuis TT | debit | keepcurrency | debit | a=bank | EUR | (8,657.00) | - | - | - | (8,757.00) | - |
| XM LIVE | 15 | ACCO | ACCO | 23794 | 11/15/2011 | 11/15/2011 | 16 | REST | REST | UVFT-R | UV Flu | 1,943,178 | receive stock | buy stock | keepstock | buy stock | a=bank | USD | - | (100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 24351 | 11/29/2011 | 11/30/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (22.60) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 24352 | 11/29/2011 | 11/30/2011 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (725.84) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 24325 | 11/30/2011 | 12/1/2011 | 19 | TDQB | TDQB | | | | Freeport Energy ck #1938 | credit | keepcurrency | credit | a=bank | CAD | 20,000.00 | - | 20,000.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 24640 | 12/1/2011 | 12/1/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (5,000.00) | (5,250.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 24641 | 12/1/2011 | 12/1/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25125 | 12/16/2011 | 12/16/2011 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (20,000.00) | - | (21,000.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25129 | 12/16/2011 | 1/2/2012 | 3 | WORK | WORK | | | | internal transfer STEV | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 250,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25338 | 12/28/2011 | 12/29/2011 | 4 | BSIT | BSIT | MRP | Mira Resources | 200,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (29,408.17) | - | (30,290.42) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25374 | 12/31/2011 | 1/2/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (133.44) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25375 | 12/31/2011 | 1/2/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (990.80) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25547 | 12/31/2011 | 1/2/2012 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (42.29) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25548 | 12/31/2011 | 1/2/2012 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (73.50) | - | - | - |

| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| XM LIVE | 15 | ACCO | ACCO | 25757 | 1/2/2012 | 1/3/2012 | 20 | TDCO | TDCO | | | | forex ck #387 | forex debit | nothing | forex debit | a=bank | USD | (86,008.82) | (86,868.91) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25757 | 1/2/2012 | 1/3/2012 | 5 | CASH | CASH | | | | forex ck #387 | forex credit | nothing | forex credit | | CAD | 85,485.55 | - | 85,485.55 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25810 | 1/3/2012 | 1/4/2012 | 20 | TDCO | TDCO | | | | forex ck #390 | forex debit | nothing | forex debit | a=bank | USD | (99,907.60) | (100,906.68) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25810 | 1/3/2012 | 1/4/2012 | 5 | CASH | CASH | | | | forex ck #390 | forex credit | nothing | forex credit | | CAD | 99,700.00 | - | 99,700.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25822 | 1/3/2012 | 1/4/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (61,768.79) | (62,386.48) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25822 | 1/3/2012 | 1/4/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 62,300.00 | - | 62,300.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25772 | 1/3/2012 | 1/3/2012 | 19 | TDQB | TDQB | L-RPCC | Quarry:RPC:6%:Demand | 150,000 | RPC Strategies ck #1366 | buy stock | keepstock | buy stock | a=bank | CAD | (150,000.00) | - | (151,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25786 | 1/3/2012 | 1/3/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25898 | 1/4/2012 | 1/5/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (2,082.97) | (2,103.80) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25898 | 1/4/2012 | 1/5/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 2,100.88 | - | 2,100.88 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25847 | 1/4/2012 | 1/4/2012 | 19 | TDQB | TDQB | | | | Airfares ck #1360 | debit | keepcurrency | debit | a=bank | CAD | (2,000.88) | - | (2,100.88) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25964 | 1/6/2012 | 1/9/2012 | 20 | TDCO | TDCO | | | | forex ck #393 | forex debit | nothing | forex debit | a=bank | USD | (10,407.11) | (10,511.18) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25964 | 1/6/2012 | 1/9/2012 | 5 | CASH | CASH | | | | forex ck #393 | forex credit | nothing | forex credit | | CAD | 10,500.00 | - | 10,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 25943 | 1/6/2012 | 1/6/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26071 | 1/9/2012 | 1/12/2012 | 2 | BCEL | BCEL | | | | Holladay ck #540 | debit | keepcurrency | debit | a=bank | USD | (20.00) | (120.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26069 | 1/9/2012 | 2/15/2012 | 16 | REST | REST | UVFT-R | UV Flu | (1,800,321) | deliver stock | stock delivery | keepcurrency | stock delivery | a=custom | USD | - | (250.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26069 | 1/9/2012 | 2/15/2012 | 16 | REST | REST | | | | deliver stock | debit | keepcurrency | Fedex #29292488549 | cid=seq0;bid=seq0;aid=seq0;a=custom;cashbank=0;cashaccount=50;custom | USD | - | (75.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26072 | 1/16/2012 | 2/6/2012 | 45 | SIL2 | SIL2 | UVFT | UV Flu | 968,348 | receive stock | buy stock | keepstock | buy stock | a=bank | USD | - | (100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26074 | 1/16/2012 | 3/26/2012 | 41 | HYPP | HYPP | UVFT | UV Flu | 831,973 | receive stock | buy stock | keepstock | buy stock | a=bank | USD | (457.51) | (557.51) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26301 | 1/17/2012 | 1/20/2012 | 2 | BCEL | BCEL | | | | Holladay ck#547 | debit | keepcurrency | debit | a=bank | USD | (20.00) | (120.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26473 | 1/20/2012 | 2/16/2012 | 41 | HYPP | HYPP | UVFT | UV Flu | (831,973) | stock split | split stock out | keepaccount | split stock out | a=custom;cashbank=0;cashaccount=0 | USD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26473 | 1/20/2012 | 2/16/2012 | 41 | HYPP | HYPP | UVFT | UV Flu | 207,994 | stock split | split stock in | keepaccount | split stock in | aid=seq0;cashbank=0;cashaccount=0 | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26468 | 1/20/2012 | 1/26/2012 | 45 | SIL2 | SIL2 | UVFT | UV Flu | (968,348) | stock split | split stock out | keepaccount | split stock out | a=custom;cashbank=0;cashaccount=0 | USD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26468 | 1/20/2012 | 1/26/2012 | 45 | SIL2 | SIL2 | UVFT | UV Flu | 242,087 | stock split | split stock in | keepaccount | split stock in | aid=seq0;cashbank=0;cashaccount=0 | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26471 | 1/20/2012 | 1/26/2012 | 16 | REST | REST | UVFT-R | UV Flu | (142,857) | stock split | split stock out | keepaccount | split stock out | a=custom;cashbank=0;cashaccount=0 | USD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26471 | 1/20/2012 | 1/26/2012 | 16 | REST | REST | UVFT-R | UV Flu | 35,714 | stock split | split stock in | keepaccount | split stock in | aid=seq0;cashbank=0;cashaccount=0 | | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26381 | 1/20/2012 | 1/23/2012 | 20 | TDCO | TDCO | | | | forex ck #398 | forex debit | nothing | forex debit | a=bank | USD | (10,553.55) | (10,659.09) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26381 | 1/20/2012 | 1/23/2012 | 5 | CASH | CASH | | | | forex ck #398 | forex credit | nothing | forex credit | | CAD | 10,500.00 | - | 10,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26319 | 1/20/2012 | 1/20/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26431 | 1/25/2012 | 1/25/2012 | 4 | BSIT | BSIT | MRP | Mira Resources | (75,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 18,481.32 | - | 17,926.88 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26450 | 1/25/2012 | 1/25/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | CAD | - | - | (17,926.88) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26450 | 1/25/2012 | 1/25/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | USD | - | 17,838.49 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26560 | 1/25/2012 | 1/27/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | CAD | - | - | (4,899.91) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26560 | 1/25/2012 | 1/27/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | USD | - | 4,930.45 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26561 | 1/25/2012 | 1/27/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | CAD | - | - | (7,964.34) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26561 | 1/25/2012 | 1/27/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | USD | - | 8,013.98 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26476 | 1/26/2012 | 1/26/2012 | 4 | BSIT | BSIT | MRP | Mira Resources | (125,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 30,812.84 | - | 29,888.45 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26570 | 1/27/2012 | 1/28/2012 | 25 | VPQU | VPQU | FEWP | Far East Wind Power | (3,900) | internal transfer | stock delivery | keepcurrency | stock delivery | a=custom;cashbank=0;cashaccount=0 | USD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26712 | 1/30/2012 | 1/31/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (288.90) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 26713 | 1/30/2012 | 1/31/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (62.34) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27018 | 2/1/2012 | 2/1/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27080 | 2/2/2012 | 2/2/2012 | 19 | TDQB | TDQB | | | | Wildcat Coal ck #1443 | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27218 | 2/3/2012 | 2/6/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (4,000.00) | - | (4,200.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27353 | 2/9/2012 | 2/9/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (15,000.00) | - | (15,750.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27426 | 2/11/2012 | 2/11/2012 | 3 | WORK | WORK | | | | Accord 12 fees | debit | keepcurrency | debit | a=custom | USD | - | (2,500.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27571 | 2/14/2012 | 2/14/2012 | 45 | SIL2 | SIL2 | UVFT | UV Flu | (202,117) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 32,059.54 | 31,097.75 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27646 | 2/15/2012 | 2/16/2012 | 19 | TDQB | TDQB | L-RPCC | Quarry:RPC:6%:Demand | 100,000 | RPC Stategies ck #1463 | buy stock | keepstock | buy stock | a=bank | CAD | (100,010.00) | - | (101,010.10) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27700 | 2/15/2012 | 2/16/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (107,137.48) | (108,208.85) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27700 | 2/15/2012 | 2/16/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 106,473.19 | - | 106,473.19 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27653 | 2/15/2012 | 2/15/2012 | 3 | WORK | WORK | | | | internal transfer STEV | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 80,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27814 | 2/16/2012 | 2/17/2012 | 26 | XPHO | XPHO | | | | Buy phone | debit | keepcurrency | debit | a=custom | USD | - | (285.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27782 | 2/17/2012 | 2/17/2012 | 19 | TDQB | TDQB | | | | Mike Veldhuis ck #72 | credit | keepcurrency | credit | a=bank | CAD | 3,150.00 | - | 3,150.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27813 | 2/17/2012 | 2/17/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27846 | 2/20/2012 | 2/20/2012 | 41 | HYPP | HYPP | UVFT | UV Flu | (50,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 7,498.48 | 7,311.02 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27962 | 2/20/2012 | 2/21/2012 | 20 | TDCO | TDCO | | | | forex ck #424 | forex debit | nothing | forex debit | a=bank | USD | (6,956.46) | (7,026.02) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 27962 | 2/20/2012 | 2/21/2012 | 5 | CASH | CASH | | | | forex ck #424 | forex credit | nothing | forex credit | | CAD | 6,817.16 | - | 6,817.16 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 28106 | 2/23/2012 | 3/19/2012 | 9 | DGMI | DGMI | | | | McMillan TT Monterra | debit | keepcurrency | debit | a=bank | USD | (20.56) | (120.56) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 28684 | 2/29/2012 | 3/1/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (148.10) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 28685 | 2/29/2012 | 3/1/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (231.45) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 29320 | 3/12/2012 | 3/12/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (20,000.00) | - | (21,000.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 29352 | 3/13/2012 | 3/13/2012 | 20 | TDCO | TDCO | | | | forex ck #441 | forex debit | nothing | forex debit | a=bank | USD | (26,118.68) | (26,379.87) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 29352 | 3/13/2012 | 3/13/2012 | 5 | CASH | CASH | | | | forex ck #441 | forex credit | nothing | forex credit | | CAD | 25,465.54 | - | 25,465.54 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 29354 | 3/13/2012 | 3/13/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (9,762.18) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 29354 | 3/13/2012 | 3/13/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 9,423.80 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 29385 | 3/13/2012 | 3/13/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (2,500.00) | (2,625.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 29419 | 3/14/2012 | 3/14/2012 | 3 | WORK | WORK | | | | Red Rock 12 fees | debit | keepcurrency | debit | a=custom | USD | - | (1,200.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 29640 | 3/19/2012 | 3/21/2012 | 8 | DGMN | DGMN | AAPH | American Petro-Hunter | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 4,112.00 | 4,009.20 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 29807 | 3/23/2012 | 3/23/2012 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 192,250.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30091 | 3/27/2012 | 3/30/2012 | 20 | TDCO | TDCO | | | | forex ck #449 | forex debit | nothing | forex debit | a=bank | USD | (147,951.00) | (149,430.51) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30091 | 3/27/2012 | 3/30/2012 | 5 | CASH | CASH | | | | forex ck #449 | forex credit | nothing | forex credit | | CAD | 144,693.86 | - | 144,693.86 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 29943 | 3/27/2012 | 3/27/2012 | 19 | TDQB | TDQB | | | | 1/2 drafts to Red Rock ck #1603 | debit | keepcurrency | debit | a=bank | CAD | (31,261.25) | - | (31,573.86) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30042 | 3/29/2012 | 3/29/2012 | 19 | TDQB | TDQB | | | | RPC Strategies ck #1609 | debit | keepcurrency | debit | a=bank | CAD | (112,000.00) | - | (113,120.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30100 | 3/29/2012 | 3/30/2012 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (127.12) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30201 | 3/29/2012 | 3/30/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (232.13) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30202 | 3/29/2012 | 3/30/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (260.06) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30475 | 3/30/2012 | 3/30/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (268.58) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30475 | 3/30/2012 | 3/30/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 260.06 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 29863 | 4/1/2012 | 4/3/2012 | 3 | WORK | WORK | | | | internal transfer KOMK #2 | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (50,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30544 | 4/3/2012 | 4/3/2012 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 1,000,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30554 | 4/3/2012 | 4/3/2012 | 41 | HYPP | HYPP | UVFT | UV Flu | (27,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 3,187.59 | 3,087.59 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30564 | 4/3/2012 | 4/3/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (7,000.00) | (7,350.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30565 | 4/3/2012 | 4/3/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30566 | 4/3/2012 | 4/3/2012 | 19 | TDQB | TDQB | | | | 0847865 BC ck #1623 | debit | keepcurrency | debit | a=bank | CAD | (25,000.00) | - | (25,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30572 | 4/3/2012 | 4/3/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (3,422.65) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30572 | 4/3/2012 | 4/3/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 3,307.40 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30583 | 4/3/2012 | 4/3/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (36,995.74) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30583 | 4/3/2012 | 4/3/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 35,750.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30559 | 4/3/2012 | 5/15/2012 | 19 | TDQB | TDQB | | | | Amex ck #1622 | debit | keepcurrency | debit | a=bank | CAD | (3,207.40) | - | (3,307.40) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30715 | 4/5/2012 | 4/5/2012 | 9 | DGMI | DGMI | | | | Oryon Technologies TT | debit | keepcurrency | debit | a=bank | USD | (75,070.00) | (75,820.70) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30828 | 4/10/2012 | 4/10/2012 | 3 | WORK | WORK | | | | Venture Capital First 12 fees | debit | keepcurrency | debit | a=custom | USD | - | (1,200.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30863 | 4/10/2012 | 4/10/2012 | 41 | HYPP | HYPP | UVFT | UV Flu | (38,850) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 4,536.22 | 4,422.81 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30945 | 4/11/2012 | 4/11/2012 | 3 | WORK | WORK | | | | internal transfer ONCS | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 269,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 30975 | 4/12/2012 | 4/12/2012 | 41 | HYPP | HYPP | UVFT | UV Flu | (72,250) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 7,292.42 | 7,110.11 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31016 | 4/13/2012 | 4/13/2012 | 19 | TDQB | TDQB | L-RPCC | Quarry:RPC:6%:Demand | 250,000 | RPC Strategies ck #1677 | buy stock | keepstock | buy stock | a=bank | CAD | (250,000.00) | - | (252,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31025 | 4/13/2012 | 4/13/2012 | 45 | SIL2 | SIL2 | UVFT | UV Flu | (39,970) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 3,124.97 | 3,024.97 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31028 | 4/13/2012 | 4/13/2012 | 41 | HYPP | HYPP | UVFT | UV Flu | (19,394) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 1,524.72 | 1,424.72 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31037 | 4/13/2012 | 4/13/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (254,100.83) | (256,641.84) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31037 | 4/13/2012 | 4/13/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 252,500.00 | - | 252,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31136 | 4/17/2012 | 4/17/2012 | 19 | TDQB | TDQB | L-RPCC | Quarry:RPC:6%:Demand | 100,000 | RPC Strategies ck #1684 | buy stock | keepstock | buy stock | a=bank | CAD | (100,000.00) | - | (101,000.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31218 | 4/17/2012 | 4/18/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (5,341.34) | (5,394.75) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31218 | 4/17/2012 | 4/18/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 5,250.00 | - | 5,250.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31160 | 4/17/2012 | 4/17/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (101,783.76) | (102,801.60) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31160 | 4/17/2012 | 4/17/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 101,000.00 | - | 101,000.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31203 | 4/17/2012 | 4/17/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31263 | 4/19/2012 | 4/19/2012 | 4 | BSIT | BSIT | ARW | Aroway Minerals | 250,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (177,382.53) | - | (182,704.01) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31278 | 4/19/2012 | 4/19/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (84,448.07) | (85,292.55) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31278 | 4/19/2012 | 4/19/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 83,004.01 | - | 83,004.01 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31276 | 4/19/2012 | 4/19/2012 | 20 | TDCO | TDCO | | | | forex ck #467 | forex debit | nothing | forex debit | a=bank | USD | (101,840.49) | (102,858.89) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31276 | 4/19/2012 | 4/19/2012 | 5 | CASH | CASH | | | | forex ck #467 | forex credit | nothing | forex credit | | CAD | 99,700.00 | - | 99,700.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31330 | 4/20/2012 | 4/20/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (5,000.00) | (5,250.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31452 | 4/23/2012 | 4/23/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (2,435.69) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31452 | 4/23/2012 | 4/23/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 2,350.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31436 | 4/23/2012 | 5/15/2012 | 19 | TDQB | TDQB | | | | Ice Sports ck #1706 | debit | keepcurrency | debit | a=bank | CAD | (2,250.00) | - | (2,350.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40385 | 4/25/2012 | 10/31/2012 | 19 | TDQB | TDQB | | | | Mark Hepplewhite ck #1717 | debit | keepcurrency | debit | a=bank | CAD | (50,000.00) | - | (50,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31525 | 4/25/2012 | 5/15/2012 | 19 | TDQB | TDQB | | | | Momentum ck #1716 | debit | keepcurrency | debit | a=bank | CAD | (11,200.00) | - | (11,312.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31599 | 4/26/2012 | 4/26/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (425,437.41) | (429,691.78) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31599 | 4/26/2012 | 4/26/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 415,312.00 | - | 415,312.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31553 | 4/26/2012 | 4/25/2012 | 19 | TDQB | TDQB | L-RPCC | Quarry:RPC:6%:Demand | 350,000 | Mike Veldhuis ck #1722 | buy stock | keepstock | buy stock | a=bank | CAD | (350,000.00) | - | (353,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31683 | 4/27/2012 | 4/27/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |







| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| XM LIVE | 15 | ACCO | ACCO | 31694 | 4/27/2012 | 4/27/2012 | 19 | TDQB | TDQB | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (10,739.49) | (10,846.88) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31694 | 4/27/2012 | 4/27/2012 | 19 | TDQB | TDQB | | | | forex | forex credit | nothing | forex credit | | CAD | 10,500.00 | - | 10,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40397 | 4/29/2012 | 5/27/2013 | 57 | LOAN | LOAN | L-RPCC | Quarry:RPC:6%:Demand | 24,316 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (4,053.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31856 | 4/30/2012 | 4/30/2012 | 3 | WORK | WORK | | | | internal transfer ONCS | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 95,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31871 | 4/30/2012 | 5/1/2012 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 451.95 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 31872 | 4/30/2012 | 5/1/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (0.01) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32054 | 5/1/2012 | 5/1/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (10,000.00) | (10,500.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32129 | 5/1/2012 | 5/2/2012 | 20 | TDCO | TDCO | | | | forex ck #481 | forex debit | nothing | forex debit | a=bank | USD | (0.01) | (0.01) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32129 | 5/1/2012 | 5/2/2012 | 5 | CASH | CASH | | | | forex ck #481 | forex credit | nothing | forex credit | | CAD | 0.01 | - | 0.01 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32369 | 5/8/2012 | 5/8/2012 | 3 | WORK | WORK | | | | repay April 4 advance | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 75,820.70 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32573 | 5/11/2012 | 5/11/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (5,107.85) | (5,158.93) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32573 | 5/11/2012 | 5/11/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 5,103.75 | - | 5,103.75 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32555 | 5/11/2012 | 5/15/2012 | 20 | TDCO | TDCO | | | | Red Rock draft ck #33 | debit | keepcurrency | debit | a=bank | CAD | (5,003.75) | - | (5,103.75) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32594 | 5/14/2012 | 5/14/2012 | 20 | TDCO | TDCO | | | | Brad Hoeppner ck #34 | debit | keepcurrency | debit | a=bank | CAD | (25,000.00) | - | (25,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32595 | 5/14/2012 | 5/14/2012 | 20 | TDCO | TDCO | | | | Andrew Cheshire ck #35 | debit | keepcurrency | debit | a=bank | CAD | (30,000.00) | - | (30,300.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32631 | 5/14/2012 | 5/14/2012 | 45 | SIL2 | SIL2 | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (27,893.07) | (28,172.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32631 | 5/14/2012 | 5/14/2012 | 45 | SIL2 | SIL2 | | | | forex | forex credit | nothing | forex credit | | CAD | 27,823.34 | - | 27,823.34 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32632 | 5/14/2012 | 5/14/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (27,749.11) | (28,026.60) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32632 | 5/14/2012 | 5/14/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 27,726.66 | - | 27,726.66 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32687 | 5/15/2012 | 5/15/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32688 | 5/15/2012 | 5/15/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (10,576.15) | (10,681.91) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 32688 | 5/15/2012 | 5/15/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 10,500.00 | - | 10,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33081 | 5/24/2012 | 5/25/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (20,000.00) | - | (21,000.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33085 | 5/24/2012 | 5/25/2012 | 3 | WORK | WORK | | | | BR repayment | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 130,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33062 | 5/24/2012 | 5/24/2012 | 20 | TDCO | TDCO | | | | Draft to Mike Veldhuis ck #72 | debit | keepcurrency | debit | a=bank | CAD | (287,461.08) | - | (290,335.69) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33111 | 5/24/2012 | 5/25/2012 | 41 | HYPP | HYPP | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (39,246.47) | (39,638.93) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33111 | 5/24/2012 | 5/25/2012 | 41 | HYPP | HYPP | | | | forex | forex credit | nothing | forex credit | | CAD | 40,000.00 | - | 40,000.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33121 | 5/24/2012 | 5/25/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (3,360.56) | (3,394.17) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33121 | 5/24/2012 | 5/25/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 3,336.40 | - | 3,336.40 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33122 | 5/24/2012 | 5/25/2012 | 45 | SIL2 | SIL2 | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (172,708.43) | (174,435.51) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33122 | 5/24/2012 | 5/25/2012 | 45 | SIL2 | SIL2 | | | | forex | forex credit | nothing | forex credit | | CAD | 172,276.66 | - | 172,276.66 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33123 | 5/24/2012 | 5/25/2012 | 9 | DGMI | DGMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (30,027.37) | (30,327.64) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33123 | 5/24/2012 | 5/25/2012 | 9 | DGMI | DGMI | | | | forex | forex credit | nothing | forex credit | | CAD | 30,100.00 | - | 30,100.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33125 | 5/24/2012 | 5/25/2012 | 19 | TDQB | TDQB | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (42,943.56) | (43,373.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33125 | 5/24/2012 | 5/25/2012 | 19 | TDQB | TDQB | | | | forex | forex credit | nothing | forex credit | | CAD | 41,985.80 | - | 41,985.80 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33231 | 5/24/2012 | 5/29/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (23,292.97) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33231 | 5/24/2012 | 5/29/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 23,636.83 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48833 | 5/29/2012 | 4/20/2013 | 3 | WORK | WORK | | | | Statement STVF | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (2,866.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33254 | 5/30/2012 | 5/30/2012 | 3 | WORK | WORK | | | | internal transfer STVF | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 700,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33792 | 5/30/2012 | 6/4/2012 | 20 | TDCO | TDCO | L-VELC | Coventry:Veldhuis:6%:Demand | 500,000 | Draft to Mike Veldhuis ck #81 | buy stock | keepstock | buy stock | a=bank | CAD | (500,007.50) | - | (505,007.58) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33366 | 5/30/2012 | 5/31/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (68,724.27) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33366 | 5/30/2012 | 5/31/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 70,007.58 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33341 | 5/31/2012 | 5/31/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (424,017.94) | (428,258.12) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33341 | 5/31/2012 | 5/31/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 435,000.00 | - | 435,000.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33486 | 5/31/2012 | 6/1/2012 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 168.55 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33487 | 5/31/2012 | 6/1/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (0.01) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33666 | 6/1/2012 | 6/1/2012 | 20 | TDCO | TDCO | | | | BMO MasterCard ck #87 | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33687 | 6/1/2012 | 6/1/2012 | 9 | DGMI | DGMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (5,004.92) | (5,054.97) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33687 | 6/1/2012 | 6/1/2012 | 9 | DGMI | DGMI | | | | forex | forex credit | nothing | forex credit | | CAD | 5,100.01 | - | 5,100.01 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 33983 | 6/7/2012 | 6/7/2012 | 3 | WORK | WORK | | | | Accord Fdn 12 fees | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (3,500.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40386 | 6/15/2012 | 10/31/2012 | 19 | TDQB | TDQB | | | | RPC Strategies ck #1832 | debit | keepcurrency | debit | a=bank | CAD | (112,000.00) | - | (113,120.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 34435 | 6/15/2012 | 6/18/2012 | 20 | TDCO | TDCO | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (110,793.34) | (111,901.27) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 34435 | 6/15/2012 | 6/18/2012 | 20 | TDCO | TDCO | | | | forex | forex credit | nothing | forex credit | | CAD | 113,120.00 | - | 113,120.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 34477 | 6/19/2012 | 6/19/2012 | 3 | WORK | WORK | | | | internal transfer CRCL | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 291,500.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 34554 | 6/19/2012 | 6/20/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (10,361.16) | (10,464.77) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 34554 | 6/19/2012 | 6/20/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 10,500.00 | - | 10,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 34513 | 6/19/2012 | 6/19/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 34482 | 6/19/2012 | 12/30/2012 | 3 | WORK | WORK | | | | internal transfer ECAU | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (225,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 34678 | 6/21/2012 | 6/22/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (32,237.33) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 34678 | 6/21/2012 | 6/22/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 32,250.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 34635 | 6/21/2012 | 6/21/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (15,000.00) | - | (15,750.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 34639 | 6/21/2012 | 6/21/2012 | 3 | WORK | WORK | | | | internal transfer boat | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | CAD | - | - | (16,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 34911 | 6/28/2012 | 6/28/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (5,000.00) | (5,250.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 34988 | 6/30/2012 | 7/1/2012 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 138.49 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 35264 | 7/1/2012 | 7/2/2012 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (31.77) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 35265 | 7/1/2012 | 7/2/2012 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (312.50) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 35458 | 7/3/2012 | 7/3/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 35460 | 7/3/2012 | 7/3/2012 | 20 | TDCO | TDCO | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (10,732.01) | (10,839.33) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 35460 | 7/3/2012 | 7/3/2012 | 20 | TDCO | TDCO | | | | forex | forex credit | nothing | forex credit | | CAD | 10,812.50 | - | 10,812.50 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 35515 | 7/4/2012 | 7/4/2012 | 20 | TDCO | TDCO | | | | BMO MasterCard ck #99 | debit | keepcurrency | debit | a=bank | CAD | (6,600.00) | - | (6,700.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 35520 | 7/4/2012 | 7/4/2012 | 18 | TDCH | TDCH | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (10,000.00) | (10,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 35520 | 7/4/2012 | 7/4/2012 | 18 | TDCH | TDCH | | | | forex | forex credit | nothing | forex credit | | CAD | 9,953.00 | - | 9,953.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 35955 | 7/19/2012 | 7/19/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (6,000.00) | (6,300.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 35957 | 7/19/2012 | 7/19/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (6,420.00) | - | (6,741.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 35967 | 7/19/2012 | 7/19/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (3,450.39) | (3,484.89) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 35967 | 7/19/2012 | 7/19/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 3,488.00 | - | 3,488.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36102 | 7/25/2012 | 7/25/2012 | 20 | TDCO | TDCO | | | | draft to Restoration Hardwood ck #119 | debit | keepcurrency | debit | a=bank | CAD | (5,956.50) | - | (6,056.50) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36115 | 7/25/2012 | 7/25/2012 | 20 | TDCO | TDCO | | | | forex ck #531 | forex debit | nothing | forex debit | a=bank | USD | (6,063.37) | (6,124.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36115 | 7/25/2012 | 7/25/2012 | 5 | CASH | CASH | | | | forex ck #531 | forex credit | nothing | forex credit | | CAD | 6,056.50 | - | 6,056.50 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36142 | 7/26/2012 | 11/2/2012 | 20 | TDCO | TDCO | | | | Draft to Northwest Refrigeration ck #120 | debit | keepcurrency | debit | a=bank | CAD | (5,359.16) | - | (5,459.16) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36370 | 7/30/2012 | 7/31/2012 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 81.11 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36371 | 7/30/2012 | 7/31/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (0.01) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36359 | 7/31/2012 | 7/31/2012 | 20 | TDCO | TDCO | | | | Update Blinds & Parts ck #121 | debit | keepcurrency | debit | a=bank | CAD | (1,300.00) | - | (1,400.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36586 | 8/1/2012 | 8/1/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (7,019.09) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36586 | 8/1/2012 | 8/1/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 6,851.67 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36753 | 8/7/2012 | 8/7/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36766 | 8/7/2012 | 8/7/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (9,953.22) | (10,052.75) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36766 | 8/7/2012 | 8/7/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 10,500.00 | - | 10,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36878 | 8/13/2012 | 8/13/2012 | 9 | DGMI | DGMI | | | | James Geiskopf TT | debit | keepcurrency | debit | a=bank | USD | (4,070.00) | (4,170.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36978 | 8/15/2012 | 8/16/2012 | 4 | BSIT | BSIT | | | | Hendrikus Veldhuis TT | debit | keepcurrency | debit | a=bank | EUR | (10,000.00) | - | - | - | (10,100.00) | - |
| XM LIVE | 15 | ACCO | ACCO | 36993 | 8/15/2012 | 8/16/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (12,390.00) | (12,639.04) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 36993 | 8/15/2012 | 8/16/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | EUR | 10,000.00 | - | - | - | 10,100.00 | - |
| XM LIVE | 15 | ACCO | ACCO | 37022 | 8/16/2012 | 8/16/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (30,000.00) | - | (31,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 37023 | 8/16/2012 | 8/16/2012 | 19 | TDQB | TDQB | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (32,450.81) | (32,775.32) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 37023 | 8/16/2012 | 8/16/2012 | 19 | TDQB | TDQB | | | | forex | forex credit | nothing | forex credit | | CAD | 31,500.00 | - | 31,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 37477 | 8/31/2012 | 9/1/2012 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 40.36 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 37478 | 8/31/2012 | 9/1/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (0.01) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 37919 | 9/1/2012 | 9/6/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (7,749.97) | (7,827.47) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 37919 | 9/1/2012 | 9/6/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 7,600.01 | - | 7,600.01 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 37797 | 9/4/2012 | 9/4/2012 | 19 | TDQB | TDQB | | | | BMO Mastercard ck #2008 | debit | keepcurrency | debit | a=bank | CAD | (7,500.00) | - | (7,600.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 38262 | 9/17/2012 | 9/17/2012 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 20,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 38335 | 9/17/2012 | 9/18/2012 | 20 | TDCO | TDCO | | | | forex ck #569 | forex debit | nothing | forex debit | a=bank | USD | (105.09) | (106.14) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 38335 | 9/17/2012 | 9/18/2012 | 5 | CASH | CASH | | | | forex ck #569 | forex credit | nothing | forex credit | | CAD | 100.00 | - | 100.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39310 | 9/24/2012 | 10/2/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (33,364.05) | (33,697.69) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39310 | 9/24/2012 | 10/2/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 32,600.01 | - | 32,600.01 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 38581 | 9/24/2012 | 9/24/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40387 | 9/27/2012 | 10/31/2012 | 19 | TDQB | TDQB | | | | RPC Strategies ck #2092 | debit | keepcurrency | debit | a=bank | CAD | (20,000.00) | - | (20,200.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 38812 | 9/28/2012 | 10/1/2012 | 3 | WORK | WORK | | | | internal transfer CRCL | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 77,500.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 38800 | 9/28/2012 | 9/28/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (10,000.00) | (10,500.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 38804 | 9/28/2012 | 9/28/2012 | 19 | TDQB | TDQB | | | | Brad Hoeppner ck #2098 | debit | keepcurrency | debit | a=bank | CAD | (1,800.00) | - | (1,900.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 38909 | 9/29/2012 | 9/30/2012 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (27.64) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39026 | 9/29/2012 | 9/30/2012 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 20.15 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39027 | 9/29/2012 | 9/30/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (0.01) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39401 | 10/3/2012 | 10/3/2012 | 19 | TDQB | TDQB | | | | BMO MasterCard ck #2116 | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39402 | 10/3/2012 | 10/3/2012 | 19 | TDQB | TDQB | | | | CIBC Visa ck #2117 | debit | keepcurrency | debit | a=bank | CAD | (3,000.00) | - | (3,100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39405 | 10/3/2012 | 10/3/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (5,000.00) | (5,250.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39416 | 10/3/2012 | 10/3/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (13,737.14) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39416 | 10/3/2012 | 10/3/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 13,200.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39471 | 10/4/2012 | 10/4/2012 | 19 | TDQB | TDQB | | | | Seca Marine ck #2122 | debit | keepcurrency | debit | a=bank | CAD | (1,113.56) | - | (1,213.56) | - | - | - |

| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| XM LIVE | 15 | ACCO | ACCO | 39566 | 10/8/2012 | 10/8/2012 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (25,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 3,656.71 | 3,547.01 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39579 | 10/9/2012 | 10/9/2012 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (5,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 666.32 | 566.32 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 38313 | 10/10/2012 | 10/10/2012 | 4 | BSIT | BSIT | ARW | Aroway Minerals | (250,000) | deliver stock | stock delivery | keepcurrency | stock delivery | a=bank | CAD | - | - | (100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40942 | 10/10/2012 | 11/7/2012 | 4 | BSIT | BSIT | | | | ARW delivery | debit | keepcurrency | debit | a=bank | USD | (50.06) | (150.06) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39747 | 10/12/2012 | 10/12/2012 | 50 | BMQB | BMQB | | | | CIBC visa ck #22 | debit | keepcurrency | debit | a=bank | CAD | (7,000.00) | - | (7,100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39940 | 10/12/2012 | 10/19/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (23,979.11) | (24,218.90) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39940 | 10/12/2012 | 10/19/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 23,463.56 | - | 23,463.56 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39896 | 10/18/2012 | 10/18/2012 | 50 | BMQB | BMQB | | | | BMO mastercard ck #25 | debit | keepcurrency | debit | a=bank | CAD | (15,000.00) | - | (15,150.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 39974 | 10/22/2012 | 10/22/2012 | 4 | BSIT | BSIT | AAPH | American Petro-Hunter | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 1,380.10 | 1,280.10 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40033 | 10/22/2012 | 10/22/2012 | 41 | HYPP | HYPP | ARW | Aroway Minerals | 440,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=custom | CAD | - | - | (220,000.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40071 | 10/22/2012 | 10/22/2012 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (26,195.94) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40071 | 10/22/2012 | 10/22/2012 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 25,455.47 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40154 | 10/24/2012 | 10/24/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (5,000.00) | (5,250.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40429 | 10/31/2012 | 11/1/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (3.99) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 40430 | 10/31/2012 | 11/1/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (1,901.07) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 41345 | 11/15/2012 | 11/19/2012 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (93,659.36) | (94,595.95) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 41345 | 11/15/2012 | 11/19/2012 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 93,237.89 | - | 93,237.89 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 41297 | 11/15/2012 | 11/17/2012 | 3 | WORK | WORK | | | | internal transfer ORYN | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 100,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 41472 | 11/21/2012 | 11/21/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 41502 | 11/21/2012 | 11/21/2012 | 26 | XPHO | XPHO | | | | buy phone | debit | keepcurrency | debit | a=custom | USD | - | (300.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 41666 | 11/27/2012 | 11/27/2012 | 3 | WORK | WORK | | | | Directors fees | debit | keepcurrency | debit | a=bank | USD | - | (100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 41691 | 11/28/2012 | 11/29/2012 | 4 | BSIT | BSIT | | | | Hendrikus Veldhuis TT | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 41955 | 11/30/2012 | 12/1/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (51.98) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 41956 | 11/30/2012 | 12/1/2012 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (3,802.69) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 43744 | 12/11/2012 | 1/7/2013 | 25 | VPQU | VPQU | ARW | Aroway Minerals | 225,000 | receive stock Atticus | buy stock | keepstock | buy stock | a=bank | CAD | - | - | (100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 42563 | 12/11/2012 | 12/11/2012 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (10,000.00) | (10,500.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 42708 | 12/13/2012 | 12/14/2012 | 26 | XPHO | XPHO | | | | buy phones | debit | keepcurrency | debit | a=custom | USD | - | (600.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 42848 | 12/18/2012 | 1/7/2013 | 8 | DGMN | DGMN | | | | Atticus Capital TT | credit | keepcurrency | credit | a=bank | USD | 10,197.88 | 10,197.88 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 43203 | 12/30/2012 | 12/31/2012 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (3.67) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 43204 | 12/30/2012 | 12/31/2012 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (489.50) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 43326 | 12/31/2012 | 1/1/2013 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (161.70) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 43327 | 12/31/2012 | 1/1/2013 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (3,448.66) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44147 | 1/14/2013 | 1/16/2013 | 9 | DGMI | DGMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (28,198.54) | (28,480.53) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44147 | 1/14/2013 | 1/16/2013 | 9 | DGMI | DGMI | | | | forex | forex credit | nothing | forex credit | | CAD | 27,606.68 | - | 27,606.68 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44055 | 1/14/2013 | 1/14/2013 | 3 | WORK | WORK | | | | internal transfer STEV | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 30,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44456 | 1/23/2013 | 1/23/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44545 | 1/25/2013 | 1/25/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (7,000.00) | - | (7,350.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44550 | 1/26/2013 | 1/26/2013 | 3 | WORK | WORK | | | | internal transfer PGroup | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 50,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44582 | 1/26/2013 | 1/28/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (49,504.95) | (50,000.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44582 | 1/26/2013 | 1/28/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 49,633.66 | - | 49,633.66 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44609 | 1/29/2013 | 1/29/2013 | 55 | BOCG | BOCG | | | | BMO ck #111 | debit | keepcurrency | debit | a=bank | CAD | (15,000.00) | - | (15,150.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44674 | 1/30/2013 | 2/1/2013 | 9 | DGMI | DGMI | | | | RPC Strategies TT | debit | keepcurrency | debit | a=bank | CAD | (112,160.00) | - | (113,281.60) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45184 | 1/30/2013 | 2/5/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (2,237.13) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45184 | 1/30/2013 | 2/5/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 2,175.63 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44670 | 1/30/2013 | 1/30/2013 | 4 | BSIT | BSIT | | | | Hendrikus Veldhuis TT | debit | keepcurrency | debit | a=bank | CAD | (5,500.00) | - | (5,600.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44671 | 1/30/2013 | 1/30/2013 | 3 | WORK | WORK | | | | Titans Season 1 | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 1,400.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44673 | 1/30/2013 | 1/30/2013 | 3 | WORK | WORK | | | | Titans Season 2 | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 850.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44663 | 1/30/2013 | 2/6/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44726 | 1/30/2013 | 1/31/2013 | 55 | BOCG | BOCG | L-REDC | BOCG:Red Rock Development Inc:6%:30/1/13 | 55,977 | Marine Chrysler draft | buy stock | keepstock | buy stock | a=bank | CAD | (55,985.14) | - | (56,544.99) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44883 | 1/31/2013 | 2/12/2013 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (0.01) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 44882 | 1/31/2013 | 2/1/2013 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (12.87) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45137 | 2/1/2013 | 2/1/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45359 | 2/6/2013 | 2/6/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (3,000.00) | (3,150.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45432 | 2/8/2013 | 2/8/2013 | 55 | BOCG | BOCG | | | | BMO card ck #127 | debit | keepcurrency | debit | a=bank | CAD | (15,000.00) | - | (15,150.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45528 | 2/12/2013 | 2/12/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (20,000.00) | - | (21,000.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45654 | 2/12/2013 | 2/14/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (400,025.94) | (404,026.20) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45654 | 2/12/2013 | 2/14/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 396,105.69 | - | 396,105.69 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45545 | 2/12/2013 | 2/12/2013 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (200,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45552 | 2/12/2013 | 2/12/2013 | 3 | WORK | WORK | | | | internal transfer ECAU | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 775,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45617 | 2/13/2013 | 2/13/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (40,000.00) | - | (42,000.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45657 | 2/14/2013 | 2/14/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (3,000.00) | (3,150.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45688 | 2/15/2013 | 2/15/2013 | 55 | BOCG | BOCG | | | | Harold James Phillips ck #134 | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45741 | 2/15/2013 | 2/18/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (5,115.19) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45741 | 2/15/2013 | 2/18/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 5,100.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45732 | 2/18/2013 | 2/18/2013 | 9 | DGMI | DGMI | | | | Oryon Technologies TT | debit | keepcurrency | debit | a=bank | USD | (50,070.00) | (50,570.70) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45766 | 2/19/2013 | 2/19/2013 | 3 | WORK | WORK | | | | internal transfer STEV | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 45,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45773 | 2/19/2013 | 2/19/2013 | 3 | WORK | WORK | | | | internal transfer ECAU | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 2,500,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45902 | 2/20/2013 | 3/1/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (338,541.03) | (341,926.44) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45902 | 2/20/2013 | 3/1/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 342,772.79 | - | 342,772.79 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45810 | 2/20/2013 | 3/21/2013 | 9 | DGMI | DGMI | | | | Mike Veldhuis TT | debit | keepcurrency | debit | a=bank | CAD | (339,389.00) | - | (342,782.89) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 45970 | 2/25/2013 | 2/25/2013 | 3 | WORK | WORK | | | | director fees | debit | keepcurrency | debit | a=bank | USD | - | (100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46015 | 2/26/2013 | 2/26/2013 | 3 | WORK | WORK | | | | Director fees | debit | keepcurrency | debit | a=bank | USD | - | (100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46072 | 2/26/2013 | 2/26/2013 | 9 | DGMI | DGMI | | | | RPC Strategies TT | debit | keepcurrency | debit | a=bank | USD | (154,446.00) | (155,990.46) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46574 | 2/28/2013 | 3/6/2013 | 9 | DGMI | DGMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (2,369.08) | (2,392.77) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46574 | 2/28/2013 | 3/6/2013 | 9 | DGMI | DGMI | | | | forex | forex credit | nothing | forex credit | | CAD | 2,400.74 | - | 2,400.74 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46324 | 2/28/2013 | 3/1/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 731.61 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46325 | 2/28/2013 | 3/1/2013 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (2,338.43) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46655 | 3/4/2013 | 3/5/2013 | 49 | HELI | HELI | ORYN | Oryon Holdings | 50,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | USD | (15,611.10) | (16,001.38) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46679 | 3/5/2013 | 3/5/2013 | 9 | DGMI | DGMI | | | | 0847865 BC TT | debit | keepcurrency | debit | a=bank | CAD | (112,160.00) | - | (113,281.60) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46776 | 3/5/2013 | 3/7/2013 | 8 | DGMN | DGMN | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (175,419.28) | (177,173.47) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46776 | 3/5/2013 | 3/7/2013 | 8 | DGMN | DGMN | | | | forex | forex credit | nothing | forex credit | | CAD | 178,909.69 | - | 178,909.69 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46726 | 3/6/2013 | 3/6/2013 | 9 | DGMI | DGMI | | | | Galloway Energy TT | debit | keepcurrency | debit | a=bank | CAD | (50,040.00) | - | (50,540.40) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46733 | 3/6/2013 | 3/6/2013 | 55 | BOCG | BOCG | | | | BMO MasterCard ck #164 | debit | keepcurrency | debit | a=bank | CAD | (15,000.00) | - | (15,150.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46960 | 3/8/2013 | 3/12/2013 | 9 | DGMI | DGMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (15,596.54) | (15,752.51) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46960 | 3/8/2013 | 3/12/2013 | 9 | DGMI | DGMI | | | | forex | forex credit | nothing | forex credit | | CAD | 15,851.50 | - | 15,851.50 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46824 | 3/8/2013 | 3/8/2013 | 3 | WORK | WORK | | | | Accord 13 fees | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (2,500.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46839 | 3/8/2013 | 3/8/2013 | 55 | BOCG | BOCG | | | | TD Visa ck #173 | debit | keepcurrency | debit | a=bank | CAD | (5,500.00) | - | (5,600.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46910 | 3/11/2013 | 3/11/2013 | 9 | DGMI | DGMI | | | | Oryon Technologies TT | debit | keepcurrency | debit | a=bank | USD | (50,070.00) | (50,570.70) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46969 | 3/12/2013 | 3/12/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (5,000.00) | (5,250.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46971 | 3/12/2013 | 3/12/2013 | 3 | WORK | WORK | ORYN | Oryon Holdings | 500,000 | internal transfer | transfer stock in | keepstock | transfer stock in | sid=seq0;cid=seq0;cashbank=0;cashaccount=0;stock=seq0 | USD | - | (100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 46972 | 3/12/2013 | 3/12/2013 | 3 | WORK | WORK | | | | buy ORYN 500 000 | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (125,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47009 | 3/13/2013 | 3/13/2013 | 26 | XPHO | XPHO | | | | Buy phone | debit | keepcurrency | debit | a=custom | USD | - | (300.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47046 | 3/14/2013 | 3/15/2013 | 49 | HELI | HELI | ORYN | Oryon Holdings | 54,065 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | USD | (21,507.05) | (22,044.73) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47199 | 3/20/2013 | 3/20/2013 | 55 | BOCG | BOCG | | | | BMO Mastercard ck #183 | debit | keepcurrency | debit | a=bank | CAD | (15,000.00) | - | (15,150.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47202 | 3/20/2013 | 3/20/2013 | 55 | BOCG | BOCG | | | | CIBC Visa ck #184 | debit | keepcurrency | debit | a=bank | CAD | (7,500.00) | - | (7,600.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47248 | 3/20/2013 | 3/21/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (25,809.24) | (26,067.33) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47248 | 3/20/2013 | 3/21/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 26,098.40 | - | 26,098.40 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47253 | 3/20/2013 | 3/21/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (398.14) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47253 | 3/20/2013 | 3/21/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 398.70 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47219 | 3/20/2013 | 3/21/2013 | 55 | BOCG | BOCG | | | | VC Holdings ck #186 | debit | keepcurrency | debit | a=bank | CAD | (13,860.00) | - | (13,998.60) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47407 | 3/21/2013 | 3/26/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (9,604.20) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47407 | 3/21/2013 | 3/26/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 9,665.83 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47272 | 3/21/2013 | 3/21/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (3,000.00) | (3,150.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47273 | 3/21/2013 | 3/21/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47448 | 3/21/2013 | 4/15/2013 | 9 | DGMI | DGMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (455,743.25) | (460,300.68) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47448 | 3/21/2013 | 4/15/2013 | 9 | DGMI | DGMI | | | | forex | forex credit | nothing | forex credit | | CAD | 458,809.68 | - | 458,809.68 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122936 | 3/27/2013 | 11/23/2018 | 57 | LOAN | LOAN | L-GREC | Charterhouse:Greenestone:3%Pledge | 453,147 | loan advance | buy stock | keepstock | buy stock | a=custom | CAD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47447 | 3/27/2013 | 4/17/2013 | 9 | DGMI | DGMI | | | | McMillan TT | debit | keepcurrency | debit | a=bank | CAD | (453,307.28) | - | (457,840.35) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48026 | 3/28/2013 | 4/1/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (3,000.00) | (3,150.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48001 | 3/29/2013 | 3/30/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (644.58) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48001 | 3/29/2013 | 3/30/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 651.09 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47674 | 3/29/2013 | 3/30/2013 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (494.04) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47675 | 3/29/2013 | 3/30/2013 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (731.50) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47790 | 3/29/2013 | 3/30/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 1,343.38 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47791 | 3/29/2013 | 3/30/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | CAD | - | - | 80.41 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 47556 | 3/30/2013 | 3/30/2013 | 3 | WORK | WORK | | | | Red Rock 13 fees | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (2,400.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48164 | 4/2/2013 | 4/10/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (1,392.29) | (1,406.21) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48164 | 4/2/2013 | 4/10/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 1,398.28 | - | 1,398.28 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48142 | 4/3/2013 | 4/3/2013 | 55 | BOCG | BOCG | | | | Air fares ck #210 | debit | keepcurrency | debit | a=bank | CAD | (1,298.28) | - | (1,398.28) | - | - | - |

| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| XM LIVE | 15 | ACCO | ACCO | 48147 | 4/3/2013 | 4/3/2013 | 9 | DGMI | DGMI | | | | Mecum Auctions TT | debit | keepcurrency | debit | a=bank | USD | (20,070.00) | (20,270.70) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48332 | 4/8/2013 | 4/8/2013 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 2,000,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48380 | 4/9/2013 | 4/9/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (3,000.00) | (3,150.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48551 | 4/10/2013 | 4/12/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (7,416.26) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48551 | 4/10/2013 | 4/12/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | EUR | - | - | - | - | 5,600.00 | - |
| XM LIVE | 15 | ACCO | ACCO | 48489 | 4/11/2013 | 4/12/2013 | 4 | BSIT | BSIT | | | | Hendrikus Veldhuis TT | debit | keepcurrency | debit | a=bank | EUR | (5,500.00) | - | - | - | (5,600.00) | - |
| XM LIVE | 15 | ACCO | ACCO | 48460 | 4/11/2013 | 4/11/2013 | 40 | CBHQ | CBHQ | ARW | Aroway Minerals | 60,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (26,650.40) | - | (27,316.66) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48550 | 4/11/2013 | 4/12/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (27,471.19) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48550 | 4/11/2013 | 4/12/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 27,316.66 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48555 | 4/12/2013 | 4/12/2013 | 55 | BOCG | BOCG | | | | buy 40 gold coins draft | debit | keepcurrency | debit | a=custom | USD | (62,244.50) | (65,356.73) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48590 | 4/15/2013 | 4/15/2013 | 55 | BOCG | BOCG | | | | buy 20 gold coins draft | debit | keepcurrency | debit | a=custom | USD | (28,563.40) | (29,991.57) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48604 | 4/15/2013 | 4/15/2013 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (125,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48626 | 4/16/2013 | 4/16/2013 | 55 | BOCG | BOCG | | | | buy 20 gold coins draft | debit | keepcurrency | debit | a=custom | USD | (28,722.00) | (30,158.10) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48681 | 4/17/2013 | 4/17/2013 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (250,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48741 | 4/18/2013 | 4/18/2013 | 9 | DGMI | DGMI | | | | Galloway Energy TT | debit | keepcurrency | debit | a=bank | CAD | (25,040.00) | - | (25,290.40) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48761 | 4/18/2013 | 4/18/2013 | 41 | HYPP | HYPP | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (24,662.03) | (24,908.65) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48761 | 4/18/2013 | 4/18/2013 | 41 | HYPP | HYPP | | | | forex | forex credit | nothing | forex credit | | CAD | 25,165.34 | - | 25,165.34 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48890 | 4/22/2013 | 4/22/2013 | 55 | BOCG | BOCG | | | | Airfares ck #236 | debit | keepcurrency | debit | a=bank | CAD | (11,648.00) | - | (11,764.48) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48911 | 4/22/2013 | 4/22/2013 | 41 | HYPP | HYPP | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (11,487.63) | (11,602.51) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48911 | 4/22/2013 | 4/22/2013 | 41 | HYPP | HYPP | | | | forex | forex credit | nothing | forex credit | | CAD | 11,764.48 | - | 11,764.48 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48976 | 4/23/2013 | 4/23/2013 | 9 | DGMI | DGMI | | | | Mike Veldhuis TT | debit | keepcurrency | debit | a=bank | USD | (72,075.94) | (72,796.70) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 48977 | 4/23/2013 | 4/23/2013 | 9 | DGMI | DGMI | | | | Mike Veldhuis TT | debit | keepcurrency | debit | a=bank | USD | (389,303.87) | (393,196.91) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49097 | 4/26/2013 | 4/26/2013 | 40 | CBHQ | CBHQ | RKR | Rokmaster Resosources | 49,500 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (11,617.64) | - | (11,908.08) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49124 | 4/29/2013 | 4/29/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (20,000.00) | - | (21,000.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49173 | 4/29/2013 | 4/29/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (32,835.84) | (33,164.20) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49173 | 4/29/2013 | 4/29/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 32,908.08 | - | 32,908.08 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 50960 | 4/29/2013 | 5/27/2013 | 57 | LOAN | LOAN | L-RPCC | Quarry:RPC:6%:Demand | 89,847 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (14,975.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49498 | 4/30/2013 | 5/14/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | EUR | - | - | - | - | 0.01 | - |
| XM LIVE | 15 | ACCO | ACCO | 49952 | 4/30/2013 | 5/5/2013 | 3 | WORK | WORK | | | | internal transfer RCCV | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | CAD | - | - | (50,450.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49496 | 4/30/2013 | 5/1/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 1,977.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49497 | 4/30/2013 | 5/1/2013 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (23.39) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49733 | 5/1/2013 | 5/1/2013 | 8 | DGMN | DGMN | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (23.37) | (23.60) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49733 | 5/1/2013 | 5/1/2013 | 8 | DGMN | DGMN | | | | forex | forex credit | nothing | forex credit | | CAD | 23.39 | - | 23.39 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49746 | 5/1/2013 | 5/1/2013 | 9 | DGMI | DGMI | | | | RPC Strategies TT | debit | keepcurrency | debit | a=bank | CAD | (224,160.00) | - | (226,401.60) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49747 | 5/1/2013 | 5/1/2013 | 8 | DGMN | DGMN | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (225,264.46) | (227,517.10) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49747 | 5/1/2013 | 5/1/2013 | 8 | DGMN | DGMN | | | | forex | forex credit | nothing | forex credit | | CAD | 226,401.60 | - | 226,401.60 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49887 | 5/3/2013 | 5/3/2013 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | CAD | - | - | 5,000.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49983 | 5/6/2013 | 5/14/2013 | 9 | DGMI | DGMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (385,995.98) | (389,855.94) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 49983 | 5/6/2013 | 5/14/2013 | 9 | DGMI | DGMI | | | | forex | forex credit | nothing | forex credit | | CAD | 384,719.10 | - | 384,719.55 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51057 | 5/6/2013 | 5/29/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (16,310.41) | (16,473.51) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51057 | 5/6/2013 | 5/29/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 16,837.24 | - | 16,837.24 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51017 | 5/6/2013 | 5/28/2013 | 9 | DGMI | DGMI | | | | McMillan TT Irma Bazan | debit | keepcurrency | debit | a=bank | CAD | (335,910.45) | - | (339,269.55) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 50223 | 5/10/2013 | 5/10/2013 | 9 | DGMI | DGMI | | | | Westwood Motorcars TT | debit | keepcurrency | debit | a=bank | USD | (46,670.00) | (47,136.70) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 50324 | 5/14/2013 | 5/14/2013 | 40 | CBHQ | CBHQ | RKR | Rokmaster Resosources | 500 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (326.79) | - | (426.79) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 50594 | 5/14/2013 | 5/18/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (423.94) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 50594 | 5/14/2013 | 5/18/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 426.79 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 50709 | 5/22/2013 | 5/22/2013 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (400,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 50922 | 5/24/2013 | 5/24/2013 | 8 | DGMN | DGMN | | | | Fitzroy TT | credit | keepcurrency | credit | a=bank | USD | 125,000.00 | 125,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 50924 | 5/24/2013 | 5/24/2013 | 23 | VERN | VERN | ORYN | Oryon Holdings | (500,000) | internal transfer | stock delivery | keepcurrency | stock delivery | a=bank;cashbank=0;cashaccount=0 | USD | - | (100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51046 | 5/29/2013 | 5/29/2013 | 41 | HYPP | HYPP | RKR | Rokmaster Resosources | 38,500 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (8,681.21) | - | (8,898.24) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51145 | 5/29/2013 | 5/30/2013 | 40 | CBHQ | CBHQ | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (11,520.78) | (11,635.99) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51145 | 5/29/2013 | 5/30/2013 | 40 | CBHQ | CBHQ | | | | forex | forex credit | nothing | forex credit | | CAD | 11,687.83 | - | 11,687.83 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51080 | 5/29/2013 | 5/29/2013 | 18 | TDCH | TDCH | | | | Airfares ck #8 | debit | keepcurrency | debit | a=bank | CAD | (5,565.84) | - | (5,665.84) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51140 | 5/30/2013 | 5/30/2013 | 41 | HYPP | HYPP | RKR | Rokmaster Resosources | 3,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (823.99) | - | (923.99) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51083 | 5/30/2013 | 5/29/2013 | 57 | LOAN | LOAN | L-VELC | Coventry:Veldhuis:6%:Demand | 30,590 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (5,098.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51401 | 5/31/2013 | 6/1/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 1,221.73 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51402 | 5/31/2013 | 6/1/2013 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (176.33) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51930 | 6/1/2013 | 6/7/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (173.01) | (174.74) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51930 | 6/1/2013 | 6/7/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 176.33 | - | 176.33 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51961 | 6/7/2013 | 6/7/2013 | 9 | DGMI | DGMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (147,591.31) | (149,067.22) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 51961 | 6/7/2013 | 6/7/2013 | 9 | DGMI | DGMI | | | | forex | forex credit | nothing | forex credit | | CAD | 150,000.00 | - | 150,000.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52047 | 6/10/2013 | 6/11/2013 | 8 | DGMN | DGMN | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (4,112.63) | (4,153.76) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52047 | 6/10/2013 | 6/11/2013 | 8 | DGMN | DGMN | | | | forex | forex credit | nothing | forex credit | | CAD | 4,147.88 | - | 4,147.88 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52021 | 6/10/2013 | 6/10/2013 | 5 | CASH | CASH | | | | buy 100 gold coins | debit | keepcurrency | debit | a=bank | CAD | (146,807.50) | - | (154,147.88) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52165 | 6/12/2013 | 6/12/2013 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (250,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52169 | 6/12/2013 | 6/12/2013 | 9 | DGMI | DGMI | | | | Aria Resort & Casino TT | debit | keepcurrency | debit | a=bank | USD | (50,070.00) | (50,570.70) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52471 | 6/19/2013 | 6/20/2013 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (150,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52592 | 6/20/2013 | 6/21/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (31,262.13) | (31,574.75) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52592 | 6/20/2013 | 6/21/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 32,200.00 | - | 32,200.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52549 | 6/20/2013 | 6/20/2013 | 3 | WORK | WORK | | | | internal transfer TUNG | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 112,400.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52551 | 6/20/2013 | 6/20/2013 | 3 | WORK | WORK | | | | internal transfer TQLA | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 400,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52557 | 6/20/2013 | 6/20/2013 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 20,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52560 | 6/20/2013 | 6/20/2013 | 4 | BSIT | BSIT | ARW | Aroway Minerals | (643,000) | internal transfer | stock delivery | keepcurrency | stock delivery | a=bank;cashbank=0;cashaccount=0 | CAD | - | - | (100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52605 | 6/21/2013 | 6/24/2013 | 4 | BSIT | BSIT | | | | Hendrikus Veldhuis TT | debit | keepcurrency | debit | a=bank | EUR | (45,000.00) | - | - | - | (45,450.00) | - |
| XM LIVE | 15 | ACCO | ACCO | 52640 | 6/21/2013 | 6/24/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (60,134.90) | (60,736.25) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52640 | 6/21/2013 | 6/24/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | EUR | 45,450.00 | - | - | - | 45,450.00 | - |
| XM LIVE | 15 | ACCO | ACCO | 52570 | 6/21/2013 | 6/21/2013 | 4 | BSIT | BSIT | ARW | Aroway Minerals | 80,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=custom | CAD | - | - | (32,100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 53520 | 6/29/2013 | 7/3/2013 | 45 | SIL2 | SIL2 | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (138.14) | (139.52) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 53520 | 6/29/2013 | 7/3/2013 | 45 | SIL2 | SIL2 | | | | forex | forex credit | nothing | forex credit | | CAD | 144.80 | - | 144.80 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52875 | 6/29/2013 | 6/30/2013 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (41.13) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 52876 | 6/29/2013 | 6/30/2013 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (158.01) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 53141 | 6/29/2013 | 6/30/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 763.10 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 53142 | 6/29/2013 | 6/30/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | CAD | - | - | 13.21 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 53896 | 7/5/2013 | 7/26/2013 | 9 | DGMI | DGMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (298,260.60) | (301,243.21) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 53896 | 7/5/2013 | 7/26/2013 | 9 | DGMI | DGMI | | | | forex | forex credit | nothing | forex credit | | CAD | 313,252.88 | - | 313,252.88 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 53638 | 7/5/2013 | 7/5/2013 | 5 | CASH | CASH | | | | buy 150 gold coins | debit | keepcurrency | debit | a=bank | CAD | (201,607.50) | - | (211,687.88) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 53684 | 7/8/2013 | 7/8/2013 | 62 | BCHA | BCHA | | | | Vancouver Police draft | debit | keepcurrency | debit | a=bank | CAD | (1,007.50) | - | (1,107.50) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 53690 | 7/8/2013 | 7/8/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 53743 | 7/9/2013 | 7/9/2013 | 5 | CASH | CASH | | | | buy 50 gold coins | debit | keepcurrency | debit | a=bank | CAD | (68,550.00) | - | (71,977.50) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 53787 | 7/10/2013 | 7/10/2013 | 9 | DGMI | DGMI | | | | RPC Strategies TT | debit | keepcurrency | debit | a=bank | USD | (300,110.00) | (303,111.10) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 53818 | 7/11/2013 | 7/11/2013 | 62 | BCHA | BCHA | L-BSCC | Charterhouse:Blackstone Capital:6%:11/7/18 | 23,000 | Blackstone Capital ck #65 | buy stock | keepstock | buy stock | a=bank | CAD | (23,000.00) | - | (23,230.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 54295 | 7/25/2013 | 7/25/2013 | 3 | WORK | WORK | | | | internal transfer TUNG | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 200,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 54453 | 7/29/2013 | 7/29/2013 | 9 | DGMI | DGMI | | | | Oryon TT | debit | keepcurrency | debit | a=bank | USD | (40,070.00) | (40,470.70) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 54495 | 7/29/2013 | 7/29/2013 | 62 | BCHA | BCHA | L-BSCC | Charterhouse:Blackstone Capital:6%:11/7/18 | 100,000 | Blackstone Capital ck #75 | buy stock | keepstock | buy stock | a=bank | CAD | (100,000.00) | - | (101,000.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 54569 | 7/29/2013 | 7/30/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (150,014.71) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 54569 | 7/29/2013 | 7/30/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 151,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 54515 | 7/30/2013 | 7/30/2013 | 62 | BCHA | BCHA | L-DEVC | Charterhouse:Devon Ventures:6%:30/07/13 | 50,000 | Devon Ventures ck #76 | buy stock | keepstock | buy stock | a=bank | CAD | (50,000.00) | - | (50,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 54598 | 7/31/2013 | 7/31/2013 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 500,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 54792 | 7/31/2013 | 8/1/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 514.53 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 54793 | 7/31/2013 | 8/1/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | CAD | - | - | 13.61 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55062 | 8/2/2013 | 8/2/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55072 | 8/2/2013 | 8/2/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (40,000.00) | - | (42,000.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55082 | 8/2/2013 | 8/2/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (51,971.82) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55082 | 8/2/2013 | 8/2/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 52,486.39 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55485 | 8/15/2013 | 8/15/2013 | 3 | WORK | WORK | | | | Accord Fdn 13 fees | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (3,500.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55656 | 8/21/2013 | 8/21/2013 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 600,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55671 | 8/22/2013 | 8/22/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55728 | 8/22/2013 | 8/23/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (9,278.14) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55728 | 8/22/2013 | 8/23/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 9,370.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55702 | 8/22/2013 | 8/22/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (10,397.06) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55702 | 8/22/2013 | 8/22/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 10,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55712 | 8/22/2013 | 8/22/2013 | 18 | TDCH | TDCH | | | | Air fares ck #9 | debit | keepcurrency | debit | a=bank | CAD | (9,270.00) | - | (9,370.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 56991 | 8/26/2013 | 9/17/2013 | 41 | HYPP | HYPP | | | | delivery RKR | debit | keepcurrency | debit | a=bank | USD | (199.31) | (299.31) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55837 | 8/27/2013 | 8/28/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (48,299.08) | (48,782.07) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55837 | 8/27/2013 | 8/28/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 50,500.00 | - | 50,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 55815 | 8/27/2013 | 8/27/2013 | 62 | BCHA | BCHA | L-GSVC | Charterhouse: Greenstone Ski Vacations Inc;6% | 50,000 | Greenstone Ski Vacations ck #85 | buy stock | keepstock | buy stock | a=bank | CAD | (50,000.00) | - | (50,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 56063 | 8/31/2013 | 9/2/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 900.34 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 56443 | 9/3/2013 | 9/5/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (5,134.36) | (5,185.70) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 56443 | 9/3/2013 | 9/5/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 5,350.00 | - | 5,350.00 | - | - | - |





| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| XM LIVE | 15 | ACCO | ACCO | 56314 | 9/3/2013 | 9/3/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 56408 | 9/4/2013 | 9/6/2013 | 51 | BSIP | BSIP | | | | Double 3 Enterprises TT | debit | keepcurrency | debit | a=bank | USD | (30,537.10) | (30,842.47) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 56694 | 9/4/2013 | 9/11/2013 | 40 | CBHQ | CBHQ | | | | delivery RKR | debit | keepcurrency | debit | a=custom | USD | (229.20) | (229.20) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 56377 | 9/4/2013 | 9/4/2013 | 40 | CBHQ | CBHQ | RKR | Rokmaster Resosources | (50,000) | internal transfer | stock delivery | keepcurrency | stock delivery | a=bank;cashbank=0;cashaccount=0 | CAD | - | - | (100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 56377 | 9/4/2013 | 9/4/2013 | 25 | VPQU | VPQU | RKR | Rokmaster Resosources | 50,000 | internal transfer | transfer stock in | keepstock | transfer stock in | sid=seq0;cid=seq0;cashbank=0;cashaccount=0;stock=seq0 | CAD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 56928 | 9/17/2013 | 9/17/2013 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (18,850.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57306 | 9/20/2013 | 9/25/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (14,762.30) | (14,909.92) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57306 | 9/20/2013 | 9/25/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 15,122.50 | - | 15,122.50 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57157 | 9/20/2013 | 9/22/2013 | 3 | WORK | WORK | | | | internal transfer GRWD | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (100,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57152 | 9/20/2013 | 9/20/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57183 | 9/23/2013 | 9/23/2013 | 18 | TDCH | TDCH | | | | Sklink Air Fares ck #15 | debit | keepcurrency | debit | a=bank | CAD | (515.00) | - | (615.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57208 | 9/23/2013 | 9/23/2013 | 62 | BCHA | BCHA | | | | Vancouver Police draft | debit | keepcurrency | debit | a=custom | CAD | (4,007.50) | - | (4,007.50) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57221 | 9/23/2013 | 9/23/2013 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 200,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57483 | 9/27/2013 | 9/30/2013 | 58 | LEMI | LEMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (11,793.11) | (11,911.04) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57483 | 9/27/2013 | 9/30/2013 | 58 | LEMI | LEMI | | | | forex | forex credit | nothing | forex credit | | CAD | 12,163.42 | - | 12,163.42 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57502 | 9/27/2013 | 9/30/2013 | 63 | SBCH | SBCH | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (19,225.59) | (19,417.85) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57502 | 9/27/2013 | 9/30/2013 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 19,336.58 | - | 19,336.58 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57440 | 9/27/2013 | 9/27/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (30,000.00) | - | (31,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57662 | 9/30/2013 | 10/1/2013 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (21.68) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57663 | 9/30/2013 | 10/1/2013 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (137.42) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 57806 | 9/30/2013 | 10/1/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 1,114.24 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58072 | 10/1/2013 | 10/2/2013 | 63 | SBCH | SBCH | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (136.22) | (137.58) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58072 | 10/1/2013 | 10/2/2013 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 137.42 | - | 137.42 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58159 | 10/3/2013 | 10/4/2013 | 24 | VERL | VERL | AAPH | American Petro-Hunter | (23,549) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 463.08 | 363.08 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58215 | 10/4/2013 | 10/4/2013 | 16 | REST | REST | | | | directors fee | debit | keepcurrency | debit | a=custom | USD | - | (200.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58455 | 10/8/2013 | 10/14/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (10,214.01) | (10,316.15) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58455 | 10/8/2013 | 10/14/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 10,500.00 | - | 10,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58290 | 10/8/2013 | 10/8/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58379 | 10/9/2013 | 10/10/2013 | 23 | VERN | VERN | ORYN | Oryon Holdings | (8,178) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=custom | USD | 235.49 | 235.49 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58380 | 10/10/2013 | 10/10/2013 | 3 | WORK | WORK | | | | internal transfer close account | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 28,539.41 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58382 | 10/10/2013 | 10/10/2013 | 45 | SIL2 | SIL2 | ORYN | Oryon Holdings | (95,887) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 3,163.96 | 3,063.96 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58554 | 10/15/2013 | 10/16/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (20,573.70) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58554 | 10/15/2013 | 10/16/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 21,000.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58514 | 10/15/2013 | 10/15/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (20,000.00) | - | (21,000.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58642 | 10/18/2013 | 10/18/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58701 | 10/18/2013 | 10/21/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (10,339.88) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58701 | 10/18/2013 | 10/21/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 10,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58684 | 10/21/2013 | 10/21/2013 | 26 | XPHO | XPHO | | | | new phone | debit | keepcurrency | debit | a=custom | USD | - | (600.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58772 | 10/22/2013 | 10/22/2013 | 62 | BCHA | BCHA | L-DEVC | Charterhouse:Devon Ventures:6%:30/07/13 | 18,000 | Devon Ventures ck #114 | buy stock | keepstock | buy stock | a=bank | CAD | (18,000.00) | - | (18,180.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58876 | 10/24/2013 | 12/9/2013 | 4 | BSIT | BSIT | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (119,213.20) | (120,405.33) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58876 | 10/24/2013 | 12/9/2013 | 4 | BSIT | BSIT | | | | forex | forex credit | nothing | forex credit | | CAD | 122,849.19 | - | 122,849.19 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58863 | 10/24/2013 | 10/24/2013 | 18 | TDCH | TDCH | | | | Air Fares Ck #19 | debit | keepcurrency | debit | a=custom | CAD | (2,578.88) | - | (3,872.42) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 58923 | 10/25/2013 | 10/25/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (100,000.00) | - | (105,000.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 59001 | 10/28/2013 | 10/28/2013 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (250,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 59625 | 10/29/2013 | 11/4/2013 | 51 | BSIP | BSIP | | | | 50% watch Payment AP | debit | keepcurrency | debit | a=bank | USD | (26,572.54) | (26,838.27) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 59333 | 10/31/2013 | 11/1/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 1,124.49 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 59334 | 10/31/2013 | 11/1/2013 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (0.01) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 59898 | 11/7/2013 | 11/13/2013 | 51 | BSIP | BSIP | | | | Cash Withdrawal 10K CHF | debit | keepcurrency | debit | a=bank | USD | (10,996.44) | (11,106.40) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 59896 | 11/8/2013 | 11/13/2013 | 41 | HYPP | HYPP | | | | debit | debit | keepcurrency | debit | a=bank | USD | (24,663.54) | (24,910.18) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 59920 | 11/13/2013 | 11/13/2013 | 62 | BCHA | BCHA | L-BSCC | Charterhouse:Blackstone Capital:6%:11/7/18 | 200,000 | Blackstone Capital ck #128 | buy stock | keepstock | buy stock | a=bank | CAD | (200,000.00) | - | (202,000.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 59933 | 11/13/2013 | 11/15/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (101,655.49) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 59933 | 11/13/2013 | 11/15/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 104,743.52 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 60010 | 11/13/2013 | 11/15/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (94,299.89) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 60010 | 11/13/2013 | 11/15/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 97,256.49 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 60128 | 11/15/2013 | 11/19/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (10,180.80) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 60128 | 11/15/2013 | 11/19/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 10,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 60037 | 11/15/2013 | 11/15/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 60125 | 11/19/2013 | 11/19/2013 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (400,100.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 60140 | 11/19/2013 | 11/19/2013 | 59 | LEPA | LEPA | | | | Hillside New Media TT | debit | keepcurrency | debit | a=bank | USD | (50,200.00) | (50,702.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 60316 | 11/22/2013 | 11/22/2013 | 18 | TDCH | TDCH | | | | Air Fares ck #23 | debit | keepcurrency | debit | a=bank | CAD | (6,695.95) | - | (6,795.95) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 60337 | 11/22/2013 | 11/22/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (6,589.35) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 60337 | 11/22/2013 | 11/22/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 6,795.95 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 60565 | 11/29/2013 | 11/29/2013 | 18 | TDCH | TDCH | | | | Airfares ck #24 | debit | keepcurrency | debit | a=bank | CAD | (7,512.40) | - | (7,612.40) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 60715 | 11/30/2013 | 12/1/2013 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 531.24 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 60716 | 11/30/2013 | 12/1/2013 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (0.01) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61219 | 12/1/2013 | 12/9/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (11,217.77) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61219 | 12/1/2013 | 12/9/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 11,815.64 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61515 | 12/13/2013 | 12/16/2013 | 45 | SIL2 | SIL2 | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (30,212.42) | (30,514.54) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61515 | 12/13/2013 | 12/16/2013 | 45 | SIL2 | SIL2 | | | | forex | forex credit | nothing | forex credit | | CAD | 31,500.00 | - | 31,500.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61432 | 12/13/2013 | 12/13/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (30,000.00) | - | (31,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61494 | 12/16/2013 | 12/16/2013 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 245,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61491 | 12/16/2013 | 12/16/2013 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 450,000.00 | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61505 | 12/16/2013 | 12/16/2013 | 62 | BCHA | BCHA | | | | Van Police Gala draft | debit | keepcurrency | debit | a=bank | CAD | (1,000.00) | - | (1,100.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61528 | 12/16/2013 | 12/16/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (1,065.59) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61528 | 12/16/2013 | 12/16/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 1,100.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61787 | 12/20/2013 | 12/20/2013 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61799 | 12/20/2013 | 12/20/2013 | 62 | BCHA | BCHA | L-DEVC | Charterhouse:Devon Ventures:6%:30/07/13 | 35,000 | Devon Ventures ck #151 | buy stock | keepstock | buy stock | a=bank | CAD | (35,000.00) | - | (35,350.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61818 | 12/20/2013 | 12/20/2013 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (39,365.76) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61818 | 12/20/2013 | 12/20/2013 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 40,600.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 62122 | 12/31/2013 | 1/1/2014 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (115.62) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 62252 | 12/31/2013 | 1/1/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 491.05 | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 86592 | 1/1/2014 | 3/18/2015 | 57 | LOAN | LOAN | L-BSCC | Charterhouse:Blackstone:6% | 70,000 | loan advance | buy stock | keepstock | buy stock | a=custom | CAD | - | - | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 62526 | 1/2/2014 | 1/4/2014 | 65 | LENO | LENO | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (110.80) | (111.91) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 62526 | 1/2/2014 | 1/4/2014 | 65 | LENO | LENO | | | | forex | forex credit | nothing | forex credit | | CAD | 115.62 | - | 115.62 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 61916 | 1/7/2014 | 1/9/2014 | 51 | BSIP | BSIP | | | | Rightscorp TT | debit | keepcurrency | debit | a=bank | USD | (150,138.61) | (151,640.00) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 62824 | 1/8/2014 | 1/16/2014 | 65 | LENO | LENO | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (13,917.09) | (14,056.26) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 62824 | 1/8/2014 | 1/16/2014 | 65 | LENO | LENO | | | | forex | forex credit | nothing | forex credit | | CAD | 15,200.00 | - | 15,200.00 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 62773 | 1/9/2014 | 1/13/2014 | 58 | LEMI | LEMI | | | | Hillside New Media TT | credit | keepcurrency | credit | a=bank | CAD | 51,459.05 | - | 51,459.05 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 62750 | 1/9/2014 | 1/9/2014 | 25 | VPQU | VPQU | | | | delivery RKR | debit | keepcurrency | debit | a=bank | USD | (44.60) | (144.60) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 62825 | 1/9/2014 | 1/10/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (174,743.56) | - | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 62825 | 1/9/2014 | 1/10/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 186,035.95 | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 62792 | 1/9/2014 | 1/9/2014 | 62 | BCHA | BCHA | L-BSCC | Charterhouse:Blackstone Capital:6%:11/7/18 | 250,000 | Blackstone Capital ck #156 | buy stock | keepstock | buy stock | a=bank | CAD | (250,000.00) | - | (252,500.00) | - | - | - |
| XM LIVE | 15 | ACCO | ACCO | 63057 | 1/17/2014 | 1/17/2014 | 62 | BCHA | BCHA | L-BSCC | Charterhouse:Blackstone Capital:6%:11/7/18 | (4,780) | interest payment | sell stock | keepstock | sell stock | a=bank | CAD | 4,780.00 | - | 4,680.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 63242 | 1/22/2014 | 1/27/2014 | 58 | LEMI | LEMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (18,311.31) | (18,494.42) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 63242 | 1/22/2014 | 1/27/2014 | 58 | LEMI | LEMI | | | | forex | forex credit | nothing | forex credit | | CAD | 20,375.00 | - | 20,375.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 63116 | 1/22/2014 | 1/22/2014 | 62 | BCHA | BCHA | L-DEVC | Charterhouse:Devon Ventures:6%:30/07/13 | 25,000 | Devon Ventures ck #158 | buy stock | keepstock | buy stock | a=bank | CAD | (25,000.00) | - | (25,250.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 63117 | 1/23/2014 | 1/30/2014 | 51 | BSIB | BSIB | | | | Nano Viricdies TT | debit | keepcurrency | debit | a=bank | USD | (105,172.32) | (106,224.04) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 63419 | 1/29/2014 | 1/31/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (17,627.33) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 63419 | 1/29/2014 | 1/31/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 19,392.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 63346 | 1/29/2014 | 1/29/2014 | 58 | LEMI | LEMI | | | | Hendrikus Veldhuis TT | debit | keepcurrency | debit | a=bank | CAD | (19,200.00) | - | (19,392.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 63574 | 1/31/2014 | 2/1/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 506.62 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 63575 | 1/31/2014 | 2/1/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | CAD | - | - | 1.05 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 63933 | 2/5/2014 | 2/5/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (4,500.00) | - | (4,725.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 63946 | 2/5/2014 | 2/5/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (4,311.97) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 63946 | 2/5/2014 | 2/5/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 4,723.95 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 64184 | 2/12/2014 | 2/12/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (18,750.00) | (19,687.50) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 64265 | 2/14/2014 | 2/14/2014 | 62 | BCHA | BCHA | L-DEVC | Charterhouse:Devon Ventures:6%:30/07/13 | 17,500 | Devon Ventures ck #166 | buy stock | keepstock | buy stock | a=bank | CAD | (17,500.00) | - | (17,675.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 64290 | 2/14/2014 | 2/14/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (16,261.16) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 64290 | 2/14/2014 | 2/14/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 17,675.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 64671 | 2/21/2014 | 2/26/2014 | 25 | SIQU | SIQU | ARW | Aroway Minerals | 25,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (7,527.50) | - | (7,790.96) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 64695 | 2/21/2014 | 2/26/2014 | 68 | LELO | LELO | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (6,941.30) | (7,010.71) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 64695 | 2/21/2014 | 2/26/2014 | 68 | LELO | LELO | | | | forex | forex credit | nothing | forex credit | | CAD | 7,690.96 | - | 7,690.96 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 64689 | 2/26/2014 | 2/26/2014 | 68 | LELO | LELO | | | | Blackrock Media TT | debit | keepcurrency | debit | a=bank | USD | (250,100.00) | (252,601.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 64911 | 2/26/2014 | 2/28/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 64920 | 2/28/2014 | 3/1/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 394.10 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 64921 | 2/28/2014 | 3/1/2014 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (10.30) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 65275 | 3/1/2014 | 3/5/2014 | 58 | LEMI | LEMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (4,748.85) | (4,796.34) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 65275 | 3/1/2014 | 3/5/2014 | 58 | LEMI | LEMI | | | | forex | forex credit | nothing | forex credit | | CAD | 5,260.30 | - | 5,260.30 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 65334 | 3/3/2014 | 3/6/2014 | 16 | REST | REST | ORYN-R | Oryon Holdings | 10,807,815 | receive stock | buy stock | keepstock | buy stock | a=custom | USD | - | (100.00) | - | - | - | - |

| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre2015 | 15 | ACCO | ACCO | 65817 | 3/5/2014 | 3/18/2014 | 58 | LEMI | LEMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (4,734.42) | (4,781.76) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 65817 | 3/5/2014 | 3/18/2014 | 58 | LEMI | LEMI | | | | forex | forex credit | nothing | forex credit | | CAD | 5,250.00 | - | 5,250.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 65303 | 3/5/2014 | 3/5/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 65415 | 3/7/2014 | 3/7/2014 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 173,000.00 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 65671 | 3/13/2014 | 3/13/2014 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 125,000.00 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 65850 | 3/18/2014 | 3/18/2014 | 3 | WORK | WORK | | | | Accord + Fdn 14 fees | debit | keepcurrency | debit | a=custom | USD | - | (6,000.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 65868 | 3/18/2014 | 3/18/2014 | 62 | BCHA | BCHA | L-BSCC | Charterhouse:Blackstone Capital:6%:11/7/18 | 250,000 | Blackstone Capital ck #181 | buy stock | keepstock | buy stock | a=bank | CAD | (250,000.00) | - | (252,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 65870 | 3/18/2014 | 3/18/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 65975 | 3/18/2014 | 3/19/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (239,531.85) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 65975 | 3/18/2014 | 3/19/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 263,000.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 66504 | 3/20/2014 | 3/31/2014 | 58 | LEMI | LEMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (1,955.42) | (1,974.97) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 66504 | 3/20/2014 | 3/31/2014 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 2,100.00 | - | 2,100.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 66198 | 3/26/2014 | 3/26/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (2,000.00) | - | (2,100.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122937 | 3/27/2014 | 11/24/2018 | 57 | LOAN | LOAN | L-GREC | Charterhouse:Greenestone:3%Pledge | 13,594 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (4,531.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 66563 | 3/31/2014 | 4/1/2014 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (160.75) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 66686 | 3/31/2014 | 4/1/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 308.39 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 66687 | 3/31/2014 | 4/1/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | CAD | - | - | 0.35 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 66904 | 4/1/2014 | 4/1/2014 | 62 | BCHA | BCHA | L-BSCC | Charterhouse:Blackstone Capital:6%:11/7/18 | 100,000 | Blackstone Capital ck #191 | buy stock | keepstock | buy stock | a=bank | CAD | (100,000.00) | - | (101,000.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 66941 | 4/1/2014 | 4/1/2014 | 64 | LEBU | LEBU | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (91,614.20) | (92,530.34) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 66941 | 4/1/2014 | 4/1/2014 | 64 | LEBU | LEBU | | | | forex | forex credit | nothing | forex credit | | CAD | 101,160.40 | - | 101,160.40 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 67538 | 4/15/2014 | 4/15/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 67611 | 4/15/2014 | 4/16/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (9,650.55) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 67611 | 4/15/2014 | 4/16/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 10,500.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 75769 | 4/16/2014 | 8/14/2014 | 25 | SIQU | SIQU | | | | delivery ARW | debit | keepcurrency | debit | a=bank | CAD | (230.00) | - | (430.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 75811 | 4/16/2014 | 8/14/2014 | 25 | SIQU | SIQU | | | | delivery RKR | debit | keepcurrency | debit | a=bank | CAD | (230.00) | - | (430.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 67757 | 4/22/2014 | 4/23/2014 | 68 | LELO | LELO | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (9,469.47) | (9,564.16) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 67757 | 4/22/2014 | 4/23/2014 | 68 | LELO | LELO | | | | forex | forex credit | nothing | forex credit | | CAD | 10,500.00 | - | 10,500.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 67713 | 4/22/2014 | 4/22/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 67827 | 4/24/2014 | 4/24/2014 | 62 | BCHA | BCHA | L-BSCC | Charterhouse:Blackstone Capital:6%:11/7/18 | 50,000 | Blackstone Capital ck #196 | buy stock | keepstock | buy stock | a=bank | CAD | (50,000.00) | - | (50,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 67896 | 4/24/2014 | 4/25/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (46,414.55) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 67896 | 4/24/2014 | 4/25/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 50,500.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 67943 | 4/28/2014 | 4/28/2014 | 62 | BCHA | BCHA | L-BSCC | Charterhouse:Blackstone Capital:6%:11/7/18 | 50,000 | Blackstone Capital ck #201 | buy stock | keepstock | buy stock | a=bank | CAD | (50,000.00) | - | (50,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 67960 | 4/28/2014 | 4/28/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (46,414.55) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 67960 | 4/28/2014 | 4/28/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 50,500.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68013 | 4/29/2014 | 4/29/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (50,000.00) | - | (52,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68021 | 4/29/2014 | 12/9/2014 | 41 | SGPE | SGPE | | | | Forex | forex debit | nothing | forex debit | a=bank | USD | (55,813.95) | (56,472.09) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68021 | 4/29/2014 | 12/9/2014 | 5 | CASH | CASH | | | | Forex | forex credit | nothing | forex credit | | CAD | 59,820.00 | - | 59,820.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 67776 | 4/29/2014 | 4/23/2014 | 57 | LOAN | LOAN | L-RPCC | Quarry:RPC:6%:Demand | 95,050 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (15,842.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68029 | 4/29/2014 | 4/29/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (7,832.57) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68029 | 4/29/2014 | 4/29/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 8,522.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68255 | 4/30/2014 | 5/1/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 154.93 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68256 | 4/30/2014 | 5/1/2014 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (1.97) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68572 | 5/1/2014 | 5/2/2014 | 41 | SGPE | SGPE | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (95.05) | (96.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68572 | 5/1/2014 | 5/2/2014 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 101.97 | - | 101.97 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68650 | 5/2/2014 | 5/6/2014 | 11 | FINC | FINC | RIHT | Rightscorp | 15,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | USD | (7,898.82) | (8,096.29) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68544 | 5/2/2014 | 5/2/2014 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 325,000.00 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68546 | 5/2/2014 | 5/2/2014 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 329,000.00 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68777 | 5/7/2014 | 5/8/2014 | 62 | BCHA | BCHA | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (20,514.08) | (20,719.22) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68777 | 5/7/2014 | 5/8/2014 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 21,805.00 | - | 21,805.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68751 | 5/8/2014 | 5/8/2014 | 62 | BCHA | BCHA | L-DEVC | Charterhouse:Devon Ventures:6%:30/07/13 | 25,000 | Devon Ventures ck #206 | buy stock | keepstock | buy stock | a=bank | CAD | (25,000.00) | - | (25,250.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68746 | 5/8/2014 | 8/20/2014 | 26 | XPHO | XPHO | | | | 4 new xphone licences | debit | keepcurrency | debit | a=custom | USD | - | (1,000.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68767 | 5/8/2014 | 5/8/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (13,890.00) | - | (14,584.50) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68813 | 5/8/2014 | 5/9/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (1,214.06) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68813 | 5/8/2014 | 5/9/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 1,299.50 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68778 | 5/8/2014 | 5/8/2014 | 47 | SGGO | SGGO | | | | forex Aris TT | forex debit | nothing | forex debit | a=bank | USD | (15,915.56) | (16,174.72) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68778 | 5/8/2014 | 5/8/2014 | 5 | CASH | CASH | | | | forex Aris TT | forex credit | nothing | forex credit | | CAD | 16,730.00 | - | 16,730.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69043 | 5/20/2014 | 5/20/2014 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (20,100.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69046 | 5/20/2014 | 5/20/2014 | 62 | BCHA | BCHA | | | | Creditloans Canada Financing ck #209 | debit | keepcurrency | debit | a=bank | CAD | (250,000.00) | - | (252,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69048 | 5/20/2014 | 5/20/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (235,898.13) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69048 | 5/20/2014 | 5/20/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 252,500.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69334 | 5/23/2014 | 5/30/2014 | 59 | LEPI | LEPI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (14,029.91) | (14,170.21) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69334 | 5/23/2014 | 5/30/2014 | 59 | LEPI | LEPI | | | | forex | forex credit | nothing | forex credit | | CAD | 15,200.00 | - | 15,200.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69270 | 5/28/2014 | 5/28/2014 | 62 | BCHA | BCHA | L-DEVC | Charterhouse:Devon Ventures:6%:30/07/13 | 25,000 | Devon Ventures ck #217 | buy stock | keepstock | buy stock | a=bank | CAD | (25,000.00) | - | (25,250.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69271 | 5/28/2014 | 5/28/2014 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 15,000.00 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69560 | 5/29/2014 | 5/30/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 433.96 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69561 | 5/29/2014 | 5/30/2014 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (32.61) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69364 | 5/30/2014 | 5/30/2014 | 18 | TDCH | TDCH | | | | Airfares | debit | keepcurrency | debit | a=bank | CAD | (2,578.44) | - | (2,678.44) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 68241 | 5/30/2014 | 4/30/2014 | 57 | LOAN | LOAN | L-VELC | Coventry:Veldhuis:6%:Demand | 32,435 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (5,406.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69546 | 5/30/2014 | 5/30/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (16,942.10) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69546 | 5/30/2014 | 5/30/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 18,134.44 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69844 | 6/2/2014 | 6/3/2014 | 49 | HELI | HELI | RIHT | Rightscorp | 46,700 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | USD | (19,104.35) | (19,581.96) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70179 | 6/2/2014 | 6/13/2014 | 62 | BCHA | BCHA | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (28,006.00) | (28,286.06) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70179 | 6/2/2014 | 6/13/2014 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 29,560.00 | - | 29,560.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70617 | 6/2/2014 | 6/20/2014 | 41 | SGPE | SGPE | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (1,508.57) | (1,623.66) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70617 | 6/2/2014 | 6/20/2014 | 41 | SGPE | SGPE | | | | forex | forex credit | nothing | forex credit | | CAD | 1,613.18 | - | 1,613.18 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69887 | 6/3/2014 | 6/4/2014 | 49 | HELI | HELI | RIHT | Rightscorp | 3,400 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | USD | (1,404.00) | (1,504.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69953 | 6/4/2014 | 6/5/2014 | 49 | HELI | HELI | RIHT | Rightscorp | 5,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | USD | (2,213.75) | (2,313.75) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69930 | 6/4/2014 | 6/4/2014 | 62 | BCHA | BCHA | L-BSCC | Charterhouse:Blackstone Capital:6%:11/7/18 | 100,000 | Blackstone Capital ck #219 | buy stock | keepstock | buy stock | a=bank | CAD | (100,000.00) | - | (101,000.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 69935 | 6/4/2014 | 6/4/2014 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 30,000.00 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70186 | 6/4/2014 | 6/11/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (94,878.33) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70186 | 6/4/2014 | 6/11/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 101,009.61 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70002 | 6/6/2014 | 6/6/2014 | 62 | BCHA | BCHA | L-BSCC | Charterhouse:Blackstone Capital:6%:11/7/18 | 50,000 | Blackstone Capital ck #220 | buy stock | keepstock | buy stock | a=bank | CAD | (50,000.00) | - | (50,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70180 | 6/6/2014 | 6/18/2014 | 41 | SGPE | SGPE | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (25,700.00) | (26,057.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70180 | 6/6/2014 | 6/18/2014 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 27,010.00 | - | 27,010.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70169 | 6/11/2014 | 6/11/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70542 | 6/18/2014 | 6/19/2014 | 41 | SGPE | SGPE | RKR | Rokmaster Resources | (30,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,048.90 | - | 3,907.19 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70465 | 6/18/2014 | 6/18/2014 | 3 | WORK | WORK | | | | Loan | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (25,100.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70648 | 6/20/2014 | 6/23/2014 | 58 | LEMI | LEMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (531.06) | (536.37) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70648 | 6/20/2014 | 6/23/2014 | 58 | LEMI | LEMI | | | | forex | forex credit | nothing | forex credit | | CAD | 571.63 | - | 571.63 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70420 | 6/20/2014 | 6/17/2014 | 57 | LOAN | LOAN | L-RPCC | Quarry:RPC:6%:Demand | 14,354 | interest-closed | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (2,392.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70421 | 6/20/2014 | 6/17/2014 | 57 | LOAN | LOAN | L-BSCC | Charterhouse:Blackstone Capital:6%:11/7/18 | 22,197 | interest-closed | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (3,700.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70661 | 6/23/2014 | 6/23/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70831 | 6/23/2014 | 6/25/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (8,606.27) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70831 | 6/23/2014 | 6/25/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 9,137.67 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 70771 | 6/24/2014 | 6/25/2014 | 41 | SGPE | SGPE | RKR | Rokmaster Resources | (11,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,462.33 | - | 1,362.33 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 73604 | 6/27/2014 | 6/28/2014 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (89.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 73605 | 6/27/2014 | 6/28/2014 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (133.80) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 73902 | 6/27/2014 | 6/28/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 193.98 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 73903 | 6/27/2014 | 6/28/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | CAD | - | - | 2.35 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74144 | 6/30/2014 | 6/30/2014 | 58 | LEMI | LEMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (123.21) | (124.44) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74144 | 6/30/2014 | 6/30/2014 | 58 | LEMI | LEMI | | | | forex | forex credit | nothing | forex credit | | CAD | 131.45 | - | 131.45 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74316 | 7/3/2014 | 7/7/2014 | 52 | VERA | VERA | IRR | Inform Resources | 100,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (4,705.00) | - | (4,822.63) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74336 | 7/7/2014 | 7/7/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (50,000.00) | - | (52,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74339 | 7/7/2014 | 7/7/2014 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 85,000.00 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74346 | 7/7/2014 | 7/7/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (54,422.10) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74346 | 7/7/2014 | 7/7/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 57,322.63 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74685 | 7/15/2014 | 7/18/2014 | 41 | SGPE | SGPE | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (10,117.00) | (10,117.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74685 | 7/15/2014 | 7/18/2014 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 10,525.00 | - | 10,525.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74606 | 7/16/2014 | 7/16/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74489 | 7/30/2014 | 7/11/2014 | 57 | LOAN | LOAN | L-DEVC | Charterhouse:Devon Ventures:6%:30/07/13 | 6,715 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (1,119.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74954 | 7/30/2014 | 7/30/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (1,038.64) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74954 | 7/30/2014 | 7/30/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 1,094.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 74994 | 7/31/2014 | 7/31/2014 | 18 | TDCH | TDCH | | | | Airfares ck #63 | debit | keepcurrency | debit | a=bank | CAD | (6,636.56) | - | (6,736.56) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 75002 | 7/31/2014 | 7/31/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (6,395.69) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 75002 | 7/31/2014 | 7/31/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 6,736.56 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 75168 | 7/31/2014 | 8/1/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 199.49 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 75169 | 7/31/2014 | 8/1/2014 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (12.56) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 75511 | 8/6/2014 | 8/6/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 75954 | 8/6/2014 | 8/19/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (10,727.82) | - | - | - | - |





| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre2015 | 15 | ACCO | ACCO | 75954 | 8/6/2014 | 8/19/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 11,360.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 75529 | 8/6/2014 | 8/6/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (9,980.62) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 75529 | 8/6/2014 | 8/6/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 10,512.56 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 75922 | 8/18/2014 | 8/18/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77622 | 8/27/2014 | 9/30/2014 | 62 | BCHA | BCHA | | | | Balckstone Capital ck #257 | debit | keepcurrency | debit | a=bank | CAD | (50,000.00) | - | (50,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 75678 | 8/27/2014 | 8/12/2014 | 57 | LOAN | LOAN | L-GSVC | Charterhouse:Greenstone:6%:27/08/13 | 3,000 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 76181 | 8/27/2014 | 8/27/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (47,646.75) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 76181 | 8/27/2014 | 8/27/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 51,000.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 76650 | 8/29/2014 | 9/1/2014 | 52 | VERA | VERA | RIHT | Rightscorp | 40,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | USD | (16,093.00) | (16,495.33) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 76434 | 8/31/2014 | 9/1/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 156.91 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 76435 | 8/31/2014 | 9/1/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | CAD | - | - | 0.58 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77089 | 9/5/2014 | 9/12/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (8,793.01) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77089 | 9/5/2014 | 9/12/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 9,463.99 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 76863 | 9/5/2014 | 9/5/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (6,000.00) | - | (6,300.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 76866 | 9/5/2014 | 9/5/2014 | 62 | BCHA | BCHA | L-DEVC | Charterhouse:Devon Ventures:6%:30/07/13 | 20,000 | Devon Ventures ck #258 | buy stock | keepstock | buy stock | a=bank | CAD | (20,000.00) | - | (20,200.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 76952 | 9/8/2014 | 9/10/2014 | 47 | SGGO | SGGO | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (14,004.86) | (14,144.91) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 76952 | 9/8/2014 | 9/10/2014 | 47 | SGGO | SGGO | | | | forex | forex credit | nothing | forex credit | | CAD | 15,000.00 | - | 15,000.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 76989 | 9/10/2014 | 9/10/2014 | 47 | SGGO | SGGO | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (4,224.99) | (4,267.24) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 76989 | 9/10/2014 | 9/10/2014 | 47 | SGGO | SGGO | | | | forex | forex credit | nothing | forex credit | | CAD | 4,564.21 | - | 4,564.21 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77024 | 9/10/2014 | 9/11/2014 | 58 | LEMI | LEMI | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (2,477.44) | (2,502.21) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77024 | 9/10/2014 | 9/11/2014 | 58 | LEMI | LEMI | | | | forex | forex credit | nothing | forex credit | | CAD | 2,721.22 | - | 2,721.22 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77037 | 9/11/2014 | 9/11/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77577 | 9/19/2014 | 9/29/2014 | 51 | BSIB | BSIB | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (9,573.76) | (9,669.50) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77577 | 9/19/2014 | 9/29/2014 | 51 | BSIB | BSIB | | | | forex | forex credit | nothing | forex credit | | CAD | 10,500.00 | - | 10,500.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77354 | 9/19/2014 | 9/19/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77356 | 9/19/2014 | 1/20/2015 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 34,950.00 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78278 | 9/23/2014 | 10/2/2014 | 62 | BCHA | BCHA | L-DEVC | Charterhouse:Devon Ventures:6%:30/07/13 | 25,000 | Devon Ventures ck #262 | buy stock | keepstock | buy stock | a=bank | CAD | (25,000.00) | - | (25,250.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77856 | 9/30/2014 | 10/1/2014 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (106.03) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77857 | 9/30/2014 | 10/1/2014 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (121.19) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77971 | 9/30/2014 | 10/1/2014 | 3 | WORK | WORK | | | | interest payment | interest payment | keepcurrency | interest payment | a=custom;cashbank=0;customdescr=y | USD | - | 92.15 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 77972 | 9/30/2014 | 10/1/2014 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (36.14) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78242 | 10/1/2014 | 10/2/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (145.40) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78242 | 10/1/2014 | 10/2/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 157.33 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78296 | 10/2/2014 | 10/3/2014 | 52 | VERA | VERA | BLO | Cannabix Technologies | 250,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (38,462.50) | - | (39,424.06) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78474 | 10/2/2014 | 10/31/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (67,226.17) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78474 | 10/2/2014 | 10/31/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 71,932.68 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78338 | 10/3/2014 | 10/3/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78445 | 10/8/2014 | 10/9/2014 | 47 | SGGO | SGGO | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (9,503.95) | (9,598.99) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78445 | 10/8/2014 | 10/9/2014 | 47 | SGGO | SGGO | | | | forex | forex credit | nothing | forex credit | | CAD | 10,341.38 | - | 10,341.38 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78458 | 10/9/2014 | 10/9/2014 | 62 | BCHA | BCHA | L-GSVC | Charterhouse:Greenstone:6%:27/08/13 | 7,000 | Greenstone Ski Vacation ck #268 | buy stock | keepstock | buy stock | a=bank | CAD | (7,000.00) | - | (7,100.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78523 | 10/10/2014 | 10/10/2014 | 3 | WORK | WORK | | | | director fee | debit | keepcurrency | debit | a=bank | USD | - | (100.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78525 | 10/10/2014 | 10/10/2014 | 52 | VERA | VERA | | | | Anthony Wonnacott TT | debit | keepcurrency | debit | a=bank | USD | (100,100.00) | (101,101.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78802 | 10/21/2014 | 10/22/2014 | 52 | VERA | VERA | BLO | Cannabix Technologies | (250,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 24,350.00 | - | 23,741.25 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79188 | 10/21/2014 | 10/31/2014 | 4 | BEAB | BEAB | RIHT | Rightscorp | (50,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 12,055.95 | 11,633.99 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79039 | 10/21/2014 | 10/28/2014 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | CAD | - | - | (8,591.25) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79039 | 10/21/2014 | 10/28/2014 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | USD | - | 7,704.30 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79191 | 10/24/2014 | 10/31/2014 | 79 | SIHA | SIHA | RIHT | Rightscorp | (20,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 4,635.89 | 4,473.63 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79189 | 10/24/2014 | 10/31/2014 | 4 | BEAB | BEAB | RIHT | Rightscorp | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 2,230.50 | 2,130.50 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 78909 | 10/24/2014 | 10/24/2014 | 62 | BCHA | BCHA | L-DEVC | Charterhouse:Devon Ventures:6%:30/07/13 | 15,000 | Devon Ventures ck #274 | buy stock | keepstock | buy stock | a=bank | CAD | (15,000.00) | - | (15,150.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79637 | 10/30/2014 | 11/3/2014 | 4 | BEAB | BEAB | RIHT | Rightscorp | (5,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 1,020.00 | 920.00 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79190 | 10/31/2014 | 10/31/2014 | 62 | BCHA | BCHA | L-DEVC | Charterhouse:Devon Ventures:6%:30/07/13 | 50,000 | loan advance | buy stock | keepstock | buy stock | a=bank | CAD | (50,000.00) | - | (50,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79192 | 10/31/2014 | 10/31/2014 | 79 | SIHA | SIHA | RIHT | Rightscorp | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | USD | 2,186.26 | 2,086.26 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79415 | 10/31/2014 | 11/1/2014 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (637.76) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79416 | 10/31/2014 | 11/1/2014 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (58.83) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79757 | 11/4/2014 | 11/5/2014 | 62 | BCHA | BCHA | L-DEVC | Charterhouse:Devon Ventures:6%:30/07/13 | (50,000) | Devon Ventures ck #43 | sell stock | keepstock | sell stock | a=custom | CAD | 50,000.00 | - | 50,000.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79787 | 11/5/2014 | 11/5/2014 | 46 | CHSD | CHSD | MAPG-E | Maple Leaf 1 oz gold coins | 200 | receive gold coins | buy stock | keepstock | buy stock | a=bank | CAD | - | - | (100.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79801 | 11/5/2014 | 11/5/2014 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (200,100.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79839 | 11/6/2014 | 11/6/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79840 | 11/6/2014 | 11/6/2014 | 3 | WORK | WORK | | | | Hys lunch | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | CAD | - | - | (1,129.84) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 79951 | 11/10/2014 | 11/10/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (5,000.00) | (5,250.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 80512 | 11/26/2014 | 11/26/2014 | 53 | HELH | HELH | | | | Booth Udall TT | debit | keepcurrency | debit | a=bank | USD | (350.00) | (550.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 80727 | 11/30/2014 | 12/1/2014 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (4,066.18) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 80728 | 11/30/2014 | 12/1/2014 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (302.54) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 80962 | 12/1/2014 | 12/1/2014 | 53 | HELH | HELH | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (11,471.98) | (11,586.70) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 80962 | 12/1/2014 | 12/1/2014 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 12,591.21 | - | 12,591.21 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81005 | 12/2/2014 | 12/2/2014 | 16 | REST | REST | ORYN-R | Oryon Holdings | (10,807,815) | deliver stock | stock delivery | keepcurrency | stock delivery | a=custom | USD | - | (500.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81005 | 12/2/2014 | 12/2/2014 | 16 | REST | REST | | | | deliver stock | debit | keepcurrency | Fedex #77206117142 | cid=seq0;bid=seq0;aid=seq0;a=custom;cashbank=0;cashaccount=50;custon | USD | - | (100.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81006 | 12/2/2014 | 12/2/2014 | 2 | BCEL | BCEL | | | | STC ck#1391 | debit | keepcurrency | debit | a=bank | USD | (75.00) | (175.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81185 | 12/5/2014 | 12/5/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (20,000.00) | - | (21,000.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81188 | 12/5/2014 | 12/5/2014 | 58 | LEMI | LEMI | RCC | Red Rock Capital | 2,000 | internal transfer | transfer stock in | keepstock | transfer stock in | sid=seq0;cid=seq0;cashbank=0;cashaccount=0;stock=seq0 | CAD | - | - | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81189 | 12/5/2014 | 12/5/2014 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 1,837.30 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81309 | 12/10/2014 | 12/10/2014 | 16 | REST | REST | ORYN-E | Oryon Holdings | 10,807,815 | receive stock | buy stock | keepstock | buy stock | a=bank | USD | - | (100.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81329 | 12/10/2014 | 12/10/2014 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 35,424.79 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81330 | 12/10/2014 | 12/10/2014 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 35,424.79 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81332 | 12/10/2014 | 12/10/2014 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 2,163.13 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81333 | 12/10/2014 | 12/10/2014 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 2,882.14 | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81334 | 12/10/2014 | 12/10/2014 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (17,712.40) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81455 | 12/15/2014 | 12/15/2014 | 62 | BCHA | BCHA | L-BL1C | Charterhouse:Blaquiere:5%; 07/09/19 | 70,000 | Blackstone Capital ck #291 | buy stock | keepstock | buy stock | a=bank | CAD | (70,000.00) | - | (70,700.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81522 | 12/16/2014 | 12/16/2014 | 62 | BCHA | BCHA | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (30,000.00) | (30,000.00) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81522 | 12/16/2014 | 12/16/2014 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 34,000.00 | - | 34,000.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81648 | 12/19/2014 | 12/22/2014 | 60 | HELR | HELR | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (28,781.21) | (28,781.21) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81648 | 12/19/2014 | 12/22/2014 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 32,450.00 | - | 32,450.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81652 | 12/19/2014 | 12/19/2014 | 3 | WORK | WORK | | | | Xmas Lunch | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | CAD | - | - | 3,500.00 | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81661 | 12/19/2014 | 12/19/2014 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (500.00) | - | (600.00) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81758 | 12/31/2014 | 1/1/2015 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | USD | - | (4,808.10) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81759 | 12/31/2014 | 1/1/2015 | 3 | WORK | WORK | | | | interest charge | interest charge | keepcurrency | interest charge | a=custom;cashbank=0;customdescr=y | CAD | - | - | (503.24) | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81961 | 12/31/2014 | 1/1/2015 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (7.29) | - | - | - | - |
| Pre2015 | 15 | ACCO | ACCO | 81962 | 12/31/2014 | 1/1/2015 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (72.51) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 86466 | 1/1/2015 | 3/13/2015 | 47 | SGGO | SGGO | | | | DTC RCC | debit | keepcurrency | debit | a=bank | USD | (500.00) | (700.00) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 86591 | 1/1/2015 | 3/18/2015 | 57 | LOAN | LOAN | L-BL1C | Charterhouse:Blaquiere:5% | (70,000) | loan payment | sell stock | keepstock | sell stock | a=bank | CAD | - | - | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 82583 | 1/20/2015 | 1/20/2015 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 83248 | 1/30/2015 | 1/30/2015 | 62 | BCHA | BMO Charterhouse | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (23,147.88) | (23,379.36) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 83248 | 1/30/2015 | 1/30/2015 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 28,647.43 | - | 28,647.43 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 83269 | 2/2/2015 | 2/4/2015 | 3 | WORK | WORK | | | | Accord Accord Fdn 15 fees | debit | keepcurrency | debit | a=custom | USD | - | (6,000.00) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 83241 | 2/2/2015 | 1/30/2015 | 18 | TDCH | TD CHE | | | | Stubhub ck #87 | debit | keepcurrency | debit | a=bank | CAD | (3,649.52) | - | (3,749.52) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 83307 | 2/3/2015 | 2/3/2015 | 3 | WORK | WORK | | | | internal transfer close account HPTG | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (552.98) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 83571 | 2/10/2015 | 2/13/2015 | 80 | VALP | VALP | | | | debit | debit | keepcurrency | debit | a=bank | USD | (3,951.66) | (4,170.21) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 83592 | 2/14/2015 | 4/1/2015 | 3 | WORK | WORK | | | | internal transfer close GRPH | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 855.12 | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 85809 | 2/26/2015 | 2/26/2015 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 86408 | 3/10/2015 | 4/1/2015 | 62 | BCHA | BMO Charterhouse | | | | forex | forex debit | nothing | forex debit | a=bank | CAD | (6,442.50) | - | (6,506.93) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 86408 | 3/10/2015 | 4/1/2015 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | USD | 5,000.00 | 5,000.00 | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 86446 | 3/12/2015 | 3/16/2015 | 46 | SAFE | SAFE | MAPG-E | Maple Leaf 1 oz gold coins | 100 | gold coins | buy stock | keepstock | buy stock | a=bank | CAD | - | - | (100.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 86586 | 3/18/2015 | 3/18/2015 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (5,000.00) | (5,250.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122938 | 3/27/2015 | 11/24/2018 | 57 | LOAN | LOAN | L-GREC | Charterhouse:Greenestone:3%Pledge | 14,002 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (4,667.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 86813 | 3/30/2015 | 3/30/2015 | 46 | SAFE | SAFE | MAPG-E | Maple Leaf 1 oz gold coins | 130 | gold coins | buy stock | keepstock | buy stock | a=bank | CAD | - | - | (100.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 87137 | 3/30/2015 | 3/31/2015 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (4.37) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 87138 | 3/30/2015 | 3/31/2015 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (42.09) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 87310 | 4/1/2015 | 4/1/2015 | 62 | BCHA | BMO Charterhouse | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (17,433.46) | (17,607.79) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 87310 | 4/1/2015 | 4/1/2015 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 21,385.05 | - | 21,385.05 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 87564 | 4/13/2015 | 4/13/2015 | 46 | SAFE | SAFE | MAPG-E | Maple Leaf 1 oz gold coins | (100) | internal transfer | stock delivery | keepcurrency | stock delivery | a=bank;cashbank=0;cashaccount=0 | CAD | - | - | (100.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 87569 | 4/13/2015 | 4/13/2015 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 87711 | 4/17/2015 | 4/17/2015 | 80 | VALP | VALP | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (8,740.62) | (8,928.03) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 87711 | 4/17/2015 | 4/17/2015 | 80 | VALP | VALP | | | | forex | forex credit | nothing | forex credit | | CAD | 10,664.43 | - | 10,664.43 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 88201 | 4/30/2015 | 5/1/2015 | 91 | CCTA | CCTA | | | | Continental TT | credit | keepcurrency | credit | a=bank | USD | 62,000.00 | 62,000.00 | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 88414 | 5/4/2015 | 5/4/2015 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (2,000.00) | (2,100.00) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 88620 | 5/14/2015 | 5/14/2015 | 18 | TDCH | TD CHE | | | | Airfares & Hotel ck #105 | debit | keepcurrency | debit | a=bank | CAD | (6,673.01) | - | (6,773.01) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 88635 | 5/14/2015 | 5/14/2015 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 88986 | 5/28/2015 | 5/28/2015 | 18 | TDCH | TD CHE | | | | Hotel ck #107 | debit | keepcurrency | debit | a=bank | CAD | (318.97) | - | (418.97) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 89493 | 6/5/2015 | 6/5/2015 | 3 | WORK | WORK | | | | internal transfer close MDDD | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (194.00) | - | - | - | - |

| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre2017 | 15 | ACCO | ACCO | 89644 | 6/15/2015 | 6/15/2015 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (2,500.00) | - | (2,625.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 89764 | 6/19/2015 | 6/19/2015 | 62 | BCHA | BMO Charterhouse | L-GSVC | Charterhouse:Greenstone:6% | 5,000 | Greenstone Ski Vacations ck #487 | buy stock | keepstock | buy stock | a=bank | CAD | (5,000.00) | - | (5,100.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 90637 | 6/20/2015 | 7/3/2015 | 57 | LOAN | LOAN | L-BSCC | Charterhouse:Blackstone:6% | 76,305 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (12,718.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 89961 | 6/25/2015 | 6/25/2015 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 90262 | 6/30/2015 | 7/1/2015 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (4.06) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 90263 | 6/30/2015 | 7/1/2015 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (25.12) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 90595 | 7/2/2015 | 7/2/2015 | 62 | BCHA | BMO Charterhouse | L-OILC | Charterhouse:OilSands:16% | 74,498 | VC Holdings ck #491 | buy stock | keepstock | buy stock | a=bank | CAD | (74,498.10) | - | (75,243.08) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 90658 | 7/6/2015 | 7/6/2015 | 62 | BCHA | BMO Charterhouse | | | | VC Holdings ck #383 | credit | keepcurrency | credit | a=bank | CAD | 75,000.00 | - | 75,000.00 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 90809 | 7/17/2015 | 7/17/2015 | 62 | BCHA | BMO Charterhouse | L-OILC | Charterhouse:OilSands:16% | 82,505 | VC Holdings ck #499 | buy stock | keepstock | buy stock | a=bank | CAD | (82,505.03) | - | (83,330.08) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 90839 | 7/17/2015 | 7/29/2015 | 62 | BCHA | BMO Charterhouse | L-BSCC | Charterhouse:Blackstone:6% | (80,000) | Blackstone Capital Partners ck #210 | sell stock | keepstock | sell stock | a=custom | CAD | 80,000.00 | - | 80,000.00 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 90840 | 7/20/2015 | 7/20/2015 | 62 | BCHA | BMO Charterhouse | L-BSCC | Charterhouse:Blackstone:6% | 50,000 | Blackstone Capital ck #500 | buy stock | keepstock | buy stock | a=bank | CAD | (50,000.00) | - | (50,500.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 90868 | 7/22/2015 | 8/5/2015 | 62 | BCHA | BMO Charterhouse | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (20,007.45) | (20,207.52) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 90868 | 7/22/2015 | 8/5/2015 | 5 | CASH | CASH | | | | forex | forex credit | nothing | forex credit | | CAD | 25,300.00 | - | 25,300.00 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 90886 | 7/23/2015 | 7/23/2015 | 18 | TDCH | TD CHE | | | | Airfares ck #115 | debit | keepcurrency | debit | a=bank | CAD | (762.92) | - | (862.92) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 91434 | 8/7/2015 | 8/7/2015 | 52 | VERA | VERA | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (44,108.61) | (44,549.70) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 91434 | 8/7/2015 | 8/7/2015 | 52 | VERA | VERA | | | | forex | forex credit | nothing | forex credit | | CAD | 56,878.38 | - | 56,878.38 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 91361 | 8/27/2015 | 8/5/2015 | 57 | LOAN | LOAN | L-GSVC | Charterhouse:Greenstone:6% | 3,607 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (601.17) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 92236 | 9/10/2015 | 9/21/2015 | 18 | TDCH | TD CHE | | | | airfares ckÃ¯Â¼Æ’119 | debit | keepcurrency | debit | a=bank | CAD | (1,835.32) | - | (1,935.32) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 92329 | 9/22/2015 | 9/22/2015 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 75,500.00 | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 92486 | 9/25/2015 | 9/28/2015 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | CAD | - | - | (99,000.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 92486 | 9/25/2015 | 9/28/2015 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | USD | - | 73,324.69 | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 92859 | 9/29/2015 | 9/30/2015 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (5.21) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 92860 | 9/29/2015 | 9/30/2015 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (15.10) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 92534 | 9/30/2015 | 9/30/2015 | 62 | BCHA | BMO Charterhouse | | | | NSF | debit | keepcurrency | debit | a=bank | CAD | (7.00) | - | (107.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 92469 | 9/30/2015 | 12/1/2015 | 62 | BCHA | BMO Charterhouse | L-BSCC | Charterhouse:Blackstone:6% | (100,000) | interest payment ck #240 | sell stock | keepstock | sell stock | a=custom | CAD | 100,000.00 | - | 100,000.00 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 93002 | 10/2/2015 | 10/2/2015 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 93066 | 10/7/2015 | 10/7/2015 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 19,100.00 | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 93094 | 10/8/2015 | 10/8/2015 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | USD | (1,500.00) | (1,600.00) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 93320 | 10/20/2015 | 10/20/2015 | 41 | SGPE | SGPE | | | | forex | forex debit | nothing | forex debit | a=custom | USD | (1,376.03) | (1,489.79) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 93320 | 10/20/2015 | 10/20/2015 | 41 | SGPE | SGPE | | | | forex | forex credit | nothing | forex credit | | CAD | 1,788.90 | - | 1,788.90 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 93376 | 10/22/2015 | 10/22/2015 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (1,500.00) | - | (1,600.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 93993 | 11/5/2015 | 11/5/2015 | 46 | SAFE | SAFE | MAPG-E | Maple Leaf 1 oz gold coins | (30) | deliver gold coins | stock delivery | keepcurrency | stock delivery | a=bank | CAD | - | - | (100.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 93995 | 11/5/2015 | 11/5/2015 | 62 | BCHA | BMO Charterhouse | | | | Blackstone Capital ck #252 | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | CAD | - | - | (29,700.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 93994 | 11/5/2015 | 12/1/2015 | 62 | BCHA | BMO Charterhouse | L-BSCC | Charterhouse:Blackstone:6% | (30,000) | Blackstone Capital ck #252 | sell stock | keepstock | sell stock | a=custom | CAD | 30,000.00 | - | 30,000.00 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 94046 | 11/10/2015 | 11/10/2015 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 104853 | 12/9/2015 | 10/17/2016 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 129,000.00 | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 95002 | 12/10/2015 | 12/10/2015 | 18 | TDCH | TD CHE | | | | Skylink ck #204 | debit | keepcurrency | debit | a=bank | CAD | (173.86) | - | (273.86) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 95466 | 12/30/2015 | 12/31/2015 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (3.32) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 95467 | 12/30/2015 | 12/31/2015 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (15.20) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 96851 | 2/22/2016 | 4/26/2017 | 63 | SBCH | State Bank of India Charte | L-GSVC | Charterhouse:Greenstone:6% | 10,000 | Greenstone Ski Vacations ck #79 | buy stock | keepstock | buy stock | a=bank | CAD | (10,000.00) | - | (10,100.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 97382 | 3/2/2016 | 3/2/2016 | 52 | VERA | VERA | IRR | Inform Resources | (100,000) | deliver stock | stock delivery | keepcurrency | stock delivery | a=bank | CAD | (680.00) | - | (780.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 97404 | 3/2/2016 | 3/15/2016 | 105 | SIVA | Silverton Varese | IRR | Inform Resources | 100,000 | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | (200.00) | - | (800.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 97542 | 3/8/2016 | 3/8/2016 | 3 | WORK | WORK | | | | Accord  Fdn 2016 fees | debit | keepcurrency | debit | a=custom | USD | - | (6,000.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122939 | 3/27/2016 | 11/24/2018 | 57 | LOAN | LOAN | L-GREC | Charterhouse:Greenestone:3%Pledge | 14,422 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (4,807.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 98274 | 3/30/2016 | 3/31/2016 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (1.36) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 98275 | 3/30/2016 | 3/31/2016 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (6.71) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 98539 | 3/31/2016 | 3/31/2016 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 99073 | 3/31/2016 | 4/20/2016 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (29,175.62) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 99073 | 3/31/2016 | 4/20/2016 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 36,550.24 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 98999 | 4/18/2016 | 4/18/2016 | 3 | WORK | WORK | | | | director fee | debit | keepcurrency | debit | a=bank | USD | - | (100.00) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 100148 | 5/20/2016 | 5/20/2016 | 3 | WORK | WORK | | | | director fee Pine | debit | keepcurrency | debit | a=custom | USD | - | (100.00) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 101097 | 6/21/2016 | 6/21/2016 | 46 | SAFE | SAFE | MAPG-E | Maple Leaf 1 oz gold coins | (103) | sell gold coins | sell stock | keepstock | sell stock | collectprice=y;a=custom | CAD | - | - | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 101102 | 6/21/2016 | 6/21/2016 | 3 | WORK | WORK | | | | sell gold coins | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 130,707.00 | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 101441 | 6/29/2016 | 6/30/2016 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (0.89) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 101442 | 6/29/2016 | 6/30/2016 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (5.08) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 101764 | 7/6/2016 | 7/6/2016 | 26 | XPHO | xPhones | | | | 4 @6 mons services | debit | keepcurrency | debit | a=custom | USD | - | (1,800.00) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 104805 | 7/15/2016 | 10/14/2016 | 105 | SIVA | Silverton Varese | IRR | Inform Resources | (100,000) | stock split reverse 10:1 | split stock out | keepaccount | split stock out | a=custom;cashbank=0;cashaccount=0 | CAD | - | - | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 104805 | 7/15/2016 | 10/14/2016 | 105 | SIVA | Silverton Varese | IRR | Inform Resources | 10,000 | stock split reverse 10:1 | split stock in | keepaccount | split stock in | aid=seq0;cashbank=0;cashaccount=0 | | - | - | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 102027 | 7/17/2016 | 7/19/2016 | 57 | LOAN | LOAN | L-BSCC | Charterhouse:Blackstone:6% | 65,090 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (10,848.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 102227 | 7/29/2016 | 7/29/2016 | 99 | BOSA | BOSA | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (8,297.18) | (8,380.15) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 102227 | 7/29/2016 | 7/29/2016 | 99 | BOSA | BOSA | | | | forex | forex credit | nothing | forex credit | | CAD | 10,853.08 | - | 10,853.08 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 102634 | 8/4/2016 | 8/10/2016 | 46 | SAFE | SAFE | MAPG-E | Maple Leaf 1 oz gold coins | (7) | deliver gold coins | corporate action out | keepstock | corporate action out | a=bank | CAD | - | - | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 102840 | 8/12/2016 | 8/13/2016 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (4,101.56) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 102840 | 8/12/2016 | 8/13/2016 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 5,250.00 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 102825 | 8/12/2016 | 8/12/2016 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 102684 | 8/27/2016 | 8/8/2016 | 57 | LOAN | LOAN | L-GSVC | Charterhouse:Greenstone:6% | 4,422 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (737.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 103616 | 9/8/2016 | 9/8/2016 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (5,000.00) | - | (5,250.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 103630 | 9/30/2016 | 10/19/2016 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (8,989.90) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 103630 | 9/30/2016 | 10/19/2016 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 11,596.97 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 104495 | 9/30/2016 | 10/3/2016 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (0.86) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 104496 | 9/30/2016 | 10/3/2016 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (44.57) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 104741 | 10/11/2016 | 10/11/2016 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (7,500.00) | - | (7,875.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 104763 | 10/12/2016 | 10/12/2016 | 46 | SAFE | SAFE | MAPG-E | Maple Leaf 1 oz gold coins | (190) | deliver gold coins | stock delivery | keepcurrency | stock delivery | a=bank | CAD | - | - | (100.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 106557 | 10/14/2016 | 12/9/2016 | 107 | WBMO | WB21 Morris | | | | Inform Resources TT | credit | keepcurrency | credit | a=bank | CAD | 15,039.05 | - | 15,039.05 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 104856 | 10/17/2016 | 12/2/2016 | 107 | WBMO | WB21 Morris | | | | 2 wires TT | credit | keepcurrency | credit | a=bank | USD | 25,000.00 | 25,000.00 | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 105007 | 10/19/2016 | 10/21/2016 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (20,769.34) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 105007 | 10/19/2016 | 10/21/2016 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 27,400.00 | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 104964 | 10/19/2016 | 10/19/2016 | 3 | WORK | WORK | | | | director fees | debit | keepcurrency | debit | a=custom | USD | - | (1,000.00) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 104965 | 10/21/2016 | 12/6/2016 | 101 | AFTR | AfrAsia Trius | | | | McMillan TT | debit | keepcurrency | debit | a=bank | CAD | (25,039.73) | - | (25,640.52) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 105132 | 10/25/2016 | 10/25/2016 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 106622 | 12/6/2016 | 12/9/2016 | 108 | WBQU | WB21 Quezon | | | | Pyronix Media TT | debit | keepcurrency | debit | a=bank | USD | (15,030.00) | (15,405.75) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 106785 | 12/9/2016 | 12/9/2016 | 107 | WBMO | WB21 Morris | | | | Kancelaria Radcy TT | debit | keepcurrency | debit | a=bank | USD | (25,050.00) | (25,676.25) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 107108 | 12/21/2016 | 12/23/2016 | 100 | CANE | Canaccord Egredior | BRZ | Bearing Lithium | 5,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (3,385.00) | - | (3,520.40) | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 107178 | 12/30/2016 | 12/31/2016 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (0.59) | - | - | - | - |
| Pre2017 | 15 | ACCO | ACCO | 107179 | 12/30/2016 | 12/31/2016 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (10.50) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 115389 | 12/31/2016 | 8/29/2017 | 45 | SIMO | Silverton Morris 1018 | ARW | Aroway Minerals | (187,000) | write off stock | sell stock | keepstock | sell stock | collectprice=y;a=custom | CAD | - | - | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 115955 | 12/31/2016 | 9/8/2017 | 16 | REST | REST | ORYN-E | Oryon Holdings | (10,807,815) | write off stock | sell stock | keepstock | sell stock | collectprice=y;a=custom | USD | - | - | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 115133 | 12/31/2016 | 8/21/2017 | 58 | LEMI | LEMI | RCC | Red Rock Capital | (2,000) | write off stock | stock delivery | keepcurrency | stock delivery | a=custom | CAD | - | - | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 107547 | 1/3/2017 | 3/3/2017 | 26 | XPHO | xPhones | | | | 2 @ 3 mons services | debit | keepcurrency | debit | a=custom | USD | - | (900.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 107702 | 1/5/2017 | 1/6/2017 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (5,000.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 107928 | 1/6/2017 | 2/9/2017 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (100,338.39) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 107928 | 1/6/2017 | 2/9/2017 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 130,439.91 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 107691 | 1/6/2017 | 1/6/2017 | 100 | CANE | Canaccord Egredior | LBY | Liberty One Lithium | 300,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (130,320.00) | - | (135,532.80) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 108611 | 1/11/2017 | 6/3/2017 | 108 | WBQU | WB21 Quezon | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (15,126.30) | (15,277.56) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 108611 | 1/11/2017 | 6/3/2017 | 108 | WBQU | WB21 Quezon | | | | forex | forex credit | nothing | forex credit | | CAD | 20,000.00 | - | 20,000.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 108645 | 1/12/2017 | 6/3/2017 | 107 | WBMO | WB21 Morris | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (34,800.00) | (35,148.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 108645 | 1/12/2017 | 6/3/2017 | 107 | WBMO | WB21 Morris | | | | forex | forex credit | nothing | forex credit | | CAD | 45,318.69 | - | 45,318.69 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 107833 | 1/13/2017 | 1/13/2017 | 3 | WORK | WORK | | | | internal transfer shell purchase repayment | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 100,000.00 | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 107845 | 1/13/2017 | 1/13/2017 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (40,000.00) | - | (42,000.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 108647 | 1/17/2017 | 6/3/2017 | 107 | WBMO | WB21 Morris | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (39,000.00) | (39,390.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 108647 | 1/17/2017 | 6/3/2017 | 107 | WBMO | WB21 Morris | | | | forex | forex credit | nothing | forex credit | | CAD | 50,787.10 | - | 50,787.10 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 108157 | 1/19/2017 | 2/27/2017 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (9,000.00) | - | (9,450.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 108677 | 2/7/2017 | 2/7/2017 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | CAD | - | - | 150,000.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 108678 | 2/7/2017 | 2/7/2017 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | CAD | - | - | 220,000.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 108740 | 2/7/2017 | 2/9/2017 | 105 | WIVA | Wintercap Varese 1090 | LBY | Liberty One Lithium | 7,500 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (4,300.25) | - | (4,472.26) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 108777 | 2/11/2017 | 2/11/2017 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 37,500.00 | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 108896 | 2/21/2017 | 3/2/2017 | 107 | WBMO | WB21 Morris | | | | StartMonday TT CAD87062.50 | debit | keepcurrency | debit | a=bank | USD | (66,362.66) | (68,021.73) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 108946 | 2/23/2017 | 3/3/2017 | 101 | AFTR | AfrAsia Trius | | | | Glenridge Partners TT | debit | keepcurrency | debit | a=bank | USD | (5,045.00) | (5,171.13) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 117604 | 2/24/2017 | 11/17/2017 | 25 | SIQU | Silverton Quezon 1019 | | | | YouCaring Jennifer McGarry | debit | keepcurrency | debit | a=bank | EUR | (2,959.83) | - | - | - | (3,059.83) | - |
| SKYFALL | 15 | ACCO | ACCO | 109356 | 2/28/2017 | 3/3/2017 | 100 | CANE | Canaccord Egredior | LBY | Liberty One Lithium | 200,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (115,200.00) | - | (119,808.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 109537 | 3/1/2017 | 3/9/2017 | 3 | WORK | WORK | | | | internal transfer MXN50k | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (2,763.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 109346 | 3/3/2017 | 3/31/2017 | 107 | WBMO | WB21 Morris | | | | Audience Marketing TT | debit | keepcurrency | debit | a=bank | USD | (10,020.00) | (10,270.50) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 109495 | 3/7/2017 | 3/31/2017 | 109 | WBRI | WB21 Riverfall | | | | Beneficial Design TT | debit | keepcurrency | debit | a=bank | USD | (5,010.00) | (5,135.25) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 109522 | 3/8/2017 | 3/31/2017 | 107 | WBMO | WB21 Morris | | | | Cheuram Consulting TT | credit | keepcurrency | credit | a=bank | USD | 24,980.00 | 24,980.00 | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 109678 | 3/22/2017 | 3/22/2017 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | CAD | - | - | (37,706.66) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 109678 | 3/22/2017 | 3/22/2017 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | USD | - | 27,930.86 | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 109712 | 3/25/2017 | 3/31/2017 | 109 | WBRI | WB21 Riverfall | | | | Beneficial Designs TT | debit | keepcurrency | debit | a=bank | USD | (5,010.00) | (5,135.25) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122940 | 3/27/2017 | 11/24/2018 | 57 | LOAN | LOAN | L-GREC | Charterhouse:Greenestone:3%Pledge | 14,855 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (4,952.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 109801 | 3/30/2017 | 3/31/2017 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | CAD | - | - | (6,949.24) | - | - | - |

| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SKYFALL | 15 | ACCO | ACCO | 109801 | 3/30/2017 | 3/31/2017 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | USD | - | 5,186.00 | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110081 | 3/31/2017 | 4/5/2017 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (391.26) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110076 | 4/4/2017 | 5/7/2017 | 101 | AFTR | AfrAsia Trius | | | | StartMonday Technology TT | debit | keepcurrency | debit | a=bank | CAD | (125,093.85) | - | (128,221.20) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110159 | 4/5/2017 | 4/28/2017 | 124 | WBVA | WB21 Varese | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (85,000.00) | (85,850.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110159 | 4/5/2017 | 4/28/2017 | 124 | WBVA | WB21 Varese | | | | forex | forex credit | nothing | forex credit | | CAD | 113,747.89 | - | 113,747.89 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110165 | 4/5/2017 | 4/27/2017 | 16 | REST | REST | | | | directors fee | debit | keepcurrency | debit | a=custom | CAD | - | - | (1,300.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110236 | 4/7/2017 | 6/3/2017 | 101 | AFTR | AfrAsia Trius | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (94,268.48) | (95,211.16) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110236 | 4/7/2017 | 6/3/2017 | 101 | AFTR | AfrAsia Trius | | | | forex | forex credit | nothing | forex credit | | CAD | 125,000.00 | - | 125,000.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110216 | 4/10/2017 | 4/27/2017 | 16 | REST | REST | | | | directors fee | debit | keepcurrency | debit | a=custom | CAD | - | - | (500.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110372 | 4/26/2017 | 4/26/2017 | 3 | WORK | WORK | | | | Office rent Jan-Apr 2017 4 mos | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | CAD | - | - | 7,560.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110389 | 4/27/2017 | 4/27/2017 | 3 | WORK | WORK | | | | internal transfer BL repayment | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 20,500.00 | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110632 | 4/27/2017 | 5/1/2017 | 100 | CANE | Canaccord Egredior | PRZ | Prize Mining | 715,000 | receive stock DAP | buy stock | keepstock | buy stock | a=custom | CAD | (250,350.00) | - | (250,350.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110394 | 4/27/2017 | 4/27/2017 | 98 | CANI | Canaccord Inland | WGO | White Gold | 10,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (19,452.30) | - | (20,230.39) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110399 | 4/27/2017 | 4/27/2017 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (13,000.00) | - | (13,650.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110430 | 4/28/2017 | 4/28/2017 | 3 | WORK | WORK | | | | internal transfer adjust pyronix/prize | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 195,000.00 | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110589 | 4/28/2017 | 6/3/2017 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (144,263.62) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110589 | 4/28/2017 | 6/3/2017 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 193,313.25 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111385 | 4/28/2017 | 6/3/2017 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (1,039.83) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111385 | 4/28/2017 | 6/3/2017 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | EUR | - | - | - | - | 812.36 | - |
| SKYFALL | 15 | ACCO | ACCO | 110792 | 5/1/2017 | 5/8/2017 | 98 | CANI | Canaccord Inland | WGO | White Gold | 10,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (20,230.00) | - | (21,039.20) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110793 | 5/3/2017 | 5/8/2017 | 100 | CANE | Canaccord Egredior | LBY | Liberty One Lithium | 171,000 | buy stock | buy stock | keepstock | buy stock | collectprice=y;a=bank | CAD | (98,474.70) | - | (102,413.69) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110701 | 5/3/2017 | 5/28/2017 | 124 | WBVA | WB21 Varese | | | | DataMentors TT | debit | keepcurrency | debit | a=bank | USD | (5,694.27) | (5,836.63) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111115 | 5/4/2017 | 5/28/2017 | 105 | WIVA | Wintercap Varese 1090 | | | | stock split IRR 10000 | debit | keepcurrency | debit | a=bank | CAD | (25.00) | - | (125.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 110978 | 5/17/2017 | 5/17/2017 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 360,000.00 | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111031 | 5/19/2017 | 5/19/2017 | 124 | WBVA | WB21 Varese | | | | Pamela Parmar TT | debit | keepcurrency | debit | a=bank | CAD | (62,499.75) | - | (64,062.24) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111057 | 5/24/2017 | 5/24/2017 | 3 | WORK | WORK | | | | director fee | debit | keepcurrency | debit | a=bank | USD | - | (100.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111106 | 5/24/2017 | 5/28/2017 | 123 | WBSA | WB21 Santos | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (6,000.00) | (6,060.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111106 | 5/24/2017 | 5/28/2017 | 123 | WBSA | WB21 Santos | | | | forex | forex credit | nothing | forex credit | | EUR | 5,349.94 | - | - | - | 5,349.94 | - |
| SKYFALL | 15 | ACCO | ACCO | 111056 | 5/25/2017 | 5/28/2017 | 123 | WBSA | WB21 Santos | | | | Autobedrijf G.H. Wessel TT | debit | keepcurrency | debit | a=bank | EUR | (6,012.00) | - | - | - | (6,162.30) | - |
| SKYFALL | 15 | ACCO | ACCO | 111454 | 5/26/2017 | 6/26/2017 | 94 | PESC | Pesic Corby | | | | debit trade 5K LND in error | debit | keepcurrency | debit | a=custom | USD | (200.00) | (200.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111123 | 5/29/2017 | 5/29/2017 | 3 | WORK | WORK | | | | director fees | debit | keepcurrency | debit | a=custom | USD | - | (1,000.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111124 | 5/29/2017 | 5/29/2017 | 124 | WBVA | WB21 Varese | | | | StarMonday TT | debit | keepcurrency | debit | a=bank | CAD | (50,100.00) | - | (51,352.50) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111125 | 5/29/2017 | 5/29/2017 | 108 | WBQU | WB21 Quezon | | | | Fortuna Investments TT | debit | keepcurrency | debit | a=bank | CAD | (35,070.00) | - | (35,946.75) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 115005 | 5/30/2017 | 8/12/2017 | 105 | WIVA | Wintercap Varese 1090 | | | | Deposit fees IRR | debit | keepcurrency | debit | a=bank | CAD | (200.00) | - | (300.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111449 | 6/1/2017 | 6/7/2017 | 105 | WIVA | Wintercap Varese 1090 | IRR | Inform Resources | (10,000) | stock split 2:1 | split stock out | keepaccount | split stock out | a=custom;cashbank=0;cashaccount=0 | CAD | - | - | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111449 | 6/1/2017 | 6/7/2017 | 105 | WIVA | Wintercap Varese 1090 | IRR | Inform Resources | 20,000 | stock split 2:1 | split stock in | keepaccount | split stock in | aid=seq0;cashbank=0;cashaccount=0 | | - | - | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111357 | 6/1/2017 | 6/1/2017 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 360,000.00 | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111440 | 6/7/2017 | 7/5/2017 | 108 | WBQU | WB21 Quezon | | | | McMillan TT LBY | debit | keepcurrency | debit | a=custom | CAD | (625,337.57) | - | (634,781.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111437 | 6/7/2017 | 6/12/2017 | 109 | WBRI | WB21 Riverfall | | | | Beneficial Designs TT | debit | keepcurrency | debit | a=bank | USD | (6,137.25) | (6,290.68) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111501 | 6/12/2017 | 6/12/2017 | 3 | WORK | WORK | | | | director fee | debit | keepcurrency | debit | a=bank | USD | - | (100.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111502 | 6/12/2017 | 6/12/2017 | 108 | WBQU | WB21 Quezon | | | | StartMonday TT | debit | keepcurrency | debit | a=bank | CAD | (70,140.00) | - | (71,893.50) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111564 | 6/15/2017 | 6/19/2017 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (189,352.18) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111564 | 6/15/2017 | 6/19/2017 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 248,051.36 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111050 | 6/20/2017 | 7/5/2017 | 107 | WBMO | WB21 Morris | | | | Liberty TT | credit | keepcurrency | credit | a=bank | CAD | 119,936.28 | - | 119,936.28 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111589 | 6/20/2017 | 7/9/2017 | 123 | WBSA | WB21 Santos | | | | Burns, Figa & Will TT | debit | keepcurrency | debit | a=bank | USD | (2,510.00) | (2,610.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111603 | 6/22/2017 | 6/22/2017 | 100 | CANE | Canaccord Egredior | BRZ | Bearing Lithium | (5,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,615.00 | - | 4,430.40 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111607 | 6/22/2017 | 6/22/2017 | 113 | COQB | Coast Capital QB | | | | 1033405 BC Ltd draft | debit | keepcurrency | debit | a=bank | CAD | (26,000.00) | - | (26,260.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111623 | 6/22/2017 | 7/4/2017 | 94 | PESC | Pesic Corby | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (91,224.06) | (92,136.30) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111623 | 6/22/2017 | 7/4/2017 | 94 | PESC | Pesic Corby | | | | forex | forex credit | nothing | forex credit | | CAD | 120,196.83 | - | 120,196.82 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111701 | 6/29/2017 | 6/29/2017 | 113 | COQB | Coast Capital QB | | | | McMillan draft | debit | keepcurrency | debit | a=bank | CAD | (45,000.00) | - | (45,450.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111847 | 6/29/2017 | 6/30/2017 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (0.74) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 111848 | 6/29/2017 | 6/30/2017 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (519.68) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112112 | 6/30/2017 | 7/20/2017 | 3 | WORK | WORK | | | | Office rent May-Jun 2017 2 mos | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | CAD | - | - | 1,180.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112302 | 7/1/2017 | 7/20/2017 | 3 | WORK | WORK | | | | forex | forex debit | nothing | forex debit | a=custom | USD | - | (72,727.52) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112302 | 7/1/2017 | 7/20/2017 | 3 | WORK | WORK | | | | forex | forex credit | nothing | forex credit | | CAD | - | - | 90,318.94 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112115 | 7/5/2017 | 7/5/2017 | 122 | COKE | Coast Capital Kendo | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (81,829.44) | (82,647.73) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112115 | 7/5/2017 | 7/5/2017 | 122 | COKE | Coast Capital Kendo | | | | forex | forex credit | nothing | forex credit | | CAD | 105,723.64 | - | 105,723.64 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112020 | 7/17/2017 | 7/4/2017 | 57 | LOAN | LOAN | L-BSCC | Charterhouse:Blackstone:6% | 77,796 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (12,966.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112258 | 7/17/2017 | 7/17/2017 | 124 | WBVA | WB21 Varese | | | | forex 1256 | forex debit | nothing | forex debit | a=bank | USD | (28,000.00) | (28,280.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112258 | 7/17/2017 | 7/17/2017 | 124 | WBVA | WB21 Varese | | | | forex 1256 | forex credit | nothing | forex credit | | CAD | 35,340.24 | - | 35,340.24 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112272 | 7/18/2017 | 7/18/2017 | 110 | WBHI | WB21 Hilton | | | | Leo Resources TT IB | debit | keepcurrency | debit | a=bank | CAD | (100,200.00) | - | (102,705.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112301 | 7/19/2017 | 7/20/2017 | 110 | WBHI | WB21 Hilton | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (32,831.36) | (33,159.67) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112301 | 7/19/2017 | 7/20/2017 | 110 | WBHI | WB21 Hilton | | | | forex | forex credit | nothing | forex credit | | CAD | 41,180.17 | - | 41,180.17 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112300 | 7/20/2017 | 8/3/2017 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (14,000.00) | - | (14,700.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112528 | 7/25/2017 | 7/31/2017 | 124 | WBVA | WB21 Varese | | | | forex 1303 | forex debit | nothing | forex debit | a=bank | USD | (140,087.51) | (141,488.39) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112528 | 7/25/2017 | 7/31/2017 | 124 | WBVA | WB21 Varese | | | | forex 1303 | forex credit | nothing | forex credit | | CAD | 175,000.00 | - | 175,000.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112423 | 7/25/2017 | 7/26/2017 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 102,000.00 | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112453 | 7/26/2017 | 7/26/2017 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (30,000.00) | - | (31,500.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112845 | 8/3/2017 | 11/3/2017 | 4 | BEAP | Beaufort Pegasus | AVN-E | Avonhurst Capital | 135,416 | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | - | - | (600.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112843 | 8/3/2017 | 11/3/2017 | 76 | BEAT | Beaufort Trius | AVN-E | Avonhurst Capital | 187,500 | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | - | - | (600.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112794 | 8/3/2017 | 8/3/2017 | 108 | WBQU | WB21 Quezon | | | | Evergreen TT GROG | debit | keepcurrency | debit | a=bank | USD | (10,020.00) | (10,270.50) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112844 | 8/3/2017 | 1/10/2018 | 69 | BEAG | Beaufort Gotama | AVN-E | Avonhurst Capital | 171,250 | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | - | - | (600.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112883 | 8/8/2017 | 9/1/2017 | 124 | WBVA | WB21 Varese | | | | Nexus 21 TT | debit | keepcurrency | debit | a=bank | USD | (5,075.14) | (5,202.02) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 112882 | 8/8/2017 | 8/8/2017 | 124 | WBVA | WB21 Varese | | | | Brown Safe Manufacturing TT | debit | keepcurrency | debit | a=bank | USD | (11,783.52) | (12,078.11) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 115178 | 8/22/2017 | 8/22/2017 | 25 | SIQU | Silverton Quezon 1019 | RKR | Rokmaster Resources | (50,000) | internal transfer | stock delivery | keepcurrency | stock delivery | a=bank;cashbank=0;cashaccount=0 | CAD | - | - | (100.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 115178 | 8/22/2017 | 8/22/2017 | 126 | WILA | Wintercap Laramee 1130 | RKR | Rokmaster Resources | 50,000 | internal transfer | transfer stock in | keepstock | transfer stock in | sid=seq0;cid=seq0;cashbank=0;cashaccount=0;stock=seq0 | CAD | - | - | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122934 | 8/27/2017 | 11/23/2018 | 57 | LOAN | LOAN | L-GSVC | Charterhouse:Greenstone:6% | 4,982 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (830.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116028 | 9/14/2017 | 9/14/2017 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (15,160.00) | - | (15,918.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116218 | 9/20/2017 | 10/18/2017 | 98 | CANI | Canaccord Inland | ML | Milennial Lithium | 96,000 | receive stock DAP | buy stock | keepstock | buy stock | a=custom | CAD | (120,000.00) | - | (120,000.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116547 | 9/21/2017 | 10/3/2017 | 123 | WBSA | WB21 Santos | | | | outgoing wire fund card | debit | keepcurrency | debit | a=bank | USD | (5,000.00) | (5,125.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116233 | 9/28/2017 | 9/29/2017 | 98 | CANI | Canaccord Inland | ML | Milennial Lithium | (20,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 27,690.00 | - | 26,582.40 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116781 | 9/30/2017 | 10/16/2017 | 3 | WORK | WORK | | | | Office rent Jul-Sep 2017 3 mos | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | CAD | - | - | 1,770.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116417 | 9/30/2017 | 10/1/2017 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (0.70) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116418 | 9/30/2017 | 10/1/2017 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (642.66) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116564 | 10/4/2017 | 10/4/2017 | 98 | CANI | Canaccord Inland | ML | Milennial Lithium | (20,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 27,690.00 | - | 26,582.40 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116600 | 10/5/2017 | 10/5/2017 | 98 | CANI | Canaccord Inland | ML | Milennial Lithium | (20,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 28,482.00 | - | 27,342.72 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116626 | 10/6/2017 | 10/6/2017 | 98 | CANI | Canaccord Inland | ML | Milennial Lithium | (20,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 29,670.00 | - | 28,483.20 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116681 | 10/10/2017 | 10/10/2017 | 98 | CANI | Canaccord Inland | ML | Milennial Lithium | (16,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 25,155.60 | - | 24,149.38 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116796 | 10/16/2017 | 10/17/2017 | 69 | BEAG | Beaufort Gotama | LBY | Liberty One Lithium | (678,500) | internal transfer | stock delivery | keepcurrency | stock delivery | a=bank;cashbank=0;cashaccount=0 | CAD | - | - | (100.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 117377 | 10/18/2017 | 11/3/2017 | 79 | WIHI | Wintercap Hilton 1095 | | | | Hadley Mining TT finders fee | debit | keepcurrency | debit | a=bank | CAD | (86,250.00) | - | (88,406.25) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116820 | 10/18/2017 | 10/18/2017 | 98 | CANI | Canaccord Inland | ML | Milennial Lithium | (48,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 115,404.00 | - | 110,787.84 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116828 | 10/18/2017 | 10/18/2017 | 98 | CANI | Canaccord Inland | ML | Milennial Lithium | 48,000 | buy stock exercise warrants | buy stock | keepstock | buy stock | collectprice=y;a=custom | CAD | (72,000.00) | - | (72,000.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 116931 | 10/24/2017 | 10/25/2017 | 100 | CANE | Canaccord Egredior | PRZ | Prize Mining | (14,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 6,535.00 | - | 6,273.60 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 117062 | 10/30/2017 | 10/31/2017 | 100 | CANE | Canaccord Egredior | PRZ | Prize Mining | (20,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 9,065.00 | - | 8,702.40 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 117053 | 10/30/2017 | 10/30/2017 | 100 | CANE | Canaccord Egredior | PRZ | Prize Mining | (5,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 2,500.00 | - | 2,400.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 117367 | 11/2/2017 | 11/3/2017 | 105 | WIVA | Wintercap Varese 1090 | | | | rebalance IRR | debit | keepcurrency | debit | a=bank | CAD | (200.00) | - | (300.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 117746 | 11/20/2017 | 11/24/2017 | 105 | WIVA | Wintercap Varese 1090 | | | | Montego Resources TT | debit | keepcurrency | debit | a=bank | CAD | (150,000.00) | - | (153,750.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 117772 | 11/27/2017 | 11/27/2017 | 100 | CANE | Canaccord Egredior | PRZ | Prize Mining | (675,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=custom | CAD | 260,587.50 | - | 260,487.50 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 118080 | 12/5/2017 | 12/5/2017 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (40,000.00) | - | (42,000.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 117728 | 12/13/2017 | 12/14/2017 | 4 | BEAP | Beaufort Pegasus | AVN-E | Avonhurst Capital | (135,416) | order DRS statement | stock delivery | keepcurrency | stock delivery | a=custom;cashbank=0;cashaccount=0 | CAD | (175.00) | - | (175.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 117728 | 12/13/2017 | 12/14/2017 | 16 | REST | REST | AVN-E | Avonhurst Capital | 135,416 | order DRS statement | transfer stock in | keepstock | transfer stock in | sid=seq0;cid=seq0;cashbank=0;cashaccount=0;stock=seq0 | CAD | - | - | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122952 | 12/13/2017 | 11/27/2018 | 57 | LOAN | LOAN | L-GSVC | Charterhouse:Greenstone:6% | (60,999) | loan payment Gillespie & Co LLP | sell stock | keepstock | sell stock | a=custom | CAD | - | - | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 118302 | 12/19/2017 | 12/19/2017 | 3 | WORK | WORK | | | | Office rent Oct-Dec 2017 3 mos | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | CAD | - | - | 1,770.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 118306 | 12/19/2017 | 12/19/2017 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (250,000.00) | - | (262,500.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 118320 | 12/20/2017 | 12/28/2017 | 3 | WORK | WORK | | | | Directors fees | debit | keepcurrency | debit | a=custom | USD | - | (1,000.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 118339 | 12/22/2017 | 12/24/2017 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | CAD | - | - | 61,000.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 118333 | 12/22/2017 | 12/23/2017 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (250,000.00) | - | (262,500.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 118346 | 12/27/2017 | 4/26/2018 | 98 | CANI | Canaccord Inland | DLI | Desert Lion | 65,935 | buy stock DAP | buy stock | keepstock | buy stock | collectprice=y;a=custom | CAD | (120,101.70) | - | (120,101.70) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 118435 | 12/31/2017 | 1/8/2018 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (0.84) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 118436 | 12/31/2017 | 1/8/2018 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (106.46) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 118706 | 1/12/2018 | 1/15/2018 | 98 | CANI | Canaccord Inland | MC | M2 Cobalt | 500,000 | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | - | - | (200.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119351 | 2/5/2018 | 2/27/2018 | 117 | WISA | Wintercap Santos 1084 | | | | forex 2203 | forex debit | nothing | forex debit | a=bank | USD | (3,763.59) | (3,801.23) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119351 | 2/5/2018 | 2/27/2018 | 117 | WISA | Wintercap Santos 1084 | | | | forex 2203 | forex credit | nothing | forex credit | | EUR | 3,059.83 | - | - | - | 3,059.83 | - |
| SKYFALL | 15 | ACCO | ACCO | 119110 | 2/7/2018 | 2/7/2018 | 98 | CANI | Canaccord Inland | MC-W | MC Coblat | 250,000 | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | - | - | (200.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119120 | 2/8/2018 | 2/8/2018 | 98 | CANI | Canaccord Inland | DLI-W | Desert Lion | 49,451 | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | - | - | (200.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119126 | 2/8/2018 | 2/8/2018 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | USD | - | 340,000.00 | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119294 | 2/9/2018 | 3/5/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | 200,000 | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | - | - | (100.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119254 | 2/20/2018 | 2/21/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 6,520.00 | - | 6,389.60 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119285 | 2/21/2018 | 2/24/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (19,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 11,783.50 | - | 11,547.83 | - | - | - |

| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SKYFALL | 15 | ACCO | ACCO | 119293 | 2/22/2018 | 2/24/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (15,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 9,145.00 | - | 8,962.10 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119340 | 2/23/2018 | 2/27/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (15,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 8,910.00 | - | 8,731.80 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119522 | 2/26/2018 | 2/28/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (15,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 9,632.50 | - | 9,439.85 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119534 | 2/27/2018 | 3/1/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (4,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 2,460.00 | - | 2,360.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119584 | 2/28/2018 | 3/6/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (26,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 15,938.80 | - | 15,620.02 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119560 | 3/1/2018 | 3/3/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (15,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 9,038.50 | - | 8,857.73 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119549 | 3/1/2018 | 3/1/2018 | 5 | CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (40,000.00) | - | (42,000.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119547 | 3/2/2018 | 3/6/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (15,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 9,187.00 | - | 9,003.26 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119583 | 3/5/2018 | 3/6/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (15,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 9,484.00 | - | 9,294.32 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119594 | 3/6/2018 | 3/7/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (15,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 10,820.50 | - | 10,604.09 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119616 | 3/8/2018 | 3/10/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (3,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,880.80 | - | 1,780.80 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119617 | 3/9/2018 | 3/10/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (27,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 17,087.20 | - | 16,745.46 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119635 | 3/12/2018 | 3/13/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (5,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,375.00 | - | 3,275.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119732 | 3/19/2018 | 3/22/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | 100,000 | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | (84.00) | - | (184.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119750 | 3/20/2018 | 3/22/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (12,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 7,105.00 | - | 6,962.90 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119749 | 3/21/2018 | 3/22/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (3,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,645.00 | - | 1,545.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119748 | 3/22/2018 | 3/23/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (15,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 8,435.00 | - | 8,266.30 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119762 | 3/23/2018 | 3/24/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (3,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,615.00 | - | 1,515.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119757 | 3/23/2018 | 3/23/2018 | 3 | WORK | WORK | | | | ATT MX 322-274-2549 to Mar 21/19 | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | USD | - | (1,300.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119769 | 3/26/2018 | 3/28/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (17,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 9,860.00 | - | 9,662.80 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122941 | 3/27/2018 | 11/24/2018 | 57 | LOAN | LOAN | L-GREC | Charterhouse:Greenestone:3%Pledge | 15,301 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (5,100.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119796 | 3/27/2018 | 3/28/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (17,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 9,670.00 | - | 9,476.60 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119795 | 3/28/2018 | 3/30/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (22,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 11,475.00 | - | 11,245.50 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119823 | 3/29/2018 | 3/30/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 5,305.00 | - | 5,198.90 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119917 | 3/30/2018 | 3/31/2018 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (0.72) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 119918 | 3/30/2018 | 3/31/2018 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (1,095.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120136 | 3/31/2018 | 4/11/2018 | 3 | WORK | WORK | | | | Office rent Jan-Mar 2018 3 mos | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | CAD | - | - | 1,770.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120221 | 4/25/2018 | 4/25/2018 | 117 | WISA | Wintercap Santos 1084 | | | | refund 21/9/17 wire to fund card 2359 | credit | keepcurrency | credit | a=bank | USD | 5,000.00 | 5,000.00 | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120268 | 4/26/2018 | 4/30/2018 | 98 | CANI | Canaccord Inland | DLI | Desert Lion | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 11,642.00 | - | 11,176.32 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120234 | 4/26/2018 | 4/26/2018 | 16 | REST | REST | | | | directors fees | debit | keepcurrency | debit | a=custom | USD | - | (200.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120266 | 4/27/2018 | 4/30/2018 | 98 | CANI | Canaccord Inland | DLI | Desert Lion | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 11,650.00 | - | 11,184.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120403 | 4/30/2018 | 5/1/2018 | 98 | CANI | Canaccord Inland | DLI | Desert Lion | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 11,850.00 | - | 11,376.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120237 | 5/1/2018 | 5/14/2018 | 117 | WISA | Wintercap Santos 1084 | | | | Tingle Merrett TT | debit | keepcurrency | debit | a=bank | CAD | (50,100.00) | - | (51,352.50) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120434 | 5/1/2018 | 5/2/2018 | 98 | CANI | Canaccord Inland | DLI | Desert Lion | (600) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 682.80 | - | 582.80 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120406 | 5/1/2018 | 6/4/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | 450,000 | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | (84.00) | - | (184.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120435 | 5/2/2018 | 5/2/2018 | 98 | CANI | Canaccord Inland | DLI | Desert Lion | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 10,550.00 | - | 10,128.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120461 | 5/3/2018 | 5/3/2018 | 98 | CANI | Canaccord Inland | DLI | Desert Lion | (9,400) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 10,472.00 | - | 10,053.12 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120468 | 5/4/2018 | 5/4/2018 | 98 | CANI | Canaccord Inland | DLI | Desert Lion | (15,935) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 18,324.82 | - | 17,591.83 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120509 | 5/10/2018 | 5/10/2018 | 126 | WILA | Wintercap Laramee 1130 | RKR | Rokmaster Resources | (50,000) | stock split 1:5 reverse | split stock out | keepaccount | split stock out | a=custom;cashbank=0;cashaccount=0 | CAD | - | - | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120509 | 5/10/2018 | 5/10/2018 | 126 | WILA | Wintercap Laramee 1130 | RKR | Rokmaster Resources | 10,000 | stock split 1:5 reverse | split stock in | keepaccount | split stock in | aid=seq0;cashbank=0;cashaccount=0 | | - | - | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120873 | 6/4/2018 | 6/4/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,180.00 | - | 4,080.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120879 | 6/4/2018 | 6/4/2018 | 16 | REST | REST | | | | directors fee | debit | keepcurrency | debit | a=custom | USD | - | (200.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120878 | 6/4/2018 | 7/26/2018 | 3 | WORK | WORK | | | | Office rent Apr-Jul 2018 4 mos | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | CAD | - | - | 2,360.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120896 | 6/5/2018 | 6/5/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,275.00 | - | 4,175.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120920 | 6/6/2018 | 6/6/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,675.00 | - | 4,575.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120928 | 6/7/2018 | 6/7/2018 | 16 | REST | REST | | | | directors fee | debit | keepcurrency | debit | a=custom | USD | - | (400.00) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120931 | 6/7/2018 | 6/7/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,255.00 | - | 4,155.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120960 | 6/8/2018 | 6/8/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,425.00 | - | 4,325.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120976 | 6/11/2018 | 6/11/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,325.00 | - | 4,225.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 120992 | 6/12/2018 | 6/12/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,425.00 | - | 4,325.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121004 | 6/13/2018 | 6/13/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,625.00 | - | 4,525.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121014 | 6/14/2018 | 6/14/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,155.00 | - | 4,055.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121031 | 6/15/2018 | 6/15/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,225.00 | - | 4,125.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121060 | 6/18/2018 | 6/20/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,910.00 | - | 3,810.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121061 | 6/19/2018 | 6/20/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,480.00 | - | 3,380.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121076 | 6/20/2018 | 6/21/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (2,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 855.00 | - | 755.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121077 | 6/21/2018 | 6/21/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,705.00 | - | 3,605.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121087 | 6/22/2018 | 6/23/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,967.50 | - | 3,867.50 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121093 | 6/25/2018 | 6/26/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,735.00 | - | 3,635.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121101 | 6/26/2018 | 6/26/2018 | 126 | WILA | Wintercap Laramee 1130 | | | | Cryptocorp USA TT | debit | keepcurrency | debit | a=bank | USD | (15,030.00) | (15,405.75) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121103 | 6/26/2018 | 6/26/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,715.00 | - | 3,615.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121137 | 6/27/2018 | 6/28/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,470.00 | - | 3,370.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121152 | 6/28/2018 | 6/30/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,420.00 | - | 3,320.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121149 | 6/29/2018 | 6/29/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,525.00 | - | 3,425.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121331 | 6/30/2018 | 7/3/2018 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (0.50) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121332 | 6/30/2018 | 7/3/2018 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (1,014.45) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121325 | 7/3/2018 | 7/3/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,405.00 | - | 3,305.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121398 | 7/4/2018 | 7/4/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,530.00 | - | 3,430.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121411 | 7/5/2018 | 7/6/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,355.00 | - | 3,255.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121429 | 7/9/2018 | 7/9/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,605.00 | - | 3,505.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121436 | 7/10/2018 | 7/10/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,811.50 | - | 3,711.50 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121446 | 7/11/2018 | 7/12/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,400.00 | - | 4,300.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121447 | 7/12/2018 | 7/12/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,890.00 | - | 3,790.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121452 | 7/13/2018 | 7/13/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,700.00 | - | 3,600.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121462 | 7/16/2018 | 7/17/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,705.00 | - | 3,605.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121469 | 7/17/2018 | 7/17/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,700.00 | - | 3,600.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121122 | 7/17/2018 | 6/27/2018 | 57 | LOAN | LOAN | L-BSCC | Charterhouse:Blackstone:6% | 82,463 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (13,744.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121476 | 7/18/2018 | 7/18/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,325.00 | - | 3,225.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121487 | 7/19/2018 | 7/19/2018 | 133 | LEEN | Leede Norton | | | | exercise Inform warrants | debit | keepcurrency | debit | a=bank | CAD | (41,750.00) | - | (41,750.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121488 | 7/19/2018 | 7/19/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,625.00 | - | 3,525.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121501 | 7/20/2018 | 7/20/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,410.00 | - | 3,310.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121508 | 7/23/2018 | 7/23/2018 | 3 | WORK | WORK | | | | internal transfer | credit | keeponlycurrency | credit | a=custom;cid=seq0;cashaccount=0;cashbank=0 | CAD | - | - | 20,000.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121509 | 7/23/2018 | 7/23/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,500.00 | - | 3,400.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121518 | 7/24/2018 | 7/29/2018 | 133 | LEEN | Leede Norton | IRR | Inform Resources | 1,670,00C | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | (42.00) | - | (142.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121517 | 7/24/2018 | 7/24/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,425.00 | - | 3,325.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121528 | 7/25/2018 | 7/25/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,500.00 | - | 3,400.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121549 | 7/26/2018 | 7/29/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,326.50 | - | 3,226.50 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121548 | 7/27/2018 | 7/29/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,450.00 | - | 3,350.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121552 | 7/30/2018 | 7/30/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,355.00 | - | 3,255.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121554 | 7/31/2018 | 7/31/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,370.00 | - | 3,270.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121705 | 8/1/2018 | 8/2/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,205.00 | - | 3,105.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121724 | 8/2/2018 | 8/7/2018 | 96 | BESQ | Banco Santa Cruz Esquire | | | | Booth Udall Fuller re: retainer top up | debit | keepcurrency | debit | a=bank | USD | (1,888.85) | (1,988.85) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121704 | 8/2/2018 | 8/2/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,155.00 | - | 3,055.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121713 | 8/2/2018 | 8/3/2018 | 3 | WORK | WORK | | | | internal transfer | debit | keepcurrency | debit | a=custom;cashaccount=0;cashbank=0 | CAD | - | - | (40,100.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121712 | 8/3/2018 | 8/3/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,200.00 | - | 3,100.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121731 | 8/7/2018 | 8/8/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 2,795.00 | - | 2,695.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121760 | 8/8/2018 | 8/19/2018 | 133 | LEEN | Leede Norton | PGP | Power Group Projects | 2,000,00C | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | (84.00) | - | (184.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121758 | 8/8/2018 | 8/11/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 2,696.00 | - | 2,596.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121759 | 8/9/2018 | 8/11/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (7,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,480.00 | - | 1,380.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 123212 | 8/13/2018 | 1/8/2019 | 62 | BCHA | BMO Charterhouse | L-114C | Charterhouse:1146915:6% | 350,000 | 1146915 BC Ltd loan advance | buy stock | keepstock | buy stock | a=bank | CAD | (350,000.00) | - | (353,500.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 121819 | 8/16/2018 | 8/23/2018 | 79 | WIHI | Wintercap Hilton 1095 | | | | TT Issuer Direct Corp 1199 | debit | keepcurrency | debit | a=bank | USD | (75,150.00) | (77,028.75) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122935 | 8/27/2018 | 11/27/2018 | 57 | LOAN | LOAN | L-GSVC | Charterhouse:Greenstone:6% | 1,621 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (270.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122231 | 9/27/2018 | 10/1/2018 | 98 | CANI | Canaccord Inland | MC | M2 Cobalt | (14,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 3,660.00 | - | 3,513.60 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122230 | 9/27/2018 | 9/28/2018 | 98 | CANI | Canaccord Inland | WGO | White Gold | (20,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 19,770.00 | - | 18,979.20 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122241 | 9/28/2018 | 10/1/2018 | 98 | CANI | Canaccord Inland | MC | M2 Cobalt | (9,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 2,535.00 | - | 2,433.60 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122347 | 9/30/2018 | 10/1/2018 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | USD | - | (0.34) | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122348 | 9/30/2018 | 10/1/2018 | 3 | WORK | WORK | | | | custody fees | debit | keepcurrency | debit | a=custom;cashbank=0 | CAD | - | - | (2,231.79) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122466 | 10/1/2018 | 10/4/2018 | 98 | CANI | Canaccord Inland | MC | M2 Cobalt | (3,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 780.00 | - | 680.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122463 | 10/2/2018 | 10/4/2018 | 98 | CANI | Canaccord Inland | MC | M2 Cobalt | (73,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 19,635.00 | - | 18,849.60 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122889 | 10/10/2018 | 11/9/2018 | 126 | WILA | Wintercap Laramee 1130 | RKR | Rokmaster Resources | (10,000) | write off stock | sell stock | keepstock | sell stock | collectprice=y;a=custom | CAD | - | - | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122893 | 10/10/2018 | 11/9/2018 | 105 | WIVA | Wintercap Varese 1090 | IRR | Inform Resources | (20,000) | write off stock | sell stock | keepstock | sell stock | collectprice=y;a=custom | CAD | - | - | - | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122865 | 10/31/2018 | 11/5/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | 450,000 | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | (65.63) | - | (165.63) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122873 | 11/5/2018 | 11/7/2018 | 98 | CANI | Canaccord Inland | MC | M2 Cobalt | (21,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 5,225.00 | - | 5,016.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122874 | 11/6/2018 | 11/7/2018 | 98 | CANI | Canaccord Inland | MC | M2 Cobalt | (26,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 6,475.00 | - | 6,216.00 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122875 | 11/7/2018 | 11/7/2018 | 98 | CANI | Canaccord Inland | MC | M2 Cobalt | (52,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 12,970.00 | - | 12,451.20 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122943 | 11/22/2018 | 11/25/2018 | 57 | LOAN | LOAN | L-GREC | Charterhouse:Greenestone:3%Pledge | 10,837 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (3,612.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122942 | 11/24/2018 | 11/29/2018 | 57 | LOAN | LOAN | L-GSVC | Charterhouse:Greenstone:6% | 442 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (74.00) | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122967 | 11/29/2018 | 12/1/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,442.50 | - | 1,342.50 | - | - | - |
| SKYFALL | 15 | ACCO | ACCO | 122968 | 11/30/2018 | 12/1/2018 | 133 | LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,330.00 | - | 1,230.00 | - | - | - |



| | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SKYFALL | 15 ACCO | ACCO | 122983 | 12/3/2018 | 12/4/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,355.00 | - | 1,255.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 122984 | 12/3/2018 | 12/4/2018 | 98 CANI | Canaccord Inland | MC | M2 Cobalt | (41,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 10,259.76 | - | 9,849.37 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123035 | 12/4/2018 | 12/5/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,330.00 | - | 1,230.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123037 | 12/4/2018 | 12/5/2018 | 98 CANI | Canaccord Inland | MC | M2 Cobalt | (19,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,845.00 | - | 4,651.20 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123038 | 12/5/2018 | 12/6/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,155.00 | - | 1,055.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123039 | 12/5/2018 | 12/6/2018 | 98 CANI | Canaccord Inland | MC | M2 Cobalt | (20,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 4,850.00 | - | 4,656.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123043 | 12/6/2018 | 12/7/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,300.00 | - | 1,200.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123046 | 12/7/2018 | 12/7/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,275.00 | - | 1,175.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123053 | 12/10/2018 | 12/11/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,350.00 | - | 1,250.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123055 | 12/10/2018 | 12/11/2018 | 62 BCHA | BMO Charterhouse | L-GREC | Charterhouse:Greenestone:3%Pledge | (536,158) | loan payment | sell stock | keepstock | sell stock | a=bank | CAD | 536,158.00 | - | 536,158.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123056 | 12/10/2018 | 12/11/2018 | 62 BCHA | BMO Charterhouse | L-GSVC | Charterhouse:Greenstone:6% | (29,075) | loan payment | sell stock | keepstock | sell stock | a=bank | CAD | 27,731.38 | - | 27,731.38 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123059 | 12/11/2018 | 12/11/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,187.50 | - | 1,087.50 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123072 | 12/12/2018 | 12/14/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,250.00 | - | 1,150.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123073 | 12/13/2018 | 12/14/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,300.00 | - | 1,200.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123077 | 12/14/2018 | 12/15/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,125.00 | - | 1,025.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123085 | 12/17/2018 | 12/18/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,300.00 | - | 1,200.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123093 | 12/19/2018 | 12/19/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (20,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 2,347.50 | - | 2,247.50 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123109 | 12/20/2018 | 12/20/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,245.00 | - | 1,145.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123110 | 12/21/2018 | 12/23/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,105.00 | - | 1,005.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123111 | 12/21/2018 | 12/24/2018 | 133 LEEN | Leede Norton | | | | Sweet Earth PP | debit | keepcurrency | debit | a=bank | CAD | (125,000.00) | - | (125,000.00) | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123112 | 12/21/2018 | 12/23/2018 | 133 LEEN | Leede Norton | | | | forex | forex debit | nothing | forex debit | a=bank | USD | (203,347.00) | (205,380.47) | - | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123112 | 12/21/2018 | 12/23/2018 | 133 LEEN | Leede Norton | | | | forex | forex credit | nothing | forex credit | | CAD | 274,614.02 | - | 274,614.02 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123115 | 12/24/2018 | 12/26/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,190.00 | - | 1,090.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123117 | 12/27/2018 | 12/28/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,180.00 | - | 1,080.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123123 | 12/28/2018 | 12/28/2018 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,125.00 | - | 1,025.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123126 | 12/31/2018 | 1/2/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,180.00 | - | 1,080.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123199 | 1/2/2019 | 1/3/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,255.00 | - | 1,155.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123202 | 1/3/2019 | 1/4/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,350.00 | - | 1,250.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123205 | 1/4/2019 | 1/5/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,257.50 | - | 1,157.50 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123208 | 1/7/2019 | 1/7/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,175.00 | - | 1,075.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123214 | 1/7/2019 | 1/8/2019 | 57 LOAN | LOAN | L-114C | Charterhouse:1146915:6% | 8,458 | interest | buy stock | keepstock | buy stock | a=custom | CAD | - | - | (1,410.00) | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123213 | 1/7/2019 | 1/8/2019 | 62 BCHA | BMO Charterhouse | L-114C | Charterhouse:1146915:6% | (250,000) | loan payment | sell stock | keepstock | sell stock | a=bank | CAD | 250,000.00 | - | 250,000.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123218 | 1/8/2019 | 1/9/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,297.50 | - | 1,197.50 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123223 | 1/9/2019 | 1/9/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,330.00 | - | 1,230.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123236 | 1/10/2019 | 1/11/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,505.00 | - | 1,405.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123242 | 1/11/2019 | 1/14/2019 | 98 CANI | Canaccord Inland | MC | M2 Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 2,470.00 | - | 2,370.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123240 | 1/11/2019 | 1/11/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,730.00 | - | 1,630.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123241 | 1/14/2019 | 1/14/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,655.00 | - | 1,555.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123243 | 1/14/2019 | 1/14/2019 | 98 CANI | Canaccord Inland | MC | M2 Cobalt | (9,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 2,220.00 | - | 2,120.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123250 | 1/15/2019 | 1/16/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,930.00 | - | 1,830.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123267 | 1/16/2019 | 1/17/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,905.00 | - | 1,805.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123270 | 1/17/2019 | 1/18/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,930.00 | - | 1,830.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123277 | 1/18/2019 | 1/18/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,825.00 | - | 1,725.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123284 | 1/21/2019 | 1/22/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,830.00 | - | 1,730.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123285 | 1/22/2019 | 1/22/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,775.00 | - | 1,675.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123302 | 1/23/2019 | 1/24/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,780.00 | - | 1,680.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123310 | 1/24/2019 | 1/26/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,730.00 | - | 1,630.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123306 | 1/25/2019 | 1/25/2019 | 5 CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (28,060.00) | - | (29,463.00) | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123309 | 1/25/2019 | 1/26/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,655.00 | - | 1,555.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123312 | 1/28/2019 | 1/28/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,750.00 | - | 1,650.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123322 | 1/29/2019 | 1/29/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,730.00 | - | 1,630.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123323 | 1/29/2019 | 1/29/2019 | 3 WORK | WORK | | | | director fees | debit | keepcurrency | debit | a=custom | USD | - | (1,100.00) | - | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123326 | 1/30/2019 | 1/30/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,725.00 | - | 1,625.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123344 | 1/31/2019 | 2/1/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,750.00 | - | 1,650.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123385 | 2/1/2019 | 2/1/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,800.00 | - | 1,700.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123390 | 2/4/2019 | 2/4/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,792.48 | - | 1,692.48 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123422 | 2/11/2019 | 2/14/2019 | 133 LEEN | Leede Norton | PGP | Power Group Projects | (2,000,000) | stock split | split stock out | keepaccount | split stock out | a=custom;cashbank=0;cashaccount=0 | CAD | - | - | - | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123422 | 2/11/2019 | 2/14/2019 | 133 LEEN | Leede Norton | PGP | Power Group Projects | 200,000 | stock split | split stock in | keepaccount | split stock in | aid=seq0;cashbank=0;cashaccount=0 | | - | - | - | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123461 | 2/26/2019 | 2/26/2019 | 16 REST | REST | | | | directors fee | debit | keepcurrency | debit | a=custom | USD | - | (300.00) | - | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123633 | 3/26/2019 | 3/26/2019 | 98 CANI | Canaccord Inland | MC | M2 Cobalt | (113,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 19,364.09 | - | 18,589.53 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123644 | 3/29/2019 | 3/29/2019 | 98 CANI | Canaccord Inland | MC | M2 Cobalt | (76,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 12,760.00 | - | 12,249.60 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123696 | 4/1/2019 | 4/1/2019 | 98 CANI | Canaccord Inland | MC | M2 Cobalt | (10,500) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,715.00 | - | 1,615.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123787 | 5/2/2019 | 5/22/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | 450,000 | receive stock | buy stock | keepstock | buy stock | a=bank | CAD | (92.18) | - | (192.18) | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123949 | 5/6/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 2,005.00 | - | 1,905.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123948 | 5/7/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,755.00 | - | 1,655.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123947 | 5/8/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,945.00 | - | 1,845.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123946 | 5/9/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,855.00 | - | 1,755.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123945 | 5/10/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,900.00 | - | 1,800.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123944 | 5/13/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,900.00 | - | 1,800.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123883 | 5/14/2019 | 5/14/2019 | 137 EPBE | Euro Pacific Bank Egredior | | | | GT Law TT Roger | debit | keepcurrency | debit | a=bank | USD | (25,042.50) | (26,044.20) | - | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123943 | 5/15/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,600.00 | - | 1,500.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123894 | 5/16/2019 | 5/16/2019 | 5 CASH | CASH | | | | debit | debit | keepcurrency | debit | a=bank | CAD | (10,000.00) | - | (10,500.00) | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123902 | 5/16/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,505.00 | - | 1,405.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123941 | 5/17/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,650.00 | - | 1,550.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123939 | 5/21/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,600.00 | - | 1,500.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123938 | 5/22/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,680.00 | - | 1,580.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123942 | 5/23/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,545.00 | - | 1,445.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123935 | 5/24/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,700.00 | - | 1,600.00 | - | - | - |
| SKYFALL | 15 ACCO | ACCO | 123934 | 5/27/2019 | 5/27/2019 | 133 LEEN | Leede Norton | BOLT | Pacific Rim Cobalt | (10,000) | sell stock | sell stock | keepstock | sell stock | collectprice=y;a=bank | CAD | 1,830.00 | - | 1,730.00 | - | - | - |

EXHIBIT

MZ

21-cv-11276-WGY

**Securities & Exchange Commission v. Frederick Sharp, et al.**
*Summary of Transfer Agent Records – Acquisitions of Stevia First / Vitality Stock*

| Date of Share Certificate Issuance | Date Share Certificate Received | Entity to Which Shares Were Issued | Number of Shares Issued | Type of Acquisition | Source Document [1] |
|---|---|---|---|---|---|
| 1/23/2012 | 1/23/2012 | Caledonia Partners LLC | 2,520,000 | Transfer | SEC-IST-E-0009736 at 9738 |
| 1/23/2012 | 1/23/2012 | Lornex Financial Ltd. | 2,536,000 | Transfer | SEC-IST-E-0009736 at 9738 |
| 1/23/2012 | 1/23/2012 | Morris Capital Inc. | 2,560,000 | Transfer | SEC-IST-E-0009736 at 9738 |
| 1/23/2012 | 1/23/2012 | Peaceful Lion Holdings Ltd. | 1,034,000 | Transfer | SEC-IST-E-0009736 at 9738 |
| 1/23/2012 | 1/23/2012 | Term Equity LLC | 2,550,000 | Transfer | SEC-IST-E-0009736 at 9738 |
| 2/24/2012 | 2/24/2012 | Fairlane Holdings Inc. | 350,000 | Transfer | SEC-IST-E-0009736 at 9744 |
| 2/24/2012 | 2/24/2012 | Hartford Equity Inc. | 350,000 | Transfer | SEC-IST-E-0009736 at 9744 |
| 2/24/2012 | 2/24/2012 | Jackson Bennett LLC | 350,000 | Transfer | SEC-IST-E-0009736 at 9744 |
| 2/24/2012 | 2/24/2012 | Millington Capital Corp. | 350,000 | Transfer | SEC-IST-E-0009736 at 9744 |
| 2/24/2012 | 2/24/2012 | Sierra Growth Inc. | 350,000 | Transfer | SEC-IST-E-0009736 at 9744 |
| 3/9/2012 | 3/9/2012 | Notalot Ltd. | 2,450,000 | Transfer | SEC-IST-E-0009736 at 9748 |
| 3/21/2012 | 3/21/2012 | Lornex Financial Ltd. | 1,400,000 | Transfer | SEC-IST-E-0009736 at 9758 |
| 3/23/2012 | 3/23/2012 | Lornex Financial Ltd. | 500,000 | Transfer | SEC-IST-E-0009736 at 9762 |
| 3/23/2012 | 3/23/2012 | Peaceful Lion Holdings Ltd. | 1,450,000 | Transfer | SEC-IST-E-0009736 at 9762 |
| 3/23/2012 | 3/23/2012 | Sharma Investments Inc. | 900,000 | Transfer | SEC-IST-E-0009736 at 9762 |
| 6/17/2016 | 6/17/2016 | Armour Securities LLC | 4,000,000 | New Shares | SEC-IST-E-0000648 at 1091 |
| 6/17/2016 | 6/17/2016 | Gotama Capital SA | 4,000,000 | New Shares | SEC-IST-E-0000648 at 1092 |
| 6/17/2016 | 6/17/2016 | Hampton Partners Inc. | 3,500,000 | New Shares | SEC-IST-E-0000648 at 1091 |
| 6/17/2016 | 6/17/2016 | Morris Capital Inc. | 5,000,000 | New Shares | SEC-IST-E-0000648 at 1091 |
| 6/17/2016 | 6/17/2016 | Quezon Group LLC | 5,000,000 | New Shares | SEC-IST-E-0000648 at 1091 |
| 6/17/2016 | 6/17/2016 | Truss Holdings Ltd. | 5,000,000 | New Shares | SEC-IST-E-0000648 at 1091 |
| 9/14/2016 | 9/14/2016 | Corby Ventures Inc. | 600,000 | New Shares | SEC-IST-E-0000648 at 1104 |
| 9/14/2016 | 10/7/2016 | Morris Capital Inc. | 588,236 | New Shares | SEC-IST-E-0000648 at 1104 |
| 9/14/2016 | 10/10/2016 | Quezon Group LLC | 294,118 | New Shares | SEC-IST-E-0000648 at 1105 |
| 9/14/2016 | 10/7/2016 | Santos Torres LLC | 588,236 | New Shares | SEC-IST-E-0000648 at 1104 |
| 9/29/2016 | 9/29/2016 | Truss Holdings Ltd. | 283,334 | Transfer | SEC-IST-E-0000648 at 1101 |
| 12/1/2016 | 12/30/2016 | Armour Securities LLC | 600,000 | New Shares | SEC-IST-E-0002740 at 2754 |
| 12/14/2016 | 1/13/2017 | Quezon Group LLC | 600,000 | New Shares | SEC-IST-E-0002740 at 2761 |
| 12/30/2016 | 1/31/2017 | Pegasus Global Ltd. | 600,000 | New Shares | SEC-IST-E-0002740 at 2765 |
| 12/30/2016 | 1/31/2017 | Truss Holdings Ltd. | 700,000 | New Shares | SEC-IST-E-0002740 at 2766 |
| 1/4/2017 | 1/6/2017 | Gotama Capital SA | 758,169 | New Shares | SEC-IST-E-0002740 at 2758 |
| 1/4/2017 | 1/9/2017 | Hampton Partners Inc. | 750,000 | New Shares | SEC-IST-E-0002740 at 2758 |
| 1/9/2017 | 1/19/2017 | Truss Holdings Ltd. | 187,654 | New Shares | SEC-IST-E-0002740 at 2763 |
| 1/10/2017 | 1/25/2017 | Gotama Capital SA | 370,549 | New Shares | SEC-IST-E-0002740 at 2764 |
| 1/10/2017 | 1/24/2017 | Quezon Group LLC | 212,989 | New Shares | SEC-IST-E-0002740 at 2763 |
| 1/11/2017 | 1/17/2017 | Santos Torres LLC | 363,557 | New Shares | SEC-IST-E-0002740 at 2762 |
| 2/1/2017 | 2/27/2017 | Quezon Group LLC | 350,881 | New Shares | SEC-IST-E-0002740 at 2771 |
| 2/3/2017 | 2/22/2017 | Hampton Partners Inc. | 231,309 | New Shares | SEC-IST-E-0002740 at 2771 |
| 3/9/2017 | 3/28/2017 | Corby Ventures Inc. | 100,000 | New Shares | SEC-IST-E-0002740 at 2776 |
| 3/9/2017 | 3/28/2017 | Hilton Capital Inc. | 750,000 | New Shares | SEC-IST-E-0002740 at 2776 |
| 3/9/2017 | 3/28/2017 | Morris Capital Inc. | 500,000 | New Shares | SEC-IST-E-0002740 at 2776 |
| 3/9/2017 | 3/28/2017 | Riverfield Group Ltd. | 150,000 | New Shares | SEC-IST-E-0002740 at 2776 |
| 7/28/2017 | 7/31/2017 | Riverfield Group Ltd. | 200,000 | New Shares | SEC-IST-E-0006788 at 6796 |
| 7/28/2017 | 7/31/2017 | Varese Capital Inc. | 200,000 | New Shares | SEC-IST-E-0006788 at 6797 |
| 12/15/2017 | 12/20/2017 | Riverfield Group Ltd. | 233,333 | New Shares | SEC-IST-E-0007021 at 7030 |
| 12/15/2017 | 12/20/2017 | Varese Capital, Inc. | 166,667 | New Shares | SEC-IST-E-0007021 at 7030 |

**Notes:**
**Sources:** Island Stock Transfer Agent Records.

A1454

STVF / VBHO Q Account Detail

| Account Code | Account Title | Batch ID | Batch Date | Bank Code | Symbol | Symbol Description | Stock | Batch Description | Transaction Description | Currency Code | Cash Bank (in Curr) | Cash Acct (USD) | Cash Acct (CAD) | Cash Acct (EUR) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STVF | ACCOPNA | 26328 | 1/26/2012 | LGTC | STVF | Stevia First | 2,520,000 | receive stock | buy stock | USD | - | (100.00) | - | - |
| STVF | ACCOPNA | 26325 | 1/27/2012 | HYPP | STVF | Stevia First | 1,034,000 | receive stock | buy stock | USD | (457.51) | (557.51) | - | - |
| STVF | ACCOPNA | 26326 | 1/27/2012 | HSIT | STVF | Stevia First | 2,550,000 | receive stock | buy stock | USD | - | (100.00) | - | - |
| STVF | ACCOPNA | 26329 | 1/27/2012 | VIRL | STVF | Stevia First | 2,536,000 | receive stock | buy stock | USD | (500.00) | (600.00) | - | - |
| STVF | ACCOPNA | 26327 | 2/1/2012 | SIL2 | STVF | Stevia First | 2,560,000 | receive stock | buy stock | USD | - | (100.00) | - | - |
| VBHO | ACCO | 107639 | 1/5/2017 | BEAG | VBHO | Vitality Biopharma | 758,169 | receive stock via DRS | buy stock | USD | - | (600.00) | - | - |
| VBHO | ACCO | 107961 | 2/7/2017 | TENT | VBHO | Vitality Biopharma | 187,654 | receive stock via DWAC | buy stock | USD | (200.00) | (800.00) | - | - |
| VBHO | ACCO | 108963 | 3/3/2017 | WHI | VBHO | Vitality Biopharma | 750,000 | receive stock via DWAC | buy stock | USD | (500.00) | (1,100.00) | - | - |
| VBHO | ACCO | 109015 | 3/6/2017 | WIRI | VBHO | Vitality Biopharma | 231,309 | receive stock via DWAC | buy stock | USD | (500.00) | (1,100.00) | - | - |
| VBHO | ACCO | 109012 | 3/6/2017 | SIQU | VBHO | Vitality Biopharma | 350,081 | receive stock via DWAC | buy stock | USD | (500.00) | (1,100.00) | - | - |

1 of 1

A1455

SJ Exhibit

9

21-cv-11276-WGY





UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

          Plaintiff,

v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R. TAYLOR,

          Defendants.

Civil Action No. 21-CV-11276-WGY

## REVISED DEPOSITION ON WRITTEN QUESTIONS OF PAUL SEXTON

      Pursuant to Fed. R. Civ. P. 31 and the agreement between the parties, plaintiff Securities and Exchange Commission requests that defendant Paul Sexton ("Sexton") respond to each of the following questions under oath and under the pains and penalties of perjury. Please provide written responses to each question by the close of business on March 20, 2023 and sign and date the certification at the conclusion of the deposition.

1



**RESERVATION OF OBJECTIONS:** Pursuant to the parties' agreement, the only objections reflected below are those that pertain to the form of the question. All other objections are expressly reserved.

Additionally, for the avoidance of doubt, foundation-related objections below related to Mr. Sexton's purported connection to certain code names in alleged payment and messaging systems are based on, among other deficiencies, the Commission's failure to lay the proper foundation, supported by admissible evidence, that Mr. Sexton is the alleged user of these systems and that the information contained in them is reliable.

<u>BACKGROUND</u>

1.     What is your full name?

**ANSWER**: Paul Sexton.

2.     What is you date of birth?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

3.     Where do you currently live?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

4.     What is the address?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

5.     How long have you lived there?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

6.     Where did you live before prior to your current home??

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1457

7.      Are you on any medication, or do you have any medical conditions, that affect your ability to understand or recall information?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

8.      Are you on any medication, or do you have any medical conditions, that affect your ability to understand these written deposition questions or to provide accurate and truthful answers to them?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

9.      Did you graduate from high school?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

10.      What school?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

11.      In what year did you graduate from high school?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

12.      Did you attend college?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

13.      What college?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

14.      Did you graduate from college?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

15.      If so, when did you graduate?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

16.      In what field did you obtain a degree?

3

A1458

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

17.    Did you attend graduate school or any professional school after college?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

18.    What school?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

19.    Did you graduate?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

20.    If so, when did you graduate?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

21.    In what field did you obtain a degree?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

22.    Describe your work history after high school, including the names of the places you were employed, the dates of your employment and brief description of your job duties.'

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

23.    How are you currently employed?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

24.    What are your current sources of income?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

25.    From what sources did you earn income over the last 5 years?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1459

26.     At any time between 2012 and 2018, did you serve as an officer or director, or otherwise control, the following entities:

    a.  BRIDGE GATE HOLDINGS INC.
    b.  BROOKS LANE ESTATES INC.
    c.  G.I.K.F. CANADA KARATE SOCIETY
    d.  GIMA-HA SHOTOKAN-RYU KARATEDO ASSOCIATION
    e.  JIKIDEN REIKI ASSOCIATION OF BC
    f.  KARATE B.C.
    g.  NEAVE HOLDINGS INC.
    h.  NOVA TREK CAPITAL INC.
    i.  P.C.S. SURVEYS
    j.  PEAK STRATEGIES INC.
    k.  PREDATOR ESTATES INC.
    l.  SECURE SELF STORAGE 2013 INC.
    m.  SOLITO CAPITAL CORP.
    n.  TGS CAPITAL CORP.
    o.  THE STOR-IT PLACE 2014 CORP.
    p.  WESTWOOD VENTURES INC.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

<u>SHARP'S BUSINESS AND EMPLOYEES</u>

27.     When did you first begin to do any business with Sharp?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

28.     You knew that Sharp and his employees did business under the name Corporate House, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

29.     You were a client of Sharp, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

30.     During what period of time were you a client of Sharp?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1460

31.     What did you understand Sharp's business to be?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

32.     During the time that you were a client of Sharp, Sharp and his employees facilitated stock sales that you understood violated the U.S. securities laws, correct?

**COUNSEL:** Objection to the use of "violated the U.S. securities laws," which lacks foundation and calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

33.     You knew that Sharp and his employees had many clients other than you, right?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

34.     During the time that you were a client of Sharp, you understood that Sharp and his employees helped their clients conceal their identities and their control of various penny stock companies' shares so that the clients could sell that stock?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

35.     During the time that you were a client of Sharp, you understood that Sharp and his employees did this by administering companies incorporated in a variety of foreign countries to hold shares on behalf of Sharp's clients?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

36.     You understood that companies and other entities administered by Sharp and his employees to buy, sell, and hold shares for your benefit are referred to as "nominees," right?

**COUNSEL**: Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

37.     During the time that you were a client of Sharp, you understood that Sharp provided an encrypted communications network to his clients that could only be used to communicate with Sharp, his employees and service providers and other Sharp clients?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1461

38.     You referred to these devices that could utilize Sharp's encrypted communications network as xphones?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

39.     During the time that you were a client of Sharp, you had and used an xphone, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

40.     During the time that you were a client of Sharp, you understood that Sharp provided an accounting system that kept track of the shares of stock his clients owned through the nominee companies he Sharp administered?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

41.     During the time that you were a client of Sharp, you understood that Sharp's accounting system kept track of the deposits of his clients' stock in brokerage accounts around the world?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

42.     During the time that you were a client of Sharp, you understood that Sharp's accounting system kept track of when stock was bought and sold on behalf of his clients?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

43.     During the time that you were a client of Sharp, you understood that Sharp's accounting system kept track of the proceeds of those sales on behalf of his clients?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

44.     During the time that you were a client of Sharp, you understood that Sharp's accounting system also kept track of when and how clients asked for distributions of the proceeds from their securities sales?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

45.     During the time that you were a client of Sharp, you understood that Sharp's accounting system also kept track of the various fees and commissions that Sharp and his employees charged for their services?

A1462

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

46.    You referred to Sharp's accounting system as Q, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

47.    You also sometimes referred to Sharp's accounting system as MT, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

48.    I'll refer to the accounting system as "Q."  You had a personal account in the Q system, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

49.    Your personal account in the Q system was the HEAR account, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

50.    Exhibit Sexton 22 is a true and correct copy of an April 15, 2016 email from Yvonne Gasarch (wires@secure.xmeridian.com) to you (paul@securecuracao.xmeridian.com) attaching an account statement for your HEAR account, correct?

**COUNSEL**: Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

51.    When did you first establish your personal account with Sharp and his employees?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

52.    Why did you choose the names HEAR for your personal Q accounts?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

53.    You had the authority to request disbursements from the HEAR account, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

8

A1463

54.     You had the authority to request disbursements from the HEAR account, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

55.     And you did, on numerous occasions, request distributions from the HEAR account to other accounts controlled by you?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

56.     You personally benefitted financially from taking disbursements of the proceeds of trading facilitated by Sharp on your behalf, right?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

57.     And you understood the trading undertaken on your behalf by Sharp violated the U.S. securities laws?

**COUNSEL**: Objection to the use of "violated the U.S. securities laws," which lacks foundation and calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

58.     Other than fees and commissions charged by Sharp and his employees, no one other than you had the authority to request any disbursements from the HEAR account, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

59.     Please refer back to Sexton Exhibit 22.  Periodically, you received copies of your HEAR account statements from the Q system, didn't you?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

60.     You know Courtney Kelln ("Kelln"), correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

61.     How do you know her?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1464

62.    You interacted with Kelln as an employee of Sharp's business?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

63.    During what period of time did you interact with Kelln as an employee of Sharp's business?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

64.    For what purposes did you interact with Kelln?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

65.    During the time that you were a client of Sharp, you understood that Kelln was responsible for dividing stock owned by Sharp's clients (including you) into blocks that would be held by the nominee companies Sharp and his employees administered?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

66.    During the time that you were a client of Sharp, you understood that Kelln also managed communications with transfer agents to get shares issued in the names of the nominee companies Sharp and his employees administered?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

67.    During the time that you were a client of Sharp, you understood that Kelln communicated with lawyers when it was necessary to get restricted legends removed from shares owned or controlled by Sharp's clients (including you)?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

68.    During the time that you were a client of Sharp, you understood that Kelln also communicated with personnel from various trading platforms and brokerage firms to get shares deposited into brokerage accounts and ready for sale on behalf of Sharp's clients (including you)?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1465

69.    You know Yvonne Gasarch ("Gasarch"), correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

70.    How do you know her?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

71.    You interacted with Gasarch as an employee of Sharp's business?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

72.    During what period of time did you interact with Gasarch as an employee of Sharp's business?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

73.    For what purposes did you interact with Gasarch?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

74.    During the time that you were a client of Sharp, you understood that Gasarch was responsible for arranging for transfers of the proceeds of stock trading back to Sharp's clients, including you?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

75.    During the time that you were a client of Sharp, you understood that Gasarch sent the proceeds from the accounts of various nominee companies administered by Sharp and his employees as you and other Sharp clients directed those proceeds to be sent?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

76.    During the time that you were a client of Sharp, you understood that Gasarch was keeping track of such transfers in the Q accounting system?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1466

77.    During the time that you were a client of Sharp, you understood that such transfers you asked Gasarch to make were being deducted from your HEAR account in the Q accounting system?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

78.    Please refer back to Exhibit Sexton 22. During the time that you were a client of Sharp, you could, and did, request statements of the transactions in your HEAR by reaching out to Gasarch, who would prepare that statement for you, correct?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

79.    During the time that you were a client of Sharp, you could and did ask Gasarch to create paperwork to provide to banks or brokerage firms to document the transfers that you were asking her to make for your benefit out of the HEAR account?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

80.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your interactions with Sharp, Kelln and Gasarch?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: Yes.

81.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your understand of, and interactions with, the business of Sharp and his employees?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: Yes.

RELATIONSHIP WITH JACKSON FRIESEN, MIKE VELDHUIS AND WILLIAM KAITZ

82.    When did you first meet Jackson Friesen ("Friesen")?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1467

83.    Describe your relationship with Friesen?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

84.    When did you first meet Mike Veldhuis ("Veldhuis")?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

85.    Describe your relationship with Veldhuis?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

86.    What was Veldhuis's business?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

87.    For what business purposes did you interact with Veldhuis?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

88.    You, Friesen and Veldhuis worked together on a number of deals by which you gained control of, and then directed sales of, large blocks of penny stock using methods that did not reveal your ownership interest inthose shares?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

89.    And then you, partnering with Veldhuis and Friesen, directed sales of those shares, right?

**COUNSEL**: Objection to the use of "partnering" to the extent is calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

90.    Both when you gained control of those shares and when you sold those shares, you used methods that did not reveal that you, Veldhuis and Friesen owned those shares, right?

**COUNSEL**: Objection. The question impermissibly groups together the purported actions of multiple individuals.

13

A1468

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

91.     When did you, Veldhuis and Friesen begin working together on these types of penny stock deals?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

92.     You understood that the these penny stock deals violated the U.S. securities laws, correct?

**COUNSEL:** Objection to the use of "violated the U.S. securities laws," which lacks foundation and calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

93.     You, together with Friesen, Veldhuis and others, controlled blocks of shares of Stevia First Corp. ("Stevia First") and its successor Vitaltiy Biopharma Inc. ("Vitality") totaling more than 10% of the company's outstanding shares, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

94.     You, together with Friesen, Veldhuis and others, controlled blocks of shares Arch Therapeutics Inc. ("Arch") totaling more than 10% of the company's outstanding shares, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

95.     You, together with Friesen, Veldhuis and others, controlled blocks of shares of OncoSec Medical Inc. ("OncoSec") totaling more than 10% of the company's outstanding shares, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1469

96.    You understood that Friesen and Veldhuis communicated with Avtar Dhillon ("Dhillon") and Graham Taylor ("Taylor") on these three deals (Stevia First, Arch and OncoSec) to get stock that the three of you would then control, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

97.    You understood that Dhillon had a management role in each of those companies?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

98.    You know William Kaitz ("Kaitz"), correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

99.    When did you first meet Kaitz?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

100.    Describe your relationship with Kaitz?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

101.    During what period of time did you work with Kaitz?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

102.    What was Kaitz's business?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

103.    When you were working with Kaitz, you understood that Kaitz's company was called Full Service Media LLC, correct?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

104.    You interacted with William Kaitz in connection with stock promotions, correct?

15

A1470

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

105.    You, Friesen and Veldhuis, acting together, paid Kaitz for his stock promotional services, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

106.    Specifically, you, Friesen and Veldhuis, acting together, paid Kaitz to promote the shares of at least the following companies:

      a.  Stevia First/Vitality,

      b.  Arch,

      c.  Echo Automotive, Inc.,

      d.  Liberty One Lithium Corp.,

      e.  Oryon Technologies, Inc.,

      f.  NewGen Biopharma Corp.,

      g.  StartMonday Technology Corp., and

      h.  BreathTec Biomedical, Inc.

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

107.    Did you, Friesen and Veldhuis, acting together, pay Kaitz to promote the stock of issuers whose stock you, Friesen and Veldhuis, acting together, would then sell at the same time that the promotion was happening?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

16

A1471

108.    You understood that when you, Friesen and Veldhuis, acting together, paid Kaitz to promote stock that he would work to convince investors to buy that stock as a good investment, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

109.    You understood that when you, Friesen and Veldhuis, acting together, paid Kaitz to promote stock, and while Kaitz was working to promote that stock, you, Veldhuis and Friesen would be working together through Sharp and his network to sell that same stock, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

110.    You understood that when you, Veldhuis and Friesen, acting together, paid Kaitz to promote stock, Kaitz's promotions would not reveal that he was being paid by the same people who would be selling stock into the demand he was working to create?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

111.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your interactions with Friesen and Veldhuis?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: Yes.

112.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your interactions with Kaitz?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: Yes.

<u>XPHONES AND XMAIL</u>

113.    Sharp and his employees provided you with two forms of secure, encrypted communication—mobile telephones referred to as "xphones" and an email service called "xmail"?

17

A1472

**COUNSEL**: Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

114.    Exhibit Sexton 23 is a true and correct copy of an xmail message dated march 18, 2012 in which you (paul@secure.xmeridian.com) correspond with Sharp employee Cory Haggerty (cohaggarty@secure.xmeridian.com) regarding your xphone device, correct?

**COUNSEL**: Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

115.    When did you get your first xphone from Sharp or his employees?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

116.    When you communicated via xphone, you used code names and numbers to identify yourself, correct?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

117.    Specifically, you used code number 3 and code names HEAR and SEXY, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

118.    You used code names and numbers because you were trying to conceal your identity, correct?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

119.    You also used code names and numbers because you were trying to conceal your communications from law enforcement personnel and securities regulators, correct?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

18

A1473

120.    And you wanted to conceal your identity because you were worried that law enforcement personnel or securities regulators would try to intercept your communications, correct?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

121.    You were concerned that law enforcement personnel and securities regulators would try to bring legal actions against you for the activity in which you were engaging with Friesen and Veldhuis, correct?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

122.    When you communicated via xphone, you used the code names/numbers in column 1 of the chart below to communicate with the individuals listed in column 2, correct?

| Code Name/Number | Individual |
|---|---|
| BOND, BONDED | Frederick Sharp |
| 2, GARD | Jackson Friesen |
| 4, 114, ACCO | Mike Veldhuis |
| CELT, CELTIC, CERTS, ESQ | Courtney Kelln |
| 76, WIRES, PEACE | Yvonne Gasarch |
| 66 | William Kaitz |

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

123.    When you communicated with xphone user WIRES or 76, did you understand that you were communicating with Gasarch?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

19

A1474

124.    Were you ever aware of anyone other than Gasarch responding to your messages using the code names Wires or 76?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

125.    To your knowledge, was Gasarch working for Sharp's business through at least 2018?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

126.    When you communicated with xphone user CELT, CELTIC, CERTS, or ESQ, did you understand that you were communicating with Gasarch?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

127.    Were you ever aware of anyone other than Gasarch responding to your messages using the code names Wires or 76?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

128.    To your knowledge, was Gasarch working for Sharp's business through at least 2018?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

129.    In addition to xphones, Sharp and his employees also provided a secure email system that they administered, correct?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

130.    The secure email system administered by Sharp and his employees was referred to as xmail or xmeridian mail?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1475

131.    You used the email addresses paul@secure.xmeridien.com and paul@secure.xmeridiencuracao.com to communicate via xmail?

**COUNSEL**: Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

132.    One of the things you used xmail to do was to review the copy for promotions that you, Friesen and Veldhuis were paying various promoters to run?

**COUNSEL:** Objection. Lack of foundation. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

133.    Please refer back to Exhibit Sexton 22.  You also received HEAR account statements via xmail, right?

**COUNSEL**: Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

134.    You also requested transfers of funds via xmail, right?

**COUNSEL**: Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

135.    Exhibits Sexton 24 and 25 are examples of such communications, right?

**COUNSEL**: Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

136.    Exhibit Sexton 26 is a true and correct copy of an xmail message dated May 2, 2012 in which you (paul@secure.xmeridian.com) request that Gasarch (wires@secure.xmeridian.com) transfer funds from the STVF and ONCS accounts to several financial institutions, right?

**COUNSEL**: Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

21

A1476

137.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your use and understanding of the xphone and xmail services?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: Yes.

<u>UNDERSTANDING OF THE SECURITIES LAWS</u>

138.    You understood at all relevant times that, before selling stock, control persons are required to register such sales with the Commission?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

139.    You understood at all relevant times that investors in certain public companies are required publicly to disclose any ownership interest in excess of 5% of the company's publicly traded stock.

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

140.    You understood at all relevant times that an "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person)?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

141.    You understood at all relevant times that "control" means the power to direct management and policies of the company in question?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

142.    You understood at all relevant times that affiliates of an issuer include officers, directors and controlling shareholders, as well as any person who is under "common control" with or has common control of an issuer?

A1477

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

143.    You understood at all relevant times that "restricted stock" includes stock that has been acquired from an issuer, or an affiliate of an issuer, in a private transaction that is not registered with the Commission?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

144.    You understood at all relevant times that all stock held by an issuer or affiliate of an issuer is restricted stock?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

145.    You understood at all relevant times that, absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a registration statement has been filed with the Commission (for an offer) or is in effect (for a sale)?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

146.    You understood at all relevant times that a registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

147.    During the time period from 2011 to 2018, you understood that that you could not sell stock publicly in the United States without registering that sale transaction or falling into one of the exemptions to registration?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1478

148.    During the time period from 2011 to 2018, you understood that people who, on their own or as part of a group, owned 10% or more of a company's stock were considered to be affiliates of that company?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

149.    During the time period from 2011 to 2018, you understood that officers and directors of a company are considered affiliates of that company?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

150.    During the time period from 2011 to 2018, you understood that that all of a company's stock held by an affiliate of that company is restricted and cannot be sold unless that sale is registered or an exemption from registration applies?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

151.    During the time period from 2011 to 2018, you were you familiar with SEC Rule 144, which places restrictions on sales of a company's stock by affiliates of that company?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

152.    During the time period from 2011 to 2018, you understood that brokerage firms gave additional scrutiny to transactions in which a shareholder acquired 5% or more of a company's shares?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

153.    During the time period from 2011 to 2018, you understood that OTC Markets required public companies for whom they provided quotation services to disclosure its 5% or more shareholders in order to meet certain listing requirements?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

A1479

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

154.    During the time period from 2011 to 2018, you understood that you had make disclosures in public filings with the SEC your ownership, either individually or as part of a group, of 5% or more of certain companies' shares?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

155.    You understood that that the 5% disclosure requirement applied to shares of Stevia First, later known as Vitality?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

156.    You didn't make any public filings disclosing that you, as part of a group, owned 5% or more of Vitality's shares?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

157. Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your knowledge of the securities laws?

**COUNSEL:** Objection to the extent this calls for a legal conclusion.

**ANSWER**: Yes.

<u>INTERACTIONS WITH SILVERTON AND BLACKLIGHT</u>

158.    Do you know Roger Knox?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

159.    When and where did you meet him?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

160.    Understand that Knox ran a business called Silverton SA and later Wintercap SA?

A1480

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

161.    Understand that Knox's business was to sell shares for groups of clients who wanted to conceal the fact that they controlled the shares they were selling into the public markets?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

162.    You were a client of Knox's business?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

163.    Did you communicate with Knox about the trading that his firm was doing on behalf of you, Friesen and Veldhuis?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

164.    Did you ever meet Knox in person?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

165.    How many times?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

166.    When?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

167.    Who else was there?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

168.    You used Wintercap SA to effectuate trades that you understood violated the U.S. securities laws?

**COUNSEL:** Objection to the use of "violated the U.S. securities laws," which lacks foundation and calls for a legal conclusion.

A1481

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

169.    Sharp and his employees also used Wintercap SA to effectuate trades that you understood violated the U.S. securities laws?

**COUNSEL**: Objection to the use of "violated the U.S. securities laws," which lacks foundation and calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

170.    You used Wintercap SA to conceal your ownership of certain shares, right?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

171.    Do you know Kenneth Ciapala ("Ciapala")?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

172.    When and where did you meet Ciapala?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

173.    Do you know Anthony Killarney ("Killarney")?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

174.    When and where did you meet Killarney?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

175.    You understand that Ciapala and Killarney together ran a business called Blacklight SA ("Blacklight") in Switzerland, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

176.    You understood that Blacklight's business was to sell shares for groups of clients who wanted to conceal the fact that they controlled the shares they were selling into the public markets?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1482

177.    You were a client of Blacklight's business?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

178.    Did you communicate with Ciapala about the trading that Blacklight was doing on behalf of Sharp, you, Veldhuis and Friesen?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

179.    Did you communicate with Killarney about the trading that Blacklight was doing on behalf of Sharp, you, Veldhuis and Friesen?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

180.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your interactions and business dealings with Silverton and Blacklight?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: Yes.

<u>PLACING ILLEGAL TRADES</u>

**COUNSEL:** Objection to the use of the word "illegal," which lacks foundation and calls for a legal conclusion. There is no question pending.

181.    From time to time, you personally directed trading activity by Sharp and his employees on your behalf, right?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

182.    Did you direct traders associated with Sharp to place trades?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1483

183.    Did that include Dashiel Solomons (code name KASH)?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

184.    Exhibit Sexton 1 is a true and correct copy of an xphone message between you (as code name HEAR) and Dashiel Solomons (code name Kash) in which you direct Solomons to "sell up 20k meme @ .63" on Jan 2, 2014.

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

185.    Exhibit Sexton 2 is a true and correct copy of an xphone message between you (as code name HEAR) and Dashiel Solomons (code name Kash) in which you direct Solomons to "sell 15-20k plsb" on February 27, 2013.

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

186.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your involvement in placing the trades at issue in this case?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: Yes.

<u>STEVIA FIRST/VITALITY</u>

187.    Did you, working with Friesen, Veldhuis, Dhillon, Taylor and Sharp and his employees sell shares of Stevia First/Vitality between 2012 and 2018?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

188.    Did you file any registration statements for any of those sales?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

189.    Did anyone else file any registration statements for any sales made on your behalf?

A1484

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

Round 1

190.    Beginning in early 2012, you, working with Friesen and Veldhuis, arranged for a number of nominee companies administered by Sharp and his employees, to assume control over approximately 19.6 million shares of Stevia First stock on your behalf?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

191.    You understand that transfer agents keep track of who owns a company's shares, right?

**COUNSEL**: Objection. Calls for speculation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

192.    You also understand that transfer agents keep packages of documents to record why they transfer a company's shares from one shareholder to another, right?

**COUNSEL**: Objection. Calls for speculation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

193.    We have previously marked as Exhibit 17 the Amended Complaint in this case.  The table in Exhibit 17, ¶83 accurately reflects these transfers of the approximately 19.6 million shares, doesn't it?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

194.    All of the companies shown in green on that chart in paragraph 83 of Exhibit 17 were administered by Sharp and his employees?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

195.    You understand, in 2012, that Sharp was allowing his companies to hold shares on your behalf, right?

       a.    And Friesen?

A1485

    b.  And Veldhuis?

    c.  And Dhillon?

    d.  And Taylor?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

196.    You further understood that Sharp was charging fees for the use of the nominee companies he administered to hold these shares on your behalf?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

197.    You understood at the time of these transfers that the shares transferred did not have restricted legends on them so it appeared that they could be publicly traded?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

198.    You understood, in 2012, that these shares shown in paragraph 83 of Exhibit 17 were about 37% of Stevia First's total outstanding stock, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

199.    You also understood at the time that these shares were about 97%, or at least a significant majority, of Stevia First's purportedly unrestricted stock?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

200.    From March to May 2012 did you, working with Friesen and Veldhuis, arrange and pay for promotions of Stevia First stock?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

201.    For example, Exhibit Sexton 24 is a true and correct copy of an xmail message dated March 16, 2012 in which you (paul@secure.xmeridian.com) request that Gasarch

A1486

([wires@secure.xmeridian.com](mailto:wires@secure.xmeridian.com)) transfer "550k usd to [stock promoter] Diamonspot Media from STVF account."?

**COUNSEL**: Objection. Lack of Foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

202.    Exhibit Sexton 25 true and correct copy of an xmail message dated February 27, 2012 in which you ([paul@secure.xmeridian.com](mailto:paul@secure.xmeridian.com)) request that Gasarch ([wires@secure.xmeridian.com](mailto:wires@secure.xmeridian.com)) transfer funds from the ONCS and STVF accounts to stock promoters, right?

**COUNSEL**: Objection. Lack of Foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

203.    Is Exhibit Sexton 3 a true and correct copy of an example of one of the stock promotions for Stevia First that you, Friesen and Veldhuis, working together arranged and paid for?

**COUNSEL:** Objection. Lack of foundation. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

204.    If you look at page 12 of Exhibit Sexton 3, is this the section of the promotion that contains disclaimers about the paying party?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

205.    This promotion claims that Conmar Capital Inc. was the paying party and states that Conmar Capital will not trade in Stevia First securities, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

206.    This promotion does not disclose that it was paid for by people who were then selling Stevia First securities, does it?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

207.    From March to May 2012, the other promotions for which you, Friesen and Veldhuis paid disclosed that Conmar Capital Inc. was the paying party and stated that Conmar Capitial will not trade in Stevia First securities, correct?

A1487

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

208.    From March to May 2012, you, working with Friesen and Veldhuis, arranged to pay Kaitz over $200,000 to promote Stevia First stock, correct?

**COUNSEL:** Objection. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

209.    When you, Friesen and Veldhuis arranged to pay Kaitz to promote Stevia First stock, you understood that Kaitz would not disclose publicly that your group was paying him, is that right?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

210.    You also understood that Kaitz would not disclose that he was being paid by a group that would be selling Stevia First stock during the promotions, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

211.    During the time period from March to May 2012, you understood that the 19.6 million shares of Stevia First stock that you controlled along with Friesen, Veldhuis, Dhillon and Taylor, were sold into the public markets, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

212.    You understood that the proceeds from selling that 19.6 million shares of Stevia First stock was over $24 million, right?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

213.    You knew that because you communicated regularly with Friesen and Veldhuis about the number of sales you were selling and the prices of those shares, correct?

33

A1488

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

214.    You received a share of that $24 million in proceeds, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

215.    What was your share of those proceeds?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

216.    I'm showing you what has been marked Exhibit Sexton 4.  This is a true and correct copy of a listing of transactions in your HEAR Q account, right?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

217.    Please look at page 6 of Exhibit Sexton 4.  As an example of your personal benefit from trading in Stevia First stock, you received in your Q HEAR account $432,750 on 3/23/2012 that was derived from trading in Stevia First stock that you understood violated the U.S. securities laws?

**COUNSEL:** Objection to the use of "violated the U.S. securities laws," which lacks foundation and calls for a legal conclusion. Objection to the phrase "your Q HEAR account," which also lacks foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

Round 2

218.    On various dates between March 2012 and February 2014, you, working with Friesen and Veldhuis, arranged for approximately 1.32 million shares of Stevia First stock to be transferred to a nominee company administered by the Sharp Group, and then transferred into the names of additional nominee companies administered by the Sharp Group, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

219.    The table in ¶91 of the Amended Complaint, which was previously marked as Exhibit 17, accurately reflects these transfers, right?

A1489

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

220.    Between 2012 and 2014, Hartford Equity, Nautilus Growth Fund and Gotama Capital were administered by Sharp and his employees, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

221.    You also understand at the time that Sharp was allowing his companies, in exchange for fees, to hold shares on behalf of you, Friesen, Veldhuis, Dhillon and Taylor, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

222.    You also understood, in 2014, that Dhillon was an officer of Stevia First?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

223.    You understood that his position as an officer meant that he was affiliated with Stevia First, right?

**COUNSEL**: Objection to the extent the word "affiliates" calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

224.    During the time period from January to July 2014, you understood that the approximately 1.32 million shares of Stevia First stock that you controlled along with Friesen, Veldhuis, Dhillon and Taylor, were sold into the public markets?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

225.    The sales of those 1.32 million shares generated $566,715 in proceeds, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

226.    You agreed with Friesen and Veldhuis to share in those proceeds, correct?

A1490

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

227.    For example, Exhibit Sexton 5 is a true and correct copy of an August 6, 2014 xphone message in which you (as code number 3) are to receive 22% of the proceeds of Stevia First trading?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

228.    As indicated in this exhibit, you knew that you (as HEAR), Veldhuis as ACCO, Friesen (as Gard), and others would also share in the Stevia First illegal trading proceeds, right?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

Round 3

229.    In March 2012, you, working with Friesen, Veldhuis, Dhillon and Taylor, arranged for approximately 15.75 million shares of Stevia First stock then owned by Dhillon to be purchased on your behalf by seven nominee companies administered by Sharp and his employees, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

230.    At the same time, you understood that Taylor would be purchasing an additional approximately 4.23 million shares then owned by Dhillon?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

231.    At the time of these transfers in March 2012, you understood that the plan was eventually to sell these shares for the joint benefit of you, Friesen, Veldhuis, Dhillon and Taylor?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

232.    The table in ¶114 of the Amended Complaint, which was previously marked as Exhibit 17, accurately reflects these transfers of roughly 20 million shares, right?

A1491

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

233.    The companies shown in green in the chart in paragraph 114 were administered by Sharp and his employees, right?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

234.    You understood at the time that Sharp was allowing his companies to hold shares on behalf of you, Friesen, Veldhuis, Dhillon and Taylor in exchange for fees?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

235.    You understood at the time that the shares shown in paragraph 114 were about 39% of Stevia First's total outstanding stock, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

236.    And you also understood at the time that Dhillon was affiliated with Stevia First as an officer or the company?

**COUNSEL**: Objection to the extent the word "affiliates" calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

237.    You further understood at the time that Dhillon would obtain a share of the profits from selling these shares because that was the deal that you, Friesen and Veldhuis, working together, had made with him?

**COUNSEL:** Objection. Calls for speculation. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

238.    You understood that the Sharp-administered nominee companies had to hold the shares shown in paragraph 114 of the Amended Complaint for at least six months because they were marked as restricted shares and because they were purchased from an affiliate of Stevia First?

A1492

**COUNSEL:** Objection to the use of "nominee" and "affiliate" to the extent they call for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

239.    In the fall of 2014, you discussed with Friesen and Veldhuis selling these shares, for the benefit of you, Friesen, Veldhuis, Dhillon and Taylor, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

240.    Beginning in December 2014, you Friesen, Veldhuis, Dhillon and Taylor agreed to sell the roughly 20 million Stevia First shares you collectively controlled using the services of Silverton SA and Blacklight SA, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

241.    The chart contained in ¶121 of the Amended Complaint accurately reflects the transfers of Stevia First shares from one set of nominee companies administered by Sharp and his employees to another set of nominee companies administered by Sharp and his employees so that the shares could be traded, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

242.    During 2015 and 2016, you, working with Friesen and Veldhuis, arranged for and paid for promotions of Stevia First stock, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

243.    When you, Friesen and Veldhuis arranged to pay Kaitz and other promoters to promote Stevia First stock, you understood that Kaitz would not disclose publicly that your group was paying him, right?

38

A1493

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

244.    You also understood that Kaitz would not disclose that he was being paid by a group that would be selling Stevia First stock during the promotions?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

245.    During 2015 and 2016 while you, working with Friesen and Veldhuis, paid for Stevia First stock promotions, you knew that more than 7 million of the roughly 20 million shares of Stevia First stock that you controlled along with Friesen, Veldhuis, Dhillon and Taylor, were sold into the public markets, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

246.    You knew this because you communicated frequently with Friesen and Veldhuis about the progress of your sales and promotional efforts, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

247.    You also understood that the proceeds from selling those more than 7 million shares of Stevia First stock was over $6 million, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

248.    You get a share of that $6 million in proceeds, did you not?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

249.    What was your share of those proceeds?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

Round 4

250.    In July 2016, Stevia First changed its name to Vitality Biopharma, correct?

39

A1494

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

251.     You agreed, in conjunction with Friesen and Veldhuis, to provide about $4.4 million in payments to or for the benefit of Vitality in exchange for shares that would be issued to nominee companies administered by Sharp and his employees, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

252.     At the time of these transfers, you understood that the plan was eventually to sell these Vitality shares for the joint benefit of you, Friesen, Veldhuis, Dhillon and Taylor?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

253.     You understood at the time that Sharp was allowing his companies to hold shares on behalf of you, Friesen, Veldhuis, Dhillon and Taylor, in exchange for fees?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

254.     You understood that the Vitality shares issued to the Sharp-administered nominee companies initially had restricted legends that needed to be removed before the shares could be sold in the public market, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

255.     You understood at the time that Dhillon, an affiliate of Vitality, retained an interest in the proceeds from the sale of these Vitality shares?

**COUNSEL:** Objection to the extent the word "affiliate" calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1495

256.     Between at least October 2016 and March 2017, did you, working with Friesen and Veldhuis, arrange for and pay for promotions of Vitality stock, including through Kaitz?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

257.     When you, Friesen and Veldhuis arranged to pay Kaitz and other promoters to promote Vitality stock, you understood that Kaitz would not disclose publicly that your group was paying him, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

258.     You also understood that Kaitz would not disclose that he was being paid by a group that would be selling Vitality stock during the promotions?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

259.     During late 2016 and into 2018, you understood that many of the shares of Vitality stock that you controlled along with Friesen, Veldhuis, Dhillon and Taylor, were sold into the public markets?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

260.     You got a share of proceeds from those Vitality sales into your HEAR account, correct?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

261.     Please look back at Exhibit Sexton 4, the Q HEAR account transaction record.

**ANSWER**: Ok.

262.     For example, as shown in Exhibit Sexton 4, your HEAR account in Q received $360,000 on 5/17/2017 that was transferred from the Vitality (ticker VBIO) account?

41

A1496

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

263.　　In the end, you received approximately $5.5 million in proceeds from trading in Stevia First and Vitality, right?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

264.　　And you understand that those trades violated the U.S. securities laws, right?

**COUNSEL**: Objection to the use of "violated the U.S. securities laws," which lacks foundation and calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

265.　　Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your sales and promotions of Stevia First and Vitality stock?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: Yes.

<u>ARCH THERAPEUTICS</u>

266.　　Did you, working with Friesen, Veldhuis, Dhillon, Taylor and Sharp and his employees, sell millions of shares of Arch Therapeutics between 2013 and 2017?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

267.　　Did you file any registration statements for any of those sales?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

268.　　Did any of Friesen, Veldhuis, Dhillon, Taylor, Sharp or Sharp's employees, file any registration statements for any of those sales?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

269.　　Did anyone else, acting on your behalf, file registration statements for any of those sales?

A1497

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

270.    In 2013, you were aware that Dhillon was an officer of Arch and was also chairman of its board of directors, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

271.    Arch's stock traded under the ticker symbol ARTH, right?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

272.    Beginning in late 2012 or early 2013, you, working with Friesen and Veldhuis, arranged for eleven nominee companies administered by the Sharp Group, to assume control over approximately 16.92 million shares of Arch stock, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

273.    These shares did not have restricted legends on them, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

274.    In 2013, you, working with Friesen and Veldhuis, asked Kelln to arrange the transfer of an additional 2.31 million Arch shares to an entity named Victory Capital that was controlled by Silverton, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

275.    These shares transferred to Victory Capital did not have restricted legends on them, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

276.    In 2013, you, working with Friesen and Veldhuis, directed the transfer of an additional 20 million restricted Arch shares to Dhillon and to a company controlled by the CEO of Arch, correct?

43

A1498

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

277.    The table in paragraph 169 of the Amended accurately reflect these transfers, doesn't it?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

278.    All of the companies shown in green on that chart in paragraph 169 were administered by Sharp and his employees, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

279.    And you understood at the time that Sharp was allowing his companies to hold shares on behalf of you, Friesen, Veldhuis, Dhillon and Taylor in exchange for fees?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

280.    At the time, you understood that the nominee companies administered by Sharp and his employees and Victory Capital, were holding these Arch shares on behalf of you, Friesen, Veldhuis, Dhillon and Taylor?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

281.    You understand at the time that the Arch shares held on your behalf by nominee companies administered and controlled by Sharp and Victory Capital did not have restricted legends on them so it appeared that they could be publicly traded?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

282.    In 2013, the shares transferred on your behalf to the eleven nominee companies administered by Sharp and to Victory Capital together were about 48% of Arch's total

A1499

outstanding shares and almost 100% of its purportedly unrestricted shares that were available for trading in the public market, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

283.    In the spring of 2013, you, working together with Friesen, Veldhuis and Anthony Alvaro ("Alvaro"), provided $1.75 million in financing to Arch at the same time that Dhillon was providing financing of $250,000, right?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

284.    You, working with Friesen, Veldhuis and Alvaro, funded the financing you provided to Arch from the proceeds of trading in securities through Sharp-administered nominee companies, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

285.    Is Exhibit Sexton 6 a true and correct copy of an xphone communication between you (as code number 3), Friesen (as code number 2), Veldhuis (as code number 4) and Alvaro (as code number 60 and code name AT) about setting up the financing for Arch?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

286.    Exhibit Sexton 6 also discusses the contribution that Dhillon would make to this financing for Arch?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

287.    Exhibit Sexton 6 also discusses the fact that the money that you, Friesen, Veldhuis and Alvaro were sending to Arch would be funneled through attorney Mark Lee's trust account and would come from your proceeds of other sales?

A1500

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

288.    From June to August 2013, you, working together with Friesen and Veldhuis, engaged Kaitz to promote Arch stock and paid him approximately $1.2 million for those promotions, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

289.    From June to August 2013, the promotions for which you, Friesen and Veldhuis paid did not disclose that the persons paying for the promotions were selling Arch stock while the promotions were encouraging investors to purchase Arch stock, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

290.    You edited and provided comments on promotional materials to be used to promote Arch stock, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

291.    You also strategized with Friesen and Veldhuis about how Arch's website would need to be updated before promotional emails were sent and what service providers to use for promotions, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

292.    Is Exhibit Sexton 7 a true and correct copy of an xphone communication between you (as code number 3), Friesen (as code number 2), and Veldhuis (as code number 4) about updating the Arch website before promotions begin and who to use for promotional services?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1501

293.    Is Exhibit Sexton 8 an example of the promotions that you, working with Friesen and Veldhuis, paid Kaitz to place for Arch stock?

**COUNSEL:** Objection. Lack of foundation. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

294.    On page 19 of this exhibit, the party paying for the promotion is identified as Advantage Media Corp.  Was Advantage Media a nominee company that Sharp administered and provided to you, Friesen and Veldhuis to use to disguise the fact that you were paying for the promotions?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

295.    The exhibit also states that "Neither Advantage Media Corp., nor its affiliates will buy or sell any shares of Arch Therapeutics Inc. during the period that this advertisement is being disseminated by FSM third party media vendors."  That statement was false, wasn't it?

**COUNSEL:** Objection to the extent the word "affiliates" calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

296.    At the time this promotion was being disseminated, you, working together with Friesen and Veldhuis, were selling Arch shares through Sharp-administered nominee companies, weren't you?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

297.    You, working together with Veldhuis and Friesen, asked Dhillon to issue news releases to support the promotions you were purchasing for Arch shares, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

298.    Is Exhibit Sexton 9 a true and accurate copy of an xphone communication between you (as code number 3) and Veldhuis (as code number 4) and Friesen (as code number 2) about

whether Dhillon would issue Arch news releases to support the promotions you, Friesen and Sexton were funding?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

299.     While the Sharp-administered nominee companies were selling Arch stock on behalf of you, Friesen, Veldhuis and others, you kept track of both the price of Arch shares, the number you had sold and how many shares you had left to sell, right?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

300.     Is Exhibit Sexton 10 a true and correct copy of an xphone communication between you (as code number 3 and code name SEXY), Veldhuis (as code number 4), Friesen (as code number 2) and Anthony Alvaro (as code number 60 and code name AT) about trading in Arch and the current profits that all of you had made?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

301.     You understood the reference to the "good Dr" to be a reference to Dhillon, correct?

**COUNSEL:** Objection. Lack of foundation and calls for speculation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

302.     This message was at a period in time when Arch stock was trading at a lower price than you wanted?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

303.     Is Exhibit Sexton 11 an accurate copy of an xphone communication between you (as code number 3 and code name SEXY), Veldhuis (as code number 4), Friesen (as code number 2) about an upcoming meeting with Dhillon to discuss, in part, upcoming Arch promotions?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1503

304.    In the bottom message on this exhibit, your question "How much are we spensding [sic] this week on E's" to mean how much are you spending on electronic promotions, didn't you?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

305.    In the same message, your reference to "I will get a print out from CH" to mean that he would get a print out of the Arch account from the Q system from Corporate House (the name of Sharp's organization), didn't you?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

306.    During the time period from mid-June through September 2013, were about 16.6 million shares of Arch stock that you controlled along with Friesen, Veldhuis, Dhillon and Taylor, through Sharp-administered nominee companies, were sold into the public markets?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

307.    The proceeds from selling that 16.6 million shares of Arch stock was over $11.5 million, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

308.    In addition, between mid-June through September 2013, an additional 1.4 million shares of Arch stock that you controlled along with Friesen, Veldhuis, Dhillon and Taylor were sold on your behalf through a nominee shareholder administered by Silverton, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

309.    The proceeds from selling those Arch shares through the Silverton-administered shareholder nominee were an additional approximately $574,000, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

310.    You received a share of that approximately $12 million in proceeds from selling Arch shares into your HEAR account, correct?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

311.    What was your share of those proceeds?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

312.    You understood that you were getting a share of the profits from Arch trading equal to the shares that Friesen and Veldhuis were getting, right??

**COUNSEL:** Objection. Lacks foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

313.    As shown on Exhibit Sexton 4 (HEAR Q printout), on or about August 21, 2013, you received a transfer of $600,000 into your HEAR account in the Q system from the ARTH account, didn't you?

**COUNSEL:** Objection. Lacks foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

314.    By virtue of your joint control over a significant percentage of Arch's shares and the fact that you were acting in concert with Dhillon, you were affiliated with Arch when the Sharp nominee companies and the Silverton nominee shareholder were selling Arch shares on your behalf in 2013, correct?

**COUNSEL:** Objection to the use of "nominee" and "affiliate" to the extent they call for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

315.    You, working together with Friesen, Veldhuis and Taylor, continued to use nominee companies administered by Sharp and his employees to sell Arch shares without disclosing your ownership interest into 2016 and 2017, correct?

A1505

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

316.    Sales of Arch shares through Blacklight SA on behalf of you, Friesen, Veldhuis, Dhillon and Taylor yielded proceeds of at least $2.5 million between June 2016 and May 2017, correct?

**COUNSEL:** Objection. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

317.    What was your share of those proceeds?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

318.    You received a share of the proceeds of those Arch sales into your HEAR account, correct?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

319.    For example, your HEAR account in Q received $37,500 on 2/11/2017 that was transferred from the Arch (ticker ARTH) account?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

320.    In total, you received approximately $1.7 million in proceeds of your trading in Arch stock, right?

**COUNSEL:** Objection to the use of the word "illegal," which lacks foundation and calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

321.    And you understood that those Arch stock trades violated the U.S. securities laws, right?

**COUNSEL**: Objection to the use of "violated the U.S. securities laws," which lacks foundation and calls for a legal conclusion.

A1506

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

322.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your sales and promotions of Arch stock?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: Yes.

<u>ONCOSEC MEDICAL INC. SHARE SALES</u>

323.    You, working together with Friesen, Veldhuis, Dhillon, Taylor and Sharp and his employees, sold millions of shares of OncoSec Medical in 2011 and 2012, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

324.    Did you file any registration statements for any of those sales?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

325.    Did any of Friesen, Veldhuis, Dhillon, Taylor, Sharp or Sharp's employees, file any registration statements for any of those sales?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

326.    Did anyone else, acting on your behalf, file registration statements for any of those sales?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

327.    In 2011, you were aware that Dhillon was chairman of OncoSec's board of directors, right?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

328.    OncoSec's stock traded under the ticker symbol ONCS, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1507

329.    Beginning in February 2011, you, working together with Friesen and Veldhuis, arranged for seven nominee companies administered by Sharp and his employees, to assume control over approximately 12.8 million shares of OncoSec stock, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

330.    These shares transferred to the Sharp-administered nominees did not have restricted legends on them?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

331.    The table in paragraph 214 of the Amended Complaint accurately reflects these transfers, right?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

332.    All of the companies shown in green on that chart in paragraph 214 were administered by Sharp and his employees, right?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

333.    The three companies shown in blue on that chart in paragraph 214 (Monterra Investments, Cliffside Partners, and Dartmore International) were other nominee companies that you, Friesen and Veldhuis used to hold shares for your collective benefit?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

334.    You understand at the time that Sharp was allowing his nominee companies to hold shares on behalf of you, Friesen, Veldhuis, and Dhillon, in exchange for fees?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1508

335.     At the time, you understood that the nominees administered by Sharp and his employees were holding these OncoSec shares on behalf of you, Friesen, Veldhuis, and Dhillon, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

336.     The OncoSec shares held by the Sharp-administered nominees on behalf of you, Friesen, Sexton and Dhillon did not have restricted legends on them so it appeared that they could be publicly traded?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

337.     In 2011, the shares transferred to the seven Sharp nominees together were more than 24% of OncoSec's total outstanding shares, right?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

338.     Between March and November 2011, you, working with Friesen and Veldhuis, used the nominee companies administered by Sharp and his employees to sell about 2.2 million shares of OncoSec for proceeds of approximately $3 million, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

339.     Between about February and August 2012, you, working with Friesen and Veldhuis, used the nominee companies administered by Sharp and his employees to sell about 11 million additional shares of OncoSec for proceeds of approximately $2.4 million, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

340.     What was your share of those proceeds?

A1509

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

341.     You receive a share of the proceeds of those OncoSec sales into your HEAR account, right?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

342.     For example, as you can see in Exhibit Sexton 4 (HEAR Q account) your HEAR account in Q received $269,000 on 4/30/2012 that was transferred from the OncoSec (ticker ONCS) account?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

343.     Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your sales and promotions of OncoSec stock?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: Yes.

<u>OTHER DEALS DONE WITH FRIESEN AND VELDHUIS USING SHARP'S SERVICES</u>

344.     You, working with Friesen and Veldhuis, used the nominee companies provided by Sharp to hold shares for you in other microcap issuers, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

345.     You, working with Friesen and Veldhuis, used the services provided by Sharp to effectuate stock sales that you understood violated the U.S. securities laws in the following issuers?

**COUNSEL:** Objection to the use of "violated the U.S. securities laws," which lacks foundation and calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1510

346.    Specifically, you, working together with Friesen and Veldhuis, used the services provided by Sharp and his employees to sell the shares of Echo Automotive Inc. (ticker symbol ECAU) in 2012 through 2014, but primarily in 2013?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

347.    The total proceeds of those Echo Automotive sales through Sharp-administered nominees were approximately $23.6 million, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

348.    You, working together with Friesen and Veldhuis, used the services provided by Sharp and his employees to sell the shares of Stevia Corp. (ticker symbol STEV) in 2011 through 2014?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

349.    The total proceeds of those Stevia Corp. sales through Sharp-administered nominees were approximately $13.2 million, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

350.    You, working together with Friesen and Veldhuis, used the services provided by Sharp and his employees to sell the shares of Liberty One Lithium Corp. (ticker symbol LBY) in 2017 through 2018?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

351.    The total proceeds of those Liberty One Lithium sales through Sharp-administered nominees were approximately $8.7 million, correct?

A1511

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

352.    You, working together with Friesen and Veldhuis, used the services provided by Sharp and his employees to sell the shares of Oryon Technologies Inc. (ticker symbol ORYN) in 2012 through 2013?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

353.    The total proceeds of those Oryon Technologies sales through Sharp-administered nominees were approximately $8.5 million, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

354.    You, working together with Friesen and Veldhuis, used the services provided by Sharp and his employees to sell the shares of Makism 3D Corp. (ticker symbol MDDD) in 2013 and 2014?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

355.    The total proceeds of those Makism 3D sales through Sharp-administered nominees approximately $8.5 million, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

356.    You, working together with Friesen and Veldhuis, use the services provided by Sharp and his employees to sell the shares of Graphite Corp. (ticker symbol GRPH) in 2012 through 2014?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1512

357.    The total proceeds of those Graphite Corp. sales through Sharp-administered nominees were approximately $6.2 million, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

358.    You, working together with Friesen and Veldhuis, used the services provided by Sharp and his employees to sell the shares of NewGen Biopharma Corp. (ticker symbol NEWG) in 2016 and 2017?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

359.    The total proceeds of those NewGen Biopharma sales through Sharp-administered nominees were approximately $3.8 million, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

360.    You, working together with Friesen and Veldhuis, used the services provided by Sharp and his employees to sell the shares of StartMonday Technology Corp. (ticker symbol STMDF) in 2016 to 2018?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

361.    The total proceeds of those StartMonday Technology sales through Sharp-administered nominees were approximately $2.4 million, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

362.    You, working together with Friesen and Veldhuis, used the services provided by Sharp and his employees to sell the shares of Lexington Biosciences Holdings Corp. (ticker symbol LNB) in 2017 to 2018?

A1513

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals. You may answer.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

363.     The total proceeds of those Lexington Biosciences sales through Sharp-administered nominees were approximately $1.37 million, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

364.     You, working together with Friesen and Veldhuis, used the services provided by Sharp and his employees to sell the shares of BreathTec Biomedical Inc. (ticker symbol BTH) in 2016?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

365.     The total proceeds of those BreathTec Biomedical sales through Sharp-administered nominees were approximately $421,745, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

366.     You, working together with Friesen and Veldhuis, used the services provided by Sharp and his employees to sell the shares of RightsCorp (ticker symbol RIHT) in 2013 to 2014?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

367.     The total proceeds of those RightsCorp sales through Sharp-administered nominees were approximately $130,328, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1514

368.    You used the nominee companies administered by Sharp and his employees to conceal the fact that you, working together with Friesen and Veldhuis, controlled large blocks of the issuers stocks, and were selling them to the public, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

369.    You did not register any of the sales that you made in the public markets using nominee companies administered by Sharp and his employees, did you?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

370.    You understood that the stock sales detailed in paragraphs 318 through 339 violated the U.S. federal securities laws?

**COUNSEL:** Objection. Calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

371.    You, working together with Friesen and Veldhuis, paid Kaitz to promote the stocks of at least Echo Automotive, Oryon Technologies and StartMonday Technology while you, working together with Friesen and Veldhuis, were selling shares of those companies, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

372.    You understood that Kaitz would not disclose that the persons paying him to promote the purchase of Echo Automotive, Oryon Technologies and StartMonday Technology were at the same time selling shares in those companies, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

373.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your sales and promotions of the other stocks listed in the

A1515

chart in Paragraph 237 of the Amended Complaint, which has been previously marked as Exhibit 17?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: Yes.

<u>COMMUNICATIONS ABOUT TRADING AND PROMOTIONS</u>

374.    You communicated with Friesen, Veldhuis and others about allocating illegal trading proceeds among you, Friesen and Veldhuis, right?

**COUNSEL:** Objection to the use of the word "illegal," which lacks foundation and calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

375.    For example, you received an allocation of profits from the Echo Automotive (ticker ECAU) deal that was equal to the profits from that deal received by Friesen and Veldhuis, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

376.    Exhibit Sexton 12 shows that on or about February 19, 2019, you received $2,500,000 as your share of the trading profits from Echo Automotive?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

377.    If you review the printout of your HEAR Q account (Exhibit Sexton 4) do you see that you received an internal transfer from the ECAU account of $2,500,000 on February 20, 2013?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

378.    You don't have any reason to doubt that you received those funds, do you?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

A1516

379.    If you review the printout of your HEAR Q account do you see that you also received an internal transfer from the ECAU account of $775,000 on February 12, 2013?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

380.    You don't have any reason to doubt that you received those funds, do you?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

381.    You communicated with Friesen, Veldhuis and others about payments you, Friesen and Veldhuis were making to Echo Automotive so that the company could get its SEC filings and registration statements finished, didn't you?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

382.    Exhibit Sexton 13 is a true and correct copy of an xphone communication between you (as code number 3 or code name SEXY), Friesen (as code number 2), Veldhuis (as code number 4) and Anthony Alvaro (as code number 60 and code name AT) about payments that the group of you had made to Echo Automotive officers and how they had spent the money?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

383.    Mark Lee was the lawyer working with Echo Automotive to file its 10Q quarterly report and to file a registration statement for its stock, correct?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

384.    How did you first meet Mark Lee?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

385.    Lee helped you, Veldhuis and Friesen take steps necessary to engage in your trades that you understood would violate the U.S. securities laws?

A1517

**COUNSEL:** Objection to the use of "violate the U.S. securities laws," which lacks foundation and calls for a legal conclusion. Additionally, this question calls for information protected by the attorney-client privilege, and I direct Mr. Sexton not to answer it.

**ANSWER**: I will follow my attorney's advice. I decline to answer this question on the basis of the attorney-client privilege.

386.    Is Exhibit Sexton 14 a true and correct copy of an xphone communication among you (as xphone user 3), Friesen (as xphone user 2) and Veldhuis (as xphone user 4) to celebrate the fact that a list of potential investors to whom the three of you were promoting the stock of Echo Automotive was generating demand, and that as a result of the promotion, the price of Echo Automotive stock had increased to $1.06?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

387.    At the time of this message, you, Friesen and Veldhuis were selling Echo Automotive stock through nominee companies administered by Sharp and his employees, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

388.    You also communicated with Friesen, Veldhuis, and others regarding stock promotion, right?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

389.    You were also involved, together with Friesen and Veldhuis, in communications about the text, images, design and timing of promotional materials that would be used to encourage investors to buy stock in Makism 3D Corp., correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

390.    Exhibit Sexton 15 is a true and correct copy of an xphone communication between you (as code number 3), Friesen (as code number 2), and Veldhuis (as code number 4) discussing edits to promotional copy for Makism 3D and the fact that they needed to start the promotion to take advantage of positive news about 3D printing technology?

A1518

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

391.    Exhibit Sexton 16 is a true and correct copy of an xphone communication between you (as code number 3), Friesen (as code number 2), and Veldhuis (as code number 4) discussing your request to start promotions for Makism 3D on the following Monday?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

392.    At the time of these communications relating to Makism 3D, you, Friesen and Veldhuis were using nominee companies administered by Sharp and his employees to sell shares of Makism 3d into the public markets, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

393.    You communicated with Veldhuis and Friesen about promotions for RightsCorp, too, didn't you?

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

394.    Is Exhibit Sexton 17 a true and correct copy of an xphone communication between you (as code number 3), Friesen (as code number 2) and Veldhuis (as code number 4) about what entity you used as the paying party on promotions the three of you funded for Echo Automotive and RightsCorp?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

395.    Is Exhibit Sexton 18 a true and correct copy of an xphone communication between you (as code number 3), Friesen (as code number 2) and Veldhuis (as code number 4) in which you discussed promoting Rightscorp via "the blogs and twitter soon" and they then discussed waiting until the promotional mailing went out?

**COUNSEL:** Objection. Lack of foundation.

A1519

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

396.    In this exhibit, when Veldhuis expressed his hope that the campaign worked, Friesen responded"No halt = success."  You understood that to mean that if trading in Rightscorp stock was not halted by the SEC the promotion would be a success?

**COUNSEL:** Objection. This question is unclear, calls for speculation, and lacks foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

397.    Is that because you saw other microcap stocks traded by you, Friesen and Veldhuis, and other Sharp clients, being halted by the SEC?

**COUNSEL:** Objection. Lack of foundation. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

398.    At the time of these communications relating to RightsCorp., you, Friesen and Veldhuis were using nominee companies administered by Sharp and his employees to sell shares of RightsCorp. into the public markets, correct?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion. The question also impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

399.    You frequently engaged in communications with Friesen and Veldhuis about the status of the promotions and sales that the three of you were making through nominee companies administered by Sharp and his employees?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

400.    For example, is Exhibit Sexton 19 a true and correct copy of an xphone communication between Veldhuis (as code number 4), Friesen (as code number 2), you (as code number 3 or code name SEXY) and Alvaro (as code number 60 or code name AT) that celebrated the successes that you collectively had in selling shares of Echo Automotive (ECAU), Stevia Corp. (STEV) and Circle Star Energy Corp. (CRCL)?

**COUNSEL:** Objection. Lack of foundation.

65

A1520

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

401.    In that message, Alvaro also suggested spending more money to promote Stevia Corp. to see if the group could double the volume and price of its shares, and thus the profit for the group, right?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

402.    As another example, is Exhibit Sexton 20 an accurate copy of an xphone communication between Veldhuis (as code number 4), Friesen (as code number 2), and you (as code number 3) celebrating your successes in selling shares of Stevia Corp., Stevia First, Echo Automotive, Arch, 3D Makism and Rightscorp?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

403.    In this exhibit, when Veldhuis wrote "$250K on a Friday.  Nice moves" you understood that he was referring to expected trading profit, correct?

**COUNSEL:** Objection. The question is unclear, lacks foundation, and calls for speculation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

404.    The stock sales discussed in this message were made through nominee companies administered by Sharp and his employees?

**COUNSEL:** Objection to the use of "nominee" to the extent it calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

405.    At the time of this message, you, Friesen and Veldhuis were funding promotions for the six companies whose stock was sold?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

406.    You communicated with Friesen and Veldhuis about the need to keep your communications protected from potential capture by government investigators?

A1521

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

407.    The reason you did this was because you knew that you were engaged in illegal stock sales and you did not want to get caught?

**COUNSEL:** Objection to the use of the word "illegal," which lacks foundation and calls for a legal conclusion.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

408.    For example, after the SEC issued subpoenas in an investigation into trading in the securities of Makism 3D Corp. and Guar Global Ltd. (which you, working with Friesen and Veldhuis, also promoted and sold), you exchanged xphone messages with Friesen and Veldhuis about how you should destroy documents, correct?

**COUNSEL:** Objection. The question impermissibly groups together the purported actions of multiple individuals.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

409.    Is Exhibit Sexton 21 a true and correct copy of an example of such a communication between Veldhuis (as code number 114), Friesen (as code number 2), and you (as code number 3) in which you responded that you would "call apple and set up the I lost my computer . . . how do I remote wipe, etc."

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

410.    In this exhibit, Friesen responded that that he "had a robbery so consider me all good"?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

411.    And you responded "Right.  I had a fire.  LOL"?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

412.    When you crossed national borders and went through customs, you deleted all communications off of your xphone, correct?

A1522

**COUNSEL:** Objection. Vague.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

413.    The reason you deleted your xphone communications at borders and at customs was because you were concerned about them being captured by law enforcement personnel or securities regulators, correct?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: On advice of counsel, I invoke my rights under the Fifth Amendment and respectfully decline to answer this question.

414.    Do you intend to assert your Fifth Amendment privilege against self-incrimination in response to all questions concerning your involvement trading and promotion of stocks?

**COUNSEL:** Objection. Lack of foundation.

**ANSWER**: Yes.

I, Paul Sexton, declare under penalty of perjury under the laws of the United States of America that my foregoing answers to the questions posed in this deposition are true and correct according to the best of my knowledge, information and belief, and on the basis of the information supplied to me.

March 20, 2023                                        _____

_____

Date                                                            Paul Sexton

68

A1523

**EXHIBIT**

**Sexton 22**

**From:**      "Wires" <wires@secure.xmeridian.com>
**To:**         paul@securecuracao.xmeridian.com
**Subject:**   HEAR
**Sent:**       Fri, 15 Apr 2016 09:06:30 -0500
HEAR.docx


--
xMeridian.com

SEC-CVDOJMX-E-0600372

A1524

# Account Statement

account: **HEAR**
from **1st of January, 2016** to **15th of April, 2016**

| bID | Date | Description | Q-ty | Name | USD | CAD | CHF | EUR | GBP | Balance |
|-----|------|-------------|------|------|-----|-----|-----|-----|-----|---------|
| ... | 2016-01-01 | opening balances | | | 360,422.57 | 9,838.28 | 0.00 | 0.00 | 0.00 | |
| ... | 2016-01-01 | o-h: Stock: Aroway Minerals | 699,158 | ARW | | | | | | |
| ... | 2016-01-01 | o-h: Escrow: Maple Leaf 1 oz gold coins | 300 | MAPG-E | | | | | | |
| ... | 2016-01-01 | o-h: Loan: Charterhouse:Sexton:3%:30/6/17 | 3,388,726 | L-SX2C | | | | | | |
| ... | 2016-01-01 | o-h: Stock: Regal Resources | 182,500 | RGR | | | | | | |
| ... | 2016-01-01 | o-h: Stock: Pulse Beverage | 340,834 | PLSB | | | | | | |
| ... | 2016-01-01 | o-h: Stock: Santacruz Silver | 100,000 | SCZ | | | | | | |
| ... | 2016-01-01 | o-h: Loan: CityGroup:Sexton: 6%: 04/04/18 | 2,354,404 | L-SX3C | | | | | | |
| ... | 2016-01-01 | o-h: Stock: Meemee Media | 204,650 | MEME | | | | | | |
| ... | 2016-01-01 | o-h: Loan: Charterhouse:Solito Capital:6%:5/6/18 | 375,760 | L-SOLC | | | | | | |
| ... | 2016-01-01 | o-h: Loan: Charterhouse:Secure Self Storage:3%:21/11/13 | 954,810 | L-SSSC | | | | | | |
| ... | 2016-01-01 | o-h: Loan: Charterhouse:Stor-It:6%:Demand | 2,014,000 | L-SITC | | | | | | |
| ... | 2016-01-01 | o-h: Loan: Charterhouse:Neave:3%:20/08/18 | 316,012 | L-NEAC | | | | | | |
| 96367 | 2016-01-31 | interest charge | | | | -194.67 | | | | 9,643.6 |
| 96366 | 2016-01-31 | interest charge | | | -10,567.19 | | | | | 370,989.7 |
| 97188 | 2016-02-29 | interest charge | | | -10,189.09 | | | | | 381,178.8 |
| 97302 | 2016-03-01 | Bridge Annual Report | | | | -245.00 | | | | 9,398.6 |
| 97558 | 2016-03-08 | Heartmore, Heartland 2016 fees | | | -6,000.00 | | | | | 387,178.8 |
| 97945 | 2016-03-23 | Paul Sexton TT | | | -25,765.46 | | | | | 412,944.. |
| 98300 | 2016-03-30 | custody fees | | | | -50.65 | | | | 9,347.9 |
| 98423 | 2016-03-30 | interest charge | | | -10,605.71 | | | | | 423,550.0 |
| 98424 | 2016-03-30 | interest charge | | | | -4.67 | | | | 9,393.9 |
| 98299 | 2016-03-30 | custody fees | | | -46.07 | | | | | 412,990.. |
| 98939 | 2016-03-31 | internal transfer adjust interest | | | 48,219.00 | | | | | 375,377.0 |
| 98952 | 2016-04-01 | forex | | | | -9,343.29 | | | | 0.0 |
| 98952 | 2016-04-01 | forex | | | 7,199.61 | | | | | 368,177.4 |
| 98972 | 2016-04-14 | Directors fees | | | -300.00 | | | | | 368,477.4 |
| ... | 2016-04-15 | closing balances | | | - | 0.00 | 0.00 | 0.00 | 0.00 | |

SEC-CVDOJMX-E-0600373

A1525

| | | | | | 368,477.48 |
|---|---|---|---|---|---|
| ... | 2016-04-15 | c-h: Stock: Aroway Minerals | 699,158 | ARW | |
| ... | 2016-04-15 | c-h: Escrow: Maple Leaf 1 oz gold coins | 300 | MAPG-E | |
| ... | 2016-04-15 | c-h: Loan: Charterhouse:Sexton:3%:30/6/17 | 3,388,726 | L-SX2C | |
| ... | 2016-04-15 | c-h: Stock: Regal Resources | 182,500 | RGR | |
| ... | 2016-04-15 | c-h: Stock: Pulse Beverage | 340,834 | PLSB | |
| ... | 2016-04-15 | c-h: Stock: Santacruz Silver | 100,000 | SCZ | |
| ... | 2016-04-15 | c-h: Loan: CityGroup:Sexton: 6%: 04/04/18 | 2,354,404 | L-SX3C | |
| ... | 2016-04-15 | c-h: Stock: Meemee Media | 204,650 | MEME | |
| ... | 2016-04-15 | c-h: Loan: Charterhouse:Solito Capital:6%:5/6/18 | 375,760 | L-SOLC | |
| ... | 2016-04-15 | c-h: Loan: Charterhouse:Secure Self Storage:3%:21/11/13 | 954,810 | L-SSSC | |
| ... | 2016-04-15 | c-h: Loan: Charterhouse:Stor-It:6%:Demand | 2,014,000 | L-SITC | |
| ... | 2016-04-15 | c-h: Loan: Charterhouse:Neave:3%:20/08/18 | 316,012 | L-NEAC | |

ts: 2016-Apr-15 14:05:05

SEC-CVDOJMX-E-0600374

A1526

**EXHIBIT**

**Sexton 24**

**From:**     "Wires" <wires@secure.xmeridian.com>
**To:**        "Paul Sexton" <paul@secure.xmeridian.com>
**Subject:**  Re: please send
**Sent:**     Fri, 16 Mar 2012 08:08:38 -0800

Send for value Mon

On Fri, 16 Mar 2012 07:45:34 -0800, Paul Sexton wrote
> Please send 550k usd to Diamondspot Media from STVF account.
>
> --
> xMeridian.com


--
xMeridian.com

SEC-CVDOJMX-E-0600957

A1527

**EXHIBIT**

**Sexton 25**

| | |
|---|---|
| **From:** | "Wires" <wires@secure.xmeridian.com> |
| **To:** | "Paul Sexton" <paul@secure.xmeridian.com> |
| **Subject:** | Re: Please send |
| **Sent:** | Mon, 27 Feb 2012 17:08:56 -0800 |

Send for Tues

On Mon, 27 Feb 2012 16:51:37 -0800, Paul Sexton wrote
> Can you please send the following wires:
>
> $287,500 to CFM (Capital Financial Media) from ONCS account.
>
> $500,000 to Diamond Spot Media from STVF account
>
> $541,546 to CDMG (Creative Direct Marketing Group) from ONCS account
>
> --
> xMeridian.com


--
xMeridian.com

SEC-CVDOJMX-E-0600505

**EXHIBIT**

**Sexton 26**

From:       "Wires" <wires@secure.xmeridian.com>
To:         "Paul Sexton" <paul@secure.xmeridian.com>
Subject:    Re: please send
Sent:       Wed, 2 May 2012 09:18:06 -0700

Send for values Thurs

On Wed, 2 May 2012 06:51:32 -0700, Paul Sexton wrote
> Please send the following wires:
>
> Send $250,000 to Blackrock from STVF account.
>
> Send $180,000 from ONCS account to the following:
> CBH Compagnie Bancaire Helvetique SA
> Boulevard Emile Jaques Dalcroze 7
> Case Postale 3754
> 1211 Geneve
>
> Swift BSSACHGG
> Account: Oel und Erdgazforschung AG
> IBAN: CH9008762000185860001
>
> --
> xMeridian.com


--
xMeridian.com

SEC-CVDOJMX-E-0600973

A1529

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:21-cv-11276-WGY |
| v. | |
| Frederick L. Sharp, *et al.*, | |
| Defendants. | |

**DEFENDANT PAUL SEXTON'S NOTICE OF NON-OPPOSITION TO ENTRY OF**
**JUDGMENT**

Defendant Paul Sexton notifies the Court that, while continuing to invoke his Fifth Amendment rights, he no longer opposes entry of a judgment of liability against him on Counts I–IV of the Amended Complaint (ECF No. 230). Mr. Sexton is enclosing a proposed order to effectuate this Notice.

If the proposed order is entered by the Court, the only remaining proceeding concerning Mr. Sexton will be the imposition of remedies, if any. Mr. Sexton does not consent, through this judgment, to the imposition of any remedies that are within the province of the Court, including the Securities and Exchange Commission's request for an injunction, a bar, a civil monetary penalty, and disgorgement. Mr. Sexton intends to contest such relief, including any calculations thereof, in the remedies stage of the proceeding. In connection with the Court's determination of the appropriate remedies, if any, Mr. Sexton will not contest liability under the claims filed against him by the Securities and Exchange Commission

1

A1530

Respectfully submitted,


*/s/ Neil T. Smith*

Neil T. Smith (BBO# 651157)
    Neil.Smith@klgates.com
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Tel:  (617) 261-3100
Fax:  (617) 261-3175


*/s/ Stephen G. Topetzes*

Stephen G. Topetzes*
        Stephen.Topetzes@klgates.com
Robert S. Silverblatt*
        Rob.Silverblatt@klgates.com
K&L Gates LLP
1601 K St. NW
Washington, DC 20006
Tel:  (202) 778-9328
Fax:  (202) 778-9100


*Admitted pro hac vice*

*Counsel for Paul Sexton*

Dated: September 11, 2023

2

A1531

<u>**CERTIFICATE OF SERVICE**</u>

     The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on September 11, 2023, and a copy thereof will be sent electronically to the registered recipients and counsel of record as identified on the Notice of Electronic Filing.

<u>*/s/ Neil T. Smith*</u>

Neil T. Smith

3

A1532

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:21-cv-11276-WGY |
| v. | |
| Frederick L. Sharp, *et al.*, | |
| Defendants. | |

### [PROPOSED] ORDER ENTERING JUDGMENT AS TO DEFENDANT PAUL SEXTON

The Securities and Exchange Commission having filed an Amended Complaint and Defendant Paul Sexton ("Mr. Sexton") have entered a general appearance; consented to the Court's jurisdiction over him and the subject matter of this action; and declined to oppose entry of this judgment:

I.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Mr. Sexton is liable under Counts I–IV of the Amended Complaint (ECF No. 230).

II.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that the Court may elect to impose remedies, including an injunction, a bar, a civil monetary penalty, and disgorgement. In connection with the determination of remedies, the Court may make a decision based on briefing by the parties and, if necessary, a hearing to resolve any material factual disputes. In connection with the Court's determination of the appropriate remedies, if any, Mr. Sexton will not contest liability under the claims filed against him by the Securities and Exchange

1

A1533

Commission. However, Mr. Sexton will be permitted to oppose the Securities and Exchange Commission's requested relief, including any calculations thereof.

III.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that nothing in this judgment or in connection with Mr. Sexton's decision to decline opposing entry of judgment shall constitute a waiver of Mr. Sexton's rights under the Fifth Amendment.

IV.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that this Court shall retain jurisdiction over this matter.

V.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this judgment forthwith and without further notice.

Done and Ordered in chambers this __ day of September 2023.

                                           _____
                                           Hon. William G. Young
                                         United States District Court Judge

A1534

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:21-cv-11276-WGY |
| v. | |
| Frederick L. Sharp, *et al.*, | |
| Defendants. | |

*WSY*

~~[PROPOSED]~~ **ORDER ENTERING JUDGMENT AS TO DEFENDANT PAUL SEXTON**

The Securities and Exchange Commission having filed an Amended Complaint and Defendant Paul Sexton ("Mr. Sexton") have entered a general appearance; consented to the Court's jurisdiction over him and the subject matter of this action; and declined to oppose entry of this judgment:

I.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Mr. Sexton is liable under Counts I–IV of the Amended Complaint (ECF No. 230).

II.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that the Court may elect to impose remedies, including an injunction, a bar, a civil monetary penalty, and disgorgement. In connection with the determination of remedies, the Court may make a decision based on briefing by the parties and, if necessary, a hearing to resolve any material factual disputes. In connection with the Court's determination of the appropriate remedies, if any, Mr. Sexton will not contest liability under the claims filed against him by the Securities and Exchange

1

A1535

Commission. However, Mr. Sexton will be permitted to oppose the Securities and Exchange Commission's requested relief, including any calculations thereof.

III.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that nothing in this judgment or in connection with Mr. Sexton's decision to decline opposing entry of judgment shall constitute a waiver of Mr. Sexton's rights under the Fifth Amendment.

IV.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that this Court shall retain jurisdiction over this matter.

V.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this judgment forthwith and without further notice.

Done and Ordered in chambers this _12th_ day of September 2023.

_William A. Young_
Hon. William G. Young
United States District Court Judge

2

A1536

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
SECURITIES AND EXCHANGE COMMISSION,)
                              )
            Plaintiff,        )
                              )
       v.                     )        CIVIL ACTION
                              )        NO. 21-11276-WGY
FREDERICK L. SHARP, et al.,   )
                              )
            Defendants.       )
_____)
```

YOUNG, D.J.                              September 19, 2023

**ORDER**

On June 21, 2023, the parties in the instant case appeared before this Court for oral argument on the Securities and Exchange Commission's ("SEC") motion for partial summary judgement.  ECF No. 327.  Following argument, this Court denied the SEC's motion, taking under advisement only the matter of whether particular trades identified in the Q system and corroborated by independent brokerage records might suffice to be established through summary judgment.  Id.  After careful consideration of the standards governing summary judgment and an evaluation of the evidence put forward by the SEC to meet its burden of proof here, the Court rules this case is not one suitable even for partial disposition on a summary judgment

A1537

basis. The Court therefore **denies** the SEC's motion in its entirety.

The core of Paul Sexton's and Jackson T. Friesen's opposition to the SEC's motion pertains to the nature of the SEC's evidence. The defendants attack the SEC's evidence on numerous grounds -- authenticity, credibility, and reliability -- all of which essentially lead to the conclusion that under the standards governing summary judgment here, this motion cannot be granted.

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Materiality depends on the substantive law, and only factual disputes that might affect the outcome of the suit can preclude summary judgment. Id. In reviewing the evidence, this Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). This Court must also "disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151.

[2]

A1538

The moving party bears the initial burden of demonstrating that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party also bears the burden at trial, as is the case here, its burden of proof includes "producing incontrovertible prima facie evidence of its claims." Atlantic Specialty Insurance Co. v. Karl's Boat Shop, Inc., No. CV 19-11219-WGY, 2020 WL 4904932 (D. Mass. Aug. 20, 2020) (citing Celotex Corp., 477 U.S. 317 at 331). If the movant does so, then the nonmovant must set forth specific facts sufficient to establish a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

The evidence that remains before this Court -- that which has not already been ruled on per the Court's order following oral argument -- is the Q data and independent brokerage records. Both sources of evidence, argue the defendants, whether viewed independently or cumulatively, do not permit a ruling in the SEC's favor.

The defendants argue that, viewed independently, it is clear that the Q system cannot sustain summary judgment for the SEC because there are substantial issues regarding the authenticity and reliability of this so-called Q data.

[3]

A1539

Frederick Sharp ("Sharp"), whose whereabouts seem to be unknown, had complete autonomy over the Q data records and presumably could alter them at will. The attempts to authenticate the Q system's data depend on Fedir Nikolayev, an employee of Sharp, who may well be charged for his role in the scheme alleged here.

Moreover, only a sample of the Q data was compared to independent brokerage records, and because of the selective sampling, the defendants ought be allowed to have their opportunity to contest the admissibility of such evidence at trial.

This determination rests on the applicable standards of evidence. The parties should note that at oral argument this Court put great stock in the holding of Reeves v. Sanderson Plumbing. Reeves, 530 U.S. at 150. Under Reeves, this Court in drawing reasonable inferences in favor of the defendants, finds it possible that a jury could disbelieve the Q data both independently and when corroborated by a partial sampling through brokerage records. Such a finding mandates that this Court exclude from its consideration the SEC's evidence for this aspect of the motion.[1]

_____

[1] At oral argument, the SEC suggested that this Court's interpretation of Reeves was inaccurate, drawing attention to LaFrenier v. Kinirey, 550 F.3d 166, 168 (1st Cir. 2008)(citing Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 856, 2008 WL 5158868, at *3 (1st Cir.2008) ("At summary judgment we need not exclude all interested testimony, specifically

A1540

This aspect of the case, in the context of the evidence undergirding it, is simply not suitable for summary judgment. The SEC's motion, ECF No. 266, is therefore denied in its entirety.

**SO ORDERED.**

/s/William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[2]

---

testimony that is uncontradicted by the nonmovant")).  To the extent that the SEC argues that affidavits from interested or cooperating witnesses ought not be disregarded and instead may be seen as filling in any gaps in the authenticity and reliability of the Q system, the Court rejects such a proposition.  In LaFrenier, the burden of proof lay with the non-moving party.  That is not the case here and therefore LaFranier has no applicability.  LaFrenier, 550 F.3d 168. Reeves fully controls.  Reeves, 530 U.S. at 150.

[2] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 45 years.

[5]

A1541

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | ¶:340 | |
| COMMISSION, | ¶ | |
| | ¶: | |
| Plaintiff, | ¶ | No. 1:21-cv-11276-WGY |
| | ¶ | |
| v. | ¶: | |
| | ¶: | |
| YVONNE GASARCH, *et al.* | ¶: | |
| | ¶: | |
| Defendants. | ¶: | |

**YVONNE GASARCH'S MOTION IN LIMINE TO PRECLUDE ADMISSION OF EXHIBIT QK**

Defendant Yvonne Gasarch moves in limine to preclude the SEC from admitting Exhibit QK (attached at Exhibit 1). The Court recently allowed the exhibit to potentially be admitted despite it not being identified in the Pretrial Memorandum.

The document - - labeled "Summary of Gasarch Earnings" is purportedly based on "transfers to her Q accounts (PEAC and PER) via the WORK account." See Note 2. Yet there has been no testimony or other evidence that the "PEAC" and "PER' account are in fact "her" accounts. In fact, Mr. Knox testified that in the Q system, Mrs. Gasarch was identified as "WIRES." Moreover, all the evidence at the trial has established that the "beneficial owners" of the nominee accounts - - such as PEAC and PER - - were not compensated with the proceeds of stock sales. The SEC may argue that some of the entries mention "commissions." But the testimony of Mr. Nikolayev established that only Mr. Knox could control commission entries. The fact that Mr. Bond may have attributed the word "commissions" to "PEAC" and "PEAR' does not establish that Mrs. Gasarch received these commissions.

1

A1542

The report also includes "Christmas Bonus" attributed to the account PEAC and PEAR. It is unclear how the payment of Christmas bonuses to an employee is connected to the alleged securities fraud.  In any event, again there is no evidence that these "Christmas bonuses" made their way to Mrs. Gasarch.  The same is true for the "Internal Transfer" and "Other" categories.

Finally, the SEC has argued for the admissibility of Q entries that otherwise may be suspect on reliability grounds because they "tie in" to bank and brokerage records.  The SEC has not presented **any** bank statements of Corporate House, Fred Sharp or Yvonne Gasarch.  Because the document is based on hearsay, is unreliable and does not "tie in" to independent evidence, it should not be admitted.

Respectfully submitted,

YVONNE GASARCH

 By her Attorney,

/s/Karen A. Pickett
_____
Karen A. Pickett (BBO # 633801)
PICKETT LAW OFFICES, PC
125 High St., 26th Floor
Boston, MA  02110
617 423 0485
kpickettlaw@gmail.com

September 21, 2023

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 21, 2023.

*/s/ Karen A. Pickett*

A1543



**EXHIBIT QK**
21-cv-11276-WGY

## Summary of Gasarch Earnings [1], [2]

| Earnings Category | Q Account Code | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Commissions | PEAC | $ 91,311 | $ 334,380 | $ 299,790 | $ - | $ - | $ - | $ - | $ - | $ - | $ 725,480 |
| Commissions | PERE | $ - | $ - | $ - | $ 249,089 | $ 202,403 | $ 175,103 | $ 155,663 | $ 72,641 | $ 3,454 | $ 858,352 |
| **Commissions Total** | | $ 91,311 | $ 334,380 | $ 299,790 | $ 249,089 | $ 202,403 | $ 175,103 | $ 155,663 | $ 72,641 | $ 3,454 | $ 1,583,832 |
| Christmas Bonus | PEAC | $ - | $ - | $ 94,393 | $ - | $ - | $ - | $ - | $ - | $ - | $ 94,393 |
| Christmas Bonus | PERE | $ - | $ - | $ - | $ 103,057 | $ 108,100 | $ 74,968 | $ 77,845 | $ 51,983 | $ - | $ 415,954 |
| **Christmas Bonus Total** | | $ - | $ - | $ 94,393 | $ 103,057 | $ 108,100 | $ 74,968 | $ 77,845 | $ 51,983 | $ - | $ 510,347 |
| Internal Transfer | PEAC | $ - | $ - | $ 596 | $ - | $ - | $ - | $ - | $ - | $ - | $ 596 |
| Internal Transfer | PERE | $ - | $ - | $ - | $ 2,460 | $ 24 | $ 227 | $ 25,821 | $ - | $ 185,842 | $ 214,374 |
| **Internal Transfer Total** | | $ - | $ - | $ 596 | $ 2,460 | $ 24 | $ 227 | $ 25,821 | $ - | $ 185,842 | $ 214,970 |
| Other | PERE | $ - | $ - | $ - | $ 3,806 | $ 2,663 | $ (585) | $ - | $ 206,984 | $ (849) | $ 212,018 |
| **Other Total** | | $ - | $ - | $ - | $ 3,806 | $ 2,663 | $ (585) | $ - | $ 206,984 | $ (849) | $ 212,018 |
| **Grand Total** | | $ 91,311 | $ 334,380 | $ 394,778 | $ 358,412 | $ 313,189 | $ 249,713 | $ 259,329 | $ 331,608 | $ 188,447 | $ 2,521,167 |

**Notes:**
[1] Source: All Q Data in Excel.
[2] Gasarch's Earnings have been quantified based on transfers to her Q Accounts (PEAC & PERE) via the WORK account. Certain transactions were denominated in Canadian Dollars and the historical daily foreign exchange rates from the Federal Reserve website were downloaded (https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H10) to calculate the daily U.S. Dollar value for each transaction based on the batch date recorded in Q.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE         ¶:340
COMMISSION,                     ¶:
                                ¶:
        Plaintiff,              ¶        No. 1:21-cv-11276-WGY
                                ¶
        v.                      ¶:
                                ¶:
YVONNE GASARCH, *et al.*        ¶:
                                ¶:
        Defendants.             ¶:


**YVONNE GASARCH'S MOTION TO STRIKE EVIDENCE THAT THE COURT
ADMITED DE BENE PURSUANT TO FED. R. EVID. 801(d)(2)(E)**

Defendant Yvonne Gasarch moves to strike all evidence that the Court has admitted de

bene pursuant to the "co-conspirator exception" to hearsay set out in Fed. R. Evid 801(d)(2)(E).

The Court has stated that it would entertain motions to strike after the close of the SEC's case.

In this circuit: "The proponent of such a statement must prove, by a preponderance of the

evidence, that the declarant and the defendant were members of a conspiracy when the statement

was made, and that the statement was made in furtherance of the conspiracy." *United States v.

Ciresi*, 697 F.3d 19, 25 (1st Cir. 2012). Thus, here, the SEC is required to show by a

preponderance of the evidence: "(1) the existence of a conspiracy, (2) the defendant's knowledge

of the conspiracy, and (3) the defendant's knowing and voluntary participation in the conspiracy.

Under the third element, the evidence must establish that the defendant both intended to join the

conspiracy and intended to effectuate the objects of the conspiracy." *United States v. Paz-

Alvarez*, 799 F.3d 12, 21 (1st Cir. 2015) (internal quotations and citation omitted).

The SEC has failed to present evidence - - let alone by a preponderance standard - - that

Mrs. Gasarch was a member of the "conspiracy" alleged by the SEC based on alleged failures to

1

A1545

to file disclosure statements and engaging in various "pump and dump schemes."  There has

been no evidence presented of the required elements that Mrs. Gasarch knew of the conspiracy

and intended to join it.  There is nothing in the documentary evidence to this effect.  Two of the

SEC's witnesses - - Avthar Dhillon and Mike Kaitz - - did not know Mrs. Gasarch at all.  The

testimony of Mr. Nikolayev who knew and worked with Fred Sharp for twenty years was that - -

like Mrs. Gasarch - - he had no reason to believe that Fred Sharp was engaged in securities fraud.

Finally, it is clear from Mr. Knox's testimony that he knew of no agreement Mrs. Gasarch

entered into or that she had any knowledge of securities fraud.  In fact, he testified that he did

**<u>not</u>** know what Mrs. Gasarch's knowledge was.  Moreover, he testified that Fred Sharp was

engaged in transactions that did not run afoul of United States securities laws.

      For these reasons, Mrs. Gasarch respectfully requests that this Court find that Mrs.

Gasarch was not a coconspirator here and strike any exhibits (or portions thereof) based on

inadmissible hearsay.


      Respectfully submitted,

      YVONNE GASARCH

       By her Attorney,

      /s/Karen A. Pickett
      _____
      Karen A. Pickett (BBO # 633801)
      PICKETT LAW OFFICES, PC
      125 High St., 26th Floor
      Boston, MA  02110
      617 423 0485
      kpickettlaw@gmail.com

September 25, 2023

A1546

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 25, 2023.

*/s/ Karen A. Pickett*

A1547

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE ¶:340
COMMISSION, ¶
 ¶:
        Plaintiff, ¶        No. 1:21-cv-11276-WGY
 ¶
    v. ¶:
 ¶:
YVONNE GASARCH, *et al.* ¶:
 ¶:
        Defendants. ¶:

## YVONNE GASARCH'S MOTION PURSUANT TO FED. R. CIV. P. 50 FOR JUDGMENT AS A MATTER OF LAW

Pursuant to Fed. R. Civ. P. 50, Defendant Yvonne Gasarch moves for judgment as a

matter of law.  On the state of the evidence, no reasonable jury could find that she was either a

primary violator or an "aider and abettor" in the offer or sale of securities.

Standard

Under Fed. R. Civ. P. 50(a)(1):  "If a party has been fully heard on an issue during a jury

trial and the court finds that a reasonable jury would not have a legally sufficient basis to find for

the party on that issue, the court may…(b) grant a motion for judgment as a matter of law against

the party on a claim…that, under the controlling law, can be maintained or defeated only with a

favorable finding on that issue."

The Claims On Which Mrs. Gasarch Seeks Judgment As A Matter Of Law

Ms. Gasarch seeks judgment as a matter of law on all claims brought against her by the

SEC.

The SEC claims that Ms. Gasarch was a primary violator of the securities laws by

1

"being engaged in transactions, practices or courses of business which operated as a fraud or deceit upon any persons, including purchasers or sellers of securities."  The SEC claims that the primary violation is of Securities Act Section 17(a)(3) [15 U.A.X. §77q(a)(3)]."(Amended Complaint Claim for Relief 10).

In their 12th and 14th Claims for Relief, the SEC also claims that Ms. Gasarch "aided and abetted" "Sharp, Kelln, Veldhuis, Sexton, Friesen, Carillo and other Sharp group clients" in their securities fraud.  The SEC claims that Gasarch "knowingly or recklessly" provided "substantial assistance" to these violators, in violation of Section 15(b) of the Securities Act [15 U.S.C. §77o(b)] and Section 20( e) of the Exchange Act [15 U.S.C. 78t( e)].

As set forth below, no reasonable jury could find that Ms. Gasarch was a primary violator of the federal securities laws or an "aider or abettor" in such where the SEC has the burden of proof by the preponderance of the evidence.

<u>Legal Argument</u>

**A.  No Reasonable Jury Could Find That Ms. Gasarch Was A Primary Violator**

The claim against Ms. Gasarch is under 15U.S.C. Section 77(q)(a)(3):

 It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement (as defined in section 3(a)(78) of the Securities Exchange Act [15 USCS § 78c(a)(78)]) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—……
(**3**) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

In the Court's opinion on the defendants' motion to dismiss, the Court defined the elements of a 17a violation as such:  To be liable, the defendant must have: "(1) made a material misrepresentation or a material omission . . . or used a fraudulent device [scheme or artifice]; (2) with scienter; (3)  in connection with the purchase or sale of securities."  *SEC v. Monarch*

*Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); see *also Deka Int'l S.A. v. Genzyme Corp. (In re Genzyme Corp. Sec. Litig.*), 754 F.3d 31, 40 (1st Cir. 2014)."  *SEC v. Sharp*, 626 F.Supp.3d 345, 389 (D. Mass. 202

    In this case, the SEC has failed to establish that Ms. Gasarch was a primary violator of the 17(a)(3).  First, there is no evidence that Ms. Gasarch was involved at all in trading securities or making any statements used by the investing public.  She made no representations at all.  The SEC claims that her nominal 'ownership" of Peaceful Lion/Peregrine could operate as a fraud, but every witness who testified said that Fred Sharp controlled these (and all the other) nominees.  Moreover, and perhaps most importantly, in order to have the requisite scienter the SEC would have to establish that Ms. Gasarch had the requisite scienter - - i.e., that she should have known of the five percent rule and the ban against "pump and dump" and ignored it.  There is not a scintilla of evidence to this effect.

### B.  No Reasonable Jury Could Find That Ms. Gasarch Was An Aider Or Abettor

    This Court in the opinion on defendants' motions to dismiss, also set out the elements of aiding and abetting liability.  Here, the SEC must prove by a preponderance of the evidence:

     (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." <u>SEC v. Apuzzo, 689 F.3d 204, 206 (2d Cir. 2012)</u> (quotations omitted). "Substantial assistance" requires the defendant to have "associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed." <u>Id.</u> (quotations and alterations omitted).

*Sharp*, 626 F.3d at 398.

The SEC has presented no evidence that Ms. Gasarch knew of the five percent rule or of a "pump and dump" scheme. As the FBI examiner Beckstrom testified, the SEC reviewed approximately one million documents that spanned approximately ten years, and we have seen not one acknowledgement by Ms. Gasarch of awareness of either of these two things. Clearly, with the encrypted communications, she would have no reason to "hide" any knowledge. The only witness who even claimed to "know" Ms. Gasarch testified that he did not know what she knew. He also testified that Ms. Gasarch beginning in 2016/2017 was not included in the third party communications system they were using.

Ms. Gasarch cannot be said to have "substantially assisted" in the scheme, much less did so knowingly or recklessly. Ms. Gasarch was a functionary who sat in the reception area of an office suite that included other businesses. She did not make trades, direct trades, divvy up stocks to nominees in less than five percent increments, engage in stock promotion or any of the other things the SEC claimed led to securities fraud. She responded to clients' requests for wire payments and documents. She responded to direction from Fred Sharp, her boss who was a lawyer (or at least claimed to be). Even Roger Knox testified that, living in Switzerland, he was not really aware of the SEC disclosure rule. He also testified that his business and Fred Sharp's business did legitimate deals. But somehow the SEC is trying to hold Mrs. Gasarch as somehow having an obligation not to not assist in client requests.

. <u>Conclusion</u>

No reasonable jury could find that the SEC has met its burden to prove either the primary violation or "aiding and abetting" violations claimed in the Complaint. This Court should dismiss these claims as a matter of law.

Respectfully submitted,

YVONNE GASARCH

 By her Attorney,

/s/Karen A. Pickett

_____
Karen A. Pickett (BBO # 633801)
PICKETT LAW OFFICES, PC
125 High St., 26th Floor
Boston, MA  02110
617 423 0485
kpickettlaw@gmail.com

September 25, 2023

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 25, 2023.

*/s/ Karen A. Pickett*

A1552

9/27/23
10:35

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____ )
SECURITIES AND EXCHANGE COMMISSION,)
                                   )
            Plaintiff,             )
                                   )
      v.                           )        CIVIL ACTION
                                   )        NO. 21-11276-WGY
                                   )
ZHIYING YVONNE GASARCH,            )
JACKSON T. FRIESEN,                )
                                   )
            Defendants.            )
_____ )
```

<u>VERDICT</u>

For each question, please place a check mark beside the
appropriate response.

We, the jury, unanimously respond to the following questions:

### **Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) thereunder**
(Fraud in Connection with the Purchase or Sale of Securities)

1. Did Jackson Friesen violate Section 10(b) of the
   Securities Exchange Act of 1934 and Rules 10b-5(a) and
   (c) thereunder?

   _____ NO      ____✓_____ YES

### **Section 17(a)(1) of the Securities Act of 1933**
(Fraud in the Offer or Sale of Securities)

2. Did Jackson Friesen violate Section 17(a)(1) of the
   Securities Act of 1933?

   _____ NO      ____✓_____ YES

A1553

### Section 17(a)(3) of the Securities Act of 1933
(Fraud in the Offer or Sale of Securities)

3. Did Jackson Friesen violate Section 17(a)(3) of the Securities Act of 1933?

    _____ NO    _____✓_____ YES

4. Did Zhiying Yvonne Gasarch violate Section 17(a)(3) of the Securities Act of 1933?

    _____ NO    _____✓_____ YES

### Section 5(a) and (c) of the Securities Act of 1933
(Unregistered Offerings of Securities)

5. Did Jackson Friesen violate Sections 5(a) and 5(c) of the Securities Act of 1933?

    _____ NO    _____✓_____ YES

### Section 13(d) of the Securities Exchange Act of 1934 and Rule 13d-1 Thereunder
(Failure to Report Over 5% Beneficial Ownership of Securities)

6. Did Jackson Friesen violate Section 13(d) of the Securities Exchange Act of 1934 and Rule 13d-1 thereunder?

    _____ NO    _____✓_____ YES

### Aiding and Abetting Violations of the Securities Laws
(Aiding and Abetting Fraud in the Offer, Purchase, or Sale of Securities)

7. Did Zhiying Yvonne Gasarch aid and abet violations of Sections 17(a)(1), Sections 17(a)(3) of the Securities Act of 1933, of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(a) and (c) thereunder by others?

    _____ NO    _____✓_____ YES

DATE: _9/27/23_                    FOREWOMAN: _Karla Peckham_

[2]

A1554

UNITED STATES DISTR395ICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ¶:340 ¶ | |
| | ¶: | |
| Plaintiff, | ¶ | No. 1:21-cv-11276-WGY |
| | ¶ | |
| v. | ¶: | |
| | ¶: | |
| YVONNE GASARCH, *et al.* | ¶: | |
| | ¶: | |
| Defendants. | ¶: | |

## YVONNE GASARCH'S RENEWED MOTION PURSUANT TO FED. R. CIV. P. 50 FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

Pursuant to Fed. R. Civ. P. 50, Defendant Yvonne Gasarch renews her motion for judgment as a matter of law.    This motion was filed on September 25, 2023 (Docket Entry 395). On the state of the evidence, no reasonable jury could find that she was either a primary violator or an "aider and abettor" in the offer or sale of securities.    Moreover, much of the evidence against Mrs. Gasarch was improperly admitted and not reliable and therefore, at a minimum, she is entitled to a new trial.

### Standard

Under Fed. R. Civ. P. 50(b):

(b)RENEWING THE MOTION AFTER TRIAL; ALTERNATIVE MOTION FOR A NEW TRIAL. If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

(1) allow judgment on the verdict, if the jury returned a verdict;

A1555

(2) order a new trial; or

(3) direct the entry of judgment as a matter of law.

### **The Claims On Which Mrs. Gasarch Seeks Judgment As A Matter Of Law**

Ms. Gasarch seeks judgment as a matter of law on all claims brought against her by the SEC.

The SEC alleged that Ms. Gasarch was a primary violator of the securities laws by "being engaged in transactions, practices or courses of business which operated as a fraud or deceit upon any persons, including purchasers or sellers of securities." The SEC alleged that the primary violation is of Securities Act Section 17(a)(3) [15 U.A.X. §77q(a)(3)]."(Amended Complaint Claim for Relief 10).

In their 12th and 14th Claims for Relief, the SEC also claims that Ms. Gasarch "aided and abetted" "Sharp, Kelln, Veldhuis, Sexton, Friesen, Carillo and other Sharp group clients" in their securities fraud. The SEC claims that Gasarch "knowingly or recklessly" provided "substantial assistance" to these violators, in violation of Section 15(b) of the Securities Act [15 U.S.C. §77o(b)] and Section 20( e) of the Exchange Act [15 U.S.C. 78t( e)].

As set forth below, despite the verdict in the SEC's favor, no reasonable jury could find that Ms. Gasarch was a primary violator of the federal securities laws or an "aider or abettor" in such where the SEC has the burden of proof by the preponderance of the evidence.

### **Legal Argument**

### **A. No Reasonable Jury Could Find That Ms. Gasarch Was A Primary Violator**

The claim against Ms. Gasarch is under 15U.S.C. Section 77(q)(a)(3):

It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement (as defined in section 3(a)(78) of the Securities Exchange Act [15 USCS § 78c(a)(78)]) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—......

2

A1556

(**3**) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

In the Court's opinion on the defendants' motion to dismiss, the Court defined the elements of a 17a violation as such:  To be liable, the defendant must have: "(1) made a material misrepresentation or a material omission . . . or used a fraudulent device [scheme or artifice]; (2) with scienter; (3)  in connection with the purchase or sale of securities."  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); see *also Deka Int'l S.A. v. Genzyme Corp. (In re Genzyme Corp. Sec. Litig.)*, 754 F.3d 31, 40 (1st Cir. 2014)."  *SEC v. Sharp*, 626 F.Supp.3d 345, 389 (D. Mass. 2022).

In this case, the SEC has failed to establish that Ms. Gasarch was a primary violator of the 17(a)(3).  First, there is no evidence that Ms. Gasarch was involved at all in trading securities or making any statements used by the investing public.  She made no representations at all.  The SEC claims that her nominal 'ownership" of Peaceful Lion/Peregrine could operate as a fraud, but every witness who testified said that Fred Sharp controlled these (and all the other) nominees.  Moreover, and perhaps most importantly, in order to have the requisite scienter the SEC would have to establish that Ms. Gasarch had the requisite scienter - - i.e., that she should have known of the five percent rule and the ban against "pump and dump" and ignored it.  There is not a scintilla of evidence to this effect.  In fact, the only witness who could testify as to Mrs. Gasarch's knowledge - - Roger Knox - - specifically said that he did not know what Mrs. Gasarch knew at all.

The exhibits submitted in the case establish that Mrs. Gasarch was acting at the direction of her boss, Fred Sharp, or at the direction of clients when sending wires.  There was no exhibit where Mrs. Gasarch was enlightened that there was a "five percent rule" Sharp and his clients

A1557

were violating or had any knowledge of any "pump and dump" scheme.  And, although the

standard can be met by "negligence," the SEC did not establish that Mrs. Gasarch *should* have

known of these securities violations.  In fact, William Kaitz - - a stock promoter who lived in the

United States and testified for the SEC - - did not know about these SEC rules/violations.

The fact that Mrs. Gasarch became a "nominee owner" of Peaceful Lion/Peregrine does

nothing to establish knowledge of the SEC rules/violations.  Moreover, Roger Knox testified that

Sharp would use photocopied signatures which was confirmed by Fedir Nikolayev.  Moreover,

she, like Nikolayev, did not have any knowledge that these nominee entities were being used to

"hide" the clients' acquisition of more than five percent of stock.

**B. No Reasonable Jury Could Find That Ms. Gasarch Was An Aider Or Abettor**

This Court in the opinion on defendants' motions to dismiss, also set out the elements of

aiding and abetting liability.  There, this Court said  SEC must prove by a preponderance of the

evidence:

 (1) the existence of a securities law violation by the primary (as opposed to the aiding

and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor;

and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary

violation." <u>SEC v. Apuzzo, 689 F.3d 204, 206 (2d Cir. 2012)</u> (quotations

omitted). "Substantial assistance" requires the defendant to have "associated himself with

the venture, that he participated in it as in something that he wished to bring about, and

that he sought by his action to make it succeed." <u>Id.</u> (quotations and alterations omitted).

*Sharp*, 626 F.3d at 398.

The SEC presented no evidence that Ms. Gasarch knew of the five percent rule or of a

"pump and dump" scheme.  As the FBI examiner Beckstrom testified, the SEC reviewed

A1558

approximately one million documents that spanned approximately ten years, and there was not

one exhibit presented where Ms. Gasarch evidenced any awareness of either of these two things.

Clearly, with the encrypted communications, she would have no reason to "hide" any

knowledge.  The testifying witnesses who were also charged as scheme participants - - Dhillon,

Kaitz, and Ciapala - - did not know Mrs. Gasarch.  The only witness who even claimed to

"know" Ms. Gasarch testified that he did not know what she knew.  He also testified that Ms.

Gasarch beginning in 2016/2017 was not included in the third party communications system they

were using.

Ms. Gasarch cannot be said to have "substantially assisted" in the scheme, much less did

so knowingly or recklessly.  Ms. Gasarch was a functionary who sat in the reception area of an

office suite that included other businesses.  She did not make trades, direct trades, divvy up

stocks to nominees in less than five percent increments, engage in stock promotion or any of the

other things the SEC claimed led to securities fraud.  She responded to clients' requests for wire

payments and documents.  She responded to direction from Fred Sharp, her boss who was a

lawyer (or at least claimed to be).  Even Roger Knox testified that, living in Switzerland, he was

not really aware of the SEC disclosure rule.  He also testified that his business and Fred Sharp's

business did legitimate deals.

Mrs. Gasarch's activities stand in stark contrast to those of the other

defendants/witnesses.  The testimony/exhibits were replete with evidence that the participants

openly discussed the schemes.  They then would meet and celebrate with champagne and fine

meals.  Mrs. Gasarch was never invited to any of these events and, as stated above, nowhere in

the million plus document universe was there any evidence that she was informed of the five

percent rule or the "pump and dump scheme" afoot.

Mrs. Gasarch understands that a verdict may be based on "circumstantial evidence."  But the SEC relied heavily on evidence (brought in through its summary witness accountant) that Mrs. Gasarch profited in a way an office assistant normally may not by presenting evidence of claimed "payments" to Mrs. Gasarch.  But this evidence was completely unreliable.  First, as all witnesses testified, Mr. Sharp was in control of the Q system and could change entries at any time.  Second of all, there was no evidence payments out of accounts labeled Peaceful Lion/Peregrine were actually directed to Mrs. Gasarch.  The SEC sought to "verify" the Q system by showing that certain transactions matched some of the trading records that they found.  But there was **no** such evidence as it related to Mrs. Gasarch because the SEC **did not have either Sharp/Custom House's bank records or Mrs. Gasarch bank records**.  Even Roger Knox testified that Sharp "shortchanged" them when compared to the Q records - - and clearly as an integral part of the "pump and dump" scheme, Knox would know what he and his firm were owed.  Moreover, Nikolayev - - the nominee owner of Gotoma which engaged in extensive trading - - testified that he did not receive the proceeds of Gotoma's trades.

### C. Because Evidence Of The Q System Was Improperly Admitted, At A Minimum, Mrs. Gasarch Is Entitled To A New Trial

As the Court is aware, the evidence as to Mrs. Gasarch's liability was not established through any live witness that testified for the SEC.  Indeed, the witnesses besides Knox could state only that Mrs. Gasarch was responsible for processing wire payments.  Even Knox said that he was unaware of her knowledge and that Sharp was involved in legitimate business activities.  Not one witness could testify that she knew (or should have known) of any regulations by the SEC on ownership limits or of the "pump and dump" scheme.  Indeed, the evidence established that the violators went to great lengths to conceal the scheme.   Moreover, the evidence established that Sharp and even Knox were engaged in legitimate business activities, and it was

6

A1560

never established by the SEC how Mrs. Gasarch - - a Chinese woman living in Canada and working for an (at least claimed) attorney Fred Sharp - - could know when something was "illegitimate."

The SEC instead relied on impermissible hearsay against Mrs. Gasarch, primarily in the form of the Q system. Through the entries of the Q system, the SEC attempted to establish that Mrs. Gasarch was not a "mere" office assistant, but a major beneficiary of the securities fraud scheme. This evidence was improperly admitted, never authenticated, and without it the jury could not have found Mrs. Gasarch liable.

The Court admitted evidence from the Q system pursuant to the Court admitted the evidence *de bene* pursuant to the "co-conspirator exception" to hearsay set out in Fed. R. Evid 801(d)(2)(E). Mrs. Gasarch moved to strike this evidence (Docket Entry 394), but the Court allowed such evidence to be used by the SEC against her.

The Q system evidence should not have been admitted against Mrs. Gasarch. In this circuit: "The proponent of such a statement must prove, by a preponderance of the evidence, that the declarant and the defendant were members of a conspiracy when the statement was made, and that the statement was made in furtherance of the conspiracy." *United States v. Ciresi*, 697 F.3d 19, 25 (1st Cir. 2012). Thus, here, the SEC was required to show by a preponderance of the evidence: "(1) the existence of a conspiracy, (2) the defendant's knowledge of the conspiracy, and (3) the defendant's knowing and voluntary participation in the conspiracy. Under the third element, the evidence must establish that the defendant both intended to join the conspiracy and intended to effectuate the objects of the conspiracy." *United States v. Paz-Alvarez*, 799 F.3d 12, 21 (1st Cir. 2015) (internal quotations and citation omitted).

A1561

The SEC failed to present evidence - - let alone by a preponderance standard - - that Mrs. Gasarch was a member of the "conspiracy" alleged by the SEC based on alleged failures to file disclosure statements and engaging in various "pump and dump schemes."  There has been no evidence presented of the required elements that Mrs. Gasarch knew of the conspiracy and intended to join it.  There is nothing in the documentary evidence to this effect.  Three of the SEC's witnesses - - Dhillon, Kaitz and Ciapalla - - did not know Mrs. Gasarch at all.  The testimony of Mr. Nikolayev who knew and worked with Fred Sharp for twenty years was that - - like Mrs. Gasarch - - he had no reason to believe that Fred Sharp was engaged in securities fraud.  Finally, it is clear from Mr. Knox's testimony that he knew of no agreement Mrs. Gasarch entered into or that she had any knowledge of securities fraud.  In fact, he testified that he did **<u>not</u>** know what Mrs. Gasarch's knowledge was.  Moreover, he testified that Fred Sharp was engaged in transactions that did not run afoul of United States securities laws.

This Court should direct a verdict for Mrs. Gasarch upon consideration that the Q system was improperly admitted.  In the alternative, the prejudice to Mrs. Gasarch by the admission of this evidence, at a minimum, should cause this Court to order a new trial for Mrs. Gasarch.

### <u>Conclusion</u>

No reasonable jury could find that the SEC has met its burden to prove either the primary violation or "aiding and abetting" violations claimed in the Complaint.  This Court should dismiss these claims as a matter of law.  In the alternative, because the verdict rested on prejudicial, improperly admitted evidence in the form of the Q system, this Court should order a new trial for Mrs. Gasarch.

A1562

Respectfully submitted,

YVONNE GASARCH

 By her Attorney,

/s/Karen A. Pickett

_____
Karen A. Pickett (BBO # 633801)
PICKETT LAW OFFICES, PC
125 High St., 26th Floor
Boston, MA  02110
617 423 0485
kpickettlaw@gmail.com

October 25, 2023

### **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 25, 2023.

*/s/ Karen A. Pickett*

9

A1563

| 414 | 10/26/2023 | Judge William G. Young: ELECTRONIC ORDER entered denying 413 Renewed Motion Pursuant to Fed.R.Civ. P.50 for Judgment as a Matter of Law or, in the alternative, for a New Trial. (Gaudet, Jennifer) (Entered: 10/26/2023) |  |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>     v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R TAYLOR,<br><br>                    Defendants. | Case No. 1:21-cv-11276-WGY |

**DEFENDANTS MIKE K. VELDHUIS AND COURTNEY KELLN'S**
**MOTION TO STAY THE PROCEEDINGS**

Defendants Mike K. Veldhuis and Courtney Kelln (the "Defendants") request that the Court stay the remaining monetary sanction phase of this proceeding as to these defendants in the above-captioned matter until the resolution of parallel criminal proceedings pending against them, 1:21-MJ-07182 (JB) (D. Mass.). In support of this motion, the Defendants submit the accompanying memorandum of law, declaration, and exhibits.

A1565

DATED: December 5, 2023
       New York, New York

SHER TREMONTE LLP

By: /s/ *Robert Knuts*
       Michael Tremonte (*pro hac vice*)
       Robert Knuts (*pro hac vice*)
       Katie Renzler (*pro hac vice*)
       90 Broad Street, 23rd Floor
       New York, New York 10004
       Tel: 212.202.2600
       Email: mtremonte@shertremonte.com

*Attorneys for Defendant Mike K. Veldhuis*

WILEY REIN LLP

By: /s/ *Claire Kellen*
       Claire E. Kellen (*pro hac vice*)
       Pamela L. Signorello (BBO# 651483)
       2050 M Street NW
       Washington, DC 20036
       Tel: 202.719.7000
       Fax: 202.719.7049
       Email: CKellen@wiley.law
             PSignorello@wiley.law

*Attorneys for Defendant Courtney Kelln*

A1566

**RULE 7.1(a)(2) CERTIFICATE OF SERVICE**

    I hereby certify that the parties have conferred and attempted in good faith to resolve or narrow the issues presented in Defendants' motion.


DATED: December 5, 2023
       New York, New York


                         /s/ *Robert Knuts*
                         Robert Knuts

A1567

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by ECF on December 5, 2023.

_____ /s/ *Robert Knuts* _____
Robert Knuts

4

A1568

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

          v.                                                    Case No. 1:21-cv-11276-WGY

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                              Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MIKE K. VELDHUIS**
**AND COURTNEY KELLN'S MOTION TO STAY THE PROCEEDINGS**

SHER TREMONTE LLP                          WILEY REIN LLP
90 Broad Street, 23rd Floor                2050 M Street NW
New York, New York 10004                   Washington, DC 20036
Tel: 212.202.2600                          Tel: 202.719.7000

*Attorneys for Defendant Mike K. Veldhuis*    *Attorneys for Defendant Courtney Kelln*

A1569

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ......................................................................................................... 2

   I.     The Criminal Action ............................................................................. 2

   II.    The SEC Action ................................................................................... 4

        A.    Asset Freezes ........................................................................... 4

        B.    Pleadings and Pre-Trial Motions ........................................... 4

        C.    Entries of Partial Judgment as to Liability ............................. 6

        D.    Trial ......................................................................................... 6

        E.    Determination of Remedies ..................................................... 7

   III.   The Interplay Between the Criminal and SEC Actions ....................... 7

LEGAL STANDARD .................................................................................................. 8

ARGUMENT ............................................................................................................... 9

   I.     The Significant Degree of Overlap Between the Criminal and SEC Actions

   Weighs in Favor of a Stay ............................................................................. 9

   II.    The Hardship to Veldhuis and Kelln Supports a Stay ..................... 11

   III.   The Good Faith and Public Interest Factors Support a Stay ........... 13

   IV.   The Remaining Factors Do Not Tip the Scale Against a Stay ........ 14

CONCLUSION ........................................................................................................... 17

A1570

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Magnusson,*
No. 19-cv-00547, 2020 WL 2770682 (D. Me. May 28, 2020).................................. 14

*Brock v. Tolkow,*
109 F.R.D. 116 (E.D.N.Y. 1985) ............................................................................. 11

*Chao v. Fleming,*
498 F. Supp. 2d 1034 (W.D. Mich. 2007) ............................................................... 11

*Cruz v. Cty. of DuPage,*
No. 96 C 7170, 1997 WL 370194 (N.D. Ill. June 27, 1997) ................................... 11

*D.R. v. Bigda,*
No. 20-cv-30085, 2021 WL 1080244 (D. Mass. Mar. 18, 2021) ............................. 8

*Eastwood v. United States,*
No. 2:06-cv-164, 2008 WL 656074 (E.D. Tenn. Mar. 6, 2008)............................... 16

*Green v. Cosby,*
177 F. Supp. 3d 673 (D. Mass. 2016) ........................................................... 10, 11, 12

*Heck v. Humphrey,*
512 U.S. 477 (1994).................................................................................................. 15

*Ismail v. Robinson,*
No. 22-cv-00150, 2022 WL 4121930 (D. Me. Aug. 1, 2022) ................................. 15

*Louis Vuitton Malletier S.A. v. LY USA, Inc.,*
676 F.3d 83 (2d Cir. 2012) ..................................................................................... 11

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.,*
385 F.3d 72 (1st Cir. 2004)............................................................................... 8, 9, 11

*Narragansett Indian Meeting Church v. Johnson,*
No. 1:21-cv-003322-MSM-PAS, 2023 WL 5094924 (D.R.I. Aug. 9, 2023) .......................... 16

*Nat'l Ass'n of Gov't Emps. v. Mulligan,*
849 F. Supp. 2d 167 (D. Mass. 2012) .................................................................... 14

*New England Sports Network, L.P. v. Alley Interactive, LLC (CT),*
No. 22-cv-10024, 2023 WL 2140474 (D. Mass. Feb. 21, 2023)............................... 8

A1571

*Russell v. Chenevert*,
    573 F. Supp. 3d 391 (D. Me. 2021) ................................................................... 14

*Sea Salt, LLC v. Bellerose*,
    No. 18-cv-00413, 2020 WL 2475874 (D. Me. May 13, 2020) ........................... 10, 14

*SEC v. Constantin*,
    No. 11 Civ. 4642, 2012 WL 1195700 (S.D.N.Y. Apr. 9, 2012) ........................... 10

*SEC v. Esposito*,
    260 F. Supp. 3d 79 (D. Mass. 2017) ................................................................... 12

*SEC v. First City Fin. Corp.*,
    980 F.2d 1215 (D.C. Cir. 1989) ......................................................................... 12

*SEC v. Happ*,
    392 F.3d 12 (1st Cir. 2004) ................................................................................ 12

*SEC v. Liberty*,
    No. 18-cv-00139, 2019 WL 3752907 (D. Me. Aug. 8, 2019) ........................... 11, 14

*SEC v. TelexFree, Inc.*,
    52 F. Supp. 3d 349 (D. Mass. 2014) ............................................... 8, 9, 10, 14

*United States v. Sharp*,
    1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021) ................................................... 2

*United Techs. Corp., Hamilton Standard Div. v. Dean*,
    906 F. Supp. 27 (D. Mass. 1995) ....................................................................... 10

*Walsh v. Contract Framing Builders, Inc.*,
    Civil Action No. 22-10215-NMG, 2023 WL 5939632 (D. Mass. Sept. 12, 2023) ........... 10, 15

**Statutes**

15 U.S.C. § 78j(b) ............................................................................................... 2

15 U.S.C. § 78ff ................................................................................................... 2

18 U.S.C. § 371 ................................................................................................... 2

**Regulations**

17 C.F.R. § 240.10b-5 ......................................................................................... 2

**Other Authorities**

J. Milton Pollack, *Parallel Civil & Criminal Proceedings*, 129 F.R.D. 201 (1989) ..................... 8

A1572

**PRELIMINARY STATEMENT**

Having been forced to choose between defending themselves in the instant action (the "SEC Action") and defending themselves in a parallel criminal proceeding, Defendants Mike K. Veldhuis and Courtney Kelln (the "Defendants") have consistently relied on their Fifth Amendment privilege to defend themselves against the threat to their liberty. Now, Defendants face the final stage of this action, in which plaintiff Securities and Exchange Commission (the "Commission" or the "SEC") will ask this Court to impose hefty financial penalties on the Defendants, likely for millions of dollars. A temporary stay of this stage of this proceeding is necessary so that Veldhuis and Kelln can meaningfully defend themselves and respond to the SEC's motion for monetary sanctions, rather than risk being forced to hand over massive sums of money without the opportunity to fully and fairly challenge the SEC's factual claims in support of that motion.

In apparent coordination, in August 2021, the SEC and the United States Attorney's Office for the District of Massachusetts (the "USAO") commenced legal proceedings against Veldhuis and Kelln, among others. The Commission and the USAO lodged nearly identical accusations against Veldhuis and Kelln—specifically, that the Defendants participated in a scheme involving the promotion, purchase, and sale of "penny stocks" in violation of criminal and civil securities laws. A criminal complaint and warrants have been issued as to Veldhuis and Kelln, and the USAO has made abundantly clear—as recently as November 17, 2023—that its criminal investigation is still active. To preserve their abilities to defend themselves in the looming criminal proceedings, Veldhuis and Kelln effectively have not defended themselves in the instant action. Rather, they have consistently invoked their rights and privileges under the Fifth Amendment in response to the Commission's pleadings and discovery requests, have

1

A1573

moved to stay this action, and have filed notices of non-opposition to entries of judgment as to liability.

All that remains in the SEC Action against Veldhuis and Kelln, is the Court's determination of financial penalties. As described below, that determination will be based on factual assertions by the SEC concerning, inter alia, funds allegedly received by Veldhuis and Kelln that arose from the violations alleged in the SEC's amended complaint. If Veldhuis and Kelln provide substantive information to this Court to contest the SEC's factual assertions, Veldhuis and Kelln will waive their Fifth Amendment privilege, in whole or in part. If they assert their Fifth Amendment privilege, the Court will be forced to determine monetary sanctions based solely on facts presented by the SEC. Veldhuis and Kelln should not be forced to choose between a waiver of their Fifth Amendment privilege and the SEC's version of monetary sanctions. Instead, in the interest of justice, the Court should exercise its power to stay these proceedings until after the resolution of the parallel criminal proceedings so that the Defendants may defend themselves to the fullest extent possible both in the criminal proceedings and with respect to the penalties stage of this litigation.

## BACKGROUND

### I.    The Criminal Action

On August 4, 2021, the USAO filed a sealed criminal complaint in this Court charging four individuals—Frederick Sharp, Luis Carrillo, Mike Veldhuis, and Courtney Kelln—with two offenses: (i) conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and (ii) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 (the "Criminal Complaint"). *See* Compl., ECF No. 3, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021); Brown Aff., ECF No. 3-1, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021). In support of the Criminal Complaint, the government submitted an

2

affidavit sworn to by FBI Special Agent Keith Brown (the "Brown Affidavit"). *See* Brown Aff., ECF No. 3-1, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021). Arrest warrants were issued for the defendants the same day. *See* ECF Nos. 5–8, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021).

The Brown Affidavit alleges "that, from no later than 2014 through no earlier than September 2018," the defendants in the Criminal Complaint, "together with multiple co-conspirators[] directed and/or participated in sophisticated pump-and-dump schemes involving concealed-control of large portions of stock in several microcap [or 'penny' stock] companies that netted, at a minimum, tens of millions of dollars in illicit proceeds." Brown Aff. ¶ 23, ECF No. 3-1, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021); *see also id.* ¶ 3. Allegedly, "[t]he scheme generally involved a similar series of steps for each microcap stock," which "would often begin with an individual or group of individuals acquiring control of a significant portion of a microcap company's free-trading shares . . . through various nominee entities." *Id.* ¶ 24. Veldhuis, according to the Criminal Complaint, "acted as [a] point person[] for such control groups," and on his behalf "deposit[s] of shares of microcap companies" would be made "into brokerage accounts" at an asset management firm, at which Kelln managed "client relations" and "prepared" documents "to facilitate the breakdown, transfer, and deposit of the control shares into blocks of less than five percent." *Id.* ¶¶ 24–25, 35. According to the Brown Affidavit, "[e]ach of the nominee entities generally held less than five percent of the given company's shares in order to avoid disclosure obligations under the federal securities laws and to circumvent brokers' compliance protocols." *Id.* ¶ 24. Sharp allegedly owned the firm, which offered "a variety of services to control persons seeking to conceal their identity when selling large quantities of shares of penny stock companies." *Id.* ¶ 26. The Brown Affidavit further

A1575

alleges that Veldhuis and others would direct, through a series of entities and individuals, the sale of shares, which occurred in tandem with promotional campaigns for those stocks, and the asset management firm would hold the proceeds until directed otherwise by co-conspirators. *See id.* ¶¶ 40–42, 47. It depicts Veldhuis as involved in illicit sales of Vitality Biopharma, Inc. stock and Kelln as involved in illicit sales of Garmatex Holdings, Ltd., OneLife Technologies Corp., and Vitality Biopharma, Inc. stocks. *See id.* ¶¶ 66–106.

## II.    The SEC Action

The day after the Criminal Complaint was filed, on August 5, 2021, the SEC commenced the instant action against nine defendants – Sharp, Kelln, Veldhuis, Zhiying Yvonne Gasarch, Paul Sexton, Jackson T. Friesen, William T. Kaitz, Avtar S. Dhillon, and Graham R. Taylor (the "SEC Action").[1]

### A.    Asset Freezes

On August 6, 2021, the SEC obtained a temporary restraining order freezing assets of the defendants. *See* Order Granting Mot. for TRO, ECF No. 7. Two weeks later, the Court issued a preliminary injunction freezing the assets of several defendants, including Veldhuis. *See* Order Allowing Mot. for Preliminary Injunction, ECF No. 39. On October 7, 2021, the Court issued a preliminary injunction freezing Kelln's assets. *See* Order Entering Preliminary Injunction, ECF No. 95.

### B.    Pleadings and Pre-Trial Motions

The complaint and amended complaint filed by the SEC in this action make practically identical allegations to those outlined in the Brown Affidavit in the Criminal Action.

---

[1]    Default judgment was entered in favor of the SEC as to Sharp. ECF No. 211. Final judgment as to defendants Taylor, Kaitz, and Dhillon was entered pursuant to consent agreements between each defendant and the SEC. Taylor, ECF No. 262; Kaitz, ECF No. 263; Dhillon, ECF No. 403.

Specifically as to Veldhuis and Kelln, the SEC asserted: Fraud in the Offer or Sale of Securities

– Violations of Sections 17(a)(1) and (3) of the Securities Act (Claim 1); Fraud in Connection

with the Purchase or Sale of Securities – Violations of Section 10(b) of the Exchange Act and

Rules 10b-5(a) and (c) (Claim 2); and Unregistered Offerings of Securities – Violations of

Sections 5(a) and 5(c) of the Securities Act (Claim 3).  Am. Compl. ¶¶ 250–58, ECF No. 230.

The SEC additionally charged Veldhuis with Failure to Report over 5% Beneficial Ownership –

Violations of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder (Claim 4)*, id.* ¶¶

259–63, and Kelln with Aiding and Abetting – Violations of Section 15(b) of the Securities Act

(Claim 8) and Aiding and Abetting – Violations of Section 20(e) of the Exchange Act (Claim 9),

*id.* ¶¶ 277–85.

      Following the close of discovery, on April 17, 2023, the SEC filed a motion for partial

summary judgment on the Third and Fourth Claims of the Amended Complaint, which charge,

respectively, (i) defendants Veldhuis, Sexton, Friesen, and Kelln with unregistered distributions

of securities in violation of Sections 5(a) and 5(c) of the Securities Act and (ii) Veldhuis, Sexton,

and Friesen with failure to report their greater than 5% ownership in Vitality Biopharma Inc. in

violation of Section 13(d) of the Exchange Act and Rule 13d-1 thereunder.  *See* SEC's Mem. in

Support of Mot. for Summ. J., ECF No. 267.  In response, on May 5, 2023, Veldhuis and Kelln

moved to stay the proceedings (the "First Motion to Stay"), arguing that they could not defend

themselves fully against the SEC's summary judgment motion without jeopardizing their rights

and privileges under the Fifth Amendment.  Mot. to Stay the Proceedings, ECF No. 280; Mem.

in Support of Mot. to Stay, ECF No. 281.  The SEC opposed the motion on May 9, 2023.  SEC

Opp. to Mot. to Stay, ECF No. 289.  On May 15, 2023, the Court denied the First Motion to

Stay.  Order Denying First Mot. to Stay, ECF No. 292.

A1577

C.     Entries of Partial Judgment as to Liability

On June 13, 2023, Kelln and Veldhuis filed a Notice of Non-Opposition to Entry of Judgment.  Veldhuis and Kelln's Notice of Non-Opposition to Entry of J., ECF No. 315; Veldhuis's Notice of Non-Opposition of Entry to J., ECF No. 318; Veldhuis Am. Mot. for Entry of J. (Non-Opposition), ECF No. 319.  On June 14 and 15, 2023, the Court entered partial final judgments as to Kelln and Veldhuis, respectively, that imposed injunctive relief but held open the issue of monetary sanctions.  Order of J. as to Kelln, ECF. No. 318; Order of J. as to Veldhuis, ECF No. 325.  The Orders provided that neither defendant "will contest liability under the claims filed by the Plaintiff, but will be permitted to challenge the remedies and sanctions sought by the Commission."  Order of J. as to Kelln, ECF. No. 318 at 5; Order of J. as to Veldhuis, ECF No. 325 at 5.  Moreover, "nothing in" those partial final judgments "or in connection with [Veldhuis' and Kelln's] decision[s] to decline opposing entry of Judgment shall constitute a waiver of [either defendant's] previously asserted invocation of [his or her] Fifth Amendment Right not to be a witness against [him or herself] or any other rights [either defendant] may have under the U.S. Constitution or the Federal Rules of Criminal Procedure concerning the pending criminal charges brought against [him or her] by the" USAO.  Order of J. as to Kelln at 5, ECF. No. 318; Order of J. as to Veldhuis at 5, ECF No. 325.

D.     Trial

On September 11, 2023, trial on the SEC Action commenced as to defendants Gasarch and Friesen.[2]  The SEC called several witnesses who had previously entered into cooperation agreements with the USAO to provide testimony against defendants Gasarch and Friesen.  *See,*

---

[2]     On September 11, 2023, defendant Sexton filed a Notice of Non-Opposition to Entry of Judgment, and the Court entered partial judgment as to Sexton the next day.  ECF No. 376; ECF No. 378.

6

A1578

*e.g.*, Sept. 19, 2023 Minute Entry, ECF No. 387.  Trial concluded on September 27, 2023, with the jury returning a verdict in the SEC's favor.  Verdict, ECF No. 402.

      E.    <u>Determination of Remedies</u>

As a result of the Notices of Non-Opposition to Entry of Judgment filed by defendants Kelln, Veldhuis, and Sexton and the trial verdict rendered against defendants Gasarch and Friesen, the remaining issues to be adjudicated by this Court are what additional monetary remedies should be imposed against defendants Kelln and Veldhuis (if any), and what injunctive and monetary remedies should be ordered against defendants Sexton, Gasarch, and Friesen (if any).  The SEC has stated that it "plans to file its motion and supporting papers during the first week of December" with respect to "the imposition of remedies."  SEC's Assented-To Motion for Leave to File Excess Pages at 2–3, ECF No. 412.

**III.    The Interplay Between the Criminal and SEC Actions**

Although no indictment has followed the filing of the Criminal Complaint, the USAO has, in no uncertain terms, made clear that the criminal investigations into Veldhuis and Kelln remain active and the Criminal Complaint remains pending.  In connection with ancillary proceedings commenced by the SEC in Canada, Assistant U.S. Attorney James R. Drabick executed an affidavit dated November 17, 2023 (the "Drabick Affidavit") in which he stated: (a) he is the lead prosecutor in both the Criminal Case and the "ongoing investigation" concerning the Criminal Complaint against defendants Kelln, Veldhuis, and others; and (b) the USAO requested that if the Canadian court ordered defendants Kelln and Veldhuis to provide information to the SEC in derogation of their Fifth Amendment rights, the Canadian court should issue an order prohibiting the SEC from sharing any such compelled disclosures by defendants Kelln and Veldhuis to the USAO or FBI because such sharing of information "could imperil the

<center>7</center>

<center>A1579</center>

U.S. criminal proceeding."  A copy of the Drabick Affidavit is attached as Exhibit 1 to this

Declaration of Robert Knuts, dated December 5, 2023 ("Knuts Decl.").

Understanding that they continue to face criminal charges that, if proven beyond

reasonable doubt, could result in decades of imprisonment in the United States, Veldhuis and

Kelln cannot fully and fairly defend themselves against the SEC's prospective motion for

imposition of monetary remedies at this time.  For the reasons set forth below, this Court should

issue an order prohibiting the SEC from filing a motion for monetary remedies against

defendants Kelln and Veldhuis until after the Criminal Action has been resolved.

**LEGAL STANDARD**

A court can exercise its discretion to grant a stay of civil proceedings when the interests

of justice so require.  *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st

Cir. 2004).  "The pendency of a parallel or related criminal proceeding can constitute such a"

circumstance.  *Id.*  The "determination is highly nuanced," and requires the court to balance

"competing interests" and "take a careful look at the idiosyncratic circumstances of the case

before it."  *Id.* at 78.

Under First Circuit law, when deciding whether to grant a stay of a civil proceeding in

the face of a criminal proceeding, courts consider "the extent to which the issues in the criminal

case overlap with those presented in the civil case."  *New England Sports Network, L.P. v. Alley

Interactive, LLC (CT)*, No. 22-cv-10024, 2023 WL 2140474, at *3 (D. Mass. Feb. 21, 2023)

(ellipsis in original) (quoting *SEC v. TelexFree, Inc.*, 52 F. Supp. 3d 349, 352 (D. Mass. 2014)).

Courts have described this factor "as the threshold or most important factor that a trial court

should consider."  *D.R. v. Bigda*, No. 20-cv-30085, 2021 WL 1080244, at *2 (D. Mass. Mar. 18,

2021) (collecting cases); *see also* J. Milton Pollack, *Parallel Civil & Criminal Proceedings*, 129

F.R.D. 201, 203 (1989).  Additionally, courts consider:

A1580

> (i) the interests of the civil plaintiff in proceeding expeditiously with
> the civil litigation, including the avoidance of any prejudice to the
> plaintiff should a delay transpire; (ii) the hardship to the defendant,
> including the burden placed upon him should the cases go forward
> in tandem; (iii) the convenience of both the civil and criminal courts;
> (iv) the interests of third parties; . . . (v) the public interest[;] . . . (vi)
> the good faith of litigants (or the absence of it)[;] and (vii) the status
> of the cases.

*Microfinancial, Inc.*, 385 F.3d at 78. The movant carries the burden of demonstrating the need

for a stay. *Id.* at 77.

## ARGUMENT

The interests of justice require that the SEC's motion for monetary remedies against

Veldhuis and Kelln be stayed until after the Criminal Action is resolved. Requiring Veldhuis

and Kelln to proceed to the monetary sanctions phase of this action with the Criminal Action still

looming would force them to choose between, on the one hand, challenging evidence presented

by the SEC, including the likely enormous amount of financial penalties the SEC requests, and,

on the other hand, asserting their Fifth Amendment rights to prevent themselves from risking

decades of imprisonment in the Criminal Action. *TelexFree, Inc.*, 52 F. Supp. 3d at 352 ("Courts

have repeatedly issued stays in securities cases involving SEC civil enforcement actions and

corresponding criminal proceedings.").

Of the eight factors relevant to the Court's analysis in determining whether or not to grant

a stay, four weigh heavily in favor of staying the SEC's prospective motion for monetary

sanctions. The remaining factors are either neutral or weigh only slightly against a stay.

## I.    The Significant Degree of Overlap Between the Criminal and SEC Actions Weighs in Favor of a Stay

The "most important factor" for the Court to consider—the degree of overlap between the

civil and criminal proceedings—unwaveringly supports staying the SEC's prospective motion

for monetary sanctions against defendants Kelln and Veldhuis. "Where there is substantial

A1581

overlap between the subject matter of the two proceedings, a stay of the civil proceeding is

favored." *Sea Salt, LLC v. Bellerose*, No. 18-cv-00413, 2020 WL 2475874, at *2 (D. Me. May

13, 2020) (citation and internal quotation marks omitted).  This is "[b]ecause there is more

danger of self-incrimination when the issues in both cases overlap." *SEC v. Constantin*, No. 11

Civ. 4642, 2012 WL 1195700, at *2 (S.D.N.Y. Apr. 9, 2012).  Here, according to the USAO, the

overlap is nearly complete.  The overlap of allegations describing the alleged illicit scheme

across the Amended Complaint and the Criminal Complaint confirms as much.  *Compare* Brown

Aff. ¶¶ 3, 18, 23–26, 29, 34–39, 40–42, 46–47, 52–56, 66–106, ECF No. 3-1, *United States v.*

*Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021)*, with* Am. Compl. ¶¶ 2, 5, 7–8, 17–18, 52–

56, 65–69, 93, 123–60, 242–63, 277–85, ECF No. 230.  Not only is "the substance of the two

parallel actions [] nearly identical," but also "[t]he cases will almost certainly rely on identical

witnesses, evidence, and financial data." *TelexFree, Inc.*, 52 F. Supp. 3d at 352.

    Considering this court has granted stays where the civil and criminal proceedings share

substantially less overlap, the high degree of overlap here weighs heavily in favor of a stay of the

SEC's motion for remedies. *See, e.g.*, *Green v. Cosby*, 177 F. Supp. 3d 673, 681 (D. Mass.

2016) (granting a stay of discovery as to the defendant even though "the specific events directly

at issue in [the civil] case and in the criminal case do not necessarily overlap"); *Walsh v.*

*Contract Framing Builders, Inc.*, Civil Action No. 22-10215-NMG, 2023 WL 5939632, at *1 (D.

Mass. Sept. 12, 2023) (staying civil case even though "[t]he underlying conduct in [the criminal

and civil] case[s are] distinct").  Accordingly, a stay as to the SEC Action is both appropriate and

necessary here.

    Relatedly, courts have reasoned that "[t]he fear of prejudice to a defendant is more

pressing" in cases where, as here, "the government is both civil and criminal litigant." *United*

A1582

*Techs. Corp., Hamilton Standard Div. v. Dean*, 906 F. Supp. 27, 29 (D. Mass. 1995). This is because "[w]hen both actions are brought by the government, there is a danger that the government may use civil discovery to obtain evidence and information for use in its criminal prosecution, and by doing so, circumvent the Fifth Amendment rights against self-incrimination." *Cruz v. Cty. of DuPage*, No. 96 C 7170, 1997 WL 370194, at *3 (N.D. Ill. June 27, 1997). Thus, a stay of civil proceedings "is even more appropriate when both actions are brought by the government." *Brock v. Tolkow*, 109 F.R.D. 116, at 119 (E.D.N.Y. 1985); *Chao v. Fleming*, 498 F. Supp. 2d 1034, 1039 (W.D. Mich. 2007). Defendants Veldhuis and Kelln face twin government-led prosecutions—one by the USAO and one by the SEC. Veldhuis' and Kelln's Fifth Amendment rights will be eviscerated if the SEC is allowed to seek devastating monetary sanctions while the Criminal Action remains pending.

## II.    The Hardship to Veldhuis and Kelln Supports a Stay

"[T]he hardship to the defendant[s], including the burden placed upon [them] should the cases go forward in tandem," necessitates the limited stay sought by this motion. *See Microfinancial*, 385 F.3d at 78. Typically, parallel proceedings prejudice a defendant by presenting him with the "precarious dilemma" of deciding "whether to assert [the] Fifth Amendment privilege against self-incrimination . . . or waive that privilege." *Green*, 177 F. Supp. 3d at 676. "In such a situation, a stay can protect a civil defendant from facing the difficult choice between being prejudiced in the civil litigation, if the defendant asserts his or her Fifth Amendment privilege, or from being prejudiced in the criminal litigation if he or she waives that privilege in the civil litigation." *SEC v. Liberty*, No. 18-cv-00139, 2019 WL 3752907, at *2 (D. Me. Aug. 8, 2019) (alterations and internal quotation marks omitted) (quoting *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97 (2d Cir. 2012)).

11

A1583

Although Veldhuis and Kelln have already made the difficult choice to assert their Fifth Amendment rights and to enter notices of non-opposition to judgments imposing permanent injunctive relief, the remedies/penalties phase of the SEC action necessarily creates the "precarious dilemma" that no person should face when asserting their Fifth Amendment privilege. *Green*, 177 F. Supp. 3d at 676 (granting defendant's motion to stay discovery as to him in civil action during pendency of criminal prosecution "in order to avoid the precarious dilemma of Defendant having to choose whether to assert his Fifth Amendment privilege against self-incrimination (which could place him at a severe disadvantage in this case) or waive that privilege (and thus potentially incriminate himself in the criminal case)").

At the remedies/penalty phase of an SEC enforcement action like this one, courts weigh a number of factors when determining the amount of monetary sanctions, if any. Generally, "courts have considered factors including the egregiousness of the violation, the defendant's willingness or failure to admit wrongdoing, the isolated or repeated nature of the violations, the degree of scienter involved, the defendant's cooperation or lack thereof with authorities, and the defendant's current financial situation." *SEC v. Esposito*, 260 F. Supp. 3d 79, 93 (D. Mass. 2017) (collecting cases). With respect to disgorgement, the amount "need only be a reasonable approximation of profits causally connected to the violation," and "[o]nce the SEC shows that the disgorgement is a reasonable approximation, the burden shifts to the defendant to demonstrate that the amount of disgorgement is not a reasonable approximation." *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004) (quoting *SEC v. First City Fin. Corp.*, 980 F.2d 1215, 1231–32 (D.C. Cir. 1989)). In light of this framework, it would be nearly impossible for Veldhuis and Kelln to meaningfully participate in the final stage of this case without waiving their Fifth Amendment rights.

A1584

Many of the factors that this Court will consider when determining financial penalties will automatically weigh against Veldhuis and Kelln if they are forced to assert their rights and privileges under the Fifth Amendment.  With the Criminal Action pending, Veldhuis and Kelln certainly cannot "admit wrongdoing" without incriminating themselves; their "failure" to do so, will be held against them.  Similarly, they will be unable to challenge the SEC's depiction of the degree of "the egregiousness of the violation" without risking incrimination.  The same is true as to any representations the SEC may make concerning the "nature of the violations" and Veldhuis' and Kelln's "current financial situation[s]."  Nor will they be able to carry their burden to challenge the "reasonableness" of the SEC's disgorgement figure.

Typically, litigation concerning the SEC's request for financial penalties involves a robust adversarial process in which defendants can present evidence and arguments, through submissions and at hearings to challenge the nature and scope of penalties that the SEC seeks. The specter of the Criminal Action effectively requires Veldhuis and Kelln to forfeit any participation in that process.  If the judgments as to Dhillon, Kaitz, and Taylor are any indication of the size of penalties that the SEC will seek as to Veldhuis and Kelln, the cost of invoking the Fifth Amendment will be steep.  *See* Final J. as to Taylor at 5, ECF No. 262 (monetary penalties totaling $4,924,867); Final J. as to Kaitz at 4, ECF No. 263 (monetary penalties totaling $1,306,868); Final J. as to Dhillon at 5–6, ECF No. 403 (monetary penalties totaling $10,446,784, with $1,493,500 to be paid to the USAO and the remainder to the SEC).  For these reasons, the burden to Veldhuis and Kelln of allowing this action to proceed is sufficiently heavy to justify staying the action until after the resolution of the Criminal Action.

**III.    The Good Faith and Public Interest Factors Support a Stay**

The good faith factor weighs in favor of a stay.  Veldhuis and Kelln have acted in good faith throughout this litigation.  The public interest factor also supports granting a stay.  Veldhuis

13

A1585

and Kelln recognize the public's interest in the resolution of the SEC Action. "Nevertheless, the

public interest in unimpeded criminal law enforcement outweighs the civil interests here."

*TelexFree, Inc.*, 52 F. Supp. 3d at 353; *see also Adams v. Magnusson*, No. 19-cv-00547, 2020

WL 2770682, at *2 (D. Me. May 28, 2020) ("The public interest in assuring that the criminal

matter, which involves serious charges, proceeds to a conclusion without any delay . . . weighs in

favor of a stay.").

### IV.    The Remaining Factors Do Not Tip the Scale Against a Stay

Although the remaining four factors either are neutral or weigh slightly against granting a

stay, they are greatly outweighed by the factors outlined above.

First, concerning the convenience to the courts factor, which assesses the burden imposed

on the courts handling the criminal and civil matters, is at least neutral. Even where a defendant

in a civil action has not been criminally indicted, courts have stayed civil proceedings if there is

nonetheless an active criminal matter. *See Nat'l Ass'n of Gov't Emps. v. Mulligan*, 849 F. Supp.

2d 167, 174 (D. Mass. 2012) (granting stay of civil action where certain defendants were the

subject of a grand jury investigation and not yet indicted); *Sea Salt, LLC*, 2020 WL 2475874, at

*1–3 (granting partial stay where there was no "formal criminal charge" but there was an

"ongoing criminal investigation"); *Liberty*, 2019 WL 3752907, at *1 (noting court previously

granted and extended a stay of the civil action pending ongoing grand jury investigation into

conduct related to SEC allegations); *cf. Russell v. Chenevert*, 573 F. Supp. 3d 391, 402 (D. Me.

2021) (finding "[c]onvenience to the [c]ourt" factor cautioned against staying civil proceedings

because there was "no clear evidence that the" prosecutor's office was "actively pursuing a case

against" the defendant).

Veldhuis and Kelln are defendants in a criminal complaint and warrants for their arrest

have been issued. *See* Compl, ECF No. 3, *United States v. Sharp*, 1:21-MJ-07182-JCB (D.

14

A1586

Mass. Aug. 4, 2021); Arrest Warrant for Veldhuis, ECF No. 7, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021); Arrest Warrant for Kelln, ECF No. 8, *United States v. Sharp*, 1:21-MJ-07182-JCB (D. Mass. Aug. 4, 2021). The USAO has repeatedly made clear—both with words and actions—that the criminal proceedings are ongoing as to Veldhuis and Kelln, and possibly other defendants in the SEC Action. *See* Knuts Decl., Exhibit 2 (Feb. 8–16, 2022 Email Exchange between AUSA Drabick and R. Knuts); *Id.*, Exhibit 3 (Feb. 17, 2023 Email from AUSA Drabick); *Id.*, Exhibit 4 (Mar. 17, 2023 Shields Email). A stay of the SEC Action would obviate "the risk of conflicting results arising from the same circumstances"—such as the amount of financial harm that is associated with the conduct underlying the Criminal and SEC Actions—an outcome which the "Supreme Court has expressed a desire to avoid." *Ismail v. Robinson*, No. 22-cv-00150, 2022 WL 4121930, at *2 (D. Me. Aug. 1, 2022) (citing *Heck v. Humphrey*, 512 U.S. 477 (1994)) (granting defendants' motion to stay civil proceeding in light of ongoing related criminal proceeding).

With respect to the status of the cases, the fact that the SEC Action is near completion does not automatically mean a stay is inappropriate. For example, in *Walsh*, Civil Action No. 22-10215-NMG, 2023 WL 5939632 (D. Mass. Sept. 12, 2023), this court recently granted a defendant's motion to stay a civil proceeding where default judgment had already been entered. There, the court ordered the defendants to substantiate certain financial information in connection with their failure to comply with default judgment; however, because doing so might have "involve[d] the production of incriminating financial information in [a defendant's] criminal case concerning federal tax fraud" (the "underlying conduct" for which was "distinct" from the civil case), the court granted the motion to stay. *Id.* at *1–2. Likewise, here, for Veldhuis and Kelln to meaningfully participate in the remedies/penalties phase of this case, they

15

A1587

would likely have to provide financial information that could be incriminating with respect to the Criminal Action.

Next, although the SEC clearly has an interest in the resolution of this case, any prejudice resulting from a stay of the SEC's remedies/penalties motion is limited. There is no risk that Veldhuis or Kelln will squander any financial assets that might be necessary to satisfy a judgment in this action because their assets are frozen. *See Narragansett Indian Meeting Church v. Johnson*, No. 1:21-cv-003322-MSM-PAS, 2023 WL 5094924, at *2 (D.R.I. Aug. 9, 2023) (granting motion to stay where plaintiff "awaits a decision on damages" only and the record did not "suggest that postponement of the litigation would cause a prejudicial loss of evidence"). Moreover, "as [a] representative[] of the Government," the SEC "embod[ies] a public interest in prompt and effective criminal prosecution." *Eastwood v. United States*, No. 2:06-cv-164, 2008 WL 656074, at *3 (E.D. Tenn. Mar. 6, 2008). The SEC's interest in resolution thus does not weigh heavily against a stay of this action.

Finally, to the extent third parties are entitled to any portion of the monetary sanctions the Court orders either defendant to pay, there is no concern that the money will disappear because both Veldhuis' and Kelln's assets are frozen.

\*      \*      \*

The most important factors pertinent to the Court's analysis weigh heavily in favor of granting Veldhuis and Kelln's motion to stay the SEC's motion for monetary sanctions until the resolution of the criminal proceedings against them. It is evident that the Criminal and SEC Actions not only overlap substantively but also that the government is coordinating with the SEC. Allowing the SEC to seek millions of dollars in monetary sanctions against defendants

16

A1588

Kelln and Veldhuis while the Criminal Action – and ongoing investigation – are pending would effectively destroy Veldhuis' and Kelln's Fifth Amendment rights.

**CONCLUSION**

For the foregoing reasons, Veldhuis and Kelln respectfully request that this Court issue a stay of the SEC's motion for monetary sanctions as to them until the related criminal proceedings against them are resolved.

17

A1589

DATED: December 5, 2023
        New York, New York

SHER TREMONTE LLP                              WILEY REIN LLP

By: _____*/s/ Robert Knuts*_____              By: _____*/s/ Claire Kellen*_____
        Michael Tremonte (*pro hac vice*)             Claire E. Kellen (*pro hac vice*)
        Robert Knuts (*pro hac vice*)                  Pamela L. Signorello (BBO# 651483)
        Katie Renzler (*pro hac vice*)                 2050 M Street NW
        90 Broad Street, 23rd Floor                    Washington, DC 20036
        New York, New York 10004                       Tel: 202.719.7000
        Tel: 212.202.2600                              Email: CKellen@wiley.law
        Email: mtremonte@shertremonte.com                     PSignorello@wiley.law


*Attorneys for Defendant Mike K. Veldhuis*     *Attorneys for Defendant Courtney Kelln*

18

A1590

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by ECF on December 5, 2023.

_____*/s/ Robert Knuts*_____
Robert Knuts

19

A1591

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

                          Plaintiff,

          v.                                      Case No. 1:21-cv-11276-WGY

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                          Defendants.

## DECLARATION OF ROBERT KNUTS

I, ROBERT KNUTS, pursuant to 28 U.S.C. § 1746 declare as follows:

1.    I represent Mike K. Veldhuis, a defendant in the above-captioned matter. I make this declaration in support Mr. Veldhuis' Motion to Stay the Proceedings.

2.    Attached hereto as Exhibit 1 is a true and accurate copy of an affidavit dated November 17, 2023 executed by Assistant United States Attorney James R. Drabick ("AUSA Drabick") that relates to an ancillary proceeding instituted by plaintiff Securities and Exchange Commission in the province of British Columbia, Canada. *U.S. Securities and Exchange Commission v. Sharp et al.*, No. S-226494.

3.    Attached hereto as Exhibit 2 is a true and accurate copy of email correspondence dated February 8, 2022, involving myself, prior and current counsel for other defendants in the above-captioned matter, and AUSA Drabick.

A1592

4.      Attached hereto as Exhibit 3 is a true and accurate copy of an email dated February 17, 2023, from AUSA Drabick to counsel for Mr. Veldhuis, Michael Tremonte and Noam Biale, both of whom are attorneys at my law firm.

5.      Attached hereto as Exhibit 4 is a true and accurate copy of an email dated March 17, 2023, from SEC Attorney Kathleen Shields to counsel for the defendants in the above-captioned matter, including myself.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 5, 2023, in New York, New York.

_____
Robert Knuts

2

A1593

# Exhibit 1

Affidavit #1 of James R. Drabick
made on November ⟨17⟩ 2023

No: **S-226494**
Vancouver Registry

## IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

PLAINTIFF

AND:

FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, and GRAHAM R. TAYLOR

DEFENDANTS

## AFFIDAVIT

I, James R. Drabick, an attorney in the City of Boston, in the State of Massachusetts, United States, AFFIRM THAT:

1.    I am an Assistant United States Attorney ("AUSA") in the United States Attorney's Office (the "USAO") for the District of Massachusetts.

2.    I have knowledge of the facts to which I depose. If I base my knowledge upon information and belief, I believe the facts are true and reliable. In swearing this affidavit neither I nor the United States intends to waive any applicable lawyer/client, litigation work product, deliberative process, or other applicable privilege.

3.    I have served as an AUSA in the Securities, Financial, and Cyber Fraud Unit of the USAO for the District of Massachusetts since August 2019. Before that, I served as an AUSA in the Violent and Organized Crime Unit of the USAO for the Eastern District of Michigan between 2016 and 2019. Additionally, I served as enforcement counsel at the U.S. Securities & Exchange Commission between 2012 and 2016, and I was an associate at the law firm Ropes & Gray LLP between 2006 and 2008 and again between 2009 and 2012. I also served as a judicial clerk for the Honorable Richard J. Leon of the

A1595

U.S. District Court for the District of Columbia between 2008 and 2009. I received a Juris Doctorate from Georgetown University Law Center in 2006, magna cum laude, and I received a Bachelor of Arts from Amherst College in 2002, magna cum laude.

4.    I am the lead prosecutor in the matter of United States v. Frederick L. Sharp et al., Case No. 21-7282-JCB, in the United States District Court for the District of Massachusetts ("the U.S. criminal proceeding"). A copy of the complaint filed in that matter is attached as **Exhibit "A"**. I am also the lead prosecutor in connection with the ongoing investigation conducted by the U.S. Federal Bureau of Investigation ("FBI") concerning Frederick L. Sharp and the matters discussed in the criminal complaint.

5.    I submit this Affidavit at the request of counsel for the Plaintiff in this matter and for the purpose of assisting the Supreme Court of British Columbia by providing the Court with the position of the USAO for the District of Massachusetts concerning the information sought by the Plaintiff in this matter regarding the assets of Frederick L. Sharp and the other Defendants.

6.    I have reviewed a copy of the affidavit of Marcus Asner, dated October 20, 2023, attached as **Exhibit "B"**.

7.    To the best of my knowledge and belief, Mr. Asner is correct that (i) Mr. Sharp has not been granted any form of immunity from criminal prosecution in the United States, and (ii) the information the Plaintiff seeks in its application for a *Mareva* injunction regarding Mr. Sharp's assets could potentially incriminate Mr. Sharp for the crimes charged in the U.S. criminal proceeding.

8.    The self-incrimination clause of the Fifth Amendment to the U.S. Constitution "flatly prohibits" U.S. criminal authorities from using an incriminating testimonial statement against the proponent of the statement if the statement was compelled, including by a foreign court. *See United States v. Allen*, 864 F.3d 63, 82 (2d Cir. 2017) (noting that "compelled testimony cannot be used to secure a conviction in an American court"); *see also* U.S. Const. Amend. V (providing that "no person … shall be compelled in any criminal case to be a witness against himself"). U.S. criminal authorities are generally prohibited from both direct and derivative use of such compelled statements against the statement's proponent. *See Allen*, 864 F.3d at 91, 101 ("When a witness has been compelled to testify relating to matters for which he is later prosecuted, the government bears 'the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources.'") (quoting *Kastigar v. United States*, 406 U.S. 441, 461-62 (1972)). The sanction for a violation of these prohibitions can be severe, including dismissal of the charges against the statement's proponent. *See id.* at 101 (dismissing indictment where tainted testimony was used at both trial and before the grand jury). The text of the Fifth Amendment and copies of the *Allen* and *Kastigar* decisions are attached as **Exhibits "C1"** to **"C3"**.

3

9.      In light of these legal protections, U.S. prosecutors take great care to avoid receipt and use (both direct and derivative) of compelled statements by existing and/or prospective defendants, as receiving and/or using such information might negatively affect any criminal prosecution of such individuals.

10.     The U.S. criminal authorities in the USAO for the District of Massachusetts involved in the U.S. criminal proceeding, including me as the lead prosecutor, have *no* desire or intent to have my office or the FBI receive (much less use) any information that might be compelled from Mr. Sharp or any of the other Defendants in this proceeding currently pending before the Supreme Court of British Columbia. To the contrary, we affirmatively do *not* want to receive any such information due to the risk that receiving the information could imperil the U.S. criminal proceeding.  To that end, should the Supreme Court of British Columbia issue an order compelling Mr. Sharp and/or any of the other Defendants in this proceeding to provide information to the U.S. Securities and Exchange Commission concerning their assets, I ask that the Court include in the order a prohibition on sharing the information with the USAO for the District of Massachusetts and the FBI.

**AFFIRMED BEFORE ME** in the City of )
Boston in the Commonwealth of )
Massachusetts on November __17__ 2023. )
)
)
_____ )
Notary Public  of the Commonwealth of )        _____
Massachusetts )        James R. Drabick

DOUGLAS P. WOOD
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
MY COMMISSION EXPIRES 1/20/2028

A1597

The attached is **Exhibit "A"** referred
to in the 1st Affidavit of James R. Drabick, affirmed
before me on this 1† day of November, 2023

_____
Notary Public

Case: 24-1770    Document: 00118249067    Page: 359    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 6 of 132
Case 1:21-mj-07182-JCB    Document 3    Filed 08/04/21    Page 1 of 1

2

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### District of Massachusetts

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| FREDERICK SHARP, | ) | Case No. |
| LUIS CARRILLO, | ) | 21-7182-JCB |
| MIKE VELDHUIS, | ) | |
| COURTNEY KELLN | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of _____2014 through October 2018_____ in the county of _____Middlesex, et al._____ in the
_____ District of _____Massachusetts_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit Securities Fraud |
| 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 | Securities Fraud |

This criminal complaint is based on these facts:

See attached affidavit by FBI Special Agent Keith Brown.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Keith Brown, FBI, Special Agent
_____
*Printed name and title*

Sworn to before me and signed telephonically.

Date:   2:43 PM, Aug 4, 2021
_____
*Judge's signature*

City and state:        Boston, Massachusetts

Hon. Jennifer C. Boal, U.S. Magistrate Judge
_____
*Printed name and title*

A1599

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Keith Brown, being duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Boston, Massachusetts Field Office.  Since joining the FBI in 2014, I have been assigned to squads that investigate economic crimes, including various forms of corporate and securities fraud.  I received training at the FBI Academy, Quantico, Virginia, in a variety of investigative and legal matters, including Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause.

2.      Pursuant to this affidavit and criminal complaint, I seek to charge FREDERICK SHARP, LUIS CARRILLO, MIKE VELDHUIS, and COURTNEY KELLN with (i) conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371, and (ii) securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.l0b-5.

3.      As described herein, I have probable cause to believe that each of SHARP, CARRILLO, VELDHUIS, and KELLN (collectively, the "DEFENDANTS") directed and/or participated in a sophisticated and lucrative securities fraud scheme involving undisclosed control of the securities of multiple microcap—or "penny"—stock companies, which securities were sold to unsuspecting investors in Massachusetts and throughout the United States during pump-and-dumps.

4.      Because this affidavit is being submitted for the limited purpose of demonstrating that there is probable cause to arrest each of the DEFENDANTS on the federal criminal charges set forth above, I have not included each and every fact known to me and to other law

A1600

Case: 24-1770     Document: 00118249067     Page: 361     Date Filed: 02/18/2025     Entry ID: 6700951
Case 1:21-cv-11276-WGY     Document 423-1     Filed 12/05/23     Page 8 of 132
Case 1:21-mj-07182-JCB     Document 3-1     Filed 08/04/21     Page 2 of 47
4

enforcement officers involved in this investigation. Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested warrant. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and witnesses.

## RELEVANT ENTITIES, PRINCIPLES, AND DEFINITIONS

5.      The Securities and Exchange Commission ("SEC") is an independent agency of the executive branch of the United States government. The SEC is responsible for enforcing the federal securities laws and promulgating rules and regulations thereunder. Those laws, rules and regulations are, among other things, designed to protect the investing public by maintaining fair and honest securities markets and eliminating manipulative and deceptive trading practices.

6.      "Transfer agents" are companies that, among other activities, issue and cancel certificates of a company's stock to reflect changes in ownership, such as when stock is changing hands. Many companies with publicly traded stock use transfer agents to track the ownership of their stock.

7.      Microcap stocks, also known as "penny" stocks, are among the securities that are subject to the federal securities laws. These stocks are, as a general matter, securities of publicly traded companies that have a low market capitalization and a low price per share (frequently, though not always, $1 or less). Microcap stocks are most often traded on the "over-the counter" market, rather than on national exchanges such as the New York Stock Exchange or the NASDAQ, and tend to be thinly traded. In addition, less information is typically available to the investing public about companies that issue microcap stock, although such companies sometimes register their shares with the SEC under Section 12 of the Securities Exchange Act of 1934 and thereby become subject to certain reporting requirements, such as the filing of annual reports

A1601

with the SEC. Additionally, large blocks of microcap stock are often controlled by a small number of individuals, which can make it easier to orchestrate manipulative trading in those stocks.

8.    Among the ways that federal securities laws and regulations aim to protect investors is by (i) mandating certain disclosures by holders of large quantities of stock registered with the SEC, and (ii) limiting the ability of executive officers, directors, and large shareholders to quickly sell significant amounts of their stock (regardless whether it is registered with the SEC) in the open market.

9.    For example, when a person or group of persons acquires beneficial ownership[1] of more than five (5) percent of a voting class of stock registered with the SEC, the person or group is required to file a Schedule 13D with the SEC disclosing such ownership and setting forth background information about the owner(s) and their investment intentions. As part of their compliance programs, brokers often ask individuals seeking to deposit shares in microcap stocks whether they own or control more than five percent of the issuer's shares.

10.    Similarly, control securities—which are securities owned by a person who directly or indirectly controls the issuer, either alone or as a member of a control group—are subject to Rule 144 of the Securities Act of 1933 ("Rule 144") [17 CFR § 230.144]. The term "affiliate" is used to describe such a control person or group, and persons or groups holding more than 10 percent of a company's stock are generally deemed to be affiliates. In the context of securities traded "over-the-counter"—such as most microcap stocks—Rule 144 provides that an affiliate cannot sell more than one percent of the issuer's total outstanding shares in any three-

---

[1] A beneficial owner is any person who directly or indirectly has (or shares) voting or investment power, which includes the power to sell or direct the sale of a security.

3

month period.  Rule 144 was enacted to "implement the fundamental purposes" of the Securities Act of 1933, namely to "provide full and fair disclosure of the character of the securities sold in interstate commerce … and to prevent fraud in the sale thereof." 37 Fed. Reg. at 596.  As part of their compliance programs, brokers often ask individuals seeking to deposit shares in microcap stocks whether they are an officer, director, 10 percent shareholder, or otherwise an affiliate of the issuer.

11.    Rule 144 also places certain restrictions on the selling of so-called "restricted" securities.  Such shares, which are acquired directly from issuers and are not registered with the SEC, generally cannot be sold to the public and bear a legend indicating that they are "restricted."  Shares that are registered with the SEC, and that do not bear a legend indicating they are restricted, are considered "unrestricted" or "free-trading," and may be sold in the market by non-affiliates.  Rule 144 also identifies circumstances in which a shareholder holding restricted shares can have the legend removed, enabling the shares to become free-trading.  One such circumstance is if the shareholder is a non-affiliate and has held the shares for a certain period of time, typically either six months (if the company's shares are registered under Section 12) or one year (if the company's shares are not so registered).

12.    The total number of unrestricted securities deposited with brokers and available for trading is known as the "float."  For example, if hypothetical company Acme Corporation issued 10 million shares, but only one million were unrestricted and deposited with brokers (and thus available to be traded), the "float" would be one million shares.  The remaining nine million shares might be a mix of restricted shares and unrestricted shares not yet deposited with any broker.  Like individuals who control greater than 10 percent of a company's total outstanding

4

A1603

shares, individuals who control a majority of a company's float are also likely to be control

persons and, therefore, affiliates for purposes of Rule 144.[2]

13.    I know from my training and experience that one form of fraud in the securities

markets involves individuals (or groups of individuals) acquiring and exercising control over a

significant portion of an issuer's shares, and often a majority of an issuer's float, while

concealing their affiliate status.  In such a scheme, after acquiring a large portion of an issuer's

free-trading shares, the individual or group will typically distribute those shares among accounts

held in the names of "nominees"—including sham entities and other third parties—to help

conceal their identities as the true owners of the stock.  In so doing, the perpetrators seek to avoid

and circumvent the reporting requirements and restrictions in the securities laws discussed

above, as well as the controls put in place by brokerages selling the stock.  The perpetrators then

sell their shares via the nominees to the unsuspecting public in contravention of the securities

laws.  The proceeds from such sales are often then funneled back to the perpetrators or to third

parties at the perpetrators' direction.  This type of "concealed control" scheme occurs most

frequently in the market for microcap stock.

14.    I know from training and experience that these concealed-control schemes are

often accompanied and supported by stock manipulation in the form of "pump-and-dumps."  A

"pump-and-dump" typically involves an effort to artificially inflate the stock price or trading

volume of a publicly traded company (the "pump") so that individuals who control a substantial

portion of the company's float can sell their shares at artificially high prices, or in a more liquid

market, to other investors (the "dump").  Typically, such schemes involve the use, among other

---

[2] *See Sec. & Exch. Comm'n v. Longfin Corp.*, 316 F. Supp. 3d 743, 759 (S.D.N.Y. 2018).

A1604

means, of news releases, email blasts, and other forms of promotion—often containing false or exaggerated information—to inflate the stock price and trading volume and generate demand for the shares. Often such schemes also employ "boiler rooms," wherein multiple individuals work in a coordinated effort to contact potential investors, often through unsolicited "cold calls," and provide false, misleading, unfounded, and/or exaggerated information about the company in order to induce the potential investors to purchase shares.

### RELEVANT INDIVIDUALS

15.    Defendant FREDERICK SHARP, age 69, is a resident of British Columbia, Canada. During the relevant time period, SHARP was associated with Corporate House, which he previously described as a "firm of private investment bankers with offices in Canada and affiliations worldwide." SHARP was at one time an attorney, but voluntary relinquished his law practice certificate in or about 1997.

16.    Defendant LUIS CARRILLO, age 47, is a U.S. citizen and is believed to be a resident of Mexico. Publicly available bar records reflect that CARRILLO was admitted to practice as an attorney in New Jersey (2000), New York (2002), and California (2005), and that he practiced in San Diego, CA. In March 2013, the SEC filed a civil action against CARRILLO and others in the United States District Court for the Southern District of New York alleging violations of the anti-fraud provisions of the federal securities laws. The SEC's complaint alleged that CARRILLO and others engaged in pump-and-dump schemes involving two companies' securities. A default judgment was ultimately entered in 2017 after CARRILLO ceased defending the action following a court order requiring that he sit for a deposition in New York.

A1605

Case: 24-1770    Document: 00118249067    Page: 366    Date Filed: 02/18/2025    Entry ID: 6700951

Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 13 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 7 of 47

9

17.     Defendant MIKE VELDHUIS, age 41, is a resident of British Columbia, Canada. During the relevant time period, VELDHUIS at times associated himself with an entity known as Venture Capital First LLC.

18.     Defendant COURTNEY KELLN, age 41, is a resident of British Columbia, Canada. During the relevant time period, KELLN worked for and supported SHARP. KELLN associated herself with the entities Celtic Consultants LLC and Esquire Corporate Services SRL.

19.     Co-Conspirator 1 ("CC-1") is a resident of British Columbia, Canada. During the relevant time period, CC-1 also worked for and supported SHARP.

20.     Cooperating Witness 1 ("CW-1") is the founder, owner, and chief executive of a purported asset management firm based in Switzerland (the "Asset Management Firm").[3] During the relevant time period, CW-1 managed the Asset Management Firm on a day-to-day basis, including by generally placing all stock trades on behalf of the firm's clients. CW-1 has met with each of the DEFENDANTS several times in person and communicated with them very frequently during the relevant time period.

21.     Cooperating Witness 2 ("CW-2") worked for the Asset Management Firm beginning in or around 2014 and through the relevant time period.[4] CW-2 was formerly

_____

[3] In 2020, CW-1 pleaded guilty to securities fraud offenses in the United States District Court for the District of Massachusetts in connection with his/her participation in pump-and-dump schemes involving an undisclosed control group. S/he is cooperating with the government's investigation in the hope of obtaining leniency when s/he is sentenced. As described herein, information provided by CW-1 has been corroborated by, among other things, documents, emails, other electronic messages, and trading records, as well as interviews with CW-2.

[4] In 2019, CW-2 pleaded guilty to securities fraud offenses in the United States District Court for the District of Massachusetts in connection with his/her participation in pump-and-dump schemes involving an undisclosed control group. S/he is cooperating with the government's investigation in the hope of obtaining leniency when s/he is sentenced. As described herein, information provided by CW-2 has been corroborated by, among other things,

A1606

associated with a separate legal entity, but took direction from CW-1. CW-2 was responsible for a number of back-office tasks for the Asset Management Firm, including incorporating companies and opening bank accounts for clients, processing redemptions for clients, assisting with trade reporting, and general information technology tasks. CW-2 has met each of the DEFENDANTS in person and communicated with them very frequently during the relevant time period.

22.     Cooperating Witness 3 ("CW-3") is a resident of Florida.[5] During the period 2016 through 2018, CW-3 had a management role in multiple boiler rooms. CW-3 has met CARRILLO multiple times.

## OVERVIEW OF THE SECURITIES FRAUD SCHEME

23.     Based on the evidence described herein, I have probable cause to believe that, from no later than 2014 through no earlier than September 2018, each of the DEFENDANTS, together with multiple co-conspirators, directed and/or participated in sophisticated pump-and-dump schemes involving concealed-control of large portions of stock in several microcap companies that netted, at a minimum, tens of millions of dollars in illicit proceeds.

---

documents, emails, other electronic messages, and trading records, as well as interviews with CW-1.

[5] CW-3 is expected to plead guilty in the United States District Court for the District of Massachusetts to securities fraud in connection with the operation of a boiler room in support of a pump-and-dump scheme. CW-3 has also pleaded guilty to a charge of conspiracy to commit wire fraud in the United States District Court for the Eastern District of New York, also in connection with the operation of a boiler room. CW-3 is cooperating with the government in the District of Massachusetts in the hope of obtaining leniency when s/he is sentenced, including via a consolidated sentencing in the Eastern District of New York. As described herein, CW-3 has been corroborated by, among other things, emails and bank records, as well as interviews with CW-1 and CW-2.

A1607

Case: 24-1770    Document: 00118249067    Page: 368    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 15 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 9 of 47
11

*The Nominee Entities*

24.     The scheme generally involved a similar series of steps for each microcap stock, with each iteration often referred to as a "deal" by those involved.  Each deal would often begin with an individual or group of individuals acquiring control of a significant portion of a microcap company's free-trading shares—if not all such shares—through various nominee entities. CARRILLO and VELDHUIS each acted as point persons for such control groups.  On numerous occasions, for CARRILLO's or VELDHUIS's respective benefit, CW-1 and/or CW-2 facilitated the deposit of shares of microcap companies into brokerage accounts in the Asset Management Firm's name, knowing that CARRILLO or VELDHUIS, along with their associates, controlled a significant portion of the company's shares through nominees.[6]  Each of the nominee entities generally held less than five percent of the given company's shares in order to avoid disclosure obligations under the federal securities laws and to circumvent brokers' compliance protocols.

25.     CW-1 and CW-2 have explained that the nominee entities CARRILLO and VELDHUIS used to conceal their control were often controlled by SHARP, who charged a fee for this and related services.  KELLN, who described herself in 2013 as in charge of "client relations" for SHARP's business, described CARRILLO and VELDHUIS as "tier 1" clients of SHARP's in an encrypted message in September 2017.

26.     The Asset Management Firm's records reflect that shares deposited by SHARP's nominees drove the majority of the firm's business.  Those records, along with records from SHARP's business itself and statements from CW-1 and CW-2, reflect that SHARP operated a

---

[6] CW-2 knew VELDHUIS primarily by his codename "Acco," which is discussed further below, as well as by his first name.  CW-2 positively identified a picture of VELDHUIS as the individual he knew as "Acco."

A1608

Case: 24-1770    Document: 00118249067    Page: 369    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 16 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 10 of 47
12

sophisticated platform that provided a variety of services to control persons seeking to conceal their identity when selling large quantities of shares of penny stock companies. As described more further herein, the array of services SHARP offered included (i) forming and providing offshore nominee entities to hold shares for undisclosed control persons; (ii) providing and administering an encrypted and closed communication network on dedicated BlackBerry devices—referred to as "xphones"—for use by control persons and other co-conspirators; (iii) facilitating the deposit of stock with the Asset Management Firm in blocks of less than five percent via SHARP's nominee entities; (iv) administering a proprietary web-based accounting system that tracked clients' total stock holdings, sales, and proceeds (known as the "Q" system); and (v) facilitating the payment of illegal stock sale proceeds to accounts around the world at control persons' directions, including through the use of fake invoices that concealed the true nature of the payments.

27.     In one client communication via xphone in July 2013, SHARP described his service as follows: "The service provided is comprehensive; it is not limited to trading. It includes pyaments [sic], loans, private placements and keeping clients out of jail" (emphasis added).

28.     At SHARP's request, CW-1 and CW-2 at times incorporated nominee entities for SHARP's use as part of the scheme, and at times also served as directors of entities that were, in turn, directors of SHARP's nominee entities. Encrypted messages involving SHARP reflect that SHARP controlled the nominee entities, which were effectively interchangeable. For example, in one message with CW-1, SHARP described planning to transfer the assets from one nominee entity to another and then closing the first nominee so as to "recycle the accounts."

A1609

Case: 24-1770    Document: 00118249067    Page: 370    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 17 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 11 of 47
13

29.    SHARP's name was not identified in documents connected with the nominee

entities.  Rather, on paper, these entities were owned by third-party beneficial owners, and all

formal documentation associated with the entities—such as share purchase agreements and wire

requests—would use the purported beneficial owners' names.  For SHARP's nominee entities,

however, CW-1 and CW-2 only took direction from SHARP or SHARP's delegates, such as

KELLN.  With limited exceptions, CW-1 and CW-2 generally did not interact with the third-

party beneficial owners.

30.    CW-1 and CW-2 also incorporated nominee entities at CARRILLO's request for

use in the scheme, the purported beneficial owners of which were all Mexican nationals.

CARRILLO's name likewise was not identified in documents connected with these nominee

entities.  But in reality, as CW-1 and CW-2 knew, the entities they incorporated at the direction

of CARRILLO were controlled by CARRILLO, and CW-1 and CW-2 took direction only from

CARRILLO or his delegates for those entities.

31.    The DEFENDANTS, along with CW-1 and CW-2, had at least two distinct lines

of communication in connection with the scheme.  The formal line of communication would take

place over ordinary emails between (i) the formal email accounts associated with Asset

Management Firm and (ii) the nominee entities, each of which had its own email account.

Emails to and from the Asset Management Firm reflect that the formal line of communication

would be used, for example, when a nominee entity was seeking to deposit a tranche of shares

via the Asset Management Firm or to submit a wire request for purposes of sending out stock

sale proceeds.

32.    A second line of communication involved encrypted messaging platforms.  The

government has obtained and reviewed thousands of these encrypted communications involving

A1610

Case: 24-1770    Document: 00118249067    Page: 371    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 18 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 12 of 47
14

the DEFENDANTS, which would be used to discuss how shares would be split up among

nominee entities, to provide updates as to when shares would be deposited and ready to trade via

the Asset Management Firm, to provide trading orders to the Asset Management Firm for shares

held across multiple nominee entities, and to check on the status of wire payments of illicit

proceeds, among other communications.

33.     One of the encrypted messaging platforms the DEFENDANTS used was provided

by SHARP.  CW-1 and CW-2 have explained, and records obtained by the government have

confirmed, that SHARP maintained an encrypted and closed communications network on a

server in Curacao that was in use from approximately 2013 through 2015.[7]  SHARP provided co-

conspirators, including CW-1, with BlackBerry phones connected to the network so they could

engage in secure communications in furtherance of the scheme.  Users referred to their

BlackBerry phones as "xphones," and accounts on the system were identified either by account

numbers or code names.  A "key" located in the Asset Management Firm's records, as well as

statements of self-identification in the messages themselves and statements by CW-1 and CW-2,

reflect that each of the DEFENDANTS had an account on the xphone system.

34.     Other encrypted platforms included the use of secure email services, such as

ProtonMail, and encrypted smartphone messaging applications, such as Threema.  CARRILLO,

for example, at times sent wire requests for his nominee entities via ProtonMail to the Asset

Management Firm.  And records obtained by the government reflect that each of CARRILLO,

VELDHUIS, KELLN, CW-1, and CW-2 used Threema to communicate frequently in the period

---

[7] In March 2020, pursuant to a Mutual Legal Assistance Treaty ("MLAT") request, the
U.S. Attorney's Office for the District of Massachusetts received forensic copies of four servers
from Curacao.  Among the materials included on the servers were hundreds of thousands of
messages from the phone network maintained by SHARP.

A1611

2016 through 2018. When using these platforms, the DEFENDANTS would often use codenames for their user IDs, and CARRILLO and VELDHUIS regularly changed their codenames. Communications among and between these same individuals reflect that they also used many of these same codenames to refer to each other. CW-1 and/or CW-2 have identified, and messages among and between the DEFENDANTS, CW-1, and CW-2 have corroborated, that: (i) CARRILLO's various codenames included "Poker," "Fire," "Spartacus," "Iceman," and "Mamba"; (ii) VELDHUIS' various codenames included "Acco," "Usual Suspects," "Kobayashi," and iterations of "Stockman"; (iii) KELLN's various codenames included "Celt" and "Esquire"; and (iv) SHARP's codename was consistently "Bond."[8]

35.     CW-1 and CW-2 have further explained that, when CARRILLO and VELDHUIS used SHARP's nominee entities in furtherance of the scheme, KELLN often prepared the share purchase agreements and other documents that were provided to transfer agents and brokers to facilitate the breakdown, transfer, and deposit of the control shares into blocks of less than five percent. KELLN's encrypted communications with CW-1 and CW-2, as well as with other SHARP clients via the xphone, reflect that KELLN played this role in the scheme.

---

[8]     CW-1 advised that VELDHUIS had a partner with whom he frequently worked (Co-Conspirator #2 ("CC-2")), and CW-1 identified "Stockman" as associated with CC-2. Encrypted messages with CW-1 and CW-2 reflect that three different iterations of "Stockman" were used in communications with CW-1 and CW-2: Stockman, Stockman00, and Stockman007. Based on the content of the messages, I have probable cause to believe that "Stockman" and "Stockman007" were used by VELDHUIS, and Stockman00 was used by CC-2. On February 14, 2017, "Stockman" sent an encrypted message to CW-1 and CW-2 stating "I am ACCO," which is a codename both CW-1 and CW-2 identified as associated with VELDHUIS. In addition, on January 25, 2017, "Stockman" told CW-1 and CW-2 that he would be in London the next two days, which matches travel records for VELDHUIS. Next, CW-1 provided the user ID for "Stockman007" to CARRILLO in October 31, 2016, stating it was associated with "Mike." And finally, on May 26, 2018, "Stockman00" sent an encrypted message to CW-2 stating "New phone," followed by CC-2's first name.

13

Case: 24-1770   Document: 00118249067   Page: 373   Date Filed: 02/18/2025   Entry ID: 6700951
Case 1:21-cv-11276-WGY   Document 423-1   Filed 12/05/23   Page 20 of 132
Case 1:21-mj-07182-JCB   Document 3-1   Filed 08/04/21   Page 14 of 47
16

36.     Transfer records reflect that, in many instances, free-trading shares flowed through two tranches of SHARP's nominee entities before being deposited with the Asset Management Firm.  CW-1 and CW-2 both understood that share purchase agreements purporting to reflect arms-length transactions between the two tranches of SHARP nominee entities were fake; no consideration was paid, as SHARP and the control group controlled both sides of the transactions.  KELLN's communications with CW-1 and CW-2 reflect that she was responsible for drafting these sham share purchase agreements and otherwise facilitating the transfer of shares among SHARP's nominee entities.

37.     KELLN's communications also reflect that she was taking direction from CARRILLO, VELDHUIS, and other SHARP clients regarding the timing of share transfers and deposits, coordinating these transfers and deposits with CW-1 and CW-2, and ensuring that no one nominee entity owned more than five percent of a company's stock at any point in time. KELLN's communications reflect that she was aware of, and closely monitored, the five percent threshold.  For example:

a.      In December 2013, KELLN messaged SHARP and two other individuals via xphone to raise a concern about a five-percent threshold issue.  KELLN noted that the issuer of a particular stock had "90m issued and out" but that "u guys want me to cancel 2,175m for each of the management," which would "knock the issued and out down to 46.5m."  KELLN indicated that this would be a problem, because it would "mean that ever [sic] single account we have stock cleared(ing) in will be well over 5%."  KELLN asked "what should I do," adding that "[w]e have no room to move the stock as every account had it."  One of the individuals responded, "We were just about start [sic] promoting on monday bought and paid

14

A1613

for, how long will this take to sort out?"  Later that same day, KELLN wrote the group again, noting that the issue was "under control and Bond [i.e., SHARP] confirms u can go ahead with ur promotion.  There will be no issues as we thought."

b.        In July 2014, KELLN messaged CW-1 via xphone alerting him/her that she would be sending the Asset Management Firm a deposit of approximately 5.1 million shares of stock for a particular SHARP nominee entity's account.  She noted that "it seems there is a lot of stock there already" and then asked, "Can we transfer the 4.8m in [that SHARP nominee entity account] to [a different SHARP nominee entity account] as to not be over 5%?"  A few weeks later, SHARP messaged KELLN to identify the same "problem," noting that, if both blocks of stock were held in the same account, it would equal "about 10%."  From my training, experience, and investigation of this case, I believe this to be a reference to 10% of the issuer's total outstanding shares.  KELLN responded that "Yes [CW-1] is supposed to transfer the 4.8m out" to another client.  The Asset Management Firm's records reflect that it did, in fact, move the 4.8 million shares out of one SHARP nominee entity account and into another SHARP nominee entity account in or about August 2014, before then selling all the shares held by both SHARP nominee entity clients by the end of December 2014.

c.        In March 2017, while discussing the timing of two deposits of stock for two different SHARP nominee entities, KELLN stated in a Threema chat with CW-1 and CW-2, "I'm always paranoid about the 5% rule."

15

A1614

Case: 24-1770    Document: 00118249067    Page: 375    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 22 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 16 of 47
18

38.     The communications further reflect KELLN's access to and control over the email addresses for SHARP's nominee entities, which were used to send the sham share purchase agreements and other documents to transfer agents and to the Asset Management Firm. For example, CW-1 and CW-2 received emails with documents from a nominee entity's email account close in time to receiving an encrypted message from KELLN discussing the documents. The nominee entities' email addresses also all generally shared the same email domain (either @yourmail.bz or @buzzmail.ltd).

39.     Following KELLN's breakdown of the control groups' shares into blocks of less than five percent, the nominee entities' shares would be assigned to the Asset Management Firm, which then deposited the stock with brokerage firms, often in omnibus accounts in the Asset Management Firm's name.  If and when asked, CW-1 provided false and misleading documents to brokerages representing, among other things, that the shareholder (i.e., Asset Management Firm, on behalf of the control group) owned less than five percent of the company's shares and/or was not a control person.  This service provided a "route to market" for CARRILLO, VELDHUIS, and their co-conspirators and enabled them to continue to hide their ownership and control of the shares and/or the company.

*Trading & Promotion*

40.     Once their shares were deposited, CARRILLO, VELDHUIS, or their delegates would then direct CW-1 and the Asset Management Firm to sell the shares, often specifying on an hour-by-hour and trade-by-trade basis the number of shares to sell and the prices at which to sell them.  These communications generally took place on the aforementioned encrypted applications.  CW-1, in turn, directed the brokers holding the shares in the Asset Management Firm's accounts to sell the shares.  When entering trade orders, CW-1 generally decided from

A1615

which nominee entity's account the trade would be placed. On at least one occasion, CW-1 alerted VELDHUIS that, based on the amount of trading the Asset Management Firm was doing for VELDHUIS, the firm was "Keeping you ahead of Fire [i.e., CARRILLO] in March [2017]." VELDHUIS responded "That's not good. I like being number 2."

41.     CW-1 and CW-2 have admitted that, based on their communications with CARRILLO and the market demand they witnessed being generated, they understood that CARRILLO was coordinating his stock sales with promotional campaigns. For example, CW-1 has explained that, even before CARRILLO's shares were fully deposited and ready to be sold, CARRILLO at times told CW-1 that he knew that buyers were ready to purchase a large number of his shares. In one example, in August 2016, CARRILLO sent CW-1 and CW-2 an encrypted message that a "big order [is] coming on" a particular stock and instructed them to "get the trigger ready." CW-2, at CARRILLO's direction, then sold into the demand that CARRILLO had previewed.

42.     Similarly, CW-1 has stated that s/he was aware that promotional campaigns were conducted for multiple VELDHUIS deals, and encrypted communications reflect that VELDHUIS engaged promotional firms to create demand for the shares he was selling through the Asset Management Firm. In August 2018, for example, VELDHUIS wrote to CW-1 and CW-2 that he had an "urgent situation" that required $75,000 to be wired to a webmedia firm whose invoice describes its work as providing an "Initial Kickoff Campaign," "Small Cap Leader Native Advertising," and "Momentum Alerts." From my experience with this investigation and other penny-stock investigations, I understand these to be descriptions of online stock promotions. VELDHUIS continued, "As soon as I can get a wire out to … [the webmedia firm] I can start selling. Right now it's pretty tough to get liquify." From my training

17

A1616

and experience, I understand "liquify" to be a reference to liquidity, meaning the ability to readily sell shares to other investors.

43.      CARRILLO often also made comments such as "the room is on fire"—which CW-1 understood to refer to promotional activity by a boiler room—or otherwise referenced the promotional campaigns.  In or about October 2016, for example, CARRILLO sent an encrypted message to CW-1 and CW-2 stating that he would "stop the promo" before letting a competitor to the Asset Management Firm keep or sell a particular stock.  These communications, and the Asset Management Firm's stock sales for CARRILLO, often took place against the backdrop of very little prior trading in the respective stocks, corroborating the admissions by CW-1 and CW-2 concerning CARRILLO's control and involvement in the promotional campaigns—i.e., the "pump."

44.      CW-1 and CW-2 have also both advised law enforcement agents that CARRILLO introduced them to two individuals who operated a boiler room in Colombia between approximately 2016 and 2018 ("Boiler Room Operators 1 & 2").  The introduction took place during a trip to a ski chalet in Switzerland in or about January 2018, the invoice for which listed CARRILLO's name as well as the names of Boiler Room Operators 1 and 2.  The invoice was paid by the Asset Management Firm from an account associated with a CARRILLO nominee entity.

45.      CW-3 also corroborated CARRILLO's use of boiler rooms.  As discussed further below, CW-3 worked in a boiler room in Medellin, Colombia, in or about early 2016 with Boiler Room Operator 1 on a deal run by CARRILLO.  Like CW-1 and CW-2, CW-3 described CARRILLO as using the code name "Fire," among others.  CW-3 understood that Boiler Room Operator 1 received payment for his work via accounts in the names of family members,

18

including his/her spouse, because he could not open accounts in Colombia him/herself. CW-3's statements are corroborated by bank records reflecting that Boiler Room Operator 1's spouse received approximately $1.7 million in payments during the period 2016 through 2017 from an account associated with Boiler Room Operator 2, which itself received approximately $4.69 million in payments from the Asset Management Firm on behalf of nominees controlled by SHARP or CARRILLO.

46.    After selling shares at CARRILLO's and VELDHUIS' respective direction (or their delegates), the Asset Management Firm recorded the sales in multiple systems. Records from the Asset Management Firm reflect that stock sales were tracked in a proprietary internal system for the Asset Management Firm's own record keeping. The Asset Management Firm would also send periodic account statements to the nominee entities' email addresses when SHARP requested them, as well as to CARRILLO directly for CARRILLO's nominees. In addition, when a client such as CARRILLO or VELDHUIS used SHARP's nominee entities, CW-1 and/or CW-2 also entered the stock sales into SHARP's separate proprietary system known as "Q." The Q accounting system tracked, among other things, stock sales by stock and by nominee, as well as commissions allocated to SHARP and the Asset Management Firm.[9] The Q system further tracked the subsequent remittance of stock sale proceeds, and each of CARRILLO and VELDHUIS had their own accounts in Q to which stock proceeds would be allocated and then remitted out to third parties. Communications among and between SHARP, KELLN, CW-1, and CW-2 further reflect that each had access to the Q accounting system. Communications also reflect that SHARP would review the entries in the Q accounting system,

_____

[9] The servers the U.S. Attorney's Office obtained from Curacao pursuant to a MLAT request also contained the Q accounting system database. *See supra* note 7.

A1618

as well as account statements for the nominees received from the Asset Management Firm, and bring to CW-1's attention any perceived discrepancies.

*Receipt of Proceeds*

47.    Proceeds from stock sales were held by the Asset Management Firm and allocated to the relevant nominee entities until SHARP, CARRILLO, VELDHUIS, and/or their co-conspirators directed the funds' transfer.  When the proceeds were associated with stock sales by SHARP's nominee entities, the directions would formally be sent to the Asset Management Firm by the nominee entities.  CW-1 and CW-2 described how such wire transfer requests were handled by CC-1, who worked for SHARP.  Encrypted messages reflect that CARRILLO or VELDHUIS directed CC-1 to issue wire transfer requests, which were subsequently sent from the nominee entity's email address to the Asset Management Firm.  CARRILLO and VELDHUIS then followed up periodically with CW-1 and CW-2 over encrypted communications to check on the status of the wires.  CARRILLO at times also sent a nominee entity's wire request directly to the Asset Management Firm via encrypted email.  When the wire requests came from SHARP's nominees, the formatting of the requests and/or invoices often closely resembled prior requests and/or invoices, and metadata reflects that they were frequently authored by CC-1.

48.    CW-1 shared, and the Asset Management Firm's records corroborate, that SHARP directed a significant amount of proceeds from the scheme to the nominee entity Cortona Equity, Inc, which the Asset Management Firm incorporated for SHARP in or about May 2017.  CW-1 identified funds going to this entity as SHARP's retirement fund, and the Asset Management Firm's records reflect that over $6.8 million was transferred to Cortona Equity between August 2017 and July 2018.  The funds were transferred from the account of one

A1619

of SHARP's nominee entities—Santos Torres, LLC ("Santos Torres")—that held and sold stock

for both CARRILLO and VELDHUIS. The formal beneficial owner of Cortona Equity is an

individual whose resume reflects he is a tennis coach, and CW-1 identified him as SHARP's

spouse's coach.

49.    The Asset Management Firm's records also reflect payments being made from

stock sale proceeds for the benefit of SHARP's children. For example, in January 2017, one of

SHARP's nominee entities that held and sold stock for both CARRILLO and VELDHUIS—

Quezon Group LLC ("Quezon")—submitted a wire request for $9,800 to be sent to SHARP's

daughter. In February, after the wire had apparently not yet arrived, Quezon emailed the Asset

Management Firm, asking it to "trace this wire" because SHARP's daughter "needs the funds to

pay her rent!"

50.    Likewise, between approximately 2016 and 2018, CARRILLO and/or those with

whom he had a close relationship received or were the beneficiaries of millions of dollars in wire

transfers reflecting the proceeds of the scheme. For example, bank records, invoices, and

communications reflect:

        a.    Between 2016 and 2018, approximately $1.4 million was transferred from

the Asset Management Firm through a series of Mexican companies to accounts

associated with CARRILLO. On at least one occasion, CARRILLO emailed the

Asset Management Firm requesting that a wire be sent to one of the intermediary

Mexican companies. The Asset Management Firm debited the wire transfers to

accounts associated, variously, with SHARP's or CARRILLO's nominees.

        b.    In or about 2016 and 2017, the Asset Management firm wired at least $1.8

million to a luxury watch retailer in Beverly Hills, CA. Invoices reflect that the

21

A1620

Case: 24-1770     Document: 00118249067     Page: 381     Date Filed: 02/18/2025     Entry ID: 6700951
Case 1:21-cv-11276-WGY     Document 423-1     Filed 12/05/23     Page 28 of 132
Case 1:21-mj-07182-JCB     Document 3-1     Filed 08/04/21     Page 22 of 47
24

payments were for watches CARRILLO purchased. The Asset Management Firm also wired approximately $325,000 to a New York law firm to pay invoices associated with the firm's representation of CARRILLO in an SEC enforcement action. The wires for the watches and the legal bills were debited to accounts associated, variously, with SHARP's or CARRILLO's nominees.

c.      In or about April 2017, the Asset Management Firm wired $134,500 to a BMW dealership in San Diego for the purchase of a BMW X5 M. The purchase was in the name of a woman with an address in Chula Vista, CA, near San Diego. CARRILLO's name was on the insurance, as well as the dealership's internal emails discussing the wire payment. Encrypted messages reflect that CARRILLO initially instructed CC-1 to submit the wire request from a SHARP nominee, but when CC-1 did not timely submit the request, CARRILLO directed the Asset Management Firm to wire the money from the account of a CARRILLO nominee instead.

d.      In or about July 2018, the Asset Management Firm wired more than $40,000 to a Colombian national for purported "event planning services." CW-1 has advised law enforcement agents that s/he met the recipient in Paris with CARRILLO and understood that CARRILLO and the woman were involved in a romantic relationship. The wire was debited to a CARRILLO nominee.

e.      In or about March 2018, the Asset Management Firm wired approximately $84,000 to a Swiss luxury chalet company to reserve a ski chalet for the 2018-2019 New Year's holiday. The reservation was in the name of a CARRILLO

A1621

nominee, and CARRILLO was listed as the only "Passenger" on the reservation. The wire was debited to a CARRILLO nominee.

f.      In or about October 2017, the Asset Management Firm wired approximately $20,000 to a dental clinic in Geneva in connection with an invoice for dental work provided to CARRILLO. The address for CARRILLO on the invoice was the same address in Chula Vista, CA, associated with the BMW purchase. The wire was debited to a SHARP nominee.

51.      CW-1 has explained, and the data in the Q accounting system reflects, that stock sales were allocated to particular deals and associated with particular SHARP clients. The clients would be identified by unique four-letter codes, and CW-1 has identified, and their communications corroborate, that CARRILLO's and VELDHUIS's account codes were SUSS and ACCO, respectively. Review of the Q accounting system reflects that, during the period approximately 2015 through 2018, CARRILLO was associated with trading proceeds from sales by the Asset Management Firm for at least approximately 22 different issuers, with total proceeds in excess of at least $70 million. Similarly, during the period approximately 2014 through 2018, VELDHUIS was associated with trading proceeds from sales by the Asset Management Firm for at least approximately eight different issuers, with total proceeds in excess of at least $23 million. And across all clients (including but not limited to CARRILLO and VELDHUIS), during the period approximately 2014 through 2018, the Q accounting system reflects over 70 issuers traded by SHARP's nominee entities through the Asset Management Firm, with total proceeds in excess of $140 million.

A1622

Case: 24-1770    Document: 00118249067    Page: 383    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 30 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 24 of 47
26

*Concerns Regarding Law Enforcement*

52.      Communications involving SHARP, VELDHUIS, and KELLN reflect that each was concerned about, and took steps to prevent, law enforcement's discovery of the scheme. Examples include:

        a.      In November 2013, KELLN asked SHARP in a xphone message whether it was dangerous to bring with her to Switzerland her "hand written list of where and which stock is what," which she described as "all symbols and codes but its how I keep track of what's clearing [i.e., being deposited]." SHARP responded "Its not dangerous over there. Its dangerous when u come back (canada customs)."

        b.      In February 2015, VELDHUIS explained to SHARP in a xphone exchange that VELDHUIS had discovered that, "If the SEC did a IP trace on any of the e-mails" sent by SHARP's nominee entities, they would "know the location of the server," as well as see that one of the websites hosted on the server was an art website registered to SHARP and SHARP's daughter. SHARP responded "We r moving [the art website] out today." In addition, just as the exchange was starting, SHARP stated, "Unless encrypted u must assume you're being recorded" when speaking on the phone.

        c.      In November 2016, KELLN sent an encrypted message to CW-1 and CW-2 stating that she "had to delete her phone going thru customs." CW-1 responded, "We approve of your security."

53.      Communications also reflect apparent jokes about law enforcement. For example, in June 2015, VELDHUIS reported to KELLN in a xphone message that he had made it through

A1623

customs while on his way to Los Angeles and that he was "not in jail. So that's nice." And in April 2017, VELDHUIS sent an encrypted message to CW-1 stating that "Today I was told that bond [i.e., SHARP] is an undercover agent." CW-1 responded "I found that out in 2012[.] Spreading false news[.]"

## REPRESENTATIVE SECURITIES IN THE FRAUD SCHEME

### PureSnax International Inc. (PSNX)

54.    In 2015 and 2016, PureSnax International Inc. ("PureSnax") was a New Jersey-based company that described itself as a "wellness brand focused on bringing healthy snacks and foods to consumers." The company was incorporated in Nevada in 2011 under a different name. Between September 2015 and September 2016, it traded on the over-the-counter market under the ticker symbol "PSNX."

55.    The company's filings and transfer agent records reflect that, in 2011 and 2012, the company issued 300 million common shares to its founder and 100 million common shares to 17 investors through a Form S-1 registered securities offering (the "PSNX S-1 investors") that purportedly raised approximately $25,000. The shares purchased by the PSNX S-1 investors were free-trading, while the founder's shares were not.[10]

56.    Transfer agent and business incorporation records reflect that, between 2012 and 2015, 48 million of the PSNX S-1 investors' shares were transferred in two installments from five S-1 investors to two SHARP nominees, Inland Trading, Ltd. ("Inland"), and Redfern

---

[10] In or about June 2015, the company underwent a 40:1 forward stock split, issuing 40 shares for each existing 1 share. The share amounts are set forth here on a post-split adjusted basis.

A1624

Investors, Ltd. ("Redfern"). Celtic Consultants—one of the companies associated with KELLN—issued the transfer requests to PureSnax's transfer agent.

57.    In or about September 2014, 9.6 million shares held by Inland were purportedly sold to yet another SHARP nominee entity—Quezon—and then deposited via the Asset Management Firm with a broker. And in July 2015, 10 million shares held by Redfern were also deposited with a broker via the Asset Management Firm. Together, these 19.6 million shares accounted for 4.9 percent of PureSnax's total shares outstanding at the time.

58.    In or about September 2015, the founder's 300 million shares were transferred to the company's president, who retired them in exchange for one million shares of convertible preferred stock. As a result, as of October 2015, PureSnax had only 101 million total shares outstanding, and the 19.6 million Quezon and Redfern shares represented close to 20 percent of the company's shares outstanding, and more than 40 percent of its float, the remainder of which was held by either Inland or successor transferees.

59.    Thereafter, between November 2015 and September 2016, the Asset Management Firm directed the sale of nearly all of those shares, generating proceeds of approximately $1.4 million. The overwhelming majority of the sales commenced in March 2016. Historical price data reflects that PSNX's stock price more than doubled between the beginning of March and mid-May 2016, rising from $0.35 to $0.82 per share, before crashing to $0.01 at the end of September 2016.

60.    Consistent with this price spike, CW-3 has advised law enforcement agents that, in March 2016, s/he worked in a Medellin boiler room hired by CARRILLO to generate demand for PSNX. Email communications corroborate that CW-3 was in Medellin in early 2016. CW-3 has told agents that s/he worked with, and sat beside, CARRILLO in the boiler room, which

A1625

Case: 24-1770    Document: 00118249067    Page: 386    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 33 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 27 of 47
29

CW-3 helped to manage with Boiler Room Operator 1. CW-3 recalled that CARRILLO told him/her that he controlled all of PureSnax's shares, which he said included 40 to 50 million shares ready to sell and another 60 million shares that were available. These figures are consistent with the 100 million shares that records reflect were sold to the original S-1 investors, of which 48 million were transferred to the SHARP nominees.

61.     CW-3 told agents that CARRILLO taught boiler room members how to pitch PSNX to prospective investors, and provided the room with a Customer Relationship Management (CRM) system to place and track calls. CW-3 said s/he used the CRM system to solicit investors using a fake name while making exaggerated and/or false statements about PureSnax and its growth opportunity. CW-3 knew the stock did not present a growth opportunity because the shares were being dumped at CARRILLO's direction, a fact that was not disclosed to prospective investors. CW-3 described witnessing CARRILLO direct stock sales from inside the boiler room while CW-3 and others placed calls to prospective investors. CW-3 said s/he spoke with CARRILLO on a daily basis about how many shares CARRILLO planned to sell, as well as about CARRILLO's "capture" rate, meaning how many sales the boiler room successfully made to investors. CW-3 explained that s/he periodically bought shares in companies the boiler room promoted in order to help maintain the stock's price. Brokerage records corroborate that CW-3 purchased 1200 shares of PSNX in May 2016, which s/he then sold three days later.

62.     An investor in South Yarmouth, MA was among those who received phone calls soliciting investments in PSNX, including from an individual using CW-3's fake name. The Massachusetts investor subsequently purchased PSNX shares while the Asset Management Firm was dumping shares.

A1626

Case: 24-1770    Document: 00118249067    Page: 387    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 34 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 28 of 47
30

63.    Bank records reflect that CW-3, through a company s/he created, received over $100,000 from the Asset Management Firm in or about March 2016, which CW-3 identified as compensation for his/her work in the PSNX boiler room.  Two of the payments were debited to Quezon, which was selling PSNX at the time.  CW-3 received additional payments from the Asset Management firm in or about April, August, and October 2016.  The April and August payments were debited to SHARP nominees, while a $50,000 payment in October was debited to a CARRILLO nominee.[11]

64.    CARRILLO discussed his involvement with PureSnax in messages sent via xphone, and those xphone messages reflect that CARRILLO was involved in, and exercised control over, the set up for the PSNX deal and the shares being sold during the relevant period.  For example, in October 2015, SHARP messaged CARRILLO, asking "What's up … [w]ith your deals," including "psnx," adding "Is anything going to trade this year?"  CARRILLO responded that another xphone accountholder, Co-Conspirator 3 ("CC-3"), is "coordinating IR," which I know from training and experience stands for "investor relations" and is a synonym for a promotional campaign.  CARRILLO added "I'm involved but more to get it ready."  In early November, CC-3 emailed CARRILLO to alert him that some "Psnx news" needed his approval.  CARRILLO responded, suggesting that CC-3 "reduce some of the irs details."  The next day, PureSnax issued a press release announcing that it had appointed a new chief financial officer, who had begun his career at the Internal Revenue Service.  Also that day, SHARP emailed CARRILLO and CC-3, asking "When will selling start?"  Then, during the last full week in

_____

[11] Other payments debited to the same CARRILLO nominee during the preceding two months included two $100,000 payments to CARRILLO's law firm and a $200,000 payment to a company associated with Boiler Room Operator 2.

A1627

November, CARRILLO messaged SHARP, stating that he and CC-3 would be "starting PSNX next week" and asking permission to "trade directly with" the Asset Management Firm. SHARP responded "Si," or "Yes" in Spanish. And on December 1, 2015, CARRILLO messaged SHARP, stating "psnx started today," to which SHARP responded "Yay." That same day, according to its internal records, the Asset Management Firm made its first substantial PSNX sale, selling 175,000 shares.[12]

65.     The Asset Management Firm's files contained an export from SHARP's Q accounting system of the "PSNX" account as of June 2016. Under a summary of "Account Holdings," the file listed 45,310,346 million PSNX shares still available to be sold and 52 million shares as in "Escrow," which amount was equal to the number of shares still purportedly in the hands of the remaining S-1 investors. The file also listed PSNX stock sales made through the Asset Management firm since November 2015, as well as additional PSNX stock sales through another firm. The file also listed debits—i.e., outgoing payments—to CW-3's company in April 2016 and to Boiler Room Operator 2 in April and May 2016. In addition, the file listed two debits in 2015, totaling over $14,000, to an individual with the same last name as four of the five S-1 investors who transferred their shares to SHARP's nominees.[13]

### Garmatex Holdings, Ltd. (GRMX)

66.     In or about early 2017, Garmatex Holdings, Ltd. ("Garmatex") was a British Columbia-based company that was purportedly planning to complete a reverse merger with a private company, Garmatex Technologies, Inc. Following the anticipated merger, Garmatex

---

[12] The Asset Management Firm's records reflect that it also sold 10,030 shares five days earlier on November 27, 2015.

[13] The name appears to be slightly misspelled in the second entry.

Case: 24-1770    Document: 00118249067    Page: 389    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 36 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 30 of 47

32

would purportedly commence operations in the "development and supply of scientifically engineered fabric technologies." The company was incorporated in Nevada in 2014 under a different name (and changed its name again after 2017). In 2017, Garmatex traded on the over-the-counter market under the ticker symbol "GRMX."

67.    The company's filings and transfer agent records reflect that, in or about September 2014, Garmatex issued 15 million shares to 32 investors through a Form S-1 registered securities offering (the "GRMX S-1 investors"), raising a reported $9,000. The GRMX S-1 investors were all from the same state in Mexico, and the shares they received were free trading. Garmatex's transfer agent sent all 32 of the physical share certificates to an attorney in Nevada.

68.    Garmatex reported that, as of March 15, 2017, it had approximately 35.5 million shares outstanding.[14] In February and March 2017, 5.25 million of the GRMX S-1 investors' shares—representing just under 15 percent of GRMX's total outstanding shares—were transferred to SHARP nominees and ultimately deposited with brokers via the Asset Management Firm. The shares were broken into blocks of 1.75 million shares each (representing just under five percent of GMRX's total outstanding shares). To make each block, three GRMX S-1 investors purportedly sold their shares to a SHARP nominee entity.

69.    The two SHARP nominees that acquired shares in the first two tranches of sales, which took place in February 2017, had their share certificates sent to the same individual in Vancouver, British Columbia. In early March, both SHARP nominees purportedly sold their

---

[14] In August 2016, the company's shares underwent a 12.5:1 forward stock split, issuing 12.5 shares for each existing 1 share. The share amounts discussed here are on a post-split adjusted basis.

A1629

blocks of 1.75 million shares to two other SHARP nominees, Quezon (which also sold PSNX), and Hilton Capital Inc. ("Hilton"). Quezon and Hilton then directed that their GRMX shares be transferred to the Asset Management Firm, which deposited the shares with different brokers. Quezon and Hilton provided the same credit card in the name of Esquire Corporate Services—a company associated with KELLN—to pay the transfer agent's fees.

70.    The third tranche of sales from GRMX S-1 investors to a SHARP nominee took place in mid-March. The acquiring SHARP nominee immediately sold the shares to a different SHARP nominee—Riverfall Group Ltd. ("Riverfall"), which was previously the SHARP nominee entity Redfern—and directed that the shares be transferred to the Asset Management Firm, which deposited the shares with a broker. Riverfall provided the same credit card to the transfer agent as Quezon and Hilton.

71.    The share breakdowns and transfers were discussed via encrypted messages among CARRILLO, KELLN, CW-1, and CW-2. For example, in or about mid-February, CW-2 told KELLN that s/he had just spoken with "Fire"—i.e., CARRILLO—who had said that he was going to be sending the Asset Management Firm documents to facilitate a deposit of GRMX shares. KELLN responded the s/he had not yet "got the certs" and that "[a]s soon as I do, we will T it all up." CW-2 subsequently inquired again, as "Fire [is] saying he wants me to try and get this in asap." KELLN responded: "I have to transfer all the stock to the Noms first. Fire needs to relax. There is a process." On or about March 9, 2017, CW-1 instructed KELLN to "re-do the GRMX quezon instruction letter" because it identified the wrong stock.[15] The

---

[15] Quezon's initial instruction letter to the transfer agent mistakenly indicated that it was enclosing a share certificate for stock of Vitality BioPharma, Inc. As discussed further below, Vitality BioPharma was simultaneously the subject of a pump-and-dump scheme led by VELDHUIS using SHARP's nominees and the Asset Management Firm.

Case: 24-1770    Document: 00118249067    Page: 391    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 38 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 32 of 47

34

corrected instruction letter was sent that same day. In the metadata for the corrected instruction

letter, the author is identified as "Courtney Kelln-Yul."

72.    Also on or about March 9th—at or about the same time that Quezon and Hilton

were engaged in the transfer of shares to the Asset Management Firm—CARRILLO messaged

CW-1 and CW-2 to ask a "huge favor." Noting that KELLN had emailed them the necessary

GRMX paperwork, CARRILLO asked CW-1 and CW-2 to facilitate the share transfers and

deposits "asap," adding that it was "urgent so we can have a good month lol."

73.    Less than a week later, on or about March 14, CARRILLO again messaged CW-

1 and CW-2, noting that the first block of 1.75 million GRMX shares was "cleared today" to the

Asset Management Firm, and that the second two blocks were at the transfer agent pending the

receipt of additional paperwork. CARRILLO identified Hilton and Riverfall as the two entities

that would be holding the GRMX shares. CARRILLO added: "Please also do best to have the

1.75 [million shares already cleared] ready to go at open - we gonna drop that shit."

CARRILLO's description of the share transfers matches how they were, in fact, transferred and

deposited. Brokerage records also reflect that CW-1 provided a false and misleading

questionnaire to at least one of the brokers receiving GRMX shares. Among other false and/or

misleading statements, CW-1 represented on the questionnaire that the depositing shareholder—

the Asset Management Firm, on CARRILLO's behalf—did not own more than five percent of

the company's shares.[16]

---

[16]    CW-1 has also noted, however, that this particular broker was sometimes in on
the scheme and therefore s/he believes the broker would not have cared had the broker been
accurately informed of the concerted action among the nominee entities holding the shares.

A1631

74.     Beginning on or about that same day, March 14, 2017, and extending into early May 2017, the Asset Management Firm sold all of the GRMX shares transferred to it from Quezon, Hilton, and Riverfall, which by that point included two additional deposits from Hilton and Riverfall totaling nearly 2 million shares. The additional deposits came after CARRILLO messaged CW-1 and CW-2 on or about March 23 to ask, "Can u take the remaining 3.2m grmx?" In total, the Asset Management Firm deposited and sold over 7.2 million GRMX shares in less than two months, accounting for approximately 20 percent of the total outstanding GRMX shares and approximately 50 percent of the float. The proceeds were approximately $5 million, of which approximately $3.4 million was generated during the first four days, just after CARRILLO's statement "we gonna drop that shit."

75.     Encrypted messages reflect that CARRILLO directed the GRMX selling. For example, on or about March 14, CARRILLO directed CW-1 to "Sell 25k grmx at .80," "Sell 50k grmx at .675," and "Sell another 50k grmx at .675," before commenting that he was "Going slow." CARRILLO later asked CW-1, "Can I turn this up now?", and his directions subsequently escalated: "Sell 185k at .66 grmx," "Sell 150K grmx at .657," "Sell 100k at .656 grmx," and "Sell 300k grmx at .644." CARRILLO did not specify from which nominee entity's holdings to sell the shares—that decision was made by CW-1—reflecting that CARRILLO had control over all of the nominee shares. At the end of the first day, CW-1 reported to CARRILLO that they had sold one million shares, the same amount reflected in the brokerage records for the various nominees.

76.     The sales coincided with a dramatic increase in GRMX's market volume. In the two weeks preceding March 14, an average of less than 100,000 GRMX shares traded per day. During the two weeks starting March 14, the average increased to over 2.5 million shares per

Case: 24-1770    Document: 00118249067    Page: 393    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 40 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 34 of 47
36

day. GRMX's price also spiked. In mid-February, the price vacillated between $0.40 and $0.60 per share. During the period mid-March through mid-April, it jumped as high as $1.21, before crashing to below $0.20 by June.

77.    The sales, and the increase in GRMX's share price and trading volume, also coincided with a multifaceted promotional campaign. Records obtained from an investor relations company incorporated in Wilmington, DE, reflect that CARRILLO hired the company to draft eight press releases touting Garmatex and its purported fabric technology. The press releases were issued between March 10, 2017 and April 21, 2017. The investor relations company communicated with CARRILLO using encrypted messaging applications and was paid by wire from the Asset Management Firm in May 2017. The payment was debited to a SHARP nominee. Similarly, records from an email marketing firm based in North Carolina for an account using the name "Global Stock Advantage" reflect that the account sent at least 20 mass marketing emails related to Garmatex between March 17 and April 27, 2017. The emails had subject lines such as, "Urgent: Buy GRMX" and "Garmatex Just Keeps On Going Higher." The account holder was an entity that received $350,000 in two payments from the Asset Management Firm in April and May 2017. The payments were debited to Riverfall, which was selling GRMX shares at the time. The contact person listed on the account had the same name as the account owner associated with one of the intermediary Mexican bank accounts used to transfer proceeds to CARRILLO.

78.    Investors who purchased GRMX during this time period reported receiving calls soliciting their investments. Records and communications tie those calls to the boiler room CARRILLO used in Medellin, Colombia. For example, encrypted messages reflect that CARILLO was traveling on one of the trading days in March 2017 when he was directing

A1633

GRMX sales, and informed CW-1 and CW-2 that, if he did not have internet access while traveling, Boiler Room Operator 2 "would relay orders" that day. The Medellin boiler room's involvement is also corroborated by records from the voice-over-internet (VOIP) service provider that provided the phone numbers from which prospective investors received calls. The email address associated with the VOIP account holder received multiple emails in 2017 from an individual CW-3 identified as working with Boiler Room Operators 1 and 2 in Medellin ("Boiler Room Operator 3"), including an invoice from a Medellin Porsche dealership for a car in the name of Boiler Room Operator 1's spouse. And records reflect that the IP address used to log in to the VOIP account in February and March 2017 was also used to log into (i) Boiler Room Operator 3's brokerage account and (ii) the bank account of Boiler Room Operator 1's wife.[17]

79.     An investor in West Newton, MA was among those who received phone calls soliciting investments in GRMX, and who subsequently purchased GRMX shares, during the time the Asset Management Firm was dumping shares. The investor also received two promotional emails touting GRMX from Global Stock Advantage, discussed above.

### OneLife Technologies Corp. (OLMM)

80.     In or about 2017 and 2018, OneLife Technologies Corp. ("OneLife") was purportedly a "mobile medical data and technologies company" based in Illinois. The company was incorporated in Nevada in 2014 under a different name. It traded on the over-the-counter market under the ticker symbol "OLMM."

81.     Corporate filings and transfer agent records reflect that, in or about January 2014, OneLife issued 70 million shares to its sole director and officer and, in or about February 2014, it

---

[17] IP addresses are unique numerical labels assigned to each device connected to a computer network.

A1634

Case: 24-1770    Document: 00118249067    Page: 395    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 42 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 36 of 47
38

issued approximately 22.7 million shares to 38 investors from Jamaica, raising approximately $3,410. Later that year, the company filed a Form S-1 with the SEC to register the shares purchased by the 38 investors (the "OLMM S-1 investors"), which had the effect of permitting their subsequent re-sale.[18] In or about October 2017, the company had approximately 92.7 million shares outstanding, although this number decreased to approximately 62.7 million after a share cancellation in December 2017. On or about March 2, 2018, the company registered its S-1 shares with the SEC under Section 12 of the Exchange Act.

82.    Encrypted communications and records from the Asset Management Firm reflect that CARRILLO controlled the overwhelming majority of OneLife's shares. In or about September 2016, approximately 37 of the 39 certificates issued to OLMM shareholders were delivered to the Asset Management Firm, including the 70 million share certificate issued to the company's sole director and officer (representing approximately 75 percent of the company's total shares). In or about January 2017, CARRILLO emailed the Asset Management Firm to confirm that it had received the certificates. CARRILLO also emailed pre-signed signature pages for share purchase agreements for 35 of the 38 OLMM S-1 investors and told the Asset Management Firm that it would receive the physical signature pages the following day, which it did, from a Vancouver address. CARRILLO also emailed a template share purchase agreement for OLMM shares in Word format, with the purchaser and seller names blank.

83.    In or about February, March, and April 2017, CARRILLO, KELLN, and CW-2 discussed how to divide the OLMM S-1 investors' shares into blocks of just under five percent

_____

[18] In or about June 2017, the company's shares underwent a 2:1 forward stock split, issuing 2 shares for each existing 1 share. The share amounts are discussed here on a post-split adjusted basis.

A1635

of the total outstanding shares and how they would be deposited. For example, in February 2017, CW-2 sent CARRILLO an encrypted message noting that s/he had "allocated the certs into 5 posns of just under 5%." CW-2 noted that CARRILLO had originally wanted half the shares placed with SHARP nominees and asked if he was happy with three positions going to "Celt," i.e., KELLN. CARRILLO responded, "Yes." In March 2017, CW-2 emailed CARRILLO a more specific proposed breakdown of the five positions, each just under or equal to five percent. CARRILLO responded with directions as to how each should be deposited: two with SHARP nominees, and three "direct with" the Asset Management Firm. And then in April 2017, CW-2 sent an encrypted message to KELLN, stating the s/he had "certs for positions of [OLMM] from Fire" that he (i.e., CARRILLO) "wants me to send to you/the TA for putting into two bond companies" (i.e., two SHARP nominees). CW-2 identified the two positions as comprising 4.7% and 4.4% of OLMM's outstanding stock, respectively. CW-2 asked what steps should be taken, to which KELLN responded, "Send certs and stock powers to me." KELLN then provided her address in British Columbia and stated that it was okay to use KELLN's name on the package given that it was being sent by CW-2.

84. Pursuant to CARRILLO's instructions, approximately 4.37 million shares were transferred to an acquiring SHARP nominee entity in early June, and then further transferred to Hilton (which had previously sold GRMX shares), before being deposited with a broker via the Asset Management Firm. In mid-June, approximately 4.67 million shares were transferred to the Asset Management Firm, where they were allocated to a CARRILLO nominee—Compton Capital Inc. ("Compton")—and deposited with a broker. And in September, approximately 4.13 million shares were transferred to a SHARP nominee, and then further transferred to a different

A1636

SHARP nominee—Santos Torres—before being deposited with a broker via the Asset Management Firm.

85.     In total, the Asset Management Firm deposited approximately 13.2 million OLMM shares, which accounted for approximately 14 percent of OneLife's total outstanding shares and approximately 92 percent of its float.  Following the share cancellation in December, the percentage of the company's shares deposited with the Asset Management Firm increased to approximately 21 percent.  As with GRMX, brokerage records reflect that CW-1 again provided a false and misleading questionnaire to at least one of the brokers receiving OLMM shares (namely, the same brokerage firm referred to above in Paragraph 73).

86.     In the meantime, in April 2017, OneLife announced that it had a new director and officer who had acquired control of the original director and officer's 70 million shares (which were in the Asset Management Firm's possession).  Transfer agent records and emails reflect that CARRILLO directed the share transfer.  Specifically, on or about May 23, 2017, CARRILLO emailed the Asset Management Firm a letter addressed to the transfer agent, on Hilton's letterhead.  The letter instructed the transfer agent to transfer the 70 million shares to the new director and officer.  Records from the Asset Management Firm indicate that it sent CARRILLO's letter and the 70 million share certificate to the transfer agent, which effectuated the transfer on or about May 30.

87.     The Asset Management Firm began selling the OLMM shares in or about November 2017.  As with GRMX, CARRILLO directed the selling via encrypted messages, including the following messages sent on various dates between February 23 and September 4, 2018: "Sell 50k olmm at 1.44"; "Sell 75k olmm at 1.47"; "Sell 76k olmm at .35"; "Sell 50k olmm at .10 please"; "Sell 120k olmm at .30"; and "Sell 205k olmm at .39."   CARRILLO also

A1637

specified which of either his or SHARP's nominees should receive the proceeds of the stock sales. For example, on March 22, he directed: "Sell another 100k and book to [SHARP] also please."

88.    The selling continued through the beginning of October 2018. In total, the Asset Management Firm sold approximately 7.5 million shares, for total proceeds of approximately $5.2 million.

89.    Shortly after the selling began, in December 2017, CW-2 and KELLN discussed the remaining two five percent blocks, which had not yet been deposited. Via an encrypted chat message, CW-2 noted, "There are 2 other posns of OLMM still in certs" and proposed that "we can now start to bring [them] in as selling starts." KELLN responded, "Just send me all the specific details for each [share purchase agreement] you need. Seller name/purchaser name/ date/price/share amount." Encrypted messages reflect that CARRILLO and the Asset Management Firm took steps to line up the additional positions in September 2018, but ultimately those shares were never deposited.

90.    As with GRMX, the Asset Management Firm's selling took place during a promotional campaign CARRILLO directed. CARILLO hired the same investor relations company that drafted the GRMX press releases to draft five press releases touting OneLife's mission and technology. The releases were issued in January and February 2018. In March, the investor relations company received a wire from the Asset Management Firm for $20,000, which was debited to a SHARP nominee.

91.    During the period the Asset Management Firm was dumping shares, an investor in Reading, MA, purchased OLMM after receiving an unsolicited phone call from an individual touting the stock.

### Vitality Biopharma, Inc. (VBIO)

92.     In or about 2016 through 2018, Vitality Biopharma, Inc. ("Vitality") was a biopharmaceutical company based in Los Angeles that focused on the develop of cannabinoids. It was incorporated in Nevada in June 2007 under a different name. Immediately before July 2016, Vitality was known as Stevia First Corp. ("Stevia First") and was a biotechnology company focused on stevia products. Vitality traded on the over-the-counter market under the ticker symbol "VBIO" and, before that, "STVF."

93.     Transfer agent records and records from the Asset Management firm reflect that, between in or about November 2016 through September 2018, eight different SHARP nominees (including four previously discussed) deposited and sold at least over 8.1 million VBIO shares with the Asset Management Firm.[19] Those shares ultimately accounted for over 33 percent of Vitality's total outstanding shares as of September 30, 2018 (approximately 24.7 million). CW-1 and CW-2 have described, and records and communications reflect, that VELDHUIS controlled all of the VBIO shares deposited in the names of the eight SHARP nominees. The shares were sold during a promotional campaign funded by four of the same SHARP nominees, generating approximately $16.8 million in proceeds.

94.     Vitality's public filings and transfer agent records reflect that all but approximately six thousand of the aforementioned shares were acquired directly from Stevia First pursuant to private securities purchase agreements. These agreements were reached immediately before the company changed its name to Vitality and effected a reverse stock split,

---

[19] In or about July 2016, the company underwent a 1:10 reverse stock split, issuing 1 share for every 10 existing shares. The share amounts are set forth here on a post-split adjusted basis.

A1639

thereby reducing the shareholdings of all other Stevia First/Vitality shareholders. Pursuant to the purchase agreements, SHARP nominees initially acquired 2.65 million shares in aggregate, with warrants providing the opportunity to purchase an additional 7.95 million shares in aggregate over the ensuing six months. The shares were issued with restricted legends, but the SHARP nominees secured legal opinion letters from law firms beginning in or about November 2016 that opined, in sum and substance, that the restricted legends could be lifted and the shares deposited and sold. The legal opinion letters were explicitly premised on the assumption that each of the shareholders—i.e., each of the SHARP nominees—was not an affiliate of Vitality and had not been so for the prior three months. To obtain the opinion letters, the SHARP nominees submitted representation letters, purportedly signed by the beneficial owners of the nominees, stating that each was not an affiliate of Vitality, including in some instances by explicitly confirming that it was not a 10% shareholder of Vitality.

95.    The VBIO shares held by the SHARP nominees, however, were all under VELDHUIS's common control. Transfer agent records reflect that the first tranche of 2.65 million shares purchased pursuant to the agreement were issued on or about May 17, 2016. Those shares equaled approximately 25 percent of Vitality's then-total outstanding shares (approximately 10.6 million)—in other words, well over 10%. Records from the Asset Management Firm and information in SHARP's Q accounting system reflect that those 2.65 million shares were issued to five SHARP nominees and associated in the Q accounting system with VELDHUIS in their entirety upon receipt. Similarly, as additional tranches of VBIO shares were issued to SHARP nominees and deposited with the Asset Management Firm over the next fourteen months, they too were all associated with VELDHUIS in the Q accounting system.

41

A1640

96.     VELDHUIS's encrypted messages with CW-1 and CW-2 further demonstrate his control over their disposition. The Asset Management Firm's records and trading records reflect that, as the SHARP nominees deposited VBIO shares, the Asset Management Firm would immediately begin selling the shares. Encrypted messages between VELDHUIS, CW-1, and CW-2 reflect that VELDHUIS directed the stock sales in detail on a daily basis, stating, for example, "Sell 50k VBIO @ 1.30"; "sell 15k VBIO @ 2.11"; and "Sell 15k VBIO @ 3.10."

97.     As shares were sold, the SHARP nominees' holdings would then be replenished with additional shares acquired pursuant to the warrants, and encrypted messages reflect VELDHUIS regularly indicated that additional VBIO shares would be forthcoming. For example, in early January 2017, after the Asset Management Firm had sold nearly all of the 1.75 million VBIO shares that had been deposited to that point, CW-1 asked about a "VBIO replen" and indicated that CW-1 was only aware of an additional 294,000 shares that were forthcoming. VELDHUIS responded "And 750k right behind that / And 294k when that starts to go / And then 294k again / And so on ...." Subsequent deposits with the Asset Management Firm in the names of Morris Capital, Inc. ("Morris"), Quezon, and Hilton (all SHARP nominees) match this forecast. Similarly, in June 2017, VELDHUIS alerted CW-1 and CW-2 that "1,800,000 VBIO on its way." CW-2 asked if KELLN was "going to send us docs," to which VELDHUIS responded "Yes." KELLN confirmed that same day in a separate encrypted message that "U will have tons of VBIO coming at you next week." Later in June and in July, 1,788,236 shares were deposited with the Asset Management Firm (and subsequently sold) in the names of Quezon, Riverfall, and Santos Torres (all SHARP nominees).

98.     Encrypted messages similarly reflect VELDHUIS keeping tabs on the status of deposits with the Asset Management Firm. In late-December 2016, when Vitality shares had just

A1641

started trading over $2.00 per share (over double the prices at which VBIO had been trading earlier in 2016), VELDHUIS urged CW-1 and CW-2 to "Please push" the transfer agent to clear a 500,000 share deposit, adding that there was "So much money on the table!"

99. Encrypted messages among KELLN, CW-1, and CW-2 also reflect a concerted effort to ensure that no one SHARP nominee held over 5% of Vitality's outstanding shares at any one time. In February 2017, KELLN was facilitating a deposit of 750,000 VBIO shares for Hilton. KELLN's messages to CW-1 and CW-2 reflect, however, that KELLN recognized that the deposit would push Hilton's holdings over 5% based on shares Hilton had not yet sold through the Asset Management Firm. To address this issue, KELLN directed CW-1 and CW-2 to "Pls make sure to allocate all Vbio sales to the [Hilton] account today. We need to make room for the pending 750k." KELLN then added, "Again 5% rule is biting me ass."

100. Encrypted messages between KELLN, CW-1, and CW-2 also reflect that the Asset Management Firm was careful not to hold, in total across SHARP's nominees, more than 20% of Vitality's outstanding shares at any one time. In January 2017, CW-2 asked KELLN "Are we going to receive any more VBIO? Can see lots in REST and I'm hungry!" Review of the Q accounting system reflects that "REST" is a category in which shares can be placed in the system. KELLN responded, "Acco [i.e., VELDHUIS] said u didn't want anymore. Have u changed ur mind?" CW-1 responded, "We didn't want to hold over 20% at any one time. The rate we are selling, happy to queue up next [deposit]."

101. Transfer agent records and encrypted messages further reflect KELLN's involvement in transferring VBIO shares to the Asset Management Firm. In December 2016, CW-2 sent an encrypted message to VELDHUIS, stating that the transfer agent was awaiting receipt of a credit card authorization before completing a share transfer. CW-2 asked

A1642

VELDHUIS, "Please get Celt [i.e., KELLN] to call them asap." VELDHUIS responded, "Sitting with her. Doing now." Transfer agent records for several of the Vitality share transfers reflect that a credit card in the name of Esquire Corporate Services—associated with KELLN—paid the transfer agent's fees.

102.    Transfer agent records and encrypted messages also reflect KELLN's involvement in obtaining the aforementioned legal opinions for the SHARP nominees. Many of the legal opinions supporting the VBIO share transfers to the Asset Management Firm were issued by an attorney in Arizona ("Attorney 1"). In August 2018, an email account for Esquire Corporate Services emailed the Asset Management Firm, asking for copies of "certificates of incumbency" for two SHARP nominees (Riverfall and Varese Capital, Inc. ("Varese")) and noting that the certificates were needed "so I can sent [sic] the VBIO shares in for legend removal." The email was a forward of an exchange between Attorney 1's paralegal and Esquire Corporate Services, which signed one of its emails "C" (the first letter of KELLN's first name). In an encrypted message the next day, KELLN told CW-1 and CW-2 that "Esquire is dealing with the lawyer in [sic] Riverfall and Varese behalf."

103.    As with GRMX and OLMM, communications and brokerage records reflect that the Asset Management Firm provided false and misleading questionnaires and other information in connection with VBIO share deposits. For example, in May 2017, in connection with a deposit of 212,989 additional VBIO shares with a broker, CW-1 signed a "Deposit Securities Request" in which s/he made several false and/or misleading representations. Among them, CW-1 falsely represented that the Asset Management Firm (which was holding the shares for a SHARP nominee, for VELDHUIS' benefit) was not, and had not been, a "5% owner of the Issuer." In truth, as recently as early March 2017, the Asset Management Firm had held over

A1643

1.68 million VBIO shares for several SHARP nominees, equal to at least 7.6% of Vitality's then

outstanding shares. CW-1 also falsely represented that the Asset Management Firm had received

only 1,059,803 VBIO shares within the last year and falsely represented that it was not selling

VBIO shares through any other broker. In truth, the Asset Management Firm was selling VBIO

shares that same day through another broker and had received, in total, over 4.8 million VBIO

shares since November 2016. (The 1,059,803 shares identified on the form only accounted for

the portion of the 4.8 million shares that had been previously deposited with that broker.)

Similarly, in March 2017, in connection with four deposits the Asset Management Firm was

placing with a different broker, CW-1 represented in an email to the broker that each of the four

shareholders (all SHARP nominees) was "solely owned by one individual." CW-2 also

separately sent an email providing the names of the purported beneficial owners. In truth,

however, the VBIO shares held by the SHARP nominees were actually controlled by

VELDHUIS, not the purported beneficial owners whose names were provided to the broker.

    104.    The Asset Management Firm's sales of VBIO shares also coincided with a

promotional campaign funded by the same SHARP nominees doing the selling. Bank records

reflect that, between September 2016 and October 2017, a company based in Maryland that

organizes advertising campaigns for publicly-traded companies ("Media Company 1") received

$587,500 from the Asset Management Firm's banking provider. The wire details for the

payments reflect that they were associated with four SHARP nominees (Morris, Quezon, Hilton,

and Riverfall), each of which was selling VBIO shares at various points during that same

timeframe. Media Company 1 allocated the incoming payments to a VBIO marketing campaign,

and invoices the SHARP nominees sent the Asset Management Firm stated that Media Company

Case: 24-1770    Document: 00118249067    Page: 405    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 52 of 132
Case 1:21-mj-07182-JCB    Document 3-1    Filed 08/04/21    Page 46 of 47
48

1 was providing items to include "Small Cap Leader Native Advertising," "Momentum Alerts," "Street Alert," and "The Stock Report."

105.    Media Company 1's records for its VBIO marketing campaign reflect that it in turn hired other firms to draft and circulate marketing materials. Among the firms Media Company 1 hired was a firm based in Florida (Media Company 2), which was paid $100,000 in late November and early December 2016. Correspondence between the media companies reflects that Media Company 2 specialized in marijuana stocks.

106.    During the period the Asset Management Firm was selling shares, an investor in Shrewsbury, MA purchased VBIO shares after receiving emails touting the stock from a marijuana stocks newsletter associated with the individual who ran Media Company 2.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

A1645

## CONCLUSION

107.    Based on my knowledge, training, and experience and the facts set forth in this

affidavit, I have probable cause to believe and I do believe that SHARP, CARRILLO,

VELDHUIS, and KELLN, together with others known and unknown, committed (i) conspiracy

to commit securities fraud, in violation of Title 18, United States Code, Section 371, and (ii)

securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title

17, Code of Federal Regulations, Section 240.10b-5.

Respectfully submitted,

Keith Brown
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to telephonically in accordance
with Fed. R. Crim. P. 41(d)(3) on this 4 day of August 2021.



Honorable Jennifer C. Boal
United States Magistrate Judge
District of Massachusetts

47

A1646

JS 45 (5/97) - (Revised USAO MA 3/25/11)

| Criminal Case Cover Sheet | U.S. District Court - District of Massachusetts |
|---|---|

**Place of Offense:**          **Category No.** _I_          **Investigating Agency** _FBI_

**City** _Yarmouth, Newton, et al._ ◼          **Related Case Information:**

**County** _Barnstable, Middlesex et al._ ◼

Superseding Ind./ Inf. _____    Case No. _____
Same Defendant _____    New Defendant _X_
Magistrate Judge Case Number _____
Search Warrant Case Number _____
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name _Frederick Sharp_          Juvenile:    ☐ Yes  ☑ No

Is this person an attorney and/or a member of any state/federal bar:    ☐ Yes  ☑ No

Alias Name _____

Address    (City & State)  West Vancouver, British Columbia

Birth date (Yr only): _1952_  SSN (last4#): _____  Sex _M_    Race: _____    Nationality: _Canadian_

**Defense Counsel if known:** _____          Address _____

**Bar Number** _____

**U.S. Attorney Information:**

**AUSA** _James R. Drabick_          Bar Number if applicable  _667460_

**Interpreter:**    ☐ Yes  ☑ No          List language and/or dialect: _____

**Victims:**    ☑ Yes  ☐ No   If yes, are there multiple crime victims under 18 USC§3771(d)(2)    ☑ Yes  ☑ No

**Matter to be SEALED:**    ☑ Yes    ☐ No

        ☑ Warrant Requested          ☐ Regular Process          ☐ In Custody

**Location Status:**

**Arrest Date** _____

☐ Already in Federal Custody as of _____ in _____ .
☐ Already in State Custody at _____    ☐ Serving Sentence    ☐ Awaiting Trial
☐ On Pretrial Release:  Ordered by: _____ on _____

**Charging Document:**    ☑ Complaint          ☐ Information          ☐ Indictment

**Total # of Counts:**    ☐ Petty _____    ☐ Misdemeanor _____    ☑ Felony _2_

Continue on Page 2 for Entry of U.S.C. Citations

☑    **I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.**

Date:    08/03/2021    ◼          Signature of AUSA: _(signature)_

A1647

JS 45  (5/97)  (Revised U.S.D.C. MA 12/7/05) Page 2 of 2 or Reverse

51

**District Court Case Number**   (To be filled in by deputy clerk): _____

**Name of Defendant**     Courtney Kelln _____

### U.S.C. Citations

| | __Index Key/Code__ | __Description of Offense Charged__ | __Count Numbers__ |
|---|---|---|---|
| Set 1 | 18 U.S.C. § 371 | Conspiracy to Commit Securities Fraud | 1 |
| Set 2 | 15 U.S.C. §§ 78j(b) and 78ff | Securities Fraud | 2 |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:**   See attached affidavit by FBI Special Agent Keith Brown.

_____

_____

_____

USAMA *CRIM* - Criminal Case Cover Sheet.pdf  3/4/2013

A1648

JS 45 (5/97) - (Revised U.S.D.C. MA 3/25/11)

**Criminal Case Cover Sheet**                    **U.S. District Court - District of Massachusetts**

| | | |
|---|---|---|
| **Place of Offense:** | **Category No.** __I__ | **Investigating Agency** __FBI__ |

**City** __Yarmouth, Newton, et al.__ ▣    **Related Case Information:**

**County** __Barnstable, Middlesex et al.__ ▣

| | |
|---|---|
| Superseding Ind./ Inf. _____ | Case No. _____ |
| Same Defendant _____ | New Defendant __X__ |
| Magistrate Judge Case Number | _____ |
| Search Warrant Case Number | _____ |
| R 20/R 40 from District of | _____ |

**Defendant Information:**

Defendant Name __Luis Carrillo__    Juvenile:    ☐ Yes  ☑ No

Is this person an attorney and/or a member of any state/federal bar:    ☐ Yes  ☑ No

Alias Name _____

Address    (City & State) __Mexico__

Birth date (Yr only): __1973__  SSN (last4#): _____  Sex __M__    Race: _____    Nationality: __U.S. and/or Mexico__

**Defense Counsel if known:** _____    Address _____

**Bar Number** _____

**U.S. Attorney Information:**

**AUSA** __James R. Drabick__    Bar Number if applicable __667460__

**Interpreter:**    ☐ Yes  ☑ No    List language and/or dialect: _____

**Victims:**    ☑ Yes ☐ No  If yes, are there multiple crime victims under 18 USC§3771(d)(2)    ☑ Yes  ☑ No

**Matter to be SEALED:**    ☑ Yes    ☐ No

☑ Warrant Requested    ☐ Regular Process    ☐ In Custody

**Location Status:**

**Arrest Date** _____

☐ Already in Federal Custody as of _____ in _____ .

☐ Already in State Custody at _____  ☐ Serving Sentence  ☐ Awaiting Trial

☐ On Pretrial Release:  Ordered by: _____ on _____

**Charging Document:**    ☑ Complaint    ☐ Information    ☐ Indictment

**Total # of Counts:**    ☐ Petty _____    ☐ Misdemeanor _____    ☑ Felony __2__

Continue on Page 2 for Entry of U.S.C. Citations

☑    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date: __08/03/2021__ ▣    Signature of AUSA: _____

A1649

53

JS 45  (5/97)  (Revised U.S.D.C. MA 12/7/05) Page 2 of 2 or Reverse

**District Court Case Number**  (To be filled in by deputy clerk): _____

**Name of Defendant** _____ Courtney Kelln _____

### U.S.C. Citations

| | __Index Key/Code__ | __Description of Offense Charged__ | __Count Numbers__ |
|---|---|---|---|
| Set 1 | 18 U.S.C. § 371 | Conspiracy to Commit Securities Fraud | 1 |
| Set 2 | 15 U.S.C. §§ 78j(b) and 78ff | Securities Fraud | 2 |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:**   See attached affidavit by FBI Special Agent Keith Brown.

_____

_____

_____

USAMA *CRIM* - Criminal Case Cover Sheet.pdf  3/4/2013

A1650

JS 45 (5/97) - (Revised USAO MA 1/22 2mji-07182-JCB    Document 3-2    Filed 08/04/21    Page 5 of 8    54

**Criminal Case Cover Sheet**                                    **U.S. District Court - District of Massachusetts**

| | | | |
|---|---|---|---|
| **Place of Offense:** | | **Category No.** I | **Investigating Agency** FBI |

**City** Yarmouth, Newton, et al. ▪    **Related Case Information:**

**County** Barnstable, Middlesex et al. ▪

| | | |
|---|---|---|
| Superseding Ind./ Inf. _____ | Case No. _____ |
| Same Defendant | New Defendant X |
| Magistrate Judge Case Number _____ |
| Search Warrant Case Number _____ |
| R 20/R 40 from District of _____ |

**Defendant Information:**

Defendant Name  Mike Veldhuis                    Juvenile:    ☐ Yes  ☑ No

Is this person an attorney and/or a member of any state/federal bar:    ☐ Yes  ☑ No

Alias Name  _____

Address    (City & State)  Vancouver, British Columbia

Birth date (Yr only): 1980    SSN (last4#): _____    Sex M    Race: _____    Nationality: Canadian

**Defense Counsel if known:** _____    Address _____

**Bar Number** _____

**U.S. Attorney Information:**

**AUSA**  James R. Drabick                    Bar Number if applicable  667460

**Interpreter:**    ☐ Yes  ☑ No        List language and/or dialect: _____

**Victims:**    ☑ Yes  ☐ No   If yes, are there multiple crime victims under 18 USC§3771(d)(2)    ☑ Yes  ☑ No

**Matter to be SEALED:**    ☑ Yes    ☐ No

    ☑ Warrant Requested        ☐ Regular Process        ☐ In Custody

**Location Status:**

**Arrest Date** _____

☐ Already in Federal Custody as of _____ in _____

☐ Already in State Custody at _____  ☐ Serving Sentence    ☐ Awaiting Trial

☐ On Pretrial Release:  Ordered by: _____  on _____

**Charging Document:**    ☑ Complaint        ☐ Information        ☐ Indictment

**Total # of Counts:**    ☐ Petty _____    ☐ Misdemeanor _____    ☑ Felony  2

Continue on Page 2 for Entry of U.S.C. Citations

☑    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
     accurately set forth above.

Date:  08/03/2021    ▪        Signature of AUSA: _____

A1651

JS 45  (5/97)  (Revised U.S.D.C. MA 12/7/05) Page 2 of 2 or Reverse

**District Court Case Number**  (To be filled in by deputy clerk): _____

**Name of Defendant**    Courtney Kelln _____

<div align="center">

**U.S.C. Citations**

</div>

| | <u>**Index Key/Code**</u> | <u>**Description of Offense Charged**</u> | <u>**Count Numbers**</u> |
|---|---|---|---|
| Set 1 | 18 U.S.C. § 371 | Conspiracy to Commit Securities Fraud | 1 |
| Set 2 | 15 U.S.C. §§ 78j(b) and 78ff | Securities Fraud | 2 |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:**    See attached affidavit by FBI Special Agent Keith Brown.

_____

_____

_____

USAMA *CRIM* - Criminal Case Cover Sheet.pdf  3/4/2013

<div align="center">

A1652

</div>

%JS 45 (5/97) - (Revised U.S.D.C. MA 3/25/2011)

56

**Criminal Case Cover Sheet**          **U.S. District Court - District of Massachusetts**

**Place of Offense:**    **Category No.** I    **Investigating Agency** FBI

**City** Yarmouth, Newton, et al.    **Related Case Information:**

**County** Barnstable, Middlesex et al.

| | |
|---|---|
| Superseding Ind./ Inf. | Case No. |
| Same Defendant | New Defendant X |
| Magistrate Judge Case Number | |
| Search Warrant Case Number | |
| R 20/R 40 from District of | |

**Defendant Information:**

**Defendant Name** Courtney Kelin    Juvenile:    ☐ Yes  ☑ No

Is this person an attorney and/or a member of any state/federal bar:    ☐ Yes  ☑ No

**Alias Name**

**Address**    (City & State) Surrey, British Columbia

Birth date (Yr only): 1980    SSN (last4#):    Sex F    Race:    Nationality: Canadian

**Defense Counsel if known:**    Address

**Bar Number**

**U.S. Attorney Information:**

**AUSA** James R. Drabick    Bar Number if applicable 667460

**Interpreter:**  ☐ Yes  ☑ No    List language and/or dialect:

**Victims:**  ☑ Yes  ☐ No  If yes, are there multiple crime victims under 18 USC§3771(d)(2)  ☑ Yes  ☑ No

**Matter to be SEALED:**  ☑ Yes  ☐ No

    ☑ Warrant Requested    ☐ Regular Process    ☐ In Custody

**Location Status:**

**Arrest Date**

☐ Already in Federal Custody as of    in    .

☐ Already in State Custody at    ☐ Serving Sentence    ☐ Awaiting Trial

☐ On Pretrial Release:  Ordered by:    on

**Charging Document:**  ☑ Complaint    ☐ Information    ☐ Indictment

**Total # of Counts:**  ☐ Petty    ☐ Misdemeanor    ☑ Felony 2

Continue on Page 2 for Entry of U.S.C. Citations

☑ **I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.**

Date: 08/03/2021    Signature of AUSA:

A1653

JS 45  (5/97)  (Revised U.S.D.C. MA 12/7/05) Page 2 of 2 or Reverse

57

**District Court Case Number**  (To be filled in by deputy clerk): _____

**Name of Defendant**    Courtney Kelln _____

### U.S.C. Citations

| | **Index Key/Code** | **Description of Offense Charged** | **Count Numbers** |
|---|---|---|---|
| Set 1 | 18 U.S.C. § 371 | Conspiracy to Commit Securities Fraud | 1 |
| Set 2 | 15 U.S.C. §§ 78j(b) and 78ff | Securities Fraud | 2 |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:**    See attached affidavit by FBI Special Agent Keith Brown.

_____

_____

_____

USAMA *CRIM* - Criminal Case Cover Sheet.pdf  3/4/2013

A1654

The attached is **Exhibit "B"** referred
to in the 1st Affidavit of James R. Drabick, affirmed
before me on this ___ day of November, 2023

_____
Notary Public

59

[1]    This is the 1st Affidavit of Marcus Asner
and was made on October 20, 2023

No. S-226494
Vancouver Registry

## IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Plaintiff

AND:

FREDERICK L. SHARP

Defendant

---

## AFFIDAVIT OF MARCUS ASNER

---

I, Marcus Asner, lawyer with offices at 250 West 55th Street, New York, N.Y., 10019-9710, AFFIRM
THAT:

1.    I am an attorney and partner at the law firm Arnold & Porter Kaye Scholer LLP ("Arnold & Porter")
      in New York, N.Y. I have personal knowledge of the facts and matters hereinafter deposed to, save
      and except where same are stated to be on information and belief, and where so stated, I verily
      believe them to be true.

2.    I have read Rule 11-2 of the BC Supreme Court Rules and confirm that I am aware that my evidence
      is intended to assist the Court and not to be an advocate for any party. I have made this affidavit
      in conformity with that Rule and, if called upon to give oral or written testimony, I will give that
      testimony in conformity with that duty.

3.    I submit this affidavit at the request of Defendant Frederick L. Sharp in relation to the above-
      captioned matter in which the United States Securities and Exchange Commission ("SEC") seeks
      a *Mareva* injunction in aid of pending civil proceedings in the United States District Court for the
      District of Massachusetts. As a component of that *Mareva* injunction petition, the SEC seeks a
      sworn statement by Mr. Sharp disclosing, and detailing, any and all assets he holds. Specifically,
      I have been asked by Mr. Sharp's counsel to provide an analysis of whether such a statement would

[2]    This is the 1st Affidavit of Marcus Asner
      and was made on October 20, 2023

implicate Mr. Sharp's Fifth Amendment rights under the United States Constitution if he were
required to comply.

4.    In fulfillment of this request, I have reviewed the documents filed in the Supreme Court of British
      Columbia for *United States Securities and Exchange Commission v. Frederick L. Sharp, et. al,*
      Case No. S-226494, and all additional materials cited in this affidavit.

5.    As detailed below, based upon my experience, Mr. Sharp has criminal exposure in the United States
      and I believe that submitting such a statement would implicate Mr. Sharp's Fifth Amendment rights
      under the U.S. Constitution if he were required to comply.

I.    **Qualifications**

6.    I am an attorney duly admitted to the practice of law in the State of New York and, as noted, a
      partner at the law firm of Arnold & Porter in New York City. I currently serve as global co-chair
      of Arnold & Porter's White Collar Defense & Investigations Practice Group and previously served
      as global co-chair of the firm's Anti-Corruption practice.

7.    In my legal practice, I regularly represent corporate and individual clients in complex criminal and
      civil litigation and investigations, frequently appear in both federal courts and state courts, and have
      argued on numerous occasions before the United States Court of Appeals, state courts, and U.S.
      District Courts, and have represented multiple clients in matters before the SEC.

8.    I regularly publish articles on topics related to U.S. legal issues. I am an editor of PLI's *Deskbook
      on Internal Investigations, Corporate Compliance and White Collar Issues* (2d Ed.), as well as the
      firm's semi-annual *Global Anti-Corruption Insights* newsletter.

9.    During my time at Arnold & Porter, I have been recognized by *Chambers USA* for Litigation:
      White-Collar Crime & Government Investigations (New York) (2013-2023), and *Chambers Global*
      for Corporate Crime & Investigations (Latin America-wide) (2019-2023). I also have been
      recognized by *The Legal 500 US* in, among other areas, International Litigation (2022), Corporate
      Investigations and White-Collar Criminal Defense (Advice to Corporates) (2013-2019, 2021-
      2023), Corporate Investigations and White-Collar Criminal Defense (Advice to Individuals) (2018-
      2019, 2021-2023), Cyber Law (including Data Privacy and Data Protection) (2017-2019), and
      Technology: Data Protection and Privacy (2014-2019).

[3]    This is the 1st Affidavit of Marcus Asner
and was made on October 20, 2023

10.    I serve on the Lawyers Council for New York City's Citizens Crime Commission and previously
served on President Obama's Advisory Council on Wildlife Trafficking.  In addition to being a
member of the New York bar, I am admitted to practice before the United States District Courts
for the Southern District of New York, the Eastern District of New York and the Eastern District
of Michigan, as well the United States Courts of Appeals for the Second and Third Circuits.

11.    Before joining Arnold & Porter, I served as an Assistant United States Attorney for the Southern
District of New York (2000-2009), where I was the Chief of the Major Crimes and Computer
Hacking/Intellectual Property (now known as Complex Frauds) unit for two years, and served in
the Public Corruption unit.   As an Assistant U.S. Attorney, I investigated, prosecuted and
supervised hundreds of U.S. federal criminal cases, including hundreds of matters concerning
complex fraud, corruption and cybercrime, and represented the United States in numerous criminal
trials in the Southern District of New York and in appeals before the U.S. Court of Appeals for the
Second Circuit.

12.    Because of my over 23 years as a practitioner of both criminal and civil litigation, I am well versed
on U.S. litigation and law enforcement practices.

13.    Earlier in my career, I served as a judicial law clerk for the Honorable Walter K. Stapleton of the
U.S. Court of Appeals for the Third Circuit and for the Honorable John Feikens of the U.S. District
Court for the Eastern District of Michigan.  I received a Juris Doctorate from the University of
Michigan Law School in 1992, cum laude; an MS in Mathematics from the University of Michigan
Rackham Graduate School in 1987; and an AB in Physics from the University of Chicago in 1985.

II.        **Factual Assumptions Relied Upon**

14.    In providing the opinions set forth herein, I have been asked by counsel for Mr. Sharp to assume
that the facts and matters described in this section are true.  I have not taken any steps to
independently verify the accuracy of any of these factual assumptions.  I have reviewed the exhibits
identified in this section, but I make no comment regarding the accuracy of any statements
contained in these exhibits.

15.    On August 4, 2021, the United States Attorney's Office for the District of Massachusetts charged
Mr. Sharp in a criminal complaint with one count of securities fraud, in violation of 15 U.S.C. §§
78j(b) and 78ff, and one count of conspiracy to commit securities fraud in violation of 18 U.S.C. §

Case: 24-1770    Document: 00118249067    Page: 419    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 66 of 132

62

[4]  This is the 1st Affidavit of Marcus Asner
and was made on October 20, 2023

371.[1]  Complaint, *United States v. Sharp et al.*, No. 21-07182 (D. Mass. Aug. 4, 2021), ECF No. 3.
With that, the United States filed an Affidavit in Support of Criminal Complaint, attached as
**Exhibit B** to this Affidavit.

16.   On August 11, 2022, the SEC filed a Notice of Application (hereinafter, "*Mareva* App.") in the
Supreme Court of British Columbia seeking "(a) An Order for the Preservation of Assets freezing
the assets of the Defendants including the British Columbia properties . . . ." and "(b) An Order that
each Defendant provide the Plaintiff with a sworn statement disclosing any and all assets held,
wherever situated, including: (i) The nature of each asset; (ii) The value of each asset; (iii) Any
identifying information in regard to the asset; (iv) The exact location of each asset; and (v) Whether
the asset is held in the Defendant's name, the name of another, or jointly with another person."
*Mareva* App. at 1–2.

17.   On March 21, 2023, the court granted the SEC's application for a *Mareva* injunction with respect
to Mr. Sharp's co-defendants in this civil action, Zhiying Yvonne Gasarch, Courtney Kelln, Mike
Veldhuis, Paul Sexton, and Jackson Friesen.  *See United States Securities and Exchange
Commission v. Sharp*, 2023 BCSC 425 (CanLII), dated March 21, 2023 (hereinafter, "Co-Def.
Ruling").

III.   **The Privilege Against Self-Incrimination Provided by the Fifth Amendment to the U.S.
Constitution**

18.   The Fifth Amendment to the U.S. Constitution includes the "Self-Incrimination Clause" which
provides that no person "shall be compelled in any criminal case to be a witness against himself."
U.S. CONST. AMEND. V.  The clause's protection may be invoked in "any proceeding, civil or
criminal, administrative or judicial, investigatory or adjudicatory," if a witness "reasonably
believes that the information sought, or discoverable as a result of his testimony, could be used in
a subsequent state or federal criminal proceeding."  *United States v. Balsys*, 524 U.S. 666, 672
(1998).

19.   The Fifth Amendment right against self-incrimination is applicable "only when the accused is [A]
compelled [B] to make a Testimonial Communication [C] that is incriminating."  *Fisher v. United
States*, 425 U.S. 391, 408 (1976).  Each requirement is discussed in turn as applicable to Mr. Sharp.

---

[1] U.S. statutes referred to in this Affidavit are attached hereto as **Exhibit A**.

[5]    This is the 1st Affidavit of Marcus Asner
and was made on October 20, 2023

**A.    Compelled**

20.    A violation of an individual's privilege against self-incrimination occurs when such evidence is used at trial, as opposed to when a statement was made. *See Chavez v. Martinez*, 538 U.S. 760, 767 (2003). Accordingly, the U.S. Supreme Court has held that, if a witness is granted immunity, she can be compelled to answer questions that may incriminate her, despite having asserted her Fifth Amendment rights. *See Kastigar v. United States*, 406 U.S. 441, 445–462 (1972); *Chavez*, 538 U.S. at 767–768.

21.    Here, Mr. Sharp has not been granted immunity, which makes his case distinguishable from others where testimony has been compelled, despite a witness's attempt to assert his or her rights under the Fifth Amendment. *See infra* Section IV. In the United States, the government must offer the witness use and derivative use immunity in order to receive a witness's constitutionally protected testimony. *Kastigar*, 406 U.S. at 445–462.[2]

22.    Accordingly, if the SEC was seeking the same sworn testimony from Sharp in the United States, the Fifth Amendment would prevent it from getting an order requiring him to affirmatively list his assets, absent an immunity grant. *See* Securities and Exchange Commission, Division of Enforcement, Enforcement Manual, attached as **Exhibit C** to this Affidavit, at 73 ("A witness testifying before the SEC may assert his or her Fifth Amendment privilege against self-incrimination. . . . If a previous grant of immunity, or the expiration of the time limits for criminal prosecution prescribed by the statute of limitations, eliminates the danger of self-incrimination, the witness may not invoke the privilege.").

23.    However, the SEC itself has no power to grant such an immunity. *See* Ex. C at 74 ("[i]f a witness testifying before the SEC asserts [his] Fifth Amendment privilege against self-incrimination, the staff should state on the record that the staff member has no authority to confer immunity"). Rather,

---

[2] Such immunity—otherwise called *Kastigar* immunity—is codified in 18 U.S.C. § 6002. The Court in *Kastigar* established that, to enforce this protection, "[w]hen a witness has been compelled to testify relating to matters for which he is later prosecuted, the government bears 'the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources.'" *See United States v. Allen*, 864 F.3d 63, 91 (2d Cir. 2017) (quoting *Kastigar*, 406 U.S. at 461–62 (1972)).

[6]    This is the 1st Affidavit of Marcus Asner
and was made on October 20, 2023

any such immunity must come from the Department of Justice, via a court order. 18 U.S.C. §§ 6001–6004.[3]

**B.    Testimonial Communication**

24.    The Fifth Amendment privilege prevents the government from compelling an individual to make a testimonial communication. Whether a statement or act, the testimonial communication "must itself, explicitly or implicitly, relate a factual assertion or disclose information" that incriminates. *United States v. Sweets*, 526 F.3d 122, 127 (4th Cir. 2007) (quoting *Doe v. United States*, 487 U.S. 201, 210 (1988)). Mere production of documents can be considered a testimonial communication where the witness must use "the contents of his own mind" to identify the documents. *See United States v. Hubbell*, 530 U.S. 27, 43 (2000).

25.    In its application for a *Mareva* injunction, the SEC seeks an order that Mr. Sharp provide "a sworn statement disclosing any and all assets held, wherever situated, including: (i) The nature of each asset; (ii) The value of each asset; (iii) Any identifying information in regard to the asset; (iv) The exact location of each asset; and (v) Whether the asset is held in the Defendant's name, the name of another, or jointly with another person." *Mareva* App. at 1–2. Such a request, if granted, would compel Sharp to make a testimonial communication.

**C.    Incriminating**

26.    Sworn testimony describing his assets also could incriminate Mr. Sharp for the crimes he has already been criminally charged with and for further criminal charges based on the facts alleged by the SEC and the DOJ.

27.    The United States Attorney's Office for the District of Massachusetts has charged Mr. Sharp in a criminal complaint with one count of conspiracy to commit securities fraud and one count of securities fraud. The affidavit in support of the criminal complaint describes the scheme as a "sophisticated and lucrative" one involving "undisclosed control of the securities of multiple microcap—or 'penny'—stock companies, which securities were sold to unsuspecting investors in Massachusetts and throughout the United States during pump-and-dumps." Ex. B ¶ 3. The Fifth Amendment privilege "not only extends 'to answers that would in themselves support a conviction'"

---

[3] *See also* U.S. Dep't of Just., Just. Manual §§ 9-23.100–9-23.140 (2020) (discussing policy and procedures for seeking a court order to grant a witness immunity when the witness asserts their privilege against self-incrimination under the Fifth Amendment), attached as **Exhibit D** to this Affidavit.

[7]    This is the 1st Affidavit of Marcus Asner
and was made on October 20, 2023

but also "those which would furnish a link in the chain of evidence needed to prosecute the claimant." *Ohio v. Reiner*, 532 U.S. 17, 20 (2001) (quoting *Hoffman v. United States*, 341 U.S. 479, 486 (1951)). It is immaterial "whether such admissions by themselves would support a conviction under a criminal statute." *Blau v. United States*, 340 U.S. 159, 161 (1950).

28.    The DOJ will be able to access investigative files, including asset lists, from the SEC. The DOJ could submit an access request to the SEC, *see* Ex. C at 82–83, or seek the information through a grand jury subpoena. The DOJ may use evidence obtained by the SEC in a subsequent criminal proceeding "unless the defendant demonstrates such use would violate his constitutional rights or depart from proper administration of criminal justice." *United States v. Mahaffy*, 446 F. Supp. 2d 115, 123 (E.D.N.Y. 2006).

### 1.    Crimes For Which Mr. Sharp Has Already Been Charged

29.    The Canadian court previously found that, where the "sole concern" was potential civil liability in the United States, there was "no risk of violation of the rights of the defendants under the Fifth Amendment of the U.S. Constitution as a consequence of evidence being disclosed in a civil proceeding in Canada." Co-Def. Ruling ¶ 39.[4] That reasoning is not applicable here where Mr. Sharp has been charged—criminally—with securities fraud[5] and conspiracy to commit securities fraud.[6]

30.    Accordingly, Mr. Sharp's "sole concern" is not just potential civil liability in the United States. Each criminal charge detailed in the complaint,[7] and how the sworn testimony requested by the SEC could incriminate Sharp, is discussed in turn below:

31.    A person may be criminally charged with securities fraud in the United States under 15 U.S.C. § 78ff for willfully violating multiple provisions of the Securities Exchange Act of 1934, including

---

[4] While the court in Canada is correct that a witness must have criminal exposure in order to assert his or her Fifth Amendment right against self-incrimination, that does not mean that the witness needs to be formally charged before asserting his or her Fifth Amendment right. Accordingly, while the fact that Mr. Sharp has been charged makes it plain that he does have criminal exposure in the United States, depending on the facts, a witness still could have criminal exposure even if he or she has not yet been formally charged. *See e.g., Ohio v. Reiner*, 532 U.S. at 20; *Blau*, 340 U.S. at 161.

[5] In violation of 15 U.S.C. §§ 78j(b) and 78ff.

[6] In violation of 18 U.S.C. § 371.

[7] While I focus in this affidavit on the charges listed, Mr. Sharp's potential criminal exposure is not necessarily limited to the specific charges listed in the criminal complaint. As explained in footnote 4 above, depending on the specific facts, a witness may have criminal exposure even if he or she has not been formally charged.

[8]    This is the 1st Affidavit of Marcus Asner
and was made on October 20, 2023

15 U.S.C § 78j(b) (more colloquially known as Section 10(b)). Section 10(b) makes it unlawful
to:

> directly or indirectly, by the use of any means or instrumentality of interstate
> commerce or of the mails, or of any facility of any national securities
> exchange— . . . To use or employ, in connection with the purchase or sale of
> any security registered on a national securities exchange or any security not so
> registered, or any securities-based swap agreement any manipulative or
> deceptive device or contrivance in contravention of such rules and regulations
> as the Commission may prescribe as necessary or appropriate in the public
> interest or for the protection of investors.

32.    Accordingly, as described in the affidavit in support of criminal complaint, the details of Mr.
Sharp's assets requested by the SEC could incriminate him for securities fraud, which the
government alleges was executed by selling securities in a pump-and-dump scheme throughout the
United States.  Ex. B ¶ 3.

33.    Sworn testimony of Sharp's assets could be particularly incriminating given the type of securities
fraud alleged.  Typically in a pump-and-dump scheme, "insiders inflate demand for a stock by
disseminating laudatory information about a company—information that is usually false" and "[i]f
the market reacts favorably, the insiders cash in their shares before the market readjusts and the
share price collapses." *United States v. Weed*, 873 F.3d 68, 70 n.1 (1st Cir. 2017) (quoting *Garvey
v. Arkoosh*, 354 F. Supp. 2d, 73, 76 n.4 (D. Mass. 2005)).  Such disclosure of asset information as
requested by the SEC could incriminate Sharp by revealing what the DOJ alleges as "large portions
of stock in several microcap companies that netted, at a minimum, tens of millions of dollars in
illicit proceeds." Ex. B ¶ 23.  Descriptions of "any identifying information in regard to the asset"
and "the nature of each asset" as demanded by the SEC could also incriminate Sharp by confirming
or revealing additional issuers of securities that may have been part of the alleged scheme.
According to charging documents, securities allegedly involved include PureSnax International,
Inc. (PSNX), *see* Ex. B ¶¶ 54–65; Garmatex Holdings, Ltd. (GRMX), *id.* ¶¶ 66–79; OneLife
Technologies Corp. (OLMM), *id.* ¶¶ 80–91; and Vitality BioPharma, Inc. (VBIO), *id.* ¶¶ 92–106,
compelled testimony could confirm these and/or reveal more.

34.    Mr. Sharp also has been charged with conspiracy to commit securities fraud in violation of 18
U.S.C. § 371.  To be held criminally liable for such a conspiracy, the government needs to prove
that "two or more persons conspire[d] either to commit any offense against the United States, or to
defraud the United States, or any agency thereof in any manner or for any purpose, and one or more
of such persons do any act to effect the object of the conspiracy." 18 U.S.C. § 371.

[9]  This is the 1st Affidavit of Marcus Asner
and was made on October 20, 2023

35.    The sworn testimony sought by the SEC, especially a description as to "whether the asset is held
in the Defendant's name, the name of another, or jointly with another person," *Mareva* App. at 1–
2, may incriminate Mr. Sharp by revealing the identities of individuals that the government may
deem to be co-conspirators.

2.    **Crimes For Which Mr. Sharp *Could* be Charged**

36.    Though sworn testimony describing his assets are sufficiently incriminating as pertaining to crimes
with which Sharp has already been charged, the testimony sought by the SEC also could
"reasonably furnish a link in the chain of evidence" for crimes Sharp has not yet been charged with.
*See Ohio v. Reiner*, 532 U.S. at 19.

37.    Because the SEC seeks to compel Mr. Sharp's testimony disclosing "(i) The nature of each asset;
(ii) The value of each asset; (iii) Any identifying information in regard to the asset; (iv) The exact
location of each asset; and (v) Whether the asset is held in the Defendant's name, the name of
another, or jointly with another person," *see Mareva* App. at 1–2, Mr. Sharp could incriminate
himself under additional criminal statutes which may include mail and/or wire fraud, money
laundering, and even crimes under state law.

38.    To be held criminally liable for mail or wire fraud, the government must prove (i) a scheme to
defraud (which implicitly includes a material false representation and the intent to defraud) and (ii)
the defendant's use of the mail; or interstate wire, radio or television communication in furtherance
of the scheme. *See* 18 U.S.C. §§ 1341 and 1343. The information sought by the SEC here could
incriminate Mr. Sharp where the second element can be evidenced by mere use of the mail or wires
by a third party, so long as it was "reasonably foreseeable." *See United States v. Fermin Castillo*,
829 F.2d 1194, 1198 (1st Cir. 1987) ("a defendant's failure personally to telegraph, mail, or
telephone information made no difference where use of the mails or wires by third parties 'would
foreseeably follow in the ordinary course of business'") (quoting *United States v. Benmuhar*, 658
F.2d 14, 16–17 (1st Cir. 1981)). Even minimal sworn testimony regarding Mr. Sharp's assets could
incriminate him by showing use of mail or a wire based on the nature and/or location of the asset.

39.    Moreover, sections 1956 and 1957 of the Money Laundering Control Act describe federal money
laundering offenses. *See* Money Laundering Control Act, 18 U.S.C. §§ 1956–57.

40.    Section 1956 prohibits acts and transactions involving "proceeds" from "specified unlawful
activity," while section 1957 prohibits knowingly engaging in "monetary transaction[s]" that

[10]    This is the 1st Affidavit of Marcus Asner
and was made on October 20, 2023

involve "criminally derived property." *Id.* Of note, section 1956 contains three distinct money
laundering offenses, two of which can be furnished by evidence provided by Mr. Sharp's
compliance with the SEC's request.[8]

41.   Section 1957 also prohibits monetary transactions in criminally derived property in an amount
greater than $10,000. *See United States v. Rivera-Izquierdo,* 850 F.3d 38, 40–49 (1st Cir. 2017)
(affirming § 1957 conviction where cars were purchased with money derived from specified
unlawful activity, namely, gambling winnings that were sourced from the funds of a fraudulent
scheme). Sworn testimony describing assets of Mr. Sharp could inherently incriminate him under
a myriad of money laundering charges especially where liability is premised on the mere *use* of
criminally obtained money.

42.   The sworn testimony requested by the SEC could incriminate Mr. Sharp for crimes prohibited by
state laws as well.[9]  *See United States v. Acevedo-Hernandez,* 898 F.3d 150, 169 (1st Cir. 2018)
(affirming trial court decision to uphold witness' privilege where "[witness] could be exposing
himself to the filing of not only possible Federal charges but possible State charges and other
charges by any other entity").

43.   Thus, Mr. Sharp risks incriminating himself if he provides sworn testimony describing his assets
in accordance with the *Mareva* injunction.

**IV.    The Facts Related to Mr. Sharp Are Distinguishable From *United States v. Allen***

44.   Mr. Sharp's case is inapposite to *United States v. Allen,* where the Second Circuit was presented
with the question of "whether testimony given by an individual involuntarily under the legal
compulsion of a foreign power may be used against that individual in a criminal case in an
American court." 864 F.3d 63, 66–67 (2d Cir. 2017). In *Allen,* defendants were compelled to

---

[8] Section 1956(a)(1) prohibits one from "conducting a financial transaction with one of the following criminal intents:
(i) 'the intent to promote the carrying on of specified unlawful activity'; or (ii) the intent to commit tax evasion or tax
fraud; or (iii) knowledge that the transaction was 'designed in whole or in part' to 'conceal or disguise the nature, the
location, the source, the ownership, or the control of the proceeds of specified unlawful activity'; or (iv) knowledge
that the transaction was 'designed in whole or in part' to 'avoid a transaction reporting requirement under State or
Federal law.'" *See* Money Laundering and Financial Institutions, Chap. 14 § 14:1.2, *Deskbook on Internal
Investigations, Corporate Compliance, and White Collar Issues* (2d ed. 2022), attached as **Exhibit E** to this Affidavit.
Section 1956(a)(2) prohibits "transporting, transmitting, or transferring monetary instruments or funds into or out of
the United States with one of the requisite intents described in section 1956(a)(1) other than the intent to commit tax
fraud or evasion." *Id.*

[9] For instance, the state of Massachusetts, among other states in which Sharp could also face charges, has its own laws
related to the white collar crimes discussed in Section III.C. *See generally,* Mass. Gen. Laws Ann., Part IV.

[11]   This is the 1st Affidavit of Marcus Asner and was made on October 20, 2023

testify by the U.K. Financial Conduct Authority and given "direct use" but not "derivative use" immunity which is sufficient under U.K. law, but not U.S. law. *See supra* Section III.A (explaining *Kastigar* immunity). The court in *Allen* found that "the Fifth Amendment's prohibition on the use of compelled testimony in American criminal proceedings applies even when a foreign sovereign has compelled the testimony." *Allen*, 864 F.3d at 101.

45.    But here, the *United States Securities and Exchange Commission* (not a foreign government) is seeking to compel sworn testimony from Mr. Sharp, even though he has not received immunity from the U.S. Department of Justice or a U.S. court. As the SEC's own Enforcement Manual makes plain, a witness testifying before the SEC in the United States has a right to "assert his or her Fifth Amendment privilege against self-incrimination." *See supra* Section III.A; Ex. C at 73–74. My legal research found no binding authority permitting the SEC to circumvent a witness's Constitutional right against self-incrimination by invoking the authority of a foreign court (in this case, a Canadian court) to compel the witness to provide testimony that the SEC would be unable to obtain in the United States.

## V.    Conclusion

46.    Unless Mr. Sharp is granted immunity, U.S. prosecutors would be able to use evidence obtained by the SEC through the Canadian action in a U.S. state or federal criminal investigation and prosecution.

47.    Ultimately, Mr. Sharp risks incriminating himself if he provides sworn testimony describing his assets in accordance with the SEC's application for a *Mareva* injunction.

[12]   This is the 1st Affidavit of Marcus Asner
and was made on October 20, 2023

48.   I swear this Affidavit for use in this civil action and for no other purpose.

AFFIRMED BEFORE ME at

the City of New York        )

State of New York           )

this 20th day of October, 2023.    )

                                    )

                                    )

                                    )

A Commissioner for taking Affidavits    )

in New York County          )

PAUL J. SOMELOFSKE
Notary Public, State of New York
No. 02SO6138877
Qualified in New York County
Commission Expires Nov. 14, 2006
25

MARCUS ASNER

A1667

The attached is **Exhibit "C1"** referred
to in the 1st Affidavit of James R. Drabick, affirmed
before me on this 17 day of November, 2023

_____
Notary Public

Case: 24-1770    Document: 00118249067    Page: 429    Date Filed: 02/18/2025    Entry ID: 6700951

Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 76 of 132

Amendment V. Grand Jury Indictment for Capital Crimes;..., USCA CONST Amend. V

72

United States Code Annotated
   Constitution of the United States
     Annotated
       Amendment V. Grand Jury; Double Jeopardy; Self-Incrimination; Due Process; Takings

U.S.C.A. Const. Amend. V

Amendment V. Grand Jury Indictment for Capital Crimes; Double Jeopardy;
Self-Incrimination; Due Process of Law; Takings without Just Compensation

Currentness

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

<Historical notes and references are included in the full text document for this amendment.>

<For Notes of Decisions, see separate documents for clauses of this amendment:>

<USCA Const. Amend. V--Grand Jury clause>

<USCA Const. Amend. V--Double Jeopardy clause>

<USCA Const. Amend. V--Self-Incrimination clause>

<USCA Const. Amend. V-- Due Process clause>

<USCA Const. Amend. V--Takings clause>

U.S.C.A. Const. Amend. V, USCA CONST Amend. V
Current through P.L. 118-19. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works

A1669

The attached is **Exhibit "C2"** referred
to in the 1st Affidavit of James R. Drabick, affirmed
before me on this 1? day of November, 2023

_____
Notary Public

U.S. v. ALLEN                                    63
Cite as 864 F.3d 63 (2nd Cir. 2017)

Matter of Wu does not alleviate our uncertainty about the BIA's views on Massachusetts law on recklessness. Simply put, we are left with too many questions about the BIA's thinking on the mental state required for a Massachusetts reckless ABDW conviction and cannot proceed with reviewing the BIA's CIMT determination before those questions are resolved.[3]

Accordingly, we remand so that the BIA can consider the following three issues: First, what is the effect, if any, of Matter of Wu on the outcome that Massachusetts ABDW is categorically a CIMT? Second, how does Welansky's prescription—that a defendant "so stupid or so heedless that ... he did not realize" the risk posed by his conduct can nonetheless be deemed to have acted recklessly, so long as "an ordinary normal man under the same circumstances would have realized" the risk—impact the BIA's analysis of the moral depravity of Massachusetts reckless ABDW? 55 N.E.2d at 910 (alterations omitted). Finally, was Coelho convicted of intentional or reckless ABDW?[4]

III.

We vacate the BIA's September 7, 2016 opinion, the effect of which was to render Coelho ineligible for cancellation of removal, and remand for further proceedings consistent with our opinion.



---

3.  We acknowledge how much Coelho's removal proceedings have been prolonged. After all, his ABDW conviction occurred more than two decades ago, removal proceedings were instituted seven years ago, the IJ ruled against him five years ago, and proceedings in this court started almost four years ago. Much of that delay, however, was occasioned by the government, which sought two remands to the BIA prior to the instant petition.

UNITED STATES of America,
Appellee,

v.

Anthony ALLEN and Anthony Conti,
Defendants–Appellants.*

Nos. 16-898-cr (Lead)
16-939-cr (con)
AUGUST TERM 2016

United States Court of Appeals,
Second Circuit.

ARGUED: JANUARY 26, 2017

DECIDED: JULY 19, 2017

**Background:** In prosecution for wire fraud and conspiracy to commit wire fraud and bank fraud, defendants moved to dismiss superseding indictment or to suppress government cooperator's testimony. The United States District Court for the Southern District of New York, Jed S. Rakoff, J., 160 F.Supp.3d 684, denied motion. Defendants were subsequently convicted of all charges and appealed.

**Holdings:** The Court of Appeals, José A. Cabranes, Circuit Judge, held that:

(1) Fifth Amendment's prohibition on the use of compelled testimony in criminal proceedings applies even when a foreign sovereign has compelled the testimony;

(2) witness's conclusory denials of taint were insufficient to sustain prosecu-

---

4.  We include this final question because the BIA's answer may obviate the need for us to address whether Massachusetts reckless ABDW is categorically a CIMT once this case returns to us.

*  The Clerk of Court is respectfully directed to amend the caption as set forth above.

**64**          864 FEDERAL REPORTER, 3d SERIES

tion's burden of proving his testimony was not derived from or motivated by defendants' compelled testimony;

(3) use of defendants' compelled testimony violated Fifth Amendment; and

(4) use of defendants' compelled testimony was not harmless.

Reversed.

**1. Criminal Law ⟨⟩42.4**

If a witness is compelled to testify, he must be granted use and derivative use immunity. U.S. Const. Amend. 5.

**2. Criminal Law ⟨⟩42.4, 42.6**
**Witnesses ⟨⟩304(1)**

Government may compel testimony from an unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring on the witness immunity from use of the compelled testimony in subsequent criminal proceedings, as well as immunity from use of evidence derived from the testimony. U.S. Const. Amend. 5; 18 U.S.C.A. § 6002.

**3. Criminal Law ⟨⟩42.3(3)**

While statements made by a would–be cooperator at a proffer session are granted use immunity, they are not granted derivative use immunity, which means that the statements can be used by the Government to develop further information that could be used against the defendant in the event that the case does go to trial.

**4. Witnesses ⟨⟩306**

Freedom from self–incrimination guaranteed by the Fifth Amendment is a personal trial right of the accused in any criminal case. U.S. Const. Amend. 5.

**5. Criminal Law ⟨⟩393(1)**

A violation of the Fifth Amendment's right against self–incrimination occurs only when a compelled statement is offered at trial against the defendant. U.S. Const. Amend. 5.

**6. Witnesses ⟨⟩300**

Whatever may occur prior to trial, the Fifth Amendment right not to testify against oneself at trial is absolute. U.S. Const. Amend. 5.

**7. Criminal Law ⟨⟩656(7), 2130**

A negative comment by a judge or prosecutor on a defendant's silence violates that defendant's Fifth Amendment right to be free from self-incrimination. U.S. Const. Amend. 5.

**8. Criminal Law ⟨⟩392.5(1), 392.6**

Fourth Amendment's exclusionary rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved. U.S. Const. Amend. 4.

**9. Criminal Law ⟨⟩411.3**

Exclusionary rule buttressing *Miranda* warnings is a judicially created remedy primarily designed to prevent United States police officers from relying upon improper interrogation techniques.

**10. Criminal Law ⟨⟩411.68**

Court of Appeals does not apply the strictures of Fourth Amendment and *Miranda* jurisprudence to foreign authorities, as exclusionary rules under such jurisprudence have little, if any, deterrent effect upon foreign police officers. U.S. Const. Amend. 4.

**11. Criminal Law ⟨⟩410.76, 411.68**

Fifth Amendment's prohibition on the use of compelled testimony in American criminal proceedings applies even when a foreign sovereign has compelled the testimony pursuant to foreign legal process in a manner that does not shock the con-

U.S. v. ALLEN    65
Cite as 864 F.3d 63 (2nd Cir. 2017)

science or violate fundamental fairness. U.S. Const. Amend. 5.

**12. Searches and Seizures ⬩23**

Fourth Amendment prohibits unreasonable searches and seizures whether or not the evidence is sought to be used in a criminal trial, such that a violation of the Amendment is fully accomplished at the time of an unreasonable governmental intrusion. U.S. Const. Amend. 4.

**13. Criminal Law ⬩393(1)**

A violation of the Fifth Amendment's self-incrimination clause occurs only at trial, even if conduct by law enforcement officials prior to trial may ultimately impair that right. U.S. Const. Amend. 5.

**14. Criminal Law ⬩393(1)**

Only sovereign power exposes those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt. U.S. Const. Amend. 5.

**15. Criminal Law ⬩393(1)**

To the extent there may be an "official/private action spectrum," when foreign authorities compel testimony they are acting in the quintessence of their sovereign authority, not in their capacity as a mere employer, and thus their compulsion is cognizable by the Fifth Amendment when testimony so compelled is used in an American criminal trial. U.S. Const. Amend. 5.

**16. Criminal Law ⬩393(1)**

Where a prosecuting sovereign is bound by the Fifth Amendment, the "same–sovereign" principle, under which the Fifth Amendment protections apply only if the same sovereign both compelled and used the testimony, no longer has force. U.S. Const. Amend. 5.

**17. Criminal Law ⬩42.3(3)**

Statutory use and derivative use protection bars use of compelled testimony, as

well as evidence derived directly and indirectly therefrom, and it prohibits the prosecutorial authorities from using the compelled testimony in any respect, therefore insuring that the testimony cannot lead to the infliction of criminal penalties on the witness. 18 U.S.C.A. § 6002.

**18. Criminal Law ⬩42.7(2)**

When a witness has been compelled to testify relating to matters for which he is later prosecuted, the government bears the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources; this burden is not limited to a negation of taint, but, rather, imposes on the prosecution the affirmative duty to prove, by the preponderance of the evidence, that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony. 18 U.S.C.A. § 6002.

**19. Criminal Law ⬩1139**

Court of Appeals reviews de novo whether the legal standard applied by a district court was in error.

**20. Criminal Law ⬩42.6**

Typically, the prosecution can meet its burden of proving witnesses' testimony was not derived from or motivated by compelled testimony by memorializing the witness's testimony prior to his or her exposure to the compelled testimony. U.S. Const. Amend. 5.

**21. Criminal Law ⬩42.7(2)**

Witness's conclusory denials of taint during *Kastigar* hearing in defendants' prosecution for wire fraud and conspiracy to commit wire fraud and bank fraud were insufficient to sustain prosecution's burden of proving that witness's testimony was not derived from or motivated by defendants' compelled testimony, in the face of

**66**    **864 FEDERAL REPORTER, 3d SERIES**

witness's materially inconsistent pre–exposure testimony. U.S. Const. Amend. 5.

**22. Criminal Law ⊜393(1)**

Use of defendants' testimony, which was compelled during course of foreign legal process, before petit and grand jury in prosecution for wire fraud and conspiracy to commit wire fraud and bank fraud violated Fifth Amendment. U.S. Const. Amend. 5.

**23. Criminal Law ⊜1170.5(1)**

Even where a prosecution runs afoul of *Kastigar*'s strict standards, Court of Appeals will not vacate or reverse a conviction where the error was harmless.

**24. Criminal Law ⊜1170.5(1)**

When evidence tainted by exposure to compelled testimony is presented at trial, Court of Appeals will deem the error harmless if it is persuaded beyond a reasonable doubt that the jury would have reached the same verdict even without consideration of the tainted evidence. U.S. Const. Amend. 5.

**25. Criminal Law ⊜1170.5(1)**

Government's use of testimony by witness who was exposed to defendants' compelled testimony, before petit and grand jury in prosecution for wire fraud and conspiracy to commit wire fraud and bank fraud, was not harmless beyond a reasonable doubt, and required dismissal of indictments, where witness was unique source of particularly significant and incriminating evidence against defendants at trial, and Government failed to prove beyond a reasonable doubt that grand jury would have indicted defendants absent witness's tainted testimony. U.S. Const. Amend. 5.

**26. Indictment    and    Information    ⊜144.1(2)**

If the government has presented immunized testimony to the grand jury, the indictment should be dismissed unless the government establishes that the grand jury would have indicted even absent that testimony; exploration of the question of taint can be made by review of the prosecution's evidence and of the grand jury transcript. U.S. Const. Amend. 5.

**27. Criminal Law ⊜1163(1)**

If defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any constitutional errors that may have occurred are subject to harmless–error analysis.

———————

On Appeal from the United States District Court for the Southern District of New York

MICHAEL S. SCHACHTER (Casey E. Donnelly, on the brief), Willkie Farr & Gallagher LLP, New York, NY, for Defendant–Appellant Anthony Allen.

Aaron Williamson, Tor Ekeland, P.C., Brooklyn, NY, for Defendant–Appellant Anthony Conti.

JOHN M. PELLETTIERI (Leslie R. Caldwell, Assistant Attorney General; Andrew Weissman, Carol Sipperly, Brian R. Young, Sung–Hee Suh, and Michael T. Koenig, Fraud Section, on the brief), Criminal Division, United States Department of Justice, Washington, D.C., for Appellee.

Before: CABRANES, POOLER, and LYNCH, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

This case—the first criminal appeal related to the London Interbank Offered Rate ("LIBOR") to reach this (or any) Court of Appeals—presents the question, among others, whether testimony given by an individual involuntarily under the legal compulsion of a foreign power may be used

against that individual in a criminal case in an American court. As employees in the London office of Coöperatieve Centrale Raiffeisen–Boerenleenbank B.A. ("Rabobank") in the 2000s, defendants–appellants Anthony Allen and Anthony Conti ("Defendants") played roles in that bank's LIBOR submission process during the now-well-documented heyday of the rate's manipulation.[1] Allen and Conti were, for unrelated reasons, no longer employed at Rabobank by 2008 and 2009, respectively. By 2013, they were among the persons being inves-

tigated by enforcement agencies in the United Kingdom ("U.K.") and the United States for their roles in setting LIBOR.

**[1, 2]** The U.K. enforcement agency, the Financial Conduct Authority ("FCA"),[2] interviewed Allen and Conti (each a U.K. citizen and resident) that year, along with several of their coworkers. At these interviews, Allen and Conti were compelled to testify and given "direct use"—but not "derivative use"—immunity.[3] In accordance with U.K. law, refusal to testify

1. Problems with LIBOR were noted at least as early as a decade ago. "Beginning in 2007, regulators and market observers noted that LIBOR had failed to behave in line with expectations given other market prices and rates." David Hou & David Skeie, *LIBOR: Origins, Economics, Crisis, Scandal, and Reform*, Federal Reserve Bank of New York Staff Report No. 667, at 1 (Mar. 2014); *see* Michael S. Derby, *Fed Aware of Libor Problems in Fall 2007*, Wall St. J. (July 13, 2012), https://www.wsj.com/articles/SB10001424052702303919504577 524830226504326; Andy Verity, *Libor: Bank of England Implicated in Secret Recording*, BBC (Apr. 10, 2017), http://www.bbc.com/news/business-39548313 ("The 2008 recording adds to evidence the central bank repeatedly pressured commercial banks during the financial crisis to push their Libor rates down .... The Bank of England said Libor was not regulated in the UK at the time.").
   Concerns with LIBOR were also publicly reported. *See* Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, Wall St. J. (May 29, 2008), https://www.wsj.com/articles/SB121200703762027135; Carrick Mollenkamp, *Bankers Cast Doubt on Key Rate Amid Crisis*, Wall St. J. (Apr. 16, 2008), https://www.wsj.com/articles/SB12083116416 7818299.
   These reports were eventually followed by criminal and regulatory probes by domestic and international enforcement agencies into banks' LIBOR submissions. *See* Carrick Mollenkamp & David Enrich, *Banks Probed in Libor Manipulation Case*, Wall St. J. (Mar. 16, 2011), https://www.wsj.com/articles/SB1000142405274870466260457620240722598060 (stating in March 2011 that the "probe began about a year ago with infor-

mal inquiries"). As of February 2, 2017, the DOJ has entered into criminal resolutions with six banks: "Barclays, UBS AG, Royal Bank of Scotland, Rabobank, Lloyds Bank, and Deutsche Bank." Gov't Ltr., Docket No. 94, at 1 & n.1. Each of these agreements includes a "Statement of Facts," in which each bank has admitted to its misconduct with respect to LIBOR. The U.K. has also reached resolutions with these banks.

2. The FCA replaced the U.K.'s Financial Services Authority ("FSA") in April 2013. Because the distinction is irrelevant for purposes of this opinion, we refer to both entities simply as the "FCA."

3. The difference between direct use and derivative use immunity is substantial. *See United States v. Plummer*, 941 F.2d 799, 803 (9th Cir. 1991) ("If the government granted [the witness/defendant] use and derivative use immunity, it would be required to have derived all the information on which the subsequent prosecution was based from a source wholly independent of the statements made in the interview. In contrast, if the government granted only direct use immunity, it would not be able to use the interview statements directly against [the witness/defendant] in a subsequent prosecution, but would be allowed to use information derived from the statements." (citations omitted)).
   Under American constitutional law, if a witness is compelled to testify, he must be granted use and derivative use immunity. *See Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Pursuant to 18 U.S.C. §§ 6002–05, "the United States Government may compel testimony from an

**68**          **864 FEDERAL REPORTER, 3d SERIES**

could result in imprisonment. The FCA subsequently decided to initiate an enforcement action against one of Defendants' coworkers, Paul Robson, and, following its normal procedures, the FCA disclosed to Robson the relevant evidence against him, including the compelled testimony of Allen and Conti. Robson closely reviewed that testimony, annotating it and taking several pages of handwritten notes.

For reasons not apparent in the record, the FCA shortly thereafter dropped its case against Robson, and the Fraud Section of the United States Department of Justice (the "DOJ") promptly took it up.[4] Robson soon pleaded guilty and became an important cooperator, substantially assisting the DOJ with developing its case. Ultimately, Robson was the sole source of certain material information supplied to the grand jury that indicted Allen and Conti and, after being called as a trial witness by the Government, Robson provided significant testimony to the petit jury that convicted Defendants.

In October 2014, a grand jury returned an indictment charging Defendants with

one count of conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349, as well as several counts of wire fraud, in violation 18 U.S.C. § 1343.[5] Following a trial held in October 2015 in the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*), a jury convicted on all counts. The District Court sentenced Allen principally to two years' imprisonment and Conti to a year-and-a-day's imprisonment.[6] Agreeing that Defendants had raised a "substantial issue" for appeal, the District Court granted bail pending appeal.[7]

In their appeal, Allen and Conti challenge their convictions on several grounds. We address only their Fifth Amendment challenge, however, and conclude as follows.

First, the Fifth Amendment's prohibition on the use of compelled testimony in American criminal proceedings applies even when a foreign sovereign has compelled the testimony.

Second, when the government makes use of a witness who has had substantial

---

unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring on the witness immunity from use of the compelled testimony in subsequent criminal proceedings, *as well as immunity from use of evidence derived from the testimony.*" *Id.* at 442, 92 S.Ct. 1653 (emphasis added).

**4.** In connection with its investigations into LIBOR manipulation, the Government submits that it has charged more than a dozen individuals (including Allen and Conti) with criminal conduct. Gov't Ltr., Docket No. 94, at 1–2. Only Allen and Conti have gone to trial in the United States, but two other individuals have pleaded not guilty and proceedings against them remain pending. *Id.* at 2. Charges were dismissed against four defendants, six defendants pleaded guilty and there are additionally two fugitives. *Id.* The Government further submits that the "United Kingdom has to date charged 19 individuals with

LIBOR–related crimes and is seeking to extradite four additional individuals for prosecution. One individual was convicted upon pleading guilty and four were convicted after trial. Six individuals were acquitted after trial. Cases against the others remain pending." *Id.*

**5.** *See* Joint Appendix ("JA") 41–76. Ultimately, pursuant to a superseding indictment returned on June 23, 2015, Allen was charged with eighteen counts of wire fraud, and Conti was charged with eight counts of wire fraud. *See* JA 77–112.

**6.** The District Court imposed mandatory special assessments of $1,900 for Allen and $900 for Conti but did not impose any supervised release or any fine on either Defendant. Special Appendix ("SPA") 68–71, 74–77.

**7.** JA 714 ("[T]he *Kastigar* issue is not without some appellate interest.").

Case: 24-1770  Document: 00118249067  Page: 437  Date Filed: 02/18/2025  Entry ID: 6700951

Case 1:21-cv-11276-WGY  Document 423-1  Filed 12/05/23  Page 84 of 132

80

exposure to defendant's compelled testimony, it is required under *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), to prove, at a minimum, that the witness's review of the compelled testimony did not shape, alter, or affect the evidence used by the government.

Third, a bare, generalized denial of taint from a witness who has materially altered his or her testimony after being substantially exposed to a defendant's compelled testimony is insufficient as a matter of law to sustain the prosecution's burden of proof.

Fourth, in this prosecution, Defendants' compelled testimony was "used" against them, and this impermissible use before the petit and grand juries was not harmless beyond a reasonable doubt.

Accordingly, we **REVERSE** the judgments of conviction and hereby **DISMISS** the indictment.

**8.** Because Allen and Conti "appeal from judgments of conviction entered after a jury trial, we draw the facts from the evidence presented at trial, viewed in the light most favorable to the government." *United States v. Vilar*, 729 F.3d 62, 68 n.2 (2d Cir. 2013).

**9.** *See, e.g.,* Gavin Finch & Liam Vaughan, *The Man Who Invented the World's Most Important Number*, Bloomberg Markets (Nov. 29, 2016), https://www.bloomberg.com/news/features/2016–11–29/the-man-who-invented–libor–iw3fpmed; Liam Vaughan & Gavin Finch, *Libor Scandal: The Bankers Who Fixed the World's Most Important Number*, Guardian (Jan. 18, 2017), https://www.theguardian.com/business/2017/jan/18/libor-scandal-the-bankers-who-fixed-the-worlds-most-important-number; Juliet Samuel & Chiara Albanese, *No Fix for Libor: Benchmark Still Broken, Regulators Say*, Wall St. J. (July 7, 2015) https://www.wsj.com/articles/libor-reform-has-not-gone-far-enough-says-regulator-1436199584 (stating LIBOR is "known as 'the world's most important number' ").

## I. BACKGROUND [8]

### A. LIBOR

Some journalists and bankers have called LIBOR the world's most important number.[9] It is a "benchmark" and "reference" interest rate meant to reflect the available borrowing rates on any given day in the "interbank market"—in which banks borrow money from other banks. The so-called LIBOR fixed rates, as published daily, are regularly incorporated into the terms of financial transactions entered into across the globe, and the overall value of these LIBOR–tied transactions reaches (measured in U.S. dollars) into the hundreds of trillions.[10]

Throughout the time period relevant to this case, LIBOR rates were administered by a private trade group, the British Bankers' Association ("BBA"). As summarized by a New York Federal Reserve staff report:

**10.** According to a New York Federal Reserve staff report:

> LIBOR serves two primary purposes in modern markets: as a reference rate and as a benchmark rate. A reference rate is a rate that financial instruments can contract upon to establish the terms of agreement. A benchmark rate reflects a relative performance measure, oftentimes for investment returns or funding costs. LIBOR serves as the primary reference rate for short–term floating rate financial contracts like swaps and futures. At its peak, estimates placed the value of such contracts at upwards of $300 trillion. Variable rate loans, primarily adjustable rate mortgages [ ] and private student loans, are also often tied to LIBOR. As a benchmark rate, it is also an indicator of the health of financial markets. The spreads between LIBOR and other benchmark rates can signal changing tides in the broad financial environment.

> Hou & Skeie, note 1, *ante*, at 2–3 (citation and footnote omitted).

LIBOR's origination has been credited to a Greek banker by the name of Minos Zombanakis, who in 1969 arranged an $80 million syndicated loan from Manufacturer's Hanover to the Shah of Iran based on the reported funding costs of a set of reference banks. In addition to providing loans at rates tied to LIBOR, banks whose submissions determined the fixing had also begun to borrow heavily using LIBOR–based contracts by the mid–1980s, creating an incentive to underreport funding costs. As a result, the [BBA] took control of the rate in 1986 to formalize the data collection and governance process. In that year, LIBOR fixings were calculated for the U.S. dollar, the British pound, and the Japanese yen. Over time, the inclusion of additional currencies and integration of existing ones into the euro left the BBA with oversight of fixings over ten currencies as of 2012.[11]

During that period of time, there was no direct governmental regulation of LIBOR submissions.[12]

For each of the world's major currencies, the BBA assembled a panel of banks—typically established institutions that were active in the interbank market in that currency and had a large presence in London. The LIBOR panels for the U.S. Dollar ("USD") and Japanese Yen ("JPY") consisted of 16 banks, including Rabobank, a Dutch bank.[13] As explained below, these panel banks submitted the figures that the BBA used to calculate a currency's official LIBOR rates.

According to the LIBOR "definition" on the BBA's website during the relevant time period, each panel bank, every day at around 11 a.m. London time, was to "contribute the rate at which it could borrow funds, were it to do so by asking for and

**11.** *Id.* at 1 (citation omitted). According to a *Wall Street Journal* report in 2007:

> The Libor became popular because in the 1980s the world needed a short-term rate on which to benchmark the costs for loans between banks. At the time, the interest rates banks charged other banks and big companies lacked a universally accepted basis. British bankers' stab at one took hold faster than others, and it is now a benchmark for many globally traded debt securities.

Ian McDonald & Alistair MacDonald, *Why Libor Defies Gravity: Divergence of a Key Global Rate Points to Strain*, Wall St. J. (Sept. 5, 2007), https://www.wsj.com/articles/SB 118891774435316875.

**12.** In 2012, Martin Wheatley, who was then managing director of the FSA and slated to become the first Chief Executive of the soon-to-be-established FCA, conducted a review of potential reforms to LIBOR (the "Wheatley Review"). This review culminated in the issuance of a final report. *See The Wheatley Review of LIBOR: Final Report* (the "Wheatley Report") (Sept. 2012), https://www.gov.uk/government/uploads/system/uploads/

attachment_data/file/191762/wheatley_review_libor_finalreport_280912.pdf. That report recommended "comprehensive reform of LIBOR," *id.* at 7–8, noting, among other things, that "there is no directly applicable specific regulatory regime covering [LIBOR submissions]," *id.* at 11. In April 2013, several reforms were enacted, including "statutory regulation of the administration of, and submission to, LIBOR; an Approved Persons regime; and both civil and criminal enforcement." ICE Benchmark Administration, *Roadmap for ICE LIBOR* (Mar. 18, 2016), https://www.theice.com/publicdocs/ICE_LIBOR_Roadmap0316.pdf. In February 2014, ICE Benchmark Administration replaced the BBA as the administrator of LIBOR, now known as "ICE LIBOR." *Id.*

**13.** Rabobank is a "co-operative owned bank, which is the Netherlands' biggest lender," and "which was formed [over a century ago] to serve Dutch farmers and later branched into international and investment banking." Laura Noonan & Pan Kwan Yuk, *Rabobank To Cut 9,000 More Jobs and Shrink Balance Sheet*, Financial Times (Dec. 9, 2015), https://www.ft.com/content/38a8afea-9e9f-11e5-b45 d-4812f209f861.

then accepting inter-bank offers in reasonable market size just prior to 1100."[14] Each panel bank typically designated a particular employee to be principally responsible for submitting that bank's LIBOR contributions generally or for a particular currency or set of currencies. That employee, a so-called LIBOR submitter, would submit multiple rates within each currency that varied based on the hypothetical loan's "tenor," or duration (pursuant to the basic proposition that the interest rate of a loan will vary based, among other things, on the loan's duration). There were fifteen tenors ranging from overnight to one year—e.g., one month (or "1M"), three months (or "3M"), and so forth.

After receiving submissions from each panel bank, the BBA would, within each tenor of each currency, sort the submissions from lowest to highest, disregard the lower and upper quartiles, and average the remaining submissions. The resulting number became the LIBOR fixed rate and was released to the public daily (through Thomson Reuters, acting as the BBA's agent).[15] Accordingly, for sixteen-bank panels like the USD and the JPY panels, each day, and with respect to each tenor, the BBA would disregard the highest four and lowest four submissions from the panel, and then average the remaining eight submissions to produce that day's LIBOR fixed rate in each tenor of USD and JPY—e.g., the 1M USD LIBOR rate.

As noted, LIBOR fixed rates, as published every day shortly after 11 a.m. London time, are incorporated into the terms of financial transactions—such as so-called "interest rate swaps"—throughout the world.[16] An interest rate swap, to take one example of a LIBOR-based financial instrument, is an agreement between two parties in which one agrees to pay a fixed interest rate on some agreed-upon notional amount, while the other party agrees to pay a floating rate (usually tied to the LIBOR) on that same amount. The two sides agree to exchange payments on agreed-upon dates over the course of an agreed-upon time period. The date on which the floating rate is set (or reset) is often called the "fixing" or "fixing date."[17] If the floating rate references LIBOR, the relevant LIBOR rate on a fixing date determines how much or how little that party pays. Put simply, one party bets that interest rates (using LIBOR as the reference) will increase, and the other bets that interests rates (again, based on LIBOR) will decrease.

14.  JA 528; see JA 517–32 (LIBOR definitions—substantially the same—from 2002 to 2008).

15.  The individual submissions of each contributor panel bank were also released simultaneously. One of the reforms to LIBOR, proposed by Wheatley and later enacted, now requires a three-month delay in the release of banks' individual submissions. See Wheatley Report, note 12, ante, at 13.

16.  See generally Hou & Skeie, note 1, ante; see, e.g., Gelboim v. Bank of Am. Corp., 823 F.3d 759, 765 (2d Cir. 2016) ("The LIBOR-based financial instruments held by the appellants included: (1) asset swaps, in which the owner of a bond pegged to a fixed rate pays that fixed rate to a bank or investor while receiving in return a floating rate based on LIBOR; (2) collateralized debt obligations, which are structured asset-backed securities with multiple tranches, the most senior of which pay out at a spread above LIBOR; and (3) forward rate agreements, in which one party receives a fixed interest rate on a principal amount while the counterparty receives interest at the fluctuating LIBOR on the same principal amount at a designated endpoint. These examples are by no means exhaustive.").

17.  See, e.g., Government's Supplemental Appendix ("GSA") 103–08 (swap agreement between Rabobank and Citibank).

In effect, and in short, money changes hands as LIBOR rates change. And the panel banks, the joint controllers of LIBOR rates, themselves entered and were parties to large-volume LIBOR–tied transactions as a matter of course.

## B. LIBOR Submissions, and Their Manipulation, at Rabobank

As relevant here, Rabobank was a contributor panel bank for USD LIBOR and JPY LIBOR. Allen joined Rabobank in 1998 as a cash trader and was the bank's USD LIBOR submitter until 2005, when he became Rabobank's Global Head of Liquidity and Finance. In that new role, which he held until being laid off when Rabobank closed its London branch in late 2008, he was responsible for supervising other cash traders. One of those cash traders was Conti, who assumed primary responsibility for USD LIBOR submissions starting in 2005 and continuing through 2009, when he quit shortly after his job

was moved to Utrecht.[18] Another cash trader, Paul Robson (whose testimony is central to the issue before us), was primarily responsible for Rabobank's JPY LIBOR submissions during the relevant time period. Others, including Allen himself, would sometimes submit USD LIBOR rates or JPY LIBOR rates when Conti or Robson were unavailable. According to the "Final Notice" issued to Rabobank by the FCA for its LIBOR–related misconduct, "Rabobank did not explicitly have a policy in place to address LIBOR submissions procedures until 30 March 2011, and certain LIBOR–related compliance risks were not addressed until August 2012."[19]

In addition to LIBOR submitters, Rabobank also employed derivatives traders who would regularly enter into interest rate swap agreements. It was a routine practice of these derivatives traders to submit requests to Conti and Robson (or, at times, their stand–ins) for higher or lower LIBOR submissions. The Govern-

18. While LIBOR has been called the world's most important number, it is not clear that anyone would call Allen and Conti "masters" of the LIBOR universe. *Cf.* Tom Wolfe, Opinion, *Greenwich Time*, N.Y. Times (Sept. 27, 2008), http://www.nytimes.com/2008/09/28/opinion/28wolfe.html (discussing the author's term "Masters of the Universe," which referred to "ambitious young men (there were no women) who, starting with the 1980s, began racking up millions every year—millions!—in performance bonuses at investment banks like Salomon Brothers, Lehman Brothers, Bear Stearns, Merrill Lynch, Morgan Stanley and Goldman Sachs"). According to the presentence reports, Allen earned an annual income at Rabobank of $190,000 (though the PSR does not list his bonus range) and Conti had an annual income of $141,583 with an annual bonus ranging from $50,000 to $186,000.

19. U.K. FCA, Final Notice to Rabobank (Oct. 29, 2013), at ¶ 2.3, https://www.fca.org.uk/publication/final–notices/rabobank.pdf. As already explained, there were likewise no governmental regulations of LIBOR during the

relevant time period, *see* note 12, *ante*, leaving oversight to the BBA, *but see* note 38, *post*.

One of the issues that Defendants raise in this appeal relates to the District Court's denial of their request to depose John Ewan, the LIBOR Manager at the BBA during the relevant time period. A U.K. resident and citizen, Ewan declined to appear at Defendants' trial in the United States, but he testified in LIBOR–related trials in the U.K. that ended in acquittals for certain individuals and convictions for others. Defendants suggest that Ewan's testimony would have been material because it would have directly rebutted the Government's theory of fraud. They argue that the District Court therefore erred in refusing to grant them permission to depose Ewan and to use his deposition testimony at trial. The Government, however, contests whether, based on Ewan's equivocal testimony in the United Kingdom, Ewan's hypothetical deposition testimony in this case would have helped Allen's and Conti's defense. Given our disposition of this appeal, we need not reach the question and intimate no final view of the issue.

U.S. v. ALLEN    73
Cite as 864 F.3d 63 (2nd Cir. 2017)

ment's theory of the case was that these trader requests were dictated by the traders' (and thus Rabobank's) interest in having LIBOR be higher or lower on particular dates based on the transactions that the trader had entered or positions they held. Allen and Conti, the Government alleged, honored those requests in lieu of making good-faith estimates of Rabobank's projected borrowing rates.

One USD derivatives trader, Lee Stewart (nicknamed the "Ambassador"), sat in the same line of desks at Rabobank's London office as did Allen and the cash traders—including Conti, the principal USD LIBOR submitter. Stewart testified at trial that he offered LIBOR requests "out loud," "in front of everyone," and never used "code" or "tr[ied] to hide what [he] was talking about."[20] Robson testified that every morning before 11 a.m., Conti led, and Allen participated in, a "gather[ing]" and "discuss[ion]" of the best way to influence LIBOR, prefaced by the shout, "right, LIBOR times[!]"[21]

By contrast, those derivatives traders located in other offices, like USD derivatives trader Christian Schluep (located in New York) or JPY derivatives trader Takayuki Yagami (located in Tokyo), would more often submit their LIBOR requests in writing. Thus there are numerous arguably incriminating written exchanges between the latter traders and the LIBOR submitters. Schluep and Conti had several exchanges regarding the setting of USD LIBOR[22]—for example:

- On July 17, 2006, Schluep asked Conti, "IF ANY CHANCE, A HIGH 3MTH TODAY PL!" Conti replied, "[o]k matey ... high one today."[23]
- On October 31, 2006, Schluep sent Conti a message discussing market activity and then stated, "SMALL FAVOUR AS USUAL, LOW 2S HIGH 3S IF POSSIBLE MATEY," meaning he wanted a low two-month LIBOR and a high three-month LIBOR. Conti responded to the earlier parts of Schluep's message and added, "[w]ill do matey on the libors."[24]
- On August 13, 2007, Schluep sent a message to Conti, requesting "HIGH 3S AND 6S PLS TODAY MATE (ESP 6MNTHS!!) IF U WOULD BE SO KIND .. [sic] GOTTA MAKE MONEY SOMEHOW!" Conti responded simply, "cool," to which Schluep replied, "CHEERS TC.. [sic] EVERY LITTLE HELPS!"[25]

Schluep also had exchanges with Allen[26]—for example:

- On October 6, 2006, Schluep sent a message to Allen stating, "HELLO SKIPPER, CAN U PUT 3S AT 37 FOR ME TOMORROW PLS... MANY THANKS." Allen replied, "NEVER IN DOUBT!"[27]
- On November 29, 2006, Schluep sent a message to Allen asking for a "LOW 1S HIGH 3S LIBOR PLS!!!" Allen replied "OK MATE, WILL DO MY BEST ... SPEAK LATER." Schluep later thanked Allen, because the sub-

---

20. JA 213–14 (Trial Tr. 259–60).

21. *Id.* at 224 (Trial Tr. 324).

22. During the roughly three-year time period, Conti received seventeen written LIBOR requests.

23. GSA 26.

24. *Id.* at 116.

25. *Id.* at 13.

26. During the roughly three-year time period, Allen received thirteen written LIBOR requests. Allen responded in writing to five of those requests.

27. *Id.* at 8.

missions were "BANG ON THE MONEY!" Allen replied, "NO WORRIES" and joked that he "HAD TO WORK MY WAY OUT OF AN AMBASS HEADLOCK TO GET THOSE IN!"[28]

- On December 1, 2006, Schluep sent a message to Allen stating, "APPRECIATE 3S GO DOWN, BUT A HIGH 3S TODAY WOULD BE NICE." Allen responded, "I AM FAST TURNING INTO YOUR LIBOR BITCH!!!!" Schluep replied, "JUST FRIENDLY ENCOURAGEMENT THAT'S ALL, APPRECIATE THE HELP." Allen replied, "NO WORRIES MATE, GLAD TO HELP[.]"[29]

There were similar, if perhaps more explicit and thus arguably more incriminating, exchanges between Yagami and Robson regarding the setting of JPY LIBOR—for example:

- On September 21, 2007, Robson told Yagami that market information supported a submission of 0.85 for the one–month JPY LIBOR. Yagami asked for a higher rate, specifically 0.90. Robson agreed, even though he would "probably get a few phone calls," telling Yagami that there were "bigger crooks in the market than us guys!"[30]

- On March 19, 2008, Yagami told Robson "[w]e have loads of 6mth fixings today" and—conveying a request from another trader—asked Robson to submit 1.10 for the six-month yen LIBOR. Robson responded that market

information supported a 1.08 submission for the six-month LIBOR but that he would submit 1.10 as asked, even though it would likely prompt "a phone call." Robson added that it "will be quite funny to see the reaction" to his submission at Yagami's requested rate.[31]

Whether Allen and Conti did, in fact, accommodate trader requests by adjusting their LIBOR submissions was an issue that Defendants contested at trial. Although Allen and Conti claim they ignored the trader requests, the Government presented evidence at trial purporting to show that these trader requests were accommodated. For instance, on August 13, 2007, Schleup e–mailed Conti and said: GONNA NEED A FRICKIN HIGH 6 MTH FIX TOMORROW IF OK WITH U ... 5.42?"[32] The next day, Schluep sent a reminder and Allen informed another trader that the six-month LIBOR submission would be 5.42 because "i think thats [sic] what [C]hristian [Schluep] needs."[33] The Rabobank submission for six-month USD LIBOR that day was 5.42.[34]

To be clear, Defendants did not argue at trial that it was *permissible* to accommodate such requests. Allen and Conti agreed with the Government that making submissions based on the interests of Rabobank's traders was not permitted.[35] And Defendants and the Government further agreed—putting aside whether, in the end, Allen and Conti honored or ignored trader requests—that the process for submitting LIBOR involved collecting "market infor-

28. *Id.* at 6; *see* JA 233–34 (Trial Tr. 403–04).

29. GSA 10.

30. *Id.* at 18–19.

31. *Id.* at 109–10.

32. *Id.* at 15.

33. *Id.* at 17.

34. *Id.* at 47.

35. *See* Trial Tr. 1277–78 ("Q. Would you have considered it impermissible at that time to take a trader's position into account? A. Yes."); *id.* at 1289; *id.* at 1303.

**U.S. v. ALLEN**
Cite as 864 F.3d 63 (2nd Cir. 2017)

**75**

mation" in the morning, typically from brokers who would canvass the rates that might be on offer in the market. There was further agreement that, as "estimates,"[36] LIBOR submissions were necessarily imprecise even when there was decent market information, such that, at any given time, there existed a "range" of reasonable LIBOR submissions.[37] This imprecision was exacerbated during periods of illiquidity in the interbank market, such as the financial crisis in 2007–2008. In a September 26, 2008 phone call, for example, the BBA's LIBOR Manager, John Ewan, told Allen that LIBOR is "just a line in the sand. What's it based on? Nothing."[38] At the same time, however, the Government presented evidence that Defendants understood that it was improper to take Rabobank's traders' interests into account in determining their submissions, and that their proper role was to give an honest estimate of Rabobank's borrowing costs.

Where Defendants and the Government parted ways on the facts was whether the traders' requests were honored. While Conti did not take the stand at trial, Allen testified that he never actually accommodated such requests.[39] On direct examination by the Government, by contrast, Robson—Rabobank's JPY LIBOR submitter—explained that LIBOR's lack of precision allowed him to accommodate trader requests without raising eyebrows:

[Robson]. I would ask the broker where he felt the LIBORs would be. They

would then give us—for example, three months they would give us a number of submissions or possible rates where the three months could be depending on credit rates and stuff like that. So there would be kind of a range of two or three numbers where LIBOR could possibly be.

Q. Before I ask about trader positions, let's say no trader request was made. What would you do with that information?

[Robson]. I would go straight down the middle as much as I could. So, for example, if the broker came on and said, three months I think I'm hearing might be 80, might be 85, might be 90, but probably 75, I would go down the middle.

Q. Now, let's say you, in fact, had a trader request where a trader wanted you to submit a LIBOR to favor their position. What would you do?

[Robson]. So given those circumstances, if one of the traders had contacted and said three months, if I needed a higher three months, I would have moved it higher at his request. I would have moved it towards the 90 level or set 90.

Q. Was that permissible?

[Robson]. No, it wasn't.[40]

Moreover, Robson proffered to the Government that Conti likewise accommodated trading positions when making LIBOR

---

**36.** Gov't Br. 11; Defs.' Br. 13–14.

**37.** *See* JA 225 (Trial Tr. 333–34).

**38.** *Id.* at 507. The Government's witnesses, Robson and Stewart, echoed this assessment. Robson testified that he had viewed the LIBOR submission process as "nonsense" and as "a charade," and that he eventually "decided not to spend much time worrying about it." *Id.* at 249 (Trial Tr. 518). When Robson first met with prosecutors in July 2014, he

"told them that [by 2007] LIBOR in general was absolute garbage." *Id.* at 251 (Trial Tr. 553). At the time, Stewart referred to LIBOR as a "made-up number," though at trial he clarified that an "[e]ducated guess would probably be more appropriate." *Id.* at 217 (Trial Tr. 274–75).

**39.** *See, e.g., id.* at 300–01 (Trial Tr. 1222, 1227).

**40.** *Id.* at 225 (Trial Tr. 333–34).

submissions.[41] And Robson was the sole source of trial and grand jury testimony that Allen specifically directed and instructed others in this scheme.[42]

The scheme was established by May 2006 and continued through early 2011; as noted previously, however, Allen and Conti left Rabobank in 2008 and 2009, respectively.

### C. Investigation and Indictment

By 2013, the British and American authorities had commenced LIBOR–related investigations into Rabobank and other institutions. As part of their investigations, the U.K. FCA and the U.S. DOJ began conducting interviews.

The FCA's interviews were compulsory; they were conducted under a grant of direct (but not derivative) use immunity,[43]

and a witness's failure to testify under such terms could result in imprisonment.[44] In order to avoid potential problems under *Kastigar*, the DOJ took care to conduct their interviews wholly independently of the FCA's interviews and their fruits. Specifically, the FCA agreed to procedures to maintain a "wall" between its investigation and the DOJ's investigation, including a "day one/day two" interview procedure in which the DOJ interviewed witnesses prior to the FCA. In accordance with that protocol, the FCA interviewed Robson (on January 17, 2013), Conti (on January 25, 2013), and Allen (on June 20 and 21, 2013), among others. Robson, in his compelled testimony to the FCA, denied any improper conduct at Rabobank.

In November 2013,[45] the FCA initiated an enforcement action against Robson and,

**41.** By contrast, Stewart acknowledged that Conti "was free to ignore [his] preferences." *Id.* at 215 (Trial Tr. 266–67) ("Q. Generally, after you express preferences like this there was no follow-up conversation, is that right? A. No, not really. Q. It was ultimately up to [Conti] to decide what rate he would submit? A. Yeah. Q. [Conti] was free to ignore your preferences? A. Yeah."). Yagami, a JPY trader, did not testify about a single instance in which Conti was responsible for a JPY LIBOR submission.

**42.** *Id.* at 980 (Transcript of *Kastigar* Hearing ("*Kastigar* Hearing Tr."), at 253) ("Q. Isn't it a fact that there is not a single witness that told you that Mr. Allen instructed them to accommodate trader requests, other than Paul Robson? [Agent Weeks]. That's correct."). By contrast, Stewart agreed that Allen had never given him a "directive to try to influence the LIBOR rate." *Id.* at 210 (Trial Tr. 192). And Yagami never discussed the LIBOR submission process with Allen. *Id.* at 262 (Trial Tr. 703) ("Q. Sir, you have never spoken to Tony Allen about the LIBOR submission process, have you? [Yagami]. No.").

**43.** On the differences between direct and derivative use, see note 3, *ante*.

**44.** There is no dispute that Defendants were compelled to testify. *See, e.g.*, Gov't Br. 25

(discussing "Robson's exposure to testimony by defendants that was compelled by regulatory authorities in the United Kingdom"); *id.* at 131, 132, 137, 138 (quoting with approval the District Court's reference to Allen's and Conti's FCA testimony as "the defendants' compelled testimony" or their "compelled statements").

**45.** The prior month, on October 29, 2013, the DOJ entered into a deferred prosecution agreement ("DPA") with Rabobank. *See United States v. Allen*, 160 F.Supp.3d 684, 689 (S.D.N.Y. 2016). The essence of the DPA bargain is that in exchange for its cooperation, the Government refrains from prosecution. *See, e.g., United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 129–31, 2017 WL 2960618, at *2–3 (2d Cir. July 12, 2017). "Under a typical DPA with a corporate defendant, the defendant admits to a statement of facts, submits to the filing of criminal charges against it on the basis of those facts, and agrees to a forfeiture or fine and to institute remedial measures. In exchange, the government agrees to defer prosecution and to ultimately seek dismissal of all charges if the defendant complies with the DPA. If the government determines that the defendant has breached the DPA, however, the government may rip up the agreement and pursue the

following its normal procedure, disclosed to Robson the relevant evidence against him, including the compelled testimony of Allen and Conti. Robson's attorney instructed him to review the materials sent by the FCA in preparation for a meeting between Robson and his attorney. Robson "reviewed the materials over the course of two to three successive or nearly successive days sometime in or about November and/or December of 2013."[46] During this review, Robson underlined, annotated, and circled certain passages of both Allen's and Conti's compelled testimony.[47] Robson also took roughly five pages of handwritten notes. Before Robson had the chance to discuss this material with his attorney, however, the FCA stayed its regulatory proceeding in favor of a criminal prosecution of Robson by the DOJ. On instruction from his lawyer, Robson placed the FCA

materials in a box, put them in his attic, and did not review them further.[48]

On April 28, 2014, a grand jury in the United States District Court for the Southern District of New York returned an indictment charging Robson (Rabobank's JPY submitter) and two JPY derivatives traders, Paul Thompson and Tetsuya Motomura, with, *inter alia*, wire fraud. The Government had not requested that the grand jury indict Conti or Allen.[49]

**[3]** In mid–July 2014, the DOJ first interviewed Robson at a so-called proffer session.[50] On August 5, 2014, Robson signed a cooperation agreement and shortly thereafter pleaded guilty. At Robson's plea hearing, the prosecutor informed the District Court that "there is … a chance that we would seek a superseding indictment in light of information that has come to light from our two cooperators"[51] and

---

prosecution." *Id.* at 129, 2017 WL 2960618 at *2.

46. *Kastigar* Hearing Tr. 20.

47. *See* JA 742–851.

48. *Kastigar* Hearing Tr. 6–7; *see also id.* at 76–88.

49. *Id.* at 227.

50. One typically "participate[s] in a proffer session in the hopes of obtaining a cooperation agreement." *United States v. Oluwanisola*, 605 F.3d 124, 127 (2d Cir. 2010). Such proffer sessions are typically conducted pursuant to an agreement in which the government may use the interviewee's statements at the proffer session only as rebuttal evidence, and the defendant waives any objection to such use. *See United States v. Velez*, 354 F.3d 190, 196 (2d Cir. 2004) ("[A] defendant remains free to present evidence [at trial] inconsistent with his proffer statements, with the fair consequence that, if he does, the Government is then permitted to present the defendant's own words in rebuttal." (internal quotation marks and alterations omitted)); *see, e.g., Oluwanisola*, 605 F.3d at 127–28 (discussing an agreement that the government

would not use any statements except "as substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [the interviewee] at any stage of a criminal prosecution"). There is no guarantee that proffers will give rise to a cooperation agreement. *See, e.g., id.* at 128 ("The government determined that Oluwanisola was not fully truthful regarding the scope of his involvement with the conspiracy and did not offer him a cooperation agreement."). While the statements made by the would-be cooperator at a proffer session are granted "use immunity," they are not granted "derivative-use immunity." *See United States v. Christian*, 111 F.Supp.3d 287, 305 (E.D.N.Y. 2015). That means that the statements can be used by the Government to develop further information that could be used against the defendant in the event that the case does go to trial. *See United States v. Ramos*, 685 F.3d 120, 127 (2d Cir. 2012) ("An individual who makes self-incriminating statements without claiming the [Fifth Amendment] privilege is deemed not to have been 'compelled' but to have spoken voluntarily.").

51. Yagami had previously agreed to cooperate with the U.S. government and, on June 10, 2014, pleaded guilty to conspiracy charges.

---

that there was "a distinct possibility" the new indictment would "involve[ ] other individuals."[52]

So it did. On October 16, 2014, the grand jury returned a superseding indictment charging two new individuals—Allen and Conti—with one count of conspiracy to commit wire fraud and bank fraud as well as several counts of wire fraud. It is not disputed that the Government's presentation of evidence to the grand jury that indicted Defendants relied on evidence that Robson had provided.[53] While Robson did not himself testify, the new information he gave was relayed to the grand jury through FBI Special Agent Jeffrey Weeks, who did testify.[54] And Weeks's testimony to the grand jury on certain matters derived exclusively from Robson.[55] In particular, Robson was the only source for Weeks's testimony that Allen "instructed, specifically instructed, LIBOR submitters in London to consider the positions and the requests of Rabobank traders and adjust their submissions for LIBOR and various currencies based on the means of those traders,"[56] and that "Mr. Robson said that sitting near Mr. Conti he was aware that Mr. Conti set U.S. dollar LIBOR rates in which he considered his own

positions as appropriate reason or justification for setting the rates."[57]

**D. Trial and Post–Trial *Kastigar* Hearing**

Allen and Conti each waived his right to contest extradition from the U.K. and appeared voluntarily. Prior to trial, they moved under *Kastigar* to dismiss the indictment or suppress Robson's testimony, but the District Court opted to address any *Kastigar* issues after trial "in accordance with prevailing practice in the Second Circuit."[58] Trial thus commenced on October 14, 2015, and lasted approximately three weeks.

At trial, the Government's case-in-chief consisted of documentary evidence (*e.g.*, e-mails, "instant chats," and phone calls involving Allen, Conti, or their alleged co-conspirators) and testimony from eight witnesses, including three cooperators: Stewart, Yagami, and Robson.[59] In addition to cross-examination of the Government's witnesses, Allen and Conti each offered an expert witness,[60] and Allen testified in his own defense. On November 5, 2015, the jury returned a verdict of guilty on all counts (nineteen counts, in total, for Allen and nine for Conti).

---

52. JA 903.

53. *See Allen*, 160 F.Supp.3d at 697; *see also Kastigar* Hearing Tr. 238–42.

54. *Kastigar* Hearing Tr. 238–42.

55. *Id.*

56. JA 907.

57. *Id.* at 910.

58. *Id.* at 921. We offer no opinion here regarding the merits of such a practice or whether such a practice prevails. This decision by a district court is an exercise of its discretion.

59. The Government also called an expert who explained LIBOR and its connection to derivative transactions, *see* Trial Tr. 115–61; an FBI accountant, *see id.* at 843–960; and three "counterparty" witnesses (*i.e.*, individuals who were at one time employed by an entity that had entered into a derivatives transaction with Rabobank during the relevant time period), *see id.* at 494–510, 822–43.

60. Conti's expert analyzed the effect of Rabobank's LIBOR submissions on the trading books of certain Rabobank derivatives traders, and Allen's expert compared Rabobank's LIBOR submissions with the contemporaneous borrowing conditions in the London interbank market. *See* Trial Tr. 981–1029, 1034–1156.

Defendants' *Kastigar* challenge remained pending, however.[61] Beginning on December 16, 2015, the District Court held a two-day hearing on *Kastigar* issues at which Robson and Agent Weeks testified. During this hearing it came to light that Robson had not only read but also marked up, and drafted notes regarding, Defendants' compelled testimony, and that material parts of Agent Weeks's testimony to the grand jury derived solely from Robson.[62]

Following subsequent *Kastigar* briefing from the parties, the District Court denied Defendants' motion by written opinion. The District Court held that, assuming *Kastigar* applies to testimony compelled by a foreign power, there had been no *Kastigar* violation.[63] In its ruling, the District Court explicitly declined to apply case law of the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") on the legal standards applicable when a government witness has previously reviewed a defendant's compelled testimony.[64] Looking to Second Circuit precedent, the District Court concluded that Robson's review of Defendants' compelled testimony

did not taint the evidence he later provided, because the Government had shown an independent source for such evidence, "to wit, [Robson's] personal experience and observations."[65]

## II. DISCUSSION

Although Defendants raise a number of substantial issues on appeal, we reach only their *Kastigar* challenge. Defendants contend that the Government violated their Fifth Amendment rights when it used—in the form of tainted evidence from Robson—their own compelled testimony against them. Specifically, they argue that the District Court applied the wrong legal standard in assessing whether the evidence provided by Robson was tainted by his review of their compelled testimony. They also assert that, properly assessed, the Government cannot meet its burden of showing that Robson's evidence was *not* tainted, and that the prosecution's use of tainted evidence from Robson was not harmless beyond a reasonable doubt.

The Government takes a different view. It submits, as a threshold argument, that

61. Defendants also filed post-trial motions, pursuant to Federal Rules of Criminal Procedure 29(c) and 33(a), for acquittal or for a new trial, respectively, which the District Court denied. *See United States v. Allen*, 160 F.Supp.3d 698 (S.D.N.Y. 2016).

62. While Robson's marked-up copies of Defendants' compelled testimony were produced and are in the record, Robson asserted attorney–client privilege over his handwritten notes. *See Kastigar* Hearing Tr. 82–88. Defendants' motion to compel production of those notes was denied. *See United States v. Robson et al.*, 1:14–cr–00272–JSR (S.D.N.Y.) ("District Court Docket"), Docket No. 206. The annotated transcripts suggest areas in which Robson's testimony was affected by his reading. For example, during his FCA interview, Robson said he "really [did not] know" the particulars of how the bonuses were structured because Allen was the one who "made

the decisions" about that. JA 727–28. In reviewing Allen's compelled testimony, he circled sections concerning bonus structures. *Id.* at 744–45. When he testified at the Defendants' trial, he testified about the "bonus pool" in accord with how Allen had described the system in his compelled testimony to the FCA. *Id.* at 234 (Trial Tr. 407).

63. *See Allen*, 160 F.Supp.3d at 690 n.8.

64. *Id.* at 691 n.9 ("While the Court is of the view that the Government would likely meet its *Kastigar* burden under the standards of the D.C. Circuit, especially in light of *U.S. v. Slough*, 641 F.3d 544 (D.C. Cir. 2011), the Court sees no reason to discuss this matter further, as the Court is obligated to apply the standards set by the Second Circuit.").

65. *Allen*, 160 F.Supp.3d at 697.

testimony compelled by a foreign sovereign and used in a U.S. criminal prosecution "do[es] not implicate the Fifth Amendment."[66] In the event that the Fifth Amendment does apply, the Government argues that the District Court employed the correct legal standard to determine, properly, that evidence provided by Robson was untainted. In the alternative, the Government argues that any use of tainted evidence was harmless.

For the reasons that follow, we conclude that Defendants prevail on each point.

**A.  Applicability of the Fifth Amendment**

In arguing that Fifth Amendment protections apply in this case, Defendants rely on our cases pertaining to foreign and cross-border law enforcement, which have consistently held that "in order to be admitted in our courts, inculpatory state-

ments obtained overseas by foreign officials must have been made voluntarily."[67] In so holding, we joined our sister circuits that have considered the issue.[68] Defendants contend that these cases are sufficient to resolve the present dispute regarding whether compulsion by a foreign power implicates the Fifth Amendment. We agree.

**1.  The Requirement of Voluntariness**

The Supreme Court has "recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment."[69] Of these two potential "constitutional bases," our precedents applying such a requirement to confessions procured by foreign law enforcement have been grounded in the Self-Incrimination Clause and *Bram v. United States*, 168

---

66.  Gov't Br. 118.

67.  *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 200 (2d Cir. 2008); *see id.* at 208 (noting that "statements obtained under … circumstances" where suspects were "forced to speak" to the agents of a foreign state "could not be admitted in a U.S. trial if the situation indicated that the statements were made involuntarily"); *United States v. Yousef*, 327 F.3d 56, 124, 145 (2d Cir. 2003) ("[T]he law is settled that statements taken by foreign police in the absence of *Miranda* warnings are admissible *if voluntary*." (emphasis added)); *United States v. Welch*, 455 F.2d 211, 213 (2d Cir. 1972) ("Whenever a court is asked to rule upon the admissibility of a statement made to a foreign police officer, the court must consider the totality of the circumstances to determine whether the statement was voluntary. If the court finds the statement involuntary, it must exclude this because of its inherent unreliability, as in *Bram v. United States*, 168 U.S. 532 [18 S.Ct. 183, 42 L.Ed. 568] (18[9]7).").

68.  *See United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) ("When *Miranda* warnings are unnecessary, as in the case of an interrogation by foreign officials, we assess

the voluntariness of a defendant's statements by asking whether the confession is the product of an essentially free and unconstrained choice by its maker. *If it is*, it may be used against him." (citation and internal quotation marks omitted) (emphasis added)); *Brulay v. United States*, 383 F.2d 345, 349 n.5 (9th Cir. 1967) ("[I]f the statement is not voluntarily given, whether given to a United States or foreign officer[]—the defendant has been compelled to be a witness against himself when the statement is admitted."); *United States v. Mundt*, 508 F.2d 904, 906 (10th Cir. 1974) (analyzing admissibility in terms of "voluntariness"); *Kilday v. United States*, 481 F.2d 655, 656 (5th Cir. 1973) (citing *Bram*). Nevertheless, our Court, along with the Fifth Circuit—each of which has explicitly held a voluntariness test applies—could be read to have elsewhere suggested that a "shocks the conscience" standard applies. That is discussed below, as is the Ninth Circuit's dictum in *United States v. Wolf*, 813 F.2d 970, 972 n.3 (9th Cir. 1987).

69.  *Dickerson v. United States*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

Case: 24-1770    Document: 00118249067    Page: 449    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 423-1    Filed 12/05/23    Page 96 of 132

92

U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).[70] This constitutional footing is significant.

[4–7] The freedom from self-incrimination guaranteed by the Fifth Amendment is a personal trial right of the accused in any American "criminal case."[71] To that end, "a violation of the Fifth Amendment's right against self-incrimination occurs *only* when a compelled statement is offered at trial against the defendant."[72] Whatever may occur prior to trial, the right not to testify against oneself *at trial* is "absolute."[73] Even a negative comment by a judge or prosecutor on a defendant's silence violates that defendant's constitutional right.[74]

[8–10] These features of the Self-Incrimination Clause distinguish it from the exclusionary rules attached to unreasonable searches and seizures and to other-

wise-valid confessions given without *Miranda* warnings. As the Supreme Court has explained, the Fourth Amendment's exclusionary rule "is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."[75] So too with the exclusionary rule buttressing *Miranda* warnings, which "were primarily designed to prevent United States police officers from relying upon improper interrogation techniques."[76] Such exclusionary rules "have little, if any, deterrent effect upon *foreign* police officers."[77] Accordingly, we do not apply the strictures of our Fourth Amendment and *Miranda* jurisprudence to foreign authorities.[78]

[11–13] The Supreme Court has taken care, however, to distinguish extraterrito-

70.    In *Bram*, the Supreme Court reversed a conviction that stemmed from a confession procured abroad by a Canadian official, and explained that "[i]n criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the fifth amendment to the constitution of the United States commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'" 168 U.S. 532, 542, 18 S.Ct. 183 (1897).

71.    U.S. Const. amend. V; *see United States v. Patane*, 542 U.S. 630, 637, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (plurality opinion) ("[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself *at trial*." (emphasis added)). One commentator has observed that "[p]rovisions in the Bill of Rights that have been interpreted as 'trial rights' protect all defendants, regardless of alienage, during their trials in the United States," and noted that "[t]his point is so widely accepted and practiced that courts rarely feel the need to state it." Mark A. Godsey, *The New Frontier of Constitutional Confession Law—The International Arena: Exploring the Admissibility of Confessions Taken*

by U.S. Investigators from Non-Americans Abroad, 91 Geo. L.J. 851, 873–74 & n.126 (2003).

72.    *In re Terrorist Bombings*, 552 F.3d at 199 (emphasis added).

73.    *Salinas v. Texas*, —— U.S. ——, 133 S.Ct. 2174, 2179, 186 L.Ed.2d 376 (2013) (internal quotation marks omitted).

74.    *See Griffin v. California*, 380 U.S. 609, 613–15, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

75.    *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *see also id.* at 347, 94 S.Ct. 613 ("[T]he rule's prime purpose is to deter future unlawful police conduct.").

76.    *Welch*, 455 F.2d at 213.

77.    *Id.* (emphasis added).

78.    *See United States v. Verdugo–Urquidez*, 494 U.S. 259, 264, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (Fourth Amendment); *In re Terrorist Bombings*, 552 F.3d at 202–03 (*Miranda* (citing cases)).

rial applications of the Fourth Amendment from those of the Self–Incrimination Clause of the Fifth Amendment.[79] The Fourth Amendment "prohibits unreasonable searches and seizures *whether or not* the evidence is sought to be used in a criminal trial," such that "a violation of the Amendment is fully accomplished at the time of an unreasonable governmental intrusion."[80] By contrast, in the case of the Fifth Amendment's Self–Incrimination Clause, "a constitutional violation occurs *only at trial,*" even if "conduct by law enforcement officials prior to trial may ultimately impair that right."[81] In light of that distinction, "it naturally follows that, regardless of the origin—*i.e.,* domestic or foreign—of a statement, it cannot be admitted at trial in the United States if the statement was 'compelled.' "[82]

Thus, the Self–Incrimination Clause's prohibition of the use of compelled testimony arises from the text of the Constitution itself, and directly addresses what happens in American courtrooms, in contrast to the exclusionary rules that are crafted as remedies to deter unconstitutional actions by officers in the field.[83] Its protections therefore apply in American

courtrooms even when the defendant's testimony was compelled by foreign officials.

Moreover, for much the same reasons, the Clause applies in American courtrooms even where, as here, the defendant's testimony was compelled by foreign officials *lawfully*—that is, pursuant to foreign legal process—in a manner that does not shock the conscience or violate fundamental fairness. The Clause flatly prohibits the use of compelled testimony and is not based on any matter of misconduct or illegality on the part of the agency applying the compulsion.

In short, compelled testimony cannot be used to secure a conviction in an American court. This is so even when the testimony was compelled by a foreign government in full accordance with its own law.

It is true that, with respect to statements taken abroad by foreign agents, we have often referred to the Fifth Amendment's prohibition against illicit use as encompassing "involuntary," rather than "compelled," statements. But this semantic distinction does not bear significant, much less dispositive, weight.[84] Accordingly, we

---

**79.** *See Verdugo–Urquidez,* 494 U.S. at 264, 110 S.Ct. 1056.

**80.** *Id.* (internal quotation marks omitted) (emphasis added).

**81.** *Id.* (emphasis added); *see also Chavez v. Martinez,* 538 U.S. 760, 767, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (plurality opinion) ("[I]t is not until [a compelled statement's] *use* in a criminal case that a violation of the Self–Incrimination Clause occurs." (emphasis added)); *Deshawn E. ex rel. Charlotte E. v. Safir,* 156 F.3d 340, 346 (2d Cir. 1998) ("Even if it can be shown that a statement was obtained by coercion, there can be no Fifth Amendment violation until that statement is introduced against the defendant in a criminal proceeding.").

**82.** *In re Terrorist Bombings,* 552 F.3d at 199 (quoting U.S. Const. amend. V).

**83.** *See United States v. Kurzer,* 534 F.2d 511, 516 (2d Cir. 1976) ("[T]he principal function of the Fourth Amendment exclusionary rule is to deter unlawful police conduct …. The Fifth Amendment, in contrast, is by its terms an exclusionary rule ….").

**84.** As a general matter, courts' descriptions of statements as "compelled" (invoking the text of the Self–Incrimination Clause) and/or "involuntary" (invoking, arguably, the Due Process Clause) are often used interchangeably and the words often treated synonymously. *See, e.g., Berkemer v. McCarty,* 468 U.S. 420, 433 n.20, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("We do not suggest that compliance with *Miranda* conclusively establishes the *voluntariness* of a subsequent confession. But cases in which a defendant can make a colorable argument that a self-incriminating statement was *"compelled"* despite the fact that

U.S. v. ALLEN                    83
Cite as 864 F.3d 63 (2nd Cir. 2017)

agree with Defendants that our cases applying a voluntariness test in the context of physical coercion extend to the present context of lawful compulsion.

**2. The Government's Counterarguments**

The Government's three principal counterarguments are unpersuasive. The Government first questions the validity of our precedents on the basis of *Colorado v. Connelly* [85] and subsequent cases involving foreign and cross-border law enforcement that have relied on *Connelly*. That case concerned a mentally ill defendant who sought out police and confessed to a murder. Despite the absence of any law enforcement misconduct, the Colorado Supreme Court affirmed the suppression from evidence of Connelly's statements because they were " 'involuntary' "—that is,

not " 'the product of a rational intellect and a free will.' "[86] In reversing, the Supreme Court held "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."[87]

We are not persuaded that *Connelly* requires reconsideration of our precedents. For one thing, *Connelly* is explicitly a Due Process Clause case, whereas the precedents we rely on today were grounded in the Self–Incrimination Clause—which, by its terms, is an exclusionary rule grounded in the very text of the Constitution and designed to protect a defendant at trial.[88] For another, *Connelly* did not concern cross-border investigations or foreign government conduct (and accordingly, the majority did not even mention *Bram*).[89] And the final reason we do not believe *Connelly*

---

the law enforcement authorities adhered to the dictates of *Miranda* are rare." (emphases added)). Although the Supreme Court has clarified that the standard for voluntariness *Bram* offered is not correct, *see Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the Court has never overruled *Bram*'s use of a voluntariness test grounded in the Self–Incrimination Clause. Relying on *Bram*, the Supreme Court proclaimed—albeit, in 1924, before *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936)—that "a confession obtained by compulsion must be excluded whatever may have been the character of the compulsion, and whether the compulsion was applied in a judicial proceeding or otherwise." *Ziang Sung Wan v. United States*, 266 U.S. 1, 14–15, 45 S.Ct. 1, 69 L.Ed. 131 (1924) (Brandeis, J.). In *Dickerson v. United States*, the Supreme Court acknowledged that it has "recognized two constitutional bases for the requirement that a confession be voluntary." 530 U.S. at 433, 120 S.Ct. 2326. And *Dickerson* declined to abandon *Miranda* as a Self–Incrimination–Clause doctrine applicable to police questioning while simultaneously explaining that the Court has "never abandoned [its] due process jurisprudence, and thus continue[s] to exclude confessions that were obtained involuntarily." *Id.* at 433–34, 120 S.Ct.

2326. More recently, in *Chavez v. Martinez*, the Supreme Court appeared to assume that both the Self–Incrimination Clause and the Due Process Clause applied to the coercive police questioning at issue in that case. 538 U.S. at 773, 123 S.Ct. 1994.

**85.** 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

**86.** *Id.* at 162, 107 S.Ct. 515 (quoting 702 P.2d 722, 728 (Colo. 1985)).

**87.** *Id.* at 167, 107 S.Ct. 515.

**88.** For that same reason, we believe that the Ninth Circuit's dictum in *United States v. Wolf*, 813 F.2d 970 (9th Cir. 1987)—proclaimed without the benefit of "argu[ment] or brief[ing]"—questioning "[t]he continuing vitality of [its prior] holding in [*Brulay v. United States*]" in light of *Connelly* was mistaken. *Id.* at 973 n.3. *Brulay*'s holding, like those of our cases, was grounded in the Self–Incrimination Clause. *See Brulay*, 383 F.2d at 349 n.5.

**89.** In that regard, the Government places too much weight on our decision in *United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998), a cross-border confession case that relied on *Connelly*. In *Salameh*, we rejected the defen-

renders our precedents invalid stems from an important acknowledgment the Government makes on appeal.

Specifically, the Government submits—in a footnote pregnant with meaning—that "there may be some other constitutional doctrine apart from the Fifth Amendment right against self-incrimination that would require exclusion of a confession coerced by foreign officials, such as a due process violation based on conduct that 'shocks the judicial conscience.'"[90] That could only be so, however, if the Due Process Clause applied in some degree to the conduct of foreign officials—the very proposition that the Government otherwise contends *Connelly* rejected. By dangling a "shocks the conscience" test in this footnote, the Government implies that it takes issue not with *whether* confessions procured by foreign officials can be excluded from American trials based on our Constitution, but with the *standard* our courts should apply in evaluating admissibility.

The Government's second counterargument extends from the premise that foreign governments are on the same footing as private employers when it comes to compelled testimony. In particular, the Government points to the fact that *private* employers may question an employee under threat of discharge without Fifth Amendment consequence,[91] whereas in certain circumstances courts have found that the same threat by an American *government* employer rendered an employee's testimony "compelled" and excludable under the Fifth Amendment.[92] "For purposes

---

dant's challenge to the admission at trial of two comments he made after being placed in U.S. custody, "informed that he was under arrest," and "advised ... of his constitutional rights." *Id.* at 117. The defendant asserted that his two comments "were given involuntarily and without a valid *Miranda* waiver because they followed ten days of incarceration and torture in Egypt." We explained, however, that these concerns would only be relevant if the defendant was being coerced when the two comments were elicited by U.S. officials. *Id.* And, indeed, the defendant did "not contend that federal agents either mentally or physically coerced his remarks during that interrogation." *Id.* The Government misreads *Salameh* as a foreign coercion case when, in fact, our holding turned on the absence of any "coercive activity of the State" during the *relevant* interrogation. *Connelly*, 479 U.S. at 165, 107 S.Ct. 515. Our reading of *Salameh* is confirmed by the fact that the decision ignored *Bram* and our own binding precedent of *Welch*.

**90.** Gov't Br. 122 n.22 (quoting *Yousef*, 327 F.3d at 146). In *Yousef*, which the Government quotes, we explained, first, "that statements taken by foreign police in the absence of *Miranda* warnings are admissible *if voluntary*." 327 F.3d at 145 (emphasis added). We then characterized the "shocks the conscience" test as an exception to the rule of

admitting voluntary confessions. The import of this passage in *Yousef* is thus that even voluntary statements resulting from foreign government conduct that shocks the judicial conscience—however unlikely it may be that conscience-shocking circumstances would produce a "voluntary" confession—will be rendered inadmissible. Admittedly, the far-fetched nature of this scenario did not help clarify the confusion created by the "shocks the conscience" test sometimes lingering in our Fifth Amendment jurisprudence. *See United States v. Karake*, 443 F.Supp.2d 8, 53 n.74 (D.D.C. 2006) (explaining that "the Second Circuit case most often cited in support of the 'shock the conscience' test [*United States v. Nagelberg*, 434 F.2d 585, 587 n.1 (2d Cir. 1970)] in fact ... relied solely on *Brulay*, which ... applies a straightforward voluntariness test in determining the admissibility of statements obtained by foreign officials"). As explained by the *Karake* Court, the "shocks the conscience" test has generally been developed in the search and seizure context. *See id.* Our discussion makes clear that self-incrimination is different.

**91.** Gov't Br. 123 (citing *United States v. Solomon*, 509 F.2d 863, 867–71 (2d Cir. 1975)).

**92.** *Id.* (citing *Garrity v. New Jersey*, 385 U.S. 493, 496, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967)).

**U.S. v. ALLEN**    **85**
Cite as 864 F.3d 63 (2nd Cir. 2017)

of the Fifth Amendment," the Government submits, "the British government is on the same footing as a private entity such as the New York Stock Exchange."[93] We disagree.

**[14, 15]**  Only sovereign power exposes " 'those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt.' "[94] Only the U.K. *government* could have immunized Defendants (neither of whom were employed by Rabobank at the time), compelling them to testify or go to jail. To the extent there may be an "official/private action spectrum,"[95] when foreign authorities compel testimony they are acting in the quintessence of their sovereign authority, not in their capacity as a mere employer, and thus their compulsion is cognizable by the Fifth Amendment (when testimony so compelled is used in a U.S. trial). The Supreme Court's decision in *Garrity v. New Jersey*—like *Connelly*—does not foreclose constitutional re-

view of a foreign sovereign's threats to deprive an individual of his liberty. If our Constitution is to prohibit the use in American trials of confessions coerced or compelled by a foreign sovereign under *some* circumstances, as the Government suggests "may be" the case, it cannot be the case that compulsion by a foreign authority *ipso facto* ends the constitutional inquiry.[96]

**[16]**  Finally, the Government's third counterargument is that testimony is only "compelled" for purposes of the Self-Incrimination Clause if the compelling sovereign is bound by the Fifth Amendment. Here, too, we disagree. The Government's argument relies on the so-called "same-sovereign" principle, under which Fifth Amendment protections apply only if the same sovereign (or, at least, a Fifth-Amendment-bound sovereign) both compelled and used testimony.[97] This "same-

93.  *Id.*

94.  *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); *see also In re Martin-Trigona*, 732 F.2d 170, 174 (2d Cir. 1984) ("The primary purpose of the self-incrimination privilege is to avoid confronting the witness with the 'cruel trilemma' of self-accusation, perjury or contempt.").

95.  Geoffrey S. Corn & Kevin Cieply, *The Admissibility of Confessions Compelled by Foreign Coercion: A Compelling Question of Values in an Era of Increasing International Criminal Cooperation*, 42 Pepp. L. Rev. 467, 476 (2015).

96.  One pair of commentators assessed *Connelly*'s import as follows:
    Setting reasonable boundaries, so that private actors cannot intentionally or unintentionally destroy criminal investigations or impede on the government's right to protect its citizens against dangerous individuals, makes sense.

    Given that premise, it certainly would not be unreasonable to conclude that the link

between a coercive act and some sort of state action is stronger when foreign government officials act than when private action is solely responsible for a coercive act. And certainly, allowing admission of foreign coerced evidence is much more offensive to basic notions of fairness in the pursuit of justice than when pure private action is responsible.

*Id.* at 481 (footnote omitted).

97.  In particular, its argument relies on cases decided prior to the application of the Fifth Amendment to the States in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), and the Supreme Court's decision in *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), that immediately followed *Malloy*. In *United States v. Murdock*, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931), the Supreme Court held that the federal government could compel a witness to give testimony that might incriminate him under state law. Complementing *Murdock*, the Court held in *Knapp v. Schweitzer*, 357 U.S. 371, 78 S.Ct. 1302, 2 L.Ed.2d 1393 (1958), that a State could compel a witness to give testimony that might

86                 864 FEDERAL REPORTER, 3d SERIES

sovereign" principle has never been fully abandoned; it still applies, for example, where the prosecuting sovereign is not bound by the Fifth Amendment (*i.e.*, where the prosecuting authority is a foreign government).[98] But where, as here, the prosecuting sovereign *is* bound by the Fifth Amendment, the "same–sovereign"

principle no longer has force. As already explained, it is now clear that the Fifth Amendment is a personal *trial* right—one violated only at the time of "use" rather than at the time of "compulsion."[99] Accordingly, the Government's reliance on the "same-sovereign" principle in the circumstances of this case is unavailing.[100]

---

incriminate him under federal law. The decision most relevant here came between *Murdock* and *Knapp*, in *Feldman v. United States*, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408 (1944). In *Feldman*, the Supreme Court held that a statement compelled under a grant of immunity by an American state (then not bound by the Fifth Amendment) could be used in a federal criminal case.

**98.** In *United States v. Balsys*, 524 U.S. 666, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998), the Supreme Court relied on *Murdock* in holding that individuals being questioned by the U.S. government may not invoke the Fifth Amendment privilege based on fear of foreign prosecution. *Balsys* is notable because the Supreme Court had overruled *Murdock* (as well as *Knapp* and *Feldman*) in its 1964 decision in *Murphy*. But the *Balsys* Court understood *Murphy* as having overruled *Murdock* not because the "same–sovereign" principle was inherently wrong in that context, but rather because the Court had just extended the Fifth Amendment to bind the states in *Malloy*. "[I]t would therefore have been intolerable," the *Balsys* Court explained, "to allow a prosecutor in one or the other jurisdiction to eliminate the privilege by offering immunity less complete than the privilege's dual jurisdictional reach." *Id.* at 682, 118 S.Ct. 2218.

**99.** In overruling *Feldman* (and its counterparts), the *Murphy* Court expressly stated that its "decision today in *Malloy v. Hogan* ... necessitate[d] a reconsideration of" its precedents. 378 U.S. at 57, 84 S.Ct. 1594. In an accompanying footnote, however, the majority in *Murphy* suggested that it had been reluctant to cure the "whipsaw" problem because of the lack of clarity regarding when a Fifth Amendment violation occurs. *See id.* at 57 n.6, 84 S.Ct. 1594 ("In every 'whipsaw' case, either the 'compelling' government or the 'using' government is a State, and, until today, the States were not deemed fully bound by the

privilege against self–incrimination. Now that both governments are fully bound by the privilege, the conceptual difficulty of pinpointing the alleged violation of the privilege on 'compulsion' or 'use' need no longer concern us.").

The concurring opinion in *Murphy* of Justice Harlan (who simultaneously dissented in *Malloy*) is instructive. Justice Harlan argued that the exercise of the Court's "'supervisory power'" over the administration of justice in federal courts," rather than the Fifth Amendment itself, was a proper basis for the exclusion from a federal criminal trial of testimony compelled by state agents. *Id.* at 80–81, 84 S.Ct. 1594 (Harlan, J., concurring) (relying on *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)). He explained in part that "[i]ncreasing interaction between the State and Federal Governments speaks strongly against permitting federal officials to make prosecutorial use of testimony which a State has compelled when that same testimony could not constitutionally have been compelled by the Federal Government and then used against the witness." *Id.* at 91, 84 S.Ct. 1594. Justice Harlan's perspective is entirely consistent with the Supreme Court's subsequent decision in *Balsys* and accords with its subsequent case law emphasizing that the core of the Fifth Amendment is a trial right violated only when compelled testimony is *used* in an American tribunal. We believe that Justice Harlan's views apply with equivalent force to the current case and the interaction between the U.S. and the U.K. authorities, and thus conclude that the application of the supervisory power of the federal courts over the administration of criminal justice would likewise compel the outcome here: the exclusion of Defendants' compelled statements from use against them at trial.

**100.** To be clear, we do not hold or suggest that the Clause applies where the prosecuting authority is not bound by the Fifth Amendment (*i.e.*, where the prosecuting authority is

### 3. The Consequences of Our Holding

The Government also asserts that a prohibition on its use in U.S. courts of testimony compelled by a foreign authority "could seriously hamper the prosecution of criminal conduct that crosses international borders."[101] In particular, the Government submits:

> A foreign government could inadvertently scuttle prosecutions in the U.S. by compelling testimony and then making the testimony available to potential witnesses or the public. Worse yet, a hostile government bent on frustrating prosecution of a defendant would have to do no more than compel [that defendant [102]] to testify and then publicize the substance of that testimony, unilaterally putting the United States to its heavy *Kastigar* burden.[103]

The Government's first concern—that foreign powers could inadvertently or negligently obstruct federal prosecutions—fails to account for the fact that this risk already exists within our own constitutional structure. In our system—composed of "State and National Governments,"[104] with the latter government further divided into separate co-equal branches—the DOJ does not control the granting or handling

---

a foreign government). That is, we do not question the rule in *Balsys* and *Murdock*.

Nor, of course, do we hold or suggest that the Defendants in this case had a right under the U.S. Constitution not to testify in England before the U.K. Financial Conduct Authority out of a concern with U.S. prosecution. That is, we do not question the rule in *Knapp*.

Rather, we merely conclude that testimony compelled by the U.K. authorities may not be *used* in a U.S. criminal trial.

**101.** Gov't Br. 123.

**102.** For clarity, we have taken the liberty of emending the Government's original use of "a witness" to "that defendant," because self-incrimination, by definition, is only a concern when *the defendant* was the witness.

---

of witness immunity by the States or by the U.S. Congress.[105] Similarly, and "[f]or better or for worse, we live in a world of nation-states in which our Government must be able to 'function effectively in the company of sovereign nations.'"[106]

We are confident the Government is able to do so. Indeed, in a March 2016 address that specifically discussed the immunity issue in this case, Leslie Caldwell, then-Assistant Attorney General for the Criminal Division, observed that

> as we and our [foreign] counterparts work together more frequently and better understand our respective systems, we are having ... conversations [about double jeopardy and Fifth Amendment protections] earlier, so that individuals are much less likely to be caught in the middle of last minute turf battles over where and by whom a prosecution should be brought.[107]

In the present case, the Government was plainly aware from the outset—well before the FCA transmitted the Defendants' compelled testimony to Robson—of the need for close coordination of its efforts with those of the U.K. authorities. The practical outcome of our holding today is that the

---

**103.** *Id.* at 123.

**104.** *Younger v. Harris*, 401 U.S. 37, 44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

**105.** *See United States v. North*, 920 F.2d 940, 942 (D.C. Cir. 1990) ("[W]itnesses' exposure to immunized testimony can taint their trial testimony irrespective of the prosecution's role in the exposure."); *see also* 18 U.S.C. § 6005.

**106.** *Verdugo-Urquidez*, 494 U.S. at 275, 110 S.Ct. 1056 (quoting *Perez v. Brownell*, 356 U.S. 44, 57, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958)).

**107.** Leslie R. Caldwell, Remarks at American Bar Association's 30th Annual National Institute on White Collar Crime (Mar. 4, 2016), https://www.justice.gov/opa/speech/assistant-attorney-general-leslie-r-caldwell-speaks-american-bar-association-s-30th.

risk of error in coordination falls on the U.S. Government (should it seek to prosecute foreign individuals), rather than on the subjects and targets of cross-border investigations.

As to the Government's concerns that a hostile foreign government might hypothetically endeavor to sabotage U.S. prosecutions by immunizing a suspect and publicizing his or her testimony—that, of course, is not this case.[108] *This* case raises no questions regarding the legitimacy or regularity of the procedures employed by the U.K. government or the U.K. government's investigation more generally. We thus need only say here that should U.S. prosecutors or judges face the situation suggested by the Government, our holding today would not necessarily prevent prosecution in the United States. That is true not only if the U.S. prosecution navigated any resulting *Kastigar* issues by meeting its burden or by not using exposed wit-

nesses. It is true for another reason as well. Specifically, should the circumstances in a particular case indicate that a foreign defendant had faced no real threat of sanctions by his foreign government for not testifying, then that defendant's testimony might well not be considered involuntary.[109] In short, the situation hypothesized by the Government is not before us today, and our resolution of this case on the facts that are before us leaves open the issue of foreign efforts to sabotage a U.S. prosecution.

On the other hand, the Government nowhere responds to the troubling consequences of accepting its argument. As conceded at oral argument, the Government's rule would remove any bar to introducing compelled testimony directly in U.S. prosecutions similar to this one—as in, "Your honor, we offer Government Exhibit 1, the defendant's compelled testimony."[110] To be

---

108.  Hostile foreign governments could, of course, simply refuse to extradite a suspect to prevent his prosecution in the U.S., rather than attempt the elaborate means of sabotage suggested here. *See, e.g., In re Terrorist Bombings*, 552 F.3d at 208 ("[I]t is only through the cooperation of local authorities that U.S. agents obtain access to foreign detainees.").

109.  *See Hoffa v. United States*, 385 U.S. 293, 304, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) ("[A] necessary element of compulsory self-incrimination is some kind of compulsion."). In assessing whether the testimony in such a case was compelled by an actual threat, it would be relevant to consider whether the underlying investigation appeared to be bona fide; a sham investigation concocted to bestow immunity on "suspects" in exchange for their "compelled" testimony is unlikely to have produced testimony that was *actually* compelled, and thus *actually* involuntary—*i.e.*, backstopped by the credible threat of imprisonment. The circumstances of the foreign government's "publiciz[ing]," Gov't Br. 123, the defendant's supposedly compelled testimony would obviously be an important factor in evaluating a purportedly bona fide investigation.

110.  See the following exchange at oral argument before us:

> MR. PELLETTIERI:  ...  [W]e don't think we had to meet our burden under *Kastigar*. We only did it out of an abundance of caution because there was no compulsion. There was no compulsion by a sovereign bound by the Fifth Amendment.
>
> JUDGE LYNCH: Well, if that's true, then it would have been OK, would it not, for you to introduce the transcript of Conti's [or Allen's] testimony at this trial. You didn't do that.
>
> MR. PELLETTIERI: Under the Fifth Amendment. But we were being cautious, your Honor.

Oral Arg. Tr. 55–56. According to the Government's brief, "there may be some other constitutional doctrine apart from the Fifth Amendment right against self-incrimination that would require exclusion of a confession coerced by foreign officials, such as a due process violation based on conduct that 'shocks the judicial conscience,'" but it submits that "no such doctrine has been—or could be—claimed to apply in this case." Gov't Br. 122 n.22 (quoting *Yousef*, 327 F.3d at 146).

U.S. v. ALLEN                                                89
Cite as 864 F.3d 63 (2nd Cir. 2017)

sure, the Government did not introduce Defendants' compelled testimony directly and appears to have generally sought in good faith to respect the principles underlying the Fifth Amendment. But it is well established that a defendant's "preservation of his rights" does not turn "upon the integrity and good faith of the prosecuting authorities."[111] We cannot entertain a rule that discards the most basic Fifth Amendment right simply because prosecutors can be expected to respect its objectives generally.

The concerns that we express here are not idle. However unusual this particular prosecution may prove to be, so-called cross-border prosecutions have become more common.[112] Such prosecutions necessarily entail intimate coordination between the United States and foreign authorities. As then-Assistant Attorney General Caldwell put it in the address to which we

referred earlier, "[c]ollaboration and coordination among multiple regulators in cross-border matters is the future of major white collar criminal enforcement."[113] Perhaps the most striking development in cooperative conduct is the embedding of U.S. prosecutors in foreign law enforcement. According to Caldwell, the DOJ "recently placed Criminal Division prosecutors with Eurojust in The Hague and INTERPOL in France" and was "exploring the possibility of embedding prosecutors with other foreign law enforcement as well."[114] In a more recent address, Acting Principal Deputy Assistant Attorney General Trevor N. McFadden announced that DOJ will be detailing one of its anti-corruption prosecutors to work at the U.K. FCA—"the first time the Criminal Division ... will detail a prosecutor to work in a foreign regulatory agency on white collar crime issues."[115]

111.  *Kastigar*, 406 U.S. at 460, 92 S.Ct. 1653; *cf. United States v. Stevens*, 559 U.S. 460, 480, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*."); *Ullmann v. United States*, 350 U.S. 422, 428, 76 S.Ct. 497, 100 L.Ed. 511 (1956) ("Having had much experience with a tendency in human nature to abuse power, the Founders sought to close the doors against like future abuses by law-enforcing agencies.").

112.  The rise in non-prosecution agreements and deferred-prosecution agreements between the U.S. and foreign entities for misconduct occurring abroad attests to this new reality. In addition to LIBOR, there have recently been agreements arising out of investigations into the manipulation of certain foreign exchange rates, *see* DOJ, Press Release, *Five Major Banks Agree to Parent-Level Guilty Pleas* (May 20, 2015), https://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas; agreements arising out of investigations into U.S. tax evasion at Swiss banks, *see* DOJ, Swiss Bank Program, https://www.justice.gov/tax/swiss-bank-program (last visited July 18, 2017); and of course agreements arising out of FCPA enforcement,

*see* DOJ, FCPA-Related Enforcement Actions: 2017, https://www.justice.gov/criminal-fraud/case/related-enforcement-actions/2017 (last visited July 18, 2017). While a rise in *individual* prosecutions of foreign defendants may not be as evident, the DOJ has expressed a clear preference that, as a matter of general prosecutorial policy, where there is a resolution with an institution, there should be a prosecution of a responsible individual (or individuals) as well. *See* Sally Quillian Yates, Memorandum, Individual Accountability for Corporate Wrongdoing (Sept. 9, 2015), https://www.justice.gov/dag /individual-accountability.

113.  Caldwell, note 107, *ante.*

114.  *Id.*

115.  Trevor N. McFadden, Remarks at American Conference Institute's 7th Brazil Summit on Anti-Corruption (May 24, 2017), https://www.justice.gov/opa/speech/acting-principal-deputy-assistant-attorney-general-trevor-n-mcfadden-speaks-american. We also note that the U.K. government recently announced the creation of an "International Anti-Corruption Coordination Centre (IACCC), hosted

One area in particular where intimate cooperation and coordination will be needed between U.S. prosecutors and foreign authorities (or, perhaps, between U.S. prosecutors and U.S. prosecutors on detail to foreign authorities) is the securing of witness testimony. As the Government explained in a letter to the District Court in this case, "large scale economic crime conspiracies that harm U.S. markets, such as LIBOR rigging and the manipulation of the foreign exchange spot, often occur, in large part, overseas and *successful prosecutions of these matters frequently rely on evidence provided by witnesses who live in foreign countries*."[116] And as this case illustrates, foreign authorities may conduct compulsory witness interviews, including interviews of those who end up being—or are already—the targets of U.S. prosecution.

We do not presume to know exactly what this brave new world of international criminal enforcement will entail. Yet we are certain that these developments

abroad need not affect the fairness of our trials at home.[117] If as a consequence of joint investigations with foreign nations we are to hale foreign men and women into the courts of the United States to fend for their liberty we should not do so while denying them the full protection of a "*trial right*"[118] we regard as "fundamental"[119] and "absolute."[120]

Accordingly, we adhere to our precedent in assessing the voluntariness of inculpatory testimony compelled abroad by foreign governments. In the instant appeal, there is no question that the Defendants' testimony was compelled and, thus, involuntary. We therefore conclude in this case that the Fifth Amendment prohibited the Government from using Defendants' compelled testimony against them.

**B.  Whether Defendants' Rights Were Violated**

We thus turn to the parties' arguments under the doctrines of the Fifth Amendment and the seminal case of *Kastigar*.[121]

by the UK's National Crime Agency," the members of which "include agencies from Australia, Canada, New Zealand, Singapore, the UK and the USA, with Interpol scheduled to join later this year," as part of an effort to "bring[ ] together specialist law enforcement officers from multiple jurisdictions into a single location to tackle allegations of grand corruption." U. K. National Crime Agency, Press Release, *International Partners Join Forces To Tackle Global Grand Corruption* (July 5, 2017), http://www.national crimeagency.gov.uk/news/1138–international– partners–join–forces–to–tackle–global–grand– corruption.

**116.**  District Court Docket, Docket No. 264 (Gov't Sentencing Submission as to Paul Robson), at 4 (emphasis added).

**117.**  *See Balsys*, 524 U.S. at 700, 118 S.Ct. 2218 (Stevens, J., concurring) ("The primary office of the Clause at issue in this case is to afford protection to persons whose liberty has been placed in jeopardy in an American tribunal. The Court's holding today will not have

any adverse impact on the fairness of American criminal trials.").

**118.**  *Patane*, 542 U.S. at 641, 124 S.Ct. 2620 (emphasis in original) (internal quotation marks omitted).

**119.**  *Verdugo–Urquidez*, 494 U.S. at 264, 110 S.Ct. 1056.

**120.**  *Salinas*, 133 S.Ct. at 2179.

**121.**  We note that, under our Fifth Amendment jurisprudence, it is not clear whether all involuntary statements or all compelled statements should be subjected to the strong medicine prescribed in *Kastigar*, or whether some other doctrine should govern in certain circumstances. *Compare, e.g., United States v. Ghailani*, 743 F.Supp.2d 242 (S.D.N.Y. 2010) (rejecting the applicability of *Kastigar* to coerced and uncounseled statements made to agents of the U.S. Central Intelligence Agency and finding an attenuation analysis applied, while at the same time concluding that the

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself ...."[122] Like the privilege itself, the lawful compulsion of testimony under a grant of immunity has "historical roots deep in Anglo–American jurisprudence."[123] In *Kastigar*, the Supreme Court upheld the constitutionality of compelling testimony in exchange for "use and derivative use" immunity under 18 U.S.C. § 6002, because the scope of the protection afforded was "coextensive with the scope of the [Fifth Amendment] privilege."[124] Thus, the scope of the constitutional privilege and use and derivative use immunity are two sides of the same coin, and we therefore seek guidance from cases interpreting either.

[17]   In its holding, the *Kastigar* Court emphasized the breadth of use and derivative use protection. Such protection bars "use of compelled testimony, as well as evidence derived directly and indirectly therefrom."[125] And it "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, ... therefore insur[ing] that the testimony cannot lead to the infliction of criminal penalties on the witness."[126] As the *Kastigar* Court

observed, "[t]his total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an investigatory lead, and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures."[127] Because this "very substantial protection[ ] [is] commensurate with that resulting from invoking the privilege itself," it "leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege."[128]

[18]   *Kastigar* also established a doctrine to enforce this protection. When a witness has been compelled to testify relating to matters for which he is later prosecuted, the government bears "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources."[129] This burden is "not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony."[130]

---

"core application" doctrine was inapplicable due to the Fifth Amendment's self-incrimination clause), *with Chavez*, 538 U.S. at 769–70, 123 S.Ct. 1994 (2003) ("[O]ur cases provide that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial. This protection is, in fact, coextensive with the use and derivative use immunity mandated by *Kastigar* when the government compels testimony from a reluctant witness." (citations omitted)). We need not resolve such questions in this case. The Government makes no argument on behalf of applying something other than *Kastigar*—instead posing the Fifth Amendment question we answered above as "all or nothing," *see* Gov't Br. 118 (asserting that foreign compulsion "do[es] not implicate the Fifth Amendment" whatsoever)—and any

argument to that effect has therefore been waived.

122.   U.S. Const. amend. V.

123.   *Kastigar*, 406 U.S. at 445, 92 S.Ct. 1653.

124.   *Id.* at 453, 92 S.Ct. 1653.

125.   *Id.*

126.   *Id.* (emphasis in original).

127.   *Id.* at 460, 92 S.Ct. 1653 (internal quotation marks and footnote omitted).

128.   *Id.* at 461–62, 92 S.Ct. 1653.

129.   *Id.*

130.   *Id.* at 460, 92 S.Ct. 1653.

We interpreted the teaching of *Kastigar* a mere four years after the Supreme Court's decision, noting that

> [w]hile this formulation repeats rather than defines the word 'derived', it places a significant gloss upon it by putting the burden firmly on the prosecution to demonstrate that an indictment [and/or conviction] is the product of legitimate rather than tainted evidence, and by insisting that legitimate evidence be from a source *wholly* independent of the compelled testimony.[131]

In *United States v. Hubbell*, the Supreme Court rejected the government's attempt to shift this burden because doing so would "repudiat[e] the basis for ... *Kastigar*."[132] The Government must prove it has met this heavy, albeit not insurmountable, burden by a preponderance of the evidence.[133]

### 1. Was Evidence from Robson Tainted?

With the foregoing principles in mind, we consider whether any evidence from Robson used in Defendants' prosecution was tainted. To be clear, there is no dis-

pute that the Government "used" evidence from Robson: he was a key cooperator and a prominent trial witness. The less straightforward question is whether any evidence supplied by Robson (to the government, to the grand jury, or at trial) was tainted by his earlier review of the testimony of Defendants compelled in the United Kingdom under U.K. law.

Our Court apparently has never encountered the circumstance in which a government trial witness had, prior to testifying, reviewed a defendant's compelled testimony. The D.C. Circuit, however, has addressed the applicable legal standards in a pair of high-profile cases arising out of the Iran–Contra affair.[134] In those cases, that Court held that "the use of immunized testimony by witnesses to refresh their memories, or otherwise to focus their thoughts, organize their testimony, or alter their prior or contemporaneous statements, constitutes" an impermissible use of the defendants' compelled testimony.[135]

[19]  Despite briefing from both parties that cited the standards used by the D.C.

---

**131.**  *United States v. Kurzer*, 534 F.2d 511, 516 (1976) (Feinberg, J.) (emphasis in original) (internal quotation marks omitted).

**132.**  530 U.S. 27, 45–46, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000).

**133.**  *United States v. Nanni*, 59 F.3d 1425, 1431–32 (2d Cir. 1995).

**134.**  *See United States v. North*, 910 F.2d 843, 861 (D.C. Cir. 1990) ("*North I*"); *United States v. North*, 920 F.2d 940, 942 (D.C. Cir. 1990) ("*North II*"); *United States v. Poindexter*, 951 F.2d 369, 373 (D.C. Cir. 1991); *see also United States v. Slough*, 641 F.3d 544, 549–50 (D.C. Cir. 2011).

**135.**  *North I*, 910 F.2d at 856; *accord Poindexter*, 951 F.2d at 373 ("[A] prohibited use occurs if a witness's recollection is refreshed by exposure to the defendant's immunized testimony, or if his testimony is in any way shaped, altered, or affected, by such expo-

sure." (citation and internal quotation marks omitted)).

There is potential for semantic confusion surrounding the term "use." The federal immunity statute, like the Fifth Amendment, provides protection from direct and derivative use—meaning that the testimony itself and evidence derived from the testimony cannot be used. In other words, there is no meaningful distinction between the testimony itself and evidence derived from the testimony. Separately, our precedents recognize that certain alleged uses are without constitutional significance. *see, e.g., United States v. Mariani*, 851 F.2d 595, 600 (2d Cir. 1988) ("To the extent that [*United States v. McDaniel*, 482 F.2d 305 (8th Cir. 1973),] can be read to foreclose the prosecution of an immunized witness where his immunized testimony *might* have *tangentially* influenced the prosecutor's 'thought processes in preparing the indictment and preparing for trial, we decline to follow that reasoning." (emphases added)).

U.S. v. ALLEN                93
Cite as 864 F.3d 63 (2nd Cir. 2017)

Circuit, the District Court in this case relegated any mention of those precedents to a footnote that indicated that it would look only to Second Circuit precedent, of which there is none directly on point. As a result, it is unclear precisely what standards the District Court applied to determine whether the evidence supplied by Robson was tainted by his study of the Defendants' compelled testimony. What *is* clear, however, is that the District Court impermissibly lowered the bar when it determined that the Government had satisfied its heavy *Kastigar* burden based on the mere fact that Robson himself asserted that his testimony was not tainted by his review of Defendants' compelled testimony and the fact that there was corroborating evidence for Robson's trial testimony.[136]

In apparent agreement with both parties on appeal,[137] we conclude that the legal standards set forth by the D.C. Circuit in *North I* are helpful here. We need not, in this case, decide whether the Government is required to demonstrate that Robson's review of Defendants' compelled testimony did not in any manner subtly "refresh his memory, focus or organize his thoughts," or in some other traceless way influence his state of mind. At a minimum, however, we agree with the D.C. Circuit that the Government is required to prove that his exposure to the compelled testimony did not shape, alter, or affect the information that he provided and that the Government used.

[20]  The most effective way to demonstrate that a witness's testimony was untainted by exposure to a defendant's immunized testimony is by demonstrating that his or her testimony was unchanged from comparable testimony given before the exposure. Thus, typically, the prosecution can meet its burden by memorializing (or "canning") the witness's testimony prior to his or her exposure.[138]

[21]  In the present case, Robson did testify to the FCA regarding Rabobank's submission and alleged manipulation of LIBOR rates, as well as the roles of Allen and Conti, *prior to* Robson's exposure to Defendants' compelled testimony. But what Robson's "canned" testimony preserved is toxic to the Government's case; it omits or contradicts in material parts the testimony Robson later provided indirectly to the grand jury and directly to the petit jury. At the *Kastigar* hearing held by the District Court, Robson agreed that "the testimony that [he] gave to the [FCA] and the testimony that [he] gave before the jury in this trial were very different."[139] For instance, Robson testified to the jury about an altercation between Stewart and Damon Robbins, an alternate submitter for USD LIBOR, on Rabobank's London desk. But Robson did not testify about this to the FCA, and the *Kastigar* hearing raised questions about whether he had even seen the incident at all or merely read about it in the compelled testimony.[140] Far from rebutting the presumption that Robson's trial testimony was tainted, his pre-exposure testimony actually *evidences*

**136.**  We review *de novo* whether the legal standard applied by a district court was in error. *See Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,* —— U.S. ——, 134 S.Ct. 1744, 1748, 188 L.Ed.2d 829 (2014).

**137.**  *See* Defs.' Br. 102–07; Gov't Br. 138–40 (arguing that the District Court "performed the analysis required by the D.C. Circuit"); *see also id.* at 126–128.

**138.**  *See North II,* 920 F.2d at 942–43 (explaining that, absent canned testimony, it may be "extremely difficult for the prosecutor to sustain its burden of proof").

**139.**  *Kastigar* Hearing Tr. 25.

**140.**  *Id.* at 51–58.

**94**                    **864 FEDERAL REPORTER, 3d SERIES**

such taint through its material differences with Robson's post–exposure trial testimony.

As Robson's FCA testimony hurts rather than helps its cause, the Government appears to contend on appeal that it satisfied its burden solely through Robson's " 'persuasive[ ]' " testimony at the *Kastigar* hearing.[141] We conclude, however, that Robson's testimony at the hearing falls far short of satisfying the demands of *Kastigar*. As explained below, the Government adduced, at bottom, nothing more than bare, self-serving denials from Robson to meet its heavy burden. We hold that such conclusory denials are insufficient as a matter of law to sustain the prosecution's burden of proof under *Kastigar* in the face of materially inconsistent pre–exposure testimony.[142]

By the Government's own count, 27 of the 58 topics discussed by Robson during his trial testimony had an antecedent in Allen's compelled testimony, and 18 of those 58 topics had an antecedent in Conti's compelled testimony.[143] Yet at no time during the *Kastigar* hearing did Robson claim that he could "segregate the effects of his exposure" with respect to each, or *any*, of those topics.[144] Notably, the Gov-

ernment never asked Robson whether his memory was, or might have been, substantially refreshed by his review of Defendants' compelled testimony—or, to put a finer point on the inquiry, whether Robson could testify under oath at the *Kastigar* hearing that his memory had *not* been refreshed.

Robson *was* asked by the Government several times in various generalized, leading ways whether his review of the compelled testimony "inform[ed] ... in any way" his cooperation or testimony and he responded, without qualification, "no."[145] Despite Robson's unqualified assertions in response to those leading questions, we are mindful that memory remains "a mysterious thing,"[146] and its mysteries were on full display at the *Kastigar* hearing in the District Court. Perhaps most mysterious was what, exactly, Robson remembered of the compelled testimony of Allen and Conti that he had reviewed. For instance, Robson was asked if he had "any specific recollection of the materials that [he] had reviewed," and he answered "[n]o, not specifically."[147] But sometimes Robson *did* have specific recollections:

    Q. But when you read Mr. Conti's F[C]A transcript, you saw that he acknowl-

141.  Gov't Br. 128 (quoting *Poindexter*, 951 F.2d at 376 ("[W]here a substantially exposed witness does not *persuasively claim that he can segregate the effects of his exposure*, the prosecution does not meet its burden merely by pointing to other statements of the same witness that were not themselves shown to be untainted." (emphasis added))).

142.  However difficult or easy it may be, precisely, for the prosecution to sustain its burden of proof in the absence of *any* canned testimony or with the aid of materially *consistent* canned testimony—questions we need not answer or discuss in detail here—it is, at a minimum and without a doubt, extremely difficult for the prosecution to sustain its burden of proof in the face of materially *inconsistent* canned testimony. *Cf. North II*, 920 F.2d at

942–43 (explaining that, absent canned testimony, it may be "extremely difficult for the prosecutor to sustain its burden of proof"). In order to be "materially" inconsistent, the witness's account of events before exposure must be significantly different, and less incriminating, than the testimony ultimately used against the defendant.

143.  *See* JA 923–64.

144.  *Poindexter*, 951 F.2d at 376.

145.  *See, e.g., Kastigar* Hearing Tr. 126.

146.  *North I*, 910 F.2d at 860 (alteration omitted).

147.  *Kastigar* Hearing Tr. 8.

edged that Lee Stewart made requests that were intended to benefit his derivative positions. Do you recall that?

A. Yes, I do.[148]

Similarly, the Government asked Robson if he "learn[ed] any new facts from reviewing those materials," to which he answered "[n]o, I didn't."[149] But it later became apparent that he had learned, through reviewing the compelled testimony of Allen and Conti, of specific communications in which he had not been an original participant—and that Robson had discussed such communications with the DOJ when he began cooperating.[150] This particular inconsistency eventually led to the following colloquy between Robson and the District Court:

THE COURT: I just want to be sure I am clear on the chronology. You reviewed [Allen's and Conti's FCA testimony] when?

THE WITNESS: Towards the end of November 2013.

THE COURT: That was before you had begun cooperating with the government?

THE WITNESS: Yes, it is.

THE COURT: Some of the things you saw in this transcript were references to conversations that you had not been a party to yourself, yes?

THE WITNESS: Yes, your Honor.

THE COURT: And they were conversations that you did not know about until reading the transcripts, true?

THE WITNESS: Yes, your Honor.

THE COURT: So when you said, in answer to government counsel's question, that you were already familiar with various things, you weren't referring to these conversations, you were referring to some of the other things?

THE WITNESS: Sorry, your Honor?

THE COURT: A few minutes ago you said that you hadn't underlined or circled things that you didn't already know, or words to that effect, if I remember correctly.

THE WITNESS: I underlined and circled things that I believe were things that I knew from my personal experiences at Rabobank.

THE COURT: But not the specific conversations?

THE WITNESS: No, your Honor.

THE COURT: Is it your testimony that you did not bring any of those conversations to the attention of the government?

THE WITNESS: No, I didn't, your Honor.

THE COURT: Now, you testified yesterday that in preparation for your testimony, the government, after you began cooperating, showed you some of the e-mails involving conversations between two third-parties that you were not a party to, yes?

THE WITNESS: Yes.

THE COURT: But you knew about them because you had seen references to them in the transcripts of Mr. Allen or Mr. Conti, yes?

THE WITNESS: Some of them I had, yes.

148. *Id.* at 119–20; *cf. id.* at 52 ("Q. [Y]ou recall that [information about the dispute between Stewart and alternate LIBOR submitter Damon Robbins] was contained in Mr. Allen's compelled testimony, right? Right? A. I have a vague recollection. I can't remember the specifics.").

149. *Id.* at 8; *see also, e.g., id.* at 15 (Q. Did you learn any specific facts about [the co-defendants who pleaded guilty] from [Allen's and Conti's] FCA testimony? A. Not that I recall, no.").

150. *See, e.g., id.* at 124, 179–80, 182, 185; *see also id.* at 143–44.

THE COURT: When they showed them to you, did you say to the government, I have seen that before?

THE WITNESS: I don't recall, sir.

THE COURT: Did you say, I haven't seen them before?

THE WITNESS: I think there were a couple I hadn't seen, which I might have mentioned I hadn't seen.[151]

Even Robson's more generalized recollection of the transcripts appeared to wax and wane depending on the month (or even the day) in which he was asked. At one point during the *Kastigar* hearing, defense counsel directed Robson's attention to an August 5, 2015 declaration—in which Robson had declared, "I recall that I did not agree with or believe everything reflected in transcripts of Messrs. Allen and Conti . . . "[152]—and the following exchange ensued:

Q. So did you recall when you signed this on August 5, 2015[,] not agreeing or believing with everything in Mr. Conti's transcript?

A. Yes.

Q. Do you recall *now* [on December 16, 2015,] not agreeing at the time that you

read the transcript with everything Mr. Conti said?

A. I don't recall. Sorry.[153]

Adding another wrinkle, Robson would, during the next day of testimony at the *Kastigar* hearing, explain his various purposes for annotating, underlining, or circling various passages of the compelled testimony of Allen and Conti as including the "circl[ing of] anything that I felt was untrue."[154]

Even putting aside such mnemonic curiosities, Robson's testimony at the *Kastigar* hearing with respect to his ability to "segregate the effects of his exposure" amounts to nothing more than simply replying "no" in a conclusory fashion to generalized leading questions from the Government.[155] We have found the sorts of bare, self-serving denials given by Robson, when given by a prosecutor (*i.e.*, an officer of the court), to be insufficient to satisfy the demands of *Kastigar*,[156] and the Government supplies no convincing reason why the same rule should not apply here.[157] In light of the foregoing discussion, moreover, it seems clear to us that the same rule *should* apply.

151. *Id.* at 220–22.

152. *Id.* at 110.

153. *Id.* (emphasis added). *But see, e.g.*, note 62, *ante* (providing an instance in which Robson circled material in the transcript that he later provided to the jury at trial, but that he earlier had told the FCA he did not know).

154. *Id.* at 185–86.

155. *See, e.g., id.* at 11–14.

156. *See Nanni*, 59 F.3d at 1432; *United States v. Tantalo*, 680 F.2d 903, 908 (2d Cir. 1982); *United States v. Nemes*, 555 F.2d 51, 55 (2d Cir. 1977). In *Tantalo*, we explained that "the heavy burden cast upon the Government . . . is not satisfied by the prosecution's assertion

that immunized testimony was not used" and that "[s]uch disclaimer provides an inadequate basis for the denial of a motion to dismiss an indictment." 680 F.2d at 908.

157. The weakness of Robson's denials is particularly troubling given the nature of his review of the immunized testimony. Robson was not merely a witness who was exposed in some tangential way to Defendants' immunized testimony. He was a subject of the same investigation, who later became a government cooperator, who was provided by his lawyer with the transcripts of their statements, and made, as instructed by his lawyer, a careful review of those transcripts, at a time when he had a substantial motive to examine that testimony and either conform his own statements to, or protect himself against, what he found there.

Accordingly, we hold that a bare, generalized denial of taint from a witness who has materially altered his testimony after being substantially exposed to a defendant's compelled testimony is insufficient as a matter of law to sustain the prosecution's burden of proof under *Kastigar* that that witness's testimony was derived from a wholly independent source.

[22]   In view of our holdings, the District Court's conclusion that the prosecution had met its heavy burden under *Kastigar* to show that the evidence supplied by Robson was untainted cannot stand. Moreover, a remand for a further factual hearing on the question of taint would be futile. For one thing, Robson was again shown, and he again reviewed, critical portions of Defendants' compelled testimony during the *Kastigar* hearing.[158] And what Robson did repeatedly claim at the hearing—an inability to recall clearly much of anything—establishes that he lacked the ability "to separate the wheat of [his] unspoiled memory from the chaff of [Defendants'] immunized testimony."[159] Notably, the Government does not even request a remand on this question or otherwise suggest it has some plausible alternative means of sustaining its burden of proof.

In sum, the Government did not, and cannot, meet its burden under *Kastigar*. We therefore conclude that the Government's use of evidence provided by Robson violated the Defendants' Fifth Amendment rights.

## 2.  Was the "Use" Harmless?

[23]   Even where a prosecution runs afoul of *Kastigar*'s strict standards, we will not vacate or reverse a conviction where the error was harmless.[160] We thus turn to whether the admission of Robson's tainted testimony constituted harmless error.

### a.  Use at Trial

[24]   When tainted evidence is presented at trial, we will deem the error harmless if we are "persuaded beyond a reasonable doubt that the jury would have reached the same verdict even without consideration of the tainted evidence."[161]

[25]   Upon review of the trial record, we have no trouble concluding that this error was not harmless beyond a reasonable doubt. While two other cooperating witnesses testified, Robson was the unique source of particularly significant and incriminating evidence. Robson was the only LIBOR *submitter* to testify on behalf of the government, and he testified—contrary to the Defendants' central argument for acquittal—that, pursuant to a scheme at Rabobank, he in fact took trading positions into account when making submissions.[162] And Robson was also the *only* witness the Government ever interviewed who said that Allen "directed" Rabobank's submitters to account for trading positions when setting LIBOR.[163] Indeed, absent Robson's testimony that Allen issued "instructions" to him,[164] Allen likely would not

---

158.  At a side bar during the *Kastigar* hearing, the parties reached an agreement in which defense counsel would be permitted to use the transcripts of Defendants' FCA testimony during cross-examination of Robson. *See Kastigar* Hearing Tr. 38–39.

159.  *North I*, 910 F.2d at 862.

160.  *See Nanni*, 59 F.3d at 1443.

161.  *Id.*

162.  JA 225 (Trial Tr. 333–34).

163.  *See Kastigar* Hearing Tr. 253.

164.  JA 908 (Agent Weeks testifying before the grand jury that Robson informed him that Allen issued "instructions" pertaining to "both yen and dollar" LIBOR manipulation).

have been charged, much less convicted, of the nine counts relating to specific JPY LIBOR submissions, because Allen never submitted LIBOR estimates for that currency.[165] Well aware of the substantial litigation risk under *Kastigar* of using a witness who not only had been exposed to Defendants' compelled testimony but who dramatically changed his own story after such exposure, the Government nevertheless chose to call Robson to the witness stand, underscoring the significance of his testimony to the Government's case.[166]

Accordingly, we conclude that the admission of Robson's trial testimony was not harmless. This error requires that Defendants' convictions be vacated and that they be awarded a new trial wherein any tainted statements are suppressed.[167] Defendants also argue, however, that the use of Robson's tainted evidence, conveyed to the grand jury through Agent Weeks's testimony, requires dismissal of the indictment. We thus turn to that argument.

### b. Use in the Grand Jury

Our precedents establish that an indictment is subject to dismissal if it was procured on the basis of tainted evidence. In *United States v. Hinton*,[168] the same grand jury that had heard a witness's immunized testimony later returned an indictment against that witness. We dismissed the indictment, explaining in part that "the fact that none of Hinton's immunized testimony was introduced at the trial does not resolve the question, for [the federal immunity statute] speaks to any use of the immunized testimony against the witness in any criminal case, and so prohibits its use not merely at trial, but in the grand jury proceedings as well."[169] Our holding in *United States v. Tantalo* was to the same effect,[170] and in *United States v. Nanni* we explained that "if the government has presented immunized testimony to the grand jury, the indictment should be dismissed unless the government establishes that the grand jury would have indicted even ab-

---

**165.** *See id.* at 301 (Trial Tr. 1225–26) (stating Paul Butler was the backup JPY submitter when Robson was unavailable).

**166.** Outside the context of this appeal, the Government itself has explicitly attested to its significance. In a letter regarding Robson's cooperation, submitted to the District Court pursuant to Section 5K1.1 of the Sentencing Guidelines, the Government argued in favor of "a downward departure [from Mr. Robson's applicable Sentencing Guidelines range] in light of [the] substantial assistance provided by Mr. Robson." District Court Docket, Docket No. 264 (Gov't Sentencing Submission as to Paul Robson), at 1. The letter explained that

> Mr. Robson provided substantial assistance to the government in two meaningful ways. First, he assisted in the prosecution of Anthony Allen and Anthony Conti by providing compelling testimony at their trial in October 2015 .... Mr. Robson was an effective witness. He was candid about his culpability and helped the jury to understand dozens of communications laced with lingo and

technical trading language. Mr. Robson's explanations for how the scheme worked and why it was dishonest were persuasive. *Id.* at 2–3 (emphasis omitted).

**167.** Pursuant to the parties' agreement in this case, *see* note 158, *ante*, such a retrial might have resulted in the Government being permitted (should it so choose) to read into the record the portions of Robson's trial testimony that did not have any overlap with Allen's and Conti's compelled testimony. *Cf. Slough*, 641 F.3d at 550 (reasoning that "elements of [an exposed witness's] testimony [which] have no antecedent in the immunized statements ... cannot be tainted (unless somehow the statements caused [the exposed witness's] testimony in some subtler way)").

**168.** 543 F.2d 1002 (2d Cir. 1976).

**169.** *Id.* at 1009.

**170.** 680 F.2d 903, 908–09 (2d Cir. 1982) ("[I]t was error to deny the appellant's motion to dismiss the superseding indictment.").

## U.S. v. ALLEN
Cite as 864 F.3d 63 (2nd Cir. 2017)

99

sent that testimony."[171]

The Government's reliance on our 1990 decision in *United States v. Rivieccio*[172] is misplaced. To whatever extent *Rivieccio* may have accurately described the law in our Circuit, at the time it was decided,[173] it has been overtaken by the Supreme Court's subsequent decision in *United States v. Hubbell*.[174] The defendant in *Hubbell* had been forced to produce documents to the grand jury, which, the Supreme Court held, violated his Fifth Amendment right pursuant to the act-of-production doctrine.[175] The Supreme Court further held that dismissal of the indictment was required despite the fact that it "assume[d] that the Government is ... entirely correct in its submission that it would not

have to advert to respondent's act of production in order to prove the existence, authenticity, or custody of any documents that it might offer in evidence at a criminal trial."[176] In fact, the Government had "disclaim[ed] any need to introduce any of the documents produced by respondent into evidence in order to prove the charges against him."[177] Nevertheless, the Supreme Court held that the government had made use of compelled testimony and that dismissal of the indictment was required.[178]

[26, 27]  Accordingly, in view of *Hubbell*, our precedents, and the general principle that harmless error review applies to violations of non-structural constitutional rights,[179] "if the government has presented immunized testimony to the grand jury,

171. 59 F.3d 1425, 1443 (2d Cir. 1995).

172. 919 F.2d 812 (2d Cir. 1990).

173. In *Rivieccio*, we stated that when the Government uses "immunized testimony before a grand jury, generally the remedy for the violation is the suppression of the tainted evidence at trial, not a dismissal of the indictment." *Id.* at 186. In a footnote, *Rivieccio* characterized *Hinton* and *Tantalo* as falling in one of "two narrow exceptions to th[is] general rule"—applicable when the same grand jury that heard the immunized testimony returned the indictment. *Id.* at 816 n.4. The other exception *Rivieccio* identified was when "the indictment rests almost exclusively on tainted evidence." *Id.* (citing *United States v. Tane*, 329 F.2d 848, 854 (2d Cir. 1964)). *Rivieccio* did not offer a rationale for this "general rule" and its "narrow exceptions."

In addition, *Rivieccio* offered a confusing holding with respect to whether *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), applies to *Kastigar* errors in the grand jury. Compare *Rivieccio*, 919 F.2d at 817 (stating that "any misuse of the immunized testimony which may have occurred before the indicting Grand Jury was rendered harmless" because at trial "the Government did not use, either directly or indirectly," any immunized testimony before the convicting petit jury), *with id.* at 817 n.5 (purporting not to "express any opinion" regarding whether

the petit jury's guilty verdicts had rendered harmless any error in the grand jury pursuant to *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986)).

174. 530 U.S. 27, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000).

175. *Id.* at 40–46, 120 S.Ct. 2037.

176. *Id.* at 41, 120 S.Ct. 2037.

177. *Id.*

178. *Id.* at 45, 120 S.Ct. 2037 ("*Kastigar* requires that respondent's motion to dismiss the indictment on immunity grounds be granted unless the Government proves that the evidence it used in obtaining the indictment and proposed to use at trial was derived from legitimate sources 'wholly independent' of the [immunized testimony].").

179. "The Supreme Court has distinguished two kinds of errors that can occur at, or in relation to, a criminal proceeding: so-called 'trial errors,' which are of relatively limited scope and which are subject to harmless error review, and 'structural defects,' which require reversal of an appealed conviction because they 'affect[ ] the framework within which the trial proceeds.'" *United States v. Feliciano*, 223 F.3d 102, 111 (2d Cir. 2000) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–10,

the indictment should be dismissed unless the government establishes that the grand jury would have indicted even absent that testimony."[180] "[E]xploration of the question of taint can be made ... by review of the prosecution's evidence and of the grand jury transcript."[181]

Upon review of the evidence and testimony presented to the grand jury in this case, we cannot conclude beyond a reasonable doubt that the grand jury would have indicted Allen and Conti without the evidence supplied by Robson. As the District Court itself acknowledged, "material parts of [Agent Weeks's] grand jury testimony derived exclusively from Mr. Robson."[182] Specifically, when Agent Weeks testified that Allen was the scheme's leader who had "instructed, specifically instructed, LIBOR submitters in London to consider the positions and the requests of Rabobank traders and adjust their submissions for LIBOR," his testimony derived exclusively from Robson's proffer.[183] And when Agent Weeks testified that Mr. Conti "adjusted his U.S. dollar LIBOR rates ... for his own benefit and the benefit of the other traders,"[184] he based his testimony exclusively upon Mr. Robson's proffer, telling the grand jury that "Mr. Robson said that sitting near Mr. Conti he was aware that Mr. Conti set U.S. dollar LIBOR rates in which he considered his own positions as appropriate reason or justification for setting the rates."[185]

These statements were not merely "material." They were essential—especially (as already noted) with respect to the JPY-related charges against Allen.[186] More broadly, they provided the grand jury with definitive, clear-cut testimony that Allen and Conti had directly participated in the scheme.

Seeking to downplay the importance of the evidence supplied by Robson, the Government emphasizes the extent of its documentary evidence. But all of this documentary evidence was available prior to Robson's cooperation and the Government did not attempt to indict Allen and Conti on the basis of it. Said differently, the fact that the Government did not charge Allen and Conti until Robson became a cooperator ("flipped," in the argot of law enforcement) further signifies the importance of his evidence to the indictment. Indeed, at

---

111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The Supreme Court has "recognized that 'most constitutional errors can be harmless.'" *Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (quoting *Fulminante*, 499 U.S. at 306, 111 S.Ct. 1246). By the same token, the Supreme Court has "found an error to be 'structural,' and thus subject to automatic reversal, only in a 'very limited class of cases.'" *Id.* at 8, 119 S.Ct. 1827 (quoting *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless–error analysis." *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *see also United States v. Dhinsa*, 243 F.3d 635, 659 (2d Cir. 2001) ("It is beyond cavil that most constitutional errors occurring during trial may [potentially] be

deemed harmless and, thus, not require automatic reversal of a conviction.").

**180.**  *Nanni*, 59 F.3d at 1433; *see also Poindexter*, 951 F.2d at 377. Because we have already concluded that Defendants' convictions at trial must be vacated, we need not and do not consider whether *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) extends to *Kastigar* error. *See* note 173, *ante*.

**181.**  *Hinton*, 543 F.2d at 1010 n.10.

**182.**  *Allen*, 160 F.Supp.3d at 697.

**183.**  JA 907; *see also id.* at 909.

**184.**  *Kastigar* Hearing Tr. 253–54.

**185.**  JA 910.

**186.**  *See* text at note 165, *ante*.

**U.S. v. ALLEN**

Cite as 864 F.3d 63 (2nd Cir. 2017)

**101**

Robson's plea hearing, the Government informed the District Court explicitly that "there is . . . a chance that we would seek a superseding indictment *in light of information that has come to light from our two cooperators*" and that there was "a distinct possibility" the new indictment would "involve[ ] other individuals."[187] We cannot discount as unreasonable the possibility that, without the evidence supplied by Robson and conveyed to the grand jury by Agent Weeks, the grand jury would not have returned an indictment charging Allen and Conti.

Neither did the District Court suggest that the evidence conveyed from Robson, through Agent Weeks, to the grand jury, was harmless; instead, the District Court concluded that the Government had met its burden to prove Robson's evidence was untainted.[188] As explained above, that conclusion was in error. Because we cannot conclude that the *Kastigar* errors before the grand jury were harmless, the indictment must be dismissed.

### III. CONCLUSION

To summarize:

(1) The Fifth Amendment's prohibition on the use of compelled testimony in American criminal proceedings applies even when a foreign sovereign has compelled the testimony. To be clear, we do not purport to prescribe what the U.K. authorities (or any foreign authority) may do in their witness interviews or their criminal trials. We merely hold that the Self–Incrimination Clause prohibits the use and derivative use of compelled testimony in an American criminal case against the defendant who provided that testimony.

(2) When the government uses a witness who has been substantially exposed to a defendant's compelled testimony, it is required under *Kastigar v. United States*, 406 U.S. 441 [92 S.Ct. 1653, 32 L.Ed.2d 212] (1972), to prove, at a minimum, that the witness's review of the compelled testimony did not shape, alter, or affect the evidence used by the government.

(3) Where, as here, the witness's account of events before exposure was significantly different, and less incriminating, than the testimony ultimately used against the defendants, the witness's bare, generalized denial of taint—here, the witness's conclusory responses to the Government's leading questions during the *Kastigar* hearing—is insufficient as a matter of law to sustain the prosecution's burden of proof.

(4) In this prosecution, Defendants' compelled testimony was "used" against them through evidence provided by a tainted witness, a key cooperator and prominent witness both at trial and (via a hearsay presentation) before the grand jury. This tainted testimony was significant both at trial and in the grand jury, because it provided the only first-hand eyewitness account that refuted the Defendants' central argument for acquittal, and was therefore not harmless beyond a reasonable doubt.

For the foregoing reasons, we **REVERSE** the judgments of conviction and hereby **DISMISS** the indictment.



187. JA 903 (emphasis added). As already noted, the other cooperator, Yagami (a JPY trader located in Japan), never discussed LIBOR with Allen and at trial never testified about a single instance in which Conti (the principal

USD LIBOR submitter) was responsible for a JPY LIBOR submission. *See* notes 41–42, *ante*.

188. *Allen*, 160 F.Supp.3d at 696–97.

The attached is **Exhibit "C3"** referred
to in the 1st Affidavit of James R. Drabick, affirmed
before me on this 14 day of November, 2023

_____
Notary Public

Kastigar v. U.S., 406 U.S. 441 (1972)

**114**

92 S.Ct. 1653, 32 L.Ed.2d 212

92 S.Ct. 1653
Supreme Court of the United States

Charles Joseph KASTIGAR and
Michael Gorean Stewart, Petitioners,
v.
UNITED STATES.

No. 70—117.
|
Argued Jan. 11, 1972.
|
Decided May 22, 1972.
|
Rehearing Denied June 26, 1972.

See 408 U.S. 931, 92 S.Ct. 2478.

**Synopsis**

Petitioners were ordered to appear before a grand jury and to answer questions under grant of immunity and, on refusal of the petitioners to answer questions, after asserting their privilege against compulsory self-incrimination, the United States District Court for the Central District of California adjudged petitioners to be in civil contempt and ordered them confined. The Court of Appeals, Ninth Circuit, affirmed, 440 F.2d 954. The Supreme Court granted certiorari, and, speaking through Mr. Justice Powell, held that although a grant of immunity must afford protection commensurate with that afforded by the privilege against compulsory self-incrimination, it need not be broader, and immunity from use and derivative use is coextensive with the scope of the privilege and is sufficient to compel testimony over claim of privilege. The Court also held that in any subsequent criminal prosecution of a person who has been granted immunity to testify, the prosecution has the burden of proving affirmatively that evidence proposed to be used is derived from a legitimate source wholly independent of compelled testimony.

Affirmed.

Mr. Justice Douglas and Mr. Justice Marshall dissented and filed opinions.

Mr. Justice Brennan and Mr. Justice Rehnquist took no part in consideration or decision.

**1654 *441 Syllabus***

The United States can compel testimony from an unwilling witness who invokes the Fifth Amendment privilege against compulsory self-incrimination by conferring immunity, as provided by 18 U.S.C. s 6002, from use of the compelled testimony and evidence derived therefrom in subsequent criminal proceedings, as such immunity from use and derivative use is coextensive with the scope of the privilege and is sufficient to compel testimony over a claim of the privilege. Transactional immunity would afford broader protection than the Fifth Amendment privilege, and is not constitutionally required. In a subsequent criminal prosecution, the prosecution has the burden of proving affirmatively that evidence proposed to be used is derived from a legitimate source wholly independent of the compelled testimony. Pp. 1655—1666.

440 F.2d 954, affirmed.

**Attorneys and Law Firms**

**1655 Hugh R. Manes, Los Angeles, Cal., for petitioners.

Sol. Gen. Erwin N. Griswold, for respondent.

**Opinion**

*442 Mr. Justice POWELL delivered the opinion of the Court.

This case presents the question whether the United States Government may compel testimony from an unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring on the witness immunity from use of the compelled testimony in subsequent criminal proceedings, as well as immunity from use of evidence derived from the testimony.

Petitioners were subpoenaed to appear before a United States grand jury in the Central District of California on February 4, 1971. The Government believed that petitioners were likely to assert their Fifth Amendment privilege. Prior to the scheduled appearances, the Government applied to the District Court for an order directing petitioners to answer questions and produce evidence before the grand jury under a grant of immunity conferred pursuant to 18 U.S.C. ss 6002, 6003. Petitioners opposed issuance of the order, contending primarily that the scope of the immunity provided by the

A1711

**Kastigar v. U.S., 406 U.S. 441 (1972)**
92 S.Ct. 1653, 32 L.Ed.2d 212

115

statute was not coextensive with the scope of the privilege against self-incrimination, and therefore was not sufficient to supplant the privilege and compel their testimony. The District Court rejected this contention, and ordered petitioners to appear before the grand jury and answer its questions under the grant of immunity.

Petitioners appeared but refused to answer questions, asserting their privilege against compulsory self-incrimination. They were brought before the District Court, and each persisted in his refusal to answer the grand jury's questions, notwithstanding the grant of immunity. The court found both in contempt, and committed them to the custody of the Attorney General until either they answered the grand jury's questions or the term of the grand jury expired.[1] The Court of *443 Appeals for the Ninth Circuit affirmed. Stewart v. United States, 440 F.2d 954 (CA9 1971). This Court granted certiorari to resolve the important question whether testimony may be compelled by granting immunity from the use of compelled testimony and evidence derived therefrom ('use and derivative use' immunity), or whether it is necessary to grant immunity from prosecution for offenses to which compelled testimony relates ('transactional' immunity). 402 U.S. 971, 91 S.Ct. 1668, 29 L.Ed.2d 135 (1971).

### I

The power of government to compel persons to testify in court or before grand juries and other governmental agencies is firmly established in Anglo-American jurisprudence.[2] The power with respect to courts was established by statute in England as early as 1562,[3] and Lord Bacon observed in 1612 that all subjects owed the King their 'knowledge and discovery.'[4] While it is not clear when grand juries first resorted to compulsory process to secure the attendance and testimony of witnesses, the general common-law principle that 'the public has a right to every man's evidence' was considered an 'indubitable certainty' that 'cannot be denied' by 1742.[5] The **1656 power to compel testimony, and the corresponding duty to testify, are recognized in the Sixth Amendment *444 requirements that an accused be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his favor. The first Congress recognized the testimonial duty in the Judiciary Act of 1789, which provided for compulsory attendance of witnesses in the federal courts.[6] Mr. Justice White noted the importance of this essential power of government in his

concurring opinion in Murphy v. Waterfront Comm'n, 378 U.S. 52, 93—94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678 (1964): 'Among the necessary and most important of the powers of the States as well as the Federal Government to assure the effective functioning of government in an ordered society is the broad power to compel residents to testify in court or before grand juries or agencies. See Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979. Such testimony constitutes one of the Government's primary sources of information.'

But the power to compel testimony is not absolute. There are a number of exemptions from the testimonial duty,[7] the most important of which is the Fifth Amendment privilege against compulsory self-incrimination. The privilege reflects a complex of our fundamental values and aspirations,[8] and marks an important advance in the development of our liberty.[9] It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory;[10] and it *445 protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.[11] This Court has been zealous to safeguard the values which underlie the privilege.[12]

Immunity statutes, which have historical roots deep in Anglo-American jurisprudence,[13] are not incompatible *446 with **1657 these values. Rather, they seek a rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify. The existence of these statutes reflects the importance of testimony, and the fact that many offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime. Indeed, their origins were in the context of such offenses,[14] *447 and their primary use has been to investigate such offenses.[15] Congress included immunity statutes in many of the regulatory measures adopted in the first half of this century.[16] Indeed, prior to the enactment of the statute under consideration in **1658 this case, there were in force over 50 federal immunity statutes.[17] In addition, every State in the Union, as well as the District of Columbia and Puerto Rico, has one or more such statutes.[18] The commentators,[19] and this Court on several occasions,[20] have characterized immunity statutes as essential to the effective enforcement

A1712

Kastigar v. U.S., 406 U.S. 441 (1972)

**116**

92 S.Ct. 1653, 32 L.Ed.2d 212

of various criminal statutes. As Mr. Justice Frankfurter observed, speaking for the Court in Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956), such statutes have 'become part of our constitutional fabric.'[21] Id., at 438, 76 S.Ct., at 506.

#### \*448  II

Petitioners contend, first, that the Fifth Amendment's privilege against compulsory self-incrimination, which is that '(n)o person '.. . shall be compelled in any criminal case to be a witness against himself,' deprives Congress of power to enact laws that compel self-incrimination, even if complete immunity from prosecution is granted prior to the compulsion of the incriminatory testimony. In other words, petitioners assert that no immunity statute, however drawn, can afford a lawful basis for compelling incriminatory testimony. They ask us to reconsider and overrule Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896), and Ullmann v. United States, supra, decisions that uphold the constitutionality of immunity statutes.[22]

We find no merit to this contention and reaffirm the decisions in Brown and Ullmann.

#### III

Petitioners' second contention is that the scope of immunity provided by the federal witness immunity statute, 18 U.S.C. s 6002, is not coextensive with the scope of the Fifth Amendment privilege against compulsory self-incrimination, and therefore is not sufficient to supplant the privilege and compel testimony over a claim of the privilege. The statute provides that when a witness is compelled by district court order to testify over a claim of the privilege:

'the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information  \*449  directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.'[23] 18 U.S.C. s 6002.

**\*\*1659** The constitutional inquiry, rooted in logic and history, as well as in the decisions of this Court, is whether the immunity granted under this statute is coextensive with the scope of the privilege.[24] If so, petitioners' refusals to answer based on the privilege were unjustified, and the judgments of contempt were proper, for the grant of immunity has removed the dangers against which the privilege protects. Brown v. Walker, supra. If, on the other hand, the immunity granted is not as comprehensive as the protection afforded by the privilege, petitioners were justified in refusing to answer, and the judgments of contempt must be vacated. McCarthy v. Arndstein, 266 U.S. 34, 42, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924).

Petitioners draw a distinction between statutes that provide transactional immunity and those that provide, as does the statute before us, immunity from use and derivative use.[25] They contend that a statute must at a minimum grant full transactional immunity in order to be coextensive with the scope of the privilege. In support of this contention, they rely on Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), the first case in which this Court considered a constitutional challenge to an immunity statute. The statute, a reenactment of the Immunity Act of 1868,[26] provided that no 'evidence obtained from a party or witness by means of a judicial  \*450  proceeding . . . shall be given in evidence, or in any manner used against him ... in any court of the United States . . .'[27] Notwithstanding a grant of immunity and order to testify under the revised 1868 Act, the witness, asserting his privilege against compulsory self-incrimination, refused to testify before a federal grand jury. He was consequently adjudged in contempt of court.[28] On appeal, this Court construed the statute as affording a witness protection only against the use of the specific testimony compelled from him under the grant of immunity. This construction meant that the statute 'could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him.'[29] Since the revised 1868 Act, as construed by the Court, would permit the use against the immunized witness of evidence derived from his compelled testimony, it did not protect the witness to the same extent that a claim of the privilege would protect him. Accordingly, under the principle that a grant of immunity cannot supplant the privilege, and is not sufficient to compel testimony over a claim of the privilege, unless the scope of the grant of immunity is coextensive with the scope of the privilege,[30] the witness' refusal to testify was held proper.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.    3

A1713

In the course of its opinion, the Court made the following statement, on which petitioners heavily rely:

'We are clearly of opinion that no statute which leaves the party or witness **1660 subject to prosecution *451 after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. (The immunity statute under consideration) does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offence to which the question relates.' 142 U.S., at 585—586, 12 S.Ct., at 206.

Sixteen days after the Counselman decision, a new immunity bill was introduced by Senator Cullom,[31] who urged that enforcement of the Interstate Commerce Act would be impossible in the absence of an effective immunity statute.[32] The bill, which became the Compulsory Testimony Act of 1893,[33] was drafted specifically to meet the broad language in Counselman set forth above.[34] The new Act removed the privilege against self-incrimination in hearings before the Interstate Commerce Commission and provided that:

'no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise . . .' Act of Feb. 11, 1893, 27 Stat. 444.

*452 This transactional immunity statute became the basic form for the numerous federal immunity statutes[35] until 1970, when, after re-examining applicable constitutional principles and the adequacy of existing law, Congress enacted the statute here under consideration.[36] The **1661 new statute, which does not 'afford (the) absolute immunity against future prosecution' referred to in Counselman, was drafted to meet what Congress judged to be the conceptual basis of Counselman, as elaborated in subsequent decisions of the Court, namely, that immunity from the *453 use of compelled testimony and evidence derived therefrom is coextensive with the scope of the privilege.[37]

The statute's explicit proscription of the use in any criminal case of 'testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information)' is consonant with Fifth Amendment standards. We hold that such immunity from

use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being 'forced to give testimony leading to the infliction of 'penalties affixed to . . . criminal acts.'[38] Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in any respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.

Our holding is consistent with the conceptual basis of Counselman. The Counselman statute, as construed by the Court, was plainly deficient in its failure to *454 prohibit the use against the immunized witness of evidence derived from his compelled testimony. The Court repeatedly emphasized this deficiency, noting that the statute:

'could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding . . .' 142 U.S., at 564, 12 S.Ct., at 198—199;

that it:

'could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion and on which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convicted,' ibid.;

and that it:

'affords no protection against that use of compelled testimony which consists in gaining therefrom a knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness or party.' 142 U.S., at 586, 12 S.Ct., at 206.

The basis of the Court's decision was recognized in Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed.

Kastigar v. U.S., 406 U.S. 441 (1972)

92 S.Ct. 1653, 32 L.Ed.2d 212

511 (1956), in which the Court reiterated **1662 that the Counselman statute was insufficient:

'because the immunity granted was incomplete, in that it merely forbade the use of the testimony given and failed to protect a witness from future prosecution based on knowledge and sources of information obtained from the compelled testimony.' Id., at 437, 76 S.Ct., at 506. (Emphasis supplied.)

See also Arndstein v. McCarthy, 254 U.S. 71, 73, 41 S.Ct. 26, 27, 65 L.Ed. 138 (1920). The broad language in Counselman relied upon by petitioners *455 was unnecessary to the Court's decision, and cannot be considered binding authority. [39]

In Murphy v. Waterfront Comm'n, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), the Court carefully considered immunity from use of compelled testimony and evidence derived therefrom. The Murphy petitioners were subpoenaed to testify at a hearing conducted by the Waterfront Commission of New York Harbor. After refusing to answer certain questions on the ground that the answers might tend to incriminate them, petitioners were granted immunity *456 from prosecution under the laws of New Jersey and New York. [40] They continued to refuse to testify, however, on the ground that their answers might tend to incriminate them under federal law, to which the immunity did not purport to extend. They were adjudged in civil contempt, and that judgment was affirmed by the New Jersey Supreme Court. [41]

The issue before the Court in Murphy was whether New Jersey and New York could compel the witnesses, whom these States had immunized from prosecution under their laws, to give testimony that might then be used to convict them of a federal crime. Since New Jersey and New York had not purported to confer immunity from federal prosecution, the Court was faced with the question what **1663 limitations the Fifth Amendment privilege imposed on the prosecutorial powers of the Federal Government, a nonimmunizing sovereign. After undertaking an examination of the policies and purposes of the privilege, the Court overturned the rule that one jurisdiction within our federal structure may compel a witness to give testimony which could be used to convict him of a crime in another jurisdiction. [42] The Court held that the privilege protects state witnesses against incrimination under federal as well as state law, and federal witnesses against incrimination *457 under state as well as federal law. Applying this principle to

the state immunity legislation before it, the Court held the constitutional rule to be that:

'(A) state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Government in investigating and prosecuting crime, the Federal Governments must be prohibited from making any such use of compelled testimony and its fruits.' [43] 378 U.S., at 79, 84 S.Ct., at 1609.

The Court emphasized that this rule left the state witness and the Federal Government, against which the witness had immunity only from the use of the compelled testimony and evidence derived therefrom, 'in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity.' Id., at 79, 84 S.Ct., at 1610.

It is true that in Murphy the Court was not presented with the precise question presented by this case, whether a jurisdiction seeking to compel testimony may do so by granting only use and derivative-use immunity, for New Jersey and New York had granted petitioners transactional immunity. The Court heretofore has not *458 squarely confronted this question, [44] because post-Counselman immunity statutes reaching the Court either have followed the pattern of the 1893 Act in providing transactional immunity, [45] or have been found deficient for failure to prohibit the use of all evidence derived from compelled testimony. **1664 [46] But both the reasoning of the Court in Murphy and the result reached compel the conclusion that use and derivative-use immunity is constitutionally sufficient to compel testimony over a claim of the privilege. Since the privilege is fully applicable and its scope is the same whether invoked in a state or in a federal jurisdiction, [47] the Murphy conclusion that a prohibition on use and derivative use secures a witness' Fifth Amendment privilege against infringement by the Federal Government demonstrates that immunity from use and derivative use is coextensive with the scope of the privilege. As the Murphy Court noted, immunity from use and derivative use 'leaves the witness and the Federal Government in substantially the same position *459 as if the witness had claimed his privilege' [48] in the absence of a grant of immunity. The Murphy Court was concerned solely

Kastigar v. U.S., 406 U.S. 441 (1972)

92 S.Ct. 1653, 32 L.Ed.2d 212

with the danger of incrimination under federal law, and held that immunity from use and derivative use was sufficient to displace the danger. This protection coextensive with the privilege is the degree of protection that the Constitution requires, and is all that the Constitution requires even against the jurisdiction compelling testimony by granting immunity. [49]

IV

Although an analysis of prior decisions and the purpose of the Fifth Amendment privilege indicates that use and derivative-use immunity is coextensive with the privilege, we must consider additional arguments advanced by petitioners against the sufficiency of such immunity. We start from the premise, repeatedly affirmed by this Court, that an appropriately broad immunity grant is compatible with the Constitution.

Petitioners argue that use and derivative-use immunity will not adequately protect a witness from various possible incriminating uses of the compelled testimony: for example, the prosecutor or other law enforcement officials may obtain leads, names of witnesses, or other information not otherwise available that might result in a prosecution. It will be difficult and perhaps impossible, the argument goes, to identify, by testimony or cross-examination, the subtle ways in which the compelled testimony may disadvantage a witness, especially in the jurisdiction granting the immunity.

This argument presupposes that the statute's prohibition *460 will prove impossible to enforce. The statute provides a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom: '(N)o testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case . . .' 18 U.S.C. s 6002.

This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory **1665 lead,' [50] and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures.

A person accorded this immunity under 18 U.S.C. s 6002, and subsequently prosecuted, is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities. As stated in Murphy:

'Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.' 378 U.S., at 79 n. 18, 84 S.Ct., at 1609.

This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

*461 This is very substantial protection, [51] commensurate with that resulting from invoking the privilege itself. The privilege assures that a citizen is not compelled to incriminate himself by his own testimony. It usually operates to allow a citizen to remain silent when asked a question requiring an incriminatory answer. This statute, which operates after a witness has given incriminatory testimony, affords the same protection by assuring that the compelled testimony can in no way lead to the infliction of criminal penalties. The statute, like the Fifth Amendment, grants neither pardon nor amnesty. Both the statute and the Fifth Amendment allow the government to prosecute using evidence from legitimate independent sources.

The statutory proscription is analogous to the Fifth Amendment requirement in cases of coerced confessions. [52] A coerced confession, as revealing of leads as testimony given in exchange for immunity, [53] is inadmissible in a criminal trial, but it does not bar prosecution. [54] Moreover, a defendant against whom incriminating evidence has been obtained through a grant of immunity may be in a stronger position at trial than a defendant who asserts a Fifth Amendment coerced-confession claim. One raising a claim under this statute need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from *462 legitimate independent sources. [55] On the other hand, a defendant raising a coerced-confession claim under the Fifth Amendment must first prevail in a voluntariness hearing before his confession and evidence derived from it become inadmissible. [56]

**1666 There can be no justification in reason or policy for holding that the Constitution requires an amnesty grant where,

A1716

Kastigar v. U.S., 406 U.S. 441 (1972)

120

92 S.Ct. 1653, 32 L.Ed.2d 212

acting pursuant to statute and accompanying safeguards, testimony is compelled in exchange for immunity from use and derivative use when no such amnesty is required where the government, acting without colorable right, coerces a defendant into incriminating himself.

We conclude that the immunity provided by 18 U.S.C. s 6002 leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege. The immunity therefore is coextensive with the privilege and suffices to supplant it. The judgment of the Court of Appeals for the Ninth Circuit accordingly is

Affirmed.

Mr. Justice BRENNAN and Mr. Justice REHNQUIST took no part in the consideration or decision of this case.

Mr. Justice DOUGLAS, dissenting.

The Self-Incrimination Clause says: 'No person . . . shall be compelled in any criminal case to be a witness against himself.' I see no answer to the proposition that he is such a witness when only 'use' immunity is granted.

My views on the question of the scope of immunity that is necessary to force a witness to give up his guarantee *463 against self-incrimination contained in the Fifth Amendment are so well known, see Ullmann v. United States, 350 U.S. 422, 440, 76 S.Ct. 497, 507, 100 L.Ed. 51 (dissenting), and Piccirillo v. New York, 400 U.S. 548, 549, 91 S.Ct. 520, 521, 27 L.Ed.2d 596 (dissenting), that I need not write at length.

In Counselman v. Hitchcock, 142 U.S. 547, 586, 12 S.Ct. 195, 206, 35 L.Ed. 1110, the Court adopted the transactional immunity test: 'In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates.' Id., at 586, 12 S.Ct., at 206. In Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819, a case involving another federal prosecution, the immunity statute provided that the witness would be protected 'on account of any transaction . . . concerning which he may testify.' Id., at 594, 16 S.Ct., at 645. The Court held that the immunity offered was coterminous with the privilege and that the witness could therefore be compelled to testify, a ruling that made 'transactional immunity' part of the fabric of our constitutional law. Ullmann v. United States, supra, 350 U.S., at 438, 76 S.Ct., at 50.

This Court, however, apparently believes that Counselman and its progeny were overruled sub silentio in Murphy v. Waterfront Comm'n, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678, Murphy involved state witnesses, granted transactional immunity under state law, who refused to testify for fear of subsequent federal prosecution. We held that the testimony in question could be compelled, but that the Federal Government would be barred from using any of the testimony, or its fruits, in a subsequent federal prosecution.

Murphy overruled, not Counselman, but Feldman v. United States, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408, which had held 'that one jurisdiction within our federal structure may compel a witness to give testimony which could be used to convict him of a crime in another jurisdiction.' Murphy v. Waterfront Comm'n, supra, 378 U.S., at 77, 84 S.Ct., at 1608. But Counselman, *464 as the Murphy Court recognized, 'said nothing about the problem of incrimination under the law of another sovereign.' Id., at 72, 84 S.Ct., at 1606. That problem is one of federalism, as to require transactional immunity between jurisdictions might

'deprive a state of the right to prosecute a violation of its criminal law on the basis of another state's grant of immunity (a result which) would be gravely in derogation of its sovereignty and obstructive of its administration **1667 of justice.' United States ex rel. Catena v. Elias, 449 F.2d 40, 44 (CA3 1971).

Moreover, as Mr. Justice Brennan has pointed out, the threat of future prosecution

'substantial when a single jurisdiction both compels incriminating testimony and brings a later prosecution, may fade when the jurisdiction bringing the prosecution differs from the jurisdiction that compelled the testimony. Concern over informal and undetected exchange of information is also correspondingly less when two different jurisdictions are involved.' Piccirillo v. New York, 400 U.S., at 568, 91 S.Ct., at 531 (dissenting).

None of these factors apply when the threat of prosecution is from the jurisdiction seeking to compel the testimony, which is the situation we faced in Counselman, and which we face today. The irrelevance of Murphy to such a situation was made clear in Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165, in which the Court struck down an immunity statute because it failed to measure up to the standards set forth

A1717

in Counselman. Inasmuch as no interjurisdictional problems presented themselves, Murphy was not even cited. That is further proof that Murphy was not thought significantly to *465 undercut Counselman. [1] See Stevens v. Marks, 383 U.S. 234, 244—245, 86 S.Ct. 788, 793—794, 15 L.Ed.2d 724; id., at 249—250, 86 S.Ct., at 796—797 (Harlan, J., concurring and dissenting); Mansfield, The Albertson Case: Conflict Between the Privilege Against Self-Incrimination and the Government's Need for Information, 1966 Sup.Ct.Rev. 103, 164.

If, as some have thought, the Bill of Rights contained only 'counsels of moderation' from which courts and legislatures could deviate according to their conscience or discretion, then today's contraction of the Self-Incrimination Clause of the Fifth Amendment would be understandable. But that has not been true, starting with Chief Justice Marshall's opinion in *466 United States v. Burr, 25 F.Cas. p. 38 (No. 14,692e) (CC Va.), where he ruled that the reach of the Fifth Amendment was so broad as to make the privilege applicable when there was a mere possibility of a criminal charge being made.

The Court said in Hale v. Henkel, 201 U.S. 43, 67, 26 S.Ct. 370, 376, 50 L.Ed. 652 that 'if the criminality has already been taken away, the Amendment ceases to apply.' In other words, the immunity granted is adequate if it operates as a complete pardon for the offense. Brown v. Walker, 161 U.S., at 595, 16 S.Ct., at 646. That is the true measure of the Self-Incrimination Clause. As Mr. Justice **1668 Brennan has stated: '(U)se immunity literally misses half the point of the privilege, for it permits the compulsion without removing the criminality.' Piccirillo v. New York, supra, 400 U.S., at 567, 91 S.Ct., at 530 (dissenting).

As Mr. Justice Brennan has also said:
'Transactional immunity . . . provides the individual with an assurance that he is not testifying about matters for which he may later be prosecuted. No question arises of tracing the use or non-use of information gleaned from the witness' compelled testimony. The sole question presented to a court is whether the subsequent prosecution is related to the substance of the compelled testimony. Both witness and government know precisely where they stand. Respect for law is furthered when the individual knows his position and is not left suspicious that a later prosecution was actually the fruit of his compelled testimony.' 400 U.S., at 568—569, 91 S.Ct. at 531 (dissenting).

When we allow the prosecution to offer only 'use' immunity we allow it to grant far less than it has taken away. For while the precise testimony that is compelled may not be used, leads from that testimony may *467 be pursued and used to convict the witness. [2] My view is that the framers put it beyond the power of Congress to compel anyone to confess his crimes. The Self-Incrimination Clause creates, as I have said before, 'the federally protected right of silence,' making it unconstitutional to use a law 'to pry open one's lips and make him a witness against himself.' Ullmann v. United States, 350 U.S., at 446, 76 S.Ct., at 511 (dissenting). That is indeed one of the chief procedural guarantees in our accusatorial system. Government acts in an ignoble way when it stoops to the end which we authorize today.

I would adhere to Counselman v. Hitchcock and hold that this attempt to dilute the Self-Incrimination Clause is unconstitutional.

Mr. Justice MARSHALL, dissenting.

Today the Court holds that the United States may compel a witness to give incriminating testimony, and subsequently prosecute him for crimes to which that testimony relates. I cannot believe the Fifth Amendment permits that result. See Piccirillo v. New York, 400 U.S. 548, 552, 91 S.Ct. 520, 522, 27 L.Ed.2d 596 (1971) (Brennan, J., dissenting from dismissal of certiorari).

The Fifth Amendment gives a witness an absolute right to resist interrogation, if the testimony sought would tend to incriminate him. A grant of immunity *468 may strip the witness of the right to refuse to testify, but only if it is broad enough to eliminate all possibility that the testimony will in fact operate to incriminate him. It must put him in precisely the same position, vis-a-vis the government that has compelled his testimony, [*] as he would have been in had he remained silent in reliance on the privilege. Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956); McCarthy v. Arndstein, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924); Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); **1669 Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896); Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

The Court recognizes that an immunity statute must be tested by that standard, that the relevant inquiry is whether it 'leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth

A1718

**122**

Amendment privilege.' Ante, at 1666. I assume, moreover, that in theory that test would be met by a complete ban on the use of the compelled testimony, including all derivative, use, however remote and indirect. But I cannot agree that a ban on use will in practice be total, if it remains open for the government to convict the witness on the basis of evidence derived from a legitimate independent source. The Court asserts that the witness is adequately protected by a rule imposing on the government a heavy burden of proof if it would establish the independent character of evidence to be used against the witness. But in light of the inevitable uncertainties of the fact-finding process, see Speiser v. Randall, 357 U.S. 513, 525, 78 S.Ct. 1332, 1341, 2 L.Ed.2d 1460 (1958), a greater margin of protection is required in order to provide a reliable guarantee that the witness **\*469** is in exactly the same position as if he had not testified. That margin can be provided only by immunity from prosecution for the offenses to which the testimony relates, i.e., transactional immunity.

I do not see how it can suffice merely to put the burden of proof on the government. First, contrary to the Court's assertion, the Court's rule does leave the witness 'dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities.' Ante, at 1665. For the information relevant to the question of taint is uniquely within the knowledge of the prosecuting authorities. They alone are in a position to trace the chains of information and investigation that lead to the evidence to be used in a criminal prosecution. A witness who suspects that his compelled testimony was used to develop a lead will be hard pressed indeed to ferret out the evidence necessary to prove it. And of course it is no answer to say he need not prove it, for though the Court puts the burden of proof on the government, the government will have no difficulty in meeting its burden by mere assertion if the witness produces no contrary evidence. The good faith of the prosecuting authorities is thus the sole safeguard of the witness' rights. Second, even their good faith is not a sufficient safeguard. For the paths of information through the investigative bureaucracy may well be long and winding, and even a prosecutor acting in the best of faith cannot be certain that somewhere in the depths of his investigative apparatus, often including hundreds of employees, there was not some prohibited use of the compelled testimony. Cf. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). The Court today sets out a loose net to trap tainted evidence and prevent its use against the witness, but it accepts an intolerably

great risk that tainted evidence will in fact slip through that net.

**\*470** In my view the Court turns reason on its head when it compares a statutory grant of immunity to the 'immunity' that is inadvertently conferred by an unconstitutional interrogation. The exclusionary rule of evidence that applies in that situation has nothing whatever to do with this case. Evidence obtained through a coercive interrogation, like evidence obtained through an illegal search, is excluded at trial because the Constitution prohibits such methods of gathering evidence. The exclusionary rules provide a partial and inadequate remedy to some victims of illegal police conduct, and a similarly partial and inadequate deterrent to police officers. An immunity statute, on the other hand, is much more ambitious than any exclusionary rule. It does not merely attempt to provide a remedy for past police misconduct, **\*\*1670** which never should have occurred. An immunity statute operates in advance of the event, and it authorizes—even encourages—interrogation that would otherwise be prohibited by the Fifth Amendment. An immunity statute thus differs from an exclusionary rule of evidence in at least two critical respects.

First, because an immunity statute gives constitutional approval to the resulting interrogation, the government is under an obligation here to remove the danger of incrimination completely and absolutely, whereas in the case of the exclusionary rules it may be sufficient to shield the witness from the fruits of the illegal search or interrogation in a partial and reasonably adequate manner. For when illegal police conduct has occurred, the exclusion of evidence does not purport to purge the conduct of its unconstitutional character. The constitutional violation remains, and may provide the basis for other relief, such as a civil action for damages (see 42 U.S.C. s 1983 and Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)), or a criminal prosecution of the responsible **\*471** officers (see 18 U.S.C. ss 241, 242). The Constitution does not authorize police officers to coerce confessions or to invade privacy without cause, so long as no use is made of the evidence they obtain. But this Court has held that the Constitution does authorize the government to compel a witness to give potentially incriminating testimony, so long as no incriminating use is made of the resulting evidence. Before the government puts its seal of approval on such an interrogation, it must provide an absolutely reliable guarantee that it will not use the testimony in any way at all in aid of prosecution of the witness. The only way to provide that

A1719

Kastigar v. U.S., 406 U.S. 441 (1972)

123

92 S.Ct. 1653, 32 L.Ed.2d 212

guarantee is to give the witness immunity from prosecution for crimes to which his testimony relates.

Second, because an immunity statute operates in advance of the interrogation, there is room to require a broad grant of transactional immunity without imperiling large numbers of otherwise valid convictions. An exclusionary rule comes into play after the interrogation or search has occurred; and the decision to question or to search is often made in haste, under pressure, by an officer who is not a lawyer. If an unconstitutional interrogation or search were held to create transactional immunity, that might well be regarded as an excessively high price to pay for the 'constable's blunder.' An immunity statute, on the other hand, creates a framework in which the prosecuting attorney can make a calm and reasoned decision whether to compel testimony and suffer the resulting ban on prosecution, or to forgo the testimony.

For both these reasons it is clear to me that an immunity statute must be tested by a standard far more demanding than that appropriate for an exclusionary rule fashioned to deal with past constitutional violations. Measured by that standard, the statute approved today by the Court fails miserably. I respectfully dissent.

**All Citations**

406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212

### Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit, Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1    The contempt order was issued pursuant to 28 U.S.C. s 1826.

2    For a concise history of testimonial compulsion prior to the adoption of our Constitution, see 8 J. Wigmore, Evidence s 2190 (J. McNaughton rev. 1961). See Ullmann v. United States, 350 U.S. 422, 439 n. 15, 76 S.Ct. 497, 507, 100 L.Ed. 511 (1956); Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919).

3    Statute of Elizabeth, 5 Eliz. 1, c. 9, s 12 (1562).

4    Countess of Shrewsbury's Case, 2 How.St.Tr. 769, 778 (1612).

5    See the parliamentary debate on the Bill to Indemnify Evidence, particularly the remarks of the Duke of Argyle and Lord Chancellor Hardwicke, reported in 12 T. Hansard, Parliamentary History of England 675, 693 (1812). See also Piemonte v. United States, 367 U.S. 556, 559 n. 2, 81 S.Ct. 1720, 1722, 6 L.Ed.2d 1028 (1961); Ullmann v. United States, supra, 350 U.S., at 439 n. 15, 76 S.Ct., at 507; Brown v. Walker, 161 U.S. 591, 600, 16 S.Ct. 644, 648, 40 L.Ed. 819 (1896).

6    1 Stat. 73, 88—89.

7    See Blair v. United States, supra, 250 U.S., at 281, 39 S.Ct., at 471; 8 Wigmore, supra, n. 2, ss 2192, 2197.

8    See Murphy v. Waterfront Comm'n, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964).

9    See Ullmann v. United States, 350 U.S., at 426, 76 S.Ct., at 500; E. Griswold, The Fifth Amendment Today 7 (1955).

10   Murphy v. Waterfront Comm'n, supra, 378 U.S., at 94, 84 S.Ct., at 1611 (White, J., concurring); McCarthy v. Arndstein, 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924); United States v. Saline Bank, 1 Pet. 100, 7 L.Ed. 69 (1828); cf. Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968).

A1720

Kastigar v. U.S., 406 U.S. 441 (1972)

124

92 S.Ct. 1653, 32 L.Ed.2d 212

11    Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170 (1950); Mason v. United States, 244 U.S. 362, 365, 37 S.Ct. 621, 622, 61 L.Ed. 1198 (1917).

12    See, e.g., Miranda v. Arizona, 384 U.S. 436, 443—444, 86 S.Ct. 1602, 1611—1612, 16 L.Ed.2d 694 (1966); Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886).

13    Soon after the privilege against compulsory self-incrimination became firmly established in law, it was recognized that the privilege did not apply when immunity, or 'indemnity,' in the English usage, had been granted. See L. Levy, Origins of the Fifth Amendment 328, 495 (1968). Parliament enacted in immunity statute in 1710 directed against illegal gambling, 9 Anne, c. 14, ss 3—4, which became the model for an identical immunity statute enacted in 1774 by the Colonial Legislature of New York. Law of Mar. 9, 1774, c. 1651, 5 Colonial Laws of New York 621, 623 (1894). These statutes provided that the loser could sue the winner, who was compelled to answer the loser's charges. After the winner responded and returned his illgotten gains, he was 'acquitted, indemnified (immunized) and discharged from any further or other Punishment, Forfeiture or Penalty, which he . . . may have incurred by the playing for, and winning such Money . . ..' 9 Anne, c. 14, s 4 (1710); Law of Mar. 9, 1774, c. 1651, 5 Colonial Laws of New York, at 623.

Another notable instance of the early use of immunity legislation is the 1725 impeachment trial of Lord Chancellor Macclesfield. The Lord Chancellor was accused by the House of Commons of the sale of public offices and appointments. In order to compel the testimony of Masters in Chancery who had allegedly purchased their offices from the Lord Chancellor, and who could incriminate themselves by so testifying, Parliament enacted a statute granting immunity to persons then holding office as Masters in Chancery. Lord Chancellor Macclesfield's Trial, 16 How.St.Tr. 767, 1147 (1725). See 8 Wigmore, supra, n. 2, s 2281, at 492. See also Bishop Atterbury's Trial, 16 How.St.Tr. 323, 604—605 (1723). The legislatures in colonial Pennsylvania and New York enacted immunity legislation in the 18th century. See, e.g., Resolution of Jan. 6, 1758, in Votes and Proceedings of the House of Representatives of the Province of Pennsylvania (1682 —1776), 6 Pennsylvania Archives (8th series) 4679 (C. Hoban ed. 1935); Law of Mar. 24, 1772, c. 1542, 5 Colonial Laws of New York 351, 353—354; Law of Mar. 9, 1774, c. 1651, id., at 621, 623; Law of Mar. 9, 1774, c. 1655, id., at 639, 641—642. See generally L. Levy, Origins of the Fifth Amendment 359, 384—385, 389, 402—403 (1968). Federal immunity statutes have existed since 1857. Act of Jan. 24, 1857, 11 Stat. 155. For a history of the various federal immunity statutes, see Comment, The Federal Witness Immunity Acts in Theory and Practice: Treading the Constitutional Tightrope, 72 Yale L.J. 1568 (1963); Wendel, Compulsory Immunity Legislation and the Fifth Amendment Privilege: New Developments and New Confusion, 10 St. louis U.L.Rev. 327 (1966); and National Commission on Reform of Federal Criminal Laws, Working Papers, 1406—1411 (1970).

14    See, e.g., Resolution of Jan. 6, 1758, n. 13, supra, 6 Pennsylvania Archives (8th series) 4679 (C. Hoban ed. 1935); Law of Mar. 24, 1772, c. 1542, 5 Colonial Laws of New York 351, 354; Law of Mar. 9, 1774, c. 1655, id., at 639, 642. Bishop Atterbury's Trial, supra, for which the House of Commons passed immunity legislation, was a prosecution for treasonable conspiracy. See id., at 604—605; 8 Wigmore, supra, n. 2, s 2281, at 492 n. 2. supra, n. 2, s 2281, at 492 n. 2. for which Parliament passed immunity legislation, was a prosecution for political bribery involving the sale of public offices and appointments. See id., at 1147. The first federal immunity statute was enacted to facilitate an investigation of charges of corruption and vote buying in the House of Representatives. See Comment, n. 13, supra, 72 Yale L.J., at 1571.

15    See 8 Wigmore, supra, n. 2, s 2281, at 492. Mr. Justice White noted in his concurring opinion in Murphy v. Waterfront Comm'n, 378 U.S., at 92, 84 S.Ct., at 1610, that immunity statutes 'have for more than a century been resorted to for the investigation of many offenses, chiefly those whose proof and punishment were

A1721

otherwise impracticable, such as political bribery, extortion, gambling, consumer frauds, liquor violations, commercial larceny, and various forms of racketeering.' Id., at 94—95, 84 S.Ct., at 1611. See n. 14, supra.

16   See Comment, n. 13, supra, 72 Yale L.J., at 1576.

17   For a listing of these statutes, see National Commission on Reform of Federal Criminal Laws, Working Papers, 1444—1445 (1970).

18   For a listing of these statutes, see 8 Wigmore, supra, n. 2, s 2281, at 495 n. 11.

19   See, e.g., 8 J. Wigmore, Evidence s 2281, at 501 (3d ed. 1940); 8 Wigmore, supra, n. 2 s 2281, at 496.

20   See Hale v. Henkel, 201 U.S. 43, 70, 26 S.Ct. 370, 377, 50 L.Ed. 652 (1906); Brown v. Walker, 161 U.S., at 610, 16 S.Ct., at 652.

21   This statement was made with specific reference to the Compulsory Testimony Act of 1893, 27 Stat. 443, the model for almost all federal immunity statutes prior to the enactment of the statute under consideration in this case. See Murphy v. Waterfront Comm'n, 378 U.S., at 95, 84 S.Ct., at 1612 (White, J., concurring).

22   Accord, Gardner v. Broderick, 392 U.S., at 276, 88 S.Ct., at 1915; Murphy v. Waterfront Comm'n, supra; McCarthy v. Arndstein, 266 U.S., at 42, 45 S.Ct., at 17 (Brandeis, J.); Heike v. United States, 227 U.S. 131, 142, 33 S.Ct. 226, 228, 57 L.Ed. 450 (1913) (Holmes, J.).

23   For other provisions of the 1970 Act relative to immunity of witnesses, see 18 U.S.C. ss 6001—6005.

24   See, e.g., Murphy v. Waterfront Comm'n, supra, 378 U.S. at 54, 78, 84 S.Ct., at 1596, 1609, 12 L.Ed.2d 678; Counselman v. Hitchcock, 142 U.S. 547, 585, 12 S.Ct. 195, 206, 35 L.Ed. 1110 (1892).

25   See Piccirillo v. New York, 400 U.S. 548, 91 S.Ct. 520, 27 L.Ed.2d 596 (1971).

26   15 Stat. 37.

27   See Counselman v. Hitchcock, supra, 142 U.S., at 560, 12 S.Ct., at 197.

28   In re Counselman, 44 F. 268 (CCND Ill. 1890).

29   Counselman v. Hitchcock, supra, 142 U.S., at 564, 12 S.Ct., at 198—199.

30   Precisely, the Court held 'that legislation cannot abridge a constitutional privilege, and that it cannot replace or supply (sic) one, at least unless it is so broad as to have the same extent in scope and effect.' Id., at 585, 12 S.Ct., at 206. See Murphy v. Waterfront Comm'n, supra, 378 U.S., at 54, 78, 81 S.Ct., at 1596, 1609.

31   Counselman was decided Jan. 11, 1892. Senator Cullom introduced the new bill on Jan. 27, 1892. 23 Cong.Rec. 573.

32   23 Cong.Rec. 6333.

33   Act of February 11, 1893, 27 Stat. 443, repealed by the Organized Crime Control Act of 1970, Pub.L.No. 91 —452, s 245, 84 Stat. 931.

34   See the remarks of Senator Cullom, 23 Cong.Rec. 573, 6333, and Congressman Wise, who introduced the bill in the House. 24 Cong.Rec. 503. See Shapiro v. United States, 335 U.S. 1, 28—29 and n. 36, 68 S.Ct. 1375, 1389—1390, 92 L.Ed. 1787 (1948).

A1722

35    Ullmann v. United States, 350 U.S., at 438, 76 S.Ct., at 506; Shapiro v. United States, supra, 335 U.S., at 6, 68 S.Ct., at 1378. There was one minor exception. See Piccirillo v. New York, 400 U.S., at 571 and n. 11, 91 S.Ct., at 532 (Brennan, J., dissenting); Arndstein v. McCarthy, 254 U.S. 71, 73, 41 S.Ct. 26, 27, 65 L.Ed. 138 (1920).

36    The statute is a product of careful study and consideration by the National Commission on Reform of Federal Criminal Laws, as well as by Congress. The Commission recommended legislation to reform the federal immunity laws. The recommendation served as the model for this statute. In commenting on its proposal in a special report to the President, the Commission said:

'We are satisfied that our substitution of immunity from use for immunity from prosecution meets constitutional requirements for overcoming the claim of privilege. Immunity from use is the only consequence flowing from a violation of the individual's constitutional right to be protected from unreasonable searches and seizures, his constitutional right to counsel, and his constitutional right not to be coerced into confessing. The proposed immunity is thus of the same scope as that frequently, even though unintentionally, conferred as the result of constitutional violations by law enforcement officers.' Second Interim Report of the National Commission on Reform of Federal Criminal Laws, Mar. 17, 1969, Working Papers of the Commission, 1446 (1970).

The Commission's recommendation was based in large part on a comprehensive study of immunity and the relevant decisions of this Court prepared for the Commission by Prof. Robert G. Dixon, Jr., of the George Washington University Law Center, and transmitted to the President with the recommendations of the Commission. See National Commission on Reform of Federal Criminal Laws, Working Papers, 1405—1444 (1970).

37    See S.Rep.No.91—617, pp. 51—56, 145 (1969); H.R.Rep.No.91—1549, p. 42 (1970).

38    Ullmann v. United States, 350 U.S., at 438—439, 76 S.Ct., at 507, quoting Boyd v. United States, 116 U.S., at 634, 6 S.Ct., at 534. See Knapp v. Schweitzer, 357 U.S. 371, 380, 78 S.Ct. 1302, 1308, 2 L.Ed.2d 1393 (1958).

39    Cf. The Supreme Court, 1963 Term, 78 Harv.L.Rev. 179, 230 (1964). Language similar to the Counselman dictum can be found in Brown v. Walker, 161 U.S., at 594—595, 16 S.Ct., at 645—646, and Hale v. Henkel, 201 U.S., at 67, 26 S.Ct., at 376. Brown and Hale, however, involved statutes that were clearly sufficient to supplant the privilege against self-incrimination, as they provided full immunity from prosecution 'for or on account of any transaction, matter or thing concerning which he may testify, or produce evidence . . .' 161 U.S., at 594, 16 S.Ct., at 645; 201 U.S., at 66, 26 S.Ct., at 375. The same is true of Smith v. United States, 337 U.S. 137, 141, 146, 69 S.Ct. 1000, 1002, 1005, 93 L.Ed. 1264 (1949), and United States v. Monia, 317 U.S. 424, 425, 428, 63 S.Ct. 409, 410, 411, 87 L.Ed. 376 (1943). In Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), some of the Counselman language urged upon us by petitioners was again quoted. But Albertson, like Counselman, involved an immunity statute that was held insufficient for failure to prohibit the use of evidence derived from compelled admissions and the use of compelled admissions as an 'investigatory lead.' Id., at 80, 86 S.Ct., at 199.

In Adams v. Maryland, 347 U.S. 179, 182, 74 S.Ct. 442, 445, 98 L.Ed. 608 (1954), and in United States v. Murdock, 284 U.S. 141, 149, 52 S.Ct. 63, 64, 76 L.Ed. 210 (1931), the Counselman dictum was referred to as the principle of Counselman. The references were in the context of ancillary points not essential to the decisions of the Court. The Adams Court did note, however, that the Fifth Amendment privilege prohibits the 'use' of compelled self-incriminatory testimony. 347 U.S., at 181, 74 S.Ct., at 445. In any event, the Court in Ullmann v. United States, 350 U.S., at 436—437, 76 S.Ct., at 505—506, recognized that the rationale

A1723

Kastigar v. U.S., 406 U.S. 441 (1972)

127

92 S.Ct. 1653, 32 L.Ed.2d 212

of Counselman was that the Counselman statute was insufficient for failure to prohibit the use of evidence derived from compelled testimony. See also Arndstein v. McCarthy, 254 U.S., at 73, 41 S.Ct., at 27.

40    The Waterfront Commission of New York Harbor is a bistate body established under an interstate compact approved by Congress. 67 Stat. 541.

41    In re Application of Waterfront Comm'n of N. Y. Harbor, 39 N.J. 436, 189 A.2d 36 (1963).

42    Reconsideration of the rule that the Fifth Amendment privilege does not protect a witness in one jurisdiction against being compelled to give testimony that could be used to convict him in another jurisdiction was made necessary by the decision in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), in which the Court held the Fifth Amendment privilege applicable to the States through the Fourteenth Amendment. Murphy v. Waterfront Comm'n, 378 U.S., at 57, 84 S.Ct., at 1597.

43    At this point the Court added the following note: 'Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.' Id., at 79 n. 18, 84 S.Ct., at 1609. If transactional immunity had been deemed to be the 'constitutional rule' there could be no federal prosecution.'

44    See, e.g., California v. Byers, 402 U.S. 424, 442, n. 3, 91 S.Ct. 1535, 1545, 29 L.Ed.2d 9 (1971) (Harlan, J., concurring in judgment); United States v. Freed, 401 U.S. 601, 606 n. 11, 91 S.Ct. 1112, 1116, 28 L.Ed.2d 356 (1971); Piccirillo v. New York, 400 U.S. 548, 91 S.Ct. 520, 27 L.Ed.2d 596 (1971); Stevens v. Marks, 383 U.S. 234, 244—245, 86 S.Ct. 788, 793—794 (1966).

45    E.g., Murphy v. Waterfront Comm'n, supra; Ullmann v. United States, supra; Smith v. United States, 337 U.S. 137, 69 S.Ct. 1000, 93 L.Ed. 1264 (1949); United States v. Monia, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 (1943); Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); Jack v. Kansas, 199 U.S. 372, 26 S.Ct. 73, 50 L.Ed. 234 (1905); Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896). See also n. 35, supra.

46    E.g., Albertson v. Subversive Activities Control Board, 382 U.S., at 80, 86 S.Ct., at 199; Arndstein v. McCarthy, 254 U.S., at 73, 41 S.Ct., at 27.

47    In Malloy v. Hogan, 378 U.S., at 10—11, 84 S.Ct., at 1494—1495 the Court held that the same standards would determine the extent or scope of the privilege in state and in federal proceedings, because the same substantive guarantee of the Bill of Rights is involved. The Murphy Court emphasized that the scope of the privilege is the same in state and in federal proceedings. Murphy v. Waterfront Comm'n, 378 U.S., at 79, 84 S.Ct., at 1609—1610.

48    Ibid.

49    As the Court noted in Gardner v. Broderick, 392 U.S., at 276, 88 S.Ct., at 1915, '(a)nswers may be compelled regardless of the privilege if there is immunity from federal and state use of the compelled testimony or its fruits in connection with a criminal prosecution against the person testifying.'

50    See, e.g., Albertson v. Subversive Activities Control Board, 382 U.S., at 80, 86 S.Ct., at 199.

51    See Murphy v. Waterfront Comm'n, 378 U.S., at 102—104, 84 S.Ct., at 1615—1617 (White, J., concurring).

52    Adams v. Maryland, 347 U.S., at 181, 74 S.Ct., at 444; Bram v. United States, 168 U.S. 532, 542, 18 S.Ct. 183, 186, 42 L.Ed. 568 (1897).

A1724

Kastigar v. U.S., 406 U.S. 441 (1972)

92 S.Ct. 1653, 32 L.Ed.2d 212

128

53    As Mr. Justice White, concurring in Murphy, pointed out:

'A coerced confession is as revealing of leads as testimony given in exchange for immunity and indeed is excluded in part because it is compelled incrimination in violation of the privilege. Malloy v. Hogan (378 U.S. 1, 7—8, 84 S.Ct. 1489, at 1493—1494, 12 L.Ed.2d 653); Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265; Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568.' 378 U.S., at 103, 84 S.Ct., at 1616.

54    Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

55    See supra, at 1664; Brief the United States 37; Cf. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

56    Jackson v. Denno, supra.

1    In Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165, the Court was faced with a Fifth Amendment challenge to the Communist registration provision of the Subversive Activities Control Act of 1950, 64 Stat. 987. We held that the provision violated the prospective registrant's privilege against self-incrimination, and that the registration provision was not saved by a so-called 'immunity statute' (s 4(f)) which prohibited the introduction into evidence in any criminal prosecution of the fact of registration under the Act. The Court's analysis of this immunity provision rested solely on Counselman:

'In Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110, decided in 1892, the Court held 'that no (immunity) statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege . . .,' and that such a statute is valid only if it supplies 'a complete protection from all the perils against which the constitutional prohibition was designed to guard . . .' by affording 'absolute immunity against future prosecution for the offence to which the question relates.' Id., at 585—586, 12 S.Ct., at 206. Measured by these standards, the immunity granted by s 4(f) is not complete.' 382 U.S., at 80, 86 S.Ct., at 199. (Emphasis added.)

Thus, the Albertson Court, which could have struck the statute by employing the test approved today, went well beyond, and measured the statute solely against the more restrictive standards of Counselman.

2    As Mr. Justice Marshall points out, post, at 1669, it is futile to expect that a ban on use or derivative use of compelled testimony can be enforced.

It is also possible that use immunity might actually have an adverse impact on the administration of justice rather than promote law enforcement. A witness might believe, with good reason, that his 'immunized' testimony will inevitably lead to a felony conviction. Under such circumstances, rather than testify and aid the investigation, the witness might decide he would be better off remaining silent even if he is jailed for contempt.

*    This case does not, of course, involve the special considerations that come into play when the prosecuting government is different from the government that has compelled the testimony. See Murphy v. Waterfront Comm'n, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

A1725

# Exhibit 2

## Robert Knuts

| | |
|---|---|
| **From:** | Drabick, James (USAMA) <James.Drabick@usdoj.gov> |
| **Sent:** | Wednesday, February 16, 2022 9:58 PM |
| **To:** | Robert Knuts |
| **Cc:** | Michael Tremonte |
| **Subject:** | RE: SEC v. Sharp et al. - Anticipated Motion to Intervene & Stay |

Mr. Knuts –

To your questions below, I anticipate that I would indeed seek to stay substantially all, if not all, depositions in the SEC case, given the extensive overlap between the criminal matter and the SEC matter. That said, if there are particular exceptions you propose, I am happy to discuss. With regard to the length of the requested stay, it would be until a resolution of the criminal matter(s) as to the overlapping charged defendants. And finally, I don't have particular other forms of discovery in mind at this juncture, but included it in my email simply out of an abundance of caution.

I would be happy to discuss any of the above, including potential resolution of the criminal matter as to your client, at your convenience.

Best,
JR

James R. (JR) Drabick
Assistant U.S. Attorney
(617) 748-3498 (o)
(617) 710-6105 (c)

---

**From:** Robert Knuts <RKnuts@shertremonte.com>
**Sent:** Tuesday, February 15, 2022 11:56 AM
**To:** Drabick, James (USAMA) <jdrabick@usa.doj.gov>
**Subject:** [EXTERNAL] RE: SEC v. Sharp et al. - Anticipated Motion to Intervene & Stay

Mr. Drabick,

Please see the below email – typo in your email address.

Bob

---

**From:** Robert Knuts
**Sent:** Tuesday, February 15, 2022 11:53 AM
**To:** james.drabik@usdoj.gov
**Cc:** mrp@dcglaw.com; Muhlendorf, Kevin <KMuhlendorf@wiley.law>; Wilson, Holly <HWilson@wiley.law>; Belostock, Lorraine <lbelostock@toddweld.com>; Michael Tremonte <MTremonte@shertremonte.com>; Smith, Neil T. <Neil.Smith@klgates.com>; Topetzes, Stephen G. <Stephen.Topetzes@klgates.com>; Walters, Sarah E. <sewalters@mwe.com>; Cmcampbell@mwe.Com; R. Daniel O'Connor <daniel.oconnor@ropesgray.com>; Brian R. Blais <brian.blais@ropesgray.com>; Yanofsky, Daniel <Daniel.Yanofsky@ropesgray.com>; George W. Vien <gwv@dcglaw.com>; Mquinn@vedderprice.Com; Jcollins@morganbrown.Com; Mmclaughlin@morganbrown.Com; 'Ward, Adrienne M.' <AWard@olshanlaw.com>; John Moon <jmoon@olshanlaw.com>; Shields, Kathleen (BRO)

1

(ShieldsKa@SEC.gov) <ShieldsKa@SEC.gov>; Forni, Eric <ForniE@sec.gov>
**Subject:** RE: SEC v. Sharp et al. - Anticipated Motion to Intervene & Stay

Mr. Drabick,

I work with Michael Tremonte and I'm primarily responsible for representing Mr. Veldhuis in the SEC civil action.

To clarify the scope of your anticipated motion: (a) do you intend to seek a stay of *all* depositions that might be taken in the SEC case; (b) for how long would such a stay be sought; and (c) what "other forms" of discovery would be stayed pursuant to your motion?

Happy to discuss by phone if that is easier but I thought the group might benefit from answers to these questions.

Bob

Robert Knuts | Sher Tremonte LLP | 90 Broad Street, 23rd Floor | New York, New York 10004 |
tel: 212.202.2600 | direct: 212.202.2638 | fax: 212.202.4156 | rknuts@shertremonte.com | www.shertremonte.com

Confidentiality Notice:  This e-mail is for the sole use of the intended recipient(s) and may contain confidential and/or privileged information.  Any unauthorized use or dissemination of this communication or any of its contents or attachments is strictly prohibited.  If you received this communication in error, please notify Sher Tremonte LLP immediately and destroy the original message and all paper and electronic copies.

---

**From:** Drabick, James (USAMA) <James.Drabick@usdoj.gov>
**Sent:** Tuesday, February 8, 2022 9:55 AM
**To:** Michelle Rita Pascucci <mrp@dcglaw.com>; Muhlendorf, Kevin <KMuhlendorf@wiley.law>; Wilson, Holly <HWilson@wiley.law>; Lbelostock@toddweld.Com; Michael Tremonte <MTremonte@shertremonte.com>; Smith, Neil T. <Neil.Smith@klgates.com>; Topetzes, Stephen G. <Stephen.Topetzes@klgates.com>; Walters, Sarah E. <sewalters@mwe.com>; Cmcampbell@mwe.Com; R. Daniel O'Connor <daniel.oconnor@ropesgray.com>; Brian R. Blais <brian.blais@ropesgray.com>; Yanofsky, Daniel <Daniel.Yanofsky@ropesgray.com>; George W. Vien <gwv@dcglaw.com>; Ward, Adrienne M. <AWard@olshanlaw.com>; John Moon <jmoon@olshanlaw.com>; Mquinn@vedderprice.Com; Jcollins@morganbrown.Com; Mmclaughlin@morganbrown.Com
**Cc:** Shields, Kathleen (BRO) (ShieldsKa@SEC.gov) <ShieldsKa@SEC.gov>; Forni, Eric <ForniE@sec.gov>
**Subject:** SEC v. Sharp et al. - Anticipated Motion to Intervene & Stay

Good morning –

I understand each of you represents a defendant in the matter SEC v. Sharp et al., 21-cv-11276-WGY, and that later this week you will be discussing a case schedule with counsel for the SEC.  As many (if not all) of you know, I am conducting a parallel criminal investigation on behalf of the U.S. Attorney's Office for the District of Massachusetts into the same matters alleged in the SEC's Amended Complaint.  Some your respective clients have already been charged by criminal complaint and I anticipate the investigation will continue to mature.

Given these circumstances, I anticipate soon moving to intervene in SEC v. Sharp to seek a stay of deposition discovery and perhaps other forms of discovery.  I'm writing to solicit your respective position(s) on such a motion.  I am available and happy to discuss with each of you individually at your convenience.

Thank you.

Best,
JR

James R. (JR) Drabick

A1728

Assistant U.S. Attorney
(617) 748-3498 (o)
(617) 710-6105 (c)

A1729

# Exhibit 3

**From:** Drabick, James (USAMA)
**Sent:** Friday, February 17, 2023 4:51 PM
**To:** Michael Tremonte; Noam Biale
**Subject:** Michael Veldhuis / xmail Filter Terms
**Attachments:** 2021_10_26 Drabick to Tremonte re xmail.pdf

Hi Michael, Noam –

As you will recall, I previously reached out to you to solicit any names, email addresses, and/or domains for attorneys with whom Mr. Veldhuis might have had privileged communications on the xmail system. During our subsequent discussions, without admitting any facts, you declined to provide information to me based on your client's Fifth Amendment rights, but also shared that your client "may be willing as an accommodation to consider providing certain information to a walled-off government 'taint team,' to enable the 'taint team' to identify potentially privileged communications without disclosing information that could be used by the prosecution team to establish a link in the chain of evidence against our client."

I'm reaching out today because I asked my office to assign a filter AUSA who has no involvement in the investigation of your client to serve as a conduit for receipt of any such attorney names, email addresses, and/or domains. If you have any attorney names/addresses/domains that you believe should be filtered out of the xmail messages for mike[@]secure.xmeridian.com, acco[@]securecuracao.xmeridian.com, and/or acco[@]sc.xmail.guru because the communications could potentially be privileged, **please send them to AUSA Laura Kaplan (cc'd) by close of business Tuesday, February 21st**. AUSA Kaplan will transmit them to the FBI forensic staff who will filter communications with those names/addresses/domains from the messages to/from those addresses. The information you provide, if any, will not be shared with me or the case agents. As noted in my earlier communication, we anticipate undertaking an independent filter review of the excluded emails at a later date.

If you have any questions about the above, please call me at your convenience. Please note, we are taking appropriate steps to filter out any suspected attorney communications regardless of your response.

Best,
JR

James R. (JR) Drabick
Assistant U.S. Attorney
U.S. Attorney's Office for the District of Massachusetts
(617) 748-3498 (o) | (617) 710-6105 (c)
james.drabick@usdoj.gov
Pronouns: he/him/his

A1731



**U.S. Department of Justice**

***Nathaniel R. Mendell***
*Acting United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*                    *John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

October 26, 2021

Michael Tremonte, Esq.
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004

       Re:    <u>Potential Privilege & "xmail"</u>

Dear Attorney Tremonte:

       I write today in connection with your representation of Mr. Mike Veldhuis.  Specifically, I write to provide your client an opportunity to identify any potentially privileged communications sent to or from your client using any email account(s) that were maintained on servers in Curacao.

       As noted in Footnote 7 in the recent criminal complaint in <u>United States v. Sharp et al.</u>, 21-mj-07182-JCB (D. Mass.), my office received forensic copies of four servers from Curacao in March 2020 pursuant to a Mutual Legal Assistance Treaty ("MLAT") request.  Decryption of the servers has resulted in the identification of emails to/from email accounts using the domains "secure.xmeridian.com" and "securecuracao.xmeridian.com," among others.  Our investigation leads us to believe that these email accounts were informally referred to as "xmail" accounts, and based on our review of the header information, we believe your client likely used one or more such email accounts.  Those accounts appear to include:

-   mike@secure.xmeridian.com
-   acco@securecuracao.xmeridian.com
-   acco@sc.xmail.guru

       Our review of the header information further leads to us to believe that there might be privileged communications among the full population of xmail emails.  In an abundance of caution, we anticipate implementing a filter screen to exclude any potentially privileged communications from the case team.  (We further anticipate undertaking an independent filter review of the excluded emails by individuals not associated with the case team at an appropriate juncture.)

       In order to ensure that we have identified the appropriate list of names and domains for the privilege filter screen, I am reaching out to provide you an opportunity to identify any attorney names and corresponding email addresses for potentially privileged communications involving

your client.  To assist you, please find attached to this letter a list of email account domains identified among the xmail emails.

Please respond with your identification of attorney names (if any) and corresponding email addresses, along with a general statement of the nature of the privilege, by close of business on Tuesday, November 2, 2021.  If you have any questions, please do not hesitate to call.

Sincerely,

James R. (JR) Drabick
Assistant United States Attorney
james.drabick@usdoj.gov
(617) 748-3498

Enclosure:     Unique Domain List

2

A1733

**Unique Domain List**

a1movingandstorage.ca
abbottcresswell.com
accountantsinbc.com
acdinsurance.com
acm-services.ch
actinver.com.mx
actionstocktransfer.com
adrenalin.la
advantecglobal.com
aeroplan.com
aetna.com
afrasiabank.com
alexandracapitalcorp.com
allianz.com
allianzworldwidecare.com
allstream.com
allwestins.com
alphayomega.mx
amadeosbistro.com
amazon.com
americancorpenterprises.com
amstock.com
ancsecservices.com
anulfoarias.info
aol.com
aol.com
aphelion.com
applegaterealtors.com
aquinas.org
argus.com.cy
argussoftware.com
arlingtoncorporation.com
armlaw.com
armoursecure.com
arnulfoarias.info
arowayenergy.com
arvayfinlay.ca
ascotmining.com
associatedtrustees.com
associated-trustees.com
atlasblockchaingroup.com
atlascloud.ca
att.com
att.net
audiencemarketing.com

3

ayogdl.com
bakerst.com
bankgutenberg.ch
banking.bz
banquehavilland.ch
basaltwhistler.com
bathway.ca
bb.com.mx
bcsc01a.gov.bc.ca
bcshipping.ca
bdconsultants.com
bdo.ca
bdo.ca
beaufortacs.com
beaufortsecurities.com
bed-rock.com
bell.blackberry.net
bellalliance.ca
bellnet.ca
bennettjones.com
Bentallkennedy.com
berrylogic.net
bfbcpa.us
bgreiglaw.com
biancardilaw.com
bigskymanagement.net
bitreturn.com
blacklightsa.ch
bmasecurities.com
bmo.com
bodcaplaw.com
bondmerc.com
boothudall.com
bordier.com
boslil.com
boslil.com
breder-suasso.com
bristol.ch
broadridge.com
bruyneelandco.ca
bsibank.com
bsibank.com
btinternet.com
bty.com
buckleyhogan.com
buzzmail.ltd

4

A1735

cameony.com
canaccord.com
canadahelps.org
cannabiscomplianceinc.com
cannonpowergroup.com
capilanovw.com
carpa.ca
casadelosarcos.com
casselsbrock.com
cbhbank.com
ccltd.ca
cdw.ca
cellalange.net
centralbank.org.bz
cgf.com
chemesis.com
choicebankld.com
choicebankltd.com
chzllp.com
cigna.com
citifund.com
claruscap.com
claruscap.com
claruscapital-hk.com
cleartrusttransfer.com
clsolutions.com.hk
coastcapitalsavings.com
colcorsa.com
columbiastock.com
com.cast.net
comcast.net
consultant.com
continentalsock.com
continentalstock.com
contrerasabogados.mx
coralwave.com
coralwave.com.bs
corphouse.net
corporatehouse.com
corporatestock.com
corptrax.com
corptrax.coom
crebermusic.com
credicorpbank.com
creel.mx
creelconcepts.com

5

A1736

csair.com
csl.ap.blackberry.net
curadon.com
cwilson.com
cwpanama.net
dacostacorp.com
dantelabs.com
dccnet.com
deanlawcorp.com
dekora.com
delanocapital.ca
deloitte.com
desjardins.com
dgmgroup.com
diamondresorts.com
diocese-geraldton.org
dlubinassociates.com
dmcl.ca
dominionlending.ca
dorchestercollection.com
dubo.com
e.fanaticsretailgroup.com
earls.ca
earlston.ca
earthlink.net
easyapplianceparts.ca
edr.com
egmfirm.com
ehtrustco.ch
elcondorminerals.com
email.hpconnected.com
emerald.life
empirestock.com
empoweredcbd.ch
engelvoelkers.com
ennova.net
enrailpartners.com
equivest.ch
equuscapital.ch
esquirecs.com
eucapitalcorp.com
europacbank.com
Fairmont.com
fasken.com
fayo.biz
fedex.com

6

A1737

fensolutions.com
filersupport.com
financialfootprint.ca
firstcanada.ca
firstlandmark.ca
firstlineholdings.com
firstmg.com
foglioabogados.com
formacompany.com
fortesecurities.com
francesmahonlaw.com
FraserLitigation.com
fredercksharp.com
fredericksharp.com
fretwell.ca
frugalware.org
fultonco.com
fyklaw.com
GBHCPAS.COM
ggsibahamas.com
gki.com.bz
glennandglenn.com
globextransfer.com
gmail.com
gmx.com
gov.bc.ca
granvilleislandcatering.com
greenhilladmin.com
greenworkscarpetcare.com
gtlaw.com
gtlaw.con
harpergrey.com
haywood.com
hbvanlaw.com
hdas.com
hecapital.com
helenaabstract.com
heliograph.ca
hellenicbank.com
hillcrestpetroleum.com
hol.gr
holladay1.com
homereworks.com
hotelmoskva.rs
hotmail.com
hotmail.fr

7

A1738

hours.bz
hsbc.com
hsbc.com.mc
hsbc.com.mx
htln.com
hushmail.com
icloud.com
incnow.com
infinity-group.sc
insurebc.ca
interiortesting.com
interwestta.com
investfortuna.com
investingpacific.com
isgsecurities.com
islandstocktranfer.com
islandstocktransfer.com
isodiol.com
itpa.org
iydaco.com
jacksoncompany.ca
jaffa.ca
jamcocapital.com
jamesstafford.ca
jamesstafford.com
jandm.com
jmgm.com
jofinancial.com
johnpunzo.com
joyroadcatering.com
jrsholdingsinc.com
jt-lex.com
juscollege.com
katanassociates.com
kearneyff,com
kearneyfs.com
KornFerry.com
korveconsulting.com
l1lithium.com
lakehg.com
la-law.ca
lancetracey.com
landquest.com
langlois.ca
larlee.com
lawlerfirm.com

8

A1739

lawrosen.com
lcpa.ca
lcrhealth.com
leedefinancial.com
leedejonesgable.com
lexingtonbiosciences.com
lgt.com
lideresadvisors.com
live.com
live.com.mx
livingspace.com
livingspacehomes.com
lklaw.ca
lloyds.com
lmu.edu
localhost
lombardforte.com
lrmm.co
lrmm.com
lsauto.ca
ltic.com
lundandguttry.com
mac.com
macdonald.com
macrealty.com
mad.uscourts.gov
madala.ch
mail.com
malone-bailey.com
manulife.com
mapleviewfamilydentistry.com
mariacondesa.com
marinedrive.com
marketplace.amazon.ca
marshbuildinginspections.ca
martinandassociates.ca
mbaerbank.com
mbtaxlaw.com
mcewanpartners.com
mclmotorcars.com
mcmillan.ca
me.com
meshdesignstudio.com
messaging.microsoft.com
mexlend.com
mhklaw.com

9

A1740

michaeldowling.ca
michaelnesbit.com
midas-offshore.com
milio.com
millersassociates.com
mininghouse.com
mixbook.com
moisolicitors.com
mollymaid.ca
monex.com.mx
monsas.co.uk
montrose.net
morandmatsushi.onmicrosoft.de
morse.biz
mossfon.com
mossfon-bvi.com
motiva.ca
msn.com
mtech.edu
mulberryproperty.ca
myflightsavers.com
namprd20.prod.outlook.com
natco.org
naturogroup.com
newsfilecorp.com
nike.ins.cwru.edu
nmu.edu
nortonrosefulbright.com
notariapublicados.com
ocsecurities.com
okanagancrushpad.com
olipv.com
onelifetc.com
openroadautogroup.com
orbislegalservices.com
origua.com
outlook.com
outlook.com
pacificangler.ca
pacificproperty.ca
pacificstocktransfer.com
palkowski.com
parttimecfo.ca
patentable.com
peckandcompany.ca
pgp.com

A1741

phx2-ss-5-lb.cnet.com
pilotelectric.ca
pintoconstruction.com
plhlaw.ca
porschedrivingexperience.de
porscheexperience.de
premierfinservices.com
presidentstocktransfer.com
primorigroup.com
prival.com
privateequitysecurities.com
prodigy.net.mx
prontomail.com
protaxbook.com
protegesoluciones.com
protonmail.ch
protonmail.com
ptmtalent.com
pubcoreporting.com
puremobile.com
qstransfer.com
quijano.com
rambler.ru
randb.co.uk
rbc.com
rci.rogers.com
rdos.bc.ca
rdscapital.com
RedwoodEG.com
regeniva.com
rentaclassiccar.com
rhbgroup.com
riedesser.com.mx
rightsignature.com
rim.com
rogers.com
ronerickson.com
routhtransfer.com
rowlandlaw.ca
royalscotsclub.com
rubinrudman.com
runbox.com
ryanwilson.com
sadlergibb.com
safe-mail.net
samcoprinters.com

11

A1742

santacruzsilver.com
santander.com.mx
saturnagroup.com
sauerenergy.com
sc.mail.guru
sc.xmail.guru
scadmissions.com
scheduleonce.com
scholefield.ca
sckservices.com
scm.ca
scottsdalecapital.com
scure.xmeridian.com
sdkcpa.com
sdlergibb.com
secrue.xmeridian.com
secure.meridian.com
secure.xmail.guru
secure.xmeridan.com
secure.xmeridian.com
secure.xmeridian.comp
secureciracao.xmeridian.com
securecucacao.xmeridian.com
securitieslaw.bc.ca
semper.ch
sepepsa.mx
sercure.xmeridian.com
sharedata.co.uk
shareregistrars.uk.com
shaw.ca
shawbiz.ca
sherani.com.fj
sierraresgroup.com
signaturestocktransfer.com
silverton.ch
sir-inc.com
sizinos.com
smallcapadmin.com
smorg.ca
smythecpa.com
sonic.net
spartansecurities.com
stanford.edu
stctransfer.com
steinerfinance.net
steinmedical.com

12

A1743

sterlinggloballtd.com
stevia-first.com
stockslaw.com
stonecroftmgt.ca
strongholdmetals.com
Sun.COM
superiortoursvallarta.com
supernaturallandscapes.com
support.ucla.edu
surfjack.com
surgetech.com
sweetome.com
sympatico.ca
tampabay.rr.com
td.com
telus.com
telus.net
tendallcapital.com
thearcaneorder.com
thebmwstore.ca
thor.ca
tinglemerrett.com
tippetrichardson.com
tmx.com
trademarkindustriesltd.com
transcendcapital.com
transferonline.com
transhare.com
trars.com
tutanota.com
unilogik.com
unitedbdc.com
valor.ky
vancity.com
vandopgallery.com
vch.ca
vencapfirst.com
verdmont.com.pa
vger.kernel.org
viabank.com
vip.net
visionquestsociety.org
visualant.net
vitality.bio
vitality.bio
volansgroup.ch

13

A1744

vontobel.ch
vpbank.com
vsmcapital.com
vstocktransfer.com
vtcusa.com
vumee.com
wb21.com
wcsti.com
wdco.com
weintraub.com
weiser.com.bs
wengervieli.ch
westcoastpool.com
westernwater.us
westnet.com.au
whidbey.net
windsorplywood.com
wintercap.ch
winvestments.ca
wiupdate.com
wlmlaw.ca
wm.com
wood.bz
worldmoto.com
worthington.bz
wow.bz
wrm.ca
wscu.com
wwg.bz
wws24.ch
xado.bz
xmail.com
xmail.guru
xmeridian.com
xn.bz
xnw.bz
xnxx.bz
xtc.bz
xtg.bz
xxx.bz
yah.bz
yahoo.ca
yahoo.com
yahoo.com.mx
yahoo.gr
yaletownlaser.com

A1745

yaletownnaturopathic.com
yamaki.bz
yarfm.co.zm
yes.et
yetmanslaw.com
yin.bz
ym.bz
ymc.bz
ymn.bz
yogen.bz
yokohama.bz
yoon.bz
yosa.com.et
youhavemail.bz
youporn.com.bz
yourbiz.com
yourbz.com
yourfuture.bz
yourmail.bz
yourmail.com
yourmailbiz.com
zamilparealtors.com
zbscpas.com
zflawfirm.com

15

A1746

# Exhibit 4

**From:** Shields, Kathleen (BRO)
**Sent:** Friday, March 17, 2023 4:09 PM
**To:** DiPaolo, Alyssa; Robert Knuts; stephen.topetzes@klgates.com; award@olshanlaw.com;
neil.smith@klgates.com; Michael Tremonte; jmoon@olshanlaw.com; kmuhlendorf@wiley.law;
maranda@fritzpc.com; hwilson@wiley.law; psignorello@wiley.law; kpickettlaw@gmail.com;
rob.silverblatt@klgates.com; hcooper@toddweld.com; mmclaughlin@morganbrown.com;
jcollins@morganbrown.com; gwv@dcglaw.com; lbelostock@toddweld.com; tfazio@mgmlaw.com; Katie
Renzler; ckellen@wiley.law
**CC:** London, David H.; Day, Alfred
**Subject:** SEC v. Sharp, et al. - xmail inadvertent production issue
**Attachments:** xmail Materials & Inadvertent Production

Dear Counsel –

An issue with the production of xmail has come to my attention.  As described in the attached letter from JR Drabick, the USAO inadvertently produced to the SEC, and the SEC then produced to you, certain xmail messages and/or attachments that hit on one or more of the search terms that the USAO used in its privilege filter review.

I was first notified of a potential problem by JR late on Tuesday afternoon.  At his request, SEC staff working on this case suspended our review of the xmail production at that time.  We have not reviewed any of the xmail since then.  When SEC staff reviewed the xmail production before Tuesday afternoon, none of the documents we reviewed appeared to us to be privileged.  This morning, JR informed me of the scope of the inadvertent production, as described in the attached letter.

I have begun the process of assembling an SEC filter team to conduct its own filter review of the potentially privileged xmail files.  That filter team will review the xmail production for privilege, and I will inform you as soon as that review is complete.  To the extent that the filter team identifies any documents it believes to be privileged, we will remove those documents from the SEC's database and ask that you do the same.

If you choose not to conduct your own filter reviews of the xmail production, I ask that you await the conclusion of the SEC's filter review before looking further at the xmail production.  I will endeavor to get the SEC's filter review completed promptly.

Please let me know if you have any questions.

-       Kathy

A1748

**From:** Drabick, James (USAMA)
**Sent:** Friday, March 17, 2023 3:59 PM
**To:** Shields, Kathleen (BRO)
**CC:** London, David H.
**Subject:** xmail Materials & Inadvertent Production
**Attachments:** 2023_03_17 Letter to Shields re xmail Materials.pdf; Veldhuis - Inadvertently Produced .eml Files.xlsx; Carrillo - Inadvertently Produced .eml Files.xlsx; Friesen - Inadvertently Produced .eml Files.xlsx; Gasarch - Inadvertently Produced .eml Files.xlsx; Kelln - Inadvertently Produced .eml Files.xlsx; Sexton - Inadvertently Produced .eml Files.xlsx; Sharp - Inadvertently Produced .eml Files.xlsx; Nikolayev - Inadvertently Produced .eml Files.xlsx

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Kathy –

Please see the attached letter and enclosed materials.  Please do not hesitate to call with any questions.

Best,
JR

James R. (JR) Drabick
Assistant U.S. Attorney
U.S. Attorney's Office for the District of Massachusetts
(617) 748-3498 (o) | (617) 710-6105 (c)
James.drabick@usdoj.gov
Pronouns: he/him/his



**U.S. Department of Justice**

***Rachael S. Rollins***
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*                    *John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

March 17, 2023

<u>VIA EMAIL</u>

Kathleen Shields
Senior Trial Counsel
U.S. Securities and Exchange Commission
33 Arch Street, 24th Floor
Boston, MA  02110
shieldska@sec.gov

      Re:    "xmail" Filter Screen & Inadvertent Production

Dear Attorney Shields:

      I write to follow-up on the potential issue I alerted you about on Tuesday afternoon this week regarding the xmail materials produced to you to date.

      As you know, the FBI and I have shared with you a selection of emails known as "xmail" messages that were recovered from servers we obtained from Curacao pursuant to a mutual legal assistance request.  We have shared these materials with you for purposes of your parallel investigations and civil enforcement actions.  Specifically, we have shared with you xmail messages believed to be associated with the following individuals:  Fedir Nikolayev, Yvonne Gasarch, Frederick Sharp, Courtney Kelln, Mike Veldhuis, Paul Sexton, Jackson Friesen, and Luis Carrillo.

      Before sharing the materials with you, we ran a filter screen against the emails believed to be associated with each of these individuals to remove any emails that might potentially contain privileged information.  To do so, we generated a list of domains, names, and generic filter terms (the "Filter Terms") based on (i) a review of the header information for the entire xmail set of emails and (ii) input we solicited from counsel to Gasarch, Sharp, Kelln, Veldhuis, Sexton, and Friesen, as well as from Carrillo directly.  Some counsel provided names and/or domains for us to include, while others declined, even after we afforded them an opportunity to provide such information to a walled-off filter AUSA.  We incorporated into the Filter Terms the information provided by the counsel who elected to respond, and an FBI forensic staff member then ran a filter screen on the xmail materials using the Filter Terms.[1]  The forensics staff

      [1] The Filter Terms that the FBI forensics staff member ran are attached hereto.

member then marked for exclusion the emails and/or attachments that hit on one or more of the Filter Terms and endeavored to export sets of xmail messages that did *not* hit on any such terms (the "Result Sets."). At the time the Results Sets were generated, I had no reason to believe there were any potentially privileged materials in the Results Sets and I authorized them to be shared with you for purposes of your parallel matters. I nevertheless requested that if you came across any messages or other materials you believe might be privileged, to please let me know immediately and cease review of those materials.

On Tuesday afternoon this week I learned that there was a theoretical possibility that certain materials that were intended to be excluded from the Results Sets were nevertheless inadvertently included and produced to you. Specifically, I learned that there was a theoretical possibility that one or more .eml files produced to you as part of the xmail materials might have included attachments that hit on one or more Filter Terms and the FBI forensic staff member accordingly intended to be excluded from the Results Sets. This possibility was discovered when my office's litigation technology staff prepared to load the xmail materials in my office's document review tool, during which process my litigation technology staff consulted with the FBI forensics staff member about the scope of documents in the Results Sets. Immediately upon learning of this possibility, I asked that you please stop any additional review of the xmail materials produced to you until I had a chance to learn more. I understand you agreed to do so.

I have since directly spoken with the FBI forensics staff member about this possibility and can now report as follows. The FBI forensics staff member inadvertently included in the Results Sets certain .eml files that included one or more attachment(s) embedded within them that were intended to be excluded because those attachment(s) hit on one or more Filter Terms. This inadvertent production applies only to a subset of the .eml files that were produced and does not apply to the duplicate .htm versions of emails (which do not have the attachments embedded within them) nor the native files (which generally are the attachments to the .htm versions of emails, but which do not include any attachments that hit on one or more Filter Terms). At this juncture, I do not know whether any of the inadvertently produced attachments are in fact privileged; I simply know that the FBI forensics staff member intended that those attachments (and, in turn, the .eml files in which they were embedded) be excluded based on the Filter Terms that were applied.

Enclosed please find Excel files by individual containing a list of the attachments and associated .eml files that were inadvertently produced.[2] We will not be loading these .eml files or attachments into our review tool or otherwise reviewing them until an independent filter review of them can be completed. We ask that the SEC likewise take appropriate steps to segregate and avoid review by any investigation and/or litigation teams of any potentially privileged materials included in the materials produced to you. To that end, I understand the SEC is considering undertaking its own independent filter review of such materials. To the extent we determine that any documents in the inadvertently produced materials are in fact privileged, we will let you know, and we ask that you likewise do the same.

---

[2] Note, there are duplicate .eml entries in the lists when multiple attachments in the same email hit on a Filter Term. There are also duplicate .eml entries across the lists, presumably because the message at issue was sent to/from two or more of the individuals.

A1751

I understand you have produced the xmail materials for certain of these individuals to certain defense counsel in your parallel civil enforcement action against Frederick Sharp et al.  I ask that you please share this letter and the relevant Excel files with those counsel so that they can take the appropriate precautions while ultimate privilege determinations are made.  They are welcome to reach out to me with questions if they so choose.

Thank you for your prompt attention to this matter.

Sincerely,

James R. Drabick
Assistant U.S. Attorney

Enclosures & Attachment

3

A1752

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>               **Plaintiff,** <br><br>    **v.** <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br>               **Defendants.** | **21-cv-11276-WGY** |

**PLAINTIFF'S MOTION FOR REMEDIES AGAINST
DEFENDANTS MIKE VELDHUIS, PAUL SEXTON, JACKSON FRIESEN, COURTNEY
KELLN AND ZHIYING YVONNE GASARCH**

Plaintiff Securities and Exchange Commission ("Commission") hereby moves for the entry of final judgments against defendants Mike Veldhuis, Paul Sexton, Jackson Friesen, Courtney Kelln and Zhiying Yvonne Gasarch.  The Court entered partial judgments imposing injunctive relief against defendants Veldhuis and Kelln providing that, for purposes of assessing monetary remedies, they would not contest liability for the Commission's claims, but would be permitted to challenge the remedies sought by the Commission.  *See* Dkt. Nos. 317, ¶VI; 325, ¶VII.  The Court also entered a partial judgment against defendant Sexton, finding him liable on Counts 1-4 of the Amended Complaint, and permitting him to challenge the remedies sought by the Commission for those violations.  *See* Dkt. No. 378, ¶¶I, II.  The jury then issued its verdict finding defendant Friesen liable for violating Section 10(b) and 13(d) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) and 13d-1 thereunder, Sections 5(a) and (c) and 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act"), (Counts 1-4 of the

A1753

Amended Complaint), and finding defendant Gasarch liable for violating Section 17(a)(3) of the

Securities Act and aiding and abetting violations of Sections 17(a)(1) and (3) of the Securities

Act and Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act (Counts 10, 12, and 14 of

the Amended Complaint). *See* Dkt. No. 402.

The Commission now moves for the imposition of injunctive relief and monetary

remedies against defendants Sexton, Friesen, and Gasarch, and for the imposition of monetary

remedies against defendants Veldhuis and Kelln. In support of this motion, the Commission

submits the accompanying memorandum of law, the declaration of Ryan Murphy and its

associated exhibits, and a proposed final judgment as to each of the defendants.

WHEREFORE, the Commission respectfully requests that the Court enter Final

Judgments in the form of the proposed judgments filed herewith against defendants Veldhuis,

Sexton, Friesen, Kelln and Gasarch.

Dated: December 8, 2023                    Respectfully submitted,

                                           **SECURITIES AND EXCHANGE
                                           COMMISSION**
                                           By its Attorneys,
                                           /s/ Kathleen Burdette Shields
                                           Kathleen Burdette Shields (Mass. Bar No. 637438)
                                           Alfred Day (Mass. Bar No. 654436)
                                           David London (Mass. Bar No. 638289)
                                           Nita K. Klunder (Mass. Bar No. 689304)
                                           33 Arch Street, 24th Floor
                                           Boston, MA 02110
                                           Telephone: (617) 573-8904 (Shields); (617) 573-
                                           4537 (Day); (617) 573-8997 (London); (617) 573-
                                           8822 (Klunder)
                                           shieldska@sec.gov; daya@sec.gov;
                                           londond@sec.gov; klunderni@sec.gov

A1754

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(A)(2)**

The undersigned conferred with counsel for defendants Veldhuis, Sexton, Friesen, Kelln and Gasarch and was unable to resolve or narrow the issues presented in this motion. Each of the defendants plans to oppose this motion.

/s/ Kathleen Shields
Kathleen Shields

**CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2023, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case. A copy will also be sent via first class mail, overnight mail and/or email to those parties who have not yet registered for notice via the Court's CM/ECF system.

/s/ Kathleen Shields
Kathleen Shields

A1755

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br><br>                    **Plaintiff,** <br><br>     **v.** <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br><br>                    **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

**FINAL JUDGMENT AS TO DEFENDANT JACKSON T. FRIESEN**

On September 27, 2023, the jury in this matter found Defendant Jackson T. Friesen ("Defendant" or "Friesen") liable for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securites Act of 1933 and Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) and 13d-1 thereunder. The Commission has moved this Court for entry of Final Judgment. Accordingly, the Court enters judgment as follows:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

1

A1756

(a)    to employ any device, scheme, or artifice to defraud;

(b)    to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; or

(c)    to engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933

(the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any

means or instruments of transportation or communication in interstate commerce or by use of the

mails, directly or indirectly:

(a)    to employ any device, scheme, or artifice to defraud;

(b)    to obtain money or property by means of any untrue statement of a material fact

or any omission of a material fact necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading;

or

(c)    to engage in any transaction, practice, or course of business which operates or

2

A1757

would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)    Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)    Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)    Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the

A1758

effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. §77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 13(d) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 13d-1 promulgated thereunder [17 C.F.R. §240.13d-1], by failing to file with the Commission a statement containing the information required by Schedule 13D (as provided in 17 C.F.R. §240.13d-101), within ten days after acquiring directly or indirectly beneficial ownership of more than five percent of any equity security of a class which is specified in Exchange Act Rule 13d-1(I) [17 C.F.R. §240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is

4

A1759

permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. §240.3a51-1].

## VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for his own personal account.

## VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for disgorgement of $11,846,176, representing net profits gained as a result of the conduct alleged in the Amended Complaint, together with prejudgment interest thereon in the amount of $4,057,737, and a civil penalty in the amount of $1,562,603 pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §78u].  Defendant shall satisfy this obligation by paying $17,466,516 to the Securities and Exchange Commission within 30 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank

A1760

cashier's check, or United States postal money order payable to the Securities and Exchange

Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; Jackson Friesen as a defendant in this action; and specifying that payment is made

pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case

identifying information to the Commission's counsel in this action.  By making this payment,

Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part

of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for disgorgement and prejudgment

interest by using all collection procedures authorized by law, including, but not limited to,

moving for civil contempt at any time after 30 days following entry of this Final Judgment.

The Commission may enforce the Court's judgment for penalties by the use of all

collection procedures authorized by law, including the Federal Debt Collection Procedures Act,

28 U.S.C. §3001 *et seq.,* and moving for civil contempt for the violation of any Court orders

issued in this action.   Defendant shall pay post judgment interest on any amounts due after 30

days of the entry of this Final Judgment pursuant to 28 U.S.C. §1961.  The Commission shall

hold the funds, together with any interest and income earned thereon (collectively, the "Fund"),

pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's

approval.  Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund

A1761

provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002.  The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

VIII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, Bank of Montreal shall transfer the entire balance of the following Bank of Montreal account(s) which were frozen pursuant to an Order of this Court to the Commission:

7

A1762

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 0469 |
| FERROUS CAPITAL CORPORATION | 0477 |
| FERROUS CAPITAL CORPORATION | 7732 |
| FIRST AVENUE CAPITAL CORP | 0202 |
| MGF STRATEGIES CORP | 3623 |
| VALLEY DRIVE ESTATES INC | 0655 |
| BOUNDARY BAY STRATEGIES CORP. | 512 |
| JACKSON FRIESEN | 2540 |
| JACKSON FRIESEN | 5120 |
| JACKSON FRIESEN | 0170 |
| WESTSIDE CAPITAL PARTNERS INC | 964 |

Bank of Montreal may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Bank of Montreal also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

    Enterprise Services Center
    Accounts Receivable Branch
    6500 South MacArthur Boulevard
    Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Final Judgment.

IX.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, PI Financial Corp. ("PI Financial") shall transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

8

A1763

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 2276 |
| ARDENT STRATEGIES CORP | 3167 |
| ARDENT STRATEGIES CORP | 0153 |
| ARDENT STRATEGIES CORP | 0161 |
| FERROUS CAPITAL CORPORATION | 2958 |
| FERROUS CAPITAL CORPORATION | 2966 |
| FERROUS CAPITAL CORPORATION | 2974 |
| JACKSON FRIESEN | 0254 |

PI Financial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. PI Financial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Final Judgment.

X.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, Canadian Imperial Bank of Commerce ("Canadian Imperial") shall transfer the entire balance of the following Canadian Imperial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|

A1764

| JACKSON FRIESEN | 2334 |
|---|---|

Canadian Imperial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Canadian Imperial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Final Judgment.

XI.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, Envision Financial ("Envision") shall transfer the entire balance of the following Envision account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| JACKSON FRIESEN | 4112 |

Envision may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Envision also may transfer these funds by certified

A1765

check, bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

<div align="center">XII.</div>

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, Research Capital Corporation ("Research

Capital")shall transfer the entire balance of the following Research Capital account(s) which

were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | KK15 |

Research Capital may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Research Capital also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Final Judgment.

XIII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, Leede Jones Gable Inc. ("Leede Jones") shall transfer the entire balance of the following Leede Jones account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 873A |
| JACKSON FRIESEN | 6901 |
| WESTSIDE CAPITAL PARTNERS INC. | 8121 |

Leede Jones may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Leede Jones also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Final Judgment.

XIV.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

A1767

being served with a copy of this Final Judgment, Haywood Securities Inc. ("Haywood") shall

transfer the entire balance of the following Haywood account(s) which were frozen pursuant to

an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
| --- | --- |
| ARDENT STRATEGIES CORP | 6164 |

Haywood may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Haywood also may transfer these funds by certified

check, bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

XV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

Further, the asset freeze order imposed by Paragraph I of this Court's Order dated October 7,

2021, except as modified by Paragraphs VIII through XIV above, shall continue in full force and

effect until the monetary obligation imposed by this Final Judgment is paid in full.

Dated: _____,        _____

                                        UNITED STATES DISTRICT JUDGE

A1768

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

<table>
<tr>
<td>

**SECURITIES AND EXCHANGE COMMISSION,**
                **Plaintiff,**

    **v.**

**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**

                **Defendants.**

</td>
<td>

**Civil Action No. 21-CV-11276 (WGY)**

</td>
</tr>
</table>

### FINAL JUDGMENT AS TO DEFENDANT YVONNE GASARCH

On September 27, 2023, the jury in this matter found Defendant Zhiying Yvonne Gasarch ("Defendant" or "Gasarch") liable for violating Section 17(a)(3) of the Securites Act of 1933 and for aiding and abetting others' violations of Sections 17(a)(1) and 17(a)(3) of the Securites Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) thereunder.  The Commission has moved this Court for entry of Final Judgment.  Accordingly, the Court enters judgment as follows:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of

1

A1769

interstate commerce, or of the mails, or of any facility of any national securities exchange, in

connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact

        necessary in order to make the statements made, in the light of the circumstances

        under which they were made, not misleading; or

    (c)    to engage in any act, practice, or course of business which operates or would

        operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).

## II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933

(the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any

means or instruments of transportation or communication in interstate commerce or by use of the

mails, directly or indirectly:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to obtain money or property by means of any untrue statement of a material fact

        or any omission of a material fact necessary in order to make the statements

A1770

made, in light of the circumstances under which they were made, not misleading;
or

(c)     to engage in any transaction, practice, or course of business which operates or
would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in
Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who
receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's
officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or
participation with Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is
permanently barred from participating in an offering of penny stock, including engaging in
activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or
attempting to induce the purchase or sale of any penny stock. A penny stock is any equity
security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the
Exchange Act [17 C.F.R. §240.3a51-1].

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section
21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], Defendant is permanently restrained and
enjoined from directly or indirectly, including, but not limited to, through an entity owned or
controlled by her, participating in the issuance, purchase, offer, or sale of any security; provided,
however, that such injunction shall not prevent Defendant from purchasing or selling securities
listed on a national securities exchange for her own personal account.

A1771

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for disgorgement of $2,522,367, representing net profits gained as a result of the conduct alleged in the Amended Complaint, together with prejudgment interest thereon in the amount of $646,366, and a civil penalty in the amount of $558,072 pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §78u]. Defendant shall satisfy this obligation by paying $3,726,805 to the Securities and Exchange Commission within 30 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Zhiying Yvonne Gasarch as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for disgorgement and prejudgment

4

A1772

interest by using all collection procedures authorized by law, including, but not limited to, moving for civil contempt at any time after 30 days following entry of this Final Judgment.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. §3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action. Defendant shall pay post judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 U.S.C. §1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that she is entitled to, nor shall she further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty

A1773

Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset

to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall

not be deemed an additional civil penalty and shall not be deemed to change the amount of the

civil penalty imposed in this Judgment.  For purposes of this paragraph, a "Related Investor

Action" means a private damages action brought against Defendant by or on behalf of one or

more investors based on substantially the same facts as alleged in the Complaint in this action.

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, Canaccord Genuity Corp ("Canaccord") shall

transfer the entire balance of the following Canaccord account(s) which were frozen pursuant to

an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ZHIYING GASARCH | 67A1 |
| ZHIYING GASARCH | 67B1 |

Canaccord may transmit payment electronically to the Commission, which will provide detailed

ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a

bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.

Canaccord also may transfer these funds by certified check, bank cashier's check, or United

States postal money order payable to the Securities and Exchange Commission, which shall be

delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

6

A1774

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, Wells Fargo shall transfer the entire balance of

the following Wells Fargo account(s) which were frozen pursuant to an Order of this Court to the

Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| W&B RIDING CLUB @ ASSUNPINK WNA LLC | 9413 |
| W&B RIDING CLUB @ ASSUNPINK WNA LLC | 5351 |

Wells Fargo may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Wells Fargo also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, G&F Financial Group ("G&F Financial") shall

transfer the entire balance of the following G&F Financial account(s) which were frozen

pursuant to an Order of this Court to the Commission:

7

A1775

| Account Owner | Acct. Ending in: |
|---|---|
| ZHIYING GASARCH | 4815 |
| ZHIYING GASARCH/BRUCE GASARCH | 5408 |
| ZHIYING GASARCH/BRUCE GASARCH | 3034 |
| SNOWPEAK MANAGEMENT LTD. | 7164 |
| GREAT WALL MANAGEMENT LTD. | 7172 |
| GREAT WALL MANAGEMENT LTD. | 7180 |

G&F Financial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. G&F Financial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Final Judgment.

IX.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, Sun Life Assurance Company of Canada ("Sun Life") shall transfer the entire balance of the following Sun Life account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ZHIYING GASARCH | 8203 |

A1776

Sun Life may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Sun Life also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Final Judgment.

## X.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, LMN Law Group Law Corporation ("LMN Law") shall transfer the entire balance of any and all moneys received from Defendant Gasarch as the result of the sale of her home as permitted by this Court's Order dated January 25, 2022 (Dkt. No. 192), and held for Gasarch's benefit in an escrow account at TD Bank to the Commission.  LMN Law may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  LMN Law also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center

A1777

Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

IX.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

Further, the asset freeze order imposed by Paragraph I of this Court's Order dated October 15,

2021, except as modified by Paragraphs VI to X above, shall continue in full force and effect

until the monetary obligation imposed by this Final Judgment is paid in full.

Dated: _____, _____

_____
UNITED STATES DISTRICT JUDGE

10

A1778

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>                     **Plaintiff,** <br><br>    **v.** <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br>                     **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

### FINAL JUDGMENT AS TO DEFENDANT PAUL SEXTON

On September 11, 2023, Defendant Paul Sexton ("Defendant" or "Sexton") agreed not to contest his liability for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securites Act of 1933 and Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) and 13d-1 thereunder. Dkt. No. 376. The following day, the Court entered judgment against Sexton finding him liable for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securites Actof 1933 and Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) and 13d-1 thereunder. Dkt No. 378. The Commission has moved this Court for entry of Final Judgment. Accordingly, the Court enters Final Judgment as follows:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5

A1779

promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

      (a)     to employ any device, scheme, or artifice to defraud;

      (b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      (c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

      (a)     to employ any device, scheme, or artifice to defraud;

      (b)     to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements

2

A1780

made, in light of the circumstances under which they were made, not misleading; or

(c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)    Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)    Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)    Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use

A1781

or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. §77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 13(d) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 13d-1 promulgated thereunder [17 C.F.R. §240.13d-1], by failing to file with the Commission a statement containing the information required by Schedule 13D (as provided in 17 C.F.R. §240.13d-101), within ten days after acquiring directly or indirectly beneficial ownership of more than five percent of any equity security of a class which is specified in Exchange Act Rule 13d-1(I) [17 C.F.R. §240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

A1782

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. §240.3a51-1].

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for his own personal account.

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for disgorgement of $17,367,474, representing net profits gained as a result of the conduct alleged in the Amended Complaint, together with prejudgment interest thereon in the amount of $5,872,145, and a civil penalty in the amount of $1,562,603 pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §78u].  Defendant shall satisfy this obligation by paying $24,802,222 to the Securities and Exchange Commission within 30 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide

A1783

detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank

cashier's check, or United States postal money order payable to the Securities and Exchange

Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

 and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; Paul Sexton as a defendant in this action; and specifying that payment is made

pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case

identifying information to the Commission's counsel in this action.  By making this payment,

Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part

of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for disgorgement and prejudgment

interest by using all collection procedures authorized by law, including, but not limited to,

moving for civil contempt at any time after 30 days following entry of this Final Judgment.

The Commission may enforce the Court's judgment for penalties by the use of all

collection procedures authorized by law, including the Federal Debt Collection Procedures Act,

28 U.S.C. §3001 *et seq.,* and moving for civil contempt for the violation of any Court orders

issued in this action.   Defendant shall pay post judgment interest on any amounts due after 30

days of the entry of this Final Judgment pursuant to 28 U.S.C. §1961.  The Commission shall

hold the funds, together with any interest and income earned thereon (collectively, the "Fund"),

A1784

pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

7

A1785

VIII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, Canaccord Genuity Corp ("Canaccord") shall

transfer the entire balance of the following Canaccord account(s) which were frozen pursuant to

an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | 08A1 |
| NOVA TREK CAPITAL INC | 08B1 |
| PAUL SEXTON | 91E1 |
| PAUL SEXTON | 91F1 |
| PAUL SEXTON | 31A7 |
| PAUL SEXTON | 31B6 |

Canaccord may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Canaccord also may transfer these funds by certified

check, bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

IX.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

A1786

being served with a copy of this Final Judgment, PI Financial Corp. ("PI Financial") shall

transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to

an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| PAUL SEXTON | 1414 |
| PAUL SEXTON | 3953 |
| NOVA TREK CAPITAL INC. | 6518 |
| NOVA TREK CAPITAL INC. | 6952 |
| SOLITO CAPITAL CORP. | 7401 |
| SOLITO CAPITAL CORP. | 6951 |
| SOLITO CAPITAL CORP. | 6977 |

PI Financial may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  PI Financial also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

A1787

X.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, TD Canada Trust ("TD Canada") shall transfer

the entire balance of the following TD Canada account(s) which were frozen pursuant to an

Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | 5109 |
| NOVA TREK CAPITAL INC | 2034 |
| PAUL SEXTON | 6857 |
| PAUL SEXTON | 8504 |
| PAUL SEXTON | 6857 |
| PAUL SEXTON | 5768 |
| PAUL SEXTON | 9202 |

TD Canada may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  TD Canada also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

A1788

XI.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, Research Capital Corporation ("Research

Capital") shall transfer the entire balance of the following Research Capital account(s) which

were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | AAZ8 |
| PAUL SEXTON | KK82 |

Research Capital may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Research Capital also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

XII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, Leede Jones Gable Inc. ("Leede Jones")shall

transfer the entire balance of the following Leede Jones account(s) which were frozen pursuant

to an Order of this Court to the Commission:

A1789

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | 8313 |
| PAUL SEXTON | 6984 |
| WESTWOOD VENTURES INC. | 227A |
| SOLITO CAPITAL CORP. | 7743 |

Leede Jones may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Leede Jones also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Final Judgment.

XIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment. Further, the asset freeze order imposed by Paragraph V of this Court's Order dated August 20, 2021, except as modified by Paragraphs VIII through XII above, shall continue in full force and effect until the monetary obligation imposed by this Final Judgment is paid in full.

Dated: _____, _____

_____
UNITED STATES DISTRICT JUDGE

A1790

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>                           **Plaintiff,** <br><br>     v. <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br>                      **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

### FINAL JUDGMENT AS TO DEFENDANT MIKE K. VELDHUIS

On June 13, 2023, Defendant Mike K. Veldhuis ("Defendant" or "Veldhuis") agreed not to contest his liability for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securites Act of 1933 and Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) and 13d-1 thereunder.  Dkt. No. 315.  On June 21, 2023, the Court entered judgment against Veldhuis which included permanent injunctions and a penny stock bar.  Dkt. No. 325.  The permanent injunctions and penny stock bar remain in full force and effect.  The judgment also contemplated additional monetary remedies that would be determined by the Court at a later date, and that Veldhuis would not contest liability for puroposes of that determination.  *Id.*  The Commission has moved this Court for entry of Final Judgment.  Accordingly, the Court enters Final Judgment as follows:

A1791

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the

A1792

mails, directly or indirectly:

(a)    to employ any device, scheme, or artifice to defraud;

(b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)    Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)    Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or

3

A1793

instruments of transportation, any such security for the purpose of sale or for

delivery after sale; or

(c)    Making use of any means or instruments of transportation or communication in

interstate commerce or of the mails to offer to sell or offer to buy through the use

or medium of any prospectus or otherwise any security, unless a registration

statement has been filed with the Commission as to such security, or while the

registration statement is the subject of a refusal order or stop order or (prior to the

effective date of the registration statement) any public proceeding or examination

under Section 8 of the Securities Act [15 U.S.C. §77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating, directly or indirectly, Section 13(d) of the

Exchange Act [15 U.S.C. §78j(b)] and Rule 13d-1 promulgated thereunder [17 C.F.R. §240.13d-

1], by failing to file with the Commission a statement containing the information required by

Schedule 13D (as provided in 17 C.F.R. §240.13d-101), within ten days after acquiring directly

or indirectly beneficial ownership of more than five percent of any equity security of a class

which is specified in Exchange Act Rule 13d-1(I) [17 C.F.R. §240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

A1794

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. §240.3a51-1].

## VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for his own personal account.

## VII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is liable for disgorgement of $13,289,897, representing net profits gained as a result of the conduct alleged in the Amended Complaint, together with prejudgment interest thereon in the amount of $4,314,031, and a civil penalty in the amount of $1,562,603 pursuant to Section 21(d) of the

A1795

Exchange Act [15 U.S.C. §78u]. Defendant shall satisfy this obligation by paying $19,166,531

to the Securities and Exchange Commission within 30 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank

cashier's check, or United States postal money order payable to the Securities and Exchange

Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

 and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; Mike Veldhuis as a defendant in this action; and specifying that payment is made

pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case

identifying information to the Commission's counsel in this action. By making this payment,

Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part

of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for disgorgement and prejudgment

interest by using all collection procedures authorized by law, including, but not limited to,

moving for civil contempt at any time after 30 days following entry of this Final Judgment.

The Commission may enforce the Court's judgment for penalties by the use of all

collection procedures authorized by law, including the Federal Debt Collection Procedures Act,

28 U.S.C. §3001 *et seq.,* and moving for civil contempt for the violation of any Court orders

A1796

issued in this action.   Defendant shall pay post judgment interest on any amounts due after 30

days of the entry of this Final Judgment pursuant to 28 U.S.C. §1961.  The Commission shall

hold the funds, together with any interest and income earned thereon (collectively, the "Fund"),

pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's

approval.  Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund

provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002.  The Court shall retain

jurisdiction over the administration of any distribution of the Fund and the Fund may only be

disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be

paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the

government for all purposes, including all tax purposes.  To preserve the deterrent effect of the

civil penalty, Defendant shall not, after offset or reduction of any award of compensatory

damages in any Related Investor Action based on Defendant's payment of disgorgement in this

action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such

compensatory damages award by the amount of any part of Defendant's payment of a civil

penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such

a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty

Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset

to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall

not be deemed an additional civil penalty and shall not be deemed to change the amount of the

civil penalty imposed in this Judgment.  For purposes of this paragraph, a "Related Investor

Action" means a private damages action brought against Defendant by or on behalf of one or

A1797

more investors based on substantially the same facts as alleged in the Complaint in this action.

VIII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, Bank of Montreal shall transfer the entire balance of the following Bank of Montreal account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| AVONHURST CAPITAL CORP | 1741 |
| MIKE VELDHUIS | 7997 |
| MIKE VELDHUIS | 1464B |

Bank of Montreal may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Bank of Montreal also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Final Judgment.

IX.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, PI Financial Corp. ("PI Financial") shall

8

A1798

transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | 9203 |
| BLACKSTONE CAPITAL PARTNERS INC | 9237 |
| BLACKSTONE CAPITAL PARTNERS INC | 4273 |
| BLACKSTONE CAPITAL PARTNERS INC | 7396 |
| MIKE VELDHUIS | 1710 |

PI Financial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. PI Financial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Final Judgment.

X.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, Canaccord Genuity Corp. ("Canaccord") shall transfer the entire balance of the following Canaccord account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|

A1799

| BLACKSTONE CAPITAL PARTNERS INC | 65A1 |
|---|---|

Canaccord may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Canaccord also may transfer these funds by certified

check, bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

XI.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, Coast Capital Savings Federal Credit Union

("Coast Capital") shall transfer the entire balance of the following Coast Capital account(s)

which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| MIKE VELDHUIS | 8846 |

Coast Capital may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Coast Capital also may transfer these funds by

A1800

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

<div align="center">XII.</div>

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, Research Capital Corporation ("Research

Capital")shall transfer the entire balance of the following Research Capital account(s) which

were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | KLA4 |
| BLACKSTONE CAPITAL PARTNERS INC | KKH4 |
| MIKE VELDHUIS | KJV9 |
| MIKE VELDHUIS | KK66 |

Research Capital may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Research Capital also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard

<div align="center">A1801</div>

Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

XIII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, Leede Jones Gable Inc. ("Leede Jones") shall

transfer the entire balance of the following Leede Jones account(s) which were frozen pursuant

to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | 231A |
| BLACKSTONE CAPITAL PARTNERS INC | 231E |
| BLACKSTONE CAPITAL PARTNERS INC | 231F |
| MIKE VELDHUIS | 953A |
| MIKE VELDHUIS | 953S |
| MIKE VELDHUIS | 862Q |
| FDS CAPITAL INC. | 726A |

Leede Jones may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Leede Jones also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

A1802

and shall be accompanied by a letter identifying the case title, civil action number, and name of
this Court; and specifying that payment is made pursuant to this Final Judgment.

<div align="center">XIV.</div>

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain
jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.
Further, the asset freeze order imposed by Paragraph V of this Court's Order dated August 20,
2021, except as modified by Paragraphs VIII through XIII above, shall continue in full force and
effect until the monetary obligation imposed by this Final Judgment is paid in full.


Dated: _____, _____


_____
UNITED STATES DISTRICT JUDGE


<div align="center">13</div>

<div align="center">A1803</div>

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                         **Plaintiff,**<br><br>    **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>                         **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

### FINAL JUDGMENT AS TO DEFENDANT COURTNEY KELLN

On June 13, 2023, Defendant Courtney Kelln ("Defendant" or "Kelln") agreed not to contest her liability for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securites Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) thereunder, and for aiding and abetting others' violations of those provisions. Dkt. No. 315. The following day, the Court entered judgment against Kelln which included permanent injunctions and a penny stock bar. Dkt. No. 317. The permanent injunctions and penny stock bar remain in full force and effect. The judgment also contemplated additional monetary remedies that would be determined by the Court at a later date, and that Kelln would not contest liability for puroposes of that determination. *Id.* The Commission has moved this Court for entry of Final Judgment. Accordingly, the Court enters Final Judgment as follows:

A1804

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the

A1805

mails, directly or indirectly:

   (a)    to employ any device, scheme, or artifice to defraud;

   (b)    to obtain money or property by means of any untrue statement of a material fact

          or any omission of a material fact necessary in order to make the statements

          made, in light of the circumstances under which they were made, not misleading;

          or

   (c)    to engage in any transaction, practice, or course of business which operates or

          would operate as a fraud or deceit upon the purchaser.

   IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).


                                         III.

   IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C.

§77e] by, directly or indirectly, in the absence of any applicable exemption:

   (a)    Unless a registration statement is in effect as to a security, making use of any

          means or instruments of transportation or communication in interstate commerce

          or of the mails to sell such security through the use or medium of any prospectus

          or otherwise;

   (b)    Unless a registration statement is in effect as to a security, carrying or causing to

          be carried through the mails or in interstate commerce, by any means or

                                          3

                                       A1806

instruments of transportation, any such security for the purpose of sale or for
delivery after sale; or

(c)     Making use of any means or instruments of transportation or communication in
interstate commerce or of the mails to offer to sell or offer to buy through the use
or medium of any prospectus or otherwise any security, unless a registration
statement has been filed with the Commission as to such security, or while the
registration statement is the subject of a refusal order or stop order or (prior to the
effective date of the registration statement) any public proceeding or examination
under Section 8 of the Securities Act [15 U.S.C. §77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in
Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who
receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's
officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or
participation with Defendant or with anyone described in (a).

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is
permanently barred from participating in an offering of penny stock, including engaging in
activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or
attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity
security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the
Exchange Act [17 C.F.R. §240.3a51-1].

4

A1807

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by her, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for her own personal account.

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for disgorgement of $1,582,785, representing net profits gained as a result of the conduct alleged in the Amended Complaint, together with prejudgment interest thereon in the amount of $460,688, and a civil penalty in the amount of $904,078 pursuant to Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78u]. Defendant shall satisfy this obligation by paying $2,947,551 to the Securities and Exchange Commission within 30 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard

A1808

Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Courtney Kelln as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by using all collection procedures authorized by law, including, but not limited to, moving for civil contempt at any time after 30 days following entry of this Final Judgment.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. §3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action. Defendant shall pay post judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 U.S.C. §1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

A1809

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that she is entitled to, nor shall she further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

VII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Final Judgment, PI Financial Corp. ("PI Financial") shall transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| EVERVEST EQUITY INC | 4535 |

PI Financial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly

A1810

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  PI Financial also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

VIII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Final Judgment, TD Canada Trust ("TD Canada") shall transfer

the entire balance of the following TD Canada account(s) which were frozen pursuant to an

Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| EVERVEST EQUITY INC | 9909 |
| COURTNEY KELLN | 9889 |

TD Canada may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  TD Canada also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch

8

A1811

6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Final Judgment.

IX.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

Further, the asset freeze order imposed by Paragraph I of this Court's Order dated October 7,

2021, except as modified by Paragraphs VII and VIII above, shall continue in full force and

effect until the monetary obligation imposed by this Final Judgment is paid in full.

Dated: _____, _____

_____
UNITED STATES DISTRICT JUDGE

9

A1812