# United States Court of Appeals

*for the*

# First Circuit

Case Nos. 24-1770,
24-1771, 24-1772,
24-1773, 24-1774

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

ZHIYING YVONNE GASARCH,

*Defendant-Appellant,*

FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS;
PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON IN CASE NO. 1:21-CV-11276-WGY,
HONORABLE WILLIAM G. YOUNG, U.S. DISTRICT JUDGE

## JOINT APPENDIX
### Volume 5 of 8 (Pages A2416 to A2945)

STEPHEN G. TOPETZES
NEIL T. SMITH
ROBERT S. SILVERBLATT
K&L GATES LLP
*Counsel for Defendant-Appellant*
  *Paul Sexton*
1601 K Street, NW
Washington, DC 20006
(202) 778-9000

MICHAEL TREMONTE
SHER TREMONTE
*Counsel for Defendant-Appellant*
  *Mike K. Veldhuis*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*(For Continuation of Appearances See Inside Cover)*

CP  COUNSEL PRESS    (800) 4-APPEAL • (336840)

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

MIKE K. VELDHUIS,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

———————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

PAUL SEXTON,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

———————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

COURTNEY KELLN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
MIKE K. VELDHUIS; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

———————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

JACKSON T. FRIESEN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; PAUL SEXTON;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

FRANK SCADUTO
KEVIN B. MUHLENDORF
WILEY REIN LLP
*Counsel for Defendant-Appellant*
   *Courtney Kelln*
2050 M Street, NW
Washington, DC 20036
(202) 719-7000


MARANDA FRITZ
MARANDA E. FRITZ PC
521 5th Avenue
17th Floor
New York, New York 10175
(646) 584-8231


TIMOTHY J. FAZIO
MANNING GROSS + MASSENBURG LLP
125 High Street
Oliver Street Tower, 6th Floor
Boston, Massachusetts 02110
(617) 670-8800


*Counsel for Defendant-Appellant*
   *Jackson T. Friesen*

DANIEL STAROSELSKY
ASSISTANT GENERAL COUNSEL
KERRY J. DINGLE
SENIOR APPELLATE COUNSEL
U.S. SECURITIES & EXCHANGE
   COMMISSION
*Counsel for Plaintiff-Appellee*
100 F Street, NE
Washington, DC 20549
(202) 551-6953

KAREN A. PICKETT
PICKETT LAW OFFICES, PC
*Counsel for Defendant-Appellant*
   *Zhiying Yvonne Gasarch*
125 High Street, 26th Floor
Boston, Massachusetts 02110
(617) 423-0485

# TABLE OF CONTENTS

**Page**

Docket Entries ......................................................................................  A1

Complaint, filed August 5, 2021 (Dkt. 1) .......................................  A55

    Exhibit A: Hearing dated August 29, 2019 ...........................  A136

    Exhibit B: Foot Loose Charlie Smith's Offshore Chronicles ...............  A143

    Exhibit C: Invoice.................................................................  A144

    Exhibit D: E-Mail Correspondence .......................................  A148

    Exhibit E: Q Account.............................................................  A184

    Exhibit F: Q Bank Broker: Work ...........................................  A191

    Exhibit G: Peaceful Lion Holdings Limited...........................  A194

    Exhibit H: Wire Transfer.......................................................  A211

    Exhibit I: Securities and Exchange Commission, Schedule 13D/A.......  A212

    Exhibit J: Chart ....................................................................  A217

    Exhibit K: August 19, 2013, Treasury Order .......................  A220

    Exhibit L: Portfolio Valuation 790-1 ....................................  A248

Declaration of Trevor T. Donelan, filed August 5, 2021................  A275

Civil Cover Sheet ..............................................................................  A310

Plaintiff's Emergency *Ex Parte* Motion for a Temporary Restraining Order, Order Freezing Assets and Order for Other Equitable Relief, filed August 5, 2021 (Dkt. 3) ..........................................................  A311

[Proposed] Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief, filed August 5, 2021 ..................  A313

Plaintiff's Memorandum of Law in Support of its Emergency *Ex Parte* Motion for a Temporary Restraining Order, Order Freezing Assets, and Other for Equitable Relief, filed August 5, 2021 (Dkt. 4)..............  A323

Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief, filed August 6, 2021 (Dkt. 7) .....................................  A358

i

**Page**

[Proposed] Preliminary Injunction Order, order Freezing Assets, and Order for Other Equitable Relief, filed August 20, 2021 (Dkt. 39).................. A368

Transcript of Motion Hearing Held on January 20, 2022, filed January 25, 2022 (Dkt. 193)........................................................................ A380

Final Judgment as to Defendant Frederick L. Sharp, filed May 12, 2022 (Dkt. 211)............................................................................. A407

Memorandum and Order, filed September 6, 2022 (Dkt. 228) ........................ A420

Amended Complaint, filed September 9, 2022 (Dkt. 230)............................... A524

Defendant Paul Sexton's Answer to Amended Complaint and Affirmative Defenses, filed September 23, 2022 (Dkt. 242) ..................................... A616

Defendant Mike K. Veldhuis Verified Answer to Verified Amended Complaint, filed September 23, 2022 (Dkt. 244) ................................... A652

Defendant Courtney Kelln's Answer to Amended Complaint, filed September 30, 2022 (Dkt. 245) ............................................................. A702

Defendant Zhiying Yvonne Gasarch's Anser to Amended Complaint and Affirmative Defenses, filed October 7, 2022 (Dkt. 246)....................... A738

Answer of Defendant Jackson T. Friesen to Amended Complaint, filed October 14, 2022 (Dkt. 247)..................................................... A848

Declaration of Roger Knox, filed April 17, 2023 (Dkt. 274) .......................... A950

Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 2, 2023 (Dkt. 280) ............................................ A959

Memorandum of Law in Support of Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 2, 2023 (Dkt. 281)................................................................................ A962

Declaration of Robert Knuts, filed may 2, 2023 (Dkt. 282) ............................ A988

Exhibit A: Email correspondence dated February 8, 2022 ................... A990

Exhibit B: Email exchange involving AUSA Drabick and Kevin Muhlendorf, counsel for defendant Courtney Kelln, dated February 8, 2022 through February 11, 2022 .............................. A994

**Page**

Exhibit C: Email dated February 17, 2023, from AUSA Drabick to counsel for Mr. Veldhuis, Michael Tremonte and Noam Biale... A997

Exhibit D: Email dated March 17, 2023, from SEC Attorney Kathleen Shields ....................................................................... A1014

Exhibit E: Notice of Civil Claim that the Securities and Exchange Commission filed in the Supreme Court of British Columbia on August 11, 2022 ........................................................ A1020

Exhibit F: Reasons for Judgment issued by the Supreme Court ofBritish Columbia on March 21, 2023 .................................. A1031

Exhibit G: SEC's Responses and Objections to Defendant Courtney Kelln's First Requests for Admissions dated March 17, 2023 . A1061

Defendant Paul Sexton's Notice of Joinder, filed May 8, 2023 (Dkt. 286) . A1079

Plaintiff's Opposition to Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 9, 2023 (Dkt. 289) ......... A1082

Exhibit A: Application Response ....................................... A1096

Electronic Order, filed May 15, 2023 (Dkt. 292) ........................................ A1101

Defendants Courtney Kelln and Mike Veldhuis' Notice of Non-Opposition to Entry of Judgment, filed June 13, 2023 (Dkt. 315)...................... A1102

[Proposed Order Entering] Judgment as to Defendant Courtney Kelln, filed June 13, 2023 ................................................................... A1106

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 13, 2023 ................................................................... A1112

Plaintiff's Response to Kelln's and Veldhuis's Notice of Non-Opposition to Entry of Judgment, filed June 14, 2023 (Dkt. 316) .......................... A1118

Order Entering Judgment s to Defendant Courtney Kelln, filed June 14, 2023 (Dkt. 317)........................................................................ A1121

Notice of Corrected Filing Regarding Defendant Mike Velhuis' Notice of Non-Opposition of Entry of Judgment, filed June 14, 2023 (Dkt. 318) ................................................................... A1127

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 14, 2023 ................................................................... A1130

**Page**

Notice of Corrected Filing Regarding Defendant Mike Veldhuis' Notice of Non-Opposition to Entry of Judgment, filed June 15, 2023 (Dkt. 319) ................................................................................... A1137

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 15, 2023 ................................................................... A1140

Judgment as to Defendant Mike Veldhuis, filed June 21, 2023 (Dkt. 325) ... A1147

Defendant Jackson T. Friesen's Motion in Limine to Exclude "Q" Records and Purported Expert Testimony, filed August 10, 2023 (Dkt. 329) ... A1154

Order, filed August 10, 2023 ................................................................. A1167

Yvonne Gasarch's Motion in Limine to Exclude "Q" Records and Purported Expert Testimony, filed August 24, 2023 (Dkt.. 334) ....................... A1168

    Exhibit 1: Deposition of Fedir Nikolayev ........................................ A1174

Plaintiff's Opposition to Defendant Jackson T. Friesen's Motion to Exclude "Q" Records and Purported Expert Testimony, filed August 25, 2023 (Dkt. 336) ............................................................................ A1261

    Exhibit 1: Declaration of Ryan Murphy .......................................... A1279

    Exhibit 2: Deposition of Written Questions of Zhiying Yvonne Gasarch .............................................................................. A1285

Defendant Paul Sexton's Motion in Limine to Exclude Q System and Associated Data, fled August 31, 2023 (Dkt. 338) ........................... A1323

    Exhibit 1: Deposition of Fedir Nikolayev ........................................ A1336

Transcript of Motion Hearing, filed September 1, 2023 (Dkt. 344) ............... A1356

Yvonne Gasarch's Motion to Supplement Her Motion in Limine filed on August 24, 2023, filed September 1, 2023 (Dkt. 346) ....................... A1377

Plaintiff's Opposition to Defendants Sexton's and Gasarch's Motions to Exclude Expert Testimony, filed September 4, 2023 (Dkt. 350) ......... A1379

    Exhibit A: Expert Witness Report of Philip A. Feigin ........................ A1385

    Exhibit B: Government's Trial Memorandum, Response to Defendants' Motion in Limine, and Supplemental 404(b) Notice ....... A1395

iv

**Page**

Plaintiff's Opposition to Defendant Yvonne Gasarch's Motion in Limine to Exclude "Q" Records and Purported Expert Testimony, filed September 5, 2023 (Dkt. 352) ............................................................. A1422

Plaintiff's Opposition to Defendant Paul Sexton's Motion in Limine to Exclude "Q" System and Associated Data, filed September 5, 2023 (Dkt. 353) ................................................................................. A1426

    Exhibit A: Securities and Exchange Commission B03147 Analysis of MySQL Databases, Summary of Accounts ............................... A1439

    Exhibit B: Summary of Transfer Agent Records – Acquisitions of Stevia First, Vitality Stock ........................................................ A1454

    Exhibit C: Q Account Detail ................................................................. A1455

    Exhibit D: Revised Deposition on Written Questions of Paul Sexton . A1456

    Exhibit E: Wire Transfer ...................................................................... A1524

    Exhibit F: E-Mail Correspondence ....................................................... A1527

    Exhibit G: E-Mail Correspondence ...................................................... A1528

    Exhibit H: E-Mail Correspondence ...................................................... A1529

Defendant Paul Sexton's Notice of Non-Opposition to Entry of Judgment, filed September 11, 2023 (Dkt. 376) .................................................... A1530

[Proposed] Order Entering Judgment as to Defendant Paul Sexton, filed September 11, 2023 ......................................................................... A1533

Order Entering Judgment as to Defendant Paul Sexton, filed September 12, 2023 (Dkt. 378) ................................................................................. A1535

Order, filed September 19, 2023 (Dkt. 385) ............................................. A1537

Yvonne Gasarch's Motion in Limine to Preclude Admission of Exhibit QK, filed September 21, 2023 (Dkt. 389) .................................................... A1542

    Exhibit 1: Summary of Gasarch Earnings ........................................... A1544

Yvonne Gasarch's Motion to Strike Evidence that the Court Admitted De Bene Pursuant to Fed. R. Evid. 801(d)(2)(E), filed September 25, 2023 (Dkt. 394) ................................................................................. A1545

Yvonne Gasarch's Motion Pursuant to Fed. R. Civ. P. 50 for Judgment as a Matter of Law, filed September 25, 2023 (Dkt. 395) .......................... A1548

**Page**

Verdict, filed September 27, 2023 (Dkt. 402) ................................................ A1553

Yvonne Gasarch's Renewed Motion Pursuant to Fed. R. Civ. P. 50 for
    Judgment as a Matter of Law or, in the Alternative, for a New Trial,
    filed October 25, 2023 (Dkt. 413) .......................................................... A1555

Electronic Order, filed October 26, 2023 (Dkt. 414) ..................................... A1564

Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the
    Proceedings, filed December 5, 2023 (Dkt. 421) ................................. A1565

Memorandum of Law in Support of Defendants Mike K. Veldhuis and
    Courtney Kelln's Motion to Stay the Proceedings, filed December 5,
    2023 (Dkt. 422) ................................................................................... A1569

Declaration of Robert Knuts, filed December 5, 2023 (Dkt. 423) ............... A1592

    Exhibit 1: Affidavit dated November 17, 2023 executed by Assistant
        United States Attorney James R. Drabick ................................. A1594

    Exhibit 2: Email correspondence dated February 8, 2022 ................ A1726

    Exhibit 3: Email dated February 17, 2023 , from AUSA Drabick to
        counsel for Mr. Yeldhuis, Michael Tremonte and Noam Biale A1730

    Exhibit 4: Email dated March 17, 2023, from SEC Attorney ............ A1747

Plaintiff's Motion for Remedies Against Defendants Mike Veldhuis, Paul
    Sexton, Jackson Friesen, Courtney Kelln and Zhiying Yvonne
    Gasarch, filed December 8, 2023 (Dkt. 425) ...................................... A1753

Final Judgment as to Defendant Jackson T. Friesen, filed December 8,
    2023 ..................................................................................................... A1756

Final Judgment as to Defendant Yvonne Gasarch, filed December 8, 2023 A1769

Final Judgment as to Defendant Paul Sexton, filed December 8, 2023 ....... A1779

Final Judgment as to Defendant Mike K. Veldhuis, filed December 8,
    2023 ..................................................................................................... A1791

Final Judgment as to Defendant Courtney Kelln, filed December 8, 2023 .. A1804

Plaintiff's Memorandum in Support of Motion for Remedies Against
    Defendants Mike Veldhuis, Paul Sexton, Jackson Friesen, Courtney
    Kelln, and Zhiying Yvonne Gasarch, filed December 8, 2023 (Dkt.
    426) ..................................................................................................... A1813

**Page**

Exhibit A: Transcript of September 27, 2023 Jury Charge ................ A1845

Exhibit B: Government's Notice of Anticipated Restitution Request
and Motion for Continuance ..................................... A1890

Declaration of Ryan Murphy, filed December 8, 2023 (Dkt. 427) ............. A1902

Exhibit 1: ACCO / ACC1 Q Account Detail.................................... A1916

Exhibit 2: HEAR Q Account Detail ................................... A1941

Exhibit 3: GARD Q Account Detail.................................... A1956

Exhibit 4: Chart........................................................... A1972

Exhibit 5: Wire Transfer................................................... A2141

Exhibit 6: Wire Transfer................................................... A2142

Exhibit 7: Wire Transfer................................................... A2143

Exhibit 8: Wire Transfer................................................... A2144

Exhibit 9: Wire Transfer................................................... A2145

Exhibit 10: Wire Transfer................................................. A2147

Exhibit 11: E-mail Correspondence ................................. A2149

Exhibit 12: E-mail Correspondence ................................. A2150

Exhibit 13: E-mail Correspondence ................................. A2151

Exhibit 14: Wire Transfer................................................. A2152

Exhibit 15: Wire Transfer................................................. A2153

Exhibit 16: E-mail Correspondence ................................. A2154

Exhibit 17: E-mail Correspondence ................................. A2155

Exhibit 18: Wire Transfer................................................. A2168

Exhibit 19: Wire Transfer................................................. A2169

Exhibit 20: DGM Bank and Trust Inc. Statement of Account Activity
................................................................. A2170

Exhibit 21: E-mail Correspondence ................................. A2171

Exhibit 22: E-mail Correspondence ................................. A2175

**Page**

Exhibit 23: Wire Transfer .................................................................. A2181

Exhibit 24: Text Messages ................................................................ A2182

Exhibit 25: Text Messages ................................................................ A2223

Exhibit 26: E-mail Correspondence .................................................. A2225

Exhibit 27: Invoice .......................................................................... A2226

Exhibit 28: Wire Transfer .................................................................. A2227

Exhibit 29: Wire Transfer .................................................................. A2228

Exhibit 30: E-mail Correspondence .................................................. A2229

Exhibit 31: Invoice .......................................................................... A2230

Exhibit 32: Bank Statement ............................................................. A2235

Exhibit 33: Veldhuis PJI Backup ...................................................... A2237

Plaintiff's Opposition to Defendants Mike K. Veldhuis and Courtney Kelln's
Second Motion to Stay the Proceedings, filed December 18, 2023
(Dkt. 429) .................................................................................. A2284

Final Pretrial Conference Transcript, filed January 24, 2023 (Dkt. 434) ....... A2289

Jury Trial Transcript Day 1, filed January 24, 2024 (Dkt. 435) ..................... A2310

Jury Trial Transcript Day 2, filed January 24, 2024 (Dkt. 436) ..................... A2416

Jury Trial Transcript Day 3, filed January 24, 2024 (Dkt. 437) ..................... A2534

Jury Trial Transcript Day 4, filed January 24, 2024 (Dkt. 438) ..................... A2674

Jury Trial Transcript Day 5, filed January 24, 2024 (Dkt. 439) ..................... A2772

Jury Trial Transcript Day 6, filed January 24, 2024 (Dkt. 440) ..................... A2865

Jury Trial Transcript Day 7, filed January 24, 2024 (Dkt. 441) ..................... A2946

Jury Trial Transcript Day 8, filed January 24, 2024 (Dkt. 442) ..................... A3103

Motion and Charge Conference Transcript, filed January 24, 2024 (Dkt.
443) ......................................................................................... A3273

Jury Trial Transcript Day 9, filed January 24, 2024 (Dkt. 444) ..................... A3331

Jury Trial Transcript Day 10, filed January 24, 2024 (Dkt. 445) ................... A3458

**Page**

Electronic Order, filed February 7, 2024 (Dkt. 451) ...................................... A3469

Defendant Paul Sexton's Opposition to Motion for Remedies, filed February 14, 2024 (Dkt. 454) ................................................................................ A3470

Defendant Courtney Kelln's and Mike K. Veldhuis's Opposition to Plaintiff SEC's Motion for Remedies Against Defendants Veldhuis, Sexton, Friesen, Kelln, and Gasarch, filed February 14, 2024 (Dkt. 455) ........ A3491

Defendants Mike K. Veldhuis and Courtney Kelln's Motion for Reconsideration, filed February 16, 2024 (Dkt. 456) ............................. A3495

Memorandum of Law in Support of Veldhuis and Kelln's Motion for Reconsideration of the Second Motion to Stay, filed February 16, 224 (Dkt. 457) ................................................................................................ A3499

Declaration of Robert Knuts, filed February 16, 2024 (Dkt. 458) .............. A3505

    Exhibit 1: Indictment filed January 9, 2024 ...................................... A3506

Defendant Paul Sexton's Motion for Stay, filed February 20, 2024 (Dkt. 459) .......................................................................................................... A3544

Electronic Order Denying Motion for Reconsideration, filed February 20, 2024 (Dkt. 460) ....................................................................................... A3547

Defendant Yvonne Gasarch's Opposition to SEC's Remedies Motion, filed February 21, 2024 (Dkt. 464) ............................................................. A3548

    Exhibit 1: Q System Data .................................................................. A3566

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against Defendants Paul Sexton, Mike Veldhuis, and Courtney Kelln, filed March 1, 2024 (Dkt. 470) .................................................................... A3587

    Exhibit A: E-Mail Correspondence .................................................... A3602

    Exhibit B: Wire Transfer .................................................................... A3604

    Exhibit C: DGM Band and Trust Inc. Statement of Account Activity ........................................................................................ A3606

    Exhibit D: E-Mail Correspondence .................................................... A3610

    Exhibit E: E-Mail Correspondence .................................................... A3617

Defendant Jackson Friesen's Opposition to Plaintiff's Motion for Remedies, filed March 1, 2024 (Dkt. 471) ........................................................... A3620

**Page**

Defendant Paul Sexton's Sur-Reply Regarding Motion for Remedies, filed
March 6, 2024 (Dkt. 473) ................................................................. A3633

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against
Defendant Yvonne Gasarch, filed March 7, 2024 (Dkt. 474) ........... A3641

    Exhibit A: Wire Transfer .................................................... A3655

    Exhibit B: Wire Transfer .................................................... A3656

    Exhibit C: Wire Transfer .................................................... A3657

    Exhibit D: Information Return for Electronic Filing of An Individual's
Income Tax and Benefit Return ............................... A3658

    Exhibit E: Officers and Directors Enquiry ......................... A3661

    Exhibit F: Wire Transfer .................................................... A3666

    Exhibit G: Wire Transfer .................................................... A3668

    Exhibit H: Letter dated April 21, 2018 ............................... A3671

    Exhibit I: Wire Transfer .................................................... A3672

    Exhibit J: Bank Statement .................................................. A3673

    Exhibit K: Chart .................................................................. A3674

    Exhibit L: Assignment ....................................................... A3676

    Exhibit M: E-mail Correspondence ................................... A3681

Declaration of Christopher Beckstrom, filed March 7, 2024 (Dkt. 475) ...... A3695

    Exhibit 1: E-Mail Correspondence .................................... A3698

    Exhibit 2: E-Mail Correspondence .................................... A3699

    Exhibit 3: E-Mail Correspondence .................................... A3700

Declaration of Ryan Murphy, filed March 7, 2024 (Dkt. 476) .................... A3701

    Exhibit 1: Summary of Cash Withdrawals ......................... A3704

    Exhibit 2: Summary of Cash Withdrawals ......................... A3706

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against
Defendant Jackson Friesen, filed March 14, 2024 (Dkt. 480) ........... A3710

**Page**

Defendant Yvonne Casarch's Sur-Reply to SEC's Reply to her Opposition
to SEC's Remedies Motion, filed March 15, 2024 (Dkt. 481)........... A3715

Plaintiff's Proposed Judgments Against Defendants Veldhuis, Sexton,
Friesen, Kelln and Gasarch, filed May 10, 2024 (Dkt. 485) .............. A3723

Judgment as to Defendant Mike K. Veldhuis, filed May 10, 2024 ............ A3725

Judgment as to Defendant Paul Sexton, filed May 10, 2024...................... A3733

Judgment as to Defendant Jackson T. Friesen, filed May 10, 2024 ............. A3741

Judgment as to Defendant Courtney Kelln, filed May 10, 2024 ................. A3749

Judgment as to Defendant Yvonne Gasarch, filed May 10, 2024 ............... A3756

Yvonne Gasarch's Objections to SEC's Proposed (Partial) Judgment, filed
May 20, 2024 (Dkt. 486) ....................................................................... A3762

Plaintiff's Response to Defendant Zhiying Yvonne Gasarch's Objections to
SEC's Proposed Judgment, filed may 20, 2024 (Dkt. 487) ................. A3766

Defendant Paul Sexton's Objections to Proposed Judgment, filed May 20,
024 (Dkt. 488)....................................................................................... A3769

Defendant Jackson Friesen's Objections to Plaintiff's Proposed Judgment,
filed May 20, 2024 (Dkt. 489)............................................................... A3773

Objections by Defendants Veldhuis and Kelln to Proposed Partial Judgments
Against Veldhuis and Kelln Submitted by Plaintiff Securities and
Exchange Commission, filed May 20, 2024 (Dkt. 490)....................... A3782

Transcript of Disgorgement, filed May 23, 2024 (Dkt. 491)........................ A3787

Memorandum and Order, filed June 17, 2024 (Dkt. 494) ............................. A3823

Judgment as to Defendant Paul Sexton, filed June 20, 2024 (Dkt. 495) ........ A3886

Judgment as to Defendant Mike K. Veldhuis, filed June 20, 2024 (Dkt.
496) ........................................................................................................ A3896

Judgment as to Defendant Jackson T. Friesen, filed June 20, 2024 (Dkt.
497) ........................................................................................................ A3907

Judgment as to Defendant Yvonne Gasarch, filed June 20, 2024 (Dkt. 498) A3917

Judgment as to Defendant Courtney Kelln, filed June 20, 2024 (Dkt. 499) .. A3925

**Page**

Motion for Orders Directing the Turnover of Frozen Funds to the Securities
and Exchange Commission, filed July 2, 2024 (Dkt. 500)................... A3935

[Proposed] Order Directing Transfer of Jackson T. Friesen's Frozen Funds
to the Securities and Exchange Commission, filed July 2, 2024 ........ A3940

[Proposed] Order Directing Transfer of Yvonne Gasarch's Frozen Funds to
the Securities and Exchange Commission, filed July 2, 2024 ........... A3947

[Proposed] Order Directing Transfer of Courtney Kelln's Frozen Funds to
the Securities and Exchange Commission, filed July 2, 2024 ........... A3952

[Proposed] Order Directing Transfer of Paul Sexton's Frozen Funds to the
Securities and Exchange Commission, filed July 2, 2024 ................. A3955

[Proposed] Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to
the Securities and Exchange Commission, filed July 2, 2024 ........... A3961

Defendant Jackson Friesen's Objections to Judgment, Motion to Amend,
Clarify or Correct Judgment and Opposition to Motion for Turnover
Order, filed July 2, 2024 (Dkt. 501) .................................................... A3968

Defendant Paul Sexton's Opposition to Motion for Orders Directing the
Turnover of Frozen Funds to the Securities and Exchange
Commission, filed July 2, 2024 (Dkt. 502) ...................................... A3974

Defendant Courtney Kelln's Notice of Joinder, filed July 3, 2024 (Dkt.
503) .................................................................................................. A3977

Defendant Yvonne Gasarch's Notice of Joinder, filed July 3, 2024 (Dkt.
504) .................................................................................................. A3979

Defendant Paul Sexton's Notice of Joinder, filed July 3, 2024 (Dkt. 505)    A3981

Defendant Mike K. Veldhuis's Notice of Joinder, filed July 3, 2024 (Dkt.
506) .................................................................................................. A3984

Plaintiff's Opposition to Defendants' Motions to Amend, Clarify or Correct
Judgment, filed July 15, 2024 (Dkt. 507)........................................ A3986

Electronic Order Allowing Motion for Release of Funds, filed July 11, 2024
(Dkt. 508)......................................................................................... A3990

Order Directing Transfer of Jackson T. Friesen's Frozen Funds to the
Securities and Exchange Commission, filed July 11, 2024 (Dkt.
509) .................................................................................................. A3991

**Page**

Order Directing Transfer of Yvonne Gasarch's Frozen Funds to the
  Securities and Exchange Commission, filed July 11, 2024 (Dkt.
  510) ................................................................................... A3998

Order Directing Transfer of Courtney Kelln's Frozen Funds to the Securities
  and Exchange Commission, filed July 11, 2024 (Dkt. 511)............. A4003

Order Directing Transfer of Paul Sexton's Frozen Funds to the Securities
  and Exchange Commission, filed July 11, 2024 (Dkt. 512)............. A4006

Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to the
  Securities and Exchange Commission, filed July 11, 2024 (Dkt.
  513) ................................................................................... A4012

Electronic Order re: Motion to Amend, filed July 16, 2024 (Dkt. 514)..... A4019

Defendant Paul Sexton's Motion to Stay Execution of Judgment, filed July
  18, 2024 (Dkt. 515)................................................................ A4020

    Exhibit 1: E-mail Correspondence .................................................. A4025

Motion of Defendants Mike Veldhuis and Courtney Kelln to Stay Execution
  of Judgment, filed July 19, 2024 (Dkt. 516)..................................... A4029

Defendant Yvonne Gasarch's Motion to Stay Execution of Judgment, filed
  July 22, 2024 (Dkt. 517)................................................................ A4035

    Exhibit 1: Order Made After Application ...................................... A4045

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 518) A4054

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 519).... A4055

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 520).... A4056

Notice of Appeal by Zhiying Yvonne Gasarch, filed August 19, 2024 (Dkt.
  521) ................................................................................... A4057

Notice of Appeal by Mike Veldhuis, filed August 19, 2024 (Dkt. 522) ........ A4059

Notice of Appeal by Courtney Kelln, filed August 19, 2024 (Dkt. 523) ....... A4061

Notice of Appeal by Paul Sexton, filed August 19, 2024 (Dkt. 524)............. A4063

Notice of Appeal by Jackson T. Friesen, filed August 19, 2024 (Dkt. 525) .. A4066

Plaintiff's Motion in Support of Distribution for the Benefit of Harmed
  Investors and Seeking and Order Establishing a Fair Fund, Appointing

a Tax Administrator, and Authorizing Payment of Tax Obligations and Related Fees and Expenses of Tax Administrator Without Further Court Order, filed September 4, 2024 (Dkt. 537) ................................ A4068

[Proposed] Order Establishing a Fair Fund, Appointing a Tax Administrator, and Authorizing Payment of Tax Obligations and Related Fees and Expenses of the Tax Administrator Without Further Court Order, filed September 4, 2024 ................................................................. A4071

Plaintiff's Memorandum of Law Describing Proposed Distribution Framework and in Support of Motion Seeking an Order Establishing a Fair Fund and Other Relief, filed September 4, 2024 (Dkt. 538) ........ A4074

Exhibit A: Order Approving Distribution Plan .................................... A4093

Exhibit B: Order Approving Plan of Distribution ................................ A4129

Exhibit C: Order Reclassifying Prejudgment Interest as Disgorgement, Appointing a Distribution Agent, and Approving a Distribution Plan for the Distribution Fund..................................................... A4160

Declaration of Dr. Thomas A. Dunn, filed September 4, 2024, filed September 4, 2024 (Dkt. 539) ..................................................... A4173

Appendix 1: Defendants' Monetary Remedies .................................... A4186

Appendix 2: Knox Restitution Fund, Losses by OTC Security Ticker  A4187

Appendix 3: Group 2 Tickers and Defendants .................................... A4188

Defendant Paul Sexton's Opposition to Motion for Fair Fund, filed September 16, 2024 (Dkt. 540) ............................................. A4189

Defendant Jackson Friesen's Opposition to Motion for Fair Fund, filed September 16, 2024 (Dkt. 541) ............................................. A4192

Defendant Yvonne Gasarch's Motion for Joinder, filed September 16, 2024 (Dkt. 542)............................................................................... A4196

Defendant Courtney Kelln's Motion for Joinder, filed September 16, 2024 (Dkt. 543)............................................................................... A4198

Defendant Mike K. Veldhuis's Notice of Joinder and Response to Motion, filed September 16, 2024 (Dkt. 544) .................................... A4200

Electronic Order, filed September 18, 2024 (Dkt. 545) .................................. A4203

**Page**

Trial Exhibits:

Exhibit 14: Xphone between 2, 4 and 66.................................................... A4204

Exhibit 16: Ian Cooper's Special Report re Arch Therapeutics................... A4205

Exhibit 17: Chuck Hughes Microcap Report (Conmar Capital) re Stevia First
    $50 Billion Sugar............................................................................. A4250

Exhibit 18: Xphone chain between 2, 3, 4 and 66 re Send.......................... A4262

Exhibit 40: E-mail from Wires to Nikolayev (FEN) re Wire please ........... A4264

Exhibit 45: Xphone chain between 2, 3, 4, 60 and Sexy re Summary ........ A4265

Exhibit 79: Xphone chain between Elgi, Wires and 19................................ A4266

Exhibit 81: Xphone chain between Bond, 104 and Blgx re Hiya................. A4268

Exhibit 87: Xphone chain between 2, 3 and 4 re Meeting........................... A4304

Exhibit 90: Xphone chain between Bond and Wires re Cash....................... A4305

Exhibit 99: Xphone chain between Gard, Celt and 2 re ARW .................... A4306

Exhibit 113: Xphone chain between 2, 3, and 4 re Copy ............................ A4307

Exhibit 126: Xphone between Gard and Kash re Yo ................................... A4308

Exhibit 134: Xphone chain between 2, 3, and 4 re Rights .......................... A4309

Exhibit 136: Xphone chain between 2, 3, and 4 re Today........................... A4311

Exhibit 140: Xphone from 4 to 2 ................................................................ A4314

Exhibit 141: Xphone chain between 2, 3, and 4 ......................................... A4315

Exhibit 151: Xphone chain between Wires and 19 ELGI ........................... A4316

Exhibit 154: Xphone from GARD to KASH and ACCO re Yo.................. A4318

Exhibit 157: Xphone chain between Wires, Kash and Celt re Wire to
    Business Venture Investments........................................................... A4319

Exhibit 168: Xphone chain between Peace, 77, Lion and Wires re Hi ....... A4320

Exhibit 170: Xphone chain between 2, 3 and 114 re There you have it...... A4321

Exhibit 180: Xphone chain between Wires, Bond, Luna and Alex 110 re
    Remo................................................................................................ A4322

**Page**

Exhibit 183: Xphone between 2 and 98 re Test ............................................ A4323

Exhibit 184: Xphone chain between Fen, Wires and 76 re Where r u ........ A4324

Exhibit 190: Xphone chain between 2 and 4 re Test .................................. A4326

Exhibit 193: Xphone chain between 76, Fen and Wires re Xvoice ............. A4327

Exhibit 233: Beckstrom Xphone Header Spreadsheet ................................ A4329

Exhibit 237: Xmail message from Wires (xMeridian) to Friesen re 2 Wires
to Go Out ................................................................ A4384

Exhibit 239: Xmail message from Wires to Friesen re 2 Wires to go out ... A4385

Exhibit 261: Xmail messages between Friesen, "acco" and "hear" re NA . A4387

Exhibit 273: Xmail message from Friesen to Acco and Hear re creative with
attachments ........................................................... A4391

Exhibit 284: Establishment of the beneficial owner's identity for Peregrine
Capital .................................................................. A4412

Exhibit 286: E-mail from Riverfall Group to Silverton Ops re wire 129k to
Greenberg with attachments showing metadata ................................ A4413

Exhibit 287: E-mail from Hilton Capital to Wintercap Operations re wire
CAD100016 to Sun Life with attachments ....................................... A4518

Exhibit 288: Text messages between Friesen, Knox, and Threema with
photos of Cristal bottles and SUB Penny $ ...................................... A4523

Exhibit 289: Threema chats .......................................................... A4534

Exhibit 290: Friesen cash collection for 9k EUR ....................................... A4536

Exhibit 292: Murphy Summary charts summarizing transfers of Arch
Therapeutics stock ................................................... A4537

Exhibit 293: MDDD Q Account Details ............................................... A4538

Exhibit 295: ARTH Q Account Details ............................................... A4546

Exhibit 296: STVFVBIO Q Account Details ......................................... A4560

Exhibit 298: STEV Q Account Details ............................................... A4583

Exhibit 299: LBY and PBAV Q Account Details .................................... A4594

Exhibit 306: RIHT & RIH1 Q Account Details ..................................... A4605

**Page**

Exhibit 307: Murphy Summary charts summarizing sales of the Fourteen
Issuers' stock by year ......................................................... A4619

Exhibit 308: Murphy Summary Charts showing sales of Fourteen Issuers'
securities based on Q system and brokerage account........................ A4620

Exhibit 310: Murphy Summary charts summarizing market trading based on
Blue Sheets in Stevia FirstVitality and Arch d................................. A4634

Exhibit 311: GARD Q reports .................................................... A4635

Exhibit 313: Murphy Summary charts showing profit allocations to the Q
accounts of Veldhuis, Sexton and Friesen ........................................ A4651

Exhibit 314: Summary chart of allocations to PEAC PERE account.......... A4659

```
1                  UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS (Boston)

3                         No. 1:21-cv-11276-WGY

4

5     SECURITIES and EXCHANGE COMMISSION,
               Plaintiff
6

7     vs.

8

9     FREDERICK L. SHARP, et al,
               Defendants
10

11                        *********

12

13

14                    For Jury Trial Before:
                      Judge William G. Young
15

16

17                    United States District Court
                      District of Massachusetts (Boston)
18                    One Courthouse Way
                      Boston, Massachusetts 02210
19                    Tuesday, September 12, 2023

20

21                        ********

22            REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
23                    United States District Court
             One Courthouse Way, Room 5510, Boston, MA 02210
24                    rhrbulldog@aol.com

25
```

A2416

```
 1                    A P P E A R A N C E S

 2

 3    KATHLEEN BURDETTE SHIELDS, ESQ.
      ALFRED A. DAY, ESQ.
 4    DAVID H. LONDON, ESQ.
      NITA KUMARASWAMI KLUNDER, ESQ.
 5       Securities and Exchange Commission - MA
         33 Arch Street, 24th Floor
 6       Boston, MA 02110
         (617) 573-8904
 7       Email: Shieldska@sec.gov
         For Plaintiff
 8

 9    KAREN A. PICKETT, ESQ.
         Pickett Law Offices, P.C.
10       125 High Street, 26th Floor
         Boston, MA 02110
11       (617) 423-0485
         Email: Kpickettlaw@gmail.com
12       For Defendant Zhiying Yvonne Gasarch

13

14    MIRANDA E. FRITZ, ESQ.
      TIMOTHY J. FAZIO, ESQ.
15       Manning Gross Massenburg
         125 High Street
16       Oliver Street Tower, 6th Floor
         Boston, MA 02110
17       (617) 670-8800
         Email: Tfazio@mgmlaw.com
18       For Defendant Jackson T. Friesen

19

20

21

22

23

24

25
```

A2417

3

```
 1                      I N D E X

 2

 3   OPENING STATEMENT BY MS. PICKETT................    4

 4   OPENING STATEMENT BY MS. FRITZ.................    11

 5

 6   WITNESS              DIRECT  CROSS  REDIRECT  RECROSS

 7

 8   AVTAR DHILLON

 9     By Ms. Shields:      25

10

11                    E X H I B I T S

12

13

          EXHIBIT 8.........................  86
14
          EXHIBIT 9.........................  97
15
          EXHIBIT 10........................ 106
16

17

18

19

20

21

22

23

24

25
```

A2418

```
 1          P R O C E E D I N G S
 2          (Jury enters, 9:45 a.m.)
 3          THE COURT:  Good morning, ladies and gentlemen,
 4     and thank you so very much for all your efforts to be
 5     here on time.  This happens not infrequently as we begin
 6     a trial.  I really appreciate your efforts to be here on
 7     time.  I recognize that the traffic is bad, but now that
 8     things have shaken down, we should be able to start
 9     right at 9:00.  We are all ready.
10          I caution you that what you've heard yesterday is
11     not evidence of anything, it is the appropriate way to
12     start a trial so you get a sense of what the Commission
13     -- in this case what the Commission hopes to prove.
14          Now we turn to the defense.  And each one is
15     separate, Mr. Friesen and Ms. Gasarch, and we'll give
16     them a chance to open.  Equally, what they say now is
17     not evidence.  They weren't there.  They don't know.
18     But it is what they hope to lay before you during the
19     course of the trial.  And we'll start with Ms. Gasarch's
20     attorney, Ms. Pickett.
21          MS. PICKETT:  Thank you, your Honor.
22
23     OPENING STATEMENT BY MS. PICKETT:
24          Good morning, ladies and gentlemen of the jury,
25     your Honor, counsel, my name is Karen Pickett, and I
```

A2419

1    represent Yvonne Gasarch, who as you know has been
2    charged by the SEC with certain claims in this case.
3         When I left yesterday, I sort of felt bad that you
4    were left with this impression of Ms. Gasarch which sort
5    of looks like, you know, a mug shot from the SEC, so I
6    did want to start by telling you a little bit about
7    Ms. Gasarch.
8         Well Ms. Gasarch -- well Mrs. Gasarch.
9    Mrs. Gasarch emigrated to Vancouver, British Columbia,
10   from Canada, um, she began working at the outfit that
11   was owned and run by Fred Sharp, whose name will come up
12   quite frequently in this case.  She was the Office
13   Manager slash Bookkeeper slash Receptionist.  Her desk
14   was at the reception -- was at the reception area of the
15   office, um, and there were other businesses in the
16   office that she also performed services for.
17        Now one of the reasons I wanted to sort of
18   counteract -- one of the ways I wanted to counteract
19   this was also to tell you that she has, um, three -- or
20   obviously three triplets who are 6 years old, um, and I
21   thought maybe I'll put up a picture of the triplets just
22   to sort of counteract this, because they're adorable.
23   But I don't know how to use Power Point and my
24   11-year-old said she wouldn't help me out.  So I won't
25   do that.

```
 1          What's the evidence going to be in this case?
 2   You're not going to hear a lot about Mrs. Gasarch,
 3   right, because she was working at the reception desk.
 4   Did she perform tasks for Fred Sharp in his outfit?
 5   Sure.  Was she running the show?  Of course not.  Was
 6   she trained by Fred Sharp, who was a lawyer himself in
 7   his 60s -- a very successful person, no criminal
 8   background?  She was.  And I think you should ask
 9   yourself, "If this was me or my daughter or my mother-
10   in-law, how would we know better, how would we know
11   about these arcane, um, SEC rules, living in Vancouver,
12   British Columbia, and being trained by this
13   highly-successful person?"
14          Now the SEC gave you a quote which said, basically
15   they described her as "moved the money," and you'll see
16   all sorts of charts in this cause, tons of charts, and
17   one of them I think shows how much money Fred Sharp, um,
18   his stock sales generated, and I think that was a
19   billion dollars.  And I want you to look at the evidence
20   of "moving the money," because basically what happened
21   is the clients of Fred Sharp would contact her and say
22   "Oh, okay, send me this," "Send me that," "Wire the
23   money to me."  Well there's nothing wrong with that if
24   they're legitimate clients and Fred Sharp is performing
25   a legitimate business, which she had no reason to
```

A2421

1    believe that he wasn't.

2         In terms of witnesses who you're going to hear

3    from, um, a lot of them are cooperators with the SEC.  I

4    think today the first person who will be testifying is a

5    man named Avtar Dhillon, who was the CEO of one of these

6    connected companies, or the Chairman of the Board, he

7    made millions and millions and millions of dollars, he

8    has pled guilty to criminal securities fraud charges,

9    and he's waiting to be sentenced, um, and he is going to

10   come in, and obviously he's cooperating with the

11   government.  But I'm pretty sure he's going to say he

12   doesn't even know who my client is, never met her.

13   Certainly she had nothing to do with the securities

14   trading.

15        There's going to be a few other cooperators like

16   that, again people who were either, um, been convicted

17   of a crime, I think there's one other one like that, or

18   who have already settled with the SEC for millions and

19   millions of dollars, again coming in here trying to

20   curry favor with the government or the SEC, and they're

21   not going to have anything -- I don't think they're

22   going to have anything or very little to say about my

23   client.

24        And I've looked at their statements in the past,

25   one of them called her a "secretary," one of them called

1    her, um, "Sharp's Man-Friday."  Why not his "Girl-

2    Friday"?  I don't know.  But essentially she's like the

3    gopher, running around, getting reports, sending the

4    money.  She's certainly not involved in directing

5    securities trading or advising on securities trading,

6    she doesn't have the skill-set for that.  Not that she's

7    not a bright woman, she is, she's a very bright woman.

8    She clearly did a good job.  She worked for Fred Sharp

9    for at least 6 or 7 years.

10        But I really want you, as the jury here today, to

11   look closely at the evidence just against Mrs. Gasarch.

12   There's going to be lots of evidence of wrongdoing and

13   money and this and that, but really please try to focus

14   on that, because this is important to her.

15        Being charged with fraud is an awful thing -- and

16   not charged criminally, but being accused of fraud and

17   having a count against you for fraud and aiding and

18   abetting fraud, it's really probably as bad as it gets

19   in the civil world.  So please, um, listen carefully to

20   the evidence against her and listen to the witnesses.

21        I do want to talk briefly about one witness.

22   There's going to be nobody from the office who

23   testifies, from Fred Sharp's office.  Fred Sharp's not

24   testifying.  Courtney Kelln, who was the other person

25   shown to you yesterday isn't testifying.  There was

A2423

```
 1    another assistant at one point named Cory, he's not on
 2    the witness list.  But there is a guy named Fedir
 3    Nikolayev, he's located in the Dominican Republic.  He's
 4    an IT guy, um -- and as we all know -- I love IT guys,
 5    they're kind of crazy and they're very very smart.  He
 6    worked for Fred Sharp for about 20 years as an
 7    independent contractor.  He was very friendly with
 8    Sharp.  My client was friendly with Sharp too.  Sharp is
 9    a very charming person apparently.
10         Well you'll see from the testimony of
11    Mr. Nikolayev that Fred Sharp asked him to sign some
12    documents to be, um, the shareholder or on the board of
13    directors of something of what's called a "nominee
14    company," and you'll see that Mr. Nikolayev said that on
15    certain documents he believed Fred Sharp forged his
16    signature.  He thinks there was one or two or some that
17    he signed, because Fred said, "Oh, could you do this for
18    me?" not understanding in any way what it was about.
19    And I think there will be some evidence that something
20    similar happened to Mr. Gasarch, um, but you'll see that
21    she was not involved in any way in a nominee company,
22    wasn't involved in buying shares, selling shares, or
23    anything like that, and, you know, established she was
24    duped by Fred Sharp, like Mr. Nikolayev.
25         In terms of Mr. Nikolayev, another really
```

A2424

```
1    important issue in this case is -- and I think the judge
2    has already highlighted it, is that a lot of -- almost
3    all of the documentary evidence comes from something
4    called the "Q-System."  The Q-System was data that was
5    on a server in Curacao maintained by Mr. Nikolayev, and
6    a lot of this data was encrypted.  And I know that the
7    SEC talked about the crazy terms, "Bond," and this and
8    that, but you'll hear from Mr. Nikolayev.  But that was
9    all from Fred Sharp.  Fred Sharp controlled everything.
10   Fred Sharp wanted this encrypted system.
11        And so you'll see, from Mr. Nikolayev's testimony,
12   um, that Fred Sharp was "Q," Fred Sharp controlled who
13   saw what was in the Q-System, he only gave access to
14   certain employees to certain of the data, he liked to
15   keep a lot of things secret, he had the power as the
16   administrator to change all the Q data.  So if there was
17   an entry for petty cash for $20, Fred Sharp could go in
18   and change it to a million dollars.  Did he do that?  I
19   don't know.  But we know that he had the authority to do
20   that, so we know the data isn't reliable.  So when the
21   SEC's showing you this data, I just also want you to
22   keep Mr. Nikolayev's, um, testimony in mind in that
23   regard.
24        Now as Judge Young says, anything I say is not
25   evidence.  I don't know that I'll be presenting any
```

A2425

```
 1    evidence.  I am going to be disputing some of the
 2    evidence.  But again, as Judge Young instructed you,
 3    it's the burden on the SEC to prove by a preponderance
 4    that, um, that Mrs. Gasarch committed fraud or aided or
 5    assisted in fraud.  I'll have a chance to obviously come
 6    back to you at the end of the case and go through the
 7    evidence with you to show you why I don't think the SEC
 8    is going to come close to meeting that standard.  And I
 9    appreciate your time and attention.
10         Thank you.
11         THE COURT:  And, Ms. Fritz, do you wish to open
12    for Mr. Friesen now or reserve, ma'am?
13         MS. FRITZ:  I wish to open now.
14         THE COURT:  And you may.
15         MS. FRITZ:  Thank you, your Honor.
16
17    OPENING STATEMENT BY MS. FRITZ:
18         Good morning, folks, my name is Miranda Fritz, I
19    represent Jackson Friesen, and I'm going to talk a
20    little bit about Jackson Friesen.  But in order to do
21    that, I'm going to give you a little bit of background
22    that I don't think would have come across yesterday in
23    terms of what the evidence is going to show.  I want to
24    talk for a moment, literally 2 or 3, about the
25    transactions that you're going to be hearing about, and
```

A2426

1  then I'm going to talk about the people that you've been

2  hearing about.

3      What you saw yesterday in those "mug shots," as we

4  call them, was unflattering, to say the least, um, and I

5  want you to hear a little more about them, and you're

6  going to hear a lot about them.  So first let's talk

7  about the transactions.

8      You are about to learn more than you ever wanted to

9  know about private finance of startup companies,

10  "microcaps," "emerging growth," that's what these

11  transactions are all about, and there is absolutely

12  nothing wrong with them.  To the contrary, these are

13  transactions that are great for, important for our

14  economy.  But they are complex transactions.  And so

15  you're going to be seeing, for one thing, all the back

16  sort of behind-the-scenes stuff that involves things

17  like a shell company.

18      You'll hear from the judge that there's nothing

19  wrong a shell company, it's a name, and it does a

20  reverse merger, and that's -- there's nothing wrong with

21  that.  And it then seeks to raise money from investors,

22  who are sometimes called "angel investors," because bear

23  in mind startups don't have access to traditional

24  finance, they don't, So they raise money by presenting

25  their company to people and saying, "Look, invest in me,

```
 1    buy my stock."  So that's what's -- that's the
 2    transaction that's going on here.
 3          And yesterday, as Mr. London described it, I felt
 4    at times as if he was describing drug deals going on in
 5    a back room.  I'm asking you to listen.  You will hear
 6    that these are entirely permissible transactions that
 7    are important and that can and should be done in full
 8    compliance with the securities laws.  So those are the
 9    transactions.
10          Let's talk about the people that you're going to
11    hear about.  Again you saw the mug shots yesterday.
12    Well what you're really going to learn is that these
13    were very successful and experienced businessmen.  If
14    you worked in their office, you would deal with these
15    individuals.  You would have absolutely no reason to see
16    their business as anything other than completely legit.
17    They're going to come in here now and say, "Oh, I did
18    all these things wrong."  But I'm going to ask you, as
19    you listen to that, think back 10 or 12 years to when my
20    client first met them and picture where they were and
21    the successful businesses they were running, and the
22    fact that no one would have seen them as something that
23    you shouldn't get involved with.
24          Fred Sharp is a lawyer, a Canadian lawyer, he's
25    obviously at the center of this, and he ran a business
```

A2428

```
 1    that offered to assist individuals engaged in private
 2    financing with U.S. law and the ins and outs of
 3    transactions involving U.S. securities laws.
 4    Imagine a group of guys in Vancouver, they want to be
 5    involved in a business, they don't know U.S. law, they
 6    don't know all of the things that the SEC says you've
 7    got to do and you've got to file and the boxes you've
 8    got to check.  Fred Sharp offers to assist with all of
 9    that.
10        Among the people that dealt with Fred Sharp were
11    two gentlemen, Paul Sexton and Mike Veldhuis.  Those
12    gentlemen again were sophisticated and experienced
13    businessmen who were involved in the business of private
14    financing, venture capital, providing money for startup
15    companies, and in exchange receiving equity and that
16    then in turn involved sales of stock.  So that's what
17    those guys were involved in.
18        What you're also going to hear is that those two
19    gentlemen worked together over a period of time, but
20    they also worked with lots of other people.  You're
21    going to hear names like Yasim, Graham Taylor, Talah,
22    Roger Knox, and that's important because one of the
23    people that they worked with, one of the people that
24    worked for them at some point was Jackson.  And I want,
25    as you listen to the evidence, to understand.
```

A2429

1          The SEC would have you believe that there was this
2     monolith and Mr. London kept calling it "Friesen-Sexton-
3     Veldhuis," which actually amounts to a significant
4     promotion for my client, he was just a lackey.  But now
5     the SEC wants to put him first in your mind.  And so
6     Mr. London must have said that phrase 20 times
7     yesterday, "Friesen-Sexton-Veldhuis."  Really?
8          You will clearly hear that Jackson was a young guy
9     who became involved with them and worked for them for a
10    while, and I just want to emphasize, changing the order
11    of their names as a way to try to suggest that he was
12    more than that?  That's not right.  That's -- that's not
13    consistent with what you're going to hear.  It is an
14    effort to persuade you of something that's not going to
15    be consistent with what you're going to hear.
16    But he was one of the individuals who dealt with them.
17         You're also going to hear that there was no
18    monolithic structure over the course of the 10 years
19    you're about to hear about.  These individuals did deals
20    with one another and others, weaving in and out in
21    different configurations, depending on who had what
22    particular contact or who got interested in a particular
23    buy.  So there is no set structure, for every deal it
24    was different.  And when Mr. London says to you, "There
25    were 14 deals where they did this scheme with these

A2430

```
 1    people," that's not the case.  You're going to hear that
 2    similar kinds of financing deals were done over time but
 3    by different people and in different ways.
 4          What you're also going to hear is that these
 5    individuals put millions of dollars into startup
 6    companies, and you're going to hear about the companies.
 7    Please bear in mind that these are companies that have
 8    interesting products and interesting businesses, and I
 9    encourage you to listen as the witnesses talk about why
10    they got involved with these particular companies, what
11    they saw that they felt was exciting or a good
12    opportunity.
13          So where does Jackson fit in?  So way back, 11 or
14    12 years ago, when all of this started, Jackson was a
15    young guy --
16          THE COURT:  The practice here is always to refer
17    to them by their last names.  I know you know him well,
18    but it's going to confuse me if you call him "Jackson."
19    Let's call him "Mr. Friesen."
20          MS. FRITZ:  Okay.
21          THE COURT:  Go ahead.
22          MS. FRITZ:  And going forward let's not confuse
23    him with the other Friesen I'm about to talk about.
24          Jackson Friesen was a young guy starting out who
25    wanted to learn the business.  His dad, Bill Friesen,
```

A2431

1    had been involved in the business.  His dad introduced

2    him to another guy, Mike Veldhuis, so that he could

3    start to sort of learn the ropes.  So that's what we

4    have, 2011 through 2014, a young guy who begins to work

5    with Mike Veldhuis and Paul Sexton on these deals to

6    learn the ropes.

7          Now at this same time Paul Sexton and Mike

8    Veldhuis have a relationship with Fred Sharp and there

9    is a lot of stuff going on behind the scenes, and you're

10   going to see -- look at all those awful binders.  You're

11   going to see unbelievable quantities of data about the

12   transactions that Fred Sharp entered into.

13         Was my client, Jackson Friesen involved in that?

14   No.  He was not in the back room with them talking about

15   the machinations, the precise way in which the deal was

16   going to be done.  He was involved in the marketing side

17   of it.  So he -- so what we have from Jackson's point of

18   view is private financing activity that looks vital and

19   exciting and profitable and he gets involved in the

20   front end of it, the marketing side of it.  That's

21   referred to as "stock promotion."  And I want to

22   emphasize again, this is not in any way unlawful.  Stock

23   promotion is in fact regulated by the SEC -- not

24   prohibited, regulated.

25         And so as a startup company is looking to reach

A2432

```
 1    out for investors, it hires these companies that

 2    increase its visibility.  It's advertising for heaven's

 3    sake, they want to advertise to potential investors, to

 4    say "Here, look at me, look at me, invest in me."  And

 5    the regulation that exists is that that's permissible so

 6    long as the individual that publishes the promotional

 7    material discloses that they are paid to do so,

 8    discloses that it is paid advertising.

 9        Now Mr. London yesterday said there's something

10    wrong with -- this is, by the way, Exhibit BZ, he showed

11    it to you briefly yesterday.  Mr. London suggested that

12    there was something wrong with this because there was an

13    effort to persuade the reader that this was objective

14    data or even research analysis.  I'm going to ask you to

15    take a look at these things as they come into evidence,

16    because what the securities laws say is that you must

17    disclose that you are paid to do this, that this is paid

18    advertising.  Admittedly it is contained in the fine

19    print, just like all those little disclaimers for your

20    credit card bills, but these guys include that exact

21    information, "We are paid, we're paid a lot of money,

22    and this is advertising."

23        So he was involved in that side of the business,

24    he was involved a long time ago, more than 10, um,

25    roughly 10 years ago.  You're going to hear that then,
```

A2433

```
 1   for a period of time starting in about 2014, he was
 2   really not involved with this Fred Sharp thing.  He did
 3   go on and try to continue in the business.  And so
 4   you'll see little snippets that they're going to use of
 5   activity that he engaged in, 2017, 2018, little moments
 6   in time when he then gets involved again, again with
 7   respect to the market.  And that's it.
 8        So what does that tell you?  Here's the key.
 9   They're going to present a whole lot of evidence about a
10   whole lot of transactions that occurred, most of them a
11   long time ago, and they are going to argue, they're
12   going to suggest through that that if you do these
13   transactions you are bad and you are liable.  They will
14   treat them as if they are somehow impermissible.  The
15   key for you is to separate out what was the perfectly
16   permissible business loan versus what was the
17   illegality, what was unlawful about it.  And keep your
18   eye on what Fred Sharp did, that's the unlawful conduct.
19   Fred Sharp, behind the scenes, was doing the things that
20   were unlawful, moving stock around, failing to file
21   things that are called "13Ds," and failing properly to
22   register that stock for sale.
23        Now talk about some complex requirements?  Imagine
24   you're a guy trying to do business in Canada --
25        THE COURT:  5 more minutes.  Go ahead.
```

A2434

```
 1          MS. FRITZ:  -- and what these individuals are
 2    talking about is whether a registration statement was
 3    properly filed in the U.S. or a Form 13D.  This is
 4    exactly what Fred Sharp was supposed to be doing, this
 5    is exactly what was done wrong, and they will not have
 6    evidence that my client was involved in the wrong thing.
 7          And so every time they show a document -- and you
 8    see Jackson was involved in a conversation, that
 9    document needs to be scrutinized.  Does it mean Jackson
10    was involved in the business --
11          THE COURT:  Mr. Friesen, please.
12          MS. FRITZ:  Oh, damn it.  Mr. Friesen.
13          Does it mean he was involved in wrongdoing or was
14    he simply involved in the business as a young guy trying
15    to learn the ropes?
16          Now what is the evidence that they're going to
17    present to you?  It really does come down to a bunch of
18    cooperators.  It is the worst-quality kind of evidence
19    and you're going to see it.
20          The first witness, for example, is an individual
21    named Avtar Dhillon.  You just listen.  Wait until you
22    see this.  An individual who is sued in this case.  An
23    individual who, according to what he said to this table,
24    has lied to them under oath over and over and over
25    again.  But eventually he agrees to cooperate, to
```

A2435

1    benefit himself, and so now these people are perfectly

2    happy to put him on the witness stand and say to you,

3    "Oh, this is a credible guy, believe this guy."

4         He was asked under oath over and over, "Do you

5    know Jackson Friesen?"  Answer, "No."  Under oath.

6    Multiple times.  Let's see what he says today, now that

7    he's going to get the benefit of it.

8         Last but not least you're going to hear a lot

9    about this Q-System.  This Q-System is nothing other

10   than a sort of paper version of Fred Sharp, it is Fred

11   Sharp just sort of inputting data apparently in any way

12   that he sees fit.  And so one of the things you're going

13   to hear, and it's not exciting.  I know you must have

14   thought yesterday "Oh, I wish I could have gotten a more

15   interesting case."  Yes, it's not exciting.  But one of

16   the things you're going to hear me asking witnesses

17   about is that Q.  And the reason I'll be asking them

18   about it is because it is not a believable, authentic,

19   reliable recitation of anything.  And ultimately I will

20   ask that you not rely on it.

21        So I'm out of time.  I thank you for your time.  I

22   ask you, as you hear the evidence, to scrutinize what's

23   coming across and ask yourself, does it mean that

24   Jackson knew what was wrong and did what was wrong or

25   does it show instead that he was a guy trying to learn

```
 1    the ropes, got involved in the business, and then got

 2    uninvolved in the business?

 3         Thank you so much.

 4         THE COURT:  All right.

 5         The Commission may call its first witness.

 6         MS. SHIELDS:  Your Honor, before the Commission

 7    calls its first witness, may we be heard at sidebar

 8    briefly?

 9         THE COURT:  You may.

10

11         AT THE SIDEBAR

12         MS. SHIELDS:  The Commission objects to the

13    factual inference being made by defense counsel, given

14    that they asserted their Fifth Amendment right not to

15    testify or to provide any substantive evidence in this

16    case, factual statements about what role Ms. Gasarch

17    played, factual statements about Friesen's involvement

18    and his -- and his learning the ropes from his father.

19    These are all questions they refused to answer in

20    discovery.  They should not now be permitted to make

21    these assertions to the jury.

22         THE COURT:  Well but they don't count for

23    anything.  Do you want me to say again that "Opening

24    statements are not evidence, the whole thing is going to

25    be based on evidence?"  I'll do that.
```

A2437

```
 1          MS. SHIELDS:  I think, your Honor, we would like
 2     an instruction from you that counsel cannot be
 3     suggesting to the jury that these things will come into
 4     evidence --
 5          MS. SHIELDS:  Your Honor --
 6          THE COURT:  Wait.  Wait.  Wait a minute.  Wait a
 7     minute.  Always talk to me, otherwise I will become a
 8     potted plant.
 9          Now look.  I assume, at this stage of the
10     proceedings, that counsel operates in good faith.  I
11     assume that they have a good faith expectation that they
12     can introduce that evidence from some witness.  If they
13     don't, I've heard closing arguments which say "Your
14     cohort, what defense counsel said in the opening is a
15     promise, that they would come up and justify that.  We
16     haven't heard anything about that.  They didn't come
17     forward."  I'll allow that.  But for now I will say,
18     "The openings are simply openings, they are not
19     evidence," and then we'll call the first witness.
20          MS. SHIELDS:  Your Honor, would you also be
21     inclined to give those jury instructions of the
22     definitions of terms?  I think some of those may come up
23     with our first witness.
24          THE COURT:  Well doesn't it make sense, when the
25     word is used by the witness, that we --
```

A2438

```
 1        MS. SHIELDS:  Sure, yes, we can do it that way.
 2        MS. FRITZ:  At the break then I'd like to show
 3   your Honor where we are with the "stock promotion"
 4   definition, because I know that one is coming up.  But
 5   we can do it at the break.
 6        THE COURT:  I hope so.
 7
 8        (In open court.)
 9        THE COURT:  While he's coming in, let me remind
10   you that we haven't had any evidence yet.  Now the
11   evidence starts.
12        Remember, you have the broadest possible powers
13   with respect to evidence.  If I let a witness testify to
14   something, or let a document come into evidence, you may
15   believe what the witness says, but equally you may
16   disbelieve and disregard what a witness says and what a
17   document shows as though it never came into evidence.
18   And between those two extremes, you can believe part of
19   what a witness says and disbelieve other parts.  Up till
20   now we've heard what the Commission and what each of the
21   defendants, Mr. Friesen -- and I'll call him
22   "Mr. Friesen," and Ms. Gasarch, what they hoped to come
23   up with in the way of evidence.
24        Here's Mr. Dhillon.  Sometimes we go to get the
25   witness and the witness has wandered off or something,
```

A2439

```
 1    and if we do that, I will tell you stories about the
 2    courtroom that have nothing to do with the case.
 3         (Laughter.)
 4         THE COURT:  You may come forward, sir.
 5         (AVTAR DHILLON, sworn.)
 6
 7         * * * * * * * * * * * * *
 8         AVTAR DHILLON
 9         * * * * * * * * * * * * *
10
11    DIRECT EXAMINATION BY MS. SHIELDS:
12    Q.    Good morning, sir.
13    A.    Good morning.
14    Q.    Would you please state your full name for the
15    jury?
16    A.    Avtar Dhillon.
17    Q.    And where do you live?
18    A.    I live in Long Beach, California.
19    Q.    And during most of your testimony this morning
20    we're going to be focused on the time period from 2011
21    to 2018.  And during that time period, where did you
22    live?
23    A.    In California.
24    Q.    When did you move to the United States?
25    A.    In 2001.
```

A2440

```
 1    Q.    And why did you do that?
 2    A.    To become a CEO of a biotech company based out of
 3    San Diego.
 4    Q.    And would you briefly describe your educational
 5    background for the jury, please.
 6    A.    I have a Bachelor of Science degree in Human
 7    Physiology and a Medical Doctor degree.
 8    Q.    And when did you get your undergraduate degree?
 9    A.    In 1984.
10    Q.    And where did you go to school?
11    A.    At the University of British Columbia.
12    Q.    And then you went to medical school?
13    A.    Yes, I did.
14    Q.    And when did you graduate from medical school?
15    A.    In 1988.
16    Q.    And when you graduated from medical school, what
17    did you do then?
18    A.    I got an internship in family practice and then
19    went into a private family practice.
20    Q.    And how long did you practice as a family
21    practitioner?
22    A.    Almost for a decade.
23    Q.    What did you do after that?
24    A.    After that I ended up becoming a venture
25    capitalist for about 3 years.
```

A2441

```
 1    Q.    And what does that mean, what's a venture

 2    capitalist?

 3    A.    A venture capitalist is a fund manager who is

 4    looking for investment opportunities.

 5    Q.    Did you have any particular area of expertise?

 6    A.    Yes, it was in health care.

 7    Q.    And then what did you do after you spent, I think

 8    you said 3 years as a venture capitalist?

 9    A.    After that, um, I ended up becoming a CEO of a

10    biotech company out of San Diego.

11    Q.    And what was that company?

12    A.    The name of the company was Genetronics at that

13    time.

14    Q.    And so roughly when did you start being the CEO of

15    Genetronics?

16    A.    From 2001 to approximately 2009.

17    Q.    And in 2009, how did your employment change?

18    A.    At that particular time we merged with a private

19    company and I became the Executive Chairman for 2 years,

20    um, followed by the Chairman for -- until 2019.

21    Q.    Okay.  So you were -- let's just get the timeline

22    straight.

23          You were Chairman until about 2009, and Executive

24    Chairman in 2009 to 2011 or so?

25    A.    I was CEO until 2009 and then Executive Chairman
```

```
 1    until 2011.

 2    Q.    Okay.  so then what did you do in 2011?

 3    A.    In 2011 I ended up taking a company public called

 4    OncoSec Biomedical in 2012.  I took another company

 5    public called Stevia First.  And then in 2013, I took

 6    another company public called Arch Therapeutics.

 7    Q.    So these three companies that you took public,

 8    we're going to talk about them in a lot more detail

 9    later.  But generally, for the jury, what does it mean

10    to take a company public?

11    A.    You can take a company public generally in two

12    ways, an IPO, or you can do something called a "reverse

13    merger," where you take a private company and merge it

14    with a public company.

15    Q.    What does it -- maybe let's start it at a more

16    basic level.

17          What's it mean to take a company public?  What's a

18    "public company"?

19    A.    As opposed to a private company, um, a public

20    company is a company that trades on the exchange, one of

21    the stock exchanges, and generally I'm referring to

22    within the United States.  And by doing so, you are able

23    to trade shares in it, you can have buyers and sellers

24    of that particular public company.

25    Q.    So after you took this set of companies public in
```

A2443

```
 1    the 2000 to 2013 time frame, did you keep, um -- did you
 2    have roles in each of those companies on a continuing
 3    basis?
 4    A.    Yes.  I was the --
 5    Q.    And describe that, please.
 6    A.    I was the Chairman of the Board of Directors for
 7    all three of those companies, including Genetronics.
 8    Q.    And how long were you Chairman of the Board of
 9    Directors of those companies?
10    A.    It, um -- it differed for each one of the
11    companies, but for OncoSec, I was Chairman of the Board
12    from 2011 till 2020.  For Stevia, I was Chairman of the
13    Board from 2012 to 2019.  And for Arch Therapeutics,
14    from 2013 to 2018.
15    Q.    And then what did you do after that for work?
16    A.    So after taking those companies public and still
17    being associated with them as a -- as the Chairman of
18    the Board, I moved on to do venture work again.  I
19    started a small -- I started a private investment
20    entity, um, Canada, that -- its main focus was to invest
21    in the, um, federally-legal cannabis space.  So I did
22    that from about 2014 until 2021.
23    Q.    And when was this case filed?
24    A.    In August of 2021.
25    Q.    Was this the only case filed against you in August
```

1    of 2021?

2    A.    No, there was also a criminal case filed.

3    Q.    And what is the status of that criminal case?

4    A.    I pled guilty via an information to three charges.

5    Q.    And what were those charges?

6    A.    The first charge is selling, um, securities

7    without disclosure.  The second charge is, um, selling

8    unregistered securities.  And then the third charge is

9    nondisclosure of a touting compensation.

10   Q.    Why did you decide to plead guilty to those

11   criminal charges?

12   A.    Um, I wanted to, um, go clean with my conduct.  I

13   had decided that, um, I wasn't going to, um, lie about

14   my conduct any further.

15   Q.    Do you have any agreements with the criminal

16   authorities in connection with your guilty plea?

17   A.    In addition to the guilty plea, I do have a

18   cooperation agreement with the government.

19   Q.    And in that cooperation agreement, what have you

20   agreed to do?

21   A.    To tell the truth.

22   Q.    And in terms of your guilty plea agreement, what

23   is that guilty plea agreement require you to do?

24   A.    The guilty plea agreement, um, has the three

25   components.  I pled guilty to the three charges.  I also

A2445

|     |                                                              |
|-----|--------------------------------------------------------------|
| 1   | have a forfeiture of about $1 1/2 million.  And, um --       |
| 2   | and, um, there is a third component that I'm forgetting      |
| 3   | right now.                                                   |
| 4   | Q.    Does your plea agreement contemplate potential         |
| 5   | prison time?                                                 |
| 6   | A.    Oh, yes.  So that's the third component.  And I'm      |
| 7   | awaiting sentencing.                                         |
| 8   | Q.    And who ultimately decides your sentence and how      |
| 9   | much prison time you might serve as a result of that        |
| 10  | criminal case?                                               |
| 11  | A.    The judge will decide.                                 |
| 12  | Q.    And do you expect that testifying here today will     |
| 13  | be taken into account as part of your criminal sentence?    |
| 14  | A.    Yes, that's part of my cooperation agreement, um,     |
| 15  | which requires me to tell the truth.  The prosecutor,       |
| 16  | um, may decide to put in, um, a recommendation to the       |
| 17  | judge for leniency, um, due to my cooperation and           |
| 18  | telling the truth.                                           |
| 19  | Q.    Have you resolved this case with the SEC?             |
| 20  | A.    I have.                                                |
| 21  | Q.    And what have you agreed to do as part of your        |
| 22  | resolution of this case?                                     |
| 23  | A.    I have injunctions.  I can't -- I can't trade         |
| 24  | penny stock permanently.  I have an officer/director        |
| 25  | bar, which is associated with another SEC case.  And I      |

```
 1    also have a forfeiture, um, or a disgorgement of over $9
 2    million.
 3    Q.    So you've agreed to pay the SEC over $9 million as
 4    part of resolving this case?
 5    A.    Yes.
 6    Q.    In addition to this case and the related criminal
 7    case, were there other SEC or criminal cases that got
 8    brought against you?
 9    A.    Yes.  Um, the third charge is related to touting
10    compensation, um, nondisclosure.  There is a related
11    case with the SEC out of the LA office.
12    Q.    And as part of your preparation to testify today,
13    have you met with me and my colleagues at the SEC?
14    A.    Yes, I have.
15    Q.    And what did I ask you to do when you testify
16    today?
17    A.    To be honest.  To tell the truth.
18    Q.    Since this case was filed in August of 2021, how
19    has your employment changed?
20    A.    I am no longer involved in public markets.  I've
21    resigned from all of my roles and positions as an
22    officer, director, et cetera.  And I've gone into, um,
23    real estate and farming.
24    Q.    Were you required, by the terms of your settlement
25    of the other SEC case, to resign from those public
```

1   company positions?

2   A.    Yes, I have a permanent officer/director bar in

3   public companies.

4   Q.    And how are you currently earning money,

5   Dr. Dhillon?

6   A.    I'm doing farming and real estate management.

7   Q.    Before this case was filed, did the SEC ask you to

8   testify as part of its investigation into the facts that

9   became this case?

10  A.    Yes.

11  Q.    And how many times did you testify before the SEC

12  as part of its investigation?

13  A.    Twice.

14  Q.    Is that typically called "investigative

15  testimony"?

16  A.    Yes.

17  Q.    And when you gave that investigative testimony,

18  were you under oath?

19  A.    Yes.

20  Q.    You were sworn to tell the truth?

21  A.    Yes.

22  Q.    And did you tell the truth during those two

23  investigative testimonies that you gave?

24  A.    No, I didn't.

25  Q.    So I'd like for you to describe to the jury,

A2448

```
 1   during the first of your investigative testimonies, what
 2   kinds of things did you not tell the truth about?
 3   A.    Um, in the first testimony I was surprised, um, by
 4   what the SEC knew.  They questioned me -- when they
 5   confronted me with having a foreign account, um, and
 6   also confronted me with receiving proceeds from an
 7   illegal sale of shares, my initial reaction was to deny
 8   it and lie about it.
 9   Q.    And what kinds of things were you not truthful
10   about the second time you came in for SEC investigative
11   testimony?
12   A.    In the second testimony, um, I tried to cover up
13   and come up with verification for why I received monies
14   from Mr. Paul Sexton by creating -- by indicating I had
15   a loan agreement, which was nonexistent, and I also
16   tried to legitimize why I received money from Mr. Taylor
17   by coming up with a land purchase agreement.
18   Q.    Why did you lie to the SEC during your
19   investigative testimony?
20   A.    I was hoping that I could make it go away.
21   Q.    Why have you decided to tell the truth about your
22   conduct now?
23   A.    Because I have decided to take ownership for my
24   conduct.  By lying I was making things worse.
25   Q.    And do you understand that today you've taken an
```

A2449

```
 1    oath to tell the truth to this jury?
 2    A.    Yes, I have.
 3    Q.    Dr. Dhillon, let's talk a little bit about your
 4    expertise with public companies.
 5          For how many years were you the CEO of a publicly-
 6    traded company?
 7    A.    The CEO?  Um, for more than one company, so
 8    collectively probably --
 9    Q.    Collectively?
10    A.    Yeah -- a dozen years.  But I've been an Officer
11    and a Director of public -- of multiple public companies
12    for more than two decades.
13    Q.    So in addition to being CEO, you were also the
14    Chairman of the Board of Directors of a number of public
15    companies?
16    A.    Yes, including the three that I mentioned earlier.
17    Q.    And about how long were you Chairman of the Board
18    of Directors of a publicly-traded company?
19    A.    So collectively, um, at least 20 years.
20    Q.    And in your role as either the CEO or the Chairman
21    of the Board of Directors of publicly-traded companies,
22    did you have responsibilities for those companies's
23    regular filings with the SEC?
24    A.    Yes, I did.
25    Q.    Have you heard of the concept of registration of
```

1    securities?

2    A.    I have.

3    Q.    Is that something that you were involved with as

4    part of the jobs that you had?

5    A.    Yes, as part of the board and certainly as the

6    Chairman of the Board, um, we had oversight over

7    registration of securities.

8    Q.    And so based on your public company experience, in

9    your mind what's the purpose of the registration of

10   securities?

11         MS. FRITZ:  Objection, your Honor.

12         THE COURT:  Yeah, sustained.

13   Q.    Do you know what a registration --

14         THE COURT:  I mean she has every right to inquire

15   about his knowledge of things.  But I think the way you

16   phrased that question, it calls for a legal description

17   and I'm the one who teaches the law.  If you were to ask

18   what does he think?  We can get to what he thinks.  And

19   the jury can listen to that.

20         MS. SHIELDS:  Okay.

21   Q.    So, Dr. Dhillon, what do you think is the purpose

22   of a registration statement?

23         MS. FRITZ:  Objection.

24         THE COURT:  Overruled.

25   A.    Um, it's to provide, um, very comprehensive,

```
 1    complete information about a company, its business plan,
 2    its shareholders, um, risk factors, et cetera, so that
 3    anybody buying those securities would have as complete
 4    knowledge about the company as possible.
 5    Q.    And do registration statements, in your
 6    experience, tell investors who owns the company?
 7    A.    Yes, um, as long as, um, they're Officers or
 8    Directors or they own more than 5 percent of the
 9    company.
10    Q.    Have you heard the term "affiliate" as it's used
11    in connection with public companies?
12    A.    Yes.
13    Q.    And to you what does that term mean?
14          MS. FRITZ:  Objection, relevance.
15          THE COURT:  No, at this stage we're going to allow
16    it.
17    A.    An "affiliate" is, generally speaking, an Officer
18    or Director or somebody that owns, um, significant, um,
19    position to be able to influence the direction of
20    management.  So a controlling shareholder would be an
21    affiliate.
22    Q.    And do you understand or did you have a view about
23    whether you were an affiliate of the public companies
24    for which you were the CEO or the Chairman of the Board
25    of Directors?
```

A2452

```
 1   A.    Yeah, as an Officer or Director and since I was

 2   the Chairman of the Board, a Director of the company, I

 3   was an affiliate of, um, a number of companies including

 4   Arch, Stevia, and OncoSec.

 5   Q.    And when you owned shares of a company of which

 6   you were either the CEO or the Chairman of the Board of

 7   Directors, what did you have to do before you could sell

 8   your shares in the public markets?

 9   A.    I have to file forms, um, typically these Form 4s.

10   Um, to be a -- whenever there's a change in ownership as

11   a Director, I have to disclose to the, um -- to the

12   public.

13   Q.    Have you heard the terms "restricted stock" and

14   "unrestricted stock"?

15   A.    I have.

16   Q.    And did those terms come up in your work with

17   public companies?

18   A.    They do.

19   Q.    And so to you what do those terms mean?

20   A.    Um, a "restricted stock," as the name implies, has

21   certain restriction on its resale.  "Unrestricted stock"

22   is something that we can freely buy or sell on a -- on a

23   public exchange.

24   Q.    And in your experience, if someone is an affiliate

25   or a controlling person of a public company and they get
```

A2453

```
 1    unrestricted stock, are there then restrictions placed
 2    on that stock?
 3    A.    Yes, there are restrictions.
 4    Q.    So those people would have to then take certain
 5    steps before that stock could be sold to members of the
 6    public?
 7    A.    Yes.
 8    Q.    For some public companies are there disclosure
 9    requirements if you own more than 5 percent of that
10    company's stock?
11    A.    My understanding is in all cases with all
12    exchanges in the United States, that if you own more
13    than 5 percent, you have a disclosure requirement.
14    Q.    We're going to turn now and talk a little bit more
15    about the details of this case.
16          Do you know Paul Sexton?
17    A.    I do.
18    Q.    And how long have you known Mr. Sexton?
19    A.    For over 20 years.
20    Q.    How did you first meet him?
21    A.    In the social circles of Vancouver.
22    Q.    At some point did you come to have more of a
23    business relationship with him?
24    A.    Yes, as of 2011, um, I ended up working with him
25    to take three companies public.
```

```
 1   Q.    So we're going to talk a lot in detail about that.
 2   But before we go into the detail, you mentioned that you
 3   had business relationships with Mr. Sexton involving
 4   three companies.
 5        Could you just tell the jury generally what those
 6   three companies were and then generally what the terms
 7   of that business arrangement was?  And then we'll delve
 8   into the details.
 9   A.    All three of those, um, business relationships
10   involve taking a private company public through a
11   reverse merger, merging a private company with a public
12   company, funding it for the initial round of, um, after
13   going public.  Since Mr. Sexton and his associates, um,
14   brought the public entity, the shell company, which
15   typically doesn't have a business plan, to which we
16   merged, they controlled all the shares, and particularly
17   the unregistered shares which they continued to control.
18   Um, subsequent to the merger, there was a promotion by
19   them, a marketing effort by which they sold their
20   freetrading unregistered, um, or "pretrading shares," I
21   should say, into the promotion, and they didn't disclose
22   their beneficial ownership of those particular shares,
23   the freetrading shares.
24        MS. SHIELDS:  Your Honor, if I may, I think this
25   might be a good time to ask your Honor to instruct the
```

A2455

```
 1    jury on the meanings of a couple of terms, the terms
 2    "shell company" and "reverse merger."  We had previously
 3    submitted to your Honor instructions on those.
 4          THE COURT:  You have, and I will so instruct.
 5          So now it's not what you may think, now this is a
 6    paraphrase of the law in this regard.  And I may repeat
 7    this at the end of the case.  But it makes sense to
 8    explain it now.
 9          A shell company is a company that's recognized
10    under the law and permitted by statute and regulation.
11    A company is defined as a "shell" when it has no or very
12    few assets or operation.  The creation, operation,
13    purchase, or sale of a shell company, does not violate
14    the federal securities laws unless there is evidence
15    that the shell company was used in furtherance of an
16    unlawful purpose or as part of a scheme.
17          So a "shell company."
18          Now mention has been made of a "reverse merger,"
19    so let me explain that a little bit.
20          A "reverse merger" is a corporate combination of a
21    public company, often a public shell company, and a
22    private company.  Now remember, it's been mentioned that
23    a public company is a company whose shares may be traded
24    on one of the stock exchanges, and the public company is
25    a company that has filed a registration statement.  A
```

A2456

```
 1    private company is a company who does business in the
 2    corporate form with shares, but it's completely private,
 3    it simply has to comply with the laws of the specific
 4    state.
 5          So now we'll start again.
 6          A "reverse merger" is a corporate combination, a
 7    merger, of a public company, often a public shell
 8    company, and a private company.  The public company's
 9    shares are traded in the public markets.  In a reverse
10    merger, the shareholders of the private company
11    surrender their shares of the private company in
12    exchange for stock of the public company.  The private
13    company transfers its assets to the public company.
14    Often the public company is renamed with the name of the
15    previously-private company and the public company then
16    engages in the business previously conducted by the
17    private company.  The shareholders of the former public
18    company continue to own shares in the now-merged
19    companies.
20          A reverse merger is a way for companies to become
21    public companies without making the disclosures about
22    their business and ownership that are typically required
23    in order to become a publicly-traded company.
24          A reverse merger does not violate the federal
25    securities laws unless there is evidence that the
```

```
 1   reverse merger was used in furtherance of an unlawful
 2   purpose or as part of a scheme.
 3        Go ahead, Ms. Shields.
 4        MS. SHIELDS:  Would you also please provide the
 5   jury with your instructions on "restricted stock" and
 6   "unrestricted stock," because I think we're going to
 7   talk about that quite a lot as well.
 8        THE COURT:  All right.
 9        Now ownership in a company is evidenced by shares
10   of the company's stock.  "Restricted stock" of a
11   publicly-traded company includes stock that has been
12   required -- strike that.  -- includes stock that has
13   been acquired from that company or from an affiliate of
14   that company in a private transaction that is not
15   registered with the Securities and Exchange Commission.
16   All stock held by a company or by one of its affiliates
17   is restricted stock even if the stock had been
18   unrestricted prior to its acquisition by the affiliate.
19   That means that if an affiliate buys or acquires
20   unrestricted stock, those shares automatically become
21   subject to the legal restrictions on shares by
22   affiliates.
23        Without a specific exemption under the federal
24   securities laws and rules, restricted stock cannot be
25   legally offered or sold to the public unless a
```

1   registration statement has been filed with the

2   Securities and Exchange Commission for an offer or is in

3   effect for a sale.  Without registration, affiliates are

4   prohibited from selling large quantities of a public

5   company's shares regardless of how the affiliate

6   obtained those shares.

7        That's restricted stock.  "Unrestricted stock" is

8   more straightforward.

9        "Unrestricted stock" of a publicly-traded company

10  may legally be offered and sold in the public securities

11  marketplace by a nonaffiliate of that company.

12  Ordinarily unrestricted stock was previously registered

13  on a registration statement.

14        Go ahead.

15        MS. SHIELDS:  Thank you, your Honor.

16  Q.    Dr. Dhillon, I'm going to now ask you to break

17  down, um, the answer that you previously gave about your

18  involvement with Mr. Sexton in those three public

19  company deals.  I want to talk about the first of those

20  deals.

21        So what company did the first of those deals

22  involve?

23  A.    OncoSec Biomedical.

24  Q.    So how did the OncoSec Biomedical deal come to

25  happen?

```
 1    A.     While I was the Executive Chairman of Genetronics,
 2    um, Genetronics decided not to develop one of the
 3    technologies.  I was tasked with trying to find funding
 4    for that technology.  We put that technology in a
 5    wholly-owned subsidiary of Genetronics and then I, as
 6    the Chairman of the subsidiary which went on to become
 7    OncoSec Biomedical, I went looking for funding for that
 8    particular entity, and that's when I approached
 9    Mr. Sexton and his group, to see if they would be
10    interested in funding OncoSec Biomedical.
11    Q.    Okay.  So you refer to Sexton and his group.  At
12    the time that you were looking for funding for the
13    company that became OncoSec, who was Mr. Sexton's group?
14          MS. FRITZ:  Objection, foundation.
15          THE COURT:  Sustained, on that foundation.
16    Q.    Who did you approach?
17    A.    I approached Mr. Paul Sexton and Mr. Graham Taylor
18    and, um, Mr. Talal Usein.
19          MS. FRITZ:  What was the last one?  I'm sorry.
20          THE COURT:  Talal Usein.
21    Q.    Did you approach the three of them together or
22    separately?
23    A.    I interacted with all three on this particular
24    matter, um, and, um, I also interacted with a fourth
25    individual, David Sidu.
```

```
 1    Q.    All of these individuals with whom you interacted,
 2    were you all working together or were you all working
 3    independently?
 4    A.    I was, um, representing the private company, um,
 5    and these individuals were representing, um, the funding
 6    and the public company that they would, um, bring should
 7    we end up doing the merger.
 8    Q.    I just want to be clear about who the individuals
 9    are that are working together on the public-company
10    side.  Can you remind the jury who is working together
11    on that side?
12    A.    So, um, there were multiple individuals, but the
13    four individuals that I interacted with over OncoSec was
14    Mr. Paul Sexton, Mr. Graham Taylor, Mr. Talal Usein, and
15    Mr. David Sidu.
16    Q.    And at some point did you come to learn whether
17    others were involved on their side of the --
18          MS. FRITZ:  Objection.
19          THE COURT:  Sustained, on that foundation.
20          MS. SHIELDS:  At some point in time did he come to
21    learn?
22          THE COURT:  Well it calls for hearsay.
23    Q.    At some point in time, as a result of your
24    interactions, did you learn other people were involved
25    in the group?
```

```
 1          THE COURT:  Sustained.  We've talked about
 2    801(d)(2)(E), and as to that it's possible it may go
 3    forward, but that's straight hearsay.
 4    Q.    What steps did you take in working with
 5    Mr. Sexton, Mr. Taylor, Mr. Usein, and, um, Mr. Sidu, in
 6    furtherance of this deal?
 7    A.    We, um, discussed what the transaction, um, would
 8    encompass and then we acted on those particular terms.
 9    So to -- once the five of us were in agreement, um, on
10    what we were going to do, how much we were going to
11    raise, on how the company was going to go public, then
12    we proceeded to, um, bring the management and counsel
13    and so forth into, um, completing the transaction.
14    Q.    And what was the deal you reached with Mr. Sexton,
15    Mr. Taylor, Mr. Usein, and Mr. Sidu?
16    A.    Um, we had, um, decided on a deal that I described
17    in general terms before, specifically I believe we were
18    going to raise or they were going to, um, bring
19    approximately $1.5 million worth of funding, that was
20    going to be the initial amount, and they were going to
21    be bringing the shell company, which they controlled.
22    The restricted shares of that company was going to
23    mainly go to management.  The unrestricted shares was
24    going to be controlled by that group.  The group was
25    going to sell those unrestricted shares into a promotion
```

```
 1    and, um -- and, um, do that through nominees without
 2    disclosing their beneficial ownership.
 3    Q.    So all of that was part of the deal that you
 4    negotiated in the beginning?
 5    A.    Yes.
 6    Q.    And at the time you negotiated that deal, in your
 7    view was that consistent with what the law required?
 8    A.    No, it wasn't.
 9    Q.    Why not?  Because, um, there is a requirement for
10    disclosing, um, ownership greater than 5 percent.  Here
11    the unregistered securities were going to be
12    approximately 24 percent, they were going to be
13    controlled by this group.  I knew that there wasn't a
14    disclosure.  They knew there wasn't a disclosure about
15    their beneficial ownership.  As a result of interacting
16    with me directly as well as owning, um, such a large
17    quantity, my understanding is, um, they were affiliates,
18    and as affiliates that also had certain restrictions and
19    disclosure requirements.
20    Q.    Part of the discussions you had with that group,
21    was it understood, as part of all those discussions,
22    that the transaction that you agreed to do was not
23    consistent with the law?
24          MS. FRITZ:  Objection.
25          THE COURT:  No, he may.
```

A2463

```
 1   A.    Well --
 2         THE COURT:  No, I'm going to sustain that.  You're
 3   leading the witness.  You called him.
 4         MS. SHIELDS:  Okay.
 5   Q.    Did you have discussions with your -- the people
 6   you entered into that agreement with, about whether that
 7   deal was consistent with the law?
 8   A.    Um, we knew it wasn't consistent with the law.
 9         MS. FRITZ:  Objection.
10         THE COURT:  No, no, just listen to her question.
11         THE WITNESS:  Okay.
12         THE COURT:  Did you discuss, or refer in any way
13   in discussing with these other three folks, the legality
14   of the proposed transaction?
15         THE WITNESS:  I don't believe that we discussed
16   the legality or the legal terms, but we went through an
17   effort to not disclose our ownership.
18   Q.    Did you have a common understanding -- oh, fine.
19         Did you, um -- did you have, um, conversations
20   with Mr. Sexton and his partners in this deal that led
21   you to believe that he had a sophisticated understanding
22   of the legal requirements?
23         MS. FRITZ:  Objection.
24         THE COURT:  Yeah, sustained in that, um, form.
25   But I'll allow you to ask him.
```

```
 1          How knowledgeable did you think he was, Sexton,
 2     about these matters?
 3          THE WITNESS:  He's quite knowledgeable.
 4          THE COURT:  Well you thought so?
 5          THE WITNESS:  I thought so, yes.  Absolutely.
 6     Yes.
 7          THE COURT:  Now he can't tell what's in somebody
 8     else's mind, but if he formed that opinion, he can so
 9     testify.
10          I'm going to give a break for 20 minutes, since we
11     got going late.  Is this a good time?
12          MS. SHIELDS:  Yes, your Honor.
13          THE COURT:  All right.
14          Ladies and gentlemen, you have not heard all the
15     evidence, please therefore keep your minds suspended.
16     Do not discuss the case either among yourselves nor with
17     anyone else.
18          The jury may recess for 20 minutes until 20
19     minutes after 11:00.  The jury may recess.  I'll remain
20     on the bench.
21          THE CLERK:  All rise for the jury.
22          (Jury leaves, 11:00 a.m.)
23          THE COURT:  Please be seated.  You may step down,
24     sir.
25          So I thought and think that this procedure of my
```

A2465

```
 1    defining various important terms is working well and I
 2    think the way Ms. Shields is doing it is fine and the
 3    defense may do the same.  It's -- but one of your
 4    definitions has drawn up really an excellent question.
 5          "Judge defined restricted stock as requiring
 6    registration to sell, quote, 'large quantities.'  Can we
 7    have a definition of size for something to get to the
 8    level of being, quote, 'large'?  Example, a number or a
 9    percentage."
10          (Juror question.)
11          THE COURT:  Now in the definition that I read to
12    them, the juror is referring to this.
13          "Without registration, affiliates are prohibited
14    from selling large quantities of a public company's
15    shares regardless of how the affiliate obtained those
16    shares."
17          What do we mean by "large"?
18          MS. SHIELDS:  So, your Honor, I guess I would have
19    a two-part answer, which is that "The law presumes that
20    anyone who owns 10 percent or more is an affiliate and
21    affiliates may not sell more than 1 percent of a
22    company's stock over a 90-day period."
23          THE COURT:  Well that's an answer.
24          Is that all right?
25          MS. FRITZ:  That's fine.
```

A2466

```
 1          THE COURT:  Fine.  All right.  I will answer the
 2     question in the appropriate form and when we resume.
 3          Now there's a dispute about something?  I can best
 4     resolve it if you give me your separate approaches here.
 5     Give me -- not just talk about them, because I am not --
 6          MS. FRITZ:  Oh, right, your Honor.  Um, if I can
 7     hand up something, we've marked up a copy?
 8          THE COURT:  Sure.
 9          MS. FRITZ:  The black is Mr. Day and the rest is
10     me.
11          THE COURT:  All right.
12          (Hands up.)
13          (Reads.)
14          THE COURT:  If I read this, I would propose to
15     charge as follows.  There's no dispute over the, um,
16     first sentence.
17          "Those laws require" -- and then I'll pick up and
18     go to the end.
19          "Those laws require that entities or individuals
20     engaged in stock promotion must disclose the
21     compensation for issuance of the promotion.  Stock
22     promotion does not violate the securities laws unless
23     the material does not contain adequate and accurate
24     disclosure."
25          MS. FRITZ:  That's fine.  Thank you.
```

A2467

```
 1              THE COURT:  And that's fine with you, isn't it?
 2              MS. SHIELDS:  Yes.  Thank you.
 3              THE COURT:  Fine.  Thank you very much.
 4              And we'll take the recess until 20 after 11:00.
 5    We'll recess.
 6              THE CLERK:  All rise.
 7              (Recess, 11:05 a.m.)
 8              (Resumed, jury enters, 11:22 a.m.)
 9              THE COURT:  While the witness is resuming the
10    stand, we have a question, a juror question just before
11    we took the recess, and I will proceed to answer that
12    question.  Let's see here.
13              You'll recall that in my definition of "restricted
14    stock," under the law, in the paraphrase, I had this
15    sentence.  "Without" -- this is as to "restricted
16    stock."
17              "Without registration, affiliates are prohibited
18    from selling large quantities of a public company's
19    shares regardless of how the affiliate obtained those
20    shares."
21              And a juror question is, in essence, "Can we have
22    a definition of the size for something to get to the
23    level of being, quote, 'large'?  For example, what's the
24    number or the percentage?"
25              Well the law provides an answer, but the answer is
```

A2468

```
 1    a little complex, but straightforward.

 2          (Jury laughs.)

 3          THE COURT:  An affiliate who owns more than 10

 4    percent of the stock of the corporation cannot sell more

 5    than 1 percent of that stock in any 90-day period.

 6          That's the definition under the law.

 7          Ms. Shields, you go right ahead.

 8    Q.    Good morning, Dr. Dhillon.

 9    A.    Good morning.

10    Q.    So before we broke you described an agreement that

11    you had reached with Mr. Sexton and some other

12    individuals, do you remember that discussion?

13    A.    Yes.

14    Q.    Okay.  So did that agreement actually take place,

15    did what you had agreed to do happen?

16    A.    Yes.

17    Q.    Okay.  And when did the reverse merger take place?

18    A.    In 2011.

19    Q.    And so as a result of that reverse merger, um,

20    what company -- what public company was created?

21    A.    OncoSec Biomedical.

22    Q.    And in that now public company, who owned that

23    company's restricted shares?

24    A.    Primarily management.

25    Q.    And who was management?
```

```
 1   A.    That was myself, the CEO, the CFO, um, scientists,
 2   et cetera.
 3   Q.    Who owned that company's unrestricted shares?
 4   A.    It was Mr. Sexton and his associates.
 5         THE COURT:  All right.  Now he said Mr. Sexton and
 6   his associates, and it's not for me to comment on
 7   testimony at all and I do not, except to say this.
 8         So far, at least as I'm listening to the evidence
 9   and I'm listening very carefully, we haven't heard Word
10   1 about Mr. Friesen or Ms. Gasarch.  We've heard about
11   other people and that may be relevant, may help you
12   understand what's going on, and I've allowed you to hear
13   that testimony.  But so far we haven't heard about
14   either of the people here.
15         Go ahead, Ms. Shields.
16   Q.    So that unrestricted stock, do you know, um,
17   roughly what percentage of OncoSec Medical's stock was
18   that unrestricted stock?
19   A.    Roughly 24 percent.
20   Q.    Okay.  And how did Mr. Sexton and his associates
21   control that 24 percent?
22         MS. FRITZ:  Objection, foundation.
23         THE COURT:  If he knows, he may answer.
24   A.    There was control by a series of nominee
25   shareholders.
```

```
 1    Q.    And how did you know that Mr. Sexton and his
 2    associates controlled that 24 percent of OncoSec stock
 3    through nominee shareholders?
 4    A.    It was part of our discussions, that they would
 5    control the 24 percent -- the 24 percent of the stock
 6    which was pretty well the entire if not all of the
 7    unregistered shares.
 8    Q.    Now you used the term "nominee shareholders."
 9    When you use that term, what do you mean by that?
10    A.    A "nominee shareholder" is basically a front
11    person for a beneficial shareholder.
12    Q.    And how many nominee shareholders did Mr. Sexton
13    and his associates use to control that 24 percent?
14    A.    I don't recall exactly the number of nominees, but
15    the primary objective was to have enough so that no one
16    owned more than 5 percent.
17    Q.    Why was it important that no nominee owned more
18    than 5 percent?
19    A.    As soon as you get past that threshold, then you
20    have to disclose who the owner of that 5 percent-plus
21    block of shares actually is.
22    Q.    When you were having your discussions that
23    produced the agreement to do this deal, what did
24    Mr. Sexton and his associates convey to you that they
25    wanted out of this deal?
```

```
 1        MS. FRITZ:  Objection, compound.

 2        THE COURT:  Yeah, it is.  If he understands, you

 3   can ask him about it specifically, who said to you and

 4   what?

 5        MS. SHIELDS:  Okay.

 6   Q.   Let's break that down a little bit.

 7        When you were having discussions with Mr. Sexton

 8   about this deal, did he tell you what it was he was

 9   interested in -- what was the reason why he wanted to do

10   this deal, that he told you?

11   A.   The reason obviously is to be able to make money

12   and you make money by being able to sell the

13   unregistered shares, and the secrecy component was not

14   to disclose who the real ownership was.

15        THE COURT:  I didn't get the end?  And the secrecy

16   component was what?

17        THE WITNESS:  Not to disclose who the beneficial

18   owners of that particular stock was.

19   Q.   And that term that you used, "beneficial owners,"

20   what does that mean?  Tell the jury what you mean when

21   you say "beneficial owners"?

22        MS. FRITZ:  Objection.

23        THE COURT:  No, overruled.

24   A.   A "beneficial owner" is the person who is actually

25   going to benefit from the sale of that stock.  Who is
```

A2472

```
 1   going to get that money?  It's not the nominee

 2   shareholder, it's the beneficial shareholder who is

 3   going to receive the funds from the sale of that stock.

 4   Q.    And who was the beneficial owner of those shares

 5   that were held in all of those nominee companies?

 6         MS. FRITZ:  Objection, legal conclusion.

 7         THE COURT:  No, he can give us his understanding.

 8   A.    It was Mr. Sexton and his associates.

 9   Q.    And we've talked a little bit, let's just be

10   precise for the jury.

11         So at the time who did you understand Mr. Sexton's

12   associates to be?

13         MS. FRITZ:  Objection, asked and answered.

14         THE COURT:  It was, but he will state it again.

15         Who did you think his associates were?

16         THE WITNESS:  I knew there were multiple

17   associates, but four people that I knew, because I knew

18   them prior to the fact, um, when we did the deal, and

19   that was, um, Mr. Paul Sexton, um, Mr. Graham Taylor,

20   Mr. Talal Usein, and Mr. David Sidu.

21   Q.    As part of your discussions about how this

22   transaction was implemented, did you talk to Mr. Sexton

23   on an ongoing basis?

24   A.    Yes.

25   Q.    And did those -- were those discussions in
```

```
 1    furtherance of doing this deal and making it succeed?
 2         MS. FRITZ:  Objection, leading.
 3         THE COURT:  Yeah, sustained on that ground.
 4         MS. SHIELDS:  Okay.
 5    Q.   For what purpose did you continue to talk to
 6    Mr. Sexton about this deal and how it proceeded?
 7    A.   Um, once the transaction got, I'll call it
 8    "consummated" because we were now merged, um, the
 9    company started to receive the initial funding, so the
10    company did proceed to build on its business plan.
11    There is the trading component of the, um, freetrading
12    securities that is going to be -- is taking place and is
13    going to take place and that involves a promotion.  So
14    the dialogue, um, subsequent to the merger with
15    Mr. Sexton and his associates, was primarily around the
16    sale of stock, um, the movement of funds, and the
17    promotion itself.
18    Q.   So was the promotion, was that part of the
19    original agreement that you entered into with him?
20    A.   Yes.  In order to be being able to, um, sell the
21    shares, you have to create, quote, "liquidity," um, and
22    that involved bringing in shareholders, and the
23    shareholders, the new shareholders came in to buy the
24    shares as a result of the marketing effort or the
25    promotion.
```

```
 1    Q.    Who organized those promotional efforts?

 2          MS. PICKETT:  Objection, foundation.

 3          THE COURT:  Sustained.

 4    Q.    Did you have discussions with Mr. Sexton about who

 5    was organizing those promotional efforts?

 6          MS. FRITZ:  Objection, hearsay.

 7          THE COURT:  Come to the sidebar.

 8

 9          AT THE SIDEBAR

10          THE COURT:  Everyone is doing this just right.

11    Now as I understand it, your objection is under

12    801(d)(2)(E)?

13          MS. FRITZ:  Correct.

14          THE COURT:  And, um, I'm going to overrule it and

15    give you a standing objection.  You need say no more as

16    we go along.  I just thought in fairness I would say, in

17    this business, that we haven't heard anything about your

18    client yet.

19          But -- and now is the serious point.  As to this

20    conspiracy, there is --

21          As to this conspiracy, do you claim that

22    Ms. Gasarch is involved?

23          MS. SHIELDS:  She is not involved in the actual

24    deal, the actual putting together of the deal, her role

25    is from the back end, moving the money around.  She's
```

A2475

```
 1    not involved in putting together the deal or the
 2    trading.
 3         THE COURT:  All right, fine.  I'm just trying to
 4    do my job under the First Circuit approach to this.
 5         So as I understand it, and this is subject to your
 6    correction as to the language that -- (Coughs.) that you
 7    say she was really necessary for this and in fact she
 8    did --
 9         MS. SHIELDS:  Yes.
10         THE COURT:  What I don't hear you say, and I know
11    it's not a separate claim, but the government's
12    evidence, I don't hear you say she was a conspirator in
13    this -- and Mr. London said it in a punchier way, you
14    know the three steps and all.
15         But you think she's a conspirator?
16         MS. SHIELDS:  I do think she is because you will
17    hear evidence later on that --
18         THE COURT:  Well all I'm saying is what's your
19    position?  Because under the First Circuit, if you say
20    she's a conspirator, I'm going to treat her as a
21    conspirator.  I'm saying to you that I --
22         I'm just trying to be transparent.  I'm more
23    skeptical about her being a conspirator, but conceivably
24    you present your case.  But that's neither here nor
25    there.  If you tell me she's a conspirator, she'll be a
```

```
 1   conspirator.
 2          All right?
 3          MS. SHIELDS:  I think her role in the conspiracy
 4   is very different from the roles of others, but I --
 5          THE COURT:  Well people can have different roles.
 6          MS. SHIELDS:  But I do think she is a conspirator
 7   because she --
 8          THE COURT:  A lot of conspirators have -- some
 9   don't need to know much, are runners, and some
10   conspirators need to know every aspect of the
11   conspiracy.
12          MS. SHIELDS:  I think she was a conspirator.
13          THE COURT:  And so under the rules that I follow
14   and explained, the objection of one is an objection of
15   all and she has a standing objection.
16          MS. PICKETT:  Thank you, your Honor.
17          THE COURT:  All right.
18
19          (In open court.)
20          THE COURT:  Subject to our discussion and my
21   instruction how to proceed, the objection is overruled.
22          And you may tell us what Mr. Sexton said to you.
23   A.     Could you please repeat the question?
24          THE COURT:  It may be repeated.
25          MS. SHIELDS:  That's a very good question.  I had
```

A2477

```
 1   forgotten the question that I asked.  But let me just
 2   try again.
 3        THE COURT:  She was asking, what did Mr. Sexton
 4   say to you about how this was going to work and what he
 5   was going to get out of it?  If anything.
 6        THE WITNESS:  Um, the discussions with Mr. Sexton,
 7   um, focused on how to execute pretty well the entire
 8   deal, which is the merger and the subsequent promotion,
 9   and then creating the liquidity.  So in terms of
10   discussing, what then?  Part of the discussion was that
11   there would be an aggressive promotion used to bring in
12   investors so that they could sell their shares.
13   Q.    Okay.
14        MS. FRITZ:  Your Honor, at this point could we get
15   the definition of "promotion" that we had spoken about?
16        THE COURT:  Yes.
17        So we used the word "promoting" the stock.
18        Federal securities laws govern the disclosure
19   requirements that exist in relation to stock promotional
20   or touting materials.  Those laws require that entities
21   or individuals engaged in stock promotions must disclose
22   the compensation for issuance of the promotion.  Stock
23   promotion does not violate the securities laws unless
24   the material does not contain adequate and accurate
25   disclosure.
```

```
 1          And go ahead, Ms. Shields.
 2   Q.    So, Dr. Dhillon, in your answer to my last
 3   question you also used the word "liquidity," another
 4   term of art.  When you say that, what do you mean by
 5   that?
 6   A.    In order to sell securities, there has to be
 7   buyers, and when I refer to "liquidity," it's referring
 8   to the volume of shares that can trade between buyers
 9   and sellers.  So, um, in that sense, in order to be able
10   to sell shares, you have to have buyers, and the buyers
11   are what I call "liquidity," and that was generated by
12   the promotional effort.
13   Q.    These promotional efforts that are to generate
14   this liquidity, where were these sales made?
15   A.    In the U.S. primarily.
16   Q.    In what markets were they made?
17   A.    Among the, um, OTC bulletin board stock exchange.
18   Q.    And what is the OTC bulletin board?
19   A.    It's a stock exchange that allows buyers and
20   sellers to be able to trade their securities.
21   Q.    These discussions that you had with Mr. Sexton
22   about promotions, can you please describe for the jury a
23   little bit the kinds of things you talked about with him
24   about promotions?
25   A.    Um, we often refer to it as "bringing eyeballs to
```

```
 1    the company," and that involved, um, sending out

 2    materials to prospective buyers by different means.  It

 3    could be mailers, it could be phone calls, it could be

 4    hiring investor-relation firms, et cetera, or social

 5    media.

 6    Q.    And who was responsible for doing all of these

 7    promotional activities?

 8    A.    Yes, again Mr. Sexton's group.

 9    Q.    Okay.  Did you learn, through conversations with

10    Mr. Sexton about these promotions, who in his group was

11    involved in doing these promotional activities?

12          MS. FRITZ:  Objection.

13          THE COURT:  Well let's find out -- no, you can

14    answer that "Yes" or "No."

15          Did you learn?

16          THE WITNESS:  Yes.

17          THE COURT:  How did you learn?

18          THE WITNESS:  Through my conversations with

19    Mr. Sexton and Mr. Taylor.

20          THE COURT:  All right.

21          You may proceed.

22    Q.    And who did you learn was involved in -- who else

23    did you learn was involved in doing those promotional

24    activities?

25    A.    I knew that they were going to be hiring outside
```

```
 1   sources, um, but at that particular time I didn't pay
 2   too much attention to specifically who these outside
 3   sources were.
 4   Q.    Did Mr. Sexton tell you anything at all about who
 5   else was involved in organizing these promotions?
 6   A.    I believe we did have general conversations, um,
 7   and I knew, um, through those conversations that himself
 8   and some of his partners were directing, liaisoning with
 9   the outside agencies that they were going to use to
10   help, you know, bring about buying.
11   Q.    And who were the partners who you learned about
12   through these conversations?
13   A.    Those partners were the ones that I mentioned
14   before.  I knew there was additional partners.  Again,
15   um, I didn't know exactly who they were.  I just -- I
16   just relied on my interaction with the people that I
17   knew from before.
18   Q.    Okay.  So while these promotions were going on,
19   what else was happening as part of this deal?
20   A.    Um, we were certainly developing the company
21   during the promotions.  Clearly there's a process for
22   trying to get those, um, freetrading shares into the
23   marketplace, um, and those steps were being taken by
24   Mr. Sexton's group.
25   Q.    And how did you know that?
```

A2481

```
 1   A.    Um, in my discussions, um, we, um, often talked
 2   about where they might be or where they were in, um,
 3   liquidating their large position.  So, um, we would
 4   often have discussions about the effectiveness of their
 5   campaign and how much -- how many shares that they had
 6   sold and how much more to go.
 7   Q.    Given the complexity of this transaction,
 8   Dr. Dhillon, would a diagram help you in explaining it
 9   and illustrating it for the jury?
10   A.    Certainly, yes.
11        MS. SHIELDS:  I would like at this point, your
12   Honor, to show a demonstrative exhibit.
13        THE COURT:  You may.
14        Now here's what a demonstrative exhibit is.  A
15   demonstrative exhibit, um, they made it up, but of
16   course it's appropriate, it's like a teaching aid, but
17   the evidence is what he says.  So, um -- and again, you
18   can believe what he says, you can disbelieve anything
19   he's saying, you can believe parts and disbelieve other
20   parts.  The demonstrative aid is there to illustrate, to
21   help you understand his testimony.
22        And when I say they "made it up," I'm not saying
23   that it's wrong in any way, I'm just saying it doesn't
24   constitute evidence, because it wasn't made up back in
25   the day, it's being made up for this trial.  And unlike
```

1    evidence, it's not going back to the jury room with you.

2    But you certainly can look at it and you may use it in

3    the course of your examination.

4         Go ahead.

5         MS. SHIELDS:  So may we publish it to the jury?

6         THE COURT:  You may.  And I'd like a hard copy and

7    we'll mark it as Demonstrative A, so the record is

8    complete.  But that can be done at your convenience.

9         MS. SHIELDS:  Certainly, your Honor.

10   Q.   So, Dr. Dhillon, do you have the diagram on the

11   screen before you?

12   A.   Yes, I do.

13   Q.   Okay.  Does this diagram help you to explain to

14   the jury the OncoSec transaction we've been discussing?

15   A.   Yes.

16   Q.   Okay.  So can you walk the jury through, please,

17   what the various steps in this transaction were with

18   respect to OncoSec's unrestricted stocks?

19   A.   Certainly.

20        So the beginning of the transaction is to be able

21   to bring the private and the shell company to form the

22   public company, and, um, the public company now has two

23   large groups of shareholders before, um, all the

24   marketing efforts to bring in new investors takes place.

25   So in the beginning we have the restricted shares, which

A2483

```
 1    is primarily with management, um, the CEO, the CFO,
 2    etc., and then, um, the, um, in grey is the unrestricted
 3    stock, and that's the stock that I'll primarily be
 4    focused on from here on.  This is that 24 percent of the
 5    outstanding shares.  These are the freetrading shares.
 6    And nearly all, if not all of it is controlled by
 7    Mr. Sexton and his associates.
 8         To conceal their ownership, um, this stock is
 9    transferred over into nominee shareholders, and each one
10    of those nominee shareholders, um, is less than a 5
11    percent shareholder, therefore disclosure requirements
12    are not there in the filing as to who these nominees are
13    or, more importantly, that these nominees are controlled
14    by Sexton and associates.
15         But prior to being able to get these shares in the
16    hands of investors, these shares have to be transferred
17    to brokerage accounts.  From brokerage accounts, there
18    is the marketing effort, and then the brokers are
19    selling these shares, um, not knowing that these shares
20    are controlled by Sexton's group.  And the investors are
21    buying these shares because of the promotion.
22         The, um, cash that's generated from these sales is
23    then -- it goes back to Mr. Sexton and his associates.
24    Q.   So then for OncoSec at least, Dr. Dhillon, the
25    sales that you've shown us in this diagram, when
```

A2484

```
 1   generally did those sales take place?
 2   A.    In 2011.
 3   Q.    And while those sales and the promotions were
 4   going on, did you keep track of what was going on in the
 5   public market for OncoSec shares?
 6   A.    Yes, generally yes.
 7   Q.    And during those promotions that were part of this
 8   scheme, what happened in the market?
 9         MS. FRITZ:  Objection, form.
10         THE COURT:  No, overruled.  He can tell us what he
11   would call it.
12   A.    Um, I, um, recall seeing an increase in the volume
13   and in the share price.  So as the marketing efforts
14   were instituted, you can see a corollary response in the
15   marketplace in terms of more volume and an increase in
16   share price.
17   Q.    Okay.  And when the promotional efforts by Sexton
18   and his associates stopped, what then happened in the
19   market?
20   A.    Um, the volume would, um, reduce and the share
21   price would often come down.
22   Q.    So just on this OncoSec transaction, did
23   Mr. Sexton ever identify anyone else other than the
24   people you've mentioned that he was working with on that
25   transaction?
```

A2485

```
 1          MS. FRITZ:  Objection.
 2          THE COURT:  No, she may have that.
 3   A.     I don't -- I don't specifically recall.  But I do
 4   recall a conversation that he had additional partners
 5   that were sharing in on the upside.
 6   Q.     And at the time of that conversation, did he give
 7   you the names of those additional partners?
 8          MS. FRITZ:  Objection, asked and answered.  He
 9   said he --
10          THE COURT:  No, overruled.  She may have it.
11   A.     He may have been.  I just don't remember.
12   Q.     So after this OncoSec --
13          MS. SHIELDS:  And I think we can take down the
14   demonstrative for right now.
15   Q.     After this OncoSec deal, did there come a time
16   when you did another deal with Mr. Sexton?
17   A.     While we were doing the OncoSec deal, um, one of
18   Mr. Sexton's associates spoke about a successful
19   promotional campaign that they had on a Stevia company
20   and they mentioned that the market would be receptive
21   to, um, another Stevia company.  I was intrigued by
22   Stevia and I offered to put together a business plan for
23   a private company that they could fund.
24   Q.     First off, what's "Stevia"?
25   A.     "Stevia" is a naturally-occurring substitute for
```

```
 1    sugar, it's low calorie.
 2    Q.    So did you have -- did you actually do what you
 3    had offered to do?
 4    A.    Um, yes.  The group was intrigued by my idea and,
 5    um, and we did end up taking a Stevia company public.
 6    Q.    And can you describe for the jury, please, did you
 7    reach some agreement with Mr. Sexton and others about
 8    taking that Stevia company public?
 9    A.    Yes, the deal was more or less similar to what we
10    had done in OncoSec, but it was a little more
11    complicated by, um, the way we organized the shares.
12    But overall, um, I started the private company, there
13    were, um -- they funded the private company.  We took
14    the private company public through a merger with the
15    shell company.  The shell company shares, as we saw on
16    the diagram, were divided up into the restricted and the
17    unrestricted.  Mr. Sexton and his associates, um,
18    control the, um, freetrading shares and then their
19    restricted shares were allocated with management, there
20    was a promotion and there was a liquidity.  But the
21    thing that was different in this here is that I was part
22    of the freetrading shares and they were part of the
23    restricted shares.  So there was, I'll call it,
24    "cross-pollination" on both sides of the initial block
25    of shares.
```

A2487

```
 1   Q.    And when you say you were "part of those shares,"
 2   what do you mean by that?
 3   A.    I was, um, going to receive a portion of the sales
 4   from those, um, freetrading stock.
 5   Q.    And did you receive a portion of those proceeds?
 6   A.    I did receive them.
 7   Q.    Okay.  So before we get into the details of the
 8   Stevia transaction, who were Mr. Sexton's associates
 9   when it came to the Stevia First transaction?
10   A.    The people I interacted with -- and again there
11   was additional partners, but the people, um, that I --
12   that I dealt with in the beginning of the transaction,
13   it was Mr. Sexton, um, Mr. Taylor, um, and Mr. Usein.
14   Those were my three primary contacts on the Stevia
15   transaction at that stage of the merger.
16   Q.    Okay.  And as the Stevia transaction -- how long
17   overall did the Stevia transactions last?
18   A.    It was, um, a much more complex transaction which
19   took place over multiple years.
20   Q.    And were there multiple phases to the Stevia
21   transactions?
22   A.    Yes, there was.
23   Q.    For today's purposes, is it okay if we call those
24   "rounds"?
25   A.    Certainly.
```

```
1   Q.    And how many rounds of transactions were there
2   with respect to Stevia First?
3   A.    There were four.
4   Q.    Okay.  And were the associates of Mr. Sexton the
5   same for all four rounds, to your knowledge?
6   A.    There were some changes over time.
7   Q.    Okay.  So how did the group of Mr. Sexton's
8   associates change over time?
9   A.    I, um, became aware that, um, Mr. Veldhuis was one
10  of the additional partners and, um, over time
11  Mr. Usein's role diminished.  And when I had meetings
12  with Mr. Sexton and Mr. Taylor, um, Mr. Mike Veldhuis
13  would come to those meetings.  So I was able to meet one
14  of the additional partners.  They had mentioned an
15  additional partner, um, but at that particular point I
16  didn't know his name.
17  Q.    Did you at some point learn his name?
18        MS. FRITZ:  Objection.
19        THE COURT:  Sustained, you're leading.
20  Q.    Were any other people part of the Stevia First
21  transaction?
22  A.    I was aware that there was an additional partner.
23  Q.    And who was that?
24  A.    I later learned that that was Mr. Jackson Friesen.
25  Q.    And how did you learn that Mr. Jackson Friesen was
```

```
 1    involved in this transaction?

 2    A.    In 2013, um, we did the, um, final transaction

 3    together with this group and those -- Arch was a smaller

 4    group.  And during that transaction, um, Mr. Friesen's

 5    name had come up multiple times.  And that's when I was

 6    able to, um, understand through my dialogue that

 7    Mr. Friesen had been a partner in this Stevia

 8    transaction prior to 2013.

 9    Q.    So let's, um -- I think we talked about that there

10    are four phases of Stevia First.  Let's talk first about

11    the first phase or Round 1 of those transactions.

12          So after the merger -- is it a reverse merger that

13    created Stevia First?

14    A.    Yes.

15    Q.    So after that reverse merger, when was it that

16    Stevia First became a public corporation?

17    A.    In 2012.

18    Q.    Okay.

19          MS. SHIELDS:  Can we put back up that

20    demonstrative exhibit again, please.

21          (On screen.)

22    Q.    Dr. Dhillon, this demonstrative that you walked

23    the jury through a little bit ago, does this diagram

24    also help you explain Round 1 of the Stevia First

25    transaction?
```

1    A.    Yes.

2    Q.    Okay.  Can you tell the jury how, using this

3    diagram, that Round 1 of the Stevia First transaction

4    happened?

5    A.    So the Round 1 refers to -- (Laughs.)

6    Q.    Oh, we can erase that.  Don't worry about it.

7    A.    The Round 1 refers to the unrestricted stock.  So

8    this entire block of shares was controlled by Mr. Sexton

9    and his associates.  Once again the company had -- the

10    shares had to be transferred into nominee shareholders

11    from the shell company shareholders in order for, um,

12    Mr. Sexton and his associates to be able to sell those

13    shares through entities that they controlled, and those

14    nominee shareholders put those shares into brokerage

15    accounts.  A promotion took place and the shares were

16    sold.  And the funds again then were allocated by

17    Mr. Sexton and his associates.

18    Q.    So this block of -- excuse me, this block of

19    unrestricted stock, about how many shares were in that

20    block?

21    A.    I believe it was 19.6 million shares.

22    Q.    And about what percentage of Stevia First stock

23    was that?

24    A.    That was approximately 37 percent.

25    Q.    And about how many different nominee companies did

```
 1   Sexton and his group use to hold that 37 percent of
 2   Stevia First stock?
 3   A.    Again I don't recall exactly the number of
 4   companies, but again, um, I understood the principle and
 5   the principle was to have -- um, to keep it under 5
 6   percent and have the appropriate number to make sure
 7   that we didn't pass over 5 percent.
 8   Q.    And what was the benefit to Mr. Sexton and his
 9   group of holding shares this way, in nominee companies
10   that each held under 5 percent?
11   A.    The overall benefit was to be able to sell
12   incognito.  But, um, basically under 5 percent, you
13   don't have a disclosure requirement as to who the
14   nominee is, um, and certainly you bypass having to
15   disclose who controls those nominee shareholders.
16   Q.    And do you know generally when in time the sales
17   of this 37 percent of Stevia First happened?
18   A.    It happened in the spring of 2012.
19   Q.    Okay.  So in the spring of 2012, did you keep in
20   touch with Mr. Sexton about the process of selling these
21   shares?
22   A.    Yes.
23   Q.    Describe for the jury please the kinds of
24   communications, what were you talking to him about?
25   A.    Um, we were mainly talking about, um, how large
```

A2492

1    that block was, which was 19.6 million, and, um, how

2    over a matter of a few months, um, that 19.6 million

3    shares was sold.  So, um -- and we talked about again

4    the effectiveness of the marketing campaign to be able

5    to buy those shares.  So, um, I believe it all happened

6    in a matter of three or four months.

7        So during those particular discussions, um, I was

8    kept abreast of where they were in selling them the

9    stock, the additional discussions centered around news

10   flow.  So certainly marketing efforts are better if

11   there is news flow from the company.  So they often talk

12   to me -- or they would talk to me during those

13   discussions about upcoming news flow so they could

14   coordinate the marketing efforts around that.

15   Q.    And when those marketing efforts were going on,

16   did you pay attention to what happened in the public

17   market for Stevia First stock?

18   A.    Yes.

19   Q.    And what happened?

20   A.    Again the volume would go up and the share price

21   would go up.

22   Q.    And what happened when the promotions stopped, to

23   the market, for Stevia First stock?

24   A.    The volume would go down and the share price

25   generally weakened.

```
 1    Q.    And did you have an interest in any of those
 2    unrestricted shares that Mr. Sexton and his group sold
 3    into the market?
 4    A.    I did.
 5    Q.    What was that interest?
 6    A.    My interest was roughly, um, 30 percent of --
 7    which I split with Mr. Taylor, approximately 60/40.
 8    Q.    Did you get -- how did you get -- let me just --
 9    the interest that you had, was that a financial
10    interest?
11    A.    Yes.
12    Q.    Okay.  So how did you get paid your share of these
13    proceeds?
14    A.    Once, um, Mr. Sexton and associates had funds that
15    were in the brokerage accounts, those funds were
16    transferred ultimately to Mr., um -- our portion, the 30
17    percent of the overall funds, um, was then transferred
18    over to Mr. Taylor's Singapore account, and then from
19    Mr. Taylor's account, I got 60 percent sent to my
20    offshore Singapore account.
21    Q.    Okay.  Do you know how or who did all of those
22    transfers to all of these accounts in Singapore?
23    A.    I don't know exactly who did them, but, um, my
24    dialogue about receiving my funds was with Mr. Taylor
25    and Mr. Sexton.
```

A2494

```
 1    Q.    Okay.  So when -- in order to get the money into
 2    your Singapore account, who do you talk to about that?
 3    A.    I talked to primarily Mr. Taylor and, um -- and
 4    often Mr. Sexton.
 5    Q.    Okay.  And you just don't know what they did in
 6    order to get that money into your account?
 7    A.    Correct, I don't know all the steps that were
 8    taken.
 9    Q.    Okay.  While you were engaged in this set of Round
10    1 transactions, did you understand that what you were
11    doing was not consistent with the law?
12    A.    I do.  I did.
13    Q.    And based on your discussions with Mr. Sexton, did
14    you communicate about whether what you were doing was
15    not consistent with the law?
16    A.    I don't recall having conversations about the
17    illegality, um, but I clearly went through an effort to
18    conceal my ownership and the funds.
19    Q.    Okay.  Did Mr. -- based on the nature of your
20    communications with Mr. Sexton, do you think he had an
21    understanding of the legal requirements that applied to
22    these transactions?
23    A.    Yes, certainly.
24    Q.    So after this Round 1 that we've looked at here,
25    um, did you have further dealings with Mr. Sexton and
```

A2495

1    Mr. Taylor and their associates in relation to Stevia

2    First?

3    A.    Um, I believe after this round, we moved on to

4    Round Number 2.

5    Q.    Okay.  So could you describe to the jury please

6    what happened as part of Round 2?

7    A.    Round 2, um, you don't necessarily see it on this

8    particular diagram, but the Round 2 is, um, where the

9    company, um, receives the funds, and in exchange for

10   receiving those funds, the company issues additional

11   shares.  So there was approximately 1.3 million shares

12   that were part of Round 2 that was issued to the, um,

13   entity that, um, provided the funding for Stevia First.

14   Q.    And who controlled the entity that provided the

15   funding?

16   A.    It was Mr. Sexton and his associates.

17   Q.    And who controlled the company that got the shares

18   as a result of that funding?

19   A.    Mr. Sexton and his associates.

20   Q.    And at this point in time who are Mr. Sexton's

21   associates?

22   A.    At this particular point, um, and again I

23   understand there are several partners, um, but the ones

24   that I'm interacting with are Mr. Sexton, um,

25   Mr. Veldhuis, um, and Mr. Taylor.

A2496

```
 1    Q.    Is Mr. Friesen one of the associates that's
 2    involved in this transaction?
 3          MS. FRITZ:  Objection.
 4          THE COURT:  Sustained, you're leading the witness.
 5    Q.    Who else was involved in this transaction?
 6          MS. FRITZ:  Objection.
 7          THE COURT:  The jury's watching.
 8          MS. FRITZ:  Okay.
 9          THE COURT:  That comment's stricken.
10    A.    Okay.
11    Q.    Who else, sir, was involved in this transaction?
12    A.    I know that there's another partner.  Again I'm
13    not exactly sure.  I know in 2013, like you said, um,
14    you know I was, um -- I became aware of who that partner
15    was, um, and during the sales of the second round, um, I
16    believe that may have happened in 2013.  But certainly
17    while we were selling those shares, I don't recall
18    making the connection of Mr. Friesen to the Stevia First
19    transaction.
20    Q.    Okay.  So when did those -- so once the shares
21    were issued to the entity controlled by Mr. Sexton and
22    his group, what happened to those shares next?
23    A.    Those shares were ultimately sold into the
24    marketplace.
25    Q.    And do you remember when those sales happened?
```

A2497

```
1    A.    I think it was 2013.  I'm not exactly sure.
2    Q.    Did you have a financial interest in those 1.3
3    million shares that were sold into the marketplace?
4    A.    Yes.
5    Q.    And what was your financial interest in those
6    shares?
7    A.    Um, I don't recall exactly.  I was going to
8    receive some of the upside.  I believe it was roughly
9    about the 30 percent.  And again, Mr. Taylor and I were
10   going to split that 60/40.
11   Q.    How did you receive your share of these sales
12   proceeds?
13   A.    I received it as, um, actual cash.
14   Q.    How did that happen?
15   A.    Mr. Sexton personally delivered cash to me, um, at
16   the -- usually at a restaurant.
17   Q.    Can you describe for the jury a little bit about
18   how that happened?
19   A.    So, um, once those shares were sold, um, I was in
20   communication with the, um, with Mr. Sexton about
21   receiving some of the funds, and Mr. Sexton offered and
22   said, "Would you like to receive them in cash?"  And I
23   said, "Certainly."  And Mr. Sexton lives in Vancouver.
24   So I said the next time I would be in Vancouver, I could
25   receive the funds from him directly, and he was willing
```

A2498

1    to do that.  So I met with him and he literally brought

2    I think close to $30,000 on one time, um, in a paper

3    bag, and handed it to me.

4    Q.    Why did you want your share of the proceeds in

5    cash?

6    A.    To hide it, um, you know, to be able to not to

7    have to disclose where that money came from.

8    Q.    Where did the rest of the proceeds of those sales

9    go?

10    A.    They were distributed among the remaining

11    associates or partners.

12    Q.    So was that the end of Round 2?

13    A.    Yes.

14    Q.    Okay.  Was there another round after that?

15    A.    After that, um, there was a Round 3.

16    Q.    Okay.  And when -- so let's just start with --

17    generally give us an overview of what happened as part

18    of Round 3 and then we'll break it down.

19    A.    Sure.  Round 3 consisted of a block of restricted

20    shares and, um, and Round 3 was centered around being

21    able to sell those restricted shares.

22    Q.    Okay.  Who controlled, at the start, those

23    restricted shares?

24    A.    There was primarily like three blocks of those

25    restricted shares.

```
1    Q.    Where did they all start?

2    A.    They all started from the shell company, um, so

3    those restricted shares were allocated, um, at the time

4    of the -- of the merger.

5    Q.    Okay.  I'm going to show you a document we've

6    marked as Exhibit D for identification.  (On screen.)

7    And, Dr. Dhillon, just page through this document, it's

8    somewhat lengthy, and let me know when you're ready.

9    A.    (Looks.)  I'm ready.

10   Q.    Okay.  Do you recognize this document we've marked

11   as Exhibit D?

12   A.    I do.

13   Q.    And generally what is it?

14   A.    Um --

15         THE COURT:  I don't know what means, "generally

16   what is it?"  Just ask him what is it.

17   A.    I guess there's a few components to the document,

18   but what we're looking at is the original share

19   certificate, um, that was issued to me, and this is the

20   beginning of the, um, the allocation of the restricted

21   shares to a number of parties.  So the document refers

22   to the allocation of the restricted shares to a group of

23   entities which ultimately would go out and sell those

24   shares.

25         MS. SHIELDS:  I move the admission of Exhibit D
```

1    into evidence.

2         THE COURT:  No objection?

3         MS. PICKETT:  No objection.

4         MS. FRITZ:  No objection.

5         THE COURT:  What's the next number?

6         MS. SHIELDS:  8, your Honor.

7         THE COURT:  8.

8         To save time they have agreed you may look at

9    certain things.  The fact that they agree simply means

10   you may look at them.  It doesn't mean you believe them

11   or disbelieve them or believe them in part.  Here now

12   I'm admitting this in evidence.  Again it's going to be

13   a document that you'll have with you in the jury room.

14   You may believe it, disbelieve it, believe it in part.

15        Exhibit 8 in evidence.

16        (Exhibit 8, marked.)

17        MS. SHIELDS:  May we publish it to the jury?

18        THE COURT:  It may be.

19   Q.   So, Dr. Dhillon, let's just walk through some of

20   the components of this document.

21        The document that's on Page 1, what is that?

22   A.   It's a share certificate for 4.5 million shares

23   issued to myself.

24   Q.   Okay.  And what company -- what company's shares

25   are these?

1    A.    This is the shell company, um, the name of the

2    company is "Legend Mining, Inc."

3    Q.    Okay.  What's the relationship between Legend

4    Mining, Inc. and Stevia First?

5    A.    This is, um, the public entity that, um, Stevia

6    First reverse-merges into.

7    Q.    So are these -- after the merger, are these

8    effectively Stevia First shares?

9    A.    Correct.

10   Q.    And how many shares are represented in this

11   certificate?

12   A.    4.5 million.

13   Q.    Okay.  After the reverse merger, how many shares

14   of Stevia First does this represent?

15   A.    It would represent the same amount, but we did do

16   a stock split to increase that number.

17   Q.    So how many -- after the stock split then, how

18   many shares of Stevia First are represented by this

19   stock certificate?

20   A.    We increased it by 7 times to bring it up to 31.5

21   million shares.

22   Q.    Okay.

23       MS. SHIELDS:  So if you go to the next page of the

24   exhibit.

25       (On screen.)

```
 1    Q.    What's that?

 2    A.    That's the back of this stock certificate.

 3    Q.    Okay.  And so to Page 3, please.  Is that your

 4    signature on it, sir?

 5    A.    It is.

 6    Q.    And to Page 3, please.  (On screen.)  Okay.

 7    What's this?

 8    A.    This is a letter to Island Stock Transfer.

 9    Q.    And who is the letter from?

10    A.    From Jasmin Santos, um, she was my assistant at

11    that time.

12    Q.    And is this a letter -- did you ask Ms. Santos to

13    send this to Island Stock Transfer?

14    A.    Yes, I authorized her to send it.

15    Q.    Okay.  What is -- what or who is Island Stock

16    Transfer?

17    A.    This is, um, a transfer company, um, where stock

18    certificates, um, are issued and split, um, so it's a --

19    it's a stock transfer agency.

20    Q.    And was Island Stock the stock transfer agency for

21    Stevia First at that time?

22    A.    Correct.

23    Q.    Okay.  If you could --

24          MS. SHIELDS:  Alyssa, could you blow up the

25    paragraph that's right under the four bullet-pointed
```

A2503

```
 1    numbers.

 2         (On screen.)

 3    Q.    Okay.  Dr. Dhillon, do you see that paragraph

 4    here?

 5    A.    I do.

 6    Q.    Okay.  Can you read it for the jury please.

 7    A.    It says "Please cancel stock certificate 1030 and

 8    issue new stock certificates to the individuals or

 9    entities listed on the schedule.  These shares were sold

10    in a private sale to individuals and companies described

11    on the schedule below.  Note that a new certificate for

12    the remaining 5.150 million shares of Stevia First

13    corporation will be reissued to Avtar Dhillon."

14    Q.    Okay.  And is that Stock Certificate 1030 the one

15    we just looked at, the one for $4,500,000 shares?

16    A.    Yeah, I believe so.

17    Q.    Okay.  So, um, the schedule attached -- so can you

18    describe for the jury basically what's -- what is this

19    request that you're making to Island Stock Transfer?

20    A.    This is the first stage of being able to split

21    those restricted shares into new entities.

22    Q.    Okay.  And who decided how to split those shares

23    up?

24    A.    Um, it was largely by myself, um, in conjunction

25    with Mr. Sexton and Mr. Taylor.
```

```
 1   Q.    Okay.  So let's look now at the schedule that's
 2   the next page of this document.  (On screen.)
 3         MS. SHIELDS:  Actually can you -- there's a couple
 4   more lines there.  Can you get the whole thing?
 5         (On screen.)
 6   Q.    All right.  Can you see that, Dr. Dhillon?
 7   A.    I can, yes.
 8   Q.    Okay.  So what does this schedule list?
 9   A.    This, um, is, um, a reflection of how the 31.5
10   million shares were allocated to different entities.
11   Q.    Okay.  And so I think you said earlier there were
12   three blocks of shares?
13   A.    Correct.
14   Q.    Can you describe for the jury please how the three
15   blocks are shown in this schedule?
16   A.    The first group, um, is individuals that are
17   associated with the private entity, um, including the
18   CEO, Mr. Brooke, um, starting with Ocean Park and going
19   down to Mill Work.
20   Q.    Can you read the names of the people you're
21   talking about just so we're all on the same page.
22   A.    So the second block here is Ocean Park Parma
23   Institute, Ashborough Holdings, Bay View Equities, um,
24   New Market Traders, Conmar Capital, Inc., and Mill Work
25   Trading, at the second block.
```

A2505

```
 1    Q.    And how do you describe that second block?

 2    A.    This is a block that's controlled by Mr. Sexton

 3    and his associates.

 4    Q.    And how do you know that?

 5    A.    That's what's part of our original discussion,

 6    that, um, Mr. Sexton would be bringing forward a number

 7    of entities for the allocation of the restricted shares.

 8    Q.    Okay.  All of those entities next to them in the

 9    address column, would you tell the jury what that says

10    please?

11    A.    The -- on the address column it says "Care of

12    Celtic Consultants, LLC, Attention Courtney Kelln," and

13    then the street address.

14    Q.    At the time you were sending these, um -- at the

15    time you were making these transfers happen, did you

16    know who Courtney Kelln was?

17    A.    I did not.

18    Q.    Did you know who Celtic Consultants was?

19    A.    I did not.

20    Q.    Did you know how Mr. Sexton and his associates

21    were able to control all of these companies?

22    A.    I knew they, um, controlled them and I knew they

23    controlled the, um, the entities and therefore the

24    shares, and I knew, um, they were going to be selling

25    those particular shares.  The exact steps, um, that they
```

A2506

```
 1    were going to be taking to sell those shares, um, wasn't
 2    something I paid a lot of attention to.
 3    Q.   Okay.  So then there are -- so we've talked about
 4    the first group, this is the second group.  Describe for
 5    the jury please the third group?
 6    A.   The final group is the, um, a group controlled by
 7    Mr. Taylor, um, Heng Hong Limited is an entity that he
 8    controlled, and Mr. Hsien Loong was an individual that,
 9    um, was holding those shares on his behalf.  So the last
10    block is a block of two entities controlled by
11    Mr. Graham Taylor.
12    Q.   And how did you know that Mr. Taylor controlled
13    the shares held by Heng Hong and Hsien Loong Wong?
14    A.   Yeah, he was, um, part of the discussion on how we
15    were going to allocate, and he indicated that he would
16    be taking his 4.2 million or so shares and putting it
17    into these two entities.
18         MS. SHIELDS:  Can you turn please to Page 40 of
19    the document please.
20         (On screen.)
21    Q.   And, Dr. Dhillon, can you see that page?
22    A.   Yes, okay.
23    Q.   Okay.  What's that page?
24    A.   It's a 2.4 million shares being allocated to
25    Conmar Capital.
```

A2507

```
 1    Q.    And who controlled Conmar Capital?

 2          MS. FRITZ:  Objection.

 3          THE COURT:  Sustained, on that foundation.

 4    Q.    Was that -- was Conmar Capital one of the

 5    companies that was just on that list we just saw, the

 6    schedule?

 7    A.    Yes.

 8    Q.    And when we talked about the schedule, who did you

 9    tell us controlled Conmar Capital?

10    A.    It was part of Sexton's group.

11    Q.    The shares that were transferred --

12          MS. SHIELDS:  Can we go back to the schedule,

13    please, I think it's Page 3.

14          (On screen.)

15    Q.    So, Dr. Dhillon, all of these shares that are

16    being transferred in -- that are on this list, are these

17    restricted shares or unrestricted shares?

18    A.    These are restricted shares.

19    Q.    And so could these shares be sold directly into

20    the public markets?

21    A.    No.

22    Q.    What had to happen in order for these shares to be

23    sold into the public markets?

24    A.    They had to be either registered or ultimately

25    transferred into, um, nonaffiliate accounts and traded
```

A2508

1    through something called Rule 144.

2    Q.    Okay.  Did that happen?

3    A.    Yes, it did.

4    Q.    Do you know how that happened?

5    A.    I know in general the steps that were taken,

6    including the first, the allocation, and then

7    subsequent, you know, the transfer into entities as per

8    that diagram we showed, um, where there's nominees, um,

9    and then ultimately they went into brokerage accounts,

10   and then the proceeds from those sales were ultimately

11   coming back to Sexton and his associates and then being

12   allocated.  And, um, I knew that whole loop was taking

13   place because I was going to be a recipient of some of

14   the proceeds.

15   Q.    So who took care of all of the -- when you -- the

16   things that you just described as that, whose

17   responsibility were all of those transfers?

18   A.    So my primary contact, um, again was Mr. Sexton or

19   Mr. Taylor, um, I could reach out to them and they would

20   provide and, um -- and, um -- so during that time they

21   would describe where they were in the process.  But as

22   far as who was actually executing each of the individual

23   steps?  Um, I didn't really pay attention, um, if they

24   told me.

25   Q.    Okay.  So at some point in time did you start

```
 1   having discussions with Mr. Sexton about selling these
 2   shares?
 3   A.    Yes, we had multiple discussions, um, pretty well
 4   since their inception, but, um, the, um, selling
 5   discussions started materializing in about 2014 where we
 6   decided that it was time for these shares to be sold.
 7   Q.    Okay.  And did you have a financial interest in
 8   this group of shares that was going to be sold?
 9   A.    Yes.
10   Q.    And what was that financial interest?
11   A.    So, um, in, um, as part of Mr. Sexton's total
12   number of shares, it was approximately in that middle
13   group of about 15.7 million shares, and out of that 15
14   million shares, I was going to receive the proceeds of
15   approximately 1 million shares.
16   Q.    Okay.  And so, um, when did those sales begin?
17   A.    I believe those shares, um, were sold in 2015 and
18   2016.
19   Q.    Okay.  Did you have any discussions with
20   Mr. Sexton about activities to accompany those sales?
21        MS. FRITZ:  Objection.
22        THE COURT:  Sustained, you're leading the witness.
23        MS. SHIELDS:  Okay.
24   Q.    In advance of those sales happening, did you have
25   any discussions with Mr. Sexton?
```

A2510

```
1    A.    I did.  We talked about --

2    Q.    What did you talk about?

3    A.    We talked about, um, news flow and that they were

4    going to be starting a promotional campaign.  So, um,

5    they were very much interested in what kind of news flow

6    was going to be coming from the company.

7         MS. SHIELDS:  Could you take this exhibit down

8    please and put up Exhibit HX.

9         (On screen.)

10        THE COURT:  Just for the witness?

11        MS. SHIELDS:  Just for the witness, yes.

12        THE COURT:  HX.

13   Q.    Dr. Dhillon, I'm showing you Exhibit HX.  Do you

14   recognize this document?

15   A.    I do.

16   Q.    What is it?

17   A.    It's a, um, e-mail communication primarily between

18   Mr. Robert Brooke, who was the CEO, and Mr. Paul Sexton,

19   and at the -- I forwarded that particular dialogue

20   through the e-mail, um, by Mr. Brooke.

21   Q.    Okay.

22        MS. SHIELDS:  I move the admission of Exhibit HX

23   into evidence.

24        THE COURT:  Subject to our discussion it's

25   admitted and your rights are saved to the defense,
```

A2511

1    Exhibit 9 in evidence.

2         (Exhibit 9, marked.)

3         MS. SHIELDS:  May it be published for the jury?

4         THE COURT:  It may be.

5    Q.    So, Dr. Dhillon, I'd like to draw your attention

6    to the, um, to the sort of the third, fourth, and fifth

7    messages down on that page.  (On screen.)

8         MS. SHIELDS:  Actually can you include the one

9    right above that too.  (On screen.)  Thanks so much.

10   Q.    All right.  So, Dr. Dhillon, what is Mr. Sexton

11   asking for in these messages?

12        MS. FRITZ:  Objection.

13        THE COURT:  It's sustained, the document speaks

14   for itself.

15   Q.    Did you have an understanding about what

16   Mr. Sexton is asking for in these messages?

17        MS. FRITZ:  Objection.

18        THE COURT:  Sustained, the document speaks for

19   itself.

20        MS. SHIELDS:  Okay.

21   Q.    Dr. Dhillon, would you please read for the jury

22   the message from Paul Sexton that's dated Tuesday,

23   December 8th, 2015 at 12:55 p.m.

24   A.    It says "Actually what we really need is a current

25   shareholder list to understand where all the stock is

A2512

```
 1    situated."

 2    Q.    And then would you read for the jury please the

 3    message too above that.

 4    A.    (Silence.)

 5    Q.    Yeah, above that one, the one at 3:03 p.m.

 6    A.    "Actually what we're looking for is the list from

 7    the transfer agent."

 8    Q.    Okay.  Do you have an understanding about why

 9    Mr. Sexton was asking for these documents?

10    A.    Yes.

11    Q.    And what is that understanding?

12    A.    He, um, wanted to get a shareholder list, um, he

13    wanted to, um, see who the shareholders were and how

14    much they owned.

15    Q.    And in terms of level of sensitivity, how

16    sensitive was this information?

17          MS. FRITZ:  Objection.

18          THE COURT:  Sustained, on that foundation.

19          MS. SHIELDS:  Okay.

20    Q.    What was your role at Stevia First at the time?

21    A.    I was the Chairman of the Board of Directors.

22    Q.    Okay.  How did you feel about sharing this

23    information with Mr. Sexton?

24          MS. FRITZ:  Objection.

25          THE COURT:  No, you may answer.
```

A2513

```
 1   A.    Um, it is, um -- it is the shareholder
 2   information, it has shareholder contact information, it
 3   is something that, um, I wouldn't want in public hands.
 4   Q.    Were you comfortable sharing it with Mr. Sexton?
 5   A.    Personally, um, because it was Mr. Sexton, um, I
 6   was okay with it being shared.
 7   Q.    And why was that?
 8   A.    Because it was, um, important to our relationship
 9   at that time that, um, I obliged to his request.
10   Q.    Did you receive a share in any of the proceeds of
11   these Round 3 sales?
12   A.    I did.
13   Q.    And would you describe for the jury what your
14   share was?
15   A.    Um, my share in the first round was 60 percent of
16   30 percent, and then in Round 2 I believe it was the
17   same 60 percent of 30 percent of those proceeds.  In the
18   third round it was, um, the amount of money generated by
19   selling approximately 1 million shares of the 15.75.
20   Q.    So after the sale of those shares in Round 4, were
21   there -- was there a round after that?
22   A.    After?
23   Q.    After the -- we just talked about Round 3.  Was
24   there a round after that?
25   A.    Yes, there was a Round 4.
```

A2514

```
 1    Q.    Okay.  So would you describe for the jury please
 2    what transactions were part of Round 4?
 3          MS. SHIELDS:  And we can take this down now.
 4    Thank you.
 5    A.    After these three rounds, um, the Stevia business
 6    was failing, um, we weren't able to develop this Stevia
 7    product to the extent that we were expecting, um, but we
 8    did make some scientific discoveries, um, that was
 9    relevant to cannabinoids, to being able to put sugar
10    molecules to cannabinoids.  We were looking to -- we saw
11    that there was an opportunity to develop these
12    particular molecules for medical ailments like
13    inflammatory bowel disease, but in order to be able to
14    do that, we needed funds.  So, um, we were looking for
15    funds, and that led to Round 4 by Mr. Sexton and his
16    associates.
17    Q.    Okay.  And who were Mr. Sexton's associates that
18    were involved in Round 4?
19    A.    I was interacting with, um, Mr. Sexton, um, and
20    Mr. -- and Mr. Veldhuis, um, primarily as a -- for the
21    Round 4.
22    Q.    Okay.  And were you aware of whether there were
23    any other individuals involved in Round 4?
24          MS. FRITZ:  Objection.
25          THE COURT:  He may answer "Yes" or "No."
```

A2515

```
 1    A.    Yes.
 2    Q.    And who were you aware were the other --
 3          THE COURT:  How did you become aware?  Excuse me.
 4    Q.    How did you become aware?
 5    A.    In my discussions with Mr. Sexton and
 6    Mr. Veldhuis, they mentioned they were going to be
 7    bringing in other partners into that particular round,
 8    um, and one of the names they mentioned was Mr. Jackson
 9    Friesen.
10    Q.    Okay.  So what agreement did you reach with
11    Mr. Sexton and his partners in terms of this Round 4
12    transaction?
13    A.    They were going to provide the funding, um, and
14    since the business plan was changing, there were a
15    number of other parameters that we had to -- that we
16    discussed as part of this particular financing.  It was
17    no longer a merger, but it was a restructuring of the
18    company.
19    Q.    So what were those other parameters?
20    A.    The other parameters were to, um, do a roll-back.
21    So previously we had to do a forward split, but now we
22    rolled back the shares 10 times, so 10 shares per 1.  We
23    ultimately changed the name of the company from Stevia
24    to Vitality.  We had a stock symbol changed as well.
25    Q.    And what was that stock symbol change?
```

A2516

```
 1   A.    It became "VBIO," um, and the company name changed
 2   to "Vitality."
 3   Q.    And what had it been before?
 4   A.    Stevia First.
 5   Q.    And what was the stock symbol that it had before?
 6   A.    The prior stock symbol was STVF.
 7   Q.    Okay.  You said there was a roll-back or reverse
 8   stock split?
 9   A.    Yes.
10   Q.    Um, what was the purpose of having a reverse stock
11   split as part of this transaction?
12   A.    To reduce the number of shares outstanding.
13   Q.    And why was that important?
14   A.    It allowed Mr. Sexton and his group to have
15   control over the -- over the shares.
16   Q.    And how is that?
17   A.    By --
18   Q.    How does that work?
19   A.    By them investing into the company, they were
20   issued, um, the larger block of shares relative to the
21   number of shares that were going to remain after the
22   roll-back, and their position increased incrementally
23   because as part of the financing they received, um,
24   warrants that could, um, that they could exercise and
25   increase their position.
```

A2517

```
 1    Q.    Just so the jury understands, what's a "warrant"?
 2    A.    A "warrant" is a right to be able to buy more
 3    shares at a fixed price.
 4    Q.    So did this transaction actually happen?
 5    A.    It did.
 6    Q.    And when did it happen?
 7    A.    In 2016.
 8    Q.    So once this transaction happened, roughly what
 9    percentage of now Vitality did Sexton and his group
10    control?
11    A.    On a fully-dilated basis, um, I can't remember the
12    exact number, but, um, it was -- it was quite high.
13    Q.    And how did Mr. Sexton and his group control those
14    shares?
15    A.    Through the entities that they controlled.
16    Q.    Do you remember any of the names of those
17    entities?
18    A.    I don't remember the names of the entities, no.
19    Q.    Okay.  Do you remember how many of those entities
20    there were?
21    A.    I don't remember the number either, no.
22    Q.    Okay.  How much of Vitality's stock did any of
23    those entities own?
24    A.    The process was, um, the same and we obviously had
25    gone through it in '11, '12, '13, and in '16, it was a
```

A2518

```
 1    placement, and, um, I had -- and they were going to do
 2    exactly the same thing and keep those shares in a number
 3    of entities under 5 percent, um, so they wouldn't need
 4    to provide disclosure on who the beneficial owner was.
 5    Q.    And those shares that they got as part of this
 6    transaction -- the shares that Sexton and his group got
 7    as part of this transaction, were those restricted
 8    shares or unrestricted shares?
 9    A.    Those were restricted shares.
10    Q.    So what happened -- or did those shares at some
11    point get those restricted legends removed?
12    A.    We first tried to file registration statements to
13    register those shares, and that was taking too long, so
14    Mr. Sexton and his associates ended up selling those
15    shares ultimately under Rule 144.
16    Q.    And "Rule 144," what's that?
17    A.    It basically allows you to be able to sell, um, a
18    certain number of your shares after a certain holding
19    period.  I believe it's usually 6 months.  And, um,
20    those shares, um, need to be nonaffiliate shares or
21    noncontrol, um, something that they obviously hid and
22    didn't disclose that it was a controlling block because
23    of the nominee.  And by having it in those nominee
24    accounts, they were able to have it under 5 percent and
25    use Rule 144 after a certain holding period to be able
```

A2519

1    to sell those.

2    Q.    If all the shares had been held in a single

3    nominee, what would have happened?

4    A.    They would have been restricted.

5    Q.    I'm showing you --

6         MS. SHIELDS:  Can you pull up what we've marked as

7    Exhibit IQ, just for identification.

8         (On screen.)

9    Q.    Dr. Dhillon, do you recognize this document that

10   we've marked as IQ?

11   A.    I do.

12   Q.    And what is it?

13   A.    It's an e-mail exchange between the CEO,

14   Mr. Robert Brooke, and Mr. Veldhuis and Mr. Sexton,

15   about the financing and particularly the urgency in

16   receiving some of the money associated with that funding

17   and why it was urgent.

18        MS. SHIELDS:  I move the admission of Exhibit IQ

19   into evidence.

20        MS. FRITZ:  No objection.

21        MS. PICKETT:  No objection.

22        THE COURT:  Received, it would be Exhibit Number

23   10.

24        MS. SHIELDS:  And may it be published to the jury,

25   your Honor?

A2520

```
 1          THE COURT:  It may be.
 2          (Exhibit 10, marked.)
 3   Q.     Dr. Dhillon, I'm going to direct your attention
 4   first to the bottom e-mail message that's part of
 5   Exhibit 10.  Do you see that?
 6   A.     I do.
 7   Q.     Okay.  The "Paul" and "Mike" to whom this message
 8   is addressed to, who are those individuals?
 9   A.     That's Mr. Paul Sexton and Mr. Mike Veldhuis.
10   Q.     And, um, who is this message from?
11   A.     This is from, um, Robert Brooke, the CEO.
12   Q.     And if you look down there are some tick marks
13   that describe costs.  Do you see that?
14   A.     Yes.
15   Q.     Okay.  Do you -- the third one down, can you read
16   that to the jury please.
17   A.     "OTC markets, we have to pay $10,000 to them or
18   else we get kicked off the OTC QB on 7-29."
19   Q.     And what's "OTC markets"?
20   A.     That's the OTC bulletin board stock exchange.
21   Q.     And then, um, the last tick mark, can you read
22   that for the jury, please.
23   A.     "Edgarizer slash filer, we owe $7,000, and
24   probably at least 5,000 payment needed for filling the
25   registration statement."
```

A2521

```
 1    Q.    What's "Edgarizer/Filer"?
 2    A.    That's, um, converting the registration statement
 3    into electronic form and making it available to
 4    shareholders.
 5    Q.    Was there actually a registration statement filed?
 6    A.    There was a registration statement filed, but it
 7    was never approved by the SEC.
 8    Q.    Okay.
 9          MS. SHIELDS:  If you go up, um, a couple of
10    messages -- let's see.  Actually, um, one more please.
11    And then actually just the top two messages please.
12          (On screen.)
13          MS. SHIELDS:  Thank you.
14    Q.    So, Dr. Dhillon, who is communicating in these
15    messages?
16    A.    This is a communication between the CEO, Robert
17    Brooke, and myself.
18    Q.    And what are you talking about?
19    A.    This is, um, a meeting that's to take place
20    between Mr. Brooke and, um, Mr. Sexton and others, and
21    we're communicating about his meeting, um, and the fact
22    that I may be meeting with Mr. Sexton as well.  And then
23    there is also a discussion about what the status is in
24    terms of, um, being able to do the symbol change for the
25    public entity.
```

A2522

```
 1    Q.    Okay.  Did you have this meeting with Mr. Sexton
 2    that's referred to in the message?
 3    A.    I did.
 4    Q.    And what did you talk about with Mr. Sexton in
 5    that meeting?
 6    A.    We talked about, um, the timing of the completion
 7    of the rest of the financing, they hadn't been, um,
 8    circulating, um, that small amount of money, um, and we
 9    needed additional funds to be able to execute on the
10    business plan.  We talked about, um, that they would be,
11    um, instituting, um, a marketing or promotional plan.
12    And we talked about a potential upcoming news flow.
13    Q.    Okay.  So at some point in time, um, were these
14    shares that were part of Round 4 sold into the market?
15    A.    Yes, they were.
16    Q.    And who was responsible for doing that selling?
17    A.    It was Mr. Sexton and his partners.
18    Q.    And when were those shares sold into the market?
19    A.    They were, um, sold, I believe, in 2017 and maybe
20    even '18.  But certainly after -- after the completion
21    of the financing in the middle of 2016.
22    Q.    And did you have any discussions with Mr. Sexton
23    or anyone else while those sales were taking place?
24    A.    I didn't.  At that particular point I was quite
25    busy with my other venture firm, um, so my dialogues
```

A2523

```
 1    were less frequent.  But certainly they were liquidating

 2    quite a bit of shares and they were interested in news

 3    flow and I was still the Chairman and I had influence

 4    over the company, so we maintained regular contact about

 5    where they were in terms of them being able to liquidate

 6    their position.

 7    Q.    And overall, from all four rounds of these Stevia

 8    First/Vitality transactions, how much money did you make

 9    out of the proceeds of the stock sales?

10    A.    Um, it was somewhere between 2.6 -- yeah, 2.6

11    million to 3 million or something like that.

12    Q.    And how did you receive your share of those

13    proceeds?

14    A.    The original 2.6 million I received it through,

15    um, Mr. Taylor.

16    Q.    And how about the rest?

17    A.    The Round 2 I received in cash.  Um, Round -- I'm

18    sorry, Round 2 I received in cash.  Round 3, I received

19    some of those monies through Mr. Sexton.

20    Q.    And when you say you received some of those monies

21    through Mr. Sexton, did you get the money personally?

22    A.    Sometimes.  But, um, most of the time it was

23    through, um, one of my designees.

24    Q.    What do you mean by that?

25    A.    Somebody that I would tell Mr. Sexton or
```

```
 1   Mr. Taylor to send the money to.
 2   Q.    And why did you have money sent to your designees?
 3   A.    Um, to try to create a layer of separation between
 4   that money and myself.
 5   Q.    And where did the rest of the proceeds go that
 6   didn't go to you?
 7   A.    Just a number of designees that, um, I either owed
 8   money to or I had some sort of a business relationship
 9   that required some funding.
10   Q.    Okay.  What I meant was the share of the overall
11   proceeds that didn't go to you, did you have an
12   agreement to whom those proceeds were going?
13   A.    Yeah, the rest of the proceeds -- you know I got
14   my share, but the rest of them went to Mr. Sexton and
15   his partners.
16   Q.    Okay, so we've talked here today about OncoSec
17   transactions, about Stevia First Vitality transactions.
18   Were you involved with Mr. Sexton and his associates in
19   any other transactions?
20   A.    Yes, in Arch Therapeutics.
21   Q.    Okay.  And what was your role at Arch
22   Therapeutics?
23   A.    I was the Chairman of the Board of Directors of
24   Arch Therapeutics.
25   Q.    And in general terms, what kind of company was
```

```
 1    Arch?
 2    A.    It's a company that, um, focused on hemostasis,
 3    basically stopping bleeding through a protein polymer.
 4    Q.    And how did it come to be that you worked with
 5    Sexton and his group in relation to Arch?
 6    A.    I knew the CEO and the CEO was interested in
 7    financing, so he approached me and asked me if I could
 8    help him finance his private company.
 9    Q.    And so what you do then?
10    A.    I ended up, um, making an introduction to
11    Mr. Sexton, um, and the CEO ultimately agreed to the
12    same kind of transaction, a merger of his private
13    company into a shell company that was controlled by, um,
14    Mr. Sexton, although the CEO didn't know the controller.
15    Q.    So how did -- what was your role in these
16    discussions that set up this transaction?
17    A.    Um, my role was to facilitate.  I knew Mr. Sexton
18    and I knew what he was going to be doing, um, I knew the
19    CEO, and I knew that he needed funds.  So as always, the
20    CEO was willing to go public.  I was going to help
21    Mr. Sexton, um, or facilitate Mr. Sexton and the CEO,
22    um, through the merger.
23    Q.    Okay.  And did the merger happen?
24    A.    It did.
25    Q.    And what was the -- who was the surviving company
```

A2526

```
 1    out of that merger?

 2    A.    The surviving company was Arch Therapeutics.

 3    Q.    And when did that merger take place?

 4    A.    In 2013.

 5    Q.    And after, did you, um -- do you know what

 6    agreements were reached as part of this Arch

 7    Therapeutics transaction?

 8    A.    There was a -- the visible components, um, the

 9    visible component was Arch Therapeutics was going to

10    receive approximately 1.75 million on the investment,

11    um, and I -- the nonvisible part of the financing was I

12    was going to participate for 250,000 of it, um, known to

13    the company.  The, um, the other visible component was

14    that Arch Therapeutics was merging with a shell company.

15    The shell company was going to allocate the restricted

16    shares to its management in which I was part of as the

17    Chairman of the Board.  And then the, um, unrestricted

18    shares or the freetrading shares was, um, controlled by

19    Mr. Sexton and his associates, um, because they were

20    primarily visible as through the nominee shareholders.

21    It wasn't visible to anybody who the control group was

22    of the unrestricted shares.  And, um, and again the, um,

23    the additional component that I was aware of, um, was

24    that Mr. Sexton and his associates would be paying for a

25    campaign independent of the company to create liquidity
```

```
 1   so that they can sell their unregistered shares.
 2   Q.    So, sir, the diagram we looked at earlier in
 3   relation to OncoSec and Round 1 --
 4         MS. SHIELDS:  Could you call that back up please.
 5         (On screen.)
 6   Q.    Okay.  Does this diagram help you describe the
 7   Arch transaction as you've described it to the jury?
 8   A.    Yes, it does, and we took the company public.  The
 9   restricted shares were divided up primarily between the
10   CEO and myself, there were approximately 20 million
11   shares, and the unrestricted shares were in the hands of
12   Mr. Sexton and his associates.  And they ended up
13   executing on exactly this same methodology, um, get the
14   unrestricted shares into accounts, then order brokers, a
15   promotional campaign, um, and get the shares into the
16   hands of the investors and the cash into their hands,
17   and then split the upside amongst their partners.
18   Q.    And so for this Arch transaction, who were
19   Mr. Sexton's associates who were involved?
20   A.    It was, um, Mr. Sexton, Mr. Veldhuis, and
21   Mr. Jackson Friesen.
22   Q.    And what -- how many of those unrestricted shares
23   of Arch did their group control?
24   A.    They controlled, um, initially about 16.7.  I
25   think it went up to, um, about 19 million shares.
```

A2528

```
 1   Q.    And roughly what percentage of Arch's stock was
 2   that unrestricted stock?
 3   A.    At 16.7 it was about 37 percent.  With the
 4   additional shares that they controlled, I believe it was
 5   close to 50 percent.
 6   Q.    And once Mr. Sexton and his group controlled the
 7   shares, what did they do with them?
 8   A.    They, um -- they sold them into a promotional
 9   campaign.
10   Q.    And how did you know that?
11   A.    Um, I was still keeping in touch, um, with
12   Mr. Sexton as the Chairman of the company, um, even
13   though again my primary focus was on other ventures.
14   Q.    So what did you discuss with Mr. Sexton?
15   A.    We talked about, um, their promotional campaign,
16   where they were in the selling process.  In addition,
17   um, I had taken a private placement where I was part of
18   the initial financing, so I was interested in getting my
19   $250,000 back, and I had, um, also participated in
20   another financing.  So I was interested in knowing where
21   they were in relation to, um, the independence of the
22   company.
23         So basically once they sold their unrestricted
24   shares, then they kind of moved on, and then you know
25   you're left with developing the company on your own,
```

```
 1   finding new investors and so forth.  So my connection
 2   with him remained until they were finished selling their
 3   unrestricted shares.
 4   Q.    And when did the sales, um, by Sexton and his
 5   group take place?
 6   A.    In 2013.
 7   Q.    Did you communicate with, um -- did they do
 8   anything else while they were selling those shares?
 9   A.    Um, I'm not exactly sure what, um --
10   Q.    In order to sell those shares, did they do
11   anything to facilitate those sales?
12   A.    Absolutely, that would be, you know, the marketing
13   and promotional campaigns.  They spent money on
14   third-party vendors that would, um, promote or market
15   the stock.
16   Q.    And how do you know that?
17   A.    Through direct communications with, um,
18   Mr. Sexton.
19   Q.    And while those promotions were happening, did you
20   pay attention to the price of Arch's shares in the
21   market?
22   A.    Yes, I did.
23   Q.    And what happened to the price of Arch's shares in
24   the market while those promotions were going on?
25   A.    The price and volume would go up.
```

A2530

```
 1    Q.    And what would happen to its price and volume when
 2    the promotions stopped?
 3    A.    They would decrease.
 4    Q.    Okay.  We talked a little bit about the $250,000
 5    contribution you made to that financing?
 6    A.    Yes.
 7    Q.    At some point were you repaid that money?
 8    A.    I was.
 9    Q.    And how did that come to be?
10    A.    I contacted Mr. Sexton and Mr. Sexton had those
11    funds wired to me.
12    Q.    And do you know how that happened?
13          THE COURT:  Excuse me, it's 1:00, Ms. Shields, so
14    we'll stop at this point.
15          MS. SHIELDS:  Okay.
16          THE COURT:  All right, we'll stop taking testimony
17    at this point.  And now tomorrow we do not sit, so we'll
18    resume at 9:00 a.m. on Thursday the 14th of September.
19          You have not heard all the evidence, so please
20    keep your minds suspended, do not discuss the case
21    either among yourselves, nor with anyone else.
22          You may stand in recess until 9:00 a.m., Thursday,
23    the 14th of September.
24          THE CLERK:  All rise for the jury.
25          (Jury leaves, 1:00 p.m.)
```

A2531

1          THE COURT:  Out of the 5 1/2 days available to

2     each side, the, um, Commission has used up 1 day, 1

3     hour, and 15 minutes.  The defendants have used up 2

4     hours and 5 minutes.  We'll stand in recess until

5     Thursday at 9:00 a.m.

6          We'll recess.

7          THE CLERK:  All rise.

8          MR. KLUNDER:  Your Honor, I think we're still

9     waiting on your ruling on --

10         THE COURT:  Yes.  With respect to the Mexican

11    brokerage company, the Court declines to fashion a new

12    exception.  Those documents are excluded.

13         But they're marked, aren't they?  They have a

14    marking for identification?

15         MS. KLUNDER:  They hadn't, they were just going to

16    --

17         THE COURT:  Mark them for identification using the

18    same protocol to save your rights.

19         MR. KLUNDER:  Okay, yes.  Thank you.

20         (Adjourned, 1:00 p.m.)

21

22

23

24

25

A2532

```
1                    C E R T I F I C A T E

2

3          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

4     do hereby certify that the foregoing record is a true

5     and accurate transcription of my stenographic notes

6     before Judge William G. Young, on Tuesday, September 12,

7     2023, to the best of my skill and ability.

8

9

10

11    /s/ Richard H. Romanow 1-23-24
      _____
12    RICHARD H. ROMANOW   Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS (Boston)

 3                              No. 1:21-cv-11276-WGY

 4

 5    SECURITIES and EXCHANGE COMMISSION,
                  Plaintiff
 6

 7    vs.

 8

 9    FREDERICK L. SHARP, et al,
                  Defendants
10

11                         *********

12

13

14                     For Jury Trial Before:
                       Judge William G. Young
15

16

17                     United States District Court
                       District of Massachusetts (Boston)
18                     One Courthouse Way
                       Boston, Massachusetts 02210
19                     Thursday, September 14, 2023

20

21                         *********

22             REPORTER: RICHARD H. ROMANOW, RPR
                       Official Court Reporter
23                 United States District Court
            One Courthouse Way, Room 5510, Boston, MA 02210
24                     rhrbulldog@aol.com

25
```

A2534

```
1                    A P P E A R A N C E S

2

3    KATHLEEN BURDETTE SHIELDS, ESQ.
     ALFRED A. DAY, ESQ.
4    DAVID H. LONDON, ESQ.
     NITA KUMARASWAMI KLUNDER, ESQ.
5       Securities and Exchange Commission - MA
        33 Arch Street, 24th Floor
6       Boston, MA 02110
        (617) 573-8904
7       Email: Shieldska@sec.gov
        For Plaintiff
8

9    KAREN A. PICKETT, ESQ.
        Pickett Law Offices, P.C.
10      125 High Street, 26th Floor
        Boston, MA 02110
11      (617) 423-0485
        Email: Kpickettlaw@gmail.com
12      For Defendant Zhiying Yvonne Gasarch

13

14   MIRANDA E. FRITZ, ESQ.
     TIMOTHY J. FAZIO, ESQ.
15      Manning Gross Massenburg
        125 High Street
16      Oliver Street Tower, 6th Floor
        Boston, MA 02110
17      (617) 670-8800
        Email: Tfazio@mgmlaw.com
18      For Defendant Jackson T. Friesen

19

20

21

22

23

24

25
```

```
 1                     I N D E X

 2

 3   WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS

 4
     AVTAR DHILLON (Continued.)
 5
       By Ms. Shields:          4                72
 6
       By Ms. Fritz:                  13                    83
 7
       By Ms. Picket:                 70
 8

 9   WILLIAM T. KAITZ

10     By Ms. Klunder:       87

11     By Ms. Fritz:

12     By Ms. Picket:

13                     E X H I B I T S

14

15         EXHIBIT 11........................... 95

16         EXHIBIT 12........................... 113

17         EXHIBIT 13........................... 116

18         EXHIBIT 14........................... 118

19         EXHIBIT 15........................... 122

20         EXHIBIT 16........................... 124

21         EXHIBIT 17........................... 128

22         EXHIBIT 18........................... 129

23         EXHIBIT 19........................... 131

24         EXHIBIT 20........................... 135

25
```

A2536

```
 1          P R O C E E D I N G S
 2          (Jury enters, 9:45 a.m.)
 3          THE COURT:  Well good morning, ladies and
 4    gentlemen, thank you so very much, this is exactly the
 5    way one would hope that it would work, and I am deeply
 6    appreciative.  Because you're all here, we're all ready
 7    to go.
 8          And would you remind the witness.
 9          THE CLERK:  I'd like to remind you, sir, that you
10    are still under oath.
11          Do you understand?
12          THE WITNESS:  Yes, I do.
13          THE COURT:  And, Ms. Shields, you may continue.
14          MS. SHIELDS:  Thank you, your Honor.
15
16    DIRECT EXAMINATION BY MS. SHIELDS:  (Continued.)
17    Q.    Good morning, Dr. Dhillon.
18    A.    Good morning.
19    Q.    When we left off on Tuesday we were talking about
20    sales of Arch stock.  Who was involved in those sales of
21    Arch stock?
22    A.    There was a combination of Mr. Veldhuis,
23    Mr. Sexton, and Mr. Friesen.
24    Q.    And how do you know that, sir?
25    A.    In my discussions with Mr. Veldhuis and
```

A2537

```
 1    Mr. Sexton, they told me, um, what the partnership was

 2    and what they were doing.

 3            MS. FRITZ:  Objection.

 4            THE COURT:  Well, noted, and subject to my -- our

 5    discussion at sidebar, overruled.  And that may stand.

 6    Q.    Did you have any financial interest in those sales

 7    of Arch stock?

 8    A.    Yes.

 9    Q.    And would you describe that for the jury please.

10    A.    I had, um, participated in the original round of

11    financing for the company, which was about $1.75

12    million, and I invested $250,000 of that, um, initial

13    round.

14    Q.    And at some point was that $250,000 repaid to you?

15    A.    Yes, it was.

16    Q.    And when did that happen?

17    A.    That happened in 2013.

18    Q.    And how did that happen?

19    A.    After there was, um, the merger and the sale of

20    shares, um, I contacted Mr. Sexton about, um, receiving

21    my $250,000.  He proceeded to send the money to me.

22    Q.    And how did he do that?

23    A.    He sent the money to, um, my Ortivo account.

24    Q.    And where -- what is "Ortivo"?

25    A.    "Ortivo" is my offshore account that I had in
```

A2538

1    Singapore and in Switzerland.

2    Q.    And how did it happen that you told Mr. Sexton you

3    wanted to be paid and money showed up at Ortivo, what

4    happened in between those things?

5         THE COURT:  I guess I don't understand.  You're

6    asking him does he -- does he understand how the money

7    was positioned in accordance with the way he's just

8    described?

9         MS. SHIELDS:  Yes, does he know.

10         THE COURT:  All right.

11    Q.    Do you know, sir, how it happened?

12         THE COURT:  Yeah, do you know of your own

13    knowledge how that happened?

14         THE WITNESS:  I don't know the specific steps.  I

15    just contacted Mr. Sexton and the money showed up in my

16    account.

17    Q.    Okay.  So in total we've talked about three sets

18    of transactions, the Arch transaction, the Stevia

19    First/Vitality transaction, and the OncoSec transaction.

20    So from those three transactions that you've described,

21    how much money did you get from your work on those

22    transactions that we've talked about?

23    A.    Somewhere north of $6 or $7 million.

24    Q.    And for all three of those transactions, how did

25    you get that $6 or $7 million?

1    A.    I got it predominantly by contacting Mr. Sexton or

2    Mr. Taylor and, um, it came to me in different ways.

3    Q.    And so what were those different ways the money

4    came to you?

5    A.    There was a, um, it either came directly to me, to

6    my Ortivo account, it came to designees of myself, and

7    it also was in the form of cash.

8    Q.    Is there any other way you got paid?

9    A.    Those were, um -- those were the main ways.

10   Q.    Okay.  When you asked for payments to go to your

11   designees, can you give the jury an example of one of

12   those designees?

13   A.    Um, Autism Partners.

14   Q.    And what was your connection to Autism Partners?

15   A.    That's where my daughter was getting therapy.

16   Q.    Did you ever get payments from Graham Taylor?

17   A.    I did.

18   Q.    How did that happen?

19   A.    Mr. Graham Taylor's payments went to different

20   places, including my Ortivo offshore account, or to

21   designees of mine.

22   Q.    When Mr. Taylor paid you, from what entity -- or

23   how did you get those payments, who did they come from?

24   A.    They predominantly came from, um, his entity

25   called Heng Hong Limited.

A2540

```
 1    Q.    And what was Heng Hong?
 2    A.    It's an offshore -- an entity that had offshore
 3    accounts in different jurisdictions.
 4    Q.    How did you know that the money coming from Heng
 5    Hong was coming from Mr. Taylor?
 6    A.    Because it would be Mr. Taylor that I would, um,
 7    contact and he had, in his discussions, indicated that
 8    he controlled Heng Hong.
 9    Q.    At some point in time, Dr. Dhillon, did you meet
10    Mike Veldhuis?
11    A.    I did.
12    Q.    And when did that happen?
13    A.    Um, my primary contact originally was Mr. Taylor,
14    then it was, um, Mr. Sexton, and then as I met with
15    Mr. Sexton, um, he started bringing Mr. Veldhuis to
16    those meetings.
17    Q.    And do you remember about when that happened?
18    A.    I believe in, um, around 2013.  Maybe even '12.
19    Q.    Okay.  And in what context did you meet
20    Mr. Veldhuis?
21    A.    It was in the context of, um, promoting the public
22    companies, um, for example, Arch, or Stevia, where we
23    were in the promotion, where we were in terms of selling
24    the shares that they controlled.
25    Q.    What kinds of -- so were there any other topics,
```

A2541

```
 1    other than what you just discussed, that you remember
 2    talking about in those meetings?
 3    A.    The other main topic was promotion and
 4    distribution of cash.
 5    Q.    Was it your understanding that Mr. Sexton and
 6    Mr. Veldhuis were working alone?
 7          MS. FRITZ:  Objection, foundation.
 8          THE COURT:  Well, one, you're leading, and, um,
 9    two, foundation.
10    Q.    Was a topic of discussion at those meetings other
11    people involved in the transaction?
12          MS. FRITZ:  Objection, asked and answered.
13          THE COURT:  Overruled.
14    A.    Yes, there was a discussion of, um, who Mr. Sexton
15    was working with.
16    Q.    And would you describe for the jury please those
17    discussions to the best of your recollection?
18          THE COURT:  Well more precisely, to the extent you
19    can remember, and you're not expected to have a
20    transcript of it, but to the extent you can remember,
21    who said what about that subject?
22          THE WITNESS:  Okay.
23    A.    As we would be discussing these companies from
24    merger to sale of stock and distribution, um, the
25    discussion would also center on splitting up the
```

A2542

```
 1    proceeds amongst various individuals, and in that
 2    context usually I met with Mr. Sexton and Mr. Veldhuis.
 3    And during those discussions, they would indicate who
 4    else they were working with and who else were their
 5    partners in the distribution of the funds.
 6    Q.    And who did they identify as their partners?
 7    A.    They identified Mr. Friesen.  They identified
 8    Mr. Taylor.  And things changed over time as well.
 9    Q.    Um, sir, did you have any business dealings with a
10    company named NewGen BioPharma?
11    A.    Yes.
12    Q.    And would you describe those dealings for the jury
13    please.
14    A.    I knew the CEO of NewGen and the CEO of NewGen, um
15    -- NewGen was a private company and he was looking for
16    funding, and he asked me if I could help raise funding
17    for the company.  I ended up introducing him to
18    Mr. Sexton.
19    Q.    Okay.  And what happened after you introduced the
20    CEO of NewGen BioPharma to Mr. Sexton?
21    A.    Mr. Sexton and, um, the CEO started working on an
22    arrangement to, um, merge the private company into a
23    company controlled by Mr. Sexton and his associates, and
24    to take that company public.
25    Q.    And in that instance, who were Mr. Sexton's
```

A2543

```
 1    associates?
 2          MS. FRITZ:  Objection.
 3          THE COURT:  Sustained, on this foundation.
 4    Q.    Did you have any discussions or were you part of
 5    any discussions about what that transaction would look
 6    like?
 7    A.    I did, yes.
 8    Q.    And tell the jury please about the kinds of
 9    discussions you had about that NewGen BioPharma
10    transaction?
11    A.    Since it -- it fit the previous pattern.  It was
12    really talking about how many freetrading shares, how
13    many restricted shares, and what the distribution of
14    those shares would be.  How much funding was coming.
15    And how much funding they were willing to provide for
16    this particular entity.
17    Q.    When you said it "fit the previous pattern," what
18    did you mean by that?
19    A.    It was going to be, once again, um, a private
20    company merging into a shell company, um, controlled by
21    Mr. Sexton and his associates, they were going to
22    provide the initial round of financing, and they would
23    be promoting the stock to be able to sell their
24    freetrading shares.
25    Q.    Okay.  And who else -- or as part of these
```

A2544

```
 1    discussions as one of the subjects, who else was
 2    involved in this transaction?
 3         MS. FRITZ:  Objection.
 4         THE COURT:  Yeah, you're leading the witness.  So
 5    you can say does it --
 6    Q.    Who participated in these discussions?
 7         MS. FRITZ:  Objection.
 8         THE COURT:  Well you weren't present at all of
 9    them, were you?
10    Q.    Who participated in the discussions when you were
11    there?
12         THE COURT:  All right, you may answer that.
13    A.    As I mentioned earlier, my primary contact was
14    Mr. Sexton, and then during those discussions with
15    Mr. Sexton, he would often bring Mr. Veldhuis to those
16    meetings or discussions.
17    Q.    And was one of the topics that you discussed how
18    the proceeds of that transaction would get divided up?
19         MS. FRITZ:  Objection.
20         THE COURT:  No, overruled.
21         How were the proceeds to be divided up?
22         Well rather than the how, and I appreciate her
23    difficulty, um, and so we'll ask.
24         Did you discuss, in the discussions you had, the
25    division of proceeds?
```

A2545

```
 1          THE WITNESS:  Yes, we did.
 2          THE COURT:  Who said what?
 3          THE WITNESS:  Um --
 4          THE COURT:  To your knowledge.
 5          THE WITNESS:  Yeah.
 6   A.    Mr. Sexton had indicated that he had partners that
 7   were going to be funding it and that they would be
 8   splitting the outside.
 9   Q.    Did he identify the partners?
10   A.    I do, um -- Mr. Veldhuis was one of the partners,
11   um, and since Mr. Sexton and Mr. Veldhuis were, um,
12   often mentioning Mr. Jackson Friesen, I assumed that he
13   was part of the partnership.
14          (Pause.)
15   Q.    Those are all the questions I have for you,
16   Dr. Dhillon.  Thank you very much.
17   A.    All right.
18          THE COURT:  Ms. Fritz, do you wish to examine this
19   witness?
20          MS. FRITZ:  Yes, thank you, your Honor.
21          THE COURT:  You may.
22
23   CROSS-EXAMINATION BY MS. FRITZ:
24   Q.    Good morning, sir.
25   A.    Good morning.
```

A2546

```
 1    Q.    I'm Miranda Fritz, I represent Jackson Friesen.
 2    And let me just start by asking.
 3          Ms. Shields has been referring to you as
 4    Dr. Dhillon.  Do you still have your medical license?
 5    A.    Um, I'm not practicing, but the Medical Doctor
 6    degree does not go away.
 7    Q.    Okay.  Do you still have the ability to practice
 8    medicine?
 9    A.    Um, I have, um -- I'd have to take certain credits
10    and so forth to be able to -- when you don't practice
11    for a number of years, you just can't walk in and start
12    practicing again.  So there's -- there's no issues with
13    my Medical Doctor degree, if I wanted to go back, I
14    would need to show additional, um, credits to be able to
15    show that I'm up to speed on where I -- with the current
16    knowledge of medicine.
17    Q.    So all of these felonies that you've pled to, all
18    these criminal charges, do not constitute an impediment
19    to your continuing to practice medicine?
20    A.    Not to my knowledge.
21    Q.    Okay.  Now I just want to start by being clear.
22    This morning, a couple of times, you had mentioned
23    Jackson Friesen.  So let's be clear.
24          Are you telling the jury that you have ever met
25    Mr. Friesen?
```

A2547

```
 1    A.    I don't recall meeting Mr. Jackson Friesen.

 2    Q.    Have you ever spoken with Mr. Friesen?

 3    A.    I don't recall that either.

 4    Q.    In all those years you've described a number of

 5    meetings with Mr. Sexton and then with Mr. Veldhuis.

 6    Mr. Friesen, to your recollection, was never present,

 7    correct?

 8    A.    He could have been in the room, but I don't recall

 9    him.

10    Q.    You've never?

11    A.    No.

12    Q.    Do you have any reason to believe Mr. Friesen was

13    present in those meetings?

14    A.    Um, sometimes there were multiple people in the

15    room and I -- like I said, I dealt primarily with people

16    that I knew for decades and that was Mr. Sexton and

17    Mr. Taylor, but in the room there would be other people,

18    just like I don't know all the people in this room.

19    Q.    So these are discussions where you're talking

20    about what you describe as "unlawful activities,"

21    failure to register stock, divvying up of stock,

22    allocating stock, correct?

23    A.    Correct.

24    Q.    And your testimony to the jury is really "I didn't

25    know who was there"?
```

1    A.    No, I knew that Mr. Taylor was there often.

2    Mr. Sexton was there.  And Mr. Veldhuis.  And those were

3    the people that represented that they had other people

4    working with them.

5    Q.    And you would want very much to know who you were

6    talking about these issues in front of, correct?

7    A.    Um, I was comfortable talking to those three

8    individuals.

9    Q.    Correct.  All right --

10    THE COURT:  Just let me explain something to the

11    jury, and it may be obvious.

12    When a side calls a witness, like the Commission

13    has called this witness, under the rules, when there's

14    an objection, the side that calls the witness can only

15    ask openended questions, who, what, where, when,

16    questions like that.  But when a witness is on cross-

17    examination, it's perfectly appropriate for, in this

18    circumstance now as we're seeing cross-examination, for

19    Ms. Fritz to suggest in her questions, um, the answer.

20    "You were wearing a red hat, weren't you?"  "You knew

21    who was in the room?"  "You wanted to know who was in

22    the room?"  And the like.  And if the witness says

23    "Yes," well then that's evidence.  But if the witness

24    says "No," or "I don't know," what she's suggests in her

25    question is not evidence of anything, it's not evidence

A2549

```
 1    one way or another.  Evidence doesn't come from the
 2    lawyers, any of the lawyers.  But it is perfectly
 3    appropriate to ask questions, as she is, suggesting
 4    certain things, and then we'll see if a witness adopts
 5    that, says "Yes, that's so," or "I think so," something
 6    like that.
 7          Go ahead, Ms. Fritz.
 8          MS. FRITZ:  Thank you, your Honor.
 9    Q.    So your testimony with respect to Mr. Friesen is
10    that during the course of meetings with Mr. Sexton and
11    Mr. Veldhuis, they said something about Mr. Friesen,
12    that's your testimony, correct?
13    A.    Correct.
14    Q.    Okay.  Now even though that's all that you're here
15    to say, I want to go back and I want us to explain to
16    the jury how you got here testifying as a cooperator.
17    All right?
18          So all of this starts back in 2019, correct?
19          THE COURT:  His involvement with this case?
20          MS. FRITZ:  No, the investigation.  I'm sorry.
21          THE COURT:  His involvement with the
22    investigation?
23          MS. FRITZ:  Yes.
24    A.    Yes.
25    Q.    Okay.  As of 2019, you learned that there was an
```

```
 1    SEC investigation relating to you and others, correct?
 2    A.    Yes.
 3    Q.    You testified under oath in 2019, correct?
 4    A.    Yes.
 5    Q.    You testified for lots of folks involved with the
 6    SEC, correct?
 7    A.    Yes.
 8    Q.    Then in the following year, in 2020, you testified
 9    again under oath, correct?
10    A.    Yes.
11    Q.    And that oath is exactly the same oath that you
12    took in this courtroom, correct?
13    A.    Yes.
14    Q.    Okay.  At that point you realized that this was
15    not going to go away, correct?
16    A.    Yes.
17    Q.    And you learned that there was a criminal
18    investigation of you, correct?
19    A.    Yes.
20    Q.    And you knew that you personally had done a great
21    many things that were illegal, correct?
22    A.    Yes.
23    Q.    You knew that you had nothing to do with the
24    particulars of the stock transaction, you had taken
25    money and hidden it, correct?
```

A2551

```
 1    A.    Yes.

 2    Q.    You had offshore accounts, correct?

 3    A.    Yes.

 4    Q.    You had failed to report the money, correct?

 5    A.    Yes.

 6    Q.    You had lied about it, correct?

 7    A.    Yes.

 8    Q.    You had even lied to the people actually that you

 9    introduced Mr. Sexton to, like the Arch CEO, correct?

10    A.    I'm sorry, I don't understand the question.

11    Q.    Did you lie to him with respect to whether or not

12    the financing was going to be perfectly legit, good

13    financing for Arch?

14          THE COURT:  Who is the "him" you have in the

15    question?  Did you lie to "him."  Who?

16          MS. FRITZ:  All right.

17    Q.    Did you, during the course of your dealings,

18    introduce Mr. Sexton to colleagues of yours that were

19    looking for financing?

20    A.    Yes.

21    Q.    And did you advise them in any way of the

22    machinations that were going on behind the scenes?

23    A.    I did not.

24    Q.    Okay.  Now you had to make a decision about what

25    to do about the criminal case as well as the civil
```

A2552

```
 1   cases, correct?

 2   A.    Yes.

 3   Q.    As of August 2021, you were confronted with both

 4   civil and criminal charges, correct?

 5   A.    Yes.

 6   Q.    Relating to not only your unlawful acts, your --

 7   your own dealings with money, your own Singapore

 8   accounts, correct?

 9   A.    Yes.

10   Q.    But also relating to the fact that you had

11   perjured yourself in two lengthy depositions, correct?

12   A.    Yes.

13   Q.    Now you said under questioning from Ms. Shields

14   that you were testifying here -- and you say telling the

15   truth, because you wanted to take responsibility for

16   what you had done, correct?

17   A.    Yes.

18   Q.    Okay.  So you wanted to sort of own up to what you

19   had done, correct?

20   A.    Yes, that's part of it.

21   Q.    That's not what you did, is it?

22   A.    That's exactly what I'm doing.  I'm pointing out,

23   taking responsibility, and telling the truth.

24   Q.    Okay.  So let's talk about how one accepts

25   responsibility in the federal system.
```

```
 1          You came to understand that in a criminal case the
 2    sentence that would be imposed by a judge depends in
 3    large part on something called the Federal Sentencing
 4    Guidelines, correct?
 5    A.    Yes.
 6    Q.    The Federal Sentencing Guidelines quantify or
 7    calculate an offense level that a judge then considers
 8    when he is imposing prison time, correct?
 9          MS. SHIELDS:  Objection.
10          THE COURT:  Would you ask the question again.
11    Q.    The sentencing guidelines provide for a
12    calculation of the offense level that the Court
13    ultimately takes into account at the time of sentencing?
14          THE COURT:  And you're asking if that's his
15    understanding?
16          MS. FRITZ:  Correct.
17    A.    That is my understanding.
18    Q.    Okay.  So you learned a lot about the guidelines
19    and how they work and what that offense level means,
20    correct?
21    A.    During the process, yes, I learned that.
22    Q.    Now the guidelines provide for consideration for
23    an individual who pleads guilty and accepts
24    responsibility for his conduct.  You became aware of
25    that, correct?
```

A2554

```
1    A.    Yes.

2    Q.    And when you plead guilty, you get a certain

3    number of levels reduced off your offense level for

4    what's called "acceptance of responsibility," correct?

5    A.    Yes.

6    Q.    And so in your instance you decided that you were

7    going to plead guilty and you understood that you were

8    going to get those levels off because under those

9    guidelines you're accepting responsibility, correct?

10   A.    I'm accepting responsibility and telling the

11   truth.

12   Q.    Okay.  Before we -- this idea of cooperating and

13   telling the truth, that's a whole different concept

14   under the guidelines, right?

15        THE COURT:  Well I don't understand that question.

16        MS. FRITZ:  Okay.

17   Q.    "Acceptance of responsibility" means you plead

18   guilty and you then face a sentencing for what you have

19   done, correct?

20   A.    I believe so, yes.

21   Q.    But you learned that there's a whole different

22   path that you could take under the guidelines that would

23   give you a much bigger break, right?

24        MS. SHIELDS:  Objection.

25        THE COURT:  Well perhaps this, since we're talking
```

A2555

```
 1    about legal matters, um, let me put it to him this way.
 2         MS. FRITZ:  Okay.
 3         THE COURT:  You -- and don't take it from me and
 4    I'm not the source of evidence, but we'll see what he
 5    says.
 6         You understand that, um, under the law now a
 7    sentencing judge is expected to take into account the
 8    sentencing guidelines, which are official guidelines set
 9    up by the United States Sentencing Commission.  The
10    judge is expected to take that into account, correct?
11         THE WITNESS:  Correct.
12         THE COURT:  But the ultimate decision is up to the
13    judge presiding, is that how you understand it?
14         THE WITNESS:  Yes, I do.
15         THE COURT:  And she launched into one aspect of
16    the guidelines which suggest that a person who pleads
17    guilty and accepts responsibility, the calculation, the
18    suggestion, the recommendation of the guidelines, is
19    less by a certain amount.
20         You understand that?
21         THE WITNESS:  Yes.
22         THE COURT:  And again it's up to the judge whether
23    the judge goes for that, but the guidelines operate that
24    way, you understand that?
25         THE WITNESS:  I do.
```

```
1        THE COURT:  Now an additional calculation is if a
2   person, having pled guilty, provides, through testimony
3   or information or otherwise, what's called "substantial
4   assistance" to the government in prosecuting other
5   cases, either civil or criminal, is that how you
6   understand it?
7        THE WITNESS:  Yes.
8        THE COURT:  And, um, the -- the plaintiff here,
9   because this is civil, the Commission, is expected to
10  inform the sentencing judge of that cooperation, is that
11  how you understand it?
12       THE WITNESS:  Yes.
13       THE COURT:  Again though ultimately it's up to the
14  sentencing judge what sentence to impose in accordance
15  with the statutory requirements, is that how you
16  understand it?
17       THE WITNESS:  Yes.
18       THE COURT:  All right, go from there.
19       MS. FRITZ:  Okay, thank you very much.
20  Q.   Now let's talk about this other path that you can
21  go down, this cooperation path.
22       You told the jury, during your direct, that you
23  understood that, by virtue of your cooperation, the
24  government would write a letter or motion for you,
25  correct?
```

```
1    A.    Yes.
2    Q.    And that letter or motion would ultimately be made
3    to the sentencing judge, correct?
4    A.    Yes.
5    Q.    And that would be, you hope, something that would
6    tell the judge that you did all these things for the
7    government and the judge would then reduce your
8    sentence, correct?
9    A.    It requires me to tell the truth, and if the truth
10   helps me, then I accept the consequences.
11   Q.    If you could just respond to my question rather
12   than reiterating that.
13         What you're hoping is that the letter telling the
14   judge that you cooperated for the government will reduce
15   your sentence, correct?
16   A.    Yes, by telling the truth.
17   Q.    And in the first instance that letter would come
18   from the criminal prosecutor involved in the case,
19   correct?
20   A.    That's my understanding, yes.
21   Q.    Okay, and that criminal prosecutor has been
22   sitting here in the courtroom watching you the whole
23   time, correct?
24   A.    I see him here, yes.
25   Q.    And you saw him when you testified Tuesday,
```

A2558

```
 1    correct?
 2    A.    I did.
 3    Q.    And when you left the courtroom, you were sort of
 4    caucusing out there with him in the hall, correct?
 5    A.    I approached him to say hi.
 6    Q.    And then there was some discussion that occurred?
 7    A.    He immediately said that "I cannot make any
 8    comments about your testimony," "Maintain your
 9    composure."
10    Q.    Okay.  Now by virtue of doing this cooperation
11    thing, what you're hoping is that you will be sentenced
12    to a time in prison that is less than the judge would
13    impose for what you have done, correct, you want it to
14    be less than that?
15    A.    Yes, if it can be less than that, um, by telling
16    the truth.
17    Q.    Okay.  So instead of simply pleading guilty and
18    being sentenced for what you've done, you've gotten into
19    this whole process of cooperating in order to try to get
20    a sentence that would be lower for you, correct?
21    A.    Yes, the government offered me a cooperation
22    agreement.
23    Q.    We'll get to why the government offered you that.
24    A.    Yes.
25    Q.    Now the judge said, a moment ago, that this
```

```
 1   cooperation process in the federal system requires that
 2   you do certain things, correct?
 3   A.    Yeah, like telling the truth.
 4   Q.    And you keep saying, "Just tell the truth," you
 5   keep reiterating that, right?
 6   A.    Yes, it's very important, that's the essence of
 7   the agreement.
 8   Q.    That's not what is required to get a 5K letter, is
 9   it?
10         THE COURT:  "5K" is the designation of the
11   guidelines which deal with substantial assistance
12   through cooperation, and in the parlance we call it a
13   "5K letter."
14   Q.    As the Judge has said, in order to get that
15   letter, you have to provide to the government
16   substantial assistance in the prosecution of other
17   people, correct?
18   A.    I've been repeatedly told to tell the truth and if
19   that helps the government, then so be it.
20   Q.    You don't -- do you understand that you can tell
21   the truth all day long and if you're not able to provide
22   evidence that allows them to go after other people, you
23   don't get a 5K letter, do you understand that?
24         MS. SHIELDS:  Objection.
25         THE COURT:  Yeah, sustained as to that.  But you
```

 1     certainly may explore it.

 2          MS. FRITZ:  Okay.

 3     Q.   So I just want to be really clear about this,

 4     because you've been going back to this "All I have to do

 5     is tell the truth."

 6          You can tell the truth, but if it does not provide

 7     substantial assistance to the government in the

 8     prosecution of other people, you do not get 5K credit,

 9     do you understand that or not?

10          MS. SHIELDS:  Objection.

11          THE COURT:  Well, no, he may have it as to whether

12     that's what he thinks.

13          Is that what you think?

14          THE WITNESS:  No.

15          THE COURT:  All right.

16     Q.   You heard the Judge a moment ago say that a 5K

17     letter requires that an individual provide substantial

18     assistance in the prosecution of other people?

19          THE COURT:  I didn't say that.

20          MS. FRITZ:  Oh?

21          THE COURT:  I just said "substantial assistance."

22          MS. FRITZ:  Okay.

23     Q.   Um --

24          MS. FRITZ:  You know, your Honor, I may be asking

25     that you read the language of 5K, which has --

```
 1        THE COURT:  Well if you do, we'll get to that.  Go
 2   ahead.
 3        MS. FRITZ:  Okay.
 4   Q.   So what you're saying is you don't understand that
 5   what is required for you to get that cooperation credit
 6   is that you assist the government in the prosecution of
 7   others?
 8   A.   I assist the government by being responsive to
 9   them, by answering their questions, by taking
10   responsibility for my conduct, and telling them
11   everything that I know about my conduct and whoever else
12   was part of that conduct.
13   Q.   So you never understood that the more individuals
14   you could provide evidence against, the better it would
15   be for you?
16   A.   Um, I think, um, my general understanding would be
17   that, um, there is some degree of relationship there,
18   but my -- my responsibility is to only speak of what I
19   know and what I remember.
20   Q.   So let's take a step back and see how this
21   testimony about Jackson Friesen, let's see how this
22   develops.
23        You testified in 2019, correct, in a sworn
24   deposition?
25   A.   Yes.
```

```
 1    Q.    And this is the first time that you testified
 2    under oath regarding the events that you're talking
 3    about today, right?
 4    A.    Yes.
 5    Q.    And during that questioning, there were
 6    individuals from the SEC present who were asking you
 7    questions, correct?
 8    A.    Yes.
 9    Q.    Including a gentleman named Lee Buck, correct?
10    A.    Yes.
11    Q.    Lee Buck works with the SEC and he's been involved
12    in this case, correct?
13    A.    Yes.
14    Q.    Lee Buck has also been here in the
15    courtroom watching -- not right now, but has been here
16    in the courtroom watching you testify, correct?
17    A.    I didn't know he was here.
18    Q.    You didn't notice Mr. Buck on Tuesday?
19    A.    I did not.
20    Q.    Okay.  During that questioning, Mr. Buck asked you
21    questions about Jackson Friesen, correct?
22    A.    Yes.
23    Q.    He asked you actually questions about Mr. Friesen
24    a number of times, correct?
25    A.    I believe so, yes.
```

1    Q.    So, for example -- and so did Mr. Donnellan, by

2    the way, he was another SEC individual, correct?

3    A.    Yes.

4    Q.    Okay.  So you were asked during that deposition,

5    "Do you know someone with the last name 'Friesen,'

6    F-R-I-E-S-E-N?"  Do you recall that?

7    A.    I -- I don't remember the testimony, but I do

8    remember being asked about Mr. Friesen, yes.

9    Q.    Do you recall that your response was "I don't know

10   that name"?

11   A.    Yes, at that time I lied.

12   Q.    What you said under oath in 2019, before you

13   entered into cooperation agreements, was "I don't know

14   that name," correct?

15   A.    Yes, when I was confronted by my conduct, I chose

16   to lie rather than take ownership at that time.

17        MS. FRITZ:  Your Honor, this will go -- if you

18   could ask the witness to be responsive.

19        THE COURT:  She gets to ask the questions and she

20   gets to ask them by, as I've just explained to the jury,

21   by what are known as "leading questions."  So most of

22   her questions grammatically can be answered "Yes" or

23   "No."

24        Now if an honest and complete answer is either

25   "Yes" or "No," answer that, not going on with anything

A2564

```
 1   else, just answer that.  If an honest and complete

 2   answer can't be answered "Yes" or "No," you can say

 3   that, "I can't answer that one 'Yes' or 'No.'"  Then she

 4   gets to decide whether to ask another question or accept

 5   that answer.

 6         Always if you don't know the answer or have

 7   forgotten, you may always say that.

 8         Now those are the rules.  You have to follow those

 9   rules.

10         Go ahead, Ms. Fritz.

11   Q.    So the question was, were you asked whether you

12   knew the name "Friesen"?  And did you say "I don't know

13   that name"?

14   A.    Yes.

15   Q.    And were you then asked a follow-up, "Jackson

16   Friesen?"  And did you again say "I don't know that

17   name"?

18   A.    (Silence.)

19   Q.    Answer, please.

20   A.    Yes.

21   Q.    Okay.  Now much later in the deposition, the issue

22   came up again and again you were asked about whether you

23   knew a person named "Jackson Friesen," much later in the

24   deposition.  Again your response was, "I don't know that

25   name."  Correct?
```

A2565

```
 1    A.    Correct.
 2    Q.    In fact you went on to talk about the fact that
 3    you knew other "Friesens."  You were asked whether the
 4    name "Friesen" appeared in your phone contacts, do you
 5    recall that?
 6    A.    I don't -- I don't recall that, but, um -- but I
 7    know there were a series of questions about Mr. Friesen.
 8    Q.    Do you recall being asked about the contacts in
 9    your phone "Albert Friesen" and "Stephanie Friesen," do
10    you recall that?
11    A.    I do.
12    Q.    And do you recall giving an answer about who those
13    Friesens were?
14    A.    I believe I gave an answer.  I don't recall the
15    answer.
16    Q.    Do you have a recollection of saying "Albert
17    Friesen is a scientist I know in the industry," do you
18    recall that?
19    A.    I do, yeah.
20    Q.    Is that true, by the way?
21    A.    It is, yeah.
22    Q.    Okay.  And again "Jackson Friesen" was the name
23    that you said you did not know, correct?
24    A.    Correct.
25    Q.    Okay.  Now during that same deposition you were
```

```
 1   asked questions about whether you knew any number of
 2   other people, correct?
 3   A.    Yes.
 4   Q.    Not just Mr. Friesen, correct?
 5   A.    Correct.
 6   Q.    To this jury what you said is "I lied during the
 7   deposition because I didn't want to admit the wrongful
 8   conduct that I had engaged in," correct?
 9   A.    More or less, yes.
10   Q.    You lied about the things that you thought would
11   get you into trouble, correct?
12   A.    Yes.
13   Q.    So you lied about things involving the
14   transactions we talked about, correct?
15   A.    Yes.
16   Q.    You lied about your Singapore accounts, correct?
17   A.    Yes.
18   Q.    You lied about getting money from Graham Taylor,
19   correct?
20   A.    Yes.
21   Q.    But when you were asked, for example, whether you
22   knew Mike Veldhuis, you didn't lie about that, did you?
23   A.    Um, I don't recall the context of the questions,
24   but as far as knowing Mr. Veldhuis, yes, um, I believe I
25   admitted knowing him, yes.
```

A2567

```
 1    Q.    So you were asked by Mr. Buck whether you knew if
 2    Paul Sexton ever had any partners?  Do you recall that
 3    question?
 4    A.    Yes.
 5    Q.    And you answered, "Not that I know of," correct?
 6    A.    Correct.
 7    Q.    Okay.  You were asked whether you had ever met
 8    someone named Mike Veldhuis, correct?
 9    A.    Yes.
10    Q.    And you said, "Um, yes, yes, Mr. Sexton introduced
11    me to him, yes, I know that name, I've met him,"
12    correct?
13    A.    Yes.
14    Q.    All right.  So you didn't lie about knowing Mike
15    Veldhuis, correct?
16    A.    Correct.
17    Q.    And there would have been no reason to lie about
18    knowing the name "Jackson Friesen," would there?
19    A.    (Silence.)
20    Q.    Just like you said, "Sure I know Mike Veldhuis,"
21    there would have been no reason to lie about that,
22    correct?
23    A.    No particular reason, no.
24    Q.    Okay.  And yet what you said under oath when
25    you're telling this jury you were lying to protect
```

A2568

```
 1    yourself with respect to things you were worried about,
 2    what you told them under oath is "No, I don't know that
 3    name," correct?
 4    A.    I don't think I can answer that as a "Yes" or
 5    "No."
 6    Q.    Let me ask you this.  When you sat in that
 7    deposition and you lied about all the things that you
 8    lied about, did you look very much like you look today?
 9    A.    (Silence.)
10    Q.    Were you wearing a coat and tie?
11    A.    Um, I was wearing a coat.  I don't know if I was
12    wearing a tie.
13    Q.    And you were sitting and responding to the
14    questions, correct?
15    A.    Yes.
16    Q.    Calmly responding, correct?
17    A.    I wouldn't necessarily call it "calmly."
18    Q.    But you weren't stuttering every time that you
19    lied to them, were you?
20    A.    There was a lot of stuttering.
21    Q.    So your demeanor today, the way that you're
22    presenting to this jury, is very much the same way you
23    looked when you sat with the SEC and you lied to them,
24    correct?
25            MS. SHIELDS:  Objection.
```

```
 1            THE COURT:  No, overruled.  She may have that.
 2   A.    Um, yes, I wore a coat and answered questions.
 3   Q.    Okay.  The point is, you don't have any crazy tell
 4   that happens when you lie, right, where somebody on the
 5   jury could see and could say, "Ah-ha, I see that you're
 6   lying," correct?
 7   A.    I think my testimony there was quite a bit
 8   different.  I was confronted by my illegal acts and my
 9   response was to try to protect myself.  Um, now I know
10   that was the wrong choice.
11   Q.    And before we move on, when you say you were
12   "confronted with your illegal acts," again there's
13   nothing illegal about knowing the name, "Jackson
14   Friesen," right?
15   A.    Not the name, no.
16   Q.    Okay.  Now the following year, 2020, you underwent
17   another deposition, correct?
18   A.    Yes.
19   Q.    And again you sat under oath and lied to the SEC,
20   correct?
21   A.    Yes.
22   Q.    And let's be clear, this went on for hours,
23   correct?
24   A.    Yes, the testimony went on for hours.
25   Q.    You lying about the transactions, the foreign
```

A2570

1    accounts, um, communications that you had with

2    Mr. Sexton, that went on and on for hours, correct?

3    A.    Yes.

4    Q.    As a result of all the lies that you were telling

5    to the SEC, when you were ultimately charged criminally,

6    you were charged also with obstruction of justice,

7    correct?

8    A.    Yes.

9    Q.    Okay.  But to fastforward a little bit, by virtue

10   of your agreement with the government, you never had to

11   plead guilty to that, did you?

12   A.    I pled guilty to three felonies.

13   A.    Not obstruction of justice?

14   A.    No.

15   Q.    Right.  And that's even though not only did you do

16   it, but you flat out admitted, in sessions with the

17   government, that you engaged in obstruction of justice,

18   correct?

19   A.    Yes.

20   Q.    Okay.  But they said, "No, you don't have to" --

21   "That one you don't have to plead to," correct?

22   A.    Yes, that was their choice.

23   Q.    All right.

24         Now there comes a time, after August 2021, when

25   you decide that you want not just to plead guilty and

```
 1    accept responsibility, you want that other thing, that
 2    other benefit that comes from providing information
 3    against other people, correct?
 4    A.    Yes.
 5    Q.    But in order to get that, you had to convince
 6    folks that you could provide information against other
 7    people, correct?
 8    A.    Yes.
 9    Q.    Because they don't just give those 5K deals away,
10    right?
11    A.    Yes.
12    Q.    You have to prove that you can offer them
13    something that they can use against other people,
14    correct?
15    A.    Yeah, that's part of my conduct.
16    Q.    So that thing led to a series of meetings,
17    correct?
18    A.    Yes.
19    Q.    And they're called "proffer sessions," correct?
20    A.    Yes.
21    Q.    And that's where you go in and you meet with
22    Mr. Drabick and Ms. Shields and other people and you
23    talk to them so that they can decide whether you can be
24    of value to them as a witness, correct?
25    A.    Correct.
```

A2572

```
 1    Q.    Okay.  So you went through a number of those
 2    meetings, correct?
 3    A.    Yeah.
 4    Q.    During the course of those meetings, they asked
 5    you many times over about what you knew about Jackson
 6    Friesen, correct?
 7    A.    Yes.
 8    Q.    And it was very clear that they were interested
 9    in, that they wanted information about Jackson Friesen,
10    correct?
11    A.    As one of the individuals.
12    Q.    This guy that you had never met or even spoken to,
13    correct?
14    A.    I don't recall meeting him or speaking to him.
15    Q.    Okay.  At that point you began to say to the
16    government "Well I know there was another partner
17    involved and it was -- it was probably Jackson Friesen,"
18    right?
19    A.    I don't remember the exact wording.
20    Q.    So if we could --
21          MS. FRITZ:  Judge, at this time I just want to
22    show the witness some material that we recently
23    received.  If we could --
24          THE COURT:  You may show him.
25          MS. FRITZ:  -- show him the 302 relating to the
```

A2573

```
 1   meeting on January 31st.  And if we could go to Page --
 2        THE CLERK:  Are you hooked up to the electronics?
 3        MR. FAZIO:  Sure.
 4        THE CLERK:  Well could you let me know what you're
 5   plugged into please.
 6        (Off the record discussion.)
 7        THE COURT:  Well if you have a paper copy?  I mean
 8   we've tried cases for many years without these computer
 9   assists here.  You can show him the document.  You've
10   got a document.
11        MS. FRITZ:  I've got a lot of paper, your Honor.
12   I'm just supposed to try to use -- I'm trying to get
13   more technologically advanced.
14        (Pause.)
15        MS. FRITZ:  Your Honor, may I approach?
16        THE COURT:  You may.
17   Q.   Mr. Dhillon, I'd like to show you a copy of a
18   17-page document dated 4-29-2022, and let me ask you a
19   couple of initial questions.
20        When you were sitting in these meetings, these
21   proffer sessions, there were a lot of people there,
22   correct?
23   A.   Yes.
24   Q.   There was Mr. Drabick, who is the Assistant United
25   States Attorney handling the criminal case, and there
```

A2574

```
 1    were lots of folks from the SEC, correct?

 2    A.    Yes.

 3    Q.    Including Ms. Shields, correct?

 4    A.    Yes.

 5    Q.    And during the course of this meeting, there were

 6    lots of folks who were taking notes of what you were

 7    telling them, correct?

 8    A.    I don't know how many people were taking notes.

 9    Q.    Do you have a recollection of whether there were

10    at least three FBI agents, Keith Brown, David Sharilli,

11    Thomas Coralatti, who were taking notes of what you were

12    saying?

13    A.    I know there were FBI agents and I know at least

14    one of them was taking notes.

15    Q.    Okay.  And you talked a lot about the same deal

16    that you talked about here, correct?

17    A.    Yes.

18    Q.    You talked about office staff, correct?

19    A.    Yes.

20    Q.    No mention of Mr. Friesen, correct?

21    A.    I don't recall, um, the entirety of the proffer.

22    Q.    Okay.  Well certainly in front of this jury you

23    talked about OncoSec, but no mention of Mr. Friesen,

24    correct?

25    A.    Correct.
```

Case: 24-1770    Document: 00118249069    Page: 181    Date Filed: 02/18/2025    Entry ID: 6700951
Case 1:21-cv-11276-WGY    Document 437    Filed 01/24/24    Page 43 of 140

43

```
1    Q.    Okay.  And then you started talking about Stevia
2    and at some point you talk about some sort of shifting
3    of the people that were involved, correct?
4    A.    Yes.
5    Q.    And what happened -- and those are the individuals
6    on Stevia that were Paul Sexton, Graham Taylor, and
7    Rasim, correct, they were the partners, correct?
8    A.    Those were the original people I was dealing with.
9    Q.    Along with David Sidu?
10   A.    Yes.
11   Q.    Okay.  So that was the group that you associated
12   with Stevia, correct?
13   A.    Yes.
14   Q.    And then, according to you, Mike Veldhuis became
15   involved, correct?
16   A.    Yes.
17   Q.    Um, and you eventually met him, correct?
18   A.    Yes.
19   Q.    And, according to you, when you were being asked
20   these questions, similar to what you actually were asked
21   today, "Who else was involved?"  "Who were the people
22   that were involved?"  At one point you talk about the
23   fact that Paul Sexton and Graham Taylor talked about
24   there being another partner.  Do you remember that?
25   A.    Um, I don't -- I don't recall the specifics,
```

A2576

```
 1    but --
 2    Q.    All right at this point I'll show you Page 7 -- on
 3    Page 7, I'm going to direct your attention to this
 4    portion.  (Circles.)
 5    A.    (Looks.)  (Reads.)  Okay, I see it.
 6    Q.    All right.  So at this point during the discussion
 7    with the FBI agents and with the prosecutor and with the
 8    SEC, you're being asked questions about who else was
 9    involved, correct?
10    A.    Yes.
11    Q.    And the name "Jackson Friesen" is being presented.
12    "Was Jackson Friesen mentioned?"  "Was Jackson Friesen
13    involved?"  Correct?
14    A.    Yes, his name came up.
15    Q.    Okay.  And so you finally tell them, "Sexton and
16    Taylor said they had another partner, the other partner
17    was probably Jackson Friesen," correct, that's what you
18    told them?
19    A.    In the context of which company?
20    Q.    This -- we've been talking about the Stevia
21    transaction, toward the end, correct?
22    A.    Correct.
23          MS. SHIELDS:  Objection.
24          THE COURT:  No.  Um, well he didn't answer, but I
25    take it she asked a question as to when in the proffer
```

```
 1    session this came up and, um, she suggested towards the

 2    end.

 3          Can you answer that?

 4          THE WITNESS:  I can't.

 5          THE COURT:  You can't.  You don't recall?

 6          THE WITNESS:  No.

 7          THE COURT:  All right.

 8          Go ahead, Ms. Fritz, with the next question.

 9    Q.    Okay, so you're being asked questions here that

10    relate to Stevia, correct?

11    A.    Yes.

12    Q.    Okay.  So when you say, "Oh, yeah, there was

13    another partner," and then as the question goes on you

14    say "Probably Friesen," correct?

15    A.    That's what it says here.

16    Q.    And then you describe what that partner had

17    responsibility for.  Do you recall that?

18    A.    Um, I don't read it obviously --

19    Q.    All right, I'd like to direct your attention to

20    the next paragraph, the bottom of Page 7, the top of

21    Page 8, um -- (Moves on screen.)  This is much easier.

22    A.    (Looks.)  Okay.

23    Q.    All right.  So is it correct that you said -- with

24    respect to this other third partner that Veldhuis and

25    Sexton had made some reference to, is it correct that
```

A2578

```
 1    you said that third partner "handled the shell company
 2    and nominee accounts"?
 3    A.    I don't -- I don't recall those specifics, no.
 4    Q.    Do you recall saying to them with respect to this
 5    third partner, "Their third partner took responsibility
 6    for the shell and hiding shares with nominees," do you
 7    recall that?
 8    A.    I don't recall that.
 9    Q.    Well as you sit here today do you have a
10    recollection of the fact that that was the context in
11    which Veldhuis and Sexton talks about having another
12    individual involved, that it was in relation to those
13    parts of the deal?
14    A.    (Pause.)  I'm not sure I understand the question.
15    Q.    Do you have a recollection of the fact, as you
16    have explained to them, that when Veldhuis and Sexton
17    referred to another partner, they spoke about someone
18    who was involved with the shell companies and with the
19    nominee accounts, just as you said?
20    A.    Yes, there were broad discussions about the
21    various roles.
22    Q.    Okay.  And the one thing that you didn't know at
23    the time was their relationship to a man named Fred
24    Sharp, correct?
25    A.    Correct.
```

1    Q.    So did you know at the time that it was Fred Sharp

2    who handled the shells and dealt with nominee accounts?

3    A.    I did not know that.

4    Q.    You did not have any idea that that's who did that

5    stuff, correct?

6    A.    I didn't know who did it.

7    Q.    All right.

8          So throughout this first proffer session you spoke

9    at great length about Paul Sexton and Mike Veldhuis and

10   lots and lots of meetings that you had, correct?

11   A.    Correct.

12   Q.    And with Graham Taylor, correct?

13   A.    Correct.

14   Q.    You met with them in Vancouver, correct?

15   A.    Yes.

16   Q.    You traveled to Vancouver every few months to meet

17   with the group, correct?

18   A.    Yes.

19   Q.    And that was Sexton, Taylor, Veldhuis, correct?

20   A.    Yes.

21   Q.    (Pause.)  You also talked about encrypted

22   communications that you had with Mr. Sexton and

23   Mr. Taylor and Mr. Veldhuis, correct?

24   A.    Yes.

25   Q.    So during this period of time, according to you,

```
 1    you were using an encrypted communication system called
 2    "Signal," correct?
 3    A.    Yes, briefly.
 4    Q.    Okay.  And that's something on your phone where
 5    the message disappears or is encoded, or what is that?
 6    A.    Yes, it's encrypted.  You could have settings to
 7    make messages disappear.  I didn't like it, so I didn't
 8    use it, um, after a brief try.
 9    Q.    And then, at least according to you, you used a
10    different App, "What's App," with Sexton, Taylor, and
11    Veldhuis, correct?
12    A.    Yes.
13    Q.    Okay.  And again, that's something where the
14    message supposedly disappears?
15    A.    Not on mine, no.
16    Q.    Okay.  So those messages -- so as this was going
17    on, you were not only talking with these people and
18    meeting with these people, you were communicating with
19    them in writing, correct?
20    A.    Yes, but predominantly Mr. Taylor and Mr. Sexton,
21    not so much Mr. Veldhuis.
22    Q.    And we saw a couple of those used during your
23    examination yesterday, correct, the communications you
24    had?
25    A.    Yes.
```

A2581

```
 1    Q.    Okay.  Not one communication relating to Jackson
 2    Friesen, correct?
 3    A.    Correct.
 4    Q.    Not one piece of paper, correct?
 5    A.    Correct.
 6    Q.    Now there came a time when you dealt with the
 7    individual that handled the stock promotion in
 8    connection with these deals, correct?
 9    A.    I had a brief meeting with Mr. Kaitz.
10    Q.    His name is "William Kaitz," correct?
11    A.    Yes.
12    Q.    And he's an individual who was and is engaged in
13    the business of stock promotion, correct?
14    A.    Correct.
15    Q.    And he was introduced to you by Mr. Sexton and
16    Mr. Veldhuis, correct?
17    A.    Yes.
18    Q.    As the guy who was going to do the promotion,
19    correct?
20    A.    As one of the guys, yes.
21    Q.    Okay.  And let's just be clear, um, promotion,
22    stock promotion is permissible, lawful, so long as
23    appropriate disclosures are made, is that your
24    understanding?
25    A.    Yes.
```

A2582

```
 1   Q.    Okay.  And those disclosures have to say, um, "I'm
 2   getting paid to do this, this is advertising," correct?
 3   A.    Yes.
 4   Q.    So as to make sure that the reader knows that this
 5   is not an objective research report, this is paid
 6   advertising, correct?
 7   A.    Yes.
 8   Q.    Okay.  And so in this -- in the deals you were
 9   involved with here with Mr. Kaitz, Mr. Kaitz did make
10   those disclosures, correct?
11   A.    I don't know what disclosures he made.
12   Q.    Okay, you never checked?
13   A.    I never checked.
14   Q.    Okay.  But the one thing we know is you did --
15   totally separate and apart from all of this, you were
16   involved in a stock promotion where there was not proper
17   disclosure, correct?
18   A.    Can you be more specific?
19   Q.    Of the three felonies that you pled to, one of
20   them was -- I think you referred to it as "Touting
21   compensation, nondisclosure," correct?
22   A.    Correct.
23   Q.    Okay.  What does that mean?
24   A.    There is a, um, a company called Emerald Health
25   Pharmaceuticals that was raising funds through an
```

```
 1    offering, there was an analyst, um, who was, um, writing
 2    about that company without disclosing the fact that he
 3    was getting compensated.  I became aware of the
 4    compensation and that's what I was charged with.
 5    Q.    And that is a criminal offense, correct?
 6    A.    Yes.
 7    Q.    And the government did require that you plead to
 8    that offense, correct?
 9    A.    Yes.
10    Q.    Even though they did not require that you plead to
11    perjury or obstruction of justice, correct?
12    A.    Correct.
13    Q.    (Pause.)  Now you had another proffer session that
14    involved the government and the SEC, correct?
15    A.    Yes.
16    Q.    Again this was so that they could decide if they
17    were willing to give you cooperation agreement, yes?
18    A.    I don't know all of their agendas, but, um, yes,
19    that was part of it.
20    Q.    And so you, during that session, were asked again
21    endless questions about whether you could provide
22    evidence against other people, correct?
23    A.    They asked questions about specific people, yes.
24    Q.    Now mainly it had to do with Mr. Sexton, correct?
25    A.    My primary contacts were with Mr. Sexton and
```

A2584

```
 1    Mr. Taylor, yes.
 2    Q.    And so they went through in detail with you what
 3    information you could provide regarding Mr. Sexton?
 4    A.    Yes.
 5    Q.    And what information you could provide regarding
 6    Mr. Taylor?
 7    A.    Yes.
 8    Q.    And what information you could provide regarding
 9    Mr. Veldhuis, correct?
10    A.    Yes.  Yes.
11    Q.    And during those meetings again, they asked what
12    information you could provide about Jackson Friesen,
13    correct?
14    A.    Correct.
15    Q.    And again in those meetings you said that Paul
16    Sexton and Mike Veldhuis talked about other people and
17    that that was -- that that was probably Mr. Friesen,
18    correct?
19    A.    Um, Mr. Sexton and Mr. Veldhuis told me that they
20    had a partner called "Jackson Friesen."
21    Q.    Yes.  So by the time you get to the second
22    proffer, that's what's coming out of you, "Yes, they
23    told me it was Mr. Friesen," correct?
24    A.    I don't recall all the sequences in the proffers.
25    Q.    And then you got your deal from the government,
```

A2585

```
 1    correct?

 2    A.    Yes.

 3    Q.    Okay.  And so last December you went in and you

 4    pled guilty to the three felonies that we've been

 5    talking about, correct?

 6    A.    Yes.

 7    Q.    Those three felonies carry a prison term of at

 8    least 20 years, correct?

 9    A.    I believe, according to the statute, it's -- it's

10    somewhere like that, but I don't know exactly.

11    Q.    Okay, that's obviously a terrifying prospect,

12    correct?

13    A.    Yes.

14    Q.    And there were additional charges that each carry

15    their own separate prison terms of 5 years, correct?

16    A.    Yes.

17    Q.    Now during the negotiations and at the time of the

18    plea, you and the government reached an agreement

19    regarding that offense level that we talked about

20    earlier, correct?

21    A.    Yes.

22    Q.    That offense level is what the Court will take

23    into account, consider in terms of how much prison time

24    to impose, correct?

25    A.    Yes.
```

A2586

```
 1    Q.    And the agreement that you reached leaves you with

 2    an offense level that translates to roughly 5 to 6

 3    years, correct, in prison?

 4    A.    There's the sentencing guidelines and then there's

 5    the statute.  The statute still is --

 6    Q.    The guideline?

 7    A.    Yes.

 8    Q.    Did you and the government, in the plea agreement,

 9    reach an agreement regarding the guideline level?

10    A.    Yes, my lawyer and the prosecutor, um, reached an

11    agreement that I agreed to.

12    Q.    And so is it your understanding that you face more

13    than 5 years in prison under the guideline analysis?

14    A.    Yes.

15    Q.    And the only way that you get a sentence less than

16    that, the only way that that would be reduced, is if

17    Mr. Drabick writes a letter and Ms. Shields writes a

18    letter and they say that you have provided assistance to

19    the government?

20          THE COURT:  Well I've got to interject.  You're

21    saying that's the only way.  Again, the guidelines are

22    advisory, so ultimately it's up to the judge.  You're

23    suggesting that a way is this 5K letter from the U.S.

24    Attorney as one of the things the Judge will consider.

25          Are you willing to put it that way?
```

A2587

1           MS. FRITZ:  Absolutely.  Sorry, your Honor.

2           THE COURT:  No, no, my problem was only just when

3      she said that was the only way.  Ultimately it's going

4      to be up to the Judge.

5           But you do understand that one of the things the

6      Judge will take into account is should the United States

7      Attorney, the Assistant United States Attorney, write

8      this so-called 5K letter, you understand that?

9           THE WITNESS:  I do understand that.

10          THE COURT:  And go ahead, Ms. Fritz.

11          MS. FRITZ:  Okay.

12     Q.   And your sentencing in connection with your

13     criminal case has been adjourned, correct?

14     A.   Yes.

15     Q.   In fact the sentencing date -- there was a

16     sentencing date for next week that was set, I believe?

17     A.   I think it's -- yeah, November.

18     Q.   Pardon me?

19     A.   I think the next date is in November, yes.

20     Q.   Prior to that date being set, your sentencing has

21     been scheduled for this week or next, correct?

22     A.   I don't recall the exact date, but, yes, it was

23     moved.

24     Q.   Okay.  And it was adjourned out to November,

25     correct?

A2588

1    A.    Yes.

2    Q.    Do you know whether that was at the request of or

3    with the consent of the government?

4    A.    It was the government's choice.

5    Q.    Okay.  It was the government's choice because they

6    will not have you go to sentencing until they have seen

7    your cooperation, correct, they want to watch it and see

8    how you do?

9    A.    I don't understand exactly their mechanisms on how

10   they make that decision.

11   Q.    You don't understand that what Mr. Drabick sees in

12   this courtroom is going to be part of his

13   recommendation?

14   A.    Mr. Drabick has made it clear I should tell the

15   truth and he will take that into consideration in

16   writing his letter, and it's up to the Judge to decide

17   what my sentence is going to be.

18   Q.    Okay.  And he is sitting here watching to see how

19   you do with that, correct?

20   A.    I don't know all the reasons why he's here.

21   Q.    So Mr. Drabick is only concerned that you tell the

22   truth, correct?

23   A.    That is my understanding.

24   Q.    So this year the meetings that you had with the

25   government went on, correct?

```
 1          THE COURT:  I don't understand the question?
 2          MS. FRITZ:  We talked about meetings last year and
 3     then the plea, so now we're into this year and there's
 4     more meetings that you're having with the government,
 5     correct?
 6     A.    Yes.
 7     Q.    Okay.  Including a meeting that occurred on April
 8     11th of 2023?
 9     A.    I believe that's the right date, yes.
10     Q.    At that meeting you didn't actually have to deal
11     with -- that meeting was with Mr. London and
12     Ms. Shields, correct?
13     A.    Correct, yeah.
14     Q.    And at that point you didn't have a whole bunch of
15     FBI agents and prosecutors sitting there, right?
16     A.    Correct.
17     Q.    It was just you guys?
18     A.    Yes.
19     Q.    Okay.  Now at that meeting again, there were
20     individuals who were basically taking notes of what you
21     were saying, correct?
22     A.    Yes, there was somebody taking notes.  As you
23     said, there's two people in the meeting, so.
24     Q.    Your lawyer was also there, right?
25     A.    Yes.  Yes.
```

A2590

1    Q.    Okay.  And you were aware that someone was taking

2    notes of the things you were telling him, correct?

3    A.    Yes.

4    Q.    And you were asked in that meeting many of the

5    same questions that you were asked yesterday, do you

6    recall that?

7    A.    Yes.

8    Q.    For example, you were asked by Ms. Shields whether

9    you knew how Sexton and others controlled the stock?  Do

10   you recall that?

11   A.    Generally, yes.

12   Q.    Now when you were asked that yesterday, you

13   readily said it was through these nominee companies and

14   there was a chart that was shown and you were just

15   explaining all of that, correct?

16   A.    Yes.

17   Q.    And suggesting that all of this was discussed and

18   clearly in your meetings with Mr. Sexton and

19   Mr. Veldhuis, correct?

20   A.    Yes, I understood the process.

21   Q.    Okay.  And yesterday you were telling the jury,

22   yes, this was all discussed, these nominees, this --

23   that's how they controlled the stock, correct?

24   A.    Yes.

25   Q.    Okay.  In your discussions in April, isn't it

```
 1    correct that you repeatedly told them that you didn't --
 2    that they did not explain to you how this stock would be
 3    distributed or how they were going to control the
 4    freetrading shares, do you recall that?
 5    A.    I recall not knowing the specifics.
 6    Q.    Did you say to them, "They didn't explain to me
 7    how they were going to control the shares"?
 8    A.    There's different layers of understanding.  Um, as
 9    far as how they were going to be moving it and which
10    account it was going to go into or what the name is on
11    the account, no, I didn't know that, but I understood
12    that it had to be less than 5 percent.  I knew it was
13    going to go into accounts that they controlled.
14    Q.    Okay.  Did you again tell them that you didn't
15    understand details of how they controlled the shares?
16    A.    "Them" was --
17          THE COURT:  "Them" is the SEC attorneys at these
18    meetings?
19          MS. FRITZ:  Yes.
20    A.    Yeah, there's different -- different degrees of
21    specificity, um, in terms of how all of this takes
22    place.  So what I explained is in general terms, what
23    the -- how they hid their beneficial ownership.
24    Q.    Did you in fact say to the SEC that how they
25    controlled the freetrading shares was implicit, not
```

A2592

```
 1   spoken, during the meetings?
 2   A.    No, I was a recipient of the funds, so that was
 3   part of -- part of the control process.
 4   Q.    Okay.
 5   A.    They had to sell those shares and give me some of
 6   the money.
 7         MS. FRITZ:  If I may approach, your Honor?
 8         THE COURT:  You may.
 9   Q.    Again, did you tell the jury yesterday that you
10   knew how they controlled the shares and you went through
11   the chart with Ms. Shields as if this was all part of
12   the discussions with Mr. Sexton?
13   A.    Yes.
14   Q.    All right.  I'm now going to show you a 6-page
15   document, a Dr. Dhillon interview for 11-23.  I'm going
16   to direct your attention to this portion, the bottom of
17   the first page.
18   A.    (Reads.)  Yes.
19   Q.    All right.  Does that refresh your recollection
20   that what you told them was that they didn't explain the
21   way the shares would be distributed and that you didn't
22   understand the details of it.  Is that what you told
23   them?
24   A.    Um, in general terms.  And as far as --
25   Q.    "Yes" or "No," is that what you told these folks
```

A2593

```
1    in April?

2    A.    (Pause.)  I can't answer that as a "Yes" or "No."

3    Q.    Okay.  So, point blank, do you have a recollection

4    of saying that the individuals involved, the Sexton

5    group, consisting of Sexton, Taylor, Halal, Rasim, and

6    David Sidu, didn't explain to you the distribution, do

7    you have a recollection of telling them that?

8    A.    I don't.

9    Q.    Do you have a recollection of telling them that it

10   was implicit, not spoken, that the Sexton group was

11   going to control freetrading shares, do you recall that?

12   A.    I -- again in general terms, yes.

13   Q.    Okay, so that sounds right?

14   A.    As I said, what I --

15   Q.    Mr. Dhillon, did you sit around in a room with

16   Paul Sexton and Mike Veldhuis and talk about things like

17   "Oh, we're going to set up a bunch of nominee accounts

18   and then we're going to reduce their ownership and

19   that's how we're going to do all of this stuff," did you

20   really?

21   A.    Yes, we discussed that -- they had the shell and

22   in the shell the S-1 was going to go into nominee, and

23   from nominee they were going to sell those shares, and

24   they were going to control them, hold them.

25   Q.    Okay.  You just mentioned S-1.  Can you explain to
```

A2594

```
 1    the jury what an S-1 is?
 2    A.    The shell has original shareholders and then those
 3    shares have to go from the original shareholders to the
 4    control groups so that they can sell those shares.
 5    Q.    And that's properly done with a registration
 6    statement, correct?
 7    A.    Yes.
 8    Q.    In fact as long as we're talking about this, you
 9    mentioned with respect to the deals you were talking
10    about yesterday, that a registration statement was filed
11    with respect to stock in that issue, do you recall
12    mentioning that?
13    A.    Which issue?
14    Q.    I believe it was Arch.  I'd have to go back and
15    look at my notes.
16    A.    It -- it was Stevia that the registration was on
17    the -- on the fourth round.
18    Q.    On the what?
19    A.    On Round 4 of the Stevia.
20    Q.    Oh, okay.  A registration statement was filed?
21    A.    Yes.
22    Q.    Okay.  Now that registration statement was filed
23    because through all of these deals there were a whole
24    bunch of lawyers that were involved in dealing with
25    securities law requirements, correct?
```

```
 1    A.    Correct.

 2    Q.    Who, for example, drafted the registration

 3    statement?

 4    A.    Um, I'm not -- we dealt with so many lawyers that

 5    that one might have been Mr. Mark Lee.

 6    Q.    Okay, Mr. Mark Lee is a partner at Greenberg

 7    Traurig, correct?

 8    A.    Correct.

 9    Q.    And Greenberg Traurig is a big law firm, correct?

10    A.    Right.

11    Q.    Which undoubtedly received a whole bunch of money

12    in connection with these deals, correct?

13    A.    Yes, they got paid for their services, which were

14    not always on time though.

15    Q.    Okay.  And that was for their advice in relation

16    to these deals and their drawing up documents that

17    needed to be done in connection with these deals,

18    correct?

19    A.    Right.

20    Q.    Okay.  And one more here.  Did you say that you --

21    you, "Didn't understand the details of how they

22    controlled freetrading shares"?

23    A.    Yes, as I said earlier, Mr. Sharp, which I didn't

24    know of, he was the one who was handling it.  So in

25    terms of the exact details and what was taking place,
```

A2596

```
 1    well I didn't take notes on the companies and so forth.
 2    But again I knew what the end game was and how that was
 3    going to be achieved.
 4    Q.    And now you know that at some point Paul Sexton
 5    and Mike Veldhuis became associated with Fred Sharp in
 6    connection with these deals, you now know that?
 7    A.    Now I know that, yes.
 8    Q.    And so you now know that sure enough they did have
 9    another partner dealing with all this behind the scenes,
10    correct?  Correct?
11    A.    I don't think I can answer that as a "Yes" or
12    "No."
13    Q.    All right.  Now I want to talk with you about the
14    issues, the things that were asked, and the things that
15    you said about Mr. Friesen during the course of this
16    interview with the SEC in April, okay?
17    A.    Okay.
18    Q.    Now in prior testimony you had said, in response
19    to being asked "Who was involved in these deals?  Was
20    Jackson Friesen involved?"  And at one point you had
21    said, "Jackson Friesen was probably involved," correct?
22    A.    I believe so, yes.
23    Q.    Pardon me?
24    A.    Yes.
25    Q.    Okay.  So now you're sitting with Mr. London and
```

A2597

```
 1    you're sitting with Ms. Shields and the same thing is
 2    happening, they're asking you "Who was involved?  Was
 3    Mr. Friesen involved?"  Correct?
 4    A.    Yes.
 5    Q.    So in this meeting and at this point you're not
 6    staring into the faces of a whole bunch of FBI agents
 7    and prosecutors, correct?
 8    A.    Correct.
 9    Q.    You're asked -- and specifically with respect to
10    Stevia Round 3, you're being asked, "Who was involved
11    with Sexton and Veldhuis in relation to that deal?"
12    Correct?
13    A.    Yes.
14    Q.    And do you have a recollection of saying "Sexton
15    and Veldhuis were involved" and again saying "Probably
16    Friesen."  Do you remember that?
17    A.    In Round 3?  Um, yes.
18    Q.    Okay.  Not "Oh, yes, there was all this discussion
19    about Mr. Friesen," your response to them was "Probably
20    Friesen," in response to their questions, correct?
21    A.    (Silence.)
22    Q.    Correct?
23    A.    I don't recall specifically, but, um -- I don't
24    know exactly.
25    Q.    Okay.  So then they continued asking you about the
```

A2598

```
 1    deals that you talked about yesterday and they ask you
 2    about the point at which Stevia changed to "VBIO," which
 3    is "Vitality," correct?
 4    A.    Yes.
 5    Q.    All right.  And at that point again they're saying
 6    "Who is it, who is involved?"  And you're saying it was
 7    Sexton, Veldhuis, and a "third partner behind the
 8    scenes," correct?
 9    A.    Yes.
10    Q.    And again they're saying, "This is Jackson
11    Friesen?  This is Jackson Friesen?"  And at that point
12    you say you're "pretty sure it was Sexton and Veldhuis
13    and Friesen" because you're "pretty sure Sexton and
14    Veldhuis had mentioned Friesen's name," correct?
15    A.    Yes.
16    Q.    Okay.  And then the interview goes on and we're
17    talking about Arch, the same kinds of questions, right,
18    "Who's involved?"  Correct?
19    A.    Yes.
20    Q.    And you're saying that the Sexton group was
21    involved, it was Sexton and Veldhuis and a third person,
22    you said that again, correct?
23    A.    I believe so.
24    Q.    And this time you said, "I can't say for certain
25    if it's Friesen."  Do you recall that?
```

A2599

1    A.    Um, I don't -- I don't remember that, no.

2         MS. FRITZ:  Well if I can approach again, your

3    Honor, I'm going to show him the same depo, Page 6.

4         THE COURT:  You may approach.

5    Q.    I'm directing your attention to the portion there.

6    A.    (Reads.)  Okay.

7    Q.    Does that refresh your recollection regarding

8    telling them, with respect to Arch, that the group was

9    Sexton, Veldhuis, and a third person, but you can't say

10   for certain if it's Friesen and" --

11        Well does that refresh your recollection that

12   that's what you told these folks in April?

13   A.    I don't recall exactly what I said.

14   Q.    Okay.

15        MS. FRITZ:  Your Honor, at this time I would offer

16   that portion of the interview notes for the interview on

17   April 11th, 2023.

18        MS. SHIELDS:  Objection.

19        THE COURT:  Sustained.  But let's mark it for

20   identification.

21        What's the next letter for identification?

22   Anyone.

23        MS. SHIELDS:  Well we've marked a Demonstrative A.

24        THE COURT:  No, a demonstrative is something else.

25        MS. SHIELDS:  Okay.

A2600

```
 1              THE COURT:  We have the whole list of documents.
 2              MS. SHIELDS:  Then RK.
 3              THE COURT:  RK.  Thank you.  The document will be
 4      marked RK for identification.
 5              Anything else, Ms. Fritz?
 6              MS. FRITZ:  Just a few more questions, your Honor.
 7              THE COURT:  Go ahead.
 8      Q.    Okay.  Again while there was this talk going on
 9      during this period of Veldhuis and Sexton being --
10      dealing with a third person, during that whole period
11      you were unaware that they had entered into a
12      relationship with Fred Sharp, correct?
13      A.    Correct.
14      Q.    You only learned that later?
15      A.    Yes.
16      Q.    Okay.  And just quickly let's talk about the fact
17      that you mentioned yesterday that you had met with
18      Ms. Shields prior to your testimony today, right?
19      A.    Yes.
20      Q.    So you don't live in this area, correct?
21      A.    Correct.
22      Q.    How long have you been here in anticipation of
23      testifying?
24      A.    I came Sunday -- Sunday night.
25      Q.    Okay.  And how many times have you come in for
```

A2601

1    meetings with Ms. Shields?

2    A.    Um, since April?

3    Q.    Throughout the year.

4    A.    Um, I don't know exactly the number, but, um, I

5    believe there was two prior and then two during this

6    last week.

7    Q.    All right.  Has Ms. Shields come and met with you

8    where you live in California?

9    A.    No.

10   Q.    And how many hours would you estimate you have

11   spent with this group, Mr. London, Ms. Shields, the

12   other folks, how many hours this year do you think you

13   have spent talking with them to prepare for your

14   testimony?

15   A.    Um, I'd have to think about that for a second.  In

16   April, I came for my declaration, um, they took notes

17   and turned that around.  I think I was there for, um, 3

18   or 4 hours, or 2 or 3 hours, I can't remember the exact

19   number, but we did a thorough declaration.  I met with

20   them again for a couple hours.  And then while I've been

21   here, we've had two additional meetings.  So, um, at

22   least a dozen hours.

23   Q.    Okay.  During the course of those meetings, did

24   Ms. Shields go over with you the questions that she was

25   reading from here yesterday?

```
1    A.    She did go over some of the questions, yes.
2    Q.    And you rehearsed how you would respond to those,
3    correct?
4    A.    We talked about how to answer those questions.
5    Q.    Yes.  All right.
6          MS. FRITZ:  Nothing further.
7          THE COURT:  Ms. Pickett, anything for this
8    witness?
9          MS. PICKETT:  Just quickly, your Honor.
10         THE COURT:  Well we're close to the break, so it
11   need be quite quick.
12         MS. PICKETT:  Yes, your Honor.
13
14   CROSS-EXAMINATION BY MS. PICKETT:
15   Q.    I'm Karen Pickett, I represent your co-defendant
16   in the civil case, Yvonne Gasarch.
17         Have you ever met Yvonne Gasarch?
18   A.    I have not.
19   Q.    Okay.  And I believe on your cross-examination you
20   said that you were pursued by the SEC in this case that
21   we're sitting here today on in August of 2021?
22   A.    Yes.
23   Q.    And Ms. Gasarch is only your co-defendant in the
24   civil case, not the criminal case, is that correct?
25   A.    That's correct.
```

A2603

```
 1    Q.    And prior to the SEC bringing the civil case
 2    against you and Mrs. Gasarch, had you ever heard of
 3    Mrs. Gasarch?
 4    A.    I had not.
 5          MS. PICKETT:  Thank you.
 6          THE COURT:  Nothing further?  And you want
 7    redirect?
 8          MS. SHIELDS:  Very briefly.  But if your Honor
 9    wishes to take the break, we can --
10          THE COURT:  Yeah, I think it makes sense to take
11    the break now.
12          Ladies and gentlemen, we haven't heard all the
13    evidence, so keep your minds suspended, do not discuss
14    the case either among yourselves, nor with anyone else.
15    We'll stand in recess for 1 half hour until 11:15.
16    We'll recess.
17          THE CLERK:  All rise for the jury.
18          (Jury leaves, 10:45 a.m.)
19          MR. KLUNDER:  Your Honor?
20          THE COURT:  Yes, what?
21          MR. KLUNDER:  There may be an issue that arises
22    this afternoon.  The next witness is Mr. Kaitz, but
23    after that we plan to play the deposition of
24    Mr. Nikolayev, the SEC-designated portion of that
25    transcript.  Ms. Pickett had requested that the entire
```

```
 1    transcript be played.  We suggested that the time should
 2    be allocated accordingly.  Ms. Pickett responded that
 3    she only wants the questions she asked during the
 4    deposition, which are about 10 minutes, to be attributed
 5    to her side.  So we're proposing --
 6           THE COURT:  Oh, I think I understand.
 7           No, if you want it played, even though they're
 8    asking questions, it comes from your time.
 9           MR. KLUNDER:  Thank you, your Honor.
10           THE COURT:  And you'll inform me as to the
11    portions.  In other words, you can figure out the time
12    now precisely.  I want to be informed about that,
13    because I'm not going to follow along the designations.
14           MR. KLUNDER:  We'll have to do some calculations,
15    but we'll let you know.
16           THE COURT:  Okay.
17           (Recess, 10:45 a.m.)
18           (Resumed, jury enters, 11:15 a.m.)
19           THE COURT:  Go ahead, Ms. Shields.
20
21    REDIRECT EXAMINATION BY MS. SHIELDS:
22    Q.   Good morning again.  So on cross Ms. Friesen asked
23    you a series of questions about --
24           MS. FRITZ:  Ms. Friesen?
25           THE COURT:  Um, you said Ms. Friesen, but you
```

A2605

```
 1    meant --
 2          MS. SHIELDS:  Yes, I'm sorry, Ms. Fritz.
 3          MS. FRITZ:  I'm no relation to Mr. Friesen.
 4          MS. SHIELDS:  Yes, I'm sorry.
 5    Q.    On cross Ms. Fritz asked you a series of questions
 6    on whether you pled guilty to obstruction of justice, do
 7    you remember that?
 8    A.    Yes.
 9    Q.    Okay.  And she also asked you a series of
10    questions about the calculation of your sentence under
11    the sentencing guidelines, do you remember that?
12    A.    Yes.
13    Q.    Okay.  Was the sentence, um, your sentencing
14    calculation under those guidelines enhanced because of
15    the obstruction of justice?
16    A.    I believe so, yes.
17    Q.    And so what that means, in other words, is that
18    your sentencing level under the guidelines, you got some
19    extra points added to it because you engaged in
20    obstruction of justice, is that right?
21    A.    Yes.
22    Q.    So did you accept responsibility for obstruction
23    of justice in that way?
24    A.    Yes.
25    Q.    Okay.  Second, do you remember on cross Ms. Fritz
```

```
 1    asked you a couple of times about why you didn't lie
 2    about or whether you lied about Mr. Friesen in the first
 3    SEC investigative testimony.  Do you remember that?
 4    A.    Yes.
 5    Q.    She showed you a section from it.
 6    A.    Yes.
 7    Q.    So at the time of that testimony, that was 2019,
 8    right?
 9    A.    Yes.
10    Q.    Okay.  And so at that point in time had you had
11    written communications with Mr. Sexton and Mr. Veldhuis?
12          THE COURT:  I don't understand the question.  You
13    mean prior to that --
14          MS. SHIELDS:  Yes.
15    Q.    So before that -- so that investigative testimony
16    was in 2019, right?
17    A.    Yes.
18    Q.    So before 2019, had you had written communications
19    with Mr. Sexton and Mr. Veldhuis?
20    A.    Yes.
21    Q.    And the SEC was showing you a whole bunch of
22    documents at that SEC -- during that investigative
23    testimony, is that right?
24    A.    Yes.
25    Q.    And so did you know it might be dangerous to lie
```

A2607

```
 1    about not knowing them because you had written
 2    communications?
 3          MS. FRITZ:  Objection.
 4          THE COURT:  Sustained.  Sustained.
 5          My problem is that that's all speculative.  So
 6    let's -- the fact of what went on and what was before
 7    him, um, you may inquire.
 8    Q.    At that SEC investigative testimony, did you lie
 9    about not knowing Mr. Friesen?
10    A.    Yes.
11    Q.    Next, um, Ms. Fritz asked you about some notes of
12    a proffer session that were taken by the FBI, do you
13    remember that?
14    A.    Yes.
15    Q.    Were those your notes?
16    A.    No.
17    Q.    Had you ever seen them before Ms. Fritz showed
18    them to you today?
19    A.    No.
20    Q.    Were you ever asked to review them for accuracy?
21    A.    No.
22    Q.    All right.  I want to ask you about a portion of
23    them that Ms. Fritz didn't show to you.
24          So on that same day that she showed you the notes
25    for, do you remember telling the FBI "Sexton and
```

A2608

```
 1      Veldhuis always referred to Friesen as their partner.

 2      Friesen was to get an equal share of the proceeds.

 3      Allocations of proceeds accounted for Friesen's share."

 4           MS. FRITZ:  Objection.

 5      Q.   Do you remember that?

 6           THE COURT:  No, no, wait a minute.

 7      A.   Well --

 8           THE COURT:  Yeah, wait a minute, and I'm slow.

 9      You have to give me a moment.

10           THE WITNESS:  Yes.  So sorry.

11           (Pause.)

12           THE COURT:  Well come to the sidebar.

13

14           AT THE SIDEBAR

15           THE COURT:  Now the document is not in evidence,

16      so how can you read from it and get him to simply adopt

17      that?

18           MS. SHIELDS:  It's exactly what Ms. Fritz did.

19           THE COURT:  But you called the witness.  She's

20      cross-examining on the document on aspects that this

21      suggests -- I think she did a professional job, but that

22      he is enhancing his testimony each time he gets out.

23      Now you may ask him questions, but redirect is just

24      that, it's redirect.

25           So how are you going to get in what he said on
```

A2609

```
1    prior occasions with the material that you have, how are
2    you going to do that?
3         MS. SHIELDS:  It's a prior consistent statement,
4    your Honor, to rebut the suggestion that he's
5    fabricating the statement.
6         THE COURT:  Why shouldn't she be allowed not to
7    read from this, but ask "What did you say about thus and
8    so?"
9         MS. FRITZ:  The formulation of the question was
10   improper.
11        THE COURT:  Well, so you say.  Yeah, I think she
12   knows how to do it.  But I'm standing on my ruling, it's
13   sustained, but she may bring out prior consistent
14   statements from this witness.  And the matters that you
15   know of are consistent with the statement.
16        MS. FRITZ:  I would ask that she do it without
17   leading him by the nose.
18        THE COURT:  Oh, well, I understand that.
19        You won that, didn't you?
20        MS. FRITZ:  Okay, thank you.
21        MS. SHIELDS:  If he doesn't recall --
22        THE COURT:  It's not a seminar.  It's not a
23   seminar, but, I can't resist, of course you can, but you
24   have to show it to him in front of the jury so that they
25   will see that you are proffering it.
```

A2610

```
 1          MS. SHIELDS:  Okay, fair enough.

 2

 3          (In open court.)

 4    Q.    Dr. Dhillon, in that interview with the FBI that

 5    Ms. Fritz asked you about earlier, were there a number

 6    of occasions during that interview where you talked

 7    about Mr. Friesen?

 8          MS. FRITZ:  Objection.

 9          THE COURT:  Sustained, you're leading the witness.

10    We just talked about that.

11    Q.    Did Mr. Friesen's name come up multiple times

12    during that interview?

13          MS. FRITZ:  Objection.

14          THE COURT:  The same problem.  You may ask him

15    what he recalls about the matters that we talked about

16    at the sidebar.

17    Q.    Dr. Dhillon, um, what do you recall about

18    Mr. Friesen's name coming up in the interview in which

19    you participated with the FBI on January 31st, 2022?

20    A.    Um, generally I recall being asked about

21    Mr. Friesen, um, generally being asked what I knew about

22    him.  But I don't recall all the specific questions that

23    I was asked.

24    Q.    Would it refresh your recollection to look at

25    notes that were taken of that interview?
```

A2611

```
 1   A.    I think it would help, yes.
 2         MS. SHIELDS:  May I approach, your Honor?
 3         THE COURT:  You may.
 4   Q.    And I show you this same set of notes that
 5   Ms. Fritz showed you and I ask you to read to yourself
 6   this portion here.
 7   A.    (Reads.)  Okay.
 8   Q.    Now that you've looked at that document, sir, does
 9   that help you to remember some of the other things that
10   you talked about during that FBI interview?
11   A.    Yes.
12   Q.    What does it cause you to remember?
13   A.    Um, it helps me to, um, place in the context of
14   the relationship or lack thereof with Mr. Friesen.  My
15   primary contacts were Mr. Sexton and Veldhuis, um, they
16   talked about another partner.  This contact was back in
17   2011.  And thinking it through and piecing all the
18   pieces, I'm trying to remember when his name came up and
19   how often it came up is, um, what is helping me to try
20   to understand.  Yes, I remember being asked questions
21   about Mr. Friesen in that interview.
22   Q.    And does looking at these notes help you to
23   remember anything that you told the FBI on that topic?
24   A.    Um, I don't remember all the details, um, what I
25   said at that particular time.
```

A2612

1    Q.    In addition, Ms. Fritz asked you a lot of

2    questions about this 5K letter that you are, um,

3    expecting the government will write as part of this

4    process of your cooperation, is that right?

5    A.    Yes.

6    Q.    Okay.  What is your understanding about what you

7    have to do in order for the government to write you that

8    5K letter?

9    A.    My understanding is to be complete and truthful,

10   um, in my answers and in any, um, cooperation that the

11   government wants, and that is the primary requirement.

12   If there's any lying, then it undoes all the benefit of

13   it.

14   Q.    So what is your understanding about what happens

15   if you don't tell the truth?

16   A.    Then the government, um, obviously doesn't have to

17   honor that agreement and certainly can take, um, the

18   full course of action that they deem is appropriate.

19   Q.    Ms. Fritz also asked you a bunch of questions

20   about stock promotions.  So, sir, what is your

21   understanding about whether stock promotions have to --

22   what is your understanding, sir, about what stock

23   promotions need to disclose about who is paid?

24   A.    My understanding is, you know, it has to be very

25   clear where the funds are coming from, um, who's paying

A2613

```
 1    for that particular promotion.
 2    Q.    And what is -- what is your understanding about
 3    whether a promotion needs to disclose the people who are
 4    behind the sales of that stock?
 5    A.    Um, my understanding is that somebody that writes
 6    a promotion or a promotional piece has to declare
 7    whether they are compensated or not.  If they didn't get
 8    compensated, it's an independent analytical review.  If
 9    they got compensated, then they need to disclose that.
10    And certainly if that compensation is related to any
11    sale of shares, then that's, um, that's a big issue.
12    Q.    Okay.  Ms. Fritz also asked you about, um, a
13    registration statement that was associated with the
14    fourth round of the Stevia First Vitality deal.  Do you
15    remember that line of questions?
16    A.    Yes.
17    Q.    Were there issues with that registration
18    statement?
19    A.    Yes.
20    Q.    Describe that for us.
21    A.    There was a registration statement filed and the
22    SEC had a lot of questions and queries and that, um, the
23    company was never able to address all of the concerns
24    that the SEC had.  So that registration statement never
25    became effective.
```

```
 1    Q.    And then the last things I want to ask you about

 2    is Ms. Fritz showed you a set of notes that was taken

 3    after you met with the SEC in April of this year.  Do

 4    you remember that?

 5    A.    Yes.

 6    Q.    Okay.  And what -- what was the -- what was that

 7    interview for, what was the purpose of that interview?

 8          MS. FRITZ:  Objection, foundation.

 9          THE COURT:  No, overruled.

10    A.    The purpose of that interview was to take my

11    declaration, my affidavit.

12    Q.    Can you describe what that means, for the jury?

13    A.    Um, Ms. Shields had contacted my attorney to be

14    able to set up a time for a declaration, um, and a

15    declaration is, um, my affidavit, my statement of facts,

16    and, um, it's based on questions that Ms. Shields had.

17    I -- I asked her if I could do that in person as opposed

18    to over Zoom or WebEx.

19    Q.    And what happened -- did you ever -- did we ever

20    send you a copy of the notes of that interview?

21          MS. FRITZ:  Objection.

22          THE COURT:  No, she may have that.

23          Have you ever seen a copy of the notes, if any

24    there be, of that interview?

25          THE WITNESS:  Yes, there was a draft that I got to
```

A2615

```
1    review and I made some edits and we went back and forth
2    on a few points.  But, yes, I did get a chance to review
3    it and comment on it.
4    Q.   So the -- what you saw though was that was a draft
5    -- was that a draft of your declaration?
6         MS. FRITZ:  Objection.
7         THE COURT:  Sustained, you're leading the witness.
8    Q.   What draft did you see?
9         MS. FRITZ:  Objection, asked and answered.
10        THE COURT:  No, overruled.  She may have it.
11   A.   I saw one of -- initial drafts of the declaration
12   that I got to review.
13   Q.   And what did you do with that draft when you got
14   it?
15   A.   I reviewed it thoroughly, I made some changes to
16   it, and, um -- and I referred it to my attorney, who
17   then referred it to you.
18   Q.   Thank you very much, Dr. Dhillon.
19        THE COURT:  Nothing further for this witness,
20   Ms. Fritz?
21        MS. FRITZ:  Very briefly, your Honor.
22        THE COURT:  You may.
23
24   RECROSS-EXAMINATION BY MS. FRITZ:
25   Q.   So, Mr. Dhillon, Ms. Shields just asked you again
```

A2616

```
 1    about a proffer session that occurred that included the
 2    FBI and included Mr. Drabick, correct?
 3    A.    Yes.
 4    Q.    Okay.  And then after that, this year, you sat
 5    down with the SEC in April and talked with them about
 6    these same issues, correct?
 7    A.    Yes, for my declaration.  Yes.
 8    Q.    And during that session you weren't staring into
 9    the face of the FBI or the representative of the
10    Department of Justice, correct?
11    A.    Correct.
12    Q.    You were talking with these folks, correct?
13    A.    Correct.
14    Q.    These same folks that are sitting here right now,
15    correct?
16    A.    Yes.
17    Q.    And it was during that interview that you told --
18    with respect to Mr. Friesen, that he was probably
19    involved in one of the transactions, correct?
20    A.    I don't recall specifically what I said.
21    Q.    We talked about this earlier.  That you stated
22    that Veldhuis and Sexton and probably Friesen were
23    involved in connection with Round 3 of Stevia, do you
24    recall talking about that earlier?
25          MS. SHIELDS:  Objection.
```

```
 1          THE COURT:  Sustained.  We've been over it.
 2          MS. FRITZ:  Okay.
 3   Q.    And then, when they asked you about VBIO, it was
 4   then that you said, "Well it was Sexton, Veldhuis, and"
 5   -- and you were pretty sure they mentioned Mr. Friesen's
 6   name, correct?
 7          MS. SHIELDS:  Objection, misstates prior
 8   testimony.
 9          THE COURT:  It does.  Sustained.
10          MS. FRITZ:  All right.
11   Q.    Let's just take a look at the interview notes.
12   And I'm showing you Page 5.  I'm going to ask you to
13   take a look at that and ask if that refreshes your
14   recollection regarding whether you said you were "pretty
15   sure"?
16   A.    (Reads.)  I don't know exactly what I said.
17   Q.    Okay.  And last but not least, with respect to
18   Arch, you were asked by these folks about who was
19   involved in that?  And do you recall telling them it was
20   Sexton, Veldhuis, and a third person, but you can't say
21   for certain if it's Friesen?
22   A.    I don't recall exactly what I said, no.
23   Q.    Okay.  And I'm going to ask you to take a look at
24   Page 6 of the notes and ask you if that refreshes your
25   recollection regarding that being what you told these
```

```
 1    folks?
 2    A.    (Reads.)  I just said I can't recall exactly what
 3    I said.
 4    Q.    All right.  Looking at it right now, does it --
 5    does this appear correct in terms of what you said to
 6    these folks?
 7          MS. SHIELDS:  Objection.  Your Honor, he said he
 8    can't recall.
 9          THE COURT:  Wait a minute.  Wait a minute.
10    Overruled.  You may answer.
11    A.    As I said, I don't recall all the specifics.  I
12    try to answer the questions to the best of my abilities.
13          THE COURT:  That's his answer.
14          MS. FRITZ:  Okay.
15    Q.    And then, after all of the statements that you
16    made during your interview with the SEC, these folks
17    bring you in front of this jury and now have you say
18    that, yes, there was -- that Jackson Friesen was
19    involved, correct?
20    A.    They're not asking me to say anything, they're
21    asking me to tell the truth.
22    Q.    Okay.  And do you know if what they're asking you
23    to say is inconsistent with exactly what you told them
24    in April?
25    A.    That's not the way I understand it, no.
```

A2619

```
 1          MS. FRITZ:  I'm done.

 2          THE COURT:  Ms. Pickett, nothing?

 3          MS. PICKETT:  I'm all set, your Honor.  Thank you.

 4          THE COURT:  Nothing further for this witness?

 5          MS. SHIELDS:  Nothing further, your Honor.

 6          THE COURT:  You may step down.  Thank you.

 7          Call your next witness.

 8          MR. KLUNDER:  The Commission calls William Kaitz.

 9          THE COURT:  He may be called.

10          (Witness takes stand.)

11          (WILLIAM T. KAITZ, sworn.)

12

13          ****************

14          WILLIAM T. KAITZ

15          ****************

16

17     DIRECT EXAMINATION BY MS. KLUNDER:

18     Q.    Good morning, Mr. Kaitz.  Would you please state

19     your full name for the record.

20     A.    William Kaitz.

21     Q.    And where do you live, Mr. Kaitz?

22     A.    Arnold, Maryland.

23     Q.    Did you graduate from high school?

24     A.    With a general equivalency, yes.

25     Q.    Okay.  Any formal education after that?
```

A2620

1    A.    None.

2    Q.    Would you briefly describe your employment

3    history.

4    A.    I started my first job in JC Penny in retail.  I

5    then worked for my father in the computer repair

6    maintenance industry.  I then worked as a bricklayer for

7    a number of years before working in an investor

8    relations firm around 2004 or '5, in a various amount of

9    capacities in investor relations, till about 2011 when I

10   started Full-Service Media.  And have been in the

11   investor-relations field, self-employed.

12   Q.    Would you explain to the members of the jury what

13   you mean when you say "investor relations"?

14   A.    "Investor relations" is a service that provides

15   exposure to investors on behalf of small -- well all

16   publicly-traded companies, but in my business small

17   publicly-traded companies.

18   Q.    And what is the purpose of that exposure?

19   A.    Their hope is that -- the public company's hope is

20   that they can increase their shareholder base, which

21   allows more trading volume in their stock and better

22   opportunity to raise capital.

23   Q.    And you said "trading volume," what does that

24   mean?

25   A.    "Trading volume" is the amount of shares that

1    trade on a daily basis.

2    Q.    And so you said the public companies want to

3    increase their investor base.  How does investor

4    relations do that?

5    A.    It raises awareness of the opportunity that that

6    company presents in the market with a large number of

7    potential investors.

8    Q.    I want to focus on the time period of 2011 to

9    2018.  What were you doing for work during that time

10    period?

11    A.    I was running Full-Service Media, providing

12    investor relations campaigns.

13    Q.    And what is a "campaign"?

14    A.    Um, a "campaign" is a concentrated effort.  For me

15    my services revolve around, um, distributing

16    advertisements on the web, primarily both online and in

17    direct mail.

18    Q.    And those campaigns relate to specific public

19    companies?

20    A.    Yes, ma'am.

21    Q.    Is there a particular type of public company for

22    which your services were used?

23    A.    Um, not in industry, but in size.  So the majority

24    of the clients I've worked with are, you know, they

25    trade below -- they're in the smaller micro or nanocap

1    range, which means they all trade usually less, you

2    know, $300 to $500 million of market capital.

3    Q.    And what about the price per share of those?

4    A.    The price per shares range anywhere from, you

5    know, 50 cents to $5.

6    Q.    How do you reach potential investors?

7    A.    I use, um, financial publication -- online

8    financial publications, media sources, websites that are

9    skewed more towards investors, as well as direct mail

10   lists that target investors that buy those publications

11   via the mail.

12   Q.    Do you have an understanding of what market

13   activity looks like for a given stock when you're hired

14   to promote that stock?

15   A.    Um, can you -- I don't understand the question.

16   Q.    Sure.

17         So prior to your engagement, does market activity

18   look a particular way for campaigns you're hired on?

19         THE COURT:  Could you ask it again?  I'm sorry.

20         MR. KLUNDER:  Sure.

21   Q.    When you're engaged, what does the market activity

22   look like in that company's stock?

23         MS. FRITZ:  Objection.

24         THE COURT:  No, overruled.  I assume she's asking

25   as a routine matter, "When they engage you, what's the,

A2623

```
 1    um, market activity look like?" is your question, and
 2    I'll allow that.
 3    A.    During the course of my engagement or my
 4    campaigns, during the course of the campaigns?
 5    Q.    Let's start at the outset, before your engagement
 6    starts.
 7          MS. FRITZ:  Is this with respect to a particular
 8    company?
 9          THE COURT:  No, he's asking about the routine
10    practices of his business, and I'm admitting it under
11    406.
12    A.    The -- there are a lot of public companies, the
13    trading volume varies depending on the company.  I would
14    say that the average is they trade anywhere from a few
15    hundred dollars worth of stock a day to a couple hundred
16    thousand dollars worth of stock a day at the time I'm
17    hired.
18    Q.    And what happens once you've been hired?
19    A.    The results also vary, but the hope is that the
20    trading volume increases.
21    Q.    And what happens in the ordinary course when a
22    campaign ends, how does that impact trading volume?
23    A.    Um, trading volume, I would say typically
24    decreases.
25    Q.    When you first started Full-Service Media in 2011,
```

A2624

```
 1    how were you compensated?
 2    A.    Um, typically I'm paid a percentage of a budget.
 3    When I first started Full-Service, I was paid a
 4    consulting fee and a small percentage of the budget as
 5    well.
 6    Q.    And what percentage of the budget are you
 7    typically paid?
 8    A.    Between 10 and 20 percent.
 9    Q.    And when you say "budget," what does that mean?
10    A.    It's the total amount of money that we apply
11    towards buying media, which is what we call "placing the
12    ads."
13    Q.    Is there an average budget that you have with
14    Full-Service Media?
15    A.    No.
16    Q.    Who paid those fees at the outset in 2011?
17    A.    I had a variety of clients, all, um, at that
18    time -- at that time all third-party payers.
19    Q.    And can you explain to the jury what you mean by
20    "third-party payers"?
21    A.    Um, "third-party" just means not the public
22    company itself.
23    Q.    Did that change over time?
24    A.    Um, for me, yes.  In my last, um, 6 years, I've
25    only been paid directly from the public companies
```

A2625

```
 1    themselves.
 2    Q.    And why did you make that change?
 3    A.    Um, I made that change for my own personal
 4    benefit, it's a much better way of doing business.
 5    It's, um -- I came to that decision in concert with
 6    advice from counsel.
 7    Q.    When did you first become aware of this
 8    litigation?
 9    A.    On August 6th, 2020.
10    Q.    And why is that?
11    A.    I received a phone call from my attorney that my
12    assets had been frozen and I've been named in a sealed
13    complaint for this matter.
14    Q.    Have you resolved this case with the SEC?
15    A.    I have.
16    Q.    And what were the terms of that resolution?
17    A.    I paid $1.3 million, um, I took a penny stock bar,
18    and I'm enjoined from breaking the law again, um, at
19    all.  Pardon me.
20    Q.    Are you familiar with the defendants that are
21    disputing liability in this trial?
22    A.    Um, just Friesen.
23    Q.    Okay.  In other words, you don't know Yvonne
24    Gasarch?
25    A.    No.
```

A2626

```
 1    Q.    You never communicated with Yvonne Gasarch?

 2    A.    No.

 3          MR. KLUNDER:  Can we show Exhibit AK.

 4          (On screen.)

 5    Q.    Mr. Kaitz, on your screen momentarily you should

 6    see a single-page document.

 7    A.    Okay.

 8    Q.    Do you recognize that?

 9    A.    (Looks.)  I'm not seeing anything.

10          MR. KLUNDER:  Jenn, may we have the witness --

11          (Adjusts witness's screen.)

12          THE CLERK:  He has it.

13          MR. KLUNDER:  Okay, great.

14    Q.    Do you recognize this?

15    A.    Yes.

16    Q.    What is it?

17    A.    This is an Xphone communication.

18    Q.    And who is on this communication?

19    A.    This is myself, Friesen, Veldhuis, and Sexton.

20          MR. KLUNDER:  Your Honor, I move the admission of

21    this exhibit.

22          THE COURT:  No objection?

23          MS. FRITZ:  Objection based on the same

24    discussions that we've had.

25          THE COURT:  Noted, and your rights are saved.  But
```

A2627

```
 1   the document is admitted.
 2          And it will be number what?
 3          MR. KLUNDER:  11.
 4          THE COURT:  Exhibit 11 in evidence.
 5          MR. KLUNDER:  Thank you, your Honor.
 6          (Exhibit 11, marked.)
 7   Q.     Are you familiar with Mr. Friesen?
 8   A.     Yes.
 9   Q.     And how is it that you know Mr. Friesen?
10   A.     Um, Friesen and I met in, um, either 2009 or 2010.
11   We've done some -- you know we've done some work
12   together and we've had a friendship over a number of
13   years.
14   Q.     What kind of work did you do together?
15   A.     Um, Jackson, um, was in venture capital at the
16   time that I met him, um, helping small companies go
17   public and raise capital, and I've been in the business
18   of investor relations, which serves to help companies in
19   their pursuit of capital.  So we were in the same
20   industry on different sides.
21   Q.     And did you work together?
22   A.     He was involved in a number of the projects that I
23   worked on, yes.
24   Q.     Okay.  What about Mr. Veldhuis, are you familiar
25   with him?
```

A2628

```
 1    A.    Yes.

 2    Q.    How are you familiar with him?

 3    A.    Veldhuis referred me the bulk of the business that

 4    Full-Service Media, um, worked on, and I've also

 5    developed a close friendship with him over the years as

 6    well.

 7    Q.    And, I'm sorry, when did you first meet

 8    Mr. Veldhuis?

 9    A.    The same day as Friesen.  I met Friesen first and

10    then Friesen introduced me to Veldhuis on the same day.

11    Q.    And that was at an industry conference?

12    A.    Yes, a conference called "The Malasia" in Las

13    Vegas.

14    Q.    And how about Mr. Sexton, are you familiar with

15    him?

16    A.    Yes.

17    Q.    How are you familiar with him?

18    A.    I don't recall exactly when I was first introduced

19    to Sexton, I want to say 2012, and I was introduced to

20    Sexton by Veldhuis.

21    Q.    Have you met Mr. Friesen in person?

22    A.    Yes, many times.

23    Q.    Have you met Mr. Veldhuis in person?

24    A.    Yes, many times.

25    Q.    Have you met Mr. Sexton in person?
```

```
 1    A.    Yes, many times.

 2    Q.    Have you been in person with the three of them

 3    together?

 4    A.    Yes.

 5    Q.    I want to talk about your modes of communication.

 6    How did you communicate with Mr. Friesen?

 7    A.    Um, in many ways.  Through this Xphone, um,

 8    through cell phone communications, text messaging, and

 9    Apps such as What's App.

10    Q.    And how frequently did you communicate with

11    Mr. Friesen?

12          MS. FRITZ:  Objection.  Can we get any time frame

13    at all?

14    Q.    When you first met with Mr. Friesen --

15          THE COURT:  I take it you withdrew it.  Go ahead.

16          MR. KLUNDER:  Sorry, your Honor.

17    Q.    When you first met Mr. Friesen in 2009 or 2010, I

18    believe you said, um, did you communicate with him?

19    A.    Yes.

20    Q.    If it changed over time, please let us know, but

21    how often did you communicate with him after first

22    meeting him?

23    A.    After first meeting him, for the first year maybe,

24    you know, a few times a -- a few times a month, once or

25    twice a month, but that would change later in 2011.
```

A2630

```
1    Q.    What happened starting in 2011?

2    A.    We talked almost weekly, I would say.

3    Q.    And by what means did you talk almost weekly?

4    A.    Um, either via an Xphone or a direct phone call.

5    Q.    And as to Mr. Veldhuis, when you first met him in

6    2009 and 2010, how often did you communicate?

7    A.    Roughly about the same.

8    Q.    And did that change over time as to Mr. Veldhuis?

9    A.    Yes, um, around 2011 we spoke nearly daily for a

10   number of years.

11   Q.    And did that stop after a number of years, or

12   change rather?

13   A.    Yes, around 20 -- the end of 2013 or the beginning

14   of 2014 we -- it became a little more sporadic.

15   Q.    And why is it that it became more sporadic?

16   A.    I wasn't working a lot of projects that Veldhuis

17   was involved in at that time.

18   Q.    And let's turn to Mr. Sexton.

19         After meeting him in 2012, how often did you

20   communicate?

21   A.    Um, rarely.  Not as frequently.

22   Q.    Okay.  And when you did communicate with him, what

23   modes did you use to communicate with him?

24   A.    Um, I'd say almost exclusively the Xphone.

25   Q.    Did you have any understanding of, um, a
```

A2631

```
 1    relationship between Mr. Veldhuis, Mr. Friesen, and

 2    Mr. Sexton?

 3    A.    Um, yes, I understood that they had some loose --

 4          MS. FRITZ:  I'm sorry.

 5          Objection, your Honor.

 6          THE COURT:  Yeah, the -- I'm going to, um, sustain

 7    the objection to that question and strike the answer.

 8    Q.    Did you have any conversations with Mr. Veldhuis,

 9    um, about Mr. Friesen?

10    A.    There had been many over the years, yes.

11    Q.    Okay.  And how did Mr. Veldhuis refer to

12    Mr. Friesen?

13    A.    I had heard him verbally refer to him as a

14    "partner" at times.

15    Q.    Did you have any conversations with Mr. Veldhuis

16    about Mr. Sexton?

17    A.    A few, yes.

18    Q.    And how did Mr. Veldhuis refer to Mr. Sexton?

19    A.    I had heard Veldhuis refer to Sexton as a

20    "partner" at times as well.

21    Q.    And when you say "partner," in what context?

22    A.    I always viewed that as a loose terminology --

23          MS. FRITZ:  Objection.

24          THE COURT:  No, well he answered "I viewed it as a

25    loose term."  I'm going to let that stand.  But I
```

A2632

```
 1   think -- come to the sidebar.

 2

 3        AT THE SIDEBAR

 4        THE COURT:  Mr. Kaitz is a co-conspirator, right,

 5   he's the --

 6        MR. KLUNDER:  Uh-huh.

 7        THE COURT:  Okay.

 8        MS. FRITZ:  Judge, before we break for the day,

 9   would you -- again this language in 5K, just that first

10   section.

11        (Looks.)

12        THE COURT:  Just the first paragraph?

13        MS. FRITZ:  Yup.

14        THE COURT:  Sure.

15

16        (In open court.)

17   Q.   Did you have an understanding of whether, um,

18   Veldhuis and Friesen worked together?

19   A.   It seemed that way, yes.

20   Q.   And did you have an understanding as to how they

21   made money?

22   A.   It wasn't openly discussed with me, but one can

23   assume.

24   Q.   Well we won't ask you to assume.  Did you observe

25   anything in your dealings with Veldhuis, Friesen, or
```

A2633

1    Sexton, that -- that was the basis of how you could

2    determine how they made money?

3    A.    I did understand them to invest in companies and

4    sell stock in those companies.

5    Q.    So other than them having used the term "partner,"

6    did you observe anything to indicate that they were back

7    operating as business partners?

8    A.    Um, yes.

9    Q.    What did you observe?

10   A.    When I was introduced to them, their business card

11   said "Venture Capital First" and their e-mail addresses

12   were "Ven Cap First" e-mails, and they both had the

13   same, you know, business cards and company name.

14   Q.    And just to be clear, who is "they both" in there?

15   A.    Friesen and Veldhuis.

16   Q.    Thank you.

17         And did you do work for Friesen, Veldhuis, and

18   Sexton, through Full-Service Media?

19   A.    Yes, through Full-Service Media I viewed it more

20   as a referral relationship.

21   Q.    Why don't you explain to the jury what you mean by

22   "referral"?

23   A.    What I mean is they're in the business of helping

24   these companies go public.  I didn't view them as my

25   direct client.  The paying party was always under my --

A2634

```
 1    my view was who was paying me and I didn't view that
 2    paying party, whatever the name of the company was that
 3    was paying me, to be owned or controlled by any of those
 4    three people.  So when I hear you say "Were you working
 5    for these three people?"  That's not how I viewed it at
 6    the time.
 7    Q.    Could you walk us through the timeline of how an
 8    engagement might work where Veldhuis, Friesen, or Sexton
 9    were involved?
10         MS. FRITZ:  Objection.
11         THE COURT:  Sustained, because you say "might
12    work."  Let's go to an example, if he has recollection
13    of an example.
14         MS. KLUNDER:  Yes, okay, your Honor.
15    Q.    Can you recall a campaign you did that involved
16    Veldhuis, Sexton, and Friesen?
17    A.    Um, yes.
18    Q.    What example comes to mind?
19    A.    Stevia First.
20    Q.    Okay.  Can you tell the jury how that engagement
21    came to pass?
22    A.    Sometime a few months before my engagement I would
23    have received either a phone call or an indication from
24    Veldhuis that I would likely get a piece of this budget
25    or that I would be able to run a certain amount of media
```

A2635

```
 1    on this upcoming public company campaign.  At some point
 2    a few months later, I would receive a deposit or an
 3    indication from or an e-mail from the third-party asking
 4    for an invoice, at which point I would receive a wire
 5    for a deposit.  And then in quick succession I would
 6    either hire or -- in this instance I received, um, like
 7    an advertisement, we call it a "creative," an
 8    advertisement to be displayed on online publications,
 9    and would, um, provide any edits or suggestions be made
10    to that advertisement, um, to all three parties and to,
11    um, the company that was in charge of creating those
12    materials.  And then I would run the media.
13         Am I answering the question?
14    Q.    You're doing great.  I'm going to pause you there.
15    You said you would provide edits or suggestions to all
16    three parties.  Who are all three parties?
17         MS. FRITZ:  Objection.  Your Honor, it sounds like
18    the witness is still speaking hypothetically rather than
19    what he recalls.
20         THE COURT:  Well you'll have a chance to examine
21    him and he may answer that question.
22         Who did you understand -- when you referred to the
23    "three parties," with whom do you refer?
24    A.    Veldhuis, Friesen, and Sexton.
25    Q.    Let's break down a few other pieces of what you
```

A2636

```
 1   said.
 2        In the Stevia First example, you were initially
 3   approached by Veldhuis, is that right?
 4   A.    Yes.
 5   Q.    And he said that some budget would be coming to
 6   you?
 7   A.    It could be, yes.
 8   Q.    Okay.  Would the amount of the budget -- did you
 9   discuss the amount of the budget with Mr. Veldhuis?
10   A.    I don't remember.
11   Q.    (Pause.)  Who controlled the timing of the
12   promotions?
13   A.    I don't know who controlled the timing, but my
14   indication of start time would come from Veldhuis.
15   Q.    Fair enough.
16        Who did you interface with regarding the amount
17   that would be spent on a campaign?
18   A.    That would be, um, usually a discussion where I'd
19   provide my input on what should be spent or what is
20   available as far as advertising sources.  Usually I
21   discussed amounts with Veldhuis.
22   Q.    Who had input as to the content of the promotions?
23   A.    I would receive inputs from many people including
24   Friesen, Veldhuis, and Sexton.
25   Q.    Did you always receive payments on a timely basis?
```

A2637

```
 1    A.    Um, no, sometimes they were late.

 2    Q.    And if payments were late, and here I'm referring

 3    to payments from third-parties, who would you

 4    communicate with?

 5         MS. FRITZ:  Objection, your Honor, again they seek

 6    --

 7         THE COURT:  We're talking about this specific

 8    example?

 9         MS. KLUNDER:  Yes.

10         THE COURT:  He may answer.

11    A.    In the case of Stevia First, I would have gone to

12    Veldhuis.

13    Q.    And what happened after you raised that with

14    Veldhuis?

15    A.    I don't remember a late payment on Stevia First,

16    but if I brought it to Veldhuis, I would usually --

17         MS. FRITZ:  Objection.

18         THE COURT:  No, if there was a practice or

19    procedure, he may tell us what it was.

20    A.    I would usually receive the payment.

21    Q.    I'm going to turn back to the exhibit before you.

22    You called this an "Xphone" communication.  What does

23    "Xphone" mean?

24    A.    "Xphone" was a, um, a device that was just a

25    Blackberry that was encrypted and for use with e-mail
```

A2638

```
 1    only.
 2    Q.   What's a "Blackberry"?
 3    A.   Um, a "Blackberry" is a smart phone that predates
 4    an Iphone that had a physical keyboard.
 5    Q.   When did you get your Xphone?
 6    A.   In 2011.
 7    Q.   How did you get it?
 8    A.   It was given to me by Veldhuis.
 9    Q.   Um, what was your understanding of why you were
10    using it -- he gave you the Xphone?
11         MS. FRITZ:  Objection.
12         THE COURT:  Well, sustained.  I mean what was his
13    understanding?  How did he get that understanding, what
14    was he told?  What was the communication?
15    Q.   In your communications with Mr. Veldhuis, did he
16    tell you why, um, you were to use the Xphone?
17    A.   (Pause.)  He said it was his preferred method of
18    communication.
19    Q.   How had you been communicating prior to that?
20    A.   Mostly phone calls.
21    Q.   What was different about the Xphone as opposed to
22    phone calls?
23    A.   It's similar to text messaging, but it's a little
24    more convenient, you can get to a message when you want
25    to get to a message.  This was encrypted.
```

A2639

```
 1    Q.    Who could you communicate with on your Xphone?
 2    A.    Um, at this time I only communicated with Friesen,
 3    Veldhuis, and Sexton.
 4    Q.    Was there a passcode on your Xphone?
 5    A.    Yes.
 6    Q.    Did the phone come with a passcode?
 7    A.    Yes.
 8    Q.    You said that the communications were "encrypted."
 9    What does "encrypted" mean?
10    A.    I'm not a data scientist, but, you know, it's
11    scrambled, you can't read it without some -- you know
12    without a device.  It's protected.
13    Q.    Did you discuss the encryption of those messages
14    with Mr. Veldhuis?
15    A.    He told me they were encrypted, yes.
16    Q.    Was that -- was that -- had your prior
17    communications been encrypted?
18          THE COURT:  Prior communications with the three?
19          MR. KLUNDER:  Yes, your Honor.
20    A.    I guess maybe when we used What's App, they would
21    be.
22    Q.    And did you ever discuss with Veldhuis, Friesen,
23    and Sexton, why encryption was necessary?
24    A.    I remember discussing it with Veldhuis, yes.
25    Q.    And what did he say?
```

A2640

```
 1    A.    He had explained to me that he would like to be --
 2    you know have some input on campaigns, and as he was not
 3    a control person -- and this is what I believed at the
 4    time, he didn't want to appear that way, and the only
 5    way to do that is to protect the encrypted information.
 6    As well as if there was nonpublic information, he
 7    wouldn't want that falling into the wrong hands either.
 8    Q.    And when you say he didn't want to "appear that
 9    way," appear to who?
10    A.    To the SEC.
11          MR. KLUNDER:  Your Honor, may I publish Exhibit 11
12    for the jury?
13          THE COURT:  You may.
14          (On screen.)
15    Q.    Mr. Kaitz, can we look at the bottom message, it
16    appears to be from "66."  Who is "66"?
17    A.    That was the number assigned to me.
18    Q.    Um, did you discuss the number assignment with
19    Mr. Veldhuis?
20    A.    Other than who -- not other than who was who.
21    That was it.
22    Q.    Did you discuss why numbers were used instead of
23    names?
24    A.    Not that I recall.
25    Q.    Did Mr. Veldhuis tell you other individuals
```

```
 1   associated with the numbers in this communication?
 2   A.    Yes.
 3   Q.    And what did he tell you?
 4   A.    That "2" was Friesen and "3" was Sexton.  And he
 5   was "4."
 6   Q.    Did any of them use any other code numbers to
 7   communicate?
 8   A.    There was at times, um, a different number
 9   assigned to Veldhuis, I believe.
10   Q.    Do you recall what that number was?
11   A.    I believe it was "114."
12   Q.    Okay, let's look at the bottom message.  You wrote
13   that, is that right?
14   A.    That is correct.
15   Q.    What are you talking about there?
16   A.    This is an update on the -- the amount of traffic,
17   the amount the money spent, and the performance of that,
18   you know, internet traffic or user base that we drove
19   for that particular campaign.
20   Q.    Okay.  And what's it mean when it gives numbers
21   and then it says "views"?
22   A.    Um, that means the amount of times that
23   advertisement was viewed by somebody.
24   Q.    And if you could look at the message above that,
25   it appears to be from "3."  Remind us who is "3"?
```

A2642

```
 1    A.    "3" would have been Sexton.

 2    Q.    Okay.  And he's saying, "We have spent 140 or sent

 3    140."  Do you understand the distinction between "spent"

 4    or "sent" there?

 5    A.    Yeah, he would be asking, um, has that money been,

 6    um -- is that in prepaid expenses or already realized?

 7    He's asking -- in some cases you to provide a media

 8    deposit when you're buying advertisements online, which

 9    means I have to -- as an agency, I would have to send

10    the money out.  But we hadn't realized the traffic or

11    experienced the traffic from that ad.  He's asking, "Is

12    that money gone or on deposit?"

13    Q.    And if we go up one more message, that's from

14    "66," that's you?

15    A.    (On screen.)  "66" is me, yes.

16    Q.    Um, I'm just looking at -- you write "Only value

17    to be realized."  In parentheses you say, "They are

18    still opening for days, usually 3 to 4 after first

19    send."  What are you referring to in those parentheses?

20    A.    At this time the bulk of my advertisements were in

21    e-mail form, so "They are still opening for days" means

22    that the people that we paid to send e-mails to is still

23    open, that it takes sometimes days for someone to open

24    their e-mail.  And so the advertisement's value isn't

25    completely over until, you know, up to a week after an
```

A2643

```
 1    advertisement.
 2         MR. KLUNDER:  Yes, take that down.  Please show
 3    him Exhibit GW, please.
 4         (On screen.)
 5    Q.   Do you recognize this document, Mr. Kaitz?
 6    A.   Yes.
 7    Q.   What is it?
 8    A.   This is an Xphone message.
 9    Q.   And who is on this communication?
10    A.   Myself, Friesen, and Veldhuis.
11         MS. KLUNDER:  And, your Honor, I move the
12    admission of this exhibit as Exhibit 12.
13         THE COURT:  Objection, your Honor.  I have a
14    question.  May we go to the sidebar?
15         THE COURT:  You may.
16
17         AT THE SIDEBAR
18         MS. FRITZ:  It appears incomplete, but maybe
19    there's a logical explanation.  It just starts with a
20    "from, to."
21         MS. KLUNDER:  Your Honor, it's read from the
22    bottom up and we don't have the headers for the last
23    one.  You can see the participants on our, um,
24    Mr. Kaitz, Mr. Friesen, and Mr. Veldhuis.  We're not,
25    you know, trying to get that in for, you know, the truth
```

A2644

```
 1    of the matter, but clearly this communication is among
 2    the co-conspirators.
 3         MS. FRITZ:  No, that's not the point, the point is
 4    where's the rest of it?
 5         THE COURT:  Well it goes beyond the --
 6         MS. KLUNDER:  The header?
 7         MS. FRITZ:  No, anything that would be there,
 8    because it's clearly incomplete.
 9         MR. KLUNDER:  Well I mean --
10         THE COURT:  Please.  Please.  Always talk to me.
11         MS. KLUNDER:  I apologize, your Honor.
12         THE COURT:  Lest I be just a potted plant.
13         MS. KLUNDER:  Forgive me.
14         THE COURT:  It seems that he's authenticated this.
15    I will strike out the "will do," since we don't know
16    anything about that, but I think his authentication is
17    adequate and it goes to the weight, not the
18    admissibility.  So we'll strike out the "will do," and
19    as redacted, GW is Exhibit 12.
20         MR. KLUNDER:  And, your Honor, this will come up
21    in a number of these communications.  Is it your
22    position that we should just redact the top one?
23         THE COURT:  I think so, assuming that the code
24    numbers are the conspirators in this case.
25         MS. KLUNDER:  Yes.
```

A2645

```
 1          MS. FRITZ:  Your Honor, a question?

 2          THE COURT:  Yes.

 3          MS. FRITZ:  Doing it this way, I think is more

 4    efficient.  You don't want me to seek to voir dire on

 5    something like this, right?  I think this is much

 6    easier.

 7          THE COURT:  Oh, approaching sidebar?

 8          MS. FRITZ:  Yeah, I'm a little --

 9          THE COURT:  Well I can't give advisory opinions.

10    I'm having fun.

11          (Laughter.)

12          THE COURT:  That's sufficient.

13

14          (In open court.)

15          (Exhibit 12, marked.)

16          THE COURT:  Nothing is funny over there, I'm just

17    demonstrating to them that this is not rocket science.

18          (Laughter.)

19          THE COURT:  Go ahead.

20          MR. KLUNDER:  And may I publish this to the jury?

21          THE COURT:  You may, in accordance with my order.

22          (On screen.)

23    Q.    Okay.  Look at the bottom again.  Who wrote that

24    message?

25    A.    I wrote the one on the bottom.
```

A2646

```
 1    Q.    And you say "You should check Archie's e-mail
 2    together."  Who is "Archie"?
 3    A.    "Archie" was the owner of companies that I had
 4    subcontracted work from.
 5    Q.    Is that also an investor relation?
 6    A.    Yes, I understood "Archie" to have an
 7    investor-lead service.
 8    Q.    How did you meet Archie?
 9    A.    Through Veldhuis.
10    Q.    And who is it that replies to you in this
11    communication?
12    A.    That would be Friesen.
13    Q.    Okay.  And scrolling up to the message above that,
14    you say "Wanted to make sure you both read and
15    discussed."  Who is "you both"?
16    A.    That would be Veldhuis and Friesen.
17    Q.    And why did you want to make sure that they both
18    read and discussed?
19    A.    I don't remember this exact communication and what
20    it was regarding, but it would have been from both of
21    their opinions.
22          MR. KLUNDER:  Can you pull up Exhibit GR, please.
23          (On screen.)
24    Q.    Mr. Kaitz, do you --
25          MS. FRITZ:  Your Honor, the same objection.
```

A2647

1      THE COURT:  Assuming the formatting is similar to

2  what we did at the sidebar, my ruling will be

3  consistent.

4      MR. KLUNDER:  I understand.

5      THE COURT:  And again it's not rocket science, the

6  way this -- I have nothing to say about the evidence,

7  but if we accept -- if you accept, and it's not for me,

8  that these are e-mails, at least in the form that I'm

9  being shown them, at the very top there's some random

10  words, and maybe they're another e-mail, maybe

11  something, we just don't know.  So I've told them, knock

12  those top line of words, knock that out.  That's all.

13  Nothing's been hidden from you.  But that's what they're

14  scurrying around to do, because they've got it on the

15  computer.  And those words, I don't know what they are,

16  so they're not evidence.

17      The rest of it's evidence, but like any other

18  evidence, it's entirely up to you whether you believe

19  it, disbelieve it, believe parts of it, or even what it

20  is.  But go ahead.  And we'll follow that protocol with

21  other similar documents.

22  Q.    Do you recognize this?

23  A.    Yes, this is an Xphone message.

24  Q.    And who is on this communication?

25  A.    That's myself and Veldhuis.

A2648

```
 1          MS. KLUNDER:  Your Honor, I'd move the admission
 2     consistent with the protocol established.
 3          THE COURT:  All right.
 4          MS. KLUNDER:  May I publish it to the jury?
 5          THE COURT:  Well now this will now be Exhibit 13?
 6          MS. KLUNDER:  Yes.
 7          MS. FRITZ:  The same objection, your Honor.
 8          THE COURT:  Noted, and your rights are saved.  But
 9     it is admitted as Exhibit 13 and it may be shown to the
10     jury.
11          (Exhibit 13, marked.)
12     Q.    Who wrote the bottom message?
13     A.    That's a message from Veldhuis.
14     Q.    And it says "STBF," what's that?
15     A.    "STBF" is the ticker symbol for Stevia First.
16     Q.    And did you have any business dealings with Stevia
17     First?
18     A.    Yes.
19     Q.    What is it that you did with regard to Stevia
20     First?
21     A.    I, um, ran a number of digital marketing campaigns
22     for that particular company.
23     Q.    Was Mr. Veldhuis working with anyone else to
24     promote Stevia First?
25     A.    I can't say for certain if Veldhuis was per se,
```

A2649

```
 1    but lots of people -- well not lots, many other
 2    companies promoted or ran campaigns on Stevia First.
 3    Q.    When you write -- sorry, when Mr. Veldhuis wrote
 4    "who was the third-party?" what does "third-party" mean
 5    there?
 6    A.    He's asking me who the company was, the
 7    third-party company that paid me to run a campaign on
 8    Stevia First.
 9    Q.    And you responded "Conmar Capital."  Was that one
10    of the third-parties that paid you for your services?
11    A.    That's correct.
12    Q.    And then looking up at the message above,
13    Mr. Veldhuis responds "Conmar Jesus," what does that
14    mean?
15          MS. FRITZ:  Objection.
16          THE COURT:  Well what do you think that means?
17          THE WITNESS:  I don't think it means anything, I
18    think it looks identical to "Conmar" below it.  They
19    look identical.
20          THE COURT:  Thank you.
21    Q.    Who facilitated payments between you and Conmar?
22    A.    I remember communicating with Veldhuis.  I don't
23    remember if there were other -- other communications
24    with others at this time.  I don't remember.
25    Q.    Did you have conversations with Mr. Friesen about
```

A2650

```
 1   third-party payments, not specifically Conmar, but in
 2   your course of dealings?
 3   A.    I don't remember.
 4         MR. KLUNDER:  Can we pull up Exhibit BA, please.
 5         (On screen.)
 6   Q.    Do you recognize this, Mr. Kaitz?
 7   A.    This is an Xphone message.
 8   Q.    And who is on this communication?
 9   A.    This is between myself, Friesen, and Veldhuis.
10         MR. KLUNDER:  Your Honor, I would move the
11   admission pursuant to our protocol.
12         THE COURT:  It may be admitted Exhibit 14 in
13   evidence.
14         (Exhibit 14, marked.)
15         MR. KLUNDER:  May I publish it to the jury.
16         THE COURT:  As we've discussed, you may.
17         (On screen.)
18   Q.    That bottom message from "66," that's you,
19   Mr. Kaitz?
20   A.    That is correct.
21   Q.    Okay.  And you're talking about "ORYN," what is
22   that?
23   A.    "ORYN" is the stock ticker symbol for a company
24   called Orion Technologies.
25   Q.    And why are you communicating with Friesen and
```

A2651

```
 1    Veldhuis about Orion Technologies?
 2          MS. FRITZ:  Your Honor, with that explanation,
 3    I'll object.
 4          THE COURT:  Yeah, sustained.
 5          You just go to the "why."  What's the foundation
 6    for that?
 7    Q.    Were others involved on the work that you did with
 8    Orion Technologies?
 9          MS. FRITZ:  Objection, and relevancy.
10          THE COURT:  No, in order to make a proper ruling,
11    we'll allow him to answer.
12          Were others involved?
13    A.    In what capacity?  Yes.  But I don't understand in
14    what capacity.
15    Q.    How were you engaged in your work on Orion
16    Technologies?
17          MS. FRITZ:  Objection.
18          THE COURT:  Overruled.
19    A.    Um, I don't recall the paying party, but this
20    would have been a third-party payment.
21    Q.    How did the work come to you in the first
22    instance?
23    A.    Um, Orion was a bit of a different project for me.
24    I introduced Orion as a private company to Veldhuis.  So
25    I was very intimately involved with this company.  And
```

A2652

```
 1    Mike allowed me to be present for the go-public
 2    conversations as a means to help me learn what it took
 3    for a company to go public.  So I would say -- even
 4    before the opportunity to promote or work a campaign for
 5    Orion, I had been very close with the leadership of that
 6    company, and, um -- but I would say, you know, Mike was
 7    instrumental in helping me get a budget for that.
 8    Q.    And when you were present for those go-public
 9    conversations, was anyone else present?
10          MS. FRITZ:  Your Honor, a continued objection.  I
11    don't believe this is involved in the case.
12          THE COURT:  As to Orion, you may.  But overruled.
13    A.    Um, yes, many people, including lawyers.
14    Q.    Um, anyone that we've discussed today at any of
15    those conversations?
16    A.    Not with the company, no.
17    Q.    I'm sorry?
18    A.    Not with the company, no.
19    Q.    Okay.  Were there other conversations about this
20    work that involved people that we've discussed today?
21    A.    Yes, I did discuss this project with Friesen as
22    well.
23    Q.    Let's look back at Exhibit 14 in front of you.
24    Let's go up to the second message from the top, it
25    appears to be from you.  You write, "Did 2 mention the
```

A2653

```
 1    header idea?"

 2          Who's "2"?

 3    A.    "2" would be Friesen.

 4    Q.    And what was the "header idea"?

 5    A.    I vaguely remember it being something to do with

 6    the potential direct mail advertisement approach, like a

 7    header being, you know, the top of a piece of mail.

 8    Q.    Had you had conversations with Mr. Friesen outside

 9    of this Xphone communication about Orion?

10    A.    Yes.

11          MR. KLUNDER:  Can you pull up Exhibit BF, please.

12          (On screen.)

13    Q.    Do you recognize this exhibit, Mr. Kaitz?

14    A.    Yes, this is another Xphone message.

15    Q.    And who is on this message?

16    A.    That is myself and Friesen.

17          MS. KLUNDER:  Your Honor, I move the admission as

18    Exhibit 15.

19          THE COURT:  It may be admitted.

20          MR. KLUNDER:  Your Honor, may I publish it to the

21    jury?

22          THE COURT:  You may.

23          MS. FRITZ:  Your Honor, the same objection,

24    whether this is an event relating to anything we're

25    dealing with in this case.
```

A2654

```
 1              THE COURT:  I entertain the relevance objection,
 2      but it's overruled.
 3              (Exhibit 15, marked.)
 4      Q.    In the first message you write, um, to
 5      Mr. Friesen, "116,135."  What does that refer to?
 6      A.    (Looks.)  I'm not 100 percent sure, but it's
 7      likely, um, a budget amount.
 8      Q.    And you go on to say "Arista Theme Limited is
 9      third-party."  What does that mean?
10      A.    I mean that that's the company that hired me and
11      paid the funds to run a campaign.
12      Q.    Why were you e-mailing Jackson Friesen with this
13      information?
14      A.    I don't remember.
15      Q.    And going up one message, Mr. Friesen writes, "And
16      you need your representation signed by Arista Theme."
17      What did you understand "your representation" to refer
18      to there?
19      A.    In 2013, a close associate of mine ran a similar
20      business, had hired an SEC compliance attorney, but
21      recommended for these types of promotional campaigns to
22      get a representation letter signed by the paying parties
23      that would represent to me whether or not they owned --
24      represent to my company whether or not they owned stock
25      and whether or not they planned on selling that stock
```

A2655

```
 1    during the course of the promotion.
 2    Q.    Okay.  If we go up, there's a 4:24 p.m. message
 3    from Mr. Friesen to you, "FYI, broke even on the dot
 4    today."  What did you understand that to mean?
 5    A.    My understanding at this time is that Friesen and
 6    Veldhuis, in their venture capital roles, represented a
 7    group of investors that invested in these or in these
 8    property companies early, and when he says this I think
 9    he means that the total group or the people that
10    participated in the market being sold shares that day,
11    sold the exact amount of money that the budget -- that
12    was spent in media that day.
13    Q.    And the "sold the exact amount of money," sold
14    what?
15    A.    Shares in that company.
16    Q.    And you said that you understood Friesen and
17    Veldhuis represented a group of investors.  Were Friesen
18    and Veldhuis among those investors?
19    A.    I would say, yes.
20          MR. KLUNDER:  Pull up Exhibit 22, please.
21          (On screen.)
22    Q.    Do you recognize this?
23    A.    Yes.
24    Q.    And what is this?
25    A.    This is an advertisement for Arch Therapeutics.
```

A2656

```
 1          MS. KLUNDER:  Your Honor, may I admit this as
 2   Exhibit 16?
 3          THE COURT:  It may be admitted as Exhibit 16 in
 4   evidence.
 5          MS. KLUNDER:  Thank you.
 6          (Exhibit 16, marked.)
 7   Q.    At whose direction did you run this campaign?
 8   A.    I believe this campaign was introduced to me by
 9   Mike Veldhuis.
10          MR. KLUNDER:  Your Honor, may I publish this to
11   the jury?
12          THE COURT:  You may.
13          (On screen.)
14          MS. KLUNDER:  Can you scroll to Page 2, please.
15          (Scrolled.)
16   Q.    Was anyone else working on this deal with
17   Mr. Veldhuis?
18   A.    I'm not sure if they were working with Veldhuis or
19   not, but, yes, I do know that Jordan Richter was working
20   on this campaign as well.
21   Q.    Anyone else that we discussed today working on
22   this campaign?
23   A.    I would have discussed this campaign with Friesen
24   and Sexton as well.
25   Q.    When did this promotion run?
```

A2657

1    A.    This would have been in the summer of 2013.

2    Q.    All right.

3         MR. KLUNDER:  Can we go to Page 19.  (On screen.)

4    Can we blow up the top part of that second paragraph.

5    (Blows up.)  Yes.  Great.  Thank you.

6    Q.    Mr. Kaitz, on the screen is what purports to be a

7    disclaimer.  Do you see that?

8    A.    Yes.

9    Q.    And I'm just going to read -- "Advantage Media

10   Corp., the third-party advertiser, has paid 390,000 U.S.

11   dollars and is expected to pay an additional 400,000 to

12   Full-Service Media, LLC."

13        "Full-Service Media, LLC" is you?

14   A.    That's correct.

15   Q.    Did those payments occur?

16   A.    I can't say how much of the $400,000, but, yes,

17   the $390,000 would have been paid by this date and I

18   would have very likely received the $400,000.

19   Q.    There's another disclosure, um, several lines down

20   that says "Advantage Media Corp., the third-party

21   advertiser, is a company based in Belize.  It does not

22   own any shares of Arch Therapeutics except for 2.5

23   million shares of restricted stock, which Advantage

24   Media Corp. will not sell, pledge, or hypothecate, or

25   otherwise agree to disclose for 90 days following the

A2658

```
 1    initial dissemination of this advertisement."
 2         Was that the type of information that was in the
 3    representation you were discussing with Mr. Friesen?
 4    A.    The representation letter for this would have the
 5    same, yes.
 6    Q.    And the following line says, "Neither Advantage
 7    Media nor its affiliates will buy or sell any shares of
 8    Arch Therapeutics during the period that this
 9    advertisement is being disseminated by FSM third-party
10    media vendors."
11         What do you understand the term "affiliates" to
12    mean?
13    A.    Um, I view that to be anybody within arm's length,
14    um, like in your media-working environment.  People that
15    help -- they may not be partners or paper or co-workers
16    per se, but "affiliates" are people that are working --
17    that are working on similar projects in concert with
18    you.
19    Q.    Would an individual who can direct payments of an
20    entity be an affiliate of that entity?
21    A.    I would view that that way, yes.
22    Q.    Who coordinated payments between you and Advantage
23    Media Group?
24    A.    I would have discussed this, these payments with
25    Veldhuis.  I can't say for certain if there were other
```

```
 1    communications with Advantage directly or not.  I don't
 2    remember.
 3    Q.    Did any of your disclaimers ever state that
 4    Veldhuis, Sexton, or Friesen, were selling stock in the
 5    promoted company?
 6    A.    No.
 7    Q.    Did any of them ever tell you to put that in the
 8    disclaimers?
 9    A.    No.
10    Q.    Did they see the disclaimer language that went out
11    in these promotions?
12    A.    Yes.
13    Q.    Did any of your disclaimers ever state that
14    Veldhuis, Sexton, or Friesen, were funding promotions?
15    A.    No.
16    Q.    Did this promotion impact market activity in Arch
17    Therapeutics?
18    A.    The trading volume did increase during the course
19    of this promotion, yes.
20          MR. KLUNDER:  Pull up Exhibit Q, please.
21          (On screen.)
22    Q.    Do you recognize this document, Mr. Kaitz?
23    A.    Yes.
24    Q.    And what is it?
25    A.    This is an advertisement for, um, Stevia First.
```

A2660

```
1              MR. KLUNDER:  Your Honor, may I mark this as
2    Exhibit 17?
3              THE COURT:  You may.
4              (Exhibit 17, marked.)
5              MS. KLUNDER:  May I publish it to the jury?
6              THE COURT:  And you may.
7              (On screen.)
8    Q.    At whose direction did you run this campaign?  Who
9    engaged you to run this campaign?
10   A.    Um, this would have been introduced to me from
11   Veldhuis.  I don't remember the name of the third-party
12   right this second.  It could have been Conmar for this
13   round.  I don't remember exactly.
14   Q.    And did you discuss this campaign with anyone
15   other than Veldhuis?
16   A.    Yes.
17   Q.    Who else did you discuss it with?
18   A.    Um, Friesen and Sexton.
19             MR. KLUNDER:  Can you pull up Exhibit QS, please.
20             (On screen.)
21   Q.    Do you recognize this, Mr. Kaitz?
22   A.    Yes, this is an Xphone message.
23   Q.    And who is on this communication?
24   A.    This is myself, Friesen, Sexton, and Veldhuis.
25             MR. KLUNDER:  Your Honor, I move the admission as
```

A2661

```
 1    Exhibit 18.
 2         THE COURT:  It may be admitted.
 3         MS. KLUNDER:  May I publish it to the jury?
 4         THE COURT:  You may.
 5         (Exhibit 18, marked.)
 6         MR. KLUNDER:  Can we go to the second page.
 7         (On screen.)
 8    Q.    Who is this first message from on Page 2?
 9    A.    This is Friesen.
10    Q.    Okay.  And he says "Send the list of subject
11    lines, please."  Subject lines for what?
12    A.    As part of our campaigns, we draft everything in
13    advance.  So these are subject lines for the e-mail
14    advertisements similar to what you've described.
15         MS. KLUNDER:  And if we can scroll back up to the
16    first page, please.
17         (On screen.)
18    Q.    Are you in fact discussing a number of possible
19    subject lines here in this e-mail, this communication?
20    A.    Yes, these are the subject lines that were given
21    to me by the writer to accompany that advertisement.
22    Q.    And near the top, you respond "'Billions' is a
23    spam word."  What is that in response to?
24    A.    Um, Friesen had previously, um, written his own or
25    made some adjustments to the subject lines that were
```

```
 1    provided by the writer, and I was letting him know that
 2    "billions" is a word that major e-mail providers like
 3    Gmail, Yahoo, and Aol, don't like to see in subject
 4    lines and will push that message into spam if that word
 5    "billions" is in the subject line.
 6    Q.    Understood.  So looking at the e-mail below, is
 7    that from Mr. Friesen?
 8    A.    Yes.
 9    Q.    And the bottom suggestion appears to be "Venture
10    capitalists are funding billions into this fast-growing
11    sector"?
12    A.    That is correct.
13    Q.    Is that why you're responding "'billions' is a
14    spam word"?
15    A.    Yes.
16          MR. KLUNDER:  Can you pull up Exhibit QT, please.
17          (On screen.)
18    Q.    Mr. Kaitz, this is a multipage document.  Do you
19    recognize this?
20    A.    (Looks.)  Yes.
21          MS. FRITZ:  Could you scroll through this, please.
22          (Scrolls.)
23    Q.    All right.  What is it?
24    A.    This is an Xphone communication.
25    Q.    And who is on this communication?
```

A2663

```
 1    A.    I see myself and Veldhuis at times.  And then

 2    above I see, um, Friesen and Veldhuis.

 3    Q.    Okay.  Do you see the number "3" on here as well?

 4    A.    Yes.

 5    Q.    And "3" is who?

 6    A.    Sexton.

 7          MS. KLUNDER:  Your Honor, I move the admission of

 8    this as Exhibit 19.

 9          MS. FRITZ:  Your Honor, we have a large chunk of

10    random texts in this one.

11          THE COURT:  It goes to the weight.  May be

12    admitted, Exhibit 19.

13          (Exhibit 19, marked.)

14          MR. KLUNDER:  Your Honor, we'll redact that when

15    we -- may I publish it to the jury redacting the top

16    chunk of large text?

17          THE COURT:  Yes.

18          MR. KLUNDER:  Thank you.

19          (On screen.)

20    Q.  Let's go to Page 2.  In the middle of the page

21    there's a message from 66, you, where you say "FLCO copy

22    in Xmail."  What's "XLCL"?

23    A.    "XLCO" is a ticker symbol, um, that was a --

24    another stock promotion, but unrelated to myself or

25    Veldhuis or Friesen or Sexton.
```

```
 1   Q.    And what do you mean by "unrelated"?
 2   A.    It was a stock promotion done, you know, by others
 3   that none of this group had any sort of involvement in.
 4   Q.    What's "Xmail"?
 5   A.    "Xmail" was like an online -- it's just exactly
 6   like an e-mail porthole, it was just connected to this
 7   same encrypted communication system.
 8   Q.    Why are you circulating the XLCO copy to this
 9   group?
10   A.    It's a common practice to send other promotions
11   that were out there.  This one in particular was because
12   at this time, um, the SEC was halting most of the
13   promoted stocks, except for this one.
14   Q.    What does "halt" mean?
15   A.    "Halt" is when the SEC stops the ability to trade
16   the stock for anybody for a period of time, if they
17   suspect bad activity, um, in an effort to protect
18   investors.  But it pretty much kills the company.
19         MS. KLUNDER:  Can we go to Page 1.  And you can
20   highlight the top part and just display it to the jury.
21         (On screen.)
22         MR. KLUNDER:  Thank you.
23   Q.    The bottom message on this page in front of you
24   now, is that from Mr. Friesen?
25   A.    Yes.
```

A2665

1    Q.   And he's referencing a lot of logos.  What does

2    that mean?

3    A.   The piece that I sent was -- the advertisement

4    that I sent was a direct-mail advertisement, and this

5    particular promoter had used a number of big companies's

6    logos and images, which is highly frowned upon,

7    especially by the owners of those brands.

8    Q.   Okay.

9        MS. KLUNDER:  And I'm going to skip up one

10    message.  There's another message from Mr. Friesen.

11        (On screen.)

12    Q.   He says "As BK says."  Who is "BK"?

13    A.   I'm "BK."

14    Q.   Bill Kaitz?

15    A.   Bill Kaitz, correct.

16    Q.   He says "There was already an extensive promo done

17    on its previous symbol."  What does "previous symbol"

18    mean?

19    A.   It is common for these smaller companies to change

20    their name, business, or trading symbol.  So their

21    symbol means the ticker symbol or the four digits that

22    you would know as the stock.

23    Q.   Okay.  He says "Something I believe needs to be

24    considered here."  What's the relevance of prior

25    promotions done?

A2666

```
 1   A.   At this time we were revealing any promotion that
 2   wasn't causing a trading halt and looking for, you know,
 3   kind of researching why we think it might not have been
 4   halted while some others have been, viewing -- not
 5   viewing promotion as a bad thing to do.  So maybe
 6   what -- so maybe looking there where a lot of, um,
 7   brand-new publicly-traded companies, they're usually
 8   denoted with a "D," it's like a post-reverse split or
 9   forward split.  Those were getting halted immediately,
10   if there was any promotion on a newly-issued one.
11        So the reason this came up is I had speculated
12   maybe the reason this promotion hasn't received a
13   trading halt is because it's an older project.  Pure
14   speculation.
15        MR. KLUNDER:  Could you pull up Exhibit QU,
16   please.
17        (On screen.)
18   Q.   Do up recognize this, Mr. Kaitz?
19   A.   (Looks.)  Yes, this looks like -- this is an
20   Xphone message.
21   Q.   And who is on this communication?
22   A.   Myself, Veldhuis, and Friesen.
23        MR. KLUNDER:  Your Honor, I move the admission as
24   Exhibit 20.
25        THE COURT:  20 may be admitted.
```

A2667

```
 1          MR. KLUNDER:  May I publish it to the jury?
 2          THE COURT:  You may.
 3          (Exhibit 20, marked.)
 4   Q.    At the bottom, Mr. Kaitz, it appears that you
 5   write, "Miserable day.  Did we get in there at all?"
 6   What does that mean?
 7   A.    I'm asking if any of the investors that Veldhuis
 8   or Friesen have introduced to this project have been
 9   able to sell any stock in the issue that we were
10   promoting.
11   Q.    And when you say "The investors that Veldhuis and
12   Friesen introduced," did you understand Veldhuis and
13   Friesen were also invested in this stock?
14   A.    Yes.
15   Q.    Moving up, Mr. Veldhuis writes "41K.  Make good
16   time."  What does that mean?
17   A.    He's indicating the number of shares that were
18   sold, and a "make-good" is what we -- is terminology we
19   use in the media business that if an advertisement
20   doesn't perform very well during its designated air time
21   or distribution, that advertiser will resend it at no
22   charge.
23          (Pause.)
24          MR. KLUNDER:  I have no further questions for this
25   witness at this time.
```

A2668

```
 1            THE COURT:  Perhaps it makes sense to stop now
 2     since I'm going to -- unless you're going to be very
 3     brief?
 4            MS. FRITZ:  No, no, I won't be brief.  I mean I'll
 5     try to be sort of brief.  But I had made a request --
 6            THE COURT:  You did and I'm going to do it now.
 7            MS. FRITZ:  Oh, thank you.
 8            THE COURT:  So you may step down, sir.
 9            And we're going to resume now tomorrow at
10     9:00 a.m.  I know I can count on you.
11            All right.  But Ms. Fritz's request, and it's an
12     appropriate one.  Since in the interrogate of the
13     previous witness, Mr. Dhillon, um, various reference was
14     made to the "sentencing guidelines," and she's asked me
15     to read a very brief portion of those guidelines, and I
16     said that I would.  Actually the guidelines have the
17     force of law, but I must explain one thing.  But let me
18     read them first, or read a paragraph.
19            This is under the heading -- well, first we'll go
20     to the guidelines.
21            Under a United States statute, the statute created
22     the United States Sentencing Commission and the
23     Commission is charged with promulgating guidelines, and
24     the beneficent idea of Congress in passing this law,
25     since we authorize judges to impose sentences on
```

A2669

1   offenders, the idea of the guidelines is that the

2   person -- a person who commits the same crime ought to

3   get the same sentence without regard to the human being,

4   the judge, who imposes this sentence.

5        We take sentencing as a very -- we all do, as a

6   very serious matter.  But inevitably sentencing requires

7   that you assess a great deal of personal data about an

8   offender, and we try to, we try to look at the whole

9   person and the whole situation.  And in discharging

10   their duty under the guidelines, the Commission, as they

11   are authorized to, has given us a whole deal of

12   instructions as to how to do it, and that's grown over

13   the years, now it's even thicker than this.

14        (Indicates.)

15        But one of the things that we are instructed to

16   take into account is the basis for departing from the

17   guidelines.  The guidelines give you a range, you

18   shouldn't sentence higher than this or lower than that.

19        And so in Part K, it's entitled "Departures," and

20   under, um, K1 is entitled "Substantial Assistance to

21   Authorities," and 5K(1.1) is entitled "Substantial

22   Assistance to Authorities Policy Statement," and this

23   simply tells any judge the policy of the sentencing

24   guidelines.

25        Now I should pause there.  The judge doesn't have

```
 1    to follow it, but the judge is advised by this
 2    Commission that the judge should take it into account.
 3          And with all that background, I'll read this
 4    lead-in paragraph.  It goes on beyond that.  But I'll
 5    read it.
 6          "Upon motion of the government, stating that the
 7    defendant has provided substantial assistance in the
 8    investigation or prosecution of another person who has
 9    committed an offense, the Court may depart from the
10    guidelines."
11          And it's appropriate, since we talked about that
12    today, that you hear that part of the guidelines today.
13          So keep your minds suspended.  Do not discuss the
14    case either among yourselves, nor with anyone else.  You
15    may stand in recess until 9:00 a.m. tomorrow.  And we're
16    moving right along and we will continue tomorrow.  The
17    jury may stand in recess.
18          THE CLERK:  All rise for the jury.
19          (Jury leaves, 1:00 p.m.)
20          THE COURT:  Please be seated.  Out of the -- and I
21    thank her.
22          Out of the 5 1/2 days allocated to each side, the
23    Commission has used up 1 day, 3 hours, 5 minutes.  The
24    defendants have used up 1 day, 25 minutes.  We'll stand
25    in recess until 9:00 a.m. tomorrow.  We'll recess.
```

A2671

```
 1          THE CLERK:  All rise.

 2          (Adjourned, 1:00 p.m.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

A2672

```
 1                    C E R T I F I C A T E

 2

 3          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 4     do hereby certify that the foregoing record is a true

 5     and accurate transcription of my stenographic notes

 6     before Judge William G. Young, on Thursday, September

 7     14, 2023, to the best of my skill and ability.

 8

 9

10

11     /s/ Richard H. Romanow 1-23-24
       _____
12     RICHARD H. ROMANOW    Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```

A2673

```
 1                    UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS (Boston)

 3                            No. 1:21-cv-11276-WGY

 4

 5    SECURITIES and EXCHANGE COMMISSION,
              Plaintiff
 6

 7    vs.

 8

 9    FREDERICK L. SHARP, et al,
              Defendants
10

11                         *********

12

13

                      For Jury Trial Before:
14                    Judge William G. Young

15

16

                      United States District Court
17                    District of Massachusetts (Boston)
                      One Courthouse Way
18                    Boston, Massachusetts 02210
                      Friday, September 15, 2023
19

20                         ********

21

22              REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
23                    United States District Court
              One Courthouse Way, Room 5510, Boston, MA 02210
24                      rhrbulldog@aol.com

25
```

A2674

```
 1                    A P P E A R A N C E S

 2

 3    KATHLEEN BURDETTE SHIELDS, ESQ.
      ALFRED A. DAY, ESQ.
 4    DAVID H. LONDON, ESQ.
      NITA KUMARASWAMI KLUNDER, ESQ.
 5       Securities and Exchange Commission - MA
         33 Arch Street, 24th Floor
 6       Boston, MA 02110
         (617) 573-8904
 7       Email: Shieldska@sec.gov
         For Plaintiff
 8

 9    KAREN A. PICKETT, ESQ.
         Pickett Law Offices, P.C.
10       125 High Street, 26th Floor
         Boston, MA 02110
11       (617) 423-0485
         Email: Kpickettlaw@gmail.com
12       For Defendant Zhiying Yvonne Gasarch

13

14    MIRANDA E. FRITZ, ESQ.
      TIMOTHY J. FAZIO, ESQ.
15       Manning Gross Massenburg
         125 High Street
16       Oliver Street Tower, 6th Floor
         Boston, MA 02110
17       (617) 670-8800
         Email: Tfazio@mgmlaw.com
18       For Defendant Jackson T. Friesen

19

20

21

22

23

24

25
```

A2675

```
 1                     I N D E X

 2

 3   WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   WILLIAM T. KAITZ (Continued.)

 6      By Ms. Klunder:        4                41

 7      By Ms. Fritz:                 6

 8      By Ms. Picket:

 9

10   MR. NIKOLAYEV'S DEPOSITION VIDEO............... 67

11

12   SPECIAL AGENT CHRIS GIANAKURA

13      By Mr. London:       73

14      By Ms. Fritz:               80

15      By Ms. Picket:              85

16

17                     E X H I B I T S

18

19      EXHIBITS 21 TO 42............................ 51

20

21

22

23

24

25
```

A2676

4

```
 1        P R O C E E D I N G S

 2        (Jury enters, 9:00 a.m.)

 3        THE COURT:  Well, good morning, ladies and

 4   gentlemen, and I do thank you.  I know you think I say

 5   this by rote each day, and that's not true, I'm so

 6   grateful, as are we all, for your promptness, it really

 7   sets the tone for these proceedings, and we are moving

 8   along.

 9        We're all ready to go.  The Commission has a few

10   more questions before cross-examination.

11        (Mr. Kaitz takes the stand.)

12        THE COURT:  And would you remind the witness.

13        THE CLERK:  I'd like to remind you, sir, that

14   you're still under oath.

15        Do you understand?

16        THE WITNESS:  I do.

17        THE COURT:  And, counsel, you may continue.

18        MS. KLUNDER:  Yes.

19

20   DIRECT EXAMINATION BY MS. KLUNDER.  (Continued.)

21   Q.   Good morning, Mr. Kaitz.

22   A.   Good morning.

23   Q.   How many campaigns did you do that involved

24   Mr. Friesen?

25   A.   It would be hard to give an exact number.  There
```

A2677

```
 1   were many campaigns that I discussed with Friesen.
 2   Q.    Okay.  Were there more than 10?
 3   A.    I'd say that's a safe amount of campaigns.
 4   Q.    Can you identify the companies that you did
 5   promotions for that involved Mr. Friesen?
 6   A.    Um, I discussed Stevia Corporation, Stevia First,
 7   um, Oryn Technologies, Lexington Biosciences, um, Arch
 8   Therapeutics.  (Pause.)  I'm struggling to remember
 9   other names.  I've worked on many many campaigns in my
10   career.
11   Q.    Would there be something that you could look at
12   that might refresh your recollection as to which
13   companies you promoted for Mr. Friesen?
14   A.    There was a list of companies in the declaration
15   that I signed from the SEC.
16         MS. KLUNDER:  Your Honor, may I approach?
17         THE COURT:  You may.
18         (Hands paper to witness.)
19   A.    (Reads.)
20   Q.    Does that refresh your recollection as to which
21   promotions you did involving Mr. Friesen?
22   A.    Um, yes.  I can't confidently say that I spoke
23   with him regarding this entire list, but I can say I
24   spoke with him regarding Echo, Automotive, and Breathtec
25   Biomedical Corp.
```

```
 1    Q.    In addition to what you've already testified?
 2    A.    Yes.
 3          (Pause.)
 4          MS. KLUNDER:  Your Honor, I have no further
 5    questions.
 6          THE COURT:  Very well.
 7          Ms. Fritz, you said you want to examine and you
 8    may.
 9          MS. FRITZ:  Thank you.
10
11    CROSS-EXAMINATION BY MS. FRITZ:
12    Q.    Good morning, Mr. Kaitz.  How are you?
13    A.    Good morning.
14    Q.    I'm Miranda Fritz.  I represent Jackson Friesen.
15    We've not met before, correct?
16    A.    Correct.
17    Q.    Okay.  You have however spent time with these
18    folks that are at the SEC table, correct?
19    A.    Um, all except for the fellow on the end.
20    Q.    Okay.  So you have spent time with each of these
21    three folks, correct?
22    A.    That is correct.
23    Q.    And how long -- when did you first begin meeting
24    with the SEC?
25    A.    I don't remember the date of it, but in, I think,
```

A2679

```
 1    early '22.
 2    Q.    Okay, so early last year?
 3    A.    I believe so.
 4    Q.    Okay.  And approximately how many meetings,
 5    whether remote or in person, did you have with these
 6    folks?
 7    A.    Um, I can't remember three.
 8    Q.    Okay.  Now let's talk about just in terms of
 9    preparing for your testimony today.  How many meetings
10    have you had with them to talk about your testimony?
11    A.    I remember two.
12    Q.    Okay.  Approximately how many hours have you spent
13    going over your testimony with them?
14    A.    Between 2 and 3.
15    Q.    Okay.  And they went over with you the questions
16    that they were going to ask that we heard yesterday,
17    correct?
18    A.    Correct.
19    Q.    Okay.  And talked through with you responses that
20    you would give, correct?
21    A.    Yes, I gave responses.
22    Q.    Okay.  At some point you entered into a settlement
23    with the SEC, correct?
24    A.    That is correct.
25    Q.    Now that settlement is what we call a
```

1    "neither-admit-nor-deny settlement," correct?

2    A.    Correct.

3    Q.    And that means, if you could just explain for the

4    jury, what if anything did you admit to doing wrong?

5    A.    Nothing.

6    Q.    (Laughs.)  Um, and in the content -- and that

7    settlement also involved -- in order to get that

8    settlement and be done with the case against you, you

9    agreed to repay the amount that you had received in

10   connection with these stock promotions, correct?

11   A.    That is correct.

12   Q.    And that amount was roughly $800,000?

13   A.    Roughly, yes.

14   Q.    And then in order to get that settlement, you also

15   had to pay another roughly half a million in interest

16   and penalties to the SEC, correct?

17   A.    That is correct.

18   Q.    Okay.  Now let's take a step back.

19         You've been working in investor relations since, I

20   believe you said, 2004?

21   A.    Yeah, '04 or '05, I can't remember which.

22   Q.    Okay, so you're pushing 20 years in the business?

23   A.    Yes, ma'am.

24   Q.    Okay.  And you worked for a while on "Money

25   Channel," is that correct?

A2681

```
 1   A.    Yes, um, it was a company called "The Money
 2   Channel," yes.
 3   Q.    Okay.  And was that a company that engaged in
 4   stock promotional activity?
 5   A.    Yes.
 6   Q.    Okay.  Was that was like a -- was that like a Jim
 7   Cramer kind of thing where a guy goes on TV and talks
 8   about a stock?
 9   A.    TV and radio, yes.
10   Q.    Okay, so you had folks that went on the media,
11   talked about stocks, um, small-cap stocks, I guess?
12   A.    Yes.
13   Q.    And again the key to that, from the regulatory
14   point of view, is that those had to be accompanied by
15   disclosures that they were paid for, correct?
16   A.    That is correct.
17   Q.    Okay.  And you've been used to that the whole time
18   you've been in the industry?
19   A.    Yes.
20   Q.    Now you also talked about conferences that you
21   attended.  Can you tell us, what kind of conferences
22   were those, were they private financing conferences?
23   A.    There were about three conferences that I attended
24   regularly between 2009 and 2014.  The first was The
25   Money Show that we talked about yesterday, and that was
```

```
 1   a, you know, kind of a large gathering for retail
 2   investors.  It's free if you're an investor.  It's just
 3   got a bunch of booths on a floor in a hotel in Las
 4   Vegas.
 5   Q.    So issuers that want investors to take a look at
 6   them had booths there?
 7   A.    Um, yeah, some of them trading platforms, and
 8   people like Jim Cramer.
 9   Q.    Okay.
10   A.    I attended a conference called "Financial Services
11   Exchange," which is also referred to as FSX, it's no
12   longer in existence.  That was a place for small-cap
13   companies to meet with, investment bankers, funding
14   sources, private equity, in the hopes of telling their
15   story for a large investment.
16   Q.    Okay.
17   A.    And then there's another conference called
18   "National Investment Banking Association," also referred
19   to as NIBA, the same platform, different company.
20   Q.    Okay, all places where companies that were looking
21   for financing could interact with folks that were
22   willing to provide it?
23   A.    Correct.
24   Q.    Okay.  Now in 2011, you then formed your own
25   company Full-Service Media, correct?
```

A2683

1    A.    Correct.

2    Q.    Okay.  And that company has since become

3    "Promethium," is that correct?

4    A.    Yes.  I can't legally say it's become Promethium,

5    but I shut down Full-Service Media's investor relations

6    and formed an entirely new company called Promethium

7    Marketing.

8    Q.    Okay.

9    A.    That services the same thing minus -- it's the

10   exact same company except I will only take money

11   directly from public companies.

12   Q.    Okay.  And you still today are engaging the same

13   kind of investor relations and promotional activities

14   that you've talked to the jury about, correct?

15   A.    Not technically today, we're -- well, yeah, I have

16   one client.  Excuse me.

17   Q.    Okay.  But that is still the nature of the

18   business that you're in?

19   A.    Yes.

20   Q.    Okay.  Now on direct you were asked some very

21   specific questions about promotions that you did and

22   Mr. Friesen and about some Xphones, so I want to go over

23   that with you, but first I would like to put this in

24   context for the jury.

25         This all started -- this activity all started back

```
 1    in about 2009 when you first met Mike Veldhuis, is that
 2    correct?
 3         THE COURT:  I'm not clear what you mean when you
 4    say "activity"?
 5    Q.   The events that you've been talking about in front
 6    of the jury, the transactions, it all began back in '09
 7    when you met Mike Veldhuis, correct?
 8    A.   I'm not sure what you mean by "events"?
 9    Q.   The transactions that you talked about with the
10    jury, Stevia, Arch, those deals, that all flowed from
11    the fact that you met Mike Veldhuis in 2009, correct?
12    A.   Yes.
13    Q.   I thought that one would be easy.  Sorry.
14         Now you met Mike Veldhuis in 2009 at a conference
15    in Las Vegas, correct?
16    A.   That's correct.
17    Q.   And you met him because you were introduced to him
18    by Jackson Friesen, correct?
19    A.   Correct.
20    Q.   Okay, you met Jackson Friesen because you knew
21    someone named Calley who knew Jackson Friesen from high
22    school, is this all correct?
23    A.   That's all correct.
24    Q.   Okay.  So she knew Jackson in high school,
25    correct?
```

A2685

```
 1    A.     Correct.
 2    Q.     And she suggested that you might get together,
 3    meet him at the conference, correct?
 4    A.     Yes.
 5    Q.     Now, um, this was 14 years ago, right?
 6    A.     Yeah, it's a long time.
 7    Q.     So you were -- you were a pretty young guy,
 8    correct?
 9    A.     Yes.
10    Q.     But you still -- you had been in the business for
11    about 5 years at that point?
12    A.     Yes.
13    Q.     Now Jackson is significantly younger than you,
14    correct?
15    A.     Yes.
16    Q.     So he was in high school with your friend Calley,
17    correct?
18    A.     Yes.
19    Q.     Okay.
20    A.     But not at the time.  Sorry.  Keep going.
21    Q.     Okay.
22           So you guys all meet at the conference, right?
23    A.     Yes.
24    Q.     You understood, when you met Mike Veldhuis, that
25    what his business did was to provide funding for startup
```

```
 1   companies, small businesses, correct?

 2   A.    Yes.

 3   Q.    Now it was your understanding that that business

 4   involved individuals who had acquired and had stock in a

 5   shell company, correct?

 6   A.    Yes.

 7   Q.    "Shell" meaning not currently active, correct?

 8   A.    Yes.

 9   Q.    Okay.  And those individuals were looking to find

10   private businesses that could do a reverse merger with

11   that shell, correct?

12   A.    Yes.

13   Q.    And then the company would move forward as a

14   public company, correct?

15   A.    Correct.

16   Q.    And those individuals would then become investors

17   in that public company, correct?

18   A.    Correct.

19   Q.    And then in order to attract more investors, there

20   would be promotional campaigns that would be done in

21   relation to the new company, correct?

22   A.    Correct.

23   Q.    Okay.  That sequence of events, just to be clear,

24   is in no way improper as far as you understand, correct?

25   A.    Correct.
```

```
1    Q.    Okay.  That sequence of shell, reverse merger,

2    promotional campaign, that's not a fraud, is it?

3    A.    No.  Well not to my knowledge.

4    Q.    Okay.  As far as you know it's all just business?

5    A.    As far as I know, yes.

6    Q.    Okay.  All right.  Let's talk about the

7    promotional aspect of it.

8          It was your understanding that promotional

9    campaigns were intended to bring new eyes, new investors

10   to the company, correct?

11   A.    Yes.

12   Q.    You did not view promotional campaigns as an exit

13   strategy for shareholders, correct?

14   A.    Correct.

15   Q.    You knew, in connection with promotional

16   campaigns, that the name of the paying party had to be

17   disclosed in the disclaimer, correct?

18   A.    Correct.

19   Q.    And to your knowledge, throughout the time that

20   you were doing these transactions that you've talked

21   about, you always did that, correct?

22   A.    Correct.

23   Q.    You were disclosing the identity of the paying

24   party and the amount of the compensation, correct?

25   A.    Correct.
```

A2688

1    Q.    And you were doing that alongside other language

2    that said, very bluntly, "This is advertising, this is

3    information that has been paid for, please go do your

4    own research," correct?

5    A.    Correct.

6    Q.    Okay.  And your understanding then and now is

7    that's what the regulators required in connection with a

8    promotion, correct?

9    A.    Correct.

10   Q.    Okay.  And you've not been charged with failing to

11   do that properly, correct?

12   A.    The allegations were against me, but I've not

13   admitted anywhere of doing it.

14   Q.    Okay.  Did you ever know, at the time you were

15   dealing with Veldhuis, that he was dealing with someone

16   named Fred Sharp behind the scenes?

17   A.    No.

18   Q.    Did he ever tell you that he had somebody behind

19   the scenes who was -- who had companies and was moving

20   stock around, all of that?

21   A.    No.

22   Q.    Okay.  Now in your business, um, you tried to make

23   sure that you were being hired by and working with only

24   companies that had real businesses, correct?

25   A.    Correct.

```
 1   Q.    Businesses that in your view could be good
 2   opportunities for investors, correct?
 3   A.    Correct.
 4   Q.    And when you put together promotional material for
 5   those, you went and did your research, correct?
 6   A.    Correct.
 7   Q.    You weren't just like "winging it" in terms of
 8   what you put into the promotions, correct?
 9   A.    Correct.
10   Q.    So you researched the sector that they were
11   working in, correct?
12   A.    Correct.
13   Q.    And the management of the company?
14   A.    Correct.
15   Q.    So you'd look at the financials of the company?
16   A.    Correct.
17   Q.    And that was -- that sort of research and due
18   diligence was what you used as the promotional material
19   was developed, correct?
20   A.    Correct.
21   Q.    You also said that you had writers that worked for
22   you?
23   A.    That is correct.
24   Q.    Would you tell us about that, what did those folks
25   do?
```

A2690

```
 1    A.     The writers took this due diligence, most of them
 2    did their own research as well, um, and there's a, um, a
 3    job where a skill called a copywriter -- copywriters are
 4    good at writing for sales copy, it's more engaging copy,
 5    it's something a little more entertaining than reading a
 6    newspaper.  So these professionals take years and years
 7    of writing in the financial sector to find a way to take
 8    something as boring at somebody's financials and make it
 9    interesting to read.
10    Q.     Okay.  You also mentioned yesterday that you spoke
11    with and I think hired an SEC compliance person to work
12    with you to ensure that you were doing things correctly?
13    A.     We have a -- I engaged my litigator after 2013 to
14    assist me in compliance efforts, and since this case
15    I've hired a full-time compliance person on my team.
16    Q.     Okay, let's go back to 2013.  Who did you engage
17    at that point or who were you talking with then?
18    A.     Um, Greenberg Traurig.
19    Q.     So Greenberg, the law firm?
20    A.     Correct.
21    Q.     Okay.  And did you work also with Mark Lee?
22    A.     Um, he worked -- he did some work for me, yes.
23    Q.     And Greenberg is a very large nationwide law firm,
24    correct?
25    A.     Correct.
```

A2691

```
 1    Q.    Okay.  So at least as of 2013, you were talking
 2    with Greenberg trial lawyers to make sure that you were
 3    doing things correctly, is that right?
 4    A.    Correct.
 5    Q.    Okay.  All right.  Let's jump back a little to
 6    when you met Mike Veldhuis.
 7          You met him in roughly 2010, okay?
 8    A.    Yes.
 9    Q.    And he then helped you set up your business Full-
10    Service Media, correct?
11    A.    Correct.
12    Q.    And how did he do that?
13    A.    He had his assistant, Aidan, setting up the
14    paperwork, he advised me -- I was living in Florida at
15    the time.  I said I was going to start a Florida
16    corporation.  He advised I should have used Delaware
17    instead, it's better protection.  Just a variety of
18    business knowledge that I wasn't exposed to at that
19    time.
20    Q.    Okay.  Now Mike Veldhuis is older than you,
21    correct?
22    A.    Yes.
23    Q.    And you're older than Jackson, correct?
24    A.    Correct.
25    Q.    Okay.  So Mike Veldhuis had significantly more
```

```
 1    experience than you did in the industry, correct?
 2    A.    Correct.
 3    Q.    And so you found yourself working pretty closely
 4    with Mike Veldhuis?
 5    A.    Yes.
 6    Q.    Did he kind of take you under his wing?
 7    A.    Yes.
 8    Q.    Okay.  And did he encourage you as you were
 9    working to develop your own business?
10    A.    Yes.
11    Q.    Now in connection with the transactions that we've
12    been talking about, um, the various promotional
13    campaigns, Mike Veldhuis was your principal contact,
14    correct?
15    A.    Yes.
16    Q.    He was the one with whom you would discuss ideas
17    or strategies in relation to the promotions, correct?
18    A.    Yes.
19    Q.    He was also the one with whom you dealt in
20    connection with payment, correct?
21    A.    Yes.
22    Q.    And he was the one that was referring these
23    various deals or campaigns to you, correct?
24    A.    Yes.
25    Q.    All right.  And let's just separate for a moment,
```

```
 1    you were asked a moment ago about how many campaigns you
 2    did and how many issuers were involved.  I just want to
 3    clarify.
 4          You might have done what you called "campaigns,"
 5    you might have done multiple campaigns in connection
 6    with Stevia, for example, correct?
 7    A.    Yes.
 8    Q.    So one campaign doesn't mean it was a separate
 9    company, it might have been for a -- multiple campaigns
10    for one company?
11    A.    Correct.
12    Q.    Okay.  All right.
13          You've indicated, in connection with the work that
14    you did, that you spoke almost daily with Mr. Veldhuis,
15    correct?
16    A.    Yes.
17    Q.    Okay.  Now you were asked, um, by the SEC what
18    was -- what generally happened after a promotion in
19    terms of the price of the stock.  Do you remember that?
20    A.    My memory is that it was related to volume.
21    Q.    Okay.  Do you recall mentioning, and on
22    questioning from the SEC, that after a promotion ended,
23    price and volume went down?
24          MS. KLUNDER:  Objection.
25          THE COURT:  Is that the substance of your
```

A2694

```
 1    testimony, as you recall it, when the Commission was

 2    asking you?

 3          THE WITNESS:  It's even in my disclaimers now.

 4    So, yes, on average price and volume go down after a

 5    promotion.

 6    Q.    Okay.  But in connection with Stevia, it was

 7    different, right?

 8    A.    Stevia Corp, correct.

 9    Q.    Okay.  So Stevia was really the first deal that

10    you did with Veldhuis, correct?

11    A.    Um, one of the first, yes.

12    Q.    Okay.  And Stevia -- again you looked at Stevia

13    and you felt that that was a good business, a good

14    company, correct?

15    A.    That is correct.

16    Q.    Okay.  What did you like about it?  I use it.  But

17    what did you like about it?

18    A.    This --

19          THE COURT:  I don't understand.  You use it?

20          MS. FRITZ:  Stevia, the little yellow sugar

21    packet.

22          MS. KLUNDER:  Objection.

23          THE COURT:  Well we'll strike out the fact that

24    you use it, this has nothing to do with anything.

25          But what did you like about the company, you, the
```

```
 1   witness?
 2        She can't testify.  We're really not interested in
 3   her personal -- with all respect, um, consumer
 4   preferences.
 5        What did you like about it?
 6   A.   What I really liked about this project is that
 7   after the promotion ended, the company was able to raise
 8   -- in excess of the $25 or more million, the stock
 9   continued to trade, consistent volume, maintain a pretty
10   solid price point for many many months, like 6 or more
11   months after the promotion ended, and that was between
12   2011 and 2012.  It was amazing.  It was a great project.
13   Q.   All right.  So everything that you were seeing in
14   connection with that project was very positive, correct?
15   A.   Correct.
16   Q.   And this was something that at some point Jackson
17   was also involved in, is that correct?
18        THE COURT:  You keep calling him "Jackson."
19        MS. FRITZ:  I'm sorry.  Mr. Friesen.
20        THE COURT:  Right.  And the reason that I require
21   that is that she may know him personally, because she
22   represents him, but they, the Commission, they can't
23   call him "Jackson," they're not personally acquainted
24   with him.
25        So we'll have a routine rule, everyone gets called
```

A2696

```
 1    by their last name.  That's the Court's rule.  So we're

 2    talking "Mr. Friesen."

 3         Put the question again.

 4         MS. FRITZ:  Sorry, your Honor.

 5    Q.   And that's -- these events relating to Stevia,

 6    these were things that you had spoken to Mr. Friesen

 7    about, correct?

 8    A.   Correct.

 9    Q.   And was he also excited and encouraged by what he

10    saw on that transaction?

11    A.   Yes.

12    Q.   All right.  Now, speaking of Mr. Friesen, um,

13    let's go back to what you understood about how Jackson

14    Friesen became involved with Mike Veldhuis.

15         When you first met Mike Veldhuis, was it your

16    understanding that he had taken Jackson Friesen under

17    his wing as well?

18    A.   Yes.

19    Q.   Okay.  Jackson Friesen again was much younger than

20    either one of you, correct?

21    A.   Correct.

22    Q.   And he was just starting out in connection with

23    this private financing business, correct?

24    A.   Correct.

25    Q.   And wanted to learn about the business, correct?
```

```
 1    A.    Correct.
 2    Q.    Now let's talk about the other Mr. Friesen.
 3          The connection, as you understood it, was
 4    Jackson's dad, Bill Friesen --
 5          MS. KLUNDER:  Objection.
 6    Q.    Mr. Jackson Friesen's dad, Mr. Bill Friesen, was
 7    someone that Mike Veldhuis had known for a very long
 8    time, correct?
 9          MS. KLUNDER:  Objection.
10          THE COURT:  Sustained on that foundation.
11    Q.    Did you have occasion to meet Jackson Friesen's
12    dad, Bill Friesen?
13          MS. KLUNDER:  Objection, scope.
14          THE COURT:  No, overruled.  And she may have that.
15    But it is beyond the scope and I'll keep that in mind,
16    as to the manner of the interrogation.
17          Did you meet that individual?
18          THE WITNESS:  I have.
19    Q.    Okay.  And Mr. Bill Friesen is the one that was
20    also involved in the private financing field?
21          MS. KLUNDER:  Your Honor, objection.
22          THE COURT:  Sustained, you're leading the witness.
23          MS. FRITZ:  I --
24          THE COURT:  The rule is plain.  You've now gone
25    beyond the scope, you've taken the witness as on direct,
```

A2698

```
 1    so you're leading him.  So you can ask a question --
 2         MS. FRITZ:  Okay.
 3         THE COURT:  When did you meet the father -- when
 4    first did you meet the father?
 5         THE WITNESS:  Roughly 2012.
 6         THE COURT:  Okay.  Go from there.
 7    Q.    And what was your understanding of the
 8    relationship, if any, between Mike Veldhuis and Mr. Bill
 9    Friesen?
10    A.    Um, Mike had once worked with Bill Friesen and
11    Bill Friesen was quasi-retired at the time.
12    Q.    Okay.  So was it your -- did you know if Bill
13    Friesen had spoken with Mike Veldhuis about having
14    Jackson Friesen work with him?
15         MS. KLUNDER:  Objection.
16         THE COURT:  Sustained.
17    Q.    Did you know whether Bill Friesen had anything to
18    do with Jackson Friesen going to work for Mike Friesen?
19         MS. KLUNDER:  Objection.
20         THE COURT:  How would he know?
21    Q.    Based on the conversations that you had with Bill
22    Friesen and Mike Veldhuis.
23         THE COURT:  But they're hearsay and there's no
24    exception.  Sustained.
25         MS. FRITZ:  Okay.
```

A2699

 1    Q.    All right.  So Jackson Friesen, to your

 2    understanding, had virtually no experience in connection

 3    with investor relations when you first became involved

 4    with Mike Veldhuis, correct?

 5    A.    Correct.

 6    Q.    And so as far as -- what you saw was Mike Veldhuis

 7    working with someone to help him learn the industry, is

 8    that correct?

 9    A.    Correct.

10    Q.    And he did very much the same thing with you,

11    correct?

12    A.    That's fair, yes.

13    Q.    For example, in connection with, I believe, the

14    Oryn deal, Mike Veldhuis got you involved in the

15    discussions with the attorneys, correct?

16    A.    Correct.

17    Q.    So that you could learn more about how these deals

18    are put together, correct?

19    A.    Correct.

20    Q.    So he had you even participating in conference

21    calls with the attorneys, correct?

22    A.    Correct.

23    Q.    Okay.  Now in your dealings with Jackson Friesen,

24    um, he would sometimes comment on or edit promotional

25    copy, is that correct?

A2700

```
 1    A.    Correct.
 2    Q.    But he was, um, he was not an experienced guy, and
 3    so there were instances where you complained to Veldhuis
 4    about the comments he was making, correct?
 5    A.    Correct.
 6    Q.    Because he just didn't yet know what he was doing,
 7    correct?
 8    A.    Correct.
 9    Q.    And we saw a little bit of that yesterday in one
10    of the e-mail communications where -- the one relating
11    to subject lines, and Jackson was suggesting the use of
12    a word that would be inappropriate, correct?
13    A.    Correct.
14    Q.    Okay.  And so you had to sort of clarify and
15    correct that?
16    A.    Correct.
17    Q.    Nonetheless, whether he was good at this
18    particular work or not, you and he became friends,
19    correct?
20    A.    Correct.
21    Q.    And so over the course of a couple of years there,
22    you would speak with him pretty regularly, correct?
23    A.    Yes.
24    Q.    All right.  Um, you also mentioned yesterday that
25    you understood that he had a business relationship with
```

A2701

```
 1    Mike Veldhuis, correct?

 2    A.    Yes.

 3    Q.    You used the word "partner," I think, correct?

 4    A.    Correct.

 5    Q.    All right.  So let's talk about that.

 6          Do you know if Jackson Friesen was someone who

 7    worked for Mike Veldhuis or was a partner in his

 8    business?

 9    A.    I only know I've heard them refer to each other as

10    "partners," but other than that I don't know, um, the

11    exact arrangement.

12    Q.    All right.  Now you also -- you mentioned

13    yesterday that Jackson Friesen had a venture capital

14    business card, correct?

15    A.    Correct.

16    Q.    And that was Mike Veldhuis's business, correct?

17    A.    Correct.

18    Q.    Okay.  You also had a venture capital e-mail

19    address, correct?

20    A.    Correct.

21    Q.    Okay.  So -- but you were not a formal business

22    partner in Mike Veldhuis's business, correct?

23    A.    Correct.

24    Q.    So that was done, um, so that your presentation

25    could be more professional, correct?
```

A2702

```
1    A.    Correct.
2    Q.    So you used an e-mail address, all of that,
3    correct?
4    A.    Yes.
5    Q.    And you also -- in connection with certain
6    dealings with Alan Marshall, you also called Mike
7    Veldhuis your partner, correct?
8    A.    Correct.
9    Q.    Okay.  And that was done in the context of the
10   dealings that you were having with Alan Marshall,
11   correct?
12   A.    Correct.
13   Q.    So you -- just to be clear, to you, that use of
14   the word "partner," really means people who are working
15   together on a deal, correct?
16   A.    Correct.
17   Q.    Okay.  All right.  The SEC did show you e-mail
18   communications that included Mr. Friesen, do you recall
19   that?
20   A.    I do.
21   Q.    So I want to talk about that for a minute, um,
22   these Xphones.
23         In 2011, Mike Veldhuis gave you an Xphone,
24   correct?
25   A.    Correct.
```

A2703

```
 1    Q.    And do you recall it at or about the same time he
 2    gave Jackson Friesen an Xphone?
 3    A.    I didn't see it, but I assume so, yes.
 4    Q.    Okay.  And those Xphones, as far as you
 5    understood, were intended to ensure privacy among those
 6    people that were communicating, correct?
 7    A.    Correct.
 8    Q.    You did not think that there was anything illegal
 9    about it, correct?
10    A.    Correct.
11    Q.    In fact to you it wasn't even a red flag with
12    respect to the business that you were doing, correct?
13    A.    Correct.
14    Q.    Okay.  And did you and Jackson ever talk about
15    that, the fact that this is the way Mike Veldhuis wanted
16    folks to communicate?
17    A.    I don't remember.
18    Q.    Okay.  Now we saw on some of those communications
19    that there are numbers instead of names, correct?
20    A.    Correct.
21    Q.    You were told by Mike Veldhuis that that was not
22    to be cute, but that was because the system only used
23    numbers, correct?
24    A.    Correct.
25    Q.    Okay.  Now the communications that we saw, um,
```

A2704

```
 1    most of them involved the period 2013, correct?

 2    A.    Correct.

 3    Q.    So 10 years ago.  So how old were you at that

 4    point?

 5    A.    32.

 6    Q.    How old was Jackson?

 7          THE COURT:  If you know.

 8    A.    Mid 20s, somewhere around there.

 9    Q.    Okay.  Um --

10          THE COURT:  Again you called him "Jackson."  I

11    really must insist.  It's my rule.  I expect you to

12    follow it.

13          Go ahead.

14          MS. FRITZ:  Yes.

15    Q.    Now if we could -- the communications that we

16    dealt with yesterday or that we saw yesterday, those

17    communications had to do with promotional activity,

18    correct?

19    A.    Correct.

20    Q.    The work that you were doing, correct?

21    A.    Correct.

22    Q.    And the work that Jackson was dealing with you

23    about?

24          THE COURT:  Mr. Friesen.

25          MS. FRITZ:  Mr. Friesen, yes.
```

A2705

```
 1    Q.    The work that Mr. Friesen was dealing with you

 2    about, correct?

 3    A.    Correct.

 4    Q.    Okay.

 5          MS. FRITZ:  So, for example, if we could show

 6    Exhibit 11 from yesterday.

 7          (On screen.)

 8    Q.    Now this one involves communications between you,

 9    as 66, and the numbers 2, 3, and 4, correct?

10    A.    Correct.

11    Q.    Okay.  If we look at the bottom of the page, this

12    seems to be you reporting about the performance or the

13    activity that went on as a result of the promotion, is

14    that correct?

15    A.    That is correct.

16    Q.    All right.  So if you could just briefly explain

17    to the jury, what is it that this information is telling

18    the other folks?

19    A.    This is just giving an update on, um, how much

20    advertising budget we've allocated, meaning how much

21    we've bought, the list of names, these are like the

22    e-mail lists or the financial websites, and that's the

23    number of page views that the advertisements received as

24    a result of sending an e-mail.

25    Q.    Okay.  And this is perfectly normal reporting for
```

A2706

```
 1   anyone that is looking for an e-mail campaign of any
 2   kind, correct?
 3   A.    That is correct.
 4   Q.    Now about a third down on the page you say "Week
 5   total spend is 155,780."  What do you mean there by
 6   "spend," is that what they're spending or does that
 7   reference what you're spending?
 8   A.    That's the amount of money that I budgeted -- the
 9   amount of money that I placed for that particular
10   campaign.  I -- I didn't assume -- I didn't think they
11   were spending this money, that was the third-party's
12   money.
13   Q.    Okay.  Now that was the amount of money that was
14   being paid to your company, correct?
15   A.    Um --
16   Q.    I just -- I want you to clarify this for the jury.
17         Does this cost money, does your business have to
18   pay money, um, and spend money in order to conduct these
19   campaigns?
20   A.    Um, yes, I have to place money in order to buy
21   media.  Nobody will send an e-mail without a deposit.
22   It's basic advertising.
23   Q.    Okay.  And does your -- do you include payment to
24   Google for, um, for clicks or anything like that?
25   A.    That's what that number would entail, is whatever
```

A2707

```
 1    the total number of, um, add placements, whether it's
 2    Google, e-mail, or anything.
 3    Q.    Okay.  So that's money, at least in part, that
 4    you're paying out in order to place all of this
 5    information on the internet, correct?
 6    A.    Correct.
 7    Q.    Okay.
 8          MS. FRITZ:  Now if we take a look at Exhibit 14,
 9    for example.
10          (On screen.)
11    Q.    This is an e-mail that has to do with what you're
12    calling "Oryn," correct?
13    A.    Correct.
14    Q.    And this is the one that I believe you said is
15    just a very different kind of deal, correct?
16    A.    Correct.
17    Q.    You were very intimately involved with this
18    company, I think you said, correct?
19    A.    Correct.
20    Q.    Okay.  And in this e-mail again we're talking
21    about spring of 2013.  In this e-mail, the second e-mail
22    down, you're saying something about "Did you mention the
23    header idea like a note or letter update?"  Do you see
24    that?
25    A.    Yes.
```

```
 1    Q.    Okay.  So is that something that you and
 2    Jackson -- you and Mr. Friesen had talked about in
 3    relation to the advertising campaign?
 4    A.    Yes.
 5    Q.    Okay.  Again talking about ideas relating to the
 6    promotion, correct?
 7    A.    Correct.
 8    Q.    Okay.
 9          (Pause.)
10          MS. FRITZ:  If we go to Exhibit 15 now.
11          (On screen.)
12    Q.    The Same idea, these are communications between
13    you and Mr. Friesen, correct?
14    A.    Correct.
15    Q.    And there's a reference here to the -- the
16    party -- the paying party that is the one that has to be
17    disclosed, um, in the public disclaimer, correct?
18    A.    Correct.
19    Q.    Okay.  In the second e-mail up, there's a
20    reference to "representations from Arista," do you see
21    that?
22    A.    I do.
23    Q.    So -- and that's a communication from Mr. Friesen
24    to you, correct?
25    A.    That is correct.
```

1    Q.    And so I believe you explained yesterday what he's

2    referring to is that you guys had learned that certain

3    representations should be obtained from the paying

4    party, correct?

5    A.    Correct.

6    Q.    Okay.  And so he's -- he's referencing this

7    information that you had gotten regarding how you should

8    do these -- how you should deal with the paying party,

9    correct?

10   A.    (Pause.)  I think I understand.

11   Q.    Okay.  This is something that an SEC compliance

12   guy had recommended, correct?

13   A.    Yes, to an associate.

14   Q.    Okay.  And so this is something that Jackson

15   Friesen is now referencing back to you, correct?

16   A.    Yes.

17   Q.    Okay.

18        MS. FRITZ:  If we go to Exhibit 18.

19        (On screen.)

20   Q.    This is the communication we talked about a moment

21   ago regarding subject lines.  This is an instance where,

22   in the second communication down, we see you correcting

23   Mr. Friesen with respect to a word choice, correct?

24   A.    That is correct.

25   Q.    Okay.  And you had -- you had also explained that

A2710

```
 1   during the period of, roughly around 2013, the SEC began

 2   halting trading in stocks that were the subject of

 3   promotions, correct?

 4   A.    Correct.

 5   Q.    And that was changing your business, ultimately

 6   slowed down your business, correct?

 7   A.    Correct.

 8   Q.    Okay.  And you guys were taking a look at other

 9   promotional materials that were available on the

10   internet where stock had not been halted, correct?

11   A.    Correct.

12   Q.    Just looking to see what is permissible, what is

13   the SEC -- what is not causing the SEC to halt trading,

14   correct?

15   A.    Correct.

16   Q.    And so if we look at Exhibit 19, this is you

17   circulating the promotion involving a company called

18   "SLCO," correct?

19   A.    Correct.

20   Q.    And this is -- this then ends up being a

21   discussion about what might have caused the stock to be

22   halted, correct, what is it in this promotion that

23   would -- that would or would not be a problem, is that

24   correct?

25   A.    It's hard to tell if this one wasn't halted or was
```

A2711

```
 1    halted based on this -- and I don't remember exactly
 2    whether it was or it wasn't, it could have been either.
 3    Q.    If you look at the first page, the second e-mail
 4    down, "from 4" means that it's from Mike Veldhuis, is
 5    that correct?
 6    A.    Um, yes, correct.
 7    Q.    Okay.  And he is saying "They won't halt based on
 8    a logo," correct?
 9    A.    Correct.
10    Q.    And that was in response to something that Jackson
11    Friesen had said about whether that might have been a
12    problem, correct?
13    A.    Correct.
14    Q.    So again he's correcting Jackson Friesen saying
15    they won't halt based on that.  And then he's saying to
16    him, "It looks like there is no backing for the 1125
17    price target," do you see that?
18    A.    Correct.
19    Q.    And so what's he referencing here?
20    A.    At this time, um, most copywriters would include
21    some sort of a price target in the advertisement, um,
22    the industry's best practice was to base it on reality
23    -- if this company meets these metrics based on how
24    these other companies are trading, provided these
25    hypothetical situations occur, this stock could be
```

```
 1    traded at this amount.  So what he's explaining here is
 2    that there's an 1125 price target in this advertisement
 3    that has no justification in reality.
 4    Q.    And so this was a reference to the fact that you
 5    guys understood that there had to be a proper basis or
 6    support if you were going to put a price target in,
 7    correct?
 8    A.    Correct.
 9    Q.    Okay.
10          Look, Mr. Kaitz, were you trying to do a good
11    business?
12    A.    Yes.
13    Q.    Did you think you were doing an illegal business?
14    A.    No.
15    Q.    Did you think that anything that you spoke about
16    with Mr. Friesen was illegal?
17    A.    No.
18    Q.    Did you think he was trying to do an illegal
19    business?
20    A.    No.
21    Q.    Um, all right.  So once we get to 2014, your
22    business really drops off, correct?
23    A.    Yes.
24    Q.    You had very few conversations with Jackson
25    Friesen after 2014, is that correct?
```

A2713

```
 1    A.    Correct.
 2    Q.    Okay.
 3          MS. FRITZ:  Nothing further.
 4          THE COURT:  Ms. Pickett, anything for this
 5    witness?
 6          MS. PICKETT:  Nothing from me, thank you, your
 7    Honor.
 8          THE COURT:  Any redirect, Ms. Klunder?
 9          MS. KLUNDER:  Yes, your Honor.
10          THE COURT:  You may.
11
12    REDIRECT EXAMINATION BY MS. KLUNDER:
13    Q.    Mr. Kaitz, what if anything did you know about who
14    owned stock of the companies you promoted?
15          MS. FRITZ:  Objection, beyond the scope.
16          THE COURT:  Who owned stock?  Say it again.
17    Q.    In the companies that you promoted.
18          MS. FRITZ:  Objection, beyond the scope.
19          THE COURT:  No, overruled.  She may have that.
20    A.    Um, my view was that, um, Veldhuis, Friesen, and
21    Sexton, if they were involved in these projects, would
22    all own stock, as well as groups of investors that they
23    had connections with.
24    Q.    And Ms. Fritz had asked you on cross about the
25    process of a shell company, a reverse merger, a
```

```
 1    promotion and sale, and she asked you if that was fraud,
 2    do you remember that?
 3    A.    Yes.
 4    Q.    Is it fraud if the people controlling the sales in
 5    the promotions hide their identities?
 6          MS. FRITZ:  Objection.
 7          THE COURT:  Well that calls for a legal
 8    conclusion, but I take it you are asking for his
 9    understanding?
10          MS. KLUNDER:  That's right, your Honor.
11          THE COURT:  And he may answer.
12          Do you have an understanding?
13    A.    My understanding is that's a little broad, I
14    think.  If they take steps to hide their identity and
15    their ownership in stocks, then, yes, I would understand
16    that to be fraud.
17    Q.    (Pause.)  Ms. Fritz asked you about payments.  Why
18    did you stop taking payments from third-parties?
19    A.    In 2013 I was the subject of an investigation by
20    the SEC for a project or a campaign we ran for a company
21    called Northstrup, and during the course of that
22    investigation I had learned that this company was a --
23    essentially a fake company, which I never wanted to work
24    on, and nor did I ever want to be in front of the SEC.
25    So after that case had finished its conclusion, or the
```

```
 1    investigation had finished its conclusion, I worked with
 2    my litigator Greenberg and said "How can I continue to
 3    do what I'm good at without winding up in front of the
 4    SEC?"  And she had vehemently recommended to only take
 5    money from sources and to never take third-party money.
 6    Q.    And with regard to that third-party money, on
 7    cross Ms. Fritz asked you, at the time of the messages
 8    that we've looked at, where you thought that third-party
 9    money was coming from?  And you said that it was the
10    third-parties, not Friesen, Veldhuis, or Sexton, do you
11    remember that?
12         MS. FRITZ:  Objection.
13         THE COURT:  I didn't understand the question, so
14    please ask it again.
15    Q.    On cross you testified about where you believed
16    the money was coming from that paid for your campaigns,
17    do you remember that?
18    A.    Yes.
19    Q.    And did you say it was the third-party?
20    A.    Correct.
21    Q.    Today do you have an understanding of whose money
22    that was?
23         MS. FRITZ:  Objection.
24         THE COURT:  Well --
25         MS. FRITZ:  Foundation.
```

A2716

```
 1          THE COURT:  And I have that in mind.

 2          Where do you get today's supposed understanding?

 3          THE WITNESS:  My knowledge today is different just

 4     based on the disclosure I received from the SEC and --

 5          THE COURT:  Yes, sustained.

 6          MS. KLUNDER:  No further questions, your Honor.

 7          THE COURT:  Nothing further for this witness?

 8          MS. FRITZ:  No.

 9          THE COURT:  You may step down.

10          (Witness steps down.)

11          THE COURT:  Is the deposition next?

12          MS. SHIELDS:  Your Honor, before we play the

13     deposition, I'd like to ask you to read the stipulations

14     that the parties have entered into, because that's

15     relevant to the deposition.

16          THE COURT:  Yes.

17          MS. SHIELDS:  May I approach you with the

18     stipulations?

19          THE COURT:  Yes.

20          Now, again, to save time, not everything is

21     disputed here, and when they agree that certain facts

22     happened, um, those things are -- you may take it as

23     true, and my practice is that I myself will read the

24     stipulations and I'll say to each party, "So stipulated,

25     do you agree with it?"
```

 1            If they agree with it, the way I read it, even

 2     though usually I'm not the source of any evidence here,

 3     then what I've read to you is evidence and more than

 4     that, it's agreed to.  You don't have to wonder about

 5     it.  No one disputes it.  You can simply take that as

 6     fact.  So I'll read the stipulation.

 7            "(1) The common stock of Stevia First Corp. slash

 8     Vitality BioPharma, Incorporated was registered with the

 9     Securities and Exchange Commission under Section 12 of

10     the Exchange Act during the time period from March 31,

11     2011 to March 31, 2019.

12            (2) during the listed time periods, the stock of

13     the following companies was quoted on a stock trading

14     platform operated by Over-The-Counter Market Group,

15     Incorporated, OTC Markets, a platform that provided

16     information used to buy and sell securities under the

17     listed ticker symbol."

18            So I'm going to read the time period, then I'll

19     read the issuer, the issuer of the stock, and then the

20     ticker symbol that was used by this Over-The-Counter

21     market.

22            "So from 2012 to 2018, Stevia First slash Vitality

23     used the ticker symbol" -- and these are all caps, "FTVF

24     slash VBIO."

25            "From 2012 to 2014, Echo Automotive, Incorporated

1    used the ticker symbol," all caps, "ECAU."

2         "From 2012 to 2017, Arch Therapeutics used the

3    ticker symbol," all caps, "ARTH."

4         "2011 to 2014, Stevia Corporation used the ticker

5    symbol," all caps, "STEV."

6         "2016 to 2018, Liberty 1 Lithium Corporation used

7    the ticker symbol," all caps, "LBY."

8         "2012 to 2013, Oyrn Technologies, Incorporated

9    used the ticker symbol," all caps, "ORYN."

10        "2013 to 2014, the corporation McKism 3D Corp.,

11   used the ticker symbol," all caps, "MDDD."

12        "2012 to 2014, the corporation, Graphite

13   Corporation used the ticker symbol," all caps, "GRPH."

14        "2011 to 2012, the corporation, OncoSec Medical,

15   used the ticker symbol," all caps, "ONCS."

16        "2016" -- strike that.  "2016 to 2017, the

17   corporation, NewGen BioPharma Corporation, used the

18   ticker symbol," "NEWG," all caps.

19        "2016 to 2018, the corporation "StartMonday

20   Technology Corp., used the ticker symbol," all caps,

21   "JOV slash FTMDX."

22        "2017 to 2018, the corporation, Lexington

23   Biosciences Holdings Corp, used the ticker symbol," all

24   caps, "LNB slash LXGPX."

25        "2016, the corporation, Breathtec Biomedical

A2719

```
 1    Incorporated, used the ticker symbol," all caps, "BTH
 2    slash BTHC."
 3         "2013 to 2014, the corporation, Rihtscorp, used
 4    the ticker symbol," all caps, "RIHT."
 5         "(3), The sales of stock of Stevia First
 6    Corporation slash Vitality Biopharma Incorporation, Echo
 7    Automotives, Inc., Arch Therapeutics, Stevia Corp,
 8    Liberty 1 Lithium Corp, Oryn Technologies Incorporated,
 9    Maxim 3D Corp, Graphite Corp, OncoSec Medical Inc.,
10    NewGen BioPharma Corp, StartMonday Technology Corp,
11    Lexington Biosciences Holdings Corp, Breathtec
12    Biomedical, and Rihtscorp, that are at issue in this
13    case were made during the means of" -- "were made using
14    the means of transportation or communication in
15    interstate commerce."
16         "(4), The equity stock of the following companies,
17    Stevia Corp slash Vitality Biopharma Incorporated, Echo
18    Automotive, Arch Therapeutics, Stevia Corp, Liberty 1
19    Lithium Corp., Oryn Technology Incorporation, Maxim 3D
20    Corp, Graphite Corp, OncoSec Medical, Inc., NewGen
21    Biopharma Corp, StartMonday Technology Corp., Lexington
22    Biosciences Holdings Corp., Breathtec Biomedical, Inc.,
23    and Rihtscorp, are," quote, "'Securities,'" closed
24    quote, "as defined by Section 2(a)(1) of the Securities
25    Act, 15 United States Code, Section 77B, parenthesis
```

A2720

1    (a), parenthesis (1), and Section 3(a)(10) of the

2    Exchange Act, 15 United States Code, Section

3    78(C)(a)(10)."

4        "(5) The bank and brokerage account records that

5    were produced to the Commission by the following third-

6    parties are authentic documents within the meaning of

7    Federal Rule of Evidence 901 and are also records of a

8    regularly-conducted activity within the meaning of

9    Federal Rule of Evidence 8036."  And I read the bank and

10    brokerage account records of the following entities.

11        "Apex Clearing Corp, Beaufort Securities Limited

12    or Beaufort Asset Clearing Services Limited, Canaccord

13    Genuity Corp., Compagnie Bancaire Helvetique SA, DMS

14    Bank & Trust Limited, EFG Bank Limited, formerly BSI

15    Bank, Forte Securities, LLC, Haywood Securities,

16    Incorporated, HSZH Verwaltungs AG, which acquired

17    Hyposwiss, LGT Bank, Singapore, Limited, Linear

18    Investments Limited, Peter Pesic & Company Securities

19    Incorporated, Prometheus Capital Finance Limited,

20    St. Galler Kantonalbank AG, Tendall Capital Markets

21    Limited, Hibiscus Group Limited, formerly Valbury

22    Capital Limited, VP Swiss Bank Limited, Wedbush

23    Securities, Inc."

24        "The documents that were produced to the

25    Securities & Exchange commission by the following third-

A2721

1    party transfer agents are authentic documents within the

2    meaning of Federal Rule of Evidence 901 and are also

3    records of a regularly-conducted activity within the

4    meaning of Federal Rule of Evidence 8036.  Action Stock

5    Transfer Corporation, Empire Stock Transfer

6    Incorporated, Island Stock Transfer, Nevada Agency &

7    Transfer Company."

8         "(7) Exhibits for identification LI and LJ on the

9    Commission's Exhibit List, which contain the Q-System

10   data in EXCEL and Native Format respectively, contain

11   information derived from data that was on a server

12   marked 'Bond underscore 15' that was obtained from

13   Curacao at the request of the Federal Bureau of

14   Investigation and then produced to the Securities &

15   Exchange Commission."

16        "(8), The Xmail and Xphone messages that are on

17   the Commission's Exhibit list were on the servers marked

18   respectively 'Bond underscore 15' and 'BondBES-70' that

19   were obtained from Curacao at the request of the Federal

20   Bureau of Investigation and then produced to the

21   Securities & Exchange Commission."

22        So stipulated on behalf of the Commission?

23        MS. SHIELDS:  Yes, your Honor.

24        THE COURT:  And on behalf of Mr. Friesen?

25        MS. FRITZ:  Yes, your Honor.

```
 1          THE COURT:  And on behalf of Ms. Gasarch?
 2          MS. PICKETT:  Yes, your Honor.
 3          THE COURT:  These are stipulated.  There's no
 4     dispute as to any of this.  It's evidence.  Should you
 5     have any question about it, since the proper way is for
 6     me to read it to you, you may simply request that some
 7     or all of it be read again during your deliberations.
 8          All right.  Now -- now we're going to play a
 9     deposition?
10          MS. KLUNDER:  That's right, your Honor.
11          THE COURT:  Let me explain what a deposition is.
12          Since not everyone physically can be present, it's
13     appropriate that a deposition be taken of a person or
14     persons and a deposition is, um, the person comes to a
15     law office, lawyers for both sides are there, there's a
16     stenographer there much like our Court Reporter, the
17     person takes the same oath as witnesses do here, and all
18     sides get a chance to ask that person questions.
19          When a deposition is read, if I've allowed it to
20     be read, and in this case the next deposition I've
21     allowed to be read, that testimony, though we're not
22     going to see the person, we're only going to see the
23     person on the screen, that's the same thing as testimony
24     as though the person were right here in the courtroom.
25     It's no better, but it's no worse.  It starts the same.
```

A2723

```
 1    Your powers with respect to it are exactly the same.

 2    You can believe everything that is testified to and

 3    played on the deposition, you can disbelieve everything

 4    that is played to you in the deposition, you may believe

 5    parts of what the witness says on the deposition, and

 6    disbelieve other parts.  You have exactly the same

 7    powers with respect to the deposition.

 8         All right, Ms. Klunder, you may proceed.

 9         MS. KLUNDER:  Your Honor, I'd like to move the

10    admission of the exhibits accompanying the designated

11    deposition.  Ms. Gaudet has a list of the letters and I

12    believe we're starting at 21, 21 in the record.

13         If that's helpful?

14         THE COURT:  All right.  So I have the list and the

15    list runs now from Exhibits 21 through 39.  I hear no --

16         MS. KLUNDER:  Your Honor, just to clarify, those

17    are the deposition exhibit numbers, we haven't got the

18    admitted numbers, so it would be 21 to 42.

19         THE COURT:  21 to 42?

20         MS. KLUNDER:  Yes.

21         THE COURT:  21 to 42 are admitted in evidence and

22    you may proceed.

23         (Exhibits 21 to 42, marked.)

24         MS. KLUNDER:  And just your Honor had requested

25    that I identify the times that our designations are and
```

A2724

```
1    that was 55 minutes.
2         THE COURT:  So we're going to listen to this for
3    55 minutes?
4         MS. KLUNDER:  Well they designated the entire
5    thing, we just did the calculated of how long --
6         THE COURT:  55 minutes?  How much longer is it?
7         MS. KLUNDER:  It's 4 hours.
8         THE COURT:  We're not going to listen to it -- let
9    me be clear on that, we're not going to sit here and
10   listen to a deposition for 4 hours.  I can go 55
11   minutes.
12        Can't we be more precise there?
13        MS. PICKETT:  I don't know if they are starting
14   from the beginning, but I can, during the break, cut
15   some.  But he is an important witness for my client.
16        THE COURT:  It's not for me to say whether the
17   witness is important or not, I'm simply saying that I'm
18   not sitting here for 4 hours watching a deposition.
19   We're not going to do that.
20        So what we'll do is, um, the parts the Commission
21   has designated, we'll sit here till it's time for the
22   break, and then you can sort that out, and when the
23   break is over, you can inform me if there's more.
24        I vetted the part that the Commission wanted.  I
25   understood you wanted the rest of it.  I haven't vetted
```

A2725

```
 1    it.  If you don't agree, I'll edit it.

 2         All right.  You may play -- and we'll stop at

 3    quarter of 11:00.

 4         MS. KLUNDER:  We can have this discussion here or

 5    at sidebar, but I think there may be a logistical issue

 6    because we had understood they wanted the entire thing

 7    played, and the parts that you saw were that portion, so

 8    you have reviewed that.  We have a subset of that

 9    portion that we want to put into evidence.  But that's

10    not what's cut on the --

11         THE COURT:  The part that I reviewed will take 4

12    hours to play?

13         MS. FRITZ:  Your Honor, may we approach?

14         MS. KLUNDER:  Okay, it sounds like there's no

15    actual problem, we can put ours in --

16         MS. FRITZ:  May we approach?

17         THE COURT:  Yes, you may.

18

19         AT THE SIDEBAR

20         THE COURT:  Let me start by telling you that I've

21    got a juror problem with one juror, and we can take that

22    up at the break, but generally, um, as Ms. Gaudet has

23    characterized it -- and I have full interaction with the

24    jury, and this is her words, but very accurate from a

25    skilled Courtroom Deputy, that this is a needy jury in
```

A2726

```
 1    the sense that they are now harping, all of them, on how

 2    long this is taking.  I try to avoid that by telling

 3    them at the beginning how long it's taking, and I do not

 4    fault you.

 5         But interesting as the openings have been, it is

 6    my sense -- and now I can see why, and maybe it's

 7    necessary, and I'm not faulting anyone, but this is very

 8    boring and -- (Laughter.) the more you can cut it down

 9    -- and if I could even signal to them, since this is a

10    Friday, that we're cutting it down, the better off in

11    terms of justice we're going to be.

12         I think it's unfortunate that we got into the time

13    with this.  So it's too early to take the break, but it

14    looks like --

15         MS. KLUNDER:  We are ready.  I misspoke, your

16    Honor.  I apologize.

17         MS. FRITZ:  Excuse me.

18         THE COURT:  All right.  All right.  I'll hear you

19    in a minute.  So we can go to a quarter of 11:00, but

20    then we revisit it.

21         MS. FRITZ:  All right.

22         It was my understanding that portions of the

23    deposition would be played, including portions

24    designated by the defense, but what I'm now hearing is

25    that what they've done is sliced out what they like and
```

A2727

```
 1    then separated it in the testimony from what we're

 2    designating.  That isn't the way that I --

 3          THE COURT:  I can understand that.

 4          MS. FRITZ:  Okay, that's what I understand they're

 5    doing.

 6          (Interruption.)

 7          THE COURT:  Always talk to me.

 8          I saw a deposition which had parts marked out in

 9    yellow and I thought that it was only those parts.  But

10    you're telling me that takes 4 hours?

11          MS. FRITZ:  Before we get to the length of it

12    though, if they have sliced out portions designated by

13    the defense, and they're going to play them afterwards,

14    if that's the case, it will make no sense to the jury.

15          THE COURT:  Yeah, it does seem that I have a

16    problem with that.

17          Do you want to take a recess and work it out?

18          MS. FRITZ:  Yes, that would be -- I would.

19          THE COURT:  I'll divide the time between you, so

20    it will be a very brief recess, no more than 10 minutes.

21          Is that all right?

22          MS. PICKETT:  Thank you, your Honor.

23          THE COURT:  It's your case, but I think --

24          MS. KLUNDER:  We just never got any designations

25    other than the entirety of -- we asked for that and we
```

A2728

```
 1   didn't get it.

 2       THE COURT:  Well what I saw was a deposition that

 3   had a bunch of stuff underlined in yellow.

 4       MS. KLUNDER:  What we received, your Honor, the

 5   deposition was dual-designated and we had given them

 6   designations for what we wanted to play, they counter-

 7   designated with the entire thing, and we responded.

 8   Unless we really have the portion of the transcript that

 9   relates to the other case, we agreed that we need it, so

10   that was the only portion cut, and that leaves us with 4

11   hours.  When we discussed with them how it was going to

12   be allocated, we said we're not going to --

13       THE COURT:  Well we're not going to watch a

14   deposition for 4 hours.

15       MS. KLUNDER:  Okay.

16       THE COURT:  I have ample authority under 403 to

17   avoid cumulative evidence.

18       MS. KLUNDER:  Uh-huh.

19       THE COURT:  This will be a lot more punchy if we

20   can work out what is relevant here.  And if I need to

21   edit it, I will edit it, under 403.  But really you

22   should do it.

23       So let's take 10 minutes now.

24       MS. KLUNDER:  All right.

25       THE COURT:  And you'll work it out.  And then,
```

```
 1    since they've only heard 4 hours, you tell me, but no
 2    longer than an hour.
 3         MS. KLUNDER:  Okay.
 4         MS. FRITZ:  Your Honor, could I just make one
 5    suggestion?
 6         THE COURT:  Yes.
 7         MS. FRITZ:  And that is that this is what had been
 8    allocated for the day.  If we -- I don't know how
 9    quickly we can fix this problem, but if your Honor
10    wanted to break for the day, we could assure your Honor
11    that we would come back with a significantly briefer and
12    hopefully sequential, not broken up --
13         THE COURT:  To break for the day seems --
14         MS. FRITZ:  I know it's extreme.
15         THE COURT:  Unless they have another witness.
16         MS. FRITZ:  Um --
17         (Pause.)
18         MS. SHIELDS:  Let us confer whether we can get
19    another witness here.
20         THE COURT:  Yes, that makes sense.  That makes
21    sense.
22         MS. FRITZ:  Oh, okay.
23         THE COURT:  So we're going to take a 10-minute
24    recess now and I'll tell them -- look, it's neutral,
25    this business about timing, and I'll say I required that
```

1    because this case is not going to go longer than 11

2    days, and this is something that Ms. Gaudet

3    appropriately has reiterated to them so that they're not

4    more antsy than they would normally be.  Put it on me.

5    And say we'll take a -- to see what we can narrow.  And

6    maybe we'll go to another witness and we'll get the --

7    they were here on time, so they'll get the 20 minutes.

8            MS. PICKETT:  Can we know who the other witness

9    might be because I --

10           MR. LONDON:  we have to talk.

11           THE COURT:  All right, that's how we're going to

12    do it.

13

14           (In open court.)

15           THE COURT:  In a civil case, and this is a civil

16    case, you can work out the time that the case will take

17    before, and we did that, and we said it's going to take

18    no more than 11 days, maybe less.  I have no criticism

19    of the evidence that the -- the way they're dealing with

20    evidence here.  And so I keep the time.  And, um, it's

21    not going to take any more than 11 days, and maybe it

22    will take less.  And so that's why we get into this

23    business about how long this is going to take.

24           Another rule of evidence that it's my job to

25    administer is to avoid what's called "cumulative

```
 1    evidence," hearing the same thing over and over.  For
 2    one thing, it's difficult to watch deposition testimony,
 3    however important it may be to the case, and that's not
 4    for me to say, it's just not as lively as watching a
 5    witness testify.  For another thing there's not going to
 6    be any ruling on objections, because I've taken care of
 7    that already, it's just going to play along and we'll
 8    all sit here, but we're not going to do it for 4 hours.
 9    Well that throws them off.  But we're not.
10         So we're going to take a 10-minute recess and
11    we're going to see one of two things, how much they can
12    cut it down, and we'll see if I'm satisfied with that,
13    and if I'm not, then maybe I'll cut other things out and
14    we'll go from there.
15         This is a witness that, again I'm characterizing
16    it now, but I think there's no dispute over this, this
17    is a witness that dealt with this so-called Q-System,
18    and they want you to hear the testimony of the witness,
19    so how much I can cut, I don't know.  Or since I'm
20    dissatisfied with a 4-hour presentation, maybe they can
21    call another witness.  Of course they have to plan for
22    the day and they plan that we watch the deposition.
23    Well we will.  But not for 4 hours.  So we'll take 10
24    minutes to see if they can sort out what they're going
25    to do.  Keep your minds suspended, you have not heard
```

A2732

```
 1    all the evidence, and do not discuss the case among

 2    yourselves nor with anyone else.

 3         Then we'll be back, um, we'll give you another 20

 4    minutes, everyone was here right on time, but they need

 5    10 minutes now to sort out what they're going to do

 6    given my instructions.

 7         These matters are my responsibility, they do not

 8    touch on how important or unimportant or significant or

 9    what the role of the witness is.  I have nothing to say

10    about that.  I do not say anything about it.  I take

11    responsibility for keeping the time.  That's what we

12    told you going in.  That's how it's going to be.  It's

13    my responsibility.

14         You may stand in recess for 10 minutes.

15         THE CLERK:  All rise for the jury.

16         (Jury leaves, 10:25 a.m.)

17         THE COURT:  Now come to the sidebar.

18

19         AT THE SIDEBAR

20         THE COURT:  Let's deal with the juror problem at

21    the same time.

22         Ms. Barbosa, the second one from the right, the

23    second row, she is a dental assistant, and her employer

24    will not pay her during the course of the trial.  While

25    we got them to pay three days, really they don't have
```

A2733

```
 1   to, but they think that's the state law.

 2        But our jury administrator has called them.  This

 3   is something -- I try to hold onto jurors, but she is

 4   continually complaining about that.  And Ms. Gaudet can

 5   correct me, because I've had no interaction at all with

 6   the jury, but I fear that given evidence of boredom --

 7   and that's no criticism of the opening, it was really

 8   rather snazzy --

 9        (Laughter.)

10        THE COURT:  -- but I'm inclined to cut her loose

11   at the end of the day.  It's Friday.  No one need know.

12        Is there any objection?  I have present 12 jurors.

13        MS. SHIELDS:  No objection from the Commission.

14        MS. FRITZ:  No objection.

15        THE COURT:  So Ms. Gaudet will let her go at the

16   end of the day.  I will tell her, "You are not to talk

17   with anyone, certainly not other jurors about the case,

18   nor with anyone else what it's about."  But she'll be

19   excused.

20        All right.  We'll recess.

21        THE CLERK:  All rise.

22

23        (In open court.)

24        (Recess, 10:30 a.m.)

25        (Resumed, 10:40 a.m.)
```

A2734

```
 1          THE COURT:  How are we going to proceed?
 2          MS. FRITZ:  Your Honor, I think we have two
 3    proposals, one, the defense objects to, and that is that
 4    the SEC would play its designated portions.
 5          THE COURT:  All right.
 6          MS. FRITZ:  The alternative is that we have now
 7    reviewed the first roughly 60 pages of the deposition
 8    and view that as material that could be designated by
 9    one side or the other and it could be played
10    continuously.  Then we would break for the weekend and
11    both sides would continue to work on any other
12    designations to make sure they were coordinated and that
13    they could be played continuously.  And obviously we all
14    understand that it needs to be less than another hour.
15          THE COURT:  The second makes sense to me if we
16    assure the jury that we're saving time by this.
17          MS. FRITZ:  Yes.
18          THE COURT:  Well that's your position.  They bear
19    the burden of proof.
20          Does that make sense?
21          MS. KLUNDER:  So I'm not sure of what the
22    mechanics of this proposal would result in.  I think --
23    we don't need to work any further on our designations,
24    we're done, we designated, and so that's 55 minutes.
25    Presumably their designations would add time to that.
```

```
 1        THE COURT:  Well if we played continuously the
 2   first 60 minutes, so there's an hour.
 3        MS. KLUNDER:  It's pages and we're not sure how
 4   long it will be, but probably approximately an hour,
 5   your Honor.
 6        THE COURT:  Right, or a little longer.  If we did
 7   that and then recessed back on Tuesday the 19th, can I
 8   be assured that we will save time by doing that and, um,
 9   give you another hour, breaking it up, but then you've
10   got 2 hours?
11        MS. KLUNDER:  We certainly have less than the
12   4-hour full run-time, your Honor, yes.
13        THE COURT:  That's not an answer.
14        MS. KLUNDER:  Well compared to our proposal to
15   play 55 minutes, no, you wouldn't save time, but as
16   compared to where we were at the beginning of the day,
17   yes, we would save time.
18        THE COURT:  And I'm going to tell the jury that.
19        MS. KLUNDER:  And the recess is not being charged
20   to either of the parties?
21        THE COURT:  Well the recess is being divided
22   equally among the parties.
23        MS. KLUNDER:  Your Honor, with that I would just
24   say that we've had continued dialogue about the
25   designations since, I believe, August 22nd, and
```

A2736

```
 1    repeatedly asked for specific designations, and

 2    indicated that your Honor would not want the 4-hour

 3    deposition played, and we haven't received those.  So we

 4    would propose that the early recess be charged to

 5    defendants.

 6         MS. PICKETT:  Your Honor, in fairness I think

 7    you've divided the time, you know, between the two of

 8    us.  This is the only testimony that I have, that I want

 9    the jury to hear.  So just for the record, I understand

10    that I agree with your Honor that --

11         THE COURT:  Well I don't think it's going to be a

12    problem, as a practical matter, to charge the time to

13    you.  They only get 5 1/2 days.

14         MS. PICKETT:  I understand that we need to cut and

15    I will cut, but this is, you know, frankly --

16         THE COURT:  Well if we play an hour -- well not an

17    hour, if we play 60 pages that I hear are supposed to be

18    so important, and we play not more than another hour,

19    and I charge whatever time is left over today to the

20    defense, it sounds like I'm being fair.

21         Do you agree?

22         MS. PICKETT:  I agree, your Honor.  I'm just

23    talking substantively that this is an important witness

24    for me, and I understand that the jury is getting bored

25    and it probably will be bored with this, but --
```

```
 1          THE COURT:  I'm not critical of anyone, this is a

 2     difficult case upon the Commission and a difficult case

 3     to defend, and it isn't a comment on the substance at

 4     all, it's a comment on the complexity of the material.

 5          So that's how we will proceed, we will play the 60

 6     pages, we will stop, we will come back on Tuesday when

 7     -- I expected to come back anyway, and we will play

 8     another hour.  You can arm wrestle about how or what's

 9     in the other hour.  But we're not going to play any more

10     than another hour.  So that's going to be 2-plus hours.

11          MS. KLUNDER:  If I could?

12          THE COURT:  Then whatever time is left today, I'm

13     charging to the defendants.

14          MS. KLUNDER:  Your Honor, if I may just clarify?

15     Ms. Powell is working on the designations.  I think

16     rather than playing the first 60 pages, can we just play

17     the first hour?  Because she's not getting a clear

18     marker on how long.

19          THE COURT:  So long it as works out the way I just

20     said.

21          MS. KLUNDER:  Yes.

22          Does that make sense?

23          MS. FRITZ:  I don't know if the jurors just looked

24     at 60 pages --

25          MS. PICKETT:  You can follow along with the
```

A2738

```
 1   transcript and cut it --

 2          THE COURT:  We will play the first hour.

 3          MS. PICKETT:  That's more than an hour?

 4          MS. KLUNDER:  No.

 5          THE COURT:  60 pages is less than an hour?

 6          MS. KLUNDER:  Yes.  But I'm not sure if the first

 7   10 pages or so are really just administrative, not

 8   really testimony.

 9          (Discussion off the record.)

10          MS. SHIELDS:  Your Honor, may I add to the

11   conversation that we've located another witness who will

12   be here at 12:30, so we're ready to put on FBI Agent

13   Chris Giankura at 12:30.

14          THE COURT:  Well then let's use the time, let's

15   play an hour.

16          No objection to that, is there?

17          MS. KLUNDER:  No, that would get us to 11:45.

18          Would you suspend then?

19          THE COURT:  Till 12:30, and charge them.

20          MS. KLUNDER:  Sure.

21          THE COURT:  All right, bring the jury in.

22          (Jury enters, 10:45 a.m.)

23          THE COURT:  As it turns out, we can save

24   everyone's time in the trial, and that's both helpful

25   and you will have all the evidence that it's appropriate
```

```
 1    for you to have.

 2         Now here's how we're going to do it.  We're going

 3    to, without taking another break, listen to no more than

 4    an hour of this deposition, then we are going to suspend

 5    and, um, it will be -- whenever that part ends, it will

 6    be the morning recess till 12:30.  The reason for that

 7    is the Commission has another witness to start at 12:30,

 8    so we will work till 1:00 and suspend.

 9         Then on Tuesday -- remember we're not going to sit

10    on Monday.  On Tuesday the 19th, we'll watch no more

11    than another hour of the deposition, but they'll focus

12    on the parts that they really want you to see.  Since we

13    will have had the weekend break, you can pay close

14    attention to what we're told is going to be about 2

15    hours of this deposition and that's fine, and we will

16    have saved time and you'll have all the evidence that

17    it's appropriate for you to have.

18         I think we're ready to go.  And I've explained to

19    the jury what a deposition is.  And so we may go ahead

20    and play it.

21         (Mr. Nikolayev's deposition video is played.)

22         THE COURT:  Is this a good place to stop?

23         MS. KLUNDER:  That's the end of the agreed-upon

24    portion.

25         THE COURT:  All right, subject to what we're going
```

A2740

```
 1    to hear on Friday.  Very well.
 2         We'll stop now.  And you have not heard all the
 3    testimony of this witness, because more is to be played
 4    on Tuesday.  We'll take a recess now, the half-an-hour
 5    recess-plus.  We'll take a recess at least till 20 after
 6    12:00.  I'm told the witness can be here by 12:30 and
 7    I'll indulge that.  So we will leave you in recess till
 8    12:30 and then we'll resume with a live witness.
 9    Following this procedure, we've saved significant time,
10    and I appreciate counsel's cooperation, because they all
11    cooperated.
12         You've not heard all the testimony, so keep your
13    minds suspended, do not discuss the case either among
14    yourselves nor with anyone else.  The jury may --
15         Yes?
16         MS. KLUNDER:  Your Honor, we're told the witness
17    is here, so if you want to give them their standard
18    break, then we'd be ready to resume.
19         THE COURT:  So that's what we'll do.  We've earned
20    a half-an-hour break, so we'll recess for one half hour
21    until 20 minutes after 12:00.  We'll stand in recess and
22    resume with a live witness.  I'll remain on the bench.
23         (Jury leaves, 11:55 a.m.)
24         THE COURT:  Please be seated.  Two matters while
25    they are fresh in my mind.
```

```
 1          First -- and I appreciate the protocol to which

 2     you've agreed for today's assessment of time, I'm going

 3     to assess 55 minutes on the Commission, because that's

 4     what they've agreed, whatever -- we went a little bit

 5     over an hour here, and whatever we play on Monday will

 6     be assessed to the defendants.

 7          The second thing, and I may be anticipating, but I

 8     hope it will save time, but as I took my notes it seems

 9     that -- and I want to be careful here, but the Q-System

10     documents themselves, now that we have the testimony of

11     this witness, would seem to satisfy the business records

12     exception.

13          And I take it that you press for admission of

14     those documents?

15          MS. KLUNDER:  Yes, your Honor.

16          THE COURT:  All right.

17          Now as we've gone back and forth, there's been

18     some talk about related documents.  I express no opinion

19     on that.  But what was on this Q-System as he maintained

20     it, um, is admissible.

21          Yeah?

22          MS. FRITZ:  Your Honor, um, I would ask that your

23     Honor hear further argument on that, because all he did

24     was establish a system.  There is no information about

25     who put data into it or what was based on.  So the
```

A2742

```
 1   system itself, yes, he can talk about, but there's no
 2   information regarding the reliability of the information
 3   that went in, who put it in, when they put it in,
 4   nothing that would satisfy the business record exception
 5   with respect to the data that's in there.  And that data
 6   that's in there is what they're claiming is reliable.
 7   So what we know at this point is nothing other than "I
 8   created a book."
 9            THE COURT:  Well, look there's --
10            MS. FRITZ:  Anyone could write in the book.
11            THE COURT:  I'm not clear that it was anyone could
12   write in the book, it appears that this was done at the
13   direction of Sharp.
14            That being said, it may be that there are things
15   in this Q-System that are hearsay.  All right?  That may
16   be.  And then they may have to rely upon another
17   exception and it will be premature to read.  But as you
18   yourself says, they created a book.  The book follows, I
19   can infer from his testimony, a regular protocol.
20            You have business records which don't allow, for
21   instance, the -- here's an example that goes back to my
22   day law-clerking.  The sale of oranges, I was clerk for
23   a judge in the state system, and, um, that's the
24   business record, backed with all the cases involved, but
25   imagine that the sale of oranges also included some
```

A2743

1    statement, um, "These oranges are wormy," or something,

2    "We don't know where that came from," et cetera.  That

3    doesn't admit that.  But the system is, it seem to me,

4    admissible.

5        MS. FRITZ:  Oh --

6        THE COURT:  And when I look at the document, I can

7    sort it out.

8        MS. FRITZ:  Okay, I believe that I understand the

9    ruling and it's not quite what I initially thought and

10   why I shot up.

11       These -- the entries in these documents -- in

12   other words, the witness just said "I created a

13   multipurpose system, it can be used by an administrator,

14   it can be used by client staff, it can be used by

15   clients, so all of those individuals.

16       THE COURT:  I'm not sure I accept that

17   characterization, but, um, I'd have to look at the

18   actual document and I will entertain your objection.

19       MS. FRITZ:  Okay.  Your Honor, at one point you

20   talked about this and I thought it was a correct

21   analogy.  This is like walking into a drug dealer den,

22   finding a ledger, it's got some names and it's got

23   numbers.  That's not a business record, that would be --

24       THE COURT:  Under 801(1)(D)(2)(e).

25       MS. FRITZ:  A co-conspirator statement.

A2744

```
 1        THE COURT:  Right.

 2        Here -- you see I faulted the Commission -- not

 3    "faulted" them, I didn't adopt it.  Your powerful

 4    argument on summary judgment is exactly correct, and I

 5    excluded it.  Now I've listened to enough of Nikolayev,

 6    unless he recants, that it seems to me that -- and I was

 7    limiting it to the Q-System, that it satisfies the

 8    requirements of a business record.  You say "Wait a

 9    minute, there's other stuff in there that can't possibly

10    satisfy a business record."  Well I have to look at the

11    document, which in all its iterations I have not, and we

12    will see if they also get it in as a co-conspirator

13    hearsay, a matter that I am not supposed to rule on, and

14    I do not, my mind is completely open until they rest.

15        All right.  So 20 after 12:00 and we'll continue.

16    We'll recess.

17        (Recess, 12:00 noon.)

18        (Resumed, jury enters, 12:25 p.m.)

19        THE COURT:  Let's swear the next witness.

20        (SPECIAL AGENT CHRIS GIANAKURA, sworn.)

21

22        ****************************

23        SPECIAL AGENT CHRIS GIANAKURA

24        ****************************

25
```

A2745

```
 1    DIRECT EXAMINATION BY MR. LONDON:

 2    Q.    Please state and spell your name for the record.

 3    A.    Chris Gianakura, and it's G-I-A-N-A-K-U-R-A.

 4    Q.    And how are you employed?

 5    A.    With the Federal Bureau of Investigation.

 6    Q.    And what's your position with the FBI?

 7    A.    I am currently the Senior Supervisor of the law

 8    resident agency at the satellite office for the FBI out

 9    of Lowell.

10    Q.    So, Special Agent Gianakura, how long have you

11    worked for the FBI?

12    A.    Shortly under 20 years.

13    Q.    Prior to the Lowell office, where did you work?

14    A.    I predominantly worked at the Boston field office.

15    Q.    Does the FBI investigate a wide range of crimes?

16    A.    Yes.

17    Q.    Does that include crimes involving stock trading?

18    A.    Yes.

19    Q.    Were you involved in an investigation concerning

20    an individual named Fred Sharp?

21    A.    Yes.

22    Q.    Was that investigation ongoing in or around 2019?

23    A.    Yes, it was.

24    Q.    What was the nature of the conduct you were

25    investigating?
```

A2746

```
 1    A.     At that time we were led to believe that Fred

 2    Sharp was the predominant, um -- had a large client base

 3    of people that are conducting securities fraud, he was

 4    facilitating that and keeping the accounting for them as

 5    well, um, and he would be a money-launderer as well, or

 6    what we would consider a professional money-launderer at

 7    the FBI.

 8    Q.     As part of the investigation, were you led to seek

 9    evidence from abroad?

10           MS. FRITZ:  Objection.

11           THE COURT:  Well I'm going to allow that as

12    background.

13    A.     Yes, we received information also from --

14           THE COURT:  The answer to that question is "Yes."

15    "Were you led to seek evidence from abroad?" can be

16    answered "Yes."  And you said "Yes."

17           Go ahead.

18    Q.     Where from abroad did you seek evidence?

19    A.     There were multiple countries, but the country

20    that I most had involvement with would be Curacao.

21    Q.     And what specifically about Curacao were you

22    involved in?

23    A.     So interviews and records that we collected led us

24    to believe that Fred Sharp was holding his records in a

25    data center in Curacao.
```

A2747

```
1    Q.    And as part of your job, did you try to get that

2    data?

3    A.    Yes.

4    Q.    How did you go about doing so?

5    A.    Since Curacao is a foreign country, not the United

6    States, there is a -- it's called a "Mutual Legal

7    Assistance Treaty," so an "MLAT" is what it is with each

8    country, and there's one that, um, we would write up a

9    document saying that we have information and we want

10   these records.

11   Q.    And did you provide or did the U.S. provide that

12   document to the foreign authority?

13   A.    Yeah, there's a chain of where it goes over there.

14   It goes through the Department of Justice, and they

15   would serve it to their Department of Justice, and then

16   their Department of Justice would give it to their

17   judge, "We have a record that you are requesting from

18   that foreign country," and then they'd agree to it, give

19   you those -- you'd take those records, and you'd send

20   them back to the United States.

21   Q.    And that process made its way out of Curasao,

22   right?

23   A.    Correct.

24   Q.    Did the authorities in Curasao take possession of

25   these servers?
```

A2748

```
 1   A.    Yes, but it was the -- so Curasao is a different
 2   country, it's a little unusual, so it's actually the
 3   Dutch -- and it's called "RTC," and I apologize, I can't
 4   pronounce the RTC, but for all intents and purposes
 5   they're like the Royal Police and they're computer
 6   experts down there.  And there's three islands that are
 7   all part of the, um, the Kingdom on the Netherlands and
 8   they actually serve for Curasao and at least two other
 9   countries in Aruba, and another one, and they actually
10   will go out and get that information for Curasao.  And
11   that's what happened there.
12   Q.    So I'll just call it the "Dutch Police," is that
13   okay?
14   A.    Yes.
15   Q.    All right.  So did the Dutch Police take
16   possession of the servers?
17   A.    They did.
18   Q.    And how do you know that?
19   A.    So this is unusual, but I was actually there at
20   the time.
21   Q.    You mean in Curacao?
22   A.    Yeah.
23   Q.    Okay.  So just very briefly, where did you go in
24   Curasao to do this?
25   A.    So there was a -- there was a data center that the
```

A2749

```
 1    records were being housed in.  So if you're not familiar
 2    with a "data center," it's kind of like -- we talked
 3    about the cloud, but it's actually just a big, huge
 4    office parkway, the Home Depot but multiple times
 5    bigger, with a bunch of computers and hard drivers.  And
 6    that's where things are housed at.  So that's where I
 7    went to.
 8    Q.    All right.  So when you went to the huge, double
 9    Home Depot-sized, um, center, what did you observe the
10    Dutch Police do?
11    A.    So I happened to be there.  The judge actually
12    came to the Data center to serve the warrant, we walked
13    to where the -- where we believed the racks and the
14    servers were.  They located the servers.  They took the
15    servers out, put them on a cart, and wheeled them out.
16    And then they went their way and I came back to the U.S.
17    Q.    And was there any identifying information on the
18    server that you were able to observe?
19    A.    Yeah, there was actually -- so everybody can
20    understand it, if you look at like a regular computer
21    and it looks like a big box, imagine it flipped over,
22    stuck in there with a lot of hard drives that you don't
23    actually see, and that's what's called the "server," and
24    there are four of them.  And on there, there's a sticker
25    that said "Bond" on each one.
```

A2750

1   Q.    How long do you figure you spent at the server

2   farm in total?

3   A.    It's been a while, but I think it was between 4

4   and 6, maybe up to 8 hours.

5   Q.    Okay.  After you left the farm, where did you go?

6   A.    Um, I went back to my hotel.

7   Q.    And ultimately back to the States?

8   A.    Yes, ultimately back to the States, yes.

9   Q.    Do you have an understanding of whether the

10  servers themselves made their way to the States?

11  A.    Yes.

12  Q.    And what is your understanding?

13  A.    So I was in contact with, um -- when I say the

14  "Dutch Police," I was in contact with them, he'd keep me

15  up to date on -- with the progress that was happening

16  with everything, and then there's an official letter

17  that comes across and actually -- and with the servers.

18  I wasn't part of the squad at the time, but he informed

19  me, and then the squad informed me that they were

20  coming.  It took some time, but, yes.

21  Q.    Did you learn whether there were any issue with

22  getting the servers to the States?

23  A.    So a computer is different, but a server is

24  processed a little bit different, so it takes a little

25  bit more time.  And also, um, Fred Sharp tried to

A2751

```
 1    contest it overseas, through his attorneys, so we
 2    wouldn't get the records as well.  He kept me informed
 3    about it as well.  So it was kind of like on a parallel
 4    track between what was going on.  But in the end, we did
 5    get everything over here.
 6    Q.    And when you said "Fred Sharp contested it," how
 7    do you know Fred Sharp contested getting the servers
 8    sent to the United States?
 9    A.    Well the contact I had was with the Dutch Police,
10    and then I -- at the end we got a copy of the record,
11    that he hired two attorneys to not have the servers --
12    for them not to follow the MLAT to bring us the servers
13    to the United States, he didn't want us to have the
14    information.
15    Q.    So Sharp tried to stop the servers from coming
16    here?
17    A.    Yes.
18    Q.    Was Sharp effective in that?
19    A.    No, he wasn't.
20    Q.    And so we ultimately got the servers in the
21    States?
22    A.    Yeah.
23    Q.    Thank you very much.
24          MR. LONDON:  I have no other questions.
25          THE COURT:  Any questions for this witness?
```

A2752

```
 1          MS. FRITZ:  Yes, just a couple.

 2          THE COURT:  You may.

 3          MS. FRITZ:  Thank you.

 4

 5     CROSS-EXAMINATION BY MS. FRITZ:

 6     Q.    I'm Miranda Fritz, I represent one of the folks

 7     involved in this case.  I just have a couple of

 8     questions about the MLAT.

 9          You talked about the fact that that was the

10     process whereby you and others requested the information

11     from Curacao, correct?

12     A.    Yes.

13     Q.    And "MLAT" stands for "Mutual Legal Assistance

14     Treaty," correct?

15     A.    Yes.

16     Q.    And in our parlance that would be the equivalent

17     of a warrant, right?

18     A.    I wouldn't -- that I don't know, whether it's

19     actually equivalent of it, but I just know that it's an

20     MLAT.

21     Q.    Okay.  Were you involved in the preparation -- the

22     MLAT is a document, literally a legal request in

23     writing, correct?

24     A.    It is.

25     Q.    Were you involved in the preparation of it?
```

A2753

```
 1    A.    Yes, I collected the information on it.

 2    Q.    And did it include, um, a description of the basis

 3    for the request for those computer servers?

 4    A.    Yes.

 5    Q.    Okay.  And so it laid out information that you had

 6    that you hoped would cause Curacao to agree to then

 7    execute on that request, correct?

 8    A.    We were led to believe that there is information

 9    there.  So I wouldn't use the word "hope," what we were

10    led to believe.

11    Q.    Before you even delivered over the MLAT, you

12    had -- you were led to believe what?

13    A.    That there were records there in Curacao.

14    Q.    Okay.  But you wanted them turned over?

15    A.    Correct.

16    Q.    By the government?

17    A.    Yes.

18    Q.    So the MLAT is the way you say "Hey, Curacao,

19    we're asking for it and here's why," correct?

20    A.    Correct.

21    Q.    Do you have a copy of that document?

22    A.    I don't have a copy of it.

23    Q.    Who does have a copy of it?

24    A.    Um, that would -- I imagine would -- so the Ops

25    International Affairs are the ones that actually send
```

A2754

```
 1    the MLAT, and they're the ones who produced it, and

 2    they're in the Department of Justice at headquarters,

 3    and what they do is they'll take the MLAT -- so I'll

 4    have it back, I'm the investigator, so -- I'm the

 5    investigator, but they put the facts together, collect

 6    the information, and then they give it to the prosecutor

 7    over here on the Federal side.  They have to work with

 8    specialists that are in the Department of Justice

 9    because, just so you know, each country is different.

10    And so that specialist is the one who actually drafts

11    and approves and sends the MLAT over to their

12    counterpart.

13    Q.    Was AUSA Draper involved with this process?

14    A.    I don't believe so, no.

15    Q.    Okay.  Who was the prosecutor that was involved?

16    A.    At that time it was, um, it was Rosen, if I'm not

17    mistaken.

18    Q.    All right.

19    A.    But I don't know the attorneys, so from there I do

20    not recall.  Because you collect it, it goes over and

21    they're the ones who do all the work.  So I don't know

22    that person's name.

23    Q.    Okay, so let's just continue through the process.

24          So that request is made --

25    A.    Yeah.
```

A2755

1   Q.    -- and is there then a written response that comes

2   back from the country to whom the request was made?

3   A.    Yeah, usually it's a certification.

4   Q.    Okay.  Did you see a copy of the certification?

5   A.    Yes.

6   Q.    And do you recall what it said, what did it agree

7   to do or not do?

8   A.    I don't -- could you rephrase that question for

9   me, please?

10  Q.    What did the certification say?

11  A.    It -- usually the certification is just a response

12  to the MLAT, and at that time I was off the squad, but I

13  did see it like, "Here are your records."  That's all I

14  remember.

15  Q.    So that was at the end of the process?

16  A.    Yeah.

17  Q.    So is that like a return on a search warrant, this

18  is the delivery now of the material?

19  A.    I don't know.  I don't want to say it's a return

20  of a search warrant, but they have to say, "Hey, these

21  are the records that you requested."  It could be bank

22  records or whatever, but it's just a certification.

23  "Here's the records that you requested, they're

24  authentic," and they were provided to us.

25  Q.    Okay.  And who has a copy of that document?

A2756

```
 1    A.    Well I have not been part of this investigation
 2    for quite a few years, so I would not know.
 3    Q.    Okay.  Do you recall whether there were -- in
 4    between the delivery of the materials, the request --
 5    the MLAT request and the delivery of the materials, was
 6    there a response from the Curacao government that said
 7    "Yay" or "Nay," "We will go do this for you"?
 8    A.    I don't recall.
 9    Q.    Okay.
10    A.    Well actually either "Yay" or "Nay," was it
11    executed?
12    Q.    Was the MLAT granted in writing?
13    A.    They said they're going to execute it, because
14    that's why I went down there.  Is that helping you?
15    Q.    Yes.
16    A.    Okay.
17    Q.    Was that in writing?
18    A.    Um, I think it was through the legal attache that
19    they were going to execute it.
20    Q.    And so you got information that this process was
21    going to take place, correct?
22    A.    Yes.
23    Q.    And then you said you went there and there were
24    Dutch Police, correct?
25    A.    Yes, that's what we're calling them, "Dutch
```

```
 1    Police."
 2    Q.    And somehow in that process the Dutch Police had
 3    been given information about how to identify, in this
 4    Home Depot-many-times-over space, how to identify the
 5    particular servers, is that correct?
 6    A.    Yes.
 7    Q.    Do you know who gave them that information?
 8    A.    It would have been in the MLAT.
 9    Q.    Okay.  All right.  Thank you.
10          THE COURT:  Ms. Pickett, anything for this
11    witness?
12          MS. PICKETT:  I just have a couple of questions.
13
14    CROSS-EXAMINATION BY MS. PICKETT:
15    Q.    Good afternoon, sir, my name is Karen Pickett, I'm
16    the lawyer for Yvonne Gasarch.
17          What day was the MLAT executed, if you recall?
18    A.    So I believe it was in April or May of 2019.
19    Q.    Okay.  And, um, after the MLAT was executed, did
20    you have occasion to notify, um, prosecutors in the U.S.
21    Attorney's Office, other FBI agents, and a lawyer from
22    the SEC, and the accountant from the SEC, sort of what
23    had happened?  Do you recall sending them an e-mail?
24    A.    I do.
25    Q.    Okay.  And, um, this e-mail that I'm reading from
```

A2758

```
1    is dated May 29th, 2019.  I'm sorry I don't have a
2    document printed out, we didn't expect you today, but,
3    um --
4         MR. LONDON:  objection.
5         THE COURT:  Well the comment is stricken, um,
6    about why she suffered, but she can ask the question.
7         MS. PICKETT:  Okay.
8    Q.    And you wrote to them all, "It was a long day and
9    night, but we were successful in taking four servers."
10        Do you recall if it was four servers that were
11   taken from this farm?
12   A.    Yes.
13   Q.    And all of them had the label "Bond"?
14   A.    Yes.
15   Q.    Okay.  And, um, "We have to get them some
16   additional information, but should be good to go."
17        When you say "them," who are you referring to?
18   A.    To the Dutch Police -- or to the Dutch Policemen,
19   that's what we're referring to.
20   Q.    To the Dutch police we've been talking about?
21   A.    Yes.
22   Q.    And why did you have to get some additional
23   information?
24   A.    So we did not want to take the servers when we
25   were there.  We were there -- they -- the MIG, you would
```

A2759

```
 1    usually get a copy of something, so we did not want to
 2    take them.  So the idea was they were going to copy them
 3    in place.  They informed us that we can't copy them, I
 4    mean I'm not technical in that manner, so what they said
 5    is that we're going to have to take them.
 6         So they went through rigorously all the different
 7    information they had and then there was some information
 8    that wasn't initially provided in the MLAT that we had
 9    back at the office, so I called my partners and said
10    that we need to attach it to the MLAT, because we don't
11    want to take anything that we're not asking for.  We
12    can't do that.  And of course they don't want to
13    respond, so that's what it was.  They responded, gave us
14    the extra information that they wanted, we attached it
15    to the MLAT, and then unfortunately we had to take the
16    servers.
17    Q.    And did you attach this information to the MLAT
18    before or after the servers were taken from the farm?
19    A.    I didn't attach it, it was -- we were talking on
20    the phone and with the -- I'm not too sure if the
21    prosecutor was there at the time.  I have to go back.
22    But I recall there was a conversation.  We said we have
23    the information, the Curacao government said it was
24    fine, and so we just provided it after the fact, to make
25    sure of that, because we were taking them.
```

```
 1    Q.    And when you say you provided it after the fact,
 2    it may have been orally done or in writing?
 3    A.    In both.
 4    Q.    In both.  Okay.  So if for some reason we were
 5    able to locate the MLAT, we would see this additional
 6    information on it?
 7    A.    So I just want to make sure that I get this clear,
 8    that there were multiple -- this is an international
 9    case, there was multiple MLATs, there were multiple form
10    requests that were out there.  And I know you're asking
11    me specifically about this one, how the process worked,
12    so I'm not exactly sure what you're trying to ask me,
13    because there was -- we have different records from
14    different ways because a lot of stuff was overseas.
15    Q.    And I'm just talking about these four servers, and
16    it sounds like at some point you had to provide
17    additional information to the Dutch Police?
18    A.    Yeah, because it's such that I said that where
19    there were a couple of IP addresses that were hitting
20    that were not in the original request to identify the
21    servers, then what we did not want to do is stay for
22    some reason.  And so I'll explain this again.
23          So with the servers, there's lots of hard drives
24    in there and usually there's more than one with a
25    backup, and so I was there with some information coming
```

```
 1   in and we're like "Hold on a second, just because it
 2   said 'Bond' and just because we know mostly all of them
 3   hit, maybe there's a couple that are in there that
 4   actually belong to a legitimate business or something
 5   that does not belong that we should not take, so we're
 6   going to harm them by taking the servers."  And so
 7   that's why I called back, made sure, "Hey, is this
 8   correct?"  Like "Give me everything you have."  And I
 9   just told them and they went through it like, "Yup,
10   that's it, okay, we can take those as well, but you have
11   to include that in your request."  Now I can't remember
12   what phone calls were made over there, but it was
13   verified.  And so that's why I said that we did it
14   verbally at first, but then afterwards, of course, we
15   put it in writing for them.
16   Q.    Okay.  Then you go in and say, "It's going to take
17   some time to image the servers, but we have something."
18   So I take it at the time you had sent this e-mail, you
19   had not yet imaged the servers?
20   A.    I --
21   Q.    Not you personally, but the FBI had yet to image
22   the servers?
23   A.    They didn't image the original servers.
24   Q.    Who did image the servers?
25   A.    The Dutch Police and they provided us a copy.
```

A2762

1   Q.    Okay.  And you say at the end, "We had no choice

2   but had to take them, and the move this morning, if not

3   already, they should be aware."

4        Again, when you say "We had no choice but to take

5   them," it's your understanding that you did not want the

6   servers to be taken themselves, but you wanted the

7   servers to be imaged by the Dutch Police, but they

8   didn't have the capability?

9   A.    Partially correct, they did have the capability.

10  But they were not able to at that time with those ones.

11  They do have the capability.  We wanted to -- like I

12  said, I just wanted to make sure I got it correct.  We

13  wanted to make copies of them, we did not want to take

14  them.  For some reason I think it would have taken too

15  long, but I don't recall why.  But they had to actually

16  take them.

17  Q.    And when you say, um, "If not already, they should

18  be aware," is "they" the Dutch Police?

19  A.    No, that would be Fred Sharp and his whole entire

20  network, because they were communicating with that as

21  well, and we just took down their secret, clandestine

22  way of communicating, the key records.  So they found

23  out.

24  Q.    Okay.  And when you say the "whole entire

25  network," this is based on your earlier testimony that

A2763

1    he had hired lawyers to try to stop the process, is that
2    correct?
3    A.    No, this is after the fact.  So after we took
4    them, he found out that we took them, and that's when he
5    hired attorneys to make sure that we could -- to try to
6    stop us from getting the information.
7    Q.    Okay, but you had already seized the servers and
8    you're saying that "We need to let Fred Sharp know about
9    them"?
10    A.    I'm lost on what you're asking.  Could you
11    rephrase the question for me, please.
12    Q.    Sure.  It says "We had no choice, but had to take
13    them, and this morning, if not already.  Oh, they should
14    be aware."  Meaning that Fred Sharp would be aware at
15    that point, not that you needed to make them aware?
16    A.    That is correct.
17    Q.    I'm sorry about that.
18    A.    That's all right.
19    Q.    Okay.
20        MS. PICKETT:  I have no further questions for this
21    witness.  Thank you.
22        THE COURT:  Anything further for this witness,
23    Mr. London?
24        MR. LONDON:  No, thank you.
25        THE COURT:  Nothing further, Ms. Fritz?

A2764

```
 1        MS. FRITZ:  Nothing.  Thank you.
 2        THE COURT:  All right, you may step down.  Thank
 3   you.
 4        (Steps down.)
 5        THE COURT:  Because we took the witness out of
 6   order, we'll stop taking testimony at this time, and
 7   we'll resume promptly on Tuesday.  Again it's my
 8   responsibility that we don't sit on Monday.  I
 9   apologize.  But we'll start on Tuesday, the 19th of
10   September, at 9:00 a.m.  I know I can count on you.
11        My instructions are a little different now.  I
12   mean I truly wish you a good weekend and I expect that
13   you may run across people that you don't routinely see
14   during the week, and should you do that during the
15   course of the weekend, don't say anything at all about
16   the substance of this case.  You cannot discuss the
17   substance of the case while the case is going on.
18        So have a good weekend.  You may stand in recess
19   until Tuesday, the 19th of September at 9:00 a.m.  Do
20   not discuss the case either among yourselves, nor with
21   anyone else until the case is over.
22        We'll recess.  I'll remain on the bench.
23        THE CLERK:  All rise for the jury.
24        (Jury leaves, 12:50 a.m.)
25        THE COURT:  Please be seated.
```

A2765

```
 1          Out of the 5 1/2 half days available to each side

 2     to try the case, the Commission has used up 2 days, 1

 3     hour, 35 minutes.  Having in mind I've charged 55

 4     minutes of the deposition playing to the Commission.

 5     Any further deposition playing, less than an hour, will

 6     be charged to the defendants.  The defendants have used

 7     up 1 day, 1 hour, 55 minutes.

 8          All right.  And we'll recess until Tuesday.

 9          MS. FRITZ:  Your Honor?

10          THE COURT:  Yes?

11          MS. FRITZ:  I just have a couple of applications

12     and if your Honor has a moment?

13          THE COURT:  Go ahead.

14          MS. FRITZ:  Yes.

15          During the testimony of Mr. Dhillon, he made

16     reference to the fact that he had edited a declaration

17     that he did, and I wanted to make a request.  We haven't

18     received edited versions of that.  I wanted to make a

19     request that those be provided.

20          THE COURT:  Well discovery is over in the case.

21     But you're telling me that the discovery already filed

22     is broad enough to cover any edited versions?

23          MS. FRITZ:  Yes.

24          THE COURT:  They are to be produced.

25          MS. FRITZ:  Okay.
```

```
 1          Secondly --

 2          MS. SHIELDS:  Your Honor, there was no discovery

 3     request.  I think what Ms. Fritz is arguing is that your

 4     Honor's order to produce verbatim witness statements

 5     would somehow cover that.  Is that your Honor's --

 6          THE COURT:  Well, if that's the -- if that's the

 7     understanding, um --

 8          MS. SHIELDS:  They have the final version of his

 9     declaration, which is his witness statement.

10          THE COURT:  Well, no, in view of what Ms. Shields

11     says, I'm not going to require anything else.  If --

12     those things could have been requested during discovery.

13          What else?

14          MS. FRITZ:  All right.

15          During the testimony of Mr. Dhillon, he testified

16     at great length regarding transactions in OncoSec as

17     well as Stevia, and during the course of that testimony

18     he made absolutely no reference to, and there was no

19     mention of Mr. Friesen being involved in anything having

20     to do with those.  So I would ask that that be struck as

21     to Mr. Friesen.

22          THE COURT:  Um --

23          MS. SHIELDS:  If I may, your Honor?

24          THE COURT:  Wait a minute.  Wait a minute.

25          It's premature.  Wait till you rest.
```

A2767

```
 1          MS. FRITZ:  Okay.

 2          Your Honor, during the course of the last week,

 3     um, while we've been here, um, and I will readily tell

 4     the Court that I have been busy this week.  I had come

 5     into the court case with an understanding that KL Gates

 6     was going to be here and then they disappeared.

 7          There have been a series of additional exhibits

 8     that keep getting provided.  I've asked -- I really ask

 9     that the Court just tell, direct the SEC that they

10     cannot provide additional exhibits while the trial is

11     going on.

12          THE COURT:  Well the exhibits all should have been

13     denominated in the pretrial memorandum.  That's a ground

14     for objection.

15          MS. FRITZ:  All right.

16          MS. SHIELDS:  Your Honor, may I respond?

17          THE COURT:  Well you didn't lose anything yet.

18          MS. SHIELDS:  Okay.

19          THE COURT:  But I meant what I said.  I mean

20     what's provided in the evidence, we're not going back.

21     On the other hand, um, everything should have been in

22     the pretrial memorandum.

23          Go ahead, Ms. Fritz.

24          MS. FRITZ:  Okay.  Last but not least, we have

25     charges here that have, on the one hand, a 10-year
```

A2768

```
 1    statute of limitations, and on the other hand, a 5-year

 2    statute of limitations.

 3            THE COURT:  I'm aware of it.

 4            MS. FRITZ:  Okay, your Honor had seen -- today was

 5    a good example, a 2013 document, and yesterday, 2011,

 6    2012, 2013 testimony.  I would ask, given the fact that

 7    this much stuff is coming in that would not relate to

 8    the 5-year charges, I would ask that the Judge give an

 9    interim instruction to the jury that some evidence will

10    not be admissible with respect to certain aspects of the

11    case.

12            THE COURT:  I'm hesitant to give that as an

13    interim instruction, but I may well have to include that

14    in the charge.  And -- and again, you'll conceivably,

15    I'm not asking you to do it, but you may move for a

16    directed verdict at the end of the government's case,

17    and to the extent that you are precise, the argument may

18    have greater or lesser strength.

19            MS. FRITZ:  Thank you.

20            MR. DAY:  Your Honor, we have one potential

21    witness issue next week.  Mr. Patrick, who is in

22    Vancouver, I was informed on Wednesday evening,

23    apparently doesn't have a passport, which is a problem.

24    He thinks he's going to get one next Friday.  But it's

25    not entirely clear.
```

A2769

```
 1          THE COURT:  I'll take witnesses out of order.

 2          MR. DAY:  Okay.

 3          THE COURT:  But it's within the 3 weeks they're

 4     allotted for this trial.  So beyond that, the burden is

 5     on you.

 6          MR. DAY:  Okay.  And he's also a very short

 7     witness and we want to propose that he might testify by

 8     video conference.

 9          THE COURT:  Well let's see if he's not going to be

10     here when you want him.

11          All right, have a good weekend, 9:00 on Tuesday

12     morning.  We'll recess.

13          (Adjourned, 12:55 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E

 2

 3

 4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 5    do hereby certify that the foregoing record is a true

 6    and accurate transcription of my stenographic notes

 7    before Judge William G. Young, on Friday, September 15,

 8    2023, to the best of my skill and ability.

 9

10

11

12

13    /s/ Richard H. Romanow 1-23-24
      _____
14    RICHARD H. ROMANOW    Date

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS (Boston)

 3                              No. 1:21-cv-11276-WGY

 4

 5    SECURITIES and EXCHANGE COMMISSION,
                Plaintiff
 6

 7    vs.

 8

 9    FREDERICK L. SHARP, et al,
                Defendants
10

11                         * * * * * * * * *

12

13

14                     For Jury Trial Before:
                       Judge William G. Young
15

16

17                     United States District Court
                       District of Massachusetts (Boston)
18                     One Courthouse Way
                       Boston, Massachusetts 02210
19                     Tuesday, September 19, 2023

20

21                         * * * * * * * *

22              REPORTER: RICHARD H. ROMANOW, RPR
                       Official Court Reporter
23                     United States District Court
               One Courthouse Way, Room 5510, Boston, MA 02210
24                         rhrbulldog@aol.com

25
```

```
 1                    A P P E A R A N C E S

 2

 3    KATHLEEN BURDETTE SHIELDS, ESQ.
      ALFRED A. DAY, ESQ.
 4    DAVID H. LONDON, ESQ.
      NITA KUMARASWAMI KLUNDER, ESQ.
 5        Securities and Exchange Commission - MA
          33 Arch Street, 24th Floor
 6        Boston, MA 02110
          (617) 573-8904
 7        Email: Shieldska@sec.gov
          For Plaintiff
 8

 9    KAREN A. PICKETT, ESQ.
          Pickett Law Offices, P.C.
10        125 High Street, 26th Floor
          Boston, MA 02110
11        (617) 423-0485
          Email: Kpickettlaw@gmail.com
12        For Defendant Zhiying Yvonne Gasarch

13

14    MIRANDA E. FRITZ, ESQ.
      TIMOTHY J. FAZIO, ESQ.
15        Manning Gross Massenburg
          125 High Street
16        Oliver Street Tower, 6th Floor
          Boston, MA 02110
17        (617) 670-8800
          Email: Tfazio@mgmlaw.com
18        For Defendant Jackson T. Friesen

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2

 3   MR. NIKOLAYEV'S DEPOSITION VIDEO (Continued.).....   4

 4

 5   WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

 6

 7   CHRISTOPHER BECKSTROM

 8     By Ms. Klunder:         5                  52

 9     By Ms. Fritz:                 40

10     By Ms. Picket:

11

12   ROGER J. KNOX

13     By Ms. Shields:      53

14     By Ms. Fritz:

15     By Ms. Picket:

16

17

18                    E X H I B I T S

19
         EXHIBIT 33 ...........................    9
20
         EXHIBIT 233 ..........................   28
21
         EXHIBITS 234 to 280 ..................   35
22
         EXHIBIT 281 ..........................   40
23
         EXHIBIT 282 ..........................   40
24
         EXHIBIT 283 ..........................   84
25
```

```
 1        P R O C E E D I N G S

 2        (Jury enters, 9:15 a.m.)

 3        THE COURT:  Good morning, ladies and gentlemen.

 4   Ms. Gaudet is right, we're going to resume the playing

 5   of the deposition, or at least less than an hour of it,

 6   of Mr. Nikolayev.  I do want to welcome you and thank

 7   you for all being here on time.

 8        You'll see that I've released a juror.  It has

 9   nothing to do with this case at all, but it is

10   appropriate under the circumstances.  So, second row,

11   feel free to move down one so you can be closer to the

12   witnesses as they testify.

13        We're all set.  We'll continue the playing, less

14   than an hour, of Mr. Nikolayev.

15        (Mr. Nikolayev's deposition video continued.)

16        THE COURT:  Okay, is that it?  I'm unclear whether

17   we're going to play anything more in the remaining --

18        MS. PICKETT:  There is a little bit more, your

19   Honor, but I think we've covered it all.  Those are my

20   designations.

21        THE COURT:  And Ms. Fritz?

22        MS. FRITZ:  No, nothing more.

23        THE COURT:  Very well.  Fine.  Call your next

24   witness.

25        (CHRISTOPHER BECKSTROM, sworn.)
```

```
 1
 2                  * * * * * * * * * * * * * * * * * * * *
 3             CHRISTOPHER BECKSTROM
 4                  * * * * * * * * * * * * * * * * * * * *
 5
 6    DIRECT EXAMINATION BY MS. KLUNDER:
 7    Q.    Good morning, Mr. Beckstrom.
 8    A.    Good morning.
 9    Q.    Would you please state your name for the record.
10    A.    My name is Christopher Beckstrom.
11    Q.    How are you employed, Mr. Beckstrom?
12    A.    I'm employed by the Department of Justice, the
13    Federal Bureau of Investigation.
14    Q.    And what is your role there?
15    A.    I'm a Digital Forensic Examiner.
16    Q.    In brief can you tell us what a Digital Forensic
17    Examiner does?
18    A.    A Digital Forensic Examiner acquires evidence,
19    like making forensic images, they process those images,
20    that makes them human readable, and they analyze the
21    data and report on the data.
22    Q.    And how long have you worked for the FBI?
23    A.    Over 7 years.
24    Q.    Have you been asked to perform any forensic tasks
25    relating to a securities fraud investigation?
```

```
 1    A.    Yes.
 2    Q.    And did you come to learn that that investigation
 3    related to Fred Sharp?
 4    A.    Yes.
 5    Q.    And what did you do on that investigation?
 6    A.    Um, I processed some images and made the data
 7    available for review.
 8    Q.    Images --
 9          THE COURT:  I guess -- help me out.
10          What do you mean by you "processed some images and
11    made them available for review," what does that mean?
12          THE WITNESS:  That means that I received --
13          THE COURT:  Always tell the jury.
14          THE WITNESS:  I received some data from the
15    evidence, it was two drives that were encrypted.  I took
16    those drives and I decrypted the drives, that was just
17    security for the drives.  Then I took the forensic
18    images and verified those forensic images and put them
19    in a program so that the data then could be reviewed and
20    read.
21          THE COURT:  I'm following one step.  First, you
22    got some drives, they were encrypted, so you decrypted
23    them?
24          THE WITNESS:  They were -- in this -- they, the
25    drives were encrypted with "Bit Locker" just to secure
```

1    them for transport.  These drives, in this instance,

2    came from another location, so I didn't acquire them

3    myself.  And once I got that data and got access to that

4    data, then I, um, verified that that data was the data

5    that I was expecting to be getting.  And then I put it

6    in a program to render it so that it could be read.

7         MR. KLUNDER:  Your Honor, if I may?

8         THE COURT:  You go ahead.

9         MR. KLUNDER:  Thanks.

10   Q.    You received two hard drives, is that right?

11   A.    That is correct.

12   Q.    And those drives -- where did those drives come

13   from?

14   A.    My understanding is they came from Boston Evidence

15   Control.

16   Q.    And do you have an understanding of where they

17   came prior to that?

18   A.    My understanding is that they came from Curacao.

19   Q.    And you say that they were encrypted.  Who

20   encrypted them?

21   A.    They were encrypted by whoever produced the

22   drives.

23   Q.    Meaning the Curacao authorities?

24   A.    The Curacao authorities.

25   Q.    And were you provided with the encryption --

```
 1    A.    Yes, we were provided with the key to unlock the

 2    drives.

 3    Q.    Okay.

 4          You mentioned that there were images that you got

 5    access to.  Can you explain to the jury what images you

 6    received?

 7    A.    Well once we got the data there were essentially

 8    four folders on the data, these folders were named

 9    something like, um, "Dell Power Edge 720 on 15 Dell

10    Power Edge 820 Bond," something like that, and within

11    that there was a forensic image and that forensic image

12    was the data that was acquired off of the files in

13    Curacao.

14    Q.    And when you say "Dell Power Edge," does that have

15    any significance to you?

16    A.    Well "Dell Power Edge" is the name of a server.

17    Q.    And so these were images of servers?

18    A.    That was my understanding, yes.

19    Q.    How many images did you receive?

20    A.    Four.

21    Q.    (Pause.)

22          MS. KLUNDER:  Pull up, please, XH.

23          (On screen.)

24    Q.    Digital Forensic Examiner Beckstrom, do you

25    recognize what's shown on the screen?
```

```
 1    A.    I do.

 2    Q.    And what is it?

 3    A.    It's a working copy CD that I created in 2020.

 4    Q.    And the information included on the label of that

 5    disk, did you create the label?

 6    A.    I created the label, yes.

 7    Q.    Okay.  And what is that information based on?

 8    A.    Well that information is what I provided, um, the

 9    body of PGP decrypt data from the location Mailbox

10    Database 1998754065 EDB from the Dell Power Edge Bond

11    X70 Dell.

12          MS. KLUNDER:  Your Honor, I move the admission of

13    this exhibit as Exhibit 43.

14          THE COURT:  No objection?

15          MS. FRITZ:  Objection to the bulk offer of

16    material that might be included on here.

17          MS. KLUNDER:  It's just the image of the disk.

18          MS. FRITZ:  Just a picture?

19          THE COURT:  No objection to the picture, it may be

20    admitted.

21          And the numbers you used?

22          MR. KLUNDER:  33, your Honor.

23          THE COURT:  33 in evidence.

24          (Exhibit 33, marked.)

25          MS. KLUNDER:  May I publish it to the jury?
```

```
 1          THE COURT:  You may.

 2          (Shows.)

 3   Q.     Digital Forensic Examiner Beckstrom, did you

 4   prepare this disk?

 5   A.     I did, yeah.

 6   Q.     And can you explain for the members of the jury

 7   what is on this disk?

 8   A.     Yes, it's literally just the body of e-mails that

 9   were decrypted.

10   Q.     Okay.  And so on the label it says "Decrypted PGP

11   e-mails."  What does "PGP" mean?

12   A.     "Pretty Good Privacy."

13          (Laughter.)

14   Q.     And in your last answer you emphasize it's the

15   body of e-mail.  What do you mean by that?

16   A.     Well the PGP, or the Pretty Good Privacy

17   encryption, essentially encrypts the body of the e-mail

18   so that when you look at the data you can't read it.

19   But there's also a header and footer that might be with

20   that e-mail.  In this instance it's just the body or the

21   encrypted portion.

22          MS. KLUNDER:  Would you pull up Exhibit 15,

23   please, and publish that for the jury.

24          (On screen.)

25   Q.     Digital Examiner Beckstrom, I'm showing you what's
```

```
 1    already been admitted as Exhibit 15.  Do you recognize
 2    the type of document this is?
 3    A.    Yes.
 4    Q.    And what is it?
 5    A.    It's a representation of the body decrypt.
 6    Q.    And so in this e-mail, um, this communication,
 7    there's no header information at the top.  Do you see
 8    that?
 9    A.    Yes.
10    Q.    And why is that?
11    A.    Because when we processed or decrypted these
12    e-mails initially, we took all of the bodies of the
13    e-mails, matched them with the keys, and provided just
14    the body information.
15    Q.    And when you say "keys," what do you mean by that?
16    A.    Well the way we were able to get the data is we
17    were able to -- the keys were in the evidence and you
18    just matched the key with the item and, um, Wallah,
19    there you have the data.
20    Q.    I'm going to turn back to Exhibit 43.  On that
21    label, um, it says "Dell Power Edge 810, Bond BES."
22    Does that have any significance to you?
23    A.    Um, I mean the -- well I mean it's the server,
24    it's some sort of designator.  "BES" could be
25    "Blackberry Enterprise Server."  No, there's no -- other
```

1    than that, there's no --

2    Q.    And so when you looked on this server, did you see

3    indicia of a Blackberry Enterprise Server?

4    A.    Oh, yes, there is indicia of a Blackberry

5    Enterprise Server.  There is a folder, "Research In

6    Motion" that contains a Blackberry Enterprise Server,

7    yes.

8    Q.    The label also says "Mailbox Database" and then

9    Number 1999875406, what is that?

10   A.    That's the location where all the e-mails exist.

11   Q.    Were the e-mails just all loose in that location,

12   were they in a folder?

13   A.    No, there's a folder essentially for each user.

14   Q.    And how were the folders designated?

15   A.    Well mostly the folders were numbers, like 2, 3,

16   4, 76, um, some of them had names like "Bond," "Kash,"

17   "Celt," "Fen."

18   Q.    When you were looking at the data from this

19   server, the, um, "Perp 8700," did you see any

20   indications of a user profile?

21   A.    Um, there were multiple user profiles on that

22   server, yes.

23   Q.    And just can you explain what a "user profile" is

24   in your line of work?

25   A.    A "user profile" is just like a configuration

```
 1    that's loads up so that each individual user gets the
 2    configuration that they want to have.
 3    Q.    And how would a user profile be added to the
 4    server?
 5    A.    Um, someone with privileges would have to add it.
 6    Q.    Were there any, um, identifiers with the user
 7    profiles on the server?
 8    A.    Um, yes, there were -- well there was one for
 9    "Fen," there was one for like "Stock Board
10    Administrator," um, something like "Star File 07."
11    There were several.
12    Q.    Have you been asked to do any additional work with
13    regard to the PGP e-mails prior to testifying today?
14    A.    Um, I was provided with a large number of
15    exhibits, yes.
16          MS. KLUNDER:  Your Honor, may I approach?
17          THE COURT:  You may.
18    Q.    I'm showing you a multipage document.  Do you
19    recognize that?
20    A.    Yes.
21    Q.    What is it?
22    A.    It's a spreadsheet that you provided me this
23    morning with all the exhibits in which I initialed and
24    said that I observed these exhibits.
25    Q.    When you say you "observed these exhibits," what
```

```
 1    does that mean?
 2    A.    Well so they sent me all the exhibits.  I went
 3    into the data, I found the exact exhibit that they were
 4    presenting.  I then connected it with the source data
 5    associated with that, um, body, so that I could match it
 6    to the actual law evidence.  And I labeled it by the
 7    exhibit name.
 8    Q.    So all of the exhibits identified on that list,
 9    you were able to observe copies in the FBI evidence?
10    A.    That is correct.
11          MR. KLUNDER:  May I approach, your Honor?
12          THE COURT:  You may.
13          MR. KLUNDER:  We move the admission of these 196
14    exhibits, so that would be 44 through --
15          MS. PICKETT:  Objection, your Honor.
16          THE COURT:  Yes, come to the sidebar.
17
18          AT THE SIDEBAR
19          THE COURT:  Let me go first, because I think it
20    will save time.
21          Putting aside any -- well, first of all, I'm
22    satisfied that the one piece then is the same Q drive
23    that we've been talking about.  Whether or not it is the
24    substance of these documents, um, satisfies the business
25    records exception, a matter on which I might think
```

A2785

```
 1    further.  I will say that it satisfies the 801(d)(2)(e)
 2    exception as statements made during the course of and in
 3    furtherance of the conspiracy.
 4         Here's the problem that I see, and I'm being
 5    transparent here, because I have not made up my mind and
 6    the Commission has not rested.  But being honest, as I
 7    listen to all of this, beside Ms. Gasarch for the
 8    moment, it seems to me that what the Commission is
 9    proving is a hub-and-spoke conspiracy, and that is to
10    say, um, Friesen wasn't in on all these deals, or maybe
11    he was, but at least as I recall my notes from the
12    original witness, Mr. --
13         MR. KLUNDER:  Mr. Dhillon.
14         THE COURT:  Yeah, Mr. Dhillon, and it's important,
15    he was in on some of them, but not all of them.  And
16    accordingly, the deals follow a pattern, that's how they
17    make money, and that pattern violates -- assuming it's
18    believed by the jury, violates various sections of the
19    Securities Act.  And those are all called out in the --
20    in the, um, proposed jury verdicts.
21         However, the ones he wasn't in on, though for
22    instance if we had Sharp here, and maybe other people,
23    um, he, Friesen, was not a co-conspirator on any of the
24    deals.  And therefore I -- if there's anything in those
25    deals, I'm inclined now, but I'm being premature, I'm
```

```
 1    going to strike the references in Dhillon's testimony.
 2    And when the government rests, unless there's more
 3    evidence of it, something else comes out, I'm worried I
 4    may have to strike these documents, or some of them.  So
 5    let's start with that here.
 6         So what about that analysis?
 7         MS. KLUNDER:  I have two responses.  One is about
 8    the Dhillon testimony.  We do have additional evidence
 9    and we've identified 14 issuers about which this case
10    was going to move forward as to Mr. Friesen and
11    Ms. Gasarch, and we will have evidence, whether it's
12    believed or not, that they are tied to all 14 tickers.
13         Separately I would say that with the case law such
14    that the conspiracy -- there needs to be statements by a
15    co-conspirator made at the time of the conspiracy, but
16    it doesn't have to be the conspiracy charged here, in
17    fact in a civil case we're not charging a conspiracy.
18         THE COURT:  I understand that, I was properly
19    corrected at the conference we had after the opening.
20    Except how they get to certain conduct, it seems -- how
21    you, the Commission, gets to certain of the conduct, is
22    whether things in his inbox are the spokes that we're
23    talking about.
24         MR. KLUNDER:  So what we would say is that we've
25    identified a larger conspiracy that admittedly we will
```

```
 1    tie Mr. Friesen to specific "spokes," per your words.

 2    As to the larger conspiracy, testimony has come in that

 3    --

 4         THE COURT:  I think that's how it's generally

 5    referred to, that's how I teach it anyway.

 6         MS. KLUNDER:  I like it.  I'll use it.

 7         THE COURT:  Okay.

 8         MS. KLUNDER:  As to the larger conspiracy,

 9    testimony has come in that Fred Sharp has elicited means

10    of communication that were used explicitly to -- and

11    just to clarify, your Honor, this isn't the Q data, it's

12    on the Q server, but these are the Xphone

13    communications.

14         THE COURT:  All right.

15         MR. KLUNDER:  That anyone who had an Xphone was

16    part of that conspiracy.  Fred Sharp gave out these

17    encrypted devices only to his clients, only for purposes

18    of making Xphone sales.

19         So, you know, we provided this list to defendants

20    on Sunday.  To the extent that there are specific

21    objections, we're happy to respond to them.  We've gone

22    through all of them, we believe we have the grounds to

23    surpass any hearsay objections.

24         THE COURT:  I don't know, and I would be

25    premature, but I always try to be transparent, and I'm
```

A2788

```
 1    skeptical.  Just because he had the Xphone which
 2    improved his access to this conspiracy or, it would
 3    seem, I'm thinking is it's got to be reasonable to be in
 4    furtherance of the conspiracy.
 5              MS. KLUNDER:  Well there's two parts.  I
 6    think, you know, the majority of these do include, um,
 7    with Mr. Friesen, Mr. Veldhuis, Mr. Sexton, Mr. -- I'm
 8    sorry, Mr. Sharp, um, the traders --
 9         THE COURT:  But the problem is sort of a practical
10    one.
11         MR. KLUNDER:  Yes.  Uh-huh.
12         THE COURT:  I try to be practical.
13         If I don't buy it, and that it was as you say, I'm
14    going to have to strike some things from the hearing of
15    the jury and they have to follow my instructions.
16    Usually you would want that.  But it's your case to try.
17         Now I've talked too much.  Again I'm being fairly
18    transparent.
19         What's the matter with this?
20         MS. FRITZ:  I appreciate what you're saying, your
21    Honor, the problem is that what they're doing through
22    this bulk-admission process, they're offering snippets,
23    e-mails, that do not identify what if any transaction
24    they were a part of.  They're offering various
25    communications from names or numbers that we've never
```

```
 1   heard of.  They're offering a whole series of
 2   communications.
 3        And I've had this issue come up in the past, where
 4   there's a communication between two people, Paul Sexton
 5   and Mike Veldhuis, for example, and Jackson Friesen is
 6   CCed, or if you believe that he's the Number 2, he's
 7   CCed.  There are, um, I think good arguments about
 8   whether that is admissible, where there's no indication
 9   that any individual ever opened or saw anything,
10   whatever.
11        THE COURT:  Well I need to have that briefed.
12        MS. FRITZ:  I know.
13        THE COURT:  My instinct here is to allow it.
14        MS. FRITZ:  What I'm dealing with -- in other
15   words, if they want to go through with it, and I think
16   they properly should, and have someone talk about "This
17   e-mail relates to this transaction and it means X, Y, or
18   Z," or we argue what it means, that would be one thing.
19   But this is a document dump.  There's no identification
20   of participants, of transactions, of time periods --
21        THE COURT:  And on the foundation that they have
22   --
23        MS. FRITZ:  There's no relevance.
24        THE COURT:  -- recognizing that I have to be
25   persuaded first when they rest --
```

A2790

```
 1          MS. FRITZ:  Right.

 2          THE COURT:  -- they're entitled to do it.  It goes

 3     to the weight.

 4          MS. FRITZ:  If there's no relevance to the

 5     communication -- the fact that a communication

 6     occurred --

 7          THE COURT:  I don't know now.

 8          MS. FRITZ:  Exactly.

 9          THE COURT:  I'm putting them on warning.  You only

10     have to argue that.

11          MS. FRITZ:  Your Honor, I would suggest that they

12     shouldn't be allowed to even do it.

13          THE COURT:  I know you do.  Overruled.

14          MS. PICKETT:  You know, I haven't had a chance to

15     speak, and I do want to say that, um, besides

16     Ms. Fritz's objections, which I join in, I don't see any

17     evidence of a conspiracy on behalf of Yvonne Gasarch.

18          THE COURT:  Oh, I would be way too far if I said

19     anything about that.  But I'm wondering about that.

20          MS. PICKETT:  Thank you, your Honor.

21          And one other thing.  It's not the -- I don't

22     really have -- I'm not arguing that these don't come

23     from a source and that they're not real, of course some

24     of them are cut off, but there are some documents that

25     have attachments that are very prejudicial to my client
```

A2791

```
 1    that don't have anything to do with this case.  So I
 2    just think there's -- and of course we had to go
 3    through, you know, hundreds of these things --
 4         THE COURT:  Well then --
 5         MS. PICKETT:  -- and we just haven't had a chance
 6    to --
 7         THE COURT:  -- and as to that you have a 403.
 8         MS. PICKETT:  Yes, right.
 9         THE COURT:  And again, being practical, I'm
10    inclined to admit these documents, give them numbers,
11    and then you'll provide them all back to me and they'll
12    all have numbers.
13         MS. PICKETT:  Um-hum.
14         THE COURT:  But when you come to speak about a
15    document, number whatever, we'll know what that is and
16    I'll entertain your objection, both of your objections.
17         MS. PICKETT:  Thank you, your Honor.
18         MS. FRITZ:  There's one more objection.  There's
19    probably 20 of them that were never included in the
20    pretrial orders that have just been sort of suddenly
21    appearing during the trial.
22         THE COURT:  They're excused.
23         MS. KLUNDER:  You'll have to identify them,
24    Miranda, because they're --
25         MS. FRITZ:  Everything after QI, QI is the last.
```

```
 1            MR. KLUNDER:  May I be heard on this, your Honor?

 2            THE COURT:  Yes.

 3            MR. KLUNDER:  So after QI, it would be V.

 4            And if I may be heard on this?

 5            THE COURT:  Yes.

 6            MS. KLUNDER:  So these are all documents that were

 7      made available to defendants throughout discovery, which

 8      closed on March 17th.  We've used the -- there's

 9      certainly no prejudice to them.

10            THE COURT:  But it's not in the pretrial order.

11            MR. KLUNDER:  But preclusion is a very severe

12      remedy which is only -- in the First Circuit it's used

13      when there is prejudice to the defendants.  They've had

14      these documents for well over a week, they're --

15            THE COURT:  When you want to do them, lay a

16      foundation for them, and I will consider it.

17            MS. KLUNDER:  So do I understand that --

18            THE COURT:  Maybe you'd want to give them to me

19      now and I'll think about them.  But for now they're

20      excluded.  And so we're up to number whatever.

21            MR. KLUNDER:  Okay, so PU will get marked, these

22      come off, but we will be able to, on this foundation,

23      show them to you and make our argument as to why they

24      have not been prejudiced?

25            THE COURT:  You will.
```

```
 1        So we're up to what number?
 2        MR. KLUNDER:  I'm going to have to do a little
 3   math, so forgive me.
 4
 5        (In open court.)
 6        THE COURT:  Well it's all very well for us to
 7   talk, but now we're up to your break time, so let's --
 8   we can go on talking, but we'll give you the recess that
 9   you have earned.
10        And you have not heard all the evidence.  Keep
11   your minds suspended.  Do not discuss the case either
12   amongst yourselves or with anyone else.  I'll remain on
13   the bench and we'll let the Court Reporter go back to
14   his station.  And you folks will stand in recess until
15   quarter after 11:00.  The jury may recess.
16        THE CLERK:  All rise for the jury.
17        (Pause.)
18        THE COURT:  The door isn't working.  We're all
19   standing here.  Jenn can open it from the other side.
20   Yes, there we are.
21        (Door opens and jury leaves.)
22        THE COURT:  Please be seated.
23        I think we've said everything that needs to be
24   said.  Why don't you do the math.
25        MR. KLUNDER:  It will be 44 through 232, and I'll
```

A2794

```
 1    let those --
 2         THE COURT:  Fine.  Very well.  We'll recess till
 3    11:15.  We'll recess.
 4         MS. KLUNDER:  Your Honor, I just want to find out
 5    the Xmail.
 6         THE COURT:  Well we'll -- and we'll have a
 7    witness?
 8         MS. KLUNDER:  Yes.
 9         (Recess, 11:00 a.m.)
10         (Jury enters, 11:20 a.m.)
11         THE COURT:  We've admitted a bunch of these
12    documents, to which reference has been made, which were
13    subject to the long discussion that we had.
14         And we're up to number?
15         MR. KLUNDER:  232, and we'll start with the next
16    one at 233.
17         THE COURT:  Very well.  Thank you.
18
19    DIRECT EXAMINATION BY MS. KLUNDER:  (Continued.)
20    Q.   Mr. Beckstrom, you've been working for the FBI for
21    7 years, is that right?
22    A.   Yes.
23    Q.   In that time how many cases or matters, where
24    you've been dealing with data like this, have you done?
25    A.   I've handled over 400 submission requests.
```

A2795

1    Q.    And prior to joining the FBI, were you required to

2    undergo any training?

3    A.    Well, no.  Prior to joining the FBI?

4    Q.    No.  Forgive me.

5          Once you joined, at the outset of your employment,

6    did you undergo any training?

7    A.    Yes, the initial training was about 400 hours, and

8    then subsequent thereafter.

9    Q.    What's the "subsequent thereafter"?

10   A.    Well we have annual proficiency tests and

11   additional certifications or things that we get over

12   time.

13         MR. KLUNDER:  Could you put up --

14         (On screen.)

15         MR. KLUNDER:  We don't want to publish it yet.

16   Q.    Do you recognize this?

17         MS. FRITZ:  Objection, your Honor.

18         MS. PICKETT:  Objection.

19         MS. FRITZ:  These were not admitted.

20         MS. KLUNDER:  I'm just asking if he recognizes it,

21   not a question about the document.

22         MS. FRITZ:  Okay.  All right.

23   Q.    Do you recognize this?

24   A.    Yes.

25   Q.    What is it?

A2796

```
 1    A.    This is a truncated version of a spreadsheet that
 2    I provided to you.
 3    Q.    And what is reflected in that spreadsheet?
 4          MS. FRITZ:  Objection.
 5          THE COURT:  No, no, he -- the jury -- he can just
 6    talk about it generally, without specifics.
 7          What's reflected there?
 8    A.    This is the results of my comparison of the
 9    exhibits that I was provided.
10    Q.    And is this -- is the data depicted in this chart
11    an accurate depiction of the underlying data from the
12    server?
13    A.    Yes.
14    Q.    And about how many entries are in this exhibit?
15    A.    Um, off the top of my head, um, it looks like 900.
16    Q.    Okay.  And you've reviewed records for each one of
17    these entries?
18    A.    Yes.
19          MR. KLUNDER:  Your Honor, I'd move the admission
20    of Exhibit RK.
21          MS. PICKETT:  Objection, your Honor.
22          MS. FRITZ:  Objection.
23          THE COURT:  Do you have any in hard copy?
24          (Hands up.)
25          THE COURT:  Come to the sidebar.
```

```
 1
 2          AT THE SIDEBAR
 3          THE COURT:  I take it that this is a -- you want
 4     this under 1006 as a summary?
 5          MR. KLUNDER:  Correct.
 6          THE COURT:  It doesn't go beyond the exhibits we
 7     just talked about?
 8          MS. KLUNDER:  So this is four of the exhibits and
 9     then we would be happy to strike the last, um, I think 7
10     that we talked about before.  This doesn't have the
11     body, right?  So what this is, and he would testify, is
12     that we have the bodies admitted, this has the header
13     information, so as you recall when Mr. --
14          THE COURT:  No, no, I actually recognize it.
15     You're telling me that what -- what I, for now, wanted
16     admitted --
17          MR. KLUNDER:  Correct.
18          THE COURT:  -- these are the header information
19     for the exhibits I've already received?
20          MR. KLUNDER:  That's correct, except for the 7 I
21     --
22          THE COURT:  No, no, you're making it clear.  So
23     with those excluded, it's admitted.
24          All right.
25
```

A2798

```
 1          (In open court.)
 2          MS. KLUNDER:  Your Honor, may we publish this to
 3     the jury?
 4          THE COURT:  RK for identification is admitted
 5     Exhibit 232.
 6          MR. KLUNDER:  233, your Honor.
 7          THE COURT:  233.  And this is 234?  Thank you.
 8          MR. KLUNDER:  Your Honor, we're on -- I might have
 9     misspoken before the break, but we finished at 232, so
10     this will be 233.
11          THE COURT:  This will be 233.  All right.  In
12     evidence, 233.
13          You may proceed.
14          MR. KLUNDER:  Thank you, your Honor.
15          (Exhibit 233, marked.)
16     Q.   Would you describe how you prepared this chart?
17     A.    Certainly.  I received the exhibits from the SEC.
18     I filed -- they were the body PGBD crypts.  I found all
19     the body PGPD crypts using keyword searches from those.
20     I linked them to the source e-mail that, um, the body
21     that was decrypted and I got from the body PGPD crypt.
22     There are multiple copies, um, for all the instances.  I
23     am -- okay.
24     Q.   I'll pause you there and we'll get into that
25     perhaps by way of example, sir.  But if you could just
```

 1    describe the columns there.

 2         The first column on the left is "Legal."  What

 3    does that signify?

 4    A.    That's the exhibit that it relates to.

 5    Q.    And then "Name," what is that?

 6    A.    Well that's the name of the file.

 7    Q.    "E-mail Subject"?

 8    A.    That's the subject and matter.

 9    Q.    "From"?

10    A.    That would be the sender.

11    Q.    "To"?

12    A.    The receiver.

13    Q.    "CC"?

14    A.    That would be if they're copied.

15    Q.    Okay.  "Submit Time"?

16    A.    The time that it was -- the time associated with

17    the e-mail.

18    Q.    And the "Delivery Time"?

19    A.    Yet another time associated with it.

20    Q.    And it appears that, looking at the first page,

21    the first row, "AI Body PGP Decrypt," the rest of the

22    entries are blank, whereas the "Source dot EML," those

23    appear to be populated.  Why is that?

24    A.    Because the Body PGP is just the body of the

25    source e-mail.  So when you look at the source e-mail,

A2800

```
 1    you see the little header information and then you see
 2    this large block of letters and numbers that -- the
 3    encrypted, um, portion of the e-mail, and that is what
 4    we originally provided decrypted, just that block.
 5    Q.    If you could turn to Page 6 of Exhibit 233.
 6          MS. KLUNDER:  And I want to pull up Exhibit 15 as
 7    well, maybe a split screen.
 8          (On screen.)
 9    Q.    Let's look on the right at Exhibit 15.  Do you
10    recognize that, Examiner Beckstrom?
11    A.    Yes.
12    Q.    Is that an e-mail that you reviewed prior to your
13    testimony?
14    A.    Yes.
15    Q.    And when you reviewed these e-mails, they were
16    designated as letters and not numbers, correct?
17    A.    Yes.  Well when I reviewed these e-mails -- I'm
18    sorry, please restate the question.
19    Q.    You received exhibits that were denominated trial
20    letters --
21    A.    Yes, they all have letters.
22    Q.    Okay.  This has now been admitted into evidence as
23    Exhibit 15.  If you can scooch that over and --
24    A.    But this is a redacted copy of another one, you
25    said.
```

```
 1    Q.    Right, and you reviewed a copy that wasn't

 2    redacted?

 3    A.    That is correct, yes.

 4    Q.    All right.  Looking at Rows BG on Exhibit 233,

 5    does that relate to Exhibit 15?

 6    A.    Off the top of my head, I believe whether that's

 7    15 or not, I'd have to look at my sheet to see the

 8    title.  But, yes, I believe it is.

 9    Q.    Would there be something that would refresh your

10    recollection about whether or not BG was Exhibit 15?

11    A.    Um, well BG would be exactly the same as 15.

12          MR. KLUNDER:  May I approach, your Honor?

13          THE COURT:  You may.

14          (Shows.)

15    Q.    Does that refresh your recollection as to whether

16    or not --

17    A.    Yes, BG is 15.

18    Q.    Can you then walk the members of the jury through

19    how your Exhibit 233, the chart you prepared, relates to

20    Exhibit 15?

21    A.    So the -- if you look at the -- there's four lines

22    for BG there, they're the bottom 4.

23          The PGP Body decrypt, when you search for the

24    specific text of BG, you get two identical blocks of

25    text, because the text exists in the same way in two
```

```
 1    locations in the media.  So they have the same MD 5 hash
 2    or same fingerprint, so they are exactly the same.
 3          When you look at those, um, with the source
 4    e-mail, which are both different, you'll find that one
 5    is in the sender's location and one is in the receiver's
 6    location.  The one that says "3 mailer demon" would be
 7    the sending location.  One of the things that's not
 8    existed in this is the pack where things came from.  But
 9    the ones that say "mailer demon" are the ones in the
10    sent folder.
11    Q.    So you can use Exhibit 233 to figure out who sent
12    the final version of the, um, the X-mail messages, is
13    that right?
14    A.    Yeah, because in the messages as presented in the
15    exhibit, it's just the body decrypt.  The top line
16    doesn't have any information about where it came from.
17    You can usually posit it from the numbers below.  But if
18    there's multiple senders, it's not necessary.
19    Q.    Let's go back to Page 1 of 233.
20    A.    (Turns.)
21    Q.    In BG we saw there were four entries.  I'm looking
22    at AK, the bottom of -- there's 8 entries here.  Can you
23    explain why that is?
24    A.    Well there were four identical copies of the Body
25    PG Decrypt in the evidence.  So when you track them back
```

```
 1    to the source e-mail, you have four separate e-mails,

 2    three recipients and one sender.  Or -- yes, three

 3    recipients and one sender.

 4          MR. KLUNDER:  Your Honor, may I approach?

 5          THE COURT:  You may.

 6          (Shows.)

 7    Q.    Do you recognize this?

 8    A.    Yes.

 9    Q.    What is that?

10    A.    This is the, um -- this is the exhibits provided

11    related to the Xmail data.

12    Q.    And did you review the exhibits identified on that

13    list?

14    A.    I did, yes.

15    Q.    And were -- what did you determine when you

16    reviewed the trial exhibits identified on that list?

17    A.    Well I located all the -- the content of all the

18    exhibits provided and located in the, um, in the data.

19    Q.    And how did the content in the trial exhibits

20    compare to the content on the FBI data?

21    A.    It was identical.

22    Q.    And were there any differences in any data?

23    A.    There were three exhibits that had minor -- that

24    didn't look like they were necessarily exported or

25    provided by the FBI, but the data was there.  But some
```

A2804

```
 1    of the meta data like the timestamp, um, that I was
 2    viewing wasn't identical.  However, for example like in,
 3    um -- well actually, um, I think KO is in the other
 4    version.  I thought KO had a timestamp mismatch.  But
 5    the, um, timestamp then is, um, in the footer of the
 6    e-mail.
 7    Q.    And so the content was the same?
 8    A.    The content was the same.
 9    Q.    And how about the sender and the recipients?
10    A.    The sender and the recipients were the same.
11    Q.    So the only discrepancy you found was an
12    occasional timestamp difference?
13    A.    That's correct.
14    Q.    And how large was that discrepancy?
15    A.    A minor scale.
16    Q.    And in your experience what could account for the
17    difference in the timestamp?
18    A.    Well it could be read from a different location.
19    Depending on how it's processed, there could have been a
20    different encoding used, say Google time instead of
21    Apple time.  The, um -- well those are it.
22    Q.    Thank you.
23          MR. KLUNDER:  Your Honor, I move the admission of
24    these exhibits excluding the last four, so that would be
25    234 to 280.
```

```
 1          MS. PICKETT:  The same objection, your Honor.

 2          MS. FRITZ:  The same objection, your Honor.

 3          THE COURT:  Let me see the documents.

 4          (Hands up.)

 5          (Pause.)

 6          THE COURT:  No, overruled, subject to the same

 7     discussion that we had earlier.  They are admitted up to

 8     Exhibit 280.

 9          (Exhibits 234 to 280, marked.)

10          MS. KLUNDER:  Can you pull up Exhibit 62, please.

11          (On screen.)

12          MS. KLUNDER:  Your Honor, may I have a sidebar?

13          THE COURT:  You may.

14

15          AT THE SIDEBAR

16          MR. KLUNDER:  I noticed, with this exhibit coming

17     up, that the top part isn't redacted.

18          You will take the position now that Exhibit 233

19     has been admitted, that we need not redact the top part?

20     But I will confirm that information before you instruct

21     the jury.

22          THE COURT:  That's correct.

23          MS. FRITZ:  I'm sorry?

24          THE COURT:  She just -- because he made -- I've

25     introduced -- I don't have the number, but the 1006
```

```
 1    exhibit with the headers, and he has testified that he's

 2    now examined them against the substantive documents.

 3    And so now this one happens to have the header on it.

 4    And so she wants to be able not to redact it, but to

 5    show it as it was in fact.

 6         MS. FRITZ:  We have a message at the top with no

 7    source?

 8         MR. KLUNDER:  233 has a source, which has now been

 9    edited.

10         MS. FRITZ:  I'm sorry, you say that 233 identifies

11    who wrote the message at the top?

12         THE COURT:  No, it doesn't identify who wrote it,

13    it identifies a mailbox.

14         MR. KLUNDER:  It's the header, and the "From," we

15    would say, is who wrote it.  But that's the mailbox it

16    came out of.

17         THE COURT:  Yeah.

18         MS. FRITZ:  And that you say ties to that random

19    piece of text at the top?

20         THE COURT:  It's what -- he doesn't testify that

21    it's random, he testifies that he matched each one of

22    them.  They may have it.

23         MS. KLUNDER:  Okay.

24

25         (In open court.)
```

A2807

```
 1    Q.    Do you see Exhibit 62 on the screen in front of
 2    you?
 3    A.    Yes.
 4    Q.    Where else did you do any additional work with
 5    regard to this exhibit?
 6    A.    Yes.
 7    Q.    Can you explain that to the jury?
 8    A.    Sure.  You asked me to take the original message
 9    portion and track it back to the source e-mail.
10    Q.    And did you do that?
11    A.    Yes.
12    Q.    And what did you find?
13    A.    Um, you've clearly identified the "From."
14    Q.    So just to be clear, the bottom message, at least
15    from here to there, is that what you were referring to?
16    A.    Yes.
17    Q.    And what did you do, in the system, when you
18    looked into that information?
19    A.    It was from 3.
20    Q.    And who was it to?
21    A.    76.
22    Q.    Okay.
23          MR. KLUNDER:  Can you put up Exhibit AI, Exhibit
24    44, please.
25          (On screen.)
```

```
 1    Q.    Do you recognize this exhibit, Examiner Beckstrom?
 2    A.    Yes, that's one of the three messages.
 3    Q.    And I'll draw your attention to the message second
 4    from the top, from Gard to Kash, January 16th, 2013, at
 5    9:09 p.m.  Did you do any additional work relating to
 6    that header?
 7    A.    Again I tracked it back to the original source
 8    message.
 9    Q.    And what did you determine?
10    A.    That it was from 2 to Kash.
11    Q.    Thank you.
12          MS. KLUNDER:  Exhibit 83, please.
13          (On screen.)
14    Q.    Do you recognize this exhibit, Examiner Beckstrom?
15    A.    It's the third of the three messages, yes.
16    Q.    Okay.  Did you do any additional work on that?
17    A.    I was asked to track the original message back to
18    the source e-mail.
19    Q.    And what did you determine?
20    A.    That the sender was 4.
21    Q.    Okay.  And the bottom from ACCO, that was 4?
22    A.    Yes.
23    Q.    Okay.
24          MS. KLUNDER:  You can take that down.
25          (Off screen.)
```

A2809

```
 1    Q.    When you were working on the Xmail, was that on a
 2    separate server than the Xmails we've also discussed?
 3    A.    Yes, it is separate.  Yes.
 4    Q.    And were there any folders on that image of the
 5    server?
 6    A.    There is a limit system and, yes, there's multiple
 7    folders.
 8    Q.    And what folders did you observe?
 9    A.    Well it looks like the user folder, the home
10    folder has, um, four, in the unencrypted, um, in the
11    encrypted image of Fen Xmail and Xphone.
12          MS. KLUNDER:  Please look at QI.
13          (On screen.)
14    Q.    Do you recognize this?
15    A.    It's a working copy USB drive.
16    Q.    Do you recognize this image?
17    A.    I mean I've seen this image before, yes.
18    Q.    Okay.  And, um, do you recognize this as something
19    relating to the, um --
20    A.    I mean it's labeled and initialed and signed by
21    Nick Nathans, it's similar to the original evidence item
22    which has more data on it.
23    Q.    And what data is on the item?
24    A.    Well according to Nick Nathans's notes, it was
25    just the Q App and the Firefox portable.
```

```
 1    Q.    Did you have an understanding of whether this data
 2    was provided to, um, to anyone?
 3    A.    I believe it's been provided to the SEC.
 4          MR. KLUNDER:  Your Honor, I'd move the admission
 5    of LJ and LI.
 6          THE COURT:  No objection to LJ and LI?
 7          MS. FRITZ:  No objection.
 8          THE COURT:  They may be admitted 281 and 282.
 9          (Exhibits 281 and 282, marked.)
10          MR. KLUNDER:  I have no further questions.
11          THE COURT:  Ms. Fritz, um, she would come first,
12    but Ms. Pickett?
13          MS. FRITZ:  I'm happy to go.
14          THE COURT:  Very well.
15
16    CROSS-EXAMINATION BY MS. FRITZ:
17    Q.    Good afternoon, Mr. Beckstrom, my name is Miranda
18    Fritz, I represent one of the folks that's involved in
19    this case.  How are you doing?
20    A.    Very well, thank you.
21    Q.    I just have a few questions about some of the data
22    that you've talked to us about.
23          So you received -- let's just go through it.  You
24    received how many hard drives?
25    A.    I received two hard drives.
```

A2811

1    Q.    Not four?

2    A.    No.

3    Q.    Okay.  And those two hard drives had some

4    indicators on them that included the word "Bond," is

5    that correct?

6    A.    The hard drives?  Those two hard drives, no.

7    Q.    Okay.

8    A.    Those two hard drives were labeled "MLAT."

9    Q.    All right.  Now, can you in any way quantify for

10   the jury the volume of data that you received?

11   A.    Um, I mean --

12   Q.    Give it a shot.

13   A.    I don't remember the size of the hard drives, they

14   were fairly large, I think they might have been 4

15   terabytes each.  I know there's over a million e-mails.

16   Q.    Okay.  All right.  So let's talk about that.

17         Over a million e-mails.  Tell the jury over what

18   period of time that e-mail data existed?

19   A.    Um, let's see.  2012 to when it was seized,

20   basically.

21   Q.    Say it again?

22   A.    Possibly 2012.

23   Q.    And ending at?

24   A.    When it was seized.

25   Q.    And when was that?

```
 1    A.    Um, it was the season 2020, I believe, right?

 2    Q.    So an 8-year period of communications, correct?

 3    A.    That would be correct, if I'm correct about the

 4    date span.

 5    Q.    Okay.  And you said there were folders that you

 6    located, for example, that related to users, correct?

 7    A.    There are user folders, yes.

 8    Q.    And how many users did you see on that system?

 9    A.    How many users?  Well you're talking about the

10    users -- the user folders?

11    Q.    Yes.  Do you remember how many different

12    individuals had folders there?

13    A.    Well if you're talking about the user of the

14    computer, then it's four.  If you're talking about the

15    users of the e-mail, it's 150.

16    Q.    150.  Okay.  And when you said a moment ago that

17    there were four, what were you talking about?

18    A.    There were -- on the, um -- on the 310 image there

19    were four home folders -- there were four distinct users

20    in the home folder.

21    Q.    Okay.  And how were you able to identify those

22    four distinct users?

23    A.    I mean when you open the image, those, um, folders

24    are labeled as such.

25    Q.    Okay.  All right.  And do you recall the labeling?
```

A2813

1    A.    Yeah, the label is "Alt" "Fen" "Xphone" "Xmail."

2    Q.    Okay.  All right.  So we had a million, um,

3    communications, and in this courtroom we've seen, um, a

4    list of perhaps less than 200, correct?

5    A.    Um, between the Xphone and Xmail, yes.

6    Q.    Okay.  Now those, um -- you indicated on direct

7    that you had -- that your were able to search through

8    the data, is that correct?

9    A.    That is correct.

10    Q.    So you were able to basically cull, look for,

11    certain kinds of communications, correct?

12    A.    Certain kinds of communications?  I'm sorry.

13    Q.    Communications for the time period, for example,

14    correct?

15    A.    For the Body PGD crypts?

16    Q.    Correct.

17    A.    It's only text searches.

18    Q.    Text searches?

19    A.    Yes, basically.  Key words.

20    Q.    Okay.  You could search for words that were in the

21    e-mail?

22    A.    You could, yes.

23    Q.    And you could also search and identify by user,

24    correct?

25    A.    Not in the Body PGD decrypts.  You could for the

```
 1   source e-mails.
 2   Q.    Okay.  And there you would go to the folder, is
 3   that correct?
 4   A.    So the process is the -- you have the e-mail, you
 5   have the source e-mail.  If you take the source e-mail
 6   out of the device and you take the key out of the device
 7   and you marry them together, you get the whole e-mail.
 8   Q.    Okay.  So you were able to pull e-mails from
 9   particular senders, correct, if you wanted to look at
10   that?
11   A.    Yes.
12   Q.    And you could look at particular words, correct?
13   A.    Um, you could search for particular words, yes.
14   Q.    And you had an 8-year time period over which you
15   had a million communications, correct?
16   A.    That seems right, yes.
17   Q.    Okay.  And did you work with these folks to find
18   communications or --
19   A.    I did not.
20   Q.    Who did the sort of culling and searching?
21   A.    I have -- all I did was verify the exhibits that
22   were provided to me.  I haven't really been part of the
23   investigative element to this.
24   Q.    All right.  Now the e-mail communications, let me
25   ask you this.
```

A2815

```
 1          If you send an e-mail, there is ordinarily
 2   evidence of whether that e-mail was received or opened,
 3   correct?
 4   A.    Not necessarily.
 5   Q.    Under what circumstances -- I mean we see that
 6   sort of day-to-day, I can get that information if I send
 7   an e-mail, correct?
 8   A.    Depends on what system you're using.
 9   Q.    Okay.  In this particular system, how did you
10   determine that?
11   A.    How did I determine that?
12   Q.    Yes.
13   A.    It's only by the sent and received information in
14   the header.
15   Q.    Okay.  So you're only able to tell that on that
16   system there was an e-mail that was sent, correct?
17   A.    Sent or received, yes.
18   Q.    And you don't have any way of knowing whether the
19   e-mail, for example, was reviewed, um, was either
20   received or opened, is that correct?
21   A.    I don't have meta data for that, no.
22   Q.    Okay.  Now you also saw, in some of the things
23   that we looked at, that there were communications going
24   from numbers like 2 or 3 or 4, correct?
25   A.    Yes.
```

```
 1    Q.    Did you have any information regarding whether,
 2    um, User 2 changed over time, for example?
 3    A.    No.
 4    Q.    Did you have any indication of whether, um -- did
 5    you know that a user number was associated with a
 6    particular Xphone?
 7    A.    The numbers are associated with a phone, I
 8    believe, yes.
 9    Q.    Okay.  And did you have any information regarding
10    whether those phones were sort of handed around over the
11    course of years?
12    A.    I have no information regarding that.
13    Q.    Okay.  Now on your chart --
14          MS. FRITZ:  If you can pull up 233, please.
15          (On screen.)
16          MS. FRITZ:  I just want to make sure that we're
17    all on the same page on this, that we're all looking
18    at -- okay.
19    Q.    If you could look at the column, after "From" and
20    "To," there's a "CC" column there, correct?
21    A.    Yes.
22    Q.    And what data should be in that column?
23    A.    There may or may not be data in a CC column.  It
24    depends on whether somebody selected it.
25    Q.    So there's --
```

A2817

```
 1          MS. FRITZ:  Let's go to Exhibit CE -- I'm sorry

 2     the pages aren't numbered, it looks like it's at the top

 3     of maybe Page 10 or 12.

 4          (On screen.)

 5     A.   (Looks.)

 6          MS. FRITZ:  Yes, a data entry for CE.  Not the

 7     communication.

 8          (On screen.)

 9          MS. FRITZ:  Yes.  And blow it up.  And now if you

10     go down a bit, please.  Okay.

11          (Scrolls.)

12     Q.   We see the entry at the top of a page that says

13     "CE," correct?

14     A.   Yes.

15     Q.   Okay.  And across that entry we see the fact that

16     there is a "From" that has the number 102, correct?

17     A.   Correct.

18     Q.   And wee see lots of numbers on this page, 102 and

19     69, things like that, correct, that are senders on this

20     page?

21     A.   Yes.

22     Q.   And you have no information regarding who 102

23     might have been?

24     A.   I don't know who 102 is.

25     Q.   Okay.  And then we see a recipient that is "Fen,"
```

```
 1   correct?

 2   A.     Yes.

 3   Q.     And then the next column is supposed to be the

 4   "CC" column, correct?

 5   A.     That is the "CC" column, yes.

 6   Q.     And so we see here that certain information

 7   apparently was CCed to an individual, correct?

 8   A.     Yes.

 9   Q.     And we have no way of knowing whether that

10   individual actually looked at, received, read, opened,

11   that communication, correct?

12   A.     You can't say anything about the user behind the

13   system, no.

14   Q.     Okay.  Particularly when you've got multiple

15   recipients, right?

16   A.     That's correct.

17   Q.     Okay.  Now if we go to CF, a little further down,

18   just CF, and I just want to be really clear about one of

19   your columns.  You have columns that say "Submit Time"

20   and columns that say "Delivery Time," is that correct?

21   A.     That's correct.

22   Q.     Okay.  "Delivery time" does not mean received by

23   the recipient, correct?

24   A.     I haven't done an analysis of what that time

25   signifies.
```

A2819

1    Q.    Okay.  All right.  And were you asked to do any

2    analysis regarding, um, any accounting records that were

3    on those servers?

4    A.    Um, I don't believe so.  Please -- I'm not sure

5    what you're looking for?

6    Q.    Okay.  Other than looking at the communication,

7    Xphone or Xmail communication, did you conduct other

8    analyses?

9    A.    I haven't conducted an analysis, I was asked to

10   look at the Q server, um, from the working copy, um, to

11   see if some of the exhibit information is there.

12   Q.    Okay.

13   A.    But they didn't provide me any exhibits.

14   Q.    All right.  Did you develop information regarding

15   who put input data into -- onto the Q server, who has

16   the authority to enter or input data?

17   A.    I don't know.

18   Q.    Did you determine whether, um, data was input at

19   different times during the entire period of 2012 through

20   the seizure in 2020?

21   A.    I don't know that information.

22   Q.    And if data had been entered in 2020, but with

23   dates reflecting events that had happened earlier, is

24   there any way that you could tell the difference between

25   the data that's entered in 2020 that reflects the 2013

A2820

 1    date versus data truly entered at a particular time?

 2    A.    Well I don't know, that's a nuanced question, I

 3    would say, because -- since I haven't reviewed it, I

 4    can't know for sure.  But there's probably a date

 5    timestamp from the timeframe in which would pin it to

 6    that timeframe.

 7    Q.    Okay.

 8    A.    However, without knowing that information, I

 9    couldn't answer that question.

10    Q.    All right.  So is that what we refer to as "meta

11    data"?

12    A.    Timestamps are "meta data."

13    Q.    Okay.  So meta data generally tells you when the

14    data is put into that system, correct?

15    A.    No, meta data is just data about data, it's

16    information that they want to have, so.

17    Q.    Okay.  So it tells you when that data was entered,

18    correct?

19    A.    Meta data can include entry time, yeah.

20    Q.    And it can also tell you who it was that entered

21    that data, correct?

22    A.    Um, sometimes it has who entered the data, yes.

23    Q.    And it can also sometimes tell who you modified

24    that data, correct?

25    A.    Sometimes it could tell you that, yes.

```
 1    Q.    Okay.  So if, during the period of 2012 through

 2    2020 -- you're familiar with the name "Fred Sharp,"

 3    right, you know of --

 4    A.    Yes.

 5    Q.    Okay.  Are you familiar with the fact that Fred

 6    Sharp basically controlled, maintained those Q servers?

 7    A.    Um, vaguely, yes.

 8    Q.    Okay.  And are you aware that he had the ability

 9    to enter data anywhere in that system, correct?

10    A.    That would stand true if he was the administrator.

11    Q.    And he had the ability to do so up until the date

12    when that thing was acquired in Curacao, correct?

13          MR. KLUNDER:  Objection.

14    Q.    To your knowledge.

15          THE COURT:  Well that's limited to his own

16    knowledge.  He may answer.

17          Is that how you thought it worked?

18    A.    The system, someone could have entered data into

19    that system up until the system was shut down.

20    Q.    And that data could have been entered in 2019 or

21    2020 pertaining to or with a date of events years

22    earlier, correct?

23    A.    It's possible.  I mean --

24    Q.    (Laughs.)

25    A.    You know, the meta data in the e-mails, um, and
```

A2822

```
 1    the dates of the items are probably -- although I

 2    haven't done an analysis, um, from that time period.

 3    But it's possible they could be manipulated, yes.

 4    Q.    All right.  And so if -- whenever the data was

 5    entered, once you guys got ahold of it, all you would be

 6    seeing is whatever the entry was with whatever date was

 7    entered relating to that entry, correct?

 8    A.    Um, it's hard to say, deleted items can be

 9    present.

10    Q.    Okay.  But you would not, by virtue of -- if you

11    print a document or print a spreadsheet, it's not going

12    to show you that the data was just entered the year

13    prior, it's just going to give you whatever the data is?

14    A.    That's right.

15    Q.    All right.

16          MS. FRITZ:  Thank you.

17          MS. PICKETT:  I have no questions, your Honor.

18    Thank you.

19          THE COURT:  Any redirect?

20          MR. KLUNDER:  Quickly, your Honor.

21

22    REDIRECT EXAMINATION BY MS. KLUNDER:

23    Q.    You were asked a line of questions about data

24    entry into the Q-system, do you recall that?

25    A.    Yes.
```

A2823

```
1    Q.    Did you do any analysis about the data entry into

2    the Q-System?

3    A.    Um, I didn't do any analysis.  I mean I took out

4    the original evidence and, um, loaded up the Q server

5    and then tested out the Firefox link so that you can

6    find data.  But beyond that, I haven't done any analysis

7    other than look up one or two items just so see that

8    they are what they request.

9    Q.    All right.

10         MS. KLUNDER:  I have no further questions.

11         THE COURT:  Nothing further for this witness?

12         MS. FRITZ:  No, thank you.

13         THE COURT:  All right, you may step down.  Thank

14   you.

15         Call your next witness.

16         MS. SHIELDS:  The Commission calls Roger Knox.

17         THE COURT:  He may be called.

18         (ROGER J. KNOX, sworn.)

19

20         * * * * * * * * * * * * *

21         ROGER J. KNOX

22         * * * * * * * * * * * * *

23

24   DIRECT EXAMINATION BY MS. SHIELDS:

25   Q.    Good morning.
```

A2824

```
 1    A.    Good morning.
 2    Q.    Would you please state your full name for the
 3    record, please.
 4    A.    Roger John Irvine Knox.
 5    Q.    And where do you live, Mr. Knox?
 6    A.    I live in Stowe, Massachusetts.
 7    Q.    During most of your testimony today, we're going
 8    to talk about the time period from 2011 to about 2018.
 9          And during those years, where did you live?
10    A.    I lived in Chamonix in France and then in Valle in
11    Switzerland.
12    Q.    And would you briefly describe your educational
13    background for the jury.
14    A.    Yes, I was -- my school was in Belfast in Northern
15    Ireland.  My college was in Stirling in Scotland.  And
16    then I went on to the World Military Academy Sandhurst
17    in England.
18    Q.    And did you serve in the military?
19    A.    Yes, I served for 7 years.
20    Q.    And what did you do in the military?
21    A.    I was in the parachute regiment -- I was an
22    officer in the parachute regiment, which is Airborne
23    Forces.
24    Q.    After you left the military, what did you do for
25    employment?
```

A2825

 1   A.     I was doing property development in London, and

 2   then I worked as an internal auditor for -- I'm sorry,

 3   auditing in the finance department of Aon, a global

 4   insurance company.

 5   Q.     And then what did you do after that?

 6   A.     In 2006 I had the opportunity to move to Geneva to

 7   work for a family office.

 8   Q.     And what was that?

 9   A.     That was what was called Euro-Health Trust Co.,

10   "EHT," and that did finance and offshoring and trusts

11   for high-net-worth individuals outside of Switzerland.

12   Q.     At some point in time did you leave EHT?

13   A.     Yes, I did.  I set up a firm with two colleagues

14   of EHT doing the same type of business in Geneva.

15   Q.     And what was that firm called?

16   A.     That was called Blacklight SA.

17   Q.     And what was Blacklight SA's business?

18   A.     Blacklight SA was very similar to Euro-Health

19   Trust, Co., we poached the clients, some of the clients,

20   and it was to assist, um, control groups to deposit

21   shares of U.S. and Canadian public companies and sell

22   them through the public market through brokerages and

23   banks based in Switzerland and elsewhere.

24   Q.     And when you use that term "control group," what

25   do you mean by that?

```
 1   A.    Predominantly it's people -- individuals who --
 2   well they're collectively doing it as a business, where
 3   they purchase a shell company, it's a reverse takeover
 4   -- they purchase a shell company, put a business into
 5   it, and then make it into a public company, and then
 6   they promote it as the next big thing.  And the
 7   promotion drives up the stock price and they sell into
 8   the excitement and the fever and the get-rich-quick
 9   opportunity.
10   Q.    What if any understanding did you have about the
11   legality of Blacklight's business?
12         MS. FRITZ:  Objection.
13         THE COURT:  No, overruled.  Again, I'm the source
14   of the law, but he may be asked what thought about it.
15   A.    We were assisting the clients to evade scrutiny as
16   regards to the securities laws in the United States and
17   Canada.
18   Q.    When you worked at Blacklight, with whom did you
19   work?
20   A.    I worked with Kenneth Ciapala and Anthony Collari.
21   Q.    Do you know a man named Fred Sharp?
22   A.    Yes, I do.
23   Q.    How do you know him?
24   A.    I had heard of Fred Sharp when I worked at Euro-
25   Health Trust Co., and I do not believe I had met him.
```

A2827

```
 1    He had heard of Blacklight being established.  He had --
 2    we heard he had watched and we were still around a year
 3    later and he then came and introduced himself to
 4    Blacklight and, um, asked if he could open up client
 5    accounts with Blacklight.
 6    Q.    And did he do that?
 7    A.    Yes, he did.
 8    Q.    And how long did you work with him while you were
 9    at Blacklight?
10    A.    I worked from 2011 until I departed Blacklight in
11    2013.
12    Q.    All right.  So just -- and during that period
13    while you were at Blacklight, what services did you and
14    Blacklight provide to Mr. Sharp?
15    A.    We, um, Mr. Sharp had a -- a group of, we would
16    call them "nominee beneficial owners," and we would open
17    up his -- an offshore company, typically the Marshall
18    Islands or the Dominican Republic or Belize.  The
19    nominee beneficial owner would look like he or she is
20    the owner of the company, but then Mr. Sharp would use
21    that structure to deposit shares on behalf of control
22    groups.  And then, um, when the time was right, we would
23    be instructed to sell shares into the public markets.
24    Once the proceeds had settled, then we would be
25    instructed to wire the money to various different
```

A2828

```
 1    locations.
 2    Q.    You said you left Blacklight in 2013, is that
 3    right?
 4    A.    That is correct.
 5    Q.    So what did you do in 2013?
 6    A.    In 2013 I had -- there was a fallout between three
 7    business partners.  I ended up setting up my own
 8    business in 2013 called "Silverton."
 9    Q.    And how long did you operate Silverton?
10    A.    I operated Silverton from spring of 2013 until my
11    arrest in October 2018.
12    Q.    We'll come back to that in a moment.
13          But during that time from 2013 to 2018, did
14    Silverton keep the same name?
15    A.    No, we changed the name in 2015 to "Wintercap SA."
16    Q.    Did the business change when the name changed?
17    A.    The business stayed exactly the same.
18    Q.    Okay.  So what was Silverton's business?
19    A.    Silverton's business was again a clone of
20    Blacklight, the main effort was to assist control
21    groups, individuals living outside of Switzerland, to
22    deposit shares in penny stocks in the U.S. and Canadian
23    markets, to provide a level of unanimity to those
24    individuals in order that we could access the markets,
25    not to declare that we're holding more than 5 percent,
```

```
 1    and sell the shares usually into a promotion of the
 2    companies.
 3    Q.    Okay.  So you said a bunch of things there that I
 4    want to unpack.  One of the things you said was that you
 5    wanted to provide anonymity, is that right?
 6    A.    That is correct.
 7    Q.    Why?
 8    A.    If, um, for individual shareholders or corporate
 9    shareholders, if they hold more than 5 percent in the
10    United States of a public company, they must declare
11    that shareholding, and/or if they hold 5 percent and
12    their business partner holds 5 percent and they discuss
13    the business, they also must declare that holding.  With
14    a small-cap public company, a control group can actually
15    purchase 100 percent of the shares, um, its freetrading
16    or restricted shares, and actually they control every
17    share of that company, and if they wanted to sell those
18    on the market, they would have to, um, each beneficial
19    owner or more than one beneficial owner, they have to
20    file a declaration with the brokerage firm that they are
21    selling those shares.
22    Q.    Okay.  And so how did your business help clients
23    avoid those requirements?
24    A.    So if I may refer to Mr. Sharp, um, when he came,
25    I -- the main point of contact was Mr. Sharp, he brought
```

A2830

```
 1    five or four individual passports for four different
 2    individuals, he hired more than that, and I did not
 3    speak to it, so he opened up four accounts, and into
 4    each of those four accounts we would only put less than
 5    -- up to or less than 5 percent of stock in each public
 6    company.  And so for that we were able to deposit 20
 7    percent of a public company without making any
 8    disclosures to the regulators.
 9    Q.    And at some point in time did you have more than
10    four accounts associated with Mr. Sharp?
11    A.    Yes, initially we only had one account -- I'm
12    sorry, there was Blacklight and then Silverton.  But
13    initially in Silverton, I just had one account with one
14    beneficial owner.
15    Q.    And did that change over time?
16    A.    Yes, it grew until in 2018, I believe I had 8 or
17    10 accounts, some -- and that was even after I had
18    closed some, and we changed -- we moved money, we
19    changed ultimate beneficial owners, and, yeah, we
20    rotated through individuals and through companies to try
21    and stay one step ahead.
22    Q.    Okay.  And what if any understanding did you have
23    about whether Silverton's business was legal?
24    A.    The -- we were skirting securities laws, um, and
25    that was the platform, um, that we were -- that we
```

```
 1    offered -- and not publicly or not advertised, but, um,
 2    that was an opportunity for people to dispose of large
 3    blocks of public company stock.
 4    Q.    Did Silverton have clients other than Mr. Sharp
 5    and his associates?
 6    A.    Yes, we did.
 7    Q.    And what -- and what roughly what portion of
 8    Silverton's business related to Sharp and his
 9    associates?
10    A.    In 2013, 2014, Mr. Sharp would approximately be
11    about 20 percent of the turnover of the cash flow, and
12    over time, as he was comfortable with our business and
13    the efficiency of it, that would have -- that grew
14    exponentially and he was a good client.  And so by 2018,
15    he would have been 80 percent of the business of the
16    turnover of the company.
17    Q.    And how long did you work with Mr. Sharp?
18    A.    In Silverton, for the entirety, from 2013 to 2018.
19    Q.    All right.  So what happened in 2018?
20    A.    Ultimately I was detained in the Mexico City
21    Airport, um, flown to Logan Airport in Boston, and, um,
22    arrested by the FBI.
23    Q.    And after you were arrested, were you charged with
24    anything?
25    A.    Yes, I was criminally indicted with securities
```

A2832

```
 1    fraud and conspiracy to commit securities fraud and I

 2    had a parallel civil case with the Securities and

 3    Exchange Commission.

 4    Q.    All right.  So let's talk about the criminal case

 5    first.  What's the status of that criminal case?

 6    A.    I was indicted in October 2018 and I pled guilty

 7    in January 2020.

 8    Q.    And have you been sentenced in that case?

 9    A.    I have not.  Sentencing is -- was continued for

10    the 10th time or the 11th time.  It is currently

11    scheduled for October 13th, 2023.

12    Q.    And do you have any agreements with the criminal

13    prosecutors in that case?

14    A.    I entered a plea agreement in September 2019.

15    Q.    And what are the terms of that plea agreement,

16    what did you agree to do?

17    A.    I -- the plea agreement, I agreed to plead guilty,

18    I agreed to pay forfeiture, and I agreed to restitution.

19    And --

20    Q.    Does your plea agreement contemplate potential

21    prison time?

22    A.    Yes, it does.  I agreed not to object to a

23    sentence, I believe, greater than 181 months.

24    Q.    181 months.  How many years is that?

25    A.    I believe that's approximately 15 years.
```

A2833

1   Q.    And do you expect that your sentence in that case

2   will actually be 15 years?

3   A.    I -- I do not know.  I hope and I expect it will

4   be less, um, but I am aware that I cannot -- I cannot,

5   um, complain if I get that length of time.

6   Q.    Do you expect your testimony here today to have

7   any impact on your sentence in that criminal case?

8   A.    Yes, because I also entered a cooperation

9   agreement with the government at the same time as I

10  entered the plea agreement.

11  Q.    And what does the cooperation agreement obligate

12  you to do?

13  A.    To discuss with the government, the Department of

14  Justice, and the Securities and Exchange Commission, the

15  details of my crime, the other individuals involved,

16  both, um, that worked with me and the clients that I did

17  business for, and to assist, um -- yeah, to answer any

18  questions they have on my conduct and to assist them in

19  further investigations.

20  Q.    And have you done that?

21  A.    Yes, I have.

22  Q.    You also mentioned that there was a civil case

23  brought against you?

24  A.    That is correct.

25  Q.    And that was a case brought against you by the

A2834

```
 1    SEC, right?

 2    A.    That is correct.

 3    Q.    What's the status of that SEC case?

 4    A.    That case was settled in December 2022.

 5    Q.    And what are the terms of that settlement?  What

 6    consequences do you have as a result of that sentence?

 7    A.    I agreed to an industry bar, so from the finance

 8    industry.  I agreed to a penny stock bar.  And I agreed

 9    to, um, a level of financial, um -- I'm not sure if it's

10    called "forfeiture," but I agreed to pay a financial

11    penalty.

12    Q.    Do you remember how much that penalty was?

13    A.    That was in the region of $6.5 million.

14    Q.    Something I forgot to ask you in your plea

15    agreement, you mentioned that forfeiture was an aspect

16    of your plea agreement?

17    A.    That is correct.

18    Q.    How much did you agree to pay in forfeiture?

19    A.    In the plea agreement document itself, I had

20    agreed to a minimum of $4.6 million.

21    Q.    And did that number change over time?

22    A.    Yes, it did.  I agreed to -- it increased.  I

23    agreed to pay approximately $5 million from funds that

24    had been illegally generated by myself, and to return

25    approximately $7 million of client funds that belonged
```

A2835

```
 1    to the Sharp group and other -- other, um, control

 2    groups that were selling stock through Wintercap.

 3    Q.    Okay.  And to prepare to testify today, did you

 4    meet with me and my colleagues?

 5    A.    Yes, I did.

 6    Q.    And what did I ask you to do when you testified

 7    today?

 8          MS. FRITZ:  Objection, quoting herself.

 9          MS. PICKETT:  Objection.

10          THE COURT:  No, she may have it.  She may have it

11    and he may answer as to what instructions you gave him.

12    Q.    You can answer the question.

13    A.    You asked me, um, told me to tell the truth.

14    Q.    So how did you come to know about Mr. Sharp's

15    business?

16    A.    Initially when I heard of Mr. Sharp, it was

17    purely, you know hearsay, it was -- I was told that he

18    was, at that time, a competitor to EHT.  EHT was based

19    in Geneva.  Mr. Sharp was based in Vancouver.

20    Q.    So over time did you acquire a deeper

21    understanding of Mr. Sharp's business?

22          MS. FRITZ:  Objection, foundation.

23          THE COURT:  Well he can answer that "Yes" or "No."

24          Do you think you did?

25          THE WITNESS:  Yes.
```

A2836

```
 1            THE COURT:  All right.
 2    Q.    How did you acquire a deeper understanding of
 3    Mr. Sharp's business?
 4    A.    Well from meeting him in person in 20 -- I'm
 5    sorry, in 2011, from meeting him then and face to face
 6    and shaking his hand to 2018, we spoke.  The frequency
 7    of our conversations or communications gradually
 8    increased daily, so from 2015 to 2018 I would speak to
 9    him literally every day, every business day Monday to
10    Friday.
11    Q.    Okay.  And so over time as you communicated with
12    Mr. Sharp, did you begin to understand how that business
13    operated?
14    A.    Yes, absolutely.
15    Q.    Okay.  So in general terms -- and I'm sure you
16    could tell us for hours, but can you give us a sense in
17    general terms of what --
18            THE COURT:  Well that comment is stricken, she
19    can't testify, she can ask questions.
20    Q.    What was Mr. Sharp's business?
21    A.    Mr. Sharp's business, it was called -- or his
22    business name was "Corporate House," it was based in
23    Vancouver, British Columbia, in Canada, and his business
24    was anonymity for clients.  So he was -- he offered
25    people, um, banker clients, brokerage accounts to
```

A2837

 1    deposit shares where they did not have to declare them

 2    to either the regulators or the Canadian tax

 3    authorities.

 4    Q.    Do you know a person named Yvonne Gasarch?

 5    A.    Yes, I do.

 6    Q.    How do you know Ms. Gasarch?

 7    A.    Ms. Gasarch worked with Fred Sharp for the

 8    entirety -- the entire time I've known Fred Sharp.

 9    Q.    And how do you know that?

10    A.    Both physically meeting her in the office in

11    Corporate House in Vancouver, and then through multiple

12    communications from 2011 through to 2018.

13    Q.    And how frequently did you communicate with

14    Ms. Gasarch?

15    A.    We would communicate approximately between 2 and 5

16    times per week.

17    Q.    And on what kinds of topics or matters did you

18    communicate?

19    A.    Predominantly we communicated through -- about

20    details for wire transfers, for moving cash from

21    Wintercap to then other entities, either clients or

22    business entities that were doing business with Fred

23    Sharp.

24    Q.    And so what kinds of things -- to facilitate that,

25    what kinds of things did you communicate with

```
 1    Ms. Gasarch about?
 2         MS. PICKETT:  Objection, your Honor.
 3         THE COURT:  No, he can give it at a level of
 4    generality.
 5         What kinds of things did you talk to her about?
 6    A.    We would, um -- the majority of time was to do
 7    with wire transfers.  She would send us an e-mail
 8    instruction from -- and each nominee company had its own
 9    separate e-mail, and she would -- but she used the same
10    template across each company, so it was a copy-and-paste
11    for each different instruction.  She would send us the
12    instruction, the bank details, the compliance documents,
13    and if it was an individual, it would be a passport or
14    an identity document.  If the individual is being paid,
15    like if it was a company being paid, um, she would send
16    us the incorporation certificate of the company.  But we
17    would -- and if there was a point that we did not
18    understand or we couldn't read it or there was a
19    mistake, we would e-mail back to her or else message her
20    just to inquire for clarity or to give -- just to ensure
21    that we got the correct instructions.
22    Q.    Okay.  When she e-mailed you those requests for
23    payment, from what -- from what address did they come?
24    A.    So from the e-mail address, um, Corporate House
25    had its own, I presume, its own e-mail server, and so we
```

```
 1    had some companies, we had -- called Morris Capital,

 2    Quezon, Santistorez, and each e-mail -- each company had

 3    a "santistorez@xmeridian.com," or

 4    "quezon@xmeridian.com," or "morriscapital@xmail.com."

 5    And so she would prepare the documents and e-mail it

 6    from whichever, um, relevant e-mail which corresponded

 7    with where the money was to come from, which bank

 8    account the money was to come from.

 9    Q.    And why did the e-mail have to come from an e-mail

10    address associated with the company?

11    A.    The -- so everything looked completely independent

12    rather than looking from just a control group that

13    controlled just four companies, so that anyone looking

14    at every company was completely independent with a

15    different beneficial owner and different instructions

16    from a different e-mail address.

17    Q.    So if you were getting these instructions from

18    quezon@xmail, how did you know it was really from

19    Ms. Gasarch?

20    A.    There was, um -- well either -- if we had

21    questions, we had -- we were able to communicate with

22    a -- we had a Blackberry device and we could message

23    her.  And so rather than going a normal e-mail chain

24    where -- which is recorded and sits on servers, we could

25    message her directly and ask her questions or queries,
```

A2840

```
 1   or sometimes there was a mistake made that was maybe the
 2   wrong account name with the correct account details and
 3   so we could message her, um, directly and ask her that
 4   question.
 5   Q.   So I want to show you an exhibit that -- just one
 6   moment.
 7        MS. SHIELDS:  Can you pull up, Allyssa, please
 8   Exhibit --
 9        (Pause.)
10        MS. SHIELDS:  Yes, 157.
11        (On screen.)
12   Q.   And, Mr. Knox, I'm going to show you what we've
13   marked as Exhibit 157, which is in evidence.
14   (On screen.)
15        Do you have that in front of you, sir?
16   A.   Yes.  I cannot see the number in the top corner,
17   but I have the message in front of me.
18   Q.   Okay.
19        MS. SHIELDS:  And may we publish that?  The jury
20   has that as well?  Yes.  Okay.
21        (On screen.)
22   Q.   So, Mr. Knox, starting down at the bottom of this
23   exhibit, who are the people communicating in this
24   message?
25   A.   It is from "Kash" to "Celt."
```

```
 1    Q.    And who is "Kash"?
 2    A.    "Kash" was a trader, a broker employed by Fred
 3    Sharp.
 4    Q.    And who is "Celt"?
 5    A.    "Celt" is Courtney Kelln who organized a lot of
 6    the share transfers, share deliveries for Fred Sharp.
 7    Q.    Okay, and if you look at the message above that,
 8    um, it adds to "Wires," do you see that?
 9    A.    That is correct.
10    Q.    Who is "Wires"?
11    A.    "Wires" is Yvonne Gasarch.
12    Q.    And what does that message say?
13    A.    The message sells "I cannot.  All wires are sent
14    by Yvonne.  She is the master of finance.  'Yvonne,
15    please help Kash with the below."
16    Q.    And if you look two messages up, who is the sender
17    on that message?
18    A.    It's from "Wires," Yvonne Gasarch.
19    Q.    And who is it to?
20    A.    It is to "Kash," a trader employed by Fred Sharp.
21    Q.    And what information does Ms. Gasarch convey in
22    that message?
23    A.    She writes, "Sender is Gotama SA, Singaller
24    Capital Bank Switzerland, USD 8K."  So United States
25    dollars.
```

1    Q.    Okay.  So the message from Celt saying "All Wires

2    are sent from Yvonne, she is the master of finance."  Do

3    you agree or disagree with that statement?

4    A.    I agree with that statement.

5    Q.    And why is that?

6    A.    Because -- and all wire requests we received or we

7    created -- I'm saying 99 percent, maybe 1 percent was

8    from Fred Sharp, but the 99 percent came from Yvonne,

9    and so that's how she communicated to us.  And also I

10   would have clients, um -- when I spoke with Fred Sharp's

11   clients directly, they would ask "Has Yvonne or has

12   Wires -- you know have you received a request for

13   $50,000 from, you know, from Wires?"  So -- and they

14   would say "I sent it to her yesterday, 3 days ago, 5

15   days ago."  And so they sent the message -- they sent

16   the request to Wires, and Wires sent the request to me.

17   Q.    And how important were wires to this business?

18         MS. PICKETT:  Objection, your Honor.

19         THE COURT:  Well, um, on that foundation, um --

20   yeah, how important is too vague.

21         MS. SHIELDS:  All right, I'll ask a more specific

22   question.

23         THE COURT:  All right.

24   Q.    In the business that you did with Mr. Sharp and

25   his clients, um, what were the main components of that

A2843

```
 1   business?
 2   A.    Um, the main components is moving -- the simple
 3   question is moving shares offshore to sell, and once
 4   those shares are sold, moving the money back on shore.
 5   Q.    So the aspect of that business that was moving the
 6   money back on the shore, how important was that to the
 7   business?
 8         THE COURT:  Well how was that -- well let me ask
 9   it.
10         How was that handled, moving the money back on
11   shore, back to the United States?
12         THE WITNESS:  It -- it was handled, um,
13   predominantly through wire transfers.
14   Q.    And who did those wire transfers or who requested
15   the wire transfers?
16   A.    The requests came from -- from -- they were
17   prepared by Yvonne Gasarch and they were communicated by
18   the relevant offshore company nominee e-mail address.
19   Q.    So I think earlier you, um -- have you ever met
20   Ms. Gasarch in person?
21   A.    I believe just once in Vancouver.
22   Q.    And can you describe for us the circumstances of
23   that meeting?
24   A.    It was the -- I think it was the one and only time
25   I was in Fred Sharp's office, Corporate House, he
```

A2844

```
 1    subsequently closed it down due to various, um,
 2    regulator scrutiny, and I had met with Fred Sharp, um,
 3    Yvonne Gasarch, and Courtney Kelln, they were in the
 4    office when I visited.
 5    Q.    How big was the office?
 6    A.    It may have been 2,000 square feet with a
 7    reception, a meeting room, and four or five independent
 8    offices.
 9    Q.    You mentioned Courtney Kelln?
10    A.    Yes.
11    Q.    I take it you know Ms. Kelln?
12    A.    Yes, I do.
13    Q.    How do you know Ms. Kelln?
14    A.    Ms. Kelln worked with Fred Sharp for the entire
15    time I've known Fred Sharp, from 2018 to 2018.
16    Q.    And on what kinds of matters did you work with
17    Ms. Kelln?
18    A.    So there was a division of duties within Corporate
19    House and Ms. Kelln, she handled all of the -- or of a
20    majority of the stock trading, the stock share
21    certificates, the movement of shares, the breaking them
22    down into portions that were 5 percent or less.
23    Q.    And what kinds of things did she do in order to
24    break shares into blocks of 5 percent or less?
25    A.    She would, um -- she would, um -- sorry, I'm
```

A2845

1    trying to summarize it.

2         When she got a shell company, it was 100 percent

3    of stock, it may be in share-certificate form, it may be

4    80 or 100 shares, she would then add up 3 or 4 share

5    certificates, so it was below 5 percent, she would put

6    them in a FedEx envelope, and she send would send them

7    to Wintercap.

8    Q.    And when -- what was the purpose of sending them

9    to Wintercap?

10   A.    Well when we received the courier package with the

11   shares, we would usually receive a second package a day

12   or two later with what is called the "stock power" and

13   the "power of attorney," so it's a signed document, and

14   when you join the two together, then you can actually --

15   it's like cashing a check, you can cash the share

16   certificates in a bank and brokerage so they are

17   available to trade and available to sell.

18   Q.    And so when Wintercap got those packages from

19   Ms. Kelln, what did Wintercap then do with them -- or

20   Silverton?

21   A.    We would then send them to the transfer agent and

22   we would take it out of the name that we received it in,

23   maybe Morris or Quezon, and we would deposit it into

24   Silverton's name, and that would change the name into

25   Silverton.  And then we'd deposit it in a bank or

A2846

```
 1    brokerage in the name of Silverton.
 2    Q.    And why would you change it out of the name of
 3    Quezon or Morris into Silverton's name?
 4    A.    Two reasons.  One is again to provide another
 5    level of unanimity for the clients, to hide -- to hide
 6    from the bank and brokerage through the client walls.
 7    And also it allowed us -- all of our accounts were in
 8    Silverton, so we could deposit it at any -- it was
 9    fungible, we could move it from one bank to another bank
10    or brokerage without much effort.
11    Q.    Do you know a person named "Jackson Friesen"?
12    A.    Yes, I do.
13    Q.    And how do you know Mr. Friesen?
14    A.    I was introduced to Mr. Friesen, to Jackson
15    Friesen, um, by Fred Sharp.
16    Q.    And when was that?
17    A.    That was, I believe, in the fall of 2013 in Geneva
18    and Switzerland.
19    Q.    And let's talk just about that meeting right now.
20    How did it happen that you met Mr. Friesen in 2013 in
21    Switzerland?
22    A.    So by that time I had been operating -- I had
23    established and had been operating Silverton for
24    approximately 6 months and, um, on a daily basis, um,
25    our communication tended to be electronic, Mr. Sharp was
```

A2847

```
 1   traveling to Europe, which he did once a year, and
 2   traveling with him on the trip was, um, Jackson Friesen,
 3   Mike Veldhuis, and Courtney Kelln.
 4   Q.    And did you meet with the group of all of those
 5   people together?
 6   A.    Yes, I did, we met in the hotel for drinks and
 7   then we went out for dinner and then went out for drinks
 8   afterwards.
 9   Q.    And what did you discuss at that meeting?
10   A.    We discussed -- it's an opportunity for -- to
11   discuss things that we would not normally put on an
12   e-mail or other communication, um, and we also
13   discussed, um -- we discussed -- every year we were
14   saying "This is the last year for penny stocks because
15   the regulations would change," moving cash, the banking
16   compliance, the compliance was increasing.  We also
17   discussed the other outlets they had, so it's from my
18   previous firm, Blacklight, to myself, to other, um,
19   venues where they were selling stock from.  You know I
20   was one of many outlets for Fred Sharp and his group.
21   Q.    So I want to sort of -- you said where "they" were
22   selling stock.  Who is the "they" in that sentence?
23         MS. FRITZ:  Objection, foundation.
24         THE COURT:  No overruled.
25   A.    Um, "they" -- actually it's two people, "they"
```

A2848

```
 1   both, um, Mike and Jackson, they sold stock, they
 2   were --
 3   Q.    So let me stop you for a second.  The judge has a
 4   rule in this courtroom about using individual first
 5   names rather than --
 6         THE COURT:  But here "they" both have the same
 7   last name, right?
 8         THE WITNESS:  No.  No, your Honor.
 9         THE COURT:  Yeah, all right.  But please use the
10   last names to identify people, Ms. Shields is right.  So
11   go ahead.
12         THE WITNESS:  Yes, your Honor.
13   A.    So "they," it covers two things.  Fred Sharp
14   provided a platform for both individuals and control
15   groups, so "they" were multiple control groups that used
16   the services of Fred Sharp.  And "they" in particular,
17   um, Friesen and Veldhuis, they worked with a third
18   person, Paul Sexton.  And Friesen, Veldhuis, and Sexton,
19   were a control group themselves.
20   Q.    How did you know that?
21   A.    Because we sat right at the table and discussed
22   it.
23   Q.    And so at that meeting what did you understand the
24   relationship between Mr. Friesen, Mr. Veldhuis, and
25   Mr. Sharp to be?
```

```
 1            MS. FRITZ:  Objection.

 2            THE COURT:  Put the question again?

 3   Q.   At that meeting, what did you understand the

 4   relationship between Mr. Friesen, Mr. Veldhuis, and

 5   Mr. Sharp to be?

 6            THE COURT:  No, sustained.

 7   Q.   At that meeting --

 8            THE COURT:  You can ask him who said what.

 9            MS. SHIELDS:  Sure.

10   Q.   At that meeting, um, do you remember what

11   Mr. Sharp said during those discussions?

12   A.   (Pause.)  I do not recall, you know, the exact

13   words.  Um --

14            THE COURT:  And you're not expected to.

15   Q.   Do you remember the substance?

16            THE COURT:  She asked you that sort of blanket

17   question.  Now you're not expected to have a transcript

18   memory, but so that the jury can better understand who

19   was doing what, um, as best you can remember, and I

20   suppose she'll ask you about the others in addition to

21   Sharp, but let's start with Sharp.

22            What do you remember Sharp saying, as best you can

23   recall?

24            THE WITNESS:  Okay.

25   A.   So my relationship, the instructions I would act
```

A2850

```
 1   upon, they had to come from either -- well they had to
 2   come from Fred Sharp --
 3           MS. FRITZ:  Objection, nonresponsive.
 4           THE COURT:  No.  No.
 5           That's what he was saying in substance?
 6           THE WITNESS:  Yes.
 7           THE COURT:  Overruled.
 8   A.     This was the first time I had met Fred Sharp where
 9   I was the principal, the owner, the finder, of
10   Silverton.  We had met before, but I was not the only
11   contracting party in that agreement.  So Fred was
12   telling me or asking me how he wanted me to run my
13   business.  And an example of this is that at Blacklight,
14   as well as charging a commission, we also charged time
15   billing.  So if I spoke to him for 30 minutes on the
16   telephone, I billed him for that.  He did not like that
17   and he said, "You can charge commission on the trades
18   and that's it."  So he was giving me directions on the
19   type of, um, how he wished to see me operating and
20   supporting his business.
21   Q.     Okay.  So what do you remember Mr. Veldhuis saying
22   during this discussion?
23   A.     So if I just go back to Mr. Sharp --
24   Q.     Uh-huh.
25   A.     -- he was also adamant that my relationship was
```

A2851

```
 1    with him, his company, Corporate House, and then the two

 2    employees he had, Yvonne Gasarch and Courtney Kelln,

 3    that's who I communicated with.  Mr. Friesen and

 4    Mr. Veldhuis were introduced -- it was clear that they

 5    were not part of the business, they were clients of Fred

 6    Sharp.

 7    Q.    And so what do you remember Mr. Veldhuis saying or

 8    contributing as part of this discussion?

 9    A.    Mr. Veldhuis?

10    Q.    Yes.

11    A.    They wanted to ensure I had outlets, and by

12    "outlets" I mean banks or brokerages, to sell shares

13    that -- that they did not have access to already.  So

14    there are hundreds if not thousands of outlets, but over

15    time people were congregating and using the same places.

16    And that -- those outlets, those banks or brokerages

17    tended to get shut down if there was a large -- a large

18    amount of stock sales.  If there was a pump-and-dump out

19    of one of those outlets, it sent up a red flag and those

20    outlets lost their ability to trade any stocks.

21    Q.    Shut down by who?

22    A.    Shut down by the SEC, or the BCSC, the British

23    Columbia Securities Commission in Canada.

24    Q.    And so that's what you remember discussing with

25    Mr. Veldhuis?
```

A2852

```
 1    A.    Yes, finding new and varied routes to market.

 2    Q.    Okay.  And what do you remember discussing with

 3    Mr. Friesen, like what did he add to this discussion?

 4    A.    Um, with Mr. Friesen, we -- to use the term

 5    "spitballing," we were talking about my competitors, the

 6    one I just lost, Blacklight, and the other competitors

 7    out there, and we were talking about the speed of

 8    execution and the speed of reporting it.  Because when a

 9    promotion is on -- when a promotion is happening, we

10    need to be very reactive on selling and passing on the

11    orders and recording if we are filled on the sell order

12    or not.

13    Q.    And so have you now told the jury what you can

14    remember about the substance of the discussions at that

15    meeting?

16    A.    There were other -- I mean as well as discussing

17    business, this was the first time I had -- you know we

18    drank some alcohol and we probably talked a lot of

19    nonsense as well.

20    Q.    Have you told the jury what you remember about the

21    substance of the business-related discussions?

22    A.    Yes, stock sales and banking -- and banking

23    outlets.

24    Q.    All right.  And so was the nature of your

25    discussions about illegal activities?
```

A2853

```
 1    A.    Yes, it was.
 2    Q.    And so after that first meeting, did you have
 3    other occasions to meet Mr. Friesen?
 4    A.    Yes, I did.
 5    Q.    About how often have you met him in person?
 6    A.    It probably averages twice a year.
 7    Q.    During what period of time?
 8    A.    I think '13, '14 and then, um, '15, '16, and '17,
 9    I would have met him more times both when I was in
10    Canada, but also he was traveling more frequently to
11    Europe.
12    Q.    And during what period of time did you do business
13    with Mr. Friesen?
14    A.    So I -- I mean going back to Mr. Sharp's
15    organization, I, um -- Mr. Sharp, although I was not
16    allowed, you know -- I was answerable only to Sharp and
17    the Corporate House, he allied his clients or some of
18    his clients to actually communicate with me directly and
19    place orders to sell stock, and to sell stock or buy
20    stock, that was all they could do, they couldn't
21    instruct wire transfers.  So to that end, when
22    Mr. Friesen would communicate, um -- again if there was
23    a deal going on, it would be several times a day, giving
24    me orders to look at the market and to sell shares.  So
25    considerably from then on once I knew who he was and
```

A2854

```
 1    there was a deal through it, then I would communicate

 2    regularly.

 3    Q.    Okay.  I want to ask you to take a look at what

 4    we've marked for identification as Exhibit PX.  (On

 5    screen.)

 6    A.    (Looks.)

 7    Q.    And do you see that on your screen?

 8    A.    Yes, I do.

 9    Q.    And do you recognize this?

10    A.    Yes, I do.

11    Q.    And what is it?

12    A.    It is a photograph of myself on the right and

13    Jackson Friesen on the left, and we are enjoying a

14    fondue in Chamonix in France.

15         MS. SHIELDS:  I move the admission of Exhibit PX

16    into evidence.

17         MS. FRITZ:  No objection.

18         THE COURT:  It may be received, Exhibit --

19         MS. SHIELDS:  Exhibit 283, I believe.

20         THE COURT:  Exhibit 283.

21         (Exhibit 283, marked.)

22         MS. SHIELDS:  May it be published to the jury?

23         THE COURT:  It may be.

24         (On screen.)

25    Q.    Mr. Knox, when was this photograph taken?
```

```
 1    A.    Close to January 2018.
 2    Q.    And what were the circumstances of you dining with
 3    Mr. Friesen on that day?
 4    A.    Mr. Friesen was traveling alone at the time from
 5    Canada, he had a girlfriend who was studying in Italy,
 6    so he had flown into Switzerland, um, and was on route
 7    to Italy, which is, you know, often going through
 8    France, and I believe he stopped, you know, to catch up,
 9    um, to talk about business and pleasure.  And I believe
10    he collected some cash, which is a common occurrence for
11    clients to do if they were in-country.
12    Q.    And when you say he "collected cash," what do you
13    mean by that?
14    A.    Well --
15    Q.    Cash from whom and how?
16          MS. FRITZ:  Objection, your Honor, sounds like
17    speculation.
18          THE COURT:  No, no, he may answer it, if he knows.
19          THE WITNESS:  Yes.
20    A.    Well going back, part of the difficulty of this
21    business is half of it is selling the stock and half of
22    it is getting, you know, using the money or getting the
23    money.  So if you have a lot of money sitting in
24    Switzerland and you happened to be passing through
25    Switzerland, then it's very convenient to ask your --
```

A2856

```
 1    ask me, um, "Can I have 5,000 euros in cash and 5,000
 2    Swiss Francs or more or less?"  And I will debit his
 3    account with Wintercap and I will give him the cash, and
 4    he will enjoy his holiday and he'll be able to spend
 5    this money without any records or no credit card or
 6    debit card.
 7    Q.    Did that happen?
 8    A.    Yes, it did.
 9    Q.    How many times did that happen?
10    A.    Um, every time -- every time a client comes to
11    Switzerland or to Geneva, they -- you know it's much
12    easier for them to ask -- it might be a $1,000 or 1,000
13    euros or it might be $10,000 or it could be 100,000.
14    Q.    And specifically with Mr. Friesen, do you remember
15    how many times you gave him cash?
16    A.    I believe three times.
17    Q.    So we talked a little bit about Mr. Veldhuis, but
18    I want to ask you a couple more details about
19    Mr. Veldhuis.
20          So when did you first -- do you know Mike
21    Veldhuis?
22    A.    Yes, I do.
23    Q.    And when did you first meet him?
24    A.    I recall it was the same time in the mid fall of
25    2013 with Friesen and Sharp and Kelln.
```

A2857

```
 1    Q.    And so after that first meeting, did you then

 2    develop a business relationship with Mr. Veldhuis?

 3    A.    Yes, I did.

 4    Q.    How long did that business relationship last?

 5    A.    That lasted from 2013 through my arrest in 2018.

 6    Q.    And as part of that business relationship, did you

 7    interact with Mr. Veldhuis?

 8    A.    Yes, I did, we communicated.  Again, if it was --

 9    there was a deal ongoing, then we were communicating

10    daily.  If there was -- if between those periods, then

11    maybe it was only once per week.

12    Q.    And on what kinds of topics did you communicate

13    with Mr. Veldhuis?

14    A.    So it was -- there was overlap with Mr. Friesen in

15    regard to trading orders to predominantly sell shares.

16    Veldhuis, um, would also chase up and chase me up as

17    regarding wire transfers specifically to pay for

18    promotions.  So when a deal is happening, we're selling

19    shares, to get the money that was created from the

20    shares, sending it like to a promoter to keep the

21    promotion running.

22    Q.    And do you know an individual named Paul Sexton?

23    A.    Yes, I do.

24    Q.    And how do you know Mr. Sexton?

25    A.    Paul Sexton was part of the Friesen, Veldhuis,
```

A2858

1    Sexton, control group.

2    Q.    How do you know that?

3    A.    Because I was told by them, um -- because I was

4    told by them.  There's three of us.  And Mr. Sharp

5    confirmed it because we would discuss -- just Sharp and

6    I would discuss some of his clients, and I met Paul

7    Sexton on at least two occasions.

8    Q.    And where did you meet Mr. Sexton when you met him

9    in person?

10   A.    The -- the first time I recall I had met him in

11   Geneva when -- it was an annual pilgrimage to Europe

12   with Sharp, Kelln, Veldhuis, Friesen, and Sexton.  And

13   the most recent time was one week before I was arrested,

14   when I had lunch with Veldhuis and Sexton in Vancouver,

15   Canada.

16   Q.    So let's take that in reverse order.  Then when

17   you met with Veldhuis and Sexton shortly before your

18   arrest, what did you talk to them about there?

19   A.    Their main concern was the, I believe, ongoing

20   investigation by the SEC into a ticker called "VBIO,"

21   "Vitality Biopharma."

22   Q.    And so what did you talk about at that meeting?

23   A.    The things that were concerning them is have you

24   received any, um -- "Have you been approached?"  "Has

25   Wintercap or you been approached by law enforcement or

A2859

```
 1    regulators?"  Which we had not.  Had we -- "Have any of
 2    your brokerages, which had been selling the stock, to
 3    your knowledge been approached by law enforcement and
 4    who has requested any further details on the underlying
 5    clients?"
 6          They also were, um, adamant that I shouldn't
 7    visit -- me personally shouldn't visit the U.S.  So this
 8    was in the Autumn of '18, the fall of '18, and I had
 9    been in the United States in the fall of 2017 and the
10    Spring of 2018, and they suggested that I do not visit
11    the United States.
12    Q.    And why was that?
13    A.    Again they were concerned because of the knowledge
14    I knew about VBIO, about the control group, and the
15    ongoing investigation into VBIO.
16    Q.    And so --
17          THE COURT:  Who -- this is my fault, but I want to
18    be clear.
19          Who was present during this conversation?
20          THE WITNESS:  That conversation was Veldhuis,
21    Sexton, and myself.
22          THE COURT:  Thank you.
23    Q.    And you said that, your "knowledge about the VBIO
24    control group."  Who was the VBIO control group?
25          MS. FRITZ:  Objection.
```

```
 1          THE COURT:  Overruled.  You may answer.
 2          THE WITNESS:  Thank you.
 3    A.    It was the control group of Friesen, Veldhuis, and
 4    Sexton.
 5    Q.    And how did you know that the control group was
 6    all three of those people working together?
 7    A.    Because several -- so Friesen told me.  Veldhuis
 8    told me.  And Fred Sharp told me.
 9    Q.    So I want to go back now.  You said you also --
10    you met Mr. Sexton that one time shortly before your
11    arrest.  You said you also met him in Switzerland.  So
12    I'd like for you to describe please for the jury what
13    you remember about meeting him that time in Switzerland.
14    Let's start with who was there?
15    A.    On that trip my colleague was with me from
16    Switzerland, Richard Target Adams.  Fred Sharp was
17    there.  Courtney Kelln was there.  Mike Veldhuis was
18    there.  Jackson Friesen was there.  And Paul Sexton was
19    there.
20    Q.    And so this group of you, did you all meet
21    together?
22    A.    Yes, they -- that group were traveling together,
23    um, and we met for predinner drinks, a good dinner, and
24    an evening of entertainment.
25    Q.    So in addition to the entertainment, was there a
```

A2861

```
 1   business component to that meeting?
 2   A.    Yes, as always, the opportunity to speak, discuss
 3   things unfiltered.  We were talking about deals, um,
 4   stock deals, deals through outlets, so banks and
 5   brokerages, wire transfers, compliance issues, um --
 6   because we're sitting around a table, we can get -- it's
 7   a very easy medium to discuss the plan, to reflect on
 8   the business to date and the business going forward.
 9   Q.    Do you remember any of the particular deals that
10   were discussed as part of that meeting?
11   A.    Um, just VBIO was one of the -- one of the main
12   deals, um, and in and around that area was, um, Rihts
13   Corp, which is R-I-H-T.  It was Arch Therapeutics,
14   A-R-C-H.  Um, there was Start Monday, which is "JOB."
15   Um, and when we were --
16   Q.    Are those the ticker symbols?
17   A.    Yes, we deal with the tickers, it's easier, it's
18   how we reconcile and how we record everything.
19         THE COURT:  Is this a good place to stop?
20         MS. SHIELDS:  Oh, yes, your Honor.
21         THE COURT:  All right, we'll stop taking testimony
22   at this time.
23         You may step down, sir.
24         (Steps down.)
25         THE COURT:  As you know, tomorrow we'll sit for 2
```

A2862

1     straight hours, but you have the rest of the day after

2     11:00 to yourself.  There's been some questions about

3     whether my obligations would preclude us from sitting

4     any day other than the religious holiday on Monday, and

5     they do not, so we will -- and we are moving right along

6     here.  So we will sit till 11:00 tomorrow, from 9:00

7     till 1:00 the rest of the week.  Next week, Monday's a

8     religious holiday, so the case will be done that week.

9     They'll be sufficient time for the case.  But we're

10    still in the middle of it.

11          So keep your minds suspended, do not discuss the

12    case either among yourselves nor with anyone else.

13    We'll start promptly at 9:00 a.m. tomorrow morning.

14          THE CLERK:  All rise for the jury.

15          THE COURT:  The jury may recess.  I'll remain on

16    the bench.

17          (Jury leaves, 1:00 p.m.)

18          THE COURT:  Please be seated.

19          Out of the 5 1/2 days available to each side, the

20    Commission has used up 3 days and the defendants have

21    used up 2 days.  We'll stand in recess until 9:00

22    tomorrow morning.

23          We'll recess.

24          THE CLERK:  All rise.

25          (Adjourned, 1:00 p.m.)

A2863

```
 1              C E R T I F I C A T E

 2

 3

 4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 5    do hereby certify that the foregoing record is a true

 6    and accurate transcription of my stenographic notes

 7    before Judge William G. Young, on Tuesday, September 19,

 8    2023, to the best of my skill and ability.

 9

10

11

12
      /s/ Richard H. Romanow 1-23-24
13    _____
      RICHARD H. ROMANOW    Date
14

15

16

17

18

19

20

21

22

23

24

25
```

A2864

```
 1                    UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS (Boston)

 3                              No. 1:21-cv-11276-WGY

 4

 5   SECURITIES and EXCHANGE COMMISSION,
               Plaintiff

 6

 7   vs.

 8

 9   FREDERICK L. SHARP, et al,
               Defendants

10

11                        *********

12

13

                    For Jury Trial Before:
14                  Judge William G. Young

15

16

                    United States District Court
17                  District of Massachusetts (Boston)
                    One Courthouse Way
18                  Boston, Massachusetts 02210
                    Wednesday, September 20, 2023

19

20                        ********

21

22             REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
23                  United States District Court
           One Courthouse Way, Room 5510, Boston, MA 02210
24                    rhrbulldog@aol.com

25
```

A2865

```
1                    A P P E A R A N C E S

2

3    KATHLEEN BURDETTE SHIELDS, ESQ.
     ALFRED A. DAY, ESQ.
4    DAVID H. LONDON, ESQ.
     NITA KUMARASWAMI KLUNDER, ESQ.
5       Securities and Exchange Commission - MA
        33 Arch Street, 24th Floor
6       Boston, MA 02110
        (617) 573-8904
7       Email: Shieldska@sec.gov
        For Plaintiff
8

9    KAREN A. PICKETT, ESQ.
        Pickett Law Offices, P.C.
10      125 High Street, 26th Floor
        Boston, MA 02110
11      (617) 423-0485
        Email: Kpickettlaw@gmail.com
12      For Defendant Zhiying Yvonne Gasarch

13

14   MIRANDA E. FRITZ, ESQ.
     TIMOTHY J. FAZIO, ESQ.
15      Manning Gross Massenburg
        125 High Street
16      Oliver Street Tower, 6th Floor
        Boston, MA 02110
17      (617) 670-8800
        Email: Tfazio@mgmlaw.com
18      For Defendant Jackson T. Friesen

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2

 3   WITNESS               DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   ROGER J. KNOX  (Continued.)

 6     By Ms. Shields:        4

 7     By Ms. Fritz:

 8     By Ms. Picket:              58

 9

10

11                     E X H I B I T S

12
        EXHIBIT 284 ...........................  13
13
        EXHIBIT 285 ...........................  16
14
        EXHIBIT 286...........................  31
15
        EXHIBIT 287 ...........................  35
16
        EXHIBIT 288 ...........................  39
17
        EXHIBIT 289 ...........................  44
18
        EXHIBIT 290...........................  55
19

20

21

22

23

24

25
```

A2867

```
 1          P R O C E E D I N G S
 2          (Jury enters, 9:15 a.m.)
 3          THE COURT:  Well, good morning, ladies and
 4     gentlemen, and believe me I say this with most
 5     sincerity, thank you for setting this tone for this
 6     trial.  We're all ready to go.
 7          And if you'd remind the witness.
 8          THE CLERK:  I'd like to remind you, sir, that
 9     you're still under oath.
10          Do you understand?
11          THE WITNESS:  Yes.
12          THE COURT:  And, Ms. Shields, you may continue.
13          MS. SHIELDS:  Thank you, your Honor.
14
15     DIRECT EXAMINATION BY MS. SHIELDS:  (Continued.)
16     Q.    Good morning, Mr. Knox.
17     A.    Good morning.
18     Q.    So when we left off yesterday, we were discussing
19     a meeting in Geneva that took place in person.  Can you
20     remind the jury of who was present for that meeting?
21     A.    Yes.  Fred Sharp.  Jackson Friesen.  Mike
22     Veldhuis.  Courtney Kelln.  And Paul Sexton.  And my
23     colleague, Richard Target Addams.
24     Q.    And so we left off describing some of the deals
25     that you were discussing during that meeting.  Were
```

```
 1    there any other topics, in addition to what you
 2    testified yesterday to, that you remember discussing
 3    during the business portion of that meeting?
 4    A.    Well just to recap, we --
 5          MS. FRITZ:  Objection, your Honor.
 6          THE COURT:  Well the question, um, put it again?
 7    Q.    Other than what we talked about yesterday, do you
 8    remember any other topic that was discussed during the
 9    business portion of that meeting?
10          THE COURT:  And you can answer that "Yes" or "No."
11    A.    No.
12    Q.    Did Mr. Friesen participate in the business-
13    discussion portion of that meeting?
14    A.    Yes, he did.
15          MS. FRITZ:  Objection, your Honor.
16          THE COURT:  The objection is sustained.  You're
17    leading the witness.
18    Q.    Who participated in the business-discussion
19    portion of that meeting?
20    A.    Everyone other than Mr. Sexton, he joined later in
21    the evening.
22    Q.    Okay.  Did you ever have any communications with
23    Mr. Friesen or Mr. Veldhuis or Mr. Sexton about the
24    relationship between the three of them?
25          MS. FRITZ:  Objection.
```

A2869

```
 1          THE COURT:  Sustained.  You may ask him what was
 2      said in the meeting.
 3          MS. SHIELDS:  Well I was just asking if they had
 4      discussion on that topic and then if he said "Yes" --
 5          THE COURT:  Fine, but you're leading him.  Let's
 6      find out what he remembers.
 7          MS. SHIELDS:  All right.
 8      Q.   Were there discussions at any point in time with
 9      any of Friesen, Sexton, or Veldhuis, about the
10      relationship?
11          MS. FRITZ:  Objection.
12          THE COURT:  She may have that.
13          You may answer.
14      A.   So just are you talking about that evening or at
15      other periods of time?
16      Q.   At any period in time.
17      A.   Yes, there were -- there were verbal discussions
18      during several other meetings about the relationship.
19      Q.   Okay.  So with whom did you have those
20      discussions?
21      A.   I had those discussions with Friesen, Veldhuis,
22      and Sharp.
23      Q.   Okay.  So let's talk first about the discussions
24      you remember with Mr. Friesen.  What do you remember
25      about those discussions -- about the nature of their
```

```
 1    relationship?
 2         THE COURT:  I take it that she's asking you what
 3    did he say in that regard, Mr. Friesen.
 4    A.    That they were business partners.  My -- that he
 5    did not operate alone, he was -- you know his business
 6    partners were Sexton and Veldhuis.  Those were his
 7    business partners.  He did not mention anyone else and
 8    he did not say "I operate alone."
 9    Q.    Okay.  What do you remember, what did Mr. Veldhuis
10    say to you about the relationship between the three of
11    them?
12    A.    Mr. Veldhuis, initially when I had -- the first
13    few years he had said that he worked with Friesen and
14    Sexton, the three of them.  I believe in 2017, on one or
15    two specific deals, he said that "Mr. Friesen was not
16    part of the deal, so I would be receiving trading
17    orders, trading instructions from Veldhuis, not from
18    Friesen."
19    Q.    And you also said you mentioned -- what did you
20    talk -- what did Mr. Sharp tell you about the
21    relationship between the three of them?
22    A.    Mr. Sharp just confirmed that that was a group,
23    that was one of the groups in his client base.
24    Q.    And based on your discussions, did the
25    relationship between Sexton, Veldhuis, and Friesen,
```

```
 1   change at any point in time?

 2   A.    Bar the part that the one or two deals that

 3   Friesen was part of -- I'm sorry, was not part of,

 4   though they were friendly between each other, friendly,

 5   amicable from the day I met them in 2013 till the last

 6   time I met them in September of 2018.

 7   Q.    And at any point in time did any of them stop

 8   being Silverton clients?

 9   A.    No, they did not.

10   Q.    Okay.  You testified yesterday that Silverton held

11   shares in accounts of nominee companies, do you remember

12   that?

13   A.    Yes, I remember.

14   Q.    So what were the names of those companies?

15   A.    There were quite a few and some changed over time.

16   There was Peaceful Lion.  Quezon.  Morris Capital.

17   Laramee.  Varese.  Santos Torres.  Hilton.  Um, I can't

18   recall -- there were more, but I can't recall them.

19   Q.    All right.  And so when you were managing shares

20   in that names of those companies, who were the people

21   you were really dealing with?

22         MS. FRITZ:  Objection, foundation.

23         THE COURT:  Overruled.

24   Q.    You can answer the question.

25   A.    Sorry, just to clarify.  The people I was dealing
```

A2872

```
 1    with who I was receiving the instructions from?
 2    Q.    Sure.  When you held shares for one of those
 3    nominees -- and let's just pick, um, pick one.
 4    A.    Quezon.
 5    Q.    Okay, so when you held shares for Quezon, who did
 6    you interact -- what human beings did you interact with
 7    when you were dealing for Quezon?
 8         MS. FRITZ:  Objection.
 9         THE COURT:  Overruled.
10    A.    For Quezon, I would interact with Sharp, Gasarch,
11    Kelln, and for certain stocks, Veldhuis, Friesen.
12    Q.    And who gave you trading instructions when you
13    traded for Quezon?
14    A.    Either Sharp, Veldhuis, or Friesen, or perhaps one
15    of Sharp's other clients.
16    Q.    And on paper, for all of those nominees, who owned
17    the nominees like Quezon and all of those entities?
18    A.    Well Fred Sharp controlled the nominees.
19    Q.    And was there a person on paper who was called the
20    ultimate beneficial owner?
21         MS. PICKETT:  Objection.
22         MS. FRITZ:  Objection.
23         THE COURT:  Yeah, sustained on the ground that the
24    document speaks for itself, if there are such documents.
25    You're asking what is the paper evidence, and the paper
```

A2873

```
 1   evidence either has to be here or explained.
 2        Go ahead.
 3   Q.   Okay, can you explain to the jury please on how
 4   the ownership of those nominee companies was papered?
 5   A.   Yes.  Mr. Sharp provided an individual to be a
 6   nominee beneficial owner for each of the offshore
 7   companies.  I did not -- I did not meet them all.  I
 8   believe I met two.  So I had not met a lot of them.  I
 9   did not communicate with them.  And I do not believe --
10   well, sorry, it's not I don't believe, we did not remit
11   a -- sorry.  We only remitted, so we only sent them, if
12   at all, a very small amount of the dollar proceeds of
13   the dollars in the account.
14   Q.   Are you familiar with an entity named "Peaceful
15   Lion Holdings"?
16   A.   Yes, I am.
17   Q.   And what was that?
18   A.   "Peaceful Lion" was a bank account that had
19   already been established at Saint Galler Kantonalbank in
20   Zurich, Switzerland.
21   Q.   And who was the owner of Peaceful Lion on paper?
22   A.   The beneficial owner was Yvonne Gasarch.
23   Q.   And how did you know that?
24   A.   Because I received the -- her passport, signed
25   account opening documents, and the certificate of good
```

```
 1    standing and incorporation for Peaceful Lion where she

 2    was named.

 3    Q.    Okay.  I'd like to show you -- I'd like to show

 4    you what we've marked for identification as Exhibit HI.

 5    A.    (On screen.)  Okay.

 6    Q.    Do you recognize this document?

 7    A.    Yes, I do.

 8    Q.    What is it?

 9    A.    It is a Trust Form A which Silverton prepared for

10    each company to show or to demonstrate with clarity who

11    the ultimate beneficial owner was of that company and we

12    requested the ultimate beneficial owner to sign and

13    acknowledge the link between the company and the

14    individual.

15         MS. SHIELDS:  I move the admission of Exhibit HI

16    into evidence.

17         THE COURT:  No objection?

18         MS. PICKETT:  Objection, your Honor.  Could we be

19    heard at sidebar just briefly, your Honor.

20         THE COURT:  You may.

21

22         AT THE SIDEBAR

23         MS. PICKETT:  Your Honor, this is the certificate

24    and it purports to be signed by my client.  But based on

25    the evidence yesterday, we only know that Ms. Gasarch
```

A2875

```
 1    was signing documents for these so-called "beneficial
 2    owners."  I'm concerned about the authenticity of this.
 3         THE COURT:  You may be concerned, but the Federal
 4    rules deal with that.
 5         When you get a document which purports to be
 6    signed, that's sufficient authentication unless we have
 7    some real evidence that suggests that -- well the burden
 8    of proof is not on you, but that's -- but it goes to the
 9    weight.
10         Overruled.
11         MS. PICKETT:  Thank you.
12         THE COURT:  Here, I've got this motion now that
13    the government -- the Commission has come up with, and
14    to save time, I am persuaded that on a proper
15    foundation, the government can get in -- of course
16    you're talking about this even after the filing of the
17    pretrial memorandum, QK and QR, and not RL, which seems
18    to be some after-acquired document that you think you
19    would now like to use.  And, um, there are so many
20    documents that the burden does unfairly fall on the
21    defense, so that's excluded.
22         All right.
23         MS. FRITZ:  I just have a question regarding this,
24    and this is a good example.  It's a document that's
25    being offered not for its truth, not to show she ever
```

A2876

```
 1    signed it, but simply because she received and used it
 2    in court?
 3         THE COURT:  Well I don't --
 4         MS. SHIELDS:  I think he can say this was my
 5    truthful record that established in my mind that Yvonne
 6    Gasarch was the beneficial owner.
 7         THE COURT:  It can be argued.  The document is
 8    sufficiently authentic and relevant that I'm going to
 9    allow it to be admitted.  It's also arguably a business
10    record, because this is the typical type of document
11    that's necessary, if it were truthful, to the evidence
12    of the paper record of who owned what.
13
14         (In open court.)
15         THE COURT:  HI is admitted in evidence as Exhibit
16    --
17         MS. SHIELDS:  284.
18         THE COURT:  284.  It's in evidence.
19         (Exhibit 284, marked.)
20    Q.   So, Mr. Knox, um, what is the nominee company to
21    which this form relates?
22    A.   Sorry, it's not on my screen at the present.
23    Q.   Oh, okay.  (Pause.)   (On screen.)
24         THE COURT:  All right.
25    Q.   So what company does this form relate?
```

```
 1          THE COURT:  Well I think she's asking you to read
 2    from it.  I don't know that it needs interpretation.
 3    What does it say?  It's in evidence.
 4    A.    Peregrine Capital Corp.
 5    Q.    And what's the relationship, if any, between
 6    Peregrine Capital Corp. and Peaceful Lion Holdings?
 7    A.    "Peaceful Lion Holdings" changed its name to
 8    "Peregrine Capital Corp."
 9    Q.    And who does this document say is the beneficial
10    owner of Peregrine Capital?
11    A.    Zhying Chen.
12    Q.    And is there a connection between Zhying Chen and
13    Yvonne Gasarch?
14    A.    Yes, they are one and the same.  I believe this is
15    her maiden name.
16    Q.    And if you look down at the bottom of the
17    document, who signed it?
18    A.    "Yvonne Gasarch."
19          THE COURT:  Well given the discussion at the
20    sidebar, the signature that appears there is "Yvonne
21    Gasarch," isn't that correct?
22          THE WITNESS:  That is correct.
23          THE COURT:  Now you were asked a slightly
24    different question, you were asked who signed it?  Are
25    you familiar with the signature of Ms. Gasarch so that
```

1    you're able to say that it was she who signed it?

2         THE WITNESS:  Your Honor, I would have to check.

3    As I have said before, we had PDF copies of signatures

4    for all of Sharp's clients.  The documents that were

5    sent were in PDF format.  So in fact this -- this

6    document could have been created and signed by ourselves

7    or by someone at Corporate House, i.e. Fred Sharp,

8    Sharp, Kelln, or Gasarch.

9         THE COURT:  Thank you.

10   Q.    Did you communicate with Ms. Gasarch about

11   Peaceful Lion or Peregrine at any time?

12   A.    The communications would have been on the Peaceful

13   Lion or Peregrine e-mail address, which was accessible

14   by Gasarch, Sharp, and Kelln.

15   Q.    Okay.  I'm going to ask you to look next at what

16   we've marked for identification as Exhibit FO.

17   A.    (Looks.)

18   Q.    Do you recognize this document, Mr. Knox?

19   A.    Yes, I do.

20   Q.    What is it?

21   A.    It is a bank advance from Saint Galler

22   Kantonalbank in Zurich, Switzerland.

23   Q.    And to whom was this sent?

24   A.    Can you repeat the question?

25   Q.    To whom was this sent?

```
1    A.    It was sent to myself, "Roger Knox, care of
2    Silverton SA."
3          MS. SHIELDS:  I move the admission of Exhibit FO.
4          THE COURT:  No objection?
5          (Silence.)
6          THE COURT:  FO is admitted, Exhibit 285.
7          (Exhibit 285, marked.)
8    Q.    So why was Exhibit 285 sent to Silverton?
9    A.    Silverton was the asset manager for the Peaceful
10   Lion Holdings Limited account at Saint Galler,
11   Kantonalbank.
12   Q.    And what is this document -- what payment does
13   this document refer to?
14   A.    This payment is a debit advance in favor of
15   Dr. James Kustin for the payment of an international
16   invoice for Courtney Kelln.  The value date is July
17   2014.  And the amount is, in United States dollars,
18   $13,950.
19   Q.    And do you understand why Peaceful Lion's account
20   was being used to pay Courtney Kelln's doctor bills?
21         MS. PICKETT:  Objection, your Honor.
22         THE COURT:  In that form I'm going to sustain it.
23   You may ask "What was your understanding?"
24         MS. SHIELDS:  Okay.
25   Q.    What was your understanding about why this payment
```

1    was made from the Peaceful Lion account?

2    A.    The Peaceful Lion account was used to make

3    multiple payments to various individuals and entities,

4    so this was no different.

5    Q.    When you say "various entities and individuals,"

6    could you be more specific, what kinds of entities and

7    individuals?

8    A.    The entities and individuals were -- they were

9    remitting funds from stock sales, which would have been

10   hundreds of thousands if not millions of dollars, and we

11   would send that money to, um, it may be to a law firm,

12   it may be to a public company itself, it may be to a

13   media or marketing company for promotion, it may be to,

14   um -- quite frequently we sent them to BC-limited

15   companies, so it's a British Columbia-numbered company.

16   And we also would send them to individuals, you know,

17   such as, um, a doctor, a school bill, an automotive, a

18   car dealership.  So it was a variety, a -- you know it

19   was not a small amount, it was to various, whoever I was

20   asked to send it to, we checked it, did our due

21   diligence, and we sent the wire.

22   Q.    And on whose behalf were those payments sent?

23        THE COURT:  I don't understand the question, "On

24   whose behalf were those payments sent?"  Are you asking

25   who directed the payments or are you asking on whose

```
 1    behalf did the payment benefit?
 2         MS. SHIELDS:  Yeah, I think there are two
 3    questions there.
 4         THE COURT:  So do I.
 5         Go ahead.
 6    Q.   So first, who directed the payments?
 7    A.   For the majority, the payments came from "Wires,"
 8    Yvonne Gasarch.
 9    Q.   And then the second part is, who benefitted from
10    those payments?
11    A.   Who benefitted?  The benefit would have been -- it
12    could have been one of the employees of Capital --
13    Capital House, Sharp, Gasarch, or Kelln, but more often
14    it was the individuals, members of the control group,
15    who were not named, which I had no documents for.  It
16    was the hidden individuals, the true beneficial owners
17    of the stock, that were hiding their funds behind
18    Peaceful Lion and behind a nominee beneficial owner.
19    Q.   And according to this Document 285, what was the
20    balance in Peaceful Lion's bank account after this
21    payment was made?
22    A.   It was U.S. dollars, $1,805,841.46 cents.
23    Q.   Okay.  Are you familiar, sir, with an entity named
24    "Victory Capital"?
25    A.   Yes, I am.
```

```
 1   Q.    And what is "Victory Capital"?

 2   A.    "Victory Capital" is an account I maintained at VP

 3   Bank in Zurich, Switzerland.

 4   Q.    And how did you use Victory Capital?

 5   A.    Initially it was used to receive commissions when

 6   I was at Blacklight SA.

 7   Q.    Did you use it at any time later to trade stock?

 8   A.    Yes, I used it during the transition period when I

 9   left Blacklight and before Silverton was incorporated

10   and, um, had accounts open and was an active business

11   entity.

12   Q.    Do you remember any of the stocks that you traded

13   through Victory Capital?

14   A.    I only traded a handful of stocks, I believe, ARTH

15   and I can't recall -- I can't recall the other ones.

16   Q.    What company is "ARTH"?

17   A.    Arch Therapeutics.

18   Q.    And you talked yesterday about the accounts, the

19   brokerage accounts where Silverton traded shares?

20   A.    Yes.

21   Q.    Where were those accounts located?

22   A.    They were located in Switzerland, the United

23   Kingdom, Mauritius, Malta, United Arab Emirates, Canada,

24   the United States, and I think that is it.

25   Q.    Switching topics now, Mr. Knox.
```

```
 1          Did you have an Xphone?
 2   A.    Yes, I did.
 3   Q.    And during what period of time?
 4   A.    From 2011 until approximately 2016, 2017.
 5   Q.    And what was the reason you used an Xphone?
 6   A.    The Xphone was -- well, it was security, that was
 7   the reasoning.
 8   Q.    Why was security important to you?
 9   A.    Because we were part of an enterprise, an illegal
10   enterprise and we did not want our communications to be
11   intercepted or read by anyone else.
12   Q.    I'm going to show you what's already in evidence
13   as Exhibit 126, it was previously EE.
14   A.    (On screen.)
15   Q.    So who are the -- do you have that in front of
16   you?
17   A.    Yes, I do.
18   Q.    Who are the participants in this communication?
19          MS. FRITZ:  Objection.
20          THE COURT:  Well you're asking who the document
21   indicates?
22          MS. FRITZ:  Correct.
23          THE COURT:  In that form, since we're looking at a
24   record, he can tell us who he understands that record to
25   reflect.
```

A2884

```
1   Q.    Who do you understand the participants in this
2   communication to be?
3   A.    It is from "Gard," G-A-R-D, and that was the user
4   name of Jackson Friesen, and it is to "Kash," which was
5   the user name of one of the traders employed by Fred
6   Sharp.
7   Q.    And would you read the substance of the message to
8   the jury please.
9         MS. PICKETT:  Objection.
10        THE COURT:  It's in evidence, he may read it.
11  A.    "Sell 10k Riht at 0.67."
12  Q.    What is "riht"?
13  A.    It is a public company, "Rihtscorp, Inc.," I
14  believe.
15  Q.    And what if any involvement did Silverton have
16  with Rihtscorp?
17  A.    We sold -- we traded that on behalf of Fred
18  Sharp's clients.
19  Q.    And which of Fred Sharp's clients?
20  A.    I would believe we traded on behalf of, um --
21  sorry, multiple clients.
22  Q.    And who were some of the those clients?
23  A.    Sorry.  The nominee companies or the --
24  Q.    The actual people.
25  A.    It was the control group of Friesen, Veldhuis, and
```

```
1    Sexton.

2    Q.    And did you communicate, via Xphone, with "Kash,"

3    one of the traders?

4    A.    Yes, I did.

5    Q.    And when you got -- and for what purpose did you

6    communicate with him?

7    A.    For receiving orders -- for Kash receiving orders

8    and giving him reports if we had sold or not sold the

9    stock.

10   Q.    I'm next going to show you what's in evidence as

11   Exhibit 154, previously FM.

12   A.    (Looks.)

13   Q.    Mr. Knox, according to Exhibit 154, who were the

14   participants in this communication?

15   A.    It's from "Gard," which was Jackson Friesen, to

16   "Kash," the trader for Fred Sharp, "cc ACCO," which was

17   the user name of Mike Veldhuis.

18   Q.    And would you read for the jury please the first

19   two lines of the message.

20   A.    "Sell 100k M triple D at 0.15 limit.  Sell 25k

21   STVF at 0.37 limit."

22   Q.    And what is "MDDD"?

23   A.    It is "Makism 3D," which is -- which is a public

24   company.

25   Q.    And what if any involvement did Silverton have
```

```
 1    with that public company?

 2    A.    We traded on behalf of clients of the Sharp group.

 3    Q.    And which clients in particular?

 4    A.    The control group of Friesen, Veldhuis, and

 5    Sexton.

 6    Q.    And what is, in the second line, "STVF"?

 7    A.    That is "Stevia First."

 8    Q.    And what's "Stevia First"?

 9    A.    It is a public company, a small cap U.S. listed

10    public company.

11    Q.    And what if any involvement did Silverton have

12    with Stevia First?

13    A.    We traded it on behalf of Fred Sharp, the clients

14    of Fred Sharp.

15    Q.    And which clients in particular?

16    A.    The control group of Sexton, Veldhuis, and

17    Friesen.

18    Q.    Okay, I'm showing you next what's in evidence as

19    Exhibit 140, it was previously EZ.  (On screen.)

20    A.    (Looks.)

21    Q.    And, Mr. Knox, who are the people communicating in

22    this exhibit?

23    A.    It is from "4," Number "4," which is Mike

24    Veldhuis, and it is -- it is to the Number "2," which is

25    Jackson Friesen.
```

A2887

```
 1    Q.    And would you read the message for the jury.  You
 2    can leave out the last part.
 3    A.    "You are getting 173k today, a cut from M triple D
 4    and STVF.  Buy a boat," expletive, "rich mother,"
 5    expletive.
 6    Q.    And are those the two tickers we've just discussed
 7    in Exhibit 140?
 8    A.    Yes, they are.
 9    Q.    What if any discussions did you have with
10    Mr. Friesen about proceeds of trading he received?
11    A.    We had discussed the purchase of automobiles and
12    real estate property in and around, um, Vancouver and
13    British Columbia.
14    Q.    I'm next showing you what's in evidence as Exhibit
15    136, it was previously ER.  (On screen.)
16    A.    (Looks.)
17    Q.    Mr. Knox, I'm going to have you go down to the
18    bottom of this document and focus your attention there.
19    A.    (Scrolls.)
20    Q.    And do you see the bottom message in this
21    document, and according to this document, who was
22    communicating?
23          MS. FRITZ:  Objection.  Your Honor, may we
24    approach?
25          THE COURT:  I don't think it's necessary.  She can
```

```
 1    have the question about what the document indicates.
 2         MS. FRITZ:  The objection is this witness had
 3    nothing to do with this document and --
 4         THE COURT:  Well that's not the point, it's in
 5    evidence and you can read it.  If he can understand the
 6    notation, he may read it and tell us his understanding.
 7    Whether he -- whether there's evidence that he was the
 8    author or had anything to do with it.
 9         MS. FRITZ:  Okay.
10         THE COURT:  I'll ask a preliminary question.
11         Do you understand the notations on the document?
12         THE WITNESS:  Yes, I do, your Honor.
13         THE COURT:  So you may answer the question, what
14    does the document indicate?
15    A.    The document indicates an Xphone communication by
16    three individuals.
17    Q.    And who are those three individuals?
18    A.    Number "4," which is Mike Veldhuis.  Number "2,"
19    who is Jackson Friesen.  And I do not know who Number
20    "3" is.
21    Q.    Okay.  Would you read the substance of the
22    message, of that bottom message for the jury please.
23    A.    (Pause.)  The message states "Must have been
24    fairly good across the board for us.  STEV traded 8.7 MM
25    shares."  8.7 million shares.  "STVF traded 132,000.
```

```
 1    ECAU traded 55,000.  ARTH traded 554,000.  M Triple D
 2    traded 150,000.  RIHT traded 738,000."
 3    Q.    Okay.  So we talked already about MDDD and RIHT
 4    and STVF, but what about some of these other ones.
 5          What is "STEV"?
 6    A.    That was -- there were two different Stevia deals.
 7    "Stevia," which is a sweetener, and that was the other
 8    deal that they were running.
 9    Q.    And what if any involvement did Silverton have
10    with Stevia?
11    A.    We traded that stock on behalf of the Sharp
12    control group.
13    Q.    And which Sharp control group?
14    A.    Friesen, Sexton, and Veldhuis.
15    Q.    And what is, um, "ARTH"?
16    A.    That is Arch Therapeutics.
17    Q.    And what if any involvement did Silverton have
18    with Arch Therapeutics?
19    A.    We traded that on behalf of the control group,
20    Sexton, Veldhuis, and Friesen.
21    Q.    Okay.  And if you go to the message above the one
22    we just looked at, who sent that message?
23    A.    That was sent by Number 2, Jackson Friesen.
24    Q.    And what does that message say?
25    A.    "SFTV is amazing right now."
```

A2890

```
1   Q.    And if you go two messages up from that, who sent
2   that message?
3         THE COURT:  Well on each of these, what does the
4   document indicate --
5   Q.    What does the document indicate sent that message?
6   A.    It was sent by Number 2, Jackson Friesen.
7   Q.    And what does that message say?
8   A.    "$250,000 on a Friday, nice moves."
9   Q.    Okay.  Mr. Knox, I'm showing you what's in
10  evidence as Exhibit 256, it was previously IM.  (On
11  screen.)
12  A.    (Looks.)
13  Q.    Mr. Knox, what is this document?
14  A.    This is an e-mail to "Silverton Operations
15  e-mail."
16  Q.    And who is it from?
17  A.    It is from "Wires."
18        THE COURT:  What does the document indicate?
19  Q.    Who does the document indicate it's from?
20  A.    It indicates it's from
21  "Wires@securecuracaoxmeridian.com."
22  Q.    And who is "wires@securecuracaoxmeridian.com"?
23  A.    "Wires" is Yvonne Gasarch.
24  Q.    And if you look down at the second message on this
25  exhibit, um, who does that message come from?
```

```
 1          THE COURT:  Who does the document --
 2   Q.    Who does the document say the message comes from?
 3   A.    From Mike Veldhuis, "mike@securexmeridian.com."
 4   Q.    And what did Mr. Veldhuis ask Ms. Gasarch to do in
 5   this document?
 6   A.    "Can we please have Silverton sign the attached
 7   documents."
 8   Q.    And why did Mr. Veldhuis ask -- do you have an
 9   understanding about why Mr. Veldhuis asked Ms. Gasarch
10   to send Silverton documents rather than sending them to
11   you himself?
12   A.    Yes.
13   Q.    What is that understanding?
14   A.    Because we did not maintain any lines of
15   communication other than secure Xphone messages between
16   the ultimate owners or beneficiaries of the stock and
17   Silverton.
18   Q.    And why is that?
19   A.    Because we were operating a criminal enterprise.
20   Q.    Okay.  So if you look at the exhibits to the
21   e-mail, what are these -- what's the attachment, what
22   kind of documents are these?
23   A.    The attachment is a securities purchase agreement
24   for Stevia First.
25   Q.    And who is buying, according to this document, the
```

A2892

```
 1   shares of Stevia First?

 2   A.    It is Silverton SA.

 3   Q.    And why is Silverton -- so, first of all, did

 4   Silverton actually pay any money for these shares?

 5   A.    No, we did not.

 6   Q.    Okay.  Why is -- what's the purpose of this

 7   document?

 8   A.    The purpose of this document is to transfer the

 9   shares out of the name of a -- I do not know the initial

10   seller, if it was an individual or a company, but it was

11   to transfer the shares into Silverton's name in order

12   that we can sell the securities.

13   Q.    I'm next going to show you Exhibit 258, which was

14   previously IX.  (On screen.)

15   A.    (Looks.)

16   Q.    Who does this document say that it is from?

17   A.    It is from "Wires@securexmeridian.com."

18   Q.    And who is that?

19   A.    Yvonne Gasarch.

20   Q.    And who received this document?

21         THE COURT:  According to the document.

22   Q.    According to the document, who received the

23   document?

24   A.    It's "operations@silverton.ch."

25   Q.    And if you look at the second message down in this
```

A2893

```
 1    document, who does the document say sent that message?

 2    A.    It is from Mike Veldhuis,

 3    "mike@securexmeridian.com."

 4    Q.    And in this document, what is Mr. Veldhuis asking

 5    Ms. Gasarch to do?

 6    A.    We are transferring to --

 7    Q.    What does it say?

 8    A.    "We are transferring to you 375,000 warrants of

 9    StartMonday to Silverton SA.  Because they are still in

10    the 4-month-hold period, we will need Silverton SA to

11    sign the attached document.  Please arrange."

12    Q.    And what was the purpose of having Silverton sign

13    these warrant documents?

14    A.    The purpose was then, if or when executed,

15    Silverton would receive, um, shares into the -- into the

16    account brokerage, the bank brokerage account for

17    trading.

18    Q.    And why did Mr. -- do you have an understanding

19    about why Mr. Veldhuis asked Ms. Gasarch to send these

20    documents to Silverton rather than sending them himself?

21    A.    Yes, because we did not maintain direct

22    communications between clients of Fred Sharp and

23    Silverton.

24    Q.    Okay.  So in addition to getting Xmail messages

25    from wires@securexmeridian.com, did you get e-mails from
```

A2894

```
 1    other addresses from Ms. Gasarch?

 2    A.    Yes, typically we would get them for all of the

 3    companies that Fred Sharp maintained at Silverton.

 4    Q.    Okay, I'm going to show you what we've marked for

 5    identification as Exhibits JS, JT, and JU.  So let's

 6    start with JS.  (On screen.)  And then JT.  (On screen.)

 7    And JU.  (On screen.)

 8    A.    (Looks.)

 9    Q.    Do you recognize these documents, Mr. Knox?

10    A.    Yes, I do.

11    Q.    And what are they?

12    A.    This is an e-mail instruction from Riverfall Group

13    to Silverton requesting a wire transfer.

14    Q.    And are JT and JU the attachments to that e-mail?

15    A.    Yes, they are.

16          MS. SHIELDS:  I move the admission of these into

17    evidence.

18          THE COURT:  No objection, they may be received.

19          Should we mark them collectively?

20          MS. SHIELDS:  Yes, I believe you should, you

21    should mark them collectively as Exhibit 286.

22          THE COURT:  286.

23          (Exhibit 286, marked.)

24    Q.    Okay, so let's go back to the cover e-mail.

25          So what was "Riverfall Group" in relation to
```

A2895

1   Silverton?

2   A.    "Riverfall Group" was a nominee -- was an offshore

3   company controlled and managed by Fred Sharp's group.

4   Q.    And what did Silverton do for Riverfall Group?

5   A.    Whatever it was instructed to do, sell stock and

6   transfer funds out of the account.

7        MS. FRITZ:  Objection.

8        THE COURT:  No, overruled.  That may stand.

9   Q.    So if you look at the invoice that's attached to

10  this cover e-mail, um, what is that document?

11  A.    It's --

12       MS. SHIELDS:  And you can scroll down.  Maybe

13  start on Page 97 of the PDF.  (Scrolls.)  All right.

14  That's fine.

15  A.    (Looks.)

16  Q.    What is this document?

17  A.    It appears to be an invoice from Greenberg Traurig

18  to Riverfall Group.

19  Q.    And, um, if you look at Page 6 of the document,

20  for what company was Greenberg Traurig working,

21  according to this invoice?

22  A.    NewGen Biopharma Corp.

23  Q.    And what if anything did Silverton have to do with

24  NewGen Biopharma Corp.?

25  A.    Silverton traded stock of NewGen BioPharma Corp.

```
 1    Q.    And if you look at the meta data on this invoice
 2    --
 3          MS. SHIELDS:  And can you show us the meta data.
 4    (on screen.)
 5    Q.    Who is the author of that document?
 6          THE COURT:  According to the meta data.
 7    Q.    According to the meta data.
 8    A.    Yvonne Gasarch.
 9    Q.    And who was the person who last modified that
10    document, according to the meta data?
11    A.    Yvonne Gasarch.
12    Q.    And when did she last modify that document?
13    A.    May 16, 2017 at 5:54 a.m.
14    Q.    Okay, so now I want to look at the third
15    attachment, or the other attachment to this e-mail.
16    Do you recognize this document?
17    A.    Yes, that is the template -- or that is a wire
18    instruction on the standard template used by the Sharp
19    group.
20    Q.    And if you look at the meta data for this
21    document, who last modified this document?
22    A.    Yvonne Gasarch.
23    Q.    And when did she do that, according to the meta
24    data?
25    A.    May 16th, 2017 at 5:52 a.m.
```

```
 1    Q.    And how does that compare to the time when Gasarch

 2    last modified the invoice that we just looked at?

 3    A.    That was 2 minutes before.

 4    Q.    And, um, going back to that document itself, do

 5    you see it has a signature on it, um, that says it's "JP

 6    Jones"?

 7    A.    Yes, I do.

 8    Q.    And, um, do you have any reason to believe that

 9    this request actually came from "JP Jones"?

10          MS. PICKETT:  Objection, your Honor.

11          THE COURT:  No, he may be asked that.

12          Do you have any knowledge yourself as to from whom

13    that request came?

14          THE WITNESS:  That request came from Yvonne

15    Gasarch.

16    Q.    And how do you know that?

17    A.    Because that was the standard format Silverton

18    received for all wire instructions for all the nominee

19    companies controlled and managed by the Sharp group, and

20    the -- we received those instructions in WORD, Microsoft

21    WORD format, and the signature block on each

22    instruction, Riverfall or any of the other companies,

23    was a PDF image that you could move around.

24    Q.    Oh, and I forgot to ask you, on whose behalf did

25    Silverton trade NewGen?
```

```
 1    A.    On the behalf of the control group of Friesen,

 2    Sexton, and Veldhuis.

 3    Q.    Okay.  I want to show you now what we've marked

 4    for identification as Exhibit KP.  (On screen.)

 5    A.    (Looks.)

 6    Q.    Do you recognize this document, Mr. Knox?  And

 7    it's got a couple of pages.

 8          MS. SHIELDS:  Let him see the pages.

 9          (Scrolls on screen.)

10    Q.    Do you recognize this document, sir?

11    A.    Yes, I do.

12    Q.    And what is it?

13    A.    It is a wire request for -- I'm sorry, from a Fred

14    Sharp, nominee company, Hilton Capital.

15          MS. SHIELDS:  I move the admission of Exhibit KP

16    into evidence.

17          THE COURT:  It may be admitted, Exhibit 286.

18          MS. SHIELDS:  287.

19          THE COURT:  287.

20          (Exhibit 287, marked.)

21    Q.    Okay, so let's look at the first page of this

22    Exhibit 287 then.

23    A.    (Looks.)

24    Q.    What is this page?

25    A.    That is the e-mail cover page from Hilton Capital
```

1    to Wintercap Operations.

2    Q.    And why is Ms. Gasarch's name and contact

3    information on that e-mail?

4    A.    Because she was the beneficiary of the requested

5    wire transfer.

6    Q.    Okay.  So what's the second page of the exhibit?

7    (On screen.)

8    A.    (Looks.)  That is a Canadian passport for Zhiying

9    Yvonne Gasarch.

10   Q.    And what's the third page of the exhibit?  (On

11   screen.)

12   A.    (Looks.)  That is the template of the wire

13   instruction to wire Canadian dollars, 100,016 at -- to

14   Yvonne Gasarch.

15   Q.    And who -- it appears to have a signature of

16   someone named "Aristobulo Barrios," do you see that?

17   A.    Yes, I do.

18   Q.    Who's that?

19   A.    That was a nominee beneficial owner of Fred

20   Sharp's control.

21   Q.    Do you have any reason to think that Mr. Barrios

22   actually signed this wire request?

23   A.    I doubt he signed it.

24   Q.    Would you turn to the next page of the exhibit.

25   (On screen.)  What's that?

```
1    A.    (Looks.)  This is a loan agreement -- again, a

2    standard loan agreement used by Fred Sharp and his

3    clients, and this is from Hilton Capital to Yvonne

4    Gasarch for the amount of $100,016 Canadian currency.

5    Q.    And what's the purpose of including this loan

6    agreement as part of the wire request package?

7    A.    We request an invoice or a document to -- for both

8    Wintercap's records, Silverton's records, and to provide

9    the bank an explanation of why we're sending the funds

10   out.

11   Q.    And did you have an understanding about why Hilton

12   Capital was really loaning $100,000 to Ms. Gasarch?

13        MS. PICKETT:  Objection, your Honor.

14        THE COURT:  Overruled.

15   A.    It was not a legitimate loan.  We made many loans

16   to many individuals and I do not recall any repayments.

17   Q.    I want to switch topics now and talk about other

18   communications methods.

19        So what if any methods of communication, other

20   than Xphones and Xmail, did you use to communicate as

21   part of Silverton's business?

22   A.    We used -- look, we used a -- seldom we used a

23   land-line telephone.  On our secure Apps or we used Apps

24   on an Iphone, we used "Threema," we used "Silent

25   Circle," we used "What's App."
```

```
 1    Q.    So "Threema" and "Silent Circle," can you tell the
 2    jury what are those?
 3    A.    They are purported secure and encrypted Apps, so
 4    your communications cannot be intercepted or read.  And
 5    they have the ability to -- you have the ability to burn
 6    your message, you know a short time after it's been sent,
 7    or burn the whole conversation.
 8    Q.    And why did you use those methods of
 9    communication?
10    A.    Because we were engaged in a criminal enterprise
11    and we did not wish to leave any records of our
12    communications.
13    Q.    Did you use either, um, Threema or Silent Circle
14    to communicate with Mr. Friesen?
15    A.    Yes, I used both.
16    Q.    Um, and how did you identify yourself when you
17    communicated via Threema?
18    A.    You know, myself, and the clients and the people I
19    was communicating with, we had code names, nicknames,
20    and I identified as "Silver Arrow," or "Arrow," or
21    "Arrow 777."
22    Q.    Why did you use code names when you communicated
23    on these platforms?
24    A.    Because we did not want -- you know if someone --
25    if the message server was compromised, we did not want
```

A2902

```
 1    our correct names to be on the messages.

 2    Q.    Okay.  Mr. Knox, I'm showing you what we've marked

 3    for identification as Exhibits JA, JB, and JE.  So just

 4    take a moment and look through those and then I'll have

 5    a question for you.

 6          MS. SHIELDS:  Yes, JB.  (On screen.)  And now JE.

 7    (On screen.)

 8    A.    (Looks.)

 9    Q.    Okay.  Do you recognize these documents?

10    A.    Yes, I do.

11    Q.    And what are they?

12    A.    They are -- the first document was a conversation

13    with, um, with Jackson Friesen and Threema, and the

14    second two are photographs I had sent Jackson Friesen

15    via Threema.

16          MS. SHIELDS:  I move the admission of JA, JB, and

17    JE, together as one exhibit.

18          THE COURT:  It may be admitted --

19          MS. FRITZ:  No objection.

20          THE COURT:  And I appreciate that.  -- as Exhibit

21    288.

22          (Exhibit 288, marked.)

23    Q.    So let's go back to the cover message, or the

24    message part of this exhibit.

25          So, Mr. Knox, who were the participants in this
```

A2903

```
 1    communication?

 2         THE COURT:  According to the documents.

 3    Q.    According to the documents.

 4    A.    The participants are Arrow 777, which was myself,

 5    and the other participant is "Stockman 00," and he is

 6    Jackson Friesen.

 7    Q.    And do you remember having this exchange with

 8    Mr. Friesen?

 9    A.    Yes, I do.

10    Q.    Okay.  So starting at the bottom of the first

11    page, would you read the message on the bottom of the

12    first page and the top message on the second page.

13    A.    The first message is from myself.  "Hey, 00, which

14    account should I debit on Q for the 1,000 Swiss"?

15    Question mark.  "It ain't no gift."  And Stockman 00

16    replies, "LOL, VBIO."

17    Q.    Okay.  So what was -- so first, what was the

18    context in which you had this exchange with Mr. Friesen?

19    A.    Mr. Friesen was in Geneva along with Sharp,

20    Veldhuis, Kelln, Sexton, at -- he had asked for a cash

21    collection of 1,000 Swiss Francs.  And I believe this

22    was the day after, when I was in the office, I was

23    doing, you know putting an entry into the Q-System to

24    debit the Q-System of a 1,000 Swiss Francs and to credit

25    Silverton with 1,000 Swiss Francs.
```

1    Q.    Okay.  And when Mr. Friesen replied "LOL VBIO,"

2    what did you understand that to mean?

3    A.    That meant that I should debit the account of VBIO

4    in the Q-System for the 1,000 Swiss Francs.

5    Q.    And what was "VBIO"?

6    A.    "VBIO" was a U.S. public company, Vitality

7    Biopharma.

8    Q.    And what was Silverton's involvement with VBIO at

9    that time?

10   A.    We traded a considerable amount of VBIO over a

11   number of years.

12   Q.    And on whose behalf did you trade VBIO?

13   A.    The control group of Friesen, Sexton, and

14   Veldhuis.

15   Q.    Okay.

16         MS. SHIELDS:  I'd like you to scroll down a couple

17   of pages in this exhibit to Page 5.  (Scrolls on

18   screen.)  Let's see.  It's the --

19   Q.    So I would like you to read for the jury the

20   messages starting, um, let's see, the bottom of Page 5,

21   over to the third message on Page 7, please.

22   A.    (Looks.)  So these messages are from Jackson

23   Friesen, "Stockman 00."  He says, "Good work," and his

24   next message was "What a night."

25   Q.    Can you keep going please.

```
 1    A.    He asked, "What time did you party until?"  And I

 2    replied "Till the man with khaki was done."  Then he

 3    said, "Ha Ha, good work, last night was lots of fun."

 4    Then I sent him an image and wrote "Apparently so."

 5    Q.    And what did he respond?

 6    A.    "Holy smokes."

 7    Q.    Okay, the image that you sent him, um, is that

 8    Exhibit j, um -- is that what we previously had marked

 9    as JB, is that this image?

10    A.    Yes, it is.

11    Q.    Okay.  So what is this an image of?

12    A.    This is an image of 7 bottles of champagne, all of

13    them empty.

14    Q.    And what was the relevance of that image?

15    A.    That was the end of the night after, um,

16    entertaining Fred Sharp and his clients.

17    Q.    And in the message that referred to the "man with

18    khakis," who was that?

19    A.    That was Fred Sharp.

20    Q.    And who was part of the group that consumed these

21    bottles of champagne?

22    A.    Myself, Richard Target Adams, Sharp, Kelln,

23    Veldhuis, Friesen, and Sexton.

24    Q.    And what kind of champagne are these bottles?

25          MS. FRITZ:  Objection -- yes, objection.
```

A2906

```
 1          THE COURT:  Overruled.
 2     A.    I believe it's Kristaur.
 3     Q.    And about how much did this cost?
 4     A.    I think it was roughly 4,000, um, 4 1/2 thousand
 5     Swiss Francs -- 4 1/2 thousand Swiss dollars.
 6     Q.    So if you go next please, in the messages, I'd
 7     like you to look at the top of Page 8.  (On screen.)
 8     And read the messages on Page 8 and on the very top of
 9     Page 9 to the jury, please.
10     A.    (Looks.)  So the message was from myself, "Did you
11     write on my car?"  And I sent a photograph.  And Jackson
12     Friesen replies, "I did."
13     Q.    Okay.  And is the photograph part of this exhibit
14     now, it was previously JE, is this the photograph that
15     you sent him?
16     A.    That is correct.
17     Q.    And would you explain this to the jury please.
18     A.    Yes, the photograph is "Sub Penny $," um, with a
19     dollar sign," and that was the evening before when we
20     discussed business, when we discussed brokerage, and
21     selling low-priced securities, um, and the difficulty
22     doing it.  "They" being clients of Sharp and his clients
23     were joking, but Silverton could do it, um, and they
24     used some other bad words, but, you know, said, "This is
25     the year of the subpenny go-to person."
```

A2907

```
 1    Q.    And, Mr. Knox, I'd like you to take a look next at
 2    what we've marked for identification as Exhibit KQ.  (On
 3    screen.)
 4    A.    (Looks.)
 5    Q.    Do you recognize this document, sir?
 6    A.    Yes, it is a conversation on the App Threema.
 7    Q.    And with whom -- who are the participants in this
 8    conversation?
 9    A.    There are three participants, "Arrow 777," which
10    is myself, "Silver wags," which is Richard Target Adams,
11    and "Stockman 00," which is Jackson Friesen.
12          MS. SHIELDS:  I move the admission of Exhibit KQ
13    into evidence.
14          THE COURT:  KQ is admitted, Exhibit 289.
15          (Exhibit 289, marked.)
16    Q.    So, Mr. Knox, when did these communications -- oh,
17    and I want to direct your attention down, um, to the
18    last message on the bottom of Page 1 and the messages on
19    Page 2.  (On screen.)
20          MS. SHIELDS:  Is it possible to show all of those?
21          (On screen.)
22          MS. SHIELDS:  Okay.
23    A.    (Looks.)
24    Q.    When did these communications take place?
25    A.    They took place on August the -- August 28th,
```

```
 1    2018.
 2    Q.    Okay.  And do you remember having this set of
 3    communications with Mr. Friesen?
 4    A.    Yes, I do.
 5    Q.    And so, um, if you look at -- first, at the bottom
 6    message on Page 1, would you read that for the jury
 7    please.
 8    A.    "How many L&B available with you guys?"
 9    Q.    And what did you understand that to mean in
10    layperson's terms?
11    A.    That means, um, "L&B" is "Lexington Biosciences,"
12    and "available with you guys" means how many shares is
13    Silverton holding for the Sharp group.
14    Q.    All right.  And if you scroll down a couple of
15    messages, the second message on Page 2, um, is that a
16    response to Mr. Friesen's question?
17    A.    Yes, that's a response from Richard Target Adams,
18    and he wrote 35,000, "35K."
19    Q.    And then what's the message under that, who is
20    that from?
21    A.    That's from Friesen.
22    Q.    And what does he ask or what does that message
23    say?
24    A.    He instructs "Sell 35K L&B at 0.145.  Please
25    confirm."
```

```
 1    Q.    And what did you understand that request to mean?
 2    A.    That was a sell order for securities.
 3    Q.    And did Silverton sell those securities?
 4    A.    Yes, we did.
 5    Q.    And if you look down a couple of more messages,
 6    how do you know that?
 7    A.    Because in 1 minute, 33 seconds, after, Richard
 8    Target Adams replied, "Filled."
 9    Q.    Okay.  So how did Silverton keep records of the
10    trades that it did, Mr. Knox?
11    A.    Silverton -- we had a database, which we called
12    "RAB," where we entered all of the securities, the
13    stocks, and then entered all the trades and the prices
14    and the fees and the commissions.
15    Q.    And what system did Silverton use to keep records
16    when it sent trading proceeds at a client's request?
17    A.    So -- so for all the stocks we used RAB.  For all
18    the cash amounts, in whatever currency, we used
19    Quickbooks, which is a standard accounting software.
20    Q.    And what if anything did you do to confirm the
21    accuracy of those two systems?
22          MS. FRITZ:  Objection.
23          MS. PICKETT:  Objection.
24          THE COURT:  Overruled.
25    A.    Well, on the finance, we would reconcile them on a
```

A2910

| | |
|---|---|
| 1 | regular basis.  On, um, depending on the -- depending on |
| 2 | the system, it was either -- it was different checks for |
| 3 | daily, weekly, and then monthly, that reconciliation. |
| 4 | Q.    Did you -- have you ever heard of the Q-System? |
| 5 | A.    Yes, I have. |
| 6 | Q.    And what was the "Q-System" to your understanding? |
| 7 | A.    The "Q-System" was a -- an accounting for both |
| 8 | cash and securities, an accounting database that Fred |
| 9 | Sharp maintained. |
| 10 | Q.    And did you interact with the Q-System? |
| 11 | A.    Yes, I did. |
| 12 | Q.    How did you interact with the Q-System? |
| 13 | A.    It developed over time.  Initially we had access |
| 14 | to just view positions in the Q-System, but then it grew |
| 15 | that we were able to enter codes directly into the |
| 16 | Q-System. |
| 17 | Q.    And during what period of time did you interact |
| 18 | with the Q-System? |
| 19 | A.    From 2011 till my arrest in September 2018. |
| 20 | Q.    Okay.  So I want you to -- you said at some period |
| 21 | of time you could enter data directly into it? |
| 22 | A.    That is correct. |
| 23 | Q.    How did you do that? |
| 24 | A.    We would log into the server and each, um -- it |
| 25 | has a data-input screen and we would -- you know if you |

1    trade, we would put in the stock name, the quantity of

2    shares sold or bought, the, um, the price -- I'm sorry,

3    not the price, the actual cash amount that, um, the net

4    broker fees, and then, um, the system worked out the

5    commission that Fred Sharp was going to charge.  And

6    then we'd press "Enter."

7    Q.    And how typically, how close in time to the

8    trading did you enter that data into the Q-System?

9    A.    So if we traded on a Monday -- and say Monday was

10    in Europe, so it was a Monday night, on Tuesday morning

11    we would have a confirmation of the trade in our e-mails

12    in Silverton, and then we would enter that trade in, um,

13    on a Tuesday morning in a European time zone.  So less

14    than 24 hours.

15    Q.    Okay.  And for the period of time before you can

16    do that direct data input into Q, how did you convey

17    information about Silverton's trading into the Q-System?

18    A.    At the end of each trading day, we would send an

19    end-of-day report to Fred Sharp, and that was the --

20    that was the end of the day, and then the following day

21    we would do -- we would do, um -- I think we call it --

22    I'm not sure if we call it at the end of the day, but we

23    would send the trade tickets for the actual, the actual

24    cash amount.  And then Fred Sharp, or one of his staff

25    members, would enter those trades into the Q-System.

A2912

```
 1    Q.    And do you know which staff members helped
 2    Mr. Sharp with that task?
 3    A.    I believe it was predominantly Fred Sharp, but
 4    either Courtney Kelln or Yvonne Gasarch had the ability
 5    to enter those trades.
 6    Q.    And in that period of time when you weren't
 7    entering the trades directly, about how long did it take
 8    for trading information to get into the Q-System?
 9    A.    Less than 24 hours.
10    Q.    Okay.  And so how or did you interact with the
11    Q-System in relation to payments that Silverton made at
12    the request of Sharp's clients?
13    A.    We -- we would use it to maybe confirm that the
14    payment was in, um, and that was about it, because
15    someone else entered the wire-transfer instructions in
16    the Q-System.
17    Q.    And who did that?
18    A.    Yvonne -- well predominantly Yvonne Gasarch and
19    occasionally Fred Sharp.
20    Q.    And how do you know that?
21    A.    Because either Fred Sharp told me directly or the
22    clients, the clients would have requested the wire from
23    Yvonne, and they would chase me up, they would say,
24    "Roger, have you received a wire request from Yvonne
25    for, you know, X number of dollars to this account?"
```

A2913

```
 1    And I would say "Yes, I have" or "No, I haven't."  And
 2    then if I said "No," there was an "Oh, dear, I will
 3    chase Yvonne today."
 4    Q.    And did you have an understanding about whether or
 5    not the Q-System would indicate whether a particular
 6    person was involved in a particular stock sale?
 7    A.    Yes.
 8    Q.    And what do you understand about that?
 9    A.    The 4-letter codes that we have seen earlier
10    today, such as "ACCO," um, "ACCO," which is Mike
11    Veldhuis, or "GARD," which is -- "GARD," which is
12    Jackson Friesen, they were the same codes that Fred
13    Sharp used in his accounting system, Q.
14    Q.    And so how do you use that information to connect
15    a person to a stock sale?
16    A.    And so if -- if the stocks were individual, then
17    when we would type in the trade, and when we would enter
18    the trade, there was always a beneficiary, and we would
19    put in, for example, "ACCO" or "Gard."  If the stock was
20    being sold on behalf of a control group, then the -- the
21    control group usually, for example VBIO, would have an
22    account called "VBIO," and we would book it to the VBIO
23    account.
24    Q.    Did you -- what if anything did you do to test the
25    accuracy of the data in the Q-System?
```

A2914

1    A.    We reconciled -- we reconciled our accounting,

2    both our security ledger and our cash ledger, with the Q

3    on a monthly basis.

4    Q.    And when you did that on a monthly basis, like

5    what did you actually do?  How did you do that

6    reconciliation?

7    A.    I mean I would print off a -- or take a PDF screen

8    shot of the Q records and download it on a CSV file

9    format, which we can work with in Microsoft XL, and then

10    we would look at our own Quickbooks data and, um, that

11    data to ensure that quantities of stock are correct, all

12    the wire transfers have been actioned.  And, um, there

13    were some instances where maybe there was a wire

14    transfer in Q that we had never received an instruction

15    for and we would maybe question that or, um,

16    occasionally if someone fat-fingers a number and instead

17    of writing 100,000 shares were sold, they write 10,000

18    shares were sold, or were made.  And so by checking

19    that, doing a reconcile, we'd make sure everything was

20    accurate.

21    Q.    Okay.  And if you found an inaccuracy, what did

22    you do about it?

23    A.    Um, Silverton did not have the ability to delete

24    any of the entries we made, so we had to, um -- normally

25    it was reaching out to Fred Sharp, because he was sort

1    of the overall gatekeeper of Q, and explain to him

2    either if it was just a mistake to be corrected or if an

3    entry had to be deleted or reentered.

4    Q.    Okay.  So earlier today -- and I believe you

5    testified about an occasion on which you gave 1,000

6    Swiss Francs to Mr. Friesen and he said debit the VBIO

7    account.  Do you remember that?

8    A.    Yes, I do.

9    Q.    So I'm going to show you, um, next an excerpt from

10   Exhibit 282, which is in evidence.

11        MS. SHIELDS:  And for ease we've marked this as

12   Exhibit 282A.  (On screen.)  Can you pull that up,

13   please.  (On screen.)

14   A.    (Looks.)

15   Q.    Okay, Mr. Knox, do you recognize this document or

16   the data in this document?

17   A.    Yes, I recognize the data in the document.

18   Q.    And what is that data?

19   A.    The data is an extraction from the accounting,

20   Fred Sharp's accounting system, Q.

21   Q.    And would you explain please the transaction, the

22   first of the transactions that's shown in this data?

23   A.    Yes.  The description is an internal transfer for

24   1,000 Swiss Francs.

25   Q.    And from what account is that debited?

```
 1    A.    It is debited from the VBIO account.

 2    Q.    Into what account is that credited?

 3    A.    It is credited to the "SIRV," the Silverton

 4    account.

 5    Q.    And underneath that, there's a credit to the

 6    "BOND" account.  Do you see that?

 7    A.    Yes.

 8    Q.    And what is that?

 9    A.    "BOND" was the user name for Fred Sharp, and that

10    was his Commission of 100 Swiss Francs.

11    Q.    And was that a typical occurrence, the crediting

12    of the Bond account for internal transfers?

13    A.    For -- as a commission payment?  Yes, it was

14    typical.

15    Q.    Okay.  The second transaction that's shown on this

16    excerpt, what is that?

17    A.    That is an internal transfer of 4,000 euros.

18    Q.    And what account is debited for that?

19    A.    VBIO.

20    Q.    And what account is credited?

21    A.    SILV, Silverton.

22    Q.    And what is that 4,000 euro payment for?

23    A.    That was another cash collection at the same time.

24    Um -- yeah, it was me handing over 4,000 euros in cash

25    to the group when they were in Geneva.
```

```
 1    Q.    And who's the group?

 2    A.    That was Sharp, Veldhuis, Friesen, Sexton, and

 3    Kelln.

 4          MS. FRITZ:  Objection, your Honor --

 5          THE COURT:  Just a moment.

 6          MS. FRITZ:  There's an "Account Title Column" I

 7    would ask the Court to take a look at.

 8          (Pause.)

 9          THE COURT:  What's the "Account Title Column"

10    relevant to here?  Read it.

11          THE WITNESS:  The "Account Title Column" for VBIO

12    is ACCO, A-C-C-O, for Silverton, it is Silverton, SILV,

13    and for BOND, it's B-O-N-D.

14          THE COURT:  The answer may stand.

15    Q.    Mr. Knox, I'm showing you what we've marked for

16    identification as Exhibit PZ.  (On screen.)

17    A.    (Looks.)  Yes, I can see it.

18    Q.    And do you recognize that document?

19    A.    Yes, I do.

20    Q.    What is it?

21    A.    This is a form that we had created, um, for

22    Silverton's records, um, for if a client has requested

23    cash and we hand them over a -- an envelope with cash,

24    that they sign for it, um, so we have it for our

25    records.
```

A2918

```
 1          MS. SHIELDS:  I move the admission of Exhibit PZ
 2     into evidence.
 3          THE COURT:  To be admitted, Exhibit 290.
 4          MS. PICKETT:  No objection.
 5          (Exhibit 290, marked.)
 6     Q.   So, Mr. Knox, to what client does this cash
 7     collection relate?
 8          MS. FRITZ:  Objection.
 9          THE COURT:  Overruled.
10     A.   Well, it is not a client, or the person, the
11     individual, was not a client.
12     Q.   To what human being --
13          THE COURT:  She'll withdraw it and ask another
14     question.
15     Q.   To what person does the cash collection relate?
16     A.   The cash collection -- the cash was handed to
17     Jackson Friesen.
18     Q.   And would you describe for the jury the
19     circumstances surrounding you giving this cash to
20     Jackson Friesen?
21     A.   Yes.  Jackson Friesen was transiting through
22     France, Chamonix France, um, I believe from Switzerland,
23     where he had landed from Canada, and he was traveling to
24     see his girlfriend in Italy, and he stopped overnight in
25     Chamonix where, um, I had, um, I took him out to dinner
```

A2919

```
 1    in a restaurant called "Munchies," in Chamonix there.

 2    And, um, I had -- he had previously requested and I

 3    handed over 9,000 euros.

 4    Q.    Why did it say "Gard" next to "name" on the

 5    document?

 6    A.    It says "Gard."  And I had asked him, um -- and

 7    that's why we're "Bond client," in order to know which

 8    account on the Q-System I should debit the money from.

 9    Q.    And what was "Gard" on the system?

10    A.    "Gard" was Jackson Friesen's account.

11    Q.    Okay, I'm next going to show you another excerpt

12    from the Q-System, which is in evidence as Exhibit 282.

13          MS. SHIELDS:  And for ease we've marked this

14    excerpt as 282C.

15          (On screen.)

16    Q.    And do you recognize --

17          MS. SHIELDS:  Yes, C please.

18          (On screen.)

19          MS. SHIELDS:  Okay.

20    Q.    And do you recognize the data in this document?

21    A.    (Looks.)  Yes, I recognize the data.

22    Q.    And what is this data?

23    A.    The data is an extract of the Q database

24    maintained by Fred Sharp.

25    Q.    And what does the data in this document reflect?
```

```
 1    A.    The data reflects a debit from Hilton Capital of
 2    9,000 euros.
 3    Q.    Okay.  And from what account is that debited?
 4    A.    The account code is "G-A-R-D" and the account
 5    title is "G-A-R-D."
 6    Q.    And who is "G-A-R-D"?
 7    A.    Jackson Friesen.
 8    Q.    And to what account is this money credited?
 9    A.    It is to "Wint," "W-I-N-T," which is Wintercap SA,
10    my company.
11    Q.    Um --
12          MS. SHIELDS:  So I move the admission of Exhibits
13    282C and 282A.
14          THE COURT:  Okay.
15          MS. SHIELDS:  And I want to go back just for a
16    moment to 282A, if we could.
17          THE COURT:  Now you've lost me.  The whole
18    document is in evidence.  So you're calling out the
19    specific portions of something in evidence?  So we don't
20    need to give it more numbers.
21          MS. SHIELDS:  Oh, okay, that's fine.  That's fine.
22    Q.    I just want to go back to that account title that
23    Ms. Fritz drew your attention to.
24          This request for the first transaction, the 1,000
25    Swiss Francs payment, who asked you for that payment?
```

```
 1    A.     Jackson Friesen.

 2    Q.     And what is your understanding about the

 3    relationship between Jackson Friesen and the Vitality

 4    BioPharma?

 5    A.     He is a member of the control group that organizes

 6    Vitality BioPharma.

 7           (Pause.)

 8           MS. SHIELDS:  Those are all the questions I have

 9    for you at this time.  Thank you.

10           THE COURT:  Ms. Pickett.

11

12    CROSS-EXAMINATION BY MS. PICKETT:

13    Q.     Good morning, Mr. Knox.

14    A.     Good morning.

15    Q.     Mr. Knox, I'd like to start out -- I believe you

16    said that you were arrested in Mexico.  When was that?

17    A.     It was approximately the 29th or the 30th of

18    September 2018.

19    Q.     Okay.  And what had you been doing in Mexico

20    before you were arrested?

21    A.     I -- I'm sorry, I was not arrested in Mexico, I

22    was denied entry into Mexico upon landing from

23    Vancouver, Canada.

24    Q.     Okay, and where did you go?  What did they do with

25    you physically?
```

A2922

1    A.    Physically I was held in a cell for two nights and

2    then I was escorted through the airport with armed

3    security and placed on a plane to Logan Airport in

4    Boston.

5    Q.    Okay.  And when you got off the plane in Logan

6    Airport, I assume that there were FBI agents to meet

7    you?

8    A.    Yeah, initially there were Customs, and they

9    processed me in Customs, and then they handed me over to

10   the Airport Police and the Federal Bureau of

11   Investigation.

12   Q.    Okay.  I'd like to just travel back a little bit

13   before you were detained in Mexico.

14         I believe you told the jury that essentially from

15   the time you started Silverton until you were arrested,

16   you were engaged in a massive securities fraud, is that

17   correct?

18   A.    Yes, engaged in -- yes, a -- there were many

19   players in the fraud, yes.

20   Q.    But you were an essential player in the fraud,

21   were you not?

22   A.    No, I was -- I was one of many outlets that the

23   control groups had to use.

24   Q.    So it was the control groups who were committing

25   the fraud and you were just the outlet for them to do

A2923

```
 1   so, is that what you're telling the jury?
 2   A.    No, I was also committing the fraud.
 3   Q.    Okay.  And as a result of committing this fraud
 4   over the course of many many many years, did you make --
 5   how much money did you make?
 6   A.    I made just over $5 million.
 7   Q.    From these security fraud transactions?
 8   A.    That is correct.
 9   Q.    Okay.  And, sir, what kind of lifestyle were you
10   living before you were detained in Mexico?  For example,
11   how many properties did you own?
12   A.    I have, I believe, 7 properties, 7 or 8.
13   Q.    Okay.  And where are those properties?
14   A.    Those properties are in France, Switzerland, and
15   the United Kingdom, and one in Italy.
16   Q.    Okay.  And if Silverton was solely devoted to
17   fraud, where did you get the other money for these many
18   properties if you only made $5 million over the course
19   of those years?
20   A.    If I may?  A lot of those properties, um, I think
21   three of them were under $100,000 in value.
22   Q.    Okay.
23   A.    And I had four mortgages, maybe five mortgages
24   from two different banks on the properties.
25   Q.    Okay.  So you've entered into a consent with the
```

```
 1   SEC, is that correct, because the SEC charged you
 2   civilly, correct?
 3   A.    That is correct, they charged me civilly.
 4   Q.    And you have agreed that the amount of
 5   disgorgement is over $6 million, is that correct?
 6   A.    That is correct.
 7   Q.    Okay.  And why are you paying more disgorgement if
 8   you're telling the jury today that you only made $5
 9   million?
10   A.    Because the funds that I was holding within
11   Silverton, I was holding client funds.  So, um, the
12   forfeiture that I'm repaying the government is $5
13   million for the -- the -- my personal gain, and $7
14   million which was, which represents funds held by, um,
15   individuals like the Sharp group, for example, funds
16   that were held by my company, um, that did not belong to
17   me.
18   Q.    Okay.  And in the course of working at Silverton
19   and Wintercap and making these millions of dollars, um,
20   and having these properties, I assume you also -- I
21   assume you also traveled quite a bit?
22   A.    Yes, I did.
23   Q.    Okay.  And was that always business travel or was
24   it also for fun?
25   A.    Yes, for fun -- for business and for fun, yes.
```

A2925

```
 1    Q.    Okay.  And on many of these trips, um, you went
 2    with Fred Sharp, is that correct?
 3    A.    The only -- I traveled with Fred Sharp on two
 4    different occasions.
 5    Q.    Okay.  And one was this party that we've just
 6    heard about that happened, I think, in Switzerland?
 7    A.    I was living in Switzerland, so I --
 8    Q.    Oh, I see.  Okay.
 9    A.    It was a drive, it wasn't a travel.
10    Q.    Okay, let's back up.
11          What were the two vacations that you took with
12    Fred Sharp?
13    A.    Well I -- it wasn't a vacation, I had met him when
14    I was with Blacklight and we traveled to Malta together
15    --
16    Q.    Okay.
17    A.    -- for I think a couple of -- actually Cypress and
18    Malta, um, to visit banks and brokerages.  And the
19    second time was in, I believe it was the spring of 2018,
20    when I traveled to his home in Mexico.
21    Q.    And that home is in Puerto Vallarta?
22    A.    That is correct.
23    Q.    Okay.  And how long did you stay at his home in
24    Mexico?
25    A.    I believe it was four or five nights.
```

A2926

```
 1    Q.    Okay.  Now besides -- and you just mentioned
 2    before the meeting that you had in Switzerland, that
 3    that wasn't a vacation, it was a mix of business and
 4    pleasure, that you'd have meetings like this business
 5    meeting, but they would also include, you know, a nice
 6    dinner, entertainment, etc., is that correct?
 7    A.    Um, a nice dinner is a business meeting, it is not
 8    entertainment -- or it is not a vacation.
 9    Q.    Right, but you weren't eating at McDonald's, you
10    went to a nice dinner, you sat around and you had
11    drinks.  I believe you testified yesterday that you were
12    comfortable enough with these people to drink in excess
13    and then discuss business, right, because you trusted
14    them, right?  These were the people that you're meeting
15    with?
16    A.    I think it's the other way around.  We would sit
17    around a table and discuss business and then if someone
18    was to drink to excess, it would be after --
19    Q.    After the business meeting?
20    A.    The dinner, yes.
21    Q.    Okay.  And we saw, um, from that particular
22    meeting, that the group consumed 7 bottles of champagne?
23    A.    Yes, that's what the -- yes.
24    Q.    Okay.  And how about, um, your family, did you --
25    were your children in private schools?
```

```
 1    A.    I do not have children.

 2    Q.    Oh, I'm sorry.  Or are you married, sir?

 3    A.    I am now married, yes.

 4    Q.    Okay.  And how about in terms of -- what kind of

 5    presentation did you make physically, would you buy nice

 6    suits, um, to wear to work, et cetera?

 7    A.    No, I was a dirt bag.

 8    Q.    (Laughter.)  In what sense?  You wouldn't wear a

 9    suit coat or anything to work?

10    A.    I wore -- my favorite T-shirts were free, um, and

11    I spent most of my time in Chamonix France where I'd

12    wear boat shoes, denim jeans or shorts, a sporting

13    T-shirt, and a fleece jacket.

14    Q.    Okay.  And you like living in Chamonix France

15    because you're a big skier, is that correct?

16    A.    Yes, I first visited Chamonix France in 1994 to

17    climb Mont Blanc, and I purchased a small apartment

18    there in 1988 while I was still in the British army.

19    And, um, it was the Mecca for climbing, altruism, and

20    extreme skiing in Europe.

21    Q.    Okay.  So when you were detained in Mexico and

22    then eventually brought to Boston, where did they keep

23    you in Boston or where did they keep you in

24    Massachusetts?

25    A.    For two nights I was held, um, in the Brookline
```

A2928

```
 1    Police Station, and then I was denied, um, bail or a
 2    bond, so then I spent the following 18 months in
 3    Plymouth County Correctional Facility.
 4    Q.    Okay.  And I take it at Plymouth County Jail they
 5    don't have, um, champagne or fondue, is that correct?
 6    A.    That is correct.
 7    Q.    And you said that you were denied bail.  Do you
 8    recall at some point asking the Court to reconsider and
 9    to let you out, um, on bail essentially?
10    A.    I believe there were several times that was asked.
11    Q.    Okay.  And the government, um, would oppose, um --
12    would oppose it, is that correct?
13    A.    Yes, they claimed I was a risk of flight.
14    Q.    Okay.  And, um, at some point you began engaging
15    in discussions with, um, the government, is that
16    correct?
17    A.    That is correct.
18    Q.    Okay.  And, um, do you recall that the first date
19    of your -- your first meeting with the government was in
20    June of 2019, does that sound correct?
21    A.    No, that first meeting was, I believe, in January
22    of 2019.
23    Q.    Oh, January of 2019.  Okay.  And what happened at
24    that meeting?
25    A.    That was a reverse proffer.
```

```
1    Q.    Okay.  And that means that the government tells
2    you and your attorneys what evidence they -- basically
3    what evidence they have against you?
4    A.    That is correct.
5    Q.    And based on the reverse proffer, were you
6    concerned that the government had mounds of evidence
7    against you?
8    A.    (Pause.)  The -- the government had mountains of
9    evidence, but their interpretation of a lot of the
10   evidence was incorrect.
11   Q.    Okay, and what was the wrong interpretation, if
12   you can recall some examples?
13   A.    That 100 percent of my assets were tainted.
14   Q.    And you're claiming that all of your assets are
15   not tainted?
16   A.    That is correct.
17   Q.    Okay.  And so given that you've told the jury that
18   the whole business of Silverton and Wintercap was
19   securities fraud, what now are you saying is not tainted
20   by that fraud?
21   A.    Well Silverton was incorporated in 2013, when I
22   was 42 years of age.  I had been, um, well-employed for
23   approximately 20 years before then in, um, the British
24   Army, as an auditor, um, doing nonfraudulent,
25   nonSilverton activities.  So up until then, the money I
```

A2930

```
 1   had earned, the money I had saved, the money I had
 2   invested, was untainted.
 3   Q.    Okay, and so -- but anything after starting
 4   Silverton was tainted, do you agree to that?
 5   A.    No, that is incorrect.
 6   Q.    I'm saying that anything you earned after you
 7   started Silverton, that is correct, right, because that
 8   was just a fraud, it wasn't a legitimate business,
 9   right?
10   A.    No, that is incorrect.
11   Q.    Okay, what was legitimate about Silverton then?
12   A.    The -- the fraud, the part of the fraud was
13   concealing, um, when control groups approached Wintercap
14   with more than 5 percent of a United States public
15   company, the securities of a United States public
16   company.  So the fraud was concealing ownership of more
17   than 5 percent.  If a client or -- a client or a -- or a
18   group of several clients held less than 5 percent of a
19   public company, there was no requirement to file, and
20   therefore any trading on that company was not a fraud.
21   Q.    So there were cases where Silverton was engaged in
22   legitimate stock transactions, is that correct?
23   A.    That is correct.
24   Q.    And to your knowledge, um, were there any
25   occasions where Fred Sharp was engaged in legitimate
```

A2931

```
 1    stock transactions?

 2    A.    To my knowledge, yes, there were occasions.

 3    Q.    Okay.  And so what it boils down to, the fraud

 4    comes down to knowledge that under the United States

 5    securities laws, if there's a control group that owns

 6    more than 5 percent of stock, they're supposed to file a

 7    registration statement with the Securities and Exchange

 8    Commission, is that correct?

 9    A.    It is --

10    Q.    I mean if they don't file it and trade, that can

11    be a continued fraud, but the fraud is on the basis that

12    the public doesn't know that there's a control group

13    that owns more than 5 percent of its specific stock, is

14    that correct?

15    A.    But that is not correct because it does not have

16    to be a control group, it could be an individual.

17    Q.    Agreed, but somebody owns more than 5 percent and

18    doesn't reveal it to the market, is that fair?

19    A.    I believe so.  But I am -- I am not a securities

20    broker, I've not been trained as a securities broker, so

21    I do not know all the rules of the United States markets

22    or the Securities and Exchange Commission.

23    Q.    Well to your knowledge was Yvonne Gasarch a

24    securities broker?

25    A.    No, not to my knowledge.
```

A2932

```
 1    Q.    Okay.  And, um, I believe yesterday you testified
 2    that you've only met Yvonne Gasarch once, is that
 3    correct?
 4    A.    That is correct.
 5    Q.    Okay.  And that was at the corporate offices of --
 6    is it called "Custom House"?
 7    A.    I think it's called "Corporate House."
 8    Q.    Oh, yes, thank you.  Sorry.  And when you went to
 9    the office at Corporate House, that's in Vancouver,
10    Canada, is that correct?
11    A.    That is correct.
12    Q.    Okay.  And you said that you walked into the
13    office and it was approximately 2,000 square feet,
14    correct?
15    A.    Yes.
16    Q.    Okay.  And, um, Fred Sharp had an office there and
17    Courtney Kelln had an office there?
18    A.    I did not -- I mean I wasn't -- I didn't go
19    through all of the offices, there were some doors that
20    were closed.  I think I met Courtney there, so I did not
21    know if she -- I don't believe she did, I believe she
22    worked from her home.
23    Q.    Okay.  Do you believe Fred had an office there?
24    A.    Yes, I was very much in his office.
25    Q.    Okay.  Was there a meeting room, do you know?
```

A2933

```
 1    A.    Yes, there was a meeting room, yeah, a table and

 2    several chairs.

 3    Q.    Okay.  And besides the Corporate House folks,

 4    there were also other businesses located in this office

 5    suite, is that correct?

 6    A.    I think there was one other that may have been a

 7    -- the brother of Fred Sharp or someone else, or it may

 8    have been a lawyer or someone in the legal industry.

 9    Q.    Okay.  And do you recall that there was a -- well

10    2,000 square feet sounds like a lot for just the two

11    offices, were there -- those were the only businesses

12    there?

13    A.    I'm sorry, I'm from Europe, I work in square

14    meters, but it --

15    Q.    Oh, yes, I'm sorry.

16    A.    But it may be -- it was not -- it wasn't three

17    floors of an office building.

18    Q.    Right, but it was a floor.  Was it a floor, a

19    whole floor?

20    A.    No, it was four or five small offices and a

21    reception and a meeting room.

22    Q.    Okay.  And, um, when you met Fred Sharp on this

23    day at the Vancouver office, um, Yvonne Gasarch actually

24    was sitting in the reception area, is that correct?

25    A.    I believe so.
```

A2934

1    Q.    And she had a desk in the reception area?

2    A.    I think there were -- um, I was only ever at

3    Corporate House once and, um, I think, yes, there was a

4    reception, and behind the reception there was, I believe

5    two computers.  Well more than one computer.

6    Q.    Right, but as far as you could tell, she didn't

7    have her own separate office?

8    A.    Correct.

9    Q.    And she was assumingly, like any receptionist,

10    would greet whoever was coming in to meet with anyone at

11    the businesses or the business there?

12    A.    Actually I don't think I met her when I arrived, I

13    think I met her when I was leaving, I was introduced to

14    her then.

15    Q.    Okay.  When we were talking about, um, you know

16    trips that you've taken and business meetings in Europe,

17    um, Yvonne Gasarch was never at these meetings, was she?

18    A.    No, she was not.

19    Q.    Okay.  I believe that the SEC asked you about, um,

20    those Xphones, do you remember that?

21    A.    Yes.

22    Q.    Okay.  And, um, and Yvonne Gasarch to you was

23    called "Wires," right?

24    A.    That is correct.

25    Q.    All right.  Okay.  And, um, at some point were you

A2935

```
 1   aware that Yvonne Gasarch had triplets?
 2   A.    Oh, I wasn't sure -- I was aware that she had --
 3   Q.    Multiple babies?
 4   A.    Babies.  I wasn't sure if it was twins or -- well
 5   okay.
 6   Q.    And she had those children in China, is that
 7   correct?
 8   A.    I mean I do not know.
 9   Q.    Well do you recall telling the FBI that when she
10   was out for the children, that things started to become
11   kind of messy?
12   A.    Yes, I recall -- yes, I recall that.
13   Q.    Okay.  So at least for some point in time she was
14   not, um, doing all her tasks, is that fair to say?
15   A.    That is correct.
16   Q.    Okay.  Okay, so, um, going back to the meeting
17   where, um, the first meeting with the FBI.
18         Did you sign a document with them called -- do you
19   remember signing a document with them called a "proffer
20   letter" or "proffer agreement"?
21   A.    Sorry, what -- what meeting?  I believe I've had
22   approximately 24 meetings to date with the FBI.
23   Q.    Okay.
24   A.    So which meeting are you referring to?
25   Q.    Well did you have one agreement that covered these
```

```
 1    24 meetings or did every time you met with the FBI, they
 2    would present you with an agreement or your lawyers with
 3    an agreement?
 4    A.    No, I don't -- I don't recall anything.
 5    Q.    Okay, so you don't have a proffer agreement with
 6    the -- I'm sorry, I'm saying "FBI," but it's the U.S.
 7    Attorney's Office.  Do you have a proffer agreement with
 8    them?
 9    A.    I have a plea agreement with the Department of
10    Justice and I have a 5K-1 cooperation agreement with the
11    Department of Justice.
12    Q.    Okay.  And this 5K-1 agreement, is that called a
13    "Substantial Assistance Agreement"?
14    A.    Sorry, I am not a lawyer, I do not --
15    Q.    What is your understanding of what you need to do
16    to comply with this cooperation agreement?
17    A.    Tell the truth.
18    Q.    Just tell the truth?
19    A.    (Pause.)  Well it's not to tell lies, so it's to
20    tell the truth.
21    Q.    Right, but the government wants this and they're
22    meeting with you 24 times because they want you to
23    provide substantial assistance in the investigation or
24    prosecution of others, is that --
25          THE COURT:  Well he can't testify to the motives
```

A2937

```
 1    of the government, so.
 2    Q.    Do you understand that part of the substantial --
 3    that the government can file a letter or a motion with
 4    the sentencing court telling the Court that you have
 5    provided substantial assistance to the government?
 6    A.    Yes, I'm aware of that.
 7    Q.    Okay.  And if the government does that, are you
 8    aware that the Court can take that into consideration?
 9    A.    Yes, I'm aware the Court can take that into
10    consideration.
11    Q.    And I believe yesterday that you testified that,
12    um, based on the sentencing guidelines set out in your
13    plea agreement, the range seems to be somewhere between
14    150 months and, I have, 188 months, is that correct?
15    A.    That is correct.
16    Q.    Okay.  And you understand, based on what the judge
17    told you when you pled guilty, that the judge has to --
18    he doesn't have to sentence you within those guidelines,
19    but he has to find what the guidelines numbers are and
20    consider them, whether he uses them exactly or not.  Do
21    you understand that?
22    A.    Yes, I understand that the judge will use
23    everything available to him, both the guidelines, both
24    sentences of other defendants in the same or similar
25    cases, and also if there is a cooperation agreement in
```

1   place.

2   Q.    Okay.  And, um, you'd agree with me that the

3   government, having met with you 24 times, um, you expect

4   them to tell the judge that you've cooperated this much,

5   right?

6   A.    (Silence.)

7   Q.    You expect the prosecutor to explain to the judge

8   that you have met with them 24 times, right?

9   A.    Ma'am, I have been detained in the United States

10  for 59 months, I do not expect anything from the

11  government.

12  Q.    Okay.  So you are meeting -- by the way, when you

13  meet with the U.S. Attorney Office, you bring your

14  lawyers from Greenberg Traurig, is that correct?

15  A.    Ma'am, I have had four sets of legal counsel since

16  being arrested in October 2018.

17  Q.    Okay, but in these -- okay, how about since 2021,

18  when you've met several times with the government and

19  the SEC, have you brought your lawyers from Greenberg

20  Traurig?

21  A.    They have attended the proffer sessions, yes.

22  Q.    Okay, and is it one lawyer or two lawyers?

23  A.    There were -- it depended, either one or two, um,

24  depending who was available.

25  Q.    Okay, and I think at some point Ms. Shields showed

```
 1    you an invoice from Greenberg Traurig, and I realize
 2    it's not your invoice, but Greenberg Traurig is a
 3    national firm, is that correct?
 4    A.    That is correct.
 5    Q.    And you'd agree with me that their rates are, and
 6    I can't say "excessive," but they have high rates,
 7    correct?
 8    A.    They have high rates, that is correct.
 9    Q.    So every time you meet with the government and
10    bring 1 or 2 lawyers from Greenberg Traurig, I assume
11    Greenberg Traurig is billing you for that time?
12    A.    Yes, they were.
13    Q.    Okay.  But you're telling me you don't expect the
14    government to tell the judge about all this cooperation
15    that you've engaged in, you have no expectation of that?
16    A.    I have no expectations.  They may tell the judge
17    or they may not tell the judge.  I have -- I do not know
18    what the government will or will not do.
19    Q.    Well didn't you testify yesterday, when
20    Ms. Shields asked you, that you expect and hope that you
21    will not do the guidelines range of 150 to 188 months?
22    A.    That is based on my observation of individuals
23    that have received a sentence, um, that were part of
24    a -- the same or the same criminal conspiracy to date.
25    Q.    And who are those people?
```

A2940

```
 1   A.    So that is Maurey Tobin, he received a sentence of

 2   4 months.  There is a Swiss attorney, Matthew LaVinna,

 3   who received 0 time incarceration.  And there is another

 4   Swiss attorney, Milan Patel, who received or served 7

 5   months incarceration.

 6   Q.    Okay.  And so you are now expecting, based on

 7   these other people whom we've never heard of -- we've

 8   never heard of any of these people before in this

 9   courtroom?

10   A.    Okay.

11   Q.    But I'm asking you, they're not related to the

12   case at hand, is that fair to say?

13   A.    That is correct.

14   Q.    Okay.  And you're telling me that based on the

15   sentences they got, you think, um, despite the, um,

16   guideline range that's much higher than that, that

17   Judge -- and your sentencing judge is Judge Gorton, by

18   the way, is that correct?

19   A.    That is correct.

20   Q.    You expect Judge Gorton to say, "Hey, I'm just

21   going to give you" -- "well maybe" -- do you think he'll

22   give you time-served?

23         MS. SHIELDS:  Objection.

24         THE COURT:  Yeah, I'm having -- he's got no basis

25   to answer that.
```

A2941

```
 1        MS. PICKETT:  Okay, I'm sorry, your Honor.  He
 2   said yesterday he expected a lighter sentence and I'm
 3   trying to --
 4        THE COURT:  I understand what he said and it's all
 5   for the jury.  He can say what he hopes the judge will
 6   do.  Um, he may certainly say that.
 7   Q.   Let me ask it this way, sir.
 8        You're not meeting with the government 24 times
 9   and paying those expensive lawyers, um, to not reap some
10   benefit for yourself, right?
11   A.   That is correct.
12   Q.   Now, um, I want to go back and, um -- how many
13   meetings did you have with the government while you were
14   incarcerated at the Plymouth County Jail, approximately?
15   A.   Um, it's hard, um, maybe 6 or 8, or 10.  I -- you
16   know I do not recall, um -- I mean those were -- every
17   day was very stressful, I was not walking into a
18   courtroom in a jacket or a sports coat.
19   Q.   Right, you were living prison life in your prison
20   garb?
21   A.   Yes, I was.
22   Q.   How did the -- did the federal agents in the U.S.
23   Attorney's Office come to the prison and meet with you
24   there?
25   A.   My day would have begun at 5:00 a.m. with an early
```

A2942

```
 1   wake-up.  I had breakfast.  Then I'd have to pack my
 2   belongings, leave my cell, walk to booking, get
 3   strip-searched, and then go into another waiting,
 4   holding area where I got shackled, arms and feet.  And
 5   then I'd sit in the back of a small van, like a
 6   refrigerator, with several other inmates.  We would
 7   travel 90 minutes to outside the courthouse, when we
 8   would arrive at about 7:50.
 9        We'd wait until the courthouse opened at 8:00 and
10   we would go in, be searched again, and put in a holding
11   cell.  And from there, depending if it was a court day
12   or a meeting -- if it was a court day, I might be there
13   for 3 or 4 hours until the meeting commenced.  When the
14   meeting finished, or the court session finished, I would
15   go down into a waiting cell.  And then everyone would
16   travel back together at the end of the day.
17   Q.   And --
18        THE COURT:  Ms. Pickett, we're going to stop
19   there, that's what I've told the jury.
20        Ladies and gentlemen, we will stop now, on this
21   day only, and we are moving right along.  So keep your
22   minds suspended, do not discuss the case either among
23   yourselves, nor with anyone else.  You may stand in
24   recess until 9:00 a.m. tomorrow.  The jury may recess.
25        THE CLERK:  All rise for the jury.
```

A2943

```
1          (Jury leaves, 11:00 a.m.)

2          THE COURT:  And we'll stand in recess.

3          (Adjourned, 11:00 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 5   do hereby certify that the foregoing record is a true

 6   and accurate transcription of my stenographic notes

 7   before Judge William G. Young, on Wednesday, September

 8   20, 2023, to the best of my skill and ability.

 9

10

11

12

13   /s/ Richard H. Romanow 1-23-24
     _____
14   RICHARD H. ROMANOW    Date

15

16

17

18

19

20

21

22

23

24

25
```