# United States Court of Appeals

*for the*

# First Circuit

Case Nos. 24-1770,
24-1771, 24-1772,
24-1773, 24-1774

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

ZHIYING YVONNE GASARCH,

*Defendant-Appellant,*

FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS;
PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

―――――――――――――

*(For Continuation of Caption See Inside Cover)*

―――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON IN CASE NO. 1:21-CV-11276-WGY,
HONORABLE WILLIAM G. YOUNG, U.S. DISTRICT JUDGE

## JOINT APPENDIX
## Volume 6 of 8 (Pages A2946 to A3504)

STEPHEN G. TOPETZES
NEIL T. SMITH
ROBERT S. SILVERBLATT
K&L GATES LLP
*Counsel for Defendant-Appellant*
*Paul Sexton*
1601 K Street, NW
Washington, DC 20006
(202) 778-9000

MICHAEL TREMONTE
SHER TREMONTE
*Counsel for Defendant-Appellant*
*Mike K. Veldhuis*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (336840)

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

MIKE K. VELDHUIS,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

————————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

PAUL SEXTON,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

————————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

COURTNEY KELLN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
MIKE K. VELDHUIS; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

————————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

JACKSON T. FRIESEN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; PAUL SEXTON;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

FRANK SCADUTO
KEVIN B. MUHLENDORF
WILEY REIN LLP
*Counsel for Defendant-Appellant*
 *Courtney Kelln*
2050 M Street, NW
Washington, DC 20036
(202) 719-7000


MARANDA FRITZ
MARANDA E. FRITZ PC
521 5th Avenue
17th Floor
New York, New York 10175
(646) 584-8231


TIMOTHY J. FAZIO
MANNING GROSS + MASSENBURG LLP
125 High Street
Oliver Street Tower, 6th Floor
Boston, Massachusetts 02110
(617) 670-8800


*Counsel for Defendant-Appellant*
 *Jackson T. Friesen*

DANIEL STAROSELSKY
ASSISTANT GENERAL COUNSEL
KERRY J. DINGLE
SENIOR APPELLATE COUNSEL
U.S. SECURITIES & EXCHANGE
 COMMISSION
*Counsel for Plaintiff-Appellee*
100 F Street, NE
Washington, DC 20549
(202) 551-6953

KAREN A. PICKETT
PICKETT LAW OFFICES, PC
*Counsel for Defendant-Appellant*
 *Zhiying Yvonne Gasarch*
125 High Street, 26th Floor
Boston, Massachusetts 02110
(617) 423-0485

# TABLE OF CONTENTS

**Page**

Docket Entries .................................................................................... A1

Complaint, filed August 5, 2021 (Dkt. 1) ........................................ A55

    Exhibit A: Hearing dated August 29, 2019 .......................... A136

    Exhibit B: Foot Loose Charlie Smith's Offshore Chronicles ............... A143

    Exhibit C: Invoice ................................................................. A144

    Exhibit D: E-Mail Correspondence ....................................... A148

    Exhibit E: Q Account ............................................................ A184

    Exhibit F: Q Bank Broker: Work ......................................... A191

    Exhibit G: Peaceful Lion Holdings Limited ........................ A194

    Exhibit H: Wire Transfer ...................................................... A211

    Exhibit I: Securities and Exchange Commission, Schedule 13D/A ....... A212

    Exhibit J: Chart .................................................................... A217

    Exhibit K: August 19, 2013, Treasury Order ...................... A220

    Exhibit L: Portfolio Valuation 790-1 ................................... A248

Declaration of Trevor T. Donelan, filed August 5, 2021 ................ A275

Civil Cover Sheet ............................................................................. A310

Plaintiff's Emergency *Ex Parte* Motion for a Temporary Restraining Order, Order Freezing Assets and Order for Other Equitable Relief, filed August 5, 2021 (Dkt. 3) .......................................................... A311

[Proposed] Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief, filed August 5, 2021 ................... A313

Plaintiff's Memorandum of Law in Support of its Emergency *Ex Parte* Motion for a Temporary Restraining Order, Order Freezing Assets, and Other for Equitable Relief, filed August 5, 2021 (Dkt. 4) ............. A323

Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief, filed August 6, 2021 (Dkt. 7) .................... A358

i

**Page**

[Proposed] Preliminary Injunction Order, order Freezing Assets, and Order for Other Equitable Relief, filed August 20, 2021 (Dkt. 39)................. A368

Transcript of Motion Hearing Held on January 20, 2022, filed January 25, 2022 (Dkt. 193)........................................................................... A380

Final Judgment as to Defendant Frederick L. Sharp, filed May 12, 2022 (Dkt. 211)................................................................................ A407

Memorandum and Order, filed September 6, 2022 (Dkt. 228) ........................ A420

Amended Complaint, filed September 9, 2022 (Dkt. 230).............................. A524

Defendant Paul Sexton's Answer to Amended Complaint and Affirmative Defenses, filed September 23, 2022 (Dkt. 242) .................................... A616

Defendant Mike K. Veldhuis Verified Answer to Verified Amended Complaint, filed September 23, 2022 (Dkt. 244) .................................. A652

Defendant Courtney Kelln's Answer to Amended Complaint, filed September 30, 2022 (Dkt. 245) .............................................. A702

Defendant Zhiying Yvonne Gasarch's Anser to Amended Complaint and Affirmative Defenses, filed October 7, 2022 (Dkt. 246)...................... A738

Answer of Defendant Jackson T. Friesen to Amended Complaint, filed October 14, 2022 (Dkt. 247).................................................... A848

Declaration of Roger Knox, filed April 17, 2023 (Dkt. 274) .......................... A950

Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 2, 2023 (Dkt. 280) ............................................ A959

Memorandum of Law in Support of Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 2, 2023 (Dkt. 281)............................................................................... A962

Declaration of Robert Knuts, filed may 2, 2023 (Dkt. 282) ............................ A988

Exhibit A: Email correspondence dated February 8, 2022 ................... A990

Exhibit B: Email exchange involving AUSA Drabick and Kevin Muhlendorf, counsel for defendant Courtney Kelln, dated February 8, 2022 through February 11, 2022 .............................. A994

**Page**

Exhibit C: Email dated February 17, 2023, from AUSA Drabick to counsel for Mr. Veldhuis, Michael Tremonte and Noam Biale... A997

Exhibit D: Email dated March 17, 2023, from SEC Attorney Kathleen Shields ...................................................................... A1014

Exhibit E: Notice of Civil Claim that the Securities and Exchange Commission filed in the Supreme Court of British Columbia on August 11, 2022 ........................................................ A1020

Exhibit F: Reasons for Judgment issued by the Supreme Court ofBritish Columbia on March 21, 2023 ................................. A1031

Exhibit G: SEC's Responses and Objections to Defendant Courtney Kelln's First Requests for Admissions dated March 17, 2023 . A1061

Defendant Paul Sexton's Notice of Joinder, filed May 8, 2023 (Dkt. 286) . A1079

Plaintiff's Opposition to Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 9, 2023 (Dkt. 289) ......... A1082

Exhibit A: Application Response ....................................... A1096

Electronic Order, filed May 15, 2023 (Dkt. 292) ........................................ A1101

Defendants Courtney Kelln and Mike Veldhuis' Notice of Non-Opposition to Entry of Judgment, filed June 13, 2023 (Dkt. 315)...................... A1102

[Proposed Order Entering] Judgment as to Defendant Courtney Kelln, filed June 13, 2023 ................................................................. A1106

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 13, 2023 ................................................................. A1112

Plaintiff's Response to Kelln's and Veldhuis's Notice of Non-Opposition to Entry of Judgment, filed June 14, 2023 (Dkt. 316) .......................... A1118

Order Entering Judgment s to Defendant Courtney Kelln, filed June 14, 2023 (Dkt. 317)......................................................................... A1121

Notice of Corrected Filing Regarding Defendant Mike Velhuis' Notice of Non-Opposition of Entry of Judgment, filed June 14, 2023 (Dkt. 318) ..................................................................... A1127

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 14, 2023 ................................................................. A1130

**Page**

Notice of Corrected Filing Regarding Defendant Mike Veldhuis' Notice of Non-Opposition to Entry of Judgment, filed June 15, 2023 (Dkt. 319) ................................................................................... A1137

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 15, 2023 ................................................................... A1140

Judgment as to Defendant Mike Veldhuis, filed June 21, 2023 (Dkt. 325) ... A1147

Defendant Jackson T. Friesen's Motion in Limine to Exclude "Q" Records and Purported Expert Testimony, filed August 10, 2023 (Dkt. 329)... A1154

Order, filed August 10, 2023 ................................................................ A1167

Yvonne Gasarch's Motion in Limine to Exclude "Q" Records and Purported Expert Testimony, filed August 24, 2023 (Dkt.. 334)........................ A1168

    Exhibit 1: Deposition of Fedir Nikolayev ........................................... A1174

Plaintiff's Opposition to Defendant Jackson T. Friesen's Motion to Exclude "Q" Records and Purported Expert Testimony, filed August 25, 2023 (Dkt. 336)........................................................................................ A1261

    Exhibit 1: Declaration of Ryan Murphy ............................................. A1279

    Exhibit 2: Deposition of Written Questions of Zhiying Yvonne Gasarch ............................................................................................. A1285

Defendant Paul Sexton's Motion in Limine to Exclude Q System and Associated Data, fled August 31, 2023 (Dkt. 338) ............................. A1323

    Exhibit 1: Deposition of Fedir Nikolayev ........................................... A1336

Transcript of Motion Hearing, filed September 1, 2023 (Dkt. 344)............... A1356

Yvonne Gasarch's Motion to Supplement Her Motion in Limine filed on August 24, 2023, filed September 1, 2023 (Dkt. 346) ........................ A1377

Plaintiff's Opposition to Defendants Sexton's and Gasarch's Motions to Exclude Expert Testimony, filed September 4, 2023 (Dkt. 350)......... A1379

    Exhibit A: Expert Witness Report of Philip A. Feigin........................ A1385

    Exhibit B: Government's Trial Memorandum, Response to Defendants' Motion in Limine, and Supplemental 404(b) Notice....... A1395

**Page**

Plaintiff's Opposition to Defendant Yvonne Gasarch's Motion in Limine to
    Exclude "Q" Records and Purported Expert Testimony, filed
    September 5, 2023 (Dkt. 352) ............................................................. A1422

Plaintiff's Opposition to Defendant Paul Sexton's Motion in Limine to
    Exclude "Q" System and Associated Data, filed September 5, 2023
    (Dkt. 353).......................................................................................... A1426

    Exhibit A: Securities and Exchange Commission B03147 Analysis of
        MySQL Databases, Summary of Accounts ............................... A1439

    Exhibit B: Summary of Transfer Agent Records – Acquisitions of
        Stevia First, Vitality Stock ....................................................... A1454

    Exhibit C: Q Account Detail ................................................................ A1455

    Exhibit D: Revised Deposition on Written Questions of Paul Sexton . A1456

    Exhibit E: Wire Transfer ...................................................................... A1524

    Exhibit F: E-Mail Correspondence...................................................... A1527

    Exhibit G: E-Mail Correspondence ..................................................... A1528

    Exhibit H: E-Mail Correspondence ..................................................... A1529

Defendant Paul Sexton's Notice of Non-Opposition to Entry of Judgment,
    filed September 11, 2023 (Dkt. 376) .................................................... A1530

[Proposed] Order Entering Judgment as to Defendant Paul Sexton, filed
    September 11, 2023 .............................................................................. A1533

Order Entering Judgment as to Defendant Paul Sexton, filed September 12,
    2023 (Dkt. 378).................................................................................... A1535

Order, filed September 19, 2023 (Dkt. 385) ...................................................... A1537

Yvonne Gasarch's Motion in Limine to Preclude Admission of Exhibit QK,
    filed September 21, 2023 (Dkt. 389) .................................................... A1542

    Exhibit 1: Summary of Gasarch Earnings ........................................... A1544

Yvonne Gasarch's Motion to Strike Evidence that the Court Admitted De
    Bene Pursuant to Fed. R. Evid. 801(d)(2)(E), filed September 25,
    2023 (Dkt. 394).................................................................................... A1545

Yvonne Gasarch's Motion Pursuant to Fed. R. Civ. P. 50 for Judgment as a
    Matter of Law, filed September 25, 2023 (Dkt. 395)........................... A1548

**Page**

Verdict, filed September 27, 2023 (Dkt. 402) ................................ A1553

Yvonne Gasarch's Renewed Motion Pursuant to Fed. R. Civ. P. 50 for
    Judgment as a Matter of Law or, in the Alternative, for a New Trial,
    filed October 25, 2023 (Dkt. 413) ......................................... A1555

Electronic Order, filed October 26, 2023 (Dkt. 414)...................................... A1564

Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the
    Proceedings, filed December 5, 2023 (Dkt. 421) ................................ A1565

Memorandum of Law in Support of Defendants Mike K. Veldhuis and
    Courtney Kelln's Motion to Stay the Proceedings, filed December 5,
    2023 (Dkt. 422)...................................................................... A1569

Declaration of Robert Knuts, filed December 5, 2023 (Dkt. 423) .............. A1592

    Exhibit 1:Affidavit dated November 17, 2023 executed by Assistant
        United States Attorney James R. Drabick ................................ A1594

    Exhibit 2: Email correspondence dated February 8, 2022 ................ A1726

    Exhibit 3: Email dated February 17, 2023 , from AUSA Drabick to
        counsel for Mr. Yeldhuis, Michael Tremonte and Noam Biale  A1730

    Exhibit 4: Email dated March 17, 2023, from SEC Attorney ............ A1747

Plaintiff's Motion for Remedies Against Defendants Mike Veldhuis, Paul
    Sexton, Jackson Friesen, Courtney Kelln and Zhiying Yvonne
    Gasarch, filed December 8, 2023 (Dkt. 425)...................................... A1753

Final Judgment as to Defendant Jackson T. Friesen, filed December 8,
    2023 ................................................................................ A1756

Final Judgment as to Defendant Yvonne Gasarch, filed December 8, 2023  A1769

Final Judgment as to Defendant Paul Sexton, filed December 8, 2023 ....... A1779

Final Judgment as to Defendant Mike K. Veldhuis, filed December 8,
    2023 ................................................................................ A1791

Final Judgment as to Defendant Courtney Kelln, filed December 8, 2023 .. A1804

Plaintiff's Memorandum in Support of Motion for Remedies Against
    Defendants Mike Veldhuis, Paul Sexton, Jackson Friesen, Courtney
    Kelln, and Zhiying Yvonne Gasarch, filed December 8, 2023 (Dkt.
    426) ................................................................................ A1813

**Page**

Exhibit A: Transcript of September 27, 2023 Jury Charge ................ A1845

Exhibit B: Government's Notice of Anticipated Restitution Request
and Motion for Continuance ..................................... A1890

Declaration of Ryan Murphy, filed December 8, 2023 (Dkt. 427) ............. A1902

Exhibit 1: ACCO / ACC1 Q Account Detail.................................... A1916

Exhibit 2: HEAR Q Account Detail .................................... A1941

Exhibit 3: GARD Q Account Detail.................................... A1956

Exhibit 4: Chart.................................... A1972

Exhibit 5: Wire Transfer.................................... A2141

Exhibit 6: Wire Transfer.................................... A2142

Exhibit 7: Wire Transfer.................................... A2143

Exhibit 8: Wire Transfer.................................... A2144

Exhibit 9: Wire Transfer.................................... A2145

Exhibit 10: Wire Transfer.................................... A2147

Exhibit 11: E-mail Correspondence .................................... A2149

Exhibit 12: E-mail Correspondence .................................... A2150

Exhibit 13: E-mail Correspondence .................................... A2151

Exhibit 14: Wire Transfer.................................... A2152

Exhibit 15: Wire Transfer.................................... A2153

Exhibit 16: E-mail Correspondence .................................... A2154

Exhibit 17: E-mail Correspondence .................................... A2155

Exhibit 18: Wire Transfer.................................... A2168

Exhibit 19: Wire Transfer.................................... A2169

Exhibit 20: DGM Bank and Trust Inc. Statement of Account Activity
.................................... A2170

Exhibit 21: E-mail Correspondence .................................... A2171

Exhibit 22: E-mail Correspondence .................................... A2175

**Page**

Exhibit 23: Wire Transfer .................................................... A2181

Exhibit 24: Text Messages ................................................. A2182

Exhibit 25: Text Messages ................................................. A2223

Exhibit 26: E-mail Correspondence ................................... A2225

Exhibit 27: Invoice .............................................................. A2226

Exhibit 28: Wire Transfer .................................................... A2227

Exhibit 29: Wire Transfer .................................................... A2228

Exhibit 30: E-mail Correspondence ................................... A2229

Exhibit 31: Invoice .............................................................. A2230

Exhibit 32: Bank Statement ................................................ A2235

Exhibit 33: Veldhuis PJI Backup ........................................ A2237

Plaintiff's Opposition to Defendants Mike K. Veldhuis and Courtney Kelln's Second Motion to Stay the Proceedings, filed December 18, 2023 (Dkt. 429) .................................................................. A2284

Final Pretrial Conference Transcript, filed January 24, 2023 (Dkt. 434) ....... A2289

Jury Trial Transcript Day 1, filed January 24, 2024 (Dkt. 435) ..................... A2310

Jury Trial Transcript Day 2, filed January 24, 2024 (Dkt. 436) ..................... A2416

Jury Trial Transcript Day 3, filed January 24, 2024 (Dkt. 437) ..................... A2534

Jury Trial Transcript Day 4, filed January 24, 2024 (Dkt. 438) ..................... A2674

Jury Trial Transcript Day 5, filed January 24, 2024 (Dkt. 439) ..................... A2772

Jury Trial Transcript Day 6, filed January 24, 2024 (Dkt. 440) ..................... A2865

Jury Trial Transcript Day 7, filed January 24, 2024 (Dkt. 441) ..................... A2946

Jury Trial Transcript Day 8, filed January 24, 2024 (Dkt. 442) ..................... A3103

Motion and Charge Conference Transcript, filed January 24, 2024 (Dkt. 443) .................................................................................... A3273

Jury Trial Transcript Day 9, filed January 24, 2024 (Dkt. 444) ..................... A3331

Jury Trial Transcript Day 10, filed January 24, 2024 (Dkt. 445) .................. A3458

**Page**

Electronic Order, filed February 7, 2024 (Dkt. 451) ...................................... A3469

Defendant Paul Sexton's Opposition to Motion for Remedies, filed February 14, 2024 (Dkt. 454) ............................................................................ A3470

Defendant Courtney Kelln's and Mike K. Veldhuis's Opposition to Plaintiff SEC's Motion for Remedies Against Defendants Veldhuis, Sexton, Friesen, Kelln, and Gasarch, filed February 14, 2024 (Dkt. 455) ........ A3491

Defendants Mike K. Veldhuis and Courtney Kelln's Motion for Reconsideration, filed February 16, 2024 (Dkt. 456) ............................ A3495

Memorandum of Law in Support of Veldhuis and Kelln's Motion for Reconsideration of the Second Motion to Stay, filed February 16, 224 (Dkt. 457) ................................................................................................ A3499

Declaration of Robert Knuts, filed February 16, 2024 (Dkt. 458) ............... A3505

    Exhibit 1: Indictment filed January 9, 2024 ...................................... A3506

Defendant Paul Sexton's Motion for Stay, filed February 20, 2024 (Dkt. 459) ...................................................................................................... A3544

Electronic Order Denying Motion for Reconsideration, filed February 20, 2024 (Dkt. 460) ...................................................................................... A3547

Defendant Yvonne Gasarch's Opposition to SEC's Remedies Motion, filed February 21, 2024 (Dkt. 464) ............................................................. A3548

    Exhibit 1: Q System Data ................................................................. A3566

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against Defendants Paul Sexton, Mike Veldhuis, and Courtney Kelln, filed March 1, 2024 (Dkt. 470) .................................................................... A3587

    Exhibit A: E-Mail Correspondence ................................................... A3602

    Exhibit B: Wire Transfer .................................................................. A3604

    Exhibit C: DGM Band and Trust Inc. Statement of Account Activity ...................................................................................... A3606

    Exhibit D: E-Mail Correspondence ................................................... A3610

    Exhibit E: E-Mail Correspondence ................................................... A3617

Defendant Jackson Friesen's Opposition to Plaintiff's Motion for Remedies, filed March 1, 2024 (Dkt. 471) .......................................................... A3620

ix

**Page**

Defendant Paul Sexton's Sur-Reply Regarding Motion for Remedies, filed
March 6, 2024 (Dkt. 473) ................................................................. A3633

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against
Defendant Yvonne Gasarch, filed March 7, 2024 (Dkt. 474) ............ A3641

 Exhibit A: Wire Transfer .................................................... A3655

 Exhibit B: Wire Transfer .................................................... A3656

 Exhibit C: Wire Transfer .................................................... A3657

 Exhibit D: Information Return for Electronic Filing of An Individual's
  Income Tax and Benefit Return ................................. A3658

 Exhibit E: Officers and Directors Enquiry ......................... A3661

 Exhibit F: Wire Transfer ..................................................... A3666

 Exhibit G: Wire Transfer .................................................... A3668

 Exhibit H: Letter dated April 21, 2018 ............................... A3671

 Exhibit I: Wire Transfer ...................................................... A3672

 Exhibit J: Bank Statement ................................................... A3673

 Exhibit K: Chart .................................................................. A3674

 Exhibit L: Assignment ........................................................ A3676

 Exhibit M: E-mail Correspondence .................................... A3681

Declaration of Christopher Beckstrom, filed March 7, 2024 (Dkt. 475) ...... A3695

 Exhibit 1: E-Mail Correspondence ..................................... A3698

 Exhibit 2: E-Mail Correspondence ..................................... A3699

 Exhibit 3: E-Mail Correspondence ..................................... A3700

Declaration of Ryan Murphy, filed March 7, 2024 (Dkt. 476) .................... A3701

 Exhibit 1: Summary of Cash Withdrawals .......................... A3704

 Exhibit 2: Summary of Cash Withdrawals .......................... A3706

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against
Defendant Jackson Friesen, filed March 14, 2024 (Dkt. 480) ............ A3710

**Page**

Defendant Yvonne Casarch's Sur-Reply to SEC's Reply to her Opposition to SEC's Remedies Motion, filed March 15, 2024 (Dkt. 481)........... A3715

Plaintiff's Proposed Judgments Against Defendants Veldhuis, Sexton, Friesen, Kelln and Gasarch, filed May 10, 2024 (Dkt. 485) .............. A3723

Judgment as to Defendant Mike K. Veldhuis, filed May 10, 2024 ............ A3725

Judgment as to Defendant Paul Sexton, filed May 10, 2024...................... A3733

Judgment as to Defendant Jackson T. Friesen, filed May 10, 2024 ............ A3741

Judgment as to Defendant Courtney Kelln, filed May 10, 2024 ................. A3749

Judgment as to Defendant Yvonne Gasarch, filed May 10, 2024 ............... A3756

Yvonne Gasarch's Objections to SEC's Proposed (Partial) Judgment, filed May 20, 2024 (Dkt. 486) ....................................................................... A3762

Plaintiff's Response to Defendant Zhiying Yvonne Gasarch's Objections to SEC's Proposed Judgment, filed may 20, 2024 (Dkt. 487) ................. A3766

Defendant Paul Sexton's Objections to Proposed Judgment, filed May 20, 024 (Dkt. 488)........................................................................................ A3769

Defendant Jackson Friesen's Objections to Plaintiff's Proposed Judgment, filed May 20, 2024 (Dkt. 489)................................................................ A3773

Objections by Defendants Veldhuis and Kelln to Proposed Partial Judgments Against Veldhuis and Kelln Submitted by Plaintiff Securities and Exchange Commission, filed May 20, 2024 (Dkt. 490)...................... A3782

Transcript of Disgorgement, filed May 23, 2024 (Dkt. 491).......................... A3787

Memorandum and Order, filed June 17, 2024 (Dkt. 494) .............................. A3823

Judgment as to Defendant Paul Sexton, filed June 20, 2024 (Dkt. 495) ........ A3886

Judgment as to Defendant Mike K. Veldhuis, filed June 20, 2024 (Dkt. 496) ....................................................................................................... A3896

Judgment as to Defendant Jackson T. Friesen, filed June 20, 2024 (Dkt. 497) ....................................................................................................... A3907

Judgment as to Defendant Yvonne Gasarch, filed June 20, 2024 (Dkt. 498) A3917

Judgment as to Defendant Courtney Kelln, filed June 20, 2024 (Dkt. 499) .. A3925

**Page**

Motion for Orders Directing the Turnover of Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 (Dkt. 500).................... A3935

[Proposed] Order Directing Transfer of Jackson T. Friesen's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........ A3940

[Proposed] Order Directing Transfer of Yvonne Gasarch's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3947

[Proposed] Order Directing Transfer of Courtney Kelln's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3952

[Proposed] Order Directing Transfer of Paul Sexton's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ................. A3955

[Proposed] Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3961

Defendant Jackson Friesen's Objections to Judgment, Motion to Amend, Clarify or Correct Judgment and Opposition to Motion for Turnover Order, filed July 2, 2024 (Dkt. 501) .................................................... A3968

Defendant Paul Sexton's Opposition to Motion for Orders Directing the Turnover of Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 (Dkt. 502) ..................................... A3974

Defendant Courtney Kelln's Notice of Joinder, filed July 3, 2024 (Dkt. 503) ................................................................................... A3977

Defendant Yvonne Gasarch's Notice of Joinder, filed July 3, 2024 (Dkt. 504) ................................................................................... A3979

Defendant Paul Sexton's Notice of Joinder, filed July 3, 2024 (Dkt. 505) A3981

Defendant Mike K. Veldhuis's Notice of Joinder, filed July 3, 2024 (Dkt. 506) ................................................................................... A3984

Plaintiff's Opposition to Defendants' Motions to Amend, Clarify or Correct Judgment, filed July 15, 2024 (Dkt. 507)......................................... A3986

Electronic Order Allowing Motion for Release of Funds, filed July 11, 2024 (Dkt. 508)........................................................................ A3990

Order Directing Transfer of Jackson T. Friesen's Frozen Funds to the Securities and Exchange Commission, filed July 11, 2024 (Dkt. 509) ................................................................................... A3991

**Page**

Order Directing Transfer of Yvonne Gasarch's Frozen Funds to the
    Securities and Exchange Commission, filed July 11, 2024 (Dkt.
    510) ................................................................................... A3998

Order Directing Transfer of Courtney Kelln's Frozen Funds to the Securities
    and Exchange Commission, filed July 11, 2024 (Dkt. 511)............. A4003

Order Directing Transfer of Paul Sexton's Frozen Funds to the Securities
    and Exchange Commission, filed July 11, 2024 (Dkt. 512)............. A4006

Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to the
    Securities and Exchange Commission, filed July 11, 2024 (Dkt.
    513) ................................................................................... A4012

Electronic Order re: Motion to Amend, filed July 16, 2024 (Dkt. 514)..... A4019

Defendant Paul Sexton's Motion to Stay Execution of Judgment, filed July
    18, 2024 (Dkt. 515)................................................................ A4020

    Exhibit 1: E-mail Correspondence ................................................. A4025

Motion of Defendants Mike Veldhuis and Courtney Kelln to Stay Execution
    of Judgment, filed July 19, 2024 (Dkt. 516)..................................... A4029

Defendant Yvonne Gasarch's Motion to Stay Execution of Judgment, filed
    July 22, 2024 (Dkt. 517)...................................................... A4035

    Exhibit 1: Order Made After Application ...................................... A4045

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 518) A4054

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 519).... A4055

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 520).... A4056

Notice of Appeal by Zhiying Yvonne Gasarch, filed August 19, 2024 (Dkt.
    521) ................................................................................... A4057

Notice of Appeal by Mike Veldhuis, filed August 19, 2024 (Dkt. 522) ........ A4059

Notice of Appeal by Courtney Kelln, filed August 19, 2024 (Dkt. 523) ....... A4061

Notice of Appeal by Paul Sexton, filed August 19, 2024 (Dkt. 524)............. A4063

Notice of Appeal by Jackson T. Friesen, filed August 19, 2024 (Dkt. 525) .. A4066

Plaintiff's Motion in Support of Distribution for the Benefit of Harmed
    Investors and Seeking and Order Establishing a Fair Fund, Appointing

a Tax Administrator, and Authorizing Payment of Tax Obligations
and Related Fees and Expenses of Tax Administrator Without Further
Court Order, filed September 4, 2024 (Dkt. 537) ................................ A4068

[Proposed] Order Establishing a Fair Fund, Appointing a Tax Administrator,
and Authorizing Payment of Tax Obligations and Related Fees and
Expenses of the Tax Administrator Without Further Court Order, filed
September 4, 2024 ................................................................... A4071

Plaintiff's Memorandum of Law Describing Proposed Distribution
Framework and in Support of Motion Seeking an Order Establishing a
Fair Fund and Other Relief, filed September 4, 2024 (Dkt. 538) ........ A4074

Exhibit A: Order Approving Distribution Plan .................................... A4093

Exhibit B: Order Approving Plan of Distribution ................................ A4129

Exhibit C: Order Reclassifying Prejudgment Interest as Disgorgement,
Appointing a Distribution Agent, and Approving a Distribution
Plan for the Distribution Fund.................................................... A4160

Declaration of Dr. Thomas A. Dunn, filed September 4, 2024, filed
September 4, 2024 (Dkt. 539) ..................................................... A4173

Appendix 1: Defendants' Monetary Remedies ................................... A4186

Appendix 2: Knox Restitution Fund, Losses by OTC Security Ticker  A4187

Appendix 3: Group 2 Tickers and Defendants .................................... A4188

Defendant Paul Sexton's Opposition to Motion for Fair Fund, filed
September 16, 2024 (Dkt. 540) .................................................... A4189

Defendant Jackson Friesen's Opposition to Motion for Fair Fund, filed
September 16, 2024 (Dkt. 541) .................................................... A4192

Defendant Yvonne Gasarch's Motion for Joinder, filed September 16, 2024
(Dkt. 542)................................................................................ A4196

Defendant Courtney Kelln's Motion for Joinder, filed September 16, 2024
(Dkt. 543)................................................................................ A4198

Defendant Mike K. Veldhuis's Notice of Joinder and Response to Motion,
filed September 16, 2024 (Dkt. 544) ............................................. A4200

Electronic Order, filed September 18, 2024 (Dkt. 545) ................................ A4203

**Page**

Trial Exhibits:

Exhibit 14: Xphone between 2, 4 and 66....................................... A4204

Exhibit 16: Ian Cooper's Special Report re Arch Therapeutics.................. A4205

Exhibit 17: Chuck Hughes Microcap Report (Conmar Capital) re Stevia First
    $50 Billion Sugar ..................................................... A4250

Exhibit 18: Xphone chain between 2, 3, 4 and 66 re Send....................... A4262

Exhibit 40: E-mail from Wires to Nikolayev (FEN) re Wire please ........... A4264

Exhibit 45: Xphone chain between 2, 3, 4, 60 and Sexy re Summary ........ A4265

Exhibit 79: Xphone chain between Elgi, Wires and 19.......................... A4266

Exhibit 81: Xphone chain between Bond, 104 and Blgx re Hiya............... A4268

Exhibit 87: Xphone chain between 2, 3 and 4 re Meeting....................... A4304

Exhibit 90: Xphone chain between Bond and Wires re Cash.................... A4305

Exhibit 99: Xphone chain between Gard, Celt and 2 re ARW .................. A4306

Exhibit 113: Xphone chain between 2, 3, and 4 re Copy ........................ A4307

Exhibit 126: Xphone between Gard and Kash re Yo .............................. A4308

Exhibit 134: Xphone chain between 2, 3, and 4 re Rights ...................... A4309

Exhibit 136: Xphone chain between 2, 3, and 4 re Today....................... A4311

Exhibit 140: Xphone from 4 to 2 .................................................... A4314

Exhibit 141: Xphone chain between 2, 3, and 4 ................................... A4315

Exhibit 151: Xphone chain between Wires and 19 ELGI ....................... A4316

Exhibit 154: Xphone from GARD to KASH and ACCO re Yo.................. A4318

Exhibit 157: Xphone chain between Wires, Kash and Celt re Wire to
    Business Venture Investments............................................ A4319

Exhibit 168: Xphone chain between Peace, 77, Lion and Wires re Hi ....... A4320

Exhibit 170: Xphone chain between 2, 3 and 114 re There you have it...... A4321

Exhibit 180: Xphone chain between Wires, Bond, Luna and Alex 110 re
    Remo..................................................................... A4322

**Page**

Exhibit 183: Xphone between 2 and 98 re Test ........................................... A4323

Exhibit 184: Xphone chain between Fen, Wires and 76 re Where r u ........ A4324

Exhibit 190: Xphone chain between 2 and 4 re Test .................................. A4326

Exhibit 193: Xphone chain between 76, Fen and Wires re Xvoice ............ A4327

Exhibit 233: Beckstrom Xphone Header Spreadsheet ................................ A4329

Exhibit 237: Xmail message from Wires (xMeridian) to Friesen re 2 Wires
    to Go Out ................................................................ A4384

Exhibit 239: Xmail message from Wires to Friesen re 2 Wires to go out ... A4385

Exhibit 261: Xmail messages between Friesen, "acco" and "hear" re NA . A4387

Exhibit 273: Xmail message from Friesen to Acco and Hear re creative with
    attachments ........................................................... A4391

Exhibit 284: Establishment of the beneficial owner's identity for Peregrine
    Capital .................................................................... A4412

Exhibit 286: E-mail from Riverfall Group to Silverton Ops re wire 129k to
    Greenberg with attachments showing metadata ............................... A4413

Exhibit 287: E-mail from Hilton Capital to Wintercap Operations re wire
    CAD100016 to Sun Life with attachments ....................................... A4518

Exhibit 288: Text messages between Friesen, Knox, and Threema with
    photos of Cristal bottles and SUB Penny $ ..................................... A4523

Exhibit 289: Threema chats .......................................................... A4534

Exhibit 290: Friesen cash collection for 9k EUR ........................................ A4536

Exhibit 292: Murphy Summary charts summarizing transfers of Arch
    Therapeutics stock ................................................................ A4537

Exhibit 293: MDDD Q Account Details ................................................. A4538

Exhibit 295: ARTH Q Account Details ................................................. A4546

Exhibit 296: STVFVBIO Q Account Details ............................................ A4560

Exhibit 298: STEV Q Account Details ................................................. A4583

Exhibit 299: LBY and PBAV Q Account Details ....................................... A4594

Exhibit 306: RIHT & RIH1 Q Account Details ........................................ A4605

**Page**

Exhibit 307: Murphy Summary charts summarizing sales of the Fourteen
Issuers' stock by year .......................................................................... A4619

Exhibit 308: Murphy Summary Charts showing sales of Fourteen Issuers'
securities based on Q system and brokerage account......................... A4620

Exhibit 310: Murphy Summary charts summarizing market trading based on
Blue Sheets in Stevia FirstVitality and Arch d.................................. A4634

Exhibit 311: GARD Q reports .................................................................... A4635

Exhibit 313: Murphy Summary charts showing profit allocations to the Q
accounts of Veldhuis, Sexton and Friesen ........................................ A4651

Exhibit 314: Summary chart of allocations to PEAC PERE account.......... A4659

1

1               UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS (Boston)

3                             No. 1:21-cv-11276-WGY

4

5    SECURITIES and EXCHANGE COMMISSION,
                 Plaintiff

6

7    vs.

8

9    FREDERICK L. SHARP, et al,
                 Defendants

10

11                       *********

12

13

                     For Jury Trial Before:
14                   Judge William G. Young

15

16

                     United States District Court
17                   District of Massachusetts (Boston)
                     One Courthouse Way
18                   Boston, Massachusetts 02210
                     Thursday, September 21, 2023

19

20                          ********

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
23                 United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
24                     rhrbulldog@aol.com

25

```
 1                    A P P E A R A N C E S

 2

 3    KATHLEEN BURDETTE SHIELDS, ESQ.
      ALFRED A. DAY, ESQ.
 4    DAVID H. LONDON, ESQ.
      NITA KUMARASWAMI KLUNDER, ESQ.
 5       Securities and Exchange Commission - MA
         33 Arch Street, 24th Floor
 6       Boston, MA 02110
         (617) 573-8904
 7       Email: Shieldska@sec.gov
         For Plaintiff
 8

 9    KAREN A. PICKETT, ESQ.
         Pickett Law Offices, P.C.
10       125 High Street, 26th Floor
         Boston, MA 02110
11       (617) 423-0485
         Email: Kpickettlaw@gmail.com
12       For Defendant Zhiying Yvonne Gasarch

13

14    MIRANDA E. FRITZ, ESQ.
      TIMOTHY J. FAZIO, ESQ.
15       Manning Gross Massenburg
         125 High Street
16       Oliver Street Tower, 6th Floor
         Boston, MA 02110
17       (617) 670-8800
         Email: Tfazio@mgmlaw.com
18       For Defendant Jackson T. Friesen

19

20

21

22

23

24

25
```

A2947

3

```
 1                        I N D E X

 2

 3   WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   ROGER J. KNOX  (Continued.)

 6     By Ms. Shields:                      110

 7     By Ms. Fritz:                 40

 8     By Ms. Picket:                 4

 9

10   KENNETH CIAPALA  (Witness by zoom.)

11     By Mr. London:       113

12     By Ms. Fritz:                147

13     By Ms. Picket:

14

15                      E X H I B I T S

16

17        EXHIBIT 291 ........................... 132

18

19

20

21

22

23

24

25
```

A2948

```
 1          P R O C E E D I N G S
 2          (Jury enters, 9:00 a.m.)
 3          THE COURT:  Good morning, ladies and gentlemen.
 4    You know what I'm going to say, and I simply -- and I'm
 5    simply going to say it, you have just set such a
 6    wonderful tone for these proceedings.  Ms. Gaudet and
 7    one of my colleagues we saw in the hall, we were talking
 8    about juror promptness, and you are exemplary, and I am
 9    so grateful.
10          And because you're all ready, everyone else is
11    ready.
12          And if you'd remind the witness.
13          THE CLERK:  I'd like to remind you, sir, that you
14    are still under oath.
15          Do you understand?
16          THE WITNESS:  Yes.
17          THE COURT:  And, Ms. Pickett, you may examine.
18
19    CROSS-EXAMINATION BY MS. PICKETT:  (Continued.)
20    Q.    Good morning, Mr. Knox.
21    A.    Good morning.
22    Q.    And just to remind you, I'm Karen Pickett and I
23    represent Yvonne Gasarch.
24    A.    Good morning, Ms. Pickett.
25    Q.    I'd like to say we're going to start off where we
```

A2949

```
 1    left off yesterday, but I'm just having a few more
 2    moments, so I think we'll just start with going through
 3    some of the happenings in your criminal case.
 4          So yesterday you were testifying that, um, while
 5    you were still incarcerated, you started meeting with
 6    the government, is that correct?
 7    A.    That is correct.
 8    Q.    Okay.  And I think you said there was a number of
 9    times that you would be brought from the Plymouth County
10    House of Corrections to here, is that correct?
11    A.    That is correct.
12    Q.    Okay.  And who from the U.S. Attorney's Office do
13    you remember meeting with?
14    A.    I was meeting with the AUSA Rosen and then AUSA
15    Drabick.
16    Q.    Okay.  And is Mr. Drabick the prosecutor that's
17    currently on your case?
18    A.    Yes, he is.
19    Q.    And Mr. Rosen is no longer with the office?
20    A.    That is correct.
21    Q.    Okay.  And has Mr. Drabick been in the audience
22    for the last three days watching your testimony?
23    A.    I believe, yes, he has.
24    Q.    Okay.  And the reason that you're testifying here
25    today against my client and Mr. Friesen is because the
```

```
 1   government has asked you --
 2        THE COURT:  You misspoke, your client is not
 3   Mr. Friesen.
 4        MS. PICKETT:  No, "and Mr. Friesen."
 5        THE COURT:  Oh, "and Mr. Friesen."  I'm sorry.
 6   Q.   Yes.  I'm sorry.
 7        The reason you're testifying against my client and
 8   Mr. Friesen is because the government has asked you to,
 9   is that correct?
10   A.   Yes, that is correct.
11   Q.   And in the course of the many years since you've
12   been arrested, have you testified against others?
13   A.   I have not sat in a court and testified, no.
14   Q.   So you have not testified against Roger Knox -- I
15   mean, I'm sorry, against Fred Sharp?
16   A.   No, I have not.
17   Q.   You haven't testified against Courtney Kelln?
18   A.   No, I have not.
19   Q.   You have not testified against Mike Veldhuis?
20   A.   No, I have not.
21   Q.   And you haven't testified against Paul Sexton?
22   A.   No, I have not.
23   Q.   Okay.  Now, after meeting with the government
24   while you were still in jail, at some point did the
25   government -- after opposing you being released on bail
```

```
 1    from prison, at some point did they join in a motion
 2    with you so that you could be released?
 3    A.    Yes, that was when Covid-19, the coronavirus, was
 4    sweeping the country.
 5    Q.    Yes.  And did you -- never mind.
 6          So when did that happen, when were you actually
 7    released?
 8    A.    I was released on April the 2nd, 2020.
 9    Q.    So how many months have you served at the Plymouth
10    County House of Correction?
11    A.    18.
12    Q.    18 months.  And we established yesterday that,
13    based on the sentencing guidelines, not what the judge
14    could impose, you're looking at somewhere between a 12-
15    and 15-year sentence, is that correct?
16    A.    That is on my plea agreement.  There has been some
17    discussion of -- I think after I was -- I think on my
18    May 11th or 12th sentencing date -- and it was January,
19    it was meant to be Monday this week, and I think the
20    Sentencing Committee, in and around January or February
21    of this year, had suggested 66 months.
22    Q.    Okay, and what do you mean the "Sentencing
23    Committee"?
24    A.    I believe it's not -- I -- I believe my crime goes
25    out to a group of -- I don't know the exact process, but
```

```
 1   I believe there are a group of U.S. Attorneys that form
 2   -- or inform a Sentencing Committee, and rather than
 3   just my sentence is in the hands of -- my recommended
 4   sentence from the government is in the hands of one
 5   person, it is -- the one person maybe proposes something
 6   and they look at -- they may send it to their colleagues
 7   for review and say "Am I out of line?" or "Is this in
 8   line with everything else?"
 9   Q.    So it's your understanding that this Sentencing
10   Committee -- by the way, have you heard it referred to
11   as the "Substantial Assistance Committee"?
12   A.    I -- I mean I don't recall it.  But I know they
13   look -- they consider my assistance or my cooperation.
14   Q.    Okay.  And this is -- so you're saying this group,
15   this committee is -- your understanding is that they are
16   now saying that the government will recommend 66 months?
17   A.    That is correct.
18   Q.    Okay.  And is that based in part on your
19   cooperation in this case?
20   A.    Um, yes, there was -- I heard that in June of this
21   year, so it was to date from June.
22   Q.    And you said, um -- I believe your next sentencing
23   date is, is it October 13th?
24   A.    That is correct.
25   Q.    Okay.  And is it your understanding that despite
```

A2953

```
 1    all the many continuances of your sentencing, that you
 2    are actually going to be sentenced on October 13th?  I
 3    know you can't predict it, but as of now the date is
 4    October 13th?
 5    A.    As of today, yes.
 6    Q.    Okay.  And so it's your understanding that you
 7    will never have to testify against any of the people I
 8    mentioned before your sentence, Sharp, Kelln --
 9    A.    I do not believe so.  I don't believe anyone else
10    is scheduled.
11    Q.    Okay.  Now I think yesterday you said that you met
12    with the U.S. Attorney's Office.  And at those meetings
13    were there also FBI agents present?
14    A.    Yes, there was.
15    Q.    Okay.  And are you aware that at least one or
16    maybe more were taking notes of the interview?
17    A.    I mean I was aware, yes, that people were writing
18    down notes of the interviews, yes.
19    Q.    Okay.  And at these meetings was there present
20    anyone from the SEC?
21    A.    Some of the -- I think some of the meetings there
22    was -- there was someone from the SEC present, yes.
23    Q.    Does the name "Trevor Donnellan" ring a bell?
24    A.    Yes, it does.
25    Q.    Okay.  And he worked for the SEC?
```

1    A.    Yes, he did.

2    Q.    Okay.  And yesterday we talked about, um, proffers

3    and you said that you don't believe that you signed a

4    proffer letter either with the U.S. Attorney's Office or

5    with the SEC -- no, sorry, you said you didn't sign a

6    proffer letter with the U.S. Attorney's Office?

7    A.    I think -- your question yesterday was each time I

8    had a proffer, did I sign a letter?

9    Q.    Oh, okay.

10   A.    And I did not sign any document each time I had a

11   proffer.

12   Q.    Okay.  But at some point toward the beginning you

13   signed a proffer letter with the U.S. Attorney's Office,

14   and I can discuss with you what's contained in the

15   proffer letter.  But do you recall that?

16   A.    It's -- I know I signed two things, I signed a

17   plea agreement and I signed the 5K.1 for the cooperation

18   agreement.

19   Q.    Okay, so you don't remember signing a proffer

20   letter which states that if you give truthful

21   information to the government, they won't use that

22   information against you directly.  Do you recall that?

23   A.    I do not recall it.

24   Q.    Okay.  So when you were sitting there in the 24

25   meetings with the U.S. Attorney's Office and the SEC,

```
 1    you don't recall, um, that you had signed a letter that
 2    gave you comfort that whatever you said to them they
 3    couldn't use it directly against you?
 4    A.    Um, sorry, could you just repeat it again?  I just
 5    want to make sure I --
 6    Q.    You're sitting in these 24 meetings and you're
 7    giving them information they may have not have known
 8    before, is that correct?
 9    A.    That is correct.
10    Q.    And some of the information, in fact a lot of it
11    was incriminatory towards yourself, right?
12    A.    That is correct.
13    Q.    You were being honest with them?
14    A.    That is correct.
15    Q.    And if you had agreed with them that they wouldn't
16    use this information against you, weren't you concerned
17    that you were giving them information that would lead
18    them to prosecute you or seek additional damages from
19    you?
20    A.    And I -- yes, I would be concerned if -- yes, that
21    is part of -- there is no agreement.  I agreed to tell
22    the truth and the government, I believe, retained a very
23    open, um -- it is -- I believe it is in their favor,
24    they remain open if I -- there were many conditions I
25    had to meet, if I lied, if I tried to interfere with
```

```
 1    their investigation.  And so there was, um -- yeah, well
 2    I told them the truth, everything I had, all the
 3    documentation, and however they chose to use it was
 4    their decision, not mine.
 5    Q.    If I showed you a proffer letter from the SEC,
 6    would that refresh your recollection about whether or
 7    not you signed a proffer letter?
 8    A.    Yes.  Yes, please.
 9          MS. PICKETT:  Would you give me a minute, your
10    Honor?
11          THE COURT:  While she's doing that, let me just
12    make some comments.  I'm not a source of evidence, but
13    what I'm going to say, I believe anyway, is undisputed
14    at all and beyond dispute.
15          Our case, what we're going to ask you about,
16    what's going on here is a civil case that a government
17    agency, the Securities and Exchange Commission, brings
18    against Mr. Friesen and Ms. Gasarch, that's what we're
19    going to ask you about.  It's at a civil case.
20          Evidently -- well I shouldn't say, because it's up
21    to you, but if you believe certain of the witnesses,
22    there exists parallel criminal proceedings, not against
23    Mr. Friesen, not against Ms. Gasarch, but against
24    certain of the witnesses who have testified here,
25    Mr. Dhillon, Mr. Knox.
```

1          Now that case -- again if you believe this

2     witness, and I haven't inquired at all, but looking at

3     the court records, that case and the responsibility for

4     sentencing in that criminal case is before my colleague,

5     Judge Gorton.  Judge Gorton is another judge, just like

6     me, who is sitting here in Boston.  And so why are we

7     getting into all this business about the sentencing

8     guidelines and proffer letters and the like, all of

9     which are aspects of the criminal justice system?

10          Now a criminal case is prosecuted by the United

11     States Attorney's Office and mention has been made of

12     Assistant United States Attorneys and the Federal Bureau

13     of Investigation, which is in the Department of Justice,

14     and that's a government agency, but it's not the

15     Securities and Exchange Commission.

16          So why, why are we getting into this?  Because

17     when I explain -- I give you the charge, the law

18     requires me to say to you that, um, witnesses, such as

19     Mr. Dhillon and Mr. Knox, their testimony must be

20     scrutinized with special care because they have

21     testified that they themselves, Mr. Dhillon, Mr. Knox,

22     were in on, um, they say, and it's entirely up to you,

23     they say they were in on various criminal activity,

24     which -- and you've heard what they said, that it

25     pertains to this case and I won't mention it.  But you

```
 1    have to give it special scrutiny because in
 2    circumstances such as this, when the person themselves
 3    has admitted to criminal activity and is awaiting
 4    sentence by another judge, there may be -- and I'm not
 5    suggesting there is, but I'm required to tell you this,
 6    that there may be a tendency to exculpate oneself and
 7    overstate the alleged misconduct of the people in our
 8    civil case.  Now I'm not saying that happened, you are
 9    the sole and absolute judge of the credibility, but I
10    have to tell you that.
11         And so it's perfectly appropriate for defense
12    counsel to point out what promises have been made by the
13    government, because it's the same government, though
14    it's separate agencies, or what the person may seek to
15    gain, the person testifying may seek to gain from their
16    testimony, if anything.
17         And then parenthetically, I will say that the
18    judges act completely independently.  I will not say a
19    word to Judge Gorton about what's going on in our civil
20    case and he has not said a word to me about the
21    proceedings in his criminal cases, nor will we.  That's
22    not what happens.  So if anyone is going to say anything
23    to Judge Gorton in the criminal case, it's an agency of
24    the government.  If they do.
25         All right.  But the credibility, the believability
```

A2959

```
 1    of every witness, that's for you.  I have nothing to say
 2    about that.
 3          Go ahead, Ms. Pickett.
 4          MS. PICKETT:  Your Honor, do you mind if I
 5    approach with my computer, I forgot to print out the
 6    plea -- I mean the proffer letter?
 7          THE COURT:  You may.
 8          (Shows her computer to witness.)
 9    Q.    Mr. Knox, I'm going to ask you to take a look at
10    this letter dated June 25th, 2019 --
11          THE COURT:  You have to step back.
12          MS. PICKETT:  Oh, I'm sorry.
13          THE COURT:  No, no, you can be up here, but you
14    can't be between the witness and the jury.
15          MS. PICKETT:  Oh, okay.
16    Q.    It's a letter dated June 25th, 2019.  Do you see
17    that?
18    A.    Yes, I do.
19    Q.    Okay.  And, um, so that was over 4 years ago,
20    correct?
21    A.    Yes.
22    Q.    And I see here that this letter isn't signed.  But
23    I'll represent to you that in the course of reviewing
24    the documents, it is said that you signed this letter
25    with the SEC prior to giving these 24 or however many,
```

```
 1    um, interviews.
 2          Is this refreshing your recollection that you
 3    signed this letter?
 4    A.    Ma'am, you showed me a letter, but it's unsigned.
 5    Q.    Okay.  And if the FBI says that you signed this
 6    letter, you're saying that you did not?
 7    A.    Ma'am, I would like to see --
 8    Q.    I wasn't provided with the signed letter, I'm just
 9    saying that --
10          THE COURT:  Well you can't testify, so --
11          MS. PICKETT:  Okay.  Okay.
12          (Takes it back.)
13    Q.    And if the prosecutor has represented that you had
14    a similar proffer letter with the U.S. Attorney's Office
15    that you signed, are you saying that you don't recall
16    that as well?
17    A.    I -- to my recollection I signed a plea agreement
18    and a 5K.1 cooperation agreement with the U.S.
19    government, the Department of Justice.
20    Q.    Okay.  And what did the 5K letter look like, what
21    did it say?
22    A.    I only recently got a copy so I'm not -- I didn't
23    think I've ever read it.
24    Q.    Okay.  And when did you sign that cooperation
25    letter?
```

```
 1    A.     I think it was in and around September 2019.
 2    Q.     Okay.  Now, um, we've gotten to the point where
 3    the government, which had initially opposed your
 4    release, has joined forces with you and asked the judge
 5    in your case to let you out on bail, is that correct?
 6    A.     That is correct.
 7    Q.     Okay.  And after that point I take it, um, you met
 8    many times again with the U.S. Attorney's Office?
 9    A.     Yes, those -- and just to clarify, the meetings
10    were mostly, it was during covid and we were doing them
11    on zoom or video conference.
12    Q.     Understood.  And again at those meetings Trevor
13    Donnellan would be typically present, the SEC guy?
14    A.     Yes, he was.
15    Q.     Okay.  Now in the course of these 24 meetings
16    where you understood that, um, notes were being taken,
17    and I imagine after 24 meetings there's voluminous
18    notes.  Do you believe that was the case?
19    A.     I do not know.  I have no idea.  I have not seen
20    the notes, so I don't know.
21    Q.     Okay.  And, um, it's fair to say, is it not, sir,
22    that Yvonne Gasarch was not the focal point of these 24
23    meetings, is that fair?
24    A.     The -- there were -- I'm sorry.  There were many
25    individuals discussed throughout the 24 meetings.
```

```
 1    Q.    Understood, but I'm just focused on my client,
 2    Yvonne Gasarch.
 3    A.    Okay.
 4    Q.    Would you agree with me that maybe there are a
 5    half a dozen approximately times where her name came up
 6    in these 24 interviews?
 7          THE COURT:  I've got a problem with the word
 8    "maybe."
 9          MS. PICKETT:  Sorry.
10          THE COURT:  I'll permit "Would you agree with the
11    estimate that there were" -- and pick them again.
12          MS. PICKETT:  Okay.  I'm sorry.
13          THE COURT:  Go ahead.
14    Q.    Would you agree with me that, um, Ms. Gasarch's
15    name came up an estimated half-dozen times?
16    A.    Um, I do not know where you're -- I do not recall
17    how many times I mentioned the name of Ms. Gasarch.
18    Q.    Okay.  And if the FBI and the U.S. Attorney's
19    Office provided me with -- and I'll represent to you,
20    almost 100 pages of single-spaced notes, I'm
21    representing that to you --
22    A.    Okay, I'm not aware of --
23          MS. SHIELDS:  Objection.
24          THE COURT:  Well let's see what question she has.
25          MS. PICKETT:  Okay.
```

```
 1   Q.    And, um, I can show you the notes, if they refresh
 2   your recollection, and I can ask you to go through these
 3   100 pages and show me the times that Yvonne Gasarch was
 4   mentioned, would you like me to do that, to refresh your
 5   recollection?
 6         MS. SHIELDS:  Objection.
 7   A.    Ma'am --
 8         THE COURT:  No, if he says he has no recollection
 9   -- well let's put it this way.
10         Would any of those materials refresh your
11   recollection so you have a recollection?
12         THE WITNESS:  No, because I -- I do not know what
13   the -- I do not know what the FBI man, who was taking
14   the notes, what he was interested in or who he was
15   interested in or whether he was interested in Yvonne
16   Gasarch, if I mentioned her name, or if I mentioned Mike
17   Veldhuis's name or someone else's name.  I don't know
18   who or what the FBI man was interested in and I don't
19   know who or what the FBI man was taking notes upon.
20         THE COURT:  I'll sustain the objection.  Let's
21   move on.
22         MS. PICKETT:  Okay.
23   Q.    And, um, are you suggesting that these notes won't
24   refresh your recollection because the FBI may not --
25         THE COURT:  No, here's the basis of my ruling.
```

A2964

```
 1          MS. PICKETT:  Okay.

 2          THE COURT:  He is suggesting that a notetaker may

 3     have that -- a notetaker's own emphasis, and so it seems

 4     to me that however many times Ms. Gasarch's name came up

 5     in some other document we don't have, and I don't make

 6     any representations about that, even showing him the

 7     documents isn't going to refresh his recollection about

 8     what actually happened at the time of his interviews.

 9     Therefore we're not going to get into it because it may

10     be -- and it's a third-party who might have his own

11     agenda, and that's -- so we're not going there.

12          Let's move on.

13          MS. PICKETT:  Okay.

14     Q.    Now I believe that during your direct testimony,

15     um, Ms. Shields showed you an e-mail from Courtney Kelln

16     that called Ms. Gasarch "The master of finance," do you

17     recall that?

18     A.    Yes, I do.

19     Q.    Okay.  And you weren't on that e-mail, is that

20     correct?

21     A.    I -- I do not believe I was.

22     Q.    Okay.

23          MS. PICKETT:  Can we pull up that e-mail?

24          (Pause.)

25          MS. PICKETT:  Okay, I'll try to find it.
```

```
 1    Q.    Did you, sir, ever call Yvonne Gasarch "The master
 2    of finance" yourself?
 3    A.    Ma'am, I used her nickname "Wires."
 4    Q.    Correct.  Okay.  And just getting to the point of
 5    "Wires."  Wires are used in business every single day,
 6    is that correct, in your business, right?
 7    A.    That is correct.
 8    Q.    Okay.  And you said yesterday that some of your
 9    business, at least, was legitimate, is that correct?
10    A.    That is correct.
11    Q.    And in those legitimate cases, would your company
12    be using wires to send funds to clients?
13    A.    Yes, they would.
14    Q.    Okay.  Now, sir, the SEC asked you whether, um,
15    Ms. Gasarch was an integral part of the scheme here, is
16    that correct?  Do you recall that?  Or an "important
17    part" of the scheme?
18    A.    If -- well I don't know what the SEC said to me,
19    but my view is and my knowledge is that, yes, she was an
20    integral part of the scheme.
21    Q.    Okay, and that's based on her instructing wires to
22    be sent to clients?
23    A.    That is -- um, yes.
24    Q.    Okay.  And in order to be part of the scheme, sir,
25    would you, um, agree with me that she would have to know
```

```
 1   that those wires were based on illegal activity, is that
 2   correct?
 3   A.    I do not know whether -- you're saying
 4   "illegality" -- if it was illegal or not?
 5   Q.    True.  Right.  In order to be a part of a criminal
 6   scheme, she'd have to know that those wires weren't
 7   legal, is that correct?
 8         MS. SHIELDS:  Objection.
 9   Q.    Well she can send wires, right, and it can be
10   completely legitimate, is that correct?
11   A.    That is correct.
12   Q.    Now, um, do you recall yesterday that the SEC
13   showed you a document, um, and it was, um, some wires,
14   and it was asking for some signatures of some documents
15   from Silverton?
16   A.    Yes, I believe there were two such e-mail
17   requests.
18   Q.    Okay.  And that was from the period of June 2016?
19   A.    I do not recall the date.
20   Q.    Okay.  And do you recall telling the FBI that when
21   you got that e-mail, at least the one that we saw
22   yesterday, from Yvonne Gasarch, do you remember that it
23   said I think something like "Transfer 5 million shares,"
24   or something to that effect?
25   A.    Yes, I think it was -- well, yes.
```

```
 1    Q.    And do you recall telling the U.S. Attorney's
 2    Office, the SEC, and the FBI, that you were surprised
 3    that that e-mail came from "Wires" and not from Courtney
 4    Kelln?
 5    A.    I do not recall that, but it was, um -- it was not
 6    the norm.  With Kelln most of it was securities and, um
 7    -- Kelln dealt with securities, Gasarch dealt with the
 8    finances.
 9    Q.    I mean say she dealt with the finances, you mean
10    that she would ask for wires to be transferred?
11    A.    She was -- she served the purpose of an
12    accountant.
13    Q.    She was Mr. Sharp's accountant?
14    A.    Well that -- she dealt with all the money, that's
15    what -- yes.
16    Q.    You say that she dealt with all the money, but
17    you're not saying that she was a CPA and balanced the
18    books and things like that, are you?
19    A.    She, um -- I mean an "accountant" is a money
20    manager, you know they make wires, they check balances,
21    she had to check balances that a nominee company had
22    enough money for the wire.  And not only a nominee --
23    excuse me.  She had to -- if a client, for example,
24    Veldhuis or Friesen, asked her to wire money, she had to
25    ensure that they had enough money.  And then when she
```

A2968

1    instructed money to come from an account such as Quezon,

2    that Quezon had enough money.  So she had to do her

3    checks and balances before instructing Silverton.

4    Q.    Right, there had to be money in an account for her

5    to ask for a wire?

6    A.    That's correct.

7    Q.    Right, and she would do that on an accounting

8    system, is that correct?

9    A.    On Q, correct.

10   Q.    Okay.  And you don't have a personal knowledge of

11   what inputs Ms. Gasarch made into the Q-System, do you?

12   A.    Yes.

13   Q.    Okay, what inputs did she make?

14   A.    She inputted the wire instructions.

15   Q.    Just the wire instructions, correct?

16   A.    Well the ones that I could see are the wire

17   instructions.  I do not know what else she did.

18   Q.    But beyond that you don't know what entries she

19   made into the Q-System?

20   A.    No, I do not know what else she had.

21   Q.    And you understand that, um, different people had

22   different levels of access for the Q-System, is that

23   correct?

24   A.    I know what my access was.

25   Q.    Okay.  Did you have an understanding that Fred

A2969

```
 1    Sharp was the administrator of the Q-System?
 2    A.    I did not think he was administrator of the
 3    Q-System.
 4    Q.    Okay.  Do you have any understanding whether he
 5    was able to change entries in the Q-System?
 6    A.    Yes, he was able to change entries.
 7    Q.    Okay.
 8          Now I believe yesterday the SEC showed you a, um,
 9    a document related to a Greenberg Traurig invoice, do
10    you remember that?
11    A.    Yes, I do.
12    Q.    Okay.  And, um, do you recall that you were
13    frustrated with Yvonne Gasarch because you didn't think
14    she was hiding things well enough in the invoices?
15    A.    (Pause.)
16    Q.    You were frustrated at different points with
17    Ms. Gasarch, is that correct?
18    A.    Um, the invoice from Greenberg Traurig, which is,
19    as you said yourself, is a very well-known international
20    law firm, um, that looked fake.  If it was from a small
21    law firm with one or two partners that no one in the
22    whole world had heard of, then it could be written on a
23    napkin.  But this invoice -- a lot of the time we got
24    invoices that were maybe a Word document.  I mean if you
25    clicked on the Word document, there were, um, the
```

```
 1   signature or the address block was movable, so it was --
 2   it looked like something from a photoshop or -- well it
 3   did not look like a credible invoice.
 4   Q.    Okay.  And is it your understanding that
 5   Ms. Gasarch would create a fake invoice on her own,
 6   um -- on her own?
 7   A.    Yes.
 8   Q.    And so she wouldn't have been instructed by
 9   Mr. Sharp to do so?
10   A.    I think she had the experience and the knowledge
11   and the tenure at Corporate House to do it herself.
12   Q.    And you don't have any information, as we sit here
13   today, what if anything Mr. Sharp asked her to do
14   regarding these invoices, is that correct?
15   A.    No, I don't know the conversations between
16   Mr. Sharp and Ms. Gasarch.
17   Q.    Okay.  And do you recall telling the FBI that you
18   thought most of the invoices were "bullshit"?
19   A.    That sounds plausible, yes.
20   Q.    And that you and Silverton and Wintercap were
21   frustrated with Yvonne because she was not covering up
22   the fraud with the invoices she sent, do you recall
23   telling the FBI that in your interviews where you swore
24   to tell the truth?
25   A.    I do recall using the word --
```

A2971

```
 1    Q.    Do you recall -- please answer my question.

 2    A.    Sorry.

 3    Q.    Please answer my question.

 4    A.    No.

 5    Q.    You don't recall that?

 6    A.    No.

 7    Q.    All right.  If I showed you the FBI interview

 8    notes, would that refresh your recollection?

 9    A.    I did not make the notes, so however someone

10    chooses to write something is their prerogative.

11    Q.    Are you telling the jury here today that an FBI

12    agent wrote down, "Knox and Silverton/Wintercap were

13    frustrated with Yvonne because she was not covering up

14    the fraud with the invoices she sent."

15         Do you believe the FBI agent made up that

16    statement?

17    A.    No, that statement sounds correct.

18    Q.    That's what I was asking you, sir.  Is that a

19    correct statement?

20    A.    You said it was my words.  It may not have been

21    word for word, but the statement sounds correct.

22    Q.    Understood.  Understood.  Understood.  (Pause.)

23         Do you recall telling the FBI that "Yvonne's

24    invoices often contained errors and Silverton would fix

25    them"?
```

1   A.    That sounds correct as well.

2   Q.    Okay.

3         Now I believe at some point you said that

4   communications between you, um, and others in the group

5   switched from the Xphone system to something I think

6   called "Threema"?

7   A.    That is correct.

8   Q.    And is there another App that was used as well?

9   A.    There were -- there's Threema, Silent Circle, and

10  What's App.

11  Q.    Okay.  And so when did that happen, that switch

12  from the Xphones to Threema and such?

13  A.    I do not recall precisely.  There were -- there

14  were three different types of Xphones, there was a

15  Blackberry Xphone that lasted a long period of time,

16  maybe 2013 to 2016.  Then there was a Samsung Xphone

17  with a -- the similar secure chat.  And during the

18  Samsung era, about a year it ran, um, I think ourselves

19  and clients we moved over to -- so maybe it was 2017, we

20  moved over to just using encrypted Apps on an Iphone.

21  Q.    Okay.  And did you all have code names on those

22  Apps?

23  A.    Yes.

24  Q.    Okay.  And what was your code name again, sir?

25  A.    It predominantly was "Arrow," or "Silver Arrow" or

A2973

```
 1    "Arrow 777."
 2    Q.    Okay.  And Mr. Sharp was on this?
 3    A.    He was a reluctant adopter and I -- I think he
 4    stayed with the Samsung Xphone for quite a long period
 5    of time.
 6    Q.    At some point there were messages used
 7    frequently --
 8    A.    I think, yes, sometimes we -- we mostly spoke on
 9    the phone.
10    Q.    Okay.  And, um, was Mike Veldhuis on these --
11    A.    Yes, he was using them.
12    Q.    Okay.  Was Paul Sexton on this system?
13    A.    I do not know.  I did not communicate with Paul
14    Sexton.
15    Q.    Okay.  And was Courtney Kelln on the system?
16    A.    I believe, yes, she was.
17    Q.    Do you recall what her, um, code name was?
18    A.    She used a couple of different ones, but one was
19    called the -- there's a bit of a expletive, but it
20    sounds like a --
21    Q.    You can say it, I think.
22    A.    "Cuntessa."
23    Q.    "Cuntessa."  Okay.
24          Now I wanted to talk a little bit about, um -- you
25    were shown some documents yesterday about "Peaceful
```

A2974

```
 1    Lion"?
 2    A.    Yes, that's correct.
 3    Q.    And Peaceful Lion was a nominee account, is that
 4    correct?
 5    A.    That is correct.
 6    Q.    And it was your understanding that Ms. Gasarch was
 7    the beneficial owner or somehow involved in Peaceful
 8    Lion?
 9    A.    That is correct.
10    Q.    Okay.  And would you ever use the Peaceful Lion
11    accounts to buy or sell shares?
12    A.    We very rarely bought shares, but we certainly
13    sold shares.
14    Q.    So you were selling shares out of the Peaceful
15    Lion account?
16    A.    Yes.
17    Q.    Okay.  Did Ms. Gasarch ever direct you to sell
18    shares out of the Peaceful Lion?
19    A.    I do not recall her ever directing share sales.
20    Q.    Okay.  And would you say that Fred Sharp controls
21    Peaceful Lion?
22    A.    Well ultimately Fred Sharp was my client for all
23    of the -- for his accounts.
24    Q.    Okay, he was your client for all of the nominee
25    accounts including Peaceful Lion?
```

A2975

```
 1    A.    That is correct.
 2    Q.    Okay.  Do you recall ever -- it was when clients
 3    made money off of these deals, Ms. Gasarch would ask you
 4    to wire money to the clients, is that correct, or
 5    arrange for the money to be wired?
 6    A.    So as I said -- for example, the clients would --
 7    if we're talking about -- if today in court we're
 8    talking about Mike Veldhuis, Paul Sexton, Jackson
 9    Friesen, I do not recall the instances where we would
10    have actually done a wire transfer to an account in one
11    of their names.
12    Q.    Okay, there were different names, but you knew
13    ultimately that the money was going to them, is that
14    correct?
15    A.    I did not know where the money was going to.
16    Q.    Okay.  So you've testified to this control group
17    that was -- owned more than 5 percent of these shares,
18    and you testified that that was -- that when they were
19    trading, it was illegal, right, because they hadn't
20    disclosed this ownership, right?
21    A.    That is correct.
22    Q.    Okay.  So based on your knowledge you know that
23    these people, um, in the control group, whatever account
24    it was going to, ultimately had access to that money, is
25    that right?
```

```
 1        MS. FRITZ:  I hate to do this, but I have to
 2   object.  Sorry.
 3        MS. PICKETT:  That's okay.
 4        THE COURT:  On this foundation, sustained.
 5        MS. PICKETT:  All right.
 6   Q.   Do you have any understanding of any trade money
 7   ever going directly to Yvonne Gasarch?
 8   A.   Yes, we sent wire transfers to Yvonne Gasarch.
 9   Q.   Okay.  And what were those transfers -- what were
10   those wire transfers for?
11   A.   As you saw yesterday, there was one for 100,000
12   Canadian.
13   Q.   Right, that was transferred to a third-party
14   presumably on behalf of Ms. Gasarch, right?
15   A.   Yes, I mean her name was on the documents, so.
16   Q.   Okay.  You haven't seen any documents where wires
17   were being sent to a personal account of Ms. Gasarch, is
18   that correct?
19   A.   I --
20   Q.   Have you seen any documents where Ms. Gasarch was
21   receiving money in her personal bank account?
22   A.   I do not -- I do not recall.
23   Q.   Okay.  You don't recall seeing any?
24   A.   I do not recall it.  I mean it may have -- we
25   dealt with a lot.
```

A2977

```
 1   Q.    And the SEC certainly didn't show you any

 2   documents where money from trading was going into

 3   Ms. Gasarch's account, is that correct?  Is that

 4   correct, did they show you any documents?

 5   A.    So you ask for money from trading, but it's --

 6   these accounts are fungible, a dollar is fungible, so

 7   that means however the money was earned.  We did not

 8   have a separate account for VBIO sales or a separate

 9   account for a stock that wasn't tainted, all of the

10   money was in the same account.  So --

11   Q.    This is a simple question.

12   A.    Okay.

13   Q.    As we sit here today, do you have any evidence or

14   knowledge that Ms. Gasarch received any funds personally

15   from -- and putting aside this third -- and we'll talk

16   about the third-party payments, but personally from the

17   trades that we've been talking about?

18   A.    I would have to check the downloaded documents

19   that I took from the Q server, and I would go down, as

20   you saw yesterday there's an account where it was

21   credited to, and if it said the word "Wires" beside it,

22   then I would be confident that the wire transfer was

23   sent on her behalf.

24   Q.    Okay, and you -- again you'd have to check, but

25   presumably we're sitting here in trial and if there were
```

```
 1   some such document, the SEC hasn't shown it to you,
 2   that's fair to say, right?  Is that fair to say that the
 3   government has not shown you this document that you may
 4   or may not have?
 5   A.    The SEC has not shown me transfers, cash transfers
 6   that are related to the Wires account.
 7   Q.    Okay, thank you, sir.
 8         Now yesterday the SEC showed you, um, I believe it
 9   was from 2018 and it was a transaction where money --
10   excuse me, money, or something in the neighborhood of
11   north of $100,000, was asked to be sent to Sun Life
12   Assurance Company.  Do you recall that?
13   A.    I believe that was the loan agreement for Yvonne
14   Gasarch.
15   Q.    Correct.  And the Sun Life Assurance Company in
16   Canada, they provide life insurance policies, is that
17   correct?
18   A.    I do not know.
19   Q.    You don't know.  So you don't know what that money
20   was for?
21   A.    No.
22   Q.    Okay.  And in order for that money to be
23   transferred to Yvonne Gasarch, that would have to be
24   approved by Fred Sharp, is that correct?
25   A.    No, not necessarily.
```

```
 1   Q.    So Yvonne Gasarch could just ask you to transfer
 2   whatever amount of dollars to whoever and for her own
 3   benefit and you wouldn't have to question that?
 4   A.    And I can speak from -- if we had access, if
 5   Silverton had an account on Q, I believe Yvonne Gasarch
 6   had an account on Q, so she could have gone in, she --
 7   her balance maybe was $100,000 or $200,000, I do not
 8   know, and she could have said, "I have $200,000 Canadian
 9   dollars in Q, I will transfer $100,000 to, um, the life
10   insurance company." So she could have entered that and
11   there was nothing -- Fred Sharp would have seen the
12   transaction just as he would see my transaction.
13         MS. FRITZ:  I want to object, Judge, this seems
14   like --
15         THE COURT:  Please.  Please.  We don't need an
16   argument.  But I will stop it at this point.  What he's
17   testified to may stand.
18         MS. FRITZ:  Okay.
19   Q.    And what account was -- you're saying there's an
20   account called "Wires" in the Q-System?
21   A.    The -- each client and each entity, they had their
22   own accounts.  So, um, Yvonne Gasarch, Courtney Kelln,
23   Fred Sharp, myself under Silverton, we all had our --
24   plus the clients, the Gard, um, Jackson Friesen, the
25   ACCO, Mike Veldhuis, we had our own accounts in Q.  So
```

A2980

1    the commission that was being paid, um, Fred Sharp would

2    charge clients commission on sales and each of the

3    clients -- I'm sorry, each of the employees, for want of

4    a better word, Sharp, Kelln, Gasarch, Silverton, we

5    would receive some of the commissions from the stock

6    sales.

7    Q.    Okay, and you're saying that Ms. Gasarch received

8    commissions from stock sales?

9    A.    I believe so.

10   Q.    And what makes you believe that?

11   A.    Because that's what Fred Sharp told me how people

12   were paid.

13   Q.    Okay.  So in lieu of perhaps salary, Fred Sharp

14   would designate commission payments to Courtney Kelln,

15   um, Ms. Gasarch, et cetera?

16   A.    That's what I understood, correct.

17   Q.    And as we sit here today you have no understanding

18   of what the commissions actually were that were paid to

19   Ms. Gasarch?

20   A.    I had no visibility on personal accounts other

21   than this Silverton account.

22   Q.    Okay.  I'll just be 1 more minute, sir.

23         (Pause.)

24   Q.    Oh, I'm sorry, one more thing.

25         Do you recall discussing with Fred Sharp that he

1    should perhaps can Yvonne Gasarch?

2    A.    I -- I do not -- perhaps that was my belief, but I

3    do not really recall saying that to him.  I knew that he

4    was -- he looked after or looked out for both Kelln and

5    Gasarch and I know he had business relationships with

6    Gasarch's husband, so I -- so that was maybe my view.  I

7    wouldn't doubt that.  But I do know that I never had the

8    nerve or audacity to actually say that to him.

9    Q.    Do you recall telling the FBI that you thought

10   that Yvonne, aka "Wires," was a liability because

11   Silverton, and that's you, was "able to perform her role

12   more efficiently"?

13   A.    That sounds totally credible, yes.

14   Q.    All right.  So you could do what Yvonne Gasarch

15   did, is that correct?  You told the FBI that you could,

16   right?

17   A.    Yes, we could.

18   Q.    Okay.  So there's nothing special about Yvonne

19   Gasarch, is that correct?

20        THE COURT:  I don't know what you mean by

21   "special"?

22        MS. PICKETT:  Yes.  I'm sorry.

23   Q.    Yvonne Gasarch is doing these wire requests, et

24   cetera, but there's nothing special about how Yvonne

25   Gasarch does that, is that correct?

1    A.    That is incorrect.

2    Q.    What is incorrect about that, sir?

3    A.    She was -- she was part of a criminal enterprise

4    and --

5    Q.    Why is she part of a criminal enterprise?  You

6    told the FBI that you don't know what she knew, didn't

7    you?  Do you recall telling the FBI that?

8    A.    Well I don't know what you know, I don't know what

9    the FBI knows, I don't know what she knew.

10   Q.    You don't know what she knew, what Yvonne Gasarch

11   knew, but what you're saying here is she was part of a

12   criminal enterprise, is that correct, sir?

13   A.    I am saying that she doctored invoices, created

14   invoices --

15   Q.    I understand that, but you're saying that based on

16   what she did --

17   A.    Yes.

18   Q.    -- and you're saying that you don't know what she

19   knew and you testified that there were legitimate

20   business operations at your firm, at Mr. Sharp's firm.

21   So you're telling the jury here today that not knowing

22   what she knew, she was part of a criminal enterprise?

23   I'm just asking you, is that your testimony?

24   A.    They would seem to be different, you are pointing

25   out different ideas.

```
1    Q.    All right, let's go back.
2          You agree that you don't know what Yvonne Gasarch
3    knew, is that correct?
4    A.    I do not know what was in her head, correct.
5    Q.    Okay.  And you understood, because you pled guilty
6    to a couple of federal securities fraud felonies, that
7    part of a federal crime involves knowledge, right?
8    A.    Yes.
9    Q.    Okay.  So you're accusing Yvonne Gasarch of being
10   part of a criminal enterprise when you don't know
11   whether she had any knowledge or not, correct?
12         MS. SHIELDS:  Objection.
13   Q.    Well you said she was part of a criminal
14   enterprise and I'm asking you how can you say that when
15   you say she didn't -- you don't know if she does --
16   A.    Ma'am, she would doctor invoices --
17   Q.    Okay, understood.
18   A.    And if I had an issue with it, I would ask her,
19   you know, "You have doctored the wrong invoice."  She
20   was creating invoices, Ma'am.
21   Q.    Can I ask a question?  Understood.  But do you
22   know what --
23         THE COURT:  Let me ask a question and see if
24   you're satisfied with the question.
25         MS. PICKETT:  All right.
```

```
 1          THE COURT:  You believed, based upon what you knew

 2     and what was in your mind, you thought she was part of a

 3     criminal enterprise?  You thought that.

 4          THE WITNESS:  I thought that, that is correct.

 5          THE COURT:  All right.

 6     Q.   And again you told the FBI, however, that you

 7     didn't know what her knowledge was, correct?

 8          THE COURT:  And he said that here today.

 9     A.   Yes, I did not know her knowledge.

10     Q.   And you didn't put a caveat saying "But I know

11     because she did this and that and the other thing," is

12     that correct?  When you're speaking with the FBI and the

13     U.S. Attorney's Office -- you just said you didn't --

14     I'm just going to keep it simple.

15          You just said you didn't know what she knew.

16     Period.  Correct?

17     A.   I did not know what she knew, correct.

18     Q.   Thank you.

19          (Ms. Pickett sits down.)

20          THE COURT:  And, Ms. Fritz, anything?

21          MS. FRITZ:  Yes, thank you, your Honor.

22          THE COURT:  You may.

23

24     CROSS-EXAMINATION BY MS. FRITZ:

25     Q.   Good morning, Mr. Knox, my name is Miranda Fritz,
```

A2985

```
 1    I represent Jackson Friesen.  I want to start by talking
 2    about the things that you actually talked about, the
 3    evidence that we actually saw yesterday that had
 4    anything to do with Jackson Friesen.  Okay?
 5    A.    Yes.
 6    Q.    Now, it appeared -- my recollection is that you
 7    were shown two chats, correct, involving Mr. Friesen?
 8    A.    (Silence.)
 9    Q.    If you don't remember, just say so.
10    A.    I thought I saw more than two chats.
11    Q.    Involving Mr. Friesen?
12    A.    (Silence.)
13    Q.    Yesterday you were shown a whole bunch of
14    communications that had nothing to do with you, correct,
15    they were between other people?
16    A.    That's correct.
17    Q.    Okay.  What I'm trying to -- so let's forget about
18    that and let's talk about what evidence there is
19    relating to you being with Mr. Friesen.
20    A.    Yes.
21    Q.    So now that we've clarified that, there are two
22    exhibits in which there are communications with
23    Mr. Friesen, is that correct, with you?
24    A.    Ma'am, I did not -- if there are two, if you would
25    like to show me that?  I did not take notes of how many,
```

A2986

```
 1   if there were two or three or one.
 2   Q.   That's fine.  So the first one we're going to look
 3   at is Exhibit 288.
 4        MS. FRITZ:  Go ahead and pull that up.
 5        (On screen.)
 6   Q.   And while we're pulling that up, let me just
 7   clarify.
 8        Threema was a system of communication that you
 9   used at Silverton, correct?
10   A.   No, that is -- it's a global messaging service.
11   Q.   But it was something that you used in your
12   communications dealing with Silverton people -- it
13   wasn't a Fred Sharp kind of communication system?
14   A.   It was a -- it's a global communication system
15   just like an Imessage on an Iphone.
16   Q.   Okay.  And you also used Silent Circle and What's
17   App, correct?
18   A.   That is correct.
19   Q.   Okay.  But Threema was not a system that Fred
20   Sharp communicated through, he had his own system,
21   correct?
22   A.   We were migrating off Fred Sharp's system onto --
23   the -- onto the Apps.  Rather than having to carry two
24   devices everywhere, we could just carry our own personal
25   cell phones.
```

```
 1    Q.    Okay.  When Mr. Sharp communicated with people
 2    though, he generally did it using the Xphones, you
 3    described him as a "reluctant Threema communicator"?
 4    A.    Yes, he reluctantly but he eventually agreed.
 5    Q.    Okay.  And when did he actually agree?
 6    A.    I do not recall exactly, I think it was the -- in
 7    and around the end of 2017.
 8    Q.    Okay.  But we haven't seen any Threema
 9    communications involving Fred Sharp, correct, during
10    your testimony?
11    A.    I do not believe so.
12    Q.    Okay.  I want to take a look at this Exhibit 288
13    and I want you to go -- unfortunately the pages aren't
14    numbered, but I want you to go to the last page of
15    messages, which is Bates-stamped 1757.
16    A.    (On screen.)
17    Q.    Now you have said that you had a meeting and a
18    dinner in Geneva and it included Jackson Friesen,
19    correct?
20    A.    That is correct.
21    Q.    And five other people, correct?
22    A.    (Silence.)
23    Q.    Mr. Sexton, Mr. Veldhuis, Mr. Sharp, Ms. Kelln,
24    and Richard Targett-Adams?
25    A.    Yes, that is correct.
```

```
 1    Q.    Would you just tell them again who is Richard
 2    Targett-Adams?
 3    A.    Richard Targett-Adams was my colleague at
 4    Silverton.
 5    Q.    All right.  So we have this assemblage for dinner
 6    and it is at that dinner that you met Mr. Friesen,
 7    correct?
 8    A.    Yes, that is correct.
 9    Q.    Okay.  Now when we see the communications on
10    Bates-stamp 1757, the first communication on the bottom,
11    in blue, is from "Stockman 007," correct?
12    A.    That is correct.
13    Q.    And it's to you, correct?
14    A.    (Reads.)  Yes, that is correct.
15    Q.    Okay.  And the word -- the only word on the
16    message is "Test," correct?
17    A.    That is correct.
18    Q.    So this is the sort of
19    getting-these-communications-going kind of activity,
20    correct?
21          MS. SHIELDS:  Objection.
22          THE COURT:  Well she -- let me instruct.
23          MS. SHIELDS:  If I may, your Honor?  I think what
24    Ms. Fritz is referring to is there's a start of another
25    communication that's copied onto the bottom of this
```

 1    message with a different individual, and --

 2         MS. FRITZ:  That's -- I'm going to ask it, because

 3    these things, dates are completely --

 4         THE COURT:  Here's why I don't allow speaking

 5    objections.  With all respect to the attorneys, and I

 6    respect them, disregard all of that.

 7         (Laughter.)

 8         THE COURT:  Now if she wants that question, she

 9    can have that question.  Just, I remind you, this is

10    cross-examination, so she may properly suggest things in

11    her examination.  If the witness says "No," just

12    disregard the question.  If the witness gives some

13    responsive answer, "Yes" or the like, the question will

14    count.  But she can ask the question in that form if she

15    wants to.

16         Now you ask what you want, Ms. Fritz, and we'll

17    see where we are.

18         MS. FRITZ:  Okay.

19    Q.    I think I was asking you whether that word "Test"

20    suggests that this was the beginning of getting your

21    communications going?

22    A.    Sorry, ma'am, I just -- I may have made a mistake

23    before, so I have to --

24    Q.    If you could answer my question.

25         THE COURT:  Well, wait.  He always may correct a

 1    mistake, even if we've gone on to other questions.

 2        If you come to think that anything you've

 3    testified to, whoever is asking the questions, is a

 4    mistake or you are mistaken, you may always correct it.

 5        So do you have something to correct?

 6        THE WITNESS:  Yes.

 7    A.    Ma'am, I cannot recall your previous question, but

 8    the user at the bottom left is "Stockman 007," which is

 9    Mike Veldhuis.

10    Q.    Correct.

11    A.    The user --

12        THE COURT:  Your "Correct" is stricken.  But go

13    ahead.

14    A.    Sorry, I --

15    Q.    Let me ask that question then.

16        The user that we just looked at, that's Mike

17    Veldhuis, correct?

18    A.    "Stockman 007" is Mike Veldhuis, correct.

19    Q.    Okay.  So now my question.

20        This reflects that you are getting communications

21    going with this individual, correct?

22    A.    That is not correct.

23    Q.    Okay.  Let me just talk about the date.  This is

24    10-30-2016, correct?

25    A.    (On screen.)  That is correct.

```
 1    Q.    Okay.  And the message from Mr. Veldhuis is
 2    "Test," correct?
 3    A.    That is correct.
 4    Q.    And the response from you is "Hello," correct?
 5    A.    That is incorrect.
 6    Q.    Okay.  The -- if we look up on the page, have I
 7    put it in the wrong order perhaps?
 8    A.    Yes, that is correct.
 9    Q.    So you say "Hello" and he says "Test"?
10    A.    So if I just scroll down a little bit, I think if
11    you look at the --
12    Q.    At the seconds?
13    A.    My message was 28 seconds and the response was 38
14    seconds, so 10 seconds later.
15    Q.    Okay.  So now, now that we've seen how these
16    messages work, I'm going to represent to you that as I
17    go through this exhibit, on the first page there's
18    messages in October, November 1st, November 2nd, um,
19    November 4th and 5th.
20          So these messages cover a time period, correct?
21    A.    That sounds correct.
22    Q.    And all of the messages cover a short period of
23    time in 2016, correct?
24    A.    Ma'am, all of these messages on this exhibit?
25    Q.    Yes.
```

```
 1    A.    That is correct.
 2    Q.    Okay.  Is this an exhibit -- again if you -- if
 3    you try to put these in order, they appear not to be.
 4          So is this an exhibit that you constructed?
 5    A.    No, it is not, ma'am.
 6    Q.    Is this something that you printed off of a phone
 7    or a computer?
 8    A.    This is not an exhibit that I produced.
 9    Q.    Okay.  So you have no idea how these particular
10    messages ended up in this format?
11    A.    That is correct.
12    Q.    All right.  Well let's just give it our best shot.
13    Okay, so we've seen messages between you and Mike
14    Veldhuis and his -- the nickname he used was "Stockman
15    007"?
16    A.    That was one of the nicknames, ma'am.
17    Q.    He also used "Stockman"?
18    A.    I recall, yes, he did.
19    Q.    Okay.  And according to you, "Stockman 00," that
20    was Jackson Friesen?
21    A.    That is correct.
22    Q.    Okay.  So according to you there are
23    communications that go forward from here between you and
24    Mr. Friesen beginning on November 4th, correct?
25    A.    (Pause.)
```

```
1    Q.    Between you and Mr. Friesen, you say?

2    A.    I see dates of November 2nd, um, downwards.

3    Q.    Okay.  If you go on to the page, Bates-stamped

4    1755 -- okay.  And if you look at the second message

5    from the bottom, this is a message from you to

6    Mr. Friesen, correct?

7    A.    That is correct.

8    Q.    And you're sending him -- correct me if I'm wrong,

9    something about "cat pornography"?

10   A.    Did you say "cat"?

11   Q.    Yeah.

12   A.    I don't think so, I think it was "robot sex

13   workers."

14   Q.    Oh, okay.  So anyway this is some kind of -- based

15   on the -- on the name, and we don't have to go beyond

16   the name, this has something to do with something

17   sexual, correct?

18   A.    I don't know.  It's an article in a respectable,

19   um, local paper in Geneva, "The Local Dossier."

20   Q.    Okay.  All right.  And Mr. Friesen responds with

21   "Holy smokes"?

22   A.    Sorry, could you zoom out again so I can see the

23   seconds of the message?

24   Q.    (Zooms out.)

25   A.    That is incorrect.
```

A2994

```
 1   Q.    Again are you quarreling with the order in which
 2   these occur?
 3   A.    Yes.  His response, "Holy smokes," is November
 4   2nd, 2018.  When I wrote "Apparently so" at 12:41 and 22
 5   seconds, he replied "Holy smokes" at 12:31 and 44
 6   seconds.  The article that I sent him from the Local,
 7   and Geneva, was sent approximately 6 hours later.
 8   Q.    Okay, so "Holy smokes" responds to some earlier
 9   communication, that's what you're saying?
10   A.    I think that was one of the images that we saw
11   yesterday, perhaps the champagne bottles or the writing
12   on the car windscreen.
13   Q.    And if we go to the first four pages, those
14   communications deal primarily with the, um, the outings,
15   the dinners and get-togethers that were occurring,
16   correct?
17   A.    I -- yes, that is correct.
18   Q.    Okay.  And when these gentlemen came into town,
19   and Ms. Kelln, this was really an event where you were
20   entertaining people who you wanted to do business with,
21   correct?
22   A.    That is correct.
23   Q.    Okay.  So this was you wining and dining folks,
24   correct?
25   A.    Yes.  But I should probably say that it's people
```

```
 1    who we "rarely do business with" rather than "wanting to
 2    do business with."  So they were established and they
 3    came once a year.
 4    Q.    Okay.  And you're saying that you had done
 5    business with them prior to 2016, the messages we're
 6    seeing?
 7    A.    Yes, ma'am.
 8    Q.    Okay.  And we've seen no communications prior to
 9    this one, this is the earliest, correct, from you or
10    with you?
11    A.    Um, I -- in exhibits I do not believe we've seen
12    prior ones.
13    Q.    Okay.  So we see this whole thing about dinner in
14    2016, and then there was another communication that was
15    shown to you that you say involved Mr. Friesen.
16          MS. FRITZ:  If we could put up Exhibit 289.
17          (On screen.)
18    Q.    And this is a communication in 2018, correct?
19    A.    That is correct, August 2018.
20    Q.    And this doesn't have anything to do with -- this
21    doesn't include the other individuals that we've been
22    talking about, there's no Mike Veldhuis or Paul Sexton
23    on here, correct?
24    A.    That is correct.
25    Q.    It's just him dealing with you and with your
```

1    colleague, Richard Targett-Adams, correct?

2    A.    That is correct.

3    Q.    Okay.  And this has to do with a particular

4    transaction called "Lexington," correct?

5    A.    Yes, I think "Lexington Biosciences."

6    Q.    And Lexington Biosciences is a Canadian company,

7    correct?

8    A.    That is correct.  It may be -- I do not recall if

9    it is dualistic, but certainly this symbol is a Canadian

10   symbol.

11   Q.    And all those things that you've been telling the

12   jury about, all those disclosure requirements that the

13   SEC imposes, are very different when you're talking

14   about a Canadian company, correct?

15   A.    I am not a broker, I'm not familiar with the

16   securities laws in Canada.

17   Q.    Okay.  Suffices to say, all those things you've

18   been telling the jury, you have no reason to think that

19   they apply with respect to Lexington?

20        MS. SHIELDS:  Objection.

21        THE COURT:  No, overruled.  He may give us his

22   view.

23   Q.    Correct?

24   A.    No, I would need to confirm it, if Lexington

25   Biosciences is also listed as a dualistic security on

```
 1   the U.S. markets.
 2   Q.    Okay, look, Mr. Knox, I asked you do you have any
 3   reason to believe that those requirements apply to
 4   Lexington?  The answer is do you or do you not?  Don't
 5   reach, just do you know as you sit here today?
 6   A.    I do not know if these requirements apply to
 7   Lexington.
 8   Q.    Okay, thank you.
 9         Were there other -- by the time we get to 2017 and
10   2018, Mr. Friesen was no longer involved with Mike
11   Veldhuis, is that correct?
12   A.    No, that is not correct.
13   Q.    You obviously have gone through endless meetings
14   with prosecutors and regulators, correct?
15   A.    I have had, yes, some meetings.  Correct.
16   Q.    And as Ms. Pickett pointed out, this has gone --
17   this has really gone on for 5 years that you have been
18   meeting with prosecutors and FBI agents and the SEC,
19   correct?
20   A.    That is correct.
21   Q.    Okay.  And undoubtedly it is difficult for you to
22   recall, over the course of 5 years, what you said 5
23   years ago versus what you recall now, correct?
24   A.    Yes, it can be.
25   Q.    And there are 100 pages of notes of your meetings
```

```
 1   going back 5 years, correct?
 2   A.    I do not know.
 3   Q.    And you have not sat and reviewed all those pages
 4   and pages of notes of what you said in order to try to
 5   refresh your recollection before you came in here, did
 6   you?
 7   A.    I am not privy to those notes.  I have never seen
 8   them.
 9   Q.    Okay.  So did you ask these folks, did you say,
10   "Look, it's been a whole lot of years here and I know
11   that there are all these notes, can I look at them in
12   order to just refresh my own recollection?"  Did you do
13   that?
14   A.    I have -- I have sufficient notes of myself and my
15   memory and my records.  I have my computer hard disk --
16   or, you know, I have sufficient notes.  Thank you,
17   ma'am.
18   Q.    All right.  So you felt you didn't need to review
19   all of those notes in order to refresh your
20   recollection?  You had enough, you just said.
21   A.    Um, ma'am, there's -- you know I ran a business
22   for 5 years, we were doing hundreds of trades each week,
23   and, you know, so my memory isn't so good, but my
24   records are spot-on.
25   Q.    We'll talk about the records that we've seen in a
```

```
 1    minute.  But right now I want to go back to the question

 2    that I asked you a moment ago.

 3          You had a meeting with the SEC on March 27th,

 4    correct?

 5    A.    Of what year, please, ma'am?

 6    Q.    This year.

 7    A.    2023.  Okay.

 8    Q.    And present at that meeting were various of these

 9    folks, correct?

10    A.    Can you give me a -- was this an in-person meeting

11    or was this online or --

12    Q.    You know that's a good question.  The notes don't

13    tell me that.

14    A.    Okay.

15    Q.    So what's your recollection?

16    A.    I -- I do not -- I do not remember which -- which

17    meeting it was.

18    Q.    Okay.  Where have you been living in 2023?

19    A.    I've been living in -- mostly it was in Lexington

20    and Massachusetts.

21    Q.    Okay.  And have you periodically come to Boston to

22    sit down with these folks?

23    A.    Three times.

24    Q.    Okay.  Do you know if one of them happened to be

25    in March?
```

```
 1    A.    I -- I know I met them with my prior attorneys.  I

 2    cannot recall which month it was.

 3    Q.    Okay.  And during the course of that meeting, did

 4    you talk about Mike Veldhuis and Paul Sexton?

 5    A.    (Silence.)

 6    Q.    "Yes" or "no."

 7    A.    I do not recall.

 8    Q.    Okay.  Do you have a recollection of talking about

 9    the fact that you had understood that Sexton was a

10    partner with Veldhuis and you understood that because

11    Mike told you that?

12    A.    That is correct.

13    Q.    Okay.  And did you also -- were you also asked

14    about Jackson Friesen?

15    A.    And -- possibly so.

16    Q.    Okay.  And did you tell the SEC at that point that

17    you assumed that he was part of the group?

18    A.    So -- sorry, the word "assumed"?

19    Q.    Correct, "assumed."

20    A.    The, um --

21    Q.    Okay, let me try again with the question.

22    A.    Yes, I mean I used the words because "assumed" is

23    one, um -- you know I never asked Mr. Sexton if he

24    worked with Veldhuis and Friesen.

25    Q.    Okay.  So is it correct that -- first of all, the
```

A3001

 1    first question.

 2           Is it correct that what you told the SEC was that

 3    Mike told you he was partners with Sexton, but that you

 4    were assuming Jackson was part of that group?

 5    A.    No, that is incorrect.

 6    Q.    Okay.  Is it also correct that you told him, as of

 7    2017, '18, "I told you Friesen was not involved"?

 8    A.    There was a period when Mike Veldhuis told me that

 9    Friesen was not involved in all of their deals.

10    Q.    Oh, okay, it wasn't -- so to the extent that the

11    notes reflect that Mike told you Friesen was not

12    involved, are you saying that's not what you said,

13    you're now parsing that out?

14    A.    The -- the content is what -- the content -- what

15    he told me was -- there was that he had a new deal and

16    he was giving me trading instructions and I had asked

17    him "Should I accept them?" or "Should I be expecting

18    them just from himself or from Friesen or both?"

19    Typically we created a chat with four people in it for

20    his group.  And he said, "Friesen was not part of this

21    deal."

22    Q.    Okay.  Well let's just back up a little.  You say

23    you generally had a chat with four people?

24    A.    That is correct.

25    Q.    And so according to you that would reflect how

A3002

1    trading was done?

2    A.    That's an all-informed "yes."

3    Q.    Okay.  And we haven't seen anything like that

4    during your testimony, have we?

5    A.    I do not recall.

6    Q.    No.  So at this point when you talked to the SEC,

7    you were telling them that Mike Veldhuis was somehow

8    explaining that he was not working with Jackson Friesen

9    at that point?

10   A.    On that particular deal.

11   Q.    Okay.  Now those -- those are the communications

12   that we -- that we saw involving you and Mr. Friesen,

13   correct?

14   A.    Yes.

15   Q.    What we didn't see was any trading instructions

16   from Mr. Friesen to you, correct?

17   A.    You did see -- you just showed me a trading

18   instruction from Mr. Friesen to me.

19   Q.    Separating out Lexington and that individual

20   transaction with Mr. Friesen, was there any other

21   trading instruction?

22   A.    Ma'am, I do not recall every exhibit.

23   Q.    Okay.

24   A.    I do not recall every exhibit.

25   Q.    Okay.  And then there's not -- with respect to

A3003

```
 1    money --
 2    A.    Yes.
 3    Q.    Okay, so we've got these communications and that's
 4    it, so let's talk about transfers of money.
 5    A.    Yes.
 6    Q.    So in all of the time that you dealt with
 7    Mr. Friesen --
 8    A.    Yes.
 9    Q.    -- and your testimony is, you know, he's part of a
10    control group, it's part of a criminal enterprise, it's
11    busily concealing its 5 percent ownership, correct?
12    A.    That is correct.
13    Q.    Okay.  And by the way, 5 years ago you didn't talk
14    that way, right?
15    A.    I would not talk that way in public, ma'am.
16    Q.    5 years ago, before you spent 5 years dealing with
17    the FBI, did you sit around talking with colleagues
18    about you guys being a control group and concealing your
19    5 percent ownership?
20    A.    Yes.
21    Q.    Okay, so that's how you spoke?
22    A.    Yes.
23    Q.    Okay.  And you did that, for example, in a
24    restaurant where all of you are having dinner and
25    Mr. Friesen is there?
```

```
 1   A.    When you're talking about "colleagues," my
 2   colleague was Richard Targett-Adams, he was my
 3   colleague, so I -- and he also had knowledge of this 5
 4   percent rule.  So, yes, it was imperative that both of
 5   us apply that to whole-stock deposits.
 6   Q.    Okay.  One question about him.  Have you
 7   cooperated against him?
 8   A.    No, I have not.
 9   Q.    Have you testified against him?
10   A.    No, I have not.
11   Q.    Was he complicit?
12   A.    Sorry, what do you mean by that?
13   Q.    Was he knowledgeable and involved in illegal
14   dealings with you?
15   A.    Yes, he was.
16   Q.    Okay.  All right.  So now let's go back.
17         When you were sitting at a restaurant having
18   dinner with folks, is it fair to say you didn't talk in
19   those terms, "Let's set up nominee companies and hide 5
20   percent ownership and conceal our control group"?
21   A.    We've discussed those.
22   Q.    And you used words like that?  Come on.
23   A.    We used -- we -- and I recall a dinner in
24   Switzerland and a table or two tables down or two tables
25   over was Anthony Bombars, so -- and that was a very
```

A3005

1    memorable evening.  And during the course of the evening

2    Mr. Sharp was there, Mr. Friesen was there, Veldhuis was

3    there, Targett-Adams, the -- and I recall discussing

4    with Targett-Adams afterwards, um, the volume of the

5    conversation went up and up and we were -- we deserved

6    that.  We did.  Because Mr. Sharp that night was

7    discussing his commission structure and he was saying,

8    as you saw yesterday, "For any transfers, charge $100,"

9    he was saying his minimum is "1 percent or a $100."  "1

10    percent or a hundred dollars."  We sat around a table

11    discussing it with him and his clients.

12    Q.    Okay, but that has nothing to do with what I asked

13    you a moment ago, does it?

14    A.    Yes, it has, you said we discuss it in public, and

15    we did.

16    Q.    You just referenced discussions about a commission

17    structure, you did not reference this kind of government

18    legalese verbiage being used among people sitting around

19    a dinner table, "We're a criminal enterprise and a

20    control group and we have to conceal our 5 percent

21    ownership," you all probably didn't talk like that, did

22    you?

23    A.    We discussed -- as I have said before, we

24    discussed bridge-to-market, banks and brokerages, my

25    competitors.

```
 1    Q.    Right.  You did talk about the business that you
 2    were doing, sure, for example routes to market, correct?
 3    A.    Yes.
 4    Q.    In fact I think you mentioned that that was one
 5    thing that Mr. Friesen was interested in talking with
 6    you about, correct?
 7    A.    They --
 8    Q.    Selling stock?
 9    A.    Yes, that's correct.
10    Q.    And that was, when you were pressed, that was the
11    only thing you can recall having spoken with Mr. Friesen
12    about, like talking about selling stock?
13          MS. SHIELDS:  Objection.
14    Q.    Is that -- when you were asked on direct, "Well
15    what did you talk to Mr. Friesen about?" that was what
16    you said?
17          THE COURT:  Well I'm not sure what the question
18    is.
19          I take it the question is, um, "When you were
20    asked about that topic, all you said, about discussions
21    with Friesen, is selling stock?"  Have I got it right?
22          MS. FRITZ:  Yeah, that he was interested in
23    talking about selling stock.
24          THE COURT:  That's the question.  That question
25    you may answer.
```

A3007

```
 1        Is that all you talked about?
 2        THE WITNESS:  Sir, I find it hard to articulate,
 3   if 6 or 8 people are sitting around a circular table and
 4   there's a point of conversation, everyone is open and
 5   free and participating in the conversation.
 6   Q.    Okay, that's the point, isn't it, Mr. Knox?  If 6
 7   or 8 people are sitting around a table, um, you really
 8   can't know or recall who was talking about what,
 9   correct?
10   A.    I can't recall specific --
11   Q.    And people are probably talking to one another,
12   correct?
13   A.    Yes, they do.
14   Q.    And people are drinking, correct?
15   A.    That is correct.
16   Q.    And this whole point is that you're entertaining
17   clients, correct?
18   A.    We are enjoying -- yes, we are able to speak
19   without fear of, um -- we're able to speak freely, which
20   we cannot for the other 11 months of the year.
21   Q.    Okay.  And what you really cared about was the
22   client that you were interested in, Fred Sharp, correct?
23   A.    Fred Sharp was my main point of contact, correct.
24   Q.    And Fred Sharp was the individual with whom you
25   had to make your business sort of negotiations on how
```

A3008

1    the business would run, correct?

2    A.    That is correct.

3    Q.    And in fact you told the FBI repeatedly that Fred

4    Sharp did not want you interacting with his clients,

5    correct?

6    A.    That changed over time.

7    Q.    Okay.  So first let's be clear.  Fred Sharp did

8    not want you, made it clear to you that he did not want

9    you interacting with his clients because essentially

10   there was a sort of competitive operation going on,

11   correct?

12   A.    No, if -- no, that is incorrect.

13   Q.    Okay.  Did Mr. Sharp make it clear he did not want

14   you interacting with his clients?

15   A.    That is not a -- I cannot answer that "Yes" or

16   "No."

17   Q.    Okay, certainly you've told the FBI repeatedly

18   that he was -- and I believe you said "adamant," that

19   you should not be dealing directly with his clients,

20   those were instructions that Fred Sharp gave you?

21   A.    That changed over time.

22   Q.    So let's just -- let's be clear, Mr. Knox.  That

23   was Fred Sharp's attitude at least initially, correct?

24   A.    That is correct.

25   Q.    Okay.  Now there were also certain individuals

A3009

```
 1    that Mr. Sharp told you you could deal with directly,
 2    correct?
 3    A.    Over time, yes, I was allowed to communicate with
 4    individuals direct.
 5    Q.    Okay.  And you explained all of this to the FBI
 6    back in 2019 when you first sat down and met with them,
 7    correct?
 8    A.    Yes, to the best of my ability.  Yes.
 9    Q.    Let's just talk about how that happened.
10          You got arrested in October 2018, correct?
11    A.    That is correct.
12    Q.    That was 5 years ago, correct?
13    A.    That is correct.
14    Q.    And your experience for the next 18 months was
15    miserable to say the least, correct?
16    A.    No, that was incorrect.
17    Q.    You described it yesterday to the jury very
18    pointedly as being strip-searched, being shackled, all
19    of that, you were very deliberate in that description,
20    correct?
21    A.    The first 6 months were terrible, then it was --
22    there was small elements of each week that would give me
23    happiness, pleasure, my -- and I believe they call it
24    "getting institutionalized."
25    Q.    So you're saying you got used to it or they
```

1    treated you better?

2    A.    No, no, the treatment there -- I have done many

3    exciting and fearful things in my life and the first

4    time I was told and dispatched down the corridor to the

5    cell blocks was the most scariest moment in October of

6    2018.

7    Q.    Okay.

8    A.    But after you're on the block for 6 months, um --

9    there's some of us only on pretrial incarceration, so

10   there's everything from someone who's had a DUI to

11   someone who has committed murder or multiple murders,

12   and a lot of drug and gun crimes.  So the first 6 months

13   is very scary as I'm trying to learn to navigate through

14   this position.

15        After 6 months there is -- I have an understanding

16   on how I see the day and how other people treat me and

17   there's an acceptance and there's some joy in the week.

18   There's a joy on Tuesday, every other Tuesday when my

19   wife visited and I spoke to her through the glass, that

20   was a joyful day.

21   Q.    Okay.  So you're saying all that to the jury by

22   way of suggesting that you were comfortable being

23   incarcerated?

24   A.    I had to -- I accepted my surroundings and had to

25   make the best of the bad situation.

A3011

1    Q.    All right.  So is it your testimony to the jury

2    that being incarcerated for you was anything other than

3    a miserable experience?

4    A.    It is a life-learning experience, ma'am.

5    Q.    Mr. Knox, what you love to do is ski, what you

6    love to do is be outdoors and ski, right?

7    A.    That is one of my passions, yes, correct.

8    Q.    And being locked up was something that you did not

9    want to have continue, correct?

10   A.    That is correct.

11   Q.    And you were doing everything humanly possible to

12   get out of there, correct?

13   A.    That is incorrect.

14   Q.    Okay.  What you did was for months you worked with

15   your lawyers to try to get released from jail, correct?

16   A.    Which set of lawyers, ma'am?

17   Q.    Whichever.  Did you work with I don't know how

18   many lawyers you had or have now, um, but were you

19   working with lawyers to try to get released?

20   A.    I was working with lawyers to understand the

21   charges I was facing and to secure efficient legal

22   counsel and eventually to, um, that worked into a

23   sufficient plea agreement, after almost one year of

24   incarceration, that I would sign.  So it took 12 months

25   to achieve a plea agreement.

A3012

```
 1    Q.    But you were not trying, throughout that period,
 2   to just enter into an agreement with the government and
 3   work with the government, that was not initially your
 4   approach, was it?
 5    A.    Um --
 6          THE COURT:  Would you ask that again?  I don't
 7   understand that question.
 8    Q.    The question is, you tried to get yourself
 9   released before you decided to enter into negotiations
10   with the government?
11    A.    Yes, that is correct.
12    Q.    So you did not, on your arrest, decide, "You know
13   what?  I just want to sit down with the government and
14   work this out," that was not what you did initially?
15    A.    That is correct.
16    Q.    What you did was you hired and worked with lawyers
17   to try to get your release from the court basically?
18    A.    (Silence.)
19    Q.    Through the hearing, do you remember that?
20    A.    Ma'am, there's a lot of -- there's a lot of
21   detail.  The initial set of lawyers -- I had been -- as
22   you can see I may -- if I may offer a bit of color to
23   the scenario?
24    Q.    We could get through this much quicker if we could
25   just talk about the fact that you went to court to get
```

A3013

1  released?

2  A.    Yes.

3  Q.    Okay.  And that release was opposed by the

4  government, correct?

5  A.    Which time?  What's the date, please?

6  Q.    The particular date of this proceeding is, um,

7  this is a proceeding on October 24th, 2018 with a lawyer

8  named Mr. Connelly.  Do you recall that?

9  A.    That's correct, yes.

10  Q.    And there was an issue before the judge about

11  whether or not you would be released on some kind of

12  bail or bail package, correct?

13  A.    That may have been the case.

14  Q.    Okay.  And during the course of the proceeding,

15  the government spoke to the Court at length about who

16  you are and why they opposed your release, correct?

17  A.    That is correct.

18  Q.    And the government spoke at length about the fact

19  that you are a liar, correct?

20  A.    Whatever is in the transcript is what the

21  government wrote.

22  Q.    Well do you have a recollection of the government

23  saying you spent 8 years lying?

24  A.    No, I do not have a recollection of that.

25  Q.    Okay.  Do you have a recollection of the

```
 1    government telling the Court that you were "Leading,
 2    participating in one of the largest microcap pump-and-
 3    dump frauds ever brought in the district."  Do you
 4    remember that?
 5    A.    Yes.
 6    Q.    Okay.  Do you have a recollection of the
 7    government telling the Court how much money you had
 8    gotten by virtue of this scheme?
 9    A.    I recall the government's estimate.
10    Q.    Do you have a recollection of the government
11    saying the total in the indictment against you was $156
12    million of which your cut was 6 percent?
13    A.    I was aware of the figures that they were
14    alleging.
15    Q.    Okay.  And that would come out -- and I'm bad at
16    math, but that would come out to $9 million, is that
17    correct, if you get 6 percent of 156?
18    A.    Ma'am, I use EXCEL or a calculator for my math.
19    Q.    Okay.  And here --
20          THE COURT:  Well I'm not seeing what the
21    government said to another judge, he's not saying he
22    agrees with that.  Now if you want him to ask -- to ask
23    him that, I'll allow it.  But we're not going any
24    further with what the government may have said.  It's
25    not evidence of anything in this civil proceeding.
```

```
 1          MS. FRITZ:  Okay.  Your Honor, only to the extent
 2     that the government, based on its knowledge, told the
 3     Court is --
 4          THE COURT:  Yeah, told the Court, and I stand on
 5     my ruling.
 6          MS. FRITZ:  Okay.
 7          THE COURT:  It doesn't prove anything in this
 8     proceeding.
 9          MS. FRITZ:  Okay.
10          THE COURT:  It's flat out hearsay what somebody
11     else said, not in this proceeding, for some other judge.
12          MS. FRITZ:  Okay.
13     Q.   Now at the end of that proceeding, based on
14     everything the judge heard, you were not released on
15     bail, correct?
16     A.   That is correct.
17     Q.   After that, and I believe you mentioned this
18     yesterday, you had lawyers seek reconsideration of that
19     again and again, correct?
20     A.   That is correct.
21     Q.   Trying to get released from incarceration,
22     correct?
23     A.   That is correct.
24     Q.   And none of that worked, you were still stuck in
25     jail, correct?
```

```
 1    A.    That is correct.
 2    Q.    Now there came a point, when you decided to get
 3    out of jail, that you were going to try to work with the
 4    government, correct?
 5    A.    That is incorrect.
 6    Q.    So you did not think that this might facilitate
 7    you getting released from jail?
 8    A.    Ma'am, you said "I decided to get out of jail,"
 9    but it was not my decision to get out of jail.
10    Q.    No, I said you decided to cooperate, to work with
11    the government to try to get out of jail.
12    A.    (Silence.)
13    Q.    That's right?
14    A.    After 12 months and after many, um, meetings with
15    the government, a plea agreement was reached.
16    Q.    Okay, it's interesting, you said the first meeting
17    that you had was called a "reverse proffer"?
18    A.    Yes, ma'am.
19    Q.    Now that meeting is where the government
20    essentially confronts you --
21    A.    That is correct.
22    Q.    -- to admit to what it says the evidence against
23    you is?
24    A.    That is correct.
25    Q.    And they had evidence of activity going back
```

A3017

```
 1   years, correct?

 2   A.     They had records of transactions going back years.

 3   Q.     They had audio recordings of you, correct?

 4   A.     They had, um, I believe I listened to over 500

 5   recordings and approximately 5 were with me.

 6   Q.     Okay.  And none of that had anything to do with

 7   the transactions we're talking about here?

 8   A.     That was with a different control group.

 9   Q.     Was that -- and let's just talk about that control

10   group.

11   A.     Yes.

12   Q.     Was that Morris Tobin?

13   A.     That is Morrie Tobin, that is correct.

14          MS. SHIELDS:  Your Honor --

15          THE COURT:  No, wait a minute.  There's an

16   objection, but it's overruled.

17          Go ahead.

18   Q.     So again, just to emphasize, you had years of

19   dealings with many many different individuals that had

20   absolutely nothing to do with, for example, Mr. Friesen?

21   A.     I had -- that is correct.

22   Q.     Okay.  So the -- so they have you on a case

23   involving, I think you just called him Morrie Tobin?

24   A.     Yes.

25   Q.     And a stock called EPTI, another stock symbol, um,
```

```
1    "CURR"?

2    A.    That is correct.

3    Q.    And they have you on securities fraud, correct?

4    A.    That is correct.

5    Q.    And a whole money laundering thing, right?

6    A.    That is incorrect.

7    Q.    You were funneling funds through an entity called

8    "WB-21," is that correct?

9    A.    I was not funneling funds, they were a payment

10   provider.

11   Q.    Okay.  So the government was interested in also

12   the way that you were moving money, correct?

13   A.    I do not know what the government was interested

14   in apart from the securities fraud.

15   Q.    So based on all of that information, again having

16   nothing to do with anybody in this courtroom, after that

17   reverse proffer you then decided that you were going to

18   try to get a cooperation agreement with the government,

19   correct?

20   A.    That is incorrect.

21   Q.    What you learned is that in order to get an

22   agreement with the government, you have to provide

23   information that would assist the government in

24   investigating and prosecuting other people, correct?

25   A.    That is incorrect.
```

A3019

```
 1   Q.    Okay.  So then you sat down and you wrote three
 2   names that you wanted conveyed to the government to say
 3   "These are people I have information about," correct?
 4   A.    That is absolutely incorrect.
 5   Q.    Okay.
 6         THE COURT:  Disregard what the question suggests.
 7   Go ahead.
 8         MS. FRITZ:  All right.
 9   Q.    Is it correct that after you tendered the first
10   reverse proffer in Boston, you met with David Moore at
11   the Plymouth County Jail?
12   A.    I -- I am -- I don't recall.  Which date would you
13   like?
14   Q.    I'm asking you is that correct information?  After
15   the reverse proffer, you met with David Moore at the
16   Plymouth County Jail?
17   A.    I met with David Moore several times at the
18   Plymouth County Jail.
19   Q.    Okay.  And at that meeting you communicated the
20   names Fred Sharp, Luis Carrillo, and Mosak Conseca to
21   Moore by writing them on a piece of paper, is that
22   correct?
23   A.    (Pause.)  That -- I do not recall exactly if that
24   was the information I wrote.
25   Q.    Okay.  So those were individuals that you had
```

1    information about, Fred Sharp and Luis Carrillo?

2    A.    That is incorrect.

3    Q.    You did not have any information about Fred Sharp

4    and Luis Carrillo?

5    A.    So there's -- ma'am, I think you're taking things

6    out of context.

7    Q.    Did you have information that you thought the

8    government would be interested in regarding Fred Sharp

9    and Luis Carrillo?

10   A.    No.  At that point in time, no.

11   Q.    Okay.  So the first meeting that you had with the

12   government --

13   A.    Yes.

14   Q.    -- you began by talking with them about things

15   that you thought they would be interested in, correct?

16   A.    The first meeting in January 2019?  That was the

17   first meeting and this was a reverse proffer and I did

18   not say anything.

19   Q.    Sorry.  Sorry.  The meeting that happened on June

20   25th, after you had decided that you wanted to meet with

21   the government, a meeting on June 25th, you went in

22   there to talk to them about information that you had

23   that you thought they might be interested in, correct?

24   A.    If that was the start of my cooperation, then that

25   is correct.

A3021

```
 1   Q.    And you started by talking --

 2         THE COURT:  Excuse me, Ms. Fritz.  Just excuse me.

 3   How much longer for this witness?

 4         MS. FRITZ:  We can take a break now.

 5         THE COURT:  Is this a good place?

 6         MS. FRITZ:  Yes.

 7         THE COURT:  We'll take the break.

 8         Ladies and gentlemen, you have not heard all the

 9   testimony, keep your minds suspended, do not discuss the

10   case either among yourselves nor with anyone else.  You

11   may stand in recess for one half hour till 11:15.  I'll

12   remain on the bench.

13         THE CLERK:  All rise for the jury.

14         (Jury leaves, 10:45 a.m.)

15         THE COURT:  You may step down.

16         (Witness steps down.)

17         THE COURT:  Now please be seated.  And would you

18   come to the sidebar.

19

20         AT THE SIDEBAR

21         THE COURT:  This is not sealed, but it is

22   appropriate that it be at the sidebar.

23         We stopped at 11:00 yesterday in order that I

24   could go and do something, speak to something outside

25   the courthouse.  So to get out of here there was an
```

```
 1    interaction with a juror that I considered innocuous,

 2    but it should be on the record.

 3         So I exited the front -- "exited the front?"

 4    (Laughter.)  I went out the front of the courthouse just

 5    as a juror, the third one, it's a lady, she's wearing a

 6    purple sweater.  There are two last doors, she went to

 7    the first one first, opened it, saw that I was coming

 8    through, and held the door for me.  I passed her without

 9    speaking, held the outer door for her.  She passed me.

10    I was looking for my ride actually.  And as she passed

11    me, she said, "You make things interesting."  And I

12    smiled.  She went her way and I went mine.

13         All right.  Now let's go off the record because --

14    (To the Court Reporter.)  Yes, this is off the record.

15         (Recess, 10:46 a.m.)

16         (Jury enters, 11:15 a.m.)

17         THE COURT:  And, Ms. Fritz, you may continue.

18         MS. FRITZ:  Thank you very much, your Honor.

19    Q.    Mr. Knox, we're talking about some of the

20    statements that you made years ago when you first began

21    talking to the FBI, when we broke?

22    A.    Yes.

23    Q.    But I want to talk about something different.

24    A.    Okay.

25    Q.    After a whole bunch of these meetings with the
```

```
 1    FBI, you then finally got out of jail, correct?
 2    A.    That is correct.
 3    Q.    And at the time you were facing guidelines of
 4    roughly 15 years, correct?
 5    A.    That is correct.
 6    Q.    And now, having cooperated with the government,
 7    with the SEC all these years, I'm understanding from
 8    earlier today that now it's only 5 years -- 60 months?
 9    A.    Exactly 66 months, 5 1/2 years, ma'am.
10    Q.    Okay.  And this happened recently, I gather?
11    A.    I believe it was the sentencing -- I was due to be
12    sentenced in February of this year, I think it was the
13    outcome of the Sentencing Committee in February of this
14    year.
15    Q.    Okay.  And was this communicated to you by
16    Mr. Drabick?
17    A.    No, it was not.
18    Q.    Was it communicated through your lawyer from the
19    government?
20    A.    Through my current lawyer, yes, in June of this
21    year.
22    Q.    Okay.  So now you feel that you're looking at 5
23    years and a few months?
24    A.    Yes, less time-served.  Yes.
25    Q.    Okay.  You mentioned on direct, um, that you have
```

```
 1    been -- your words were "detained" for 59 months, I
 2    believe you said?
 3    A.    That is correct.
 4    Q.    Okay.  What did you mean when you said -- we know
 5    you got out of jail.
 6    A.    Yes.
 7    Q.    So what is you mean when you say you have been
 8    "detained" for 59 months?
 9    A.    So when I got out of jail I was, a friend -- I had
10    gone to his home, and I was on home confinement at his
11    home for 18 months, and I had a -- I had electronic
12    monitoring, so an ankle bracelet, and I was allowed to
13    walk around his yard.  And that was the extent of my
14    travel ability for 18 months.
15         And after that I was -- approximately September
16    2021, um, I was able to move in with my fiance and I
17    went from electronic monitoring, home confinement, to a
18    curfew.  And from then I was allowed to move around
19    Massachusetts, but I had to be home between 9:00 p.m.
20    And 5:00 a.m.
21    Q.    Okay.  All right.  But being told that you have to
22    stay in a house with your fiance is not exactly
23    detention, is it?
24    A.    I believe the term is "custody."  I think -- I
25    don't live in the United States and, um, I haven't been
```

```
 1    able to visit my friends or family in Europe.
 2    Q.    Okay.  So your view -- and you talked to the jury
 3    before about the fact that you know of other cases in
 4    which individuals have gotten sentences of 4 months or 7
 5    months, correct?
 6    A.    That is correct.
 7    Q.    And you feel that you have been detained for 59
 8    months already, correct?
 9    A.    Yes, correct.
10    Q.    So your position with the Court would be, correct
11    me if I'm wrong, that you should be sentenced to little
12    or no time in prison, correct?
13    A.    My hope would be that I would get a sentence of
14    time-served.
15    Q.    Okay.  And Mr. Drabick, who is sitting with us
16    today, is going to be the guy standing up in court when
17    you're sentenced in your case, correct?
18    A.    Yes, I believe so.
19    Q.    Okay.  Now there was also a monetary component of
20    your settlement, correct?
21    A.    That is correct.
22    Q.    And so I want to understand that.
23          You said that you had to disgorge $6 million,
24    correct?
25    A.    The SEC's, um, yes, was the --
```

```
 1    Q.    Yes.
 2    A.    I -- my forfeiture was $5 million and I returned
 3    $7 million that belonged to clients of Silverton's.
 4    Q.    Okay.  So it wasn't 6, it was 5 million?
 5    A.    The SEC calculates their figures differently.
 6    Q.    Okay.  And you consider that "forfeiture" as
 7    opposed to "disgorgement," either way you repay the
 8    government the money?
 9    A.    Yes.
10    Q.    Okay.  Now you said that that amount, the amount
11    that you are going to repay the government, you said
12    that that was based on the fact that only your time at
13    Silverton involved tainted money, correct?
14    A.    (Pause.)  Um, that is correct.
15    Q.    I'm just trying to move through this.
16    A.    Yes.  Sorry.
17    Q.    Your position with the government is that money
18    that you earned before Silverton is not tainted and you
19    shouldn't have to pay it back, correct?
20    A.    That's correct.
21    Q.    Okay.  And that was a lot of money, correct?
22    A.    No, it was not.
23    Q.    Okay, let's take a step back.  Let's just quickly
24    go over what that was.
25          As of 2006, I believe, you went to EHT, correct?
```

```
 1    A.    That is correct.
 2    Q.    EHT is "EuroHelvetica," correct?
 3    A.    Correct.
 4    Q.    And "EuroHelvetica" is a European banking
 5    institution, correct?
 6    A.    It is an asset manager.
 7    Q.    Okay.  An asset manager is what Silverton would
 8    also be referred to, correct?
 9    A.    That is correct.
10    Q.    So you go to EHT and you work with them for
11    approximately -- or at that firm for approximately 7
12    years, correct?
13    A.    For 4 years, from 2006 to 2010.
14    Q.    Okay.  Oh, and then you formed Blacklight?
15    A.    That is correct.
16    Q.    Okay.  So let's talk about EHT.
17    A.    Yes.
18    Q.    EHT is one of the things that you kept telling the
19    government about when you were trying to cooperate,
20    correct?
21    A.    Yes, I disclosed the practice, that's where I was
22    made aware of this business practice.
23    Q.    Okay.  And when you say "this business practice,"
24    you say that because Blacklight was modeled on EHT --
25    A.    That is correct.
```

1    Q.    -- and Silverton is modeled on Blacklight,

2    correct?

3    A.    That is correct.

4    Q.    And this is an entirely legitimate -- not

5    entirely, um, the business that was done by EHT is

6    legitimate asset management for clients, correct?

7    A.    That is incorrect.

8    Q.    They did no legitimate work?

9    A.    They did a mix.

10   Q.    Okay.  So some of the work that was done by EHT in

11   asset management was normal asset management for, I

12   believe you said, "high-net-worth individuals"?

13   A.    Some of it, yes.

14   Q.    Okay.  But your position is folks at EHT were also

15   engaged in fraud?

16   A.    Yes, they were.

17   Q.    And that's Mr. Craven, I guess?

18   A.    That is correct.

19   Q.    And Mr. Drayton?

20   A.    That is correct.

21   Q.    And you were telling the government all about that

22   --

23         MS. SHIELDS:  Objection, your Honor.  Relevance.

24         THE COURT:  She's entitled to a few questions, and

25   that about exhausts it.  But that question may stand.

A3029

```
 1          And you told the government all about that?
 2          THE WITNESS:  Yes, I did.
 3          THE COURT:  So let's move on.
 4          MS. FRITZ:  Okay.
 5   Q.     Just one last wrap up.
 6          But your position, in terms of the monetary
 7   penalty, is that anything you earned at EHT is not
 8   something that you should have to repay, correct?
 9   A.     Anything I earned at -- I mean I earned a salary
10   at EHT and that wasn't discussed.
11   Q.     So you didn't have to repay any of that money?
12   A.     That was a salary, um, no.
13   Q.     Okay.  Everybody agreed that you did not have to
14   repay things derived from your work at EHT?
15   A.     Correct.
16   Q.     Thank you.  Then we go to Blacklight.
17          Now in 2010 you start your own business with Tony
18   Collarny, correct?
19   A.     That is correct.
20   Q.     And Kenneth Ciapala, correct?
21   A.     That is correct.
22   Q.     And you had worked together at EHT?
23   A.     That is correct.
24   Q.     So you decided the three of you were to form a
25   similar operation and you called it "Blacklight,"
```

A3030

```
 1   correct?

 2   A.      Correct.

 3   Q.      Now, you worked at Blacklight until 2013?

 4   A.      That is correct.

 5   Q.      And then your partners forced you out of the

 6   business?

 7   A.      That is correct.

 8   Q.      Okay.  So Kenneth Ciapala and Tony Collarny, you

 9   had a complete falling out with them and they forced you

10   out of Blacklight?

11   A.      That is correct.

12   Q.      Okay.  In the meantime though, at Blacklight, you

13   were engaged in a similar activity?

14   A.      That is correct.

15   Q.      And so did you earn any money at Blacklight?

16   A.      Yes, I did.

17   Q.      And the government agreed that you didn't have to

18   repay any of the money you made at Blacklight?

19   A.      We did not discuss it.

20   Q.      Oh, they didn't even ask?

21   A.      Um, I do not recall.

22   Q.      Okay.  So do you know how much that was from

23   Blacklight?

24   A.      I don't.  I don't have recollections.

25   Q.      Okay.  Okay.  So then, um -- and just to put a
```

A3031

```
 1    point on that, your position that you took in your

 2    testimony here is that those were not funds derived from

 3    fraud, right, the Blacklight stuff?

 4    A.    So I don't understand which part of my testimony

 5    that I was discussing the Blacklight funds?

 6    Q.    When you were talking about the negotiations

 7    regarding the monetary penalty --

 8    A.    Yes.

 9    Q.    -- you took the position with the government that

10    only Silverton money should be the subject of forfeiture

11    or disgorgement?

12    A.    That was not my position, it was that the -- what

13    was being discussed was monetary with the proceeds at

14    Silverton and neither Blacklight nor EHT were discussed.

15    Q.    Okay.  You also mentioned, in addition to the

16    funds that you did end up having to -- and by the way,

17    did you actually repay any money to the government?

18    A.    I believe out of the $12 million, and $11.7

19    million is in the U.S. Marshal's service.

20    Q.    Okay, and that's because the government had gone

21    out and identified and frozen a bunch of accounts,

22    correct?

23    A.    Yes, in general.

24    Q.    So, um, you mention this other 7 million.

25    A.    Yes.
```

A3032

```
 1   Q.    And your -- I think your explanation is that it
 2   wasn't your money and you agreed to turn it over to the
 3   government?
 4   A.    That is correct.
 5   Q.    Okay.  So whose money was it?
 6   A.    It belongs to clients of Silverton that had, um,
 7   participated in illegal activities.
 8   Q.    All right.  So again, just to be clear, Silverton
 9   was involved in the receipt and sale of stocks, correct?
10   A.    Correct.
11   Q.    They derived proceeds, correct?
12   A.    Correct.
13   Q.    And those proceeds then, at least theoretically,
14   would go back to the individuals from whence the stock
15   came, correct?
16   A.    Eventually, correct.
17   Q.    But lots and lots of millions didn't go back?
18   A.    That is correct.
19   Q.    Okay.  And so do you have any idea whether those
20   millions include anything having to do with Sharp's
21   clients?
22   A.    Yes, they do.
23   Q.    Is there a lot of Luis Carrillo's money in there?
24   A.    Yes, there is.
25   Q.    Okay, tell me how much?
```

A3033

```
 1    A.     I do not have the breakdown in hand.

 2    Q.     Okay.  And was there any money that you had

 3    previously allocated to Fred Sharp?

 4    A.     Yes, there was.

 5    Q.     How much?

 6    A.     Again it was part of the $7 million.

 7    Q.     Okay.  So amounts that were derived from activity

 8    involving Fred Sharp's clients never left Silverton -- a

 9    significant amount never left Silverton?

10    A.     That is correct.

11    Q.     I just want to talk about the business for a

12    moment.

13    A.     Yes.

14    Q.     You made it clear that the work that you were

15    involved in, private financing of small -- of companies

16    through reverse mergers, that that is an entirely

17    legitimate way for a company to get private financing?

18    A.     Yes.

19    Q.     Okay.  The reverse-merger transactions enable a

20    company to reach out to an investing public through

21    equity, through sale of its stock, correct?

22    A.     That is correct.

23    Q.     And these were transactions that you were involved

24    in with, for example, Mr. Veldhuis, correct?

25    A.     That is correct.
```

```
 1    Q.     So, for example, were they all -- no, withdrawn.
 2           Stevia --
 3    A.     Yes.
 4    Q.     -- was that kind of a deal, correct?
 5    A.     Yes.
 6    Q.     Okay.  And what we haven't talked about is that
 7    the money that is being obtained through these --
 8    through the transactions that you're involved in, that
 9    money is being used, at least in part, to finance the
10    companies?
11    A.     Yes, it can be.
12    Q.     So that money -- that money's not being divvied up
13    by you guys, it is part of the financing transactions
14    that are enabling the company to develop its business,
15    correct?
16    A.     Part of the money is.
17    Q.     And so what we didn't talk about before is that
18    millions of dollars went back to the issuer companies
19    through the transactions that you were part of?
20    A.     I believe a portion -- I would need to check on my
21    records of how much went to the actual public company.
22    Q.     Okay.  You also confirmed that the wrongful
23    conduct that you keep talking about, "We control them,
24    we only need 5 percent, and then we hide it, and then
25    we're in business, um, that activity, there were any
```

```
 1    number of instances where that was not a problem in

 2    connection with deals that you were involved in?

 3    A.    The minority.

 4    Q.    Okay.  So in any instance in which investors have

 5    less than 5 percent --

 6    A.    Correct.

 7    Q.    -- this issue doesn't exist?

 8    A.    Not for me.  If they're holding it with Silverton,

 9    correct.

10    Q.    Okay.  Or any instance in which the doggone

11    lawyers actually filed this Form 13D, correct?

12    A.    I don't know about the lawyer's responsibility

13    there for filing.

14    Q.    Well the concealing-ownership thing, do you

15    understand that what you're talking about there is the

16    failure to file a Form 13D?

17    A.    I do not know what a Form 13D is.

18    Q.    Okay.  All right.  Okay.  Or there's another

19    instance where lawyers file a registration statement

20    relating to the stock.  Do you know whether that then

21    resolves any issues regarding the sale of stock?

22    A.    Are you talking about 144 stock?

23    Q.    No.

24    A.    I'm sorry, I don't --

25    Q.    No.  No.  The registration statements would be
```

```
 1   over here, exceptions, including 144, would be

 2   different.

 3   A.    Okay.

 4   Q.    So if a registration statement is filed, then that

 5   also addresses issues regarding sale of stock, correct?

 6   A.    I do not know.

 7         MS. SHIELDS:  Objection.

 8         THE COURT:  Yeah, sustained.  Sustained.

 9         MS. FRITZ:  Okay.

10         THE COURT:  Well in view of his answer that he

11   does not know, do you press the objection?

12         MS. SHIELDS:  No, your Honor.

13         THE COURT:  All right, it's waived.  He doesn't

14   know.

15         MS. FRITZ:  Okay.

16   Q.    So in this case -- you're not a lawyer?

17   A.    No, I'm not a lawyer.

18   Q.    But in this case we know that there were bunches

19   of lawyers dealing with these transactions, correct?

20         MS. SHIELDS:  Objection.

21   Q.    A number of lawyers?

22         THE COURT:  Um --

23         MS. FRITZ:  Some lawyers?

24         THE COURT:  No, no, that's not my problem.  My

25   problem is -- well at that level of generality, it's
```

```
 1    sustained because generally I don't see the relevance.
 2    But you may ask a question that is more precise.
 3         MS. FRITZ:  Okay, thank you, your Honor.
 4    Q.    We know that, with respect to the Fred Sharp
 5    transactions --
 6    A.    Yes.
 7    Q.    -- there was a lawyer involved, because Fred Sharp
 8    is a lawyer, correct?
 9         MS. SHIELDS:  Objection.
10         THE COURT:  Well, um, sustained.
11    Q.    Do you know if Fred Sharp is a lawyer?
12    A.    No, he is not a lawyer.
13    Q.    Okay.  Do you know if Fred Sharp represented to
14    clients that he had the knowledge and ability to deal
15    with and understand U.S. securities laws?
16    A.    I do not know how he represented himself to
17    clients.
18    Q.    Okay.  And were you familiar with Greenberg
19    Traurig being involved in these deals?
20    A.    Not directly.
21    Q.    You did not know that?
22    A.    For example, the wire transfer that we saw, um, a
23    payment for, I did not know.  The services, we just get
24    told -- we receive our instructions of who to pay and
25    the details to meet and we send it out.
```

A3038

```
 1    Q.    So you didn't know that lots of lawyers at
 2    Greenberg were doing lots and lots of work, for example,
 3    for a client company called "Riverfall"?
 4    A.    No, I did not.
 5    Q.    Okay.
 6          MS. FRITZ:  If we could pull up Exhibit 286.
 7          (On screen.)
 8    Q.    Now this is something that you talked about during
 9    your direct testimony, correct?
10    A.    That is correct.
11    Q.    And this has to do with directions to pay $129,000
12    to Greenberg Traurig, correct?
13    A.    Correct.
14    Q.    So you were familiar with this, correct?
15    A.    Correct.
16    Q.    Are you "Silverton Operations"?
17    A.    Yes, I am.
18    Q.    Okay.  So you've seen this document?
19    A.    That is correct.
20    Q.    Okay.  So if you go to the fourth page in --
21    A.    Yes.
22    Q.    (Turns.)
23          MS. FRITZ:  We're looking for the page.
24          (Pause.)
25          MS. FRITZ:  Okay, your Honor, may I approach?
```

A3039

```
 1          THE COURT:  You may.
 2    Q.    I'm going to show you, Mr. Knox, pages, um,
 3    relating to the Greenberg Traurig invoice, I'm going to
 4    ask you, first of all, if you've seen them before?
 5    A.    (Looks.)  Yes, I have.
 6    Q.    Okay.  So this is -- this is what a Greenberg
 7    Traurig invoice looks like that you received, correct?
 8    A.    This is what I received, but it's not a normal
 9    Greenberg Traurig -- as I said, the details, there was
10    patchwork.
11    Q.    The details are patchwork?
12    A.    Because we could --
13    Q.    Okay.  So let's just -- let's take a look at a few
14    of these very-detailed lawyer entries.
15    A.    Yes.
16    Q.    Um, and you're saying you don't think that that's
17    a real Greenberg invoice?
18          MS. SHIELDS:  Objection.
19          THE COURT:  No, the question may be put.  The
20    question is not evidence of anything.
21    A.    Well I -- I was a director of Riverfall Group and
22    if Greenberg Traurig did $120,000 worth of work for
23    someone a company that I was a director of, I would have
24    expected to have seen some work product.  I did not
25    receive any work product on behalf of Riverfall Group.
```

```
1    Q.    Okay.  So do you know an attorney at Greenberg

2    Traurig named Mark Lee?

3    A.    I only knew them after -- I don't know him

4    personally.

5    Q.    How about Peggy Autrey?

6    A.    I do not know her.

7    Q.    Brooke Candra?

8    A.    I do not know her.

9    Q.    Do you know whether Brooke, for example one day

10   finalized a Form 15 and order of consent for signature

11   and filing?

12   A.    I do not know that.

13   Q.    Okay.  All right.  If you could take a look at

14   this.

15   A.    Yes.

16   Q.    Just this one page.

17   A.    Yes.

18   Q.    Is there anything on here that looks like it's not

19   a boring corporate lawyer's description of his work?

20   A.    (Looks.)

21         MS. SHIELDS:  Objection.

22         THE COURT:  Sustained in that form.

23   A.    Um --

24         THE COURT:  No, that was sustained.

25   Q.    Is there anything on here that you can point to to
```

A3041

```
 1    suggest that this is made up or patchwork?
 2    A.    (Looks.)  None on this page, Page 2.
 3    Q.    Well I don't want to be that particular so --
 4    A.    (Looks.)
 5    Q.    I'm going to ask you to look at Page 3.  Page 3
 6    includes the firm's disbursements or expenses.  Can you
 7    take a look and see whether those appear to be
 8    disbursements by Greenberg Traurig relating to various
 9    of the corporate entities' issuers including New Age?
10          MS. SHIELDS:  Objection.
11          THE COURT:  Well you're asking -- the document is
12    not in evidence.
13          MS. FRITZ:  Oh, sorry.
14    Q.    Do those appear to be disbursements relating to
15    the businesses that you were involved in, issuers and
16    companies?
17    A.    I do not know, ma'am, we've never dealt with them.
18    Q.    "NewGen BioPharma" you mentioned, yes?
19    A.    We dealt with selling the shares, we did not deal
20    with any regulatory filings.
21    Q.    Okay.  So it sounds like what you're saying is
22    "This must be made up because I, Roger Knox, did not
23    direct that all this legal work occur"?
24    A.    No, ma'am, if -- we may have literally received
25    it, in fact it was a genuine Greenberg Traurig invoice,
```

A3042

1   but whom it was addressed to initially had been changed.

2   Q.    Okay, so now it's not a patchwork invoice, now

3   it's a genuine invoice, correct?

4   A.    No, it is not a genuine invoice, it is a doctored

5   -- it's patchwork, it did not have the correct details

6   on it.

7   Q.    Do you have any idea if this document reflects

8   actual work done by Mark Lee and others in relation to

9   an entity called "Riverfall"?

10  A.    I do not know.

11        (Pause.)

12  Q.    We've talked about the fact that reverse mergers

13  being used for private financing of companies, that that

14  is a legitimate way for a company to get private

15  financing, correct?

16  A.    Correct.

17  Q.    Likewise the involvement of stock promoters is a

18  legal way for that to be presented out to the investing

19  public, is that correct?

20  A.    I do not know about stock promoters.

21  Q.    So you don't know what the rules and regs are for

22  stock promotion?

23  A.    The only thing I'm aware of is I've paid for a lot

24  of illegal stock promotions.

25  Q.    You've paid for a lot of illegal ones?

1    A.    Correct.

2    Q.    Okay.  But you seem to be aware that stock

3    promotion is not inherently illegal, correct?

4    A.    Correct.

5    Q.    Okay.  Did you have an understanding that that

6    sort of marketing activity was what Jackson Friesen was

7    involved in?

8    A.    No, I was not.

9    Q.    Okay.  And the companies that you've talked about,

10    for example VBIO, that company was -- was in your view a

11    good opportunity for investors, correct?

12    A.    Sorry, ma'am, I just go back to your actual --

13    you're saying, in your previous question when you said

14    Jackson Friesen, about the promotion, that that is what

15    he did or what was one of the activities of the group

16    that he worked for.

17    Q.    But that happened to be the role that he played,

18    the activities in which he --

19    A.    No, I did not know his specific role.

20    Q.    Okay.  And VBIO, for example --

21    A.    Yes.

22    Q.    -- you did view that as a company that was a good

23    opportunity for investors, correct?

24    A.    I did not -- I did not analyze or recommend, um,

25    any of the companies.  My job -- my job was to agree to

```
 1   market and sell the shares.  I did not know if the
 2   company was good or bad.
 3   Q.    Okay.  All right.  So you've given some testimony
 4   regarding having met Jackson Friesen and we've seen a
 5   couple of communications with him, correct?
 6   A.    Correct.
 7   Q.    Now when we go back to 2019 when you were seeking
 8   to get a cooperation agreement with the government, you
 9   focused on and talked to the government about the people
10   that you really did know, correct?
11   A.    Correct.
12   Q.    You talked about the EHT people that you worked
13   with, correct?
14   A.    Correct.
15   Q.    And you then began to talk about Fred Sharp,
16   correct?
17   A.    Correct.
18   Q.    And you talked about -- and you referenced Mike
19   Veldhuis and Jackson Friesen way back in 2019, correct?
20   A.    Correct.
21   Q.    And what you said is that Veldhuis was a friend of
22   Jackson Friesen, correct?
23   A.    Correct.
24   Q.    Friesen's dad was in the penny stock business,
25   correct?
```

A3045

```
 1    A.    Correct.

 2    Q.    And was a friend of Sharp's, correct?

 3    A.    Correct.

 4    Q.    You also emphasized to them that Sharp did not

 5    allow trading directions to come from clients generally,

 6    correct?

 7    A.    Correct.

 8    Q.    And you emphasized to them that Carrillo was

 9    certainly an exception to that, correct?

10    A.    Sorry, I think I said for -- that it changed over

11    time.

12    Q.    By the time we get to 2019 --

13    A.    Yes.

14    Q.    -- you're telling them that Sharp was very careful

15    about who trading orders could come from?

16    A.    Yes, but by then it was direct from client to

17    Silverton.  He no longer employed the users "Trad" or

18    "Kash."

19    Q.    Okay.  So what you're saying here, what you're

20    telling them in 2019 is, that Sharp limited the ability

21    of clients to trade in a prior period?

22    A.    Yes, that's correct.

23    Q.    Okay.  And what you're saying is that Carrillo was

24    allowed by Sharp to trade?

25    A.    He may have been the first one.
```

A3046

```
 1    Q.    And then --
 2          THE COURT:  Have in mind what you've told us about
 3    the length of time you needed here.
 4          MS. FRITZ:  This, your Honor -- I will wrap it up
 5    now.
 6          THE COURT:  All right.
 7    Q.    Look, did you also tell them that, in addition to
 8    Carrillo, Mike Veldhuis was the one who Sharp allowed to
 9    trade?
10    A.    When I spoke -- when I spoke with Fred Sharp, when
11    I discussed Mike Veldhuis, I was speaking -- and the
12    same with Luis Carrillo, I was speaking with him and his
13    control group.  It's easier using one name than all.
14    Q.    Mr. Knox, we don't want to have a -- we don't want
15    to have a whole bunch of people giving trading
16    directions, right, that would be wrong?
17    A.    Correct.
18    Q.    Okay.  So Mike Veldhuis, you told the FBI again
19    and again was the guy that traded in relation to deals
20    that he was involved in, correct?
21    A.    Not just Mike Veldhuis, Mike Veldhuis and Jackson
22    Friesen.
23    Q.    Okay.  Did you tell the FBI that VBIO was a deal
24    controlled by Mike Veldhuis?
25    A.    Yes.
```

A3047

1    Q.    Did you tell the FBI that you received buy-and-

2    sell orders from ACCO on that deal from Mike Veldhuis?

3    A.    That sounds correct, yes.

4    Q.    Okay.  Did you tell, at another meeting with the

5    FBI, that again VBIO was a deal controlled by Mike

6    Veldhuis?

7    A.    Yes.

8    Q.    Did you tell them again that Mike Veldhuis was the

9    one giving instructions regarding VBIO?

10    A.    Yes.

11    Q.    Okay.  Did you also tell the FBI, with respect to

12    Friesen, that Bill Friesen is Jackson Friesen's father?

13    A.    That is correct.

14    Q.    And that Jackson Friesen worked for Bill Friesen?

15    A.    No, I don't recall saying that.

16    Q.    Okay.  I'm going to show you -- these are notes of

17    12 -- the meeting 12-4 -- 12-4-20.  Again there were

18    lots of conversations over lots of years that surely had

19    nothing to do with Jackson Friesen, correct?

20    A.    No, my recollection was Bill Friesen had an office

21    and within that office were three offices with Jackson

22    Friesen, Paul Sexton, and Mike Veldhuis, and those three

23    together worked on deals, um, separate from Bill

24    Friesen, Jackson's father.

25    Q.    Okay.  So Jackson Friesen had an office with Bill

A3048

```
 1    Friesen in that they had offices --
 2    A.    There were four offices, one for each of them.
 3    Q.    Okay.  So, um, now, if I could approach, I'm
 4    showing you Page 2 of 9, and I'm showing you this and
 5    asking you if this refreshes your recollection that you
 6    said that "Bill Friesen is Friesen's father, Friesen
 7    worked for Bill Friesen"?
 8    A.    (Looks.)  Yes, that sounds correct.
 9    Q.    Okay.  (Pause.)  Do you have a recollection of
10    telling the FBI that you actually rarely spoke to
11    Friesen or Sexton by phone?
12    A.    Correct.
13    Q.    Okay.  Do you have a recollection of telling the
14    FBI that you don't recall specific business discussions
15    with Mike Veldhuis or Jackson Friesen, that they were
16    very guarded?
17    A.    Yes.
18    Q.    Okay.  Do you recall telling the FBI that you did
19    not know what Sexton's role was?
20    A.    That is correct.
21    Q.    Or his -- any detail of any partnership he was in,
22    correct?
23    A.    Well his partnership was with Jackson Friesen and
24    Mike Veldhuis.
25    Q.    Okay, I know now you're saying that, but when you
```

```
 1    talked to the FBI years ago, when maybe this was a
 2    little clearer in your mind, did you tell them you
 3    didn't actually know the details about a partnership?
 4    A.    I did not know the role of Paul Sexton in the
 5    control group.
 6    Q.    In the control group?
 7    A.    Yes.
 8    Q.    Okay.  Did you tell the FBI that you learned about
 9    the relationship between Veldhuis and Sexton from Fred
10    Sharp?
11    A.    No.
12    Q.    Okay.
13    A.    I learned about the relationship when we had --
14    when we sat down and had dinner in Geneva in 2013.
15    Q.    And everybody just was talking about it?
16    A.    Yes.
17    Q.    Okay.  So is it fair to say that in 24 meetings
18    and 100 pages of notes, that doesn't appear?
19          MS. SHIELDS:  Objection.
20          THE COURT:  Yeah, sustained.
21          MS. FRITZ:  Okay.
22    Q.    In fact the way that you explained your knowledge
23    to the FBI is that you learned it from Fred Sharp, do
24    you recall that?
25    A.    No, I do not.
```

1   Q.    Do you recall telling the FBI that in your view

2   Veldhuis and Sexton were equals, Friesen, not so?

3   A.    No, I do not recall that.

4   Q.    All right.

5         THE COURT:  The answer's "No," so your question is

6   to be ignored.

7         MS. FRITZ:  Hold on.  I'm not done.

8         THE COURT:  I didn't say you were.

9         MS. FRITZ:  Well I hope I'm not.

10        THE COURT:  Well you're close to being done, I'm

11   sure.

12        MS. FRITZ:  I know.  I understand that, your

13   Honor.

14        (Pause.)

15   Q.    Now we've talked about the fact that you met with

16   the SEC also?

17   A.    Yes.

18   Q.    And you said you met with them three times, is

19   that correct?

20   A.    I think three times this year just with the SEC,

21   they were present at some of the other proffers.

22   Q.    Okay.  And it was in that meeting that you told

23   the FBI about Mike's remark about, as of 2017, Friesen

24   not being involved?

25   A.    I believe he stepped back for a period of time.

A3051

```
 1    Q.    Okay.  (Pause.)   All right, just a few more

 2    questions.

 3          You were asked about the use of encrypted devices,

 4    correct?

 5    A.    Yes, ma'am.

 6    Q.    And I think what you told the jury is "Gosh, we

 7    used those because we were part of a criminal enterprise

 8    and we wanted to hide stuff," right?

 9    A.    Yes, ma'am.

10    Q.    Okay.  You talked about that with the FBI at

11    different times, correct?

12    A.    Yes, ma'am.

13    Q.    And what you told the FBI is that "Sharp used

14    Xphones to get things done," correct?

15    A.    Yes.

16    Q.    And you told the FBI that there was no discussion

17    that it was to evade law enforcement, correct, that was

18    not discussed?

19    A.    I do not recall the specifics.

20    Q.    All right.  We were talking about whether, um,

21    Mike Veldhuis was the guy that gave direction on the

22    VBIO deal, correct?

23    A.    We were, correct.

24    Q.    Okay.

25          MS. FRITZ:  If we could just quickly put up
```

A3052

```
 1    Exhibit 282, we looked at this briefly yesterday, it
 2    showed an account title next to VBIO, and I just want to
 3    make sure you identify that for the jury.
 4         (On screen.)
 5    Q.    What is the account title that shows up next to
 6    the code "VBIO"?
 7    A.    It's "ACCO," A-C-C-O.
 8    Q.    And "ACCO" is Mike Veldhuis?
 9    A.    That is correct.
10    Q.    Okay.
11         In terms of all these transactions that were done,
12    what we saw you talk about yesterday -- in terms of
13    actual money that went to Jackson Friesen, we saw you
14    talk about two things, 1,000 Swiss Francs, correct?
15    A.    Yes.  Yes.
16    Q.    Okay.  And was that something that you liked to
17    offer to clients just to be a good host, um, to be
18    gracious?
19    A.    That wasn't a -- as I said, it wasn't a gift, the
20    client asked me for cash and I endeavored to get it for
21    them.
22    Q.    Okay.  And what's your recollection of what you
23    did in relation to that particular transaction, who did
24    you book that to?
25    A.    As per Jackson Friesen's request, to VBIO.
```

```
 1    Q.    Okay.  And that's one of the entries we're seeing
 2    here?
 3    A.    That is correct.
 4    Q.    Okay.
 5          You also talked about a payment supposedly of
 6    9,000 euros relating to Mr. Friesen?
 7    A.    That's correct.
 8    Q.    And there was an exhibit, 290, that was shown.
 9          MS. FRITZ:  If we could put that up.
10          (On screen.)
11    A.    Yes.
12    Q.    And this is the kind of document, I think you've
13    testified yesterday, that you're the guy that fills in
14    all the info, right?
15    A.    I filled in everything barring the signature, but
16    that was a scroll with -- Jackson did the scroll at
17    dinner in Chamoix.
18    Q.    Oh, so you're saying that Jackson made a scroll on
19    that?
20    A.    Yeah, correct.
21    Q.    You testified yesterday that one of your jobs was
22    you used to create these with PDF signatures and all of
23    that?
24    A.    No, not these documents.  I think you're talking
25    about the Trust Form A.
```

A3054

```
 1    Q.    Oh, okay.  So the sum total, after everything that
 2    you've talked about, is you know of 9,000 euros and
 3    1,000 Swiss Francs going to Mr. Friesen?
 4    A.    That's not --
 5    Q.    That's not what we saw here?
 6    A.    That is what we have seen here, it's not the sum
 7    total.
 8    Q.    That is all the evidence that has been presented
 9    through you here?
10    A.    Okay, I accept that.  Thank you.
11          (Pause.)
12          MS. FRITZ:  I'm done.
13          THE COURT:  Any redirect?
14          MS. SHIELDS:  Just very briefly, your Honor.
15
16    REDIRECT EXAMINATION BY MS. SHIELDS:
17    Q.    Mr. Knox, on cross-examination Ms. Fritz asked you
18    a couple of times about who you got trading instructions
19    from on VBIO?
20    A.    Yes.
21    Q.    From whom did you get trading instructions on
22    VBIO?
23    A.    From Mike Veldhuis and Jackson Friesen.
24    Q.    And in general when you did deals for the group of
25    Sexton, Veldhuis, and Friesen, from whom did you get
```

A3055

```
 1    trading instructions?
 2    A.      Jackson Friesen.
 3    Q.      Thank you.
 4            MS. SHIELDS:  Nothing further, your Honor.
 5            THE COURT:  Nothing further, Ms. Pickett?
 6            MS. PICKETT:  No, your Honor, thank you.
 7            THE COURT:  And nothing further, Ms. Fritz?
 8            MS. FRITZ:  No, your Honor.
 9            THE COURT:  You may step down.
10            (Witness steps down.)
11            THE COURT:  Call your next witness.
12            MR. LONDON:  The SEC calls Kenneth Ciapala.  Your
13    Honor, Mr. Ciapala will be testifying remotely.
14            THE COURT:  Oh, all right.
15            (Pause.)
16            MR. LONDON:  May I have a moment, your Honor?
17            THE COURT:  I said if we couldn't find the witness
18    and we can't find him even remotely --
19            THE CLERK:  He's here now.
20            THE COURT:  Oh, he's here in the waiting room now.
21            (Pause.)
22            THE COURT:  Well, very quickly.
23            The arches in all the courtrooms have a real
24    symbolic significance, and I'll go through it quickly
25    because I don't see his face yet.
```

A3056

```
1          The arch over the doors to the courtroom is, um,

2     represents the public, the courtroom must be open to the

3     public, there are very rare instances when it can be

4     closed.

5          The arch over the jury box is for that portion of

6     the public which, duly-qualified, sits as the jury to

7     adjudicate the facts.

8          The arch over the judge's bench is for the judge,

9     who is the neutral moderator and law teacher in the, um,

10    premises.

11         And the arch here, across the way, is best

12    appreciated by the jury because it frames the lawyers,

13    um, the lawyers who present the evidence, who fairly and

14    carefully, in accordance with the ethical rules, really

15    facilitate the fair and impartial adjudication of every

16    case.

17         And now I see a face and we'll go from there.

18         THE CLERK:  Can you hear us okay, sir?

19         THE WITNESS:  Yes.

20         THE CLERK:  Can you please raise your right hand.

21         (KENNETH CIAPALA, sworn.)

22

23         * * * * * * * * * * * * * *

24         KENNETH CIAPALA

25         * * * * * * * * * * * * * *
```

A3057

| | |
|---|---|
| 1 | |
| 2 | DIRECT EXAMINATION BY MR. LONDON:  (Witness by zoom.) |
| 3 | Q.    Would you state your name for the record, sir. |
| 4 | A.    Yes, my name is Kenneth Ciapala. |
| 5 | Q.    And where are you currently located? |
| 6 | A.    In Switzerland. |
| 7 | Q.    During your testimony today, Mr. Ciapala, we're |
| 8 | going to be talking about the time period from 2011 to |
| 9 | 2019.  During that period of time, what country did you |
| 10 | work in? |
| 11 | A.    Switzerland. |
| 12 | Q.    And was there an organization that you worked with |
| 13 | at that point in time? |
| 14 | A.    Yes, I was employed by Blacklight and -- |
| 15 | Q.    And what was your role with Blacklight? |
| 16 | A.    I was an administrator, um, an administrator of |
| 17 | the company. |
| 18 | Q.    Were you an owner of Blacklight? |
| 19 | A.    Yes. |
| 20 | Q.    Were you arrested in connection with your work at |
| 21 | Blacklight? |
| 22 | A.    Yes. |
| 23 | Q.    And what work did you do at Blacklight that led to |
| 24 | your arrest? |
| 25 | MS. PICKETT:  Objection, your Honor. |

A3058

```
 1          MS. FRITZ:  Objection.
 2          THE COURT:  There's an objection.  Overruled.
 3     Q.   You can answer.
 4          So the question, sir, was what was the work you
 5     were doing at Blacklight that led to your arrest?
 6          THE COURT:  Well he can't testify to what's in the
 7     authorities's minds, but I take it you're asking him why
 8     does he think he was arrested?
 9     Q.   What is your understanding of why you were
10     arrested?
11     A.   Um, stock trading.
12     Q.   And if you could expand a little bit, what were
13     you doing at Blacklight?
14     A.   We were -- we had some clients and we were
15     administrating their accounts, introducing stocks, and
16     then selling it in the market.
17     Q.   As part of administering the stock, did that
18     involve breaking up shares into smaller chunks?
19     A.   Correct, yes.
20     Q.   And what was the size of the smaller chunks you
21     would break stocks up into?
22     A.   5 percent, below 5 percent, um, of outstanding
23     stock.
24     Q.   Now what was your understanding about the legality
25     in the United States of breaking up the stocks into
```

A3059

```
 1   lower than 5 percent?
 2   A.    We didn't have to report to the SEC.
 3   Q.    What is the current status of your criminal case?
 4   A.    Um, it's pending judgment.
 5   Q.    And as part of the status of pending judgment, um,
 6   did you plead guilty?
 7   A.    Yes.
 8   Q.    And why did you decide to plead guilty?
 9   A.    Because the, um -- for the crimes.
10   Q.    I'm sorry I just couldn't understand it.  Would
11   you just say that again, sir.
12   A.    For the crimes I committed.
13   Q.    Do you mean you decided to plead guilty because
14   you were guilty, is that what you mean?
15   A.    Yes.
16   Q.    Okay.  Do you have any agreements with the federal
17   criminal prosecutors in connection with your guilty
18   plea?
19   A.    Yes, I do.
20   Q.    What type of agreements do you have?
21   A.    Cooperation agreements.
22   Q.    And what is your understanding of what the
23   cooperation agreement requires you to do?
24   A.    To help authorities and give them information on
25   what was done.
```

```
1    Q.    Information on what --

2    A.    Basically --

3    Q.    I think because of the delay between us and

4    Switzerland, and I don't mean to jump on you, so just go

5    ahead and answer the question.

6    A.    Yes.

7    Q.    What is your understanding of what the cooperation

8    requires you to do?

9    A.    Basically to help authorities to answer the

10   questions and to testify or to help them, um, on crimes

11   or whatever, whatever they need.

12   Q.    Okay.  And does the plea agreement you entered

13   into with the federal criminal authorities contemplate

14   sanctions that you could be facing?

15   A.    Yes.

16   Q.    And what type of sanctions are you facing?

17   A.    Um, numerous years in jail.

18   Q.    Do you have a sense of the potential range of the

19   years in jail you could be facing?

20   A.    No, not exactly.  It's just many counts and 25

21   years.

22   Q.    At the end of the day, who actually imposes the

23   jail sentence on you?

24   A.    A judge.

25   Q.    And is it your expectation that testifying for the
```

A3061

```
 1    SEC in this case here today will be taken into account

 2    as part of that criminal sentence?

 3    A.    Yes.

 4    Q.    Were you charged by the SEC in connection with

 5    your conduct at Blacklight?

 6    A.    Yes.

 7    Q.    And how many SEC charges or how many SEC cases are

 8    you facing?

 9    A.    Three.

10    Q.    And what, generally speaking, could you just give

11    us the status of the three SEC cases?

12    A.    I think two settled and one is in process.

13    Q.    And in connection with the one that's still in

14    process, is it your expectation that testifying today

15    will be taken into account by the SEC as part of that

16    resolution?

17    A.    Potentially, yes.

18    Q.    So to prepare to testify today in court, did you

19    meet with me and some of my colleagues -- and I'm not

20    sure if you can see them, but did you meet with me and

21    others at the SEC?

22    A.    I didn't meet, we did video calls.

23    Q.    Did you meet remotely with us, I should say?

24    A.    Yes.

25    Q.    How many times did you meet remotely with myself
```

A3062

```
 1    and colleagues to prepare for today?

 2    A.    I believe three times.

 3    Q.    And at any point in those three meetings did I

 4    show you documents?

 5    A.    Yes, you did.

 6    Q.    Do you recall which meeting I showed you

 7    documents?

 8    A.    On the second one -- on the second meeting you

 9    showed me documents.

10    Q.    And did the documents I showed you help refresh

11    your recollection as to the events that I was asking you

12    about?

13          MS. PICKETT:  Your Honor, objection.

14          MS. FRITZ:  Objection, it's leading throughout.

15          THE COURT:  I'm sorry, the grounds for the

16    objection?

17          MS. FRITZ:  Leading throughout.

18          THE COURT:  Well we'll let that stand, but you did

19    call the witness, Mr. London.  But I'll be alert to it,

20    if you object.

21          Go ahead.

22    Q.    Do you know Fred Sharp?

23    A.    Yes.

24    Q.    How do you know Fred Sharp?

25    A.    I met him in Geneva once, um, back in about 2012.
```

```
 1    Q.    Did Blacklight ever conduct any services for Fred

 2    Sharp?

 3    A.    Yes, we did.

 4    Q.    And approximately when did that begin?

 5    A.    I believe in 2013, the end of 2012, 2013.

 6    Q.    And what services did Blacklight provide for

 7    Sharp?

 8    A.    We opened and traded some accounts for some of his

 9    clients.

10    Q.    And when you say you "opened accounts," what do

11    you mean by that?

12    A.    We opened a bank account and trading accounts from

13    the brokerage firm.

14    Q.    Are you familiar with a term "nominee account"?

15    A.    Yes.

16    Q.    And what is a "nominee account"?

17    A.    A "nominee" is someone that's holding the accounts

18    on the benefit of others.

19    Q.    And were any of the accounts that you opened for

20    Sharp nominee accounts?

21    A.    All three of them.

22    Q.    Did you have names for those accounts?

23    A.    Yes, Pegasis, Gotama, and Trius.

24    Q.    And if you could expand a little bit, what was the

25    nature of the services that you offered Fred Sharp?
```

```
 1    A.    Basically it was depositing stock in the system,

 2    freetrading stock in the system, into brokerage

 3    accounts, selling it into the market, and then removing

 4    the money to the bank accounts, and receiving wire

 5    instructions from him in order to process the wires and

 6    to send the money to his requests.

 7    Q.    And with respect to your response there about, um,

 8    depositing stock into the accounts, what --

 9    percentage-wise what were the amounts of stock you

10    deposited into Fred Sharp's nominee accounts?

11         MS. PICKETT:  Objection.

12         THE COURT:  No, overruled.

13    Q.    You can answer.

14    A.    Every position that we put in was at most 5

15    percent.

16    Q.    What was the rough time range that you provided

17    services for Sharp, from start to end?

18    A.    I would say the end of -- the beginning of 2013 to

19    the end of about 2018, mid 2018 -- mid 2019, I would

20    say.

21    Q.    Do you know somebody by the name of Yvonne

22    Gasarch?

23    A.    Yes.

24    Q.    And who do you understand Yvonne Gasarch to be?

25    A.    Yvonne was an employee of Fred and she was
```

A3065

 1   responsible for taking care of all the wires that was to

 2   be requested by the clients of Fred.

 3   Q.   And so how do you know that, sir?

 4   A.   Because she's the one that sent us the wires and I

 5   was told that by Fred.

 6   Q.   And what was the purpose of the wires?

 7   A.   The wires was instructions, wiring instructions

 8   and amounts and banks to where to send the money and

 9   from which accounts.

10   Q.   And when you said you were told that by Fred, if

11   you could, um, to the best of your ability, explain what

12   did Fred Sharp tell you about Yvonne Gasarch's role?

13   A.   Well basically if we had a problem with wires,

14   like there was a problem with the wire detail, a number

15   or we couldn't read the fax, then we had to contact her.

16   She was the one responsible for giving us the

17   information.

18   Q.   Do you know somebody by the name of Courtney

19   Kelln?

20   A.   Yes.

21   Q.   And what is your understanding of who Courtney

22   Kelln is?

23   A.   She was responsible for all the stock

24   certificates, she was sending them to us and organizing

25   the certificates of those shares and with which accounts

```
 1    to put them into.

 2    Q.    Do you know somebody by the name of Jackson

 3    Friesen?

 4    A.    Yes.

 5    Q.    How do you know Jackson Friesen?

 6    A.    I met him once in Geneva, the same thing.  Well

 7    twice I think.

 8    Q.    Did you have any business interactions with

 9    Jackson Friesen?

10    A.    Yes, we did.

11    Q.    Can you describe for us the nature of the business

12    interactions you had with Jackson Friesen?

13    A.    Jackson Friesen had some stock that he deposited

14    and he sometimes gave us some trade orders and some sale

15    orders for the -- from stocks that he was managing on or

16    that he had.

17    Q.    Are you able to identify for us and for the jury,

18    who are here in the courtroom, are you able to identify

19    the timeframes that Jackson Friesen provided you with

20    these trading instructions?

21    A.    I believe it was between 2015 and 2016.

22    Q.    Was that the extent of it or were there any other

23    years that you recall Jackson Friesen providing

24    instructions?

25    A.    There could have been more because there was
```

A3067

```
 1    Xphones and I wasn't always sure who was behind the
 2    Xphones, which number was entitled to who.
 3    Q.    I'm going to get to the Xphones in a moment, but
 4    before I do, just to close the loop.
 5          When Jackson Friesen communicated with you in 2015
 6    and 2016, in what manner did Jackson Friesen communicate
 7    trading instructions to you?
 8    A.    Mainly by Xphone.
 9    Q.    Okay.
10    A.    It was only by Xphone.
11    Q.    Um, do you know somebody by the name of Mike
12    Veldhuis?
13    A.    Yes.
14    Q.    And how do you know Mike Veldhuis?
15    A.    I met him also with Jackson when he came to
16    Geneva.
17    Q.    All right, I'd like to go back to what you said a
18    moment ago about the Xphones.
19          Can you explain, um, the circumstances where you,
20    um, got an Xphone?
21    A.    We got an Xphone sent to us back in 2012, 2013, to
22    our office, it was a Blackberry phone which was linked
23    to a server, um, and we had to use that as the means of
24    contact that we had to use with Fred.
25    Q.    So when you say "We got a cell phone," who do you
```

A3068

```
 1    mean by "We"?
 2    A.     Well, Roger, Tony, and myself.
 3    Q.     How many cell phones, how many Xphones at the time
 4    did you receive?
 5    A.     One.
 6    Q.     And when you used the Xphone to communicate, did
 7    you have a handle, a code name that you used?
 8    A.     No, because we just got the phone, we didn't know
 9    what number we were, you know, or what was -- we knew it
10    was our phone, it was blacklight's phone.
11    Q.     Well let me ask you this way.  Did you have an
12    understanding that there was a code name assigned to
13    your Xphone?
14    A.     Yes.
15    Q.     And do you happen to recall what that code name
16    was?
17    A.     After -- it was "B-L-A-C."
18    Q.     "B-L-A-C"?
19    A.     Yeah, "Blacklight" for B-L, and B-L-A-C.
20    Q.     Okay.  And, um, so I just want to ask you about
21    the part of your answer that you talked about receiving
22    trading instructions on the Xphone, and at the time
23    we're talking about when you first received the Xphone.
24           What was your understanding of who was providing
25    you trading instructions?
```

1    A.    Trading instructions was "Kash," who was another

2    guy other than Fred, um, who was giving us trading

3    instructions.

4    Q.    And so Kash was the other person you understood to

5    be acting on behalf of Fred Sharp?

6    A.    Correct.

7    Q.    Okay.  Generally speaking, what were the types of

8    instructions you received on the Xphone?

9    A.    It was basically a symbol of stocks like "XYZ,"

10   sell 5,000 shares, and a value at like for $1, and then

11   which accounts.

12   Q.    And so you had identified three accounts earlier,

13   um, for us, three nominee accounts.  What was the

14   connection between the instructions to trade in those

15   three nominee accounts?

16   A.    It was just where the stock was placed and where

17   they wanted to sell them.

18   Q.    All right.  On paper, from a corporate-formality

19   standpoint, who owned those three nominee companies?

20   A.    Well I can't remember the beneficial owners, but

21   the beneficial owner that we had gotten the details

22   from.

23   Q.    So let me just unpack that a little bit.  So with

24   respect to the nominee companies you're using the term

25   "beneficial owner."  So if you can just explain for the

```
 1    jury how did -- how did that work out, how did the
 2    companies get created and formed for you to use?
 3    A.    Basically we incorporated or he had already
 4    incorporated companies in various jurisdictions that
 5    basically needed beneficial owners in order to open bank
 6    accounts, and we could get the identification of the
 7    beneficial owners to the bank.  So those were the
 8    nominees that we used for the structures.
 9    Q.    So for the three accounts that you created on
10    behalf of Sharp, who actually, which people actually
11    benefitted from the trades you placed through those
12    accounts?
13          MS. FRITZ:  Objection.
14    A.    Fred's clients.
15          THE COURT:  In view of that answer, do you press
16    the objection?  His answer was "Fred's clients."
17          MS. FRITZ:  Withdrawn.  Sorry, that's fine.
18          THE COURT:  Very well, it's withdrawn.
19    Q.    How did Blacklight receive the stock shares from,
20    um, Fred Sharp's clients?
21    A.    Either by FedEX or directly by transfer agents.
22    Q.    How did Blacklight sell the shares?
23    A.    Through brokerage, various brokerages around
24    Europe and Asia.
25    Q.    In order to sell the shares through the various
```

A3071

1   brokerage firms, what was the process you engaged in?

2   A.    We received the stock from transfer agents, placed

3   it into the account with Fred, um, that he asked us to

4   open, and then we received a trading order from either

5   Kash or someone, and then we would trace the trade with

6   the broker, and then we would confirm whether the trade

7   that was set had failed or not.

8   Q.    And as part of this process did you have to

9   provide certain documentation to the banks and brokerage

10  firms?

11  A.    Yes, for example shareholder agreements, um,

12  compliance -- I'll call them "compliance documents."

13  Q.    Did you ever have to provide any types of

14  invoices?

15  A.    Yes, we had to prove -- to work we had to prove

16  that the stock had been paid for.

17  Q.    And so if you could just explain a little bit,

18  expand on that, what was the purpose of providing

19  invoices to the banks and brokerage firms?

20  A.    It was mainly to confirm that the stock had been

21  purchased and that, um, it was acquired in a correct

22  manner.

23  Q.    Was that in fact the truth?

24  A.    I wouldn't be able to confirm.  But we were not

25  able to verify the invoices of the shareholder

A3072

```
 1    agreements or checks, or that it was impossible for us
 2    to be 100 percent sure.
 3    Q.    Well let me ask you this.  The invoices that you
 4    provided to the brokerage firms, were they all
 5    legitimate invoices?
 6    A.    I don't think they were, no.
 7    Q.    And why do you not think that?
 8    A.    Because some seem to be basically -- on many
 9    occasions we used to go back to our clients and say the
10    bank wouldn't accept the invoices or the documents that
11    we received by the client, it looked fake or it didn't
12    add up together.
13    Q.    With respect to your company, Blacklight, how did
14    you keep track of the stock trading, the selling of the
15    shares and the transfers of money?
16    A.    We had a program called "CPS," which is an
17    accounting program that we used to use, that we used to
18    reconcile the brokerages, the bank accounts for our
19    clients, and we used to keep records, and we were able
20    to produce statements and portfolio validations that we
21    would then send to the clients, which would show the
22    sales and the stock positions and the cash amounts.
23    Q.    And did you ever provide any of this information
24    from the CPS system, did you ever provide that to Fred
25    Sharp?
```

A3073

```
 1    A.    Yes, we did at the beginning.

 2    Q.    Have you heard of something called the "Q-System"?

 3    A.    Yes, it's Fred's own accounting system that we

 4    then started to use, around 2015 or 2016, that we used

 5    instead of using CPS, we used his program to enter all

 6    the trading information and wiring information.

 7    Q.    So if you could help me understand.  If you have

 8    your own system, CPS, what was the reason you had to be

 9    involved with the Q-System?

10    A.    Fred wanted us to input it directly and it was his

11    way of making sure that we basically, you know, either

12    we do it or we don't want his business.

13    Q.    Okay.  And what was your understanding about the

14    connection between the information that you had in the

15    CPS system and the information you were inputting into

16    the Q-System?

17    A.    What do you mean by "connection"?

18    Q.    Sure, it's probably not a great question.  Let me

19    try that over.

20          When you input information into the Q-System from

21    the information you had, did you change any of the

22    information or did you input the information on your end

23    into the Q-System?

24    A.    No, we had to input exactly what our brokers

25    showed us.
```

A3074

```
 1    Q.    Okay.

 2    A.    The values were input exactly what the brokers

 3    gave us.

 4    Q.    And I think as part of your answer to one of my

 5    questions earlier, I asked if you had sent information

 6    from your end to Fred.  In addition to inputting it, did

 7    you actually send documents to Fred Sharp?

 8    A.    Yes, Fred wanted to make sure that what we were

 9    doing was accurate, or check on us, and what we did

10    every two weeks was to send statements, cash statements,

11    and also a portfolio of valuations of what the positions

12    were of each stock, to reconcile and check that those

13    were correct, and that we were not lying on the value

14    that we were reporting to him.

15    Q.    So with respect to the, um, services you provided

16    Sharp through those three nominee companies, do you have

17    a sense of how many different companies, how many

18    different, um, stocks by company name you traded for

19    Sharp and his clients?

20    A.    I would be incapable of telling you today how

21    many.  We never kept track of that.

22    Q.    Okay, and I'm not looking for -- just so I make

23    sure I didn't ask you a bad question, I'm not looking

24    for how many times you traded stocks, I'm looking for

25    how many companies you traded?
```

A3075

```
 1    A.    I would say a minimum of 20, but maybe more.  I

 2    wouldn't be able to pinpoint it exactly.  I wouldn't

 3    want to give a number that would be completely

 4    inaccurate.  But there was more than 10, I would say for

 5    sure.

 6        MR. LONDON:  Your Honor, I would like to show for

 7    identification to the witness the document that we

 8    currently have marked as Exhibit QR.

 9        THE COURT:  It may be shown.

10    Q.    Mr. Ciapala --

11        MR. LONDON:  And just so everyone understands, I

12    have provided documents ahead of time because we can't

13    share screens, and so he has the documents.

14        THE COURT:  I appreciate that.

15        MR. LONDON:  But we can see it here.

16        MS. FRITZ:  Okay, but just give us a second

17    please.

18        MR. LONDON:  Sure.

19        Can we take a moment so that defense counsel can

20    locate the document?

21        THE COURT:  Of course.

22    Q.    And, Mr. Ciapala, while we're just taking a moment

23    to locate a document, just on your end you should have a

24    package of documents that I sent you.  We're looking for

25    the one that has a yellow sticker "QR" on it.  Just let
```

```
1    us know if you see it.

2    A.    Yes, let me check.  (Looks.)  Um, okay.

3    Q.    On the bottom right corner of the first page

4    you'll see a yellow sticker with the letters QR.

5    A.    (Looks.)  Yes.

6         MR. LONDON:  Your Honor, this is a document I

7    would like to enter into evidence and if agreed, publish

8    to the jury.

9         THE COURT:  Is this a document I've ruled on

10   before?

11        MR. LONDON:  We haven't entered it before, but we

12   have discussed it and it's one of the documents that

13   your Honor had, um --

14        THE COURT:  That I approved.

15        UR is admitted, Exhibit 291, and it is in

16   evidence.

17        (Exhibit 291, marked.)

18        MR. LONDON:  And may I publish that?

19        THE COURT:  You may.

20        (On screen.)

21   Q.    Mr. Ciapala, do you have the document in front of

22   you?

23   A.    Yeah, I do have it.

24   Q.    Okay.  So this document, um, if you would read for

25   us the line that says "Trading Statement," can you read
```

```
 1    that?
 2         THE COURT:  Mr. London, just so you can follow.
 3    Ms. Gaudet has a split screen, the jurors and I do not,
 4    so they are not looking at the document, though it is in
 5    evidence.  So just proceed as you see fit.
 6         MR. LONDON:  Understood.  Thank you for
 7    clarifying.
 8         (Pause.)
 9    Q.    All right, well let me do this, I will ask the
10    questions of the witness and refer to the document.
11         MR. LONDON:  Thank you, your Honor.
12         THE COURT:  You proceed.
13    Q.    Mr. Ciapala, can you read that line, the first
14    line of text in the document that starts with "Trading
15    Statement"?
16    A.    "Trading statement from June 2015, 2016 to
17    November 2018."
18    Q.    Okay.  And then to the right of that there's a
19    name with a little symbol next to it.  What's the name?
20    A.    "Tendall."
21    Q.    And so what is "Tendall"?
22    A.    "Tendall" was a brokerage firm that was based in
23    Malta.
24    Q.    And what was the connection of Tendall to your
25    company, Blacklight?
```

A3078

```
 1    A.    Tendall was a brokerage firm that Blacklight had,
 2    um, had open accounts for its clients.
 3    Q.    Okay.  And just so you understand, the jurors here
 4    can't actually see the document, just because of the way
 5    the technology is working, so what I would like you to
 6    do is to just explain it so that the jurors understand
 7    what is it we're looking at.
 8          So what is this document and what is the purpose
 9    of it?
10    A.    This is a trading statement, all the transactions
11    had occurred in Trius Holdings Limited.  So you've got a
12    sale or purchase, you've got additions which means that
13    stock has been deficited, you've got the quantity, the
14    security name, you've got the price at which it's been
15    sold at, and you've got the commission that the
16    brokerage was taking in, and you've got the total that
17    will be credited to the client's account.
18    Q.    And so which nominee company were you using for
19    this particular Tendall account?
20    A.    Trius Holdings.
21    Q.    Okay.  And with respect to the Trius Holdings
22    account, the stocks that are trading through the
23    document we're looking at, Exhibit 291, on whose behalf
24    were you making these trades?
25    A.    For Fred and his clients.
```

A3079

```
 1    Q.    And so what was your understanding of who was
 2    actually benefitting from the sales of stocks through
 3    this account?
 4    A.    Fred's clients.
 5    Q.    Okay.  I had asked you earlier if you could, um,
 6    identify the different companies traded and you gave us
 7    the general answer.  But taking a look at this document,
 8    can you read off to us some of the companies you see
 9    that you traded on behalf of Fred Sharp and his clients?
10    A.    Arch Therapeutics.  Vitality Biopharma.  Apex
11    Energy.  NewGen BioPharma.  Supernova.  Stevia Corp.
12    Liberty One Lithium.  Lexington Biosciences.  Mutual
13    Resource.  Mirabeau Compagnie.  One Life Technologies.
14    Cannacord Corp.  Liberty One Lithium.
15    Q.    And I appreciate you're doing that, so I'm not
16    going to have you -- it's a rather lengthy document, so
17    I'm not going to have you go through all the different
18    companies, but I just wanted to get a flavor.
19    But let me ask you this, sir.
20          The stocks that you've identified on this
21    particular trading statement that's dated June 1, 2015
22    to November 16, 2018, these particular companies, were
23    these companies that you traded on more than one
24    occasion on behalf of Sharp and his clients?
25    A.    Yes.
```

A3080

```
 1    Q.    And taking a look at the document, just seeing it

 2    on your end, are there companies that aren't on this

 3    particular document that you also traded on behalf of

 4    Sharp and his clients?

 5    A.    More than this, yes.

 6    Q.    Is the timeframe of this document, um, the June 1,

 7    2015 to November 16th, 2018 timeframe, does that

 8    timeframe encompass the timeframe that Jackson Friesen

 9    was directing you to make trades in nominee accounts?

10         MS. FRITZ:    Objection.

11         THE COURT:    Yeah, sustained.    You are leading the

12    witness.

13         MR. LONDON:    okay.    And we can take down this

14    exhibit now.

15    Q.    Having taken a look at that, sir, can you recall

16    any other companies that you traded, any company names

17    that you traded on behalf of Sharp and his clients?

18    A.    There was MTDD, um, I can't remember the other

19    one.  I'm not exactly sure how it's all been many many

20    to many years for me to remember all the symbols.    But

21    MTDD is one that comes to mind right away.

22    Q.    Okay.

23         MR. LONDON:    What I'd like to do, your Honor, is

24    show the witness for identification, so not to be shown

25    to the jury, Document MQ.
```

A3081

```
 1          (On screen.)
 2     Q.    So, sir, one of the documents in the package I
 3     sent you, on the bottom right, will have the yellow
 4     sticker MQ.  Just let us know when you have that.
 5     A.    (Looks.)
 6     Q.    Just making sure.  Were you able to locate the
 7     document on your end?
 8     A.    Yeah, I've got it.
 9     Q.    Okay.  So, um, sir, the reason I'm showing this to
10     you is I'd like you to -- it's a 14-page document.  I'd
11     like you to flip through it and see if this refreshes
12     your recollection on other companies that you traded for
13     Fred Sharp and his clients.
14     A.    Yes.  Echo Mortgage.  Stevia Corp.  Oryon
15     Technologies.  Makism 3D, which is MD.  Graphite Corp.
16     OncoSec.  NewGen Biopharma.  StartMonday.  Um, Breathtec
17     Biomedical.  There are a couple there that refresh my
18     memory.
19     Q.    Thank you.  And you can put that document down
20     now.
21          Did you charge fees for your services?
22          (Pause.)
23          MR. LONDON:  We lost the video.  I'm not sure if,
24     um --
25          THE WITNESS:  I can't see you anymore either.
```

A3082

```
 1          MR. LONDON:  Yeah, did something happen with the,
 2     um --
 3          THE WITNESS:  When I tried to close the document,
 4     I lost the video.
 5          MR. LONDON:  Yes, it's back now.  All right.
 6     Q.    So the last question I asked you was, did you
 7     charge fees for your services?
 8     A.    Yes, we charged a percentage.
 9     Q.    I'm sorry, I think I talked over you there.  What
10     were the fees you charged to Sharp and his clients?
11     A.    We used to charge a percentage on the stock
12     trading between -- most of the time 0.5 and 6, I think
13     it was, and he agreed to give us 1 percent.
14     Q.    Just so that we don't have to do hard math in our
15     head, could you give us an example of the cost of a
16     trade and how much you charged Fred Sharp?
17     A.    Basically out of $100, 1 percent would be $1, and
18     a half of a percent would be .50 cents.
19     Q.    Okay.
20     A.    Was that clear?
21     Q.    That was clear.  Thank you so much.
22          Sir, I'd like to --
23          MR. LONDON:  Your Honor, I'd like to publish a
24     document previously entered into evidence as Exhibit
25     103.  I'd like to, um -- is it still the case that the
```

```
 1    jury can either see Mr. Ciapala or a document?
 2         THE CLERK:  Yes.
 3         MR. LONDON:  Okay.
 4    Q.    In that case, you know what?  Mr. Ciapala, I'm
 5    going to have you look at a document.  There should be a
 6    document in your package that we've marked as Exhibit
 7    Number 103.  Just let me know when you've located that.
 8    A.    105 and 82.  I don't have 103.
 9    Q.    You don't have a number 103 on there?
10    A.    No.
11    Q.    Okay.  Don't worry about it.  Let me just try to
12    ask you some questions.
13         With respect to the Xphones, when you received
14    communications, were you aware of any, um,
15    identification of people who were contacting you on the
16    other end of the Xphone?
17    A.    Yes, there was a -- each potential owner of an
18    Xphone happens with a number, and once the client gave
19    me the number he was, I was able to locate the stock.
20    Q.    Did you ever come to learn at any point in time
21    who Number 2 was?
22    A.    Yes.
23    Q.    What was your understanding?
24    A.    I've found out now, um --
25         MS. FRITZ:  Objection, your Honor.
```

```
 1        THE COURT:  Wait a minute.

 2        The question was?

 3        MR. LONDON:  The question was "What was your

 4   understanding?" and referring to the prior question.

 5        THE COURT:  Who Number 2 was?

 6        MR. LONDON:  Yes.

 7        MS. FRITZ:  Your Honor, if we can approach?  This

 8   one was --

 9        THE COURT:  You may.

10        MS. FRITZ:  Okay.

11

12        AT THE SIDEBAR

13        THE COURT:  You're about done?

14        MR. LONDON:  With the total --

15        THE COURT:  With him.

16        MR. LONDON:  Just two topics left, I haven't

17   covered, your Honor.

18        THE COURT:  All right.

19        MS. FRITZ:  This one is particularly clear.  The

20   SEC was told by the witness he does not know who Number

21   2 is, and his only identifier for Jackson Friesen is

22   "JAX."  If they're now saying to him, "Who's Number 2?"

23   It's because they told him.

24        THE COURT:  Well I understand that's your

25   position.  I'll let you ask, "How do you know?"  And
```

A3085

```
 1    then we'll see.  And you can examine him.
 2         MS. FRITZ:  All right.
 3
 4         (In open court.)
 5         THE COURT:  On that foundation, the objection is
 6    sustained.  You may proceed.
 7    Q.   Did anyone ever tell you who, um --
 8         THE COURT:  No, no, you may ask him how does he
 9    know?
10    Q.   How do you know?  We're talking about Number 2.
11    How do you know?
12    A.   Um --
13         THE COURT:  You think you know what Number 2, um,
14    who that relates to?  You think you know that?
15         THE WITNESS:  I'm not 100 percent sure.
16         THE COURT:  Well how do you come about any
17    knowledge?
18         THE WITNESS:  Someone, the person who was holding
19    Number 2 had to say "I am Handle Number 2" or Fred had
20    to say "Number 2 is such and such," that was the only
21    way for me to know who was who.
22         THE COURT:  I see.  And the "Fred" here is
23    Mr. Sharp?
24         THE WITNESS:  Correct, yes.
25         THE COURT:  All right.  Thank you.
```

```
 1   Q.    So what was your understanding of who Number 2

 2   was?

 3         MS. FRITZ:  Objection.

 4   A.    I believe --

 5         THE COURT:  No, overruled.

 6         MS. FRITZ:  The witness just said "I believe."

 7         THE COURT:  I understand what the witness said

 8   and, um, he gave us the source of his alleged knowledge.

 9   You may examine the witness at the appropriate time.  He

10   may tell us.

11   A.    I believe it's --

12   Q.    You may have to repeat that, we had a glitch in

13   the audio.

14   A.    I believe it's Jackson Friesen.

15   Q.    Thank you.

16         In your package of documents, do you have a

17   document marked as Exhibit 105?

18   A.    Yes, I've got that one.

19         MR. LONDON:  If you can call that up.

20   It's just a one-page exhibit.

21         (On screen.)

22   Q.    At the bottom of the first page -- it's just a

23   one-page exhibit, but at the bottom there's a

24   transmission from Bond to 109.  Do you see that?

25   A.    Yes, correct.
```

A3087

```
 1          MR. LONDON:  Your Honor, is it possible for us to

 2    pass a paper copy amongst the jurors?

 3          THE COURT:  If it's in evidence.

 4          MR. LONDON:  It is in evidence, yes.

 5          (Starts to pass it to the jury.)

 6          THE COURT:  Wait a minute.  Wait a minute.  It's

 7    possible, but we have a protocol for doing it, and the

 8    protocol is that Ms. Gaudet will do it.

 9          And the reason is, um, over the years,

10    inadvertently someone may say something to the lawyer or

11    the like, so the best way is for the Clerk to pass the

12    documents, just pass them around and pay attention to

13    what's going on.  And you can just put them on that rest

14    right there and we'll -- Ms. Gaudet will recover it.

15          Go ahead.

16          MR. LONDON:  Thank you, your Honor.

17    Q.    Sir, would you read for us the first sentence of

18    that initial message at the bottom there that I

19    identified it from Bond to 109.

20    A.    Yes.  "We would like to come your way for lunch.

21    Would it be possible to get" --

22    Q.    Are you on 105?  Which exhibit are you on?

23    A.    Oh, sorry.  Sorry.  Sorry.  Sorry.  I went too

24    far.  Sorry.

25          "Yeah, we said Mike, Jack, and Courtney and myself
```

```
 1    arrive on Sunday Afternoon, November 3rd, and leave
 2    Tuesday, November 5th.  May I suggest one of you escort
 3    her and one with you?  Shall we have dinner on Sunday?
 4    Also working with" -- (Unintelligible.)
 5    Q.    Yeah, and what is your understanding -- actually
 6    let me back up.
 7          So the message is from Bond to 109.  Do you have
 8    an understanding of who "Bond" is, the sender?
 9    A.    It's Fred Sharp.
10    Q.    And do you have an understanding of who the
11    receiver is, 109?
12    A.    That's us, me, or Blacklight.
13    Q.    With respect to Blacklight, is that you or
14    somebody else at Blacklight based on your understanding
15    of the messages?
16    A.    It could have been me or Tony.
17    Q.    Okay.  And with respect to the substance of the
18    message, the reference to having dinner, does that mean
19    anything to you?  Did that ever happen at dinner?
20    A.    Um, I'm not 100 percent sure that dinner happened
21    that time, I remember once that he cancelled or they had
22    to change their plans.  I know that it wasn't -- we met
23    at least twice with, um, Jackson, Mike, and Courtney,
24    and some other people.
25    Q.    Okay, so regardless of the tying -- don't tie the
```

A3089

```
 1    dinner to this particular exhibit, but just generally
 2    speaking when do you recall, roughly speaking, having
 3    dinner with that group of people you identified?
 4    A.    After she left there in 2016 and 2017.  We used to
 5    come every year, once a year.
 6    Q.    And those are two different dinners that you've
 7    identified.  Can you just give us, to the best of your
 8    recollection, the participants at the first dinner and
 9    then the participants at the second dinner?
10    A.    It was me, um, Tony, Fred, Mike, and Jackson, and
11    some other guy, but I can't remember the name now.
12    Q.    And that's the first dinner.  What about the
13    second dinner, did the participants change?
14    A.    Yes, the second dinner was the same people, but
15    one extra person was Luis Carrillo.
16    Q.    And, um, just because we have a bit of a formality
17    here in court, we have been instructed to use last names
18    and not first names of people.  So what I'd like you to
19    do is with respect to the names you've identified by
20    first names, if you can give us just those first and
21    last names of those individuals, that would be helpful.
22    A.    Um, Mike Veldhuis.  Jackson Friesen.  Courtney --
23    I can't remember her name anymore.  Fred Sharp.  Um,
24    Luis Carrillo.  And Tony was there also.  And I think
25    someone else.  I believe Harry Young was also there, I
```

```
 1    believe.
 2    Q.    Okay.  All right.  During the dinners that you
 3    participated in with these individuals, um, was
 4    Blacklight's business services to Sharp discussed?
 5    A.    Yes.
 6    Q.    Okay.  Did Jackson Friesen participate in the
 7    business discussions?
 8          MS. FRITZ:  Objection.
 9          THE COURT:  Sustained.  Sustained.  You're leading
10    the witness and you may not.
11    Q.    Who participated in the business discussions?
12    A.    The whole table.
13    Q.    And I understand I'm belaboring a little bit, but
14    if you could just identify by first and last name who
15    the whole table was?
16          MS. FRITZ:  Objection, repetitive.
17          THE COURT:  No, he may have it.
18    Q.    Just give us the names.
19    A.    All the people I mentioned before.
20          THE COURT:  All right, that's the answer.  Go
21    ahead.
22          MR. LONDON:  Thank you.
23          (Pause.)
24          MR. LONDON:  I have no more questions.  Thank you
25    so much, sir.
```

A3091

```
 1          THE COURT:  Ms. Fritz, do you wish to inquire of
 2     the witness?
 3          MS. FRITZ:  Okay.
 4
 5     CROSS-EXAMINATION BY MS. FRITZ:
 6     Q.   Hello, Mr. Ciapala.
 7     A.   Hello.
 8     Q.   My name is Miranda Fritz, I represent Jackson
 9     Friesen.
10          You're in Switzerland, right?
11     A.   Correct.
12     Q.   And you are appearing remotely today because the
13     government has asked you to testify in this proceeding,
14     right?
15     A.   Correct.
16     Q.   And that's pursuant to your cooperation agreement,
17     right?
18     A.   Correct.
19     Q.   And your cooperation agreement followed on the
20     fact that you got arrested and charged with a great many
21     crimes, correct?
22     A.   Correct.
23     Q.   And as a result of the commission of a great many
24     crimes, you face a great many years in prison, correct?
25     A.   Correct.
```

A3092

```
 1    Q.    So you're trying, through this cooperation with

 2    the government, to get that amount of time in jail

 3    reduced, correct?

 4    A.    No, I'm just doing what I believe to be right.

 5    Q.    You're only doing what's right, is that correct?

 6    A.    Yes, answering people's questions.

 7    Q.    Okay.

 8    A.    Because there's no guarantee that it will be

 9    reduced, that's what's been explained.

10    Q.    You've met with Mr. London or spoken with him

11    about your testimony before now, right?

12    A.    Correct.

13    Q.    And he went through the questions that he would

14    ask and you gave -- and you rehearsed your answers,

15    correct?

16    A.    Yes, he showed me some documents, that's correct.

17    Q.    Okay.  And, um, did he also talk to you about the

18    fact that you should say that the only thing that you

19    have to do is to tell the truth, was that something he

20    talked to you about?

21    A.    He said the things I say have to be the truth.

22    Q.    Okay.  Do you have an understanding of the fact

23    that you only get the benefit of a 5K.1 letter if you

24    help the government prosecute other people?

25    A.    Sorry, what's the question?
```

```
 1    Q.    Do you understand that you only get a benefit

 2    under the cooperation agreement, under a 5K.1 letter, if

 3    you help the government prosecute other people?

 4    A.    Um, that was never explained to me that way.

 5    Q.    Nobody ever told you that?

 6    A.    Nope.

 7    Q.    So do you have an understanding of whether, if you

 8    tell the truth but it doesn't help them prosecute other

 9    people, then you would not be eligible for a 5K.1

10    letter.  Do you understand that?

11    A.    Yes.

12    Q.    Never mind.  Okay.  Anyway there came a time when

13    you decided that you wanted to cooperate in order to try

14    to reduce the time that you'll have to spend in jail,

15    correct?

16    A.    Correct.

17    Q.    And you came to understand that in order to do

18    that you had to meet with the government a number of

19    times so that they could decide -- so that they could

20    decide if they were willing to give you a cooperation

21    agreement, correct?

22    A.    Correct.

23    Q.    And so you -- honestly you've had more than 20

24    different meetings with the government, correct?

25    A.    I wouldn't be able to say how many we had.
```

A3094

```
 1    Q.    You've been meeting with the government for 3
 2    years, is that correct?
 3    A.    No, that's wrong.
 4    Q.    When was the first time that you met with the
 5    government?
 6    A.    It was in 2020.
 7    Q.    Okay.  If I tell you it was May of 2020, does that
 8    sound right?
 9    A.    That's, um, wrong, I believe.
10    Q.    Okay.  If I tell you that you also met with the
11    government in July, in August, and September, and
12    October of 2020, does that sound right?
13    A.    Um, I'm not convinced.  I think it was later than
14    the dates you gave me.
15    Q.    Okay.  All right.  And during -- would you agree
16    that it was roughly 20 times, does that sound correct?
17    A.    As I said, I didn't count how many times it was.
18    I'm not sure I would be able to give you a correct
19    answer for that.
20    Q.    Okay.  And what you talked to the government about
21    had a lot to do with the company that you worked at
22    called EHT, correct?
23    A.    Not really, no.
24    Q.    Did you -- do you recall the government asking you
25    about the operations of EHT?
```

1    A.    There was a couple of questions, yes.

2    Q.    Do you recall the government asking you about

3    people like, um, Mr. Craven and Mr. Dreighton at EHT?

4    A.    No, I didn't get any questions on that really.

5    Q.    Okay.  Do you have a recollection of whether they

6    asked you about other individuals other than Sharp --

7    Fred Sharp and the people we're talking about today, did

8    they ask you a great many questions about other people

9    that you did business with?

10   A.    Yes.

11   Q.    And you mentioned, for example, Luis Carrillo,

12   correct?

13   A.    Correct.

14   Q.    And did the government talk to you at great length

15   about Mr. Carrillo?

16   A.    Not really, no.

17   Q.    Um, and -- you also have met with the SEC,

18   correct?

19   A.    Nope.

20   Q.    No?  I'm sorry?  Your answer is "No"?

21   A.    I never met with them.  I never met with them

22   personally.

23   Q.    Okay.  On August 30th of this year, 2023, at

24   10:01 a.m., did you have a meeting, I guess a remote

25   meeting, with David London, Al Day, Anita Klunder, and

A3096

```
 1    Cathy Shields?

 2    A.    Potentially, yes, but I'm not sure of the date.

 3    But we did have a remote meeting, yes.

 4    Q.    Okay.  And during the course of that meeting, did

 5    you talk with them about the people that we've been

 6    speaking about today, about Mike Veldhuis and others?

 7    A.    Sorry, could you repeat that question again?

 8    Q.    During the meeting with the SEC, did they ask you

 9    questions about the people that you've been talking

10    about today?

11    A.    Um, some, yes.

12    Q.    Do you have a recollection of whether individuals

13    were taking notes of the things that you told them?

14    A.    Yes.

15    Q.    Do you have a recollection of whether you talked

16    to them about, for example, someone named Bill Friesen?

17    A.    Not really, no.

18    Q.    You don't remember?

19    A.    Sorry, could you be more specific with your

20    question?

21    Q.    Did you explain to the SEC, for example, that you

22    met Fred Sharp because Bill Friesen introduced you to

23    him?

24    A.    Yes, correct.  Yes.

25    Q.    Okay.  And did you explain to the SEC that the
```

```
 1   trader -- that you worked with two traders in relation
 2   to Fred Sharp's deals, that they were someone named Kash
 3   and Bill Friesen?
 4   A.    Nope, I said it was Kash and someone else, but I
 5   couldn't remember the name.
 6   Q.    All right, I have -- do you have in front of you a
 7   set of typewritten notes headed "Call with Kenneth
 8   Ciapala dated August 30th of 2023"?
 9   A.    Um, how would I get that?
10   Q.    They were conveyed to your attorney.
11   A.    Okay.
12   Q.    Do you see those notes in front of you?
13   A.    Let me just pull them out.  I was told not to open
14   them until you told me.  So let me just pull them up.
15   Q.    Okay.
16   A.    Yes, I have them now.
17   Q.    All right.  And you do have a recollection of a
18   phone meeting on or about this date that's reflected
19   here, August 30th of 2023?
20   A.    As I say, I just got this document.  What's your
21   question?
22   Q.    Is it correct that you have a recollection of
23   having a meeting with the SEC by phone on or about the
24   date that's reflected on this, August 30th, 2023?
25   A.    It's possible, yes.
```

```
 1    Q.    If you could look three bullet points up from the
 2    bottom.
 3    A.    From the bottom of the document?  Yeah.
 4    Q.    From the bottom of the document on the first page,
 5    do you see "KC dealt with two traders, Kash and Bill
 6    Friesen," do you see that language?
 7    A.    Um, no, I can't see it.
 8          THE COURT:  Ms. Fritz --
 9    A.    Exactly from the bottom, I can't see it.
10          THE COURT:  Since I have something --
11    A.    I can't see anything in the back --
12    Q.    Mr. Ciapala, just a second.
13          THE COURT:  Since I have something to explain to
14    the jury, maybe this is a good time to stop.  Is it?
15          MS. FRITZ:  Yes, that's fine, your Honor.
16          THE COURT:  Very well.
17          So as the trial is going along, and I'm saying to
18    you "Well we're moving right along," in fact we are, um,
19    and that is a tribute really to all of the attorneys
20    here, and they've told me -- now no promises here,
21    because everyone gets a chance to put on all the
22    evidence that it's appropriate to lay before you, but
23    our best estimate is that by 1:00 tomorrow, um, we will
24    have all the evidence that we're going to have in this
25    case.  That's tomorrow.  But the weekend is coming up
```

```
1     and Monday is a religious holiday.  But if that holds --
2     and again this is no promise and I'm taking the
3     responsibility myself for telling you this, but if that
4     holds, we'll be ready for final arguments and my charge,
5     my explanation of the law will be ready to do that on
6     Tuesday, um, following the Monday holiday.
7          So if that holds, and we'll know tomorrow, then
8     it's Tuesday, and so long as your deliberations take,
9     that we will expect you to be here all day.  And I told
10    you at the beginning that no one's going to be held
11    after 5:00, we'll just go on, as we do, day by day.  But
12    the case will come to you, as best we can figure it, on
13    Tuesday, the 26th.  Yes, that's right, Tuesday the 26th.
14         The other thing counsel have asked me to say to
15    you is we've been working together -- I mean it's a
16    magnificent courthouse, but necessarily we all have to
17    go in and out the same doors, and you're all welcome to
18    use the cafeteria and the like, and if you see any of
19    the attorneys, don't ever think that they are being
20    discourteous to you in any way if they were to pass you
21    by without speaking.  They know that's the rule.
22         All right.  Again, the last witness is as
23    important as the first and the first witness is as
24    important as the last.  We haven't gotten to the last
25    witness and so keep your minds suspended, do not discuss
```

A3100

1    the case either among yourselves nor with anyone else.

2    You may stand in recess until 9:00 a.m., and I know I

3    can count on you, until 9:00 a.m. tomorrow morning.  The

4    jury may stand in recess.

5             THE CLERK:  All rise for the jury.

6             (Jury leaves, 1:00 p.m.)

7             THE COURT:  Please be seated.

8             The total elapsed time, um -- and I hoping this

9    will all be moot, but I'm still keeping it, is the

10   plaintiff has used up 3 days, 2 hours, 35 minutes, the

11   defense has used up 3 days, 25 minutes.  We'll stand in

12   recess until 9:00 a.m. tomorrow morning.  We'll recess.

13            THE CLERK:  All rise.

14            (Adjourned, 1:00 p.m.)

15

16

17

18

19

20

21

22

23

24

25

A3101

```
1                    C E R T I F I C A T E

2

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5    do hereby certify that the foregoing record is a true

6    and accurate transcription of my stenographic notes

7    before Judge William G. Young, on Thursday, September

8    21, 2023, to the best of my skill and ability.

9

10

11

12

13   /s/ Richard H. Romanow 1-23-24
     _____
14   RICHARD H. ROMANOW    Date

15

16

17

18

19

20

21

22

23

24

25
```

A3102

```
 1                  UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS (Boston)

 3                            No. 1:21-cv-11276-WGY

 4

 5    SECURITIES and EXCHANGE COMMISSION,
                Plaintiff
 6

 7    vs.

 8

 9    FREDERICK L. SHARP, et al,
                Defendants
10

11                         * * * * * * * * *

12

13

14                      For Jury Trial Before:
                        Judge William G. Young
15

16

17                      United States District Court
                        District of Massachusetts (Boston)
18                      One Courthouse Way
                        Boston, Massachusetts 02210
19                      Friday, September 22, 2023

20

21                          * * * * * * * *

22              REPORTER: RICHARD H. ROMANOW, RPR
                       Official Court Reporter
23                   United States District Court
            One Courthouse Way, Room 5510, Boston, MA 02210
24                     rhrbulldog@aol.com

25
```

A3103

```
 1                    A P P E A R A N C E S

 2

 3    KATHLEEN BURDETTE SHIELDS, ESQ.
      ALFRED A. DAY, ESQ.
 4    DAVID H. LONDON, ESQ.
      NITA KUMARASWAMI KLUNDER, ESQ.
 5        Securities and Exchange Commission - MA
          33 Arch Street, 24th Floor
 6        Boston, MA 02110
          (617) 573-8904
 7        Email: Shieldska@sec.gov
          For Plaintiff
 8

 9    KAREN A. PICKETT, ESQ.
          Pickett Law Offices, P.C.
10        125 High Street, 26th Floor
          Boston, MA 02110
11        (617) 423-0485
          Email: Kpickettlaw@gmail.com
12        For Defendant Zhiying Yvonne Gasarch

13

14    MIRANDA E. FRITZ, ESQ.
      TIMOTHY J. FAZIO, ESQ.
15        Manning Gross Massenburg
          125 High Street
16        Oliver Street Tower, 6th Floor
          Boston, MA 02110
17        (617) 670-8800
          Email: Tfazio@mgmlaw.com
18        For Defendant Jackson T. Friesen

19

20

21

22

23

24

25
```

A3104

```
 1                    I N D E X

 2

 3    WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

 4

 5    KENNETH CIAPALA  (Continued witness by zoom.)

 6       By Mr. London:                    22

 7       By Ms. Fritz:              6              23

 8       By Ms. Picket:

 9

10    RYAN MURPHY

11       By Ms. Shields:     26              159

12       By Ms. Fritz:             134

13       By Ms. Picket:            126

14

15                    E X H I B I T S

16

17

18       EXHIBIT 292 ........................... 31

19       EXHIBIT 293 ........................... 36

20       EXHIBIT 294 ........................... 44

21       EXHIBIT 295 ........................... 46

22       EXHIBIT 296 ........................... 46

23       EXHIBIT 297 ........................... 47

24       EXHIBIT 298 ........................... 48

25                    (Continued.)
```

A3105

```
1
                        (Continued.)
2

3      EXHIBIT 299 ............................   48

4      EXHIBIT 300 ............................   49

5      EXHIBIT 301 ............................   49

6      EXHIBIT 302 ............................   50

7      EXHIBIT 303 ............................   51

8      EXHIBIT 304 ............................   51

9      EXHIBIT 305 ............................   52

10     EXHIBIT 306 ............................   53

11     EXHIBIT 307 ............................   59

12     EXHIBIT 308 ............................   62

13     EXHIBIT 309 ............................   66

14     EXHIBIT 310 ............................   69

15     EXHIBIT 311 ............................   88

16     EXHIBIT 312 ............................   93

17     EXHIBIT 313 ............................  100

18     EXHIBIT 314 ............................  106

19     EXHIBIT 315 ............................  116

20     EXHIBIT 316 ............................  117

21

22

23

24

25
```

A3106

```
 1        P R O C E E D I N G S
 2        (Jury enters, 9:00 a.m.)
 3        THE COURT:  Good morning, ladies and gentlemen,
 4   you are so welcome, you have set the tone for this
 5   proceeding.  I believe we're all ready to continue.
 6        Would you remind the witness.
 7        THE CLERK:  I'd like to remind you, sir, that
 8   you're still under oath.
 9        Do you understand?
10        THE WITNESS:  Yes.
11        (By zoom, pause.)
12        MS. FRITZ:  Mr. Ciapala --
13        THE COURT:  Wait.  He hasn't answered.
14        MS. FRITZ:  He did.
15        THE COURT:  Do you understand, sir, that you're
16   still under oath?
17        THE WITNESS:  Yes, I do.
18        THE COURT:  Okay.
19        Proceed.
20        MS. FRITZ:  Mr. Ciapala, I had a little trouble
21   hearing you, can you adjust your volume?
22        THE WITNESS:  Um, I can't change the volume.  It's
23   a microphone.  I can't change it.
24        MS. FRITZ:  Okay, just maybe stay forward a
25   little.
```

A3107

```
 1              THE WITNESS:  Okay.

 2

 3      CROSS-EXAMINATION BY MS. FRITZ:  (Continued.)

 4      A.   Yesterday we were talking about some of the things

 5      you mentioned about Mr. Friesen and I believe you said,

 6      in response to questioning from Mr. London, that he was

 7      the Number 2, as you understood, on the Xphone?

 8      A.   Yes.

 9      Q.   And I believe you stated that you received trading

10      instructions from him?

11      A.   Yes.

12      Q.   Okay.  In terms of having actually ever met the

13      man, is it correct that you had dinner with him maybe

14      once?

15      A.   Twice.  Sure.

16      Q.   All right.  Now I want to -- before we get into

17      that, I want to back up a little and talk about EHT.

18           You worked at EHT, correct?

19      A.   Yes.

20      Q.   Okay.  And you knew a man named Bill Friesen,

21      correct?

22      A.   Correct.  Well I met him once or twice.

23      Q.   Bill Friesen?

24      A.   Yes.

25      Q.   Okay.  And did you know him from when you were
```

```
 1    working at EHT?
 2    A.    Well I used to -- I never had the position of
 3    talking to clients, but if he was invited into the board
 4    room, I would have met him.  But I never really spoke to
 5    people, as I was an assistant, not a manager.
 6    Q.    Okay.  And when you went to -- let's just be
 7    clear.  When you went to EHT, you believed that you were
 8    working at a very legitimate banking institution,
 9    correct?
10    A.    Correct.
11    Q.    And you worked there for a long time before you
12    figured out that there was anything wrong with what they
13    were doing, correct?
14    A.    Correct.
15    Q.    Um, you were young at the time, correct, when you
16    started there?
17    A.    Correct.
18    Q.    Okay.  But after literally years of working there
19    you came to understand that there was something wrong
20    with what EHT was doing --
21         MR. LONDON:  objection.
22    Q.    -- is that correct?
23         THE COURT:  No, overruled.  She may ask the
24    question.  We'll see what he says.
25    Q.    Is that correct?
```

```
 1    A.    Correct, yes.

 2    Q.    Okay.  Now with respect to your dealings after

 3    EHT, when you left EHT, you, Tony Collarny, and Roger

 4    Knox formed Blacklight, correct?

 5    A.    Correct.

 6    Q.    And Blacklight was modeled on the EHT business,

 7    correct?

 8    A.    Not exactly modeled, but it was inspired.

 9    Q.    Okay.  Now after working -- after you were working

10    at Blacklight for a couple of years, you forced Roger

11    Knox out of the business, correct?

12    A.    Wrong.

13    Q.    You did not force Roger Knox out of the business?

14    A.    Nope.

15    Q.    Is it fair to say that Mr. Knox believed he was

16    forced out of the business?

17          THE COURT:  Well he can't testify to what Knox

18    believed.

19          MS. FRITZ:  Okay.

20    Q.    Was there a dispute, a falling out between

21    Mr. Collarny and you, on the one hand, and Mr. Knox?

22    A.    There was a disagreement on the orientation of the

23    business, yes.

24    Q.    Okay.  At that point Mr. Knox went off and started

25    his own business, correct?
```

A3110

```
 1   A.    We discovered that one or two years after.  Roger,
 2   when he left, said he wanted benefits from employment
 3   and enjoy skiing and sledding in the Swiss -- in the
 4   French Alps.
 5   Q.    So there's a dispute and you understood that Roger
 6   was going to step away from the business?
 7   A.    I had no idea if Roger was going to step away from
 8   the business, I strongly doubted he would step away from
 9   the business, there was more for him to establish there.
10   But he was going to take some time off.  I had no doubt
11   that he was going to do something -- well he was going
12   to do something, and I was quite happy and content for
13   him to do so.
14   Q.    Okay.  So after you guys split up, he then started
15   Silverton, correct?
16   A.    Yes.
17   Q.    Okay.  Now let's switch and talk about Fred Sharp.
18         You have spoken to the SEC in prior meetings about
19   Fred Sharp, correct?
20   A.    I never directly spoke to the SEC.
21   Q.    When I say "spoke to," were you on remote zoom
22   meetings with people at the SEC?
23   A.    Yes, but I never spoke to them directly and they
24   never really asked me any questions.
25   Q.    Okay.  Well let me ask you.  Was there a remote
```

A3111

1    call between people at the SEC and you on August 30th,

2    2023?

3    A.    Maybe.  I didn't keep dates.  I didn't have an

4    agenda when all of these things took place.

5    Q.    Do you have a recollection of whether there was a

6    call that included Mr. London, Mr. Day, Ms. Klunder, and

7    Ms. Shields from the SEC?

8    A.    No idea.  There were so many people on those calls

9    that I couldn't humanly remember how many people were on

10   those calls.

11   Q.    Okay.  During that call, do you recall talking

12   about Fred Sharp and your dealings with him?

13   A.    There were so many discussions that I've had to

14   remember, that to remember one would be impossible for

15   me.

16   Q.    Okay, let me just ask you this.

17         Do you recall telling the SEC, during that

18   meeting, that you understood that there was a rule about

19   disclosure, if you owned more than 5 percent, but that

20   you never knew whether Fred Sharp was making those

21   reports or not?

22   A.    (Pause.)  Could you repeat that so I can have a

23   clear understanding?  Could you say that again please?

24   Q.    Okay, let me break it up.

25         During the course of your conversation with the

```
 1    SEC, was there a discussion about whether you understood
 2    about a 5 percent rule that forms had to be filed if you
 3    owned more than 5 percent of stock in the company, do
 4    you remember that?
 5    A.    Yes, that had to be done.  Yes.
 6    Q.    Okay.  And do you recall telling them that you --
 7    that it was never clear to you whether Sharp was
 8    reporting or not reporting with respect to that
 9    ownership?
10    A.    The whole idea was we kept below 5 percent in each
11    account and there was no need to report.
12    Q.    Okay, let me ask you, does your attorney have --
13    are you with your attorney right now?
14    A.    Yes, he's on the line here.  I would say he was on
15    the line here, but I really have no idea.
16    Q.    Okay.  What I would like for you to do is to get
17    in front of you a set of notes headed "Call with Kenneth
18    Ciapala" with the date of August 30th, 2023.
19    A.    It's the ones that my lawyer sent to me, correct,
20    we agree?
21    Q.    Correct.
22    A.    Okay, well I've got two, so which ones do you
23    want?  Oh, August.  Yes, I've got it.
24    Q.    You've got the one dated August 30th, 2023?
25    A.    At 10:01.
```

```
 1    Q.    Correct.  Now I'm going to ask you to go to Page

 2    2.

 3    A.    Yup.

 4    Q.    And now I'm going to ask you to go about halfway

 5    down the page and take a look at the bullet point that

 6    begins "KC stated he was not aware that you had to

 7    register stock in order to sell, but aware of the 5

 8    percent rule."  Do you see that?

 9    A.    Just let me read it all.  Sorry, just 2 seconds.

10    (Reads.)  Yes, I'm seeing that.  Correct.  Yes.

11    Q.    Okay.  Now is that consistent with your

12    recollection of the conversation you had with the SEC,

13    that you knew generally about the 5 percent rule?

14    A.    Yes.

15    Q.    And if you could take a look one more bullet point

16    down, "KC stated" --

17          MR. LONDON:  Objection.

18          THE COURT:  This is in evidence, isn't it?

19          MR. LONDON:  No.

20          THE COURT:  Yeah.  So you can't read from it.

21    Q.    If you could take a look at the next bullet point,

22    read that, and tell me if that refreshes your

23    recollection regarding whether you stated that it was

24    never clear what Sharp was reporting or not reporting?

25          MR. LONDON:  Objection, your Honor.
```

```
 1          THE COURT:  No, she may have it in that form, the
 2   question is not evidence of anything.
 3   A.    "KC stated that" --
 4          THE COURT:  Yeah, you read that, sir, and does
 5   that jog your memory about what you said on that
 6   occasion?
 7          THE WITNESS:  Yes.
 8          THE COURT:  It does.  All right.  Now she can ask.
 9          MS. FRITZ:  Okay.
10   Q.    So during that meeting you told the SEC that from
11   your vantage point it was not clear to you whether those
12   forms were being filed by Sharp or not?
13   A.    To a certain extent he was filing them, it's
14   possible, but he never told me about it.  Let's put it
15   this way.
16   Q.    Okay.
17   A.    I can't be 100 percent sure he was not doing it.
18   Let's put it this way.
19   Q.    Okay.  And you also told him that from your
20   vantage point you had doubts about whether what he was
21   doing was illegal, but you couldn't be sure?
22   A.    The problem is, as I said -- well, no, I didn't
23   say it, but it was very difficult to understand what was
24   really going on in Sharp's business.  We had opinions
25   and we had ideas of what was going on, but it was very
```

A3115

```
 1    difficult, and he never told us more than what he wanted
 2    to tell us.  Obviously we could guess and we could see
 3    and over time we started learning things.
 4    Q.    Right.
 5    A.    But was he reporting?  If you want my answer, I
 6    would say 98 percent he was not reporting.
 7    Q.    I don't want you to guess.  Yeah, but I don't want
 8    you to guess.
 9    A.    Okay.
10    Q.    But you already did.
11          THE COURT:  Well more to the point, guessing is
12    not evidence, and I will tell you that you can't guess.
13    So therefore if a witness says "I guess," that's not
14    evidence of anything one way or another.
15    Q.    And let me just follow up on that for a second,
16    Mr. Ciapala.
17          You said that Fred -- that this was not something
18    that Fred simply talked about openly, whether his
19    process was illegal or not, correct?
20    A.    Obviously he's not going to say that, correct.
21    Q.    So even when you sit around and have these dinners
22    where you're entertaining clients, was there any open
23    discussion about the fact that illegal stuff was
24    happening?
25    A.    Yes, there were discussions.  Yes.
```

```
 1    Q.    At dinners?

 2    A.    Yes.

 3    Q.    With Fred Sharp?

 4    A.    Yes.

 5    Q.    So Fred Sharp -- well help me out here.

 6          You just said Fred Sharp was not openly telling

 7    you guys that there was anything illegal going on.  Now

 8    you're saying that --

 9    A.    There's not only the 5 percent rule, there were

10    other discussions about other matters concerning the

11    stocks and the company.

12    Q.    Okay.  So with respect to whether forms were being

13    filed, that was not something that was being discussed

14    with you or at these dinners, correct?

15    A.    Correct.

16    Q.    As a matter of fact what you told the SEC is --

17    hold on one second.  (Pause.) -- that you and the other

18    participants never discussed that this scheme was

19    illegal, is that correct?

20    A.    It was never openly said it was "illegal," but we

21    kind of knew, we kind of asked questions making sure

22    that we were trying to make it as concealed as possible.

23    Q.    Okay.  But this was not something that folks flat-

24    out talked about, "Let's do this in a way to conceal

25    ownership of stock," that was not the way it was
```

```
 1    discussed, correct?
 2    A.    Well it was discussed that way, meaning that we
 3    had to make sure that we had 5 percent in different
 4    brokers, in different banks, so we could spread it
 5    around, that was our discussions.  And one of the
 6    reasons we had to do things was to clearly discuss the
 7    fact that if we had any new brokers, if we had any new
 8    banks, if we had any new traders, in order to, you know,
 9    have more places, more outlets, in order to sell 5
10    percent positions.
11    Q.    Okay.  Now you're talking about, at this point,
12    dealing with new brokerage firms, correct?
13    A.    Correct.
14    Q.    And during this period of time there was a real
15    problem in terms of finding brokerage firms that were
16    comfortable dealing with low-priced securities, correct?
17    A.    Not exactly, no, there were always places willing
18    to do it, the problem was that we didn't really out
19    asset managers.  We didn't really openly discuss about
20    it because any time we found a new place, everyone else
21    would go to it and we would run of business.  So it was
22    a way of keeping our avenues for ourselves.  And so we
23    never really -- we made it sound difficult, but there
24    were always places that we could go to, but we wanted to
25    try and make sure that those places remained only
```

```
 1    available for us and the other people, Thank God, in the
 2    room, or it would make them go bankrupt.
 3    Q.    One of the selling points for your firm, was it
 4    not, that you did locate avenues through which
 5    low-priced securities could properly be sold?
 6    A.    Yes.
 7    Q.    Okay.  Now we talked yesterday about the fact that
 8    you had told the SEC that you dealt with two traders
 9    relating to Fred Sharp, one that you knew as "Kash" and
10    the other was Bill Friesen, do you recall that?
11    A.    If that is the case that is wrong, Bill Friesen, I
12    don't think, was ever a trader for Sharp.
13    Q.    Okay.  All right.  And you were asked, during
14    these meetings with the SEC, specifically whether you
15    knew who was attached to that code Number 2.  Do you
16    recall that?
17    A.    Correct.
18    Q.    Okay.  And Mr. London asked you that yesterday and
19    you said eventually that that was Jackson Friesen,
20    correct?
21    A.    Correct.
22    Q.    Okay.  So now let me ask you to take a look at the
23    notes of August 30th and I'm going to ask you, if you
24    could look at Page 3, whether in fact in August, on
25    August 30th -- which was what, last month, this month,
```

A3119

```
 1   um, but within the last month or so, you were asked that

 2   same question by the SEC and you told them you do not

 3   remember who was --

 4   A.     That does not -- the reason why I remember now is

 5   because I was put in front of some conversations that

 6   clearly led me to understand who the Number 2 was.

 7   Q.     So during the course of your conversations with

 8   the SEC, you -- you think you figure out who Number 2

 9   is?

10   A.     I don't think, I'm pretty sure I figured out who

11   Number 2 was.

12   Q.     Okay, but it's fair to say though that a month

13   ago, in response to that question, what you said is "I

14   don't remember who Number 2, 3, or 4 is"?

15   A.     Correct.

16   Q.     And you told them, a month ago, that you can't

17   remember Friesen's code, but that you chatted with him

18   at times on the Xphone, do you recall saying that?

19   A.     Correct.

20   Q.     And do you recall saying that it was Code Number

21   4, not 2, who was in charge of and directed the trading?

22   A.     Potentially, yes.

23   Q.     That's what you told them a month ago, um, on

24   August 30th, correct?

25   A.     The only question is when?  Potentially, yes.  But
```

1    that was before I obtained any documents.

2    Q.    Mr. Ciapala, do you want to look at the notes to

3    refresh your recollection?  If so look at --

4    A.    I've got them.

5    Q.    Look at Page 3 of the notes, bullet point number

6    5.

7    A.    (Looks.)  "Code Number 4 was" -- "I didn't know

8    the person behind Code 4, but knew to take directions."

9    Yes, because 4 was also giving me trades.  I was given

10   trades from many different folks on some stocks.

11   Q.    Okay, so when you were asked a month ago about the

12   trading, you're very clear that Code Number 4 was the

13   person who directed the trading, correct?

14   A.    Correct.

15   Q.    And then you're asked the same thing on September

16   5th at another session with the SEC, correct?

17   A.    Correct.

18   Q.    So if you could put in front of you the notes of

19   that meeting headed "9-5-23."

20   A.    Yup.

21   Q.    And if you could look, right from the get-go in

22   that meeting, there was a discussion regarding who was

23   giving trading instructions.

24   A.    (Looks.)  Uh-huh.

25   Q.    The second bullet point, do you see that?

```
 1    A.    Yes.
 2    Q.    And you told them, again in a second meeting, 4,
 3    the Number 4, was the trader giving --
 4          MR. LONDON:  Objection.
 5          THE COURT:  Well you can't read what the document
 6    not in evidence says, but you may inquire.
 7    Q.    During that meeting did you tell them that Number
 8    4 was the trader giving instructions from Sharp's side?
 9    A.    Sorry, repeat that again?
10    Q.    Again at another meeting, on September 5th, just a
11    couple of weeks ago, starting at 2:07 in the afternoon,
12    did you tell them Number 4 was the trader giving Ciapala
13    instructions from Sharp's side?
14    A.    Yes.
15    Q.    You did.  And then, a little bit later in the
16    meeting, did you repeat that you don't know who Code
17    Name 2 is?  If you look at the top of Page 2, the fifth
18    bullet point, the second subbullet point.
19    A.    Yes, correct, I didn't know if 4 was Veldhuis,
20    correct.
21    Q.    But this is -- 4 is Veldhuis, correct?
22    A.    Yes, that's what I believe.  Yes.
23    Q.    Okay.  What you said here, again in a meeting on
24    September 5th is, "I don't know who Code Name 2 is,"
25    correct?
```

A3122

```
 1    A.    Um, I'm trying to look where I said that?

 2    Q.    The second page, the fifth bullet point, the

 3    second subbullet point.

 4    A.    Yeah, okay.

 5    Q.    You said that to him on September 5th, correct?

 6    A.    Yeah.

 7    Q.    Okay.  In fact you went on to say that the only

 8    code you associate with Jackson Friesen is "J-A-X,"

 9    "JAX," correct?

10    A.    Correct.

11    Q.    (Pause.)  All right, a couple more questions.

12          Sharp, you learned, was cheating you and cheating

13    his clients, correct?

14    A.    That's what I understood, yes, and that's what I

15    heard from clients as well.

16    Q.    Okay.  So Sharp would be the recipient of enormous

17    amounts of money that were derived from proceeds of

18    sales of stock, correct?

19    A.    At least he had control over them, yes.

20    Q.    He had control over that money and he was

21    stealing, keeping that money, correct?

22    A.    Correct.  At least some of our commissions he did

23    not give to us, he was taking it away from us, correct.

24    Yes, I confirm.

25    Q.    Not just stealing from you, but also, you learned,
```

A3123

```
 1    skimming and stealing from the clients, correct?
 2    A.    That's what I understand, yes, that's what I was
 3    told and that's what I have half-solved from some
 4    statements.
 5    Q.    Okay.
 6          MS. FRITZ:  Nothing further.  Thank you.
 7          THE COURT:  Ms. Pickett, anything?
 8          MS. PICKETT:  I have nothing, your Honor.  Thank
 9    you.
10          THE COURT:  Any redirect?
11          MR. LONDON:  A very short redirect.
12          THE COURT:  Very well.
13
14    REDIRECT EXAMINATION BY MR. LONDON:
15    Q.    Good morning, Mr. Ciapala, or good afternoon where
16    you are, I suppose.
17    A.    Good afternoon.
18    Q.    How many times did you and I have calls, um, prior
19    to you testifying in court?
20    A.    Three.
21    Q.    And during any of those calls did I show you
22    Xphone chats?
23    A.    Yes, you did, in the two -- in the two last
24    meetings.
25    Q.    So in the first meeting did I show you any Xphone
```

```
 1   chats?
 2   A.    None.
 3   Q.    Okay.  And did the Xphone chats I showed you help
 4   refresh your recollection about the events that were
 5   taking place?
 6   A.    Yes.  Absolutely, yes.
 7   Q.    And did the Xphone chats I showed you help you
 8   refresh your recollection as to who was on the chat
 9   messages with you?
10   A.    Yes, I confirm.
11   Q.    Okay.
12         MR. LONDON:  Thank you very much.  I have no other
13   questions, your Honor.
14         MS. FRITZ:  May I, your Honor?
15         THE COURT:  You may.
16
17   RECROSS-EXAMINATION BY MS. FRITZ:
18   Q.    Mr. Ciapala, what is it that Mr. London showed
19   you?
20   A.    In terms of what Xphone chats, you mean?
21   Q.    Was it something that you were on that related to
22   trading?
23   A.    It was related to the discussions that we had on
24   Xphone chats, yes.
25   Q.    And nothing has been shown to you during the
```

```
 1   course of your testimony here, correct?
 2   A.    Yeah, I think we saw one yesterday, I believe, if
 3   I remember correctly.
 4   Q.    Okay.  Was -- so it was in your conversations with
 5   Mr. London where you come to believe now, years later,
 6   that Number 2 is Mr. Friesen, correct?
 7   A.    No, at the time I knew that.  But it's been almost
 8   4 or 5 years since I left all of this business, um, and
 9   as you can understand, memory kind of fades away, and
10   having the -- the messages sort of helped me, reminded
11   me of the who-was-who and the conversations that we had
12   at the time.
13   Q.    Yeah, okay.  So what we do know is, um, when
14   asked, without Mr. London sort of prompting, without
15   that --
16          MR. LONDON:  Objection.
17          THE COURT:  We'll say "without that interaction,"
18   and you may ask your question.
19          MS. FRITZ:  Yes.
20   Q.    -- your clear recollection was that Mike Veldhuis,
21   Number 4, was the guy that handled the trading, correct?
22   A.    Yes, he gave me some trades, yes, I confirm.
23   Q.    Okay.  And that was all that you remembered, being
24   asked over and over again, correct?
25   A.    Well there's lots of other things that I remember,
```

A3126

```
 1    but we never went into detail of other things that could
 2    have happened.
 3    Q.    Okay.  And the recollection you had with respect
 4    to Mr. Friesen was that that was associated with
 5    something, some code name "JAX," correct?
 6    A.    Correct.
 7    Q.    And Mr. London did not show us, during the course
 8    of your testimony, any written direction from
 9    Mr. Friesen to you with respect to trading, correct?
10    A.    In this case, you mean?  In the courtroom, you
11    mean?
12    Q.    Correct.
13    A.    I don't think we did, no.
14    Q.    Okay.
15          (Ms. Fritz is seated.)
16          THE COURT:  All right, Ms. Pickett, nothing?
17          MS. PICKETT:  Nothing, your Honor.  Thank you.
18          THE COURT:  Mr. London, anything further?
19          MR. LONDON:  I'm all set, your Honor.  Thank you.
20          THE COURT:  Thank you.  He's excused.
21          Call your last witness.
22          MS. SHIELDS:  The Commission calls Ryan Murphy.
23          THE COURT:  He may be called.
24          (RYAN MURPHY, sworn.)
25
```

A3127

```
 1        ***********

 2        RYAN MURPHY

 3        ***********

 4

 5    DIRECT EXAMINATION BY MS. SHIELDS:

 6    Q.    Good morning.

 7    A.    Good morning.

 8    Q.    Would you please state your name for the jury.

 9    A.    Ryan Dominic Murphy.

10    Q.    And what city and state do you live in?

11    A.    Marshfield, Massachusetts.

12    Q.    How are you employed, Mr. Murphy?

13    A.    I work at the Securities and Exchange Commission.

14    Q.    And what do you do there?

15    A.    I'm an Enforcement Accountant.

16    Q.    And what does that mean, what does your job

17    entail?

18    A.    I assist the Commission by investigating potential

19    violations of the federal securities laws.

20    Q.    And would you briefly describe your education for

21    the jury, please.

22    A.    Yes.  I graduated from the University of Richmond

23    with a degree in Accounting and Business Administration

24    and a concentration in finance.

25    Q.    And when you graduated from college, where did you
```

A3128

```
 1    go to work?
 2    A.    I worked at a forensic accounting firm called
 3    StoneTurn.
 4    Q.    And what kind of work did you do there?
 5    A.    I was a Managing Director there and I worked on
 6    complex accounting and financial investigations.
 7    Q.    Do you have any professional licenses or
 8    certifications?
 9    A.    Yes, I'm a CPA, which is a Certified Public
10    Accountant, in the Commonwealth of Massachusetts and the
11    State of New York, and I'm also certified in financial
12    forensics by the American Institute of Certified Public
13    Accountants.
14    Q.    And what does it mean to be a Certified Public
15    Accountant?
16    A.    It means that you're an accountant that has
17    achieved educational and technical proficiency in
18    accounting topics such as financial reporting, financial
19    accounting, um, regulatory matters, among other topics.
20    Q.    And what does it mean to be certified in financial
21    forensics?
22    A.    It's a designation that's given to CPAs who
23    specialize in forensic accounting.
24    Q.    And at some point in time did you become involved
25    in this litigation?
```

A3129

1    A.    Yes, I did.

2    Q.    And when was that?

3    A.    Um, December of 2022.

4    Q.    And what did you do as part of your involvement in

5    this litigation?

6    A.    I reviewed the data and documents that were

7    produced in this matter, including bank and brokerage

8    records, Q-System data, public company filings,

9    transagent records, as well as Xphone and Xmail

10   communications, to prepare summaries in this matter.

11   Q.    And did you participate in the SEC's investigation

12   that led up to the filing of this case?

13   A.    I did not.

14   Q.    Would you describe for the jury, please, um, the

15   types of -- actually I think we just did that.

16         So how -- you said one of the things you reviewed

17   was the Q-System?

18   A.    Yes.

19   Q.    In what format did you review that?

20   A.    I reviewed it in Microsoft EXCEL.

21   Q.    And is that the same as Exhibit 282 that's in

22   evidence in this case?

23   A.    Yes, it is.

24   Q.    And you referred to summaries you prepared.  Would

25   you describe for the jury generally what types of

A3130

```
 1   summaries you prepared?
 2   A.    Generally the types of summaries I prepared were,
 3   um, summaries of the transfer of shares to certain
 4   issuers.  In addition, I also prepared summaries of
 5   trading records and stock sales and proceeds in issuers
 6   that are part of this case as well as the distribution
 7   of those proceeds.
 8   Q.    And what did you do to ensure that the summaries
 9   that you prepared were reliable?
10   A.    I ensured that the information that was in my
11   summaries matched the supporting documents that I was
12   reviewing.
13   Q.    And were the records you summarized voluminous?
14   A.    Yes, they were.
15   Q.    Would you give the jury, please, an idea about how
16   many pages of records or how much data you reviewed?
17   A.    Sure.  There were, um, thousands of pages of
18   records as well as tens of thousands of records of data.
19   Q.    And can you describe for the jury, please,
20   generally how much time you spent preparing the
21   summaries that you're talking about?
22   A.    Several hundred hours.
23   Q.    All right.  So I want to talk first about, um --
24   did you review any documents produced by transfer
25   agents?
```

```
 1    A.    Yes, I did.
 2    Q.    And generally what type of transfer-agent records
 3    did you review?
 4    A.    Generally I reviewed the transfer journal, which
 5    is a summary of what the transfer agent has in its
 6    records, it's a summary of the share issuances, the
 7    share cancellations, and transfers.  In addition, I also
 8    reviewed some supporting packages for certain of those
 9    transfers that were on record at the transfer agent.
10    Q.    Okay.  And did you focus on transfer agent records
11    for any particular issuers?
12    A.    Yes, I focused on records for Arch Therapeutics,
13    for Stevia First and Vitality, as well as OncoSec.
14    Q.    I'm going to show you what we've marked as Exhibit
15    NA.  Do you recognize this as -- and just for
16    identification purposes, do you recognize this document?
17    A.    Yes, I do.
18    Q.    And what is it?
19    A.    This is a summary of the Arch Therapeutics's share
20    distribution that was on record at the Empire Stock
21    transfer agent.
22    Q.    And is this summary an accurate depiction of the
23    underlying data in the transfer agent's records?
24    A.    Yes, it is.
25          MS. SHIELDS:  Your Honor, I move the admission of
```

A3132

```
 1    Exhibit NA into evidence.
 2          THE COURT:  No objection?
 3          MS. FRITZ:  Nope.
 4          THE COURT:  NA is admitted, Exhibit 292.
 5          (Exhibit 292, marked.)
 6          MS. SHIELDS:  May we publish that to the jury?
 7          THE COURT:  You may.
 8          (On screen.)
 9    Q.    So, Mr. Murphy, would you describe for the jury
10    what is shown in this summary?
11    A.    This is a summary of the Arch Therapeutics share
12    distribution from S-1 shareholders to, um, Mr. Dhillon,
13    um, nominees that were administered by the Sharp Group,
14    as well as Victory Capital.
15    Q.    And how -- would you describe for the jury,
16    please, how you prepared this chart?
17    A.    Yes.  I prepared this chart by reviewing a source
18    document at the bottom left-hand corner, which is the
19    transfer journal, and I summarized the transfer of those
20    shares into this chart as depicted here.
21    Q.    And why have you shown some of the shares in green
22    boxes?
23    A.    Because those in the green boxes are nominees that
24    were administered by the Sharp Group.
25    Q.    And how do you know that?
```

```
 1    A.    I know that because the transfers to those
 2    nominees at the transfer agent were recorded in the
 3    Q-System.
 4    Q.    And what are some of the nominee companies who
 5    received shares of Arch?
 6    A.    There's a number here, um, but some of those
 7    companies include Peaceful Lion Holdings, Gotama
 8    Capital, Morris Capital, and Quezon Group.
 9    Q.    Mr. Murphy, your summary also shows a distribution
10    or a transfer of shares to an entity called "Victory
11    Capital."  What is "Victory Capital"?
12    A.    That's an entry associated with Roger Knox.
13    Q.    And why did you put that in a purple box instead
14    of another color?
15    A.    Because it wasn't administered by the Sharp Group.
16    Q.    And how did you know that Victory Capital was
17    administered by Roger Knox?
18    A.    Based on e-mails between Mr. Knox and Courtney
19    Kelln.
20    Q.    And how many shares in Arch Therapeutics were
21    transferred to these Sharp-administered nominees?
22    A.    There were 16,920,000 shares that were transferred
23    to the Sharp nominees.
24    Q.    And if you add in the Victory Capital shares, how
25    many shares in total were transferred to Mr. Knox and
```

A3134

```
 1    the Sharp-administered nominees?

 2    A.    19,230,000 shares.

 3    Q.    And what percentage of Arch's outstanding stock

 4    was 19,230,000 shares at the time of these transfers?

 5    A.    That was approximately 48 percent.

 6    Q.    So after you prepared this summary that's Exhibit

 7    292, what if anything did you do to compare this data to

 8    the data about these share transfers in the Q-System?

 9    A.    Um, I reviewed the Q-System to determine whether

10    or not these were, um, transferred into the Q-System.

11    Q.    And what did you conclude?

12    A.    I concluded that they were transferred into the

13    Q-System and recorded.

14    Q.    And did the number of shares match between what

15    was in the transfer agent records and what was in the

16    Q-System?

17    A.    Yes, it did.

18    Q.    Okay.  So I want to talk now about your review of

19    the Q-System.

20          MS. SHIELDS:  And we can take this exhibit down.

21    Thank you.

22          (Off screen.)

23    Q.    So based on your review of the Q-System, how many

24    accounts did you observe in the Q-System?

25    A.    Um, in total there's hundreds of accounts
```

1    throughout the entirety of the Q-System.

2    Q.    Did you focus your summarizing on any particular

3    account?

4    A.    Yes, I focused my summaries on the issuers that

5    are the center of this case as well as the accounts that

6    are associated with Mr. Friesen and Ms. Gasarch.

7    Q.    And how did you determine which account in the

8    Q-System were the accounts for the 14 issuers whose

9    shares are at issue in this case?

10    A.    The account in the Q-System for the issuers are

11    the same name as the ticker symbol or similar to the

12    ticker symbol that issuer trades in the public markets.

13    In addition, within the Q-System there's also a field

14    for "Stock Symbol" and "Stock Name," which indicates

15    which issuer that account is related to.

16    Q.    And did each of the 14 issuers have their own

17    account in the Q-System?

18    A.    They did, but for two of them.

19    Q.    And what two were those?

20    A.    That was Breathtec Biomedical and Lexington

21    Biosciences.

22    Q.    And how did you find those issuers in the

23    Q-System?

24    A.    Those were both under the, um, account name "LMB,"

25    and within that account you had trades for both of those

```
 1    symbols, and you could denote which symbols and which
 2    trades were associated with those stocks based on the
 3    stock symbol and the stock name in the LMB account for
 4    those two issuers.
 5    Q.    And was "LMB" a stock ticker for one of those two
 6    companies?
 7    A.    Yes, Lexington Biosciences.
 8    Q.    And, um, so what was one of the issuer-specific
 9    accounts that you reviewed as part of the Q-System?
10    A.    One of the accounts was "MDDD," or "Makism 3D."
11    Q.    So I'm going to show you what we've marked, um,
12    Mr. Murphy, as Exhibit ML.
13         MS. SHIELDS:  If we could pull that up for
14    identification.
15         (On screen.)
16    Q.    Mr. Murphy, do you recognize this document?
17    A.    Yes, I do.
18    Q.    And what is it?
19    A.    This is a summary of the MDDD Q-account detail
20    from the Q-System data.
21    Q.    And is this an accurate summary of all of the data
22    in the MDDD account in the Q-System?
23    A.    Yes, it is.
24         MS. SHIELDS:  I move the admission of Exhibit ML
25    into evidence.
```

```
 1          MS. FRITZ:  Objection, based on our discussion.
 2          THE COURT:  Noted.  Overruled.  And your rights
 3     are saved.  ML is admitted, Exhibit 293.
 4          (Exhibit 293, marked.)
 5     Q.   Okay.  So, Mr. Murphy, would you please describe
 6     for the jury, um, just very briefly the columns of data
 7     that are shown in this account in the Q-System?
 8     A.   Yes, there's a number of columns here.  There is
 9     the "Account Code," which represents the account code
10     for that issuer.  There's the "Account Title" which
11     represents individuals that are associated with this
12     account.  There is the "Batch ID," which represents the,
13     um, Batch-ID Number associated with each transaction,
14     this is a unique ID for those transactions.  Um, there's
15     the "Batch Date," which is the date of the transaction.
16     "Bank Code" represents the, um, the bank or brokerage
17     account that is associated with each of these
18     transactions.  It can also represent an internal
19     records-keeping account within Q such as "Work," and I
20     think you'll see that on the screen.  There's also the
21     "Symbol" and "Symbol Description" column, which I
22     discussed earlier, which names the name of the issuer.
23          Within the Stock Column, any time that this
24     relates to a stock transaction there will be a figure
25     here and that represents the client or shares that were
```

1    involved in that transaction.  And there's also the

2    "Batch Description," which is a description of the

3    transaction.  The "Transaction Description" is a

4    higher-level, um, description of that, um, and can

5    include debits and credits to the account or, um,

6    deductions and additions to the account.  There's a

7    "Currency Code" to indicate the currency that the

8    transaction was recorded in.  And then the other two

9    accounts are the "Cash Bank and Currency" and "Cash

10   Accounts," which denote the amount of the transactions

11   that were recorded in Q.

12   Q.   And what's in general the difference between the

13   "Cash Bank and Currency" column and the "Cash Account"

14   column?

15   A.   It's used to record, um, fees that were associated

16   with transactions.

17   Q.   So I want to go back to the fifth column, the

18   "Bank Code" column, and have you explain that column a

19   little bit more.  Would you show the jury an example of

20   a bank or brokerage code?

21   A.   Yes.  And like I said earlier, this is the, um --

22   the bank code pertains to the, um, the account and

23   financial institution that was associated with these

24   transactions, and if we scroll to the second page --

25   Q.   Which entry would you like us to blow up?

A3139

1    A.    Can we look at Batch ID 56833 for "STEL."

2    Q.    So what transaction is described there?

3    A.    Yes, this is a, um, this is a transaction from the

4    STEL bank and brokerage account and that involves a

5    debit of $15,200 to Pacific Words and Images, and the

6    STEL account, um, within the bank and brokerage codes,

7    based on my review of this Q-System data, the first few

8    letters of the bank and brokerage code pertains to the

9    financial institution that was associated with that

10   transaction, and the last letter refers to the name of

11   the account.  In this instance "STEL" pertains to the

12   Sterling Securities account and the -- excuse me, the

13   Sterling Securities brokerage firm and the Loathe Lorem

14   account.

15   Q.    Did you do any work to determine how many

16   different brokerage accounts were used to record in the

17   Q-System purchases and sales of the 14 issuers shares?

18   A.    Yes, I did.

19   Q.    Would you look next, please, at Exhibit MM. (on

20   screen.)

21         And, Mr. Murphy, do you recognize this document?

22   A.    I do.

23   Q.    And what is this?

24   A.    This is a summary of the bank and brokerage code

25   names that were used in the Q-System to purchase and

```
 1    sell securities in the 14 issuers.

 2    Q.    And is this summary an accurate depiction of the

 3    data in the underlying Q-System?

 4    A.    Yes, it is.

 5         MS. SHIELDS:  I move the admission of Exhibit MM

 6    into evidence.

 7         MS. PICKETT:  Objection.

 8         MS. FRITZ:  Objection, your Honor.  And may we

 9    approach?

10         THE COURT:  You may.

11

12         AT THE SIDEBAR

13         THE COURT:  First let me ask a question.  I

14    understand from his lead-in for what he's testified to

15    now that he has focused on what I have referred to at

16    the sidebar on the deals as to which there is evidence

17    that Friesen was involved, and while there's much fewer

18    on the deals where there is evidence anyway that Gasarch

19    was involved, not in receiving money, but involved as a

20    principal, that the records show that she was part of

21    the deal.

22         Isn't that right?

23         MS. SHIELDS:  I'm not sure I understand the

24    question?  Are you asking if --

25         THE COURT:  Is this those deals?
```

```
 1            MS. SHIELDS:  Yes, this is the 14.

 2            THE COURT:  And nothing else, right?

 3            MS. SHIELDS:  Right.

 4            THE COURT:  All right.  Okay.  So I accept that

 5       representation.

 6            So what's the matter?

 7            MS. FRITZ:  Two things.  First of all, suffices to

 8       say, we haven't heard anything about this M Triple D

 9       being something that Jackson Friesen is involved in.

10            MS. SHIELDS:  So --

11            THE COURT:  Wait a minute.  Always talk to me.

12            MS. FRITZ:  So I do believe what they're going to

13       do is just put in the 14 issuers whether there's been

14       any testimony connecting up these two individuals.  I

15       think that is clearly what they're going to do, for

16       better or for worse.

17            The reason I objected is that one of the things

18       your Honor has excluded, to my understanding, are

19       records relating to Verdmont Capital.  And sure enough

20       the first thing he did was to go directly to a Verdmont

21       Capital account and say Verdmont -- I thought it was

22       Verdmont loans --

23            MS. SHIELDS:  It's Sterling Securities.

24            THE COURT:  Wait a minute.

25            This fellow is just a -- no, no, I mean it with no
```

A3142

```
 1    disrespect, but he's just a summary witness, he's not a
 2    substantive witness, he's dealing with records we
 3    already have.  So it's appropriate to say that I think
 4    the liability of Friesen -- I'm making an evidentiary
 5    finding, because I can make that now, but Friesen, I am
 6    convinced, by a fair preponderance of the evidence, is a
 7    co-conspirator as to every deal that he has taken part
 8    in on a hub-and-spoke rationale.  The reasoning as to,
 9    um, Ms. Gasarch is more complex because she worked, I
10    find, at the hub.
11         But having said that, I am satisfied that the, um
12    -- that she's certainly -- "certainly" is too strong --
13    that by a fair preponderance of the evidence she was a
14    co-conspirator as to the two deals that were reflected
15    -- it's only two, of her being a principal.  Though it
16    seems to me that under the law of the First Circuit and
17    co-conspirator hearsay, um, anything that went on at the
18    Sharp office, um, is properly in evidence.
19         Now having said that, what's your response to
20    Ms. Fritz's --
21         MS. FRITZ:  Your Honor, I believe Verdmont --
22         MS. SHIELDS:  Hold on.
23         So the -- we didn't talk about Verdmont.  The bank
24    code he called out was a Sterling Securities account
25    with the, um -- with Loathe Lorem as the issuer.
```

```
 1        MS. FRITZ:  Okay.

 2        MS. SHIELDS:  This list, your Honor -- so I would

 3   say specifically with respect to the "MDDD," we saw

 4   three exhibits where Friesen gets a cut -- where he both

 5   participates in discussions about trading in MDDD --

 6        THE COURT:  You're shaking your finger, Ms. Fritz,

 7   but you're making the argument for me and I appreciate

 8   that.

 9        (Laughs.)

10        MS. SHIELDS:  I'm sorry, your Honor.  -- that he

11   also got a cut of the trading proceeds from MDDD.

12        THE COURT:  Yes.

13        MS. SHIELDS:  Specifically this list is the

14   account name and bank and broker in which the trades in

15   those 14 securities happened.

16        THE COURT:  And those 14 securities, you say, and

17   I'm accepting the representation, are trades -- are

18   companies rather that the evidence shows that Friesen or

19   Gasarch themselves were part of it.

20        And you represent that?

21        MS. SHIELDS:  Yes.  And I believe the summaries

22   do.

23        THE COURT:  And I think the evidence supports that

24   sufficient for me to make the evidentiary finding.  I'm

25   saying nothing about whether, for example, these were
```

A3144

 1     her signatures.  That's all open.

 2          MS. FRITZ:  Understood.

 3          THE COURT:  All I can do and all I'm doing is

 4     making an evidentiary finding that we'll see where that

 5     leads us with respect to the motions for directed

 6     verdict.  But having made it, um, and I'll allow you

 7     full cross-examination, as long as we're limited to the

 8     14 and we haven't got evidence around here, because I'm

 9     going to strike it out if there is more evidence of more

10     deals, at least as to Friesen, but I'm not so sure as to

11     the shadowing of Ms. Gasarch, because I'm not sure when

12     she comes on the scene.  It may be there's evidence

13     before she's on the scene at least.  But sufficient for

14     making a ruling here, and I'm not for all of this, it's

15     overruled.  And your rights are saved.

16          MS. FRITZ:  Verdmont Capital was excluded.  When I

17     went and glanced at what she's now trying to put into

18     evidence, it's Verdmont transactions included.

19          MS. SHIELDS:  No.  So, your Honor, you excluded

20     Mr. Murphy's reliance on records produced to the

21     Commission by Verdmont.  This is a summary of the

22     Q-System.  You didn't require us, if Verdmont appears in

23     the Q-System, to take this out.  I mean he's just

24     summarizing what's in the Q-System.  So the fact that we

25     can't rely for other purposes on Verdmont records

A3145

```
 1    doesn't mean that a summary of the Q-System can't

 2    accurately reflect that it's in the Q-System.

 3         THE COURT:  Well let me put it another way, and I

 4    think this is fair because there's something to what you

 5    say.  I'm not going to let you argue as to Verdmont, and

 6    I won't mention it.

 7         MS. SHIELDS:  Okay.

 8         THE COURT:  All right.

 9

10         (In open court.)

11         MS. SHIELDS:  I move the admission of Exhibit MM

12    into evidence.

13         THE COURT:  And in front of the jury I will say MM

14    is admitted, Exhibit 294, and the rights of the

15    individuals are saved.

16         (Exhibit 294, marked.)

17    Q.   Okay, Mr. Murphy, now that the jury can see

18    Exhibit 294, would you describe please the data that

19    you've summarized in this exhibit?

20    A.   Yes.  This data is a summary of all of the bank

21    and brokerage codes listed within the Q-System that were

22    used to purchase and sell securities in the 14 issuers.

23    Q.   And how many bank and brokerage accounts,

24    according to the Q-System, were used to purchase and

25    sell shares of the 14 issuers?
```

A3146

```
 1   A.     47 accounts.

 2   Q.     And are those accounts the accounts that are

 3   listed here with the account name and the financial

 4   institution where that account was held?

 5   A.     That's correct.

 6   Q.     Did you prepare, um, summaries of each of the 14

 7   issuers's accounts in the Q-System, one for each

 8   account?

 9   A.     Yes, I did.

10   Q.     And I'm going to show you, um, each of these

11   exhibits, I'm going to show them to you briefly.

12          MS. SHIELDS:  And then, your Honor, I'm going to

13   move the admission of each of those exhibits.

14   Q.     So Exhibit LK.

15   A.     I see it.

16   Q.     Do you recognize that exhibit?

17   A.     Yes.

18   Q.     What is it?

19   A.     This is a summary of the RQ account detail from

20   the Q-System.

21          THE COURT:  Your Honor, I move the admission of

22   Exhibit LK.

23          THE COURT:  LK is admitted.

24          MS. PICKETT:  The same objection.

25          MS. FRITZ:  The same objection, your Honor.
```

```
 1              THE COURT:  And you may have a running objection

 2     to this, as we've discussed at the sidebar.

 3              MS. FRITZ:  Thank you, your Honor.

 4              THE COURT:  And your rights are saved.

 5              But LQ, is it?

 6              MS. SHIELDS:  LK.

 7              THE COURT:  LK is Exhibit 295.

 8              (Exhibit 295, marked.)

 9     Q.    I'm next showing you Exhibit NO.  Mr. Murphy, do

10     you recognize this document?

11     A.    Yes, I do.

12     Q.    And what is it?

13     A.    It's a copy of the Stevia First and Vitality Bio

14     Q-account detail from the Q-System.

15     Q.    And is this an accurate depiction of the data in

16     the underlying Q-System?

17     A.    Yes, it is.

18              MS. SHIELDS:  I move the admission of Exhibit NO.

19              THE COURT:  NO is admitted in evidence, Exhibit

20     296.  Your rights are saved.

21              (Exhibit 296, marked.)

22     Q.    Mr. Murphy, would you look please at Exhibit LT.

23     A.    (On screen.)

24     Q.    Do you recognize this document?

25     A.    Yes, this is a copy of the ECAU Q-account detail
```

Case: 24-1770   Document: 00118249070   Page: 224   Date Filed: 02/18/2025   Entry ID: 6700951
Case 1:21-cv-11276-WGY   Document 442   Filed 01/24/24   Page 47 of 170

47

```
 1    from the Q-System.

 2    Q.    And is this an accurate reflection of the data in

 3    the underlying account, um, the ECAU account in the

 4    Q-System?

 5    A.    Yes, it is.

 6          MS. SHIELDS:  I move the admission of Exhibit,

 7    um --

 8          THE COURT:  LT.  LT is admitted, Exhibit 297 in

 9    evidence, and the rights of all individuals are saved.

10          (Exhibit 297, marked.)

11    Q.    Would you look next please at Exhibit NM.

12    A.    (Looks.)

13    Q.    Do you recognize this document, Mr. Murphy?

14    A.    Yes, I do.

15    Q.    And what is it?

16    A.    This is a copy of the STEV Q-account detail from

17    the Q-System.

18    Q.    And what company is "STEV"?

19    A.    That is "Stevia Corp."

20    Q.    And is this document an accurate reflection of the

21    underlying data in the Q-System?

22    A.    Yes, it is.

23          MS. SHIELDS:  I move the admission of Exhibit MN.

24          THE COURT:  NM is admitted, the rights of all

25    parties are saved, it's Exhibit 298.
```

```
 1              (Exhibit 298, marked.)

 2       Q.    I'm showing you next Exhibit MI.

 3       A.    (Looks.)

 4       Q.    Mr. Murphy, do you recognize this document?

 5       A.    Yes, I do.

 6       Q.    And what is it?

 7       A.    This is a copy of the LBY and PBAV Q-account

 8       detail from the Q-System.

 9       A.    And, um, what company is "LBY"?

10       A.    "LBY" is "Liberty One Lithium."

11       Q.    And is this exhibit an accurate representation of

12       what is contained in the LBY account in the Q-System?

13       A.    Yes, it is.

14              MS. SHIELDS:  I move the admission of Exhibit MI.

15              THE COURT:  MI is admitted, the rights of all

16       parties are saved, it's Exhibit 299.

17              (Exhibit 299, marked.)

18       Q.    I'm next going to show you Exhibit NG.

19       A.    (Looks.)

20       Q.    Mr. Murphy, do you recognize this document?

21       A.    Yes, I do.

22       Q.    What is it?

23       A.    This is the ORYN Q-account detail.

24       Q.    And what company is "ORYN"?

25       A.    That's "Oryon Holdings."
```

A3150

```
 1    Q.    And is this document an accurate reflection of the
 2    Oryon account in the Q-System?
 3    A.    Yes, it is.
 4          MS. SHIELDS:  I move the admission of the Exhibit
 5    NG.
 6          THE COURT:  NG is admitted, the rights of all
 7    parties are saved, it's Exhibit 300.
 8          (Exhibit 300, marked.)
 9    Q.    Mr. Murphy, I'd like to show you Exhibit ME.
10    A.    (Looks.)
11    Q.    Do you recognize this document?
12    A.    Yes, I do.
13    Q.    And what is it?
14    A.    This is a copy of the "GRPH," or "Graphite Corp"
15    Q-account detail from the Q-System.
16    Q.    And is this an accurate reflection of the
17    underlying data in the Q-System?
18    A.    Yes, it is.
19          MS. SHIELDS:  I move the admission of Exhibit ME.
20          THE COURT:  ME is admitted, it will be Exhibit
21    301, the rights of all parties are saved.
22          (Exhibit 301, marked.)
23    Q.    Mr. Murphy, I'd like you to look next at Exhibit
24    NF.
25    A.    (Looks.)
```

A3151

```
1    Q.    Do you recognize this document?

2    A.    Yes, I do.

3    Q.    What is it?

4    A.    This is a copy of the "ONCS," for "OncoSec

5    Medical," Q-account detail from the Q-System.

6    Q.    And is this exhibit an accurate depiction of the

7    underlying OncoSec account in the Q-System?

8    A.    Yes, it is.

9          MS. SHIELDS:  I move the admission of Exhibit NF.

10         THE COURT:  NF is admitted, the rights of all

11   parties are saved, it will be Exhibit 302.

12         (Exhibit 302, marked.)

13   Q.    I'd like you to look next at Exhibit NE, please.

14   A.    (Looks.)

15   Q.    And what is this -- or do you recognize this

16   document, Mr. Murphy?

17   A.    Yes.

18   Q.    What is this?

19   A.    This is a copy of the NewGen Q-account detail from

20   the Q-System.

21   Q.    And is this exhibit an accurate depiction of the

22   NewGen account in the Q-System?

23   A.    Yes, it is.

24   Q.    And what company is -- sorry, what company is

25   "NEWG"?
```

A3152

```
 1   A.    "NEWG" is "NewGen."

 2          MS. SHIELDS:  I move the admission of Exhibit NE.

 3          THE COURT:  Ne is admitted, the rights of all

 4   parties are saved, it will be Exhibit 303.

 5          (Exhibit 303, marked.)

 6   Q.    Next I'd like you to take a look at Exhibit MF,

 7   please.

 8   A.    (Looks.)

 9   Q.    And, Mr. Murphy, do you recognize this document?

10   A.    Yes, I do.

11   Q.    And what is this?

12   A.    This is a copy of the JOB Q-account detail from

13   the Q-System.

14   Q.    And what company does "JOB" refer to?

15   A.    "StartMonday."

16   Q.    And is this an accurate depiction of the

17   underlying data in that account in the Q-System?

18   A.    Yes.

19          MS. SHIELDS:  I move the admission of Exhibit MF.

20          THE COURT:  MF is admitted, the rights of all

21   parties are saved, it will be Exhibit 304.

22          (Exhibit 304, marked.)

23   Q.    I'd like for you to look next at Exhibit MK.

24   A.    (Looks.)

25   Q.    Mr. Murphy, do you recognize this document?
```

```
 1    A.    Yes, I do.

 2    Q.    And what is this?

 3    A.    This is a copy of the LMB Q-account detail, um,

 4    which is from the Q-System.

 5    Q.    And what company is "LMB"?

 6    A.    "LMB" is "Lexington Biosciences."

 7    Q.    Is this an accurate depiction of what appears in

 8    the LMB account in the Q-System?

 9    A.    Yes, it is.

10          MS. SHIELDS:  I move the admission of Exhibit MK.

11          THE COURT:  MK is admitted, the rights of all

12    parties are saved, it will be Exhibit 305.

13          (Exhibit 305, marked.)

14    Q.    And the last one of these, I'd like you to look at

15    Exhibit MJ, please.

16    A.    (Looks.)

17    Q.    And, Mr. Murphy, do you recognize this document?

18    A.    Yes.

19    Q.    And what is this?

20    A.    This is a copy of the "RIHT" or "Rihtscorp"

21    Q-account detail from the Q-System.

22    Q.    And is this document an accurate reflection of the

23    Rihtscorp account in the Q-System?

24    A.    Yes.

25          MS. SHIELDS:  I move the admission of Exhibit MJ.
```

A3154

```
 1          THE COURT:  MJ is admitted, the rights of all
 2     parties are saved, it will be Exhibit 306.
 3          (Exhibit 306, marked.)
 4     Q.    And, Mr. Murphy, did you review communications
 5     relating to any other trading that's shown in these
 6     printouts?
 7     A.    Yes, I did.
 8     Q.    I'm going to show you what we've marked as Exhibit
 9     -- or what is in evidence, I'm sorry, as Exhibit 45.
10     Would you take a look at that, please.
11     A.    (Looks.)  I see it.
12     Q.    Who are the people, according to this document,
13     communicating in this message?
14     A.    Um, the people are, um, Mr. Veldhuis as 4,
15     Mr. Sexton as Number 3, Mr. Friesen as Number 2, and 60
16     is another individual.
17     Q.    Okay.  Starting at the bottom of the message, um,
18     would you read the bottom message for the jury, please.
19     A.    The bottom message is from Mr. Veldhuis, and the
20     subject is "Summary," and it was sent on January 18th,
21     2013.  And the message states "Sold 6,000 ECAU at .931.
22     Sold 135,000 STEV at .2058.  And sold 525 CRCL at .34."
23     Q.    And the message above that, who is that message
24     from?
25     A.    That message is from Mr. Friesen.
```

A3155

1    Q.    And what does that message say?

2    A.    It says "Staff," exclamation point, "Yahoo."

3    Q.    What if anything did you do to confirm whether the

4    trades, or at least the first two of the trades

5    referenced in that bottom message, matched the data in

6    the Q-System?

7    A.    I reviewed the Q-System and the trades for ECAU

8    and STEV are recorded and match in the Q-System.

9    Q.    And what is "ECAU"?

10   A.    That is "Echo Automotive"?

11   Q.    And what is "STEV"?

12   A.    "Stevia Corp."

13   Q.    Okay.  I'd like you to look next at what's in

14   evidence, please, as Exhibit 141.

15   A.    (Looks.)

16   Q.    Mr. Murphy, do you have that in front of you?

17   A.    Yes.

18   Q.    Who are the people communicating in this message?

19   A.    Again, this is Mr. Veldhuis is Number 4,

20   Mr. Sexton is Number 3, and Mr. Friesen is Number 2.

21   Q.    And what does the bottom message say?

22   A.    The message from Mr. Veldhuis says, "Yo," and it

23   was sent on March 7th, 2014, and the text says "S

24   220,000 RIHT at .76565.  S 50K STVF at .47.  S 38,000

25   562 ECAU at .2674.  S 150,000 MDDD at .546.  S 30,000

1    HPTG at .7113.  And S 694,000 STEV at .269."

2    Q.    And what do you understand the "S" in front of

3    each of those lines to mean?

4    A.    "Sale."

5    Q.    And then who responds to that message?

6    A.    Um, Mr. Sexton.

7    Q.    And who is also copied on that message?

8    A.    Mr. Friesen and -- Mr. Friesen is copied.

9    Q.    And what does that message say?

10   A.    "That's another 500K day."

11   Q.    And what if anything did you do to confirm whether

12   the sales that are reflected in that bottom message are

13   also reflected in the Q-System?

14   A.    I reviewed the Q-System and the sales in this

15   bottom message pertaining to the issuers that reviewed,

16   so that's all the issuers but for HPGT.  Those were

17   recorded on the Q-System.

18   Q.    And what issuers were those?

19   A.    That is Rhtscorp from the top, um, Stevia First

20   and Vitality, Echo Automotive, Makism 3D, and Stevia

21   Corp. at the bottom.

22   Q.    I'm next showing you what's in evidence as Exhibit

23   237.

24   A.    (Looks.)

25   Q.    Who are the people communicating in this message?

```
1    A.    This is a message between Mr. Jackson Friesen and
2    Ms. Yvonne Gasarch.
3    Q.    And if you, um, look at the bottom message first,
4    would you read that, at least the top of that message to
5    the jury, please.
6    A.    Sure.  On January 4th, 2012, Jackson Friesen
7    wrote, "Two wires go out against ORYN account.  First
8    wire, $35,000 to Research-Driven Investor LLC," and
9    there's wire details below that.  Second wire, "Please
10   wire 30,000 U.S.D. to RPR Agency LLC," and again there's
11   wire details below that.  And the last statement is
12   "These wires are for marketing efforts beginning next
13   week."
14   Q.    And then how did Ms. Gasarch respond to that
15   message?
16   A.    She responded on the same day with the message,
17   "Send for values Thursday."
18   Q.    And what if any work did you do to determine
19   whether the wires discussed in Mr. Friesen's message are
20   reflected in the Q-System?
21   A.    I reviewed the Q-System for the Oryon account and
22   these wires are recorded as requested.
23   Q.    I'm next showing you what's in evidence as Exhibit
24   239.
25   A.    (Looks.)
```

```
 1    Q.    Who are the people communicating in this message?

 2    A.    This is another message between Jackson Friesen

 3    and Ms. Yvonne Gasarch.

 4    Q.    And would you read the message for the jury,

 5    please.

 6    A.    At the bottom --

 7    Q.    Yes, read the bottom message first.

 8    A.    At the bottom, on Monday, February 27th, 2012,

 9    Jackson Friesen wrote "Please wire 10,000 U.S.D. to

10    Electronic Media LLC, wire instructions on file.  Please

11    wire 20,000 U.S.D to Vulcan Communications with account

12    details below."  And he said, "Please place the above

13    two wires against the NYXO account."

14    Q.    And how did Ms. Gasarch respond to that?

15    A.    She responded on the same day, "Send for values

16    Tuesday."

17    Q.    And then how did Mr. Friesen respond to that?

18    A.    He subsequently responded and wrote, "Correction

19    to the accounts credited, please apply the 20K for

20    Vulcan as follows.  5K ARW.  5K ONCS.  5K STVF.  And 5K

21    CIRC."

22    Q.    What, Mr. Murphy, is "ONCS"?

23    A.    "ONCS" is "OncoSec Medical."

24    Q.    And what is "STVF"?

25    A.    That's "Stevia First and Vitality."
```

A3159

```
 1    Q.    And what if anything did you do to confirm whether
 2    the wires requested in that second message are reflected
 3    in the Q-System?
 4    A.    I reviewed the Q-System for ONCS and STVF and
 5    those wires were recorded in the Q-System as requested.
 6    Q.    All right, I now want to ask you to look at the --
 7    or give me just a moment.
 8          Did you create summaries describing the trading in
 9    the 14 issuers's securities that we've been discussing?
10    A.    Yes, I did.
11    Q.    And what summary did you prepare?
12    A.    I prepared summaries of the net proceeds in the 14
13    issuers as well as, um, other summaries comparing the
14    trading of the 14 issuers to third-party banking
15    brokerage records.
16    Q.    And is that data voluminous?
17    A.    Yes, it is.
18    Q.    How much data did you look at to prepare these
19    summaries?
20    A.    There's several thousand trades among all the 14
21    issuers.
22    Q.    I'd like you to take a look, please, next to
23    Exhibit MX.
24    A.    (Looks.)
25    Q.    Do you recognize this document, Mr. Murphy?
```

1    A.    Yes, I do.

2    Q.    What is it?

3    A.    This is a summary of the net proceeds of the

4    issuer sales as listed in Q from 2011 to 2018.

5    Q.    And is this summary an accurate depiction of the

6    data in the underlying Q-System?

7    A.    Yes, it is.

8          MS. SHIELDS:  I move the admission of Exhibit MX.

9          MS. PICKETT:  Objection on the same.

10         THE COURT:  You object on the same grounds?

11         MS. FRITZ:  Yes, your Honor.

12         THE COURT:  All right.  MX is admitted, Exhibit --

13    and the rights of the parties are saved, Exhibit 307.

14         (Exhibit 307, marked.)

15         MS. SHIELDS:  And may we publish this to the jury?

16         THE COURT:  You may.

17         And I take it the same objection, um, I'll give

18    you a running objection to other similar documents,

19    because there's a different group of documents.

20         MS. FRITZ:  Yes, your Honor.

21         (On screen.)

22    Q.    So, Mr. Murphy, now that the jury has this in

23    front of them, would you explain please the data that

24    you've included in this summary?

25    A.    Yes, this is a summary of the net proceeds of the

A3161

```
 1    issuer stock by nominees that were administered by Sharp
 2    that were listed in the Q-System.
 3    Q.    And when you use the term "net proceeds," what do
 4    you mean by that?
 5    A.    "Net proceeds" represents the dollar value of the
 6    total stock that was sold minus the dollar value of the
 7    total stock that was bought.
 8    Q.    So let's look at the first line as an example.
 9    Would you please walk the jury through what that
10    Vitality Stevia First line means.
11    A.    Yes.  This is the net proceeds that were generated
12    by the nominees that were mentioned by Sharp in the
13    trading of Vitality and Stevia First listed in the
14    Q-System, and it summarizes those net proceeds on an
15    annual basis from 2012 to 2018.
16    Q.    So what were the total proceeds for sales of
17    Stevia First and Vitality stock from 2012 to 2018?
18    A.    The total proceeds was $45.6 million.
19    Q.    And overall what were the net proceeds from
20    trading in the 14 issuer securities by Sharp nominee
21    accounts?
22    A.    The net proceeds by trading in the 14 issuers by
23    the Sharp nominees was $144,144,625.
24    Q.    And at the bottom of this exhibit you have a note
25    about your sources.  Can you explain that to the jury,
```

1    please.

2    A.    Yes, the source is from all Q data and, um,

3    specifically this represents all stock sales and stock

4    purchases from the Q-System data.

5    Q.    You have a notation there that's Exhibit 330.  Do

6    you understand that that exhibit number has changed as

7    we've numbered exhibits in evidence here?

8    A.    Yes, it's 282 right now.

9    Q.    And did you prepare any other summaries that break

10   down this trading in more detail?

11   A.    Yes, I did.

12   Q.    I'm going to show you Exhibit MQ, please.

13   A.    (Looks.)

14   Q.    Mr. Murphy, do you recognize this document?

15   A.    I do.

16   Q.    And what is this?

17   A.    This is a summary of the, um, Q-account sales for

18   each of the issuers and the accounts that were used to

19   sell, um, securities for those issuers in the Q-System.

20   Q.    And did you -- this document has a number of

21   pages.  What are each of the pages?

22   A.    Each of the pages is a summary for each of the

23   different issuers.

24   Q.    And is this summary an accurate reflection of the

25   data in the underlying Q-System?

A3163

1    A.    Yes, it is.

2         MS. SHIELDS:  Your Honor, I move the admission of

3    Exhibit MQ.

4         THE COURT:  MQ is admitted, the rights of all

5    parties are saved, it will be Exhibit 308.

6         (Exhibit 308, marked.)

7         MS. SHIELDS:  May we publish it to the jury?

8         THE COURT:  You may.

9         (On screen.)

10   Q.    So, Mr. Murphy, now that the jury has this

11   exhibit, let's look just at the first page of it.

12   A.    (Looks.)

13   Q.    Can you explain, please, the data that you've

14   included in this summary?

15   A.    Yes, the data includes the account name and

16   financial institution that was used to sell securities

17   of Stevia First and Vitality in Q.  I put that

18   information into this chart based on the bank and

19   brokerage code information that we saw earlier.  In

20   addition, I summarized relevant statistics associated

21   with each of the sales in these accounts, including the

22   date of the first sale, the date of the last sale in

23   this account, as well as the quantity of Stevia First

24   and VBIO shares that were sold in each of those

25   accounts, and the total entries in the Q-System that

1    there were stock sales within these accounts as well.

2    Q.    Okay.  In the middle of this chart, um, you have

3    the account name "Gotama Capital" listed twice.  Do you

4    see that?

5    A.    I do.

6    Q.    Can you explain why you've listed that twice?

7    A.    Because Gotama Capital sold securities in both the

8    Beaufort Securities account and the Hyposwiss for Stevia

9    First and Vitality.

10   Q.    And in a number of instances in this chart you

11   list the financial institution of "Wintercap SA."  Do

12   you see that?

13   A.    I do.

14   Q.    Did "Wintercap" go by any other names?

15   A.    It also went by "Silverton."

16   Q.    And overall how many sales of Stevia First stock

17   were there recorded in these Sharp nominees in the

18   Q-System?

19   A.    Um, quantities or the entries?

20   Q.    Why don't you describe both, please.

21   A.    Sure.  The total entries for stock sales within

22   the Q-System were 553 entries, and the total amount of

23   shares that were sold across all those entries was

24   38,513,522 shares of Stevia First stock.

25   Q.    And did you prepare a summary like this for each

A3165

1    one of the 14 issuers?

2    A.    Yes, I did.

3    Q.    So, for example, if you look at Page 2 of this

4    exhibit, what is this summary show?

5    A.    This is the same summary but for Echo Automotive.

6    Q.    And how many shares or how many entries in the

7    Q-System for trades in Echo Automotive were there?

8    A.    112 entries.

9    Q.    Representing how many shares of stock sold?

10    A.    21.5 million shares of Echo Automotive.

11    Q.    And if you look at the next page, what does that

12    show?

13    A.    This shows the same summary for Arch Therapeutics.

14    Q.    And how many instances of trades or instances of

15    sales of Arch Therapeutics are shown in the Q-System?

16    A.    There were 264 entries in the Q-System.

17    Q.    And how many shares of Arch stock does that

18    represent?

19    A.    31.1 million shares of Arch stock.

20    Q.    Okay.  And if we scroll through each of the other

21    pages you would see the same data for each of the 14

22    issuers?

23    A.    That's correct.

24    Q.    In preparing these summaries, did you see the same

25    nominees's brokerage account trading in more than one of

A3166

1   the 14 issuers's securities?

2   A.    Yes.

3   Q.    So, for example, in how many of the 14 issuers's

4   securities did the nominee Gotama Capital trade?

5   A.    Gotama Capital traded in 12 of the 14 securities.

6   Q.    And in how many of the 14 securities did the

7   nominee Peaceful Lion trade?

8   A.    Peaceful Lion traded in 9 of the securities.

9   Q.    And after you compiled the data that's in this

10  Exhibit 308, did you do anything to confirm the accuracy

11  of this data?

12  A.    Yes, I did, I compared the data to underlying bank

13  and brokerage records.

14  Q.    So I'm going to show you for identification what

15  we've marked as Exhibit PV.

16  A.    (Looks.)

17  Q.    Mr. Murphy, do you recognize this document?

18  A.    I do.

19  Q.    And what is this?

20  A.    This is a summary of the Q-System and the third-

21  party brokerage record comparison that I performed.

22  Q.    And is this an accurate reflection of the data

23  both in the underlying Q-System and in all of that

24  third-party bank and brokerage records?

25  A.    Yes.

```
 1          MS. SHIELDS:  Your Honor, I move the admission of
 2    Exhibit PV.
 3          THE COURT:  PV is admitted, saving the rights of
 4    the parties, it will be Exhibit 309.
 5          (Exhibit 309, marked.)
 6          MS. SHIELDS:  May I publish it to the jury,
 7    please?
 8          THE COURT:  You may.
 9          (On screen.)
10    Q.    So, Mr. Murphy, would you please walk the jury
11    through what the data in this summary that you prepared
12    shows?
13    A.    Yes, the data shows the comparison that I
14    performed of the entries and stock sales within the
15    Q-System to the quantity of stock that was sold in the
16    bank and brokerage records.  In the first column, in the
17    left-most column is the "Issuer" column, and that is a
18    line for each of the 14 issuers.  The "Total Q Sales
19    Transaction" column next to that represents the Number
20    of trades within the Q-System where there were stock
21    sale entries.  The, um --
22    Q.    Well let me stop you there.  How many stock sales
23    of these 14 issuers were there in the Q-System?
24    A.    There were 2,115 stock sales across all the
25    issuers in the Q-System.
```

1    Q.    Okay.  And so what does the next column represent?

2    A.    The next column is the total transactions that

3    were covered by brokerage records and the commissions

4    deduction.

5    Q.    And then in, um, the next column, what's that?

6    A.    That is the total Q-sales transactions tied out.

7    That represents the number of entries within Q that were

8    covered by brokerage records where I was able to tie out

9    the quantity of sales that were sold within the Q-System

10   to the quantity of shares that were sold in the

11   underlying bank and brokerage records.

12   Q.    And how many of those sales were you able to tie

13   out?

14   A.    I was able to tie out 1,111 sales.

15   Q.    Out of how many?

16   A.    1,136 that were covered by brokerage records in

17   the commissions deductions that I reviewed.

18   Q.    And what percentage is that?

19   A.    It's 97.8 percent.

20   Q.    The next column over, "Number of Variances," could

21   you describe what that means, please?

22   A.    Yes, that represents the number of, um, variances

23   that I noted in my review where the trade that was

24   listed in the Q-System and the quantity of shares that

25   were sold in the Q-System didn't match, um, what was in

```
 1    the underlying brokerage records that were covered in
 2    the commissions deduction.
 3    Q.    And generally can you explain for the jury what
 4    kinds of variances you found?
 5    A.    Um, the variances are categorized in two ways,
 6    either the trade that was listed in Q was not present
 7    and I didn't find it in the underlying brokerage
 8    records, or the quantity of shares that were sold as
 9    listed in Q for trade were different than the quantity
10    of shares that were listed for the same trade within the
11    brokerage records.
12    Q.    All right.  Mr. Murphy, did you look at the
13    trading in the market of any of these 14 issuers's
14    shares?
15    A.    Yes, I did.
16    Q.    For which issuer did you do that?
17    A.    I looked at the trading in the market for Arch
18    Therapeutics.
19    Q.    I'd like you to look, please, at Exhibit MU for
20    identification.
21    A.    (Looks.)
22    Q.    Mr. Murphy, do you recognize this document?
23    A.    I do.
24    Q.    And what is it?
25    A.    This is a summary of Arch Therapeutics's, um,
```

```
 1    closing stock price and total reported market volume

 2    from May 2013 to September 2013.

 3    Q.    And where did you get the data that you've

 4    reflected in this summary?

 5    A.    From Bloomberg.

 6    Q.    And what is Bloomberg?

 7    A.    It's a business information and research tool.

 8    Q.    And is the data that you've included in Exhibit MU

 9    an accurate reflection of the data you obtained from

10    Bloomberg?

11    A.    Yes.

12          MS. SHIELDS:  Your Honor, I move the admission of

13    the Exhibit MU.

14          THE COURT:  No objection to MU?  (Silence.)  MU is

15    admitted 310 in evidence.

16          (Exhibit 310, marked.)

17          MS. SHIELDS:  And may we publish this to the jury,

18    please?

19          THE COURT:  You may.

20          (On screen.)

21    Q.    So, Mr. Murphy, there's a lot of information here,

22    I'm going to ask you to sort of walk us through the

23    various pieces of data you've included.

24    A.    Sure.

25    Q.    So can you start first with the orange line.  What
```

A3171

```
 1    does that mean?
 2    A.    Yes, the orange line represents the closing price
 3    of Arch Therapeutics stock on a daily basis from May
 4    2013 to September 2013.
 5    Q.    And so can you give us an example of, for
 6    instance, um, one of the dates you have down below is
 7    July 18th, 2013.  Can you tell us what that orange line
 8    means then?
 9    A.    Yeah, the orange line around July 18th, 2013
10    should be, um, the price was approximately .70 cents.
11    Q.    And are those the numbers that are on the left
12    side of the chart?
13    A.    Yes, it is.
14    Q.    Okay.  And so what about the -- what do the blue
15    bars mean?
16    A.    The blue bars represent the total reported market
17    volume of Arch Therapeutics.
18    Q.    And do you have on here a scale that shows you
19    that market volume?
20    A.    Yes, I do, that's on the right-hand side.
21    Q.    And so, um, why did you choose the time period
22    that you chose for this summary, um, to depict the
23    market price and volume?
24    A.    Because these were the months where there was the
25    greatest amount of sales in Arch Therapeutics by
```

```
 1    nominees that were administered by the Sharp Group.

 2    Q.    All right.

 3          MS. SHIELDS:  Thank you.  You can take that one

 4    down now.

 5          (Off screen.)

 6    Q.    Mr. Murphy, have you reviewed the Stevia First

 7    promotion that's in evidence as Exhibit 17?

 8    A.    Yes, I have.

 9          MS. SHIELDS:  Can we put that one up, please.

10          (On screen.)

11          MS. SHIELDS:  And can we go to the last page of

12    that document.

13          THE COURT:  Can I interrupt, just because now

14    you're going to something that's in evidence, and simply

15    say this.

16          These summaries that you've been looking at, they

17    were prepared or they're made up by the Securities and

18    Exchange Commission.  Now that doesn't mean in any way,

19    and I'm not suggesting, that they're inaccurate and the

20    like.  The law permits that when there are voluminous

21    documents, thousands of documents, that an accurate

22    summary may be given to the jury in order to help the

23    jury make its own analysis.  He has so testified and I

24    have admitted the documents and have allowed you to see

25    these summaries.
```

A3173

```
 1          But it still is entirely up to you, one, whether
 2     you believe that what he said is true and accurate and
 3     the like, you can believe it, you can disbelieve it, you
 4     can believe parts of it, and of course we're going to
 5     have cross-examination of these materials.
 6          These summaries again are entirely within your
 7     province.  I've admitted them in evidence.  You can
 8     believe what they show, what they indicate, equally you
 9     can disbelieve and disregard any one or all of them, or
10     you can believe some of them and disbelieve others, just
11     like any other witness or any other exhibit.
12          Go ahead, Ms. Shields.
13          MS. SHIELDS:  Thank you.
14     Q.   So we're going to look next at the promotion
15     that's in evidence as Exhibit 17.
16          MS. SHIELDS:  I'd like you to go to the last page
17     of that document, please, in the bottom paragraph.  Can
18     you blow that up.
19          (On screen.)
20     Q.   So do you see where it says, "Content of this
21     message is published by Conmar Capital," in parentheses,
22     "CCI"?
23     A.   I do.
24     Q.   And later it says, "CCI will not trade in the
25     securities of Stevia First Corp."  Do you see that?
```

A3174

```
 1    A.    Yes.

 2    Q.    Okay.  I'm next showing you what's in evidence as

 3    Exhibit 241.

 4    A.    (Looks.)

 5    Q.    So who are the people communicating in this

 6    message?

 7    A.    This is a message between Mr. Jackson Friesen and

 8    Ms. Yvonne Gasarch.

 9    Q.    And would you please read the bottom message first

10    for the jury.

11    A.    On March 12th, 2012, Jackson Friesen wrote,

12    "Please apply a signature to the attached 3 documents on

13    behalf of Conmar Capital, Inc.  I believe it is Kishma

14    Williams's signature that is needed.  Thanks."

15    Q.    And then in response what does Ms. Gasarch do?

16    A.    She attaches a PDF.

17    Q.    And what's the title of that PDF?

18    A.    "Conmar.pdf"

19    Q.    All right, let's look at those attachments.

20          MS. SHIELDS:  Can you scroll to the next page of

21    the exhibit, please.

22          (On screen.)

23    Q.    And what is this?

24    A.    This is an invoice to Conmar Capital from Yolo

25    Publishing.
```

A3175

```
1    Q.    And has Ms. Gasarch -- is there a signature
2    applied to this invoice for Conmar Capital?
3    A.    Yes, there is.
4    Q.    And would you look, please, at the next page of
5    this exhibit.
6    A.    (Looks.)
7    Q.    And what is this?
8    A.    This is an invoice from Jaycurris, Inc. to Conmar
9    Capital.
10   Q.    And has there been a signature applied for Conmar
11   Capital to this invoice?
12   A.    Yes.
13   Q.    And to the next page of the exhibit, please.  What
14   is this?
15   A.    (Looks.)  This is another invoice, um, from
16   Business Financial Publishing to Conmar Capital.
17   Q.    And has a signature for Conmar Capital been
18   applied to this invoice?
19   A.    Yes.
20   Q.    So, Mr. Murphy, what if anything did you do to
21   determine whether information about these invoices is
22   reflected in the Q-System?
23   A.    I reviewed the Q-System and these payments were
24   paid to the, um, three entries as requested.
25   Q.    And from what account in the Q-System were they
```

1    paid?

2    A.    From the Stevia First account.

3    Q.    Have you reviewed the Arch promotion that's in

4    evidence as Exhibit 16?

5    A.    Yes, I have.

6         MS. SHIELDS:  Could we go to that one, please.

7         (On screen.)

8    Q.    And I'm going to direct you attention to Page 19

9    of that document, um, to the second paragraph there.

10   A.    (Looks.)

11   Q.    And do you see where it says that Advantage Media

12   Corp., the third-party advertiser, is a company based in

13   Belize City, Belize?

14   A.    Yes.

15   Q.    Advantage Media Corp. represents that it does not

16   own any shares of Arch Therapeutics, except for 2.5

17   million shares of restricted stock, which "Advantage

18   Media Corp. will not sell, pledge, or hypothecate, or

19   otherwise agree to dispose of for 90 days following the

20   initial dissemination of this advertisement."

21   A.    Yes.

22   Q.    Have you reviewed any Xphone or Xmail

23   communications relating to Advantage Media?

24   A.    I haven't.

25   Q.    And what do those, um, communications reveal about

```
 1    who controlled Advantage Media?

 2    A.    Mr. Sharp.

 3    Q.    And I'm going to next show you what's marked as

 4    Exhibit 182 in evidence.

 5    A.    (Looks.)

 6    Q.    Who are the people communicating in this message?

 7    A.    This is a message between Mr. Veldhuis as "ACCO,"

 8    um, "Bond" is Mr. Sharp, and there are other messages

 9    including Ms. Courtney Kelln and Ms. Yvonne Gasarch.

10    Q.    So can you -- would you read, please, for the jury

11    the messages going from the bottom up to the top.

12    A.    On the bottom, Mr. Veldhuis wrote to Mr. Sharp

13    with the subject "Promo," and on March 21st, 2015,

14    Mr. Veldhuis wrote "Can any of the 8 companies be used

15    as the payee for promotion or should we set up a new

16    company?"  Mr. Sharp responded, "Use one of the 8."

17    Mr. Veldhuis responded, "See below.  Can you please send

18    me one of the 8 companies including the address.  Any

19    chance I can get today?"  Ms. Kelln responds, "Wire,

20    please provide ACCO a current 2015 holding code with

21    address.  Thanks."  Ms. Gasarch responds, "Xmail to

22    ACCO."

23    Q.    Mr. Murphy, were you in court when Dr. Dhillon

24    testified that he received some of his share of the

25    proceeds of tradings in Arch, Stevia First, and OncoSec,
```

```
 1    through Graham Taylor's entity named Encom Investments?
 2    A.    Yes.
 3    Q.    I'm showing you what's in evidence as Exhibit 139.
 4    A.    (Looks.)
 5    Q.    Who are the people communicating in this message?
 6    A.    This is a message between Mr. Sexton as "Here,"
 7    Ms. Gasarch, and Mr. Veldhuis.
 8    Q.    And in the bottom message, um, what is Mr. Sexton
 9    asking of Ms. Gasarch?
10    A.    Mr. Sexton asked Ms. Gasarch, "Can I get 16K in
11    cash charged to STVF account?  Can I also get a wire
12    sent from STVF for $124,000 to Heng Hong Limited?"  She
13    responds, "No cash today, sent for value Friday."
14    Mr. Sexton responds, "When do you think for the cash,
15    Monday?"  And the response was, "I don't know yet.  Let
16    you know when we got it."
17    Q.    What is "ST" -- when it refers to the "STVF"
18    account, what account is that?
19    A.    That's Stevia First and Vitality.
20    Q.    And what if anything did you do to confirm whether
21    the wire to Heng Hong that's requested here was
22    reflected in the Q-System?
23    A.    I reviewed the Q-System for Stevia First and
24    Vitality and a wire was recorded as requested.
25    Q.    And were you in --
```

A3179

```
 1          MS. SHIELDS:  And we can take this one down.
 2          (Off screen.)
 3   Q.    Were you in court, Mr. Murphy, when Dr. Dhillon
 4   testified that he received some of his share of the
 5   proceeds of trading in Arch, OncoSec, and Stevia First,
 6   directly into his own entity, Ortivo?
 7   A.    Yes.
 8   Q.    And I'm showing you what's in evidence as Exhibit
 9   93.
10   A.    (Looks.)
11   Q.    And, Mr. Murphy, who are the people communicating
12   in this message?
13   A.    This is a message between Ms. Gasarch and
14   Mr. Veldhuis.
15   Q.    And would you read the messages for the jury.
16   Please.
17   A.    On September 6th, 2013, Ms. Gasarch writes,
18   "Please wire 250" -- excuse me, it's a message to
19   Ms. Gasarch.  "Please wire 250K to, um, bank details
20   with the beneficiary name of Ortivo Enterprises Corp."
21   And Mr. Veldhuis responds to Wires from "ARTH."
22   Q.    And what is "ARTH"?
23   A.    "ARTH" is the Q-account code for Arch
24   Therapeutics.
25   Q.    And what if anything did you do to confirm whether
```

```
 1    this payment to Ortivo was reflected in the Arch account
 2    in the Q-System?
 3    A.    I reviewed the Q-account system for Arch
 4    Therapeutics and this payment was recorded as requested.
 5    Q.    I'm next showing you what's in evidence as Exhibit
 6    261.
 7    A.    (Looks.)
 8    Q.    And, Mr. Murphy, who is communicating in this
 9    message?
10    A.    This is a message between Mr. Jackson Friesen,
11    "ACCO," or Mr. Veldhuis, and "Here," Mr. Sexton.
12    Q.    And would you read for the jury, please, the
13    substance of the message.
14    A.    Mr. Friesen wrote, on August 21st, 2017,
15    "Attached.  Not much has changed from the last
16    go-around.  I for sure like the visuals and layout of
17    this piece better.  But the connection from," quote, "Y
18    Lithium," end quote, to, quote, "Y Liberty One Lithium,"
19    end quote, "still needs to be made stronger.  We could
20    do a much better job of getting the reader excited about
21    his trip to Argentina and how big of an impact that trip
22    was in the resulting Liberty One recommendation."
23    Q.    Mr. Murphy, is Liberty One Lithium one of the 14
24    issuers who share sales you analyzed?
25    A.    Yes.
```

```
 1    Q.    And does this e-mail have an attachment?
 2    A.    Yes, the attachment is called "Megalog edits,
 3    August 21.docs."
 4    Q.    And if you scroll down to the next pages of the
 5    document, is that the attachment to the e-mail?
 6    A.    Yes, it is.
 7    Q.    I'd like to ask you to look next at Exhibit 262 in
 8    evidence.
 9    A.    (Looks.)
10    Q.    And who are the people communicating in this
11    message?
12    A.    Again this is a message between Mr. Jackson
13    Friesen, "ACCO," or Mr. Veldhuis, and "Here," which is
14    Mr. Sexton.
15    Q.    And what's the date of this message?
16    A.    It is Monday, September 18th, 2017.
17    Q.    And what's the substance of the message?
18    A.    It says "LBY edits attached."
19    Q.    And what is "LBY"?
20    A.    That's "Liberty One Lithium."
21    Q.    And if you scroll down to the attachments to the
22    e-mail, are those the edits that were attached?
23    A.    (Looks.)  Yes.
24    Q.    I'm next showing you what's in evidence as Exhibit
25    266.
```

1    A.    (Looks.)

2    Q.    Who are the people communicating in this message?

3    A.    This is a message between Mr. Fred Sharp and

4    Jackson Friesen as well as Ms. Gasarch.

5    Q.    And I'd like to focus your attention first on the

6    bottom message that's part of this e-mail chain.

7    A.    (Looks.)

8    Q.    Would you read that for the jury, please.

9    A.    Yes.  On Friday, December 22nd, 2017, Jackson

10   Friesen wrote, "Please fill out the subscription

11   agreement and send money to the attached bank account.

12   The subscriber will be Norton, the new code that Bond

13   set up, with Norton's correct address and contact info.

14   May have to ask Bond.  The amount is $38,000 CBM."

15   Q.    And can you keep going.  Keep going to the next

16   page.

17   A.    (Looks.)  It goes on to say, "850,000 units,

18   credit against LBY account and reference DH in the memo.

19   Any questions, please let me know."

20   Q.    Okay.  And when it says "credit against LBY

21   account," what account is that?

22   A.    That is "Liberty One Lithium."

23   Q.    And what if anything did you do to confirm whether

24   this wire that was requested in the communication is

25   reflected in the Liberty One Lithium account in the

```
 1    Q-System?

 2    A.    I reviewed the Q-System and this wire is recorded

 3    in that account as requested.

 4          MS. SHIELDS:  All right, we can take this one

 5    down.

 6          (Off screen.)

 7    Q.    All right.  Mr. Murphy, I want to focus you now on

 8    the individual accounts in the Q-System.

 9          How did you determine which accounts in the

10    Q-System related to the individuals involved in this

11    case?

12          MS. PICKETT:  Objection, your Honor.

13          MS. FRITZ:  Objection, your Honor.

14          MS. PICKETT:  Can we approach sidebar, your Honor?

15          THE COURT:  Yes, we could.

16

17          AT THE SIDEBAR

18          THE COURT:  The question is vague in that I don't

19    know what "the people involved with the case" means?  If

20    you mean Mr. Friesen and Ms. Gasarch, use their name.

21          MS. SHIELDS:  Okay.

22          THE COURT:  If you mean all of the people

23    mentioned in the case, that's something else.

24          So tell us first what you mean?

25          MS. SHIELDS:  I mean Mr. Friesen and Ms. Gasarch.
```

```
 1    And then we're also going to look at Mr. Veldhuis and
 2    Mr. Sexton.
 3          THE COURT:  So, I suppose, if she revises it,
 4    what's the matter?
 5          MS. FRITZ:  You told the jury it's their job to
 6    decide whether there is evidence.  What he's going to
 7    try to do is say, "Well I thought that 'Gard' means
 8    Friesen'."  It's not necessary.  He should just marshal
 9    the Q-stuff.
10          THE COURT:  Well we already have -- we already
11    have evidence from the other sources that "2" means
12    "Friesen," for example.
13          MS. FRITZ:  So we're going to let him -- I don't
14    see any reason why he should be permitted?
15          THE COURT:  No, no, I'm going to permit it.
16          You don't think my cautionary instruction is
17    sufficient already?
18          MS. FRITZ:  (Pause.)  What he's about to do, your
19    Honor, is the job that is in front of the jury.  I think
20    this is a different area.
21          THE COURT:  I think not.  He may give us how he
22    did it.  He prepared these summaries.
23          MS. PICKETT:  Your Honor, I have a different
24    issue, which is based on the Exhibit QK, which your
25    Honor recently allowed the Commission to present,
```

```
 1    subject to my objection.

 2         But QK is -- the entire chart is based on "PEAC"

 3    and "PERE," which we know are Peaceful Lion and

 4    Peregrine.  All the evidence that's been presented here

 5    is that Peaceful Lion and Peregrine, although there's a

 6    couple of documents with Ms. Gasarch's signature, she

 7    was not the beneficial -- she was listed as the

 8    beneficial owner, but all the evidence here has been

 9    that the beneficial owner is not benefitting from the

10    sales.

11         THE COURT:  That goes to the weight.  You can

12    argue it and cross-examine him.

13         MS. PICKETT:  And the other point I just wanted to

14    make is that these -- some of these are called

15    "commissions," and one thing we know, I think from

16    Mr. Nikolayev's testimony, is that Fred Sharp had

17    absolute control over commissions.  We even heard

18    through Roger Knox that Fred Sharp was "mucking around"

19    in commissions.  It's not reliable.

20         And so for this witness, who knows nothing about

21    the context, to get up and say, "This is what

22    Mrs. Gasarch earned" --

23         THE COURT:  He's not going to say that.

24         MS. PICKETT:  It's on the chart.

25         MS. SHIELDS:  He's going to say "This is what the
```

A3186

```
 1    Q-System reflects.  This is a summary of the data in the
 2    Q-System."
 3         MS. PICKETT:  But he did --
 4         THE COURT:  Wait a minute.  Wait a minute.  I'll
 5    allow that.
 6         MS. PICKETT:  But it says -- on the chart itself
 7    it says "Mrs. Gasarch's earnings," in yellow.
 8         MS. FRITZ:  And Jackson too.
 9         MS. SHIELDS:  Well if you would like, we can
10    redact that.
11         THE COURT:  Yeah, anybody's "earnings" is out.
12         MS. FRITZ:  And the same thing, if you did that
13    with anything relating to "Gard."
14         MS. SHIELDS:  I didn't.  I didn't --
15         THE COURT:  Okay.
16         MS. FRITZ:  I just have one other point, your
17    Honor.  And let's bear in mind, that's not a summary,
18    what they did is they parsed from all of this data, they
19    pulled any instance where they found a disbursement.
20    They ignored all the crazy data that's actually in that
21    chart as it goes back and --
22         THE COURT:  You'll get cross-examination.
23         MS. FRITZ:  Okay, your Honor, I just want to be
24    clear.
25         MR. LONDON:  Your Honor, with all due respect, um,
```

A3187

```
 1    there's no testimony of "mucking" around.

 2          MS. PICKETT:  Oh, yes, there was.

 3          THE COURT:  Wait a minute.  Wait a minute.  I've

 4    heard testimony that he was "skimming it."  I think we

 5    can allow it.

 6          About how much longer do you have?

 7          MS. SHIELDS:  Probably about 45 minutes.

 8          THE COURT:  All right, so it's a good time to take

 9    the recess.  We'll take the recess.

10          MS. PICKETT:  Thank you, your Honor.

11

12          (In open court.)

13          THE COURT:  Having been interrupted, it's probably

14    a good time to take the morning recess.  We are going to

15    finish today.  But keep your minds suspended though, you

16    have not heard all the evidence.  Do not discuss the

17    case either among yourselves, nor with anyone else.  You

18    may stand in recess for one half hour, until 11:15.  The

19    jury may recess.

20          THE CLERK:  All rise for the jury.

21          (Jury leaves, 10:45 a.m.)

22          (Resuming, Jury enters, 11:20 a.m.)

23          THE COURT:  Ms. Shields, you may continue.

24          MS. SHIELDS:  Thank you, your Honor.

25    Q.    So, Mr. Murphy, what account in the Q-System did
```

A3188

```
 1    you identify as the personal account of defendant
 2    Jackson Friesen?
 3         MS. FRITZ:  Objection.
 4         THE COURT:  No, you may tell us.
 5    A.    "Gard."
 6         THE COURT:  And how did you do that?
 7         THE WITNESS:  Based on Xphone and Xmail messages
 8    that identified what --
 9         THE COURT:  Always tell the jury, this case is
10    being tried to the jury.
11         THE WITNESS:  Based on Xphone and Xmail messages
12    where Mr. Friesen was identified as "Gard."
13         THE COURT:  Okay.
14         Now I'm allowing him to give his conclusion from
15    looking at the documents.  Remember, a conclusion such
16    as this is ultimately for you to make.  So there's the
17    testimony, he's telling us how, but you're going to have
18    to look at these documents and draw your own
19    conclusions.
20         Now go from there.
21    Q.    Mr. Murphy, I'd like to show you, for
22    identification, what's been marked as Exhibit LZ.
23    A.    (Looks.)
24    Q.    And do you recognize this document, Mr. Murphy?
25    A.    Yes.
```

A3189

1    Q.    And what is it?

2    A.    This is a PDF printout of the Gard account.

3    Q.    And is this an accurate representation of the Gard

4    account data as it exists in the Q-System?

5    A.    Yes.

6          MS. SHIELDS:  I move the admission of Exhibit LZ.

7          MS. FRITZ:  Objection.

8          THE COURT:  Noted, but overruled.  LZ is admitted,

9    Exhibit 310, in evidence.

10         MS. SHIELDS:  Your Honor, is it 310 or is it 311?

11         THE COURT:  It's 311, and I thank you for the

12   correction.

13         (Exhibit 311, marked.)

14   Q.    Mr. Murphy, why does this format look different

15   from some of the other Q-account data sets we've seen?

16   A.    Because this is a native PDF and not an EXCEL

17   copy.

18   Q.    What do you mean when you say that?

19   A.    Meaning that this is generated in PDF form and the

20   other versions were data that was pulled from the

21   Q-System in EXCEL format.

22   Q.    Does this exhibit contain the same columns that

23   we've looked at in the EXCEL version of the Q data?

24   A.    Yes, it does.

25   Q.    On the first page, about a dozen lines down or so,

```
 1    there's an entry dated December 2nd, 2013 with a
 2    descriptor of "Ferrous Capital TT."  Do you see that?
 3    A.    I do.
 4    Q.    What does the "TT" mean?
 5    A.    That means "Telegraphic Transfer."
 6    Q.    Is that the same as a wire transfer?
 7    A.    Yes.
 8    Q.    And do you know what "Ferrous Capital" is?
 9    A.    That's an entity controlled by Jackson Friesen.
10    Q.    And how do you know that?
11    A.    Based on corporate documents.
12    Q.    And --
13          THE COURT:  Again, the same caution.  He's putting
14    these documents together, I guess, and this is what he
15    thinks.  You'll have to draw your own conclusions.
16          Go ahead.
17    Q.    And if you look next at Page 11, in the middle of
18    that page with the date of February 24th, 2014, there's
19    a descriptor of "Debit."  Do you see that line?
20    A.    Yes, I do.
21    Q.    And what does that line mean?
22    A.    Um, I believe the one that's highlighted is, um,
23    it should be above, but "debit" means any deduction from
24    the account of Gard.
25    Q.    And from what account was that debit deducted?
```

A3191

```
 1    A.     This was deducted from the Gard account.

 2    Q.     What's the bank broker code on that account?

 3    A.     "Cash."

 4    Q.     And what does that mean?

 5    A.     That represents a cash withdrawal from the, um,

 6    account.

 7    Q.     And, um --

 8           MS. SHIELDS:  So I believe we're actually

 9    highlighting -- well let's see.

10    A.     It's the Batch ID.

11    Q.     Okay.  Yeah, we were looking at the one a couple

12    -- the cash debit a couple lines above.

13           But it's the same information in the line you've

14    highlighted, right, Mr. Murphy?

15    A.     It is.

16    Q.     Okay.  And so, um, with respect to that cash debit

17    on 2-24, what was the amount of that debit?

18           MS. FRITZ:  It looks like 2-14.

19           MS. SHIELDS:  If you look up a couple of lines to

20    2-24.

21    A.     The amount of the, um, debit that was just

22    highlighted on 2-24-2014 is $10,500.

23    Q.     And did you review any communications related to

24    that cash withdrawal?

25    A.     Yes, I did.
```

```
 1    Q.    I'm showing you what's in evidence as Exhibit 133.

 2    A.    (Looks.)

 3    Q.    And, Mr. Murphy, who are the people in this

 4    communication?

 5    A.    This is a message between "Gard," which is

 6    Mr. Friesen, and "Wires," which is Ms. Yvonne Gasarch.

 7    Q.    And would you please read that message for the

 8    jury from the bottom up.

 9    A.    Starting from the bottom, Mr. Friesen wrote, on

10    February 24th, 2014 with the subject "Cash," and he

11    asked, "Do you have any?"  And Ms. Gasarch responded,

12    "Yes."  Mr. Friesen responded, "Big or small bills?"

13    Ms. Gasarch's response was "Half/half."  Mr. Friesen's

14    response was, "K, I will take 20K, please."

15    Mrs. Gasarch's response was "We just have $10,000 only."

16    And the response was, "Cool, I will take it."

17    Q.    I'm showing you next what's been marked in

18    evidence as Exhibit 252.

19    A.    (Looks.)

20    Q.    And who are the people communicating in this

21    message?

22    A.    This is again a message between Mr. Jackson

23    Friesen and Ms. Yvonne Gasarch.

24    Q.    And would you read the bottom message first,

25    please?
```

A3193

92

```
 1    A.    Jackson Friesen wrote, on July 16th, 2012, "Please
 2    send me a Gard statement for the past 2 months.  Thank
 3    you."
 4    Q.    And how does Ms. Gasarch respond?
 5    A.    She attaches an account statement.
 6    Q.    And if we scroll down to the next pages of this,
 7    is it the attachment to the e-mail message?
 8    A.    Yes, it is.
 9    Q.    And what if anything did you do to compare the
10    data in this attachment to the Gard account statement in
11    the Q-System?
12    A.    I compared the data of docket entries to the
13    information in the Gard account -- or the Gard account
14    from the Q-System.
15    Q.    And what did you conclude when you made that
16    comparison?
17    A.    The information about the entries is the same.
18    Q.    All right.  I'm next showing you what we've marked
19    as Exhibit MB.
20    A.    (Looks.)
21    Q.    Do you recognize this document, Mr. Murphy?
22    A.    I do.
23    Q.    And what is this?
24    A.    This is a copy of the Q-account data from the
25    "PEAC" and "PERE" account.
```

A3194

```
 1    Q.    And is this an accurate representation of the data

 2    as it exists -- representation of the data from the

 3    PEAC, PERE account in the Q-System?

 4    A.    Yes, it is.

 5          MS. SHIELDS:  I move the admission of Exhibit MB.

 6          MS. PICKETT:  Objection, your Honor.  The same

 7    objection.

 8          THE COURT:  Noted.  MB is admitted.  It will be

 9    Exhibit --

10          MS. PICKETT:  312, I believe, your Honor.

11          THE COURT:  312, it is.

12          (Exhibit 312, marked.)

13    Q.    Okay, so looking about two-thirds of the way down

14    that first page, do you see an entry dated, um, April

15    29th, 2011, with the description "Yvonne, Check Number

16    798"?

17    A.    Yes, I do.

18    Q.    And so what does that mean?

19    A.    That means that --

20          MS. PICKETT:  Objection, your Honor.

21          THE COURT:  Overruled.

22    A.    Based on the description, there was a Check Number

23    798 that was written to Yvonne in the amount of 5,000

24    Canadian dollars.

25    Q.    Okay.  And if you go down to Page 4 of this
```

A3195

```
 1    exhibit, do you see the entry about 10 lines down on
 2    January 26th, 2012 from the TDCO bank broker?
 3    A.    Yes, I do.
 4    Q.    And what's the description there?
 5    A.    The description is "Yvonne, Check Number 406."
 6    Q.    And what's the amount of that check?
 7    A.    $5,000 U.S. dollars.
 8    Q.    And then if you go down to Page -- actually
 9    further down that page, about three-quarters of the way
10    down, if you look at the entry on March 9th, 2012, in
11    the amount of 8,000 Canadian.  What's the entry
12    description there?
13    A.    The description is "Yvonne, Check Number 1572."
14    Q.    And if you go down to Page 5 of this document,
15    about 10 lines down, the entry on April 11th, 2012, do
16    you see that?
17    A.    (Looks.)  Yes, I do.
18    Q.    And what's the description there?
19    A.    The description is "Draft to Yvonne, Check Number
20    1671."
21    Q.    And what's the amount of that check?
22    A.    It's 7,007.50 Canadian.
23    Q.    And if you go about 10 or 12 lines further down to
24    May 17th, 2012, what's the description of that entry?
25    A.    (Looks.)  It is "Bruce Gasarch TT."
```

A3196

```
 1    Q.    And again what does the "TT" mean?
 2    A.    "Telegraphic Transfer," which is a name for wire
 3    transfers.
 4    Q.    And what's the amount of that transfer?
 5    A.    It is $10,021.93.
 6    Q.    Okay.  If you go down towards the bottom of that
 7    page, maybe about 6 lines or so up from the bottom,
 8    there's an entry dated July 30th, 2012.  Do you see
 9    that?  In the amount of 2,000 Canadian.
10    A.    (Looks.)
11    Q.    What's the description of that entry?
12    A.    It is "ZU check Number 1932."
13    Q.    And if you look at the last line on that page,
14    what's the description of that transaction?
15    A.    It is "Yvonne Check, Number 1939."
16    Q.    So did you make any determination about who was
17    the owner of the PEAC, PERE account?
18    A.    Yes.
19          MS. PICKETT:  Objection, your Honor.
20          THE COURT:  Well wait a minute.  He can't make any
21    determination of his own knowledge because so far we
22    haven't heard that he has any direct knowledge of this
23    case.  So you're going to have to say "based on
24    something" --
25    Q.    Based on your review of documents and evidence in
```

A3197

```
 1    this case, did you -- were you able to identify the

 2    owner of the PEAC, PERE account?

 3            MS. PICKETT:  Objection, your Honor.

 4            THE COURT:  No, again, that's too strong.

 5            MS. SHIELDS:  Okay.

 6            THE COURT:  Try this question.

 7            Based upon the documents in this case, have you

 8    come to your opinion as to --

 9            And what is it?

10            MS. SHIELDS:  Um, who is the owner of the PEAC,

11    PERE account?

12            THE COURT:  I'll allow that.

13            Having in mind that you're going to have to review

14    all these documents and, for starters, think that

15    they're genuine and accurate.

16            But you may have that question.

17            So did you come to the conclusion based upon those

18    source materials?

19            THE WITNESS:  Yes.

20    A.    Based upon my review, um, the PEAC account is

21    related to Ms. Yvonne Gasarch.

22    Q.    And on what --

23            THE COURT:  What do you mean "related to"?

24            THE WITNESS:  It's -- it's -- it's her account in

25    the Q-System.
```

```
 1          THE COURT:  All right.
 2   Q.    And on what do you base that statement?
 3   A.    Um, Ms. Gasarch was the owner of a company called
 4   "Peaceful Lion Holdings," which later changed its name
 5   to "Peregrine Capital."  And, um, in addition, these
 6   entries within the PEAC and PERE account pertain to, um,
 7   Ms. Yvonne Gasarch.
 8   Q.    I'm showing you what's in evidence as Exhibit 287.
 9   A.    (Looks.)
10   Q.    Were you in court yesterday when Mr. Knox
11   discussed this payment to Sun Life Assurance --
12          MS. SHIELDS:  Actually can we go to page, I
13   believe it's 3 of this exhibit.
14          (On screen.)
15   Q.    Mr. Murphy, were you in court when Mr. Knox
16   discussed this payment of $100,016 to Sun Life Assurance
17   with a reference of "Zhiying Yvonne Gasarch"?
18   A.    Yes, I was.
19   Q.    And what if anything did you do to determine
20   whether this payment was reflected in the Q-System?
21   A.    I reviewed the Q-account system and this payment
22   was reflected as shown.
23   Q.    Okay.  And from what account was this payment
24   debited?
25   A.    Um, can you please refer me to, um --
```

A3199

```
 1    Q.    Sure.  If we look back at Exhibit M -- it's now
 2    Exhibit 312 in evidence, Exhibit MB.  If you go to Page
 3    16 of that exhibit.
 4    A.    (Looks.)
 5    Q.    Do you see that payment to Sun Life reflected on
 6    this page?
 7    A.    Yes -- sorry.  Yes, I do.
 8    Q.    And where is it?
 9    A.    It is, um, on 5-1-2018, and with the Batch ID
10    120410, and this is within the PEAC and PERE account.
11    Q.    And what is the bank brokerage code listed for
12    that transaction?
13    A.    "WIHI."
14    Q.    And what does that mean?
15    A.    That is the Wintercap Hilton account.
16    Q.    And is that the account from which that wire
17    transfer request was made?
18    A.    Yes.
19    Q.    Did you also reach conclusions about -- based on
20    your review of the documents in this case, were you able
21    to identify the personal accounts of Mr. Veldhuis and
22    Mr. Sexton in the Q-System?
23          MS. FRITZ:  Objection.
24    A.    Yes.
25    Q.    And what --
```

```
 1          THE COURT:  He's giving us his opinion based upon
 2     the documents that she referred, but he can give us his
 3     opinion based on those documents with the caution I've
 4     already made.
 5     Q.    And what did you identify -- what is the account
 6     in the Q-System that you identified as belonging to
 7     Mr. Veldhuis?
 8     A.    Based upon my review, I identified the ACCO
 9     account as belonging to Mr. Veldhuis.
10     Q.    And what account in the Q-System did you identify
11     as belonging to Mr. Sexton?
12     A.    The "Here" account.
13     Q.    So we've talked now about, in the Q-System, issuer
14     accounts and personal accounts.  What if anything did
15     you observe about transactions between the issuer
16     accounts and the individual accounts?
17     A.    Um, I observed on numerous occasions that there
18     were transfers and debits from the issuer accounts and
19     credits to the personal accounts of Mr. Friesen.
20     Q.    And how were those transactions recorded in the
21     Q-System?
22     A.    They were recorded through an internal clearing
23     account called "Work," which moves the funds from the
24     debit accounts, which reduces the value in the issuer
25     account, and credits them to the account of Mr. Friesen.
```

1    Q.    And how do you connect debits from an issuer

2    account to credits to an individual account?

3    A.    The debits and the credits each have the same

4    Batch ID Number.

5    Q.    Would you look next, please, at Exhibit MO for

6    identification.

7    A.    (Looks.)

8    Q.    Do you recognize this document, Mr. Murphy?

9    A.    Yes, I do.

10    Q.    And what is this?

11    A.    This is a summary of the issuer profit allocations

12    to the accounts of Mr. Veldhuis, Sexton, and Friesen,

13    that are listed in Q.

14    Q.    And what is the source of the data in this chart?

15    A.    It's from the Q-System.

16    Q.    And is this summary an accurate depiction of the

17    data that's in the Q-System?

18    A.    Yes, it is.

19        MS. SHIELDS:  I move the admission of Exhibit MO.

20        MS. FRITZ:  The same objection.

21        THE COURT:  It's noted, and your rights are saved,

22    but I'll admit MO as Exhibit 313.

23        (Exhibit 313, marked.)

24    Q.    So would you please explain for the jury what

25    information you've included in this summary?

A3202

1    A.    This is a summary of the internal transfers that

2    were debited or taken out of the issuer accounts and

3    subsequently transferred into the accounts of

4    Mr. Veldhuis, Mr. Sexton, and Mr. Friesen.

5    Q.    And what is the -- can you explain for the jury

6    what the color-coding means?

7    A.    Sure.  There's color-coding on these transactions

8    and the color-coding is just meant to make it easier to

9    see the specific line items that are part of each

10    transaction.

11    Q.    So maybe can you just, um -- taking that first

12    transaction, can you walk the jury through what data

13    you've included?

14    A.    Sure.  The first transaction, um, this is a debit

15    from the Stevia Corp. account, and the Batch ID is

16    25129.  You'll see, also associated with that

17    transaction, is a credit to the ACCO account for

18    Mr. Veldhuis's account.  The debit from the Stevia Corp.

19    account was $250,100.  There was $250,000 credited to

20    Mr. Veldhuis's account.  And $100 was credited to the

21    Bond account as a bank and broker cash Commission.

22    Q.    And what is the "Bond" account?

23    A.    That's the account associated with Mr. Fred Sharp.

24    Q.    And why is the Bond account getting $100 as part

25    of this transaction?

A3203

```
 1          MS. FRITZ:  Objection.
 2          THE COURT:  Why against the --
 3   Q.    Why does the Q-System indicate that the Bond
 4   account is getting $100 as part of this transaction?
 5          MS. FRITZ:  Objection.
 6   A.    Based upon my review of --
 7          THE COURT:  Overruled.  You may answer.
 8   A.    Based upon my review of the Q-System, every time
 9   there's an internal transfer process, the Bond account
10   receives $100 associated with that transfer.
11   Q.    Okay.  So we talked about the first transfer shown
12   on this page.  Can you explain for the jury, please, the
13   second and third transfers?
14   A.    Yes.  Below it you will see the Batch ID 25130 and
15   26149.  The second transfer that's highlighted is a
16   debit from the Stevia Corp. account in the amount of
17   $250,100, and that amount is subsequently credited to
18   Mr. Friesen's Gard account in the amount of $250,000.
19          The third transaction, under the Batch ID 26149,
20   is again another debit from the Stevia Corp. account and
21   a credit to Mr. Sexton's account in the amount of
22   $481,833.  And each of these transfers also resulted in
23   a $100 credit to the Bond account.
24   Q.    So when you were preparing this summary, what did
25   you observe about transfers between issuer-specific
```

A3204

```
 1    accounts and the accounts of Mr. Friesen, Mr. Veldhuis,
 2    and Mr. Sexton?
 3    A.    I observed that on numerous instances there are
 4    transfers that occur on the same day and in the exact
 5    same or similar amounts.
 6    Q.    So if you look at Page 3 of this exhibit, um, and
 7    look at, I believe there are 6 transactions on February
 8    19th, 2013, and is -- would you describe for the jury
 9    what you see there?
10    A.    Yes.  On February 19th, 2013, there are, um, three
11    transfers from the Stevia account to the ACCO, Gard, and
12    Here accounts.  Um, with respect to Mr. Friesen's Gard
13    account, there was $45,000 credited from the Stevia
14    account.  The ACCO account was also credited with
15    $45,000 from the Stevia account on 2-19.  And the Here
16    account was credited with $55,000 on 2-19 from the
17    Stevia account.
18    Q.    And if you look at the set of transactions right
19    below that, um, does that reflect the same pattern?
20    A.    Yes.
21    Q.    And did you review any communications relating to
22    the transfers in this summary?
23    A.    Yes, I did.
24    Q.    I'd like to show you what's in evidence as Exhibit
25    52.
```

A3205

```
 1    A.    (Looks.)

 2    Q.    Is this one of the communications you reviewed?

 3    A.    Yes, it is.

 4    Q.    And who are the individuals communicating in this

 5    communication?

 6    A.    This is a message between ACCO, which is

 7    Mr. Veldhuis, and Bond, which is Mr. Sharp.

 8          THE COURT:  According to --

 9          THE WITNESS:  According to the message.

10          THE COURT:  Okay.

11    Q.    And would you please read the message for the

12    jury, please.

13    A.    The message from Mr. Veldhuis states, "Subject

14    PIE," on February 19th, 2013, "Please transfer from

15    ECAU:  Gard, $2,500,000.  ACCO, $2,500,000.  Mend,

16    $2,500,000.  Here, 2,500,000.  For a total of $10

17    million."

18    Q.    And what is the response?

19    A.    "Done."

20    Q.    And the response to that?

21    A.    "I'd better get spending."

22    Q.    And are these -- so what is "ECAU"?

23    A.    "ECAU" is the Q-account for "Echo Automotive."

24    Q.    And are these transfers reflected on the summary

25    that's now in evidence as Exhibits 313?
```

A3206

1  A.    Yes, they are.

2  Q.    So if you scroll down, um, to the last page of

3  Exhibit 313, your summary chart.

4  A.    (Looks.)

5  Q.    What information are you describing in that chart

6  at the bottom?

7  A.    The chart at the bottom summarizes the total

8  credits from the internal transfers within the exhibit

9  to -- on the ACCO, Gard, and Here accounts, and it

10  summarizes the account code, on the left-hand side,

11  which indicates from which accounts that those credits

12  came from.

13  Q.    And so the "Account Code Column," those are, um --

14  those are issuer accounts?

15  A.    Yes, they are.

16  Q.    And so based on your summaries of the data in the

17  Q-System, how much did Mr. Friesen's Gard account

18  receive from these issuer accounts?

19  A.    $11,846,176.

20  Q.    And how much did Mr. Veldhuis's account receive?

21  A.    $13,378,870.

22  Q.    And Mr. Sexton's account?

23  A.    $17,367,474.

24  Q.    All right.  And did you prepare any summaries

25  relating to the transfers to the PEAC, PERE account?

A3207

```
 1    A.    Yes, I did.

 2    Q.    Would you look next, please, at Exhibit QK for

 3    identification.

 4    A.    (Looks.)

 5    Q.    Mr. Murphy, do you recognize this document?

 6    A.    Yes, I do.

 7    Q.    And what is it?

 8    A.    This is a summary of the, um, transfers into the

 9    PEAC and PERE account.

10          THE COURT:  According to the Q-System.

11          THE WITNESS:  According to the Q-System.

12    Q.    And what is the source of the data in this

13    summary?

14    A.    The source of the data is from the Q-System.

15    Q.    And is this summary an accurate depiction of the

16    data in the Q-System?

17    A.    Yes, it is.

18          MS. SHIELDS:  I move the admission of Exhibit QK.

19          MS. PICKETT:  Objection, your Honor.

20          THE COURT:  Noted.  QK is admitted, Exhibit 314 in

21    evidence.

22          (Exhibit 314, marked.)

23    Q.    So, Mr. Murphy, now that the jury has this, would

24    you please explain to the jury what data is included in

25    this summary?
```

A3208

```
 1    A.    Yes.  This data is a summary of the transfers into
 2    the PEAC and PERE account that were processed through
 3    that --
 4    Q.    And you've broken it down into sort of four
 5    categories.  Would you explain for me, please, the first
 6    of the categories?
 7    A.    Yes.  The first category, "Commissions," relates
 8    to anything in the, um -- any transfer where the
 9    transaction description was "Commission."
10    Q.    And how about the second line?
11    A.    The second line relates to anything where the
12    transaction description was "Christmas bonus."
13    Q.    And what's the -- I forgot to ask you, sorry, but
14    what's the total of the commissions that are going into
15    that PEAC PERE account?
16    A.    It's $1,582,832.
17    Q.    And how much in Christmas bonuses?
18    A.    $510,347.
19    Q.    And then would you next -- what's that third
20    category, "Internal Transfer" mean?
21    A.    The third category is any transaction description
22    where the description was "internal transfer."
23    Q.    And what's the dollar value of those transfers?
24    A.    $214,970.
25    Q.    And what's the last category?
```

A3209

1    A.    The last category, "Other," represents any other

2    transactions that did not have the transaction

3    descriptions noted above.

4    Q.    And how much are those?

5    A.    $212,018.

6    Q.    So what is your conclusion in total about the

7    amount of proceeds that Mrs. Gasarch's account received?

8         MS. PICKETT:  Objection, your Honor.

9         THE COURT:  Well it's simple addition, isn't it?

10        MS. FRITZ:  No.  I think she used the word

11    "received."

12        THE COURT:  Oh, okay.

13    Q.    That the account was credited.  What's the total

14    that this account was credited?

15        MS. PICKETT:  Objection, your Honor, in the PEAC

16    --

17        THE COURT:  Just in these records.

18        Say again, Ms. Pickett?  I'm sorry.

19        MS. PICKETT:  When she says "her account," she

20    means the PEAC account was credited?

21        THE COURT:  I think --

22        Is that what you mean?

23        MS. SHIELDS:  It is what I mean, and I believe

24    Mr. Murphy has previously identified that as

25    Ms. Gasarch's account.

A3210

```
 1          THE COURT:  All right.  He may answer.

 2          What do those records show?

 3          THE WITNESS:  Okay.

 4   A.     The Q-System shows that the PEAC and PERE account

 5   was credited $2,521,167.

 6   Q.     Okay.

 7          All right, we're now going to switch gears,

 8   Mr. Murphy, and talk about registration statements.

 9   A.     Uh-huh.

10   Q.     Where are registration statements filed?

11   A.     They're filed with the Securities and Exchange

12   Commission on a system that we have called "EDGAR."

13   Q.     And can anyone in the public look at EDGAR?

14   A.     Yes.

15   Q.     Did you do any work relating to registration

16   statements in this case?

17   A.     Yes, I did.

18   Q.     And what did you do?

19   A.     I, um, reviewed registration statements to

20   determine whether there were any registration statements

21   filed for the 14 issuers that contained the names of any

22   of the Sharp nominees that traded in those issuers as

23   well as in the names of Mr. Veldhuis, Mr. Friesen, and

24   Mr. Sexton.

25   Q.     All right.  And what did you do first to do this
```

 1    search?

 2    A.    I created a list of all of the nominee accounts

 3    that traded in the 14 issuers, and within that list I

 4    also included the names of Mr. Veldhuis, Mr. Friesen,

 5    and Mr. Sexton.

 6    Q.    And if you look at Exhibit 294, which was admitted

 7    this morning, it was earlier marked as Exhibit MM, is

 8    that the list to which you're referring?

 9    A.    Yes, it is.

10    Q.    And so what did you do with this list?

11    A.    I performed a keyword search for all of these, um,

12    nominees that were mentioned by Sharp using a tool

13    called "Intelligize" to help search all SEC registration

14    statements to identify any of these account names and

15    nominee names within registration statements.

16    Q.    And what did you observe when you did that search?

17    A.    I observed that 12 of the 14 issuers had no

18    registration statements that contained the names of any

19    of the nominees that were administered by Sharp nor the

20    names of Mr. Friesen, Mr. Veldhuis, and Mr. Sexton.

21    Q.    Okay.  So which were the two issuers for which you

22    did get search results?

23    A.    Arch Therapeutics and Stevia First and Vitality.

24    Q.    Okay, so let's talk about the Arch Therapeutics

25    search results first.

A3212

```
 1              When you got a search result that hit on Arch,
 2     what do you observe further?
 3     A.    I observed that the registration, um, there was,
 4     um, two registration statements at a minimum that named
 5     Honor Securities as a potential reseller of Arch
 6     Therapeutics shares, however when I reviewed the
 7     Q-System data, Honor Securities didn't transact in any
 8     Arch Therapeutics shares.
 9     Q.    And then the Stevia First Vitality search results
10     that you obtained, when you reviewed those search
11     results, what did you observe?
12     A.    There were three registration statements and
13     related amendments for Stevia First that named nominees
14     for Sharp as potential resellers.  The first of those
15     registration statements didn't have a Notice of
16     Effectiveness, and so I disregarded that one.
17     Q.    And how about the second one?
18     A.    The second and third registration statements
19     identified Varese Capital and Riverfall Group as
20     potential resellers of Stevia First and Vitality stock.
21     Q.    And what did you observe further when you looked
22     at those?
23     A.    When I looked at the Q-System data, I noted that,
24     um, Varese Capital did not sell any Stevia First and
25     Vitality stock after 2016, so the registration statement
```

A3213

```
 1    for 2017 and 2018 didn't apply.  When I looked at the

 2    Q-System data for Riverfall Group, between the 2017

 3    registration statement and the 2018 registration

 4    statement, Riverfall sold 577,000 shares of Stevia First

 5    and Vitality, however the registration statement only

 6    registered 300,000 shares.

 7    Q.    So for 300,000 shares, um, based on the Q-System,

 8    how many sales -- how does that compare to the number of

 9    Stevia First Vitality shares whose sales are at issue in

10    this case?

11    A.    Um, the total amount of shares that were at issue

12    in this case is 38 1/2 million.

13    Q.    And so what percentage of that 38 1/2 million were

14    even mentioned on a registration statement?

15    A.    Approximately 1 percent.

16    Q.    Okay, we're next going to switch topics and talk

17    about ownership disclosure forms.

18          Is there a name for those ownership disclosure

19    forms?

20    A.    Yes, those are Forms 13D.

21    Q.    And where are Schedules 13D filed?

22    A.    Those are also filed with the Securities and

23    Exchange Commission in our EDGAR system.

24    Q.    And can anyone in the public look at EDGAR to see

25    these 13D statements?
```

A3214

```
1    A.    Yes, they can.

2    Q.    And did you do any work related to 13D statements

3    in this case?

4    A.    Yes, I did.

5    Q.    What did you do?

6    A.    Similar to my search for registration statements,

7    I made a list of all of the Sharp nominees as well as

8    the names of Mr. Friesen, Mr. Sexton, and Mr. Veldhuis,

9    and I searched the, um, Form 13Ds, using the tool

10   "Intelligize," to identify whether or not there were any

11   Form 13Ds filed in the names of the nominees or in the

12   name of Mr. Friesen, Mr. Sexton, and Mr. Veldhuis.

13   Q.    And what did you observe when you ran that search?

14   A.    There were no Form 13Ds filed for any of the

15   issuers that contained the names of the Sharp nominees

16   or the names of Mr. Friesen, Mr. Veldhuis, or

17   Mr. Sexton.

18   Q.    Mr. Murphy, did you do any summarizing to

19   determine during what time period Sharp nominees owned 5

20   percent or more of Stevia First shares?

21   A.    Yes, I did.

22   Q.    And how did you do that work?

23   A.    I reviewed the, um, public company disclosures for

24   Stevia First and Vitality that had, um, where it was

25   disclosed what the number of shares outstanding were,
```

A3215

```
 1    and I also reviewed the Q-System data to quantify the
 2    total amount of shares that the Sharp nominees held, um,
 3    from 2012 to 2018.
 4    Q.    And did you reach any conclusions about those time
 5    periods?
 6    A.    Yes.  I concluded that the Sharp nominees owned
 7    more than 5 percent of Stevia First and Vitality stock
 8    in two time periods, those time periods were from
 9    January 18th, 2012 to April 27th, 2012, as well as the
10    time periods of April 18th, 2016 to November 5th, 2018.
11    Q.    And did you do anything further to determine
12    whether, during those time periods, Sharp nominees
13    acquired any additional shares of Stevia First and
14    Vitality?
15    A.    Yes, I did.
16          MS. FRITZ:  I'm sorry, your Honor, could we
17    specify what Sharp nominees are being discussed?
18          MS. SHIELDS:  Sure.  If you look at Exhibit --
19    just give me a moment.  It is in evidence as, um,
20    Exhibit 308.
21          Can we pull up 308, please.  I'm looking at the
22    first page of that.
23          (On screen.)
24          MS. FRITZ:  Thank you.
25    Q.    Mr. Murphy, are those the nominees that you're
```

A3216

1    talking about?

2    A.    Yes.

3    Q.    Okay.  So did you review any records to determine

4    whether these nominees, or any other nominees controlled

5    by Sharp, acquired additional shares of Stevia

6    First/Vitality during that time period you've

7    identified?

8    A.    Yes, I reviewed transfer-agent records as well as,

9    um, brokerage records.

10   Q.    Okay.  So would you look next, please, at Exhibit

11   MZ marked for identification.

12   A.    (Looks.)

13   Q.    Mr. Murphy, do you recognize this document?

14   A.    Yes, I do.

15   Q.    And what is this?

16   A.    This is a summary of the, um, acquisitions of

17   Stevia First and Vitality stock based on Island Stock

18   transfer-agent records.

19   Q.    And is this an accurate summary of the

20   transfer-agent records that you reviewed?

21   A.    Yes.

22        MS. SHIELDS:  I move the admission of Exhibit MZ

23   into evidence.

24        THE COURT:  It may be admitted, it will be Exhibit

25   315.

A3217

```
 1            (Exhibit 315, marked.)
 2    Q.    And based, Mr. Murphy, on these transfer-agent
 3    records, um, how many times did Sharp nominees acquire
 4    Stevia First stock during the time period you've
 5    identified when those nominees owned more than 5
 6    percent?
 7    A.    4 to 6 times.
 8    Q.    And would you next look at Exhibit MP.
 9    A.    (Looks.)
10    Q.    And, Mr. Murphy, do you recognize that document?
11    A.    Yes.
12    Q.    And what is this?
13    A.    This is a summary of the brokerage account
14    purchases of Stevia First and Vitality stock that were
15    listed in the Q-System.
16    Q.    And during what time period are you focusing here?
17    A.    It's during the time period that I stated earlier,
18    from January 18th, 2012 to April 27th, 2012, and from
19    April 18th, 2016 to November 5th, 2018.
20    Q.    And is this summary an accurate depiction of the
21    data in the Q-System?
22    A.    Um, yes, it is.
23            MS. SHIELDS:  I move the admission of Exhibit MP.
24            THE COURT:  "NP"?
25            MS. SHIELDS:  "M" -- "Mary Hall."
```

```
 1          THE COURT:  Right.  MP is admitted in evidence,
 2     Exhibit 316.
 3          (Exhibit 316, marked.)
 4     Q.    And so, Mr. Murphy, in addition to the transfers
 5     we saw or acquisitions of stock we saw in the
 6     transfer-agent records, how many acquisitions of Stevia
 7     First stock were made in the open market?
 8     A.    There were 51.
 9     Q.    I'm next going to show you Exhibit 170 that's in
10     evidence.
11     A.    (Looks.)
12     Q.    And according to this document, who were the
13     participants in this communication?
14     A.    This was a message between Mr. Friesen,
15     Mr. Sexton, and Mr. Veldhuis.
16     Q.    And what Number is Mr. Veldhuis?
17     A.    He is 114.
18     Q.    Okay.  And would you read this message from the
19     bottom up for the jury, please.
20     A.    Mr. Veldhuis writes --
21          MS. FRITZ:  Objection.  114?  We haven't heard
22     that before.
23          MS. SHIELDS:  Mr. Kaitz testified as to that.
24          MS. FRITZ:  As to 114?
25          MS. SHIELDS:  Yes.
```

A3219

```
 1          MS. FRITZ:  My bad.
 2          THE COURT:  You may answer.
 3   A.     The message from Mr. Veldhuis to Mr. Sexton and
 4   Mr. Friesen, with the subject "There you have it," sent
 5   on November 17th, 2014, reads "Received the GGBL
 6   subpoena today, it's a combined MDDD and GGBL
 7   investigation.  They had subpoenaes in e-mail, which
 8   when received will lead them to Jordan, et cetera.
 9   Requesting two weeks to respond.  I am sure T was aware
10   that MDDD was wrapped up in this long ago before
11   Tuesday.  I haven't seen the actual subpoena, but we'll
12   get it securely tomorrow.  Please do not share with
13   others at this time."
14   Q.     And who responds?
15   A.     Mr. Sexton, responds, "Okay, that sucks."
16   Q.     Who then responds?
17   A.     Mr. Veldhuis writes, "Yes, we should start to
18   consider losing computers, et cetera."
19   Q.     And then who responds?
20   A.     Mr. Sexton writes, "Yes, most definitely.  As soon
21   as I get home, we'll call Apple and set up the "I Lost
22   My Computer...have a remote life, et cetera."
23   Q.     And then who responds?
24   A.     Mr. Friesen responds, "I had a robbery, so
25   consider me all good."
```

A3220

```
 1    Q.    And then who responds to that?

 2    A.    "Right, I had a fire, Lowell."

 3    Q.    And do you understand whose response is the top

 4    message?

 5    A.    Yes, Mr. Veldhuis.

 6    Q.    And how do you understand that?

 7    A.    Based on the FBI exhibit.

 8    Q.    Okay.  And I'm next showing you what's in evidence

 9    as Exhibit 190.

10    A.    (Looks.)

11    Q.    And who does this document indicate are the

12    communicants in this message?

13    A.    This is a message between, um, Mr. Veldhuis and

14    Mr. Friesen.

15    Q.    And would you read this message for the jury,

16    please.

17    A.    Mr. Veldhuis writes to Mr. Friesen, "RE Test," on

18    May 23rd, 2015, "Hey, sorry, forgot to send the message.

19    Mitch Adams was apparently arrested by the FBI in Dallas

20    when changing planes from Mexico.  We don't know why yet

21    or know 100 percent that the details are even true.

22    Just in case, we should all stay out of the U.S. until

23    we get the better handle on everything.  Mitch showed up

24    in the SEC subpoena on New York's.  When Mark Lee was

25    here last week, he mentioned that the SEC had said it
```

A3221

```
 1   was now a criminal matter."
 2        And Mr. Friesen responds, "And is he still in
 3   custody?" Question mark.  And the response from
 4   Mr. Veldhuis was, "I'm not overly worried about it.
 5   Mitch was desperate.  He could not have done any number
 6   of things" -- excuse me, "He could have done any number
 7   of things.  But I just want to make sure you don't fly
 8   to NYC or something on your way back.  If there's a
 9   pending indictment, then it will be unsealed in the
10   coming days."
11   Q.    And how do you know that the top message is from
12   Mr. Veldhuis?
13   A.    Based on the FBI's exhibit.
14   Q.    I'm next going to show you what's in evidence as
15   Exhibit 87.
16   A.    (Looks.)
17   Q.    And according to this document, Mr. Murphy, who
18   are the people communicating?
19   A.    This is a message between Mr. Sexton,
20   Mr. Veldhuis, and Mr. Friesen.
21   Q.    And would you please read this message for the
22   jury.
23   A.    Mr. Sexton writes to Mr. Veldhuis and Mr. Friesen
24   with the subject "Meeting on August 12th, 2013," "Going
25   to meet Avtar today.  I will get printout from CH and go
```

```
 1    over it with him.  How much are we spending this week on

 2    Es?  I will tell him we plan to run a couple more weeks

 3    at least."

 4    Q.    And who responds?

 5    A.    Mr. Veldhuis responds and writes, "150K.  This

 6    might be the last week."

 7    Q.    And who responds to that message?

 8    A.    Mr. Sexton writes, "News-max still has to run as

 9    well, towards the end of August."

10    Q.    And who responds to that?

11    A.    Mr. Friesen writes, "If we still get a good return

12    this week on our spend, wouldn't we continue?"

13    Q.    And who responds?

14    A.    Mr. Veldhuis writes, "Yeah, but it's not looking

15    good."

16    Q.    I'd like to show you next Exhibit 90, which is in

17    evidence.

18    A.    (Looks.)

19    Q.    And, Mr. Murphy, who are the -- according to this

20    document, who is communicating in this message -- these

21    messages?

22    A.    This is a message between Mr. Fred Sharp and

23    Ms. Yvonne Gasarch.

24    Q.    And would you read it, from the bottom up, to the

25    jury, please.
```

```
 1    A.    Mr. Sharp writes to Ms. Gasarch, on August 23rd,

 2    2013, with the subject "Cash."  "On August 12th, you

 3    wrote a draft for Grand Yachts against cash.  COD, would

 4    you please explain to me how is this a legitimate

 5    payment?  My concern is money laundering.  Hells Angels

 6    gives us cash, we give them a draft to buy a boat.

 7    Later the boat is seized, police investigate, find out

 8    Charter House paid for it, visit us and ask why?  What

 9    will you say?"

10    Q.    And who responds?

11    A.    Ms. Gasarch responds, "Can we lend money to them?

12    Thomas asked them to sign loan agreement for us.  Thomas

13    will call me back."

14    Q.    And who responds?

15    A.    Mr. Sharp responds, "Who are they?"

16    Q.    And what does Ms. Gasarch respond?

17    A.    Ms. Gasarch responds, "Thomas S. Client."

18    Q.    And who responds to that?

19    A.    Mr. Sharp responds, "Yes, but who?  A person?  A

20    company?  What business?"

21    Q.    And who responds?

22    A.    "Waiting Thomas reply."

23    Q.    Next I'd like to show you Exhibit 180, which is in

24    evidence.

25    A.    (Looks.)
```

```
 1    Q.    And, Mr. Murphy, according to this document, who

 2    are the people communicating?

 3    A.    This is a message between Mr. Fred Sharp,

 4    Ms. Yvonne Gasarch, and another individual.

 5    Q.    And would you read the message from the bottom up,

 6    please.

 7    A.    Mr. Sharp writes, "Subject Remro," on February

 8    18th, 2015, "There's a BM e-mail, Number 17, from Mark

 9    Lee yesterday, attaching docs to sign to change the

10    name.  I don't see reply attaching the signed pages.

11    Please sign and e-mail them back to him immediately.

12    Please confirm."

13          THE COURT:  Ms. Shields, have in mind what you

14    told me about how long you needed.

15          MS. SHIELDS:  I'm very --

16          THE COURT:  Just go ahead.

17          MS. SHIELDS:  Yeah, got it.

18    Q.    Can you please keep reading, Mr. Murphy.

19    A.    Yes.  "From Luna," Mr. Sharp responds, "The notary

20    did not sign, only stamped and sealed."  Ms. Gasarch

21    responds, "Who can sign for notary?"  Mr. Sharp

22    responds, "Ask Wires.  Who prepared the docs, you or

23    her?"  Ms. Gasarch responds, "We did all directors

24    signatures, I don't know who signed for notary."  The

25    response from Mr. Bond, "Of course you do, his name is
```

```
 1   on the stamp."
 2   Q.    And how do you know that that top message is from
 3   Bond?
 4   A.    Based on the FBI exhibit.
 5   Q.    Two more documents for you, Mr. Murphy.  Next is
 6   Exhibit 168 in evidence.
 7   A.    (Looks.)
 8   Q.    And, Mr. Murphy, who are the communicants in this
 9   message?
10   A.    It's a message between Ms. Gasarch and another
11   individual.
12   Q.    And would you read it from the bottom up, please.
13   A.    Yes.  The message to Ms. Gasarch was, "Not
14   possible to get wire for links sent out sooner than the
15   10th?"  The response?  "We have a lot of motion wires
16   needed from that account.  We could not send too much
17   every day.  Piece on wire is promotion.  We have to use
18   BSR Bank."  The response, "Is that the soonest we can
19   get?  It's a problem."  The response, "I will send
20   Wednesday.  I play safe.  Tell you Friday.  Okay."
21   Q.    And then, Mr. Murphy, the last exhibit is Exhibit
22   151 in evidence.
23   A.    (Looks.)
24   Q.    And, Mr. Murphy, according to this document, who
25   are the people participating in this communication?
```

A3226

1    A.    It's Ms. Gasarch and another individual.

2    Q.    And would you read, um, the messages for the jury

3    beginning with the top message on Page 2 and reading up.

4    A.    The message from the individual to Ms. Gasarch

5    states, on April 29th, 2014, "281,233.  I have very good

6    paperwork now for large wires, but need to know the

7    following info for sender, name of the court, mailing

8    address, jurisdiction, name and title explanatory.  And

9    from the brokers, the full brokerage name.  It's not all

10   good with just above info.  I already have all the

11   paperwork for Norton BioLegacy drawn up, but can switch

12   easily."

13        The response from Ms. Gasarch, "Is the promotion?"

14   Question mark.  "Which stock?"  The individual responds,

15   "Sorry, what?  You asked the amount of the PR News wire.

16   The amount is 281,233 K in USD."  Ms. Gasarch responds,

17   "Is for promotion?  If 'Yes,' please tell me which

18   stock?  I need to find a safe account for wire if this

19   is a promotion."  The response, "No, it's not for

20   promotion, it's a marketing contract with Fort Source

21   Limited and PR News wire."  Ms. Gasarch responds, "TY,

22   let you know when I back to office."  The response,

23   "Okay.  TY."  The response, "Is it safe to assume it's

24   not for Norton?"  "No, based on which stock and how much

25   wire."

126

```
 1    Q.    Thank you, Mr. Murphy, those are all the questions
 2    I have for you at this time.
 3          THE COURT:  Ms. Fritz?
 4          (Pause.)
 5          THE COURT:  Oh, go ahead, Ms. Pickett.
 6
 7    CROSS-EXAMINATION BY MS. PICKETT:
 8    Q.    Good afternoon, Mr. Murphy, I'm Karen Pickett and
 9    I represent Yvonne Gasarch.
10    A.    Good afternoon.
11    Q.    You testified that you've done hundreds of hours
12    of work looking at documents and analyzing documents and
13    preparing reports, is that correct?
14    A.    Yes.
15    Q.    Okay.  And, um, for the accounting documents, you
16    were relying on the Q data -- you were looking at the Q
17    data, is that correct?
18    A.    Yes.
19    Q.    Okay.  And you said sometimes you could match the
20    Q data up with external forces, for example, trading
21    records, bank and brokerage account records, et cetera,
22    is that correct?
23    A.    Yes.
24    Q.    Okay.  And have you ever been able to -- were you
25    ever asked to analyze or have you analyzed records for
```

A3228

```
 1    Corporate House, the bank records for Corporate House?
 2    A.    No.
 3    Q.    You don't have access to the bank records for
 4    Corporate House?  You haven't had access?
 5    A.    No.
 6    Q.    Okay.  Have you ever had access to the bank
 7    records of Fred Sharp?
 8    A.    No.
 9    Q.    And have you ever had access to the bank records
10    of my client, Yvonne Gasarch?
11    A.    No.
12    Q.    Okay.  So besides the entries in the Q-System, um
13    -- well I should say, the entries in the Q-System are
14    the only documents that you have in order to prepare
15    these reports today, the summary reports, etc., is that
16    correct?
17    A.    Yes, I've used the Q-System to prepare my
18    summaries.
19    Q.    Right.  And I understand you were not involved in
20    the Q-System, but, um, you've sat here for most of the
21    trial, I believe, is that correct?
22    A.    Some of it.
23    Q.    Okay.  And you're aware that the Q-System was
24    designed by Fred Sharp?
25    A.    I don't know who designed it.
```

A3229

```
 1    Q.    Okay.  Are you aware that Fred Sharp was an
 2    administrator of the Q-System?
 3    A.    Yes.
 4    Q.    Okay.  And are you aware that as an administrator
 5    of the Q-System, Fred Sharp could change entries in the
 6    Q-System?
 7    A.    I'm not aware.
 8    Q.    Okay.  When you're analyzing the Q-System, and I'm
 9    sorry I'm not a technical person, is there a way -- was
10    there a way for you to look on the Q-System and see who
11    made those entries?
12    A.    No.
13    Q.    No.  So were you here when, for example, Mr. Knox
14    testified about his access to the Q-System?
15    A.    Yes, I was.
16    Q.    Okay, and he said it was -- that at one point in
17    time he had access to make entries into the Q-System, is
18    that correct?
19    A.    Yes.
20    Q.    Okay.  And we've only heard from a few -- several
21    witnesses in this case, but are you aware of who did or
22    who did not have access to make entries in the Q-System?
23    A.    I understand that Mr. Sharp and his employees had
24    access to make entries, but I don't know who made them.
25    Q.    You don't know if there were other people, for
```

A3230

```
 1    example like Mr. Knox, who could make entries in the
 2    Q-System, is that correct?
 3    A.    Could you repeat your question?
 4    Q.    You're not aware of -- okay.  Are you aware that
 5    there are other people besides Mr. Knox, other money
 6    managers or traders or whoever, that can make changes,
 7    had access to the Q-System and could make changes?
 8    A.    I don't know who else could make changes.
 9    Q.    Okay.  Now --
10          MS. PICKETT:  Can we pull up Exhibit 309.
11          (On screen.)
12    Q.    Mr. Murphy, do you recall, um, Ms. Shields going
13    through this exhibit with you?
14    A.    Yes, I do.
15    Q.    Okay.  And, um, there's several columns.  "Total
16    Q-sales Transactions" is one, correct?
17    A.    Yes.
18    Q.    "Total Transactions Covered by Brokerage Records"?
19    A.    Yes.
20    Q.    Okay.  So I'm interested in that.  I don't think
21    she called your attention to this.  But again, this
22    chart was to sort of tie-out the information in the
23    Q-System, and as an accountant and an auditor, you were
24    using the outside records to verify some of the
25    information in the Q-System, is that correct?
```

```
 1    A.    Yes.
 2    Q.    Okay.  And do you see underneath the chart, um, it
 3    says "Percentage of transactions in Q covered by
 4    brokerage records," correct?
 5    A.    Yes.
 6    Q.    And the amount -- um, the percentage listed there
 7    is 53.7 percent, is that correct?
 8    A.    That's correct.
 9    Q.    Okay.  And again, we don't have any records of
10    Mrs. Gasarch, or even Custom House, to try to verify the
11    Q-records, is that correct?
12    A.    No, I do not.
13    Q.    (Pause.)  Now I believe you testified that, um --
14    you figured out that when it says "PEAC" or "PERE," that
15    means Yvonne Gasarch, is that correct?
16    A.    Yes.
17    Q.    Okay.  And it's your -- is it your understanding
18    that Mrs. Gasarch was a beneficial owner, um, in writing
19    in any event, of Peaceful Lion and then Peregrine?
20    A.    Yes.
21    Q.    Okay.  Have you been here at any point during the
22    trial where, um, the evidence has come in that the
23    nominee companies, or the owners of the nominee
24    companies, did not receive the proceeds from the stock
25    sales, is that right?
```

A3232

```
 1          MS. SHIELDS:  Objection.
 2          THE COURT:  Oh, no, she may put that question.
 3   A.    Can you repeat your question, please?
 4   Q.    Have you heard any testimony, as you've sat here
 5   or prepared for today, that, um, the nominee companies,
 6   for example Peaceful Lion, Peregrine, Gotama, that they,
 7   um -- that the beneficial owner, Ms. Gasarch,
 8   Mr. Nikolayev, did not receive the benefits of the stock
 9   trading in those nominee accounts?  Have you been here
10   for that testimony?
11          THE COURT:  And you can answer that -- well now
12   you asked a compound question.
13          MS. PICKETT:  Well let me narrow it down.
14          THE COURT:  All right.
15   Q.    Have you -- are you aware, from either testimony
16   or looking at records or anything else, that the
17   beneficial owners on paper of these nominee companies
18   were not receiving the, um, proceeds of the stock sales
19   that the SEC alleges were unlawful?
20   A.    I don't understand the question.  Can you repeat
21   it, please?
22   Q.    Well, for example, say Peaceful Lion bought -- and
23   I believe you saw a chart where it said Peaceful Lion
24   bought a million-plus stocks of, I believe it was -- I
25   don't know if it was Stevia or Arch, forgive me, but
```

A3233

```
 1   assuming that Peaceful Lion bought a million shares of
 2   stock and maybe generated that stock and then sold the
 3   stock, and that stock sale generated a million dollars.
 4   And I don't know the exact amount.
 5        Are you aware that Ms. Gasarch, as the beneficial
 6   owner of Peaceful Lion, was not receiving the proceeds,
 7   the million dollars of the stock sale?
 8   A.   She didn't receive proceeds from the stock sale,
 9   but she received, um, proceeds and transfers into that
10   PEAC and PERE account from other accounts.
11   Q.   Okay.  And in the -- and you're assuming, based
12   just on the Q-System, that if it says "PEAC" or "PERE,"
13   and there's money transferred into that account, that
14   Ms. Gasarch was able to withdraw money from that
15   account, which we don't even know what the bank
16   statement says it was for, right, is that correct?
17   A.   Yes, I identified, um, transactions and
18   withdrawals from that account.
19   Q.   Yes, in the Q-System, correct?
20   A.   That's correct.
21   Q.   But not independently verified, is that correct?
22   A.   I verified the information in the Q-System with
23   bank and brokerage records and trading records, as well
24   as transagent records, but I didn't look at bank
25   statements such as a cash withdrawal.
```

```
 1    Q.    Okay, so you have -- so just to be -- for the jury
 2    to be clear, that as you sit here today, you have no
 3    record of monies flowing out of Corporate House, however
 4    it's categorized, to Ms. Gasarch?
 5    A.    No.
 6          MS. SHIELDS:  Objection.
 7          THE COURT:  Did I hear an objection?
 8          MS. SHIELDS:  Yes, your Honor.
 9          THE COURT:  The objection is overruled.  He may
10    answer -- and the answer may stand.
11    A.    The Q-System indicates that there was money that
12    was transferred into the PEAC and PERE account that was
13    owned by Mrs. Gasarch.
14    Q.    Okay, but you're not answering my question though.
15    My question, sir, is there's nothing -- besides the
16    Q-System with, you know, typing these things in an EXCEL
17    spreadsheet, you have not looked at any records from
18    Corporate House -- bank records, I should say, that show
19    that Ms. Gasarch received any money from Corporate
20    House?
21    A.    Not bank records, but there were cash withdrawals
22    within the, um, PEAC and PERE account as well.
23    Q.    Okay.  And what was the bank account -- when you
24    say "cash withdrawals," do you have the bank records for
25    PEAC or PERE?
```

A3235

1    A.    I do not, no.

2    Q.    Okay.  And again, this is based on the Q-System,

3    correct?

4    A.    Yes, it's based on my review of the Q-System.

5    Q.    Okay.  Now, um -- I think I'm done.  Thank you

6    very much.

7          THE COURT:  Ms. Fritz?

8          MS. FRITZ:  Thank you, your Honor.

9

10   CROSS-EXAMINATION BY MS. FRITZ:

11   Q.    Good afternoon, Mr. Murphy.

12   A.    Good afternoon.

13   Q.    My name is Miranda Fritz, I represent Jackson

14   Friesen, and I think we can deal with this pretty

15   expeditiously.

16         Just to follow up for a moment on what Ms. Pickett

17   was talking about, the Q-System -- every time you talked

18   about the Q-System, what your understanding is, is that

19   those are entries that were made by Fred Sharp, correct?

20   A.    No, by Mr. Sharp and his employees.

21   Q.    Do you have any basis to conclude that entries,

22   certain entries were made by his employees?

23   A.    No.

24   Q.    Okay.  So we know -- we sat here through the trial

25   and we know that Fred Sharp is a defendant in criminal

A3236

```
 1   and civil cases, correct?

 2   A.    I believe so.

 3   Q.    And that he has -- that he's the mastermind of

 4   fraud schemes that are arguably global, correct?

 5   A.    I don't know what's alleged in those complaints.

 6   Q.    Okay.  Is it fair to say that you know that Fred

 7   Sharp is not a reliable or trustworthy person?

 8   A.    I don't have any basis to say that he's reliable

 9   or trustworthy.

10   Q.    Do you have a basis to say he's probably not

11   reliable or trustworthy?

12   A.    I can't say one way or the other.

13   Q.    Notwithstanding everything you've heard about what

14   Fred Sharp did?

15   A.    That's correct.

16   Q.    Okay.  All right.  But you're familiar, as an

17   accountant, with the phrase "Garbage in, Garbage out,"

18   right?

19   A.    I'm generally familiar with the phrase, but not as

20   an accountant.

21   Q.    Okay.  So that phrase refers to the fact that if

22   data is coming from an unreliable source, then the

23   analysis of that data may be kind of useless, right?

24   A.    Could you repeat your question, please?

25   Q.    "Garbage in, Garbage out" means, if all the data
```

```
 1    is being input by an unreliable and untrustworthy
 2    source, then any analysis coming out of that is equally
 3    unreliable, untrustworthy, correct, "Garbage in, Garbage
 4    out"?
 5         MS. SHIELDS:  Objection.
 6         THE COURT:  Well that's hypothetical.  Sustained.
 7    Q.    In this particular case you've testified that --
 8    and I think you said it twice, that you undertook hours
 9    of what must have been painstaking, mind numbing review
10    of documents, to confirm the data that you derived from
11    the Q-System, correct?
12    A.    That's right.
13    Q.    And that is an order -- that's the process that a
14    person goes through in order to verify possibly
15    unreliable data, correct?
16         MS. SHIELDS:  Objection.
17         THE COURT:  No, she may have that.
18    A.    Can you repeat the question, please?
19    Q.    And that would be the process that you would go
20    through as an analyst to try to verify unreliable or
21    perhaps unreliable data, correct?
22    A.    I disagree with the characterization of
23    "unreliable data," it's a process that you would go
24    through with any data.
25    Q.    Okay.  So what you were doing was, you were taking
```

A3238

```
 1    this Q-System data regarding stock -- stock

 2    transactions, and you had available to you all of those

 3    brokerage records that related to stock transactions,

 4    correct?

 5    A.    That's right.

 6    Q.    And you know, and you've told the jury, that all

 7    of these transactions that we have seen here, those were

 8    all Fred Sharp stock transactions, you said all of them

 9    were done by Fred Sharp or nominees administered by Fred

10    Sharp, correct?

11    A.    The stock sales were, um, sales by nominees that

12    were administered by Sharp.

13    Q.    Okay.  So what we know is that there are no

14    records in the Q-System that says that any individual

15    that we've been talking about purchased or sold stock,

16    correct?

17    A.    Can you repeat the question, please?

18    Q.    The records show -- the only records you could

19    compare to were records of entities purchasing and

20    selling the stock that we've been talking about,

21    correct?

22    A.    Yes.

23    Q.    All administered by Fred Sharp, correct?

24    A.    That's correct.

25    Q.    Okay.  And you did charts of the data that you saw
```

A3239

1   with respect to issuers, correct?

2   A.    Yes.

3   Q.    I want to show you just a couple of them.

4         MS. FRITZ:  Alyssa, could you put up 296.

5         (On screen.)

6         MS. FRITZ:  Okay.

7   Q.    Now we saw a whole bunch of similar charts that

8   you prepared that relate to different issuers, correct?

9   A.    That's right.

10  Q.    I happened to pull up Stevia, correct?

11  A.    You did.

12  Q.    All right.

13  A.    Stevia First.

14  Q.    Okay.  In each of these charts is it correct that

15  you have sought to sort of pull from the Q-System pieces

16  of data that were in the system and you've reformatted

17  it?

18  A.    Yes, I did that.

19  Q.    Okay.  The second column in each of your charts is

20  "Account Title," right?

21  A.    That's right.

22  Q.    And did you notice something, as you prepared

23  these charts, regarding who appears in the "Account

24  Title" column?

25  A.    I did not.

A3240

```
 1    Q.    Did you do any analysis to see who is it that
 2    these accounts, who are these accounts attributed to?
 3    A.    They're accounts that are attributed to people
 4    that are associated with the deal.
 5    Q.    Okay.  So who's ACCO Pina?
 6    A.    "ACCO" is Mr. Veldhuis, and I don't know who
 7    "Pina" is?
 8    Q.    So first of all we know "ACCO" is Mr. Veldhuis,
 9    correct, you concluded?
10    A.    That's right, "ACCO" is Mr. Veldhuis.
11    Q.    And every one of these charts that you prepared
12    has "ACCO" in that column, correct?
13    A.    I don't know that.
14    Q.    Okay.  And we have no idea who or what "Pina" is?
15    A.    I don't know who "Pina" is.
16    Q.    And in fact the way that these accounts are
17    titled, there is no -- there's no documentation that
18    explains why this account is attributed to Mr. Veldhuis,
19    correct, there's no contract or agreement or brokerage
20    record that you saw that would explain that, correct?
21    A.    I did not see anything.
22    Q.    Right.  You have no idea who "Pina" is, correct?
23    A.    I do not.
24    Q.    Let's take a look.  There's one -- let's look at
25    it.  There's one that includes that reference "Gard"
```

```
 1    that you talked about.  Okay?
 2         MS. FRITZ:  If we could pull up 303.
 3         (On screen.)
 4    Q.   And this is the first page of a chart that relates
 5    to something called --
 6         What is this stock?
 7    A.   This is NewGen BioPharma.
 8    Q.   Which is "GRWD"?
 9    A.   Um, "GRWD" changed its name to "NewGen Biopharma."
10    Q.   Okay, because I would not have gotten "NewGen" out
11    of that.
12         Now what we see here, um, for a period of time in
13    September of 2013 and continuing for a few months, we
14    see a reference to "Gard," correct?
15    A.   Yes.
16    Q.   "ACCO," "Gard," and then "Here," correct?
17    A.   That's right.
18    Q.   And then that reference disappears, correct?
19    A.   It appears on the exhibit.
20    Q.   And so that tells us -- and again I'll represent
21    to you that the others that we looked at -- and I could
22    show you all of them, that "ACCO" is in that column,
23    okay, and sometime "Pina," whoever that is it, okay?
24    A.   Yes.
25    Q.   So what we know is that something was going on
```

A3242

```
 1    that we have no idea about that is causing some entry to
 2    be made in a record by Fred Sharp that is attributing
 3    something to people, and we have no idea why, correct?
 4         MS. SHIELDS:  Objection.
 5         THE COURT:  I'm not sure I understand the
 6    question.
 7         MS. FRITZ:  Okay, let me -- that was bad.  You're
 8    right.
 9    Q.   What we're seeing in these records is the accounts
10    that you have analyzed are being attributed to ACCO, but
11    we have no extrinsic evidence of why that happened?
12         THE COURT:  Beyond -- and you said "extrinsic,"
13    beyond the Q-System?
14         MS. FRITZ:  Exactly.
15         THE COURT:  Yeah, extrinsic to the Q-System.
16    A.   The accounts are in the "Account Title Column"
17    attributed to ACCO, however there are also withdrawals
18    from this account to the ACCO account, to the Gard
19    account, and to the Here account, among this and other
20    issuers.
21    Q.   Right.  So what we see there is ACCO, Mike
22    Veldhuis, apparently then is directing other transfers
23    to people including some accounts that you associate
24    with Mr. Friesen, correct?
25    A.   Yes, I saw messages where he was directing
```

A3243

```
 1    transfers.
 2    Q.    But again, is there any extrinsic evidence of why?
 3    A.    Can you define "extrinsic"?
 4          THE COURT:  Outside the Q-System.
 5    Q.    Anything other than Q.
 6          MS. FRITZ:  Sorry, your Honor.
 7          THE COURT:  Outside the Q-System.
 8    A.    Um, sorry, I'm confused, can you please repeat
 9    that?
10    Q.    Is there any partnership agreement that anybody
11    has shown you that said, "Okay, we're partners and we're
12    going to give you this"?
13    A.    I have not seen any agreement.
14    Q.    And is there anything that suggests that anyone
15    other than Mr. Veldhuis had control over that?
16    A.    I don't know.
17    Q.    All right.
18          Now what you did is you took massive amounts of
19    data and you sort of distilled it down into this chart,
20    correct?
21    A.    For NewGen, yes.
22    Q.    Okay.  And if you hadn't distilled it, correct me
23    if I'm wrong, would it look a lot like Exhibit 311?
24    A.    Um, it would look the same.  311 is just a PDF
25    copy of the same data, it's just a different format.
```

A3244

```
1    Q.    Okay, but is this the format that would exist if

2    you simply pulled it off Q rather than manipulating it

3    and formatting it?

4    A.    I believe so.

5    Q.    Okay.  So what We see here are you've taken a

6    column called "Description" and you've included that as

7    "Batch Description"?

8    A.    I didn't include that as "Batch Description,"

9    that's what the Q-System data says.

10    Q.    Okay.  Now, um, you said earlier, by the way, that

11    we have no way of knowing -- from the data that you

12    received, we have no way of knowing who made the

13    entries, correct?

14    A.    That's correct.

15    Q.    And we have no way of knowing when they made the

16    entries, correct?

17    A.    There's -- within the data there's a batch date

18    posted.

19    Q.    And that doesn't give us meta data, does it?

20    A.    No.

21    Q.    Okay.  So -- and we have no way of knowing what --

22    withdrawn.

23          Now let's look at the entries here, the

24    descriptions of activity.

25          Were you able to determine, as an accountant, what
```

A3245

```
 1   all these credits and debits relate to or are based on?
 2   A.    In this account?
 3   Q.    Yes.
 4   A.    I didn't review every single credit and debit in
 5   the account.
 6   Q.    Well not just every single, there are, um -- there
 7   are things like internal transfers, director fees,
 8   interest charges, do you see all of that?
 9   A.    Yes.
10   Q.    So there's all these debits that somebody is doing
11   against these accounts, correct?
12   A.    That's correct.
13   Q.    And there's also -- hold on, um, director fees --
14         MS. FRITZ:  If you could go to the next page.
15         (On screen.)
16   Q.    There are -- and I'm not sure if I'm going to come
17   up with it, um, but we see disbursements to the law firm
18   of Greenberg Traurig, correct?
19   A.    Yes, I see that.
20   Q.    And we don't know who directed that, correct?
21   A.    That is correct.
22   Q.    And -- all right.  Okay.  And we have no idea
23   of -- if interest is being charged, we have no idea what
24   the basis is for that, correct?
25   A.    I do not.
```

```
 1    Q.    Lots and lots of entries that say "Internal
 2    Transfers," correct?
 3    A.    Yes.
 4    Q.    Lots of entries that appear to relate to loan
 5    transactions, correct?
 6    A.    Yes.
 7    Q.    Lots of entries that talk about buying stock,
 8    correct?
 9    A.    Yes.
10    Q.    And what you've been analyzing are sales of stock,
11    correct?
12    A.    I've analyzed sales and purchases of stock as well
13    as transfers.
14    Q.    So how much money was spent buying stock?
15    A.    It would -- at least in Stevia First and Vitality,
16    that would have been what's reflected in my exhibit.
17    Q.    Okay, is it in the -- I apologize.  Is it millions
18    of dollars?
19    A.    I believe it was $2 million approximately.
20    Q.    All right.  So accounts received money from the
21    proceeds, but then somebody at Fred Sharp's shop
22    disburses it and trades in the stock, correct?
23    A.    I don't understand your flow.
24    Q.    Does that reflect -- does that indicate that, in
25    addition to receiving funds relating to sales of stock,
```

A3247

```
 1   those funds are then recycled and used to buy stock?
 2   A.    In which accounts?
 3   Q.    In all of them.
 4   A.    In issuer accounts?
 5   Q.    And in individual accounts.  Do you know that?
 6   A.    I'd have to look at an individual account to see.
 7   Q.    All right.  So what you know is -- and we'll look
 8   at it.  But what you know right now is that that process
 9   is going on in the issuer accounts, correct?
10   A.    The issuer accounts are where the stock is bought
11   and sold.
12   Q.    Okay.
13         Now these are all the things that we know about
14   stock and what you then did was you took the Q-System
15   and you got these voluminous brokerage records, and if
16   we look at the 309s, I think, you did this painstaking
17   comparison to see if you could validate information in
18   the Q-System, correct?
19   A.    That's correct.
20   Q.    And you did that because that is what you do in
21   order to try to ascertain whether data is reliable?
22   A.    That's a step that you can take, yes.
23   Q.    And you were able to do that with 58 percent of
24   the transactions, correct?
25   A.    The Commission had brokerage records for 53
```

A3248

```
 1    percent of the transactions.  I tied out 97.8 percent of
 2    the transactions that we had records for.
 3    Q.    I'm sorry, you had records for 53 percent and you
 4    found them 98 -- on those 53 percent, they were 98
 5    percent reliable?
 6    A.    That's correct.
 7    Q.    Okay.  Now completely changing the subject.
 8          You also analyzed individual accounts with names
 9    like "Gard," correct?
10    A.    That's correct.
11    Q.    And you, in this multiyear investigation, the SEC
12    has been able to gather countless records that relate to
13    these transactions, correct?
14    A.    There's hundreds of thousands of records, yes.
15    Q.    Yeah, from banks and from brokerage firms, all
16    over the world in fact, correct?
17    A.    Yes.
18    Q.    So then you start looking at the Gard accounts and
19    the Gard accounts, you would represent, have to do with
20    individuals, correct?
21    A.    That's associated with Mr. Friesen.
22    Q.    So -- and you came up with amounts received into
23    those accounts, correct?
24    A.    Received from the issuers, yes.
25    Q.    Okay.  So you totaled the amount of money that
```

A3249

1    goes into a Gard account from another Fred Sharp

2    account, correct?

3    A.    Yes, into the Gard account from the issuer

4    accounts.

5    Q.    And again, all of those entries are things that

6    Fred Sharp is sitting and doing at his offices, correct?

7    A.    I don't know if it's Sharp, but someone in his

8    group.

9    Q.    Okay.  And then you reviewed not a single bank

10   record that would tell you whether Fred Sharp ever

11   disbursed those funds?

12        MS. SHIELDS:  Objection.  May I be heard at

13   sidebar?

14        (Pause.)

15        THE COURT:  I don't think it's necessary.  I don't

16   think that's necessary.  She may have that question.

17        MS. SHIELDS:  Your Honor, there's a corellary

18   issue that I'd like to raise as part of this objection.

19        THE COURT:  All right.

20

21        AT THE SIDEBAR

22        THE COURT:  Ms. Fritz, you're going to finish

23   shortly here, you said.

24        (Silence.)

25        MS. SHIELDS:  Your Honor, my objection is the fact

A3250

```
 1   that her saying there are no bank records is an attempt
 2   to use the assertion of the Fifth Amendment as a sword
 3   rather than -- we requested these bank records and they
 4   refused to produce them.
 5        THE COURT:  No, they won't do that.
 6        MS. FRITZ:  That's not what I'm saying.
 7        THE COURT:  No, it isn't what she's saying.  It's
 8   simply that he didn't look at them, not that there
 9   aren't any records.
10        MS. SHIELDS:  But she's attempting to suggest that
11   --
12        THE COURT:  No, she's not, or I won't permit it.
13        MR. KLUNDER:  Can we come in on redirect and ask
14   him why he didn't look at bank records?
15        THE COURT:  No.
16        MS. FRITZ:  Okay, I already set the foundation by
17   saying that --
18        THE COURT:  If you want, I'll give an instruction
19   that legally those records weren't available to him?
20        MS. SHIELDS:  Yeah, that's fine.
21        MS. FRITZ:  But that's not true, your Honor.
22        THE COURT:  So how could they get them?
23        MS. FRITZ:  They had the ability to go to banks
24   and brokerage firms all over the world and they got
25   them.  They got every bit of banking --
```

A3251

```
 1          THE COURT:  They -- well let's see how I can do
 2    this.  They got the bank records from --
 3          MS. SHIELDS:  No, not from Mr. Friesen.
 4          THE COURT:  No, no, but that's the point.
 5          But you were able to get them from the bank?
 6          MS. FRITZ:  Yes.
 7          MS. SHIELDS:  But at the point in time when they
 8    refused to produce them, I didn't have enough time left
 9    in the discovery period to get them.
10          THE COURT:  I'll explore that.  It's of no moment
11    here.
12          MS. FRITZ:  Thank you.
13
14          (In open court.)
15          THE COURT:  Now especially with that ruling,
16    you're about done.  But you go ahead.
17          MS. FRITZ:  All right.
18    Q.  So the question to you was, um, you did not look at
19    the records of Corporate House or its bank account in
20    order to verify any transfers out to individuals?
21    A.    The records I looked at were the Q-System and the
22    brokerage records.  I did not look at any bank records.
23    Q.    Right.  You did not look at any records relating
24    to Mr. Friesen's accounts, for example, that would
25    demonstrate whether he ever received any of these
```

A3252

```
 1   proceeds?
 2   A.    I didn't look at any accounts related to
 3   Mr. Friesen's personal banking and brokerage accounts.
 4   Q.    All right.
 5         MS. FRITZ:  Just a couple more questions, your
 6   Honor.
 7   Q.    You were shown some communications that related to
 8   Mr. Friesen, correct?
 9   A.    Yes.
10   Q.    Just a couple of questions, Mr. Murphy.
11         MS. FRITZ:  If we pull up Exhibit 237.
12         (On screen.)
13   Q.    This is one of the things that you were shown,
14   correct?
15   A.    That's right.
16   Q.    And again, you say that you associate Mr. Friesen
17   with "Gard," correct?
18   A.    Yes, that's his account.
19   Q.    Pardon me?
20   A.    That's his Q account.
21   Q.    You think.  Okay.
22         In the communications that you were shown,
23   Mr. Friesen does not use "Gard" as his sender name,
24   correct, he uses his own name?
25   A.    In this e-mail his name is used.
```

A3253

```
 1          MS. FRITZ:  Okay, let's pull up 239.
 2          (On screen.)
 3   Q.     And it's fair to say again that Mr. Friesen is
 4   communicating as none other than "Jackson Friesen,"
 5   correct?
 6   A.     That's correct.
 7   Q.     Okay.  Now what we did see is a statement in the
 8   name of "Gard" that is Exhibit 311, correct?
 9   A.     Yes.
10   Q.     We also, by the way, saw an e-mail communication
11   back from 2012 in which, um, Gard asked for a statement
12   to be sent to him.  Do you recall that?
13   A.     I recall the e-mail, yes.
14   Q.     Okay.  And so let's just be clear.  This Corporate
15   House account, it did not mail statements out to its
16   supposed customers every month, right?
17   A.     I don't know when it mailed out statements.
18   Q.     Did you ever see -- this is not like Chase
19   Manhattan Bank, it's not spewing out statements every
20   month to the people it's dealing with, correct?
21   A.     I don't know.
22   Q.     Did you ever see any statements that were sent out
23   on a regular basis from Corporate House?
24   A.     No.
25   Q.     Okay.  So the folks that are dealing with
```

A3254

```
1    Corporate House are not getting these nice little

2    monthly iterations?

3         THE COURT:  Well there's no foundation for that.

4    He says he didn't see any of them.  You're assuming they

5    don't send statements out.  We'll see what evidence

6    there is, if any.

7         MS. FRITZ:  Well we're very close to the end, your

8    Honor.

9         THE COURT:  I'm very sensitive to that.

10        (Laughter.)

11   Q.    Okay.  You sat through the trial and you've done

12   hundreds of hours of work on this case.  Were you ever

13   provided with anything that looked anything like a

14   monthly or periodic statements that went to individuals

15   that dealt with Corporate House?

16   A.    What do you mean by "dealt with Corporate House"?

17   Q.    Any of the people we've talked about -- I mean

18   honestly, did you ever see any statements that were sent

19   by Corporate House on a periodic basis to anybody?

20   A.    There was the account statement that was sent to

21   "Gard."

22   Q.    And that was on a request, correct?

23   A.    Yes.

24   Q.    "I'd like to see it."  And that's back in 2012,

25   correct?
```

A3255

```
 1    A.    I believe so.

 2    Q.    And I think you know that's not what I'm asking?

 3          THE COURT:  Well, in fairness I think maybe you

 4    were asking it, but go ahead.

 5          MS. FRITZ:  All right.

 6    Q.    Did you see any normal or periodic reporting by

 7    this financial institution pursuant to which folks would

 8    get monthly or even quarterly statements regarding their

 9    account?

10    A.    I did not.

11    Q.    Okay.  All right.

12          MS. FRITZ:  Last but not least, if we could pull

13    up Exhibit 311.

14          (On screen.)

15    Q.    And this is the document that we've called the

16    "Gard" account, correct?

17    A.    Yes, it is.

18    Q.    And again, this document -- from this document or

19    from this data, the only thing that you have pulled and

20    summarized for the jury are incoming transfers, correct?

21    A.    Can you repeat the question, please?

22          THE COURT:  This is money in for that account, is

23    that correct?

24          THE WITNESS:  It's money into the account and

25    money out of the account.
```

A3256

```
 1   Q.    This is.  Right.
 2         The summary that you did for the jury where you
 3   said all of the amounts, um --
 4         MS. FRITZ:  Can you give me an exhibit number for
 5   the one that said "all of the amounts allocated to these
 6   accounts"?
 7         MS. SHIELDS:  That's 313.
 8         MS. FRITZ:  Okay.  If we could quickly put that up
 9   and then go to the last page, if you could, Alyssa.
10         (On screen.)
11   Q.    So you did this summary for the jury and it's
12   based on these accounts -- this account data, correct?
13   A.    Yes, that's all the internal transfers into those
14   accounts.
15   Q.    Okay.  But the only thing you pulled from all of
16   this data is some indications of money in, correct?
17   A.    That's right.
18   Q.    Okay.  And what we see in the underlying data are
19   page after page of entries that are money in, money out,
20   correct?
21   A.    Yes.
22   Q.    And those include lots and lots of entries that
23   say "Forex," for example?
24         THE COURT:  Say again?
25         MS. FRITZ:  "Forex," F-O-R-E-X.
```

```
 1    Q.    Is that correct?
 2    A.    Those are included in these pages, yes.
 3          MS. FRITZ:  And why don't we go back to 311.
 4          (On screen.)
 5    Q.    And a lot of those are money going out, correct?
 6    A.    Forex?
 7    Q.    Yup.
 8    A.    It's money in and money out.
 9    Q.    Correct.  We see a lot of interest charges?
10          THE COURT:  Your "Correct" is stricken.
11          Go ahead.
12    Q.    We see a lot of interest charges, correct?
13    A.    Yes.
14    Q.    Interest payments, correct?
15    A.    Yes, there are interest payments.
16    Q.    We see a cash withdrawal on this first page,
17    correct?
18    A.    Yes, we do.
19    Q.    And the cash withdrawal isn't attributed to
20    anyone, correct, we have no idea if that's Fred Sharp or
21    somebody else?
22    A.    This cash withdrawal is attributed to the Gard
23    account.
24    Q.    No, I know that.  But the cash, do we know if Fred
25    Sharp was the one who got the cash?
```

```
 1    A.    I do not know who got the cash.

 2    Q.    We have, um -- we have just a ton of things that

 3    just say "debit," correct?

 4    A.    Yes.

 5    Q.    We have tons of things that say "internal

 6    transfer," correct?

 7    A.    Yes.

 8    Q.    We have no earthly idea what these entries mean,

 9    correct?

10    A.    That's incorrect.

11    Q.    The entries that I just said to you, can you

12    explain what those entries relate to?

13    A.    The internal transfers relate to transfers from

14    the other issuer accounts into this account.

15    Q.    And there are internal transfers out as well,

16    correct?

17    A.    Yes, there are.

18    Q.    Mr. Murphy, you have -- you're an accountant,

19    right?  You did not have the ability to analyze this

20    account with an understanding of what all of these

21    entries refer to, correct?

22    A.    I didn't analyze the transfers out of the account,

23    the internal transfers out, but the internal transfers

24    in, I did analyze.

25    Q.    Okay.  The -- and the transfers out that you saw
```

A3259

```
 1    on here, what we know is that there is nothing, no

 2    evidence that you have seen to suggest that those

 3    transfers actually occurred, you did not see the banking

 4    records that would tell you whether those transfers

 5    occurred or not?

 6         MS. SHIELDS:  Objection.

 7         THE COURT:  Overruled.

 8    A.    The transfers occurred in this Q-account system

 9    and that's what I summarized.

10    Q.    You did not get or see the records that would have

11    told you whether the transfers actually occurred,

12    correct?

13    A.    The transfers occurred in the Q-account system

14    through the work account.

15    Q.    Okay.  So the transfers occurred according to data

16    compiled by Fred Sharp?

17    A.    Based on the Q-account system.

18    Q.    Okay.

19         (Pause.)

20         MS. FRITZ:  Nothing further.

21         THE COURT:  Any redirect, Ms. Shields?

22         MS. SHIELDS:  May I have just one moment, your

23    Honor?

24         THE COURT:  Yes.

25         (Pause.)
```

A3260

```
 1          MS. SHIELDS:  Just very briefly, your Honor.
 2          THE COURT:  Of course.
 3
 4    REDIRECT EXAMINATION BY MS. SHIELDS:
 5    Q.    Mr. Murphy, on cross you were asked about a number
 6    of the kind of entries that appear in the Gard account,
 7    do you recall being asked that by Ms. Fritz?
 8    A.    Yes, I do.
 9    Q.    And one of the things she asked about was "Forex,"
10    what's that?
11    A.    That's a description of foreign exchange
12    transactions.
13    Q.    And when there are foreign exchange transactions,
14    do you see essentially offsetting transactions in
15    multiple currencies?
16          MS. FRITZ:  Objection, the witness is not a --
17          THE COURT:  I know.  Overruled.  I think that's
18    within the scope.  But I'm alert to that.
19          Is that what you see in looking at this Gard
20    account?
21          THE WITNESS:  Yes.
22    Q.    And then Ms. Fritz also asked you, I think she put
23    it, "You have no idea how to determine what the internal
24    transfers are about?"
25          How would you determine what the internal
```

A3261

```
 1    transfers that are debits to the account, how would you

 2    use the Q-System to figure out what those are about?

 3         MS. FRITZ:  Objection, would you or did you?

 4         THE COURT:  Not how would you do it?

 5         How would you do that?

 6         THE WITNESS:  You review the work account to

 7    determine where those transfers went.

 8    Q.   And so if you reviewed the work account, you could

 9    figure out exactly where those transfers went, right?

10    A.   Yes.

11    Q.   And did you review all of the bank and brokerage

12    records that were available to the Commission to do your

13    work?

14         MS. FRITZ:  Objection.

15         THE COURT:  No, he may have that.  She may have

16    that.  Excuse me.

17    A.   Yes, I did.

18         MS. SHIELDS:  Thank you.

19         THE COURT:  All right.

20         Nothing further, Ms. Pickett?

21         MS. PICKETT:  No, your Honor.  Thank you.

22         THE COURT:  Nothing further, Ms. Fritz?

23         MS. FRITZ:  Nothing further.  Thank you.

24         THE COURT:  Does the Commission rest?

25         MS. SHIELDS:  Yes, your Honor, the Commission
```

A3262

```
 1    rests.
 2          THE COURT:  Approach the sidebar.
 3
 4          AT THE SIDEBAR
 5          THE COURT:  I will entertain motions for directed
 6    verdict on Monday before we get to, if we get to talking
 7    about the charge.  So you're not waiving anything at
 8    this stage.
 9          MS. PICKETT:  Thank you, your Honor.
10          THE COURT:  But that being so, do I understand
11    that when we go back there and I call upon you two, you
12    each will rest?
13          MS. FRITZ:  Correct.
14          MS. PICKETT:  Correct.
15          THE COURT:  All right.
16
17          (In open court.)
18          THE COURT:  And Mr. Friesen rests?
19          MS. FRITZ:  Yes, your Honor.
20          THE COURT:  And Ms. Gasarch rests?
21          MS. PICKETT:  Yes, she does, your Honor.  Thank
22    you.
23          THE COURT:  All right.
24          Now I do know that you have all the testimony and
25    exhibits and depositions that you're going to have in
```

A3263

```
 1   this case.  But there are two very important parts of
 2   the case left.
 3        The lawyers, all of the lawyers get a chance to
 4   sum up and argue to you the conclusions that they want
 5   you to draw from the evidence that you have seen and
 6   heard, and I, now having presided over the case and
 7   aided by the attorneys, all of them, I must craft the
 8   specific instructions that I'm going to give to you on
 9   Tuesday.
10        Now Tuesday is the next time we meet, because
11   Monday's the religious holiday -- actually we're going
12   to work because they need to advise me carefully about
13   the law, candidly, and we have other legal things to
14   talk about.  So Tuesday, 9:00, we'll begin.
15        I'm not clear who will go first, whether we'll get
16   the arguments first and then I'll explain the law, or
17   the reverse.  That's one of the things we need to talk
18   about to see what is most understandable for you.
19        But from your point of view, you will have this
20   case in your hands late morning.  And, um, on the day
21   that the jury deliberates, lunch is on us, cafeteria
22   food.  (Laughter.)  But you should be prepared on
23   Tuesday to stay for the full business day.
24        Now going in, I said no one was going to be held
25   after 5:00 and that's so.  In fact once you get the
```

A3264

```
 1    case, you are in complete charge.  If you come to a snag

 2    in your discussions and you want to go home, you just

 3    tell us you want to stop and then we'll come back

 4    Wednesday and go on and so forth.  But I'll explain all

 5    of that on Tuesday.  But the important thing is that

 6    Tuesday the case is going to be in your hands.

 7         For now, however, keep your minds suspended, and

 8    that's because the arguments of the attorneys are so

 9    important as, respectfully, is my charge, so you have to

10    know exactly now what it is that the Commission has to

11    prove here, and I'll be considerably more specific than

12    I was when we started.

13         Also, since the weekend is coming up, as I've said

14    before, you may run into other people, but you must

15    follow my instructions, no talking about the case, don't

16    start talking about it with anyone, or among yourselves,

17    and that's absolutely crucial given the time that you

18    and all of us have invested in this case.

19         I hope you have a very fine weekend, as well as

20    Monday, and we'll come back with the jury at 9:00 on

21    Tuesday morning.  You may stand in recess until that

22    time.

23         THE CLERK:  All rise for the jury.

24         (Jury leaves, 12:55 p.m.)

25         THE COURT:  Please be seated.
```

```
 1          I just want to say a couple words about my

 2     evidentiary ruling.  It's only an evidentiary ruling,

 3     but you deserve to know it in detail and what I expect

 4     from you.  Let's start with what I think is the most

 5     simple.

 6          I'm persuaded, by a fair preponderance of the

 7     evidence, that at least as to -- and I think I can say

 8     those "deals" that have been at issue in this case in

 9     which there is evidence that Mr. Friesen was a part, he

10     was a co-conspirator with the others, and every

11     statement relating to those deals is in evidence as to

12     Mr. Friesen.  I must analyze them separately because

13     I've allowed the objection of one to be the objection of

14     all, and they both objected, and I gave them a running

15     objection, so they have it.  That has the effect that if

16     we've talked about some other deal beyond those, then

17     that's -- that evidence is not admitted.  And so if

18     there's evidence which properly -- well let me stop

19     there.

20          Here's why it's more complex as to Ms. Gasarch.

21     She was at the hub.  And, um, I am satisfied that based

22     on the evidence, that she was, um, what one could

23     characterize as a "beneficiary of a deal," and at least

24     as to that point, everything having to do with that deal

25     or those couple deals is admitted.  But beyond that, by
```

A3266

```
 1    then -- by that point in time, she was a co-conspirator

 2    with Sharp and the others.  And under a -- under the

 3    First Circuit law and under the general interpretation

 4    of 801(d)(2)(E), conspirators need not know the whole

 5    deal, they can only know part of it, and, um, all the

 6    testimony of conspirators made during and in furtherance

 7    of the conspiracy is admitted.

 8          Also, under First Circuit law, even if she joined

 9    the conspiracy later in time than her initial

10    employment, which candidly I think is the fact, I'm not

11    persuaded she was a co-conspirator at that time,

12    whenever it was, that she became employed by Sharp.  I'm

13    not clear when she joined the conspiracy.  But it is of

14    little legal moment in the evidentiary rulings because

15    under First Circuit law, um, if you get on the moving

16    train, the evidence on the -- of the other cars is

17    admissible against such a co-conspirator.  And so she,

18    um, becomes a partner of all the talk that took place

19    before at least at such time as she became an employee.

20    I don't know when that is on this record.  And there may

21    be, because the evidence goes back sometime in history,

22    that she's not employed and the evidence is not admitted

23    as to her.  That may, um, have separate consequences.

24    I'd like to minimize that.

25          Other than those things that now having gotten my
```

```
 1    complete findings, you have to strike out or anyone

 2    thinks you have to strike out, I'm not undertaking

 3    myself to order anything stricken out.  That's a matter

 4    that we can talk about Monday.

 5         So Monday, starting at 10:00, um, we will

 6    entertain the motions for directed verdict, resolve

 7    those motions.  If anything is left standing on which we

 8    can go forward, and anyone wants any of this data

 9    stricken, I will hear you.  And then we will talk about

10    the charge.

11         I offer to charge first.  I don't require it.

12    It's an involved case and once we've worked our way

13    through the, um, charge conference, I will ask you

14    whether you want me to charge first or last?

15         All right.

16         MS. PICKETT:  Your Honor, may I just ask a

17    clarifying question?

18         THE COURT:  Please.

19         MS. PICKETT:  I know you mentioned that you have

20    found that Ms. Gasarch was a co-conspirator at some

21    point in time based on a -- I think you said one or two

22    deals.

23         THE COURT:  Right.

24         MS. PICKETT:  And I'm just trying to, in my mind,

25    just based on the evidence -- and I'm not criticizing
```

A3268

```
 1   you, I believe you, but I'm not sure what deals you're
 2   talking about, so I can look at those and figure out
 3   what I want to strike.
 4        THE COURT:  The ones on which she is a named
 5   beneficiary, whether it was her signature or not.  The
 6   test here is, to me, a fair preponderance of the
 7   evidence.  And I say at least by that time she was a
 8   co-conspirator.
 9        Now one of the things that confuses me here, but
10   I'm sure counsel can figure it out.  I look at the
11   verdict slip, which is crucial, they say she's in as a
12   conspirator as to certain violations, but as to other
13   things she's only an aider and abetter, and I gave them
14   the general charge on aider and abetter.  And quite
15   appropriately they are up and say "Wait, wait, wait,
16   wait, under the securities laws it's slightly
17   different," and you all know that and I of course will
18   give an appropriate charge.  But conceptually I don't
19   understand that, being an aider and abetter is not a
20   subset, a lesser included charge of the charge of
21   conspiracy.  If you're a conspirator, you're not also an
22   aider and abetter.  If you're an aider and abetter,
23   you're not a conspirator.
24        And I'm -- quite candidly I'm not going to go on
25   talking because we have our time on Monday, but I'm not
```

A3269

```
 1    sure, and I'll want the Commission to tell me, as to
 2    what offenses -- because the verdict slip says she's
 3    both, which is conceptually possible, but I'm going to
 4    ask her the factual question that in essence you're sort
 5    of asking me.  I've made an evidentiary ruling -- well
 6    it's a finding and ruling, under 801(b)(2)(E), it isn't
 7    leading me to strike anything, but I have to make it,
 8    and I've made it as accurately and carefully as I know
 9    how.  That's just to aid you in arguing the -- any of
10    the motions for Monday.
11         All right?
12         MS. FRITZ:  Your Honor, it's my understanding that
13    we will not receive the charge in writing, correct?
14         THE COURT:  That's correct.
15         MS. FRITZ:  So based on that, I do feel that I
16    would prefer to hear the charge delivered before I sum
17    up.  Usually I'm --
18         THE COURT:  Well you don't have to make the
19    argument -- that's right, but you don't have to make
20    that argument now, we'll discuss that on --
21         MS. FRITZ:  Oh, okay.
22         THE COURT:  It looks like you're all agreed with
23    that, and that's an advantage.
24         MS. FRITZ:  Yes.
25         THE COURT:  Again the disadvantage is, once I've
```

A3270

1    given it, it's my charge.  If anyone conjures with it,

2    I'm not waiting for an objection, I'm coming over to the

3    bench and saying, "No, that's not what I said, thus and

4    so."

5            MS. FRITZ:  Yes.  Thank you.

6            THE COURT:  All right.  Have a good weekend.

7            THE CLERK:  All rise.

8            (Adjourned, 1:50 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A3271

```
1                    C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5   do hereby certify that the foregoing record is a true

6   and accurate transcription of my stenographic notes

7   before Judge William G. Young, on Friday, September 22,

8   2023, to the best of my skill and ability.

9

10

11

12

13   /s/ Richard H. Romanow 1-23-24
     _____
14   RICHARD H. ROMANOW   Date

15

16

17

18

19

20

21

22

23

24

25
```

A3272

```
 1                    UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS (Boston)

 3                             No. 1:21-cv-11276-WGY

 4

 5   SECURITIES and EXCHANGE COMMISSION,
              Plaintiff
 6

 7   vs.

 8

 9   FREDERICK L. SHARP, et al,
              Defendants
10

11                         *********

12

13

14                   For Jury Trial Before:
                     Judge William G. Young
15
                  Motions and Charge Conference
16

17                   United States District Court
                     District of Massachusetts (Boston)
18                   One Courthouse Way
                     Boston, Massachusetts 02210
19                   Monday, September 25, 2023

20

21                         ********

22
                  REPORTER: RICHARD H. ROMANOW, RPR
23                     Official Court Reporter
                   United States District Court
24      One Courthouse Way, Room 5510, Boston, MA 02210
                     rhrbulldog@aol.com
25
```

A3273

```
1                    A P P E A R A N C E S

2

3    KATHLEEN BURDETTE SHIELDS, ESQ.
     ALFRED A. DAY, ESQ.
4    DAVID H. LONDON, ESQ.
     NITA KUMARASWAMI KLUNDER, ESQ.
5       Securities and Exchange Commission - MA
        33 Arch Street, 24th Floor
6       Boston, MA 02110
        (617) 573-8904
7       Email: Shieldska@sec.gov
        For Plaintiff
8

9    KAREN A. PICKETT, ESQ.
        Pickett Law Offices, P.C.
10      125 High Street, 26th Floor
        Boston, MA 02110
11      (617) 423-0485
        Email: Kpickettlaw@gmail.com
12      For Defendant Zhiying Yvonne Gasarch

13

14   MIRANDA E. FRITZ, ESQ.
     TIMOTHY J. FAZIO, ESQ.
15      Manning Gross Massenburg
        125 High Street
16      Oliver Street Tower, 6th Floor
        Boston, MA 02110
17      (617) 670-8800
        Email: Tfazio@mgmlaw.com
18      For Defendant Jackson T. Friesen

19

20

21

22

23

24

25
```

A3274

```
 1          P R O C E E D I N G S
 2          (No jury, 10:00 a.m.)
 3          THE COURT:  Well good morning.  Thank you for
 4     attending on court today.  I think the logical place to
 5     begin is with motions for a -- for "judgment as a matter
 6     of law," as they like to say it now and, um --
 7          Do you press such a motion either way?
 8          MS. PICKETT:  I did, your Honor, and I apologize,
 9     I was in Chicago yesterday for a wedding and so I just
10     filed it early this morning and I handed it over.  It's
11     a very brief motion.
12          THE COURT:  Well I'll hear you.
13          MS. PICKETT:  Okay.
14          So I filed a Rule 50 motion this morning.  As you
15     know, Ms. Gasarch has been charged as a primary
16     violator, under Section 17(a)(3), and as an aider and
17     abetter to the other defendant, under two other sections
18     which are alluding me right now, the titles of them, but
19     they're in my motion.
20          In terms of the evidence on a primary violation,
21     my position is that Ms. Gasarch herself did not commit
22     fraud, at best the Commission has shown that she engaged
23     in activity that was helpful perhaps in the Commission
24     of securities fraud.  And I'll argue later why she
25     didn't have the knowledge for that, to be an aider and
```

 1    abetter.

 2        I think that their theory, although I could be

 3    wrong, is that because she was a nominal owner of

 4    Peaceful Lion, that then became Peregrine, and that

 5    Peaceful Lion was buying shares and dumping shares, et

 6    cetera, that perhaps that's what their theory is, that

 7    she's being, you know, the primary violator.  But I

 8    think all of the evidence in this case has shown that

 9    the entities that had nominal ownership of stock, um,

10    the people behind it, such as Mr. Gasarch and

11    Mr. Nikolayev, who testified -- you remember he was

12    behind allegedly the owner of Gotama, which also was

13    involved in many many stock transactions, the evidence

14    was simply that they didn't direct the trades, they

15    didn't get the profits from the trades, um, they were

16    relying on Fred Sharp, Fred Sharp had been in the

17    business for a long time, Fred Sharp had never been in

18    trouble, Fred Sharp represented that he was a lawyer.

19    And so --

20        THE COURT:  But that's the jury argument?

21        MS. PICKETT:  The jury has to -- there has to be

22    enough evidence for the jury to find that she's a

23    primary violator, and I think as the gatekeeper, your

24    job is to determine whether a reasonable jury could find

25    that she's a primary violator.  And all of this I think

A3276

```
 1   goes to -- and again that's my theory, I guess that's
 2   what I believe the SEC's theory is, that the nominal
 3   owners were not the primary violators of the securities
 4   laws.
 5           THE COURT:  I see.
 6           MS. PICKETT:  Um, turning to the aiding and
 7   abetting.  I listed out, your Honor, the elements of
 8   aiding and abetting that you have already stated, um --
 9           THE COURT:  Which are not exactly, and counsel has
10   called it to my attention, the language of the statute,
11   and assuming this stays in the case, I'm going to use
12   the language of the statute.
13           MS. PICKETT:  Okay.  So one of the elements, and
14   as listed in the statute, is that she has to be a
15   knowing -- and I believe it's even in their jury charge
16   --
17           THE COURT:  Knowing or reckless, yes.
18           MS. PICKETT:  Yes, she has to know of the -- she
19   has to know of these securities violations.  She doesn't
20   have to know that people are acting badly, maybe they're
21   evading their taxes, whatever the reasons are for these
22   funky things, but she has to know about the primary
23   securities violations.  And the SEC has been very
24   specific that the primary securities violations are that
25   these people -- and they set it out in a chart at the
```

A3277

```
 1    very beginning, that these people were -- at the tail
 2    end -- I'm sorry, the very end, people like Mr. Sharp,
 3    were grabbing onto these nominee entities and
 4    "deceiving" people, if you will, into being the
 5    beneficial owner, and then using those to do reverse
 6    mergers, and then, um, you know doing the whole
 7    pump-and-dump scheme.
 8         Now the SEC has presented evidence from the, um,
 9    forensic examiner, and there are over a million
10    documents in this case and they're encrypted, and if
11    Ms. Gasarch knew about this, there hasn't been anything
12    in the documents that we've seen where she's the -- I
13    mean Fred Sharp is sort of the tisk-tisk on the --
14         THE COURT:  This -- I -- you're asking me to take
15    this from the jury, and under the law I have to draw all
16    reasonable inferences in favor of the Commission's
17    position here.
18         Now I grant you that, um, their case depends upon
19    drawing inferences from circumstantial evidence, some
20    stronger than others --
21         MS. PICKETT:  Yes.
22         THE COURT:  -- but a case can be proved on
23    circumstantial evidence and it seems to me that, um,
24    they can prove this case on circumstantial evidence.  So
25    --
```

A3278

1          MS. PICKETT:  Yeah, I'd like to make a brief point

2     on that.

3          THE COURT:  Go ahead.

4          MS. PICKETT:  I -- of course I'm mostly a criminal

5     defense lawyer and I understand that cases can be proved

6     on circumstantial evidence, but the only evidence as to

7     her state of mind, and the only direct evidence -- every

8     person who came in here says, "I don't know what this

9     is," right?  So we had one witness who, you know,

10    claimed to know Ms. Gasarch, in some ways through

11    e-mails or whatever, and he said, "I don't know what she

12    knew."  And I'm saying even the evidence, the e-mails

13    and whatever, I don't even think it's circumstantial

14    evidence that she knew.

15         Again we're talking about, you know -- they have

16    documents over 8 or 9 years, and I think they've

17    presented 4 or 5 documents scattered over the years, um,

18    and I just don't think it's enough for a reasonable jury

19    to find.

20         Thank you, your Honor.

21         THE COURT:  Um, the motion -- well I'll hear the

22    government -- um, the Commission.

23         MR. KLUNDER:  I hate to interrupt you, your Honor,

24    I think you might, um -- beyond to what our argument is

25    here, in brief as to the primary violation, there is

A3279

```
 1    plenty of evidence in addition to the fact that

 2    Ms. Gasarch allowed her name to be used for Peaceful

 3    Lion and Peregrine Falcon, that she received commissions

 4    as a result of letting her name be used, that she

 5    processed those payments to herself, and that she put

 6    her own signature on those documents.  She was also on a

 7    number of documents we saw with Mr. Murphy where they

 8    discussed using the same name of the notary and putting

 9    other signatures on for Conmar Capital.

10         As for aiding and abetting, Ms. Gasarch's counsel

11    is just wrong on this, your Honor.  She needs to have

12    known that the underlying violation -- the securities

13    law violation rather, is that she had a general

14    awareness that her role or conduct was part of an

15    overall act that was improper, and I point to those same

16    e-mails we saw with Mr. Murphy.

17         THE COURT:  All right, the motion for a directed

18    verdict is denied, um, or a judgment as a matter of law

19    is denied.

20         Let me ask you, because we're going to have to

21    face up to it.

22         You've got her in here on your suggested verdict

23    slip three times for different violations of the

24    securities law.  Wouldn't one be sufficient?

25         MR. KLUNDER:  Um --
```

A3280

```
 1            THE COURT:  And I'll follow up the thought.
 2            As I understand the way this works and as I --
 3       you've got 14 different issuers as to which you claim,
 4       and claim to have proved, that, um, as to Friesen and as
 5       to two of the issuers to Ms. Gasarch, that they have
 6       made specific violations under the securities laws.  But
 7       I think I agree with you that as to Friesen, for
 8       example, if he did any -- if he violated the securities
 9       laws in the way or ways you have called out, as to any
10       one of them, um, then the jury should answer "Yes" to
11       the question.
12            What will happen then is we will move to a remedy
13       phase where, armed with the jury verdict, I can impose
14       all of the remedies, legal and equitable, but of course
15       my determination of what sanctions, if any, I will
16       impose, it is going to depend on -- for instance with
17       Ms. Gasarch, on how much she was into this?  And I
18       expect to get argument on that, and if we ever get
19       there.  So I don't understand why I don't just ask one,
20       um, aiding and abetting, she either did or she didn't,
21       and with respect to the two on which you -- the one
22       really that changed its name on which she had a
23       beneficial interest, um, we'll see what the jury says as
24       to that.  I'm always yearning for simplicity in the
25       verdict slip.
```

A3281

```
 1          MS. KLUNDER:  Your Honor, I think the primary

 2     reason why we would do 17(a)(3), um, is the state of

 3     mind is different for aiding and abetting and for

 4     17(a)(3), and so I think we would like to have both of

 5     those options go --

 6          THE COURT:  But you see you get -- if -- I'm not

 7     saying -- we'll ask two questions as to Gasarch, we'll

 8     ask the question about her, well, primary role here,

 9     you've got her in here on, um, 17(a)(3), and in my

10     redraft of your verdict slip I've got her there, "Did

11     she violate Section 17(a)(3) of the Securities Act of

12     1933?"  "No."  "Yes."  But also to ask her -- ask the

13     jury, in the same verdict slip, "Did she aid and abet,"

14     um, and I'll list the different violations here,

15     "violations," um, and ask them, "No," "Yes," as to that,

16     um, twice.  Not four times.

17          Why do we need four times?

18          MS. KLUNDER:  So the aiding and abetting would

19     have two questions underneath it?

20          THE COURT:  No, it's just one aiding and abetting.

21          (Pause.)

22          THE COURT:  You see an aiding and abetting --

23          MS. KLUNDER:  That's fine, your Honor.

24          THE COURT:  Oh, all right.

25          (Laughter.)
```

A3282

```
 1          THE COURT:  All right.  Okay.

 2          Now, the other thing we need to talk about -- well

 3     the third thing's the charge, but the second thing is,

 4     does anyone take any position that given my finding as

 5     to the reach of 801(d)(2)(e), are there exhibits or

 6     portions of exhibits or testimony that should be

 7     stricken?

 8          MS. FRITZ:  Um, yes.  And may I be heard regarding

 9     a directed verdict in favor of Mr. Friesen?

10          THE COURT:  Oh, I didn't understand -- yes, you

11     may.

12          MS. FRITZ:  Thank you.

13          Okay.  From a very legalistic point of view, I

14     think the issue here on Section 5 is probably the

15     clearest, it comes down to whether there is evidence

16     that he's a necessary participant or substantial factor

17     in connection with the sales of securities?  I do

18     believe it's fairly clear that whatever the cascade of

19     people here, Fred Sharp was the one actually

20     accumulating and selling, and then apparently others

21     were in communication with him.  The evidence actually

22     is clear that Veldhuis would be in sort of controlling

23     deals to the extent that anyone was.  But I think the

24     evidence is clear that Jackson Friesen was not a

25     necessary participant in relation to sales of
```

```
 1    securities.
 2          He comes into the group, according to Dhillon,
 3    well into their work on Stevia.  He then falls out of
 4    the group at some point.  The conduct never changes.
 5    Jackson Friesen was not the reason that stock was sold.
 6    And so under Section 5, I don't think there's enough to
 7    go to the jury.
 8          THE COURT:  And that's your argument for directed
 9    verdict?
10          MS. FRITZ:  That's on Section 5.
11          THE COURT:  Well keep going.
12          MS. FRITZ:  Okay.
13          With respect to 13(d), a similar analysis, I would
14    argue, applies.  Beneficial ownership has to apply.  In
15    other words, where Fred Sharp is causing endless and
16    countless securities transactions to occur, Fred Sharp
17    ordinarily would be the one who would have the 13(d)
18    obligation.  Where Fred Sharp is directing that it occur
19    in the name of nominee entities, but he is causing it to
20    be done, the 13(d) obligation would still be with Fred
21    Sharp.
22          If Fred Sharp is then -- has an agreement or
23    relationship with someone like Paul Sexton regarding
24    actual control of the stock, then you can push the
25    envelope and you might be able to get to Mr. Veldhuis.
```

1     But under no circumstances, under the definition of

2     "beneficial ownership," can the SEC actually get away

3     with saying everyone has a 13(d) obligation and so

4     everyone is guilty of violating 13(d).  There are --

5     there's just too many layers here.  And you do not ever

6     get to a similar concept, and that is who has the power,

7     who has the control and the power over the stock?  And

8     so the 13(d) claim again is too much of a reach.

9          I still can't quite get over the fact that the SEC

10    can claim that no less than 5 people violated 13(d) in

11    connection with a stock transaction.  That's

12    counterintuitive.  It's illegal.  But the SEC does

13    believe "Heads, they win, tails, I lose," and that they

14    can just attribute the stock.

15         So if what we're doing is attributing the stock,

16    then again the actor in this is Fred Sharp, the nominee

17    entities are controlled by Fred Sharp, and their

18    wonderful data that they put together shows that if

19    control does drop down to another level, it is ACCO.

20    Every single one of their Q charts has ACCO as the

21    holder of the account.  You can't -- it's just too --

22    it's too much of a reach, Judge, to say, "And you know

23    what?  Jackson Friesen also had a 13(d) obligation."

24    They just haven't made it out.

25         As a result of that then, the 10(b)(5), since it's

```
 1    predicated on those failures to disclose, the 10(b)(5)

 2    should also be dismissed.

 3         THE COURT:  Thank you.  I'll hear the Commission.

 4         MS. KLUNDER:  Thank you, your Honor.

 5         First, as to the Section 5 claims.  The Commission

 6    doesn't reach the necessary participant or substantial

 7    factor analysis because Mr. Friesen was a direct or

 8    indirect seller.  There is case law that just because a

 9    nominee entity is used to sell the stock, that in fact

10    the person controlling those sales and benefitting from

11    those sales is a direct or indirect seller.  Therefore

12    the Commission has met all the necessary elements for

13    Section 5.

14         As to 13(d), um, "beneficial ownership," as

15    defined in the statute, is pretty clear.  A "beneficial

16    owner" of stock is a person that directly or indirectly

17    has or shares voting power or investment power for that

18    security, which includes the power to sell or direct a

19    sale of the stock.

20         We've seen numerous instances, be it testimony or

21    an exhibit, that Mr. Friesen did in fact direct the

22    sale.  We've also seen that he very much benefitted from

23    the sale of all 14 issuers of stock.  The notion that

24    Fred Sharp was controlling that stock is not accurate,

25    your Honor.  Fred Sharp administered the nominee
```

A3286

```
 1    entities, he offered them to clients like Mr. Friesen
 2    for "rent," if you will.  He was not directing those
 3    sales, as you saw Friesen and other members of his
 4    control group, Mr. Veldhuis and Mr. Sexton, would direct
 5    those sales and benefitted from those sales.
 6           As to 10(b)(5), your Honor --
 7           THE COURT:  Wait.  Wait.  Wait, before you get to
 8    10(b)(5), which is the, I would say, overarching
 9    violation.
10           What's your best case for a person in Friesen's
11    situation for a violation of 13(d)?
12           MR. KLUNDER:  So he was -- he was a beneficial
13    owner of stock, your Honor, as defined by --
14           THE COURT:  Try my -- you're just going straight
15    from the statute?
16           MR. KLUNDER:  That's right, yes.
17           THE COURT:  You don't have a case like this?
18           (Pause.)
19           MR. KLUNDER:  Um, I don't at my fingertips.
20    Perhaps my colleagues will scroll through it.
21           THE COURT:  All right.
22           No, I'm going to deny the motion for judgment as a
23    matter of law.  I will tell you that of course both
24    parties have now properly moved for judgment as a matter
25    of law, and the matter may be revisited, if necessary,
```

```
 1    after the verdict is in.

 2         MS. KLUNDER:  Your Honor, if I may answer your

 3    question?  In our proposed jury instructions filed

 4    yesterday, um, in our footnotes we cited Jammen Java and

 5    Wellman v. Dickinson in the beneficial ownership

 6    definition that's on Page 21.

 7         THE COURT:  Thank you.

 8         All right.  Now that takes care of the motions for

 9    directed verdict, at least for now.  What do you think

10    should be stricken, Ms. Fritz?

11         MS. FRITZ:  Your Honor, I'm going to start with

12    this lurking problem of the Q-System, and I want to

13    break it out into two very distinct parts, and there's

14    one half of it I don't even want to talk about, and that

15    is that somewhere within the Q-System, somebody, whether

16    it was Roger Knox or Fred Sharp or who cares, was

17    inputting data regarding stock being accumulated and

18    then sold.  The SEC, to their credit, had some poor guy,

19    Mr. Murphy, cross-reference, spend hundreds of hours

20    cross-referencing that against actual records of sales

21    of stock.  And that -- and he did that for a reason.

22    And so I want to put that aside and I want to say that

23    may be a credible statement.  But now I want to switch

24    to what they call the individual accounts.

25         The individual accounts purport to be, for
```

```
 1    example, a Gard account that supposedly relates to

 2    Mr. Friesen.  They have no basis for that document.  And

 3    I don't know if other similar documents -- you know I

 4    think the same argument would apply with respect to

 5    Sexton or Veldhuis.  In other words, if they want to

 6    argue, as they just did by the way, that Mr. Friesen

 7    benefitted mightily from these transactions, am I going

 8    to hear that in summation by the way?  If they want to

 9    argue that, there is no basis for it.

10         In other words, imagine that Fred Sharp got on

11    that witness stand and said "Oh, yeah, sure, I sent

12    money to a company that Jackson Friesen is associated

13    with," and there was not a single record to support

14    that, would that be credible?  That's all that the Q is.

15         But perhaps more importantly, your Honor, if I

16    could spend -- and this is sort of an awkward --

17         THE COURT:  But that's why we have juries.  If --

18    if -- I mean I've made a ruling of law.  I can revisit

19    it, but I thought we were talking now should I strike

20    anything out because I didn't, um, across the board say,

21    "Everything in this case is admissible under the law

22    against hearsay under 801(d)(2)(e)"?  Here I've admitted

23    this document, and I will tell you, um, I've admitted

24    the document because I think its authenticity has been

25    adequately, um, established, and, um, it would seem to
```

```
 1   me that as to the, um, number of issuers -- that I guess
 2   is the way to talk about it, in which Friesen benefits,
 3   yes, under the name "Gard," it is a reasonable inference
 4   that that's Friesen, and, um, the statement is one made
 5   during and in furtherance of the conspiracy.  So I'm not
 6   likely to strike it now.  I agree with you that it is
 7   not perhaps the most persuasive evidence, but that's why
 8   we have juries.
 9        MS. FRITZ:  Okay, just one more point, and I can't
10   really do it in a courtroom setting.  If I could spend 5
11   minutes with your Honor and go through the entries on
12   that Gard account, you would see why I called it
13   "Garbage in, garbage out."  It is not mathematically a
14   running total of anything, your Honor, it truly is
15   garbage.  It has a million dollar balance, and then a
16   $50 debit, and then a $100,000 balance, and then a
17   $200,000 credit, and it goes back to a million.  It
18   truly is garbage, your Honor.
19        THE COURT:  Well I'll give you 5 minutes with the
20   jury, but I don't see any reason to strike it out.
21        MS. FRITZ:  Okay.  Can I back up and ask you a
22   question about the issuers?  With respect to, for
23   example, I'm going to use OncoSec as an example.
24        One of the first things that happened was, um,
25   Mr. Dhillon came in here and said, "Oh, yes, I did that
```

```
 1    deal," and he couldn't have been more precise in terms
 2    of who was involved and it was not Jackson Friesen.  Now
 3    -- and so I still would argue that unless there has been
 4    a tie, a sufficient connection between Mr. Friesen and
 5    an issuer, the testimony regarding that issuer should
 6    not go to the jury.  And I would ask your Honor whether
 7    the jury has to be unanimous in terms of its
 8    determination of what conduct occurred in relation to
 9    what issuers?
10         THE COURT:  Yes.
11         MS. FRITZ:  Okay.  So -- all right, so that's a
12    question we'll deal with, I guess, in a few minutes,
13    right?
14         THE COURT:  Well I'm clear, they have to be
15    unanimous.
16         MS. FRITZ:  Okay.  So you would say to the jury,
17    "You can consider any of the 14 issuers, but all of you
18    have to agree as to which issuer the bad conduct
19    occurred?"
20         THE COURT:  Yes.
21         MS. FRITZ:  Okay.  All right.  Then I would just
22    take one more step back and say, the idea that your
23    Honor has, um, that deeply troubles me, that Mr. Friesen
24    benefitted from all of this conduct, again, your Honor,
25    is based on one document -- is based on Q data.
```

A3291

```
 1          THE COURT:  I guess our problem is in
 2     conceptualization, Ms. Fritz, it's not me you have to
 3     convince, it's the jury.
 4          (Laughter.)
 5          The test is fair preponderance.  All I'm saying --
 6     and my understanding of how I must discharge my duty, is
 7     that could a reasonable jury, looking at this evidence,
 8     draw the conclusion of Friesen's culpability, that it is
 9     Friesen, he's benefitting from it?"  I think "Yes."  And
10     therefore the evidence will stand.
11          All right.  Anything else?
12          MS. FRITZ:  May I ask one more question?
13          THE COURT:  Of course.
14          MS. FRITZ:  Um, um, because I'm concerned about
15     the extent to which -- well let's talk about Section 5
16     for a moment, that's a 5-year statute, and their
17     evidence of trading, for example, predates that, their
18     evidence that Mr. Friesen had anything to do with
19     trading or selling stocks predates that period.  So I
20     would, first of all, emphasize that that should factor
21     into whether Section 5 is tossed, because the evidence
22     they're alluding to is not within the relevant
23     timeframe, first of all.  Again, the same for 13(d), the
24     evidence that would be relevant to whether Mr. Friesen
25     violated Section 5 would post-date 2016.
```

A3292

```
 1        THE COURT:  Yeah, I saw that in the pretrial
 2   memorandum, which was very helpful, and I guess I should
 3   ask them about that.  But as I understand the interplay
 4   of the statutes of limitations here, that fact may well
 5   come into play if the jury finds Mr. Friesen culpable,
 6   and I'll have to figure out, in the remedy hearing,
 7   whether any monetary remedy can apply to events that
 8   took place outside the applicable statute of
 9   limitations.
10        MS. FRITZ:  Your Honor, to the contrary.  The only
11   evidence that would properly be considered -- the only
12   reason they got in the dozen-year-old evidence is really
13   because of 10(b)(5), um, but it does -- it is not
14   relevant to and can't be considered.  In other words, if
15   the jury said, "You know what?  There was an in exhibit
16   2012 that showed that Mr. Friesen sold some stock," they
17   don't get --
18        THE COURT:  Actually I want to hear -- well let me
19   see if I understand what you say.  You say I must charge
20   --
21        MS. FRITZ:  Yes.
22        THE COURT:  Well, all right.  So far I haven't
23   heard any reason for striking anything, but let's -- my
24   poor mind can grab itself around that.  So anything else
25   that should be said about striking anything?  And then
```

```
 1   we are going to get to talking about the charge, under
 2   which maybe I have to charge that.
 3        MS. FRITZ:  Thank you.
 4        THE COURT:  And -- all right.  So --
 5        MS. FRITZ:  I think Ms. Pickett has some more
 6   striking stuff.
 7        THE COURT:  Okay.
 8        MS. PICKETT:  Or would you rather hear from the
 9   SEC responding to --
10        THE COURT:  So far they're winning, no, and
11   therefore much as I respect everybody, and as I've said,
12   find it enjoyable to entertain the discussion, I don't
13   need to hear it.  When their ox is gored, you can be
14   sure they'll have something to say, and I will be eager
15   to hear it.
16        Now what should be stricken?
17        MS. PICKETT:  So, your Honor -- and I apologize, I
18   realize your Honor made a ruling the other day allowing
19   in the Q-System and some other stuff based on the
20   co-conspirator exception, and I just wanted, for the
21   record, to object to that.
22        THE COURT:  And your rights are saved.
23        MS. PICKETT:  Thank you.
24        And, um, I guess when you parse it out, like as I
25   think about conspiracy, I'm trying to figure out what
```

A3294

```
 1    the -- and this isn't -- this is my problem more than

 2    anyone's, but I still haven't figured out when the SEC

 3    claims that Ms. Gasarch joined the conspiracy?  I don't

 4    know if it's based on her back in -- when she first

 5    started working there, that Fred Sharp asked her to sign

 6    a document, if it goes back that far, or, for example, I

 7    think we saw something the other day where, um, there

 8    was a Q entry where some, um, I want to say life

 9    insurance, but in any event, $120,000 went to Sun Life

10    Assurance company.  So I'm trying to figure out, um,

11    based on what your Honor said the other day about you

12    finding that she was part of the conspiracy, about when?

13    And I don't have a clear, um, understanding, I guess, of

14    what your view is on that.  And maybe --

15         THE COURT:  Well let me state it again, because

16    this is my view and this is my finding.

17         She was a conspirator at least at the time when

18    she got into and her name appears with respect to -- and

19    you must say it again?

20         MS. PICKETT:  Peaceful Lion?

21         THE COURT:  Yes, Peaceful Lion.  I'm not clear

22    that she was a conspirator before -- at any time before

23    that.  But having said that, it makes no difference,

24    because at least from the time she worked there, the law

25    in the First Circuit is, you are responsible for the
```

A3295

```
 1   statements of your co-conspirators once you join the
 2   conspiracy.
 3        Now does that make sense?
 4        MS. PICKETT:  And I think she signed that
 5   document.  And obviously if you're finding that it's
 6   through the course of her employment, then I'll just
 7   preserve my objection.
 8        THE COURT:  And noted.  Very well.  All right.
 9        MS. KLUNDER:  Your Honor, the Commission, in our
10   general review of the Xphones and Xmails, in light of
11   your comments that, um, we wouldn't want to send
12   anything to the jury that wasn't tied to the 14 issuers,
13   we did in fact identify some documents that we would
14   propose removing from the binder that goes to the jury.
15   Ms. DiPaolo has an updated set.  Um, probably there were
16   2 dozen or so and --
17        THE COURT:  Well the defense gets it.  Do they
18   know what they are?
19        MR. KLUNDER:  We can share them.
20        THE COURT:  I shouldn't think that they would --
21   they may be removed.  And if that changes the defense's
22   argument as to a judgment as a matter of law, I'll have
23   to entertain it further.
24        But, yes, Ms. Fritz?
25        MS. FRITZ:  Your Honor, I've been going it, in
```

```
 1    order to identify actual trading instructions, not the

 2    supposed Jackson Friesen trading instructions, and so if

 3    they're taking out anything that shows that Mike

 4    Veldhuis was the trader, of which there are gazillions,

 5    I would object.

 6         THE COURT:  Well, um, if that's so, that's easy to

 7    take care of because you would be waiving an objection

 8    that you made for co-conspirator hearsay.

 9         MS. FRITZ:  Yes.

10         THE COURT:  Therefore I express my appreciation to

11    the Commission, because this is a complex matter, that

12    they have gone through, and pursuant to my instructions,

13    are prepared to strike things out.  If there's anything

14    there that you want in, you get it.

15         MS. FRITZ:  Okay, great.  Thank you.

16         THE COURT:  All right.

17         And, Ms. Klunder, I thank you and I thank the

18    Commission's whole team.

19         All right.  Now let's talk about the charge,

20    because a charge there will be, and let's talk about the

21    order of things.

22         So tomorrow morning I take it that you want me to

23    go first.  I will go first.  When I am done, I will call

24    you to the sidebar and, um, you can make your objections

25    to the charge.
```

A3297

```
1          The First Circuit is very strict on these
2     objections.  So notwithstanding the fact that we're
3     going to go over the charge this morning, when you are
4     at the sidebar, you be clear that I know exactly what
5     your objection is, because otherwise you do not preserve
6     it.
7          When that's done, I think it will be time to take
8     a brief recess.  We'll take a recess.  I think that, um
9     -- and this is not an invitation to take this long, but
10    we'll give the Commission 50 minutes and the defense,
11    between them, 50 minutes to argue the case.  I think
12    that will be overkill, but I will give you 50 minutes.
13         I follow the -- this is a civil case, so I follow
14    the Massachusetts order of argument, the defense will
15    argue first, then the Commission will argue, there will
16    be no rebuttal.  Since I'm going first, I will also go
17    last, but it's just boilerplate about -- very important
18    boilerplate, but about how they deliberate together.
19         The second time around, since I think what I said
20    is time-tested and unobjectionable, you're going to have
21    to stand up and ask to be heard, because when I'm done
22    the second time, I'm just excusing them.  That's
23    important because if, once that door closes and they
24    start deliberating, I haven't got the power simply to
25    call them back and say, "Oh, I made a mistake, here's
```

```
 1    what really applies."

 2         Having set that up, let's take, um -- I've been

 3    favored and I express my gratitude for it as well, um,

 4    with now the Commission's revised jury instructions and

 5    the defense has given me an edited version of the

 6    proposed jury instructions that the Commission

 7    originally, um, set forward, and we'll work from both

 8    those documents.  But let me, before we get into the

 9    specifics, um, give you the outline up to the specific

10    details here.

11         And so, because I think it's significant to work

12    from the verdict slip, Ms. Gaudet will give you the

13    verdict slip as I have revised it, and we will

14    understand that I am now, with agreement, further going

15    to revise it to have only a single paragraph referring

16    to aiding and abetting violations of the Securities Act,

17    in which I will, um, refer to the specific, um, three

18    violations in one question.  Now -- but the general --

19    the way I charge is as follows.

20         I'm going to start by reminding the jury of their

21    duty.  The verdict must be unanimous.  The burden of

22    proof remains on the Commission throughout.  I do this

23    business with my arms, (Indicates.) proof is by a

24    preponderance of the evidence, which means more likely

25    to be true than not.  I go over that.  I caution the
```

A3299

```
 1    jury that they are limited to the evidence that they

 2    have received.  No bias.  No prejudice.  No sympathy for

 3    anyone.

 4         I talk about the two types of proof, direct

 5    evidence and circumstantial evidence.  I say that direct

 6    evidence -- that a case may be proved by direct evidence

 7    or circumstantial evidence or any combination of the

 8    two.  I then will talk about the sources of evidence in

 9    this case.  The sources of evidence in this case, it

10    appears to me are four, and I will start by reminding

11    them of the stipulation that I read, and that those

12    matters are not disputed, and they may take them as true

13    simply because it has been stipulated before them that

14    those matters are true.

15         Second, I will go and give pretty much a stock

16    charge on credibility, but as I did during the trial, I

17    will call out and hear you, and you must correct me, um,

18    that Dhillon, Knox, Ciapala, um, for special scrutiny,

19    having agreed that they were conspirators in this stock

20    fraud activity.

21         MS. FRITZ:  Your Honor?

22         THE COURT:  Yes.

23         MS. FRITZ:  I believe their position is that the

24    other two witnesses also are co-conspirators.

25         THE COURT:  The other two witnesses?  Yes.
```

A3300

```
 1          MS. FRITZ:  Mr. Kaitz and Mr. Nikolayev.

 2          THE COURT:  Well -- but the fact that they may be

 3     co-conspirators, I haven't got any evidence of criminal

 4     activity against them.  I don't think the stock charge

 5     about special scrutiny -- the reason -- the reason that

 6     I call out these three is that they have pled guilty and

 7     are facing a sentence.

 8          MS. FRITZ:  Could your Honor just tell me a little

 9     about what language you use with respect to the benefit

10     that they are --

11          THE COURT:  Yes, of course, and that's why we're

12     doing this.  And please ask for precisely that.

13          MS. FRITZ:  Yes.

14          THE COURT:  I will say language in substance.

15          Now as to the witnesses, again you can believe any

16     of the witnesses here, you can disbelieve any of the

17     witnesses.  How do you do it?  You can believe parts.

18     You can look at their testimony.  You look at all the

19     other evidence in the case, does other evidence back it

20     up, does it detract from it?  What is their interest in

21     the case?  Do they have any -- are they employed by one

22     side or the other?  Do they have any reason to cooperate

23     with or slant their testimony one way or another?

24          And then now as to these three, as to three

25     witnesses, I will say the law requires you to scrutinize
```

A3301

```
 1    their testimony with special care, because if you
 2    believe their testimony here, each one of them has pled
 3    guilty to charges in connection with the activity that
 4    is involved in this case and each one is facing a
 5    sentence before another judge, and the law recognizes
 6    that, um, they may, but they may not, um, be influenced
 7    to slant their testimony exculpating themselves and
 8    inculpating the people on trial.  In essence that's it.
 9         All right.  Then I will talk about the exhibits.
10    Again -- oh, no, after the witnesses, the depositions.
11    And by "depositions," we're talking about the video
12    depositions.  Um, and again, they're to treat those
13    people just like the people who testified live.  And
14    again, they have the complete power to believe it, to
15    disbelieve it, to believe parts of it.
16         MR. DAY:  Your Honor, briefly backing up to the
17    credibility charge.
18         THE COURT:  Right.
19         MR. DAY:  The Commission would object to calling
20    out specific witnesses for special scrutiny.  Our
21    position is that the general credibility charge would be
22    sufficient for all the witnesses.
23         THE COURT:  Noted, but overruled, they're going to
24    be called out specifically.
25         And then exhibits will be last.  They may believe
```

A3302

```
 1    the exhibits, disbelieve them, believe them in part.

 2    They'll have all the exhibits with them in the jury

 3    room.

 4         Then I'll take a motion to explain what's not

 5    evidence in this case.  Here, um -- and I -- I think

 6    this is fair, but I would like to hear the defense on

 7    this.  I intend to call attention to the fact that, um,

 8    Ms. Gasarch and Mr. Friesen are not here, they don't

 9    have to be, this is a civil case, they're ably

10    represented by their attorneys, and so "Don't you draw

11    anything from that."  Part of the proposed charge here

12    that the Commission gives me, which I will give in

13    substance -- and other people have been mentioned here

14    and have not appeared, is "Don't" -- "that counts for

15    nothing.  Don't speculate about it.  All the evidence

16    that it's appropriate that you have has been laid before

17    you."

18         MS. FRITZ:  Your Honor?

19         THE COURT:  Yes.

20         MS. FRITZ:  You will charge the jury that they

21    should consider not only evidence, but the lack of

22    evidence.  And on that issue I may call out the fact

23    that they did not present certain individuals to the

24    jury.  So I would like not --

25         THE COURT:  Like who?
```

A3303

```
 1        MS. FRITZ:  Um, we're talking about 10 years worth
 2   of conduct, um, individuals that would have been
 3   involved.  For example, um, someone who -- an investor
 4   perhaps could have been called by them, or other
 5   employees who they say are not culpable.  There were
 6   certain individuals that were involved, present, at
 7   these events.
 8        THE COURT:  I don't see an investor, they don't
 9   need an investor, because it they approve violations,
10   then I will take into account what the impact has been
11   on the market.
12        MS. FRITZ:  But I do have to -- I do intend to
13   point out that Mr. London spent a fair chunk of time in
14   his opening telling them that they would hear evidence
15   about the impact -- about the importance of these
16   disclosures, that an investor needs this information,
17   and yet we get through the whole trial and not
18   surprisingly there's not a single person who got on that
19   witness stand to say, "You know I actually look on the
20   SEC website to see the Form 13(d)s and I then I compare
21   it to the disclosure in the touting material," and that
22   to me is very significant.
23        THE COURT:  I think I'll allow you to say that.
24        MS. FRITZ:  Okay.
25        THE COURT:  All right.
```

A3304

```
 1            So having said that, I also will compliment you

 2      all, and I think -- I don't do it in every case, but

 3      I'll give you a compliment, and then try to take it away

 4      by saying that the case is not to be judged in any way,

 5      shape, or form, based upon how you react to the

 6      attorneys.  And then I say the same is true of me, "I

 7      tell you I have no idea about the outcome of the case, I

 8      do not talk about it with Mr. Romanow or Ms. Gaudet or

 9      any of my law clerks, we may talk about law, but not

10      about the substance of the case, that's for you."

11            Once I've done that, we pass out to the jury the

12      verdict slip.  And so now I -- we'll go a little slower

13      and we will, um -- I'm not clear that I -- that the

14      order of these questions is the most understandable

15      order.  So let's start with Question 1, Section

16      17(a)(1).  And I have no question at all that the

17      Commission has the right to call out each violation, but

18      in simple terms, um, and this question is for the

19      Commission, what -- what is the 17(a)(1) violation here?

20      What is it?  What -- what caused Mr. Friesen to violate

21      it?

22            MR. DAY:  Yes, your Honor, it's all of the

23      evidence we've been discussing about a scheme.  17(a)(1)

24      and 17(a)(3) both relate to a combination of conduct

25      that constitutes a scheme to defraud investors.  It's
```

```
 1    the -- the jury has to be unanimous that a scheme
 2    existed, but they can consider all the evidence
 3    underlying it to reach that conclusion.
 4         THE COURT:  Well -- all right, that makes sense to
 5    me.  And so what's the difference between (a)(1) and
 6    (a)(3)?
 7         MR. DAY:  Your Honor, there isn't a huge
 8    difference between (a)(1) and (a)(3).
 9         THE COURT:  Why can't we just ask one question
10    then?
11         MR. DAY:  (a)(3) does have a significance
12    difference from (a)(1), and that is that, um, it
13    includes conduct that the statutory language is "would
14    operate as a fraud."  So the jury is entitled, under
15    that one, to conclude that there was conduct that could
16    have deceived investors or the investing public, which
17    is a little bit broader than 17(a)(1).
18         THE COURT:  All right, I follow that.
19         MR. DAY:  Oh, your Honor, I'm sorry, my colleague
20    also reminded me that there's a state of mind
21    difference.  17(a)(1) requires proof of scienter.
22    17(a)(3) requires proof of scienter or negligence.
23         THE COURT:  I understand that.  And then I -- I
24    think I understand what 10(b) is.
25         What is the 5(a) violation?
```

A3306

```
 1          MR. DAY:  That's the --

 2          THE COURT:  (a) and (c), what's that?

 3          MR. DAY:  So that is the unregistered offering of

 4    securities.  I'm going to have to take a quick look at

 5    the statute before -- I'm sorry, are you referring to

 6    10(b)(5) and (c)?

 7          THE COURT:  No, I skipped over it.

 8          MR. DAY:  Okay.  Okay.  Yeah, I'd have to look at

 9    the specific language in the statute, but I believe that

10    both of those provisions apply to unregistered sales of

11    securities.

12          THE COURT:  All right, that they should be

13    registered and were not?

14          MR. DAY:  Correct.

15          THE COURT:  All right.  And then --

16          MS. FRITZ:  I'm sorry, your Honor.  For Section 5

17    it's always they should have been the subject of a

18    registration statement or exempt from the registration

19    requirement, that's the language.

20          THE COURT:  And I propose to give that.

21          MS. FRITZ:  Okay.

22          THE COURT:  And then 13(d) is this failure to

23    report over 5 percent beneficial ownership?

24          MR. DAY:  Yes, your Honor.

25          THE COURT:  All right.
```

A3307

```
 1            MR. DAY:  And we've proposed an instruction at

 2    Page 21 that covers not only the requirement to disclose

 3    the ownership, but also what it means to be a

 4    "beneficial owner" and operating as a group.

 5            THE COURT:  No, I understand.

 6            All right.  (Pause.)  All right.  I -- as he

 7    explains it, and I accept that, um, I can see the logic

 8    of laying it out like this.

 9            Does the defense have any, um, suggestions as to a

10    better logic?

11            MS. FRITZ:  I would submit that the scheme that --

12    sorry.  The scheme they're alleging truly is the Section

13    5 and 13(d) violations, and that therefore it might make

14    more sense for the jury to address those issues in order

15    to then -- if they find that Mr. Friesen is not liable

16    for Section 5 and they find that he's not liable for

17    13(d), I think that they're kind of done at that point

18    because that's the conduct that forms the basis for the

19    Section 17 and 10(b)(5) assertions.

20            THE COURT:  Is that your position?

21            MR. DAY:  No, your Honor, that is absolutely not

22    what we have alleged in this case and it is not a

23    predicate for finding fraud liability.  The scheme is

24    fraud.  Mr. London described it to the jury at the very

25    beginning, a massive "hoarding," using my colleague's
```

```
1    words, "large chunks of stock," "controlling stock,"
2    "hiding them from the public," "pumping up the stocks
3    through promotions," and then "clandestinely selling it
4    into the market," and that is a much much broader set of
5    evidence than just whether there was a violation of
6    these specific statutory requirements.
7         MS. FRITZ:  The only problem, your Honor, is that
8    those things are not illegal.  Everything that he just
9    said, acquiring all the stock in a shell, being part of
10   a reverse merger, then engaging in promotional activity
11   in relation to the newly-formed company, none of that is
12   a scheme, none of that should be argued to the jury as a
13   basis for a finding of liability.
14        THE COURT:  Well all of those steps, taken
15   singularly, are not unlawful, and that's something I
16   should point out.
17        MS. FRITZ:  Right.
18        THE COURT:  However, all of them can be elements
19   of, to use 10(b)(5), "a scheme or artifice to defraud."
20        MS. FRITZ:  But again the difference -- the
21   transaction becomes wrongful, in their view, when
22   Section 5 and 13(d) -- no, not "when," because, in this
23   case, there was a failure of disclosure.  In other
24   words, your Honor, flip it over.  If Fred Sharp had
25   properly filed every 13(d) and registration statements
```

```
 1    had been filed, they don't have a -- they don't have an
 2    argument, they don't have a problem with the
 3    transaction.  So those are, I would argue, they really
 4    are the predicates for their particular version of 17(a)
 5    and 10(b)(5) violations.
 6         MR. DAY:  Your Honor, if we had not charged either
 7    Section 5 or Section 13, we would plainly have a claim
 8    under the antifraud portions of the statutes.
 9         MS. FRITZ:  It wouldn't change their theory.
10    Their theory is the fraud exists by virtue of failures
11    to disclose.
12         MR. DAY:  Then they're not predicates.
13         MS. FRITZ:  But there is --
14         THE COURT:  This is -- wait.  Wait.  This is
15    helpful.  And I think I can handle it in the charge.  I
16    think I will leave the, um -- I think I will leave the
17    order as it stands.
18         All right.  Let's then look at the government's,
19    um, suggestions as to -- oh, interestingly, in your
20    proposed suggestions now, you've moved 10(b)(5) up to
21    the initial instruction and then go to 17(a).  That does
22    make some sense to me.
23         Doesn't it make --
24         MS. PICKETT:  Your Honor, can I speak to something
25    on the verdict form?  I'm sorry.
```

A3310

```
 1          THE COURT:  Go ahead.
 2          MS. PICKETT:  Before we leave it.
 3          I know you said that you're going to sort of lump
 4     in -- are you going to make those two questions now
 5     under one heading?
 6          THE COURT:  I'm going to make -- if you look at
 7     the form that I have given you, which is the draft I'm
 8     working from, um, the question -- what's here starting
 9     with Question 7 --
10          MS. PICKETT:  Yes.
11          THE COURT:  -- 8, and 9, will all be a single
12     question.
13          Does that answer your --
14          MS. PICKETT:  Yes, thank you, your Honor.
15          THE COURT:  All right.
16          I think it makes sense to charge 10(b)(5) first.
17          MR. DAY:  Your Honor, we have no objection to
18     that.
19          THE COURT:  All right.  So --
20          MS. FRITZ:  Your Honor, at what point are you
21     going to tell the jury that they have to be unanimous in
22     terms of --
23          THE COURT:  Oh, that will be in the very first --
24     when I first stand up and I talk about the duty of the
25     jury.  "Your verdict must be unanimous, unanimous as to
```

A3311

```
 1    each element I'm going to charge you."  And I'll be
 2    specific.  "If we're talking about a specific issuer, a
 3    specific issuer of securities, you must be unanimous
 4    about which issuer you are deciding on.  It can't be
 5    some of you thinking, 'Well, he committed fraud or she
 6    committed fraud with respect to this one, but not that
 7    one,' you've got to be unanimous as to which one."
 8         MS. FRITZ:  Okay.
 9         MR. DAY:  Your Honor, the Commission would object
10    to that charge on unanimity.  The jury only has to find,
11    first of all, that there's a violation as to one issuer
12    with respect to liability.
13         THE COURT:  Correct, I'll say that.
14         MR. DAY:  But also it's our position that the law
15    for scheme liability, the jury has to be unanimous that
16    there was a scheme, but they don't have to be unanimous
17    as to the underlying evidence.
18         THE COURT:  Oh, yes, they do.  Absolutely they do.
19         MR. DAY:  Your Honor, that's our view of the law
20    on scheme liability and we object to the instruction.
21         THE COURT:  Noted, but I'm going to charge that
22    they have to be unanimous as to what specific scheme is
23    being talked about here.
24         All right.  (Reads.)  So let's look at their, um
25    -- we'll work from the government's most recent
```

```
1    submission, their Instruction Number 4.  And when I say
2    "I'll give it," it's always in substance, I will give
3    all the, um -- I will give the substance of that charge.
4    The word choice may be mine.
5        I'll give 4.  I'll give 5.  (Looks.)  Let's be
6    specific, um, because the issue here is -- I said I
7    would give 5, but the issue we were just talking about
8    is, um, appears on the bottom of Page 7.
9        "Further, you need not agree upon the specific
10   conduct that constituted" -- I'm not giving that.
11       MR. DAY:  Yes, your Honor, and we would just renew
12   our objection on that point.
13       THE COURT:  Yes, but understand it's helpful --
14   you don't make the record here, and if you persuade me,
15   fine, but be sure to make that objection tomorrow
16   because I'm not giving it.
17       (Pause.)
18       THE COURT:  (Looks.)  I'll give 6.  6 is a good
19   example.  Here you're slipping into "If a defendant."  I
20   will always use the names.  And, um, as to 10(b)(5),
21   it's only Mr. Friesen, and so I will only use
22   Mr. Friesen's name.  (Looks.)  So I will give 6.  I will
23   give --
24       MS. FRITZ:  Your Honor, on Page 9.
25       THE COURT:  Yes.
```

A3313

```
 1        MS. FRITZ:  I think it includes the word
 2   "negligently" in the second full paragraph, which
 3   shouldn't be there.
 4        THE COURT:  Not -- the second full paragraph?
 5   Just a moment.  What does -- yes, for 10(b)(5), no.
 6        MS. FRITZ:  Right, should be "knowing and
 7   reckless."
 8        THE COURT:  All right.
 9        MR. DAY:  Yes, your Honor.
10        THE COURT:  All right.
11        So I'll give, um -- I'll give Number 7,
12   Instruction Number 7.
13        Okay, now for the 17(a) claims.  I'll give 8.
14        MS. PICKETT:  Your Honor, can I just make a
15   request on 8, that, um, there be some kind of exclusion
16   that each of the defendants be considered separately?
17        THE COURT:  I, um, will say that, but I think I
18   will put that in before I get to the substance.
19        MS. PICKETT:  Yes, thank you.
20        THE COURT:  I conceive of the charge though, the
21   first part is very important, and they're hearing it for
22   the first time, and to me that's the general
23   boilerplate.  Then I'm going to warn them away from
24   things that are not, absence of your clients, other
25   people who are mentioned but not here, et cetera, et
```

A3314

1    cetera.

2         MS. PICKETT:  Thank you, your Honor.

3         THE COURT:  And the business about our

4    participation in the trial has a role, but it's not

5    evidence.

6         Then what actually happens is Ms. Gaudet is

7    passing out the verdict slips to them all, because I

8    want them to follow them in the order that I'm talking

9    about them.  And as I start that, I should start, "Now

10   we've got two people here and the evidence against them,

11   some of it is the same evidence, some of it is different

12   evidence, you've got to keep the two separate, entirely

13   separate in your mind."

14        MS. PICKETT:  Thank you, your Honor.

15        THE COURT:  But I'm not going to mention that for

16   each different offense.  Where it's just Friesen, it

17   will be just Friesen.  The substantive one, I'll mention

18   the two.  The aiding and abetting, it's just

19   Ms. Gasarch.

20        Ms. Fritz?

21        MS. FRITZ:  On Page 12, in the 17(a) claim,

22   sometimes they do include Friesen and Gasarch, but

23   sometimes they're just picking on Mr. Friesen in here.

24   So sometimes the language relates only -- refers only to

25   Mr. Friesen.  It should be both throughout.

A3315

```
1              THE COURT:  Actually --
2              MS. FRITZ:  The second line is --
3              THE COURT:  No, the claim -- Sexton's out, so they
4      don't have to prove anything as to Sexton, they have to
5      prove it as to Friesen.
6              MS. FRITZ:  Right.  But this count relates to
7      either Mr. Friesen or Ms. Gasarch.
8              THE COURT:  Right.
9              MS. FRITZ:  And sometimes they reference both in
10     their charge, but sometimes they just call out
11     Mr. Friesen.
12             THE COURT:  Well as between Friesen and Gasarch --
13     here.  Here the, um, this one relates to Ms. Gasarch as
14     well.
15             MS. FRITZ:  So the second line, for example,
16     shouldn't say "Friesen," and then in the third paragraph
17     down on Page 12, it shouldn't say "Friesen," it should
18     say both.
19             MR. DAY:  Your Honor, I think --
20             THE COURT:  It's not going to say both, it's going
21     to be the names of the people who are charged.  And
22     they'll be a disjunctive, "or," between them, "or both,"
23     Mr. Friesen, Ms Gasarch, "or both," and then the --
24             MR. DAY:  Your Honor, I think the source of
25     confusion here may be that Ms. Gasarch was not charged
```

A3316

```
 1   with 17(a)(1).
 2        THE COURT:  Okay, thank you.  So it's just going
 3   to be Friesen.  And I appreciate it.
 4        MS. FRITZ:  So then in that case why does it say
 5   "Friesen" --
 6        THE COURT:  Talk to me.
 7        MS. FRITZ:  -- "and Gasarch"?
 8        THE COURT:  Well because that's a mistake, and
 9   he's acknowledging it.
10        MS. FRITZ:  Oh, okay.
11        MR. DAY:  Your Honor, I think maybe I didn't
12   explain this well, but on Page 12, the very first
13   paragraph --
14        THE COURT:  Yes.
15        MR. DAY:  -- Friesen is called out after 17(a)(1)
16   by showing that Friesen "employed any scheme or artifice
17   to defraud."  And the next section is referring to
18   Section 17(a)(3), and that's where both names are
19   included.
20        MS. FRITZ:  Okay, that's just confusing.
21        THE COURT:  No, it's not.  It's not.  We'll start
22   with (a)(1).  I'll have to work on this Page 12 -- no,
23   13, but then I propose to give, um, what's here on Page
24   14, because here there is, and it's a significant
25   difference, you can violate this by negligence as well,
```

```
 1    and I will make a point of saying that.
 2         MS. FRITZ:  Why when we go to -- back to Page 12,
 3    in the third paragraph, why is that reference only to
 4    Mr. Friesen?
 5         THE COURT:  Because it -- because at this stage
 6    I'm talking just about (a)(1).
 7         MS. FRITZ:  But two lines down it says (a)(1) and
 8    (a)(3)?
 9         THE COURT:  Well I said I was going to have to
10    work on it.
11         MS. FRITZ:  Thank you.
12         THE COURT:  I mean I do the best I can.
13         All right.  So then, um, I'm going to give -- I am
14    going to give, um -- I'm not going to give all the
15    language in, um -- well I'm going to alter Instruction
16    13 and read the language of the statute for aiding and
17    abetting, that it's a violation of the securities laws
18    for any person to "knowingly or recklessly provide
19    substantial assistance to another person in violation of
20    a provision of this act or of -- of any rule or
21    regulation issued thereunder."  And then I'll go and
22    give first and second and third, but I won't call out
23    Friesen necessarily in the first paragraph, I will call
24    out Sharp or any of the other people whom you have
25    concluded directly or indirectly violated, and then I'll
```

A3318

```
 1    call out each of the provisions that we're talking
 2    about.  And then I'll give the second, "Gasarch had a
 3    general awareness that her role or conduct was part of
 4    an overall activity that was improper and that she
 5    knowingly or recklessly," and then I'll give the
 6    definitions that appear in the last paragraph.
 7         MS. PICKETT:  Your Honor, can I be heard briefly
 8    on this?
 9         THE COURT:  Yes.
10         MS. PICKETT:  As you'll see in the defendants'
11    proposed instructions -- I actually spent a lot of time
12    on this because I, um, wanted to make sure that I got
13    that aiding and abetting --
14         THE COURT:  Sure.
15         MS. PICKETT:  -- language correctly, and, um, in
16    the defendants' proposed instructions, I followed along
17    with what you said were the elements in your order on
18    the, um, Sharp, um, dismissal, motion to dismiss, and
19    it's not that there's just some general awareness -- so,
20    for example, based on this instruction, there was some
21    stuff where Ms. Gasarch -- I think the jury could say
22    "Why is she doing this?"  But it's not just a general
23    awareness, she has to be -- she has to have -- she has
24    to know of the securities violations.  And she has to --
25         THE COURT:  She doesn't have to know that it's a
```

```
 1    securities violation, she has to know what the conduct
 2    is.
 3          MS. PICKETT:  Well she has to know that the
 4    underlying conduct rises to a standard --
 5          THE COURT:  And she says is improper under the,
 6    um -- yeah, I think there's much to that.  A "general
 7    awareness," she has to know that the conduct is improper
 8    under the securities laws --
 9          MS. PICKETT:  Yes, your Honor.
10          THE COURT:  -- or she has to be recklessly
11    indifferent to such conduct.
12          MS. PICKETT:  Your Honor, I just -- and I know
13    it's confusing, but I -- like I said, she has to know
14    that the -- of the underlying conduct that gives rise to
15    the securities violations.  Then, the next step is, she
16    has to knowingly or recklessly provide substantial
17    assistance.  The recklessness doesn't come in on the
18    "Does she know of the underlying" --
19          THE COURT:  Yes, I think you're right.
20          MS. PICKETT:  And there is some language that you
21    adopted, and I can point it to you, um, maybe after we
22    take a break, but there was some language in your
23    opinion where you said what it means to provide
24    substantial assistance, and I would like you to give
25    that same instruction to the jury.  Because I don't know
```

A3320

1    that "substantial assistance" is, um, it sounds like

2    common sense, but it has a sufficient meaning under the

3    statute.

4        THE COURT:  What's the matter with theirs?  "To

5    provide 'substantial assistance' means that the

6    Commission has proved that Ms. Gasarch in some way

7    associated herself with the venture, that she

8    participated in it as something that she wished to bring

9    about, and that she sought, by her actions, to make it

10   succeed"?

11       MS. PICKETT:  I apologize, your Honor, I was

12   looking at their -- they made the changes that I had

13   requested.  I'm sorry about that.  I apologize.  I'm

14   looking at three different things now.

15       THE COURT:  That's okay.  And, um, when -- as I've

16   talked this through, there's one other general matter.

17       When we get into this, going back to where I say,

18   right after I say, um, "Treat each person individually,"

19   I will say generally that "The securities laws are

20   intended to provide for fair disclosure in the trading

21   of securities.  Now that doesn't mean that it's left to

22   you people to decide what's fair.  Rather the idea of

23   these different statutes," that I'm going to go through,

24   "is to set out the rules for what constitutes fair

25   disclosure."

```
 1          Now I've given pretty much everything I intend to
 2     give.  Does anyone want anything specific that has not
 3     been mentioned here?
 4          Yes?
 5          MR. DAY:  Your Honor, just a point of
 6     clarification.  On Page 16, in the middle, the second
 7     element of aiding and abetting, I wasn't sure where we
 8     landed on the language there?
 9          THE COURT:  Oh, no, you're right.  (Reads.)
10     Instead of "general awareness," I'm going to use the
11     word "understood."  All right?
12          (Silence.)
13          THE COURT:  All right.  Thank you very much.  9:00
14     tomorrow morning.
15          MS. FRITZ:  Oh, Judge?
16          THE COURT:  Yes.
17          MS. FRITZ:  I have so many things to say about the
18     Section 5 charge.
19          THE COURT:  Go ahead.
20          MS. FRITZ:  Um, I do object, just for the record,
21     I object to the --
22          THE COURT:  No, no --
23          MS. FRITZ:  I'll do it quickly.
24          THE COURT:  It's not a matter of quick.  It
25     doesn't make any difference what you object to, for the
```

A3322

```
 1    record, unless you're trying to persuade me.  For the
 2    record, if I were to -- though you'll still be trying to
 3    respectfully persuade me at the sidebar, my mind won't
 4    be closed until I've finally sung.
 5         MS. FRITZ:  Okay.
 6         THE COURT:  And in effect you get -- because I may
 7    slip a paragraph or something, and you get to bring that
 8    to my attention.
 9         All right.  What would you like changed in Section
10    5?
11         MS. FRITZ:  The most important thing is the
12    "necessary participant" language on 18.  We had
13    previously -- the defense had previously submitted an
14    instruction.
15         THE COURT:  Go ahead.
16         MS. FRITZ:  This "necessary participant" language
17    is sort of skewed to try to pull in, um, I would argue,
18    a broader raft of people than the case law actually
19    provides for.  I believe I had submitted language that
20    really includes a sort of but-for concept in there.
21         THE COURT:  Where specifically are -- you're
22    talking about 10(b)(5) here?
23         MS. FRITZ:  No, I'm on Page 18.
24         THE COURT:  Thank you.
25         MS. FRITZ:  And I'm on the first element with
```

A3323

```
 1   respect to Section 5, which is they have to prove
 2   obviously that Mr. Friesen sold securities.  And if
 3   you -- I would ask your Honor to take a look at what we
 4   had submitted on Page 21, which includes language, for
 5   example, that "A defendant is a necessary participant if
 6   but for the defendant's participation, the sale
 7   transaction would not have taken place."  And that's
 8   sort of the language I'm used to with respect to Section
 9   5.
10           THE COURT:  (Reads.)
11           MS. FRITZ:  That he's a but-for participant -- I
12   mean he's a but-for factor in the sale.
13           THE COURT:  (Reads.)  I am disposed to add the
14   language after the "or was a substantial factor in the
15   process," "that is they would not have occurred but for
16   his involvement."
17           MS. FRITZ:  Okay, thank you.
18           MR. DAY:  Your Honor, the First Circuit law on
19   this is clear that it's not a but-for causation test
20   with Section 5, um, it's broader.
21           THE COURT:  The case?
22           MR. DAY:  Sorry?
23           THE COURT:  The case?
24           MR. DAY:  Um, SEC vs. Jones, 300 F. Supp. 3rd, 312
25   at 315.  And we also direct your Honor to the motion to
```

A3324

```
 1   dismiss ruling in this case, which is 626 F. Supp. 3rd
 2   at 396.
 3        THE COURT:  Thank you very much.  All right.  I'll
 4   take that matter under advisement.
 5        And we'll stand in recess until 9:00 tomorrow
 6   morning.  Thank you.
 7        MS. FRITZ:  Your Honor, one last question?  I'm
 8   sorry.
 9        THE COURT:  Never apologize, zealous advocacy is
10   to be favored.
11        MS. FRITZ:  The 5-year period?
12        THE COURT:  What?  Oh, yes.  Well how do you
13   expect me to deal with this?
14        MS. FRITZ:  I would argue that when you're telling
15   them what the evidence is, as you start, then at that
16   point you need to explain to the jury that certain of
17   the offenses relate to a time period of only 5 years,
18   and that the evidence that they may consider as to
19   whether that violation occurred is not something that
20   happened 12 years ago, that they need to consider the
21   evidence of whether that wrongful conduct occurred
22   during the 5-year period.
23        THE COURT:  Well, but that gives them no guidance
24   as to what evidence.
25        MS. FRITZ:  I'll sum up on what's -- all the
```

A3325

```
 1    evidence is 2013 and 2014.  So I will be arguing to the

 2    jury that they can't be telling you there's a Section 5

 3    violation because of something he did or said in 2012.

 4         MR. DAY:  Your Honor, the jury should be able to

 5    consider all of the evidence.

 6         THE COURT:  Well, no, she isn't saying they won't

 7    get to consider all the evidence, she's saying that the

 8    liability -- for the liability to attach, it has to be

 9    more -- the specific offense has to have occurred, um,

10    more recently than --

11         What was the date that this case was filed, some,

12    um, date in 2021?

13         MR. DAY:  August of 2021, your Honor.

14         MS. FRITZ:  The 5-year period, as I recall, kicks

15    in at some point in late 2016.  August 2016, I think.

16    So if he's doing something in 2012, that's not properly

17    a basis for finding that he engaged in a Section 5

18    violation.

19         THE COURT:  Well I'm not charging that that was

20    the case, rather I'm saying that -- I propose to say

21    that "There's a statute of limitations that goes back to

22    August 2016.  You've heard of activity that took place

23    before that.  Why did I let you hear about that?

24    Because you must consider whether that connected conduct

25    -- connected conduct, not a specific deal, extended into
```

A3326

```
 1    a period after August 2016."

 2         You're satisfied with that?

 3         MS. FRITZ:  As long as it's clear that you must

 4    find that the violation occurred during the 5-year

 5    period.

 6         MR. DAY:  Your Honor, that is absolutely not a

 7    correct statement of the law for a number of reasons.

 8    First of all, conduct -- well I think I should start

 9    with the big picture, that the statute of limitations

10    applies to remedies, not to liability.  That this jury

11    is not being asked to decide anything about remedies.

12    It's not like a private suit for damages where the jury

13    would consider the statute of limitations --

14         THE COURT:  And that was raised again in the

15    pretrial memorandum.  So let me be clear.  If we get to

16    remedies, and I'm coming to think about remedies, and I

17    think that violation was pre-August 2016, then I cannot

18    impose a monetary penalty.

19         MR. DAY:  Yes, that's right, your Honor.

20         THE COURT:  I'm satisfied with that.  And so we

21    don't need to -- they can consider it.  That is how I

22    thought the law worked.  If we get to the remedies

23    stage, um, you make sure you get a transcript of that

24    statement right there.  We're not going to be

25    considering -- but I can do equitable remedies, I can do
```

```
 1    disgorgement if they can prove true equitable
 2    disgorgement, but we're not making disgorgement some
 3    pseudo-legal remedy which, in other circumstances, I
 4    have accused the Commission of doing.  But a truly
 5    equitable remedy, I can impose that.
 6         MS. FRITZ:  Your Honor, all I'm saying is if
 7    there's evidence of what he did in 2012, that should not
 8    form -- the jury should not be able to say "Something
 9    happened in 2012 and therefore he violated Section 5."
10         THE COURT:  But in fact if something happened in
11    2012, or within 10 years -- yeah, 2012.  If something
12    happened in 2012, he still be can be liable for
13    violating Section 5, that's right, he can be.
14         MS. FRITZ:  Under what, um --
15         THE COURT:  I can't impose a monetary penalty on
16    him.
17         MS. FRITZ:  But I don't know of any law that
18    says -- particularly post *Cocash*, that you get to prove
19    up conduct that occurred any time in the past --
20         THE COURT:  Not any time, within 10 years.
21         MS. FRITZ:  I do not -- that 10-year provision
22    seems, I would argue, is not applicable as they consider
23    whether a violation of Section 5 occurred.
24         THE COURT:  Okay, let me just try one last time so
25    you can see what you're going to have to deal with.
```

A3328

```
 1          As I have stated the law to Ms. Fritz, the
 2     Commission agrees with that, is that right?
 3          MR. KLUNDER:  Yes, your Honor.
 4          MR. DAY:  Yes.
 5          THE COURT:  Yeah, right, that is what I think the
 6     law is, and I thank you.  And that's how I was -- well
 7     I'm not going to mention the statute of limitations.
 8     But I understand what -- if I am authorized, what I may
 9     do and what I may not do.
10          We'll recess until 9:00 a.m. tomorrow morning.
11     We'll stand in recess.
12          (Adjourned, 11:35 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

A3329

```
 1                    C E R T I F I C A T E

 2

 3

 4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 5     do hereby certify that the foregoing record is a true

 6     and accurate transcription of my stenographic notes

 7     before Judge William G. Young, on Monday, September 25,

 8     2023, to the best of my skill and ability.

 9

10

11

12
       /s/ Richard H. Romanow 1-23-24
13     _____
       RICHARD H. ROMANOW    Date
14

15

16

17

18

19

20

21

22

23

24

25
```

A3330

```
 1                    UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS (Boston)

 3                              No. 1:21-cv-11276-WGY

 4

 5      SECURITIES and EXCHANGE COMMISSION,
                   Plaintiff
 6

 7      vs.

 8

 9      FREDERICK L. SHARP, et al,
                   Defendants
10

11                           *********

12

13

                            For Jury Trial Before:
14                          Judge William G. Young

15

16

                            United States District Court
17                          District of Massachusetts (Boston)
                            One Courthouse Way
18                          Boston, Massachusetts 02210
                            Tuesday, September 26, 2023
19

20                           ********

21

22              REPORTER: RICHARD H. ROMANOW, RPR
                        Official Court Reporter
23                     United States District Court
              One Courthouse Way, Room 5510, Boston, MA 02210
24                        rhrbulldog@aol.com

25
```

A3331

1                    A P P E A R A N C E S

2

3     KATHLEEN BURDETTE SHIELDS, ESQ.
      ALFRED A. DAY, ESQ.
4     DAVID H. LONDON, ESQ.
      NITA KUMARASWAMI KLUNDER, ESQ.
5         Securities and Exchange Commission - MA
          33 Arch Street, 24th Floor
6         Boston, MA 02110
          (617) 573-8904
7         Email: Shieldska@sec.gov
          For Plaintiff
8

9     KAREN A. PICKETT, ESQ.
          Pickett Law Offices, P.C.
10        125 High Street, 26th Floor
          Boston, MA 02110
11        (617) 423-0485
          Email: Kpickettlaw@gmail.com
12        For Defendant Zhiying Yvonne Gasarch

13

14    MIRANDA E. FRITZ, ESQ.
      TIMOTHY J. FAZIO, ESQ.
15        Manning Gross Massenburg
          125 High Street
16        Oliver Street Tower, 6th Floor
          Boston, MA 02110
17        (617) 670-8800
          Email: Tfazio@mgmlaw.com
18        For Defendant Jackson T. Friesen

19

20

21

22

23

24

25

A3332

```
 1                    I N D E X
 2
 3   JUDGE'S CHARGE TO JURY...........................   4
 4   CLOSING ARGUMENT BY MS. PICKETT..................  51
 5   CLOSING ARGUMENT BY MS. FRITZ...................  68
 6   CLOSING ARGUMENT BY MS. SHIELDS.................  83
 7   JURY QUESTION................................... 118
 8
 9
10                  E X H I B I T S
11                 (None marked.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1        P R O C E E D I N G S
 2        (Jury enters, 9:15 a.m.)

 3

 4   JUDGE'S CHARGE TO JURY:
 5        Well good morning, ladies and gentlemen, and again
 6   I say thank you most sincerely, your promptness, your
 7   attention, has set just the right tone for this
 8   proceeding.
 9        Now the lawyers and I have talked and we've
10   decided that the best way to present this case to you is
11   if I go first and teach you now specifically the law
12   that applies now that all of us have heard the evidence
13   in this case.  Once I'm done, we'll take a brief recess
14   and then the attorneys will get a chance to argue to you
15   the -- what they -- they'll try to persuade you of how
16   you should answer 7 questions that we're going to ask
17   you, and the questions can all be answered "No" or
18   "Yes," but the questions deal with different legal
19   requirements of our securities laws, and that, what you
20   believe the facts are in this case, is going to
21   determine the answer to those questions.
22        Now what happens now, this judge's charge is like
23   a law school class, I will explain as best I can and as
24   carefully as I can what it is that the Commission has to
25   prove, and in this case the Commission has got to do the
```

A3334

```
 1    proving.  Mr. Friesen, Ms. Gasarch, they don't have to
 2    explain anything to you.  Here of course you see there
 3    has been cross-examination of witnesses and there's been
 4    documents submitted to you and I'm sure their counsel is
 5    going to make arguments to you about what conclusions
 6    you should draw, and that's all appropriate, but the
 7    Commission brought this civil case.  This is not a
 8    criminal case.  Some people have been charged criminally
 9    and you've heard from some of those people, but
10    Ms. Gasarch and Mr. Friesen, they have not, and so don't
11    speculate about that at all.  This is a civil case.  And
12    in a civil case the burden on the Commission is not the
13    same as in a criminal case, it's proof by a fair
14    preponderance of the evidence.
15         Now proof by a fair preponderance of the evidence,
16    it doesn't mean who has called the witnesses, it doesn't
17    mean who -- the various number -- what do we have?
18    Almost 300 exhibits.  It doesn't mean who put in the
19    most evidence.  It means, on the points I'm going to
20    tell you, what -- are you persuaded, are you persuaded
21    more likely than not -- more likely than not that the
22    Commission's point, the Commission's position is true?
23    It's as simple as that.  The Commission, on each of the
24    points that I'm going to tell you they have to prove, on
25    each of those points they have to show you, by a fair
```

A3335

1     preponderance of the evidence, that their position is

2     more likely to be true than not true.

3         So you see in a civil case it's one way or the

4     other, either they have persuaded you, more likely to be

5     true than not, or they have not persuaded you, more

6     likely to be true than not, on that position, and if

7     something else is more likely true, then, um,

8     Mr. Friesen, Ms. Gasarch -- and we keep them separate

9     because there's separate claims against each one of

10    them, they would -- they win, the proof has not been

11    more likely to be true than not true.

12        Also suppose you get into a situation where on a

13    particular point you think that it's equal, it's neither

14    more likely nor less likely, and you can't decide.   In

15    that case that has not been proved by a fair

16    preponderance of the evidence.   Mr. Friesen,

17    Ms. Gasarch, or whoever the point pertains to, they win

18    on that point.   But so long as what the Commission is

19    trying to prove is more likely to be true than not, the

20    Commission wins.   So let's start then, since we've got

21    that framework, with your function here.

22        You are the finders of the facts, you are the

23    judges of the facts, that is not given to me, it is not

24    part of my function, and while I must talk about the

25    evidence here to explain the different points, I have

```
 1    nothing to say about the evidence, nothing whatsoever,
 2    under the Constitution that's given to the people
 3    themselves, a duly-qualified jury, and you are a superb
 4    one, you are going to decide that.  And we're going to
 5    talk about how.
 6         But it's obvious -- well it isn't obvious, but
 7    I'll emphasize it, you're going to decide based solely
 8    and entirely on the evidence that you have seen here in
 9    this courtroom and on nothing else whatsoever.  No bias.
10    No prejudice.  No sympathy for anyone.  No desire that
11    anyone have revenge.  Just the cool, careful, sifting of
12    the evidence so that here, in this courtroom, justice
13    truly may be done.
14         Now your verdict must be unanimous and by
15    "unanimous" I mean all of you, all 11 of you -- and
16    that's the genius of the system, all 11 of you genuinely
17    agreeing.  You'll deliberate, you'll talk among
18    yourselves, but there's not to be any going along here,
19    and there's not to be "Oh, yeah, well now it's getting
20    later in the afternoon and there we are," that's a
21    failure of the system.  We ask you for your verdict, we
22    do not demand it.
23         Under this fair preponderance of the evidence
24    system, one side -- now remember to keep Ms. Gasarch and
25    Mr. Friesen separate because you could find against one
```

A3337

```
 1    of them and for the other or against both or for both,
 2    but keep them separate in your mind.  It's just candidly
 3    for efficiency that we try one case instead of two
 4    because some of the evidence overlaps and we think the
 5    jury can understand it.  But by "unanimous," I mean on
 6    the specific point all of you genuinely agreeing.
 7         Now we're going to come back -- I've said it and
 8    I'm not going to repeat it, your verdict has to be
 9    unanimous, but it has to be unanimous as to each point
10    of analysis, and the Commission claims, they allege, and
11    the questions ask you, whether Ms. Gasarch or
12    Mr. Friesen or both violated certain discrete provisions
13    of our securities laws?  And then it asks you, or as
14    part of those questions, the evidence in this case shows
15    that there are a number of different stocks, a number of
16    different securities that we're going to -- you're going
17    to be talking about.
18         Now when you get to the analysis, you're going to
19    have to do the analysis as to each different stock
20    offering.  The Commission only has to win on one in
21    order to have your answer to the questions that we put
22    to you, if they win as to each element, "Yes" as to that
23    answer, and even if you're not persuaded as to other
24    stocks.  If you're persuaded as to one stock, that is
25    sufficient.  At the same time, when I say your verdict
```

A3338

1    has to be "unanimous," it has to be unanimous with

2    respect to the dealings in that specific stock.

3        If some of you -- and don't take any suggestion

4    from this, but if you think that Mr. Friesen, for

5    instance, violated one or more of the securities laws as

6    to a particular stock and 6 of you think that, but the

7    other 5 think that "Yeah, he did violate, but it's as to

8    another stock," you haven't got a unanimous verdict.

9    It's got to be unanimous as to the particular stock and

10   the sales and the offering, the first sale of that

11   particular stock, a unanimous verdict.

12       Now what's my function?  It's my function at this

13   stage and throughout the case to go follow the law and

14   now teach you the law.  What I'm trying to do is build

15   for you a mental framework within which you and you

16   alone can decide what the facts show or do not show.

17   Don't -- since I will try to be thorough, don't take

18   from my explanations of the law that I think anything

19   has been proved or that I think nothing has been proved,

20   I have nothing to say about that.  It's just that I have

21   to cover every issue.  Don't listen to me and then grab

22   onto something that I say and say to yourself, "Ah-ha,

23   the case turns on this or that," no, listen to the

24   entire charge.

25       Of course you may take notes.  Of course you may

```
 1    ask questions.  In this case it's best if you wait till
 2    you get back and start deliberating and then if you have
 3    a question, write it out, we'll bring you back in here,
 4    and I will explain that point more thoroughly.  This
 5    whole exercise is our human system reaching out for
 6    justice, that's what we're asking you to do here.  So in
 7    asking you, um, naturally you have to know what the law
 8    requires, and if I haven't made it clear, don't hesitate
 9    to ask me.
10          Because of really the busyness of the courts, I'm
11    explaining it to you now, so feel free to take notes,
12    but I will not be able today to send a typed copy of my
13    teaching to you.  If your deliberations go into
14    tomorrow, we'll have one ready for you.  But today, with
15    everything fresh in your mind, the arguments fresh in
16    your mind, we will not give you a typed copy.
17          So let's start.  I've talked about your function,
18    my function -- well I should say you have to follow the
19    law the way I say it, the way I teach it.  If I say the
20    Commission's got to prove these three things and you
21    think they've proved two of them, but not the third,
22    then whoever you're considering, they win, they have to
23    prove all three.  Likewise, if I say they have to prove
24    three things and they've proved those three things, but
25    you're really wondering why they haven't proved a fourth
```

1    and you think "Well really they ought to have proved the

2    fourth," you can't add it.  This is why I -- a couple of

3    weeks ago when I introduced the process to you, I said

4    to you, "You're not here to make up your own law."  You

5    have to follow the law the way the Congress has passed

6    it.  And I keep talking about proof.  Let's start

7    talking about proof now.

8         To "prove something" simply means that you come to

9    believe it, you come to believe that actually happened

10   with these various elements.  In the law we say there

11   are two types of proof, two types of evidence, direct

12   evidence and circumstantial evidence.

13        Direct evidence is evidence from a witness or a

14   video or an exhibit that actually says the point that

15   you're considering, someone was there and saw an event

16   take place, there is a video of it, or there's an

17   exhibit that demonstrates directly that an event takes

18   place, a stock sale, for instance.  If an exhibit shows

19   that and you believe the exhibit is accurate, you can

20   say that point is demonstrated, that's "proved."

21   Circumstantial evidence is direct evidence of a

22   circumstance which, when combined with other evidence,

23   persuades you of a point.

24        Cases can be proved by direct evidence,

25   circumstantial evidence, any combination of the two.  A

```
 1    case can be proved entirely by circumstantial evidence
 2    so long as, from those circumstances, you've drawn what
 3    are called "reasonable inferences," and I'm going to
 4    come back to this, not speculation, not guesswork.
 5    You're not in there discussing "Well possibly this
 6    happened" or "Maybe that happened," you've got to be
 7    convinced that more likely than not this or that
 8    happened.  That's proof.
 9         Now what tools do you have here to prove -- on
10    which the Commission rests, to prove its case?  The
11    evidence in this case is of four types, and let me talk
12    about each type of evidence.
13         First, to save you time and because it's not
14    disputed, the parties have entered into a detailed
15    stipulation, I read it to you, and that is a very
16    special type of evidence, nobody disputes it, you can
17    take it as given.  That is undisputed evidence in the
18    case.
19         Then we have the testimony of the witnesses.  You
20    have the broadest possible power with -- over the
21    testimony of the witnesses.  This is really the essence
22    of your adjudicative power here, this, and on the other
23    types of evidence.  Each one of the witnesses who
24    testified here before you, if I let you hear what the
25    witness had to say, then it's properly before you and
```

```
 1    it's entirely up to you what you make of it.  You can
 2    believe it, believe everything the witness says, but
 3    equally you have the power to disbelieve it all, just
 4    disbelieve it as though the witness never took the
 5    stand.  And between those two extremes, you have the
 6    power to believe parts of what a witness says, but
 7    disbelieve other parts.  That adjudicative determination
 8    of the believability of witness testimony is the very
 9    essence of your role.
10         So how do you do it?  Well you're entitled to use
11    everything you know about the witness.  Everything.  How
12    the witness answered questions both on direct and cross-
13    examination.  Did the witness appear to know what he was
14    talking about?  Did the witness -- was he in a position,
15    from your point of view, that -- to know the things
16    about which he talked?
17         What bias could the witness have?  Think about
18    that.  Is the witness employed by, is the witness
19    hostile to, is the witness friends with other people who
20    play roles in this case?  Is the witness trying to curry
21    favor in any way with one side or the other?  Does the
22    witness have any motive to fabricate?  In this regard,
23    as I said as the trial was going on, these witnesses,
24    Dhillon, Knox, and, um, his name begins with "C."
25         MS. SHIELDS:  Ciapala, your Honor.
```

```
 1          THE COURT:  Yes, Ciapala.  Thank you.  And I
 2     appreciate it.
 3          Each one of them, if you believe their testimony,
 4     they have been prosecuted criminally for acts which
 5     involve some of the same conduct that the Commission is
 6     trying to prove here and each one has pleaded guilty and
 7     made a plea bargain with the government.  Now the
 8     government of course includes the Commission too, but
 9     they are actually separate agencies, and this is a
10     separate case, but you're entitled to know that.
11     Criminal prosecutions are brought by the Department of
12     Justice, the Securities and Exchange Commission is a
13     different entity.
14          Having said that, they've pleaded guilty, and
15     there is some overlap between what they say they know
16     and to which they've pleaded guilty and what the
17     Commission is trying to prove here.  The law says
18     scrutinize that testimony with a special care for the
19     natural human tendency to tend to downplay one's own
20     role, because those three are facing sentencing -- they
21     haven't been sentenced, by a colleague of mine -- at
22     least two of them by a colleague and one by another
23     judge, and minimizing their role and perhaps maximizing
24     the role of one or both of the people who in this civil
25     case are litigants.  In short, as you are reasonable men
```

A3344

1    and women, you have the right to sum up a witness's

2    testimony, decide whether it has the ring of truth, and

3    decide then what believability you will give it.

4         In addition to the testimony of the witnesses,

5    we've had video depositions -- video testimony or video

6    depositions of witnesses who are so situated that they

7    can't be here, and you've looked at them, and that's

8    just the same as though the witness was here in court.

9    You have the same power.  If you've listened or watched

10   a witness say whatever the witness said on the video and

11   you believe that, you have every right to believe it and

12   believe all of it.  Equally you can disbelieve it as

13   though the video was never played or you can believe

14   parts and disbelieve other parts.  One of the things you

15   want to do, of course, with all this evidence, is you

16   want to compare it to the testimony of other witnesses,

17   does it back up the testimony of other witnesses, does

18   it make it more credible or believable, does it take

19   away from that testimony?  But it's left to you.

20        And then, fourth, we have exhibits, and we have a

21   bunch of them.  Now with exhibits you really have a

22   two-step analysis.  The first step is, um, take a look

23   at the exhibit.  Now the -- you have the same power with

24   respect to exhibits.  The fact that I've let you see an

25   exhibit, that doesn't mean that the exhibit is

 1    believable or at least my letting you see it doesn't

 2    mean that it's believable, and that's because that's not

 3    my business, I just see if it fits the appropriate legal

 4    parameters to show it to the jury.

 5           And so we've got this bunch of exhibits that are

 6    going to be shown to the jury, but it's entirely up to

 7    you whether you believe that they are accurate or

 8    believe that they are genuine documents, believe that

 9    they -- and it's up to you, you could consider whether

10    they're fake, all of those things are left to you.  An

11    exhibit doesn't gain any power just because I let the

12    jury see it.

13           So with exhibits you can believe them -- that's

14    the second step, if you think the thing is authentic and

15    it actually tells you something about the case, you read

16    it and look at it and compare it to the testimony, see

17    how it fits, does it back up the testimony?  Does it

18    detract from the testimony?  Does it make what the

19    Commission has to prove here more likely than it would

20    be without looking at that exhibit?  If you think it's

21    genuine.

22           So those are the sources of evidence, those are

23    the only sources of the evidence, the stipulations, the

24    testimony of the witnesses, the video testimony that

25    you've received, and the exhibits.  On that evidence the

A3346

```
 1   Commission rests and Mr. Friesen and Ms. Gasarch equally
 2   rest.
 3          From that evidence you may, and I've mentioned
 4   this already, draw what are known as "reasonable
 5   inferences," logical deductions, common sense.  You
 6   don't check your common sense at the door to the jury
 7   room, just the reverse, apply your common sense to the
 8   evidence that you've seen and heard in order that
 9   justice be done.  At the same time, the standard of
10   proof is not just some sort of common sense, what it is
11   is a fair preponderance of the evidence on each
12   essential point.
13          Let me give an example.  I do this in every case.
14   I like it, because I think it explains well what's meant
15   by a "reasonable inference."  And this has nothing to do
16   with the case.
17          Imagine we have a case, we have a woman and she's
18   walking along a field -- walking on a road, but the road
19   borders a field of barley.  Barley is what they make
20   scotch from.  And there it is, it's all there, full-
21   grown gray tassels on the top.  And she notices that in
22   that field the barley was lying down in an irregular
23   course through the field, and that's the evidence.  And
24   let's say you believe that evidence.
25          Now from that evidence alone you can infer --
```

A3347

```
 1   nobody says or saw anything, but you can infer something
 2   went through that field.  That's common sense.  If --
 3   and we've had enough rain that you understand what I'm
 4   talking about, but if it really had been a hard rain, it
 5   would have knocked all the barley down.  Something went
 6   through that field.
 7        Now that's the reasonable inference.  But you see
 8   you can't guess, you can't speculate, you can't say,
 9   "Well maybe this," "perhaps that," and "It could
10   possibly be," you'd need other evidence.  Is that an
11   animal?  Is it a human?  Is it someone on a dirt bike?
12   An adult?  A child?  You'd have to have other evidence,
13   maybe other circumstantial evidence, so you could fit
14   the circumstances together logically.  You can't just
15   pile inference on inference.  But if you look at the
16   evidence, all of it, you decide what you believe, you
17   can draw reasonable common sense inferences.
18        Now at this stage Ms. Gaudet is going to pass to
19   each of you the verdict slip, because I'm going to go
20   over it question by question and while she's doing that
21   I want to call to your attention some things that are
22   not evidence in this case.
23        (Passes out verdict slip.)
24        And, first of all, please understand that under
25   the law there's no requirement that Ms. Gasarch or
```

```
 1    Mr. Friesen be here.  If you're wondering about that,

 2    ignore it.  There's no requirement in a civil case that

 3    they be here.  They've been here through their lawyer

 4    representatives who have done, as all these lawyers

 5    have, have done an excellent job.  So don't -- if you

 6    hold that against them for some reason, there's no

 7    improper reason why they're not here, they're not

 8    required to be here, and they've gone about their

 9    business, represented here by their attorneys.

10         Likewise there have been other names of people who

11    are not here in this case and you shouldn't speculate

12    about that.  You can draw any conclusions you want from

13    the mention of the people, but the fact that other

14    people are not here, that doesn't count for anything.

15    It certainly doesn't count against Mr. Friesen or

16    Ms. Gasarch, it doesn't count in their favor.  It just

17    doesn't count.

18         Now closer to home, and I don't say this in every

19    case, but with counsel here I do want to address you and

20    say that you all, each one of you, have done a fine job.

21    I am privileged to preside over a case that has been so

22    well-tried.  There's been no waste of time of the jury

23    here.  Not at all.  Now having said that, and I'm

24    sincere when I compliment them, ignore it.

25         (Laughter.)
```

A3349

```
 1          Because none of them, and I'm sure they're going
 2   to do a good job in their closings, they're going to try
 3   -- as they're supposed to, they're going to try to
 4   persuade you on how to answer these questions, and I
 5   think they'll do an excellent job.  And if in fact they
 6   do persuade you, if they, trying to teach what they
 7   claim are the facts or are unknown, if they do persuade
 8   you, that's fine, that's what lawyers should do as
 9   advocates.  But I remind you, none of them were there at
10   all.  They don't know -- well they don't know of their
11   own personal knowledge, what they've done is tried to
12   teach you from various evidence that I've let you see.
13   They don't know.  At the same time I know you'll give
14   them careful and close attention because they've worked
15   so hard to lay the evidence, both its strengths and its
16   weaknesses, before you.
17          Now a word about me.  I don't know either.  And,
18   um, I have no view about how these questions should be
19   answered.  None.  I do talk to my law clerks about the
20   law.  I do not talk to Ms. Gaudet or Mr. Romanow about
21   the law, we're not sitting back there speculating as to
22   what you're going to do, it's not our business.  I will
23   tell you this.  I do believe passionately in the jury
24   system.  I do believe that you 11 men and women will do
25   justice.  But my job is limited solely to teaching the
```

A3350

```
 1   law.  I do not know and do not speculate how you will

 2   answer these questions.

 3        All right.  Now with that said, um, we're only

 4   going to take back one jury verdict, but you're all

 5   welcome to have the jury -- and I'm looking at the

 6   forelady because it's the forelady who actually puts the

 7   checkmarks in answer to the question once the jury has

 8   reached the unanimous verdict, and then you sign it at

 9   the end of the second page.

10        So with that in mind, let's, um, turn to talking

11   about the specific ways that the Commission will

12   argue -- the Commission claims that the securities laws

13   have been violated.  And before I get into the details,

14   let me make these general comments.

15        Ms. Gasarch, Mr. Friesen, are different people.

16   While this evidence relates to both of them, the

17   evidence in certain respects is different and pertains

18   only to one of the two of them.  You keep them separate.

19   I've already said we try one case instead of two because

20   it's efficient, but it equally must be fair, and you

21   must be fair to Mr. Friesen, you must be fair to

22   Ms. Gasarch, and that is you must focus on what you

23   believe they did or didn't do.

24        A word about the securities laws.  The securities

25   laws of the United States that are involved in this case
```

```
 1    have as their goal fair disclosure of relevant
 2    information so that an investor can invest believing
 3    that the information before that investor, um,
 4    accurately tells what you need to know about a
 5    publicly-traded stock.  I expect, because we heard it in
 6    the opening, that in their closing the Commission -- now
 7    again I'm not the source of evidence here, but I expect
 8    the Commission to say that this fellow, Sharp, and
 9    others had a scheme -- and we'll go over the ways where
10    they claim investors were defrauded.
11         Understand that this alleged -- and it's not even
12    for me to say there's a scheme, I heard them say it in
13    their opening, but I don't know, we'll see what the
14    evidence has shown.  You'll decide that.  But the point
15    I want to make is you go stock by stock.  In other
16    words, it's not just -- let's say you do think there was
17    a scheme as to one of these stocks or more than one of
18    these stocks, but not as to others, well so be it.  But
19    go stock by stock.  The Commission only need win on one
20    or more than one in order to get a "Yes" answer.  But as
21    I've said before, you all have to be unanimous as to the
22    one, or more than one, that you think they have proved.
23         Again still talking generally about some of the
24    words that have been used, and I'll just touch on a few
25    of them.  It is lawful under the securities laws for a
```

A3352

```
 1    publicly-traded company, whose shares are traded on a

 2    stock exchange and who has a registration statement

 3    which was perfectly lawful at the time it was filed with

 4    the Commission, to go dormant because business is bad or

 5    for any reason, any economic reason.  It's not wrong in

 6    our capitalist society to set out with perfectly honest

 7    and good intentions and things don't work out and

 8    become, and it's been referred to here, as a "shell

 9    company."  Shell companies are not by definition illegal

10    and they're certainly, simply something that's referred

11    to as a "shell company," that's not deceptive.

12        It's not wrong to enter into what the witnesses

13    have called a "reverse merger."  It's not wrong -- so

14    long as various notifications that are required, it is

15    not wrong to advertise a stock, to advertise and pay for

16    the advertisement so long as appropriate disclosure is

17    made.

18        The question in this case, even though each one of

19    those things taken separately is perfectly lawful, as

20    you believe -- if you believe, as to a specific stock,

21    there have been violations of the specific laws?  Now

22    let me go over them.

23        Let's look at Question 1.  Question 1, the

24    Commission says that a specific statute, um, and it's

25    Section 10(b) of the Securities and Exchange Act of
```

A3353

```
 1    1934, and it has rules under it, and I've listed the
 2    rules there, here's what they have to prove as to that.
 3         Now as to that, Question 1, you're only asked
 4    about Mr. Friesen.  So going, um, stock by stock, the
 5    specific stock you're interested in has to in some way
 6    involve Mr. Friesen.  And so first, the Commission must
 7    prove that Mr. Friesen, directly or indirectly, engaged
 8    in fraudulent conduct.  Second, that Mr. Friesen acted
 9    with the intent to deceive, manipulate, or defraud, that
10    is he knew his conduct, statements, or omissions, were
11    deceptive and he acted with reckless disregard of the
12    truth.  Third, he engaged in such conduct in connection
13    with the purchase or sale of a specific security.  Let
14    me explain in more detail.
15         Now this requires that he -- for fraudulent
16    conduct he has to do either one or more of the
17    following.  He, Mr. Friesen, has to have employed a
18    device, scheme, or artifice to defraud, or, two, he had
19    to engage in an act, practice, or course of business
20    that operated or would operate as a fraud or deceit upon
21    any person.  The government just has -- the Commission
22    just has to prove one of those two types, but they can
23    prove both, but they have to prove at least one.
24         The first type of fraud is a device, scheme, or
25    artifice to defraud.  A "device," in this context, means
```

```
 1    a trick, a contrivance, or the result of some plan or
 2    design.  A "scheme" is a design or a plan formed to
 3    accomplish some purpose.  The phrase "device, scheme, or
 4    artifice to defraud" refers to any plan designed or
 5    course of action that involves false or fraudulent
 6    pretenses or representations or any pattern of conduct
 7    calculated to deceive.  A "scheme to defraud" means
 8    conduct that has the principal purpose and effect of
 9    creating a false appearance of fact, discovers a wide
10    range of conduct, and the Commission does not need to
11    prove that any particular investor or prospective
12    investor was actually defrauded or actually suffered an
13    injury.
14         A second way that the Commission may prove the
15    first element of fraud is that they could prove that
16    Friesen and others engaged in an act, practice, or
17    course of business, that operated or would operate as a
18    fraud or deceit on any person.  The phrase "would
19    operate" means that the act, practice, or course of
20    business, had the capacity to defraud a purchaser or
21    seller, but it is not necessary that anyone was actually
22    defrauded.
23         The SEC claims -- now this is the claim.  They
24    claim that, um -- the scheme in which they claim to you
25    that Friesen participated had several parts.  One, that
```

1    he and others controlled significant blocks or shares of

2    14 different companies's stock by using the services of

3    Sharp, Kelln, and others to hold their shares through

4    nominee companies.  They and their associates, um, paid,

5    they say -- they say, it's not for me to say, that they

6    paid to promote those companies's stock while selling

7    their shares into the public markets.  Three, they claim

8    that Friesen and these others failed to register their

9    shares or make the disclosures required by law for

10   persons owning significant amounts of a company's

11   shares.  And fourth, they claim that their actions

12   concealed from investors that the persons owning

13   significant blocks of shares were selling those shares

14   into the market.

15        The Commission claims that Friesen's conduct was

16   deceptive and fraudulent because it had the capacity to

17   deceive investors who did not know that the increased

18   volume and price for the shares they were buying were

19   the result of promotions funded by and large blocks of

20   shares sold by persons, including Friesen, who

21   controlled and were selling large blocks of the specific

22   company's shares.  Go company by company.  And you ask,

23   "Was Friesen involved, was he involved in that way?"

24        Now this requires a specific state of mind on the

25   part of Friesen.  There has to be evidence that Friesen

```
 1    was acting here with the intent to deceive, manipulate,
 2    or defraud, and that means the SEC must show, by a fair
 3    preponderance, that Friesen knew that his conduct was
 4    deceptive or that he acted with reckless disregard for
 5    the truth.
 6         To act "knowingly" means to act intentionally and
 7    deliberately rather than mistakenly or inadvertently.
 8    "Reckless" means that -- recklessness represents an
 9    extreme departure from the standards of ordinary care,
10    meaning that the danger of misleading investors was
11    either known to Friesen and the others or so obvious
12    that they must have been aware of it.  Similarly,
13    evidence that Friesen failed to review or check
14    information that he had a duty to monitor or ignored
15    obvious signs of fraud and should have known that he and
16    the others were misrepresenting important facts, that
17    constitutes a showing of recklessness.
18         (Pause.)
19         If Friesen was aware of facts that make his
20    conduct objectively misleading as to important facts, he
21    acts recklessly even if he, Friesen, genuinely believed
22    that his conduct did not create a risk of misleading
23    investors or securities market participants.  A person's
24    state of mind can be proved by direct evidence or
25    circumstantial evidence.  You may infer Mr. Friesen's
```

A3357

```
1    state of mind from his acts and words in light of all
2    the circumstances.  You cannot peer into Mr. Friesen's
3    head to see what he and the others were thinking at
4    sometime in the past, therefore you may determine
5    whether he acted knowingly or recklessly based upon
6    circumstantial evidence about his actions and the
7    reasonable inferences that you draw from such evidence.
8    The burden of proof is on the SEC to prove these
9    elements by a fair preponderance of the evidence.
10        The last point that they must prove as to this
11   first question is that the conduct was in connection
12   with the purchase or sale of securities.  They -- the
13   Commission proves that if you find there was some
14   connection or relationship between the deceptive conduct
15   and the sale or purchase of securities, that is stock in
16   the particular company that you're talking about,
17   fraudulent conduct directed at anyone involved in a
18   securities transaction, such as the transfer agents, the
19   broker dealers, that is in connection with the purchase
20   and sale of securities.  That's Question 1.
21        Now Question 2.  Now this is a different section
22   of the law, and Question 2 also deals only with
23   Mr. Friesen.  And for Question 2 -- and you'll see these
24   overlap, but we've got to figure each question or take
25   each question -- and take each question separately.  The
```

```
 1    elements seem much the same in Question 2 because there
 2    are three elements and they ask, did Mr. Friesen
 3    directly or indirectly engage in fraudulent conduct?
 4    Second, did Mr. Friesen act with the required state of
 5    mind?  And third, was his conduct in connection with the
 6    offer or sale of a security?
 7         Now the elements there are the same as what I've
 8    already explained to you but for this -- or not "but for
 9    this," remember that for the alleged A(1) violation, the
10    Commission must prove that Mr. Friesen was acting
11    knowingly or recklessly, as I've already explained to
12    you.
13         Now when we move on to Question 3, you will see
14    that -- for the first time in this verdict slip anyway,
15    Ms. Gasarch is mentioned, and here again, the difference
16    between A(1) and A(3) is this.  In order to violate
17    A(3), if the fraud is proved and the -- just as I've
18    explained it, but in addition to acting knowingly or
19    recklessly, one can violate Section A(3) if you act
20    negligently.  Now that is -- the government has to prove
21    less for negligence because it doesn't have to be
22    intentional.
23         In order to act "negligently" is the failure to
24    use ordinary care under the circumstances.  Ordinary
25    care is the care that a reasonably careful person would
```

A3359

```
 1   exercise in the management of their own affairs in order

 2   to avoid injury to themselves or their own property or

 3   to avoid injury to the persons or property of others.

 4   In other words, "negligence" is doing something that a

 5   reasonably careful person would not do or not doing

 6   something that a reasonably careful person would do

 7   under the circumstances.

 8          In deciding whether ordinary care was exercised in

 9   a given case, you should view the conduct in light of

10   all the surrounding circumstances as shown by the

11   evidence in this case.  You may find that either

12   Mr. Friesen or Ms. Gasarch acted negligently with

13   respect to the A(3) violation if they failed to exercise

14   ordinary or reasonable care or competence in the making

15   of those statements or engaging in deceptive or

16   misleading conduct.  Again, as was the case in answer to

17   Question 1, the 10(b)(5) alleged violation, this has to

18   be done in connection with the purchase or sale of a

19   security.

20          Now let's look at Question 5.  This charges only

21   Mr. Friesen with offering unregistered securities.  The

22   Commission must prove two things, that Mr. Friesen

23   directly or indirectly sold or offered to sell a

24   security and that no registration statement was filed

25   with the SEC or was in effect for offers or sales of
```

A3360

1   that security.

2        A registration statement registers transactions,

3   not shares, meaning that each registration statement

4   applies to each separate offer and sales transaction, it

5   does not attach to the security itself.  Thus, proper

6   registration of a security at one stage does not

7   necessarily suffice to register subsequent offers or

8   sales of that security.

9        As to the first element, the Commission may prove

10  its claim as to this question, Question Number 5, they

11  may prove it showing either that Friesen was a direct or

12  indirect seller or offerer of the security.  If you find

13  that Friesen was responsible for directing the sales of

14  securities and shared in the proceeds of those sales,

15  even though the sales took place in the names of other

16  people or companies acting on his behalf, you may find

17  him liable, you may answer "Yes."

18       The Commission may also prove its claim by

19  establishing that Friesen was an indirect seller of

20  securities, that is that he was meaningfully involved in

21  the process of the sales or offers to sell or was a

22  necessary participant in the process or was a

23  substantial factor in the process.  You may find that

24  Friesen was a necessary participant or a substantial

25  factor in securities offers or sales if he directed

A3361

```
 1    others to make those offers or sales or planned the

 2    process by which those offers or sales were made.

 3         There's been some discussion in the law as to

 4    whether the sales would have -- the test is whether the

 5    sales would have taken place but for Mr. Friesen's

 6    involvement?  That's really not the test, not but-for,

 7    and the law has directly spoken to this.  Because if you

 8    employed that test, then it could catch, for instance,

 9    someone who just printed up documents, which were

10    necessary, and that person would not have been a

11    substantial factor in the process or a necessary

12    participant in the process.  So that's not the test.  It

13    is the words that I just read to you.

14         On this, however, unlike these others, the first

15    four questions, on Question 5, the Commission doesn't

16    have to prove any specific state of mind, just that he

17    did it, nothing else.  Not what was going on in his

18    mind, whether it was knowing, whether it was reckless,

19    whether -- as to 17(a)(3), whether it was negligent,

20    just that he did it.

21         All right.  Now as to Question 6.  This is the

22    alleged 13(d) violation.  To prevail on this claim the

23    Commission must prove two things.  First, that Friesen

24    acquired, directly or indirectly, individually or acting

25    together with others, beneficial ownership of more than
```

A3362

```
 1    5 percent of Stevia First/Vitality -- that was the
 2    second name, stock.  That he acquired, directly or
 3    indirectly, individually or acting together with others,
 4    beneficial ownership of more than 5 percent of Stevia
 5    First stock.  And second, that Friesen, and others with
 6    whom he was working, failed to file with the SEC, within
 7    10 days of acquiring beneficial ownership of those
 8    shares, a Schedule 13(d) statement.  If he had that
 9    beneficial ownership and he failed to file the requisite
10    13(d) form, then he is liable under Question 6.
11           Again his state of mind as to this question, like
12    Question 5, is of no moment, you don't have to ask
13    knowingly or recklessly or negligently, just did that
14    happen?
15           And then last, Question 7, alleges -- or it
16    doesn't allege, it's the question, it asks you, did
17    Ms. Gasarch, did she aid and abet the violations, any of
18    the violations of the securities laws by others?  And
19    here you can look at all the different -- you've got to
20    look at the stocks you're talking about, but with
21    respect to any of those transactions that -- in which
22    she had any involvement, whether or not Friesen had any
23    involvement or -- again this is as to her and it's
24    separate, if you believe she worked for Sharp, over what
25    period, and what did she do for Sharp, that type of
```

A3363

 1    thing.

 2        Now here's what the law says.  Any person that

 3    knowingly or recklessly provides substantial assistance

 4    to another person in violation of any provision of the

 5    securities laws or any rule or regulation issued under

 6    those laws shall be deemed to be in violation of such

 7    provision to the same extent as the person to whom such

 8    assistance is provided.  That requires that the

 9    Commission prove three things as to Ms. Gasarch.

10        That first, that Sharp or these others, perhaps

11    beyond Friesen, who you believe were clients of Sharp in

12    a scheme that, as I've described it, would violate the

13    securities laws, that Ms. Gasarch -- excuse me, that

14    these others, any of them, directly Sharp and these

15    others, directly or indirectly violated Rule 10(b)(5),

16    which we've talked about here, Sections 17(a)(1) and

17    17(a)(3), which we've talked about, the ones which

18    require that you -- except for A(3), that you -- that

19    they were knowingly recklessly violating the securities

20    law, and for 17(a)(3), were negligently violating the

21    securities law, if they or any of them were doing that.

22    Second, they have to prove that Ms. Gasarch understood

23    that her role or conduct was part of an overall activity

24    that was improper.  And third, that Gasarch knowingly or

25    recklessly provided substantial assistance to the

```
1    violation.

2         Now "substantial assistance" -- I've defined the

3    others, but "substantial assistance" means that Gasarch

4    in some way associated herself with the venture, that

5    she participated in it as something that she wished to

6    bring about, and that she sought by her action to make

7    it succeed.

8         All right, I think that covers the question.  And

9    I -- and what happens now, it's about time for us to

10   take a recess, but before we do, I may have misstated

11   something, I may have stated something inaccurately, or

12   left something out, and the lawyers have a chance to

13   bring that to my attention now.

14        Counsel.

15

16        AT THE SIDEBAR

17        THE COURT:  Well I thought that was rather

18   comprehensive.  Let's start with the Commission.

19        MR. DAY:  Okay.

20        First, the Commission believes that an instruction

21   should have been given on the Fifth Amendment, that we

22   could make reference to that, that the defendants and

23   others are invoking the Fifth Amendment.

24        THE COURT:  I do understand that and I stand by my

25   rulings.  Okay.
```

A3365

```
 1          MR. DAY:  Yes, and related.  We proposed an
 2    instruction that the jury could draw an adverse
 3    inference from the invocation of the Fifth.
 4          THE COURT:  That's pretty much the same and I'm
 5    not going to allow it.
 6          MR. DAY:  Okay.
 7          As to Instruction Number 5, we maintain that the
 8    jury should be instructed that it has to be unanimous as
 9    to the existence of a scheme, but not the specific
10    conduct under the scheme.
11          THE COURT:  Noted, but I stand on my proposal.
12          MR. DAY:  Okay.
13          We would ask that our proposed Instruction Number
14    19 be given, and that's that the SEC doesn't have to
15    show the evidence on loss causation.
16          THE COURT:  I thought I did that.  I mean you may
17    want a more wordy one, but, um, I said that.
18          MR. DAY:  Yes, your Honor, I think you did touch
19    on it.
20          THE COURT:  I did.  No, I think I've said that and
21    I won't allow argument to the contrary.
22          MR. DAY:  We had proposed, in Instructions 21
23    through 23, regarding persons not on trial,
24    nontestifying persons, and documents, and then remedies.
25          THE COURT:  I think I've allowed that -- I mean I
```

```
 1   think I've covered it.  I meant to do it and I'm
 2   satisfied with what I said.
 3           MR. DAY:  Okay.  Thank you.
 4           (Pause.)
 5           MR. DAY:  Yeah, Number 23, I'm sorry.  I'm sorry,
 6   Number 23, was the jury's --
 7           THE COURT:  You know I stayed away from remedies
 8   due to the usual, um, the sentences not be considered in
 9   a criminal case.
10           But you're okay with, um, my giving 23?  Well,
11   I'll ask her.  I -- yeah, I thought you were Ms. Fritz.
12   Sorry.  Forgive me.
13           (Laughter.)
14           MR. KLUNDER:  Easily.
15           THE COURT:  No, my eyes were elsewhere.
16           Any objection to my giving 23?
17           MS. FRITZ:  I would need to look at it.
18           THE COURT:  It's right here.  That they shouldn't
19   be concerned about what would happen if they answer
20   "Yes."  I don't know as I'll give this language, but I'm
21   going to touch on it.
22           MS. FRITZ:  Okay.
23           THE COURT:  Yes, I will give it, um, the idea.
24   Okay.
25           MS. PICKETT:  It's fine with me, your Honor.
```

A3367

```
 1        THE COURT:  Okay.
 2        MR. DAY:  In an abundance of caution, your Honor,
 3    we have a number of these, so bear with me.
 4        THE COURT:  You go right ahead.
 5        MR. DAY:  In the sort of preliminary, Judge, um,
 6    you mentioned that the defendants had not been charged
 7    criminally.  I think it was in the context of not
 8    considering, you know, remedies and sanctions.  But the
 9    way it was phrased, I'm concerned that the jury might
10    conclude that these defendants are less culpable than
11    others who had been charged criminally.
12        THE COURT:  Well that's, um -- no, I'm satisfied
13    with what I've given.
14        All right?
15        MR. DAY:  Similarly, the Court called out the
16    criminal pleas as requiring special scrutiny.
17        MS. FRITZ:  Judge, one of the jurors has a
18    question, I think?
19        THE COURT:  (Looks.)
20        MS. FRITZ:  Oh, it's just for Jenn.  Never mind.
21        THE COURT:  Yes, a juror, Jenn.
22        Okay?
23        MS. FRITZ:  Sorry, your Honor.
24        MR. DAY:  Yes.
25        So we would object to the instruction as given
```

```
 1    that, um, the criminal pleas require special scrutiny,
 2    and we would have proposed that that should be
 3    considered by the jury, um, similarly to any matter that
 4    bears on credibility.
 5           THE COURT:  Noted, but I'm satisfied.
 6           MR. DAY:  Okay, we covered that.  (Looks.)  Just a
 7    couple more.
 8           (Clerk hands question of juror to judge.)
 9           THE COURT:  (Reads juror question.)  Oh, all
10    right.
11           The juror says, "I don't understand the difference
12    between Question 1 and 2?"  And there's some merit to
13    that.  And I will explain that they are under different
14    acts, but the language used is so sufficiently similar
15    that I charged the way I did.
16           (Pause.)
17           MR. DAY:  And in Instruction Number 13, on aiding
18    and abetting, we would stand on our suggestion that in
19    the second column, that there's only a requirement of a
20    general awareness and not --
21           THE COURT:  Noted, but I'm satisfied.
22           MR. DAY:  All right.
23           And then at the very end of that instruction,
24    there was something to the effect of, um -- well we
25    would want to add, similarly to some other instructions,
```

A3369

```
 1   that, um, Ms. Gasarch did not need -- have to be the
 2   sole cause of the underlying violation.
 3         THE COURT:  Oh, I'll say that.
 4         MR. DAY:  Okay.  And let's see.
 5         And Instruction Number 16, we had proposed --
 6   maybe it's easiest to show you the definition of
 7   "beneficial owner of stock," it's in this section, and
 8   then the, um --
 9         THE COURT:  Why do they need that?
10         MR. DAY:  It's part of the test for whether the
11   statutes have been violated.  Similarly there's a
12   definition of what it means to be "beneficial owners"
13   and combining as a group.
14         THE COURT:  Oh, I'll give that.  All right.  And
15   that's your -- that's your --
16         MR. DAY:  16.
17         THE COURT:  You're on Page 16.
18         MS. KLUNDER:  Your Honor, it's on Page 21.
19         MR. DAY:  Instruction 16.
20         THE COURT:  Yes, I understand.  I'll give it.
21         MS. FRITZ:  I just want to make sure that it
22   includes the language about power.
23         MR. DAY:  Yeah, it's right here.
24         MS. FRITZ:  (Reads.)  All right.
25         THE COURT:  Okay.
```

```
 1          MS. FRITZ:  Okay.

 2          THE COURT:  Okay, is that it?

 3          MR. DAY:  Let me just double-check here.

 4          (Looks.)

 5          MR. DAY:  And the last one, I believe it's

 6     Instruction Number 12, the 17(a) claim.  Um, the last

 7     part of the proposed instruction that says the concept

 8     of the offer and sale of a security, it just explains

 9     the element in a little bit more detail.

10          THE COURT:  I'm satisfied that I've covered it.

11          All right?

12          MS. FRITZ:  Just one comment.

13          With respect to the sale of unregistered

14     securities as a violation of Section 5.  The law says

15     that you don't violate Section 5 if there's a

16     registration statement or an exemption to registration.

17     I don't think that was conveyed.  But it can be one?

18          THE COURT:  Oh, but is there a viable argument

19     here that there's an exemption?

20          MS. FRITZ:  Yes, as a matter of fact one of the

21     witnesses talked about Rule 140 -- we got into a little

22     thing about the fact that if in fact the exemption under

23     Rule 144 is satisfied, then no registration statement

24     would be required.  That's part of the problem with

25     Section 5, your Honor, in order to file it, you have to
```

A3371

```
 1    not only say that there was no registration statement,
 2    you have to all say there's no exemption in this case.
 3         Oh, sorry.
 4         THE COURT:  But state of mind is not an issue
 5    under 5, the question is whether in fact there was a
 6    registration statement or exemption.
 7         MS. FRITZ:  And in this case there were legal
 8    opinion letters that were part of the various --
 9         THE COURT:  Are they in evidence?
10         MS. SHIELDS:  No.
11         THE COURT:  They're not?
12         MS. SHIELDS:  And for that, your Honor, the
13    exemptions --
14         THE COURT:  Wait a minute.  Okay.  Yes, I
15    understand.
16         Yes, Ms. Shields?
17         MS. SHIELDS:  Under Section 5 --
18         (Interruption by Court Reporter.)
19         MS. SHIELDS:  The plaintiffs bear the burden of
20    proving exemptions.  At no point in this case have
21    defendants asserted a narrative which define an
22    exemption and have certainly not undertaken the burden
23    of establishing it.
24         THE COURT:  I think that's right.  Yeah, I'm not
25    going to give them anything about exemptions, nor any
```

```
 1    argument as to exemptions.
 2         All right?
 3         MS. PICKETT:  Your Honor, on the aiding and
 4    abetting instruction, I'm going to object to the second,
 5    the instruction on the second element, that Ms. Gasarch,
 6    um, understood that her role or conduct was part of an
 7    overall activity that was improper.  I refer the Court
 8    to, um, what it found in the, um -- in its own decision
 9    on the motions to dismiss, citing SEC vs. Appruzo from
10    the Second Circuit, which would say that Mrs. Gasarch
11    would need to have the knowledge of this violation on
12    the part of the aider and abetter.
13         THE COURT:  Yeah, we'll work that through.  I'm
14    satisfied.
15         All right?
16         MS. PICKETT:  And, sorry, one other thing, your
17    Honor, and it's probably, you know, not a big deal, but
18    just for the record I want to object to the lumping in,
19    making 17(a)(1) and 17(a)(3).  As you know, Mrs. Gasarch
20    is only charged under (1).  And the statutory language
21    is different for 17(a)(3) than it is for 17(a)(1).
22         THE COURT:  But in what respect?
23         MS. PICKETT:  Well in one respect, it's not in the
24    offer or -- it has to go to a purchaser of a security,
25    it has to be defined as a "purchaser of a security,"
```

```
 1   which is less inclusive than say, for example, under
 2   10(b)(5).
 3        And, um, under that -- under the statute, there's
 4   no mention of "scheme."  I think you'll see it in the --
 5   in the SEC's own instructions, um, on 17(a)(3), that it
 6   has to be like a device, artifice, etc.  So there's
 7   really only one way to prove it up and it has to be, um,
 8   towards a scheme.  I mean towards a --
 9        THE COURT:  I will give it.
10        MS. PICKETT:  Thank you, your Honor.
11        MS. KLUNDER:  Your Honor, pardon me?
12        On the verdict sheet, the last Question 7 where
13   you combined for aiding and abetting, shouldn't it be an
14   "or" in there?
15        THE COURT:  It should be.  All right.
16        MR. KLUNDER:  Thank you, your Honor.
17
18        (In open court.)
19        THE COURT:  Well as they've been throughout, the
20   lawyers are very helpful to the Court, and further I
21   have a juror question about the law and I appreciate it.
22   Let me just take a moment to get the right page.
23        (Pause.)
24        The first addition I want to make, and correction
25   really, is a juror said, "I don't understand the
```

1  difference between Question 1 and Question 2?"

2          Question 1, which I took some time in explaining,

3  was the use of the terms in -- as to the violation of

4  Section 10(b) and the rule under it, 10(b)(5), and

5  Section -- Question 2 dealt with Section 17.  And as it

6  turns out, that's -- I was too glib, that's a very good

7  question.

8          Generally -- generally now, the reason that there

9  are two separate questions is that there's two separate

10  laws, and the Commission is rightfully entitled to claim

11  that there's been a violation of both of those laws.  In

12  fact, the language that I have used where in essence I

13  said, "Well the rules as to fraud are the same," that's

14  generally true with one exception.

15          In Question 2 -- Question 2 talks about

16  engaging -- well in Question 3, which deals with

17  17(a)(3) -- strike that.  I'm not being clear.  I'm

18  trying to be clear.

19          There is no substantial difference between

20  Question 1 and Question 2.  There is a substantial

21  difference that I didn't mention in between 17(a)(1),

22  Question 2, and 17(a)(3), Question 3, and I've mentioned

23  one aspect, a person can be liable under Section

24  17(a)(3) just -- obviously they're liable if they acted

25  knowingly or recklessly, but also they could be liable

1    because they acted negligently.  But there are some

2    restrictions in 17(a)(3) that do not appear in 17(a)(1),

3    specifically that the 17(a)(3) violation, in order to be

4    proved, the thrust of the conduct must be to a purchaser

5    of stock, not both a purchaser and seller, and further

6    the -- the SEC can prevail without proving a scheme,

7    they need only prove a fraud or deceit upon a purchaser

8    of a security.  That's not required in -- or rather it

9    takes more to prove the violation under 17(a)(1).

10        Now some other things that they pointed out to me.

11   If we look at Question 7, that's the aiding and abetting

12   question, and I want to add to my instruction that, um,

13   the Commission need not prove -- with aiding and

14   abetting the Commission need not show that Ms. Gasarch's

15   assistance here was the sole cause of the violation of

16   the securities laws.

17        Then some general matters on which I had not

18   charged and I should.

19        Look at Question 6.  And Question 6, as you know,

20   talks about failure to report over 5 percent beneficial

21   ownership of securities.  I should say some more about

22   beneficial ownership and let me do that.

23        A person is a "beneficial owner" of stock if that

24   person directly or indirectly has or shares voting power

25   or investment power for that security.  Investment power

```
 1    includes the power to sell or direct the sale of a
 2    stock.  A person directly or indirectly has or shares
 3    investment power when he has the sole power to sell a
 4    share or when he shares the power to sell a share with
 5    someone else.
 6         "Beneficial ownership" does not turn on who owns
 7    legal title to the stock or whose name is -- or in whose
 8    name the stock is held.  People can combine as a group
 9    to be beneficial owners of stock.  When two or more
10    people agree to act together for the purpose of
11    acquiring, holding, voting, or disposing of stock, the
12    group formed by that agreement shall be considered the
13    "beneficial owners" of the stock.  The definition of a
14    "group" is broad, it includes any members who have
15    combined in furtherance of a common objective.
16         "Beneficial ownership" can be obtained through any
17    contact, arrangement, understanding, relationship or
18    otherwise.  This can include an informal oral agreement
19    that give a person voting or investment power.  You
20    should consider whether the facts of the defendants'
21    relationship -- the defendants' relationship?  There's
22    only -- there's Mr. Friesen.  -- Mr. Friesen and others
23    who with whom you find he combined, gave them
24    significant ability to affect how investment power will
25    be used.  Substance governs over form.
```

```
 1          Now one last thing.  This is different than a
 2   civil case -- than other civil cases with which, um,
 3   I've tried, where in the normal jury case you -- if
 4   damages are involved, we say to the jury, "Well we find
 5   for the defendant, we find for the plaintiff, and we
 6   assess damages of X."  In this case don't you speculate
 7   about what happens if you were to answer "Yes."  If you
 8   were to answer "No" as to the questions pertaining to
 9   Mr. Friesen or the questions pertaining to Ms. Gasarch,
10   or both, then this civil action is over, finished,
11   that's the end.
12          But let's say you answered "Yes" to one or more of
13   the questions.  Then it falls to me to sort out what
14   remedies the Commission may have.  And those remedies
15   could include orders to these people, injunctions about
16   their behavior, depending upon how recent the violation
17   was, it could include a money sanction.  But you don't
18   have to figure any of that out.  The law says, first,
19   were there any of these violations?  So don't you
20   speculate about that.  They'll be other proceedings if
21   you answer "Yes."  And again I'm not speculating on what
22   they may be and you need not.
23          There is one typo on the verdict slip and I'm
24   going to correct it right now and it has to do with the
25   aiding and abetting question.  And I've listed the
```

A3378

```
 1    various violations which Ms. Gasarch is charged with
 2    aiding and abetting and they should be separated by the
 3    injunctive -- the disjunctive "or," and I'm writing "or"
 4    in on the one that we give to the forelady.  But you can
 5    see it's any one of these alleged violations.  You can
 6    answer "Yes" were you to find that she aided and abetted
 7    any one of these violations.  So I'll give to the Clerk
 8    the annotated copy and that's the one, ma'am, that
 9    you'll make your decisions on.
10         (Hands to jury.)
11         Now is there any objection to the supplementary
12    instructions?
13         On the part of the Commission?
14         MR. DAY:  No, your Honor.
15         THE COURT:  On the part of Ms. Gasarch?
16         MS. PICKETT:  No, your Honor.
17         THE COURT:  And on Mr. Friesen?
18         MS. FRITZ:  No, your Honor.
19         THE COURT:  Very well.
20         All right, ladies and gentlemen, we'll take 15
21    minutes, um, and it will take the better part of the
22    morning for the arguments.
23         Because the government -- I shouldn't say the
24    government.  Because the Commission is the plaintiff in
25    this case and bears the burden of proof by a fair
```

```
 1   preponderance of the evidence, by the rules of court
 2   they'll get to argue last.  So we hear first from the
 3   people who they've made these allegations against.
 4        And I think we can say this right in front of the
 5   jury.  Who is going to go first?
 6        MS. PICKETT:  I am, your Honor.
 7        THE COURT:  Very well.  We'll hear first from
 8   Ms. Gasarch's attorney.  And then from Mr. Friesen's
 9   attorney.  And then we'll hear from the Commission.  If
10   it goes too long, we'll take another break, but we will
11   have the case to you comfortably before lunch time.
12        So still, because the arguments are vital, keep
13   your minds suspended, do not start to talk about the
14   case either among yourselves, nor with anyone else.  You
15   may stand in recess until 11:00.
16        THE CLERK:  All rise for the jury.
17        (Jury leaves, 10:45 a.m.)
18        (Resumed, jury enters, 11:00 a.m.)
19        THE COURT:  We now come to the part where counsel
20   make the closing arguments, the attorneys get a chance
21   to sum up and candidly seek to persuade you of the
22   conclusions that they would hope that you draw.
23        This is the highest calling of an attorney, this
24   is the epitome of what a trial lawyer does, stand before
25   an American jury and argue on behalf of the client.  And
```

```
 1    I know you're going to give these same attorneys the
 2    same courteous and careful attention that you've given
 3    me.  But I remind you that they weren't there, they
 4    don't personally know, either side, anything.  They talk
 5    from the information, the exhibits, the evidence that
 6    they have.
 7         If their argument persuades you, fine, but you
 8    should not react to it that you like the presentation or
 9    dislike the presentation.  And always remember, if your
10    memory of the evidence is different than what's argued
11    to you now, your memory governs.
12         Ms. Pickett.
13
14    CLOSING ARGUMENT BY MS. PICKETT:
15         Good morning, ladies and gentlemen of the jury.  I
16    hope that you had a good weekend.  I was able to go to
17    Chicago in the 24-hour span for my nephew's wedding and,
18    um, my family's crazy, maybe some of yours are too, but
19    we got to talking a lot about how we grew up.
20         I grew up in Somerville in the 1970s and '80s,
21    back before it was sort of a gentrified city, and I was
22    the youngest of four kids.  We didn't have a yard.  So
23    at that point, I think when I came along, my parents
24    were kind of exhausted and they plopped me in front of
25    the TV and that's basically how I grew up.  And as my
```

A3381

```
 1    kids are shocked to know, I actually had to get up and
 2    turn the channel manually.  And one of the things back
 3    then was that you had to watch commercials, because
 4    there was no streaming service, it was all network TV.
 5         And so we were talking about commercials on this
 6    trip and, um, what came up was one was a Wendy's
 7    commercial back in the 1980s and the tag line of the
 8    commercial is "Where's the beef?"  I'm confident many of
 9    you probably have not seen this commercial, because you
10    may not even have been born yet, but the premise of it
11    was essentially that there's three elderly woman at a
12    burger joint and they're presented with this enormous
13    burger and they're excited to start, you know, eating
14    the burger, and one of the women opens up the bun and
15    the other women next to her sees that it's a hamburger
16    the size of a quarter, and she says "Where's the beef?"
17         In any event, this took off and it reminds me of
18    this case because all along, all along I've been saying,
19    "Where's the proof?"  "Where's the Beef?"  I would
20    suggest to you that we've sat here now for two weeks,
21    with some days off, and the SEC has not shown you the
22    beef.
23         And I will talk specifically about the claims
24    against Mrs. Gasarch later on, but I wanted to start by
25    going through, um, some of the evidence.  As the Judge
```

```
 1    told you, there's different kinds of evidence, um, and
 2    one of the things that the SEC is relying on are these
 3    documents that they showed you called "exhibits."
 4         I'm not going to show you every document that
 5    Yvonne Gasarch was on or every document that says
 6    "Wires," but you've seen plenty of them, right, where a
 7    client says, "Yvonne, can you wire me this money?"
 8    "Yvonne, can you fax me this statement?"  "Yvonne, can
 9    you just do this or that?"  And you see Yvonne
10    responding to them.
11         The SEC, for some reason, loves using the word
12    "wires."  Well there's nothing wrong with sending a
13    wire, it's a very efficient way to pay your clients or
14    return money to somebody or whatever else.  The only
15    reason that there's going to be any problem with it is
16    if Ms. Gasarch knew what was gong on.  And you know, and
17    I'll go through it, that people went through
18    painstaking, um, efforts to hide what was going on.
19         If we could pull up Exhibit 157.
20         (Technical difficulties.)
21         THE COURT:  Jenn said something to you?
22         MS. PICKETT:  She responded, Judge.  Thank you.
23         THE COURT:  Okay, fine.
24         (Pause.)
25         MS. PICKETT:  I don't want to waste your time,
```

A3383

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | ladies and gentlemen.  I apologize.  You will have the               |
| 2  | binders of exhibits back with you.  And if this comes                |
| 3  | up, we can look at it together.                                      |
| 4  | But essentially Exhibit 157 was an e-mail exchange                   |
| 5  | between Courtney Kelln and one of the traders for                    |
| 6  | Mr. Sharp, who I think was named "Kash," and he was                  |
| 7  | asking for some kind of document.  And Yvonne wasn't on              |
| 8  | that e-mail from him and Courtney says, "Oh, no," and                |
| 9  | she brings Yvonne into the e-mail exchange, "This is a               |
| 10 | question for Yvonne, she's the Master of Finance."                   |
| 11 | For some reason this was an important document to                    |
| 12 | the SEC, they showed it to Roger Knox, who wasn't on the             |
| 13 | document at all.  And I would argue that when you're                 |
| 14 | looking at these documents, try to keep things in                    |
| 15 | context.  Have you ever had a client or somebody asking              |
| 16 | for -- a co-worker asking for something and you don't                |
| 17 | want to deal with it?  And so you say, "Ask Sally, she's             |
| 18 | the best in the business." I mean that's what's going on             |
| 19 | here.                                                                |
| 20 | Yvonne Gasarch is not a "Master of Finance,"                         |
| 21 | there's been no evidence here to that effect.  I know                |
| 22 | she had access to look at certain things in the                      |
| 23 | Q-System, but -- and I'm sure she made entries for, you              |
| 24 | know, petty cash withdrawals, office supplies, and that              |
| 25 | kind of stuff, but she's not the person running the                  |

A3384

```
 1   show, we know that that was Fred Sharp.  And he had
 2   complete control over what he called "commissions,"
 3   which was the money that he took in.
 4         There's another exhibit -- oh, here it is.  Great.
 5   (On screen now.)  So anyway, you can look at that back
 6   in the jury room.  But I think what I represented is
 7   accurate.
 8         If we could pull up Exhibit 180.  (On screen.)
 9   And you'll recall that this is an e-mail exchange, which
10   was strange, but it was between, um, "Bond 110" and
11   "Wires," and basically Bond is saying that there's some
12   problem with some document that the lawyers at Greenberg
13   Traurig have, and Yvonne says something like "Well the
14   Board of Directors signed," and then somebody says,
15   "Well the notary didn't sign."  And she says, "Well who
16   should sign for the notary, I don't know who should
17   sign?"  And Sharp yells at her, "Read the stamp."
18         Okay, I'm not exactly sure what transaction this
19   involved, and as the Judge said you'd have to find that,
20   you know, that you're unanimous on her committing fraud
21   or helping fraud in certain specifics and finding a
22   certain specific transaction, but again what's the
23   context?  I mean she's not saying, "Oh, yeah, let me
24   fill in the name, we don't know what happened."
25         And again it's just -- this is the stuff they're
```

```
 1    coming up with when you know that they had a million

 2    documents to look at over a long course of time that

 3    Mrs. Gasarch was employed there, and this is what

 4    they're showing you.  Does that make sense?

 5         Well let's see.  Okay, let's pull up Exhibit 284.

 6    (On screen.)  I believe you'll remember this one, um,

 7    ladies and gentlemen, because this is a -- I believe

 8    it's a bank form, um -- oh, no, I'm sorry, it's about an

 9    establishment of a beneficial owner's identity for

10    Peregrine, which apparently used to be called "Peaceful

11    Lion."  And you'll see that at the bottom -- if I can

12    scroll to the bottom, is a signature of -- I think they

13    said it looked like Yvonne Chen, or maybe Yvonne

14    Gasarch.

15         But in any event, we don't have any testimony that

16    she did actually sign this, right?  We don't have a

17    witness to say that she did.  But the SEC showed that to

18    Roger Knox.  And then they asked him, "Well because her

19    signature's on there, Yvonne signed it?"  And he said,

20    "Well, maybe not, because we had PDF signatures of

21    people and we used those."  And what do we know from

22    Mr. Nikolayev?  He said the same thing, "I signed some

23    things because Fred asked me to, others things they were

24    using my, you know, PDF signature, and in one case they

25    -- I think they forged my signature."
```

```
 1        So why is it that Mr. Nikolayev didn't sign in

 2   this page, but Ms. Gasarch did?  I mean he signed the

 3   same kind of documents.  Well because in fairness, just

 4   like Mrs. Gasarch, he didn't receive proceeds from

 5   trades that Gotama made, he didn't receive the profits

 6   from the trades that Gotama made, he didn't direct the

 7   sales of shares that Gotama made, he was a dupe, you

 8   know.  And -- and frankly, you know, and I told you,

 9   Mrs. Gasarch liked Fred Sharp, but the same situation

10   seems to be happening here.

11        Can we look at Exhibit -- oh, yeah, let's look at

12   Exhibit 286.  (On screen.)  This you'll recall is the,

13   um -- a May 16th, 2017 e-mail.  And, first of all, I

14   note from my cross-examination of Mr. Nikolayev, um, I

15   have asserted that many of these e-mails may not even be

16   Mrs. Gasarch's, um, based on the date, et cetera.  But

17   we did see that there was meta data that said "Yvonne

18   Gasarch."  I don't know if that was from the computer

19   that was in her reception area or what.

20        But let's assume that in this page, um, Riverfall

21   Group Limited, where the e-mail's coming from, is

22   Mrs. Gasarch, and we see that there was an e-mail --

23   that there was an e-mail sent to Silverton asking for

24   Greenberg Traurig to be paid.

25        And we know in this case -- whose name have we
```

A3387

```
 1    heard more than Yvonne Gasarch?  Mark Green of Greenberg
 2    Traurig and Greenberg Traurig.  We know that Greenberg
 3    Traurig was performing legal services, very expensive
 4    legal services for the people here, including, um,
 5    Riverfall.  And, um, so I guess that the plot is sort of
 6    lost on me on what transaction this relates to, how it
 7    advanced securities fraud, um, I just don't see it.  But
 8    I didn't want to ignore it, because apparently it's
 9    important to the Commission's case.
10         I'd also like to pull up Exhibit 287.  (On
11    screen.)  Again, this is from 2018, um, from Hilton
12    Capital, Inc., and this is the transaction where, um, a
13    request was being sent to Wintercap, which was formerly
14    Silverton, requesting that Sun Life Assurance Company be
15    paid, um, $100,000.  I can't represent to you what Sun
16    Life insurance company is, perhaps some of you know it.
17    But in any event, if we could also pull up 280.  (On
18    screen.)
19         This is an e-mail that I don't think that's been
20    called to your attention, and I bring it up only because
21    it's a guy talking to Yvonne in 2019, and this is to her
22    e-mail address, not to the Xphone system.  It says, um,
23    he's talking about his grandchildren, and she says, "My
24    children are doing good, they are 2 already, they go to
25    daycare every weekday."  And so we know as of May 2019,
```

```
 1    Yvonne has children, and we know that Fred somehow is
 2    managing to pay Sun Life Assurance Company $100,000 in
 3    2018.  Again, you can take the reasonable inference that
 4    Fred Sharp is trying to help out Yvonne Gasarch, who
 5    just had three babies.
 6         Now in comparison to, um, Mrs. Gasarch -- but
 7    again, a million e-mails over many many years.  Did they
 8    show you one e-mail where Mrs. Gasarch talked about
 9    trading where she mentions the companies whose stocks
10    are at issue, um, you know, saying, "Hey, Fred, give me
11    the money"?  There's nothing like that, right?  We've
12    seen that for other people, right, but not for
13    Mrs. Gasarch.  Her e-mails are very tight, "Send
14    Thursday."  I mean she's a functionary, she's doing what
15    Mr. Sharp asked her to do, nor more, no less.  And
16    again, the SEC doesn't have the evidence that she knew
17    that there was securities fraud.
18         Now in contrast to, um, to Mrs. Gasarch, I'm going
19    to just list some e-mails to Courtney Kelln, to and from
20    Courtney Kelln, who was Ms. Gasarch's co-worker, and I
21    believe the testimony was that she was the one who would
22    divide things up into less than 5 percent, and
23    understood the scheme, went on all the trips, um, et
24    cetera.  And if you take a look at these when you're
25    back in the jury room, if you'd like, I think you'll see
```

A3389

```
 1    the stark difference between the kind of e-mails where

 2    somebody knows what's going on versus the e-mails of

 3    Mrs. Gasarch.  So that, um, just to give you the

 4    numbers, the numbers of Ms. Kelln's e-mails to look at

 5    are, um, 109, 117, 127, 173, and 226.

 6         And included in those e-mails you'll see that

 7    something was sent to "Wires," to Mrs. Gasarch, that

 8    somehow involved the companies, and then what does Fred

 9    Sharp say?  "This should have gone to Courtney."  He's

10    keeping things away from Mrs. Gasarch.  And you know

11    this because there's no documents that implicate

12    Ms. Gasarch except what the SEC pulls from random

13    documents without context over the course of many many

14    years.

15         Now, um, one other thing, um, is that we know that

16    at some point in 2016, 2017, the parties switch to

17    something called "Threema," and I believe you were

18    shown, um, you know, group chats in different colors.

19    While Mr. Knox testified "Yvonne wasn't included in

20    that, Yvonne wasn't part of Threema, she wasn't part of

21    this encrypted communication system that they had

22    between themselves as of 2016, 2017."

23         Just one quick point about documents.  As the

24    Judge told you, you don't have to believe a document

25    just because it's there, and the best case in point on
```

```
 1   that is this Q-System.  The Q-System, I don't know how
 2   else to say it, is garbage, right?
 3        The SEC wants you to believe that Fred Sharp was a
 4   mastermind in securities fraud and, um, was doing all
 5   sorts of things to hide his securities fraud, but
 6   somehow when he's dealing with the Q-System -- and he's
 7   the one, we know, he was the administrator, he could
 8   change any entry, we know that he was responsible for
 9   all the Commission's entries, but they want you to
10   believe, "Oh, when he's keeping the Q-System, he's 100
11   percent accurate.  You can rely on these."
12        Well, I'm sorry, why would you rely on the
13   Q-System vis-a-vis Ms. Gasarch?  By the way, Roger Knox
14   said that her account was "Wires."  I don't think you
15   see anything with "Wires."  But in any event, you'll
16   remember that the SEC's accountant came in and testified
17   that he spent hundreds of hours going through the
18   Q-System and he was not able, once, to tie any
19   transaction to the Corporate House bank account, he
20   couldn't see money going out, and he couldn't tie any
21   transaction to Mrs. Gasarch's own personal financial
22   records.  No evidence of money laundering.  And he
23   testified that tieing these things together is important
24   because it verifies it, right?  And we have nothing to
25   -- nothing to verify any of the Q data that the SEC is
```

```
 1   claiming involves Mrs. Gasarch.

 2        Now the other source of evidence that we've seen

 3   in this case are the witnesses and, um, you know, my

 4   daughter, my 11-year-old kept asking me during the first

 5   week of trial, "How's trial going?" And I said, "I don't

 6   know, because my client's name hasn't come up."  We sat

 7   here for a week before Mrs. Gasarch's name came up.

 8        We listened to Avtar Dhillon, who is a convicted

 9   felon, and what did he say?  "I never even heard of

10   Yvonne until the complaint was filed and we were

11   co-defendants."  They're co-defendants in this case and

12   he had never heard of her.

13        Then we heard from Mr. Kaitz, who lived in the

14   United States and worked as a stock promoter.  And I

15   thought that -- obviously I thought he said that he had

16   settled with the SEC, he didn't admit or deny anything,

17   but one thing I thought was interesting is that he said

18   he wasn't aware of this 5 percent rule.  And I thought

19   he was credible in that regard maybe.  Maybe he's trying

20   to save his skin.  But, um, it's not self-evident,

21   right?  It's not self-evident.  And Mrs. Gasarch was in

22   Canada and is from China, but for some reason the SEC

23   thinks she's supposed to know about this 5 percent rule

24   and about this pump-and-dump scheme that everyone was

25   hiding.  And remember, we know that there were
```

```
 1    legitimate transactions, so how do we know Mrs. Gasarch
 2    didn't think she was involved in legitimate
 3    transactions?
 4         We heard from Mr. Ciapala, and that was
 5    interesting, he said that Yvonne was involved in sending
 6    wires.  That's it.
 7         So there are two witnesses who testified
 8    substantively about Mrs. Gasarch.  One was
 9    Mr. Nikolayev, who we've talked about.  I think he
10    really became my witness, didn't he, because he was
11    saying, "Fred Sharp, I worked with him for 20 years, I
12    didn't know that he had any bad dealings.  He wasn't a
13    criminal.  I thought he was a lawyer.  Or he was a
14    lawyer.  He told everyone he was a lawyer.  And, yeah, I
15    got involved in this Gotama thing because he asked me to
16    and I trusted him."  But do you believe that
17    Mr. Nikolayev understood anything about the securities
18    fraud here?  I doubt it.  But I thought he was very
19    credible.
20         The other witness is our friend, um, Roger Knox.
21    If I never heard the word "Ma'am" again, I would be very
22    very happy.  My father had a saying, like he would say
23    "That guy's lying," and I would say "How do you know?"
24    And he said, "Because his lips are moving."  That's
25    Mr. Knox, right?  I have never seen anyone less credible
```

A3393

```
 1    in my -- in any part of my life.
 2         So what do we know here?  We know Mr. Knox was
 3    staring down the barrel of a -- what was it, a
 4    15-plus-year sentence, right?  And he wouldn't even
 5    admit to you guys that prison is horrific and he wanted
 6    to get out, for him it was a "learning lesson."
 7         And, um --
 8         THE COURT:  5 more minutes.
 9         MS. PICKETT:  Thank you.
10         And, um, he was shown the "Master of Finance"
11    e-mail, you know, that was one of the documents he was
12    shown.
13         Then he tried to convince you that Yvonne Gasarch
14    was integral to the securities fraud, he said she was
15    the accountant, she's very knowledgeable, but you know
16    what?  He obviously had forgotten that he had been
17    given, um, apparently -- or he didn't know that we had
18    the notes from the 24 interviews that he had with the
19    government, and perhaps more importantly in those
20    interviews, he said he met Yvonne once, she was in a
21    reception area of Corporate House, which also had other
22    offices, so she was working as the receptionist.  And
23    again I'm not trying to downplay her role, she obviously
24    did other things besides sitting in the reception area.
25    But she's an assistant, not an integral part of this
```

A3394

1    scheme, as Mr. Knox tried to suggest.

2        And he sat here and he said, yeah, he was outraged

3    that he spent 18 months in jail.  And he thinks, even

4    though he was looking at 15 years, that by coming in

5    here and testifying against Yvonne Gasarch, that he may

6    never go back to jail?  Does that seem right to you?  I

7    mean isn't it usually the case that someone like Yvonne

8    Gasarch comes in and points the finger up to somebody

9    like Roger Knox?  Of course it is.

10        Now I want to get to -- so I would just say that

11    whatever Mr. Knox said, um, don't believe it.  Oh, and

12    don't forget that he also said, "Yvonne was not

13    value-added."  He thought she wasn't helping in the

14    fraud, he said.  He thought that he could do the job

15    better than her.  "She's not an integral part to this

16    scheme."

17        Now Judge Young has testified -- I mean not

18    testified, has charged you about the elements of, um,

19    securities fraud, and there's two chunks for

20    Mrs. Gasarch.  One is the primary violation.  The

21    primary violation is that Yvonne Gasarch committed a

22    primary violation of the securities laws by violating

23    what's called 17(a)(3), and that she, she committed

24    fraud against somebody who was a purchaser of the

25    securities, who maybe she perhaps didn't even know what

A3395

1    the names of the securities were.  I don't know.  But

2    there's no evidence that Mrs. Gasarch personally engaged

3    in fraud.  I think it's based on everything that we've

4    talked about.

5         Fraud is very very serious, right?  And -- well

6    all we know is that Mrs. Gasarch was Fred Sharp's

7    assistant.  And I want you to look at the documents and

8    see if there's any evidence that she committed fraud

9    against the purchaser of the securities.

10        Now on the aiding and abetting side, I assume that

11   that sounds better than a primary violation, but it's

12   not, right?  The Judge said to you that the person who

13   aids and abets is equally liable as the primary

14   violator.  But the Judge also instructed you that

15   Mrs. Gasarch had to understand the wrongful conduct that

16   was going on.  And again, we don't have any evidence of

17   that.  We don't have any evidence she knew about the 5

18   percent rule.  We don't have any evidence that she knew

19   about the pump-and-dump scheme.

20        And then she had to provide substantial assistance

21   and she had to have a mental state of doing that

22   knowingly or recklessly.  I would suggest to you, and I

23   asked Mr. Knox, and I want you to use your common sense,

24   is somebody who is responding to client requests, um,

25   following the orders of her boss, is she providing

```
 1    substantial assistance to securities fraud?  She's doing

 2    her job.  Somehow it seems like the SEC wanted her to

 3    jump up and say, "There's fraud here, what about the 5

 4    percent rule?"  But think about her role and think about

 5    her knowledge.  Mr. Knox said he didn't know that she

 6    had any knowledge of this being a fraud.

 7         So one thing quickly I do want to say is that

 8    obviously the SEC has done a great job here, right?

 9    We've had three people come in who pled guilty to

10    securities fraud violations.  They seemingly have

11    collected a lot of money, right?  So we want the SEC to

12    do their job, we want them to cast a wide net to pick up

13    the sharks like Mr. Knox and Mr. Ciapala, right?  But

14    what we don't want is for a little fish like

15    Ms. Gasarch, who is the assistant in this case, to get

16    caught up in that net.

17         And I think it's time, ladies and gentlemen, for

18    Ms. Gasarch to find justice, as Judge Young instructed

19    the jury's duty here, and when you're looking at that

20    verdict slip, I encourage you to think about the facts,

21    consider the law, and find that she did not commit any

22    of the claims that the SEC has filed.

23         Thank you for your time and attention.

24         THE COURT:  Ms. Fritz?

25
```

```
 1    CLOSING ARGUMENT BY MS. FRITZ:
 2         Okay.  First of all, thank you.  I just want to
 3    reiterate, you guys sat through some less than
 4    exhilarating testimony and we all appreciate your
 5    patience and attention.  Now, finally, we all stop
 6    talking and you guys get to decide what you're going to
 7    do with the evidence that these folks presented to you.
 8    Did they present to you reliable and substantial
 9    evidence that my client committed each of the various
10    elements of these various charged offenses?
11    Specifically a violation of Section 5, failing to
12    register securities, Section 13(d), ownership, or -- and
13    did he also, by doing so, engage in violations of 17(a)
14    and 10(b)(5)?
15         There are lots and lots of different ways that
16    juries, as I've learned over the years, tackle evidence,
17    consider evidence, and the Judge talked to you a little
18    bit about the fact that you may sift through evidence,
19    you may analyze, one by one, each of the securities, you
20    may assess, if you choose to, each of the statements
21    that came out of the mouth of Roger Knox, those are ways
22    to assess the evidence.  What I want to say to you here
23    is I do not think that that is what you need to do in
24    order to decide this case.
25         This case should be viewed as a whole, and it's
```

A3398

```
 1   unusual in that sense.  What the SEC chose to do in this
 2   case was to present to you its three key witnesses, each
 3   of which are convicted felons, each of which was coming
 4   in here with a guillotine hanging over their head, a gun
 5   pointed at them, and with a desire to get a benefit, a
 6   reduction in their sentence by virtue of testifying
 7   against people they barely knew.  That's the currency
 8   that you were provided with, that's the nature of the
 9   evidence that you were supposed to rely on, these people
10   who have engaged in years and years of deliberate and
11   sophisticated fraud, these individuals who have lied
12   again and again.  But now the SEC says, "Here they are,
13   trust them, rely on them."
14        It reminded me of the whole issue that arises in
15   connection with stock promotion.  You learned a little,
16   not that much, about the fact that stock promotion is
17   legal, but according to SEC regs, if you engage in stock
18   promotion, you must provide a disclaimer at the bottom
19   that says, "This is paid advertising," "This is paid-for
20   information."  And the SEC wants you, insists that that
21   be done so that the reader knows the information is not
22   objective, it's not reliable.  It should not be relied
23   on by the recipient.
24        Well isn't that the same thing that the SEC did
25   here over and over?  They put some of them on the
```

```
 1   witness stand, and let's face it, that testimony was
 2   bought and paid for through the most critical currency a
 3   person could ever be involved in, and that is their
 4   time, how much time would they have to spend in prison.
 5   That is the currency that is involved in every word that
 6   came from Roger Knox, Avtar Dhillon, and Kenneth
 7   Ciapala.  And yet the SEC would say to you now, "Rely on
 8   it, they're credible."  I truly invite you to reject
 9   that.  I truly invite you to reject the idea that you
10   should pass judgment on someone like Jackson Friesen
11   based on this bought-and-paid-for kind of testimony.
12        And let me talk about the testimony for a moment.
13   What we saw first was Avtar Dhillon.  Avtar Dhillon has
14   sworn under oath in the past, sworn things like "I don't
15   really know Jackson Friesen.  I don't know him."  But
16   these folks, knowing full well that he swore to that,
17   put him on the witness stand to tell you something very
18   very different, it's very different, and expect you to
19   rely on it, and expect you to reach a decision against
20   another person based on what he has to say, when the
21   whole time -- and I don't think he's here today, but the
22   whole time the Assistant United States Attorney that is
23   going to stand up at his sentencing was sitting right
24   there to make absolutely sure they were comfortable and
25   happy with what was being said.
```

A3400

```
 1          That was Avtar Dhillon.  He was the first of the
 2     witnesses, and you saw him incredibly well-rehearsed.
 3     He was incredibly well-prepared.  And he got on the
 4     stand and he looked terrified that he was going to make
 5     some kind of misstep.  And he dutifully went through
 6     with the SEC a back-and-forth Q & A, a well-rehearsed
 7     back and forth Q & A, in which he recited back to them
 8     the claims that they wanted to hear, that they had
 9     prepared him to say.
10          And then we got Roger Knox, very very different.
11     Arrogant.  Arrogant.  Cocky.  But equally
12     well-rehearsed.  He was the one that had the mantra that
13     he must have said a thousand times of, "Oh, yes, we
14     would go to dinner once a year and at that dinner we
15     would then sit around and discuss the fact that we used
16     nominee companies normally to conceal our 5 percent
17     ownership interest so as to engage in a criminal
18     enterprise."  Really?  That's not -- that's not how
19     people talk.  That's not what happened over those
20     dinners.  Use your common sense.
21          And sure enough, when I went back and talked to
22     him about the things that he had told not just the FBI,
23     but the SEC previously, sure enough he had said, "No,
24     Mr. Veldhuis, Mr. Friesen, we didn't talk about
25     specifics, we didn't talk about business, we didn't talk
```

A3401

1    about illegal stuff, that was not what we did."

2        And then we had Mr. Ciapala, who was the guy that

3    appeared on the screen who, in my view, was very

4    unnerving, he was darting eyes, he was gulping, he did

5    not in any way appear to be someone that was simply

6    telling you what happened.  Again we got a rehearsed,

7    scripted examination this time by Mr. London.  And this

8    time we learned how the SEC does their prep, because

9    this was a witness who did not know pieces of

10   information that the SEC wanted him to know and wanted

11   him to testify about.

12       And so what did Mr. London tell you on redirect?

13   That though the witness didn't actually know that

14   information, "Was Jackson Friesen the Code Number 2?"

15   The witness didn't know that.  But Mr. London brought

16   out the fact that Mr. London, during their meetings,

17   showed him stuff that persuaded him that he was Number

18   2.  And so he testified to it.

19       Over and over again ask yourself, "Did we have

20   witnesses put on the stand to tell us, just tell us what

21   happened?"  "When did you meet these folks?"  "Where did

22   you go?"  "What did you talk about?"  Did we have people

23   that were giving you recollections of anything that

24   actually occurred or did we have scripted answers

25   recited back by witnesses who are scared out of their

A3402

1    ever-loving minds about going to prison?

2          You would only, I would argue, want to rely on

3    people like that against someone like my client if that

4    testimony was unimpeached and supported by some kind of

5    documentary evidence.  In this case neither is true.

6          With Mr. Ciapala, for example, he wants to tell

7    you that, yes, he got trading instructions from my

8    client, and so I asked him the simple question, "Well,

9    if those are communicated in writing, where are they?"

10   "Oh, I don't know."  "I don't have them."  Nothing.  Why

11   are these things being said in the absence of any

12   support?  But that's what you have, that's what you're

13   confronted with.

14         There's an old sort of adage about, um, if you're

15   in a car with your family and you're driving up to a

16   bridge and the bridge looks like it might be made of

17   sort of rotten wood, and standing on the river bed are

18   Mr. Knox, Mr. Ciapala, and Mr. Dhillon, and each one of

19   them says to you, "You know what?  Drive right across.

20   Go ahead.  It's fine."  Would you rely on them?  Would

21   you rely on that with respect to yourself or with

22   respect to someone you care about?  The answer is "No."

23   I wouldn't.  And what's worse is the fact that the

24   entire case is based on the worst-quality evidence that

25   could have been presented, and that's combined with the

A3403

1    fact that it's based on wrong theories, poor evidence

2    and wrong theories.

3         From the get-go here, Mr. London in the opening

4    tried to persuade you of a couple of things.  He tried

5    to persuade you, for example, that the transactions are

6    bad, they're a scheme, and I'm going to emphasize this

7    one more time and it may well come up in summation, what

8    they say the scheme is, is that blocks of stocks are

9    owned in shell companies, which then reverse-merge with

10   a private entity, which then is the subject of a

11   paid-for stock promotion.  That's the scheme.  I would

12   argue to you that's not a scheme, that's a transaction.

13   And the only thing that makes it impermissible is if you

14   are in the back room with Fred Sharp where he is

15   divvying up and deciding how to play "shell games," no

16   pun intended, with the stock.  That's a Fred Sharp

17   thing.

18        Now when they were presenting these witnesses, I

19   got into tussles with the witnesses over what at the

20   time seemed to me as sort of a dumb issue, and that is

21   they were having the witnesses say that over this

22   once-a-year business dinner, there was this open-and-

23   blatant talk in a crowded restaurant in which the

24   illegality of what was going on was discussed.  And I

25   was pushing back and showing them prior testimony and I

```
 1    was doing all of that.  But finally it dawned on me why
 2    that was going on, because the testimony makes no sense
 3    and it's not supported.  The reason that tussle occurred
 4    is because that's their only argument that Jackson
 5    Friesen knew about that wrongdoing.  If they couldn't
 6    get that out, there is no evidence that Jackson Friesen
 7    knew about it.  So it finally dawned on me, we're having
 8    this fight because without that, they know there is no
 9    evidence and there is no case.
10        So that's what we ended up with being presented to
11    you, wrong theories, bad evidence, poor-quality evidence
12    that you -- that I suspect you do not feel is reliable
13    and trustworthy and credible.  So that is one way that
14    you can look at this case.  I would suggest to you that
15    that is the appropriate way to look at this case and to
16    decide that the case as a whole is insufficient to
17    support any finding against Jackson Friesen.  Done.
18    Without parsing out what Roger Knox said about certain
19    things.  Without digging into the binders' worth of
20    documents to decide what stock involved what sort of
21    testimony.  I would argue that that's not what -- that's
22    not what you need to do to decide this case.
23        But -- but jurors -- lots of jurors view things
24    differently.  So let me tell you, if you go through the
25    binders and you go through the documents, and you sift
```

```
 1    through all the evidence, and you look at what they
 2    presented regarding Jackson Friesen, you will get to the
 3    same result.  Because what you learned is Jackson
 4    Friesen was a young guy who got involved in 2011, and
 5    that was 12 years ago, and he got involved because his
 6    Dad knew Mike Veldhuis and got him a, um, I don't know,
 7    hooked him up with Veldhuis.  And so from that point and
 8    for a couple of years, what you see is a brand-knew
 9    young guy working with two very experienced guys, Mike
10    Veldhuis and his partner, Paul Sexton.  I would argue
11    working for them.  I would argue working at their
12    direction.  I would argue that the idea that he
13    magically walks in the door on Day 1 and is controlling
14    anything, directing trading, a partner, I would argue
15    that that makes absolutely no sense.  And so what we
16    have is the guy who is a lot like Bill Kaitz.
17         Bill Kaitz was the second or third witness, I
18    think, he was a young stock promoter -- not as young as
19    my client, but he was the only witness who had extensive
20    contact with my client.  The only one.  Because my
21    client's involvement in these transactions was from the
22    marketing side and so was Bill Kaitz's.
23         Bill Kaitz was a stock promoter and he did deal
24    with Jackson on a regular basis.  And what did he tell
25    you?  That he, Bill Kaitz, believed that he was involved
```

A3406

```
 1    in a good business, that it was a business that was
 2    helping startup companies to get financing.  That they
 3    worked hard on the marketing, because what these
 4    companies need is to get sales and purchases of stock.
 5    That's part of the way that they raise their money.  He
 6    did that.  He dealt with Jackson, he said, on a regular
 7    basis until 2014.  Then very little contact he said
 8    after that.  But in the meantime he said they didn't
 9    talk about anything that was illegal.  He did not think
10    there was anything illegal.  He did not believe that
11    what he and Jackson Friesen were talking about was at
12    all illegal.
13        That's the closest counterpart to my client, a
14    perfectly good guy trying to do a perfectly good
15    business without any knowledge that what was going on
16    with Fred Sharp was something very different.
17        Not only did Kaitz convey that, but interestingly
18    Kenneth Ciapala even agreed.  That when he started at a
19    company called EHT, which is an asset management firm
20    that was doing these kinds of things, Ciapala said it
21    took him years to understand that there was anything
22    wrong with the business that was being done.  Same as
23    with Kaitz.  These guys, what they see is a good
24    legitimate business, and that's what they want to be
25    involved in.
```

A3407

```
 1          Now there was also a -- an argument with respect
 2     to, um, whether or not the lawyers involved in the case
 3     were doing the right job?  We heard a whole lot about
 4     the lawyers.  We heard a whole lot about Greenberg &
 5     Traurig.  And so I just want to mention to you, that not
 6     only would Kaitz and Ciapala had not thought there was
 7     anything improper about the business, but also there
 8     were lots of reasons buried in all those documents for
 9     someone like Jackson Friesen to believe that what was
10     going on made perfect sense here.
11          Greenberg & Traurig was dealing with the
12     transactions and in one exhibit after another what is
13     going across is discussion about the filing of the
14     registration statements that need to be filed.  I'm just
15     going to give you a couple of them.  Exhibit 59.
16     Exhibit 64.  Exhibit 84.  Exhibit 200.  All of those
17     deal with the fact that Mark Lee, the lawyer, is being
18     paid to do the documentation, including the registration
19     statements relating to these stocks.
20          Now in addition, other than the three witnesses
21     that I've already talked about, and Bill Kaitz, who I
22     think is, um, is a good example of what someone like
23     Jackson Friesen is like in this business, um, other than
24     that, what did they present to you, what did they say
25     that would suggest that Jackson Friesen had any
```

A3408

```
 1   knowledge, intent to defraud, intent to deceive

 2   investors?

 3        Well, first of all, I think they're probably going

 4   to mention that there are two instances in which

 5   Mr. Friesen requests and receives Gard statements.

 6   Those are Exhibits 235 --

 7        MS. FRITZ:  If you would just pull one of them up.

 8        (On screen.)

 9        MS. FRITZ:  Exhibit 235 and Exhibit 252.  Those

10   are the only times in which Mr. Friesen is shown to have

11   requested and received a statement that relates to

12   what's going on in his mind.  I want to point out to

13   you, that if you look at what he received --

14        MS. FRITZ:  Go to Page 2, please.

15        (On screen.)

16        MS. FRITZ:  None of the transactions that are at

17   issue in this case are reflected there.  And the same is

18   true of the other statements.

19        So if these folks try to stand up and say he knew,

20   because twice in 10 years he requested a statement?  The

21   answer is "No," not unless the problem that we're

22   dealing with is the stock in American Petrol Hunter, for

23   example.  So that's -- that's a red herring, that

24   doesn't tell him that there is any illegality.

25        If they argue to you that the guilt lies in the
```

A3409

```
 1    fact that he got benefits or shared in proceeds?  Again,

 2    the answer is "No, it doesn't."  The evidence wasn't

 3    there to show that there was any sharing of proceeds

 4    that went on with him.  There is one exhibit, one

 5    exhibit only, Exhibit 173, which I'm sure you're going

 6    to hear about, where Mr. Friesen is told by Mr. Veldhuis

 7    "You're going to get some money," and he references two

 8    particular deals that they did.  Well, yeah, Mike

 9    Veldhuis was certainly employing and paying Jackson

10    Friesen.

11        The fact that other e-mails showed that stock was

12    being sold?  Well that tells you nothing either, that's

13    the purpose of these transactions.  And Mr. Friesen had

14    no reason to think that it was being done improperly.

15        THE COURT:  5 more minutes, Ms. Fritz.

16        MS. FRITZ:  Oh, okay.

17        You have no idea how terrifying this is.  I have

18    to sit down.  I'm sorry, I have to sit down in 4 minutes

19    and 30 seconds, and I don't get to stand up again, and

20    these folks are then going to sum up to you, and I don't

21    know what they're going to say, and I don't know what

22    they're going to pull, I don't know what they're going

23    to pull out as an exhibit.  And so I'm going to ask you,

24    I'm going to ask you now a few things.

25        First of all, with respect to 13(d), that
```

A3410

```
 1    disclosure requirement, please remember how many hoops
 2    have to be jumped in order to get liability down to
 3    Jackson Friesen, because what we have is Fred Sharp
 4    owning stock in nominee names -- are those the 13(d)
 5    people?  Or we have Mike Veldhuis on the Q-System
 6    accounting data as being the account holder.  Has he got
 7    the 13(d) application?  How far does it go?  How many
 8    people does the SEC want to ding when it comes to
 9    reporting?
10         So in order to be liable, Mr. Friesen would have
11    to basically know that stock was being allocated and
12    then allocated again, and then allocated again -- and by
13    the way, that last -- that last part didn't happen.
14    With respect to Section 5, he would have to be the
15    seller of stock.
16         And so I'm going to ask you to bear in mind, 13(d)
17    liability and Section 5 liability, I just said a moment
18    ago, how far does it go?  If somebody works for me and I
19    paid them with proceeds of stock, are they liable now?
20    No.  And the answer lies in the charges that you heard.
21         For 13(d), Mr. Friesen would have had to have been
22    a beneficial owner, and that means have power, control,
23    over the stock.  He did not.  And if they try to argue
24    that this new young guy had power, just think about it.
25         What happened in this case is that Mr. Friesen's
```

A3411

```
 1    e-mails here, it's all here, here are the e-mails
 2    involving the trading of stock and the way in which
 3    companies were being used to hold the stock, not
 4    Mr. Friesen.  These binders are full of Mike Veldhuis
 5    doing the trading and Mike Veldhuis and Fred Sharp
 6    deciding what to do with respect to nominee companies.
 7    Full of it.  Did you hear that?  Did they -- was there
 8    ever a moment when they acknowledged Mike Veldhuis
 9    traded in the stock?  No.
10         THE COURT:  You have to sum up, Ms. Fritz.
11         MS. FRITZ:  I'm going to ask you finally, if they
12    say to you that he got benefits and therefore is liable,
13    remember they did not ever go and get the records that
14    would reflect any benefit to him.  They didn't do it.
15    They went around the world gathering documents, got none
16    of that.  If they say to you that there is some random
17    e-mail that suggests that he had knowledge or intent to
18    defraud -- because I'm going to be sitting over there,
19    please think about whether it's in context, is there a
20    clear explanation that's consistent with what happened,
21    that Jackson Friesen went to work with these guys and
22    then didn't?  And I'm going to ask you find that
23    Mr. Friesen is not liable of these charges.  And I'm
24    going to thank you one more time.
25         THE COURT:  Ms. Shields?
```

A3412

1

2    CLOSING ARGUMENT BY MS. SHIELDS:

3        Good morning, ladies and gentlemen.  You've been

4    asked "Where's the beef?"  Here the beef.

5        Defense counsel, Mr. Friesen's counsel doesn't

6    want you to look at the evidence, but that's what we're

7    going to do, because that is your job.  You've heard

8    defense counsel argue about a lot of things that aren't

9    evidence in this case.  They want you to speculate, as

10   the judge told you you cannot do, about what some other

11   lawyers doing some other things might have done or said,

12   about what some Canadian bank documents that you don't

13   have in evidence might or might not say.  They're trying

14   to distract you from the evidence in this case.  And

15   it's your job to stay focused on precisely that

16   evidence.  You will need to decide whether Jackson

17   Friesen and Yvonne Gasarch should be held responsible

18   for their roles in the massive securities fraud scheme

19   that you have learned about over the last two weeks.

20       This complex scheme involved a network of shell

21   companies and banks and brokerage accounts around the

22   globe.  It involved a lot of money, $144 million in

23   fraudulent trading.  The scheme left investors making

24   decisions in the dark about who was funding promotions.

25   It involved encrypted messages on Xphones and Xmail

A3413

between people who are hiding their identities with code
names to avoid detection by law enforcement.  This
scheme was designed to do one thing, make all of the
people involved a lot of money.

How did this scheme make money?  Again and again
Friesen and his partners got control of the majority of
the stock of 14 small companies, then they worked with
Sharp's organizations to split that stock up into blocks
of less than 5 percent.  Why?  To avoid rules requiring
them to disclose their control of those companies.

Then the stock was parceled out to numerous
nominees.  Sharp and his employees, Kelln and Gasarch,
made these nominees available for rent to Friesen and
others to hide the true beneficiaries of their illegal
trading.  For rent.  Friesen and his partners paid large
fees to Sharp in order to be able to use these nominees.
They rented them.  Then that stock was sent to people
who could trade it, like Knox and Ciapala, at Silverton
and Blacklight.

Then Friesen and his partners paid for promotions
to create investor demand for this stock.  Remember how
Mr. Knox described it, "To build up the excitement."
When those promotions were working, Friesen and his
partners sold their shares to investors who paid a lot
of money to buy those shares.  They paid over $144

```
 1    million stashed in brokerage accounts around the world.
 2         Friesen and his partners needed a way to access
 3    that money, that's where Ms. Gasarch came in.  Gasarch,
 4    code-named "Wires," was the person who got the money
 5    where it needed to go.  You've seen many exhibits where
 6    Friesen and his partners asked Gasarch to send money to
 7    various people, including service providers like
 8    promoters and importantly to themselves.  Gasarch
 9    herself was paid well for her work.  She earned more
10    than $2.5 million from this scheme.  How many
11    receptionists or assistants are paid like that?
12    Ms. Gasarch was no mere assistant, rather, she was the
13    "Master of Finance," as Courtney Kelln described her.
14         Remember when Mr. London told you in opening that
15    there are three parts to this scheme.  Now you've seen
16    those parts.  I'm going show them to you again.
17         Part 1, accumulate stock and illegally hide your
18    ownership.  This is Exhibit 292 and it showed the Arch
19    Therapeutics part of this scheme.  Friesen and his
20    partners broke up their ownership of stock into numerous
21    nominees, shown in green.  These nominees were created
22    and managed by Sharp, Gasarch, and Kelln, for Friesen
23    and others' benefit.
24         Part 2, pay a professional stock promoter to
25    create demand for the stock and pretend that an
```

```
 1    unrelated third-party is paying for that promotion.

 2    Remember these advertisements for Arch and Stevia First

 3    stock?  They're Exhibits 16 and 17.

 4          Friesen and his partners edited these promotions

 5    to get, as Dr. Dhillon told you, investors's eyeballs on

 6    these stocks, to get them excited to buy.  And then, to

 7    mask what they're really doing, they said third-parties

 8    were paying for the promotions and that those third-

 9    parties weren't selling stock.  But who was really

10    paying?  Nominees that Friesen and his partners rented

11    from Sharp's organizations.  These are Exhibits 241 and

12    81, and they show that Conmar Capital and Advantage

13    Media were controlled by these defendants.  Conmar and

14    Advantage were not third-parties, they were fronts.

15          And even Mr. Kaitz, who was very eager to tell you

16    that stock promotion can be legal, admitted that when

17    you promote stock that you're selling and you hide your

18    identity from unwitting investors, that breaks the law.

19    That's fraud.

20          And Part 3 of this scheme, sell your shares to the

21    investing public.  Friesen and his partners' sales

22    produced $144 million.  This is Exhibit 307.  Who paid

23    this $144 million?  Investors in the public markets who

24    didn't know that they were buying stock from the people

25    who controlled the majority of these companies' shares.
```

1    Investors bought these shares and then what happened?

2    As Dr. Dhillon and Mr. Kaitz both told you, the price of

3    the stock dropped when Friesen and his partners stopped

4    paying to promote it.  This is Exhibit 310.  As the

5    Commission's accountant explained, you can see the price

6    drop after the promotions stopped.

7        Friesen and his partners took many complicated

8    steps to divide up shares that they controlled among

9    nominees.  Why?  To dupe investors and to avoid the

10   requirements of the law.  Judge Young has instructed you

11   on the law that you need to apply.  You also heard from

12   witnesses Dhillon, Knox, and Ciapala, about the

13   importance of the rules that they evaded.  When a group

14   of people own 5 percent or more of a company's shares,

15   that group needs to disclose its ownership to the

16   brokerage firms where they're trading and to the public

17   in SEC filings.  Friesen and his partners didn't do

18   that.  And Gasarch assisted them by helping to conceal

19   their ownership of the stock through nominees.

20       Another thing that Friesen and his partners didn't

21   do was register the sales they made through nominees.

22   The Judge told you what a registration statement is, it

23   provides important disclosures to potential investors,

24   including disclosures about who owns the majority of a

25   company's stock.  You also heard from the Judge that the

1    law requires every securities seller to file a

2    registration statement before selling their shares.

3    Friesen and his partners simply didn't file those

4    registration statements.  Avoiding this important

5    disclosure protection for investors was the whole point

6    of using Sharp's network of nominees.  Make no mistake

7    about this, if Friesen and his partners had told the

8    truth about the fact that they owned the majority of

9    these companies' shares, they would not have been able

10   to deposit those positions in brokerage firms and sell

11   them in the way that they did in the quantities they did

12   to make the profits they earned.

13        The fact that Sharp may have been a bad guy

14   doesn't get Jackson Friesen and Yvonne Gasarch off the

15   hook for their actions.  They both chose to work with

16   Sharp to engage in fraud.  Friesen used Sharp's services

17   over and over again to make more than 2,000 sales of

18   stock in 14 public companies.  Gasarch worked with Sharp

19   day in and day out, they both attempted to hide their

20   identities so they wouldn't get caught, they used code

21   names and they hid behind nominees.  Friesen was

22   Gasarch's assistant, paid for promotions that didn't

23   disclose that the real-paying parties were dumping their

24   shares.  Friesen talked with Sexton and his partner

25   Veldhuis about destroying documents.  Gasarch directed

A3418

```
 1    -- sorry, Gasarch doctored invoices to make it look like

 2    nominee companies had incurred real expenses.  Gasarch

 3    knew she was engaged in laundering money from sales of

 4    stock.  All of these things demonstrate that Friesen and

 5    Gasarch knew they were breaking the law.

 6         So ladies and gentlemen, what's your job in this

 7    case?  You've been given a verdict form to complete

 8    which asks you to decide whether Friesen and Gasarch are

 9    responsible for violating four different types of

10    securities laws.  I'll talk about each of these four

11    groups separately.  There are fraud claims against both

12    Friesen and Gasarch.  There's an aiding and abetting

13    claim against Ms. Gasarch.  There's a claim that Friesen

14    sold shares and unregistered transactions.  There's a

15    claim that Friesen failed to disclose his ownership of

16    more than 5 percent of Stevia First stock.

17         Recall that Judge Young told you that the SEC

18    needs to prove its case by a preponderance of the

19    evidence.  So ask yourself, is it more likely than not

20    that the defendants violated the law?  You will find the

21    answer is "Yes."

22         Let's talk about the fraud claims first.  These

23    are the claims under Section 17(a)(1) and (a)(3) of the

24    Securities Act and 10(b) of the Exchange Act.  Judge

25    Young has already instructed you about the elements of
```

A3419

```
 1    these claims, that's the law you should follow, and I'm
 2    going to explain to you how the evidence satisfies these
 3    elements.
 4         First, to show that Friesen violated Section 17(a)
 5    (1), 17(a)(3), and 10(b), the SEC has to prove
 6    fraudulent conduct.  That's a scheme, a plan, a course
 7    of business that is designed to deceive or create a
 8    false appearance of fact.  The evidence shows that
 9    Friesen's conduct was deceptive, it was designed to hide
10    his control, with others, of millions of shares of stock
11    that he sold into the U.S. public markets.
12         First, Friesen, working with his partners, Mike
13    Veldhuis and Paul Sexton, sold the shares in at least 14
14    companies to investors in the U.S. through nominees that
15    they rented from Sharp and his employees.  If you want
16    to look at the details of how they did this for each of
17    the 14 companies that are part of this case, just look
18    at Exhibit 308, all of the detail is right there for
19    you.  There's a separate page for each one of the 14
20    companies.
21         This is just one example, this is Stevia First,
22    which later changed its name to Vitality.  To sell
23    Stevia First/Vitality shares to the public, Friesen and
24    his partners used these 23 brokerage accounts, including
25    some managed by Silverton, Mr. Knox, some managed by
```

A3420

```
 1    Blacklight, Ken Ciapala, and other nominees' accounts at
 2    other brokerage firms, including Peaceful Lion, that's
 3    the nominee of which Ms. Gasarch was the beneficial
 4    owner.  These nominees were provided by the Sharp
 5    organization who created and maintained them for
 6    substantial fees.  Using these nominees, Friesen and his
 7    partners made 553 sales of Stevia First stock, in total
 8    selling over 38 million shares, for proceeds from
 9    investors of $45 million.
10         You do not need to decide that Friesen was
11    involved in selling every one of these companies, 14
12    company's shares, he's liable if you find that he was
13    involved in selling any one of them as part of this
14    scheme.
15         Friesen's done a lot of finger pointing in his
16    arguments, he argues that all the blame lies with Sharp
17    or Veldhuis or Sexton, he argues that he was only some
18    junior guy learning the ropes, but if he was learning
19    any ropes at all, it was how to commit a massive
20    securities fraud scheme.  And the evidence shows that he
21    was a full participant in this fraud, even if he was
22    younger.
23         First there's testimony.  At the start of this
24    case you heard from Mr. Dhillon that he worked with
25    Sexton and his partners to sell three of these
```

A3421

```
 1    companies' shares, Stevia First, Arch, and OncoSec.
 2    Dhillon knew that Friesen was the third partner in these
 3    deals by the time of the Arch deal in 2013.  And other
 4    evidence that we'll get to in a moment, shows that
 5    Friesen was involved in OncoSec and Stevia First even if
 6    Dhillon didn't know it at the time.  The scheme was
 7    compartmentalized by design, Dhillon didn't talk to
 8    Friesen, Knox didn't interact frequently with Sexton.
 9         Next, Bill Kaitz corroborated Dhillon's testimony
10    about Friesen's involvement.  Kaitz told you that
11    Friesen was personally involved in Kaitz's promotion of
12    7 of these 14 issuers.  He told you in no uncertain
13    terms that Friesen was involved in drafting and editing
14    the promotions and in discussing strategy for them.
15         Next, you heard further corroboration from Roger
16    Knox that he sold many of these companies' shares for
17    the benefit of Friesen, Veldhuis, and Sexton.  You heard
18    Knox describe how Friesen and Veldhuis both directed
19    these trades.  How Friesen was part of the control
20    group.  How he had extensive contact with Friesen.  He
21    described for you the business meeting where Sharp and
22    Veldhuis and Friesen and others all talked about the
23    illegal nature of their business, and Friesen
24    participated in this conversation.
25         Now you've heard a lot from defense counsel
```

A3422

```
 1    attacking these witnesses, Mr. Knox, Mr. Ciapala,
 2    Dr. Dhillon, who came in here and told you about the
 3    securities fraud scheme in which they participated.  You
 4    all are the judges of credibility, not defense counsel.
 5    When you think about these witnesses' testimony, think
 6    about a couple of things.
 7         Think about whether they all told you the same
 8    story.  Think about whether they told you a consistent
 9    story.  Think about whether what they told you is
10    supported by the documents.  Think about whether they
11    admitted that they engaged in wrongdoing or whether
12    they're just trying to blame someone else.  They're not.
13    They told you how they participated in this scheme.  And
14    I would submit to you, ladies and gentlemen, that if you
15    want to know how a scheme works, you have to hear it
16    from the people who participated in it, criminals or
17    not.
18         The next piece of evidence you heard about
19    Mr. Friesen's involvement was from Ken Ciapala of
20    Blacklight, that he sold all 14 of these companies'
21    shares for the benefit of Sharp's clients.  Mr. Ciapala
22    told you that in an earlier time period, Sharp did not
23    let him communicate with clients directly.  But in a
24    later time period, he was communicating directly with
25    clients, and it was Mr. Friesen and Mr. Veldhuis from
```

A3423

```
 1    whom he was getting trading instructions.
 2         Ms. Fritz sort of argued with you a little bit
 3    about why she thinks you shouldn't believe Mr. Ciapala.
 4    I would submit to you that what happened with
 5    Mr. Ciapala's memory is what happens with everyone's
 6    memory, if you don't think about something for a long
 7    time, you say you don't remember, you're shown
 8    documents, and then you remember.  Think about whether
 9    any of you would recall the details of transactions you
10    were involved with 5, 6, or 7 years ago, if you didn't
11    have documents to look at.  When Mr. Ciapala looked at
12    the documents, he remembered Mr. Friesen's code number.
13         Then you take all of that testimony and you look
14    at how it's corroborated by the written record.  You've
15    seen numerous examples of Friesen, Veldhuis, and Sexton,
16    working together on a scheme to sell these 14 companies'
17    shares.  They used Xphones and Xmail to further their
18    scheme.
19         Here's a chart showing some of the names they
20    used.  We know that Friesen used "Number 2" and "Gard,"
21    because multiple witnesses told us that, including
22    Kaitz, Knox, and Ciapala.  You can also look at the
23    exhibits where he identifies himself, those are 99 and
24    183.
25         We know that Gasarch used "76," "Wires," and
```

A3424

```
 1    "Piece" from the testimony of Mr. Nikolayev, Mr. Knox,

 2    and from the FBI's exhibit that ties those names

 3    together.  You can also look at the exhibits where she

 4    identifies herself, those are 24, 79, 184, and 193.

 5         Why did Friesen and Gasarch and these others use

 6    Xmail and Xphones?  Knox told you, because they were

 7    engaged in illegal conduct and they didn't want the

 8    government to be able to see their communications.

 9    Friesen, Veldhuis, and Sexton, used their Xphones to

10    discuss the details of their schemes.

11         In this message, Exhibit 87, they're talking about

12    a meeting with Avtar Dhillon to plan for Round 3 of the

13    Stevia First sale.  Even when Friesen wasn't in the

14    meeting, he was part of the discussion with Veldhuis and

15    Sexton about them.

16         Friesen, Veldhuis, and Sexton, also celebrated

17    their successes.  This outing with Roger Knox in Geneva

18    is during the time period when Friesen, Veldhuis, and

19    Sexton, were selling Vitality, VBIO shares.  Remember

20    how Friesen directed Knox to charge the 1,000 Swiss

21    Francs that Knox gave him to the VBIO account?  That's

22    because Friesen had the authority to direct VBIO

23    stock-sale proceeds out of the Q-System for his own

24    real-life benefit.

25         Here are other examples of Friesen, Sexton, and
```

A3425

1   Veldhuis, celebrating their successes.  These are

2   Exhibits 136 and 140.  In the message on the left,

3   Friesen, as Number 2, crowed about the group earning

4   $250,000 on a Friday from trading in 6 different

5   companies' stock.  In the message on the right, Friesen

6   thanks Veldhuis for sending him $173,000 as his share of

7   the trading proceeds in two tickers, including Stevia

8   First.

9        By the way, how do we know that that top message

10   is for Friesen?  Just look at Exhibit 233, if you ever

11   want to check who sent the top message in one of these

12   Xphone exchanges.

13        And when Veldhuis told Friesen he was getting

14   $173,000 to buy a boat, how does Friesen get that money

15   to spend?  There's a transfer into the Gard account in

16   the Q-System.  Look for yourself, it's on Page 11 of

17   Exhibit 311.

18        So you know that Friesen and his partners

19   controlled these 14 companies' shares because you look

20   at the money flow.  The whole point of the securities

21   fraud scheme, remember, is to make money.

22        Recall what Knox told you about giving cash to

23   Friesen to finance his vacations in Europe, that's in

24   Exhibits 288 and 290.  Knox also told you that he talked

25   to Friesen about how Friesen spent his proceeds, to buy

```
 1   real estate.  So use your common sense and ask yourself

 2   who was profiting from the sales of these 14 companies'

 3   stock?  The answer is clear, Friesen and his partners,

 4   Sexton, and Veldhuis.

 5        Friesen made over $11 million as part of this

 6   scheme, this is Exhibit 313.  As a result of this

 7   conduct, Friesen was able to direct Gasarch on how to

 8   allocate that 11 million, just like Veldhuis could, just

 9   like Sexton could, from their accounts in the Q-System.

10        You heard Friesen's counsel argue that you can't

11   rely on the Q-System, but I would submit to you that the

12   Gard account in the Q-System ties into every other

13   aspect of the Q-System, it shows internal transfers from

14   the issuer-specific accounts into the Gard account, and

15   it shows outflow from the Gard account to things like

16   cash that Mr. Friesen requested and got, and things like

17   his purchases of real estate, and to other companies he

18   controlled.  Friesen need not have committed fraud all

19   by himself for you to find him responsible, he worked

20   with Mr. Veldhuis and Mr. Sexton, and when people like

21   that work together as a group to scheme together and

22   each play a meaningful role, they are all responsible.

23        So what was Jackson Friesen's role in this scheme?

24   Remember this slide from Mr. London's opening?  (Shows.)

25   You've now seen the evidence of how Friesen did each of
```

A3427

 1    these things in furtherance of the scheme.

 2         First, he personally directed trading.  The

 3    evidence shows you how Friesen communicated both with

 4    traders employed by Sharp and with Roger Knox who

 5    directed Silverton's trading.  Look at this exhibit,

 6    which is 289.  Other exhibits in evidence also show that

 7    Friesen directed trades in Makism 3D and Stevia First

 8    and Rhitescorp.  Those are Exhibits 126 and 154.

 9         Second, Friesen drafted and edited promotions for

10    the stock that he and his partners sold.  This is

11    Exhibit 261.  Here's Friesen providing comments to

12    Veldhuis, "ACCO," and Sexton, "Here," on a promo piece

13    for Liberty 1 Lithium.  The three of them sold that

14    stock in 2017 and 2018.  There are also numerous

15    examples showing Friesen talking to Veldhuis and Sexton

16    about promotional campaigns.  Those are Exhibits 14,

17    113, 134, and 273.

18         Third, Friesen celebrated how many shares he and

19    his partners were able to sell and got updates on the

20    progress in their selling.  These exhibits, 45 and 141,

21    show Friesen, Veldhuis, and Sexton, celebrating their

22    shares -- their sales of Echo Automotive, Stevia Corp,

23    Rhitescorp, Stevia First, and Makism 3D.  That's

24    Mr. Friesen talking, "Stevia, Yahoo."  He's getting

25    Mr. Sexton's message, "That's another $500,000 day."

1          Fourth, Friesen directed how the group's trading
2     proceeds should be spent.  You have evidence that
3     Friesen directed payments out of the 14 companies' Q
4     accounts.  Here just a couple of examples.  In these
5     messages, it's 237 and 239, Friesen directed Gasarch to
6     make payments out of the Oryon Technologies, OncoSec,
7     and Stevia First accounts.  This exhibit shows that even
8     though Dhillon may not have known it, Stevia was --
9     sorry, Friesen was working on the OncoSec and Stevia
10     First deal.  Now you've seen that Friesen engaged in
11     fraudulent conduct.
12          The next element that's common to the 17(a)(1)
13     claim and the 10(b) claim against Friesen is that the
14     SEC must show that he acted intentionally, knowingly, or
15     recklessly.  It is clear that he did.  How do you decide
16     whether a defendant acted intentionally, knowingly, or
17     recklessly?  Here you have direct evidence, you have
18     Friesen's own words to show you that he knew he was
19     engaged in illegal conduct.  Come with me to Exhibit
20     170.
21          This is a message between Friesen, "Number 2,"
22     Sexton, "Number 3," and Veldhuis, "Number 114."
23     Veldhuis told Sexton and Friesen that the SEC sent a
24     subpoena that day about trading in Makism 3D Corp.
25     Veldhuis then suggested to Sexton and Friesen that they

A3429

```
 1   should "start to consider losing computers."  In
 2   response, Sexton said that he would "call out and set up
 3   the argument that he lost his computer."  Friesen then
 4   responded that he "had a robbery, so consider me all
 5   good."  And then Veldhuis responded, "Right, I had a
 6   fire.  LOL."  This e-mail tells you exactly what those
 7   three men were thinking.  Since the SEC was asking
 8   questions, they had to take steps to destroy any
 9   documents that would link them to the trading in Makism
10   3D that is part of this case.
11        Another example.  Exhibit 190.  When Veldhuis told
12   Friesen about the arrest of someone they worked with, he
13   warned Friesen not to fly into the United States so that
14   he too would not be arrested.  There can be no doubt
15   that Friesen knew he was breaking the law.
16        In addition to this direct evidence, you may use
17   circumstantial evidence to figure out Friesen's state of
18   mind for his actions and his words.  While you cannot
19   peer into Friesen's head to see what he was thinking,
20   you should use common sense to draw reasonable
21   inferences about what he was thinking based on his
22   actions.  There is clear circumstantial evidence that
23   Friesen knew what he was doing was wrong.  Encrypted
24   messages using code names are not used by reasonable
25   people engaged in legal business.
```

A3430

1          Relatedly, Friesen and his partners didn't trade

2    in their own name, instead they went to great lengths to

3    rent nominees from the Sharp organization so their

4    trading would look independent to any market observers.

5    The fact that he and his partners went to such lengths

6    to hide their trading is clear evidence that they knew

7    that what they were doing was wrong.  All of the

8    evidence that you have seen shows that Friesen acted

9    intentionally, knowingly, or at least recklessly, and

10   that constitutes fraud.

11         The next count requires you to think a little

12   differently about Friesen's actions.  To show that

13   Friesen violated Section 17(a)(3), the SEC must show

14   that he acted negligently.  Someone can act both

15   knowingly, recklessly, and negligently, it's not one or

16   the other, it can be all of them, and the evidence shows

17   that Friesen was at least negligent.  For all the same

18   reasons that you should find Friesen acted intentionally

19   or knowingly, you should also find that he acted

20   negligently.  The series of complex and tortured steps

21   that Friesen and his partners engaged in to conceal

22   their ownership, promotion, and sale of these companies'

23   stock is not something that reasonable, ordinary,

24   careful people do.

25         The last element of these claims is that the

A3431

```
 1    fraudulent conduct was in the offer or sale of a
 2    security, for 17(a), or in connection with the purchase
 3    or sale of a security, for 10(b).  That's easy.  The 14
 4    issuers' stock that we've been discussing were
 5    securities.  The rest of this element means that the
 6    deceptive conduct related to any portion of the sale --
 7    sorry, any portion of that selling.  It clearly did.
 8    Their sales took place in 47 different brokerage
 9    accounts around the world.
10         In the face of this evidence, what does
11    Mr. Friesen's counsel argue about why he didn't commit
12    fraud?  There were basically three arguments.
13         The first is that shell companies, reverse
14    mergers, and stock promotion are not inherently illegal.
15    They're not.  But remember what the Judge told you, when
16    they're used in furtherance of an unlawful purpose, and
17    as part of a scheme, they can be illegal.  And that's
18    precisely what you have here.  Friesen and his partners
19    used nominees to conceal their ownership of these
20    companies' shares, and then they sold those shares using
21    promotions that concealed who was paying.  As even
22    Mr. Kaitz admitted to you, that's fraud.
23         Second, Mr. Friesen's counsel argues that he was
24    younger and he trusted Mr. Veldhuis and so you can't
25    find a young guy responsible for fraud.  There's no age
```

A3432

```
 1    limit on fraudulent conduct.  The evidence here shows
 2    that Friesen was in the center of both oral and written
 3    communications about the details of this fraudulent
 4    scheme and that he knowingly participated in it.
 5         Third, Ms. Fritz raised some nonsense about
 6    lawyers being peripherally involved.  It's a
 7    distraction.  Yes, some lawyers somewhere did something
 8    for these companies.  No one has shown you, there is no
 9    evidence that these lawyers were involved in what
10    Friesen, Sexton, and Veldhuis, were doing.  That's a
11    distraction.  You can't speculate about what those
12    lawyers may or may not have done.  There is no claim
13    that they gave advice about the legality of these
14    actions, the actions that are before you to evaluate.
15         So now let's talk about the fraud claim against
16    Yvonne Gasarch.  You will need to decide whether
17    Ms. Gasarch violated Section 17(a)(3).  (On screen.)
18    These are the elements that the SEC needs to prove.
19         First, did Gasarch engage in fraudulent conduct?
20    More than a fair preponderance of the evidence shows
21    that she did.  Gasarch was at the center of this scheme.
22    Gasarch hid the facts that millions of dollars of sales
23    of stock made through dozens of nominees were being
24    directed by the people responsible for those sales.
25         This is Exhibit 157.  Gasarch was the accountant
```

A3433

```
 1    who made this scheme worthwhile.  She was "Wires."  She
 2    was the "Master of Finance."  She sent the payments.  As
 3    Knox told you, Ms. Gasarch was instrumental in this
 4    scheme.  Without her services, the proceeds from this
 5    massive securities fraud would have been locked up in
 6    nominee accounts beyond the reach of Friesen and his
 7    partners.  Gasarch's job was to coordinate the payments
 8    for the control groups who rented Sharp's nominees,
 9    including Friesen, his partners, and others.
10         Knox testified that Gasarch sent him 99 percent of
11    the wire requests from Sharp's group.  Knox told you how
12    he needed documentation for these payments because banks
13    often sought backup to prevent precisely these types of
14    fraudulent transfers.  You heard both Knox and Ciapala
15    testify about how Gasarch doctored up the backup
16    documents to appear real, but they weren't real.
17    Gasarch fabricated invoices and wire request forms to
18    look like they were coming from the people who on paper
19    own the nominees that she and her colleagues
20    administered.
21         This is Exhibit 286.  This might originally had
22    been a law firm invoice, but Knox told you it certainly
23    was never sent by that law firm to the address here,
24    Riverfall Groups.  As the meta data shows you, that was
25    Gasarch's handiwork, she took what might have been a
```

 1    real invoice and made it look like it was payable by

 2    someone it wasn't, all to justify the fact that the

 3    payment was coming from Riverfall Group out of the

 4    proceeds of stock sales made by Silverton.

 5         Gasarch's role was necessary to this fraudulent

 6    scheme because this was a fraud that needed a paper

 7    trail.  The papers had to look right in case the banks

 8    or brokerage firms from whom these payments were

 9    requested asked for backup.  Take a look at Exhibits 180

10    and 287 for other examples of Gasarch forging backup

11    documents to support this fraud.  One of these is where

12    -- Ms. Pickett showed you that one of these is where she

13    had already forged directors' signatures on a document

14    and Sharp then reminded her to forge the notary's

15    signature as well.  This is someone who knew exactly

16    what she was doing.

17         Gasarch did another very important thing as part

18    of this fraud, she was on paper the person who owned one

19    of the nominee companies that Sharp rented out.  She was

20    the owner of Peaceful Lion Holdings, which later changed

21    its name to "Peregrine."  Knox told you how Peaceful

22    Lion was one of the first nominees from Sharp for which

23    he opened an account at Silverton.  Knox told you that

24    this is Yvonne Gasarch's signature.

25         When brokerage firms used Peaceful Lion accounts

A3435

```
 1    to trade for Sharp's control group clients, like Friesen
 2    an his partners, Gasarch wasn't the main person
 3    benefitting from those trades, the control group were
 4    the primary beneficiaries, but it's not like she didn't
 5    get anything for her work.  Let's compare her to
 6    Mr. Nikolayev from whom you heard.
 7         Nikolayev told you about serving as the owner of a
 8    similar nominee, Gotama Capital.  Mr. Nikolayev knew
 9    that he was the beneficial owner of Gotama and
10    periodically he had to sign documents for Gotama and
11    give Mr. Sharp copies of personal information about
12    himself.  Mr. Nikolayev also testified that he gave
13    Sharp a digital copy of his signature, he understood
14    that Sharp would use it.  Mr. Nikolayev also received a
15    small commission when Gotama traded shares for Sharp's
16    clients.  This is -- this is his testimony.  He accessed
17    his small share of those commissions through the
18    G-O-T-A, or GOTA account, in the Q-System.  This is the
19    evidence before you.  And the fair inference you should
20    draw from that evidence is that at a minimum Gasarch
21    understood exactly what Mr. Nikolayev understood.
22    But think even more deeply about this.  Gasarch knew a
23    lot more than Mr. Nikolayev about how her nominee was
24    being used.
25         Unlike Nikolayev, to do her job Gasarch spent
```

```
 1   every day looking at the details of the Q-System,

 2   processing payment requests, and looking at the balances

 3   in both the issuer accounts and the individual accounts

 4   to see if there was enough money in those accounts to

 5   make the payments that people were asking her to make.

 6   Unlike Mr. Nikolayev, who admitted that people hired him

 7   because he didn't ask questions, Ms. Gasarch had to ask

 8   questions.  She could not avoid knowing the details of

 9   what was in those accounts.  That was her job.  And how

10   was Gasarch compensated for her actions?  She got over

11   $2.5 million into her personal account in the Q-System

12   for her role in this scheme between August of 2011 and

13   2019 when this scheme fell apart.

14        Use your common sense, does someone pay an

15   assistant $2.5 million or is that what you pay the

16   "Master of Finance"?  The reasonable inference is that

17   Yvonne Gasarch still worked for Sharp in 2019 and that

18   she got large payments into her life insurance account

19   that you saw because she was doing this work every day

20   to help Sharp conceal the fraudulent scheme.  All of

21   this evidence means that Gasarch engaged in a scheme

22   designed to deceive when she fabricated invoices to

23   disguise why payments were being made and when she

24   allowed her name to be used as a nominee to shield the

25   stock ownership and payment requests of others.
```

A3437

```
 1          Now Ms. Gasarch argued that --
 2          THE COURT:  5 more minutes, Ms. Shields.
 3          MS. SHIELDS:  So let's go through this a little
 4   bit more quickly then.
 5          One of the next things that you're going to have
 6   to decide is whether Ms. Gasarch was at least negligent
 7   when she did these things.  I would submit to you that
 8   the evidence shows that she was more than negligent, but
 9   that she was at least negligent about her knowing
10   participation in this scheme.
11          First, as this exhibit shows you, she knows that
12   what she was doing was money laundering.  In this Xphone
13   exchange between Ms. Gasarch as "Wires" and Mr. Sharp as
14   "Bond," Sharp called Gasarch to task for writing a check
15   for a yacht against cash.  He said, "Could you please
16   explain to me how this is a legitimate payment?  My
17   concern is money laundering.  Hell's Angels give them
18   cash, we give them a draft to buy a boat, later the boat
19   is seized, the police investigate, find out Charter
20   House paid for it, visit us and ask why?  What would you
21   say?"  In response, Gasarch suggested creating a loan
22   document to provide cover for the payment.  This
23   communication could not be more clear, Gasarch knows she
24   is breaking the law laundering money.
25          Making up false documents as backup for payment
```

A3438

1    from stock sale proceeds is at least negligence.  She

2    knew that the payments she was making came from stock

3    sale proceeds because she looked at the Q-System.  When

4    you look at the Q-System, you will see that the money in

5    those issuer accounts comes from stock sales.  Look at

6    them, it's clear, you see "Stock sale," "Stock sale,"

7    "Stock sale," that's where the money comes from, that's

8    what she knew.

9         The other thing that Yvonne Gasarch knew was that

10   -- from looking at the Q-System, is that her nominee,

11   Peaceful Lion, traded stock for Sharp's clients.  As

12   this chart shows, Ms. Gasarch's nominee, Peaceful Lion,

13   traded in 9 of the 14 company stocks at issue in this

14   case.  That data is in Exhibit 308.  Gasarch was, at the

15   very least, negligent.  And as with Mr. Friesen, there's

16   no doubt that her actions were in the offer -- in the

17   purchase, offer, or sale of a security.

18        Moving to the aiding and abetting claim against

19   Ms. Gasarch.  We've already discussed the evidence of a

20   lot of these things when we talked about the evidence

21   that she participated in fraud, but there are a couple

22   of additional things I want to just draw to your

23   attention quickly.

24        How did she know that her role was part of

25   improper activity?  First, because she knew she was

A3439

1    laundering money, but also because she knew she had an

2    important role to play in separating nominee accounts

3    that were engaged in trading from nominee accounts that

4    paid for promotions.  She said so herself.

5         This is Exhibit 151.  She asked a Sharp client if

6    the wire he was requesting was for a promotion?  Why?

7    Because she needs to find a safe account for this wire

8    if this is a promotion.  She expressed the same idea in

9    Exhibit 168, telling another Sharp client that she needs

10   to play it safe when paying for promotions.  These

11   messages show that Gasarch's clear understanding is that

12   she was engaged in improper activity and that she was

13   trying to assist that activity.

14        The evidence shows that Gasarch knew or was at the

15   very least reckless about what Sharp's clients were

16   doing.  She routinely made up false documents to cover

17   the wire transfer requests she was sending.  She knew

18   how Peaceful Lion was used.  That is the very definition

19   of "knowing" or at least "reckless conduct."

20        The third group of claims on your verdict form is

21   the SEC's claim that Friesen violated Section 5 of the

22   Securities Act by selling securities in unregistered

23   transactions.  There were simply no registration

24   statements filed for the vast majority of the sales of

25   the 14 issuer securities that Friesen and his partners

A3440

1    controlled through Sharp's nominee entities.  There's no

2    dispute about that.  Those registration statements just

3    aren't there.  There were only two effective

4    registration statements that even arguably covered even

5    a tiny fraction of the shares of Stevia First sold by

6    Friesen and his partners.

7         The last type of claim you'll be asked to consider

8    is the ownership disclosure claims, that's the 13(d)

9    claims, which Mr. Friesen and his partners violated when

10   they failed to file Schedule 13(d) with the SEC.  Those

11   forms simply weren't filed.  There's no dispute about

12   that.

13        THE COURT:  Best sum up, Ms. Shields.

14        MS. SHIELDS:  The only argument that Mr. Friesen

15   raises in this regard is that he claims that he didn't

16   know he was the beneficial owner of those shares.

17   However, the evidence shows you that he and his people

18   met all of the tests for being a beneficial owner of

19   those shares, they schemed to sell those shares

20   together, they controlled the nominees, they paid for

21   the promotions, they directed trading, and they divvied

22   up the proceeds.  That shows he was a beneficial owner

23   of those shares and he was responsible for filing these

24   forms.

25        A fair preponderance of the evidence shows that

A3441

```
 1    both Jackson Friesen and Yvonne Gasarch committed or
 2    aided and abetted securities fraud and that Mr. Friesen
 3    also failed to file registration statements and
 4    ownership disclosure forms.  I ask that when you
 5    deliberate, you return a verdict for the SEC on all of
 6    the counts in your verdict form.
 7         Thank you so much for your attention.
 8         (Pause.)
 9         THE COURT:  Now let's just talk a moment about
10    logistically how this is going to work and I do have a
11    few words to say about how you deliberate.
12         First the logistics.  We've ordered lunch for --
13    1:00, cafeteria food.  After I've made these remarks,
14    we're going to send you out.  Ms. Gaudet will stay here
15    and will over go over with the lawyers the exhibits, and
16    then shell bring you back the exhibits.
17         Are they -- so you'll have the actual exhibits,
18    but also you'll have access to them so you can all look
19    at them together on that screen in there, the Jury
20    Electronic Retrieval System.
21         If you go over them all numerically, you will see
22    that some of the numbers are missing.  No one made any
23    mistake, no one has hidden anything for you, though
24    again, with the help of the lawyers, we've combed the
25    exhibits at the end of this submission and found a few
```

```
 1    that really are not pertinent to the case as it comes to

 2    you, and so I've excluded them.  You'll have all the

 3    exhibits which you are entitled to which are in

 4    evidence.

 5         Now just a few words about your deliberations.

 6    Madam Forelady, as forelady it doesn't mean you do all

 7    the talking nor does it mean you keep your mouth shut,

 8    what I'm saying really is you all talk together.  I

 9    think these are wonderful jury rooms and we have that

10    really terrific -- that's the only place in the

11    courthouse, is the jury rooms, where we have those big

12    conference tables, everyone can sit at it and look at

13    the others.  Set things up in there so that each and

14    every one of you has a chance to express your views

15    about the matter under discussion with all the rest of

16    you listening and then commenting on the views being

17    expressed.

18         It's probably not a good idea to start right out

19    and say, "All right, Question 1, how many of you think

20    yes, how many of you think no?"  And the reason is that

21    jury deliberations are just that, they're deliberations,

22    and if you start out with a straw vote, you may think

23    that under your oath you're required to stick to that

24    view.

25         Now if you have a strong view about any aspect of
```

```
 1    this case, by all means stick to it, unless you are
 2    persuaded, generally -- genuinely persuaded by the views
 3    of your fellow jurors.  That's what deliberations are.
 4    And if that, listening to the others, if that changes
 5    your mind, that's fine.  But there's no going along
 6    here.  That would be a violation of your oath.  And it
 7    isn't a majority vote, it's a unanimous vote on each of
 8    the questions we've given you and then on the key issues
 9    that I've explained that you must find or must find that
10    that has not been proved.
11         Take your notes with you.  You have every right
12    now to use your notes.  Don't pass your notes around,
13    your notes are not evidence of anything, they are for
14    you and they'll be destroyed at the end of the trial.
15    So they're for you to refresh your recollection, they're
16    not for anybody else.
17         We will leave you alone.  If you have any
18    questions about the law, how the law -- well any
19    questions about the law, I can't say anything about the
20    evidence.  If you have any questions about the law, by
21    all means write them out, we'll have you back in here
22    and I'll explain the matter further.
23         If you hit a snag and you'd rather sleep on it,
24    just tell us you want to stop deliberating today and we
25    will stop at once and you can come back tomorrow and
```

A3444

1    start at 9:00 and go right on.  That's how deliberations

2    work.

3        If you are still deliberating and it gets to be

4    about 5:00, about 10 of 5:00, then Ms. Gaudet will come

5    in and say, "Are you about to return a verdict?"  Now

6    don't tell her anything about where you stand or

7    anything, but you can say yes or no.  And if you say No,

8    I'll bring you back into the courtroom because then I

9    have some instructions to give you once you've started

10   deliberating.  But as I promised you, we'll stop at

11   5:00, so you can sleep on it.

12       If you -- when you return a verdict -- and I'm

13   going to say as I said earlier, we ask you for your

14   verdict, we do not demand your verdict, a fair,

15   impartial, honest verdict.

16       If you reach a verdict, just tell the Court

17   Security Officer, and we'll have one outside the jury

18   room, that you've reached a verdict, don't give the

19   verdict to him.  And stick with the original verdict

20   where I wrote the little "or" in there and that's the

21   one that the foreperson makes the checks and then she

22   signs it.

23       This is how we take a verdict.  You don't give it

24   to the security officer, but just tell him you have a

25   verdict.  Ms. Gaudet sets everything up in here and you

A3445

```
 1    all come in and then court begins.  Shell say, "Ladies
 2    and gentlemen of the jury, have you reached a unanimous
 3    verdict?"  And if you're back with the verdict, I
 4    imagine you'll say yes.  And she'll say "Would you
 5    please rise."  And it's the only time in the whole trial
 6    where you stand up and we all look at you, and intently.
 7    And Ms. Gaudet will say, "Would you please pass the
 8    verdict slip."  The verdict slip is passed to me.  I
 9    look at it.  I'm experienced and I'm poker-faced, so
10    they all look at me then.
11         Now I look at it just to see that it's logical,
12    and in this case a logical verdict could be all no, it
13    would be all yes, it could be any combination of yeses
14    and nos though -- and the question of the juror was
15    right on.  It seems to me that if you answer Question 1,
16    Question 2, which deals with 17(a)(1) is so similar that
17    logically it would have the same answer.  That's not
18    true for Question 3, which is 17(a)(3), which the
19    Commission could prove on the basis of negligence.
20         So if you went one way on Question 1 and the other
21    way on Question 2, I'd have a problem with that.  But
22    other than that, it would be whatever you think has been
23    proved or not proved.
24         I will look to see that all the questions are
25    answered and that it's signed.  If it's all logical, I
```

A3446

```
 1    give it to the Clerk and shell say, "Ladies and

 2    gentlemen, harken to your verdict as the court records

 3    it."  She reads it out as it says, she'll read not all

 4    the headings, but she'll read each of the questions and

 5    then she'll read whether the answer to that question is

 6    no or yes.

 7         At that time, while you're standing there, if

 8    you're satisfied with the consciousness of your judgment

 9    faithfully recorded by the Clerk, you will have done

10    what's required of you.  The word "verdict" comes from

11    two Latin words, they mean "to speak the truth," and

12    that's what's asked of you at this time, to speak the

13    truth about these matters.

14         Very well.  With those instructions you may retire

15    to commence your deliberations.  The jury may retire and

16    I'll remain on the bench.

17         THE CLERK:  All rise for the jury.

18         (Jury leaves, 12:55 p.m.)

19         THE COURT:  Please be seated.  And let me say

20    again that the compliment was not just something to say,

21    you've done very well and I am very grateful.  You

22    haven't wasted any time, you have cooperated properly as

23    zealous advocates, and it's been a privilege to preside.

24         Now if we get questions -- and you have to check

25    with Ms. Gaudet about what I have on in the afternoon,
```

A3447

```
 1    but except when I'm holding hearings, this is a big
 2    courtroom and you're welcome to hang out in here or in
 3    the little lawyer conference room right out the door.
 4    Also you're equally -- well it will be lunch, we think,
 5    between 1:00 and 2:00, but you're equally allowed to go
 6    wherever you want, but I need you within about 5
 7    minutes, because I'll wait no longer than 5 minutes to
 8    answer a question, and I get notified right away and
 9    that's when the 5 minutes start.  So be in touch with
10    Ms. Gaudet so she can be in touch with you, in the
11    answers to questions.
12         Again, I've explained how -- if we get to about 10
13    minutes to 5:00 and I have to let them separate, I'm
14    going to give them some special instructions, and you
15    may wish to be in the courtroom.  But I won't come
16    looking for you.  About 10 minutes of 5:00, I'll be
17    ready to shut down until tomorrow.
18         So with my thanks, let's go over the exhibits with
19    Ms. Gaudet.  And we'll recess.
20         THE CLERK:  All rise.
21         (Recess, 1:00 p.m.)
22         (Jury question, 2:55 p.m.)
23         THE COURT:  I've received the follow question.
24    "Could we have a copy of the text of the Securities Act
25    clauses referred to in the verdict document?"
```

A3448

```
 1          Is that the question, Madam Forelady?

 2          THE FOREPERSON:  Yes.

 3          THE COURT:  Is that the question, ladies and

 4     gentlemen of the jury?

 5          (Nods.)

 6          THE COURT:  To that question I make this answer.

 7     "Yes."  "Yes" with this proviso.

 8          I want to go over with the lawyers the actual

 9     language.  There may be extraneous language in the

10     section that does not apply to this case, so we'll

11     prepare that for you with the title of the reference on

12     the verdict slip.  The text that's been referred to and

13     is appropriate in this case, if there is elisions, "dot

14     dot dot," no one's hiding anything from you, it's

15     something that does not pertain to this case.

16          So with that -- and it will take us a while to

17     knock that out, but we'll get it to you as soon as we

18     can.

19          With those instructions, you may retire and

20     continue your deliberations.

21          THE CLERK:  All rise for the jury.

22          (Jury leaves, 2:55 p.m.)

23          THE COURT:  Please be seated.

24          One thing that occurs to me.  I don't know where

25     that business about exemption in 13(d) fits, but that
```

A3449

 1    can be excluded.  If there's something else that is

 2    appropriate to be excluded, it may be excluded.  I'll

 3    put it on the Commission to prepare the document.  Let's

 4    make it as simple as possible, just a reference in the

 5    verdict slip like "Securities Act of whatever, 17" --

 6    for instance, 17(a)(1) would be one thing, then 17(a)(3)

 7    would be another.

 8         Yes, Ms. Fritz?

 9         MS. FRITZ:  I object to them receiving just the

10    statute, that's the reason, in my view, that we do the

11    charge.  There are important aspects to the law that

12    only come through the charge.  If they get the language

13    of the statute, they will sit back there and interpret

14    it in their own, bless their hearts, kind of way.

15         THE COURT:  I reflected on that and my reason is,

16    um, that's like -- um, I don't mean to offend anyone

17    religiously, but that's like the Mass in Latin, the

18    whole thing, can you only understand -- believe me, I do

19    not think statutes are the word of God, but statutes are

20    meant to be written and meant to be understood.  I've

21    explained that I'm here to explain anything to them.

22    And there's nothing in those statutes -- and also

23    include the aiding and abetting statute, you've got the

24    appropriate portion in your footnote there, that's the

25    portion and fact that I read to them.  So it seems to me

```
 1   that since I'm available to interpret, if interpretation
 2   is necessary, and since they already have my charge,
 3   it's not a problem.  But your rights of course are
 4   saved.
 5        MS. PICKETT:  I'm sorry, your Honor, I also wanted
 6   to make an objection, because if you read the aiding and
 7   abetting statute, judicial decisions that have been
 8   cited break it out into elements that aren't necessarily
 9   contained in the statute, and I think, um, that the jury
10   shouldn't be allowed not to know how to apply the
11   elements as you've told them.  And so if you are going
12   to give them the statute, I think at least they should
13   be reinstructed on the elements then.
14        MS. FRITZ:  Your Honor, please suggest to them
15   that there are aspects to your charge that are important
16   and are not contained in the statute and you could
17   reinstruct.
18        THE COURT:  I'm satisfied with the instructions
19   I've given them, and, um --
20        MS. SHIELDS:  May I just ask you a question, your
21   Honor?
22        THE COURT:  Once you've prepared it, show it to
23   the other side, and I want to see it and --
24        MS. SHIELDS:  Just the question though.  The
25   question specifically related to the Securities Act
```

A3451

```
 1    provisions, do you want the Exchange Act provisions as
 2    well?
 3         MS. FRITZ:  Yes, that's what they meant.
 4         MS. SHIELDS:  No, I didn't --
 5         THE COURT:  Actually Ms. Fritz's comment is -- we
 6    have to interpret the question.  I didn't ask them that
 7    follow-up and I'm going to interpret it to say "They
 8    wanted it as to each of the questions."
 9         MS. SHIELDS:  Okay.
10         MS. FRITZ:  Now the words couldn't be aiding and
11    abetting actually.
12         THE COURT:  It might, but I'm going to include it.
13         MS. SHIELDS:  So for Section 10(b), we would also
14    give you the text of Rule 10(b)(5)?
15         THE COURT:  Yes.
16         MS. SHIELDS:  And then for 13(d), we would also
17    give you the text of Rule 13(d)(1).
18         THE COURT:  Is it referred to in the title?
19         MS. SHIELDS:  It is, yes.
20         THE COURT:  Then you should.
21         All right, thank you.  We'll recess.
22         (Recess, 3:00 p.m.)
23         (Jury enters, 4:00 p.m.)
24         THE COURT:  Let the record show that the 11
25    deliberating jurors are present in the courtroom.
```

A3452

```
 1          Now consistent with what I said to you, we will
 2     stop for the day at your direction.  The instructions
 3     now are different.
 4          I can no longer say "Keep your minds suspended, do
 5     not discuss the case, because of course you've started
 6     discussing the case, as you should, and I have no
 7     business knowing of where your minds are with respect to
 8     it, and that's what's key.  Neither does anybody else.
 9     And no one else must know anything about the course of
10     your discussions, what you're focusing on, what you're
11     thinking.  So it is so vital, the whole integrity of
12     this proceeding depends on it, that you not discuss this
13     case, the substance of the case, with anyone in any way,
14     shape, or form.
15          So important is this, that tomorrow, instead of
16     starting -- and I know I can count upon you to be here
17     at 9:00, at 9:00 I will ask you, in here -- first record
18     that all 11 of you are here, and then ask you, "On your
19     oath as jurors, have you" -- and I'll add to it, though
20     there's been no coverage of this case of which I am
21     aware, but I will say, "Have you heard, read, or seen
22     anything at all concerning the substance of the case?
23     Have you discussed the substance of the case with anyone
24     or among yourselves?"
25          And now that I've excused you, no more talking
```

A3453

```
 1    about the case because the deliberations have to be all

 2    11 of you together, not 3 of you walking down or going

 3    back to your cars.  This frequently happens, I mean it's

 4    not surprising that you would stop and come back

 5    tomorrow.  It's routine.  It shows how careful and

 6    thoughtful you are with respect to the case.  But no

 7    talking about the case.  Have a good evening, enjoy the

 8    evening, and then come back fresh tomorrow.  And we'll

 9    start -- you'll continue your deliberations at 9:00

10    tomorrow morning.

11         The jury may stand in recess until that time.

12         THE CLERK:  All rise for the jury.

13         (Jury leaves, 4:00 p.m.)

14         MS. FRITZ:  May I be heard?

15         THE COURT:  You may.

16         MS. FRITZ:  Now that I have seen what the jury

17    would receive in terms of the statutory language, I just

18    want to emphasize again, there is no intent component

19    even alluded to in there.  And so again I would ask your

20    Honor, if you provide that --

21         THE COURT:  I don't understand, I have provided

22    it.  But I don't understand?

23         MS. FRITZ:  To remind the jury that there are

24    critical elements of each offense that you spoke about,

25    but that are not reflected in the language.
```

A3454

```
 1          THE COURT:  My answer is reflected in 17 and Rule

 2     10.

 3          MS. FRITZ:  I don't believe it is.  I don't think

 4     there's a peep about it.  Not a peep.

 5          THE COURT:  Well then in that respect, I think I

 6     must draft it, I will do that.

 7          MS. FRITZ:  Thank you.

 8          THE COURT:  Does the SEC have any objection to

 9     that?

10          MR. LONDON:  Just one question.

11          Your Honor, you were going to provide them the

12     written jury charge, you said when it was ready?

13          THE COURT:  Well they hadn't requested it.

14          MR. LONDON:  Okay, I think it's -- so is the

15     contemplation you would just reiterate the elements that

16     you --

17          THE COURT:  Just emphasizing the fact that 17

18     (a)(1) and 10(b)(5) require an intention.

19          MR. LONDON:  I think just to be complete, we would

20     just request that you also then just reiterate that

21     17(a)(3) can be established by negligence and that

22     Section 5 and 13 require no intent or negligence

23     whatsoever.

24          THE COURT:  I will not do any negative framing, I

25     will do the two that do, 17(a)(1) and Rule 10.
```

A3455

```
1           MR. LONDON:  Thank you.

2           THE COURT:  That's the order.  And we'll recess.

3           THE CLERK:  All rise.

4           (Adjourned, 4:00 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

A3456

```
 1              C E R T I F I C A T E

 2

 3

 4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 5   do hereby certify that the foregoing record is a true

 6   and accurate transcription of my stenographic notes

 7   before Judge William G. Young, on Tuesday, September 26,

 8   2023, to the best of my skill and ability.

 9

10

11

12   /s/ Richard H. Romanow 1-23-24
     _____
13   RICHARD H. ROMANOW   Date

14

15

16

17

18

19

20

21

22

23

24

25
```

A3457

```
 1                 UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS (Boston)

 3                             No. 1:21-cv-11276-WGY

 4

 5    SECURITIES and EXCHANGE COMMISSION,
                 Plaintiff
 6

 7    vs.

 8

 9    FREDERICK L. SHARP, et al,
                 Defendants
10

11                         * * * * * * * * *

12

13

                          For Jury Trial Before:
14                        Judge William G. Young

15

16

                       United States District Court
17                     District of Massachusetts (Boston)
                       One Courthouse Way
18                     Boston, Massachusetts 02210
                       Wednesday, September 27, 2023
19

20

                              * * * * * * * *
21

22             REPORTER: RICHARD H. ROMANOW, RPR
                       Official Court Reporter
23                   United States District Court
              One Courthouse Way, Room 5510, Boston, MA 02210
24                       rhrbulldog@aol.com

25
```

A3458

```
 1                  A P P E A R A N C E S

 2

 3   KATHLEEN BURDETTE SHIELDS, ESQ.
     ALFRED A. DAY, ESQ.
 4   DAVID H. LONDON, ESQ.
     NITA KUMARASWAMI KLUNDER, ESQ.
 5      Securities and Exchange Commission - MA
        33 Arch Street, 24th Floor
 6      Boston, MA 02110
        (617) 573-8904
 7      Email: Shieldska@sec.gov
        For Plaintiff
 8

 9   KAREN A. PICKETT, ESQ.
        Pickett Law Offices, P.C.
10      125 High Street, 26th Floor
        Boston, MA 02110
11      (617) 423-0485
        Email: Kpickettlaw@gmail.com
12      For Defendant Zhiying Yvonne Gasarch

13

14   MIRANDA E. FRITZ, ESQ.
     TIMOTHY J. FAZIO, ESQ.
15      Manning Gross Massenburg
        125 High Street
16      Oliver Street Tower, 6th Floor
        Boston, MA 02110
17      (617) 670-8800
        Email: Tfazio@mgmlaw.com
18      For Defendant Jackson T. Friesen

19

20

21

22

23

24

25
```

A3459

I N D E X

JURY QUESTION.....................................    4

VERDICT..........................................    7

E X H I B I T S

(None marked.)

```
 1          P R O C E E D I N G S
 2          (Jury enters, 9:00 a.m.)
 3          THE COURT:  Good morning, ladies and gentlemen,
 4      thank you so much for being so prompt.
 5          Let the record show that the 11 deliberating
 6      jurors are present in the courtroom.
 7          Now, members of the jury, on your oath as jurors,
 8      since we recessed yesterday afternoon, have any of you
 9      heard, read, or seen anything at all concerning the
10      substance of this case?  Have you discussed the
11      substance of this case with anyone or continued to
12      discuss the substance of the case among yourselves?
13          The jury answers in the negative.
14          After we let you recess yesterday, again aided by
15      the lawyers, I realized that the -- you requested the
16      text of the various statutes or the particular
17      provisions that the Commission alleges to be violated,
18      and you have it, and it's all accurate, it's the actual
19      language of the law.
20          You'll recall that I've explained that language in
21      my charge, and you've got to keep my charge in mind.
22      However, the lawyers properly pointed out to me that we
23      didn't give you enough, because the way statutes are
24      written, or the way these statutes are written, certain
25      of these alleged violations require the Commission to
```

A3461

```
 1   prove, always by a fair preponderance of the evidence,
 2   but they require -- and I have said this in my charge
 3   and I'm repeating it, that -- they require the state of
 4   mind of Mr. Friesen or Ms. Gasarch or both.
 5        So take -- if you have it, but it would be easy to
 6   follow, take your verdict slip and I'm simply going to
 7   remind you of the state of mind that the Commission must
 8   prove to prove liability under certain, but not all of
 9   these questions.
10        So look at Questions 1 and 2, that's the Section
11   10(b) and the Section 17(a)(1) provisions, and those two
12   questions pertain to Mr. Friesen.
13        Now what we've given you describes the conduct
14   that would violate those sections.  What is omitted is
15   the state of mind of Mr. Friesen that the Commission
16   must prove, and it's this.
17        That Mr. Friesen was doing, whatever he was doing
18   and whatever you believe by a fair preponderance he was
19   doing, he's got to be committing the fraud
20   intentionally, knowingly, or recklessly.  And I
21   explained that language in my charge.
22        In Question 3, which deals with 17(a)(3) and also
23   is charged against Ms. Gasarch, the -- in order for the
24   violation of that subsection to occur, in addition to
25   the language we gave it -- gave you, and remember, keep
```

```
 1    Ms. Gasarch and Mr. Friesen separate, but the Commission
 2    must prove, by a fair preponderance of the evidence,
 3    that Mr. Friesen and Ms. Gasarch, or both, were acting
 4    intentionally, knowingly, recklessly, or negligently,
 5    and I explained what it meant -- what it means to act
 6    negligently.
 7         Then in Questions 5 and 6 -- excuse me.  Yes, in
 8    Questions 5 and 6, those are what are called "strict
 9    liability" sections.  The government -- the Commission
10    must prove that the conduct that you have in the -- as
11    to those particular statutes, that the conduct occurred,
12    but they don't have to prove the state of mind of a
13    person, just that the person did the conduct that the
14    securities laws, those particular securities laws,
15    forbid.
16         And then I think I've actually or adequately
17    charged you as to what aiding and abetting means.
18         So because of that omission, counsel properly
19    wanted me to explain that to you.
20         Is the supplementary charge satisfactory to the
21    Commission?
22         MS. SHIELDS:  Yes, your Honor.
23         THE COURT:  To Ms. Gasarch?
24         MS. PICKETT:  Yes, your Honor.
25         THE COURT:  Mr. Friesen?
```

```
 1          MS. FRITZ:  Yes, your Honor.

 2          THE COURT:  Very well.  The jury may retire and

 3   continue their deliberations.

 4          THE CLERK:  All rise for the jury.

 5          (Jury leaves, 9:10 a.m.)

 6          THE COURT:  Please be seated.

 7          Thanks to Mr. Romanow's excellent work, and I

 8   expressed my appreciation to him, I have the charge.

 9   Should they ask for the charge, the written charge, the

10   answer will be "Yes," and I'm not going to convene us to

11   explain that, I'll just give it to Ms. Gaudet and she

12   can send it in.

13          (Clerks speaks to judge.)

14          THE COURT:  Okay, so we'll put that on the record,

15   and that's sufficient, and it may be sent in.

16          All right, we'll recess.

17          THE CLERK:  All rise.

18          (Recess, 9:10 a.m.)

19          (Jury enters, verdict, 10:30 a.m.)

20          THE CLERK:  Madam Forelady, members of the jury,

21   has the jury reached a unanimous verdict?

22          (Foreperson nods head.)

23          THE CLERK:  Please pass the slip.

24          (Passes up.)

25          THE COURT:  The verdict is in order, it may be
```

A3464

1    recorded.

2        THE CLERK:  Madam Forelady, members of the jury,

3    please stand and listen to the verdict as the Court

4    records it.

5        In the matter of the Securities and Exchange

6    Commission versus Zhiying Yvonne Gasarch and Jackson T.

7    Friesen, Civil Action Number 21-11276, we the jury

8    unanimously respond to the following questions.

9        Did Jackson Friesen violate Section 10(b) of the

10   Securities and Exchange Act of 1934 and Rules 10(b)-5(a)

11   and (c) thereunder?

12       Yes.

13       Did Jackson Friesen violate Section 17(a)(1) of

14   the Securities Act of 1933?

15       Yes.

16       Did Jackson Friesen violate 17(a)(3) of the

17   Securities Act of 1933?

18       Yes.

19       Did Zhiying Yvonne Gasarch violate Section

20   17(a)(3) of the Securities Act of 1933?

21       Yes.

22       Did Jackson Friesen violate Sections 5(a) and 5(c)

23   of the Securities Act of 1933?

24       Yes.

25       Did Jackson Friesen violate Section 13(d) of the

A3465

```
 1    Securities Exchange Act of 1934 and Rule 13(d)-1

 2    thereunder?

 3          Yes.

 4          Did Zhiying Yvonne Gasarch aid and abet violations

 5    of Section 17(a)(1), Section 17(a)(3), of the Securities

 6    Act of 1933 or Section 10(b) of the Securities Exchange

 7    Act of 1934 and Rule 10(b)(5)(a) and (c) thereunder by

 8    others?

 9          Yes.

10          So say you, Madam Forelady, is that your verdict?

11          THE FOREPERSON:  It is.

12          THE CLERK:  So say you, members of the jury?

13          THE JURY:  Yes.  (In unison.)

14          THE COURT:  Thank you, ladies and gentlemen, I do

15    most sincerely thank you.  I don't thank you for your

16    verdict, I thank you whatever your verdict was, but you

17    have paid careful attention, you have obviously given

18    the most careful scrutiny to all these matters, and I am

19    deeply grateful.  By your verdict you have spoken the

20    truth about these matters and you will be discharged.

21    And now, of course, you do have the right to say

22    anything to anyone about anything having to do with this

23    case.

24          I told you, when we recessed yesterday, that I

25    haven't seen any press coverage of the case, then today
```

A3466

```
 1    I did see in a legal blog, I saw a mention of the case.

 2    And I only mention that because I ask you -- I can't

 3    tell you, because you're going to be discharged and your

 4    service is at an end, but I ask you, if the press comes

 5    calling -- and I'm not suggesting they will, there's

 6    only one mention and that in a legal blog, but if they

 7    did, um, it really is best that you not talk about what

 8    went on in the jury room, that's private to the 11 of

 9    you.  By your verdict you've spoken the truth about

10    these matters.

11         So I ask you, don't talk about what went on in the

12    jury room.  But that's all I can do is ask.  You do have

13    the right to say anything to anyone about anything.

14         I thank you for your service.  I'd like to come

15    back and thank you personally.  So if you wouldn't just

16    wait a moment and I'll do that.

17         And we'll stand in recess.

18         THE CLERK:  All rise for the jury.

19         (Ends, 10:40 a.m.)

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E

 2

 3        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 4    do hereby certify that the foregoing record is a true

 5    and accurate transcription of my stenographic notes

 6    before Judge William G. Young, on Wednesday, September

 7    27, 2023, to the best of my skill and ability.

 8

 9

10

11    /s/ Richard H. Romanow 1-23-24
      _____
12    RICHARD H. ROMANOW    Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```

A3468

| 02/07/2024 | 451 | Judge William G. Young: ELECTRONIC ORDER entered denying 421 Second MOTION to Stay the Proceedings. (Paine, Matthew) (Entered: 02/07/2024) |

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

             v.

Frederick L. Sharp, *et al.*,

    Defendants.

Case No. 1:21-cv-11276-WGY

## DEFENDANT PAUL SEXTON'S OPPOSITION TO MOTION FOR REMEDIES

    Although the Securities and Exchange Commission ("SEC" or "Commission") has obtained a judgment against Defendant Paul Sexton, it continues to carry the burden to establish which remedies, if any, should be imposed. The Commission's request for disgorgement and civil penalties fails because it is based almost exclusively on unsubstantiated hearsay from the purported Q system. Critically, the remedies evidence comes from an entirely different part of the Q system than the bulk of what the Commission entered into evidence at the trial of Mr. Sexton's co-defendants Jackson Friesen and Yvonne Gasarch, and the Court can—and should—reject these records even if it believes that other parts of the database have been substantiated. Myriad other issues, including a lack of evidence that any investors suffered pecuniary harm, as well as the expiration of relevant limitations periods, also preclude monetary relief. Finally, because there is no reasonable likelihood of future violations, the Court should refrain from imposing injunctive relief.

A3470

## I.    Numerous Issues Remain in Dispute Following Entry of Judgment

Mr. Sexton acknowledges that he is not writing on a blank slate. Prior to trial, Mr. Sexton consented to the entry of a judgment against him on Counts I-IV of the Amended Complaint. *See* ECF No. 378. That judgment reserves to Mr. Sexton the full ability to contest all remedies sought by the Commission, with the lone caveat that, in doing so, he "will not contest liability under the claims filed against him by the Securities and Exchange Commission." *Id.* at 1-2. The Commission contends that the defendants violated the securities laws with respect to the stock of 14 issuers. Liability under a particular count means a defendant is presumed to have engaged in the prohibited conduct through at least one of the issuers.

As the Court instructed the jury during the trial of Mr. Friesen and Ms. Gasarch: "The Commission only has to win on one [issuer] in order to have your answer to the questions that we put to you, if they win as to each element, [be] 'Yes' as to that answer, and even if you're not persuaded as to other stocks. If you're persuaded as to one stock, that is sufficient." ECF No. 444 at 8:18-25. When the jury found Mr. Friesen and Ms. Gasarch liable, they were required to have agreed among themselves as to which security or securities were at issue, but they were not obligated to, and they did not, include that determination in their verdict. As a result, there are no findings in the record that particular transactions constituted violations of the securities laws.

Of course, in Mr. Sexton's case, there was no determination of any kind by a factfinder because the judgment was entered through consent. But Mr. Sexton, consistent with the judgment, files this brief under the assumption (but not the concession[1]) that there is sufficient evidence on

---

[1] The Commission attempts to weaponize the lack of a full concession as evidence of a purported lack of contrition and the need to impose severe penalties. During the entirety of these proceedings, Mr. Sexton has been subject to the threat of criminal prosecution, and he was recently indicted based on allegations that are materially similar to those in this matter. Mr. Sexton has clearly

A3471

each count against him with regard to at least one issuer. However, at the remedies stage, it is the Commission's burden to establish all additional facts. For instance, to obtain disgorgement and penalties, the Commission must demonstrate profits, tie them to particular securities, and establish that the gains are ill-gotten due to violations of the securities laws. Similarly, to obtain injunctive relief, the SEC must prove that such remedies are necessary to prevent future violations.

Finally, Mr. Sexton files this opposition subject to the restrictions of his invocation of the Fifth Amendment given that the Court has declined to stay the civil proceedings while the pending criminal case, in which Mr. Sexton has been indicted, runs its course. Mr. Sexton is therefore unable to present affirmative evidence, even if doing so would undercut central portions of the Commission's case, and must instead confine himself to pointing out infirmities in the evidentiary record. Mr. Sexton expressly preserves the argument that being required to provide an opposition under these circumstances materially prejudices his defense.

## II.    The Commission Is Not Entitled to Monetary Remedies or Injunctive Relief

The Commission asks the Court to impose numerous remedies against Mr. Sexton. First, the SEC seeks disgorgement of $17,367,474, plus prejudgment interest in the amount of $5,872,145. Next, the Commission requests a $1,562,603 civil penalty. Finally, the Commission asks for various injunctions against future violations of specified securities laws, as well as a penny stock bar and a ban on participation in the issuance, purchase, offer, or sale of securities. With regard to all of these remedies, the SEC bears the burden of establishing that they are warranted. *See Steadman v. SEC*, 450 U.S. 91, 103 (1981); *see also SEC v. Boey*, No. 07-CV-39-SM, 2013 WL 3805127, at *3 (D.N.H. July 22, 2013) ("Because a permanent injunction is a severe remedy,

---

established Fifth Amendment rights in this context, and his careful invocation of these rights should not be used against him in the manner suggested by the Commission.

A3472

the SEC carries a heavy burden to justify its imposition[.]"). For the reasons discussed below, the Commission has not carried this burden for any of the remedies.

*A. The Commission Is Not Entitled to Disgorgement*

The Commission's disgorgement request fails because there is no credible evidence of ill-gotten gains. In particular, the Commission has not established that Mr. Sexton ever received any of the supposed profits, and even setting that aside, it has not made an effort to tie many of the funds allegedly at issue to the conduct for which Mr. Sexton has accepted a consent judgment. For those reasons, the SEC has not met its burden to show a reasonable approximation for disgorgement. Moreover, the Commission has not demonstrated that the alleged ill-gotten gains resulted from conduct with investor victims, which is a prerequisite to disgorgement. Nor has the SEC demonstrated that its calculations, even to the extent they are accurate, reflect net rather than gross gains. Finally, the requested remedy is time-barred.

*i.    There Is No Documentary Evidence to Corroborate the Purported Gains*

Notwithstanding the voluminous record in this case, there was not a shred of documentary evidence at trial of Mr. Sexton receiving tainted funds. Nor is there any such evidence appended to the present motion. To the contrary, the Commission has not offered a single bank record purportedly belonging to Mr. Sexton, and its summary witness candidly admitted that he "did not look at any bank records" in arriving at the SEC's disgorgement calculations. ECF No. 442 at 150:18-22. Relatedly, for any transactions that allegedly did not involve bank transfers, the Commission's summary witness conceded, "I do not know who got the cash." *Id.* at 156:22-157:1.

This in marked contrast to how the SEC typically seeks to meet its burden to demonstrate a reasonable approximation for purposes of disgorgement. *See, e.g.*, *SEC v. Tropikgadget FZE*, 146 F. Supp. 3d 270, 281 (D. Mass. 2015) (finding reasonable approximation where the SEC's

forensic accountant "reviewed documents and bank records…concerning [a defendant's] bank account," which included "monthly statements and supporting records for individual transactions"); *SEC v. Spongetech Delivery Sys., Inc.*, No. 10-CV-2031 DLI RML, 2015 WL 5793303, at *3 (E.D.N.Y. Sept. 30, 2015) (same where the SEC had a "comprehensive calculation of monetary proceeds" based on "evidence that…proceeds from the illegal sale…were deposited into" a bank account); *SEC v. Bass*, No. 1:10-CV-00606 (LEK/DRH), 2012 WL 5334743, at *2- *3 (N.D.N.Y. Oct. 26, 2012) (same where the SEC submitted, among other things, "exhibits containing a comprehensive listing of Defendants' bank account activity involving investor funds"). Without this type of evidence, the Commission cannot satisfy its obligation to present a reliable number.

To the extent that the Commission, as it did at trial under similar circumstances, attempts to blame Mr. Sexton for its lack of evidence, the Court should squarely reject such an argument. Although it is true that Mr. Sexton, as was his right, invoked the Fifth Amendment in response to discovery requests, this did not prevent the SEC from subpoenaing any bank records it desired to obtain. Indeed, the Commission has known of accounts it believes are tied to Mr. Sexton since before this case began, as it accompanied the complaint with a request for a temporary restraining order freezing specified accounts.

If anything, the SEC's conscious decision, which played out over a number of years, to not seek validation through bank records is evidence that the Commission knows the wildly speculative and unreliable Q entries are far more attractive than any evidence-based calculation. That is presumably why the SEC, knowing full well that the defendants would invoke the Fifth Amendment, only sought records from the defendants and not directly from the banks. This

5

transparent effort to concoct an adverse inference to backstop its fanciful numbers should not be countenanced.

Consistent with its pretrial rulings, the Court should preclude the Commission from obtaining an adverse inference at the remedies stage. As the SEC has acknowledged, a defendant's invocation of the Fifth Amendment cannot be the sole basis for establishing a fact, and any inference needs to be supported by "additional evidence." ECF No. 267 at 11. As described below, such additional evidence does not exist in any reliable form in this case.

> ii.   *Q Is Not a Reliable or Admissible Source for Disgorgement Calculations*

Instead of demonstrating actual receipt of funds, the Commission relies on entries in the so-called Q system—which the Court expressly declined to admit as a business record—and asks the Court to accept, without any substantiation, that entries in that database reflect economic reality. At the outset, Mr. Sexton reiterates and preserves his argument that the Q entries are not admissible against him. As the Court has already ruled, the database is not a business record because, among other issues, there are not sufficient indications that the records were entered contemporaneously by a knowledgeable person or that the information is any way reliable. Although Mr. Sexton understands that the Court admitted certain Q evidence under Federal Rule of Evidence 801(d)(2)(E), Mr. Sexton reiterates and preserves his objections, as reflected in his motion *in limine*. *See* ECF No. 338 at 9-11. In particular, there is insufficient evidence of who made the supposed entries upon which the SEC seeks to rely, thereby depriving the Court of a basis to conclude that they were made by a member of a conspiracy. *See United States v. Sepulveda*, 15 F.3d 1161, 1181 (1st Cir. 1993). Nor is there proof of Mr. Sexton's participation in a conspiracy with respect to each of the relevant securities. Additionally, the Q system purports to

6

A3475

contain statements of historical events, which by their very nature are backward looking and not in furtherance of any conspiracy. *See United States v. Ciresi*, 697 F.3d 19, 28 (1st Cir. 2012).

But even setting that aside, the Q records that the SEC relies upon for disgorgement are fundamentally different than those that formed the basis for the bulk of its presentation at trial. The Q system purports to serve two separate functions: (1) recording stock transactions and (2) reflecting the division of proceeds stemming from those transactions. The distinction between these functions is critical because, although the Commission introduced evidence that purportedly validated the stock transactions from the Q system, it did no such thing for the records that allegedly show profits. As explained below, it is the equivalent of asking the Court to accept a financial institution's unauthenticated ATM records merely because its separate brokerage records had been authenticated.

To date, the Commission's efforts to legitimize Q have all been focused on its recording of purported stock transactions. For instance, the SEC's summary witness testified that he was able, over the course of hundreds of hours, to match many of the stock transactions to corresponding brokerage records. ECF No. 442 at 67:12-19. However, the SEC apparently made no similar effort to validate the records of alleged payments.

The closest the testimony came to this subject was when cooperating witness Roger Knox addressed the Q system. However, Mr. Knox conceded that he did not make entries of purported wire instructions in the Q system. ECF No. 440 at 49:10-19. Additionally, for proceeds attributed to the so-called Veldhuis Control Group, of which Mr. Sexton was allegedly a member, Mr. Knox testified that he was involved in allocating funds to the group, but he did not claim that he had any role in further allocation of those amounts to individuals within the alleged group. *Id.* at 50:16-23. And with the exception of one-off situations, like when Mr. Knox allegedly provided 4,000 Euros

A3476

to a group that included Mr. Sexton (without any indication that any of it was for Mr. Sexton's use), Mr. Knox has no knowledge of actual receipt of funds by individuals. *Id.* at 53:15-54:3. As he acknowledged, "I had no visibility on personal accounts other than this Silverton account." ECF No. 441 at 36:20-21.

As a fallback, the SEC attempts to rely on messages that Mr. Sexton allegedly sent. Even assuming the Commission has a foundation to attribute those messages to Mr. Sexton even though some of them do not use his name, they collectively reference approximately 4 percent of the total amount attributed to Mr. Sexton. *See* ECF Nos. 427-12, 427-13, 427-14, 427-15, 427-16. And there is no indication that any of them relate to any of the 14 issuers that the Commission has identified as its basis for disgorgement.

> iii.    *The SEC Has Not Tied Funds to Violations of the Securities Laws*

Additionally, even if the Commission could establish that Mr. Sexton received funds, it has not demonstrated that they are ill-gotten gains. Multiple cooperating witnesses testified that they were involved in legitimate transactions in addition to ones that they now say were violative. *See, e.g.*, ECF No. 440 at 67:21-68:2 (testimony of Mr. Knox) (Q: So there were cases in which Silverton was engaged in legitimate stock transactions, is that correct? A: That is correct. Q: And to your knowledge…were there any occasions where Fred Sharp was engaged in legitimate stock transactions? A: To my knowledge, yes, there were occasions."). And, as Mr. Knox explained, "[w]e did not have a…separate account for a stock that wasn't tainted, all of the money was in the same account." ECF No. 441 at 33:5-10.

This is particularly problematic given that the Commission is asking the Court to conclude that all transactions involving 14 issuers were fraudulent even though the evidence was scant to nonexistent regarding some of them. For instance, the Commission seeks to disgorge from Mr.

8

A3477

Sexton $5,275,000 allegedly related to Echo Automotive. Apart from the SEC's summary witness, there were only two references to this issuer during the entirety of the trial. In one, William Kaitz testified that he talked to Mr. Friesen about Echo, and in the other, Kenneth Ciapala indicated that he traded Echo. ECF No. 438 at 5:22-25; ECF No. 441 at 137:14-18. There were no witnesses who testified from personal knowledge as to any involvement by Mr. Sexton in the trading of Echo, and there was no testimony that the supposed Echo transactions were in any way unlawful. Likewise, the SEC requests to disgorge $1.1 supposedly attributable to Graphite even though the only time it came up outside the testimony of the summary witness was when Mr. Ciapala said it was one of the securities he traded. ECF No. 441 at 137:14-18.

Indeed, for the bulk of the funds at issue, it is unclear what the purported violation of the securities laws even was. The Commission's main theory at trial was that the defendants violated Section 13(d) of the Exchange Act by not disclosing beneficial ownership interests in excess of 5 percent. However, the SEC only presented evidence of combined ownership in excess of 5 percent for Stevia First/Vitality, and even then only for the time periods of January 18, 2012–April 27, 2012 and April 18, 2016–November 5, 2018. ECF No. 442 at 114:6-10. There is no evidence that any of the proceeds attributed to Mr. Sexton arose from conduct during those limited timeframes. Although the Commission also introduced evidence that certain transactions were unregistered, the Court has already concluded that those claims, which arise under Section 5 of the Securities Act, have a five-year limitations period. ECF No. 228 at 50-51.

That means that, for the overwhelming majority of the Commission's requested disgorgement, which is heavily concentrated in years 6-10 prior to the filing of the complaint, the Commission needs to demonstrate fraud even though there is no evidence of concealment of ownership in excess of 5 percent. There is nothing unlawful about stock promotion. Nor is there

A3478

anything inherently wrong with communicating about stock promotion via encrypted channels. The Commission has offered no evidence that any of the stock promotions contained any false or misleading information about the performance or attractiveness of the securities. Nor has the SEC pointed, outside the context of Sections 5 and 13(d), to any affirmative obligation to register transactions or provide disclosures. On this record, there is therefore no basis to order disgorgement.

iv.     *The Commission Has Not Proven That There Are Victims*

Another fatal deficiency is that the Commission has not established that there are any victims to whom disgorgement should be allocated. The Commission is entitled to disgorgement only if it is "awarded for victims." *SEC v. Govil*, 86 F.4th 89, 106 (2d Cir. 2023) (quoting *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020)) (internal quotation marks omitted). As a result, a court must "determine that the investors [who were] defrauded suffered pecuniary harm before awarding disgorgement." *Id.* at 94. The mere existence of fraud, or the fact that investors were told a "lie," is insufficient, because "pecuniary harm" is an indispensable prerequisite. *Id.* at 104.

Here, however, apart from some generalized testimony that stock promotions (including lawful ones) can cause prices to rise and sell-offs can have the opposite effect, the Commission has offered no evidence of pecuniary harm generally, and the Commission most assuredly has not done so with respect to each of the issuers that form the basis of the request for disgorgement. Apart from showing pecuniary harm, the SEC would also need to tie that harm to specific conduct, and it is difficult to imagine how it can do so given the absence of any evidence that the promotional materials contained false or misleading claims about the performance or attractiveness of the securities.

10

A3479

*v.*    *The SEC Has Not Established That Its Numbers Represent Net Amounts*

The Supreme Court has recognized strict limits on disgorgement, holding that "Congress prohibited the SEC from seeking an equitable remedy in excess of a defendant's net profits from wrongdoing." *Liu*, 140 S. Ct. at 1946. Put differently, expenses incurred by a defendant must typically be netted out. Although the distinction between gross and net profits is often information that is uniquely within a defendant's knowledge, that is not the case here. In particular, the Commission has included purported Q printouts that contain voluminous "debits" that appear to reflect numerous expenses. *See* generally ECF No. 427-2. Although the SEC refers to "net" proceeds, there is no indication that it made any attempt to account for expenses or otherwise engage in an exercise to arrive at a net calculation.

The Commission also has numerous cooperating witnesses who claim to have been paid out of the proceeds of various stock transactions, but the Commission's brief nowhere indicates whether those payments come from purported gains attributed to Mr. Sexton. Mr. Knox, for instance, testified that he had agreed to return millions of dollars of funds that he believed belonged to "Sharp Group" clients. ECF No. 441 at 88:19-22. Mr. Kaitz and Avtar Dhillon also reported receiving various payments and have entered into consent judgments that include disgorgement. Given that the Commission has presented no evidence of Mr. Sexton ever receiving the funds attributed to him, it is particularly important to ensure that its calculations are not artificially larded with amounts the government has already received or that others have already been ordered to repay.

*vi.*    *Disgorgement Is Time-Barred As a Remedy*

Finally, the Commission is barred as a matter of law from obtaining disgorgement for any conduct that occurred more than five years prior to the filing of the complaint. Although the

11

A3480

Commission claims that Mr. Sexton earned gains within the five-year window, there is no evidence that ties those amounts to conduct that occurred within that period. As described below, the mere receipt of funds within the limitations period is not a sufficient basis to impose remedies. Moreover, the overwhelming majority of the gains attributed to Mr. Sexton were allegedly paid outside the five-year window and therefore cannot form the basis for disgorgement. Although Mr. Sexton recognizes that the Court has already rejected this argument for scienter-based claims, he briefly reiterates it here for purposes of preserving it.

At the time of all of the conduct alleged in this case, the SEC had five years "from the date when the claim first accrued" to file actions seeking disgorgement. *See* 28 U.S.C. § 2462; *see also Kokesh v. SEC*, 137 S. Ct. 1635, 1639 (2017). Under § 2462, the clock starts running when the "allegedly fraudulent conduct occurs," not when it is discovered. *Gabelli v. SEC*, 568 U.S. at 442, 448 (2013).

In 2021, long after all of the alleged conduct, Congress established a new limitations period for disgorgement claims. In particular, a provision now codified as 15 U.S.C. §78u(d)(8)(A)(ii) was inserted on page 1,239 of the 1,480-page National Defense Authorization Act ("NDAA"), and it extends the limitations period for certain scienter-based offenses to "not later than 10 years after the latest date of the violation that gives rise to the action or proceeding in which the Commission seeks the claim." The legislation provides that the new limitations period "shall apply with respect to any action or proceeding that is pending on, or commenced on or after, the date [January 1, 2021] of enactment of this Act." *See* NDAA for Fiscal Year 2021, Pub. L. 116-283, § 6501. However, the provision does not apply retroactively to reach conduct that had occurred more than five years prior to its enactment.

12

A3481

Although Congress can in certain contexts apply new civil statutes retroactively to reach conduct that had become stale, in this case Congress did not use any of the language required to reach this result. *See, e.g.*, *Lieberman v. Cambridge Partners, L.L.C.*, 432 F.3d 482, 490-91 (3d Cir. 2005), as amended (Feb. 8, 2006); *Enter. Mortg. Acceptance Co., LLC, Sec. Litig. v. Enter. Mortg. Acceptance Co.*, 391 F.3d 401, 406 (2d Cir. 2004), as amended (Jan. 7, 2005). Additionally, because disgorgement is penal in nature rather than serving as a standard civil remedy, applying the statute to reach stale conduct would violate the *ex post facto* prohibition. *See, e.g.*, *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 972 (2d Cir. 1985); *see also Massachusetts v. Schering-Plough Corp.*, 779 F. Supp. 2d 224, 233 (D. Mass. 2011); *DeVeau v. Braisted*, 363 U.S. 144, 160 (1960) (pl. op.).

### B. The Commission Is Not Entitled to Prejudgment Interest

The Court has broad discretion to deny prejudgment interest, and its rulings are reviewed under an abuse of discretion standard. *SEC v. Sargent*, 329 F.3d 34, 40-41 (1st Cir. 2003) (upholding denial of prejudgment interest). The purpose of prejudgment interest is to prevent wrongdoers from keeping profits that are derivative of ill-gotten gains. *Id.* Here, however, there is no evidence that this occurred. The Commission, for instance, has not presented any evidence that Mr. Sexton invested any funds or even placed them in an interest-bearing account. To the contrary, the SEC has not even established that Mr. Sexton withdrew (or even had access to) any funds or that the entries in Q are anything other than an electronic fiction. Moreover, most of the funds the SEC claims are ill-gotten were purportedly earned as early as 2012. The Commission seeks to charge prejudgment interest all the way through mid-2021, nearly a decade later, without any proof that those funds, to the extent they were ever earned in the first instance, were retained during that

entire period. Finally, prejudgment interest would be cumulative, given that the Commission is already seeking disgorgement of more than the value of Mr. Sexton's frozen accounts.

### C. The Commission Is Not Entitled to Penalties

The Commission cannot obtain penalties because it has failed to demonstrate any violations of the securities laws within the five-year window preceding the filing of the complaint. That the SEC is subject to a five-year lookback window for civil monetary penalties is beyond dispute. *See Gabelli*, 568 U.S. at 444 ("Under the general statute of limitations for civil penalty actions, the SEC has five years to seek such penalties."). On that basis, the Court has already concluded that conduct prior to August 5, 2016 cannot give rise to penalties. ECF No. 228 at 49. The Court emphasized this at the charging conference, stating: "So let me be clear. If we get to remedies…and I think that [a] violation was pre-August 2016, then I cannot impose a monetary penalty." ECF No. 443 at 55:14-18. After the Commission noted its agreement with this principle, the Court remarked: "If we get to the remedies stage…you make sure you get a transcript of [the SEC's] statement right there." *Id.* at 55:19-24.

Notwithstanding the clear case law and the Commission's concession at the charging conference, the remedies motion makes virtually no attempt to apply this guardrail. The lone support for the penalty claim is a statement from a summary witness alleging that, based on unknown criteria, he determined that Mr. Sexton, along with others, "traded the securities of seven [issuers]" between August 5, 2016 and August 5, 2021. ECF No. 427 at 13. This barebones presentation is problematic for a number of reasons.

First, the Commission does not provide any evidence in support of its contention that Mr. Sexton was involved in these transactions, and it does not provide evidence of any of these transactions, to the extent they occurred, being unlawful. Additionally, the contention is directly

14

A3483

contrary to the Commission's argument about Mr. Sexton's supposed profits. Indeed, the SEC contends that Mr. Sexton only received profits related to three issuers—not seven—during the relevant timeframe. *See id.* at 5. Third, not even evidence of receipt of funds during the applicable timeframe is relevant without proof, which is entirely missing, of actual conduct within that window. *See SEC v. Jones*, 300 F. Supp. 3d 312, 316 & n.7 (D. Mass. 2018) (rejecting as "pretty thin gruel" the SEC's argument that the "passive receipt of commission payments" from allegedly fraudulent conduct could restart the five-year clock); *SEC v. Cohen*, 332 F. Supp. 3d 575, 591 (E.D.N.Y. 2018) ("[T]he statute of limitations runs from when Defendants allegedly engaged in misconduct, not when they received compensation in connection with that misconduct."). Finally, although the Commission acknowledges that investor loss, or at least a substantial risk of loss, is a prerequisite to the types of penalties it seeks, ECF No. 426 at 18, it has not, for the reasons discussed above, established that there are any victims, or even that there were promotional claims that created a risk of loss.

Even if the Commission were able to demonstrate conduct within the five-year window, its requested penalties are still excessive. Although the Commission asks the Court to take into account the seriousness of the conduct and Mr. Sexton's financial condition, ECF No. 426 at 19, it misapplies both of those factors. For instance, the requested $1,562,603 in civil penalties exceeds even the Commission's calculation of Mr. Sexton's profits during the five-year window. *See* ECF No. 427 at 5 (alleging $959,500 in profits in 2017, $340,000 in profits in 2018, and no profits in the remaining three years). For two of the issuers, the Commission's requested penalty of $223,229 per security is far greater than Mr. Sexton's alleged profits. *See id.* (reflecting purported profits of $37,500 for Arch Therapeutics and $100,000 for Newgen Biopharma).

15

A3484

With regard to Mr. Sexton's financial condition, the Commission alleges that it has frozen $13.8 million, ECF No. 426 at 20, but ignores its parallel request for $17,367,474 in disgorgement and $5,872,145 in prejudgment interest. The SEC has not presented any evidence that Mr. Sexton would have any ability to pay a penalty in the event the Court orders disgorgement of more than the entirety of his frozen accounts.

### D. The Commission Is Not Entitled to Injunctions or Bars

The Commission is not entitled to injunctive relief generally or to the specific bars and obey-the-law injunctions that it seeks. A fundamental issue with the requests is that the SEC has not established a reasonable likelihood of recurrence. The last of the purported profits attributed to Mr. Sexton were in 2018—three years before the SEC filed suit. ECF No. 427 at 5. In fact, nearly 93 percent of the alleged profits are from in or before 2015. *Id.* Even in cases where the "alleged prior conduct is grave" and a defendant's involvement is "prominent," the Commission still needs to demonstrate a likelihood of future misconduct. *SEC v. Pinez*, 989 F. Supp. 325, 335 (D. Mass. 1997) ("Other than the allegation in the complaint that Pinez's fraud is 'ongoing,' however, the SEC has presented no evidence that Pinez is likely to engage in insider trading practices *in the future*, an allegation that is essential to its prima facie case….") (emphasis in original); *see also SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992) ("A permanent injunction is a drastic remedy and should not be granted lightly, especially when the conduct has ceased.") (internal quotation marks omitted).

Instead of demonstrating any prospect of future violations, the Commission makes the conclusory argument that there are "no assurances that the defendants' conduct will end." ECF No. 426 at 12. But that gets things backwards and inappropriately shifts the burden to Mr. Sexton, notwithstanding the lack of evidence of recent misconduct. The so-called Sharp network is no

16

A3485

more. The alleged instrumentalities and communication networks have been seized. The purported

proceeds have been frozen. And the individuals allegedly involved have faced civil and, in many

cases, criminal charges. Simply put, "in a practical sense there is nothing remaining to be

enjoined." *Jones*, 300 F. Supp. 3d at 318.

Even if the Court concludes that injunctive relief is proper, the requested obey-the-law

injunctions are not. The requested injunctions purport to prohibit an extremely broad amount of

ill-defined conduct by simply copying and pasting statutory obligations and ordering Mr. Sexton

not to violate them, at the pain of civil or criminal contempt. For instance, notwithstanding the

requirement in Federal Rule of Civil Procedure 65(d) to "describe in reasonable detail…the act or

acts restrained or required," one of the proposed injunctions would prohibit Mr. Sexton from

employing "any device, scheme, or artifice to defraud," and from engaging "in any act, practice,

or course of business which operates or would operate as a fraud or deceit upon any person." ECF

No. 425-3 at 1-2.

This approach has been rejected or criticized by many courts, including district courts

within the First Circuit. For example, an injunction like what the SEC requests here, which simply

parrots the "language of § 10(b) of the Exchange Act or Rule 10b-5," gives a "defendant reading

the injunction…little guidance on how to conform his conduct to the terms of the injunction"; such

a defendant "would need to review hundreds of pages of the Federal Reporters, law reviews, and

treatises before he could begin to grasp the conduct proscribed by § 10(b) and in turn the

injunction." *SEC v. Goble*, 682 F.3d 934, 951 (11th Cir. 2012); *see also Jones*, 300 F. Supp. 3d at

318 (rejecting, under Rule 65, an injunction that would "simply admonish Jones to obey the federal

securities laws in any future venturing on her part into what for her will likely prove perilous

territory"); *SEC v. MacDonald*, No. CA 78-0073, 1981 WL 1635, at *6 (D.R.I. Apr. 23, 1981)

A3486

("Insofar as an injunction is concerned, this Court does not intend to issue a hollow edict which simply says to somebody obey the law.").

Likewise, the Commission has not established that bars are appropriate. As with injunctions tied to particular provisions of the securities laws, bars are only proper if the Commission can establish a reasonable likelihood of future violations. *See, e.g.*, *SEC v. John Adams Tr. Corp.*, 697 F. Supp. 573, 577 (D. Mass. 1988). Such evidence is absent here. The bars also substantially overbroad and purport to limit, for instance, Mr. Sexton's personal trading activities by restricting him to securities listed on national exchanges. A bar is an "extraordinary remedy," and courts should actively consider other alternatives prior to imposing one. *SEC v. Chan*, 465 F. Supp. 3d 18, 34 (D. Mass. 2020). The Commission has not demonstrated why these extremely broad, draconian remedies are appropriate here.

Additionally, even if the Court determines that injunctions or bars are appropriate, it has substantial discretion to craft appropriate relief. For instance, the Commission seeks lifetime injunctions and bars but has not established why shorter-lived restrictions would not be appropriate. *Cf. SEC v. Lemelson*, 57 F.4th 17, 30 (1st Cir. 2023). Given the dated nature of the conduct and the lack of evidence that future violations are likely, the Court should, at a minimum, substantially limit the relief the Commission seeks.

Finally, the Commission's requested injunctive relief constitutes a time-barred penalty. Although Mr. Sexton recognizes that the Court has already rejected this argument, he briefly reiterates it here for purposes of preserving it. In particular, the requested injunctive relief is time-barred under 28 U.S.C. § 2462. *See Cohen*, 332 F. Supp. 3d at 594 (dismissing SEC's request for injunctive relief as untimely because it "would function at least partly as a penalty, and thus is subject to § 2462"). Importantly, the requested injunctive relief relates to dated allegations and

18

does not serve the remedial purposes of equitable relief. Although the NDAA extended the limitations period for injunctions, it did not serve to revive stale conduct for the same reasons noted above with respect to disgorgement.

### Conclusion

Like all plaintiffs, the Commission must be put to its proof. Neither the result at trial nor the agreed-upon judgment against Mr. Sexton relieves the SEC of its burden to establish that the requested remedies are appropriate. The Commission must meet this burden in detail for each form of relief and every transaction forming the basis for those requests. This is the minimum that should be expected of a law enforcement agency before it is permitted to seize all of an individual's assets and bar him from an industry. The SEC's attempt to substitute innuendo and generalizations for this specific burden should be rejected, and the requested remedies should be denied.

Respectfully submitted,

*/s/ Neil T. Smith*

Neil T. Smith (BBO# 651157)
   Neil.Smith@klgates.com
K&L Gates LLP
One Congress Street
Suite 2900
Boston, MA 02114
Tel:  (617) 261-3100
Fax:  (617) 261-3175

*/s/ Stephen G. Topetzes*

Stephen G. Topetzes*
     Stephen.Topetzes@klgates.com
Robert S. Silverblatt*
     Rob.Silverblatt@klgates.com
K&L Gates LLP
1601 K St. NW
Washington, DC 20006

A3488

Tel: (202) 778-9328
Fax: (202) 778-9100

*Admitted pro hac vice*

*Counsel for Paul Sexton*

Dated: February 14, 2024

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on February 14, 2024, and a copy thereof will be sent electronically to the registered recipients and counsel of record as identified on the Notice of Electronic Filing.

_/s/ Neil T. Smith_

Neil T. Smith

21

A3490

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R TAYLOR,<br><br>Defendants. | Case No. 1:21-cv-11276-WGY |

## DEFENDANT COURTNEY KELLN'S AND MIKE K. VELDHUIS'S OPPOSITION TO PLAINTIFF SEC'S MOTION FOR REMEDIES AGAINST DEFENDANTS VELDHUIS, SEXTON, FRIESEN, KELLN, AND GASARCH

Courtney Kelln and Mike K. Veldhuis, through counsel, pursuant to Local Rule 7.1(b)(2), oppose Plaintiff Securities and Exchange Commission's ("SEC") Motion for Remedies (Dkt No. 425).

On January 9, 2024, a criminal indictment was filed against Ms. Kelln and Mr. Veldhuis in a parallel criminal proceeding brought by the U.S. Attorney's Office for the District of Massachusetts captioned *United States v. Sharp*, 24-CR-100002 (D. Mass.) (the "Criminal Action"). Because of the Criminal Action, Ms. Kelln and Mr. Veldhuis cannot fully and fairly defend themselves from the monetary sanctions sought here without waiving their Fifth Amendment rights. Most starkly, the SEC expressly asks this Court to order more than $1 million in financial penalties based, in part, upon "the defendant's willingness or failure to admit

A3491

wrongdoing . . ." [Dkt No. 426 at 13]. Worse, plaintiff seeks an equitable order mandating disgorgement of more than $14 million against Ms. Kelln and Mr. Veldhuis without any direct proof that either Ms. Kelln or Mr. Veldhuis actually received those funds – while the SEC knows that neither Ms. Kelln nor Mr. Veldhuis can contest those calculations without waiving their Fifth Amendment privileges. [Id., at 17-21]

      For present purposes, subject to and without waiving their Fifth Amendment rights, Ms. Kelln and Mr. Veldhuis join in the legal arguments of all other defendants against the SEC's Motion for Remedies. Specifically, the SEC has failed to carry its burden to establish a basis for disgorgement from either Ms. Kelln or Mr. Veldhuis. *See Liu v. SEC*, 591 U.S. __, 140 S.Ct. 1936, 1940 (2020) (holding that disgorgement requires proof that the defendant actually received net profits from the fraud scheme). Moreover, if this Court waited for the resolution of the parallel criminal proceedings before ruling on the SEC's motion for remedies, both Ms. Kelln and Mr. Veldhuis would be able to provide evidence concerning the requested monetary penalties that would be relevant to the Court's consideration of the public interest that is required for the assessment of such penalties.

Dated: February 14, 2024

Respectfully submitted,

*Claire E. Kellen*

Claire E. Kellen (*pro hac vice*)
Pamela L. Signorello (BBO# 651483)
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
Tel.: 202.719.7000
Fax: 202.719.7049
CKellen@wiley.law
PSignorello@wiley.law

*Counsel for Defendant Courtney Kelln*

2

A3492

Michael Tremonte (pro hac vice)
Robert Knuts (pro hac vice)
Katie Renzler (pro hac vice)
90 Broad Street, 23rd Floor
New York, NY 10004
Tel: 212.202.2600
mtremonte@shertremonte.com

*Counsel for Defendant Mike K. Veldhuis*

3

A3493

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2024, I filed the foregoing via the Court's ECF system, which electronically serves a copy on all counsel of record.

*Claire E. Kellen*
_____
Claire E. Kellen

A3494

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

                         Plaintiff,

      v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                        Defendants.

Case No. 1:21-cv-11276-WGY

**DEFENDANTS MIKE K. VELDHUIS AND COURTNEY KELLN'S**
**MOTION FOR RECONSIDERATION**

Defendants Mike K. Veldhuis and Courtney Kelln (the "Defendants") request that the

Court reconsideration its February 7, 2024 denial of Defendants' motion to stay the monetary

sanction phase of this proceeding as to these defendants in the above-captioned matter until the

resolution of parallel criminal proceedings pending against them, 1:21-MJ-07182 (JB) (D.

Mass.).  ECF No. 451.  In support of this motion, the Defendants submit the accompanying

memorandum of law, declaration, and exhibit.

A3495

DATED: February 16, 2024
    New York, New York

SHER TREMONTE LLP                        WILEY REIN LLP

By: /s/ Robert Knuts                     By: /s/ Claire E. Kellen
    Michael Tremonte (*pro hac vice*)        Claire E. Kellen (*pro hac vice*)
    Robert Knuts (*pro hac vice*)            Pamela L. Signorello (BBO# 651483)
    Katie Renzler (*pro hac vice*)           2050 M Street NW
    90 Broad Street, 23rd Floor              Washington, DC 20036
    New York, New York 10004                 Tel: 202.719.7000
    Tel: 212.202.2600                        Fax: 202.719.7049
    Email: mtremonte@shertremonte.com        Email: CKellen@wiley.law
                                                    PSignorello@wiley.law

*Attorneys for Defendant Mike K. Veldhuis*    *Attorneys for Defendant Courtney Kelln*

2

A3496

**RULE 7.1(a)(2) CERTIFICATE OF SERVICE**

I hereby certify that the parties have conferred and attempted in good faith to resolve or narrow the issues presented in Defendants' motion.


DATED: February 16, 2023
      New York, New York


                              /s/ *Robert Knuts*
                              Robert Knuts

A3497

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by ECF on February 16, 2024.

_____/s/ *Robert Knuts*_____
Robert Knuts

A3498

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM TAYLOR,<br><br>     Defendants. | Case No. 1:21-cv-11275-WGY |

## MEMORANDUM OF LAW IN SUPPORT OF VELDHUIS AND KELLN'S
## MOTION FOR RECONSIDERATION OF THE SECOND MOTION TO STAY

Defendants Mike K. Veldhuis and Courtney Kelln (collectively, "Defendants") respectfully move for reconsideration of this Court's February 7, 2024 denial of their second motion to stay the proceedings. ECF No. 451 (the "Denial of the Second Motion to Stay"). "A federal district court has the discretion to reconsider interlocutory orders and revise or amend them at any time prior to final judgment." *Davis v. Lehane*, 89 F. Supp. 2d 142, 147 (D. Mass. 2000); *see also* Fed. R. Civ. P. 54(b). "[A] court should grant a motion for reconsideration of an interlocutory order only when the movant demonstrates (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error of law in the first order." *Davis*, 89 F. Supp. 2d at 147.

Veldhuis and Kelln seek reconsideration in light of new information—the filing of a criminal indictment in which the alleged offense conduct mirrors the conduct alleged in the instant action and naming both Veldhuis and Kelln, among others, as defendants. Approximately one month after Defendants filed the Second Motion to Stay the Proceedings ("Second Motion to

Stay"), ECF No. 421, and after the Securities and Exchange Commission (the "SEC") filed its Motion for Remedies (the "Motion for Remedies"), ECF No. 426, the U.S. Attorney's Office for the District of Massachusetts (the "USAO") filed the Indictment on January 9, 2024 in the parallel criminal proceeding that has been pending since the USAO filed a criminal complaint against Veldhuis and Kelln, among others, on August 4, 2021 (the "Criminal Action"). Indictment, ECF No. 11, *United States v. Sharp*, 1:24:cr-10002 (D. Mass. Jan. 9, 2024). A copy of the Indictment is attached as Exhibit 1 to this Declaration of Robert Knuts, dated February 16, 2024 ("Knuts Decl."). Now that Kelln and Veldhuis are under indictment, the strength of the Fifth Amendment protections afforded them is greater than ever. At the same time, in the face of the Motion for Remedies, their assertion of the Fifth Amendment in lieu of disputing the SEC's factual allegations dramatically increases the likelihood that the Court will grant the SEC's request to enter judgment against them for $1,582,785 and $13,289,897, as to Kelln and Veldhuis respectively. *See* Motion for Remedies at 17–21, ECF No. 426; *see also* Second Mot. to Stay at 12–13, ECF No. 422.

As anticipated in Defendants' previous motions to stay, the newly filed indictment in the Criminal Action names both Kelln and Veldhuis as defendants and the charged conduct is substantially the same as the conduct alleged in the instant action. *See, e.g.*, Second Mot. to Stay at 10, ECF No. 422. Thus, of the five defendants named in the Indictment—Frederick Sharp, Luis Carrillo, Mike Veldhuis, Paul Sexton, and Courtney Kelln—four are defendants in this action. *Id.* As in the instant case, the four counts charged in the Indictment allege securities fraud: Counts One and Two charge conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and Counts Three and Four charge securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff(a), 17 C.F.R. § 240.10b-5, 18 U.S.C. § 2. *Id.* ¶¶ 106–13. Kelln is charged in all four counts, and Veldhuis is charged in Counts Two and Four. *Id.* ¶¶ 106–13. The USAO seeks

A3500

forfeiture as to all defendants, including Kelln and Veldhuis, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  *Id.* ¶ 114–15.  And the scheme alleged in the Indictment is nearly indistinguishable from that alleged in the instant case.  Specifically, the Indictment alleges that "[b]etween in or about 2012 and in or about July 2020, the defendants conspired with one another, and with others known and unknown to the Grand Jury, to commit securities fraud by orchestrating and participating in sophisticated pump-and-dump schemes involved in the concealed control of securities of several microcap companies."  *Id.* ¶ 27.  The roles of each defendant in the Indictment are also the same as in this case.  Thus, with respect to Veldhuis, the Indictment alleges that he was an "undisclosed control person[] who—together with [Sexton] and with [Co-Conspirator 3] (the 'VELDHIUS Control Group')—used SHARP's platform and" co-conspirator Roger Knox's asset management firm, Wintercap SA, "to deposit and sell large quantities of penny-stock companies' shares through nominees and to then distribute the illicit proceeds for their benefit."  *Id.* ¶ 28(c).  According to the Indictment, the Veldhuis Control Group "also organized promotional campaigns to facilitate pump-and-dumps of the stocks they controlled," among other things.  *Id.*  With respect to Kelln, the Indictment alleges that she "worked for SHARP and facilitated the use of SHARP's platform by undisclosed control persons" and "closely monitored the five percent threshold and ensured that no one nominee formally owned more than five percent of a company's stock at any point in time."  *Id.* ¶ 28(d).  According to the Indictment, Kelln conspired to and did commit securities fraud with respect to shares of Pure Snax International Inc. (PSNX); Garmatext Holdings, Ltd. (GRMX); OneLife Technologies Corp. (OLMM); and Vitality Biopharma, Inc. (VBIO), f/k/a Stevia First Corp. (STVF), and Veldhuis conspired to and did commit securities fraud with respect to only Vitality Biopharma, Inc. (VBIO), f/k/a Stevia First Corp. (STVF).  Both the Indictment and the Amended

A3501

Complaint allege that the same group of individuals orchestrated a "pump-and-dump" scheme spanning approximately the same decade (2010 to 2019 in the instant action and 2012 to 2020 in the Criminal Action) involving Garmatext Holdings, Ltd. (GRMX) and Vitality Biopharma, Inc. (VBIO), f/k/a Stevia First Corp. (STVF). *Compare, e.g.*, Indictment ¶¶ 1–5, 14, 16, 40–52, 71–105, ECF No. 11, *United States v. Sharp*, 1:24:cr-10002 (D. Mass. Jan. 9, 2024)*, with, e.g.*, Am. Compl. ¶¶ 22, 24–26, 31, 34, 42, 70–152, ECF No. 230. Moreover, both pleadings describe the individuals' alleged roles in the same way, including allegations that Kelln prepared and obtained false and misleading documents to facilitate obscuring control persons' identities and that Veldhuis was an undisclosed control person who used co-defendant Sharp's platform and Wintercap SA to deposit, sell, and transfer the proceeds from penny-stock sales and he participated in promotional campaigns to facilitate pump-and-dumps. *Compare, e.g.*, Indictment ¶¶ 28(c)–(d), 29(a)–(c), ECF No. 11, *United States v. Sharp*, 1:24:cr-10002 (D. Mass. Jan. 9, 2024)*, with, e.g.*, Am. Compl. ¶¶ 5–8, 52–54, ECF No. 230. Here, the substantial overlap between the Indictment and the Amended Complaint counsel strongly in favor of a stay of this action until the resolution of the Criminal Action as to Veldhuis and Kelln. *See* Second Mot. to Stay at 9–11, ECF No. 422.

Now that the grand jury has returned the Indictment, absent a stay of the Motion for Remedies in the instant action, the Defendants are put in an untenable position. They cannot meaningfully contest the government's penalties arguments in this case without forfeiting their bedrock Fifth Amendment right against self-incrimination in the criminal case. Nothing more dramatically illustrates the unfairness of requiring Veldhuis and Kelln to simultaneously litigate both civil damages and criminal liability than their opposition, filed yesterday, to the SEC's motion for the imposition of penalties in this case. As stated in that brief, "if this Court waited

4

A3502

for the resolution of the parallel criminal proceedings before ruling on the SEC's Motion for Remedies, both Ms. Kelln and Mr. Veldhuis would be able to provide evidence concerning the requested monetary penalties that would be relevant to the Court's consideration of the public interest that is required for assessment of such penalties." Opp. to Mot. for Penalties at 2, ECF No. 455. Presently, they can mount no such defense. So long as the Criminal Action is ongoing, if Defendants want to protect themselves against self-incrimination in that action, they have no choice but to effectively surrender in here and forgo any efforts to challenge the evidentiary basis and multi-million-dollar disgorgement and penalty sums that the SEC is requesting. The Court should not, and need not, force Defendants into choosing between contesting the financial penalties sought by the SEC and forfeiting their Fifth Amendment rights.

For these reasons, the Court should reconsider its denial of Defendants' Second Motion to Stay and stay the resolution of the Motion for Remedies until the resolution of the Criminal Action as to Veldhuis and Kelln.[1]

DATED: February 16, 2024
New York, New York

SHER TREMONTE LLP                      WILEY REIN LLP

By: _/s/ Robert Knuts_                By: _/s/ Claire E. Kellen_
    Michael Tremonte (*pro hac vice*)     Claire E. Kellen (*pro hac vice*)
    Robert Knuts (*pro hac vice*)         Pamela L. Signorello (BBO# 651483)
    Katie Renzler (*pro hac vice*)        2050 M Street NW
    90 Broad Street, 23rd Floor           Washington, DC 20036
    New York, New York 10004              Tel: 202.719.7000
    Tel: 212.202.2600                     Email: CKellen@wiley.law
    Email: mtremonte@shertremonte.com            PSignorello@wiley.law

*Attorneys for Defendant Mike K. Veldhuis*    *Attorneys for Defendant Courtney Kelln*

---

[1]    The same impossible choice is faced by Defendant Sexton and any relief granted to Defendants Veldhuis and Kelln should also apply to Defendant Sexton. *See* ECF No. 454.

A3503

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by ECF on February 16, 2024.


_____ */s/ Robert Knuts* _____
Robert Knuts

A3504