# United States Court of Appeals
*for the*
# First Circuit

Case Nos. 24-1770,
24-1771, 24-1772,
24-1773, 24-1774

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

ZHIYING YVONNE GASARCH,

*Defendant-Appellant,*

FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS;
PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

—————————
*(For Continuation of Caption See Inside Cover)*
—————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON IN CASE NO. 1:21-CV-11276-WGY,
HONORABLE WILLIAM G. YOUNG, U.S. DISTRICT JUDGE

## JOINT APPENDIX
## Volume 7 of 8 (Pages A3505 to A4128)

STEPHEN G. TOPETZES
NEIL T. SMITH
ROBERT S. SILVERBLATT
K&L GATES LLP
*Counsel for Defendant-Appellant*
  *Paul Sexton*
1601 K Street, NW
Washington, DC 20006
(202) 778-9000

MICHAEL TREMONTE
SHER TREMONTE
*Counsel for Defendant-Appellant*
  *Mike K. Veldhuis*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

—————————
*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (336840)

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

MIKE K. VELDHUIS,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

———————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

PAUL SEXTON,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

———————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

COURTNEY KELLN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
MIKE K. VELDHUIS; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

———————————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

JACKSON T. FRIESEN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; PAUL SEXTON;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

FRANK SCADUTO
KEVIN B. MUHLENDORF
WILEY REIN LLP
*Counsel for Defendant-Appellant*
 *Courtney Kelln*
2050 M Street, NW
Washington, DC 20036
(202) 719-7000


MARANDA FRITZ
MARANDA E. FRITZ PC
521 5th Avenue
17th Floor
New York, New York 10175
(646) 584-8231

TIMOTHY J. FAZIO
MANNING GROSS + MASSENBURG LLP
125 High Street
Oliver Street Tower, 6th Floor
Boston, Massachusetts 02110
(617) 670-8800

*Counsel for Defendant-Appellant*
 *Jackson T. Friesen*

DANIEL STAROSELSKY
ASSISTANT GENERAL COUNSEL
KERRY J. DINGLE
SENIOR APPELLATE COUNSEL
U.S. SECURITIES & EXCHANGE
 COMMISSION
*Counsel for Plaintiff-Appellee*
100 F Street, NE
Washington, DC 20549
(202) 551-6953

KAREN A. PICKETT
PICKETT LAW OFFICES, PC
*Counsel for Defendant-Appellant*
 *Zhiying Yvonne Gasarch*
125 High Street, 26th Floor
Boston, Massachusetts 02110
(617) 423-0485

# TABLE OF CONTENTS

**Page**

Docket Entries ................................................................................... A1

Complaint, filed August 5, 2021 (Dkt. 1) ........................................ A55

    Exhibit A: Hearing dated August 29, 2019 ........................... A136

    Exhibit B: Foot Loose Charlie Smith's Offshore Chronicles ................ A143

    Exhibit C: Invoice ................................................................ A144

    Exhibit D: E-Mail Correspondence ....................................... A148

    Exhibit E: Q Account ............................................................ A184

    Exhibit F: Q Bank Broker: Work .......................................... A191

    Exhibit G: Peaceful Lion Holdings Limited .......................... A194

    Exhibit H: Wire Transfer ..................................................... A211

    Exhibit I: Securities and Exchange Commission, Schedule 13D/A ....... A212

    Exhibit J: Chart .................................................................... A217

    Exhibit K: August 19, 2013, Treasury Order ......................... A220

    Exhibit L: Portfolio Valuation 790-1 .................................... A248

Declaration of Trevor T. Donelan, filed August 5, 2021 ................. A275

Civil Cover Sheet .......................................................................... A310

Plaintiff's Emergency *Ex Parte* Motion for a Temporary Restraining Order, Order Freezing Assets and Order for Other Equitable Relief, filed August 5, 2021 (Dkt. 3) ........................................... A311

[Proposed] Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief, filed August 5, 2021 ................... A313

Plaintiff's Memorandum of Law in Support of its Emergency *Ex Parte* Motion for a Temporary Restraining Order, Order Freezing Assets, and Other for Equitable Relief, filed August 5, 2021 (Dkt. 4) .............. A323

Temporary Restraining Order, Order Freezing Assets, and Order for Other Equitable Relief, filed August 6, 2021 (Dkt. 7) ................... A358

i

**Page**

[Proposed] Preliminary Injunction Order, order Freezing Assets, and Order for Other Equitable Relief, filed August 20, 2021 (Dkt. 39).................. A368

Transcript of Motion Hearing Held on January 20, 2022, filed January 25, 2022 (Dkt. 193)........................................................................ A380

Final Judgment as to Defendant Frederick L. Sharp, filed May 12, 2022 (Dkt. 211)............................................................................ A407

Memorandum and Order, filed September 6, 2022 (Dkt. 228) ........................ A420

Amended Complaint, filed September 9, 2022 (Dkt. 230)............................... A524

Defendant Paul Sexton's Answer to Amended Complaint and Affirmative Defenses, filed September 23, 2022 (Dkt. 242) .................................... A616

Defendant Mike K. Veldhuis Verified Answer to Verified Amended Complaint, filed September 23, 2022 (Dkt. 244) ................................... A652

Defendant Courtney Kelln's Answer to Amended Complaint, filed September 30, 2022 (Dkt. 245) .............................................................. A702

Defendant Zhiying Yvonne Gasarch's Anser to Amended Complaint and Affirmative Defenses, filed October 7, 2022 (Dkt. 246)....................... A738

Answer of Defendant Jackson T. Friesen to Amended Complaint, filed October 14, 2022 (Dkt. 247)..................................................... A848

Declaration of Roger Knox, filed April 17, 2023 (Dkt. 274) ........................... A950

Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 2, 2023 (Dkt. 280) ............................................ A959

Memorandum of Law in Support of Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 2, 2023 (Dkt. 281)................................................................................ A962

Declaration of Robert Knuts, filed may 2, 2023 (Dkt. 282) ............................ A988

Exhibit A: Email correspondence dated February 8, 2022 ................... A990

Exhibit B: Email exchange involving AUSA Drabick and Kevin Muhlendorf, counsel for defendant Courtney Kelln, dated February 8, 2022 through February 11, 2022 .............................. A994

**Page**

Exhibit C: Email dated February 17, 2023, from AUSA Drabick to counsel for Mr. Veldhuis, Michael Tremonte and Noam Biale... A997

Exhibit D: Email dated March 17, 2023, from SEC Attorney Kathleen Shields ..................................................................... A1014

Exhibit E: Notice of Civil Claim that the Securities and Exchange Commission filed in the Supreme Court of British Columbia on August 11, 2022 ....................................................... A1020

Exhibit F: Reasons for Judgment issued by the Supreme Court ofBritish Columbia on March 21, 2023 .................................. A1031

Exhibit G: SEC's Responses and Objections to Defendant Courtney Kelln's First Requests for Admissions dated March 17, 2023 . A1061

Defendant Paul Sexton's Notice of Joinder, filed May 8, 2023 (Dkt. 286) . A1079

Plaintiff's Opposition to Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the Proceedings, filed May 9, 2023 (Dkt. 289) ......... A1082

Exhibit A: Application Response ...................................... A1096

Electronic Order, filed May 15, 2023 (Dkt. 292) ........................................ A1101

Defendants Courtney Kelln and Mike Veldhuis' Notice of Non-Opposition to Entry of Judgment, filed June 13, 2023 (Dkt. 315)...................... A1102

[Proposed Order Entering] Judgment as to Defendant Courtney Kelln, filed June 13, 2023 ................................... A1106

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 13, 2023 ................................... A1112

Plaintiff's Response to Kelln's and Veldhuis's Notice of Non-Opposition to Entry of Judgment, filed June 14, 2023 (Dkt. 316) .......................... A1118

Order Entering Judgment s to Defendant Courtney Kelln, filed June 14, 2023 (Dkt. 317)......................................... A1121

Notice of Corrected Filing Regarding Defendant Mike Velhuis' Notice of Non-Opposition of Entry of Judgment, filed June 14, 2023 (Dkt. 318) .................................. A1127

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 14, 2023 ................................... A1130

**Page**

Notice of Corrected Filing Regarding Defendant Mike Veldhuis' Notice of Non-Opposition to Entry of Judgment, filed June 15, 2023 (Dkt. 319) ................................................................................. A1137

[Proposed Order Entering] Judgment as to Defendant Mike Veldhuis, filed June 15, 2023 ............................................................... A1140

Judgment as to Defendant Mike Veldhuis, filed June 21, 2023 (Dkt. 325) ... A1147

Defendant Jackson T. Friesen's Motion in Limine to Exclude "Q" Records and Purported Expert Testimony, filed August 10, 2023 (Dkt. 329) ... A1154

Order, filed August 10, 2023 ................................................. A1167

Yvonne Gasarch's Motion in Limine to Exclude "Q" Records and Purported Expert Testimony, filed August 24, 2023 (Dkt.. 334) ........................ A1168

Exhibit 1: Deposition of Fedir Nikolayev ............................. A1174

Plaintiff's Opposition to Defendant Jackson T. Friesen's Motion to Exclude "Q" Records and Purported Expert Testimony, filed August 25, 2023 (Dkt. 336) ..................................................................... A1261

Exhibit 1: Declaration of Ryan Murphy ............................. A1279

Exhibit 2: Deposition of Written Questions of Zhiying Yvonne Gasarch ............................................................... A1285

Defendant Paul Sexton's Motion in Limine to Exclude Q System and Associated Data, fled August 31, 2023 (Dkt. 338) ............................. A1323

Exhibit 1: Deposition of Fedir Nikolayev ............................. A1336

Transcript of Motion Hearing, filed September 1, 2023 (Dkt. 344) ............... A1356

Yvonne Gasarch's Motion to Supplement Her Motion in Limine filed on August 24, 2023, filed September 1, 2023 (Dkt. 346) ........................ A1377

Plaintiff's Opposition to Defendants Sexton's and Gasarch's Motions to Exclude Expert Testimony, filed September 4, 2023 (Dkt. 350) ......... A1379

Exhibit A: Expert Witness Report of Philip A. Feigin ........................ A1385

Exhibit B: Government's Trial Memorandum, Response to Defendants' Motion in Limine, and Supplemental 404(b) Notice ....... A1395

**Page**

Plaintiff's Opposition to Defendant Yvonne Gasarch's Motion in Limine to Exclude "Q" Records and Purported Expert Testimony, filed September 5, 2023 (Dkt. 352) .............................................................. A1422

Plaintiff's Opposition to Defendant Paul Sexton's Motion in Limine to Exclude "Q" System and Associated Data, filed September 5, 2023 (Dkt. 353) .................................................................................... A1426

    Exhibit A: Securities and Exchange Commission B03147 Analysis of MySQL Databases, Summary of Accounts ............................... A1439

    Exhibit B: Summary of Transfer Agent Records – Acquisitions of Stevia First, Vitality Stock ....................................................... A1454

    Exhibit C: Q Account Detail ................................................ A1455

    Exhibit D: Revised Deposition on Written Questions of Paul Sexton . A1456

    Exhibit E: Wire Transfer ..................................................... A1524

    Exhibit F: E-Mail Correspondence ........................................ A1527

    Exhibit G: E-Mail Correspondence ....................................... A1528

    Exhibit H: E-Mail Correspondence ....................................... A1529

Defendant Paul Sexton's Notice of Non-Opposition to Entry of Judgment, filed September 11, 2023 (Dkt. 376) .................................... A1530

[Proposed] Order Entering Judgment as to Defendant Paul Sexton, filed September 11, 2023 .................................................................. A1533

Order Entering Judgment as to Defendant Paul Sexton, filed September 12, 2023 (Dkt. 378) .................................................................... A1535

Order, filed September 19, 2023 (Dkt. 385) .................................... A1537

Yvonne Gasarch's Motion in Limine to Preclude Admission of Exhibit QK, filed September 21, 2023 (Dkt. 389) .................................... A1542

    Exhibit 1: Summary of Gasarch Earnings ............................. A1544

Yvonne Gasarch's Motion to Strike Evidence that the Court Admitted De Bene Pursuant to Fed. R. Evid. 801(d)(2)(E), filed September 25, 2023 (Dkt. 394) .................................................................... A1545

Yvonne Gasarch's Motion Pursuant to Fed. R. Civ. P. 50 for Judgment as a Matter of Law, filed September 25, 2023 (Dkt. 395) .......................... A1548

**Page**

Verdict, filed September 27, 2023 (Dkt. 402) ................................................ A1553

Yvonne Gasarch's Renewed Motion Pursuant to Fed. R. Civ. P. 50 for
    Judgment as a Matter of Law or, in the Alternative, for a New Trial,
    filed October 25, 2023 (Dkt. 413) .......................................................... A1555

Electronic Order, filed October 26, 2023 (Dkt. 414)..................................... A1564

Defendants Mike K. Veldhuis and Courtney Kelln's Motion to Stay the
    Proceedings, filed December 5, 2023 (Dkt. 421) ................................. A1565

Memorandum of Law in Support of Defendants Mike K. Veldhuis and
    Courtney Kelln's Motion to Stay the Proceedings, filed December 5,
    2023 (Dkt. 422)..................................................................................... A1569

Declaration of Robert Knuts, filed December 5, 2023 (Dkt. 423) ............... A1592

    Exhibit 1:Affidavit dated November 17, 2023 executed by Assistant
        United States Attorney James R. Drabick................................ A1594

    Exhibit 2: Email correspondence dated February 8, 2022 ................ A1726

    Exhibit 3: Email dated February 17, 2023 , from AUSA Drabick to
        counsel for Mr. Yeldhuis, Michael Tremonte and Noam Biale  A1730

    Exhibit 4: Email dated March 17, 2023, from SEC Attorney ............ A1747

Plaintiff's Motion for Remedies Against Defendants Mike Veldhuis, Paul
    Sexton, Jackson Friesen, Courtney Kelln and Zhiying Yvonne
    Gasarch, filed December 8, 2023 (Dkt. 425)...................................... A1753

Final Judgment as to Defendant Jackson T. Friesen, filed December 8,
    2023 ...................................................................................................... A1756

Final Judgment as to Defendant Yvonne Gasarch, filed December 8, 2023  A1769

Final Judgment as to Defendant Paul Sexton, filed December 8, 2023 ....... A1779

Final Judgment as to Defendant Mike K. Veldhuis, filed December 8,
    2023 ...................................................................................................... A1791

Final Judgment as to Defendant Courtney Kelln, filed December 8, 2023.. A1804

Plaintiff's Memorandum in Support of Motion for Remedies Against
    Defendants Mike Veldhuis, Paul Sexton, Jackson Friesen, Courtney
    Kelln, and Zhiying Yvonne Gasarch, filed December 8, 2023 (Dkt.
    426)....................................................................................................... A1813

**Page**

Exhibit A: Transcript of September 27, 2023 Jury Charge ................ A1845

Exhibit B: Government's Notice of Anticipated Restitution Request
and Motion for Continuance ..................................... A1890

Declaration of Ryan Murphy, filed December 8, 2023 (Dkt. 427) ............. A1902

Exhibit 1: ACCO / ACC1 Q Account Detail.................................... A1916

Exhibit 2: HEAR Q Account Detail .................................... A1941

Exhibit 3: GARD Q Account Detail.................................... A1956

Exhibit 4: Chart.................................... A1972

Exhibit 5: Wire Transfer.................................... A2141

Exhibit 6: Wire Transfer.................................... A2142

Exhibit 7: Wire Transfer.................................... A2143

Exhibit 8: Wire Transfer.................................... A2144

Exhibit 9: Wire Transfer.................................... A2145

Exhibit 10: Wire Transfer.................................... A2147

Exhibit 11: E-mail Correspondence .................................... A2149

Exhibit 12: E-mail Correspondence .................................... A2150

Exhibit 13: E-mail Correspondence .................................... A2151

Exhibit 14: Wire Transfer.................................... A2152

Exhibit 15: Wire Transfer.................................... A2153

Exhibit 16: E-mail Correspondence .................................... A2154

Exhibit 17: E-mail Correspondence .................................... A2155

Exhibit 18: Wire Transfer.................................... A2168

Exhibit 19: Wire Transfer.................................... A2169

Exhibit 20: DGM Bank and Trust Inc. Statement of Account Activity
.................................... A2170

Exhibit 21: E-mail Correspondence .................................... A2171

Exhibit 22: E-mail Correspondence .................................... A2175

**Page**

Exhibit 23: Wire Transfer................................................................ A2181

Exhibit 24: Text Messages ............................................................. A2182

Exhibit 25: Text Messages ............................................................. A2223

Exhibit 26: E-mail Correspondence ................................................ A2225

Exhibit 27: Invoice ......................................................................... A2226

Exhibit 28: Wire Transfer................................................................ A2227

Exhibit 29: Wire Transfer................................................................ A2228

Exhibit 30: E-mail Correspondence ................................................ A2229

Exhibit 31: Invoice ......................................................................... A2230

Exhibit 32: Bank Statement ............................................................ A2235

Exhibit 33: Veldhuis PJI Backup..................................................... A2237

Plaintiff's Opposition to Defendants Mike K. Veldhuis and Courtney Kelln's Second Motion to Stay the Proceedings, filed December 18, 2023 (Dkt. 429)............................................................................... A2284

Final Pretrial Conference Transcript, filed January 24, 2023 (Dkt. 434)....... A2289

Jury Trial Transcript Day 1, filed January 24, 2024 (Dkt. 435) ..................... A2310

Jury Trial Transcript Day 2, filed January 24, 2024 (Dkt. 436) ..................... A2416

Jury Trial Transcript Day 3, filed January 24, 2024 (Dkt. 437) ..................... A2534

Jury Trial Transcript Day 4, filed January 24, 2024 (Dkt. 438) ..................... A2674

Jury Trial Transcript Day 5, filed January 24, 2024 (Dkt. 439) ..................... A2772

Jury Trial Transcript Day 6, filed January 24, 2024 (Dkt. 440) ..................... A2865

Jury Trial Transcript Day 7, filed January 24, 2024 (Dkt. 441) ..................... A2946

Jury Trial Transcript Day 8, filed January 24, 2024 (Dkt. 442) ..................... A3103

Motion and Charge Conference Transcript, filed January 24, 2024 (Dkt. 443)............................................................................... A3273

Jury Trial Transcript Day 9, filed January 24, 2024 (Dkt. 444)..................... A3331

Jury Trial Transcript Day 10, filed January 24, 2024 (Dkt. 445)................... A3458

**Page**

Electronic Order, filed February 7, 2024 (Dkt. 451) ...................................... A3469

Defendant Paul Sexton's Opposition to Motion for Remedies, filed February
14, 2024 (Dkt. 454).................................................................................... A3470

Defendant Courtney Kelln's and Mike K. Veldhuis's Opposition to Plaintiff
SEC's Motion for Remedies Against Defendants Veldhuis, Sexton,
Friesen, Kelln, and Gasarch, filed February 14, 2024 (Dkt. 455)........ A3491

Defendants Mike K. Veldhuis and Courtney Kelln's Motion for
Reconsideration, filed February 16, 2024 (Dkt. 456)........................... A3495

Memorandum of Law in Support of Veldhuis and Kelln's Motion for
Reconsideration of the Second Motion to Stay, filed February 16, 224
(Dkt. 457)................................................................................................. A3499

Declaration of Robert Knuts, filed February 16, 2024 (Dkt. 458) .............. A3505

    Exhibit 1: Indictment filed January 9, 2024 ...................................... A3506

Defendant Paul Sexton's Motion for Stay, filed February 20, 2024 (Dkt.
459) .......................................................................................................... A3544

Electronic Order Denying Motion for Reconsideration, filed February 20,
2024 (Dkt. 460)....................................................................................... A3547

Defendant Yvonne Gasarch's Opposition to SEC's Remedies Motion, filed
February 21, 2024 (Dkt. 464) ............................................................... A3548

    Exhibit 1: Q System Data .................................................................... A3566

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against
Defendants Paul Sexton, Mike Veldhuis, and Courtney Kelln, filed
March 1, 2024 (Dkt. 470) ...................................................................... A3587

    Exhibit A: E-Mail Correspondence ..................................................... A3602

    Exhibit B: Wire Transfer ...................................................................... A3604

    Exhibit C: DGM Band and Trust Inc. Statement of Account
        Activity ........................................................................................ A3606

    Exhibit D: E-Mail Correspondence ..................................................... A3610

    Exhibit E: E-Mail Correspondence....................................................... A3617

Defendant Jackson Friesen's Opposition to Plaintiff's Motion for Remedies,
filed March 1, 2024 (Dkt. 471).............................................................. A3620

**Page**

Defendant Paul Sexton's Sur-Reply Regarding Motion for Remedies, filed
    March 6, 2024 (Dkt. 473) .................................................................... A3633

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against
    Defendant Yvonne Gasarch, filed March 7, 2024 (Dkt. 474) ............ A3641

    Exhibit A: Wire Transfer ..................................................................... A3655

    Exhibit B: Wire Transfer ..................................................................... A3656

    Exhibit C: Wire Transfer ..................................................................... A3657

    Exhibit D: Information Return for Electronic Filing of An Individual's
        Income Tax and Benefit Return ................................................. A3658

    Exhibit E: Officers and Directors Enquiry ......................................... A3661

    Exhibit F: Wire Transfer ...................................................................... A3666

    Exhibit G: Wire Transfer ..................................................................... A3668

    Exhibit H: Letter dated April 21, 2018................................................ A3671

    Exhibit I: Wire Transfer ...................................................................... A3672

    Exhibit J: Bank Statement ................................................................... A3673

    Exhibit K: Chart.................................................................................. A3674

    Exhibit L: Assignment ........................................................................ A3676

    Exhibit M: E-mail Correspondence .................................................... A3681

Declaration of Christopher Beckstrom, filed March 7, 2024 (Dkt. 475)...... A3695

    Exhibit 1: E-Mail Correspondence ..................................................... A3698

    Exhibit 2: E-Mail Correspondence ..................................................... A3699

    Exhibit 3: E-Mail Correspondence ..................................................... A3700

Declaration of Ryan Murphy, filed March 7, 2024 (Dkt. 476).................... A3701

    Exhibit 1: Summary of Cash Withdrawals ......................................... A3704

    Exhibit 2: Summary of Cash Withdrawals ......................................... A3706

Plaintiff's Reply Memorandum in Support of Motion for Remedies Against
    Defendant Jackson Friesen, filed March 14, 2024 (Dkt. 480) ........... A3710

**Page**

Defendant Yvonne Casarch's Sur-Reply to SEC's Reply to her Opposition to SEC's Remedies Motion, filed March 15, 2024 (Dkt. 481)........... A3715

Plaintiff's Proposed Judgments Against Defendants Veldhuis, Sexton, Friesen, Kelln and Gasarch, filed May 10, 2024 (Dkt. 485) .............. A3723

Judgment as to Defendant Mike K. Veldhuis, filed May 10, 2024 ............ A3725

Judgment as to Defendant Paul Sexton, filed May 10, 2024...................... A3733

Judgment as to Defendant Jackson T. Friesen, filed May 10, 2024 ............ A3741

Judgment as to Defendant Courtney Kelln, filed May 10, 2024 ................. A3749

Judgment as to Defendant Yvonne Gasarch, filed May 10, 2024 ............... A3756

Yvonne Gasarch's Objections to SEC's Proposed (Partial) Judgment, filed May 20, 2024 (Dkt. 486) ....................................................................... A3762

Plaintiff's Response to Defendant Zhiying Yvonne Gasarch's Objections to SEC's Proposed Judgment, filed may 20, 2024 (Dkt. 487) ................. A3766

Defendant Paul Sexton's Objections to Proposed Judgment, filed May 20, 024 (Dkt. 488)......................................................................................... A3769

Defendant Jackson Friesen's Objections to Plaintiff's Proposed Judgment, filed May 20, 2024 (Dkt. 489)................................................................. A3773

Objections by Defendants Veldhuis and Kelln to Proposed Partial Judgments Against Veldhuis and Kelln Submitted by Plaintiff Securities and Exchange Commission, filed May 20, 2024 (Dkt. 490)...................... A3782

Transcript of Disgorgement, filed May 23, 2024 (Dkt. 491).......................... A3787

Memorandum and Order, filed June 17, 2024 (Dkt. 494) .............................. A3823

Judgment as to Defendant Paul Sexton, filed June 20, 2024 (Dkt. 495) ........ A3886

Judgment as to Defendant Mike K. Veldhuis, filed June 20, 2024 (Dkt. 496) ..................................................................................................... A3896

Judgment as to Defendant Jackson T. Friesen, filed June 20, 2024 (Dkt. 497) ..................................................................................................... A3907

Judgment as to Defendant Yvonne Gasarch, filed June 20, 2024 (Dkt. 498) A3917

Judgment as to Defendant Courtney Kelln, filed June 20, 2024 (Dkt. 499) .. A3925

**Page**

Motion for Orders Directing the Turnover of Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 (Dkt. 500)................... A3935

[Proposed] Order Directing Transfer of Jackson T. Friesen's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........ A3940

[Proposed] Order Directing Transfer of Yvonne Gasarch's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3947

[Proposed] Order Directing Transfer of Courtney Kelln's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3952

[Proposed] Order Directing Transfer of Paul Sexton's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ................. A3955

[Proposed] Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 ........... A3961

Defendant Jackson Friesen's Objections to Judgment, Motion to Amend, Clarify or Correct Judgment and Opposition to Motion for Turnover Order, filed July 2, 2024 (Dkt. 501) .................................................... A3968

Defendant Paul Sexton's Opposition to Motion for Orders Directing the Turnover of Frozen Funds to the Securities and Exchange Commission, filed July 2, 2024 (Dkt. 502) ...................................... A3974

Defendant Courtney Kelln's Notice of Joinder, filed July 3, 2024 (Dkt. 503) ...................................................................................... A3977

Defendant Yvonne Gasarch's Notice of Joinder, filed July 3, 2024 (Dkt. 504) ...................................................................................... A3979

Defendant Paul Sexton's Notice of Joinder, filed July 3, 2024 (Dkt. 505) A3981

Defendant Mike K. Veldhuis's Notice of Joinder, filed July 3, 2024 (Dkt. 506) ...................................................................................... A3984

Plaintiff's Opposition to Defendants' Motions to Amend, Clarify or Correct Judgment, filed July 15, 2024 (Dkt. 507)......................................... A3986

Electronic Order Allowing Motion for Release of Funds, filed July 11, 2024 (Dkt. 508)........................................................................................ A3990

Order Directing Transfer of Jackson T. Friesen's Frozen Funds to the Securities and Exchange Commission, filed July 11, 2024 (Dkt. 509) ................................................................................................. A3991

**Page**

Order Directing Transfer of Yvonne Gasarch's Frozen Funds to the
    Securities and Exchange Commission, filed July 11, 2024 (Dkt.
    510) ................................................................................................ A3998

Order Directing Transfer of Courtney Kelln's Frozen Funds to the Securities
    and Exchange Commission, filed July 11, 2024 (Dkt. 511)............. A4003

Order Directing Transfer of Paul Sexton's Frozen Funds to the Securities
    and Exchange Commission, filed July 11, 2024 (Dkt. 512)............. A4006

Order Directing Transfer of Mike K. Veldhuis's Frozen Funds to the
    Securities and Exchange Commission, filed July 11, 2024 (Dkt.
    513) ................................................................................................ A4012

Electronic Order re: Motion to Amend, filed July 16, 2024 (Dkt. 514)..... A4019

Defendant Paul Sexton's Motion to Stay Execution of Judgment, filed July
    18, 2024 (Dkt. 515)....................................................................... A4020

    Exhibit 1: E-mail Correspondence ................................................. A4025

Motion of Defendants Mike Veldhuis and Courtney Kelln to Stay Execution
    of Judgment, filed July 19, 2024 (Dkt. 516)..................................... A4029

Defendant Yvonne Gasarch's Motion to Stay Execution of Judgment, filed
    July 22, 2024 (Dkt. 517).................................................................... A4035

    Exhibit 1: Order Made After Application ....................................... A4045

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 518) A4054

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 519).... A4055

Electronic Order Denying Motion to Stay, filed July 24, 2024 (Dkt. 520).... A4056

Notice of Appeal by Zhiying Yvonne Gasarch, filed August 19, 2024 (Dkt.
    521) ................................................................................................ A4057

Notice of Appeal by Mike Veldhuis, filed August 19, 2024 (Dkt. 522) ........ A4059

Notice of Appeal by Courtney Kelln, filed August 19, 2024 (Dkt. 523) ....... A4061

Notice of Appeal by Paul Sexton, filed August 19, 2024 (Dkt. 524)............. A4063

Notice of Appeal by Jackson T. Friesen, filed August 19, 2024 (Dkt. 525) .. A4066

Plaintiff's Motion in Support of Distribution for the Benefit of Harmed
    Investors and Seeking and Order Establishing a Fair Fund, Appointing

a Tax Administrator, and Authorizing Payment of Tax Obligations
and Related Fees and Expenses of Tax Administrator Without Further
Court Order, filed September 4, 2024 (Dkt. 537) ................................ A4068

[Proposed] Order Establishing a Fair Fund, Appointing a Tax Administrator,
and Authorizing Payment of Tax Obligations and Related Fees and
Expenses of the Tax Administrator Without Further Court Order, filed
September 4, 2024 ................................................................ A4071

Plaintiff's Memorandum of Law Describing Proposed Distribution
Framework and in Support of Motion Seeking an Order Establishing a
Fair Fund and Other Relief, filed September 4, 2024 (Dkt. 538) ........ A4074

Exhibit A: Order Approving Distribution Plan .................................... A4093

Exhibit B: Order Approving Plan of Distribution ................................ A4129

Exhibit C: Order Reclassifying Prejudgment Interest as Disgorgement,
Appointing a Distribution Agent, and Approving a Distribution
Plan for the Distribution Fund .................................................... A4160

Declaration of Dr. Thomas A. Dunn, filed September 4, 2024, filed
September 4, 2024 (Dkt. 539) ...................................................... A4173

Appendix 1: Defendants' Monetary Remedies .................................... A4186

Appendix 2: Knox Restitution Fund, Losses by OTC Security Ticker  A4187

Appendix 3: Group 2 Tickers and Defendants .................................... A4188

Defendant Paul Sexton's Opposition to Motion for Fair Fund, filed
September 16, 2024 (Dkt. 540) .................................................... A4189

Defendant Jackson Friesen's Opposition to Motion for Fair Fund, filed
September 16, 2024 (Dkt. 541) .................................................... A4192

Defendant Yvonne Gasarch's Motion for Joinder, filed September 16, 2024
(Dkt. 542) .............................................................................. A4196

Defendant Courtney Kelln's Motion for Joinder, filed September 16, 2024
(Dkt. 543) .............................................................................. A4198

Defendant Mike K. Veldhuis's Notice of Joinder and Response to Motion,
filed September 16, 2024 (Dkt. 544) ............................................ A4200

Electronic Order, filed September 18, 2024 (Dkt. 545) ...................... A4203

**Page**

Trial Exhibits:

Exhibit 14: Xphone between 2, 4 and 66 .......................................... A4204

Exhibit 16: Ian Cooper's Special Report re Arch Therapeutics ................... A4205

Exhibit 17: Chuck Hughes Microcap Report (Conmar Capital) re Stevia First $50 Billion Sugar ............................................................ A4250

Exhibit 18: Xphone chain between 2, 3, 4 and 66 re Send ......................... A4262

Exhibit 40: E-mail from Wires to Nikolayev (FEN) re Wire please ........... A4264

Exhibit 45: Xphone chain between 2, 3, 4, 60 and Sexy re Summary ........ A4265

Exhibit 79: Xphone chain between Elgi, Wires and 19 ............................ A4266

Exhibit 81: Xphone chain between Bond, 104 and Blgx re Hiya ............... A4268

Exhibit 87: Xphone chain between 2, 3 and 4 re Meeting .......................... A4304

Exhibit 90: Xphone chain between Bond and Wires re Cash ..................... A4305

Exhibit 99: Xphone chain between Gard, Celt and 2 re ARW ................... A4306

Exhibit 113: Xphone chain between 2, 3, and 4 re Copy .......................... A4307

Exhibit 126: Xphone between Gard and Kash re Yo ................................ A4308

Exhibit 134: Xphone chain between 2, 3, and 4 re Rights ........................ A4309

Exhibit 136: Xphone chain between 2, 3, and 4 re Today.......................... A4311

Exhibit 140: Xphone from 4 to 2 ........................................................ A4314

Exhibit 141: Xphone chain between 2, 3, and 4 ..................................... A4315

Exhibit 151: Xphone chain between Wires and 19 ELGI ......................... A4316

Exhibit 154: Xphone from GARD to KASH and ACCO re Yo ................. A4318

Exhibit 157: Xphone chain between Wires, Kash and Celt re Wire to Business Venture Investments ........................................... A4319

Exhibit 168: Xphone chain between Peace, 77, Lion and Wires re Hi ....... A4320

Exhibit 170: Xphone chain between 2, 3 and 114 re There you have it...... A4321

Exhibit 180: Xphone chain between Wires, Bond, Luna and Alex 110 re Remo ............................................................................... A4322

**Page**

Exhibit 183: Xphone between 2 and 98 re Test ............................................. A4323

Exhibit 184: Xphone chain between Fen, Wires and 76 re Where r u ........ A4324

Exhibit 190: Xphone chain between 2 and 4 re Test .................................. A4326

Exhibit 193: Xphone chain between 76, Fen and Wires re Xvoice ............ A4327

Exhibit 233: Beckstrom Xphone Header Spreadsheet ................................. A4329

Exhibit 237: Xmail message from Wires (xMeridian) to Friesen re 2 Wires
to Go Out ................................................................................. A4384

Exhibit 239: Xmail message from Wires to Friesen re 2 Wires to go out ... A4385

Exhibit 261: Xmail messages between Friesen, "acco" and "hear" re NA . A4387

Exhibit 273: Xmail message from Friesen to Acco and Hear re creative with
attachments ............................................................................... A4391

Exhibit 284: Establishment of the beneficial owner's identity for Peregrine
Capital ....................................................................................... A4412

Exhibit 286: E-mail from Riverfall Group to Silverton Ops re wire 129k to
Greenberg with attachments showing metadata ................................. A4413

Exhibit 287: E-mail from Hilton Capital to Wintercap Operations re wire
CAD100016 to Sun Life with attachments ....................................... A4518

Exhibit 288: Text messages between Friesen, Knox, and Threema with
photos of Cristal bottles and SUB Penny $ ...................................... A4523

Exhibit 289: Threema chats ...................................................................... A4534

Exhibit 290: Friesen cash collection for 9k EUR ....................................... A4536

Exhibit 292: Murphy Summary charts summarizing transfers of Arch
Therapeutics stock .................................................................... A4537

Exhibit 293: MDDD Q Account Details ....................................................... A4538

Exhibit 295: ARTH Q Account Details ......................................................... A4546

Exhibit 296: STVFVBIO Q Account Details ................................................. A4560

Exhibit 298: STEV Q Account Details .......................................................... A4583

Exhibit 299: LBY and PBAV Q Account Details ........................................... A4594

Exhibit 306: RIHT & RIH1 Q Account Details .............................................. A4605

**Page**

Exhibit 307: Murphy Summary charts summarizing sales of the Fourteen
Issuers' stock by year ........................................................................... A4619

Exhibit 308: Murphy Summary Charts showing sales of Fourteen Issuers'
securities based on Q system and brokerage account......................... A4620

Exhibit 310: Murphy Summary charts summarizing market trading based on
Blue Sheets in Stevia FirstVitality and Arch d................................... A4634

Exhibit 311: GARD Q reports ..................................................................... A4635

Exhibit 313: Murphy Summary charts showing profit allocations to the Q
accounts of Veldhuis, Sexton and Friesen ........................................ A4651

Exhibit 314: Summary chart of allocations to PEAC PERE account.......... A4659

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

                                    Plaintiff,

        v.                                                              Case No. 1:21-cv-11276-WGY

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                                    Defendants.

## DECLARATION OF ROBERT KNUTS

I, ROBERT KNUTS, pursuant to 28 U.S.C. § 1746 declare as follows:

1.        I represent Mike K. Veldhuis, a defendant in the above-captioned matter.  I make this declaration in support Mr. Veldhuis' Motion to Stay the Proceedings.

2.        Attached hereto as Exhibit 1 is a true and accurate copy of the indictment filed on January 9, 2024 in *United States v. Sharp*, 1:24-cr-10002 (D. Mass. Jan. 9, 2024).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 16, 2024, in New York, New York.

_____
Robert Knuts

A3505

# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Criminal No.  24-cr-10002 |
| v. | ) Violations: |
| (1) FREDERICK L. SHARP, <br> a/k/a "Bond," | ) Counts One & Two: Conspiracy to <br> ) Commit Securities Fraud <br> ) (18 U.S.C. § 371) |
| (2) LUIS CARRILLO, <br> a/k/a "Fire," a/k/a "SUSS," | ) |
| (3) MIKE K.G. VELDHUIS, <br> a/k/a "ACCO," | ) Counts Three & Four: Securities Fraud <br> ) (15 U.S.C. §§ 78j(b) and 78ff(a); 17 <br> ) C.F.R. § 240.10b-5; 18 U.S.C. § 2) |
| (4) PAUL SEXTON, <br> a/k/a "HEAR," and | ) |
| (5) COURTNEY M. KELLN, <br> a/k/a "Celt," a/k/a "Esquire," | ) Forfeiture Allegation: <br> ) (18 U.S.C. § 981 and 28 U.S.C. <br> ) § 2461) |
| Defendants | ) |

## INDICTMENT

At all times relevant to this Indictment:

### General Allegations

### Key Persons and Entities

1.      Defendant FREDERICK L. SHARP resided in British Columbia, Canada.  SHARP operated an entity known as Corporate House, which he described as a firm of private investment bankers with offices in Canada and affiliations worldwide.  SHARP used the codename "Bond."

2.      Defendant LUIS CARRILLO resided in Mexico.  CARRILLO previously practiced as a securities attorney in the United States.  CARRILLO used various codenames, including "Fire" and "SUSS" and iterations of "Iceman," "Mamba," and "Spartacus."

A3507

3.     Defendant MIKE K.G. VELDHUIS resided in British Columbia, Canada. VELDHUIS at times associated himself with an entity known as Venture Capital First LLC. VELDHUIS used various codenames, including "ACCO" and iterations of "Stockman."

4.     Defendant PAUL SEXTON resided in British Columbia, Canada. SEXTON used various codenames, including "HEAR."

5.     Defendant COURTNEY M. KELLN resided in British Columbia, Canada. KELLN worked for SHARP and utilized the entities Celtic Consultants LLC and Esquire Corporate Services SRL when doing so. KELLN used various codenames, including "Celt" and "Esquire."

6.     Roger Knox was a co-conspirator who resided variously in France and Switzerland. Knox was the founder, owner, and chief executive of the asset management firm Wintercap SA, formerly known as Silverton SA ("Wintercap"), based in Switzerland.

7.     Richard Targett-Adams was a co-conspirator who resided in France and worked for Knox. Targett-Adams was responsible for several back-office tasks for Wintercap.

8.     Co-Conspirator 1 ("CC-1") resided variously in Colombia and Florida. CC-1 at times worked with CARRILLO.

9.     Co-Conspirator 2 ("CC-2") resided in California and was the Chairman of the Board of Directors of Vitality Biopharma, Inc., a company described further below.

10.     Co-Conspirator 3 ("CC-3") resided in British Columbia, Canada. CC-3 at times worked with VELDHUIS and SEXTON.

11.     Co-Conspirator 4 ("CC-4") generally resided in British Columbia, Canada. CC-4 worked for SHARP.

2

A3508

12.     Co-Conspirator 5 ("CC-5") resided in British Columbia, Canada.

13.     Pure Snax International Inc. ("Pure Snax") was a New Jersey-based penny-stock company that described itself as a "wellness brand focused on bringing healthy snacks and foods to consumers." The company was incorporated in Nevada in 2011 under the name B-Maven Inc. Between September 2015 and September 2016, it traded on the over-the-counter securities market under the ticker symbol "PSNX."

14.     Garmatex Holdings, Ltd. ("Garmatex") was a British Columbia-based penny-stock company that was purportedly planning to complete a reverse merger with a private company, Garmatex Technologies, Inc., in or about early 2017. Following the merger, Garmatex would have purportedly commenced operations to "provide performance fabric solutions in virtually every sector that has textile applications." The company was incorporated in Nevada in 2014 under the name Oaxaca Resources Corp. In 2017, Garmatex traded on the over-the-counter securities market under the ticker symbol "GRMX."

15.     OneLife Technologies Corp. ("OneLife") was a "mobile medical data and technologies" penny-stock company based in Illinois. The company was incorporated in Nevada in 2014 under the name Oculus Inc. In late 2017 and 2018, it traded on the over-the-counter securities market under the ticker symbol "OLMM." On or about March 2, 2018, the company registered its S-1 shares with the SEC under Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act").

16.     Vitality Biopharma, Inc. ("Vitality") was a biopharmaceutical penny-stock company based in Los Angeles that focused on the development of cannabinoids. It was incorporated in Nevada in June 2007 under the name Legend Mining Inc. Between in or about

A3509

2012 and mid-2016, Vitality was known as Stevia First Corp. and was a biotechnology company focused on products involving stevia, a sugar substitute. Vitality traded on the over-the-counter market under the ticker symbol "VBIO" and, before that, "STVF." Vitality's common stock was registered with the SEC under Section 12 of the Exchange Act.

Relevant Entities, Principles, and Definitions

17.     The Securities and Exchange Commission ("SEC") is an independent agency of the executive branch of the United States government responsible for enforcing the federal securities laws and promulgating rules and regulations thereunder. Those laws, rules and regulations are, among other things, designed to protect the investing public by maintaining fair and honest securities markets and eliminating manipulative and deceptive trading practices.

18.     Transfer agents are companies that, among other activities, issue and cancel certificates of a company's stock to reflect changes in ownership, such as when stock is changing hands. Many companies with publicly traded stock use transfer agents to track the ownership of their stock.

19.     Microcap stocks, also known as "penny" stocks, are among the securities that are subject to the federal securities laws. These stocks are, as a general matter, securities of publicly traded companies that have a low market capitalization and a low price per share (frequently, though not always, $1 or less). Microcap stocks are most often traded on the "over-the counter" securities markets, rather than on national exchanges such as the New York Stock Exchange or the NASDAQ Stock Market, and tend to be thinly traded. (OTC Markets Group, Inc. ("OTC Markets") operates the predominant "over-the-counter" securities markets.) In addition, companies that issue microcap stock typically make less information available to the investing

4

A3510

public about their operations and performance, although such companies sometimes register their shares with the SEC under Section 12 of the Exchange Act and thereby become subject to certain reporting requirements, such as the filing of annual reports with the SEC. Additionally, large blocks of microcap stock are often controlled by a small number of individuals, which can make it easier to orchestrate manipulative trading in those stocks.

20.     Among the ways that federal securities laws and regulations aim to protect investors are (i) mandating certain disclosures by holders of large quantities of stock registered with the SEC, and (ii) limiting the ability of executive officers, directors, and large shareholders to quickly sell significant amounts of their stock (regardless of whether it is registered with the SEC) in the open market.

21.     For example, when a person or group of persons acquires beneficial ownership[1] of more than five percent of a voting class of stock registered with the SEC, the person or group is required to file a Schedule 13D with the SEC disclosing such ownership and setting forth background information about the owner(s) and their investment intentions. As part of their compliance programs, brokers often ask individuals seeking to deposit shares in microcap stocks whether they own or control more than five percent of the issuer's shares. OTC Markets also requires public companies to disclose shareholders who own five percent (or more) of their shares, in order to meet certain listing requirements. In addition, under Section 16 of the Exchange Act, officers, directors, and persons who acquire beneficial ownership of more than ten percent of a public company's stock registered with the SEC are also required to disclose in public SEC filings

---

[1] A beneficial owner is any person who directly or indirectly has (or shares) voting or investment power, which includes the power to sell or direct the sale of a security.

A3511

the number of shares they beneficially own, as well as any changes to that number as they acquire

or sell shares, on SEC Form 3 ("Initial Statement of Beneficial Ownership of Securities") and SEC

Form 4 ("Statement of Changes in Beneficial Ownership"), respectively.

22.    Similarly, control securities—which are securities owned by a person who directly

or indirectly controls the issuer, either alone or as a member of a control group—are subject to

Rule 144 of the Securities Act of 1933 ("Rule 144") [17 CFR § 230.144].  The term "affiliate" is

used to describe such a control person or group, and persons or groups holding more than 10

percent of a company's stock are generally deemed to be affiliates.  In the context of securities

traded "over-the-counter"—such as most microcap stocks—Rule 144 provides that an affiliate

cannot sell more than one percent of the issuer's total outstanding shares in any three-month period.

Rule 144 was enacted to "implement the fundamental purposes" of the Securities Act of 1933,

namely to "provide full and fair disclosure of the character of the securities sold in interstate

commerce … and to prevent fraud in the sale thereof."  37 Fed. Reg. at 596.  As part of their

compliance programs, brokers often ask individuals seeking to deposit shares of microcap stocks

whether they are officers, directors, ten percent shareholders, or otherwise affiliates of the issuer.

23.    Rule 144 also places certain restrictions on the selling of so-called "restricted"

securities.  Such shares, which are acquired directly from issuers and are not registered with the

SEC, generally cannot be sold to the public and bear a legend indicating that they are "restricted."

Shares that are registered with the SEC, and that do not bear a legend indicating they are restricted,

are considered "unrestricted" or "free-trading," and may be sold in the market by non-affiliates.

Rule 144 also identifies circumstances in which a shareholder holding restricted shares can have

the legend removed, enabling the shares to become free-trading.  One such circumstance is if the

A3512

Case: 24-1770    Document: 00118249071    Page: 29    Date Filed: 02/18/2025    Entry ID: 6700951

Case 1:21-cr-10012-NMG Document 1521-1 Filed 01/09/24 Page 8 of 37
Case 1:21-cr-10012-NMG Document 451-1 Filed 01/09/24 Page 8 of 38

shareholder is a non-affiliate and has held the shares for a certain period of time, typically either six months (if the company's shares are registered under Section 12) or one year (if the company's shares are not so registered).

24.    The total number of unrestricted securities deposited with brokers and available for trading is known as the "float."  For example, if hypothetical company Acme Corporation issued 10 million shares, but only one million were unrestricted and deposited with brokers (and thus available to be traded), the "float" would be one million shares.  The remaining nine million shares might be a mix of restricted shares and unrestricted shares not yet deposited with any broker.  Like individuals who control greater than ten percent of a company's total outstanding shares, individuals who control a majority of a company's float are also likely to be control persons and, therefore, affiliates for purposes of Rule 144.

25.    One form of fraud that occurs in the market for microcap stocks is a "concealed control" scheme.  Such a scheme typically involves individuals (or groups of individuals) acquiring and exercising control over a significant portion of an issuer's shares, and often a majority of an issuer's float, while concealing their affiliate status.  After acquiring a large portion of the issuer's free-trading shares, the individual or group will typically distribute those shares among accounts held in the names of "nominees"—including sham entities and other third parties—to help conceal their identities as the true owners of the stock.  In so doing, the perpetrators seek to avoid and circumvent the restrictions in the securities laws discussed above, as well as the controls put in place by brokerages selling the stock.  The perpetrators then sell their shares via the nominees to the unsuspecting public in contravention of the securities laws.  The

A3513

proceeds from such sales are often then funneled back to the perpetrators or to third parties at the perpetrators' direction.

26.     Concealed control schemes are often accompanied and supported by stock manipulation in the form of "pump-and-dumps." A "pump-and-dump" typically involves an effort to artificially inflate the stock price or trading volume of a publicly traded company (the "pump") so that individuals who control a substantial portion of the company's float can sell their shares at artificially high prices, or in a more liquid market, to other investors (the "dump"). Typically, such schemes involve the use, among other means, of news releases, email blasts, and other forms of promotion—often containing false or exaggerated information—to inflate the stock price and trading volume and to generate demand for the shares. Such schemes also at times employ "boiler rooms," wherein multiple individuals work in a coordinated effort to contact potential investors, often through unsolicited "cold calls," and provide false, misleading, unfounded, and/or exaggerated information about the company in order to induce potential investors to purchase shares.

<u>Overview of the Conspiracies and the Schemes to Defraud</u>

27.     Between in or about 2012 and in or about July 2020, the defendants conspired variously with one another, and with others known and unknown to the Grand Jury, to commit securities fraud by orchestrating and participating in sophisticated pump-and-dump schemes involving the concealed control of securities of several microcap companies. The schemes netted at least tens of millions of dollars in illicit proceeds at the expense of the investing public.

28.     The defendants played different roles in the conspiracies and the schemes to defraud, as follows:

A3514

a. SHARP operated a sophisticated platform that provided a variety of services to control persons seeking to conceal their identities when selling large quantities of penny-stock companies' shares in contravention of the securities laws. In exchange for fees, the array of services SHARP offered included (i) forming and providing offshore nominees to hold shares for undisclosed control persons; (ii) providing and administering encrypted communications networks for use by control persons and other co-conspirators (known as the "xphone" and "xmail" systems); (iii) facilitating the deposit of stock with Wintercap in blocks of less than five percent via SHARP's nominees; (iv) administering a proprietary web-based accounting system that tracked clients' total stock holdings, sales, and proceeds (known as the "Q" system); and (v) facilitating the payment of illegal stock sale proceeds to accounts around the world at control persons' directions, including through the use of fake invoices that concealed the true nature of the payments. In or about July 2013, SHARP described his service as follows: "The service provided is comprehensive; it is not limited to trading. It includes pyaments [sic], loans, private placements and keeping clients out of jail."

b. CARRILLO was an undisclosed control person who, either alone or as part of an undisclosed control group, used SHARP's platform and Wintercap to deposit and sell large quantities of shares of penny-stock companies through nominees and to then distribute the illicit proceeds for CARRILLO's benefit. CARRILLO organized promotional campaigns, including boiler rooms, to

9

A3515

facilitate pump-and-dumps of the stocks he controlled. The account name for CARRILLO's account in the Q system was "SUSS."

c. VELDHUIS and SEXTON were undisclosed control persons who—together with each other and with CC-3 (the "VELDHUIS Control Group")—used SHARP's platform and Wintercap to deposit and sell large quantities of penny-stock companies' shares through nominees and to then distribute the illicit proceeds for their benefit. The VELDHUIS Control Group also organized promotional campaigns to facilitate pump-and-dumps of the stocks they controlled. The VELDHUIS Control Group also at times worked with, and shared proceeds with, CC-2, and SEXTON was CC-2's primary point of contact. The account names for VELDHUIS's and SEXTON's accounts in the Q system were "ACCO" and "HEAR," respectively.

d. KELLN worked for SHARP and facilitated the use of SHARP's platform by undisclosed control persons—including CARRILLO and the VELDHUIS Control Group—by preparing and/or obtaining false and misleading documents that were provided to transfer agents and brokers to facilitate the breakdown, transfer, and deposit of the undisclosed control persons' shares in nominees' names in blocks of less than five percent. KELLN used email accounts in the nominees' names when sending formal documents to effectuate the transfers and deposits but used encrypted messaging systems and codenames when discussing the breakdown of shares with Wintercap and/or the control persons. KELLN closely monitored the five percent threshold and ensured that no one

10

A3516

nominee formally owned more than five percent of a company's stock at any

point in time, even though the undisclosed control persons secretly did own and

control more than five percent.

29.  The conspiracies and schemes to defraud involved the following general pattern:

a.  First, the control persons (*i.e.*, CARRILLO or the VELDHUIS Control Group)

acquired control over a significant portion, if not all, of a penny-stock issuer's

outstanding shares and a majority, if not all, of the issuer's float.  In instances

in which the companies' shares were registered with the SEC under Section 12

of the Exchange Act, the control persons failed to file any of the required

disclosures reflecting (i) their ownership of greater than five and/or ten percent

of the companies' outstanding shares and (ii) changes in their ownership as they

sold shares.

b.  Second, the control persons transferred their unrestricted stock to nominee

entities controlled by SHARP or by the control person(s) themselves.  While

the nominee entities were officially owned by third-party individuals (the

supposed "beneficial owners"), in reality the control persons retained control

over the shares.  These transfers were typically made in blocks of less than five

percent of the total outstanding shares of the issuer in order to evade and

circumvent the securities laws and to evade scrutiny by brokers.  KELLN often

facilitated these transfers.

c.  Third, the control persons, often acting through KELLN, then arranged to

transfer the shares from each nominee entity to Wintercap, ostensibly on behalf

A3517

of each separate nominee.  In reality, all of the shares transferred to Wintercap remained under the control persons' control and Knox and Targett-Adams took direction from the control persons (and from SHARP and KELLN for nominees on SHARP's platform) rather than from the nominees' purported beneficial owners.

d.  Fourth, Knox and Targett-Adams arranged to deposit the stock into accounts in Wintercap's name with multiple brokerage firms around the world.  Knox often sent each nominee entity's shares to a different broker, thereby giving the false appearance that each nominee entity was a separate client with its own individual position of less than five percent of the issuer's outstanding shares.  By formally staying below five percent, Knox assisted the control persons in evading disclosure obligations and sought to avoid triggering direct inquiries and potential rejections by the brokerage firms.  Knox also often provided false and/or misleading representations to the brokers indicating that the stock was not beneficially owned or controlled by control persons and/or affiliates of the issuer.  Knox's general policy was to not hold greater than 20 percent of any one issuer's total outstanding stock at any point in time; however, Knox was willing to and did "re-load" positions for control persons—that is, to bring their holdings back up to 20 percent—as Knox sold their stock.

e.  Fifth, through Wintercap's brokerage accounts, Knox and Targett-Adams then dumped—*i.e.*, sold—the control persons' stock into the securities markets to unsuspecting investors at the direction of the control persons.  The "dump"

12

A3518

phase of the scheme typically corresponded with a promotional campaign funded by the control persons to generate public interest in the stock, which often artificially inflated the market price of the stock. Knox and Targett-Adams typically took direction from the control persons over encrypted messaging systems using codenames regarding when and how much stock to sell.

f.    Sixth, following the "dump," Knox swept the stock sale proceeds from the brokerage accounts into Wintercap's bank accounts. Wintercap then retained a small portion of the proceeds as Wintercap's fees and distributed the remainder of the proceeds at the control persons' direction, including for the control persons' personal benefit and to support the scheme. Before transferring proceeds, Knox required the control persons to provide Wintercap with documentation purporting to support the transfers. Often, Wintercap received (and thereafter maintained) fake invoices from CC-4 describing services purportedly provided to the nominees that were never, in fact, rendered.

<u>Object and Purpose of the Conspiracies and the Schemes to Defraud</u>

30.    The object of the conspiracies and the schemes to defraud was for the defendants and their co-conspirators to commit securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and attendant regulations. The principal purpose of the conspiracies and the schemes to defraud was for the defendants and their co-conspirators to make money by selling large quantities of penny-stock companies' shares in more liquid markets and/or at

13

artificially inflated prices while concealing their identities and actions from investors, regulators, and law enforcement.

<u>Manner and Means of the Conspiracies</u>

31.    Among the manner and means by which the defendants and their co-conspirators known and unknown to the Grand Jury carried out the conspiracies were the following:

    a.  Distributing free-trading shares of various penny stock companies among several nominees to disguise the fact that the shares were controlled by control person(s) acting alone or as part of a group;

    b.  Transferring the shares from the nominees to Wintercap, which in turn deposited the shares with brokers, including at times based on false and/or misleading representations;

    c.  Concealing from transfer agents, brokers, and the investing public that the shares held by the nominees and deposited by Wintercap were secretly controlled by the control person(s), including by failing to make required disclosures under the securities laws and applicable regulations;

    d.  Engaging in promotional campaigns in Massachusetts and elsewhere to artificially boost the securities' share prices and trading volumes;

    e.  Secretly selling the shares from Wintercap's accounts during the promotional campaigns in contravention of the federal securities laws and regulations governing the sale of stock by affiliates;

14

A3520

    f.  Distributing the proceeds from the stock sales for the benefit of the control persons or to third parties at the control persons' direction, including to stock promoters;

    g.  Using proprietary accounting systems, including the Q system, to track the control persons' stock holdings, the stock sales and the proceeds generated therefrom, and the distribution of the proceeds; and

    h.  Taking steps designed to conceal their actions and to avoid discovery by regulators and law enforcement, including by using encrypted and/or private communications networks and messaging systems, using codenames, and making false statements to regulators when asked about aspects of the schemes.

<u>Overt Acts in Furtherance of the CARRILLO Conspiracy and Scheme to Defraud</u>

32.    On or about various dates between 2014 and approximately November 2018, the defendants CARRILLO, SHARP, and KELLN, together with others known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others, in furtherance of the CARRILLO conspiracy and scheme to defraud:

*Pure Snax International Inc. (PSNX)*

33.    In two transactions in or about May 2013 and in or about September 2014, KELLN caused 1.2 million free-trading PSNX shares (which at the time bore the symbol BMAV) to be transferred from five PSNX shareholders to two nominees under SHARP's control. Following a subsequent forward stock split by Pure Snax in June 2015, and the cancellation of 300 million shares by the company's President and CEO in September 2015, the two SHARP nominees

15

A3521

together controlled 48 million PSNX shares, which represented approximately 48 percent of Pure Snax's total outstanding shares.

34.     In two transactions in or about September 2014 and in or about July 2015, KELLN, Knox, and Targett-Adams caused 19.6 million PSNX shares (on a post-split basis) to be transferred from two different SHARP nominees to Wintercap, which deposited the shares for trading.  The shares deposited with Wintercap represented close to 20 percent of Pure Snax's total outstanding shares and over 40 percent of Pure Snax's float.

35.     On or about November 25, 2015, CARRILLO sent an xphone message to SHARP stating that CARRILLO and a co-conspirator were "starting psnx next week" and asking if they could "trade directly" with Wintercap.  SHARP responded "Si."

36.     Thereafter, between in or about November 2015 and on or about September 30, 2016, Wintercap, at the direction of CARRILLO and/or one or more co-conspirators, sold nearly all 19.6 million PSNX shares, generating over $1.6 million in illicit proceeds.  Pure Snax's stock price more than doubled between the beginning of March and mid-May 2016 before crashing by the end of September 2016.

37.     During that same period, beginning in or about March 2016, CARRILLO caused CC-1 and other co-conspirators to operate a boiler room from Medellin, Colombia to generate demand for PSNX shares based on exaggerated and false statements about Pure Snax and its growth opportunity.

38.     As part of the boiler room campaign, in or about March and in or about April 2016, CARRILLO caused CC-1 and other co-conspirators to place promotional calls to a prospective

16

A3522

investor in Massachusetts who purchased PSNX shares as a result, as well as to other prospective investors.

39.     In or about April 2016, CARRILLO or a co-conspirator caused Wintercap to wire tens of thousands of dollars to CC-1 and at least one other co-conspirator as compensation for running the boiler room.

*Garmatex Holdings, Ltd. (GRMX)*

40.     In three transactions in or about February and in or about March 2017, KELLN caused 5.25 million free-trading GRMX shares to be transferred from nine GRMX shareholders to three nominees under SHARP's control.  Each block consisted of 1.75 million shares, representing just under five percent of Garmatex's total outstanding shares.  In total, the three blocks represented just under 15 percent of Garmatex's total outstanding shares.

41.     On or about February 13, 2017, just weeks before KELLN caused the first GRMX share transfers to SHARP nominees, Targett-Adams told KELLN in an encrypted message that he had just spoken with CARRILLO, who had said that KELLN would be sending Wintercap documents to facilitate a deposit of GRMX shares.

42.     KELLN responded that same day that she had not yet "got the certs" and that "[a]s soon as I do, we will T it all up."

43.     On or about February 17, 2017, after Targett-Adams asked about the status of the documents and told KELLN that CARRILLO "wants me to try and get this in asap," KELLN responded in an encrypted message, "I have to transfer all the stock to Noms first" and "There is a process."

17

A3523

44.     In or about March 2017, KELLN, Knox, and Targett-Adams caused all 5.25 million GRMX shares held by the SHARP nominees to be transferred to Wintercap, which deposited the shares for trading.

45.     On or about March 9, 2017, during the process of transferring the GRMX shares to Wintercap, CARRILLO asked Knox and Targett-Adams in an encrypted message to get the deposits completed "asap," noting that it was "Urgent so we can have a good month lol."

46.     On or about March 14, 2017, CARRILLO asked Knox and Targett-Adams in an encrypted message to have the first block of 1.75 million shares "ready to go at open - we gonna drop that [expletive]."

47.     On or about March 15, 2017, in connection with Wintercap's deposit of one of the blocks of GMRX shares, Knox made false and misleading written representations to a broker, including that the shareholder did not own five or more percent of Garmatex's shares.

48.     Between on or about March 14, 2017 and on or about May 2, 2017, CARRILLO caused Wintercap to sell over 7.2 million GMRX shares, accounting for approximately 20 percent of Garmatex's total outstanding shares, including by sending sale instructions via encrypted messages.  The 7.2 million shares sold included approximately two million GRMX shares that KELLN, Knox, and Targett-Adams caused to be transferred from SHARP nominees to Wintercap in or about April 2017.  The sales, in total, generated approximately $5 million in illicit proceeds.  Garmatex's stock price approximately doubled between mid-March and mid-April 2017, before crashing by June 2017.

49.     During that same period, in or about March and April 2017, CARRILLO orchestrated a multifaceted promotional campaign—including press releases, email blasts, and

18

A3524

telephone calls from a boiler room to prospective investors—to generate demand for GRMX shares.

50.    As part of the promotional campaign, CARRILLO caused an investor relations company to draft press releases that Garmatex published online, including to prospective investors in Massachusetts and elsewhere.

51.    Also as part of the promotional campaign, CARRILLO caused a boiler room to place promotional calls to a prospective investor in Massachusetts who purchased GRMX shares as a result, as well as to other prospective investors.

52.    On or about June 9, 2017, CARRILLO sent SHARP and CC-4 an xmail message regarding the Q accounting system, requesting that they "please transfer the remaining cash balance in GRMX to SUSS [CARRILLO's account in the Q system], and then close the GRMX account please."

*OneLife Technologies Corp. (OLMM)*

53.    In or about September 2016, CARRILLO or a co-conspirator caused approximately 37 of OneLife's 39 total outstanding share certificates (which at the time bore the symbol OCLL) to be physically delivered to Wintercap. The certificates included a restricted 70-million share certificate issued to the company's sole director and officer, which alone represented approximately 75 percent of OneLife's total outstanding shares at the time.[2] The certificates also included approximately 36 restricted certificates in the names of different individual investors.

_____

[2] In or about June 2017, the company's shares underwent a two-for-one forward stock split, issuing two new shares for each existing share. The OLMM share amounts are discussed herein on a post-split adjusted basis.

19

A3525

54.     On or about January 11, 2017, CARRILLO emailed Wintercap to confirm that Wintercap had possession of the share certificates.

55.     On or about January 16, 2017, CARRILLO emailed pre-signed signature pages for share purchase agreements in the names of 35 OLMM investors and told Wintercap that it would receive the physical signature pages the following day, which it did.  In the same email, CARRILLO also sent a template share purchase agreement for OLMM shares in Microsoft Word format, with the purchaser and seller names blank.

56.     In or about February, March, and April 2017, CARRILLO, KELLN, and Targett-Adams discussed how to divide the OLMM investors' shares into blocks of just under five percent of the total outstanding shares:

    a.  As one example, in or about February 2017, Targett-Adams sent CARRILLO an encrypted message noting that he had "allocated the certs into 5 posns of just under 5%."

    b.  In or about March 2017, Targett-Adams emailed CARRILLO a more specific proposed breakdown of the five positions, each just under or equal to five percent.

    c.  CARRILLO responded with directions as to how each should be deposited:  two with SHARP nominees, and three "direct with" Wintercap.

    d.  In or about April 2017, Targett-Adams sent an encrypted message to KELLN, stating that he had "certs for positions of [OLMM]" from CARRILLO that CARRILLO "wants me to send to you/the TA for putting into two bond companies" (*i.e.*, two SHARP nominees).  Targett-Adams identified the two

20

A3526

positions as comprising approximately 4.7 percent and 4.4 percent of OLMM's outstanding stock, respectively.

    e. KELLN directed Targett-Adams to "Send certs and stock powers to me" and provided her address in British Columbia.

57.    In two transactions taking place in or about June and in or about September 2017, KELLN caused approximately 4.37 million OLMM shares and approximately 4.13 million OLMM shares, respectively, to be transferred from 14 individual investors to two SHARP nominees in free-trading form. The two positions accounted for just under five percent of OneLife's total outstanding shares each.

58.    After KELLN caused the OLMM shares to be transferred to the two SHARP nominees, KELLN, Knox, and Targett-Adams caused each position to be transferred to Wintercap, which deposited the shares for trading.

59.    Also in or about June 2017, Targett-Adams and Knox caused a third position of OLMM shares—totaling approximately 4.67 million shares—to be transferred from eight individual investors to Wintercap in free-trading form, so that Wintercap could deposit the shares with brokerage firms for trading and allocate them to a nominee associated with CARRILLO. In total, Wintercap deposited approximately 13.2 million OLMM shares with brokerage firms, accounting for approximately 14 percent of OneLife's total outstanding shares and approximately 92 percent of its float.

60.    On or about September 11, 2017, in connection with Wintercap's deposit of one of the blocks of OLMM shares, Knox made false and misleading written representations to a broker, including that the shareholder did not own five or more percent of OneLife's shares.

21

A3527

61.    Between in or about late November 2017 and through on or about October 1, 2018, CARRILLO—using selling instructions sent via encrypted messages—caused Wintercap to sell approximately 7.5 million OLMM shares, generating approximately $5.2 million in illicit proceeds.

62.    During this same November 2017 to October 2018 period, CARRILLO directed Wintercap to allocate the proceeds of the OLMM stock sales to particular nominees that he or SHARP controlled.

63.    On or about February 5, 2018, CARRILLO sent an xmail message to CC-4 requesting that a wire transfer in the amount of $100,000 be sent to a Mexican construction company, adding that the wire should be charged to the OLMM account in the Q system.

64.    On or about February 7, 2018, Wintercap sent the requested $100,000 wire from stock sale proceeds allocated to a SHARP nominee.

65.    On or about December 6, 2017, KELLN and Targett-Adams discussed the remaining two five percent blocks, which had not yet been deposited.  Via an encrypted message, Targett-Adams told KELLN, "There are 2 other posns of OLMM still in certs" and proposed that "we can now start to bring [them] in as selling starts."  KELLN responded, "Just send me all the specific details for each [share purchase agreement] you need.  Seller name/purchaser name/ date/price/share amount [sic]."  KELLN added "I'll get it done."

66.    In or about January and February 2018, as part of a promotional campaign CARRILLO orchestrated, CARRILLO caused an investor relations company to draft press releases that OneLife published online, including to prospective investors in Massachusetts and elsewhere.

67.    Wintercap paid the investor relations firm from stock sale proceeds allocated to a SHARP nominee.

68.    Also as part of the promotional campaign, in or about September 2018, CARRILLO or a co-conspirator caused an individual to call a prospective investor in Massachusetts to tout OLMM shares, thereby inducing the Massachusetts resident to buy OLMM shares.

69.    On or about October 15, 2018, SHARP sent CARRILLO an xmail message with an account statement for the OLMM account from the Q system that reflected, among other transactions, stock sales that CARRILLO directed through Wintercap.

70.    On or about November 26, 2018, SHARP sent CARRILLO an xmail message with an account statement for CARRILLO's "SUSS" account from the Q system that reflected, among other transactions, an internal transfer of over $21,000 from October 10, 2018 associated with the closure of the OLMM account.

<u>Overt Acts in Furtherance of the VELDHUIS Control Group Conspiracy and Scheme to Defraud</u>

71.    On or about various dates between 2012 and July 2020, the defendants SHARP, VELDHUIS, SEXTON, and KELLN, together with others known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others, in furtherance of the VELDHUIS Control Group conspiracy and scheme to defraud:

*Vitality Biopharma, Inc. (VBIO), f/k/a Stevia First Corp. (STVF)*

72.    In or about March 2012, CC-2 and other co-conspirators caused approximately 15.75 million restricted STVF shares to be transferred from CC-2 to seven SHARP nominees (representing approximately 31 percent of the company's total outstanding shares) and an additional approximately 4.23 million restricted STVF shares (representing an additional eight

23

percent) be transferred to two nominees controlled by CC-5. At the time of the transfer, and throughout the conspiracy period, CC-2 was the Chairman of Stevia First, later known as Vitality, and retained a beneficial interest in the shares. CC-2, however, failed to publicly report CC-2's beneficial interest in the shares, as he was required to do under applicable securities laws and regulations.

73.     On or about October 29, 2014, SEXTON sent an xphone message to VELDHUIS, reporting on a discussion between SEXTON and CC-2. SEXTON reported that CC-2 was sharing in CC-5's block of shares and that CC-2 would "prefer if we took the shares in [CC-5's nominees] and sold them all together." VELDHUIS responded, "I think we all agree with that."

74.     In three transactions taking place in or about June 2015, May 2016, and June 2016, KELLN or a co-conspirator caused approximately 1.66 million, 4.9 million, and 5.06 million STVF shares, respectively, to be transferred from a mix of SHARP and CC-5's nominees to Wintercap in the names of three different SHARP nominees in free-trading form.

75.     Beginning no later than in or about May 2016, VELDHUIS or a co-conspirator caused Wintercap to begin selling hundreds of thousands of STVF shares. In or about July 2016, during the period Wintercap was selling STVF shares, the company underwent a one-for-ten reverse stock split (meaning that it replaced every ten existing shares with one new share) and changed its name to Vitality and its stock symbol to VBIO.

76.     Beginning no later than in or about September 2016 and continuing through no earlier than in or about October 2017, VELDHUIS or a co-conspirator caused Wintercap to wire hundreds of thousands of dollars to a media company ("Media Company 1") for the purpose of promoting VBIO to investors.

24

A3530

77.    For example, on or about February 1, 2017, SEXTON or a co-conspirator sent an xmail message to CC-4 requesting that $50,000 be sent by wire transfer to Media Company 1, adding that the wire should be charged to the VBIO account in the Q system. VELDHUIS responded that same day with the message "approved."

78.    Wintercap debited the media company payments from the accounts of SHARP nominees who were selling VBIO shares on behalf of the VELDHUIS Control Group.

79.    Media Company 1, in turn, arranged for other media companies, including Media Company 2, to draft and publish promotional materials touting VBIO to investors.

80.    Media Company 2, in turn, sent out email blasts touting VBIO, including on or about December 14, 2016 to a prospective investor in Massachusetts who purchased VBIO shares as a result.

81.    Between in or about January and May 2016, SEXTON, with CC-2's knowledge and participation, orchestrated the execution of private securities purchase agreements between Vitality and multiple SHARP nominees. Pursuant to the purchase agreements, the SHARP nominees initially acquired 2.65 million VBIO shares in aggregate (on a post-split basis), with warrants providing the opportunity to purchase an additional 7.95 million VBIO shares in aggregate (on a post-split basis) over the ensuing six months. The initial 2.65 million VBIO shares equaled approximately 25 percent of Vitality's then-outstanding shares. All of the VBIO shares and warrants were under the VELDHUIS Control Group's common control. Neither VELDHUIS, nor SEXTON, nor CC-3 publicly reported their beneficial interest in the shares as they were required to do under applicable securities laws and regulations.

A3531

82.    Beginning in or about October 2016, and on numerous occasions through in or about August 2018, KELLN engaged an attorney to issue opinion letters falsely representing that the SHARP nominees that had purchased VBIO shares were not affiliates of Vitality.

83.    On or about August 7, 2018, in connection with obtaining two such opinion letters for SHARP nominees, KELLN sent an email to KNOX and TARGETT-ADAMS requesting paperwork related to the nominees, which KELLN said she needed in order to "sen[d] … VBIO shares in for legend removal."

84.    Between in or about November 2016 and on or about January 19, 2018, KELLN caused over 8.1 million VBIO shares to be transferred to Wintercap in the names of eight different SHARP nominees.

85.    Wintercap, in turn, deposited each block of shares with a broker, and each transfer and deposit was in an amount under five percent of Vitality's then-total outstanding shares.

86.    In or about February 2017, KELLN recognized that one of the Wintercap deposits would push the SHARP nominee's holdings over five percent based on shares not yet sold by Wintercap in that nominee's name.  KELLN directed Wintercap in an encrypted messages to "Pls make sure to allocate all Vbio sales to [that nominee's] account today. We need to make room for the pending 750k."  KELLN then added, "Again 5% rule is biting me ass."

87.    On or about May 5, 2017, in connection with Wintercap's deposit of one of the blocks of VBIO shares, Knox made false and misleading written representations to a broker, including that the shareholder did not own five or more percent of Vitality's shares.

26

A3532

88.     On or about June 23, 2017, VELDHUIS alerted Wintercap in an encrypted message that "1,800,000 VBIO on its way."  Targett-Adams asked if KELLN was "going to send us docs," to which VELDHUIS responded "Yes."

89.     KELLN confirmed that same day in a separate encrypted message that "U will have tons of VBIO coming at you next week."

90.     Later in June and in July 2017, KELLN caused approximately 1.79 million shares to be transferred to Wintercap in the names of three SHARP nominees.

91.     Between in or about May 2016 and on or about September 24, 2018, VELDHUIS or a co-conspirator used encrypted messages to cause Wintercap to sell more than 1.2 million STVF shares and more than nine million VBIO shares (on a post-split basis), generating more than $17 million in illicit proceeds.

92.     On or about February 10, 2017, SEXTON sent an xmail message to CC-4, with a copy to SHARP, requesting a wire transfer in the amount of $139,200 to a bank in the United States for an account associated with a mortgage loan servicer.  SEXTON stated, "I need to make a lump sum payment to the mortgage for Palm Springs."

93.     Later in or about February 2017, Wintercap wired $139,200 to the mortgage loan servicer, which credited the payment against a mortgage in SEXTON's name.  Wintercap debited the funds from the account of a SHARP nominee that had been selling VBIO shares in January and early February 2017.

94.     On or about November 22, 2017, SEXTON or a co-conspirator sent an xmail message to CC-4 requesting a wire transfer in the amount of $85,000 to a university foundation for CC-2's benefit, adding that the wire should be charged to the VBIO account in the Q system.

A3533

95.     That same day, CC-4 sent an xmail message to SHARP, requesting SHARP's approval of the wire to the university foundation.  The following day, SHARP suggested that CC-4 change the format of the documentation supporting the wire request and then directed CC-4 to send the wire request to Wintercap.

96.     Later in or about November 2017, Wintercap wired $85,000 to the university foundation and debited the funds from a SHARP nominee's account.

97.     On or about November 6, 2017, VELDHUIS sent an xmail message to SEXTON, with a copy to CC-3, containing a draft article touting VBIO that was to be published on a financial news website.  VELDHUIS wrote that the material needed "approval by you and the company before we can go live with the campaign."

98.     On or about November 7, 2017, SEXTON sent an xmail message to VELDHUIS, with a copy to CC-3, containing SEXTON's edits on the draft article.

99.     On or about August 9, 2018, VELDHUIS sent an xmail message to CC-3, stating that he "would like three emails written" on VBIO, which would become an "e-mail series." VELDHUIS explained that the first email should "Announce VBIO as the 2018 BioTech [Marijuana] pick of the year."

100.     On or about August 9, 2018, VELDHUIS sent an xmail message to CC-4, with a copy to SEXTON or a co-conspirator, requesting that a wire transfer in the amount of $50,000 be sent to a media company to pay for an advertising campaign, adding that the wire should be charged to the VBIO account in the Q system.

101.     On or about August 22, 2018 and August 23, 2018, CC-3 sent draft promotional emails to VELDHUIS and SEXTON, respectively, via xmail messages.

102.    On or about January 8, 2019, SEXTON or a co-conspirator sent an xmail message to SHARP and CC-4 requesting that a wire transfer in the amount of $50,000 be sent to MEDIA COMPANY 1, adding that the wire should be charged to the VBIO account in the Q system.

103.    On or about August 29, 2019, during sworn testimony to the SEC, CC-2 made multiple false and misleading statements for the purpose of concealing the scheme, including that CC-2 never received proceeds from the sale of VBIO shares and that he was unaware of anyone who had sold VBIO shares.

104.    Following CC-2's testimony, CC-2 conferred with SEXTON about payments sent to third parties on CC-2's behalf from the proceeds of the VELDHUIS Control Group's illicit stock sales.  SEXTON showed CC-2 a spreadsheet identifying hundreds of thousands of dollars of such payments.

105.    On or about July 30, 2020, during a second round of sworn testimony to the SEC, and for the purpose of concealing the scheme, CC-2 falsely testified that hundreds of thousands of dollars that had been distributed to a third party for the care of CC-2's daughter in 2016 and 2017 had been provided by SEXTON pursuant to a loan.  CC-2 also falsely testified that the $85,000 paid in November 2017 to a university foundation on behalf of CC-2 was a donation by SEXTON. In truth, the payments were distributions from CC-2's portion of the VELDHUIS Control Group's illicit stock sale proceeds.

A3535

<u>COUNT ONE</u>
Conspiracy to Commit Securities Fraud
(18 U.S.C. § 371)

The Grand Jury charges:

106.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 70 of this Indictment.

107.    From in or about 2014 through in or about November 2018, in the District of Massachusetts and elsewhere, the defendants,

> (1) FREDERICK L. SHARP,
> (2) LUIS CARRILLO, and
> (5) COURTNEY M. KELLN,

conspired with others known and unknown to the Grand Jury to commit an offense against the United States, specifically securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, that is, to knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the SEC, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit in connection

A3536

with the purchase and sale of securities, to wit, shares of Pure Snax International Inc., Garmatex

Holdings, Ltd., and OneLife Technologies Corp., among others.

    All in violation of Title 18, United States Code, Section 371.

A3537

<u>COUNT TWO</u>
Conspiracy to Commit Securities Fraud
(18 U.S.C. § 371)

The Grand Jury further charges:

108.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 31 and 71 through 105 of this Indictment.

109.    From in or about 2012 through in or about July 2020, in the District of Massachusetts and elsewhere, the defendants,

> (1) FREDERICK L. SHARP,
> (3) MIKE K.G. VELDHUIS,
> (4) PAUL SEXTON, and
> (5) COURTNEY M. KELLN,

conspired with others known and unknown to the Grand Jury to commit an offense against the United States, specifically securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, that is, to knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the SEC, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit in connection

A3538

with the purchase and sale of securities, to wit, shares of Vitality Biopharma, Inc. f/k/a Stevia First Corp., among others.

    All in violation of Title 18, United States Code, Section 371.

A3539

## COUNT THREE
### Securities Fraud
(15 U.S.C. §§ 78j(b) and 78ff(a); 17 C.F.R. §§ 240.10b-5; 18 U.S.C. § 2)

The Grand Jury further charges:

110.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 70 of this Indictment.

111.    From in or about 2014 through in or about November 2018, in the District of Massachusetts and elsewhere, the defendants,

> (1) FREDERICK L. SHARP,
> (2) LUIS CARRILLO, and
> (5) COURTNEY M. KELLN,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the SEC, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon any person in connection with the purchase and sale of securities, to wit, shares of Pure Snax International Inc., Garmatex Holdings, Ltd., and OneLife Technologies Corp., among others.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

34

A3540

COUNT FOUR
Securities Fraud
(15 U.S.C. §§ 78j(b) and 78ff(a); 17 C.F.R. §§ 240.10b-5; 18 U.S.C. § 2)

The Grand Jury further charges:

112.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 31 and 71 through 105 of this Indictment.

113.    From in or about 2012 through in or about July 2020, in the District of Massachusetts and elsewhere, the defendants,

(1) FREDERICK L. SHARP,
(3) MIKE K.G. VELDHUIS,
(4) PAUL SEXTON, and
(5) COURTNEY M. KELLN,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the SEC, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon any person in connection with the purchase and sale of securities, to wit, shares of Vitality Biopharma, Inc. f/k/a Stevia First Corp., among others.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

A3541

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

114.    Upon conviction of one or more of the offenses set forth in Counts One through Four, the defendants,

(1) FREDERICK L. SHARP,
(2) LUIS CARRILLO,
(3) MIKE K.G. VELDHUIS,
(4) PAUL SEXTON, and
(5) COURTNEY M. KELLN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

115.    If any of the property described in Paragraph 114, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 114 above.

36

A3542

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

States Code, Section 2461(c).


                                        A TRUE BILL


                                        _____
                                        FOREPERSON



_____
JAMES R. DRABICK
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS


District of Massachusetts: January __9__, 2024
Returned into the District Court by the Grand Jurors and filed.


                                        /s/Douglas Warnock
                                        _____
                                        DEPUTY CLERK          2:25 PM

A3543

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

        v.

Frederick L. Sharp, *et al.*,

    Defendants.

Case No. 1:21-cv-11276-WGY

## <u>DEFENDANT PAUL SEXTON'S MOTION FOR STAY</u>

Defendant Paul Sexton moves to stay this matter until the conclusion of the parallel criminal proceedings. As reflected in the recent filing by Defendants Mike Veldhuis and Courtney Kelln, Mr. Sexton was recently indicted in a criminal case that is substantially similar to this case. *See* ECF No. 457. Although Mr. Sexton has opposed the Securities and Exchange Commission's motion for remedies, his ability to mount a defense is substantially constrained given that he is under indictment in a parallel matter, in which he is asserting his Fifth Amendment rights. *See* ECF No. 454 at 3. In support of this motion, Mr. Sexton joins in and incorporates the arguments made by Mr. Veldhuis and Ms. Kelln. *See* ECF Nos. 280-82, 286, 421-23, 456-58.

Prior to filing this motion, Mr. Sexton conferred with counsel for the Securities and Exchange Commission. The Securities and Exchange Commission opposes the relief sought herein.

1

A3544

Respectfully submitted,

/s/ Neil T. Smith

Neil T. Smith (BBO# 651157)
    Neil.Smith@klgates.com
K&L Gates LLP
One Congress Street
Suite 2900
Boston, MA 02114
Tel:  (617) 261-3100
Fax:  (617) 261-3175

/s/ Stephen G. Topetzes

Stephen G. Topetzes*
      Stephen.Topetzes@klgates.com
Robert S. Silverblatt*
      Rob.Silverblatt@klgates.com
K&L Gates LLP
1601 K St. NW
Washington, DC 20006
Tel:  (202) 778-9328
Fax:  (202) 778-9100

*Admitted pro hac vice

Counsel for Paul Sexton

Dated: February 20, 2024

A3545

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on February 20, 2024, and a copy thereof will be sent electronically to the registered recipients and counsel of record as identified on the Notice of Electronic Filing.

<u>/s/ Neil T. Smith</u>

Neil T. Smith

A3546

| 02/20/2024 | 460 | Judge William G. Young: ELECTRONIC ORDER entered denying re 456 MOTION for Reconsideration filed by Mike K. Veldhuis, Courtney Kelln (Paine, Matthew) (Entered: 02/20/2024) |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | ¶: | |
| COMMISSION, | ¶ | |
| | ¶: | |
| Plaintiff, | ¶ | No. 1:21-cv-11276-WGY |
| | ¶ | |
| v. | ¶: | |
| | ¶: | |
| YVONNE GASARCH, *et al.* | ¶: | |
| | ¶: | |
| Defendants. | ¶: | |

**DEFENDANT YVONNE GASARCH'S OPPOSITION TO SEC'S REMEDIES MOTION**

In what can only be described as a "money grab" supported by neither the evidence nor the law, the SEC asks this Court to order defendant Yvonne Gasarch ("Mrs. Gasarch") to pay $3,726,805 in disgorgement, prejudgment interest and civil penalties. *See* D.E. 425-2. The SEC also seeks broad and permanent injunctive relief against Mrs. Gasarch. *Id.* As set forth below, there are a multitude of reasons why this Court must deny the SEC relief it requests.

    **I.**      **FACTUAL BACGROUND**

        A.   <u>The Verdict Against Mrs. Gasarch</u>

As an initial matter, the SEC misrepresents the jury's verdict in this matter. The SEC asserts that the jury found Mrs. Gasarch "liable for violating Section 17(a)(3) of the Securities Act and aiding and abetting violations of Sections 17(a)(1) **and** (3) of the Securities Act **and** Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act." (SEC Remedies Motion, D.E. 425, p. 2) (emphasis added). The jury verdict in this case specifically found Mrs. Gasarch liable under Section 17(a)(3) and aiding and abetting "Sections 17(a)(1), 17(a)(3) of the Securities Act of 1933, **or** Section 10(b) of the Securities Exchange Act of 1934 and Rule  or Section 10b—5(a)

1

A3548

and (c)…" (D.E. 402) (emphasis added).  Thus, the jury verdict can be read as finding Mrs.

Gasarch liable only under Section 17(a)(3) - - as a primary violator and aider/abettor to others'

violations.  As the Court knows, Section 17(a)(3) is **not** a scienter-based violation.   Thus, the

SEC's remedies motion rests on a faulty premise.

B.  Relief Sought Based Entirely On Unreliable/Unverified Q Data

As the Court knows, the SEC's request for disgorgement from Mrs. Gasarch is based

entirely on a "summary chart" pulled from Q system data that captures transactions in accounts

(labeled presumably by Sharp) as "PEAC" or "PERE."  (Trial Exhibit 312).  Curiously, not one

witness testified that Mrs. Gasarch ever went by the code name "PEAC" or "PERE," only that

her signature appeared on documents establishing her alleged nominal ownership in these

entities.   Instead, every witness testified that Mrs. Gasarch was referred to as "WIRES."

Nowhere in the SEC accountant's summary charts does "WIRES" appear.  This is in contrast to

the other defendants - - referred to consistently as "ACCO" (Veldhuis); HEAR (Sexton); GARD

(Friesen) and CELT/CEL1 (later ESQ/ESQ1).  (Ryan Murphy Aff., para. 8).

While Mrs. Gasarch understands that the Court admitted the Q System data at trial on the

basis of the "coconspirator hearsay exception,"[1] it is now the Court's duty to examine the data

and decide whether it can be used to support the SEC's very specific disgorgement claims.  The

Court has not found that the Q data is independently reliable (as would be necessary if the Court

admitted the records under the "business records" exception).  There was not a single witness at

trial who could testify to Sharp keeping accurate and contemporaneous records.   In fact, Roger

Knox testified that Sharp often kept false records in the Q system in order to benefit himself.

_____

[1]      Mrs. Gasarch incorporates by reference her motion to strike evidence admitted pursuant
to this hearsay exception, the arguments in her motions for directed verdict that the Q system
cannot support the verdict as well as other defendants' motions to preclude reliance on the Q
system.

A3549

And there is a complete lack of verification of the Q data as it relates to Mrs. Gasarch. The SEC has presented literally **no** bank records of Custom House or Sharp that show the amounts reflected in the Q system going to Ms. Gasarch. Nor has the SEC - - despite investigating this case for many, many years and having an agent review over a million documents – presented any evidence of Mrs. Gasarch's bank records. Unlike with the other defendants where the SEC found at least some brokerage and transfer records to verify some entries in the Q system, as it relates to Mrs. Gasarch, there are **none**. (See Murphy trial testimony, pp. 126-127). As Mr. Murphy admitted in his trial testimony, he never reviewed bank records for PEAC or PERE, and he reviewed no records that showed money flowing out of Corporate House to Mrs. Gasarch. (*Id*, pp. 123-124).

Perhaps in recognition of the lack of evidence to establish that Mrs. Gasarch received funds from any alleged unlawful transaction, the accountant now points to a piece of "evidence" not introduced at trial: a BSi record that references a 1/25/13 payment to Yvonne Chen in the amount of $9,050.00. (D.E. 377-34). Also, there is a wire transfer document that references a $49,861.10 transfer to W&B Riding Club from 1/2/2019. There is a corresponding Q entry which dates the transaction as of 2/1/2019 is an amount of $49,991.10. Thus, the Q system entry is not accurate. Moreover, as Mr. Knox testified, Mr. Sharp had separate business/real estate deals with Mrs. Gasarch's husband unrelated to stock transactions. The third and final "tie-in" to the Q system is Exhibit 287 which was a payment to Sun Life Assurance company for Mrs. Gasarch.

But even assuming these are **three** examples of the Q system somewhat matching external records, the number of entries in the summary chart is **832**.[2] Moreover, all the

---

[2]   Attached as Exhibit 1 is Trial Exhibit 312, the Q system data "attributed" by the accountant to Mrs. Gasarch, which has been converted to an Excel file for purposes of numbering the entries.

A3550

testimony supported that Mr. Sharp had strict control over "commissions" - - why does the SEC accountant assume that "commissions" or "internal transfers" from the PEAC/PERE accounts went to Mrs. Gasarch and not Sharp himself or others?   It is unclear why he simply deems "PEAC" and "PERE" as Mrs. Gasarch's "personal" accounts in Q.  Moreover, there are very specific entries in Exhibit 312 that reference alleged payments/wires to Mrs. Gasarch by name - - why would that be necessary if all PEAC/PERE transactions were monetary distributions to her?

Perhaps most tellingly, the SEC never sets forth the allegedly fraudulent stock sales to which the alleged payments from the PEAC/PERE accounts relate.  Mr. Knox testified that Mr. Sharp (like Knox himself) was involved in legitimate business transactions.  There was no evidence that PEAC/PERE served as a nominee company in only allegedly fraudulent stock sales.  Moreover, Mr. Knox testified that Mr. Sharp paid Mrs. Gasarch's salary out of various accounts and there is no way in which to attribute which or how much of the salary payments and/or bonuses made to Mrs. Gasarch relate to an allegedly fraudulent stock sale.  The SEC acknowledges that unlike Mrs. Kellen whom the Q records show received portions of commissions (split between herself and Mr. Sharp), there was no such allocation for Mrs. Gasarch.  Instead, the decision of when and what amount to pay Mrs. Gasarch appears to be entirely in the discretion of Mr. Sharp.

To the extent that the SEC could establish payments to Mrs. Gasarch (which, as set forth above, it cannot), it does not even attempt to factor out the work on "legitimate" deals done over the course of Mrs. Gasarch's lengthy employment.  Indeed, given the paucity of evidence against Mrs. Gasarch presented at trial - - including the facts that all witnesses did not even know who she was and/or what she knew and that she was "excluded" from the group's  elaborate "parties" where the details were discussed and from the encrypted discussions on Threema- - it should be

4

A3551

assumed that the vast majority of Mrs. Gasarch's services were performed on legitimate Custom House business dealings.

**II.**     **LEGAL ARGUMENT**

    A.     The General Legal Framework

The general statutory framework governing the SEC's entitlement to monetary and injunctive relief it seeks against Mrs. Gasarch is set out in 15 U.S.C. §78u ("Investigations and actions"). Pursuant to Section 78u(d)(5), the Commission "may seek…any equitable relief that may be appropriate or necessary for the benefit of investors." Pursuant to Section 78u(d)(3)(A)(i), the Commission may seek "upon a proper showing, a civil penalty to be paid by the person who committed such violation…." The amount of penalty to be assessed is set out in various "tiers" under Section 78u(d)(3)(B). Moreover, the Commission may seek disgorgement under Section 78u(d)(7) from "the person who received such unjust enrichment as a result of the violation." Section 78u(d)(3)(A)(ii). As the SEC acknowledges, it has the burden to show by a "preponderance of the evidence" that the remedies it seeks are appropriate. (D.E. 426, p. 2). *See Steadman v. SEC*, 450 U.S. 91, 103 (1981).

    B.     The SEC Has Not Met Its Burden To Establish Disgorgement

Pursuant to *United States v. Liu*, 140 S.Ct. 1936, 1940 (2020): "[A] disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." The SEC has failed in presenting evidence to establish Mrs. Gasarch's "net profits." Further, it points to no "victims" to which any disgorgement award could be directed because it cannot even, at a minimum, relate any alleged payments to Mrs. Gasarch to any of the alleged fraudulent stock transactions in the fourteen companies.

    1.     The SEC Has No Documentary Evidence To Corroborate Its Disgorgement Claim

5

As the Court Is aware, the SEC investigation lasted several years during which Agent Beckstrom testified that he reviewed approximately one million documents. Yet, unlike the case with other defendants where deals and profits and commissions were discussed, there was <u>not one</u> document presented to show that Mrs. Gasarch sought (or received) proceeds from any alleged illegal stock transaction. Moreover, despite claiming that any Q entries listing "PEAC" and "PERE" were Mrs. Gasarch's "personal accounts" in Q, the SEC accountant candidly admitted that he "did not look at any bank records" in arriving at the disgorgement calculations. (D.E. 442, p. 150). Moreover, he admitted: "I do not know who got the cash." (Id., pp. 156-157.) Yet the SEC wants the Court to find by a preponderance of the evidence that the disgorgement number for Mrs. Gasarch exceeds $2.5 million. There literally is no credible basis for the Court to do so.

In other cases where the SEC has obtained disgorgement against an alleged wrongdoer, it has presented bank records to show at least a "reasonable approximation" of net profit. For example, in *SEC v. Tropikgadget FZE*, 146 F.Supp.3d 270, 281 (D. Mass. 2015), the court awarded the SEC disgorgement based on its accountant's review and analysis of the wrongdoer's bank records. *See also SEC v. Spongetech Delivery Sys., Inc.*, 2015 U.S. Dist. LEXIS 134138, *7-8 (E.D.N.Y. 2015) (finding disgorgement appropriate based on bank deposit records); *SEC v. Bass*, 2012 U.S. Dist. LEXIS 153900, * 7 (N.D.N.Y. 2012) (ordering disgorgement based on SEC's presentation of comprehensive listing of Defendants' bank account activity involving investor funds"). Here, the SEC is asking the Court to order over $2.5 million in disgorgement against Mrs. Gasarch without any showing - - let alone by a preponderance of the evidence - - that she received any money as a result of allegedly fraudulent stock transactions. The Court must deny the disgorgement request.

6

2.  <u>The Court Should Not Rely On the Q System To Order Disgorgement</u>

Without re-litigating the question of whether the Court properly admitted the entirety of the Q system and all of its entries as evidence based on the co-conspirator hearsay exception (though, of course, maintaining her objections to such), Mrs. Gasarch asserts that the SEC's reliance on entries in the Q system to establish disgorgement is simply untenable.  In order to come to a finding that disgorgement is appropriate and equals over $2.5 million dollars, the Court necessarily must find by a preponderance that the "PEAC" and "PERE" entries in the Q system are entirely attributable to Mrs. Gasarch, accurately reflect monetary disbursements to her and can be tied to any or all of the fourteen companies that allegedly were involved in securities violations.

As set forth above, although the SEC's accountant blithely states that Mrs. Gasarch "is" "PEAC" and "PERE" in the Q system, he fails to state how he comes to this conclusion.  He was candid in that he did not review PEAC or PERE bank records.  He did not review any Custom House/Sharp bank records <u>at all</u>.  He did not review any of Mrs. Gasarch's bank records (despite the SEC having investigated the case for many years and freezing Mrs. Gasarch's assets, including financial accounts).  He could not even say who received any of the money from cash distributions.  The SEC "assuming" that all of these entries relate to Mrs. Gasarch does not meet its evidentiary burden.

Moreover, there are very few entries in the Q system that specifically attribute payments/transfers to Mrs. Gasarch.  *See* Exhibit 1 hereto and specifically entries:  36; 161; 187; 206; 243; 248; 255; 264; 275; 277; 285; 291; 302; 319; 327; 340; 349; 350; 364; 373; 378; 387; 388; 404; 405; 472; 643; 698; 774 (referencing Mrs. Gasarch).  See also entries:  778 (reflecting wire to Sun Life); 813 (reflecting wire to W&B Riding Club).  In contrast to these entries, Mrs.

7

A3554

Gasarch refers to the following entries as examples which, on their face, do not appear to be distributions to Mrs. Gasarch (of course, there is no documentary evidence or witness testimony concerning any specific entries period):  157 ("Pershing TT"); 215 ("Pershing TT"); 426 ("Renewal Ref. #2504"); 422 ("Andrew Kaplan TT"); 488 ("Xphone dividend"); 496 ("Receiver General");; 521 ("Receiver General"); 544 ("PTAE Annual Dues"); 570 ("Andrew TT"); 592 ("Aim Capital TT"); 602 ("Aim Capital TT"); 759 ("Internal Transfer Bevendale 2 %").  Yet all of these entries (and others were there is zero proof that they are attributable to Mrs. Gasarch) have been included in the SEC's disgorgement figure.  This is not a "reasonable approximation" of Mrs. Gasarch's "net profits" in any way, shape or form.

The SEC is happy to make assumptions not based on any evidence and asks the Court to assess a huge disgorgement figure based on these assumptions.  But the Court should find that the Q system entries are not a reliable indicator of any distributions to Mrs. Gasarch and deny the SEC's disgorgement request based solely on these Q system entries.  After all, the Court has specifically <u>not</u> admitted the Q system (and its entries) as business records (which would require a finding of reliability).  And as the First Circuit has stated about the co-conspirator hearsay exception:  "the underlying co-conspirator exception to the hearsay rule makes little sense as a matter of evidence policy.  No special guarantee of reliability attends such statements, save to the extent that they resemble declarations against interest. The exception derives from agency law, an analogy that is useful in some contexts but (as the Advisory Committee noted) is 'at best a fiction' here." *United States v. Goldberg*, 105 F.3d 770, 775 (1st Cir. 1997).  The Court should not be asked to assess a $2.5million disgorgement amount on unreliable and unverified data.

   3.  <u>The SEC Has Not Tied Disgorgement To Securities Laws Violations</u>

The SEC's request for disgorgement fails for another simple reason:  the SEC does not tie

A3555

any of the payments it alleged went to Mrs. Gasarch to any particular security violation. In fact, the SEC does not even attempt to do so. Nowhere in its papers does it state which of the 14 companies allegedly involved in securities fraud contributed to the alleged disbursements to Mrs. Gasarch. In fact, in its Memorandum, the SEC's request for disgorgement against Mrs. Gasarch is but <u>one</u> paragraph that does not even attempt to link the entries in the "summary chart" for disgorgement to a <u>single</u> securities violation.

The SEC has a major problem in attempting to do so. First, as Roger Knox testified:

Q:    So there were cases in which Silverton engaged in legitimate stock transactions, is that correct?

A.    That is correct.

Q:    And to your knowledge…were there any occasions where Fred Sharp was Engaged in legitimate stock transactions?

A:    To my knowledge, there were occasions.

(D.E. 440; pp. 67-68).

Second, as Mr. Knox testified that he did not know what Mrs. Gasarch knew regarding the alleged securities violations. (D.E. 441, p. 40).

Third, as the SEC itself must admit, unlike Courtney Kellen who split commissions with Mr. Sharp, there was no "standard" for the payments to Mrs. Gasarch. And though there are entries in the Q labeled "commissions" (without evidence as to whom the commissions were paid), Mr. Knox testified that Mrs. Gasarch, unlike the other defendants, never directed the buying and selling of securities. Moreover, PEAC and PERE were accounts controlled solely by Mr. Sharp.  (*Id.*, pp. 30-31).

9

A3556

The SEC has not attempted to tie any alleged payments to Mrs. Gasarch to underlying securities violations.  Obviously, Mrs. Gasarch was a long-term employee and would be entitled to salary and whatever bonuses determined by Mr. Sharp.  Clearly, given the length of time and the number of accounts and activities, Mrs. Gasarch was compensated for supporting Mr. Sharp in his legitimate business activities.  Because the SEC has not tied any specific fraud to any specific payment to Mrs. Gasarch, the SEC is not entitled to disgorge any payments made to her.  See  *SEC v. Lemelson*, 596 F. Supp. 3d 227(D. Mass. 2022).  In *Lemelson*, Judge Saris refused to order disgorgement after finding that the SEC did not meet its burden:  "In order to establish a proper disgorgement amount, the party seeking disgorgement must distinguish between the legally and illegally derived profits."  Id. at 237-38.

The cases discussing disgorgement of salary and bonuses are clear:  any salary or bonus payments must be causally connected to securities fraud.  See, e.g., *SEC v. E-Smart Techs, Inc*., 139 F.Supp.3d 170, 189 (D.D.C. 2015) ("A defendant may certainly be ordered to disgorge salary payments when such payments are tied to unlawful act." ).  In *E-Smart*, the court denied the SEC's attempt to disgorge an employee's salary.  The court noted that it is the SEC's burden to "reasonably approximate profits and tie those profits to benefits received by [the employee]."  See also SEC v. Chapman, 826 F.2d 847, 859 (D. Md.) (denying SEC's request for disgorgement where "[t]he SEC has not shown a causal relationship between [defendant's] salary and bonuses and the fraud.").  Moreover, the case law is clear that disgorgement cannot be based on speculation.  *See SEC v. Mapp*, 2018 U.S. Dist. 125352, *21 (E.D. Tx. 2018).

4.    The SEC Admits That The Disgorgement It Seeks Is Not For The Benefit of Investors

Contrary to the clear holding of Liu, the SEC does not even attempt to argue that the

A3557

claimed disgorgement amount will be "awarded for victims." After charging securities

violations <u>related to fourteen companies and having a jury trial on same</u>, the SEC now states that:

> Developing a list of the investors who were harmed by the conduct of
> Veldhuis, Sexton and Friesen is a more discrete task than developing a
> list of investors harmed by the conduct of Kelln and Gasarch, whose misconduct
> on behalf of additional Sharp Group clients involved a far larger group of
> securities. Whereas disgorgement collected from Veldhuis, Sexton and Friesen
> may be distributed to investors in the Fourteen Issuers' securities, further analysis
> is warranted to determine whether disgorgement from Kelln and Gasarch could
> potentially be divided among the investors in the over 200 securities that were
> traded by Sharp Group clients during the 10-year disgorgement period. The
> Commission *will conduct further analysis* to determine whether meaningful
> payments may be made to harmed investors in some or all of these securities.

(SEC Memorandum, D.E. 46, p. 22).

Undersigned counsel is unaware of any statute or case law that allows the SEC to charge

specific conduct in a Complaint, try a case on that specific conduct, and then at some (unknown)

point in the future, "consider" or "look into" whether disgorgement based on a finding of liability

in this current case can instead be determined based on the "analysis" of the SEC of other

transactions. Obviously, the Supreme Court has held that disgorgement is punitive in nature and

allowing this cockamamie theory of the SEC would violate Mrs. Gasarch's due process rights.

Not to mention the practical issue that the SEC has been working on this case for many, many

years, and now is the time for them to present their proof. It is absolutely astounding that it fails

to do so. *See, e.g., Lemelson*, 596 F.Supp.3d 227, 238 (denying disgorgement based, in part, on

SEC's "lack of adequate discussion of victims…"). Without tying the $2.5million to any

securities violation alleged in the Complaint or to any identifiable victim, the SEC is not entitled

to disgorgement at all.

    5. <u>Disgorgement Is Time-Barred</u>

This Court held in its opinion on the Motions to Dismiss that the NDAA extended the

A3558

relevant statute of limitations to ten years for "scienter-based claims for disgorgement…"  SEC

v. Sharp, 628 F.3d 345, 381 (D. Mass. 2022).  "Non-scienter based claims for disgorgement

continue to require a five-year statut3e of limitations under the NDAA."[3]

As set forth above, the jury found Mrs. Gasarch liable for violating Section 17(a)(3) of

the Securities Act and for aiding and abetting others in violation of Section 17(a)(1), Section

17(a)(3) **or** Section 10(b) and Rule 10-b-5.  B.  Section 17(a)(3) is a non-scienter based claim, as

it can be found on a showing of mere negligence.  And, as this Court instructed the jury, any

person who aids and abets a violation "shall be deemed to be in violation of such provision to the

same extent as the person to whom such assistance is provided."  D.E. 426-1.   In a related case,

the SEC has admitted - - and the district court so found  - - that Section 17(a)(3) provides for a

five-year period for disgorgement.  *See SEC v. Stubos*, 634 F.Supp.3d 174, 194 (S.D.N.Y.

2022).[4]

Here, the jury was not instructed to find that the claims against Mrs. Gasarch were within

a five-year statute of limitations.  Because the five years is relevant for remedies purposes, this

Court can order disgorgement only based on alleged securities violations committed by Mrs.

Gasarch on or after August 5, 2016 (five years prior to filing of Complaint).

The SEC points to no specific disbursements linked to securities violations after August 6, 2016.

Nor does it identify any "victims" harmed on or after August 6, 2016.  As such, the SEC cannot

make out a case for disgorgement.

To the extent that the Court finds that there are distributions made to Mrs. Gasarch based

on violations after August 6, 2016 (which, as argued throughout this opposition, it should not),

---

[4]      As the Court may recall, Mr. Stubos was on the SEC's witness list but the SEC declined
to call him at trial.

12

A3559

the Court should be aware that in the SEC accountant's "summary chart," the entries post-dating August 6, 2016, run from numbers 671 – 832. Thus, the Court should not consider any entries pre-dating August 6, 2016 (i.e., entries 1-670). *See* Exhibit 1, appended hereto.

In conclusion regarding disgorgement, there are a multitude of reasons why this Court should deny the SEC's request for disgorgement. Moreover, because there is no disgorgement that should be ordered, no prejudgment interest should be assessed. *See SEC v. Sargent*, 329 F.3d 34, 41 (upholding denial of prejudgment interest).

B. <u>This Court Should Not Assess Penalties Against Mrs. Gasarch</u>

As with the case of non-scienter based claims, civil penalties are subject to a five year statute of limitations. *See Sharp*, 626 F,Supp.3d at 382 ("The applicable limitations period thus runs from August 5, 2016 to August 5, 2021 for civil penalties and non-scienter-based disgorgement claims."). The only specific transaction cited by the SEC falling within that time period is that there were four "rounds" of fraudulent stock sales relating to Stevia First/Vitality from 2012-2018. (SEC Memorandum, D.E. 426, p. 10). Here, the Court would need to find that any Section 17(a)(3) violation of Mrs. Gasarch's (either primarily or as an aider/abettor) occurred on or after August 5, 2016. It is unclear from the SEC's papers which company's stock and which transactions post-dating August 5, 2016, are violations on Mrs. Gasarch's part. As the Court stated during the charging conference: "So let me be clear. If we get to remedies…and I think that [a] violation was pre=August 2016, then I cannot impose a monetary penalty." (D.E. 443, p. 55). Without proof of a violation post-dating August 5, 2016, the SEC's request for penalties should be denied.

Even if the SEC were to establish a timely violation (which it has not), the penalties it seeks are not congruent with the principles governing the award of penalties. Pursuant to 15

13

A3560

U.S.C. § 17(d)(3)(B)(i): the court determines the penalty "in light of the facts and circumstances." First, in comparison to other defendants, it is clear that Mrs. Gasarch was not responsible for concealing ownership of more than five percent in any company nor for any part of the alleged "pump and dump." If anything, she was asked to distribute proceeds for clients - - just as she would for clients in legitimate stock transactions. It was clear from the testimony that Mr. Sharp was responsible for the transactions at issue, and took great care to conceal any wrongdoing. Moreover, no one testified that Mr. Sharp was known to be a fraudster – in fact, Mr. Nikolayev, another long-term associate of Mr. Sharp, testified that Mr. Sharp represented himself as a lawyer. Finally, Mrs. Gasarch was alleged to have worked for Sharp for many, many years and yet the SEC introduced scant written exhibits against her and the testimony established that she was not an integral part of the "scheme."

"In assessing the appropriate civil monetary penalty, courts have considered the following factors: (1) the egregiousness of the defendant's violations; (2) the level of scienter involved; (3) the repeated nature of the violations; (4) the defendant's willingness to admit his wrongdoing; (5) the losses or risk of loss the defendant's misconduct caused to others; (6) the defendant's cooperation and honesty with the authorities, and (7) the defendant's current and future financial situation." *SEC v. Bajic*, 2023 U.S. Dist. LEXIS 172978, * 13 (S.D.N.Y. 2023) (internal quotations and citations omitted). Based on the factors set forth above and the verdict that can only "safely" said to be based on negligent violations, Mrs. Gasarch asserts that the SEC's seeking two third-tier penalties and one second-tier penalty in the amount of $558,072 is excessive. First, the jury did not find three separate violations as the aiding and abetting violation could have been based on one underlying violation. Second, when Mrs. Gasarch was distributing proceeds, the "fraud" in the purchase or sale of securities had already occurred.

14

A3561

There was no showing that she was responsible for hiding information from investors or engaging in "pump and dump" activities. Finally, Mrs. Gasarch's current financial situation is not a good one. She is caring for her triplets. She is unable to find meaningful employment because of the publicity this case has generated. Indeed, after the trial, the Vancouver Sun published an article with a headline that Mrs. Gasarch had been found "guilty" in United States civil court for a "1.3 billion stock fraud." BC residents found guilty in US court for roles in $1.3 billion fraud | Vancouver Sun

Mrs. Gasarch respectfully requests that, If the Court assesses civil penalties, It limits It to two first-tier penalties or $10,000, not the $558,072 the SEC seeks.

C.   <u>There Is No Need To Enter Injunctive Relief Against Mrs. Gasarch</u>

The SEC seeks broad injunctive relief against Mrs. Gasarch including the following requested relief in the proposed judgment:

> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. §240.3a51-1

> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by her, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for her own personal account

D.E. 425-2, Section III; IV.

As set forth above, Mrs. Gasarch was never involved in "participating in the issuance, purchase, offer or sale of security" so it is unclear why she needs to be so enjoined. Of course, being so enjoined could seriously hinder many job prospects for her including at publicly-traded

companies.  In any event, the SEC has not established the reasonable likelihood of reoccurrence.

Moreover, Mrs. Gasarch was found(or could have been found as an aider/abettor)  liable for

17(a)(3) violations based on negligence.  Even in cases where the "alleged prior conduct is

grave" (not the case here) and the defendant's involvement is "prominent" (again, not the case

here), the SEC still needs to demonstrate a likelihood of future misconduct.  There is no such

likelihood here.  See *SEC v. Pinez*, 989 F.Supp. 325, 224 (D. Mass. 1997) (SEC did not make a

showing of likelihood of future misconduct).

Moreover, the requested injunctive relief in 425-2 (I-III) which in essence "prohibits"

Mrs. Gasarch from engaging in violations of Section 17(a) or Section 10(b) is not necessary

where Mrs. Gasarch was not found liable for any violation besides 17(a)(3) (supported by

negligence).

D.  Mrs. Gasarch Adopts And Incorporates By Reference All Arguments Made By Other
    Defendants That Are Applicable To Her

Mrs. Gasarch specifically adopts and Incorporates by reference all arguments made by

the other Defendants In this matter.  Specifically, Mrs. Gasarch Incorporates by reference the

arguments made by Mr. Sexton (D.E. 454) and Mr. Veldhuis/Ms. Kelln (D.E. 455).  Moreover,

Mrs. Gasarch Incorporates by reference the arguments made by Mr. Friesen In his opposition to

be filed In the future.

III.    **CONCLUSION**

For the reasons set forth above, Mrs. Gasarch respectfully requests that this Court

deny the SEC's motion for relief.

16

A3563

Respectfully submitted,

YVONNE GASARCH

 By her Attorney,

/s/Karen A. Pickett

_____
Karen A. Pickett (BBO # 633801)
PICKETT LAW OFFICES, PC
125 High St., 26th Floor
Boston, MA  02110
617 423 0485
kpickettlaw@gmail.com

February 21, 2024

A3564

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 21, 2024.

*/s/ Karen A. Pickett*

A3565

| No. | Database Source | Account ID | Account Code | Account Title | Batch ID | Batch Date | Bank Code | Bank Title | Batch Description | Currency Code | Cash Bank (in Curr) | Cash Acct (USD) | Cash Acct (CAD) | Cash Acct (EUR) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | XM LIVE | 123 | PEAC | PEAC | 7437 | 12/20/2010 | WORK | WORK | Merry Christmas! | CAD | - | - | 10,000.00 | - |
| 2 | XM LIVE | 123 | PEAC | PEAC | 8064 | 12/30/2010 | WORK | WORK | interest payment | CAD | - | - | 0.27 | - |
| 3 | XM LIVE | 123 | PEAC | PEAC | 9592 | 1/30/2011 | WORK | WORK | interest payment | CAD | - | - | 8.49 | - |
| 4 | XM LIVE | 123 | PEAC | PEAC | 11634 | 2/28/2011 | WORK | WORK | interest payment | CAD | - | - | 7.95 | - |
| 5 | XM LIVE | 123 | PEAC | PEAC | 11371 | 3/4/2011 | HYPP | HYPP | receive stock | CAD | - | 18.00 | 18.00 | - |
| 6 | XM LIVE | 123 | PEAC | PEAC | 11510 | 3/11/2011 | HYPP | HYPP | receive stock | CAD | - | 18.00 | 18.00 | - |
| 7 | XM LIVE | 123 | PEAC | PEAC | 11877 | 3/14/2011 | HYPP | HYPP | receive stock | CAD | - | 18.00 | 18.00 | - |
| 8 | XM LIVE | 123 | PEAC | PEAC | 12949 | 3/30/2011 | WORK | WORK | receive stock | USD | - | - | 8.23 | - |
| 9 | XM LIVE | 123 | PEAC | PEAC | 13024 | 3/31/2011 | HYPP | HYPP | commission withdrawal | USD | - | (144.00) | - | - |
| 10 | XM LIVE | 123 | PEAC | PEAC | 13024 | 3/31/2011 | HYPP | HYPP | commission withdrawal | CAD | - | 144.00 | - | - |
| 11 | XM LIVE | 123 | PEAC | PEAC | 13373 | 3/31/2011 | HYPP | HYPP | interest payment | USD | - | 226.00 | - | - |
| 12 | XM LIVE | 123 | PEAC | PEAC | 13025 | 3/31/2011 | HYPP | HYPP | commission withdrawal | CAD | - | - | 5,715.00 | - |
| 13 | XM LIVE | 123 | PEAC | PEAC | 13433 | 4/13/2011 | HYPP | HYPP | receive stock | USD | - | 18.00 | 18.00 | - |
| 14 | XM LIVE | 123 | PEAC | PEAC | 13865 | 4/13/2011 | HYPP | HYPP | receive stock | USD | - | 704.98 | - | - |
| 15 | XM LIVE | 123 | PEAC | PEAC | 13434 | 4/7/2011 | HYPP | HYPP | sell stock | USD | - | 2,690.72 | - | - |
| 16 | XM LIVE | 123 | PEAC | PEAC | 13406 | 4/6/2011 | HYPP | HYPP | buy stock | USD | - | 442.36 | - | - |
| 17 | XM LIVE | 123 | PEAC | PEAC | 13405 | 4/6/2011 | HYPP | HYPP | sell stock | USD | - | 783.89 | - | - |
| 18 | XM LIVE | 123 | PEAC | PEAC | 13355 | 3/31/2011 | WORK | WORK | internal transfer | CAD | - | 226.00 | - | - |
| 19 | XM LIVE | 123 | PEAC | PEAC | 13024 | 3/31/2011 | HYPP | HYPP | commission withdrawal | CAD | - | - | (144.00) | - |
| 20 | XM LIVE | 123 | PEAC | PEAC | 13024 | 3/31/2011 | HYPP | HYPP | receive stock | USD | - | 18.00 | 18.00 | - |
| 21 | XM LIVE | 123 | PEAC | PEAC | 13024 | 3/31/2011 | HYPP | HYPP | receive stock | USD | - | 18.00 | 18.00 | - |
| 22 | XM LIVE | 123 | PEAC | PEAC | 14090 | 4/27/2011 | HYPP | HYPP | receive stock | USD | - | 18.00 | - | - |
| 23 | XM LIVE | 123 | PEAC | PEAC | 14297 | 4/26/2011 | HYPP | HYPP | buy stock | USD | - | 920.23 | - | - |
| 24 | XM LIVE | 123 | PEAC | PEAC | 14296 | 4/21/2011 | HYPP | HYPP | buy stock | USD | - | 774.80 | - | - |
| 25 | XM LIVE | 123 | PEAC | PEAC | 13406 | 4/18/2011 | HYPP | HYPP | receive stock | USD | - | 5,849.09 | - | - |
| 26 | XM LIVE | 123 | PEAC | PEAC | 13832 | 4/18/2011 | HYPP | HYPP | receive stock | CAD | (5,000.00) | - | - | - |
| 27 | XM LIVE | 123 | PEAC | PEAC | 14648 | 4/18/2011 | WORK | WORK | buy stock | USD | - | (5,849.09) | - | - |
| 28 | XM LIVE | 123 | PEAC | PEAC | 14647 | 4/28/2011 | WORK | WORK | sell stock | USD | - | 18.00 | - | - |
| 29 | XM LIVE | 123 | PEAC | PEAC | 14422 | 4/28/2011 | WORK | WORK | interest payment | CAD | - | 0.11 | - | - |
| 30 | XM LIVE | 123 | PEAC | PEAC | 14439 | 4/29/2011 | HYPP | HYPP | commission withdrawal | CAD | - | - | 12.52 | - |
| 31 | XM LIVE | 123 | PEAC | PEAC | 14438 | 4/28/2011 | HYPP | HYPP | commission withdrawal | USD | - | - | 18.00 | - |
| 32 | XM LIVE | 123 | PEAC | PEAC | 14438 | 4/29/2011 | HYPP | HYPP | commission withdrawal | CAD | - | - | 18.00 | - |
| 33 | XM LIVE | 123 | PEAC | PEAC | 14439 | 4/29/2011 | HYPP | HYPP | commission withdrawal | CAD | - | - | (18.00) | - |
| 34 | XM LIVE | 123 | PEAC | PEAC | 14740 | 4/29/2011 | TDQB | TDQB | Yvonne ck #798 | CAD | (5,000.00) | - | (5,000.00) | - |
| 35 | XM LIVE | 123 | PEAC | PEAC | 14741 | 4/29/2011 | CASH | CASH | debit | CAD | (5,000.00) | (5,000.00) | (5,000.00) | - |
| 36 | XM LIVE | 123 | PEAC | PEAC | 14740 | 4/29/2011 | WORK | WORK | buy stock | CAD | - | (5,849.09) | - | - |
| 37 | XM LIVE | 123 | PEAC | PEAC | 14439 | 4/29/2011 | HYPP | HYPP | sell stock | USD | - | 783.89 | - | - |
| 38 | XM LIVE | 123 | PEAC | PEAC | 14811 | 5/2/2011 | HYPP | HYPP | buy stock | USD | - | 80.47 | - | - |
| 39 | XM LIVE | 123 | PEAC | PEAC | 14882 | 5/4/2011 | HYPP | HYPP | sell stock | USD | - | 80.47 | - | - |
| 40 | XM LIVE | 123 | PEAC | PEAC | 14952 | 5/4/2011 | HYPP | HYPP | buy stock | USD | - | 782.45 | - | - |
| 41 | XM LIVE | 123 | PEAC | PEAC | 14954 | 5/4/2011 | HYPP | HYPP | sell stock | USD | - | 18.00 | - | - |

A3566

| # | | | ID | Date | Code | Description | Curr | Amt1 | Amt2 | Amt3 |
|---|---|---|---|---|---|---|---|---|---|---|
| 42 | XM LIVE | 123 PEAC | 15004 | 5/5/2011 | HYPP | sell stock | USD | | 18.00 | |
| 43 | XM LIVE | 123 PEAC | 14999 | 5/5/2011 | HYPP | sell stock | USD | | 128.61 | |
| 44 | XM LIVE | 123 PEAC | 15091 | 5/6/2011 | HYPP | sell stock | USD | | 127.61 | |
| 45 | XM LIVE | 123 PEAC | 15006 | 5/6/2011 | HYPP | buy stock | USD | | 18.00 | |
| 46 | XM LIVE | 123 PEAC | 15552 | 5/24/2011 | HYPP | buy stock | USD | | 18.00 | |
| 47 | XM LIVE | 123 PEAC | 15710 | 5/24/2011 | HYPP | receive stock | USD | | 18.00 | |
| 48 | XM LIVE | 123 PEAC | 15709 | 5/24/2011 | HYPP | receive stock | USD | | 18.00 | |
| 49 | XM LIVE | 123 PEAC | 16041 | 5/26/2011 | HYPP | buy stock | USD | | 326.72 | |
| 50 | XM LIVE | 123 PEAC | 16041 | 5/26/2011 | CASH | debit | CAD | (9,900.00) | | (9,900.00) |
| 51 | XM LIVE | 123 PEAC | 15935 | 5/26/2011 | WORK | forex | CAD | | (4,293.20) | |
| 52 | XM LIVE | 123 PEAC | 15939 | 5/26/2011 | WORK | forex | CAD | | 4,093.54 | 4,093.54 |
| 53 | XM LIVE | 123 PEAC | 14057 | 5/27/2011 | HYPP | receive stock | USD | | 18.00 | |
| 54 | XM LIVE | 123 PEAC | 16044 | 5/27/2011 | HYPP | buy stock | USD | | 185.33 | |
| 55 | XM LIVE | 123 PEAC | 16043 | 5/27/2011 | HYPP | sell stock | USD | | 138.56 | |
| 56 | XM LIVE | 123 PEAC | 15930 | 5/30/2011 | HYPP | receive stock | USD | | 18.00 | |
| 57 | XM LIVE | 123 PEAC | 15930 | 5/30/2011 | HYPP | receive stock | USD | | 18.00 | |
| 58 | XM LIVE | 123 PEAC | 16045 | 5/30/2011 | HYPP | buy stock | USD | | 392.55 | |
| 59 | XM LIVE | 123 PEAC | 16197 | 5/31/2011 | HYPP | commission withdrawal | USD | | (3,054.20) | |
| 60 | XM LIVE | 123 PEAC | 16197 | 5/31/2011 | HYPP | commission withdrawal | USD | | 3,054.20 | 3,054.20 |
| 61 | XM LIVE | 123 PEAC | 16305 | 5/31/2011 | HYPP | buy stock | USD | | 1,209.57 | |
| 62 | XM LIVE | 123 PEAC | 16409 | 6/2/2011 | WORK | interest payment | USD | | 4.80 | 4.30 |
| 63 | XM LIVE | 123 PEAC | 16410 | 6/2/2011 | WORK | interest payment | USD | | | |
| 64 | XM LIVE | 123 PEAC | 15927 | 6/2/2011 | HYPP | receive stock | USD | | 18.00 | |
| 65 | XM LIVE | 123 PEAC | 15717 | 6/3/2011 | HYPP | receive stock | USD | | 18.00 | |
| 66 | XM LIVE | 123 PEAC | 16116 | 6/3/2011 | HYPP | receive stock | USD | | 18.00 | |
| 67 | XM LIVE | 123 PEAC | 16133 | 6/7/2011 | HYPP | buy stock | USD | | 18.00 | |
| 68 | XM LIVE | 123 PEAC | 16995 | 6/17/2011 | HYPP | receive stock | USD | | 18.00 | |
| 69 | XM LIVE | 123 PEAC | 16739 | 6/24/2011 | HYPP | receive stock | USD | | 18.00 | |
| 70 | XM LIVE | 123 PEAC | 16739 | 6/24/2011 | HYPP | receive stock | USD | | 18.00 | |
| 71 | XM LIVE | 123 PEAC | 17518 | 6/24/2011 | TDCO | forex ck #228 | CAD | (4,115.01) | | |
| 72 | XM LIVE | 123 PEAC | 17518 | 6/24/2011 | TDCO | forex ck #228 | CAD | (4,156.16) | | (4,156.16) |
| 73 | XM LIVE | 123 PEAC | 17486 | 6/24/2011 | CASH | debit | CAD | (4,000.00) | | (4,000.00) |
| 74 | XM LIVE | 123 PEAC | 18324 | 6/28/2011 | HYPP | sell stock | USD | | 18.00 | |
| 75 | XM LIVE | 123 PEAC | 17713 | 6/30/2011 | HYPP | commission withdrawal | USD | | (1,317.57) | |
| 76 | XM LIVE | 123 PEAC | 17713 | 6/30/2011 | HYPP | commission withdrawal | USD | | 1,317.57 | 1,317.57 |
| 77 | XM LIVE | 123 PEAC | 18019 | 6/30/2011 | WORK | interest payment | USD | | 3.15 | |
| 78 | XM LIVE | 123 PEAC | 17630 | 7/7/2011 | HYPP | receive stock | USD | | 18.00 | |
| 79 | XM LIVE | 123 PEAC | 18652 | 7/14/2011 | HYPP | sell stock | USD | | 18.00 | |
| 80 | XM LIVE | 123 PEAC | 18961 | 7/20/2011 | HYPP | sell stock | USD | | 18.00 | |
| 81 | XM LIVE | 123 PEAC | 18962 | 7/21/2011 | HYPP | sell stock | USD | | 674.18 | |
| 82 | XM LIVE | 123 PEAC | 18750 | 7/21/2011 | HYPP | sell stock DAP | USD | | 21.58 | |
| 83 | XM LIVE | 123 PEAC | 18967 | 7/22/2011 | HYPP | sell stock | USD | | 339.39 | |
| 84 | XM LIVE | 123 PEAC | 18889 | 7/25/2011 | CASH | debit | CAD | (1,600.00) | | (1,600.00) |

| # | | | | | ID | Date | Type | Description | Cur | Amt 1 | Amt 2 | Amt 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 85 | XM LIVE | 123 | PEAC | PEAC | 18943 | 7/25/2011 | TDCO | forex ck #259 | USD | (1,723.89) | (1,741.13) | - |
| 86 | XM LIVE | 123 | PEAC | PEAC | 18943 | 7/25/2011 | CASH | forex ck #259 | CAD | 1,600.00 | 1,600.00 | - |
| 87 | XM LIVE | 123 | PEAC | PEAC | 18968 | 7/26/2011 | HYPP | sell stock | USD | | 18.00 | - |
| 88 | XM LIVE | 123 | PEAC | PEAC | 19003 | 7/27/2011 | HYPP | sell stock | USD | 18.00 | 18.00 | - |
| 89 | XM LIVE | 123 | PEAC | PEAC | 19043 | 7/28/2011 | HYPP | sell stock | CAD | | 488.77 | - |
| 90 | XM LIVE | 123 | PEAC | PEAC | 20627 | 7/28/2011 | HYPP | sell stock | USD | | | - |
| 91 | XM LIVE | 123 | PEAC | PEAC | 19044 | 7/28/2011 | WORK | order certificate | USD | | | - |
| 92 | XM LIVE | 123 | PEAC | PEAC | 15007 | 7/28/2011 | HYPP | receive stock | USD | | 18.00 | - |
| 93 | XM LIVE | 123 | PEAC | PEAC | 19432 | 8/7/2011 | HYPP | interest payment | USD | | 2,871.70 | - |
| 94 | XM LIVE | 123 | PEAC | PEAC | 19432 | 8/7/2011 | HYPP | commission withdrawal | USD | | 1,330.21 | - |
| 95 | XM LIVE | 123 | PEAC | PEAC | 15868 | 8/17/2011 | HYPP | commission withdrawal | USD | | 18.00 | - |
| 96 | XM LIVE | 123 | PEAC | PEAC | 19869 | 8/16/2011 | HYPP | buy stock | USD | | 81.00 | - |
| 97 | XM LIVE | 123 | PEAC | PEAC | 19869 | 8/16/2011 | HYPP | buy stock | USD | | 18.00 | - |
| 98 | XM LIVE | 123 | PEAC | PEAC | 18951 | 8/10/2011 | HYPP | sell stock | USD | | 1.29 | - |
| 99 | XM LIVE | 123 | PEAC | PEAC | 18952 | 8/10/2011 | HYPP | sell stock | USD | | 18.00 | - |
| 100 | XM LIVE | 123 | PEAC | PEAC | 19268 | 7/29/2011 | HYPP | buy stock | USD | | 18.00 | - |
| 101 | XM LIVE | 123 | PEAC | PEAC | 19268 | 7/29/2011 | HYPP | buy stock | USD | | 156.47 | - |
| 102 | XM LIVE | 123 | PEAC | PEAC | 19942 | 8/19/2011 | HYPP | buy stock | USD | | 717.81 | - |
| 103 | XM LIVE | 123 | PEAC | PEAC | 19943 | 8/19/2011 | HYPP | buy stock | USD | | 18.00 | - |
| 104 | XM LIVE | 123 | PEAC | PEAC | 19981 | 8/22/2011 | HYPP | sell stock | USD | | 27.38 | - |
| 105 | XM LIVE | 123 | PEAC | PEAC | 20060 | 8/25/2011 | HYPP | sell stock | USD | | 45.71 | - |
| 106 | XM LIVE | 123 | PEAC | PEAC | 20090 | 8/26/2011 | HYPP | buy stock | USD | | 50.36 | - |
| 107 | XM LIVE | 123 | PEAC | PEAC | 20118 | 8/29/2011 | HYPP | buy stock | USD | | 70.57 | - |
| 108 | XM LIVE | 123 | PEAC | PEAC | 20151 | 8/30/2011 | HYPP | buy stock | CAD | | 22.04 | - |
| 109 | XM LIVE | 123 | PEAC | PEAC | 20379 | 8/31/2011 | HYPP | interest payment | USD | | 987.30 | - |
| 110 | XM LIVE | 123 | PEAC | PEAC | 20379 | 8/31/2011 | HYPP | commission withdrawal | USD | | 1.25 | - |
| 111 | XM LIVE | 123 | PEAC | PEAC | 20159 | 8/31/2011 | HYPP | commission withdrawal | USD | | (5,726.83) | - |
| 112 | XM LIVE | 123 | PEAC | PEAC | 20650 | 8/31/2011 | TDCO | forex ck #279 | USD | (1,234.57) | (1,234.57) | - |
| 113 | XM LIVE | 123 | PEAC | PEAC | 20650 | 8/31/2011 | CASH | forex ck #279 | CAD | 1,200.00 | 1,200.00 | - |
| 114 | XM LIVE | 123 | PEAC | PEAC | 20312 | 8/31/2011 | WORK | interest payment | USD | | 5,726.83 | - |
| 115 | XM LIVE | 123 | PEAC | PEAC | 20099 | 9/1/2011 | HYPP | Cayman Institutional Bank DTC | USD | | 263.58 | - |
| 116 | XM LIVE | 123 | PEAC | PEAC | 20215 | 9/1/2011 | CASH | debit | CAD | (1,200.00) | (1,200.00) | - |
| 117 | XM LIVE | 123 | PEAC | PEAC | 20625 | 9/6/2011 | CASH | commission withdrawal | CAD | | 18.00 | 18.00 |
| 118 | XM LIVE | 123 | PEAC | PEAC | 20624 | 9/7/2011 | HYPP | sell stock | CAD | | (1,233.15) | (1,233.15) |
| 119 | XM LIVE | 123 | PEAC | PEAC | 20766 | 9/12/2011 | CASH | debit | CAD | 1,200.00 | 1,233.15 | 1,200.00 |
| 120 | XM LIVE | 123 | PEAC | PEAC | 21022 | 9/13/2011 | BSIT | forex | USD | (5,839.63) | (5,839.60) | (1,050.00) |
| 121 | XM LIVE | 123 | PEAC | PEAC | 21022 | 9/13/2011 | BSIT | forex | CAD | 5,746.20 | 5,746.20 | |
| 122 | XM LIVE | 123 | PEAC | PEAC | 21226 | 9/23/2011 | CASH | debit | CAD | (2,280.00) | (2,280.00) | (2,280.00) |
| 123 | XM LIVE | 123 | PEAC | PEAC | 21816 | 9/29/2011 | WORK | interest payment | USD | | 1.94 | |
| 124 | XM LIVE | 123 | PEAC | PEAC | 21817 | 9/29/2011 | WORK | interest payment | CAD | | 1.75 | 1.75 |
| 125 | XM LIVE | 123 | PEAC | PEAC | 21955 | 9/30/2011 | WORK | commissions | CAD | | 21,429.59 | |
| 126 | XM LIVE | 123 | PEAC | PEAC | 21601 | 9/30/2011 | CASH | commissions | CAD | (2,200.00) | | (2,200.00) |
| 127 | XM LIVE | 123 | PEAC | PEAC | 21966 | 9/30/2011 | WORK | commissions | CAD | | | 4,181.11 |

A3568

| # | | | | Ref | Date | Type | Description | Cur | Amt 1 | Amt 2 | Amt 3 | Amt 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 128 | XM LIVE | 123 | PEAC | 22108 | 10/3/2011 | WORK | forex | USD | - | | | (15,841.58) |
| 129 | XM LIVE | 123 | PEAC | 22108 | 10/3/2011 | CASH | debit | CAD | (15,000.00) | | (15,000.00) | 16,331.53 |
| 130 | XM LIVE | 123 | PEAC | 22126 | 10/4/2011 | CASH | debit | CAD | (5,000.00) | | | (15,000.00) |
| 131 | XM LIVE | 123 | PEAC | 22305 | 10/7/2011 | CASH | debit | USD | | (5,000.00) | | - |
| 132 | XM LIVE | 123 | PEAC | 23529 | 10/14/2011 | CASH | debit | CAD | (2,000.00) | | (2,000.00) | (2,000.00) |
| 133 | XM LIVE | 123 | PEAC | 23177 | 10/31/2011 | WORK | commission | CAD | 17,858.00 | | | 17,858.00 |
| 134 | XM LIVE | 123 | PEAC | 23034 | 10/31/2011 | CASH | debit | CAD | (2,000.00) | | (2,000.00) | (2,000.00) |
| 135 | XM LIVE | 123 | PEAC | 24303 | 10/31/2011 | CASH | debit | CAD | (1,800.00) | | (1,800.00) | (1,800.00) |
| 136 | XM LIVE | 123 | PEAC | 23282 | 10/31/2011 | WORK | interest payment | CAD | - | | 2.65 | 2.65 |
| 137 | XM LIVE | 123 | PEAC | 23283 | 10/31/2011 | WORK | interest payment | CAD | (4,000.00) | | | (4,000.00) |
| 138 | XM LIVE | 123 | PEAC | 23480 | 11/4/2011 | WORK | commission | CAD | - | | 18,884.00 | 18,884.00 |
| 139 | XM LIVE | 123 | PEAC | 23530 | 11/7/2011 | CASH | debit | CAD | (10,000.00) | | (10,000.00) | (10,000.00) |
| 140 | XM LIVE | 123 | PEAC | 24159 | 11/23/2011 | CASH | debit | CAD | (1,000.00) | | (1,000.00) | (1,000.00) |
| 141 | XM LIVE | 123 | PEAC | 24303 | 11/23/2011 | CASH | debit | CAD | (1,800.00) | | (1,800.00) | (1,800.00) |
| 142 | XM LIVE | 123 | PEAC | 24448 | 11/23/2011 | WORK | interest payment | CAD | - | | 0.34 | 0.34 |
| 143 | XM LIVE | 123 | PEAC | 24449 | 11/29/2011 | WORK | interest payment | CAD | - | | 4.28 | 4.28 |
| 144 | XM LIVE | 123 | PEAC | 24606 | 11/29/2011 | CASH | commission | CAD | (3,500.00) | | | (3,500.00) |
| 145 | XM LIVE | 123 | PEAC | 24636 | 12/5/2011 | CASH | debit | CAD | (5,000.00) | | (5,000.00) | (5,000.00) |
| 146 | XM LIVE | 123 | PEAC | 24758 | 12/6/2011 | CASH | debit | CAD | (2,000.00) | | (2,000.00) | (2,000.00) |
| 147 | XM LIVE | 123 | PEAC | 24804 | 12/19/2011 | WORK | commission | CAD | (4,000.00) | | (4,000.00) | (4,000.00) |
| 148 | XM LIVE | 123 | PEAC | 25226 | 12/19/2011 | WORK | interest payment | CAD | - | | (6,699.46) | (6,699.46) |
| 149 | XM LIVE | 123 | PEAC | 25226 | 12/19/2011 | CASH | debit | CAD | (5,000.00) | | (5,000.00) | (5,000.00) |
| 150 | XM LIVE | 123 | PEAC | 25178 | 12/19/2011 | WORK | forex | CAD | - | | 6,565.48 | 6,565.48 |
| 151 | XM LIVE | 123 | PEAC | 25230 | 12/20/2011 | CASH | debit | USD | - | (2,000.00) | (2,000.00) | (2,000.00) |
| 152 | XM LIVE | 123 | PEAC | 25767 | 12/31/2011 | WORK | commission | USD | - | 29,361.00 | | 29,361.00 |
| 153 | XM LIVE | 123 | PEAC | 25475 | 12/31/2011 | WORK | interest payment | USD | - | 0.28 | | 7.36 |
| 154 | XM LIVE | 123 | PEAC | 25816 | 12/31/2011 | WORK | forex | CAD | (9,914.73) | | (9,914.73) | (9,914.73) |
| 155 | XM LIVE | 123 | PEAC | 25816 | 1/4/2012 | BSIT | forex | CAD | 10,000.00 | | 4.99 | (9,914.73) |
| 156 | XM LIVE | 123 | PEAC | 25834 | 1/4/2012 | BSIT | forex | CAD | - | | 10,000.00 | 10,000.00 |
| 157 | XM LIVE | 123 | PEAC | 25906 | 1/4/2012 | DGMI | Pershing TT | USD | (9,980.00) | | (9,980.00) | (9,980.00) |
| 158 | XM LIVE | 123 | PEAC | 26210 | 1/5/2012 | CASH | debit | CAD | (5,000.00) | | (5,000.00) | (5,000.00) |
| 159 | XM LIVE | 123 | PEAC | 26274 | 1/17/2012 | CASH | debit | CAD | (2,000.00) | | (2,000.00) | (2,000.00) |
| 160 | XM LIVE | 123 | PEAC | 26524 | 1/17/2012 | CASH | debit | USD | (1,500.00) | | (1,500.00) | (1,500.00) |
| 161 | XM LIVE | 123 | PEAC | 26524 | 1/23/2012 | TDCO | debit | CAD | (5,000.00) | | (5,000.00) | (5,000.00) |
| 162 | XM LIVE | 123 | PEAC | 26806 | 1/26/2012 | TDCO | Yvonne ck #406 | USD | - | | 7.36 | - |
| 163 | XM LIVE | 123 | PEAC | 26806 | 1/30/2012 | WORK | interest payment | CAD | - | | 3.17 | 3.17 |
| 164 | XM LIVE | 123 | PEAC | 26807 | 1/30/2012 | WORK | commission | USD | 18,406.00 | | 18,406.00 | - |
| 165 | XM LIVE | 123 | PEAC | 26951 | 1/31/2012 | WORK | commission | USD | (8,106.13) | | (8,106.13) | (8,106.13) |
| 166 | XM LIVE | 123 | PEAC | 27072 | 2/1/2012 | TDCO | forex ck #411 | CAD | 7,976.14 | | 7,976.14 | 7,976.14 |
| 167 | XM LIVE | 123 | PEAC | 27072 | 2/1/2012 | CASH | forex ck #411 | CAD | (10,000.00) | | (10,000.00) | - |
| 168 | XM LIVE | 123 | PEAC | 27008 | 2/3/2012 | CASH | debit | USD | (5,000.00) | | (5,000.00) | - |
| 169 | XM LIVE | 123 | PEAC | 27708 | 2/15/2012 | BSIT | forex | USD | (10,002.98) | | (10,002.98) | - |
| 170 | XM LIVE | 123 | PEAC | 27708 | 2/15/2012 | BSIT | forex | CAD | 9,940.96 | | 9,940.96 | - |

| # | | | | | Ref | Date | Type | Description | Cur | Amt 1 | Amt 2 | Amt 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 171 | XM LIVE | 123 | PEAC | PEAC | 28883 | 2/29/2012 | WORK | commission | USD | 39,198.00 | | 9,927.00 |
| 172 | XM LIVE | 123 | PEAC | PEAC | 28884 | 2/29/2012 | WORK | interest payment | CAD | | 4.74 | 4.20 |
| 173 | XM LIVE | 123 | PEAC | PEAC | 28783 | 2/29/2012 | WORK | interest payment | CAD | | | |
| 174 | XM LIVE | 123 | PEAC | PEAC | 28784 | 2/29/2012 | WORK | interest payment | CAD | | | |
| 175 | XM LIVE | 123 | PEAC | PEAC | 28965 | 3/1/2012 | TDQB | MBNA ck #1534 | CAD | (589.04) | | (589.04) |
| 176 | XM LIVE | 123 | PEAC | PEAC | 28899 | 3/1/2012 | CASH | debit | CAD | (10,000.00) | | (10,000.00) |
| 177 | XM LIVE | 123 | PEAC | PEAC | 29244 | 3/2/2012 | BSIT | forex | USD | (16,224.61) | | (16,386.86) |
| 178 | XM LIVE | 123 | PEAC | PEAC | 29244 | 3/2/2012 | BSIT | forex | CAD | | | |
| 179 | XM LIVE | 123 | PEAC | PEAC | 28988 | 3/2/2012 | WORK | forex | USD | (3,029.40) | | (3,029.40) |
| 180 | XM LIVE | 123 | PEAC | PEAC | 28988 | 3/2/2012 | WORK | forex | CAD | (2,000.00) | | (2,000.00) |
| 181 | XM LIVE | 123 | PEAC | PEAC | 29049 | 3/2/2012 | WORK | forex | CAD | (8,000.00) | | (8,000.00) |
| 182 | XM LIVE | 123 | PEAC | PEAC | 29049 | 3/2/2012 | WORK | debit | CAD | (1,000.00) | | (1,000.00) |
| 183 | XM LIVE | 123 | PEAC | PEAC | 28939 | 3/2/2012 | CASH | debit | USD | (22,000.00) | | (22,000.00) |
| 184 | XM LIVE | 123 | PEAC | PEAC | 29058 | 3/6/2012 | CASH | debit | USD | | 6,489.27 | 6,489.27 |
| 185 | XM LIVE | 123 | PEAC | PEAC | 29206 | 3/8/2012 | CASH | debit | CAD | (5,000.00) | | (5,000.00) |
| 186 | XM LIVE | 123 | PEAC | PEAC | 29256 | 3/9/2012 | WORK | Great Wall ck #1571 | CAD | (1,000.00) | (6,575.04) | (6,575.04) |
| 187 | XM LIVE | 123 | PEAC | PEAC | 29257 | 3/9/2012 | TDQB | Yvonne ck #1572 | CAD | (1,000.00) | | (1,000.00) |
| 188 | XM LIVE | 123 | PEAC | PEAC | 29386 | 3/13/2012 | CASH | debit | USD | (8,000.00) | | (8,000.00) |
| 189 | XM LIVE | 123 | PEAC | PEAC | 29515 | 3/16/2012 | BSIT | forex | USD | (3,029.40) | | (3,029.40) |
| 190 | XM LIVE | 123 | PEAC | PEAC | 29515 | 3/16/2012 | BSIT | forex | CAD | | 2,609.67 | (2,644.16) |
| 191 | XM LIVE | 123 | PEAC | PEAC | 29827 | 3/23/2012 | CASH | debit | CAD | (1,000.00) | | (1,000.00) |
| 192 | XM LIVE | 123 | PEAC | PEAC | 30458 | 3/23/2012 | WORK | interest payment | USD | | 7.33 | |
| 193 | XM LIVE | 123 | PEAC | PEAC | 30305 | 3/29/2012 | WORK | debit | CAD | | 3.06 | |
| 194 | XM LIVE | 123 | PEAC | PEAC | 30504 | 3/30/2012 | BSIT | forex | USD | (40,393.91) | (40,393.91) | (40,393.91) |
| 195 | XM LIVE | 123 | PEAC | PEAC | 30504 | 3/30/2012 | BSIT | forex | USD | (3,029.40) | | (3,029.40) |
| 196 | XM LIVE | 123 | PEAC | PEAC | 30458 | 3/30/2012 | WORK | commission | CAD | | 41,843.00 | |
| 197 | XM LIVE | 123 | PEAC | PEAC | 30456 | 3/30/2012 | WORK | commission | CAD | | | |
| 198 | XM LIVE | 123 | PEAC | PEAC | 30480 | 3/30/2012 | TDQB | interest payment | CAD | | | 3.06 |
| 199 | XM LIVE | 123 | PEAC | PEAC | 30516 | 4/2/2012 | CASH | debit | CAD | (24,000.00) | | (24,000.00) |
| 200 | XM LIVE | 123 | PEAC | PEAC | 30538 | 4/2/2012 | BSIT | Amex ck #1615 | CAD | (10,000.00) | | (10,000.00) |
| 201 | XM LIVE | 123 | PEAC | PEAC | 30706 | 4/4/2012 | BSIT | debit | USD | (5,000.00) | | (5,000.00) |
| 202 | XM LIVE | 123 | PEAC | PEAC | 30706 | 4/4/2012 | BSIT | forex | USD | (5,000.00) | (5,000.00) | (5,000.00) |
| 203 | XM LIVE | 123 | PEAC | PEAC | 30713 | 4/5/2012 | WORK | forex | CAD | (1,000.00) | | (1,000.00) |
| 204 | XM LIVE | 123 | PEAC | PEAC | 31001 | 4/9/2012 | WORK | debit | CAD | (5,000.00) | | (5,000.00) |
| 205 | XM LIVE | 123 | PEAC | PEAC | 31001 | 4/9/2012 | WORK | debit | USD | 4,985.00 | | 4,985.00 |
| 206 | XM LIVE | 123 | PEAC | PEAC | 30930 | 4/17/2012 | TDQB | Draft to Yvonne ck #1671 | CAD | (7,007.50) | 2,976.30 | (7,007.50) |
| 207 | XM LIVE | 123 | PEAC | PEAC | 31359 | 4/20/2012 | CASH | debit | CAD | (2,000.00) | | (2,000.00) |
| 208 | XM LIVE | 123 | PEAC | PEAC | 31828 | 4/30/2012 | CASH | debit | CAD | | 25,735.00 | |
| 209 | XM LIVE | 123 | PEAC | PEAC | 31830 | 4/30/2012 | WORK | commission | CAD | | | 9,081.00 |
| 210 | XM LIVE | 123 | PEAC | PEAC | 31974 | 4/30/2012 | WORK | commission | CAD | | 1.72 | |
| 211 | XM LIVE | 123 | PEAC | PEAC | 31975 | 4/30/2012 | CASH | interest payment | CAD | | | 9.15 |
| 212 | XM LIVE | 123 | PEAC | PEAC | 32064 | 5/1/2012 | CASH | forex | CAD | (16,140.00) | | (16,140.00) |
| 213 | XM LIVE | 123 | PEAC | PEAC | 32083 | 5/1/2012 | WORK | forex | USD | | | |

| # | Acct | Ref | Number | Date | Type | Description | Cur | Amt 1 | Amt 2 | Amt 3 |
|---|---|---|---|---|---|---|---|---|---|---|
| 214 | XM LIVE | 123 PEAC | 32083 | 5/1/2012 | WORK | forex | CAD | | | 3,317.69 |
| 215 | XM LIVE | 123 PEAC | 32185 | 5/3/2012 | DGMI | Pershing TT | USD | (10,040.00) | (10,040.00) | |
| 216 | XM LIVE | 123 PEAC | 32764 | 5/17/2012 | SIL2 | Bruce Gasarch TT | USD | (10,021.93) | (10,021.93) | |
| 217 | XM LIVE | 123 PEAC | 33696 | 5/31/2012 | WORK | commission | USD | 28,515.00 | | |
| 218 | XM LIVE | 123 PEAC | 33597 | 5/31/2012 | WORK | interest payment | USD | 6.89 | 6.89 | |
| 219 | XM LIVE | 123 PEAC | 33921 | 6/1/2012 | BSIT | forex | CAD | (14,619.88) | (14,619.88) | |
| 220 | XM LIVE | 123 PEAC | 33921 | 6/1/2012 | BSIT | forex | CAD | 15,000.00 | 15,000.00 | |
| 221 | XM LIVE | 123 PEAC | 33921 | 6/1/2012 | WORK | forex | CAD | | | |
| 224 | XM LIVE | 123 PEAC | 33822 | 6/4/2012 | TDCO | Cash Advantage MasterCard ck #89 | CAD | (4,842.20) | (4,842.20) | |
| 225 | XM LIVE | 123 PEAC | 33947 | 6/6/2012 | CASH | Amex ck #88 | CAD | (2,000.00) | (2,000.00) | |
| 226 | XM LIVE | 123 PEAC | 34550 | 6/20/2012 | BSIT | debit | CAD | (2,538.29) | (2,967.67) | |
| 227 | XM LIVE | 123 PEAC | 34550 | 6/20/2012 | BSIT | debit | USD | 3,000.00 | 3,000.00 | |
| 228 | XM LIVE | 123 PEAC | 34550 | 6/20/2012 | BSIT | debit | USD | (10,000.00) | (10,000.00) | |
| 229 | XM LIVE | 123 PEAC | 33821 | 6/4/2012 | TDCO | debit | CAD | (1,039.76) | (1,039.76) | |
| 230 | XM LIVE | 123 PEAC | 34189 | 6/11/2012 | CASH | debit | CAD | (5,000.00) | (5,000.00) | |
| 231 | XM LIVE | 123 PEAC | 34242 | 6/12/2012 | CASH | debit | CAD | (3,000.00) | (3,000.00) | |
| 232 | XM LIVE | 123 PEAC | 34598 | 6/29/2012 | BSIT | debit | USD | 5,000.00 | 5,000.00 | |
| 233 | XM LIVE | 123 PEAC | 34979 | 7/3/2012 | CASH | debit | CAD | (2,000.00) | (2,000.00) | |
| 234 | XM LIVE | 123 PEAC | 35439 | 7/3/2012 | CASH | interest payment | CAD | | 5.90 | 4.67 |
| 235 | XM LIVE | 123 PEAC | 35101 | 7/11/2012 | WORK | commission | CAD | (4,933.89) | (4,933.89) | |
| 236 | XM LIVE | 123 PEAC | 35101 | 7/11/2012 | WORK | commission | CAD | (3,000.00) | (3,000.00) | |
| 237 | XM LIVE | 123 PEAC | 35102 | 7/18/2012 | WORK | commission | USD | (5,000.00) | (5,000.00) | |
| 240 | XM LIVE | 123 PEAC | 35903 | 7/18/2012 | BSIT | interest payment | CAD | | 31,996.00 | |
| 241 | XM LIVE | 123 PEAC | 35903 | 7/25/2012 | CASH | debit | CAD | (3,000.00) | (3,000.00) | |
| 242 | XM LIVE | 123 PEAC | 36119 | 7/25/2012 | TDCB | Zhi Ying ck #1932 | CAD | (2,000.00) | (2,000.00) | |
| 243 | XM LIVE | 123 PEAC | 36217 | 7/30/2012 | TDCB | interest payment | CAD | | 4,338.00 | |
| 244 | XM LIVE | 123 PEAC | 36217 | 7/30/2012 | WORK | interest payment | USD | | 19.50 | |
| 245 | XM LIVE | 123 PEAC | 36478 | 7/30/2012 | CASH | debit | CAD | (1,120.00) | (1,120.00) | |
| 246 | XM LIVE | 123 PEAC | 36479 | 7/30/2012 | WORK | commission | CAD | 20,000.00 | 20,000.00 | |
| 247 | XM LIVE | 123 PEAC | 36547 | 7/31/2012 | WORK | commission | CAD | (19,784.35) | (19,784.35) | |
| 248 | XM LIVE | 123 PEAC | 36548 | 7/31/2012 | WORK | commission | CAD | (5,000.00) | (5,000.00) | |
| 249 | XM LIVE | 123 PEAC | 36580 | 8/1/2012 | TDCB | debit | CAD | (850.00) | (850.00) | |
| 250 | XM LIVE | 123 PEAC | 37020 | 8/16/2012 | CASH | forex | USD | 7,938.00 | | |
| 251 | XM LIVE | 123 PEAC | 37123 | 8/20/2012 | WORK | forex | CAD | (5,000.00) | (5,000.00) | |
| 252 | XM LIVE | 123 PEAC | 37745 | 8/31/2012 | WORK | debit | USD | | 9,705.00 | |
| 253 | XM LIVE | 123 PEAC | 37747 | 8/31/2012 | WORK | debit | USD | 9.18 | | |
| 254 | XM LIVE | 123 PEAC | 37591 | 8/31/2012 | WORK | Yvonne ck #399 | CAD | | 16.30 | 13.45 |
| 255 | XM LIVE | 123 PEAC | 37868 | 9/5/2012 | TDCB | Yvonne ck #2016 | CAD | (4,000.00) | (4,000.00) | (4,000.00) |
| 256 | XM LIVE | 123 PEAC | 38642 | 9/28/2012 | TDCB | American Ex ck #2103 | CAD | (12,000.00) | (12,000.00) | (12,000.00) |

| # | | | ID | Date | Code | Description | Cur | Amount 1 | Amount 2 | Amount 3 |
|---|---|---|---|---|---|---|---|---|---|---|
| 257 | XM LIVE | 123 PEAC | 38798 | 9/28/2012 | CASH | debt | CAD | (3,000.00) | | (3,000.00) |
| 258 | XM LIVE | 123 PEAC | 39146 | 9/29/2012 | WORK | interest payment | USD | - | 20.02 | - |
| 259 | XM LIVE | 123 PEAC | 39147 | 9/29/2012 | WORK | interest payment | USD | - | 10.29 | - |
| 260 | XM LIVE | 123 PEAC | 39222 | 9/30/2012 | WORK | commission | CAD | - | 5,348.00 | - |
| 261 | XM LIVE | 123 PEAC | 39224 | 9/30/2012 | WORK | commission | CAD | 14,976.00 | 14,976.00 | - |
| 262 | XM LIVE | 123 PEAC | 39469 | 10/2/2012 | DGMH | forex | CAD | (20,000.00) | (20,000.00) | - |
| 263 | XM LIVE | 123 PEAC | 39469 | 10/2/2012 | DGMH | forex | CAD | 19,463.40 | 19,463.40 | - |
| 264 | XM LIVE | 123 PEAC | 39525 | 10/5/2012 | TDGB | Yvonne ck #2125 | CAD | (10,000.00) | | (10,000.00) |
| 265 | XM LIVE | 123 PEAC | 40263 | 10/26/2012 | CASH | debt | USD | (10,000.00) | | (10,000.00) |
| 266 | XM LIVE | 123 PEAC | 40766 | 10/31/2012 | CASH | debt | CAD | (1,000.00) | | (1,000.00) |
| 267 | XM LIVE | 123 PEAC | 40768 | 10/31/2012 | WORK | commission | USD | - | 9,391.00 | - |
| 268 | XM LIVE | 123 PEAC | 40548 | 10/31/2012 | WORK | interest payment | CAD | - | 18.63 | - |
| 269 | XM LIVE | 123 PEAC | 40549 | 10/31/2012 | WORK | interest payment | CAD | - | 13.43 | - |
| 270 | XM LIVE | 123 PEAC | 41547 | 11/22/2012 | CASH | debt | USD | (10,000.00) | | (10,000.00) |
| 271 | XM LIVE | 123 PEAC | 42171 | 11/30/2012 | CASH | debt | CAD | - | 8,699.00 | - |
| 272 | XM LIVE | 123 PEAC | 42173 | 11/30/2012 | WORK | commission | CAD | 2,518.00 | 2,518.00 | - |
| 273 | XM LIVE | 123 PEAC | 42083 | 11/20/2012 | WORK | interest payment | USD | - | 23.51 | - |
| 274 | XM LIVE | 123 PEAC | 42084 | 11/20/2012 | WORK | interest payment | USD | 12.75 | 12.75 | - |
| 275 | XM LIVE | 123 PEAC | 42418 | 12/6/2012 | BSIT | Chen TT | CAD | (3,015.00) | (3,015.00) | - |
| 276 | XM LIVE | 123 PEAC | 42493 | 12/10/2012 | CASH | debt | USD | (3,000.00) | (3,000.00) | (3,000.00) |
| 277 | XM LIVE | 123 PEAC | 42648 | 12/13/2012 | BMQB | Zhiying ck #288 | CAD | (10,000.00) | (10,000.00) | (10,000.00) |
| 278 | XM LIVE | 123 PEAC | 43075 | 12/20/2012 | WORK | commission DIDG MDMC GSTV BLTF MORAJ,SWTRJ PTAE | USD | 23,500.00 | 23,500.00 | - |
| 279 | XM LIVE | 123 PEAC | 43320 | 12/31/2012 | WORK | interest payment | USD | 19,483.00 | 19,483.00 | - |
| 280 | XM LIVE | 123 PEAC | 43322 | 12/31/2012 | CASH | debt | USD | (9,050.00) | | (9,050.00) |
| 281 | XM LIVE | 123 PEAC | 43462 | 12/31/2012 | WORK | commission | CAD | - | 29.57 | - |
| 282 | XM LIVE | 123 PEAC | 43463 | 12/31/2012 | WORK | interest payment | CAD | - | 4.26 | - |
| 283 | XM LIVE | 123 PEAC | 44335 | 1/25/2013 | BSIT | forex | USD | (59,844.41) | (59,844.41) | - |
| 284 | XM LIVE | 123 PEAC | 44335 | 1/25/2013 | BSIT | forex | USD | 60,000.00 | 60,000.00 | - |
| 285 | XM LIVE | 123 PEAC | 44541 | 1/25/2013 | BSIT | Yvonne TT | CAD | (9,050.00) | | 3,057.00 |
| 286 | XM LIVE | 123 PEAC | 45118 | 1/31/2013 | WORK | commission | CAD | 21,853.00 | 21,853.00 | - |
| 287 | XM LIVE | 123 PEAC | 45117 | 1/31/2013 | WORK | commission | CAD | - | 1,146.00 | - |
| 288 | XM LIVE | 123 PEAC | 45015 | 1/31/2013 | WORK | interest payment | CAD | - | 51.64 | - |
| 289 | XM LIVE | 123 PEAC | 45015 | 1/31/2013 | WORK | interest payment | CAD | - | 13.26 | - |
| 290 | XM LIVE | 123 PEAC | 45016 | 1/31/2013 | WORK | commission | CAD | (10,000.00) | | (10,000.00) |
| 291 | XM LIVE | 123 PEAC | 45136 | 2/1/2013 | CASH | debt | CAD | (10,000.00) | | (10,000.00) |
| 292 | XM LIVE | 123 PEAC | 45225 | 2/4/2013 | SI2 | Gsasch TT | CAD | (3,000.00) | (3,000.00) | - |
| 293 | XM LIVE | 123 PEAC | 45409 | 2/7/2013 | CASH | debt | CAD | 3,113.00 | 3,113.00 | - |
| 294 | XM LIVE | 123 PEAC | 46317 | 2/28/2013 | WORK | commission | USD | - | 51.64 | - |
| 295 | XM LIVE | 123 PEAC | 46319 | 2/28/2013 | WORK | commission | USD | 12,963.00 | 12,963.00 | - |
| 296 | XM LIVE | 123 PEAC | 46447 | 2/28/2013 | WORK | interest payment | USD | - | 19.56 | - |
| 297 | XM LIVE | 123 PEAC | 46446 | 2/28/2013 | WORK | interest payment | USD | - | 35.45 | - |
| 298 | XM LIVE | 123 PEAC | 47917 | 3/29/2013 | WORK | interest payment | USD | - | 29.25 | - |
| 299 | XM LIVE | 123 PEAC | 47916 | 3/29/2013 | WORK | interest payment | USD | - | 39.22 | - |
| | XM LIVE | 123 PEAC | 48014 | 3/30/2013 | WORK | commission | USD | - | - | 2,832.00 |

| # | | | | ID | Date | Code | Description | Cur. | Amt 1 | Rate | Amt 2 | Amt 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 300 | XM LIVE | 123 | PEAC | 48012 | 3/30/2013 | WORK | commission | USD | 24,409.00 | | - | - |
| 301 | XM LIVE | 123 | PEAC | 48230 | 4/4/2013 | BOCG | gold coins | USD | 160.00 | | - | - |
| 302 | XM LIVE | 123 | PEAC | 48403 | 4/10/2013 | BSIT | | USD | - | | - | |
| 303 | XM LIVE | 123 | PEAC | 48760 | 4/11/2013 | BOCG | Receiver draft | CAD | (30,854.02) | | (30,854.02) | |
| 304 | XM LIVE | 123 | PEAC | 48769 | 4/15/2013 | HYPP | forex | USD | (6,220.85) | | 6,346.60 | |
| 305 | XM LIVE | 123 | PEAC | 48769 | 4/16/2013 | HYPP | forex | USD | 6,346.60 | | 6,346.60 | |
| 306 | XM LIVE | 123 | PEAC | 48910 | 4/22/2013 | HYPP | forex | USD | (29,294.01) | | (29,294.01) | |
| 307 | XM LIVE | 123 | PEAC | 48910 | 4/22/2013 | HYPP | commission | CAD | 30,000.00 | | 30,000.00 | |
| 308 | XM LIVE | 123 | PEAC | 49436 | 4/30/2013 | WORK | commission | CAD | | | 3,105.00 | |
| 309 | XM LIVE | 123 | PEAC | 49438 | 4/30/2013 | WORK | commission | CAD | (9,500.00) | | - | |
| 310 | XM LIVE | 123 | PEAC | 49639 | 4/30/2013 | WORK | commission | USD | 15,888.00 | | 15,888.00 | |
| 311 | XM LIVE | 123 | PEAC | 49640 | 4/30/2013 | WORK | interest payment | CAD | | | - | |
| 312 | XM LIVE | 123 | PEAC | 50739 | 5/22/2013 | CASH | debit | CAD | | | - | |
| 313 | XM LIVE | 123 | PEAC | 51070 | 5/28/2013 | BSIT | forex | CAD | (19,328.76) | 19,328.76 | (19,328.76) | |
| 314 | XM LIVE | 123 | PEAC | 51070 | 5/28/2013 | BSIT | forex | CAD | 19,953.09 | | 19,953.09 | |
| 315 | XM LIVE | 123 | PEAC | 51612 | 5/31/2013 | WORK | commission | CAD | | | 8,191.00 | |
| 316 | XM LIVE | 123 | PEAC | 51614 | 5/31/2013 | WORK | commission | CAD | 8,191.00 | | - | |
| 317 | XM LIVE | 123 | PEAC | 51546 | 5/31/2013 | WORK | interest payment | CAD | | 33.51 | 33.51 | |
| 318 | XM LIVE | 123 | PEAC | 51547 | 5/31/2013 | BSIT | interest payment | USD | | 44.47 | - | |
| 319 | XM LIVE | 123 | PEAC | 53129 | 6/30/2013 | WORK | commission | USD | 35,047.00 | | 35,047.00 | |
| 320 | XM LIVE | 123 | PEAC | 53131 | 6/30/2013 | WORK | commission | USD | | 33.40 | - | |
| 321 | XM LIVE | 123 | PEAC | 53277 | 6/29/2013 | WORK | interest payment | USD | | 50.34 | - | |
| 322 | XM LIVE | 123 | PEAC | 53277 | 6/29/2013 | WORK | commission | USD | 37,491.00 | | 37,491.00 | |
| 323 | XM LIVE | 123 | PEAC | 53534 | 7/2/2013 | SIL2 | forex | CAD | | 43.07 | 7,121.00 | |
| 324 | XM LIVE | 123 | PEAC | 53534 | 7/2/2013 | SIL2 | forex | CAD | 7,121.00 | | - | |
| 325 | XM LIVE | 123 | PEAC | 52614 | 6/21/2013 | BSIT | internal transfer | CAD | 100.00 | | - | |
| 326 | XM LIVE | 123 | PEAC | 53965 | 7/16/2013 | SIL2 | forex | CAD | 45.75 | | - | |
| 327 | XM LIVE | 123 | PEAC | 55787 | 7/16/2013 | BSIT | forex | USD | (9,600.00) | | (9,600.00) | |
| 328 | XM LIVE | 123 | PEAC | 54771 | 7/31/2013 | WORK | commission | CAD | | 1,461.00 | 1,461.00 | |
| 329 | XM LIVE | 123 | PEAC | 54773 | 7/31/2013 | WORK | commission | USD | | | - | |
| 330 | XM LIVE | 123 | PEAC | 54925 | 7/31/2013 | WORK | interest payment | USD | (45,000.00) | | (45,000.00) | |
| 331 | XM LIVE | 123 | PEAC | 54926 | 7/31/2013 | WORK | forex | USD | 47,170.91 | | 47,170.91 | |
| 332 | XM LIVE | 123 | PEAC | 55059 | 8/1/2013 | CASH | debit | CAD | | 93.63 | - | |
| 333 | XM LIVE | 123 | PEAC | 55787 | 8/26/2013 | BSIT | forex | USD | (9,564.17) | | (9,564.17) | |
| 334 | XM LIVE | 123 | PEAC | 55787 | 8/26/2013 | BSIT | commission | CAD | 15,899.00 | 46.84 | - | |
| 335 | XM LIVE | 123 | PEAC | 56047 | 8/30/2013 | WORK | commission | USD | 10,495.00 | | 10,000.00 | |
| 336 | XM LIVE | 123 | PEAC | 56059 | 8/30/2013 | WORK | commission | USD | | | 3,385.00 | |
| 337 | XM LIVE | 123 | PEAC | 56397 | 8/31/2013 | BSIT | Yvonne TT | CAD | (9,660.00) | 55.11 | (9,600.00) | |
| 338 | XM LIVE | 123 | PEAC | 56338 | 8/31/2013 | WORK | interest payment | CAD | (25,000.00) | | - | |
| 339 | XM LIVE | 123 | PEAC | 57051 | 9/19/2013 | WORK | interest payment | CAD | | 83.22 | - | |
| 340 | XM LIVE | 123 | PEAC | 57051 | 9/19/2013 | CASH | Yvonne TT | CAD | | | (25,000.00) | |
| 341 | XM LIVE | 123 | PEAC | 57145 | 9/20/2013 | CASH | debit | CAD | (1,460.00) | | (1,460.00) | |
| 342 | XM LIVE | 123 | PEAC | 57799 | 9/30/2013 | WORK | commission | USD | - | | - | |

| # | Acct | | | | Num | Date | Type | Description | Cur | Amt 1 | Amt 2 | Amt 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 343 | | PEAC | PERE | | 57801 | 9/30/2013 | WORK | commission | CAD | | | 2,945.00 |
| 344 | | PEAC | PERE | | 57927 | 9/30/2013 | WORK | interest payment | USD | | 55.11 | |
| 345 | | PEAC | PERE | | 57928 | 9/30/2013 | WORK | interest payment | USD | | 73.80 | |
| 346 | XM LIVE | 123 | PEAC | PERE | 58416 | 10/10/2013 | SIL2 | Gisardh TT | USD | (9,970.44) | (9,970.44) | |
| 347 | XM LIVE | 123 | PEAC | PERE | 58475 | 10/10/2013 | BST | forex | CAD | (76,479) | (77,244.28) | |
| 348 | XM LIVE | 123 | PEAC | PERE | 58475 | 10/10/2013 | BST | forex | CAD | 78,620.91 | 78,620.91 | |
| 349 | XM LIVE | 123 | PEAC | PERE | 58396 | 10/17/2013 | BST | Yvonne TT | CAD | (25,000.00) | | (25,000.00) |
| 350 | XM LIVE | 123 | PEAC | PERE | 58773 | 10/18/2013 | BST | Yvonne TT | CAD | (28,000.00) | (28,000.00) | |
| 351 | XM LIVE | 123 | PEAC | PERE | 59161 | 10/31/2013 | CASH | debit | CAD | (10,000.00) | | (10,000.00) |
| 352 | XM LIVE | 123 | PEAC | PERE | 59305 | 10/31/2013 | WORK | commission | CAD | | 8,389.00 | |
| 353 | XM LIVE | 123 | PEAC | PERE | 59307 | 10/31/2013 | WORK | commission | CAD | | 3,882.00 | |
| 354 | XM LIVE | 123 | PEAC | PERE | 59469 | 10/31/2013 | WORK | interest payment | CAD | | 33.67 | |
| 355 | XM LIVE | 123 | PEAC | PERE | 59470 | 10/31/2013 | WORK | interest payment | CAD | | 91.50 | |
| 356 | XM LIVE | 123 | PEAC | PERE | 59843 | 11/30/2013 | WORK | interest payment | CAD | | 19.01 | |
| 357 | XM LIVE | 123 | PEAC | PERE | 60842 | 11/30/2013 | WORK | interest payment | CAD | | | 4,741.00 |
| 358 | XM LIVE | 123 | PEAC | PERE | 60843 | 11/30/2013 | WORK | commission | CAD | (2,000.00) | (2,000.00) | (2,000.00) |
| 359 | XM LIVE | 123 | PEAC | PERE | 60703 | 11/29/2013 | WORK | commission | CAD | (9,800.00) | (9,800.00) | |
| 360 | XM LIVE | 123 | PEAC | PERE | 61671 | 11/29/2013 | WORK | commission | CAD | | 9,865.00 | |
| 361 | XM LIVE | 123 | PEAC | PERE | 62074 | 11/29/2013 | CASH | debit | CAD | (10,000.00) | (10,000.00) | |
| 362 | XM LIVE | 123 | PEAC | PERE | 62073 | 12/31/2013 | WORK | commission | CAD | | 1,918.00 | |
| 363 | XM LIVE | 123 | PEAC | PERE | 62067 | 12/31/2013 | WORK | commission opening balance | CAD | | 524.77 | |
| 364 | XM LIVE | 123 | PEAC | PERE | 62380 | 12/31/2013 | WORK | commission | CAD | 31,096.00 | 31,096.00 | |
| 365 | XM LIVE | 123 | PEAC | PERE | 62381 | 12/31/2013 | WORK | interest payment | CAD | | 28.04 | |
| 366 | XM LIVE | 123 | PEAC | PERE | 61663 | 12/18/2013 | BST | Yvonne TT | USD | | 500.00 | |
| 367 | XM LIVE | 123 | PEAC | PERE | 61451 | 12/13/2013 | WORK | internal transfer | USD | | 127.15 | |
| 368 | XM LIVE | 123 | PEAC | PERE | 61437 | 12/13/2013 | WORK | Merry Xmas 2013! | USD | | 933.30 | |
| 369 | XM LIVE | 123 | PEAC | PERE | 62722 | 12/13/2013 | WORK | interest payment | USD | | | 100,000.00 |
| 370 | XM LIVE | 123 | PEAC | PERE | 71000 | 12/31/2013 | SGPE | commission | USD | | 15,000.00 | |
| 371 | XM LIVE | 123 | PEAC | PERE | 70999 | 12/31/2013 | SGPE | commission opening balance | CAD | (9,371.94) | (9,371.94) | (9,371.94) |
| 372 | XM LIVE | 123 | PEAC | PERE | 62659 | 1/7/2014 | XPHO | xphore dividend | USD | (17,070.16) | (17,071.16) | |
| 373 | XM LIVE | 123 | PEAC | PERE | 64178 | 1/9/2014 | WORK | Yvonne TT | USD | (10,000.00) | (10,000.00) | |
| 374 | XM LIVE | 123 | PEAC | PERE | 62805 | 1/9/2014 | WORK | Yvonne TT | USD | 18,995.15 | 18,995.15 | |
| 375 | XM LIVE | 123 | PEAC | PERE | 63247 | 1/9/2014 | BSIB | debit | USD | (9,138.86) | (9,138.86) | |
| 376 | XM LIVE | 123 | PEAC | PERE | 63247 | 1/9/2014 | CASH | debit | CAD | | 5,575.00 | |
| 377 | XM LIVE | 123 | PEAC | PERE | 63247 | 1/22/2014 | LENO | forex | USD | | | (17,071.16) |
| 378 | XM LIVE | 123 | PEAC | PERE | 64116 | 1/22/2014 | BSIB | commission | CAD | | 2,004.00 | |
| 379 | XM LIVE | 123 | PEAC | PERE | 63559 | 1/29/2014 | WORK | commission | CAD | | 59.06 | |
| 380 | XM LIVE | 123 | PEAC | PERE | 63560 | 1/31/2014 | WORK | debit | CAD | (10,000.00) | | (10,000.00) |
| 381 | Pre2015 | 123 | PEAC | PERE | 63572 | 1/31/2014 | CASH | debit | CAD | | | 151.16 |
| 382 | Pre2015 | 123 | PEAC | PERE | 63710 | 1/31/2014 | WORK | commission | CAD | | | |
| 383 | Pre2015 | 123 | PEAC | PERE | 63711 | 1/31/2014 | WORK | debit | CAD | | | |
| 384 | Pre2015 | 123 | PEAC | PERE | 64299 | 2/14/2014 | CASH | debit | USD | (500.00) | (500.00) | |
| 385 | Pre2015 | 123 | PERE | PERE | 64703 | 2/24/2014 | LELO | forex | USD | (14,053.05) | (14,053.05) | |

| # | | | | Num | Date | Code | Description | Cur | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 386. | Pre2015 | 123 | PERE | 64703 | 2/24/2014 | LELO | forex | CAD | 15,576.76 | - | 15,576.76 |
| 387. | Pre2015 | 123 | PERE | 64615 | 2/25/2014 | SGGO | | CAD | (9,600.00) | - | (9,600.00) |
| 388. | Pre2015 | 123 | PERE | 64737 | 2/25/2014 | LELO | Yvonne TT | USD | (8,945.91) | (8,945.91) | (8,945.91) |
| 389. | Pre2015 | 123 | PERE | 64737 | 2/25/2014 | LELO | forex | CAD | 9,934.44 | - | 9,934.44 |
| 390. | Pre2015 | 123 | PERE | 64906 | 2/28/2014 | WORK | commission | USD | | 4,670.00 | |
| 391. | Pre2015 | 123 | PERE | 64907 | 2/28/2014 | WORK | commission | USD | | | 3,428.00 |
| 392. | Pre2015 | 123 | PERE | 64316 | 2/28/2014 | WORK | commission RIHT ECAU ARTH DOGI LGSRI PVEN | USD | (10,000.00) | 26,750.00 | |
| 393. | Pre2015 | 123 | PERE | 64817 | 2/28/2014 | WORK | Feb Parking | USD | | | 155.00 |
| 394. | Pre2015 | 123 | PERE | 65055 | 2/28/2014 | WORK | commission | CAD | | | 140.40 |
| 395. | Pre2015 | 123 | PERE | 65056 | 2/28/2014 | SGGO | | CAD | (9,900.00) | | (9,900.00) |
| 396. | Pre2015 | 123 | PERE | 74365 | 2/28/2014 | SGGO | Yvonne TT | USD | (9,700.00) | 34.83 | (9,700.00) |
| 397. | Pre2015 | 123 | PERE | 65235 | 3/4/2014 | CASH | debit | CAD | (6,530.00) | | (6,530.00) |
| 398. | Pre2015 | 123 | PERE | 65869 | 3/18/2014 | CASH | debit | CAD | (10,000.00) | 59,250.00 | (10,000.00) |
| 399. | Pre2015 | 123 | PERE | 65487 | 3/31/2014 | WORK | commission | USD | | | 1,585.00 |
| 400. | Pre2015 | 123 | PERE | 65486 | 3/31/2014 | WORK | commission | USD | | | 139.50 |
| 401. | Pre2015 | 123 | PERE | 66543 | 3/31/2014 | WORK | Parking | CAD | (4,000.00) | | (4,000.00) |
| 402. | Pre2015 | 123 | PERE | 66824 | 3/31/2014 | WORK | interest payment | USD | | 47.95 | 152.28 |
| 403. | Pre2015 | 123 | PERE | 66825 | 3/31/2014 | WORK | interest payment | USD | (9,000.00) | | (9,000.00) |
| 404. | Pre2015 | 123 | PERE | 67159 | 4/4/2014 | VPDU | Gasaran TT | USD | | 7,172.00 | 4,074.00 |
| 405. | Pre2015 | 123 | PERE | 67319 | 4/9/2014 | SGGO | Yvonne TT | CAD | (9,742.38) | | (9,742.38) |
| 406. | Pre2015 | 123 | PERE | 67940 | 4/28/2014 | CASH | debit | CAD | (9,700.00) | | (9,700.00) |
| 407. | Pre2015 | 123 | PERE | 68060 | 4/28/2014 | CASH | debit | CAD | (20,000.00) | | (20,000.00) |
| 408. | Pre2015 | 123 | PERE | 68237 | 4/30/2014 | WORK | commission | CAD | (20,000.00) | | (20,000.00) |
| 409. | Pre2015 | 123 | PERE | 68238 | 4/30/2014 | WORK | commission | CAD | (4,000.00) | | (4,000.00) |
| 410. | Pre2015 | 123 | PERE | 68391 | 4/30/2014 | WORK | interest payment | CAD | (4,000.00) | | (4,000.00) |
| 411. | Pre2015 | 123 | PERE | 68392 | 4/30/2014 | WORK | interest payment | CAD | | 80.66 | 143.73 |
| 412. | Pre2015 | 123 | PERE | 68474 | 5/1/2014 | WORK | parking | CAD | (10,000.00) | | (10,000.00) |
| 413. | Pre2015 | 123 | PERE | 68841 | 5/12/2014 | CASH | debit | CAD | (10,000.00) | | (10,000.00) |
| 414. | Pre2015 | 123 | PERE | 69066 | 5/20/2014 | CASH | debit | CAD | (9,000.00) | | (9,000.00) |
| 415. | Pre2015 | 123 | PERE | 69993 | 5/29/2014 | WORK | interest payment | CAD | | 79.43 | 115.08 |
| 416. | Pre2015 | 123 | PERE | 69994 | 5/29/2014 | WORK | interest payment | CAD | | | 2,891.00 |
| 417. | Pre2015 | 123 | PERE | 69558 | 5/30/2014 | WORK | internal transfer | CAD | | 7,124.00 | 310.00 |
| 418. | Pre2015 | 123 | PERE | 69559 | 5/30/2014 | WORK | Parking | CAD | | | 310.00 |
| 419. | Pre2015 | 123 | PERE | 69945 | 5/31/2014 | WORK | | CAD | (4,100.00) | | (4,100.00) |
| 420. | Pre2015 | 123 | PERE | 70128 | 6/10/2014 | CASH | debit | CAD | (6,704.15) | | (6,704.15) |
| 421. | Pre2015 | 123 | PERE | 70426 | 6/17/2014 | BCHA | debit | CAD | (1,384.09) | | (1,384.09) |
| 422. | Pre2015 | 123 | PERE | 70427 | 6/17/2014 | BCHA | City of Richmond ck #234 | CAD | (8,000.00) | | (8,000.00) |
| 423. | Pre2015 | 123 | PERE | 70580 | 6/19/2014 | CASH | City of Richmond ck #235 | CAD | (8,000.00) | | (8,000.00) |
| 424. | Pre2015 | 123 | PERE | 70660 | 6/20/2014 | LEMI | debit | USD | (6,491.19) | (6,491.19) | (6,491.19) |
| 425. | Pre2015 | 123 | PERE | 70660 | 6/20/2014 | LEMI | forex | USD | 6,987.14 | | 6,987.14 |
| 426. | Pre2015 | 123 | PERE | 70938 | 6/27/2014 | CASH | Renewal Ref #2504 | USD | | | 1,089.00 |
| 427. | Pre2015 | 123 | PERE | 74048 | 6/27/2014 | WORK | interest payment | USD | | 1,089.00 | 105.11 |
| 428. | Pre2015 | 123 | PERE | 74049 | 6/27/2014 | WORK | interest payment | CAD | | 84.05 | - |

| No. | Year | Acct | Init | Name | Date | Type | Description | Cur. | Amount 1 | Amount 2 | Amount 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 429 | Pre2015 | 123 | PERE | PERE | 6/28/2014 | WORK | commission | USD | - | - | - |
| 430 | Pre2015 | 123 | PERE | PERE | 6/28/2014 | WORK | commission | USD | - | 33,089.00 | 7,151.00 |
| 431 | Pre2015 | 123 | PERE | PERE | 6/30/2014 | LEMI | forex | USD | (13,804.96) | - | - |
| 432 | Pre2015 | 123 | PERE | PERE | 6/30/2014 | LEMI | forex | CAD | 14,729.91 | 14,729.91 | 14,729.91 |
| 433 | Pre2015 | 123 | PERE | PERE | 6/30/2014 | SGPE | Andrew Kaplan TT | CAD | (55,000.00) | (55,000.00) | (55,000.00) |
| 434 | Pre2015 | 123 | PERE | PERE | 6/30/2014 | WORK | parking | CAD | - | 217.00 | 217.00 |
| 435 | Pre2015 | 123 | PERE | PERE | 7/12/2014 | XPHD | xphone dividend | USD | - | 10,000.00 | 10,000.00 |
| 436 | Pre2015 | 123 | PERE | PERE | 7/14/2014 | SGPE | Bruce TT | CAD | (9,100.00) | (9,100.00) | (9,100.00) |
| 437 | Pre2015 | 123 | PERE | PERE | 7/14/2014 | CASH | debit | CAD | (10,000.00) | (10,000.00) | (10,000.00) |
| 438 | Pre2015 | 123 | PERE | PERE | 7/17/2014 | CASH | debit | CAD | - | - | - |
| 439 | Pre2015 | 123 | PERE | PERE | 7/31/2014 | WORK | commission | CAD | - | - | 2,679.00 |
| 440 | Pre2015 | 123 | PERE | PERE | 7/31/2014 | WORK | commission | USD | - | 4,857.00 | - |
| 441 | Pre2015 | 123 | PERE | PERE | 7/31/2014 | SGPE | interest payment | USD | (5,000.00) | - | 124.94 |
| 442 | Pre2015 | 123 | PERE | PERE | 7/31/2014 | WORK | interest payment | CAD | (5,000.00) | - | (5,000.00) |
| 443 | Pre2015 | 123 | PERE | PERE | 8/25/2014 | CASH | debit | CAD | (340.00) | (340.00) | (340.00) |
| 444 | Pre2015 | 123 | PERE | PERE | 8/25/2014 | CASH | debit | CAD | (5,000.00) | - | (5,000.00) |
| 445 | Pre2015 | 123 | PERE | PERE | 8/29/2014 | WORK | commission | CAD | - | 2,966.00 | 2,449.00 |
| 446 | Pre2015 | 123 | PERE | PERE | 8/29/2014 | WORK | commission | USD | - | - | - |
| 447 | Pre2015 | 123 | PERE | PERE | 8/29/2014 | SGPE | interest payment | USD | (45,270.00) | - | 111.51 |
| 448 | Pre2015 | 123 | PERE | PERE | 8/31/2014 | WORK | Park West TT | USD | (45,270.00) | - | (45,270.00) |
| 449 | Pre2015 | 123 | PERE | PERE | 8/31/2014 | WORK | interest payment | CAD | - | 73.54 | 73.54 |
| 450 | Pre2015 | 123 | PERE | PERE | 8/31/2014 | CASH | debit | CAD | (3,000.00) | - | (3,000.00) |
| 451 | Pre2015 | 123 | PERE | PERE | 9/2/2014 | SGPE | interest payment | CAD | - | - | - |
| 452 | Pre2015 | 123 | PERE | PERE | 9/9/2014 | CASH | commission | USD | - | - | (825.00) |
| 453 | Pre2015 | 123 | PERE | PERE | 9/11/2014 | WORK | parking | CAD | - | - | 50.40 |
| 454 | Pre2015 | 123 | PERE | PERE | 9/19/2014 | WORK | interest payment | CAD | - | - | 103.15 |
| 455 | Pre2015 | 123 | PERE | PERE | 9/20/2014 | BCHA | gold coins ck #266 | CAD | (13,910.00) | - | (13,910.00) |
| 456 | Pre2015 | 123 | PERE | PERE | 9/30/2014 | WORK | interest payment | CAD | - | 79.72 | - |
| 457 | Pre2015 | 123 | PERE | PERE | 9/30/2014 | CASH | debit | CAD | - | - | - |
| 458 | Pre2015 | 123 | PERE | PERE | 10/16/2014 | CASH | debit | USD | (825.00) | (825.00) | (825.00) |
| 459 | Pre2015 | 123 | PERE | PERE | 10/24/2014 | WORK | internal transfer Labyrinth donation | USD | - | 21,994.00 | - |
| 460 | Pre2015 | 123 | PERE | PERE | 10/30/2014 | WORK | commission | CAD | - | 69.71 | 69.71 |
| 461 | Pre2015 | 123 | PERE | PERE | 10/31/2014 | WORK | commission | CAD | - | - | - |
| 462 | Pre2015 | 123 | PERE | PERE | 10/31/2014 | WORK | interest payment | CAD | (5,000.00) | - | (5,000.00) |
| 463 | Pre2015 | 123 | PERE | PERE | 10/31/2014 | WORK | interest payment | CAD | - | 56.49 | 93.47 |
| 464 | Pre2015 | 123 | PERE | PERE | 10/31/2014 | WORK | commission | USD | - | (200.00) | - |
| 465 | Pre2015 | 123 | PERE | PERE | 11/5/2014 | CASH | debit | USD | - | - | (5,000.00) |
| 466 | Pre2015 | 123 | PERE | PERE | 11/7/2014 | WORK | parking | CAD | - | 12,132.00 | 2,899.00 |
| 467 | Pre2015 | 123 | PERE | PERE | 11/7/2014 | WORK | interest payment | CAD | - | 165.00 | 23,038.00 |
| 468 | Pre2015 | 123 | PERE | PERE | 11/14/2014 | WORK | forex | USD | - | (26,700.00) | (50,000.00) |
| 469 | Pre2015 | 123 | PERE | PERE | 11/14/2014 | WORK | forex | CAD | - | - | - |
| 470 | Pre2015 | 123 | PERE | PERE | 11/21/2014 | CASH | debit | USD | (8,500.00) | (8,500.00) | 30,000.00 |
| 471 | Pre2015 | 123 | PERE | PERE | 11/21/2014 | CASH | debit | USD | - | 30,000.00 | - |

| # | Year | | | | Doc# | Date | Type | Description | Cur | Amt1 | Amt2 | Amt3 | Amt4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 472 | Pre2015 | 123 | PERE | PERE | 80935 | 11/28/2014 | BCHA | Chen draft | CAD | (100,007.50) | - | (100,007.50) | - |
| 473 | Pre2015 | 123 | PERE | PERE | 80720 | 11/29/2014 | WORK | commission | USD | - | 6,341.00 | 1,713.00 | - |
| 474 | Pre2015 | 123 | PERE | PERE | 80721 | 11/29/2014 | WORK | commission | USD | - | - | - | - |
| 475 | Pre2015 | 123 | PERE | PERE | 80867 | 11/30/2014 | WORK | interest payment | USD | - | 36.45 | - | - |
| 476 | Pre2015 | 123 | PERE | PERE | 80868 | 11/30/2014 | WORK | Car | CAD | (8,800.00) | - | (8,800.00) | - |
| 477 | Pre2015 | 123 | PERE | PERE | 81391 | 12/12/2014 | WORK | Merry Xmas! | CAD | - | - | 120,000.00 | - |
| 478 | Pre2015 | 123 | PERE | PERE | 81598 | 12/18/2014 | CASH | debit | CAD | (8,000.00) | - | (8,000.00) | - |
| 479 | Pre2015 | 123 | PERE | PERE | 81670 | 12/22/2014 | CASH | debit | CAD | - | - | - | - |
| 480 | Pre2015 | 123 | PERE | PERE | 81682 | 12/22/2014 | CASH | debit | CAD | (8,000.00) | - | (8,000.00) | - |
| 481 | Pre2015 | 123 | PERE | PERE | 81723 | 12/24/2014 | WORK | interest payment | CAD | - | 23.73 | - | - |
| 482 | Pre2015 | 123 | PERE | PERE | 82198 | 12/31/2014 | WORK | commission | USD | - | 92.11 | - | - |
| 483 | Pre2015 | 123 | PERE | PERE | 82199 | 12/31/2014 | WORK | interest payment | USD | - | 19,738.00 | - | - |
| 484 | Pre2015 | 123 | PERE | PERE | 81891 | 12/31/2014 | WORK | commission | USD | - | 1,714.98 | - | - |
| 485 | Pre2015 | 123 | PERE | PERE | 81892 | 12/31/2014 | WORK | interest payment | CAD | - | 35.91 | - | - |
| 486 | Pre2015 | 123 | PERE | PERE | 83286 | 12/31/2014 | SGPE | commission opening balance | CAD | - | - | - | - |
| 487 | Pre2015 | 123 | PERE | PERE | 83287 | 12/31/2014 | SGPE | commission opening balance | CAD | - | 524.77 | - | - |
| 488 | Pre2015 | 123 | PERE | PERE | 82544 | 1/16/2015 | XPHO | xphone dividend | CAD | - | 933.30 | - | - |
| 489 | Pre2015 | 123 | PERE | PERE | 82759 | 1/27/2015 | CASH | debit | CAD | (5,220.00) | - | (5,220.00) | - |
| 490 | Pre2015 | 123 | PERE | PERE | 82798 | 1/28/2015 | CASH | debit | CAD | (6,000.00) | 10,000.00 | (6,000.00) | - |
| 491 | Pre2017 | 123 | PERE | PERE | 83167 | 1/29/2015 | WORK | interest payment | CAD | - | 46.55 | 92.72 | - |
| 492 | Pre2017 | 123 | PERE | PERE | 83168 | 1/29/2015 | WORK | commission | CAD | - | - | - | - |
| 493 | Pre2017 | 123 | PERE | PERE | 83017 | 1/30/2015 | WORK | commission | CAD | - | 926.00 | - | - |
| 494 | Pre2017 | 123 | PERE | PERE | 83018 | 1/30/2015 | WORK | debit | CAD | (8,000.00) | - | (8,000.00) | - |
| 495 | Pre2017 | 123 | PERE | PERE | 83238 | 1/30/2015 | CASH | debit | CAD | (10,681.50) | - | (10,681.50) | - |
| 496 | Pre2017 | 123 | PERE | PERE | 83695 | 2/19/2015 | BCHA | Receiver General | CAD | - | - | - | - |
| 497 | Pre2017 | 123 | PERE | PERE | 83744 | 2/20/2015 | CASH | debit | USD | (4,000.00) | - | (4,000.00) | - |
| 498 | Pre2017 | 123 | PERE | PERE | 85708 | 2/24/2015 | BCHA | BMO Chart 59597628 draft | CAD | (17,425.50) | - | (17,425.50) | - |
| 499 | Pre2017 | 123 | PERE | PERE | 85993 | 2/28/2015 | WORK | commission | CAD | - | 19,954.00 | - | - |
| 500 | Pre2017 | 123 | PERE | PERE | 85994 | 2/28/2015 | WORK | commission | CAD | (5,000.00) | - | (6,000.00) | - |
| 501 | Pre2017 | 123 | PERE | PERE | 86137 | 2/28/2015 | WORK | interest payment | USD | - | 59.39 | - | - |
| 502 | Pre2017 | 123 | PERE | PERE | 86138 | 2/28/2015 | WORK | debit | USD | (6,000.00) | - | - | - |
| 503 | Pre2017 | 123 | PERE | PERE | 86291 | 3/4/2015 | CASH | debit | CAD | - | 7,778.00 | - | - |
| 504 | Pre2017 | 123 | PERE | PERE | 86683 | 3/23/2015 | CASH | debit | CAD | (5,000.00) | - | - | - |
| 505 | Pre2017 | 123 | PERE | PERE | 86721 | 3/24/2015 | CASH | debit | USD | (4,000.00) | - | (4,000.00) | - |
| 506 | Pre2017 | 123 | PERE | PERE | 88702 | 3/30/2015 | WORK | forex | USD | - | (30,000.00) | 38,310.00 | - |
| 507 | Pre2017 | 123 | PERE | PERE | 88702 | 3/30/2015 | WORK | forex | USD | - | - | - | - |
| 508 | Pre2017 | 123 | PERE | PERE | 88607 | 3/30/2015 | WORK | forex | CAD | - | (7,500.00) | 9,620.25 | - |
| 509 | Pre2017 | 123 | PERE | PERE | 88607 | 3/30/2015 | WORK | forex | CAD | - | - | - | - |
| 510 | Pre2017 | 123 | PERE | PERE | 87081 | 3/30/2015 | WORK | interest payment | CAD | - | 71.68 | 47.42 | - |
| 511 | Pre2017 | 123 | PERE | PERE | 87082 | 3/30/2015 | WORK | interest payment | CAD | - | - | - | - |
| 512 | Pre2017 | 123 | PERE | PERE | 87236 | 3/31/2015 | WORK | commission | CAD | - | 21,438.00 | 3,192.00 | - |
| 513 | Pre2017 | 123 | PERE | PERE | 87237 | 3/31/2015 | WORK | commission | CAD | - | - | - | - |

A3577

| # | | | | | Ref | Date | Type | Description | Cur | Amount 1 | Amount 2 | Amount 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 514. | Pre2017 | 123 | PERE | PERE | 87268 | 3/31/2015 | WORK | forex | USD | - | (10,000.00) | 12,674.27 |
| 515. | Pre2017 | 123 | PERE | PERE | 87268 | 3/31/2015 | WORK | forex | CAD | - | - | - |
| 516. | Pre2017 | 123 | PERE | PERE | 87270 | 3/31/2015 | WORK | internal transfer | CAD | - | 30.00 | 30.00 |
| 517. | Pre2017 | 123 | PERE | PERE | 87317 | 4/1/2015 | CASH | debit | CAD | (6,000.00) | - | (6,000.00) |
| 518. | Pre2017 | 123 | PERE | PERE | 87317 | 4/2/2015 | CASH | debit | USD | - | - | - |
| 519. | Pre2017 | 123 | PERE | PERE | 87834 | 4/10/2015 | WORK | forex | CAD | (28,649.00) | - | 36,069.86 |
| 520. | Pre2017 | 123 | PERE | PERE | 87834 | 4/10/2015 | WORK | forex | USD | - | - | - |
| 521. | Pre2017 | 123 | PERE | PERE | 87816 | 4/27/2015 | BCHA | Receiver General | CAD | (4,750.00) | - | (4,750.00) |
| 522. | Pre2017 | 123 | PERE | PERE | 87908 | 4/27/2015 | BCHA | Chen Lian Yong draft | CAD | (22,609.31) | - | (22,609.31) |
| 523. | Pre2017 | 123 | PERE | PERE | 88704 | 4/29/2015 | CASH | forex | CAD | (100,007.50) | - | (100,007.50) |
| 524. | Pre2017 | 123 | PERE | PERE | 88657 | 4/29/2015 | CASH | debit | CAD | (5,450.00) | - | (5,450.00) |
| 525. | Pre2017 | 123 | PERE | PERE | 88616 | 4/30/2015 | CASH | debit | CAD | (5,000.00) | - | (5,000.00) |
| 526. | Pre2017 | 123 | PERE | PERE | 88137 | 4/30/2015 | WORK | interest payment | CAD | - | 73.30 | 73.30 |
| 527. | Pre2017 | 123 | PERE | PERE | 88136 | 4/30/2015 | WORK | interest payment | USD | - | - | - |
| 528. | Pre2017 | 123 | PERE | PERE | 88137 | 4/30/2015 | WORK | commission | CAD | 66.84 | - | 2,634.00 |
| 529. | Pre2017 | 123 | PERE | PERE | 88136 | 4/30/2015 | WORK | commission | USD | - | - | 2,994.00 |
| 530. | Pre2017 | 123 | PERE | PERE | 89168 | 5/29/2015 | WORK | commission | CAD | - | - | 165.00 |
| 531. | Pre2017 | 123 | PERE | PERE | 89167 | 5/29/2015 | WORK | commission | USD | - | 165.00 | - |
| 532. | Pre2017 | 123 | PERE | PERE | 89022 | 5/29/2015 | WORK | parking | CAD | - | 2,994.00 | - |
| 533. | Pre2017 | 123 | PERE | PERE | 89021 | 5/30/2015 | WORK | commission | CAD | - | 2,634.00 | - |
| 534. | Pre2017 | 123 | PERE | PERE | 89301 | 5/30/2015 | WORK | commission | CAD | - | - | 3,252.00 |
| 535. | Pre2017 | 123 | PERE | PERE | 89302 | 5/30/2015 | WORK | interest payment | USD | - | - | 9,659.97 |
| 536. | Pre2017 | 123 | PERE | PERE | 88710 | 5/21/2015 | WORK | interest payment | CAD | 9,659.97 | - | - |
| 537. | Pre2017 | 123 | PERE | PERE | 88710 | 5/21/2015 | VPDU | forex | USD | 3,252.00 | - | - |
| 538. | Pre2017 | 123 | PERE | PERE | 88793 | 5/20/2015 | VPDU | forex | CAD | - | 5,837.00 | 17,964.67 |
| 539. | Pre2017 | 123 | PERE | PERE | 88793 | 5/20/2015 | CASH | debit | USD | (8,062.66) | - | (8,062.66) |
| 540. | Pre2017 | 123 | PERE | PERE | 88399 | 5/19/2015 | CASH | debit | CAD | (4,280.00) | - | (4,280.00) |
| 541. | Pre2017 | 123 | PERE | PERE | 88748 | 5/15/2015 | CASH | debit | CAD | (205,000.00) | - | (205,000.00) |
| 542. | Pre2017 | 123 | PERE | PERE | 89632 | 6/12/2015 | BCHA | Levon Resources ck #458 | CAD | - | - | 22,590.14 |
| 543. | Pre2017 | 123 | PERE | PERE | 89652 | 6/1/2015 | BMO Chart | forex | CAD | - | 22,590.14 | - |
| 544. | Pre2017 | 123 | PERE | PERE | 89710 | 6/1/2015 | BMO Chart | forex | USD | (18,072.11) | - | - |
| 545. | Pre2017 | 123 | PERE | PERE | 89710 | 6/2/2015 | WORK | interest payment | CAD | 81.84 | - | 81.84 |
| 546. | Pre2017 | 123 | PERE | PERE | 89302 | 5/30/2015 | WORK | interest payment | USD | 16.76 | - | 16.76 |
| 547. | Pre2017 | 123 | PERE | PERE | 89301 | 5/30/2015 | WORK | commission | CAD | - | - | 2,994.00 |
| 548. | Pre2017 | 123 | PERE | PERE | 89722 | 6/16/2015 | WORK | commission | USD | - | - | - |
| 549. | Pre2017 | 123 | PERE | PERE | 89713 | 6/16/2015 | WORK | parking | CAD | - | 875.00 | - |
| 550. | Pre2017 | 123 | PERE | PERE | 89355 | 6/16/2015 | CASH | debit | CAD | (134.58) | - | (134.58) |
| 551. | Pre2017 | 123 | PERE | PERE | 90354 | 6/25/2015 | CASH | PTAC 2015 annual fees | USD | (875.00) | 875.00 | (875.00) |
| 552. | Pre2017 | 123 | PERE | PERE | 90234 | 6/16/2015 | BMO Chart | debit | CAD | - | - | - |
| 553. | Pre2017 | 123 | PERE | PERE | 90487 | 6/30/2015 | WORK | commission | CAD | - | 0.50 | 30.00 |
| 554. | Pre2017 | 123 | PERE | PERE | 90614 | 7/11/2015 | WORK | forex | USD | (19,113.50) | - | 20.49 |

| ID | | | | Ref # | Date | Type | Description | Cur | Amt 1 | Amt 2 | Amt 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 555 | Pre2017 | 123 | PERE | 90614 | 7/1/2015 | WORK | forex | CAD | - | - | 24,194.30 |
| 556 | Pre2017 | 123 | PERE | 90552 | 7/1/2015 | XPHO | xphone dividend | CAD | - | 8,000.00 | - |
| 557 | Pre2017 | 123 | PERE | 90725 | 7/9/2015 | CASH | xphones | CAD | - | - | - |
| 558 | Pre2017 | 123 | PERE | 90921 | 7/24/2015 | CASH | debit | CAD | (20,000.00) | - | (20,000.00) |
| 559 | Pre2017 | 123 | PERE | 91111 | 7/31/2015 | WORK | commission | CAD | (1,520.00) | - | (1,520.00) |
| 560 | Pre2017 | 123 | PERE | 91110 | 7/31/2015 | WORK | commission | CAD | - | 949.00 | 949.00 |
| 561 | Pre2017 | 123 | PERE | 91260 | 7/31/2015 | WORK | interest payment | USD | - | 2,507.00 | 2,507.00 |
| 562 | Pre2017 | 123 | PERE | 92199 | 8/1/2015 | VERA | commission | USD | 0.07 | 0.07 | 0.05 |
| 563 | Pre2017 | 123 | PERE | 92598 | 8/1/2015 | VERA | forex | CAD | 3,232.89 | 3,232.89 | 3,232.89 |
| 564 | Pre2017 | 123 | PERE | 91662 | 8/25/2015 | CASH | debit | CAD | (2,507.07) | (2,507.07) | (2,340.00) |
| 565 | Pre2017 | 123 | PERE | 91877 | 8/31/2015 | WORK | commission | USD | - | - | 1,804.00 |
| 566 | Pre2017 | 123 | PERE | 91876 | 8/31/2015 | CASH | commission | USD | - | 949.00 | 1,135.00 |
| 567 | Pre2017 | 123 | PERE | 92024 | 8/31/2015 | WORK | commission | USD | - | - | - |
| 568 | Pre2017 | 123 | PERE | 92199 | 8/31/2015 | CASH | debit | CAD | (3,000.00) | (3,000.00) | (3,000.00) |
| 569 | Pre2017 | 123 | PERE | 92598 | 9/8/2015 | CASH | NV License fee | USD | - | 989.00 | 989.00 |
| 570 | Pre2017 | 123 | PERE | 92224 | 9/9/2015 | BCHA | Andrew TT | USD | 35,000.00 | 35,000.00 | 35,000.00 |
| 571 | Pre2017 | 123 | PERE | 92225 | 9/9/2015 | WORK | forex | USD | - | (37,793.05) | (37,793.05) |
| 572 | Pre2017 | 123 | PERE | 92225 | 9/9/2015 | WORK | commission | CAD | - | - | - |
| 573 | Pre2017 | 123 | PERE | 92318 | 9/22/2015 | CASH | debit | CAD | - | - | (5,200.00) |
| 574 | Pre2017 | 123 | PERE | 92433 | 9/24/2015 | CASH | debit | CAD | - | - | - |
| 575 | Pre2017 | 123 | PERE | 92798 | 9/24/2015 | WORK | interest payment | USD | - | 14,761.00 | 14,761.00 |
| 576 | Pre2017 | 123 | PERE | 92945 | 9/29/2015 | WORK | commission | USD | - | 14,761.90 | 5,839.00 |
| 577 | Pre2017 | 123 | PERE | 92954 | 9/30/2015 | WORK | commission | CAD | (1,000.00) | - | (1,000.00) |
| 578 | Pre2017 | 123 | PERE | 92968 | 10/1/2015 | WORK | parking | CAD | - | 60.00 | 60.00 |
| 579 | Pre2017 | 123 | PERE | 92968 | 10/1/2015 | CASH | debit | CAD | - | - | (5,200.00) |
| 580 | Pre2017 | 123 | PERE | 93468 | 10/2/2015 | WORK | forex | CAD | - | - | 19,682.29 |
| 581 | Pre2017 | 123 | PERE | 93479 | 10/2/2015 | WORK | interest payment | CAD | (3,010.00) | (3,010.00) | (3,010.00) |
| 582 | Pre2017 | 123 | PERE | 93708 | 10/28/2015 | CASH | commission | CAD | - | - | 4,354.00 |
| 583 | Pre2017 | 123 | PERE | 93709 | 10/28/2015 | WORK | Commission | CAD | - | - | 2,068.00 |
| 584 | Pre2017 | 123 | PERE | 93836 | 10/31/2015 | WORK | interest payment | USD | - | 0.40 | 0.40 |
| 585 | Pre2017 | 123 | PERE | 93958 | 10/31/2015 | WORK | debit | CAD | - | - | 285.00 |
| 586 | Pre2017 | 123 | PERE | 93964 | 10/31/2015 | CASH | debit | CAD | (430.00) | (430.00) | (430.00) |
| 587 | Pre2017 | 123 | PERE | 93964 | 11/4/2015 | CASH | forex | USD | - | - | - |
| 588 | Pre2017 | 123 | PERE | 94055 | 11/4/2015 | WORK | commission adjust to 10% | USD | - | 2,068.00 | - |
| 589 | Pre2017 | 123 | PERE | 94014 | 11/6/2015 | WORK | commission adjust to 10% | USD | - | 39,770.00 | 39,770.00 |
| 590 | Pre2017 | 123 | PERE | 94050 | 11/6/2015 | WORK | debit | CAD | (5,000.00) | - | (5,000.00) |
| 591 | Pre2017 | 123 | PERE | 94055 | 11/10/2015 | CASH | forex | CAD | - | - | 12,843.00 |
| 592 | Pre2017 | 123 | PERE | 94238 | 11/19/2015 | BCHA | Aim Capital TT | USD | 38,453.00 | 38,453.00 | 38,453.00 |
| 593 | Pre2017 | 123 | PERE | 94244 | 11/19/2015 | WORK | forex | CAD | - | - | 58,542.05 |
| 594 | Pre2017 | 123 | PERE | 94244 | 11/19/2015 | CASH | forex | CAD | - | (38,453.00) | 51,142.50 |
| 595 | Pre2017 | 123 | PERE | 94246 | 11/19/2015 | CASH | debit | CAD | (15,000.00) | - | (15,000.00) |
| 596 | Pre2017 | 123 | PERE | 94532 | 11/30/2015 | WORK | Commission | USD | - | 6,921.00 | - |

| ID | Year | Code | | | Num | Date | Type | Description | Cur | Amt 1 | Amt 2 | Amt 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 597 | Pre2017 | 123 | PERE | PERE | 94533 | 11/30/2015 | LOAN | Commission | CAD | - | - | 3,371.00 |
| 598 | Pre2017 | 123 | PERE | PERE | 94539 | 11/30/2015 | WORK | parking | CAD | - | - | 105.00 |
| 599 | Pre2017 | 123 | PERE | PERE | 94673 | 11/30/2015 | WORK | interest payment | USD | - | - | 0.79 |
| 600 | Pre2017 | 123 | PERE | PERE | 94674 | 11/30/2015 | WORK | interest payment | CAD | - | - | 10.62 |
| 601 | Pre2017 | 123 | PERE | PERE | 94862 | 12/4/2015 | CASH | debit | USD | (1,500.00) | - | (1,500.00) |
| 602 | Pre2017 | 123 | PERE | PERE | 95089 | 12/11/2015 | BCHA | Aim Capital TT | CAD | 13,328.23 | 13,328.23 | 13,328.23 |
| 603 | Pre2017 | 123 | PERE | PERE | 95041 | 12/11/2015 | BCHA | BMO Chart | CAD | - | - | - |
| 604 | Pre2017 | 123 | PERE | PERE | 95164 | 12/16/2015 | CASH | debit | USD | (5,890.00) | - | (5,890.00) |
| 605 | Pre2017 | 123 | PERE | PERE | 95179 | 12/16/2015 | CASH | debit | CAD | (1,000.00) | - | (1,000.00) |
| 606 | Pre2017 | 123 | PERE | PERE | 95139 | 12/18/2015 | WORK | Merry Xmas 2015! | CAD | - | - | 150,000.00 |
| 607 | Pre2017 | 123 | PERE | PERE | 95558 | 12/31/2015 | WORK | commission | USD | (4,000.00) | - | (4,000.00) |
| 608 | Pre2017 | 123 | PERE | PERE | 95559 | 12/31/2015 | WORK | commission | CAD | (3,120.00) | - | (3,120.00) |
| 609 | Pre2017 | 123 | PERE | PERE | 95937 | 12/31/2015 | WORK | parking | CAD | - | - | 210.00 |
| 610 | Pre2017 | 123 | PERE | PERE | 95851 | 12/31/2015 | WORK | interest payment | CAD | - | - | 4,238.00 |
| 611 | Pre2017 | 123 | PERE | PERE | 95852 | 12/31/2015 | WORK | interest payment | CAD | - | - | 92.71 |
| 612 | Pre2017 | 123 | PERE | PERE | 95935 | 1/13/2016 | CASH | debit | CAD | (5,000.00) | - | (5,000.00) |
| 613 | Pre2017 | 123 | PERE | PERE | 96081 | 1/25/2016 | CASH | debit | CAD | (20,000.00) | - | (20,000.00) |
| 614 | Pre2017 | 123 | PERE | PERE | 96200 | 1/29/2016 | CASH | commission | USD | (1,170.00) | - | (1,170.00) |
| 615 | Pre2017 | 123 | PERE | PERE | 96471 | 1/31/2016 | WORK | interest payment | USD | - | - | 1,570.00 |
| 616 | Pre2017 | 123 | PERE | PERE | 96472 | 1/31/2016 | WORK | commission | CAD | - | - | 75.00 |
| 617 | Pre2017 | 123 | PERE | PERE | 96198 | 1/31/2016 | WORK | parking | CAD | - | 26,661.00 | - |
| 618 | Pre2017 | 123 | PERE | PERE | 96415 | 1/31/2016 | WORK | interest payment | USD | - | 164.01 | 164.01 |
| 619 | Pre2017 | 123 | PERE | PERE | 96416 | 1/31/2016 | WORK | interest payment | CAD | - | 25.13 | - |
| 620 | Pre2017 | 123 | PERE | PERE | 96508 | 2/7/2016 | XPHO | xphone dividend | USD | - | 9,000.00 | 9,000.00 |
| 621 | Pre2017 | 123 | PERE | PERE | 96649 | 2/9/2016 | CASH | debit | CAD | (1,170.00) | - | (1,170.00) |
| 622 | Pre2017 | 123 | PERE | PERE | 95723 | 2/19/2016 | SBCH | RISP ck #73 | CAD | - | 4.16 | - |
| 623 | Pre2017 | 123 | PERE | PERE | 96893 | 2/24/2016 | CASH | debit | USD | (5,000.00) | - | (5,000.00) |
| 624 | Pre2017 | 123 | PERE | PERE | 97093 | 2/29/2016 | WORK | commission | CAD | - | - | 3,395.00 |
| 625 | Pre2017 | 123 | PERE | PERE | 97107 | 2/29/2016 | WORK | commission | USD | 7,636.00 | - | - |
| 626 | Pre2017 | 123 | PERE | PERE | 97238 | 2/29/2016 | WORK | interest payment | CAD | 34.32 | - | - |
| 627 | Pre2017 | 123 | PERE | PERE | 97239 | 2/29/2016 | WORK | interest payment | USD | - | 147.14 | 147.14 |
| 628 | Pre2017 | 123 | PERE | PERE | 97472 | 3/6/2016 | WORK | Postcard from Paradise film donation | USD | (1,000.00) | - | (1,000.00) |
| 629 | Pre2017 | 123 | PERE | PERE | 97721 | 3/11/2016 | WORK | debit | USD | (730.00) | - | (730.00) |
| 630 | Pre2017 | 123 | PERE | PERE | 97938 | 3/23/2016 | CASH | debit | CAD | (2,910.00) | - | (2,910.00) |
| 631 | Pre2017 | 123 | PERE | PERE | 97976 | 3/24/2016 | CASH | debit | CAD | (25,000.00) | - | (25,000.00) |
| 632 | Pre2017 | 123 | PERE | PERE | 98477 | 3/30/2016 | WORK | interest payment | USD | 37.87 | - | - |
| 633 | Pre2017 | 123 | PERE | PERE | 98478 | 3/30/2016 | WORK | interest payment | CAD | - | 124.75 | 124.75 |
| 634 | Pre2017 | 123 | PERE | PERE | 98364 | 3/31/2016 | WORK | commission | USD | - | 29,330.00 | 3,002.00 |
| 635 | Pre2017 | 123 | PERE | PERE | 98365 | 3/31/2016 | WORK | commission | CAD | - | - | 3,002.00 |
| 636 | Pre2017 | 123 | PERE | PERE | 98661 | 3/31/2016 | WORK | parking | CAD | - | - | 15.00 |
| 637 | Pre2017 | 123 | PERE | PERE | 98705 | 4/6/2016 | CASH | debit | CAD | (5,000.00) | - | (5,000.00) |
| 638 | Pre2017 | 123 | PERE | PERE | 98755 | 4/7/2016 | CASH | debit | USD | (1,500.00) | (1,500.00) | - |

| ID | Code | | | | Ref # | Date | Acct | Description | Cur | Amt 1 | Amt 2 | Amt 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 639 | Pre2017 | 123 | PERE | PERE | 98835 | 4/11/2016 | BOSA | debit | USD | (1,500.00) | (1,500.00) | - |
| 640 | Pre2017 | 123 | PERE | PERE | 98943 | 4/14/2016 | CASH | debit | CAD | (740.00) | (740.00) | - |
| 641 | Pre2017 | 123 | PERE | PERE | 99062 | 4/20/2016 | CASH | debit | CAD | (13,000.00) | (13,000.00) | - |
| 642 | Pre2017 | 123 | PERE | PERE | 99131 | 4/22/2016 | CASH | debit | USD | (1,000.00) | (1,000.00) | - |
| 643 | Pre2017 | 123 | PERE | PERE | 99179 | 4/25/2016 | SRCH | Suite Bank Gaskech ck #105 | CAD | (21,000.00) | (21,000.00) | - |
| 644 | Pre2017 | 123 | PERE | PERE | 99734 | 4/29/2016 | WORK | commission | CAD | - | 3,133.00 | - |
| 645 | Pre2017 | 123 | PERE | PERE | 99737 | 4/29/2016 | WORK | commission | CAD | - | 3,360.00 | - |
| 646 | Pre2017 | 123 | PERE | PERE | 99615 | 4/30/2016 | WORK | debit | CAD | - | 70.54 | - |
| 647 | Pre2017 | 123 | PERE | PERE | 99616 | 4/30/2016 | WORK | interest payment | CAD | - | 97.66 | - |
| 648 | Pre2017 | 123 | PERE | PERE | 99490 | 5/2/2016 | WORK | internal transfer parking April | CAD | - | 285.00 | - |
| 649 | Pre2017 | 123 | PERE | PERE | 100689 | 5/31/2016 | CASH | commission | CAD | (2,000.00) | (2,000.00) | - |
| 650 | Pre2017 | 123 | PERE | PERE | 99930 | 5/11/2016 | CASH | debit | CAD | (1,485.00) | (1,485.00) | - |
| 651 | Pre2017 | 123 | PERE | PERE | 100150 | 5/23/2016 | CASH | debit | CAD | (1,540.00) | (1,540.00) | - |
| 652 | Pre2017 | 123 | PERE | PERE | 100144 | 5/20/2016 | CASH | interest payment | CAD | - | 82.76 | - |
| 653 | Pre2017 | 123 | PERE | PERE | 100636 | 5/30/2016 | WORK | interest payment | CAD | - | 85.29 | - |
| 654 | Pre2017 | 123 | PERE | PERE | 100639 | 5/29/2016 | WORK | interest payment | CAD | - | 64.35 | - |
| 655 | Pre2017 | 123 | PERE | PERE | 101150 | 6/23/2016 | CASH | interest payment | CAD | - | 66.04 | - |
| 656 | Pre2017 | 123 | PERE | PERE | 101638 | 6/29/2016 | CASH | commission | CAD | - | 120.00 | - |
| 657 | Pre2017 | 123 | PERE | PERE | 101639 | 6/29/2016 | WORK | parking | CAD | - | 4,965.00 | - |
| 658 | Pre2017 | 123 | PERE | PERE | 101722 | 6/30/2016 | WORK | commission | USD | - | 5,001.00 | - |
| 659 | Pre2017 | 123 | PERE | PERE | 101439 | 6/30/2016 | WORK | commission | CAD | - | 7,597.00 | - |
| 660 | Pre2017 | 123 | PERE | PERE | 101440 | 6/30/2016 | WORK | interest payment | CAD | - | 1,993.00 | - |
| 661 | Pre2017 | 123 | PERE | PERE | 102224 | 7/1/2016 | HERO | commission | CAD | (6,000.00) | (6,000.00) | - |
| 662 | Pre2017 | 123 | PERE | PERE | 101738 | 7/4/2016 | CASH | Great Wall TT | CAD | (9,450.00) | (9,450.00) | - |
| 663 | Pre2017 | 123 | PERE | PERE | 101840 | 7/8/2016 | XPHO | xphone dividend | CAD | (12,362.10) | (12,362.10) | - |
| 664 | Pre2017 | 123 | PERE | PERE | 102078 | 7/12/2016 | CASH | debit | CAD | - | 77.50 | - |
| 665 | Pre2017 | 123 | PERE | PERE | 102079 | 7/12/2016 | CASH | debit | USD | - | 78.95 | - |
| 666 | Pre2017 | 123 | PERE | PERE | 102375 | 7/30/2016 | WORK | Commission | USD | - | 14,174.00 | - |
| 667 | Pre2017 | 123 | PERE | PERE | 102497 | 7/30/2016 | WORK | debit | CAD | (8,850.00) | (8,850.00) | - |
| 668 | Pre2017 | 123 | PERE | PERE | 102498 | 7/30/2016 | WORK | interest payment | CAD | (4,500.00) | (4,500.00) | (4,500.00) |
| 669 | Pre2017 | 123 | PERE | PERE | 102827 | 8/2/2016 | WORK | debit | CAD | - | 8,000.00 | - |
| 670 | Pre2017 | 123 | PERE | PERE | 102827 | 8/2/2016 | WORK | forex | CAD | 102.45 | 102.45 | - |
| 671 | Pre2017 | 123 | PERE | PERE | 102743 | 8/10/2016 | CASH | credit | CAD | (100,000.00) | (100,000.00) | (100,000.00) |
| 672 | Pre2017 | 123 | PERE | PERE | 102824 | 8/12/2016 | CASH | debit | CAD | 9,000.00 | 9,000.00 | - |
| 673 | Pre2017 | 123 | PERE | PERE | 102093 | 8/24/2016 | CASH | forex | CAD | (6,915.87) | - | (6,915.87) |
| 674 | Pre2017 | 123 | PERE | PERE | 103093 | 8/24/2016 | WORK | commission | CAD | (9,160.00) | (9,160.00) | (9,160.00) |
| 675 | Pre2017 | 123 | PERE | PERE | 103050 | 8/26/2016 | CASH | debit | CAD | (2,376.75) | (2,376.75) | (2,376.75) |
| 676 | Pre2017 | 123 | PERE | PERE | 105155 | 8/31/2016 | BOSA | LI TT | USD | - | 8,712.00 | - |
| 677 | Pre2017 | 123 | PERE | PERE | 103312 | 8/31/2016 | WORK | commission | USD | - | 16,287.36 | - |
| 678 | Pre2017 | 123 | PERE | PERE | 103313 | 8/31/2016 | WORK | commission | CAD | 972.00 | 972.00 | - |
| 679 | Pre2017 | 123 | PERE | PERE | 105431 | 8/31/2016 | WORK | interest payment | CAD | 81.29 | 81.29 | - |
| 680 | Pre2017 | 123 | PERE | PERE | 103432 | 8/31/2016 | WORK | Huang Haisheng TT returned | CAD | - | 97.66 | - |
| 681 | Pre2017 | 123 | PERE | PERE | 103540 | 9/6/2016 | BOSA | interest payment | USD | (96.98) | (96.98) | (96.98) |

| ID | Source | | | | Ref | Date | Acct | Description | Cur | Amt1 | Amt2 | Amt3 | Amt4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 682 | Pre2017 | 123 | PERE | PERE | 103572 | 9/7/2016/CASH | CASH | debit | CAD | (1,000.00) | | (1,000.00) | - |
| 683 | Pre2017 | 123 | PERE | PERE | 103629 | 9/8/2016 | WORK | forex | CAD | | (7,676.56) | | - |
| 684 | Pre2017 | 123 | PERE | PERE | 103629 | 9/8/2016 | WORK | forex | CAD | | 9,995.52 | | - |
| 685 | Pre2017 | 123 | PERE | PERE | 103625 | 9/9/2016 | CASH | debit | USD | (10,000.00) | | (10,000.00) | - |
| 686 | Pre2017 | 123 | PERE | PERE | 103760 | 9/13/2016 | WORK | forex | USD | | (15,140.00) | | - |
| 687 | Pre2017 | 123 | PERE | PERE | 103760 | 9/13/2016 | WORK | forex | USD | 20,000.00 | | 20,000.00 | - |
| 688 | Pre2017 | 123 | PERE | PERE | 103961 | 9/20/2016 | WORK | interest payment | USD | | (15,187.40) | | - |
| 689 | Pre2017 | 123 | PERE | PERE | 103961 | 9/20/2016 | WORK | interest payment | CAD | | 13.80 | | - |
| 690 | Pre2017 | 123 | PERE | PERE | 103992 | 9/26/2016 | CASH | debit | CAD | (20,000.00) | | 20,000.00 | - |
| 691 | Pre2017 | 123 | PERE | PERE | 103992 | 9/20/2016 | WORK | Commission | CAD | | 7,951.00 | (20,000.00) | - |
| 692 | Pre2017 | 123 | PERE | PERE | 104318 | 9/30/2016 | WORK | parking | CAD | | 135.00 | 135.00 | - |
| 693 | Pre2017 | 123 | PERE | PERE | 104340 | 9/30/2016 | WORK | Commission | CAD | (10,000.00) | 17,704.00 | | - |
| 694 | Pre2017 | 123 | PERE | PERE | 104337 | 9/30/2016 | WORK | interest payment | CAD | | (3,057.03) | (3,057.03) | - |
| 695 | Pre2017 | 123 | PERE | PERE | 104311 | 9/30/2016 | WORK | interest payment | CAD | | 14,244.00 | | - |
| 696 | Pre2017 | 123 | PERE | PERE | 104311 | 9/30/2016 | WORK | forex | USD | | 61.48 | | - |
| 698 | Pre2017 | 123 | PERE | PERE | 104443 | 9/30/2016 | WORK | forex | CAD | | | 4,065.85 | - |
| 699 | Pre2017 | 123 | PERE | PERE | 104444 | 9/30/2016 | WORK | debit | USD | | | 13.80 | - |
| 700 | Pre2017 | 123 | PERE | PERE | 104571 | 10/3/2016/BCHA | BCHA | Yvonne Gatarch | CAD | 15,000.00 | | 15,000.00 | - |
| 701 | Pre2017 | 123 | PERE | PERE | 104693 | 10/5/2016/CASH | CASH | debit | CAD | (20,000.00) | | (20,000.00) | - |
| 702 | Pre2017 | 123 | PERE | PERE | 105785 | 11/9/2016/CASH | CASH | debit | CAD | (20,000.00) | | (20,000.00) | - |
| 703 | Pre2017 | 123 | PERE | PERE | 105550 | 11/30/2016 | WORK | Commission | CAD | | | 18,184.00 | - |
| 704 | Pre2017 | 123 | PERE | PERE | 105561 | 11/30/2016 | WORK | Commission | CAD | | | 2,258.00 | - |
| 705 | Pre2017 | 123 | PERE | PERE | 105606 | 10/29/2016 | WORK | Commission | CAD | 15,000.00 | 15,934.00 | | - |
| 706 | Pre2017 | 123 | PERE | PERE | 105607 | 10/29/2016 | WORK | Commission | CAD | | 52.86 | | - |
| 707 | Pre2017 | 123 | PERE | PERE | 106448 | 10/28/2016 | WORK | interest payment | CAD | | 75.23 | 28.82 | - |
| 708 | Pre2017 | 123 | PERE | PERE | 106449 | 10/28/2016 | WORK | interest payment | CAD | | | | - |
| 709 | Pre2017 | 123 | PERE | PERE | 106491 | 12/16/2016/CASH | CASH | cash found in desk | USD | (20,000.00) | | 100,000.00 | - |
| 710 | Pre2017 | 123 | PERE | PERE | 106492 | 11/30/2016 | WORK | Merry Xmas 2016! | CAD | | | 210.00 | - |
| 711 | Pre2017 | 123 | PERE | PERE | 106491 | 11/30/2016 | WORK | interest payment | CAD | | 81.55 | 63.71 | - |
| 712 | Pre2017 | 123 | PERE | PERE | 106983 | 12/28/2016 | WORK | interest payment | CAD | | | | - |
| 713 | Pre2017 | 123 | PERE | PERE | 107129 | 12/30/2016 | WORK | Commission | CAD | | | 10,762.00 | - |
| 714 | Pre2017 | 123 | PERE | PERE | 107335 | 12/30/2016 | WORK | Commission | USD | | 933.30 | | - |
| 715 | SKYFALL | 123 | PERE | PERE | 107336 | 12/31/2016 | WORK | Commission | CAD | | | 1,745.00 | - |
| 716 | SKYFALL | 123 | PERE | PERE | 107537 | 12/31/2016/SGPE | SGPE | commission opening balance | CAD | | | 524.77 | - |
| 717 | SKYFALL | 123 | PERE | PERE | 107538 | 12/31/2016/SGPE | SGPE | commission opening balance | CAD | | | | - |
| 718 | SKYFALL | 123 | PERE | PERE | 108416 | 12/31/2016/SGPE | SGPE | Commission | USD | | | 3,626.00 | - |
| 718 | SKYFALL | 123 | PERE | PERE | 108417 | 1/31/2017 | WORK | internal transfer | CAD | | 11,998.00 | | - |
| 719 | SKYFALL | 123 | PERE | PERE | 108810 | 1/31/2017 | XPHO | xphone dividend | CAD | | 6,000.00 | | - |
| 720 | SKYFALL | 123 | PERE | PERE | 109182 | 2/28/2017 | iPhones | Commission | USD | | 3,063.00 | | - |

A3582

| # | | | | | Num | Date | Code | Description | Cur | Amt1 | Amt2 | Amt3 | Amt4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 721 | SKYFALL | 123 | PERE | PERE | 109183 | 2/28/2017 | WORK | Commission | CAD | | | 3,707.00 | - |
| 722 | SKYFALL | 123 | PERE | PERE | 109640 | 3/15/2017 | AFTR | AfAsia Truc Huo Xiaoping TT | USD | (40,560.75) | | | - |
| 723 | SKYFALL | 123 | PERE | PERE | 110007 | 3/30/2017 | WORK | commission | CAD | | 13,909.00 | | - |
| 724 | SKYFALL | 123 | PERE | PERE | 110006 | 3/30/2017 | WORK | commission | USD | | 5,678.00 | | |
| 725 | SKYFALL | 123 | PERE | PERE | 110577 | 4/28/2017 | WORK | commission | CAD | | | 2,041.00 | - |
| 726 | SKYFALL | 123 | PERE | PERE | 110576 | 4/28/2017 | WORK | commission | USD | | 538.00 | | |
| 727 | SKYFALL | 123 | PERE | PERE | 110854 | 5/2/2017 | AFTR | AfAsia Truc Huo Xiaoping TT | USD | (35,773.55) | (35,773.55) | | - |
| 728 | SKYFALL | 123 | PERE | PERE | 111029 | 5/19/2017 | AFTR | AfAsia Truc Huo Xiaoping TT | USD | (40,180.15) | (40,180.15) | | - |
| 729 | SKYFALL | 123 | PERE | PERE | 111288 | 5/31/2017 | WORK | commission | USD | | 6,039.00 | | |
| 730 | SKYFALL | 123 | PERE | PERE | 111289 | 5/31/2017 | AFTR | commission | CAD | | | | |
| 731 | SKYFALL | 123 | PERE | PERE | 111620 | 6/25/2017 | AFTR | W&8 TT | USD | (39,078.50) | (39,078.50) | | - |
| 732 | SKYFALL | 123 | PERE | PERE | 111643 | 6/27/2017 | TOCH | TD CHE | OBC returned | USD | 421.00 | 421.00 | | - |
| 733 | SKYFALL | 123 | PERE | PERE | 111914 | 6/30/2017 | WORK | commission | USD | | 10,079.00 | | - |
| 734 | SKYFALL | 123 | PERE | PERE | 111915 | 6/30/2017 | WORK | Commission | CAD | | | 3,871.00 | - |
| 735 | SKYFALL | 123 | PERE | PERE | 111934 | 6/30/2017 | TOCH | TD CHE | Great Will ck #236 | CAD | (11,000.00) | (11,000.00) | | - |
| 736 | SKYFALL | 123 | PERE | PERE | 112270 | 7/18/2017 | WBMO | W&21 Mor | Great Wall TT | CAD | (9,869.70) | (9,869.70) | | - |
| 737 | SKYFALL | 123 | PERE | PERE | 112372 | 7/24/2017 | CASH | debit | CAD | (10,335.00) | (10,335.00) | | - |
| 738 | SKYFALL | 123 | PERE | PERE | 112452 | 7/26/2017 | CASH | debit | CAD | (20,000.00) | (20,000.00) | | - |
| 739 | SKYFALL | 123 | PERE | PERE | 112516 | 7/28/2017 | CASH | debit | CAD | (287.00) | (287.00) | | - |
| 740 | SKYFALL | 123 | PERE | PERE | 112703 | 7/31/2017 | WORK | Commission | CAD | | | | |
| 741 | SKYFALL | 123 | PERE | PERE | 112704 | 7/31/2017 | WORK | Commission | USD | | 9,583.00 | 3,645.00 | - |
| 742 | SKYFALL | 123 | PERE | PERE | 112808 | 8/3/2017 | CASH | debit | CAD | (844.00) | (844.00) | | - |
| 743 | SKYFALL | 123 | PERE | PERE | 115416 | 8/29/2017 | CASH | debit | CAD | (9,975.00) | (9,975.00) | | - |
| 744 | SKYFALL | 123 | PERE | PERE | 115675 | 8/31/2017 | WORK | Commission | USD | | 6,680.00 | | |
| 745 | SKYFALL | 123 | PERE | PERE | 115676 | 8/31/2017 | WORK | Commission | CAD | | | 4,282.00 | - |
| 746 | SKYFALL | 123 | PERE | PERE | 116126 | 9/23/2017 | debit | debit | CAD | (11,125.00) | (11,125.00) | | - |
| 747 | SKYFALL | 123 | PERE | PERE | 116649 | 9/29/2017 | CASH | CASH | CAD | (9,192.00) | (9,192.00) | | - |
| 748 | SKYFALL | 123 | PERE | PERE | 116504 | 9/30/2017 | WORK | Commission | CAD | - | - | 8,492.00 | - |

| # | | | | | | Date | | Description | Cur | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 749 | SKYFALL | 123 | PERE | PERE | 116503 | 9/30/2017 | WORK | Commission | USD | - | 11,327.00 | - | - |
| 750 | SKYFALL | 123 | PERE | PERE | 116851 | 10/19/2017 | AFTR | AirAsia Tru W&8 TT | USD | (38,077.00) | (38,077.00) | - | - |
| 751 | SKYFALL | 123 | PERE | PERE | 116926 | 10/24/2017 | CASH | debit | CAD | (5,990.00) | - | (5,990.00) | - |
| 752 | SKYFALL | 123 | PERE | PERE | 117274 | 10/31/2017 | WORK | Commission | USD | - | 6,186.00 | - | - |
| 753 | SKYFALL | 123 | PERE | PERE | 117275 | 10/31/2017 | WORK | Commission | USD | - | 8,046.00 | - | - |
| 754 | SKYFALL | 123 | PERE | PERE | 117693 | 11/20/2017 | CASH | debit | CAD | (20,000.00) | (20,000.00) | (20,000.00) | - |
| 755 | SKYFALL | 123 | PERE | PERE | 117975 | 11/20/2017 | WORK | Commission | USD | - | 7,252.00 | 6,576.00 | - |
| 756 | SKYFALL | 123 | PERE | PERE | 117976 | 11/30/2017 | WORK | Commission | CAD | - | - | - | - |
| 757 | SKYFALL | 123 | PERE | PERE | 118250 | 12/16/2017 | WORK | Merry Xmas! | USD | - | - | 100,000.00 | - |
| 758 | SKYFALL | 123 | PERE | PERE | 118259 | 12/18/2017 | CASH | debit | CAD | (30,000.00) | (30,000.00) | - | - |
| 759 | SKYFALL | 123 | PERE | PERE | 118305 | 12/19/2017 | CASH | debit | CAD | (18,160.00) | - | (18,160.00) | - |
| 760 | SKYFALL | 123 | PERE | PERE | 118633 | 12/31/2017 | WORK | commission | USD | - | - | 15,540.00 | - |
| 761 | SKYFALL | 123 | PERE | PERE | 118632 | 12/31/2017 | WORK | commission | USD | - | 16,416.00 | - | - |
| 762 | SKYFALL | 123 | PERE | PERE | 118351 | 1/1/2018 | AFTR | AirAsia Tru Hua TT | CAD | (30,150.12) | - | (30,150.12) | - |
| 763 | SKYFALL | 123 | PERE | PERE | 118763 | 1/19/2018 | CASH | debit | CAD | (18,160.00) | - | (18,160.00) | - |
| 764 | SKYFALL | 123 | PERE | PERE | 118384 | 1/31/2018 | WORK | Commission | USD | - | 4,089.00 | - | - |
| 765 | SKYFALL | 123 | PERE | PERE | 118985 | 1/31/2018 | WORK | Commission | USD | - | - | 3,385.00 | - |
| 766 | SKYFALL | 123 | PERE | PERE | 119225 | 2/19/2018 | CASH | debit | CAD | (8,010.00) | - | (8,010.00) | - |
| 767 | SKYFALL | 123 | PERE | PERE | 119470 | 2/28/2018 | WORK | Commission | USD | - | 4,892.00 | - | - |
| 768 | SKYFALL | 123 | PERE | PERE | 119471 | 2/28/2018 | CASH | debit | CAD | (17,620.00) | - | (17,620.00) | - |
| 769 | SKYFALL | 123 | PERE | PERE | 119572 | 3/14/2018 | CASH | debit | CAD | - | 2,674.00 | - | - |
| 770 | SKYFALL | 123 | PERE | PERE | 119909 | 3/28/2018 | WORK | Norland 51.6M x 16.67% | CAD | - | - | 266,720.00 | - |
| 771 | SKYFALL | 123 | PERE | PERE | 120004 | 3/31/2018 | WORK | Commission | CAD | - | 7,290.00 | - | - |
| 772 | SKYFALL | 123 | PERE | PERE | 120005 | 3/31/2018 | WORK | Commission | CAD | - | - | 5,662.00 | - |
| 773 | SKYFALL | 123 | PERE | PERE | 120022 | 4/2/2018 | WIRI | Wintercap Hua TT | USD | (30,060.00) | (30,060.00) | - | - |
| 774 | SKYFALL | 123 | PERE | PERE | 120206 | 4/23/2018 | WIRI | Wintercap Chen TT | USD | (15,030.00) | (15,030.00) | - | - |
| 775 | SKYFALL | 123 | PERE | PERE | 120057 | 4/30/2018 | WORK | Commission | CAD | - | - | 1,027.00 | - |
| 776 | SKYFALL | 123 | PERE | PERE | 120058 | 4/30/2018 | WORK | Commission | USD | - | 2,046.00 | - | - |

A3584

| # | Entity | | | | Ref | Date | Code | Description | Cur | Amount 1 | Amount 2 | Amount 3 | Amount 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 777 | SKYFALL | 123 | PERE | PERE | 120410 | 5/1/2018 | WIHI | Wintercap Sun Life TT | CAD | (100,216.03) | | (100,216.03) | - |
| 778 | SKYFALL | 123 | PERE | PERE | 120647 | 5/23/2018 | CASH | debit | CAD | (16,700.00) | | (16,700.00) | - |
| 779 | SKYFALL | 123 | PERE | PERE | 120796 | 5/31/2018 | WORK | Commission | CAD | | 5,778.00 | | - |
| 780 | SKYFALL | 123 | PERE | PERE | 120797 | 5/31/2018 | WORK | Commission | CAD | 1,030.00 | | 1,030.00 | - |
| 781 | SKYFALL | 123 | PERE | PERE | 121120 | 6/27/2018 | CASH | debit | CAD | (50,000.00) | | (50,000.00) | - |
| 782 | SKYFALL | 123 | PERE | PERE | 121253 | 6/30/2018 | WORK | Commission | USD | | 10,699.00 | | - |
| 783 | SKYFALL | 123 | PERE | PERE | 121252 | 6/30/2018 | WORK | Commission | CAD | | 9,246.00 | | - |
| 784 | SKYFALL | 123 | PERE | PERE | 121481 | 7/18/2018 | WFRR | Wells Farg shareholders loan | USD | (20,000.00) | | (20,000.00) | - |
| 785 | SKYFALL | 123 | PERE | PERE | 121483 | 7/18/2018 | WFLL | Wells Farg | USD | 500.00 | 500.00 | 500.00 | - |
| 786 | SKYFALL | 123 | PERE | PERE | 121660 | 7/31/2018 | WORK | Commission | USD | 500.00 | 500.00 | | - |
| 787 | SKYFALL | 123 | PERE | PERE | 121661 | 7/31/2018 | WORK | Commission | CAD | | 1,633.00 | | - |
| 788 | SKYFALL | 123 | PERE | PERE | 121773 | 8/13/2018 | CASH | Commission | CAD | 530.00 | | 530.00 | - |
| 789 | SKYFALL | 123 | PERE | PERE | 122005 | 8/31/2018 | WORK | shareholders loan | USD | | | 4,239.00 | - |
| 790 | SKYFALL | 123 | PERE | PERE | 122006 | 8/31/2018 | WORK | Commission | USD | | 879.00 | | - |
| 791 | SKYFALL | 123 | PERE | PERE | 121905 | 9/1/2018 | WIHI | Xiaoping Huo TT BM | USD | (20,040.00) | | (20,040.00) | - |
| 792 | SKYFALL | 123 | PERE | PERE | 122112 | 9/12/2018 | CASH | debit | CAD | (690.00) | | (690.00) | - |
| 793 | SKYFALL | 123 | PERE | PERE | 122131 | 9/17/2018 | CASH | debit | CAD | (10,000.00) | | (10,000.00) | - |
| 794 | SKYFALL | 123 | PERE | PERE | 122452 | 9/28/2018 | CASH | debit | CAD | (1,720.00) | | (1,720.00) | - |
| 795 | SKYFALL | 123 | PERE | PERE | 122401 | 9/30/2018 | WORK | Commission | CAD | | | 3,627.00 | - |
| 796 | SKYFALL | 123 | PERE | PERE | 122402 | 10/31/2018 | WORK | Commission | USD | | 5,518.00 | | - |
| 797 | SKYFALL | 123 | PERE | PERE | 122822 | 10/31/2018 | WORK | Commission | USD | | 516.00 | | - |
| 798 | SKYFALL | 123 | PERE | PERE | 122823 | 10/31/2018 | WORK | Commission | CAD | | | 2,469.00 | - |
| 799 | SKYFALL | 123 | PERE | PERE | 122855 | 11/1/2018 | CASH | debit | CAD | (7,810.00) | | (7,810.00) | - |
| 800 | SKYFALL | 123 | PERE | PERE | 122947 | 11/26/2018 | CASH | debit | CAD | (20,000.00) | | (20,000.00) | - |
| 801 | SKYFALL | 123 | PERE | PERE | 123014 | 11/30/2018 | WORK | Commission | USD | - | | - | - |
| 802 | SKYFALL | 123 | PERE | PERE | 123015 | 11/30/2018 | WORK | Commission | CAD | - | 785.00 | 1,574.00 | - |
| 803 | SKYFALL | 123 | PERE | PERE | 123282 | 12/3/2018 | CASH | debit | CAD | (20,000.00) | | (20,000.00) | - |
| 804 | SKYFALL | 123 | PERE | PERE | 123076 | 12/15/2018 | CASH | debit | CAD | (20,000.00) | | (20,000.00) | - |

| ID | | | | | Ref | Date | Type | Description | Cur | Amt1 | Amt2 | Amt3 | Amt4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 805 | SKYFALL | 123 | PERE | PERE | 123068 | 12/18/2018 | WORK | Merry Xmas! | CAD | | | 70,000.00 | - |
| 806 | SKYFALL | 123 | PERE | PERE | 123157 | 12/31/2018 | WORK | Commission | USD | 649.00 | | | - |
| 807 | SKYFALL | 123 | PERE | PERE | 123158 | 12/31/2018 | WORK | Commission | CAD | | | | 395.00 |
| 808 | SKYFALL | 123 | PERE | PERE | 123255 | 1/16/2019 | CASH | debit | CAD | (20,000.00) | | 25.00 | (20,000.00) |
| 809 | SKYFALL | 123 | PERE | PERE | 123288 | 1/22/2019 | WORK | internal transfer certified BMO cheque | CAD | (20,000.00) | | | (20,000.00) |
| 810 | SKYFALL | 123 | PERE | PERE | 123331 | 1/30/2019 | CASH | debit | CAD | (20,000.00) | | | (20,000.00) |
| 811 | SKYFALL | 123 | PERE | PERE | 123376 | 1/31/2019 | WORK | Commission | CAD | | 659.00 | | - |
| 812 | SKYFALL | 123 | PERE | PERE | 123377 | 1/31/2019 | WORK | Commission | CAD | | | 1,450.00 | |
| 813 | SKYFALL | 123 | PERE | PERE | 123379 | 2/1/2019 | BSCI | W&B TT | USD | (49,911.10) | (49,911.10) | | - |
| 814 | SKYFALL | 123 | PERE | PERE | 123415 | 2/12/2019 | BSCI | forex | USD | (25,087.50) | | | (55,341.90) |
| 815 | SKYFALL | 123 | PERE | PERE | 123458 | 2/25/2019 | CASH | debit | CAD | (27,000.00) | | | (27,000.00) |
| 816 | SKYFALL | 123 | PERE | PERE | 123507 | 2/28/2019 | WORK | Commission | CAD | | 530.00 | | 170.00 |
| 817 | SKYFALL | 123 | PERE | PERE | 123512 | 2/28/2019 | WORK | Commission | CAD | | | | - |
| 818 | SKYFALL | 123 | PERE | PERE | 123512 | 2/28/2019 | WORK | forex | USD | | 41,925.68 | | - |
| 819 | SKYFALL | 123 | PERE | PERE | 123674 | 2/28/2019 | WORK | forex | USD | | | 197.00 | - |
| 820 | SKYFALL | 123 | PERE | PERE | 123674 | 3/30/2019 | WORK | Commissions | CAD | | | | - |
| 821 | SKYFALL | 123 | PERE | PERE | 123675 | 3/30/2019 | WORK | Commissions | CAD | | | 303.00 | - |
| 822 | SKYFALL | 123 | PERE | PERE | 123708 | 4/3/2019 | WORK | internal transfer Coleman sale | USD | | 148,272.00 | | 50,000.00 |
| 823 | SKYFALL | 123 | PERE | PERE | 123709 | 4/3/2019 | WORK | adjust Coleman split 2/3 of Norland profit balance | CAD | | | | (31,060.00) |
| 824 | SKYFALL | 123 | PERE | PERE | 123710 | 4/3/2019 | WORK | adjust Coleman split by 1/2 of bank account shortfall $14 | CAD | | | | 29,929.00 |
| 825 | SKYFALL | 123 | PERE | PERE | 123711 | 4/3/2019 | WORK | adjust shortfall of Coleman payments vs split $1,331,705 | USD | (148,596.00) | (148,596.00) | | - |
| 826 | SKYFALL | 123 | PERE | PERE | 123648 | 4/3/2019 | BSCI | Huo Xianqing TT | USD | (14,000.00) | | | (14,000.00) |
| 827 | SKYFALL | 123 | PERE | PERE | 123717 | 4/4/2019 | CASH | Banco Sant | CAD | (14,000.00) | | | (14,000.00) |
| 828 | SKYFALL | 123 | PERE | PERE | 123763 | 4/13/2019 | CASH | debit | CAD | (10,000.00) | | | (10,000.00) |
| 829 | SKYFALL | 123 | PERE | PERE | 123825 | 4/13/2019 | WORK | Commission | CAD | | | | 543.00 |
| 830 | SKYFALL | 123 | PERE | PERE | 123826 | 4/30/2019 | WORK | Commission | CAD | | | 204.00 | - |
| 831 | SKYFALL | 123 | PERE | PERE | 123832 | 5/1/2019 | CASH | debit | CAD | (15,000.00) | | | (15,000.00) |
| 832 | SKYFALL | 123 | PERE | PERE | 123915 | 5/22/2019 | CASH | debit | CAD | (20,000.00) | | | (20,000.00) |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br> **Plaintiff,** <br><br> v. <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br> **Defendants.** | **No. 21-cv-11276-WGY** <br><br><br> **Leave to file granted on February 22, 2024** |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION**
**FOR REMEDIES AGAINST DEFENDANTS PAUL SEXTON, MIKE**
**VELDHUIS, AND COURTNEY KELLN**

The Commission submits this reply memorandum in support of its motion for remedies against defendants Paul Sexton ("Sexton"), Courtney Kelln ("Kelln") and Mike Veldhuis ("Veldhuis") and to address certain of the arguments raised in the opposition brief filed by Sexton ("Sexton Br.") and the joinder to that brief filed by Kelln and Veldhuis ("Joinder"). *See* Dkt. Nos. 454, 455. Those briefs assert that the defendants should not bear any consequences of their violations even though they have conceded their liaiblity. Such a result would be inconsistent with the Court's judgments imposing remedies on their co-defendants Sharp, Taylor, Dhillon and Kaitz, and would be contrary to the law.

**A. Defendants' Course of Conduct Violated the Anti-Fraud Provisions of the Securities Laws.**

Defendants betray a fundamental misunderstanding of the Commission's theory of liability *and* the evidence against them and ask this court to consider only each individual tree,

1

A3587

rather than the forest itself.  Sexton repeats throughout his brief arguments to the effect of "there

are no findings in the record that particular transactions constituted violations of the securities

laws."  Sexton Br. at 2.  That is because every step taken by defendants to sell stock through

Sharp-administered nominees was designed to conceal their control over stock and companies

and thereby circumvent both required disclosure rules and registration requirements..  To be

clear, Veldhuis, Sexton, and Friesen (together the "Veldhuis Control Group") could not have

sold their holdings in the Fourteen Issuers without disguising their ownership through the web of

nominees offered by Sharp.  This anonymity was the raison d'etre of Sharp's enterprise,

Silverton, and Blacklight.  Roger Knox said it best, they "were operating a criminal enterprise."

Tr. 9.20.23 Knox 28:19.[1]

As numerous witnesses testified, and documents corroborate, a critical service provided

by the Sharp Group was to allow control groups, like the Veldhuis Control Group, to split shares

into certificates of less than five percent and have them held in the names of various nominee

entities.  Tr. 9.12.23 Dhillon 49:16-17 ("we went through an effort to not disclose our

ownership"); 56:15-16 ("the primary objective was to have enough so that no one [nominee]

owned more than 5 percent"… "[a]s soon as you get past that threshold, then you have to

disclose who the owner of that 5 percent-plus block of shares actually is.") 68:16-69:23 (walking

jurors through Demonstrative A showing stock being split into groups of less than 5%); 77:3-15

(splitting shares into less than 5% so that Sexton and his group could avoid disclosure and sell

"incognito"); 1041-4 (same); Tr. 9.19.23 Knox 58:18-60:8 (Silverton provided "a level of

unanimity [sic] to [control groups] in order that we could access the markets, not to declare that

---

[1] Citations to the trial transcripts appear in this form, which includes the date of the testimony, the witness' name and the page and line numbers of the witness' testimony.  Admitted trial exhibits are designated as "Tr. Ex." and their admitted number.

A3588

we're holding more than 5 percent, and sell shares usually into a promotion of the companies";

Silverton initially offered four nominee accounts so that they could "deposit 20 percent of a

public company without making any disclosures to the regulators."); 66:20-67:3 (Sharp's

business offered clients the ability to deposit shares without having to reveal their ownership of

those shares); 74:16-75:7 (Kelln broke stock into 5% or less); Tr. 9.21.23 Ciapala 114:17-115:2

(stock broke into below 5%); 120:7-15 (same).  Dividing stock like this and transferring it to

nominee entities was essential to defendants' scheme because, before selling their shares into the

public markets, those shares "had to be either registered or ultimately transferred into…

nonaffiliate accounts."  Tr. 9.20.23 Dhillon 93:22-25.  If the shares had been held by a single

nominee, "[t]hey would have been restricted."  *Id.* at 105:2-4.  This was precisely the scheme

that Sexton, Veldhuis and Friesen used to sell shares of the Fourteen Issuers.  Tr. Ex. 308

(showing sales of the Fourteen Issuers shares through numerous Sharp Group nominees).

Second, the Veldhuis Control Group's significant holdings were often sold into the

demand created by a concurrently-run promotional campaign which created trading volume, and

propped up the stock's price.  Tr. 9.14.23 Kaitz 91:18-24 (volume); Tr. 9.12.23 Dhillon 70:7-16

(price and volume); 78:15-21 (same); 115:19-25 (same).  William Kaitz, who ran promotions on

behalf of the Veldhuis Control Group, coordinated the timing of those campaigns with Veldhuis,

sought payment from nominee entities through Veldhuis, and received input on the content from

Veldhuis, Sexton, and Friesen.  Tr. 9.14.23 Kaitz 104:11-105:20.  Veldhuis, Sexton, and Friesen

knew that none of the dislcaimers included in those promotions would reveal that the Veldhuis

Control Group was selling stock in the promoted company, nor that they wre funding the

promotions.  *Id.* at 127:3-15.

Sexton, Veldhuis, and Friesen all knew what they were doing was wrong.  *See* Comm.

A3589

Brief, Dkt. No. 426, at 17 (Sexton, Veldhuis, and Friesen discuss "losing" their computers in response to a subpoena); *see also* Tr. 9.12.23 Dhillon 80:13-23 (Sexton understood the legal requirements pertaining to the fraudulent transactions). In addition to destroying their own evidence, Veldhuis and Sexton advised Roger Knox not to travel to the United States based on concerns over the ongoing SEC investigation. Tr. 9.19.23 Knox 88:16-89:15. Finally, Defendants used encrypted messaging and code names for additional security precisely because they knew they were involved in a criminal enterprise. Tr. 9.20.23 Knox 20:5-11; 38:8-12.

Numerous witnesses testified that Sexton, Veldhuis and Friesen were business partners and worked together on deals relating to sales of stock in the Fourteen Issuers. Tr. 9.14.23 Kaitz 99:8-20; Tr. 9.19.23 Knox 78:16-19; 87:24-88:1; Tr. 9.20.23 Knox 7:2-6; 7:12-14. Moreover, records from the Q system show that Veldhuis, Sexton, and Friesen routinely received the proceeds of stock sales from the Fourteen Issuers into their own personal Q accounts. Dkt. No. 427, ¶¶10-15. Although defendants seem to have overlooked the Court's ruling (*see* Sexton Br. at 6), the Q system was admitted as a business record following Fedir Nikolayev's testimony and was also admitted as co-conspirators' statements. Tr. 9.15.23 Court 72:5-8 ("Now I've listened to enough of Nikolayev, unless he recants, that it seems to me that – I was limiting it to the Q-System, that it satifies the requirements of a business record."). In addition to Nikolayev's testimony establishing the admissibility of Q, both Knox and Kenneth Ciapala testified regarding the reliability and accordingly the weight that should be afforded to the Q system records. Both testified to inputting data directly into the Q system based on their brokerage records or providing the underlying data to Sharp to be entered. Tr. 9.20.23 Knox 47:6-48:6; 49:6-9; Tr. 9.21.23 Ciapala 128:13-130:14. Following a stock transaction, Knox logged into the Q system and entered the stock name, quantity of shares, the cash value, and the net broker fees, and then

4

A3590

the system would provide the commission that Sharp retained.  Tr. 9.20.23 Knox 47:20-48:6.

Knox even testified to conducting monthly reconciliations between his data and the data in Q in

order to make sure everything was accurate  *Id.* at 50:24-51:20.  This record shows that all of the

sales in the Fourteen Issuers were fraudulent, and remedies linked to those sales are appropriate.

**B.  The Court Should Order Disgorgement and Prejudgment Interest.**

Sexton makes several unpersuasive arguments, which Kelln and Veldhuis perfunctorily

join, that the Commission has not met its burden of establishing disgorgment and prejudment

interest.  Sexton Br. at 3-14; Joinder at 2.  The Commission's calculation, based on the admitted

business records of the Q system, more than satisfies its burden of reasonably approximating

disgorgement, and Defendants have failed to carry their burden of proving tbat the Commission's

calculation is unreasonable.  *See* Comm. Br. at 22 (uncertainty in disgorgement is resolved

against the defrauding party).

First, Sexton argues that there is no proof that he received any proceeds of fraud because

the Commission did not obtain his personal bank records.  Sexton Br. at 4-6.  This is a red

herring.  As discussed above, the Q records showing line by line entries of transfers into the

personal accounts controlled by each of the defendants were admitted as business records, and

numerous witnesses testified regarding the reliability of those records.  The Q records are

equivalent to brokerage firm records showing stock sale proceeds and Sexton's personal account

in the Q system is analogous to an account at the "Bank of Sharp" – from which he directed

those proceeds to a variety of destinations just as he would have done with a traditional bank

account.  Sexton fails to cite a single case suggesting that when presented with records showing a

defendant's control over illegal stock sale proceeds, a court need review additional downstream

financial records before ordering disgorgement.  This is not the standard, particularly when the

Commission asked the defendants to produce their bank records in discovery and the defendants

A3591

refused, citing their 5th Amendment rights.  The defendants cannot use the assertion of their 5th Amendment rights as both a sword and a shield.  *See United States v. Rylander*, 460 U.S. 752, 758 (1983); *Unum  Grp. v. Benefit P'ship, Inc.*, 938 F. Supp. 2d 177, 184-85 (D. Mass. 2013).

Moreover, the evidence adduced at trial suggests that presenting bank records would not provide the overwhelming corroboration defendants posit.  The purpose of using Q to record money transfers, like the primary purpose of the entire Sharp enterprise, was to obscure the connection between the control group, their trades, and the proceeds of their trades.  Tr. 9.19.23 Knox 85:15-86:16 ("Well going back, part of the difficulty of this business is half of it is selling the stock and half of it is getting, you know ,using the money or getting the money…. [When Friesen is traveling in Switzerland and asks for money] I will debit [Friesen's] account with Wintercap and I will give him the cash, and he will enjoy his holiday and he'll be able to spend this money *without any records* or no credit card or debit card.") (emphasis added).  After all of their efforts to evade detection, Veldhuis, Sexton, and Friesen usually did not have their money wired to bank accounts in their names.  Tr. 9.21.23 Knox 31:2-11.  Instead, Knox's Silverton and other brokerage firms holding the proceeds of Sexton, Veldhuis and Friesen's trades, received wire instructions from defendant Gasarch to transfer the proceeds of their fraud to pay their bills or make other investments as directed.  Tr. 9.20.23 Knox 49:10-19.  The money transfers recorded in Q were not "fanciful" as Sexton suggests; rather, the transfers recorded in Q went to people and entities outside of the Q system as Sexton himself directed.  *See, e.g.* Ex. A hereto (Sexton directing Gasarch to pay the mortgage on his house).  As Knox recounted, Sharp's clients would request a wire via Gasarch, and if that money did not arrive in the destination account as anticipated, those clients would follow up with Knox and Gasarch to make sure the funds got transferred.  Tr. 9.20.23 Knox 49:20-50:3.  One example of such a request is the

A3592

February 20, 2013 wire in the amount of $24,035 that Sexton requested from Gasarch out of his HEAR account. *See* HEAR Account Statement (Dkt. No. 427-2) at 7, line with Batch ID 45808. Documents showing Sexton's request for those funds to be deducted both from his own HEAR account (in the amount of $24,000) and another account (in the amount of $12,000), as well as bank records showing that wire payment, are attached hereto as Exhibit B.[2]

Sexton also incorrectly argues that disgorgement is inappropriate because the Commission has not identified his victims. Sexton Br. at 10. Defendant's reliance upon *SEC v. Govil*, 86 F. 4th 89 (2d Cir. 2023), is misplaced. First, this Court should not adopt *Govil's* holding that a district court may not order disgorgement "without finding that the defrauded investors suffered pecuniary harm." *Id.* at 98. Binding precedent holds that disgorgement prevents "unjust enrichment" and restores the *violator* to the "status quo" by taking "money out of the wrongdoer's hands." *Liu*, 140 S. Ct. 1936, 1942-43 (2020); *see also SEC v. Happ*, 392 F.3d 12, 32 (1st Cir. 2004) (disgorgement is measured by "a reasonable approximation of the amount of unjust enrichment"). *Govil* improperly confuses equitable disgorgement with compensatory damages.

*Govil's* pecuniary harm requirement also frustrates Congress's post-*Liu* authorization of disgorgement, 15 U.S.C. 78u(d)(7), which aims to deprive all wrongdoers of their ill-gotten gains from *any* violation of the securities laws. Contrary to the broad language of the new statutory

---

[2] Other wire transfers to Sexton that are recorded in his HEAR account are also shown both on the DGM Island Trust bank statement that is attached as part of Exhibit B and other DGM statements attached as Exhibit C. For some of these transfers, the fraudulent backup documents that Gasarch created to provide cover for these wire payments are also attached in Exhibit C. For example, *Compare* HEAR statement at 7 (wire dated 2/22/2013 to DF Gurney for "Bridge Gate") *with* Ex. B at 2 (DGMI statement showing wire dated 2/25/2013 to Donald F. Gurney Law Corporation); *Compare* HEAR statement at 8 (wire dated 4/25/2013 to Paul Sexton) *with* Ex. C at 1-2 (DGMI statement showing wire dated 4/26/2013 to Sexton and backup for wire provided to DGMI); *Compare* HEAR statement at 8 (wire dated 4/4/2013 to DF Gurney to "buy stock") *with* Ex. C at 3-4 (DGMI statement showing wire dated 4/5/2013 to Donald F. Gurney Law Corporation and backup for wire provided to DGMI).

A3593

provision, *Govil* read into subsection (d)(7) the requirement found in subsection (d)(5)—the provision interpreted by *Liu*—that disgorgement must be "appropriate or necessary for the benefit of investors," 15 U.S.C. §78u(d)(5). But even if *Govil* was correct that (d)(5)'s limitation on disgorgement is satisfied only by a finding of pecuniary harm, (d)(7)'s omission of that language extinguishes any basis for that requirement. *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 777 (2020) (Congress's omission is presumed to be "intentional[] and purpose[ful.]").

Second, in any event, victims suffered pecuniary harm here.[3] Both Dhillon and Kaitz testified that defendants paid to promote the stock they were selling and that the stocks' prices always decreased when the artificial demand and volume created by those promotions evaporated. Tr. 9.14.23 Kaitz 91:21-24 (volume); Tr. 9.12.23 Dhillon 70:17-21 (price and volume), 78:22-25 (same), 116:1-3 (same); Tr. Ex. 310 (Arch stock price graph); Tr. Ex. 295 (Q account statement for Arch showing five wires to Kaitz's Full Service Media totaling over $1.1 million); Tr. Ex. 296 (Q account statement for Stevia First/Vitality showing 15 wires to Full Service Media totaling over $1.3 million). *See SEC v. iFresh, Inc.*, No. 22CV3200, 2024 WL 416709, at *3 (E.D.N.Y. Feb. 5, 2024) (ordering disgorgement and finding that "[t]he SEC's allegation that iFresh's stock prices were artificially inflated during the relevant time period, taken as true, also establishes the requisite pecuniary harm to those who purchased iFresh stock

---

[3] *Govil* does not require courts to quantify the amount of pecuniary harm suffered, nor to identify the specific investors who suffered pecuniary harm. Instead, *Govil* makes clear that "disgorgement aims to divest profits" of the wrongdoer and, thus, once the court find that a victim suffered pecuniary harm because of the defendants' wrongdoing, disgorgement is measured by the defendant's ill-gotten gains. 86 F.4th at 106-08; *see, e.g.*, *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006).

A3594

during that time period"). Thus, it is appropriate for this court to award disgorgement of $17,603,928 as to Sexton—the amount of his net profits from his violations.

Next, Sexton argues that the Commission has not established that its disgorgement figure represents net profits as opposed to gross profits. Sexton Br. at 11. Sexton's mere say so without identifying any particular amounts that should be excluded from net profits does not carry his burden. More importantly, Sexton is apparently confused about how funds were allocated to co-conspirators. When stock was sold on behalf of the Veldhuis Control Group, stock sale proceeds were booked to a Q account named after the stock at issue, like VBIO. Tr. 9.20.23 Knox 50:14-23. Then, the Veldhuis Control Group used these issuer-named accounts to pay co-conspirators, as well as vendors like promoters, and to pay other expenses of the scheme such as the costs incurred for lawyers, transfer agents, and funding promised to the company.[4] *See, e.g.* Tr. Ex. 296 (STVF/VBIO Q account statement) at 1 (showing expenses for promoters like Diamond Spot Media and Vulcan Communications), at 2 (checks to Island Stock Transfer and payment to Stevia First on 3/22/2012); Tr. Exs. 93 (xphone message where Velduis directed $250,000 payment from ARTH to Dhillon's entity, Ortivo); 139 (email where Sexton directed $124,000 payment from STVF to Taylor's entity Heng Hong); 237 (Friesen directing payments out of the ORYN account to pay for marketing efforts); 239 (xmail where Frisen directed $5,000 out of ONCS and STVF among others to Vulcan Communications); 295 (Q Account Details for ARTH showing $250,200 wire to Ortivo on September 6, 2013 and five wire transfers to Kaitz'

---

[4] Although the Commission has not sought all of the proceeds of the Fourteen Issuers' stock sales as disgorgment, its estimate of disgorgement is highly conservative because it is doubtful that these expenses of conducting the defendants' fraudulent scheme, which provide no independent value at all to investors, are "legitimate business expenses" that *Liu* would permit to be deducted from the calculation of a defendant's ill-gotten gains. *See Liu v. SEC*, 140 S. Ct. 1936, 1950 (2020) (instructing that courts must determine whether expenses are legitimate or whether the "'entire profit of a business or undertaking' results from the wrongdoing").

9

A3595

Full Service Media totaling over $1.1 million). Then, the Veldhuis Control Group's profits from their schemes were transferred from the issuer-named accounts to each of their own personal Q accounts. *See, e.g.,* Tr. Ex. 52 (Veldhuis directing Sharp to transfer $2.5 million of profit to each of himself, Sexton, Friesen and another partner). Sexton has provided no basis to conclude that the "debits" shown in his HEAR Q Account represent anything other than transfers made at Sexton's request and for his benefit. They are therefore appropriately subject to disgorgement.

Finally, Sexton makes the novel and unavailing argument that the Commission is not entitled to prejudgment interest because there is no evidence that Sexton's funds were in an interest-bearing account. Sexton Br. at 13-14. This is not a required showing. *See, e.g., SEC v. Knox*, Civ. Action No. 18-12058-RGS, 2022 WL 1912877, at *4 (D. Mass. June 3, 2022) (entering final judgment calculating prejudgment interest from the date the fraudulent proceeds were obtained through the date of judgment without reference to actual interest earned in any accounts). Even the lone case cited by Sexton notes that holding illicit funds amounts to an interest-free loan of those profits. *SEC v. Sargent*, 329 F.3d 34, 41 (1st Cir. 2003) (upholding district court's denial of prejudgment interest based on the standard of review and noting that it would have come out differently as to one defendant had the panel been sitting as the trial judge). Money is of course fungible, and the law does not require a showing that the defendant actually earned interest on his ill-gotten gains. The IRS underpayment rate, which the Commission asks this court to apply, "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from the fraud." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996). Likewise, the harmed investors have been denied the benefit of their funds and the related interest, and should be reunited with both in order to be made whole. Accordingly, this court should order that the

10

A3596

Defendants pay disgorgement and prejudgment interest.

**C.      Defendants Should Be Ordered to Pay The Third Tier Penalties Requested.**

The evidence shows that Sexton, Veldhuis and Friesen's fraudulent scheme involved the

securities of at least seven of the Fourteen Issuers in the five years before the complaint was filed

(that is, on or after August 5, 2016).  Sexton's argument to the contrary is simply wrong.  Sexton

Br. at 14-16.  Specifically, the trading data shows that the securities of each of these seven

issuers were sold as part of the defendants' scheme on or after August 5, 2016 through Sharp

nominee entities that concealed the defendants' control over those companies.  *See* Tr. Exs. 307,

308.  Moreover, Dhillon testified about Sexton's direct involvement in the sales of two of those

issuers (Arch and Vitality), Knox testified that he discussed sales of at least three of the issuers at

dinners with Sexton, Veldhuis and Friesen (Arch, Vitality and StartMonday) and that he sold

NewGen Biopharma shares on behalf of Sexton, Veldhuis and Frisen; Kaitz testified about his

work on promotional campaigns with Friesen for four of those issuers (and also talked about

working with Sexton as part of a group with Friesen and Veldhuis on promotions) and the trial

exhibits demonstrate Sexton's involvement with Veldhuis and Friesen relating to another issuer,

Liberty One Lithium.  *See* Tr. 9.12.23 Dhillon 76:2-17 (Round 1 Stevia First), 108:16-17 (Round

4 Vitality), 110:16-20 (Arch); Tr. 9.14.23 Dhillon 4:19-23 (Arch); Tr. 9.19.23 Knox 90:9-91:18;

Tr. 9.20.23 Knox 34:24-35:2; Tr. 9.15.23 Kaitz 4:23-6:2; Tr. 9.14.23 Kaitz 104:22-24; 124:16-

24; 128:8-18; Tr. Ex. 261, 262 (promotions for Liberty One Lithium).

Sexton next complains that he could not have been involved in all seven of these deals

because he only received profits from three of the deals (Vitality, Arch and NewGen) during the

relevant timeframe.  *See* Dkt. No. 427, ¶12.  The trading records are clear that his (and his co-

defendants') *illegal sales* of all seven of these deals took place during the five-year limitations

11

period.  Tr. Ex. 308.  The caselaw that Sexton cites emphasizes that it is when the illegal sales occur that matters.  Sexton Br. at 15.  The fact that Sexton, Veldhuis and Friesen decided not to allocate profits from four of these deals directly to their own personal Q accounts, and rather, transferred their proceeds to pay expenses or to fund other schemes does not make them any less violations of the securities laws.  All that fact means is that the Veldhuis Control Group chose to spend their illegal proceeds from these four deals in other ways.  *See, e.g.,* Tr. Ex. 305 at 2-5 (Q account statement for Lexington Bioscience and BreathTec showing large payments of trading proceeds to promoters (including Mergerr and Midam Ventures) and to Glenwood Acquisitions, the company that was renamed Lexington Bioscience); *see also* Ex. D (communications showing payments to promoters) and Ex. E (showing that Glenwood Acquisitions became Lexington).

Finally, the penalty of $1,562,603 that the Commission seeks from each of Sexton, Veldhuis and Friesen is far from excessive.  Even combined, those penalties pale in comparison to the $31 million in proceeds generated by Sexton's, Veldhuis' and Friesen's illegal trading over the relevant five-year time period.  Tr. Ex. 307.  Also, while Sexton argues that the Commission has only frozen $13.8 million in his financial accounts, he entirely ignores the value of his significant real estate holdings and other assets not held in frozen financial institution accounts when arguing about his ability to pay.  *See* Sexton Br. at 16.  The Commission fully intends to seek to enforce any judgment it obtains against Sexton's substantial non-frozen assets.

**D.    The Court Should Order Injunctions and Bars for Sexton.**

The need to enjoin Sexton, and the legal arguments justifying doing so, are detailed in the Commission's opening brief.  *See* Comm. Br., at 2-7.  In sum:

1.  His conduct was recurrent and sustained: the fraudulent sales of stock (and procurement of millions of dollars in proceeds) occurred over more than ten years;

A3598

2.  His conduct was egregious: the violations comprised conduct specifically designed to flout the registration requirements of the securities laws;

3.  He has not recognized that his conduct was unlawful; and

4.  He remains in a position to violate the federal securities laws.

The gravamen of Sexton's argument is the last point, in which he states that the "Sharp network is no more." Sexton Br. at 16-17. Despite Sexton's claims that he has no prospect of future violations, this is not so. The scheme at issue originated outside the United States and was executed through a complex network transversing several foreign jurisdictions. While Sharp masterminded the scheme, there is nothing precluding Sexton from engaging in the same or similar misconduct given his knowledge of how to flout the U.S. securities laws. He remains in Canada where, to this day, he has not provided the Commission or the Court with any evidence of gainful employment.

The cases Sexton cites for support are inapposite. *SEC v. Jones* was decided at the motion to dismiss stage where the court held that Section 5 claims were time barred and thus the defendant was not subject to liability. 300 F. Supp. 3d 312, 317-18 (D. Mass. 2018). That is a far cry from the instant case, where Sexton is liable for both registration and anti-fraud violations. *See* Dkt. No. 378, at §I; *see also SEC v. Ripple Labs, Inc*., No. 20 Civ. 10832 (AT) (SN), 2022 WL 762966, at *14 n. 17 (S.D.N.Y. Mar. 11, 2022) (distinguishing *Jones* on statute of limitation grounds).

In *SEC v. John Adams Tr. Corp.,* the court specifically noted that the Investment Advisers Act "provides specific and narrowly tailored remedies for the misconduct." 697 F. Supp. 573, 577 (D. Mass. 1988) (recognizing the SEC's ability to suspend or revoke the registration of an investment adviser who violates the securities laws). There are no such comparable remedies available here—Sexton is not employed in a position regulated by the SEC.

13

A3599

Sexton also cites cases involving insider trading.  That crime, by its very nature, requires one to be in a position to come into possession of material, non-public information.  *See SEC v. Pinez*, 898 F. Supp. 325, 335 (D. Mass. 1997) ("Pinez's status as CEO gave him a unique opportunity … to use this inside knowledge"); *SEC v. MacDonald*, No. CA 78-0073, 1981 WL 1635, at *6 (D.R.I. Apr. 23, 1981) ("At the present time, Mr. Macdonald is in a fiduciary relationship with a publicly traded corporation…").  Sexton's misconduct, to the contrary, does not depend on his being in the right place at the right time.

As a result, the factors for imposing injunctive relief against Sexton support that relief today.  Significantly, courts in this and other districts have imposed the same type of permanent relief in cases involving similar conduct, including in this case.  *See* Dkt. Nos. 211 (Sharp), 262 (Taylor), 263 (Kaitz); 317 (Kelln); 325 (Veldhuis); 404 (Dhillon); Comm. Br., at 4 (citing D. Mass. cases imposing obey the law injunctions in similar penny stock fraud cases) and 7-8 (citing cases in D. Mass. and elsewhere imposing conduct-based injunctions in penny stock fraud cases); *see also SEC v. LBRY, Inc.,* No. 21-cv-260-PB, 2023 WL 4459290, at *2 (D.N.H. July 11, 2023) (holding that permanent injunctions are warranted where defendant's Section 5 violations were egregious, continuous, and lacked acknowledgement of unlawful conduct).

## CONCLUSION

Accordingly, for all the foregoing reasons, the Commission respectfully requests that the Court grant its Motion for Remedies.

14

A3600

Dated: March 1, 2024                    Respectfully submitted,

                                        **SECURITIES AND EXCHANGE
                                        COMMISSION**
                                        By its Attorneys,

                                        /s/ Kathleen Burdette Shields
                                        Kathleen Burdette Shields (Mass. Bar No. 637438)
                                        Alfred Day (Mass. Bar No. 654436)
                                        David London (Mass. Bar No. 638289)
                                        Nita K. Klunder (Mass. Bar No. 689304)
                                        33 Arch Street, 24th Floor
                                        Boston, MA  02110
                                        Telephone: (617) 573-8904 (Shields); (617) 573-
                                        4537 (Day); (617) 573-8997 (London); (617) 573-
                                        8822 (Klunder)
                                        shieldska@sec.gov; daya@sec.gov;
                                        londond@sec.gov; klunderni@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2024, a true and correct copy of the foregoing
documentwas filed through the Court's CM/ECF system, and accordingly, these documents will
be sent electronically to all participants registered to receive electronic notice in this case.

                                        /s/ Kathleen Burdette Shields
                                        Kathleen Burdette Shields

A3601

**From:**    "Paul Sexton" <paul@securecuracao.xmeridian.com>
**To:**    "Wires" <wires@secure.xmeridian.com>
**Cc:**    "Fred Sharp" <fsharp@securecuracao.xmeridian.com>
**Subject:**    Re: please send
**Sent:**    Tue, 14 Feb 2017 11:41:46 -0800

SLS is Secured Lending Services, they are the collection arm of Bank of America.  This is a mortgage payment for Palm Springs house.  A payment has been previously made to this account already.  I can't get them to sign a loan doc or give me there incorporation docs.  It would be impossible.


On Fri, 10 Feb 2017 20:39:25 -0500, Wires wrote
> Your wire need the supporting documents as following:
>
> 1.Please fill in SLS address and sign the loan agreement, and send back
> 2. cert of incorp: SLS
> 3. SLS wire clearing s  address
>    Swift code
> 4. Reference just account #, no reference account name?
>
> On Fri, 10 Feb 2017 12:44:49 -0800, Paul Sexton wrote
> > I need to make a lump sum payment to the mortgage for Palm Springs
> > (77812 cottonwood Cove).
> >
> > Please wire usd $139,200 to the following:
> >
> > Wells Fargo Bank
> > 420 Montgomery Street
> > San Francisco,CA
> > 94104
> > 415-396-7392
> >
> > Acc# 2000042928232
> > ABA 121000248
> > Acc Name: SLS Wire Clearing
> >
> > Reference Acc 1012017053
> >
> > --
> > xMeridian.com
>
> --
> xMeridian.com


--
xMeridian.com

SEC-CVDOJMX-E-0600503

A3602

**From:**    "Wires" <wires@secure.xmeridian.com>
**To:**    "Paul Sexton" <paul@securecuracao.xmeridian.com>
**Subject:**    Re: please send
**Sent:**    Thu, 16 Jun 2016 11:58:52 -0500

what is the beneficiary name? you gave me 2 account names.
Please provide the supporting documents from the beneficiary to the sender
(Morris Capital Inc. 21 Regent Street, Belize City, Belize)
And please send us the cert of incorp for the beneficiary too.

Thank you!

On Thu, 16 Jun 2016 08:05:28 -0700, Paul Sexton wrote
> Please send $110,431.86 to the following in relation to the Palm
> House Mortgage.  This payment is direct to lender.
>
> Wells Fargo Bank
> 420 Montgomery Street
> San Francisco, CA 94104
>
> Acc# 2000042928232
> ABA# 121 000 248
> Acc Name: SLS Wire Clearing
>
> Memo Line 1012017053
>
> Account holder:
> Specialized Loan Servicing LLC
> P.O. Box 636005
> Littleton, CO 80163-6005
>
> --
> xMeridian.com


--
xMeridian.com

SEC-CVDOJMX-E-0600504

A3603

```
Yes
-----Original Message------
From: HEAR
To: WIRES
Subject: Re: DGM wire
Sent: Feb 21, 2013 1:07 PM

Yes. 36 k to palm (paul sexton)
24k from hear and 12k from wate

------Original Message------
From: 76
To: 3
Subject: Re: DGM wire
Sent: Feb 21, 2013 4:06 PM

Is 36K to you plam
-----Original Message------
From: HEAR
To: WIRES
Subject: Re: DGM wire
Sent: Feb 21, 2013 12:13 PM

Was that for the 50k??
------Original Message------
To: 76
Subject: Re: DGM wire
Sent: Feb 21, 2013 3:11 PM

Mar 17 1968
------Original Message------
From: 76
To: 3
Subject: DGM wire
Sent: Feb 21, 2013 2:54 PM

DGM asked your date of birth
```

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0132959

A3604

DGM Bank and Trust Inc
## CASH LEDGER
### 33573
### *Islandtrust LLC f.k.a Permatrust LLC*
From 06-01-10 To 08-20-13

**Reporting Currency: US Dollar.**

| Trade Date | Settle Date | Tran Code | Activity | Security | FX Rate | Local Amount | Reporting Amount |
|---|---|---|---|---|---|---|---|
| 02-19-2013 | 02-19-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -17,000.00 | -17,000.00 |
| | | | F/O Anatom Associates SA | | | | |
| 02-19-2013 | 02-19-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-19-2013 | 02-19-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-19-2013 | 02-19-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-19-2013 | 02-19-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-19-2013 | 02-19-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-20-2013 | 02-20-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -13,000.00 | -13,000.00 |
| | | | F/O Glendale Securities Inc | | | | |
| 02-20-2013 | 02-20-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-21-2013 | 02-21-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -63,500.00 | -63,500.00 |
| | | | F/O B A Wetherall | | | | |
| 02-21-2013 | 02-21-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -100,000.00 | -100,000.00 |
| | | | F/O W.L. MacDonald Law Corporation | | | | |
| 02-21-2013 | 02-21-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -25,000.00 | -25,000.00 |
| | | | F/O Law Offices of Thomas E Puzzo | | | | |
| 02-21-2013 | 02-21-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-21-2013 | 02-21-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -110.00 | -110.00 |
| 02-21-2013 | 02-21-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-22-2013 | 02-22-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -36,000.00 | -36,000.00 |
| | | | F/O Paul Sexton | | | | |
| 02-22-2013 | 02-22-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -30,000.00 | -30,000.00 |
| | | | F/O First America Silver | | | | |
| 02-22-2013 | 02-22-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -20,000.00 | -20,000.00 |
| | | | F/O Richard T. Heard | | | | |
| 02-22-2013 | 02-22-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -55,000.00 | -55,000.00 |
| | | | F/O FinnCom Inc | | | | |
| 02-22-2013 | 02-22-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-22-2013 | 02-22-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-22-2013 | 02-22-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-25-2013 | 02-25-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -5,700.00 | -5,700.00 |
| | | | F/O Sadler Gibb & Associates LLC | | | | |
| 02-25-2013 | 02-25-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -6,000.00 | -6,000.00 |
| | | | F/O Pacific Word & Image Inc | | | | |
| 02-25-2013 | 02-25-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -9,900.00 | -9,900.00 |
| | | | F/O Banco Actinver S.A. | | | | |
| 02-25-2013 | 02-25-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -60,000.00 | -60,000.00 |
| | | | F/O Beaumont Media LLC | | | | |
| 02-25-2013 | 02-25-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -792,040.00 | -792,040.00 |
| | | | F/O Donald F. Gurney Law Corporation | | | | |
| 02-25-2013 | 02-25-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-25-2013 | 02-25-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-25-2013 | 02-25-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-25-2013 | 02-25-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -70.00 | -70.00 |
| 02-25-2013 | 02-25-2013 | wd | Expense | WIRE TRANSFER FEE | 1.0000000 | -150.00 | -150.00 |
| 02-25-2013 | 02-25-2013 | dp | Transfer from | INCOMING FUNDS | 1.0000000 | 200,000.00 | 200,000.00 |
| | | | B/O American Stock Transfer | | | | |
| 02-26-2013 | 02-26-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -15,000.00 | -15,000.00 |
| | | | F/O Business Wire Inc | | | | |
| 02-26-2013 | 02-26-2013 | wd | Transfer to | WIRE TRANSFER | 1.0000000 | -100,000.00 | -100,000.00 |
| | | | F/O Echo Automative LLC | | | | |

176

DGM000546

A3605

DGM Bank and Trust Inc
## STATEMENT OF ACCOUNT ACTIVITY
### 33573
**Islandtrust LLC f.k.a Permatrust LLC**
*From 04-01-13 To 04-30-13*

| Date | Description | Charges/Credits | Account Balance |
|---|---|---|---|
| | F/O Beaumont Media LLC | | |
| 25-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,591,522.42 |
| 25-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,591,452.42 |
| 25-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,591,382.42 |
| 25-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,591,312.42 |
| 25-Apr-13 | Expense WIRE TRANSFER FEE | -110.00 | 1,591,202.42 |
| 25-Apr-13 | Expense WIRE TRANSFER FEE | -110.00 | 1,591,092.42 |
| 26-Apr-13 | Transfer to WIRE TRANSFER | -4,000.00 | 1,587,092.42 |
| | F/O Beneficial Designs Inc | | |
| 26-Apr-13 | Transfer to WIRE TRANSFER | -30,000.00 | 1,557,092.42 |
| | F/O Sigma Management Limited | | |
| 26-Apr-13 | Transfer to WIRE TRANSFER | -800.00 | 1,556,292.42 |
| | F/O Anton & Chia LLP | | |
| 26-Apr-13 | Transfer to WIRE TRANSFER | -45,000.00 | 1,511,292.42 |
| | F/O Paul Sexton | | |
| 26-Apr-13 | Transfer to WIRE TRANSFER | -50,000.00 | 1,461,292.42 |
| | F/O Greenberg Traurig | | |
| 26-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,461,222.42 |
| 26-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,461,152.42 |
| 26-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,461,082.42 |
| 26-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,461,012.42 |
| 26-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,460,942.42 |
| 30-Apr-13 | Transfer to WIRE TRANSFER | -300.00 | 1,460,642.42 |
| | F/O Lori Page E.A | | |
| 30-Apr-13 | Transfer to WIRE TRANSFER | -420.00 | 1,460,222.42 |
| | F/O Island Capital Management LLC | | |
| 30-Apr-13 | Transfer to WIRE TRANSFER | -850.00 | 1,459,372.42 |
| | F/O Lori Page E.A | | |
| 30-Apr-13 | Transfer to WIRE TRANSFER | -1,712.81 | 1,457,659.61 |
| | F/O Filer Support Services Inc | | |
| 30-Apr-13 | Transfer to WIRE TRANSFER | -9,500.00 | 1,448,159.61 |
| | F/O Diljit Bains | | |
| 30-Apr-13 | Transfer to WIRE TRANSFER | -2,150.00 | 1,446,009.61 |
| | F/O Jack Justin Cohen | | |
| 30-Apr-13 | Transfer to WIRE TRANSFER | -3,600.00 | 1,442,409.61 |
| | F/O LiveCall Investor Relations Company | | |
| 30-Apr-13 | Transfer to WIRE TRANSFER | -4,000.00 | 1,438,409.61 |
| | F/O Equities Awareness Group | | |
| 30-Apr-13 | Transfer to WIRE TRANSFER | -12,144.72 | 1,426,264.89 |
| | F/O Greenberg Traurig | | |
| 30-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,426,194.89 |
| 30-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,426,124.89 |
| 30-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,426,054.89 |
| 30-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,425,984.89 |
| 30-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,425,914.89 |
| 30-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,425,844.89 |
| 30-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,425,774.89 |
| 30-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,425,704.89 |
| 30-Apr-13 | Expense WIRE TRANSFER FEE | -70.00 | 1,425,634.89 |
| 29-Apr-13 | Unrealized Gain MMF | 0.00 | 1,425,634.89 |
| 29-Apr-13 | Realized Gain MMF | 0.00 | 1,425,634.89 |
| | **Balance at April 30, 2013** | | **1,425,634.89** |
| | | | |
| **Canadian Dollar.** | | | |
| | **Balance at March 31, 2013** | | **1,338,057.79** |
| 02-Apr-13 | Transfer to WIRE TRANSFER | -8,764.46 | 1,329,293.33 |

8

**DGM001116**

A3606

25/04/13  16:24    HP LASERJET FAX                              p.01

FAX TO JP JONES                                    1-246-431-3439

RE: Account #33573

Please TT USD45,000.00 from the above account to:

Pacific Western Bank, 74-750 Highway 111, Indian Wells, CA
SWIFT# FNSDUS6D   ABA #122 238 200
Beneficiary: Paul Sexton, 77812 Cottonwood Cove, Indian Wells, CA
Account # 019 100618

**Please send for value Friday, April 26, 2013.**

The purpose of this wire is payment of an international consulting invoice.

Regards,

ISLANDTRUST LLC

Clifford Wilkins

April 25, 2013

COMPLIANCE CHECK

SIGNATURE VERIFIED BY:        M. Clarke
CALL BACK COMPLETED BY:       N/A
CONTACT PERSON:               N/A
SCREENING REVIEWED BY:

DGM001181

A3607

DGM Bank and Trust Inc
## STATEMENT OF ACCOUNT ACTIVITY
### 33573
*Islandtrust LLC f.k.a Permatrust LLC*
From 04-01-13 To 04-30-13

| Date | Description | Charges/Credits | Account Balance |
|------|-------------|----------------|-----------------|
| F/O Canadian Vacation Homes Ltd | | | |
| 02-Apr-13 | Transfer to WIRE TRANSFER | -40,000.00 | 1,289,293.33 |
| F/O Steadfast Management Corp | | | |
| 02-Apr-13 | Transfer to WIRE TRANSFER | -75,000.00 | 1,214,293.33 |
| F/O Mayan Minerals Ltd | | | |
| 02-Apr-13 | Expense WIRE TRANSFER FEE | -100.00 | 1,214,193.33 |
| 02-Apr-13 | Expense WIRE TRANSFER FEE | -100.00 | 1,214,093.33 |
| 02-Apr-13 | Expense WIRE TRANSFER FEE | -100.00 | 1,213,993.33 |
| 03-Apr-13 | Transfer to WIRE TRANSFER | -9,250.00 | 1,204,743.33 |
| F/O Martin Bajic | | | |
| 03-Apr-13 | Transfer to WIRE TRANSFER | -13,500.00 | 1,191,243.33 |
| F/O Liddy Deell | | | |
| 03-Apr-13 | Expense WIRE TRANSFER FEE | -100.00 | 1,191,143.33 |
| 03-Apr-13 | Expense WIRE TRANSFER FEE | -100.00 | 1,191,043.33 |
| 05-Apr-13 | Transfer to WIRE TRANSFER | -900,000.00 | 291,043.33 |
| F/O Donald F. Gurney Law Corporation | | | |
| 05-Apr-13 | Expense WIRE TRANSFER FEE | -100.00 | 290,943.33 |
| 08-Apr-13 | Transfer to WIRE TRANSFER | -3,000.00 | 287,943.33 |
| F/O Colleen Scammell | | | |
| 08-Apr-13 | Expense WIRE TRANSFER FEE | -100.00 | 287,843.33 |
| 09-Apr-13 | Transfer to WIRE TRANSFER | -155,000.00 | 132,843.33 |
| F/O Pearce Taylor Schneiderat | | | |
| 09-Apr-13 | Expense WIRE TRANSFER FEE | -160.00 | 132,683.33 |
| 12-Apr-13 | Transfer to WIRE TRANSFER | -47,000.00 | 85,683.33 |
| F/O Ursa Mining Corp | | | |
| 12-Apr-13 | Expense WIRE TRANSFER FEE | -100.00 | 85,583.33 |
| 15-Apr-13 | Transfer from WIRE TRANSFER | 155,000.00 | 240,583.33 |
| Cancelled F/O Pearce Taylor Schneiderat | | | |
| 15-Apr-13 | Expense WIRE TRANSFER FEE | 160.00 | 240,743.33 |
| Cancelled Wire Fee | | | |
| 16-Apr-13 | Transfer from INCOMING FUNDS | 1,051,943.00 | 1,292,686.33 |
| B/O West Plateau Properties Inc. | | | |
| 16-Apr-13 | Transfer to WIRE TRANSFER | -155,000.00 | 1,137,686.33 |
| F/O Pearce Taylor Schneiderat | | | |
| 16-Apr-13 | Expense WIRF TRANSFER FEE | -160.00 | 1,137,526.33 |
| 19-Apr-13 | Transfer to WIRE TRANSFER | -11,500.00 | 1,126,026.33 |
| F/O Steadfast Management Corp | | | |
| 19-Apr-13 | Transfer to WIRE TRANSFER | -100,000.00 | 1,026,026.33 |
| F/O Galloway Energy Inc | | | |
| 19-Apr-13 | Transfer to WIRE TRANSFER | -200,000.00 | 826,026.33 |
| F/O Canyonview Construction Ltd | | | |
| 19-Apr-13 | Expense WIRE TRANSFER FEE | -100.00 | 825,926.33 |
| 19-Apr-13 | Expense WIRE TRANSFER FEE | -160.00 | 825,766.33 |
| 19-Apr-13 | Expense WIRE TRANSFER FEE | -160.00 | 825,606.33 |
| 22-Apr-13 | Transfer to WIRE TRANSFER | -5,000.00 | 820,606.33 |
| F/O Mary M Hethey | | | |
| 22-Apr-13 | Transfer to WIRE TRANSFER | -8,340.80 | 812,265.53 |
| F/O Tristram Developments Ltd | | | |
| 22-Apr-13 | Transfer to WIRE TRANSFER | -9,200.00 | 803,065.53 |
| F/O Richard Hethey | | | |
| 22-Apr-13 | Transfer to WIRE TRANSFER | -9,700.00 | 793,365.53 |
| F/O Pick N Save Marketing Inc | | | |
| 22-Apr-13 | Expense WIRE TRANSFER FEE | -100.00 | 793,265.53 |
| 22-Apr-13 | Expense WIRE TRANSFER FEE | -100.00 | 793,165.53 |
| 22-Apr-13 | Expense WIRE TRANSFER FEE | -100.00 | 793,065.53 |
| 22-Apr-13 | Expense WIRE TRANSFER FEE | -100.00 | 792,965.53 |

9

DGM001117

A3608

04/04/13   14:27    HP LASERJET FAX                                    p.01

FAX TO JP JONES                                        1-246-431-3439

RE: Account #33573

Please TT CAD900,000.00 from the above account to:

CIBC, 400 Burrard Street, Vancouver, BC
SWIFT# CIBCCATT
Beneficiary: Donald F. Gurney Law Corporation, Suite 200-100 Park Royal, West Vancouver, BC
Account # 0010-3113612
Reference: Paul Sexton

**Please send for value Friday, April 5, 2013.**

**Please ensure the reference is shown in the SWIFT.**

The purpose of this wire is a loan.

Regards,

ISLANDTRUST LLC

Clifford Wilkins

April 4, 2013

COMPLIANCE CHECK

SIGNATURE VERIFIED BY:    M. Clarke

CALL BACK COMPLETED BY:   S Dargave

CONTACT PERSON:           Yvonne Gasarch

SCREENING REVIEWED BY:    UT

DGM001304

A3609

| From: | "guss" <guss@securecuracao.xmeridian.com> |
|---|---|
| Sent: | 8/7/2017 10:43:38 PM -0500 |
| To: | Wires <wires@secure.xmeridian.com> |
| CC: | acco@securecuracao.xmeridian.com |
| Subject: | 100K - LNB |
| Attachments: | Morris Capital August 7, 2017.docx; Mergerr LTD Contact Information.docx; MERGERR LTD - Overview.pdf |

Can you please send $100,000 USD to Mergerr.

Attached are the wire instructions, invoice, contact information and entity details.

Please debit LNB account

This will be guaranteed by all ACCO accounts.
--
xMail

| Return-Path: | <guss@securecuracao.xmeridian.com> |
|---|---|
| Received: | from securecuracao.xmeridian.com (localhost [127.0.0.1]) by secure.xmeridian.com (8.14.4/8.14.4) with ESMTP id v783hc46024160; Mon, 7 Aug 2017 23:43:38 -0400 |
| Message-Id: | <20170808034050.M92402@securecuracao.xmeridian.com> |
| X-Mailer: | OpenWebMail 2.53 20090308 336 |
| X-OriginatingIP: | 127.0.0.1 (guss) |
| MIME-Version: | 1.0 |
| Content-Type: | multipart/mixed; boundary="----=OPENWEBMAIL_ATT_0.998241078199015" |
| Status: | R |
| X-Status: | A |

SEC-CVDOJMX-E-0367412

A3610

# INVOICE

Amount Due (USD)

## $100,000.00

BILL TO

**Morris Capital**
**21 Regent Street**
**Belize City, Belize**

**Invoice Number:** 62
**Invoice Date:** August 7, 2017
**Payment Due:** Upon Receipt

| ITEMS | QUANTITY | PRICE | AMOUNT |
|---|---|---|---|
| **Website Development and Content Distribution Copyright and Legal** | 1 | $50,000.00 | $50,000.00 |
| **Web Developers** | 15 | $3,000.00 | $45,000.00 |
| **Web Developer – Manager** | 1 | $5,000.00 | $5,000.00 |
| | | **Total:** | $100,000.00 |
| | | **Amount Due (USD):** | **$100,000.00** |

**Notes**
Account Name: Mergerr LTD
IBAN: GB20MIDL40051576666191
BIC: MIDLGB22
Account Number: 76666191
Bank Address: HSBC, 26 Broad St, Reading RG1 2BU,
United Kingdom



**Mergerr LTD**
61/63 Crockhamwell Road, Woodley, Reading, Berkshire RG5 4JB
United Kingdom

A3611

B-03147_ARCH_SEG-005036799

**Mergerr LTD Contact Information**

Andrejs Jermilous
UK Phone Number: +44 118 321 3755
E: Andrew@mergerr.com

5/16/2016                        MERGERR LTD - Overview (free company information from Companies House)

# Companies House

BETA This is a trial service — your underlined feedback (https://response.questback.com/companieshouse/chpbeta/) will help us to improve it.

# MERGERR LTD

Company number 09902857

Registered office address
    61/63 Crockhamwell Road, Woodley, Reading, United Kingdom, RG5 3JP

Company status
    Active

Company type
    Private limited Company

Incorporated on
    4 December 2015

## Accounts

First accounts made up to 31 December 2016
due by 4 September 2017

## Annual return

First annual return made up to 4 December 2016
due by 1 January 2017

## Nature of business (SIC)

To be provided on next annual return.

https://beta.companieshouse.gov.uk/company/09902857                                                                1/1

A3613

**From:**     "guss" <guss@securecuracao.xmeridian.com>
**To:**       "Wires" <wires@secure.xmeridian.com>
**Cc:**       acco@securecuracao.xmeridian.com
**Subject:**  Re: 100K - LNB
**Sent:**     Tue 8/8/2017 2:25:55 PM

Guaranteed by VBIO, NEWG, LBY.

On Tue, 8 Aug 2017 11:26:08 -0500, Wires wrote
> ACCO and LNB are overdrawn
>
> On Mon, 7 Aug 2017 22:43:38 -0500, guss wrote
> > Can you please send $100,000 USD to Mergerr.
> >
> > Attached are the wire instructions, invoice, contact information and
> > entity details.
> >
> > Please debit LNB account
> >
> > This will be guaranteed by all ACCO accounts.
> > --
> > xMail
>
> --
> xMeridian.com


--
xMail

A3614

**From:**    "Wires" <wires@secure.xmeridian.com>
**To:**        "Jackson Friesen" <jackson@securecuracao.xmeridian.com>
**Cc:**        "Fred Sharp" <fsharp@secure.xmeridian.com>
**Subject:**  Re: Wire to Midam has not yet arrived
**Sent:**      Tue 1/9/2018 8:11:04 PM
Wire confirm Emerald Health 155,000.PDF

Sent $155k first , please find the attached confirmation

On Tue, 9 Jan 2018 07:13:31 -0800, Jackson Friesen wrote
> The confirm I was requesting was for $250,000.00 USD to Midam
> Ventures. Sent from LNB account guaranteed by ACCO and GARD. You
> said it was sent on January 3 but they still have not received.
> Please confirm and please send a wire confirm if possible.


--
xMeridian.com

A3615

MIDAM Ventures LLC  (MIDAM)

| DUE DATE | JOB |
|----------|-----|
| 9/13/2017 | Marketing Services |

| DESCRIPTION | PAYMENT | LINE TOTAL |
|-------------|---------|------------|
| Lexington Biosciences Marketing Services | $100,000.00 | $100,000.00 |

TOTAL

Paying Party Information

*INTERNATIONAL WIRE INSTRUCTIONS*
*PLEASE CALL BANKER'S NAME (IF QUESTIONS): AMANDA ABRIL (305-313-5976) IF SHE IS NOT AVAILABLE ASK FOR ANYONE THAT CAN ASSIST WITH SENDING AN INTERNATIONAL WIRE.*

*INTERMEDIARY BANK: WELLS FARGO BANK INTL*
*INTERMEDIARY BANK LOCATION: SAN FRANCISCO, CA*
*INTERMEDIARY BANKS SWIFT: WFBIUS6S*
*BENEFICIARY BANK: CITY NATIONAL BANK OF FLORIDA*
*BENEFICIARY BANK LOCATION: 2855 LEJEUNE RD, CORAL GABLES, FL 33134 BENEFICIARY*
*SWIFT/ABA: CNBFUS3M//066004367*
*BENEFICIARY ACCOUNT NUMBER: 2804877349 BENEFICIARY*
*ACCOUNT NAME: MIDAM VENTURES LLC*
*ADDRESS OF BENEFICIARY: 1501 VENERA AVE SUITE 225 CORAL GABLES, FL 33146*

A3616

**From:**      "Jackson Friesen" <jackson@securecuracao.xmeridian.com>
**To:**        "Courtney Kelln" <ckelln@securecuracao.xmeridian.com>
**Subject:**   Re: Please forward this attachment
**Sent:**      Wed 3/7/2018 3:37:11 PM
Glenwood for celt.pdf

Please forward the following to BL according to the name associated with
this account. This is a DRS and can be recognized and traded immediately.
Make sure Julie or whoever knows this and confirms they can trade it. It is
Lexington Biosciences, formerly Glenwood Acquisitions Corp.
Please confirm.

A3617

# GLENWOOD ACQUISITIONS CORP.
## COMMON SHARES

### DIRECT REGISTRATION STATEMENT



CST TRUST COMPANY
PO BOX 700, STATION B
MONTREAL, QC H3B 3K3
TEL. 800-387-0825  FAX. 888-249-6189
www.canstockta.com
Email: inquiries@canstockta.com

TRIUS HOLDINGS LTD,
AJELTAKE ROAD,
AJELTAKE ISLAND MAJURO,
96960
MARSHALL ISLANDS

Company    GLENWOOD ACQUISITIONS CORP,
           COMMON SHARES

CUSIP/ISIN    CA37918610S7

| STATEMENT DATE | ACCOUNT NUMBER |
|---|---|
| JUNE 29, 2016 | 026885764 |

## TRANSACTION INFORMATION

| TRANSACTION DATE | TRANSACTION TYPE | NUMBER OF SHARES | TRANSACTION REFERENCE |
|---|---|---|---|
| JUNE 30, 2016 | DRS CREDIT | 125,000 | Y4415565 |

## ACCOUNT SUMMARY

| DRS SHARES (UNRESTRICTED) | DRS SHARES (RESTRICTED) | CERTIFICATED/NCI SHARES | DIVIDEND REINVESTMENT SHARES | TOTAL SHARES | MARKET VALUE |
|---|---|---|---|---|---|
| 125,000 | | | | 125,000.000 | 0.00 |

### TRANSACTION REQUEST FORM

PLEASE RETURN PORTION BELOW FOR ADDITIONAL TRANSACTIONS

Please mark one box only. (Please see reverse of this form for instructions.)

☐ Deposit Certificate(s).
  Quantity of securities to be
  deposited into your DRS
  account.

☐ Withdraw Certificate.
  Quantity of securities for which you
  would like a certificate issued from
  your DRS account.

| COMPANY NO. | PLAN TYPE | ACCOUNT NO. |
|---|---|---|
| 2468-001 | DRS | 026885764 |

Date (dd/mm/yyyy)

REGISTRATION

TRIUS HOLDINGS LTD

PLEASE SIGN EXACTLY AS SHOWN ABOVE

DRE007

## About this statement

This is a record of your recent transaction, and above the resulting number of securities held in your Direct Registration account as of the statement date. This is not a security certificate and has no monetary value. You should keep this document in a safe place for your records.

**How to complete the Transaction Request Form**

To deposit additional certificated securities into your account, please complete the Deposit Securities section of the tear off portion of the form on the reverse side, and send with your certificate to CST Trust Company (preferably by courier or registered mail). Do not endorse the certificate. A further confirmation statement will be sent within two business days of receipt of your request.

To request a certificate, please complete the Issue Securities section of the tear off portion of the form on the reverse side and send to CST at the address shown. A certificate will be sent to you by first class mail along with a confirmation statement within two business days of receipt of your request.

**Transferring shares to a Broker (Canada)**

If you are a Canadian resident, and wish to transfer some or all of your DRS securities to a broker, please give them a copy of this statement. Brokers must provide the following information for your request to be completed:

- Your CST shareholder account number
- Your Social Insurance Number
- The number of securities to be transferred (may not exceed your total position)

Upon receipt of a properly documented request, CST will electronically transfer your securities to your broker's account.

**Access your account online**

Register online at www.canstockta.com to view and manage your account.

**Need more Information?**

If you have any questions about your holdings, or wish to do a transaction not described above, please contact CST at the phone number or email on your statement.

**Privacy Statement**

At CST, an important part of our commitment to you is respect for your right to privacy. Keeping your information and affairs in strict confidence is a cornerstone of our business and an integral part of our commitment to service excellence. To learn more about our privacy policy, please visit our website at http://www.canstockta.com/Privacy/Policy.aspx.

A3619

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETT.;

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>　　　　　　　　**Plaintiff,**<br>　　**v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>　　　　　**Defendants.** | **Civil Action No. 21-CV-11276-WGY** |

### DEFENDANT JACKSON FRIESEN'S OPPOSITION TO PLAINTIFF'S MOTION FOR REMEDIES

#### Preliminary Statement

Plaintiff has failed to put forth any sufficient foundation for its colossal demands for disgorgement and civil penalties against Mr. Friesen. Plaintiff had every opportunity to present that which is routine in disgorgement cases and properly establish for the Court the amount of money *received by Mr. Friesen* from the wrongful conduct at issue. But Plaintiff declined to do so. Instead, Plaintiff expects this Court to ignore that absence of reliable evidence and rely instead on pieces of the Q system that are the unauthenticated and unexplained entries of an unreliable and absent witness.

Effectively acknowledging that it lacks meaningful proof of actual profits or gains by Mr. Friesen, Plaintiff relegates its request for disgorgement to the last section of its brief and then simply repeats the same numbers derived from one portion of the Q system. To its credit, Plaintiff

1

A3620

concedes that disgorgement, to be *lawful*, must be calculated based on the defendant's "net profits." See Pl. Mem. At 15-16 (citing *Liu v. SEC*, 140 S.Ct. 1936, 1940 (2020). As this Court previously held,

> The Supreme Court held that if the disgorgement "does not exceed a wrongdoer's net profits and is awarded for victims," then it is equitable relief. Id. In short, Kokesh, 137 S. Ct. at 1639, and Liu, 140 S. Ct. at 1940, limited the SEC's disgorgement power such that the SEC could not seek disgorgement for wrongful acts committed more than five years before filing of the SEC's enforcement action, could not receive disgorgement as equitable relief in amounts that exceeded the wrongdoer's profits, and was required to award such equitable relief to the victims.

*SEC v. Sharp*, 626 F. Supp. 3d 345, 379 (D. Mass. 2022).

Plaintiff then proceeds to ignore those critical strictures, aggressively pivoting to the notion that the amount of disgorgement "need only be a reasonable approximation of profits." Pl.Mem. at 16, 19. Plaintiff expressly bases its disgorgement claim against Mr. Friesen on this those words: "reasonable approximation." Pl.Mem.at 19. But Plaintiff stretches the idea of a "reasonable approximation" far beyond its actual meaning. This is not an instance of the SEC seeking to take a *proven* substantial number and add to it some items that were less certain; this is instead an almost complete substitution of speculation for proof. It is an argument that $11 million is a "reasonable approximation" based on evidence of transfers that total *less than $1 million*. That approach flies in the face of the burden of proof and is even less appropriate in this particular case, where the Plaintiff has failed to offer any evidence of pecuniary loss by identified victims or any reasonable explanation for the lack of relevant evidence.

Plaintiff's request for substantial penalties also lacks any reasonable evidentiary foundation. This case is certainly unusual for its focus on events that occurred more than a decade ago, and evidence concerning Mr. Friesen made clear that his active involvement with the other defendants ended well before August 2016, the beginning of the limitations period for penalties.

2

A3621

Consideration of evidence of his conduct within the relevant period does not support Plaintiff's demand for penalties.

Plaintiff also requests injunctive relief including a penny stock bar without providing to the Court any evidence that would support that relief. Its case against Mr. Friesen was largely historical, dealing primarily with events from 2011 through 2015, and Plaintiff has failed to offer any evidence of Mr. Friesen's current business activities or any likelihood of recurring violations.

## ARGUMENT

**A.    The Commission Has Not Demonstrated Its Entitlement to the More than $15 Million in Disgorgement and PJI That it Seeks**

**1.    An Order of Disgorgement Requires That Plaintiff Prove the Defendant's Wrongful Gains or Net Profit**

Disgorgement is an equitable remedy that is calculated based on the defendant's "wrongful gain." *Liu*, 140 S.Ct. at 1943. It is intended to extract from a wrongdoer the "ill gotten gains" that he "illegally obtained." *SEC v. Williams*, 884 F.Supp. 28, 30 (D.Mass. 1995). ("A defining feature of the disgorgement action is that the amounts disgorged may not exceed the amount of the illicit gain. The S.E.C., in other words, will be called upon to prove the amount of the defendants' illegal gain, and the court's authority to order disgorgement will extend no further."); *SEC v. Govil*, 86 F.4th 89, 106 (2d Cir. 2023) ("forcing a defendant to pay disgorgement" that exceeds the amount of his gain "amounts to a penalty.") It applies to the defendant's "net profits" and so amounts received by the defendant but expended in the course of the business may not be subject to disgorgement. *Liu*, 140 S.Ct. at 1940. As this Court has previously observed, "disgorgement that seeks to remedy unjust enrichment is equitable in nature and equity "historically excludes punitive sanctions."" *Sharp*, 626 F. Supp. 3d at 379.

The Supreme Court's decision in *Liu* further anchored this historical notion by cabining disgorgement to a wrongdoer's net profits and requiring that such awards

3

A3622

be returned to the victims. See id. Well before the cabining of SEC enforcement power by *Liu,* however, courts "repeatedly stressed that [] disgorgement is an equitable, not a punitive, remedy" and applied this concept in limiting the boundaries of the disgorgement remedy. See Elaine Buckberg & Frederick C. Dunbar, *Disgorgement: Punitive Demands and Remedial Offers,* 63 Bus. Law 347, 357 (2007-2008). …

The Supreme Court has entrenched disgorgement's non-punitive character in the context of securities violations, by requiring that it be used to make victims whole. *See Liu,* 140 S. Ct. at 1947-49. Other courts are in accord that disgorgement does not have a punitive purpose or result. See *SEC v. Happ*, 295 F. Supp. 2d 189, 198 (D. Mass. 2003) (Keeton, S.J.) (acknowledging disgorgement as not punitive), aff'd, 392 F.3d 12 (1st Cir. 2004); *SEC v. Gordon,* 822 F. Supp. 2d 1144, 1159-61 (N.D. Okla. 2011) (holding disgorgement to be non-punitive in nature and rejecting the argument that it triggered application of the Double Jeopardy clause when levelled in tandem with a criminal conviction for insider trading violations), aff'd, 522 F. App'x 448 (10th Cir. 2013).

*Id*. at 379-80. *The* proper approach is, therefore, to assess the Plaintiff's evidence of amounts received by Mr. Friesen or paid for his benefit, and then determine whether there were any disbursements that should offset those receipts, *e.g*., proceeds from the sale of unregistered stock could be reduced by the amount defendant paid for the stock. But here, the SEC did not obtain, review or present to this Court any of the bank records that would establish for this Court whether Mr. Friesen received proceeds from the transactions at issue. Remarkably, the SEC failed to present either of the obvious and appropriate forms of evidence to support the disgorgement claims: it did not review or present records of transfers *to Mr. Friesen* from any Sharp-related account, nor did it review or present records of transfers received *by Mr. Friesen*. ECF 442 at 150, 156-157. The absence of credible and appropriate evidence itself should be taken into account by the Court as it considers the SEC's excessive demands.[1] Because the Plaintiff failed to provide to

---

[1] Any assertion that the Plaintiff should not be held to its burden of proof because of defendants' assertion of the Fifth Amendment is nonsensical. Plaintiff amassed records from financial institutions all over the globe in conducting its analysis of stock transactions. Yet it seemingly deliberately failed to do the same with bank records of either the Sharp-entities or the defendants. Plaintiff's failure to obtain those records is striking and further undercuts its reliance

the Court reliable evidence of amounts paid to or for the benefit of Mr. Friesen, *i.e.*, *records of funds being sent to him or records of funds being received by him,* the inquiry ends.

Even if one ignores the lack of evidence of funds sent or received, and considers other evidence that makes reference to funds being sent to Mr. Friesen, the total involved remains under $200,000. The SEC argues, for example, that it obtained testimony from Roger Knox that he gave Mr. Friesen 1000 Swiss francs. Pl. Mem at 19. Plaintiff also argues that there are communications that refer to a total of $177,000 being sent to Mr. Friesen. Pl.Mem. at 18. That evidence is a poor substitute for proper and credible evidence of his receipt of funds, but, even if credited, the total remains a fraction of what has been demanded.

**2. The Q Records of Supposed "Personal Accounts" are Inadmissible Hearsay**

During the course of the trial, Plaintiff relied on different portions of the Q system. Plaintiff was not able to provide testimony from anyone in Sharp's organization who made the entries, and did not offer the most basic aspects of authentication including testimony concerning the basis for the entries, the meaning of entries, whether the entries were made contemporaneously with the events, or whether the person making the entries possessed a duty to record the information accurately.

Obviously aware of the substantial evidentiary issues associated with the Q data, Plaintiff went to great lengths to obtain records of the actual stock transactions and had analysts spend countless hours comparing those records to the entries in the Q system. ECF 442 at 67. The Court ultimately concluded that those records of *stock transactions* were admissible.

In stark contrast, Plaintiff provided little or no support for the Q system entries pertaining to "personal accounts." Plaintiff did not gather the most basic records that would correspond to

---

on the unauthenticated and unexplained Sharp entries. Certainly the Court should not grant the Plaintiff any adverse inference associated with defendant's responses to inquiries related to receipt or transfer of funds.

5

the movement of funds. Plaintiff clearly had access to actual accounting records reflecting disbursements by Sharp, but those were not presented. Plaintiff had the ability to gather records of Sharp-related accounts that would have included disbursements, but it did not present those. Plaintiff did not have present analysts who painstakingly verified the accuracy of Sharp's entries concerning the "personal accounts." Plaintiff did not even analyze or explain the totality of the entries in those "accounts" or the methodology that it employed. And even those Q system records contradict Plaintiff's claim for disgorgement. While Plaintiff has argued that Mr. Friesen received a "distribution" of $100,000 in 2017, the Q system states that the payment was not gains or profit but was instead a *"repayment"* relating to a prior transaction. ECF 309 at 5-6. Plaintiff has contended that Sharp in his records "allocated" or "credited" to Mr. Friesen a total of $333,500 to Mr. Friesen after 2015 (ECF 309 at 8), but its accountant, Trevor Donelan, provided a summary of amounts supposedly "withdrawn" by Mr. Friesen during that same period, and it shows no withdrawals in 2016, a total of $68,250 in 2017, and none for 2018. Fritz Declaration at ¶ 7 (citing June 8, 2022 Affidavit of Trevor Donelan at ¶ 21).

In fact, page after page of entries exist for which the Court received no explanation. ECF 442 at 155-158. Those scores of entries reflect innumerable debits or offsets that were apparently ignored by the Plaintiff. In the end, Plaintiff did nothing more than cull certain selected entries that appeared to be credits to the account, total them up, and have their summary witness present them. Because of the inherent unreliability of the source of that information, the lack of any authenticating witness, and Plaintiff's failure to explicate or incorporate the debits, offsets and other entries in the accounts that included costs of acquisition of securities, Plaintiff's totals of credits in the personal accounts constitute unreliable hearsay statements that should not be admitted.

6

A3625

### 3. The Q Records Of Personal Accounts Purport to Show Debits and Credits – Not Amounts Even Available to Much Less Received by Mr. Friesen

Even assuming that the "personal account" information was admissible, and it is not, it would fall well short of constituting a proper basis for disgorgement. Bear in mind, those entries do not even **purport** to be records of actual funds held in an account belonging to a defendant, or to be even a listing of transfers.  They are merely amounts credited and debited by Sharp on "personal account" *ledgers*, an unexplained assortment of entries.  It is not as if Sharp actually created separate accounts or transferred those funds into accounts belonging to others; the entries all relate to funds that *Sharp received and held somewhere within his organization*.  As even the Plaintiff admits, the testimony that they were able to muster from government witness Roger Knox suggested only that those accounts reflected amounts that defendants would supposedly "be able to direct" or funds that could be "spent as they directed."  Pl.Mem. at 18.  Until and unless someone directed the transfer of funds, they were nothing more than entries – probably fictitious – in Sharp's scheme.

Further, while Plaintiff may claim that Mr. Friesen had the ability to direct or control those funds, the evidence is to the contrary.  There exists not one document or communication in which Mr. Friesen directs a transfer.  Plaintiff put forth schedules showing that Sharp's records attributed those transactions *to Veldhuis*. ECF 442 at 138-139.  Those schedules also showed that Mr. Veldhuis – not Mr. Friesen – had directed transfers of funds to Mr. Friesen. ECF 442 at 141-142. That means that there would have had to be some entirely unknown and unproven sequence of events that would have led Sharp to at some later point attribute proceeds to the GARD account, and that transfers were directed by Mr. Veldhuis.  Since there exists no evidence of the basis for those allocations, Mr. Friesen's receipt of funds, or even his ability to direct transfers of those funds, the entries remain a poor basis for imposition of massive monetary awards.

7

A3626

4. **The Q Records Fail to Support the Plaintiff's Sweeping Requests for Disgorgement Relating to the Fourteen Issuers**

The SEC's evidence focused on only a handful of issuers. The testimony was excruciatingly detailed in relation to Stevia, for example, but almost nonexistent as to Echo Automotive. Plaintiff put forth hours and hours of detailed evidence as to certain transactions and time periods but barely touched others, yet it seeks millions of dollars in disgorgement relating to issuers that were hardly mentioned.

Plaintiff also fails to properly connect the alleged violations to the charged conduct. In relation to the alleged failures to disclose ownership, for example, Plaintiff put forth allegations about the time periods during which those violations occurred. ECF 442 at 114. But it failed to identify any transactions that occurred during those periods.

And even assuming that the entries are accepted by the Court as some evidence, they do not reflect amounts transferred to or for Mr. Friesen. Again, disbursements from Sharp's organization would have been provable through accounting entries of those specific outlays and bank records confirming the transfers. But the SEC has provided none of that. Instead, the evidence at trial established that Sharp skimmed from accounts and that huge quantities of funds were never disbursed but were instead *seized by the government*.

5. **Plaintiff Has Failed to Identify Victims To Whom Disgorgement Should Be Awarded**

The courts have now confirmed that disgorgement, an equitable remedy, should not be employed by the SEC as yet another means to garner funds for the government. Plaintiff is entitled to ask a court to order disgorgement to identified victims who suffered a loss from defendants' conduct. This Court is now required to determine that victims suffered pecuniary harm and to ensure that Plaintiff is properly identifying those individuals and directing funds to those whom were harmed. *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023). Failure to identify those who suffered

8

A3627

pecuniary harm and failure to ensure that disgorgement will be applied to reimburse them for losses

has been held to be dispositive on this issue:

> One of the equitable limitations identified in Liu is that disgorgement must be "awarded for victims." Liu, 140 S. Ct. at 1940. Because a defrauded investor is not a "victim" for equitable purposes if he suffered no pecuniary harm, the district court needed to determine that the investors Govil defrauded suffered pecuniary harm before awarding disgorgement. Even though Ahmed was decided after the district court ruled in this case, the district court abused its discretion in making the award without that predicate determination.

*Govil*, 86 F.4th at 89; *see also SEC v. Almagarby*, No. 21-13755, 2024 U.S. App. LEXIS 3475 (11th

Cir. Feb. 14, 2024)  ("the [Supreme] Court clarified that disgorgement must "not exceed a

wrongdoer's net profits" and must be "awarded for victims" to be permissible under section

78u(d)(5).").

### 6.  The Q Records Are Not a Proper Basis for Plaintiff's "Approximation"

Plaintiff knows full well that the Q records of personal accounts do not constitute evidence

of amounts received by Mr. Friesen and so it seeks effectively to eliminate the evidentiary

requirement through a claim that it may "reasonably approximate" a defendant's gain.  First, to

accept that proposition in this case would be to gut critical evidentiary requirements.  This amounts

to an attempt to offer an out-of-court statement by Fred Sharp that a defendant "made millions" in

these transactions.  Actually, this runs instance run even further afoul of evidentiary requirements:

here Sharp's out-of-court statement constitutes only an allocation; it does not even purport to say

that a defendant received or made that money.

Plaintiff's evidence does not, therefore, constitute a basis for a "reasonable approximation"

of amounts paid to or for Mr. Friesen.  It is, first of all, not "reasonable" to rely solely on the entries

made by Fred Sharp to the exclusion of available reliable evidence.  Certainly there is no other

purpose for which Sharp's testimony would be considered credible and reliable by the SEC.

A3628

Secondly, the statement does not even entail that defendants even received those funds, much less that the funds constitute profits or gains. The Court should not rely on such shoddy evidence to impose the excessive amounts sought by Plaintiff.

**B. Plaintiff Has Failed to Demonstrate its Entitlement to Penalties Against Mr. Friesen**

This Court has previously confirmed that there is a five-year limitations period applicable to Plaintiff's requests for penalties. ECF 228 at 49; 443 at 55. That limitation is particularly critical with respect to Mr. Friesen, who, according to the testimony of Plaintiff's own evidence, ceased his involvement with the other defendants in or about 2015. Mr. Donelan prepared a chart showing instances where Mr. Friesen's alleged account was "allocated profit," and that data clearly reflect a marked difference in Sharp's allocations to a GARD account after 2014.

| Issuer | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| Echo Automotive Inc. | $ - | $ (525,000) | $ 3,275,300 | - | - | - | - | - | 4,750,300 |
| Vringo - Stevia First | - | 1,892,550 | - | 125,200 | - | - | 198,300 | 120,100 | 2,334,150 |
| Arch | - | - | 800,300 | 30,100 | 129,100 | - | 37,600 | - | 997,100 |
| Malcom (D Corp. | - | - | 295,200 | 512,350 | (194) | - | - | - | 807,356 |
| Stevia Corp. | 250,100 | 80,100 | 95,300 | 370,482 | - | - | - | - | 795,982 |
| Circle Star Energy Corp | - | 369,200 | - | - | - | - | - | - | 369,200 |
| OncoSec | - | 364,200 | - | - | - | - | - | - | 364,200 |
| Orven Technologies, Inc. | - | 230,200 | (125,000) | - | - | - | - | - | 105,200 |
| NewGen Biopharma Corp | - | - | - | - | - | - | 100,100 | - | 100,100 |
| Graphite Corp. | - | - | 50,100 | - | - | - | - | - | 50,100 |
| TOTAL | $ 250,100 | $ 2,411,250 | $ 6,391,200 | $ 1,038,132 | $ 128,906 | $ - | $ 334,000 | $ 120,100 | $ 10,673,688 |

Affidavit of Trevor Donelan at ¶ 20. Even according to Mr. Donelan's summary of the Q system data, Mr. Friesen received "allocations" in 2016 of 0% of the listed total for the "group" of approximately $6 million; in 2017, that account received 1.3% of the total of more than $25 million, and in 2018, the account was allocated 2.5% of the total of $4.6 million.

And even those figures are not consistent with Mr. Donelan's chart concerning "transfers" to Mr. Friesen: as noted above, Mr. Donelan states that there were no "withdrawals" by Mr. Friesen in 2016, a total of $68,250 in 2017, and none for 2018. Fritz Declaration at ¶ 7 (citing June 8, 2022 Affidavit of Trevor Donelan at ¶ 21).

10

A3629

Plaintiff's witness, William Kaitz, the only witness who had significant interaction with Mr. Friesen, confirmed the same chronology: he dealt with Mr. Friesen during the period 2011 through 2014 but was aware that he had little or no involvement after that time.   ECF 438 at 40-41..  And while the Sharp records do show some residual allocations in 2017 and 2018, the evidence at trial related to conduct only in earlier years.

**C.  The Court Should Decline to Order the Requested Injunctive Relief**

The SEC seeks sweeping proscriptions and an "obey the law" injunction for which it has failed to establish an adequate basis. Most importantly, the SEC cannot, and has not even attempted to, demonstrate any likelihood of recurrence.  It simply asserts that conduct occurred many years ago and there are "no assurances that defendants' conduct will end."  ECF 426 at 12.  That is plainly the wrong inquiry, because theplaintiff bears the burden of demonstrating that the conduct is continuing and likely to recur.  The Court has been provided with no evidence of ***any conduct in the last six years*** and no proper basis to make the requisite finding of a likelihood of recurrence.

Further, courts have properly rejected or criticized the SEC's request for such "obey the law" injunctions based on fair notice and due process issues.  *United States v. Askins & Miller Orthopaedics, P.A.,* 924 F.3d 1348 (11th Cir. 2019) ("Such injunctions are disfavored because they often run afoul of Rule 65(d)'s requirement that injunctions state their terms specifically and "describe in reasonable detail" the "act or acts restrained or required.");" *SEC v. Goble*, 682 F.3d 934, 951 (11th Cir. 2012); *see also Jones*, 300 F. Supp. 3d at 318 (rejecting, under Rule 65, an injunction that would "simply admonish Jones to obey the federal securities laws in any future venturing on her part into what for her will likely prove perilous territory"); *SEC v. MacDonald*, No. CA 78-0073, 1981 WL 1635, at *6 (D.R.I. Apr. 23, 1981) Case 1:21-cv-11276-WGY

A3630

Document 454 Filed 02/14/24 Page 17 of 21 18 ("Insofar as an injunction is concerned, this Court does not intend to issue a hollow edict which simply says to somebody obey the law.").

If there is conduct that has occurred and which can and should be prohibited from recurring, then that conduct should be spelled out.  This case includes a clear example of conduct that would properly be the subject of an injunction, *i.e.*, failure to disclose beneficial ownership and/or engage in the sale of unregistered securities.  That is the conduct that should be proscribed; the SEC should not, instead, be able to impose an undefined bar and thereby convert any future alleged misconduct into a purported violation of a prior order.

Likewise, the Commission has not established that the requested bars are appropriate.  As with injunctions tied to particular provisions of the securities laws, bars are only proper if the Commission can establish a reasonable likelihood of future violations.

> Recognition that "an injunction is a drastic remedy, not a mild prophylactic," *Aaron v. SEC*, 446 U.S. 680, 703, 64 L. Ed. 2d 611, 100 S. Ct. 1945 (1980) (Burger, C.J., concurring), has led courts to require not only "positive proof of a realistic likelihood that past wrongdoing will recur," *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977), but also a demonstration that recurring violations are a relatively imminent threat, *SEC v. Dimensional Entertainment Corp.*, 493 F. Supp. 1270, 1278 (S.D.N.Y. 1980). *The SEC has failed to make such a showing as to JAT in this case.*

*SEC v. John Adams Tr. Corp.*, 697 F. Supp. 573, 577 (D. Mass. 1988) (emphasis added).  Here, too, the SEC has failed to make a showing that there is any likelihood of recurring violations, much less that recurrence is an imminent threat.

The proposed bars are also substantially overbroad and purport to limit, for instance, defendant's personal trading activities by restricting him to securities listed on national exchanges. Plaintiff has not demonstrated why these extremely broad remedies are appropriate here.  A similar issue was raised in *Almagarby*, and the Eleventh Circuit Court of Appeals found that a bar against sales of unregistered securities was appropriate but a penny stock bar was not.  Such a bar, the

12

A3631

Court reasoned, "prohibits both unlawful *and* lawful penny-stock transactions." While acknowledging that the defendant could conceivably have an opportunity to engage in misconduct in the future, the Court concluded that "none of the other factors weigh in favor of an injunction." The court held, therefore, that "the district court's finding otherwise was an abuse of discretion."

**Conclusion**

For the foregoing reasons, Plaintiff's motion for disgorgement and penalties and certain of its requests for injunctive relief should be denied.

Dated: March 1, 2024

MG+M THE LAW FIRM

By: /s/ Timothy J. Fazio
    Timothy J. Fazio
    125 High Street
    Oliver Street Tower
    Boston, MA 02110
    Tel: 617 670 8635
    Email: TFazio@mgm.law

Counsel for Jackson T. Friesen

MARANDA E. FRITZ PC

By: /s/ Maranda E. Fritz
    Maranda E. Fritz (*pro hac vice*)
    521 Fifth Avenue
    New York, New York 10017
    Tel: 646-584-8231
    Email: Maranda@fritzpc.com

A3632

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:21-cv-11276-WGY |
| v. | Leave to file granted on February 22, 2024 (ECF No. 466) |
| Frederick L. Sharp, *et al.*, | |
| Defendants. | |

## DEFENDANT PAUL SEXTON'S SUR-REPLY REGARDING MOTION FOR REMEDIES

Venturing beyond the trial record in an attempt to cure fatal deficiencies, the reply from the Securities and Exchange Commission ("SEC" or the "Commission") only serves to highlight the yawning gap between the evidence and the requested relief. Even with new exhibits added to an already-crowded record, the problem remains that the Commission is asking the Court to take isolated data points related to particular securities and limited timeframes and extrapolate results for 14 issuers over a decade-long period. The inferences and assumptions required for this relief leave it completely untethered from the record.

In summing up the current state of affairs, the Commission picked the right metaphor but stumbled in its application. Mr. Sexton is not, as the SEC contends, asking the Court "to consider only each individual tree, rather than the forest itself." ECF No. 470 at 1-2. Rather, the SEC is pointing to a single tree and asking the Court to hypothesize the existence of a forest. Given that the Court granted leave to file this sur-reply in order to address new evidence or arguments, Mr. Sexton does not reiterate every point from his opposition and instead confines this filing to

A3633

demonstrating why, even in light of the new parts of the Commission's reply, the request for remedies should be denied.

**First**, the Commission's primary argument regarding disgorgement exemplifies a significant flaw in its case. The SEC contends that the Court should impose disgorgement for transactions involving 14 issuers because anonymity was the "raison d'etre of Sharp's enterprise" and a "critical service" was to leverage that anonymity to "split shares into certificates of less than five percent and have them held in the name of various nominee entities." *Id.* at 2. This assertion makes it all the more jarring that the SEC has only offered proof of beneficial ownership in excess of 5 percent for just one of the 14 issuers, and even then only for discrete time periods. *See* ECF No. 454 at 9. Given that there is nothing unlawful about the use of nominees, and considering that the SEC's own key witness admitted that not all transactions were unlawful, *id.* at 454, it is surely incumbent upon the SEC to offer more than a single example of its supposed central element of the case before the Court orders relief related to a decade's worth of alleged conduct.

But it is not just that the Commission has not offered proof of crossing the 5 percent threshold for 93 percent of the relevant issuers. It is also that the SEC has not offered anything at all related to some of them. As examples, Mr. Sexton pointed out in his opposition two issuers that hardly came up at trial: Echo Automotive and Graphite. *Id.* at 8-9. Even when given license to present new materials in its reply brief, the Commission devotes not even a word to these issuers, even though they account for more than $6 million (exclusive of prejudgment interest) of the requested disgorgement amount. The only reasonable conclusion is that no evidence exists as to these (and other) issuers.

A3634

**Second**, to support its argument that that there are identifiable victims who suffered pecuniary harm, which is a necessary prerequisite to a disgorgement award,[1] the Commission improperly asks the Court to infer a widespread pump-and-dump scheme. The SEC is no stranger to the type of proof typically used to establish investor harm in those scenarios. *See, e.g.*, *SEC v. Jammin Java Corp.*, No. 215CV08921SVWMRW, 2016 WL 6595133, at *3 (C.D. Cal. July 18, 2016) ("'Pump-and-dump' schemes typically consist of promoters first boosting the price of a stock with false or misleading statements about the company, then dumping their own holdings of stock on the market. After promoters dump their shares and stop hyping the stock, the price typically falls, and investors lose money."). Nonetheless, the Commission offered just one chart (Exhibit 310) related to a single security for a five-month period in 2013 purporting to show a rise in price associated with promotional campaigns and an associated drop corresponding to an alleged stock "dump." This leaves no such evidence for 93 percent of the issuers and 96 percent of the 10-year time period. The Commission has now had three opportunities to put forth evidence—at trial, in its motion for remedies, and in its reply brief—and its failure to do so should preclude relief.

**Third**, in an attempt to rehabilitate the Q system, the Commission mischaracterizes the Court's basis for admitting records at trial. Specifically, the records upon which the SEC seeks to rely for disgorgement and penalty calculations were not "admitted as a business record following Fedir Nikolayev's testimony." ECF No. 470 at 4. To the contrary, the Court made a preliminary ruling that the Q system's basic architecture met the standards of a business record but expressly reserved a conclusion on the data entered into it. The Court noted that it was "premature" to reach issues about entries into the Q system and that the Court's mind was "completely open" as to the

---

[1] A case presenting this issue is currently before the First Circuit in *SEC v. Navellier & Assocs.*, No. 20-1581, which was argued earlier this week.

A3635

"other stuff in there." ECF No. 438 at 69:7-72:16. Borrowing the analogy used by the Court and the parties during this discussion, it was akin to admitting a book but withholding judgment as to whether anything written on the pages was separately admissible. *Id.* The Court then based further evidentiary rulings on the co-conspirator statement doctrine.

**Fourth**, the Commission's concession on disgorgement—that it does not have bank records showing receipt of funds by Mr. Sexton—continues to be fatal. At the outset, the SEC fails in its attempt to normalize its absence of proof through its argument that Q is like a "traditional bank" system and that there is no case law requiring proof of "additional downstream financial records." ECF No. 470 at 5. This flips the burden on its head. It is the SEC's burden to cite precedent that its so-called "Bank of Sharp," *id.*, is real and reliable. And the dearth of precedent regarding the use of something like Q for disgorgement awards speaks more to how far afield and anomalous this case is than to the propriety of the Commission's arguments.

The Commission's next argument—the contention that "presenting bank records would not provide the overwhelming corroboration that defendants posit" because not all proceeds were allegedly deposited into defendants' accounts—likewise falters. *See id.* at 6. Critically, the SEC does not contend that no transactions were conducted via bank transfers or even that such an exercise would not be probative as to a statistically significant portion of transactions. There is therefore no basis for the Commission to forgo a verification exercise, other than its apparent desire not to subject its astronomical figures to a reality check. Nor is the Commission's cherry-picked example of an alleged $24,000 transaction—which is just 0.14 percent of the requested disgorgement amount and is not even tied to one of the 14 issuers—close to the type of evidence needed to bridge the evidentiary gap.

4

A3636

Even for payments beyond those that allegedly went to defendants' bank accounts, the Commission has not demonstrated why it lacks the ability to trace them (or at least a meaningful sample of them) given its access to troves of messages, records of wires, and other information. At most, the SEC has shown that an unreliable database reflects payments that Mr. Sexton could purportedly access—not even that he did access them, direct them to others, or otherwise obtain any benefit from them. This is not the stuff of which a disgorgement order is made.

**Fifth**, the SEC does not meaningfully contest issues related to double counting and netting. Pressed to account for whether any of the millions of dollars that Mr. Knox agreed to disgorge constituted funds allegedly held on behalf of Mr. Sexton, ECF No. 454 at 11, the Commission does not even offer a bare denial. And presented with scores of so-called "debits" on the purported statement of the HEAR account that the SEC attributes to Mr. Sexton, the Commission accuses the defense of being "confused about how funds were allocated to co-conspirators." ECF No. 470 at 9. The funds, the Commission asserts, were transferred to issuer-specific accounts, where expenses were paid, ***before*** being sent to individuals' supposed accounts, such as the HEAR account. *Id.* at 9-10. Far from contradicting Mr. Sexton's argument, this explanation leaves unresolved the question of why there are numerous debits on the purported HEAR statement ***after*** the funds allegedly left the issuer-specific accounts with descriptions that appear to constitute business expenses, such as custody and interest fees. *See generally* ECF No. 427-2.

**Sixth**, the Commission continues to insist on penalties related to issuers for which there is no evidence of transactions related to Mr. Sexton in the relevant five-year window. The SEC points to Exhibits 307 and 308 as support for the unsubstantiated claim that Mr. Sexton engaged in unlawful conduct related to seven issuers during the relevant timeframe. ECF No. 470 at 11. These exhibits, however, do not use Mr. Sexton's name, or even any code names purportedly attributable

5

A3637

to him, even once, and instead merely reflect that there were trades in particular securities by unknown individuals. Nor can the Commission rely on a hodgepodge of uncontextualized references in documents and testimony to Mr. Sexton, many of which on their face relate to conduct occurring outside the five-year window, to cure these defects. *See id.*

### Conclusion

Having brought a single action alleging 10 years of trading by nine defendants in 14 securities, the Commission has an obligation to prove each and every component of its case. Although a single tree may suffice at the liability stage, the SEC's burden at the remedies phase is to prove the existence of a forest. The sprawling and sparse nature of the Commission's case does not relieve it of the requirement to offer evidence with regard to each and every form of alleged conduct. If anything, the huge gap between the SEC's evidence and its requested extrapolation makes it all the more important to hold the agency to its burden. The motion for remedies should therefore be denied.

Respectfully submitted,

*/s/ Neil T. Smith*

Neil T. Smith (BBO# 651157)
   Neil.Smith@klgates.com
K&L Gates LLP
One Congress Street
Suite 2900
Boston, MA 02114
Tel: (617) 261-3100
Fax: (617) 261-3175

*/s/ Stephen G. Topetzes*

Stephen G. Topetzes*
   Stephen.Topetzes@klgates.com
Robert S. Silverblatt*
   Rob.Silverblatt@klgates.com

A3638

K&L Gates LLP
1601 K St. NW
Washington, DC 20006
Tel:  (202) 778-9328
Fax:  (202) 778-9100

*Admitted pro hac vice*

*Counsel for Paul Sexton*

Dated: March 6, 2024

A3639

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on March 6, 2024, and a copy thereof will be sent electronically to the registered recipients and counsel of record as identified on the Notice of Electronic Filing.

<u>*/s/ Neil T. Smith*</u>

Neil T. Smith

A3640

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**        **Plaintiff,** <br><br> **v.** <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br>        **Defendants.** | **No. 21-cv-11276-WGY** <br><br> **Leave to file granted on February 26, 2024** |

### PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR REMEDIES AGAINST DEFENDANT YVONNE GASARCH

The Commission submits this reply memorandum in support of its motion for remedies against defendant Yvonne Gasarch ("Gasarch") and to address certain of the arguments raised in the opposition brief filed by Gasarch ("Gasarch Br."). *See* Dkt. No. 464. Like her co-defendants, Gasarch asserts that the she should not bear any consequences of her violations even though she was found liable by a jury. Such a result would be inconsistent with the Court's judgments imposing remedies on her co-defendants Sharp, Taylor, Dhillon and Kaitz, and would be contrary to the law.

**A.    Gasarch Should Disgorge the Funds She Received in the Q Account She Controlled.**

Gasarch's defense to the Commission's disgorgement claim relies on rhetoric without engaging the facts presented by the Commission, let alone identifying any other evidence that would support her position. As described in its prior briefing, once the Commission has shown a reasonable approximation of disgorgement, the burden shifts to Gasarch as the party engaged in

1

A3641

fraud to show why that calculation is unreasonable.  *See* Comm. Br. (Dkt. No. 426) at 16, Comm. Reply Br. (Dkt. No. 470) at 5.  The Commission has met its burden by relying mostly on the Q system, which the Court admitted as a business record and related corroborating evidence.  *See* Comm. Reply Br. at 4-5.  Gasarch's disgorgement argument has three main parts.  First, ignoring the Commission's evidence, Gasarch argues that she did not control the PEAC/PERE Q account. Second, without offering any supporting evidence, Gasarch argues that the funds she received were generated by legimate business activities.  Finally, Gasarch mischaracterizes the difference between her conduct that caused investor harm, and specifically identifying the individuals that will receive funds to compensate their losses.

Documents and testimony introduced at trial identified Gasarch as the beneficial owner of Peacful Lion Holdings and Peregrine Capital Corp., which were presumably shortened to PEAC and PERE to name her Q account.  9.23.2023 Knox 10:14-11:2 (Gasarch was the beneficial owner of Peaceful Lion); 14:5-22 (Peaceful Lion changed its name to Peregrine Capital Corp. of which Gasarch was also the beneficial owner); Tr. Ex. 284 (Zhiying Chen (Gasarch's maiden name) identified as beneficial owner of Peregrine Capital).  At least one of Sharp's clients referred to Gasarch as "Peace."  Tr. Ex. 168 (xphone communication between Peace/Wires and George Stubos (Lion/77)).  Sharp himself told Blacklight, "Yvonne is account pere" and "wires to yvonne r charged to pere".  *See* Exhibits A, B attached hereto.  Sharp also acknowledged the change in account name from PEAC to PERE.  *See* Exhibit C attached hereto; Declaration of Chistopher Beckstrom, ¶¶5-6 and Exs 1-3.

Having established that the PEAC/PERE Q account was controlled by Gasarch, how she spent her share of the fraudulent proceeds does not impact the disgorgement calculation.  *See* Comm. Reply Br. at 5-7 (discussing defendants' control over their respective Q accounts).

2

A3642

However, Gasarch contends that the withdrawals from the PEAC/PERE account cannot be linked to her. Gasarch Br. at 3-4, 7-8. First, Gasarch argues – incredibly – that disbursements to her by name establish that the PEAC/PERE account was not hers. *Id.* at 4. Gasarch was simply transferring money she controlled within the Q system to other accounts that she controlled outside of Q in the same way someone would transfer funds between two bank accounts she controlled. In fact, the Q accounts controlled by Sexton,Veldhuis, and Kelln show that they all occasionally transferred funds from their Q accounts to other accounts in their names. Dkt. No. 427-1 at 2, 6-8, 10-11 (Veldhuis Q account showing money transfers to Mike Veldhuis); 427-2 at 3-14 (Sexton Q account showing money transfers to Paul Sexton); 427-6 at 30, 38, 47, 49 (Kelln Q account showing money transfers to Kelln). Far from showing that the PEAC/PERE account was not hers, these transfers show that Gasarch controlled the disposition of the funds in the account. Gasarch also argues, on the basis of one transaction from BSI Bank, that the Q system is inaccurate because it does not match the third party bank records. *See* Gasarch Br. at 3. Her analysis simply omits the Sharp Group's commission -- which applied to every transaction in the Q system. 9.23.21 Knox 61:6-11 (Sharp discussing the commission structure whereby he would charge a minimum of 1% or $100 for every transfer).

Gasarch then argues that there are only about 30 entries in her PEAC/PERE Q account that directly mention her by name and thus the PEAC/PERE account cannot be hers. *See* Gasarch Br. at 7-8 (also acknowledging payments to Sun Life and W&B Riding Club linked to her).[1] However, she fails to mention many other payments to her relatives or to entities of which

---

[1] Gasarch argues that the February 1, 2019 transfer to her riding club in the amount of $49,861.10 shows that the Q system is wrong because it shows a debit of $49,911.10. Gasarch Br. at 3 (comparing Tr. Ex. 312 to Dkt. No. 427-35). She also transposes the month and day incorrectly, concluding that the transfer was on January 2, 2019, when the documents show the transfer on February 1, 2019. *See* Dkt. No. 427-35 at 1. The $130 delta is clearly explained by Sharp's commission. Likewise, the Sun Life payment she

A3643

she was an officer, director or affiliate. *See e.g.* Dkt. No. 464-1 (PEAC/PERE acct statement

with line numbers) at lines 216, 436, 731, 750 (Bruce Gasarch is Gasarch's husband – *see*

Exhibit D filed herewith at 2, and W&B Riding Club is an entity he owned jointly with Gasarch,

*see* Dkt. No. 427, ¶24; Dkt. No. 427-35); lines 722, 727, 728, 762, 772, 791, 826 (Xiaoqing Huo

is Bruce Gasarch's mother and thus Gasarch's mother in law – *see* Exhibit D at 3); lines 186,

661, 735, 736 (Great Wall is an entity controlled by Gasarch and her purported employer – *see*

Exhibit E at 4); lines 421, 422, 547, 548 (the city of Richmond is where Gasarch lived at the time

of these payments – *see* Exhibit E at 3).  The withdrawals to these entities alone, which are

indisputably associated with Gasarch, total almost $1 million of the Commission's requested

disgorgement. *See* Declaration of Ryan Murphy, filed herewith, ¶6, Ex. A.  A significant portion

of the additional disgorgement the Commission requests, about $1.1 million, was withdrawn by

Gasarch in cash withdrawals, that are not traceable. *See id.*, ¶7, Ex. B (listing cash withdrawals).

Gasarch further argues that there are both deposits to, and withdrawals from, her

PEAC/PERE account that do not appear to be connected to her. *See* Gasarch Br. at 8.  She

articulates no reason, beyond speculation, that some of the entries in the PEAC/PERE account

would be connected to her and others would not.  Moreover, she is wrong that none of these

entries are connected to her.  Examples of these entries are itemized in the chart below.

| Line # in Dkt. 464-1 | Date/Amount | Description from Q system | Connection to Gasarch | Attached Supporting Exhibit |
|---|---|---|---|---|
| 433[2] | 6/30/2014 | Andrew Kaplan TT | Gasarch loaned $55,000 to Kaplan in exchange for | Exhibit F - Jul. 3, 2014 two xphone messages |

directed for CAD $100,016 (*see* Tr. Ex. 287) is $200 less than the corresponding Q entry because of
Sharp's commission. *See* Tr. Ex. 312, at 16.

[2] Gasarch's brief mistakenly identifies this payment to Andrew Kaplan as row 422, but it is actually row
433. *See* Dkt. No. 464 at 8.

| | USD debit of $55,000 | | interest. Sharp asked "What is $55k tt to andrew kaplan from pere?" Gasarch says he is her friend and responded: "It is mine. . . This wire is he borrowed my money, I will make $5k for 2 months." | between Sharp (Bond) and Gasarch (Wires) |
|---|---|---|---|---|
| 570 | 9/9/2015 USD credit of $35,000 | Andrew TT | "Andrew" is the Andrew Kaplan referred to in line 433 | Exhibit G at 3, wire detail for payment shows payment is from Andrew Kaplan. |
| 496 <br><br> 521 | 2/19/2015 CAD debit of $10,681.50 4/27/2015 CAD debit of $22,609.31 | Receiver General | The Receiver General is the person to whom Canadian tax payments are made. Reasonable to assume that this is Gasarch's payment of her tax obligations. | *See, e.g.*, Exhibit H, tax return letter to Gasarch. |
| 544 | 6/16/2015 USD credit of $875 | PTAE 2015 annual fees | Gasarch paid annual fees on her credit card for an issuer whose stock the Sharp Group sold named Plata Resources (ticker PTAE) and she was reimbursed for doing so. | Exhibit I, Jun. 10, 2015 xphone message between Sharp (Bond) and Gasarch (Wires) |
| 592 <br><br> 602 | 11/19/2015 USD credit of $38,453 12/11/2015 CAD credit of $13,318.23 | Aim Capital TT | Aim Capital is the DBA name of Barry Kaplan Assoc., which appears to be related to Andrew Kaplan, *see* above. | Exhibit G at 1-2, wire detail for payments; showing USD payment of $10,000 at .7495 exchange rate, which matches CAD amount); *see also* Exhibit J, Charterhouse bank statement for Aim deposit (showing deduction of $14 fee from Aim wire, which matches amount recorded in PERE Q account). |
| 759 | 12/19/2017 CAD credit of $29,719 | Internal Transfer Bevendale 2% | Lakehouse Capital, of which Gasarch is President, made loans to Bevendale Holdings Inc. (of which Bruce Gasarch | Exhibit E at 1, Exhibit K at line 8 (public records search of corporate registry for Bruce |

5

A3645

| | | | is a Director and Gasarch is an authorized signatory) and those loans were repaid in part | Gasarch); Exhibit L; Exhibit M at 2, 6. |
|---|---|---|---|---|

These entries are thus properly included in a reasonable approximation of Gasarch's disgorgement, which is based on the reliable business record of the Q system and other corroborating evidence. The evidence in this case demonstrates the reliability of the Q system as a business record, as this Court admitted it. *See* Comm. Reply Br. at 4.

Gasarch next argues that the funds she received are not tied to any securities law violations. *See* Gasarch Br. at 8-10. First, Gasarch ignores this Court's finding that she was at the "hub" of the conspiracy. 9.22.2023 Young, J. 41:3-18 ("Ms. Gasarch is more complex because she worked, I find, at the hub…. It seems to me that under the law of the First Circuit and co-conspirator hearsay, um, anything that went on at the Sharp office, um, is properly in evidence."); 164:20-167:8 (finding that Gasarch was a part of the Sharp conspiracy at least by the time she was named as a beneficiary on one of the deals). Accordingly, and distinct from Veldhuis, Sexton, and Friesen (whose liability was based on trading in the Fourteen Issuers), Gasarch's liability is premised on all of the fraudulent trading facilitated by the Sharp Group.

Second, Gasarch claims that "given the length of time and the number of accounts and activities, Mrs. Gasarch was compensated for supporting Mr. Sharp in his legitimate business activities." Gasarch Br. at 10. Gasarch fails to carry her burden of producing any evidence to demonstrate any legitimate business activities in which the Sharp Group engaged that were not funded by or related to the proceeds of their securities fraud. Gasarch provides no evidence to identify the stock, the time period, let alone the stock sale proceeds, that were supposedly legitimately transferred to her. The sole evidence upon which Gasarch relies is Knox's

testimony that to his knowledge, "there were occasions" when Sharp was engaged in legitimate

stock transactions.  Gasarch Br. at 9.  This is not enough to carry her burden.  *See* Comm. Br. at

22 (uncertainty in disgorgement is resolved against the defrauding party); *SEC v. Balboa*, No 11

CIV 9731 PAC, 2015 WL 4092328, at *4 (S.D.N.Y. July 6, 2015) (defendant's speculative

assertion that disgorgment was incorrect was insufficient).  Knox also explained Sharp's

business as offering people the ability to "deposit shares where they did not have to declare them

to either the regulators or the Canadian tax authorities."  9.19.23 Knox 66:20-67:3.  Any

accidentally legal transactions were *de minimis*; the purpose of the Sharp Group, and the work

performed by Gasarch, was to allow clients to avoid securities regulations.  The cases that

Gasarch cites do not support her view that disgorgement is improper as to her.  Rather, they

stand for the uncontroversial proposition that disgorgement must be linked to securities fraud,

which has been amply done here.  *See SEC v. E-Smart Tech., Inc.*, 139 F. Supp. 3d 170, 189

(D.D.C. 2015) (denying disgorgement of salary where most of it was earned before the violation

at issue); *SEC v. Chapman*, 826 F. Supp. 2d 847, 859 (D. Md. 2011) (no connection between

fraud and salary where defendant would have received salary whether or not fraud occurred).

Gasarch also relies on Knox for the point that he "did not know her knowledge" --

notwithstanding the fact that he repeatedly testified that he believed Gasarch was part of a

criminal enterprise and "doctor[ed] invoices."  9.21.23 Knox 37:23-40:17.  The idea that Gasarch

was not part of the Sharp criminal enterprise from the day that she began to work for Corporate

House contradicts the evidence.  Sharp ran a lean outfit with Kelln responsible for moving stock

and Gasarch responsible for moving money.  Tr. Ex. 157 (Gasarch is the "master of finance");

9.19.23 Knox 71:4-6 (Kelln "organized a lot of the share transfers") 74:16-75:7 (describing how

Kelln broke shares into blocks of less than 5 percent); 72:1-16 (Knox considered Gasarch the

A3647

master of finance because 99 percent of wire requests to Wintercap came from her).  Moreover, Gasarch was not naively moving money; in addition to doctoring invoices, she used email addresses that appeared to come from nominee entities to create an appearance of independence and sent wire instructions with pdf images of signatures.  *Id.* 68:5-70:4 (using email addresses that appeared to come from independent nominee entities); 73:10-18; 9.20.23 Knox 34:16-23 (Gasarch sent wire instructions with movable signature image).

Gasarch further argues that the Commission admits that the disgorgement it seeks is not for the benefit of investors.  *See* Gasarch Br. at 10-11.  Gasarch misconstrues the Commission's position, and constricts the scope of the evidence that was offered against her.  As opposed to Sexton, Veldhuis, and Friesen, who were charged with securities violations involving 14 issuers, the scope of the violations that Sharp, Kelln, and Gasarch committed were far broader and involved the trading of over 200 separate securities facilitated by the Sharp Group.  *See, e.g.*, Amended Complaint, Dkt. No. 230, ¶¶42-43 (describing illegal sales of "hundreds of penny stock companies" generating over $1 billion in gross proceeds); 57-63 (describing Gasarch's participation in illegal schemes involving Sharp Group clients other than Sexton, Veldhuis, and Friesen); *see also, e.g.,* Tr. Exs. 144, 148, 151, 166, 168 (relating to Gasarch's involvement with Sharp Group clients other than Sexton, Veldhuis and Friesen).

Contrary to Gasarch's current assertion, the Commission made it clear that it intends to distribute all monetary sums it collects from Gasarch and the other defendants in this case to the victims of their schemes.  *See* Comm. Br. at 21-24.  What requires further analysis, however, is whether it is administratively feasible to include all of the defendants' victims in the distribution of the sums that are likely to be collected, or whether cut-offs will need to be imposed to limit the number of issuers for which a distribution will be conducted, or to set a threshold loss

A3648

amount below which victims will not be compensated.  Such administrative features are routinely proposed to courts as part of proposed distribution plans and are even included in the *United States v. Knox* restitution fund to which the Commission intends to contribute some of the funds collected from the defendants in this case.  *See United States v. Knox*, No. 18-cr-10385-NMG, Amended Judgment (Dkt. No. 277) entered Jan. 5, 2024; Restitution Victim List (Dkt. No. 277-1) (ordering restitution totaling $58,046,278.24 to 8051 investors in 17 different issuers' securities); *see also* Government's Notice of Anticipated Restitution Request, Dkt. No. 269 (dated Dec. 4, 2023) at 3-6 (explaining methodology for identifying victims), at 6-7 (explaining administrative reasons why victims included in the restitution fund were only those who suffered total losses of $500 or more and impacts of various distribution scenarios).  Similar calculations will need to be performed in this case to determine which victims are eligible for distributions based on the monetary remedies that this Court issues against the defendants including Gasarch.

Gasarch's argument that this case is analogous to *SEC v. Lemelson*, 596 F. Supp. 3d 227, 238 (D. Mass. 2022) is misplaced.  In *Lemelson*, the jury found the defendants liable for discrete misstatements, rather than a fraudulent scheme, the court could not determine what harm to victims was caused by those discrete misstatements, and the court found that the Commission did not "provide[] any evidence that it could identify victims."  *Id.*  By contrast, the jury in this case found Gasarch liable for aiding and abetting fraudulent schemes, and victims are identifiable through the blue sheets that report trading in securities.  Disgorgement is thus appropriate here so that it can be returned to those victims.

**B.  The Court Should Impose the Requested Penalty of $558,072.**

Gasarch makes various arguments that the Commission's requested penalty should be denied or reduced.  As an initial matter, she claims that the Commission's penalty claim is

A3649

limited to violations that occurred within five years of commencing this action. The Commission agrees and that is why its penalty request is limited to that five year time period.

Next, Gasarch argues that she was a bit player in Sharp's scheme. *See* Gasarch Br. at 13-14. This is the same argument she made to the jury and which the jury rejected, having found that she violated Securities Act Section 17(a)(3) and aided and abetted the Sharp Group's clients' violations of the securities laws. Further, Gasarch cites nothing in the record, relying only on her own characterization of the facts. This is insufficient for the Court to credit her argument.

Gasarch goes on to say that the Court can only "safely" conclude that all her violations were negligence based. Gasarch Br. at 15. It is not clear what she means by "safely" but what is clear is that the jury necessarily found she acted with scienter when she aided and abetted the violations of others. Tr. 9.27.23 Jury Charge at 32 (instructing that aiding and abetting requires knowing or reckless conduct). Gasarch's argument that she acted *solely* negligently is thus inconsistent with the jury's finding and should be rejected.

Gasarch next says that she committed two violations, whereas the Commission submits that there were *at least* three violations. The proposed penalty, based on three violations, is $558,072 – one second-tier penalty for her violation of Securities Act Section 17(a)(3) and two third-tier penalties based on her aiding and abetting the violations of others under both Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 under the Exchange Act. *See* Amended Complaint, Counts 12, 14. The consolidation of the aiding and abetting questions on the verdict form was designed to simplify the form for the jury, not to eliminate theories of liability as to Gasarch. *See* Tr. 9.25.23 Charge Conference 9:12-10:24. Because the jury found that Friesen violated both Securities Act Section 17(a) and Exchange Act Section 10(b), it also presumably found, with its yes answer on question 7 as to Gasarch, that she aided and abetted

both of those violations, especially as the only relevant difference between those violations was whether they occurred in the "offer or sale" of securities (Section 17(a)) or the "purchase and sale" of securities (Section 10(b)/Rule 10b-5). *See* Dkt. No. 402.

Lastly, Gasarch argues that she does not have the means to pay a penalty. Again, she cites no evidence for this proposition. There is nothing in her brief providing any information about her income or assets. The Commission notes that it has already frozen approximately $1 million USD of Gasarch's funds pursuant to the preliminary injunctions in this case, so at least that amount is available to satisfy any monetary component of a final judgment. *See, e.g.,* Dkt. No. 192 (order modifying preliminary injunction to freeze half of proceeds of sale of house); Dkt. No. 311-1 at ¶9 (declaration reporting that as of December 2022, CAD $365,294 was frozen in Gasarch accounts). Gasarch has failed to show that she cannot pay any excess financial obligation out of existing assets or future earnings.

The Commission further notes that Gasarch does not directly address the seven factors relevant to imposing civil penalties: "(1) the egregiousness of the defendant's violations; (2) the level of scienter involved; (3) the repeated nature of the violations; (4) the defendant's willingness to admit his wrongdoing; (5) the losses or risk of loss the defendant's misconduct caused to others; (6) the defendant's cooperation and honesty with the authorities, and (7) the defendant's current and future financial situation. *See SEC v. Bajic*, 2023 U.S. Dist. LEXIS 172978, * 13 (S.D.N.Y. 2023) (internal quotations and citations omitted). Specifically, she says nothing about the egregiousness of her violations, her willingness to admit wrongdoing, any cooperation with authorities, and the losses to investors that her actions caused. The Court should therefore deem that these factors weigh in favor of imposing the Commission's proposed penalty.

11

A3651

**C.    The Court should Order Injunctions and Bars for Gasarch.**

Gasarch makes four arguments as to why the Court should not impose injunctive relief. None of her arguments merit consideration for the following reasons.[3]

First, Gasarch argues against the imposition of a penny-stock bar and a conduct-based injunction because it is "unclear why she needs to be so enjoined." It is actually quite clear. As Gasarch's counsel elicited during cross examination, Gasarch was an "integral part of" Sharp's "criminal enterprise." Tr. 9.21.23 Knox 21:14-20; 38:3-40:4; *see also* Tr. 9.15.23 Gianakura 90:19-22 (testifying about Sharp's "secret, clandestine" network). Moreover, the Court has imposed penny stock bars and conduct-based injunctions on the other defendants in this case. Gasarch deserves the same. *See* Dkt. Nos. 211, at §§IV-V (Sharp); 262, at §IV (Taylor); 263, at §III (Kaitz); 317, at §§IV-V (Kelln); 325, at §§IV, VI (Veldhuis); 404, at §VI (Dhillon).

Second, Gasarch claims that she was found liable for only negligent conduct under Securities Act Section 17(a)(3). But she fails to recognize that she was also found liable for scienter-based fraud as an aider/abettor. Section 20(e) of the Exchange Act and Section 15(b) of the Securities Act impose liability for "knowingly or recklessly provid[ing] substantial assistance to another person …" and provide that such lialbility is "to the same extent as the person to whom such assistance is provided." 15 U.S.C. §§77o(b), 78t(e); *accord SEC v. Wilcox,* 663 F. Supp. 3d 146, 161 (D. Mass. 2023) (aiding and abetting liability requires pleading the requisite scienter). Thus, the jury's finding that Gasarch is liable as an aider and abettor means that she

---

[3] As to establishing a reasonable likelihood of recurrence, the Commission incorporates arguments already raised in its Reply Memorandum in Support of Remedies Against Defendants Sexton, Veldhuis, and Kelln, Comm. Reply Br. at 12-14. Gasarch, like Sexton, remains in Canada where nothing precludes her from engaging in the same or similar conduct, nor has she presented any attempts to seek gainful employment.

A3652

acted with scienter, even though she was also found liable for a direct negligence-based charge under Section 17(a)(3).

Third, Gasarch claims that injunctive relief "could seriously hinder many job prospects for her including at publicly-traded companies." Gasarch Br., at 15-16. Tellingly, Gasarch makes this bald assertion without supplying any underlying evidentiary support. For example, she offers no affidavit or other documentary evidence establishing that she was rebuffed in any attempt to find employment.[4] Further, Gasarch fails to argue why it would be inappropriate, given her decades long history of involvement in a massive securities fraud scheme, to impose hurdles to her working at a public company.

Last, Gasarch questions why the Commission seeks injunctive prohibitions from violating the entirety of Securities Act Section 17(a) and Exchange Act Section 10(b) (and Rule 10b-5), given that, in her mistaken view, she was only found liable for violating 17(a)(3). Gasarch misses the mark: as stated above, she was also found liable for aiding and abetting violations of those sections. *See* Dkt. 402 (jury verdict) at §7. Numerous courts in this district, including in this case, have imposed such comprehensive injunctions against defendants found liable for violating subsections of the anti-fraud provisions and/or aiding and abetting. *Compare* Dkt. No. 230 (Amended Complaint), at ¶17 (Kaitz, like Gasarch, was charged only with violating Securities Act Section 17(a)(3) and with aiding and abetting) *with* Dkt. No. 263, at §§I-II (permanent injunctions imposed against Kaitz prohibiting comprehensive violations of

---

[4] As part of Gasarch's motion to modify the preliminary injunction, Dkt. No. 379 (denied by Order dated September 14, 2023, Dkt. No. 380), Gasarch submitted an affidavit stating that she received two job offers that were rescinded after a background check. *See* Dkt. No. 379-2. At that time, she provided no supporting documentation (such as copies of any correspondence with the potential employers). Now, six months later, she claims she has still been unable to find employment--yet she offers no support at all showing any attempts at a job hunt.

13

Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5.[5]

## CONCLUSION

For all the foregoing reasons, the Commission respectfully requests that the Court grant

its Motion for Remedies.

Dated: March 7, 2024                         Respectfully submitted,

                                             **SECURITIES AND EXCHANGE
                                             COMMISSION**
                                             By its Attorneys,

                                             /s/ Kathleen Burdette Shields
                                             Kathleen Burdette Shields (Mass. Bar No. 637438)
                                             Alfred Day (Mass. Bar No. 654436)
                                             David London (Mass. Bar No. 638289)
                                             Nita K. Klunder (Mass. Bar No. 689304)
                                             33 Arch Street, 24th Floor
                                             Boston, MA  02110
                                             Telephone: (617) 573-8904 (Shields); (617) 573-
                                             4537 (Day); (617) 573-8997 (London); (617) 573-
                                             8822 (Klunder)
                                             shieldska@sec.gov; daya@sec.gov;
                                             londond@sec.gov; klunderni@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2024, a true and correct copy of the foregoing
documentwas filed through the Court's CM/ECF system, and accordingly, these documents will
be sent electronically to all participants registered to receive electronic notice in this case.

                                             /s/ Kathleen Burdette Shields
                                             Kathleen Burdette Shields

---

[5] Other District of Massachusetts cases imposing similarly broad injunctive relief include *SEC v. DiChara*, No. 1:20-cv-11645-DPW, Dkt. No. 7 at § I, II (dated Sept. 1, 2021) (enjoining DiChara from violating all subsections of Exchange Act 10(b) and Securities Act Section 17(a) when he was charged with aiding and abetting violations of those statutes); *SEC v. Leighton, et al.,* No. 20-cv-10686-RGS, Dkt. No. 17, at §I (June 3, 2020) (permanent injunction against violations of all of Section 17(a) where defendant Sullivan was charged with violating 17(a)(3)), and *SEC v. Laborio, et al.,* No. 12-cv-11489-MBB, Dkt. No. 28, at §§I-II (Nov. 27, 2013) (permanent injunctions against violations of all of Section 17(a) and 10(b)/Rule 10b-5 where defendant Lazar was charged with violating 17(a)(2) and 10(b)/Rule 10b-5(b)).

A3654

**EXHIBIT**

**A**

Thx

------Original Message------
From: Bond
To: 109
Subject: Re: 9K
Sent: Feb 13, 2014 7:12 PM

Ok. Yvonne is account pere. I have amended mt for u
------Original Message------
From: Blsa
To: bond
Subject: 9K
Sent: Feb 13, 2014 8:50 AM

Beneficiary: yvonne gasarch, vancouver

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0683239

B-03147_ARCH_SEG-005253726

**EXHIBIT**

**B**

Ok

-----Original Message------
From: Bond
To: 109
Subject: Re: Hypg
Sent: Feb 25, 2014 5:00 PM

1. wires to yvonne r charged to pere; have changed
-----Original Message------
From: Blsa
To: bond
Subject: Re: Hypg
Sent: Feb 25, 2014 7:54 AM

Correcting label on 1.

2. Is the annual corp fees owed to marshall islands

3. Bank's annual compliance.
-----Original Message------
From: Bond
To: 109
Subject: Hypg
Sent: Feb 25, 2014 4:29 PM

1. Feb 25: what is cad9,600 debit to bond?
2. Feb 18: what is usd565 debit "trust company opt the marshall islands"?
3. Feb 17: what is usd284.83 compliance fee tt?

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0608508

A3656

B-03147_ARCH_SEG-006313878

**EXHIBIT**

**C**

```
Account peac is now pere
```

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0368469

A3657

**EXHIBIT**

**D**

File: Gasarch, Bruce   SIN: 752 997 114   Printed: 2018/04/21 10:45

■✦ Canada Revenue    Agence du revenu
   Agency          du Canada

**Information Return for Electronic Filing of
an Individual's Income Tax and Benefit Return**

**Protected B**
when completed

**Tax Year : 2017**

- The information found on this form corresponds to the tax year indicated on the right.
- Before you fill out this form, read the information and instructions on page 2 of this form.
- Part D must be signed by the individual identified in Part **A** or by the individual's legal representative. Your electronic filer must fill out Parts **C** (prior to your return being submitted) and Part **E** (once your return has been submitted).
- Give the signed original of this form to your electronic filer and keep a copy for yourself.

**Part A – Identification and address as shown on your return** (mandatory)

| First name | Last name | | | | Social insurance number | |
|---|---|---|---|---|---|---|
| Bruce | Gasarch | | | | ■■■■■■ | |
| Mailing address: Apt no – Street no Street name | PO Box | RR | City | | Prov./Terr | Postal code |
| 7971 Gabriola Gate | | | Richmond | | BC | V7C 1V8 |

**Part B – Declaration of amounts from your General Income Tax and Benefit Return** (mandatory)

Enter the following amounts from your return, if applicable:

| | | | |
|---|---|---|---|
| Total income (line 150) | ■■■■68 | | |
| Taxable income (line 260) | ■■■■58 | Refund (line 484) | |
| | | or | |
| Total federal non-refundable tax credits (line 350 of Schedule 1) | ■■■■79 | Balance owing (line 485) | ■■■62 |

**Part C – Electronic filer identification** (mandatory)

By signing Part **D** below, I declare that the following person or firm is electronically filing the T1 return or the amended T1 return of the person named in Part **A**. Part **D** must be signed before the return is electronically transmitted.

Name of person or firm : Pandher & Co        Electronic filer number : F5626

**Part D – Declaration and authorization** (mandatory)

I declare that the information entered in Part A, **B and C** is correct and complete and fully discloses my income from all sources. I also declare that I have read the information on **page 2** of this form, and that the electronic filer identified in Part **C** is filing my return. I allow this electronic filer to communicate with the CRA to correct any errors or omissions.

2018/04/21

| Signature (individual identified in Part A or legal representative) | Name and title of legal representative | Year Month Day |
|---|---|---|

**Part E – Document control number** (mandatory)

Enter the document control number for the individual's electronic record:

F5626172QCNL4

**Part F – Delivery of your notices of assessment and reassessment** (a selection must be made)

How do you want to receive your notices of assessment and reassessment?
Select one or more of the following **electronic** options:

☐ I am already registered for online mail and can view and access my notices of assessment and reassessment online.

**Sign up for online mail!**

☐ I would like to view and access my notices of assessment and reassessment online anytime. I will sign up for online mail by providing my email address below.

My email address is: _____

**To access online mail, you must be registered for My Account.**
I understand that by providing my email address, **I am registering for online mail and I accept the terms and conditions that are set out on page 2 of this form.** I understand that by ticking (X) the box above, I will now receive my notices of assessment and other CRA correspondence online. I can also print and download my online notices of assessment and reassessment. For more information, see page 2 of this form.

☐ I would like my electronic filer to receive my notices of assessment and reassessment electronically in their software and provide me with a copy.
**Provide your electronic filer with authorization** by filling out Form T1013, Authorizing or Cancelling a Representative.
I understand that by ticking (X) the box above, I am allowing the CRA to electronically provide my assessment results and my notices of assessment and reassessment to the electronic filer (including a discounter) named in Part C. I will now receive a copy of my notices of assessment and reassessment from my electronic filer. For more information, see **page 2** of this form.

**OR**

☒ I would like to receive paper notices of assessment and reassessment through Canada Post.

**Part G – Pre-authorized debit agreement** (optional)

**Do you want to Pre-authorize the CRA to withdraw a specified amount from your bank account? If so, fill in the information below:**

I hereby authorize the electronic filer to create this personal pre-authorized debit on my behalf. I authorize the CRA to automatically withdraw the funds from my bank account as per the agreement details listed below. I acknowledge that I have read and understood the information about pre-authorized debit on **page 2** of this form.

| Signature | | Year Month Day |
|---|---|---|

One time payment for your Individual income tax (T1), to be withdrawn on _____ , for the amount of [        ]
Year Month Day

*Privacy Act*, personal information bank numbers CRA PPU 005 and CRA PPU 175

T183 E (12/17)                    (Ce formulaire est disponible en français)


Page 1 of 2

SEC-CVDOJMX-E-0470381

A3658



Canada Revenue Agency    Agence du revenu du Canada

**Protected B** when completed

# T1 GENERAL 2017

**Income Tax and Benefit Return**

## Step 1 – Identification and other information

BC    7

### Identification

Print your name and address below.

First name and initial
Bruce

Last name
Gasarch

Mailing address: Apt No – Street No Street name
7971 Gabriola Gate

| PO Box | RR |
|--------|-----|

| City | Prov./Terr. | Postal Code |
|------|------------|-------------|
| Richmond | BC | V7C 1V8 |

### Email address

I understand that by providing an email address, I am **registering** for online mail. I **have read** and I **accept the terms and conditions** on page 17 of the guide.

Enter an email address:

### Information about your residence

Enter your province or territory of residence on **December 31, 2017**:    British Columbia

Enter the province or territory where you **currently** reside if it is not the same as your mailing address above:

If you were self-employed in 2017, enter the province or territory of self-employment:    British Columbia

If you **became** or **ceased** to be a **resident of Canada** for income tax purposes **in 2017**, enter the date of:

Month/Day    Month/Day
**entry** _____    or    **departure** _____

### Information about you

Enter your social insurance number (SIN):

Enter your date of birth:    Year/Month/Day    1961/

Your language of correspondence:    English ☒    Français ☐
Votre langue de correspondance :

### Is this return for a deceased person?

If this **return** is for a **deceased person**, enter the date of death:    Year/Month/Day

### Marital status

Tick the box that applies to your marital status on December 31, 2017:

1 ☒ Married    2 ☐ Living common-law    3 ☐ Widowed
4 ☐ Divorced    5 ☐ Separated    6 ☐ Single

### Information about your spouse or common-law partner (if you ticked box 1 or 2 above)

Enter his or her SIN:

Enter his or her first name:    Zhiying Yvonne

Enter his or her net income for 2017 to claim certain credits:

Enter the amount of universal child care benefit (UCCB) from line 117 of his or her return:

Enter the amount of UCCB repayment from line 213 of his or her return:

Tick this box if he or she was self-employed in 2017:    1 ☒

**Do not use this area.**



| Do not use this area | 172 | | | | | 171 | | | | |
|---------------------|-----|--|--|--|--|-----|--|--|--|--|

SEC-CVDOJMX-E-0470382

A3659

File: Gasarch, Bruce   SIN: 752 997 114   Printed: 2018/04/21 10:45

**Protected B** when completed

**BRITISH COLUMBIA**    **Provincial Worksheet**    2017 T1 General

Use these charts to do some of the calculations you may need to complete Form BC428, *British Columbia Tax*.
You can find more information about completing these calculations in the forms book.
Keep this worksheet for your records. **Do not attach it to the return you send us.**

### Line 5808 – Age amount

| | | |
|---|---|---|
| Maximum amount | | 1 |
| Your net income from line 236 of your return | 2 | |
| Base amount | 00 3 | |
| Line 2 minus line 3 (if negative, enter "0") | 4 | |
| Applicable rate | 15 00 % 5 | |
| Multiply line 4 by line 5. | ▶ | 6 |
| Line 1 minus line 6 (if negative, enter "0"). Enter this amount on line 5808 of Form BC428. | | 7 |

### Line 5820 – Amount for infirm dependants age 18 or older

**Complete this calculation for each dependant.**

| | | |
|---|---|---|
| Base amount | 00 1 | |
| Dependant's net income (line 236 of his or her return) | 2 | |
| Line 1 minus line 2 (if negative, enter "0") | **(maximum $4,467)** 3 | |
| If you claimed this dependant on line 5816, enter the amount claimed. | 4 | |
| Allowable amount for this dependant: Line 3 minus line 4 (if negative, enter "0") | 5 | |

**Complete this calculation for each dependant.**
Enter, on line 5820 of Form BC428, the total amount claimed for **all** dependants.

| | Date of birth | Relationship to you | Net income in 2017 | Nature of infirmity | Amount of claim |
|---|---|---|---|---|---|
| Last Name | | | | | |
| First Name | | N/A | | | |
| | | | | Total amount for all dependants. | |

### Line 5830 - Volunteer firefighters' amount

Do you wish to claim this credit?   ☐ Yes   ☒ No

Volunteer firefighters' amount

### Line 5833 – Adoption expenses

| | | |
|---|---|---|
| Total adoption expenses (maximum : **$15,670** per child) | | 1 |
| Amount claimed by the other adoptive parent, | % | 2 |
| Subtract line 2 from line 1. | | |
| Carry the result to line 5833 of Form BC428 | | 3 |

### Line 5840 – Caregiver amount

| | | |
|---|---|---|
| Base amount | 00 1 | |
| Dependant's net income (line 236 of his or her return) | 00 2 | |
| Line 1 minus line 2 (if negative, enter "0") | **(maximum $4,467)** 4,467 00 3 | |
| If you claimed this dependant on line 5816, enter the amount claimed. | 4 | |
| Allowable amount for this dependant: Line 3 minus line 4 (if negative, enter "0") | 4,467 00 5 | |

**Complete this calculation for each dependant.**
Enter, on line 5840 of Form BC428, the total amount claimed for **all** dependants.

| | | Date of birth | Relationship to you | Net income in 2017 | Nature of infirmity (if it applies) | Amount of claim |
|---|---|---|---|---|---|---|
| Last Name | Huo | | | | | |
| First Name | Xiaoqing | 1933/ | Mother | | | 4,467 00 |
| | | | | | Total amount for all dependants. | 4,467 00 |

Page 1 of 3

SEC-CVDOJMX-E-0470394

A3660

```
APPL: CIF  TRAN: EOAD     ID:                                     SC:
BR #: 7770            OFFICERS AND DIRECTORS ENQUIRY      PAGE   1 OF LAST
                         LAKEHOUSE CAPITAL INC.                   DEP HOLD
                                                                 REFER ECOM
```



**EXHIBIT**

**E**

```
FN
_ NAME: MS     : ZHIYING YVONNE*GASARCH*         SIGN  %OWN: 100.00
   TITLE: PRES   TITLE DESC: PRESIDENT      : DIR: Y   OFFR: Y ON MCIF: Y

_ NAME: MR     : FREDERICK L*SHARP*              SIGN  %OWN:
   TITLE: SECT   TITLE DESC: SECRETARY      : DIR: N   OFFR: Y ON MCIF: Y

  NAME:        :                                 SIGN  %OWN:
   TITLE:       TITLE DESC:                : DIR:     OFFR:   ON MCIF:

  NAME:        :                                 SIGN  %OWN:
   TITLE:       TITLE DESC:                : DIR:     OFFR:   ON MCIF:


USER ID: CRISTA4      PSWD:        SUPV ID:              PSWD:
REQUEST NEXT TRANSACTION
1/HELP 3/END 4/MAIN
              IMSTX TCIF0190 LTRM M4900037 MOD MOC190A1 03/25/19 08:37:23
```

Case 53243

**RECEIVED**

APR 0 2 2019

British Columbia
Securities Commission
Intelligence & Assessment

Confidential pursuant to Securities Exchange Act s.24(d).

SEC-BCSC-E-0032543

A3661

```
APPL: CIF  TRAN: ECIF     ID:                              SC:
BR #: 7770          CUSTOMER INFORMATION ENQUIRY      PAGE  1 LAST
                                                 ADDRESS    1 OF  1
NAME       : LAKEHOUSE CAPITAL INC.           :        DEP HOLD
NAME CONTD :                                  :       REFER ECOM
NAME CONTD :                                  :
ALIAS NAME :                                  :
ATTN       : LAKEHOUSE CAPITAL INC            : LAST MAINTENANCE
SP ADDR    :                                  :  DATE   : SEP/08/2017
STREET     : 7971 GABRIOLA GATE               :  BRANCH : 3577
CITY/FRGN  : RICHMOND                         :
PROV/ST    : BC  P/Z CODE : V7C 1V8   COUNTRY : CAN
PHONE      : 604 374 - 3931      FAX: 604 370 - 1408   MOBILE:     -
INTERNATIONAL PHONE:  011
EMAIL: yg@lakehg.com
----------------------------------------------------------------------
```

Confidential pursuant to Securities Exchange Act s.24(d).

SEC-BCSC-E-0032544

A3662

```
APPL: CIF  TRAN: ECIF      ID:                          SC:
BR #: 7770              CUSTOMER INFORMATION ENQUIRY        PAGE   1 MORE
                                                       ADDRESS   1 OF   1
FSA #      : 10011557170 :                                    JUN/07/2011
NAME       : MRS     : ZHIYING YVONNE*GASARCH*          :
ALIAS NAME          : ZHIYING*CHEN*                     : DEP HOLD
                                                          REFER ECOM
ATTN      :                              : LAST MAINTENANCE
SP ADDR   :                              : DATE  : SEP/21/2018
STREET    : 7971 GABRIOLA GATE           : BRANCH : 3157
CITY/FRGN : RICHMOND                     :
PROV/ST   : BC  P/Z CODE : V7C 1V8   COUNTRY : CAN  AT ADDR SINCE : FEB/2014
PHONE: HOME: 604 370 - 1408  BUS: 604 370 - 1408     MOBILE: 778 321 - 1468
INTERNATIONAL PHONE:  011
EMAIL: yvonnech@telus.net
-----------------------------------------------------------------------
```

Confidential pursuant to Securities Exchange Act s.24(d).

SEC-BCSC-E-0032545

A3663

```
APPL: CIF  TRAN: EEMP     ID:             SC:
BR #: 7770              EMPLOYMENT INFORMATION ENQUIRY


                  MRS ZHIYING YVONNE GASARCH              DEP HOLD
                                                         REFER ECOM
OCCUPATION
   STATUS    : E  EMPLOYED    STATUS SINCE DATE: PND     E-EMPLOYED
   CATEGORY  : ADMINISTRATIVE/CLERICAL                   U-UNEMPLOYED
   DESCRIPTION: OFFICE MANAGER                           R-RETIRED
                                                         H-HOMEMAKER
SCHOOL NAME :                                            S-STUDENT


EMPLOYER    : GREAT WALL MANAGEMENT INC.
SP ADDR     :                              : LAST MAINTENANCE
STREET      : 1100 MELVILLE ST SUITE 320   :   DATE  : OCT/26/2015
CITY        : VANCOUVER                    :   BRANCH : 0216
PROV/ST     : BC        P/Z CODE:  V6E 4A6    COUNTRY:  CAN
BUS PHONE   : 604  370 - 1408
START DATE  : JUN/2009   ( 09 YRS  09 MTHS )


USER ID: CRISTA4       PSWD:
PER & NON-PER CUST, SEE EREL - REQUEST NEXT TRANSACTION
1/HELP 3/END 4/MAIN 5/PREV 6/NEXT 10/EMP HIST 12/LOGOFF
                  IMSTX TCIF0130 LTRM M4900037 MOD MOC130E1 03/25/19 08:37:56
```

Confidential pursuant to Securities Exchange Act s.24(d).

SEC-BCSC-E-0032546

A3664



**TD Canada Trust**

**Corporate Resolution**

Resolution of the Directors of  LAKEHOUSE CAPITAL INC. _____ (the Corporation)

carrying on business under the name of _____ (the Business Name)

Whereas it is in the interest of the Corporation to enter into arrangements for the provision of accounts for the deposit and withdrawal of funds, credit facilities and other financial services with The Toronto-Dominion Bank, TD Mortgage Corporation, TD Pacific Mortgage Corporation and The Canada Trust Company (collectively, the "Bank") and to provide security and agreements therefore;

**Be it resolved that:**

1. The Corporation is authorized to:
   (a) open, maintain and operate one or more accounts with the Bank and to do all things in relation thereto;
   (b) enter into credit agreements from time to time with the Bank using the Bank's standard forms and to borrow money from the Bank pursuant to the credit facilities described in such agreements; and
   (c) enter into further arrangements for the provision of financial services with the Bank.

2. The Corporation is authorized and directed to create, execute and deliver in favour of the Bank;
   (a) the Bank's standard documentation for the opening and operation of accounts for each account opened;
   (b) the credit agreements referred to above and any additional agreements described in such credit agreements; and
   (c) such further instruments and agreements as may be reasonably required to carry out the agreements described herein;
   and by doing so, to bind the Corporation and create the security set out in such agreements.

3. In accordance with any restrictions set out below, the officers, directors and employees of the Corporation listed hereafter as signing officers are hereby authorized for and on behalf of the Corporation to execute and deliver all of the documents and instruments described in paragraph 2, and any others that may be reasonably required from time to time to carry out the transactions contemplated, subject to such amendments as the authorized representatives may approve, such approval to be conclusively evidenced by the execution of the said documents or instruments. In accordance with any restrictions set out below, such persons are also authorized to conduct all aspects of the Corporation's banking relationship with the Bank and, notwithstanding the generality of the foregoing,:
   (i) to give the Bank instructions and perform transactions on behalf of the Corporation in connection with the ongoing operation of the accounts, credit facilities and other financial services contemplated by this resolution; and
   (ii) to authorize any person or persons to do any one or more of the following:
      (1) to receive from the Bank any (a) cash or securities, (b) bills of exchange (including cheques), promissory notes, orders for payment of money, securities, coupons, clearing items or other value items, and other instruments (each of which individually called an "Instrument") or (c) other property, or to give instructions to the Bank for the delivery or other transfer of any such cash, securities, Instruments or other property to any party named in those instructions;
      (2) to deposit with, negotiate or transfer to the Bank, for the credit of the Corporation, cash or any security, Instrument or other property, endorsed (by rubber stamp or otherwise) with the Corporation's Business name; and
      (3) to settle the Corporation's accounts with the Bank and to receive from the Bank, and provide receipt of, statements, passbooks, debit vouchers and any other items (including paid and unpaid cheques). The Bank is entitled to rely on such documents, Instruments, instructions and transactions as duly and validly authorized and binding on the Corporation. The Bank does not need to make any further inquiry into the authority of the authorized representatives to bind the Corporation.

**Signing Officers**

| | |
|---|---|
| Name:  FREDERICK L. SHARP | Name: |
| Title:  SECRETARY | Title: |
| Name:  YVONNE GASARCH | Name: |
| Title:  PRESIDENT | Title: |
| Name: | Name: |
| Title: | Title: |

**Signing Officer Requirements/Restrictions**
*Record the signing requirements for the account, using titles where possible, e.g. "any one to sign", "the President to sign alone", the President and the Secretary to sign together.*

ANY ONE TO SIGN

_____

_____

Certified a true copy of a Resolution passed by the Board of Directors of the said Corporation at a meeting duly called and regularly held on the

15 day of  December , 2014 , and recorded in the minute book, and now in full force and effect and unamended.

Dated this  15  day of  December , 20 14

x _____    x _____

Note: This form must be signed by any two of the corporation's titled officers , e.g. President, Secretary, Treasurer, Vice-President.
Note: In order to change the signing officers set out above:
   (i) if the signing officers have been designated by name, a new Corporate Resolution is required.
   (ii) if the signing officers have been designated by title, a letter of direction from the Corporation is required.

592014 (0311)

Confidential pursuant to Securities Exchange Act s.24(d).    SEC-BCSC-E-0032559

A3665



```
Hope so
------Original Message------
From: Wires
To: bond
Subject: Re: Q
Sent: Jul 3, 2014 2:14 PM

This wire is he borrowed my money, I will make $5K for 2 months.
------Original Message------
From: BOND
To: WIRES
Subject: Re: Q
Sent: Jul 3, 2014 1:47 PM

Who is kaplan? What is wire for?
------Original Message------
From: Wires
To: bond
Subject: Re: Q
Sent: Jul 3, 2014 1:46 PM

It is mine
------Original Message------
From: BOND
To: WIRES
Subject: Q
Sent: Jul 3, 2014 1:45 PM

What is $55k tt to andrew kaplan from pere?
```

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0424418

A3666

```
My friend
------Original Message------
From: BOND
To: WIRES
Subject: Re: Q
Sent: Jul 3, 2014 1:47 PM

Who is kaplan? What is wire for?
------Original Message------
From: Wires
To: bond
Subject: Re: Q
Sent: Jul 3, 2014 1:46 PM

It is mine
------Original Message------
From: BOND
To: WIRES
Subject: Q
Sent: Jul 3, 2014 1:45 PM

What is $55k tt to andrew kaplan from pere?
```

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0730672

A3667

EXHIBIT

G

**Wire transaction details**

CA160831040867000

{1:F01BOFMCAM2AXXX5000175008}{2:O1031519160831ROYCCAT2BXXX43072183461608311520N}{3:{
103:CAD}{108:2}{115:LVTS5RAN6TP9ETR2}}{4:
:20:CA160831397948
:23B:CRED
:32A:160831CAD68000,
:33B:CAD68000,
:50K:/009203028818
MERFIN MANAGEMENT LIMITED
C/O DIETER PETER
502 1633 ONTARIO STREET
VANCOUVER BC V5Y 0C2
:52A://CC000300920
ROYCCAT2
:57D://CC000100040
BANK OF MONTREAL
FIRST BANK TOWER
595 BURRARD STREET
VANCOUVER B C
:59:/1828904
CHARTERHOUSE CAIPTAL INC
7TH FLOOR WARWICK COURT PATERNOSTER
SQUARE, LONDON UK
:71A:SHA
:71F:CAD0,
:72:/ACC/1828904 TRANSIT 001 00040
-}{5:{CHK:047149CE25C5}}


CA151211033965000

{1:F01BOFMCAM2AXXX4873052423}{2:O1031535151211TDOMCATTATOR79980835031512111536N}{3
:{103:CAD}{108:2}{115:LVTS5FTNJ4G8UTR2}}{4:
:20:TI151211S2523400
:23B:CRED
:32A:151211CAD13342,23
:33B:USD10000,00
:36:0,7495
:50K:/36568872
AIM CAPITAL DBA
BARRY KAPLAN ASSOC
623 RIVER RD
FAIR HAVEN, NJ 07704-
:52A:NRTHUS33XXX

Confidential pursuant to Securities Exchange Act s.24(d).

SEC-BCSC-E-0372893

:57D:BMO
595 BURRARD STREET
VANCOUVER CANADA
:59:/000404731605
CHARTERHOUSE CAPITAL INC
3RD FLOOR 830 WEST PENDER STREET
VANCOUVER CANADA
:70:ORIG AMT USD 10000.00 AT 0.7495
:71A:SHA
:72:/ACC/PAY INVOICE
/INS/NRTHUS33XXX
-}{5:{CHK:D343378FF6BD}}


CA151119019285000


{1:F01BOFMCAM2AXXX4864780095}{2:O1031119151119BKTRUS33AXXX21088462321511191119N}{3:{
108:C263529BBK111915}}{4:
:20:C263529BBK111915
:23B:CRED
:32A:151119USD38467,00
:33B:USD38470,
:50K:/36568872
AIM CAPITAL DBA
BARRY KAPLAN ASSOC
623 RIVER RD
FAIR HAVEN, NJ 07704-
:52D://FW031101266
TD BANK NA
:57D:BMO
595 BURRARD STREET
VANCOUVER CANADA
:59:/00040-4731-605
CHARTERHOUSE CAPITAL INC.
830 WEST PENDER STREET
3RD FLOOR
VANCOUVER CANADA
:71A:BEN
:71F:USD3,
:72:/INS/DBTCA IPG FOR TDBNA JERSEY CIT
//Y, NJ 07311 USA
/REC/REPAY LOAN
-}{5:{CHK:9B2B1B804A4D}}

Confidential pursuant to Securities Exchange Act s.24(d).

SEC-BCSC-E-0372894

A3669

CA150909011007000

{1:F01BOFMCAM3AXXX4613510399}{2:O1030730150909PNCCUS33AXXX06619919621509090730N}{3:{
108:1509090000416-01}}{4:
:20:2015090900000416
:23B:CRED
:32A:150909USD35000,
:33B:USD35000,
:50K:/203002605
ANDREW J KAPLAN
8 CRENSHAW COURT
MARLBORO NJ 07746-2710
:52D:/0608026325969
1ST CONSTITUTION BANCORP
2650 ROUTE 130 + DEY RD
CRANBURY, NJ 08512
:57A:BOFMCAM2
:59:/000404731605
CHARTERHOUSE CAPITAL INC
3RD FLOOR 830 WEST PENDER STREET
VANCOUVER, BC
:70:/RFB/4326603
:71A:SHA
:72:/INS/PNC BANK PITTSBURGH PA 15219
-}{5:{CHK:916AF3832D64}}

Confidential pursuant to Securities Exchange Act s.24(d).

SEC-BCSC-E-0372895

A3670

**EXHIBIT**

**H**

April 21, 2018

Napinder Pandher, CPA, CGA
Pandher & Co
Unit 6 14722 64 Ave
Surrey, British Columbia
V3S 1X7

Bruce and Zhiying Yvonne Gasarch
7971 Gabriola Gate
Richmond, BC
V7C 1V8

Dear Mr and Mrs Gasarch:

We have transmitted your returns electronically to Canada Revenue Agency (CRA) using the EFILE system.  The enclosed copies of your 2017 income tax returns are for your records.  We have prepared your returns based on the information you provided to us. Keep all information slips, receipts, and other documents for six years, in case CRA asks to see them.

**Bruce**

Your return shows a balance owing of ███████ that must be paid on or before April 30, 2018. You can pay the balance at most financial institutions using form T7DR(A). Alternately, you can mail form T7DR(A) and a cheque, made out to the Receiver General, to CRA. Please write your social insurance number on the back of your cheque.

We have calculated that you will need to make tax instalment payments this year totalling ███████ Please remit these payments to CRA according to the following schedule:
    September 15, 2018  $███████
    December 15, 2018   $███████
    March 15, 2019      $███████

Total estimated federal and provincial Child Benefit of $███████ are payable for the year starting in July 2018 and ending in June 2019.

Your RRSP deduction limit for 2018 is $███████

**Zhiying Yvonne**

Your return shows a balance owing of $███████ that must be paid on or before April 30, 2018. You can pay the balance at most financial institutions using form T7DR(A). Alternately, you can mail form T7DR(A) and a cheque, made out to the Receiver General, to CRA. Please write your social insurance number on the back of your cheque.

Your RRSP deduction limit for 2018 is $███████

SEC-CVDOJMX-E-0470409

A3671

EXHIBIT

I

OK
-----Original Message-----
From: BOND
To: WIRES
Subject: Re: Plata Resources NV businese License annual fees
Sent: Jun 10, 2015 11:33 AM

Si. Debit ptae
-----Original Message-----
From: Wires
To: bond
Subject: Plata Resources NV businese License annual fees
Sent: Jun 10, 2015 8:13 PM

Plata Resources Inc. ( NV) need to renew annual with Nevada before July.
The renewal fee: $575
Agent fee: $89
I paid my creidt card last year. Do I file and pay the annual fees?

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0768246

A3672

**EXHIBIT**

**J**

**Your branch address:**

595 BURRARD STREET
VANCOUVER, B.C. V7X1L7

## Business Banking



**Your Branch**
MAIN OFFICE VANCOUVER
Transit number: 0004

**For questions about your
statement call**
(604) 665-2643

**Direct Banking**
1-877-262-5907
www.bmo.com

**C H A R T E R H O U S E   C A P I T A L   I N C .
3RD
830 PENDER ST W
VANCOUVER BC    V6C 1J8**

# Business Banking statement

For the period ending November 30, 2015

## Summary of account

| Account | Opening balance ($) | - | Total amounts debited ($) | + | Total amounts credited ($) | = | Closing balance ($) on Nov 30, 2015 |
|---|---|---|---|---|---|---|---|
| US$ Business Current Account -605 | 123,640.79 | | 124.92 | | 38,467.00 | | 161,982.87 |

## Transaction details

| Date | Description | Amounts debited from your account ($) | Amounts credited to your account ($) | Balance ($) |
|---|---|---|---|---|
| | **US$ Business Current Account #**████-605 | | | |
| | Business name:<br>CHARTERHOUSE CAPITAL INC. | | | |
| Oct 31 | **Opening balance** | | | **123,640.79** |
| Nov 02 | Cheque, BR.0496 | 103.67 | | 123,537.12 |
| Nov 19 | Incoming Wire Payment, US, AIM CAPITAL DBA | | 38,467.00 | 162,004.12 |
| Nov 19 | Wire Payment Fee, HANDLING CHG 019285000 | 14.00 | | 161,990.12 |
| Nov 30 | Maintenance Fee, FIXED CHARGE $6.00 | 6.00 | | 161,984.12 |
| Nov 30 | Branch Transaction Fee, BRANCH 01 ITMS AT 1.25 | 1.25 | | 161,982.87 |
| **Nov 30** | **Closing totals** | **124.92** | **38,467.00** | |

Number of items processed ............................................................. 4...................................... 1

Number of cheques or related items enclosed in your statement............................... 1

Please check this statement and report any errors or omissions within 30 days of delivery.

**BMO** Bank of Montreal

A member of BMO Financial Group

15130E (09/02)

A3673

| Surname | First Name | Middle Nar | Office Held | Appointed | Ceased |
|---------|-----------|------------|-------------|-----------|--------|
| Gasarch | Bruce | | Officer CEO | 2011-12-19 | |
| Gasarch | Bruce | | Incorporator | 2016-06-17 | |
| Gasarch | Bruce | | Officer Secretary | 2011-12-19 | |
| Gasarch | Bruce | | Director | 2014-06-23 | |
| Gasarch | Bruce | | Director | 2015-10-23 | |
| Gasarch | Bruce | | Director | 2015-07-24 | |
| Gasarch | Bruce | | Director | 2015-05-01 | |
| GASARCH | BRUCE | | Director | 2016-01-07 | |
| Gasarch | Bruce | | Director | 2015-05-04 | |
| gasarch | bruce | | Director | 2015-09-17 | |
| Gasarch | Bruce | | Director | 2015-08-06 | |
| Gasarch | Bruce | | Director | 2015-08-10 | |
| Gasarch | Bruce | | Director | 2015-12-18 | 2017-02-15 |
| Gasarch | Bruce | | Director | 2015-09-17 | |
| Gasarch | Bruce | | Director | 2010-11-09 | |
| Gasarch | Bruce | | Director | 2016-06-17 | |
| Gasarch | Bruce | | Director | 2016-06-26 | 2017-02-15 |
| Gasarch | Bruce | | Incorporator | 2015-05-04 | |
| Gasarch | Bruce | | Incorporator | 2010-11-09 | |
| Gasarch | Bruce | | Officer President | 2011-12-19 | |

EXHIBIT

K

EXHIBIT
Gasarch 6

A3674

| Company Name | Company Email | Inc/Reg # |
|---|---|---|
| CANADIAN SUN SUPPLEMENT CITY LTD. | bgasarch@gmail.com | 0677823 |
| CANADIAN SUN HOLDINGS LTD. | yvobru@gmail.com | 1079747 |
| CANADIAN SUN SUPPLEMENT CITY LTD. | bgasarch@gmail.com | 0677823 |
| NORLAND ESTATES INC. | yg@corphouse.net | 1006064 |
| COLEMAN STRATEGIES INC. | yg@corphouse.net | 1052969 |
| HIGHPOINT DRIVE ESTATES INC. | admin@ottermail.biz | 1043854 |
| CREERY ESTATES INC. | admin@ottermail.biz | 1035356 |
| BEVENDALE HOLDINGS INC. | ch@corphouse.net | 1060884 |
| MONOPOLY ADMINISTRATION INC. | yvobru@gmail.com | 1035439 |
| CROSS PACIFIC VENTURES INC. | yvobru@gmail.com | 1049287 |
| HERITAGE PEAKS CAPITAL INC. | admin@ottermail.biz | 1045054 |
| SNOWPEAK MANAGEMENT INC. | yvobru@gmail.com | 1045354 |
| 1058903 B.C. LTD. | yg@lakehg.com | 1058903 |
| CROSS PACIFIC HOLDINGS INC. | ch@corphouse.net | 1049286 |
| BEA PER CONSULTING INC. | bgasarch@gmail.com | 0894990 |
| CANADIAN SUN HOLDINGS LTD. | yvobru@gmail.com | 1079747 |
| CROSS PACIFIC TIRE CORPORATION | yg@lakehg.com | 1047233 |
| MONOPOLY ADMINISTRATION INC. | yvobru@gmail.com | 1035439 |
| BEA PER CONSULTING INC. | bgasarch@gmail.com | 0894990 |
| CANADIAN SUN SUPPLEMENT CITY LTD. | bgasarch@gmail.com | 0677823 |

A3675

**EXHIBIT**

**L**

# ASSIGNMENT

For valuable consideration, the undersigned hereby sells, assigns and transfers to LAKEHOUSE CAPITAL INC. (the "Assignee") all debts owed to the undersigned by FINGRO HOLDINGS LTD. (the "Borrower").

DATED: December 31, 2016.

BEVENDALE HOLDINGS INC.

Per: _____
Authorized Signatory

A3676

## ASSIGNMENT

For valuable consideration, the undersigned hereby sells, assigns and transfers to CITY GROUP LLC (the "Assignee") all debts owed to the undersigned by FINGRO HOLDINGS LTD. (the "Borrower").

DATED:  December 31, 2016.

LAKEHOUSE CAPITAL INC.

Per:  _____
        Authorized Signatory

# Promissory Note

**$2,000,000 CAD**                                           **Date: February 19, 2014**

FOR VALUE RECEIVED, **CITY GROUP LLC** (the "Promissor") hereby promises to pay to **CHARTERHOUSE LLC**, or such other holder for the time being hereof (the "Holder"), the principal amount of Two Million Dollars (2,000,000.00) in Canadian funds (the "Principal Amount"), together with interest thereon at the rate of five per cent (5%) per annum calculated annually on so much of the Principal Amount as shall be outstanding from time to time, ON DEMAND.

Time shall be of the essence of this Note. Extension of time for payment of all or any part of the amount owing hereunder at any time or times, or failure of the Holder to enforce any of the rights or remedies hereunder, shall not release the Promissor and shall not constitute a waiver of the rights of the Holder to enforce such rights and remedies thereafter.

The Promissor hereby waives demand and presentment for payment, notice of non-payment, protest and notice of protest of this Note.

IN WITNESS WHEREOF the Promissor has executed this Note on February 19, 2014.

CITY GROUP LLC

Per: _____
        Authorized Signature

A3678

# Promissory Note

**$1,000,000**                                                    **Date:  March 23, 2016**

FOR VALUE RECEIVED, **FINGRO HOLDINGS LTD.** (the "Promissor") hereby promises to pay to **BEVENDALE HOLDINGS INC.**, or such other holder for the time being hereof (the "Holder") at Vancouver, Canada, the principal amount of ONE MILLION Dollars ($1,000,000.00) in Canadian funds, together with interest thereon of eight per cent (8%) per annum calculated annually, ON DEMAND.

Time shall be of the essence of this Note.  Extension of time for payment of all or any part of the amount owing hereunder at any time or times, or failure of the Holder to enforce any of the rights or remedies hereunder, shall not release the Promissor and shall not constitute a waiver of the rights of the Holder to enforce such rights and remedies thereafter.

The Promissor hereby waives demand and presentment for payment, notice of non-payment, protest and notice of protest of this Note.

IN WITNESS WHEREOF the Promissor has executed this Note on March 23, 2016.

FINGRO HOLDINGS LTD.

Per: _____

Michael Groot
Authorized Signatory

{00457327;1}

A3679



# CHARTERHOUSE LLC

December 18, 2017

City Group Alliance Inc.
Suite 320-1100 Melville Street
Vancouver, BC V6E 4A6

## STATEMENT

| Date | Description | Amount CAD | Balance CAD |
|------|-------------|-----------:|------------:|
| Feb 19/14 | Principal advance | 2,000,000 | 2,000,000 |
| Feb 19/15 | Interest at 5% | 100,000 | 2,100,000 |
| Feb 19/16 | Interest at 5% | 105,000 | 2,205,000 |
| Jan 6/17 | Principal advance | 150,000 | 2,355,000 |
| Feb 19/17 | Interest at 5% | 110,250 | 2,465,250 |
| Dec 18/17 | Payment | -800000 | 1,665,250 |

Yours very truly,

CHARTERHOUSE LLC

E. &O.E.

1201 ORANGE STREET, SUITE 600, WILMINGTON, DE 19899-0511 TEL/FAX: (702) 973-1853
Email: charterhouse@buzzmail.ltd

A3680

**EXHIBIT**

**M**

**From:**    "Wires" <wires@secure.xmeridian.com>
**To:**      "Fred Sharp" <fsharp@secure.xmeridian.com>
**Subject:** Re: LH 2017 FS-v4
**Sent:**    Thu, 21 Dec 2017 23:25:24 -0500
Lakehouse Aug 2017.xlsx

1. CG Dec 2016 balance is not 900,000, is 13,057,299.
   CG Dec 2017 balance is 12,333,507
   Whole year transactions are shown in shareholder loan.  the shareholder
loan balance is match the balance sheet.

   I don't understand that you said Dec 2016 is 900,000.


2. I didnt find the wrong spelling for Earnings. Do you read the correct version?

3. corrected the spelling for interest

4. changed that line in Bevendale loan.

Please review the attachment again.

Thanks!

On Thu, 21 Dec 2017 14:09:15 -0500, Fred Sharp wrote
> Corrections:
>
> 1. Shareholder Loan: last 2 lines:
>
> City Group Alliance  Dec-16  -900,000
> City Group Alliance  May-17  +176,208
>
> This will make the loan balance to CG $12,333,507 which xupports the
> amount in the Balance Sheet
>
> 2. Statement of Income: last line: correct spelling of Earnings
>
> 3. Expenses: third line: correct spelling of interest
>
> 4. Assets-Loans: item 7 Bevendale Holdings: delete last line dated
> May 1, 2017; and change line dated Dec 31, 2016 to be $900,000
>
> Pls xmail revised FS
>
> --
> xMeridian.com


--
xMeridian.com

SEC-CVDOJMX-E-0194036

A3681

LAKEHOUSE CAPITAL INC
**BALANCE SHEET**
as at August 31, 2017

| **Assets** | 2016 | 2017 |
|---|---|---|
| **Investments** | | |
| Cash | 801,058 | 144,770 |
| Norland | 3,250,292 | 3,250,292 |
| Creery | 2,125,645 | 2,215,510 |
| Coleman | 2,186,800 | 2,186,800 |
| Cross Pacific | 850,000 | 700,000 |
| Highpoint | 1,851,238 | 2,208,266 |
| Heritage | 1,404,779 | 1,925,255 |
| Bevendale | 900,000 | 0 |
| | | |
| **Total Assets** | 13,369,812 | 12,630,893 |
| | | |
| **Liabilities** | | |
| A/P & accrued liabilities | 5,234 | 6,720 |
| | 5,234 | 6,720 |
| Long-term liabilities | | |
| Due to related parties-Shareholders | 13,057,299 | 12,333,507 |
| | 13,057,299 | 12,333,507 |
| | | |
| **Total Liabiilties** | 13,062,533 | 12,340,227 |
| | | |
| **Shareholder s equity** | | |
| Share Capital | 10 | 10 |
| Retained Earnings | 259,326 | 307,269 |
| | 307,269 | 290,656 |
| | 13,369,812 | 12,630,893 |

A3682

LAKEHOUSE CAPITAL INC
**STATEMENT OF INCOME AND EXPENSES**
as at August 31, 2017

| | 2016 |
|---|---|
| **Revenue** | |
| Interest Income | 0 |
| | 0 |
| | |
| **Operating Expenses** | |
| Rent | 6,851 |
| Bank Services | 260 |
| Intersts Costs | 1,479 |
| Accounting fees | 8,187 |
| Tele | 2,386 |
| | 19,163 |
| | |
| **Net Income/Loss** | -19,163 |
| | |
| Other items | |
| Unrealized foreign exchange Income | 2,550 |
| | |
| **Net for the period** | -16,613 |
| | |
| Retained Earnings Beg of the year | 307,269 |
| | |
| Retained Earnings End of the year | 290,656 |

A3683

LAKEHOUSE CAPITAL INC
## Shareholder Loan
August 31, 2017

| Items | Dates | Loan Amount | Repaid | Shareholder Paid | Notes |
|---|---|---|---|---|---|
| City Group Alliance Inc | 23/Jul/14 | 3,250,292 | | 3,250,292 | |
| | 19/Dec/14 | 1,999,990 | | 5,250,282 | |
| | 16/Dec/14 | 5,000 | 5,407 | 5,249,875 | |
| | 9/Jun/15 | 3,750 | | 5,253,625 | |
| | 30/Jun/15 | 1,826,054 | | 7,079,679 | |
| | 24/Jul/15 | 50,000 | | 7,129,679 | |
| **Total 2015** | | **7,135,086** | **5,407** | **7,129,679** | |
| City Group Alliance Inc | Sep 10-2015 | 1,446,583 | | 1,446,583 | |
| | Sep 10-2015 | 200,000 | | 200,000 | |
| | Dec 4-2105 | 2,071,948 | | 2,071,948 | |
| | Dec 9-2015 | 1,128,034 | | 1,128,034 | |
| | Apr 26-2016 | 1,028,045 | | 1,028,045 | |
| | | 55,010 | | 55,010 | |
| 2016 | | 5,929,620 | 0 | 5,929,620 | |
| | Aug 31 2016 | | | **13,057,299** | |
| Charterhouse Capital Ir | Jan-17 | 150,000 | 150,000 | 0 | |
| City Group Alliance | Dec-16 | 200,000 | | 200,000 | by City |
| City Group Alliance | Dec-16 | | 1,000,000 | -1,000,000 | |
| City Group Alliance | May-17 | 76,208 | 0 | 76,208 | Interes |
| 2017 | | 426,208 | 150,000 | -723,792 | |
| | Aug 31 2017 | | | **12,333,507** | |

A3684

Group-Bevendale Assignment

t to CG

LAKEHOUSE CAPITAL INC
**Asset - Loans**
August 31, 2017

| | Items | Dates | Loan Amount | Repaid | Shareholder Paid |
|---|---|---|---|---|---|
| 1 | Norland Estates Inc | Aug 31 2016 | 3,250,292 | | 3,250,292 |
| 2 | Creery Estates Inc | Aug 31 2016 | 2,125,645 | | |
| | | 1/Oct/16 | 110,000 | | |
| | | 1/Jan/17 | 155,685 | | |
| | | Jan 6 2017 | | 225,820 DP | |
| | | 17/Aug/17 | 50,000 | | 2,215,510 |
| 3 | Coleman Strategies | Aug 31 2016 | 2,186,800 | | |
| | | | | | 2,186,800 |
| 4 | Cross Pacific | Aug 31 2016 | 850,000 | | |
| | | Aug 17,2017 | | 150,000 | |
| | | | | | 700,000 |
| 5 | Highpoint Drive | Aug 31,2016 | 1,851,238 | | |
| | | 1-Sep | 3,125 | | |
| | | 1-Oct | 282,477 | | |
| | | 1-Nov | 56,667 | | |
| | | 1-Jan | 8,233 | | |
| | | 1-Feb | 1,466 | | |
| | | 1-Mar | 1,667 | | |
| | | 1-May | 1,667 | | |
| | | 1-Jul | 1,667 | | |
| | | 1-Aug | 60 | | |
| | | | | | 2,208,266 |
| 6 | Heritage Peaks | Aug 31,2016 | 1,404,779 | | |
| | | 1-Sep | 3,125 | | |
| | | Oct-17 | 209,289 | | |
| | | 1-Nov | 74,050 | | |
| | | 1-Jan | 1,667 | | |
| | | Jan 6,2017 | 225,820 DP | | |
| | | 1-Feb | 1,466 | | |
| | | 1-Mar | 1,667 | | |
| | | 1-May | 1,667 | | |
| | | 1-Jul | 1,667 | | |
| | | 1-Aug | 60 | | 1,925,255 |
| 7 | Bevendale Holdings | Aug 31,2016 | 900,000 | | |
| | | Dec 31,2016 | | 900,000 | 0 |
| | **Total** | | **13,761,943** | **1,275,820.00** | **12,486,123** |

A3686

B-03147_SW_ARCH_P-000012915

2 of 2

A3687

Case: 24-1770    Document: 00118249071    Page: 204    Date Filed: 02/18/2025    Entry ID: 6700951

B-03147_SW_ARCH_P-000012915

Case 1:21-cv-11276-WGY    Document 474-13    Filed 03/07/24    Page 8 of 14

Note

by City Group-Bevendale assignment

2 of 2

A3688

B-03147_SW_ARCH_P-000012915

2 of 2

A3689

B-03147_SW_ARCH_P-000012915

LAKEHOUSE CAPITAL INC
**EXPENSES**
August 31, 2017

| Account | Items | Date | Amount | Total |
|---------|-------|------|--------|-------|
| Rent | CHE Holdings Inc | 4 Months | 6,720 | 6,720 |
| Bank charges | TD Bank | 12 Months | 260 | 260 |
| Interest costs | paid to loan interest | May-17 | 1,479 | 1,479 |
| Accounting fees | James Stafford | Mar-17 | 7,565 | |
| | | Mar-17 | 622 | 8,187 |
| Rent | TD bank | Feb-17 | 131 | 131 |
| Tele | Rogers | Jan-Aug | 2,386 | 2,386 |
| Total | | | 19,163 | 19,163 |

A3690

Bank Account

## LAKEHOUSE CAPITAL INC
## TD BANK ACCOUNT
August 31, 2017

| Month | Items | Dr. CAD | USD | Cr. CAD | USD | Total CAD | USD |
|---|---|---|---|---|---|---|---|
| Aug 31,2016 | | | | | | 651,936 | 113,625 |
| Sep-16 | Snowpeak | 1,299 | | | | | |
| | Snowpeak | | | 6,532 | | | |
| | Loan-Highpoint | | | 3,125 | | | |
| | Loan-Heritage | | | 3,125 | | | |
| | Bank Charges | | | 2 | | 640,450 | 113,625 |
| Oct-16 | Loan-Highpoint | | | 277,686 | | | |
| | Loan-Heritage | | | 204,497 | | | |
| | Loan-Crerry | | | 110,000 | | | |
| | Loan-Highpoint | | | 1,667 | | | |
| | Loan-Heritage | | | 1,667 | | | |
| | Loan-Highpoint | | | 3,125 | | | |
| | Loan-Heritage | | | 3,125 | | | |
| | Bank Charges | | | 2 | | 38,682 | 113,625 |
| Nov-16 | Loan-Highpoint | | | 1,667 | | | |
| | Loan-Heritage | | | 1,667 | | | |
| | Loan-Highpoint | | | 55,000 | | | |
| | Loan-Heritage | | | 72,383 | | | |
| | Bank Charges | | | 2 | 19 | | |
| | forex | 147,136 | | | 110,000 | 55,099 | 3,606 |
| Dec-16 | Bank Charges | | | | 19 | | |
| | total | | | | | 55,099 | 3,587 |
| Jan-17 | Bank Charges | | | 2 | 19 | | |
| | Loan-Highpoint | | | 1,667 | | | |
| | Loan-Heritage | | | 1,667 | | | |
| | borrow Loan-CH | 150,000 | | | | | |
| | Rogers | | | 513 | | | |
| | Loan-Highpoint | | | 6,566 | | | |
| | Loan-Creery | | | 155,685 | | 39,000 | 3,568 |
| Feb-17 | Bank Charges | | | 2 | 19 | | |
| | Loan-Highpoint | | | 1,466 | | | |
| | Loan-Heritage | | | 1,466 | | | |
| | Rogers | | | 287 | | | |
| | Safety deposit | | | 131 | | 35,647 | 3,549 |
| Mar-17 | Bank Charges | | | 2 | 19 | | |
| | Stafford-Accounting | | | 7,565 | | | |
| | Stafford-Accounting | | | 622 | | | |
| | Loan-Highpoint | | | 1,667 | | | |
| | Loan-Heritage | | | 1,667 | | | |
| | Rogers | | | 256 | | 23,869 | 3,530 |
| Apr-17 | Bank Charges | | | 2 | 19 | | |
| | Rogers | | | 273 | | 23,594 | 3,511 |
| May-17 | Bank Charges | | | 2 | 19 | | |
| | Loan Repym-L-Bev | 100,000 | | | | | |

1 of 2

A3691

Bank Account

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
|  | Interest-loan fm CC | 76,208 |  |  |  |  |
|  | Paid Loan-CH |  | 150,000 |  |  |  |
|  | Paid Loan Interest-CH |  | 1,479 |  |  |  |
|  | Loan-Highpoint |  | 1,667 |  |  |  |
|  | Loan-Heritage |  | 1,667 |  |  |  |
|  | Rogers |  | 256 |  | 44,732 | 3,492 |
| Jun-17 | Bank Charges |  | 2 | 19 |  |  |
|  | Rogers |  | 260 |  | 44,470 | 3,473 |
| Jul-17 | Bank Charges |  | 2 | 19 |  |  |
|  | Rogers |  | 191 |  |  |  |
|  | Loan-Highpoint |  | 1,667 |  |  |  |
|  | Loan-Heritage |  | 1,667 |  | 40,943 | 3,454 |
| Aug-17 | Bank Charges |  | 2 | 19 |  |  |
|  | Rogers |  | 350 |  |  |  |
|  | Loan Repym-Cross | 150,000 |  |  |  |  |
|  | Loan-Creery |  | 50,000 |  |  |  |
|  | Loan-Highpoint |  | 61 |  |  |  |
|  | Loan-Heritage |  | 61 |  | 140,470 | 3,435 |
| Rate |  |  |  |  |  | 1.2518 |
| bank chagres |  |  | 22.00 | 190.00 |  |  |
| CAD total |  |  | 260 |  | 144,770 |  |

A3692

LAKEHOUSE CAPITAL INC
**ACCOUNTS PAYABLE**
August 31, 2017

|   | Accounts | Balance 31-Aug-16 | Cr. Addition | Dr. Deduction | Balance 31-Aug-17 |
|---|---|---|---|---|---|
| 1 | CHE Holdings Inc Office Rent | 0.00 | 6,720.00 | 0.00 | 6,720.00 |
| 2 | Snowpeak Managemen | 6,532.42 | 0.00 | 6,543.42 | 0.00 |
| Total | | 6,532.42 | 6,720.00 | 6,543.42 | **$ 6,720.00** |
| Total | | | 6,720.00 | 0.00 | |

A3693

LAKEHOUSE CAPITAL INC
**SHAREHOLDERS**
August 31, 2017

| Cert | Items | From Date | Percent | Shares | Amount |
|------|-------|-----------|---------|--------|--------|
| 1 | City Group Alliance Inc<br>320-1100 Melville Street<br>Vancouver BC V6E 4A6 | 25-11-2014 | 100% | 1,000 | $ 10 |

A3694

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff,<br><br>v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,<br><br>Defendants. | Civil Action No. 21-CV-11276 (WGY) |

## DECLARATION OF CHRISTOPHER BECKSTROM

I, Christopher Beckstrom, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1.     I am a Senior Digital Forensic Examiner employed by the Department of Justice (DOJ), Federal Bureau of Investigation (FBI). I am currently assigned to the New England Regional Computer Forensics Laboratory (NERCFL) at the FBI Boston Field Office in Massachusetts.  I was hired as an Information Technology Specialist - Digital Forensic Examiner in 2015 after the completion of my Masters of Science in Computer Science from the University of Illinois Springfield.  I received at least 400 hours of training in device acquisition, preservation, and analysis from the FBI.  I have completed additional technical certifications related to digital forensics from independent technology vendors such as Cellebrite, CompTIA, and SANS.  I have also completed additional trainings from the FBI. The FBI laboratories, including NERCFL, operate under a quality program that includes annual proficiency testing.  I have taken both internal and external proficiency tests.  The FBI laboratories, including the NERCFL, are

A3695

accredited in Digital Forensics by the ANSI (American National Standards Institute) National
Accreditation Board (ANAB). I have served as the NERCFL quality manager since 2017. I am
also a member of the FBI Adjunct Faculty and assist in FBI training related to Digital Forensics.

2.     I make this Declaration based upon my personal knowledge as set forth below. I
testified at trial in this case about the fact that certain SEC trial exhibits were identical to xphone
messages that were recovered from the servers seized in Curacao and that the messages in certain
SEC trial exhibits that were recovered from those servers were sent and received by certain users
of the xphone system.

3.     The MailboxDatabase1999875406.edb within the DELL_PERC_H700_2p4TB.dd
image seized from Curacao contained messages related to the investigation. Pretty Good Privacy
(PGP) encryption was encountered. Only the body of the messages were found to be encrypted in
the source data. Decryption keys for some user messages were located within the evidence
allowing for many messages to be decrypted. The initial decryption process used generated a
body.pgp.decrypt file, containing the decrypted message body only. The body.pgp.decrypt file
was saved with a copy of the encrypted source message. The body.pgp.decrypt files can be
matched with the encrypted message. Messages can be individually reverified by using the proper
decryption key with a PGP decryption tool.

4.     I was provided with a body.pgp.decrypt message bearing text "peac is now pere."
Ex. 1. I was asked to identify the date of the communication as well as the sender and recipient of
that message.

5.     An encrypted PGP message with the subject "New account name" and the sent
date 1/27/2014 that decrypts to read "peac is now pere." was located in the message Inbox folder
for the mailbox user known as "76." Ex. 2. According to the header information

2

A3696

76@xmeridian.com received this message matching Ex. 1 from bond@xmeridian.com on Mon, 27 Jan 2014.

6.    An encrypted PGP message with the subject "New account name" containing the identical encrypted message with a sent date of 1/27/2014 was located in the Sent Items folder for mailbox user known as "Bond." Ex. 3.  The Ex 1. message was sent from the account for user 'bond' to the account for user '76.'


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 7, 2024, in Boston, Massachusetts.

Christopher Beckstrom
Senior Digital Forensic Examiner
New England Regional Computer Forensics Lab

3

A3697

B-03147_ARCH_SEG-006313878

**EXHIBIT**

**1**

Beckstrom

```
Account peac is now pere
```

Confidential Pursuant to Securities Exchange Act s.24(d).
Onward sharing of the materials with other Federal Agencies is not permitted
Contact OIA for further information at x16691

SEC-MLATCKLP-E-0368469

| From: | bond <bond@xmeridian.com> |
|---|---|
| Sent: | 1/27/2014 3:54:41 PM -0300 |
| To: | 76 <76@xmeridian.com> |
| Subject: | New account name |

**EXHIBIT**

**2**

Beckstrom

-----BEGIN PGP MESSAGE-----
Version: Research In Motion 1.0

wcBMAx6BoAcv01I9AQf/Uv9WBB1VnUZWCJjKJkKw3fjRxos3tPvPZxInUZJXgrUc
24R0to7ikk+A4ZIKANiV9E8byFCDdNXA48Lv0gF7HWFCO6px5tdITMC6CYiL9ne+
iGenWREvU3a7/tYg0T4r0eEEfvKzHk/FN4IfK11t6EcKwaILsWqQagw0MHUMXgnx
zTT01cntGvLhuwq/rR2iPGN6LXhMNRnQd94LviXKimn6c/aqR3kkGPufzgUn/8Y0
8qhdP9GgD+6KBWFJtH5/Ss6n3cGH80h5HoZehFqLWW1j3f0s8trhYJYbHLJg8mC5
NtzA7N7BNIbeSKKvkS0oT0e2MFEwQSotZxzT7R2Mm8HATAN0ajPP/czV0gEH/28i
AQcdjMMFquwIK7e6YazA5xM7g7Y0JD7LTShzbkikg/6FpyBQn/NzbWj+/gpaBxm1
9I8tNcQq9L/p9YUnp/E9fnm8bbYInkjiPcGDg3Cv9n6OfEcRQ56iYVKVGzqrCubW
XOwYFPkZbVfrVWQPfhkB6GQhcItkVHItfIMjP+uu1gWGyqjM8gPICYuaadJ9oQ2q
35I3esYVcHLqy/kDcLX2/LwnWojBxgG7ZkWgtx7QsUCPeT85Y9PSRKjhR2nQQk2M
f+tzV7BaCFgFCs9KbURTf8YL4gnv7zactE1FTwxrivsl
y+QbIacr0e1fkxvda4i76SPsCUWsouS8srHEWIfJwJM50qDA32fvQs0sxowRW/zN
0psmLwjQRI3UYmRTdTIur5MSCoZyuBZAUnYXdt+S+6HXRekeFI/tYfOEg1EV/cWQ
M7GG0phvCf6HRsVR0A9adzvWbNLJYLaqIEDTwavyXXPit18cd4k5h4hsgEQHqT7N
VesL6dCLV3d8TMMCeFtUzy+zXmNutdNbBwsXrS6g57zAt33aii/rCn04SP1AE+AC
w/G6IXJCK/eNVsP9U1N1bmpMbqJVN0XFESFHYas24I34IyXJDiogEdFh7hWaH7sV
ZgTYQCRJmwVqQfeolmN5e5LRcy12R+6oeWHMP8K1RtZp8Ow0gEtTbZetE7M3/+bW
TYkITC7OSYVqa4UhhDIjI6w67v1If7P+KAmUALG9YYLU6shy3B6Vgt76FftpkcYR qAmnE84B
tO7/C78etsKQQs00bXrAsH265XjIT46s2zzL/fs=
=0IAh
-----END PGP MESSAGE-----

| Received: | from starport2.milkyway.local ([fe80::841b:1d8e:4023:ae90]) by starport2.milkyway.local ([fe80::841b:1d8e:4023:ae90%10]) with mapi id 14.01.0438.000; Mon, 27 Jan 2014 14:54:42 -0400 |
|---|---|
| Thread-Topic: | New account name |
| Thread-Index: | Ac8bkTySiQSyGB8gQ/26IunvFbwKFQ== |
| Message-ID: | <C926735DF8E24640A49E238D7C7FAC47D6C750@starport2.milkyway.local> |
| Accept-Language: | en-US |
| Content-Language: | en-US |
| X-MS-Exchange-Organization-SCL: | -1 |
| X-MS-TNEF-Correlator: | <C926735DF8E24640A49E238D7C7FAC47D6C750@starport2.milkyway.local> |
| X-MS-Exchange-Organization-AuthSource: | starport2.milkyway.local |
| X-MS-Exchange-Organization-AuthAs: | Internal |
| X-MS-Exchange-Organization-AuthMechanism: | 03 |
| X-Originating-IP: | [fe80::841b:1d8e:4023:ae90] |
| Status: | RO |
| X-libpst-forensic-sender: | /O=XMERIDIAN PHONES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=BOND66F |
| MIME-Version: | 1.0 |
| Content-Type: | multipart/mixed; boundary="--boundary-LibPST-iamunique-462345952_-_-" |

**From:** bond <MAILER-DAEMON>
**Sent:** 1/27/2014 6:54:41 PM +0000
**To:** 76
**Subject:** New account name

**EXHIBIT**

**3**

Beckstrom

-----BEGIN PGP MESSAGE-----
Version: Research In Motion 1.0

wcBMAx6BoAcv01I9AQf/Uv9WBB1VnUZWCJjKJkKw3fjRxos3tPvPZxlnUZJXgrUc
24R0to7ikk+A4ZlKANiV9E8byFCDdNXA48Lv0gF7HWFCO6px5tdITMC6CYiL9ne+
iGenWREvU3a7/tYg0T4r0eEEfvKzHk/FN4IfK11t6EcKwalLsWqQagw0MHUMXgnx
zTT01cntGvLhuwq/rR2iPGN6LXhMNRnQd94LviXKimn6c/aqR3kkGPufzgUn/8Y0
8qhdP9GgD+6KBWFJtH5/Ss6n3cGH80h5HoZehFqLWW1j3f0s8trhYJYbHLJg8mC5
NtzA7N7BNlbeSKKvkS0oT0e2MFEwQSotZxzT7R2Mm8HATAN0ajPP/czV0gEH/28i
AQcdjMMFquwlK7e6YazA5xM7g7Y0JD7LTShzbkikg/6FpyBQn/NzbWj+/gpaBxm1
9l8tNcQq9L/p9YUnp/E9fnm8bbYInkjiPcGDg3Cv9n6OfEcRQ56iYVKVGzqrCubW
XOwYFPkZbVfrVWQPfhkB6GQhcItkVHltflMjP+uu1gWGyqjM8gPICYuaadJ9oQ2q
35I3esYVcHLqy/kDcLX2/LwnWojBxgG7ZkWgtx7QsUCPeT85Y9PSRKjhR2nQQk2M
f+tzV7BaCFgFCs9KbURTf8YL4gnv7zactE1FTwxrivsl
y+QbIacr0e1fkxvda4i76SPsCUWsouS8srHEWIfJwJM50qDA32fvQs0sxowRW/zN
0psmLwjQRI3UYmRTdTIur5MSCoZyuBZAUnYXdt+S+6HXRekeFI/tYfOEg1EV/cWQ
M7GG0phvCf6HRsVR0A9adzvWbNLJYLaqlEDTwavyXXPit18cd4k5h4hsgEQHqT7N
VesL6dCLV3d8TMMCeFtUzy+zXmNutdNbBwsXrS6g57zAt33aii/rCn04SP1AE+AC
w/G6IXJCK/eNVsP9U1N1bmpMbqJVN0XFESFHYas24I34IyXJDiogEdFh7hWaH7sV
ZgTYQCRJmwVqQfeoImN5e5LRcy12R+6oeWHMP8K1RtZp8Ow0gEtTbZetE7M3/+bW
TYkITC7OSYVqa4UhhDIjI6w67v1If7P+KAmUALG9YYLU6shy3B6Vgt76FftpkcYR qAmnE84B
tO7/C78etsKQQs00bXrAsH265XjIT46s2zzL/fs=
=0IAh
-----END PGP MESSAGE-----

**Status:** RO
**Message-Id:** <C926735DF8E24640A49E238D7C7FAC47D6C750@starport2.milkyway.local>
**X-libpst-forensic-sender:** /O=XMERIDIAN PHONES/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=BOND66F

**MIME-Version:** 1.0
**Content-Type:** multipart/mixed; boundary="--boundary-LibPST-iamunique-240118137_-_-"

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

**SECURITIES AND EXCHANGE**
**COMMISSION,**
                                                   **Plaintiff,**

        **v.**

**FREDERICK L. SHARP, ZHIYING**
**YVONNE GASARCH, COURTNEY**
**KELLN, MIKE K. VELDHUIS, PAUL**
**SEXTON, JACKSON T. FRIESEN,**
**WILLIAM T. KAITZ, AVTAR S.**
**DHILLON, and GRAHAM R. TAYLOR,**

                                            **Defendants.**

---

Civil Action No. 21-CV-11276 (WGY)

---

## DECLARATION OF RYAN MURPHY

    I, Ryan Murphy, pursuant to 28 U.S.C. §1746, hereby declare as follows:

    1.    Since January 2020, I have been employed as an Enforcement Accountant with the

U.S. Securities and Exchange Commission ("the Commission") in its Boston Regional Office.

My duties include conducting investigations relating to potential violations of the federal

securities laws.

    2.    I received a Bachelor of Science degree in accounting and business administration,

with a concentration in finance, from the University of Richmond in Virginia in 2009.  Before

joining the Commission, I was most recently a managing director in the forensic accounting and

complex business litigation practice at StoneTurn, in Boston, where I worked for over ten years.

    3.    I am a Certified Public Accountant in the Commonwealth of Massachusetts and

the State of New York.  I am also Certified in Financial Forensics by the American Institute of

Certified Public Accountants.

A3701

4.      I make this Declaration based upon my personal knowledge and upon information and belief as set forth below, and in connection with the Commission's reply memorandum in support of its motion for remedies against defendant Zhiying Yvonne Gasarch ("Gasarch").  I have submitted several prior declarations in this case and I testified at trial in support of the Commission's claims.

5.      I have been asked by counsel for the Commission to calculate what portion of the Commission's disgorgement claim is based on certain identified line items that are associated with Gasarch in her PEAC/PERE Q account statement.  Those line items are withdrawals (and one deposit) that either 1) name Gasarch directly, 2) are withdrawals for Gasarch's Sun Life insurance policy or for her W&B Riding Club that were previously shown to benefit Gasarch (*see* Trial Ex. 287, Dkt. No. 427-35), 3) name Gasarch's husband directly, 4) name Gasarch's mother-in-law directly, 5) name Gasarch's entity Great Wall Management directly, or 6) are withdrawals sent to the City where Gasarch lived at the time.  For this analysis, I reviewed Dkt. No. 464-1, which is the copy of Gasarch's PEAC/PERE Q account statement with line numbers added.  I also reviewed Trial Exhibit 312, which is the PEAC/PERE Q account statement produced to the Commission.

6.      A summary of those itemized withdrawals (and one deposit) is attached hereto as Exhibit A.  Together, these line items total USD $521,553 and CAD $513,618.  After converting the CAD transactions into USD as of the batch date of each of those transactions, the CAD transactions are equivalent to USD $452,217.  Thus, these transactions together total USD $973,770.

7.      Further, there are many transactions in Gasarch's PEAC/PERE account in which she withdraws cash from her account.  *See, e.g.,* Dkt. No. 464-1 at lines 122, 126, 131, 132, 134,

2

A3702

137-141, as examples.  I totaled all of the cash withdrawals from Gasarch's PEAC/PERE account

beginning on August 6, 2011, and found that those withdrawals totaled USD $1,136,169 (after

converting all CAD withdrawals into USD as of the batch date of the transaction).   *See* Exhibit B

attached hereto for a summary of those cash withdrawals.

        I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

        Executed on March 7, 2024, in Boston, Massachusetts.

                                            Ryan Murphy

3

A3703

**EXHIBIT Murphy A**

| Line | Account Code | Account Title | Batch ID | Batch Date | Bank Code | Batch Description | Transaction Description | Currency Code | Cash Bank (in Curr) | Cash Acct (USD) | Cash Acct (CAD) | USD Value - Calculated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 161 | PEAC | PEAC | 26524 | 1/26/2012 | TDCO | Yvonne ck #406 | debit | USD | (5,000) | (5,000) | - | (5,000) |
| 186 | PEAC | PEAC | 29256 | 3/9/2012 | TDQB | Great Wall ck #1571 | debit | CAD | (1,000) | - | (1,000) | (1,011) |
| 187 | PEAC | PEAC | 29257 | 3/9/2012 | TDQB | Yvonne ck #1572 | debit | CAD | (8,000) | - | (8,000) | (8,086) |
| 206 | PEAC | PEAC | 30930 | 4/11/2012 | TDQB | Draft to Yvonne ck #1671 | debit | CAD | (7,008) | - | (7,008) | (6,980) |
| 216 | PEAC | PEAC | 32764 | 5/17/2012 | SIL2 | Bruce Gasarch TT | debit | USD | (10,022) | (10,022) | - | (10,022) |
| 243 | PEAC | PEAC | 36217 | 7/30/2012 | TDQB | Zhi Ying ck #1932 | debit | CAD | (2,000) | - | (2,000) | (1,995) |
| 248 | PEAC | PEAC | 36580 | 8/1/2012 | TDQB | Yvonne ck #1939 | debit | CAD | (5,000) | - | (5,000) | (4,992) |
| 255 | PEAC | PEAC | 37868 | 9/5/2012 | TDQB | Yvonne ck #2016 | debit | CAD | (4,000) | - | (4,000) | (4,040) |
| 264 | PEAC | PEAC | 39525 | 10/5/2012 | TDQB | Yvonne ck #2125 | debit | CAD | (10,000) | - | (10,000) | (10,243) |
| 275 | PEAC | PEAC | 42418 | 12/6/2012 | BSIT | Chen TT | debit | USD | (3,015) | (3,015) | - | (3,015) |
| 277 | PEAC | PEAC | 42648 | 12/13/2012 | BMQB | Zhiying ck #288 | debit | CAD | (10,000) | - | (10,000) | (10,157) |
| 285 | PEAC | PEAC | 44541 | 1/25/2013 | BSIT | Yvonne TT | debit | CAD | (9,050) | - | (9,050) | (8,980) |
| 291 | PEAC | PEAC | 45225 | 2/4/2013 | SIL2 | Gasarch TT | debit | USD | (9,553) | (9,553) | - | (9,553) |
| 302 | PEAC | PEAC | 48403 | 4/10/2013 | BSIT | Yvonne TT | debit | CAD | (9,500) | - | (9,500) | (9,361) |
| 319 | PEAC | PEAC | 52082 | 6/11/2013 | BSIT | Yvonne TT | debit | CAD | (9,600) | - | (9,600) | (9,322) |
| 327 | PEAC | PEAC | 53965 | 7/16/2013 | BSIT | Yvonne TT | debit | CAD | (9,600) | - | (9,600) | (9,241) |
| 337 | PEAC | PEAC | 56059 | 8/30/2013 | BSIT | Yvonne TT | debit | CAD | (9,600) | - | (9,600) | (9,096) |
| 340 | PEAC | PEAC | 57091 | 9/19/2013 | BSIT | Yvonne TT | debit | CAD | (25,000) | - | (25,000) | (24,421) |
| 346 | PEAC | PEAC | 58416 | 10/10/2013 | SIL2 | Gasarch TT | debit | USD | (9,970) | (9,970) | - | (9,970) |
| 349 | PEAC | PEAC | 58596 | 10/17/2013 | BSIT | Yvonne TT | debit | CAD | (25,000) | - | (25,000) | (24,307) |
| 350 | PEAC | PEAC | 58773 | 10/18/2013 | BSIT | Yvonne TT | debit | CAD | (28,000) | - | (28,000) | (27,219) |
| 364 | PEAC | PEAC | 61663 | 12/18/2013 | BSIT | Yvonne TT | debit | CAD | (9,800) | - | (9,800) | (9,206) |
| 373 | PEAC | PEAC | 62722 | 1/9/2014 | BSIP | Yvonne TT | debit | USD | (9,372) | (9,372) | - | (9,372) |
| 374 | PERE | PERE | 64178 | 1/9/2014 | BSIB | Yvonne TT | debit | USD | (9,372) | (9,372) | - | (9,372) |
| 378 | PERE | PERE | 64116 | 1/29/2014 | BSIB | Yvonne TT | debit | CAD | (9,139) | (9,139) | - | (9,139) |
| 387 | PERE | PERE | 64615 | 2/25/2014 | SGGO | Yvonne TT | debit | CAD | (9,600) | - | (9,600) | (8,660) |
| 396 | PERE | PERE | 74365 | 3/4/2014 | SGGO | Yvonne TT | debit | CAD | (9,900) | - | (9,900) | (8,908) |
| 404 | PERE | PERE | 67159 | 4/4/2014 | VPQU | Gasarch TT | debit | USD | (9,742) | (9,742) | - | (9,742) |
| 405 | PERE | PERE | 67319 | 4/9/2014 | SGGO | Yvonne TT | debit | CAD | (9,700) | - | (9,700) | (8,897) |
| 421 | PERE | PERE | 70426 | 6/17/2014 | BCHA | City of Richmond ck #235 | debit | CAD | (6,704) | - | (6,704) | (6,178) |
| 422 | PERE | PERE | 70427 | 6/17/2014 | BCHA | City of Richmond ck #234 | debit | CAD | (1,384) | - | (1,384) | (1,276) |
| 436 | PERE | PERE | 74567 | 7/14/2014 | SGPE | Bruce TT | debit | USD | (9,100) | (9,100) | - | (9,100) |
| 472 | PERE | PERE | 80935 | 11/28/2014 | BCHA | Chen draft | debit | CAD | (100,008) | - | (100,008) | (87,526) |
| 547 | PERE | PERE | 89683 | 6/25/2015 | BCHA | City of Richmond ck #481 | debit | CAD | (1,338) | - | (1,338) | (1,083) |
| 548 | PERE | PERE | 89682 | 6/25/2015 | BCHA | City of Richmond ck #478 | debit | CAD | (6,201) | - | (6,201) | (5,023) |
| 643 | PERE | PERE | 99179 | 4/25/2016 | SBCH | Gasarch ck #105 | debit | CAD | (21,000) | - | (21,000) | (16,564) |
| 661 | PERE | PERE | 102224 | 7/1/2016 | HERO | Great Wall TT | debit | CAD | (9,450) | - | (9,450) | (7,327) |
| 698 | PERE | PERE | 104571 | 10/3/2016 | BCHA | Yvonne Gasarch | credit | CAD | 15,000 | - | 15,000 | 11,417 |
| 722 | PERE | PERE | 109640 | 3/19/2017 | AFTR | Huo Xiaoqing TT | debit | USD | (40,561) | (40,561) | - | (40,561) |
| 727 | PERE | PERE | 110854 | 5/2/2017 | AFTR | Huo Yuaoqing TT | debit | USD | (35,774) | (35,774) | - | (35,774) |
| 728 | PERE | PERE | 111029 | 5/19/2017 | AFTR | Huo Xiaoqing TT | debit | USD | (40,180) | (40,180) | - | (40,180) |
| 731 | PERE | PERE | 111620 | 6/25/2017 | AFTR | W&B TT | debit | USD | (39,079) | (39,079) | - | (39,079) |
| 735 | PERE | PERE | 111934 | 6/30/2017 | TDCH | Great Wall ck #236 | debit | CAD | (11,000) | - | (11,000) | (8,473) |
| 736 | PERE | PERE | 112270 | 7/18/2017 | WBMO | Great Wall TT | debit | CAD | (9,870) | - | (9,870) | (7,794) |
| 750 | PERE | PERE | 116851 | 10/19/2017 | AFTR | W&B TT | debit | USD | (38,077) | (38,077) | - | (38,077) |
| 762 | PERE | PERE | 118351 | 1/1/2018 | AFTR | Huo TT | debit | CAD | (30,150) | - | (30,150) | (24,087) |

| Line | Account Code | Account Title | Batch ID | Batch Date | Bank Code | Batch Description | Transaction Description | Currency Code | Cash Bank (in Curr) | Cash Acct (USD) | Cash Acct (CAD) | USD Value - Calculated |
|------|--------------|---------------|----------|------------|-----------|-------------------|-------------------------|---------------|---------------------|-----------------|-----------------|------------------------|
| 773 | PERE | PERE | 120022 | 4/2/2018 | WIRI | Huo TT | debit | USD | (30,060) | (30,060) | - | (30,060) |
| 774 | PERE | PERE | 120206 | 4/23/2018 | WIRI | Chen TT | debit | USD | (15,030) | (15,030) | - | (15,030) |
| 777 | PERE | PERE | 120410 | 5/1/2018 | WIHI | Sun Life TT | debit | CAD | (100,216) | - | (100,216) | (77,850) |
| 791 | PERE | PERE | 121905 | 9/1/2018 | WIHI | Xiaoqing Huo TT BM | debit | CAD | (20,040) | - | (20,040) | (15,330) |
| 813 | PERE | PERE | 123379 | 2/1/2019 | BSCI | W&B TT | debit | USD | (49,911) | (49,911) | - | (49,911) |
| 826 | PERE | PERE | 123648 | 4/3/2019 | BSCT | Huo Xianqing TT | debit | USD | (148,596) | (148,596) | - | (148,596) |
| | | | | | | | | **Total** | **(521,553)** | **(521,553)** | **(513,618)** | **(973,770)** |

**EXHIBIT**

**Murphy B**

| Line | Account Code | Account Title | Batch ID | Batch Date | Bank Code | Batch Description | Transaction Description | Currency Code | Cash Bank (in Curr) | Cash Acct (USD) | Cash Acct (CAD) | USD Value - Calculated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 116 | PEAC | PEAC | 20215 | 9/1/2011 | CASH | debit | debit | CAD | (1,200.00) | - | (1,200.00) | (1,230.64) |
| 119 | PEAC | PEAC | 20766 | 9/12/2011 | CASH | debit | debit | CAD | (1,050.00) | - | (1,050.00) | (1,054.53) |
| 122 | PEAC | PEAC | 21226 | 9/23/2011 | CASH | debit | debit | CAD | (2,280.00) | - | (2,280.00) | (2,217.90) |
| 126 | PEAC | PEAC | 21601 | 9/30/2011 | CASH | debit | debit | CAD | (2,200.00) | - | (2,200.00) | (2,117.62) |
| 130 | PEAC | PEAC | 22126 | 10/4/2011 | CASH | debit | debit | CAD | (15,000.00) | - | (15,000.00) | (14,144.27) |
| 131 | PEAC | PEAC | 22305 | 10/7/2011 | CASH | debit | debit | USD | (5,000.00) | (5,000.00) | - | (5,000.00) |
| 132 | PEAC | PEAC | 22529 | 10/14/2011 | CASH | debit | debit | CAD | (2,000.00) | - | (2,000.00) | (1,970.83) |
| 134 | PEAC | PEAC | 23034 | 10/31/2011 | CASH | debit | debit | CAD | (2,000.00) | - | (2,000.00) | (2,013.69) |
| 137 | PEAC | PEAC | 23379 | 11/2/2011 | CASH | debit | debit | CAD | (4,000.00) | - | (4,000.00) | (3,950.62) |
| 138 | PEAC | PEAC | 23480 | 11/4/2011 | CASH | debit | debit | CAD | (3,500.00) | - | (3,500.00) | (3,438.45) |
| 139 | PEAC | PEAC | 23530 | 11/7/2011 | CASH | debit | debit | CAD | (10,000.00) | - | (10,000.00) | (9,829.94) |
| 140 | PEAC | PEAC | 24199 | 11/25/2011 | CASH | debit | debit | CAD | (1,000.00) | - | (1,000.00) | (953.56) |
| 141 | PEAC | PEAC | 24303 | 11/29/2011 | CASH | debit | debit | CAD | (1,800.00) | - | (1,800.00) | (1,748.25) |
| 145 | PEAC | PEAC | 24636 | 12/1/2011 | CASH | debit | debit | CAD | (5,000.00) | - | (5,000.00) | (4,915.45) |
| 146 | PEAC | PEAC | 24758 | 12/5/2011 | CASH | debit | debit | CAD | (4,000.00) | - | (4,000.00) | (3,944.77) |
| 147 | PEAC | PEAC | 24804 | 12/6/2011 | CASH | debit | debit | CAD | (2,000.00) | - | (2,000.00) | (1,977.07) |
| 150 | PEAC | PEAC | 25178 | 12/19/2011 | CASH | debit | debit | USD | (5,000.00) | (5,000.00) | - | (5,000.00) |
| 151 | PEAC | PEAC | 25230 | 12/20/2011 | CASH | debit | debit | USD | (2,000.00) | (2,000.00) | - | (2,000.00) |
| 158 | PEAC | PEAC | 25906 | 1/5/2012 | CASH | debit | debit | CAD | (5,000.00) | - | (5,000.00) | (4,903.40) |
| 159 | PEAC | PEAC | 26210 | 1/17/2012 | CASH | debit | debit | CAD | (2,000.00) | - | (2,000.00) | (1,974.33) |
| 160 | PEAC | PEAC | 26374 | 1/23/2012 | CASH | debit | debit | CAD | (1,500.00) | - | (1,500.00) | (1,488.24) |
| 167 | PEAC | PEAC | 27008 | 2/1/2012 | CASH | debit | debit | CAD | (10,000.00) | - | (10,000.00) | (10,016.03) |
| 168 | PEAC | PEAC | 27140 | 2/3/2012 | CASH | debit | debit | USD | (5,000.00) | (5,000.00) | - | (5,000.00) |
| 176 | PEAC | PEAC | 28899 | 3/1/2012 | CASH | debit | debit | CAD | (10,000.00) | - | (10,000.00) | (10,154.35) |
| 183 | PEAC | PEAC | 28939 | 3/2/2012 | CASH | debit | debit | CAD | (22,000.00) | - | (22,000.00) | (22,251.44) |
| 184 | PEAC | PEAC | 29058 | 3/6/2012 | CASH | debit | debit | CAD | (2,000.00) | - | (2,000.00) | (1,997.40) |
| 185 | PEAC | PEAC | 29206 | 3/8/2012 | CASH | debit | debit | USD | (5,000.00) | (5,000.00) | - | (5,000.00) |
| 188 | PEAC | PEAC | 29386 | 3/13/2012 | CASH | debit | debit | CAD | (1,000.00) | - | (1,000.00) | (1,009.59) |
| 191 | PEAC | PEAC | 29827 | 3/23/2012 | CASH | debit | debit | CAD | (1,000.00) | - | (1,000.00) | (1,001.70) |
| 198 | PEAC | PEAC | 30480 | 3/30/2012 | CASH | debit | debit | CAD | (10,000.00) | - | (10,000.00) | (10,010.01) |
| 200 | PEAC | PEAC | 30538 | 4/2/2012 | CASH | debit | debit | CAD | (1,000.00) | - | (1,000.00) | (1,008.47) |
| 203 | PEAC | PEAC | 30713 | 4/5/2012 | CASH | debit | debit | USD | (5,000.00) | (5,000.00) | - | (5,000.00) |
| 207 | PEAC | PEAC | 31359 | 4/20/2012 | CASH | debit | debit | CAD | (2,000.00) | - | (2,000.00) | (2,017.76) |
| 212 | PEAC | PEAC | 32064 | 5/1/2012 | CASH | debit | debit | CAD | (16,140.00) | - | (16,140.00) | (16,404.11) |
| 222 | PEAC | PEAC | 33747 | 6/1/2012 | CASH | debit | debit | CAD | (10,000.00) | - | (10,000.00) | (9,635.77) |
| 225 | PEAC | PEAC | 33947 | 6/6/2012 | CASH | debit | debit | CAD | (2,000.00) | - | (2,000.00) | (1,942.12) |
| 228 | PEAC | PEAC | 34179 | 6/11/2012 | CASH | debit | debit | USD | (5,000.00) | (5,000.00) | - | (5,000.00) |
| 229 | PEAC | PEAC | 34189 | 6/11/2012 | CASH | debit | debit | CAD | (5,000.00) | - | (5,000.00) | (4,863.34) |
| 230 | PEAC | PEAC | 34242 | 6/12/2012 | CASH | debit | debit | USD | (3,000.00) | (3,000.00) | - | (3,000.00) |
| 233 | PEAC | PEAC | 34979 | 6/29/2012 | CASH | debit | debit | CAD | (2,000.00) | - | (2,000.00) | (1,962.71) |
| 238 | PEAC | PEAC | 35439 | 7/3/2012 | CASH | debit | debit | CAD | (5,300.00) | - | (5,300.00) | (5,235.60) |
| 239 | PEAC | PEAC | 35739 | 7/11/2012 | CASH | debit | debit | CAD | (3,000.00) | - | (3,000.00) | (2,942.62) |
| 242 | PEAC | PEAC | 36119 | 7/25/2012 | CASH | debit | debit | CAD | (1,120.00) | - | (1,120.00) | (1,100.09) |
| 249 | PEAC | PEAC | 37020 | 8/16/2012 | CASH | debit | debit | CAD | (850.00) | - | (850.00) | (860.24) |
| 250 | PEAC | PEAC | 37123 | 8/20/2012 | CASH | debit | debit | USD | (5,000.00) | (5,000.00) | - | (5,000.00) |
| 257 | PEAC | PEAC | 38798 | 9/28/2012 | CASH | debit | debit | CAD | (3,000.00) | - | (3,000.00) | (3,049.71) |

A3706

| Line | Account Code | Account Title | Batch ID | Batch Date | Batch Description | Bank Code | Transaction Description | Currency Code | Cash Bank (in Curr) | Cash Acct (USD) | Cash Acct (CAD) | USD Value - Calculated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 265 | PEAC | PEAC | 40263 | 10/26/2012 | debit | CASH | debit | USD | (1,000.00) | (1,000.00) | - | (1,000.00) |
| 270 | PEAC | PEAC | 41547 | 11/22/2012 | debit | CASH | debit | CAD | (10,000.00) | - | (10,000.00) | (10,020.04) |
| 276 | PEAC | PEAC | 42493 | 12/10/2012 | debit | CASH | debit | USD | (3,000.00) | (3,000.00) | - | (3,000.00) |
| 290 | PEAC | PEAC | 45136 | 2/1/2013 | debit | CASH | debit | CAD | (10,000.00) | - | (10,000.00) | (10,013.02) |
| 292 | PEAC | PEAC | 45409 | 2/7/2013 | debit | CASH | debit | USD | (3,000.00) | (3,000.00) | - | (3,000.00) |
| 312 | PEAC | PEAC | 50739 | 5/22/2013 | debit | CASH | debit | CAD | (10,000.00) | - | (10,000.00) | (9,679.61) |
| 332 | PEAC | PEAC | 55016 | 8/1/2013 | debit | CASH | debit | CAD | (10,000.00) | - | (10,000.00) | (9,673.05) |
| 341 | PEAC | PEAC | 57145 | 9/20/2013 | debit | CASH | debit | CAD | (1,460.00) | - | (1,460.00) | (1,419.27) |
| 351 | PEAC | PEAC | 59161 | 10/31/2013 | debit | CASH | debit | CAD | (10,000.00) | - | (10,000.00) | (9,588.65) |
| 356 | PEAC | PEAC | 60245 | 11/21/2013 | debit | CASH | debit | CAD | (2,000.00) | - | (2,000.00) | (1,903.67) |
| 357 | PEAC | PEAC | 60333 | 11/22/2013 | debit | CASH | debit | CAD | (2,000.00) | - | (2,000.00) | (1,898.61) |
| 365 | PEAC | PEAC | 61671 | 12/18/2013 | debit | CASH | debit | CAD | (10,000.00) | - | (10,000.00) | (9,394.08) |
| 375 | PEAC | PEAC | 62805 | 1/9/2014 | debit | CASH | debit | CAD | (10,000.00) | - | (10,000.00) | (9,216.59) |
| 381 | PERE | PERE | 63572 | 1/31/2014 | debit | CASH | debit | CAD | (10,000.00) | - | (10,000.00) | (8,996.04) |
| 384 | PERE | PERE | 64299 | 2/14/2014 | debit | CASH | debit | CAD | (500.00) | - | (500.00) | (455.33) |
| 397 | PERE | PERE | 65235 | 3/4/2014 | debit | CASH | debit | CAD | (6,530.00) | - | (6,530.00) | (5,876.00) |
| 398 | PERE | PERE | 65869 | 3/18/2014 | debit | CASH | debit | CAD | (10,000.00) | - | (10,000.00) | (9,017.95) |
| 406 | PERE | PERE | 67940 | 4/28/2014 | debit | CASH | debit | CAD | (20,000.00) | - | (20,000.00) | (18,129.08) |
| 407 | PERE | PERE | 68060 | 4/30/2014 | debit | CASH | debit | CAD | (4,000.00) | - | (4,000.00) | (3,650.97) |
| 413 | PERE | PERE | 68841 | 5/12/2014 | debit | CASH | debit | CAD | (10,000.00) | - | (10,000.00) | (9,186.11) |
| 414 | PERE | PERE | 69066 | 5/20/2014 | debit | CASH | debit | CAD | (9,000.00) | - | (9,000.00) | (8,256.88) |
| 420 | PERE | PERE | 70128 | 6/10/2014 | debit | CASH | debit | CAD | (4,100.00) | - | (4,100.00) | (3,756.64) |
| 423 | PERE | PERE | 70580 | 6/19/2014 | debit | CASH | debit | CAD | (8,000.00) | - | (8,000.00) | (7,388.25) |
| 437 | PERE | PERE | 74686 | 7/17/2014 | debit | CASH | debit | CAD | (10,000.00) | - | (10,000.00) | (9,299.73) |
| 442 | PERE | PERE | 76110 | 8/25/2014 | debit | CASH | debit | CAD | (5,000.00) | - | (5,000.00) | (4,553.73) |
| 443 | PERE | PERE | 76252 | 8/29/2014 | debit | CASH | debit | CAD | (340.00) | - | (340.00) | (313.13) |
| 449 | PERE | PERE | 77080 | 9/11/2014 | debit | CASH | debit | CAD | (3,000.00) | - | (3,000.00) | (2,719.36) |
| 450 | PERE | PERE | 77355 | 9/19/2014 | debit | CASH | debit | CAD | (5,000.00) | - | (5,000.00) | (4,558.72) |
| 457 | PERE | PERE | 78686 | 10/16/2014 | debit | CASH | debit | CAD | (5,000.00) | - | (5,000.00) | (4,438.53) |
| 458 | PERE | PERE | 78926 | 10/24/2014 | debit | CASH | debit | CAD | (825.00) | - | (825.00) | (735.88) |
| 465 | PERE | PERE | 79794 | 11/5/2014 | debit | CASH | debit | CAD | (5,000.00) | - | (5,000.00) | (4,394.83) |
| 468 | PERE | PERE | 80132 | 11/14/2014 | debit | CASH | debit | CAD | (50,000.00) | - | (50,000.00) | (44,271.29) |
| 471 | PERE | PERE | 80363 | 11/21/2014 | debit | CASH | debit | USD | (8,500.00) | (8,500.00) | - | (8,500.00) |
| 478 | PERE | PERE | 81598 | 12/18/2014 | debit | CASH | debit | CAD | (8,800.00) | - | (8,800.00) | (7,590.13) |
| 480 | PERE | PERE | 81682 | 12/22/2014 | debit | CASH | debit | CAD | (8,000.00) | - | (8,000.00) | (6,870.49) |
| 489 | PERE | PERE | 82759 | 1/27/2015 | debit | CASH | debit | CAD | (5,220.00) | - | (5,220.00) | (4,209.00) |
| 490 | PERE | PERE | 82798 | 1/28/2015 | debit | CASH | debit | CAD | (6,000.00) | - | (6,000.00) | (4,818.50) |
| 495 | PERE | PERE | 83238 | 1/30/2015 | debit | CASH | debit | CAD | (8,000.00) | - | (8,000.00) | (6,291.29) |
| 497 | PERE | PERE | 83744 | 2/20/2015 | debit | CASH | debit | CAD | (10,000.00) | - | (10,000.00) | (7,998.08) |
| 503 | PERE | PERE | 86291 | 3/4/2015 | debit | CASH | debit | CAD | (6,000.00) | - | (6,000.00) | (4,823.54) |
| 504 | PERE | PERE | 86683 | 3/23/2015 | debit | CASH | debit | USD | (5,000.00) | (5,000.00) | - | (5,000.00) |
| 505 | PERE | PERE | 86721 | 3/24/2015 | debit | CASH | debit | CAD | (4,000.00) | - | (4,000.00) | (3,197.44) |
| 517 | PERE | PERE | 87317 | 4/1/2015 | debit | CASH | debit | CAD | (6,000.00) | - | (6,000.00) | (4,758.13) |
| 520 | PERE | PERE | 87816 | 4/22/2015 | debit | CASH | debit | CAD | (4,750.00) | - | (4,750.00) | (3,877.55) |
| 529 | PERE | PERE | 88616 | 5/14/2015 | debit | CASH | debit | CAD | (5,000.00) | - | (5,000.00) | (4,169.79) |
| 530 | PERE | PERE | 88657 | 5/15/2015 | debit | CASH | debit | CAD | (5,450.00) | - | (5,450.00) | (4,538.26) |

A3707

| Line | Account Code | Account Title | Batch ID | Batch Date | Bank Code | Batch Description | Transaction Description | Currency Code | Cash Bank (in Curr) | Cash Acct (USD) | Cash Acct (CAD) | USD Value - Calculated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 532 | PERE | PERE | 88748 | 5/20/2015 | CASH | debit | debit | CAD | (4,280.00) | - | (4,280.00) | (3,504.75) |
| 543 | PERE | PERE | 89678 | 6/16/2015 | CASH | debit | debit | CAD | (134.58) | - | (134.58) | (109.17) |
| 557 | PERE | PERE | 90725 | 7/9/2015 | CASH | debit | debit | CAD | (20,000.00) | - | (20,000.00) | (15,714.62) |
| 558 | PERE | PERE | 90921 | 7/24/2015 | CASH | debit | debit | CAD | (1,520.00) | - | (1,520.00) | (1,163.95) |
| 564 | PERE | PERE | 91662 | 8/25/2015 | CASH | debit | debit | CAD | (2,340.00) | - | (2,340.00) | (1,760.06) |
| 568 | PERE | PERE | 92199 | 9/8/2015 | CASH | debit | debit | CAD | (3,000.00) | - | (3,000.00) | (2,273.93) |
| 573 | PERE | PERE | 92318 | 9/22/2015 | CASH | debit | debit | CAD | (1,000.00) | - | (1,000.00) | (753.24) |
| 574 | PERE | PERE | 92433 | 9/24/2015 | CASH | debit | debit | CAD | (5,200.00) | - | (5,200.00) | (3,895.71) |
| 581 | PERE | PERE | 93479 | 10/28/2015 | CASH | debit | debit | CAD | (3,010.00) | - | (3,010.00) | (2,289.15) |
| 586 | PERE | PERE | 93958 | 11/14/2015 | CASH | debit | debit | CAD | (430.00) | - | (430.00) | (326.65) |
| 591 | PERE | PERE | 94050 | 11/10/2015 | CASH | debit | debit | CAD | (5,000.00) | - | (5,000.00) | (3,771.31) |
| 595 | PERE | PERE | 94246 | 11/19/2015 | CASH | debit | debit | CAD | (15,000.00) | - | (15,000.00) | (11,307.10) |
| 601 | PERE | PERE | 94862 | 12/4/2015 | CASH | debit | debit | USD | (1,500.00) | (1,500.00) | - | (1,500.00) |
| 603 | PERE | PERE | 95041 | 12/11/2015 | CASH | debit | debit | USD | (1,500.00) | (1,500.00) | - | (1,500.00) |
| 604 | PERE | PERE | 95164 | 12/16/2015 | CASH | debit | debit | CAD | (5,890.00) | - | (5,890.00) | (4,266.57) |
| 605 | PERE | PERE | 95179 | 12/16/2015 | CASH | debit | debit | USD | (1,000.00) | (1,000.00) | - | (1,000.00) |
| 612 | PERE | PERE | 95935 | 1/13/2016 | CASH | debit | debit | CAD | (5,000.00) | - | (5,000.00) | (3,497.97) |
| 613 | PERE | PERE | 96081 | 1/25/2016 | CASH | debit | debit | CAD | (3,120.00) | - | (3,120.00) | (2,189.78) |
| 614 | PERE | PERE | 96200 | 1/29/2016 | CASH | debit | debit | CAD | (4,000.00) | - | (4,000.00) | (2,842.12) |
| 621 | PERE | PERE | 96649 | 2/9/2016 | CASH | debit | debit | CAD | (1,170.00) | - | (1,170.00) | (844.16) |
| 623 | PERE | PERE | 96893 | 2/24/2016 | CASH | debit | debit | CAD | (5,000.00) | - | (5,000.00) | (3,632.40) |
| 629 | PERE | PERE | 97721 | 3/11/2016 | CASH | debit | debit | CAD | (730.00) | - | (730.00) | (552.57) |
| 630 | PERE | PERE | 97938 | 3/23/2016 | CASH | debit | debit | CAD | (2,910.00) | - | (2,910.00) | (2,204.71) |
| 631 | PERE | PERE | 97976 | 3/24/2016 | CASH | debit | debit | CAD | (25,000.00) | - | (25,000.00) | (18,839.49) |
| 637 | PERE | PERE | 98705 | 4/6/2016 | CASH | debit | debit | CAD | (5,000.00) | - | (5,000.00) | (3,824.68) |
| 638 | PERE | PERE | 98755 | 4/7/2016 | CASH | debit | debit | USD | (1,500.00) | (1,500.00) | - | (1,500.00) |
| 639 | PERE | PERE | 98835 | 4/11/2016 | CASH | debit | debit | USD | (1,500.00) | (1,500.00) | - | (1,500.00) |
| 640 | PERE | PERE | 98943 | 4/14/2016 | CASH | debit | debit | CAD | (740.00) | - | (740.00) | (576.55) |
| 641 | PERE | PERE | 99062 | 4/20/2016 | CASH | debit | debit | CAD | (13,000.00) | - | (13,000.00) | (10,298.66) |
| 642 | PERE | PERE | 99131 | 4/22/2016 | CASH | debit | debit | USD | (1,000.00) | (1,000.00) | - | (1,000.00) |
| 649 | PERE | PERE | 99930 | 5/11/2016 | CASH | debit | debit | CAD | (2,000.00) | - | (2,000.00) | (1,558.36) |
| 650 | PERE | PERE | 100144 | 5/20/2016 | CASH | debit | debit | CAD | (1,540.00) | - | (1,540.00) | (1,172.35) |
| 655 | PERE | PERE | 100150 | 6/23/2016 | CASH | debit | debit | CAD | (1,485.00) | - | (1,485.00) | (1,164.80) |
| 662 | PERE | PERE | 100738 | 7/4/2016 | CASH | debit | debit | CAD | (6,000.00) | - | (6,000.00) | (4,652.24) |
| 664 | PERE | PERE | 102078 | 7/21/2016 | CASH | debit | debit | USD | (4,500.00) | (4,500.00) | - | (4,500.00) |
| 665 | PERE | PERE | 102079 | 7/21/2016 | CASH | debit | debit | CAD | (8,850.00) | - | (8,850.00) | (6,778.49) |
| 672 | PERE | PERE | 102824 | 8/12/2016 | CASH | debit | debit | CAD | (100,000.00) | - | (100,000.00) | (77,261.84) |
| 675 | PERE | PERE | 103050 | 8/26/2016 | CASH | debit | debit | CAD | (9,160.00) | - | (9,160.00) | (7,076.64) |
| 682 | PERE | PERE | 103572 | 9/7/2016 | CASH | debit | debit | CAD | (1,000.00) | - | (1,000.00) | (775.49) |
| 685 | PERE | PERE | 103625 | 9/9/2016 | CASH | debit | debit | CAD | (10,000.00) | - | (10,000.00) | (7,672.24) |
| 690 | PERE | PERE | 103992 | 9/26/2016 | CASH | debit | debit | CAD | (20,000.00) | - | (20,000.00) | (15,156.11) |
| 699 | PERE | PERE | 104693 | 10/5/2016 | CASH | debit | debit | CAD | (20,000.00) | - | (20,000.00) | (15,177.96) |
| 704 | PERE | PERE | 105785 | 11/9/2016 | CASH | debit | debit | CAD | (20,000.00) | - | (20,000.00) | (14,918.69) |
| 737 | PERE | PERE | 112372 | 7/24/2017 | CASH | debit | debit | CAD | (10,335.00) | - | (10,335.00) | (8,255.45) |
| 738 | PERE | PERE | 112452 | 7/26/2017 | CASH | debit | debit | CAD | (20,000.00) | - | (20,000.00) | (15,992.32) |
| 739 | PERE | PERE | 112516 | 7/28/2017 | CASH | debit | debit | CAD | (287.00) | - | (287.00) | (230.78) |

A3708

Case 1:21-cv-11276-WGY    Document 476-2    Filed 03/07/24    Page 4 of 4

| Line | Account Code | Account Title | Batch ID | Batch Date | Bank Code | Batch Description | Transaction Description | Currency Code | Cash Bank (in Curr) | Cash Acct (USD) | Cash Acct (CAD) | USD Value - Calculated |
|------|--------------|---------------|----------|------------|-----------|-------------------|-------------------------|---------------|---------------------|-----------------|-----------------|------------------------|
| 742 | PERE | PERE | 112808 | 8/3/2017 | CASH | debit | debit | CAD | (844.00) | - | (844.00) | (671.81) |
| 743 | PERE | PERE | 115416 | 8/29/2017 | CASH | debit | debit | CAD | (9,975.00) | - | (9,975.00) | (7,969.16) |
| 746 | PERE | PERE | 116126 | 9/23/2017 | CASH | debit | debit | CAD | (11,125.00) | - | (11,125.00) | (9,041.04) |
| 747 | PERE | PERE | 116249 | 9/29/2017 | CASH | debit | debit | CAD | (9,192.00) | - | (9,192.00) | (7,348.31) |
| 751 | PERE | PERE | 116926 | 10/24/2017 | CASH | debit | debit | CAD | (5,990.00) | - | (5,990.00) | (4,731.44) |
| 754 | PERE | PERE | 117693 | 11/20/2017 | CASH | debit | debit | CAD | (20,000.00) | - | (20,000.00) | (15,631.11) |
| 758 | PERE | PERE | 118259 | 12/18/2017 | CASH | debit | debit | CAD | (30,000.00) | - | (30,000.00) | (23,335.41) |
| 763 | PERE | PERE | 118763 | 1/19/2018 | CASH | debit | debit | CAD | (18,160.00) | - | (18,160.00) | (14,579.32) |
| 766 | PERE | PERE | 119225 | 2/9/2018 | CASH | debit | debit | CAD | (8,010.00) | - | (8,010.00) | (6,391.64) |
| 769 | PERE | PERE | 119672 | 3/14/2018 | CASH | debit | debit | CAD | (17,620.00) | - | (17,620.00) | (13,610.38) |
| 778 | PERE | PERE | 120647 | 5/23/2018 | CASH | debit | debit | CAD | (16,700.00) | - | (16,700.00) | (12,963.83) |
| 781 | PERE | PERE | 121120 | 6/27/2018 | CASH | debit | debit | CAD | (50,000.00) | - | (50,000.00) | (37,593.98) |
| 788 | PERE | PERE | 121773 | 8/13/2018 | CASH | debit | debit | CAD | (20,000.00) | - | (20,000.00) | (15,223.02) |
| 792 | PERE | PERE | 122112 | 9/12/2018 | CASH | debit | debit | CAD | (690.00) | - | (690.00) | (530.57) |
| 793 | PERE | PERE | 122131 | 9/17/2018 | CASH | debit | debit | CAD | (10,000.00) | - | (10,000.00) | (7,682.26) |
| 794 | PERE | PERE | 122452 | 9/28/2018 | CASH | debit | debit | CAD | (1,720.00) | - | (1,720.00) | (1,331.06) |
| 799 | PERE | PERE | 122855 | 11/1/2018 | CASH | debit | debit | CAD | (7,810.00) | - | (7,810.00) | (5,958.19) |
| 800 | PERE | PERE | 122947 | 11/26/2018 | CASH | debit | debit | CAD | (20,000.00) | - | (20,000.00) | (15,109.16) |
| 803 | PERE | PERE | 122982 | 12/3/2018 | CASH | debit | debit | CAD | (20,000.00) | - | (20,000.00) | (15,163.00) |
| 804 | PERE | PERE | 123076 | 12/15/2018 | CASH | debit | debit | CAD | (20,000.00) | - | (20,000.00) | (14,939.87) |
| 808 | PERE | PERE | 123255 | 1/16/2019 | CASH | debit | debit | CAD | (20,000.00) | - | (20,000.00) | (15,102.32) |
| 810 | PERE | PERE | 123331 | 1/30/2019 | CASH | debit | debit | CAD | (20,000.00) | - | (20,000.00) | (15,164.15) |
| 815 | PERE | PERE | 123458 | 2/25/2019 | CASH | debit | debit | CAD | (27,000.00) | - | (27,000.00) | (20,480.92) |
| 827 | PERE | PERE | 123717 | 4/4/2019 | CASH | debit | debit | CAD | (14,000.00) | - | (14,000.00) | (10,481.40) |
| 828 | PERE | PERE | 123763 | 4/13/2019 | CASH | debit | debit | CAD | (10,000.00) | - | (10,000.00) | (7,500.75) |
| 831 | PERE | PERE | 123832 | 5/1/2019 | CASH | debit | debit | CAD | (19,000.00) | - | (19,000.00) | (14,161.14) |
| 832 | PERE | PERE | 123915 | 5/22/2019 | CASH | debit | debit | CAD | (20,000.00) | - | (20,000.00) | (14,906.46) |
| | | | | | | | | **Total** | | (73,000) | (1,282,883) | (1,136,169) |

A3709

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **No. 21-cv-11276-WGY** |
| **Plaintiff,** | |
| **v.** | **Leave to file granted on March 12, 2024** |
| **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** | |
| **Defendants.** | |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION**
**FOR REMEDIES AGAINST DEFENDANT JACKSON FRIESEN**

The Commission submits this reply memorandum in support of its motion for remedies against defendant Jackson Friesen ("Friesen") and to address certain of the arguments raised in the opposition brief filed by Friesen ("Friesen Br."). *See* Dkt. No. 471. Like his co-defendants, Friesen asserts that he should not bear any consequences of his violations even though he was found liable by a jury. Such a result would be inconsistent with the Court's judgments imposing remedies on his co-defendants Sharp, Taylor, Dhillon and Kaitz, and would be contrary to the law.

**A. The Funds Friesen Received into the Q Account He Controlled Should be Disgorged.**

Friesen repeats most of the failed arguments advanced by his co-defendants as to why they should not pay disgorgement. *See* Friesen Br. at 3-10. Accordingly, the Commission respectfully refers the Court to its earlier responses to those arguments. *See* Dkt. No. 470 ("Comm. Sexton Reply"), at 1-11; Dkt. No. 474 ("Comm. Gasarch Reply"), at 8-9. Much of

1

A3710

Friesen's disgorgement argument complains about the lack of Sharp's accounting records, but ignores the overwhelming evidence of the Q system itself, which was Sharp's accounting record. *See* Friesen Br. at 4-6. Friesen riffs on the argument that the Commission did not present his bank records, but rather "ledgers" from the Q system that "relate to funds that *Sharp received and held somewhere within his organization*." Friesen Br. at 7 (emphasis original). What Friesen describes is no different from a bank and its associated account records. When funds are deposited at a bank, there is no pile of cash siloed in an account controlled by a particular customer. A customer's funds may be loaned out to a different customer. Rather, customers control the funds reflected in their account "ledger" and can direct the movement of those funds within, and out of, a bank – just like Friesen directed funds out of his Q account. Friesen goes further – saying there are no documents in which he directs a transfer of funds. *Id.* This ignores the Commission's earlier filings on this motion. *See* Dkt. No. 427 ("Murphy Decl."), at ¶¶15-16, Dkt. Nos. 427-17 to 427-25 (identifying numerous exhibits in which Friesen directs the transfer of funds from his GARD account). In addition, Friesen confuses profit allocations out of the issuer accounts (like STVF/VBIO into which the Sexton, Veldhuis, and Friesen control group received their stock sale proceeds, with Friesen's personal GARD account, which received distributions from the issuer accounts and over which Friesen exercised complete control. *See* Friesen Br. at 7 (arguing that trial exhibit 296, the STVF/VBIO account, somehow undermines the Commission's disgorgement calculation). As already explained by the Commission, its calculation of Friesen's disgorgement is based on transfers to the GARD account from the defendants' scheme – the trading proceeds received into all fourteen issuers' Q accounts. *See* Murphy Decl. at ¶14.

2

A3711

B.    **Friesen Should Pay a Civil Penalty of $1,562,603.**

The Commission seeks the same civil penalty amount of $1,562,603 from each of

defendants Friesen, Sexton and Veldhuis because the evidence strongly compels the conclusion

that the three of them worked together on their scheme involving the fourteen issuers in this case.

Though Friesen contends, without citation, that the evidence at trial suggested that Friesen

ceased his involvement with the other defendants in 2015 (*see* Friesen Br. at 10), he is mistaken.

For example, there were numerous exhibits at trial showing Friesen's involvement in Vitality,

Arch, Lexington BioSciences, and Liberty One Lithium after 2015, and Knox testified that he

sold shares of Vitality, Arch, StartMonday, Lexington Biosciences, and NewGen Biopharma on

behalf of Friesen, Veldhuis and Sexton, which sales occurred after 2015.  *See* Trial Exs. 263-264

(2017 messages showing Friesen's involvement in Vitality promotions); 266 (Friesen directing

payments out of Liberty One Lithium account in 2017); 267 (Friesen directing payments out of

Lexington BioSciences account in 2018); 272 (Friesen arranging for deposit of Lexington

BioSciences shares with Blacklight in 2018); 288 (Friesen telling Knox to charge Vitality

account for money he received in 2016), 289 (Friesen directing Silverton's trades in Lexington

BioSciences in 2018); Tr. 9.19.23 Knox 89:23-91:18 (describing Geneva meeting "shortly before

his arrest" [in Oct. 2018] at which Friesen was present and they discussed Silverton's trades for

the Veldhuis Control Group in Vitality, Arch, and StartMonday); Tr. 9.20.23 Knox 34:24-35:2;

41:5-14, 45:5-46:4; Dkt. No. 310, ¶¶142-147.

Friesen contends that the fact that the defendants' scheme was less profitable after 2015,

and that his allocation of profits from the defendants' gross proceeds was therefore smaller after

2015, means that he was no longer involved at all.  *See* Friesen Br. at 10.  This is the same

logical fallacy that Friesen argued in opposition to the Commission's summary judgment

A3712

briefing.  What matters is not the overall amount of Friesen's profits when compared to the defendants' gross proceeds, but Friesen's profit allocation compared to that of his partners, Sexton and Veldhuis.  That comparison shows that the three received comparable amounts of profit.  *See* Trial Ex. 313, Dkt. No. 427 at ¶¶10, 12, 14.  The Commission addressed these arguments fully in its reply brief to Friesen's summary judgment opposition and incorporates those arguments by reference here.  *See* Dkt. No. 309 at 6-9.

    **C.**    **The Court Should Order Injunctions and Bars for Friesen.**

    Friesen argues nothing new as to why permanent injunctions are inappropriate here. Therefore, the Commission relies on its prior briefs to address this argument.  *See* Dkt. No. 426, at 2-9; Comm. Sexton Reply, at 12-14; Comm. Gasarch Reply, at 12-13.  There are two areas worthy of short responses.  First, Friesen relies on case law that is unique to the Eleventh Circuit disfavoring "obey-the-law" injunctions.  *See* Friesen Br. at 11.  These cases are not followed in the First Circuit, which routinely approves obey-the-law injunctions as part of the relief in Commission cases.  *See e.g. SEC v. Lemelson,* 57 F.4th 17, 20-31 (1st Cir. 2023).  Second, Friesen again relies on an out of circuit opinion to argue against imposition of a penny stock bar. *See* Friesen Br. at 12.  In *SEC v. Almagarby*, the court determined that a penny stock bar was not appropriate because—unlike Friesen—that defendant was charged only with a strict liability violation (failure to register as a dealer); there was no fraud, no scienter, and no egregious conduct.  *See* No. 21-13755, 2024 U.S. App. LEXIS 3475, at *30-35 (11th Cir. Feb. 14, 2024). The *Almagarby* court emphasized that the conduct at issue involved "more minor, technical violations."  *See id.,* at *36 (internal citations omitted).  Of note, the court recognized that egregious conduct, such as fraudulent pump and dump schemes like that committed by Friesen and the other defendants in this case, do warrant bars.  *See id.*

A3713

**CONCLUSION**

Accordingly, for all the foregoing reasons, the Commission respectfully requests that the

Court grant its Motion for Remedies.

Dated: March 14, 2024                    Respectfully submitted,

                                        **SECURITIES AND EXCHANGE
                                        COMMISSION**
                                        By its Attorneys,

                                        /s/ Kathleen Burdette Shields
                                        Kathleen Burdette Shields (Mass. Bar No. 637438)
                                        Alfred Day (Mass. Bar No. 654436)
                                        David London (Mass. Bar No. 638289)
                                        Nita K. Klunder (Mass. Bar No. 689304)
                                        33 Arch Street, 24th Floor
                                        Boston, MA  02110
                                        Telephone: (617) 573-8904 (Shields); (617) 573-
                                        4537 (Day); (617) 573-8997 (London); (617) 573-
                                        8822 (Klunder)
                                        shieldska@sec.gov; daya@sec.gov;
                                        londond@sec.gov; klunderni@sec.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2024, a true and correct copy of the foregoing
documentwas filed through the Court's CM/ECF system, and accordingly, these documents will
be sent electronically to all participants registered to receive electronic notice in this case.

                    /s/ Kathleen Burdette Shields
                    Kathleen Burdette Shields

5

A3714

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE<br>COMMISSION, | ¶:<br>¶<br>¶: | |
| Plaintiff, | ¶<br>¶ | No. 1:21-cv-11276-WGY |
| v. | ¶:<br>¶: | (LEAVE TO FILE GRANTED<br>ON 3/11/2024) |
| YVONNE GASARCH, *et al.* | ¶:<br>¶: | |
| Defendants. | ¶: | |

## DEFENDANT YVONNE GASARCH'S SUR-REPLY TO SEC'S REPLY TO HER OPPOSITION TO SEC'S REMEDIES MOTION

In her Opposition to the SEC's remedies motion, Mrs. Gasarch challenged the SEC on its failure to meet its burden of proof as required in the remedies phase. Specifically, Mrs. Gasarch called the SEC to task on, inter alia, its (A) failure to identify which of the losses of the fourteen claimed stock trades (as charged to the jury that they needed to find at least one) were attributable to ; (B) failure to identify the alleged victims of the fourteen stock trades to which Mrs. Gasarch owes restitution; (C) failure to present evidence within the five-year statute of limitations for both restitution and penalties; and (D) failure to establish the Q system as a reliable "business record" or financial records to show the disbursement to/receipt by Mrs. Gasarch of the amounts the SEC attributes to her.

The SEC now presents information that it did not present to the jury but attempts to argue that the jury verdict necessitates the relief it seeks against Mrs. Gasarch. The Court should not consider this evidence introduced so late in the day in a reply brief. The SEC knew that Mrs. Gasarch has challenged from the "jump" that she controlled the "PEAC" and "PERE" entries in

A3715

the Q system and could and should have offered this evidence long before.  In any event, as

shown below, the SEC is mistaken and the Court should find that it has not met its burden here.

I.     **LEGAL ARGUMENT**

A.  Contrary to the SEC's bald assertion, this Court has never admitted the Q
     system as "reliable" business records.

The SEC asserts that the Court already admitted the records in the Q system as a

"business record."  (SEC Reply, p. 2).  Not so.  As the Court is aware, it allowed the Q system to

be presented to the jury on the basis that there was sufficient evidence to admit the entries under

the co-conspirator hearsay exception.  The Court has never in fact found that the Q system

entries were reliable business records.

The Court has been presented with some evidence tying certain of the Q system entries

for other defendants to outside financial records in order to corroborate those entries.  But there

is absolutely not one shred of bank or financial institution evidence to tie the alleged

distributions to Mrs. Gasarch, despite the SEC having investigated the case for years (and tying

up funds at her financial institutions for years).

Moreover, the evidence from both Mr. Nikolayev and Mr. Knox established:  (1) that Mr.

Sharp always controlled commissions and (2) as an administrator to the Q system could always

change entries in the Q system in an unfettered way.  Mr. Knox himself testified that the entries

were not always correct and that Mr. Sharp "shortchanged" him and his comrades at times.

Despite the submission of additional affidavits from the SEC accountant and the FBI forensic

examiner, neither sets forth a basis for "knowledge" that Mrs. Gasarch was allowed to make

disbursements to herself without approval by Mr. Sharp.  At most, they can say what has not

been contested:  Mrs. Gasarch's signature was on papers related to Peaceful Lion and Peregrine

A3716

(though as Mr. Knox and Mr. Nikolayev testified, there were "papered" versions of signature lines.).

The SEC does not have sufficient information or even circumstantial evidence that the ! system entries for PEAC and PERE represent financial distributions to Mrs. Gasarch or that Mrs. Gasarch controlled these entries. She did not.

> B. The SEC still fails to identify which alleged distributions to Mrs. Gasarch are related to the fourteen stocks it specifically averred in the Amended <u>Complaint and on which the jurors were charged</u>.

As the Court is aware, it instructed the jurors that they needed to be unanimous as to at least of the fourteen stocks for which the SEC sought to held Mrs. Gasarch liable under the securities law. In its verdict form, the jury did not need to identify which stock(s) were involved in Mrs. Gasarch's violations. Nor was the jury asked to determine statute of limitations issues, as the Court appropriately found that to be a judicial function.

In its remedies motion and even now in its reply, the SEC does not mention any <u>one</u> of the stock deals related to alleged distributions to Mrs. Gasarch (which of course, as set forth above, are not verified and unreliable). Again, the burden is on the SEC to show Mrs. Gasarch's "net profits" based on one of alleged fourteen stock transactions, *United States v. Liu*, 140 S.Ct. 1936, 1940 (2020). The SEC wrongfully places this burden on Mrs. Gasarch, presumably because it does not have the evidence it needs to meet its burden.

Moreover, despite its own witness Mr. Know discussing Mr. Sharp's legitimate business operations and the lack of documentary evidence in which Mrs. Gasarch (even in an encrypted system where she presumably could speak without repercussion) knew of a United States securities fraud afoot, the SEC now says that all payments to Mrs. Gasarch that it claims are reflected in the Q system are subject to disgorgement. As Mrs. Gasarch pointed out in her

3

A3717

Opposition, the case law requires the SEC to specifically identify the "tainted" proceeds in order

to recoup salary/bonuses to Mrs. Gasarch.  The SEC does not.

C.  <u>The SEC still does not tie its disgorgement claim to any specific victims</u>

Contrary to the clear holding of *Liu*, the SEC still does not assert  that the

claimed disgorgement amount will be "awarded for victims."  After charging securities

violations <u>related to fourteen companies and having a jury trial on same</u>, the SEC has stated  that:

> Developing a list of the investors who were harmed by the conduct of
> Veldhuis, Sexton and Friesen is a more discrete task than developing a
> list of investors harmed by the conduct of Kelln and Gasarch, whose misconduct
> on behalf of additional Sharp Group clients involved a far larger group of
> securities.  Whereas disgorgement collected from Veldhuis, Sexton and Friesen
> may be distributed to investors in the Fourteen Issuers' securities, further analysis
> is warranted to determine whether disgorgement from Kelln and Gasarch could
> potentially be divided among the investors in the over 200 securities that were
> traded by Sharp Group clients during the 10-year disgorgement period.  The
> Commission *will conduct further analysis* to determine whether meaningful
> payments may be made to harmed investors in some or all of these securities.

(SEC Memorandum, D.E. 46, p. 22).

Undersigned counsel is unaware of any statute or case law that allows the SEC to charge

specific conduct in a Complaint, try a case on that specific conduct, and then at some (unknown)

point in the future, "consider" or "look into" whether disgorgement based on a finding of liability

in this current case can instead be determined based on the "analysis" of the SEC of other

transactions.  Obviously, the Supreme Court has held that disgorgement is punitive in nature and,

due process requires that the SEC identify the victims (at least to the extent of identifying a

"class" of purchasers of particular stocks) for which it will pay amounts it seeks to disgorge from

Mrs. Gasarch.  The jury did not find that Mrs. Gasarch was involved in 200 securities that

involved fraud.  And in fact, the SEC's agreeing that the jury would need to find unanimously

that only one of the fourteen charged securities was tied to Mrs. Gasarch when there are

A3718

allegedly 200 or so securities involved bolsters Mrs. Gasarch's claim that the vast majority of her work involved transactions that did not involve SEC fraud at all.

### D. Disgorgement Is Time-Barred

In its initial remedies motion, the SEC asserted that the jury found Mrs. Gasarch "liable for violating Section 17(a)(3) of the Securities Act and aiding and abetting violations of Sections 17(a)(1) **and** (3) of the Securities Act **and** Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act." (SEC Remedies Motion, D.E. 425, p. 2) (emphasis added). The jury verdict in this case specifically found Mrs. Gasarch liable under Section 17(a)(3) and aiding and abetting "Sections 17(a)(1), 17(a)(3) of the Securities Act of 1933, **or** Section 10(b) of the Securities Exchange Act of 1934 and Rule  or Section 10b—5(a) and (c)…" (D.E. 402) (emphasis added).

The SEC acknowledges that an aider and abettor may be liable only "to the same extent as the person to whom such assistance is provided.  15 U.S.C. §§ 77(0(b); 78t(e)…" (SEC reply, p. 12).  The SEC then asks the Court to divine that even though by the specific terms of the jury verdict, Mrs. Gasarch could have been found to have aided/abetted a negligence violation (under Section 17(a)(3)_, the jury meant to find that she aided and abetted in scienter-based violations. The SEC did not object to the Court's instruction here and must accept that it cannot seek disgorgement outside of the five-year statute of limitations.  Again, the SEC does not attempt to identify and calculate for the Court which violations it seeks disgorgement on within the five-year window and thus does not establish a "reasonable approximation" of Mrs. Gasarch's supposed "net profits" as it must do.

### E. This Court Should Not Assess Penalties Against Mrs. Gasarch

As with the case of non-scienter-based claims, civil penalties are subject to a five year

A3719

statute of limitations. *See Sharp*, 626 F,Supp.3d at 382 ("The applicable limitations period thus runs from August 5, 2016 to August 5, 2021 for civil penalties and non-scienter-based disgorgement claims."). The only specific transaction cited by the SEC falling within that time period is that there were four "rounds" of fraudulent stock sales relating to Stevia First/Vitality from 2012-2018. (SEC Memorandum, D.E. 426, p. 10). Here, the Court would need to find that any Section 17(a)(3) violation of Mrs. Gasarch's (either primarily or as an aider/abettor) occurred on or after August 5, 2016. It is unclear from the SEC's papers which company's stock and which transactions post-dating August 5, 2016, are violations on Mrs. Gasarch's part. As the Court stated during the charging conference: "So let me be clear. If we get to remedies…and I think that [a] violation was pre-August 2016, then I cannot impose a monetary penalty." (D.E. 443, p. 55). Without proof of a violation post-dating August 5, 2016, the SEC's request for penalties should be denied.

The SEC states that Mrs. Gasarch did not argue based on the factors appropriate for assessing civil penalties. Again, not so. Mrs. Gasarch refers the Court to her Opposition, pp. 14-15 (D.E.) Similarly, Mrs. Gasarch refers the Court to her arguments why injunctive relief against Mrs. Gasarch is wholly unnecessary. (Opposition, pp. 15-16).

> F. The Court should not consider the additional documentary evidence submitted by the SEC for the first time in its reply

The SEC had the burden to establish liability at trial and retains the burden to establish its entitlement to the remedies it seeks. First, the SEC seeks to admit now Affidavits of the SEC accountant and FBI forensic examiner who already testified at trial. If the SEC wanted to elicit the current information it now seeks the Court to consider, it could have done so either at trial or in its initial remedies motion.

A3720

In any event, the "new" information that the SEC seeks to admit bolsters Mrs. Gasarch's claim that the SEC is seeking to disgorge from her funds utterly unrelated to the fourteen securities at issue.  (See the chart the SEC now submits it its Reply, pp. 5-6 - - nothing related to the fourteen securities).   Moreover, all of the transactions in the chart (except line 459) are outside the five-year statute of limitations.   Although the SEC may not want to be limited to the five-year statute, the jury verdict demands it, and the SEC does not even attempt to parse out which transactions postdating August 2016 it seeks remedies.

G. Mrs. Gasarch Continues To Adopt And Incorporates By Reference All Argument Made By Other Defendants That Are Applicable To Her

Mrs. Gasarch specifically adopts and Incorporates by reference all arguments made by the other Defendants In this matter.  Specifically, Mrs. Gasarch Incorporates by reference the arguments made by Mr. Sexton in his sur-reply.  (D.E. 473),   Moreover, Mrs. Gasarch Incorporates by reference the arguments made by Mr. Friesen In his sur-reply to be filed In the future.

II.     CONCLUSION

For the reasons set forth above and in her initial Opposition, Mrs. Gasarch respectfully requests that this Court deny the SEC's motion for relief.

7

A3721

Respectfully submitted,

YVONNE GASARCH

 By her Attorney,

/s/Karen A. Pickett

_____
Karen A. Pickett (BBO # 633801)
PICKETT LAW OFFICES, PC
125 High St., 26th Floor
Boston, MA  02110
617 423 0485
kpickettlaw@gmail.com

March 15, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 15, 2024.

*/s/ Karen A. Pickett*

8

A3722

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    **Plaintiff,**<br><br>    **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>                    **Defendants.** | **No. 21-cv-11276-WGY** |

## PLAINTIFF'S PROPOSED JUDGMENTS AGAINST DEFENDANTS VELDHUIS, SEXTON, FRIESEN, KELLN AND GASARCH

At the remedies hearing held by the Court on May 8, 2024, the Court requested that the Commission prepare proposed judgments against defendants Mike Veldhuis, Paul Sexton, Jackson Friesen, Courtney Kelln and Yvonne Gasarch (collectively "Defendants") that reflected the Court's rulings on the Commission's motion for remedies as the Court articulated those rulings at the hearing. The Commission prepared those proposed judgments and sent them to Defendants' counsel on May 9, 2024. The Commission has not received any comments from Defendants suggesting that the proposed judgments do not reflect the Court's orders at the hearing. The Commission understands, however, that counsel for at least Defendants Friesen and Gasarch intend to file objections to the proposed judgments within the ten-day period permitted by the Court.

The proposed judgments reflecting the Court's orders at the remedies hearing are filed

A3723

herewith.

Dated: May 10, 2024                    Respectfully submitted,

                                       **SECURITIES AND EXCHANGE**
                                       **COMMISSION**
                                       By its Attorneys,

                                       /s/ Kathleen Burdette Shields
                                       Kathleen Burdette Shields (Mass. Bar No. 637438)
                                       Alfred Day (Mass. Bar No. 654436)
                                       David London (Mass. Bar No. 638289)
                                       Nita K. Klunder (Mass. Bar No. 689304)
                                       33 Arch Street, 24th Floor
                                       Boston, MA  02110
                                       Telephone: (617) 573-8904 (Shields); (617) 573-
                                       4537 (Day); (617) 573-8997 (London); (617) 573-
                                       8822 (Klunder)
                                       shieldska@sec.gov; daya@sec.gov;
                                       londond@sec.gov; klunderni@sec.gov

                    **CERTIFICATE OF SERVICE**

     I hereby certify that on May 10, 2024, a true and correct copy of the foregoing
documentwas filed through the Court's CM/ECF system, and accordingly, these documents will
be sent electronically to all participants registered to receive electronic notice in this case.

                              /s/ Kathleen Burdette Shields
                              Kathleen Burdette Shields

2

A3724

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                                      **Plaintiff,**<br><br>     **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>                              **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

**JUDGMENT AS TO DEFENDANT MIKE K. VELDHUIS**

On June 13, 2023, Defendant Mike K. Veldhuis ("Defendant" or "Veldhuis") agreed not to contest his liability for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securites Act of 1933 and Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) and 13d-1 thereunder. Dkt. No. 315. On June 21, 2023, the Court entered judgment against Veldhuis which included permanent injunctions and a penny stock bar. Dkt. No. 325. The permanent injunctions and penny stock bar remain in full force and effect and are incorporated herein. That judgment also contemplated additional monetary remedies that would be determined by the Court at a later date, and that Veldhuis would not contest liability for purposes of that determination. *Id.* On May 8, 2024, the Court, at a hearing, imposed a civil penalty on Veldhuis that is incorporated into this judgment. The Court held the issues of disgorgement and prejudgment interest under advisement. Accordingly, the Court enters partial Judgment as follows:

1

A3725

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933

A3726

(the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).


III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)     Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

3

A3727

(b)     Unless a registration statement is in effect as to a security, carrying or causing to

be carried through the mails or in interstate commerce, by any means or

instruments of transportation, any such security for the purpose of sale or for

delivery after sale; or

(c)     Making use of any means or instruments of transportation or communication in

interstate commerce or of the mails to offer to sell or offer to buy through the use

or medium of any prospectus or otherwise any security, unless a registration

statement has been filed with the Commission as to such security, or while the

registration statement is the subject of a refusal order or stop order or (prior to the

effective date of the registration statement) any public proceeding or examination

under Section 8 of the Securities Act [15 U.S.C. §77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers,

agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).


IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating, directly or indirectly, Section 13(d) of the

Exchange Act [15 U.S.C. §78j(b)] and Rule 13d-1 promulgated thereunder [17 C.F.R. §240.13d-

1], by failing to file with the Commission a statement containing the information required by

Schedule 13D (as provided in 17 C.F.R. §240.13d-101), within ten days after acquiring directly

or indirectly beneficial ownership of more than five percent of any equity security of a class

4

A3728

which is specified in Exchange Act Rule 13d-1(I) [17 C.F.R. §240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. §240.3a51-1].

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for his own personal account.

VII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for a civil penalty in the amount of $1,562,603 pursuant to Section 21(d) of the

A3729

Exchange Act [15 U.S.C. §78u]. Defendant shall satisfy this obligation by paying $1,562,603 to the Securities and Exchange Commission within 30 days after entry of this Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Mike Veldhuis as a defendant in this action; and specifying that payment is made pursuant to this Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. §3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action. Defendant shall pay post judgment interest on any amounts due after 30 days of the entry of this Judgment pursuant to 28 U.S.C. §1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending

A3730

further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

7

A3731

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.  Further, the asset freeze order imposed by Paragraph V of this Court's Order dated August 20, 2021, shall continue in full force and effect until the monetary obligation imposed by this Judgment is paid in full.

IX.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.


Dated:  _____, _____


_____
UNITED STATES DISTRICT JUDGE

8

A3732

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                          **Plaintiff,**<br><br>     **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>                          **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

**JUDGMENT AS TO DEFENDANT PAUL SEXTON**

On September 11, 2023, Defendant Paul Sexton ("Defendant" or "Sexton") agreed not to contest his liability for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securites Act of 1933 and Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) and 13d-1 thereunder.  Dkt. No. 376.  The following day, the Court entered judgment against Sexton finding him liable for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securites Actof 1933 and Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) and 13d-1 thereunder.  Dkt No. 378.  On May 8, 2024, the Court, at a hearing, imposed injunctive relief and a civil penalty on Sexton that is incorporated into this judgment.  The Court held the issues of disgorgement and prejudgment interest under advisement.  Accordingly, the Court enters partial Judgment as follows:

A3733

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)   to employ any device, scheme, or artifice to defraud;

(b)   to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)   to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the

2

A3734

mails, directly or indirectly:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

    (a)    Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

    (b)    Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or

A3735

instruments of transportation, any such security for the purpose of sale or for

delivery after sale; or

(c)    Making use of any means or instruments of transportation or communication in

interstate commerce or of the mails to offer to sell or offer to buy through the use

or medium of any prospectus or otherwise any security, unless a registration

statement has been filed with the Commission as to such security, or while the

registration statement is the subject of a refusal order or stop order or (prior to the

effective date of the registration statement) any public proceeding or examination

under Section 8 of the Securities Act [15 U.S.C. §77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers,

agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).


IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating, directly or indirectly, Section 13(d) of the

Exchange Act [15 U.S.C. §78j(b)] and Rule 13d-1 promulgated thereunder [17 C.F.R. §240.13d-

1], by failing to file with the Commission a statement containing the information required by

Schedule 13D (as provided in 17 C.F.R. §240.13d-101), within ten days after acquiring directly

or indirectly beneficial ownership of more than five percent of any equity security of a class

which is specified in Exchange Act Rule 13d-1(I) [17 C.F.R. §240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

A3736

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. §240.3a51-1].

## VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for his own personal account.

## VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for a civil penalty in the amount of $1,562,603 pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §78u].  Defendant shall satisfy this obligation by paying $1,562,603 to the Securities

5

and Exchange Commission within 30 days after entry of this Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Paul Sexton as a defendant in this action; and specifying that payment is made pursuant to this Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. §3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action. Defendant shall pay post judgment interest on any amounts due after 30 days of the entry of this Judgment pursuant to 28 U.S.C. §1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

A3738

The Commission may propose a plan to distribute the Fund subject to the Court's approval.  Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002.  The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

A3739

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment. Further, the asset freeze order imposed by Paragraph V of this Court's Order dated August 20, 2021, shall continue in full force and effect until the monetary obligation imposed by this Judgment is paid in full.

IX.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

Dated: _____, _____

_____
UNITED STATES DISTRICT JUDGE

A3740

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>　　　　　　　　　　　　**Plaintiff,**<br><br>　　v.<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>　　　　　　　　　　　**Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

### JUDGMENT AS TO DEFENDANT JACKSON T. FRIESEN

On September 27, 2023, the jury in this matter found Defendant Jackson T. Friesen ("Defendant" or "Friesen") liable for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securites Act of 1933 and Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) and 13d-1 thereunder. On May 8, 2024, the Court, at a hearing, imposed injunctive relief and a civil penalty on Friesen that is incorporated into this judgment. The Court held the issues of disgorgement and prejudgment interest under advisement. Accordingly, the Court enters partial Judgment as follows:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of

A3741

interstate commerce, or of the mails, or of any facility of any national securities exchange, in

connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers,

agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).


II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933

(the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any

means or instruments of transportation or communication in interstate commerce or by use of the

mails, directly or indirectly:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to obtain money or property by means of any untrue statement of a material fact

or any omission of a material fact necessary in order to make the statements

2

made, in light of the circumstances under which they were made, not misleading; or

(c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)    Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)    Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)    Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use

3

A3743

or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. §77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 13(d) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 13d-1 promulgated thereunder [17 C.F.R. §240.13d-1], by failing to file with the Commission a statement containing the information required by Schedule 13D (as provided in 17 C.F.R. §240.13d-101), within ten days after acquiring directly or indirectly beneficial ownership of more than five percent of any equity security of a class which is specified in Exchange Act Rule 13d-1(I) [17 C.F.R. §240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

A3744

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. §240.3a51-1].

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for his own personal account.

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for a civil penalty in the amount of $1,562,603 pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §78u]. Defendant shall satisfy this obligation by paying $1,562,603 to the Securities and Exchange Commission within 30 days after entry of this Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

A3745

http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank

cashier's check, or United States postal money order payable to the Securities and Exchange

Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

 and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; Jackson Friesen as a defendant in this action; and specifying that payment is made

pursuant to this Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case

identifying information to the Commission's counsel in this action.  By making this payment,

Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part

of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for penalties by the use of all

collection procedures authorized by law, including the Federal Debt Collection Procedures Act,

28 U.S.C. §3001 *et seq.,* and moving for civil contempt for the violation of any Court orders

issued in this action.   Defendant shall pay post judgment interest on any amounts due after 30

days of the entry of this Judgment pursuant to 28 U.S.C. §1961.  The Commission shall hold the

funds, together with any interest and income earned thereon (collectively, the "Fund"), pending

further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's

approval.  Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund

provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002.  The Court shall retain

jurisdiction over the administration of any distribution of the Fund and the Fund may only be

A3746

disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment. Further, the asset freeze order imposed by Paragraph I of this Court's Order dated October 7, 2021 shall continue in full force and effect until the monetary obligation imposed by this Judgment is paid in full.

A3747

IX.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.


Dated: _____,                    _____

                                          UNITED STATES DISTRICT JUDGE

A3748

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>     **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>                              **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

### JUDGMENT AS TO DEFENDANT COURTNEY KELLN

On June 13, 2023, Defendant Courtney Kelln ("Defendant" or "Kelln") agreed not to contest her liability for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securites Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) thereunder, and for aiding and abetting others' violations of those provisions. Dkt. No. 315. The following day, the Court entered judgment against Kelln which included permanent injunctions and a penny stock bar. Dkt. No. 317. The permanent injunctions and penny stock bar remain in full force and effect and are incorporated herein. That judgment also contemplated additional monetary remedies that would be determined by the Court at a later date, and that Kelln would not contest liability for puroposes of that determination. *Id.* On May 8, 2024, the Court, at a hearing, imposed a civil penalty on Kelln that is incorporated into this judgment. The Court held the issues of disgorgement and prejudgment interest under advisement. Accordingly, the Court enters partial Judgment as follows:

A3749

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)    to employ any device, scheme, or artifice to defraud;

(b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the

2

A3750

mails, directly or indirectly:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

### III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. §77e] by, directly or indirectly, in the absence of any applicable exemption:

    (a)    Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

    (b)    Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or

A3751

instruments of transportation, any such security for the purpose of sale or for

delivery after sale; or

(c)    Making use of any means or instruments of transportation or communication in

interstate commerce or of the mails to offer to sell or offer to buy through the use

or medium of any prospectus or otherwise any security, unless a registration

statement has been filed with the Commission as to such security, or while the

registration statement is the subject of a refusal order or stop order or (prior to the

effective date of the registration statement) any public proceeding or examination

under Section 8 of the Securities Act [15 U.S.C. §77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers,

agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).


IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently barred from participating in an offering of penny stock, including engaging in

activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or

attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity

security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the

Exchange Act [17 C.F.R. §240.3a51-1].

4

A3752

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by her, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for her own personal account.

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for a civil penalty in the amount of $904,078 pursuant to Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78u].  Defendant shall satisfy this obligation by paying $904,078 to the Securities and Exchange Commission within 30 days after entry of this Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

5

A3753

this Court; Courtney Kelln as a defendant in this action; and specifying that payment is made pursuant to this Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. §3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action. Defendant shall pay post judgment interest on any amounts due after 30 days of the entry of this Judgment pursuant to 28 U.S.C. §1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this

A3754

action, argue that she is entitled to, nor shall she further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment. Further, the asset freeze order imposed by Paragraph I of this Court's Order dated October 7, 2021, shall continue in full force and effect until the monetary obligation imposed by this Judgment is paid in full.

VIII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

Dated: _____, _____

_____
UNITED STATES DISTRICT JUDGE

A3755

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>                **Plaintiff,** <br>     **v.** <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br>              **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

**JUDGMENT AS TO DEFENDANT YVONNE GASARCH**

On September 27, 2023, the jury in this matter found Defendant Zhiying Yvonne Gasarch ("Defendant" or "Gasarch") liable for violating Section 17(a)(3) of the Securites Act of 1933 and for aiding and abetting others' violations of Sections 17(a)(1) and 17(a)(3) of the Securites Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) thereunder. On May 8, 2024, the Court, at a hearing, imposed injunctive relief and a civil penalty on Gasarch that is incorporated into this judgment. The Court held the issues of disgorgement and prejudgment interest under advisement. Accordingly, the Court enters partial Judgment as follows:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5

1

A3756

promulgated thereunder [17 C.F.R. §240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)    to employ any device, scheme, or artifice to defraud;

(b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)    to employ any device, scheme, or artifice to defraud;

(b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements

A3757

made, in light of the circumstances under which they were made, not misleading; or

(c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. §240.3a51-1].

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by her, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for her own personal account.

3

A3758

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable

for a civil penalty in the amount of $269,651 pursuant to Section 21(d) of the Exchange Act [15

U.S.C. §78u]. Defendant shall satisfy this obligation by paying $269,651 to the Securities and

Exchange Commission within 30 days after entry of this Judgment.

Defendant may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank

cashier's check, or United States postal money order payable to the Securities and Exchange

Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; Zhiying Yvonne Gasarch as a defendant in this action; and specifying that payment is

made pursuant to this Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case

identifying information to the Commission's counsel in this action. By making this payment,

Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part

of the funds shall be returned to Defendant.

The Commission may enforce the Court's judgment for penalties by the use of all

collection procedures authorized by law, including the Federal Debt Collection Procedures Act,

28 U.S.C. §3001 *et seq.,* and moving for civil contempt for the violation of any Court orders

A3759

issued in this action.   Defendant shall pay post judgment interest on any amounts due after 30

days of the entry of this Judgment pursuant to 28 U.S.C. §1961.  The Commission shall hold the

funds, together with any interest and income earned thereon (collectively, the "Fund"), pending

further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's

approval.  Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund

provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002.  The Court shall retain

jurisdiction over the administration of any distribution of the Fund and the Fund may only be

disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be

paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the

government for all purposes, including all tax purposes.  To preserve the deterrent effect of the

civil penalty, Defendant shall not, after offset or reduction of any award of compensatory

damages in any Related Investor Action based on Defendant's payment of disgorgement in this

action, argue that she is entitled to, nor shall she further benefit by, offset or reduction of such

compensatory damages award by the amount of any part of Defendant's payment of a civil

penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such

a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty

Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset

to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall

not be deemed an additional civil penalty and shall not be deemed to change the amount of the

civil penalty imposed in this Judgment.  For purposes of this paragraph, a "Related Investor

Action" means a private damages action brought against Defendant by or on behalf of one or

A3760

more investors based on substantially the same facts as alleged in the Complaint in this action.

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.  Further, the asset freeze order imposed by Paragraph I of this Court's Order dated October 15, 2021, shall continue in full force and effect until the monetary obligation imposed by this Judgment is paid in full.

VII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

Dated: _____, _____

_____
UNITED STATES DISTRICT JUDGE

A3761

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE          ¶:
COMMISSION,                      ¶
                                 ¶:
        Plaintiff,               ¶        No. 1:21-cv-11276-WGY
                                 ¶
        v.                       ¶:
                                 ¶:
YVONNE GASARCH, *et al.*         ¶:
                                 ¶:
        Defendants.              ¶:

## YVONNE GASARCH'S OBJECTIONS TO SEC'S PROPOSED (PARTIAL) JUDGMENT

Defendant Yvonne Gasarch ("Mrs. Gasarch") files the following objections to the SEC's

proposed (partial) judgment form submitted to the court on May 10, 2024.

1.  Mrs. Gasarch objects to the following underlined language in the proposed partial

    judgment:  "a jury in this matter found Defendant Zhiying Yvonne Gasarch

    ("Defendant" or Gasarch) liable for violating Section 17(a)(3) of the Securities Act

    of 1933 and for aiding and abetting others' violations of Section 17(a)(1) and 17(a)(3)

    of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of

    1934 and Rules 10b-5(a) and (c) thereunder."   The jury verdict is to the contrary.

    Specifically, the jury answered Question 7 as follows:

1

A3762

**Aiding and Abetting Violations of the Securities Laws**
      (Aiding and Abetting Fraud in the Offer, Purchase, or
      Sale of Securities)

   7. Did Zhiying Yvonne Gasarch aid and abet violations of
      Sections 17(a)(1), Sections 17(a)(3) of the Securities
      Act of 1933, or Section 10(b) of the Securities Exchange Act
      of 1934 and Rule 10b-5(a) and (c) thereunder by others?

         _____ NO      _____ YES

(D.E. 401) The jury did not find specifically that Mrs. Gasarch aided and abetted in all the

violations listed by the SEC.  Based on its answer, the jury can only be said to have found aiding

and abetting to violations of one statute which could be Section 17(a)(3), a violation that can be

rooted in negligence.

        As this Court instructed the jury, any person who aids and abets a violation "shall be

deemed to be in violation of such provision to the same extent as the person to whom such

assistance is provided."  D.E. 426-1.   In a related case, the SEC has admitted - - and the district

court so found  - - that Section 17(a)(3) provides for a five-year period for disgorgement.  *See*

*SEC v. Stubos*, 634 F.Supp.3d 174, 194 (S.D.N.Y. 2022).[1]

        Mrs. Gasarch wishes to make this objection at this time as it is relevant to the SEC's

claims for disgorgement which must be limited to five years prior to the filing of the Complaint.

Mrs. Gasarch understands that the Court stated at the hearing that it believed Mrs. Gasarch acted

intentionally, but even if her "aid" was intentional, she can only face the same penalty as the one

she aided, which in this case could be based on the jury's finding aiding and abetting a violation

of Section 17(a)(3) (requiring only a finding of negligence).  And of course she was found liable

as a "primary" violator only under Section 17(a)(3).

---

[1]      As the Court may recall, Mr. Stubos was on the SEC's witness list but the SEC declined
to call him at trial.

2. Mrs. Gasarch objects to the amount of the penalty only to the extent that it was assessed by the Court for conduct more than five years before the filing of the Complaint or it was based on the Court's understanding that her "aid" necessarily was found by the jury to be more than aiding and abetting a non-scienter violation of Section 17(a)(3). Otherwise, Mrs. Gasarch believes the Court has discretion to order the amount it did.

3. Mrs. Gasarch objects to the Court's entry of partial judgment. For efficiency sake, and for purposes of evaluating any potential notice of appeal, Mrs. Gasarch requests that the Court issue one final judgment in the matter and not do so in a piecemeal fashion.

4. Mrs. Gasarch objects to the requirement that the penalty must be paid within 30 days of any judgment. As the Court knows, the SEC has frozen assets in Canada and satisfaction of the penalty amount (by "unfreezing" such Canadian assets of Mrs. Gasarch) may take longer than 30 days. Also, if Mrs. Gasarch decides to appeal the final judgment, she may seek a stay of enforcement of any of the civil penalties ordered.

5. Mrs. Gasarch adopts and incorporates by reference any objections made by her co-defendants in this case that are applicable to her as well.

Respectfully submitted,

YVONNE GASARCH

By her Attorney,

/s/Karen A. Pickett
_____
Karen A. Pickett (BBO # 633801)
PICKETT LAW OFFICES, PC
125 High St., 26th Floor
Boston, MA  02110
617 423 0485
kpickettlaw@gmail.com

May 20, 2024

A3764

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 20, 2024.

*<u>/s/ Karen A. Pickett</u>*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>**Plaintiff,**<br><br>**v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>**Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

**PLAINTIFF'S RESPONSE TO DEFENDANT ZHIYING YVONNE GASARCH'S**
**OBJECTIONS TO SEC'S PROPOSED JUDGMENT**

Plaintiff Securities and Exchange Commission (the "Commission") hereby responds to defendant Zhiying Yvonne Gasarch's ("Gasarch") opposition to the Commission's proposed judgment against her, which incorporated the findings made by the Court at the hearing held on May 8, 2024. Gasarch's Opposition, filed as Dkt. No. 486, errs in the following two aspects:

1.  Regardless of whether the jury found Gasarch liable for aiding and abetting violations of all, or only some, of Sections 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act, it is indisputable that the jury found Gasarch liable for aiding and abetting at least one of these violations. To find her liable for aiding and abetting any of these violations, the jury necessarily found that she acted with scienter. *See* Jury Instructions, Tr. 9.27.23 at 32 (instructing jury that aiding and abetting required knowing or reckless conduct). A necessary element of an aiding and abetting charge, regardless of the scienter required

1

A3766

for the underlying violation, is that the defendant acted at least recklessly. *See* 15

U.S.C. §§77o(b), 78t(e). As a result, the court should reject Gasarch's argument that

the jury did not find her responsible for a violation that requires proof of scienter, and

thus that disgorgement is necessarily limited to a five-year time period.

2. Contrary to Gasarch's argument, the Commission's requested penalty is based only

on her conduct within five years of the filing of the Complaint. She was found liable

for conduct that lasted during the entire time period at issue and the civil penalty

amount chosen by the Court appears to reflect, as the Commission requested, civil

penalties associated with each of the counts of the Complaint for which she was

found liable.

For the reasons set forth above, the Commission respectfully requests that the Court

reject Gasarch's opposition and enter the Commission's proposed judgment against her (Dkt. No.

485-5).

Dated: May 20, 2024                     Respectfully submitted,

                                        **SECURITIES AND EXCHANGE
                                        COMMISSION**

                                        By its Attorneys,
                                        /s/ Kathleen Burdette Shields
                                        Kathleen B. Shields (Mass. Bar No. 637438)
                                        Alfred Day (Mass. Bar No. 654436)
                                        David H. London (Mass. Bar No. 638289)
                                        Nita K. Klunder (Mass. Bar No. 689304)
                                        33 Arch Street, 24th Floor
                                        Boston, MA  02110
                                        Telephone: (617) 573-8904 (Shields); (617) 573-
                                        4537 (Day); (617) 573-8997 (London); (617) 573-
                                        8822 (Klunder)
                                        Fax: (617) 573-4590
                                        Email: shieldska@sec.gov; daya@sec.gov;
                                        londond@sec.gov; klunderni@sec.gov

2

A3767

**<u>CERTIFICATE OF SERVICE</u>**

     I hereby certify that on May 20, 2024, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

<u>/s/ Kathleen Burdette Shields</u>
Kathleen Burdette Shields

A3768

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:21-cv-11276-WGY |
| v. | |
| Frederick L. Sharp, *et al.*, | |
| Defendants. | |

**DEFENDANT PAUL SEXTON'S OBJECTIONS TO PROPOSED JUDGMENT**

Defendant Paul Sexton, while reserving all arguments that neither injunctive relief nor a civil monetary penalty is proper in this matter and that key factual predicates related to the calculation of monetary relief are lacking, files these objections to the proposed order submitted by the Securities and Exchange Commission ("SEC").[1] Specifically, Mr. Sexton objects to the proposed requirement that he pay a civil monetary penalty "within 30 days" or else face possible "civil contempt." ECF No. 485-2 at 6. Mr. Sexton requests that these provisions be removed from the judgment. Mr. Sexton also objects to entry of the judgment under Federal Rule of Civil Procedure 54(b).

As the SEC itself acknowledges, civil monetary penalties are monetary judgments sounding in law rather than equity and are thus enforceable under the Federal Debt Collection

---

[1] Mr. Sexton understands that these objections proceed from the premise that the Court has already ordered injunctive relief and penalties in a fixed amount and that this filing is not the proper forum for litigating those issues. However, for the avoidance of doubt, Mr. Sexton, in addition to preserving all previously raised arguments, also specifically objects to any consideration by the Court, in the context of setting a penalty, of conduct that predates the filing of the complaint by more than five years. *See Gabelli v. SEC*, 568 U.S. 442, 444 (2013).

1

A3769

Procedures Act. *Id.* It is therefore the SEC's obligation to collect its judgment consistent with the many tools at its disposal, not Mr. Sexton's obligation to pay it within a specified time frame. There is a strong presumption that federal law "does not authorize enforcement of a civil money judgment" through the court's contempt power. *See Aetna Cas. & Sur. Co. v. Markarian*, 114 F.3d 346, 349 (1st Cir. 1997). This principle applies with equal force to civil monetary penalties. *See, e.g.*, *CFTC v. S. Tr. Metals, Inc.*, No. 14-22739-CIV, 2017 WL 2875427, at *19 (S.D. Fla. May 15, 2017) ("Unlike equitable restitution, a civil monetary penalty has long been understood to be a legal remedy because it merely constitutes the exchange of money damages. . . . Like money damages, the enforcement of a civil monetary penalty by contempt would this time run afoul of [case law].").

Finally, Mr. Sexton objects to entry of the proposed judgment under Federal Rule of Civil Procedure 54(b). Mr. Sexton believes that the preferable course is for the Court to address all remedies, including disgorgement, in a single order to avoid creating multiple deadlines for seeking appellate relief, if any, in this matter.

Respectfully submitted,

*/s/ Neil T. Smith*

Neil T. Smith (BBO# 651157)
   Neil.Smith@klgates.com
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Tel: (617) 261-3100
Fax: (617) 261-3175

*/s/ Stephen G. Topetzes*

Stephen G. Topetzes*

2

A3770

Stephen.Topetzes@klgates.com
Robert S. Silverblatt*
Rob.Silverblatt@klgates.com
K&L Gates LLP
1601 K St. NW
Washington, DC 20006
Tel:  (202) 778-9328
Fax:  (202) 778-9100

*Admitted pro hac vice

*Counsel for Paul Sexton*

Dated: May 20, 2024

3

A3771

<u>**CERTIFICATE OF SERVICE**</u>

      The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on May 20, 2024, and a copy thereof will be sent electronically to the registered recipients and counsel of record as identified on the Notice of Electronic Filing.

                     */s/ Neil T. Smith*

                     Neil T. Smith

A3772

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

                                Plaintiff,

        v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R. TAYLOR,

                                Defendants.

Civil Action No. 21-CV-11276-WGY

**DEFENDANT JACKSON FRIESEN'S OBJECTIONS
TO PLAINTIFF'S PROPOSED JUDGMENT**

        Set forth below are defendant Jackson Friesen's objections to plaintiff's proposed

judgment.

## A.  Plaintiff is Not Entitled to the Penalties it Seeks

        This Court has previously confirmed that there is a five-year limitations period applicable to

Plaintiff's requests for penalties.  ECF 228 at 49; 443 at 55. *See SEC v. Wyly*, 2013 U.S. Dist.

LEXIS 83897 (S.D.N.Y. June 13, 2013) ("the Securities and Exchange Commission's ("SEC")

penalty claims against defendants in this case were time barred insofar as they accrued more than

five years before tolling agreements with the SEC took effect. Therefore, for those claims against

the Wylys that accrued prior to February 1, 2001, the only monetary relief available is

disgorgement."). Furthermore, the amount of "pecuniary gain" is limited to those that were

received by the defendant within a five-year statute of limitations. *SEC v. Cole*, 2014 U.S. Dist.

1

A3773

LEXIS 133739 at *5 (S.D.N.Y. Sept. 22, 2014). And in contrast to disgorgement, a court may not impose a civil penalty on a joint and several basis. *SEC v. GTF Enters.*, 2015 U.S. Dist. LEXIS 20355 (S.D.N.Y. Feb. 19, 2015) ("unlike disgorgement, gross pecuniary gain *may only include gains from frauds occurring within the five-year statute of limitations for civil penalties …*, [must] be based on the pecuniary gain of each defendant and do not allow the penalties to be imposed jointly and severally.") (emphasis added) (citing *SEC v. Pentagon Capital Mgmt., PLC*, 725 F.3d 279, 288 (2d Cir. 2013)). In fact, courts have noted the fundamental distinction between penalties and disgorgement: because "[d]isgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud," while "penalties serve as 'the deterrence of securities law violations.'" *SEC v. Wyly*, 2013 U.S. Dist. LEXIS 83897 (S.D.N.Y. June 13, 2013) (quoting H.R. Rep. No. 101-616 (1990)) (citing *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998) (noting that civil penalties serve a different role under the Exchange Act because "[d]isgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty.")

The relevant statutory penalty provisions provide generally that the court may impose the greater of the illicit proceeds or a statutorily specific dollar amount per violation and contain tiers setting a penalty range dependent on the conduct and intent of the defendant. 15 U.S.C. 77t(d)(2)(C); 78u(d)(3)(B). A second-tier penalty is appropriate for offenses that "involve fraud, deceit or a deliberate disregard of a regulatory requirement. A third-tier penalty becomes appropriate if the SEC also establishes that the conduct "resulted in substantial losses or created a significant risk of substantial losses to other persons."

"[T]he actual amount of the penalty [is] left up to the discretion of the district court," based on the case's particular facts. *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005) (explaining that the

A3774

statute "establishes a ceiling" but does not "require that the full . . . allowable penalty be imposed"). In exercising that discretion, courts have considered factors including (1) the egregiousness of the violation, (2) the defendant's scienter, (3) the repeated nature of the violation, (4) defendant's admission of wrongdoing and cooperation with authorities, and (5) the defendant's financial situation. *See, e.g., SEC v. Kapur*, 2012 U.S. Dist. LEXIS 169784, 2012 WL 5964389, at *7 (S.D.N.Y. Nov. 29, 2012); *SEC v. Locke Capital Mgmt., Inc*., 794 F. Supp. 2d 355, 370 (D.R.I. 2011).

The SEC, in its request for penalties of more than $1.5 million, agrees that the penalty must be based on conduct within five years.[1]  But it then skips past the statutory reference to a penalty based on the defendant's illicit proceeds, apparently dissatisfied with that figure, and instead uses the *highest tier* and the *highest penalty figure in that tier*, and multiplies that number *by seven different issuers*. See ECF 427: Murphy Dec. paragraph 30.

The plaintiff's generic penalty request ignores, first, the authorities that illustrate that courts generally determine the disgorgement figure and *then* consider that amount in setting the penalty. In *United States SEC v. Esposito*, 2011 U.S. Dist. LEXIS 161924 (M.D. Fla. June 24, 2011), for example, where defendants engaged in violations of Section 10(b)(5), Section 5 and Schedule 13d, the court held that the "facts and circumstances of this case favor imposition of a penalty *equal to*

---

[1] Civil penalties are governed by 28 U.S.C. § 2462, which dictates that an action "shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon." The SEC is not arguing that the calculation of penalties should include earlier conduct. Nor is there any basis for equitable tolling of a period applicable to a penalty.  The statutory reference to an offender "not found within the United States" is expressly directed to the issue of service and the SEC here does not allege that defendants were not "found" in the United States *at any point during the five-year period. CFTC v. WorldWideMarkets, Ltd*., No. 21-20715 (KM) (LDW), 2022 U.S. Dist. LEXIS 148305 (D.N.J. Aug. 18, 2022) or that their location precluded or delayed service. *SEC v. Bartek,* 484 Fed.Appx 949 (5th Cir  2012) (tolling limitation is applicable where the defendant is outside of the United States *precluding service of process.) See also Cetel v. Kirwan Fin. Grp., Inc*., 460 F.3d 494, 509 (3d Cir. 2006) (addressing requirements for tolling including the need for allegations and evidence of plaintiff's "reasonable due diligence").

*the defendants' ill-gotten gains*".  (Emphasis added). *See SEC v. Aly*, 2018 U.S. Dist. LEXIS 172467 (S.D.N.Y. Oct. 5, 2018) (penalty set at $425,665 — "*equal to the amount of Aly's pecuniary gain*.") (citing *SEC v. One Wall St., Inc.,* 2008 U.S. Dist. LEXIS 110351, 2008 WL 5082294, at *10 (E.D.N.Y. Nov. 26, 2008) (concluding that a civil *penalty equal to the amount of the defendant's ill-gotten gains* was appropriate.")

It is perhaps not surprising that plaintiff ignores that traditional means of assessing penalties, because they failed to demonstrate that Mr. Friesen obtained *any gains* during the five-year period.  The information on which plaintiff relies, *allocations* of proceeds contained within Fred Sharp's Q system, constitutes nothing other than an unexplained divvying up done by Fred Sharp and provides no evidence of transfers to Mr. Friesen or his actual *gain*.  Further, the amount sought by plaintiff is vastly disproportionate to even that purported allocation of proceeds over that period: plaintiff seeks three times the amount of the *allocation* of approximately $450,000.  Murphy Dec. at 14.  Thus, the plaintiff's request for a penalty of approximately $1.5 as to each of three defendants fails to take into account either their actual gain *or* the substantial difference in the roles occupied by those individuals.

Even setting aside the use of gain as a measure, the amount sought by plaintiff would be justified only if the Court resolves three distinct issues in plaintiff's favor.  First, the Court must conclude that a *third-tier* penalty is warranted, *i.e,* that the SEC has established that the conduct resulted in the existence or risk of substantial losses.  The Court must then consider what figure within that tier is appropriate in light of the particular defendant's role and conduct.  Finally, the Court must decide whether it should impose one penalty for the conduct of whether, as plaintiff contends, it should be multiplied by seven.  Certainly the jury verdict provides no aid to the Court on those points; it reflects only that the jury found violative conduct in relation to a single issuer.

A3776

Plaintiff has failed to provide to the Court a basis for rulings in its favor on any of those three issues. Plaintiff, in contending that a third-tier penalty is warranted based on *substantial losses* or the risk thereof, simply cites back to their description of the beneficial ownership disclosure requirements. Plaintiff's Brief at 12. Plaintiff ignores the fact that the conduct at issue involved specific and technical disclosure requirements that do not necessarily translate into any investor loss. There was no contention, much less evidence, that investors relied on or even looked at Schedule 13d requirements or disclosures when they made the decision to purchase or sell a security. And while there was evidence of promotional activity, the Exchange Act makes clear that such activity is *not* unlawful and, again, there was no evidence that any investor looked at or relied on the specific names of the entities identified as having paid for the promotions. In the end, it is equally likely that the alleged conduct at issue would not and *did not result* in investor losses. The plaintiff has failed to provide this Court with any basis for reaching the conclusion required for imposition of third-tier penalties and cases support the use instead of tier-two penalties. *See SEC v. Carrillo Huettel LLP*, 2017 U.S. Dist. LEXIS 6570 (S.D.N.Y. Jan. 17, 2017) (where noting that the SEC sought third-tier penalties based on conclusory contentions that the 'the conduct warrants the imposition of maximum third-tier penalties, … [that] their egregious and recurrent actions involved fraud, deceit, and manipulation and caused substantial losses to the investors,' court held that the SEC's "argument is rather lackadaisical," that it did not establish 'substantial risk of loss' and "impos[ed] tier-two fines in the amount of $75,000 for each securities law or rule violated").

The plaintiff also failed to provide evidence that it is entitled to seven penalties. As an initial matter, the information put forth by the plaintiff relating to Mr. Friesen refers to only *three issuers* in the relevant period: Arch Therapeutics, Newgen Biopharma and Vitality Biopharma. Murphy Dec. at 14. And with respect to the other four issuers, it would appear that the Plaintiff

wants to assume the liability of Mr. Friesen for conduct in relation to issuers that were barely mentioned in the proceedings and as to which he received *not even an* allocation of proceeds, much less gain, even in the Q system on which they rely so heavily.

The issue of ability to pay is also arguably deeply distorted by the plaintiff. The plaintiff argues that Mr. Friesen has the ability to pay *a substantial penalty* because the SEC seized assets with a current balance of $2,803,645. Pl.Br. at 14. That assumes, of course, that the SEC should be able to take *for itself* the bulk of those funds, leaving only the remainder for disgorgement to investors. The SEC's effort to obtain for itself the lion's share of those funds is contrary to basic principles of equitable remedies and is arguably inappropriate. The Court should resolve *first* the issue of a disgorgement figure that would inure in favor of investors and then consider the extent to which there is any evidence that Mr. Friesen has the ability to pay penalties to the SEC above and beyond that.

Finally, defendant requests that the Court not enter a partial judgment pertaining to penalties or direct that the penalties be paid "within 30 days" or otherwise in advance of the resolution of issue of disgorgement. To do so would enable the plaintiff to try to siphon to itself the amounts that have been frozen prior even to a determination and allocation of funds for disgorgement. It would also likely require additional and arguably duplicative litigation since the defendants would have to begin immediately the appellate process and seek of a stay of enforcement of that partial judgment prior to entry of the remainder of the judgment. [2]

---

[2] In the alternative, the defendant asks that the Court expressly stay its imposition of any penalty pending resolution of the remaining issues relating to disgorgement.

6

A3778

B.     **The Court Should Decline to Order the Requested Injunctive Relief**

Recognition that "an injunction is a drastic remedy, not a mild prophylactic," *Aaron v. SEC*, 446 U.S. 680, 703, 64 L. Ed. 2d 611, 100 S. Ct. 1945 (1980) (Burger, C.J., concurring), has led courts to require "positive proof of a realistic likelihood that past wrongdoing will recur," *SEC v. John Adams Tr. Corp*., 697 F. Supp. 573, 577 (D. Mass. 1988) *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18 (2d Cir. 1977), *SEC v. Dimensional Entertainment Corp*., 493 F. Supp. 1270, 1278 (S.D.N.Y. 1980). The SEC cannot and has not even attempted to demonstrate any likelihood of recurrence as to Mr. Friesen.  It simply asserts that conduct occurred many years ago and that there are "no assurances that defendants' conduct will end."  ECF 426 at 12.  But that is plainly the wrong inquiry; it is Plaintiff that bears the burden of demonstrating that the conduct is continuing and is likely to recur.  The Court has been provided with no evidence of any conduct in the last six years and no proper basis to make the requisite finding of a likelihood of recurrence.

Further, courts have properly rejected or criticized the SEC's request for such obey-the-law injunctions based on fair notice and due process issues.  *United States v. Askins & Miller Orthopaedics, P.A*., 924 F.3d 1348 (11th Cir. 2019) ("Such injunctions are disfavored because they often run afoul of Rule 65(d)'s requirement that injunctions state their terms specifically and "describe in reasonable detail" the "act or acts restrained or required."); *SEC v. Goble*, 682 F.3d 934, 951 (11th Cir. 2012); see also *Jones,* 300 F. Supp. 3d at 318 (rejecting, under Rule 65, an injunction that would "simply admonish Jones to obey the federal securities laws in any future venturing on her part into what for her will likely prove perilous territory"); *SEC v. MacDonald,* No. CA 78-0073, 1981 WL 1635, at *6 (D.R.I. Apr. 23, 1981) Case 1:21-cv-11276-WGY Document 454 Filed 02/14/24 Page 17 of 21 ("Insofar as an injunction is concerned, this Court does not intend to issue a hollow edict which simply says to somebody obey the law.").

A3779

If there is conduct that has occurred, but can and should be prohibited in the future, then that conduct should be spelled out.  This case includes a clear example of conduct that would properly be the subject of an injunction, *i.e., failure to disclose beneficial ownership* and/or engage in the sale of unregistered securities.  That is the conduct that should be proscribed and the SEC should not, instead, be able to impose an undefined bar and thereby convert any future alleged misconduct into a purported violation of a prior order.

The proposed bars are also substantially overbroad and purport to limit, for instance, defendant's personal trading activities by restricting him to securities listed on national exchanges. Plaintiff has not demonstrated why these extremely broad remedies are appropriate here.  A similar issue was raised in *SEC v. Almagarby*, 92 F.4th 1306 , 1325-26 (11th Cir. 2024), and the Eleventh Circuit Court of Appeals found that a bar against sales of unregistered securities was appropriate but that a *penny stock bar* was not.  Such a bar, the Court reasoned, "prohibits both unlawful and lawful penny-stock transactions" and questioned whether it as appropriate to "enjoin[] a defendant from participating in otherwise-lawful behavior when that defendant had not already exhibited his unlikeliness to comply with the law going forward"  While acknowledging that the defendant could conceivably have an opportunity to engage in misconduct in the future, the Court concluded that "none of the other factors weigh in favor of an injunction." The court held, therefore, that "the district court's finding otherwise was an abuse of discretion."

### Conclusion

For the foregoing reasons, Plaintiff's motion for penalties and certain of its requests for injunctive relief should be denied.

Dated: May 20, 2024

A3780

MG+M THE LAW FIRM

By: /s/ Timothy J. Fazio
      Timothy J. Fazio
      125 High Street
      Oliver Street Tower
      Boston, MA 02110
      Tel: 617 670 8635
      Email: TFazio@mgm.law

Counsel for Jackson T. Friesen


Dated: May 20, 2024

MARANDA E. FRITZ PC

By: /s/ Maranda E. Fritz
      Maranda E. Fritz (*pro hac vice*)
      521 Fifth Avenue
      New York, New York 10017
      Tel: 646-584-8231
      Email: Maranda@fritzpc.com

A3781

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>      v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM TAYLOR,<br><br>                              Defendants. | Case No. 1:21-cv-11276-WGY |

## OBJECTIONS BY DEFENDANTS VELDHUIS AND KELLN
## TO PROPOSED PARTIAL JUDGMENTS AGAINST VELDHUIS AND KELLN
## <u>SUBMITTED BY PLAINTIFF SECURITIES AND EXCHANGE COMMISSION</u>

Defendants Mike K. Veldhuis and Courtney Kelln (collectively, "Defendants") hereby

object as follows to the entry of the partial judgments against them submitted by plaintiff

Securities and Exchange Commission ("SEC").  ECF No. 485 (the "Proposed Partial

Judgments").[1]

1.      Entry of a partial judgment against Defendants is not appropriate because the

Court has not "expressly determine[d] that there is no just reason for delay." Fed.R.Civ.P. 54(b).

Nor should the Court make such a determination at this time. "The entry of '[j]udgments under

Rule 54(b) must be reserved for the unusual case in which the costs and risks of multiplying the

number of proceedings and of overcrowding the appellate docket are outbalanced by pressing

---

[1]      In light of the pending criminal charges pending against them in this Court of which the Court has prior notice, Defendants Veldhuis and Kelln preserve and assert fully their right under the Fifth Amendment to the U.S. Constitution and, therefore, must decline to make any factual assertions concerning the claims brought and remedies sought by Plaintiff SEC.

needs of the litigants for an early and separate judgment as to some claims or parties.'" *Amyndas Pharmaceuticals, S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 28 (1st Cir. 2022) (quoting *Spiegel v. Trustees Of Tufts Coll.*, 843 F.2d 38, 42 (1st Cir. 1988). The factors for such a determination by a District Court include: "(1) whether the disputed ruling is final; (2) whether the disputed ruling raises legal or factual issues that overlap with any claims that remain pending in the district court; and (3) how the equities and efficiencies of piecemeal review would compare to those in a single proceeding." *Britton v. Maloney*, 196 F.3d 24, 27 n.2 (1st Cir. 1999). *See also Patel v. 7-Eleven, Inc.*, 504 F. Supp.3d 1, 3-4 (D. Mass. 2020).

Here, the SEC's motion for remedies has not been adjudicated fully by the Court. There is no "pressing need" for the SEC to obtain a partial monetary judgment against Defendants. Moreover, the Court's determination of appropriate monetary sanctions to be imposed against Defendants should take into account the amount of each sanction – disgorgement and civil penalty – standing alone.  A single appeal by Defendants from a judgment that sets forth all monetary sanctions ordered by this Court is more equitable and more efficient than multiple judgments and multiple appeals concerning those sanctions.

2.      The proposed judgments improperly include: (i) a thirty-day time limit for payment of the civil monetary penalty; and (ii) Court authorization for a prospective civil contempt motion. ECF No. 485 [Proposed Judgments against Defendants Veldhuis and Kelln, paragraph V, p. 6]. The Federal Debt Collection Procedures Act, 28 U.S.C. § 3001, et seq. states the collection procedures that may be used by the SEC (and the Federal Government generally) to collect a civil monetary penalty. A motion for civil contempt is not included among the collection procedures authorized by this controlling statute. This Court should not create a new

A3783

collection tool for the entire Federal Government and thereby subject every single person who

owes money to the Federal Government to the potential sanction of civil contempt.

3.      Defendants join in the objections to the proposed partial judgments made by

Defendants Zhiyang Yvonne Gasarch, Paul Sexton, and Jackson T. Friesen.


Dated: May 20, 2024

SHER TREMONTE LLP                         WILEY REIN LLP

By: ___/s/ Robert Knuts_____          By: ____/s/ Frank Scaduto_____
    Michael Tremonte (*pro hac vice*)         Frank Scaduto (BBO #663430)
    Robert Knuts (*pro hac vice*)             2050 M Street NW
    Katie Renzler (*pro hac vice*)            Washington, DC 20036
    90 Broad Street, 23rd Floor               Tel: 202.719.7000
    New York, New York 10004                  Email: FScaduto@wiley.law
    Tel: 212.202.2600
    Email: rknuts@shertremonte.com


*Attorneys for Defendant Mike K. Veldhuis*    *Attorneys for Defendant Courtney Kelln*

A3784

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by ECF on May 20, 2024.

_/s/ Robert Knuts_
Robert Knuts

A3785

A3786

1                    UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS (Boston)

3                              No. 1:21-cv-11276-WGY

4

5    SECURITIES and EXCHANGE COMMISSION,
              Plaintiff

6

7    vs.

8

9    FREDERICK L. SHARP, et al,
              Defendants

10

11                          * * * * * * * * *

12

13

                         For Hearing Before:
14                      Judge William G. Young

15
                            Disgorgement
16

17                    United States District Court
                      District of Massachusetts (Boston)
18                    One Courthouse Way
                      Boston, Massachusetts 02210
19                    May 8, 2024

20

21                          * * * * * * * *

22

              REPORTER: RICHARD H. ROMANOW, RPR
23                    Official Court Reporter
                    United States District Court
24          One Courthouse Way, Room 5510, Boston, MA 02210
                        rhr3tubas@.com

25

A3787

```
1              A P P E A R A N C E S

2

3    KATHLEEN BURDETTE SHIELDS, ESQ.
     ALFRED A. DAY, ESQ.
4    DAVID H. LONDON, ESQ.
     NITA KUMARASWAMI KLUNDER, ESQ.
5       Securities and Exchange Commission - MA
        33 Arch Street, 24th Floor
6       Boston, MA 02110
        (617) 573-8904
7       Email: Shieldska@sec.gov
        For Plaintiff
8

9    KAREN A. PICKETT, ESQ.
        Pickett Law Offices, P.C.
10      125 High Street, 26th Floor
        Boston, MA 02110
11      (617) 423-0485
        Email: Kpickettlaw@gmail.com
12      For Defendant Zhiying Yvonne Gasarch

13

14   NEIL THOMAS SMITH, ESQ.
     ROBERT S. SILVERBLATT, ESQ.
        K & L Gates LLP - MA
15      One Lincoln Street
        State Street Financial Center
16      Boston, MA 02111
        (617) 261-3180
17      Email: Neil.smith@klgates.com
        For Defendant Paul Sexton
18

19   MIRANDA E. FRITZ, ESQ.
        Manning Gross Massenburg
20      125 High Street
        Oliver Street Tower, 6th Floor
21      Boston, MA 02110
        (617) 670-8800
22      Email: Tfazio@mgmlaw.com
        For Defendant Jackson T. Friesen
23

24

25
```

A3788

```
 1      (Continued.)

 2

 3    ROBERT KNUTS, ESQ.
         Sher Tremonte LLP
 4       90 Broad Street, 23rd Floor
         New York, NY 10004
 5       (212) 202-2638
         Email: Rknuts@shertremonte.com
 6       For Defendant Mike K. Veldhuis

 7

     FRANK SCADUTO, ESQ.
 8       Wiley Rein, LLP
         2050 M Street NW
 9       Washington, DC 20036
         (202) 719-3479
10       Email: Fscaduto@wiley.law
         For Defendant Courtney Kelln

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

A3789

```
 1          P R O C E E D I N G S
 2          (Begins, 11:00 a.m.)
 3          THE CLERK:  Now hearing Civil Matter 21-11276, the
 4      SEC versus Sharp.
 5          THE COURT:  Good morning.  Would counsel identify
 6      themselves and who they represent.
 7          MS. SHIELDS:  Good morning, your Honor, Kathleen
 8      Shields for the Securities and Exchange Commission, and
 9      with me are my colleagues, David London and Alfred Day.
10          THE COURT:  Good morning.
11          MS. SHIELDS:  And Nita Klunder.  I'm sorry.
12          MR. SMITH:  Good morning, your Honor, Neil Smith
13      and Rob Silverblatt on behalf of the defendant Paul
14      Sexton.
15          THE COURT:  Good morning.
16          MS. FRITZ:  Maranda Fritz for Jackson Friesen.
17      Hello, your Honor.
18          THE COURT:  Good morning.
19          MR. SCADUTO:  Good morning, your Honor, Frank
20      Scaduto for the defendant Courtney Kelln.
21          MR. KNUTS:  Good morning, your Honor, Robert Knuts
22      for the defendant Mike Veldhuis.
23          MS. PICKETT:  Good morning, your Honor, Karen
24      Pickett for the defendant Yvonne Gasarch.
25          THE COURT:  And good morning to you all and you're
```

```
 1   welcome.  Here's how we're going to proceed.

 2        I have an hour for this hearing, that's not an

 3   invitation to take the hour, it is however the time I

 4   have available for oral argument.  I've read the

 5   materials, I believe I'm prepared for oral argument, and

 6   I come on the bench thinking that I may make conclusory

 7   rulings at the close of the hearing.  So we're going to

 8   divide up the time, as to the SEC, as to the defendants,

 9   and pick your strongest arguments.  If, um -- because

10   that will be most helpful to the Court.

11        There is one point that I want to be clear on from

12   the SEC.  If I look at your memorandum in support of a

13   motion for remedies filed on the 8th of December, you

14   say, at the bottom of Page 23, in the paragraph that

15   begins on Page 23, that it's open to me, as to

16   disgorgement, to order disgorgement now, in a judgment,

17   that would result in you collecting the monies, but to

18   specifically direct that the, um, monies not be

19   disbursed until I have approved a plan of disbursement,

20   um, given the fact that disgorgement is an equitable

21   remedy.

22        Is that the position of the SEC?

23        MS. SHIELDS:  Yes, your Honor, and I can explain

24   further, if you would like?

25        THE COURT:  And if you wish, you may, but not now.
```

A3791

```
 1    Because if I come to that conclusion, as to some or all
 2    of the defendants, it is my strong belief that anything
 3    that you collect in the way of funds, subject to
 4    disgorgement, will be held subject to further order of
 5    the Court.  And I just see "equitable disgorgement" as
 6    someone wrongfully took from Party A, now they must give
 7    it back to Party A.  That is to say I don't think we
 8    have to identify the victims at the judgment stage, but
 9    I may order funds to be returned or the like depending
10    on the Court's satisfaction that the money is actually
11    going back to identified victims, not just some
12    pseudopenalty to be held by the SEC.
13         Now having said that -- and I have not prejudged
14    these matters, though I do have views about them, I
15    think I'm going to give the defense the argument first.
16    You divide up the time however you wish.  And, um, then
17    I'll turn to the SEC.
18         MR. SILVERBLATT:  Good morning, your Honor, Robert
19    Silverblatt for the defendant Paul Sexton.  The defense
20    group has conferred amongst ourselves and I will be
21    starting with some arguments that are common to the
22    defendants and then will give my colleagues the
23    opportunity to --
24         THE COURT:  That makes perfect sense and I'm eager
25    to hear you.
```

1          MR. SILVERBLATT:  Great.  So, your Honor, I want

2     to focus on two arguments.  The first is that the

3     Q-System is not a proper basis for ordering

4     disgorgement, and the second is that even if it were a

5     proper basis for ordering disgorgement, the Commission

6     would still need to establish, with respect to each of

7     the 14 issuers, that there are violations of the

8     securities laws, and it has not done so.

9          And one theme that I think is going to run

10    throughout this argument is that we recognize that the

11    Court is being presented with somewhat of a stark choice

12    on the question of disgorgement.  We have the SEC that

13    is claiming tens of millions of dollars of disgorgement

14    and we have the defendants who are saying that they are

15    entitled to either nothing at all or substantially less

16    than that.

17         And what I want to make clear at the outset is

18    that it is not our argument that these securities laws

19    do not provide for disgorgement in this type of case or

20    that there's some sort of blind spot in the law, our

21    argument is that in this particular case what we have is

22    a good old-fashioned failure to prove the disgorgement

23    amount.

24         And starting with Q, um, it's important to think

25    of Q as two different databases that are under one

```
 1    heading, which is the Q-System.  But they could just as
 2    easily be in separate databases.
 3         So the first is a record of purported stock
 4    transactions and the Court heard a lot about that at
 5    trial and the SEC went to tremendous lengths to try to
 6    substantiate the stock transactions that were in the
 7    Q-System by spending hundreds of hours, according to
 8    their own witness, of poring through brokerage records
 9    to compare them to what was in the Q-System.  So that's
10    the first part of the Q-System.
11         The second part of the Q-System we heard very
12    little at trial, but it is the sole basis for the SEC's
13    request for disgorgement, and that is a purported ledger
14    of allocations of money to the defendants.  And the
15    difference here is stark because whereas the Commission
16    went to great lengths to validate the first part of the
17    Q-System, they went to no lengths to validate the second
18    part.
19         There were many steps the Commission could have
20    taken.  They could have looked at bank records for
21    entities, they could have looked at bank records for
22    individuals.  We know this is something that they could
23    have done because at the beginning of this case they
24    froze funds that they say are attributable to the
25    defendants, so they knew where to look, but they didn't
```

A3794

```
 1    look.  And that's a question for the Commission as to

 2    why?

 3         But one option that we posited in our papers is

 4    that the Q-System presented a number that was very high

 5    and very appealing and, um, that number could only get

 6    lower and lower and lower if you actually tried to

 7    substantiate it by going through the bank records.  So

 8    the Commission has presented the Court with a choice of

 9    accepting the full number without any type of

10    substantiation, without any bank records, without a

11    shred of evidence, or nothing, and that is the

12    Commission's choice that they made.  They did not go

13    through the same exercise that they did with respect to

14    the brokerage records, even though they had the ability

15    to do that.

16         And layered on top of that is the fundamental

17    problem with the Q-System, apart from being unreliable,

18    apart from being unsubstantiated, with respect to that

19    second piece of it.

20         THE COURT:  Let me see if I follow your argument.

21    Your argument is not answered by my initial question to

22    the SEC because your point is not that -- and you would

23    agree with me, they've got to identify the victims at

24    some stage in order to get disgorgement, rather your

25    problem is with this allocation of profits among the
```

A3795

```
 1    various defendants on which the disgorgement amounts

 2    rely.

 3         Have I got that right?

 4         MR. SILVERBLATT:  That is correct, except I would

 5    add one nuance to that, which is it's not just the

 6    allocation among defendants, it's whether this is real

 7    money to begin with in the first instance.

 8         The Q-System is an internal ledger of allocation.

 9    We have had no proof that there is actual money behind

10    the Q-System, at best it is an IOU that it handed to

11    individuals, but there is no evidence that they can

12    actually withdraw from the Q-System or from the -- what

13    is considered to be Corporate House, any funds at all,

14    let alone the funds that are allocated to them.

15         This is not like a bank account where the money

16    was sitting in defendant Sexton's bank account, this is

17    a line in a database that attributes funds, that might

18    as well be Monopoly money, to defendant Paul Sexton,

19    without any proof that there is any real money behind it

20    or that he ever received the funds or even had the

21    ability to access the funds, that's our fundamental

22    issue.  And there are steps that the government could

23    have taken to validate the Q-System, but they chose not

24    to do that and they chose to rely on the unsubstantiated

25    very-large number without any effort to tie it to a
```

1    reality by tracing account transactions or showing that

2    there is money behind this.

3        They have alleged in their papers that this is not

4    uncommon, they call this a "normal" bank account, they

5    call it "The Bank of Fred Sharp," but that's not what

6    this is.  Because when you have a bank, you have a

7    history of people walking into the bank and being able

8    to withdraw the money from their account, and that is

9    established over time.  We have none of that here.  We

10   have a ledger that shows the allocation and that's

11   really the extent of it.  And that's a problem because

12   it doesn't show any actual money that, um, any of the

13   defendants even had the ability to control, let alone

14   that they actually had in their pockets.

15       And they tried to rely on the efforts they took

16   with the first part of the Q-System, which is

17   essentially the brokerage side, but the analogy that we

18   use in our papers is that that's akin to, if we do have

19   a real bank, trying to say "Okay, we've authenticated

20   the brokerage records, so therefore the ATF records must

21   be authentic," and you can't do that.

22       This is -- to come back to where we started with

23   this, essentially a second database that happened to be

24   held under the umbrella of Q, that serves an entirely

25   different purpose, um, and requires separate

```
 1   authentication, which we just don't have in this case.
 2   So that is the main argument that we have and we believe
 3   that it flows through to all of the SEC's requests,
 4   because there's not a single bank record here.
 5        But even if we were to set that aside and say that
 6   the Q-System could somehow be counted on as a basis to
 7   calculate disgorgement, the next fundamental issue is
 8   that disgorgement can only be ordered for violations of
 9   the securities laws.  And what we have here are 14
10   different securities that the SEC put at issue in this
11   case.  And the Court was very clear with the jury that
12   they only needed to find a violation with respect to one
13   of those securities, they didn't need to agree amongst
14   themselves as to what it was, they didn't need to tell
15   the Court, but they needed to find a violation with
16   respect to one.  And that is similar to the posture that
17   defendant Sexton, not having gone to trial, was in,
18   because, um, he has conceded, for purposes of this
19   exercise, that, um, there is, um, liability with respect
20   to at least one of the issuers.
21        So what the SEC has done is they have focused a
22   lot on one or two of the issuers and that is a basically
23   where all their proof is.  They describe this as a
24   scheme to defeat the, um, reporting requirements by
25   disguising beneficial ownership, but they showed
```

A3798

```
 1    beneficial ownership in excess of the reporting
 2    requirement for exactly 1 of the 14 issuers, the other
 3    13 issuers they didn't even attempt to make that case.
 4    And one would think that if that evidence were
 5    available, it would have been presented.
 6         So what they have is a lot of effort devoted to
 7    one or two of the securities, whereas we have 14.  And
 8    as we pointed out in our papers, there are some that are
 9    very high value, millions of dollars, where there was
10    absolutely no evidence about them at all at trial except
11    for a reference by the summary witness that they're part
12    of the case.
13         And the SEC's response to that in its papers is
14    that this is all part of a pattern, um, we're missing
15    the forest from the trees, but, um, what we think is
16    more apt to the analogy is that they have pointed to a
17    couple of trees and they're asking the Court to say
18    "There must be a forest here," and they haven't done
19    that.
20         And it was their choice to pick a case with 14
21    issuers, complicated facts, there was nothing that
22    prohibited them from going security by security and
23    entering evidence and saying "This is the evidence that
24    there is a violation of the securities laws with respect
25    to each and every one of them," but they didn't.  And
```

```
 1   they had many opportunities to do that.  We pointed out
 2   in our papers they had the opportunity to supplement the
 3   record in this briefing and they didn't.
 4        So --
 5        THE COURT:  But the record, such as it is, is
 6   before the Court, and is it not open to me?  You say the
 7   evidence is insufficient, and I understand that
 8   argument, but, um, we'll see what they say about that,
 9   but doesn't that put it on me to determine the
10   sufficiency of the evidence?  And if I consider the
11   evidence sufficient -- I consider the evidence
12   sufficient, then we could -- the SEC could prevent it.
13   Isn't that so?
14        MR. SILVERBLATT:  Yes, the evidence is for the
15   Court to evaluate and that would include the trial
16   record.  Our point with respect to the evidence is that
17   there are securities for which there is no evidence at
18   all.
19        THE COURT:  Yes, I'm following.  Yes.  Yes, thank
20   you.
21        MR. SILVERBLATT:  Another point I wanted to touch
22   on is --
23        THE COURT:  You have about 15 minutes left.  Go
24   ahead.
25        MR. SILVERBLATT:  And I'll turn it over to my
```

A3800

```
 1    colleagues in a minute.

 2          But even setting all of this aside, we have a

 3    substantial concern about double-counting in this case,

 4    and we raised this in our papers and we got no response

 5    from the SEC.

 6          We know, for instance from the testimony of, um,

 7    Roger Knox, that money has already been seized in this

 8    case and it's money that he claims to have been related

 9    to Sharp transactions, and we pose the question, "Well

10    does any of that provide for an offset against our

11    defendants, was any of this in accounts that were

12    attributed to us?"  And we got no answer.

13          And there are other pots too, there's the Sharp

14    pot -- there are all of these pots of money that the SEC

15    has frozen or collected in the course of this

16    litigation, and we have a real concern that they're

17    collecting some of this money twice or attempting to.

18    Particularly because this is not -- and going back to

19    the original argument, like a bank account, this is an

20    internal ledger, and if some of that money that was

21    sitting in what the SEC considers to be Corporate House,

22    has already been seized, that money should be offset

23    against our liabilities, if any.  That is something that

24    they have not explained and something that we think is

25    important to have explained, because they're only
```

A3801

```
 1    entitled to collect the money once.
 2            THE COURT:  Thank you.
 3            MR. SILVERBLATT:  With that I will, um -- I
 4    believe we have decided amongst ourselves that the
 5    defendant Friesen would go next.
 6            THE COURT:  Yes.
 7            MS. FRITZ:  Thank you, your Honor.
 8            I'm going to move through a few points that I
 9    think, woven together, really demonstrate that the SEC
10    has hardly even attempted to satisfy its burden of
11    demonstrating that Jackson Friesen or the other
12    individuals actually received money that needs to be
13    taken back from him.  And I start with the fact, and
14    your Honor started with the fact that we've got clear
15    case law since 2020 that this is the very real
16    requirement, that it has to be the profits received by
17    the individuals.  *Lou* established it and your Honor then
18    set forth that law in your Honor's earlier decision.  So
19    that requirement now is very clear, it has to be money
20    that was received.
21            Absent that evidence, this is not properly an
22    equitable remedy, it shifts over, and the Court in *Lou*
23    made it clear, the SEC had done that in the past and
24    could not do that going forward.  And so we start with
25    the fact that their burden is to show that funds were
```

A3802

```
 1    received by us.  And as Mr. Silverblatt pointed out, we
 2    had a very stark difference in the trial.
 3         We started With -- and let's not even call them
 4    the "Q-System," let's call them "Fred's records,"
 5    because that's what they are, Fred Sharp put some stuff
 6    in a computer.  Fred Sharp, who the witnesses said stole
 7    from his clients and customers.  Fred Sharp, who we, I
 8    think would agree, would not be considered a credible or
 9    reliable witness.  And so what we're doing here is
10    they're offering up Fred's records and saying those
11    records alone, that hearsay statement of Fred Sharp,
12    forms a sufficient basis.
13         THE COURT:  No, respectfully, and your colleagues
14    divided the two types of records, part of it is the
15    allocation among these defendants and others, and that's
16    something I'm going to ask the SEC about.  But they do
17    support the stock transfers, they've checked those out,
18    and while not 100 percent, they seem to be credible.
19         MS. FRITZ:  I absolutely agree, your Honor, and I
20    think that underscores what's wrong with these personal
21    account records.  The SEC knew full well that these are
22    nothing more than the statements of Fred Sharp that
23    would require a real authentication in order for them to
24    be admitted and considered.  And so for the stock
25    records, they did the right thing.
```

A3803

```
 1          They had the resources to do the exact same thing
 2    in relation to a very simple question that comes up in
 3    every single one of these cases.  This is not rocket
 4    science.  We have all had cases where we had to look at
 5    what our client received and that then forms the basis
 6    for the argument that the client should have to then
 7    disgorge or give it back.
 8          Well instead of looking at our client's bank
 9    records, and we all agree they didn't do that, no bank
10    records are before the Court, that's a failure of proof
11    as Mr. Silverblatt said.  But it's worse than that.
12    What they offer instead, and I would -- I think the only
13    thing that they have offered the Court to support their
14    very large disgorgement demands is Document 427, the
15    declaration of Ryan Murphy, and a set of exhibits.  So
16    that's where I started, as I look to see whether there
17    was any credible argument that this is enough.  So
18    Mr. Murphy starts with the Q-records.
19          Your Honor, I want to emphasize, it is the wrong
20    premise, this record of my client's supposed personal
21    account does not even purport to be a record of what he
22    ever received, it doesn't even purport to be that.  This
23    is a record of what Fred Sharp had over in Fred Sharp's
24    world and he's written down these things.  This does not
25    even pretend to be a document that your Honor could rely
```

1   on to say "Well Mr. Friesen received that and therefore

2   has to give it back."  These are "credits," Mr. Murphy

3   admits.

4        And so what the SEC did was they took Fred Sharp's

5   records, added up credits, and came up with figures

6   that, over the course of this litigation, have varied

7   from, Mr. Donnellan said 9 million, another time said 10

8   million, now Mr. Murphy's saying 11 million, that is not

9   even the basis for disgorgement.  There is no proper

10  argument that an individual should have to disgorge

11  things that were still over in Fred Sharp's accounts but

12  were credited in some way to him.

13       So the records are inherently unreliable, as

14  Mr. Silverblatt pointed out.  But even if your Honor

15  wants to look at these records, this in not proof of

16  what *Lou* requires.  *Lou* requires that the government

17  prove what my client got because that's what can be

18  taken from him, anything else is punitive and therefore

19  impermissible.  And they've just ignored that basic

20  requirement.  We're not sure why.  But they have not

21  proved what my client got.  And the Q-Account records,

22  and their totaling of supposed credits, isn't even --

23  that's not even in the Q-System a record of what my

24  client received.  So there's a complete disconnect

25  between what this record supposedly does and what the

1    requirement is for disgorgement.

2         Then when we go behind that, when you look at the

3    declaration of Mr. Murphy, Document 427, what your Honor

4    is getting in that document is just a conclusory number,

5    "I did the totals of the credits and it's $11 million."

6    I just want your Honor to bear in mind, there's no work

7    product behind that, there's no detail behind that,

8    there's nothing that your Honor can look at to try to

9    decipher how that corresponds to what I consider to be

10   indecipherable Fred Sharp records on which they're

11   relying.  So there is an absence even of an effort to

12   give to your Honor substance that would support the

13   massive disgorgement awards.

14        We already know from Mr. Silverblatt that they

15   certainly didn't attempt to corroborate any of it.  They

16   could have gotten the records of Fred Sharp accounts,

17   but didn't.  They could have offered up internal records

18   from Fred Sharp's system of actual disbursements, actual

19   disbursements, but they didn't.  Most importantly they

20   could have gone to our clients' accounts to simply

21   prove, as is done in every case, what the individual

22   actually received, and they didn't.  Then after we go

23   through those layers of --

24        THE COURT:  I just want to say 5 more minutes, but

25   you go right ahead.

A3806

```
 1          MS. FRITZ:  I'm wrapping it up.
 2          So then the last step is even if Q -- even if Fred
 3     Sharp's records actually even purported to be records of
 4     transfers, even if the SEC had offered enough substance
 5     there so that your Honor could assess their supposed
 6     analysis, then we still end up with the problem
 7     Mr. Silverblatt raised, which is as to which issuers?
 8     Again not only are they taking the Q-System credits and
 9     lumping it to go for the big number, they're also doing
10     the same things in terms of issuers.
11          They spent a lot of time proving, providing the
12     evidence as to Arch and Echo.  But from my client, if
13     you look at Mr. Murphy's declaration, well they want $1
14     million based on a company called "Makism."  I think if
15     your Honor checks the record, there's not -- we don't
16     know anything about that company.  And that's just one
17     example.  The same thing applies with respect to
18     RitesCorp.  So it's the same idea of just lumping these
19     things together in the absence of meaningful proof and
20     expecting your Honor to go along with it.
21          What we end up with then -- I would argue that
22     their generic argument is inexplicable.  Why didn't they
23     do the work?  It's insufficient.  So then I went to
24     Mr. Murphy's declaration to see is there anything there,
25     anything that would actually be evidence of money
```

A3807

```
 1    received by my client?  And I'll tell you, I read
 2    through every single exhibit, he cites something like a
 3    half a dozen exhibits, and I can tell your Honor that if
 4    you even accepted Mr. Murphy's claim that he actually
 5    has evidence as to these transactions, you come up with
 6    something around $1.4 million.
 7          And so that may answer the question that we're all
 8    asking, why did they not go in and focus on what the
 9    clients actually got, what would actually legally be a
10    proper basis for disgorgement?  Because the numbers are
11    not big enough for them.  The numbers are not that big.
12          That's it.
13          THE COURT:  Thank you.
14          MS. FRITZ:  Thank you.
15          THE COURT:  Anyone else in the last 3 minutes?
16          Yes, Ms. Pickett.
17          MS. PICKETT:  Thank you, your Honor.  I concur
18    obviously with the arguments made by my co-defendants.
19          I did want to point out that Mrs. Gasarch is in a
20    bit of a different situation than any of the other
21    defendants in that, um, if you read the jury verdict as
22    it is and not what the SEC purports it to be, then
23    Mrs. Gasarch was found liable on 17(a)(3), and aiding
24    and abetting potentially 17(a)(3), and both of those are
25    supported by negligence, and, um, if the case -- if
```

1   there's -- if it's a nonscienter violation, then the

2   statute of limitations, as you found in the original

3   motion to dismiss and has been found in the courts, is 5

4   years.

5         We know the case was brought here in August of

6   2020 -- I think it was August of 2021, and so they would

7   have to prove that she committed this securities

8   violation, which in their papers they never say which of

9   the 14 issuers any of these transactions relate to, so

10  I'm sort of arguing into a vacuum, but they would have

11  to show that she -- that her violations related to 1 of

12  the 14 issuers after August of 2016, and they haven't

13  even tried to do that, your Honor.

14        The other issue, your Honor, is, um, I just wanted

15  to piggyback on the others, but the SEC has also said,

16  "Oh, your Honor allowed the Q-System in as business

17  records," that actually is not the case.  As your Honor

18  may remember it, you allowed them in sort of de bene on

19  the basis of the co-conspirator hearsay exception.  But

20  your Honor has never found that the actual entries

21  themselves are reliable.

22        And if the Court remembers the testimony, for

23  example of their star witness, Roger Knox, he said that

24  Sharp would shortchange him.  We know from Nikolayev --

25  I don't know how to pronounce his name, Nikolayev, he

A3809

```
 1    was like Mrs. Gasarch in that he was used to set up a
 2    nominal company, but --
 3         THE COURT:  I -- I really have to stick to my
 4    time.  But I understand the argument.
 5         MS. PICKETT:  All right, thank you, your Honor.
 6         THE COURT:  All right.
 7         So to sharpen up the argument of the SEC, and upon
 8    reflection, you may take it as understood that this
 9    Court is satisfied that the Q-System records qualify as
10    business records under the Federal Rules of Evidence
11    8036.
12         Also, you may understand as to Ms. Gasarch, that
13    the Court, um, holds that there is sufficient evidence
14    to, um, establish that she acted intentionally and the
15    longer statute of limitations applies.
16         The arguments that have been made, um, focusing on
17    disgorgement, do give the Court pause.  I'll hear you.
18         MS. SHIELDS:  Thank you, your Honor.
19         Taking those last two points that your Honor just
20    articulated, I think the only thing I would then add as
21    to Ms. Gasarch's argument, is that her violations, as
22    your Honor has already found, relate to far more than 14
23    issuers who were involved in the violations of Sexton,
24    Friesen, and, um, Veldhuis, because as your Honor has
25    found, she was at the hub of Sharp's business, and
```

A3810

```
 1    therefore all of the transactions flowing through the

 2    Sharp system were ones in which she was involved.  And

 3    we presented significant evidence at the trial as to her

 4    involvement in violative transactions for other Sharp

 5    clients.

 6         So now we'll go back to the argument that I think

 7    Mr. Sexton and Mr. Friesen's counsel harped upon, which

 8    is that, um -- they constructed an argument that I think

 9    your Honor does not follow given your ruling about the

10    business records exception, but --

11         THE COURT:  You mean that I don't understand it?

12    But I --

13         MS. SHIELDS:  No.  Sorry.

14         THE COURT:  Well let me give you my understanding.

15         MS. SHIELDS:  Okay.

16         THE COURT:  Even if I say these are business

17    records, the allocation, the credits upon which the

18    disgorgement is based are like bank records, that, um --

19    but with a bank you know that the person could go and

20    withdraw it.  That commends itself to the Court.  What's

21    the matter with that?  It's a business record, but what

22    does it show?  It shows that, as against this

23    co-conspirator, they, um, could argue you ought -- you

24    ought credit me with this amount.  For disgorgement

25    you've got to get the money in the hands of the
```

```
 1    wrongdoer.
 2         MS. SHIELDS:  And I think that is precisely what
 3    the Q-System does as a business record.
 4         THE COURT:  Go ahead.
 5         MS. SHIELDS:  The Q-System shows the transfers of
 6    illegal stock sale proceeds from the issuer accounts
 7    into each of these defendants' personal accounts.
 8         THE COURT:  I agree.
 9         MS. SHIELDS:  It then shows these defendants'
10    disbursements out of their accounts just like their
11    disbursements out of any other bank account they
12    controlled, it shows them paying their mortgages, taking
13    withdrawals in cash, sending money to pay tuition for
14    their family members, making other transfers to their
15    family members.  And each of those records is part of
16    the Q-System and just as reliable as all other aspects
17    of the Q-System.
18         THE COURT:  But --
19         MS. SHIELDS:  This idea that --
20         THE COURT:  -- the difference is, if I am
21    following, and I think I am, when -- and for the -- I
22    know that disgorgement is equitable, but I do give all
23    intendments in favor of the jury verdict.  Let's be very
24    clear, you tried a jury case, it was well-tried on both
25    sides, the jury's come back with its verdict.  This
```

A3812

```
 1    Court honors that, though I have independent factfinding

 2    responsibilities.

 3         So you show these disbursements, and let's say the

 4    disbursements come up to $500,000, $600,000, pick any

 5    defendant, these are the disbursements.  Well we know

 6    that money got into his, I'll say, "account," and he's

 7    got no right to it, so now he's got to disgorge it.

 8    That's not $11 million, because the credit remaining is

 9    $10,500,000.

10         MS. SHIELDS:  So, your Honor, these defendants

11    have not argued that there is money that is in their

12    account in the Sharp system that still remains there,

13    they haven't presented your Honor with any evidence to

14    show that.

15         THE COURT:  Isn't it their obligation?  That's

16    important.  Is it their obligation to do that?

17         MS. SHIELDS:  Yes, because our obligation, as the

18    SEC, is to show your Honor a reasonable approximation of

19    their ill-gotten gains.  Their ill-gotten gains are the

20    credits, the profits they received out of these illegal

21    trades.  And that's demonstrated in the Q-System.  The

22    Q-System also shows how they spent their profits.  And I

23    don't think any one of them has argued that "Oh, I

24    didn't get a chance to spend all my money before the

25    music stopped."  I think to the contrary you will see
```

```
 1    that the disbursements go almost all the way down to

 2    zero, if not specifically to zero in these accounts.

 3         THE COURT:  What's your best -- Sharp's a

 4    co-conspirator here.

 5         MS. SHIELDS:  Yes.

 6         THE COURT:  We don't know where Sharp is.

 7         MS. SHIELDS:  Well we know he's in Canada.

 8         THE COURT:  I stand on what I just said, it's a

 9    big country.

10         MS. SHIELDS:  Yes, it is.

11         THE COURT:  All right.

12         Now I'm having trouble with the idea that because

13    there is evidence which I credit out of the Q-System,

14    that they disbursed this and that and so, that the total

15    amount of the credits are somehow available to them.

16         MS. SHIELDS:  Because --

17         THE COURT:  Sharp is not a bank.

18         MS. SHIELDS:  But he functioned as a bank.  That

19    was part of the purpose of this scheme, was to provide a

20    way through him to get the proceeds of their money while

21    concealing that they're connected to the funds.

22         THE COURT:  I accept that, that makes -- that is

23    true.

24         MS. SHIELDS:  And so he functioned essentially as

25    a bank and these personal Q-Accounts functioned as the
```

A3814

```
 1   defendants' bank accounts.  I mean the argument that the
 2   defendants are making is essentially "Disgorgement of
 3   sums in my bank account shouldn't count."
 4       THE COURT:  It's not in a bank account, that's the
 5   analogy, but it's not a bank account.  When I go to my
 6   bank, whether it's FDIC-insured or not, it has some
 7   Massachusetts, um, backup to the bank, and I've got some
 8   reasonable expectation that I can get that money.  Now
 9   this whole thing has collapsed there.
10       MS. SHIELDS:  I understand your Honor's argument,
11   but that's not the argument -- no -- not one of these
12   defendants has argued "When the music stopped, I had
13   money left in my Sharp account."  Had they made that
14   argument, that is certainly something we would have
15   looked into and investigated.  None of them have made
16   that claim before your Honor.  None of them have
17   disputed the reasonable approximation propounded by the
18   Commission by making precisely that argument.
19       Instead what we see are every time the defendants
20   made a request, essentially "Pay this out of my bank
21   account," we see correspondence related to those
22   transfers, we see those transfers happening, and then on
23   the occasions when something goes wrong and the transfer
24   isn't made in a timely manner, we see further
25   communications, "That wire didn't go through, can you
```

```
 1   find out what's going on?" "The bank transfer, it's
 2   later than I thought it was going to be."  That shows
 3   that these defendants relied upon the accuracy and the
 4   reliability of the Q-System and its ability to disburse
 5   their money in real-time, because these are their
 6   communications to Ms. Gasarch and to Mr. Sharp.  But
 7   when the payments they requested don't happen in a
 8   timely way, they say, "Hey, what's wrong, you didn't do
 9   what I asked, can you please get on that," and then it
10   happens.
11        So the argument that, um, I think Friesen and
12   Mr. Sexton's counsel have articulated, that there's no
13   proof that this happened, I think that's quite honestly,
14   your Honor, not what the evidence shows.
15        And I think the other argument that they've made
16   about, um, the Commission not having to demonstrate that
17   all 14 of these issuers were part of the scheme, I think
18   that's belied by the evidence your Honor heard at trial.
19   Your Honor heard lots of evidence from Dr. Dhillon, from
20   Mr. Knox, from Mr. Kaitz, from Mr. Ciapala, about how
21   all of these tickers were involved in the same scheme.
22   They follow the same methodology.  They used the same
23   resources.  They used the same nominee entities.  They
24   used the same offshore brokerage accounts.  Sharp
25   manipulated the blocks of these securities into groups
```

A3816

```
 1    of less than 5 percent and distributed them for sale.
 2    The money that came back in, it was distributed back to
 3    them through the Q-System after their promoters were
 4    paid, it's all the same.
 5         THE COURT:  How can I be sure that there is not
 6    double-counting here?
 7         MS. SHIELDS:  So this argument about double-
 8    counting, um, I think what Mr. Sexton is trying to
 9    suggest is that when other people, like Mr. Knox, um,
10    entered into final judgments with the Commission, that
11    somehow their liability should be offset against his own
12    liability.  So when the Commission sought and obtained
13    disgorgement against Mr. Knox, it had to make the exact
14    same showing to that court that it makes here, which is
15    that those were his ill-gotten gains.  And so for your
16    Honor to assume that Mr. Knox's ill-gotten gains should
17    somehow be offset against theirs, I would submit is not
18    something that your Honor can determine and certainly
19    not something your Honor can determine based on the
20    state of the evidence here.
21         It is the Defendants' burden to come forward and
22    show why the reasonable approximation of disgorgement
23    the Commission has presented to your Honor is not
24    reasonable.  They haven't done that.  They haven't
25    presented your Honor with any credible evidence that you
```

A3817

```
 1   can write off some amount of their ill-gotten gains,

 2   because Mr. Knox also profited from the business he did

 3   as part of the scheme.  That's not something your Honor,

 4   I would submit, can decide to do.

 5        THE COURT:  Thank you.

 6        Anything else to be said?

 7        (Pause.)

 8        MS. SHIELDS:  I don't, unless your Honor has --

 9   Oh, the one point I did want to, um, address very

10   briefly was the question you asked at the outset of the

11   hearing -- I'm sorry, your Honor, about, um, equitable

12   disgorgement being held subject to the Court's order of

13   disbursement, that's absolutely something that the

14   Commission agrees with.  And it may be that part of the

15   disbursement we asked your Honor to consider is a

16   disbursement of the sums -- should your Honor order

17   disgorgement, should we be able to collect them, um,

18   part of the disbursement we may ask your Honor to

19   consider is a disbursement of funds into the restitution

20   fund that already existed, whether that would be

21   appropriate versus the creation of a separate

22   disgorgement fund.  So I wanted to let your Honor know

23   that that's something that I believe is not ready for

24   determination at this stage, but we would certainly come

25   back to your Honor before seeking any disbursements.
```

```
 1          THE COURT:  I agree and I understand what you're
 2     saying, and, um, we deal with the real world, there's
 3     how much can be recovered and, um, et cetera.
 4          All right, thank you.  Very well.  Here's how the
 5     Court's going to proceed, and I've been well-aided by
 6     the briefing and by the, um, really by the arguments
 7     here today.
 8          Just so we're clear, I'm taking the matter of
 9     disgorgement, with respect to any of these defendants,
10     under advisement in light of these arguments, and, um, I
11     will have to enter a further order, and indeed if I do
12     rule disgorgement is appropriate, a judgment of
13     disgorgement.  But other than that, I think the Court is
14     in order to render judgment against these defendants,
15     and I'll name them, Sexton, Friesen, Gasarch, Kelln,
16     Veldhuis, in the following terms, um, and it will be up
17     to the SEC to prepare a form of judgment.
18          There is a claim for, um, injunctive relief, and
19     as to Sexton, Friesen, and Gasarch, the Court allows,
20     against those three defendants, their agents, servants,
21     employees, counsel, and all persons operating in
22     conjunction or at the direction of any of those three,
23     they shall be permanently enjoined against (1) violating
24     the securities laws, and in the form that the SEC
25     requested, they shall be specifically -- a conduct-based
```

A3819

```
 1    injunction against them operating in their professional,

 2    but not personal engagements, in the United States

 3    securities markets.  And then (3), there shall be a

 4    penny stock bar as to each of those three as the SEC

 5    requested.

 6         The following civil penalties are imposed.  As to

 7    Sexton, a civil penalty in the amount of $1,562,603.  As

 8    against Friesen, a civil penalty in the amount of

 9    $1,562,603.  As against Gasarch, a civil penalty in the

10    amount of $269,651.  As to the defendant, um, Kelln, a

11    civil penalty in the amount of $904,078.  And as to the

12    defendant Veldhuis, a civil penalty in the amount of

13    $1,562,603.  There shall be prejudgment interest as to

14    each of the penalties so adjudicated.

15         The SEC may prepare a form of judgment, show it to

16    the defendants, and they will have 10 days to object to

17    the form of judgment.  I will enter the form of

18    judgment.  I will support this judgment by a written

19    opinion which will address and resolve the issues of

20    disgorgement which have been, um, covered in the

21    briefing and in oral arguments.

22         I see Ms. Fritz rising, but let me start with the

23    government.

24         Are there any questions?  This is not a time for

25    argument.  Questions.
```

```
 1          MS. SHIELDS:  I do have a question about the last
 2    thing that your Honor said.
 3          The prejudgment interest is something the
 4    Commission only sought as to the disgorgement amount,
 5    not as to the penalty amount.
 6          THE COURT:  I stand corrected and I will -- that
 7    part is stricken.
 8          Yes, Ms. Fritz?
 9          MS. FRITZ:  With respect to civil penalties, again
10    that is constrained by the statute of limitations.  The
11    total amount even alleged as to Mr. Friesen during the
12    5-year period is $450,000.  I think there is a very very
13    serious issue.
14          THE COURT:  There may be, but I am satisfied with
15    the conduct running back the 10 years, that's the basis
16    for it.
17          All right.  I'll explain it all.
18          MS. FRITZ:  Again we certainly object to that
19    given the amounts within 5 years.
20          THE COURT:  Thank you.  I mean I don't in any way
21    mean to be flip, but I didn't expect people to be happy.
22    This is the remedies.
23          MS. FRITZ:  This isn't happy or unhappy, this is
24    having gone through the cases, they do seem to say it is
25    the -- the penalty should focus on the 5 years and not
```

A3821

```
 1    harken back.

 2         THE COURT:  While I will reflect upon that, my

 3    order stands.  Thank you all.  You've been a great help.

 4    And we'll recess.

 5         THE CLERK:  All rise.

 6         (Ends, 11:50 a.m.)

 7

 8              C E R T I F I C A T E

 9

10         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

11    do hereby certify that the foregoing record is a true

12    and accurate transcription of my stenographic notes

13    before Judge William G. Young, on May 8, 2024, to the

14    best of my skill and ability.

15

16

17

18    /s/ Richard H. Romanow 5-23-24
      _____
19    RICHARD H. ROMANOW    Date

20

21

22

23

24

25
```

A3822

```
                     UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
_____
                                  )
SECURITIES AND EXCHANGE           )
COMMISSION,                       )
                                  )
              Plaintiff,          )
                                  )
v.                                )        CIVIL ACTION
                                  )        NO. 21-11276-WGY
FREDERICK L. SHARP,               )
ZHIYING YVONNE GASARCH,           )
COURTNEY KELLN,                   )
MIKE K. VELDHUIS,                 )
PAUL SEXTON,                      )
JACKSON T. FRIESEN,               )
WILLIAM T. KAITZ,                 )
AVTAR S. DHILLON, and             )
GRAHAM R. TAYLOR,                 )
                                  )
              Defendants.         )
                                  )
_____ )
```

YOUNG, D.J.                                    June 17, 2024

**MEMORANDUM & ORDER**

## I.   INTRODUCTION

Following a ten day civil securities fraud jury trial resulting in a verdict for the plaintiff Securities and Exchange Commission ("SEC"), the SEC now moves for remedies against the defendants Zhiying Yvonne Gasarch ("Gasarch"), Courtney Kelln ("Kelln"), Mike K. Veldhuis ("Veldhuis"), Paul Sexton ("Sexton"), and Jackson T. Friesen ("Friesen") (collectively, the "Defendants"). See generally Pl.'s Mot. for Remedies against Defs. ("Mot. Remedies"), ECF No. 425.  The Defendants

oppose the SEC's proposed remedies.  See Def. Sexton's Opp'n
Mot. Remedies ("Sexton's Opp'n"), ECF No. 454; Defs. Kelln &
Veldhuis' Opp'n Mot. Remedies ("Kelln & Veldhuis' Opp'n), ECF
No. 455; Def. Gasarch's Opp'n Mot. Remedies ("Gasarch's Opp'n),
ECF No. 464; Def. Friesen's Opp'n Mot. Remedies ("Friesen's
Opp'n"), ECF No. 471.

    The SEC filed replies to all of the above-mentioned
opposition memoranda.  See Pl.'s Reply Mem. Supp. Mot. Remedies
against Defs. Sexton, Veldhuis, and Kelln ("Pl.'s Reply to
Sexton, Veldhuis & Kelln"), ECF No. 470; Pl.'s Reply Mem. Supp.
Mot. Remedies against Def. Gasarch ("Pl.'s Reply to Gasarch"),
ECF No. 474; Pl.'s Reply Mem. Supp. Mot. Remedies against Def.
Friesen ("Pl.'s Reply to Friesen"), ECF No. 480.  Sexton and
Gasarch filed sur-replies to the SEC's replies.  See Sexton's
Sur-Reply Mot. Remedies ("Sexton's Sur-Reply"), ECF No. 473;
Gasarch's Sur-Reply Mot. Remedies ("Gasarch's Sur-Reply"), ECF
No. 481.

    On September 27, 2023, a unanimous jury found Friesen and
Gasarch to have committed various securities violations alleged
by the SEC.  See Jury Verdict, ECF No. 402.[1]  As to the other
defendants presently before the Court, Kelln, Veldhuis, and

--------

[1] These were various violations of both the Securities Act of
1933 ("Securities Act") and the Securities Exchange Act of 1934
("Exchange Act").

A3824

Sexton, the Court entered partial judgments against them before the trial.  <u>See</u> J. as to Kelln ("Kelln J."), ECF No. 317; J. as to Veldhuis ("Veldhuis J."), ECF No. 325; J. as to Sexton ("Sexton J."), ECF No. 378.  Pursuant to those judgments, the Court ordered Kelln, Veldhuis, and Sexton, and they each agreed, not to "contest liability under the claims filed by the [SEC]" at the remedies stage.  Kelln J. 5; Veldhuis J. 5; Sexton J. 1-2.  In the same partial judgments, however, the Court ordered that these three defendants, while accepting liability, would "be permitted to challenge the remedies and sanctions sought by the [SEC]," Kelln J. 5; Veldhuis J. 5, and that they would "be permitted to oppose the [SEC's] requested relief, including any calculations thereof."  Sexton J. 2.

The remedies now sought by the SEC are three-fold.  <u>See</u> <u>generally</u> Pl.'s Mem. Supp. Mot. Remedies ("Mem. Supp."), ECF No. 426.  <u>First</u>, the SEC requests injunctive relief against Sexton, Friesen, and Gasarch, asking this Court to (1) permanently restrain and enjoin them from violating securities laws; (2) issue specific conduct-based injunctions permanently barring them from professionally -- but not personally -- participating in a national securities exchange; and (3) issue penny stock

A3825

bars permanently barring them from trading in penny stocks.[2]  See id. at 2-11.

Second, the SEC requests this Court impose civil penalties against the Defendants in the following amounts: (1) $1,562,603 against Sexton; (2) $1,562,603 against Friesen; (3) $1,562,603 against Veldhuis; (4) $904,078 against Kelln; and (5) $558,072 against Gasarch.  Id. at 1.

Third, the SEC seeks disgorgement awards and prejudgment interest as to the Defendants in the following amounts: (1) $17,367,474 in disgorgement and $5,872,145 in prejudgment interest against Sexton; (2) $11,846,176 in disgorgement and $4,057,737 in prejudgment interest against Friesen; (3) $13,289,897 in disgorgement and $4,314,031 in prejudgment interest against Veldhuis; (4) $1,582,785 in disgorgement and $460,687 in prejudgment interest against Kelln; and (5) $2,522,367 in disgorgement and $646,366 in prejudgment interest against Gasarch.  Id.

Having reviewed the parties' briefs and having held a hearing on the question of remedies, see ECF No. 484, this Court (1) granted the SEC's request for injunctive relief against

_____

[2] Penny stock "generally refers to a security issued by a very small company that trades at less than $5 per share."  Am. Compl. ¶ 40, ECF No. 230; see also Securities and Exchange Commission v. Sharp, 626 F. Supp. 3d 345, 366 n.3 (D. Mass. 2022).

4

A3826

Sexton, Friesen, and Gasarch in its entirety; (2) imposed civil penalties against Sexton, Friesen, Veldhuis, and Kelln in the amounts requested by the SEC, and as to Gasarch, having considered a downward variance from the SEC's requested amount of $558,072 equitable and appropriate, imposed a civil penalty of $269,651; and (3) took the issue of disgorgement and prejudgment interest as to all of the Defendants under advisement.  See id.

With this memorandum and order, the Court now provides its written disposition of the SEC's motion for remedies.  In addition to providing its explanation for imposing the above-mentioned injunctions and civil penalties against the Defendants, for the reasons elucidated below, the Court now **GRANTS** the SEC's motion for disgorgement in its entirety, but modifying it to hold the Defendants jointly and severally liable in the following manner, and **DENIES** the SEC's motion for prejudgment interest.

## II.  FACTUAL BACKGROUND

At its core, the present enforcement action centers around an elaborate securities fraud scheme involving a sequence of separate pump and dump endeavors.  Each proceeded in three steps.  Certain defendants (1) accumulated penny stocks in national markets in micro-cap companies; (2) promoted the penny stocks in these companies by using paid promotions to garner the

5

attention and interest of unwitting investors; and (3) sold their stocks to investors, not in their own names but through so-called shell or nominee companies they formed in order to skirt securities laws that otherwise prohibit the unregulated sale of restricted and control securities. See Sharp, 626 F. Supp. 3d at 366 (detailing the scheme based on allegations in SEC's complaint). In essence, the Defendants "engaged in a decade-long scheme to profit at the expense of unwitting investors by concealing their, or their clients', ownership and control of many microcap companies." Mem. Supp. 1.

Each of the Defendants played a different role in the interconnected pump-and-dump schemes. Sexton, Veldhuis, and Friesen acted as a group that teamed with Sharp to "sell stock surreptitiously in the public market." Am. Compl. ¶ 7. They acquired, held, and then disposed of shares. Id. ¶ 153. Kelln, Sharp's employee, helped conceal common control of shares by distributing them accordingly to Sharp's directions. Id. ¶¶ 52-53. "Much of Kelln's work was grouping stocks for transmission to transfer agents such that the totals appeared five percent to avoid disclosure and registration requirements." Sharp, 626 F. Supp. 3d at 366 (footnote omitted). Gasarch, another Sharp employee, "organized wire transfers of the proceeds from the illegal stock sales while concealing the beneficiaries, maintained records in the encrypted accounting system, and

A3828

routinely created false invoices to support the payments." Id. at 366-67; see also Am. Compl. ¶¶ 57-59.

Importantly, Kelln, Veldhuis, and Sexton have admitted their liability, and this Court has entered partial judgments against them in which they were instructed not to contest liability but were given the opportunity to challenge any and all remedies the SEC now seeks against them. See Kelln J. 5; Veldhuis J. 5; Sexton J. 1-2. As for the remaining defendants, Friesen and Gasarch, a ten-day trial ensued in which a unanimous jury found both liable for the various securities laws violations alleged in the SEC's complaint. See Jury Verdict; see also generally Tr. Jury Trial Day Ten 7-9, ECF No. 445.

## III. ANALYSIS

The SEC seeks three remedies: (1) injunctive relief against Sexton, Friesen, and Gasarch; (2) civil penalties against the Defendants, in varying amounts; and (3) disgorgement and prejudgment interest against the Defendants, in varying amounts. See generally Mem. Supp. 1.

### A. Injunctive Relief Against Sexton, Friesen, and Gasarch

Section 21(d) of the Exchange Act permits the SEC to seek temporary or permanent injunctions against persons "engaged or [] about to engage" in Exchange Act violations. 15 U.S.C. § 78(u)(d)(1); see also Securities and Exchange Commission v.

A3829

Sargent, 329 F.3d 34, 39 (1st Cir. 2003). "Such an injunction
is appropriate where there is, 'at a minimum, proof that a
person is engaged in or is about to engage in a substantive
violation of either one of the Acts or of the regulations
promulgated thereunder.'" Sargent, 329 F.3d at 39 (quoting
Aaron v. SEC, 446 U.S. 680, 700-01 (1980)). "The legal standard
for issuing an injunction is 'reasonable likelihood of
recidivism, not an imminent threat of it.'" Securities and
Exchange Commission v. Lemelson, 596 F. Supp. 3d 227, 231 (D.
Mass. 2022) (Saris, J.) (quoting Sargent, 329 F.3d at 39). In
assessing the likelihood of recidivism, courts look at several,
non-dispositive factors, including "the nature of the violation,
including its egregiousness and its isolated or repeated
nature"; "whether the defendants will, owing to their
occupation, be in a position to violate again"; and "whether the
defendants have recognized the wrongfulness of their conduct."
Id. In analyzing whether injunctive relief is appropriate,
courts consider the relevant factors to be established based on
"a preponderance of the evidence." Steadman v. SEC, 450 U.S.
91, 95 (1981) (affirming a lower court "holding that in a
disciplinary proceeding before the [SEC] violations of the
antifraud provisions of the securities laws may be established
by a preponderance of the evidence").

A3830

Here, the SEC seeks three types of injunctive relief: (1) permanent injunctions; (2) specific, conduct-based injunctions; and (3) penny stock bars.  See Mem. Supp. 2-11.

### 1. Permanent Injunctions

The SEC seeks permanent injunctions against Sexton, Friesen, and Gasarch that would prevent them from violating securities laws.  Id. at 2.

Specifically, the SEC makes three arguments.  First, it argues that the three Defendants' conduct was "egregious, recurrent, and sustained."  Id. at 3.  The SEC notes in support of this contention that the scheme in which these three Defendants were involved "resulted[ed] in the fraudulent sale of more than $144 million worth of penny stocks," id.; that Gasarch enabled the scheme by, among other things, concealing beneficial ownership and fabricating invoices and other documents, id. at 3-4; and that Sexton and Friesen exercised control over the stock of 14 issuers but concealed their control in their pump-and-dump schemes, id. at 4.  Second, the SEC argues that these three Defendants "have the opportunity to violate again."  Id. at 5.  The SEC notes that they engaged in illegal conduct spanning a decade; that they are located in "metropolitan Vancouver where they apparently have not found gainful employment"; and that they have refused to testify before the SEC to answer questions about their activity.  Id. at 5-6.

9

A3831

Third, the SEC argues that these three Defendants "have not yet recognized the wrongful nature of their conduct." Id. at 6. The SEC also notes that this Court has issued similar injunctions against certain other defendants in this case. Id. at 3; see, e.g., Final J. as to Sharp 2 ("Sharp J."), ECF No. 211 (ordering that Sharp "is permanently restrained and enjoined" from violating securities laws); Kelln J. 2-4 (same language); Veldhuis J. 2-4 (same language).

The three Defendants oppose. Sexton argues that the SEC "has not established a reasonable likelihood of recurrence," Sexton's Opp'n 16, emphasizing that the last purported profit attributed to him is dated 2018, and that "nearly 93 percent of the alleged profits are from in or before 2015," id. Friesen contends that the SEC has failed to provide the Court with "evidence of any conduct in the last six years" to establish a likelihood of recurrence. Friesen's Opp'n 11 (emphasis in original). Gasarch also opposes a permanent injunction, arguing that she was never involved in the actual issuance, purchase, offer or sale of security, which the permanent injunction seeks to enjoin. Gasarch's Opp'n 15. She also notes that the SEC has failed to establish the likelihood of recurrence. Id. at 16.

While "an injunction is a drastic remedy," Aaron, 446 U.S. at 703 (Burger, C.J., concurring), for the following reasons,

A3832

this Court concludes that a permanent injunction against Sexton, Friesen, and Gasarch is an appropriate remedy.

First, the Court finds that these three Defendants' securities laws violations were egregious and of a repeated nature. As the First Circuit has observed, a securities law "violation [may be considered] not an egregious one, particularly where [the defendant] neither traded on the information himself nor derived any direct personal profit." Sargent, 329 F.3d at 39. Conversely, here, each of the three Defendants directly and personally profited from the scheme. Pursuant to the partial judgment as to Sexton, he "is liable under Counts I-IV of the Amended Complaint[.]" Sexton J. 1. Those counts attribute liability to Sexton for engaging in fraud in connection with the offer and sale of unregistered securities, Am. Compl. ¶¶ 250-63, which has resulted in "the fraudulent sale of more than $144 million worth of penny stocks," Mem. Supp. 3, from which Sexton personally profited. See, e.g., Decl. of Ryan Murphy ("Decl. of Ryan Murphy I") ¶¶ 48-49, ECF No. 273; Mem. Supp. 4. Friesen and Gasarch have similarly profited from the schemes. See Decl. of Ryan Murphy I ¶¶ 48-49 (Friesen); Mem. Supp. 3-4 (Gasarch).

In addition to the egregiousness of the deceit undergirding it, the pump-and-dump schemes, far from being isolated or short in duration, lasted for a decade. See Mem. Supp. 1. Courts in

A3833

this district and others have not hesitated to impose permanent

injunctive relief against securities law violations much shorter

in duration.  See, e.g., Securities and Exchange Commission v.

Chan, 465 F. Supp. 3d 18, 38 (D. Mass. 2020) (Burroughs, J.)

(finding an "egregious" violation where "an [] insider trading

scheme [] lasted for nearly two years and involved multiple

trades"); Securities and Exchange Commission v. Wall, 2020 U.S.

Dist. LEXIS 56152, at *25 (D. Me. Mar. 31, 2020) (ordering

permanent injunction where "the defendants' violations were part

of a pattern lasting more than four years").

    Additionally, in view of the fact that the pump-and-dump

scheme involved fourteen separate issuers, thus rendering these

Defendants' securities violations repetitive and schematic in

nature, the Court does not hesitate to conclude that said

violations were egregious.  Cf. Securities and Exchange

Commission v. Cody, 2019 U.S. Dist. LEXIS 210452, at *11 (D.

Mass. Dec. 5, 2019) (Saylor, J.) (finding egregious conduct in

view of "the fact that [defendant] made multiple representations

over a prolonged period of time and created falsified documents

to hide his deceptions"); Securities and Exchange Commission v.

Weed, 315 F. Supp. 3d 667, 676 (D. Mass. 2018) (Gorton, J.)

(finding egregiousness where "[t]he violations [] were repeated

in nature"); Securities and Exchange Commission v. Spencer

Pharm. Inc., 2015 U.S. Dist. LEXIS 132909, at *17 (D. Mass.

A3834

Sept. 30, 2015) (Talwani, J.) (finding that "the scope and complexity of the scheme supports the need for a permanent injunction").

Second, the Court finds that these three Defendants have the opportunity to violate securities laws again.  As the First Circuit has clarified, under this prong of the analysis, courts must find a reasonable likelihood -- not mere possibility -- of recidivism.  See Securities and Exchange Commission v. Lemelson, 57 F.4th 17, 31 (1st Cir. 2023).  Here, the Court so finds. Although Sexton points out that his "proceeds have been frozen," Sexton's Opp'n 17, the SEC notes that "all three defendants recently sought a release of frozen funds," and none presented the Court with evidence that there are now gainfully employed outside of the microcap industry in which their fraudulent scheme operated.  See Mem. Supp. 5.  Remaining in the same sector or industry in which one's offensive conduct took place is a factor that courts have weighed in favor of finding a likelihood of recidivism.  Cf. Lemelson, 57 F.4th at 31 ("Lemelson's continued position as a hedge fund manager and investment adviser would readily allow him to benefit from future material misstatements concerning investments."). Further, Sexton's argument that the "so-called Sharp network is no more," Sexton's Opp'n 16-17, is unavailing.  The "Sharp network" is no more not because the Defendants ceased to operate

13

A3835

it on their own accord, which could have been an indication to the Court that the Defendants do not intend to engage in future violations.  That counterfactual is of no moment: the Sharp network is no more simply because of law enforcement and the present action brought by the SEC, not because the Defendants do not intend to engage in future violations.

Moreover, that considerable time has elapsed since these three Defendants last violated securities laws, see, e.g., Sexton's Opp'n 16; Friesen's Opp'n 11, does not persuade the Court that they will not offend in the future.  Courts have found a likelihood of recurrence where Defendants were seemingly similarly, if not more, unlikely to offend again.  See, e.g., Cody, 2019 U.S. Dist. LEXIS 210452, at *10-11 (finding likelihood of recurrence "[a]lthough it is true that he is currently imprisoned, and thus not immediately in a position to commit further violations"); Securities and Exchange Commission v. Present, 2018 U.S. Dist. LEXIS 45056, at *5 n.1 (D. Mass. Mar. 20, 2018) (Sorokin, J.) (finding likelihood of recidivism in 2018 even though defendant "has not worked in the securities industry since 2014").[3]

---

[3] The Court also observes that the duration of the schemes, spanning nearly a decade, in addition to weighing in favor of issuing a permanent injunction in and of itself, persuades the Court, in combination with the reasons provided under this paragraph, that the three defendants have significant experience in the securities industry, rendering a future violation more

Third, the Court finds that these three Defendants have not acknowledged their wrongdoing. Sexton still contends that the SEC, at most, can establish discrete securities laws violations but not that there was a fraudulent scheme where "all transactions involving 14 issuers were fraudulent," Sexton's Opp'n 8, thereby attempting to minimize his offensive conduct. Sexton also contends that "[t]here is nothing unlawful about stock promotion," id. at 9, denying the impropriety and illegality of his conduct. Sexton further avers that the SEC has not been able to show that there "are any victims" of the scheme, id. at 10, a contention reiterated by Friesen, see Friesen's Opp'n 8, that, once again, endeavors to deny or at least minimize the large-scale harm perpetrated by their schemes. In similar fashion, Gasarch, despite a unanimous jury verdict finding her liable of independent and aiding-and-abetting violations of securities laws, see Jury Verdict, continues to argue that her involvement in the scheme was legitimate. See, e.g., Gasarch's Opp'n 10 ("Clearly, given the length of time and the number of accounts and activities, Mrs. Gasarch was compensated for supporting Mr. Sharp in his

---

likely than not. Cf. Securities and Exchange Commission v. Baccam, 2017 U.S. Dist. LEXIS 88450, at *26 (C.D. Cal. June 8, 2017) (granting SEC's request for a permanent injunction in view of the fact, among others, that "[defendant] has more than a decade of experience in the securities industry").

15

A3837

legitimate business activities."); see also id. at 16

(contending that her conduct was not "grave" and her involvement

in the scheme not "prominent").  The Court accordingly finds

that these three Defendants have failed to show proper remorse

and acknowledge the wrongful nature of their conduct.

Finally, Gasarch unpersuasively argues that a permanent

injunction restraining and enjoining her from the issuance,

purchase, offer or sale of securities is inappropriate because

she did not independently and directly engage in any violations

involving such actions but, at most, aided and abetted others

who directly engaged in those actions.  See Gasarch's Opp'n 15.

Other sessions of this Court have not hesitated to permanently

restrain and enjoin defendants from engaging in violations whose

perpetration they aided and abetted.  See, e.g., Spencer Pharm.

Inc., 2015 U.S. Dist. LEXIS 132909, at *15, *18 (issuing

permanent injunction against aider and abettor of securities law

violation).[4]

_____

[4] Accepting Gasarch's contention that the Court ought not
issue a permanent injunction against her because she merely
aided and abetted others in their fraudulent participation in
the securities market is unmeritorious for two additional
reasons.  First, the jury, in addition to finding her to have
aided and abetted others, found Gasarch independently liable of
violating Section 17(a)(3).  See Jury Verdict 2.  While that
independent violation does not directly pertain to the issuance
of securities, it supports this Court's finding - - made during
the trial - - that Gasarch was "at the hub" of the scheme.  Tr.
Jury Trial Day Eight 41, 164, ECF No. 442.  Her role at the hub
of the scheme supports this Court's finding that she was an

A3838

Accordingly, this Court finds that Sexton, Friesen, and Gasarch engaged in egregious and repeated violations of securities laws for many years; are in a position to violate again; and have failed to recognize the wrongfulness of their conduct. In view of these findings, a permanent injunction against each of the three is appropriate.[5]

---

important part of the scheme even though she may not have been as culpable as the other defendants. Second and more generally, permanent injunctions are equitable remedies over which courts enjoy a great degree of latitude. See, e.g., Securities and Exchange Commission v. Tropikgadget FZE, 2017 U.S. Dist. LEXIS 25495, at *12 (D. Mass. Feb. 23, 2017) (Burroughs, J.) ("The Court has broad authority to grant such an injunction."). Gasarch's contention that she ought not be enjoined from activity she herself did not commit but only aided and abetted would run afoul of that latitude and also of the relevant statutory text that grants this Court broad equitable powers: "In any action or proceeding brought or instituted by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78(u)(d)(5) (emphasis added).

[5] At least one of the three defendants has averred that permanent injunctions enjoining future securities laws violations, so-called "obey-the-law injunctions," do not make sense because everyone, regardless of an injunction, is bound to not violate laws, including the securities laws in question. See, e.g., Sexton's Opp'n 17; see also Securities and Exchange Commission v. Goble, 682 F.3d 934, 949 (11th Cir. 2012) ("As the name implies, an obey-the-law injunction does little more than order the defendant to obey the law. We have repeatedly questioned the enforceability of obey-the-law injunctions not only in the context of securities cases but other cases as well.").
   While the First Circuit has struck general and vaguely worded "obey-the-law" injunctions in other contexts, see Equal Employment Opportunity Commission v. Aviation Port Servs., LLC, 2020 U.S. Dist. LEXIS 57073, at *34-35 (D. Mass. Apr. 1, 2020) (Saylor, C.J.) (collecting and analyzing cases), courts in this

A3839

## 2. Specific, Conduct-Based Injunctions

The SEC requests this Court specifically enjoin Sexton, Friesen, and Gasarch from "participating in the issuance, purchase, offer, or sale of any security; provided, however, that such an injunction shall not prevent [defendants] from purchasing or selling securities listed on a national securities exchange for [their] own personal account." See, e.g., Mot. Remedies, Text of Proposed Order Proposed Final J. as to Gasarch, ECF No. 425-2. In essence, the requested conduct-based injunction would prevent the three Defendants from professionally -- but not personally -- engaging in the national securities market.

This Court is authorized to issue the requested conduct-based injunction. See 15 U.S.C. § 78(u)(d)(1); 15 U.S.C. § 78(u)(d)(5). "The Court has wide discretion to impose a conduct-based injunction in SEC actions." Securities and Exchange Commission v. CKB168 Holdings, Ltd., 2022 U.S. Dist. LEXIS 144893, at *9 (E.D.N.Y. Aug. 12, 2022). The analysis for the SEC's request for permanent injunctions, see supra Section

_____

Circuit as well as other sessions of this Court have issued injunctions in the securities context that are similar to the injunctions requested in the present case. See, e.g., Chan, 465 F. Supp. 3d at 38; Present, 2018 U.S. Dist. LEXIS 45056, at *2-3.

A3840

III.A.1 ("Permanent Injunctions"), is equally applicable here.
See CKB168 Holdings, Ltd., 2022 U.S. Dist. LEXIS 144893, at *9
(applying its permanent injunction analysis in its entirety --
"[f]or the same reasons laid out [above]" -- to its conduct-
based injunction analysis).

    For the same reasons elucidated above, the Court issues the
specific, conduct-based injunctions requested by the SEC.  The
Court additionally notes three points in support of its
conclusion.  First, as the SEC correctly brings to this Court's
attention, "[t]his Court has issued this same requested
injunction against Sharp, Kelln, and Veldhuis already."  Mem.
Supp. 7.  Sexton, Friesen, and Gasarch have not raised any
convincing argument as to why their cases ought be treated any
differently.  Second, other courts, including those in this
Circuit, have issued similar specific, conduct-based
injunctions.  See, e.g., Wall, 2020 U.S. Dist. LEXIS 56152, at
*26-27.  Third, the injunction still allows the three Defendants
to "purchas[e] or sell[] securities listed on a national
securities exchange for [their] own personal account."  See,
e.g., Mot. Remedies, Text of Proposed Order Proposed Final J. as
to Sexton 5, ECF No. 425-3.  As such, this conduct-based
injunction "does not deprive [the three defendants] of [their]
living or the opportunity to purchase and sell securities for

19

A3841

[their] own personal account." <u>Wall</u>, 2020 U.S. Dist. LEXIS 56152, at *27.

### 3. Penny Stock Bars

The SEC requests that Sexton, Friesen, and Gasarch be barred from participating in future offerings of penny stocks. <u>See</u> Mem. Supp. 8-11; <u>see also</u> Mot. Remedies, Text of Proposed Order Proposed Final J. as to Sexton 5 (requesting the Court decree the three Defendants "permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock").

"The standard for imposing a penny stock bar essentially 'mirrors that for imposing an officer-or-director bar.'" <u>Weed</u>, 315 F. Supp. 3d at 677 (quoting <u>Securities and Exchange Commission</u> v. <u>Universal Exp., Inc.</u>, 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007)).  The criteria to determine whether an officer-or-director bar is appropriate, in turn, are: "(1) the egregiousness of the underlying securities law violation, (2) whether defendant was a repeat offender, (3) defendant[']s[] role in the fraud[,] (4) defendant's degree of scienter, (5) defendant's economic stake in the fraud and (6) the likelihood that misconduct will recur." <u>Id.</u> (citing <u>Securities and Exchange Commission</u> v. <u>Patel</u>, 61 F.3d 137, 142 (2d Cir. 1995)).

A3842

These criteria, also known as the <u>Patel</u> factors, are "neither mandatory nor exclusive." <u>Securities and Exchange Commission</u> v. <u>Bankosky</u>, 716 F.3d 45, 46 (2d Cir. 2013); <u>see also</u> <u>Securities and Exchange Commission</u> v. <u>Johnston</u>, 368 F. Supp. 3d 247, 251 (D. Mass. Mar. 21, 2019) (Gorton, J.) ("While the <u>Patel</u> factors are instructive . . . they are not exhaustive and it is not necessary to apply all of the factors in every case.").

Here, the analysis in the foregoing sections has already established that Sexton, Friesen, and Gasarch meet many of the <u>Patel</u> factors,[6] which obviates the need for repetition. Accordingly, the Court grants the SEC's request for penny stock bars against each of the three Defendants.

The Court finds it appropriate to dispose of Gasarch's argument concerning her scienter –- or rather, in her formulation, the lack thereof -- here, as a "defendant's degree of scienter" is among the relevant <u>Patel</u> factors quoted above. <u>Weed</u>, 315 F. Supp. 3d at 677.

In her opposition, Gasarch correctly points to a misquotation by the SEC. <u>See</u> Gasarch's Opp'n 1. Indeed, in its motion for remedies, the SEC submitted that the jury found

_____

[6] For example, Sexton, Friesen, and Gasarch's conduct was egregious, <u>see</u> <u>supra</u> pp. 11-12; repeated over the course of many years, <u>see</u> <u>supra</u> pp. 12-13; and resulted in economic benefit to the three defendants, <u>see</u> <u>supra</u> pp. 11-12. Further, there is a likelihood that their misconduct, in the absence of an appropriate injunction, will recur. <u>See</u> <u>supra</u> pp. 13-14.

21

A3843

"Gasarch liable for violating Section 17(a)(3) of the Securities Act and aiding and abetting violations of Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act. . . ." Mot. Remedies (emphasis added). Yet, as Gasarch points out and as the jury verdict form clearly indicates, the jury found Gasarch liable for independently violating Section 17(a)(3) of the Securities Act and aiding and abetting violations of Section 17(a)(1) or Section 17(a)(3) of the Securities Act or Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act. See Jury Verdict 2; see also Gasarch's Opp'n 1. While the jury may have found multiple aiding and abetting violations, the use of the disjunctive "or" indeed makes it also entirely possible, as Gasarch contends, that the jury may have found her liable for her independent violation of Section 17(a)(3) of the Securities Act and for aiding and abetting violations of, again, Section 17(a)(3). See Gasarch's Opp'n 1.

Since a Section 17(a)(3) violation does not require scienter, as this Court previously held, see Sharp, 626 F. Supp. 3d at 382, Gasarch argues that it is possible that she is liable for her independent non-scienter-based conduct violating Section 17(a)(3) and for aiding and abetting others' non-scienter-based conduct violating the same. See Gasarch's Opp'n 2. Gasarch goes on to argue that, assuming those are her only two

22

A3844

securities law violations, "an aider and abettor may be liable
only to the same extent as the person to whom such assistance is
provided." Gasarch's Sur-Reply 5 (quotation omitted). Her
contention seems to be that her aiding and abetting violation
may be without scienter since the conduct she aided and abetted
itself is non-scienter-based if it is just the aiding and
abetting of others' non-scienter-based Section 17(a)(3)
violations.

This Court rejects this contention for two reasons and
instead finds that Gasarch acted with a degree of scienter in
aiding and abetting securities violations by other defendants.
First, even assuming, <u>arguendo</u>, that they jury found Gasarch
liable only for her independent and non-scienter-based violation
of Section 17(a)(3) and for aiding and abetting other
defendants' violation of the same, this Court is still permitted
to make findings of fact as to the appropriate remedy that do
not conflict with the jury's findings as to liability. Such
findings as to remedy may -- and here they do -- include the
finding that Gasarch acted with scienter. Based on ample
evidence presented at trial, and as the Court made clear during
the hearing on remedies, the Court finds that there is
sufficient evidence to establish that Gasarch acted
intentionally. Second, and relatedly, the Court rejects
Gasarch's contention as erroneous that an aiding and abetting

A3845

violation ought have, at most, the same degree of scienter as
the underlying violation.  That is because here, the very act of
aiding and abetting a securities violation, regardless of
whether the aided conduct itself requires scienter for its
commission, requires its own culpable mental state.  See, e.g.,
Malouf v. SEC, 933 F.3d 1248, 1268 (10th Cir. 2019) (holding
that "scienter is an essential element of aiding and abetting a
violation of the securities law"); Securities and Exchange
Commission v. Blackburn, 2015 U.S. Dist. LEXIS 120747, at *21
(E.D. La. Sept. 10, 2015) ("[A] prima facie claim for aiding and
abetting a violation of securities laws involves an underlying
requirement of scienter.").  In the case at bar, this Court
instructed the jury during Gasarch's trial that an aiding and
abetting violation requires knowing or reckless conduct.  See
Tr. Jury Trial Day Nine 34:24-25, 35:1, ECF No. 444 (instructing
the jury on the aiding and abetting allegation against Gasarch,
explaining that it must find, among other things, that "Gasarch
knowingly or recklessly provided substantial assistance to the
violation").  Thus, regardless of the conduct Gasarch aided and
abetted, that she aided and abetted others' conduct in violation
of the securities laws suffices for this Court to find that she
acted with scienter.[7]

---

[7] In any event, in view of the fact that scienter is but one

A3846

Accordingly, a permanent penny stock bar will issue against Sexton, Friesen, and Gasarch.

### B. Civil Penalties Against All of the Defendants

#### 1. Legal Standard

Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the SEC to seek, and this Court to impose, civil penalties to be determined "in light of the facts and circumstances." See Lemelson, 596 F. Supp. 3d at 233. In assessing civil penalties, courts may choose from three tiers, Tier I, Tier II, and Tier III, in increasing order of severity. Tier II requires "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77(t)(d)(2)(B). Tier III requires all of the elements of Tier II and the additional requirement that "such violation directly or indirectly result[] in substantial losses or create[] a significant risk of substantial losses to other persons." 15 U.S.C. § 77(t)(d)(2)(C). Tier I is available for all other violations. See also Mem. Supp. 12 (outlining the tier system). "The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court."

---

of the many Patel factors discussed above, the egregiousness of Gasarch's conduct, her economic stake in the fraud, and the likelihood that her misconduct will recur, still weigh in favor of issuing a penny stock bar against her.

A3847

Securities and Exchange Commission v. Kern, 425 F.3d 143, 153
(2d Cir. 2005) (citing 15 U.S.C. § 77(t)(d)).

In fashioning an appropriate civil penalty, courts look to
a variety of factors, including: "the egregiousness of the
violation, the defendant's willingness or failure to admit
wrongdoing, the isolated or repeated nature of the violations,
the degree of scienter involved, the defendant's cooperation
with authorities or lack thereof, and the defendant's current
financial condition." Securities and Exchange Commission v.
Esposito, No. 16-cv-10960-ADB, 2018 U.S. Dist. LEXIS 72728, at
*9 (D. Mass. Apr. 30, 2018) (Burroughs, J.).

Importantly, civil penalty claims may be time-barred. As
this Court previously held in disposing of a prior motion to
dismiss in this case, see Sharp, 626 F. Supp. 3d at 385-86, the
applicable statute subjects civil penalty claims like those
requested here to a five-year statute of limitations. Thus,
this Court may impose civil penalties only in relation to
securities law violations that may have occurred between August
5, 2016, and August 5, 2021, id. at 382. By contrast, as this
Court previously stated, it cannot impose a monetary penalty in
relation to violations prior to August 2016. See Tr. Motion and
Charge Conference 55:15-18, ECF No. 443 ("So let me be clear.
If we get to remedies, and I'm coming to think about remedies,
and I think that violation was pre-August 2016, then I cannot

A3848

impose a monetary penalty."); see also Sexton's Opp'n 14 (same); Gasarch's Opp'n 13 (same).

### 2. Parties' Arguments

With the foregoing legal standard in mind, the SEC requests this Court condemn the Defendants' conduct as repeated and egregious violations "evinc[ing] a high degree of scienter." Mem. Supp. 13.  The SEC also argues that none of the Defendants have acknowledged the wrongfulness of their conduct and that they are in possession of "substantial assets to satisfy a judgment."  Id. at 14; see also id. at 3-5 (describing how the Defendants' conduct caused substantial loss to investors).

As for each of Sexton, Veldhuis, and Friesen, the SEC requests the Court impose "individual civil penalties in the amount of $1,562,603."  Id. at 14.  The SEC's proposed methodology is as follows: multiply a one-time Tier III penalty amount of $223,229 by seven since each of these three Defendants traded in seven issuers' stock -- out of the 14 -- during the five-year statute of limitations period between August 2016 and August 2021, that is, $223,229 x 7 = $1,562,603.  See id.

Sexton opposes, arguing that the SEC's position that he was involved in issuing stock from seven companies between August 2016 and August 2021 is based on "a summary witness['] alleg[ations.]"  Sexton's Opp'n 14.  Sexton also argues that the evidence, at most, demonstrates that he profited from three

27

A3849

issuers, not seven, and even then, that the passive receipt of pay checks is not, in and of itself, sufficient to restart the five-year clock for what were payments relating to conduct predating August 2016. See id. at 15. Finally, Sexton argues that in alleging that he has sufficient funds to pay a civil penalty -- $13,808,338 in frozen assets according to the SEC, see Mem. Supp. 14 -- the SEC has failed to take into account the fact that it is also asking this Court to impose disgorgement and prejudgment interest against him in the amount of $17,367,474. Sexton's Opp'n 15. Veldhuis concurs with Sexton's objections. See Kelln & Veldhuis' Opp'n 2. Friesen similarly argues that the evidence proffered by the SEC shows that he "ceased his involvement with the other defendants in or about 2015," thus before the applicable five-year window beginning in August 2016. Friesen's Opp'n 10.

As for Kelln and Gasarch, the SEC requests this Court impose civil penalties in the amount of $904,078 and $558,072, respectively. Mem. Supp. 15. For Kelln, the SEC's proposed methodology is as follows: the sum of (1) one Tier III penalty for violating Section 17(a); (2) one Tier III penalty for violating Section 10(b); (3) one Tier III penalty for aiding and abetting violations of the Securities Act by the Sharp network clients; (4) one Tier III penalty for aiding and abetting violations of the Exchange Act by the Sharp network clients; and

(5) one Tier I penalty for her primary violation of Section 5 of the Securities Act.  See id.  In general, Kelln concurs with Sexton's objections to the civil penalties sought by the SEC. See Kelln & Veldhuis' Opp'n 2.

For Gasarch, the SEC's proposed methodology is as follows: the sum of (1) one Tier III penalty for aiding and abetting violations of the Securities Act by the Sharp network clients; (2) one Tier III penalty for aiding and abetting violations of the Exchange Act by the Sharp network clients; and (3) one Tier II penalty for her primary violation of Section 17(a)(3) of the Securities Act.  Mem. Supp. 15.  Gasarch opposes, arguing that the SEC has failed to proffer evidence that convincingly imputes any post-August 2016 liability to Gasarch.  See Gasarch's Opp'n 13.  She further objects to the amount as excessive, contending that the jury finding regarding her aiding and abetting "could have been based on one underlying violation," not two or three, id. at 14; that her distribution of proceeds happened after the purported fraud, id.; and that she does not have the requisite financial condition to pay the requested sum, id. at 15.

### 3. Analysis

The Court agrees with the SEC's proposed methodology for calculating civil penalties against Sexton, Veldhuis, and Friesen, determining that they each ought be liable for seven Tier III violations, as their fraudulent schemes concerned seven

29

A3851

out of the 14 issuers during the applicable five-year period.
Another session of this Court recently adopted a similar
methodology where a civil penalty was imposed against each of
the so-called entity defendants, that is, corporations who
engaged in penny stock fraud.  See Securities and Exchange
Commission v. Knox, 2022 U.S. Dist. LEXIS 99321, *9-10 (D. Mass.
June 3, 2022) (Stearns, J.).  Similarly, this Court finds it
appropriate to impose a civil penalty against each of Sexton,
Veldhuis, and Friesen per the number of entities they utilized
to defraud unwitting investors during the five years preceding
August 2021.  The SEC asserts, and this Court agrees, that that
number is seven.

        Further, that the SEC is not seeking civil penalties in
relation to stock sold through all 14 of the issuers is
congruent with this Court's statement during trial that if it is
persuaded that a violation "was pre-August 2016, then [it]
cannot impose a monetary penalty."  Tr. Motion and Charge
Conference 55:17-18.

        Indeed, evidence offered by the SEC supports its contention
that seven out of the 14 issuers were involved in the fraudulent
scheme between August 2016 and August 2021.  An affidavit by
Ryan Murphy, an enforcement accountant at the SEC, submits to
this Court "[his] determin[ation] that during that time period,
Veldhuis, Sexton and Friesen traded the securities of seven of

the Fourteen Issuers: Stevia First/Vitality, Arch Therapeutics,
Liberty One Lithium, NewGen Biopharma, StartMonday Technology
Corp., Lexington Biosciences, and BreathTec Biomedical." Decl.
of Ryan Murphy ("Decl. of Ryan Murphy II") ¶ 30, ECF No. 427.
While Sexton attempts to have the Court dismiss this as an
unsupported allegation of "a summary witness," Sexton's Opp'n
14, the SEC responds by drawing the Court's attention to
numerous pieces of evidence from trial exhibits as well as other
witness statements that show that Sexton sold stock of the seven
aforementioned issuers between August 5, 2016, and August 5,
2021. See Pl.'s Reply to Sexton 11 (collecting evidence). In
his sur-reply, Sexton argues that certain pieces of evidence put
forward by the SEC do not meaningfully identify that it was
Sexton who traded the stock of these seven issuers. Sexton's
Sur-Reply 5-6. Even assuming, arguendo, that Sexton's
objections have any merit, he fails to respond to witness
testimony as well as other evidence relating to his involvement
in these issuers. See, e.g., Tr. Jury Trial Day Two 108:19-20,
ECF No. 436 (Dhillon's testimony that Seton participated in the
sale of Vitality stock "in 2017 and maybe even '18"); Tr. Jury
Trial Day Five 91:9-18, ECF No. 439 (Knox's testimony regarding
Sexton's involvement in Vitality and Arch throughout 2018); Tr.
Jury Trial Day Six 34:24-25, 35:1-2, ECF No. 440 (Knox's
testimony regarding NewGen trading in 2017).

A3853

Sexton's remaining objections that he, at most, profited from three out of the seven issuers during the five-year period and that the penalty amount is excessive, <u>see</u> Sexton's Opp'n 14-15, are unavailing.  As for profits, Sexton misconstrues the law: the relevant inquiry for purposes of determining the applicable period in relation to which civil penalties are to be imposed is <u>not</u> whether he profited from his misconduct during the relevant period but rather whether his misconduct, that is, the illegal stock trading, occurred during that same period. <u>See, e.g.</u>, <u>Securities and Exchange Commission</u> v. <u>Cohen</u>, 332 F. Supp. 3d 575, 591 (E.D.N.Y. 2018) ("[T]he statute of limitations runs from when Defendants allegedly engaged in misconduct, not when they received compensation in connection with that misconduct.").  Regarding the alleged excessiveness of the penalty, the SEC convincingly raises two points: (1) that the Sexton, Veldhuis, and Friesen control group generated a total amount of $31,000,000 in profits during the five-year window; and (2) that Sexton "entirely ignores the value of his significant real estate holdings and other assets not held in frozen financial institutional accounts."  Pl.'s Reply to Sexton 12.  Sexton's frozen assets already total $13,808,338 as of December 2022, according to the SEC.  Mem. Supp. 14. Accordingly, this Court overrules Sexton's objection based on

A3854

his purported financial inability to pay the requested civil penalty.

Much of the above analysis applies with equal force to Veldhuis and Friesen against whom the SEC requests identical civil penalties. Veldhuis and Friesen, too, illegally traded in the stock of seven out of the 14 issuers during the relevant five-year period.[8] Friesen, like Sexton, argues that the SEC has failed to establish that he engaged in illegal conduct during the five-year window, averring instead that he simply profited from some deals that transpired prior to those five years. See Friesen's Opp'n 10-11. The voluminous evidence provided during trial contradicts that contention. See Pl.'s Reply to Friesen 3 (referring to numerous trial exhibits). Indeed, evidence was put before the jury during trial that indicated Friesen's –- and Veldhuis' –- involvement in the scheme post-dating August 5, 2016. See Pl.'s Reply to Sexton 11; see also Decl. of Ryan Murphy II ¶ 30 (documenting Friesen and Veldhuis' engagement in the trade of stocks of seven out of the 14 issuers during the applicable window). In view of the foregoing as well as voluminous evidence from trial demonstrating that Sexton, Veldhuis, and Friesen acted in concert, the Court is persuaded

---

[8] Since Veldhuis concurs with Sexton's objections to the civil penalty sought by the SEC, see Kelln & Veldhuis' Opp'n 2, and since those objections have been overruled above, the remainder of this paragraph deals with Friesen's objections.

A3855

that these three Defendants illegally traded in the stock of
seven issuers between August 2016 and August 2021.  See, e.g.,
Tr. Jury Trial Day Five 78, 87-88, 90; Tr. Jury Trial Day Three
13-16, 24, 41, 96-97, ECF No. 437.

    The Court also agrees with the SEC that the maximum Tier
III penalty is warranted for each of the seven violations.  The
scheme in which Sexton, Veldhuis, and Friesen were involved,
this Court finds, operated through fraud and deceit, thereby
fulfilling the statutory requirement that this Court impose Tier
III penalties against violations involving "fraud, deceit,
manipulation, or deliberate or reckless disregard of a
regulatory requirement."  15 U.S.C. § 77(t)(d)(2)(B).  It is
also clear that their violations "directly or indirectly
resulted in substantial losses or created a significant risk of
substantial losses to other persons," 15 U.S.C. §
77(t)(d)(2)(C), as it is inconceivable for the scheme these
three Defendants participated in during the five-year period to
not have caused actual loss, let alone a significant risk
thereof.[9]

_____

    [9] While courts have split over the issue of whether a
demonstration of actual loss is required to impose a Tier III
penalty, see Lemelson, 596 F. Supp. 3d at 235 (collecting
cases), this Court need not adopt a position as to that split
since here it is clear that investors were defrauded through the
pump-and-dump schemes.

A3856

Accordingly, the SEC's request of one Tier III penalty multiplied by seven against each of the three Defendants Sexton, Veldhuis, and Friesen is appropriate and hereby granted. The Court imposes a civil penalty of $223,229 x 7 = $1,562,603 against each of them.

The Court also grants the SEC's proposed civil penalty against Kelln. Pursuant to the partial judgment as to her, Kelln was ordered to "not contest liability under the claims filed by the [SEC]." J. as to Kelln 5. Those claims allege five different violations: (1) an independent violation of Section 17(a) of the Securities Act; (2) an independent violation of Section 10(b) of the Exchange Act; (3) aiding and abetting others in their violation of the Securities Act; (4) aiding and abetting in their violation of the Exchange Act; and (5) an independent violation of Section 5 of the Securities Act. See Mem. Supp 15; see also Am. Compl. ¶¶ 259-58, 277-85. "Liability under Section 17(a)(1) [and] Section 10(b) . . . requires materiality and scienter." Flannery v. SEC, 810 F.3d 1, 9 (1st Cir. 2015). Aiding and abetting securities violations, as the above discussion regarding Gasarch's aiding and abetting violation reveals, see supra pp. 21-24, requires, at a minimum, knowledge or recklessness. As such, the first four of the five violations by Kelln, this Court finds, qualify as Tier III violations.

As for Kelln's independent violation of Section 5 of the Securities Act, because liability under thereof need not require a showing of scienter, a less severe civil penalty is appropriate.  See Securities and Exchange Commission v. Esposito, 2017 U.S. Dist. LEXIS 192120, at *5-6 (D. Mass. Nov. 21, 2017) (Burroughs, J.) (collecting cases that have held that a Section 5 violation does not require scienter); Securities and Exchange Commission v. Smith, 2015 U.S. Dist. LEXIS 86625, at *25 (D.N.H. July 2, 2015) ("Section 5 imposes no scienter requirement."); see also Mem. Supp. 15 (contending that "liability under [Section 5] does not require a showing of scienter").  Accordingly, a Tier I civil penalty for Kelln's independent and non-scienter-based violation of Section 5 is appropriate.  In sum, a Tier III civil penalty of $223,229 for each of her first four violations and a Tier I civil penalty of $11,162 for her Section 5 violation is appropriate.  This Court therefore imposes a civil penalty against Kelln in the amount of ($223,229 x 4) + $11,162 = $904,078.

As for Gasarch, the Court agrees with the SEC's proposed methodology for calculating a monetary penalty but is persuaded that a downward variance from the SEC's requested amount is appropriate.  At the outset, the Court dismisses Gasarch's contention that she merely rendered legitimate secretarial services to Sharp and, at most, just arranged the distribution

A3858

of proceeds after the fraud by other occurred.  <u>See</u> Gasarch's Opp'n 14.  That is precisely the unwitting secretary contention and defense mounted by Gasarch during trial that the jury necessarily rejected in finding her liable for various securities law violations.  Relying on the disjunctive "or" appearing on the jury verdict, <u>see</u> Jury Verdict 2, that found her liable for alternative aiding and abetting violations, Gasarch contends that she is liable for, at most, two violations: (1) an independent violation of Section 17(a)(3) of the Securities Act and (2) one aiding and abetting violation of securities laws.  <u>See</u> Gasarch's Opp'n 14.

Gasarch is not wrong, <u>per se</u>, to argue that the jury, in addition to finding her independently liable for a violation of Section 17(a)(3) of the Securities Act, may have found that she aided and abetted just one of the two violations separated by the disjunctive "or" on the jury slip.  Conversely, the jury may have found Gasarch liable for aiding and abetting both Securities Act and Exchange Act violations in addition to her independent violation of the Securities Act.

Moreover, and more importantly, for purposes of fashioning appropriate remedies in the context of a securities enforcement adjudication, "[a]t the remedies stage, trial judges may make factual findings and rely on such findings in assessing the amount of civil penalties so long as the court's findings do not

conflict with the jury's findings as to liability." <u>Securities</u>
<u>and Exchange Commission</u> v. <u>Life Partners Holdings, Inc.</u>, 854
F.3d 765, 781-82 (5th Cir. 2017).  At trial, this Court found
that Gasarch worked "at the hub" of the fraudulent Sharp
enterprise.  <u>See</u> Tr. Jury Trial Day Eight 41:10, 164:21, ECF No.
442.  In her role as Sharp's aide working "at the hub," <u>id.</u>, she
aided and abetted the Sharp scheme clients in their violation of
both the Securities Act and the Exchange Act.  This finding does
not conflict but rather comports with and honors the jury
verdict against Gasarch.

Accordingly, this Court agrees with the SEC that she is
liable for three violations: (1) her independent violation of
Section 17(a)(3) of the Securities Act; (2) aiding and abetting
others in their violation of the Securities Act; and (3) aiding
and abetting others in their violation of the Exchange Act.  <u>See</u>
Mem. Supp. 15.  Further, in view of the earlier discussion that
Gasarch's aiding and abetting required scienter, <u>see</u> <u>supra</u> pp.
21-24, a Tier III monetary penalty for her two aiding and
abetting violations is appropriate.  As for her independent
violation of Section 17(a)(3) of the Securities Act, a Tier II
penalty is appropriate, as an independent violation of Section
17(a)(3) does not require a showing of scienter.  <u>See</u> <u>Sharp</u>, 626
F. Supp. 3d at 382; <u>see also</u> <u>supra</u> p. 22.

A3860

While the Court agrees with the SEC's proposed methodology for imposing a monetary penalty against Gasarch, the Court will not impose the exact amount proposed by the SEC of ($223,229 x 2)[10] + $111,614[11] = $558,072. At least three reasons persuade this Court that a downward variance is appropriate. First, while this Court indeed found Gasarch to be an operative of the Sharp scheme and one at its hub, see Tr. Jury Trial Day Eight 41:10, 164:21, her role at the hub was necessarily under the command of Sharp and also meant that she did not operate at the spoke end of the hub-and-spoke scheme, where investors were directly harmed. Second, evidence presented at trial points to the fact that Gasarch was involved in the fraudulent enterprise not at the outset but later in time.[12] As such, the Court finds that, at least as an initial matter, prior to joining the scheme as co-conspirator, Gasarch performed legitimate secretarial

---

[10] A total of two Tier III penalties for Gasarch's two aiding and abetting violations: one for aiding and abetting Securities Act violations and the other for aiding and abetting Exchange Act violations.

[11] One Tier II penalty for Gasarch's independent and non scienter-based violation of Section 17(a)(3) of the Securities Act.

[12] At trial, the Court stated as much: "[Gasarch] joined the conspiracy later in time than her initial employment, which candidly I think is the fact, I'm not persuaded she was a co-conspirator at that time, whenever it was, that she became employed by Sharp. I'm not clear when she joined the conspiracy." Tr. Jury Trial Day Eight 165:8-13.

A3861

services to Sharp.  Third, the two Tier III civil penalties
against her are in relation to Gasarch's aiding and abetting,
not independent and primary, violations.  While her aiding and
abetting required its own mental culpability and scienter,
equitable considerations demand that a lesser civil penalty be
imposed against her than other Defendants whom she aided and
abetted in their primary and scienter-based violations of the
various securities laws.  Cf. Securities and Exchange Commission
v. Zwick, 2007 U.S. Dist. LEXIS 19045, at *83-84 (S.D.N.Y. Mar.
16, 2007) (imposing a Tier III penalty against an aider and
abettor but with a downward variance because of aider and
abettor status, as opposed to being the primary violator, among
other reasons).

In view of the fact that the SEC submits to this Court that
as of December 2022 Gasarch has $296,651 in frozen assets, the
Court imposes a civil penalty of $296,651 against her.[13]

---

[13] The Court observes that the civil penalty amounts
requested by the SEC are all based on inflation-adjusted figures
from 2023.  See Mem. Supp. 12.  Since the SEC moved for remedies
in December 2023, the SEC has updated its civil penalty amounts,
announcing in January 2024 its inflation adjustment figures for
2024.  See Inflation Adjustments to the Civil Monetary Penalties
Administered by the Securities and Exchange Commission (as of
January 15, 2024), SEC.gov (Jan. 16, 2024),
https://www.sec.gov/enforce/civil-penalties-inflation-
adjustments.  The question arises whether the Court ought
consider the most recent inflation-adjusted figures for 2024 or
instead ought consider the inflation-adjusted figures for 2023
used by the SEC in its calculation.

A3862

## C. Disgorgement and Prejudgment Interest Against All of the Defendants

### 1. Legal Standard

Disgorgement is an equitable remedy that is intended to deprive a wrongdoer of his ill-gotten gains at the expense of victims.  See Liu v. SEC, 591 U.S. 71, 75 (2020) (clarifying "that a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78(u)(d)(5)").  Liu provided three clarifications to disgorgement law.

First, it clarified that disgorgement is non-punitive and intended to make victims whole.  See id. at 74 (defining courts' power to award equitable relief as "a power that historically excludes punitive sanctions"); id. at 75 (holding that a disgorgement award "is awarded for victims"); see also Sharp, 626 F. Supp. 3d at 380 ("The Supreme Court has entrenched disgorgement's non-punitive character in the context of securities violations, by requiring that it be used to make victims whole.").

---

The parties have not raised the issue of inflation adjustment in their briefs nor during oral argument.  In the interest of fairness, the Court will not adjust figures to reflect inflation for 2024, although it is highly likely that the Court has the equitable power to do so sua sponte.  Cf. Weed, 315 F. Supp. 3d at 677 (taking notice of the SEC's "increasing the maximum Tier-III penalty from the statutory limit of $100,000 to account for inflation adjustments").

A3863

<u>Second</u> and relatedly, a disgorgement award ought be limited to a wrongdoer's "net profits," <u>Liu</u>, 591 U.S. at 75, calculated by "deducting legitimate expenses" from a wrongdoer's gross ill-gotten gains, <u>id.</u> at 1946. The Court noted one historical exception to the rule that legitimate expenses ought be diminished from the show of profits, defining that exception as "when the entire profit of a business or undertaking results from [a] wrongful activity." <u>Id.</u> at 84 (quotation omitted).

<u>Third</u>, <u>Liu</u> clarified that the general rule in awarding disgorgement is to hold wrongdoers individually liable for their personal ill-gotten gains. <u>See</u> <u>id.</u> at 82-83 ("Equity courts also generally awarded profits-based remedies against individuals or partners engaged in concerted wrongdoing, not against multiple wrongdoers under a joint-and-several liability theory."). Reviewing a corpus of precedents, the Supreme Court observed that a "rule against joint-and-several liability for profits that have accrued to another appears throughout equity cases awarding profits." <u>Id.</u> Still, the Supreme Court also observed that "[t]he common law did . . . permit liability for partners engaged in concerted wrongdoing." <u>Id.</u> at 90.

In sum, then, "[t]he [C]ourt's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." <u>Securities and Exchange Commission</u> v. <u>MacDonald</u>, 699 F.2d 47, 54 (1st Cir. 1983) (en

42

A3864

banc) (quoting Securities and Exchange Commission v. Blatt, 583
F.2d 1325, 1335 (5th Cir. 1987)).  "[C]ourts consistently
restrict[] awards to net profits from wrongdoing after deducting
legitimate expenses[,]" Liu, 591 U.S. at 84, though it is also
possible -- under exceptional circumstances -- to dispense with
that requirement, especially if the entire business,
undertaking, or enterprise involves wrongful activity, id. at
83.

   In any case, "[t]he amount of disgorgement 'need only be a
reasonable approximation of profits causally connected to the
violation.'" Securities and Exchange Commission v. Happ, 392
F.3d 12, 31 (1st Cir. 2004) (quoting Securities and Exchange
Commission v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C.
Cir. 1981)).  "The risk of uncertainty in calculating
disgorgement should fall on the wrongdoer whose illegal conduct
created that uncertainty." Id.  "Once the SEC shows that the
disgorgement is a reasonable approximation, the burden shifts to
the defendant to demonstrate that the amount of disgorgement is
not a reasonable approximation." Id.

   Finally, the Court takes notice of its previous holding
regarding the applicable statute of limitations in issuing
disgorgement awards: scienter-based claims for disgorgement
require a ten-year statute of limitations whereas non-scienter-

based claims for disgorgement "continue to require a five-year statute of limitations." Sharp, 626 F. Supp. 3d at 381.

### 2. Parties' Arguments

The SEC requests this Court issue disgorgement awards in the following amounts: (1) $17,367,474 against Sexton; (2) $13,289,897 against Veldhuis; (3) $11,846,176 against Friesen; (4) $1,582,785 against Kelln; and (5) $2,522,367 against Gasarch. Mem. Supp. 1.

The SEC bases its calculation "on the sums that each of them received into their personal Q accounts of the Fourteen Issuers whose illegal trading was at issue."[14] Id. at 17-18. The SEC further asserts that the applicable statute of limitations is ten, not five, years, rendering the Defendants' profits from 2011 -- not from 2016 -- onward susceptible to disgorgement. Id. at 17 ("[I]t is appropriate to award disgorgement for a ten-year time period, given that each of the

---

[14] As the following discussion on the Q data will make clear, in proposing respective amounts for its proposed disgorgement awards, the SEC focuses on a specific piece of evidence presented at trial: the so-called "Q records" or "Q data" that is a compilation of internal records kept by Sharp that the SEC contends shows stock proceeds allocated to each of the Defendants that they gained throughout the course of the pump-and-dump scheme, as well as commissions received by some of them. See, e.g., Mem. Supp. 17-18, 19, 21.

Separately, because some of the transfers reflected on the Q system were made in Canadian Dollars, the SEC informs the Court that its estimate "converts all of those transfers into US Dollars, using the applicable exchange rate on the date of the transfer in the Q system." Id. at 18.

Defendants was found liable, or is being held liable, for violating a statute requiring the proof of scienter as an element."). As such, the SEC requests the Court award disgorgement based on the time period from August 5, 2011, that is, ten years before the SEC filed this present action. Id.

The Defendants object to the SEC's position as well as the specific award amounts proposed by the SEC on numerous grounds. After having carefully reviewed their briefs and the arguments made during the hearing held on the question of remedies, the Court distills these various objections to seven separate contentions.

First, the Defendants impeach the credibility of the Q data evidence by variously characterizing it as hearsay or as a document susceptible to manipulation. See, e.g., Sexton's Opp'n 6 (arguing that "the Court has already ruled, the database is not a business record, because, among other issues, there are not sufficient indications that the records were entered contemporaneously"); Kelln & Veldhuis' Opp'n 2 (concurring with Sexton's objections); Friesen's Opp'n 5 (characterizing Q records as inadmissible hearsay); Gasarch's Opp'n 2, 7-8 (arguing that the Q data is unreliable and unverified). As a corollary to the objection regarding its reliability, Gasarch also contends that there is no evidence that the designations

A3867

"PEAC" or "PERE" in the Q data indicate her Q account.
Gasarch's Opp'n 4.

Second, even assuming that the Q data is reliable, the
Defendants argue, it shows, at most, the proceeds generated over
the course of a decade but, crucially, not the actual
disbursements made from the generated proceeds to the individual
Defendants.  Sexton argues that the Q system may be considered
indicative of the stock transactions that transpired, but that
there is no evidence that this data is reflective of "the
division of proceeds stemming from those transactions."
Sexton's Opp'n 7.  In furtherance of his objection, Sexton also
points out that the SEC has not presented this Court with any
"documentary evidence to corroborate the purported gains" shown
on the Q system, specifically, bank records that would verify
that the Q system transfers actually happened and were received
by the Defendants.  See id. at 4-5; see also Kelln & Veldhuis'
Opp'n 2 (concurring with Sexton's objections).  Friesen, too,
argues that the Q records, at most, indicate stock entries but
not actual transfers to each of the Defendants.  See Friesen's
Opp'n 7.

Third, the Defendants argue that the SEC has not shown that
any transfers that they may have received from trading in all 14
of the issuers are ill-gotten, and not legitimate, gains.  See
Sexton's Opp'n 8 (arguing that the SEC "has not tied funds to

violations of the securities laws"); Kelln & Veldhuis' Opp'n 2 (same); Friesen's Opp'n 3 (same); Gasarch's Opp'n 12 (rejecting the SEC's position that she received ill-gotten funds).

Fourth, the Defendants argue that the SEC has failed to show that disgorgement would make victims whole, as the SEC has failed to specifically point to any victims who have suffered pecuniary harm as a result of the Defendants' alleged misconduct. Sexton avers, for example, that the SEC "has not established that there are any victims to whom disgorgement should be allocated." Sexton's Opp'n 10; see also Friesen's Opp'n 8-9 (same); Gasarch's Opp'n 10-11 (same).

Fifth, the Defendants argue that the SEC, in relying on the sums reflected in the Q system to calculate proposed disgorgement award amounts, failed to factor out legitimate expenses and payments received by the Defendants. Friesen agues, for example, that the Q records also show repayments, debt payments, and offsets, which the SEC has not but should have considered in its calculation. Friesen's Opp'n 6. Gasarch similarly contends that the SEC does not attempt to factor out "legitimate" payments to her for her secretarial services. Gasarch's Opp'n 4-5, 10.

Sixth, the Defendants contend that disgorgement is time-barred as the SEC has failed to establish that disgorgement is

47

tied to scienter-based conduct.  Sexton's Opp'n 11; Gasarch's
Opp'n 12 (similar).

Seventh, the Defendants argue that the SEC should have but
has not avoided double counting in its calculations, failing to
offset funds frozen or funds collected from others -- such as
Sharp, Knox, or Dhillon -- involved in the Sharp enterprise.
See ECF No. 484.

### 3. Analysis

After reading the briefs and hearing the above-mentioned
objections from Defendants during a hearing held on the question
of remedies, the Court took the issue of disgorgement and
prejudgment interest under advisement.  See id.  The Court is
now prepared to rule on the issue and for the following reasons
**GRANTS** the SEC's motion for disgorgement in its entirety,
subject to certain caps as described below, see infra pp. 56-57,
and **DENIES** its motion for prejudgment interest in its entirety.

First, the Court has previously rejected, and once again
rejects, characterizations of the Q data that seek to describe
it as hearsay.  While the Court did not make a final finding
during the course of the trial, it intimated that it was
prepared to admit the Q system into evidence under the business
records exception to the rule against hearsay.  See generally
Tr. Jury Trial Day Four 69-72, ECF No. 438 (the Court, upon
hearing from witness testimony, holding that the Q data "would

A3870

seem to satisfy the business records exception"; noting that not "anyone could write in the book"; holding that the Q data "satisfies the requirements of a business record"); see also Tr. Hr'g Disgorgement 24:8-11, ECF No. 491 (the Court holding during the hearing on remedies that "[t]his Court is satisfied that the Q system records qualify as business records under the federal rules of evidence"). Thus, the Q system is admissible evidence and not hearsay.

Further, the Defendants' efforts to describe the Q data as easily manipulable are unavailing. See, e.g., Tr. Jury Trial Day Two 10:15-16 (Gasarch contending that Sharp "had the power as the administrator to change all the Q data"); id. at 21:11-12 (Friesen describing the Q system data as Sharp "sort of inputting data apparently in any way that he sees fit"); see also id. at 21:18-19 (Friesen arguing that the Q system data "is not a believable, authentic, reliable recitation of anything"); Tr. Jury Trial Day Nine 61:2 (Gasarch calling the Q data "garbage"). That Sharp may have been the main administrator of the Q system, see, e.g., Tr. Jury Trial Day Seven 129:3, ECF No. 441 (witness testimony characterizing the Q system as "[Sharp]'s own accounting system"), does not by itself demonstrate that the data has been unreliably manipulated.

The SEC has compared the Q data to independent brokerage records, Decl. of Ryan Murphy I ¶ 15, and the comparison has

A3871

returned a very high rate of accuracy.  As the affidavit of Ryan
Murphy indicates, the comparison between Q data for each of the
14 issuers and independent brokerage records has confirmed the
reliability of Q data with considerable accuracy: (1) 95% for
Stevia First/Vitality, id. ¶ 17; (2) 94% for Echo Automotive,
id. ¶ 20; (3) 97% for Arch Therapeutics, id. ¶ 23; (4) 100% for
Stevia Corp., id. ¶ 26; (5) 95% for Liberty One Lithium Corp.,
id. ¶ 29; (6) 96% for Oryon Technologies, id. ¶ 31; (7) 100% for
Makism 3D Corp., id. ¶ 33; (8) 98% for Graphite Corp., id. ¶ 35;
(9) 97% OncoSec Medical Inc., id. ¶ 37; (10) 97% for NewGen
Biopharma Corp., id. ¶ 39; (11) 91% for StartMonday Technology
Corp., id. ¶ 41; (12) 100% for Lexington Biosciences Holdings
Corp., id. ¶ 43; (13) 100% for BreathTec Biomedical Inc., id. ¶
45; and (14) 75% for RightsCorp., id. ¶ 47.  While the
Defendants are correct to argue that only a sample, and not all,
of the brokerage records and Q transactions were compared, they
do not meaningfully challenge, much less demonstrate, how the
sample is not representative.  Securities and Exchange
Commission v. Commonwealth Equity Servs., LLC, 2024 U.S. Dist.
LEXIS 59361, at *28 (D. Mass. Mar. 29, 2024) (Talwani, J.)
(rejecting the argument that the SEC's sample was "cherry-
picked").  Accordingly, the Q record, as a comparison with
independent brokerage records confirms, is a detailed and highly

50

A3872

accurate representation of the funds generated by the Sharp pump-and-dump schemes.

The Court is further persuaded that the Q data is highly accurate since evidence presented at trial demonstrated that Q system entries were made very close in time to the illegal trading that occurred.  See, e.g., Tr. Jury Trial Day Six 49:9 (witness testimony that Q entries were made within "less than 24 hours" following trade).  The Court therefore finds the Q data reliable and credible evidence of the proceeds generated through the illegal trading that occurred with respect to the 14 issuers.

Second, the Court rejects the Defendants' contention that there is no evidence that the proceeds recorded in the Q system were actually disbursed and distributed to and received by the Defendants.  To be sure, the Defendants are correct to point out that the SEC compared the Q data to independent brokerage records but did not "look at any bank records."  Tr. Jury Trial Day Eight 150:22 (SEC analyst testifying that he did not look at bank records to confirm receipt of the proceeds by the Defendants).  The Defendants repeatedly emphasized this point during the hearing on remedies.  See Tr. Hr'g Disgorgement 16:12, 17:1, 20:21-22, (mentioning the lack of evidence that the Defendants "actually received money"; that there are no "funds received were by us"; and asking the Court to focus on "what the

51

A3873

individual actually received"). Moreover, witness testimony at trial seemed to indicate that not all of the proceeds generated by the pump-and-dump scheme actually went to the Defendants. See, e.g., Tr. Jury Trial Day Seven 89.

The SEC notes that the Q system shows the transfers of illegal stock sale proceeds from the issuer accounts into each of the Defendants' personal accounts, and that the system shows, just like a bank account would, the Defendants paying their mortgages, paying the expenses of their family members, and making other transfers. See Tr. Hr'g Disgorgement 26:9-17. This, while true, does not change the fact that the SEC has not submitted any bank records to this Court that show actual receipt of funds by the Defendants.

Having carefully reviewed the record and considered the question of the lack of bank records showing actual receipt of funds by the Defendants, this Court is persuaded, for the following reasons, that the balance of equities favors the awarding of the disgorgement amounts requested by the SEC. First, the Q data's high degree of internal accuracy as to the proceeds generated counsels a similar finding of accuracy as to its figures regarding the money going into the Defendants' personal Q accounts, especially because the Defendants failed to argue, much less show, that there is money in their accounts in the Q system that still remains there. See Happ, 392 F.3d at 31

A3874

(burden of proof shifting to defendants once SEC makes a
reasonable approximation).

    Second, the production of bank records confirming actual
receipt of funds, to this Court's knowledge, has never been
declared a sine qua non before finding the SEC's disgorgement
calculation reasonable.  Rather, courts in this district and in
others have looked at bank records in combination with other
evidence and sometimes have not looked at bank records at all.
See, e.g., Securities and Exchange Commission v. Lazare Indus.,
294 Fed. Appx. 711, 715 (3d Cir. 2008) (holding that the
defendants' argument that the district court "abused its
discretion in fixing the amount of disgorgement because the SEC
did not offer bank records showing that defendants actually
received the amounts memorialized on the subscription
agreements" "lacks merit"); Securities and Exchange Commission
v. Eiten, 2014 U.S. Dist. LEXIS 139428, at *3 (D. Mass. Sept.
30, 2014) (O'Toole, J.) (finding the SEC's disgorgement
calculation based on "bank records, other financial information,
and documents" reasonable).

    Third and most importantly, in cases involving concerted
wrongdoing, joint and several liability may be appropriate, in
which case the ill-gotten gains subject to disgorgement need not

accrue to each defendant individually.[15]  Cf. Securities and
Exchange Commission v. San Francisco Reg'l Ctr. LLC, 2019 U.S.
Dist. LEXIS 4983, at *9-10 (N.D. Cal. Jan. 10, 2019) (rejecting
the SEC's contention that the court can disgorge profits
accruing to a defendant that "it never had" because SEC failed
to articulate a conspiracy claim and that the defendant was "a
participant in the wrongdoing").  Here, the Defendants were co-
conspirators within a hub-and-spoke model: Gasarch conspired
with Sharp; Kelln conspired with Sharp; and Sexton, Veldhuis,
and Friesen conspired with each other and with Sharp as part of

---

[15] Here, the Court notes that the antecedent question may
arise as to whether joint and several liability is permissible
in the context of disgorgement.  As noted above, Liu, while
articulating the default rule of individual liability in the
disgorgement context, still carved out an exception applicable
to instances of "concerted wrongdoing."  Liu, 591 U.S. at 90.
Further, the Liu Court eschewed "wad[ing] into all the
circumstances where an equitable profits remedy might be
punitive when applied to multiple individuals[,]" id. at 91,
remanding the case to the lower court instead so that it could
determine whether joint and several liability would be
appropriate, "[g]iven the wide spectrum of relationships between
participants and beneficiaries of unlawful schemes—from equally
culpable codefendants to more remote, unrelated tipper-tippee
arrangements."  Id.  As such, the Liu Court recognized the
permissibility of assigning joint and several liability to
defendants engaged in concerted wrongdoing.
    Post-Liu, at least two sessions of this Court have held
securities law offenders jointly and severally liable for
disgorgement.  See Knox, 2022 U.S. Dist. LEXIS 99321, at *11
("The interchangeable role the Entity Defendants played within
the scheme makes joint and several liability appropriate."); see
also Securities and Exchange Commission v. Gomes, 2022 U.S.
Dist. LEXIS 191457, at *19-20 (D. Mass. Oct. 20, 2022) (Saylor,
C.J.).

A3876

specific pump-and-dump schemes.  As such, joint and several liability is appropriate: Gasarch is jointly and severally liable with Sharp; Kelln is jointly and severally liable with Sharp; and Sexton, Veldhuis, and Friesen are jointly and severally liable with Sharp.  Given that Sharp was a co-conspirator in each of the conspiracies, the ill-gotten gains need not have accrued personally to each of the Defendants -- that they may have partially or entirely accrued to Sharp suffices to award disgorgement.  See Securities and Exchange Commission v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1098 (9th Cir. 2010) ("We hold that the district court did not abuse its discretion in holding Martin jointly and severally liable with Platforms.  We have never held that a personal financial benefit is a prerequisite for joint and several liability."); see also Securities and Exchange Commission v. Monterosso, 756 F.3d 1326, 1337-38 (11th Cir. 2014) ("[Defendant] argues it would be inequitable to hold him liable for disgorgement when he did not receive proceeds.  The Ninth Circuit, however, has stated, and we agree, a personal financial benefit is not a prerequisite for joint and several liability." (quotations omitted)).

The Court, in exercising its "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged[,]" Securities and

A3877

<u>Exchange Commission</u> v. <u>Druffner</u>, 802 F. Supp 2d 293, 297 (D.
Mass. 2011) (Gorton, J.) (quotation omitted), will, however, cap
the individual amount that may be disgorged from each of the
Defendants, notwithstanding their joint and several liability,
at the following amounts requested by the SEC based on the Q
system data: (1) $17,367,474 against Sexton; (2) $11,846,176
against Friesen; (3) $13,289,897 against Veldhuis; (4)
$1,582,785 against Kelln; and (5) $2,522,367 against Gasarch.

<u>Third</u>, the Court finds the remaining objections raised by
the Defendants unavailing.  As evidence submitted to this Court
as well as presented during trial indicates, the proceeds
reflected in the Q system are, absent any showing to the
contrary proffered by the Defendants, generated by illegal pump-
and-dump schemes that involved 14 different issuers.

Additionally, the argument the SEC has failed to show any
victims is premature: the SEC has agreed in writing, <u>see, e.g.</u>,
Mem. Supp. 22-24, and verbally represented to this Court during
the hearing on remedies, <u>see</u> ECF No. 482, that a plan can and
will be submitted to the Court, to its satisfaction, detailing
plans to return the disgorged funds to the harmed investors.

The objection that disgorgement is time-barred is also
without merit, as all of the Defendants acted with varying
degrees of scienter, rendering the applicable statute of
limitations ten, not five, years.  Finally, as to offsetting

A3878

legitimate expenses, the Defendants' objections are, again, unpersuasive for two reasons. First, the Defendants do not meaningfully counter the SEC's calculation by any showing how certain payments were indeed legitimate, bearing in mind the SEC's obligation is to formulate a "reasonable approximation." Happ, 392 F.3d at 31. Second, even though there may have been incidental expenses that could be offset, the exception articulated in Liu that offsetting or diminishing legitimate business expenses is not necessary where the enterprise itself is fraudulent, see Liu, 591 U.S. at 83-84, is applicable here.

For the foregoing reasons, the Court holds the Defendants jointly and severally liable as follows:

- Gasarch is jointly and severally liable with Sharp for disgorgement in the amount of $2,522,367;

- Kelln is jointly and severally liable with Sharp for disgorgement in the amount of $1,582,785; and

- Sexton, Veldhuis, and Friesen are jointly and severally liable with Sharp for disgorgement in the amount of $42,503,547; provided, however, that the amount to be disgorged from Sexton, Veldhuis, and Friesen will be capped at, and shall not exceed, $17,367,474, $13,289,897, and $11,846,176, respectively.

The disgorgement awards are, of course, subject to the SEC's submission, and this Court's approval, of a plan detailing

A3879

how the disgorged funds will be returned to the harmed
investors.

### 4. Prejudgment Interest

"Prejudgment interest, like disgorgement, prevents a
defendant from profiting from his securities violations."
Sargent, 329 F.3d at 40 (internal quotations omitted). "An
award of prejudgment interest is based on consideration of a
variety of factors, including the remedial purpose of the
statute [involved], the goal of depriving culpable defendants of
their unlawful gains, and . . . unfairness to defendants." Id.
(citing Securities and Exchange Commission v. First Jersey
Securities, 101 F.3d 1450, 1477 (2d Cir. 1996)). The award of
prejudgment interest in securities violations prevents a
defendant from "receiving the benefit of what would otherwise be
an interest-free loan." Druffner, 802 F. Supp. 2d at 298.

Here, the SEC seeks prejudgment interest against all five
Defendants. See Mem. Supp. 24. The SEC "computed prejudgment
interest using the IRS underpayment rate, compounded quarterly
on defendants' net proceeds for each calendar year separately,
assuming (favorably to the defendants) that each year's net
profit was received on the last day of the year in which it was
received into each defendant's personal Q account." Id. at 25.
The end date for the SEC's calculation is August 5, 2021, when
the SEC obtained the asset freeze against the Defendants. See

A3880

id.  The IRS methodology for calculating prejudgment interest is one which other sessions of this Court have previously determined to be appropriate.  See, e.g., Commonwealth Equity Servs., LLC, 2024 U.S. Dist. LEXIS 59361, at *34; Securities and Exchange Commission v. Esposito, 260 F. Supp. 3d 79, 83 (2017) (Burroughs, J.).

Accordingly, the SEC asks that the Defendants pay the following amounts in prejudgment interest: (1) $5,872,145 against Sexton; (2) $4,314,031 against Veldhuis; (3) $4,057,737 against Friesen; (4) $460,687 against Kelln; and (5) $646,366 against Gasarch.  Mem. Supp. 25.

The Defendants do not meaningfully oppose, having instead focused their objections on the SEC's request for disgorgement. Sexton argues, however, that the SEC "has not presented any evidence that [he] invested any funds or even placed them in an interest-bearing account."  Sexton's Opp'n 13.  Sexton misconstrues the law here: a showing of the defendant gaining interest on the ill-gotten funds is not necessary for the Court to award prejudgment interest.  The very act of obtaining and retaining ill-gotten funds is enough for defendants to benefit from what resembles an interest-free loan: a showing that the Defendants used ill-gotten funds to make more money out of it is not necessary.  Cf. Druffner, 802 F. Supp. 2d at 298 ("The

59

A3881

defendants derived direct monetary benefit from their misrepresentations and retained those profits unjustly.").

Because this Court holds the Defendants jointly and severally liable as described above, see supra pp. 54, 56, however, the imposition of prejudgment interest is not equitable.  In holding the Defendants jointly and severally liable, the Court noted above that the ill-gotten gains need not have accrued to each of the individual offenders, see supra p. 54, and noted further that it suffices in the context of disgorgement for ill-gotten gains to have accrued to one or more of the co-conspirators.

The institution of prejudgment interest is premised, on the other hand, on the notion that a wrongdoer derives direct monetary benefit by unjustly "retain[ing]" profits.  Druffner, 802 F. Supp. 2d at 298.  While the Q data evidence, verified by external brokerage records, persuades this Court that ill-gotten gains have been generated by the pump-and-dump scheme perpetrated by the Defendants -- irrespective of to whom among the co-conspirators the proceeds accrued -- thereby necessitating disgorgement, the same data does not show that ill-gotten gains have been obtained and retained by the individual Defendants, much less in the amounts requested by the SEC.  Where actual accrual to each of the Defendants cannot be shown and where it is entirely possible that at least a portion

of the ill-gotten gains may never have reached the pockets of individual Defendants, it is not possible to speak with any reasonable degree of certainty that the Defendants benefited from what resembled an "interest-free loan." Sargent, 329 F.3d at 41.

Additionally, and equally importantly, as "[t]he decision whether to grant prejudgment interest [is] confided to the district court's broad discretion," Sargent, 329 F.3d at 40 (quotation omitted), this Court, in view of having issued injunctive relief, imposed monetary penalties, and awarded disgorgement, is satisfied that the foregoing relief will serve a significant remedial purpose. Going any further and awarding prejudgment interest, in the absence of a precise determination as to the amount of ill-gotten gains actually obtained by the individual co-conspirators in the various conspiracies, may occasion unfairness to defendants. Having weighed these factors, the Court will not award prejudgment interest. Cf. id. at 40-41 (upholding a district court's finding of joint and several liability in the context of disgorgement, its disgorgement award, and its refusal to award prejudgment interest).

For the foregoing reasons, this Court **DENIES** the SEC's motion for prejudgment interest.

**IV.   CONCLUSION**

A3883

Pursuant to the proposed judgments by the SEC, see ECF No. 485, which this Court hereby incorporates into this memorandum and order, injunctive relief will issue forthwith.

Civil penalties imposed against the Defendants in these amounts:

- Sexton: $1,562,603

- Friesen: $1,562,603

- Veldhuis: $1,562,603

- Kelln: $904,078

- Gasarch: $296,651

Such sums will be payable to the SEC within 30 days after entry of this memorandum and order, and together with it, entry of the incorporated judgments as to the Defendants.

Disgorgement, is ordered as follows:

- Gasarch is jointly and severally liable with Frederick L. Sharp ("Sharp") for disgorgement in the amount of $2,522,367;

- Kelln is jointly and severally liable with Sharp for disgorgement in the amount of $1,582,785; and

- Sexton, Veldhuis, and Friesen are jointly and severally liable with Sharp for disgorgement in the amount of $42,503,547; provided, however, that the amount to be disgorged from Sexton, Veldhuis, and Friesen will be capped at, and shall not exceed, $17,367,474, $13,289,897, and $11,846,176, respectively.

A3884

The disgorgement awards shall be subject to the SEC's submission, and this Court's approval, of a plan detailing how the funds disgorged will be used to make victims whole. The SEC shall submit said plan in due course and without any unreasonable delay.

No prejudgment interest will be awarded.

For the reasons elucidated above, the Court **GRANTS** the SEC's motion for remedies in part, ECF No. 425.


**SO ORDERED.**


                                    /s/ William G. Young
                                   WILLIAM G. YOUNG
                                        JUDGE
                                        of the
                                   UNITED STATES[16]

---

[16] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.

A3885

```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
_____
                               )
SECURITIES AND EXCHANGE        )
COMMISSION,                    )
                               )
              Plaintiff,       )
                               )
v.                             )          CIVIL ACTION
                               )          NO. 21-11276-WGY
FREDERICK L. SHARP,            )
ZHIYING YVONNE GASARCH,        )
COURTNEY KELLN,                )
MIKE K. VELDHUIS,              )
PAUL SEXTON,                   )
JACKSON T. FRIESEN,            )
WILLIAM T. KAITZ,              )
AVTAR S. DHILLON, and          )
GRAHAM R. TAYLOR,              )
                               )
              Defendants.      )
                               )
_____)

YOUNG, D.J.                               June 20, 2024
```

### JUDGMENT AS TO DEFENDANT PAUL SEXTON

On September 11, 2023, Defendant Paul Sexton ("Defendant" or "Sexton") agreed not to contest his liability for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act of 1933 and Sections 10(b) and 13(d) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) and 13d-1 thereunder. Dkt. No. 376. The following day, the Court entered judgment against Sexton finding him liable for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act of 1933 and Sections 10(b) and 13(d) of the Securities Exchange Act of 1934

1

A3886

and Rules 10b-5(a) and (c) and 13d-1 thereunder.  Dkt No. 378.
On May 8, 2024, the Court, at a hearing, imposed injunctive
relief and a civil penalty on Sexton that is incorporated into
this judgment.  The Court held the issues of disgorgement and
prejudgment interest under advisement.  Accordingly, the Court
enters partial Judgment as follows:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is
permanently restrained and enjoined from violating, directly or
indirectly, Section 10(b) of the Securities Exchange Act of 1934
(the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5
promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means
or instrumentality of interstate commerce, or of the mails, or of
any facility of any national securities exchange, in connection
with the purchase or sale of any security:

    (a)  to employ any device, scheme, or artifice to defraud;

    (b)  to make any untrue statement of a material fact or to
omit to state a material fact necessary in order to
make the statements made, in the light of the
circumstances under which they were made, not
misleading; or

    (c)  to engage in any act, practice, or course of
business which operates or would operate as a fraud
or deceit upon any person.

2

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a) to employ any device, scheme, or artifice to defraud;

(b) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

3

A3888

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

(a) Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b) Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c) Making use of any means or instruments of

4

A3889

transportation or communication in interstate commerce

or of the mails to offer to sell or offer to buy

through the use or medium of any prospectus or

otherwise any security, unless a registration

statement has been filed with the Commission as to

such security, or while the registration statement is

the subject of a refusal order or stop order or (prior

to the effective date of the registration statement)

any public proceeding or examination under Section 8

of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as

provided in Federal Rule of Civil Procedure 65(d)(2), the

foregoing paragraph also binds the following who receive actual

notice of this Judgment by personal service or otherwise: (a)

Defendant's officers, agents, servants, employees, and attorneys;

and (b) other persons in active concert or participation with

Defendant or with anyone described in (a).

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

is permanently restrained and enjoined from violating, directly or

indirectly, Section 13(d) of the Exchange Act [15 U.S.C. § 78j(b)]

and Rule 13d-1 promulgated thereunder [17 C.F.R. § 240.13d- 1], by

failing to file with the Commission a statement containing the

information required by Schedule 13D (as provided in 17 C.F.R. §

5

A3890

240.13d-101), within ten days after acquiring directly or indirectly beneficial ownership of more than five percent of any equity security of a class which is specified in Exchange Act Rule 13d-1(I) [17 C.F.R. § 240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1].

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], Defendant is permanently restrained and enjoined from directly or

A3891

indirectly, including, but not limited to, through an entity owned
or controlled by him, participating in the issuance, purchase,
offer, or sale of any security; provided, however, that such
injunction shall not prevent Defendant from purchasing or selling
securities listed on a national securities exchange for his own
personal account.

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that (i)
Defendant is jointly and severally liable with co-Defendants
Frederick L. Sharp, Jackson T. Friesen, and Mike K. Veldhuis for
disgorgement of $42,503,547.00, with the amount to be disgorged
from Defendant to not exceed $17,367,474.00, representing
profits gained as a result of the conduct on which he was found
liable, and (ii) is liable for a civil penalty in the amount of
$1,562,603.00 pursuant to Section 21(d) of the Exchange Act [15
U.S.C. § 78u].   The Court does not award prejudgment interest.
Defendant shall satisfy this obligation by paying $18,930,077.00
to the Securities and Exchange Commission within 30 days after
entry of this Judgment.

Defendant may transmit payment electronically to the
Commission, which will provide detailed ACH transfer/Fedwire
instructions upon request.   Payment may also be made directly
from a bank account via Pay.gov through the SEC website at
http://www.sec.gov/about/offices/ofm.htm.   Defendant may also

7

A3892

pay by certified check, bank cashier's check, or United States
postal money order payable to the Securities and Exchange
Commission, which shall be delivered or mailed to

     Enterprise Services
     Center Accounts
     Receivable Branch 6500
     South MacArthur
     Boulevard Oklahoma
     City, OK 73169

and shall be accompanied by a letter identifying the case title,
civil action number, and name of this Court; Paul Sexton as a
defendant in this action; and specifying that payment is made
pursuant to this Judgment.

    Defendant shall simultaneously transmit photocopies of
evidence of payment and case identifying information to the
Commission's counsel in this action.  By making this payment,
Defendant relinquishes all legal and equitable right, title, and
interest in such funds and no part of the funds shall be
returned to Defendant.

    The Commission may enforce the Court's judgment for
penalties by the use of all collection procedures authorized by
law, including the Federal Debt Collection Procedures Act, 28
U.S.C. § 3001 et seq., and moving for civil contempt for the
violation of any Court orders issued in this action.  Defendant
shall pay post judgment interest on any amounts due after 30
days of the entry of this Judgment pursuant to 28 U.S.C. § 1961.
The Commission shall hold the funds, together with any interest

8

A3893

and income earned thereon (collectively, the "Fund"), pending
further order of the Court.

The Commission may propose a plan to distribute the Fund
subject to the Court's approval.  Such a plan may provide that
the Fund shall be distributed pursuant to the Fair Fund
provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002.
The Court shall retain jurisdiction over the administration of
any distribution of the Fund and the Fund may only be disbursed
pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is
made, amounts ordered to be paid as civil penalties pursuant to
this Judgment shall be treated as penalties paid to the
government for all purposes, including all tax purposes.  To
preserve the deterrent effect of the civil penalty, Defendant
shall not, after offset or reduction of any award of
compensatory damages in any Related Investor Action based on
Defendant's payment of disgorgement in this action, argue that
he is entitled to, nor shall he further benefit by, offset or
reduction of such compensatory damages award by the amount of
any part of Defendant's payment of a civil penalty in this
action ("Penalty Offset").  If the court in any Related
Investor Action grants such a Penalty Offset, Defendant shall,
within 30 days after entry of a final order granting the Penalty
Offset, notify the Commission's counsel in this action and pay

A3894

the amount of the Penalty Offset to the United States Treasury
or to a Fair Fund, as the Commission directs.  Such a payment
shall not be deemed an additional civil penalty and shall not be
deemed to change the amount of the civil penalty imposed in this
Judgment.  For purposes of this paragraph, a "Related Investor
Action" means a private damages action brought against Defendant
by or on behalf of one or more investors based on substantially
the same facts as alleged in the Complaint in this action.

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court
shall retain jurisdiction of this matter for the purposes of
enforcing the terms of this Judgment.  Further, the asset freeze
order imposed by Paragraph V of this Court's Order dated August
20, 2021, shall continue in full force and effect until the
monetary obligation imposed by this Judgment is paid in full.

IX.

There being no just reason for delay, pursuant to Rule 54(b)
of the Federal Rules of Civil Procedure, the Clerk is ordered to
enter this Judgment forthwith and without further notice.

**SO ORDERED.**

          /s/ William G. Young
           WILLIAM G. YOUNG
           DISTRICT JUDGE

A3895

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
SECURITIES AND EXCHANGE         )
COMMISSION,                     )
                                )
            Plaintiff,          )
                                )
v.                              )        CIVIL ACTION
                                )        NO. 21-11276-WGY
FREDERICK L. SHARP,             )
ZHIYING YVONNE GASARCH,         )
COURTNEY KELLN,                 )
MIKE K. VELDHUIS,               )
PAUL SEXTON,                    )
JACKSON T. FRIESEN,             )
WILLIAM T. KAITZ,               )
AVTAR S. DHILLON, and           )
GRAHAM R. TAYLOR,               )
                                )
            Defendants.         )
                                )
_____)
```

YOUNG, D.J.                                    June 20, 2024

**JUDGMENT AS TO DEFENDANT MIKE K. VELDHUIS**

On June 13, 2023, Defendant Mike K. Veldhuis ("Defendant"

or "Veldhuis") agreed not to contest his liability for violating

Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act

of 1933 and Sections 10(b) and 13(d) of the Securities Exchange

Act of 1934 and Rules 10b-5(a) and (c) and 13d-1 thereunder.

Dkt. No. 315.  On June 21, 2023, the Court entered judgment

against Veldhuis which included permanent injunctions and a

penny stock bar.  Dkt. No. 325.

The permanent injunctions and penny stock bar remain in full

1

A3896

force and effect and are incorporated herein. That judgment
also contemplated additional monetary remedies that would be
determined by the Court at a later date, and that Veldhuis would
not contest liability for purposes of that determination. Id.
On May 8, 2024, the Court, at a hearing, imposed a civil penalty
on Veldhuis that is incorporated into this judgment. The Court
held the issues of disgorgement and prejudgment interest under
advisement. Accordingly, the Court enters partial Judgment as
follows:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is
permanently restrained and enjoined from violating, directly or
indirectly, Section 10(b) of the Securities Exchange Act of 1934
(the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5
promulgated thereunder [17 C.F.R. § 240.10b-5], by using any
means or instrumentality of interstate commerce, or of the
mails, or of any facility of any national securities exchange,
in connection with the purchase or sale of any security:

    (a)  to employ any device, scheme, or artifice to defraud;

    (b)  to make any untrue statement of a material fact or to
omit to state a material fact necessary in order to
make the statements made, in the light of the
circumstances under which they were made, not
misleading; or

2

(c)  to  engage  in  any  act,  practice,  or  course  of
     business which operates or would operate as a fraud
     or deceit upon any person.

     IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as
provided in Federal Rule of Civil Procedure 65(d)(2), the
foregoing paragraph also binds the following who receive actual
notice of this Judgment by personal service or otherwise: (a)
Defendant's officers, agents, servants, employees, and attorneys;
and (b) other persons in active concert or participation with
Defendant or with anyone described in (a).

                              II.

     IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant
is permanently restrained and enjoined from violating Section
17(a) of the Securities Act of 1933 (the "Securities Act") [15
U.S.C. § 77q(a)] in the offer or sale of any security by the use
of any means or instruments of transportation or communication in
interstate commerce or by use of the mails, directly or
indirectly:

(a)  to employ any device, scheme, or artifice to defraud;

(b)  to obtain money or property by means of any untrue
     statement of a material fact or any omission of a
     material fact necessary in order to make the
     statements made, in light of the circumstances under
     which they were made, not misleading; or

A3898

    (c)   to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

### III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

    (a)   Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

    (b)   Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or

A3899

instruments of transportation, any such security for
the purpose of sale or for delivery after sale; or

(c)  Making use of any means or instruments of
transportation or communication in interstate commerce
or of the mails to offer to sell or offer to buy
through the use or medium of any prospectus or
otherwise any security, unless a registration
statement has been filed with the Commission as to
such security, or while the registration statement is
the subject of a refusal order or stop order or (prior
to the effective date of the registration statement)
any public proceeding or examination under Section 8
of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as
provided in Federal Rule of Civil Procedure 65(d)(2), the
foregoing paragraph also binds the following who receive actual
notice of this Judgment by personal service or otherwise: (a)
Defendant's officers, agents, servants, employees, and attorneys;
and (b) other persons in active concert or participation with
Defendant or with anyone described in (a).

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant
is permanently restrained and enjoined from violating, directly or
indirectly, Section 13(d) of the Exchange Act [15 U.S.C. § 78j(b)]

5

A3900

and Rule 13d-1 promulgated thereunder [17 C.F.R. § 240.13d- 1], by failing to file with the Commission a statement containing the information required by Schedule 13D (as provided in 17 C.F.R. § 240.13d-101), within ten days after acquiring directly or indirectly beneficial ownership of more than five percent of any equity security of a class which is specified in Exchange Act Rule 13d-1(I) [17 C.F.R. § 240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1].

VI.

6

A3901

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for his own personal account.

## VII.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that (i) Defendant is jointly and severally liable with co-Defendants Frederick L. Sharp, Jackson T. Friesen, and Paul Sexton for disgorgement of $42,503,547.00, with the amount to be disgorged from Defendant to not exceed $13,289,897.00, representing profits gained as a result of the conduct on which he was found liable, and (ii) Defendant is liable for a civil penalty in the amount of $1,562,603.00 pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u]. The Court does not award prejudgment interest. Defendant shall satisfy this obligation by paying $14,852,500.00 to the Securities and Exchange Commission within 30 days after entry of this Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire

A3902

instructions upon request.   Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.   Defendant may also

pay by certified check, bank cashier's check, or United States

postal money order payable to the Securities and Exchange

Commission, which shall be delivered or mailed to

> Enterprise Services
> Center Accounts
> Receivable Branch  6500
> South MacArthur
> Boulevard Oklahoma
> City, OK 73169

and shall be accompanied by a letter identifying the case title,

civil action number, and name of this Court; Mike Veldhuis as a

defendant in this action; and specifying that payment is made

pursuant to this Judgment.

Defendant shall simultaneously transmit photocopies of

evidence of payment and case identifying information to the

Commission's counsel in this action.   By making this payment,

Defendant relinquishes all legal and equitable right, title, and

interest in such funds and no part of the funds shall be

returned to Defendant.

The Commission may enforce the Court's judgment for

penalties by the use of all collection procedures authorized by

law, including the Federal Debt Collection Procedures Act, 28

U.S.C. § 3001 et seq., and moving for civil contempt for the

violation of any Court orders issued in this action.   Defendant

A3903

shall pay post judgment interest on any amounts due after 30 days of the entry of this Judgment pursuant to 28 U.S.C. § 1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval.  Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related

9

A3904

Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.  Further, the asset freeze order imposed by Paragraph V of this Court's Order dated August 20, 2021, shall continue in full force and effect until the monetary obligation imposed by this Judgment is paid in full.

IX.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

**SO ORDERED.**

A3905

  /s/ William G. Young
    WILLIAM G. YOUNG
    DISTRICT JUDGE

A3906

```
                 UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
_____
                                    )
SECURITIES AND EXCHANGE             )
COMMISSION,                         )
                                    )
            Plaintiff,              )
                                    )
v.                                  )          CIVIL ACTION
                                    )          NO. 21-11276-WGY
FREDERICK L. SHARP,                 )
ZHIYING YVONNE GASARCH,             )
COURTNEY KELLN,                     )
MIKE K. VELDHUIS,                   )
PAUL SEXTON,                        )
JACKSON T. FRIESEN,                 )
WILLIAM T. KAITZ,                   )
AVTAR S. DHILLON, and               )
GRAHAM R. TAYLOR,                   )
                                    )
            Defendants.             )
                                    )
_____)
```

YOUNG, D.J.                                    June 20, 2024


### JUDGMENT AS TO DEFENDANT JACKSON T. FRIESEN

On September 27, 2023, the jury in this matter found
Defendant Jackson T. Friesen ("Defendant" or "Friesen") liable
for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the
Securities Act of 1933 and Sections 10(b) and 13(d) of the
Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) and
13d-1 thereunder.  On May 8, 2024, the Court, at a hearing,
imposed injunctive relief and a civil penalty on Friesen that is
incorporated into this judgment.  The Court held the issues of
disgorgement and prejudgment interest under advisement.

1

A3907

Accordingly, the Court enters partial Judgment as follows:

### I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)   to employ any device, scheme, or artifice to defraud;

    (b)   to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)   to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a)

A3908

Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    (a)   to employ any device, scheme, or artifice to defraud;

    (b)   to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)   to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a)

3

A3909

Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)   Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)   Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)   Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to

4

A3910

such security, or while the registration statement is

the subject of a refusal order or stop order or (prior

to the effective date of the registration statement)

any public proceeding or examination under Section 8

of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as

provided in Federal Rule of Civil Procedure 65(d)(2), the

foregoing paragraph also binds the following who receive actual

notice of this Judgment by personal service or otherwise: (a)

Defendant's officers, agents, servants, employees, and attorneys;

and (b) other persons in active concert or participation with

Defendant or with anyone described in (a).


IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

is permanently restrained and enjoined from violating, directly or

indirectly, Section 13(d) of the Exchange Act [15 U.S.C. § 78j(b)]

and Rule 13d-1 promulgated thereunder [17 C.F.R. § 240.13d- 1], by

failing to file with the Commission a statement containing the

information required by Schedule 13D (as provided in 17 C.F.R.

§240.13d-101), within ten days after acquiring directly or

indirectly beneficial ownership of more than five percent of any

equity security of a class which is specified in Exchange Act Rule

13d-1(I) [17 C.F.R. § 240.13d-1(i)].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as

A3911

provided in Federal Rule of Civil Procedure 65(d)(2), the
foregoing paragraph also binds the following who receive actual
notice of this Judgment by personal service or otherwise: (a)
Defendant's officers, agents, servants, employees, and attorneys;
and (b) other persons in active concert or participation with
Defendant or with anyone described in (a).

V.

    IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant
is permanently barred from participating in an offering of penny
stock, including engaging in activities with a broker, dealer, or
issuer for purposes of issuing, trading, or inducing or attempting
to induce the purchase or sale of any penny stock.  A penny stock
is any equity security that has a price of less than five dollars,
except as provided in Rule 3a51-1 under the Exchange Act [17
C.F.R. § 240.3a51-1].

VI.

    IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant
to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)],
Defendant is permanently restrained and enjoined from directly or
indirectly, including, but not limited to, through an entity
owned or controlled by him, participating in the issuance,
purchase, offer, or sale of any security; provided, however, that
such injunction shall not prevent Defendant from purchasing or
selling securities listed on a national securities exchange for

6

A3912

his own personal account.

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that (i)
Defendant is jointly and severally liable with co-Defendants
Frederick L. Sharp, Paul Sexton, and Mike K. Veldhuis for
disgorgement of $42,503,547.00, with the amount to be disgorged
from Defendant to not exceed $11,846,176.00, representing
profits gained as a result of the conduct on which he was found
liable, and (ii) Defendant is liable for a civil penalty in the
amount of $1,562,603.00 pursuant to Section 21(d) of the
Exchange Act [15 U.S.C. § 78u].  The Court does not award
prejudgment interest.  Defendant shall satisfy this obligation
by paying $13,408,779.00 to the Securities and Exchange
Commission within 30 days after entry of this Judgment.

Defendant may transmit payment electronically to the
Commission, which will provide detailed ACH transfer/Fedwire
instructions upon request.   Payment may also be made directly
from a bank account via Pay.gov through the SEC website at
http://www.sec.gov/about/offices/ofm.htm.  Defendant may also
pay by certified check, bank cashier's check, or United States
postal money order payable to the Securities and Exchange
Commission, which shall be delivered or mailed to

        Enterprise Services
        Center Accounts
        Receivable Branch 6500
        South MacArthur

7

A3913

Boulevard Oklahoma
City, OK 73169

and shall be accompanied by a letter identifying the case title,
civil action number, and name of this Court; Jackson Friesen as a
defendant in this action; and specifying that payment is made
pursuant to this Judgment.

Defendant shall simultaneously transmit photocopies of
evidence of payment and case identifying information to the
Commission's counsel in this action.  By making this payment,
Defendant relinquishes all legal and equitable right, title, and
interest in such funds and no part of the funds shall be
returned to Defendant.

The Commission may enforce the Court's judgment for
penalties by the use of all collection procedures authorized by
law, including the Federal Debt Collection Procedures Act, 28
U.S.C. § 3001 et seq., and moving for civil contempt for the
violation of any Court orders issued in this action.  Defendant
shall pay post judgment interest on any amounts due after 30
days of the entry of this Judgment pursuant to 28 U.S.C. § 1961.
The Commission shall hold the funds, together with any interest
and income earned thereon (collectively, the "Fund"), pending
further order of the Court.

The Commission may propose a plan to distribute the Fund
subject to the Court's approval.  Such a plan may provide that
the Fund shall be distributed pursuant to the Fair Fund

8

A3914

provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that he is entitled to, nor shall he further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor

9

A3915

Action" means a private damages action brought against Defendant
by or on behalf of one or more investors based on substantially
the same facts as alleged in the Complaint in this action.

                              VIII.

     IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this
Court shall retain jurisdiction of this matter for the purposes
of enforcing the terms of this Judgment.  Further, the asset
freeze order imposed by Paragraph I of this Court's Order dated
October 7, 2021 shall continue in full force and effect until
the monetary obligation imposed by this Judgment is paid in
full.

                               IX.

     There being no just reason for delay, pursuant to Rule 54(b)
of the Federal Rules of Civil Procedure, the Clerk is ordered to
enter this Judgment forthwith and without further notice.


     **SO ORDERED.**


                                        /s/ William G. Young
                                        WILLIAM G. YOUNG
                                        DISTRICT JUDGE




                                10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
SECURITIES AND EXCHANGE        )
COMMISSION,                    )
                              )
          Plaintiff,           )
                              )
v.                             )          CIVIL ACTION
                              )          NO. 21-11276-WGY
FREDERICK L. SHARP,            )
ZHIYING YVONNE GASARCH,        )
COURTNEY KELLN,                )
MIKE K. VELDHUIS,              )
PAUL SEXTON,                   )
JACKSON T. FRIESEN,            )
WILLIAM T. KAITZ,              )
AVTAR S. DHILLON, and          )
GRAHAM R. TAYLOR,              )
                              )
          Defendants.          )
                              )
_____)
```

YOUNG, D.J.                                    June 20, 2024


**JUDGMENT AS TO DEFENDANT YVONNE GASARCH**

On September 27, 2023, the jury in this matter found Defendant Zhiying Yvonne Gasarch ("Defendant" or "Gasarch") liable for violating Section 17(a)(3) of the Securities Act of 1933 and for aiding and abetting others' violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) thereunder. On May 8, 2024, the Court, at a hearing, imposed injunctive relief and a civil penalty on Gasarch that is incorporated into this judgment. The Court held the issues of

1

A3917

disgorgement and prejudgment interest under advisement. Accordingly, the Court enters partial Judgment as follows:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)    to employ any device, scheme, or artifice to defraud;

(b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a)

2

A3918

Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    (a)  to employ any device, scheme, or artifice to defraud;

    (b)  to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)  to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a)

3

A3919

Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1].

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], Defendant is permanently restrained and enjoined from directly or indirectly, including, but not limited to, through an entity owned or controlled by her, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendant from purchasing or selling securities listed on a national securities exchange for her own personal account.

V.

4

A3920

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that (i) Defendant is jointly and severally liable with co-Defendant Frederick L. Sharp for disgorgement of $2,522,367.00, representing profits gained as a result of the conduct on which she was found liable, and (ii) Defendant is liable for a civil penalty in the amount of $269,651.00[1] pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u].  The Court does not award prejudgment interest.  Defendant shall satisfy this obligation by paying $2,792,018.00 to the Securities and Exchange Commission within 30 days after entry of this Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

---

[1] In its Memorandum & Order on the Securities and Exchange Commission's Motion for Remedies, the Court made an error with respect to its civil penalty award imposed upon Gasarch.  Mem. & Order 5, 40, 62, ECF No. 494.  As this judgment confirms, this Court imposes a civil penalty of $269,651.00 against Gasarch, which reflects Gasarch's frozen assets as of December 2022, as reported by the Securities and Exchange Commission.  Pl.'s Mem. Supp. Mot. Remedies Against Defs. Veldhuis, Sexton, Friesen, Kelln, and Gasarch 14, ECF No. 426; Mem. & Order 40, ECF No. 494 (explaining that it calculated Gasarch's civil penalties by looking at her frozen assets as of December 2022).

A3921

Enterprise Services
Center Accounts
Receivable Branch 6500
South MacArthur
Boulevard Oklahoma
City, OK 73169

and shall be accompanied by a letter identifying the case title,

civil action number, and name of this Court; Zhiying Yvonne

Gasarch as a defendant in this action; and specifying that payment

is made pursuant to this Judgment.

Defendant shall simultaneously transmit photocopies of

evidence of payment and case identifying information to the

Commission's counsel in this action.  By making this payment,

Defendant relinquishes all legal and equitable right, title, and

interest in such funds and no part of the funds shall be

returned to Defendant.

The Commission may enforce the Court's judgment for

penalties by the use of all collection procedures authorized by

law, including the Federal Debt Collection Procedures Act, 28

U.S.C. § 3001 et seq., and moving for civil contempt for the

violation of any Court orders issued in this action.  Defendant

shall pay post judgment interest on any amounts due after 30

days of the entry of this Judgment pursuant to 28 U.S.C. § 1961.

The Commission shall hold the funds, together with any interest

and income earned thereon (collectively, the "Fund"), pending

further order of the Court.

The Commission may propose a plan to distribute the Fund

A3922

subject to the Court's approval.  Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on Defendant's payment of disgorgement in this action, argue that she is entitled to, nor shall she further benefit by, offset or reduction of such compensatory damages award by the amount of any part of Defendant's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Defendant shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.  Such a payment shall not be deemed an additional civil penalty and shall not be

7

A3923

deemed to change the amount of the civil penalty imposed in this Judgment.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.  Further, the asset freeze order imposed by Paragraph I of this Court's Order dated October 15, 2021, shall continue in full force and effect until the monetary obligation imposed by this Judgment is paid in full.

VII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.


**SO ORDERED.**


                                    /s/ William G. Young
                                    WILLIAM G. YOUNG
                                    DISTRICT JUDGE

A3924

```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
_____
                                    )
SECURITIES AND EXCHANGE             )
COMMISSION,                         )
                                    )
              Plaintiff,            )
                                    )
v.                                  )       CIVIL ACTION
                                    )       NO. 21-11276-WGY
FREDERICK L. SHARP,                 )
ZHIYING YVONNE GASARCH,             )
COURTNEY KELLN,                     )
MIKE K. VELDHUIS,                   )
PAUL SEXTON,                        )
JACKSON T. FRIESEN,                 )
WILLIAM T. KAITZ,                   )
AVTAR S. DHILLON, and               )
GRAHAM R. TAYLOR,                   )
                                    )
              Defendants.           )
                                    )
_____ )
```

YOUNG, D.J.                                        June 20, 2024

### JUDGMENT AS TO DEFENDANT COURTNEY KELLN

On June 13, 2023, Defendant Courtney Kelln ("Defendant" or "Kelln") agreed not to contest her liability for violating Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5(a) and (c) thereunder, and for aiding and abetting others' violations of those provisions.  Dkt. No. 315. The following day, the Court entered judgment against Kelln which included permanent injunctions and a penny stock bar. Dkt. No. 317.  The permanent injunctions and penny stock bar

1

A3925

remain in full force and effect and are incorporated herein.
That judgment also contemplated additional monetary remedies
that would be determined by the Court at a later date, and that
Kelln would not contest liability for purposes of that
determination.  Id.  On May 8, 2024, the Court, at a hearing,
imposed a civil penalty on Kelln that is incorporated into this
judgment.  The Court held the issues of disgorgement and
prejudgment interest under advisement.  Accordingly, the Court
enters partial Judgment as follows:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is
permanently restrained and enjoined from violating, directly or
indirectly, Section 10(b) of the Securities Exchange Act of 1934
(the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5
promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means
or instrumentality of interstate commerce, or of the mails, or of
any facility of any national securities exchange, in connection
with the purchase or sale of any security:

    (a)   to employ any device, scheme, or artifice to defraud;

    (b)   to make any untrue statement of a material fact or to
omit to state a material fact necessary in order to
make the statements made, in the light of the
circumstances under which they were made, not
misleading; or

2

A3926

(c)  to  engage  in  any  act,  practice,  or  course  of
     business  which  operates  or  would  operate  as  a  fraud
     or  deceit  upon  any  person.

IT  IS  FURTHER  ORDERED,  ADJUDGED,  AND  DECREED  that,  as
provided  in  Federal  Rule  of  Civil  Procedure  65(d)(2),  the
foregoing  paragraph  also  binds  the  following  who  receive  actual
notice  of  this  Judgment  by  personal  service  or  otherwise:  (a)
Defendant's  officers,  agents,  servants,  employees,  and  attorneys;
and  (b)  other  persons  in  active  concert  or  participation  with
Defendant  or  with  anyone  described  in  (a).

                                  II.

IT  IS  FURTHER  ORDERED,  ADJUDGED,  AND  DECREED  that  Defendant
is  permanently  restrained  and  enjoined  from  violating  Section
17(a)  of  the  Securities  Act  of  1933  (the  "Securities  Act")  [15
U.S.C.  §  77q(a)]  in  the  offer  or  sale  of  any  security  by  the  use
of  any  means  or  instruments  of  transportation  or  communication  in
interstate  commerce  or  by  use  of  the  mails,  directly  or  indirectly:

(a)  to  employ  any  device,  scheme,  or  artifice  to  defraud;

(b)  to  obtain  money  or  property  by  means  of  any  untrue
     statement  of  a  material  fact  or  any  omission  of  a
     material  fact  necessary  in  order  to  make  the
     statements  made,  in  light  of  the  circumstances  under
     which  they  were  made,  not  misleading;  or

                                   3

(c)   to engage in any transaction, practice, or course of
      business which operates or would operate as a fraud
      or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as
provided in Federal Rule of Civil Procedure 65(d)(2), the
foregoing paragraph also binds the following who receive actual
notice of this Judgment by personal service or otherwise: (a)
Defendant's officers, agents, servants, employees, and attorneys;
and (b) other persons in active concert or participation with
Defendant or with anyone described in (a).

### III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant
is permanently restrained and enjoined from violating Section 5 of
the Securities Act [15 U.S.C. § 77e] by, directly or indirectly,
in the absence of any applicable exemption:

(a)   Unless a registration statement is in effect as to a
      security, making use of any means or instruments of
      transportation or communication in interstate commerce
      or of the mails to sell such security through the use
      or medium of any prospectus or otherwise;

(b)   Unless a registration statement is in effect as to a
      security, carrying or causing to be carried through
      the mails or in interstate commerce, by any means or

4

A3928

instruments of transportation, any such security for

the purpose of sale or for delivery after sale; or

(c)   Making use of any means or instruments of

transportation or communication in interstate commerce

or of the mails to offer to sell or offer to buy

through the use or medium of any prospectus or

otherwise any security, unless a registration

statement has been filed with the Commission as to

such security, or while the registration statement is

the subject of a refusal order or stop order or (prior

to the effective date of the registration statement)

any public proceeding or examination under Section 8

of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as

provided in Federal Rule of Civil Procedure 65(d)(2), the

foregoing paragraph also binds the following who receive actual

notice of this Judgment by personal service or otherwise: (a)

Defendant's officers, agents, servants, employees, and attorneys;

and (b) other persons in active concert or participation with

Defendant or with anyone described in (a).

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

is permanently barred from participating in an offering of penny

stock, including engaging in activities with a broker, dealer, or

5

issuer for purposes of issuing, trading, or inducing or attempting
to induce the purchase or sale of any penny stock.  A penny stock
is any equity security that has a price of less than five dollars,
except as provided in Rule 3a51-1 under the Exchange Act [17
C.F.R. § 240.3a51-1].

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that pursuant
to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)],
Defendant is permanently restrained and enjoined from directly
or indirectly, including, but not limited to, through an entity
owned or controlled by her, participating in the issuance,
purchase, offer, or sale of any security; provided, however,
that such injunction shall not prevent Defendant from purchasing
or selling securities listed on a national securities exchange
for her own personal account.

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that (i)
Defendant is jointly and severally liable with co-Defendant
Frederick L. Sharp for disgorgement of $1,582,785.00,
representing profits gained as a result of the conduct on which
she was found liable, and (ii) Defendant is liable for a civil
penalty in the amount of $904,078.00 pursuant to Section 21(d)
of the Securities Exchange Act of 1934 ("Exchange Act") [15

6

U.S.C. § 78u].   The Court does not award prejudgment interest.
Defendant shall satisfy this obligation by paying $2,486,863.00
to the Securities and Exchange Commission within 30 days after
entry of this Judgment.

Defendant may transmit payment electronically to the
Commission, which will provide detailed ACH transfer/Fedwire
instructions upon request.   Payment may also be made directly
from a bank account via Pay.gov through the SEC website at
http://www.sec.gov/about/offices/ofm.htm.   Defendant may also
pay by certified check, bank cashier's check, or United States
postal money order payable to the Securities and Exchange
Commission, which shall be delivered or mailed to

        Enterprise Services
        Center Accounts
        Receivable Branch  6500
        South MacArthur
        Boulevard Oklahoma
        City, OK 73169

and shall be accompanied by a letter identifying the case title,
civil action number, and name of this Court; Courtney Kelln as a
defendant in this action; and specifying that payment is made
pursuant to this Judgment.

Defendant shall simultaneously transmit photocopies of
evidence of payment and case identifying information to the
Commission's counsel in this action.   By making this payment,
Defendant relinquishes all legal and equitable right, title, and
interest in such funds and no part of the funds shall be

7

A3931

returned to Defendant.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 et seq., and moving for civil contempt for the violation of any Court orders issued in this action.  Defendant shall pay post judgment interest on any amounts due after 30 days of the entry of this Judgment pursuant to 28 U.S.C. § 1961. The Commission shall hold the funds, together with any interest and income earned thereon (collectively, the "Fund"), pending further order of the Court.

The Commission may propose a plan to distribute the Fund subject to the Court's approval.  Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only be disbursed pursuant to an Order of the Court.

Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Defendant shall not, after offset or reduction of any award of

8

A3932

compensatory damages in any Related Investor Action based on
Defendant's payment of disgorgement in this action, argue that
she is entitled to, nor shall she further benefit by, offset or
reduction of such compensatory damages award by the amount of
any part of Defendant's payment of a civil penalty in this
action ("Penalty Offset").   If the court in any Related
Investor Action grants such a Penalty Offset, Defendant shall,
within 30 days after entry of a final order granting the Penalty
Offset, notify the Commission's counsel in this action and pay
the amount of the Penalty Offset to the United States Treasury
or to a Fair Fund, as the Commission directs.   Such a payment
shall not be deemed an additional civil penalty and shall not be
deemed to change the amount of the civil penalty imposed in this
Judgment.   For purposes of this paragraph, a "Related Investor
Action" means a private damages action brought against Defendant
by or on behalf of one or more investors based on substantially
the same facts as alleged in the Complaint in this action.

                              VII.

     IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court
shall retain jurisdiction of this matter for the purposes of
enforcing the terms of this Judgment.   Further, the asset freeze
order imposed by Paragraph I of this Court's Order dated October
7, 2021, shall continue in full force and effect until the
monetary obligation imposed by this Judgment is paid in full.

A3933

VIII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Judgment forthwith and without further notice.

**SO ORDERED.**

                                        /s/ William G. Young
                                     WILLIAM G. YOUNG
                                     DISTRICT JUDGE

A3934

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>          **Plaintiff,**<br><br>   **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>          **Defendants.** | **21-cv-11276-WGY** |

### MOTION FOR ORDERS DIRECTING THE TURNOVER OF FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION

Plaintiff, the United States Securities and Exchange Commission (the "Commission"), hereby submits this motion for orders to turn over frozen funds to the Commission to partially satisfy the monetary judgments entered against Mike K. Veldhuis ("Veldhuis"), Paul Sexton ("Sexton"), Jackson T. Friesen ("Friesen"), Yvonne Gasarch ("Gasarch"), and Courtney Kelln ("Kelln") (collectively, "Defendants"), and in support thereof states the following:

1. On August 5, 2021, the Commission filed this case, and the following day obtained a temporary restraining order that froze assets controlled by the Defendants. *See* Dkt. No. 7. At various times during the early stages of litigation, the temporary restraining orders were extended, and the Court issued preliminary injunctions continuing the asset freezes, as periodically modified. *See, e.g.,* Dkt. Nos. 39, 41, 42, 44, 45, 65, 68, 69, 91, 95, 101, 177, 192, 265, 411.

2. The Commission staff served the asset freeze orders on the financial institutions identified in the temporary restraining orders and preliminary injunctions, thereby freezing the Defendants' assets during the pendency of this litigation. As of this filing, the approximate value of

A3935

assets that remain frozen in financial institutions as to each of the Defendants are in the below chart

(with value in Canadian dollars as provided to the Commission staff, and conversion to U.S. dollars at

the rate of 1.00 CAD to 0.7306 USD):

| Defendant | Approximate Amounts Currently Frozen (CDN) | Approximate Amounts Currently Frozen (USD) |
|---|---|---|
| Zhiying Yvonne Gasarch | $365,294 | $266,871 |
| Courtney Kelln | $584,417 | $426,954 |
| Mike Veldhuis | $5,473,946 | $3,999,073 |
| Paul Sexton | $18,711,119 | $13,669,688 |
| Jackson Friesen | $3,799,106 | $2,775,493 |

3.      Before the trial in this matter, the Court entered partial judgments against Kelln and

Veldhuis in June 2023. Dkt. Nos. 317, 325. The Court then entered a partial judgment against Sexton on

September 12, 2023. Dkt. 378. On September 27, 2023, after a ten-day jury trial, a jury found Gasarch

and Friesen liable for violating the securities laws. Dkt. No. 402. Thereafter, the Commission moved for,

and the Court granted, remedies against the Defendants. *See* Dkt. No. 494-499.[1]

4.      The judgments against Veldhuis, Sexton, and Friesen ordered them each to pay a civil

penalty of $1,562,603. The judgments further held Veldhuis, Sexton, and Friesen liable for

disgorgement, with the amount to be disgorged by Veldhuis not to exceed $13,289,897, the amount to be

disgorged by Sexton not to exceed $17,367,474, and the amount to be disgorged by Friesen not to

exceed $11,846,176. *See* Dkt. Nos. 495-497, at VII. Though the judgments describe these amounts as

joint and several, the Commission is seeking turnover of funds only up to the maximum amount of

disgorgement liability as to each defendant as stated in the judgments and does not seek to hold any of

the defendants liable beyond that amount.

5.      The judgment against Gasarch ordered her to pay a civil penalty of $269,651 and held her

liable for disgorgement of $2,522,367. *See* Dkt. No. 498, at V.

---

[1] The Court ordered the Commission to submit a plan detailing how the funds disgorged will be used to make victims whole. *See* Dkt. No. 494, at 63. The Commission staff intends to file its submission for the Court's approval by August 30, 2024.

2

6.      The judgment against Kelln ordered her to pay a civil penalty of $904,078 and held her liable for disgorgement of $1,582,785. *See* Dkt. No. 499, at VI.

7.      Each judgment also ordered that the previously entered asset freeze orders "shall continue in full force and effect until the monetary obligation imposed by [the Judgments are] paid in full." *See* Dkt. No. 495, at VIII (Sexton); 496, at VIII (Veldhuis); 497, at VIII (Friesen); 498, at VI (Gasarch); 499, at VII (Kelln).

8.       Because of the freeze orders, the Commission is unable to collect the frozen funds. Therefore, the Commission requests that the Court enter the attached proposed orders that direct the financial institutions to pay the frozen funds to the Commission in partial satisfaction of the monetary judgments as to each Defendant. Because the funds currently frozen are insufficient to completely satisfy the Defendants' monetary obligations as ordered by this Court, the Commission will continue collection efforts against other assets owned or controlled by the Defendants.

9.      In addition to the freeze orders directing financial institutions to freeze funds belonging to the Defendants, this Court entered an additional order that froze a portion of the funds resulting from Gasarch's sale of her primary residence in January 2022. *See* Dkt. No. 192 (Court Order dated Jan. 25, 2022), ¶6. Given that the precondition to the Court's January 25, 2022 Order has now been satisfied in that a monetary judgment has been issued against Gasarch, Gasarch should now be directed, as the Order instructs, to "cooperate with the Commission to ensure that the escrowed funds are available to satisfy any judgment."

**WHEREFORE**, the Commission respectfully requests that this Court enter the attached Proposed Orders and grant such other relief as the Court deems just and proper.

3

A3937

July 2, 2024                          Respectfully submitted,

                                     SECURITIES AND EXCHANGE COMMISSION

                                     By its attorneys,

                                     /s/ David H. London
                                     Kathleen B. Shields (Mass. Bar No. 637438)
                                     Alfred Day (Mass. Bar No. 654436)
                                     David London (Mass. Bar No. 638289)
                                     Nita K. Klunder (Mass. Bar No. 689304)
                                     Boston Regional Office
                                     33 Arch Street, 24th Floor
                                     Boston, MA  02110
                                     Tel: (617) 573-8997 (London Direct)
                                     Email: LondonD@sec.gov

4

A3938

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(2)**

Pursuant to Local Rule 7.1(a)(2), undersigned counsel certifies that, prior to making this motion, he conferred with counsel for Veldhuis, Friesen, Sexton, Kelln, and Gasarch in a good-faith attempt to resolve or narrow the issues presented in this motion. Counsel for Veldhuis, Friesen, Sexton, Kelln, and Gasarch indicated that they oppose this motion.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2024, a true and correct copy of the foregoing motion was filed electronically and served on all counsel of record via the Court's ECF system.

/s/ David H. London

5

A3939

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>                                **Plaintiff,**<br>     **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>                          **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

### [PROPOSED] ORDER DIRECTING TRANSFER OF JACKSON T. FRIESEN'S FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION

This Court, having reviewed the Motion for an Order Directing Turnover of Frozen Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown, it is hereby

**ORDERED** that the Motion is **GRANTED**; and

### I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Bank of Montreal shall transfer the entire balance of the following Bank of Montreal account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 0469 |
| FERROUS CAPITAL CORPORATION | 0477 |

1

A3940

| FERROUS CAPITAL CORPORATION | 7732 |
|---|---|
| FIRST AVENUE CAPITAL CORP | 0202 |
| MGF STRATEGIES CORP | 3623 |
| VALLEY DRIVE ESTATES INC | 0655 |
| BOUNDARY BAY STRATEGIES CORP. | 512 |
| JACKSON FRIESEN | 2540 |
| JACKSON FRIESEN | 5120 |
| JACKSON FRIESEN | 0170 |
| WESTSIDE CAPITAL PARTNERS INC | 964 |

Bank of Montreal may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Bank of Montreal also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

## II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, PI Financial Corp. ("PI Financial") shall transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 2276 |

2

A3941

| ARDENT STRATEGIES CORP | 3167 |
|---|---|
| ARDENT STRATEGIES CORP | 0153 |
| ARDENT STRATEGIES CORP | 0161 |
| FERROUS CAPITAL CORPORATION | 2958 |
| FERROUS CAPITAL CORPORATION | 2966 |
| FERROUS CAPITAL CORPORATION | 2974 |
| JACKSON FRIESEN | 0254 |

PI Financial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. PI Financial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

III.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Canadian Imperial Bank of Commerce ("Canadian Imperial") shall transfer the entire balance of the following Canadian Imperial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| JACKSON FRIESEN | 2334 |

A3942

Canadian Imperial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Canadian Imperial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

IV.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Envision Financial ("Envision") shall transfer the entire balance of the following Envision account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| JACKSON FRIESEN | 4112 |

Envision may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Envision also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

A3943

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

V.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Research Capital Corporation ("Research Capital") shall

transfer the entire balance of the following Research Capital account(s) which were frozen

pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | KK15 |

Research Capital may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Research Capital also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

A3944

VI.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Leede Jones Gable Inc. ("Leede Jones") shall transfer the

entire balance of the following Leede Jones account(s) which were frozen pursuant to an Order

of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 873A |
| JACKSON FRIESEN | 6901 |
| WESTSIDE CAPITAL PARTNERS INC. | 8121 |

Leede Jones may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Leede Jones also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

VII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Haywood Securities Inc. ("Haywood") shall transfer the

entire balance of the following Haywood account(s) which were frozen pursuant to an Order of

A3945

this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 6164 |

Haywood may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Haywood also may transfer these funds by certified

check, bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

**SO ORDERED.**

Dated:  _____,

_____
WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

A3946

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>                              Plaintiff,<br>     v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,<br><br>                              Defendants. | Civil Action No. 21-CV-11276 (WGY) |

**[PROPOSED] ORDER DIRECTING TRANSFER OF YVONNE GASARCH'S**
**FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION**

This Court, having reviewed the Motion for an Order Directing Turnover of Frozen Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown, it is hereby

**ORDERED** that the Motion is **GRANTED**; and

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Canaccord Genuity Corp ("Canaccord") shall transfer the entire balance of the following Canaccord account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ZHIYING GASARCH | 67A1 |
| ZHIYING GASARCH | 67B1 |

1

A3947

Canaccord may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Canaccord also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

## II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Wells Fargo shall transfer the entire balance of the following Wells Fargo account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| W&B RIDING CLUB @ ASSUNPINK WNA LLC | 9413 |
| W&B RIDING CLUB @ ASSUNPINK WNA LLC | 5351 |

Wells Fargo may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Wells Fargo also may transfer these funds by

A3948

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, G&F Financial Group ("G&F Financial") shall transfer

the entire balance of the following G&F Financial account(s) which were frozen pursuant to an

Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---:|
| ZHIYING GASARCH | 4815 |
| ZHIYING GASARCH/BRUCE GASARCH | 5408 |
| ZHIYING GASARCH/BRUCE GASARCH | 3034 |
| SNOWPEAK MANAGEMENT LTD. | 7164 |
| GREAT WALL MANAGEMENT LTD. | 7172 |
| GREAT WALL MANAGEMENT LTD. | 7180 |

G&F Financial may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  G&F Financial also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

A3949

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Sun Life Assurance Company of Canada ("Sun Life")

shall transfer the entire balance of the following Sun Life account(s) which were frozen pursuant

to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
| --- | --- |
| ZHIYING GASARCH | 8203 |

Sun Life may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Sun Life also may transfer these funds by certified

check, bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

V.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

A3950

being served with a copy of this Order, LMN Law Group Law Corporation ("LMN Law") shall

transfer the entire balance of any and all moneys received from Defendant Gasarch as the result

of the sale of her home as permitted by this Court's Order dated January 25, 2022 (Dkt. No.

192), and held for Gasarch's benefit in an escrow account at TD Bank to the Commission.  LMN

Law may transmit payment electronically to the Commission, which will provide detailed ACH

transfer/Fedwire instructions upon request. Payment may also be made directly from a bank

account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.

LMN Law also may transfer these funds by certified check, bank cashier's check, or United

States postal money order payable to the Securities and Exchange Commission, which shall be

delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

**SO ORDERED.**

Dated: _____,

_____
WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

A3951

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                Plaintiff,<br><br>    v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,<br><br>                         Defendants. | Civil Action No. 21-CV-11276 (WGY) |

**[PROPOSED] ORDER DIRECTING TRANSFER OF COURTNEY KELLN'S**
**FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION**

       This Court, having reviewed the Motion for an Order Directing Turnover of Frozen Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown, it is hereby

       **ORDERED** that the Motion is **GRANTED**; and

I.

       IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, PI Financial Corp. ("PI Financial") shall transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| EVERVEST EQUITY INC | 4535 |

1

A3952

PI Financial may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  PI Financial also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

## II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, TD Canada Trust ("TD Canada") shall transfer the entire

balance of the following TD Canada account(s) which were frozen pursuant to an Order of this

Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| EVERVEST EQUITY INC | 9909 |
| COURTNEY KELLN | 9889 |

TD Canada may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  TD Canada also may transfer these funds by

A3953

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

**SO ORDERED.**

Dated: _____,          _____
                                 WILLIAM G. YOUNG
                                 UNITED STATES DISTRICT JUDGE

A3954

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>          **Plaintiff,** <br><br>   v. <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br>         **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

**[PROPOSED] ORDER DIRECTING TRANSFER OF PAUL SEXTON'S**
**FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION**

This Court, having reviewed the Motion for an Order Directing Turnover of Frozen Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown, it is hereby

**ORDERED** that the Motion is **GRANTED**; and

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Canaccord Genuity Corp ("Canaccord") shall transfer the entire balance of the following Canaccord account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | 08A1 |

1

A3955

| NOVA TREK CAPITAL INC | 08B1 |
|---|---|
| PAUL SEXTON | 91E1 |
| PAUL SEXTON | 91F1 |
| PAUL SEXTON | 31A7 |
| PAUL SEXTON | 31B6 |

Canaccord may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Canaccord also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

## II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, PI Financial Corp. ("PI Financial") shall transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| PAUL SEXTON | 1414 |
| PAUL SEXTON | 3953 |
| NOVA TREK CAPITAL INC. | 6518 |
| NOVA TREK CAPITAL INC. | 6952 |

A3956

| SOLITO CAPITAL CORP. | 7401 |
| SOLITO CAPITAL CORP. | 6951 |
| SOLITO CAPITAL CORP. | 6977 |

PI Financial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  PI Financial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

     Enterprise Services Center
     Accounts Receivable Branch
     6500 South MacArthur Boulevard
     Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

III.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, TD Canada Trust ("TD Canada") shall transfer the entire balance of the following TD Canada account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
| --- | --- |
| NOVA TREK CAPITAL INC | 5109 |
| NOVA TREK CAPITAL INC | 2034 |
| PAUL SEXTON | 6857 |
| PAUL SEXTON | 8504 |
| PAUL SEXTON | 6857 |
| PAUL SEXTON | 5768 |

A3957

| PAUL SEXTON | 9202 |
|---|---|

TD Canada may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  TD Canada also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

IV.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Research Capital Corporation ("Research Capital") shall

transfer the entire balance of the following Research Capital account(s) which were frozen

pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | AAZ8 |
| PAUL SEXTON | KK82 |

Research Capital may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Research Capital also may transfer these funds by

A3958

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

V.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Leede Jones Gable Inc. ("Leede Jones")shall transfer the

entire balance of the following Leede Jones account(s) which were frozen pursuant to an Order

of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | 8313 |
| PAUL SEXTON | 6984 |
| WESTWOOD VENTURES INC. | 227A |
| SOLITO CAPITAL CORP. | 7743 |

Leede Jones may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Leede Jones also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard

A3959

Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

Dated: _____, _____

_____
WILLIAM G YOUNG
UNITED STATES DISTRICT JUDGE

A3960

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>        **Plaintiff,**<br><br>  v.<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br><br>        **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

### [PROPOSED] ORDER DIRECTING TRANSFER OF MIKE K. VELDHUIS'S FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION

This Court, having reviewed the Motion for an Order Directing Turnover of Frozen Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown, it is hereby

**ORDERED** that the Motion is **GRANTED**; and

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Bank of Montreal shall transfer the entire balance of the following Bank of Montreal account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| | |

1

A3961

| AVONHURST CAPITAL CORP | 1741 |
| MIKE VELDHUIS | 7997 |
| MIKE VELDHUIS | 1464B |

Bank of Montreal may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Bank of Montreal also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

## II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, PI Financial Corp. ("PI Financial") shall transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
| --- | --- |
| BLACKSTONE CAPITAL PARTNERS INC | 9203 |
| BLACKSTONE CAPITAL PARTNERS INC | 9237 |
| BLACKSTONE CAPITAL PARTNERS INC | 4273 |
| BLACKSTONE CAPITAL PARTNERS INC | 7396 |
| MIKE VELDHUIS | 1710 |

2

A3962

PI Financial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. PI Financial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

III.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Canaccord Genuity Corp. ("Canaccord") shall transfer the entire balance of the following Canaccord account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | 65A1 |

Canaccord may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Canaccord also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

A3963

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

IV.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Coast Capital Savings Federal Credit Union ("Coast

Capital") shall transfer the entire balance of the following Coast Capital account(s) which were

frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---------------|------------------|
| MIKE VELDHUIS | 8846 |

Coast Capital may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Coast Capital also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

A3964

V.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Research Capital Corporation ("Research Capital")shall transfer the entire balance of the following Research Capital account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | KLA4 |
| BLACKSTONE CAPITAL PARTNERS INC | KKH4 |
| MIKE VELDHUIS | KJV9 |
| MIKE VELDHUIS | KK66 |

Research Capital may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Research Capital also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

    Enterprise Services Center
    Accounts Receivable Branch
    6500 South MacArthur Boulevard
    Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

A3965

VI.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Leede Jones Gable Inc. ("Leede Jones") shall transfer the

entire balance of the following Leede Jones account(s) which were frozen pursuant to an Order

of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | 231A |
| BLACKSTONE CAPITAL PARTNERS INC | 231E |
| BLACKSTONE CAPITAL PARTNERS INC | 231F |
| MIKE VELDHUIS | 953A |
| MIKE VELDHUIS | 953S |
| MIKE VELDHUIS | 862Q |
| FDS CAPITAL INC. | 726A |

Leede Jones may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Leede Jones also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

A3966

**SO ORDERED.**

Dated: _____,           _____
                                  WILLIAM G. YOUNG
                                  UNITED STATES DISTRICT JUDGE

A3967

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

                          Plaintiff,

     v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R. TAYLOR,

                          Defendants.

Civil Action No. 21-CV-11276-WGY

**DEFENDANT JACKSON FRIESEN'S OBJECTIONS TO JUDGMENT [DOC. 497],
MOTION TO AMEND, CLARIFY OR CORRECT JUDGMENT,
AND OPPOSITION TO MOTION FOR TURNOVER ORDER [Doc. 400]**

Pursuant to Federal Rules of Civil Procedure 59(e) and 60(a), Defendant Jackson Friesen, through undersigned counsel, moves for amendment, clarification or correction of the judgment to incorporate this Court's prior order that its disgorgement figure was "subject to" Plaintiff's submission of a detailed plan providing for return of disgorged funds to harmed investors for this Court's review and approval.[1]  Defendant also opposes the motion filed by Plaintiff [Doc. 400] seeking immediate turnover of defendants' funds before it has even offered, much less received approval from this Court, of a detailed plan identifying any harmed investors who would receive disgorged funds.

---

[1] Defendants are also preparing motions for a stay of enforcement of the judgment on related grounds which will be filed with the Court next week.

A3968

Defendant has conferred with Plaintiff's counsel and has been advised that they intend to oppose this motion.

As grounds for this motion, Mr. Friesen asserts the following:

**Legal Argument**

FRCP 59 (e) allows the District Court the opportunity to correct any errors associated with its judgments in the time-period immediately following entry of judgment. *Innovative Home Health Care v. P.T.-O.T. Assocs*., 141 F.3d 1284, 40 Fed. R. Serv. 3d (Callaghan) 1043, 1998 U.S. App. LEXIS 7681 (8th Cir. 1998).   Similarly, FRCP 60 allows for relief from judgment based *inter alia* on "clerical mistakes, oversights or omission" or "inadvertence."   FRCP 60 (a) and (b)(1). *United States v. Mun. Auth*., 181 F.R.D. 290 (M.D. Pa. 1996).

In accordance with those provisions, defendant asks the Court to amend or correct the judgment to reflect this Court's rulings concerning the predicate and process for a judgment of disgorgement in this case.   This Court's numerous and consistent statements and rulings -- that disgorgement is a remedy that would be ordered to the extent that it served to reimburse harmed investors -- date back to pretrial motions in this case, continued in the trial and the oral argument as to remedies, and was memorialized in its recent decision on remedies.  In its decision in *SEC v. Sharp*, 626 F. Supp. 3d 345 (D. Mass. 2022), this Court focused on the Supreme Court's decision in *Liu* and explained that it "further anchored this historical notion by cabining disgorgement to a wrongdoer's net profits and **requiring that such awards be returned to the victims**. *Liu v. Securities and Exchange Commission*, 591 U.S. 71 (2020) (emphasis added). This Court continued:

> The Supreme Court has entrenched disgorgement's non-punitive character in the context of securities violations, by requiring that it be used to make victims whole. *See Liu*, 140 S. Ct. at 1947-49.

2

A3969

The Court reiterated that ruling at the oral argument as to penalties, stating that it intended to set a disgorgement figure that would then be subject to revision based on the Plaintiff's evidence concerning amounts due to harmed investors. Hearing Transcript at 6 ("I may order funds to be returned or the like depending on the Court's satisfaction that the money is actually going back to identified victims, not just some pseudopenalty to be held by the SEC.")

Those principles and authorities were then incorporated into the Court's Memorandum & Order of June 17, 2024 [Doc. 494] regarding penalties. The Court again described the holding of the Supreme Court in *Liu v. SEC*, 591 U.S. 71, 75 (2020) that disgorgement is "permissible" so long as the amount "does not exceed a wrongdoer's net profits ***and is awarded for victims.***"

> [I]t clarified that disgorgement is non-punitive and intended to make victims whole. See id. at 74 (defining courts' power to award equitable relief as "a power that historically excludes punitive sanctions"); id. at 75 (holding that **a disgorgement award "is awarded for victims"**); *see also Sharp*, 626 F. Supp. 3d at 380 ("The Supreme Court has entrenched disgorgement's non-punitive character in the context of securities violations, by requiring that it be **used to make victims whole**.").

Id. at 41 (emphasis added).

The Court then discussed the procedures that would be employed in this case to address the issue of disgorgement. As to the defendant's arguments that the SEC had failed to demonstrate a basis for disgorgement because it failed to identify any harmed investors, the Court described that contention as "premature." The reason, the Court explained, was that "the SEC has agreed in writing, see, e.g., Mem. Supp. 22-24, and verbally represented to this Court during the hearing on remedies, see ECF No. 482, that a plan can and will be submitted to the Court, to its satisfaction, **detailing plans to return the disgorged funds to the harmed investors**." *Id*. at 56 (emphasis added).

The Court then twice reiterated in that Order that its discussion of disgorgement amounts was "subject to" the SEC's compliance with that process and the Court's approval of the plan for

3

A3970

paying funds to "the harmed investors."    Again, at the conclusion of its decision, the Court

confirmed that the disgorgement awards were "subject to" the submission of a plan "to make

victims whole" and the Court's approval of it."

> The disgorgement awards shall be subject to the SEC's submission, and this Court's
> approval, of a plan detailing how the funds disgorged will be used to make victims whole.

The Court directed the SEC to "submit said plan in due course and without any unreasonable

delay" so that the Court could review it and decide whether it met with its approval.

The parties at that point fully anticipated that the SEC would adhere to the Court's direction

and submit a "detailed plan" identifying harmed investors, and that defendants would have an

opportunity to review and respond.

Instead, three days later, this Court issued judgments that failed to incorporate those prior

rulings.  [Doc. 497].  The judgment instead sets a disgorgement amount and directs the defendant

to pay a total of more than $13 million "within 30 days after entry of the judgment."  [Doc. 497 at

7].  That document provides for immediate enforcement of the Court's judgment, without any

reference to submission or approval of a plan identifying harmed investors and allows for civil

contempt for violation of the Court orders.  *Id*. at 8.

While that language may be appropriate and may have been used in other securities matters,

it is not consistent with the process that was ordered by this Court.  This Court directed that the

process of identification of harmed investors should occur without delay and that, through that

process, the Court would determine if the disgorgement figures should be adjusted or reduced.  It

anticipated the possibility, for example, that these particular violations would have resulted in harm

to investors that fell below the disgorgement figure that is based only on allocations contained in

defendant Sharp's Q records.  It did not endorse the notion that those disgorgement figures could,

A3971

in the absence of identification of harmed investors, end up being nothing more than a massive and further penalty, delivered over to the U.S. Treasury.

Rather than address those critical issues, the judgment treats the disgorgement figures as final penalty figures requiring prompt payment by the defendant. It places the defendants in the position of having to appeal where the disgorgement figure was "subject to" further actions of the SEC and the Court. And it makes no provision for proper and timely consideration of the issue emphasized by this Court: that disgorgement may be ordered where it can be and is "returned to the harmed investors."

Plaintiff has immediately seized on the language in the judgment that appeared to relieve it of any obligation to provide any information or detailed plan to the Court.[2] By motion dated today, July 2, 2024, Plaintiff moved for immediate turnover of millions of dollars of funds that had been frozen during the pendency of the case. The Plaintiff makes that motion although such action would be contrary to the Canadian court's prior ruling that a portion of those funds should be released so that defendants can pay their counsel. Certainly Plaintiff would prefer to immediately obtain all of the frozen funds without regard for the prior rulings of this Court or the Canadian court, but its request should be denied and it should be required to do that which was articulated by this Court in its decision: submit a detailed plan identifying harmed investors for this Court's review and approval.

---

[2] The judgment states that the SEC "may" submit a plan and fails to include any requirement of identification of harmed investors.

A3972

**Conclusion**

For the foregoing reasons, defendant asks that this Court deny Plaintiff's motion for

turnover of funds and amend or correct the judgment to reflect the Court's directive to Plaintiff

concerning submission of a detailed plan to return funds to harmed investors.

Dated: July 2, 2024

MG+M THE LAW FIRM                           MARANDA E. FRITZ PC


By: /s/ Timothy J. Fazio                     By: /s/ Maranda E. Fritz
        Timothy J. Fazio                             Maranda E. Fritz (*pro hac vice*)
        125 High Street                              521 Fifth Avenue
        Oliver Street Tower                          New York, New York 10017
        Boston, MA 02110                             Tel: 646-584-8231
        Tel: 617 670 8635                            Email: Maranda@fritzpc.com
        Email: TFazio@mgm.law

Counsel for Jackson T. Friesen


CERTIFICATE OF SERVICE

I, Timothy J. Fazio, hereby certify that a true copy of the above document was served
upon the attorney of record for each party via ECF on July 2, 2024.


/s/ Timothy J. Fazio
Timothy J. Fazio

A3973

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:21-cv-11276-WGY |
| v. | |
| Frederick L. Sharp, *et al.*, | |
| Defendants. | |

**DEFENDANT PAUL SEXTON'S OPPOSITION TO MOTION FOR ORDERS**
**DIRECTING THE TURNOVER OF FROZEN FUNDS TO THE SECURITIES AND**
**EXCHANGE COMMISSION**

Defendant Paul Sexton opposes the Securities and Exchange Commission's motion, which is premature. Under Federal Rule of Civil Procedure 62, the Court's June 20, 2024 judgment is automatically stayed for 30 days. That period has not yet elapsed. Mr. Sexton intends to file a timely notice of appeal, along with a motion for a stay of execution, and requests that the Court withhold a ruling on the Commission's procedurally improper motion until he has the opportunity to brief this issue in the timeframe permitted by the Federal Rules of Civil Procedure.

Respectfully submitted,

*/s/ Neil T. Smith*

Neil T. Smith (BBO# 651157)
    Neil.Smith@klgates.com
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Tel:  (617) 261-3100
Fax:  (617) 261-3175

1

A3974

/s/ Stephen G. Topetzes

Stephen G. Topetzes*
    Stephen.Topetzes@klgates.com
Robert S. Silverblatt*
    Rob.Silverblatt@klgates.com
K&L Gates LLP
1601 K St. NW
Washington, DC 20006
Tel:  (202) 778-9328
Fax:  (202) 778-9100

*Admitted pro hac vice

Counsel for Paul Sexton

Dated: July 2, 2024

2

**<u>CERTIFICATE OF SERVICE</u>**

      The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on July 2, 2024, and a copy thereof will be sent electronically to the registered recipients and counsel of record as identified on the Notice of Electronic Filing.

                                            */s/ Neil T. Smith*

                                            Neil T. Smith

A3976

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

SECURITIES AND EXCHANGE
COMMISSION,

                  Plaintiff,

    v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                  Defendants.

Case No. 1:21-cv-11276-WGY

---

## <u>DEFENDANT COURTNEY KELLN'S NOTICE OF JOINDER</u>

      Defendant Courtney Kelln hereby provides notice that she joins in Defendant Jackson

Friesen's Objections to Judgment, Motion to Amend, Clarify or Correct Judgment, and

Opposition to Motion for Turnover Order (ECF No. 501) and Defendant Paul Sexton's

Opposition to Motion for Orders Directing the Turnover of Frozen Funds to the Securities and

Exchange Commission (ECF No. 502).

                              Respectfully submitted,

Dated: July 3, 2024

                              */s/ Frank Scaduto*
                              Frank Scaduto (BBO #663430)
                              WILEY REIN LLP
                              2050 M Street NW
                              Washington, DC 20036
                              Tel.: 202.719.7000
                              Fax: 202.719.7049
                              fscaduto@wiley.law

                              *Counsel for Defendant Courtney Kelln*

A3977

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2024, I filed the foregoing via the Court's ECF system, which electronically serves a copy on all counsel of record.

*/s/ Frank Scaduto*
Frank Scaduto

A3978

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                          Plaintiff,<br><br>    v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R TAYLOR,<br><br>                          Defendants. | Case No. 1:21-cv-11276-WGY |

## <u>DEFENDANT YVONNE GASARCH'S NOTICE OF JOINDER</u>

Defendant Yvonne Gasarch  hereby provides notice that she joins in Defendant Jackson Friesen's Objections to Judgment, Motion to Amend, Clarify or Correct Judgment, and Opposition to Motion for Turnover Order (ECF No. 501) and Defendant Paul Sexton's Opposition to Motion for Orders Directing the Turnover of Frozen Funds to the Securities and Exchange Commission (ECF No. 502).   The SEC has indicated that it does not oppose Ms. Gasarch joinder.

Dated: July 3, 2024

Respectfully submitte*d,*

*/s/Karen A. Pickett*
Karen A. Pickett, BBO #633801

Pickett Law Offices, PC

125 High St., 26th FL

Boston, MA  02110

617.423.0485

kpickettlaw@gmail.com

A3979

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2024, I filed the foregoing via the Court's ECF system, which electronically serves a copy on all counsel of record.

*/s/Karen A. Pickett*
Karen A. Pickett

A3980

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>Frederick L. Sharp, *et al.*,<br><br>Defendants. | Case No. 1:21-cv-11276-WGY |

**DEFENDANT PAUL SEXTON'S NOTICE OF JOINDER**

Defendant Paul Sexton hereby provides notice that he joins in Defendant Jackson Friesen's Objections to Judgment, Motion to Amend, Clarify or Correct Judgment, and Opposition to Motion for Turnover Order (ECF No. 501).

Respectfully submitted,

*/s/ Neil T. Smith*

Neil T. Smith (BBO# 651157)
    Neil.Smith@klgates.com
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Tel: (617) 261-3100
Fax: (617) 261-3175

*/s/ Stephen G. Topetzes*

Stephen G. Topetzes*
    Stephen.Topetzes@klgates.com
Robert S. Silverblatt*
    Rob.Silverblatt@klgates.com
K&L Gates LLP

1

A3981

1601 K St. NW
Washington, DC 20006
Tel:  (202) 778-9328
Fax:  (202) 778-9100

*Admitted pro hac vice*

*Counsel for Paul Sexton*

Dated: July 3, 2024

2

A3982

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on July 3, 2024, and a copy thereof will be sent electronically to the registered recipients and counsel of record as identified on the Notice of Electronic Filing.

*/s/ Neil T. Smith*

Neil T. Smith

A3983

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

                           Plaintiff,

        v.

FREDERICK L. SHARP, ZHIYING
YVONNE GASARCH, COURTNEY
KELLN, MIKE K. VELDHUIS, PAUL
SEXTON, JACKSON T. FRIESEN,
WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R TAYLOR,

                           Defendants.

Case No. 1:21-cv-11276-WGY

### DEFENDANT MIKE K. VELDHUIS'S NOTICE OF JOINDER

        Defendant Mike K. Veldhuis hereby provides notice that he joins in Defendant Jackson

Friesen's Objections to Judgment, Motion to Amend, Clarify or Correct Judgment, and

Opposition to Motion for Turnover Order (ECF No. 501) and Defendant Paul Sexton's

Opposition to Motion for Orders Directing the Turnover of Frozen Funds to the Securities and

Exchange Commission (ECF No. 502). The SEC has indicated that it does not oppose Mr.

Veldhuis's joinder.

 Dated:  New York, New York
         July 3, 2024

SHER TREMONTE LLP

By:___/s/ Robert Knuts_____
        Michael Tremonte (*pro hac vice*)
        Robert Knuts (*pro hac vice*)
        Katie Renzler (*pro hac vice*)
        90 Broad Street, 23rd Floor
        New York, New York 10004
        Tel: 212.202.2600
        Email: mtremonte@shertremonte.com

*Attorneys for Defendant Mike K. Veldhuis*

A3984

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2024, I filed the foregoing via the Court's ECF system, which electronically serves a copy on all counsel of record.

_____/s/ Robert Knuts_____
Robert Knuts

A3985

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br>                               **Plaintiff,** <br><br>    **v.** <br><br> **FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,** <br><br>                               **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS
TO AMEND, CLARIFY OR CORRECT JUDGMENT**

Plaintiff Securities and Exchange Commission (the "Commission") submits this opposition to defendant Jackson Friesen's ("Friesen") Motion to Amend, Clarify or Correct Judgment, which was joined by the four other defendants. *See* Dkt. No. 501 (Friesen); Dkt. Nos. 503-506 (joined by Kelln, Gasarch, Sexton, Veldhuis). For efficiency, the Commission will address Friesen's substantive argument, and requests that the Court deem this opposition as applying to the other four defendants by way of their joinder.

The Court could not have been clearer in either its June 17, 2024 order (Dkt. No. 494) (the "Order")--or in all five judgments issued shortly thereafter (Dkt Nos. 495-499)--that it awarded disgorgement against all five defendants with no predicate conditions. Of note, the Court analyzed disgorgement (which was heavily briefed by all parties) for over 17 pages in the Order. Order, 41-58. At no point did the Court state that ordering disgorgement was dependent on anything else occurring first. Quite to the contrary. In fact, the Court stated that it "GRANTS

the SEC's motion for disgorgement in its entirety, but modifying it to hold the Defendants jointly and severally liable…" *Id.* at 5. Thus, the only condition imposed by the Court is that disgorgement would be joint and several, nothing more. Federal Rules of Civil Procedure 59(e) and 60(a) are therefore inapplicable here.

Friesen's argument that submission of a distribution plan is a prerequisite to a disgorgement order is contradicted by the language in both the Court's Order and the five judgments. Moreover, his position is premised solely on defining "subject to" as meaning "dependent on something else to happen first" (for example, The sale of property is *subject to* city council approval."). However, "subject to" has other ordinary meanings--one of which is the more natural fit here:

> 1. Affected by something (for example, "The schedule is tentative and *subject to* change"); and

> 2. Likely to do, have, or suffer from something (for example, "My cousin is *subject to* panic attacks.").

*See* "Subject to." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/subject%20to (last visited July 12, 2024).

Thus, the Court's statement that disgorgement is "subject to" the submission of a distribution plan is not, as Friesen claims, premised on the plan coming first, but rather the other, more apt definition, that the disgorgement awarded (and to be collected by) the Commission is "affected by" the plan. Or, to put it in context, the disgorgement ordered is imbedded in the plan such that the Commission can only disburse funds for the benefit of victims and with approval and oversight by the Court. *See, e.g.,* Friesen's Judgment, Dkt. No. 497, at VII ("The Court shall retain jurisdiction over the administration of any distribution of the Fund and the Fund may only

A3987

be disbursed pursuant to an Order of the Court."); *Cf. U.S. v. Knott*, 256 F.3d 20, 28 (1st Cir. 2001) (where terms are not defined in a statute, courts typically read statutory terms to convey their ordinary meaning, including as reflected in dictionary definitions).

The Commission takes seriously the Court's oversight of the distribution process and the directive to propose a plan detailing how the disgorged funds will be used to compensate victims for their losses. As previously stated in the Commission's Motion for Orders Directing the Turnover of Frozen Funds, Dkt. No. 500, at 2 n.1, "The Commission staff intends to file its submission for the Court's approval by August 30, 2024."

For the reasons set forth above, the Commission respectfully requests that the Court deny Friesen's motion to amend, clarify or correct the judgments entered in this case.

Dated:  July 15, 2024                      Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its Attorneys,

/s/ Nita K. Klunder
Kathleen B. Shields (Mass. Bar No. 637438)
Alfred Day (Mass. Bar No. 654436)
David H. London (Mass. Bar No. 638289)
Nita K. Klunder (Mass. Bar No. 689304)
33 Arch Street, 24th Floor
Boston, MA  02110
Telephone: (617) 573-8904 (Shields); (617) 573-4537 (Day); (617) 573-8997 (London); (617) 573-8822 (Klunder)
Fax: (617) 573-4590
Email: shieldska@sec.gov; daya@sec.gov; londond@sec.gov; klunderni@sec.gov

3

A3988

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2024, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

/s/ Nita K. Klunder
Nita K. Klunder

A3989

| 07/11/2024 | 508 | Judge William G. Young: ELECTRONIC ORDER entered 500 MOTION for Release of Funds Motion for Order Directing the Turnover of Frozen Funds to the SEC. (Paine, Matthew)<br><br>**Motion allowed. Funds held for disgorgement shall be held in an interest bearing account pursuant to the earlier orders of this Court.**<br><br>(Entered: 07/16/2024) |
|---|---|---|

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>                              Plaintiff,<br><br>     v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,<br><br>                              Defendants. | Civil Action No. 21-CV-11276 (WGY) |

~~[PROPOSED]~~ ORDER DIRECTING TRANSFER OF JACKSON T. FRIESEN'S
FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION

This Court, having reviewed the Motion for an Order Directing Turnover of Frozen

Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown,

it is hereby

**ORDERED** that the Motion is **GRANTED**; and

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Bank of Montreal shall transfer the entire balance of the

following Bank of Montreal account(s) which were frozen pursuant to an Order of this Court to

the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 0469 |
| FERROUS CAPITAL CORPORATION | 0477 |

1

A3991

| | |
|---|---|
| FERROUS CAPITAL CORPORATION | 7732 |
| FIRST AVENUE CAPITAL CORP | 0202 |
| MGF STRATEGIES CORP | 3623 |
| VALLEY DRIVE ESTATES INC | 0655 |
| BOUNDARY BAY STRATEGIES CORP. | 512 |
| JACKSON FRIESEN | 2540 |
| JACKSON FRIESEN | 5120 |
| JACKSON FRIESEN | 0170 |
| WESTSIDE CAPITAL PARTNERS INC | 964 |

Bank of Montreal may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Bank of Montreal also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, PI Financial Corp. ("PI Financial") shall transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 2276 |

2

A3992

| ARDENT STRATEGIES CORP | 3167 |
|---|---|
| ARDENT STRATEGIES CORP | 0153 |
| ARDENT STRATEGIES CORP | 0161 |
| FERROUS CAPITAL CORPORATION | 2958 |
| FERROUS CAPITAL CORPORATION | 2966 |
| FERROUS CAPITAL CORPORATION | 2974 |
| JACKSON FRIESEN | 0254 |

PI Financial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. PI Financial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

III.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Canadian Imperial Bank of Commerce ("Canadian Imperial") shall transfer the entire balance of the following Canadian Imperial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| JACKSON FRIESEN | 2334 |

3

A3993

Canadian Imperial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Canadian Imperial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

IV.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Envision Financial ("Envision") shall transfer the entire balance of the following Envision account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| JACKSON FRIESEN | 4112 |

Envision may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Envision also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

4

A3994

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

V.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Research Capital Corporation ("Research Capital") shall

transfer the entire balance of the following Research Capital account(s) which were frozen

pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | KK15 |

Research Capital may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Research Capital also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

A3995

VI.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Leede Jones Gable Inc. ("Leede Jones") shall transfer the

entire balance of the following Leede Jones account(s) which were frozen pursuant to an Order

of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 873A |
| JACKSON FRIESEN | 6901 |
| WESTSIDE CAPITAL PARTNERS INC. | 8121 |

Leede Jones may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Leede Jones also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

VII.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Haywood Securities Inc. ("Haywood") shall transfer the

entire balance of the following Haywood account(s) which were frozen pursuant to an Order of

A3996

this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ARDENT STRATEGIES CORP | 6164 |

Haywood may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Haywood also may transfer these funds by certified

check, bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

**SO ORDERED.**

Dated: _July 11, 2024_                          _William G. Young_
                                                WILLIAM G. YOUNG
                                                UNITED STATES DISTRICT JUDGE

A3997

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>                                   Plaintiff,<br><br>    v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,<br><br>                                   Defendants. | Civil Action No. 21-CV-11276 (WGY) |

## ~~[PROPOSED]~~ ORDER DIRECTING TRANSFER OF YVONNE GASARCH'S FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION

This Court, having reviewed the Motion for an Order Directing Turnover of Frozen Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown, it is hereby

**ORDERED** that the Motion is **GRANTED**; and

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Canaccord Genuity Corp ("Canaccord") shall transfer the entire balance of the following Canaccord account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ZHIYING GASARCH | 67A1 |
| ZHIYING GASARCH | 67B1 |

1

A3998

Canaccord may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Canaccord also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

II.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Wells Fargo shall transfer the entire balance of the following Wells Fargo account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| W&B RIDING CLUB @ ASSUNPINK WNA LLC | 9413 |
| W&B RIDING CLUB @ ASSUNPINK WNA LLC | 5351 |

Wells Fargo may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Wells Fargo also may transfer these funds by

2

A3999

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, G&F Financial Group ("G&F Financial") shall transfer

the entire balance of the following G&F Financial account(s) which were frozen pursuant to an

Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ZHIYING GASARCH | 4815 |
| ZHIYING GASARCH/BRUCE GASARCH | 5408 |
| ZHIYING GASARCH/BRUCE GASARCH | 3034 |
| SNOWPEAK MANAGEMENT LTD. | 7164 |
| GREAT WALL MANAGEMENT LTD. | 7172 |
| GREAT WALL MANAGEMENT LTD. | 7180 |

G&F Financial may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  G&F Financial also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

3

A4000

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Sun Life Assurance Company of Canada ("Sun Life")

shall transfer the entire balance of the following Sun Life account(s) which were frozen pursuant

to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| ZHIYING GASARCH | 8203 |

Sun Life may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Sun Life also may transfer these funds by certified

check, bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

V.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

A4001

being served with a copy of this Order, LMN Law Group Law Corporation ("LMN Law") shall

transfer the entire balance of any and all moneys received from Defendant Gasarch as the result

of the sale of her home as permitted by this Court's Order dated January 25, 2022 (Dkt. No.

192), and held for Gasarch's benefit in an escrow account at TD Bank to the Commission.  LMN

Law may transmit payment electronically to the Commission, which will provide detailed ACH

transfer/Fedwire instructions upon request. Payment may also be made directly from a bank

account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.

LMN Law also may transfer these funds by certified check, bank cashier's check, or United

States postal money order payable to the Securities and Exchange Commission, which shall be

delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

**SO ORDERED.**

Dated: July 11, 2024

William G. Young
WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

A4002

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, **Plaintiff,** v. FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR, **Defendants.** | Civil Action No. 21-CV-11276 (WGY) |

~~[PROPOSED]~~ ORDER DIRECTING TRANSFER OF COURTNEY KELLN'S
FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION

This Court, having reviewed the Motion for an Order Directing Turnover of Frozen

Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown,

it is hereby

**ORDERED** that the Motion is **GRANTED**; and

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, PI Financial Corp. ("PI Financial") shall transfer the

entire balance of the following PI Financial account(s) which were frozen pursuant to an Order

of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| EVERVEST EQUITY INC | 4535 |

1

A4003

PI Financial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. PI Financial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, TD Canada Trust ("TD Canada") shall transfer the entire balance of the following TD Canada account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
| --- | --- |
| EVERVEST EQUITY INC | 9909 |
| COURTNEY KELLN | 9889 |

TD Canada may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. TD Canada also may transfer these funds by

A4004

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

     Enterprise Services Center
     Accounts Receivable Branch
     6500 South MacArthur Boulevard
     Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.


**SO ORDERED.**

Dated: _July 11, 2024,_               _William M. Young_
                                   WILLIAM G. YOUNG
                                   UNITED STATES DISTRICT JUDGE

A4005

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                           **Plaintiff,**<br><br>     **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>                           **Defendants.** | Civil Action No. 21-CV-11276 (WGY) |

~~**[PROPOSED]**~~ **ORDER DIRECTING TRANSFER OF PAUL SEXTON'S FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION**

This Court, having reviewed the Motion for an Order Directing Turnover of Frozen Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown, it is hereby

**ORDERED** that the Motion is **GRANTED**; and

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Canaccord Genuity Corp ("Canaccord") shall transfer the entire balance of the following Canaccord account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | 08A1 |

1

A4006

| | |
|---|---|
| NOVA TREK CAPITAL INC | 08B1 |
| PAUL SEXTON | 91E1 |
| PAUL SEXTON | 91F1 |
| PAUL SEXTON | 31A7 |
| PAUL SEXTON | 31B6 |

Canaccord may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Canaccord also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, PI Financial Corp. ("PI Financial") shall transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| PAUL SEXTON | 1414 |
| PAUL SEXTON | 3953 |
| NOVA TREK CAPITAL INC. | 6518 |
| NOVA TREK CAPITAL INC. | 6952 |

2

A4007

| SOLITO CAPITAL CORP. | 7401 |
|---|---|
| SOLITO CAPITAL CORP. | 6951 |
| SOLITO CAPITAL CORP. | 6977 |

PI Financial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  PI Financial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

III.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, TD Canada Trust ("TD Canada") shall transfer the entire balance of the following TD Canada account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | 5109 |
| NOVA TREK CAPITAL INC | 2034 |
| PAUL SEXTON | 6857 |
| PAUL SEXTON | 8504 |
| PAUL SEXTON | 6857 |
| PAUL SEXTON | 5768 |

A4008

| PAUL SEXTON | 9202 |
|---|---|

TD Canada may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. TD Canada also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

IV.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Research Capital Corporation ("Research Capital") shall transfer the entire balance of the following Research Capital account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | AAZ8 |
| PAUL SEXTON | KK82 |

Research Capital may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Research Capital also may transfer these funds by

4

A4009

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

V.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Leede Jones Gable Inc. ("Leede Jones")shall transfer the

entire balance of the following Leede Jones account(s) which were frozen pursuant to an Order

of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| NOVA TREK CAPITAL INC | 8313 |
| PAUL SEXTON | 6984 |
| WESTWOOD VENTURES INC. | 227A |
| SOLITO CAPITAL CORP. | 7743 |

Leede Jones may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Leede Jones also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard

5

A4010

Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

Dated: _July 11, 2024_

_William B. Young_
WILLIAM G YOUNG
UNITED STATES DISTRICT JUDGE

6

A4011

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**      **Plaintiff,**<br><br>   **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>             **Defendants.** | **Civil Action No. 21-CV-11276 (WGY)** |

~~**[PROPOSED]**~~ **ORDER DIRECTING TRANSFER OF MIKE K. VELDHUIS'S FROZEN FUNDS TO THE SECURITIES & EXCHANGE COMMISSION**

This Court, having reviewed the Motion for an Order Directing Turnover of Frozen Funds to the Securities and Exchange Commission ("Commission"), and for good cause shown, it is hereby

**ORDERED** that the Motion is **GRANTED**; and

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Bank of Montreal shall transfer the entire balance of the following Bank of Montreal account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| | |

I

| AVONHURST CAPITAL CORP | 1741 |
|---|---|
| MIKE VELDHUIS | 7997 |
| MIKE VELDHUIS | 1464B |

Bank of Montreal may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Bank of Montreal also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

## II.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, PI Financial Corp. ("PI Financial") shall transfer the entire balance of the following PI Financial account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | 9203 |
| BLACKSTONE CAPITAL PARTNERS INC | 9237 |
| BLACKSTONE CAPITAL PARTNERS INC | 4273 |
| BLACKSTONE CAPITAL PARTNERS INC | 7396 |
| MIKE VELDHUIS | 1710 |

2

A4013

PI Financial may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. PI Financial also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

III.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Canaccord Genuity Corp. ("Canaccord") shall transfer the entire balance of the following Canaccord account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | 65A1 |

Canaccord may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Canaccord also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

A4014

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

IV.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Coast Capital Savings Federal Credit Union ("Coast

Capital") shall transfer the entire balance of the following Coast Capital account(s) which were

frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| MIKE VELDHUIS | 8846 |

Coast Capital may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Coast Capital also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

4

A4015

## V.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after being served with a copy of this Order, Research Capital Corporation ("Research Capital")shall transfer the entire balance of the following Research Capital account(s) which were frozen pursuant to an Order of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | KLA4 |
| BLACKSTONE CAPITAL PARTNERS INC | KKH4 |
| MIKE VELDHUIS | KJV9 |
| MIKE VELDHUIS | KK66 |

Research Capital may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Research Capital also may transfer these funds by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; and specifying that payment is made pursuant to this Order.

5

A4016

VI.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that within 3 days after

being served with a copy of this Order, Leede Jones Gable Inc. ("Leede Jones") shall transfer the

entire balance of the following Leede Jones account(s) which were frozen pursuant to an Order

of this Court to the Commission:

| Account Owner | Acct. Ending in: |
|---|---|
| BLACKSTONE CAPITAL PARTNERS INC | 231A |
| BLACKSTONE CAPITAL PARTNERS INC | 231E |
| BLACKSTONE CAPITAL PARTNERS INC | 231F |
| MIKE VELDHUIS | 953A |
| MIKE VELDHUIS | 953S |
| MIKE VELDHUIS | 862Q |
| FDS CAPITAL INC. | 726A |

Leede Jones may transmit payment electronically to the Commission, which will provide

detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly

from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Leede Jones also may transfer these funds by

certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; and specifying that payment is made pursuant to this Order.

6

A4017

**SO ORDERED.**

Dated: July 11, 2024

William A. Young
WILLIAM G. YOUNG
UNITED STATES DISTRICT JUDGE

7

A4018

| 07/16/2024 | 514 | Judge William G. Young: ELECTRONIC ORDER entered 501 Motion to Amend (Paine, Matthew) **There is no occasion to clarify. The judgment stands.** (Entered: 07/16/2024) |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|   |   |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:21-cv-11276-WGY |
| v. | |
| Frederick L. Sharp, *et al.*, | |
| Defendants. | |

<u>**DEFENDANT PAUL SEXTON'S MOTION TO STAY EXECUTION OF JUDGMENT**</u>

Defendant Paul Sexton moves, pursuant to Federal Rule of Civil Procedure 62, for a stay of execution of the Court's June 20, 2024 judgment (ECF No. 495) (the "Partial Judgment") pending appeal. Mr. Sexton, who will file a timely notice of appeal within the deadline set by Federal Rule of Appellate Procedure 4(a)(1)(B), requests that the Court accept as sufficient security the approximately $13,669,688 in frozen funds in Canadian accounts. Although defendants are entitled to an automatic stay by posting a bond in accordance with Rule 62 and Local Rule 62.2, courts have discretion to order a stay with modified security—or even without any security at all. *See, e.g.*, *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 18 (1st Cir. 2002) (allowing for "reductions in [the bond] amount that [the district] court may in its discretion be prepared to afford"); *Real View, LLC v. 20-20 Techs., Inc.*, No. CIV.A. 07-12157-PBS, 2011 WL 3568022, at *2 (D. Mass. Aug. 12, 2011) ("However, the Court may grant a stay without requiring the judgment debtor to post a bond if the judgment debtor can show that in the absence of standard security, the judgment creditor will be properly secured against the risk that the judgment debtor will be less able to satisfy the judgment…."). Under that standard, a stay is warranted in this case.

1

A4020

At the outset, the Securities and Exchange Commission ("SEC" or "Commission") already has all the security it can possibly obtain. This Court imposed against Mr. Sexton a worldwide asset freeze that the Court expressly continued in the Partial Judgment. His cash and securities, totaling nearly $14 million (which is a significant portion of the judgment), are in frozen financial accounts that he cannot access. All his assets are subject to stringent restrictions that prevent him from engaging in any "transfer, dissipation, assignment, pledge, alienation, encumbrance, disposal, or diminution in value…." ECF No. 39 at 5. This freeze has been in place for three years, and the Commission has never argued that Mr. Sexton has in any way violated it. Mr. Sexton's assets are as safe under the freeze as they would be in the hands of the Commission if execution were ordered. Granting a stay does nothing to "alter[]" the "status quo" and is therefore appropriate. *Real View*, 2011 WL 3568022, at *3.

A stay absent full security is also appropriate where, as here, it is apparent that a "full bond is impossible or impracticable." *Id.* at *2. Under Local Rule 62.2, a full bond would need to be in the amount of approximately $20,823,584.47—or more than $7 million in excess of the value of the frozen accounts. Mr. Sexton has already filed a declaration in this matter attesting that the freeze interfered with his ability to pay even reasonable trial fees. *See* ECF No. 331-1. There is simply no manner in which he can, with all of his assets subject to a freeze, obtain any sort of additional bond without engaging in a prohibited encumbrance.

Moreover, it is conceivable that the nearly $14 million already frozen will be fully sufficient to cover the judgment against Mr. Sexton. The Court imposed joint and several liability for disgorgement and did not cap the amount that the SEC will collect from Frederick Sharp, meaning that Mr. Sexton's disgorgement judgment can be covered in whole or in part by any contributions from Mr. Sharp. *See* ECF No. 494 at 57.

A4021

The strength of Mr. Sexton's planned appeal likewise favors a stay. *See, e.g.*, *Exxon Corp. v. Esso Worker's Union, Inc.*, 963 F. Supp. 58, 59 (D. Mass. 1997) (noting the relevance of whether the "stay applicant has made a strong showing that he is likely to succeed on the merits"). Respectfully, when issuing the Partial Judgment, the Court did not follow controlling U.S. Supreme Court precedent concerning the equitable remedy of disgorgement when the Court did not require the SEC to demonstrate both that Mr. Sexton actually received the disgorgement amount requested by the SEC and that all such funds were received by Mr. Sexton in connection with a violation of the federal securities laws. Worse, the Court improperly shifted the burden of proof concerning the requested disgorgement remedy to Mr. Sexton even though Mr. Sexton could not provide any evidence without waiving his Fifth Amendment rights in the face of a parallel criminal indictment. The Court also abused its discretion in denying a motion to stay the resolution of the SEC's request for remedies until after the disposition of the parallel criminal action. Finally, the Court granted the SEC's request for a 7x maximum civil monetary penalty and stated in the Partial Judgment that failure to pay that debt could result in a finding of contempt of court despite the fact that contempt is not a remedy for failure to pay a penalty.

Finally, a stay is appropriate due to ongoing proceedings in Canada that will determine the Commission's ability, consistent with Canadian law, to effectuate the judgment in Canada. The SEC has already obtained an order from this Court directing Canadian financial institutions to turn over to the Commission funds purportedly belonging to Mr. Sexton. *See* ECF No. 512. But as counsel for the SEC has acknowledged to Defendants, only the Canadian court system has jurisdiction to enter such an order, and that matter will need to be litigated in Canada. *See* Exhibit A. And counsel for the SEC has agreed in writing that the SEC will not serve that turnover order on any financial institution pending the determination of this motion for a stay pending appeal. *See*

A4022

*id.* Pausing execution until the Canadian court system can fully adjudicate the impact of the Court's judgment on funds frozen in Canada best respects sovereignty concerns without prejudicing the SEC in any way. Indeed, given that the SEC has consented to allowing the Canadian proceedings to play out before domesticating funds, granting a stay simply effectuates the agreement that the Commission has already made to Defendants.

WHEREFORE, Mr. Sexton, for the foregoing reasons, respectfully requests a stay of execution pending appeal.

*/s/ Neil T. Smith*

Neil T. Smith (BBO# 651157)
   Neil.Smith@klgates.com
K&L Gates LLP
1 Congress St.
Boston, MA 02114
Tel:  (617) 261-3100
Fax:  (617) 261-3175

*/s/ Stephen G. Topetzes*

Stephen G. Topetzes*
   Stephen.Topetzes@klgates.com
Robert S. Silverblatt*
   Rob.Silverblatt@klgates.com
K&L Gates LLP
1601 K St. NW
Washington, DC 20006
Tel:  (202) 778-9328
Fax:  (202) 778-9100

*\*Admitted pro hac vice*

*Counsel for Paul Sexton*

Dated: July 18, 2024

4

A4023

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on July 18, 2024, and a copy thereof will be sent electronically to the registered recipients and counsel of record as identified on the Notice of Electronic Filing.

*/s/ Neil T. Smith*

Neil T. Smith

A4024

**Silverblatt, Rob S.**

| | |
|---|---|
| **From:** | Shields, Kathleen (BRO) <ShieldsKa@SEC.gov> |
| **Sent:** | Wednesday, July 17, 2024 4:22 PM |
| **To:** | Maranda Fritz |
| **Cc:** | Silverblatt, Rob S.; London, David H.; Scaduto, Frank; Robert Knuts; Karen Pickett; Timothy J. Fazio; Smith, Neil T.; Muhlendorf, Kevin; Day, Alfred; Klunder, Nita; DiPaolo, Alyssa |
| **Subject:** | Re: SEC v. Sharp - notice of subpoena |

> **This Message Is From an External Sender**
> This message came from outside your organization.

Hi Maranda -

Sorry, I forgot to respond to your email yesterday.  The SEC will act as its Canadian counsel stated.

Kathy

---

**From:** Maranda Fritz <maranda@fritzpc.com>
**Sent:** Wednesday, July 17, 2024 3:49:30 PM
**To:** Shields, Kathleen (BRO) <ShieldsKa@SEC.gov>
**Cc:** Silverblatt, Rob S. <Rob.Silverblatt@klgates.com>; London, David H. <LondonD@SEC.gov>; Scaduto, Frank <FScaduto@wiley.law>; Robert Knuts <RKnuts@shertremonte.com>; Karen Pickett <kpickettlaw@gmail.com>; Timothy J. Fazio <tfazio@mgmlaw.com>; Smith, Neil T. <Neil.Smith@klgates.com>; Muhlendorf, Kevin <KMuhlendorf@wiley.law>; Day, Alfred <DayA@SEC.GOV>; Klunder, Nita <klunderni@SEC.gov>; DiPaolo, Alyssa <DiPaoloA@SEC.GOV>
**Subject:** FW: SEC v. Sharp - notice of subpoena

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Kathy,

I'm following up because I think the hearing may be tomorrow and I'd like to be able to advise Canadian counsel of your position.

Maranda

*mef*
MARANDA E. FRITZ PC

521 Fifth Avenue 17th Floor
New York, New York 10175
Phone: 646 584-8231
Email: maranda@fritzpc.com

1

A4025

The information transmitted in this email is considered attorney privileged and confidential and is intended only for the use of the individual or entity named.  If you are not the intended recipient, you should be aware that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone and permanently delete this email.

---

**From:** Maranda Fritz
**Sent:** Tuesday, July 16, 2024 12:16 PM
**To: Subject:** RE: SEC v. Sharp - notice of subpoena

Kathy

I've been asked by Mr. Friesen's Canadian counsel to follow up with you to try to get additional clarification in advance of a hearing that will be held later this week in the Canadian proceeding.  As I'm sure you're aware, that court is expected to make rulings regarding the frozen funds. I understand that Malcolm Ruby, Canadian counsel for the SEC, has previously confirmed that an order from the BC court would be required before the SEC could execute against assets in the British Columbia.  Would you also confirm that the SEC would not seek to execute against assets in the British Columbia without an order from the BC court authorizing such execution?

Maranda



521 Fifth Avenue 17th Floor
New York, New York 10175
Phone: 646 584-8231
Email: maranda@fritzpc.com

The information transmitted in this email is considered attorney privileged and confidential and is intended only for the use of the individual or entity named.  If you are not the intended recipient, you should be aware that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone and permanently delete this email.

---

**From:** Shields, Kathleen (BRO) <ShieldsKa@SEC.gov>
**Sent:** Tuesday, July 16, 2024 11:19 AM
**To:** Silverblatt, Rob S. <Rob.Silverblatt@klgates.com>; London, David H. <LondonD@SEC.gov>; Scaduto, Frank <FScaduto@wiley.law>; Robert Knuts <RKnuts@shertremonte.com>; Karen Pickett <kpickettlaw@gmail.com>; Maranda Fritz <maranda@fritzpc.com>; Timothy J. Fazio <tfazio@mgmlaw.com>; Smith, Neil T. <Neil.Smith@klgates.com>; Muhlendorf, Kevin <KMuhlendorf@wiley.law>
**Cc:** Day, Alfred <DayA@SEC.GOV>; Klunder, Nita <klunderni@SEC.GOV>; DiPaolo, Alyssa <DiPaoloA@SEC.GOV>
**Subject:** RE: SEC v. Sharp - notice of subpoena

Hi Rob –

A4026

As you request, the SEC agrees that it will not serve the turnover orders on Canadian institutions until the court rules upon the defendants' motion for a stay pending appeal.

- Kathy

---

**From:** Silverblatt, Rob S. <Rob.Silverblatt@klgates.com>
**Sent:** Tuesday, July 16, 2024 11:17 AM
**To:** London, David H. <LondonD@SEC.gov>; Scaduto, Frank <FScaduto@wiley.law>; Robert Knuts <RKnuts@shertremonte.com>; Karen Pickett <kpickettlaw@gmail.com>; Maranda Fritz <maranda@fritzpc.com>; Timothy J. Fazio <tfazio@mgmlaw.com>; Smith, Neil T. <Neil.Smith@klgates.com>; Muhlendorf, Kevin <KMuhlendorf@wiley.law>
**Cc:** Shields, Kathleen (BRO) <ShieldsKa@SEC.gov>; Day, Alfred <DayA@SEC.GOV>; Klunder, Nita <klunderni@SEC.GOV>; DiPaolo, Alyssa <DiPaoloA@SEC.GOV>
**Subject:** RE: SEC v. Sharp - notice of subpoena

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Kathy, Al, Dave, and Nita,

I am writing to request that the SEC voluntarily withhold service of the turnover orders until our forthcoming motion for a stay pending execution, which will be filed this week, is decided. The automatic stay in Rule 62 prevents execution for 30 days following entry of a judgment. We are still inside that period. The defendants have rights, including the right to seek a stay pending appeal, and are still within their timeframe for exercising them.

The order, which purports to require Canadian financial institutions to turn over funds, is also inconsistent with the discussions we understand to be taking place in Canada, as the order does not provide for review by Canadian courts.

To negate the need for us to seek emergency relief from the Court, will you withhold service of the turnover orders until our forthcoming motion is ruled on?

Best,
Rob

**Rob Silverblatt**
Partner
K&L Gates LLP
1601 K Street NW
Washington, D.C.  20006
Phone: 202-778-9132
Fax: 202-778-9100
rob.silverblatt@klgates.com
www.klgates.com

---

**From:** London, David H. <LondonD@SEC.gov>
**Sent:** Wednesday, July 3, 2024 10:07 AM
**To:** Scaduto, Frank <FScaduto@wiley.law>; Silverblatt, Rob S. <Rob.Silverblatt@klgates.com>; Robert Knuts <RKnuts@shertremonte.com>; Karen Pickett <kpickettlaw@gmail.com>; Maranda Fritz <maranda@fritzpc.com>; Timothy J. Fazio <tfazio@mgmlaw.com>; Smith, Neil T. <Neil.Smith@klgates.com>; Muhlendorf, Kevin

A4027

<KMuhlendorf@wiley.law>
**Cc:** Shields, Kathleen (BRO) <ShieldsKa@SEC.gov>; Day, Alfred <DayA@SEC.GOV>; Klunder, Nita <klunderni@SEC.GOV>;
DiPaolo, Alyssa <DiPaoloA@SEC.GOV>
**Subject:** SEC v. Sharp - notice of subpoena


Counsel,

Under Fed. R. Civ. P. 45(a)(4), this email serves as notice of the attached subpoena the SEC will be serving today on a
third-party.

Regards,

-Dave

**David H. London**
Trial Attorney
Boston Regional Office
**OFFICE** +1 617 573 8997
**MOBILE** +1 617 449 8199
LondonD@sec.gov

_____


U.S. Securities and
Exchange Commission

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for
the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of
this message is prohibited. If you have received this e-mail in error, please contact me at Rob.Silverblatt@klgates.com.

A4028

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

        v.

Frederick L. Sharp, *et al.*,

    Defendants.

Case No. 1:21-cv-11276-WGY

---

<u>**MOTION OF DEFENDANTS MIKE VELDHUIS AND COURTNEY KELLN**
**TO STAY EXECUTION OF JUDGMENT**</u>

    Defendants Mike Veldhuis and Courtney Kelln move, pursuant to Federal Rule of Civil Procedure 62, for a stay of execution of the Court's June 20, 2024, judgments (ECF Nos. 496, 499) (the "Partial Judgments") pending appeal. Under FRCP 62 and Local Rule 62.2, defendants would be entitled to an automatic stay by posting a bond. Here, however, all of defendants' assets are already frozen pursuant to a prior order of this Court and that order was expressly continued in the Partial Judgments. As a result, defendants do not have access to any assets to support the posting of a bond. Therefore, defendants Veldhuis and Kelln request that this Court exercise its discretion to accept as sufficient security the more than $4,426,027 in funds that are frozen in Canadian accounts attributed to these defendants. *See, e.g.*, *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 18 (1st Cir. 2002) (allowing for "reductions in [bond] amount that [the district] court may in its discretion be prepared to afford"); *Sec. and Exch. Comm'n v. Navellier & Assocs., Inc.*, Nos. 20-1581, 21-1857, 22-1733, 23-150, ---F.4th---, 2024 WL 3423045, at *15 (1st Cir. July 16, 2024) ("The nature and the amount of [a supersedeas bond] is entrusted to the discretion of the trial court." (alteration in original) (quoting *Acevedo-Garcia*, 296 F.3d at 17)); *Real View, LLC v. 20-*

---

A4029

*20 Techs., Inc.*, No. CIV.A. 07-12157-PBS, 2011 WL 3568022, at *2 (D. Mass. Aug. 12, 2011) ("However, the Court may grant a stay without requiring the judgment debtor to post a bond if the judgment debtor can show that in the absence of standard security, the judgment creditor will be properly secured against the risk that the judgment debtor will be less able to satisfy the judgment…."); *Bowers v. Baystate Tech., Inc.*, No. CIV. A. 91-40079-NMG, 2001 WL 640876, at *1 (D. Mass. June 5, 2001) (granting motion to stay enforcement of monetary judgment and request for reduced bond where court found defendant "was unable to post a full supersedeas bond"); *Cipes v. Mikasa, Inc.*, 404 F. Supp. 2d 367, 369 (D. Mass. 2005) ("[T]his Court has discretion to alter the supersedeas bond requirement.").

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") obtained the maximum security for the Partial Judgments at the very start of this case when the Court issued first a temporary restraining order and then preliminary injunction freezing all assets of defendants Veldhuis and Kelln. This freeze has been in place for nearly three years, and there is no allegation that defendants Veldhuis or Kelln have violated it. Therefore, a stay of execution while the freeze remains in place pending appeal does nothing to "alter[]" the "status quo" and is therefore appropriate. *Real View*, 2011 WL 3568022 at *3.

Courts also recognize that a stay absent full security is appropriate where it is apparent that a "full bond is impossible or impracticable." *Id.* at *2. Under Local Rule 62.2, the amounts of full bonds for defendants Veldhuis and Kelln would be more than $10 million greater than the value of the frozen accounts. Thus, there is simply no manner in which defendants Veldhuis and Kelln can obtain the bond required by Local Rule 62.2.

Moreover, the amounts of funds already frozen for defendants Veldhuis and Kelln could be sufficient to cover their partial judgments because the Court imposed joint and several liability

2

A4030

for disgorgement in the amount of $42,503,547 (Veldhuis) and $1,582,785 (Kelln) against defendant Frederick Sharp, meaning that the disgorgement portion of the partial judgments against defendants Veldhuis and Kelln may be covered in whole or in part by any contributions from Mr. Sharp. *See* ECF Nos. 494 at 57, 496 at 7, 499 at 6.

The strength of defendants' appeal supports a stay of execution pending that appeal. *See, e.g.*, *Exxon Corp. v. Esso Worker's Union, Inc.*, 963 F. Supp. 58, 59 (D. Mass. 1997) (noting the relevance of whether there "stay applicant has made a strong showing that he is likely to succeed on the merits"). Respectfully, when issuing the Partial Judgments, the Court did not follow controlling U.S. Supreme Court precedent concerning the equitable remedy of disgorgement when the Court did not require the SEC to demonstrate both: (a) defendants Veldhuis and Kelln actually received the disgorgement amount requested by the SEC; and (b) *each such transfer of funds* was received by defendants in connection with a violation of the Federal securities laws. *Liu v. Sec. and Exch. Comm'n*, 591 U.S. 71, 75, 79 (2020); *Sec. and Exch. Comm'n v. Govil*, 86 F.4[th] 89, 106 (2d Cir. 2023). Worse, the Court improperly shifted the burden of proof concerning the requested disgorgement remedy to defendants generally even though defendants could not provide any evidence without waiving their Fifth Amendment rights in the face of a parallel criminal indictment. *See Green v. Crosby*, 177 F. Supp. 3d 673, 676 (D. Mass. 2016) (explaining that parallel civil and criminal proceedings prejudice a defendant by presenting him with the "precarious dilemma" of deciding "whether to assert [the] Fifth Amendment privilege against self-incrimination . . . or waive that privilege"). The Court also abused its discretion in denying the prior motion of defendants Veldhuis and Kelln to stay the resolution of the SEC's request for remedies until after the disposition of the parallel criminal action. ECF No. 451. Finally, the Court erroneously: (a) granted the SEC's request for a 7x maximum statutory civil monetary penalty

3

against Veldhuis and more than a 4X maximum statutory civil monetary penalty against Kelln; and (b) stated in the Partial Judgment that failure to pay that Federal debt could result in a finding of contempt of court despite that contempt is not a remedy for failure to pay a Federal debt. Fed. R. Civ. P. 69(a) ("A money judgment is enforced by a writ of execution, unless the court directs otherwise."); *Aetna Cas. & Sur. Co. v. Markarian*, 114 F.3d 346, 349 (1st Cir. 1997) (holding that in Massachusetts, contempt is not an available remedy for failure to satisfy a money judgment); *id.* ("[W]hen a party fails to satisfy a court-imposed money judgment the appropriate remedy is a writ of execution, not a finding of contempt." (alteration in original) (quoting *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 980 (11th Cir. 1986))); *Bd. of Com'rs of Stark Cnty., OH v. Cape Stone Works, Inc.*, 206 F. Supp. 100, 103 (D. Mass. 2002) ("[A] writ of execution is the only means by which the plaintiff may enforce the money judgment.").

Finally, a stay is appropriate due to ongoing proceedings in Canada to determine the Commission's ability, consistent with Canadian law, to effectuate the judgment in Canada. The SEC has already obtained an order from this Court directing Canadian financial institutions to turn over to the Commission funds purportedly belonging to defendants Veldhuis and Kelln. *See* ECF Nos. 508, 511, 513. But only the Canadian court system has jurisdiction to enter such an order, and that matter will need to be litigated in Canada. And counsel for the SEC has agreed in writing that the SEC will not serve that turnover order on any financial institution pending the determination of this motion for a stay pending appeal. Pausing execution until the Canadian court system can fully adjudicate the impact of the Court's judgment on funds frozen in Canada best respects sovereignty concerns without prejudicing the SEC in any way.

A4032

WHEREFORE, defendants Mike Veldhuis and Courtney Kelln respectfully move for a stay of execution of the Partial Judgments pending appeal.

Dated: July 19, 2024

SHER TREMONTE LLP

By: ____/s/ Robert Knuts____
     Michael Tremonte (*pro hac vice*)
     Robert Knuts (*pro hac vice*)
     Katie Renzler (*pro hac vice*)
     90 Broad Street, 23rd Floor
     New York, New York 10004
     Tel: 212.202.2600
     Email: mtremonte@shertremonte.com

*Attorneys for Defendant Mike K. Veldhuis*


WILEY REIN LLP

By: ____/s/ Frank Scaduto____
     Frank Scaduto (BBO# 663430)
     Kevin Muhlendorf (*pro hac vice*)
     2050 M Street NW
     Washington, DC 20036
     Tel: 202.719.7000
     Email: FScaduto@wiley.law
      KMuhlendorf@wiley.law

*Attorneys for Defendant Courtney Kelln*

A4033

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on July 19, 2024, and a copy thereof will be sent electronically to the registered recipients and counsel of record as identified on the Notice of Electronic Filing.

*/s/ Robert Knuts*

Robert Knuts

A4034

UNITED STATES DISTR395ICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE                ¶:
COMMISSION,                            ¶
                                       ¶:
        Plaintiff,                     ¶        No. 1:21-cv-11276-WGY
                                       ¶
        v.                             ¶:
                                       ¶:
YVONNE GASARCH, *et al.*               ¶:
                                       ¶:
        Defendants.                    ¶:

## DEFENDANT YVONNE GASARCH'S MOTION TO STAY EXECUTION OF JUDGMENT

Pursuant to Fed. R. Civ. P. 62, Defendant Yvonne Gasarch moves for a stay of execution on the Court's June 20, 2024 judgment (ECF No. 498) pending appeal. Ms. Gasarch plans to file a timely notice of appeal concerning both her liability and the Court's disgorgement order. Ms. Gasarch's assets have been frozen - - and will remain frozen - - pending the resolution of the appeal. This amount exceeds $1 million. (*See* ECF 379-1).

Mrs. Gasarch states that she has not worked in many years and her assets have been frozen for years by the Plaintiff SEC. Mrs. Gasarch does not have the financial ability to post a bond pending appeal, and suggests the over $1,000,000 frozen by the SEC acts as sufficient security. As pointed out in Mr. Sexton's Motion for a Stay (ECF No. 516), courts in this district have ordered stays without the posting of a bond, particularly if the judgment creditor has sufficient security - - which the SEC has here.

Moreover, the Court should be aware of the Canadian courts' involvement in the matter. Attached as Exhibit 1 is an order entered in the Supreme Court of British Columbia prior to this Court's judgment in the matter. As the Court can see, the Canadian court has ordered that Mrs.

1

A4035

Gasarch's assets continue to be frozen while she pursues any appellate rights, subject only to the Canadian court's allowance of disbursements from the funds for requested-and-approved reasonable living expenses or attorney's fees. Because the parties and the assets are in Canada and subject to a specific order there, the Court should defer to the Canadian court while the appeal process is pending.

Ms. Gasarch also suggests that she can demonstrate a likelihood of success on the merits on appeal in several areas as set forth below.

## I.    Mrs. Gasarch Has Made A Substantial Showing That She Cannot Be Liable For Violating Security Laws

The SEC alleged that Ms. Gasarch was a primary violator of the securities laws by "being engaged in transactions, practices or courses of business which operated as a fraud or deceit upon any persons, including purchasers or sellers of securities." The SEC alleged that the primary violation is of Securities Act Section 17(a)(3) [15 U.A.X. §77q(a)(3)]."(Amended Complaint Claim for Relief 10).

In their 12th and 14th Claims for Relief, the SEC also claims that Ms. Gasarch "aided and abetted" "Sharp, Kelln, Veldhuis, Sexton, Friesen, Carillo and other Sharp group clients" in their securities fraud. The SEC claims that Gasarch "knowingly or recklessly" provided "substantial assistance" to these violators, in violation of Section 15(b) of the Securities Act [15 U.S.C. §77o(b)] and Section 20( e) of the Exchange Act [15 U.S.C. 78t( e)].

As set forth below, despite the verdict in the SEC's favor, no reasonable jury could find that Ms. Gasarch was a primary violator of the federal securities laws or an "aider or abettor" in such where the SEC has the burden of proof by the preponderance of the evidence.

### A.  No Reasonable Jury Could Find That Ms. Gasarch Was A Primary Violator

The claim against Ms. Gasarch is under 15U.S.C. Section 77(q)(a)(3):

2

A4036

 It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement (as defined in section 3(a)(78) of the Securities Exchange Act [15 USCS § 78c(a)(78)]) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—……
(**3**) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

In the Court's opinion on the defendants' motion to dismiss, the Court defined the elements of a 17a violation as such:  To be liable, the defendant must have: "(1) made a material misrepresentation or a material omission . . . or used a fraudulent device [scheme or artifice]; (2) with scienter; (3)  in connection with the purchase or sale of securities."  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); see *also Deka Int'l S.A. v. Genzyme Corp. (In re Genzyme Corp. Sec. Litig.*), 754 F.3d 31, 40 (1st Cir. 2014)."  *SEC v. Sharp*, 626 F.Supp.3d 345, 389 (D. Mass. 2022).

In this case, the SEC failed to establish that Ms. Gasarch was a primary violator of the 17(a)(3).  First, there is no evidence that Ms. Gasarch was involved at all in trading securities or making any statements used by the investing public.  She made no representations at all.  The SEC claims that her nominal 'ownership' of Peaceful Lion/Peregrine could operate as a fraud, but every witness who testified said that Fred Sharp controlled these (and all the other) nominees.  Moreover, and perhaps most importantly, the SEC failed to establish that Ms. Gasarch had the requisite scienter - - i.e., that she should have known of the five percent rule and the ban against "pump and dump" and ignored it.  There is not a scintilla of evidence to this effect.  In fact, the only witness who could testify as to Mrs. Gasarch's knowledge - - Roger Knox - - specifically said that he did not know what Mrs. Gasarch knew at all.

The exhibits submitted in the case establish that Mrs. Gasarch was acting at the direction of her boss, Fred Sharp, or at the direction of clients when sending wires.  There was no exhibit

A4037

where Mrs. Gasarch was enlightened that there was a "five percent rule" Sharp and his clients

were violating or had any knowledge of any "pump and dump" scheme.  And, although the

standard can be met by "negligence," the SEC did not establish that Mrs. Gasarch *should* have

known of these securities violations.  In fact, William Kaitz - - a stock promoter who lived in the

United States and testified for the SEC - - did not know about these SEC rules/violations.

The fact that Mrs. Gasarch became a "nominee owner" of Peaceful Lion/Peregrine does

nothing to establish knowledge of the SEC rules/violations.  Moreover, Roger Knox testified that

Sharp would use photocopied signatures which was confirmed by Fedir Nikolayev.  Moreover,

she, like Nikolayev, did not have any knowledge that these nominee entities were being used to

"hide" the clients' acquisition of more than five percent of stock.

**B.  No Reasonable Jury Could Find That Ms. Gasarch Was An Aider Or Abettor**

This Court in the opinion on defendants' motions to dismiss, also set out the elements of

aiding and abetting liability.  There, this Court said  SEC must prove by a preponderance of the

evidence:

> (1) the existence of a securities law violation by the primary (as opposed to the aiding
>
> and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor;
>
> and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary
>
> violation." SEC v. Apuzzo, 689 F.3d 204, 206 (2d Cir. 2012) (quotations
>
> omitted). "Substantial assistance" requires the defendant to have "associated himself with
>
> the venture, that he participated in it as in something that he wished to bring about, and
>
> that he sought by his action to make it succeed." Id. (quotations and alterations omitted).

*Sharp*, 626 F.3d at 398.

The SEC presented no evidence that Ms. Gasarch knew of the five percent rule or of a "pump and dump" scheme. As the FBI examiner Beckstrom testified, the SEC reviewed approximately one million documents that spanned approximately ten years, and there was not one exhibit presented where Ms. Gasarch evidenced any awareness of either of these two things. Clearly, with the encrypted communications, she would have no reason to "hide" any knowledge. The testifying witnesses who were also charged as scheme participants - - Dhillon, Kaitz, and Ciapala - - did not know Mrs. Gasarch. The only witness who even claimed to "know" Ms. Gasarch testified that he did not know what she knew. He also testified that Ms. Gasarch beginning in 2016/2017 was not included in the third party communications system they were using.

Ms. Gasarch cannot be said to have "substantially assisted" in the scheme, much less did so knowingly or recklessly. Ms. Gasarch was a functionary who sat in the reception area of an office suite that included other businesses. She did not make trades, direct trades, divvy up stocks to nominees in less than five percent increments, engage in stock promotion or any of the other things the SEC claimed led to securities fraud. She responded to clients' requests for wire payments and documents. She responded to direction from Fred Sharp, her boss who was a lawyer (or at least claimed to be). Even Roger Knox testified that, living in Switzerland, he was not really aware of the SEC disclosure rule. He also testified that his business and Fred Sharp's business did legitimate deals.

Mrs. Gasarch's activities stand in stark contrast to those of the other defendants/witnesses. The testimony/exhibits were replete with evidence that the participants openly discussed the schemes. They then would meet and celebrate with champagne and fine meals. Mrs. Gasarch was never invited to any of these events and, as stated above, nowhere in

A4039

the million plus document universe was there any evidence that she was informed of the five percent rule or the "pump and dump scheme" afoot.

Mrs. Gasarch understands that a verdict may be based on "circumstantial evidence." But the SEC relied heavily on evidence (brought in through its summary witness accountant) that Mrs. Gasarch profited in a way an office assistant normally may not by presenting evidence of claimed "payments" to Mrs. Gasarch. But this evidence was completely unreliable. First, as all witnesses testified, Mr. Sharp was in control of the Q system and could change entries at any time. Second of all, there was no evidence payments out of accounts labeled Peaceful Lion/Peregrine were actually directed to Mrs. Gasarch. The SEC sought to "verify" the Q system by showing that certain transactions matched some of the trading records that they found. But there was **no** such evidence as it related to Mrs. Gasarch because the SEC **did not have either Sharp/Custom House's bank records or Mrs. Gasarch bank records**. Even Roger Knox testified that Sharp "shortchanged" them when compared to the Q records - - and clearly as an integral part of the "pump and dump" scheme, Knox would know what he and his firm were owed. Moreover, Nikolayev - - the nominee owner of Gotoma which engaged in extensive trading - - testified that he did not receive the proceeds of Gotoma's trades.

## II.    Mrs. Gasarch Has Made A Substantial Showing That The Disgorgement Judgment Cannot Stand

Mrs. Gasarch can make a substantial showing that the disgorgement figure ordered by the Court cannot stand.

### A.    The Court Improperly Substituted Its Own Scienter Finding For That Of The Jury

As the Court is aware, the jury found Mrs. Gasarch liable for a violation of Section 17(a)(3) (primary violation) and as an "aider and abettor" - - potentially only of another's

6

A4040

17(a)(3) violation.  A 17(a)(3) violation can be premised on mere negligence - - which makes the statutory period for disgorgement five, not ten, years.  Despite the black letter law that an aider and abettor can only be liable to the extent of the primary violator aided, the Court has made its *own* findings - - not found by the jury itself - - that Mrs. Gasarch acted with the requisite scienter to require her to disgorge her ill-gotten profits for a period of ten years prior to the date of the filing of the Complaint.  It is a violation of Mrs. Gasarch's procedural due process rights for the Court to substitute its own findings in the absence of a jury verdict.  The SEC did not object to the verdict form which set out the potential violations of the primary violators in the alternative and Mrs. Gasarch demanded a trial by jury on all issues, including that of scienter.  The Court, no matter what its view of the evidence, is not allowed to substitute its own judgment for that of the jury.  Because the jury verdict supports only a finding of primary or aiding violations of Section 17(a)(3) (which can be sustained on a negligence finding), the potential disgorgement period is limited to five, not ten, years.

     **B.**     **The SEC failed to identify which alleged distributions to Mrs. Gasarch are related to the fourteen stocks it specifically averred in the Amended Complaint and on which the jurors were charged**

As the Court is aware, it instructed the jurors that they needed to be unanimous as to at least one of the fourteen stocks for which the SEC sought to held Mrs. Gasarch liable under the securities law.  In its verdict form, the jury did not need to identify which stock(s) were involved in Mrs. Gasarch's violations.  Nor was the jury asked to determine statute of limitations issues, as the Court appropriately found that to be a judicial function.

In its remedies motion and its reply, the SEC did not mention any <u>one</u> of the stock deals related to alleged distributions to Mrs. Gasarch.  Again, the burden is on the SEC to show Mrs. Gasarch's "net profits" based on one of alleged fourteen stock transactions, *United States v. Liu*,

A4041

140 S.Ct. 1936, 1940 (2020).  The SEC wrongfully places this burden on Mrs. Gasarch, presumably because it does not have the evidence it needs to meet its burden.

Moreover, despite its own witness Mr. Knox discussing Mr. Sharp's legitimate business operations and the lack of documentary evidence in which Mrs. Gasarch (even in an encrypted system where she presumably could speak without repercussion) knew of a United States securities fraud afoot, the SEC now says that all payments to Mrs. Gasarch that it claims are reflected in the Q system are subject to disgorgement.  The SEC, however, is required  to specifically identify the "tainted" proceeds in order to recoup salary/bonuses to Mrs. Gasarch. The SEC has not.

### C.     The SEC has  not tied its disgorgement claim to any specific victims

Contrary to the clear holding of *Liu*, the SEC still does not assert  that the claimed disgorgement amount will be "awarded for victims."  After charging securities violations <u>related to fourteen companies and having a jury trial on same</u>, the SEC has stated  that:

> Developing a list of the investors who were harmed by the conduct of Veldhuis, Sexton and Friesen is a more discrete task than developing a list of investors harmed by the conduct of Kelln and Gasarch, whose misconduct on behalf of additional Sharp Group clients involved a far larger group of securities.  Whereas disgorgement collected from Veldhuis, Sexton and Friesen may be distributed to investors in the Fourteen Issuers' securities, further analysis is warranted to determine whether disgorgement from Kelln and Gasarch could potentially be divided among the investors in the over 200 securities that were traded by Sharp Group clients during the 10-year disgorgement period.  The Commission *will conduct further analysis* to determine whether meaningful payments may be made to harmed investors in some or all of these securities.

(SEC Memorandum, D.E. 46, p. 22).

Undersigned counsel is unaware of any statute or case law that allows the SEC to charge specific conduct in a Complaint, try a case on that specific conduct, and then at some (unknown) point in the future, "consider" or "look into" whether disgorgement based on a finding of liability

8

A4042

in this current case can instead be determined based on the "analysis" of the SEC of other transactions. Obviously, the Supreme Court has held that disgorgement, in order to be equitable and not punitive, requires that the SEC identify the victims (at least to the extent of identifying a "class" of purchasers of particular stocks) for which it will pay amounts it seeks to disgorge from Mrs. Gasarch. The jury did not find that Mrs. Gasarch was involved in 200 securities that involved fraud. And in fact, the SEC's agreeing that the jury would need to find unanimously that only one of the fourteen charged securities was tied to Mrs. Gasarch when there are allegedly 200 or so securities involved bolsters Mrs. Gasarch's claim that the vast majority of her work involved transactions that did not involve SEC fraud at all.

**Conclusion**

For the reasons set forth above and for the reasons set forth by her co-defendants (which Mrs. Gasarch adopts and incorporates by reference), Mrs. Gasarch respectfully requests that this Court issue a stay of execution on the judgment against her pending the resolution of her appeal to the First Circuit.

Respectfully submitted,

YVONNE GASARCH

By her Attorney,

/s/Karen A. Pickett
_____
Karen A. Pickett (BBO # 633801)
PICKETT LAW OFFICES, PC
125 High St., 26th Floor
Boston, MA  02110
617 423 0485
kpickettlaw@gmail.com

July 22, 2024

9

A4043

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 22, 2024

.

*/s/ Karen A. Pickett*

A4044

No. S226494
Vancouver Registry

## IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN:

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

PLAINTIFF

AND:

FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, and GRAHAM R. TAYLOR

DEFENDANTS

### ORDER MADE AFTER APPLICATION
### (PRESERVATION OF ASSETS OF ZHIYING YVONNE GASARCH)

| | | |
|---|---|---|
| BEFORE THE HONOURABLE | ) | |
| MADAM JUSTICE FRANCIS | ) | Monday the 15th day of |
| | ) | April, 2024 |
| | ) | |

ON THE APPLICATION of the Plaintiff, coming before me at the Courthouse at 800 Smithe Street, Vancouver, British Columbia between February 6 and 8, 2023, and on hearing Malcolm Ruby, counsel for the Plaintiff, United States Securities and Exchange Commission; Gregory DelBigio, counsel for the Defendants Zhiying Yvonne Gasarch ("**Gasarch**"), Courtney Kelln ("**Kelln**"), Mike K. Veldhuis ("**Veldhuis**") and Paul Sexton ("**Sexton**"); Owais Ahmed and Tricia Milne, counsel for the Defendant Jackson T. Friesen ("**Friesen**"); and Emily Thorpe, appearing as agent for the Defendant Graham R. Taylor ("**Taylor**"); and on reading:

1.  Notice of Application filed August 11, 2022;

2.  Notice of Civil Claim filed August 11, 2022;

3.  Affidavit No. 1 of Trevor T. Donelan, affirmed July 6, 2022;

4.  Affidavit No. 2 of Trevor T. Donelan, affirmed December 27, 2022;

5.  Affidavit No. 1 of Allison Baker, affirmed August 2, 2022;

6.  Application Response of Frederick L. Sharp filed September 12, 2022;

A4045

7.    Application Response of Gasarch, Kelln, Veldhuis and Sexton filed November 10, 2022;

8.    Application Response of Friesen filed November 14, 2022;

9.    Affidavit No. 1 of Camila Couto Dantas de Carvalho, affirmed November 10, 2022;

10.    Application Response of Taylor filed November 14, 2022;

11.    Affidavit No. 1 of Tianna Copfer, affirmed November 14, 2022;

AND ON the Plaintiff having undertaken to comply with the terms of the undertaking as set out in Section 2 of Schedule "A" to this Order;

AND ON the United States of America, on behalf of the Plaintiff, having undertaken to comply with the terms of the undertaking set out in Section 3 of Schedule "A" to this Order;

THIS COURT ORDERS AND DIRECTS THAT:

**FREEZING ORDER**

1.    Except as permitted by this Order, Gasarch must not:

    a)    in any way dispose of or deal with or diminish the value of any of her assets whether they are in or outside British Columbia whether in her own name or not and whether solely or jointly owned unless assets having a fair market value of at least USD $2,634,466 net of all secured interests remain in all jurisdictions combined and are not dealt with, disposed of, or diminished in value.

    b)    This prohibition applies to all of Gasarch's assets, and includes the following assets in particular:

        i)    shares in Creery Estates Inc. in which Gasarch is registered as the debtor and holds as collateral;

        ii)    any money in the accounts listed in the preliminary injunction order of Judge William G. Young of the United States District Court, District of Massachusetts (the "**U.S. District Court**") dated October 15, 2021 against Gasarch in the civil proceeding pending before the U.S. District Court, Securities and Exchange Commission v. Frederick L. Sharp et al., civil action number 1:21-cv-11276-WGY (the "**U.S. District Court Proceeding**");

        iii)    any money in the accounts listed in the following orders of the British Columbia Securities Commission (the "**BC Securities Commission**"):

            (1)    preservation order COR #2021/076 dated August 8, 2021 against Gasarch;

            (2)    preservation order COR #2021/077 dated August 8, 2021 against Gasarch;

        (3)      preservation order COR #2021/078 dated August 8, 2021 against Gasarch;

        (4)      preservation order COR #2021/102 dated September 24, 2021 against Gasarch; and

        (5)      preservation order COR #2021/103 dated September 24, 2021 against Gasarch.

2.      If the total net value of Gasarch's assets in British Columbia does not exceed USD $2,634,466, Gasarch must not remove any of those assets from British Columbia and must not dispose of or deal with any of them, but if she has other assets outside British Columbia Gasarch may dispose of or deal with those assets so long as the total net value of all her assets whether in or outside British Columbia remains above USD $2,634,466.

**EXCEPTIONS TO THIS ORDER**

3.      Subject to further Orders of this Court, Gasarch may apply to spend reasonable amounts on ordinary living expenses, reasonable amounts on legal advice and representation from Gasarch's Canadian solicitor, reasonable amounts on legal advice and representation from Gasarch's United States lawyers, and reasonable amounts on ordinary and proper business expenses, including payment of taxes owing in Canada by Gasarch personally, or by companies controlled by her with assets affected by this Order (the "**Permitted Expenses**"). Before making any such application for Permitted Expenses, an Asset List (defined below at paragraph 19) must first be filed with the Court under seal, and Gasarch must inform the Court of the source of the payment; communication to the Court regarding the source of the payment may be *ex parte* and under seal. In paying the Permitted Expenses, Gasarch must first exhaust other sources before using the accounts frozen by the BC Securities Commission enumerated at paragraph 1(b)(iii) of this Order. This provision does not relieve Gasarch of any requirements she may have to satisfy before this Court or the U.S. District Court relating to the Permitted Expenses.

4.      Without contravening existing or future Orders made in the U.S. District Court Proceeding, or further Orders of this Court, this Order does not prohibit Gasarch from dealing with or disposing of any of her assets in the ordinary and proper course of business.

5.      Without contravening existing or future Orders made in the U.S. District Court Proceeding, or further Orders of this Court, Gasarch may agree with the Plaintiff that the above spending limits should be increased or that this Order should be relaxed in any other respect but any such agreement will be effective only if confirmed in writing and signed by all parties.

**DURATION OF THIS ORDER**

6.      Unless this Order is varied or discharged or extended by order of the Court, this Order shall remain in force until the later of:

a) 30 days following expiry of any time to appeal a U.S. disgorgement judgment against Gasarch or, if an appeal is commenced, 30 days following determination of any timely appeal of a U.S. disgorgement judgment (the "**Final U.S. Judgment**"); or

b) if, within 30 days of a Final U.S. Judgment, proceedings are commenced in this Court for recognition and enforcement (the "**B.C. Enforcement Proceeding**"), then expiry of 30 days following pronouncement of a final judgment in the B.C. Enforcement Proceeding.

7. For clarity, the within proceedings, and any B.C. Enforcement Proceeding are collectively referred to as the "**B.C. Civil Proceedings**".

8. This Order will cease to have effect if Gasarch provides security by paying the sum of USD $2,634,466 into Court or makes provision for security in that sum by some other method agreed in writing with the Plaintiff.

9. In respect of the assets subject to the orders below, this Order is deemed satisfied in respect of such assets for so long as the relevant order applying to such assets remains in place:

a) the temporary restraining order of Judge Nathaniel Gorton of the US District Court dated August 6, 2021 freezing the assets held by or for the benefit of the Defendants and entities they control, wherever such assets may be located;

b) the preliminary injunction order of Judge Young of the US District Court dated October 15, 2021 against Gasarch;

c) the following orders of the BC Securities Commission:

i) preservation order COR #2021/076 dated August 8, 2021 against Gasarch;

ii) preservation order COR #2021/077 dated August 8, 2021 against Gasarch;

iii) preservation order COR #2021/078 dated August 8, 2021 against Gasarch;

iv) preservation order COR #2021/102 dated September 24, 2021 against Gasarch; and

v) preservation order COR #2021/103 dated September 24, 2021 against Gasarch.

**VARIATION OR DISCHARGE OF THIS ORDER**

10. Anyone affected by this Order may apply to the Court at any time to vary or discharge it on giving no less than 24 hours' notice to the Plaintiff's solicitor of his or her intention to do so, but this Order will remain in force until further Order even if such an application is pending.

Case: 24-1770     Document: 00118249071     Page: 565     Date Filed: 02/18/2025     Entry ID: 6700951
Case 1:21-cv-11276-WGY     Document 517-1     Filed 07/22/24     Page 5 of 9

5

11.  All applications to vary or discharge this Order, or arising out of the issuance or enforcement of this Order, shall be heard by the Judge who issued this Order with the exception of:

    a)  urgent matters for which the Judge is not available; or

    b)  as otherwise directed by the Judge.

**THIRD PARTIES**

12.  Except as permitted by this Order, no person or other legal entity with notice of this Order may deal with any bank or other accounts of Gasarch (including money market, retirement savings plan accounts, investment certificates, treasury bills, and deposits) or with other assets of Gasarch in her possession or control.

13.  No person or other legal entity with notice of this Order shall breach or permit a breach of this Order.

14.  To the extent that any person or other legal entity holds assets of Gasarch in excess of USD $2,634,466, that person or other legal entity is not restrained from dealing with that part of the assets held by that person or other legal entity which is in excess of USD $2,634,466.

15.  The terms of this Order do not affect any person or legal entity outside the jurisdiction of this Court unless and until this Order is declared enforceable or is enforced by a Court in the relevant jurisdiction, except that this Order is enforceable as against a person or other legal entity who or which:

    a)  is Gasarch or an officer or an agent of Gasarch; or

    b)  is subject to the jurisdiction of this Court and has been given written notice of this Order.

16.  This Order does not prevent any bank, financial institution or secured party from exercising any rights to claim interest, to levy service charges, to claim set off, to enforce security, or to enforce any other contractual right, arising from contracts made before being notified of this Order.

17.  No bank or financial institution needs to enquire as to the application or proposed application of any money withdrawn by Gasarch if the withdrawal appears to be permitted by this Order.

18.  This Order binds Gasarch and every other person who is subject to this Order and obtains notice of the Order, as of the time Gasarch or such person first receives notice of the Order, and whether or not Gasarch or such person has been served with a copy of the Order, but is subject to that person's ability to apply to the Court for reimbursement of their reasonable costs of complying with the Order which are incurred by anyone, other than the Defendants, to whom or to which the Plaintiff provides a copy of this Order, including the reasonable costs of ascertaining whether that person or entity holds any of Gasarch 's assets.

**DISCLOSURE ORDER**

19.    Gasarch must, within fourteen days of service of this Order, file with the Court under seal a list (the "**Asset List**"), verified by her affidavit, setting out all of Gasarch's assets as of the date of this Order whether in or outside British Columbia and whether in her own name or not and whether solely or jointly owned, and details of all such assets, including the nature of each asset, all identifying numbers and other identifying information, its exact location as of the date of this Order, and whether the asset is held in Gasarch's name or jointly held with another person, or by another on her behalf.

20.    If Gasarch holds any assets over which she has no beneficial interest, that asset shall be included in the Asset List, along with an indication that the asset is held in trust for others.

21.    Access to the sealed Asset List will be restricted to counsel for Gasarch until final determination of the criminal proceeding before the U.S. District Court, United States of America v. Frederick L. Sharp et al., case no. 1:24-cr-10002-NMG (the "**U.S. Criminal Proceeding**"), or further Order of this Court. Gasarch will inform the Plaintiff's solicitor forthwith upon filing the Asset List under seal.

22.    Upon final determination of the U.S. Criminal Proceeding, the Plaintiff's solicitor shall be entitled to access the Asset List and any material filed *ex parte* and under seal in accordance with paragraph 3 from the Court file. The Asset List and any material filed *ex parte* and under seal in accordance with paragraph 3 are referred to collectively as the "**Sealed Material**".

23.    The Plaintiff's solicitor shall not disclose the Sealed Material, any information within the Sealed Material, or any information derived from the Sealed Material to any person (including the Plaintiff or designated counsel from the Civil Division of the United States Department of Justice) until after the pronouncement of the Final U.S. Judgment. The Plaintiff's solicitor shall be at liberty, if circumstances require, to obtain direction from the Court to vary this provision consistent with the right to variation of this Order as set out at paragraphs 10 and 11.

24.    The Plaintiff's solicitor, the Plaintiff, and designated counsel from the Civil Division of the United States Department of Justice, or any other entity that comes into possession of the Sealed Material, shall not disclose the Sealed Material, any information within the Sealed Material, or any information derived from the Sealed Material, to the United States Attorney's Office for the District of Massachusetts, the United States Federal Bureau of Investigation, or any person involved in a criminal investigation or proceeding of any of the Defendants in the United States.

25.    Subject to paragraphs 21 and 22 and any further Order of the Court, the Plaintiff's solicitor may only use the Sealed Material, information within the Sealed Material, or any information derived from the Sealed Material for the purpose of the B.C. Civil Proceedings. Before making any disclosure for purposes of the B.C. Civil Proceedings (including to the Plaintiff or designated counsel from the Civil Division of the United States Department of

Justice), counsel shall obtain a written undertaking from the person to whom disclosure is to be made in the form attached to this Order as Schedule "B".

26.    On or before such later date as provided in a further order, the Plaintiff's solicitor shall destroy all copies of the Sealed Material received from Gasarch, and any person (including the Plaintiff) who receives a copy of the Sealed Material must destroy or return to the Plaintiff's solicitor all copies of the Sealed Material and any document that contains information derived from the Sealed Material, except that the Plaintiff is at liberty to file with the Court a sealed copy of the Sealed Material, to be retained in the Court file so that it will be available on further court order.

27.    Before making use of the Sealed Material in the B.C. Civil Proceedings, whether by filing the Sealed Material itself, or filing any document that makes reference to information in the Sealed Material, or any information derived from the Sealed Material, the Plaintiff will seek a sealing order pursuant to Practice Direction 58 of the Supreme Court of British Columbia.

BY THE COURT


VANCOUVER
REGISTRAR

**SCHEDULE "A"**

I, Malcolm Ruby, declare as follows:

1. I have read the draft order (the "Order").

2. I am authorized by the Plaintiff, United States Securities and Exchange Commission, to undertake as follows:

   a. to provide a copy of the Order to any person who the Plaintiff intends will be bound to honour the terms of the Order; and

   b. to take all reasonable steps to notify, in writing, any person or entity which the Plaintiff serves with a copy of the Order of any changes to the Order that might affect that person, including any occurrence which results in the Order ceasing to have effect.

3. I am authorized by the United States of America to undertake, on behalf of the Plaintiff, United States Securities and Exchange Commission:

   a. to abide by any Order that the British Columbia Supreme Court may make as to damages in the event this Court is of the opinion that damages have been sustained from the Order which the Plaintiff ought to pay; and

   b. to pay the reasonable costs of complying with the Order which are incurred by anyone, other than the defendants, to whom or to which the Plaintiff provides a copy of this Order, including the reasonable costs of ascertaining whether that person or entity holds any of the Defendant Friesen's assets.

Dated: April 19, 2024

_____          _____
Signed: Malcolm Ruby                      Witness: Will Chamberlain

**SCHEDULE "B"**

1.  I understand, agree and undertake to the Court that I will not disclose the Sealed Material, any information within the Sealed Material, or any information derived from the Sealed Material, to anyone other than Canadian counsel for the Plaintiff in this action, or a person who is designated in writing by Canadian counsel for the Plaintiff and who signs a separate form of this undertaking and provides me with a signed and witnessed copy.

2.  I agree and undertake to the Court that I will only use the Sealed Material, any information within the Sealed Material, or any information derived from the Sealed Material for the purpose of the B.C. Civil Proceedings and for any purpose that is expressly permitted by order of this Court.

3.  I understand, agree and undertake to the Court that I will destroy or return to the Plaintiff's counsel my copy of the Sealed Material, and any other document that contains information derived from the Sealed Material, by such later date expressly permitted by order of this Court.

_____

Dated *[month, day]*, 2024

_____        _____

Signed *[name of person giving undertaking]*        Witness *[name of witness]*

| 07/24/2024 | 518 | Judge William G. Young: ELECTRONIC ORDER entered denying 515 Motion to Stay (Paine, Matthew) (Entered: 07/24/2024) |

| 07/24/2024 | 519 | Judge William G. Young: ELECTRONIC ORDER entered denying <u>516</u> Motion to Stay (Paine, Matthew) (Entered: 07/24/2024) |

| 07/24/2024 | 520 | Judge William G. Young: ELECTRONIC ORDER entered 517 Motion to Stay (Paine, Matthew)<br><br>**The motion for stay is denied but the Court in no way intrudes on or impugns the orders of the Canadian courts of British Columbia as to funds subject to its orders.**<br><br>(Entered: 07/24/2024) |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

Frederick L. Sharp, *et al.*,

Defendants.

Case No. 1:21-cv-11276-WGY

<u>NOTICE OF APPEAL</u>

 

PLEASE TAKE NOTICE that Defendant Zhiying Yvonne Gasarch hereby appeals to the United States Court of Appeals for the First Circuit from the judgment entered in this action on June 20, 2024 (Dkt. No. 498) as well as all orders encompassed therein.

ZHIYING YVONNE GASARCH

By her Attorney,
/s/Karen A. Pickett

_____
Karen A. Pickett (BBO # 633801)
PICKETT LAW OFFICES, PC
125 High St., 26th Floor
Boston, MA  02110
617 423 0485
kpickettlaw@gmail.com

August 19, 2024

1

A4057

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 19, 2024

./s/Karen A. Pickett

2

A4058

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

Frederick L. Sharp, *et al.*,

Defendants.

Case No. 1:21-cv-11276-WGY

NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendant Mike K. Veldhuis hereby appeals to the United States Court of Appeals for the First Circuit from the judgment entered in this action on June 20, 2024 (Dkt. No. 496), as well as all orders encompassed therein, and the following orders issued by the District Court (to the extent that these Orders are not merged into the June 20, 2024 judgment): July 11, 2024 Order (Dkt. No. 513); July 16, 2024 Order (Dkt. No. 514); and July 24, 2024 Order (Dkt No. 519).

Dated: August 19, 2024

SHER TREMONTE LLP

By:    */s/ Robert Knuts*
        Michael Tremonte *(pro hac vice)*
        Robert Knuts *(pro hac vice)*
        Katie Renzler  *(pro hac vice)*
        90 Broad Street, 23rd Floor
        New York, New York 10004
        Tel: 212.202.2600
        Email: rknuts@shertremonte.com

A4059

**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2024, I filed the foregoing via the Court's ECF system, which electronically serves a copy on all counsel of record.


/s/ Robert Knuts _____
Robert Knuts *(pro hac vice)*

A4060

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiff,

      v.

FREDERICK L. SHARP, ZHIYING YVONNE
GASARCH, COURTNEY KELLN, MIKE K.
VELDHUIS, PAUL SEXTON, JACKSON T.
FRIESEN, WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R. TAYLOR,

               Defendants.

Case No. 1:21-cv-11276-WGY

---

### DEFENDANT COURTNEY KELLN'S NOTICE OF APPEAL

      PLEASE TAKE NOTICE that Defendant Courtney Kelln hereby appeals to the United

States Court of Appeals for the First Circuit from the judgment entered in this action on June 20,

2024, ECF No. 499, as well as all orders encompassed therein, and the following orders issued by

the district court (to the extent they are not merged into the June 20, 2024 judgment): the July 11,

2024 Orders, ECF Nos. 508, 511; the July 16, 2024 Order, ECF No. 514; and the July 24, 2024

Order, ECF No. 519.

Dated: August 19, 2024          Respectfully submitted,

                              */s/ Frank Scaduto*
                              Frank Scaduto (BBO # 663430)
                              WILEY REIN LLP
                              2050 M Street NW
                              Washington, DC 20036
                              Tel.: 202.719.7000
                              Fax: 202.719.7049
                              fscaduto@wiley.law

                              *Counsel for Defendant Courtney Kelln*

A4061

**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2024, I filed the foregoing via the Court's ECF system, which electronically serves a copy on all counsel of record.

_/s/ Frank Scaduto_
Frank Scaduto (BBO # 663430)

A4062

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:21-cv-11276-WGY |
| v. | |
| Frederick L. Sharp, *et al.*, | |
| Defendants. | |

### DEFENDANT PAUL SEXTON'S NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendant Paul Sexton hereby appeals to the United States

Court of Appeals for the First Circuit from the judgment entered in this action on June 20, 2024

(ECF No. 495), as well as all orders encompassed therein, including, without limitation, the

District Court's July 11, 2024 Order (ECF No. 512) and July 24, 2024 Order (ECF No. 518).

Respectfully submitted,

*/s/ Neil T. Smith*

Neil T. Smith (BBO# 651157)
  Neil.Smith@klgates.com
K&L Gates LLP
One Congress Street
Boston, MA 02114
Tel: (617) 261-3100
Fax: (617) 261-3175

A4063

_/s/ Stephen G. Topetzes_

Stephen G. Topetzes*
    Stephen.Topetzes@klgates.com
Robert S. Silverblatt*
    Rob.Silverblatt@klgates.com
K&L Gates LLP
1601 K St. NW
Washington, DC 20006
Tel:  (202) 778-9328
Fax:  (202) 778-9100

*Admitted pro hac vice

*Counsel for Paul Sexton*

Dated:  August 19, 2024

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that the foregoing was filed through the Electronic Court Filing system on August 19, 2024, and a copy thereof will be sent electronically to the registered recipients and counsel of record as identified on the Notice of Electronic Filing.

<u>*/s/ Neil T. Smith*</u>

Neil T. Smith

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

FREDERICK L. SHARP, ZHIYING YVONNE
GASARCH, COURTNEY KELLN, MIKE K.
VELDHUIS, PAUL SEXTON, JACKSON T.
FRIESEN, WILLIAM T. KAITZ, AVTAR S.
DHILLON, and GRAHAM R. TAYLOR,

Defendants.

Case No. 1:21-cv-11276-WGY

**DEFENDANT JACKSON FRIESEN'S AMENDED NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Defendant Jackson Friesen hereby appeals to the United

States Court of Appeals for the First Circuit from the order and judgment entered in this action

dated June 17, 2024 and June 20,2024, ECF No. 494 and 497, as well as all orders encompassed

therein, and the following orders issued by the district court (to the extent they are not merged

into the June 20, 2024 judgment): the July 11, 2024 Orders, ECF No. 509; and the July 16, 2024

Order, ECF No. 514.

Dated: August 20, 2024

Respectfully submitted,

/s/ Maranda E. Fritz
Maranda E. Fritz PC
521 Fifth Avenue 17th Floor
New York, New York 10175
646 584-8231
maranda@fritzpc.com

*Counsel for Defendant Jackson Friesen*

A4066

**CERTIFICATE OF SERVICE**

I hereby certify that on August 20, 2024, I filed the foregoing via the Court's ECF system,

which electronically serves a copy on all counsel of record.


*/s/ Maranda Fritz*_____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>             Plaintiff,<br><br>    v.<br><br>FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,<br><br>             Defendants. | Case No. 1:21-CV-11276 (WGY) |

PLAINTIFF'S MOTION IN SUPPORT OF DISTRIBUTION FOR THE BENEFIT OF
HARMED INVESTORS AND SEEKING AN ORDER ESTABLISHING A FAIR FUND,
APPOINTING A TAX ADMINISTRATOR, AND AUTHORIZING PAYMENT OF TAX
OBLIGATIONS AND RELATED FEES AND EXPENSES OF TAX ADMINISTRATOR
WITHOUT FURTHER COURT ORDER

Plaintiff Securities and Exchange Commission (the "Commission") intends to distribute

funds collected in this matter for the benefit of investors harmed by the Defendants' misconduct

and respectfully moves this Court for an Order (i) establishing a Fair Fund (the "Fair Fund"),

pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended by the Dodd-Frank

Act of 2010 [15 U.S.C. § 7246(a)], (ii) appointing Miller Kaplan Arase LLP ("Miller Kaplan"), a

certified public accounting firm with an office in San Francisco, California, as Tax Administrator

to execute all income tax reporting requirements, and (iii) authorizing payment of future taxes

and fees and expenses of the Tax Administrator from the Fair Fund without further Court Order,

with respect to funds under this Court's jurisdiction in this case.  In support of this motion, the

Commission relies upon its Memorandum Describing Proposed Distribution Framework and In

1

A4068

Support of Motion Seeking an Order Establishing a Fair Fund and Other Relief and its exhibits,

filed herewith, the Declaration of Dr. Thomas A. Dunn, and a proposed order.

　　　　　**WHEREFORE**, the Commission respectfully requests that this Court enter the

proposed Order filed herewith and grant such other relief as the Court deems just and proper.


Dated: September 4, 2024

　　　　　　　　　　　　　　　Respectfully submitted,


　　　　　　　　　　　　　**SECURITIES AND EXCHANGE COMMISSION,**
　　　　　　　　　　　　　By its attorneys,

　　　　　　　　　　　　　<u>/s/ Kathleen B. Shields</u>
　　　　　　　　　　　　　Kathleen B. Shields (Mass. Bar No. 637438)
　　　　　　　　　　　　　David London (Mass. Bar No. 638289)
　　　　　　　　　　　　　Nita K. Klunder (Mass. Bar No. 689304)
　　　　　　　　　　　　　Alfred Day (Mass. Bar No. 654436)
　　　　　　　　　　　　　33 Arch Street, 24th Floor
　　　　　　　　　　　　　Boston, MA  02110
　　　　　　　　　　　　　Telephone: (617) 573-8904 (Shields); (617) 573-4537
　　　　　　　　　　　　　(Day); (617) 573-8997 (London)
　　　　　　　　　　　　　Fax: (617) 573-4590
　　　　　　　　　　　　　Email: shieldska@sec.gov; daya@sec.gov;
　　　　　　　　　　　　　londond@sec.gov

　　　**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(2)**

　　　　　The undersigned invited counsel for all defendants to meet and confer on this motion.
The Commission was unable to resolve or narrow the issues presented in this motion with
defendants Veldhuis, Sexton, Kelln, Friesen and Gasarch.  Defendants Veldhuis, Sexton, Kelln,
Friesen and Gasarch intend to oppose this motion.  The Commission did not receive responses
from the other defendants' counsel.

　　　　　　　　　　　　　<u>/s/ Kathleen B. Shields</u>
　　　　　　　　　　　　　Kathleen B. Shields

2

A4069

<u>**CERTIFICATE OF SERVICE**</u>

     I certify that on September 4, 2024, this motion was filed electronically with the Court. The filing will be sent to the registered participants as identified on the Notice of Electronic Filing and may also be accessed through the Court's ECF system.


             <u>/s/ Kathleen B. Shields</u>
             Kathleen B. Shields

A4070

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    **Plaintiff,**<br><br>    **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>                    **Defendants.** | **Case No. 1:21-CV-11276 (WGY)** |

**[PROPOSED]**
**ORDER ESTABLISHING A FAIR FUND, APPOINTING A TAX ADMINISTRATOR, AND AUTHORIZING PAYMENT OF TAX OBLIGATIONS AND RELATED FEES AND EXPENSES OF THE TAX ADMINISTRATOR WITHOUT FURTHER COURT ORDER**

The Court, having considered Plaintiff's Securities and Exchange Commission ("Commission's") Motion Seeking an Order Establishing a Fair Fund, Appointing A Tax Administrator, and Authorizing Payment of Tax Related Fees, Expenses, and Obligations of the Tax Administrator Without Further Court Order (the "Motion") and the Memorandum of Law in Support, and for good cause shown,

**IT IS HEREBY ORDERED:**

The Motion is GRANTED.

1.      A Fair Fund is established, pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended by the Dodd-Frank Act of 2010 [15 U.S.C. § 7426(a)] for $1,620,587.49 collected from the Defendants to date pursuant to the Final Judgments, plus accrued interest and earnings and any funds paid or collected in the future pursuant to Court Order, plus accrued interest

1

A4071

and earnings (all funds under the Court's jurisdiction in this case)  (the "Fair Fund") so that these funds can be distributed for the benefit of investors.  In addition, post-judgment interest, including any future post-judgment interest paid by the Defendants, will be included in the Fair Fund.

2.    Miller Kaplan is appointed Tax Administrator to execute all income tax reporting requirements, including the preparation and filing of tax returns, for the Fair Fund.

3.    Miller Kaplan shall be designated the Tax Administrator of the Fair Fund, pursuant to Section 468B(g) of the Internal Revenue Code (IRC), 26 U.S.C. § 468B(g), and related regulations, and shall satisfy the administrative requirements imposed by those regulations, including but not limited to (a) obtaining a taxpayer identification number, (b) filing applicable federal, state, and local tax returns and paying taxes reported thereon out of the Fair Fund, and (c) satisfying any information, reporting, or withholding requirements imposed on distributions from the Fair Fund. Upon request, the Tax Administrator shall provide copies of any filings to the Commission's counsel of record.

4.    The Tax Administrator shall, at such times as the Tax Administrator deems necessary to fulfill the tax obligations of the Fair Fund, submit a request to the Commission's counsel of record for payment from the Fair Fund of any tax obligations of the Fair Fund.

5.    The Tax Administrator shall be entitled to charge reasonable fees for tax compliance services and related expenses in accordance with its agreement with the Commission for the Tax Years 2022 through 2024. The Tax Administrator shall, at such times as the Tax Administrator deems appropriate, submit a request to the Commission's counsel of record for payment of fees and expenses from the Fair Fund.

6.    The Commission is authorized to approve and arrange payment of all tax obligations owed by the Fair Fund and the fees and expenses of the Tax Administrator directly from the Fair Fund without further approval of this Court. All payments for taxes and the fees and

2

A4072

expenses of the Tax Administrator shall be reported to the Court in a final accounting.

**IT IS SO ORDERED.**

Dated: _____

_____
United States District Court Judge

A4073

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>        **Plaintiff,**<br><br>  **v.**<br><br>**FREDERICK L. SHARP, ZHIYING YVONNE GASARCH, COURTNEY KELLN, MIKE K. VELDHUIS, PAUL SEXTON, JACKSON T. FRIESEN, WILLIAM T. KAITZ, AVTAR S. DHILLON, and GRAHAM R. TAYLOR,**<br><br>        **Defendants.** | **Case No. 1:21-CV-11276 (WGY)** |

## PLAINTIFF'S MEMORANDUM OF LAW DESCRIBING PROPOSED DISTRIBUTION FRAMEWORK AND IN SUPPORT OF MOTION SEEKING AN ORDER ESTABLISHING A FAIR FUND AND OTHER RELIEF

Plaintiff Securities and Exchange Commission (the "Commission") submits this Memorandum describing its proposed Distribution Framework and in support of its motion requesting an order establishing a Fair Fund pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7246] (the "Fair Fund"), appointing a tax administrator, and authorizing the Commission staff to approve and direct the payment of the tax obligations of the Fair Fund and expenses and fees of the tax administrator without further Court order.  The Commission provides this memorandum in furtherance of a distribution of the funds collected in this matter and related matters for the benefit of harmed investors.

The Commission staff has preliminarily developed a three-part approach to compensate investors harmed by the Defendants' violations of the federal securities laws (the "Distribution Framework").  The proposed Distribution Framework is designed to provide

1

A4074

meaningful recoveries to the largest possible number of investors who were harmed by the Defendants' violations in a fair and reasonable way, while minimizing the administrative expenses associated with the distribution.

The three types of relief requested at this stage are the initial steps in the distribution process and are necessary to maximize the funds available to compensate investors and to comply with applicable state and federal tax laws. The Commission has collected approximately $1,620,587.49 to date that may be used to reimburse investors for their losses. Any future collections of the over $50 million ordered in this matter will also be distributed pursuant to the Distribution Framework described below and set forth more fully in a distribution plan to be approved by this Court.

## I.     Background

On August 5, 2021, the SEC filed a Complaint charging nine individuals, including a public company chairman, for their participation in a series of long-running fraudulent schemes that collectively generated hundreds of millions of dollars from unlawful stock sales and caused significant harm to retail investors in the United States and around the world.

This Court has entered final judgments in this case against all nine Defendants. Five of the judgments were issued following a ten-day jury trial resulting in a verdict for the Commission against two Defendants. All judgments were entered after the Court's careful consideration of numerous motions and responses. This Court has ordered civil penalties, disgorgement, and prejudgment interest against the Defendants totaling more than $52 million.

The judgments required eight of the nine Defendants to pay the full amount of disgorgement and civil penalties ordered to the Commission within 30 days following entry of the judgments. (The only exception being the Final Judgment for Dhillon, which provides for

A4075

payments to be made pursuant to a payment plan.)  Pursuant to the Court's judgments as detailed

above, the Commission has collected $1,620,587.49 to date (including revenue from funds

collected).  These funds are being held in an interest-bearing account at the U.S. Department of

the Treasury pending disbursement pursuant to a distribution plan to be approved by the Court.

Accrued interest will be added to the collected funds.

Collection efforts of outstanding amounts due to the Commission are ongoing.  In 2023

and 2024, the Commission obtained injunctions in the British Columbia Supreme Court freezing

assets of defendants Sharp, Sexton, Veldhuis, Friesen, Gasarch and Kelln.  The British Columbia

Supreme Court injunctions froze assets beyond assets already frozen by administrative orders

entered against the Defendants in 2021 by the British Columbia Securities Commission.  On

June 14, 2024, the Commission obtained a judgment from the British Columbia Supreme Court

enforcing the disgorgement and prejudgment interest aspects of this Court's judgment that was

entered against Sharp in May 2022.  The British Columbia judgment against Sharp relates to the

same scheme and transactions that form the basis of judgments recently granted by this Court, in

June 2024, against Defendants Sexton, Veldhuis, Friesen, Gasarch and Kelln.  The Commission

anticipates bringing additional proceedings in British Columbia in 2024 to enforce the

disgorgement aspect of this Court's judgments against Sexton, Veldhuis, Friesen, Gasarch and

Kelln.[1]  It is the Commission's intention, once anticipated British Columbia judgments are

obtained, to execute against all funds frozen by the orders of the British Columbia Securities

---

[1] It is not likely that Canadian courts will enforce the civil penalty portions of the judgments by this Court.  *See SEC v. Cosby and Glob. Action Inv. Ltd.*, 2000 BCSC 0338, 9-10 (Mar. 29, 2000) (quoting A.G. New Zealand v. Ortiz [1982] 3 All E.R. 432 (C.A.) ([V]iolations, "punishable by pecuniary mulct, [e.g., monetary penalties] or otherwise, at the instance of the state government, or someone representing the public, are local in this sense, that they are only cognizable and punishable in the country where they were committed.").
.

A4076

Commission and the additional assets frozen by the British Columbia Supreme Court. Execution efforts by the Commission in British Columbia will depend on the timing and outcome of appeals by the Defendants in the United States and British Columbia. It is anticipated that actual execution efforts will not begin until all the Defendants' appeals are determined, which the Commission anticipates will occur in 2025.

All nine Final Judgments provide that the Commission may propose a plan for this Court's approval to distribute the collected funds. *E.g.* Dkt, No. 497 at 8-9 ("The Commission may propose a plan to distribute the Fund subject to the Court's approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund provision of Section 308(a) of the Sarbanes-Oxley Act of 2002."). Consistent with the Commission staff's prior representations to this Court and the Commission's intent to use funds ordered and collected for the benefit of harmed investors, the proposed Distribution Framework described below is presented for the Court's consideration.

## II.    Description of the Commission's General Distribution Process

### A.    Overview

Though the facts and the recommendations made about the allocation of funds to investors are different in every case, the Commission's distribution process has been standardized over the years to provide uniformity and to ensure the fair allocation of funds to investors. The Commission's discrete steps of distributing funds to harmed investors are set forth herein to assist the Court in understanding the factors that the Commission staff considers in determining whether to conduct a distribution and the appropriate method and procedures necessary to plan and execute the distribution. This memorandum also describes the proposed Distribution Framework for the funds collected in connection with this matter.

4

A4077

B.    **Feasibility Determination by the Staff**

Following the entry of a final judgment, the first step in any distribution process is to determine whether a distribution is feasible. The Commission staff uses a feasibility analysis to make this determination and considers various factors unique to each case which may warrant making a distribution. The most important factors are the amount of funds ordered and collected or expected to be collected in the future, the availability of investor information, whether investor harm is quantifiable, and the cost of administering a distribution.

1.    *Collections*

In cases where collection efforts are necessary, a feasibility analysis is most effective when the collections phase of the case has been completed and most, if not all, of the funds ordered have been paid. In the absence of such information, it is difficult to predict whether the funds will be sufficient to provide a meaningful recovery to harmed investors.

2.    *Investor Information*

In determining feasibility, the Commission staff also considers whether harmed investors can be easily identified through documents and information obtained through the investigation and subsequent litigation and whether the amount of each harmed investor's losses can be quantified. Among other things, the Commission staff collects and reviews trading records, investment agreements, and other contemporaneous documents reflecting the identities of investors and their investment amounts. Economists in the Commission's Division of Economic and Risk Analysis ("DERA") also evaluate market data to identify investors, determine the economic impact of the defendants' conduct on the relevant securities, and quantify the associated harm to investors, where possible.

3.    *Administrative Costs*

A4078

Finally, the staff considers the administrative costs of a distribution of funds to determine the most cost-effective approach. While the Commission often conducts internal distributions overseen by the staff of the Office of Distributions, this approach is impractical in cases where the Commission staff does not have complete identifying information for investors, the expected pool of eligible claimants will be large, and/or the calculation of losses and distribution payments is complex. The Commission staff lacks the resources necessary to evaluate claims and distribute funds under these circumstances, and typically proposes a notice-and-claims process administered by a distribution agent under the supervision of the Court and the Commission staff. Along with the tax obligations of the distribution fund, the fees and expenses of the tax administrator and distribution agent factor into the Commission staff's calculation of the funds available for distribution. Considering the administrative costs to conduct the distribution, the Commission staff will determine whether the net available funds are sufficient to compensate harmed investors, making a distribution feasible.

### C.       Establishment of A Fair Fund

The creation of a Fair Fund is a precursor to proposing that the Court approve a plan to distribute collected civil penalties, along with collected disgorgement and prejudgment interest, to victims of the violations of the securities laws. The Fair Fund mechanism allows civil penalties to be distributed to harmed investors along with disgorgement and prejudgment interest and thus maximizes investor recovery.

### D.       Appointment of a Tax Administrator

Once the Commission staff has determined that a distribution is feasible and the Court has created a Fair Fund, the Commission staff recommends that the Court appoint a Tax Administrator. A distribution fund (whether it consists solely of disgorgement and prejudgment

A4079

interest, or also includes civil penalty money) constitutes a Qualified Settlement Fund (QSF)

under section 468B(g) of the Internal Revenue Code, 26 U.S.C. §468B(g), and related

regulations, 26 C.F.R. §§1.468B-1 through 1.468B-5.

**E.      Selection and Appointment of a Distribution Agent**

When the number of potential payees is large and a notice and claims process is

necessary to identify harmed investors, the Commission typically engages a third-party

distribution agent that specializes in investor outreach, handling claims, and making payments.

In general, the duties of the distribution agent are to work with the staff to develop a proposed

distribution plan, to oversee any administrative matters relating to the noticing of investors and

processing of claims, to coordinate with the Tax Administrator to ensure compliance with the

Fair Fund's tax obligations, to prepare accountings of the Fair Fund, to maintain accurate records

concerning the Fair Fund, and to oversee the distribution of the Fair Fund to investors.

The Commission staff selects distribution agents through a rigorous and competitive

process.  The Commission maintains a pool of qualified and experienced administrators who

have been approved by the Commission to be recommended for appointment in civil

proceedings.  Each firm is a full-service distribution agent, capable of performing advanced

investor location and providing investor support services with both automated and live toll-free

telephone support and case-specific websites.  The Commission staff solicits written bids from

multiple approved distribution agents in the Commission's pool, requiring each to provide a

detailed description of its proposed approach to the distribution, staffing, technological

resources, and anticipated fees and expenses.  The Commission staff then reviews and analyzes

each proposal and selects an administrator that best meets the unique needs of the distribution in

the most cost-effective way.  Once a distribution agent is selected, the Commission presents its

A4080

selection to the Court and seeks the appointment of the distribution agent to oversee the distribution.

**F.    Development of a Distribution Plan**

Once the Court appoints a distribution agent, the distribution agent and staff of the Commission's Office Distributions and the Division of Economic and Risk Analysis draft a proposed distribution plan.  The distribution plan identifies the class of investors who are eligible to participate in the distribution and the relevant period and describes the claims process and the calculation of losses and distribution payments.  It usually takes at least two months to evaluate investor records and market data, develop the distribution methodology, and prepare the distribution plan that will maximize the recovery to harmed investors.  The Commission then files a motion with the Court seeking approval of the distribution plan.  The standard that courts should apply to determine whether to approve the plan is whether the proposed distribution of funds is "fair and reasonable."  *See Official Committee of Unsecured Creditors of Worldcom, Inc. v. SEC*, 467 F.3d 73, 81-83 (2d Cir. 2006) ("[u]nless the consent decree specifically provides otherwise[,] once the district court satisfies itself that the distribution of proceeds in a proposed SEC disgorgement plan is fair and reasonable, its review is at an end") (affirming district court decision to approve Commission's distribution plan for settlement funds).

**G.    Administration of a Notice and Claims Process**

If the distribution plan is approved by the court, the distribution agent then conducts the distribution according to the approved plan.  The distribution agent locates and notifies harmed investors who might be potential claimants to the distribution fund.  This is the initial step in a "notice-and claims" process and can be accomplished in two ways.  First, Commission staff economists working with the Blue Sheets trading records for each OTC security can create a

A4081

baseline list of investors who purchased shares during each security's respective inflation period. Second, in recognition of the fact that not all investors' transactions are captured in the Blue Sheets and that the contact information in the Blue Sheets may be stale, the distribution agent will notify the public through various public online channels, including a dedicated website created for the Fair Fund, posts on the Commission's website and forums such as X/Twitter and Reddit as well as in print media (e.g., PR Newswire, the Wall Street Journal)—tailored to target the specific harmed investor pool. The distribution agent provides a copy of the Distribution Plan and documents that explain how eligibility is determined, how losses are calculated, and how to submit a claim.

As part of the claims process, the distribution agent gathers transaction information relating to each security from claimants through a claims process. Investors complete and submit a standardized claim form and supporting documents either through an online portal maintained by the distribution agent on the Fair Fund's website or by sending them to the distribution agent by mail. The distribution agent reviews each claim and evaluates whether the claimant is an excluded party, the claim relates to the correct security(ies) and period, and the claim form and supporting documents are accurate and complete. If the distribution agent discovers any deficiencies, it will work with the claimant to cure any defects and resolving incomplete claims and disputed transactions.

### H.    Preparation of a Payment File and Disbursing Payments

The distribution agent prepares a payment file listing the claimants who are eligible to receive a distribution payment, the amount of their calculated losses according to the distribution plan, and the amount of their distribution payments. The distribution agent first calculates the recognized (qualifying) loss amount for each claimant by applying loss formulas developed by

A4082

Commission economists in the "Plan of Allocation" section of the distribution plan for their purchases in each of the securities. Based on these calculations, the distribution agent will compile a list of claimants who may be eligible to receive a distribution payment. An Eligible Claimant: 1) is not an excluded party; 2) submitted a valid claim and supporting documentation; and 3) suffered a recognized loss as calculated under the Plan of Allocation.

Then, the distribution agent determines the amount of each claimant's distribution payment by allocating the net Fair Fund (the Fair Fund minus administrative costs, including taxes and fees) to eligible claimants on a *pro rata* basis according to their loss amounts, up to the full amount of their losses. Claimants whose *pro rata* amounts fall below the *de minimis* threshold (typically $10.00) are declared ineligible to recover and the *de minimis* amounts are reallocated to the distribution payments of the other claimants. The Commission staff reviews and approves the payment file reflecting the list of Eligible Claimants and their proposed distribution payments.

Finally, the Commission seeks the Court's approval to disburse the Fair Fund to the harmed investors who were identified through this notice-and-claims process and have been determined to be eligible to receive a distribution payment. The distribution is usually followed by a second payment attempt for uncashed or undelivered first-round payments. The distribution plan also provides for a second-tranche distribution if 1) sufficient funds from uncashed or undelivered payments remain or more remedies are collected after the initial distribution; and 2) the eligible claimants who negotiated their payments in the initial distribution have not been fully compensated for their recognized losses.

Based on the Commission's experience in similar cases, the distribution process takes approximately two years after the full amount of ordered remedies are collected (or a

A4083

determination is made that no further collections are likely) and a distribution plan is approved by the Court. This is the amount of time necessary to locate and notify investors, permit investors sufficient time to respond, resolve disputes, calculate losses and distribution payments, disburse funds, and satisfy reporting obligations to the Court.

### III.    The Proposed Distribution Framework for Returning Collected Funds to Harmed Investors in this Action.

#### A.    Distribution in this Matter is Feasible

The Commission has determined that a distribution is feasible in this matter, and thus seeks to have a Fair Fund established, and a Tax Administrator appointed.

Here, because there are tens of thousands of harmed investors who traded in at least 15 OTC Securities during overlapping and extended periods, the Commission staff will seek the appointment of a third-party distribution agent to oversee the distribution through a notice-and-claims process. However, given the current uncertainty concerning the amount available for distribution, it is premature to seek the appointment of a distribution agent at this time. The staff is conscious of administration costs and, to preserve funds for the benefit of investors, does not plan to seek appointment of the distribution agent until there is greater certainty regarding the amount of money available for distribution. If the Court grants the pending motion, the Commission will solicit potential distribution agents to recommend to the Court in the future.

#### B.    The Proposed Distribution Framework

The Commission has preliminarily developed the Distribution Framework, a three-part approach to compensate harmed investors in this matter. In nearly all Commission distributions, legal and accounting staff in the Division of Enforcement work with in-house economists in DERA. Because this matter involves numerous OTC securities and schemes, DERA will be instrumental in developing an appropriate methodology to analyze and compensate investor loss.

11

A declaration from the DERA economist who is working on this matter, Dr. Thomas Dunn (the "Dunn Dec."), is submitted herewith. In his declaration, Dr. Dunn describes his work to develop a preliminary Distribution Framework, elements of which will be further detailed in a forthcoming proposed distribution plan. As part of the proposed Distribution Framework and ultimately the distribution plan, the Commission staff anticipates seeking this Court's approval to transfer amounts collected to a restitution fund in a parallel criminal case.

The Distribution Framework attempts to make meaningful recoveries to the largest number of investors in the OTC securities manipulated by the Defendants, while treating all investors fairly and limiting administrative expenses.

First, the Commission proposes to contribute any monetary remedies collected from Gasarch and Kelln toward the restitution fund established in *U.S. v. Knox*, No. 1:18-cr-10385-1-NMG (D. Mass.) (the "Knox Restitution Fund"). *See* Amended Judgment in a Criminal Case, *US v. Knox*, No. 1:18-cr-10385-1-NMG (D. Mass. Jan. 5, 2024), ECF No. 277. Thus, collections from Gasarch and Kelln would be distributed to victim-investors who purchased shares in any of 17 OTC securities during the period in which the share price had been manipulated as part of the fraudulent schemes in which Knox participated and for which he pled guilty (the "Knox Restitution Tickers"). Kelln's and Gasarch's misconduct, as part of their roles in the Sharp Group, also involved 16 of those same 17 securities. In addition, the Commission plans to seek to contribute to the Knox Restitution Fund the remedies it has collected from other defendants in the Commission's other cases in which those defendants' misconduct involved trading in any of the 17 Knox Restitution Tickers. Evaluating the Knox Restitution Fund, and given that the bulk of the work has been done to identify investor-victims and to calculate their losses, and given the involvement of both Gasarch and Kelln with 16 of the 17 Knox Restitution Tickers, the

A4085

Commission views the contribution of monetary remedies collected from them to be the most efficient use of those funds that will benefit a large number of victim-investors at a minimal additional cost to the Commission or the U.S. Attorney's Office.

The Commission's proposed approach is consistent with the evidence developed during the trial of this matter. Knox testified at trial that he traded in many of the securities at issue in this case as part of the Defendants' fraudulent scheme. *See e.g.,* Tr. Transcript 9.19.23 at 89:23-91:18 (Knox describing Geneva meeting "shortly before his arrest" [in Oct. 2018] at which Friesen was present and they discussed Silverton's trades for the Veldhuis Control Group in Vitality, Arch, and StartMonday); Tr. 9.20.23 at 34:24-35:2; 41:5-14, 45:5-46:4. Of the 17 issuers whose investors would be compensated by the Knox Restitution Fund, all but one (Environmental Packaging Technologies Holdings, Inc.) was traded through the Sharp Group's services, and thus it would be logical to contribute funds collected from Kelln and Gasarch, whose conduct enabled those sales, to the Knox Restitution Fund for distribution to the investors in the 17 issuers in the Knox Restitution Fund.[2]

Second, if the Court grants the Commission's motion to establish a Fair Fund, the Commission will propose that it contribute to that Fund any remedies collected from Sexton, Veldhuis, Friesen, Dhillon, Taylor and Kaitz for distribution to harmed investors in an additional 15 OTC securities that the Court found that these Defendants collectively participated in manipulating, the "Group 2 Tickers." The Commission staff considered contributing a portion of the funds collected from these Defendants to the Knox Restitution Fund. However, the 15 OTC

---

[2] Kelln and Gasarch were not involved in the trading of Environmental Packaging Technologies Holdings, Inc. This ticker accounts for well less than 1% of the losses proposed to be compensated by the Knox Restitution Fund. *See* Dunn Dec., App. 2 at line 3 (line for EPTI). Thus, the fact that some funds derived from remedies paid by Kelln and Gasarch may be used to compensate investors in Environmental Packaging stock is immaterial as the amount of such contributions, if any, will be very small in relation to the use of their funds to compensate investors who were directly harmed by their misconduct.

A4086

securities that were the focus of this case are not part of the Knox Restitution Fund and the Commission believes that it is appropriate to have a separate mechanism focused on compensating the harmed investors in those 15 securities, as well as the additional security manipulated by Dhillon and Taylor (Inovio Pharmaceuticals) that is described in the Complaint.

The staff then will develop a methodology to compensate investors who purchased shares of the Group 2 Tickers and suffered losses as a result of the Defendants' manipulation, following the same general approach as previous plans addressing similar conduct and securities. *See* Dunn Dec., at ¶¶24-28. The methodology would become part of the Distribution Plan, that would rely upon a "notice and claims" procedure augmented with Blue Sheets analysis. The process would be similar if the number of OTC securities that are part of the distribution plan were decreased or increased, but the administrative expenses and time to completion would decrease or increase as the number of securities changed. Though the facts and the specific allocation of funds among investors are different in every case, sample court-approved distribution plans relating to the compensation of investors who were harmed by the manipulation of microcap securities are attached for the Court's review. *See* Exhibit A (Order Approving Distribution Plan, *see* Attachment, Plan of Distribution, *SEC v. Garrett O'Rourke*, et al, No. 19-cv-4137 (KAM) (E.D.N.Y.), Dkt. No. 95 (May 26, 2021); *see also* Exhibit B (Order Approving Plan of Distribution, *SEC v. AIMSI Technologies, Inc.*, et al, No. 05-cv-4724 (LLS) (S.D.N.Y.), Dkt. No. 155 (Mar. 2, 2017).

Third, the Commission staff will determine later how to allocate the remedies from Sharp: (a) to the Knox Restitution Fund, (b) to the proposed distribution to Group 2 Tickers, and/or (c) to a Court-approved distribution to a third set of OTC securities.

14

A4087

The Commission asserts that its approach for the distribution of the Fair Fund in this case is equitable and reasonable.  *See SEC v. Wang*, 944 F.2d. 80, 85, 88 (2d Cir. 1991).  The Commission is vested with broad discretion in fashioning distribution plans for disgorgement funds and Fair Funds.  *See SEC v. Levine*, 881 F. 2d 1165 (2d Cir. 1989).   The Commission's distribution plans have been approved by numerous courts, including the District of Massachusetts.  *See* Exhibit C, *SEC v. Vassilios Trikantzopoulos, et al.* Civil Action No. 1:20-11156 (RGS) (D. Mass.), Dkt, 40, Mar. 22, 2023 Order (order *inter alia* approving a distribution plan).  The Commission's proposed three-pronged approach under the Distribution Framework is a reasonable path for distribution for this fund, since it seeks to maximize investor recovery and fairly compensate investors harmed by the Defendants' conduct.

### IV.     Argument and Relief Requested

#### A. The Court Should Establish a Fair Fund in this Matter.

The creation of a Fair Fund is a precursor to proposing for Court approval a plan to distribute collected civil penalties, along with collected disgorgement and prejudgment interest, to victims of the violations of the securities laws.  Before the Sarbanes-Oxley Act, all civil penalties obtained by the Commission were required to be paid to the United States Treasury under Section 21(d)(3)(C) of the Securities Exchange Act of 1934 [15 U.S.C. §78u(d)(3)(C)].  If the Court approves the present motion, then, once the appeals are resolved, the Commission staff will begin soliciting bids for a distribution agent, seek the Court's approval to appoint a distribution agent, develop a distribution plan for the fifteen tickers as described above (the "Plan"), and present the proposed Plan for the Court's approval.

To maximize the relief available to harmed investors, the Court should establish a Fair Fund pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7246] so that

A4088

the civil penalties collected to date in this case and any future civil penalties collected can be distributed along with collected disgorgement and pre-judgment interest.

Section 308(a) provides, in relevant part:

> If, in any judicial or administrative action brought by the [SEC] under the securities laws, the [SEC] obtains a civil penalty against any person for a violation of such laws, or such person agrees, in settlement of any such action, to such civil penalty, the amount of such civil penalty shall, on the motion or at the direction of the [SEC], be added to and become part of a disgorgement fund or other fund established for the benefit of the victims of such violation.

15 U.S.C. § 7246(a).  The Commission brought this action under the federal securities laws and this Court has ordered payment of civil penalties in addition to disgorgement and prejudgment interest (as to Defendants Sharp, Kaitz, Dhillon, and Taylor), some of which has been collected and is being held at the U.S. Treasury.  Section 308(a)'s requirements have thus been satisfied, and the creation of a Fair Fund for the benefit of harmed investors is appropriate so that these funds can be distributed to compensate harmed investors.

**B.    The Court Should Appoint Miller Kaplan as Tax Administrator for the Fair Fund.**

The Fair Fund constitutes a Qualified Settlement Fund ("QSF") under Section 468B(g) of the Internal Revenue Code (IRC), 26 U.S.C. § 468B(g), and related regulations, 26 C.F.R. §§ 1.468B-1 through 1.468B-5.  A tax administrator on behalf of the Fair Fund should be appointed and authorized to take all necessary steps to enable the Fair Fund to obtain and maintain the status of a taxable QSF, including the filing of all required elections and statements contemplated by those provisions.  The Tax Administrator will cause the Fair Fund to pay taxes in a manner consistent with treatment of the Fair Fund as a QSF.  The reasonable costs, fees, and other expenses incurred in the performance of the Tax Administrator's duties will be paid by the Fair Fund in accordance with the agreement between the Commission and the Tax Administrator.

The Commission currently has a three-year contract with two accounting firms that sets forth the firm's compensation for services and fees in connection with the distribution funds for which it is appointed by the Court.

The Commission recommends the appointment of Miller Kaplan, which has served as a tax administrator on numerous QSF's established by the Commission and which is experienced in the taxation of QFSs.  Miller Kaplan has agreed to reasonable fees for its services.  In summary, the current agreement with Miller Kaplan provides for compensation for services and expenses as follows:

| SERVICE | FIXED FEE |
|---|---|
| Income tax returns, including items a-f (below). | $1,850 |
| Income tax returns, including items a-f (below), for funds with assets of $120,000 or less or that are open and closed within the same year. | $925 |

Fixed fee tax compliance services include:[3]

a.    Obtain a federal tax identification number for the QSF.

b.    Prepare and file federal and state income tax returns, as required.

c.    Where required, calculate quarterly estimated tax payments, and provide information to the Commission so that payments may be made timely.

d.    Make arrangements with the Commission or its agents to pay tax liability.

e.    Calculate and recommend retention of a reserve for penalties and interest to be assessed as a result of any late filing of tax returns and late payment of taxes.

---

[3] These fixed fees include all copying expenses, and any internal expenses of the Tax Administrator in performing these services such as facsimile fees and telephone charges.  Expenses that are not included are postage, expedited delivery fees (such as Federal Express), and other extraordinary costs, such as extended telephone conferences and reports.  Additional tax compliance services and services for the administration of the QSF would be provided at the Commission's request and billed at the Tax Administrator's current rates discounted by 20%.

A4090

     f.     Determine and comply with tax reporting obligations of the QSF relating to distributions or payments to vendors, if applicable.

By the proposed Order, Miller Kaplan will execute all income tax reporting obligations of the Fair Fund, including the preparation and filing of tax returns and compliance with the Foreign Account Tax Compliance Act. At the completion of the distribution, it will assist the Court-appointed distribution agent to prepare a final report and final accounting for filing with the Court. If appointed, Miller Kaplan may be removed *sua sponte* by the Court or upon motion of the Commission and replaced with a successor and, in the event it decides to resign as tax administrator, it must first give written notice to the Court and to the Commission's counsel of such intention, and the resignation, if permitted, will not be effective until the Court appoints a successor.

### C. The Court Should Authorize the Commission Staff to Pay Future Tax Obligations and Tax Administrator Fees and Expenses Without Further Court Order.

To meet future tax payment deadlines, avoid the assessment of late payment penalties, and make timely payment to the Tax Administrator for services provided, the Commission further requests that its staff be authorized to approve and arrange payment of all future tax obligations and Tax Administrator fees and expenses from the Fair Fund without further Court approval. Authorizing the Commission's staff to approve and pay future tax obligations and tax administration fees and expenses from the Fair Fund without further Court approval will expedite the payment process, reducing the risk of late tax payments and penalties. All tax payments and tax administration fees will be reported to this Court in the final accounting of the Fair Fund once any court authorized distribution is complete.

### V.    CONCLUSION

For all the foregoing reasons, the Commission respectfully requests that the Court enter the

A4091

proposed Order submitted with the Motion and grant such other relief as the Court deems

appropriate.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION,**
By its attorneys,

/s/ Kathleen B. Shields
Kathleen B. Shields (Mass. Bar No. 637438)
David London (Mass. Bar No. 638289)
Nita K. Klunder (Mass. Bar No. 689304)
Alfred Day (Mass. Bar No. 654436)
33 Arch Street, 24th Floor
Boston, MA  02110
Telephone: (617) 573-8904 (Shields); (617) 573-4537
(Day); (617) 573-8997 (London)
Fax: (617) 573-4590
Email: shieldska@sec.gov; daya@sec.gov;
londond@sec.gov

## CERTIFICATE OF SERVICE

I certify that on September 4, 2024, this motion was filed electronically with the Court.
The filing will be sent to the registered participants as identified on the Notice of Electronic
Filing and may also be accessed through the Court's ECF system.

/s/ Kathleen B. Shields
Kathleen B. Shields

A4092



**EXHIBIT**

A
_____

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                       **Plaintiff,**<br><br>              **v.**<br><br>GARRETT O'ROURKE and MICHAEL J. BLACK,<br><br>                    **Defendants.** | **Case No.:  19-CV-4137 (KAM)** |

**Order Approving Distribution Plan**

       The steps set forth in the Order to Show Cause (ECF No. 92) relating to investor notice of the proposed distribution plan having been completed;

       **AND**, pursuant to the Order to Show Cause, the SEC having filed a Notice informing the Court that no objections to the proposed plan have been submitted as of the date of that Notice, and that the Plan and the Order to Show Cause have been published in accordance with Section I of that Order;

       **AND** having considered all arguments presented and for good cause shown;

       **IT IS HEREBY ORDERED** that:

   1.  The proposed (attached) plan is hereby approved (the "Distribution Plan"); and

   2.  The Distribution Plan shall govern the administration and distribution of collections in this matter.

Dated: ___May 26_, 2021

                                  _/s/ Kiyo A. Matsumoto_____
                                  Kiyo A. Matsumoto
                                  U.S. District Judge

Attachment: Approved Plan

Case 1:21-cv-11276-WGY   Document 538-105   Filed 09/04/24   Page 2 of 36

# Attachment:

# Plan of Distribution

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                           **Plaintiff,**<br><br>          **v.**<br><br>GARRETT O'ROURKE and<br>MICHAEL J. BLACK,<br><br>                     **Defendants** | **Case No.:  19-CV-4137 (KAM)**<br><br>**[Proposed] Plan of Distribution** |

<u>**Introduction**</u>

1.      The Securities and Exchange Commission (the "SEC") instituted this action by Complaint filed on July 17, 2019, alleging that, from approximately May 2016 through July 2018, Garrett O'Rourke ("O'Rourke") and Michael J. Black ("Black") (collectively, the "Defendants") schemed to sell the stock of five publicly traded companies to investors through false and misleading statements and high pressure stock promotional campaigns. (ECF No. 1).  The SEC further alleged that the defendants disguised their control over some or all of the companies and their stock, thereby circumventing their obligations to register the stock with the SEC pursuant to Section 5 of the Securities Act of 1933 and conduct sales in accordance with the governing registration regulations.  *Id*. The SEC charged the Defendants, variously, with violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a), e(c), q(a)] and Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. *Id.*

2.      The matter has since been resolved against O'Rourke.  By amended final order entered by consent on December 7, 2020, the Court ordered O'Rourke, among other things, to pay disgorgement and prejudgment interest aggregating to $5,763,719 (the "O'Rourke

Order"). ECF No. 79. The SEC has since collected this monetary relief in full and holds

over $5.7 million in an interest-bearing account at the U.S. Treasury's Bureau of Fiscal

Service (the "Distribution Fund"). Accrued interest will be added to the Distribution Fund.[1]

The O'Rourke Order provides that the SEC may propose a plan to distribute the collected

funds.

3.     By Order dated March 4, 2021, this Court appointed Miller Kaplan Arase LLP as

Tax Administrator (the "Tax Administrator"), appointed JND Legal Administration as

Distribution Agent (the "Distribution Agent"), and authorized the SEC to pay all tax

obligations and administrative fees and expenses without further Court Order (the

"Appointment Order"). ECF No. 89.

4.     The SEC developed this distribution plan (the "Plan") jointly with the Distribution

Agent and the Tax Administrator, in accordance with practices and procedures customary in

Distribution Fund administrations. The Plan governs the administration and distribution of

the Distribution Fund, and sets forth the method and procedures for distributing the assets of

the Distribution Fund to investors harmed by the conduct alleged in the Complaint.

### Definitions

5.     In addition to words otherwise defined herein, the following definitions apply to the

Plan:

    a.     "Administrative Costs" means any administrative costs and expenses,

including without limitation the fees and expenses of the Tax Administrator and the

---

[1] The matter is still pending with respect to Black and the SEC likely will seek to add any additional collections in this matter to the Distribution Fund if the Distribution Fund has not yet been distributed. Moreover, the SEC anticipates that collections in related SEC or other actions, if timely, may be directed to the Distribution Fund for distribution.

A4096

Case 1:21-cv-11276-WGY Document 95-1 Filed 10/04/24 Page 5 of 36   1153

Distribution Agent, tax obligations, and investment costs. All Administrative Costs will be paid by the Distribution Fund.

b.    The "Bank" shall refer to a United States commercial bank that is not unacceptable to the SEC staff.

c.    "Claim Form" shall mean the form designed by the Distribution Agent and reviewed by SEC staff, for the filing of claims in accordance with the Plan. The Claim Form will require, at a minimum, sufficient documentation of transactions in the Securities during the Relevant Period such that eligibility under the Plan can be determined; tax identification and related information from the Potential Claimant as determined necessary by the Distribution Agent in coordination with the Tax Administrator; information on Prior Recoveries, if any; and a certification that the Potential Claimant is not an Excluded Party.

d.    "Claims Bar Date" shall mean the date established in accordance with the Plan by which Claim Forms must be postmarked or submitted electronically by in order to receive consideration under the Plan. Subject to certain extensions provided for in this Plan, the Claims Bar Date will be one hundred twenty (120) days from the initial mailing date of the Claims Packet.

e.    "Claims Packet" shall mean the materials relevant to submitting a claim and provided to Potential Claimants, including Potential Claimants who request such materials through a website or otherwise prior to the Claims Bar Date. The Claims Packet will include, at minimum, a copy of the Plan Notice and a Claim Form (together with instructions for completion of the Claim Form).

3

f.    "Days" shall mean calendar days, unless otherwise specified herein. Should a deadline fall on a weekend or holiday, that deadline should be pushed to the next business day.

g.    "Determination Notice" shall mean the notice sent by the Distribution Agent within ninety (90) days of the Claims Bar Date to all Potential Claimants that submitted a Claim Form. The Determination Notice will set forth the Distribution Agent's determination of the eligibility of the claim (eligible, partially or wholly deficient, or ineligible) and the Eligible Loss Amount. The Determination Notice will provide to each Potential Claimant whose claim is deficient, in whole or in part, the reason(s) for the deficiency; notify the Potential Claimant of the opportunity to cure such deficiency; and provide instructions regarding further necessary actions. In the event the claim is denied, the Determination Notice will state the reason(s) for such denial and notify the Potential Claimant of their opportunity to request reconsideration of their claim.

h.    "Distribution Payment" means the payment to an Eligible Claimant in accordance with the Plan.

i.    "Eligible Claimant" means a Potential Claimant who is not an Excluded Party and who is determined by the Distribution Agent to be eligible under the Plan for a Distribution Payment.

j.    "Eligible Loss Amount" means, for each Eligible Claimant, the aggregate of the Recognized Loss on each Security as defined and calculated in accordance with ¶¶ 13-20.

k.    "Escrow Account" means the account established to hold the Escrow Property.

4

A4098

l.     "Escrow Property" means the funds transferred to the Bank in accordance with ¶57.

m.     "Excluded Parties" shall mean the following entities of individuals:

i)     The Defendants in the captioned action and the legal representatives, nominees, assigns, creditors, heirs, distributees, spouses, parents, children, successors-in-interest, or controlled entities of the foregoing;

ii)     Any respondent or defendant in an SEC enforcement action or criminal proceeding that is instituted prior to the determination of Eligible Claimants under the Plan and that seeks relief for the activities underlying the conduct underlying this action, including, without limitation, the defendants in *SEC v. Knox, et al.*, No. 18-cv-12058-RGS (D. Mass.) and *SEC v. Bajic, et al.*, No. 20-cv-7-LGS (S.D.N.Y.), and the legal representatives, nominees, assigns, creditors, heirs, distributees, spouses, parents, children, successors-in-interest, or controlled entities of the foregoing;

iii)     The Distribution Agent, its employees, and those persons assisting the Distribution Agent in its role as the Distribution Agent; and

iv)     Any purchaser or assignee of another Person's purported right to obtain a recovery from the Distribution Fund for value; provided, however, that this provision shall not be construed to exclude Third-Party Filers or those Persons who obtained such a right by gift, inheritance, devise or operation of law.

5

A4099

n.      "Final Determination Notice" means the Distribution Agent's written reply to each Potential Claimant who timely responded to the Determination Notice in an effort to cure a deficiency or seek reconsideration of a denied claim.  The Final Determination Notice will constitute the Distribution Agent's final ruling regarding the status of the claim.

o.      "Net Available Distribution Fund" means the Distribution Fund, plus accrued interest or earnings, less Administrative Costs.

p.      "Person" means natural individuals as well as legal entities including, but not limited to, corporations, partnerships, limited liability companies, and governmental entities.

q.      "Plan Notice" means the written notice from Distribution Agent to Potential Claimants informing them of the Distribution Fund, the Plan and its eligibility requirements, and explaining how to submit a claim and how to obtain a copy of the approved Plan and Claim Form by request or from the Distribution Fund's website.

r.      "Plan of Allocation" refers to the allocation method used in the Plan to determine eligibility and determine Distribution Payments as set forth in ¶¶13-20.

s.      "Post-Period Price" means the volume-weighted average share price for each Security for the 90 calendar days directly following the Relevant Period.  The Post-Period Price for each Security was calculated by Commission's Division of Economic and Risk Analysis and is included in Exhibit A.

t.      "Potential Claimant(s)" means individuals and entities, or their lawful successors, who purchased one or more of the Securities during the Relevant Period.

u.      "Prior Recovery" means the amount of compensation received by an Eligible Claimant from any source for the loss that resulted from the conduct underlying this action.

A4100

To the extent an Eligible Claimant's Prior Recovery is known to the Distribution Agent, the Distribution Agent will reduce an Eligible Claimant's Distribution Payment by the amount of their Prior Recovery.  Aside from the application of ¶19 (Reasonable Interest), in no instance will an Eligible Claimant receive a Distribution Payment that when combined with his, her, or its Prior Recovery exceeds his, her, or its Eligible Loss Amount.

v.      "Recognized Loss" shall mean the amount of loss on each Security depending on when the share was acquired, sold, or if it was retained, as calculated pursuant to the Plan of Allocation.

w.      The "Relevant Period" is different for each of the Securities, and is set forth on Exhibit A.

x.      "Securities" are listed with their trading symbol on Exhibit A.

y.      "Summary Plan Notice" means the notice published in print or internet media that shall include, at a minimum, a statement of the purpose of the Distribution Fund and the Plan, the means of obtaining a Claims Packet, and the Claims Bar Date.

z.      "Third-Party Filer" means a third-party, including without limitation a nominee, custodian, or an intermediary holding in street name, who is authorized to, and submits, a claim(s) on behalf of one or more Potential Claimants.  Third-Party Filer does not include assignees or purchasers of claims, which are excluded from receiving distribution payments.  *See* ¶ 5.m.(iv).

**The Distribution Agent**

6.      The Distribution Agent will be responsible for administering the Distribution Fund in accordance with the Plan and the Appointment Order.

A4101

7.      To carry out the purposes of this Plan, the Distribution Agent is authorized to make and implement immaterial changes to the Plan upon agreement of the SEC staff.  If a change is deemed to be material by SEC staff, Court approval is required prior to implementation by amending the Plan.

8.      The Distribution Agent may extend any procedural deadline contained in the Plan for good cause shown, if agreed upon by the SEC staff.

9.      The Distribution Agent is authorized to enter into agreements with institutions ("Institutions") as may be appropriate or necessary in the administration of the Distribution Fund, provided such Institutions are not excluded pursuant to other provisions of this Plan. In connection with such agreements, the Institutions shall be deemed to be agents of the Distribution Agent under this Plan.  As set forth in the Appointment Order, the Distribution Agent will be entitled to payment from the Distribution Fund of reasonable fees and expenses incurred in the performance of its duties (including any such fees and expenses incurred by agents, consultants or third parties retained by the Distribution Agent in furtherance of its duties).

10.      The Distribution Agent will retain all claims materials in paper and electronic form, and all other distribution records in either (or both) form for a period of six (6) years from the date of Court approval of a final fund accounting, and will thereafter transfer the documents to the SEC if and as directed by the SEC staff.  In addition, the Distribution Agent will shut down the website, P.O. Box and customer service telephone line(s) established specifically for the administration of the Distribution Fund six (6) months after the closing of the Escrow and Deposit Accounts (*see* ¶¶ 5.k., 48, and 49), or at such earlier time as the Distribution Agent determines with concurrence of the SEC staff.

A4102

**Tax Compliance**

11.     The Distribution Fund is a Qualified Settlement Fund ("QSF") under Section 468B(g) of the Internal Revenue Code, 26 U.S.C. § 468B(g), as amended.  The Tax Administrator is the administrator of such QSF for purposes of Treas. Reg. § 1.468B-2(k)(3)(I), and shall satisfy the tax related administrative requirements imposed by Treas. Regs. § 1.468B-1 to § 1.468B-5, as set forth in the Appointment Order.

12.     Payment of tax obligations and tax related costs and expenses will be requested and made from the Distribution Fund in accordance with the Appointment Order.

**Plan of Allocation**

13.     This Plan of Allocation is designed to compensate Eligible Claimants for losses in the Securities purchased and sold during each Security's respective Relevant Period that were caused by the misconduct of the Defendants.  The Recognized Loss will be calculated separately for each Security, and then summed for each Potential Claimant. Investors who did not transact in shares of a Security during its Relevant Period are ineligible to recover for that Security under the Plan.

        a.      The Recognized Loss on a Security will be calculated as the total purchase amount for shares of the Security purchased during the Relevant Period, less the sales proceeds on shares sold during the Relevant Period, less the holding value of excess shares.

        b.      The holding value of excess shares will be calculated as the difference between the number of shares purchased during the Relevant Period and the number of shares sold during the Relevant Period (which can be positive or negative), multiplied by the Post-Period Price set forth on the table included as Exhibit A.

A4103

      c.      If the Recognized Loss on a Security is less than zero, reflecting a gain, the Recognized Loss on that Security will equal $0.00.

      d.      The Eligible Loss Amount for a Potential Claimant will be the sum of his, her, or its Recognized Losses on all of the Securities, some of which may be zero.

      e.      An example calculation is attached as Exhibit B.

14.      All prices mentioned in the calculations exclude all taxes, fees, and commissions. Purchases and sales shall be deemed to have occurred on the "contract" or "trade" date as opposed to the "settlement" or "payment" date.

15.      The date of covering a short sale is deemed to be the date of purchase of the Security and the date of a short sale is deemed to be the date of sale of the Security.

16.      The receipt or grant of a Security to the Potential Claimant by gift, devise, inheritance, or operation of law during the Relevant Period is not considered an eligible purchase if the original purchase did not occur during the Relevant Period. Such shares will be excluded from the calculation of the Potential Claimant's Eligible Loss Amount.

17.      The Securities are the only securities eligible for recovery under the Plan (*see* ¶ 5.x. "Securities"). Option contracts to purchase or sell a Security are not eligible for recovery under the Plan. With respect to a Security purchased or sold through the exercise of an option, the purchase/sale date is the exercise date of the call and the assignment date of the put, and the purchase/sale price is the strike price of the call at the time of exercise and the strike price of the put at the time of assignment. Transactions in a Security that are pursuant to, or in connection with, a swap or another derivative will not be eligible for a recovery.

A4104

18.     Aside from the application of ¶19, regarding Reasonable Interest, in no instance will an Eligible Claimant receive a Distribution Payment that when combined with his, her, or its Prior Recovery, exceeds his, her, or its Eligible Loss Amount.

19.     If the Net Available Distribution Fund is less than the sum of the Eligible Loss Amounts of all Eligible Claimants, each Eligible Claimant will receive a Distribution Payment equal to the Net Available Distribution Fund multiplied by the ratio of the Eligible Claimant's Eligible Loss Amounts to the Eligible Loss Amounts of all Eligible Claimants. If the Net Available Distribution Fund equals or exceeds the sum of the Eligible Loss Amounts of all Eligible Claimants, each Eligible Claimant will receive a Distribution Payment equal to the amount of his, her, or its Eligible Loss Amount. If the Net Available Distribution Fund has funds in excess of that necessary to pay each Eligible Claimant a Distribution Payment equal to the amount of their Eligible Loss Amount, the Distribution Agent, in consultation with the SEC staff, may include in the Distribution Payments an additional amount to compensate each Eligible Claimant for the time value of their respective Eligible Loss Amount ("Reasonable Interest").[2]

20.     If a Potential Claimant's Distribution Payment is less than $10.00 (the "*De Minimis* Amount"), that Potential Claimant will not receive a Distribution Payment and the funds will be distributed to Eligible Claimants whose Distribution Payments are equal to or greater than $10.00.

---

[2] "Reasonable Interest" will be calculated by the Division of Economic and Risk Analysis ("DERA"), at a rate determined to be appropriate under the facts and circumstances of this case, compounded quarterly from the approximate date of the loss through the approximate date of the disbursement of the Distribution Fund.

A4105

Case: 24-1770     Document: 00118249071     Page: 622     Date Filed: 02/18/2025     Entry ID: 6700951

Case 1:24-cv-11276-WGY   Document 538   Filed 09/04/24   Page 14 of 36
Case 1:21-cr-10276-WGY   Document 105   Filed 10/04/24   Page 14 of 36   PageID: 1162

**Identification of and Notice to Potential Claimants**

21.     The Distribution Agent shall, as practicable, use its best efforts to identify Potential Claimants from a review of records obtained by the SEC, account information provided by the transfer agent(s) for the Securities, registered broker-dealers, investment advisors, and any other commercially reasonable sources available to it.

22.     Within forty-five (45) days of Court approval of the Plan, the Distribution Agent shall:

  a.     create a mailing and claim database of all Potential Claimants based upon information identified by the Distribution Agent;

  b.     design and submit a Claims Packet to the SEC staff for review and approval;

  c.     mail a Claims Packet to each Potential Claimant identified by the Distribution Agent and to the Distribution Agent's list of banks, brokers, and other nominees in accordance with ¶26, below;

  d.     establish and maintain a website dedicated to the Distribution Fund.  The Distribution Fund's website, located at  www.OrourkeDistributionFund.com, will make available in downloadable form the approved Plan, components of the Claims Packet, and related materials, and such other information that the Distribution Agent believes will be beneficial to Potential Claimants;

  e.     establish and maintain a traditional mailing address and an email mailing address which will be listed on all correspondence from the Distribution Agent to Potential Claimants as well as on the Distribution Fund's website; and

12

A4106

    f.      establish and maintain a toll-free telephone number for Potential Claimants to call and speak to a live representative of the Distribution Agent during its regular business hours or, outside of such hours, to hear pre-recorded information about the Distribution Fund.

23.     The Summary Plan Notice will be published in print or internet media acceptable to the SEC staff once a week for three consecutive weeks starting within five (5) days of the initial mailing of Claims Packets to Potential Claimants.

24.     The SEC staff retains the right to review and approve any material posted on the Distribution Fund's website, any material mailed, and any scripts used in connection with communication with Potential Claimants.

25.     The Distribution Agent will promptly provide a Claims Packet to any Potential Claimant upon request made via mail, phone, or email prior to the Claims Bar Date.

26.     The Distribution Agent will mail a Claims Packet to the Distribution Agent's list of banks, brokers, and other nominees, as well as any other institutions identified during the outreach process that may have records of purchasers of the Securities during the Relevant Period.  The Distribution Agent will request that these entities, to the extent that they were record holders for beneficial owners of the Securities during the Relevant Period:

    a.      notify the respective beneficial owners within fourteen (14) days of receipt of the Claims Packet so that beneficial owners may timely file a claim. The burden will be on the record holders to ensure the Claim Packets and other relevant materials are properly disseminated to their customers; and/or

    b.      provide to the Distribution Agent within fourteen (14) days of receipt a list of last known names and addresses for all beneficial owners for whom the

record holders purchased the Securities during the Relevant Period so that the
Distribution Agent can communicate with them directly.

27.     Before commencing any mailing, the Distribution Agent shall run a National Change
of Address search to retrieve updated U.S. addresses for all Potential Claimants recorded in
the database.

28.     The Distribution Agent shall attempt to locate anyone whose Claims Packet has been
returned by the United States Postal Service ("USPS") as undeliverable.  The Distribution
Agent shall immediately re-mail any returned undelivered mail for which the USPS has
provided a forwarding address.

29.     The Distribution Agent, with SEC staff approval, may engage a third-party search
firm to conduct more rigorous searches for persons whose Claims Packet is returned as
undeliverable.  The Distribution Agent will utilize all means reasonably available to obtain
updated addresses in response to undeliverable notices, and forward any returned mail for
which an updated address is provided or obtained.  The Distribution Agent will make
available, upon request by the SEC staff, a list of all Potential Claimants whose Claims
Packets have been returned as "undeliverable" due to incorrect addresses and for which the
Distribution Agent has been unable to locate current addresses.

## Claims Process

30.     In all materials that refer to the Claims Bar Date, the filing deadline will be clearly
identified with the date, which is one hundred twenty (120) days from the initial mailing
date of the Claims Packet.

31.     To avoid being barred from asserting a claim, on or before the Claims Bar Date, each
Potential Claimant must submit to the Distribution Agent a properly completed Claim Form

14

A4108

reflecting such Potential Claimant's claim, and it must be accompanied by such documentary evidence as the Distribution Agent deems necessary or appropriate to substantiate the claim. Without limitation, this information may include third-party documentary evidence of purchases and dispositions of the Securities, as well as holdings of the Securities, at relevant dates.

32.     The burden to prove timely receipt of a claim by the Distribution Agent will be upon the Potential Claimant; therefore Potential Claimants will be instructed to submit their Claim Forms in a manner that will enable them to prove timely receipt of the Claim Form by the Distribution Agent. A Claim Form that is postmarked or otherwise received by the Distribution Agent after the Claims Bar Date will not be accepted unless the deadline is extended by the Distribution Agent for good cause shown, after consultation with the SEC staff.

33.     The Distribution Agent shall review each claim and determine the eligibility of each Potential Claimant to participate in the Distribution Fund by reviewing claim data and supporting documentation (or lack thereof), verifying the claim, and calculating each Potential Claimant's Recognized Loss pursuant to the Plan.

34.     Each Potential Clamant will have the burden of proof to establish the validity and amount of his or her claim, and that they qualify as an Eligible Claimant, including the burden to certify that they are not an Excluded Party. The Distribution Agent will have the right to request, and the Potential Claimant will have the burden to promptly provide to the Distribution Agent, any additional information and/or documentation deemed relevant by the Distribution Agent.

35.     All claims and supporting documentation necessary to determine a Potential Claimant's eligibility to receive a distribution from the Distribution Fund under the terms of the Plan must be verified by a declaration executed by the Potential Claimant under penalty of perjury under the laws of the United States.  The declaration must be executed by the Potential Claimant, unless the Distribution Agent accepts such declaration from someone authorized to act on the Potential Claimant's behalf, whose authority is supported by such documentary evidence as the Distribution Agent deems necessary.

36.     Electronic claims submission is encouraged; the Claims Packet will include directions on how Potential Claimants can submit their claims electronically via the Distribution Fund's website.  If using the web-based claim filing option, a Potential Claimant must submit their claim to the Distribution Agent by 11:59 p.m. PST on the Claims Bar Date.  The Claims Packet will also include directions for submission of claims if the Potential Claimant is unable to submit their claim electronically.

37.     When submitting claims to the Distribution Fund on behalf of its clients, all Third-Party Filers must use the electronic filing template provided by the Distribution Agent in this matter.  Files that do not comply with the template and format provided by the Distribution Agent will be rejected. Third-Party Filers must also submit a signed master proof of claim and release, as well as proof of authority to file on behalf of the claimant(s) at the time the electronic file of transactions is submitted.  Failure to do so may result in rejection of the claim(s).

38.     Each Third-Party Filer must establish the validity and amount of each claim in its submission.  Like all other Potential Claimants, Third-Party Filers must submit such supporting documentary evidence of purchases, dispositions, and holdings of Eligible Securities as the Distribution Agent deems necessary or appropriate to substantiate each individual

16

A4110

claim. Without limitation, this includes the complete name of the Potential Claimant (beneficial account owner) and its TIN (for individuals) or EIN (for companies), sufficient contact information to confirm the identity of the beneficial owner, and documentation from the original bank, broker or other institution of purchases and dispositions of Eligible Securities (account statements, confirmations and other documentation of purchases and dispositions ), as well as holdings of the Securities on pertinent dates. Documentation generated by the Third-Party Filer as well as affidavits in lieu of supporting documentation, will not be accepted unless, for good cause, the Distribution Agent determines it acceptable. The Distribution Agent will have the right to request, and the Third-Party Filer will have the burden of providing to the Distribution Agent, any additional information and/or documentation deemed necessary by the Distribution Agent to substantiate the claim(s) contained in the submission. Documentation from a Third-Party Filer that is not acceptable to the Distribution Agent will result in rejection of the affected claim(s). The determination of the Distribution Agent to reject a claim for insufficient documentation, as reflected on the Final Determination Notice, is final and within the discretion of the Distribution Agent.

39. Distribution Payments must be made by check or electronic payment payable to the Eligible Claimant (beneficial account owner). The Third-Party Filer shall not be the payee of any Distribution Payment check or electronic Distribution Payment. Subject to ¶68 below (ERISA Plans), any other payment arrangement must be discussed with the Distribution Agent in consultation with the SEC staff and must be authorized by the Eligible Claimant. Compensation to the Third-Party Filer for its services may not be paid or deducted from the Distribution Payment.

A4111

40.     If, after discussion with the Distribution Agent in consultation with the SEC, and authorization by the Eligible Claimant(s), a Distribution Payment is to be made to a Third-Party Filer to distribute to the Eligible Claimant(s), the Third-Party Filer will be required to complete a certification, which will require them, at a minimum, to attest that any distribution to the custodian, trustee, or investment professional representing multiple potentially eligible beneficial owners, will be allocated for the benefit of current or former pooled investors and not for the benefit of management. The certification form will be available upon request from the Distribution Agent. All such Third-Party Filers must have an auditable mechanism available to the Distribution Agent and the SEC staff to confirm that each Potential Claimant, if determined an Eligible Claimant, received the Distribution Payment directed to them.

41.     The receipt of the Securities by gift, inheritance, devise, or by operation of law will not be deemed to be a purchase of the Securities, nor will it be deemed an assignment of any claim relating to the purchase of the Securities unless specifically so provided in the instrument of inheritance. However, the recipient of the Securities as a gift, inheritance, devise or by operation of law will be eligible to file a Claim Form and participate in the distribution of the Distribution Fund to the extent the original purchaser would have been eligible under the terms of the Plan. Only one claim may be submitted with regard to the same transactions in the Securities, and in cases where multiple claims are filed by the donor and donee, the donee claim will be honored, assuming it is supported by proper documentation.

42.     The Distribution Agent will provide a Determination Notice within ninety (90) days of the Claims Bar Date to each Potential Claimant who has filed a Claim Form with the Distribution Agent, setting forth the Distribution Agent's determination of the eligibility of

A4112

the claim (eligible, partially or wholly deficient, or ineligible) and the Eligible Loss Amount. The Determination Notice will provide to each Potential Claimant whose claim is deficient, in whole or in part, the reason(s) for the deficiency (*e.g.*, failure to provide required information or documentation). The Determination Notice will also notify the Potential Claimant of the opportunity to cure such deficiency, and provide instructions regarding what is required to do so.

43.     Any Potential Claimant with a deficient claim will have thirty (30) days from the date of the Determination Notice to cure any deficiencies identified in the Determination Notice.

44.     In the event the claim is denied, in whole or in part, the Determination Notice will state the reason for such denial. Any Potential Claimant seeking reconsideration of a denied claim must advise the Distribution Agent in writing within thirty (30) days of the date of the Determination Notice. All requests for reconsideration must include the necessary documentation to substantiate the basis upon which the Potential Claimant is requesting reconsideration of their claim.

45.     The Distribution Agent will send, as appropriate, a Final Determination Notice to all Potential Claimants who responded to the Determination Notice in an effort to cure a deficiency or to seek reconsideration of a rejected claim. The Distribution Agent will send such Final Determination Notices no later than sixty (60) days following receipt of documentation or information in response to the Determination Notice, or such longer time as the Distribution Agent determines is necessary for a proper determination concerning the claim.

Case: 24-1770    Document: 00118249071    Page: 630    Date Filed: 02/18/2025    Entry ID: 6700951

Case 1:21-cv-11276-WGY Document 538-105 Filed 09/04/24 Page 22 of 36
Case 1:24-cv-11276-WGY Document 538-105 Filed 09/04/24 Page 22 of 36    ID: 1170

46.     The Distribution Agent may consider disputes of any nature presented by Potential

Claimants, and will consult the SEC staff as appropriate.  The Distribution Agent will have

the authority to waive technical claim deficiencies and approve claims on a case-by-case

basis, or in groups of claims.  All determinations made by the Distribution Agent in

accordance with the Plan in any dispute, request for reconsideration, or request to cure a

deficient claim will be final and not subject to appeal.

47.     Any Eligible Claimant who relocates or otherwise changes contact information after

receipt of the Claims Packet must promptly communicate any change in address or contact

information to the Distribution Agent.

### **Procedures for Distribution of the Net Available Distribution Fund**

48.     Prior to the disbursement of the Net Available Distribution Fund, the Distribution

Agent will establish an escrow agreement with the Bank in a form substantially similar to an

agreement provided by SEC staff (the "Escrow Agreement").

49.     The Distribution Agent, pursuant to the Escrow Agreement, shall establish with the

Bank a deposit account (the "Deposit Account") (e.g. controlled distribution account,

managed distribution account, linked checking and investment account), insured by the

FDIC up to the guaranteed FDIC pass through limit. The Deposit Account shall be linked

with the Escrow Account.   Both Accounts shall have the same name, with the first line

being identical to the full name of the qualified settlement fund established by the Tax

Administrator with the IRS.  The second line of the account name shall include "a Qualified

Settlement Fund."  The "deposit account records" for the Escrow  and Deposit Accounts, as

defined in FDIC regulations, 12 CFR § 330.1(e) ("Deposit Account Records"), shall

expressly identify the two Accounts as holding the assets of a QSF established pursuant to

A4114

Case 1:24-cr-41276-WGY Document 538-105/Filed 09/04/23 of Page 23 of 36: 1171

section 468B of the Internal Revenue Code of 1986, 26 USC 468B, and shall disclose the

respective Account's fiduciary relationship as custodian of funds for the benefit of investors

allocated a distribution pursuant to the approved Plan of Distribution in *SEC v. O'Rourke, et*

*al*., Case No. 19-CV-4137 (KAM) (E.D.N.Y.).

50.     During the term of the Escrow Agreement, the Escrow Property shall be fully

invested and reinvested by the Bank in short-term U.S. Treasury securities backed by the

full faith and credit of the United States Government or an agency thereof, of a type and

term necessary to meet the cash liquidity requirements for payments to Eligible Claimants

and tax obligations, including  money market mutual funds registered under the Investment

Company Act of 1940 that invest 100% of their assets in direct obligations of the United

States Government.

51.     All interest, dividends, and/or income earned will accrue for the benefit of the

Distribution Fund.  All costs associated with the Escrow and Deposit Accounts will be paid

by the Distribution Fund; however no fees or compensation may be paid to the Bank, its

agents, and/or its affiliates from the Escrow Property.

52.     The Distribution Agent shall distribute the Net Available Distribution Fund to all

Eligible Claimants only after all timely submitted Proof of Claim Forms have been

processed and all Potential Claimants whose claims have been denied or disallowed, in

whole or in part, have been notified and provided the opportunity to cure pursuant to the

procedures set forth above.

53.     The Distribution Agent, in consultation with the Tax Administrator and the SEC

staff, shall determine the Net Available Distribution Fund by retaining a prudent reserve to

pay Administrative Costs.  After all distributions and payment of all tax obligations, any remaining amounts in the reserve will become part of the residual described in ¶78.

54.     Within seventy-five (75) days following the date of the Final Determination Notices described above, ¶45, the Distribution Agent shall compile and send to the SEC staff the payee information, including the names, addresses, and Distribution Payments of all Eligible Claimants ("Payee List").  The  Payment File shall be accompanied by a Declaration from the Distribution Agent in a form acceptable to the SEC staff, representing, among other things, that a prudent reserve has been retained and that the Payee List: (a) was compiled in accordance with the Plan; (b) is accurate as to Eligible Claimants' names, addresses, and Eligible Loss Amount; and (c) provides all information necessary to make a payment equal to the amount of the applicable Distribution Payment for each Eligible Claimant (the "Declaration").

55.     After the Escrow and Deposit Accounts have been established but prior to the transfer of Escrow Property to the Bank, the Distribution Agent shall provide the Payee List to the Bank.  The Payee List shall be maintained by the Bank in the Deposit Account Records of the Deposit and Escrow Accounts. The Distribution Agent will also obtain from the SEC staff and communicate to the Bank the anticipated timing for the transfer of Escrow Property.

56.     Upon receipt of the Payee List and the estimated timing for the transfer of the Escrow Property, the Bank will take all necessary steps to prepare for the Escrow Funds Pledge described in ¶58.  Upon completion of all preparation, the Bank will so inform the Distribution Agent in writing (the "Pledge Notice").  The Distribution Agent will transmit the Pledge Notice to the SEC staff.

A4116

57.     Upon the SEC staff's receipt, review, and acceptance of the Payee List, the

Declaration, and the Pledge Notice, the SEC staff will petition the Court for authority to

disburse the Escrow Property, comprised of the aggregate amount of the Distribution

Payments, including any withholding amounts, from the SEC to the Distribution Agent for

distribution to Eligible Claimants pursuant to the Plan.  The Payee List shall, upon request,

be made available to the Court under seal.

58.     Immediately upon receipt of the Escrow Property, the Bank shall pledge collateral in

the form of U.S. Government Securities in an amount equal to or exceeding the value of the

Escrow Property to fully protect the Escrow Property from the time of its receipt by the

Bank through its transfer to the Escrow Account and full investment in short-term U.S.

Treasury securities backed by the full faith and credit of the United States Government (the

"Escrow Funds Pledge").

59.     Following the Court's approval of the SEC's petition for an order to disburse, the

Distribution Agent shall use its best efforts to commence mailing Distribution Payment

checks or effect electronic payments within fifteen (15) business days of the transfer of the

funds into the Escrow Account.  All efforts will be coordinated to limit the time between the

Escrow Account's receipt of the funds and the issuance of Distribution Payments.

60.     The Distribution Agent shall provide duplicate original bank and/or investment

statements on any accounts established by the Distribution Agent to the Tax Administrator

on a monthly basis and shall assist the Tax Administrator in obtaining mid-cycle statements,

as necessary.

61.     In consultation with SEC staff, the Distribution Agent shall work with the Bank on

an ongoing basis to deposit or invest funds in the Escrow and Deposit Accounts so as to

A4117

result in the maximum return, taking into account the safety and the tax implications of such deposits or investments; and to determine an allocation of funds between the Escrow and the Deposit Accounts.

62.    All funds shall remain in the Escrow Account, separate from bank assets, pursuant to the Escrow Agreement until needed to satisfy a presented check.  All Distribution Fund checks presented for payment will be subject to "positive pay with payee verification" controls before being honored by the Bank, at which time funds will be transferred from the Escrow Account to the Deposit Account to pay the approved checks.

63.    All checks issued to Eligible Claimants by the Distribution Agent shall bear a stale date of one hundred twenty (120) days.  Checks that are not negotiated before the stale date shall be voided and the issuing financial institution shall be instructed to stop payment on those checks.  Such Eligible Claimant's claim is extinguished as of the stale date and the funds will remain in the Net Available Distribution Fund.  If a check reissue has been requested before the stale date, such request is governed by the following section.

64.    Electronic payments, in accordance with the Bank's procedures, may be utilized at the discretion of the Distribution Agent to pay approved Distribution Payments if the payment information has been provided by the Eligible Claimant and/or if the Distribution Agent, in consultation with the SEC staff, has otherwise determined the payment information to be accurate.  Notwithstanding, unless determined unnecessary by the Distribution Agent in consultation with the SEC staff, the Distribution Agent shall confirm electronic payment information in advance of issuing payments.  Acceptable methods of confirmation include (without limitation):

24

A4118

a.    Confirmation of the payment information with the recipient financial institution; or

b.    Sending a test payment to the account and, as appropriate, requesting confirmation of receipt.

65.    For any electronic payment, the exact amount necessary to make a payment shall be transferred from the Escrow Account to the payee bank account in accordance with written instruction provided to the Bank by the Distribution Agent. All electronic payments will be initiated by the Distribution Agent using a two-party check and balance system, whereby completion of an electronic payment will require authorization by two members of the Distribution Agent's senior staff.

66.    For every electronic payment that is returned after the day of issuance, the Bank shall pledge collateral in the form of U.S. Government Securities to fully protect the payment until the returned payment has been fully invested in short-term U.S. Treasury securities backed by the full faith and credit of the United States Government or an agency thereof, or invested as otherwise directed in the Plan and/or Escrow Agreement.

67.    Subject to ¶¶40 and 68, Distribution Payments will be made directly to Eligible Claimants and not to counsel or someone other than the Eligible Claimant unless, at the discretion of the Distribution Agent, sufficient documentation has been provided by or with respect to the Eligible Claimant to demonstrate that the full payment will be applied to the benefit of the Eligible Claimant, and not to pay attorney fees or otherwise to benefit someone other than the Eligible Claimant.

68.    Claims on behalf of a retirement plan covered by Section 3(3) of ERISA, 29 U.S.C. § 1002(3), which do not include individual retirement accounts, and such plan's participants,

are properly made by the administrator, custodian or fiduciary of the plan and not by the plan's participants. The Distribution Agent will issue any payments on such claims directly to the administrator, custodian or fiduciary of the retirement plan. The custodian or fiduciary of the retirement plan will distribute any payments received in a manner consistent with its fiduciary duties and the governing account or plan provisions. With respect to any retirement plan that has been closed prior to the Distribution Agent's identification of Potential Claimants, the Distribution Agent will endeavor to distribute funds directly to the beneficial account owner of such retirement plans if the information required for such a distribution is known to or provided to the Distribution Agent.

69.     All Distribution Payments shall be preceded or accompanied by a communication that will include, as appropriate: (a) a statement characterizing the distribution; (b) a statement from the Tax Administrator regarding the tax consequences of Distribution Payments and informing Eligible Claimants that the tax treatment of the distribution is the responsibility of each recipient and that the recipient should consult their tax advisor for advice regarding the tax treatment of the distribution; (c) a statement that checks will be void after one hundred twenty (120) days; and (d) providing contact information for the Distribution Agent, to be used in the event of any questions regarding the distribution. All such communications shall be submitted to the SEC staff and the Tax Administrator for review and approval. Distribution Payments on their face or the accompanying mailbag, shall clearly indicate that the money is being distributed from a Distribution Fund established by the Court for the benefit of investors for harm as a result of securities law violations.

## Uncashed Checks and Reissues

A4120

70.     The Distribution Agent will work with the Bank and maintain information about uncashed checks, returned payments, any returned items due to non-delivery, insufficient addresses, and/or other deficiencies.  The Distribution Agent is responsible for researching and reconciling errors and reissuing payments when possible and for maintaining a record of such efforts.  The Distribution Agent is also responsible for accounting for all payments.  The amount of all uncashed or un-received payments will continue to be held in the Distribution Fund.

71.     The Distribution Agent shall use its best efforts to make use of reasonable commercially available resources and other reasonably appropriate means to locate all Eligible Claimants whose checks are returned to the Distribution Agent as undeliverable by the USPS or whose electronic or otherwise issued payment was returned.

72.     When new address information becomes available, the Distribution Agent shall repackage the distribution check and send it to the new address.  Where new address information is not available after a diligent search (and in no event later than one hundred twenty (120) days after the initial mailing of the original check) or if the distribution check is returned again, the check shall be voided and the Distribution Agent shall instruct the issuing financial institution to stop payment on such check.  If the Distribution Agent, despite best practicable efforts, is unable to find an Eligible Claimant's correct address, the Distribution Agent, in its discretion, may remove such Eligible Claimant from the distribution and the allocated Distribution Payment will remain in the Net Available Distribution Fund for distribution, if practicable, to the remaining Eligible Claimants.

73.     When the Distribution Agent receives sufficient new or corrected payment information in connection with returned electronic or other non-check payments, the Distribution shall re-issue the payment based on the new information. If the Distribution

Agent, despite best practicable efforts, is unable to find an Eligible Claimant's correct payment information, the Distribution Agent, in its discretion, may remove such Eligible Claimant from the distribution and the allocated Distribution Payment will remain in the Net Available Distribution Fund for distribution, if practicable, to the remaining Eligible Claimants.

74.    At the discretion of the Distribution Agent, costs of reissue that were not factored into the Reserve, such as bank fees offset upon the return of a payment, may reduce the Eligible Claimant's Distribution Payment. In such situations, the Distribution Agent will immediately notify the Tax Administrator of the reduction in Distribution Payment.

75.    The Distribution Agent will re-issue new checks to Eligible Claimants upon the receipt of a valid, written request from the Eligible Claimants prior to the initial stale date. Such reissued checks will be void if not negotiated by sixty (60) days after issuance.

76.    In cases where an Eligible Claimant is unable to endorse a Distribution Payment (*e.g.*, as the result of a name change because of marriage or divorce, or as the result of death), any request by an Eligible Claimant or a lawful representative for reissuance of a Distribution Payment in a different name must be documented to the satisfaction of the Distribution Agent.  If, in the sole discretion of the Distribution Agent, such change is properly documented, the Distribution Agent will issue an appropriately redrawn Distribution Payment, subject to the time limits detailed herein.

77.    The Distribution Agent will make and document reasonable efforts to contact Eligible Claimants to follow-up on the status of uncashed Distribution Payments (other than those returned as "undeliverable") and take appropriate action to follow up on the status of

A4122

uncashed checks at the request of SEC staff.  The Distribution Agent may reissue such

checks, subject to the time limits detailed herein.

### Disposition of Remaining Funds after Distribution

78.     A residual within the Distribution Fund (the "Residual") will be established for any

amounts remaining after all assets have been disbursed. The residual may include, among

other things, collections after the initial distribution, funds reserved for future

Administrative Costs, amounts from Distribution Payment checks that have not been cashed,

amounts from Distribution Payments that were not delivered or accepted upon delivery, and

tax refunds. After all Administrative Costs have been paid, all funds remaining in the

Residual that are infeasible to distribute to investors will be returned to the SEC, pending a

final accounting.  Upon completion of the final accounting the SEC staff will file a motion

with this Court to approve the final accounting, which will include a recommendation as to

the final disposition of the Residual, consistent with *Liu v. SEC*, 140 S. Ct. 1936 (2020) and

15 U.S.C. 78u(d)(7).  If distribution of the Residual to investors is infeasible, the SEC staff

may recommend the transfer of the Residual to the general fund of the U.S. Treasury subject

to Section 21F(g)(3) of the Exchange Act.[3]

79.     The Distribution Agent, in consultation with SEC staff, may distribute any residual

funds to (a) Eligible Claimants, if any, who filed claims with the Distribution Agent after the

Claims Bar Date or who were late in curing a denied claim in accordance with the Plan and,

if feasible, (b) on a *pro rata* basis to all Eligible Claimants that negotiated the checks issued

in the immediately preceding distribution or that received electronic payments, up to their

---

[3] Section 21F(g)(3) of the Exchange Act, 15 U.S.C. § 78u-6(g)(3), provides, in relevant part, that any monetary sanction of $200 million or less collected by the SEC in any judicial action brought by the SEC under the securities laws that is not added to a disgorgement fund or Distribution Fund or otherwise distributed to victims, plus investment income, shall be deposited or credited into the SEC Investor Protection Fund.

Eligible Loss Amount plus Reasonable Interest (if applicable), and subject to the *De Minimis Amount*.

**Distribution Fund Reporting and Accounting**

80.     The Distribution Agent will provide reports in accordance with the Appointment Order, including, in consultation with the Tax Administrator, a final accounting and final report.

**Termination of the Distribution Fund**

81.     Once all Distribution Payments have been negotiated or voided, any funds remaining in the Escrow and Deposit Accounts will be transferred to the SEC.

82.     Upon completion of the final report and accounting, the SEC staff will seek an Order from the Court, as appropriate, approving the final accounting; discharging the Distribution Agent; transferring the remaining Residual, and any amounts returned to the Distribution Fund in the future, to the U.S. Treasury subject to Section 21F(g)(3) of the Exchange Act; and terminating the Distribution Fund

83.     The Distribution Fund will be eligible for termination and the Distribution Agent will be eligible for discharge after all of the following have occurred:

    a.     A final report and accounting has been submitted to and approved by the Court;

    b.     All Administrative Costs have been paid; and

    c.     The remaining Residual has been transferred to the SEC for disposition in accordance with Court Order.

84.     Once the Distribution Fund has been terminated, no further claims will be allowed and no additional payments will be made whatsoever.

A4124

**Miscellaneous**

85.     The Court reserves the right to amend this Plan from time to time, and retains

exclusive jurisdiction over all claims arising in connection with this Plan, including, but not

limited to, claims against the Distribution Agent or Tax Administrator asserting liability for

violation of any duty imposed by this Plan or other Court order.

86.     The Distribution Agent and the Tax Administrator are entitled to rely on all

outstanding rules of law and Court orders.

87.     The submission of the Claim Form and the receipt and acceptance of a distribution

by an Eligible Claimant will not affect an Eligible Claimant's rights and claims as against

any defendant to this action or their past or present directors, officers, employees, affiliates,

nominees, creditors, advisors and agents.

Att:     Exhibit A (Symbols, Relevant Periods, and Post-Period Prices for Securities)
          Exhibit B (Example of Calculation)

31

A4125

**Exhibit A**

**Trading Symbols, Relevant Period (Inclusive), and Post-Period Prices for Securities**

| Company Name | Trading Symbol | Relevant Period Start Date | Relevant Period End Date | Post-Period Price |
|---|---|---|---|---|
| AV1 Group, Inc. | AVOP | 5/4/2016 | 10/19/2016 | $0.192 |
| EnviroTechnologies International, Inc. | ETII | 2/1/2017 | 6/30/2017 | $0.210 |
| EnviroTechnologies International, Inc. | ETII | 1/30/2018 | 5/10/2018 | $0.191 |
| Cyberfort Software, Inc. | CYBF | 6/29/2018 | 8/15/2018 | $0.461 |
| Link Reservations, Inc. | LRSV | 10/7/2016 | 2/9/2017 | $0.152 |
| BioHemp International, Inc. | BKIT | 5/10/2019 | 7/16/2019 | $0.288 |

A4126

**Exhibit B**

**Hypothetical Example of Recognized Loss Calculation**

Assume a hypothetical investor reported the following transactions in the Securities during the Relevant Period:

  a.  Purchased 60 shares of LRSV at $1.00.

  b.  Sold 60 shares of LRSV at $0.20.

  c.  Purchased 100 shares of AVOP at $1.00.

  d.  Purchased 50 shares of AVOP at $1.10.

  e.  Sold 50 shares of AVOP at $0.25.

  f.  Purchased 25 shares of CYBF at $1.60.

  g.  Sold 75 shares of CYBF at $1.80.

84.  As explained above, the Recognized Loss on a Security is (1) the total purchase amount for shares of the Security purchased during the Relevant Period, less (2) the sales proceeds on shares sold during the Relevant Period, and less (3) the holding value of excess shares.

  a.  *Recognized Loss on LRSV*: The total purchase amount for shares of LRSV purchased during the Relevant Period by the hypothetical investor is (60 * $1.00), or $60.00. The sales proceeds on shares sold during the Relevant Period by the hypothetical investor is (60 * $0.20), or $12.00. The holding value of excess shares is [(60 - 60) * $0.152], or $0.00, where the $0.152 value per share is read from Exhibit A. The Recognized Loss on LRSV for the hypothetical investor would be ($60.00 - $12.00 - $0.00), or $48.00.

  b.  *Recognized Loss on AVOP*: The total purchase amount for shares of AVOP purchased during the Relevant Period by the hypothetical investor is [(100 * $1.00) + (50 * $1.10)], or $155.00. The sales proceeds on shares sold during the Relevant Period by the hypothetical investor is (50 * $0.25), or $12.50. The holding value of excess shares is [(100 + 50 - 50) * $0.192], or $19.20, where the $0.192 value per share is read from Exhibit A. The Recognized Loss on AVOP for the hypothetical investor would be ($155.00 - $12.50 - $19.20), or $123.30.

  c.  *Recognized Loss on CYBF*: The total purchase amount for shares of CYBF purchased during the Relevant Period by the hypothetical investor is (25 *

33

A4127

$1.60), or $40.00. The sales proceeds on shares sold during the Relevant Period by the hypothetical investor is (75 * $1.80), or $135.00. The holding value of excess shares is [(25 - 75) * $0.461], or -$23.05, where the $0.461 value per share is read from Exhibit A. The Recognized Loss on CYBF for the hypothetical investor would be ($40.00 - $135.00 + $23.05), or -$71.95. Because the Recognized Loss on CYBF for the hypothetical investor is less than zero, the Recognized Loss would be set equal to $0.00.

d.   *Eligible Loss Amount for the Hypothetical Investor:* The hypothetical investor's Eligible Loss Amount is the sum of the Recognized Losses for each Security. Thus, the hypothetical investor's Eligible Loss Amount would be $171.30. See Table A.

**Table A: Eligible Loss Amount for the Hypothetical Investor**

| AVOP | | ETII (2017) | | ETII (2018) | | CYBF | | LRSV | | BKIT | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $123.30 | + | $0.00 | + | $0.00 | + | $0.00 | + | $48.00 | + | $0.00 | = | $171.30 |

34

A4128