# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

Nos. 24-1770, 24-1771, 24-1772, 24-1773, 24-1774

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

v.

ZHIYING YVONNE GASARCH,
Defendant-Appellant,

FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS;
PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

Defendants.

*(Caption Continued on Inside Cover)*

On Appeal from the United States District Court for the
District of Massachusetts, No. 21-cv-11276-WGY

## BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, APPELLEE

JEFFREY B. FINNELL
*Acting General Counsel*

TRACEY A. HARDIN
*Solicitor*

DANIEL STAROSELSKY
*Assistant General Counsel*

KERRY J. DINGLE
*Senior Appellate Counsel*

Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-6953 (Dingle)

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

v.

MIKE K. VELDHUIS,

Defendant-Appellant,

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP; COURTNEY KELLN; PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

Defendants.

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

v.

PAUL SEXTON,

Defendant-Appellant,

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS; JACKSON T. FRIESEN; WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

Defendants.

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

v.

COURTNEY KELLN,

Defendant-Appellant,

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP; MIKE K. VELDHUIS; PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

Defendants.

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

v.

JACKSON T. FRIESEN,

Defendant-Appellant,

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP; MIKE K. VELDHUIS; PAUL SEXTON; COURTNEY KELLN; WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

Defendants.

# TABLE OF CONTENTS

Table of Authorities ............................................................. v

Introduction ..................................................................... 1

Counterstatement of Jurisdiction.............................................. 2

Counterstatement of the Issues ............................................... 3

    A.    Background .............................................................. 4

    B.    Facts ..................................................................... 7

        1.    Overview of the appellants' scheme ........................ 7

        2.    Veldhuis, Sexton, and Friesen sold hundreds of millions of microcap shares into U.S. markets in fraudulent and unregistered transactions. ........................................... 9

            a.    Veldhuis, Sexton, and Friesen executed stock price manipulation schemes involving the shares of fourteen penny stock issuers. ........................................... 9

            b.    The sales violated the securities laws' registration and disclosure requirements. ................................... 13

            c.    Appellants and their co-conspirators used a variety of methods to evade detection of their schemes. ............... 14

        3.    Kelln and Gasarch engaged in a variety of deceptive conduct to enable Sharp Group clients, like Veldhuis, Sexton, and Friesen, to violate the securities laws. ............... 16

            a.    Gasarch executed payments and made proceed distributions of the scheme as "Master of Finance." .... 16

i

b.   Kelln concealed who owned the issuers' shares so they could be sold to unsuspecting investors without legally required disclosures. ..........................................................18

4.   The conspirators' internal records showed that appellants obtained millions of dollars from their scheme....................20

a.   The Q accounting system tracked the scheme's flow of funds and the conspirators' profits. ................................20

b.   Each of the appellants obtained substantial profits from their conduct while investors suffered losses................22

C.   Procedural History ............................................................24

1.   Pre-Trial Proceedings .................................................24

2.   Trial............................................................................26

3.   Post-Trial Remedies Proceedings ...............................27

Standards of Review ...............................................................32

Summary of Argument ...........................................................33

Argument ................................................................................36

I.   The district court acted within its discretion in admitting evidence from the Q accounting system at trial. ....................................36

A.   The district court reasonably determined that the Q system records were authenticated by Sharp's IT contractor Fedir Nikolayev and the reliability of the records was independently corroborated at trial. ........................................................37

B.   The district court properly admitted the Q system records under exceptions to the hearsay rule. ...........................................41

ii

      1.    The Q system records were properly admitted as business records.......................................................................42

      2.    The Q system records were co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). ..................................44

    C.    Friesen's sufficiency of the evidence arguments are not properly before the Court and are meritless in any event. ........49

II. The jury's findings that Gasarch violated Section 17(a)(3) and aided and abetted violations of the securities laws should not be disturbed. . .........................................................................................53

    A.    The jury was properly instructed on the requirements for finding that Gasarch aided and abetted violations of the securities laws. ..................................................................................53

    B.    Ample evidence supports the jury's findings that Gasarch both committed and aided and abetted securities law violations by engaging in practices that operated as a fraud or deceit upon securities investors. ..........................................................55

III. The district court acted within its discretion in determining appropriate remedies for the appellants' violations. ............................62

    A.    The district court properly ordered each of the appellants to disgorge their ill-gotten gains from their violations. .................62

      1.    The district court acted within its discretion in calculating a reasonable approximation of each appellants' ill-gotten gains based on the Q records....................................................63

      2.    Appellants failed to rebut the Commission's reasonable approximation. ..........................................................66

         a.    The district court reasonably relied on the Q system records in determining appellants' ill-gotten gains......66

      b.    The district court limited disgorgement to amounts causally connected to appellants' violations. ...............71

      c.    Appellants' objection to the joint-and-several liability designations fails...............................................................74

   3.   *Navellier* forecloses the argument that disgorgement requires proof that investors suffered pecuniary harm. ......76

   4.   None of the disgorgement amounts were time-barred........80

B.    The civil penalties awards are not time-barred. .........................86

C.    The district court acted within its discretion in enjoining Sexton from future violations of the securities laws...............................89

CONCLUSION ..........................................................................................................95

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                            **Page(s)**

*Aaron v. SEC,*
   446 U.S. 680 (1980) ..................................................................... 56, 91

*Ahmed v. SEC,*
   144 S. Ct. 2658 (2024) ...................................................................... 84

*Aldridge v. A.T. Cross Corp.,*
   284 F.3d 72 (1st Cir. 2002) ............................................................... 61

*BioPoint, Inc. v. Dickhaut,*
   110 F.4th 337 (1st Cir. 2024) ............................................................ 74

*Bourjaily v. United States,*
   483 U.S. 171 (1987) ......................................................................... 48

*CFTC v. Tayeh,*
   848 F. App'x 827 (11th Cir. 2021) ................................................. 69, 75

*Correa v. Hosp. San Francisco,*
   69 F.3d 1184 (1st Cir. 1995) ............................................................. 55

*Davignon v. Hodgson,*
   524 F.3d 91 (1st Cir. 2008) ........................................................... 32, 55

*Dupree v. Younger,*
   598 U.S. 729 (2023) ......................................................................... 50

*Dyno Constr. Co. v. McWane, Inc.,*
   198 F.3d 567 (6th Cir. 1999) ............................................................. 42

*Earle v. Benoit,*
   850 F.2d 836 (1st Cir. 1988) ............................................................. 45

*Falto De Román v. Mun. Gov't of Mayagüez,*
   46 F.4th 51 (1st Cir. 2022) ............................................................... 50

*Graham v. SEC,*
   222 F.3d 994 (D.C. Cir. 2000) .......................................................... 58

*Hawkins v. Dep't of Health & Hum. Servs.*,
665 F.3d 25 (1st Cir. 2012) ............................................................. 94

*Hillsborough Investmemt Corp. v. SEC*,
276 F.2d 665 (1st Cir. 1960) ...................................................... 93, 95

*Infusaid Corp. v. Intermedics Infusaid, Inc.*,
756 F.2d 1 (1st Cir. 1985) ......................................................... 94-95

*In re PHC, Inc. S'holder Litig.*,
894 F.3d 419 (1st Cir. 2018) ...................................................... 66, 67

*Kokesh v. SEC*,
581 U.S. 455 (2017) .................................................................. 85, 90

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) ........................................................................ 84

*Lemelson v. SEC*,
144 S. Ct. 486 (2023) ................................................................ 33, 56

*Liu v. SEC*,
591 U.S. 71 (2020) ..................................................................... *passim*

*Lorenzo v. SEC*,
587 U.S. 71 (2019) .......................................................................... 58

*Martin v. Hadix*,
527 U.S. 343 (1999) ........................................................................ 84

*McComb v. Jacksonville Paper Co.*,
336 U.S. 187 (1949) .................................................................. 92, 93

*Morales v. Quintel Ent., Inc.*,
249 F.3d 115 (2d Cir. 2001) ............................................................. 6

*NLRB v. Express Publ'g Co.*,
312 U.S. 426 (1941) .................................................................. 92, 93

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) .......................................................................... 5

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
　11 F.4th 90 (2d Cir. 2021) ............................................... 58

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
　217 F.3d 8 (1st Cir. 2000) ............................................... 93

*Santa Fe Indus., Inc. v. Green*,
　430 U.S. 462 (1977) ....................................................... 7

*Santos v. Sunrise Med., Inc.*,
　351 F.3d 587 (1st Cir. 2003) ........................................... 32

*SEC v. Ahmed*,
　72 F.4th 379 (2d Cir. 2023) ............................................ 84

*SEC v. Almagarby*,
　92 F.4th 1306 (11th Cir. 2024) ........................................ 81

*SEC v. Alpine Sec. Corp.*,
　354 F. Supp. 3d 396 (S.D.N.Y. 2018) ............................... 4-5

*SEC v. Alpine Sec. Corp.*,
　982 F.3d 68 (2d Cir. 2020) .............................................. 5

*SEC v. Apuzzo*,
　689 F.3d 204 (2d Cir. 2012) ........................................ 53, 54

*SEC v. Big Apple Consulting USA, Inc.*,
　783 F.3d 786 (11th Cir. 2015) ......................................... 54

*SEC v. Bilzerian*,
　112 F. Supp. 2d 12 (D.D.C. 2000) .................................... 94

*SEC v. Bilzerian*,
　75 F. App'x 3 (D.C. Cir. 2003) ........................................ 94

*SEC v. Blackburn*,
　15 F.4th 676 (5th Cir. 2021) ........................................... 78

*SEC v. Calvo*,
　378 F.3d 1211 (11th Cir. 2004) ....................................... 64

*SEC v. Collector's Coffee, Inc.*,
   2025 WL 752221 (S.D.N.Y. Mar. 10, 2025) ................................................. 75

*SEC v. de Maison*,
   2021 WL 5936385 (2d Cir. Dec. 16, 2021) ............................................ 70, 71

*SEC v. DeFrancesco*,
   699 F. Supp. 3d 228 (S.D.N.Y. 2023) ............................................................ 55

*SEC v. Esposito*,
   260 F. Supp. 3d 79 (D. Mass. 2017) ............................................................. 57

*SEC v. First City Fin. Corp.*,
   890 F.2d 1215 (D.C. Cir. 1989) ....................................................................... 6

*SEC v. Fowler*,
   6 F.4th 255 (2d Cir. 2021) ............................................................................. 83

*SEC v. Fujinaga*,
   696 F. App'x 203 (9th Cir. 2017) .................................................................. 65

*SEC v. Goble*,
   682 F.3d 934 (11th Cir. 2012) .................................................................. 93, 94

*SEC v. Hallam*,
   42 F.4th 316 (5th Cir. 2022) .......................................................................... 84

*SEC v. Happ*,
   392 F.3d 12 (1st Cir. 2004) ..................................................................... *passim*

*SEC v. Keener*,
   102 F.4th 1328 (11th Cir. 2024) ............................................................... 93-94

*SEC v. LBRY, Inc.*,
   26 F.4th 96 (1st Cir. 2022) ...................................................................... 72, 86

*SEC v. Lemelson*,
   57 F.4th 17 (1st Cir.) .......................................................... 33, 55, 90, 91

*SEC v. Life Partners Holdings, Inc.*,
   854 F.3d 765 (5th Cir. 2017) ................................................................... 66, 67

viii

*SEC v. Manor Nursing Ctrs., Inc.,*
    458 F.2d 1082 (2d Cir. 1972) ........................................................... 93

*SEC v. Medoff,*
    759 F. Supp. 3d 165 (D. Mass. 2024) .............................................. 94

*SEC v. Morrone,*
    997 F.3d 52 (1st Cir. 2021) .............................................................. 83

*SEC v. Navellier & Assocs.,*
    108 F.4th 19 (1st Cir. 2024) ................................................. *passim*

*SEC v. O'Brien,*
    2024 WL 2813722 (2d Cir. June 3, 2024) ....................................... 65

*SEC v. Patel,*
    61 F.3d 137 (2d Cir. 1995) .............................................................. 70

*SEC v. Radius Cap. Corp.,*
    653 F. App'x 744 (11th Cir. 2016) .................................................. 58

*SEC v. Razmilovic,*
    738 F.3d 14 (2d Cir. 2013), *as amended* (Nov. 26, 2013) ............. 71

*SEC v. Sargent,*
    329 F.3d 34 (1st Cir. 2003) .............................................................. 91

*SEC v. Sargent,*
    589 F. Supp. 3d 173 (D. Mass. 2022) ...................................... 50-51

*SEC v. Sargent,*
    129 F.4th 1 (1st Cir. 2025) ................................................. 33, 50-51

*SEC v. Savoy Indus., Inc.,*
    587 F.2d 1149 (D.C. Cir. 1978) ....................................................... 51

*SEC v. Saxena,*
    26 F. App'x 22 (1st Cir. 2001) ........................................................ 33

*SEC v. Silverman,*
    328 F. App'x 601 (11th Cir. 2009) .................................................. 65

*SEC v. Tambone,*
    550 F.3d 106 (1st Cir. 2008) ................................................................ 54, 59, 85

*SEC v. Tambone,*
    573 F.3d 54 (1st Cir. 2009) .................................................................... 54

*SEC v. Tambone,*
    597 F.3d 436 (1st Cir. 2010) ................................................................. 54

*SEC v. Tex. Gulf Sulphur Co.,*
    401 F.2d 833 (2d Cir. 1968) ................................................................... 7

*SEC v. Universal Express, Inc.,*
    2007 WL 2469452 (S.D.N.Y. Aug. 31, 2007) ..................................... 94

*SEC v. Wolfson,*
    539 F.3d 1249 (10th Cir. 2008) ............................................................ 59

*SEC v. Xia,*
    2022 WL 17539124 (E.D.N.Y. Dec. 8, 2022) ..................................... 81

*United States v. Askins & Miller Orthopaedics, P.A.,*
    924 F.3d 1348 (11th Cir. 2019) ........................................................... 94

*United States v. Aviles-Colon,*
    536 F.3d 1 (1st Cir. 2008) ..................................................................... 46

*United States v. Blanchard,*
    867 F.3d 1 (1st Cir. 2017) ................................................................ 38, 39

*United States v. Cassiere,*
    4 F.3d 1006 (1st Cir. 1993) ................................................................... 39

*United States v. Ceballos,*
    789 F.3d 607 (5th Cir. 2015) ................................................................ 39

*United States v. Ciresi,*
    697 F.3d 19 (1st Cir. 2012) ................................................................... 46

*United States v. Condron,*
    98 F.4th 1 (1st Cir. 2024) ..................................................................... 61

*United States v. Doyon,*
    194 F.3d 207 (1st Cir. 1999) ................................................................ 37

*United States v. Gil,*
    604 F.2d 546 (7th Cir. 1979) ............................................................... 45

*United States v. McKeeve,*
    131 F.3d 1 (1st Cir. 1997) ................................................. 32, 45, 46

*United States v. Naftalin,*
    441 U.S. 768 (1979) .................................................................... 58, 59

*United States v. Paulino,*
    13 F.3d 20 (1st Cir. 1994) ................................................................. 37

*United States v. Piper,*
    298 F.3d 47 (1st Cir. 2002) ............................................................... 46

*United States v. Tin Yat Chin,*
    371 F.3d 31 (2d Cir. 2004) ......................................................... 37, 41

*United States v. Tom,*
    330 F.3d 83 (1st Cir. 2003) ............................................................... 48

*United States v. Trowery,*
    542 F.2d 623 (3d Cir. 1976) .............................................................. 45

*United States v. Weed,*
    873 F.3d 68 (1st Cir. 2017) ............................................................... 58

*U.S. Bank Tr., N.A. ex rel. LSF9 Master Participation Tr. v. Jones,*
    925 F.3d 534 (1st Cir. 2019) ....................................................... 42, 43

*USF Red Star, Inc. v. NLRB,*
    230 F.3d 102 (4th Cir. 2000) ............................................................. 45

*Wellman v. Dickinson,*
    682 F.2d 355 (2d Cir. 1982) ................................................................ 6

*World of Sleep, Inc. v. La-Z-Boy Chair Co.,*
    756 F.2d 1467 (10th Cir. 1985) ......................................................... 45

## Statutes

Securities Act of 1933, 15 U.S.C. 77a *et seq.*

    Section 5, 15 U.S.C. 77e ................................................................. *passim*

