# United States Court of Appeals

*for the*

# First Circuit

Case Nos. 24-1770,
24-1771, 24-1772,
24-1773, 24-1774

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

ZHIYING YVONNE GASARCH,

*Defendant-Appellant,*

FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS;
PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON IN CASE NO. 1:21-CV-11276-WGY,
HONORABLE WILLIAM G. YOUNG, U.S. DISTRICT JUDGE

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS MIKE K. VELDHUIS, PAUL SEXTON AND COURTNEY KELLN

STEPHEN G. TOPETZES
NEIL T. SMITH
ROBERT S. SILVERBLATT
K&L GATES LLP
*Counsel for Defendant-Appellant*
  *Paul Sexton*
1601 K Street, NW
Washington, DC 20006
(202) 778-9000

MICHAEL TREMONTE
SHER TREMONTE
*Counsel for Defendant-Appellant*
  *Mike K. Veldhuis*
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*(For Continuation of Appearances See Inside Cover)*

CP COUNSEL PRESS    (800) 4-APPEAL • (382927)

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

MIKE K. VELDHUIS,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

---

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

PAUL SEXTON,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

---

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

COURTNEY KELLN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
MIKE K. VELDHUIS; PAUL SEXTON; JACKSON T. FRIESEN;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

---

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

v.

JACKSON T. FRIESEN,

*Defendant-Appellant,*

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP;
COURTNEY KELLN; MIKE K. VELDHUIS; PAUL SEXTON;
WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

*Defendants.*

FRANK SCADUTO
WILEY REIN LLP
*Counsel for Defendant-Appellant*
  *Courtney Kelln*
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ..............................................................................1

ARGUMENT ......................................................................................4

    I.     The SEC's Concession Requires a Remand on the Disgorgement
           Award .................................................................................4

    II.    *Navellier* Does Not Change the Requirement for Pecuniary Harm ..........9

    III.   The Q System Records Are Not a Reasonable Approximation of
           Appellants' Purported Ill-Gotten Gains ....................................11

    IV.   The Q System Proceeds Data Is Inadmissible Hearsay ..........................16

    V.    The District Court Failed to Assess Whether Only Ill-Gotten
           Gains Were Included in Its Disgorgement Award ..................17

    VI.   The NDAA's Limitations Period Does Not Apply to This Action ..........20

    VII.  The District Court's Obey-The-Law Injunctions Were
           Impermissibly Vague and Ran Afoul of Fed. R. Civ. P. 65....................23

CONCLUSION ..................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alfaro De Quevedo v. De Jesus Schuck,*
556 F.2d 591 (1st Cir. 1977)..................................................................13

*BioPoint, Inc. v. Dickhaut,*
110 F.4th 337 (1st Cir. 2024)...............................................4, 5, 6, 7, 8

*Goya Foods, Inc. v. Wallack Mgmt. Co.,*
290 F.3d 63 (1st Cir. 2002)..................................................................24

*Hughes Aircraft Co. v. United States ex rel. Schumer,*
520 U.S. 939 (1997)..............................................................................23

*Kansas Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.,*
61 F.3d 608 (8th Cir. 1995) ................................................................22

*Lattab v. Ashcroft,*
384 F.3d 8 (1st Cir. 2004).....................................................................23

*Lieberman v. Cambridge Partners, L.L.C.,*
432 F.3d 482 (3d Cir. 2005) ...........................................................21, 22

*Liu v. SEC,*
591 U.S. 71 (2020)..........................................................1, 3, 8, 17

*Miller v. United States,*
77 F.4th 1 (1st Cir. 2023).....................................................................21

*SEC v. Collector's Coffee, Inc.,*
No. 19 CIV. 4355 (VM), 2025 WL 752221 (S.D.N.Y. Mar. 10, 2025)...........7, 8

*SEC v. Commonwealth Equity Servs., LLC,*
133 F.4th 152 (1st Cir. 2025)...................................................11, 12

*SEC v. Engler,*
No. 120CV1625DGPK, 2022 WL 4596745 (E.D.N.Y. Sept. 30, 2022)............18

*SEC v. Fujinaga,*
696 F. App'x 203 (9th Cir. 2017) ......................................................14

*SEC v. Fujinaga,*
No. 2:13-CV-1658 JCM (CWH), 2015 U.S. Dist. LEXIS 98987
(D. Nev. Jul. 29, 2015)........................................................................14

*SEC v. Goble*,
   682 F.3d 934 (11th Cir. 2012) ...................................................23, 24

*SEC v. Govil*,
   86 F.4th 89 (2d Cir. 2023) .............................................................9, 10

*SEC v. Keener*,
   102 F.4th 1328 (11th Cir. 2024) .........................................................24

*SEC v. McLellan*,
   737 F. Supp. 3d 95 (D. Mass. 2024) ...................................................24

*SEC v. Morrone*,
   997 F.3d 52 (1st Cir. 2021) ................................................................21

*SEC v. Mortenson*,
   No. CV-04-2276 SJF WDW, 2013 WL 991334
   (E.D.N.Y. Mar. 11, 2013) ...................................................................19

*SEC v. Navellier & Assocs., Inc.*,
   108 F.4th 19 (1st Cir. 2024).........................................2, 9, 10, 12, 20

