# United States Court of Appeals
## For the First Circuit

————————————————

No. 24-1770

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

v.

ZHIYING YVONNE GASARCH,

Defendant - Appellant,

FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS;
PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ; AVTAR S.
DHILLON; GRAHAM R. TAYLOR,

Defendants.

————————————————

No. 24-1771

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

v.

MIKE K. VELDHUIS,

Defendant - Appellant,

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP; COURTNEY
KELLN; PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

Defendants.

_____

No.    24-1772

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

v.

PAUL SEXTON,

Defendant - Appellant,

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP; COURTNEY
KELLN; MIKE K. VELDHUIS; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

Defendants.

_____

No.    24-1773

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

v.

COURTNEY KELLN,

Defendant - Appellant,

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP; MIKE K.
VELDHUIS; PAUL SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ;
AVTAR S. DHILLON; GRAHAM R. TAYLOR,

Defendants.

No. 24-1174

_____

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff - Appellee,

v.

JACKSON T. FRIESEN,

Defendant - Appellant,

ZHIYING YVONNE GASARCH; FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS; PAUL SEXTON; WILLIAM T. KAITZ; AVTAR S. DHILLON; GRAHAM R. TAYLOR,

Defendants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

_____

REPLY BRIEF OF DEFENDANT - APPELLANT JACKSON T. FRIESEN

_____

Dated:  July 1, 2025

By: */s/ Timothy J. Fazio*
    Timothy J. Fazio, No. 120461
    MG+M The Law Firm
    125 High Street, 6th Floor
    Oliver Street Tower
    Boston, MA  02110
    TEL:  617-670-8635
    Email:  Tfazio@mgmlaw.com

    *Counsel for Jackson T. Friesen*

By: */s/ Maranda E. Fritz*
    Maranda E. Fritz, No. 1213765
    Maranda E. Fritz, PC
    521 Fifth Avenue
    New York, NY  10017
    TEL:  646-584-8231
    Email:  Maranda@fritzpc.com

# TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………. i

TABLE OF AUTHORITIES…………………………………………………iii

PRELIMINARY STATEMENT……………………………………………....1

ARGUMENT………………………………………………………………3

    A. The District Court's Treatment of Q Records is Reversible Error………3

        1. Appellee Fails to Demonstrate that the Q Records are Admissible as Business Records………………………………3

        2. The Q Records Were Not Properly Admitted as Co-Conspirator Statements………………………………………………..7

        3. The Error Was Not Harmless ………………………………..9

    B. The District Court's Order of Disgorgement Must Be Reversed……….. 11

        1. As Even the District Court Confirmed, There was no Adequate Evidence that the Individual Defendant's Received Proceeds…………………………………………………….11

        2. There Was No Proper Basis for Imposing on Mr. Friesen Joint and Several Liability for Amounts Received by Fred Sharp……………………………………………………..12

        3. Because Appellee Has Conceded that Funds May Be Disgorged Only to Reimburse the Harmed Investors but Has Refused to Demonstrate that There are Harmed Investors, This Matter Should be Remanded Before any Disgorgement Award Should be Affirmed…………………..14

CONCLUSION……………………………………………………………...15

CERTIFICATE OF COMPLIANCE……………………………………...17

i

CERTIFICATE OF SERVICE……………………………………………………….18

## TABLE OF AUTHORITIES

**Cases**

*BioPoint, Inc. v. Dickhaut*, 110 F.4th 337 (1st Cir. 2024) ..................................….13

