UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

Case Nos. 24-1770, 24-1771, 24-1772, 24-1773, 24-1774

SECURITIES AND EXCHANGE COMMISSION,
*Plaintiff-Appellee,*
v.
ZHIYING YVONNE GASARCH,
*Defendant-Appellant,*

FREDERICK L. SHARP; COURTNEY KELLN; MIKE K. VELDHUIS; PAUL
SEXTON; JACKSON T. FRIESEN; WILLIAM T. KAITZ; AVTAR S.
DHILLON; GRAHAM R. TAYLOR,
*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON IN CASE NO. 1:21-CV-11276-
WGY, HONORABLE WILLIAM G. YOUNG, U.S. DISTRICT JUDGE

REPLY BRIEF OF APPELLANT ZHIYING YVONNE GASARCH

COUNSEL FOR DEFENDANT-APPELLANT
ZHIYING YVONNE GASARCH

Karen A. Pickett (First Circuit No. 89088)
Pickett Law Offices, P.C.
125 High Street, 26th Floor
Boston, MA  02110
617-423-0485
kpickettlaw@gmail.com

July 1, 2025

i

TABLE OF CONTENTS

TABLE OF AUTHORITIES                                                                      iii

I.      INTRODUCTION                                                                       1

II.     ARGUMENT                                                                          5
        A. The District Court Abused Its Discretion In
           Admitting Entries From The Q System For
           Purposes Of Establishing Liability And
           Disgorgement                                                                   5

        B. The Trial Judge Erred In Instructing The Jury
           On Aiding/Abetting Liability                                                   8

        C. Even With All The Presumptions In Its Favor, The
           SEC Fails To Point To Sufficient Evidence Justifying
           The Verdict                                                                   11

        D. The Disgorgement Award Simply Cannot Stand                                   14

        E. Adoption Of Other Arguments                                                  17

III.    CONCLUSION                                                                       17

Certificate of Compliance

Certificate of Service

TABLE OF AUTHORITIES

<u>CASES</u>

*Arizona v. California,* 540 U.S. 605 (1983)                               11

*Gonnella v. SEC,* 954 F.3d 536 (2nd Cir. 2020)                     10

*SEC v. Apuzzo,* 689 F.2d 204 (2nd Cir. 2013)                    passim

*SEC v. Chapman*, 826 F. Supp. 2d 847 (D. Md. 2011)            17

*SEC v. E-Smart Techs, Inc.*, 139 F. Supp. 2d 170 (D.D.C. 2015)      16

*SEC V. Jarkesy*, 603 U.S. 109 (2024)                               15

*SEC v. Lemelson*, 596 F. Supp. 3d 227 (D. Mass. 2022)           16

*SEC v. Life Partners Holdings, Inc*. 854 F.3d 765 (5th Cir. 2012)    15

*SEC v. Mapp*, 2018 U.S. Dist. LEXIS 125352 (E.D. Tx. 2018)      17

*SEC v. Sharp,*  626 F. Supp. 3d 345 (D. Mass. 2022)          passim

*United States v. Matthews*, 643 F.3d 9 (1st Cir. 2011)             11

<u>CONSTITUTIONAL PROVISIONS, STATUTES AND RULES</u>

Seventh Amendment                                            15

Securities Act of 1933                                      passim
Securities Act of 1934                                      passim

Fed.R.Evid. 803(6)                                            6

I.    <u>INTRODUCTION</u>

In her initial brief, Ms. Gasarch asked this Court to review the (extensive) record to find evidence that she knew or should have known of United States securities violations perpetrated by her Canadian employer Fred Sharp - - a lawyer by trade who had never been accused of fraudulent behavior during her employment with him - - and by various sophisticated investors and brokers. As Ms. Gasarch suggested, in a multiyear-long investigation with federal authorities reviewing **one million** documents and during the testimony over the course of a ten-day trial, not one document or witness identified Ms. Gasarch's knowledge of the SEC's arcane "five percent rule" or of the alleged "pump and dump" scheme afoot.   Despite the challenge, the SEC also fails on appeal to identify such proof.  Instead, Ms. Gasarch (as she did at trial) gets swept up in "guilt by association" arguments that do not sustain the judgment or remedies ordered against her.