    Section 5(a), 15 U.S.C. 77e(a) ............................................................ 24

    Section 5(c), 15 U.S.C. 77e(c) ............................................................ 24

    Section 15(b), 15 U.S.C. 77o(b) ......................................................... 24

    Section 17(a), 15 U.S.C. 77q(a) ................................................... *passim*

    Section 17(a)(1), 15 U.S.C. 77q(a)(1) ......................................... 6, 7, 24

    Section 17(a)(2), 15 U.S.C. 77q(a)(2) ................................................ 57

    Section 17(a)(3), 15 U.S.C. 77q(a)(3) ......................................... *passim*

    Section 20(b), 15 U.S.C. 77t(b) ......................................................... 90

    Section 20(d), 15 U.S.C. 77t(d) ........................................................... 2

    Section 22(a), 15 U.S.C. 77v(a) ........................................................... 2

Securities and Exchange Act of 1934, 15 U.S.C. 78a *et seq.*

    Section 3(a)(51), 15 U.S.C. 78c(a)(51) ................................................ 4

    Section 10, 15 U.S.C 78j ..................................................................... 89

    Section 10(b), 15 U.S.C. 78j(b) ................................................... *passim*

    Section 13, 15 U.S.C 78m ................................................................... 89

    Section 13(d), 15 U.S.C. 78m(d) ................................................. *passim*

    Section 20(e), 15 U.S.C. 78t(e) ............................................. 24, 54, 82

    Section 21(d), 15 U.S.C. 78u(d) ........................................................... 2

    Section 21(d)(1), 15 U.S.C. 78u(d)(1) ............................................... 90

    Section 21(d)(3)(A)(ii), 15 U.S.C. 78u(d)(3)(A)(ii) ......................... 63

    Section 21(d)(3)(B)(i), 15 U.S.C. 78u(d)(3)(B)(i) ........................... 31

    Section 21(d)(3)(B)(iii), 15 U.S.C. 78u(d)(3)(B)(iii) ...................... 30

    Section 21(d)(5), 15 U.S.C. 78u(d)(5) ......................................... 63, 78

    Section 21(d)(7), 15 U.S.C. 78u(d)(7) ............................................... 63

    Section 21(d)(8), 15 U.S.C. 78u(d)(8) ................................... 81, 83, 84

    Section 21(d)(8)(A), 15 U.S.C. 78u(d)(8)(A) ................................... 81

    Section 21(d)(8)(A)(i), 15 U.S.C. 78u(d)(8)(A)(i) ..................... 80, 81

    Section 21(d)(8)(A)(ii), 15 U.S.C. 78u(d)(8)(A)(ii) ............. 80, 81, 82

Section 21(d)(8)(B), 15 U.S.C. 78u(d)(8)(B) ................................................ 81

Section 21(d)(8)(C), 15 U.S.C. 78u(d)(8)(C) ........................................ 81, 83

Section 21(e), 15 U.S.C. 78u(e) ......................................................... 2

Section 27, 15 U.S.C. 78aa.................................................................. 2

28 U.S.C. 1291 .................................................................................. 3

28 U.S.C. 2462 ............................................................... 30, 83, 85, 86

National Defense Authorization Act for Fiscal Year 2021,
    Pub. L. No. 116-283, 134 Stat. 3388 ...................................... 83, 84

Penny Stock Reform Act of 1990, Pub. L. No. 101-429, 104 Stat. 931 ........... 4

**Rules**

<u>Rules Under the Securities Exchange Act of 1934, 17 C.F.R. 240.01 <i>et seq.</i></u>

Rule 3a51-1, 17 C.F.R. 240.3a51-1 .................................................. 4

Rule 10b-5, 17 C.F.R. 240.10b-5 .................................................. 6, 89

Rule 10b-5(a), 17 C.F.R. 240.10b-5(a) ................................. 7, 24, 57

Rule 10b-5(b), 17 C.F.R. 240.10b-5(b) ............................................ 57

Rule 10b-5(c), 17 C.F.R. 240.10b-5(c) ................................. 7, 24, 57

Rule 13d-1, 17 C.F.R. 240.13d-1 .................................................. 14, 24

Rule 13d-1(a), 17 C.F.R. 240.13d-1(a) ......................................... 5, 89

Rule 13d-5(b)(1), 17 C.F.R. 240.13d-5(b)(1) .................................. 6

Federal Rule of Civil Procedure 50(a) ....................................... 27, 50

Federal Rule of Civil Procedure 50(b) ....................................... 27, 50

Federal Rule of Civil Procedure 65(d) ............................................ 91

Federal Rule of Evidence 801(d)(2)(E) .................................... <i>passim</i>

Federal Rule of Evidence 802 ...................................................... 41

Federal Rule of Evidence 803(6) ...................................... 26, 37, 42

Federal Rule of Evidence 901 ...................................................... 37

Federal Rule of Evidence 901(b)(1) ............................................ 38

**Legislative History**

H.R. Rep. No. 90-1711 (1968) ................................................... 6

H.R. Rep. No. 98-355 (1984) ................................................... 90

H.R. Rep. No. 111–687(I) (2010) ......................................... 54

S. Rep. No. 90-550 (1967) ...................................................... 6

S. Rep. No. 101-337 (1990) .................................................... 5

# INTRODUCTION

In this civil securities fraud enforcement action, each of the five appellants has been found liable for participating in a long-running, multi-national scheme to defraud retail investors in violation of antifraud, registration, and disclosure provisions of the federal securities laws. Working with a number of non-appealing defendants, the appellants engaged in a series of stock price manipulation schemes in which they concealed their beneficial ownership of companies whose shares they were promoting to artificially inflate demand for the stock so they could sell to unsuspecting investors at inflated prices.

The defendants played different roles in the interconnected schemes, each of which was integral to the effort to mislead investors.  Appellants Mike Veldhuis, Paul Sexton, and Jackson Friesen acquired beneficial ownership stakes in penny stock companies, engaged in fraudulent promotions, and sold shares to the public.  Appellant Courtney Kelln's role was to disguise who beneficially owned the companies and their stock by grouping stock ownership to avoid disclosure requirements.  And Appellant Zhiving Yvonne Gasarch organized wire transfers of the proceeds from the illegal sales while concealing the beneficiaries,

1

maintained records in an encrypted accounting system, and routinely created false invoices to support the payments.

Veldhuis, Sexton, and Kelln consented to liability for securities law violations on the eve of trial. The remaining appellants, Friesen and Gasarch, were found liable by a jury on all counts following a ten-day trial.

In challenging the district court's judgments below, appellants Friesen and Gasarch raise a variety of baseless challenges to the court's discretionary and other decisions in overseeing their trial. And all of the appellants challenge the district court's exercise of its discretion in awarding remedies. In doing so, appellants both ignore a wealth of evidence supporting the findings of the jury and the district court and misconstrue controlling precedent. The judgments should be affirmed.

## COUNTERSTATEMENT OF JURISDICTION

The district court had jurisdiction over the Securities and Exchange Commission's ("Commission" or "SEC") civil enforcement action under Sections 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. 77t(d), 77v(a), and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78u(d), 78u(e), and 78aa. The court entered final judgments against each appellant on June 20, 2024.

2

Appellants Gasarch, Veldhuis, Sexton, and Kelln filed timely notices of appeal on August 19, 2024.  Appellant Friesen filed a notice of appeal on August 19, 2024, which the court rejected for failure to follow the CM/ECF NextGen prompts in violation of court rules.  Friesen then filed an amended notice of appeal on August 20, 2024.  This Court consolidated the appeals for the purposes of briefing and oral argument on September 23, 2024.  This Court has jurisdiction under 28 U.S.C. 1291.

## COUNTERSTATEMENT OF THE ISSUES

1.  Whether the district court acted within its discretion in admitting into evidence records from the accounting system that the appellants used to contemporaneously document the stock transactions and proceed payouts involved in the scheme.

2.  Whether the district court correctly instructed the jury, consistent with this Court's precedents, that it could find Gasarch liable for aiding and abetting securities law violations if she both understood that her role or conduct was part of an overall activity that was improper and knowingly or recklessly provided substantial assistance to the violation.

3.  Whether the district court correctly denied Gasarch's motion for judgment as a matter of law for violating the antifraud prohibition in

Securities Act Section 17(a)(3) where the evidence showed that she worked

as the "master of finance" throughout the scheme, served as the paper

owner of one of the nominee companies used to perpetrate the fraud, and

falsified documents to legitimize illegal transactions.

4.  Whether the district court acted within its discretion in ordering

remedies, including ordering the appellants to disgorge the ill-gotten gains

they received as a result of their violations, imposing civil penalties on each

appellant, and enjoining appellant Sexton from further violating the

securities laws.

## COUNTERSTATEMENT OF THE CASE

### A. Background

Congress, courts, and the Commission have all recognized that

penny stocks are uniquely susceptible to fraud, manipulation, and abuse.

*See* Exchange Act Section 3(a)(51), 15 U.S.C. 78c(a)(51); Rule 3a51-1, 17

C.F.R. 240.3a51-1; Penny Stock Reform Act of 1990, Pub. L. No. 101-429, tit.

V, § 502, 104 Stat. 931, 951 (Congressional findings that penny stocks

"suffer from a serious lack of adequate information" and that

"[u]nscrupulous market practices and market participants have pervaded

the 'penny stock' market"); *SEC v. Alpine Sec. Corp.*, 354 F. Supp. 3d 396,

406-07 (S.D.N.Y. 2018) (describing abuses involving penny stocks), *aff'd*, 982 F.3d 68 (2d Cir. 2020).  Penny-stock fraud causes "billions of dollars of losses to small investors."  S. Rep. No. 101-337, at 2 (1990).

Appellants' penny stock scheme began with acquiring or creating shares in publicly traded company.  They then sold those shares to the public without registering the offering as required by the registration provisions of the Securities Act of 1933.  *See* Section 5 of the Securities Act of 1933, 15 U.S.C. 77e.  Such an unregistered offering deprives investors of the "full and fair disclosure of information relevant to a public offering" that the registration requirements are designed to provide.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178 (2015) (internal quotation marks omitted).

Appellants' acquisition of large stakes in the companies also implicates beneficial ownership disclosure requirements under the Exchange Act.  Section 13(d) of the Exchange Act requires beneficial owners of 5% or more of certain companies' securities to disclose their ownership in public filings with the Commission.  15 U.S.C. 78m(d); 17 C.F.R. 240.13d-1(a).  This requirement is designed to enable "corporations, their shareholders and others [to] adequately evaluate the possible effects

5

of a change in substantial shareholdings." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 n.21 (D.C. Cir. 1989) (internal quotation marks and editing omitted).  And, pursuant to Commission rule, "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership."  17 C.F.R. 240.13d-5(b)(1).  The rule is aimed at "prevent[ing] evasion of the disclosure requirement" and is "'designed to obtain full disclosure of the identity of any person or group obtaining the benefits of ownership by reason of any contract, understanding, relationship, agreement or other arrangement.'" *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 123 (2d Cir. 2001) (quoting *Wellman v. Dickinson*, 682 F.2d 355, 366 (2d Cir. 1982)); *see* S. Rep. No. 90-550, at 8 (1967); H.R. Rep. No. 90-1711, at 9 (1968).

Finally, appellants' efforts to artificially inflate demand for the securities implicate the broad antifraud provisions that appear in both the Securities Act and the Exchange Act.  *See* Exchange Act Section 10(b), 15 U.S.C. 78j(b); Exchange Act Rule 10b-5, 17 C.F.R. 240.10b-5; Securities Act Sections 17(a)(1) and (a)(3), 15 U.S.C. 77q(a)(1) & (3).  Exchange Act Section 10(b), which was modeled on Sections 17(a)(1) and (3) of the Securities Act,

makes it "unlawful for any person … to use or employ … any manipulative or deceptive device or contrivance in contravention of [Commission rules]." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 471 (1977); 15 U.S.C. 78j(b); *see also SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 867 (2d Cir. 1968) (en banc) (Friendly, J., concurring).  Rule 10b-5 promulgated thereunder broadly "prohibits … any 'artifice to defraud' or any act 'which operates or would operate as a fraud or deceit.'"  *Santa Fe Indus.*, 430 U.S. at 471; 17 C.F.R. 240.10b-5(a) and (c); *see also* 15 U.S.C. 77q(a)(1) & (3) (similar).

## B. Facts

### 1. Overview of the appellants' scheme

The appellants engaged in their deceptive conduct in concert with non-appealing defendant Frederick Sharp, a purported finance professional and Canadian citizen at the "hub" of a sprawling securities fraud conspiracy that has given rise to many U.S. and Canadian civil and criminal fraud cases.  A3143[1]; *see* A1323 (Appellant Sexton conceding that

---

[1] "A___" refers to the Joint Appendix filed with appellants' briefs.  "SA___" refers to the supplemental appendix filed by the Commission with this brief.  "VSK Br." refers to the consolidated brief filed by Veldhuis, Sexton, and Kelln, whereas "Friesen Br." and "Gasarch Br." refer to the individual briefs filed by those appellants.

Sharp is a "criminal mastermind"); *see, e.g.*, Indictment, *United States v. Sharp et al.*, No. 24-cr-10002 (D. Mass.), Dkt. No. 11, entered Jan. 9, 2024; Notice of Civil Claim, *SEC v. Sharp et al.*, No. S226494 (B.C.S.C.), entered Aug. 11, 2022; Notice of Civil Claim, *SEC v. Sharp*, No. S225495 (B.C.S.C.), entered Jul. 7, 2022.  Sharp defaulted in this civil enforcement action and has been ordered to disgorge $21,760,936 plus prejudgment interest of $7,173,497 as well as pay a civil penalty of $23,990,781.  A412 (Final Judgment as to Defendant Frederick L. Sharp).

Appellants Gasarch and Kelln, both Canadian residents, worked with Sharp as part of the "Sharp Group."  A2842-45.  The Sharp Group charged clients (in reality, co-conspirators) lucrative fees to facilitate the clients' fraudulent stock sales into U.S. and Canadian securities markets.  The service provided was "comprehensive"; it was not limited to trading but "include[d] pyaments [sic], loans, private placements and keeping clients out of jail."  A4268 (Trial Ex. 81).  Appellants Veldhuis, Sexton, and Friesen comprise one group of Sharp's clients.  Veldhuis, Sexton, and Friesen, with assistance from Kelln and Gasarch, fraudulently sold more than 220 million shares into U.S. markets, generating net trading proceeds of more than $144 million.  A4619-33 (Trial Exs. 307 and 308).

8

**2. Veldhuis, Sexton, and Friesen sold hundreds of millions of microcap shares into U.S. markets in fraudulent and unregistered transactions.**

From 2011 through 2018, Veldhuis, Sexton, and Friesen perpetrated stock price manipulation schemes in which they accumulated blocks of stock of fourteen public company issuers whose shares traded in the United States over-the-counter market, funded promotions to inflate the price of the stock, then sold those shares to unwitting investors in the market. A2832, A2871 (Knox Trial Test.); A2849; A2826-27 (explaining that the three "were a control group" that took companies public through reverse mergers with shell companies owned by the group); *see also* A2629-32 (Kaitz testifying that Veldhuis, Sexton, and Friesen were partners and that he met and communicated with them individually and as a group). Working together, Veldhuis, Sexton, and Friesen owned, sold and divided the proceeds of sales of at least fourteen issuers. A957 (Knox Decl. ¶ 27); A4619 (Trial Ex. 307, summary chart listing issuers).

> *a. Veldhuis, Sexton, and Friesen executed stock price manipulation schemes involving the shares of fourteen penny stock issuers.*

The scheme proceeded in three steps with respect to each issuer. *See generally*, A2462-643 (detailed testimony about the scheme with respect to

9

one issuer's stock).  First, Veldhuis, Sexton, and Friesen, using a variety of

methods, accumulated sufficient stock in a target penny stock issuer to

control trading in that company's stock.  *See, e.g.*, A2455; *see also* A2459-65,

A2469-75; A2487-90; A2525-28.