*SEC v. O'Brien*,
   No. 23-1071, 2024 U.S. App. LEXIS 13225 (2d Cir. Jun. 3, 2024) ...........14, 15

*SEC v. Putnam*,
   No. 2:20-cv-00301-DBB-DAO, 2024 U.S. Dist. LEXIS 163296
   (D. Utah Sept. 10, 2024) ....................................................................15

*SEC v. Ripple Labs, Inc.*,
   No. 20 CIV. 10832 (AT), 2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024)..............9

*SEC v. Rooney*,
   No. 11 C 8264, 2014 WL 3500301 (N.D. Ill. Jul. 14, 2014)..............................17

*SEC v. Stack*,
   No. 23-50327, 2024 WL 4199017 (5th Cir. Sept. 16, 2024)....................... 5, 8-9

*SEC v. Uboh*,
   No. 21-CV-02049(KAM)(CLP), 2024 WL 2832811
   (E.D.N.Y. Jun. 4, 2024) ......................................................................17

*United States v. Ciresi*,
   697 F.3d 19 (1st Cir. 2012)..................................................................17

*United States v. Jackson*,
   636 F.3d 687 (5th Cir. 2011) ..............................................................16

iii

*Weingarten v. United States*,
   865 F.3d 48 (2d Cir. 2017) ..................................................................21

**Statutes & Other Authorities:**

17 C.F.R. § 240.13d-101 ....................................................................24

Fed. R. Civ. P. 65 ....................................................................4, 23, 24

National Defense Authorization Act for Fiscal Year 2021 ..............3, 20, 21, 22, 23

SEC Rule 10b-5 ...................................................................................24

SEC Rule 13d-1 ..................................................................................24

Securities Exchange Act § 5 ..............................................................24

Securities Exchange Act § 8 ..............................................................24

Securities Exchange Act § 10(b)........................................................24

Securities Exchange Act § 13(d)........................................................24

## **INTRODUCTION**

Nothing in the brief from the Securities and Exchange Commission ("Commission" or "SEC") changes the reality that the District Court's disgorgement award is legally erroneous, and that the penalties and injunctions imposed are untimely, unsupported, and impermissibly vague.

The District Court's imposition of joint-and-several disgorgement liability is improper. Tellingly, the SEC does not object to the removal of this designation. SEC Br. 75. Notwithstanding the SEC's lack of objection, however, the designation is legally erroneous and runs afoul of the default rule counseling against imposing joint-and-several disgorgement liability. *See Liu v. SEC*, 591 U.S. 71, 85 (2020) (recognizing the imposition of joint-and-several disgorgement liability is "in considerable tension with equity practices."). Without the joint-and-several liability designation, the District Court's disgorgement award is improper because, as the District Court concedes, the award does not encompass only those amounts that accrued to the Appellants.[1] Indeed, no disgorgement award can pass muster because the District Court has expressly found that there is no basis to determine what amounts, if any, Appellants received.

---

[1] "Appellants" refers collectively to Paul Sexton, Mike Veldhuis, and Courtney Kelln.

Contrary to the SEC's assertion, *SEC v. Navellier & Assocs., Inc.*, 108 F.4th 19 (1st Cir. 2024), does not foreclose the fact that pecuniary harm must be present in order for disgorgement to issue. *Navellier*'s holding that a showing of pecuniary harm is not required for disgorgement is applicable only to the specific facts of that case – namely, the defendant's role as a fiduciary. This case's circumstances are not analogous to *Navellier* and do not change the pecuniary harm mandate.

Additionally, and notwithstanding the joint-and-several liability issue, the District Court erred in relying on the Q system's purported proceeds allocations as a reasonable approximation of Appellants' profits for disgorgement. As is undisputed, the SEC only verified stock transaction entries (as reflected on Q). The SEC did not independently verify the proceeds allocation to each Appellant (as reflected on Q). Moreover, and as acknowledged by the District Court, the Q system records were not a reliable indicator of Appellants' alleged ill-gotten profits. The complete absence of any reliable verification of the alleged Q system allocations forecloses any contention that the SEC has met its initial burden to establish a reasonable approximation of ill-gotten gains. It was therefore improper for the District Court to rely on the Q data for disgorgement purposes and, for the same reasons, the liability "caps" imposed by the District Court must also fail. Separately, the Q evidence is inadmissible hearsay.

The District Court's disgorgement award also failed to sufficiently determine that the amounts included therein were actually ill-gotten. For certain profits included in its award, there is no record evidence to show either (1) that Appellants participated in the underlying transactions and/or (2) that the transactions were unlawful. By including these profits in its award without first determining whether the amounts were ill-gotten, the District Court's disgorgement award cannot be said to include only unjust profits and is thus punitive in clear violation of *Liu*. 591 U.S. at 79. Furthermore, the SEC's argument that Appellants' consent judgments preclude the argument that the District Court is not required to separately assess whether the profits included in its award are ill-gotten is belied by the judgements' plain language.

Moreover, the National Defense Authorization Act for Fiscal Year 2021 (the "NDAA") does not extend the limitations period for this matter to 10 years for any form of relief. The District Court undertook an incomplete analysis when assessing its application. Specifically, the District Court only assessed whether the NDAA applied retroactively. It did not, as it should have, also examine whether the NDAA revived time-barred claims. This analysis was improper, and the District Court was incorrect to assume that, because the NDAA applied retroactivity, it necessarily revived the SEC's stale claims.