*Liu v. SEC,* 591 U.S. 71 (2020) ………………………………………….…13-14

*SEC v. Stack,* 2024 WL 4199017 (5th Cir. Sept. 16, 2024) ………………………13

*United States v. Mouzin*, 785 F.2d 682 (9th Cir. 1986) ……………………………9

*United States v. Petrozziello,* 548 F.2d 20 (1st Cir. 1977)………………………7-8

*United States v. Ramos-Baez,* 86 F.4th 28 (1st Cir. 2023) ………………………...8

## PRELIMINARY STATEMENT

Appellee's submission, in relation to Defendant Jackson T. Friesen, presents a lengthy and elaborate tale concerning the activities of an ostensibly monolithic trio, "Veldhuis, Sexton, and Friesen," and their involvement as clients of the business of the fugitive Fred Sharp. But that story is a fiction, a device through which Appellee seeks to attribute to Mr. Friesen all conduct of other Defendants including Sharp, Veldhuis and Sexton and obfuscate the sparsity of the evidence relating to Mr. Friesen. It relies on Appellee's conclusory and vague claim, based on unsupported and imprecise bits of testimony, that Mr. Friesen was "partners" with Veldhuis and Sexton and then uses that misnomer as the springboard for a narrative that includes Mr. Friesen's name in every description of the activities of the others.

Appellee in the process simply ignores the evidence that actually pertains to Mr. Friesen. Friesen Appeal Brief ("Friesen Br."), Document: 00118245308, at 16-18, 25, 31-34, 38-39, 41. Appellee fails to respond to the fact that its case against Mr. Friesen was reed thin, resting on two spindly predicates. First, and for each of the critical components of its claims – the stock sales, percentage of stock holdings and alleged "proceeds" – the case was dependent on the Q Records. Absent the information placed in those records by someone at Fred Sharp's organization (we have no evidence of who or why or when), there is no evidence that Mr. Friesen acquired or held stock, that someone had attributed to him a percentage of stock that

1

(when aggregated with his supposed "group") required that he file a Schedule 13D, or that he "received profits" from stock sales that would be subject to disgorgement. But Appellee remains unable to refute either of the two fundamental flaws associated with its reliance on the Q data: the obvious lack of foundation and authentication for the portion of the Q Records pertaining to stock holdings and purported proceeds, and the fact that the records do not even purport to establish the amount of "proceeds received." The records do not show that the amounts listed on the various accounts were ever transferred to Defendants. They do not reflect transfer of money to any accounts that Defendants could control. They do not reflect whether Fred Sharp kept those funds, spent them or had them seized by the government.

That lack of any evidence of amounts received by these Defendants appears to be the reason that the District Court went the step of *sua sponte* imposing joint and several liability on the Defendants with Fred Sharp. As is clear from the District Court's analysis, it saw no basis on which to conclude that Mr. Friesen or others had "received proceeds" and so, on its own initiative, pivoted to the theory that joint and several liability could be imposed on the Defendants alongside the individual who did receive the money, Fred Sharp. But, as discussed below, imposition of joint and several liability is not supported or proper under these circumstances.

Appellee combines that reliance on the Q Records with the second prong of its case against Mr. Friesen, the notion of a triumvirate. Again, instead of addressing

the nature and limited extent of the evidence as to Mr. Friesen, Appellee ignores and obscures the cooperating witnesses' *lack* of knowledge about him and the evidence of his limited role in the underlying activities.

It is against that backdrop that the specific evidentiary and disgorgement issues must be assessed. With respect to the admissibility of the Q Records, Appellee consistently sought during the trial to have the information admitted as a business record, which the District Court allowed after trial. A3870-73 (Memorandum and Order). On appeal, Appellee makes the argument that the data was admissible as a business record but devotes considerably more time to the contention that the records were admissible as co-conspirator statements. In the process, Appellee sidesteps the fact that it did not seek nor did the District Court engage in the requisite findings to support a sweeping admission of those records as co-conspirator statements against Mr. Friesen. Nor was there any basis to do so. The record lacks support for the admission of Fred Sharp's unauthenticated and unexplained records under either theory.

## ARGUMENT

### A. The District Court's Treatment of the Q Records is Reversible Error.

#### 1. Appellee Fails to Demonstrate that the Q Records are Admissible as Business Records.

Appellant demonstrated that the District Court's decision as to the admission of the Q Records, contained in its Memorandum and Order (A 3870-73), was

fundamentally flawed because it took evidence pertaining to only one aspect of the Q Records and wrongly applied it to the data at issue, i.e., the entries concerning stock holdings, stock sales and proceeds. Friesen Br. at 26-28. The Court's decision expressly held that the data was proven to be reliable through the analysis of Ryan Murphy. Appellee does not acknowledge, but it is patently clear, that Mr. Murphy's analysis had nothing to do with the entries regarding allocation of stock and proceeds. In fact, Mr. Murphy's analysis illustrates the opposite: the crucial and material portions of the Q Records should have been but were not cross-checked, corroborated or supported in any way. Appellee does not and cannot refute the fact that it analyzed a selected portion of the data and did not authenticate, corroborate or establish the reliability of the portion that it used against these Defendants.