Concerning her attack on the admission of the "Q' system, the SEC once again misunderstands Ms. Gasarch's arguments.  Ms. Gasarch did not assert that the SEC did not access a massive amount of data in Curacao that had been kept by defaulting so-called "mastermind" Fred Sharp.  What she has challenged, however, is the authenticity of entries made by Sharp that the SEC somehow determined represented funds that she received.  And the

SEC goes to great lengths to argue that the trading records were in large part verified by access to third-party brokerage accounts.  But in so arguing, it highlights that the SEC failed to verify - - or even attempt to verify - - that the Q system entries it claims were "proceeds" to Mrs. Gasarch were in fact that.  The SEC also fails to rebut Ms. Gasarch's arguments that these particular entries are inadmissible hearsay, not falling within any Fed. R. Evid. 803 exception to hearsay.

The SEC's argument that the instructions on "aiding and abetting" another violator's primary violation of the securities laws was a proper statement of the law ignores the "law of the case" doctrine.  Here, the district court, in it published opinion denying defendants' motions to dismiss, already had adopted the requirement in *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) that the SEC, must prove the "existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of **this** violation on the part of the aider and abettor…" (Emphasis added).  The SEC does not attempt to show that Ms. Gasarch had any knowledge of the alleged violations of SEC's registration laws or prohibitions against "pump and dump schemes."  In fact, the SEC has always acknowledged that Sharp and his outside associates - - including the testifying co-conspirator Roger Knox - - went to great lengths to conceal

2

the alleged scheme.

The SEC acknowledges that Ms. Gasarch properly preserved her argument that there was insufficient evidence to support the jury's verdict that she violated Section 17(a)(3) and also "aided and abetted" in others' violations. The SEC acknowledges that the securities violations were carefully orchestrated and concealed by sophisticated investment types. Yet it cannot show that Ms. Gasarch was anything more than an owner "on paper" of a shell company (Peaceful Lion) that engaged in trading (and as the SEC has agreed all along, shells in themselves are not illegal) and did not direct anything in regard to the shell. And it focuses on her providing wire payments and documents <u>as requested by Mr. Sharp and his clients</u>. The SEC simply did not meet its burden of proof to establish Mrs. Gasarch's liability under United States securities laws.

Perhaps the biggest "head-scratcher" in the SEC's opposition to Mrs. Gasarch's arguments is that any claim for disgorgement (even if liability were permitted – which it is not) is subject to a ten, <u>not</u> five, year statute of limitations. Here, almost all of the disgorgement awarded against Mrs. Gasarch was based on alleged conduct preceding the five years before the Complaint was filed. The SEC acknowledges that any violation of Section 17(a)(3) either as a primary violator or as an "aider and abettor" is subject to

a five-year statute of limitations.  It then completely ignores the actual jury

verdict which specifically allowed the jury to find only aiding and abetting a

Section 17(a)(3) violation.  The fact that the district court later said that the

jury "could" have found that Mrs. Gasarch was aiding and abetting a

scienter-based violation does nothing to "save" the case from a five-year

statute of limitations.  Indeed, the SEC itself acknowledges that "the district

court had discretion, at the remedies stage, to make and rely on factual

findings in assessing remedies, 'so long as [those findings d[id] not conflict

with the jury's findings as to liability. *SEC v. Life Partners Holdings, Inc.*,

854 F.3d 765, 782 (5th Cir. 2012)"  SEC Brief, p. 66.  Here, the verdict on

its face has to be read as supporting only aiding and abetting liability to a

non-scienter violation, thus limiting the statute of limitations to five years.

Finally, the SEC ignores its own argument that disgorgement must be

a "reasonable approximation" of ill-gotten gain where it has argued that

<u>every</u> penny it alleges Mrs. Gasarch received over many years of

employment must be disgorged even though Roger Knox - - the SEC's so-

called star witness co-conspirator - - testified that Mr. Sharp engaged in

legitimate business transactions and that he did not know what Mrs.

Gasarch knew about the alleged scheme.  Then, after arguing that Mrs.