Veldhuis, Sexton, and Friesen used the services provided by the

Sharp Group—including appellant Courtney Kelln—to conceal their

ownership and evade registration and reporting requirements.  A2483-84;

A2492 (Dhillon Trial Test.).  The group relied on a network of offshore shell

companies that the Sharp Group created and administered to conceal their

stock ownership.  A2828 (Knox Trial Test.).  Kelln split up the large blocks

of stock held by Veldhuis, Sexton, and Friesen and transferred smaller

blocks of under 5% each to those shell companies to establish the shells as

nominee shareholders.  A951-52 (Knox. Decl. ¶ 7); A2471-72 (Dhillon Trial

Test.); *see, e.g.*, A4537 (Trial Ex. 292, Murphy summary chart showing how

shares for one of the issuers were distributed among nominee entities); *see

also infra* at 18-20.

Second, Veldhuis, Sexton, and Friesen surreptitiously paid

professional stock promoters to drum up interest in the stock among the

investing public, while concealing from the investing public that they

10

beneficially owned the companies' stock, paid for the promotions, and intended to sell the stock once the price and volume were inflated. *See* A4205-61 (Trial Exs. 16 and 17, examples of promotional materials); A2455. Friesen, Veldhuis, and Sexton used encrypted communications to discuss ideas for those promotional campaigns. *See, e.g.*, A4262-63 (Trial Ex. 18, Xphone discussion between Friesen, Sexton, and Veldhuis regarding subject lines for the campaign emails); A4204 (Trial Ex. 14) (similar); A4307 (Trial Ex. 113, discussion between Sexton, Veldhuis, and Friesen regarding promotional campaign). Friesen took an active role in designing and editing campaigns. *See, e.g.*, A4391 (Trial Ex. 273, email from Friesen attaching drafts of 10 promotional emails for Vitality BioPharma); A4387 (Trial Ex. 261, email from Friesen attaching edits to Liberty One Lithium promotional campaign). And Gasarch—often at Friesen's direction—routed payments through nominee entities to conceal the true identities of those paying for the promotions. A4384-85 (Trial Exs. 237 and 239, showing Friesen directing Gasarch to make payments out of accounts in the Q system to pay "for marketing efforts").

Third, using the nominees' accounts at offshore trading platforms or brokers, Veldhuis, Sexton, and Friesen sold their stock to investors in U.S.

11

markets.  A2828-29; A951-52 (explaining his work with Sharp's group at

foreign trading platforms); A3058-65 (trading platform administrator

Ciapala testifying about his work with Sharp's group from early 2013

through mid-2019).  As co-conspirator Roger Knox[2] testified, the three

explained to Knox early in the scheme that they were interested in "finding

new and varied routes to market," and needed to ensure that he "had

outlets" in the form of "banks or brokerages" from which he could sell the

group's stock.  A2852-53.  Knox explained that if there was a "pump-and-

dump out of one … outlet[], it sent up a red flag" and the outlet "lost their

ability to trade any stocks."  A2852.

Once Veldhuis, Sexton, and Friesen established a relationship with

Knox's offshore trading platform, Knox met with Friesen multiple times a

year from 2013 through 2017 and Friesen communicated with him up to

"several times a day" to give "orders to look at the market and to sell

---

[2] Knox was the defendant in a separate criminal action, in which he has
pled guilty and been ordered to pay restitution to more than 8,000
investors.  Amended Judgment in a Criminal Case, *United States v. Knox*,
No. 18-cr-10385-NMG (D. Mass.), Dkt. No. 277, entered Jan. 5, 2024;
Restitution by Victim List, *Knox*, No. 18-cr-10385-NMG, Dkt. No. 277-1
(ordering restitution totaling $58,046,278.24).

shares." A2854. Knox's platform used U.S.-based and foreign broker-dealers to trade the stock through its own omnibus brokerage accounts. A957 (Knox Decl. ¶ 29). Those trades occurred without Veldhuis, Sexton, and Friesen ever disclosing either that they beneficially owned the stock or that they had paid to promote the stock for the purpose of dumping the stock on unwitting investors once the price and volume increased.

> b. *The sales violated the securities laws' registration and disclosure requirements.*

The vast majority of the stock transactions undertaken by Veldhuis, Sexton, and Friesen using Sharp Group-administered nominee entities were not registered with the SEC, as required. SEC accountant Ryan Murphy testified that he searched a database of all publicly available SEC filings to look for any statements that registered sales by any of the nominee entities. *See* A3211-12. He determined that registration statements existed with respect to only two of the fourteen issuers whose shares Veldhuis, Sexton, and Friesen sold, and that only one of those statements arguably covered the sale of a small amount of one issuer's shares sold through a single Sharp Group-administered nominee. A3212-14. Murphy's conclusion comports with Knox's understanding that, with

13

respect to the stocks his trading platform sold, "no registration statements were being filed with the Securities and Exchange Commission" and that "it would have been contrary to the entire purpose of using my services and Sharp's services for Veldhuis, Sexton, and Friesen to disclose in a public filing that they were directing those sales."  A958 (Knox Decl. ¶ 31).

Veldhuis, Sexton and Friesen also failed to file any Schedules 13D with the Commission to disclose their joint ownership interest in 5% or more of one issuer's stock they sold, as required by Exchange Act Section 13(d) and Rule 13d-1.  A3214-16 (Murphy Trial Test.).

> ### c. *Appellants and their co-conspirators used a variety of methods to evade detection of their schemes.*

In an effort to evade detection, the defendants used encrypted devices and networks to carry out their schemes, which were "part of a secure, encrypted communications network."  A953 (Knox Decl. ¶ 12).  The defendants took those measures because they knew they were engaged in an illegal enterprise and did not want criminal authorities or securities regulators to be able to see their communications.  A2884 (Knox Trial Test.); *see also* A954 (Knox Decl. ¶ 17); *see also* A1188-91.  The defendants further

obfuscated their communications on those devices and networks using

code names and numbers, including the following:

| Name | Code Name(s) and Number(s) |
|------|----------------------------|
| Jackson Friesen | GARD; 2; Stockman00 |
| Yvonne Gasarch | WIRES; Peace; 76 |
| Courtney Kelln | CELT; The C***essa; Esquire; Celtic |
| Paul Sexton | 3; HEAR; SEXY |
| Mike Veldhuis | ACCO; Stockman 007; Usual Suspects; Kobayashi; 4 |
| Roger Knox | SILV; SILR; BLAG; Silverton; Arrow; Silver Arrow; Arrow 777 |
| Frederick Sharp | BOND |
| Sharp-employed traders | KASH; TRAD |

A953-54 (Knox Decl.); A2902, A2841-42 (Knox Trial Test.); A2642 (Kaitz

Trial Test.); A3226, A4320 (Murphy trial testimony and Trial. Ex. 168

identifying Gasarch as "Peace"); A4266, A4324, and A4327 (Trial Exs. 79,

184, and 193).

Veldhuis, Sexton, and Friesen also discussed their plans to destroy

evidence and other means to avoid detection.  After learning of a subpoena

about trading in one of the companies at issue, Veldhuis suggested to

Sexton and Friesen that they should "start to consider loosing [sic]

15

computers." A4321 (Trial Ex. 170). In response, Sexton said that he would

call Apple and set up the argument that he lost his computer, while Friesen

responded that he had a robbery so "consider me all good." A4321.

Veldhuis then responded, "Right. I had a fire. LOL." A4321. Later, when

Veldhuis told Friesen about the arrest of someone involved in one of the

deals the group was also involved in, he warned Friesen not to fly into the

United States so that he, too, would not be arrested. A4326 (Trial Ex. 190).

After the SEC began its investigation in 2018, Veldhuis and Sexton likewise

advised Knox not to travel to the United States based on their concerns that

he might be approached by law enforcement or regulators. A2859-60.

Knox ultimately was arrested and detained in late 2018 and the scheme

began to unravel.

### 3. Kelln and Gasarch engaged in a variety of deceptive conduct to enable Sharp Group clients, like Veldhuis, Sexton, and Friesen, to violate the securities laws.

#### a. *Gasarch executed payments and made proceed distributions of the scheme as "Master of Finance."*

Gasarch, who used the codename "Wires" throughout the scheme,

was the scheme's "master of finance." A2842-43 (Knox Trial Test.); A4319

(Trial Ex. 157, Xphone message in which Kelln described Gasarch as

16

"master of finance").  Gasarch created and doctored backup documentation

to justify millions of dollars of deceptive transactions.  A2984 (Knox

testifying that Gasarch "would doctor invoices").  For example, numerous

documents admitted at trial showed that she created and doctored invoices

and loan agreements to create the false appearance that the nominee

companies used to perpetrate the schemes had incurred real expenses.

A4413, A4515-17 (Trial Ex. 286, email from nominee entity Riverfall Group

Ltd. asking Knox to wire $129,000 to Greenberg Traurig based on an

invoice the metadata revealed was doctored by Gasarch); A4518-22 (Trial

Ex. 287, loan agreement doctored by Gasarch).

In addition, Gasarch was primarily responsible for transmitting

money and coordinating payments for the control groups that used Sharp's

services.  Gasarch transferred funds to pay promoters for marketing efforts

when the clients sold their stock into the market—ensuring that she used

"safe" accounts that adequately concealed the promotions' funder.  A4316-

17 (Trial Ex. 151, Gasarch asks a client if the wire he is requesting is for a

promotion so she can find a "safe account"); A4320 (Trial Ex. 168, Gasarch

explaining that she needs to "play safe" when paying for promotions).

And, once shares were sold from offshore platforms into the U.S. market,

Gasarch was responsible for executing the wire transfers that paid out the proceeds of those stock sales to members of the control group or to the vendors they directed her to pay. A2843-44 (Knox Trial Test.); A3065-66 (Ciapala testifying that Gasarch was responsible for all the wires that were requested by and sent to Sharp's clients). Finally, Gasarch was the beneficial owner of one of the Sharp Group's nominee entities, Peaceful Lion, which had accounts at brokerage firms that were used to sell clients' shares into the market. A4412 (Trial Ex. 284, showing Gasarch as the beneficial owner of Peregrine Capital Ltd); A194-95 (registering a change of name from Peaceful Lion Holdings Ltd to Peregrine Capital Ltd); A2974-75 (Knox testifying that Gasarch was the beneficial owner of Peaceful Lion, and that his platform used Peaceful Lion to sell shares); A4620-33 (Trial Ex. 308, showing that Peaceful Lion traded in 9 of the 14 companies' stock traded by Veldhuis, Sexton, and Friesen).

> b. *Kelln concealed who owned the issuers' shares so they could be sold to unsuspecting investors without legally required disclosures.*

Kelln took steps to repackage and conceal clients' ownership of large blocks of microcap shares to permit them to sell the stock without appropriate disclosures. First, she broke clients' holdings into smaller

18

blocks comprising less than 5% of the issuer's outstanding shares. A2845-46 (Knox Trial Test.); A951-52 (Knox Decl. ¶ 7). Kelln described her role in the scheme as follows:

> I group certs [stock certificates] together that keep the total under 5%. Then I send them in for transfer to the TA [transfer agent]. Once processed the TA fedex's them to the broker. Then we wait for the shares to clear [i.e., become available for trading]. We only submit 1 transfer a day per broker until we have submitted all the shares.

A4271 (Trial Ex. 81). Trial witnesses confirmed that the purpose of the arrangement was to evade U.S. securities regulations requiring disclosure of stock sales made by beneficial owners who control 5% or more of the issuers' stock. A3059-60 (Ciapala Trial Test.); A2829-32 (Knox Trial Test.). As Knox explained, "[i]t was important to me, to Kelln, and to Sharp's clients to keep an issuer's shares held by a nominee company under 5% of the issuer's outstanding shares" to avoid "regulatory disclosure requirements" and "greater scrutiny" and "additional requirements" from brokerage firms "before allowing those shares to be traded." A952 (Knox Decl. ¶ 8); *see also* A2471 (Dhillon testifying that the "primary objective" was to split the stock among enough nominee entities "so that no one owned more than 5 percent" of a given company, because, under Section

19

13(d), "[a]s soon as you get past that threshold, … you have to disclose who the owner of that 5 percent-plus block of shares actually is.").

Kelln concealed the true ownership of the smaller blocks of shares by collecting or creating supporting documents, including powers of attorney and share purchase agreements, to permit transfer agents to transfer each block of shares into the name of the nominee entities.  A951-52 (Knox Decl. ¶ 7).  She then assisted with the transfer of the shares into the nominees' accounts at foreign trading platforms and to foreign brokerage firms, so that the platforms and brokers were able to trade the shares without disclosing the beneficial owners.  A2828-31; A2846; A952.  Kelln also provided false information to attorneys she hired to write opinion letters that were given to transfer agents to secure the removal of restricted legends on some shares, allowing them to be sold into the public markets.  SA2-3.

### 4. The conspirators' internal records showed that appellants obtained millions of dollars from their scheme.

#### a. The Q accounting system tracked the scheme's flow of funds and the conspirators' profits.

The conspirators tracked the flow of funds and proceeds from fraudulent trading in the "Q accounting system," which recorded stock

purchases, sales, and commissions.  A1183-85 (Nikolayev Dep. Test.);

A2911 (Knox Trial Test.); A3074 (Ciapala Trial Test.).  Fedir Nikolayev, a

Dominican Republic-based software engineer who developed the system

for Sharp in 2015 testified that the system was hosted on a server in

Curacao and named after the character from the James Bond movies.

A1184; A1178.  The Q system "kept track of all of the financial transactions

for Sharp's business, including all payments sent at client's direction out of

the proceeds of their trading and all fees and commissions they were

charged for using Sharp's services."  A955 (Knox Decl. ¶ 21).  Sharp

insisted those who used his group's services must use the Q system.  A3074

(Ciapala Trial Test.).

The Q system was accessible to and relied upon by the co-

conspirators.  A2911-14; A2980-81 (Knox trial test.); A3074 (Ciapala Trial

Test.).  Nikolayev described at length the various levels of permissions that

members of the conspiracy had to review and edit the data in the system.

A1185-86.  And Knox explained that his trading platform relied on the Q

system and that it was paid fees and commissions based on the

transactions that he reported in the system.  A955-56 (Knox Decl. ¶ 22);

A2911-14.  Knox took steps to verify the accuracy of the Q system by

21

reconciling it with his platform's own accounting monthly.  A2914-15; A955-56 (Knox Decl. ¶ 22).

Ryan Murphy, an experienced forensic accountant, testified at trial that he spent many hours confirming that the data in the Q system matched the data maintained by independent third-party brokerage firms and transfer agents.  A3160; A313; A3131-32.  For trading data, the information in the Q system matched 97.8% of the available brokerage records Murphy examined.  A3169.  In addition, Murphy reviewed contemporaneous messages about sending wires to various vendors against Q system records and determined that payments were reflected accurately in the Q system.  *See, e.g.*, A3159-60; A3175-77.

> ### b. *Each of the appellants obtained substantial profits from their conduct while investors suffered losses.*

Veldhuis, Sexton, and Friesen made more than $144 million in total proceeds by repeatedly following those steps with respect to fourteen issuers.  A4619.  Of that amount, records in the Q system showed that more than $13 million was transferred to Veldhuis, A1905, more than $17 million was transferred to Sexton, A1906, and nearly $12 million was transferred to Friesen, A1907.  Evidence before the jury showed Veldhuis, Sexton, and

Friesen celebrating their profits, with Sexton at one point crowing to the other two that they had "another 500K day."  A4315 (Trial Ex. 141, Xphone conversation between Veldhuis, Sexton, and Friesen); *see also* A4265 (Trial Ex. 45, Xphone conversation between Veldhuis, Sexton, Friesen, and another individual regarding stock sales); A3155-57 (Murphy testimony explaining that those sales were recorded in the Q system).

In addition, Q records reflected that Gasarch made more than $2.5 million for her role in the scheme.  A1910 (Murphy Decl., explaining chart summarizing the net transfers into Gasarch's personal Q account); A4659 (Trial Ex. 314, reflecting a similar chart shown to the jury).  And Kelln made nearly $1.6 million for her role.  A1909 (Murphy Decl., explaining chart summarizing the net transfers into Kelln's personal Q account).

Investors, meanwhile, suffered losses.  At trial, one co-conspirator explained that the volume of trading and share price of the issuer being promoted went up during the marketing efforts, but "when the promotions stopped … [t]he volume would go down and the share price generally weakened" leaving investors with devalued shares.  A2493.  An exhibit introduced at trial illustrated the rising and falling volume and share price of one issuer's stock over the course of one manipulation scheme executed

23

by Veldhuis, Sexton, and Friesen.  It showed that shareholders were left with shares worth a fraction of their value after the scheme.  A4634 (Trial Ex. 310).