Meanwhile, the obey-the-law injunctions entered by the District Court do not meet the demands of Fed. R. Civ. P. 65. Notably, the SEC makes no effort to explain how the injunctions complied with the rule. The injunctions merely regurgitate statutory language and require Mr. Sexton to look "outside the four corners of the injunction" to determine the prohibited conduct. This is not permissible.

## **ARGUMENT**

### I.   The SEC's Concession Requires a Remand on the Disgorgement Award

Tellingly, the SEC's defense of the District Court's joint-and-several liability designation spans just over two pages in its 95-page brief. The SEC never asked for such a designation and now does "not object to striking [the joint-and-several] designation and holding each Appellant individually liable for his or her disgorgement award" – likely because it realizes such a designation is improper. SEC Br. 75. On this basis alone, this Court should remove the designation. However, the removal of the "joint-and-several" designation is not as simple as the SEC would suggest since its removal requires that the award be vacated and remanded. *See BioPoint, Inc. v. Dickhaut*, 110 F.4th 337, 353 (1st Cir. 2024) (remanding where the court found the district court's joint-and-several liability analysis deficient).

In determining whether the disgorgement amounts were proper, the District Court depended on the joint-and-several designation. JA3875–76 ("Third and *most*

*importantly*, in cases involving concerted wrongdoing, joint and several liability may be appropriate, in which case the ill-gotten gains subject to disgorgement need not accrue to each defendant individually.") (emphasis added).  Because the District Court awarded disgorgement on a joint-and-several basis, it did not determine what amounts accrued to Appellants individually.  JA3882 ("In holding Defendants jointly and several liable, the Court noted above that ill-gotten gains need not have accrued to each of the individual offenders … [and] it suffices in the context of disgorgement for ill-gotten gains to have accrued to one or more of the co-conspirators.").  Without this designation, Appellants would be required to disgorge profits that did not accrue to them personally.  This is improper, and remand is required.  *See BioPoint*, 110 F.4th at 353; *see also SEC v. Stack*, No. 23-50327, 2024 WL 4199017, *4 (5th Cir. Sept. 16, 2024) (remanding the case to recalculate disgorgement after joint-and-several liability was deemed improper).

And the remand should be with instructions to reject the SEC's disgorgement request in its entirety.  The District Court has already found that the Commission's evidence "does not show that ill-gotten gains have been obtained and retained by the individual Defendants, much less in the amounts requested by the SEC."  JA3882. This factual determination is outcome determinative, as it completely precludes the issuance of any disgorgement award.  The Commission's suggestion that the joint-and-several designation simply be removed with the judgments remaining the same

runs headfirst into the District Court's express finding that there was no way to justify the judgments without joint-and-several liability, as there was no evidence of receipt of the funds by the individual Appellants. With the joint-and-several liability removed, the disgorgement awards in turn topple. It is no answer, as the SEC suggests in a footnote, that the District Court's judgment limits collection to the amount attributed to each Appellant in the Q system, as the District Court has expressly found that there is no basis to conclude that Appellants received those amounts.

Notwithstanding its passive position regarding the removal of the joint-and-several designation, the SEC makes a feeble attempt to justify disgorgement based on the "concerted wrongdoing" exception. This position is without merit. The SEC failed to advance any argument demonstrating Appellants engaged in concerted wrongdoing – it merely just states that is the case. However, and as explained more fully in Appellants' affirmative brief, the facts of this case demonstrate that the exception does not apply. *See BioPoint*, 110 F.4th at 351 (identifying factors which may render the concerted wrongdoing exception inapplicable). To summarize, Appellants did not commingle finances, and there is no evidence Appellants "receive[d] any profits or otherwise enjoy[ed] the fruits of the scheme." *Id.* at 352. To the contrary, the District Court found no basis to conclude that Appellants received the at-issue funds. The SEC's approach mirrors that of the District Court,

which simply concluded Appellants engaged in concerted wrongdoing without any substantive analysis.  *Cf. id.* at 353 ("It is sufficient, for today, to decide that the district court exceeded its equitable powers when it imposed joint-and-several liability on an individual, non-owner, non-director employee, without concluding whether or how much the employee benefited from the scheme, merely because the employee '*collaborated with* and ranks high' in the entity that profited from the wrongdoing.") (emphasis added).  The facts of this case do not suggest the concerted wrongdoing exception is applicable, and the SEC has failed to demonstrate that it is.  This case falls therefore squarely within the default rule against joint-and-several liability.

*SEC v. Collector's Coffee, Inc.*, No. 19 CIV. 4355 (VM), 2025 WL 752221, at *13 (S.D.N.Y. Mar. 10, 2025), does not support the SEC's position that disgorgement is appropriate.  There, the court imposed joint-and-several liability against an individual and an entity defendant because the individual was (1) "'primarily liable' for the fraud that created the profits"; (2) "'intimately involved' in the perpetration of the fraud"; and (3) "a 'controlling person' of the company."  *Id.*  None of these factors are present in this case, which involves only individual defendants.