More importantly, Appellee fails to present any evidence of the basis for, the process for or the timing of entry of Q data. Not one witness could explain the basis on which information concerning actual stock sales by Fred Sharp was then sliced and diced by someone at the Sharp organization and there was no extrinsic evidence of any agreements or allocations to support someone's reimagining of the data as to stock sales.

Instead, Appellee insists that the records were somehow "authenticated" by Fedir Nikolayev and were shown to be reliable. Appellee Br. at 37-39. Strikingly, Appellee was unable to demonstrate *either* of those contentions. Appellee cherry

4

picks and strings together snippets from the transcript trying to create the impression that it presented testimony that addressed and satisfied the requisites for admission as a business record. The reality remains clear and indisputable: Mr. Nikolayev was not involved in anything other than the creation of the format and had no knowledge concerning the entries on which Appellee relied. Appellee Br. at 42-44. No amount of wordsmithing can obscure the plain fact that, while there were undoubtedly any number of individuals who handled the input of the relevant data, neither they nor anyone else with knowledge of *the entry of the data* testified. No one explained how data that related to actual sales of stock *by Sharp* ended up being transmogrified into the accounts relied on by Appellee. No one testified as to who directed those entries, or why or when. No document was put forth, whether email or agreement, that would explain the basis for the entry of that data. And certainly no one could establish that those who entered the data operated under the requisite business duty to record information accurately. *See* Friesen Br. at 25 (discussing cases holding that authentication of business records requires witness who can explain the data and is subject to cross-examination).

And, in fact, there was no evidence in the record establishing the accuracy or reliability of the particular aspects of the data on which Appellee relied. There were no brokerage accounts to which the allocations corresponded; to the contrary, the stock holdings and allocations were inconsistent with the records of the stock sales

which showed all sales by various entities established and operated by Fred Sharp. There was no testimony or document to support those allocations of stock or money, no "partnership" agreement that existed among the Defendants, no witness attesting to Mr. Friesen's ownership or sales of stock. Appellee's failure to offer corroboration speaks volumes.

Not even an internal *disbursement* ledger was offered by Appellee notwithstanding its seizure of enormous volumes of data from the Sharp organization. Nonetheless, Appellee continues to tell this Court that "nearly $12 million was transferred to Friesen." Appellee Br. at 22 (citing A1907) when that was plainly not the case. This Court should readily conclude that Appellee's claim is baseless.

Appellee insists that it was not required to verify or authenticate the Q Records or its claim that Mr. Friesen "received proceeds" subject to disgorgement. And that, of course, is correct. But Appellee cannot amply illustrate what that verification would look like (as to other aspects of the Q Records) and then superimpose that assertion onto unverified and unreliable data.

As to this evidence, and as the District Court ultimately concluded, the Q data is not evidence of any stock ownership, sales or receipt of proceeds by the Defendants. There is only a supposed account in the Q system that shows that the

nearly $12 million was at some point allocated to that account – and massive amounts also *deducted*.  Friesen Br. at 38-39.

### 2.  The Q Records Were Not Properly Admitted as Co-Conspirator Statements.

Appellee argues at some length that the Q Records are admissible evidence as co-conspirator statements and, in a footnote, claims that the District Court "provisionally admit[ed]" the Q Records under Federal Rule of Evidence 801(d)(2)(E), "deferring a final decision until the close of evidence."  Appellee Mem. at 46 n.2.  Appellee fails to acknowledge that its offer of the records was based on the claim that they were business records.  Not surprisingly, given the absence of any "conspirator" to testify as to the supposed "statements" and the lack of any evidence concerning the input of the data, the reasons for that input, and the timing of the input, Appellee did not press the argument that the records were co-conspirator statements. Similarly, the decision by the District Court involved their admissibility as business records.  There was no point at the trial at which the District Court addressed the abundant issues that would exist if the Q Record accounts were going to be analyzed as co-conspirator statements.  And there would have been no proper basis to do so.