Gasarch was a "master of finance" (a stray comment made by a coworker

4

unrelated to anything to do with the alleged conspiracy), the SEC asserts

that allegedly earning $2,000,000 over eight years of employment does not

comport with real earnings for an "assistant." The SEC cannot have it both

ways.

    II. <u>ARGUMENT</u>

  A. The District Court Abused Its Discretion In Admitting Entries From
     The Q System For The Purposes Of Establishing Liability And
     <u>Disgorgement</u>

    The SEC argues that entries from the Q system were properly

"authenticated" pursuant to testimony of Mr. Nikolayev, a long-term IT

consultant for Mr. Sharp. First, Mr. Nikolayev was not an employee of Mr.

Sharp and was not located in the Caribbean where Mr. Sharp was in Canada.

Mr. Nikolayev could testify that the system was created to track Mr. Sharp's

business. But in this regard, it would be like having someone testify that he

knew the business he consulted for used QuikBooks. No one is saying that there

was not this data system called "the Q" created. What Mrs. Gasarch and others

have argued strenuously is that the specific entries were <u>not</u> authenticated and

<u>not</u> reliable. The SEC "cherry-picks" certain aspects of Mr. Nikolayev's

testimony, but fails to show how he could establish the authenticity of the data

entered. And the SEC does not even acknowledge that, at Mr. Sharp's request,

Mr. Nikolayev would remove information from the server. Mr. Nikolayev

testified: "I would take balances of everything and then just clear it as of the first of January. Basically just going to keep the balance and the holdings, *but did not contain any record of what happened before – before that date*." A1127 et seq. Significantly, Mr. Nikolayev could not and did not testify as to when and how Mr. Sharp made entries into the Q system and whether they actually reflected real events.

Second, even if these records were properly "authenticated" by Mr. Nikolayev, the entries themselves do not fit within the business records exception to hearsay. Rule 803(6), known as the business records exception, authorizes the admission of certain documents under an exception to the usual prohibition against the admission of hearsay statements…"Rule 803(6) provides that "[a] record of an act, event, condition, opinion, or diagnosis" is "not excluded by the rule against hearsay" if:

'(A) the record was made at or near the time by-or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the

method or circumstances of preparation indicate a lack of trustworthiness."

(F)

Nothing in Mr. Nikolayev's testimony establishes that he knows when and under what circumstances the records in the Q system were made, who made them, and even whether Mr. Sharp's allegedly criminal activities were a "regular practice" of his business. On the other hand, his testimony establishes that the source of the information and the circumstances indicate an utter lack of trustworthiness.

Perhaps because the Q entries clearly cannot meet the stringent test for "business records," the SEC asserts that they could come in instead as co-conspirator statements. In this regard, Mrs. Gasarch adopts the arguments set forth specifically in the reply brief of codefendant Jackson Friesen, pp. 7-9. Mrs. Gasarch, the "administrator," was not alleged in the Complaint to have been in a conspiracy. In fact, she was only alleged to have acted negligently or to have aided and abetted other primary violators - - including for their own negligence. Despite the stray comment by the district judge that Mrs. Gasarch was at the "hub" of the conspiracy (presumably for being in the same office as Mr. Sharp), there simply was not any evidence submitted that Mrs. Gasarch knew of and conspired with the other defendants to defraud American investors.

7

For Mrs. Gasarch, the error in admitting the Q system records is especially problematic because there is no extrinsic evidence that she was receiving any funds from any alleged securities fraud scheme. Despite its years-long investigation, the SEC did not introduce any bank/financial records of either Mr. Sharp, Mr. Sharp's business or Ms. Gasarch herself. Nor was there an email or some other document over the course of eight years where Mrs. Gasarch acknowledges receipt of funds from any scheme or demands the same. Instead, the SEC points out in great detail its staff accountant Mr. Murphy's claim that business records from independent third-party brokers helped to substantiate certain trades reflected in the Q system. But Mr. Murphy was forced to admit that concerning the alleged "proceeds," he could not verify the allocation or receipt by any person, including Mrs. Gasarch.