### C. Procedural History

#### 1. Pre-Trial Proceedings

The Commission filed a complaint against defendants Sharp, Gasarch, Kelln, Veldhuis, Sexton, and Friesen,[3] on August 5, 2021, alleging violations of antifraud, registration, and beneficial ownership disclosure requirements of the federal securities laws.  *See* Sections 17(a)(1) and (3), 15(b), and 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. 77q(a)(1) & (3), 77o(b), & 77e(a) & (c); Sections 10(b), 13(d), and 20(e) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b), 78m(d) & 78t(e)); Exchange Act Rules 10b-5(a) and (c), 13d-1, 17 C.F.R. 240.10b-5(a) & (c), 240.13d-1.  A60-61.

Together with its complaint, the Commission sought a temporary restraining order ("TRO") and a preliminary injunction to halt the defendants' fraud, restrain the defendants from further dissipating and

---

[3] Other defendants included non-appellants William T. Kaitz, Avtar S. Dhillon, and Graham R. Taylor, each of whom entered consent judgments.

concealing assets, and preserve the court's ability to award monetary relief

for the benefit of the retail investors to whom the defendants "caused

hundreds of millions of dollars in harm," A325-26, through fraudulent

promotional campaigns that artificially inflated various issuers' stocks'

price and left investors with nearly worthless shares. *See* A306, 308

(Donelan Decl. ¶¶ 96, 102-03).

Immediately prior to trial, Kelln, Veldhuis, and Sexton filed notices

that they did not intend to challenge liability, A1102, A1530, and the

district court entered judgments against them contemplating that the court

would later impose remedies, A1121, A1147, A1535.  The principal

difference between the judgments is that Kelln and Veldhuis consented to

permanent injunctions, but Sexton did not.  Thus, the judgments entered

against Kelln and Veldhuis stated that "Defendant may be ordered to pay

disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil

penalty," that "[i]n connection with any such determination of

disgorgement and/or civil penalties, the Court may determine the amounts

of the disgorgement and civil penalty after briefing  … and, if necessary, a

hearing to resolve any material factual disputes before the Court," and that

"[f]or purposes of that determination, Defendant will not contest liability

25

under the claims filed by the Plaintiff[.]"  A1125, A1151.  The judgment

against Sexton stated that "the Court may elect to impose remedies,

including an injunction, a bar, a civil monetary penalty, and disgorgement"

and that Sexton would "not contest liability under the claims filed against

him."  A1535.

### 2.  Trial

The Commission proceeded to a 10-day jury trial against defendants

Gasarch and Friesen, which resulted in a unanimous verdict finding these

defendants liable on all claims.  The Commission introduced 316 exhibits

into evidence and presented testimony from co-defendants Dhillon and

Kaitz, FBI Supervisory Special Agent Chris Gianakura, FBI Digital Forensic

Examiner Christopher Beckstrom, co-conspirators Roger Knox and

Kenneth Ciapala, and SEC Enforcement Accountant Ryan Murphy.

The district court found the Q system records admissible on two

grounds:  (1) as business records, under Federal Rule of Evidence 803(6),

A2745; and (2) as co-conspirator statements, under Federal Rule of

Evidence 801(d)(2)(E), A3143; A3266-68; *see also* A2293-95 (pre-trial

preliminary finding that the records were admissible as co-conspirator

statements).

During the trial, the district court denied Gasarch's motion for a directed verdict under Federal Rule of Civil Procedure 50(a) on the Securities Act Section 17(a) (antifraud) claim against her, A1548, and Friesen's motion for a directed verdict on the Securities Act Section 5 (unregistered sale of securities) and Exchange Act Section 13(d) (beneficial ownership disclosure requirements) claims. *See* A3287-88. On September 27, 2023, the jury returned a verdict finding in favor of the Commission on all claims. A1553-54. Gasarch moved for judgment notwithstanding the verdict under Rule 50(b), *see* A1555, which the district court again denied, *see* Dkt. 414. Friesen filed neither a motion for judgment under Rule 50(a) nor a renewed motion for judgment notwithstanding the verdict under Rule 50(b).

### 3. Post-Trial Remedies Proceedings

Following trial, the Commission moved for the entry of final judgment against the appellants, seeking injunctive relief and monetary remedies against defendants Gasarch, Friesen, and Sexton, and monetary remedies against defendants Kelln and Veldhuis, who had already consented to the entry of injunctions. A1753-54. The district court held a

hearing and then issued an opinion explaining its rationale for imposing remedial sanctions.  A3787 (hearing); A3823 (remedies opinion).

Finding a reasonable likelihood that Gasarch, Friesen, and Sexton would violate the law again, A3835, the district court enjoined them from future violations of the securities laws provisions that they violated, A3831-39, and permanently barred them from participating in penny stock offerings, A3842-43.  The court entered the requested injunctions, pointing to the "egregious" and "repeated nature" of the violations lasting "for a decade."  A3833-34.  The court further determined that the defendants had "the opportunity to violate [the] securities laws again" because "none presented the Court with evidence that they are now gainfully employed outside of the microcap industry in which their fraudulent scheme operated."  A3835.  Finally, the court found that the defendants had "not acknowledged their wrongdoing" and had instead, without basis, "endeavor[ed] to deny or at least minimize the large-scale harm perpetrated by their schemes."  A3837.

The court ordered the defendants to disgorge "the proceeds reflected in the Q system," which it found, "absent any showing to the contrary proffered by the Defendants, [were] generated by illegal pump-and-dump

28

schemes that involved 14 different issuers." A3878. The court was

"persuaded that the Q data is highly accurate since evidence presented at

trial demonstrated that Q system entries were made very close in time to

the illegal trading that occurred." A3873. The court found that "the Q

system shows the transfers of illegal stock sale proceeds from the issuer

accounts into each of the Defendants' personal accounts, and that the

system shows, just like a bank account would, the Defendants paying their

mortgages, paying the expenses of their family members, and making other

transfers." A3874. The court further found that the defendants' failure "to

argue, much less show, that there is money in their accounts in the Q

system that still remains there" undermined arguments that they did not

receive the money shown in their Q accounts. A3874. The court thus

ordered disgorgement in the following amounts: (1) $17,367,474 against

Sexton; (2) $13,289,897 against Veldhuis; (3) $11,846,176 against Friesen; (4)

$1,582,785 against Kelln; and (5) $2,522,367 against Gasarch. A3879.

Because those amounts reflected the amount the Commission determined

each defendant personally received in his or her own Q account, the

Commission did not request that disgorgement be imposed on a joint-and-

several basis. The court designated the awards as "joint-and-several" with

29

Sharp's previously-ordered disgorgement, however, in partial response to the appellants' argument that the Q records *may* have been manipulated by Sharp. *See* A3874-77.[4]

The district court, citing the applicable statute of limitations found in 28 U.S.C. 2462, imposed civil penalties "only in relation to securities law violations that may have occurred between August 5, 2016, and August 5, 2021" and declined to enter penalties "in relation to violations prior to August 2016." A3848. The court found that Tier III penalties were appropriate under 15 U.S.C. 78u(d)(3)(B)(iii) because Veldhuis, Sexton, and Friesen "operated through fraud and deceit" and "it is inconceivable for the scheme [they] participated in during the five-year period to not have caused actual loss, let alone a significant risk thereof." A3856. The court adopted the Commission's proposed methodology of applying one Tier III statutory penalty for each of the seven issuers Veldhuis, Sexton, and

---

[4] To further account for any uncertainty in the amount of ill-gotten gains "obtained and retained by the individual Defendants," A3882, the court exercised its equitable discretion to not award prejudgment interest. The Commission does not challenge that decision on appeal.

Friesen traded securities during the relevant period.  A3852-56.  Thus, the

court imposed a $1,562,603 penalty against each of them.  A3857.

For Kelln and Gasarch, the court imposed a statutory penalty for each

statute violated.  A3857-58; A3860.  The court imposed a Tier III civil

penalty for each of the four statutes Kelln violated that required scienter

and a Tier I penalty under 15 U.S.C. 78u(d)(3)(B)(i) for Kelln's non-scienter-

based violation of Section 5.  Thus, the court imposed a penalty of $904,078

against Kelln.  A3858.  Finally, the court agreed that Gasarch was liable for

three violations—Section 17(a)(3), aiding and abetting violations of the

Securities Act, and aiding and abetting violations of the Exchange Act—but

declined to impose the SEC's requested penalty of $558,072.  A3860-61.

Instead, because Gasarch operated under the command of Sharp and two

of her violations were for aiding and abetting, the court imposed a penalty

of $296,651, which it found was the amount of Gasarch's frozen assets held

in financial institutions.  A3861-62.

The district court entered final judgments as to all defendants on June

20, 2024.  *See* A3886 (Judgment as to Defendant Paul Sexton); A3896

(Judgment as to Defendant Mike K. Veldhuis); A3907 (Judgment as to

31

Defendant Jackson Friesen); A3717 (Judgment as to Defendant Yvonne

Gasarch); A3925 (Judgment as to Defendant Courtney Kelln).

## STANDARDS OF REVIEW

The Court reviews "decisions to admit or exclude evidence for abuse

of discretion." *United States v. McKeeve*, 131 F.3d 1, 12 (1st Cir. 1997).

The court reviews jury instructions *de novo*, but "[w]here a district

court refuses to give a party's requested instruction" this Court "will

reverse only if the requested instruction was (1) correct as a matter of

substantive law, (2) not substantially incorporated into the charge as

rendered, and (3) integral to an important point of the case." *Davignon v.*

*Hodgson*, 524 F.3d 91, 108 (1st Cir. 2008) (internal quotation marks omitted).

This Court also reviews *de novo* the denial of a motion for judgment as a

matter of law, viewing the evidence and reasonable inferences therefrom in

the light most favorable to the jury's verdict, *SEC v. Happ*, 392 F.3d 12, 19

(1st Cir. 2004), and reversing "only if the facts and inferences point so

strongly and overwhelmingly in favor of the movant that a reasonable jury

could not have reached a verdict against that party," *Santos v. Sunrise Med.,*

*Inc.*, 351 F.3d 587, 590 (1st Cir. 2003) (internal quotation marks omitted).

Finally, this Court reviews the district court's remedies determinations, including disgorgement, penalties, and injunctions for an abuse of discretion. *Happ*, 392 F.3d at 31, 32; *SEC v. Saxena*, 26 F. App'x 22, 24 (1st Cir. 2001) (finding "no abuse of discretion in the district court's disgorgement order") (per curiam) (unpublished); *SEC v. Sargent*, 129 F.4th 1, 16 (1st Cir. 2025) ("'In an SEC enforcement action, we review the district court's decision to enter an injunction for abuse of discretion.'" (quoting *SEC v. Lemelson*, 57 F.4th 17, 30 (1st Cir.), *cert. denied*, 144 S. Ct. 486 (2023) (mem.))).

## SUMMARY OF ARGUMENT

This Court should affirm the jury's verdict—which was based on substantial, admissible testimonial and documentary evidence submitted at trial—and the district court's subsequent imposition of remedies, which was fully consistent with that verdict. Appellants' arguments largely center around erroneous challenges to the admissibility and reliability of records from Sharp's Q accounting system. But the district court carefully analyzed admissibility of those records before, during, and after the trial. The court correctly determined that the records were properly authenticated, independently admissible under exceptions to the exclusion

of hearsay because they were business records and statements by defendants' co-conspirators in furtherance of the conspiracy, and likely to be "highly accurate," A3873.

There is no sound basis for Friesen's argument, in particular, that without the Q records he could not have been found liable for securities law violations. He waived any sufficiency challenge by failing to make the appropriate motions below, and, in any event, his argument ignores that voluminous testimonial and documentary evidence apart from the Q records admitted at trial revealed that for years he played a central role in fraudulent schemes involving the manipulation of stock prices and concealed ownership of stock.

In addition to her challenge to the Q records, Gasarch challenges the court's instruction to the jury on aiding and abetting liability and the sufficiency of the evidence supporting claims against her. Both arguments fail. The jury instruction was a correct statement of the substantive law of this Circuit. And, based on ample documentary and testimonial evidence, the jury reasonably found that Gasarch's work as the "master of finance," A4319, for the scheme—which included faking invoices and other

documents—both directly violated Section 17(a)(3) and aided and abetted others' violations of at least one antifraud provision of the securities laws.

Turning to remedies, all appellants again focus on the Q records. But they cannot show that the district court abused its discretion in relying on the records to determine a reasonable approximation of their ill-gotten gains from the scheme. And appellants have failed to cite *any* evidence rebutting that reasonable approximation, nor do they provide any other basis to second-guess the amount of disgorgement the district court ordered.

None of appellants' other arguments provide a basis to overturn any of the remedies ordered against them. As the district court made clear, any disgorgement collected will be paid out to injured investors, but the court was not required to make specific findings on identities of victims or their loss amounts prior to awarding disgorgement. Furthermore, the district court applied the correct statutes of limitations in ordering disgorgement and civil penalties. And the court acted within its considerable discretion in enjoining Sexton from further violations of the securities laws. The verdict and remedies should be affirmed.

## ARGUMENT

### I.    The district court acted within its discretion in admitting evidence from the Q accounting system at trial.

The district court acted within its discretion in admitting records from the Q accounting system, which Gasarch and Friesen concede was an "electronic ledger system" used to record the appellants' stock holdings and profits.  Gasarch Br. 5; Friesen Br. 3.  Appellants do not identify a single, specific, objectionable record nor do they explain why any statement reflected in the records is untrustworthy.

Contrary to appellants' arguments (Gasarch Br. 10-12; Friesen Br. 23-25), the Commission authenticated and laid a proper foundation for the records through multiple trial witnesses, including Nikolayev, who created the ledger system at Sharp's direction, and co-conspirators Knox and Ciapala, who described using the system to track stock holdings and the flow of funds.  Appellants' categorical assertions to the contrary go to the weight of the evidence—not its admissibility—and the jury rejected their argument that the evidence was unreliable.

Nor are the records inadmissible hearsay.  *Contra* Gasarch Br. 13-14; Friesen Br. 26-28.  The district court properly identified two bases for

admission, correctly finding that the records were (1) business records under Federal Rule of Evidence 803(6) and (2) co-conspirator statements made in furtherance of a conspiracy under Federal Rule of Evidence 801(d)(2)(E).  Both of those determinations were well-grounded in the evidence and were within the court's discretion.

### A. The district court reasonably determined that the Q system records were authenticated by Sharp's IT contractor Fedir Nikolayev and the reliability of the records was independently corroborated at trial.

"The 'foundation' required in order to authenticate real evidence … is simply an evidentiary showing of whatever facts are necessary in the circumstances to prove that the item is what the proponent claims it to be." *United States v. Doyon*, 194 F.3d 207, 212 (1st Cir. 1999); *see* Fed. R. Evid. 901. "If the court discerns enough support in the record to warrant a reasonable person in determining that the evidence is what it purports to be, then Rule 901(a) is satisfied and the weight to be given to the evidence is left to the jury."  *United States v. Paulino*, 13 F.3d 20, 23 (1st Cir. 1994).  Because the "ultimate reliability" of evidence is a matter properly resolved by the jury, Rule 901 sets a "minimal standard[] for authentication."  *United States v. Tin Yat Chin*, 371 F.3d 31, 38-40 (2d Cir. 2004).

37

To authenticate the Q records, the SEC submitted testimony from Nikolayev, who was "a [w]itness with [k]nowledge" of the Q accounting system, including its structure, purpose, and use.  Fed. R. Evid. 901(b)(1); *United States v. Blanchard*, 867 F.3d 1, 5 (1st Cir. 2017) ("Evidence of authenticity may consist of direct testimony of either a custodian or a percipient witness." (internal quotation marks omitted)).  As appellants acknowledge, Nikolayev testified that the records are what the Commission claims them to be—i.e., entries from an accounting system created by Nikolayev at Sharp's direction for the purpose of enabling Sharp to track the appellants' (and others') stock holdings as well as the "commissions" or "profits" owed to the various members of the scheme.  A1183-85; Gasarch Br. 5; Friesen Br. 3.  Nikolayev testified that the Q system was designed to store information about the commissions and that the information entered into the system was kept on a server in Curacao.  A1185-86.