While the court in *Collector's Coffee* acknowledged that imposition of joint-and-several liability may be appropriate "where apportionment of the disgorgement award is difficult or practically impossible because the defendants engaged in

7

complex, heavily disguised transactions" to conceal their fraud, the court did not conduct any further inquiry to determine whether defendants' conduct satisfied this standard. *Id.* at *12–13. It is worth noting, however, that the defendants in *Collector's Coffee* furnished the SEC with falsified documents and fake contracts and bank statements during its investigation. *Id.* at *3. Such conduct is not present here. Instead, any ambiguity is the product of the SEC's own deliberate inaction. As discussed at length in Appellants' opening brief, the SEC did not offer a single bank record belonging to Appellants to corroborate whether any of the funds allegedly allocated to Appellants in the Q system were actually received, and it made no meaningful effort to procure such records.

In sum, the Commission's paltry response speaks volumes. Notwithstanding Appellants' extensive discussion of *Liu*'s default rule against joint-and-several liability, the SEC ignores *Liu* entirely in its discussion of this subject. Likewise, the Commission breezes past this Court's binding precedent in *BioPoint*, calling it "distinguishable … because the court ordered the appellants to disgorge only the amount he or she personally received as reflected in the Q accounting system." SEC Br. 74. To reiterate, though, that is not what the District Court did. To the contrary, the District Court expressly disclaimed any conclusion that Appellants actually received those funds. And not even mentioned in the Commission's brief is the Fifth Circuit's ruling, cited by Appellants, in *SEC v. Stack*, No. 23-50327, 2024 WL

8

4199017 (5th Cir. Sept. 16, 2024). The Court should reject the Commission's attempts to justify a remedy that not even it stands by to substitute its view of Appellants' gains for the District Court's clear factual finding, to ignore this Court's precedent and the Supreme Court's unambiguous guidance, and to create a circuit split. There is no basis to order disgorgement, and this Court should therefore remand with instructions to deny the SEC's requested relief.

## II.    *Navellier* Does Not Change the Requirement for Pecuniary Harm

For disgorgement to be proper, the SEC is required to identify victims who suffered pecuniary harm. *SEC v. Govil*, 86 F.4th 89, 94 (2d Cir. 2023). Without suffering pecuniary harm, an investor cannot be said to be a "victim," and disgorgement is therefore improper. *Id.* ("Because a defrauded investor is not a 'victim' for equitable purposes if he suffered no pecuniary harm, the district court needed to determine that the investors Govil defrauded suffered pecuniary harm before awarding disgorgement."); *see also SEC v. Ripple Labs, Inc.*, No. 20 CIV. 10832 (AT), 2024 WL 3730403, *5–6 (S.D.N.Y. Aug. 7, 2024) (rejecting the SEC's request for disgorgement where it could not show pecuniary harm). Lies and misrepresentations to investors, without more, do not satisfy the pecuniary harm requirement. *See Govil*, 86 F.4th at 105 ("[T]he right to make informed decisions about the dispositions of one's assets is not a property interest" that can be vindicated through disgorgement) (internal quotations and citation omitted).

*Navellier* does not alter this general rule. To be sure, *Navellier* found that disgorgement was available notwithstanding the absence of economic loss. *Id.* But that holding was specific to the circumstances of that case. This Court held:

> *We have similarly emphasized that "[t]he case law holds with conspicuous clarity that when a **fiduciary has secured an undue advantage by virtue of his position**, equitable relief is available even in the absence of direct economic loss to the complaining party." We thus conclude that, "**in the circumstances of this case**, the equitable remedy of disgorgement was available in principle."*

108 F.4th at 41 (citation omitted) (emphasis added). There is no evidence that Appellants were fiduciaries to the investors who traded in any of the 14 issuers involved in this case, much less that they obtained an undue advantage because of that position. Thus, *Navellier* is not applicable and does not obviate the requirement that the purported victims suffer pecuniary harm.

The SEC has failed to demonstrate that any pecuniary harm exists. Without more information, such as security purchase price, type of security held, terms of the securities, when the security was sold, and sale price, one cannot effectively assess whether pecuniary harm exists. *See Govil*, 86 F.4th at 104 n.16 ("But whether the investors actually suffered pecuniary harm would depend on the type of securities held, the terms of those securities, and when those securities were sold."). Moreover, the SEC's graph depicting the closing prices for Arch Therapeutics, Inc. ("Arch") – one of 14 issuers in this case – does not prove pecuniary harm. JA4634. At most, the chart provides a limited snapshot of Arch trading volume and closing prices

between May 2013 through September 2013. *Id.* The District Court's award imposed disgorgement for ill-gotten gains starting on August 5, 2011, as a result of trading in 14 different issuers. More importantly, the chart offers no information related to financial harm. The chart does not show when investors brought shares, the prices of those shares at purchase, when investors sold shares, or the share price at sale. *Id.* And the SEC's expert provided no insight into any of these critical data points. Put simply, none of the evidence marshalled demonstrates investors suffered pecuniary harm, and the District Court's disgorgement award is legally erroneous.[2]

## III. The Q System Records Are Not a Reasonable Approximation of Appellants' Purported Ill-Gotten Gains

The proceeds allocation as reflected on the Q system is not a reasonable approximation of any of Appellants alleged profits for disgorgement purposes. To summarize, the Q system is alleged to have served two separate functions: (1) recording stock transactions and (2) reflecting the division of proceeds stemming from those transactions. The SEC took no steps to verify the accuracy of the *proceeds amounts* allocated to Appellants on the Q system – *i.e.*, the second function. *See SEC v. Commonwealth Equity Servs., LLC*, 133 F.4th 152, 171 (1st Cir. 2025)

---

[2] The lack of identifiable victims prohibits the SEC's plan to redirect collections from Ms. Kelln to the unrelated Knox Restitution Fund. *See* Appellants' Opening Br. 38–40. The SEC does not dispute as much and, instead, claims (inaccurately) that it has not yet decided what to do with Ms. Kelln's funds. SEC Br. 80. That assertion is belied by the record, which states in no uncertain terms the SEC's plan for distribution as to Ms. Kelln. JA4085.