Under *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977) "the party seeking admission of a statement as a co-conspirator statement would have to establish by a preponderance of the evidence that the declarant and the defendant

were members of the same conspiracy at the time the statement was made and that

it was made 'in furtherance' of the conspiracy" and provide corroborative extrinsic

evidence of declarant's involvement in the conspiracy. *United States v. Ramos-Baez,*

86 F.4th 28, 72 (1st Cir. 2023).

> To operationalize *Petrozziello's* requirements, we have 'constructed a model for the handling of evidence proffered under Rule 801(d)(2)(E).  Under that model, the trial court may conditionally admit the alleged coconspirator statements at the time that they are offered but then must, at the close of all the evidence, 'assess whether the government has met its burden for admitting statements under Rule 801(d)(2)(E).'

*Id.*

Appellee skips past those foundational requirements, offering instead only

conclusory arguments concerning Mr. Friesen's involvement in a conspiracy.

Appellee fails to acknowledge that it did not establish who made the entries and so

did not establish that those one or more individuals were members in a conspiracy

with Mr. Friesen.  It did not establish when the entries were made, the data was not

seized until years after the supposed events, and the entries supposedly cover years

after Mr. Friesen ceased any active involvement with Mr. Veldhuis so Appellee can

point to no evidence that the entries were made during and in furtherance of a

conspiracy.  The unreliability and inadmissibility of the evidence is underscored by

the fact that there was no "declarant" available for cross-examination. Because there

was no testimony as to the basis for the entries, no extrinsic evidence to support the

8

particular allocations, and no witness to cross-examine concerning those critical issues, the admission of the Q Records was error.

*United States v. Mouzin*, 785 F.2d 682, 692-93 (9th Cir. 1986) ("The government's failure to identify the author or authors of the ledger entries rendered the ledger inadmissible under Rule 801(d)(2)(E) for a lack of proper foundation. Knowledge of the identity of the declarant is essential to a determination that the declarant is a conspirator whose statements are integral to the activities of the alleged conspiracy.")

### 3. The Error Was Not Harmless.

Appellee's attempt to argue sufficiency of the evidence as to Mr. Friesen illustrates for this Court the actual absence of such evidence. Appellee Br. at 51 (citing 2849, 2826-27, 4315, 4265, 3055-56, 4391, 4387). Its description of the evidence that supposedly pertains to Mr. Friesen is predicated on the generic claim that Veldhuis, Sexton and Friesen were "partners." Appellee Br. at 9. To support that claim, Appellee cites to testimony from William Kaitz that those individuals were, at some point, "partners." Id. (citing A2629-32). That citation utterly fails to support Appellee's claim that Mr. Friesen had some kind of control in relation to the activities of Veldhuis or that there was any agreement as to or allocation of revenue: Kaitz confirmed that all he meant by the word "partner" was that they worked with one another, and that during a later period they did not. Friesen Br. at 9-10.

On that insubstantial basis, Appellee then launches into a purported description of the activities of those three Defendants, using evidence as to the actions of one as evidence as to all.   Id. at 10-16.  Focusing on the references to evidence that relates to Mr. Friesen, they are striking for the fact that they pertain to his involvement in marketing and stock promotional campaigns (Id. at 11) – lawful activities not associated with the behind-the-scenes devices and failures to disclose. The evidence that Mr. Friesen was simply working for Veldhuis for some period of time prior to 2015, that it was Sexton and Veldhuis who dealt with Fred Sharp and with the other witnesses, that it was Veldhuis who was identified as the "account title" in relation to sales of stock, that it was Veldhuis who handled the trading of stock, the limited quantity of emails that fall far short of the volume that would have existed had Mr. Friesen been an active participant in years of fraudulent schemes (Friesen Br. at 16, 18, 34) – all of that evidence is not even discussed, much less refuted, by Appellee.