Ms. Gasarch also specifically incorporates and adopts by reference the arguments made in the briefs submitted by her co-defendants to this Court as to why the Q system records never should have been admitted or relied upon to fashion a remedy.

B. The Trial Judge Erred In Instructing The Jury On Aiding/Abetting <u>Liability</u>

In order to prove aiding and abetting liability under either the Exchange

Act or the Securities Act, the SEC was required to prove: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3)'substantial assistance' by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 206 (2nd Cir. 2012)." *SEC v. Sharp*, 626 F. Supp. 3d 345, 397 (D. Mass. 2022). Despite the trial judge adopting the *Apuzzo* standard in his opinion on the motions to dismiss, the judge charged the jury on the second element as follows: "Second, they have to prove that Ms. Gasarch understood that her role or conduct was *part of an overall activity that was improper*." (A3364) (emphasis added). Ms. Gasarch objected to this formulation of the standard. (A3373).

The judge's instruction to the jury lessened the SEC's burden of proof. It was not enough that Ms. Gasarch had knowledge that the "overall activity" was improper but instead had to have knowledge of the specific securities violation by the primary violator. *See Apuzzo*, 689 F.3d at 204. The SEC made much of a few exhibits in which it claimed that Ms. Gasarch created false "backup" documents (invoices and the like) for Mr. Sharp's clients. But the jury could have viewed that as "improper activity" (perhaps, e.g., with a desire to aid in hiding things for tax purposes, etc.), but did not require the jurors to find the

9

specific violations here - - failure to report a five percent beneficial ownership of certain stocks and then engaging in a "pump and dump" scheme.

The SEC argues in its opposition that the instruction was a proper elucidation of the law on aiding and abetting because "recklessness," not knowledge can be shown instead of knowledge. (See SEC Brief, pp. 54-55). The SEC asserts that the *Apuzzo* court was somehow mistaken in setting out the requirement of 'knowledge of the violation" on the aider or abettor and that subsequent cases law in the SDNY makes that clear. This argument is meritless. The Second Circuit itself has recited the same exact standard as recently as 2020, and certainly has not overturned it. *See Gonnella v. SEC*, 954 F.3d 536 (2nd Cir. 2020).

Moreover, the SEC misinterprets Mrs. Gasarch's argument that - - regardless of whether the scienter is reckless or knowing - - it applies to the <u>underlying securities violation</u>. It is not enough for the SEC to show "improper conduct." For this reason, the jury could have found that alterations of invoices at clients' direction was "improper" and found Mrs. Gasarch an "aider and abettor" without considering what it was she knew or was reckless about knowing in regard to the primary securities violations which certainly are not "obvious" to someone not in the know. For

example, a settling codefendant, William Kaitz, testified that even though he worked as a stock promoter *in the United States*, he was unaware of the "five percent" rule.

Finally, the SEC's argument completely ignores that in its published decision denying the defendants' motions to dismiss, the district court specifically adopted the holding in *Apuzzo*. "Writ large, the law of the case doctrine ;posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)." *U.S. v. Matthews*, 643 F.3d 9 (1st Cir. 2011). Mrs. Gasarch's defense to aiding and abetting was premised on this law of the case and consistently throughout the trial, she showed that she was unaware of the specific securities violations alleged. This instruction was a legal error and prejudiced Mrs. Gasarch's defense. The judgment should be overturned.

### C. Even With All The Presumptions In Its Favor, The SEC Fails To Point To Sufficient Evidence Justifying The Verdict

First, assuming that this Court finds that the Q records were improperly admitted against Mrs. Gasarch (as it should), clearly the case should be dismissed because they were the only records that allegedly

showed any benefit to Mrs. Gasarch from any so-called securities violations. But even assuming this Court finds some basis that those records were properly authenticated and not hearsay, there simply is insufficient evidence against Mrs. Gasarch even under a negligence standard.