FBI Supervisory Special Agent Gianakura testified at trial that he accompanied Dutch Police to seize the servers hosting the Q records in Curacao, and that the FBI eventually brought those servers into the United States.  A2748-52.  Under this Court's case law, that testimony, taken

together, was more than sufficient "to warrant a reasonable person in determining that the evidence is what it purports to be." *Blanchard*, 867 F.3d at 6 (internal quotation marks omitted). Multiple circuits have "found evidence of ledgers maintained in furtherance of conspiracies to be adequately authenticated by their distinctive contents and the circumstances of their discovery—at least when the proponent offers the testimony of a participant in the conspiracy or a witness familiar with its operations." *United States v. Ceballos*, 789 F.3d 607, 618 (5th Cir. 2015) (collecting cases).

To the extent Gasarch and Friesen object to the *credibility* of the records—i.e., whether each entry accurately reflects the stock holdings or payment it purports to document—such determinations are for the factfinder. *United States v. Cassiere*, 4 F.3d 1006, 1021 (1st Cir. 1993) (appellant's view that testimony was "inconsistent, incredible, and suspect" was insufficient to warrant overturning district court's decision to admit it); *see Blanchard*, 867 F.3d at 6-7 (holding that where the standard for admission was met, discrepancies in a document go to "the weight the evidence should receive rather than its admissibility").

And, here, substantial evidence was presented to the jury to demonstrate the reliability of the Q records. Commission accountant Ryan Murphy explained how he matched Q system data with corresponding brokerage records. A3135 (Murphy Trial Test.). Murphy focused on summarizing Q system data of "the issuers that are the center of this case" and the accounts associated with Friesen and Gasarch. A3136. After spending hundreds of hours reviewing tens of thousands of pages of records, he concluded that stock transactions were documented in the Q system accurately because they matched those transactions as recorded in third party brokerage records. A3167, A3131.

Many Q records related to individual conspirator accounts and disbursements were also independently corroborated by witnesses and documents admitted at trial. A2911-15 (Knox testifying that he logged transactions within 24 hours and conducted monthly reconciliations between his data and the data in the Q system); *see infra* at 67-68 (describing disbursements from appellants' Q accounts to pay personal expenses); *see also* A3073-75 (Ciapala Trial Test.). This evidence, taken together, amply supports the district court's determination that the Q system records were admissible. Nor do Gasarch and Friesen point to any

40

evidence that undermines that conclusion.  Appellants' generic objections that Q system records *could* contain errors simply because they relied on manual inputs would apply to practically *any* accounting system.  And the Commission was not required to tick-and-tie each transfer out of the Q system to its ultimate recipient, or introduce third party evidence corroborating each entry, to satisfy the "minimal standard[]" for authentication.  *Tin Yat Chin*, 371 F.3d at 38.

### B. The district court properly admitted the Q system records under exceptions to the hearsay rule.

Appellants next incorrectly argue that, even if the Q system records were properly authenticated, the court nonetheless erred in admitting them because they were hearsay under Federal Rule of Evidence 802.  Friesen Br. 27-28; Gasarch Br. 13-14.  The district court identified two appropriate bases for admission of the records, either of which independently satisfies the standard for admission.  A2745 (finding by the district court that the Q system "satisfies the requirements of a business record" based on the testimony of its creator, Fedir Nikolayev); *see also* A3810.  *See* A3143, A3266-68 (finding the Q records admissible as statements by a co-conspirator under Federal Rule Evidence 801(d)(2)(E)).

41

1. **The Q system records were properly admitted as business records.**

Under Rule 803(6), "'[a] record of an act, event, condition, opinion, or diagnosis' is 'not excluded by the rule against hearsay' if:

> '(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business[] [or] organization …;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.'"

*U.S. Bank Tr., N.A. ex rel. LSF9 Master Participation Tr. v. Jones*, 925 F.3d 534, 537 (1st Cir. 2019) (first alteration in original). It is not necessary that the person laying the foundation "be the person who actually prepared the record[s]," *id.* at 538 (internal quotation marks omitted), or "have personal knowledge of their preparation," *Dyno Constr. Co. v. McWane, Inc.*, 198 F.3d 567, 576 (6th Cir. 1999). "Rather, a qualified witness is simply one who can

42

explain and be cross-examined concerning the manner in which the records are made and kept." *Jones*, 925 F.3d at 538 (internal quotation marks omitted).

The district court reasonably found that Nikolayev meets these criteria, and that his testimony established that the Q records were kept "at the direction of Sharp" following "a regular protocol." A2742-43. Nikolayev testified that, as an IT professional, he created and administered the Q system as part of his work for Sharp. A1178; A1183-85. Nikolayev further testified that Sharp used the Q system to track financial transactions, stock holdings, purchases and sales of stock, proceeds from stock sales, client and bank account information, and commissions distributed to Sharp's clients. A1183-85. Nikolayev explained that only he and Sharp had full access to the system, that Sharp's staff (such as Gasarch and Kelln) had more limited access to input data, and that Sharp's "clients" (such as Friesen, Sexton, and Veldhuis) could view only their own accounts. A1185. Critically, Nikolayev testified that it was Sharp's regular practice in conducting his business to keep all this information in the Q system. A1186. And Nikolayev confirmed that Sharp "used the Q system as a regular function of his business." A1186.

43

That conclusion was corroborated at trial by co-conspirator Knox, who testified that the Q system was "an accounting [database] for both cash and securities … that Fred Sharp maintained."  A2911.  Knox testified that documentation of the trades in the Q system occurred close in time to when the trading occurred, usually within twenty-four hours.  A2911-13 (further explaining that at some period of time, he would directly enter trading date into the Q system and that at earlier times "it was predominantly Fred Sharp," who entered the trades into the system, but Kelln and Gasarch were also able to do so).  Trades were "booked" to individual accounts based on a field that listed the code name for the beneficiary of each stock trade.  A2914.  Knox also verified the accuracy of the Q system "on a monthly basis" by reconciling the Q records with his platform's own Quickbooks data to "ensure that quantities of stock are correct" and "all the wire transfers have been actioned."  A2915.

## 2.  The Q system records were co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E).

The district court also reasonably found that the Q records were independently admissible under Federal Rule of Evidence 801(d)(2)(E) as statements made by the appellants' coconspirator "during and in

44

furtherance of the conspiracy." *United States v. McKeeve*, 131 F.3d 1, 12 (1st Cir. 1997); *see* A3143; A3266-68; *see United States v. Trowery*, 542 F.2d 623, 626 (3d Cir. 1976) (per curiam) (Rule 801(d)(2)(E) "may be applied in both civil and criminal cases" because its "rationale is the common sense appreciation that a person who has authorized another to speak or to act to some joint end will be held responsible for what is later said or done by his agent, whether in his presence or not); *see also United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979) (following *Trowery*); *USF Red Star, Inc. v. NLRB*, 230 F.3d 102, 108 n.2 (4th Cir. 2000) (co-conspirator exception applies in both civil and criminal cases); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985) (same).

To make that determination, the court was required to find that the records were created "(1) during the course and (2) in furtherance (3) of a conspiracy (4) of which declarant is a member." *Earle v. Benoit*, 850 F.2d 836, 841 (1st Cir. 1988) (internal quotation marks omitted). "To be deemed 'in furtherance,' a statement need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to

advance the goals of the conspiracy in some way." *United States v. Piper,*

298 F.3d 47, 54 (1st Cir. 2002) (internal quotation marks omitted).[5]

The district court had a "reasonable basis for concluding that, more

likely than not," the Q system records reflected statements by co-

conspirators made during the course of and in furtherance of Sharp and his

co-conspirators' fraudulent scheme. *See McKeeve*, 131 F.3d at 12 (upholding

court's decision to admit co-conspirator statements where a preponderance

of the evidence suggested that the speakers were co-conspirators). As

Nikolayev testified, all entries were made by either Sharp himself, his staff,

Knox, or—to a much more limited extent and only with respect to their

own accounts—Sharp's "customers." A1185-86; A2911-12. Only Sharp and

Nikolayev, as administrators, had complete control over the system and

the ability to make manual adjustments to entries. A1186; A2915-16. And

_____

[5] District courts may, as the court did here (A2293-95), provisionally admit
co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E),
"deferring a final decision until the close of evidence." *United States v.
Ciresi*, 697 F.3d 19, 25 (1st Cir. 2012). A defendant's objection is then
properly preserved if they object when statements are provisionally
admitted and again at the close of evidence. *United States v. Aviles-Colon*,
536 F.3d 1, 13-14 (1st Cir. 2008); *see* A1545-46 (preserving challenge).
Preserved challenges are reviewed for clear error. *Ciresi*, 697 F.3d at 26.

only Sharp, a co-conspirator, manually adjusted the commissions to be paid out to the others' accounts.  A1186.

The records were undoubtedly in furtherance of a conspiracy.  At trial, multiple co-conspirators testified that they used the Q system to assist with their fraudulent sales of hundreds of millions of dollars in stocks into the United States markets.  For example, Knox testified that he spoke with Sharp "every business day Monday to Friday" from 2015 to 2018 about his role in Sharp's "illegal enterprise" to "mov[e] shares offshore to sell, and once those shares [we]re sold, mov[e] the money back on shore."  A2884; A2843-44.  He explained that the Q system was an accounting database maintained by Sharp and used by the members of that enterprise to track stock holdings and the flow of funds.  A2911-14.  Knox further testified that he communicated with each of the appellants in connection with his involvement with Sharp's scheme and described the role each played in facilitating that scheme.  A2842-49.  Each of those individuals had a personal account in the Q system where they received proceeds from stock sales.  A2980-81; A3200-01.

Knox's testimony was corroborated by Ciapala, who testified that he used the Q system to "enter all the trading information and wiring

47

information" for stocks he traded on behalf of Sharp's clients, and that

Sharp insisted those he worked with must use the Q system. A3074-75.

There was thus more than sufficient evidence for the district court to

conclude that any statements reflected in the Q system records were

created during the course and in furtherance of a conspiracy of which the

appellants were a members, and there was no error in the admission of the

evidence.

Although Friesen does not challenge the *admission* of the Q records as

co-conspirator statements, he suggests throughout his brief that this Court

should discount the records because they were made by Sharp, a criminal

co-conspirator, and are therefore inherently unreliable. His counsel made

the same argument to the jury, which implicitly rejected it in reaching the

verdict. This Court should not undertake an independent reliability

assessment of co-conspirator statements. *United States v. Tom*, 330 F.3d 83,

93 (1st Cir. 2003) (noting when evidence falls firmly within the co-

conspirator hearsay exception, an independent inquiry into the reliability

of the evidence is not required); *see also Bourjaily v. United States*, 483 U.S.

171, 183 (1987) ("We think that the co-conspirator exception to the hearsay

rule is firmly enough rooted in our jurisprudence that … a court need not independently inquire into the reliability of such statements.").

### C. Friesen's sufficiency of the evidence arguments are not properly before the Court and are meritless in any event.

Friesen further argues (Friesen Br. 28-34) that admission of the Q system records was prejudicial because there was otherwise insufficient evidence for the jury to find him liable for violating the registration and reporting requirements in Section 5 of the Securities Act and Section 13(d) of the Exchange Act.  Friesen fails, conspicuously, to challenge the fraud claims for which the jury also found him liable.  And he does not dispute that the jury was correctly instructed on both Section 5 and Section 13(d). *See* A3360-61 (instructing the jury that Section 5 required them to find that Mr. Friesen "directly or indirectly sold or offered to sell a security and that no registration statement was filed with the SEC or was in effect for offers or sales of that security"); A3362-63 (instructing the jury that Friesen could be held liable for Section 13(d) if he "acquired, directly or indirectly, individually or acting together with others, beneficial ownership of more than 5 percent of Stevia First/Vitality … stock").

Friesen is barred from directly challenging the sufficiency of the evidence supporting the jury's verdict because he failed to make those arguments below in a proper motion under Federal Rule of Civil Procedure 50(a), nor did he file a renewed motion for a directed verdict under Rule 50(b). *Falto De Román v. Mun. Gov't of Mayagüez*, 46 F.4th 51, 55-56 (1st Cir. 2022) (finding that defendant waived Rule 50(b) challenge by failing to file a motion under Rule 50(a), and defendant briefly raising the argument on the trial record was insufficient to preserve arguments for appeal); *see also Dupree v. Younger*, 598 U.S. 729 (2023).

Insofar as Friesen is arguing that any error in the admission of the Q records was not harmless with respect to the Section 5 and 13(d) violations, his arguments lack merit. As already discussed, the district court acted well within its discretion in admitting the Q records. This Court therefore need not address that argument.

Regardless, Friesen has not come close to showing that any error was prejudicial. Friesen's argument that the Commission failed to show that he had knowledge of his wrongdoing is unavailing—both Sections 5 and 13(d) are strict liability statutes that do not require a showing of scienter. *See SEC v. Sargent*, 589 F. Supp. 3d 173, 205 (D. Mass. 2022), *aff'd*, 129 F.4th 1

50

(1st Cir. 2025) (Section 5); *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1167 (D.C. Cir. 1978) (Section 13(d)); *see also* Friesen Br. 30-32.

Moreover, even setting aside the Q records, other evidence submitted at trial unequivocally showed that—working with Veldhuis and Sexton and using nominee entities—Friesen sold shares from offshore trading platforms into the U.S. securities markets in violation of Section 5. *See, e.g.*, A2849; A2826-27; A4315; A4265. Indeed, Knox testified that when his platform sold shares for the Veldhuis control group, *he often received his trading instructions from Friesen*. A3055-56. Friesen also actively participated in creating the promotional campaigns aimed at pumping up share prices for the issuers whose stock he then sold with Veldhuis and Sexton. *See, e.g.*, A4391 (Trial Ex. 273); A4387 (Trial Ex. 261). And documents introduced at trial showed that Friesen shared in the proceeds from the group's stock sales. A4315; A4265.

Likewise, evidence submitted at trial showed that Friesen was part of a control group that beneficially owned up to 37% of the shares of the company Stevia First without making the appropriate disclosures under Section 13(d). Co-conspirator Dhillon, the Chairman of the Board of Stevia First, A2443-44, testified that Friesen was partners with Veldhuis and

51

Sexton throughout the Stevia First transactions and that the group acquired Stevia First shares amounting to well over the 5% threshold through multiple rounds of transactions. *See, e.g.*, A2489-92 (testifying that after the first round of the transaction, Sexton, Veldhuis, and Friesen acquired and held 37% of Stevia First stock); A2516.  Kaitz, another co-conspirator, testified that Veldhuis referred to Friesen as a "partner," A2632, and that Veldhuis, Sexton, and Friesen engaged him to run media for a promotional campaign for Stevia First, A2635-36.

Moreover, Knox testified that his trading platform traded Stevia First shares "on behalf of … the clients of Fred Sharp … the control group of Sexton, Veldhuis, and Friesen."  A2887.  Indeed, Knox testified that Friesen personally directed the disposition of Stevia First shares.  A3055 (Knox testifying that he received trading instructions on VBIO from Friesen); A2517 (Dhillon Trial Test.).  And Murphy testified that he reviewed the Commission's publicly available filings and "[t]here were no Form 13Ds filed" on behalf of Friesen, Sexton, or Veldhuis.  A3215.

**II.  The jury's findings that Gasarch violated Section 17(a)(3) and aided and abetted violations of the securities laws should not be disturbed.**

**A. The jury was properly instructed on the requirements for finding that Gasarch aided and abetted violations of the securities laws.**

Consistent with this Court's case law, the district court instructed the jury that, to find Gasarch liable for aiding and abetting, the SEC must show *both* "that Ms. Gasarch understood that her role or conduct was part of an overall activity that was improper" *and* that she "knowingly or recklessly provided substantial assistance to the violation."  A3364-65.  Gasarch focuses only on the first instruction and argues that the court erroneously failed to require the jury to find that she had knowledge of the "specific securities violation" she was aiding.  Gasarch Br. 15 (citing *SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012)).  But the court's instruction accurately reflects the law, which contains no such specific knowledge requirement.

Instead, just as the court instructed, this Court has held that

> [t]o establish a claim of aiding and abetting liability under the securities laws, the Commission must prove: (1) a primary violation was committed; (2) the defendant was generally aware that his role or conduct was part of an overall activity that was improper; and (3) the defendant knowingly and substantially assisted in the primary violation.