("Disgorgement may only be ordered in an amount that is 'a reasonable approximation *of profits* causally connected to the [underlying] violation.'") (internal citation omitted) (emphasis added). Rather, the SEC spent "[s]everal hundred hours" reviewing "thousands of pages of records as well as tens of thousands of records of data," JA3131, to confirm that the *stock transactions* as reflected in the Q system aligned with those in third-party brokerage records – *i.e.*, the first function. SEC Br. 20, 40. It was this data the District Court found "highly accurate." JA3873. It is the SEC's burden to establish a reasonable approximation *of profits*. *See Navellier*, 108 F.4th at 42. Verifying the accuracy of stock transactions entries – without separately verifying the accuracy of the profits allocations flowing from those entries – does not meet this burden, and the District Court erred in concluding that it did. *See Commonwealth Equity Servs., LLC*, 133 F.4th at 171 ("[T]he causal connection required is between the amount by which the defendant *was unjustly enriched*, that is, the amount ... by which the *defendant profited* from [their] wrongdoing and the amount [they] can be required to disgorge.") (internal citation and quotation marks omitted) (emphasis added).

The importance of separately analyzing and verifying proceeds allocations in Q is paramount given the dubious record evidence regarding Appellants' actual receipt of the proceeds reflected on the Q system. As the District Court recognized: "[W]itness testimony at trial seemed to indicate that not all of the proceeds generated

by the pump-and-dump scheme actually went to the Defendants." JA3874. The District Court further noted that the Q data "does not show that the ill-gotten gains have been obtained and retained by individual defendants, much less in the amounts requested by the SEC." JA3882. Thus, and as acknowledged by the District Court, the amounts reflected in the Q system have already shown to be an inadequate indicator of profits. *See Alfaro De Quevedo v. De Jesus Schuck*, 556 F.2d 591, 593 (1st Cir. 1977) (remanding the case where the District Court's ultimate finding was not supported by the evidence and inconsistent with its own factfinding).

Indeed, as detailed in Appellants' opening brief, the SEC's supposed evidence only accounts for 7% of the funds ordered to be disgorged from Ms. Kelln, 4% of the funds ordered to be disgorged from Mr. Sexton, and less than 1% of the funds ordered to be disgorged from Mr. Veldhuis. *See* Appellants' Opening Br. 52–53. The SEC does not rebut these glaring problems.

Given these findings and evidence, it is improper to view the Q proceeds data as a reasonable reflection of the purported ill-gotten gains Appellants received. For the same reasons, the liability caps – which were based on the balances of Appellants' individual Q accounts (JA3878) – do not serve as a reasonable profits approximation.

The SEC attempts to wave a magic wand over these problems by asserting that courts "routinely accept such expert testimony and calculations as the basis for

13

disgorgement awards." SEC Br. 65. While true that courts sometimes consider such expert testimony and calculations in conjunction with other evidence, sole reliance on experts is generally reserved for circumstances where defendants' control over the funds is undisputed. The cases cited by the SEC are inapplicable for this reason.

For example, the SEC cites *SEC v. Fujinaga*, 696 F. App'x 203, 206 (9th Cir. 2017). In *Fujinaga*, the defendants challenged the District Court's disgorgement award that was based on an accountant's calculation that showed the defendant's profit based on "investments received by Defendants and the amount Defendants paid out to investors." *Id.* The Ninth Circuit upheld this award, holding it was not an abuse of discretion to rely on the accountant's testimony to approximate profit. *Id.* What was never in dispute in *Fujinaga*, however, is that the money was *actually received* by the defendants; instead, the issue was to what extend the profits were illegal. *SEC v. Fujinaga*, No. 2:13-CV-1658 JCM (CWH), 2015 U.S. Dist. LEXIS 98987, at *11 (D. Nev. July 29, 2015) ("[D]efendants do not challenge the fact that these transactions occurred. Instead, they argue solely that they have a legitimate claim to the funds at issue."). Thus, since there was no dispute about control of profits, the expert's review and calculation were sufficient by itself to establish which of the defendants' profits were ill-gotten and subject to disgorgement.

Similarly in *SEC v. O'Brien*, No. 23-1071, 2024 U.S. App. LEXIS 13225, at *7 (2d Cir. Jun. 3, 2024), the Second Circuit upheld a disgorgement award based on

14

an expert's testimony and calculations. Again, however, there was no dispute between the parties in *O'Brien* regarding the defendant's actual receipt of the funds at issue. *See generally id.* Rather the expert's role was confined to sifting through legitimate and illegitimate conduct and calculating profits. Here, by contrast, there is significant dispute about whether Appellants actually received the funds reflected in the Q. An expert's calculations of profits, no matter how meticulous, cannot by itself establish a reasonable approximation of a disgorgement award where there is uncertainty about whether the parties actually received the profits calculated.