Other than that, Appellee makes much of discussions to "avoid detection."  Id at 15-16.  Those communications, no matter how often Appellee repeats them, do not provide any evidence that actually supports the allegations of "beneficial ownership" or a "control group" nor does it address whether Mr. Friesen owned stock or received proceeds.

10

Nor does Appellee acknowledge or come to terms with the legal requirements that apply to ownership and control of stock. The significant issues concerning beneficial ownership and control – critical to claims of violations of Section 5 and Schedule 13D – are left unanswered by Appellee's submission.

## B. The District Court's Order of Disgorgement Must Be Reversed.

### 1. As Even the District Court Confirmed, There was no Adequate Evidence that the Individual Defendant's Received Proceeds.

Appellee does not discuss or even acknowledge the key findings of the District Court that the evidence presented "does not show that ill-gotten gains have been obtained and retained by the individual Defendants, much less in the amounts requested by the SEC." Friesen Br. at 36 (A3883). Likewise, Appellee turns a blind eye to the District Court's acknowledgement of what was clear from the evidence: it is "not possible to speak with any reasonable degree of certainty" regarding receipt of proceeds because "actual accrual to each of the Defendants cannot be shown and [] it is entirely possible that at least a portion of the ill-gotten gains may never have reached the pockets of the individual Defendants." Id. at 37.

Oddly, Appellee also argues that Defendants offered "no alternative" to Mr. Murphy's calculations. Appellee Br. at 66. Not so. Mr. Friesen has identified the extent to which there is any evidence of Mr. Friesen's receipt of proceeds, but Appellee does not like that number. Friesen Br. at 38-39.

Further, and incredibly, Appellee points to the District Court's view that "defendants' failure to argue, much less show, that there is *money in their accounts in the Q system that still remains there*" and contend that it "undermined arguments that they did not *receive the money* shown in their Q accounts." Appellee Br. at 29. That argument improperly and illogically seeks to elevate the fiction of the Q accounts into a fact that defendants should have sought to controvert. In reality, there was no "money" in any "account." Defendants could not and did not try to argue that they still had a balance in the Sharp account – in part because there was no balance! And Mr. Friesen did in fact show that there was no "money" in the account: the unexplained and incomprehensible string of entries in the Q Records, while not including a real "balance," showed massive debits and transfers out of the account that negated Appellee's claim that Mr. Friesen "received" $12 million. Friesen Br. at 38-39.

### 2. There was no Proper Basis for Imposing on Mr. Friesen Joint and Several Liability for Amounts Received by Fred Sharp.

As if acknowledging those basic facts, and the absence of evidence of Defendants' receipt of proceeds, the District Court fell back on the only argument left that could justify the enormous disgorgement amounts: joint and several liability. A3875-76. Under that theory, the District Court reasoned, it could impose those same amounts of disgorgement on each Defendant, based on the Q Records, even though they were *not shown to have received proceeds* because "ill gotten gains need

12

not have accrued personally to each of the Defendants" – that they accrued to Fred Sharp "suffices." A3876.

Appellee's claim that the District Court's ruling as to joint and several liability was "unnecessary" and a "red herring" represents yet another instance of Appellee seeking to simply ignore that which is obvious but inconsistent with its desired result. Appellee Br. at 74. The District Court's *sua sponte* imposition of joint and several liability was an outgrowth of the Court's own conclusion that there was *no evidence* of the Defendants' receipt of proceeds, that the evidence supported only the conclusion that ill-gotten gains accrued to Fred Sharp. Appellee's claim that the award in this case does not "hold any appellant liable for 'profits that have accrued to another,'" that the award only directs disgorgement of amounts that a defendant "personally received," is simply wrong and its efforts to distinguish the decision in *BioPoint Inc. v. Dickhaut,* 110 4th 337 (1st Cir. 2024), are disingenuous at best.