The SEC lays out in excruciating detail what the claimed securities violations were and how they were committed. *See* SEC Counterstatement of the Case, SEC Brief, pp. 4-24. Tellingly, the SEC recounts testimony and exhibits as to the other codefendants' awareness of the SEC's five percent rule and the attempts to obfuscate ownership in excess of five percent. But for Mrs. Gasarch, the SEC can only point to evidence that establishes no such awareness or even why Mrs. Gasarch, an assistant from China working in Vancouver, Canada for a well-established businessman would have reason to know that American securities regulatory violations were afoot. The only witness who had even met Mrs. Gasarch was Mr. Knox - - who saw Mrs. Gasarch in the reception area of Mr. Sharp's business one time when he met with Mr. Sharp in Canada. Significantly, Mr. Knox testified that he did not know what Mrs. Gasarch knew, and that she was not invited to any meetings in which the scheme was discussed. Moreover, there is not one document

in the course of her eight-year employment where Mrs. Gasarch references anything related to the five percent rule or any "pump and dump scheme." The SEC argues that Mrs. Gasarch was the "nominal owner" of Peaceful Lion (later Peregrine) - - but cannot argue that a shell in and of itself runs afoul of United States securities laws. And again Mr. Nikolayev testified that he also was the "nominal owner" of a shell and that, like the case with Mrs. Gasarch, Fred Sharp controlled all the investment decisions of the shell corporation.

　　To the extent that, just as at trial, Mrs. Gasarch is referenced as a "master of finance," she wishes to put that stray comment in context. Gasarch Exhibit 13 (A4319) is a 2014 email exchange between Mrs. Gasarch, "Kash" (identified as one of Fred Sharp's traders) and codefendant Ms. Kelln. In this email, Kash is asking Ms. Kelln to clarify certain details of an $8K wire to "Business Venture Investments." Ms. Kelln responds that she "can not. All wires are sent by Yvonne. She is the master of finance…" From this stray comment, the SEC has extrapolated that Ms. Gasarch was somehow integral to the scheme. She was not. Of course, people like to praise administrative staff for jobs well done, but even Mr. Knox testified that Mr. Sharp or the clients were responsible for directing the wire payments. It does not take a "master of finance" to do so. And perhaps

more importantly, Roger Knox - - the SEC's "star" witness - - testified that he, like Fred Sharp, engaged in legitimate business. Finally, the SEC does not even attempt to argue that this 2014 "Business Venture Investments" wire has anything to do with the scheme <u>alleged in the complaint</u>.

The SEC also points to two 2014 emails in which Mrs. Gasarch discusses using a "safe" account for the payment of promotional expenses. Again, the SEC offers no argument that these stray emails (remember: there were 1,000,000 documents reviewed) somehow related to the fourteen stocks alleged by the SEC to have been traded in violation of SEC regulatory rules. Nor does it even attempt to decipher what Mrs. Gasarch meant in 2014 by the word "safe."

D. <u>The Disgorgement Award Simply Cannot Stand</u>

The SEC does not dispute that Mrs. Gasarch's Section 17(a)(3) violation is a non-scienter based violation and, as such, subject to a five-year statute of limitations. Instead, the SEC engages in tortured legal gymnastics to ignore the jury's verdict finding aiding and abetting liability on Sections 17(a)(1), 17(a)(3) of the Securities Act of 1933, **<u>or</u>** Section 10(b) of the Securities Exchange Act of 1934 and Rule or Section 10b—5(a) and (c)…" (D.E. 402) (emphasis added). Thus, the jury verdict can be read as finding Mrs. Gasarch liable only under Section 17(a)(3) - - as a primary violator

and aider/abettor to others' violations.  In other words, there can be no confidence that the jury found Mrs. Gasarch as an aider and abettor to another's scienter-based violation.

The SEC astonishingly "blames" Mrs. Gasarch for the jury verdict because Mrs. Gasarch did not object to the verdict form.  Frankly, because of the wording of the specific question, a finding of liability still would subject Mrs. Gasarch to a five-year statute of limitations.  It was a <u>favorable</u> jury verdict form for Mrs. Gasarch.  If the SEC wanted to subject Mrs. Gasarch to a ten-year statute of limitations, <u>the SEC (who bears the burden of proof) could have objected to the question and required the trial judge to parse it out</u>.