*SEC v. Tambone*, 550 F.3d 106, 144 (1st Cir. 2008), *reh'g en banc granted, opinion withdrawn*, 573 F.3d 54 (1st Cir. 2009), *and opinion reinstated in part on reh'g*, 597 F.3d 436 (1st Cir. 2010) (en banc).  Following this Court's decision in *Tambone*, the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") amended the aiding and abetting provisions to state that "any person that knowingly or recklessly provides substantial assistance to another person … shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."  15 U.S.C. 78t(e).  That "amendment 'clarif[ies] that recklessness is sufficient for bringing an aiding and abetting action.'"  *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 801 (11th Cir. 2015) (alteration in original) (quoting H.R. Rep. No. 111–687(I), at 80 (2010)).

    *Apuzzo* is doubly inapplicable.  First, the Second Circuit's statement in that case that the defendant must have "knowledge of th[e] violation," 689 F.3d at 211, diverged from this Court's controlling holding in *Tambone* that the defendant must be only "generally aware" that the "overall activity" was "improper," 550 F.3d at 144.  Second, and more importantly, *Apuzzo* addressed conduct that pre-dated Dodd-Frank.  689 F.3d at 211 n.6. After Dodd-Frank, even courts in the Second Circuit have held that

54

"general awareness" of the aider-and-abettor's "overall role" in the illegal

scheme is all that is necessary to establish the requisite knowledge. *See,*

*e.g.*, *SEC v. DeFrancesco*, 699 F. Supp. 3d 228, 245 (S.D.N.Y. 2023) (internal

quotation marks omitted). Gasarch's alternative requested aiding and

abetting instruction was not "correct as a matter of substantive law" and

her objection to the instruction thus provides no grounds for reversing the

jury's verdict. *Davignon v. Hodgson*, 524 F.3d 91, 108 (1st Cir. 2008) (internal

quotation marks omitted).

## B. Ample evidence supports the jury's findings that Gasarch both committed and aided and abetted securities law violations by engaging in practices that operated as a fraud or deceit upon securities investors.

Gasarch similarly fails to establish she was entitled to judgment as a

matter of law. Gasarch Br. 16-19. "[W]hen the losing party protests the

sufficiency of the evidence, the court of appeals must take both the facts

and the reasonable inferences therefrom in the light most hospitable to the

jury's verdict." *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1188 (1st Cir.

1995); *see also SEC v. Lemelson*, 57 F.4th 17, 23 (1st Cir.) (the Court asks only

whether "a rational jury could have found in favor of the party that

prevailed … and set[s] aside the jury verdict only if the jury failed to reach

the only result permitted by the evidence" (internal quotation marks, citation omitted)), *cert. denied*, 144 S. Ct. 486 (2023) (mem.).  And ample evidence supports  the jury's finding that Gasarch violated Section 17(a)(3) and aided and abetted the violation of at least one antifraud provision of the securities laws.  A1554 (verdict form).

Section 17(a)(3) provides: "It shall be unlawful for any person in the offer or sale of any securities … directly or indirectly—(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. 77q(a)(3).  Scienter is not an element of a Section 17(a)(3) claim, which may be established through a showing that the defendant acted negligently.  *Aaron v. SEC*, 446 U.S. 680, 696-97 (1980) (holding that the language of Section 17(a)(3) "quite plainly focuses upon the *effect* of particular conduct on members of the investing public, rather than upon the culpability of the person responsible").

The trial evidence was sufficient to support Gasarch's liability under that provision.  At trial, the jury heard that Gasarch was the "master of finance" in the scheme.  A4319 (Trial Ex. 157); A2842-43 (Knox Trial Test.).  The jury heard evidence that, in addition to executing the wire transfers

that controlled the flow of funds in the fraud, Gasarch fabricated invoices

and wire request forms to conceal the payments being made to the true

owners of the stock.  A4413-4517 (Trial Ex. 286, law firm invoice that the

metadata showed was doctored by Gasarch (A4517); A2895-99 (Knox Trial

Test.); *see also* A4322 (Trial Ex. 180); *see SEC v. Esposito*, 260 F. Supp. 3d 79,

91 (D. Mass. 2017) (granting default judgment on the Commission's Section

17(a)(3) claim where defendants "fabricated" documents to create the

"deceptive appearance" that certain securities "were not subject to trading

restrictions").

Gasarch wrongly contends (Gasarch Br. 17) that this evidence was

insufficient for the jury to find her liable for violating Section 17(a)(3)

because the Commission failed to introduce evidence that she personally

traded or made statements to investors.  But the plain text of Section

17(a)(3) does not require the Commission to point to a misrepresentation.

To the contrary, "untrue statement[s]" and "omission[s]" are expressly

governed by a different provision, Section 17(a)(2), 15 U.S.C. 77q(a)(2).

Unlike that provision and its analogue in Commission Rule 10b-5(b),

provisions that prohibit deceptive conduct—including Section 17(a)(3) and

Rule 10b-5(a) and (c)—"do not require the defendant to make a

misstatement or omission; they require only deceptive conduct." *See Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (citing *Lorenzo v. SEC*, 587 U.S. 71, 74, 80 (2019)). Nor does the text of Section 17(a)(3) require a showing that the defendant engaged in trading.

Fraudulent conduct must be "in the offer or sale" of a security to be actionable under Section 17(a)(3), but a fraud "need not be explicitly directed at the investing public" to satisfy that requirement. *SEC v. Radius Cap. Corp.*, 653 F. App'x 744, 751 (11th Cir. 2016) (per curiam) (unpublished); *see United States v. Naftalin*, 441 U.S. 768, 773 & n.4 (1979) (explaining that "Congress expressly intended to define broadly" the terms "offer" and "sale" and that Section 17 does not "require fraud in any particular phase of the selling transaction"); *United States v. Weed*, 873 F.3d 68, 73 n.6 (1st Cir. 2017) ("[C]ourts have interpreted the federal securities laws to proscribe frauds against intermediaries, as well as those perpetrated directly on investors.") (citing *Naftalin*, 441 U.S. at 770)); *Graham v. SEC*, 222 F.3d 994, 1001-02 (D.C. Cir. 2000) (argument that fraud must be perpetrated on an investor to be "in connection with the purchase or sale of … security[ies]" is "foreclosed" by *Naftalin* (internal quotation

58

marks omitted)).  Congress enacted Section 17(a) "to prohibit a wide swath of fraudulent behavior that Congress believed impeded the smooth and honest functioning of the securities markets" and thus "the SEC need not base its claim of liability on any completed transaction at all."  *Tambone*, 550 F.3d at 120, 122.  It is thus more than sufficient that Gasarch posed as the owner of a nominee entity that was used to trade shares of at least nine of the issuers at issue in this case.  A3167.  Gasarch's other deceptive conduct in connection with the scheme reinforces the conclusion.  *See Naftalin*, 441 U.S. at 473 ("in the offer or sale" is "expansive enough to encompass the entire selling process"); *SEC v. Wolfson*, 539 F.3d 1249, 1263-64 (10th Cir. 2008) (holding that a defendant need not be an "actual seller or offeror of securities" to be liable under Section 17(a) and affirming liability where "the misrepresentations or omissions … were made on behalf of the issuer, concerned the use of the proceeds of the stock sale, and were made while [entity] was in the process of peddling newly issued … stock to investors").

Gasarch's challenge to the jury's finding that she aided and abetted other conspirators' violations fares no better.  Testimony revealed that Gasarch provided substantial assistance to Sharp's and the appellants' scheme because she was responsible for disbursing the proceeds of the

illicit offshore stock sales to the control groups that were the true owners of the stocks. A2843-44 (Knox testifying that "99 percent" of the wire requests received by one of his trading platforms came from Gasarch); *see* A2844-54 and A2858-59 (Knox describing Silverton's illegal sale of stock on behalf of the Veldhuis control group). Gasarch was the record owner of Peaceful Lion, one of Sharp's for-rent nominee entities. A4412 (Trial Ex. 284); A2872, A2874-75 (Knox Trial Test.); A2878. The jury also heard that the Peaceful Lion account was used to make payments to various entities and individuals involved in the scheme from the proceeds of stock sales. A2880-81 (Knox Trial Test.); *see* A2878. And the jury heard that Veldhuis, Sexton, and Friesen used Peaceful Lion as a conduit to trade nine of the fourteen issuers' securities that formed the basis of the Commission's claims against those appellants. A3167 (Murphy Trial Test.).

The jury also considered communications highlighting that Gasarch provided her assistance knowingly or recklessly, including encrypted Xphone messages in which she exhibited an understanding that certain accounts must be used to pay for stock promotions to avoid disclosing the identity of the funders. *See* A4316-17 (Trial Ex. 151, Gasarch asking a client if the wire he is requesting is for a promotion so she can find a "safe

account"); A4320 (Trial Ex. 168, Gasarch explaining that she needs to "play safe" when paying for promotions); *see also* A4305 (Trial Ex. 90, email showing that in response to Sharp's concern about "money laundering" Gasarch suggests creating a loan document to make a payment appear legitimate). This Court has found similar evidence sufficient to permit an inference of intent to defraud. *United States v. Condron*, 98 F.4th 1, 18 (1st Cir. 2024) (inference of criminal intent to defraud permitted where defendant, among other things, "was the listed principal or manager of each of the companies" the primary fraudster used in the fraud).

Finally, the jury heard that Gasarch reaped compensation of more than $2.5 million for her work with Sharp—far above market rate for an assistant. A4659 (Trial Ex. 314). These facts and circumstances, taken together, more than suffice to permit the jury to draw an inference that Gasarch acted with the requisite intent to aid and abet a scheme to defraud. *Cf. Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002) (stating that a "plaintiff may combine various facts and circumstances indicating fraudulent intent" to show the necessary state of mind).

### III.   The district court acted within its discretion in determining appropriate remedies for the appellants' violations.

The district court acted within its discretion in ordering appellants to disgorge the unjust enrichment they received as a result of their violations and to pay civil penalties.  The court also acted within its discretion in enjoining all appellants from further violations of the securities laws they violated, and only Sexton objects to his injunction on appeal.

#### A. The district court properly ordered each of the appellants to disgorge their ill-gotten gains from their violations.

To deprive the appellants of their ill-gotten gains from the fraud scheme's illegal stock sales, the district court ordered them to disgorge the following amounts:

- Gasarch:    $2,522,367
- Kelln:    $1,582,785
- Sexton:    $17,367,474
- Veldhuis:    $13,289,897
- Friesen:    $11,846,176

A3879-80.  Each disgorgement award is "subject to the SEC's submission, and th[e] [c]ourt's approval, of a plan detailing how the disgorged funds will be returned to the harmed investors."  A3879-80.

The district court acted within its discretion and consistent with governing law in ordering disgorgement.  Appellants raise a variety of challenges to the disgorgement awards, all of which lack merit.

**1. The district court acted within its discretion in calculating a reasonable approximation of each appellants' ill-gotten gains based on the Q records.**

Congress has authorized the SEC to seek, and district courts to grant, "any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. 78u(d)(5).  In *Liu v. SEC*, 591 U.S. 71, 75 (2020), the Supreme Court held that the equitable relief authorized by that provision includes disgorgement—i.e., an order requiring a wrongdoer to surrender profits gained through violations of the securities laws. After *Liu*, Congress enacted an amendment that specifically authorizes the Commission to seek, and district courts to grant, "disgorgement" of "any unjust enrichment" received "as a result of [a] violation." 15 U.S.C. 78u(d)(3)(A)(ii); see 15 U.S.C. 78u(d)(7).  These provisions apply in Commission proceedings "under any provision of the securities laws."  *Id.* 78u(d)(5), (d)(7).

The Commission bears the burden of establishing a reasonable approximation of the defendant's actual profits.  *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004).  The "burden" then "shifts to the defendant to

demonstrate that the amount of disgorgement is not a reasonable approximation." *Id.* "District courts must 'deduct legitimate expenses before ordering disgorgement' so that the disgorgement award does not 'exceed the gains "made upon any business or investment, when both the receipts and payments are taken into the account."'" *SEC v. Navellier & Assocs.*, 108 F.4th 19, 42 (1st Cir. 2024) (quoting *Liu*, 591 U.S. at 91-92).  But "[e]xactitude is not a requirement," *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) (per curiam), and so long as the measure of disgorgement is reasonable, any risk of uncertainty "'should fall on the wrongdoer whose illegal conduct created that uncertainty,'" *Navellier*, 108 F.4th at 42 (quoting *Happ*, 392 F.3d at 31).

The district court acted well within its discretion in accepting the Commission's reasonable approximations of the appellants' ill-gotten gains, which were based on Commission forensic accountant Ryan Murphy's meticulous review of the Q records.  As described above, *supra* at 22, 40, Murphy testified that he spent "[s]everal hundred hours" reviewing "thousands of pages of records as well as tens of thousands of records of data."  A3131.  Murphy identified the accounts associated with each appellant and calculated "the proceeds of the Sharp Groups' securities

trading that was deposited into their personal accounts in the Q system during the 10 years before the filing of the Complaint in this case." A1903-04 (stating that he examined records dated from August 5, 2011, to mid-2019). Murphy further explained how he identified only those amounts in the appellants' accounts that flowed from "specific deal proceeds" or "from fees or commissions charged by the Sharp Group for its services," thus excluding funding sources other than stock sales from the fourteen issuers. A1904; *contra* Friesen Br. 39. Courts routinely accept such expert testimony and calculations as the basis for disgorgement awards. *See, e.g.*, *SEC v. O'Brien*, 2024 WL 2813722, at *24 (2d Cir. June 3, 2024) (upholding disgorgement award where the SEC "reasonably approximated [defendant's] net profits through expert analysis"); *SEC v. Fujinaga*, 696 F. App'x 203, 206 (9th Cir. 2017) (unpublished) (same); *see also SEC v. Silverman*, 328 F. App'x 601, 604 (11th Cir. 2009) (per curiam) (unpublished) (upholding disgorgement award "based upon the affidavit of an accountant who spent more than 600 hours on the case" and noting that any uncertainty was "due to Defendants' poor record-keeping").

## 2. Appellants failed to rebut the Commission's reasonable approximation.

Appellants offer no alternative to Murphy's disgorgement calculations. Instead, they argue that the Q records are inadmissible hearsay, that they provide an insufficient basis for disgorgement without independent corroboration from external bank records, and that Murphy failed to consider legitimate expenses. Gasarch also argues that the amount she received in her personal Q account was not causally connected to her violations. All of appellants' arguments are meritless.

### a. The district court reasonably relied on the Q system records in determining appellants' ill-gotten gains.

As discussed above, *supra* Section I, the Q system records were properly authenticated and admitted by the court under at least two exceptions to the prohibition against hearsay. Thus, they were properly considered by both judge and jury. Moreover, the district court had discretion, at the remedies stage, to make and rely on factual findings in assessing remedies "so long as [those] findings d[id] not conflict with the jury's findings as to liability." *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 782 (5th Cir. 2017) (citing cases); *see also In re PHC, Inc. S'holder Litig.*, 894 F.3d 419, 437 (1st Cir. 2018) (district court permissibly ordered

66

disgorgement, even though the jury had found no damages, where the "disgorgement order did not contradict the jury's finding" of no loss and, "[r]ather, the court accepted that finding and relied on the jury's other findings … to form an acceptable predicate for equitable relief"). Beyond being legally admissible, the court found, based on extensive trial testimony, that the data contained in Q was "highly accurate," A3873—a finding the appellants fail to dispute with evidence. The court was therefore well within its discretion in relying on the Q records to make factual findings in determining the appropriate disgorgement amount. *Life Partners*, 854 F.3d at 782.; *PHC, Inc.*, 894 F.3d at 437.