When courts have relied on expert testimony as the basis for disgorgement awards, the expert has traced the ill-gotten funds all the way from their origin into accounts controlled by the defendants. *See, e.g.*, *SEC v. Putnam*, No. 2:20-cv-00301-DBB-DAO, 2024 U.S. Dist. LEXIS 163296, at *7 (D. Utah Sep. 10, 2024) (tracing funds until they reached "an address identified as belonging to investors, Defendants, or Defendants' associates in documents produced to the SEC"). Crucially, this is what the SEC and its accountant failed to do in this case. By stopping one step short and only tracing funds into the Q "accounts," the SEC did not establish the final link tying ill-gotten profits into the actual hands of the defendants. JA3882. The Commission's accountant concedes the fatal mistake when he admitted "I do not know who got the cash." JA3259. This dooms any

disbursement calculation based purely on expert analysis of the alleged profits reflected in the allocation section of the Q records.

## IV.   The Q System Proceeds Data Is Inadmissible Hearsay

The also SEC fails to grapple with the distinct levels of hearsay within the separate parts of the Q system.  The District Court relied upon hearsay within the Q system for the truth of the matter asserted as to Appellants' actual receipt of ill-gotten gains.  But the purported proceeds data contained in the Q system is a separate level of hearsay that does not independently satisfy the business records requirements.  The SEC ignores this distinction.

As explained in Appellants' opening brief, this case is like *United States v. Jackson*, 636 F.3d 687, 693–94 (5th Cir. 2011), which rejected reliance upon narcotics ledgers as business records to substantiate profit allocations.  The SEC does not even address *Jackson*.

For similar reasons, the purported profit data contained in the Q system does not constitute a co-conspirator statement.  *See* Appellants' Opening Br. 48–50.  Here again, the SEC focuses its co-conspirator hearsay exception argument entirely on evidence about data entered into Q to record stock trades, not internal allocation of profit.  *See* SEC Br. 47–48.  But to the extent the SEC relies on unrelated Q system profit data as proof of what Appellants ultimately received from their alleged conspiracy, that data by definition does not reflect statements made in furtherance of

16

the conspiracy.  As the First Circuit has recognized, "narratives of past events" do not satisfy the "'in furtherance' requirement."  *United States v. Ciresi*, 697 F.3d 19, 28 (1st Cir. 2012).

It was reversible error for the District Court to award disgorgement based on inadmissible Q system hearsay evidence.

## V.     The District Court Failed to Assess Whether Only Ill-Gotten Gains Were Included in Its Disgorgement Award

The SEC's position as to the effect of consent judgment vis-à-vis disgorgement misses the mark.  The entry of a consent judgement does not obviate the need to only include ill-gotten gains in its disgorgement award.  *See SEC v. Uboh*, No. 21-CV-02049(KAM)(CLP), 2024 WL 2832811, at *6 (E.D.N.Y. June 4, 2024) (recognizing disgorgement cannot exceed a wrongdoer's net profits notwithstanding a consent judgment).  The Court is still required to determine "whether the profits, fees, and other compensation derived from wrongdoing."  *SEC v. Rooney*, No. 11 C 8264, 2014 WL 3500301, at *2 (N.D. Ill. July 14, 2014).  Failing to do so results in the imposition of a punitive remedy – the very thing that *Liu* proscribes.  *See Liu*, 591 U.S. at 79 ("[T]o avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's net profits[.]").  In order to determine whether a gain is ill-gotten, it logically follows that a court must find that the underlying transaction was improper.

Despite the SEC's characterization, Appellants do not contend "that the district court was required to find specific evidence proving each element of every claim with respect to each of the stock sales of the fourteen issuers." SEC Br. 71. Appellants are not contesting liability with respect to the substantive claims. Rather, they challenge the remedy the District Court imposed. *See* JA458 (noting that liability and disgorgement "are separate elements of a SEC action."). The plain language of the consent judgments unequivocally permits such a challenge. Mr. Veldhuis's consent judgment states he "will not contest liability under the claims filed by the Plaintiff, *but will be permitted to challenge the remedies and sanctions* sought by the Commission *as a result of that liability*." JA1151 (emphasis added). Mr. Sexton's judgment allows him "to oppose the Securities and Exchange Commission's requested relief, including any calculation thereof." JA1536. And Ms. Kelln's consent judgment is the same as Mr. Veldhuis's in this regard, allowing her "to challenge the remedies and sanctions sought by the Commission," including disgorgement. JA1125.