As for Appellee's argument that disgorgement is permissible for those "engaged in concerted wrongdoing" (Appellee Br. at 75), it ignores not only the result reached in *BioPoint* but also the Supreme Court's ruling in *Liu v. SEC,* 591 U.S. 71 (2020). As stated in *SEC v. Stack*, 2024 WL 4199017 (5th Cir. Sept. 16, 2024) holding Mr. Friesen liable "for funds he did not keep or benefit from does not constitute a reasonable approximation of a defendant's unjust enrichment as required

by *Liu* and our precedent." There is no proper basis for imposing joint and several

liability on Mr. Friesen with Fred Sharp and that judgment must be reversed.

**3. Because Appellee Has Conceded that Funds May Be Disgorged Only to Reimburse the Harmed Investors but Has Refused to Demonstrate that There are Harmed Investors, This Matter Should be Remanded Before any Disgorgement Award Should be Affirmed.**

Appellee's submission reveals that there are a few issues on which all Parties

agree: First, disgorgement in this case will be limited to amounts that can be

reimbursed to investors for the losses resulting from the conduct in this case;[1]

Second, there are already millions of dollars that were frozen and are still held so, in

the event that the jury verdict is affirmed, there would be substantial amounts that

would continue th be held and would be available for reimbursement; and, Third,

Appellee has *for years* failed or refused to conduct the analysis and identify the

amounts of alleged investor losses. This is no small matter in a case like this: a

claim that there were inadequate disclosures of beneficial ownership or failures to

file registration statements – unlike proof of materially false statements concerning

the issuer – are not readily translatable into loss amounts. In fact, not one investor

testified in this case that, if there had been a Schedule 13D filed disclosing that Mr.

---

[1] Appellee confirms that "each disgorgement award is "subject to the SEC's
submission and th[e] [c]ourt's approval of a plan detailing how the disgorged funds
will be returned to the harmed investors." Appellee Br. at 62. Appellee also states
that "the Commission is not seeking to disburse funds to the Treasury." Appellee
Br. at 78 n. 13.

Friesen owned more than 5%, it would have altered the total mix of information available to him or caused him not to purchase the stock.

Yet Appellee continues to refuse to take the time to develop and provide the information, as if suggesting that it wants to do that work only if the findings of liability and massive disgorgement awards are actually upheld by this Court. Appellee offers, as its excuse, that it wants to know how much money will be "collected" and available for disgorgement before it conducts its analysis. Appellee Br. at 79. Appellee cites no authority for the notion that it can fail to prove the elements of its monetary claim and yet ask this Court to affirm it. It is not rational, appropriate or efficient for Appellee to expect this Court to adjudicate the correctness of the judgment when even Appellee concedes that it has failed to provide the necessary predicate for review of the disgorgement amounts.

## CONCLUSION

For the reasons set forth above, the judgment of liability as to Defendant Jackson T. Friesen should be reversed. In the alternative, the District Court's decision awarding disgorgement (A3823) (Memorandum and Order), the Judgment (A3907) and the Order Directing Transfer (A3911) as to Mr. Friesen should be reversed.

Dated: July 1, 2025

MG+M The Law Firm                      Maranda E. Fritz, PC


By: */s/ Timothy J. Fazio*                By: */s/ Maranda E. Fritz*
    Timothy J. Fazio, No. 120461           Maranda E. Fritz, No. 1213765
    125 High Street, 6th Floor             521 Fifth Avenue
    Oliver Street Tower                    New York, NY  10017
    Boston, MA  02110                     TEL:  646-584-8231
    TEL:  617-670-8635                    Email:  Maranda@fritzpc.com
    Email:  Tfazio@mgmlaw.com

    *Counsel for Jackson T. Friesen*

**CERTIFICATE OF COMPLIANCE**

This reply brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because (1) it contains 3,708 words, excluding the parts of the reply exempted by Fed. R. App. P. 32(f); and (2) this reply complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) because this reply has been prepared in 14 point proportionally spaced Times New Roman font.

By: */s/ Timothy J. Fazio*
Timothy J. Fazio
Counsel for Jackson T. Friesen

Dated: July 1, 2025

## CERTIFICATE OF SERVICE

I certify that on July 1, 2025, I served a copy of the foregoing document on all counsel of record in the ECF system.

By: */s/ Timothy J. Fazio*
Timothy J. Fazio
Counsel for Jackson T. Friesen

Dated: July 1, 2025