The SEC then attempts to "save" the application of a ten-year statute of limitations based on the trial judge's finding that the jury "could" have found the aiding and abetting of a scienter-based violation.  Yet, the SEC itself admits that the trial judge was not allowed to substitute his view for the jury's finding: "[T]he district court had discretion, at the remedies stage, to make and rely on factual findings in assessing remedies, 'so long as [those findings d[id] not conflict with the jury's findings as to liability. *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 782 (5th Cir. 2012)"  SEC Brief, p. 66.  The SEC's argument also ignores the import of the Seventh Amendment which the Supreme Court recently held required a jury trial, if demanded by a defendant, in a case where

15

the SEC (as here) was seeking penalties.  *See SEC v. Jarkesy*, 603 U.S. 109

(2024).  The Seventh Amendment is meaningless if the jury's verdict can be

ignored.  Even if liability is upheld, the case must be remanded so that any

proper disgorgement is limited to a five year statute.

To the extent that the SEC could establish payments to Mrs. Gasarch (which, as

set forth above, it cannot because the Q system "proceeds" records are not reliable,

are hearsay and admittedly were not even attempted to be verified by third party

bank records), the SEC does not even attempt to factor out the work on

"legitimate" deals done over the course of Mrs. Gasarch's lengthy employment.

Instead, it argues that every entry in the "PEAC" account in the Q system

amounts to a payment to Mrs. Gasarch and all such alleged payments must be

recovered without a showing of any connection to the allegations of the

complaint.  As such, the SEC cannot establish that recouping every last dime is

a "reasonable approximation" of her ill-gotten gains.  *See  SEC v. Lemelson*,

596 F. Supp. 3d 227(D. Mass. 2022).  In *Lemelson*, Judge Saris refused to order

disgorgement after finding that the SEC did not meet its burden:  "In order to

establish a proper disgorgement amount, the party seeking disgorgement must

distinguish between the legally and illegally derived profits." Id. at 237-38.

The cases discussing disgorgement of salary and bonuses are clear:

any salary or bonus payments must be causally connected to securities

16

fraud. See, e.g., *SEC v. E-Smart Techs, Inc*., 139 F.Supp.3d 170, 189 (D.D.C. 2015) ("A defendant may certainly be ordered to disgorge salary payments when such payments are tied to unlawful act.") In *E-Smart*, the court denied the SEC's attempt to disgorge an employee's salary. The court noted that it is the SEC's burden to "reasonably approximate profits and tie those profits to benefits received by [the employee]." *See also SEC v. Chapman*, 826 F.Supp.2d 847, 859 (D. Md. 2011) (denying SEC's request for disgorgement where "[t]he SEC has not shown a causal relationship between [defendant's] salary and bonuses and the fraud."). Moreover, the case law is clear that disgorgement cannot be based on speculation. *See SEC v. Mapp*, 2018 U.S. Dist. 125352, *21 (E.D. Tx. 2018).

E.  Adoption Of Other Arguments

Ms. Gasarch specifically adopts and incorporates by reference all arguments made by the other Defendants/Appellants in this appeal, including in their reply briefs submitted on this date.

III     **CONCLUSION**

For the reasons set forth above and in her initial brief, Mrs. Gasarch respectfully requests that the judgment be vacated and the complaint against her dismissed.

Respectfully submitted,

ZHIYING YVONNE GASARCH

By her counsel,

/s/Karen A. Pickett

Karen A. Pickett
First Circ. No. 89099
Pickett Law Offices
119 High Street
Boston, MA  02110
617.423.0485
kpickettlaw@gmail.com

July 1, 2025

<u>CERTIFICATE OF COMPLIANCE UNDER FED.R.APP.P. 32(a)(7)</u>

I hereby certify that this brief complies with the type-volume limitation of

Fed. R. App. P. 32(a)(7)(B) because:  (1) this brief contains 3,925 words and (2)

this brief complies with the typeface requirements of Fed.R.App.P. 32(a)(6)

because this brief has been prepared in 14 point proportionality spaced using

Times New Roman font.

<u>/Karen A. Pickett</u>

Dated:        July 1, 2025

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

<u>/s/Karen A. Pickett</u>

DATED:  July 1, 2025