Contrary to appellants' assertions (*see, e.g.* VSK Br. 11), the district court was not required to demand independent corroboration, such as external bank records, for each dollar attributed to the appellants in the Q system. The court reasonably found that the Q accounts themselves functioned as bank accounts to provide Sharp's co-conspirators "a way through him to get the proceeds of their money while concealing that they're connected to the funds." A3814. Ample evidence in the record supports that finding. For example, documents showed that appellants withdrew funds from those accounts in cash, *see, e.g.*, A2145-47, and had

other funds wired directly from Q to third parties to pay personal expenses—including mortgages,[6] tuition,[7] vacations,[8] and medical bills.[9] *See generally* A1905-08 (Murphy Decl. ¶¶ 11-16, describing disbursements made from Veldhuis's, Sexton's, and Friesen's Q accounts to pay various bills for their benefit); A1911 (Murphy Decl. ¶ 24, describing Gasarch's withdrawal of funds and payments made from her Q account); A2881-82 (Knox testifying that proceeds from stock sales could be directed out of the Q system to pay "a law firm, … a public company itself, … a media or marketing company for promotion, … a British Columbia-numbered company" or to individuals "such as … a doctor, a school bill, [or] a car dealership").  Indeed, Knox provided Sharp's clients with cash when they traveled through France or Switzerland to move proceeds of the fraud into their hands "without any records."  A2856-57.  These cash payments were

---

[6] *See* A2149-50 (Murphy Decl., Exs. 11 and 12 showing Sexton's requests to Gasarch to make mortgage payments on his property).

[7] A2155 (Murphy Decl., Ex. 17 showing Friesen's request to Gasarch to pay his girlfriend's tuition from his Q account).

[8] A2143 (Murphy Decl., Ex. 7 showing Veldhuis requesting $5,000 Canadian dollar check to Greenstone Ski Vacations).

[9] A2880-82; SA5 (Trial Ex. 285, reflecting payment of an invoice from Peaceful Lion's account to Kelln's doctor).

then recorded in the Q system.  Thus, appellants took steps to avoid creating bank records to corroborate their receipt of proceeds from the fraud and, as a factual matter, it was reasonable for the district court to conclude that each appellant received ill-gotten gains as soon as funds hit their Q account.  *See* A3874.

Appellants hypothesize that the Commission's "painstaking" (Friesen Br. 3) effort to match stock *sale* entries in Q to independent data from brokerages reveals some deficiency in the Q entries reflecting their *proceeds*.  But appellants have failed to identify even a single error in the Q records pertaining to their proceeds, much less rebut the Commission's reasonable approximation with "concrete and credible" evidence of errors, and speculation is insufficient to meet that burden.  *CFTC v. Tayeh*, 848 F. App'x 827, 830 (11th Cir. 2021) (per curiam) (unpublished).  Appellants' failure to come forward with any such evidence is telling given that, as discussed, Sharp's "customers"—i.e., persons like appellants—had some ability to make entries in the Q system with respect to their own accounts. *Supra* at 46.

Moreover, because any risk of uncertainty falls on the wrongdoers, *Navellier*, 108 F.4th at 42*; Happ*, 392 F.3d at 31, the district court was well

69

within its discretion in declining to reduce the disgorgement awards based on appellants' speculation about mistakes in the Q system. *See SEC v. de Maison*, 2021 WL 5936385, at *2 (2d Cir. Dec. 16, 2021). Friesen points to no case law requiring the district court to make deductions solely based on "cryptic and unexplained entries" in Friesen's Q account. Friesen Br. 39-40.

For the same reason, appellants are incorrect (VSK Br. 58) that the district court abused its discretion in declining to require additional proof in response to arguments that there was overlap between the disgorgement figures in this case and amounts that were already paid as restitution by Knox. "District courts must be given wide latitude" to reasonably approximate ill-gotten gains, *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995), and nothing in Knox's testimony rebuts the amount of the district court's disgorgement calculation. The sole evidence appellants rely on in support of this argument is a snippet of trial testimony in which Knox stated that he believed some of the money in his trading platform's possession that he remitted to the government belonged to Luis Carrillo—a different Sharp client. *See* A3033. From this, appellants extrapolate that perhaps some of that money may also have belonged to them. But the district court

70

reasonably declined to reject the figures reflected in the "highly accurate," A3873, Q records on the basis of such speculation.

> b. *The district court limited disgorgement to amounts causally connected to appellants' violations.*

The district court reasonably found that appellants' gains were causally connected to their violations. Appellants' "assertion[s] that a portion of" the funds they received were legitimate "does not demonstrate that those funds did not in fact constitute [their] net profits, especially given that 'any risk of uncertainty should fall on the wrongdoer.'" *de Maison*, 2021 WL 5936385, at \*2 (quoting *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013), *as amended* (Nov. 26, 2013)); *see Navellier*, 108 F.4th at 42.

The terms of Veldhuis and Sexton's consent judgments preclude their contention (VSK Br. 53-58) that the district court was required to find specific evidence proving each element of every claim with respect to each of the stock sales of the fourteen issuers identified by Commission accountant Ryan Murphy. In consenting to liability, these appellants agreed that they would not contest liability for the claims the Commission

filed against them.  A1151; A1535.[10]  Included in the claims they agreed

they would not contest were allegations that Veldhuis, Sexton, and Friesen

defrauded investors by selling stock in fourteen issuers "using Sharp

Group-administered nominee shareholders to disguise their control."

A597-98; A602-03.  And, given the evidence introduced at trial that

Veldhuis and Sexton engaged in a comprehensive and long-running

scheme to defraud investors, the district court acted within its discretion in

counting profits from all fourteen issuers identified by Murphy as ill-gotten

gains.  A1904-06.  Appellants "failed to demonstrate that any of the" stock

sales "were *unconnected to*" their scheme to defraud.  *Navellier*, 108 F.4th at

43 (emphasis added).

　　　With respect to Kelln, the amended complaint alleged that she

"profited handsomely from [her] illicit services to the Sharp Group's

clients" and that "[o]n various dates between 2010 and 2019," she was the

beneficiary of more than $1 million "derived from the Sharp Group's

---

[10] Friesen does not challenge whether the Commission showed that there
was an adequate causal connection between his misconduct and the
proceeds he received.  He has therefore waived any such argument.  *SEC v.
LBRY, Inc.*, 26 F.4th 96, 100 n.6 (1st Cir. 2022) (arguments not raised in an
opening brief are waived on appeal).

conduct." A547. The Commission presented evidence through Murphy that Kelln received commission payments and Christmas bonuses that were derived from fees the Sharp Group obtained for services performed for clients. A1908-10. The Commission presented substantial evidence—including Kelln's own communications, A4271, Trial Ex. 81—that Kelln received those payments because she bundled and transferred stocks for the specific purpose of evading the securities laws and defrauding investors. *See also* A2830-31; A2845-46; A951-52. In response, Kelln offers no evidence that any portion of those commissions or bonuses were linked to legitimate conduct.

Gasarch likewise argues (Gasarch Br. 26-27) that her disgorgement figure improperly includes payments she received from Sharp for legitimate services. But the district court correctly determined that, in finding here liable for multiple violations of the securities laws, the jury "necessarily rejected," A3859, Gasarch's argument that she was an unwitting secretary performing legitimate services. On the contrary, she worked at the "hub" of the conspiracy, A3143, where she both committed her own violations and aided and abetted Sharp's co-conspirators in committing violations of the securities laws, A1554. Gasarch has not

presented any evidence showing that any sums she received into her Q account were for legitimate services and has therefore failed to meet her burden to rebut the Commission's reasonable approximation.

> c. *Appellants' objection to the joint-and-several liability designations fails.*

Finally, the appellants' focus on the district court's designation of the disgorgement as joint-and-several is a red herring. Contrary to appellants' arguments (Friesen Br. 41-43; Gasarch Br. 29-30; VSK Br. 25-26), the award does not hold any appellant liable for "profits that have accrued to another." *See BioPoint, Inc. v. Dickhaut*, 110 F.4th 337, 351 (1st Cir. 2024). In *BioPoint*, the plaintiff sought to hold Defendant Dickhaut liable for ill-gotten profits that the plaintiff admitted had "accrued to [Dickhaut's employer] and not to Dickhaut." *Id*. at 352. This case is distinguishable from *BioPoint* because the court ordered the appellants to disgorge only the amount he or she personally received as reflected in the Q accounting system.

Indeed, the joint-and-several designations were unnecessary given this Court's clear pronouncements that any risk of uncertainty in calculating the disgorgement amount "'should fall on the wrongdoer

whose illegal conduct created that uncertainty.'"  *Navellier*, 108 F.4th at 42

(quoting *Happ*, 392 F.3d at 31).[11]  Although the Commission does not

believe the designation prejudices the appellants in any way, it would not

object to striking that designation and holding each appellant individually

liable for his or her disgorgement award.

   In any event, *Navellier* permits disgorgement for partners "engaged in

concerted wrongdoing."  *Navellier*, 108 F.4th at 43; *see* VSK Br. 19

(conceding that joint-and-several liability is permissible in those

circumstances); *see also SEC v. Collector's Coffee, Inc.*, 2025 WL 752221, at *13

(S.D.N.Y. Mar. 10, 2025), *appeal docketed* No. 25-924 (2d Cir. Apr. 17, 2025)

(ordering joint and several disgorgement "where apportionment of the

disgorgement award is difficult or practically impossible because the

defendants engaged in complex, heavily disguised transactions in an effort

---

[11] The Commission did not seek joint-and-several disgorgement awards in part because, in the Commission's view, appellants' use of transactions through nominee entities and the Q system to "obscure[]" the flow of funds in their scheme means the risk of any uncertainty in the Q records should be resolved against them.  *Tayeh*, 848 F. App'x at 830.  Even after the court entered judgment, the Commission made plain that it would seek recovery "of funds only up to the maximum amount of disgorgement liability as to each defendant as stated in the judgments and does not seek to hold any of the defendants liable beyond that amount."  A3936.

to conceal their fraud").  And to the extent the court finds any uncertainty

in the evidence regarding the amount attributable to each appellant, it is

due to their fraud and obfuscation in engaging in a long-running

conspiracy to defraud investors through more than a dozen stock price

manipulation schemes.  In these circumstances, the district court did not

abuse its discretion in imposing a limited form of joint-and-several liability

holding each of them liable up to the amount they personally received

according to the Q accounts.  A3864.

### 3.  *Navellier* forecloses the argument that disgorgement requires proof that investors suffered pecuniary harm.

This Court's precedent forecloses appellants' argument (VSK Br. 37-

38), that a district court must identify victims before ordering

disgorgement.  *Navellier*, 108 F.4th at 41.  In *Navellier*, this Court explained

that "[d]isgorgement is a 'profit-based measure of unjust enrichment'

which reflects the foundational principle that 'it would be inequitable that

[a wrongdoer] should make a profit out of [their] own wrong.'"  *Id.* (second

and third alterations in original) (quoting *Liu*, 591 U.S. at 79-80).  Thus, the

Court held that disgorgement is "'tethered to a *wrongdoer*'s net unlawful

profits'" and does not "require investors to suffer pecuniary harm as a

precondition to a disgorgement award." *Id.* at 41 & n.14 (quoting *Liu*, 591 U.S. at 80).[12]

The district court's measure of disgorgement was consistent with this approach. The court repeatedly made it clear that it will order any disgorgement paid by appellants to be distributed to investors—not disbursed to Treasury. *See* A3792 (stating that the court would order disgorgement only if it was satisfied the money was going back to "identified victims"). Noting the Commission's assurance that it would submit a plan "to return the disgorged funds to the harmed investors," the Court determined that requiring identification of victims at the remedies stage would be "premature." A3878. That approach is well within the district court's discretion. *See Navellier*, 108 F.4th at 41 n.14 (disgorgement appropriate where the SEC intended to distribute collected funds to

---

[12] Regardless, as the district court aptly stated, the notion that appellants' fraud did not cause "actual loss" "is inconceivable." A3856. In seeking an asset freeze and TRO, the Commission demonstrated that many account holders in the United States had purchased securities sold by Veldhuis, Sexton, and Friesen during their various schemes. A308. Likewise, at trial, the Commission introduced evidence showing a steep drop in the price of one issuer's shares following the group's with respect to that stock. A4634 (Trial Ex. 310); A3171-73 (testimony of Ryan Murphy regarding Trial Ex. 310).

victims); *SEC v. Blackburn*, 15 F.4th 676, 682 (5th Cir. 2021) (finding *Liu*'s

"awarded for victims" language satisfied where "money the defendants

return will go to the harmed investors" (internal quotation marks

omitted)).[13]

Friesen's argument (Friesen Br. 46) that the Commission failed to

adhere to the district court's direction to submit a detailed plan is incorrect.

After the district court's entry of judgment, the Commission, as directed,

filed a motion in support of a distribution for the benefit of harmed

investors and moved for the establishment of a Fair Fund. A4068. In

support of that motion, the Commission described a proposed

"distribution framework" involving a three-part approach to compensate

investors harmed by the appellants' violations of the federal securities

laws. A4074-75. The Commission explained the process by which it

proposed to select and appoint a distribution agent, A4080-81, and work

---

[13] The 2021 amendments omit Section 21(d)(5)'s requirement that relief be "for the benefit of investors"—the phrase that *Liu* interpreted to mean that, where feasible, proceeds recovered through disgorgement generally must be "disbursed to known victims" rather than deposited in the Treasury. 591 U.S. at 87. That issue is not relevant here because the Commission is not seeking to disburse funds to the Treasury.

with that agent to (1) identify the class of investors who are eligible, A4081, (2) examine the "Blue Sheet" trading records for each security to "create a baseline list of investors who purchased shares during each security's respective inflation period," A4081-82, (3) administer a notice-and-claims process to identify additional investors, A4081-82, (4) calculate the appropriate *pro rata* payment to be made to each eligible claimant, A4082-83, and (5) seek the district court's approval to disburse the Fair Fund accordingly, A4083-84.

The Commission explained that further analysis, including identification of investors, will be conducted once funds are received, because a "feasibility analysis is most effective when the collections phase of the case has been completed and most, if not all, of the funds ordered have been paid." A4078. Without that information "it is difficult to predict whether the funds will be sufficient to provide a meaningful recovery to harmed investors." A4078. Contrary to counsel's insinuation (Friesen Br. 46), Friesen and the other appellants had the opportunity to respond to the Commission's proposed distribution framework. A4192 (Friesen's Opp. To Mot. For Fair Fund, filed Sept. 16, 2024). Thus, the Commission has provided all the information requested by the district court and appellants

have not shown that any additional information is necessary to support the disgorgement awards.

Kelln's objection (VSK Br. 38) to the district court's statement that any disgorgement she pays *may* be added to a fund to compensate victims of Sharp's scheme who have been identified in other cases is likewise premature. The court properly ordered Kelln to disgorge her ill-gotten *gains* and will address how best to use those funds to compensate Kelln's many victims once the money is collected.

### 4. None of the disgorgement amounts were time-barred.

The district court correctly held that the Commission's disgorgement claims are timely under the limitations periods set forth in Exchange Act Section 21(d)(8), 15 U.S.C. 78u(d)(8). Section 21(d)(8) provides a 10-year limitations period when the Commission seeks disgorgement for a claim that "involves conduct that violates" Exchange Act Section 10(b), Securities Act Section 17(a), or any other provision of the securities laws for which scienter must be established. *Id.* 78u(d)(8)(A)(ii). Disgorgement claims arising from non-scienter-based provisions are subject to a five-year limitations period. *Id.* 78u(d)(8)(A)(i). In both types of cases, the limitations period runs from the "latest date of the violation that gives rise

80

to the action or proceeding in which the Commission seeks the claim." *Id.*

78u(d)(8)(A)(i), (ii).  For the purposes of calculating any limitations period

under these provisions, "any time in which the person against which the

action or claim, as applicable, is brought is outside of the United States

shall not count towards the accrual of that period." *Id.* 78u(d)(8)(C).

Appellants correctly do not dispute that, if the ten-year limitations

period applies, the disgorgement claims against them are timely.  The

Commission filed its complaint on August 5, 2021, within 10 years of the

latest date of each violation giving rise to the Commission's disgorgement

claims.  *Id.* 78u(d)(8)(A)-(B); *see SEC v. Almagarby*, 92 F.4th 1306, 1320 (11th

Cir. 2024) (applying that provision); *SEC v. Xia*, 2022 WL 17539124, at *16-

17 (E.D.N.Y. Dec. 8, 2022) (same), *appeal filed* No. 22-3137 (2d Cir. Dec. 14,

2022).

The district court determined that each appellant's disgorgement

liability is subject to the 10-year limitations period under Section 21(d)(8).