While consent judgments can preclude a defendant from challenging a remedy, the language necessary to foreclose this challenge is not present in Appellants' judgements. For example, the judgments do not require Appellants to accept the allegations in the SEC's Amended Complaint as true. *Compare SEC v. Engle*r, No. 120CV1625DGPK, 2022 WL 4596745 (E.D.N.Y. Sept. 30, 2022)

18

(finding that the consent judgment precluded defendant's challenge where defendant agreed to accept the allegations in the complaint as true for the purposes of disgorgement); *but see SEC v. Mortenson*, No. CV-04-2276 SJF WDW, 2013 WL 991334, at *6 (E.D.N.Y. Mar. 11, 2013) (finding the SEC did not establish certain bonuses were ill-gotten despite language in the consent order requiring defendant to accept the SEC's allegations as true). Instead, Appellants simply agreed to not contest liability. They did not agree to accept the SEC's allegations or otherwise bind themselves to the SEC's position. The consent judgments' language, coupled with express permission to challenge the SEC's requested relief, cannot be read to foreclose Appellants' challenge to the legitimacy of funds compromising the District Court's disgorgement award. *See Mortenson*, 2013 WL 991334, at *6.

And indeed, the District Court's disgorgement award included profits for which there was no basis to conclude (1) Appellants were involved in the underlying transaction and/or (2) the transaction was illegal. For example, and as stated more fully in Appellants' opening brief, the District Court's award included disgorgement of $5,275,000 each from Mr. Veldhuis and Mr. Sexton for trading in Echo Automotive despite the lack of evidence demonstrating either traded in the company. *Cf id.* (finding the SEC did not establish certain gains were ill-gotten where it alleged certain bonuses were ill-gotten by virtue of them being paid during "the height of [defendants'] fraud"). Similarly, the District Court's award encompassed $1.1

million in disgorgement from Mr. Sexton for trading in Graphite despite no testimonial or non-Q evidence of his involvement. Given this evidence, or lack therefore, it cannot logically follow that profits from trading in these issuers are ill-gotten gains attributable to Mr. Veldhuis or Mr. Sexton.

With respect to Ms. Kelln, the SEC failed to demonstrate that she engaged in any violative conduct with respect to any of the relevant 14 issuers. Again, without proof of illegal conduct, it does not follow that the profits emanating from such conduct are ill-gotten.

The SEC failed to meet its initial burden to demonstrate any of the profits were ill-gotten. Appellants' burden to offer countervailing evidence therefore did not inure. *See Navellier*, 108 F.4th at 43 (imposing burden shifting only after the SEC met its initial burden). For these reasons, the District Court's disgorgement award is clearly erroneous and improperly put the burden on Appellants – in the first instance – to demonstrate which profits were ill-gotten and which were not.

## VI.    The NDAA's Limitations Period Does Not Apply to This Action

The District Court erred in finding that the 10-year limitations period as prescribed by the NDAA revives the SEC's otherwise time-barred claims. As a preliminary matter, the NDAA extends the limitations period for certain disgorgement-based claims. The NDAA does not, as the SEC argues, merely define "the scope of the disgorgement remedy," rather than establish a new limitations

period.  SEC Br. 84; *compare* JA3878 (finding "the applicable *statute of limitations*" to be 10 years) (emphasis added).  Ironically, and despite its position to the contrary, the SEC conceded the NDAA established a new limitations period.  SEC Br. 83 (noting this Court found the NDAA "'changed' the appliable statute of limitations for disgorgement") (quoting *SEC v. Morrone*, 997 F.3d 52, 55 n.3 (1st Cir. 2021)).  Thus, there is no credible dispute that the NDAA established a new limitations period.

As noted in Appellants' opening brief, there are two ways in which limitations periods can apply retroactively: (1) extending the limitations window for an unexpired and timely claim and (2) reviving a time-barred claim.  *See Miller v. United States*, 77 F.4th 1, 7 (1st Cir. 2023) ("[T]here is a critical 'difference between revoking a vested statute of limitations defense and extending a filing period for live claims.'") (quoting *Weingarten v. United States*, 865 F.3d 48, 57 (2d Cir. 2017)).  The District Court completed part one of the analysis (retroactivity), but did not conduct part two (revival).  Instead, the District Court conflated the two analyses and arrived at the conclusion the NDAA revived time-barred claims simply because the statute had retroactive application.  *See* JA440 (holding "the NDAA **applies retroactively** to cases commenced after its passage, given the express mandate by Congress") (emphasis in the original); *see also Lieberman v. Cambridge Partners, L.L.C.*, 432 F.3d 482, 488 (3d Cir. 2005) (noting that, "[t]hough related," the two categories of

retroactivity "are analytically distinct, requiring separate inquiries into congressional intent"); *Kansas Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs.*, *Inc.*, 61 F.3d 608, 615 (8th Cir. 1995) ("[T]he statute must … address not only the issue of retroactivity, but revival as well.").

More specifically, the District Court found that the NDAA's "pending on" language represented Congress's express intent that the statute apply retroactively. However, the District Court never looked to see whether, in addition to retroactivity, the NDAA's language also provided for the revival of stale claims. *See Lieberman*, 432 F.3d at 489 ("Even assuming … that Section 804(b) clearly provides for retroactive application, it does not necessarily follow that Section 804(b) thereby clearly provides for the resurrection of moribund claims."); *see also Kansas*, 61 F.3d at 615 (finding that, while a state statute applied retroactively, it did not revive time-barred actions). The NDAA contains no language that even intimates it is intended to restore lapsed claims. *See Lieberman*, 432 F.3d at 490 (holding a statute revives expired claims only when it does so "in the clearest possible terms"); *see also Kansas*, 61 F.3d at 615 (noting a statute revived stale claims where the statute explicitly stated "*[t]he intent of this subsection is to revive causes of action … which*