Veldhuis, Sexton, Kelln, and Friesen have been found liable for primary

violations of Exchange Act Section 10(b) and Securities Act Section 17(a), which are subject to the 10-year period. 15 U.S.C. 78u(d)(8)(A)(ii).[14]

Gasarch is also subject to the ten-year statute of limitations for disgorgement because the court found that she received ill-gotten gains for aiding and abetting violations "involv[ing] conduct that violates" provisions for which scienter must be established. *Id.* In imposing remedies, the court made the specific finding—consistent with the jury's verdict—that Gasarch "aided and abetted the Sharp scheme clients in their violation of both the Securities Act and the Exchange Act." A3859-60. The relevant Exchange Act provision listed in the verdict that Gasarch aided and abetted is Section 10(b).

Gasarch is therefore "deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided," 15 U.S.C. 78t(e), and the ten-year statute of limitations applies. Although Gasarch notes (Gasarch Br. 27), that the verdict form combined the claims against her for aiding and abetting scienter and non-scienter violations,

---

[14] Therefore, this Court need not reach Veldhuis, Sexton, and Kelln's tolling argument. VSK Br. 35-37.

Gasarch did not object, nor did she request a special verdict.  *See* A3310-

11.[15]

The appellants are incorrect in arguing for the application of the five-

year statute of limitations in 28 U.S.C. 2462.  That provision applies only

"[e]xcept as otherwise provided by Act of Congress."  On January 1, 2021,

Congress enacted the National Defense Authorization Act for Fiscal Year

2021, Pub. L. No. 116-283, 134 Stat. 3388 ("NDAA"), which includes the

limitations periods for disgorgement codified at section 78u(d)(8).  Indeed,

this Court has recognized that the NDAA "changed" the applicable statute

of limitations for disgorgement.  *SEC v. Morrone*, 997 F.3d 52, 55 n.3 (1st Cir.

2021); *see also, e.g.*, *SEC v. Fowler*, 6 F.4th 255, 260 n.5 (2d Cir. 2021) ("A

recent amendment to the Exchange Act took the SEC's claims for

disgorgement … outside of the ambit of § 2462 and retroactively imposed"

new periods).

---

[15] This Court does not need to address whether, as the Commission argued
below, and the district court held, aiding and abetting violations
necessarily involve scienter for the purpose of the disgorgement statute of
limitations.  The Court also need not address section 15 U.S.C.
78u(d)(8)(C)'s provision that "any time" that a defendant was "outside of
the United States" does not count toward the accrual of the limitations
period.

The NDAA applies to "any action or proceeding that is pending on, or commenced on or after" January 1, 2021. *Id.* 6501(b), 134 Stat. at 4626. Every court to have considered the question has rejected appellants' contention that Section 21(d)(8) is impermissibly retroactive. *SEC v. Ahmed*, 72 F.4th 379, 400 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2658 (2024) (mem.); *SEC v. Hallam*, 42 F.4th 316, 335 (5th Cir. 2022). As the Second Circuit has explained, the NDAA provision must be read as retroactive because the Supreme Court has "interpreted nearly identical language as a retroactivity command." *Ahmed*, 72 F.4th at 400, (discussing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 255-56 & n.8 (1994)); *see Martin v. Hadix*, 527 U.S. 343, 354 (1999) (describing the language in *Landgraf* as "unambiguously address[ing] the temporal reach of the statute").

There is no merit to the appellants' contention (VSK Br. 35) that application of the NDAA would improperly revive stale claims. Section 78u(d)(8) is not a statute of limitations for a claim and its application in this case does not revive any "time-barred" cause of action or increase any party's liability. *Contra* VSK Br. 34-35. Instead, it defines the scope of the disgorgement remedy in actions, like this one, that are "pending on, or

commenced on or after," the date of enactment.[16]  Each of appellants'

relevant violations occurred within ten years before the commencement of

this action, and thus disgorgement is appropriate of all unjust enrichment

they received as a result of those violations.  But, in any event, all

appellants violated the securities laws within five years of the

commencement of this action.  *See infra* Section III.B (summarizing

evidence).  Thus, because the appellants' fraudulent scheme was ongoing

well into the five-year statute of limitations period that applied before the

NDAA's enactment, the Commission's claims against the appellants were

never time-barred and this Court need not consider whether the NDAA's

retroactivity provision permits reviving disgorgement based on stale

claims.

---

[16] Prior to *Kokesh v. SEC*, 581 U.S. 455 (2017), which changed the status quo
by applying the 5-year statute of limitations in 28 U.S.C. 2462 to
disgorgement, under this Court's precedent there was *no* statute of
limitations for disgorgement.  *Tambone*, 550 F.3d at 148 (Section 2462
applies "only to penalties sought by the SEC, not its request for …
disgorgement of ill-gotten gains").  Thus, all of appellants' violations prior
to August 2016 occurred at a time when they could not have had any
expectations that their disgorgement liability would be time limited.

**B. The civil penalties awards are not time-barred.**

The district court correctly determined that the applicable limitations period for civil penalties is five years, thus encompassing all violations that occurred after August 5, 2016.  A470; 28 U.S.C. 2462.  Appellants' sole argument is that the penalties are time-barred because, although they received payments within the relevant period, they committed no violations within that time.[17]  That argument is belied by the record.

Extensive record evidence shows that appellants' long-running scheme to violate various securities laws continued well after August 2016 and that each appellant contributed to the scheme within that time.  For example, the district court pointed to "voluminous evidence from trial demonstrating that Sexton, Veldhuis, and Friesen acted in concert" and "illegally traded in the stock of seven issuers between August 2016 and August 2021."  A3855-56; *see, e.g.*, A2849, A2858-61 (Knox testifying that he worked with Friesen, Veldhuis, and Sexton through his arrest in fall 2018).  Among other evidence, the Commission introduced a photograph of

---

[17] Appellants raise no other challenge to the district court's imposition of civil penalties and thus have waived any argument that there is any error in the amount of the penalties assessed.  *LBRY, Inc.*, 26 F.4th at 100 n.6.

Friesen and Knox dining together in January 2018, and heard Knox testify

that they talked about "business" and that Friesen "collected some cash"

that he could then spend "without any records."  A2856-57.  Emails sent by

Friesen in 2017 and 2018 further reflected Friesen's heavy involvement in

promotional campaigns for stocks that were the subject of the price

manipulation schemes.  *See* A4391 (Trial Ex. 273); A4387 (Trial Ex. 261).

Veldhuis and Sexton consented to liability for the conduct described

in the amended complaint, which alleged that they conducted unregistered

stock sales while surreptitiously funding a promotional campaign for those

same stocks through the end of 2016.  A566-67; A569 ("In conjunction with

their promotional activities, the Veldhuis Control Group sold shares of

Stevia First/Vitality through Sharp-administered nominees between

December 1 and 22, 2016 for proceeds of more than $1.7 million."); A572-

73.  Testimony at trial bore that out.  See A2523 (Dhillon testifying that

Sexton participated in the sale of Vitality stock "in 2017 and maybe even

'18"); A2896-99 (Knox testifying that he traded NewGen stock on behalf of

Friesen, Sexton, and Veldhuis in 2017).

Testimony at trial also established that Kelln was involved in some of

those dealings as late as 2018.  A2845 (Knox testifying that Kelln worked

87

with Sharp for the entire time he knew Sharp until 2018). And Kelln

consented to liability for the conduct described in the amended complaint,

A1125, which explained that she helped recruit attorneys for the Sharp

Group in 2016 and 2018 to create fraudulent opinion letters to legitimize

the unregistered sale of restricted Stevia First/Vitality stock. A571. In

connection with its motion for summary judgment, the Commission

submitted evidence of more than 300 communications between Kelln and

one such attorney between August 18, 2016, and April 3, 2019, in which she

misrepresented the controller of shares held by Sharp's nominee entities.

SA2-3. The amended complaint also alleged that in 2017, Kelln directed the

redistribution of funds among nominee entities to help clients contravene

the five percent disclosure required of Section 13(d) of the Exchange Act.

A572.

Finally, ample evidence at trial showed that Gasarch continued to

facilitate Sharp's illegal scheme after August 2016, including creating

fictitious loan agreements for Sharp's enterprise as late as 2018. A2897;

A4518-22 (Trial Ex. 287). Moreover, Gasarch's argument that the district

court was required to identify which transactions "are violations on Mrs.

Gasarch's part" (Gasarch Br. 31) misunderstands the premise of her

liability.  Gasarch worked at the "hub" of the conspiracy, A3143, and as a

co-conspirator she facilitated the overall illegal scheme, not necessarily

particular transactions.  *See* A3266-67.

Thus, appellants' violations—not just their receipt of proceeds—

occurred within the relevant period, and the statute of limitations does not

bar the district court's imposition of any of the civil penalties awarded.

## C. The district court acted within its discretion in enjoining Sexton from future violations of the securities laws.

Sexton challenges (VSK Br. 61-65) the portions of the district court's

judgment enjoining him from future violations of two sets of the securities

law provisions that he admitted to have violated: (1) the antifraud

provisions, *see* 15 U.S.C. 77q(a); 15 U.S.C. 78j(b); 17 C.F.R. 240.10b-5; A3887-

89; and (2) the beneficial ownership disclosure requirements, *see* 15 U.S.C.

78m(d); 17 C.F.R. 240.13d-1(a); A3890-91.[18]  Sexton does not contest two

additional injunctions permanently restraining him from participating in

any offering of penny stock and participating in the issuance, purchase,

offer, or sale of any security listed on a national exchange (other than for

---

[18] The Section 13(d) injunction contains a typographical error in its citation
to the U.S. code, because it cites 15 U.S.C. 78*j*, instead of 15 U.S.C. 78*m*.
A3890.  Sexton does not challenge the injunction on that basis.

his own account).  A1782.  Sexton's arguments with respect to the

injunctive relief he challenges lack merit.

The Commission has been authorized since its inception to file

actions to enjoin violations of the federal securities laws.  *See, e.g.*, Section

20(b) of the Securities Act, 15 U.S.C. 77t(b); Section 21(d)(1) of the Exchange

Act, 15 U.S.C. 78u(d)(1).  A standard injunction issued under these

provisions restrains a defendant from violating particular securities laws.

*See, e.g.*, *Lemelson*, 57 F.4th at 30 (affirming injunction restraining defendant

"from violating Section 10(b) and Rule 10b-5").  Such injunctions were long

the "principal" statutory remedies available in Commission actions and

have been since the 1930s, serving the "remedial function" of protecting

investors from a person whom a court finds reasonably likely to engage in

future misconduct.  H.R. Rep. No. 98-355, at *7 (1984); *see also Kokesh*, 581

U.S. at 458 ("Initially, the only statutory remedy available to the SEC in an

enforcement action was an injunction barring future violations of securities

laws.").

Consistent with these principles, this Court has explained that a

district court may enjoin a defendant from violating the securities laws

"where there is, 'at a minimum, proof that a person is engaged in or is

90

about to engage in a substantive violation of either one of the Acts or of the regulations promulgated thereunder'" and there is "a reasonable likelihood of recidivism." *SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003) (quoting *Aaron*, 446 U.S. at 700–01). This Court assesses the risk of recidivism by examining "inter alia, (1) the 'nature of the violation, including its egregiousness and its isolated or repeated nature,' (2) 'whether the defendants will, owing to their occupation, be in a position to violate again,' and (3) 'whether the defendants have recognized the wrongfulness of their conduct.'" *Lemelson*, 57 F.4th at 30 (quoting *Sargent*, 329 F.3d at 39). The district court reasonably enjoined Sexton from future violations of the securities laws after finding that the Commission had met its burden of demonstrating a likelihood that Sexton would engage in future misconduct, including by showing that his previous violations were egregious, he failed to recognize the wrongfulness of his conduct, and he was in a position to commit such violations again. A3833-39.

Sexton does not object to any aspect of the court's thorough discussion of the *Lemelson* factors. Instead, he argues (VSK Br. 63) that the challenged injunctions are invalid and insufficiently specific under Federal Rule of Civil Procedure 65(d) because they track the language of the

statutory provisions that Sexton admittedly violated.  But given Sexton's background and proclivity for further misconduct, he is incorrect to argue that the injunctions are per se impermissible simply because they track the statutory language.

"A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past."  *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 435 (1941).  In *McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949), the Supreme Court considered a decree that "directed respondents to obey the provisions of the [Fair Labor Standards Act] dealing with minimum wages, overtime, and the keeping of records."  *Id.* at 191-92.  The Court stated:

> By its terms [the decree] enjoined any practices which were violations of those statutory provisions. Decrees of that generality are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown.  Respondent's record of continuing and persistent violations of the Act would indicate that that kind of a decree was wholly warranted in this case.

*Id.* at 192 (citations omitted).

Citing *Express Publishing* and *McComb*, this Court in *Hillsborough Investmemt Corp. v. SEC*, 276 F.2d 665, 667-68 (1st Cir. 1960), affirmed an injunction against "sales of securities without registration." The Court reasoned that the "district court was correct in broadening the injunction to prevent an evasion of the preliminary injunction and to insure compliance with the provisions of the Act." *Id.* at 668. More recently, this Court quoted with approval the Second Circuit's holding that "[t]here can be no abuse of discretion in framing an injunction in terms of the specific statutory provision which the court concludes has been violated." *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972), quoted in *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir. 2000).

Even in *SEC v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012) (cited at VSK Br. 63-64), the Eleventh Circuit recognized that "a broad, but properly drafted injunction, which largely uses the statutory or regulatory language," is permissible "so long as it clearly lets the defendant know what he is ordered to do or not do." In the circumstances of this case, including Sexton's background and proclivity for further misconduct, the district court was well within its discretion in imposing broad injunctions against future violations. *See SEC v. Keener*, 102 F.4th 1328, 1336 (11th Cir.

2024) (citing *Goble* and explaining that "a broader injunction might be 'necessary to prevent further violations where a proclivity for unlawful conduct has been shown'" (quoting *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1362 (11th Cir. 2019))).

Sexton's concerns about the use of contempt proceedings (VSK Br. 62-63), do not warrant a contrary result.  In any proceeding to hold Sexton in contempt, the Commission will be required to prove by clear and convincing evidence that (1) Sexton had notice of the injunctions, (2) the injunctions were clear and unambiguous, (3) Sexton had the ability to comply with the injunctions, and (4) Sexton violated the injunctions. *Hawkins v. Dep't of Health & Hum. Servs.*, 665 F.3d 25, 31 (1st Cir. 2012). Courts hold the Commission to that burden and recognize that alleged contemnors have due process rights.  *See, e.g.*, *SEC v. Medoff*, 759 F. Supp. 3d 165, 171 (D. Mass. 2024); *SEC v. Universal Express, Inc.*, 2007 WL 2469452, at *3 (S.D.N.Y. Aug. 31, 2007); *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 28 (D.D.C. 2000), *aff'd*, 75 F. App'x 3 (D.C. Cir. 2003) (unpublished).

Moreover, if Sexton has "doubt about the lawfulness of a proposed course of action, [he] can ask the district court for guidance about whether [such conduct] will violate the injunction."  *Infusaid Corp. v. Intermedics*

*Infusaid, Inc.*, 756 F.2d 1, 2 (1st Cir. 1985). In light of these guardrails, and given the district court's thorough findings about the need for injunctive relief in the circumstances of this case, the court was within its discretion in issuing injunctive relief broad enough to prevent evasion and secure compliance with the securities laws. *See Hillsborough*, 276 F.2d at 668.

## CONCLUSION

The judgments should be AFFIRMED.

Dated: May 19, 2025

Respectfully submitted,

JEFFREY B. FINNELL
*Acting General Counsel*

TRACEY A. HARDIN
*Solicitor*

DANIEL STAROSELSKY
*Assistant General Counsel*

<u>s/ *Kerry J. Dingle*</u>
KERRY J. DINGLE
*Senior Appellate Counsel*
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-6953

95

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) and this Court's March 7, 2025, Order granting the Commission leave to file an oversized, consolidated answering brief because it contains 18,973 words, excluding the items listed in Federal Rule of Appellate Procedure 32(a)(f).

I also certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-Point Book Antiqua.

Dated:  May 19, 2025                    <u>s/ Kerry J. Dingle</u>

**CERTIFICATE OF SERVICE**

I certify that on May 19, 2025, I electronically filed the foregoing brief by using the appellate CM/ECF system. I further certify that the parties in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


/s/ Kerry J. Dingle