*were barred*") (emphasis in the original).  Thus, the District Court erred in applying a 10-year limitations period.[3]

## VII.   The District Court's Obey-The-Law Injunctions Were Impermissibly Vague and Ran Afoul of Fed. R. Civ. P. 65

The SEC's arguments that the "obey-the-law" injunctions Mr. Sexton challenges comply with Fed. R. Civ. P. 65 are without merit.  In fact, noticeably absent from the SEC's brief is any explanation as to how the injunctions comply with Fed. R. Civ. P. 65.  *Cf. SEC v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012). Instead, the SEC maintains the injunctions – which it concedes mimic the statutory language – are proper given Mr. Sexton's "background and proclivity for further misconduct."  SEC Br. 93.  This is wrong.

The SEC is correct that the *Goble* court concluded injunctions that merely parrot the statutory language may be permissible in some instances.  682 F.3d at 950. What the SEC fails to mention is that the court rejected such injunctions "in *all* circumstances," including those present here.  *Id.* (emphasis in the original).  For

---

[3] For reasons already stated, applying the NDAA to the case at bar "would have an impermissiblly retroactive effect." *Lattab v. Ashcroft*, 384 F.3d 8, 15 (1st Cir. 2004); *see also Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 950 (1997) ("[E]xtending a statute of limitations after the pre-existing period of limitations has expired impermissibly revives a moribund cause of action.") (internal citation and quotations omitted).  Moreover, and as explained more fully in Appellants' opening brief, the SEC failed to meet its burden to present evidence that Appellants violated the securities laws prior to August 5, 2016.

example, the court found that injunctions that simply use the language of § 10(b) of the Exchange Act or Rule 10b-5 do not meet the demands of Fed. R. Civ. P. 65. The District's Court's § 10(b) and Rule 10b-5 injunction falls squarely within this category. The *Goble* court further rejected injunctions "that merely cross-reference the relevant statutes and regulations." *Id.* at 952. Again, that situation exists here with the District Court's § 5 of the Securities Act, § 13(d) of the Exchange Act, and Rule 13d-1 injunctions. In addition to being vague and non-specific, the § 5 injunction references § 8 of the Securities Act, and the § 13(d) of the Exchange Act and Rule 13d-1 provisions refer to the terms of Schedule 13D (as provided in 17 C.F.R. § 240.13d-101). It is undisputable that Mr. Sexton would be forced to look outside "the four corners of the injunction to determine what he must do or refrain from doing" to comply with these orders. *Id.*; *see also Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 76 (1st Cir. 2002).[4] This is improper.

---

[4] The District Court's § 17(a) injunction also fails to comport with Fed. R. Civ. P. 65 because it does not sufficiently describe the prohibited conduct. *Cf. SEC v. Keener*, 102 F.4th 1328, 1336–37 (11th Cir. 2024) (holding that, while the district court's § 15(a) injunction largely tracked the statutory language, the district court added additional, clarifying detail using plain language). Here, the injunction merely regurgitates the statutory language and employs technical language to describe the enjoined behavior. *See SEC v. McLellan*, 737 F. Supp. 3d 95, 107 n.4 (D. Mass. 2024) ("A court order should be phrased in terms of objective actions, not legal conclusions.") (quoting *Goble*, 682 F.3d at 950–51).

# CONCLUSION

For the foregoing reasons, the Court should vacate and remand.[5]


Respectfully Submitted,


/s/ Stephen G. Topetzes
Stephen G. Topetzes
Neil T. Smith
Robert S. Silverblatt
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006

*Counsel for Defendant-Appellant*
*Paul Sexton*

/s/ Michael Tremonte
Michael Tremonte
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004

*Counsel for Defendant-Appellant*
*Mike K. Veldhuis Rechnitz*

/s/ Frank Scaduto
Frank Scaduto
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036

*Counsel for Defendant-Appellant*
*Courtney Kelln*

---

[5] Appellants maintain that the penalties were incorrect for the reasons previously addressed. Appellants consider that issue to be fully briefed.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,822 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Times New Roman font.

Dated:  July 1, 2025

*/s/ Stephen G. Topetzes*
Stephen G. Topetzes
Neil T. Smith
Robert S. Silverblatt
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006

*Counsel for Defendant-Appellant*
*Paul Sexton*

*/s/ Michael Tremonte*
Michael Tremonte
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004

*Counsel for Defendant-Appellant*
*Mike K. Veldhuis Rechnitz*

/s/ Frank Scaduto
Frank Scaduto
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036

*Counsel for Defendant-Appellant*
*Courtney Kelln*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this same date, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which electronically served a copy on all counsel of record.

Dated:  July 1, 2025

<u>*/s/ Stephen G. Topetzes*</u>
Stephen G. Topetzes
Neil T. Smith
Robert S. Silverblatt
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006

*Counsel for Defendant-Appellant*
*Paul Sexton*

<u>*/s/ Michael Tremonte*</u>
Michael Tremonte
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004

*Counsel for Defendant-Appellant*
*Mike K. Veldhuis Rechnitz*

<u>/s/ Frank Scaduto</u>
Frank Scaduto
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036

*Counsel for Defendant-Appellant*
*Courtney Kelln*